**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, Co-Executor of<br>The Estate Of HOWARD R. ROSS,<br>AND FIRST BANK<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-524 C<br><br>(Judge G. Miller) |

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

David B. Bergman
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for Plaintiffs

*Of Counsel*:

Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

Co-counsel for First Bank:

Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
Gunn and Gunn
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, MO 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

September 25, 2007

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

ISSUE TO BE DECIDED BY THE COURT .......... 5

CONTENTIONS OF FACT .......... 6

I. THE SAVINGS & LOAN CRISIS AND THE VALUE OF THE GOVERNMENT'S REGULATORY CAPITAL PROMISES .......... 6

II. PRIOR TO THE GOVERNMENT'S BREACH, BOTH BEFORE AND AFTER CONTRACTING WITH THE GOVERNMENT, RIVER VALLEY WAS HIGHLY SUCCESSFUL AND WELL MANAGED .......... 8

III. THE HOME AND REPUBLIC ACQUISITIONS SAVED THE GOVERNMENT MILLIONS, AND WERE STRUCTURED TO PROVIDE FOR RIVER VALLEY'S GROWTH AND PROFITABILITY .......... 12

A. The Galva/Home/Mutual Transaction .......... 14

B. The Republic Transaction .......... 19

IV. PRIOR TO THE BREACH, RIVER VALLEY OUTPACED ITS PROJECTIONS AND PROSPERED .......... 23

V. THE GOVERNMENT BREACHED ITS CONTRACTS WITH RIVER VALLEY BY ENFORCING THE NEW FIRREA CAPITAL STANDARD AGAINST RIVER VALLEY .......... 29

VI. THE BREACH RUINED RIVER VALLEY'S PLANS FOR GROWTH AND COST RIVER VALLEY MILLIONS IN LOST PROFITS .......... 31

VII. THE BREACH PREVENTED RIVER VALLEY FROM ACQUIRING SAFSB .......... 34

VIII. IN ADDITION, THE BREACH IMPOSED ON RIVER VALLEY THE MITIGATION COSTS OF RETAINING EARNINGS TO REPLACE SOME OF THE BREACHED REGULATORY CAPITAL .......... 39

IX. THE GOVERNMENT'S OWN ANALYSES OF THE VALUE OF THE RIVER VALLEY PREFERRED STOCK FSLIC BOUGHT AND SOLD ESTABLISH THAT THE BREACH CAUSED RIVER VALLEY'S OVERALL ECONOMIC VALUE TO DECLINE BY AT LEAST $21.846 MILLION .......... 47

CONTENTS OF LAW ..................................................................................................... 51

I. STANDARDS GOVERNING FIRST BANK'S EXPECTATION DAMAGES CLAIMS ..................................................................................................... 53

A. Foreseeability ..................................................................................................... 53

B. Causation ..................................................................................................... 55

C. Reasonable Certainty ..................................................................................................... 58

D. Benefit of the Bargain ..................................................................................................... 60

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bank of America v. United States*,
70 Fed. Cl. 246 (2006) ....................................................64, 65, 66

*Bank of America v. United States*,
__ F.3d __, 2007 WL 2137774 (Fed. Cir. July 26, 2007)....................62, 63

*Bluebonnet Sav. Bank v. United States*,
339 F.3d 1341 (Fed. Cir 2003)....................................................59

*Bluebonnet Savings Bank, FSB v. United States*,
266 F.3d 1348 (Fed. Cir. 2001).................................................... *passim*

*Cal. Fed. Bank, FSB v. United States*,
245 F.3d 1342 (2001)....................................................7, 58

*Cal Fed Bank v. United States*,
395 F.3d 1263 (Fed. Cir. 2005)....................................................51, 52, 53, 59

*Chain Belt Co. v. United States*,
115 F. Supp. 701 (Ct. Cl. 1953)....................................................53, 58

*Citizens Fed. Bank, FSB v. United States*,
64 Fed. Cl. 498 (2005) ....................................................55

*Citizens Fed. Bank v. United States*,
474 F.3d 1314 (Fed. Cir. 2007).................................................... *passim*

*Citizens Federal*,
374 F.3d at 1317-19 ....................................................53, 55, 56

*Coast Fed. Bank, FSB v. United States*,
48 Fed. Cl. 402 (2000) ....................................................54

*Confederated Tribes v. United States*,
248 F.3d 1365 (Fed. Cir. 2001)....................................................58

*Dale Constr. Co. v. United States*,
168 Ct. Cl. 692 (1964) ....................................................66

*Energy Capital Corp.*,
302 F.3d 1314 (Fed. Cir. 2002)....................55, 56

*Energy Capital Corp. v. United States*,
47 Fed. Cl. 382 (2000)....................56

*Estate of Berg v. United States*,
687 F.2d 377 (Ct. Cl. 1982)....................61

*Gardner Displays Co. v. United States*,
346 F.2d 585 (Ct. Cl. 1965)....................54

*George H. Whike Constr. Co. v. United States*,
140 F. Supp. 560 (Ct. Cl. 1956)....................66

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001)....................7, 51

*Glendale Fed. Bank, FSB v. United States*,
378 F.3d 1308 (Fed. Cir. 2004)....................52, 53

*Glendale Fed. Bank v. United States*,
43 Fed. Cl. 390 (1999)....................54

*Guerini Stone Co. v. P.J. Carlin Constr. Co.*,
248 U.S. 334 (1919)....................66

*Holland v. United States*,
57 Fed. Cl. 540 (2003).................... *passim*

*Holland v. United States*,
59 Fed. Cl. 735 (2004)....................4

*Holland v. United States*,
62 Fed. Cl. 395 (2004)....................4

*Holland v. United States*,
74 Fed Cl. 225 (2006).................... *passim*

*Holland v. United States*,
75 Fed. Cl. 483 (2007)....................51, 52, 55

*Home Savings of Am. v. United States*,
399 F.3d 1341 (Fed. Cir. 2005).................... *passim*

*Hughes Communications Galaxy, Inc. v. United States*,

271 F.3d 1060 (Fed. Cir. 2001)....................63

*Indiana Michigan Power Co. v. United States,*
422 F.3d 1369 (Fed. Cir. 2005)....................53, 55

*Int'l Harvester Co. of Am. v. United States,*
72 Ct. Cl. 707 (1931)....................66

*J.D. Hedin Constr. Co. v. United States,*
456 F.2d 1315 (Ct. Cl. 1972)....................65

*Kennedy v. United States,*
24 Ct. Cl. 122 (1889)....................66

*LaSalle Talman Bank, F.S.B.,*
317 F.3d 1363 (Fed. Cir. 2003)....................52, 58, 62

*LaSalle Talman v. United States,*
462 F.3d 1331 (Fed. Cir. 2006)....................52, 61

*La Van v. United States,*
382 F.3d 1340 (Fed. Cir. 2004)....................59

*Landmark Land Co., Inc. v. FDIC,*
256 F.3d 1365 (Fed. Cir. 2001)....................6

*Locke v. United States,*
151 Ct. Cl. 283 F.2d 521 (1960)....................52, 58, 59

*N. Helex Co. v. United States,*
634 F.2d 557 (Ct. Cl. 1980)....................51

*National Australia Bank v. United States,*
452 F.3d 1321 (Fed. Cir. 2006)....................58, 60

*Neely v. United States,*
285 F.2d 438 (Ct. Cl. 1961)....................59

*S.S. Mullen, Inc. v. United States,*
389 F.2d 390 (Ct. Cl. 1968)....................65

*Seaboard Lumber Co. v. United States,*
308 F.3d 1283 (Fed. Cir. 2002)....................58

*Sir Speedy, Inc. v. L & P Graphics, Inc.,*
957 F.2d 1033 (2d Cir. 1992)....................60, 65

*Staples v. United States*,
511 U.S. 600 (1994)....53

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)....58

*Suburban Contracting Co. v. United States*,
76 Ct. Cl. 533, 544 (1932)....66

*Suess v. United States*,
52 Fed. Cl. 221....59

*Super Valu Stores, Inc. v. Peterson*,
506 So. 2d 317 (Ala. 1987)....60, 65

*Thompson v. Haynes*,
305 F.3d 1369 (Fed. Cir. 2002)....58

*United States v. Buffalo Pitts Co.*,
234 U.S. 228 (1914)....66

*United States v. Winstar*,
518 U.S. 839 (1996).... *passim*

*Wells Fargo Bank, NA v. United States*,
88 F.3d 1012 (Fed. Cir. 1996)....54, 61

*William Cramp & Sons Ship & Engine Bldg. Co. v. United States*,
50 Ct. Cl. 179 (1915)....66

**STATUTES**

12 C.F.R. § 561....29

12 C.F.R. § 561.13....20, 29

12 C.F.R. § 561.13(b)....44

12 C.F.R. § 563 (1990)....29

12 C.F.R. § 567....29

12 U.S.C. §§ 1464(t)(2)(A)-(B), 1464(t)3, 1464(t)(9)(A)-(B) (1989)....30

**MISCELLANEOUS**

11 Corbin on Contracts § 56.7 (2005 rev. ed.)....................................................................54

Restatement (Second) of Contracts § 344(a) ....................................................................51

Restatement (Second) of Contracts § 347....................................................................52, 61

Restatement (Second) of Contracts § 350....................................................................52

Restatement (Second) of Contracts § 351 & cmt. a....................................................................53, 54

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, Co-Executor of<br>The Estate Of HOWARD R. ROSS,<br>AND FIRST BANK<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 95-524 C<br><br>(Judge G. Miller) |

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**INTRODUCTION**

Plaintiff First Bank, as successor-in-interest and real-party-in-interest to the claims of the federally chartered River Valley Savings Bank, FSB ("River Valley I") and the Illinois-chartered River Valley Savings Bank ("River Valley II") (collectively, "the River Valley thrifts" or "River Valley") seeks monetary damages for the breach of two *Winstar*-type contracts formed between the government and the River Valley thrifts. Pursuant to each of these contracts, River Valley acquired insolvent thrifts for which the government bore insurance liability. In exchange, the government promised the River Valley thrifts certain favorable regulatory treatment. The government subsequently breached, depriving River Valley of the benefit of its bargains, diminishing River Valley's economic value, and forcing River Valley to undertake costly measures to mitigate as best it could the harm of the breach.

In the first transaction, River Valley acquired three failing institutions — Galva, Home, and Mutual — in exchange for, among other things, the government's promises to treat an $8 million "capital credit" and $4.6 million of subordinated debt as regulatory capital.[1] In the second transaction, River Valley acquired a fourth failing institution — Republic — in exchange for, among other things, the government's promises to treat a $5 million "capital credit," $2 million of subordinated debt, and $1.31 million in goodwill amortizing over a period of twenty-five years as regulatory capital.

The government knew and expected that the River Valley thrifts would rely on the contract capital not only to meet the thrifts' regulatory requirements but also to support further growth by acquisitions and internal expansion. The track record of growth and success at Rock Falls -- the River Valley predecessor thrift owned and managed by plaintiff Homer Holland and the late Howard Ross -- was well known to government regulators, and the business plans River Valley submitted in connection with each acquisition reflected steady growth and profits. The government sought and acquired an economic stake in River Valley, acquiring an equity interest in River Valley I by purchasing $5 million of preferred stock.

Prior to FIRREA, River Valley grew profitably, just as its government-approved business plans anticipated. In the first two years following the Home and Republic acquisitions, River Valley skillfully leveraged its regulatory capital, growing by more than 22% in the two-year period of July 31, 1988 through July 31, 1990, while earning $4.35 million of profits. Thus,

[1] The government also agreed to the regulatory capital treatment of $5 million in FSLIC-owned preferred stock in River Valley. Plaintiffs reserve their right to appeal the Court's ruling that the parties' understanding concerning the regulatory capital treatment of the preferred stock was not contractual.

River Valley's pre-breach performance met or exceeded every projection presented to government regulators.

River Valley planned to grow in large part by acquisition, and aggressively pursued opportunities to acquire other thrifts. River Valley identified as potential acquisition targets between 20 and 50 other thrifts, and by early 1989 had gone so far as to perform due diligence on three thrifts located in Grand Junction, Colorado. Indeed, in December 1988 River Valley acquired an additional thrift, Peoria Savings, from FSLIC.

With the enactment and enforcement of FIRREA's capitals standards against River Valley, the government repudiated and materially breached the Home and Republic contracts. The breach excluded $4.6 million in sub debt and $7.547 million of capital credits from River Valley I's regulatory capital; it wiped out $2 million in sub debt, $4.717 million of capital credits, and $1.236 million of supervisory goodwill from River Valley II's regulatory capital. In all, the breach eliminated $20.100 million in contract capital — slashing River Valley's total regulatory capital by half. The government's breach harmed River Valley, and immediately diminished its value — as reflected by the government's decision to sell its preferred stock back to River Valley at a substantially reduced price.

The government's breach foreclosed River Valley's expansion plans and forced drastic changes in its operations; its managers struggled simply to keep the institution in regulatory compliance, let alone to grow the thrift as planned. In March 1991, because the breach had so weakened River Valley's capital levels, the government imposed harsh regulatory sanctions — requiring River Valley to meet an increased, individualized capital requirement under the terms of an OTS "Supervisory Agreement" — that exacerbated the breach's harm, and forced River Valley to shrink even more. River Valley sold assets, paid down borrowings, retained earnings,

and forwent profitable acquisitions. In 1992, the breach forced River Valley to abandon the opportunity to acquire San Antonio Federal Savings Bank ("SAFSB"), a profitable, solvent subsidiary of a failed thrift that has since generated more than $44.930 million of profits for another acquirer. In addition, the breach forced River Valley to use retained earnings (its accumulated and accumulating profits) that should have been available for other business purposes to substitute for the breach-eliminated regulatory capital.

Following the several years during which this case was stayed by the *Winstar* case-management orders, this Court on summary judgment held the government liable to Plaintiffs Holland and Ross for breach of the Home and Republic contracts.[2] The Court then ruled that Holland and Ross could not recover damages derivative of River Valley's corporate injuries, but permitted the joinder of River Valley's successor-in-interest First Bank to pursue River Valley's expectation damages.[3] In a second summary judgment ruling, the Court held the government liable directly to First Bank, as River Valley's successor, for breach of the Home and Republic contracts, and reserved for trial the determination of the quantum of damages the government owes First Bank in that capacity.[4]

Accordingly, First Bank now seeks damages based on River Valley's expectation interest — its right under contract law to be placed in the same financial position it would have occupied had the government not dishonored its promises. First Bank will demonstrate that the government's breach (1) foreseeably caused River Valley to forgo profitable growth

---

[2] *See Holland v. United States*, 57 Fed. Cl. 540 (2003) ("*Holland I*").

[3] *See Holland v. United States*, 59 Fed. Cl. 735 (2004) ("*Holland II*"); *Holland v. United States*, 62 Fed. Cl. 395 (2004) ("*Holland III*"); Opinion and Order of May 12, 2005 ("*Holland IV*").

[4] *See Holland v. United States*, 74 Fed Cl 225 (2006) ("*Holland V*").

opportunities, including the opportunity to acquire SAFSB, (2) foreseeably caused River Valley to incur costs in partially mitigating the government's breach by allocating retained earnings to do the job the contracted-for regulatory capital would have done but for the breach, and (3) foreseeably caused River Valley's overall economic value to decline.

First Bank has calculated these elements of River Valley's damages with reasonable certainty. Plaintiffs base the SAFSB lost profits claim on actual, verifiable, historical cash flows — SAFSB's *actual* annual earnings, which, because of the breach, accrued to a third-party acquirer rather than River Valley. Plaintiffs base the cost of partial mitigation claim on the *actual* amount of retained earnings that functioned as replacement for the contracted-for regulatory capital, and the *actual* amount the government computed as River Valley's cost of equity capital. Likewise, Plaintiffs base their lost-value claim on the government's own *actual* pre- and post-breach valuations of River Valley preferred stock.

Moreover, where, as here, "a reasonable probability of damages can be clearly established, uncertainty as to the amount will not preclude recovery, and the court's duty is to make a fair and reasonable approximation of the damages."[5] Accordingly, the Court's duty is to award First Bank damages that fairly and reasonably reflect the magnitude of the harm the government's breach visited upon River Valley.

**ISSUE TO BE DECIDED BY THE COURT**

The Court must decide only a single issue — the quantum of damages to which Plaintiffs are entitled. In doing so, the Court must determine whether Plaintiffs have established that the damages were reasonably foreseeable, whether the breach was a substantial factor in causing the

[5] *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001) (internal quotations omitted) (citing *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960)).

damages, and whether the damages have been measured with reasonable certainty. The Court must apply these requirements separately to Plaintiffs' lost-profits (SAFSB) claim, their cost-of-partial-mitigation claim, and their lost-economic-value claim.

## CONTENTIONS OF FACT

### I. THE SAVINGS & LOAN CRISIS AND THE VALUE OF THE GOVERNMENT'S REGULATORY CAPITAL PROMISES

1. By 1988, when River Valley acquired Home and Republic, literally hundreds of savings and loans throughout the country had failed. The "Federal Savings and Loan Insurance Corporation ("FSLIC") was itself insolvent by over $50 billion." *United States v. Winstar*, 518 U.S. 839, 845-47 (1996).

2. In response to the crisis, "FSLIC encouraged private investors . . . to purchase struggling thrifts so that it would not be necessary to liquidate the thrifts using FSLIC funds to reimburse depositors. The primary inducement that the FSLIC offered potential purchasers was a partial forbearance from regulatory capital requirements. . . . This made the thrift far more attractive to potential purchasers, at no cost to the FSLIC." *Landmark Land Co., Inc. v. FDIC*, 256 F.3d 1365, 1370 (Fed. Cir. 2001). In many instances, FSLIC promised to treat the difference between the acquired institution's liabilities and assets — goodwill — as an element of the resulting institution's regulatory capital. *Id*.

3. In addition, "a further inducement, described as a 'capital credit' . . . arose when FSLIC itself contributed cash to further a supervisory merger and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital. By failing to require the thrift to subtract this FSLIC contribution from the amount of supervisory goodwill generated by the merger, regulators effectively permitted double counting of the cash as both a

tangible and intangible asset. Capital credits thus inflated the acquiring thrift's regulatory capital and permitted leveraging of more and more loans." *United States v. Winstar Corp.*, 518 U.S. 839, 853 (1996) (citations omitted).

4. FSLIC also negotiated arrangements with acquirers of troubled thrifts to allow for regulatory capital credit treatment of funds other than FSLIC cash contributions, such as the proceeds of subordinated debt issuances. *See Holland I*, 57 Fed. Cl. at 566.

5. FSLIC's regulatory capital promises had "substantial value" to acquirers. *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1381-82 (Fed. Cir. 2001); *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (2001).

6. Given the choice between two otherwise identical assets selling at the same price that differ only in the amount of capital required (by government regulation) to support them, a rational purchaser would always select the asset with the lower capital requirement because it would leave you capital left over to buy something else. Joint Stipulation of Facts, dated Dec. 31, 2003 ("JSF") ¶ 10.

7. One reason FSLIC's regulatory capital promises had "substantial value" to acquirers is that lower effective capital requirements increase the value of the deposit insurance the government provided. The regulatory capital promises increase the value of the acquirer's deposit insurance because the promises allocate to the government certain financial risks that would otherwise have been borne by the acquirer; this effect is often described by economists as an increase in the value of an implicit "put option" associated with deposit insurance. U.S. Dep't of Treasury, Modernizing the Financial System (February 1991) at 35 (PX 508); Def.'s Resp. to Plaintiffs' Proposed Statement of Facts dated Dec. 31, 2003 ("Def.'s Resp. to PPSF") ¶ 3 (agreeing that deposit insurance shares characteristics of a put option).

## II. PRIOR TO THE GOVERNMENT'S BREACH, BOTH BEFORE AND AFTER CONTRACTING WITH THE GOVERNMENT, RIVER VALLEY WAS HIGHLY SUCCESSFUL AND WELL MANAGED

8. River Valley brought a history of success in the banking and savings and loan industries to the Home and Republic acquisitions.

9. From 1971 to 1979, Dr. Holland held several positions at the First National Bank of Chicago, from Loan Officer to Senior Vice President. His responsibilities included: Head of Ship Financing; Head of the Information Systems Division; Head of the Retail Banking Department; and Head of the Administrative Department (all of the bank's back office functions). *See* JSF ¶ 48; Corrected Expert Report of Dr. Homer J. Holland dated July 27, 2001 ("Holland Report") at 1-2 ¶¶ 1-3 (PX 601); September 1989 River Valley Savings Bank Acquisition and Capital Plan, H&R-B44-1392-1407 at 1403, 1405 (PX 351); Holland Dep. I at 10-12 (JA 1947A); *Bank Vet Plots Ambitious S&L Empire*, Crain's Chicago Business, August 15, 1988, H&R-B44-1290-91 (PX 217).

10. Howard Ross and other investors recapitalized the Exchange International Corporation and its subsidiary, the Exchange National Bank of Chicago, and hired Dr. Holland as their President in 1979. *See* JSF ¶ 49; Holland Report at 24 ¶ 58 (PX 601); June 17, 1988 FHLBB "Issues" Memorandum from Root to FHLBB, WOT013 0818-26 at 0823 (PX 172); *Bank Vet Plots Ambitious S&L Empire*, Crain's Chicago Business, August 15, 1988, H&R-B44-1290-91 (PX 217); September 1989 River Valley Savings Bank Acquisition and Capital Plan, H&R-B44-1392-1407 at 1403 (PX 351).

11. From 1979 to 1983, Dr. Holland served as President and Director of the Exchange International Corporation and its subsidiary, the Exchange National Bank of Chicago. In that capacity, he directed the turnaround of that previously troubled bank and successfully negotiated

the acquisition and turnaround of another troubled bank, the Central National Bank in Chicago. *See* JSF ¶50; Holland Report at 2 ¶ 4 (PX 601); May 4, 1988 Addendum to the "S" Memorandum, WON436 2326-31 at 2330 (PX 154); June 17, 1988 FHLBB "Issues" Memorandum from Root to FHLBB, WOT013 0818-26 at 0823 (PX 172); Holland Dep. I at 8, 11-32 (JA 1947-1947F); *Bank Vet Plots Ambitious S&L Empire*, Crain's Chicago Business, August 15, 1988, H&R-B44-1290-91 (PX 217); September 1989 River Valley Savings Bank Acquisition and Capital Plan, H&R-B44-1392-1407 at 1403 (PX 351).

12. From 1983 to 1986, Dr. Holland provided executive management and consulting services to financial institutions including 1st Interstate Bank, First Federal Savings and Loan Association of Chicago, United Services Automobile Association ("USAA"), and Gilldorn Savings, where he also served as CEO and Director. *See* JSF ¶51; Holland Report at 2 ¶ 5 (PX 601); March 14, 1991 USAA Memorandum, H&R-B07-00726-32 (PX 518); *Bank Vet Plots Ambitious S&L Empire*, Crain's Chicago Business, August 15, 1988, H&R-B44-1290-91 (PX 217); September 1989 River Valley Savings Bank Acquisition and Capital Plan, H&R-B44-1392-1407 at 1403 (PX 351); May 4, 1988 Addendum to the "S" Memorandum, WON436 2326-31 at 2330 (PX 154); June 17, 1988 FHLBB "Issues" Memorandum from Root to FHLBB, WOT013 0818-26 at 0823 (PX 172).

13. Beginning in 1985, Dr. Holland began a ten-year tenure on the Board of Directors of USAA, an insurance and diversified financial services company owning and operating, among other things, a federal savings bank with nationwide credit card operations and serving the military community. *See* JSF ¶52; Holland Report at 2-3 ¶ 7 (PX 601); March 14, 1991 USAA Memorandum, H&R-B07-00726-32 (PX 518); January 23, 1991 Memorandum from USAA Corporate Counsel, H&R-B07-00659-690 (PX 505).

14. Dr. Holland and Mr. Ross, along with two additional investors completed the acquisition of Rock Falls Savings & Loan Association, Rock Falls, Illinois ("Rock Falls"), a state chartered stock savings and loan association, in April 1985. JSF ¶53; Acquisition Proposal for Republic dated March 18, 1988, WON534 0417-0430, 0430 (PX 129); FHLBB Memorandum Re: Notice of Intent to Acquire Control of Rock Falls S&LA, Rock Falls, IL dated March 21, 1985, WON394 0077-0080 (PX 12); Memorandum Re: Notice of Intent to Acquire Control of Rock Falls Savings and Loan Association, Rock Falls, Illinois, from Norman J. Kost to FHLBB dated April 5, 1985, WON394 0067 (PX 14).

15. Dr. Holland became Rock Falls' CEO on November 25, 1986. JSF ¶53; Holland Report at 2 ¶ 6 (PX 601), at 24 ¶¶ 59-60 (PX 601); August 1987 Rock Falls Savings and Loan Business Plan, H&R-B44-687-700 at 689-90 (PX 77); *Bank Vet Plots Ambitious S&L Empire*, Crain's Chicago Business, August 15, 1988, H&R-B44-1290-91 (PX 217); Memorandum to FHLBB dated November 25, 1986, WON394 0068-0069 (PX 47); Acquisition Proposal for Republic dated March 18, 1988, WON534 0417-0430, 0430 (PX 129).

16. As managed by Holland and Ross, Rock Falls established a track record of strong growth and profit. Net income for the year ending July 31, 1985 was $128,345, which increased to $957,395 for the year ending July 31, 1986, and was $596,195 for the next year. Rock Falls' net worth increased from $3,346,973 as of April 30, 1985 to $4,449,114 as of July 31, 1987. *See* JSF ¶56; Rock Falls FHLBB Monthly Report dated April 30, 1985 at PHO050 0856 (PX 16); Rock Falls Consolidated Financial Report, July 31, 1987, WOT645 1044, 1047 (PX 76); March 18, 1988 Acquisition Proposal for Republic, WOT645 1024-1037, 1027 (JA 416); The June 15, 1987 State of Illinois and FHLB of Chicago examination of Rock Falls at p. 2 (H&R-B43-00591-97) (PX 69).

17. Rock Falls also established a successful mortgage-backed securities operation, growing its portfolio of collateralized mortgage obligations from zero to more than $18 million over the fiscal year ending July 31, 1987. Rock Falls Consolidated Financial Statement (July 31, 1987) WOT645 1044, 1047 (PX 76) at 2.

18. By 1988, before contracting with the government, Rock Falls carried assets of $120 million, a net worth of almost $5 million, and a market value of $6.72 million. June 28, 1988 FHLBB Issues Memorandum, WON534 0346-0365, 0351 (PX 177); River Valley II March 1988 Thrift Financial Report ("TFR"), CHO001 0839-0848 (PX 124); *see also* Holland Report at 34 ¶ 80 (PX 601).

19. Thus, by the time of the Home and Republic acquisitions, River Valley's managers had earned a reputation among thrift regulators as excellent bankers.[6] As the Bank Board staff noted:

> Messrs. Ross and Holland appear to be of the utmost integrity. They are well known and respected . . . not only for their current involvement at River Valley, but also for Mr. Holland's assistance in the successful turnaround of Enterprise Savings Bank . . . as well as the Exchange National Bank of Chicago. Their involvement at these institutions has demonstrated to us their ability to operate profitably in the financial services industry.[7]

[6] *See*, *e.g.*, JSF ¶ 72; Blaber Dep. at JA 1845-46, 1857, 1873; Ferries Dep. at JA 1903, 1909-10, 1918, 1931-32, 1937, 1940; Kenny Dep. at 171-74, 199-200, 221-23, 329-31 (Plaintiffs' Supplemental Appendix ("PSA" at Tab 8); "S" Mem. (4/22/88) (PX 146); "Issues" Mem. (6/17/88) (PX 172); FHLBB Mem. from Blaber to Buckley (6/28/88) (PX 183); "S" Mem. (6/28/88) (PX 182); "S" Mem. Supp. (7/6/88) (PX 191); FHLBB Mem. (7/8/88), CHO023 0396-0418 at 0399 (PX 192).

[7] FHLBB "S" Mem., Addendum (5/4/88) (PX 154).

## III. THE HOME AND REPUBLIC ACQUISITIONS SAVED THE GOVERNMENT MILLIONS, AND WERE STRUCTURED TO PROVIDE FOR RIVER VALLEY'S GROWTH AND PROFITABILITY

20. By no later than July 1988, each of the four acquired thrifts involved in this case — Galva Federal Savings and Loan Association of Galva, Illinois ("Galva"); Mutual Savings and Loan Association of Canton, Illinois ("Mutual"); Home Federal Savings and Loan Association of Peoria, Illinois ("Home"); and Republic Savings of South Beloit, Illinois ("Republic" — had become insolvent and was operating at a loss. Collectively, the five thrifts had multimillion-dollar net-worth deficits. JSF ¶ 57; *Holland I*, 57 Fed. Cl. at 543-48 (JA 255-94); April 14, 1987 Memorandum from Biedron to Smuzynski (Mutual), WON074 1190-92 at 1190 (PX 62); June 17, 1988 "Issues" Memorandum from FSLIC to FHLBB at 2-3, WOT013 0819-20 (PX 172); Ferries Dep. at 39-44 (JA 1897-1944); FHLBB Bid Package for Home Federal S&L at 3.1 (PX 79); Blaber Dep. at 66, 215 (JA 1843-1877); June 1987 Mutual Bid Package, WOT646 0528-71 (PX 68); June 28, 1988 "Issues" Memorandum (Rep.), WON534 0346-0365 (PX 177); July 28, 1988 FHLBB Resolution No. 88-638 (Home, Mutual and Galva), WOT013 0775-92 at 0778, 0782 (PX 199); December 20, 1988 FHLB Chicago "L" Memorandum, WOB026 0006-17 at 0007 (PX 272).

21. As of March 31, 1988, FSLIC reported that on a combined basis, Galva, Mutual, and Home had a tangible net worth *deficit* of $28.3 million, and a net operating income *deficit* of $3.47 million for the preceding twelve months. JSF ¶ 63; JA 4780-4782, 4781, Issues Memorandum from FSLIC to FHLBB dated June 17, 1988, WON534 0346-0365, 0346 (PX 177).

22. Republic began reporting operating losses in March 1985, and it first reported insolvency in June 1986. The Government placed the thrift into receivership in October 1986,

and by March 31, 1988, Republic was reporting a net worth *deficit* of almost $17 million (more than 43 percent of assets). JSF ¶ 65; "S" Memorandum by Leo Blaber dated June 28, 1988, WOT013 0194-0203, 0195, 0198-0199 (PX 182).

23. FSLIC tried to attract potential acquirers for these failing thrifts. Its efforts notwithstanding, FSLIC had attracted few if any prospective acquirers other than Rock Falls. JSF ¶ 66; *See Holland I*, 57 Fed. Cl. at 547 (JA 255-94); January 27, 1988 Recommendation Memorandum, WOT685 1015-20 at 1016 (PX 111); June 28, 1988 "S" Memorandum from Blaber to Buckley, WOT013 0194-204 at 0199 (PX 182); June 17, 1988 FHLBB "Issues" Memorandum from Root to FHLBB, WOT013 0818-26 at 0820 (PX 172); Ferries Dep. at 39-41 (JA 1897-1944); July 26, 1988 "L" Memorandum, WOF016 2391-2402 at 2399 (PX 197); July 17, 1987 Letter from Mirza to Batties, WON397 0286 (PX 75).

24. Consistent with its growth strategy, Rock Falls responded to FHLB Chicago's invitation to consider acquiring troubled Illinois thrifts. JSF ¶ 66; Holland Report at 25 ¶¶ 60-61 (PX 601).

25. The government recognized that Rock Falls, as well as Holland and Ross, had a proven track record of success in the savings and loan industry. JSF ¶ 71; *Holland I*, 57 Fed. Cl. at 545, 548, 558-59 (JA 255-94); Ferries Dep. 49-51, 52, 53, 85-86, 123-24, 273 (JA 1897-1944); Blaber Dep. at 30, 127, 182, 196-97, 254-55, 273 (JA 1843-1877); June 17, 1988 FHLBB "Issues" Memorandum from Root to FHLB, WOT013 0819-26 at 0824, 0825 (PX 172); June 28, 1988 Addendum to the "S" Memorandum, WOT645 1515-20 at 1516 (PX 183); May 4, 1988 Addendum to the "S" Memorandum (PX 154).

26. Government regulators who worked on the acquisitions maintained a high regard for the character and management abilities of Messrs. Holland and Ross. For example, when

recommending that the government go forward with the Peoria transaction, Leo Blaber, the Principal Supervisory Agent ("PSA") of FHLB Chicago, wrote that "Messrs. Ross and Holland . . . take [a] very active part in the day to day operations of [River Valley,] . . . appear to be of the utmost integrity . . . and are well known and respected within the seventh district . . . for their performance [in the banking industry]." Blaber testified that he "was very satisfied" with the management abilities and character of Mr. Holland, and that "a major influence" in his recommendation of the transactions was "the financial integrity and managerial competence of Messrs. Holland and Ross." Mr. Blaber also confirmed that, based on its owners and managers' history of success, he believed that River Valley's growth projections "were likely achievable." JSF ¶ 72; December 16, 1988 Applications Digest from Blaber to Buckley, WON424 0026-29 at 0028 (PX 271); *accord* April 22, 1988 "S" Memorandum, WOL604 0285-0300 at 0285 (PX 146) (Home transaction); May 4, 1988 Addendum to the "S" Memorandum (PX 154) (Home transaction); June 28, 1988 Addendum to the "S" Memorandum, WOT645 1515-20 at 1516 (PX 183) (Republic transaction). Blaber Dep. at 30-31, 127, 196-97 (JA 1843-1877).

27. Similarly, government regulator Larry Ferries regarded Mr. Holland as a "very capable, competent individual," and that was one reason Mr. Ferries recommended approval of the Home acquisition. JSF ¶ 72; Ferries Dep. at 52, 53 (JA 1897-1944).

**A. The Galva/Home/Mutual Transaction**

28. In the fall of 1987, Holland and Ross submitted a bid proposal to acquire Home Federal of Peoria, Peoria, IL ("Home"); Mutual Savings of Canton, Canton, IL ("Mutual"); and Galva Federal Savings and Loan Association, Galva, IL ("Galva"). JSF ¶ 73; Holland Report at 27-28 ¶ 66 (PX 601); *Holland I*, 57 Fed. Cl. at 545 (JA Tab 5).

29. On July 28, 1988, FHLBB issued Resolution 88-638, and on July 29, 1988 the parties entered into an Assistance Agreement. JSF ¶ 78; FHLBB Resolution 88-638 dated July 28, 1988, WOT013 0775-0792 (PX 199).

30. The combination of Galva, Mutual, and Home became known as River Valley Savings Bank, FSB of Peoria, Illinois ("River Valley I"), a federal stock savings bank. JA 4798-4800, 4799, River Valley I Consolidated Financial Statements as of December 31, 1988, H&R-B08-00331-00361 at 00341 (PX 285).

31. FHLBB Resolution 88-638 authorized River Valley I to issue preferred stock to FSLIC, and FSLIC to purchase preferred stock, "in an amount not to exceed $5,000,000[,]" subject to certain terms and conditions. FHLBB Resolution No. 88-638 dated July 28, 1988, WOT013 0775-0792, 0784 (PX 199). FSLIC purchased 50,000 shares of Series A preferred stock at par value of $10,000 per share, for a total investment of $5,000,000. In connection with making that investment, FSLIC analyzed the value of the preferred stock based on the cash flows expected to flow to the holder of the shares, and determined that the value of the 50,000 shares FSLIC was to purchase exceeded $5,000,000. JSF ¶ 86; Letter from Richard Weiss (Financial Analyst, FHLBB) to David Adkins (Financial Analyst, FHLBB) dated June 22, 1988, WOF016 2577-2578, 2578 (PX 174); Letter from Richard Weiss (Financial Analyst, FHLBB) to David Atkins (Financial Analyst, FHLBB) dated April 28, 1988, WOF016 2572-2575, 2573 (PX 148).

32. FHLBB Resolution 88-638 approved the issuance of a $4,600,000 subordinated debenture by River Valley I to ANB, "and the inclusion in [River Valley I's] regulatory capital of such subordinated debenture in accordance with § 561.13 of the Insurance Regulations," subject to certain conditions. JSF ¶ 87; JA 4987-5004, 4996-4997, FHLBB Resolution No. 88-638 dated July 28, 1988, WOT013 0775-0792, 0784-0785 (PX 199).

33. The "Accounting" section of FHLBB Resolution 88-638 provided, in part, that River Valley I was to report to the FHLBB and FSLIC in accordance with GAAP, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent of the following departures:

> (a) Eight million dollars of the initial contribution by the FSLIC to River Valley I, and four million six hundred thousand dollars of the principal amount of the Subordinated Debenture... shall be credited to the regulatory capital account of River Valley I in accordance with the forbearance letter authorized pursuant to this Resolution;
>
> (b) The value of any unidentifiable intangible assets resulting from the application of push-down accounting in accounting for the Mergers and Stock Acquisition may be amortized by River Valley I over a period not in excess of twenty-five (25) years by the straight line method....

JSF ¶ 88; JA 4987-5004, 5000-5001, FHLBB Resolution No. 88-638 dated July 28, 1988, WOT013 0775- 0792, 0788-0789 (PX 199).

34. On July 28, 1988, FHLBB sent a letter to Dr. Holland, as President and Chief Executive Officer of River Valley I, granting certain regulatory forbearances with respect to the Galva, Mutual, and Home transaction. JSF ¶ 90; FHLBB forbearance letter dated July 28, 1988, WOT013 0583-0585 (PX 200).

35. The forbearance letter provided, among other things, that (1) "[a] portion of the [FSLIC] cash contribution not to exceed $8.0 million may be credited to River Valley I's regulatory capital; therefore, for regulatory accounting purposes, River Valley I may book such contribution as a direct addition to its regulatory capital..." subject to certain limitations; and (2) for purposes of reporting to the FHLBB, "the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchases, may be amortized by River

Valley I over a period not to exceed 25 years by the straight line method." JSF ¶ 91; FHLBB forbearance letter dated July 28, 1988, WOT013 0583-0585, 0584 (PX 200).

36. With respect to the Galva, Mutual, and Home acquisition, River Valley I initially recorded $1.136 million of GAAP goodwill; however, this GAAP goodwill was retroactively eliminated during the fourth quarter of 1989 due to a revaluation of the tangible assets acquired. JSF ¶ 97; River Valley I Audited Financial Statements as of December 31, 1989, WON240 0238-0272, 0250-0253 (PX 393); TFR for River Valley I dated December 31, 1989, H&R-BX70-2510-2522 at 2510 (PX 392); Sheshunoff Information Services, Inc. (PX 288).

37. The $4.6 million of subordinated debt issued by River Valley I to ANB had a stated "Maturity Date" of March 31, 1998 (approximately 10 years from the date of the execution of the subordinated debenture agreement), but the maturity date would be extended according to the following provision of the agreement:

> [T]he Maturity Date shall be automatically extended for successive one year periods unless [River Valley FSB] mails written notice to [ANB] not less than ninety (90) days prior to the anniversary date of the issuance of this debenture stating that the Maturity Date of this debenture and/or any portion thereof held by any other person shall no longer be automatically extended and fixing the eleventh succeeding March 31 following the aforementioned notice as the date on or before which all accrued interest and principal due and payable under this debenture shall be paid in full.

JSF ¶ 98; Subordinated Debenture Agreement dated June 1988, WOF016 1613-1624 (PX 204).

38. The purchase agreement for the subordinated debt authorized River Valley I to acquire "any other business" without ANB's consent, as long as the effect of the action was not to diminish River Valley I's net worth below the level existing at the date of the Agreement. Purchase Agreement between American National Bank and River Valley I dated July 29, 1988, WOF016 1625-1643 at 1631 (PX 209).

39. On July 29, 1988 River Valley I entered into a Stock Purchase Agreement with the FSLIC. Homer J. Holland signed the agreement on behalf of River Valley I. JSF ¶ 102; Stock Purchase Agreement between River Valley I and the FSLIC dated July 29, 1988, CHO023 0106-0208, 0106, 0165 (PX 202).

40. The Series A preferred stock River Valley I issued and sold to FSLIC paid a fixed rate dividend of 8 percent that was scheduled to remain flat until July 1999 but then to increase steadily to 12 percent in five annual steps. The Series A Preferred also contained a profit participation component in the form of a supplemental dividend equal to 25 percent of "Adjusted Net Income." Adjusted Net Income was determined as the amount of reported net income (pursuant to GAAP), after deducting the fixed rate dividend, that exceeded 0.4 percent of average assets for the first 10 years, declining five basis points a year until it leveled off at 0.15 percent thereafter. *See* JSF ¶ 103; Stock Purchase Agreement between River Valley I and the FSLIC dated July 29, 1988, CHO023 0106-0208, 0167-0174 (PX 202).

41. The Series A preferred stock was redeemable at the option of River Valley I, in whole or in part, within 30 days of the completion of any fiscal quarter at a redemption price of $100 per share – *i.e.*, at par value – plus accrued and unpaid fixed dividends and supplemental dividends thereon to the date fixed for redemption. *See* JSF ¶ 104; River Valley Stock Purchase Agreement between River Valley I and the FSLIC dated July 29, 1988, CHO023 0106-0208, 0171-0172 (PX 202).

42. In an April 28, 1988 letter, the FHLBB provided an estimate of $3.371 million for the income-sharing component of the preferred stock (using a 16% discount rate), and a range of values from $2.6 million (20 percent discount rate) to $3.85 million (13.91 percent discount

rate). JSF ¶ 108; Letter from Richard Weiss (Financial Analyst, FHLBB) to David Atkins (Financial Analyst, FHLBB) dated April 28, 1988, WOF016 2572-2575, 2573 (PX 148).

43. In its letter of June 22, 1988, FSLIC updated the present value of the fixed rate feature of the preferred stock to $3.145 million. With the same $3.371 million value for the supplemental dividend feature from the April 28, 1988 analysis, the aggregate value of the preferred stock was $6.52 million, according to the FSLIC analysis of June 22, 1988. *See* JSF ¶ 109; Letter from Richard Weiss (Financial Analyst, FHLBB) to David Adkins (Financial Analyst, FHLBB) dated June 22, 1988, WOF016 2577-2578, 2578 (PX 174).

**B. The Republic Transaction**

44. On December 24, 1987 River Valley II (*i.e.*, Rock Falls) also submitted a bid to acquire Republic. JSF ¶ 111.

45. In exchange for River Valley II's acquisition of Republic the government promised to treat the following as regulatory capital: a $5 million "capital credit," the $2 million subordinated debenture, and supervisory goodwill created by the use of the purchase method of accounting. In addition, the goodwill was to be amortized over twenty-five years, using the straight-line method. *See* JSF ¶¶ 125-127; *Holland I*, 57 Fed. Cl. at 566 (JA Tab 5); *see also* Holland Report at 32 ¶ 76 (PX 601); March 1988 Republic Acquisition Proposal, WON534 0417-0430 at 0420 (PX 129); March 22, 1988 Jaski-Januska Memorandum, WOT645 1007-1011 at 1010 (PX 134) ($2 million sub debt); June 28, 1988 "S" Memorandum Addendum, WOT645 1515-1520 at 1517-19 (PX 183) ($2 million sub debt); July 29, 1988 Republic Forbearance Letter, WOT645 0847-0849 at 0847 (PX 754) ($2 million sub debt); Republic Assistance Agreement, WOT013 0051-0119 at 0074 (PX 205) ($5 million capital credits); April 28, 1988 Holland-Mirza Letter, WOT685 0902-0908 at 0902 (PX 150) ($5 million capital credits); June

28, 1988 Addendum to the "S" Memorandum, WOT645 1515-1520 at 1517 (PX 183) ($5 million capital credits); March 18, 1988 Republic Acquisition Proposal, WON534 0417-0430 at 0420 (PX 129) (25-year amortization); July 6, 1988 "S" Memorandum Supplement, WOT645 1521-1526 at 1521 (PX 191) (25-year amortization); July 29, 1988 Memorandum to H. Holland from FHLBB (permission to include sub debt), WOT645 1256-1257 (PX 206).

46. On July 29, 1988, FSLIC and Rock Falls (*i.e*., River Valley II) entered into an assistance agreement relating to the merger of Republic into Rock Falls. JSF ¶ 113; Republic Assistance Agreement dated July 29, 1988, WOT013 0051-0119 (PX 205).

47. On July 27, 1988, FHLBB issued Resolution 88-612. JSF ¶ 122; FHLBB Resolution No. 88-612 dated July 27, 1988, WOT645 1171-1179 (PX 198).

48.. The "Accounting" section of FHLBB Resolution 88-612 provided, in part, that, in accounting for the merger, River Valley II was to use generally accepted accounting principles,

> as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC except that $5,000,000 of the initial cash contribution by the FSLIC to [River Valley II], pursuant to § 6(a) of the Assistance Agreement, shall be credited to the regulatory capital account of [River Valley II] and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulation.

JSF ¶ 125; FHLBB Resolution No. 88-612 dated July 27, 1988, WOT645 1171-1179, 1175 (PX 198).

49. On July 29, 1988, FHLBB sent a letter to River Valley II, approving the issuance and inclusion in its regulatory capital of "a subordinated debenture in the aggregate principal amount not to exceed $2,000,000 as calculated in accordance with 12 C.F.R. §561.13 [,]" subject to certain conditions. JSF ¶ 127; Letter from Leo Blaber to River Valley II dated July 29, 1988, WOT645 1256-1257 (PX 206).

50. On May 18, 1989, FHLBB sent a letter to River Valley II granting certain regulatory forbearances with respect to the acquisition of Republic. JSF ¶ 129; FHLBB forbearance letter dated May 18, 1989, WOT645 0847-0849 (PX 754).

51. The forbearance letter dated May 18, 1989, provided, among other things, that (1) "[a] portion of the [FSLIC] cash contribution not to exceed $5.0 million may be credited to [River Valley II's] regulatory capital; therefore, for regulatory accounting purposes, [River Valley II] may book such contribution as a direct addition to its regulatory capital..." subject to certain limitations; and (2) for purposes of reporting to the FHLBB, "the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchase, may be amortized by [River Valley II] over a period not to exceed 25 years by the straight line method." JSF ¶ 130; FHLBB forbearance letter dated May 18, 1989, WOT645 0847-0849, 0848 (PX 754); FHLBB Memorandum SP-24 at p. 6, OGC049 0378-0404, 0383 (PX 3).

52. The fiscal year 1989 audited consolidated financial statements for River Valley II show that the application of purchase accounting to the Republic acquisition produced $1.3 million in GAAP goodwill. JSF ¶ 133; River Valley II Consolidated Financial Statements as of March 31, 1989, PHO042 0689-0715, 0703 (PX 325).

53. The $2.0 million of subordinated debt issued by River Valley II to ANB had a stated "Maturity Date" of March 31, 1998 (approximately 10 years from the date of the execution of the subordinated debenture agreement), but the maturity date would be extended according to the following provision of the agreement:

> [T]he Maturity Date shall be automatically extended for successive one year periods unless [River Valley II] mails written notice to [ANB] not less than ninety (90) days prior to the anniversary date of the issuance of this debenture stating that the Maturity Date of this debenture and/or any portion thereof held by any other person

> shall no longer be automatically extended and fixing the eleventh succeeding March 31, following the aforementioned notice as the date on or before which all accrued interest and principal due and payable under this debenture shall be paid in full.

JSF ¶ 139; Subordinated Debenture Agreement dated July 29, 1988, H&R-B37-00038-00049 at 00040-41 (PX 208).

54. The purchase agreement for the subordinated debt authorized River Valley II to acquire "any other business" without ANB's consent, as long as the effect of the action was not to diminish the net worth below the level existing at the date of the Agreement. *See* JSF ¶ 100; Purchase Agreement between ANB and River Valley II dated July 29, 1988, WOF016 1625-1643 at 1631-33 (PX 209).

55. In all, the government promised to treat as capital for all regulatory purposes the $20.91 million in capital credits, subordinated debt, and supervisory goodwill created in connection with Plaintiffs' acquisition of the Home, Mutual, Galva, and Republic thrifts. *See Holland v. United States*, 74 Fed. Cl. 225, 230-33 (2006); Holland Report at 35 ¶ 83 & n.67 (PX 601); July 29, 1988 Memorandum to H. Holland from FHLBB (permission to include sub debt), WOT645 1256-1257 (PX 206).]

56. Following the acquisitions, River Valley reasonably expected to achieve increased returns because it could leverage the government-promised regulatory capital in the same manner that it could leverage cash capital. *See* Holland Report at 35 ¶ 84 (PX 601); Ferries Dep. at 188-190 (JA 1897-1944).

57. In connection with both the Home and Republic acquisitions, River Valley negotiated to retain the acquired institutions' net operating losses ("NOLs"). *See* JSF ¶ 58; Def.'s Response to PPSF ¶29.

## IV. PRIOR TO THE BREACH, RIVER VALLEY OUTPACED ITS PROJECTIONS AND PROSPERED

58. At the beginning of 1988, before contracting with the government, River Valley II had assets of approximately $120 million, a net worth of almost $5 million and a market value estimated at about $6.72 million (based on a premium of 40% over book value, which is the approximate acquisition premium that generally prevailed in 1988). June 28, 1988 FHLBB Issues Memorandum, WON534 0346-0365 (PX 177); River Valley II March 1988 Thrift Financial Report ("TFR"), CHO001 0839-0848 (PX 124); *see also* Holland Report at 34 ¶ 80 (PX 601).

59. Prior to the Home/Mutual/Galva transaction, there was no River Valley I institution.

60. After acquiring Home, Mutual, Galva, Republic and Peoria, River Valley I and II (collectively, "River Valley") had aggregate assets of $620.9 million and regulatory net worth of $34.9 million. JSF ¶ 167; River Valley Savings Bank, Rock Falls January 26, 1989 Internal Financial Statements, H&R-BX70-0256-0341 (JA 1237-1322) (PX 1173); RVSB, FSB Audit Report: KPMG (Home-Mutual-Galva-Peoria Savings), December 31, 1988, H&R-B08-00331-00361 (PX 199) *See also* Holland Report at 34 ¶ 81 (PX 601).

61. River Valley did substantial due diligence before contracting with the government, and the government also performed detailed analyses to confirm that River Valley's plans for operating the acquired thrifts would succeed. October 26, 1987 Acquisition Proposal for Home, Mutual and Galva, H&R-B44-449-68 at 455-57 (PX 89); March 18, 1988 Acquisition Proposal for Republic, WON534 0417-0430, 0420 (PX 129); July 7, 1987 Liquidation Costing, Run #4, WON074 1095-1101 (PX 71); June 28, 1988 Republic Liquidation Analysis, WON534 0732-0733 (PX 180); March 2, 1987 Mutual Liquidation Analysis, Run #1, WON074 1209-11

(PX 57); March 27, 1987 Mutual Liquidation Analysis, Run #2, WON074 1202-1206 (PX 59); April 13, 1987 Galva Liquidation Costing, Run #2, WON397 0301-05 (PX 61); December 4, 1987 Republic Costing Run #5, WOT685 1056, 1058 (PX 97); October 13, 1988 Peoria Liquidation Analysis, WOT613 0032-48 (PX 231).

62. The River Valley thrifts were required to submit business plans prior to each of the government-assisted transactions and, in the case of River Valley I, regularly after the acquisitions. *See* JSF ¶ 170; July 6, 1988 "S" Memorandum, WOT645 1521-1526 at 1521 (PX 191); Holland Report at 36 ¶ 86 (PX 601); *see also* March 23, 1988 Projections for RVSB, FSB, (PX 136); November 21, 1989 Plan to S. Mooney from R. Pikus, WOT288 0020-0026 at 0024 (PX 249); December 9, 1988 Plan to H. Lucherini from R. Pikus, WON339 0092-0113 at 0099 (PX 262); July 31, 1989 Plan to S. Mooney from R. Pikus, WOL275 0154-0166 at 0155 (PX 345); October 30, 1989 Plan to S. Mooney from R. Pikus, WOL275 0087-0099 (PX 363).

63. The government approved River Valley's plans, which called for growth in assets and earnings for River Valley. *See* March 23, 1988 Projections for RVSB, FSB, (PX 136); November 21, 1988 Plan to Susan Mooney, FHLB-Chicago from Ron Pikus, RVSB, FSB, WOT288 0020-0026, at 0024 (PX 249); December 9, 1988 Plan to Henry Lucherini of FHLB-Chicago from Ron Pikus, RVSB, FSB, WON339 0092-0113 at 0099 (PX 262); July 31, 1989 Plan to Susan Mooney, FHLB-Chicago from Ron Pikus, RVSB, FSB, WOL275 0154-0166, at 0155 (PX 345); October 30, 1989 Plan to Susan Mooney, OTS-Chicago from Ron Pikus, RVSB, FSB, WOL275 0087-0099 at 0092 (PX 363).

64. These business plans were based on the same business strategy that had yielded a history of growth and profitable operations for Rock Falls, the predecessor to River Valley II.

*See, e.g.*, Rock Falls Balance Sheet, H&R-B43-00966-00971 (PX 54); Rock Falls Savings and Loan Association 1987 Business Plan, H&R-B44-687-700 (PX 77).

65. The government agreed that the growth strategy reflected in the business plans was appropriate and sound. *See Holland I*, 57 Fed. Cl. at 545, 548, 557 (JA Tab 5); Ferries Dep. at 44-45, 51-55, 58-59, 83-88 (JA 1903, 1905-06, 1907, 1909-10); Blaber Dep. at 196-97, 253-56 (JA 1864, 1872-73); June 28, 1988 "S" Memorandum, WOT013 0194-0204 at 0194 (PX 182); July 12, 1988 "S" Memorandum Supplement, WOF016 2430-34 at 2433 (PX 193); April 22, 1988 "S" Memorandum, WOl604 0285-0300 at 0285 (PX 146).

66. As set forth in the business plans, River Valley expected to leverage the contracted-for regulatory capital by purchasing capital market assets (*e.g.*, securitized adjustable rate mortgages (ARMs) or collateralized mortgage obligations (CMOs)). The business plans also envisioned modest growth in the manner traditional to thrifts—increasing retail loans and deposits. Holland Report at 36 ¶ 86(a) (PX 601), 41-43 ¶¶ 98-99 (PX 601); December 9, 1988 Business Plan to H. Lucherini from R. Pikus, WON339 0092-0113 at 0093 (PX 262); *see, e.g.*, July 12, 1988 "S" Memorandum Supplement, WOF016 2430-34 at 2430 (PX 193); July 31, 1989 Business Plan to S. Mooney, WOL275 0154-67 at 0163 (PX 345).

67. As the government has stipulated, River Valley also intended to grow through the acquisition of other thrifts or branches of other thrifts. JSF ¶ 168; Rock Falls Savings and Loan 1987 Business Plan, H&R-B44-687-700 at 693 (PX 77); *see* Holland Report at 40-41 ¶ 97 (PX 601).

68. And, indeed, in December 1988 River Valley acquired from the government another insolvent thrift, Peoria Savings and Loan Association ("Peoria"), located in central Illinois. *Holland I*, 57 Fed. Cl. at 567-69; JSF ¶¶142-45.

69. The pre-acquisition business plan approved by FHLB Chicago for River Valley II called for 15% annual growth after acquisition. *See* July 6, 1988 "S" Memorandum, WOT645 1521-1526, at 1521 (PX 191); *see also* Holland Report at 36 ¶ 86(a) (PX 601).

70. In October 1989, River Valley I submitted the last business plan prepared with the expectation that the government would honor its regulatory capital promises. All subsequent plans were drafted with full knowledge of the breach. The October 1989 business plan, which was approved prior to the government's breach, proposed 27% growth in assets over three years (8.3% per year, compounded). *See* October 30, 1989 Plan to Susan Mooney from R. Pikus, RVSB, FSB, WOL275 0087-0099 at 0092 (PX 363); *see also* Holland Report at 36 ¶ 86(a) (PX 601).

71. River Valley's business plans, which were submitted to and approved by the government prior to 1990, envisioned that River Valley would leverage its contract capital and grow the thrift with acquisitions. In River Valley I's post-closing plan for the Home agreement (dated November 21, 1988), net worth-to-liabilities ratios were projected in the 9.0% range.

72. In the plans submitted after the acquisition of Peoria Savings at the end of 1988, River Valley I's projected capital ratios declined to roughly 5.5%, reflecting the growth and leverage from the Peoria acquisition. *See* November 21, 1988 Plan to Susan Mooney, FHLB Chicago, from Ron Pikus, RVSB, FSB, WOT288 0020-0026, 0026 (PX 249); July 31, 1989 Plan to Susan Mooney, FHLB-Chicago from Ron Pikus, RVSB, FSB, WOL275 0154-0166, at 0155 (PX 345); October 30, 1989 Plan to Susan Mooney, OTS-Chicago from Ron Pikus, RVSB, FSB, WOL275 0087-0099 (PX 363); *see also* Holland Report at 36 ¶ 86(b) (PX 601).

73. The pre-acquisition business plan for River Valley II and the December 9, 1988 plan for River Valley I, which were both approved by the government, projected an aggregate

net income of $3.83 million in the first two years (July 31, 1988 through July 31, 1990), with annual returns on assets of approximately 0.4%. *See* July 6, 1988 "S" Memorandum Supplement, WOT645 1521-1526, 1522 (PX 191); July 12, 1988 "S" Memorandum Supplement, WOF016 2430-2434, 2432 (PX 193); December 9, 1988 Plan to Henry Lucherini, FHLB-Chicago from Ron Pikus, RVSB, FSB, WON339 0092-0113, 0105 (PX 262); Holland Report at 37 ¶ 86(c) (PX 601).

74. Under skillful management, River Valley leveraged the promised regulatory capital to surpass the profit or net income estimate set forth in their government-approved business plans by 14%, earning $4.35 million in the first two years (July 31, 1988 through July 31, 1990). *Compare* July 6, 1988 "S" Memorandum Supplement, WOT645 1521-1526, 1522 (PX 191), *and* July 12, 1988 "S" Memorandum Supplement, WOF016 2430-2434, 2432 (PX 193), *and* December 9, 1988 Plan to Henry Lucherini, FHLB-Chicago from Ron Pikus, RVSB, FSB, WON339 0092-0113, 0105 (PX 262), *with* **For River Valley I,** *see* KPMG Audit Report, River Valley Savings Bank, FSB, December 31, 1988, H&R-B08-00330-00360 (PX 285); KPMG Audit Report RVSB, FSB, December 31, 1989 and 1988, WON240 0238-0272 (PX 393); River Valley, FSB, Internal Financial Stmts., H&R-BX70-1057-1062 at 1058, Internal Financial Stmts., H&R-BX70-1292-1299 at 1295 (PX 423); River Valley, FSB, Internal Financial Stmts., H&R-BX65-00311-00316 at 00312 (PX 430); River Valley, FSB, Internal Financial Stmts., H&R-BX70-1836-1844 at 1840 (PX 437A); River Valley, FSB, Internal Financial Stmts., H&R-BX70-1540-1548 at 1544 (PX 441), *and* **for River Valley II,** *see* River Valley, FSB, Internal Financial Stmts., H&R-BX61-01612-01623 at 01613 (PX 220); River Valley, FSB, Internal Financial Stmts., H&R-BX61-01547-01552 at 01548 (PX 227); River Valley, FSB, Internal Financial Stmts., H&R-B51-359-365 at 359 (PX 241); River Valley, FSB,

Internal Financial Stmts., H&R-BX59-01220-01226 at 01220a (PX 258); River Valley, FSB, Internal Financial Stmts., H&R-BX70-0097-0103 at 0099 (PX 302); River Valley, FSB, Internal Financial Stmts., H&R-B51-597-602 at 601 (PX 326); River Valley, FSB, Internal Financial Stmts., H&R-BX65-00006-00010 at 00007 (PX 342); River Valley Savings Bank, March 31, 1989 and 1988 Audited Financials, Note 2, H&R-B43-00559-00589 at 00572 (PX 313); River Valley, Rock Falls, Internal Financial Stmts., H&R-BX70-1282-1290 at 1286 (PX 425); River Valley, Rock Falls, Internal Financial Stmts., H&R-BX65-00485-00492 at 00488 (PX 447); *see also* Holland Report at 37-38 ¶ 87(a) (PX 601).

75. River Valley also grew at a rate faster than the one projected in the business plans, increasing total liabilities by more than 22% in the two-year period of July 31, 1988 through July 31, 1990. This growth does not include the December 31, 1988 acquisition of Peoria Savings. *Compare* RVSB Internal Financial Stmts., H&R-BX65-00525-00530 at 00526 (PX 450); RVSB, FSB Internal Fin. Stmts., H&R-BX65-00518-00522 at 00518 (PX 449) and RVSB, FSB December 31, 1989 and 1988 Consol. Fin. Stmts., H&R-BX62-00133-68 at 00149 (PX 393) *and* RVSB Internal Fin. Stmts., H&R-BX65-00485-00492 at 00487 (PX 447); RVSB, FSB Internal Fin. Stmts., H&R-BX59-00207-00211 at 00209 (PX 212); RVSB, FSB Internal Fin. Stmts., H&R-BX00518-00520 at 00518, 00522, 00526, 00530 (PX 449, PX 450) and H&R-B56-01226-01235 at 01226 (PX 390) *with* July 6, 1988 “S” Memorandum Supplement, WOT645 1521-1526, 1522 (PX 191); July 12, 1988 “S” Memorandum Supplement, WOF016 2430-2434, 2432 (PX 193); December 9, 1988 Plan to Henry Lucherini, FHLB-Chicago from Ron Pikus, RVSB, FSB, WON339 0092-0113, 0105 (PX 262); *see also* Holland Report at 37-38 ¶ 87(a) & 87(b) (PX 601).

76. The River Valley thrifts' successful performance during the first two years, including generating profits of $4.35 million, came in the face of the challenges incumbent in taking over several troubled institutions which, prior to the acquisition, had different management, diverse and incompatible data processing and accounting systems, asset problems, and histories of operating losses. *See* December 9, 1988 Business Plan to Lucherini from Pikus, WON339 0092-0113 at 098 (PX 262); July 31, 1989 Business Plan to S. Mooney, WOL275 0154-67 at 0163 (PX 345); Holland Report at 37 ¶ 87 (PX 601).

## V. THE GOVERNMENT BREACHED ITS CONTRACTS WITH RIVER VALLEY BY ENFORCING THE NEW FIRREA CAPITAL STANDARD AGAINST RIVER VALLEY

77. On August 9, 1989, then-President George H. W. Bush signed into law FIRREA, a comprehensive thrift reform package.

78. The relevant portions of the FIRREA legislation enacted on August 9, 1989, required, among other things, three different measures of capital for thrift institutions: (1) "core capital"; (2) "tangible capital"; and (3) "risk-based capital." 12 C.F.R. §§ 561, 563 and 567 (1990). The Office of Thrift Supervision ("OTS"), which succeeded the FHLBB as a result of FIRREA, issued implementing regulations for the new legislation on November 8, 1989, with an effective date of December 7, 1989. 12 C.F.R. § 567; JSF ¶ 41.

79. FIRREA and its implementing regulations limited the amount of goodwill, including "capital credit" goodwill, that could be included in core and risk-based capital and required such qualifying goodwill to be phased out over a five-year period. As an intangible asset, goodwill could not be included in the tangible capital computations. Capital credits, subordinated debt, and cumulative preferred stock could not be included in tangible capital computations. Cumulative preferred stock and subordinated debt could generally be included in

risk-based capital, but could not be included in either tangible or core capital. 12 U.S.C. §§ 1464(t)(2)(A)-(B), 1464(t)3, 1464(t)(9)(A)-(B) (1989); JSF ¶ 40a.

80. The government breached the Home contract when it enacted FIRREA and issued implementing regulations that prohibited River Valley I from continuing to treat the capital credits, subordinated debt, and supervisory goodwill as full-fledged components of regulatory capital as the government had promised. *See Holland I*, 57 Fed. Cl. at 565 (JA Tab 5); Ferries Dep. at 91-95, 126, 170-71, 344-357, 369-375, 380 (JA 1897-1944); Blaber Dep. at 205-208 (JA 1866-67).

81. The government breached the Republic contract when it enacted FIRREA and issued implementing regulations that prohibited River Valley II from continuing to treat the capital credit, subordinated debt and goodwill as full-fledged components of regulatory capital as the government had promised. *Holland I*, 57 Fed. Cl. at 566 (JA Tab 5); Ferries Dep. at 91-95, 344-357, 369-375 (JA 1911-12, 1936-39, 1941-42).

82. The government's breach of the Home contract excluded $4.6 million in subordinated debt and $7.547 million of capital credits from River Valley I's regulatory capital. *See Holland I*, 57 Fed. Cl. at 565; PPSF ¶ 54.

83. The government's breach of the Republic contract wiped out $2 million in subordinated debt, $4.717 million of capital credits, and $1.236 million of supervisory goodwill from River Valley II's regulatory capital. *See Holland I*, 57 Fed. Cl. at 566; Holland Report at ¶ 89 (PX 601).

84. The immediate impact of the breach on River Valley was a 50% reduction from the amount of regulatory capital prior to the breach to the amount of tangible capital after the breach. *See* Holland Report at 43 ¶ 100 (JA 23); *see also id.* at 38-39 ¶¶ 88-90.

## VI. THE BREACH RUINED RIVER VALLEY'S PLANS FOR GROWTH AND COST RIVER VALLEY MILLIONS IN LOST PROFITS

85. By slashing River Valley's regulatory capital in half, the government caused River Valley to lose substantial profits, including specifically those River Valley would have reaped from the SAFSB acquisition.

86. The breach forced River Valley to make drastic changes in its operations and strategy. Instead of growth through leveraging their regulatory capital, River Valley was forced to shrink the thrifts so that they would have enough capital to support the liabilities and meet the government's new requirements. Holland Report at 40-43 ¶¶ 95-100 (PX 601), at 46-48 ¶ 107 (PX 601).

87. The government's breach compelled River Valley to shrink its liabilities by nearly $290.8 million, reorganize its holdings, sell assets and branches, and restructure by creating a holding company (RV Holdings) to support a merger of River Valley I and River Valley II (as merged, River Valley III). *See* OTS Examination Report, October 29, 1991, H&R-BX63-00053-000126, at 00062 (PX 625); River Valley Savings Bank, FSB Audited Financial Statements, December 31, 1992 and 1991 H&R-BX66-00129-00170 (PX 781); RVSB, FSB Audit Report: December 31, 1988, H&R-B08-00330-00360 (PX 285); KPMG Audit Report RVSB-Rock Falls, March 31, 1988 and 1989, H&R-BX43-00559-00589 (PX 313); KPMG Audit Report RVSB, FSB, December 31, 1988 and 1989, WON240 0238-0272 (PX 393); KPMG Audit Report RVSB-Rock Falls, March 31, 1990 and 1989, WON158 0017-0045 (PX 439); KPMG Audit Report RVSB, FSB, December 31, 1990 and 1989, H&R-BX66-00062-00093 (PX 493); KPMG Audit Report RVSB, FSB, December 31, 1991 and 1990, H&R-BX66-00094-00128 (PX 642); KPMG Audit Report RVSB, FSB, December 31, 1993 and 1992, H&R-B20-00888-00937 (PX

885); KPMG Audit Report RVSB, FSB, December 31, 1992 and 1991 H&R-BX66-00129-00170 (PX 781).

88. But for the government's breach, River Valley would have grown rather than shrunk. River Valley's pre-breach operating history, government-approved business plans, and the sworn testimony of River Valley's executives and the senior government regulators directly responsible for the supervision and oversight of River Valley all support this conclusion. *See* Holland Report at 63-64 ¶ 148 (PX 601).

89. The government's breach also caused the River Valley thrifts to enter into a supervisory agreement with the OTS under threat of even more severe sanctions in March 1991. *See* March 25, 1991 Supervisory Agreement (JA 1699-1289); October 26, 1991 FDIC Report of Examination (RVSB, FSB), H&R-BX63-000129-000227 at 000134 (PX 623).

90. This supervisory agreement required River Valley's owners to infuse $2 million into the River Valley thrifts, and required River Valley to meet a heightened, individualized, minimum tangible capital requirement of 4% as of September 1991, and 5% as of September 1992 (compared to FIRREA's requirement of 1.5% tangible capital). *See* March 25, 1991 Supervisory Agreement (PX 521); October 26, 1991 FDIC Report of Examination (RVSB, FSB), H&R-BX63-000129-000227 at 000134 (PX 623); River Valley Savings Bank, FSB Audited Financial Statements, December 31, 1992 and 1991, H&R-BX66-00129-70 at 0156-57 (PX 781); October 28, 1991 OTS Report of Examination, H&R-BX63-00053-126 at 00057 (PX 625).

91. This Supervisory Agreement would *not* have been imposed but for the government's breach and the resulting loss of regulatory capital. *See* Ferries Dep. at 147 (JA 1920).

92. In 1991, River Valley I redeemed the government-owned Series A preferred stock (which no longer counted as regulatory capital) at a discounted price of $3.675 million. *See* March 28, 1991 Redemption Agreement between RVSB, FSB and FDIC, H&R-BX60-00520-00590 (PX 526); Holland Report at 46-47 ¶ 107(c) (PX 601); JSF ¶ 278.

93. By shrinking the balance sheet, retaining earnings, and restructuring River Valley's capital, River Valley's managers operated the thrifts in such a way that they survived the government's breach. *See generally*, Holland Third Supplemental Expert Report dated June 1, 2007 (PX 605).

94. On or about March 31, 1991, River Valley II was merged with and into River Valley I (post-merger, "River Valley III"). The resulting institution later became a wholly owned subsidiary of RV Holdings. *See* RV Holdings Audited Financial Statements as of December 31, 1991, Note 2, H&R-B03-00676-00710 at 00687 (PX 643); OTS Report of Examination of River Valley III dated October 28, 1991, H&R-BX63-00052-00126 at 00062 (PX 625).

95. River Valley I, River Valley II, and River Valley III were in compliance with the FIRREA capital requirements at each quarter-end from March 31, 1990, to December 31, 1994. JSF ¶ 192; JA 5343-5439, 5404 Expert Report of W. Barefoot Bankhead dated December 10, 2001, Exhibit D; JA 4396-4766, Sheshunoff Information Services, Inc. (PX 288).

96. On April 15, 1993, the OTS terminated all of the provisions of the Supervisory Agreement except those provisions addressing River Valley III's mortgage derivative securities portfolio and capital position. The OTS subsequently determined that River Valley III's mortgage derivative securities portfolio and capital position were no longer areas of significant supervisory concern and the entire Supervisory Agreement was terminated on August 16, 1993.

*See* JA ¶ 324; Memorandum from Ellen Fowler, Analyst to File dated August 19, 1993, WON469 0016-0017 (PX 843).

97. The OTS set forth a composite rating of "2" for River Valley III in its October 1993 report of examination. OTS Report of Examination of River Valley III dated October 12, 1993, H&R-B55-00145-00176 at 00150 (PX 857); JSF ¶326.

98. The OTS set forth a composite rating of "2" for River Valley III in its October 1994 report of examination. OTS Report of Examination of River Valley III dated October 3, 1994, H&R-BX70-2329-2363 at 2334 (PX 982); JSF ¶328.

99. Throughout its operating history, River Valley's primary OTS regulator and capital market investment specialist Larry Kenny believed that River Valley's capital markets investments were well-managed, and he held in high regard the investment expertise and sophistication of River Valley's managers. *See*, *e.g.*, Kenny Dep. at pp. 172-74; 199-201.

**VII. THE BREACH PREVENTED RIVER VALLEY FROM ACQUIRING SAFSB**

100. In 1991, River Valley I and River Valley II merged into one institution, River Valley III, and created a holding company, River Valley Holdings, Inc. ("RV Holdings"). *See* JSF ¶ 329; Holland Report at 48 ¶ 107(f) (JA 25A); River Valley Savings Bank, FSB Audited Financial Statements, December 31, 1992 and 1991, H&R-BX66-00129-00170 at 00142 (PX 781); December 31, 1991 and 1990 River Valley Holdings Consolidated Financial Statements, H&R-B03-00676-00710 at 00687 (PX 643).

101. This restructuring facilitated an increase in River Valley's tangible capital by converting $2 million of subordinated debt held by American National Bank to $2 million of holding company debt. While the $2 million of subordinated debt held by the thrift did not qualify as tangible regulatory capital, the same $2 million, when borrowed by the holding

company, could be downstreamed and treated as tangible capital at the thrift level. But this could only be achieved at a cost — the lender demanded that the interest rate on the loan be increased by .5%. *Compare* Subordinated Debenture, H&RBX37 0038, 0041 (PX 208) *with* OTS Report of Examination of River Valley III dated October 28, 1991, H&R-BX63-00052-00126 at 00062 (PX 625); *see also* Holland Report at 48 ¶ 107(f) (JA 25A); Holland Dep. III at 95 (JA 1991).

102. But for the breach, River Valley would have had additional regulatory capital – approximately $20 million of it – with which to grow and earn substantial returns. *See* Ferries Dep. at 344-357, 369-375 (JA 1936-39); Holland Rep at 35 ¶ 83 (PX 601).

103. It was reasonably foreseeable that the government's breach would force Plaintiffs to abandon their successful, government-approved business plan for River Valley. *See* Holland Report at 5 ¶ 13 (PX 601), at 8 ¶ 17 (PX 601); Ferries Dep. at 17, 21, 92-93, 116, 126 (JA 1899, 1900, 1911, 1915, 1917); Blaber Dep. at 208, 293-294 (JA 1867, 1876-77).

104. As of September 30, 1991, River Valley III's total assets were $537 million and its tangible capital ratio was 4.48 percent, exceeding the projections in its February 1991 business plan of $529 million and 4.10 percent, respectively. JSF ¶ 342; *see also* Projections per correspondence from Steve Bangert to Larry Ferries (Manager, OTS) dated February 21, 1991, WON107 1612-1653, 1612, 1617 (PX 512); Quarterly Financial Information for River Valley III, Sheshunoff Information Services, Inc. (PX 288).

105. As of September 30, 1991, River Valley III was in compliance with both minimum regulatory requirements and the capital provisions of the March 25, 1991 Supervisory Agreement. As of September 30, 1991, the institution reported tangible capital of $24.1 million (4.5 percent of tangible assets) and core capital of $32.1 million (6.0 percent of adjusted tangible

assets). Each was approximately $15.9 million in excess of the minimum regulatory requirement. Risk based capital was $34.1 million (12.6 percent of risk-weighted assets) and approximately $14.6 million in excess of the minimum regulatory requirement. However, the Supervisory Agreement required tangible capital ratios, at September 30, 1991 and 1992 to be 4.0% and 5.0%, respectively. JSF ¶ 343; OTS Report of Examination of River Valley III dated October 28, 1991, H&R-BX63-00052-00126 at 00066 (PX 625); JA 5595-5597, 5596, Supervisory Agreement between River Valley I and the OTS dated March 25, 1991, H&R-B04-1276-1289 (PX 521).

106. In late 1991, River Valley was presented with an opportunity to acquire SAFSB from the RTC, which had seized SAFSB's corporate parent, San Antonio Savings Association ("SASA"). Although SASA was insolvent, its SAFSB subsidiary was strong, with a net worth of approximately $60 million. *See* JSF ¶ 344; Ernst & Young Audit Report, Western Capital Holdings, Inc. and Subsidiary, Year Ended December 31, 1992, WCH-B76-0114-0158 at 0127-0128 (PX 777).

107. No later than November 20, 1991, Dr. Holland informed River Valley III's board of a potential acquisition of SAFSB. JSF ¶ 345; River Valley III Board of Director Meeting Minutes dated November 20, 1991, H&R-BO3-00126-00130, 00129 (PX 631).

108. River Valley decided in late 1991 to pursue the SAFSB acquisition. *See* JSF ¶ 346.

109. River Valley sought to purchase SAFSB but was unable to do so because of the effects of the breach.

110. As a regulatory matter, but for the breach, River Valley would have had more than adequate capital to support the acquisition; adding back the breached contract capital —

including $13 million in capital credits — River Valley easily would have satisfied the requirements associated with what would have been a $10 million investment in SAFSB.

111. Further, without the breach, River Valley could have acquired SAFSB without need for any outside funding.

112. River Valley nevertheless pursued the opportunity, seeking from any available source the financing necessary to make the acquisition possible in spite of the breach. Holland Report (2001) at ¶ 114 (PX 601).

113. American National Bank ("ANB") had provided capital to River Valley management for years and therefore was the most likely source of the required funds. Holland Report (2001) at ¶ 114 (PX 601).

114. Because ANB wanted to avoid exposure to the OTS Supervisory Agreement and other breach-imposed restrictions that had been placed upon River Valley by the regulators, ANB would only consider financing the institution on a stand-alone basis.

115. Plaintiffs could not find another lender that would make such a loan. JSF ¶ 347; Holland Report at 50 ¶ 114 (PX 601).

116. On August 14, 1992, Western Capital Holdings, Inc. ("WCHI") acquired SAFSB from the RTC for $25 million, of which $15 million was paid to the RTC from SAFSB assets prior to closing as a cash dividend, and the remaining $10 million was paid in cash by the new shareholders at closing. All of SAFSB's outstanding common stock was acquired by WCHI and SAFSB became a wholly owned subsidiary of WCHI. JSF ¶ 355; OTS Report of Examination of SAFSB dated November 2, 1992, p. 1, H&R-B06-01130-01177 at 01143 (PX 733); Stock Purchase Agreement dated December 17, 1991, H&R-BX61-00787-00819 at 00788 (PX 633); Letter from Ernst & Young to the WCHI Board of Directors dated December 1, 1992, H&R-

BX61-01068-01069 (PX 742); OTS Report of Examination of SAFSB dated November 2, 1992, p. 1, H&R-B06-01130-01177 at 01142 (PX 733).

117. But for the alleged breach, River Valley III, rather than WCHI, would have acquired SAFSB. Holland Report at ¶¶124(a), 133, 135-136 (PX 601).

118. Indeed, River Valley III would have acquired SAFSB and been able to use its NOLs to shelter SAFSB's earnings but for the breach. Holland Report, Ex. B (discussion of non-breach capital levels) (PX 601-B).

119. Had River Valley acquired SAFSB, River Valley would have operated SAFSB comparably to the way SAFSB operated under WCHI's ownership, and at least as profitably.

120. In 1992 and 1993, WCHI earned $568,336 through the operation of SAFSB. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

121. In 1994, WCHI earned $3,623,189 through the operation of SAFSB. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

122. In 1995, WCHI earned $1,697,900 through the operation of SAFSB. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

123. In 1996, WCHI earned $21,531,269 through the operation of SAFSB. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

124. In 1997, WCHI earned $5,325,936 through the operation of SAFSB. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

125. In 1998, WCHI earned $5,361,220 through the operation of SAFSB. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

126. In 1999, WCHI earned $4,482,025 through the operation of SAFSB. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

127. In mid-1999, WCHI was converted to a liquidating trust, Western Capital Liquidating Trust ("WCLT"). That year, WCLT earned $306,398 through the operation of SAFSB and the disposition of its assets. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

128. In 2000, WCLT earned $318,953 through the operation of SAFSB and the disposition of its assets. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

129. In 2001, WCLT earned $491,217 through the operation of SAFSB and the disposition of its assets. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

130. In 2002, WCLT earned $247,317 through the operation of SAFSB and the disposition of its assets. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

131. In 2003, WCLT earned $479,613 through the operation of SAFSB and the disposition of its assets. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

132. In 2004, WCLT earned $405,848 through the operation of SAFSB and the disposition of its assets. *See* PX 1171. Absent the breach, River Valley would have earned these profits.

## VIII. IN ADDITION, THE BREACH IMPOSED ON RIVER VALLEY THE MITIGATION COSTS OF RETAINING EARNINGS TO REPLACE SOME OF THE BREACHED REGULATORY CAPITAL

133. First Bank's damages can also be measured by the cost to the River Valley thrifts and their successors of partially mitigating some of the effects of the government's breach by

replacing contracted-for regulatory capital with retained earnings, and through the exchange of debt securities for equity securities. *See generally* Holland Third Supplemental Expert Report dated June 1, 2007 ("Holland Third Supp. Report") (PX 605).

134. The enactment of FIRREA eliminated four categories of regulatory capital from River Valley's regulatory capital account — capital credits, goodwill, subordinated debt, and preferred stock that had been issued to the FSLIC ("FSLIC preferred"). Holland Third Supp. Report at ¶ 10, 16 (PX 605).

135. To mitigate some of the harm of the breach, River Valley took certain actions that partially replaced some of the regulatory capital FIRREA eliminated. Specifically, the River Valley thrifts (1) used retained earnings that would have been available for other purposes to substitute for some of the eliminated regulatory capital, (2) converted a tranche of subordinated debentures into equity securities, and (3) repurchased the FSLIC preferred at a price lower than that at which it had been sold at issuance. Holland Third Supp. Report at ¶ 11 (PX 605).

136. Because the Court has ruled that the FSLIC preferred was not contractually promised regulatory capital, First Bank presently seeks only the breach imposed costs associated with allocating retained earnings to serve as replacement capital for the supervisory goodwill, capital credits and sub debt, and with converting debt to equity. *Holland V.*, 74 Fed. Cl. 225, 258-263 (2006); Holland Third Supp. Report at ¶ 12 (PX 605).

137. The net cost of each element of new capital that replaced a category of contracted-for regulatory capital is properly computed, over the contracted-for life of each category of promised regulatory capital, as the difference between (1) the incremental cost of the replacement capital relative to the contract capital, and (2) the incremental benefit of the

replacement capital relative to the contract capital. *See* Holland Third Supp. Report at ¶ 35 (PX 605).

138. For the regulatory capital elements River Valley replaced with retained earnings, River Valley's net cost for each period can be computed as River Valley's cost of equity capital times the amount of retained earnings functioning as replacement capital in that period, less an offset based on the an intermediate-term Treasury rate times the same amount of retained earnings. *See* Holland Third Supp. Report at ¶ 36 (PX 605).

139. The government's own analysis of the post-breach value of the Series A preferred shows that after the breach, River Valley's cost of capital was greater than 20 percent. To avoid any possibility of incorporating effects of remote events into the cost side of the calculations, it is appropriate to apply the government-determined 20 percent post-breach cost of capital over all time periods following the breach. Holland Third Supp. Report at ¶ 43 (PX 605).

140. To compute the benefits of the replacement capital, it is appropriate to consider the after-tax yield on intermediate-term U.S. Treasury securities (10-year Notes) auctioned in mid-1990, at the time of the breach. The average pre-tax yield on such securities was 8.825 percent. Applying a tax rate of 35 percent, the after-tax yield was 5.736 percent. Holland Third Supp. Report at ¶ 45 & n. 8 (PX 605).

141. Based upon the 20% cost of equity capital, the 5.736% after-tax Treasury rate, and the amount of River Valley's actual retained earnings, River Valley incurred costs of $4.668 million in allocating retained earnings to replace the contracted for capital credits prior to the First Bank merger. Computed the same way, the cost of allocating retained earnings to replace the contractual capital credits over the period between the First Bank merger and through December 2007 is $10.900 million. The December 2007 value of the future costs, computed the

same way but discounted at River Valley's 20 percent cost of capital, is $0.697 million. Thus, the total cost of allocating retained earnings to replace the contractual capital credits is $16.266 million. Holland Third Supp. Report at ¶ 47 & Exhibits E and F (chart depicting the replacement and table showing the calculations) (PX 605-E, PX 605-F).

142. Based upon the 20% cost of equity capital, the 5.736% after-tax Treasury rate, and the amount of River Valley's actual retained earnings, in allocating retained earnings to replace the contractual non-Peoria goodwill, River Valley incurred costs of $0.470 million prior to the First Bank merger. Computed the same way, the cost of allocating retained earnings to replace the contractual the non-Peoria goodwill over the period between the First Bank merger and through December 2007 is $1.087 million. The December 2007 value of the future costs, computed the same way but discounted at River Valley's 20 percent cost of capital, is $0.065 million. Thus, the total cost of allocating retained earnings to replace the contractual non-Peoria goodwill with retained earnings is $1.622 million. Holland Third Supp. Report at ¶ 47 & Exhibits G and H (chart depicting the replacement and table showing the calculations) (PX 605-G, PX 605-H).

143. Based upon the 20% cost of equity capital, the 5.736% after-tax Treasury rate, and the amount of River Valley's actual retained earnings, in allocating retained earnings to replace the contractual regulatory capital corresponding to the $4.6 million tranche of sub-debt, River Valley incurred costs of $1.846 million prior to the First Bank merger. Computed the same way, the cost of allocating retained earnings to replace the contractual regulatory capital corresponding to the $4.6 million tranche of sub-debt over the period between the First Bank merger and through December 2007 is $1.076 million. Assuming that all regulatory capital corresponding to the sub-debt would have been excluded under the contract beginning in the

second quarter of 1999, there are no costs in the post December 2007 period. Thus, the total cost of allocating retained earnings to replace the contractual regulatory capital corresponding to the $4.6 million tranche of sub-debt is $2.922 million. Holland Third Supp. Report at 49 & Exhibits I and J (chart depicting the replacement and table showing the calculations) (PX 605-I, PX 605-J).

144. Based upon the 20% cost of equity capital, the 5.736% after-tax Treasury rate, and the amount of River Valley's actual retained earnings, in allocating retained earnings to replace the contractual regulatory capital corresponding to the $2 million tranche of sub-debt, River Valley incurred costs of $0.093 million prior to the September 1991 conversion of those debentures into preferred shares, after which it is no longer appropriate to treat retained earnings as a source of replacement capital for that tranche. Accordingly, the total cost of replacing contracted-for regulatory capital with retained earnings is $20.903 million. Holland Third Supp. Report at ¶ 50 & Exhibits K and L (chart depicting the replacement and table showing the calculations) (PX 605-K, PX 605-L).

145. In September 1991, River Valley converted the $2 million tranche of sub-debt into a series of preferred shares that the holding company purchased with funds secured through an issuance of debt at the holding company level. In economic substance, therefore, the River Valley sub-debt was simply converted into holding company sub-debt in such a way as to permit River Valley to recover the associated regulatory capital. Holland Third Supp. Report at ¶ 53 (PX 605). The holder of the notes both before and after the exchange was the same, American National Bank. The preferred dividend rate was established at the level necessary to fund the holding company's payment of the interest on the debt it issued to purchase the preferred, and River Valley in fact paid that level of dividend to the holding company. Holland Third Supp.

Report at ¶ 51 (PX 605); OTS Report of Examination, RVSB, FSB, October 28, 1991, H&R-BX63-00053 (PX 625) (OTS Exam Report reflecting the conversion).

146. The exchange was costly to River Valley, because the lender, American National, charged 0.5 percent higher interest on the holding company notes than it had on the River Valley notes. Accordingly, the net cost for each period is simply 0.5 percent times the outstanding amount of the obligation. *Compare* Subordinated Debenture, H&RBX37 0038, 0041 (PX 208) *with* OTS Report of Examination of River Valley III dated October 28, 1991, H&R-BX63-00052-00126 at 00062 (PX 625); *see also* Holland Third Supp. Report at ¶ 54 (PX 605).

147. The original $2 million obligation was reduced by 6/7 when River Valley redeemed that fraction of the preferred shares in May 1992. Accordingly, for periods from September 1991 to May 1992, it is appropriate to consider the full $2 million obligation. Holland Third Supp. Report at ¶ 55 (PX 605); OTS Report of Examination, RVHI, October 19, 1992, H&R-B04-593 (PX 727) (OTS Exam Report reflecting redemption).

148. Upon the May 1992 redemption, the outstanding obligation drops to $285,714. The regulatory phase-out provision of 12 CFR 561.13(b) applies to compute the fraction of that amount that functions as replacement capital. Holland Third Supp. Report at ¶ 56 (PX 605).

149. Based upon the change in interest rate and the amount of outstanding principal that would have counted as regulatory capital under the contract over time, in exchanging the $2 million tranche of sub-debt for preferred stock in September 1991, River Valley incurred costs of $13,190. Holland Third Supp. Report at ¶ 58 & Exhibits K and L (chart depicting the replacement and table showing the calculations) (PX 605-K, PX 605-L).

150. The total recoverable cost of mitigation is no less than the sum of the $20,903,193 cost of retained earnings and the $13,190 cost of the sub-debt-to-preferred exchange, or

$20,916,382. Holland Third Supp. Report at ¶ 59 & Exhibits M (chart depicting all of the replacement elements calculated), N (table summarizing calculations), O (summary of all replacement damages elements) (PX 605-M, PX 605-N, PX 605-O)..

151. Because the capital replacement did nothing to alleviate the harm to River Valley that resulted from River Valley's breach-related inability to acquire SAFSB, the cost of retaining earnings to partially mitigate the breach measures loss in addition to the profits River Valley lost because the breach made it impossible for River Valley to acquire SAFSB. Holland Third Supp. Report at ¶ 9 (PX 605).

152. One of the defendant's experts, Dr. Anjan Thakor, asserts in his report that the "computational approach" of Dr. Holland's cost-or-mitigation analysis is "conceptually similar to a lost-profits model." Thakor Report (July 30, 2007) at ¶35 (PX 1162). Indeed, Dr. Thakor claims that one of his exhibits "demonstrate[s] the close relationship between Dr. Holland's approach and a lost-profits approach." *Id*. at n.15. In that exhibit, Dr. Thakor purports to show the "equivalence of Dr. Holland's cost of replacement retained earnings model with lost profits." Id. at Exh. 4. Dr. Thakor claims that Dr. Holland's analysis is financially similar to a computation based upon multiplying three things — (1) River Valley's leverage ratio, times (2) the difference between River Valley's expected return on assets and its expected cost of debt (*i.e.*, its expected net interest margin), times (3) one minus River Valley's marginal tax rate. Dr. Thakor also asserts that the product of those three items reflects a lost-profits computation.

153. The leverage ratio, net interest margin, and tax rate River Valley could reasonably have expected to achieve but for the breach were similar to the corresponding figures the breach-impaired and shrunken River Valley actually achieved on a smaller portfolio of assets and liabilities notwithstanding the breach. Dr. Thakor's report and exhibits (as well as other

evidence to be introduced at trial) provides a basis to compute (1) River Valley's actual post-breach leverage ratio, (2) River Valley's actual post-breach net interest margin, and (3) River Valley's actual post-breach marginal tax rate. Accordingly, Dr. Thakor's analysis provides a reasonable basis to compute the profits River Valley would have earned had the government not breached.

154. Dr. Thakor's report shows that in the actual post-breach world, River Valley leveraged its capital approximately 18 times (*i.e.*, River Valley's assets totaled about 18 times its capital and, equivalently, the institution's capital was about 5.5% of its assets). Dr. Thakor's Exhibit 7 shows that River Valley's post-breach core capital ratio grew from just over 3% (about a 30x leverage ratio) in 1991 to just under 7% (about a 15x leverage ratio) in 1993 (the last year of the supervisory agreement) before settling at just under 5.5% (about an 18x leverage ratio). *Id*. at Exh. 7. Dr. Thakor also includes in his report information from which River Valley's net interest margin can be determined — exhibits showing both (1) River Valley's average yield on tangible assets, *see id*. at Exh. 19A, and (2) River Valley's average cost of funds. *See id*. at Exh. 12. Dr. Thakor's report shows that in the actual post-breach world, River Valley generated net interest margins substantially exceeding 2% (200 basis points) — indeed, often exceeding 4% (400 basis points) — annually.

155. Dr. Thakor contends that River Valley's marginal tax rate was zero. If he is correct, one can simply ignore the tax-effect term in his lost-profits formula. Even if one applies the 35% marginal tax rate Dr. Holland incorporated into his analysis, however, River Valley's actual, post-breach performance was more than sufficient to support lost profits based on Dr. Thakor's formula that are at least equal to River Valley's cost of partial mitigation as Dr. Holland computed it.

156. Accordingly, Dr. Thakor's data and analysis show that River Valley's actual, post-breach profits are entirely consistent with Dr. Holland's analysis of the damages River Valley incurred in allocating costly retained earnings to support the assets the contracted-for regulatory capital would have supported had the government not breached.

## IX. THE GOVERNMENT'S OWN ANALYSES OF THE VALUE OF THE RIVER VALLEY PREFERRED STOCK FSLIC BOUGHT AND SOLD ESTABLISH THAT THE BREACH CAUSED RIVER VALLEY'S OVERALL ECONOMIC VALUE TO DECLINE BY AT LEAST $21.846 MILLION

157. In 1988, the government purchased 50,000 shares of Series A preferred stock issued by River Valley I.

158. The Series A preferred stock had an 8% dividend for the first 10 years, gradually increasing to 12% in years 11-15. This term of the security was called the "Fixed Dividend."

159. The Series A preferred stock also conveyed a participation in the earnings of River Valley I when they exceeded a certain level. As the holder of the Series A preferred, FSLIC received 25% of all of River Valley I's earnings in excess of 40% (40 basis points) of total assets, after deducting the fixed-dividend payments. After ten years, the earnings threshold for the supplemental dividend was to decline five basis points per year until it reached 15 basis points. This term of the security was known as the "Supplemental Dividend." Murphy Rep. at 17 ¶ 39 (PX 606); July 29, 1988 Stock Purchase Agreement Between River Valley I and FSLIC, Ex. B to Assistance Agreement, CHO023 0106-0208 (PX 202).

160. Pre-breach documents show that FSLIC valued the FSLIC preferred stock at just over $6.5 million when it purchased the shares for $5,000,000. FSLIC determined that the fixed stream of dividends had a then-present value of $3,145,000, while the present value of the equity

participation interest had a then-present value of $3,371,000. *See, e.g.*, June 22, 1988 FHLBB Memorandum, WOF016 2577-78 (PX 174); *see also* Murphy Rep. at 17 ¶ 39 (PX 606).

161. In 1990, the government and River Valley I negotiated over a potential redemption of the FSLIC preferred stock at a discount. The government retained the investment banking firm of Donaldson, Lufkin, & Jenrette to advise the government on valuing the stock. *See* September 25, 1990 Letter from River Valley to FDIC, H&R-BX-64-02353-54 (PX 466); *see also* Murphy Rep. at 18-19 ¶ 41 (PX 606).

162. On March 28, 1991, the government accepted a redemption payment of $3,675,000; in exchange the government surrendered the shares to River Valley. *See* Murphy Rep. at 18-19 ¶ 41 (PX 606).

163. The government's pre and post-breach valuations of the FSLIC preferred stock demonstrate that FIRREA's exclusion of regulatory capital caused the value of River Valley I, exclusive of Peoria, to decline. Specifically, FIRREA caused River Valley I to lose $16.872 million of non-Peoria regulatory capital, and this exclusion caused River Valley I to lose $14.794 million of value. This loss equates to a reduction in value of approximately 87.69 cents for every dollar of regulatory capital that was lost due to FIRREA. *See* Murphy Supp. Rep. at ¶¶ 29, 31, (PX 607); March 29, 1991 RTC Authorization Memorandum (PX 528); Murphy Rep. at 19-20 ¶ 42 (PX 606).

164. The breach was a substantial factor in causing the entire $14.794 million loss. It is possible nevertheless to allocate the loss ratably among the contractual (capital credit and sub debt) and non-contractual (preferred stock) components that FIRREA eliminated from River Valley I's regulatory capital; one simply multiplies (a) the amount of contractual capital the breach eliminated, times (b) the 87.69 cents of loss in value per dollar of excluded capital.

165. The only non-contractual element of River Valley I's regulatory capital that FIRREA excluded was the preferred stock issued to FSLIC, which prior to FIRREA had accounted for $5 million of River Valley I's regulatory capital. After FIRREA, River Valley recaptured $1.325 million of that regulatory capital by redeeming the preferred at a discount, meaning that the net amount FIRREA excluded was $3.675 million. Deducting that $3.675 million from the $16.872 million of total regulatory capital FIRREA excluded means that the breach eliminated $13.197 million of River Valley I's regulatory capital. Multiplying that amount times the 87.69 cents of economic loss per dollar of excluded capital shows that $11.572 million of the loss in River Valley's economic value can be traced directly to the government's exclusion of the contractual regulatory capital.

166. River Valley II was managed by the same people as River Valley I, with the same asset/liability management, the same interest rate risk management, the same underwriting standards, and similar business plans. It is therefore reasonable to infer that the government's assessment of the impact of the breach for River Valley I can be applied to River Valley II. *See* Murphy Rep. at 20-21 ¶ 43 (PX 606).

167. As it applied to River Valley II, FIRREA eliminated only *contractual* regulatory capital, and therefore to determine the effect of the breach one need only to apply the 87.69 cents of economic loss per dollar of excluded regulatory capital to the $8,041,000 of regulatory capital that the government's breach eliminated at River Valley II. That simple calculation shows that the breach caused River Valley II's value to decline by $7,051,153. Murphy Supp. Rep. at 11 ¶ 32 (PX 607).

168. Thus, using the government's own contemporaneous valuation analyses, Plaintiffs have determined to a reasonable degree of certainty that the government's breaching actions

were a substantial factor in causing a combined total reduction in value of at least $21.846 million in the River Valley thrifts. *See* Murphy Supp. Rep. at 11, 13 ¶¶ 33, 36 (PX 607). If it is necessary to apportion the lost value between breaching and non-breaching provisions of FIRREA, at least $18.622 million of the total $21.846 million loss ($11.572 million of the $14.794 million loss at River Valley I, and all of the $7.051 million dollar loss at River Valley II) is properly allocable to the breach.

## CONTENTIONS OF LAW

1. This Court has held the government "liable to First Bank for breach of [] express contracts" promising the River Valley thrifts $20.91 million in regulatory capital. *See Holland v. United States*, 74 Fed. Cl. 225, 264 (2006). All that remains for this Court to determine is the amount of damages that the government owes to River Valley's successor-in-interest as a result of that breach.

2. The government is liable to First Bank as River Valley's successor, and First Bank seeks damages based solely on *River Valley's losses* as a result of the breach. *See Holland v. United States*, 74 Fed. Cl. 225, 229 (2006) (First Bank is "the direct successor in interest to the damages claims of River Valley"). First Bank does not seek any damages based on any breach-caused losses that First Bank itself (or its parent company, First Banks, Inc.) may have suffered as a result of acquiring River Valley.

3. Contract remedies are designed to make the non-breaching party whole. *Holland v. United States*, 75 Fed. Cl. 483, 489 (2007) (citing *Cal Fed Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005).

4. "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Id.* (citing *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001); *see also* Restatement (Second) of Contracts § 344(a) (1981). By this expectation measure, the party injured by the government's breach is entitled to recover the full benefit of its bargain with the government. *See N. Helex Co. v. United States*, 634 F.2d 557, 563 (Ct. Cl. 1980).

5. This Court has wide latitude in crafting an appropriate expectation damages award; its methodology for measuring damages is reviewed only for abuse of discretion. *See*

*LaSalle Talman v. United States*, 462 F.3d 1331, 1336 (Fed. Cir. 2006); *Home Savings of Am. v. United States*, 399 F.3d 1341, 1347 (Fed. Cir. 2005).

6. Expectancy damages can include lost profits. *Holland v. United States*, 75 Fed. Cl. 483, 489 (2007); Restatement (Second) of Contracts § 347.

7. In addition, a breach victim is entitled to recover the costs of mitigating the breach. *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007); *see also* Restatement (Second) of Contracts § 350 (expectation damages restore to a breach victim the benefit of its bargain plus compensation for "any other loss, including incidental or consequential loss, caused by the breach"); *Id.* comment *c* ("[i]ncidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss").

8. The cost of allocating retained earnings to replace breached regulatory capital is recognized by the Federal Circuit as a reliable measure of mitigation damages in the *Winstar* cases. *See Home Savings*, 399 F.3d at 1341; *see also Citizens Fed. Bank*, 474 F.3d at 1321 (cost of replacement capital is a valid mitigation damages measure); *LaSalle Talman Bank, F.S.B.*, 317 F.3d 1363, 1375 (Fed. Cir. 2003) (explaining that "[a]ll capital raised by a corporation has a cost" and that "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings").

9. Uncertainty as to the amount of damages will not preclude recovery where plaintiff can establish " a reasonable probability of damage." *Cal Fed Bank*, 395 F.3d at 1267 (quoting *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004); *Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960).

## I. STANDARDS GOVERNING FIRST BANK'S EXPECTATION DAMAGES CLAIMS

10. In order to establish its expectancy damages claims, a plaintiff need only prove by a preponderance of the evidence that (1) its damages were reasonably foreseeable by the breaching party at the time of contracting, *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005); (2) Defendant's breach was a substantial factor in causing the damages, *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1317-19 (Fed. Cir. 2007); and (3) "the measure[s] of damages [are] reasonably certain." *Cal Fed Bank*, 395 F.3d at 1267 (quoting *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed. Cir. 2004).

### A. Foreseeability

11. A party establishes "foreseeability" by demonstrating that the damages claimed were reasonably foreseeable by the breaching party at the time of contract formation. *See Citizens Federal*, 374 F.3d at 1321; *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); Restatement (Second) of Contracts § 351 (1981).

12. A plaintiff may show that the consequences of a breach were foreseeable "in the ordinary course of events," even if the defendant did not actually foresee them. Restatement (Second) of Contracts § 351 & cmt. a (1981).

13. "[T]he test is an objective one based on what [the defendant] had reason to foresee." *Id. Accord Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953); *cf. Staples v. United States*, 511 U.S. 600, 615 n.11 (1994) (As with any question of knowledge, the defendant's actual foresight "can be inferred from circumstantial evidence.").

14. A plaintiff need not show that the defendant foresaw (or reasonably should have foreseen) the plaintiff's *specific* injury; rather, the defendant need only have foreseen the general kind of injury: "What is required is merely that the injury actually suffered must be one of a kind

that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction. The rule does not require that anything should have been foreseeable to a dead certainty; seldom can anything be predicted with such assurance as that. *It is merely that the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of [the] breach.*" 11 *Corbin on Contracts* § 56.7 at 108 (2005 rev. ed.) ("Foreseeability of the Specific Injury and Its Exact Amount Not Required") (emphasis added). *See also Citizens Fed. Bank*, 474 F.3d at 1314, 1321 (Fed. Cir. 2007) (quoting same).

15. Moreover, "[t]he party in breach need not have made a 'tacit agreement' to be liable for the loss. Nor must he have had the loss in mind when making the contract, for the test is an objective one based on what he had reason to foresee." Restatement (Second) of Contracts § 351 (quoted in *Citizens Federal Bank, F.S.B. v. United States*, 59 Fed. Cl. 507, 519 (2004)).

16. Neither does the breaching party need to have foreseen the precise amount of damages for those damages to be awarded. *See, e.g., Coast Fed. Bank, FSB v. United States*, 48 Fed. Cl. 402, 423 (2000) (citing *Gardner Displays Co. v. United States*, 346 F.2d 585, 589 (Ct. Cl. 1965)).

17. Foreseeability is closely interrelated to the underlying purpose of the contract; if the purpose of a contract is for something to occur, then that occurrence is generally foreseeable. *See, e.g., Glendale Fed. Bank v. United States*, 43 Fed. Cl. 390, 398 (1999) ("Critical to this issue [of foreseeability] is the purpose of the contract."); *see also Wells Fargo Bank, NA v. United States*, 88 F.3d 1012, 1033 (Fed. Cir. 1996) (holding that lost profits are foreseeable where the "purpose of the contract . . . was for the plaintiff to make profits on the subject of the contract").

18. In the *Winstar* cases, "[the Government] had reason to know that if [a plaintiff's] supervisory goodwill and capital credit[s] were taken away that [the plaintiff] would lose potential profits from leveraging that capital." *Citizens Fed. Bank, FSB v. United States*, 64 Fed. Cl. 498, 504 (2005).

19. Because the government knew or should have known that River Valley intended to leverage its contract capital to grow and make profits, damages arising from the loss of that capital are foreseeable here. *See* ¶¶ 63-76 (Facts), *supra*.

20. Specifically, the government regulators at the time of contracting with River Valley had reason to foresee (1) that shrinkage and/or forgone growth would cause a reduction in River Valley's profits, and (2) that River Valley's anticipated acquisition-oriented growth could generate millions of dollars of profits. *See* ¶¶ 2-7, 63-76 (Facts), *supra*.

21. Thus, it was foreseeable to the government at the time of contracting with River Valley that a breach eliminating River Valley's contract capital, could cause River Valley to lose acquisition opportunities on the scale of the lost SAFSB acquisition. *Id.*

22. Likewise, it was foreseeable to the government at the time of contracting with River Valley that a breach eliminating River Valley's contract capital, would cause River Valley's overall equity value to decline. *Id.*

**B. Causation**

23. In order to establish causation, First Bank must show only that the breach was a "substantial factor" in causing River Valley's losses. *Holland*, 75 Fed. Cl. at 489 (citing *Citizens Federal*, 374 F.3d at 1317-19). *Accord Indiana-Michigan*, 422 F.3d at 1373; *Energy Capital Corp.*, 302 F.3d 302 F.3d 1314, 1320 (Fed. Cir. 2002); *Bluebonnet Savings Bank, FSB v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001).

24. First Bank need not prove that River Valley's losses were an "inevitable" result of the breach, nor that the breach was the "sole cause" of River Valley's losses. *Citizens Federal*, 374 F.3d at 1317-19; *Bluebonnet*, 266 F.3d at 1356.

25. Rather, First Bank must prove by a preponderance of the evidence only that the government's breach was a substantial factor, perhaps among others, causing River Valley to lose the opportunity to acquire SAFSB, to incur the cost of partially mitigating the harm of the breach, and to lose value. *See Energy Capital Corp. v. United States*, 47 Fed. Cl. 382, 395 (2000) *aff'd in relevant part by* 302 F.3d 1314 ("Because often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that the defendant's breach was a 'substantial factor' in causing the injury.").

26. Nevertheless, River Valley's losses here were the but-for result of the government's contract capital breach. *See* ¶¶ 101-120 (Facts), *supra*.

27. Each of the critical factors contributing to River Valley's inability to acquire SAFSB was rooted in the government's breaching disqualification of $20.1 million of River Valley's regulatory capital. *See* ¶¶ 101-120 (Facts), *supra*.

28. No regulatory impediments or restrictions unrelated to the government's breach constrained River Valley from acquiring SAFSB.

29. But for the breach, River Valley would have had ample regulatory capital and funds available to consummate the SAFSB acquisition within the River Valley structure. *See* ¶¶ 105-06, 111-12 (Facts), *supra*.

30. The breaching elimination of $20.1 million of River Valley's capital made it impossible for River Valley to finance the SAFSB acquisition on its own. *See* ¶¶ 103, 111-112 (Facts), *supra*.

31. The OTS Supervisory Agreement and increased regulatory scrutiny of River Valley in 1990 and 1991 were caused by the breach. *See* ¶¶ 90-92 (Facts), *supra*.

32. In turn, this increased regulatory scrutiny, and River Valley's breached-weakened capital position fueled American National Bank's refusal to lend River Valley the financing that the breach made necessary to acquire SAFSB (without the breach, River Valley would have acquired SAFSB with no outside funding). *See* ¶¶ 114-15 (Facts), *supra*.

33. Likewise, the breach was the single defining factor causing River Valley's equity value to decline between 1988 and the time that FSLIC repurchased its River Valley preferred stock. *See* ¶¶ 83-89, 164-65 (Facts), *supra*.

34. Before the breach, River Valley was hugely profitable, well capitalized, and met or exceeded all of the financial projections in its business plans. *See* ¶¶ 63-76 (Facts), *supra*.

35. The breach threw the thrift out of capital compliance, frustrated River Valley's plans for continued, profitable growth, and instead forced the thrift to shrink and to operate under an onerous capital plan. *See* ¶¶ 83-92 (Facts), *supra*; PPSF ¶¶ 56, 66, 68, 76, 130.

36. Changes in macroeconomic factors that occurred from the time of the pre-breach valuation of the FSLIC preferred at $6.5 million to its post-breach redemption at $3.65 million should have increased, not decreased, the shares' value over that period. Murphy Rep. at ¶¶ 39-42 (PX 606).

37. Similarly, the thrift's track record of profitability — especially in light of the specific terms of the preferred stock and its structure of escalating dividends — should have increased the value of the Series A preferred. *Id.*

**C. Reasonable Certainty**

38. "'Where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *National Australia Bank v. United States*, 452 F.3d 1321, 1327 (Fed. Cir. 2006) (quoting *Bluebonnet*, 266 F.3d at 1355). *See also, LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) ("when damages are hard to estimate, the burden of imprecision does not fall on the innocent party"); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002) ("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."); *Confederated Tribes v. United States*, 248 F.3d 1365, 1372 (Fed. Cir. 2001) ("a reasonable degree of approximation . . . is sufficient to support an award"); *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2000) ("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."); *accord Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521 (1960); *Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)); *Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed. Cir. 2002) ("The Supreme Court . . . [has] draw[n] a distinction between proof of the fact of damages, which must be established with at least reasonable certainty, and the amount of damages, which may be estimated, provided it is not merely speculative.") (citing *Story Parchment*, 282 U.S. at 563-64).

39. As the Court of Claims held in *Locke*:

> The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable. . . . Any other rule would enable the wrongdoer to profit by his wrongdoing at the

> expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery by rendering the measure of damages uncertain. Failure to apply (this rule) would mean that the more grievous the wrong done, the less likelihood there would be a recovery. The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

*Locke v. United States,* 283 F.2d 521, 524 (Ct. Cl. 1960) (emphasis added) (citations and internal quotations omitted);

40. The Federal Circuit urges the lower courts to award a "jury verdict" of approximate damages "where the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof." *Bluebonnet*, 266 F.3d at 1358; *see also Bluebonnet Sav. Bank v. United States*, 339 F.3d 1341, 1346 (Fed. Cir 2003) ("reiterat[ing] the point . . . that, at a minimum, jury verdict damages would be appropriate in this case"); *Suess v. United States*, 52 Fed. Cl. 221, 226 (*Locke* supports award of jury verdict damages even where lost profits held speculative).

41. Here, River Valley's lost SAFSB opportunity is readily quantifiable, and its losses in connection with that foregone acquisition reasonably certain. *See* ¶¶ 118-133 (Facts), *supra*.

42. As the Court of Claims has held, in a decision invoked by the Federal Circuit in the Winstar cases, the earnings an enterprise actually generated in the hands of a third party is "the best available proof on which to base an estimate of plaintiff's loss" of earnings from that same enterprise. *Neely v. United States,* 285 F.2d 438, 443-44 (Ct. Cl. 1961) (emphasis added); see also Cal. Fed., 395 F.3d 1263, 1268 (Fed. Cir. 2005) (citing *Neely*); *La Van v. United States*, 382 F.3d 1340, 1351 (Fed. Cir. 2004) (same).

43. By this standard, the $44.930 million that SAFSB earned as managed and disposed of by Western Capital Holdings, Inc. ("WCHI") and Western Capital Liquidating Trust

("WCLT"), is not only reasonably certain, but the "best available proof" of what River Valley would have earned had the breach not prevented its acquisition of SAFSB in 1992.

44. The $35 million that SAFSB earned as managed by WCHI prior to 1993 is also reliable proof of what River Valley would have earned as owner of SAFSB during that period.

45. Likewise, the $29.63 million in gains embedded in the bargain purchase price that WCHI paid for SAFSB provides the court with a reasonably certain, real world measure of the opportunity River Valley lost when the breach blocked its ability to acquire SAFSB. *See* Corrected Second Supplemental Expert Report and Declaration of Dr. Homer J. Holland ("Holland Second Supp. Report") at ¶¶ 6-9 (PX 603).

46. The government's own valuations of River Valley's stock also provide the court with a "fair and reasonable approximation" of River Valley's equity value at various points in time. *National Australia Bank v. United States*, 452 F.3d at 1327.

47. With the breach the most significant factor in causing a nearly 50% decline in the value of River Valley's preferred stock between 1988 and 1991, *see* Murphy Rep. at ¶¶ 39-42 (PX 606), the government's own assessment of that decline provides an excellent gauge for measuring the overall decline in River Valley's value as a going concern. *See Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) ("In estimating damages, a claimant may rely on reports and projections made by the wrongdoer itself."); *Super Valu Stores, Inc. v. Peterson*, 506 So. 2d 317, 330 (Ala. 1987) (awarding lost profits to an un-established business on the basis of projections that the defendant had prepared in the normal course of business).

**D. Benefit of the Bargain**

48. An award compensating First Bank for River Valley's lost SAFSB opportunity and the cost of partially mitigating the harm of the breach through the allocation of retained

earnings to replace the contracted-for regulatory capital would satisfy the goal of expectation damages to "place the injured party in as good a position as he or she would have been in had the breaching party fully performed." *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1021 (Fed. Cir. 1996) (quoting *Estate of Berg v. United States*, 687 F.2d 377, 379 (Ct. Cl. 1982)); *accord* Restatement (Second) of Contracts § 347 cmt. a (1981).

49. In addition to recovering the benefit of River Valley's bargain, First Bank is entitled to the incidental losses River Valley suffered as a result of the breach, including River Valley's mitigation costs. *See Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007); *see also* Restatement (Second) of Contracts § 347 (expectation damages restore to a breach victim the benefit of its bargain plus compensation for "any other loss, including incidental or consequential loss, caused by the breach"; *Id.* comment c ("[i]ncidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss").

50. The Federal Circuit has repeatedly held that the cost of mitigating a government breach is a recoverable form of damages. *Citizens Fed*, 474 F.3d at 1321 (upholding award of mitigation damages); *LaSalle Talman Bank, F.S.B. v. United States*, 462 F.3d 1331 (Fed. Cir. 2006) (same); *Home Savings*, 399 F.3d at 1353-54 (same); *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001) (non-breaching party entitled to the reasonable costs of "cover"); *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355-56 (Fed. Cir. 2001) (awarding increased financing costs associated with capital infusions required to keep the bank in regulatory compliance following the breach).

51. Likewise, the Federal Circuit has recognized repeatedly that capital has a cost, and that the costs of replacing the breached contract capital in *Winstar* cases are recoverable. *Citizens Fed.*, 474 F.3d at 1321 (upholding cost of capital replacement award); *Home Savings*,

399 F.3d at 1354 ("capital is not costless; its cost is the required rate of return on various terms of financing"); *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1374 (Fed. Cir. 2003) (explaining that "[a]ll capital raised by a corporation has a cost" and that "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings").

52. Further, the Federal Circuit has accepted a thrift's institution's cost of retaining earnings to replace breached regulatory capital as a valid measure of mitigation damages in the *Winstar* cases. See *Home Savings*, 399 F.3d at 1352 (upholding damages award measured in part by "rates [plaintiff's] investors would expect on retained earnings to replace the supervisory goodwill").

53. Dr. Holland's analysis of the cost River Valley incurred in partially mitigating the harm of the government's breach by allocating retained earnings to serve as a replacement for the contractual regulatory capital that the government's breach eliminated is fully consistent with the Federal Circuit's panel decision in *Bank of America*. *See generally*, *Bank of America v. United States*, __ F.3d __, 2007 WL 2137774 (Fed. Cir. July 26, 2007).

54. As an initial matter, the *Bank of America* panel decision could not and did not purport to alter the existing precedent of *Home Savings* and *LaSalle Talman*, each of which affirms an award of damages measured by the cost of allocating retained earnings to replace contracted-for regulatory capital. To the contrary, the *Bank of America* panel expressly acknowledged the validity of measuring damages by computing the cost of using retained earnings as a substitute for breach-eliminated regulatory capital — the panel analyzed and ruled on proposed refinements to the offset computation embedded with the *Bank of America* plaintiffs' retained-earnings claim. Id. at *4-*5. That analysis would plainly have been

unnecessary, and the panel would not have included it in its opinion, if the panel had intended to bar future claims for the cost of using retained earnings as substitute capital (as the government claims). Accordingly, *Bank of America* cannot foreclose Plaintiffs from presenting their cost-of-retained-earning claim here.

55. In any event, the *Bank of America* panel analyzed a claim that Plaintiffs here do not present — a claim for the cost of earnings "that the government['s] [breach] forced" the thrift to retain in order to "maintain its pre-breach position." *Id.* at *4. The Federal Circuit, accordingly, analyzed the case as one for the cost of "forced retained earnings," i.e., earnings that the thrift retained because of the breach but would not have retained absent the breach. *Id.* Plaintiffs here make no such claim. Dr. Holland's analysis is premised on the breach having caused River Valley to allocate its retained earnings — a sizable portion of which already existed within River Valley at the time of the breach — to support the assets and liabilities that the contracted-for regulatory capital would have supported absent the breach. Dr. Holland does not assume that that the government's breach forced River Valley to retain additional earnings; indeed, but for the breach, River Valley would have been larger and more profitable, and would have had even more retained earnings than it accumulated in the real world given the breach. Thus, Dr. Holland measures the cost of allocating — not building — retained earnings. Plaintiffs' claim, therefore, is not for the cost of "forced retained earnings," and the panel's decision is therefore inapplicable.

56. To the extent that the government claims that Judge Weise's opinion for the Court of Federal Claims in *Bank of America v. United States*, 70 Fed. Cl. 246 (2006) can be applied to Dr. Holland's analysis in this case, the government errs. Judge Weise grounded his rejection of Bank of America's retained earnings claim on a factual determination that Bank of America's

calculation "ignore[d]" certain "benefits [the thrift] actually received and in so doing drastically understate[d] the appropriate offset." *Id.* at 248. Specifically, Bank of America sought to compute the costs of retained earnings based on one amount of retained earnings, while computing the associated benefits on a different (smaller) amount. *Id.* Here, there is no such discontinuity in Plaintiffs' calculation, and Plaintiffs will show that Dr. Holland did not ignore any purported benefit to River Valley of allocating retained earnings to support the assets and liabilities the contractual regulatory capital would have supported absent the government's breach. Dr. Holland's calculation is not analogous to the calculation Judge Weise addressed, and Judge Weise's opinion is therefore off-point.

57. The Federal Circuit has also held that it is appropriate to rely upon U.S. Treasury bond rates to calculate an offset from the costs of replacing intangible contract capital with earnings generated by the investment of tangible replacement capital. See *Home Savings*, 399 F.3d at 1354 ("We agree with the Court of Federal Claims that this safe rate offset [based on the intermediate-term Treasury bond] 'account[s] for the difference between what was lost and what was substituted.'").

58. Here, First Bank seeks as damages its partial mitigation costs in replacing the breached contract capital with retained earnings. *See* Holland Third Supp. Report (PX 605).

59. As in *Citizens Federal* and *Home Savings*, there is no doubt that the breach foreseeably caused River Valley to incur costs in replacing its breached contract capital. *See* ¶¶ 83-85, 136-151 (Facts), *supra*; *Citizens Fed.*, 474 F.3d at 1320-21 (upholding trial court finding that "'it was foreseeable at the time of the contract that Citizens would have to replace the capital credit and goodwill in order to continue to be a self-sufficient institution' if the

government breached the 'regulatory goodwill' provisions of the Assistance Agreements" and that the breach was a substantial factor in causing the replacement).

60. Further, as it is derived from the government's own calculations of River Valley's cost of equity capital, *see* ¶ 140 (Facts), *supra*, First Bank's replacement capital model is a reasonably certain measurement of the cost to River Valley of retaining earnings to replace the breached contract capital over the course of its expected life. *See Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) ("In estimating damages, a claimant may rely on reports and projections made by the wrongdoer itself."); *Super Valu Stores, Inc. v. Peterson*, 506 So. 2d 317, 330 (Ala. 1987) (awarding lost profits to an un-established business on the basis of projections that the defendant had prepared in the normal course of business).

61. Moreover, as in *Home Savings*, First Bank here appropriately offsets the cost of replacing the intangible contract capital by subtracting the amount by which River Valley could earn by investing the replacement cash capital at the "safe" or "risk-free" rate of return. *See* ¶ 141 (Facts), *supra*.

62. First Bank's retained earnings damages claim is further supported by decades of decisions by the Supreme Court and Federal Circuit awarding government contract counter-parties their costs in using their own property for government purposes under circumstances where the government breached its promises to cover those costs itself. *See, e.g.*, *J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 1328 (Ct. Cl. 1972) (awarding plaintiffs "the rental value of [plaintiff's] equipment, machinery, and tools," which the Government used to complete a construction contract it improperly terminated); *S.S. Mullen, Inc. v. United States*, 389 F.2d 390, 391, 398 (Ct. Cl. 1968) (awarding an "equitable adjustment" to reimburse plaintiff for its increased costs of using its own tractor instead of a promised government tram to transport to the

job site materials needed to carry out a government construction contract); *George H. Whike Constr. Co. v. United States*, 140 F. Supp. 560, 563 (Ct. Cl. 1956) (holding that where the government, in order to obtain a lower contract price, represented that the contractor would not have to work overtime but then required the contractor to work overtime, the government had to reimburse the contractor's overtime labor costs); *William Cramp & Sons Ship & Engine Bldg. Co. v. United States*, 50 Ct. Cl. 179, 183, 189 (1915) (holding that where a government delay required the contractor to leave its ship-building facility idle for an extended period, the government had to pay the contractor the rental value of that facility); *Kennedy v. United States*, 24 Ct. Cl. 122, 143 (1889) (government must reimburse contractor for rental value of contractor's tools where following improper contract termination, government used contractor's tools to complete performance); *see also Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 248 U.S. 334, 343 (1919); *United States v. Buffalo Pitts Co.*, 234 U.S. 228, 235-36 (1914); *Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 725, 733 (1964); *Suburban Contracting Co. v. United States*, 76 Ct. Cl. 533, 544 (1932); *Int'l Harvester Co. of Am. v. United States*, 72 Ct. Cl. 707, 712, 718 (1931).

63. Here, River Valley was forced to retain earnings that could otherwise have been used profitably to generate growth and earnings instead to replace contracted-for capital that River Valley needed to maintain regulatory compliance. *See, e.g.*, ¶ 152 (Facts), *supra*.

64. Under longstanding Supreme Court and Federal Circuit principles, River Valley is entitled to recoup the costs of diverting those earnings to partially mitigate the government's breach.

Respectfully submitted,

/s/ David Bergman
David B. Bergman
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for plaintiffs
Holland and Ross and First Bank.

Of Counsel:

Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

Co-counsel for First Bank:

Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
Gunn and Gunn
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, Missouri 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

Dated: September 25, 2007

## CERTIFICATE OF SERVICE

I certify that on this 25th day of September 2007, I caused the foregoing **Plaintiffs' Memorandum of Contentions of Fact and Law** to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: September 25, 2007 /s/ Joshua P. Wilson
Joshua P. Wilson