**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, co-executor of the<br>ESTATE OF HOWARD R. ROSS,<br>AND FIRST BANK<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-524 C<br><br>(Judge G. Miller) |

**PLAINTIFFS' MOTION TO INTRODUCE AT TRIAL THE DEPOSITION TESTIMONY OF CERTAIN GOVERNMENT AGENTS AND DECEASED FACT WITNESSES**

Pursuant to the Rules of the Court of Federal Claims ("RCFC") Appendix A, ¶15(b) and this Court's Order of March 20, 2007, Plaintiffs hereby respectfully move for leave to introduce as substantive evidence at trial portions of the deposition testimony of government officials (1) Lawrence Kenny, (2) Ronald Karr, (3) Diana Januska, and (4) Larry Ferries, and deceased fact witnesses (5) Leo B. Blaber and (6) Howard R. Ross.

"Use of depositions as substantive evidence is normal in federal practice." *Ueland v. United States*, 291 F.3d 993, 996 (7th Cir. 2002) (Easterbrook, J). This is particularly so under circumstances where the deposition offered as evidence is the testimony of an opposing party or its agent, or the testimony of the deceased. *See* RCFC 32(a)(3)(A); Fed. R. Evid. 801(d); *Long Island Savings Bank, FSB v. United States*, 63 Fed. Cl. 157, 162-165 (2004) (in *Winstar* case, permitting for use at trial as substantive evidence deposition excerpts of government thrift regulators); *Globe Savings Bank, FSB v. United States*, 61 Fed. Cl. 91, 96 (2004) (same).

The Federal Rules of Evidence allow the introduction of deposition testimony of "party opponents," providing that " [a] statement is not hearsay if... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship...." Federal Rule of Evidence 801(d)(2)(D). "It is a 'widely accepted rule that admissions of a party-opponent under Rule 801(d)(2)(D) are accorded generous treatment in determinations of admissibility.'" *Globe*, 61 Fed. Cl. at 96-97 (quoting *Aliotta v. National R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003)). With respect to party opponents, no showing that a witness is unavailable to testify personally at trial is prerequisite to the introduction of that witness's deposition testimony as substantive evidence. *Long Island*, 63 Fed. Cl. at 163. Indeed, "the common law's preference for live testimony has no bearing on the use of party admissions as evidence." *Long Island*, 63 Fed. Cl. at 163.

Here, Plaintiffs seek to introduce as substantive evidence at trial portions of the deposition testimony of several current or former government officials, all of whom were employed by Defendant at the time of their depositions, and all of whom testified concerning matters squarely within the scope of their employment:

**1. Lawrence Kenny**

At the time of his deposition in February and March 2004, Mr. Kenny was a capital markets specialist with the OTS central regional office in Chicago. The portions of Mr. Kenny's deposition testimony submitted for inclusion as substantive evidence concern his experience as a regulator assigned to examine River Valley's capital markets investments. *See* Ex. 1 (Kenny Deposition Testimony Excerpts).

**2. Ronald Karr**

At the time of his deposition in July and August 2000, Mr. Karr was the director of the OTS central regional office in Chicago. The portions of Mr. Karr's deposition testimony submitted for inclusion as substantive evidence concern his experience supervising River Valley's regulation by the OTS. *See* Ex. 2 (Karr Deposition Testimony Excerpts).

**3. Diana Januska**

At the time of her deposition in August 2000, Ms. Januska was a policy analyst for the Federal Home Loan Bank of Chicago. The portions of Ms. Januska's deposition testimony submitted for inclusion as substantive evidence concern her experience in evaluating for the government the terms of River Valley's acquisition of the Galva, Home, and Mutual institutions. *See* Ex. 3 (Januska Deposition Testimony Excerpts).

**4. Larry Ferries**

At the time of his August 2000 deposition, Mr. Ferries was a field manager in the OTS central regional office in Chicago. The portions of Mr. Ferries' deposition testimony submitted for inclusion as substantive evidence concern his work as the FHLBB and OTS examiner principally responsible for supervising River Valley. *See* Ex. 4 (Ferries Deposition Testimony Excerpts).

The portions of the deposition testimony submitted for each of these individuals satisfies all requirements for admissible party admissions under Fed. R. Evid. 801(d)(2): all testimony submitted is (1) "offered against" Defendant, and (2) constitutes "statements by [Defendant's] agent[s] or servants[s]," (3) " concerning a matter within the scope of the agency or employment" (4) "made during the existence of the relationship." *See also*

*Globe*, 61 Fed. Cl. at 97 (setting forth requirements for party admissions); *Aliotta*, 315 F.3d at 761 (same).

The fact that these witnesses may also be called upon by the government to provide live testimony has "no bearing" on whether their deposition testimony may be used as evidence. *Long Island*, 63 Fed. Cl. at 163. "'The general rule that the witness must be shown unavailable for testifying in court does not apply to a party's use of his *party-opponent's deposition*...-for the simple reason that every statement of an opponent may be used against him as an *admission* without calling him ...; the opponent's sworn statement, though called a deposition, is no less an admission than any other statement of his. *Globe*, 61 Fed. Cl. at 95 (quoting 5 *Wigmore on Evidence* § 1415, at 243) (emphasis in original).

Accordingly, Plaintiffs respectfully request that the Court admit for use as substantive testimony at trial the deposition testimony of government agents Kenny, Karr, Januska and Ferries designated in Exhibits 1-4 attached hereto.

Separately, Court of Federal Claims Rule 32(a)(3)(A) provides that "[t]he deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds … that the witness is dead." In accordance with this rule, Plaintiffs here submit for use as substantive evidence at trial portions of the deposition testimony of two deceased fact witnesses whose testimony is important and relevant to Plaintiffs' damages claims: the deceased former Federal Home Loan Bank of Chicago principal supervisory agent Leo B. Blaber, and the late Plaintiff Howard R. Ross. *See* Exs. 5 & 6.

Respectfully submitted,

/s/ David B. Bergman
David B. Bergman
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for plaintiffs
Holland and Ross and First Bank.

*Of Counsel*:
Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

*Co-counsel for First Bank*:
Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
Gunn and Gunn
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, Missouri 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

Dated: September 25, 2007

## CERTIFICATE OF SERVICE

I certify that on this 25th day of September 2007, I caused the foregoing **Plaintiffs' Motion To Introduce At Trial The Deposition Testimony Of Certain Government Agents And Deceased Fact Witnesses** to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: September 25, 2007 /s/ Joshua P. Wilson
Joshua P. Wilson

**RON KARR DEPOSITION EXCERPTS FOR USE AT TRIAL**

p. 6, lines 2-3
p. 7, lines 14-20
p. 11, lines 11-25
p. 12, lines 1-5, 19-25
p. 13, lines 1-11
p. 15, line 25
p. 16, lines 1-2, 12-25
p. 17, lines 1-9
p. 18, line 2 - p. 23, line 23
p. 28, line 9 - p. 29, line 18
p. 29, line 19 - p. 31, line 11
p. 31, line 23 - p. 32, line 24
p. 38, lines 2-20, 21-25
p. 39, lines 6-25
p. 40, line 1 - p. 44, line 19
p. 46, line 7 - p. 50, line 22
p. 51, line 18 - p. 53, line 18
p. 54, lines 9-25
p. 55, lines 8-17
p. 66, line 16 - p. 69, line 1
p. 71, line 22 - p. 72, line 2
p. 76, lines 1-11
p. 80, line 3 - p. 81, line 1
p. 81, line 8 - p. 88, line 8
p. 88, line 13 - p. 89, line 14
p. 92, line 2 - p. 95, line 9
p. 96, line 4 - p. 98, line 15
p. 101, line 24 - p. 104, line 1
p. 112, line 17 - p. 113, line 14
p. 149, line 1 - p. 150, line 14
p. 158, line 3 - p. 159, line 13
p. 162, line 21 - p. 163, line 5
p. 164, line 20 - p. 165, line 14
p. 193, line 18 - p. 194, line 10
p. 250, line 17 - p. 252, line 3
p. 255, line 25 - p. 256, line 12
p. 257, lines 3-17
p. 263, line 7 - p. 264, line 2
p. 264, line 23 - p. 266, line 13
p. 269, lines 14-22
p. 278, line 21 - p. 279, line 16
p. 280, lines 4-19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

```
BANK OF AMERICA, FSB,         )
et al.,                       )
                              )
          Plaintiffs,         )
                              )
     vs.                      ) Case No. 95-660C
                              )
UNITED STATES OF AMERICA,     )
                              )
          Defendant.          )
------------------------------)
HOMER J. HOLLAND and HOWARD   )
R. ROSS,                      )
                              )
          Plaintiffs,         )
                              )
     vs.                      ) Case No. 95-524C
                              )
THE UNITED STATES OF          )
AMERICA,                      )
                              )
          Defendant.          )
```

AMERICAN CAPITAL CORPORATION)
and TRANSCAPITAL FINANCIAL )
CORPORATION )
Plaintiff, )
)
vs. ) Case No. 95-523C
)
THE UNITED STATES, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 12, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For Plaintiffs Bank of America and American Capital:

RACHEL L. BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C, 20005
(202) 220-9670

For the U.S. Department of Justice in Case No. 95-660C:

TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Deposition of RONALD NEAL KARR taken by the Plaintiff at 101 North Wacker Drive, Suite 1600, Chicago, Illinois, on the 12th day of July, 2000, at the hour of 9:00 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

CONTENTS

| The Witness: RONALD NEAL KARR | Examination |
|---|---|
| By Mr. Cayne | 6 |

INDEX OF EXHIBITS

| For the Plaintiff | Page |
|---|---|
| 1 | 78 |
| 2 | 108 |
| 3 | 124 |
| 4 | 124 |
| 5 | 138 |
| 6 | 146 |
| 7 | 154 |
| 8 | 154 |
| 9 | 160 |
| 10 | 162 |
| 11 | 186 |
| 12 | 194 |
| 13 | 201 |
| 14 | 204 |
| 15 | 221 |
| 16 | 238 |
| 17 | 238 |

Whereupon, RONALD NEAL KARR, having been duly
sworn, was examined and testified as follows:

MATERIAL REDACTED

MATERIAL REDACTED

Q. What is your current employment, Mr. Karr?

A. I work for the Office of Thrift Supervision. I'm the regional director of the central region.

Q. Is that in Chicago?

A. Yes.

MATERIAL REDACTED

Q. Are savings and loan examiners commissioned, similar to national bank examiners?

A. They are, yes.

Q. When did you receive your commission?

A. Actually, the Federal Home Loan Bank Board didn't begin its commissioning program until I think it was about 1986 -- '85, '86. When they started the program, I became commissioned then.

Q. Back in 1974, when you originally became an examiner, what was your official title?

A. Well, I started as a GS-7. Assistant examiner is what that position was called. I progressed through 1979 to a GS-12.

Q. What were your functions and duties as

an assistant examiner?

A. In doing examinations of savings and loans, I assisted more senior examiners in doing the various programs, in examining various functions of a savings and loan.

MATERIAL REDACTED

Q. And for how long did you hold the position of assistant examiner?

A. For a year.

Q. And then what position did you obtain?

A. I moved to a GS-9, which was examiner, held that for a year. Went to GS-11, held that for a year. Went to GS-12, which is journeyman

examiner.

Q. What were your duties and functions as a journeyman examiner, and when did you begin that position?

A. In 1979. Duties of a journeyman examiner are to be examiner in charge of any kind of an institution, any size; to run the examination, write the examination report, make the conclusions as to what you found at the examination, include those in the report, and transmit that to my superiors.

MATERIAL REDACTED

MATERIAL REDACTED

A. I left the bank board on August 30th of

1984 and began employment with the Federal Home Loan Bank, Seattle, on September 1st, 1984.

MATERIAL REDACTED

Secondly, it was a promotion, and it gave me an opportunity to get more involved with the direct examination and supervision of institutions, as opposed to the administrative functions, which I found more challenging.

Q. And when did you begin your position at the Federal Home Loan Bank?

A. September 1st, '84.

Q. Your title at that time?

A. Initially supervisory analyst. Within a few months I was titled supervisory agent for the Federal Savings and Loan Insurance Corporation.

Q. What were your duties and

responsibilities?
A. I had a caseload of savings institutions that I was responsible for the supervision of.
Q. How many institutions?
A. Approximately 50.
Q. How many of those were problem institutions, approximately?
A. A dozen.

MATERIAL [illegible]

MATERIAL REDACTED

Q. Did you report to Mr. Dochow for the remainder of your tenure at the Federal Home Loan Bank, Seattle?

A. No. I believe in the fall of 1987, Mr. Dochow went to Washington, D.C., as director of examinations and supervisions of the Federal Home Loan Bank Board, and Dennis Halvorson was hired by the Federal Home Loan Bank, Seattle, to replace him. I reported to him.

Q. For how long did you report to Mr. Halvorson?

A. Until sometime in the middle of '89, I believe it was. Maybe early '89. I can't remember the exact dates. It was in -- sometime in the early part to the middle part of '89, and then Mr. Halvorson left the Federal Home Loan Bank.

Q. Who did you report to next?

A. I took over his position, and I reported directly to James Faulstich, who was the president of the bank and principal supervisory agent.

Q. And what was your title at that point?

A. Executive vice president, director of

regulatory affairs.

Q. Prior to that promotion, had you been a supervisory agent for the entire period after --

A. I had that title. I was a supervisory agent through all those positions -- through all that time period.

Q. Did you hold any other positions during the interim period, other than supervisory agent?

A. Well, supervisory agent is a designation given by the FSLIC that authorizes you to act on their behalf as an employee of the Federal Home Loan Banks. My title at the Federal Home Loan Bank changed from supervisory agent, assistant vice president, to vice president, to senior vice president, to executive vice president. And at one point -- this would have been about 1986 -- I became manager of the supervisory activities department. I supervised all of the supervisory agents that had caseloads.

We split the supervision responsibilities in 1986 into two groups. One was called the mergers and acquisitions department. One was called the supervisory activities department. I was in charge of the supervisory activities department. Pat McJoynt

was in charge of the mergers and acquisitions department. We split the caseloads so that all of the problem institutions that were near failure or needed rehabilitation were transferred to the mergers and acquisition department, and those people focused specifically on those.

Supervisory activities department kept all of the other cases and did the day-to-day examination and supervision and hopefully prevented them from ever having to be transferred to the mergers and acquisitions department.

Q. So in 1989, was it, you began to report to Mr. Faulstich directly; is that correct?

A. Yes.

Q. How long did you remain in that capacity?

A. Until August 9th, if that's the day that FIRREA was passed. And at that point, FIRREA effectively split all of the regulatory staff of the Federal Home Loan Bank's off and created the Office of Thrift Supervision. I think the actual effective date of the Office of Thrift Supervision was October 9th. It was a transition period.

In that transition period I became the

acting principal supervisory agent in the Seattle district, and I reported directly to Darryl Dochow.

Q. Now, you said for the transition, 60-day transition period?

A. Yeah.

Q. What was your position on and after October 9th, 1989?

A. I was director of agency functions for the Seattle district on October 9th.

Q. What did that position involve?

A. I was in charge of all of the examination and supervisory activities of the district.

Q. How long did you hold that position?

A. For about 20 days.

Q. What happened in 20 days?

A. I was transferred to Topeka, where I took over the same position in charge of the Topeka district.

Q. Who did you report to in Topeka?

A. To Darryl Dochow.

Q. This would have been in?

A. 1989.

Q. November 1989?

A. I think my official date in Topeka was October 25th. So approximately that time period. We moved into our house in Topeka on November 12th. I remember that.

Q. And over what states did the jurisdiction of the Topeka bank for the Topeka office run?

A. We had Oklahoma, Kansas, Nebraska, and Colorado.

Q. Now, were you the primary person within the Topeka office at that time responsible for thrift supervision?

A. Yes, I was.

Q. And at that time what did that involve, the duty of being in charge of thrift supervision?

A. I supervised the activities of that office in conducting examinations and supervision of the thrifts in those four or five states.

Q. Is that both healthy thrifts and problem thrifts?

A. Yes.

Q. Were you involved in the closure of savings and loan associations?

A. Yes.

Q. And at appointment of the RTC as receiver?

A. Yes.

Q. How long did you hold the position in Topeka?

A. Until approximately September of 1991.

Q. And what happened in September 1991?

A. I transferred here to Chicago.

Q. What was your position in Chicago?

A. Initially, when I started here, it was regional deputy director. I reported to Stuart Brafman, who was the regional director.

Q. And how long did you hold that position?

A. Until May of '92, when I became regional director.

Q. And can you describe -- is that the position you hold today?

A. Yes, it is.

Q. Can you describe that position?

A. I'm responsible for supervising the entire examination and supervisory activities of the central region.

MATERIAL REDACTED

A. Supervisory goodwill was goodwill that was allowed in assisted transactions to be accounted as capital.
Q. As regulatory capital, correct?
A. As regulatory capital.
Q. Is supervisory goodwill otherwise allowed to be accounted as regulatory capital during that time period, other than in supervisory acquisitions?
A. I think by definition, supervisory goodwill was allowed to be -- was the only kind that was allowed to be capital; the only kind of goodwill that was allowed to be capital.
Q. Did you ever have occasion to deal with, during your time at Federal Home Loan Bank, Seattle, what is known as capital credits?
A. I don't know what you mean by "capital credits".
Q. When you came to the Federal Home Loan -- it wasn't called the Federal Home Loan Bank, Chicago, when you came to it, correct? You came to the Chicago office of the OTS?
A. Yes.
Q. And how many institutions were under your jurisdiction when you first arrived?

A. I think there were about 580, 590; somewhere in that range.

Q. Can you describe for me when you arrived how the office was organized? You reported to who?

A. When I came here to Chicago, I reported to Stuart Brafman, who was the regional director.

Q. And who did you replace in your position? Who had your position prior to --

A. I didn't replace anyone. It was a new position.

Q. What position did Leo Blaber have? Was he ever with the OTS?

A. No.

Q. He left prior to you?

A. Leo Blaber was the president of the Federal Home Loan Bank, Chicago.

Q. Okay, and he stayed with the Federal Home -- did he stay with the Federal Home Loan Bank, Chicago, subsequent to FIRREA?

A. Yes.

Q. And how was the office organized under you when you first arrived? What position reported to you?

A. When I came to Chicago, it was at the

request of John Downey and Tim Ryan. John Downey was the head of supervision in D.C. Tim Ryan was director of OTS. They had worked out an agreement with Mr. Brafman for his departure in the early part of 1992. Mr. Brafman was going into a new business venture with a partner or an old friend of his.

When I came in, it was to familiarize myself with the region and to prepare for taking over as regional director, upon Mr. Brafman's departure.

MATERIAL REDACTED

A. I was asked to take over when he left. So I came in September. I reported to Mr. Brafman. He and I worked together on various

issues. No one directly reported to me except my secretary during that time period. Once I became regional director, then everybody did.

Q. And when did you begin, the date?

A. It was in May.

Q. Of '92?

A. Of '92.

Q. So can you describe for me your duties during this initial period, from November '91 through May '92?

A. As I said, I worked with Mr. Brafman. He familiarized me with the region, with the people in the region, with the activities that he was -- he was involved with.

I also tried to work with other regional deputies in regard to some of their major issues and some of their major cases to familiarize myself with what those cases were and what they were about.

Q. Now, you were responsible for all thrifts in the Chicago district, correct, not just healthy ones or not just problem ones; is that correct?

A. Right.

MATERIAL RES...

Q. Of the members of your staff who would have briefed you on River Valley, would that have been Mr. Biedron?

A. Yes.

Q. And do you recall your first briefing on River Valley?

A. No, I don't.

Q. What do you first recall learning about River Valley, whenever that briefing might have occurred?

A. I don't have a good recollection of any of the briefings, of any of the institutions. That happened eight years ago. I know that I had them, and this -- what I recall about River Valley is it was a shop that Mr. Biedron had confidence was going to become a well-operated institution and solve its problems. It had some work to do, some issues that had to be resolved, and they were working on those.

Q. Do you recall whether River Valley had supervisory goodwill either when you arrived or prior to the enactment -- when you arrived at the Chicago office or prior to the enactment of FIRREA?

MATERIAL REDACTED

A. I believe it did, yes.

Q. Do you recall how much that was?

A. No, I have no idea.

Q. Do you recall what effect FIRREA had on that supervisory goodwill?

A. Well, FIRREA eliminated supervisory goodwill from being counted as capital. So anybody who had any had that impact by FIRREA.

Q. And do you recall offhand what effect -- what was the immediate effect on River Valley's operations of the enactment of FIRREA?

A. The immediate effect was in 1989. I wasn't in Chicago in 1989. I have no idea what the immediate effect on River Valley was.

In 1991 when I came, and in 1992 when I took over as regional director, they were meeting their capital requirements, as I recall.

Q. Was the institution, during your tenure at the Chicago office of the OTS, subject to any supervisory enforcement actions?

A. I believe there was a supervisory agreement in place on River Valley.
Q. And do you recall why that supervisory agreement was issued?
A. No.
Q. That's too long ago?
A. I didn't issue it.
Q. It was before your --
A. It was before me.
Q. Did you ever meet Mr. Ross and Mr. Holland?
A. Yes.
Q. When did you first meet them?
A. I don't remember specifically, whether it was in the fall of or early winter of '91, or whether it was in '92. It was during my first months in Chicago, that time period.
Q. Do you recall the purpose of the meetings during which you met them?
A. Not specifically. When -- and I -- I know I met with Mr. Holland on more than one occasion. I only remember Mr. Ross maybe once, and I'm not even -- I'm not sure I can remember what he looks like, but I'm pretty sure I met him.

Mr. Holland I met with maybe three or four times over the time span. As I recall, our meetings were usually in regard to talking about what was going on at his institution.

Q. Do you recall, again, before we look at documents to refresh your recollection, issues that were going on with his institution after you arrived at the OTS Chicago office?

A. I don't have a good recollection of the specifics. I have a vague recollection that one of the primary issues at River Valley had to do with a large portfolio of derivative products that exposed them to some substantial amount of interest rate risk and that they were working down that portfolio.

Q. Do you recall at the time dealing with officials at the Federal Deposit Insurance Corporation Chicago office concerning that portfolio?

A. Working with the FDIC?

Q. Dealing with officials in the FDIC, either by phone or correspondence, relating to the portfolio to which you just referred.

A. Yes, vaguely.

Q. Simona Frank?

A. Simona Frank was the regional director at the time, yeah. And I think -- I think -- I think that we had different opinions as to whether or not the portfolio should be classified or not.

Q. What do you remember, sitting here before you look at any documents to refresh your recollection, as to your difference of opinions? And I understand, it was eight years ago.

A. I'm not so sure it's just River Valley. At that time period, we had -- I mean, the FDIC took a position that products that -- derivative products in particular that represented interest rate risks issues to institutions should be classified, and classified meaning that they present safety and soundness risks to the institution that require more capital, other things, okay?

We disagreed that -- with the FDIC that you classify residuals because based on -- based on the fact that they represented interest rate risk. If they represented credit risk, we would agree that they needed to be classified. That our classification policies of both agencies indicated that we should only classify assets

based on credit issues, not interest rate risk issues, and I think we had that same issue with River Valley.

Q. And this was an issue that -- between the -- am I correct this is an issue that was between the agencies, OTS and FDIC, rather than being an issue between you and Ms. Frank?

A. Oh, yeah, it was -- I had it in Topeka. I had it in Chicago. They had it all around the country.

Q. When did this issue first surface?

A. I think in the '90s.

Q. Early '90s?

A. Yes. As soon as the FDIC got involved with the examination of some of these institutions, which was somewhere in the '90s, that was one of the issues that came up as far as our viewpoints on how to examine and how to deal with derivative products.

Q. So when you said --

A. It was a philosophical difference between the agencies.

Q. When you said the FDIC first got involved, you are referring to after August 9, 1989, when the FDIC had a formal examination role

with respect to institutions for which the Office of Thrift Supervision was the primary federal supervisor?

A. That's correct.

Q. So it's probably sometime starting perhaps in late '89 this issue first bubbled to the surface?

A. They didn't actually start doing their examinations until 1990. Until they got in and started taking the positions, it didn't really become an issue. I don't think they did any joint examinations with us -- I don't recall any in 1989.

Q. Perhaps then this issue came to the surface sometime in 1990?

A. That's my recollection.

Q. Do you recall dealing with this issue during your time in Topeka?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I believe you indicated, if I understood, that because the FDIC and the OTS had different views on this specific issue, it could cause the results of an FDIC safety and soundness examination to differ in certain aspects from the results of an Office of Thrift Supervision safety and soundness examination, correct?

A. That's right.

Q. Now I'm asking in what specific ways could the differences between the agencies on this particular issue cause the examination -- safety and soundness examinations conducted by the two agencies to differ?

A. Well, on derivative products we would look -- the OTS would look at those products from two aspects; is there credit risk and is there interest rate risk, and are they being well managed, obviously.

If we didn't find credit risk in the

derivative products, we would only look to the risk -- the interest rate risk that they posed and make a judgment as to how significant that was or not. And we would base our conclusions on interest rate risk.

The FDIC looked at those same products and would, because of the interest rate risk, would classify those assets. We would not. Once they classified the assets, they would view them as having asset quality problems. We did not unless there was credit risk involved. If there was credit risk involved, then we would view them as having asset quality problems.

Now, if you classify an asset, in most cases, based on reserve policies, an institution would be required to add to its general loss reserves because of the additional classifications.

So having classified derivative products could increase the amount of reserves required. And if you add reserves, you're going to impact earnings, because it comes out of earnings or it comes out of capital. And you can have those impacts.

So those are the kinds of things that

can happen in that kind of a situation. So the result could be that we would class- -- just view interest rate risk as an issue and not classify them, and our rating of that area might be adverse or not, depending on the amount of that risk. And we would reflect that only in that part of the CAMELS rating that relates to interest rate risk.

The FDIC would not only impact its rating on interest rate risk but would look at asset quality, and that also could impact capital, and it could impact earnings. So it could have a wider range. And we also have to look at whether or not we were double-hitting for the same issue.

Q. Can you explain to me -- the term you just used was double-hitting?

A. Yes.

Q. I'm not familiar with that term. What do you mean?

A. If you adversely rate one area of an institution's operations, essentially you try not to take that same issue and impact another one with it, unless there is a direct and clear correlation that creates a relationship where you

should use both of them.

For example, interest rate risk; if you don't -- if you classify -- if you hit them for interest rate risk and you say this has an impact on earnings, okay, and then you also take that same asset and say I'm going to classify it because of credit risk when there is no credit risk, and you hit asset quality, and then you make them do GVAs -- general valuation allowances -- and that takes earnings. Now you've hit them twice on the ratings for the same issue. You try not to do that unless there are direct and clear relationships that you need to do it with.

Q. Do I understand correctly, Mr. Karr, then, one of the differences between the FDIC's approach and the approach of the Office of Thrift Supervision is in dealing with these derivative products, correct? We're dealing with derivative products here?

A. Yes.

Q. The OTS approach did not involve double-hitting, but the FDIC approach did result in double-hitting; is that correct?

A. It could.

Q. In your opinion did it?

A. In some cases, yes.

Q. Explain to me, so I'm clear, how in some cases did the FDIC's approach result -- let's make it specific. I think I understand now, based on your explanation, what double-hitting is. Explain to me why the OTS approach did not result in double-hitting, but why the FDIC approach could result in double-hitting?

A. If we don't classify the asset, we're not going to require more GVAs.

Q. "We," the OTS?

A. Right. As soon as you classify that asset, you're going to need more GVAs, and that's going to double-hit the same issue, a derivative product that shows only one kind of risk, interest rate risk. You're going to double-hit an adverse rating on two different factors.

Q. So the report is clear, please give me an example where the approach followed by the FDIC would result in what you call a double-hit.

MATERIAL REDACTED

MATERIAL REDACTED

A. If you classify derivatives for credit risk because of interest rate risk, you're going to give them a different rating for asset quality because you classified them for interest rate risk. You're also going to hit the rating for interest rate risk because you're taking that into consideration, too. So you've taken the same asset and double-hit it in two different

ratings categories.

Q. So in the FDIC approach -- how long did this issue continue for, the issue between the two agencies? Does it continue today, for example?

A. No, it doesn't.

Q. When was it resolved?

A. It sort of evolved out of -- I don't know specifically when it went away. We dealt with it for a few years. We had our position. The FDIC had their position. We agreed to disagree, which we do on some things, and I don't recall that we have this -- I don't -- I haven't had a discussion with my FDIC colleagues on this issue for a long time.

Q. What was the period that you recall the issue being present? Was it approximately '92 to '94 or '95?

A. It was the early '90s.

Q. Early '90s?

A. Yes.

Q. And does the Office of Thrift Supervision continue to follow the same position on this issue or has it changed its position?

A. We will not today classify an asset

because of its interest rate risk. We classify them because of credit risk.

Q. Today, July of 2000, that continues to be the position of OTS?

A. That's right.

Q. And when the Federal Deposit Insurance Corporation examines institutions subject to your supervision, Mr. Karr, does it take that position today, or does it still take its former position?

A. I have no recollection of any differences of opinion on that issue at any of our recent exams over the last few years. We agree.

Q. So the FDIC now agrees with the OTS on this issue?

A. You'll have to ask them if they agree with us. We have not had any differences of opinion with my colleagues.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did you have any discussions with your colleagues at the FDIC concerning this issue?

A. Yes.

Q. With whom did you have discussions concerning this issue?

A. Simona Frank.

Q. And what were the nature of those discussions?

A. We simply explained our positions on each of them. We took the position that we would -- that we dealt with the interest rate risk piece. We would not classify them if there wasn't a credit risk.

Q. And Ms. Frank took what position during your conversations?

A. They took the position that they would classify them for interest rate risk.

MATERIAL REDACTED

Q. Please state your understanding of their position.

A. That they would classify derivatives based on the interest rate risk.

Q. When you say "derivatives," when you use that term, what do you mean by that term?

A. A derivative is a financial product that is derived from another product, like an interest-only strip, a principal-only strip, a cash flow residual; that type of product.

MATERIAL REDACTED

Q. When would your internal policies and procedures call for you to see the reports? For example, the CAMEL rating system you referred to, that's still a 1-to-5 rating system, correct?

A. Yes.

Q. 1 being the best and 5 being the worst?

A. Yes.

Q. In the Office of Thrift Supervision during the period '92 to '95, would problem institutions be institutions that were assigned a

composite rating of 4, 5, or 3, 4, or 5? Do you recall?

A. Say that again.

Q. I'm asking what ratings would designate a problem institution? I know a 5 would be a problem institution, on the verge of failure, and -- is that correct?

A. Yes.

Q. I think I understand that a 4 would designate a problem institution, correct?

A. That's correct.

Q. I'm unclear whether a 3 rating -- an institution receiving a 3, would that be considered a problem?

A. The answer is yes or no -- yes and no. It depends on what the 3 is relative to whether you would consider it a problem. A 3 typically indicates there are issues that need to be resolved, but you expect they be through normal day-to-day management. So it's -- it could be a deterioration, it could be -- someone could be a 3 because they've deteriorated from good. They could be a 3 because they've improved from a 4. So the 3 is relative, based on what the merits of the case are.

Q. So in a particular case -- am I correct, then, in a specific case, you may or may not consider a 3 institution to be a problem institution?

A. That's correct.

Q. And with respect to 4s and 5s, would you in all cases expect to receive a copy of an examination report for a 4 or 5 rating institution?

A. Would I expect to?

Q. Would your internal policies and procedures call for your staff to provide you with a copy of an examination report either in final or draft form for an institution that received a rating of a 4 or a 5?

A. They don't specifically say if it's a 4 or 5, regional director is going to get a copy, but I always do.

Q. What about with respect to a 3?

A. Only if it was something that I needed to see. More likely I would just be briefed on what the issues are that cause a 3, and I probably wouldn't be reading the entire report. I might be given drafts of the comments that relate to the sections that describe why a 3

rating is given, but maybe not a whole report.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you generally consider an institution with a 2 rating to be sound?

A. Yes.

Q. Without significant supervisory

problems?

A. That's correct.

MATERIAL REDACTED

Q. Does your office ever terminate supervisory agreements?

A. Oh, yes.

Q. Under what circumstances will the office terminate a supervisory agreement?

A. When the issue at hand has been resolved and the track record proves they remain resolved.

Q. How long a track record is required?

A. Depends on the case, depends on the issue.

ATERIAL REDAC

MATERIAL REDACTED

Q. And you see the supervisory criticisms set forth in this letter?
A. Yes.
Q. Do you recall, with respect to Peoria, whether the Office of Thrift Supervision shared these concerns at the time you arrived in the fall of 1991?
A. This document is dated February 13th, 1991. I don't know whether the regional office shared those concerns in February of '91 or not.
Q. No, I was asking whether your office shared those concerns in the fall of 1991, at the time you arrived.
A. My recollection is that when I arrived, there was only one institution; and my recollection is that the issues at that time related to just their derivative portfolio. That was the primary concern. That's my recollection.
Q. That was the issue you discussed earlier in which the Office of Thrift Supervision and FDIC had differences of view?
A. That's my recollection, that we had a difference of opinion as to the classification of

the derivatives, yes.

MATERIAL REDACTED

Q. How did that process interrelate with the examination process conducted by the FDIC with respect to thrift supervisions under the jurisdiction of the Chicago regional office?

A. Following the passage of FIRREA, the FDIC was given the backup examination authority, and they took it upon themselves that they needed to examine each and every savings institution under our jurisdiction as soon as they possibly could. And they did that over a -- I think it was a two-year time frame; so examined each and every one.

Most of the time they tried to do those concurrently with us. If we were doing an exam, they would do it at the same time we did. If schedules didn't work out, they might have done a separate examination.

Once they did that first round of doing

every -- every institution, then they conducted examinations with us on -- essentially on an as-needed kind of basis. There were significant safety and soundness concerns that posed a threat to the insurance fund. They could either do an independent examination on their own, or they could join us for an exam. Typically they joined us for an exam. We did concurrent exams.

Q. In the situation where concurrent exams were performed, would a joint report be issued, or would each agency issue its own separate report relating to that institution?

A. We always -- we did not do joint reports. I can't remember ever doing a joint report.

OTS will issue its own report, and as it's required to do, at the completion of an examination. The FDIC has an option. They can either complete a report of their own or not, and they can either provide it to the institution or not. And they decide that.

Q. When a concurrent report of examination was conducted during this period of '92 through '95, would both agencies have its examiners physically on site at the particular institution

at the same time?

A. On a concurrent exam?

Q. On a concurrent exam.

A. Yes.

Q. And would the examiners of the two agencies divide and share tasks, such as examiner X will look at ten loans, examiner Y will look at ten loans? Or did they separately review loan portfolios and the other operational areas of the bank?

A. It depended. Sometimes it was a complete division with no overlap. Other times there would be some overlap. It depended on what the issues were.

Q. Was one framework more generally used, either sharing resources or separately reviewing each aspect of the institution's operations?

A. Well, it depends on the institution. Since most of them were healthier -- on the healthier institutions, the nonproblem institutions, it was -- I count on the fact there was a division of duties and no overlap. Where there were significant issues, there would be some overlap and continues today. If you're going to register your own opinions, you've got

to look at the documents.
Q. At what level were the examinations coordinated? Was that at the EIC level, field manager level, assistant director level?
A. Where was it coordinated?
Q. Yes.
A. Field manager level.
Q. Is that also the level at which the decision was made, the initial decision was made to conduct a concurrent examination?
A. Typically no. It would have been made at a level above that to do a concurrent examination. In fact, today, in today's world, the FDIC regional director will issue me a written request to join, if they wish to join, and give me the reasons why. Or I will issue a written request to them to join us and tell them why we want them to join us, if -- and it can go either way. But it's between the regional directors.
Now, obviously regional directors are being advised by staff as to whether we need to do that. Typically today the only time we do concurrent examinations is if an institution is rated 4 or worse. On some occasions we will do

3-rated institutions jointly. We don't do many concurrent examinations these days. We used to do lots of them.
Q. In the '92 to '95 period, there were lots of them?
A. Yeah, there were several then.
Q. When a concurrent examination was conducted, did the FDIC and OTS examiners share with each other their draft examination reports?
A. Yes.
Q. Usually in all cases?
A. Yes.
Q. Was there an opportunity or typically dialogue between the agencies, either you're being too harsh or too easy on a particular point? Was there any, for example, negotiation between the agencies on what the reports would state?
A. We always tried to look at things from the same perspective and come to the same conclusions, if possible. That starts at the examiner level and works its way up through the supervisors' levels.
There are some issues that we have differences of opinion on and different

philosophies and policies on, and we come to different conclusions on those, the classification of derivatives being one of those.

Q. You talked -- used a term "CAMEL ratings" earlier.

A. Right.

Q. That stands for capital asset management earnings and liquidity?

A. And now the S is sensitivity.

Q. Each one of those areas would be assigned a rating of 1 to 5, correct?

A. Yes.

Q. Then there would be an overall composite rating?

A. That's correct.

Q. During the period 1992 through 1995, am I correct the OTS and the FDIC use CAMEL ratings?

A. We started with what we used to call MACRO ratings, and then -- I can't remember the exact date, sometime in the early '90s -- went to the CAMELS designation. MACRO means the same thing as CAMELS, just different acronym.

Q. At the time the OTS used the CAMEL rating system, do I understand that although this wasn't necessarily successful in all cases, there

would be an effort to see whether the agencies could agree on the same ratings for the CAMEL factors and the overall composite ratings?

A. According to our interagency agreement on concurrent examinations, it was we were supposed to try to come to a concurrence as to what the findings would be. If we couldn't, we agreed to disagree.

Q. And based on your experience and your position as regional director, were you generally successful in that effort of reaching concurrence with the FDIC in specific examinations as to the CAMEL ratings that would be assigned to the institution under examination?

A. Were we generally successful in coming to the same rating?

Q. Yes.

A. Is that what the question is?

I think there is two things that have to be said to that. One is yes, I think we were generally successful in coming to agreement on the ratings. But secondly, yes, we -- even in those cases where we didn't come to agreement on what the actual rating was, that we were in agreement as to what the supervisory issues were

and how they would be addressed through the supervisory process. And as long as we were comfortable with the actions that were taken, the ratings differences weren't significant to us.

Q. Do I recall correctly that you indicated, before the actual coordination of the examination would occur at the field manager level?

MATERIAL REDACTED

A. Right.

Q. Now, in the situation where it turns out that the agencies were not seeing eye to eye on the CAMEL ratings to be assigned, in that situation, would the level at which the decisions were made as to the CAMEL ratings, would that rise at the two agencies to higher levels?

A. Yes. Ratings -- ratings work like this: The EIC recommends ratings to the field manager. The field manager recommends ratings to the AD. The AD has the authority to finalize those and can do it at that level.

If there is an issue in regard to the

ratings, or a difference between what the field manager has recommended to the AD and what the AD thinks it will be, the AD will usually consult with the regional deputy director to make sure, if there is going to be a difference.

If a rating is ever changed by a senior person in the chain, they go back and get concurrence with those ratings from everyone below. Or if we can't get concurrence, a written description as to why there is no difference. But ultimately it gets to -- the regional deputy director has a final say only subject to my override. I've never overridden a regional deputy director.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Is it always the case that when there is a disagreement on ratings between the two agencies, either composite or individual CAMEL ratings, that the FDIC takes the more adverse view?

A. Is it always the case?

Q. Yes. I'm asking you, as a factual matter, has it proven to always be the case where the two agencies have disagreed as to the appropriate composite or individual component CAMEL ratings to be assigned to a particular agency, that that disagreement has involved a situation where the FDIC has taken a more adverse view as to the appropriate classification than the OTS?

A. I think that's accurate. I can't recall any situation where we've taken the more adverse position.

Q. Do you know why that's the case?

A. My opinions; a couple of thoughts that I have, yes, as to why that is the case.

Q. Why do you believe that to be the case?

A. When FDIC first got its backup authority to examine thrifts, they didn't

understand thrifts. Their whole experience was examination of commercial banks. Thrifts are different. Thrifts have different assets. Thrifts make home loans. Their portfolios are composed primarily of single-family residential loans, and the FDIC initially looked at those portfolios as being concentrations of assets, and that a concentration in real estate assets was bad.

They also looked at the funding of thrifts and found that thrifts used Federal Home Loan Bank advances to a far greater extent than commercial banks. And that was because commercial banks couldn't belong to a Federal Home Loan Bank. And since it was nondeposit funding that they weren't used to, and it was market financing, which they found from their experience with commercial banks having to get market financing, it was less stable and higher cost. Therefore, it wasn't good.

They didn't understand residential lending, home lending, and bank financing. Not understanding the thrift business led them to be more conservative in many of the areas. That was one thing that I think was very obvious.

Secondly, they're the insurer. It's their job to be more conservative. They protect a fund, and any risk to the fund is a risk they have to protect first. The credo of the FDIC, as I see it, is there should be no losses to the insurance fund ever.

So you take supervisory actions to prevent losses to the fund. In reality, they all know that's not always going to work. There will be losses. But their efforts are to prevent it. They're more conservative in their positions than the other regulators. And that includes the OCC and the Fed, as well as the OTS. That's my opinion.

Q. Well, the OTS tends to assign active ratings also, doesn't it?

A. Absolutely.

Q. You just described what you understand the FDIC's primary supervisory goal is. What is, then, your view of the primary supervisory goal of your agency in conducting examinations and assigning ratings also?

A. Our primary goal is to assure they're operating in a safe and sound manner in compliance with their laws and regulations.

Q. Do you believe that the OTS is nonsufficiently rigorous in examining institutions under its jurisdiction in assigning ratings?
A. I believe we do our job very well.
Q. Do you believe that your agency assigns the appropriate rating and examination findings under the given concerns?
A. Yes, I do.

MATERIAL REDACTED

MATERIAL REDACTED

Q. That's all I'm asking.

In the situations where at the end of the day -- and by "the end of the day," I'm referring to the end of the day of a joint examination, the two agencies were not able to reconcile their differing views, is it -- was it most often the case that the agencies would differ by a single numerical factor? For example, the FDIC says capital should be rated a 4, the OTS said 3; the FDIC says earnings should be a 3, the OTS says 2? Did it typically come down to a single-digit difference, or would it typically be a more serious difference of opinion, when the agencies could not reconcile their views, based on your personal experience?

A. My experience -- and there are two things to this, too, okay?

Component ratings aren't as significant as the composite, so far as differences between the agencies. What we try to reconcile at the end of the day is the composite rating. That's what we try to get to. And we may differ on the

components and how we get there, but we try to reconcile to the composite. If that's what we can't reconcile, we can often agree to disagree.

On composite ratings, I don't think you'll find any situations -- I can't think of any situations, put it that way, that the difference would have been more than one level, a 3 versus a 4 or a 4 versus a 5 or a 2 versus a 3.

On the component ratings, there would have been more than one or two. But I think generally the differences are kept to within one.

Q. Was any effort made -- any effort at all made in cases of difference to reconcile component ratings, even if the effort wasn't as large an effort, to reconcile composite ratings?

A. Oh, yeah, we always talk about the component ratings as well. We try to get to agreement there. But that's not as important to us as getting a composite reconciliation.

Q. Not as important, but you'd still try to reconcile them if you could?

A. Yeah. If we had a difference, we want to understand why. "What do you see we don't see?" "Why do you think this way?" And typically I think we would find that the reasons

that there was a difference between a rating on a component basis is because of different philosophies or approaches to those -- to the same issues, not just agency culture and agency policy, agency philosophy.

Q. In the late '90s through today, Mr. Karr, do you find that situations where the agencies are not able to reconcile their view as to the composite rating of a given institution occur less frequently?

A. They're rare today.

Q. For what period --

A. In fact, I don't know of any in the last four or five years that we haven't been able to come to agreement on.

MATERIAL REP

MATERIAL REDACTED

Q. Mr. Karr, prior to the break, do you
recall we were talking about differences in CAMEL

ratings assigned by the FDIC and the OTS, and you testified as to the efforts that would be made to reconcile opinions between the agencies? Do you recall that?
A. Yes.
Q. And the cases in which there were differences, it would be a difference in only one number, 3 to a 4 or a dispute between a 2 and a 3. Do you recall that?
A. That was generally the case, yes.
Q. Why weren't there cases, in light of the thousands of institutions examined, differences would be two numbers, a 4 to 2, for example?
A. Why would that happen?
Q. Why wouldn't that happen?
A. Why wouldn't there be two-grade differences?
Q. Right.
A. If it, in fact, happened that -- I -- why would there be two? I answered the question with why would there be two?
Why wouldn't there be two? We don't get -- when we look at issues, we may have differences of opinion as to our conclusions on

those. We're not that far apart.
Q. What would it indicate to you, as a supervisor, if there was a difference of two in the composite rating on a specific component?
A. What would it indicate to me if there were?
Q. What would it indicate to you with respect to a specific institution if the FDIC were to assign a 4, for example, and the OTS were to assign a 2?
A. Purely hypothetical. What's the merits in why? What are we talking about here? There was a ratings difference of 2. My first question is, why are we so far apart? But I'd need to know the details. Anybody would ask that question. I would hope the examiners would have done that in the first place.
Q. Would you consider that a significant difference in the supervisory judgment, the difference between a 4 and a 2, if it could not be reconciled?
A. I don't think it's -- if you've got a ratings difference of two, I don't think it's in judgment. I think it's in approach and philosophy and policy that would create that

difference, not in judgment.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Sorry. Does this document indicate to you whether or not the OTS and the FDIC had a different view of the supervisory health of River Valley during the period covered by this document?

A. I think what this document indicates to me is we had a difference in the rates that we assigned to the institution.

Q. Does this refresh your recollection,

sir, on a specific point, which is, do you recall this morning I asked you whether you could recall any instance -- any situation where there was a difference of at least two numbers between the composite rating signed by the OTS and the composite rating signed by the FDIC, and I believe you indicated that you could this morning recall no such instance. Do you recall that testimony?

A. That's right.

Q. What does this document indicate, sir?

A. This indicates a composite rating -- that we had a 2 composite rating, and they had a 4.

MATERIAL REDACTED

Q. Who was Larry Kenny?
A. He's our capital market specialist.
Q. What is a capital market specialist?
A. He's our expert on capital markets issues, including investments, portfolios, derivatives, that kind of thing.
Q. Is Mr. Kenny still employed in your office?
A. Yes.
Q. What position does he hold today?
A. He's our capital market specialist.
Q. Same position?
A. Yes.
Q. Does he report directly to you?
A. No.
Q. Who does he report to?
A. He reports to one of my deputy directors, Dan McKee.
Q. Would he have reported to Mr. McKee at the time of this memorandum in 1992?
A. No, Mr. McKee was in -- I'm not even sure he was with us then. If he was, he would have been in Cincinnati.
At that time my recollection is he probably reported to Deputy Director Gerbick,

G-e-r-b-i-c-k, first name Phil.
Q. Is Mr. Kenny a one-man show, or does he have a staff of capital market specialists?
A. He's a one-man show. He has nearly a hundred examiners that all have their own unique expertise in capital markets that assist him.
Q. Who would have made the decision to involve Mr. Kenny in the supervision of River Valley Savings Bank at this time?
A. Who would have made the decision?
Q. Yes. How would he have become involved in this situation?
A. Usually on request of the field manager. In this case Larry Ferries.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you know whether, referring to this Frank letter again, your office ever required -- do you see the reference at the bottom of the second paragraph to a 7 percent tangible capital level?

A. Yes.

Q. Did your office ultimately require such a capital level?

A. I'm not aware that it required 7 percent tangible capital ratio.

Q. Is that something that you likely would have been aware of, if it would have been done?

A. Yes.

Q. Do you know why the decision would have been made not to impose such a capital requirement, based on your understanding of the condition of the bank and issues presented by the bank?

A. Why we wouldn't have done it?

Q. Yes. I read this as a suggestion by the FDIC, to require 7 percent tangible capital level. I'm asking you, based on everything you know on the institution, do you have an

understanding why your office would not have implemented this suggestion?

A. I -- my recollection of the case, institution was meeting its fully phased-in capital requirements at this time. Absent a conclusion on our part that there was significant risk to the capital position of the institution that would reduce that level, we would not require a higher capital level.

Q. And your examiners did not find that type of risk, so you did not require the capital level suggested by the FDIC, correct?

A. That's correct.

MATERIAL REDACTED

Q. Now if you look at Exhibit 10, the second page, Mr. Karr, the third paragraph, second sentence states:

"Our transmittal letter to the OTS again urges that an increased capital level

should be strived for and strongly suggests that appropriate dividend restrictions be established."

Do you see that?

A. Yes.

Q. Let me step back. This letter was, presumably received by you shortly -- "this letter" being Exhibit 9, was presumably received by you shortly after March 9, 1993, and we refer to the suggestion in the letter that "the level of capital protection is still considered

inadequate," and it continues, "We continue to believe that an increased level of capital protection is warranted for this institution."

And my question is simply, in response to that statement, or otherwise, did your office, in response to the receipt of Exhibit 9, direct River Valley Savings Bank to increase its capital level?

A. Not in response to this letter or subsequent to it, I don't believe we did.

Q. You're not aware of --

A. I'm not aware of any action we took in response to this letter to have River Valley increase its capital levels.

MATERIAL REDACTED

With respect to the -- do you believe or do you know whether this information contained in Ms. Frank's letter that this volume of classifications on which the agencies did not agree represents 85 percent of the FDIC's total classifications, do you believe that that fact was a large part of the reason underlying the difference between the 4 composite rating

assigned by the FDIC and the 2 composite rating assigned by the OTS?

A. I believe it was, yes.

Q. And you base that based on your general personal involvement at the time?

A. And these documents that we've reviewed today.

Q. To the extent they refreshed your recollection?

A. Yes.

MATERIAL REDACTED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BANK OF AMERICA, FSB, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-660C
)
UNITED STATES OF AMERICA, )
)
Defendant. )
------------------------------)
HOMER J. HOLLAND and HOWARD )
R. ROSS, )
)
Plaintiffs, )
)
vs. ) No. 95-524C
THE UNITED STATE OF AMERICA, )
)
Defendant. )

AMERICAN CAPITAL CORPORATION )
and TRANSCAPITAL FINANCIAL )
CORPORATION, )
)
Plaintiffs, )
)
vs. ) No. 95-523C
THE UNITED STATES OF AMERICA, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 13, 2000

Reported by: Melissa Belice, CSR No. 084-003391

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For Plaintiffs Bank of America and American Capital:

RACHEL BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C. 20005
(202) 220-9670

For the U.S. Department of Justice in Case No. 95-660C:

TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case
No. 95-524C:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil
Division
1100 L Street
Washington, D.C. 20530
(202) 353-8841

For the FDIC in Case No. 95-523C:

BARBARA KATRON, ESQ., (telephonically)
550 17th Street, N.W.
Washington, D.C. 20429
(202) 393-8400

INDEX

| WITNESS | PAGE |
|---|---|
| RONALD N. KARR | |
| By Mr. Cayne (Holland) | 250 |
| By Ms. Brand (AMCAP) | 285 |
| By Ms. Brand (HonFed) | 317 |
| Afternoon Session - 329 | |
| By Mr. Cayne (Bank of America) | 409 |

EXHIBITS

| | |
|---|---|
| Holland-Karr Exhibit | |
| No. 18 | 258 |
| No. 19 | 267 |
| Nos. 20 and 21 | 270 |
| AMCAP-KARR Exhibit | |
| Nos. 1 and 2 | 287 |
| No. 3 | 292 |
| No. 4 | 293 |
| No. 5 | 300 |
| Nos. 6 and 7 | 302 |
| No. 8 | 315 |

EXHIBITS (cont.):


| HonFed-Karr Exhibit | |
|---|---|
| No. 1 | 322 |
| No. 2 | 329 |
| No. 3 | 338 |
| No. 4 | 339 |
| No. 5 | 348 |
| No. 6 | 353 |
| No. 7 | 358 |
| Nos. 8 and 9 | 363 |
| No. 10 | 372 |
| No. 11 | 373 |
| No. 12 | 376 |
| No. 13 | 378 |
| No. 14 | 380 |
| No. 15 | 381 |
| No. 16 | 384 |
| No. 17 | 390 |
| No. 18 | 395 |
| No. 19 | 395 |
| No. 20 | 400 |
| Nos. 21 and 22 | 402 |
| No. 23 | 438 |

MATERIAL REDACTED

Q. Just for the record, could you identify what Exhibit 2 is.

A. It's a memo to me from Chester Biedron. Subject: FDIC risk-based subgroupings.

Q. Am I correct that that memorandum reflects the CAMEL rating assigned to the management component of River Valley Savings at that time?

A. Yes.

Q. And what is the management rating assigned at that time?

A. Under our rating, it's a 2. Under the FDIC rating, it's a 3.

Q. And under the OTS rating, do I understand correctly from yesterday's testimony that you would consider a 2 a fully satisfactory management rating?

A. Yes.

Q. And you indicated that you were familiar at least with Mr. Ross, correct?

A. Yes.

Q. And was that your view personally that management of River Valley Savings, during the period of your supervision of the institution, was satisfactory?

A. The only management official that I knew well enough to make a personal opinion on was Homer Holland. And I viewed Mr. Holland to be a competent, able, highly respected manager.

Q. And what was the basis of your personal view that you just stated?

A. From conversations with him in regard to how he was managing the institution.

Q. Would the basis of your understanding or

your view also be conversations with your staff or
your examiners?
     A.    Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And I understand that in sitting here

today you don't have a recollection whether you specifically or your office was contacted concerning the San Antonio transaction, but let me ask you this, sir, which I think you might be able to answer, and tell me if you can.

Had you been contacted based on your opinions of particularly I believe Mr. Holland, what views would you have given to the I think you said Midwestern district and advise them whether Mr. Holland in particular had the competence or the integrity to acquire an additional thrift institution?

MATERIAL REDACTED

THE WITNESS: I wasn't asked to my recollection, but my guess is that I would have given a favorable opinion of Mr. Holland.

BY MR. CAYNE:

Q. And specifically what would you have said?

A. As I said before, that I believe that he was a competent and highly respected manager.

Q. And you would I take it not have a qualm or a hesitancy in -- you would not have a reason to advise your colleagues that the office considering the application ought not to approve the transaction, not to approve the acquisition?

A. Not based on his management ability, that's correct.

MATERIAL REDACTED

Q. I'd like to go two paragraphs down, Mr. Karr. Five, six lines into the paragraph, the text reads the OTS did not classify the investment securities -- and let me just clarify. I'm going to read you a passage, and then you can read as much as you need to put it into context.

But I simply want to ask you whether you agree or disagree with another passage from this memorandum. And the passage I want to ask whether you agree with or disagree with is the following:

The OTS did not classify the investment securities since we determined that the derivative instruments were acceptable investments. Based upon our past experience with the institution, we determined that the management of River Valley had adequate expertise and analytical systems to manage and evaluate the investment portfolio.

My question simply is whether or not you agree or disagree with that statement from

Mr. Biedron.

A. Yes, I do.

MATERIAL REDACTED

Q. Turn, please, Mr. Karr, to Page 3. And I'd like to ask you about the final paragraph on this page. It specifically reads the difference

in the capital adequacy as determined by the FDIC and OTS is attributed to the classified derivative products. The level of adverse classifications, excluding the high risk mortgage derivative products, does not raise significant concern with regards to its impact on River Valley's capital position.

Could I understand correctly, Mr. Karr, based on your previous testimony, that you would also agree with the statement I just read?

A. Yes, I would.

Q. And could I just ask you what would the basis of your agreement with that statement be.

A. I think the statement speaks for itself. I think it's an accurate statement. I agree with it because I believe it's an accurate statement.

Q. And then the next paragraph, Mr. Karr, on Page 4, and I have the same type of question, it states, starting with the second sentence of that paragraph, the primary difference between the FDIC and the OTS's findings is attributed to the treatment of high risk mortgage derivative products set forth in the FDIC and OTS's respective policies.

Do I also understand correctly that you

would agree with that statement, Mr. Karr?
     A.   I believe that's an accurate statement,
yes.
     Q.   Mr. Karr, my last question on this document, at the end of this paragraph the sentence reads, however, the OTS continues to maintain that the high risk mortgage derivative portfolio does not warrant classification in accordance with OTS regional policy since we do not classify interest rate risk.
          Do I also understand correctly that you would agree with that statement, Mr. Karr?
     A.   Yes.

MATERIAL REDACTED

Q. In the period following enactment of FIRREA, what agency or what office was the primary regulatory power or supervisor of River Valley Savings Bank?

A. OTS.

Q. And was the OTS the primary supervisor of River Valley for the entire period from the enactment of FIRREA until River Valley was sold?

A. Yes.

MATERIAL REDACTED

Q. We spoke briefly yesterday about Larry Kenney. Do you recall that?

A. Yes.

Q. He is your office capital market specialist?

A. Yes.
Q. Can you describe for me your view of his qualifications?
A. He's one of the best in the country.
Q. And on what basis do you give me that view? What is your basis for that view?
A. I've seen his work. Others have seen his work, and they have commented to me on the quality of his work. Institutions have had him come out and help them with their own problems. They have given me their opinion of his work. He's been evaluated not only by his own supervisors but by the industry itself. He's proven himself to be a highly qualified, one of the best capital market specialists in the country.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And we touched on this yesterday, but I want it clear on the record. How, if at all, did Mr. Kenney, during the time period 1992 through 1995, assist in the review and analysis of the investment portfolios of the River Valley Savings Bank?

A. I don't know specifically what his role was. If he participated in the examination, I don't know specifically what he did.

Q. And you believe that the examiner in charge would have requested his participation?

A. That's what I said yesterday, yes.

Q. Would you believe that Mr. Ferries as the field manager would be familiar with the role that Mr. Kenney played back in that time period?

A. That's likely, yes.

# EXHIBIT 2

November 4, 1992

TO: Ronald N. Karr
Central Regional Director

FROM: Chester A. Biedron
Deputy Regional Director

SUBJECT: FDIC Risk-based Subgroupings
River Valley SB, FSB, #08515
Peoria, Illinois

Asset Size: $446,740,00 as of 9/30/92

| | C | M A C R O | DATE |
|---|---|---|---|
| Most Recent OTS Exam Ratings: | 2 | 2 2 2 3 2 | 10/28/91 |

| | C | C A M E L | DATE |
|---|---|---|---|
| Most Recent FDIC Exam Ratings: | 4 | 4 4 3 2 3 | 10/26/91 |

Comments

The FDIC Difference Analysis has assigned River Valley to Supervisory Subgroup C. The primary concern noted in the Analysis concerns the significant volume of high risk mortgage derivative products adversely classified by the FDIC. As a result of the large amount of classified assets and investment activity, the FDIC has determined that River Valley's level of capital is inadequate.

The October 26, 1991 FDIC Report of Examination ("FDIC Report") indicated that adversely classified assets totaled $48,058,000, or 8.95% of total assets and 211.45% of tangible capital. Investments in derivative real estate mortgage-backed products comprised 85% of total adverse classifications.

The FDIC Report cited that management of River Valley failed to document how the mortgage derivatives purchased reduced overall interest rate risk. Further, management did not document how these investments were used to control interest rate risk on identified assets or a well defined group of assets. The FDIC noted that the derivative products purchased were extremely volatile to changing interest rates and exposed the institution to substantial loss. The FDIC believed that the limitations regarding the amount of derivative products the institution may purchase were too high and that these limitations should be reviewed by the board. As a result, the FDIC considered most of these instruments unsuitable investments for a depository institution and were adversely classified.

EXHIBIT
Holland-Karr 8
7-12-00

The October 28, 1991 OTS Report of Examination ("OTS Report") noted that classified assets totaled $8,118,925, or 1.51% of total assets and 31.1% to tangible capital plus general valuation allowances as of September 30, 1991. Classified assets primarily consisted of mortgage loans and real estate owned. Although the OTS did not classify the investment securities, we did agree that they presented a high risk profile.

The OTS Report criticized the investment activity at River Valley with regards primarily to documentation deficiencies and excessive investment limits. Corrective action for these deficiencies was recommended to the board of directors in the Summary section of the OTS Report and all recommendations had been agreed to by management. The OTS did not classify the investment securities since we determined that the derivative instruments were acceptable investments and that the management of River Valley had the expertise to manage the investment portfolio. In their review of investments, the examiners followed the guidelines set forth in Thrift Bulletin 52 which was not yet issued but in the comment stages at the examination. However, the memorandum mirrors the OTS Regional Policy regarding the treatment of derivative investments. The OTS determined that the derivative investments did not warrant classification according to TB 52 and Regional Policy.

As a result of the serious concerns regarding investment activity and the volume of classified assets, the FDIC considered capital protection at River Valley inadequate. The OTS determined that the institution maintained an acceptable level of capital in relation to classified assets and investment activity. At the October 1991 examinations, River Valley reported fully phased-in tangible, core and risk-based capital of 4.5%, 6.0% and 12.6% of tangible, adjusted tangible and risk-weighted assets, respectively. The institution also complied with its March 25, 1991 Supervisory Agreement which required a tangible capital level of 4.0% of tangible assets at September 30, 1991.

As of September 30, 1992, the institution remains in compliance with the Agreement which requires a tangible capital level of 5.0% of tangible assets. River Valley reported tangible, core and risk-based capital of 5.2%, 6.7% and 12.9% of tangible, adjusted tangible and risk-weighted assets, respectively.

Based upon the findings of the most recent FDIC and OTS examinations, the OTS does not agree that River Valley should be assigned to Supervisory Subgroup C. Although we have not classified the high risk derivative investments, we do maintain the same supervisory concerns with regards to the numerous documentation deficiencies noted. Both FDIC and OTS examinations are currently in progress at the institution and the risk management area is being thoroughly reviewed. While this examination may result in increased concerns regarding the investment activity, we do not anticipate an overall rating below "3". Therefore, we believe that River Valley should be in Subgroup A, but no lower than B.

# EXHIBIT 9

**FDIC**
Federal Deposit Insurance Corporation
Division of Supervision
30 South Wacker Drive, Suite 3100, Chicago, Illinois 60606 • 312-207-0210
Chicago Regional Office

OFFICE OF THRIFT SUPERVISION
93 MAR 11 AM 11:57

March 9, 1993

Mr. Ronald N. Karr
Regional Director
Office of Thrift Supervision
111 East Wacker Drive - 8th Floor
Chicago, Illinois 60601

EXHIBIT
Holland-Karr #9
7-12-06

Dear Mr. Karr:

SUBJECT: River Valley Savings Bank, F.S.B.
Peoria, Illinois

Enclosed for your review and files is a copy of the Federal Deposit Insurance Corporation's Report of Examination of River Valley Savings Bank, F.S.B. (River Valley), Peoria, Illinois. This Report of Examination was prepared by Examiner Nancy L. Griffin as of October 16, 1992 and was conducted concurrently with examiners from your Agency.

As indicated in our letter of January 12, 1993, while this office acknowledges improvement in River Valley's condition, we continue to have serious concerns with regard to the institution's overall risk profile. Tier 1 leverage capital and tangible capital ratios have increased to 5.06% and 4.04%, respectively, but the level of capital protection is still considered inadequate given the institution's investment practices. We continue to believe that an increased level of capital protection is warranted for this institution and strongly suggest that appropriate dividend restrictions be established to prevent any potential depletion of the current capital position. The institution continues to heavily invest in mortgage derivative products such as Interest Only strips, Principal Only strips, residual tranche Collateralized Mortgage Obligations and excess servicing strips. Such products have reportedly been purchased for hedging and non-hedging purposes; however, documentation in support of the hedge position continues to be lacking. As outlined in the Report, in most instances these instruments are considered unsuitable investments for a depository institution and are subject to adverse classification. Adversely classified assets, centered mainly in derivative products, represent a high 149.5% of tangible capital.

As you are aware, our examination reports utilized the "vector analysis approach" for classification of the derivative products. Subsequent instructions from our Washington Office indicate the regulatory agencies have agreed that this approach is no longer to

WOL234 0941 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 881230 GALVA FSLA DOCKET # 03926 TRANS 880729 WIN BOX # WC00019096 OLD BOX # KEEPER 4 C2498 CORRESPONDENCE; EXHIBITS; REPORTS; REGULATORY PLAN; SUMMARIES; AGREEMENTS; FINANCIAL STATEMENTS; COMMENTS AND CONCLUSIONS 900899- 941099
CONFIDENTIAL MATERIAL-SUBJECT TO PROTECTIVE ORDER

River Valley Savings Bank, F.S.B.
Peoria, Illinois

be utilized. Although we did not believe it appropriate to adjust the findings of our report, it is important to note that a calculation of the value of these derivative products using consensus prepayment estimates reflects additional loss of approximately $5 million. If this $5 million were deducted from the institution's capital accounts, the Tier 1 leverage capital ratio would decline to 3.97% and the tangible capital ratio would approximate 2.94%. It is suggested that the institution be promptly informed of the agencies' mutual decision not to accept vector analysis at this time so that they may appropriately account for their mortgage derivative portfolio in the future. who are the "agencies"

It again appears that several of the derivative products have not received appropriate accounting treatment. The Report indicates that management has not always restated the carrying values of residuals in accordance with Emerging Issues Task Force (EITF) 89-4. In addition, the investment policy is in need of revision. The policy currently permits transaction sizes and maximums for the trading account which are considered large and expose the institution to sizeable potential losses at the present stop loss limits. Appropriate limits for the institution's "held for sale" portfolio should also be established. All writedowns required by GAAP have been taken Loss limits have been established

Although the institution reported an impressive 1.78% return on assets for 1991, it is noted that this earnings performance was boosted by several non-recurring items. The losses detailed in the enclosed Report of Examination will have a substantial adverse impact on 1992 earnings performance. An increase in interest rates would also adversely impact earnings due to the institution's liability sensitive position. Management has established a "stop loss limit" of 15% of tangible capital for a 200 basis point increase in interest rates; however, this limit is considered too high and continues to expose the institution to substantial risk involving interest rate movements. reduced to

As indicated in our January 12, 1993 letter, due to the continued high risk profile of the institution we believe the outstanding Supervisory Agreement continues to be warranted. In addition, based upon the findings of our examination we have assigned a composite 4 rating to the institution under the Uniform Financial Institutions Rating System. Should you have any comments or concerns regarding the above, Assistant Regional Director Susan Madson or Review Examiner Jeffrey Bonham may be contacted.

Sincerely,

Simona L. Frank
Regional Director

Enclosure

# EXHIBIT 10

CHI:JJPoskonka:2-23-93:W:\SA\32600\docs\prb
cc: (original)DOS/SSAS, File 2, Ms. Frank, Ms. Madson, Mr. Reinhardt, JMB, RTL, Section File, R/F

Recd. WO: 3-16-93

CONFIDENTIAL PROBLEM INST MEMORANDUM CERT: 32600 MEMO-DATE: 02 / 23 / 93
CITY: [redacted] ST: IL CLASS: SB RATING: CURRENT 4
INST: [redacted] FORMER 4
DATE ESTABLISHED: 07 / 28 / 1988 DATE INSURED: 07 / 28 / 1988 FUND ID: SAIF
CONTROLLING OWNER: RIVER VALLEY HOLDINGS, INC PERCENT OWNED: 100. %
DATE ACQUIRED: 09 / 25 / 91
CHAIN IDENTIFICATION: N/A
BHC NUMBER: N/A BANKS CONTROLLED BY BHC/CHAIN: 1 / 0

INSTITUTION EXAMINATION DATA:

| | | | |
|---|---|---|---|
| EXAM DATE/TYPE/SCOPE........ | 10-16-92/C/1 | 10-26-91/C/1 | 08-18-90/C/R |
| EXAMINER-IN-CHARGE......... | GRIFFIN,N.L | JOHNSON,R.F | JOHNSON,R.F |
| UNIFORM BANK RATING........ | 44333/4 | 44323/4 | 55333/4 |
| TOTAL ASSETS............... | 446,791 | 537,200 | 425,371 |
| TOTAL LOANS................ | 242,704 | 223,916 | 162,371 |
| TOTAL DEPOSITS............. | 355,528 | 355,850 | 276,076 |
| EQUITY CAPITAL............. | 27,880 | 24,136 | 11,723 |
| DISALLOWED INTANGIBLES..... | 129 | 93 | 0 |
| LOSS....................... | 5,444 | 2,142 | 1,996 |
| PART 325 TOTAL ASSETS...... | 441,095 | 534,603 | 423,375 |
| TIER 1 CAPITAL/TIER 1 RATIO | 22,307/ 5.1 | 21,901/ 4.1 | 9,727/ 2.2 |
| ADJ TIER 1 CAP/ADJ TIER 1 % | 22,307/ 5.1 | 21,715/ 4.1 | 9,727/ 2.2 |
| TOTAL RISK WEIGHTED ASSETS. | 228,753 | 260,628 | N/A |
| TIER 1/TOT RISK BASED CAP % | 9.8 / 10.3 | 8.4 / 8.9 | N/A / N/A |
| ALLOWANCE FOR LOANS........ | 1,201 | 1,386 | 476 |
| PROVISION NEEDED........... | 0 | 0 | N/A |
| SUBSTANDARD................ | 21,231 | 45,630 | 19,272 |
| DOUBTFUL................... | 0 | 286 | 0 |
| TOTAL CLASSIFICATIONS...... | 26,675 | 48,058 | 21,268 |
| TOT CLASS/TOT CAP & (X) LVR | 113.5 | 206.4 | 174.3 |
| LOAN %:CLAS/OD/NONAC(NOTOD) | 2.1/ 4.4/ N/A | 2.0/ 6.0/ N/A | 2.5/ 3.2/ N/A |
| SPECIAL MENTION/TIER 1 CAP. | 0/ 0.0 | 0/ 0.0 | 595/ 4.9 |
| CONCENTRATION TO TIER 1 CAP | 138.9 | 203.5 | 690.3 |
| CLASS CONCENTRATION/NO..... | 23,537 / 1 | 36,380 / 2 | 86 / 1 |
| LIQUIDITY %/DEPENDENCY %... | 42.9 / 11.0 | 46.5 / 27.6 | 45.3 / 56.1 |
| LRG DEP %/NO LRG/EST INS DE | 0.0 / 0/ 97.0 | 0.0 / 0/ 96.0 | 0.0 / 0/ 99.0 |
| RSA - RSL 3/6/12........... | 53.1/41.2/50.8 | 27.6/30.2/47.6 | 58.6/68.6/72.2 |
| GAP AS % ASSETS 3/6/12..... | 14R/ 27R/ 28R | 29R/ 37R/ 33R | N/A / N/A / N/A |
| % RSA/RSL CAPTURED 3/6/12.. | 31.5/48.9/61.7 | 42.8/55.7/66.4 | N/A / N/A / N/A |
| TANGIBLE/CORE CAP. RATIOS | 4.04/5.06 | 4.06/4.06 | 1.12/2.61 |

INSTITUTION EARNINGS AND RESERVES

| COMPONENT DISPLAYED/PERIOD... | 12-31-92 | 12-31-91 | 12-31-90 | 12-31-89 |
|---|---|---|---|---|
| NET OPERATING INCOME......... | 3,314 | 9,003 | 3,157 | 1,518 |
| CASH DIVIDENDS............... | 509 | 598 | 651 | 767 |
| SALE OF EQUITY CAPITAL....... | 0 | 2,002 | 0 | 0 |
| NET OTH ADDITIONS OR DEDUCTIO | 5,898R | 3,677R | 0 | 0 |
| NET CNG IN EQU CAP ACCNTS.... | 3,093R | 6,730 | 2,506 | N/A |
| NET LOSSES-INT. BEARING ASSET | 1,705 | 1,722R | 502 | 0 |
| PROVISIONS FOR LOSSES........ | 190 | 325R | 1,929 | 409 |

SELECTED RATIOS AND TRENDS:

| SELECTION DISPLAYED/PERIOD. | 09-30-92 | 12-31-91 | 12-31-90 | 12-31-89 |
|---|---|---|---|---|
| ASSET GROWTH RATE.......... | 16.78R | 30.78 | 3.78 | 8.49R |
| CASH DIVD TO NET INCOME.... | 20.12 | 8.61 | 23.79 | 54.17 |
| NET OPER INC TO AVG ASSETS. | 1.21 | 1.80 | 0.78 | 0.37 |
| OVERHEAD EXP/AVG ASSETS.... | 2.58 | 2.23 | 2.13 | 2.55 |
| NET INT INC (TE)/AVG ASSETS | 3.76 | 3.29 | 2.81 | 2.25 |
| NONINT INC/AVG ASSETS...... | 0.72 | 0.34 | 0.56 | 0.39 |
| LOAN RES TO TOTAL LOANS.... | 0.86 | 1.05 | 1.34 | N/A |
| NET LOAN LOSSES TO AVG LNS. | 0.22 | 1.07R | 0.31 | N/A |
| EARN COVG NET LOAN LOSS.... | 19.08 | N/A | 11.13 | N/A |
| AVG EARN ASSETS/AVG ASSETS. | 95.26 | 97.21 | 99.13 | N/A |
| VOLATILE LIAB DEPENDENCE... | 25.50 | 55.31 | 68.29 | N/A |
| BROKER DEPOSITS TO DEPOSITS | 1.44 | 1.38 | 0.00 | 0.00 |

R - Indicates deficit figure NA - Not Available or Not Applicable
(000's omitted in dollar amounts)

EXHIBIT
Holland-Kane #10

CONFIDENTIAL MEMO TO DOS FILES - (S&L)

River Valley Savings Bank, F.S.B.
Peoria, Illinois

Identification and Nature of Problem

Operating with a high volume of unsuitable investments along with inadequate policies and procedures regarding investment strategies and interest rate risk render capital protection inadequate.

Subject is the resultant of the 9-25-91 merger between affiliated River Valley Savings Bank, Rock Falls, IL and River Valley Savings Bank, FSB, Peoria, IL. Simultaneously, River Valley Holdings, Inc. was formed and acquired subject. The parent company is wholly owned by Chairman of the Board Howard R. Ross and Director Homer J. Holland. Messrs. Holland and Ross, along with CEO Bangert, dominate in policy matters. Overall, management is considered knowledgeable but is too willing to take excessive risk through investment practices. Approximately 73% ($19.6 million) of total classifications are represented by mortgage derivative products. The examination report was completed utilizing "vector analysis" rather than "consensus analysis" in estimating the actual market value of the mortgage derivative products. Subsequent to the examination being completed, it is understood that the regulatory agencies have determined that vector analysis is not an acceptable method of market value determination, at this time. While changes to the examination report were not made, using the "consensus analysis" would increase Loss classifications for the derivative securities by approximately $5 million and would cause the institution's Tier 1 and tangible capital ratios to decline to 3.97% and 2.94%, respectively. Derivative products have been purchased for hedging and non-hedging purposes; however, documentation supporting a hedge position is often inadequate. With the types and volume of transactions, it is apparent that management is speculating on interest rates. It was also noted that management was not always restating the carrying values of residuals according to Emerging Issues Task Force 89-4 which requires that the recorded balance not exceed the undiscounted estimated future cash flows. In addition, established limits for the trading account are considered excessive and expose the institution to an undue amount of risk. Our concerns regarding the volume of derivative products held by the institution were detailed in the transmittal letter to the OTS. Follow-up action regarding these investments will be determined based upon the response received from the OTS. Concentrations consist of derivative products and purchased mortgage servicing rights.

Given management's investment activities, the institution's capital position is considered inadequate. Our transmittal letter to the OTS again urges that an increased capital level should be strived for and strongly suggests that appropriate dividend restrictions be established to prevent the unwarranted depletion of the current capital position. The ALLL/total loan ratio of 0.5% was considered adequate by the examiners due to overall sound condition of the loan portfolio. Earnings for both 1990 and 1991 were favorably affected by various one-time accounting adjustments (sale of branches/loans/investments and reverse provision for loan losses).

Liquidity ratio is representative of the high investment in mortgage backed securities and derivative products; however, as the dependency ratio reflects, the institution utilizes a large volume of borrowings to fund these investments. Although still highly liability sensitive, the institution's rate sensitivity is improved over prior years due to an increase in adjustable rate mortgages and a reduction in short-term borrowings from FHLB and reverse repo agreements. While not included in the rate sensitivity analysis, the large holdings of residual products do provide some protection against the potential effects of rising interest rates; however, thrift's mortgage banking activities are unhedged, increasing the exposure to increased interest rates. Significance of the institution's liability sensitive position is further evidenced at the 3 year horizon, where a negative GAP of 43.2% is evident with 85% of all interest bearing liabilities captured.

River Valley Savings Bank, F.S.B.
Peoria, Illinois

Management of the institution does not monitor Gap, but rather manages interest rate risk on a "net bond basis". Net bond represents the difference in duration between asset and liability portfolios. The asset/liability policy also prescribes guidelines, within the limitations set by the OTS, for maximum changes in market value of portfolio equity and net interest income for up to 4% changes in interest rates. Although the institution is presently within these guidelines, the unhedged position of the thrift's mortgage banking activity and the high volume of derivative products present a substantial risk exposure to interest rate movements. Our concerns in this area are included in the transmittal letter to the OTS.

Brokered deposits reflected as of the examination date were acquired through the merger with River Valley Savings Bank, Rock Falls, IL. Maturities of these deposits range from 7-2-93 to 6-6-95. No rollovers or renewals of such deposits have occurred and the thrift has not applied for a waiver to increase or continue the use of these deposits.

Despite concerns over the large volume of volatile mortgage derivative products and the inadequate level of capital protection, the institution is not believed to represent an immediate threat to the insurance fund.

Corrective Action

As a result of the August 18, 1990 examination, the institution entered into a Supervisory Agreement ("SA") with the OTS on March 25, 1991. The SA addressed violations, classifications, capital, investment practices and transactions with affiliates. For the most part, provisions of the SA have been met with the exception of tangible capital maintenance and compliance with applicable laws. This office has informed Chicago OTS that continuation of the SA is believed necessary. Recommendations for further corrective action will be reviewed upon receipt of the OTS' response to our concerns regarding inadequate capital, the substantial volume of mortgage derivative products which are poorly documented, and the significant interest rate risk potential.

While results of the concurrent OTS and FDIC examinations are similar, with the exception of the Substandard classification accorded the derivative products by the FDIC, the agencies continue to assign a different composite rating. A MACRO rating of 32443/3 was assigned by the OTS based upon results of the current examination, a reduction from the composite 2 rating assigned by the OTS following the October 26, 1991 concurrent examination. The significant difference in the component ratings assigned to the thrift's asset quality appears to result from policy differences between the agencies regarding how to reflect the substantial risk presented by the large mortgage derivative product holdings. The OTS reflects this exposure in their "Risk" component, opposed to the FDIC's assignment of such risk in the "Asset" component. The difference in the composite ratings were discussed thoroughly at the field examiner level, were also relayed to OTS Field Manager Larry Ferris, and were clearly detailed in this office's 1-12-93 response to the OTS examination report. The lower FDIC rating continues to reflect our philosophical difference with the OTS in assessing the risk profile of this institution; as has been evident at prior examinations.

General

Peoria, Illinois is located approximately 160 miles southwest of Chicago. Subject operates 11 branches throughout northern Illinois, including an office in downtown Chicago. Five wholly-owned subsidiaries are operated but all are basically inactive, with primary assets being cash. The institution has trust powers; however, examination reports do not mention any problems in that area.

A composite 4 rating is recommended.

Simona L. Frank
Regional Director - Chicago

**RIVER VALLEY SAVINGS BANK, F.S.B.**
**PEORIA, ILLINOIS**

Washington Office Addendum:

The Net Other Deductions identified in the 1991 and 1992 earnings display are primarily the result of redemption of the institution's Noncumulative Perpetual Preferred Stock. This stock had been held by the thrift's parent holding company. The Office of Thrift Supervision has notified the thrift that redemption of preferred stock is considered a dividend and has discouraged additional dividends until the institution's dividend to income ratio falls within the safe-harbor limitations pursuant to OTS regulations (no more than a 75% dividend payout ratio). The institution currently has only $1 million of outstanding preferred stock.

The thrift's GAP, at the one year and three year time horizons, declines to 10.25%R and 24.69%R, respectively, when Savings and NOW accounts are excluded from the calculation.

Reviewed 5-5-93:

Kenneth A. Laun
Review Examiner

CONCUR:
Richard D. Heiar, Manager
Special Situations and
Applications Section

# LAWRENCE KENNY DEPOSITION EXCERPTS FOR USE AT TRIAL

p. 4 lines 1-6, 9-25
p. 5 line 1, lines 9-25
p. 6 lines 1-9, 16-25
p. 7 lines 1-4
p. 11 lines 19-25
p. 12 lines 1-24
p. 13 line 25
p. 14 lines 1-20
p. 15 lines 22-25
p. 16 lines 1-18
p. 23 lines 15-25
p. 24 lines 1-25
p. 25 lines 1-25
p. 26 lines 1-25
p. 27 lines 1-25
p. 28 lines 1-25
p. 29 lines 1-25
p. 30 lines 1-25
p. 31 lines 1-25
p. 32 lines 1-9, 11-25
p. 33 lines 1-17
p. 72 lines 23-25 [Kenny Exhibit 1]
p. 73 lines 1-25
p. 74 lines 1-25
p. 75 lines 1-6
p. 77 lines 15-25
p. 78 line 1, 14-19
p. 79 lines 3-25
p. 80 lines 1-12, 18-25
p. 81 lines 1-25
p. 82 lines 1-25
p. 83 lines 1-25
p. 84 lines 1-23
p. 85 lines 13-25
p. 86 lines 1-25
p. 87 lines 1-25
p. 88 lines 1-2
p. 171 lines 21-25
p. 172 line 4-15
p. 173 lines 2-25
p. 174 lines 1-12
p. 199 lines 3-25
p. 200 lines 1-25

p. 201 lines 1-25
p. 202 line 1
p. 204 lines 10-25
p. 205 lines 2-25
p. 206 lines 2-9
p. 217 lines 12-20
p. 218 lines 1-25
p. 219 lines 1-21
p. 220 lines 19-25
p. 221 lines 1-25
p. 222 lines 1-17, 19-25
p. 223 lines 1-11
p. 231 lines 14-16, 24-25
p. 232 lines 1-6
p.236 lines 12-20
p. 237 lines 1-13, 15-25
p. 238 lines 1-21, 23
p. 240 line 25
p. 241 lines 1-4
p. 254 lines 16-20 [Kenny Exhibit 6]
p. 255 lines 2-17, 20-25
p. 256 lines 1-13
p.329 line 25
p. 330 lines 1-3, 5
p. 331 lines 7-12
p. 334 lines 20-25
p. 335 lines 3-5, 18-22, 25
p. 336 lines 1-5

UNITED STATES COURT OF CLAIMS

- - - - - - - - - - - - - - - -x
HOMER HOLLAND, HOWARD ROSS, :
Plaintiffs, :
vs. :Case No. 95-524C
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - -x

Washington, D.C.

Wednesday, February 25, 2004

Deposition of LAWRENCE A. KENNY, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, LLP, 555 12th Street, N.W., Washington, D.C. 20004, at 9:06 a.m., Wednesday, February 25, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

CERTIFIED COPY

APPEARANCES:

On behalf of the Plaintiffs:

HOWARD N. CAYNE, ESQ.
MICHAEL A. JOHNSON, ESQ.
DAVID B. BERGMAN, ESQ.
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5656

On behalf of the Defendant:

KENNETH M. DINTZER, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
(202) 616-0385

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| LAWRENCE A. KENNY | PLAINTIFFS | DEFENDANT |
| By Mr. Cayne | 4 | |

Afternoon Session - Page 147

E X H I B I T S

| KENNY EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Transcript | 72 |
| 2 | Ltr dtd 02/13/91 to Brafman | 148 |
| 3 | Transcript | 154 |
| 4 | Memo dtd 04/11/91 fr Brafman | 248 |
| 5 | Memo dtd 06/29/89 to Short fr Martens | 251 |
| 6 | Minutes of meeting | 254 |
| 7 | Report of Examination | 259 |
| 8 | Notices document | 274 |

TELEPHONE CALL TO JUDGE MILLER: 90

P R O C E E D I N G S

Whereupon,

LAWRENCE A. KENNY,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

MATERIAL REDACTED

Q. Good morning, Mr. Kenny.

A. Good morning.

Q. For the record, could you please state and spell your name?

A. Lawrence Kenny, L-a-w-r-e-n-c-e, K-e-n-n-y.

Q. And where do you live?

A. I live in Mt. Prospect, Illinois.

Q. And where are you currently employed?

A. I'm currently employed for the Office of Thrift Supervision.

Q. What is your current business position?

A. I'm a capital markets examiner.

Q. And for how long have you held that position?

A. I have been a capital markets examiner

since May of 2002.

MATERIAL REDACTED

Q. Do you know a Mr. Ronald Karr?
A. Yes.
Q. Did he, was he formerly with the Office of Thrift Supervision?
A. Yes.
Q. What was your relationship in the corporate structure to Mr. Karr?
A. Mr. Karr was the regional director, and I reported to a supervisor who reported to him.
Q. And who was the supervisor you reported to?
A. Are we talking back at that time in nineteen -- when this occurred?
Q. Yes.
A. Oh, okay. I'm sorry. That I believe it was Phil Gerbick. You know, they changed us

around a bit, but I think Phil Gerbick was who I reported to at the time from '88 to '94, thereabouts.

Actually I had -- let me qualify that. From '88 to '94, I believe during that period, there was a couple of years where I reported to Mr. John Valek maybe until '90, '91. I lose track; and then from maybe '91 to '94, Mr. Gerbick.

MATERIAL REDACTED

Q. And who is Mr. Larry Ferries? Is that how you say his name?

A. Larry Ferries, yes. He was the field manager for the River Valley companies.

Q. And how did he relate to you in the corporate structure of the OTS?

A. As the field manager, he was responsible for reviewing my work and my comments in conjunction with the examiner-in-charge.

Usually the way it flowed was the examiner-in-charge would review the information, and then Larry would review the examiner-in-charge's findings.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Now I would take it then from your previous answer that you have taught courses for regulators?

A. Yes, sir. I developed in the '80s a course called financial instruments, futures and options.

It was a course that explained

investments and hedging and derivative instruments to examiners and regulatory people, and taught that class, wrote a manual.

Q. And for how long did you teach that class?

A. You know, I taught off and on for several years.

I think I completely got out of it around 1988 or 1987.

I may have taught it for, off and on for, you know, up to maybe five years.

Q. Have you taught any other courses?

A. Let me think. I, in 1982, I taught new examiner training school for the government, but I have not taught any, any courses outside of the government.

Q. Again, tell me the name of the course you did teach.

A. The course I taught was -- its name changed over time, but it was called at the time I developed it, financial instruments -- and I jointly developed it with another gentleman, Mr. Biedron -- financial instruments, futures and options.

MATERIAL REDACTED

MATERIAL REDACTED

Q. One thing I'm a little confused about

is you indicated that you taught that course in the 1980s, correct?
A. Yes.
Q. But you received the designation as a capital markets specialist in 1992?
A. Well, in nineteen, in 1985, when the Federal Home Loan Bank Board examiners were put under the Federal Home Loan Bank, there was a position created, and I took that position.
It was called security supervisor. Essentially it was a capital market examiner, but it was called securities supervisor, and then when OTS was created in 1989, I became a capital markets examiner or capital markets specialist, and I essentially did the same thing.
Q. So that was just the new name for, or new designation or title for what you had already been active in?
A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Back on, back to your course on financial instruments, to the extent you recall, what were, what did the curriculum of that course involve?

A. The curriculum involved a discussion of the use of derivative instruments for hedging, how to use them, a description of the types of investments and types of instruments, a discussion on various kinds of derivative investments such as CMOs, and the use of various types of borrowings related to reverse repos, dollar reverse repos, and things along those lines.

Q. Any other topics you can recall?

A. You know, that's a pretty broad gamut. I mean it covers, you know, investments. It covers hedging and all the derivative instruments that are used, and it covers borrowings, and it may have also involved, you know, the use of, you know, additional leverage with Federal Home Loan Banks and you know, other kinds of borrowings other than reverse repos.

MATERIAL REDACTED

MATERIAL REDACTED

Q. In the course of your work as a capital market specialist, do you ever perform financial analyses relating to mortgage-backed securities?

A. Yes.

Q. What types of analyses do you perform?

A. It depends on the instruments that I'm analyzing.

Q. Well, give me an example of the instruments you would analyze in the MBS field and what type of analysis you would conduct.

A. Well, I think from the most basic standpoint, if you looked at say a Freddie Mac or Fannie Mae mortgage-backed security, fixed rate 30-year mortgage with a specific interest rate, you would look at the sensitivity of that instrument based on rate changes.

And you would also look at, you know, what the, you know, what the company's initial market value was, and then again, with that analysis, how the market value changes over time and how much they have.

Q. What other types of analyses, if any, in the course of your work would you conduct with respect to mortgage-backed securities?

A. Oh, you would look at the, the characteristics of the underlying collateral, you know, the demographics of them, again, depending on how, how much they have, you do a selective test check of the, of the instruments.

Looked at the QUSIP numbers and look at the prepayment experience on those instruments as well, and what the estimated prepayments on those instruments may be in the future.

Q. QUSIP is Q-U-S-I-P?

A. Yes, it is.
Q. What does that stand for?
A. It's an acronym that, that stands for -- I don't remember the exact, you know, the exact acronym that, that it stands for, but it's a unique identifying number that's widely accepted and makes it easy to access in financial data bases information related to that specific security.
Q. Under what circumstances would you make the decision that it's necessary to conduct the types of analyses you just referred to with respect to mortgage-backed securities?
A. It would depend on the materiality of the holdings of the company, the company's capital position, and their risk profile.
Q. What is the relevance of the capital position?
A. Capital is, is the ability to absorb risk.
Q. And if you found a company that was excessively very highly capitalized, how would that affect whether or not you would conduct such analyses?
A. The analysis would have to be done

regardless.

It would just be the ability to absorb the risk of the holdings, so if a company, you know, had more capital, they could absorb more risk.

Q. And how would that tie into your overall analyses of the portfolio of that company's mortgage-backed securities?

A. Well, you would analyze what the risk of that portfolio was, what their other risks were, and how much capital they had to support those risks, and determine whether it's adequate or not, and determine whether or not the risk that they are assuming is, is acceptable.

Q. So in determining whether risk is acceptable, you would need to know the capital level, is that correct?

A. You would need to know the risk from the investments first, and then you would need to know the capital level.

Q. And why is that?

A. Because capital, if the, if the situation works out unfavorably for the company, then they -- and they take a loss, then that loss, the capital account has to be charged for

that loss.
Q. Now do I take it then that if you -- assume you're examining an institution that you would consider thinly or inadequately capitalized, okay?
A. Yes.
Q. And you went through the analyses of the mortgage-backed securities of the types you just mentioned, and you came to an assessment of the overall risk -- follow that?
A. Yes.
Q. You might well determine that based on the thinness or the inadequacy of the capitalization, the risk was excessive that you had identified, correct?
A. Yes.
Q. And then what would your next step be having determined that the risk was excessive?
A. Two choices probably -- the first choice is that the risk would have to be reduced, or that they would have to get more capital, or a combination of both.
Q. Anything else?
A. No.
Q. Could that cause --

A. Oh, curtail, of course, curtail future activity in that area; in other words, not increase the risk any further.

Q. And how would you communicate your direction or advice to curtail activity?

A. There is a number of forums, but the most common forum is in the Report of Examination.

Q. Would that advice or direction ever take the form of some type of more formal supervisory action?

A. Well, the Report of Examination would only convey the information to the, to the supervisory bodies, and the supervisory bodies may write a letter to the company, directive if you will, to tell them to, you know, citing the examination report, to do this or do that, reduce the risk or increase your capital or combination thereof.

Q. Is it also possible the supervisory authorities would issue an, what you would consider to be an enforcement action with that directive?

A. Yes.

Q. And what kind of enforcement actions

could be issued?

A. Cease and desist orders are the strongest.

That means immediate, you know, could be immediate cease and desist, or divestiture required of holdings, and then also there is supervisory agreements where they, the company agrees to comply with certain provisions.

Q. And have you ever recommended that the OTS issue a cease and desist order with respect to an institution you were examining?

A. Yes.

Q. Under what circumstances?

A. They had excessive holdings of various kinds of investments and unique transactions.

Q. What do you mean by unique transaction?

A. Well, the unique, unique, very unique types of instruments that they were holding.

Q. And why would you need instruments?

A. They were inappropriate for that, for the company based on their capital position.

Q. So the recommendation -- and have you made that type of recommendation more than once?

A. I'm sure I have.

Q. And so what would, what were the key factors you would have looked at in those situations in making the recommendation that a cease and desist order be issued?

A. Analyze the and identify all of the areas that are considered risky, quantify the risk as best as possible, and then explain why that risk is excessive related to their company's operating position, earnings and capital.

Q. And capital; and again, have you also under similar circumstances suggested to the OTS that a supervisor agreement be issued?

A. I have.

Q. And under what circumstances would you make that suggestion?

A. Similar situation where, where the, the risk is high on a particular area that I'm looking at, and it needs to be addressed formally and needs to be cut down, or there has to be a timetable established for divestiture or reduction of borrowings, reduction of leverage.

Q. And if I understood, in both cases, you were comparing risk to -- first you assessed risk through these various financial modeling

techniques, correct?
A. Yes.
Q. And then you measured that level of risk against the adequacy of that institutional capital, correct?
A. Their earnings capacity and capital, yes.
Q. And remember a few moments ago, I asked you to consider a situation where an institution was inadequately capitalized and it had a high level of risk, correct?
A. Yes.
Q. And I think you indicated in that case you may formally or informally suggest that the institution take certain types of actions to reduce that risk, correct?
A. Yes.
Q. Could your advice or recommendation to that same institution be different if it had the same precise level of risk, but it had what you considered to be an abundance of capital?
A. It would be -- it may be different.
Q. And why may it be different?
A. Capital is the, is the capacity to absorb risk.

If you have more capital, you can absorb more risk.

Q. So if you have more capital, your view as to whether or not risk needs to be reduced might be different, correct?

A. Yes.

Q. Might be materially different, correct, depending on the adequacy of the capital?

MATERIAL REDACTED

THE WITNESS: These are, these are very specific instances.

You know, you can't, you can't apply generalities, but if an instance were such that all things being equal, if a company had X degree of risk, the company had more capital, that X degree of risk would be perceived in a better light than if they had, than if they had, than if they had less risk.

BY MR. CAYNE:

Q. When why would the X degree of risk be perceived in a better light if they had more capital?

A. Because the capital is the capacity to absorb losses.

If the risk, the risk, if the situation works out unfavorably for the company, a loss has to be taken, it flows through the operating statement and then through capital, so the more, the more capital the company has, the more capacity they have to take risk.

Q. When you examine an institution, do you first focus on capital or risk?

How do you do that?

A. When I'm preparing to go into an examination, as a rule, I generally look at the company's overall operation, and I look at their capital position, and then I start my analysis on the areas that I work on keeping in mind what, what their, their capital position is and what their other factors, you know, that may, may impact, you know, my analysis.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I'm handing the witness a document marked for identification as Kenny Exhibit No. 1, which is the deposition transcript of a

deposition in a number of cases taken of Mr. Ronald Karr on July 12th, 2000.

Do you have that document before you, Mr. Kenny?

A. Yes.

Q. Have you ever seen this document before?

A. No.

Q. And we discussed Mr. Karr very briefly earlier this morning.

Do you recall that?

A. Yes.

Q. And what would your professional relationship to Mr. Karr have been during the time you were examining River Valley?

A. I believe Mr. Karr took over after Mr. Brafman left, Stuart Brafman, and my position to Mr. Brafman or to Mister, Mr. Karr would have been I reported to Mr. Gerbick. Mr. Gerbick reported to Mr. Karr, and that would have been my relationship with Mr. Karr through my involvement with Mr. Gerbick, my supervisor.

Q. Did you ever speak directly with Mr. Karr?

A. I have spoken with Mr. Karr.

Q. When was the first time you personally were involved in any respect with respect to any of the River Valley institutions?

A. A guess, I believe in the late '80s, and I don't have the exact date, and that's a guess.

I believe, I believe it was the late '80s.

Q. Do you recall whether it was prior to FIRREA, F-I-R-R-E-A?

A. If it was in the late '80s, it would have been prior to FIRREA, yes.

Q. And what was, would the nature of your first involvement have been?

A. I may have reviewed their activities at that point in time as part of a, an examination of one of the River Valley banks.

Q. And from that time, were you continuously involved with the River Valley institutions until a certain date?

A. I believe I was.

Q. And for what period of time did that involvement, over what period of time did that involvement last?

A. If, if my involvement began in the

late '80s, I'm sure that I was involved through 1993, and I can't say that I participated fully in every exam, but I may have, but I'm sure that I -- because there was an exam that I did in 1993 that I signed, and so I'm sure that I did that, that work.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could you turn to page 41 of this deposition?

And if you would, read from the first question on page 41?

A. This starts do you recall?

Q. Yes.

A. Okay.

Q. Through page 44, and let me know when you're complete?

A. Okay.

Q. Thank you.

(The witness reviewed the document.)

MATERIAL REDACTED

Q. Could you start on page 42, lines --
A. Forty-two, sure.
Q. Line 6?
A. Line 6, sure.
Q. Through page 43, line 3, read that question and answer into the record, please.

MATERIAL REDACTED

THE WITNESS: Reading starting on line, starting on page 42, line 6, and reading through which line did you say, sir?

BY MR. CAYNE:

Q. Line 3.

A. Line 3.

Q. On page 43.

A. "What do you remember, sitting here before you look at any documents to refresh your recollection, as to your difference of opinions? And I understand, it was eight years ago."

Answer: "I'm not so sure it's just River Valley. At that time period, we had -- I mean, the FDIC took a position that products that -- derivative products in particular that represented interest rate risks issues to institutions should be classified, and classified meaning that they present safety and soundness risks to the institution that require more capital, other things, okay?

"We disagreed that -- with the FDIC that you classify residuals because based on -- based on the fact that they represented interest

rate risk. If they represented credit risk, we would agree that they needed to be classified. That our classification policies of both agencies indicated that we should only classify assets based on credit issues, not interest rate risk issues, and I think we had that same issue with River Valley."

Q. My question, Mr. Kenny, is do you agree with Mr. Karr's answer on, from lines 10 on page 42 through line 3 on page 43, to my question, which appeared on line 6 through 9 on page 42?

MATERIAL REDACTED

A. I generally agree with Mr. Karr's statement that our position, the OTS' -- and this was, this was pre-'89. It was, it wasn't OTS. It was Federal Home Loan Bank Board and bank, Federal Home Loan Bank, that our position was that generally, if it was credit risk related, we classified it.

If it wasn't credit risk related, we

didn't classify it, whereas the FDIC classified derivative instruments based on their own internal guidance.

Q. Is there any aspect of Mr. Karr's answer with which you don't agree?

A. Let me say that I generally agree with what he said, but it was, at the time, related to derivative instruments, it was evolving treatment, and so we may have had a period there where we actually did classify some of the assets ourselves, the OTS, for one reason or another, you know, and so that, that would not -- qualifier, that there may have been instances within that time period that the OTS did classify certain residuals, and until such time as we had an official position that we would not classify them.

Q. And what time period are you referring to?

A. I'm referring to the period in the late '80s.

Q. What about into the early '90s, '91, say '90 through '92, would Mr. Karr's answer accurately reflect the situation between 1990 and 1992?

A. Here again, I have to qualify it in that I believe generally that was the case, but there may have been -- you know, I can't recall with a hundred percent accuracy, that we may not have classified some part of the derivative portfolio for one reason or another.

Q. Do you recall whether this was an issue in connection with your examinations of River Valley?

A. What issue? What -- an issue between Mr. Karr and myself?

Q. No. No. No. No -- the issue between the OTS and the FDIC with respect to whether or not derivative products should be classified.

A. Yes. That was, that was an issue between the OTS and the FDIC, and it related to River Valley, yes.

Q. And can you describe the issue as it related to River Valley?

A. As best that I can recollect, that the FDIC generally classified I believe all of the, what they perceived as high-risk mortgage derivatives while we did not classify all of them.

Q. Why did the FDIC determine to classify

all the high-risk mortgage derivatives?
A. That was their internal guidance.
Q. Do you recall the basis for that guidance?
A. Vaguely.
Q. And what's your vague recollection?
A. I think that it was a combination of things.
The, there was a policy statement by the FFIEC, and then they may have had some internal, internal guidance that they had written as well.
Q. And did the OTS not subscribe to this FFIEC policy statement?
A. We did ultimately. I don't remember if we did during the entire time period between '90 and '92.
Q. Well, then why did the OTS come to a different conclusion as to whether or not these derivative products should be classified?
A. The OTS felt that classification of assets should be primarily based on credit risk rather than interest rate risk.
Q. Is that what Mr. Karr is saying in his answer?

A. Yes.
Q. So you agree with that answer, correct?
A. That was the philosophy of the agency, and to the extent that that was the philosophy of the agency, I agree with it.
Q. Do you recall whether this difference in philosophy between the FDIC and OTS had a material effect on the total dollar volume of assets classified by the two different agencies?
A. Yes.
Q. And can you describe that material effect?
A. The River Valley institution held a lot of high-risk mortgage derivatives, so the FDIC's classification of the mortgage derivatives was higher than the OTS-classified assets.
Q. How much higher was it?
A. I don't remember the exact amount.
Q. Was it a significant difference?
A. Several million, yes, it was significant.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did you ever have any discussions with Mr. Ferries concerning this issue?

A. I believe we did. I believe we talked about it.

Q. And what is your recollection of those discussions?

A. It was a difference that was, was difficult to reconcile.

We couldn't, we -- you had to accept our position or not accept it, the FDIC's position, and we had our position. It was a difference.

Q. Do you -- what was your professional

relationship with Mr. Ferries in connection with your work on River Valley?

A. I was a, I did field examination work and wrote some of the reports throughout the time, presented those to the examiner-in-charge, who varied from year to year, and then Mr. Ferries was responsible for reviewing all of that information.

Q. And did Mr. Ferries speak with you concerning his review of your work?

A. Yes. After he looked at my work, he would probably give me some feedback one way or another.

Q. Do you recall whether you and Mr. Ferries had any in-person meetings relating to your work on River Valley?

A. I believe we had. We met generally informally I believe. Just he would show up on a job and review it, or he would be in the office, and we might go over some of the stuff, so probably several times that occurred, numerous times.

Q. Do you recall whether you and Mr. Ferries were in accord on the proper regulatory approach to River Valley?

A. Related, as far as OTS' approach?
Q. Yes.
A. Yes, I believe we were in agreement.
Q. Do you recall whether there were any issues on which you and Mr. Ferries disagreed with respect to River Valley?
A. There may have been, but I don't recall what they were.
Let me say that when I write the report, they could ultimately change whatever I did, so if he disagreed in any fashion materially with what I did, they had the right to change it.
Q. Do you know if he made any changes to your report?
A. I don't remember any material changes.
Q. So sitting here today, you believe, would you believe that you and Mr. Ferries were in particular agreement with respect to your findings on River Valley?
A. Yes.
Q. And you were in material agreement as with respect to the proper regulatory approach to take to River Valley?
A. By OTS? By OTS standards?

Q. Yes.

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

My first question is with respect to Mr. Ferries' answer appearing on line 3 of page 45, did you share his confidence, Mr. Ferries' confidence, in the managerial competence of the Holland and Ross investors?

MATERIAL REDACTED

THE WITNESS: Not in that fashion. I didn't, I didn't view, I didn't view them in that light.

BY MR. CAYNE:

Q. What do you mean by that?

A. Well, I wouldn't, I wouldn't, I wouldn't make that statement that Mr. Ferries made.

As far as their managerial competence, I don't have an opinion about their managerial competence.

I view them as investors.

MATERIAL REDACTED

A. Because my involvement with River Valley was not them as managers, but as investors, so my perception was, is not, I don't have a perception of them as managers.

Q. Did you have a perception of them as investors?

A. Yes, I did.

Q. And what was your perception of them as investors?

A. Savvy investors.

Q. And what was the basis of your perception of them as savvy investors?

A. They seemed to bring in the correct management to, to, to run the activities that, of the company's that they were managing, that they were investing in.

Q. And what was the basis of that conclusion, in your view, that Messrs. Holland and Ross brought in the correct management to run the activities of, in this case, River Valley?

A. Management that I deal with in working on the risk management area seemed to be competent.

Q. And can you recall the names of the management official or officials during your, do you recall the names of the management official or officials to whom you're now referring?

A. As the lead manager, I worked primarily with Mr. Bangert as the lead manager.

Q. Did you also work with a woman, I believe her name was then Susan Vranes, V-r a-n-e-s, now it's Susan Els, E-l-s?

A. Yes.

Q. Did you consider her competent?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. What was your assessment of the River Valley investment portfolios?
A. My assessment was that it was a very risky portfolio.
It was a very illiquid portfolio, yet it was, their management was, was adequate to, you know, to manage it.
Q. What does that mean?
A. Well, what it means is that just what I said.
It was a risky, it was a risky, illiquid portfolio that required an extreme amount of management, and it required an extreme amount of management on the part of OTS.
Q. And did River Valley have, in your opinion, adequate management to manage this portfolio?
A. Yes.
Q. Then what was the basis of your opinion in that regard?
A. My review of their, of the management, their analytics, their documentation.
Q. What do you mean by their analytics?

A. How they, how they reviewed the, their return risk profiles on them, on the instruments that they held.

Q. How did they review them?

A. It varied over time, but they had internal, internal models that they used to analyze them.

Q. Did you think the models they used were appropriate for the assets that were being modeled?

A. I thought, I thought the models were okay, but the, you know, the assumptions were questioned throughout time as well as some of their documentation I believe.

Q. Did you believe that management of River Valley brought a sophisticated approach to the management of these assets?

A. I thought they brought an adequate approach to manage the risky assets.

Q. Did you ever direct River Valley to reduce the volume of the assets to which you are referring?

A. I don't believe I did.

Q. And why didn't you direct River Valley to reduce the volume of assets?

A. Because I believed they, at the time, that they had adequate expertise to manage them.

Q. Did you, in evaluating these asset portfolios, consider the capital, capitalization of River Valley capital levels?

A. Yes.

Q. And what role did the capital levels of River Valley play in your analysis of these asset portfolios?

A. The capital portfolio, the capital position provided the ability to, to hold these instruments.

Q. And you had that view even after the capital position had been reduced following FIRREA, is that correct?

A. Yes.

Q. And how did you make that determination?

A. I looked at the capital at the time I made a review, and looked at their holdings, and made a determination whether, whether the holdings were adequate relative to their capital position.

Q. You said holdings adequate relative to their capital position?

A. Yeah, whatever they invested in.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Would an additional $10 million of capital on the books of River Valley had any effect on your analysis of their, of what is referred to I think in your examination as high-risk investment securities?

A. Yes. Yes. It would have had some impact.

Q. And what would that impact have been?

A. If they had, if they had more capital, we would have been maybe more comfortable with their holdings.

Q. Based on the specific circumstances of River Valley, what effect on your analysis of these portfolios would there have been had the institution had an additional $10 million in capital?

MATERIAL REDACTED

THE WITNESS: We would have felt more comfortable with the risk of these assets, their capacity to absorb risk.

BY MR. CAYNE:

Q. Would that comfort have been reflected in your exam reports?

A. In some fashion, probably.

Q. In what fashion would it have been reflected?

A. I can't speak -- you know, that's the capital section of the report.

I didn't write that. I don't know how, I don't know how the EIC and whoever would be assigned to that area would write that.

Q. But I --

A. It clearly would show it was a higher ratio, you know, in the report regardless of how it was presented, higher ratio of capital, which would be a positive.

Q. Um-hm. Is it possible that -- I'm not going to ask you to quantify this, but is it possible that there would have been some level of capital that if River Valley in the late '80s and early '90s had capital above that level, the

MATERIAL REDACTED

A. I don't think it would have improved beyond a 2, but it may have been improved from a 3 to a 2.

Q. And a 2 would have been considered --

A. This is OTS ratings.

Q. I understand. A 2 OTS rating would have been considered a satisfactory rating?

A. Yes.

MATERIAL REDACTED

Q. Thank you. Have there been, have you conducted examinations of institutions that have had portfolios of high-risk mortgage derivatives in which at the conclusion of the examination, you recommended or directed that the institution reduce or eliminate its portfolio of such investments?

A. I may have. I can't recall specifically which ones.

Q. What would have led you in those cases to issue such a recommendation or directive?

A. Combination of things -- the riskiness of the assets, the ability to manage the assets, the size of the holdings; all of those things would have come into play.

The capital, the position, earnings position of the company, what else they were holding that was risky, all of those decisions would be, all of those would be looked at together to make a final determination.

It's not, it's not the preferred course.

Q. What's not the preferred course?

A. Required, required divestiture.

Q. Why is that?

A. Well, because it's, if the instrument's illiquid, forcing a company to sell it is, you know, could be problematic as far what price they will get for it, so you're forcing them to make kind of a fire sale.

You know, the most reasonable thing to do is not to let them do any more of those kind of investments, to restrict future investments.

Q. Did you restrict future investments at

River Valley?
A. I don't believe we did.
Q. And why did you make the decision not to require the restriction of future investments by River Valley?
A. I didn't think it was necessary.
Q. But specifically for the record, on what basis did you conclude that it was not necessary?
A. That they had, that their -- you know, I can't remember exactly from, because everything changed from period to period, exam to exam, but generally speaking, whatever their internal limits were, we ultimately accepted them, and their holdings, we ultimately accepted them, and we accepted what their promises were for managing them, and we were, we were satisfied with, with those areas.
So their intentions of what they planned to do were acceptable, so we didn't have to restrict the future investments.

MATERIAL REDACTED

MATERIAL REDACTED

Q. You spent, do I understand correctly, a good bit of time dealing with Mr. Bangert?

A. Yes.

Q. What issues would you generally cover with him in those discussions?

A. Things that needed to be corrected.

Q. Such as?

A. Exam reports would have laid out everything that I suggested, but it may be documentation for what they're doing, you know, improvements, and how they may do something, certain regulations that require they do certain things, and they didn't do them.
I mean everything that I would have, I identified as needing correction would have been laid out in the exam reports.
Q. Did you find Mr. Bangert responsive to the concerns or issues you identified in your conversations?
A. Generally.
Q. Did you, in subsequent examinations, seek to determine whether he had followed through with commitments he had made to you?
A. Yes.
Q. And what was your conclusion?
A. Generally, that he honored what he said he would do.
Q. And he would have been the officer in charge of this function in the bank, right?
A. He was the ultimate authority in the bank on that, yes, as far as a line person, line management.

Even though he may not have handled day-to-day operations and day-to-day analysis, he ultimately was the one that made things happen.

Q. Other than Mr. Bangert and Ms. Els, who we spoke about earlier, are there any other individuals you recall in particular who you dealt with at River Valley?

A. I think, I think those two were the ones I primarily dealt with over time.

Those are the ones that come back to memory.

Q. Did you have a view at the time whether they were more sophisticated and knowledgeable in this area than similarly-situated officers of comparably-sized institutions?

MATERIAL REDACTED

THE WITNESS: There were very few companies that had the holdings that River Valley had.

They were very unique, and so it would have been hard to compare the expertise of those individuals to other individuals that didn't have similar holdings.

Q. So those other institutions then would not have had individuals with comparable expertise, is that correct?

A. As best I could tell, or else they would have had all those same kind of investments.

Q. But the, if I understood your earlier answer, the expertise of Mr. Bangert and Mr. Els was appropriate to and adequate to manage the portfolios that you examined, correct?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. So you had -- well, were you aware that River Valley had NOLs?

A. Yes.

Q. How was it, how would it have been relevant to your review?

A. It would have been a motivation to generate as high a return as possible from the investment portfolio to use those NOLs before they expired.

Q. And was it such a motivation?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. You did have discussions about certain issues with Mr. Holland and Ross, is that correct?

A. Limited; most of my discussions with them were at those formal meetings that were scheduled, and most of the meetings were, that I had with them were official meetings that were scheduled, as I said, not impromptu meetings, generally speaking.

Q. What was the basis of your conclusion that they were savvy investors?

A. Just, just the feeling based on observations.

Q. Such as?

A. Looking at the company's that they currently operated and what they did.

Q. By what they did, you mean what they accomplished with those company's?

A. The operations of the company's, yes; the direction of the company's.

Q. You thought they were operating in a positive, forward-looking, successful manner?

MATERIAL REDACTED

THE WITNESS: It seemed like they were opportunistic, and the, and, and that's, you know, one of the reasons that I thought they were savvy investors.

BY MR. CAYNE:

Q. When you say opportunistic, what do you mean by that?

A. Attempting to profit from various situations such as, you know, the, the investments that they made, and you know, and the company's that they acquired through the,

you know, with, as you mentioned, the net operating loss, tax carry-forwards, and other motivations, being able to leverage and borrow from the Federal Home Loan Banks and use the deposits as a, as a basis as well.

Q. Those were all factors that lead to your conclusion that they were savvy investors?

A. It seemed like -- I don't know exactly how much they put up, but it seemed like, you know, if, if they were successful in their endeavors, that they would have had a high return on their investment, and it seems like at the time, I thought they had a reasonable chance of achieving success.

Q. What was the basis of that conclusion?

A. Just kind of an overall feeling based on the operations just strictly was my perception. That's all.

Q. But it was your perception based on your personal review of their operations, is that correct?

MATERIAL REDACTED

THE WITNESS: Yes.

MATERIAL REDACTED

Q. Did you believe that Mr. Bangert and

Ms. Els were professionally competent and able to adequately manage the interest rate risk of River Valley?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. The reporter has handed you a document marked for identification as Exhibit 6 bearing Bates numbers 02043 through 02047.

Would you please read this document? And then I'll have a few questions.

MATERIAL REDACTED

THE WITNESS: Okay. I've read it.

BY MR. CAYNE:

Q. Does this exhibit help refresh your recollection concerning the December 16th, 1992 Board of Directors meeting of River Valley Savings Bank?

A. Yes.

Q. And what are your overall principal recollections of that meeting, having reviewed this document?

A. I take, you know, for the most part what was said here, you know, related to this stuff I worked on as, you know, in the ballpark.

Q. Does that mean you believe this memorandum is an accurate summary of the, of that meeting?

THE WITNESS: I mean the management team, you know, the company prepared this, you know, so it's presented from their light.

I don't necessarily disagree with anything that was said in this, in this document.

Nothing stands out as being extremely objectionable.

BY MR. CAYNE:

Q. Does anything stand out as being objectionable at all based on your review?

A. Well, yeah. We, we as regulators don't usually use terminology like the regulators are very satisfied with the competency and corporation of management.

I would never say that.

Q. What would you have said?

A. Well, if I didn't say anything, that's a compliment.

MATERIAL REDACTED

UNITED STATES COURT OF CLAIMS

- - - - - - - - - - - - - - - -x

HOMER HOLLAND, HOWARD ROSS, :

Plaintiffs, :

vs. :Case No. 95-524C

UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Thursday, February 26, 2004

Deposition of LAWRENCE A. KENNY, a witness herein, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, LLP, 555 12th Street, N.W., Washington, D.C. 20004, at 9:24 a.m., Thursday, February 26, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

CERTIFIED COPY

APPEARANCES:

On behalf of the Plaintiffs:

HOWARD N. CAYNE, ESQ.
DAVID B. BERGMAN, ESQ.
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5656

On behalf of the Defendant:

WILLIAM G. KANELLIS, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 515-7300

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| LAWRENCE A. KENNY | PLAINTIFFS | DEFENDANT |
| By Mr. Cayne | 281 | |

Afternoon Session - Page 372

E X H I B I T S

| KENNY EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 9 | Report of Examination | 337 |
| 10 | Report of Examination | 344 |
| 11 | Report of Examination | 349 |
| 12 | Report of Examination | 352 |
| 13 | Errata sheet | 372 |
| 14 | Errata sheet | 372 |
| 15 | Subpoena | 372 |
| 16 | Report of Examination | 374 |
| 17 | Report of Examination | 410 |
| 18 | Report of Examination | 419 |
| 19 | Ltr dtd 02/18/92 to Directorate fr Ferries w/attachment | 436 |
| 20 | Report of Examination | 428 |
| 21 | Report of Examination | 455 |
| 22 | Report of Examination | 463 |

MATERIAL REDACTED

Q. But do you recall that the capital

markets group had available to it fully adequate resources and capabilities to manage its portfolio of mortgage-backed securities?

MATERIAL REDACTED

THE WITNESS: Yes.

MATERIAL REDACTED

Q. Did River Valley have complex activities?
A. Yes.
Q. Did River Valley have the expertise to manage those complex activities?
A. Yes.

MATERIAL REDACTED

How did the amount of resources and personnel devoted to capital markets by River Valley compare to the amount of resources and personnel devoted by other thrift institutions to capital markets during the time period in which you examined River Valley?

MATERIAL REDACTED

THE WITNESS: River Valley's dedication of resources to capital markets was higher than most thrifts.

Q. Would it have been in the top 10 percent?

A. I don't have that information available.

It could have been.

Q. Is it possible that it was in the top

5 percent?
A. It's possible.
Q. Would you be surprised if you found out it was in the top 5 percent?
A. No.

MATERIAL REDACTED

# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

BANK OF AMERICA, FSB, )
et al., )
)
Plaintiffs, )
)
vs. ) Case No. 95-660C
)
UNITED STATES OF AMERICA, )
)
Defendant. )
---------------------------)
HOMER J. HOLLAND and HOWARD)
R. ROSS, )
)
Plaintiffs, )
)
vs. ) Case No. 95-524C
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

AMERICAN CAPITAL CORPORATION)
and TRANSCAPITAL FINANCIAL )
CORPORATION )
Plaintiff, )
)
vs. ) Case No. 95-523C
)
THE UNITED STATES, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 12, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For Plaintiffs Bank of America and American Capital:

RACHEL L. BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C, 20005
(202) 220-9670

For the U.S. Department of Justice in Case No. 95-660C:

TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.

U.S. Department of Justice, Civil Division

1100 L Street, N.W.

Washington, D.C. 20530

(202) 353-8841

Deposition of RONALD NEAL KARR taken by the Plaintiff at 101 North Wacker Drive, Suite 1600, Chicago, Illinois, on the 12th day of July, 2000, at the hour of 9:00 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

CONTENTS


| The Witness: RONALD NEAL KARR | Examination |
|---|---|
| By Mr. Cayne | 6 |


INDEX OF EXHIBITS


| For the Plaintiff | Page |
|---|---|
| 1 | 78 |
| 2 | 108 |
| 3 | 124 |
| 4 | 124 |
| 5 | 138 |
| 6 | 146 |
| 7 | 154 |
| 8 | 154 |
| 9 | 160 |
| 10 | 162 |
| 11 | 186 |
| 12 | 194 |
| 13 | 201 |
| 14 | 204 |
| 15 | 221 |
| 16 | 238 |
| 17 | 238 |

Mr. Holland I met with maybe three or four times over the time span. As I recall, our meetings were usually in regard to talking about what was going on at his institution.

Q. Do you recall, again, before we look at documents to refresh your recollection, issues that were going on with his institution after you arrived at the OTS Chicago office?

A. I don't have a good recollection of the specifics. I have a vague recollection that one of the primary issues at River Valley had to do with a large portfolio of derivative products that exposed them to some substantial amount of interest rate risk and that they were working down that portfolio.

Q. Do you recall at the time dealing with officials at the Federal Deposit Insurance Corporation Chicago office concerning that portfolio?

A. Working with the FDIC?

Q. Dealing with officials in the FDIC, either by phone or correspondence, relating to the portfolio to which you just referred.

A. Yes, vaguely.

Q. Simona Frank?

A. Simona Frank was the regional director at the time, yeah. And I think -- I think -- I think that we had different opinions as to whether or not the portfolio should be classified or not.

Q. What do you remember, sitting here before you look at any documents to refresh your recollection, as to your difference of opinions? And I understand, it was eight years ago.

A. I'm not so sure it's just River Valley. At that time period, we had -- I mean, the FDIC took a position that products that -- derivative products in particular that represented interest rate risks issues to institutions should be classified, and classified meaning that they present safety and soundness risks to the institution that require more capital, other things, okay?

We disagreed that -- with the FDIC that you classify residuals because based on -- based on the fact that they represented interest rate risk. If they represented credit risk, we would agree that they needed to be classified. That our classification policies of both agencies indicated that we should only classify assets

based on credit issues, not interest rate risk issues, and I think we had that same issue with River Valley.

Q. And this was an issue that -- between the -- am I correct this is an issue that was between the agencies, OTS and FDIC, rather than being an issue between you and Ms. Frank?

A. Oh, yeah, it was -- I had it in Topeka. I had it in Chicago. They had it all around the country.

Q. When did this issue first surface?

A. I think in the '90s.

Q. Early '90s?

A. Yes. As soon as the FDIC got involved with the examination of some of these institutions, which was somewhere in the '90s, that was one of the issues that came up as far as our viewpoints on how to examine and how to deal with derivative products.

Q. So when you said --

A. It was a philosophical difference between the agencies.

Q. When you said the FDIC first got involved, you are referring to after August 9, 1989, when the FDIC had a formal examination role

with respect to institutions for which the Office of Thrift Supervision was the primary federal supervisor?

A. That's correct.

Q. So it's probably sometime starting perhaps in late '89 this issue first bubbled to the surface?

A. They didn't actually start doing their examinations until 1990. Until they got in and started taking the positions, it didn't really become an issue. I don't think they did any joint examinations with us -- I don't recall any in 1989.

Q. Perhaps then this issue came to the surface sometime in 1990?

A. That's my recollection.

Q. Do you recall dealing with this issue during your time in Topeka?

A. Yes.

Q. And in what context did this issue arise while you were at Topeka?

A. I don't remember the specific context. I would be guessing if I would -- what the specific context was. I don't know.

Q. Did you have conversations or dialogue

with FDIC officials, while you were employed at Topeka, concerning this issue?

A. Yes.

Q. And again, it was still an issue once you arrived in Chicago?

A. Yes.

Q. The issue may have been presented by a number of institutions, but it definitely included the River Valley institution?

A. It's my recollection it included River Valley.

Q. Could this issue have effect on examination reports? And by that, Mr. Karr, I mean because your agency and the Federal Deposit Insurance Corporation took a different view on this issue, could it result in different safety and soundness or supervisory ratings of a specific institution being assigned by the FDIC and the Office of Thrift Supervision?

A. Yes.

Q. And specifically how could this issue have impacted on the examination process for a given institution?

A. How would it have impacted the examination process?

Q. What I mean by that, how could it -- could it have caused a difference in results or difference in conclusions between an FDIC exam and an Office of Thrift Supervision examination?

A. How could it effect a difference? I'm not understanding your question.

Q. I believe you indicated, if I understood, that because the FDIC and the OTS had different views on this specific issue, it could cause the results of an FDIC safety and soundness examination to differ in certain aspects from the results of an Office of Thrift Supervision safety and soundness examination, correct?

A. That's right.

Q. Now I'm asking in what specific ways could the differences between the agencies on this particular issue cause the examination -- safety and soundness examinations conducted by the two agencies to differ?

A. Well, on derivative products we would look -- the OTS would look at those products from two aspects; is there credit risk and is there interest rate risk, and are they being well managed, obviously.

If we didn't find credit risk in the

derivative products, we would only look to the risk -- the interest rate risk that they posed and make a judgment as to how significant that was or not. And we would base our conclusions on interest rate risk.

The FDIC looked at those same products and would, because of the interest rate risk, would classify those assets. We would not. Once they classified the assets, they would view them as having asset quality problems. We did not unless there was credit risk involved. If there was credit risk involved, then we would view them as having asset quality problems.

Now, if you classify an asset, in most cases, based on reserve policies, an institution would be required to add to its general loss reserves because of the additional classifications.

So having classified derivative products could increase the amount of reserves required. And if you add reserves, you're going to impact earnings, because it comes out of earnings or it comes out of capital. And you can have those impacts.

So those are the kinds of things that

can happen in that kind of a situation. So the result could be that we would class- -- just view interest rate risk as an issue and not classify them, and our rating of that area might be adverse or not, depending on the amount of that risk. And we would reflect that only in that part of the CAMELS rating that relates to interest rate risk.

The FDIC would not only impact its rating on interest rate risk but would look at asset quality, and that also could impact capital, and it could impact earnings. So it could have a wider range. And we also have to look at whether or not we were double-hitting for the same issue.

Q. Can you explain to me -- the term you just used was double-hitting?

A. Yes.

Q. I'm not familiar with that term. What do you mean?

A. If you adversely rate one area of an institution's operations, essentially you try not to take that same issue and impact another one with it, unless there is a direct and clear correlation that creates a relationship where you

should use both of them.

For example, interest rate risk; if you don't -- if you classify -- if you hit them for interest rate risk and you say this has an impact on earnings, okay, and then you also take that same asset and say I'm going to classify it because of credit risk when there is no credit risk, and you hit asset quality, and then you make them do GVAs -- general valuation allowances -- and that takes earnings. Now you've hit them twice on the ratings for the same issue. You try not to do that unless there are direct and clear relationships that you need to do it with.

Q. Do I understand correctly, Mr. Karr, then, one of the differences between the FDIC's approach and the approach of the Office of Thrift Supervision is in dealing with these derivative products, correct? We're dealing with derivative products here?

A. Yes.

Q. The OTS approach did not involve double-hitting, but the FDIC approach did result in double-hitting; is that correct?

A. It could.

Q. In your opinion did it?

A. In some cases, yes.

Q. Explain to me, so I'm clear, how in some cases did the FDIC's approach result -- let's make it specific. I think I understand now, based on your explanation, what double-hitting is. Explain to me why the OTS approach did not result in double-hitting, but why the FDIC approach could result in double-hitting?

A. If we don't classify the asset, we're not going to require more GVAs.

Q. "We," the OTS?

A. Right. As soon as you classify that asset, you're going to need more GVAs, and that's going to double-hit the same issue, a derivative product that shows only one kind of risk, interest rate risk. You're going to double-hit an adverse rating on two different factors.

Q. So the report is clear, please give me an example where the approach followed by the FDIC would result in what you call a double-hit.

MS. TORNATORE: I'll just object to the extent you're asking Mr. Karr to provide you with testimony regarding FDIC procedures. I think

that's beyond this witness's capability.

BY MR. CAYNE:

Q. You may respond, sir.

A. You want a specific example of where that happened?

Q. No, not -- give me an example. It doesn't have to be attached to a particular institution, just so I understand what you're referring to. Describe to me a situation where the FDIC approach would involve what you call a double-hit.

MS. TORNATORE: You're asking him to come up with a hypothetical.

THE WITNESS: I gave you my example of how it could happen.

BY MR. CAYNE:

Q. What was that?

A. If you classify derivatives for credit risk because of interest rate risk, you're going to give them a different rating for asset quality because you classified them for interest rate risk. You're also going to hit the rating for interest rate risk because you're taking that into consideration, too. So you've taken the same asset and double-hit it in two different

ratings categories.
Q. So in the FDIC approach -- how long did this issue continue for, the issue between the two agencies? Does it continue today, for example?
A. No, it doesn't.
Q. When was it resolved?
A. It sort of evolved out of -- I don't know specifically when it went away. We dealt with it for a few years. We had our position. The FDIC had their position. We agreed to disagree, which we do on some things, and I don't recall that we have this -- I don't -- I haven't had a discussion with my FDIC colleagues on this issue for a long time.
Q. What was the period that you recall the issue being present? Was it approximately '92 to '94 or '95?
A. It was the early '90s.
Q. Early '90s?
A. Yes.
Q. And does the Office of Thrift Supervision continue to follow the same position on this issue or has it changed its position?
A. We will not today classify an asset

because of its interest rate risk. We classify them because of credit risk.

Q. Today, July of 2000, that continues to be the position of OTS?

A. That's right.

Q. And when the Federal Deposit Insurance Corporation examines institutions subject to your supervision, Mr. Karr, does it take that position today, or does it still take its former position?

A. I have no recollection of any differences of opinion on that issue at any of our recent exams over the last few years. We agree.

Q. So the FDIC now agrees with the OTS on this issue?

A. You'll have to ask them if they agree with us. We have not had any differences of opinion with my colleagues.

MR. CAYNE: It's 10:13. Let's take a 10-minute break. Off the record.

(Brief pause.)

MR. CAYNE: Back on the record.

BY MR. CAYNE:

Q. Mr. Karr, referring to the issue we were discussing prior to the break we just took,

# EXHIBIT 6

EXHIBIT
Ferries #19
8-10-00

**MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS OF RIVER VALLEY SAVINGS BANK, F.S.B.**

**DECEMBER 16, 1992**

A special meeting of the board of directors of River Valley Savings Bank, F.S.B. ("FSB") was held at the offices of Holleb & Coff, 55 East Monroe Street, Suite 4100, Chicago, Illinois 60603 to discuss the OTS and FDIC examiners' findings.

Howard R. Ross chaired the meeting and called the meeting to order at 10:10 a.m. Mark S. Kipnis served as secretary and recorded the following members present:

| | |
|---|---|
| Howard R. Ross | Homer J. Holland |
| L. David DeTrempe | Steven Bangert |
| Chester J. Clauden (by telephone) | Mark S. Kipnis |
| Calvin L. Morgan | Fred Tuerk |
| | Ronald Pikus (subject to regulatory confirmation) |

Robert Powers' seat is vacant, Mr. Powers finally having lost his bout with cancer. Attending as guests of the board were Larry Ferries, Ellen Fowler, Gary Curtin, Larry Kenney and David Kalina of the Office of Thrift Supervision, Dean Morse and Nancy Griffin of the Federal Deposit Insurance Corporation and Anne W. Brody of Holleb & Coff.

Mr. Ross turned the meeting over to the Office of Thrift Supervision, our primary regulator.

Mr. Curtin stated that the purpose of the meeting was to discuss the examiners' findings and that a formal request for corrective action will be presented at a later date. Mr. Curtin stated that as part of a joint exam River Valley Holdings, Inc. was also examined. The only holding company issue, a 23(b) violation, was that a certain amount of time spent by Ron Seib was not correctly allocated to and paid for by the holding company. The holding company has already reimbursed FSB for approximately $136.00 of Ron Seib's time and in the future shall reimburse FSB at the rate of $500.00 per quarter, as passed by resolutions of both the holding company and FSB.

Mr. Curtin next reviewed OTS's "Credit Crunch" statement that in evaluating commercial real estate loans, the regulators will look not only to the value of the underlying security but also to the borrowers' ability to pay. Mr. Curtin acknowledged that the Credit Crunch statement was fairly irrelevant to FSB.

PLAINTIFF'S EXHIBIT PX 767

Confidential Material — Subject to Protective Order

Mr. Curtin next explained the new examination procedures whereby there is increased coordination between the FDIC and OTS and that we will only receive a report from OTS.

With respect to management, Mr. Curtin highlighted the following:

1. In contradiction to the by-laws, Ron Pikus has been president without being a member of the board of directors. Such oversight was cured with Ron's election at the November board meeting, subject to regulatory approval.

2. With respect to affiliated transactions, as previously mentioned in connection with the holding company exam, there needs to be a proper allocation of Ron Seib's time. Additionally, although the airplane has been sold, there was an approximate $1,300 reimbursement for gas expense issue. It was further suggested that we look at our credit card policies with respect to business vs. personal use.

3. Pursuant to Regulatory Bulletin 27, in connection with our review of senior management salaries, we need to compare those salaries annually with comparable officers in the market place. The U.S. League prepares such a study and it will be presented to the audit/personnel committee in January.

4. With respect to political contributions, FSB spent $200.00 to attend a dinner sponsored by the Peoria GOP. Although not for a particular candidate, donations of this sort are deemed illegal contributions under 11 C.F.R. 100. This isolated expenditure has already been reimbursed to FSB.

5. With respect to management bonuses, annual bonuses have been paid to senior management without written guidelines. In the future, operating goals will be set forth in our annual business plan or other board statements.

6. With respect to our internal auditor, Trinia Witt's work is monitored by Ron Seib, FSB's CFO. Mr. Seib also evaluates her. Consequently, her independence is questioned. The regulators want to make sure that department heads have no input on internal audit reports, that the internal auditor regularly meets with the audit committee and that the audit committee has input upon the internal auditor's annual evaluation.

With respect to asset quality, Mr. Curtin stated the following:

1. As of September 30, 1992, FSB had $6,314,000 of classified assets of which approximately $3,400,000 was

Confidential Material —
Subject to Protective Order

commercial real estate acquired at the time of acquisition. The amount of classified assets has been steadily going down each and every year and this is a very good trend.

2. Mr. Curtin acknowledged that there is an 18.5 million dollar differential in the OTS/FDIC treatment of classified assets based upon the FDIC's classification of all of our residuals.

3. Our general valuation allowance is adequate.

4. With respect to our lending activities, we lend primarily to single family homeowners and securitize and sell most of those loans. The report is very positive and our underwriting is good.

With respect to operations, Mr. Curtin reported the following:

1. It is difficult for the regulators to analyze our operations because of the effect of our investments. As of September 30, 1992, FSB had a 1.2% return on average assets before write-downs. Income is lower this year than last year because of our shrinkage in assets. We had a 360 basis point interest rate spread as of June 30 and the reduction in hedging expenses will have a large positive effect on future income.

2. Our tangible capital ratio as of September 30 was 5.2% which would be reduced to 4.7% if the regulators were to reduce capital by the isolated residual loss without looking at any of the other gains within the institution. Our ratio, as of November 30, is 5.37% and OTS acknowledges that we are in compliance with the capital requirements of our supervisory agreement. It was noted that as of September 30, the ratios were lower because the bank was unduly large because of our large pipeline. We have subsequently sold 40 million dollars of loans in that pipeline.

3. There were a couple of reporting errors that have been corrected and are generally deemed immaterial.

4. From the regulators standpoint, FSB's primary risk is still its investment portfolio.

Larry Kenney next discussed the regulators' risk management concerns:

1. As of September 30, 1992, we had an approximate $23.5 million balance of high risk mortgage derivatives. They





Confidential Material —
Subject to Protective Order

are very sensitive to prepayments. The regulators want greater documentation relative to our prepayment analyses and estimated cash flows. They would like us to document the thought process used by management in selecting the assumptions (prepays and yields) used to determine market value and sensitivity. Where the assumption is a negative yield, that we write down the differential. The $2.5 million write-down during the last quarter was not unusual as we are writing down approximately $8 million of such derivatives during the course of the year. The FDIC policy, although not the OTS policy, still is to classify all such investments.

2. As of November 30, 1992, our purchase money servicing rights balance is over $7,000,000. At the exam date (September 30), the balance was less than $3,000,000. We are required to have an outside party come in once a year to independently value our purchase money servicing rights. Peat Marwick did the appraisal last year but did not give a clear certification as to value. In March, 1993, the regulators expect to see a clear appraisal with the assumptions documented.

3. With respect to our accounting methodology, the regulators want us to be consistent in our prepayment estimates.

4. With respect to our investment policies, we have had large amounts in our intended for sale investment portfolio. The average duration of such investments is 15 days. The regulators recommend that we set up policy position limits and loss limits. With respect to our trading portfolio, our loss limit of 1% was exceeded in one isolated instance and it was acknowledged that management had promptly brought the matter to the board's attention.

The regulators next spent substantial time answering questions from various members of the board, primarily Messrs. Clauden, Tuerk, DeTrempe and Morgan, concerning the following:

1. Although the regulators are concerned about the high risk derivatives, they acknowledge that River Valley is in a stronger capital position this year than last year, the amount of the derivatives is smaller and that in every aspect of the MACRO Ratings, River Valley is currently as strong or stronger than it was at the last exam.

2. The regulators are very satisfied with the competency and cooperation of management.



Confidential Material —
Subject to Protective Order

H&R-B55-00560

3. The regulators believe that the directors are adequately performing their duties, asking the questions they should be asking and monitoring the subject areas they should be involved in.

4. When asked for areas of improvement or direction that either the management or the board should take, or whether the institution should no longer invest in the derivatives, neither the FDIC nor OTS suggested any alternative course of action.

There being no further business, the meeting adjourned 11:40 a.m.

Submitted: Approved:

Mark S. Kipnis, Secretary Howard R. Ross, Chairman



Confidential Material —
Subject to Protective Order

H&R-B55-00561

**DIANA JANUSKA DEPOSITION EXCERPTS FOR USE AT TRIAL**

p. 4, line 2-4
p. 5, line 4 – p. 6, line 2
p. 6, line 10 – p. 10, line 13
p. 11, line 6 – p. 11, line 19
p. 12, line 5 – p. 15, line 2
p. 15, line 15 – p. 17, line 2
p. 18, lines 7 – 24
p. 23, lines 23-25
p. 24, lines 1-25
p. 25, lines 1-21
p. 26, lines 2-12
p. 26, line 23 – p. 27, line 1
p. 30, line 3-16
p. 69, line 22 – p. 75, line 19 [Januska Ex. 5]
p. 75, line 24 – p. 76, line 17 [Januska Ex. 6]
p. 78, line 13 – p. 81, line 13
p. 81, lines 14 – 19, 24
p. 82, line 3 – p. 84, line 20
p. 87, lines 11 – 20 [Januska Ex. 8]
p. 88, line 1 – p. 92, line 14
p. 109, lines 2-25
p. 110, lines 1-6, 15-22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and HOWARD R. ROSS, )
)
Plaintiffs, )
)
vs. ) No. 95-524C
THE UNITED STATES OF AMERICA, )
)
Defendant. )

Deposition of DIANA JANUSKA
(Taken by Plaintiff)
Chicago, Illinois
August 11, 2000

Reported by: Melissa Belice, CSR No. 084-003391

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

DAVID B. BERGMAN, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the U.S. Department of Justice:

PATRICK T. MURPHY, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

## I N D E X

| WITNESS | DX | CX | REDX | RECX |
|---|---|---|---|---|
| DIANA JANUSKA | | | | |
| By Mr. Bergman | 4 | | | |
| By Mr. Murphy | | 112 | | |

## E X H I B I T S

| Januska Exhibit | |
|---|---|
| No. 1 (4/14/87 memo from C. Biedron to A. Smuzynski) | 46 |
| No. 2 (7/7/87 memo from M. Jaski to D. Januska) | 49 |
| No. 3 (11/13/87 memo from M. Jaski to D. Januska) | 54 |
| No. 4 (11/17/87 memo from M. Jaski to D. Januska) | 68 |
| No. 5 (5/27/88 memo from D. Sabella to E. Bonhomme) | 69 |
| No. 6 ("S" memo) | 75 |
| No. 7 (6/24/88 memo from S. Root to FHLBB) | 85 |
| No. 8 ("S" memo) | 87 |
| No. 9 (Rock Falls S&L Bid Proposal) | 93 |
| No. 10 (River Valley Bid Propsal for Republic) | 93 |
| No. 11 (Liquidation analysis for Republic S&L) | 93 |
| No. 12 (6/29/88 memo) | 93 |
| No. 13 (3/23/89 letter from A. Webber Brody to M. Jaski) | 104 |
| No. 14 (4/18/89 letter from A. Webber Brody to FSLIC) | 105 |
| No. 15 (E-mail from D. Harootuniand) | 106 |

DIANA JANUSKA,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could you please state your full name for the record.
A. Diana Lynn Januska.
Q. And could you spell the last name.
A. J-a-n-u-s-k-a.
Q. Are you taking any medication or is there any other reason why you may not be able to give truthful testimony today?
A. No.
Q. Please tell me about your educational background starting with college and anything beyond.
A. I have an associate's degree from Triton College with a major in business. I have a bachelor's degree from the University of Illinois at Chicago with a major in finance and an MBA from DePaul University with a concentration in finance.
Q. And what years did you achieve those degrees?
A. '82, '85, and '89.
Q. And was the MBA through a night program?
A. Um-hum.

Q. That's a yes?
A. Yes.

MATERIAL REDACTED

And if you could tell me about your professional career beginning with first job after college.
A. I've had two after college. My first one was at a savings and loan. I worked there for nine months. I was a systems analyst.
Then I was hired by the Federal Home Loan Bank of Chicago in April of '86. The first nine months I was an examiner in the field. Then I was a supervisory analyst beginning in January of '87.
I was an analyst until approximately 1990, then I was a financial analyst, and now I have my current title of policy analyst, and I think that changed in '96.
Q. What savings and loan did you work for

for those nine months?
A. MidAmerica Federal Savings Bank.
Q. And what basically were your responsibilities as systems analyst there?
A. I worked with the reports that were generated by the computer system. They had an in-house data system, so I worked for the vice president. I can't remember which vice president he was, but he was in charge of their securities, and the comptroller reported to her.
Q. And so you were working with data relating to the securities portfolio of the savings and loan?
A. Just the overall general, the balance sheet, just reports that came off of the system.
Q. What were your responsibilities as an examiner in the field at the Federal Home Loan Bank of Chicago?
A. I reviewed the books and records of institutions where I was assigned. The first jobs were basically reviewing their loan portfolio, and then some subsequent jobs I was assigned different areas, some reviewing securities, different aspects of the bank.
Q. In your work as an examiner in the

field, do you recall whether you worked on any of the five institutions that were eventually acquired by Holland and Ross? And I'll review them with you now. It's the Home, Mutual, or Galva or Republic or Peoria Federal Savings and Loan.

A. Republic.

Q. And you were an examiner in the field for Republic before Republic was acquired by Holland and Ross?

A. Yes.

Q. At the time that you were working on Republic, it was a troubled institution at the time, is that true?

A. Yes.

Q. Was it insolvent?

A. I believe so. It must have been.

Q. And do you recall anything about the types of problems it was facing?

A. Asset quality problems. There are some large loans that the recent owner caused the institution to make.

Q. Do you recall the name of the recent owner?

A. Timothy Huer.

Q. And he made some loans that turned out in retrospect to be not so good?
A. Correct.
Q. Was he still operating the thrift when you were examining it?
A. No, I didn't meet him.
Q. Had he been removed?
A. I don't remember.
Q. Who was managing the thrift when you reviewed it?
A. A woman. I can't remember her name.
Q. Was the condition improving after the Timothy Huer management was removed?
A. I don't remember.
Q. Do you recall the rough time frame in which you examined Republic?
A. It would have to be early fall of '86.
Q. And do you recall who was the examiner in charge on that examination?
A. I believe Ken Issacson (phonetic).
Q. And when in 1987 did you become a supervisory analyst?
A. January, the first week of January.
Q. What were your responsibilities as a supervisory analyst?

A. I was given a specific caseload with institutions to monitor their operations between exams, review their examination reports. The majority of the institutions in my caseload were insolvent institutions, so once it was determined that they were scheduled for a resolution, then I worked on that as well.

Q. Did this work involve any field work at the locations of the thrifts?

A. No.

Q. It was all in the Federal Home Loan Bank of Chicago office?

A. Correct.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And tell me the whole reporting structure when you were a supervisory analyst beginning in January '87 and if it changed over time through 1990.

A. Helen Mirza was my supervisor. And there was another analyst that also reported to her. Her name was Leslie Sommers. And Helen reported to Chet Biedron. And Chet Biedron reported to Leo Blaber. And probably sometime I think in '88 or the end of '87 Stuart Brafman was hired. And I believe Chet then reported to Stuart who then reported to Leo.

Q. Did anyone report to you?

A. No.

MATERIAL REDACTED

Q. You testified I think that you were monitoring mostly insolvent institutions and when they were scheduled for a resolution you would do work on the resolution. What did you mean scheduled for a resolution?

A. Well, if you had an insolvent institution, you would first see if anybody wanted to merge with them on an unassisted basis. If that wasn't possible, then the Washington office would schedule institutions to be put out for bid on an assisted basis. And a bid conference would be scheduled or you would contact institutions through the mail asking if they were interested in seeing a bid package on a particular institution or a group of institutions.

Then a bid would come in, you look at them, ask them to be cost through a recommendation memo. If that was approved, then Helen and her staff, meaning Leslie and I, would negotiate that, sometimes with the help of Stuart, Stuart Brafman I think in some of the later cases and sometimes

with the assistance of the Washington office. And then if that was approved, then you'd work on the final board package.

Q. And what is contained in a final -- did you say final board package?

A. It's a variety of memoranda. I think the "S" memo. I think there's a legal memo, maybe an executive summary, copy of the draft assistance agreement before it was signed.

Q. And all these materials go to the Federal Home Loan Bank Board in Washington?

A. Yes.

Q. Was it the government's preference to resolve these situations first on an unassisted basis?

A. Yes.

Q. And second choice was on an assisted basis?

A. If it was less than the cost of liquidation.

Q. So if you can't find an unassisted deal, the choices are assisted or liquidation, and you would do whichever is cheaper; is that right?

A. Correct.

Q. And how did you figure out whether an

assisted deal was cheaper than the cost of liquidation?

A. Mike's area or Dennis and Mike, usually Mike ran the -- there is a FSLIC model that they use to determine the cost of liquidation. They would run that.

Then if we had bids, they would be run using that model, and they would come out with a figure, and you would look at them and see which was less.

Q. And the Mike you referred to is Michael Jaski?

A. Yes.

Q. Did anyone else do that kind of analysis?

A. The Washington office also had analysts that do that.

Q. And how did you decide whether to rely on Michael's analysis or the Washington office's analysis?

A. I think they kind of did it simultaneously. I wasn't in that area.

Q. What was your role in the process of negotiating with potential acquirers?

A. I was in the meetings, but Helen was the

negotiator or whoever came in from Washington if that was the case. Sometimes they came out.

MATERIAL REDACTED

Q. You worked on the Mutual, Home, Galva acquisition and the Republic acquisition?

A. Yes.

Q. Did you also work on the Peoria acquisition?

A. No.

Q. Do you know who did?

A. No.

Q. How was it determined who would work on which acquisition?

A. Republic, Mutual of Canton, and Home of

Peoria were all in my caseload, so I worked on those. Galva was not in my caseload, it was in Leslie's. So we worked together on the Mutual, Home, and Galva transaction.

Q. So you were responsible for monitoring, between examinations, the operations of Republic and Mutual and Home?

A. Yes.

Q. And Leslie was responsible for monitoring Galva?

A. Correct.

Q. How did it come to be that Mutual, Home, and Galva were aggregated together for the purpose of resolving the institution?

A. All three of the institutions were small. They were not near the Chicago metropolitan area, so they didn't -- none of the institutions had a substantial branch network. So they may not have generated a lot of interest if they were bid alone, stand-alone institutions.

But if you package the three together, they were geographically close to one another, and they may have been attractive to an acquirer as a branch network in the middle of the State of Illinois. I think the idea came from somebody in

the Chicago office, and we recommended it to the Washington office.

MATERIAL REDACTED

MATERIAL REDACTED

Q. How many times did you meet with either Homer Holland or Howard Ross in the course of the negotiations only? Not any operations subsequent but in the course of negotiations.

A. I don't remember.

Q. Was it more than once?

A. Probably.

Q. Do you recall any meeting?

A. I remember meeting them. I remember them bringing Steve Bangert. But I don't remember the number of meetings, no.

Q. Do you recall meeting with anyone other than Homer Holland and Howard Ross and Steve Bangert from that group?

A. No.

Q. Did you ever meet Ron Pikus?

A. His name sounds familiar, but I don't remember him.

MATERIAL REDACTED

Q. You characterized the discussions as
negotiations between Homer Holland and Howard Ross
and the government, which is principally you and

Helen Mirza in these negotiations; is that right?
A. Probably.
Q. And what was the nature of the negotiations?
A. Well, they submitted a bid. Theirs was the winning bidder. They submitted a bid. And we would try to lower the cost of their bid.
Q. How would you try to do that?
A. Helen would do that.
Q. How did Helen try to do that?
A. Maybe asking them to reduce the cash that they're requesting or lower some other portion of their bid. With these I don't remember what the negotiations would have been.
Q. What were the kinds of inducements that the government was offering that cost the government money that you could work with and try to lower besides cash?
A. I don't remember all of them. One of them was the tax NOLs.
Q. And what do you mean by that?
A. There were -- the institutions had tax carry-forwards that could be used by the acquirer if they were transferred to the acquirer to lessen their tax.

Q. Lessen the acquirer's tax?
A. Um-hum.
Q. And this was something you were aware of at the time?
A. Um-hum.
Q. I'm sorry, is that a yes?
A. Yes.
Q. And the government used this as an inducement or an asset that it could sell to the potential acquirers, is that true?
A. Well, it was a benefit that the acquirer would ultimately have, so that was on the table.
Q. When you say that was on the table, what does that mean?
A. That was considered in the cost of the bid.
Q. Was that a cost for the government?
A. No, but it was a benefit to the acquirer. I mean, they're getting a benefit. They obviously couldn't lower some other portion of their bid if they were getting its benefit.

MATERIAL REDACTED

MATERIAL REDACTED

Q. So in view of the fact that the acquirers get the use of the NOLs, Helen Mirza perhaps or you would argue --

A. Or MAD, Washington, FSLIC.

Q. Someone in the government would argue that to the acquirers because you're getting the benefit of these NOLs maybe you don't need as much cash or loan coverage or some other package of benefits you don't need because you realize you're getting the benefits of these NOLs; is that right?

A. Right.

Q. And the government would then try to use that to lower other amounts of assistance, they had out-of-pocket costs for the government?

A. That's what I remember, yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did you meet with Holland and Ross in connection with the Republic acquisition as well? I've been focusing on the Home, Mutual, and Galva.

A. No, I kind of vaguely remember what they look like. I vaguely remember them coming into the office. I don't remember on which transaction.

Q. Do you have a recollection of the condition of Republic at the time that Holland and Ross agreed to acquire it?

A. You know, it was insolvent. That's all I remember. I don't remember about how much, I don't remember the institution's asset size. I don't remember any detail about the institution.

MATERIAL REDACTED

Q. Ms. Januska, you now have before you a document marked Januska Exhibit 5. It is a letter dated May 27, 1988, with an enclosure from Deborah Sabella, S-a-b-e-l-l-a, to Evelyne, E-v-e-l-y-n-e,

Bonhomme, B-o-n-h-o-m-m-e, at the Federal Home Loan Bank Board. You are shown as a carbon copy recipient. And it is Bates numbered CHO024 0072 through 0075.

A. Okay.

Q. Ms. Januska, you've read through the document. Will you please describe its substance for the record.

A. It appears to be a letter from I would guess the attorneys representing Mr. Ross and Mr. Holland, I don't remember who they were at the time, to an attorney at the Federal Home Loan Bank who was working on drafting the assistance agreement. And it appears to be the changes that Mr. Holland and Mr. Ross wanted to the assistance agreement.

Q. And the changes relate to the issue of the NOLs that we've been discussing; is that correct?

A. They're included in this, yes.

Q. Do you understand that the changes were to clarify that all of the benefits of the net operating loss carry-forwards were to be kept by Mr. Holland and Mr. Ross and were not to be shared with the government in connection with the Home,

Mutual, and Galva acquisition?
A. That's what it says.
Q. Do you recall that that was an issue at this time?
A. No.
Q. I take it you don't have any reason to doubt that that was an issue at this time based on the document, is that true?
A. The document kind of speaks for itself.
Q. Do you have any reason to doubt that the issue of who would get the full benefits of the NOLs was an issue of negotiation at the time of the Home, Mutual, and Galva deal?
A. From this document it appears to have been an item that was discussed, yes.
Q. And that I take it is consistent with your general recollection about the practices of marketing the insolvent institutions like Home, Mutual, and Galva, is that true?
A. I think the NOLs were discussed in other transactions, yes.
Q. And based on the evidence you've seen and based on general practices, do you believe they were also discussed in the Holland and Ross acquisition of Home, Mutual, and Galva?

A. Yes.
Q. And when you say discussed, they were in fact recognized as a benefit of the transaction that the government could offer to the acquirers to induce them to take on these insolvent thrifts, is that true?
A. It was an item that was discussed. Either they'd get the benefit or they wouldn't.
Q. Yes. And if they did get the benefit, that was something good for them and it would hopefully induce them to take on the failing thrifts for less costs than they would otherwise want in terms of government assistance, is that true?
A. I guess that answer would be yes. I mean, the whole thing would depend on whether or not the acquirer was able to use the NOLs. If they weren't able to use them, then, no, it wouldn't.
Q. When you say use them, what do you mean by that?
A. Well, if the acquirer wasn't able to use the NOLs for whatever reason, then they wouldn't be of benefit to them, would they.
Q. Your point being that you have to have

earnings in order to have the NOLs be convertible to cash essentially, is that true?

A. Right.

Q. And if you don't have earnings, you can't use the NOLs, and therefore they don't really have much value?

A. Right.

Q. They don't have any value.

A. Right.

Q. But if one believes that one will in fact have earnings and if business plans project earnings, then presumably you don't want to do a deal unless you think the resulting institution will be profitable and will have earnings, true?

A. Well, if I remember correctly, NOLs have a time limit to them, so you'd have to make the money within the time limit before the NOLs expired. So if the acquirer wasn't able to do that, then they wouldn't be able to use the NOLs, and they wouldn't be of benefit to them.

Q. So your point is that although the NOLs may well be an inducement and a benefit to buyers, there are restrictions on the ability to use them, and the government recognized that at the time, and presumably acquirers recognized that as well,

is that accurate?
A. I would assume so, yes.
Q. And so I take it the benefit of the NOLs is not something that's necessarily easy for you to quantify as you're sitting there assessing the benefits that the government is giving the government in these deals, is that true?
A. Did you just say the government twice. What was your question? Could you repeat your question.
Q. Sure. You made some effort to understand the value of the benefits that the government was offering to acquirers of these insolvent thrifts, correct?
A. Yes.
Q. And you recognize that the NOLs were a benefit that the government could offer to the acquirers of these insolvent thrifts, true?
A. It could be a benefit of the transaction, yes.
Q. And I take it from your testimony that it would be difficult for you to sit here and place a dollar value on the benefit of the NOLs, but you nonetheless recognize that it was a benefit and one that could potentially be very big

or potentially could be small?
A. It could be a potential benefit, yes.
Q. And that I take it was the context of discussions about the NOLs when you had negotiations with acquirers about trying to sell insolvent thrifts to them, true?
A. Yes.
Q. Did you have any understanding as to what kind of value or importance Mr. Holland and Mr. Ross placed on the NOLs in the Home, Mutual, and Galva deal?
A. I don't remember the detail of the transaction.
Q. Seeing the letter that is Januska Exhibit 5 and based on whatever recollection you may have, does this indicate that there was in fact importance to the NOLs to Mr. Holland and Mr. Ross in this deal?
A. It appears to be.

MATERIAL REDACTED

Q. Ms. Januska, you've been provided a copy of a document Bates stamped CHO022 0607 through

0613. It has been marked as Januska Exhibit 6. I'd like you to look through it, and then please if you could describe it for the record.

A. Okay.

Q. Could you describe the document for the record, please.

A. It's an "S" memo supplement, the subject of which is the acquisition and conversion of the Home of Peoria, Galva Federal, Mutual Savings by Mr. Howard and Mr. Ross -- Mr. Ross and Mr. Holland. It discusses the business plan that they submitted and their viability on a going-forward basis if the transaction was pursued.

Q. Is this a memorandum that you wrote?

A. Probably parts of it. I think Helen also probably wrote part of it.

MATERIAL REDACTED

MATERIAL REDACTED

Q. What is an "S" memorandum exactly?

A. Supervisory memoranda. This was a supplement having to do with the proposed acquisition by Mr. Ross and Mr. Holland. Usually the original "S" memorandum would have discussed the financial condition of the institution and possibly whatever marketing efforts had gone on to date. I don't remember what else was in it. It was kind of a standard kind of memo that we used at the time.

Q. And in this supplement, the first big heading here is financial viability on the first page, correct?

A. Viability?
Q. Financial viability.
A. Right, I thought you said liability.
Q. No, viability with a V.
A. Um-hum.
Q. There is a discussion of the amount of regulatory capital that the institution will have. Do you see at the end of the first paragraph?
A. Um-hum.
Q. Again, was that significant in assessing the financial viability of the resulting institution?
A. Probably was at the time. Like I said earlier, I don't remember, regulatory capital, what we thought was a good level at the time. I don't remember that.
Q. But you would have made an effort to be accurate in this memorandum in characterizing the amount of regulatory capital that would result from this deal, is that true?
A. I think, yes, that we would have wanted accurate information in the memo, yes.
Q. Do you believe this is accurate, the information contained in this memorandum?
A. I would believe so.

Q. The second page contains some proforma financial information which appears to be taken from information provided by the acquirers or potential acquirers, is that true?

A. That's what I would guess, yes.

Q. Look at the line that reads retained earnings. Do you see that?

A. Um-hum.

Q. What does that indicate to you from the time of at merger of zero and then other numbers entered in Year 1, Year 2, and Year 3?

A. If I had to guess, I would say those were the profits that they thought they were going to earn in Years 1, 2, and 3.

Q. And why do you say if you had to guess? Are you not familiar with this format?

A. I don't know -- you know, I'd like to see the document that it came from. But based on what's here, that would be my understanding of what it is.

Q. You understand retained earnings to be profits basically?

A. Yes.

Q. And in this memorandum that you may have had a hand in writing, that would be the typical

way that one would view the retained earnings entry here in this memorandum, is that true?
A. Yes.
Q. And this indicates that they are projecting profitability in Year 1, Year 2, and Year 3, correct?
A. Yes, they are projecting it, yes.
Q. Would that suggest to you that there would be value to the NOLs, that if they achieved these expectations, they would be able to convert NOLs to cash by using the NOLs to shield this income?
A. That's what it looks like, yes.
Q. On Page 4 there is a statement in the first full paragraph at the end that says taking into account all of these factors and the proven managerial record of the acquirers, the viability of the resulting association does not appear to be a major concern. Do you see that?

MATERIAL REDACTED

A. Um-hum. I see that.

MATERIAL REDACTED

Q. Do you have any reason to believe it's inaccurate?

A. I don't remember the managerial record of the acquirer. If it was in here, somebody must have written it. I don't know who it was. I don't think I wrote it.

Q. Is it fair to believe that there was an effort to make sure that this memorandum was as accurate as possible --

A. Yes.

Q. -- before it was sent to the Federal Home Loan Bank Board in Washington, D.C.?

A. Yes.

Q. And that in fact there were in fact, by your testimony, four individuals who had input in this memo, Leo Blaber, Helen Mirza, yourself, and Dennis Thomas?

A. I don't think Leo had input. I think he would have read it and signed it. If he didn't agree with something, I think he probably would have changed it, but I don't think he drafted it.

Q. You have three drafters and one person reviewing to make sure he is fully comfortable

with everything in it, is that true?
A. Correct.
Q. I take it if you were uncomfortable with anything at the time it was drafted, you would have expressed that discomfort with someone?
A. I'm at the bottom of the totem pole. That decision would have been made higher up.
Q. Yes, but you would have expressed your discomfort if you believed anything was inaccurate, wouldn't you?
A. Yes.
Q. Do you recall any incident in which you discussed a view that anything in a memo relating to Holland and Ross was inaccurate?
A. Not that I remember.
Q. Do you recall that you and others in your office believed that the viability of the resulting institution would not be a major concern if the deal went forward on this basis?
A. I don't remember any concern about it on a going-forward basis, no.
Q. Do you believe that Holland and Ross would be able to operate the thrift successfully?
A. From what I remember of the transaction, yes.

Q. And successfully means profitably, doesn't it?
A. Yes.
Q. In the next paragraph it states that the analysis and evaluation division of the FSLIC has run a viability analysis as well and that they can concur with the decision that the institution would be viable. Does viable again mean profitable in the future?
A. Yes.
Q. And was it typical for FSLIC to do its own independent viability analysis?
A. Yes.
Q. Why was that?
A. They wanted to make sure.
Q. It was important to you and the other government regulators that any deal that you conclude have a good opportunity for success, is that true?
A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Ms. Januska, you have before you what's been marked as Januska Exhibit 8. It's a document Bates stamped CHO022 0602 through 0606. Take as much time as you'd like. I'm going to focus on the bottom of Page 1 and the top of Page 2 of the memorandum itself.

A. Okay.

Q. What is this document?

A. It's another addendum to the "S" memo on transaction of Home, Galva, and Mutual of Canton.

Q. The first page of this document is a fax cover sheet; is that correct?
A. Yes.
Q. Is that your handwriting on the fax cover sheet?
A. Yes, it is.
Q. And does this indicate that you in fact sent a memorandum by facsimile to David Adkins in the FSLIC office in Washington?
A. That's what it says, yes.
Q. Any doubt that you did it?
A. No.
Q. There is a discussion in the addendum to the "S" memorandum of the net operating loss carry-forwards; is that correct?
A. Um-hum.
Q. What is the purpose of the discussion?
A. Probably to clarify the NOLs, which would survive the merger and which would not.
Q. And does this indicate to you that the acquirers had done some work and had their accountants do some work to determine exactly how many of the NOLs would survive the merger and would be available for their use after the acquisition is completed?

A. That's what I understand from the paragraph.

Q. Is there any doubt in your mind that the government, in the months and weeks before the acquisition was completed in the summer of 1988, was aware that the net operating loss carry-forwards were a significant inducement to Holland and Ross to go forward with this transaction?

A. I don't know if I'd clarify it as a significant inducement. I would just say it was part of the transaction.

Q. It was part of the transaction, and it was something that was the subject of a back and forth about what the benefits would be and how they would be able to use them, is that true?

A. It's been in a couple documents that you've shown me. I don't know if it was substantial. I don't remember the merits, the details of this transaction. It's in this memo. It was part of the transaction.

Q. Why was it in this memo and who is Linda Plye who is the recipient of the memorandum?

A. The director of corporate activities. I don't know why the memo was written. I don't know

that I was part of the memo. I don't remember the memo. Looks like I sent the memo. I don't remember why.

Q. What was the general practice in determining whether a matter was significant enough to put in an "S" memorandum and send up to the Federal Home Loan Bank Board?

A. Probably if somebody raised questions about it.

Q. And who would be somebody?

A. Anybody in MAD.

Q. What kind of questions would MAD have raised about the NOLs?

A. Maybe which ones would expire. Maybe that's why he wrote the paragraph. I don't know.

Q. Based on your 15 years in this office, can you think of any reason why someone at MAD would be curious about the treatment of the NOLs, when they would expire, the ability to be used by the acquirers?

A. Probably wants to know what the value of it was to the acquirer. That would be my guess.

Q. Again, why would FSLIC want to know if this had value to the acquirer?

A. Because it's part of this transaction.

Either there were something to them or not. I think we talked about that earlier this morning.

Q. I'm just trying to figure out why the Mergers and Acquisition Division of FSLIC would be interested in this fact.

A. I think I said this morning, and maybe she could find it, that if it was a benefit to the acquirer, they would be getting something. And if they're getting a benefit, they shouldn't get it for nothing, it would be offset by something else in a FSLIC assistance.

It's a benefit. Either it has a value or it doesn't. If it has a value, then it should be accounted for in the transaction.

Q. Is it your belief that that actually happened in this case?

A. From the documents you're showing me, yeah. I would think we talked about the value of the NOLs.

Q. And that the government recognized that this was a benefit it could offer to Holland and Ross, Holland and Ross recognized that it was a benefit they would receive, is that true?

A. You know, I have a problem with you saying the government could offer it as a benefit.

It was the NOLs of the institution and the institutions that were being merged, and Homer and Howard were going to acquire them.

And some of them would survive and they thought they were able to use them, so they would have a value. So it was part of the transaction in determining -- they put them in their bid. They could say we didn't want them. But they said in their bid they wanted them, so it became part of the transaction.

Q. When you said they could say they didn't want them, meaning that they could assign to the government any benefits of the NOLs?

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you have any understanding of the effect of FIRREA's eradication of regulatory capital from the books of River Valley and the effect of that occurrence on the operations of River Valley?

A. No, not specifically River Valley, no.

Q. Do you have a general understanding as to the effect on other thrifts similarly situated?

A. The passage of FIRREA required the institutions to immediately write off goodwill and other regulatory capital that didn't conform to GAAP.

Q. And what is your understanding of the effect that that had on the institutions that had to write off the regulatory capital?

A. They would have a one-time hit to their balance sheet.

Q. What do you mean by that?

A. They would have to write off that amount to be a reduction to retained earnings, would offset whatever earnings they made in the quarter that they wrote it off.

Q. And what about the effect on their capital position?

A. On what basis? On a GAAP basis it would probably be the same because on a regulatory capital basis it would be less.

Q. You're saying they would have less regulatory capital?

A. Yes.

MATERIAL REDACTED

Q. And you understand that that effect was disadvantageous?

A. From their point of view, yes.

Q. Yes. That they had to either find capital or replace it or go out of capital compliance, perhaps be ceased, change business plans, all true?

A. That would be true, yes.

# EXHIBIT 5

JONES, DAY, REAVIS & POGUE

AUSTIN HONG KONG
CHICAGO LONDON
CLEVELAND LOS ANGELES
COLUMBUS NEW YORK
DALLAS PARIS
GENEVA RIYADH

METROPOLITAN SQUARE
1450 G STREET, N.W.
WASHINGTON, D.C. 20005-2088

TELEPHONE: 202-879-3939
TELEX: DOMESTIC 892410
TELEX: INTERNATIONAL 64363
CABLE: ATTORNEYS WASHINGTON
TELECOPIER: 202-466-8642
WRITER'S DIRECT NUMBER:
(202) 879-3664

May 27, 1988

VIA MESSENGER

Evelyne Bonhomme, Esq.
Office of the General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

Re: Proposed Acquisition of Home Federal Savings and Loan Association of Peoria, Peoria, Illinois, Galva Federal Savings and Loan Association, Galva, Illinois, and Mutual Savings and Loan Association, Canton, Illinois, by Messrs. Howard R. Ross and Homer J. Holland

Dear Evelyne:

Prior to forwarding to you under cover of May 24 our comments to the Assistance Agreement relating to the above-referenced transaction, we did not have an opportunity to consult with our tax lawyers. After reviewing the Assistance Agreement, our tax lawyers have suggested that two changes be made to clarify that the net operating losses acquired in the transaction are not tax benefits to be paid to FSLIC. Enclosed are pages 46 and 47 of the Assistance Agreement, marked to reflect such changes.

Also enclosed is page 18 of the Assistance Agreement, marked to reflect that the opinion to be delivered by us with respect to the enforceability of the Stock Purchase Agreement must be qualified with respect to the indemnification provisions contained therein.

Please contact me at the above-referenced number or Peter Barnett at (202) 879-3972 with any questions or comments you may have.

Sincerely,

Deborah A. Sabella

Deborah A. Sabella

DAS/pgd
Enclosures
cc: Mr. David Adkins
Peter M. Barnett, Esq.
Mr. Robert A. Cline
Steven Dimmick, Esq.
Ms. Wilvia Galbraith
John P. Harootunian, Esq.
Van E. Holkeboer, Esq.
Mr. Homer J. Holland
Ms. Diana Januska
Ms. Janice Soergel ✓

EXHIBIT
PENGAD-Bayonne, N.J.
Januska 35
8-11-00

except as such enforceability may be limited by

Subordinated Debenture and related Purchase Agreement, and the Stock Purchase Agreement have been duly authorized, executed and delivered by, and constitute valid and binding obligations of RIVER VALLEY and the INVESTORS, enforceable against each of them in accordance with their respective terms, bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of the rights of creditors generally (or the rights of creditors of federal savings banks generally in the case of RIVER VALLEY), and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and

(2) The CORPORATION shall receive on or prior to the Effective Date a certified copy of the corporate resolutions of RIVER VALLEY authorizing the Transaction, the execution and delivery of the Acquisition Agreement, this Agreement, the Subordinated Debenture and related Purchase Agreement, and the Stock Purchase Agreement and;

(3) The INVESTORS and RIVER VALLEY, within the time periods specified by the terms of this Agreement or by the Bank Board, (a) shall execute and deliver to the CORPORATION all other agreements, instruments, and documents, including but not limited to the Regulatory Capital Maintenance Agreement, the Irrevocable Proxy, the Stock Issuance Stipulation and the Stock Transfer Stipulation, required to be executed and delivered by the terms of this Agreement and by any action of the Bank Board in approving the Transaction, and

, and except as the rights to indemnity under the Stock Purchase Agreement may be limited by applicable securities laws.



 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

(B) the state income tax liability for such taxable year (taking into account all allowable carryovers and carrybacks to such year) actually incurred by RIVER VALLEY.

(d) Timing of Payment. The Net Tax Benefit shall be credited to the Special Reserve Account or paid to the CORPORATION with thirty (30) days after RIVER VALLEY files its Federal and state income tax returns for the taxable year in which such Net Tax Benefits are realized ~~(including by way of carryovers and carry-backs)~~.

(e) Cooperation. RIVER VALLEY shall, upon request of the CORPORATION, provide copies of the tax returns and amended tax returns of RIVER VALLEY and any of its Subsidiaries and Affiliates for any taxable years specified by the CORPORATION. RIVER VALLEY agrees to use its best efforts, cooperate fully with the CORPORATION and take all such actions as are necessary to maximize the Net Tax Benefits realizable by it and to implement the provisions of this § 9.

(f) Disallowed Deductions. In the event Net Tax Benefits are paid with respect to Tax Benefit Items that are subsequently disallowed or that cease to be Tax Benefit Items because it is determined that payments with respect to such Tax Benefit Items are not excludible from gross income, such Net Tax Benefits shall be debited to the Special Reserve Account or paid to RIVER VALLEY.

, to the extent that

(g) Survival. This § 9 shall survive the termination of this Agreement. After the date of this Agreement terminates, RIVER VALLEY shall make immediate payment to the CORPORATION in cash of all amounts that would have been due to the CORPORATION pursuant to this § 9 prior to termination of this Agreement.

**Section 10.** Duplicate Payments. Any cost or expense for which an INVESTOR or RIVER VALLEY has been reimbursed under any section of this Agreement, or any recovery which has been paid over to or retained by the CORPORATION under any section of this Agreement, shall not be reimbursed to an INVESTOR or RIVER VALLEY or paid over to or retained by the CORPORATION, under any other section of this Agreement, even though such cost, expense, or recovery may be described in whole or in part in two or more sections of this Agreement.

**Section 11.** Non-Reimbursable Expenses. Except as specifically provided in § 3(c) with respect to opinion reports required to be filed under § 12(f)(2) and (3), the INVESTORS and RIVER VALLEY shall not seek reimbursement from the CORPORATION for expenses incurred in the administration of this Agreement. For purposes of this § 11, such expenses shall include, but shall not be limited to, compensation paid to employees or agents of the INVESTORS, RIVER VALLEY, or any Affiliates thereof, for services performed in connection with the preparation of reports and supporting documentation required to be filed with the CORPORATION under § 12 of this Agreement.

# EXHIBIT 6

07/12/88 16:11 FHLB CHICAGO OFS 312-565-5823 NO.254 P001/007

FEDERAL HOME LOAN BANK OF CHICAGO
111 E. Wacker Drive
CHICAGO, ILLINOIS 60601
(312) 565-5700

FACSIMILE TRANSMITTAL

FROM: Diana Januska

MACHINE PHONE #565-5823

DEPARTMENT/DIVISION: 081 Supervision

DATE 7/12/88

CONTACT PERSON: Same

PHONE # 312-565-5307

FAX TRANSMITTAL FORM COMPLETED BY: Same

PHONE #

PRIORITY: (CHECK ONE)

☒ URGENT (WITHIN 15 MINUTES)

☐ QUICK (WITHIN 4 HOURS)

☐ DELAY (OVERNIGHT)

NOTE: IF ALL PAGES ARE NOT RECEIVED, CALL ROSE FORD IMMEDIATELY AT (312) 565-5822

NAME/DEPARTMENT/COMPANY/CITY & STATE OF RECEIVER: Dave Adkins
MAD, FSLIC
Washington, DC

MACHINE PHONE# 202-254-2563

SPECIAL INSTRUCTIONS:
Dave - Please give a copy to Herb.

6 PAGES TO FOLLOW

Form No. 16-037 (REV 11/87) M2067

JUL 12 '88 17:10 PAGE.001

EXHIBIT
PENGAD-Bayonne N.J
Januska #6
8-11-00

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

July 12, 1988

**"S" MEMORANDUM SUPPLEMENT**

To: John Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Slaber, Jr.
Principal Supervisory Agent
Federal Home Loan Bank of Chicago

LBB by HKM

Subject: Acquisition and Conversion of Home Federal Savings and Loan Association of Peoria, Galva Federal Savings and Loan Association, and Mutual Savings and Loan Association by Messrs. Howard R. Ross and Homer J. Holland

FINANCIAL VIABILITY

Business Plan

The proposed merger of Galva Federal Savings and Loan Association (Galva Federal) and Mutual Savings and Loan Association (Mutual Savings) with and into Home Federal Savings and Loan Association of Peoria (Home Federal) will create a $210 million institution. In order to recapitalize the institution, Messrs. Ross and Holland (the acquirers) have requested an accounting forbearance which would allow $8 million of the $33 million of FSLIC assistance to be credited to regulatory capital. In addition, $5 million in preferred stock will be issued to the FSLIC and a $4.6 million subordinated debt security will be issued, which will be purchased by the American National Bank and Trust Company of Chicago. The total regulatory capital of the institution at the time of merger will total $17.6 million or 8.38% of assets.

The $33 million of FSLIC assistance, proceeds from the preferred stock issue and proceeds from the subordinated debt issue will be invested in FNMA/FHLMC adjustable rate mortgage securities. The institution will then have a one and three year GAP position equal to approximately 5% of assets.

As a result of the merger, the initial goodwill will total $13.3 million or 6.3% of assets. This goodwill amount is $8 million higher than it would be if accounted for under Generally Accepted Accounting Principles (GAAP). Under GAAP the $8 million in FSLIC assistance would not be counted as regulatory capital and would be used to offset the goodwill account.

"S" Memorandum Supplement
Page 2

Liabilities of the resulting institution will total $192.5 million and will consist primarily of the existing deposits of the three institution as well as $6 million in FHLB of Chicago advances. The regulatory capital to total liabilities ratio would be 9.1%.

The following proforma financial information indicates that the new institution will be a viable entity.

(000's omitted)
As of March 31, 1988

| | At Merger | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Cash and Investments | $100,064 | $ 99,968 | $117,105 | $137,206 |
| Loans | 91,177 | 94,654 | 98,304 | 102,137 |
| Goodwill | 13,343 | 12,699 | 11,639 | 10,305 |
| Other Assets | 5,600 | 5,037 | 4,635 | 4,347 |
| Total Assets | $210,184 | $212,358 | $231,683 | $253,995 |
| Deposits | $183,160 | $183,425 | $202,467 | $223,486 |
| FHLB Advances | 6,000 | 7,744 | 7,238 | 7,950 |
| Other Liabilities | 3,424 | 3,424 | 3,424 | 3,424 |
| Total Liabilities | $192,584 | $194,593 | $213,129 | $234,860 |
| Preferred Stock | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| Subordinated Debt | 4,600 | 4,600 | 4,600 | 4,600 |
| FSLIC Assistance | 8,000 | 8,000 | 8,000 | 8,000 |
| Retained Earnings | 0 | 165 | 954 | 1,535 |
| Total Regulatory Capital | $ 17,600 | $ 17,765 | $ 18,554 | $ 19,135 |
| Total Liabilities and Capital | $210,184 | $212,358 | $231,683 | $253,995 |
| Regulatory Capital to Total Liabilities | 9.14% | 9.13% | 8.71% | 8.15% |



 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

"S" Memorandum Supplement
Page 3

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Interest Income | $ 17,407 | $ 18,645 | $ 20,605 |
| Interest Expense | (13,566) | (14,152) | (15,527) |
| Interest Margin | $ 3,841 | $ 4,493 | $ 5,078 |
| Other Income | $ 696 | $ 696 | $ 696 |
| General & Administrative Exp. | (2,913) | (2,526) | (2,425) |
| Amortization of Goodwill | (534) | (534) | (534) |
| Net Income Before Tax, Sub-Debt and Preferred Stock | $ 1,090 | $ 2,129 | $ 2,815 |
| Subordinated Debt Expense | 414 | 414 | 414 |
| Preferred Stock Expense | 400 | 400 | 400 |
| Net Income Before Tax | $ 276 | $ 1,315 | $ 2,001 |
| Charge in Lieu of Taxes | (110) | (526) | (800) |
| Net Income | $ 166 | $ 789 | $ 1,201 |
| Net Income to Assets | .08% | .34% | .47% |

Under GAAP, net income would be $320,000 higher in each year due to the amortization of a smaller amount of goodwill. The above financial information appears reasonable and achievable based on the infusion of cash into the association from the issuance of preferred stock, subordinated debt and the $33 million of FSLIC assistance.

During the last three quarters, the three separate associations have reported the following operating results on a combined basis:

| | 9/30/87 | 12/31/87 | 3/31/88 |
|---|---|---|---|
| Net Loss | $ (2,608) | $ (5,564) | $(2,197) |
| Add Adjustments: * | | | |
| Provision for Loan Loss | 1,677 | 4,521 | 1,239 |
| Amort. of Deferred Losses | 175 | 207 | 205 |
| Loss on Investment Securities | | | 978 |
| Adjusted Net Income (Loss) | $ (756) | $ (836) | $ 225 |

* The adjustments to net income reflect extraordinary charges to income that will not recur when the assets and liabilities are marked-to-market.

If the past nine months of operation as adjusted are projected out for one year, the loss from operations would be $1.8 million. The investment of the FSLIC assistance of $33 million at 8.5% will generate $2.9 million. Furthermore, the consolidation of the three institutions will create cost savings and economies of scale that will be realized by the acquirers. Finally, a projected ten percent growth in deposits will be reinvested to yield a net interest spread of 150 basis point. Taking into account all of these factors and the proven managerial record of the acquirers, the viability of the resulting association does not appear to be a major concern.

The Analysis and Evaluation Division of the FSLIC has run a viability analysis of the resulting institution. Based on their analysis, they concur with our conclusion that the institution will be viable. A copy of their analysis accompanies this memorandum.

## Assistance Credited to Regulatory Capital

As shown on the projected balance sheet, with the inclusion of $8 million of FSLIC assistance in regulatory capital, the resulting institution would have a regulatory capital to total liabilites ratio of 9.14% at merger. The ratio declines to 8.15% in year three due to ten percent (10%) annual growth in deposits. If the accounting forbearance was not to be granted, the association's regulatory capital would be reduced by $8 million. The regulatory capital to total liabilities ratio under this scenario would be as follows:

| | |
|---|---|
| At Merger | 4.98% |
| Year 1 | 5.02% |
| Year 2 | 4.95% |
| Year 3 | 4.74% |

Although historically the Bank Board has been disinclined to allow one hundred percent of the FSLIC assistance to be credited to capital, on a case by case basis, a portion of the assistance has been credited to regulatory capital at the request of the acquirer. This policy is stated and clarified in the Supervisory Procedures Memorandum 37a, which states, that in connection with a supervisory merger, the resulting institution may request that a portion of the cash contribution be credited to regulatory capital for regulatory accounting purposes. It further states that this forbearance generally will be granted upon the request of the resulting institution in a supervisory merger. The three association were marketed under these guidelines.

The acquirer is also aware that the Bank Board has in the past credited a portion of the cash contribution to regulatory capital. As a result, their proposal was based on the assumption that this forbearance would be available, since the marketing instructions did not state otherwise. The Mergers and Acquisitions Division of the FSLIC (MAD) has negotiated a solution to this case, which involved the granting of an accounting forbearance which would allow the acquirers to credit $8 million of the FSLIC assistance to RAP capital. The negotiations were entered into in good faith, and we believe that a change in the terms of the agreement at this time could jeopardize the credibility of future negotiations and have a dampening effect upon the disposition of FSLIC cases.

Since a tentative agreement has been reached between the acquirer and MAD, with respect to the terms of this transaction, the acquirer proceeded to present proforma financial statements to American National Bank and Trust Company of Chicago in support of a subordinated debt offering. In these financial statements, the acquirer stated that the resulting institution was projected to have certain capital characteristics. One of these characteristics was the inclusion of $8 million of FSLIC assistance in the regulatory capital of the association. On the basis of these financial statements, American National agreed to purchase the debt securities from River Valley. The acquirer is understandably reluctant to amend the financial statements submitted in support of the offering, feeling that this may cast an unfavorable light on him as a businessman.

The FHLB of Chicago supervisory staff will, through its records, be continuously aware of the $8 million in "soft" RAP capital in analyzing the resulting institution's financial position in future applications and/or mergers.

## Conclusion

Although current policy issues question the use of the accounting forbearance regarding this matter, we emphasize that this transaction was negotiated prior to these policy concerns being brought to the forefront. Therefore, we recommend granting this forbearance. However, if the Bank Board so desires, the acquirer has expressed a willingness to enter into an agreement which would disallow inclusion of the assistance in capital for purposes of growth, investment limitations, or for declaring dividends. The principal purpose for which the acquirer wishes to receive this credit to capital is in order to be well positioned vis-a-vis his capital with respect to future FSLIC insurance premium assessments. All other benefits of assistance to capital he is willing to forego.

LBB:HKM:DJ:DT

cc: L. Blaber
S. Brafman
C. Biedron
D. Bagus
D. Januska
H. Mirza
L. Sommers
D. Thomas

D. Adkins, MAD
E. Bonhomme, OGC, FSLIC Div.
R. Cline, ORPOS
D. Dochow, ORPOS
H. Held, MAD

# EXHIBIT 8

06/29/88 12:33 FHLB CHICAGO OFS 312-565-5823 NO.090 P001/005

FEDERAL HOME LOAN BANK OF CHICAGO
111 E. Wacker Drive
CHICAGO, ILLINOIS 60601
(312) 565-5700

FACSIMILE TRANSMITTAL

FROM: Diana Januska

DEPARTMENT/DIVISION: 081 Supervision

DATE: 6/29/88

CONTACT PERSON: Same

PHONE #: 565-5301

FAX TRANSMITTAL FORM COMPLETED BY: Same

PHONE #:

MACHINE PHONE #565-5823

JUN 29 2 43 PM '88

MERGERS & ACQUISITIONS DIVISION

PRIORITY: (CHECK ONE)

- [x] URGENT (WITHIN 15 MINUTES)
- [ ] QUICK (WITHIN 4 HOURS)
- [ ] DELAY (OVERNIGHT)

NOTE: IF ALL PAGES ARE NOT RECEIVED, CALL ROSE FORD IMMEDIATELY AT (312) 565-5822

NAME/DEPARTMENT/COMPANY/CITY & STATE OF RECEIVER: Dave Adkins MAD Washington DC

MACHINE PHONE#: 202-254-2563

SPECIAL INSTRUCTIONS: Discard prior 4th Addendum & Replace with this copy

4 PAGES TO FOLLOW

Form No. 16-037 (REV 11/87) M2067

Call if you have questions.

EXHIBIT
Januska #8
8-11-00
PENGAD-Bayonne N.J.

JUN 29 '88 13:31 PAGE.001

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

June 22, 1988

**FOURTH ADDENDUM TO THE "S" MEMORANDUM**

TO: Linda Plye, Director, Corporate Activities

FROM: Leo B. Blaber, Jr., Principal Supervisory Agent LBB

SUBJECT: Proposed Acquisition of Home FS&LA of Peoria, Illinois, Galva FS&LA, Galva, Illinois and Mutual S&LA, Canton, Illinois, by Messrs. Howard Ross and Homer Holland

**Management Interlock**

This section addresses the waiver of the Management Interlocks Act requested by the applicant for Mr. Chester Claudon.

The waiver is required since Mr. Claudon will be serving on the board of two local financial institutions. The applicant has made its request pursuant to 12 C.F.R. Section 563f.4(b)(3). This section allows a person to serve as a management official of 2 or more depository organizations if one of them faces conditions endangering its safety or soundness.

The resulting institution in this situation will be the combination of three FSLIC cases. Therefore, the applicant's retention of Mr. Claudon for purposes of facilitating the consolidation and integration of operations is justified under the paragraph cited. Additionally, the waiver will only be effective for an eight month period (assuming the transaction can be consummated by the end of this month) due to grandfathered rights set to expire on November 10, 1988. We recommend that the Bank Board grant the waiver as requested in this situation.

**Net Operating Loss Carryforwards**

The applicant has provided a schedule listing the NOL's and their respective expiration dates for each of the referenced institutions. The applicant has also indicated those NOL's that will survive the mergers and those that will not. This information was certified by the applicant's accountants. However, identical schedules and expiration dates were provided in each of the referenced institution's annual audit report, all of which were prepared by Peat Marwick. These findings support the accuracy of the figures and dates provided by the applicant.

Addendum #4
Peoria Group
Page 2

As we understand the structure of the transaction Mutual and Galva will be separately but simultaneously merged into Home of Peoria. As we understand the new tax rule regarding retention of NOL benefits, the deposits of each of the separate merging institutions must represent more than 20% of the combined value of the deposits of the resulting institution, after each separate merger. Therefore, it appears that the applicant's calculations are correct (see our calculations below).

(March 31, 1988 data; 000's omitted)

| | |
|---|---|
| (1) Total Deposits: Mutual S&LA | $ 39,063 |
| (2) Total Deposits: Home FS&LA | 129,247 |
| (3) Total Deposits After Merger | $168,310 |
| | x 20% |
| (4) 20% of Combined Value | $ 33,662 |

Since line #1 is greater than line #4 the NOL's of Mutual S&LA will survive the merger.

| | |
|---|---|
| (1) Total Deposits: Galva FS&LA | $ 14,252 |
| (2) Total Deposits: Home FS&LA | 129,247 |
| (3) Total Deposits After Merger | $143,499 |
| | x 20% |
| (4) 20% of Combined Value | $ 28,700 |

Since line #1 is less than line #4 the NOL's of Galva FS&LA will not survive the merger.

We believe the applicant's findings regarding the NOL's are accurate. Therefore, the absence of a supporting tax opinion at this time should not be cause to delay Bank Board approval of this transaction. However, we recommend that the Bank Board condition its approval upon receipt of such an opinion within 90 days after consummation of the transaction, satisfactory to the Supervisory Agent.

Blu-Max Bankruptcy

The bankruptcy of Blu-Max Pigments, Inc. (Blu-Max) was not the result of mismanagement or inability of the investors or management officials. As outlined by counsel it was due to the inability of the company to meet the highly sophisticated technology of the printing ink industry.

Counsel has also stated that there is no continuing litigation and he is aware of no potential liabilities in connection with the liquidation of Blu-Max. Additionally, Mr. Holland's exposure in the case was limited to his investment and limited guarantee on the debt. Counsel has stated that Mr. Holland has fully satisfied his guarantee in this case.

Addendum #4
Peoria Group
Page 3

Therefore, this bankruptcy should not further impact the personal financial resources of Mr. Holland and will have no effect on the subject transaction. Additionally, it is our opinion that this bankruptcy does not demean the character of Mr. Holland or his ability to successfully manage a financial institution. We refer you to our original addendum to the "S" Memo, dated May 4, 1988, for comments on the acquirors. In that document we concluded that no grounds exist to form a basis for denial and recommended that the Bank Board approve the proposed acquisition.

## Stock Purchase Agreement

In connection with the proposed FSLIC-assisted acquisition, the FSLIC will purchase 50,000 shares of non-voting 8% Cumulative Preferred Stock ("Class A Preferred Stock") to be issued in five series of 10,000 shares per series. Each share will have a par value of $100.00. The FSLIC will pay $5 million in cash for the 50,000 shares of Class A Preferred Stock.

The Class A Preferred Stock is redeemable in whole or in part at the option of River Valley at any time within 30 days of the completion of any fiscal quarter of River Valley. Moreover, River Valley may convert the Class A Preferred Stock into Subordinated Debentures at any time, provided the FSLIC has not given notice to River Valley that it intends to sell its Class A Preferred Stock. Such debentures shall continue under the same terms and conditions as the Class A Preferred Stock and may be sold by the FSLIC.

We have reviewed this agreement from a supervisory perspective and find no reason for objection on that basis. If this agreement is acceptable to the FSLIC we recommend that the Bank Board approve this transaction including execution of this agreement by the FSLIC.

## Charter Supplements

The two supplementary sections to the charter, which are also attached to the Stock Purchase Agreement as exhibits, set forth the rights, terms and privileges of the two classes of preferred stock the resulting institution will be authorized to issue. We have no further comments to add other than those contained in our review of the Stock Purchase Agreement. Again, we have reviewed these documents from a supervisory perspective and find no reason for objection.

Addendum #4
Peoria Group
Page 4

**Stock Certificates**

We have reviewed the Common and Preferred Stock Certificates to be issued to the respective holders by the resulting institution. The language contained in these documents is standard and conforms with various terms of this transaction. Therefore, we have no reason to take supervisory objection and recommend that the Bank Board approve the forms of the certificates as submitted.

**Business Plan**

The acquirers have submitted an acceptable business plan consistent with economical home financing and which does not raise a presumption of disqualification under 12 CFR 547.7g(2)(ii). However, as a condition to granting FSLIC assistance pursuant to 12 USC 1729f, we would require that the business plan be supplemented subsequently with certain additional detail. The acquirer has been notified of this requirement and has agreed to provide the necessary subsequent detail within 90 days of the effective date in a form acceptable to the Supervisory Agent.

LBB:DRB

**Larry Ferries Deposition Excerpts**

p. 4, lines 1-4, 12-15

p. 6, lines 16-25

p. 7, line 10 – p. 8, line 10

p. 9, lines 6-24

p. 10, line 16 – p. 11, line 19

p. 12, lines 3-22

p. 14, lines 17-23

p. 15, lines 15-25

p. 16, line 7 – p. 23, line 9

p. 24, lines 1-25

p. 28, lines 3-7

p. 29, line 16 – p. 30, line 11

p. 31, line 15 – p. 32, line 16

p. 33, line 2 – p. 37, line 5

p. 37, line 6 – p. 38, line 4

p. 38, lines 18-21

p. 39, line 14 – p. 42, line 8

p. 42, line 13 – p. 43 line 1

p. 43, line 11 – p. 46, line 2

p. 46, lines 8-14

p. 46, line 23 – p. 47, line 11

p. 47, lines 20-23

p. 48, line 6 – p. 49, line 2

p. 49, lines 3-12

p. 49, line 18 – p. 51, line 7

p. 51, line 8 – p. 53, line 15

p. 57, line 25 – p. 60, line 10

p. 63, line 9 – p. 64, line 4

p. 64, line 18 – p. 67, line 13

p. 68, line 3 – p. 69, line 10

p. 69, line 23 – p. 71, line 16

p. 73, line 19 – p. 75, line 13

p. 78, line 19 – p. 79, line 17

p. 82, line 9 – p. 83, line 18

p. 84, line 6 – p. 88, line 25

p. 89, lines 4 – 13

p. 90, line 6 – p. 91, line 7

p. 91, line 25 – p. 93, line 17

p. 94, line 19 – p. 96, line 13

p. 101, line 15 – p. 102, line 6

p. 103, line 20 – p. 104, line 11

p. 105, line 5 – p. 107, line 20

p. 116, line 20 – p. 119, line 23

p. 123, line 14 – p. 128, line 25

p. 129, line 5 – p. 130, line 7

p. 134, lines 16–22

p. 135, lines 10-15

p. 138, line 23 – p. 139, line 15

p. 143, line 12 – p. 145, line 15

p. 146, line 20 – p. 148, line 14

p. 151, line 17 – p. 153, line 5

p. 157, line 12 – p. 158, line 6

p. 159, line 1 – p. 163, line 22

p. 174, line 19 – p. 177, line 22

p. 179, line 22 – p. 181, line 13

p. 185, line 20 – p. 186, line 22

p. 187, line 10 – p. 190, line 23

p. 193, line 15 – p. 195, line 5

p. 195, lines 6 – 15; 21-23

p. 198, line 21 – p. 199, line 20

p. 206, line 12 – p. 208, line 12

p. 209, lines 9–24

p. 213, lines 1-18

p. 214, line 19 – p. 215, line 22

p. 218, line 20 – p. 219, line 25

p. 220, line 1 – p. 221, line 11

p. 222, line 8 – p. 224, line 21

p. 226, line 5 – p. 228, line 11

p. 230, line 1 – p. 231, line 8

p. 236, line 4 – p. 237, line 12

p. 243, line 17 – p. 244, line 5

p. 244, line 23 – p. 247, line 17

p. 251, line 13 – p. 252, line 5

p. 252, line 9 – p. 254, line 14

p. 256, lines 3-7

p. 263, line 23 – p. 264, line 3

p. 265, line 14 – p. 267 line 6

p. 268, line 2 – p. 269, line 17

p. 273, lines 1-18.

p. 284, line 1 -- p. 287, line 13

p. 289, line 20 -25.

p. 291, line 22 -- p. 292, line 10.

p. 294, line 16 -- p.296, line 5.

p. 297, lines 8-20.

p. 329, line 18 -- p.330 line 6

p. 330, lines 11-24

p. 333, lines 6-10, 15-17

p. 334 lines 15-19

p. 334 line 24 -- p.335 line 7

p. 335, lines 15-21

p. 357, lines 16-23

p. 358, lines 7-19

p. 358, line 25 -- p. 359, line 11

p. 359, line 15 -- p. 360, line 25

p. 365, line 14 -- p.366, line 8.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND AND HOWARD P. ROSS, )
Plaintiff, )
VS ) NO.5-524C
THE UNITED STATES OF AMERICA, )
Defendants. )

CERTIFIED COPY

The deposition of LARRY FERRIES called for examination pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, pertaining to the taking of depositions, taken before Frances I. Okrei, CSR-CM, a notary public within and for the County of Will and State of Illinois, and a Certified Shorthand Reporter in the State of Illinois, Certificate No. 84-1074, at 54 W. Hubbard Street, Chicago, Illinois, on the 10th day of August, A.D., 2000, commencing at the hour of 9:00 o'clock a.m.

APPEARANCES:

ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 42-5656
BY: MR. HOWARD N. CAYNE
and MR. DAVID BERGMEN,
Appeared on behalf of Plaintiffs;

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L. Street
Washington, D.C. 20530
(202) 353-8841
BY: MS. PATRICIA A. SMITH,
Appeared on behalf of Defendants.

INDEX

WITNESS:

LARRY FERRIES

Direct Examination by MR. CAYNE 4

EXHIBITS:

| | |
|---|---|
| Ferries Exhibit No. 1 | 79 |
| Ferries Exhibit No. 2 | 81 |
| Ferries Exhibit No. 3 | 108 |
| Ferries Exhibit No. 4 | 116 |
| Ferries Exhibit No. 5 | 120 |
| Ferries Exhibit No. 6 | 130 |
| Ferries Exhibit No. 7 | 134 |
| Ferries Exhibit No. 8 | 135 |
| Ferries Exhibit No. 9 | 139 |
| Ferries Exhibit No. 10 | 148 |
| Ferries Exhibit No. 11 | 151 |
| Ferries Exhibit No. 12 | 153 |
| Ferries Exhibit No. 13 | 166 |
| Ferries Exhibit No. 14 | 231 |
| Ferries Exhibit No. 15 | 237 |
| Ferries Exhibit No. 16 | 237 |
| Ferries Exhibit No. 17 | 241 |
| Ferries Exhibit No. 18 | 250 |
| Ferries Exhibit No. 19 | 254 |

LARRY FERRIES,

called as a witness herein, after having been first duly sworn, was examined and testified as follows:

MATERIAL REDACTED

Q For the record, would you state and spell your full name?

A Larry L A R R Y Ferries F E R R I E S.

MATERIAL REDACTED

Q Where are you currently employed?
A The Office of Thrift Supervision.
Q In the Chicago office?
A Chicago office.
Q What is your position?
A I'm a field manager.
Q And where did you go to college?
A University of Wisconsin, LaCross.
Q What did you major in?
A Business administration.

MATERIAL REDACTED

Q What was your first position following your graduation from college?

A I was a field examiner for Federal Home Loan Bank Board.

Q Assigned to what office?

A Chicago.

Q And as field examiner, were you an employee of both the Federal Home Loan Bank Board and the FSLIC or just the Federal Home Loan Bank Board?

A Just the Federal Home Loan Bank Board.

Q Beginning in what year did you hold that position?

A 1975.

Q What did your training for that position involve?

A The standard courses. I mean, you had to meet certain requirements. I don't remember what those were.

You had to have a college degree and have taken certain courses, passed the government test to be even considered and then there was a formal training process.

There were different classes; appraisal classes, examiner training classes. It was a full process and then hands-on experience.

MATERIAL REDACTED

MATERIAL REDACTED

Q Can you describe to me your responsibilities and duties as an examiner when you first became an examiner in 1975?

A In 1975, I was still learning so I would be assigned as an assistant working with a senior examiner.

You go to the various jobs throughout the Chicago and Illinois area. Once in a while Wisconsin but mostly always Chicago and Illinois.

So you learned a lot by just hands-on working with more senior guys that have been on, you know, fifteen, twenty years. And then you took the courses and by the end of your first year, ten or eleven months, you had your first examination where you were first in charge.

Then in that whole process you look at loans, you look at real estate owned, you look at the operations of the bank or thrift. The earnings, the risk and all that.

MATERIAL REDACTED

Q For how long did you hold the title Assistant Examiner?

A We didn't really -- Assistant Examiner. That was your primary job was assisting but you might be assisting for the first -- I was an examiner for ten years.

So you'd be assisting on some jobs and in charge on others. So you might be in charge of a big job one -- you know, for two months and then you go and assist someone else on another job.

That's just the way we operate. You weren't always in charge.

Q Did your title or formal position change during that ten year period?

A The title wasn't officially Assistant Examiner, it was always Examiner. And then sometimes you are Examiner in Charge, sometimes your Assistant Examiner.

Q And did you ever --

A It was grade levels. There was grade levels. And that was probably -- you start at a Grade 7 and then after about a year, you became a Grade 9 and after two years, you were Grade 11 and then it was competitive to Grade 12 or 13.

Q What was the highest grade level you achieved as an examiner?

A As a field examiner a Grade 12, which was a senior examiner. There is only one step higher, which was a Grade 13.

MATERIAL REDACTED

MATERIAL REDACTED

Q Did you examine any institutions that as a result of your examination were subject to an enforcement action?

A Yes.

Q What situations were those; were there a lot of them?.

A There is a lot. It was just common back in the early '80s. There was a lot of problem shops and everything. I can't even remember all the ones that -- but it was routine for a problem institution to have an agreement.

Q So you are familiar with the enforcement process?

A Right; right.

Q And you are familiar with the supervisory agreements?

A Yes.

Q Were you familiar with orders to cease and desist?

A Yes.

MATERIAL REDACTED

Q Can I correctly assume that in your experience as an examiner and as a field manager, you dealt with a significant number of institutions that had -- that were permitted to include supervisory good will as an element of their regulatory capital?

A Yes.

Q You were familiar with the importance of supervisory good will to the institutions that carried it on their books, correct?

A Yes.

Q What did you understand the importance of supervisory good will to be?

A It gave them capital and that was one way FSLIC was able to get people interested in taking over some of the problem shops that we had.

Because they could include the good will in capital.

MATERIAL REDACTED

Q You indicated that supervisory good will was one way FSLIC was able to get people interested in taking over some of the problem shops. Do you recall that?

A Right.

Q Possibly asking why were people interested in taking over insolvent shops if they were allowed to use supervisory good will?

A They needed less -- they needed less capital and it actually -- I don't remember all the aspects, but it was basically they needed less of their money in the deal or they were willing to put less of their money in the deal.

And this was a way that FSLIC could basically sell it because you were amortizing the good will out over 20 years, so it was just a smaller hit to earnings in theory.

Q And it was also important because the supervisory good will could be included as an

element of regulatory capital, correct?

A Right.

Q And you understood as a professional examiner and field manager that regulatory capital was important to a savings and loan association, correct?

A It is. Capital was king was the quote.

Q And why is capital king?

A Because without capital, you can't do anything.

Q What can't you do without capital?

A You just can't operate. You needed the capital to be able to invest in loans, to be able to continue your operations.

Q And you needed regulatory capital, right?

A Right; right.

Q And regulatory capital could be Greenbacks, correct?

A Greenbacks as in cash.

Q Dollars?

A Yes.

Q And regulatory capital could also be supervisory good will.

A Right.

Q And do you know what I mean when I use the term capital credits?

A Yes.

Q What is your understanding of the term?

A Well, they were -- the government -- it was a complicated I don't really remember quite everything that was involved.

But the government would give you credits. You could count them as, you know, as capital but they were future payments, basically.

Q Do you remember the River Valley -- you personally had a lot of hands-on experience with River Valley, correct?

A Right.

Q And River Valley, after their acquisition by Messrs. Holland and Ross, was authorized to include supervisory good will as a component of regulatory capital, correct?

A Right.

Q River Valley was also authorized to include subordinated debt as an element of regulatory capital, correct?

A Correct.

Q River Valley was also authorized to include preferred stock purchased by FSLIC as

regulatory capital; correct?
A Yes.
Q When I use the term capital credit, I'm referring to one more element of River Valley's regulatory capital.
You recall when Messrs. Holland and Ross acquired the institutions that became River Valley, the FSLIC granted financial assistance. Do you recall that?
A Yes.
Q And there was the Rock Falls transaction and the Peoria transaction. Do you recall that?
A Right.
Q And in one case, the Federal Home Loan Bank Board and FSLIC said, of the total dollar amount of cash assistance being provided by the FSLIC, the acquiring institution can include 8 million dollars of that amount as a direct addition to regulatory net worth. Do you recall that?
A Yes.
Q And that's what was referred to at that time as a capital credit?
A Right; right.
Q With respect to the other institution,

the Federal Home Loan Bank Board and FSLIC said of the total dollar amount of financial assistance being granted in this case, River Valley can include five million dollars of that amount as a direct contribution as a direct addition to its regulatory net worth. Do you recall that?

A I can't remember the dollar amounts but in theory.

Q Do you recall the concept?

A The concept, yes. The dollar amounts I don't remember. They were big at the time but --

Q And do you recall that --

A It's been a long time.

Q And do you recall those items which were called capital credits, correct?

A Yes.

Q And the capital credits counted as components of regulatory capital just as supervisory good will did, correct?

A Right.

Q Just as US cash did, correct?

A Right.

Q And all those elements of regulatory capital, am I not correct, were critical to the success and profitability of River Valley, right?

A Yes.

Q And why -- as an examiner, what is your -- I know this is basic but what is your understanding? We need to make a complete record.

What is your understanding of why each of those elements of regulatory capital would have been critical to the profitability and success?

A The more capital you have, the more things you can do. And the more -- if you fall below certain numbers of capital, I can't recall what levels were, you were put in the restrictions you couldn't do certain things and you couldn't expand, you couldn't do different things.

There were penalties depending if the capital fell below certain levels. But basically, you needed the capital to run the Thrift and to expand and grow.

Q Okay. Bottom line is you needed capital to be profitable, didn't you?

A Well, with capital you are going to be profitable, yes.

Q Without capital you are not going to be profitable and you may be out of business, correct?

A True.

Q And you personally had a lot of experience with institutions, from your testimony, that went out of business because they had inadequate capital, correct?
A Yes.
Q And I also take it you personally had a lot of experience with institutions that were not profitable because they had inadequate capital, correct?
A Yes. But some were profitable even with low capital.
Q Were they as profitable had they had a lot of capital?
A No; no.
Q In fact, they were a lot less profitable, weren't they?
A Yes.
Q Correct?
A Correct.
Q What did you mean when you said capital is king?
A That was a theory -- not a theory, that was just a statement that was flying around all the time.
As long as you had capital, you could do

whatever you wanted to, basically. I don't even know who coined it.

It was just a -- you know, a thing -- you need capital, capital is the most important thing. If you've got capital, then you can continue on with business.

Q Without capital, you can't be profitable, right?

A Right.

MATERIAL REDACTED

Q Would you agree with me that capital was important in 1975 when you first became an examiner?

A Yes.

Q Would you also agree with me as a result of various Congressional enactments and regulations adopted by the Federal Home Loan Bank Board and the Office of Thrift Supervision, capital became actually more and more important as time went on?

A Yes.

Q And specifically, FIRREA F I R R E A, emphasized the importance of capital, correct?

A It certainly did.

Q And FIRREA eliminated the ability of a lot of savings associations to include various types of regulatory capital that they had previously been allowed to include, correct?

A That's correct.

Q One type of capital that FIRREA eliminated was supervisory good will, correct?

A Correct.

Q Another type was capital credits, correct?

A Yes.

MATERIAL REDACTED

Q I'd like to go back to your experience as examiner. You were a field examiner until 19 --

A 1985 I was promoted to field manager as I was a field examiner for ten years.

MATERIAL REDACTED

Q 1985 or '86?
A '85 I became a field manager.
Q And can you tell me what does the position of field manager involve?
A A field manager is assigned a caseload of several institutions. You are responsible for the exam when it comes up. You have certain examiners that are assigned to you.

In between exams, you may participate in monitoring. You -- usually you had a -- there is

other people involved with monitoring but you work with them in different things.

But you are kind of responsible for a certain caseload of institutions.

Q And you've held the position of field manager for the past fifteen years?

A In practice, yes. Different titles along the way. Case manager, manager, case manager, field manager.

Now we are back to using the term field manager.

MATERIAL REDACTED

MATERIAL REDACTED

Q But your substantive duties remain the same for that period?

A Right; correct.

Q So you've had now over fifteen years experience in supervising the staff of field examiners, correct?

A Right.

Q And how many examiners would you typically supervise at any given time?

A That has fluctuated probably between seven and fourteen.

Q And were you responsible for a given geographic area or simply specific individual examiners?

A Specific examiners and my caseload was usually in a specific area and that was usually always in Illinois.

Q Did your caseload vary over the years or was it generally the same geographic area?

A No, it's varied over the years. Usually it primarily has been Chicago, western suburbs and northern Illinois and a couple years I had northwest Indiana but then I lost those and I was back to my northern Illinois.

Q All right.

A The furthest south I usually have gone would be Peoria, Champaign, right about there.

MATERIAL REDACTED

Q On a day-to-day basis, what does your position involve? Do you actually go out to the banks and assist in examinations?

A No, I don't assist. Basically, when an exam is in process, I will visit a couple times during the exam and I'm there at the end.

Just reviewing the findings, reviewing the report. Making minor changes to the report, you know, grammatical. If there are problems that come up during the exam, they call me, tell me about it and I might go out and visit a little bit more often.

Q On occasion you suggest substantive changes to reports, don't you?

A Yes.

Q That's part of your job?.

A Yes, that's just part of the job.

Q And do you ever drop parts of the report or do you simply edit and review and edit?

A Simply review and edit. The examiner in charge is responsible for the report. Assistant examiner may write parts of it and then he or she would, you know, make suggestions and improve the comments and then I have the final review of the

report.

Q Does that mean that you individually would have to approve an examination report before it was issued in final form?

A Yes.

Q So in other words, when an examination report is issued final, it means that you personally agree with its contents, correct?

A For the most part.

Q Would you issue examination reports that you did not agree with?

A Over my career, yes, there's been a report that I did not agree with some of the stuff that was in it.

Q Which report was that?

A It's not related to this case.

Q Okay. But all the examination reports that you approved of relating to River Valley, you were in agreement with at the time they were issued?

A Yes; yes.

Q Is that a fair statement?

A Yes.

Q Would you meet, yourself, with management or the board of directors of an

institution under examination?
A Yes.
Q And would that be during the course of an exam?
A We usually have an exit meeting with management that I would attend. And then also we have board meetings at the -- after the report has been issued or before the report is issued to discuss things with the board. That's common.
Q Was that an important part of your job as a field manager?
A Yes.
Q What is the importance of the exit reviews?
A So everyone is on the same page. That they know what our concerns are or that they understand what we feel is the problems with the shop or if there are no concerns, just that everyone is on the same level playing field so there are no surprises.
Q So as a field manager, am I -- would you agree with the statement that you fully familiarize yourself with all of the issues facing the institutions under your supervision?
A Yes. I may not remember everything ten

years later. But at the time, I would.
Q In fact, you couldn't properly carry out your job duties if you were not aware of all the issues, correct?
A Right; correct.
Q Particularly, the important issues, you would have ongoing discussions with your examination staff during the course of the examination?
A Yes.
Q And again, in connection with River Valley, am I correct you would have followed your formal procedures and have discussed with the examiners conducting examinations of River Valley their tentative conclusions and the important issues during the course of the examination?
A Yes.
Q And in the context of River Valley, you would have attended exit reviews?
A Yes, sir.
Q And you would have met with the management of River Valley, correct?
A Yes.
Q And you would have met with the board of directors of River Valley?

A Yes.

Q And you would have considered yourself fully familiar with the specific supervisory issues facing River Valley?

A Yes.

Q When did -- when was River -- let me step back.

You indicated that you examined Galva G A L V A?

A Galva.

Q That was before you became a field manager?

A Yes.

Q What is your recollection of the condition of Galva at the time of your final examination of it?

A I was only there once as an examiner and it was a very, well, clean little place. When I got my first caseload, it was in -- that was one of my shops and in that time period from '76 to '85, it had deteriorated.

Q Significantly?

A Yes. They went through several managing officers and each one got a little bit worse.

Q Did actually it become insolvent?

A Yes.

Q And what was the cause of that insolvency?

A Poor management and bad loans.

Q Did you ever recommend that Galva be placed into receivership?

A I would believe so. I can't remember exactly but I'm sure I did.

MATERIAL REDACTED

Q Do you recall that it took a long time, several years, for the Galva situation to be resolved, even after it became insolvent?

A Yes.

Q Didn't that cause you as a field manager a great level of concern?

A Yes.

Q And why were you concerned?

A Because they didn't have capital. And everything was so busy -- it was a small -- Galva was a very small institution.

Big institutions had priority, you know.

They are big names. Who's heard of Galva, Illinois?

It's just a little podunk town in the boonies. So it wasn't a high priority.

And FSLIC at the time took care of the top priorities, you know, the bigger shops first. And no one was really interested.

There was not much of a perceived interest in this little bank or Thrift.

Q And why as a professional regulator were you concerned that it remained in this condition, insolvent condition for a several year period?

A Because a lot of strange things can happen. We had the institution under an agreement that they couldn't do certain things. They had to come to us.

And for the last -- after the one guy left, I can't remember his name, they basically weren't allowed to do much of anything.

They were strictly just sitting there allowing people to take their deposits out. You know, they were making -- taking deposits. It was just a very sad condition.

It was just -- it was there and then basically after we got rid of the one president, I

can't think of his name -- the flasher -- but the head teller who had only been there like a year, we let her be the -- you know she was kind of running the place.

They weren't allowed to do loans. They weren't allowed to do much of anything. But she was just going there and for several months, I sent an examiner down every Monday or it was every Friday.

But one day a week he would go and look and see that they were abiding by the agreement and that they hadn't issued any big checks and looked at the activity.

So we were sending people down every week just to look at what happened that week so we weren't caught by surprise that some big misappropriation or something like that.

Q But you were dealing with an insolvent institution here and it was effectively being run on a day-to-day basis by a teller?

A Yes.

Q Does that keep you up at nights?

A Yes. But my examiner that went out there every Monday was very good. She would call him during the week or call me if there was

anything unusual.

Q Why did you let that go on --

A I had no control over it. I mean, FSLIC wouldn't take it over or they wouldn't do things.

I mean, they were too busy to -- I personally couldn't go in and take it over. It was up to FSLIC and they were just so busy at the time.

Q In other words, it was insolvent but it wasn't large enough to get their attention because they had so many larger insolvent institutions?

A Right; correct.

Q But it was continuing to lose money, wasn't it?

A It was losing money but, you know -- nothing I could do. It was strictly out of our hands.

It was up to FSLIC and they moved very slow on some deals.

Q By definition, an insolvent institution is going to hemorrhage until it's resolved, right?

A Correct.

Q I assume you periodically would do whatever you could to try to push FSLIC along?

A Right. There was things along the way. They did their bid package and they came up with this, we are going to group this together with a couple other shops and try to bid it that way.

Q At that point, it had already been solvent for a number of years?

A It had been insolvent. But as long as there was cash flow, FSLIC didn't -- as long as there was cash flow, they allowed them to go a while.

There wasn't any perceived -- there was a lot of bad loans but a lot of it was due to local economic trouble. They didn't go out --

there was a lot of unemployment and everything.
Q But even though there was cash flow on a day-to-day basis, this institution was continuing to cost FSLIC money, correct?
A Right.
Q And that hemorrhaging didn't stop until the Holland and Ross investors took it over, correct?
A That's correct.
Q Their acquisition of this institution effectively stopped the hemorrhaging, right?
A Correct.
Q And you have no doubt that the hemorrhaging would have gone on indefinitely had they not come in, correct?
A Correct.
Q So I take it that as professional supervisor, you were enormously relieved when Holland and Ross did come in and took over Galva?
A Yes.
Q And based on -- we'll take some time to look at documents. But based on the documents that I reviewed, that you prepared at the time, I take it it's a fair statement that you had a lot of confidence in the managerial competence of the

Holland and Ross investors. Is that a fair statement?

A Yes.

Q And that confidence panned out to be well-placed in that the Holland and Ross investors resolved this situation and got this insolvent institution out of the FSLIC receivership pool, correct?

A Correct.

Q What about Republic Savings, was that under your --

A No.

Q When did you first deal with Republic Savings?

A I was never involved with Republic Savings. You heard little things, yes, there is problems and this and that. But until they -- I didn't care about that.

I had my own concerns to worry about in my caseload and until Holland and Ross took that over and merged it into Rock Falls, I didn't have any dealings with Republic.

Q Would it surprise you to find out as bad as Galva was, the head of the Chicago office of Federal Home Loan Bank has testified that Republic

was a lot worse?

A Oh, it was a lot, lot worse that Galva.

Q What about Mutual, that was another one of the institutions that --

A Mutual of Canton.

Q Yes. What is your understanding?

A I was never involved with that one at all until the -- they threw it -- threw Galva and them and Home, I think it was, together.

Q But I assume, based on one-on-one conversations with the other field managers, you knew that each of those institutions were deeply

troubled, yes?

A Right.

Q And I assume that field managers didn't simply sit behind their desks all day?

A No, we would have meetings and you knew what was happening in other people's caseloads but not -- we would meet, you know, monthly at least or weekly.

I don't even remember but we would meet and talk about the significant institutions and the significant problems.

Q But each of those institutions, Mutual, Home and Republic were dealt with at the monthly meetings as significant supervisory problems?

A Right; right.

MATERIAL REDACTED

Q What about Peoria Savings?

A I never had anything to do with them either. That was out of my grid.

Q Until they were also --

A Until they were all acquired and put into one.

Q What was -- was Rock Falls, prior to its acquisition of Republic, under your jurisdiction?

A Yes.

Q And Rock Falls was a sound institution, correct?

A Yes, very sound, well-run little shop.

Q And who owned Rock Falls. Am I correct it was Messrs. Holland and Ross?

A They bought it from another group and I had it -- I had Rock Falls. It was the prior group. I don't remember who it was. I just remember Cal Morgan was the president.

Q But you were also -- am I correct that you had Rock Falls in your caseload when it was

acquired by Messrs. Holland and Ross?

A Yes; yes.

Q And were you involved in the -- in processing the change in control application that authorized Messrs. Holland and Ross to acquire Rock Falls?

A No. Because I was -- applications would have handled that and then whoever, the other people would have done a lot of that.

I didn't until after the first exam of Rock Falls, would not have known who Homer and Howard were.

Q So I'm correct, am I not, you would have had several years of experience dealing with Messrs. Holland and Ross prior to the time in 1988 that they engaged in the supervisory acquisitions?

A Right.

Q And I take it that the Federal Home Loan Bank officials would have, among other things, relied upon your assessment of Messrs. Holland and

Ross in making the decision to allow them to acquire five insolvent institutions in 1988, correct?

A Yes.

Q So I take it --

A By 1988, I had had an exam with them, knew what they had done at Rock Falls, how they had run it or -- and everything.

And at that time, I would have been involved with the proposition to acquire these other institutions and they asked us our opinions, you know, of what they were like and everything like that. We would have had input.

Q And do you think there would have been two or three exams by 1988 of Rock Falls that you had personal involvement in?

A No more than two, I wouldn't think.

Q Does two sound like a good estimate?

A I would guess maybe two.

Q And what were your views of the manner in which Messrs. Holland and Ross had been running Rock Falls during the period for which you were responsible for the examination of Rock Falls?

A They did a fine job. I mean, they came in. They didn't do anything crazy. They just

continued doing what it was doing and then looking -- it was their stepping stone, kind of.

In that time, they were looking to acquire other institutions.

Q And you were aware that they were looking to acquire other institutions?

A Yes; yes.

Q Now, remember we were talking quite a bit a few minutes ago about Galva?

A Uh-hum.

Q And the heartache it was causing you. Do you recall that?

A Yes.

Q Did you -- and you were anxious to see Galva resolved, correct?

A Yes, I would have wished it was gone a year or two earlier.

Q And you had special experience with Messrs. Holland and Ross, correct?

A From Rock Falls and also Homer. I had known Homer previously.

Q How did you know Mr. Holland previously?

A He was employed by Enterprise & Gilldorn G I L L D O R N Savings.

Q And you were involved with those

institutions how?
A I was -- I assisted on several exams of Gilldorn.
Q Was that a problem institution?
A Yes.
Q And Enterprise was a problem institution?
A Yes.
Q And you -- in both cases you dealt with Mr. Holland?
A Yes.
Q And what was your assessment of Mr. Holland based on those dealings?
A Very capable, competent individual. The problems at Gilldorn were not of his doing.
Richardson Gilldorn brought him in to help correct -- to help turn around the institution.
Q What about the problems at Enterprise? He was brought in after it was already in trouble, wasn't he?
A Well, Gilldorn became Enterprise.
Q Oh, it's the same institution?
A It's the same institution. Started at Gilldorn and the problems there were basically

Richardson Gilldorn.

And they were having problems, they were going down. I mean, less and less and less. And Homer brought in another investor to help turn around -- they got Richardson Gilldorn out.

He brought in another investor to help turn it around. Buddy Cohen was the other investor.

Q When you made your recommendations in connection with the five supervisory acquisitions in 1988 and you supported the application filed by Messrs. Holland and Ross, was one of the reasons you supported the application, Mr. Holland's experience at Gilldorn and Enterprise?

A Yes.

Q So Messrs. Holland and Ross acquired

Mutual, Home, Galva and Peoria Savings directly, correct?

A Right.

Q And they were all merged together?

A Right.

Q And they acquired Republic Savings through Rock Falls?

A Right.

Q Do you recall whether it would have made a difference to you whether they had acquired them all through Rock Falls?

A I don't think it would have made a difference in my thinking.

Q Would it have made any difference in your thinking if they had acquired them all directly?

A No.

Q Because at the end of the day you saw Messrs. Holland and Ross taking over all the institutions directly?

A Right; right. Instead of having one shop, they had two. So it didn't really matter to me.

Q So that was just a matter of form, correct?

A Right.

Q The substance of it was that Messrs. Holland and Ross were personally acquiring each of these five institutions, correct?

A Correct.

Q And that's what gave you the great level of comfort, correct?

A Correct.

Q And that's why you would have recommended the approval of those acquisitions, correct?

A Yes.

Q Immediately after the closing of the acquisition of Home, Mutual and Galva in July, 1988, I take it the River Valley FSB would have been under your supervisory jurisdiction?

A Right. The decision at that time was made at that time both institutions should be under the same -- in the same case loads.

Because you had -- they had one team of people to report to, I mean, dealing with the institution. And since I don't remember why I was chosen, but I was given the -- I was given that pleasure.

Q Do you think you were chosen because you

already had Galva in your caseload?
A I think it was because I had Rock Falls. I had Rock Falls and I had Galva, so I did have one thing -- Galva was the smallest one of the ones that went into River Valley.
Q Do you think you may have been chosen because you already had significant personal supervisory experience with Messrs. Holland and Ross?
A Probably.

Q Okay. Did you -- how would you decide which examiners on your staff you would assign to examine River Valley FSB and River Valley Savings?

A I would take my examiners in to do it. Actually, I think I took my examiners in at the time but also included that we brought in Larry Kenney who was our -- I can't remember his title, Capital Market Specialist.

He was our investment specialist because they were very active investments and that was his expertise. Although he didn't report to me, I wanted him there because of the investments and the type of stuff that was going on.

Q Is it fair to say that in your view, Mr. Kenney had a very high degree of expertise in the capital markets field?

A Yes.

Q And you relied on Mr. Kenney very heavily in assessing the safety and soundness of River Valley's various investments?
A Yes.

Q And do you recall -- and we'll look at the documents and I'm sure you'll painfully recall when you see the documents -- but do you recall that there were very large disputes between the Office of Thrift Supervision and the Federal Deposit Insurance Corporation relating to the proper assessment of the safety and soundness of River Valley?

A Yes.

Q And do you recall that Mr. Kenney played a large role in formulating the position of the OTS regarding the safety and soundness of River Valley's portfolios.

A Yes. Without him I wouldn't have been able to analyze it.

Q Do you recall that the FDIC took a totally different view of River Valley's assets quality than Mr. Kenney did and the Office of Thrift Supervision did?

A Yes.

Q And you and your staff and superiors, including later on Mr. Karr, relied on Mr. Kenney, correct?

A Correct.

Q And do you recall that these disputes between the Office of Thrift Supervision and the Federal Deposit Insurance Corporation resulted in examination reports issued by the two agencies that reached vastly different conclusions concerning the safety and soundness and capital adequacy of River Valley?

A Yes.

Q In fact, do you recall that in one

instance, your agency, the Office of Thrift Supervision assigned a composite rating of 2 to River Valley when at the same time, the Federal Deposit Insurance Corporation assigned a composite rating of 4?

A Yes.

Q And do you recall that painfully?

A Yes.

Q Was that a very major issue in your office at the time?

A Yes, it was. But FDIC is a -- they always -- routinely always rated institutions one lower, one rating lower than we did.

I think you can go historically -- when they came in by FIRREA when they were required to come into every shop, they came in with a very tainted opinion of the savings and loan industry and savings and loan executives and Federal Home Loan Bank examiners.

Q They didn't think much of the Federal Home Loan Bank examiners?

A They didn't think much of us so they were there to prove a point. Not just River Valley, but the whole theory.

For the first couple years, they had to

come in on every exam with us. And after that, I'd say about a two-year period, after they had made their whole rounds, they had realized that things weren't as bad, not every savings and loan manager wasn't a crook and that the examiners actually did know what we were doing.

And then after that, they just chose to come in on high priority, what they considered high priority institutions.

Q So it wasn't unusual in your experience for there to be one rating difference in the composite rating, correct?

A No; no.

And my question is, other than this situation in River Valley, are you aware of any situation where there was a two level composite rating difference with respect to a specific savings and loan association assigned by the FDIC and the OTS?

A No, I'm not.

Q So this was a very serious matter?

A Yes.

Q Why was the rating difference assigned by the agencies in this case so significantly different?

A Philosophical differences. FDIC does not have to justify what they do. They do whatever the hell they want and they don't listen to reason.

And asked why, they just say, "Because we can."

Q Because we --

A "We can."

Q Why did they not have to justify what they do?

A Because they are God. They have the

insurance fund and they think that they are God. And if they don't like you, they try to make your life hell.

Q Did they ever make your life hell?

A No. I mean, just by rating differences, yes. And if they don't understand something, it is -- if they don't understand something, it is bad.

They don't have to understand it, they don't try to understand it, it is just bad.

REDACTED

Q Excuse me. River Valley. You indicated you didn't consider it unusual for the FDIC to disagree with you by one rating but other than

this case, it was unheard of to have a two rating difference, correct?

A Uh-hum.

Q What is it about River Valley that resulted in that two rating difference?

A They classified mortgage derivatives. They did not understand the mortgage derivatives, they didn't try to understand them.

They were intimately bad so, therefore, they are a classified asset. So they had classified assets that were way -- you know, way higher than OTS because we did not classify those investments.

Q The FDIC said they were intimately bad, correct?

A In their -- their supervisor who pulled the shots, yes.

Q The Office of Thrift Supervision and specifically Mr. Kenney did not at all agree with that, did they?

A No, we thought -- we think -- we did not have a problem but FDIC didn't really understand mortgage derivatives and didn't -- they didn't try to understand them or this group of examiners, the FDIC examiners.

Q But every examination conducted by even the OTS comes up with certain criticisms of an institution, correct?

A Oh, yes. There is nothing different. We had criticisms.

Q Of River Valley?

A Right.

Q But you didn't have the broad scale -- the OTS did not make the broad scale attack on River Valley's asset portfolios that the FDIC did, correct?

A No.

Q And your agency just absolutely, fundamentally disagreed with the position taken by the FDIC, correct?

A Correct.

MATERIAL REDACTED

MATERIAL REDACTED

Q But you do know that capital was of extreme importance to the FDIC?

A Yes.

Q So when FIRREA came along and wiped out a large portion of River Valley's -- both of the River Valley's regulatory capital, that immediately placed those institutions in hot water

with the FDIC. Isn't that a fair statement?

A Correct; yes.

Q I mean before River -- before FIRREA, these institutions were both solidly capitalized, correct?

A Yes.

Q After FIRREA, they were both in very serious regulatory hot water, correct?

A Correct.

Q And the fact that River Valley had an assest portfolio that the FDIC was uncomfortable with simply exacerbated the problems caused to River Valley by the elimination of a large portion of its regulatory capital as a result of FIRREA, correct?

A Correct.

Q So the River Valley, in other words, would have had enormous problems with the FDIC, even if it didn't have the asset portfolios that Mr. Kenney thought that were sound but the FDIC didn't understand, correct?

A Correct.

Q But when you put those two together, the asset portfolios that the FDIC did not understand and the FIRREA induced impairment of River

Valley's regulatory capital, River Valley was sitting on a regulatory barrel of dynamite, wasn't it?

A Yes. There were serious concerns, yes.

Q And the FDIC was making, frankly, life impossible for River Valley. Wasn't that your personal experience in dealing with them?

A Yes, they were -- there was problems between the two, yes.

Q And there was problems between your agency and the FDIC relating specifically to River Valley?

A Yes; yes.

Q Did River Valley have borrowings?

A Yes.

Q And how did the existance of those borrowings affect the FDIC's view towards River Valley?

A They did -- like I said, they did not like borrowed money because if you needed to

borrow money, it was bad.

Q You and Mr. Kenney did not share that view?

A Right.

Q In fact, you strongly disagreed with that view?

A Right.

Q And again, in the context of River Valley, the existance of these borrowings greatly exacerbated an already difficult situation because the FDIC was very unhappy about River Valley's regulatory capital levels immediately following the enactment of FIRREA, correct?

A Probably in their mind, yes.

Q That would be your best recollection, isn't it?

A Yes.

Q Why did you issue Exhibit 2 and Exhibit 1 in April and May of 1992?
A The Ross and Holland group were trying to acquire another institution, this time in Texas, San Antonio Federal.
Q And you understand that institution ultimately was acquired?
A Yes, it was.
Q Was that institution ultimately named also River Valley, do you recall?
A Yes, it was. I believe it was.
Q And you personally, I assume, dictated this -- these exhibits?
A Yes, I did.
Q And you agreed with their contents when you wrote it?
A With the exception of the typo in the

memo. Yes. Because I did not know Mr. Rose at all.

Q That's why I figured it was a typo. What was the basis for your opinions of Messrs. Holland and Ross that are reflected in Exhibits 1 and 2?

A Could you repeat the question?

Q Yes. On what basis did you draw the opinions, your personal opinions of Messrs. Holland and Ross that you reflect in these two exhibits?

A Just on my personal dealings with them and how they were running River Valley FSB and River Valley Savings Bank.

Q And you thought they were doing quite a nice job in running the institution, correct, at this time?

A Yes.

Q Okay. Do you recall that -- the institution they were attempting to acquire, what was the name again?
A San Antonio Federal Savings Bank.
Q And you have two separate reference letters here. Excuse me, one a letter, one a memorandum, correct?
A Uh-hum.
Q Why did you have to issue basically the same statement on two occasions?
A One was to an applications analyst. I assumed that would be in our Washington office and the other one was to the Resolution Trust Corporation also known as RTC.
Q And why would the Resolution Trust Corporation have wanted your opinion of Messrs. Holland and Ross?
A Because they were trying to get rid of RTC at the time was the -- they were in charge of getting -- cleaning up the savings and loan

crisis.

Q And in preparing, finalizing and signing Exhibit No. 1, were you aware, I assume you were aware that the RTC would rely on your opinion on Messrs. Holland and Ross in making the decision to whether or not to allow them to acquire the San Antonio institution?

A Yes, I believe my opinion would have counted with them.

Q And what was the purpose, to your understanding, of your memorandum to the applications division, Exhibit 2?

A They were just -- they were responsible for San Antonio, Texas. They would have to give their opinions down there and they just wanted to know about these people from Illinois coming down there. What are your dealings with them.

They are an entity, so it's just standard procedure that you contact the people they are coming from and have had dealings with them.

Q You also understood, did you not, that the OTS applications division would be relying on your personal judgment of the integrity and banking experience of Messrs. Holland and Ross in

determining whether or not to authorize them to acquire the San Antonio institution?

A Yes.

Q In both of these exhibits you made the statement, Mr. Ferries, that it also should be noted that they have always met or exceeded every projection that they have ever given to myself or the OTS. Do you see that?

A Yes.

Q To what are you referring and what was the basis for that statement?

A Basically, they -- they had to submit quarterly reports to us and they had -- when they acquired the institution originally, they had a business plan.

And they would file with us various timeframes. We are going to hit this at this point or whatever. At certain capital levels or certain earnings or activities.

Q Profit targets?

A Right.

Q Okay.

A And basically, I guess my opinion was that they had always met those, always on time, and they were always straightforward.

A lot of times over a given period, your business plan changes but they were always up front with us, came in, said, "We want to file an amended business plan because we want to do this now."

And we'd look at it and say, "Okay, that's fine." So there was always a lot of that interplay between exams and over the course of the organization.

Q I take it since you were so positive in making this statement, that all Thrift executives didn't act in the same manner that you dealt with?

A Right.

Q Is that a fair statement?

A Correct.

Q I assume over the years, you've seen all sorts of business plans?

A Yes.

Q Some very good, such as the business plans presented by Messrs. Holland and Ross, correct?

A I've seen a lot of plans, some good, some bad, some people meet their plans, some people don't.

Q And would you agree that the business

plans based on the statements you made here submitted by Messrs. Holland and Ross would have fallen into the good category, the realistic category?

A Yes.

Q You saw a lot of business plans that weren't realistic, did you?

A Correct.

Q I assume some of the business plans you saw you thought were not worth the paper they were written on; is that a fair statement?

A That's a fair statement.

Q That's not a problem you had with these two individuals, is it?

A No.

Q Their plans were conservative. Is that a fair statement, conservative and realistic?

A They were realistic. I don't remember the specifics, you know, conservative, whatever. But based on what I wrote, I stand by that, that they were.

Q Realistic in the sense as you state that they met or exceeded every projection they ever made?

A Right; right.

Q But I assume that there would be very few bankers that you would make that statement about that they met or exceeded every projection they ever made to you. Is that a fair statement?

A Yes.

Q And when you -- we spoke about that you had supervisory jurisdiction over both of the River Valleys immediately following the 1988 supervisory acquisitions, correct?

A Correct.

Q And you understood the capital projections, correct?

A Yes.

Q You understood what their earnings goals were, correct?

A At the time, yes.

Q And you and your staff would have understood at the time that the business plans in 1988, specifically the capital portions of the business plans, were predicated in very large part on the continuing existance of the forebearance capital, correct?

A Correct.

Q And business plans, specifically, would have been predicated in very large part on the continuing includeability in capital of supervisory good will, correct?

A Yes.

Q The capital credits, correct?

A Uh-hum.

Q Subordinated debt, correct?
A Uh-hum.
Q And when you made the two uh-hums a moment ago, you meant to say yes, correct?
A Correct.
Q And preferred stock, correct?
A Correct.

Q With respect to the business plans of

the two River Valleys in 1988 at the time of the supervisory acquisitions, you would have understood when you and your staff reviewed and considered the viability and the realism of those business plans, that the success of those business plans was dependent on the paticular includeability and regulatory capital of subordinated debt, supervisory good will, FSLIC preferred stock and the thirteen million dollars in total capital credits, correct?

A Correct.

Q And you would have understood a year later, when FIRREA was enacted, excluding the includeability of those different elements of regulatory capital, that the business plan as then stated, was no longer workable in its current form, correct?

A Correct.

Q And --

A And they filed the amended plan.

Q And in fact, they had to drastically alter their business plan to take account for the fact that River Valley suddenly lost a very large component of its total regulatory capital, correct?

A Correct.

Q And you as one of the direct supervisors of River Valley, I assume, had no discretion to go up to Messrs. Holland and Ross and say, "I think you guys are great bankers, so I'm going to let you continue to include this forebearance capital." Is that a fair statement?

A Yes, we couldn't have done it.

Q You couldn't have done it even if you wanted to, could you have?

A Right.

Q So a business plan that was viable and had been approved by the Federal Home Loan Bank Board and your staff, staff of Federal Home Loan Bank of Chicago, excuse me, just a year earlier suddenly was no longer workable, correct?

A That's correct.

Q Would you understand that Thrift executives such as Messrs. Holland and Ross would have been upset with the United States government when FIRREA was enacted?

A They had a right to be very upset with it.

Q Why did they in your view have a right

to be very upset with the United States government?

A The only law course I took in college was business law and dealt with contracts and to me a contract is a contract.

Q A deal is a deal.

A They entered the contract with the government, and the government changed the rules afterwards.

Q Your view is they had a deal to include supervisory good will, capital credits, subordinated debt and FSLIC preferred stock as a full-fledged component of their regulatory capital, correct?

A Correct.

Q And the government came along and broke its contractual commitment made personally to Messrs. Holland and Ross, correct?

A In my opinion, yes.

Q And so you believe that they had every reason in the world to be upset about that?

A Yes.

Q So in light of all that, why didn't you cut them some slack?

A I didn't have the authority to do that.

We wouldn't have been able to do it because we had to enforce the new rules.

Q What would have happened if you on your own said, "I am not going to stand for this. I think it's wrong and I'm going to write these bankers a letter saying they are allowed to act as if this regulatory capital is still good capital because I believe a deal is a deal."

What would have happened if you had done that?

A I wouldn't have a job because I'd be overstepping my authority because it wasn't within my authority to do something like that.

Q But you understood with respect to River Valley, in particular, and the other institutions under your supervisory jurisdiction, that although supervisory good will over a 25 year period would be a drag on earnings, that institutions such as River Valley would still be anxious to include it on its books because it counted as regulatory capital?

A Right.

Q But when FIRREA came down the pike, only the bad aspect of supervisory good will was left,

the negative aspect. It would be amortized, correct?

A That's correct.

Q It no longer would count as regulatory capital, correct?

A Correct.

And isn't it correct that FIRREA established three requirements, core, risk base and tangible capital?

A Yes.

Q And immediately after FIRREA was enacted, Holland and Ross, Messrs. Holland and

Rosco did not include a single dollar of the forebearance capital relating to the supervisory good will, the preferred stock, the subordinated debt and the capital credits as a component of their institution's tangible capital, correct?

A Right.

Q So that would make the effect of FIRREA on the tangible capital account of River Valley's -- it would have a drastic immediate affect. Is that a fair characterization?

A Right, I think so.

Q Had the -- in your opinion, as a direct supervisor of River Valley, could the effects of the government's decision to reneg on its deal and no longer allow River Valley to include the forebearance capital as one of the regulatory capital had been rectified had the government replaced that forebearance capital with an equal amount of cash capital. Did you understand?

A Yes.

Q In other words, do you recall that River Valley lost something in excess of 20 million dollars in regulatory capital as a result of the enactment of FIRREA?

A Right.

Q And as we've discussed today, that loss of the regulatory capital had very adverse consequences on River Valley, correct?

A Right.

Q Specifically, including on its ability to remain profitable, correct?

A Correct.

Q And its ability to continually implement business, correct?

A Correct.

Q And I'm simply asking if an officer of the United States or an officer of Federal Home Loan Bank Board on the day after FIRREA said, "I'm sorry that you can no longer count this capital -- these capital forebearances as regulatory capital but a deal is a deal so we are going to make it up to you and we are going to replace that in excess of 20 million dollars of lost forebearance capital with 20 million dollars of hard cold cash."

Would that have rectified the problem?

A Of course it would rectify the problem but there was no such -- that's just theory. There wasn't any offer to do that.

Q Was any consideration given to that by your office in replacing the supervisory good will with cash?

A Not that I recall. I don't think the government -- that would have been way out of our hands. That's all beyond Washington.

Q To your knowledge, was any consideration given to that idea at the higher levels of the Office of Thrift Supervision, replacing River

Valley's lost forebearance capital with cash?
A I wouldn't think so. I wouldn't think so.
Q But that would have cured the adverse consequences had that cash been given River Valley the day after FIRREA, correct?
A Yes, if it was a -- if it was something that was allowed. I mean, if they came up with that to replace it, but that would -- that would have solved everything.
Q Well --
A There was no such offer, so --
Q Was there any other way that the very adverse consequences resulting from the abrogation of the capital forebearances could have been resolved the day after FIRREA was enacted that you are aware of?
A Not that I'm aware of.
Q Other than this lawsuit?
A That's about it.

Q Mr. Ferries, could you please identify for the record an exhibit marked as Exhibit No. 4?

A A letter to the directors at River Valley Savings in Rock Falls dated January 9, 1990.

It's a followup letter to the response

that the directors had written to an exam report -- no, to a supervisory letter.

Q And does this letter contain your signature?

A Yes, it does.

Q And my only question on this is, is this letter representative of correspondence, the type of correspondence you, as on a regular basis, would have with River Valley?

A Yes, normally we do an exam report. The board splits a response. We review their response and in this case, it looks like we had one other something that we wanted them to address. That they wanted addressed.

Q The point I wanted to clarify is you indicated with respect to the examination, the conduct of the examinations of the River Valleys, your staff of examiners would conduct the exams and you'd be involved in editing, reviewing and finalizing the exams, correct?

A Right.

Q But on a -- am I correct, based on this letter on a day-to-day oversight regulatory basis, you had direct contacts and relationships with the management and board of the River Valleys?

A Right. Just to clarify, my title changed here from Field Manager to Manager.

Q I see that.

A We kind of -- early 1990's, we kind of consolidated the old supervisory agent and field manager position into one and we were called managers.

So starting in the early '90s, it was probably right around -- must have been very early 1990 here, I not only had that responsibility but I also had the follow-up responsibility.

Whereas in the past, the supervisory agents would have taken care of that.

Q So you were rarely using the pre-FIRREA designation wearing two hats after the enactment of FIRREA.

You were both the field manager with respect to River Valley and you were also, in effect, River Valley supervisory agent?

A Well, we eliminated the term supervisory agent but yes, I was. Those two people became one.

Q And you were playing both roles after the enactment of FIRREA with respect to River Valley?

A Yes.
Q So there was nothing unusual in you preparing and sending a letter such as Exhibit 4, to the board of directors or the management of River Valley?
A Correct.
Q Because on a day-to-day basis, it was now your responsibility to remain fully apprised of all the issues dealing with River Valley as an institution under your direct supervision, correct?
A Correct.
Q So you would have been aware, again, on a day-to-day basis on issues of loan quality, correct?
A Right.
Q You would have been aware on a day-to-day basis of the effect of the loss of the forebearance capital on River Valley, correct?
A Correct.
Q And you made it your business to be aware of those effects, correct?
A Of course.

Q So you had the most pervasive and extensive contact with River Valley when you were the case manager and then the manager responsible for the valley, correct?

A Yes.

Q And other individuals assisted you in discharging that responsibility, correct?

A Yes.

Q But you had the ultimate supervisory responsibility, correct?

A Correct.

Q And you had that responsibility with

respect to River Valley until the time River Valley was merged out of existance into another institution in the 1994 time period, correct?

A Correct.

Q Do you recall we were looking at Exhibit 1 earlier this morning?

A Yes.

Q And we were discussing your statement that they have always met or exceeded every projection that they have ever given to myself or the OTS. Do you recall that?

A Yes.

Q Our discussion?

A Yes.

Q You recall you indicated you were referring specifically to business plans that Messrs. Holland and Ross had submitted to your office?

A Correct.

Q And you were indicating the statement that they had given you realistic business plans and had complied with those business plans, correct?

A Yes. That they had complied with the business plans.

Q And we also talked about the business plan that was submitted by the -- the business plans that were submitted by the two River Valleys prior to the enactment of FIRREA. Do you recall that?

A Yes.

Q And do you recall that you testified that the two River Valleys had complied with those business plans up until the time that FIRREA had abrogated their forebearance capital. Do you recall that?

A Yes.

Q And do you recall that you indicated at that time their business plans, the business plans of the two River Valleys became unworkable as a result of the abrogation of a very large portion of their regulatory capital.

A They needed to be reworked.

Q Because as they were, then composed, they were no longer achieveable since a big portion of the regulatory capital was gone, correct?

A Correct.

Q And that was because they needed capital to support their assets, correct?

A And their activities, yes.

Q And they needed capital to expand their activities and grow their assets, correct?

A Correct.

Q And when FIRREA abrogated that regulatory capital, they no longer had the necessary ingredients to achieve the goals set forth in the business plan, correct?

A Correct. They would have had to do something else because a big chunk of their plans were changed.

Q They somehow would have to raise cash capital to replace the forebearance capital that had been abrogated, correct?

A Correct.

Q And the government wasn't offering to give them that cash capital, was it?

A Not that I'm aware of.

Q Had FIRREA not been enacted, though, in 1989, just make that assumption, okay.

A Okay.

Q And assume that River Valley had been allowed to continue to include in its regulatory capital all the forebearance capital that it had acquired and contracted for in connection with its

supervisory acquisition of the five insolvent savings and loan associations. Okay.

A Okay.

Q And based on your experience that Messrs. Holland and Ross met or exceeded every projection that they had ever made, do you -- you don't have any reason to believe that had FIRREA not occurred, Messrs. Holland and Ross could have not continued to successfully have implemented their existing business plan, correct?

A It's hard to say.

Q You don't have any reason to believe that they couldn't, correct?

A They should have been able to, but then they could have made a mistake or something else.

It's -- business plans are very fluid. Things can happen. They could have gotten a bad investment or bad something and things would have materially changed.

I can't say that everything would be fine just because --

Q Nothing in this life is certain, correct?

A Correct.

Q And you realized that when you reviewed

any business plan, correct?
A Correct.
Q Nevertheless, you required business plans to be filed, correct?
A Right.
Q And you required that a business plan be realistic, right?
A Yes.
Q Before you would approve it, you required that it be realistic?
A Right.
Q And you had quite a bit of experience dealing with Messrs. Holland and Ross' ability to comply with their business plans, correct?
A Right.
Q And recognizing that nothing in life is certain and recognizing everything in life has risks, don't you believe based on the realism of their business plans, that had FIRREA not been enacted, it is likely that they would have continued to have been able to successfully have implemented the business plan that your office had approved?
A They should have been able to but then again, something else could have happened.

Q Based on your dealings with these two individuals, you would have had, would you have not, in 1989, a significant level of confidence although again nothing is certain, but you would have had a significant level of confidence in their ability to continue to successfully be able to carry out their business plan, correct?

A I was confident that they could handle it. But again, who knows what would have happened.

Q All right. But again, you would have been confident of their ability, correct?

A Yes.

Q You wouldn't have given that same testimony, would you, concerning the ability of all the Thrift executives you supervised their ability to carry out their business plans, correct?

A I wouldn't give it to everyone, no.

Q It would be a case-by-case determination on your part based on the qualifications and

competence of the particular Thrift executive, correct?

A Correct.

Q And as you've testified, these two Thrift executives, you had great confidence in, correct?

A Yes.

MATERIAL REDACTED

Q Mr. Ferries, kindly identify Exhibit 7 for the record.

A It's a letter from Holland Partners to myself dated January 25, 1990. They've sent in a report on the institution sensitivity measurements and also telling us they've hired Ron Pikus as President and Chief Operating Officer.

Q Did you ever deal with Mr. Pikus?
A Many times.
Q Did you find him to be a competent banker?
A Very, very competent. Very conscientious.

Q Okay. We are characterizing FIRREA as a roadblock to the continuing successful implementation of the business plan, correct?

A A hurdle.
Q Okay. Your term is hurdle. So FIRREA was a new hurdle that had to be overcome, correct?
A Correct.
Q And that hurdle had to be overcome by somehow replacing the capital forebearances with cash capital, correct?
A Correct.
Q Now, I'm simply asking, had FIRREA not been enacted, are you aware of any other hurdles that had been placed in front of River Valley that would have imposed substantial impediments to the continuing successful implementation of the business plan?
A I'm not aware of any.

Q Do you recall whether there were discussions between you and your staff and representatives of the FIDC concerning any efforts by the FDIC to impose more rigorous enforcement actions on River Valley?

A I don't remember any such discussions. I know we were worried they may try to do some back up actions.

Every once in a while they kind of threatened things, but I can't remember that happening in this case.

Q In the context of River Valley, why would you have been worried about that?

A Just that you don't like to be second

guessed and have something go up to the board. It makes you look like --

Q Would you have also been worried in the context of River Valley, the FDIC was taking a significantly more adverse regulatory posture as we discussed this morning with respect to River Valley?

A I wasn't about that because I knew that -- I knew that my ratings were right and theirs were wrong and I could support my ratings.

And I think a reasonable third party could assume that my ratings were good and theirs were bad.

Q And at that time, when you entered into the supervisory agreement of River Valley, I assume I'm correct in understanding that at that time, in fashioning the requirements of that supervisory agreement, you gave River Valley absolutely no credit for the supervisory good will, the subordinated debt, the preferred stock and the capital credits. Is that a fair statement?

A Correct.

Q Because again, your main goal in the supervisory agreement, was it not, was to assure

that River Valley maintained adequate regulatory
capitalization, correct?
A Correct.
Q And for the reason you testified earlier
today, whether or not you agreed with FIRREA
wasn't the issue, you were bound yourself to
comply with its provisions?
A Correct.
Q And so you couldn't, in making your
decision to have River Valley introduced into a
supervisory agreement, you were not free to give
River Valley any credit, even a dollar credit, for
all the capital forebearances that had been
abrogated by FIRREA, correct?
A Correct.

Q And again, the -- River Valley had significant capital compliance issues following FIRREA as we discussed because FIRREA wiped out such a large portion of its regulatory capital, correct?

A Correct.

Q Now, you don't have any doubt, do you, that hypothetically, had FIRREA not been enacted, you wouldn't have been pressuring Messrs. Holland and Ross to put in additional capital because the capital already would have been fully adequate, correct?

A Probably. Unless something else had happened.

Q But if something you aren't aware of today hadn't happened, you would not have been, in 1991, interposing a supervisory agreement to require Messrs. Holland and Ross to very promptly infuse their own funds as equity capital into River Valley, correct?

A Correct.

Q And the reason for that's quite simple, isn't it? Because had FIRREA not been enacted, River Valley's regulatory capital would have been fully adequate in March, 1991, correct?

A Should have been, yes.

Q And sitting here today, you are not aware of any reason, are you, why it wouldn't have been fully adequate had FIRREA been enacted, correct?

A Not to my knowledge, would have taken me

to that conclusion.

Q But the fact is, FIRREA was enacted, right?

A Yes.

Q And that's what you had to live with as a regulator, correct?

A Correct.

Q And the fact is, your office and you in particular, in discharging your official responsibilities, placed quite a bit of pressure on Messrs. Holland and Ross to very quickly put in capital that they would not have had to infuse had FIRREA not been enacted, correct?

A Correct.

Q And in fact, in Ferries Exhibit No. 11 which I'm now handing you, Mr. Howard Ross expressed some of his hard feelings concerning your demand that Messrs. Ross and Holland be required to infuse the capital.

Would you agree with that? First, of course, read the letter.

A Yes, this letter is written by Howard.

Q And based on your testimony and your

recollection of these events, you are not surprised that Mr. Ross had the feelings he had that are expressed in Exhibit 11?

A Right.

Q And do I also understand from your testimony, although you had to do what you did, you would have fully understood in August, 1991 why Mr. Ross had the feelings that he had as expressed in Exhibit 11?

A Right. And he -- they also understood where we were coming from. So this was basically a way to vent his frustration.

Q But you wouldn't have considered his frustration at that time to have been unreasonable for the reasons you've already testified to, correct?

A Correct.

Q And he indicates in here that the enactment of FIRREA and the imposition and the -- the imposition of the capital requirements resulting from the exclusion of the supervisory good will and other forebearance capital caused River Valley harm. You saw that?

A Yes. He's basically saying -- that's exactly what he's saying.

Q Base on your testimony this morning, would I be correct in understanding when you read this statement about harm by Mr. Howard Ross, you would not have disagreed with it?

A I would not have disagreed with it.

Q So why did you issue the supervisory agreement against River Valley?

Would it be because in light of the inadequate capital resulting from FIRREA, you really felt you did not have any choice?

A At that time, any institution that was rated a 3 or lower, had to have an agreement.

Q And aren't I correct that the reason River Valley was rated at 3 or lower was because of the deprivation of a very large amount of its regulatory capital as a result of the enactment of FIRREA?

A That was the primary reason, yes.

Q Isn't it fair to say that it is

extremely likely if not a sure thing, that had River Valley not been deprived of its contracted for forebearance capital, it would have been rated a 2?

A It probably would have been rated higher than what it was, yes.

Q What is your recollection of the role American National played in the ultimate survival of River Valley?

A They gave them the financing that they needed to bring in the capital.

Q And do you recall that at that time, Messrs. Holland and Ross were unable to identify any other sources of capital other than American National?

A As I recall, they had looked at other things but Mr. Ross had a very good relationship with American National and that's why they stuck with Holland and Ross.

Q When you say American National stuck with Holland and Ross, do you say that because at that time in the early 1990's, not many financial institutions would want to be involved in extending substantial funds to under-capitalized savings and loan associations such as River Valley?

A Most institutions, big players were not loaning them money and American National lost a lot of money dealing with certain savings and loans in our area.

Q Okay.

A They liked Mr. Ross from his prior dealings with them and they respected him and that was -- they had a good relationship.

Q So it sounds as if they basically had the same feelings toward Messrs. Holland and Ross as your office did, is that a fair statement?

A That is -- they had that opinion of Mr. Ross.

Q And you believe American National also had a favorable opinion of Homer Holland?

A I would assume so or they wouldn't have done it. But I know they were -- Ross and American National went way back.

Q Again, as you understood it from your direct dealing with River Valley, this was a very important relationship for Messrs. Holland and Ross to retain in order to survive through the hard times generated by FIRREA, correct?

A Correct. Mr. Ross had -- in the scheme of things at River Valley, Mr. Ross had the financial backings. Homer ran day-to-day and was more -- got his hands dirty.

Howard was just the financer and he had the connections for the money.

Q So Howard was out there trying to bring

in the capital necessary to replace the capital lost as a result of the enactment of FIRREA, correct?

A That was my understanding and my conclusion.

Q Howard wasn't the day-to-day banker, right?

A No, he was the pot, the money. Homer was the banker.

Q All right. In fact, Howard, you wouldn't expect to be that knowledgeable about the day-to-day events at the bank, would you?

A Not really.

Q He would have a general supervisory --

A Yes, he knew what was going on and would read the reports but he would rely on what Homer and Steve Bangert and people relayed to him.

Q You wouldn't have expected, for example, Howard Ross to know the intracacies of the business plan, would you?

A No, he would know the big picture.

Q The big picture?

A It was up to everyone else to pull it together.

Q But Mr. Holland, on the other hand, you

would expect him to know in excruciating detail everything that was going on at River Valley at all times, would you not?

A Yes. He was the one that liked to get his hands dirty and he was the real reason they got into these deals because he liked the challenge of turning things around.

Q And would you understand that Mr. Ross would have had a general understanding, for example, of the overall negative impact that the FIRREA capital abrogation provisions would have had on River Valley, correct?

A Right.

Q But you wouldn't have expected Mr. Ross to know in detail how the capital abrogation provisions of FIRREA would adversely affect River Valley, correct?

A Not in detail, no.

Q But on the other hand, you would expect Mr. Holland to know in exquisite detail how River Valley would have been adversely affected on a day-to-day going forward basis as a result of the deprivation of the forebearance capital. Is that a fair statement?

A Yes.

Q And again, just to wrap it up and come back to an initial point. In light of the troubled condition of River Valley resulting from the enactment of the capital abrogation provisions of FIRREA, you would have expected, would you have not, that other than the pre-existing excellent relationship between Mr. Howard Ross and American National Bank, it would have been very difficult if not impossible for Messrs. Holland and Ross to bring in some other new third-party lender for the first time to make significant loans in order to provide for the recapitalization of River Valley?

A I don't think that they would have been able to find any other -- if Howard -- Homer didn't have Howard there, River Valley would not have had success.

They would have been -- they would have had to throw in the towel.

Q And wouldn't you say the same thing, if Howard Ross did not have American National there, River Valley would have been down the tubes?

A Probably.

Q What was the basis for the statement by the OTS that River Valley bank FSB was well managed, profitable and in capital compliance?

A I think it's self-explanatory.

Q Just for the record, I need to have it clear what the source of that information was.

That would have been the examination

report?

Q And you personally --

A I'm not sure what date the examination report would have been, but it would have probably been the end of '91, October or November.

Q You personally would have agreed with that assessment at the time it was delivered, correct?

A Right.

Q And well-managed, the statement well-managed, I take it, would have been referring very specifically to the management of Homer Holland and Mr. Pikus, correct?

A And Steve Bangert, yes.

Q I -- Steve Bangert, you dealt with him directly?

A Yes. Well, he would sometimes call or different things. But yes, we were involved -- my examiners talked to him a lot.

He called me several times. He dealt with Larry Kenney a lot.

Q You dealt with Mr. Bangert again for a several year period?

A Yes.

Q You also, as with the case of Mr. Homer

Holland and Mr. Ronald Pikus, you were reasonably impressed with Mr. Bangert?
A Yes, I was.
Q You consider him to be a competent Thrift manager, correct?
A He was very competent in the investments and was very well versed in investments and that type of stuff, securities.
Q And these investments and securities to which you are now referring, would those be the same investments and securities that the Federal Deposit Insurance Corporation was raking River Valley over the coals with respect to?
A Yes.
Q And again, you thought they were just totally off base in that regard, right?
A Right. Larry Kenney and Steve -- that's why we had Larry Kenney look into the investments because he and Steve were -- their understanding -- when they would talk, they are up here and -- it was very confusing listening to those two talk.
Q You are pointing to a place over your head, right?
A They are talking way high and after

Steve would leave, you'd ask Larry, "Exactly what are we talking about here?"

Because they were on the same level. That's why we brought Larry, our specialist, to look at these investments.

Q So Larry Kenney, after meeting with Mr. Steve Bangert who would explain to you in detail what it was what they had just been talking about?

A A lot of times, yes. You knew what they were talking about but they would use terms that were not normally used.

Q And Mr. Kenney would indicate to you in these sessions that he had a high degree of confidence in Mr. Bangert's abilities to effectively purchase and sell and administer these various securities, correct?

A Correct.

Q Notwithstanding the fact that the FDIC was doing everything in its power to force the institution out of that line of business, correct?

A Correct.

MATERIAL REDACTED

Q My question is, I understood that OTS concluded FSB was well-run with capable management.

That was OTS's conclusion, correct?

A Correct; correct.
Q My only question was, was this first reference to all regulators, was that to your recollection, this meeting also referring to FDIC officials or officials outside of the Office of Thrift Supervision?
A I don't have any recollection. Like I said, we have a difference on the opinion on the investments but I don't think they ever questioned management's ability, FDIC.
Q You had no reason to believe, did you, Mr. Ferries, that the FDIC shared your opinions on Mr. Pikus and Mr. Holland and Steve Bangert?
A I think they shared those opinions, but they are coming from -- they didn't like the investments.
But I don't think they thought -- I can't speak for them. But our big disagreements were strictly the investment that they were dealing with.
Q Another way of saying the same thing, is it not, is that the substantial difference in the assigned composite rating of 2 and the 4 rating assigned by the FDIC related to the differences in the analysis of the investment and asset

portfolios and not to differences in analysis and evaluation of the skills of management?

A Correct.

Q According to this, do you recall this Mr. Ferries: Even the FDIC, as harsh as they were to this institution, believed that with respect to loans and real estate owned, the institution was doing an excellent job?

A Yes.

Q Does that statement I just read comport with your personal recollection of the FDIC's views?

A Yes.

Q And you personally relied heavily on Larry Kenney, right?

A Yes.

Q Because he was the expert within the Office of Thrift Supervision when it came to the analysis and understanding of many of the

different types of investment securities held in the portfolio of River Valley, correct?

A Correct.

Q And again, many times you were faced with a situation where Mr. Kenney's judgment was diametrically opposed to the judgment of the Federal Deposit Insurance Corporation on a large volume of securities, correct?

A Correct.

Q And you would, based on your personal dealings with him, you went along with the judgment of Mr. Kenney because it had been your experience that he knew what he was talking about and he was right, correct?

A Correct.

Q And the FDIC were newcomers to Thrift regulations and they didn't know what they were doing in that regard, did they?

A That's pretty similar to what I said this morning, yes.

Q Do you agree with my statement?

A Yes.

Q Now, you also recall this morning in Exhibits 1 and 2, we addressed references that you gave with respect to Messrs. Holland and Ross relating to their proposed acquisition of a financial institution in San Antonio. Do you recall that?

A Yes.

Q That was an institution that ultimately you agreed was named also River Valley?

A Right.

Q And as you testified this morning, based on your personal working experience with Messrs. Holland and Ross over a period of years, you supported that application, did you not?

A Yes.

Q And, in fact, you would have and perhaps

did, support -- you would have supported their proposal to acquire River Valley in San Antonio as a subsidiary of River Valley in Illinois, correct?
A Probably would have supported that. But trying to run one shop out of too many locations is a problem.
I was glad that they did two different institutions.
Q But you would not have interposed any supervisory objection whatsoever, would you have, to merging the San Antonio institution into the Illinois institution, correct?
A Probably not.
Q And do you recall -- you know what nonoperating losses are, don't you, NOL's?
A Uh-hum.
Q And do you recall that as in most such acquisitions, the supervisory acquisition of Home, Mutual, Galva, Republic Savings and Peoria Savings gave rise to a significant level of NOL's?
A Correct.
Q And NOL's basically are an assest that the FSLIC sold in the context of supervisory transactions, correct?
A Right. It was a tax planning tool.

Q And we discussed earlier today, capital forebearances were one way that the FSLIC enticed potential acquirers of insolvent institutions to acquire those institutions, correct?

A Correct.

Q NOL's were another asset that the FSLIC could sell to potential acquirers, correct?

A Correct.

Q And in fact, the FSLIC sold NOL's to Messrs. Holland and Ross in connection with the five supervisory acquisitions that you and I are talking about, correct?

A Correct.

Q But NOL's you can't simply go down the street to the First National Bank of Chicago and exchange them into cash, can you?

A No.

Q You have to convert them into cash, correct?

A Correct.

Q And how do you convert NOL's into cash assets?

A Well, basically, you get -- you can use those to offset your income, the income you are making for tax purposes.

You can offset those NOL's against that so then you pay no taxes or less tax.

Q Which means in order to convert NOL's into cash into assets, an institution has to make income, right?

A Correct.

Q Now, if after FIRREA, River Valley was unable to make income or unable to make as much income as it otherwise would have made, that would have irreparably hindered River Valley's ability to convert its purchased NOL's into hard cash, correct?

A Yes.

Q And again, that's one of the damaging consequences of FIRREA that Mr. Howard Ross would have been referring to in the letter he sent to you of August 28th, I believe it was, 1991 that we looked at a few moments ago, correct?

A I'm sure.

Q You are sure --

A I'm not sure that was the date on the letter right now, but yes, that's one of the things he felt was not fair.

Q But when you and your staff reviewed the plans, you understood that the intent of Messrs. Holland and Ross was to convert the NOL's into cash, correct?

A Their plans were going to be make money and you are going to make more money by not having to pay taxes on it.

Q That would have been your personal understanding back in 1989 on, correct?

A Right.

Q Okay. And you also indicated you

understood that an institution needed to produce income to translate NOL's into cash, correct?

A Correct.

Q And I believe you also indicated that to the extent FIRREA eliminated or lowered the amount of earnings produced by River Valley, it would eliminate or lower or limit the ability to turn those NOL's into cash, correct?

A Yes.

Q In other words, no earnings, the NOL's just stay that, NOL's. They are not a viable asset at that point, correct?

A Correct.

Q And in evaluating back in 1988, and subsequently when you took over the supervision of the institution, the realism of the business plan produced by the River Valleys, one of the factors you and your staff would have looked at is the ability of the River Valleys to produce income adequate to convert the NOL's into cash assets, correct?

A That would be one factor. I mean, we are going to look that they are going to make money on an ongoing basis.

Q Because if you did not believe that they

were going to make money on an ongoing basis, you would have not considered it realistic to project that these NOL's would be converted into cash assets over time. Is that a fair statement, sir?

A That's fair.

Q Now, returning to San Antonio, the San Antonio situation, you indicated, I believe, although it could present some -- I believe you indicated that with respect to the San Antonio institution, if Messrs. Holland and Ross said the only way we can do this deal is through our existing Illinois bank, you would not have had a supervisory basis to interpose an objection to acquiring the San Antonio institution through River Valley in Illinois, correct?

Q Correct, sir?

A I wouldn't have had a problem with them -- with the holding company acquiring and holding the separate Thrift.

Q And does it surprise you that American National Bank was willing to lend Messrs. Holland and Ross the funds necessary to acquire San Antonio but not if they were -- Messrs. Holland and Ross were going to make the San Antonio

institution a subsidiary of or part of River Valley in Illinois?

A No, it doesn't surprise me.

Q And why would that not surprise you, sir?

A American National is looking out for themselves. I mean, they are looking out for what's best for American Nationnal.

If they loan them the money directly, form a new company and then they have another institution, that institution wouldn't have been subject to a supervisory agreement that was in place in River Valley of Illinois.

Q And based on our earlier discussion, do you believe that the supervisory agreement would have at a minimum, made American National uneasy about lending --

A Yes. Because American Nationnal had to be careful what the regulators would and would not do under that agreement.

Q But had American Nationnal been willing to lend the money in such a way so that Messrs. Holland and Ross could have acquired San Antonio through River Valley in Illinois, they could have sent Mr. Richard Dalton down to San Antonio to be the on-site president but have designated him as branch manager as opposed to designating him as president, correct?

A I can't speak for them, but that would have been a possibility.

Q But as the primary supervisor, you don't see any reason as a primary supervisor, you would have not authorized that arrangement, do you?

A Not offhand. I don't know what any of

the problems were. I don't know what any of the problems were at San Antonio, why it was losing money or why it was up for sale. I don't have any recollection of that.

Q But sitting here today, you don't see any reason why you would have declined to approve the acquisition of San Antonio as a subsidiary of or part of River Valley in Illinois, correct?

A I can't think of any reason why we wouldn't have unless it would have been a drain on the earnings of -- unless there was something else, you know, like it would have been we would have perceived it to be a drain on the earnings of River Valley Peoria.

I mean, without knowing that, I don't know what the other conditions were, you know.

Was it bleeding? Was it doing well? There are a lot of factors but not -- I'm not aware of anything.

In theory, I wouldn't have had a problem being here as a branch of my Peoria shop.

Q What if it turned out to be the fact and I'm asking you to assume this for these purposes, that rather than being a cash drain, San Antonio, after the acquisition, produced significant

earnings?

A Well, that would have been good for Peoria so I would have been happy.

Q That's my point. If you knew that San Antonio was going to produce significant earnings, you would have as a supervisor, have -- would you not have affirmatively liked to have seen San Antonio brought into the Illinois operation in order to restore the capital, correct?

A That would have been a positive in my mind, yes.

Q Well, let's talk about that in a minute. Referring back to Exhibit 13. Did you see that in order to structure the transaction as it was, in fact, structured, River Valley in Illinois was required to pay out a 6 million dollar dividend?

A That's what it says here.

Q And your office would have had a say in that, would it not?

A Yes, we would have.

Q In fact, your office would have had the power to approve that or disapprove that?

A Right. We would have looked at that transaction and how much that six million affected the operations of River Valley.

Q That River Valley in Illinois?

A Right.

Q But my question was, if we could identify the specific assets that River Valley disposed of in order to reduce their size as a result of the six million dollars in dividend, six million dollar dividend paid in order to affect the San Antonio transaction, we could determine could we not, with mathematical precision how much in earnings River Valley lost as a result of those of the disposal of those specific assets, correct?

A Probably.

Q Would you see any reason we couldn't, sir?

A Not really.

Q So we could, right?

A Could from a reasonable estimate.

Q Very solid estimate, wouldn't you agree with that?

A Yes.

Do you recall, we -- let me strike that and come back to Exhibit 13.

The portion you've been examining that refers to the six million dollar dividend, correct. The next page. I think the six million dollar dividend is referred to at the top of the next page. Do you see that?

A Uh-hum.
Q That was the dividend payment that you ultimately approved, correct?
A I believe we did.
Q If you continue reading that passage, it indicates the anticipated amount of earnings reduction to be sustained in River Valley in Illinois, correct?
A Right.
Q What does it indicate?
A It estimates that there will be a decrease in earnings of a hundred thousand dollars.
Q And --
A Per month.
Q Aren't I correct, Mr. Ferries, that when you and your staff made the decision to approve that dividend payment, you would have required River Valley Bank in Illinois to advise your office of the anticipated effect of that dividend payment, correct?
A Right. We would have had input on that

Q But you considered the fact that the earnings would have gone down a hundred thousand dollars?
A Right. And if we had a significant problem with that, we wouldn't have allowed the dividend.

Q All right. But you were willing to authorize a reduction of earnings by a hundred thousand dollars so that the San Antonio --
A When the other people in my office looked at it, so we did it.
Q It made sense, even though the six million dollar dividend resulted in a loss of earnings of a hundred thousand dollars a month, correct?
A Right. If we had a problem with it, we haven't allowed them to do it and they would have had to do some other type of deal.
But we felt it was a reasonable request and it made sense when we looked at the big picture and we had no problem with that.
Q Now, had San Antonio been acquired directly by River Valley in Illinois, that six million dollar dividend payment would not have been required to have been made, correct?
A Correct.
Q And then the hundred thousand dollars in earnings produced by that six million dollars that ultimately was paid out would have been retained by River Valley in Illinois, correct?
A Correct.

Q And let's get to the issue of, isn't it all part of the same happy family that you were referring to. Okay?

A Uh-hum.

Q Now, do you recall this afternoon we discussed NOL's?

A Yes.

Q And you remembered from your personal involvement in the River Valley supervision that River Valley had a significant volume of NOL's, correct?

A Correct.

Q And you also understood that to make the NOL's productive, River Valley needed earnings, right?

A Right.

Q And you also understand, don't you, that even if the San Antonio institution was enormously profitable, River Valley Illinois' NOL's were not available to shelter the earnings of River Valley in San Antonio, correct?

A Correct. But there may have been some NOL's from down in Texas that I'm not aware of.

Q You are not aware there are, in fact, any?

A I don't know anything about that institution.

Q But you do know that the earnings by the San Antonio institution could not be sheltered from taxation through utilization of the NOL's on the books of River Valley in Illinois, correct?

A Of course.

Q But earnings produced by River Valley in Illinois could be insulated from taxation through River Valley of Illinois' NOL's, correct?

A Correct.

I'm asking you, wearing your hat as a professional Thrift regulator, and that's all I need. I'm not asking you to step into the brains of Messrs. Holland and Ross.

But sitting here today, based on everything you know from your years of experience as a regulator and your years of personal experience in regulating River Valley, can you understand why it would be preferable to have earnings produced in River Valley, Illinois as opposed to having those same earnings produced by River Valley in San Antonio to the extent that River Valley, Illinois has available sufficient NOL's to protect those earnings from taxation?

A On the cover, that would make the most sense to use the NOL's merged up here. But there was factors that I'm not aware of that they chose to do it the other way.

And that he gave up that potential for the NOL's by doing it the other way. So whatever caused them to do that, acquisition the way they did, they must have weighed.

They are very smart individuals, they do everything for tax reasons. So they would have considered that on their advice of their consultant and their tax attorneys and stuff, so I don't know why they ultimately did the two separate.

Q Don't you understand based on your testimony today and the documents you reviewed today and the documents you reviewed ten years ago, that they structured the acquisition of San Antonio the way they did because the financial institution financing that acquisition refused to provide the financing for that acquisition if it were to be done through River Valley in Illinois?

A I believe that was the case. American National wanted it done this way so they were the ones with money to give to them to do it so you have to listen to who is giving you -- whoever is holding the money, you have to make sure they are happy.

You have to make sure the regulator is

happy. But more importantly, you've got to make sure your lender is happy and you are going to restructure the deal.

So that -- American National must have had an awful strong impact on that decision because they are giving away the use of those NOL's, yes.

Q Right. And --

A I'm not arguing that point with you but that's their call. I don't know why. But knowing the two individuals, I'm sure that they made the best decision, what was best for themselves under all loan circumstances.

Q Because if they acquired it directly as opposed to River Valley, Illinois, at least they could do the deal on the terms American National mandated, correct?

A Right. Because without the additional capital, they couldn't have done the deal any way.

So whoever is holding that capital is going to call the shots.

Q Okay. Now, we had a lot of conversation today about the adverse impact of FIRREA, correct?

A Correct.

Q And we had a lot of discussion that indicated that River Valley would have been a much sounder, better capitalized and more profitable institution had the breach of the FIRREA -- the breach of contract affected by FIRREA not occurred, do you recall that?

A Yes. It would have been -- they would not have had a cap problem if the government hadn't changed their rules.

Q Okay.

A Sound capital is a different thing.

Q Do you understand --

A Personally, I don't think the good will in everything was solid capital. Okay. To me, cash is capital but it was allowed so, therefore, it was capital.

Q And you as a regulator gave full credit to the forebearance capital, did you not?

A Yes, we did. Did I personally think it was good capital, no. But it was capital because it met the definition.

Q Right. And when that capital was gone, it had all the adverse consequences on River Valley that you've testified to, correct?

A Right. We've established that.

Q And you indicated that those adverse consequences were substantial, do you recall that?

A Yes.

Q Okay. And do you understand -- well, based on your knowledge of the institution and the transaction we are talking about, you understand that River Valley in Illinois would have required additional capital in order to support the acquisition of the assets resulting from an acquisition of the San Antonio Bank, correct?

A Correct.

Q And River Valley in Illinois did not have sufficient capital, correct, to support -- not to acquire another Thrift at that time?

Q They could have had sufficient capital if American National was willing to lend to them but they weren't, correct?

A Correct.

Q But had American Capital lent that money then, as a regulator, you would have seen the capital as being sufficient and as you indicated before, you would not have had a reason to interpose a supervisory objection, correct?

A Not that I'm aware of. It would depend -- we would have looked at the resulting institution and analyzed everything.

Q But sitting here today, you are not aware of any basis for objecting to it, right?

A Right.

Q So under that circumstance, River Valley in Illinois -- had FIRREA not been enacted -- River Valley in Illinois could have directly acquired the San Antonio institution without obtaining additional capital through a loan from American National, correct?

A Probably, yes.

Q And Mr. Ferries, again as we sit here today -- assuming that FIRREA had not been enacted. Okay.

Sitting here today assuming that FIRREA had not been enacted, you are not aware of any reason, are you, that River Valley couldn't have consummated -- River Valley, Illinois couldn't have consummated the acquisition of River Valley, San Antonio in precisely the manner that I just suggested, are you?

A I don't know why they wouldn't have been able to unless there was some -- unless something else happened in that two and a half years.

But as we know -- if nothing else had changed, they probably could have done it directly if they wanted to.

Q And based on your understanding as a savings and loan regulator, you would understand

that had the institution been -- had the acquisition been accomplished in that manner and had River Valley, San Antonio produced positive earnings, those positive earnings could have been shielded from taxation by the NOL's that River Valley had on its books at that time, until such time as those NOL's were used up, correct?

A Correct.

Q Is it fair to state that your personal assessment of the level of risk presented by River Valley increased significantly following the eradication of its forebearance capital?

A Yes, I think we spent more time because of that. If the capital had been always there and the rules hadn't changed, we probably wouldn't have spent as much time.

Q So -- but as a result of that, you knew much more about River Valley than perhaps you would have known about a less capital challenged institution under your jurisdiction at that time, correct?

A Yes. I always tried to know my institutions. Even though the nice clean ones, I can tell -- I know of them and what they do and different things.

Q But in order to carry out your assigned responsibilities, it was incumbent upon you to be extraordinarily familiar with all the particulars of institutions, such as River Valley, that were facing capital challenges, correct?

A Right; right.

Q And you did that?

A Right.

Q You spent most of your time on those institutions?

A Yes.

Q And you expended a large amount of your personal professional supervisory time dealing with River Valley during the period about which you and I have been speaking throughout this deposition, correct?

A Right, correct.

Q Based on the documents we are looking at, is it fair to say that you had a hands-on physical presence at River Valley meetings on a fairly regular basis throughout the early 1990's?

A All the ones relating to the examination reports, yes.

Q Even so, I believe some meetings that you attended that were not -- did not follow an exam report?

A I believe there was some.
Q And you attended those, too?
A Whatever we've talked about so far, yes.
Q So --
A My name is all over this report.

Q And I assume that you personally had or played a substantial role in making the decision to termination of the supervisory agreement?

A Yes, I would have had input on that termination.

Q And do you recall in making that determination, if you based your decision in large part on the fact that Messrs. Holland and Ross had infused additional equity capital into the institution and based on your overall level of confidence in the management team at River Valley?

A Yes, they had complied with the agreement and some of the conditions of that agreement probably were no longer -- you know, they were probably dated.

Just no longer applicable. And full compliance, normally OTS would keep an agreement in place for a couple exam cycles. So when they showed after, you know, routinely after a couple of exams that they were abiding by that, it was a common practice to remove the agreement.

Q On page 2 of this memorandum under section 5, operations, it states: The examiners looked hard at our earnings trends and have no concerns. Especially when they consider our business plan for future operations. Our overall rating is a 2 and OTS is very comfortable with that rating. OTS anticipates that FDIC will adopt

the OTS report and rating for assessment purposes. After further discussions and questions from the directors, the representatives from OTS left the meeting and Mr. Tuerk T U E R K concluded the conference call.

Do you believe that Section 5 accurately sets forth the views of the OTS at the time of this meeting.

A Yes. By this time, I think FDIC wasn't participating on the exams any more. As I had said earlier, FDIC came in on everything right away and each year they went on less and less.

Q Does this statement that OTS anticipates that FDIC will adopt the OTS report, do you see that?

A Uh-hum.

Q Does that indicate that by this time, the FDIC had concluded that Mr. Kenney was right and that it was wrong?

A No. By this time they had concluded that OTS knew what they were doing and they were confident in our report.

We also had an agreement with FDIC after a couple years of them going in on every shop. After that, a formal agreement was signed between

OTS and FDIC that they would accept our report.
And they had a -- we had to present them with a draft copy of the report and they had ten days to make commentary on that if they had any problems with it.
Q But by this time, had the continuing disagreement concerning River Valley Bank been resolved, the disagreement between FDIC and OTS?
A Concerning their reducing those derivatives and getting conservative types of investment. Their concern was lessening because there was stronger capital and, you know, not the high concentration in the derivative product.
Q Again the FDIC, was it your experience, in assessing an institution, put a high weight or a high reliance on the capital level, correct?
A Right.

Q A few documents ago, your office approved Ron Seib as the Chief Financial Officer?

A Senior VP, I think it was.

Q And as we reflect in this minute, Exhibit 18, Mr. Seib fulfilled the role of the bank CFO, correct?

A Okay. Yes.

Q Did you consider Mr. Seib to be a competent and experienced banker?

A He had been working for them for some time as the comptroller and he seemed very cooperative and competent when we were in doing examinations.

Q You didn't have any examination concerns relating to Mr. Seib; is that correct?

A Correct.

Q Am I correct?

A Yes; yes. I had no problems with him.

Q Had the board simply, once again, solicited your advice concerning the issue of proposed board restructuring and you were giving your thoughts on it?

A I believe they -- River Valley always liked to make sure that we were on the same -- they always liked to keep us fully informed of what was happening.

And I think this was -- that was the case here.

Q I assume as a regulator that was something you liked, right?

A Yes. Because we don't like to be surprised and find out two months later -- we would have been very concerned with Steve leaving and finding out about it three months later, just because of his involvement in everything.

Q River Valley did a very good job of making sure that you were not surprised, correct?

A Yes, they were always very straightforward with us and kept us apprised.

Q In the scheme of heavily regulated financial institutions that we operate under, that's a very important feature, correct?

A Yes, it is. You don't want to surprise your regulator.

Q And that assisted -- that provided you another basis for having a significant level of confidence in the management of this institution, correct?

A Right. And I think this meeting was basically their -- they just wanted to -- they called us and asked us to meet so they could, instead of sending it all written, they wanted to do it face-to-face and say, "These are the changes" and "Do you have any problems?" And just keep the open dialogue with us.

Q And I take it, based on your supervisory style, face-to-face meetings were something that you liked to promote and thought were very useful and facilitated your ability to properly supervise River Valley, correct?

A Yes; correct.

Q And by keeping you advised and by apprising you in advance of the board restructuring and that Mr. Bangert was transferring positions, it allowed you to have confidence, did it not, that River Valley had in place the mechanism for an orderly transition of management officials, correct?

A Correct.

Q That's something, again, you felt to be very important in assuring ongoing viability of an institution such as River Valley, correct?

A Right, we like to know things and keep -- be kept apprised of what's happening.

Q And they -- River Valley did an excellent job, again, of always keeping your office fully apprised of everything of interest and note going on at River Valley, correct?

A Correct.

STATE OF ILLINOIS )
) SS:
COUNTY OF WILL )

I, FRANCES I. OKREI, CSR, RPR, CM, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

OFFICIAL SEAL
FRANCES I OKREI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 12/03/02

Notary Public in and for the County of Will.

My commission expires: 12-03-02.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

- - - - - - - - - - - - - - X
HOMER J. HOLLAND and :
HOWARD R. ROSS :
Plaintiffs :
v. : No. 95-5240
THE UNITED STATES OF AMERICA :
Defendant. :
- - - - - - - - - - - - - - X

Continued Deposition of LARRY FERRIES
(Taken by Plaintiff)
Chicago, Illinois
August 11, 2000

Reported by: Mary C. Kelly, CSR No. 084-001915

APPEARANCES:

For the Plaintiff:

HOWARD N. CAYNE, ESQ.
ARNOLD & POTTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the Defendant:

PATRICIA A. SMITH, ESQ.
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
1100 L Street, N.W.,
Washington, D.C., 20530
(202) 353-8841

Continued Deposition of LARRY FERRIES taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 11th day of August, 2000, at 9:00 o'clock a.m., before Mary C. Kelly, Certified Shorthand Reporter and Notary Public within and for the County of Cook and State of Illinois, CSR License No. 084-001915.

CONTENTS


| The Witness: LARRY FERRIES | Examination |
|---|---|
| By Mr. Cayne | 263 |
| (Resumed) | 337 |
| (Resumed) | 379 |
| By Ms. Smith | 322 |
| (Resumed) | 376 |


INDEX OF EXHIBITS


| Ferries Deposition Exhibit | | Page |
|---|---|---|
| 20 | (minutes) | 263 |
| 21 | (letter) | 283 |
| 22 | (letter) | 286 |
| 23 | (letter) | 289 |
| 24 | (memorandum) | 292 |
| 25 | (letter) | 297 |
| 26 | (FIRREA's Impact on Regulations) | 307 |
| 27 | (memorandum) | 311 |
| 28 | (letter) | 317 |
| 29 | (letter) | 340 |
| 30 | (report) | 366 |

Q Mr. Ferries, I'm handing you a document marked for identification as Ferries Exhibit Number 20. Kindly identify that document for the record?

A It's copies of Board of Directors Minutes of River Valley dated November 16, 1994, regarding a Board meeting.

Q And what CAMEL rating was assigned to River Valley at the conclusion of this examination?
A CAMEL rating of a 2.
Q And would you have viewed a CAMEL rating of a 2 as a positive rating?
A Yes.
Q It indicates on the first page of Exhibit 20, Mr. Ferries, that River Valley was well capitalized, and that term appears in quotes. Do you see that?
A Right.
Q Did the term well capitalized -- was that a

term of art under FIRREA capital abrogation provisions?

A Yes. That's in the -- Well capitalized is the definition in the regulations. You're either well capitalized, adequately capitalized or under capitalized, and that's why we put it in quotes because it's not our -- just that we're using the term as it relates to the regulation.

Q You are using the term as it relates to the regulation?

A Yes. That's why it's in quotes.

Q And that's as positive a classification as can be assigned to a savings and loan association with respect to capital, correct?

A Yes.

Q And would I be correct in understanding that, at this time in 1994, you would have been quite pleased with River Valley's progress, having progressed from the very damaged condition in which it stood after the enactment of the FIRREA capital abrogation provisions in August, 1989, and to this point in November, 1994, where they had attained the position of well capitalized franchise, correct?

A Yes.

Q To what would you attribute that success?

A Management's ability to infuse capital and to have positive earnings to improve capital ratios.

Q Do these results indicate that your early confidence in the management of River Valley was well placed?

A Yes.

Q You understood, did you not, back in the 1989 time frame when River Valley was following its initial government approved business plan, it was attempting to attain significant growth, correct?
A Yes.
Q And it was attempting to attain significant growth through a number of avenues, correct?
A Correct.
Q Those avenues included increasing deposit levels, correct?
A I don't specifically recall the different avenues, but that could have been one.
Q And you recall River Valley also was attempting to acquire additional branch offices, correct?
A Yes.
Q And they were also in the market looking for other problem and non-problem institutions to acquire to grow through acquisition, correct?
A I don't remember any of the specifics, but I know that they were looking at things.
Q You know that was part of the business plan?
A Right. Right.
Q Just sitting here today, you don't remember

the names of the institutions they were trying to acquire, right?

A No, I don't.

Q But you have no doubt that was a key part of the government approved business plan, correct?

A Right.

Q And as we discussed yesterday, the enactment of FIRREA and capital abrogation provisions of FIRREA put an immediate halt to that aspect of River Valley's business plans, correct?

A Correct.

Q There was simply no way they could grow, correct?

A Without the capital, you couldn't grow.

Q In fact, without the capital, they had to face downsizing, correct?

A Correct.

Q And so it's fair to say that these gentlemen had a very good track record of meeting their business plans, correct?

A Right.

Q And is it fair to say then, again, recognizing that nothing in life is certain, had FIRREA not abrogated the forbearance capital that Messrs. Holland and Ross contracted for with the United States Government, there was a good likelihood, not a certainty, but there was a good likelihood that they would have operated -- been able to continue to operate River Valley in conformance with their business plan and achieve a -- you didn't like the word significant -- let me say substantial level of growth through deposit growth, branch purchases and acquisition of other financial institutions, correct?

A Yes.

BY MR. CAYNE:

Q Mr. Ferries, I'm handing you a document marked for identification as Ferries Exhibit 21. Could you kindly identify that document for the record?

A It's a letter dated May 20, 1992, from River Valley Savings Bank to Simona Frank, Regional Director of FDIC.

Q I'd like to request that you read that entire document. I have a couple questions about it I'd like to ask.

Have you had an opportunity to read the entirety of Exhibit 21?

A Yes.

Q And that exhibit deals, does it not, with a number of the issues you and I discussed yesterday, correct?

A Correct.

Q And is it fair to characterize this letter as this is the bank complaining to the FDIC concerning the FDIC's treatment of the bank's security portfolios?

A Yes.

Q Do you believe that either you or Mr. Kenny or anyone on your staff would have suggested to River

Valley that they send this letter to the FDIC setting forth their position concerning the matters discussed in the letter?

A That is a possibility.

Q Do you believe it's a likelihood?

A It probably is a likelihood. I think I may have -- I don't remember specifically. I think River Valley management asked me and not Larry Kenny if there's anything -- what they could do about the exam rating differences, and I probably told them to, you know, write to -- Since there's the one issue, and you feel you're being treated unfairly, write to the Regional Director and state your case.

Q The next question is then before I go through paragraph by paragraph, let me ask you on the bigger picture, can I understand correctly, based on the testimony you provided yesterday, that you and Mr. Kenny would have agreed with the contents of Exhibit 21?

A I can't speak for Larry Kenny. I agree. I don't really remember the specific numbers, but I would assume that these numbers that Steve is quoting in this response are correct. I would agree with the institution's presentation.

Q As reflected in Exhibit 21?

A Right, because that's the different -- we had a difference of rating on the report.

Q And the positions reflected in Exhibit 21 parallel the positions taken by you and Mr. Kenny and your staff at that time, correct?

A Correct.

(Ferries Exhibit No. 22 was marked for identification.)

BY MR. CAYNE:

Q Mr. Ferries, I'm handing you a document marked for identification as Ferries Number 22. Kindly identify it for the record?

A A letter written to me from Anne Brody of the law firm of Holleb & Coff dated February 2, 1993.

Q Would you have read that letter upon receiving it from Ms. Brody?

A Yes, I would have.

Q And what is the topic of the correspondence reflected by Exhibit 22?

A It's a letter -- They're asking about a correspondent agreement entered into, a correspondent agreement with San Antonio Federal and River Valley where San Antonio would sell mortgage loans to River Valley.

Q And why is Ms. Brody writing about this? To

advise you or to seek some type of approval?
A They're asking for our approval to enter the transaction because of the supervisory agreement that they've entered into with us, River Valley with OTS.
Q If River Valley and San Antonio had been acquired directly by River Valley in Illinois rather than being acquired and held separately by Messrs. Holland and Ross, would Ms. Brody have needed to seek your approval to establish the arrangements referred to in Exhibit 22?
A No, it wouldn't have been -- if they acquired it directly, there wouldn't have been any correspondent agreement.

Q Mr. Ferries, I'm handing you document marked for identification as Exhibit 23. Kindly identify it for the record?

A Letter dated June 20, 1991, from River Valley Savings Bank signed by Steve Bangert to myself.

Q And does this Exhibit, Exhibit 23, refresh your recollection that, in fact, Messrs. Holland and Ross attempted to obtain financing from other sources other than American National and were unsuccessful?

A That's what it says in the letter, that they had tried to obtain financing from LaSalle National, I think, so they couldn't get it from LaSalle so they had to go back to American National.

Q And is what you just read in this letter consistent with your general recollection concerning the difficulties Messrs. Holland and Ross had in obtaining financing from sources other than American National?

A Yes.

Q Mr. Ferries, do you recall yesterday we spoke about or you spoke about issues related to affiliate transactions, and I believe you mentioned Section 23A of the Federal Reserve Act?

A Right, as it was mentioned.

Q And do you recall what you were referring to during that part of your testimony?

A I believe I made the statement that one of the positive -- one of the positives about having River Valley Rock Falls merge with River Valley Peoria was there was a less chance of an inadvertent

error or a violation of Reg. O.
Q And I just want to ask you to explain why is that the case? Why would there have been less of a chance for violation of Reg. O had the transaction been accomplished in that manner?
A Reg. O just details what type of transactions you can have with affiliates, and there's limits to the transactions, and it's a complicated reg, and there's a lot of little nuances, but Reg. O had come in effect in the early '90s for us. It was a new thing, and we already had to watch what we were doing. Here you had similar institutions with the same management or similar management, and there might have been an inadvertent violation that wouldn't look good.
Q In order to avoid an inadvertent violation, it's your understanding that the two River Valleys would have had to put in place various compliance procedures, policies and mechanisms?
A Yes, they would have had to have a management sharing agreement, expense reimbursement agreements, similar things like that.
Q And there are various expenses and time factors involved in complying with that regulation, correct?

A Correct.

Q By expense, I mean the expense of preparing the agreement, correct, the expense of monitoring the compliance with the agreement?

A Correct.

Q And, in fact, on more than one occasion, penalties have been assessed by the administrative agencies, including the OTS, for institutions that run afoul of Regulation O and Section 23A, correct?

A Correct.

Q Now, am I correct that had River Valley San Antonio been acquired directly by River Valley Illinois, those Section 23A, Regulation O agreements and compliance mechanisms and other monitoring devices would not have been necessary for the same reasons they would not have been necessary in the example you gave, correct?

A Correct.

Q Mr. Ferries, would you have reviewed the business plans that were submitted by Homer Holland and/or Howard Ross and/or the River Valley entities prior to the assisted acquisitions taking place?

A Not prior to the assisted. After the assisted is when I would have had input. I would have been responsible for monitoring the business plan because all that was handled by FSLIC at the

time.

Q And with respect to the business plans that were submitted over time and which you reviewed, did you have an understanding, Mr. Ferries, as to whether those business plans were static -- were static or were subject to change over time?

A We reviewed the business plans. Business plans always change because things, you know, from outside forces, but as they amended business plans, we reviewed the new business plans, and they always met their projections on the amended. I stated that in that first thing. We were always happy because they'd always -- I wouldn't have made that statement in 1, and I think it was Exhibit Number 1, that they always met their plans, but the plans always -- I mean, there isn't one business plan that stays the same from Day 1 to -- I mean, Year 1 to Year 5. There's always changes along the way, but they flowed -- they went with the flow and always met their revised plans.

Q Mr. Ferries, do you know whether or not the business plans that were submitted by either of the River Valley institutions specifically indicated that they intended to grow the institutions by acquiring other institutions?

A Their business plan called for growth, and that's the easiest way to get the growth is through acquisitions.

Q Again, Mr. Ferries, the question is do you know whether or not the business plans submitted by either of the River Valley entities specifically identified they intended to grow by acquiring other institutions?

A As I said before, the business plan required growth, and that's the easiest way to get growth so

you would have to have some acquisitions along the way, and I'm sure that's what it was predicated on.

BY MS. SMITH:

Q Do you recall anything specific in the business plans that discussed acquisition opportunities and/or intended growth by virtue of acquiring institutions?

A I don't know how to answer the question other than the way I've answered it. There's nothing -- They don't mention specific names of institutions in there, but the only way to grow is through acquisitions, I mean, to really make a major impact and to grow to the levels that they had wanted to would have been through acquisitions.

Q And, specifically, counsel inquired of you concerning the state of your knowledge with respect to efforts made by Messrs. Holland and Ross to persuade the FDIC to eliminate the cumulative dividend feature of the $5 million issuance of FSLIC preferred stock? Do you recall that line of questioning?

A Yes.

Q And, in fact, if we went back and looked at your testimony, we would see that you indicated you were highly confident that they, in fact, did that? Do you recall that?

A Yes. Like I said, they said they would do it, and I would not doubt that they did.

Q And this wasn't speculation on your part? You had a basis -- And I would appreciate if Counsel does not laugh at my questions. You had a basis in fact, did you not, to know that you could rely on statements and promises made by Messrs. Holland and Ross, correct?

A Right.

Q Correct, sir?

A I've stated in the past that every time they said they would do something, they did it.

Q And it was based on that extensive experience you had with Messrs. Holland and Ross that they always carried out their commitments and promises that you testified to Government Counsel that you were highly confident that Messrs. Holland and Ross did, in fact, attempt to persuade the FDIC to eliminate the cumulative dividend feature of the FSLIC $5 million preferred, correct?

A Correct.

Q And you've testified quite a bit in this deposition concerning the importance of business plans, correct?

A Correct.

Q And you indicated in response to counsel's question that adjustments need to be made at appropriate time, correct?

A Yes. Every business plan always has fine tuning because the first one you do is like a five year plan. You can predict Year 1 pretty darn good. Year 2 and 3 is a little bit fuzzier. But we always

looked at it as a fluid document. We wanted to make sure in the five year plan they overall -- When we would look at the five year plan, we put a lot of confidence in the first year, but we also looked at where they're going to be in the five years, but how they got there sometimes is different than what Year 2, 3, 4 would have indicated, but it was just because of outside conditions so it's always flexible or fluid.

Q And you indicated fine tuning is required, right?

A Right.

Q And for fine tuning to occur successfully, management must have the competence and ability to adjust, correct?

A Correct, and they always were able to adjust no matter what was thrown in front of them.

Q So no matter what fine tuning they had to make during the course of the five year plan, for example, your experience had been that Messrs. Holland and Ross and the management they selected always could make the necessary midcourse fine tuning adjustments in order to continue to successfully implement their overall business plan, correct?

A Correct.

Q And am I not correct, based on your testimony yesterday, to understand that you and your staff concluded that the business plan as it stood at the time of the consummation, as it stood in 1988 following the consummation of the supervisory acquisitions, was realistic, reasonable and achievable assuming that the capital forbearances remained intact, correct?

A We would have determined that it was a feasible plan; and, as I said, at that point, what we knew at that point it was a feasible plan.

Q And when you made the determination it was a

feasible plan, you assumed, did you not, that the capital forbearances would remain in full force and effect for their agreed upon duration, correct?

A At that time, yes.

Q Had you made any other assumption, you would not have found those business plans to have been feasible, correct?

A Correct?

REDACTED

# EXHIBIT 1

**Office of Thrift Supervision**
Department of the Treasury
Central Region
111 East Wacker Drive, Suite 800, Chicago, IL 60601 • (312) 565-5300

May 8, 1992

Ms. Maria Vidales
Resolution Trust Corporation
10100 Reunion Place
San Antonio, Texas 78216

Subject: Background Check Request

Dear Ms. Vidales:

In response to your request dated April 28, 1992 concerning information on Steven Bangert, Homer J. Holland, Howard R. Ross, Ronald Mitchell Pikus, and John Wilson Rose. I am not familiar with Mr. Rose and have no information on him. I am very familiar with the other four individuals and have had many dealings with them over the past several years. In my opinion these four individuals have always been very straight forward in their dealings with River Valley and the OTS. I believe them to be honest and reputable as they have kept every promise that they have made to the OTS. Also, it should be noted that they have always met or exceeded every projection that they have ever given to myself or the OTS. River Valley has been very successful under they control. It should be noted that they have acquired five insolvent S&LAs and turned them into a very well run, profitable institution.

In summary, Messrs. Ross, Holland, Bangert and Pikus are very knowledgeable, competent and trustworthy individuals. If you have any additional questions please call me at (312) 565-5293.

Sincerely,

Larry E. Ferries

Larry E. Ferries
Manager
OTS-Chicago

EXHIBIT
Ferries #1
8-10-00

# EXHIBIT 2

TO: Martha H. Carter, Applications Analyst

FROM: Larry Ferries, Manager

DATE: April 24, 1992

SUBJECT: Candidate Background Check
San Antonio Federal Savings Bank
San Antonio, Texas OTS No. 8367

In response to your request dated April 15, 1992 concerning information on Steven Bangert, Homer J. Holland, Howard R. Ross, Ronald Mitchell Pikus, and John Wilson Rose. I am not familiar with Mr. Rose and have no information on him. I am very familiar with the other four individuals and have had many dealings with them over the past several years. In my opinion these four individuals have always been very straight forward in their dealings with River Valley and the OTS. I believe them to be honest and reputable as they have kept every promise that they have made to the OTS. Also, it should be noted that they have always met or exceeded every projection that they have ever given to myself or the OTS. River Valley has been very successful under they control. It should be noted that they have acquired five insolvent S&LAs and turned them into a very well run, profitable institution.

In summary, Messrs. Rose, Holland, Bangert and Pikus are very knowledgeable, competent and trustworthy individuals. If you have any additional questions please call me at (312) 565-5293.

EXHIBIT
Ferries #2
8-10-00

# EXHIBIT 4

FEB-12-90 MON 11:14

EXHIBIT
Ferries #4
8-10-00

# Office of Thrift Supervision

Department of the Treasury
Seventh District Office
111 East Wacker Drive, Chicago, Illinois 60601-4360 • (312) 565-5300

Rec'd 1/10/90

January 9, 1990

mailed H Holland 1/10/90

Board of Directors
River Valley Savings
Bank, #6822
201 First Avenue
Rock Falls, Illinois 61071

Members of the Board:

We have reviewed the board of director's response to the October 10, 1989, supervisory letter. In general, we feel that you have addressed the most significant matters of supervisory concern in a satisfactory manner. However, we would like the board to consider the following.

Interest Rate Risk Management

We request that the board submit, on a quarterly basis, a copy of the in-house report generated by Holland Partners, Inc. regarding the institution's sensitivity measurements. We need this information in order to compare River Valley's estimate of its sensitivity to the results provided in Section H of the Thrift Financial Reports.

This letter should be considered by your board at its next meeting. We shall appreciate your reply, signed by all directors, within 30 days. It should be sent to us in triplicate, and it, together with a copy of this letter should be entered verbatim in the minutes of your next board meeting.

Sincerely,

Larry E. Ferries

Larry E. Ferries
Manager

# EXHIBIT 7

HOLLAND PARTNERS, INC

EXHIBIT
Ferries #7
8-10-00

January 25, 1990

Mr. Larry E. Ferries
Manager
Office of Thrift Supervision
Department of the Treasury
111 East Wacker Drive
Chicago, IL 60601

RECEIVED
FEDERAL HOME LOAN BANK
OF CHICAGO
FEB 0 5 1990
OK TO FILE
REFERRED TO LEF, SRS

Dear Larry:

The board of directors of River Valley Savings Bank considered your letter dated January 9, 1990 at their board meeting held January 24, 1990. Enclosed is the in-house report generated by Holland Partners regarding the institution's sensitivity measurements.

I failed to get the signatures of the board of directors at this meeting and will obtain them at our next meeting on February 21.

At the board meeting yesterday of River Valley Savings Bank, FSB, Ron Pikus was appointed president and chief operating officer to succeed me. My new title is vice chairman and chief executive officer.

Enclosed is a copy of Ron's resume and a press release.

Sincerely,

Homer J. Holland

Homer J. Holland
President

HJH/cw
Enclosures

309 West Washington Street, Suite 550, Chicago, Illinois 60606 (312) 419-8040 FAX# 419-1939

# RONALD M. PIKUS

**General Data:**

| | |
|---|---|
| Date of Birth: | June 10, 1947 |
| Marital Status: | Married, two children |
| Residence: | 1873 Jahns Drive<br>Wheaton, Illinois 60187 |

**Education:**

Loyola University, Chicago, Illinois BA Sociology - 1969
Loyola University, Chicago, Illinois MBA Finance - 1971
CPA, State of Illinois - 1979

**Business History:**

1988-Present

Senior Vice President
Holland Partners, Inc.
Chicago, Illinois

HPI is a consulting firm which specializes in the restructuring and management of troubled thrift institutions.

Most recently, I have been involved in the management of the Loan Administration Division of the River Valley Savings Bank group. During the same time period, I served as project coordinator in the investigation of a defunct mortgage banking company as the agent of the Illinois Savings and Loan Commissioner's Office.

1982-1985
1986-1988

Vice President/Chief Financial Officer
The Federation of Financial Institutions
Cicero, Illinois

The Federation is a mortgage servicing and consulting firm which services a $1 billion loan portfolio and provides mortgage-related consulting services.

As Chief Financial Officer, I was responsible for the management of all financial activities of the company. As the head of The Federation's Secondary Marketing Consulting Group, I oversaw several projects involving both local and out-of-state thrifts, banks and mortgage banking companies.

# EXHIBIT 11

RIVER VALLEY
Savings Bank, FSB

EXHIBIT
Ferries #11
8-10-00

August 28, 1991

Mr. Larry E. Ferries
Manager
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Il 60601-4360

Dear Mr. Ferries:

We are in receipt of your letter of August 22, 1991 regarding the infusion of $2 million into River Valley Savings Bank, F.S.B. or it's holding company. It comes as an unwelcome shock as we have, every step of the way, kept your office completely informed as to our actions and intentions to comply. You already know of the American National Bank commitment and our request to form a holding company. The holding company application is in your possession. The additional capital will be promptly infused, subsequent to your approval.

Your move to enforce civil penalties against River Valley Savings Bank, F.S.B. and each of it's directors is an action that is absolutely counterproductive. Many of our directors are also possible investors in River Valley Savings Bank, F.S.B. At a time when it is very difficult for this industry to obtain and retain "the best and the brightest", our board has steered a convervative and extremely profitable course. Your actions against a group that has, in two years, turned five bankrupt thrifts into a dynamic banking force in their communities is unconscionable and unproductive.

This move, together with the actions at the December meeting at which we were treated unfairly by the regulators, is ludicrous. We have molded a $52 million thrift in Rock Falls, Illinois, with a total net worth of $2.6 million, into a thrift with assets in excess of $500 million and a mark-to-market net worth in excess of $42 million. You have caused our institution irreparable harm, instilling doubts of our viability in our officers and directors at a time when it is very difficult to obtain additional capital. You are rendering our efforts impossible. Therefore, we insist that

Confidential Material —
Subject to Protective Order



River Valley Savings Bank, FSB 200 South Wacker Drive, Second Mezzanine Chicago, Illinois 60606 (312) 930-0944 FAX (312) 930-0911

August 28, 1991
Mr. Larry E. Ferries
Page 2

the third paragraph of your letter dated August 22, 1991, be recinded immediately. We demand that Chester Biedron or those individuals with the authority to remedy this matter, be present at our meeting on Tuesday, September 3, 1991 at 10:00 A.M.

Sincerely,
RIVER VALLEY SAVINGS BANK, FSB

Howard R. Ross
Chairman of the Board of Directors

HRR:sk
cc: Stuart Brafman
Chester Biedron

# EXHIBIT 13

EXHIBIT

Ferjuis #13
8-10-00

MINUTES OF MEETING OF THE
BOARD OF DIRECTORS OF
RIVER VALLEY SAVINGS BANK, FSB

January 22, 1992

The regular meeting of the Board of Directors of River Valley Savings Bank, FSB ("FSB") was held at the offices of Holleb & Coff, 55 E. Monroe, Suite 4100, Chicago, Illinois 60603.

Howard R. Ross chaired the meeting and called the meeting to order at 10:05 a.m. Mark S. Kipnis served as secretary of the meeting and recorded the following members present:

| | |
|---|---|
| Howard R. Ross | Homer J. Holland |
| L. David DeTrempe | Mark S. Kipnis |
| Chester J. Clauden | Robert Powers |
| Noel Rothman | Steven Bangert |
| Michael Rothman | Calvin L. Morgan |
| Fred Tuerk | |

Attending as guests of the board were John D. Weier and Richard F. Johnson, Jr., representativses of the FDIC, Larry Ferries, Lawrence Kenny and Marie Brandt, representatives of OTS, Ronald Pikus, Anne Brody and Kennard Besse.

The OTS and FDIC representatives were present to discuss their respective examination findings. Their reports will be sent to us at a later date, each of which will contain requests for corrective actions.

As an overview, OTS stated that FSB was "well managed, profitable and in capital compliance." OTS considers interest rate risk our most important area and was "overall satisfied", but FSB is held to a higher standard because of our large portfolio. There will be certain specific requests with respect to accounting treatment and documentation, especially because of our investment in Super P.O. securities. Institutions are sometimes asked to value investments at the lower of cost or market when the investments are "actively managed". OTS will request the Board to affirmatively represent that the investments are held for investment purposes, and state the reasons why, and represent that the institution is not actively managing such investments. We will additionally be requested to document the reasons why securities are sold. OTS additionally feels our major risks are prepayment risks and yield curve risks. Consequently, FSB will be asked to investigate new ways to analyze its risk-and not just analyze parallel rate shifts. Because swaps are used to protect

active management issue), we will be asked to document the reasons why we open or close swaps (after looking at the interest rate risk to the entire institution). In the mortgage banking area, because of our increases in servicing and loans originated and sold, there will be some accounting issues and requests for additional control over servicing bid decisions. Certain elements of our Investment Policy will be requested to be brought current. FDIC stated they have a different policy. FDIC classifies assets at substandard unless certain steps are taken. Effective February 10, 1992, FDIC policy will be the same as OTS on a go forward basis. FDIC will want stricter documentation as to whether an investment is held for trading or for investment; they will also be suggesting certain policy limits.

The regulators acknowledged compliance with our Supervisory Agreement and will look to River Valley Holdings, Inc. to pay the guaranty fee to Messrs. Ross and Holland now that the American National Bank debt is at the holding company level. With respect to bonus plans, if bonuses are based upon a return on equity, instead of performance, the regulators' position is that such bonuses are equivalent to dividends and should be treated as dividends. The regulators want a written tax allocation agreement with River Valley Holdings, Inc. and, with respect thereto, their stated policy is that River Valley Holdings, Inc. can't take a greater allocation than it would otherwise be allowed independently. All regulators felt that management was generally good and capable.

With respect to asset quality, OTS has no supervisory concerns regarding our loan underwriting. OTS policy is different from FDIC; they only have small recommendations. FDIC differs mainly with respect to our high risk investments. With respect to loans and REOs, FDIC stated we are doing an excellent job.

With respect to terminating our Supervisory Agreement, OTS normally likes to see an institution go through two full exam cycles. However, we can consider applying to OTS to rescind the transaction after we maintain the 5% tangible capital ratio for a period of time.

OTS concluded that FSB was well run with capable management, had shown significant improvement and that capital was adequate, being well above their minimums. OTS also agreed that our future projections look reasonable. FDIC concurred that our operations are good. The regulators concluded by answering questions from the board members regarding their rating systems, with OTS hoping to have its report issue in the next two weeks, while FDIC is hoping to have its issue in approximately 60 days.

The regulators left the meeting at approximately 11:15 a.m. and the Board continued with its regular agenda.



FHO010 0088 HOLLAND 95-524C ACC # 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 8 OF 40 WIN BOX # WC00006693 939999 CORR/APPL FIRST BANK FSB CLAYTON MO 11 OF 11 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

The Board had been provided with minutes of the November 20, 1991 Board meeting and minutes of the December 11, 1991 and December 18, 1991 Executive Committee meetings. DeTrempe moved, Clauden seconded, to approve such Board and Executive Ccommittee minutes.

Voting: Aye 11 Nay 0

Ron Pikus presented the financial statement review and compared the December 31, 1991 balance sheet with that of December 31, 1990. For December, total assets decreased $2.6 million. FHLB advances grew $10.5 million, while other borrowed funds decreased $14 million as we continue to reduce reverse repurchase borrowings. Our tangible capital ratio increased in December from 4.88% to 4.95%. Our risk-based capital ratio increased from 10.52% to 10.61%. Pre-tax income for December was $452,000.00, of which $410,000.00 was core pre-tax earnings.

Steven Bangert presented the Investment Report. FSB's December 31, 1991 mark-to-market was $49 million. The portfolio activity was reviewed, as was the institution's interest rate sensitivity.

Ron Pikus next reported on lending, loan administration and retail banking/operations. Because of current interest rates, lending activity is extremely high and employee staffing was discussed. Delinquencies were reviewed as was the general reserve reconciliation, employee loans during November and December, the loan modification for Four Seasons Mobile Home Park and the specific request for loan chargeoffs for Perl Williamson in the amount of $8,811.00 and Carrie Carter in the amount of $577.30. With respect to retail banking, we are keeping to our strategy of increasing relationship accounts and we are not as competitive on certificates of deposit. In Peoria we expect the competitive environment to increase as other local institutions have been acquired by regionals.

Homer Holland next reviewed problem assets. Our classified assets were $18 million at December 31, 1991 as compared to $34 million at December 31, 1990. We settled our claims under the Assistance Agreement for $3.2 million and anticipate that we will ultimately profit from that transaction. Mr. Holland reviewed the major assets removed during the year and those major assets that we anticipate resolving in the forthcoming year. As of December 31, 1991, FSB had 13 residential REOs at a value of $227,329.00. These numbers were compared to December 31, 1990 where we had 26 valued at $516,000.00 and December 31, 1989 where we had 126 valued at $3,600,000.00.

After further discussion, Powers moved, Clauden seconded, to approve the adequacy of the general reserve allowance, the amount of classified assets, and the aforesaid loan modification and chargeoffs.



FHO010 0089 HOLLAND 95-524C ACC # 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 8 OF 40 WIN BOX # WC00006693 939999 CORR/APPL FIRST BANK FSB CLAYTON MO 11 OF 11 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Voting: Aye 11 Nay 0

Powers moved, Tuerk seconded, that our rules for changing passbook rates be amended to provide that such rates may be changed by decision of the Executive Committee, without the necessity of full Board approval.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to approve the payment of quarterly Class C dividends for calendar year 1992.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to amend the first sentence of Article IV, Section 2 of the By-laws to read as follows: "The board of directors shall consist of no less than 10 members and no more than 12 members and shall be divided into 3 classes as nearly equal in number as possible."

Voting: Aye 11 Nay 0

Tuerk moved, Clauden seconded, that an annual review of appraisers be required and presented to the board at regularly scheduled meetings.

Voting: Aye 11 Nay 0

Mark Kipnis next reviewed the Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement attached as Exhibit A to these minutes. After further discussion, Clauden moved, DeTrempe seconded, to approve the Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement form.

Voting: Aye 11 Nay 0

Bangert moved, Noel Rothman seconded, that all Management Reports be approved.

Voting: Aye 11 Nay 0

Management bonuses were discussed and Mr. Bangert and Mr. Pikus were requested to leave the meeting. Mr. Ross summarized the accomplishments of Messrs. Bangert and Pikus during the 1991 calendar year and recommended a $50,000.00 performance bonus for Mr. Bangert and a 1992 compensation increase from $250,000.00 to $262,500.00 and further recommended a $50,000.00 performance bonus for Mr. Pikus and a compensation increase from $117,750.00 to $123,638.00. After further discussion, Morgan moved, DeTrempe seconded, to approve such bonuses and compensation increase.

Voting: Aye 10 Nay 0

Mr. Bangert and Mr. Pikus returned to the meeting and Mr. Pikus next reviewed current salaries, proposed salaries, cash bonuses and stock appreciation right dollar equivalents for senior vice presidents, vice presidents and certain other individuals and further recommended $300.00 bonuses to all other full-time employees and $150.00 bonuses to all other part time employees, all as more fully set forth on Exhibit B attached hereto. After further discussion, Clauden moved, Powers seconded, to award such bonuses, stock appreciation right dollar equivalents and new salaries.

Voting: Aye 11 Nay 0

Mr. Bangert recommended that FSB pay Messrs. Holland and Ross $300,000 and $175,000, respectively, for 1989 accrued but unpaid bonuses. Mr. Bangert also recommended that a common stock dividend be approved to permit River Valley Holdings, Inc. to pay a $420,000 guaranty fee to Messrs. Holland and Ross for their personal guarantees of bank debt. The guaranty fee has also been accrued and such dividend is not to be paid unless FSB will still have a tangible capital ratio in excess of 5.0% after such payment. Mr. Bangert expects payment to occur by the end of January. After further discussion, and with Messrs. Holland and Ross abstaining, Powers moved, Tuerk seconded, to approve such dividend payment.

Voting: Aye 9 Nay 0

The employee loan schedule was again reviewed. With Mr. Kipnis abstaining, Tuerk moved, Holland seconded, that the November and December employee loans be ratified and approved.

Voting: Aye 10 Nay 0

Homer Holland next reviewed the potential acquisition of San Antonio Federal Savings Bank. American National Bank has agreed to finance the acquisition, but only if the acquisition is by an entity totally separate from FSB. It is contemplated that a new entity, Western Capital Holdings, Inc., an entity owned by Messrs. Ross, Holland and Bangert, will acquire 89% of the SAFSB stock, while John Rose, an independent investor who brought the deal to FSB's attention, will acquire 11% of SAFSB. Although the transaction will now be independent of FSB, a substantial discussion ensued relative to the allocation of management resources (and compensation to FSB for management time and asset/liability management services) and the effect on FSB's future earnings as American National Bank is requesting that FSB dividend $6 million to River Valley Holdings, Inc. for the purpose of River Valley Holdings retiring $6 million of its debt to American National Bank. The ensuing discussion covered a wide range of topics including discussions with OTS - Dallas and Western Capital Holdings' business plan. With respect to FSB's

ability to pay a $6 million dividend, it is contemplated that management will shrink our balance sheet by reducing our Investment portfolio and not our loan portfolio where we have larger spreads. Additional funds will be generated from core earnings and from security sale gains where we would sell part of our fixed rate portfolio that is attractive to sell at this time. It is anticipated that monthly core earnings will decrease by approximately $100,000.00. Any security sales will actually improve our interest rate risk management as we will pay off short-term borrowings. After further discussion, Kipnis moved, Bangert seconded, that provided FSB maintains a 5% tangible capital ratio after the payment of said dividends and OTS approves said payment, that $6 million of common stock dividends be paid to River Valley Holdings, Inc. for the purpose of River Valley Holdings reducing its debt to American National Bank by such amount.

Voting: Aye 11 Nay 0

Mr. Pikus next reported that our CRA/compliance exam will begin next Tuesday.

Mr. Bangert and Mr. Pikus next presented copies of the proposed 1992 Business Plan to the Board for review and discussion at the next meeting.

Mark Kipnis next presented the unfunded deferred compensation plan attached as Exhibit C to these minutes. After further discussion, Holland moved, Ross seconded, that the unfunded deferrred compensation plan be approved.

Voting: Aye 11 Nay 0

Mr. Bangert next recommended that Sharon Kristof, Senior Vice President, and Cathy Knapp, Assistant Vice President, each be authorized, along with any FSB officer attesting to their signatures if attestation is required, to execute and deliver any and all conveyance deeds and other ancillary documents to transfer all REO properties to third party buyers. Holland moved, Bangert seconded, to approve such recommendation.

Voting: Aye 11 Nay 0

Mr. Ross next recommended that the fees to directors be increased to a $500.00 retainer for each meeting plus $400.00 for each meeting attended. After further discussion, Holland moved, Ross seconded, that such increase be approved.

Voting: Aye 11 Nay 0

The next scheduled board meeting is March 25, 1992 in Peoria.

There being no further business, Tuerk moved, DeTrempe seconded, to adjourn the meeting.



FHO010 0092 HOLLAND 95-524C ACC # 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 8 OF 40 WIN BOX # WC00006693 939999 CORR/APPL FIRST BANK FSB CLAYTON MO 11 OF 11 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Voting: Aye 11 Nay 0

The meeting adjourned at 3:10 p.m.

Submitted: Approved:

Mark S. Kipnis
Secretary

Howard R. Ross
Chairman

# EXHIBIT 18

EXHIBIT
Ferries 18
8-10-00

LF, EF, MD

Docket # 8515

S ____ F ____
S X ____ L ____
____ LI ____
C ____ I ____
H ____

RIVER VALLEY
Savings Bank, FSB

February 10, 1994

Larry Ferries, Manager
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Illinois 60601

Dear Mr. Ferries:

Enclosed are the minutes of the January 19, 1994 Executive Committee meeting of River Valley Savings Bank which you and Ellen Fowler attended. Since these minutes contain several organizational and board of directors' changes, you asked that we forward the minutes to you and that this would be considered our notice of the changes to the Office of Thrift Supervision.

Please review the minutes and, if you have any questions regarding any of the issues contained therein, do not hesitate to contact me.

Very truly yours,

Ronald M. Pikus

Ronald M. Pikus
President

Enclosure

River Valley Savings Bank, FSB 200 S.W. Jefferson Street, Peoria, Illinois 61602 (309) 673-4405

RIVER VALLEY SAVINGS BANK, FSB
EXECUTIVE COMMITTEE MEETING - JANUARY 19, 1994

Committee members in attendance: Homer Holland (Chairman), Howard Ross and Steve Bangert. Also in attendance: Mark Kipnis and Ron Pikus (RVSB); Larry Ferries and Ellen Fowler, Office of Thrift Supervision.

The representatives of the OTS were invited to the meeting to discuss two organizational changes: the resignation of Steve Bangert as CEO of the Bank and the proposed changes in the composition of River Valley's board of directors.

Steve advised the OTS that he will announce his resignation as CEO of the Bank at the board meeting to be held later in the day. Steve explained that his decision was based on the personal wishes of his family to relocate to Denver, Colorado, their original home, and his involvement with financial institutions in Connecticut and Colorado. Steve could no longer devote his full time efforts to the position as CEO of RVSB. At the request of the shareholders, he has agreed to remain on the board of directors and to serve as chairman of the Asset & Liability Committee (ALCO) of the board. In his capacity as ALCO chairman, Steve will provide the Bank with investment advise and continue to provide his input on deposit and mortgage product pricing.

Steve's position as CEO of the Bank will be filled by Ron Pikus, the Bank's current president and COO. Ron's nomination to the CEO position will be presented to the board of directors at the meeting of January 19th.

The status of Susan Vranes and the Bank's Capital Markets Group will also change. In order for this group to provide investment advisory and analytical services to River Valley and directly to Steve Bangert, Susan will form a new company (Summit Financial) with no ownership interest by RVSB, Steve, Homer or Howard. Susan is preparing a proposal which will detail the services to be provided and the fees which will be charged. This proposal will be presented to the full board of directors of RVSB for approval.

Ron Seib, the Bank's CFO, will take on the additional responsibility of overseeing the asset and liability structure of the Bank. While Ron Seib will work with Steve on pricing issues and on investments, and obtain analytical work from Susan's group, he will make the investment decisions for the Bank and report on those decisions to the board of directors and to the regulatory authorities.

Ron Pikus then explained to the group the changes which will take place in the Bank's mortgage lending structure. The position of chief lending officer has been assumed by Steve Bangert since the departure of Richard Dalton to Texas. The decision has been made to name Jordan Lamm, currently Vice President-Secondary Marketing, to become the new Chief Residential Lending Officer. The board of directors will



VON456 0261 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880728 WIN BOX # WC00017542 OLD BOX # 1 OF 4 MW2044 ACC # 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 GENERAL FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; AREA MAPS; COPY; MEETING MINUTES; EXHIBITS 940199-940999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

also be asked to name Jordan a Senior Vice President.

In addition to his current duties as coordinator of secondary marketing activities and mortgage pricing, Jordan will be asked to take on the responsibility for mortgage lending in Peoria and in the Bank's other branches. This move should revitalize mortgage lending in the non-Chicago markets served by the Bank.

In order to better manage the Bank's wholesale and retail (Aurora/Oak Brook) mortgage operations, the decision has been made to move these functions into separate subsidiaries of the Bank. Each subsidiary will be 80% owned by RVSB and 20% owned by Jill Brickman (retail) and Dan Doede (wholesale). Jill and Dan will be named "President" of their respective companies. The board of directors for the wholesale company will be: Homer Holland (Chairman), Dan Doede, Steve Bangert, Ron Pikus and Jordan Lamm. For the retail company, the board will be made up of: Howard Ross (Chairman), Jill Brickman, Steve Bangert, Ron Pikus and Jordan Lamm. Both of these companies will be set up in existing subsidiaries of the Bank which have the authority to originate and close loans. Each company will enter into a written operating agreement with the Bank.

Homer Holland then raised the issue of reconstituting RVSB's board of directors. Homer indicated that the original concept of retaining local directors was to maintain the continuity with the boards of the original entities which make up River Valley Savings Bank: Rock Falls Savings, Mutual Savings of Canton, Peoria Savings and Home Federal of Peoria. With the full integration of the original institutions into River Valley, the issue of continuity no longer exists. Several of the local directors have also expressed concern regarding the personal liability which comes with being a financial institution director. Given these considerations, it is more appropriate to have a board composed of individuals who have a financial stake in the institution. This will be discussed with the following individuals and it is anticipated that they will resign from the board: Cal Morgan, Chester Claudon, Dave DeTrempe and Peter Bynoe. In their place, Scott Ross, son of Howard Ross and Penny Holland, wife of Homer Holland, will be asked to serve on the board. With the remaining board members (Howard Ross, Homer Holland, Steve Bangert, Mark Kipnis and Ron Pikus), the number of directors will be seven. The Audit Committee of the board will be composed of Mark Kipnis and Steve Bangert; neither individual is a member of management nor a principal shareholder. Based on the review of the OTS regulations, the composition of the board meets all regulatory requirements.

Larry Ferries responded that, in his opinion, the restructuring of the board of directors was in compliance



VON456 0262 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880728 WIN BOX # WC00017542 OLD
3OX # 1 OF 4 MW2044 ACC # 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 GENERAL FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; AREA MAPS;
COPY; MEETING MINUTES; EXHIBITS 940199-940999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

with OTS regulations. Since there is no change in control of the institution nor is RVSB operating under any type of agreement with the OTS, there is no need to request OTS approval of the proposed board changes. Larry asked that, for informational purposes, a copy of the minutes of this meeting be sent to him. The minutes will constitute notification to the OTS regarding the above organizational changes.

Homer Holland asked Ron Pikus to prepare minutes for the meeting and to distribute them to the Committee members for their review prior to forwarding them to the OTS.

Submitted:

Homer J. Holland, Chairman



VON456 0263 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880728 WIN BOX # WC00017542 OLD BOX # 1 OF 4 MW2044 ACC # 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 GENERAL FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; AREA MAPS; COPY; MEETING MINUTES; EXHIBITS 940199-940999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 20

# JOINT MINUTES OF THE REGULAR MEETING OF THE BOARD OF DIRECTORS OF RIVER VALLEY SAVINGS BANK, F.S.B. AND SPECIAL MEETING OF THE BOARD OF DIRECTORS OF RIVER VALLEY HOLDINGS, INC.

**November 16, 1994**

The regular meeting of the Board of Directors of River Valley Savings Bank, F.S.B. ("FSB") and a special meeting of the Board of Directors of River Valley Holdings, Inc. ("Holdings") was held at the executive offices of FSB at 200 South Wacker Drive, Second Mezzanine, Chicago, Illinois 60606.

Howard R. Ross chaired the meeting and called the meeting to order at 10:00 a.m. Mark S. Kipnis served as secretary of the meeting and recorded the following members present:

| | |
|---|---|
| Howard R. Ross (via telephone) | Penny Holland |
| ~~Homer J. Holland~~ | Scott Ross (via telephone) |
| Ronald Pikus | Mark S. Kipnis |

Larry Ferries and Ronald Harvey of the Office of Thrift Supervision attended as guests of the Boards, as did Ronald Seib. Steven Bangert was absent.

Mr. Ross stated that the first order of business was approval of the October 26, 1994 FSB Executive Committee Unanimous Consent. Kipnis moved, Holland seconded, to approve said Unanimous Consent.

Voting: Aye 6 Nay 0

Mr. Ross stated that the next order of business was a presentation by OTS of its Safety and Soundness Examination Findings and turned the meeting over to Larry Ferries. Mr. Ferries stated that the examination report format has changed. All of the regulatory agencies have adopted a new common report of examination. In addition to the new report, OTS has also replaced the familiar MACRO rating with the CAMEL rating used by the other banking agencies. Mr. Ferries then turned the meeting over to Ronald Harvey, FSB's examiner-in-charge. Mr. Harvey stated that FSB's overall financial condition is sound; the institution is managed in a safe and sound manner; classified assets continue to decrease; all minimum capital requirements are exceeded, the institution is a "well-capitalized" institution; OTS has agreed with all classifications of assets; and loan loss reserves have been found to be adequate. The only issue mentioned was valuation of purchase mortgage servicing rights for regulatory capital purposes. We had valued the rights based upon a market value discount rate. New regulations were issued in 1994 that required an initial discount rate to be maintained (for TFR purposes). FSB made the adjustments during the 1994 year. Mr. Harvey concluded that FSB's overall

H&R-B9-01371
Confidential Material - Subject to Protective Order

EXHIBIT
20
FERRIES
9-11-2

CAMEL rating is a "2", reflective of a fundamentally sound operation, and that Holdings has been assigned a rating of "S", a rating which is considered satisfactory, i.e., Holdings has a neutral effect on FSB. A general discussion ensued and the regulators then left the meeting.

The entire examination reports for both Holdings and FSB were then reviewed by the members and discussed in detail. It was noted that as no significant areas of concern were noted in the reports, no formal reply to OTS is necessary.

Mr. Ross then had to leave the meeting.

Susan Vranes and Jordan Lamm joined the meeting to discuss the status of the sale to First Banks. Closing requirements were discussed, as were plans for portfolio sales, including residuals, and dealing with "built-in gains and losses". Some of the wholesale group may join Regency Savings Bank (with the knowledge and approval of First Banks). Regency may or may not take over our pipeline. This issue will have to be worked out with Regency and First Banks. If Regency does not take over the pipeline, it was determined to stop wholesale loan production. On the retail side, we have still received no direction from First Banks and we are continuing operations as normal. Loan servicing will be transferred to First Banks in St. Louis effective January 1, 1995. Contracts with Fannie Mae and Freddie Mac expire at the end of the year. Jordan Lamm is trying to extend them for at least one month, otherwise there may be a $40,000 to $50,000 pairing-off fee.

Ron Seib next presented the financial statement report. The institution is relatively unchanged from the previous month. Our leverage ratio as of October 31, 1994 was 5.11%, our tier 1 ratio was 12.48% and our risk based ratio was 12.90%.

Mr. Seib continued with an investment report. He followed up on our discussions relative to First Banks with a review of the mark-to-market and the portfolio.

Ron Pikus next presented the lending report, loan service report, problem asset report and retail banking report. Loan charge-off requests included in Mary Lou Janssen's memorandum to the Board and included in the Board package along with those requests set forth in Sharon Kristof's November 16, 1994 memorandum to the Board were approved.

Ron Pikus next gave a short CRA/compliance update.

Ron Pikus next presented a final compensation, bonus and severance pay-out proposal to the Board for Ron Seib and recommended that a bonus be paid to Linda Porter consistent with her contribution even though she is leaving prior to year end. Penny Holland moved, Mark Kipnis seconded, to approve such bonus program.



H&R-B9-01372
Confidential Material -
Subject to Protective Order

Voting: Aye 5 Nay 0

There being no further business, Pikus moved, Homer Holland seconded, to adjourn the meeting.

Voting: Aye 5 Nay 0

The meeting adjourned at 11:40 a.m.

Submitted by: Approved by:

Mark S. Kipnis, Secretary Howard R. Ross, Chairman

5044398.01



H&R-B9-01373
Confidential Material -
Subject to Protective Order

# EXHIBIT 21

EXHIBIT A

RIVER VALLEY
Savings Bank, FSB

EXHIBIT
21
FERRIES 8-11-00

May 20, 1992

Simona L. Frank, Regional Director
Federal Deposit Insurance Corporation
Division of Bank Supervision
30 South Wacker Drive, Suite 3100
Chicago, Illinois 60606

Dear Ms. Frank:

I have been asked by the Board of Directors of River Valley Savings Bank, FSB (the "Board"), to provide you with this response to the FDIC Report of Examination as of October 26, 1991. With the exception of the RVSB's investment activities, the FDIC's examination results closely parallel the OTS findings. I have enclosed a copy of the Board's response to the OTS examination for your consideration. The response includes the actions the Bank has taken regarding the OTS findings.

The FDIC and the OTS examination findings for "classified assets" are substantially different, and consequently, a separate response is necessary to clarify the Board's position on this matter.

The OTS examiners classified $8.1 million of the Bank's assets which is 31.1% of tangible capital and general valuation allowances. This is consistent with management's internal classified assets schedule. The FDIC, however, classified $48 million of the Bank's assets, increasing the classified asset to tangible capital percentage to 211% (using the reduced capital position calculated by the FDIC). The primary difference is the FDIC's approach to classifying the Bank's mortgage-backed derivative securities portfolio.

The FDIC has classified the Bank's derivative portfolio because management did not identify the specific assets that were being hedged with the derivative instruments prior to purchasing the instrument. This approach to hedge classification is not consistent with management's use of interest rate risk management instruments. It is also not consistent with the FFIEC's Statement of Policy on Securities Activities approved by the FFIEC on 12/3/91 and adopted by the FDIC on 12/31/91 and made effective on 2/10/92. The new policy statement allows an institution to use a macro approach and does not require that specific assets be identified. In the Board of Directors meeting held on 1/22/92 and attended by OTS representatives and Senior Banking Analyst John Weier and Examiner Richard Johnson of the FDIC, this inconsistency was emphasized by Management. The FDIC's response was that the

H&R-B56-02857
Confidential Material -
Subject to Protective Order

instruments were purchased prior to the FDIC's adoption of the new policy statement and, therefor, the new policy was not applicable for this portfolio. Mr. Weier acknowledged that the existing portfolio could be replaced today with similar instruments that would then not be classified, but he discouraged management from implementing this strategy. Mr. Weier said the FDIC would take this into consideration when the final report was completed and the FDIC's composite rating was issued. Apparently it was not considered.

The Board of Directors and management also disagree with the examiner's conclusion that the derivative portfolio increases the Bank's interest rate risk. This conclusion was based on information that was extracted from reports provided by management. The examiner used only part of the information provided to reach this conclusion.

The interest rate risk exposure profile prepared by the examiner argues that the risk is greater in a rising rate environment due to the use of derivatives as hedging vehicles. This is based on market value estimates provided by management. The analysis includes the impact of the Bank's Super P.O. portfolio but it does not include the other hedging instruments used in tandem with this portfolio,(e.g., caps and swaps). Also, this analysis does not comment on the impact the hedging instruments have on the net interest income of the Bank. The derivative portfolio's yield profile and the effect the mortgage derivative portfolio have on the Bank's net interest income are better indicators of the hedge value of these instruments. Management uses the yield profile and not the market value estimates when investment decisions are made for these type of instruments. The attached exhibit demonstrate that the market value of the portfolio does in fact increase in a rising rate environment but more importantly, the volatility of the Bank's net interest income is reduced significantly from the use of these instruments.

In conclusion, the Board of Directors and management believe the Bank's use of mortgage derivatives is consistent with the FFIEC's Supervisory Statement on mortgage derivative products and that Management has been able to demonstrate over the last five years that these instruments can be valuable portfolio tools if managed correctly.

Thank you for your consideration on this matter.

Sincerely,

Steven Bangert
Vice Chairman
SB/cw


Confidential Material -
Subject to Protective Order

# EXHIBIT 22

FILE

# HOLLEB & COFF
ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900

WRITER'S DIRECT DIAL (312) ________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MICHAEL V. CASEY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID I. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOPINGARNER
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ
JEFFREY K. ANDERSON
LYNNE M. BAKER
RICHARD G. BERNET
ALLAN S. BRILLIANT
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
SUSAN WARD COOPER
BRUCE DOPKE
MICHAEL L. ELOWE
KATHRYN J. GERBER
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
KRISTOPHER S. HESTON
PERRI L. IRMER
SHERI A. JORGENSEN
STEVEN P. KAISER
REBECCA L. KENT
BRIAN P. KERWIN
DANIEL L. KRAUS
DAVID A. LISCO
WILLIAM F. LITTLE
JAMES L. LUCARI
JAMES W. MARKS
JAMES T. MARKUS
ALVIN K. MARR
MICHAEL S. MOSTOW
BENJAMIN L. NORTMAN
KATHRYN A. PYSZKA
STUART N. RAPPAPORT
GREGORY G. SCHULER
JULIE L. SCHULZ
THOMAS B. SHAPIRA
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
JANET L. SMERLING
PAUL A. SMITH
JAMES M. SNYDER
GENE S. STERN
GREGG E. SZILAGYI
MICHAEL S. TALBETT
JAMES P. TEUFEL
JOHN C. THEISS
MARK H. VAN DE VOORDE
ROBERT S. WERT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH

February 2, 1993

Mr. Larry E. Ferries
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Illinois 60601

Dear Larry:

As we discussed, River Valley Savings Bank, F.S.B. ("FSB") would like to enter into a correspondent agreement with San Antonio Federal Savings Bank ("SAFSB") whereby SAFSB would sell certain mortgage loans to FSB. The terms of this proposed arrangement are set forth in a letter dated December, 1992, from Ron Pikus, President of FSB to Richard Dalton, President of SAFSB, a copy of which is enclosed for your convenience.

Both institutions understand that any such arrangement is a covered transaction between affiliates and that they must abide by the quantitative and qualitative restrictions of Sections 563.41 and 563.42 of the OTS Regulations. Moreover, since FSB is subject to a supervisory agreement, we hereby request your prior written approval to enter into the proposed transaction.

If you have any questions concerning the proposed transaction, please do not hesitate to contact Ron Pikus at FSB. If you have any other questions, please do not hesitate to contact me.

We appreciate your prompt consideration of our request.

Yours very truly,

Anne Webber Brody

Anne Webber Brody

AWB:mf
Enclosure
cc: Steven Bangert
Ronald Pikus
Richard Dalton
Mark S. Kipnis

EXHIBIT 22 FERRIES

Confidential Material — Subject to Protective Order

H&R-B47-00808

December 1992

Mr. Richard Dalton
President
San Antonio Federal Savings Bank
801 Nolana Suite 201
McAllen, TX 78504

Dear Richard:

The following represents an agreement whereby San Antonio Federal Savings Bank (SAFSB) would make and/or arrange mortgage loans on residential real estate for sale to River Valley Savings Bank (RVSB).

1. RVSB is interested in residential mortgage loans which meet the following terms:

   a) Eligible Borrower - Individuals who intend to occupy the subject property as their primary residence and who have majority ownership interest in said property. Such applicants will be credit-qualified per the underwriting guidelines of RVSB. Second homes and investment properties meeting the guidelines of Fannie Mae and Freddie Mac will also be eligible.

   b) Loan Product - First mortgage loans on residential single-use real estate no larger than 4 units in size in Texas and Arizona. This agreement shall cover "conventional" type mortgage loans and agency qualifying community homebuyers loans and shall not cover loans insured or guaranteed by the United States of America or any agency or instrumentality thereof, or mortgage loans processed under any state, county or municipal programs. The following options would be available:

      - Conventional Fixed and Adjustable Rate Mortgages ranging up to 30 years.
      - Jumbo loans which exceed the maximum loan amount of the Federal National Mortgage Association (Fannie Mae).
      - Other loan products subsequently as made available.

   c) Maximum Loan Amount - As established by RVSB per product.

   d) Minimum Loan Amount - N/A

   e) Private Mortgage Insurance - Required on all loans with LTV greater than 80% with coverage of 22% which must reduce RVSB'S exposure to no more than 75%.

Confidential Material —
Subject to Protective Order

f) Product Terms - Price and parameters quoted daily by RVSB. A new rate sheet shall be distributed at least weekly via fax machine or mail delivery.

g) Tax Escrows - Tax escrow is required. A sum equal to1/12 of the yearly taxes will be added to the monthly principal and interest payment

h) Hazard Insurance - At closing, a policy and one year's paid receipt must be presented. Borrowers must also pay 1/12 of the annual insurance premium into escrow at closing, and 1/12 of their premium will be added on each monthly payment. The policy should at least cover the amount of the mortgage, have an expiration date, and the mortgage clause should read, "(your institution's name), its successors and assigns".

i) Flood Insurance - If flood insurance is required, provisions in the above paragraph also apply for flood insurance coverage.

2. For loans SAFSB intends to have purchased by RVSB after closing, the following procedures will apply:

a) RVSB shall make available to SAFSB current price quotations for mortgage loans along with information as to loan programs being offered by RVSB. The points listed refer to fees required by RVSB with the acceptable loan package at the corresponding rate. Any points or fees in excess of those listed shall be compensation retained by SAFSB.

b) Upon receipt of a completed application, SAFSB will register the loan the same day with RVSB. Loans must be closed within 60 days and delivered to RVSB no more than 10 days after closing. Loans not closed or delivered within these time periods will be subject to the current market rate and points.

c) SAFSB will have the responsibility for gathering or preparing all documentation for a complete loan package as required by RVSB and based on secondary market mortgage standards. This includes but is not limited to consumer disclosures, satisfactory appraisal, acceptable credit reports, verification of employment/income, and verification of sufficient funds for closing.

d) SAFSB will prepare a secondary market guidelines worksheet as provided by RVSB. This worksheet will be included with a packet of duplicate copies of all documents. Upon delivery to RVSB for the required prior approval, RVSB will evaluate the completed packet and make an approval/disapproval decision within 2 business days. This decision will be reported to SAFSB by phone. In case of approval, a commitment letter will be sent outlining the conditions.

e) SAFSB has full responsibility for closing loans, including the preparation of all pertinent disclosures and loan document

Confidential Material —
Subject to Protective Order

f) In certain instances, RVSB will fund the loan at closing if the closing takes place at an RVSB approved title company. The following information must be supplied to RVSB: name of mortgage, address of new residence, social security number, tax I.D. of new property, principal amount, monthly payment to include P & I and escrow breakdown, rate, date of first payment, maturity date, date of closing, time of closing, and the contact person at the approved title company. This information and a copy of the disbursement statement to the title company would preferably be supplied to RVSB 3 to 5 business days before closing (a minimum of 24 hours is required). If the date of closing is subsequently delayed, your institution will notify RVSB within 24 hours of the new closing date. The procedures contained in this paragraph will only be applicable to institutions pre-approved by RVSB.

g) At closing, SAFSB is to notify the customer of the loan sale to RVSB and the name of River Valley Savings Bank, FSB as servicer. Payments are due on the first of each month (in arrears) with a grace period of 15 days, otherwise a 5% penalty is assessed on the monthly principal and interest payment due.

3. SAFSB is deemed to make to RVSB and any subsequent purchaser of any mortgage loan originated by you all of the representations and warranties set forth below:

a) SAFSB has no knowledge of any facts and circumstances which would deem the information shown in the loan package to be untrue, inaccurate, or misleading.

b) SAFSB has complied with all applicable Federal and State laws and all consumer credit regulations including equal opportunity, Truth in Lending (Regulation Z), and settlement procedures.

c) The mortgage is a valid, perfected and subsisting lien on the mortgaged property described therein. The mortgage and any security agreements or equivalent documents relating to it have been properly executed, genuine, and what they purport to be, and their terms may be enforced by its successors and assigns.

d) If SAFSB shall breach any of its representations or warranties outlined in paragraph 3 in connection with any mortgage or if any representations or warranties shall otherwise be untrue for any reason, SAFSB shall upon request of RVSB repurchase the mortgage whether or not SAFSB had actual knowledge of the untruthfulness.

Confidential Material —
Subject to Protective Order

4. Termination of this Agreement may occur by either party with 10 days written notice. However, any files that were registered with RVSB and are still in process and any applications received by RVSB during this 10 day period will be purchased, if approved, under the terms of this Agreement.

If this represents our mutual agreement, please indicate so by endorsing and returning a copy of this proposal at your earliest convenience.

Sincerely,

Ronald M. Pikus
President

ACCEPTED:

__________________________ Date: ________________________
Name (Typed)

__________________________
Authorized Signatue

Confidential Material —
Subject to Protective Order

# EXHIBIT 23

Mark Kipnis

RIVER VALLEY
Savings Bank, FSB

June 20, 1991

Mr. Larry Ferries 5655293
Manager
Office of Thrift Supervision
111 East Wacker Drive
Suite 800
Chicago, IL 60601

Dear Larry:

We have received your denial of our request to pay preferred stock dividends due American National. As I explained in our phone conversation today, it is unlikely that American National would approve our recent borrowing request if River Valley misses a quarterly dividend payment. As you know, American National is our current and only source for new capital. We believe that our request will be approved, but American has been very sensitive to the current regulatory environment in our industry. I believe it is in both OTS and RVSB's best interest to pay the current dividend and not disrupt the current loan request at American. Our loan is scheduled to go to American's loan committee within 7 to 10 days.

I am aware that we are not in compliance with our management agreement with OTS. We were not able to obtain financing for the $2 million capital infusion from LaSalle National, which was the first bank approached. After it was determined that LaSalle was not going to be able to help us, we approached American National. They have been very positive about our request, but have demanded a holding company structure. This delayed the capital infusion for several reasons. We had to research the holding company regulations and run new financial projections. During this process, our legal counsel (Holleb & Coff) contacted Joe Uson at the OTS to find out what the regulatory process would involve and how long it would take. We were encouraged by the OTS to wait until late July because the paper work and expense would be reduced considerably. Apparently, the process is much less time consuming for institutions in existence for three years or more (July 29, 1991 will be the three year anniversary for RVSB, FSB). If we wait until July, we will still have a 45 day waiting period. This means the holding company will not be formed until the middle of September. At this time, the capital will be put in the holding company and pushed down to the thrift as equity capital.

My most immediate concern is the dividend payment due American National this month. River Valley is ahead of schedule for meeting the higher capital requirements. Our tangible capital will be approximately 3.6% as of June 30, 1991. If we had been able to inject the $2 million, this month, we would have exceeded the 4% target in June (90 days ahead of schedule). Our earnings have been strong during the first half of 1991 and are expected to continue. Our operating earnings will exceed $3.5 million during this period and an additional $1.3 million will be earned on the branch sale scheduled to close on Friday, June 21st.

Confidential Material —
Subject to Protective Order

H&R-B55-00357

River Valley Savings Bank, FSB 200 South Wacker Drive, Second Mezzanine Chicago, Illinois 60606 (312) 930-0944 FAX (312) 930-0911

EXHIBIT 23 FERRIES 8-11-00

Larry Ferries
June 20, 1991
Page 2

Please respond to our request to pay the dividend as quickly as possible. I will be out of the office until next Thursday, but I will try to contact you. If we are unable to contact each other, please contact Mark Kipnis at Holleb & Coff. His number is (312) 807-4656.

Thanks for your consideration.

Respectfully,

Steven Bangert
Vice Chairman

SB/cw

Confidential Material —
Subject to Protective Order

H&R-B55-00358

**LEO BLABER DEPOSITION EXCERPTS FOR TRIAL**

p. 2, lines 17-21
p. 5, lines13-14, 17-25
p. 6, lines 1-3
p. 7, lines 13-25
p. 8, lines 1-2, 6-16
p. 12, lines 15-21
p. 13, lines 5-23
p. 17, lines 2-14, 17-25
p. 18, lines 1-12
p. 19, lines 10-25
p. 20, lines1-4
p. 21, lines 1-25
p. 22, lines 1-25
p. 23, lines 1-25
p. 24, lines 1-15
p. 26, lines 18-24
p. 29, line 25
p. 30, lines 1-25
p. 31, lines 1-14, 21-25
p. 32, lines 1-5, 18-21
p. 52, lines 2-9, 14-17, 23-25
p. 53, lines 1-18
p. 60, lines 15-25
p. 61, lines 1-2
p. 62, lines 23-25
p. 63, lines 1-15, 22-25
p. 64, lines 1-7
p. 65, lines 3-15
p. 69, lines 4-25
p. 70, lines 1-25
p. 71, lines 1-2, 13-16, 19-21
p. 73, lines 20-25
p. 74, lines 1-2, 11-25
p. 75, lines 1-4, 23-25
p. 76, lines 1-7, 24-25
p. 77, lines 1-3, 17-25
p. 78, lines 1, 24-25
p. 79, lines 1-18
p. 84, lines 20-25
p. 85, lines 1-25
p. 110, lines 21-25
p. 111, lines 1-10

# LEO BLABER DEPOSITION EXCERPTS FOR TRIAL

p. 112, lines 12-25
p. 113, lines 1-7, 18-25
p. 114, lines 1-9
p. 138, lines 7-25
p. 139, lines 1-16
p. 162, lines 7-23
p. 163, lines 4-7
p. 168, lines 10-23
p. 179, lines 5-12
p. 182, lines 9-25
p. 191, lines 19-25
p. 192, lines 1-9
p. 193, lines 24-25
p. 194, lines 1-25
p. 195, lines 1-14
p. 244, lines 14-25
p. 248, lines 10-16
p. 251, lines 18-21
p. 252, lines 4-22
p. 253, lines 3-4
p. 254, lines 20-25
p. 255, lines 1-24
p. 285, lines 22-25
p. 286, lines 1-10, 15-19
p. 287, lines 7-14
p. 289, lines 15-25
p. 290, lines 1-25
p. 291, lines 1-5, 18-25
p. 292, lines 1-11
p. 293, lines 7-25
p. 294, lines 1-23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND and HOWARD)
R. ROSS, )
)
Plaintiffs, )
)
vs. ) Case No. 95-524C
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

Deposition of LEO B. BLABER
(Taken by Plaintiff)
Chicago, Illinois
August 8, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

2

MATERIAL REDACTED

Deposition of LEO B. BLABER taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 8th day of August, 2000, at the hour of 9:09 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

3

MATERIAL REDACTED

4

MATERIAL REDACTED

5

MATERIAL REDACTED

MR. CAYNE: That's fine.

Whereupon, LEO B. BLABER, having been duly sworn, was examined and testified as follows:

Q. Good morning, Mr. Blaber.
A. Good morning.
Q. For the record, could you state and spell your full name?
A. Sure. First name is Leo, middle initial B., last name Blaber, B-l-a-b-e-r.
Q. Mr. Blaber, you've been deposed before?
A. Yes, I have.
Q. On how many occasions?

A. More than 1 and less than 50, I guess. I couldn't tell you precisely, but I have been deposed frequently.

MATERIAL REDACTED



MATERIAL REDACTED

Q. When did you join the Federal Home Loan Bank Board?
A. November 1980.
Q. And before that, you were a banker?
A. I was the president of St. Paul Federal Savings and Loan Association.
Q. Which is located?
A. 6700 West North Avenue in Chicago. It no longer exists. It has been purchased by Charter One Financial from Cleveland.
Q. St. Paul was a state-chartered --
A. Federally chartered savings and loan association.



Q. How long were you president?
A. 12 or 13 years.

Q. When you joined the -- you joined the Federal Home Loan Bank of Chicago or the Federal Home Loan Bank Board?
A. Federal Home Loan Bank of Chicago.
Q. In what position?
A. President.
Q. And you were supervisory agent?
A. I was the principal supervisory agent for the Seventh Federal Home Loan Bank District, which includes the states of Illinois and Wisconsin.

MATERIAL REDACTED



MATERIAL REDACTED

10

MATERIAL REDACTED

11

MATERIAL REDACTED

12

MATERIAL REDACTED

Q. Were you the principal supervisory agent for your entire tenure at the Federal Home Loan Bank of Chicago?
A. Yes.
Q. Until when did you work at the Federal Home Loan Bank of Chicago?
A. September of 1991.
Q. After FIRREA was enacted in August of 1989, did you ever play any role or have any position with the Office of Thrift Supervision?
A. No, I did not.

13

MATERIAL REDACTED

Q. What position did you take in September 1991 when you left the Federal Home Loan Bank of Chicago?
A. I took early retirement.
Q. Are you retired today?
A. I am, yes.
Q. Have you been involved in any way in the banking or savings and loan industry since September 1991?
A. Yes, I have.
Q. In what way?
A. I was a consultant for a period of a year and a half, and then for three years -- from January 1st, 1994, until December 31st, 1996 -- I was the president of Regency Savings Bank in Naperville, Illinois.
Q. How large a bank was that when you left?
A. About $2 billion.

14

MATERIAL REDACTED

16

MATERIAL REDACTED

15

MATERIAL REDACTED

17

MATERIAL REDACTED

Q. Mr. Blaber, how did you prepare for today's deposition?
A. I read some memoranda that dealt with the acquisitions by Holland Ross and their entities, and some correspondence in that connection, and met with Ms. Smith yesterday for an hour and a half. That was the preparation.
Q. Did the memoranda and correspondence you reviewed refresh your recollection concerning the events relating to today's deposition, specifically the acquisitions by Messrs. Holland and Ross?
A. No.

Q. When you read them, you had no recollection of any of the events described in those documents?
A. I remembered -- I did not remember the specific components of the various memoranda that were exchanged between the Federal Home Loan Bank of Chicago and the FSLIC in Washington. The signatures, my initials on them were my initials, and in the few instances where Chester Biedron

18

had signed on my behalf, I'm sure that I had given him the authority to sign, but evidently I did very little of the face-to-face negotiation in these cases because I did not remember any of the specifics.

Obviously if -- if you would ask me independently of all of this if I knew that Holland and Ross, or their entities, had acquired troubled thrifts in the late '80s, sure, I remember all of that. But I did not remember any of the specifics that were covered in those memos.

MATERIAL REDACTED

19

MATERIAL REDACTED

Q. But am I correct, Mr. Blaber, you did sign a number of memos and letters relating to the Holland and Ross acquisitions in the late 1980s; is that correct?

A. Yes, that's correct.

Q. At the time you signed those letters and memos, do you believe all the statements in those letters and memos to be correct?

A. Yes.

Q. You wouldn't have signed them if you thought there were any inaccuracies in those letters and memos, correct?

A. That is correct.

Q. And you would have discussed the matters relating to the Holland and Ross acquisitions with your staff at that time,

20

correct?

A. Yes, I would have discussed them if there was anything in there that I didn't understand or anything with which I disagreed.

MATERIAL REDACTED

21

Q. You had indicated that you were well aware of the events leading up to the demise of Republic?

A. Uh-hum.

Q. Can you describe those events to me?

A. Well, Republic of South Beloit was the subject of a change-in-control application filed by an individual named Timothy Heuer, probably in 1983 and 1984.

Q. Were you involved in approving that application?

A. The -- I was involved in recommending the approval of it. We -- the local bank had no jurisdiction to approve or to disapprove a change-in-control application, but I was involved in the -- I was directly involved in the processing of the application.

I met with the principal stockholders. I met with the proposed applicant. So I had a very active role in that, and so I remember those transactions.

I remember the fact that they proposed a switch of some sort of receivables -- I can't remember whether it was house trailer paper or something -- in the seven-and-a-half million

22

dollars for two-and-a-half million dollars cash and five million dollars in capital, proposed recapitalization of the institution.

I remember that we told them that they were -- that was unacceptable, that they should not do it. They went ahead and did it anyway.

I personally, on the telephone, followed the $28 million around the country and got it frozen in a bank in San Francisco, and then turned the matter over to the office of general counsel.

So I was directly involved in that. But contrast that with my involvement in this -- in these particular transactions, and it's dramatically different.

Q. In connection with the change in control of Republic, was it in 1983?

A. It was either '83 or '84. I'm not sure. It was early in the game.

Q. Was it '83? Is that what you're telling me? I was just repeating what --

A. It was '83 or '84, yes.

Q. Was it a healthy institution at the time of that change in control?

A. It was borderline. It -- it was

23

borderline. It was -- it probably was a doomed institution.

Q. Did the institution ultimately fail?

A. Yes.

Q. And do you recall when it failed?

A. Well, let me -- when it failed. Probably -- well, it failed immediately after they transferred two-and-a-half million dollars in connection with this transaction, which turned out a sham. There were no receivables held in trust at a Texas bank -- or there were 3- or 400,000 in receivables held at a Texas bank, and they had transferred something in the neighborhood of two-and-a-half million dollars to that bank.

If you want a date on that, I can't say, but you can refer to one of the memos in there. I think it was '86 we put it in receivership and then formed a new Federal Mutual and put the association in the management consignment program.

Q. And so there was a significant amount of time, was there not, after the institution failed and the time when it was ultimately acquired by Messrs. Holland and Ross?

24

A. Yes. I would say probably two years.

Q. And why did the office -- the Federal Home Loan Bank of Chicago wait so long to resolve Republic, approximately two years, to your recollection?

A. It was hoped with good management we could make it a more salable product for somebody who might acquire it. Initially the hope was that good management could restore the entity to the ability to function on its own. I don't know -- that probably happened once or twice around the country. I don't think it ever happened in our district, but when it got to a point where we thought it was at least salable, then we marketed it.

MATERIAL REDACTED

25

MATERIAL REDACTED

26

MATERIAL REDACTED

Q. After you joined the Federal Home Loan Bank of Chicago, do you recall the first time you again dealt with Mr. Holland?
A. I dealt with him in connection with the acquisition of a thrift called Gilldorn Savings, which was acquired by Mr. Holland and a man name Buddy Cohen (phonetc).

27

was that a local institution in Chicago?
A. Yes.
Q. Was it a troubled institution?
A. It was a troubled institution that -- when they acquired it, yes, it was a troubled institution. It was a change in control. I can't remember the name of the entity that was acquired, but a savings and loan was acquired by a man named Richardson Gill. After he acquired it, he changed the name to Gilldorn Savings and Loan Association and operated it, and that savings and loan association eventually got pretty close to insolve- -- it was a troubled thrift. I can't remember whether they were technically insolvent or not at the time that Holland and Ross acquired them.
Q. Do you remember --
A. I'm sorry, at the time that Holland and Cohen acquired them.
Q. Do you recall how Mr. Holland became involved in that acquisition? Specifically if you recall whether Mr. Holland came to your office, or whether someone within your office contacted Mr. Holland to suggest that this is a transaction he may be interested in looking at?

28

MATERIAL REDACTED

29

MATERIAL REDACTED

Q. Were you satisfied with the performance

of Mr. Holland with respect to Enterprise during the period he was affiliated?
A. Yes, I was.
Q. On that basis, did you make your judgment with respect to Mr. Holland's participation in Enterprise?
A. Well, I closely followed what Enterprise was doing, and the principals, the individuals who were running it were always cooperative, were always responsible, and as far as I could see, they were honest. They didn't make any imprudent investments. Just an overall evaluation of management abilities and also the character of Mr. Holland. I was very satisfied with both of them.
Q. With respect to Mr. Holland specifically, what was your view on the two categories you just mentioned, character and management competence?
A. Good.
Q. You thought he was a professional banker?
A. Yes, sir. Yes, I did.
Q. You considered him a capable banker?
A. Yes.



Q. Did Mr. Holland's experience at the Enterprise factor into your analysis of whether or not to approve his application to acquire Republic a few years later?
A. Yes.
Q. And how did it factor into that analysis?
A. Well, we felt that we were getting capable management for the resulting entity.
Q. Do you recall, in connection with Republic again, whether Mr. Holland contacted you or your office or someone within your office contacted Mr. Holland to see if he was interested in engaging in that transaction?

MATERIAL REDACTED

A. Okay. Republic, I believe, probably that was a bid conference for Republic. We probably sent out bid packages. It's more likely that we contacted him than that they contacted us, one way or another. I think there was a



bidder's conference for Republic. So the FSLIC or the Chicago bank would have acquired individuals and entities that we knew to be potential acquirers or to be interested in acquiring other savings and loan associations.

MATERIAL REDACTED

Q. Do you recall that Mr. Holland and Ross acquired three other -- four other institutions during the same general period?
A. Yes.



MATERIAL REDACTED

50

MATERIAL REDACTED

51

MATERIAL REDACTED

52

MATERIAL REDACTED

Q. Can you explain to me the importance of a business plan in connection with the consideration by your office of acquisitions to acquire savings associations?

A. Yes. Any applicant was required to submit a business plan showing that the acquired entity would be viable for a three-year period subsequent to the acquisition.

Q. Were savings associations required to attempt to comply with their business plans once an acquisition was consummated?

A. Yes.

Q. Did you make a determination whether a business plan was conservative or optimistic, in reviewing a business plan?

53

A. Yes, such a determination would have been made.

Q. And did you require that a business plan be conservative or optimistic in making a determination whether to approve the business plan?

A. We required that it be realistic. So I guess that's my answer. We required it to be realistic. We required the projected volume to be attainable, based upon what our experience told us was attainable. We required that the interest rate forecast be accurate, again, based upon our interest rate projections. And nobody's interest rate projections are that accurate, but at least be in line with them.

Q. Would your office approve a business plan that did not appear to be realistic?

A. No.

MATERIAL REDACTED

58

MATERIAL REDACTED

60

MATERIAL REDACTED

Q. The court reporter has handed you a document marked for identification as Blaber No. 6. Could you please identify this document for the record?

A. It is a recommendation memorandum dated January 27th, 1988, from me as principal supervisory agent of the Federal Home Loan Bank of Chicago to B.J. Brookins, Director of Mergers and Acquisiton Division in FSLIC, and it is a recommendation for negotiation of the FSLIC-assisted merger of Republic Savings of

59

MATERIAL REDACTED

61

South Beloit into Rock Falls Savings and Loan Association of Rock Falls, Illinois.

MATERIAL REDACTED

62

MATERIAL REDACTED

Q. Based on your review of this document and your understanding of the procedures governing the handling of supervisory

63

institutions in 1988, would you and your staff have recommended to the FSLIC that negotiations commence for a FSLIC-assisted merger of Republic Savings at this time?

A. Because we thought the proposal that was given was desirable from the standpoint of FSLIC.

Q. Would you have, prior to making this recommendation, attempted to market or shop Republic Savings on an unassisted basis?

A. Normally, yes, but you've asked me to review the document, and the document indicates that we've considered the condition to be so poor that an unassisted effort would have been unavailing.

MATERIAL REDACTED

Q. What was it about Republic's condition that led your office to the conclusion that shopping efforts would have likely been unavailing?

64

A. The magnitude of the negative net worth relative to the size of the entity.

Q. And what is the magnitude of that --

A. 15 million, as I recall from reading - it, 157 and a half million. $15,522,000 on a 39 and a half million dollar asset entity. No one would have accepted that on an unassisted basis.

MATERIAL REDACTED

65

MATERIAL REDACTED

Q. Does your memorandum indicate that Republic Savings, in 1988, was continuing to lose money on a daily basis?

A. Well, I'd have to -- I didn't get that out of here. If it's in here, I missed it.

(Witness examines document.)

THE WITNESS: It is not jumping out at me one way or another, but based upon my experience, it would have been losing money on a daily basis. When there is only 31 and a half million dollars in assets and $15 million in liabilities, there is no way you could be anything but unprofitable.

66

MATERIAL REDACTED

68

MATERIAL REDACTED

67

MATERIAL REDACTED

69

MATERIAL REDACTED

Q. As principal supervisory agent in 1988, was that a responsibility of yours, to determine whether or not an institution such as Republic could be resolved on an unassisted basis?
A. Yes.
Q. And if you made the determination, such as you did in Republic, that the institution could not be resolved on an unassisted basis, was it your responsibility to make recommendations to the FSLIC concerning the appropriate structuring of a resolution of the institution?
A. Yes.
Q. And it was your responsibility to recommend whether or not FSLIC assistance should be granted in connection with that resolution?
A. Yes.
Q. And was it your responsibility to make a recommendation concerning how much FSLIC assistance should be granted in effecting a resolution?
A. Yes, that was part of the process.
Q. And in processing an institution,

70

specifically Rock Falls, was it your responsibility to make a recommendation concerning what capital forbearances should be granted in connection with the supervisory transaction?

A. Yes. Generally the applicant would request forbearances, and as part of the recommendation, we would recommend that they be granted them or not.

Q. Would you recommend that all forbearances requested by an applicant, such as Messrs. Holland and Ross, be approved by the Federal Home Loan Bank Board and the FSLIC?

A. Would we recommend that everything they requested be approved?

Q. In the way of capital forbearances.

A. Not necessarily.

Q. How would you decide, specifically in the context of the Holland and Ross acquisition, which capital forbearances to recommend approval of and which capital forbearances not to recommend approval of?

A. It would be a question of which ones we thought were reasonable and which ones we didn't in the context of the negotiation. It's a

71

negotiation. All of these things, there is always give and take in a negotiation.

MATERIAL REDACTED

Q. And what is your understanding of why Messrs. Holland and Ross requested capital forbearances in connection with their acquisition of Republic Savings?

A. Because it would facilitate their ability to operate profitably in the relatively short run.

72

MATERIAL REDACTED

73

MATERIAL REDACTED

Q. And do you understand why Messrs. Holland and Ross wanted to have $5 million of additional capital at the outset of the transaction?

A. Yes.

Q. And why is that?

74

A. Because the more capital you have, the better.

MATERIAL REDACTED

A. It's necessary to meet certain capital standards to operate on an unfettered basis. If your capital is limited, there are regulatory restrictions that can be imposed. Eventually the FSLIC insurance premiums could increase if capital decreased. I'm not sure whether at that time that feature had been imposed or whether it was just something that was clearly on the horizon in 1988, but there just are many more restrictions that can be placed upon a capital-deficient entity that a well-capitalized or adequately capitalized entity does not have to bear up under. So it's important to somebody operating a financial institution that they meet the capital requirements.

75

Q. Did more capital provide the investors with more opportunities to operate their institution in a profitable manner?
A. You could say that, yes.

MATERIAL REDACTED

Q. Because banking is all about leverage, right?
A. Yes.

76

Q. What do you understand leverage to be?
A. Leverage is using -- is making more in the -- more investments relative to your capital than less, right.
Q. And again, we just said that bank leverage is at the heart of banking, right?
A. Yes.

MATERIAL REDACTED

Q. And more capital would allow a banker such as Messrs. Holland and Ross to make more

77

investments, correct?
A. It would allow them to make more investments.

MATERIAL REDACTED

Q. So the more capital Messrs. Holland and Ross had, the more investments could be made, and they obviously would attempt to make prudent investments, correct?
A. Correct.
Q. If they were successful in making prudent investments, the more capital Messrs. Holland and Ross had, the more profitable their institution would be, correct?

78

A. Correct.

MATERIAL REDACTED

Q. My last question simply was, did you understand, based on your view of the documents,

80

MATERIAL REDACTED

79

that Messrs. Holland and Ross also negotiated with your staff for the right to include subordinated debt as a component of regulatory capital?

A. Yes.

Q. And the answer may be the same, but just so the record is clear, what's your understanding of why Mr. Holland and Ross would have negotiated also for the right to include subordinated debt as a component of regulatory capital?

A. To increase the amount of capital.

Q. And it's your understanding that at the conclusion of the negotiations, your office recommended that Messrs. Holland and Ross be allowed to include subordinated debt as a component of regulatory capital?

A. Yes.

MATERIAL REDACTED

81

MATERIAL REDACTED

82

MATERIAL REDACTED

83

MATERIAL REDACTED

84

MATERIAL REDACTED

Q. On page 3 of Exhibit 6, it indicates that one of the features of the transaction would provide for the retention of Republic's net operating loss carryforwards. Do you see that?
A. Yes.
Q. Based on your review of the documents,

85

your general understanding of these transactions, what was the importance to an acquirer, such as Messrs. Holland and Ross, to be able to include operating losses as an asset of the institution following the supervisory transaction?
A. By "asset," you're not talking about something specific in their balance sheet, are you.
Q. I'm talking a more generic sense.
A. Yes. To retain the right to use -- the operating loss carryforwards can reduce the amount of income taxes you have to pay on future profits. You can offset a certain percentage of the losses for a certain period of time against future profits, and that reduces your tax.
Q. Is it your understanding at the time, in 1988, that the existence of nonoperating losses would facilitate the ability of your office to market and resolve insolvent institutions?
A. Did we understand that that was something that was desirable for a potential acquirer? Is that what you're asking me?
Q. Yes. Was it a selling point?
A. Sure, yes.

110

MATERIAL REDACTED

Q. Mr. Blaber, the court reporter has handed you a document marked for identification as Exhibit 8. Could you kindly identify it for the record?

A. It's an April 22nd, 1988, memorandum to

111

John M. Buckley, B-u-c-k-l-e-y, Jr., the secretary of the Federal Home Loan Bank Board, from me. And the subject is the FSLIC-assisted acquisition of Galva Federal, Home Federal Savings of Peoria, and Mutual Savings and Loan Association of Canton by Homer Holland and Howard Ross.

Q. Can you look to see if your signature appears on that letter?

A. My initials are here.

MATERIAL REDACTED

112

MATERIAL REDACTED

Q. And would you have personally reviewed and edited this letter before you signed it --

A. Yes.

Q. (Continuing) -- before you affixed your initials on the front page?

A. Yes.

Q. Would you have agreed with all of its contents before you sent it to Mr. Buckley?

A. Yes.

Q. Would you have understood that Federal Home Loan Bank Board would have relied on this memorandum in making the decision to grant assistance and forbearances in connection with the acquisitions of Galva Federal Savings and

113

Loan Association, Home Federal Savings and Loan Association of Peoria, and Mutual Savings and Loan Association by Messrs. Holland and Ross?

A. Yes.

Q. This document is called an S memorandum, correct?

A. Yes.

MATERIAL REDACTED

Q. And this memorandum contains a summary of the financial condition of each of the three institutions being acquired by Messrs. Holland and Ross, does it not?

A. Yes.

Q. And what would the -- from what sources would you and your staff have derived the information relating to each of those

114

institutions?
A. Financial condition primarily from the examination reports.
Q. And again, you would have assured yourself of the accuracy of the financial information concerning each of those institutions before you forwarded this memorandum on to the bank board in Washington, correct?

MATERIAL REDACTED

116

MATERIAL REDACTED

115

MATERIAL REDACTED

117

MATERIAL REDACTED

MATERIAL REDACTED

Q. Is it a fair statement that in light of this reference to subordinated debt significantly bolstering regulatory capital, you viewed that as a positive or significantly positive factor in deciding to recommend the transaction?
A. No question about that.
Q. Why do you have no question about that?
A. Because it's $5 million more in capital. So that's a significant factor.
Q. Significant positive factor?
A. Yes, a significant positive factor.
Q. So the record is clear, why would there have been a significant positive factor?
A. Because it increases the amount of capital that the entity has. The more capital it has, the greater the likelihood of survival.
Q. The greater the likelihood of profitability, also?
A. Sure.



Q. Under "character of acquirers," it states, "Messrs. Ross and Holland appeared to be of the utmost integrity." Do you see that?
A. Yes.
Q. Would that have been an important factor in your deliberations concerning whether or not to recommend approval of the supervisory transaction?
A. I think that's already a given in this whole -- I've said that I don't know how many times. The answer is yes. It would have been important, yes.
Q. It was something you relied on?
A. Yes. I mean, that point has been made so often that it seems hardly worth going over again.

MATERIAL REDACTED



MATERIAL REDACTED



MATERIAL REDACTED

162

MATERIAL REDACTED

Q. Mr. Blaber, would you kindly identify Exhibit 19 for the record?

A. It is a document entitled "Executive Summary." It is from me to the Federal Home Loan Bank Board. It is dated June 28th, 1988. My initials are affixed by Chester Biedron, but I have no doubt that he affixed them strictly in accordance with authority.

Q. Can you briefly review the memorandum and indicate to me why it was issued at the time it was?

A. It's a summary of all of the documentation back and forth on the acquisition of Republic Savings in South Beloit, and it was issued to give a thumbnail sketch to the Federal Home Loan Bank Board, so maybe they wouldn't have to read through everything.

163

Q. And would you have agreed with all the contents of this memorandum at the time it was sent in to Washington?

A. Yes.

MATERIAL REDACTED

164

MATERIAL REDACTED

165

MATERIAL REDACTED

166

MATERIAL REDACTED

167

MATERIAL REDACTED

168

MATERIAL REDACTED

Q. Kindly identify Exhibit 20 for the record, Mr. Blaber.
A. It's a document -- an S memorandum dated June 28th, 1988, to John Buckley, the secretary of the Federal Home Loan Bank Board, from me as principal supervisory agent, initialed on my behalf by CAB, who is Chester A. Biedron, and the subject is the FSLIC-assisted supervisory conversion/merger of Republic Savings with and into River Valley Savings Bank.
Q. Although Mr. Biedron signed this memorandum on your behalf, do you have any doubt that you approved of its contents?
A. No.

169

MATERIAL REDACTED

178

MATERIAL REDACTED

180

MATERIAL REDACTED

179

MATERIAL REDACTED

Q. Mr. Blaber, the court reporter nas handed you Exhibit 21. Identify it.

A. An addendum to the S memorandum, dated June 21, 1988, to John Buckley, Jr., secretary of the Federal Home Loan Bank Board, from me. My initials are affixed, pursuant to authority, by Chester A. Biedron, relative to the proposed FSLIC acquisition of Republic Savings.

181

MATERIAL REDACTED

182

MATERIAL REDACTED

Q. Could you just read it into the record, so the record is clear?
A. "We are satisfied that the resulting institution will operate profitably and free of supervisory concern."
Q. What was the basis of your office's conclusions reflected in that statement?
A. The applicants would have submitted an operating plan showing viability for three years, and we were convinced that the operating plan was reasonable, and so we were satisfied that they'd operate profitably and free of supervisory concern.
Q. Using, I think, the language you used this morning, is it fair to say you would have believed their plans to have been realistic?
A. Yes.

183

MATERIAL REDACTED

184

MATERIAL REDACTED

185

MATERIAL REDACTED

190

MATERIAL REDACTED

191

MATERIAL REDACTED

Q. Kindly identify Exhibit 23 for the record.
A. This is an S memorandum supplement, dated July 6th, 1988, to John Buckley Jr., the Federal Home Loan Bank Board secretary, from me, initialed on my behalf by Chester Biedron, relative to the Republic Savings transaction.

192

That's it.
Q. Are you confident you signed off on and approved this memorandum?
A. Yes.
Q. On page 1, you see the reference to, "The acquisition of Republic Savings will result in $7 million goodwill to be amortized over 25 years"?
A. I see that.

MATERIAL REDACTED

193

MATERIAL REDACTED

Q. Could you explain to me what is meant by the entry on page 1, "The growth of

194

$25 million immediately is needed to increase the interest margin, increase profitability, and to cover acquired operating expenses"?
A. Let's add stuff up. What the language means is that this entity is going to grow $25 million immediately. It's going to -- what I don't know is whether they mean on both sides of the balance sheet. Obviously -- is there anything on the business plan here? Let's take a look.
Yes, this is a -- between acquisition and the end of year one, there is a growth in assets from 181 million to 210 million, which would be $29 million. That's fairly significant growth in one year for an entity this size. It would be in excess of 10 percent. Sure, it would be in excess of 10 percent. That's pretty good growth.
So we are explaining that we need to grow by this amount in order to generate sufficient income to operate profitably. It's really a comment on there.
Q. I take it there was an expectation at the time you prepared this memorandum that the acquirers would be able to utilize that growth in

195

assets in a profitable way?
A. Yes. The business plan indicates a net income of $483,000 in the first year, so the answer to your question is yes.
Q. One of the reasons that the acquirers needed to be able to include the forbearance capital as regulatory capital was to support that immediate growth, correct?
A. Right, unless we had given them some sort of a waiver of the net worth requirements.
Q. Rather than giving them a waiver, you allowed them to include forbearance capital as regulatory capital, correct?
A. Correct, yes.

MATERIAL REDACTED

196

MATERIAL REDACTED

197

MATERIAL REDACTED

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:
HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the U.S. Department of Justice in Case No. 95-524C:
PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Deposition of LEO B. BLABER taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 9th day of August, 2000, at the hour of 9:10 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.



CONTENTS


| The Witness: LEO B. BLABER | Examination |
|---|---|
| By Mr. Cayne (Continued) | 244 |
| By Ms. Smith | 276 |
| By Mr. Cayne | By |
| Mr. Cayne (285 | |


INDEX OF EXHIBITS


| For the Plaintiff | Page |
|---|---|
| 28 (12/16/88 letter) | 244 |




MATERIAL REDACTED

Q. The court reporter has handed you a document marked for identification as Blaber No. 28. Kindly identify it for the record.

A. It is an applications digest, or a document titled "Applications Digest," dated December 16th, 1988, to John M. Buckley, Jr., secretary to the Federal Home Loan Bank Board, from me as principal supervisory agent, Federal Home Loan Bank of Chicago, bearing my initials. "Subject: Proposed Supervisory Conversion and FSLIC Assisted Merger of Peoria Savings and Loan Association into River Valley Savings Bank."



MATERIAL REDACTED

246

MATERIAL REDACTED

247

MATERIAL REDACTED

248

MATERIAL REDACTED

Q. And whoever prepared the initial draft of Exhibit 28, you testified you executed it, correct?

A. Yes.

Q. And you would agree with all of its contents at the time you executed it, correct?

A. Yes.

249

MATERIAL REDACTED

250

MATERIAL REDACTED

251

MATERIAL REDACTED

Q. Under "Future Prospects," your memorandum states that "the subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District . . . ."

252

MATERIAL REDACTED

Q. And it continues. I'll read the whole thing again to be clear:

"The subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District by combining it with a well capitalized and profitable institution."

By "well capitalized and profitable institution," of course, is referring to River Valley Savings Bank FSB, correct?

A. Yes.

Q. And in making the determination that it was well capitalized, you would have considered the entire amount of River Valley's regulatory capital as of the time of your memorandum, correct?

A. Yes.

Q. And that regulatory capital included the subordinated debt and the capital credit that we discussed yesterday, correct?

253

A. Then the answer to your question is yes.

MATERIAL REDACTED

254

MATERIAL REDACTED

Q. In making your determination to recommend that Messrs. Ross and Holland be allowed to acquire Peoria Savings, would you have considered the information contained in that paragraph concerning their role to be a significant factor in your deliberations?

255

A. I'm not sure I follow you.
Q. That section of your memorandum --
A. I see it. I see what is there, yes.
Q. (Continuing) -- indicates that Messrs. Ross and Holland were going to take an active role in the day-to-day operations of Peoria Savings, correct?
A. Yes.
Q. And it further indicates, as the document we looked at yesterday indicated, that both of the individuals were, in the view of your office, individuals of the utmost integrity, correct?
A. That's what it says.
Q. It further says that both of the individuals are "known and respected within the seventh district not only for their performance at River Valley" and other institutions, correct?
A. That's what it says.
Q. I'm simply asking you, sir, would those factors have been significant factors in your office's consideration of recommending approval of the acquisition of Peoria Savings?
A. Yes.

MATERIAL REDACTED

256

MATERIAL REDACTED

257

MATERIAL REDACTED

282

MATERIAL REDACTED

284

MATERIAL REDACTED

283

MATERIAL REDACTED

285

MATERIAL REDACTED

Q. Was there any exhibit that you reviewed that you needed more time to review than you were provided?

A. No.

286

Q. Were you able to review as much of every document that you reviewed as you felt you needed to accurately testify?
A. Yes.
Q. And did you review as much of each document as you felt was necessary in order to adequately and accurately testify?
A. I reviewed as much as I thought I needed to review to respond to your questions, yes.

MATERIAL REDACTED

Q. Are you aware of any documents prepared by you or any member of your staff that were inconsistent in any way with the documents at which you looked during your deposition?
A. No.

287

MATERIAL REDACTED

Q. But you have no doubt, do you, that the events about which you testified actually did occur?
A. None whatsoever.
Q. And you have no doubt that the testimony you've given today and yesterday has been fully accurate and truthful, correct?
A. That's correct.

288

MATERIAL REDACTED

289

MATERIAL REDACTED

Q. You indicated that business plans make projections as of the time they are submitted, correct?
A. Based upon -- based upon conditions at the time they are submitted.
Q. But you didn't, as you testified yesterday, simply haphazardly accept any business plan that crosses your desk, correct?
A. Correct.
Q. You would make sure that that business plan was realistic at the time it was submitted,

correct?
A. That's correct.
Q. And you said circumstances can change, correct?
A. Circumstances do change, invariably and inevitably, yes.
Q. And you said one of the factors that's important is whether the management in place at an institution has the competency and ability to adjust to changes, correct?
A. That's correct.
Q. Based on the statements made in these documents about Messrs. Holland and Ross, and based upon your own personal dealings with Messrs. -- with Mr. Holland, do you have any doubt that Mr. Holland was a banker capable of adjusting to changes in the market?
A. I believe that he was.
Q. That he was able to adjust to changes in the market?
A. Correct.
Q. And although you did not have supervisory jurisdiction over the institutions acquired by Messrs. Holland and Ross following the enactment of FIRREA, you did understand, as a



professional banker and as a professional regulator, the importance of capital to a financial institution, such as the institutions acquired by Messrs. Holland and Ross, correct?
A. Yes.

MATERIAL REDACTED

Q. I'm simply asking, Mr. Blaber, to clarify, that although you did not have direct supervision over these institutions after FIRREA was enacted, because you were aware of the importance of capital to these institutions at the time they were created in these supervisory acquisitions, you had a basis or you have a basis to understand the effect of the provisions of



FIRREA, which eliminated portions of the capital of these institutions, correct?
A. Yes; elimination of capital is not good.
Q. And you have a basis to give that testimony?
A. That is correct, yes.
Q. Your decades of experience as a professional banker, a professional regulator, correct?
A. Right.

MATERIAL REDACTED



MATERIAL REDACTED

Q. And you were involved in many cases in recommending the approval of capital forbearances, correct?
A. I recommended them in these instances, as a matter of fact.
Q. In these instances, in the acquisitions by Messrs. Holland and Ross, correct?
A. Correct.
Q. You understood the purposes why Mr. Holland and Ross requested the capital forbearances they requested, correct?
A. Yes.
Q. And you understood the importance of these capital forbearances to the ultimate success and the profitability of the institutions acquired by Messrs. Holland and Ross in these supervisory acquisitions, correct?
A. Yes.
Q. And again, what was that importance?

A. Because they needed capital.
Q. Without the capital created by these capital forbearances, these institutions could not have thrived and could not have been successful and could not have been profitable, correct?
A. Unless some other means of increasing the capital were found.
Q. And you're not aware of any other means of increasing capital being found at the time of these supervisory acquisitions, correct?
A. No -- well, unless Holland and Ross had some money that they could put into them. That certainly could have substituted for them.
Q. Right. They could have substituted dollar-for-dollar cash for the capital forbearances, right?
A. Yes, they could have.
Q. And if they had substituted dollar-for-dollar cash, the institutions would have been in as good of condition as they were with the capital forbearances, correct?
A. Correct.

MATERIAL REDACTED



MS. SMITH: No questions.
MR. CAYNE: Deposition is concluded. Thank you for your attendance and patience with me, Mr. Blaber. It's appreciated.
(Whereupon, at 10:23 a.m. the taking of the instant deposition ceased.)

____________________________
Signature of the Witness

SUBSCRIBED AND SWORN
TO before me this_____day
of __________________________, 2000.

____________________________
Notary Public

My commission expires: ________________________



STATE OF ILLINOIS )
) SS:
COUNTY OF DuPAGE )

I, ROBIN TOKARZ-CHIMNIAK, CSR, RMR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

____________________________
Notary Public in and for the
County of DuPage.

My commission expires: 4/21/04

# EXHIBIT 6

Federal
Home Loan Bank
Board
111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

RECOMMENDATION MEMORANDUM

FROM: Leo B. Blaber, Jr.
Principal Supervisory Agent
FHLB of Chicago

Date: January 27, 1988

TO: B.J. Brookins
Director of Mergers and Acquisition Division
FSLIC

Subject: Recommendation for Negotiation of the FSLIC-Assisted Merger of:

| | | (000's) |
|---|---|---|
| Republic Savings, A FS&LA | Assets: | $ 39,523 |
| South Beloit, Illinois | Liabilities: | 55,045 |
| FHLBB No. <u>8346</u> | Net Worth: | (15,522) |
| | NW/Liab.: | (28.20)% |
| | (Data as of 11/30/87) | |

Into:

| | | |
|---|---|---|
| Rock Falls S&LA | Assets: | $112,880 |
| Rock Falls, Illinois | Liabilities: | 108,185 |
| FHLBB No. <u>6822</u> | Net Worth: | 4,695 |
| | NW/Liab.: | 4.34% |
| | (Data as of 11/30/87) | |

1. **<u>Background</u>**

Republic Savings, A Federal Savings and Loan Association ("Republic") is a $39.5 million federal mutual association with a deficit net worth of $15.5 million as of November 30, 1987. Republic received its insurance of accounts and membership in the Federal Home Loan Bank system in January of 1963. The association's main office is located in South Beloit, Illinois. In addition, it operates a branch office in Roscoe, Illinois.

Mr. Timothy Heuer acquired 96% of the outstanding permanent stock of the association on June 30, 1984. Republic's financial condition deteriorated rapidly under Mr. Heuer's ownership. Within the first ten months of Mr. Heuer's ownership, 87% of all new loans originated were commercial-type real estate loans which represented a major shift in lending activity for Republic.

Applications (312) 565-5700 / Examinations (312) 353-5777 / Supervision (312) 565-5744

Mailing address: Post Office Box 7809, Chicago, Illinois 60680-7809



WOT685 1015 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

PLAINTIFF'S EXHIBIT
PX 111

This commercial lending activity was centered in the sunbelt states of Florida and Texas. The majority of these loans have since been found to be of substandard quality, with several presently in either a non-earning status or having been determined to represent large indicated losses. The association's negative net worth is directly attributed to the indicated losses on these loans.

On September 2, 1986, the former board of directors entered into an unauthorized transaction intended to recapitalize the association. The transaction was with ParkCrest Consulting, Ltd., a Canadian firm whose principal is Mr. William Grantmyre. The proposal called for the delivery of approximately $7.3 million in privately insured mobile home loans to Republic with $5 million representing a non-cash capital contribution and the remaining $2.5 million to be purchased outright by Republic. Republic wired $2.3 million in funds to ParkCrest, however, delivery of the mobile home loans was not made. This transaction was in violation of an October 30, 1985 Consent Agreement and resulted in a further dissipation of assets beyond the losses stemming from Republic's commericial lending activity.

On September 29, 1986, as a result of the unauthorized transaction, the Federal Home Loan Bank of Chicago recommended the appointment of the FSLIC as Receiver for Republic. The Receivership took place on October 2, 1986. Upon completion of this action, a new federal mutual association was formed with Kenosha Savings and Loan Association, Kenosha, Wisconsin, appointed as the MCP institution. The association was transferred to the FSLIC on October 30, 1986.

II. Solution Efforts

On November 10, 1987, the Federal Home Loan Bank of Chicago marketed Republic on an in-state, assisted basis. Due to the financial condition of the association, attempts to market the association on an unassisted basis were not conducted. Of the 61 private investors and in-state savings and loans contacted 25 received a copy of the June 30, 1988 bid package. As a result of this solicitation, only one bid was received by the December 28, 1987 due date. The proposal was submitted by Rock Falls Savings and Loan Association ("Rock Falls").

III. Background of the Potential Acquirer

Rock Falls is a state chartered, FSLIC-insured, stock savings and loan association located in Rock Falls, Illinois. Mr. Howard Ross and Mr. Homer Holland own 49% and 51% of the outstanding shares of this institution respectively.

As of November 30, 1987, Rock Falls had regulatory capital of $4.7 million, total assets of $112 million, and savings deposits of $66 million. The association's principal business is to serve the Rock Falls, Sterling and surrounding communities of northern Illinois with residential mortgage loan and savings deposit services.

The association's principal subsidiary, Holland Partners, Inc., is located in Chicago, Illinois. It provides executive management as well as asset/liability and investment management services to banks and savings institutions throughout the Midwest.

IV. Structure of the Proposed Acquisition

The proposed form of acquisition is a merger, whereby, Republic would merge with and into Rock Falls Savings and Loan Association. After the consummation of the proposed merger, Rock Falls will continue in its current form and will fully incorporate Republic's assets and operations into its own.

Rock Falls submitted four alternative proposals. Proposal B is the least costly proposal. It requests the following:

1. One-time cash contribution of $17.8 million if the transaction is completed by January 31, 1988;

2. Retention of Republic's net operating loss carryforwards;

3. Indemnification with respect to lawsuits in which Republic is a defendent as of the date of the acquisition and lawsuits subsequently arising on the basis of facts existing prior to the acquisition;

4. Indemnification with respect to any undisclosed liabilities of Republic or any subsidiaries thereof, claims not reserved for or any subsequently asserted against Republic and litigation, including judgments, costs and attorneys' fees challenging the acquisition;

5. Five year forbearance for any failure to meet the regulatory capital requirement arising from a) an increase in Rock Falls contingency factor attributable to the assets of Republic existing as of the acquisition date or b) an increase in Rock Falls liabilities attributable to the liabilities of Republic as of the acquisition date; and;

6. Seven year forbearance from including assets of Republic existing as of the acquisition date that are or become scheduled items, from any computation to determine whether Rock Falls meets the requirement of such regulations.

V. Cost Analysis

The FHLB of Chicago has prepared a cost of liquidation analysis and bid cost analysis. The following table summarizes the results of this analysis (see attachments):

| | Data as of 9/30/87 (000's) |
|---|---|
| Cost of Liquidation | $ 19,054 |
| Cost of Bid Proposal | 17,800 |
| Savings to the FSLIC | $ 1,254 |
| | ====== |
| Cost of Bid/Total Assets | 45.04% |
| Cost of Bid/Cost of Liquidation | 93.42% |

VI. Options

Rock Falls's Proposal

| Pro's | Con's |
|---|---|
| - Only proposal received | - Utilizes a portion of the FSLIC fund |
| - Resolves a FSLIC Case | |
| - Keeps the association within the industry | |

P.A. 400

Liquidation

| Pro's | Con's |
|---|---|
| - Provides a permanent solution | - Most expensive solution |
| | - Possible negative public response |
| | - Less costly solution is available |

VII. Negotiating Strategies

We propose to attempt to extend the deadline of January 31, 1988 to at least May 31, 1988. In addition, we will try to effect a reduction in the cash requested by discovering how the figure was calculated and whether or not cogent arguments for reduction can be made.

VIII. Recommendation

We recommend that the best course of action is to negotiate an assistance agreement and to close this transaction as soon as possible. Based on the analysis performed by the FHLB of Chicago, Rock Falls' proposal would enable the FSLIC to resolve this case at a cost less than the cost to liquidate the association. Moving forward with this proposal will save the Bank Board the time and expense involved in marketing this association on a nationwide basis. In addition, this proposal will recapitalize the association.

Attachments

DLJ

cc: Held



WOT685 1019 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**ATTACHMENTS**

1. Rock Falls S&LA Proposal for Republic Savings
2. Cost of Liquidation Analysis
3. Costing Analysis of the Rock Falls Proposals



WOT685 1020 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED
CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 8

JONES, DAY, REAVIS & POGUE

AUSTIN
CHICAGO
CLEVELAND
COLUMBUS
DALLAS
GENEVA

HONG KONG
LONDON
LOS ANGELES
NEW YORK
PARIS
RIYADH

METROPOLITAN SQUARE
1450 G STREET, N.W.
WASHINGTON, D.C. 20005-2088

TELEPHONE: 202-879-3939
TELEX: DOMESTIC 892410
TELEX: INTERNATIONAL 64363
CABLE: ATTORNEYS WASHINGTON
TELECOPIER: 202-466-8642
WRITER'S DIRECT NUMBER

(202) 879-3664

April 22, 1988

Ms. Wilvia Galbraith
~~Assistant to the Director~~
Federal Savings and Loan Insurance Corporation
801 17th Street, N.W.
Washington, D.C. 20552

Re: Proposed Acquisition of Home Federal Savings and Loan Association of Peoria, Peoria, Illinois, Galva Federal Savings and Loan Association, Galva, Illinois, and Mutual Savings and Loan Association, Canton, Illinois, by Messrs. Howard R. Ross and Homer J. Holland

Dear Ms. Galbraith:

Enclosed is a copy of the term sheet describing the features of the Preferred Stock of River Valley Savings Bank, F.S.B. to be issued to the Federal Savings and Loan Insurance Corporation in connection with the above-referenced transaction. The term sheet has been revised from the copy which you received on April 15 to reflect the floor on the calculation of Net Income in determining the income participation dividend in the event of a merger, and to reflect that .25 is used in the calculation of Average Total Assets, and not .025.

Please contact me at the above-referenced number or Peter Barnett at 202/879-3972 with any questions in this regard.

Sincerely,

Deborah A. Sabella

Deborah A. Sabella

Enclosure

cc: Mr. Herb Held
Regional Director
Mergers and Acquisitions Division
Federal Savings and Loan Insurance Corporation
801 17th Street, N.W.
Washington, D.C. 20552

Mr. Robert A. Cline
Financial Analyst
Office of Regulatory Policy,
Oversight and Supervision
Federal Home Loan Bank Board
900 Nineteenth Street, N.W.
Washington, D.C. 20006

PLAINTIFF'S EXHIBIT
PX 147

Evelyne Bonhomme, Esq.
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

Gregory Brett Smith, Esq.
Deputy Director for Supervisory Transactions
Corporate and Securities Division
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

V. Gerard Comizio, Esq.
Director
Corporate and Securities Division
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

John P. Harootunian, Esq.
Assistant General Counsel
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

Mr. David Adkins
Financial Analyst
Mergers and Acquisition Division
Federal Savings and Loan Insurance Corporation
801 17th Street, N.W.
Washington, D.C. 20552

Ms. Helen Mirza
Supervisory Agent
Federal Home Loan Bank of Chicago
111 East Wacker Drive, Suite 800
Chicago, IL 60601

RIVER VALLEY SAVINGS BANK, F.S.B.

PREFERRED STOCK TO BE ISSUED TO THE
FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

Term Sheet

| | |
|---|---|
| Amount: | River Valley Savings Bank, F.S.B. ("River Valley") will issue 50,000 shares of preferred stock, par value $100 per share (the "Preferred Stock") to the Federal Savings and Loan Insurance Corporation ("FSLIC") in exchange for a promissory note issued by FSLIC to River Valley in the amount of $5 million. |
| Seniority: | The Preferred Stock will be senior to all other outstanding stock of River Valley as to payment of dividends and upon liquidation of River Valley. River Valley will agree not to issue any capital stock of equal or greater priority in liquidation prior to redemption of the Preferred Stock. |
| Redemption: | The Preferred Stock will be subject to redemption at any time by River Valley at par value plus accrued but unpaid dividends. |
| Purchase Option: | Homer J. Holland and Howard R. Ross (the "Acquirors") will have the option at any time to purchase the Preferred Stock from FSLIC at a purchase price of par value plus any accrued but unpaid dividends on the Preferred Stock at the time of such purchase. |

| | |
|---|---|
| Voting Rights: | FSLIC shall have no voting rights with respect to the Preferred Stock, except that (1) in the event that more than one year's dividend due to FSLIC on the Preferred Stock remains unpaid, then FSLIC shall have the right to elect one member to River Valley's board of directors, and (2) FSLIC shall have the right to approve any transaction that would result in the Acquirors owning in the aggregate less than ~~51%~~ 90% of the voting stock of River Valley. |
| Dividends: | Ninety days after the close of each fiscal year of River Valley, FSLIC shall be entitled to receive cumulative dividends on the Preferred Stock equal to 8% per annum. FSLIC also shall be entitled to receive at such time a cumulative Income Participation Dividend ("IPD") on the Preferred Stock, which shall be equal to 25% of the Adjusted Income of River Valley. Adjusted Income for any year shall be defined as River Valley's net income for such year reported in accordance with GAAP ("Net Income"), less the sum of (1) dividends previously paid to FSLIC on the Preferred Stock and (2) 0.4% of River Valley's Average Total Assets (defined as .25 multiplied by the sum of River Valley's total assets as reported at the end of each of the previous four quarters). |
| IPD Adjustment In The Event of A Merger: | In the event that River Valley is acquired by or merged into another savings and loan association or savings bank (the institution which acquires River Valley or into which River Valley is merged being referred to as the "Acquiring Association" and the resulting institution being referred to as the "Merged Association"), then for purposes of calculating the IPD payable to FSLIC, (1) Net Income shall be defined as the Net Income of the Merged Association multiplied by the greater of (a) a fraction, the numerator of |

which shall be the Net Income of River Valley for the previous fiscal year, and the denominator of which shall be the sum of the Net Income of River Valley for the previous fiscal year and the Net Income of the Acquiring Association for the previous fiscal year, or (b) .25 multiplied by a fraction, the numerator of which shall be the total assets of River Valley (reported as of the date of merger or acquisition) and the denominator of which shall be the total assets of the Merged Association (reported as of the date of merger or acquisition), and (2) Average Total Assets shall be defined as the Average Total Assets of the Merged Association multiplied by a fraction, the numerator of which shall be the total assets of River Valley (reported as of the date of merger or acquisition) and the denominator of which shall be the total assets of the Merged Association (reported as of the date of merger or acquisition).

# EXHIBIT 19

Federal
Home Loan Bank 111 East Wacker Drive, Chicago, Illinois 60601-4360
Board

Seventh District Office

EXECUTIVE SUMMARY

From: Leo B. Blaber, Jr. LBB Control No:
Principal Supervisory Agent by CAB

To: Federal Home Loan Bank Board Date: June 28, 1988

Issue:

Whether to approve the FSLIC-assisted acquisition of Republic Savings, A Federal Savings and Loan Association, South Beloit, Illinois ("Republic") by River Valley Savings Bank, Rock Falls, Illinois ("River Valley") through a supervisory conversion and merger of Republic with and into River Valley.

Background:

Republic is a $39 million mutual savings and loan association with reported deficit regulatory capital of $16.8 million or (43.1%) of assets as of March 31, 1988.

The association has been insolvent on a regulatory basis since June, 1986. The insolvency is attributed to continued operating losses caused by a high level of non-performing commercial loans. The association presently has four large loans on its books with an aggregate total of $5.7 million. This figure is net of established reserves of $3.9 million. Two of the loans have been restructured, one is real estate owned and the other is in the process of foreclosure.

The association was placed into receivership on October 2, 1986 as a result of direct violations of a supervisory agreement and a consent merger resolution. The violations included the prior board of directors' decision to enter into an agreement for a non-cash recapitalization of the institution with Mr. William Grantmyre of ParkCrest. The details of the transaction included the following: Republic was to receive a pool of mobile home loans valued at $7.2 million in exchange for $5 million in association stock and $2.5 million in cash. The loans were to be held in trust at the Republic Bank, Waco, Texas. However, only $497,000 of the loans were found being held in trust for ParkCrest, and they had not been assigned to Republic.



WON534 0343 F HOLLAND 95-524C RIVER VALLEY SB DOCKET # 06822 TRANS 910401 REPUBLIC SAVINGS A FSLA DOCKET # 08346 TRANS 880729 WIN BOX # WC00017072 ACC # 483- 92-0117 OLD BOX # 4 OF 19 C2228 FSLIC ASSISTED ACQUISITION FILE; BOARD PACKAGE 880629 CONFIDENTIAL MATERIALS -- SUBJECT TO PROTECTIVE ORDER

In conjunction with the receivership action, the association was placed into the Management Consignment Program. A new board of directors was appointed and Kenosha Savings and Loan Association, Kenosha, Wisconsin was asked to provide management services for the association.

It is proposed that Republic be converted to a stock institution and merged with and into River Valley. River Valley, the surviving institution, will acquire all of the assets and liabilities of Republic. To facilitate this transaction, FSLIC will make a cash contribution in an amount equal to $16.6 million plus $7,500.00 per diem for each day after March 31, 1988 until the effective date. In addition, the FSLIC will provide capital loss coverage on the four commercial loans, a pool of mobile home loans and an interest account receivable. The last two items are associated with the settlement of the ParkCrest litigation. The losses will be shared on an 80/20 basis until such time as the acquirer has absorbed $150,000 in losses. Once this occurs, the FSLIC will provide 100% loss coverage on these assets. River Valley has also requested indemnifications against litigation challenging the transaction, undisclosed liabilities, unreserved claims and litigation arising on the basis of facts existing prior to the merger. River Valley has requested forbearances with regard to regulatory capital requirements.

River Valley has also submitted an application to issue a $2 million subordinated debt security to American National Bank and Trust Company in exchange for a cash infusion of $2 million. The subordinated debt is to qualify as regulatory capital. The Federal Home Loan Bank of Chicago recommends approval of this application.

The FSLIC assistance has a projected present value cost of $17.8 million, which represents 45.65% of assets and 85.2% of the projected cost of liquidation.

Recommendation:

That the Bank Board approve, by notational vote, the FSLIC assisted conversion/merger of Republic with and into River Valley, subject to the approval of the merger application and plan of merger by the Illinois Savings and Loan Commissioner.

In order to perserve one year of net operating loss tax benefits, it is necessary that Board action take place no later than June 30, 1988.

Staff Contact:

Helen K. Mirza, Supervisory Agent, (312) 565-5737 or
Tracy Wiesen, Attorney, (312) 565-5762

LBB:DLJ

Concurrence: ____________________________
Stuart D. Root
Executive Director,
Federal Savings and Loan
Insurance Corporation

# EXHIBIT 20

*Federal Home Loan Bank Board* 111 East Wacker Drive, Chicago, Illinois 60601-4360

*Seventh District Office*

June 28, 1988

**"S" MEMORANDUM**

To: John M. Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Blaber, Jr.
Principal Supervisory Agent
FHLB of Chicago

Subject: FSLIC Assisted Supervisory Conversion/Merger of:

Republic Savings, A Federal Savings and Loan Association
South Beloit, Illinois
FHLBB No. 8346

With and into

River Valley Savings Bank
Rock Falls, Illinois
FHLBB No. 6822

The Federal Home Loan Bank of Chicago recommends that the Federal Home Loan Bank Board approve the proposal submitted by River Valley Savings Bank ("River Valley") to acquire Republic Savings, A Federal Savings and Loan Association ("Republic") consistent with the terms and conditions set forth in the accompanying "L" memorandum. This recommendation is based on the following: 1) the present value cost of liquidation exceeds the projected present value cost of the River Valley proposal, and 2) River Valley has demonstrated an ability to profitably operate a savings institution in the northern Illinois market.

The following information is in support of the above recommendation:

Republic is a federally chartered mutual savings and loan association maintaining its principal place of business at 640 Blackhawk Boulevard, South Beloit, Illinois. The association operates one branch office in Roscoe, Illinois. Republic does not

PLAINTIFF'S EXHIBIT PX 182

operate a service corporation or a subsidiary. The association is presently a participant in the Management Consignment Program and is currently being managed by Kenosha Savings and Loan Association, Kenosha, Wisconsin.

I. Financial Condition

Republic has been reporting operating losses since March, 1985 and first reported insolvency in June, 1986. The association's insolvency and operating losses are attributed to a high level of non-performing commercial loans, which led to an increasing level of loan loss reserves and write-offs. The majority of the non-performing loans were comprised of approximately $11.3 million in speculative land development and commercial loans underwritten by the former stockholder, Mr. Timothy Heuer.

After Mr. Heuer's removal, the former board of directors, in an effort to recapitalize Republic, approved and initiated a plan to permit a non-cash recapitalization of the association by ParkCrest Consulting, Ltd. ("ParkCrest"). This transaction was in direct violation of a Supervisory Agreement executed on July 16, 1984 and the Consent Merger Resolution executed on October 30, 1985. The details of the transaction included the following: Republic was to receive a pool of mobile home loans valued at $7,280,234 in exchange for $5,000,000 in association stock and $2,530,824 in cash. The loans were to be held in trust at Republic Bank, Waco, Texas. However, only $497,000 of the loans had been found being held in trust for ParkCrest, and they had not been assigned to Republic.

In February 1988, successful litigation by the FSLIC led to the recovery of approximately $2.1 million of the funds disbursed by the association.

A. Operating History

As of March 31, 1988, Republic reported total assets of $39.06 million, total liabilities of $55.89 million, and deficit net worth (according to both Regulatory Accounting Principles and Generally Accepted Accounting Principles) of $16.83 million or (43.10% of assets). Real estate owned totaled $4.76 million and represents 12.18% of assets. The association has established valuation reserves of $3.90 million. For the three month period ended March 31, 1988, Republic reported a net loss of $428,000 and a net operating loss of $413,000.

Total assets of the association have declined from a high of $57 million in August, 1986 to $39 million in March, 1988. The decrease in assets is attributed to the sale and/or write-off of non-performing loans and securities. In addition, Republic's savings base has been steadily shrinking. The following table summarizes the quarterly savings flows.

(000's)

| | Quarter | Deposits Received Less Deposits Withdrawn | Interest Credited to Deposits | Net Flow |
|---|---|---|---|---|
| 1985 | March | $ (1,349) | $ 1,148 | $ (201) |
| | June | (1,799) | 1,061 | (738) |
| | September | (1,161) | 978 | (183) |
| | December | (350) | 750 | 400 |
| 1986 | March | (689) | 1,246 | 557 |
| | June | 602 | 740 | (138) |
| | September | (2,090) | 554 | (1,536) |
| | December | (3,255) | 445 | (2,800) |
| 1987 | March | (1,118) | 50 | (1,068) |
| | June | (586) | 44 | (542) |
| | September | (914) | 48 | (866) |
| | December | (202) | 62 | (140) |
| 1988 | March | 379 | 146 | 525 |

B. Service Corporations

Republic had two wholly-owned service corporations, First Financial Centre, Inc. and American Realty Properties, Inc. On September 1, 1987, both of these service corporations were dissolved due to inactivity. At dissolution, assets totaling $691,430 were transferred to Republic, the sole shareholder. The only liability was a $153,060 note payable to the association from First Financial Centre, Inc. The note was repaid at dissolution.

C. Supervisory History

The association has been closely monitored by Supervision since the acquisition of the institution

by Timothy Heuer on June 30, 1984. Immediately after the acquisition, the institution began to concentrate its lending activities in high risk, high yield commercial loans. Due to a lack of staff expertise, these loans were underwritten by stockholder Heuer himself. Conceptually, the loans were supposed to generate greater income and improve Republic's eroding regulatory capital. However, the opposite occurred. The commercial loans, which eventually caused the insolvency of the institution, were poorly under-written and lacked proper documentation.

The September 1, 1984 Report of Examination stated that the association had several loans-to-one borrower and documentation deficiencies. These deficiencies were resolved by management through sale of participation interests and the submission of additional documentation.

Subsequent field visits reported continuing large loan activity. The April 25, 1985 field visit report stated that four additional large loans were granted over a fourteen day period (2/28/85 - 3/13/85). The association already had two such loans on their books. As a result, a supervisory directive was issued on May 1, 1985. The directive restricted Republic's lending activity to loans secured by one-to-four family dwellings.

On May 9, 1985, the District Appraiser reviewed the appraisal reports supporting the six large loans granted by the association. Test appraisals were recommended on three of the six properties. As a result, the scope of the May 11, 1985 limited examination was expanded and a full scope examination was conducted.

The May 11, 1985 Report of Examination revealed violations of the June, 1984 Supervisory Agreement, which was drafted and executed in connection with Mr. Heuer's acquisition of the association. The violations included loan documentation deficiencies and loans-to-one borrower violations.

On September 23, 1985, Supervision received the findings of the District Appraiser's review of the test appraisals performed on the Ocala, Florida

properties. The indicated market value of the property was determined to be $1.1 million. This resulted in a $3.6 million indicated loss on the loan. The write-down of this one loan was sufficient to cause the insolvency of the institution.

The institution was directed to establish the $3.6 million valuation reserve by a supervisory directive issued on October 3, 1985. The establishment of the reserve reduced the association's regulatory capital to a negative $1.5 million. Mr. Heuer was then informed that a cash infusion of $4.5 million would be required by November 13, 1985 to cure the existing default in the security agreement and collateral pledge executed when he acquired the institution.

On October 30, 1985, Republic's board of directors adopted a Consent Merger Resolution conditioned upon their ability to rescind it if Mr. Heuer raised the required capital. Mr. Heuer made several attempts to recapitalize the association; however, he was not able to obtain the cash needed and eventually signed a consent removal and prohibition order on May 22, 1986.

On August 14, 1986, Mr. Heuer contacted the FHLB of Chicago to inform us of the non-cash recapitalization plan involving ParkCrest Ltd. The board of directors and William Grantmyre of ParkCrest were informed that a transaction of this nature would not be approved by the FHLB of Chicago. However, on September 2, 1986, the board of directors entered into an agreement with ParkCrest, Ltd. The association exchanged $5.0 million in association stock and $2.5 million in cash for a pool of mobile home loans supposedly valued at $7.3 million. ParkCrest also received $272,808 in fees for its participation in the transaction.

During September 1986, examiners were sent to Waco, Texas to verify the existence of the loans purchased. They found that only $497,000 in loans were being held in trust for ParkCrest. The custodian, Republic Bank, did not recognize Republic as the new owner.

On September 12, 1986, a supervisory board of directors was held and notice was given that removal action against the board had been initiated.

Due to the recurring losses from poorly underwritten commercial loans and the ParkCrest transaction, Republic was placed into receivership on October 2,

1986. As a result of the receivership, substantially all of the assets and liabilities of the association were transferred to a de novo federal mutual association. The institution is presently in the Management Consignment Program. Management services are being provided by Kenosha Savings and Loan Association.

A Supervisory Chronology is attached as Exhibit S-2.

## II. Condition of the Industry

Seventh District thrifts continue to have earnings problems. District net income for 1987 totaled $199 million compared to $574 million for 1986. The annualized return on average assets ratio for 1987 and 1986 was .24% and .73% respectively. The decrease in net income from 1986 to 1987 is partially attributable to the mandatory write-off of the secondary reserves in May, 1987.

The District's assets grew from $81.1 billion in December, 1986 to $85.3 billion in December, 1987. This represents an asset growth rate of 5.2% as compared to a 9.0% asset growth rate for the nation. As of December, 1987, 7.8% of the District assets were held in institutions with negative regulatory capital. Mortgage loans closed for District Seven thrifts declined nearly 15% from 1986 to 1987.

The slow economy of the Midwest continues to hamper Seventh District thrifts. The unemployment rate for Illinois remains a full percentage point above the national unemployment rate. The District Seven economy is expected to exhibit some improvement in the remainder of 1988.

## III. Solution Efforts

The association was marketed on November 10, 1987, with assistance, to in-state associations and private and corporate investors. Due to the financial condition of the institution, attempts to market the association on an unassisted basis were not conducted. Of the 61 parties contacted, marketing packages were distributed to twenty-five interested parties with proposals being due on or before December 28, 1987.

River Valley was the only party to submit a proposal as a result of this solicitation. The proposal was analyzed by the FHLB of Chicago and reviewed by the FSLIC. It was determined that the proposal was lower than the cost of liquidation.

IV. Summary of Proposed Acquisition

River Valley, formerly Rock Falls Savings and Loan Association, is an Illinois state-chartered stock association, located in Rock Falls, Illinois. Messrs. Howard Ross and Homer Holland own respectively 49% and 51% of the outstanding shares of stock in this institution. The institution operates one branch office in Sterling, Illinois and two service corporations. Rock Falls Service Corporation is wholly-owned. The principal activity of the service corporation is to offer insurance products to the association's customers. It has also invested $180,000 in Holland Partners, Inc. Holland Partners, Inc. is an 80% owned service corporation. Its principal business is to offer investment consulting and advisory services to financial institutions.

As of March 31, 1988, River Valley had total assets of $119.2 million, and regulatory capital of $4.8 million. The most recent examination of River Valley was conducted as of November 16, 1987. The association received a composite rating of 2. River Valley's board of directors and management have responded adequately to supervisory concerns and continue to exhibit a willingness to cooperate.

River Valley has proposed to acquire Republic through a FSLIC-assisted acquisition, and to merge the acquired institution into River Valley. They have requested the following forms of assistance:

- Cash contribution in an amount equal to $16.6 million plus $7,500.00 per diem for each day after March 31, 1988 until the Effective Date of the transaction.

- Reimbursement for losses resulting from capital losses on Covered Assets, write-down of Covered Assets and for certain related costs and expenses. Covered assets include the following four loans: H&K Development, Hess, Pittway Plaza and Brookside Realty. In addition, the mobile home loans received as partial settlement in the ParkCrest transaction and the interest account receivable

are also identified as covered assets. The losses on the covered assets will be shared on an 80/20 basis until such time as the acquirer has absorbed $150,000 in losses. Once this occurs, the FSLIC shall provide 100% loss coverage on these assets.

- Indemnifications

  River Valley has requested the following standard indemnifications:

  Indemnification from undisclosed liabilities of the acquired association.

  Indemnification from claims not reserved for and asserted against the acquired association.

  Indemnification from litigation challenging the acquisition.

River Valley has submitted an application to issue a $2 million subordinated debt security. The security will be issued to American National Bank and Trust Company and is to qualify as regulatory capital. A further discussion of the subordinated debt application is contained in the addendum to the "S" Memorandum.

## V. Cost Analysis

An analysis performed by the FHLB of Chicago and reviewed by the Analysis and Evaluation Division of the FSLIC resulted in a determination that the proposal submitted by River Valley is lower than the cost to liquidate Republic. The following table represents the present value cost to liquidate the association and cost of the proposal as calculated by the FHLB of Chicago:

As of March 31, 1988
Amounts in (000's)

| | PV Cost | Savings to FSLIC | Percent of Liquidation |
|---|---|---|---|
| Liquidation | $20,925 | N/A | N/A |
| River Valley's Offer | $17,831 | $3,094 | 85.2% |

VII. Community Reinvestment Act

Republic's compliance with the CRA regulations and requirements has been satisfactory.

VIII. Personnel Issues

The board of directors of Republic will submit their written resignations on the effective date of the merger.

The management contract with Kenosha Savings and Loan Association will be terminated on the earlier of the effective date of the merger or June 30, 1988.

IX. Supervisory Forbearances

River Valley has requested the following forbearances, which are standard pursuant to SP 37a:

- Section 563.13 (Regulatory Capital Requirement) of the Rules and Regulations for Federal Savings and Loan Corporation Insured Institutions ("Insurance Regulations") provides no exceptions in the case of acquisitions which permit the exclusion of scheduled items or assets that are or become assets classified as "substandard" or "doubtful," pursuant to Sections 561.16c (Classification of certain Assets), 563.17-2 (Re-evaluation of assets; adjustment of book value; adjustment charges), and 571.1a (Classification of certain assets), and are referred to as "assets acquired in a merger instituted for supervisory reasons," of an institution in computing the regulatory capital requirements of this section.

  Since this merger was instituted for supervisory reasons, River Valley has requested that the FSLIC forbear, for a period of five years from the acquisition date, from exercising its authority, pursuant to Insurance Regulation 563.13. This forbearance applies to the following two conditions: a) An increase in River Valley's contingency factor attributable to the assets of Republic existing at the effective date of the transaction or b) any increase in the net growth of River Valley as of the effective date by reason of River Valley's assumption of Republic's liabilities.

- This transaction has been deemed to be an acquisition instituted for supervisory reasons. Therefore, pursuant to any section of the regulations administered by the FHLBB where scheduled items, or assets that are or become assets classified as "substandard" or "doubtful" pursuant to Section 563.16 c, 563.17-2 and 571.1a and are referred to as "assets acquired in a merger instituted for supervisory reasons", scheduled items and assets classified as "substandard" or "doubtful" attributable to Republic shall be excluded for a period of five years from the computation of scheduled items when determining whether River Valley meets the requirements of such sections.

Based on our review of the transaction, the Federal Home Loan Bank of Chicago believes that these requests for these forbearances are justified and recommends that they be granted to River Valley.

## X. Accounting Issues

The acquirer intends to use the purchase method of accounting to account for the acquisition. In connection therewith, River Valley requests the following forbearances identified in SP 37a:

- That $5 million of the FSLIC cash contribution be credited to regulatory capital. Therefore, for regulatory purposes, River Valley may book such contribution as a direct addition to its regulatory capital.

- For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by River Valley over a period not to exceed 25 years by the straight line method.

In connection with the forbearances described above, the acquirer will agree to the following condition:

Not later than 90 days following the effective date of the merger, River Valley shall submit to the Supervisory Agent an independent certified public accountant's opinion that River Valley has accounted for the merger in accordance with generally accepted accounting principles except that as herein provided by the Board for the

purposes of reporting to the FHLBB: a) $5 million of the cash contribution by the FSLIC to River Valley with respect to Republic pursuant to the assistance agreement shall be deemed a contribution to regulatory capital; and b) the value of any resulting intangible assets may be amortized by River Valley over a period of 25 years by the straight line method.

The Federal Home Loan Bank of Chicago recommends that these forbearances be granted to River Valley.

## XI. Net Operating Losses

The acquirer has requested that the net operating loss carryforwards remain with the association. In exchange for this, the acquirer has reduced the amount of FSLIC assistance requested by $900,000.

As of October 2, 1986 the association had $12,769,442 in net operating loss carryforwards available.

## XII. Viability of the Converted Insured Institution

A review of the transaction pursuant to Insurance Regulation 563b.26 has been completed. As of March 31, 1988, River Valley had regulatory capital of $4.7 million. In conjunction with this transaction, $2 million in subordinated debt and $5 million of the FSLIC assistance will be used to increase the resulting institution's regulatory capital. Therefore, the resulting institution will have $177 million in assets and regulatory capital of $11.7 million or 6.6% of assets.

## XIII. Conclusions

The Federal Home Loan Bank of Chicago recommends that the Federal Home Loan Bank Board approve the acquisition and merger of Republic by River Valley based on the facts discussed in this memorandum and consistent with the terms and conditions set forth in the accompanying "L" Memorandum.

Concurrence: ______________________
Office of Regulatory Policy,
Oversight and Supervision

LBB:DLJ

# EXHIBIT 21

*Federal Home Loan Bank Board* 111 East Wacker Drive, Chicago, Illinois 60601-4360

*Seventh District Office*

June 28, 1988

ADDENDUM to the "S" Memorandum

TO: John M. Buckley, Jr.
Secretary to the FHLBB

FROM: Leo B. Blaber, Jr. LBB by CAS.
Principal Supervisory Agent, FHLB of Chicago

SUBJECT: Proposed FSLIC-Assisted Acquisition of:
Republic Savings, A FS&LA ("Republic")
South Beloit, Illinois, FHLBB No. 8346
by
River Valley Savings Bank ("River Valley")
Rock Falls, Illinois, FHLBB No. 6822

MERGER APPLICATION

Background

The subject transaction is to be consummated pursuant to a supervisory conversion/merger of Republic with and into River Valley.

In connection with this acquisition, River Valley proposes to issue $2.0 million in subordinated debt (discussed below) to be included as regulatory capital. This, along with the inclusion of $5 million of the assistance as regulatory capital will increase the resulting association's regulatory capital to approximately $11.7 million or 6.65% of assets.

For a history of the referenced institutions, refer to the original "S" memo.

Accounting

The acquisition will be accounted for under the purchase method of accounting. The use of such accounting method is supported by an opinion of an independent CPA. The applicant will submit an additional opinion regarding any tax liability that may result from such merger subsequent to consummation of the merger.

Officers, Directors and Employees

The current officers of River Valley will remain the management officials of the resulting institution. Similarly, the board of directors of the resulting institution will be that of River Valley. River Valley will not retain an advisory board or special or legal consultants from the merging institution. All other employees of Republic shall continue to be employed by the resulting institution subsequent to acquisition.

Applications (312) 565-5700 / Examinations (312) 353-5777 / Supervision (312) 565-5744

Mailing address: Post Office Box 7809, Chicago, Illinois 60680-7809

PLAINTIFF'S EXHIBIT PX 183

Management Interlocks

Messrs. Ross and Holland as well as Mr. Mark S. Kipnis currently serve on the board of directors of River Valley. All three individuals are proposed directors of River Valley Savings Bank, FSB, Peoria, Illinois. River Valley, FSB will be the resulting institution upon consummation of a separate FSLIC-assisted acquisition of three insolvent associations in central Illinois. Upon FHLBB approval of that transaction, the two separate institutions will become "affiliated" due to common ownership by Messrs. Ross and Holland. Therefore, the Management Interlocks Act will not be applicable in this situation.

Additionally, Mr. Holland serves on the board of United Services Automobile Association of San Antonio, Texas ("USAA"), a diversified savings and loan holding company. The two institutions involved do not maintain offices in the same geographic market and they do not meet the asset size test of 12 C.F.R. § 563f.3(c). Therefore, this interlock is not prohibited under 12 C.F.R. § 563f.3.

CRA Statement

The applicant's defined lending area currently includes that of Republic as well. Therefore, no change in the resulting institution's statement will be necessary.

Anti-Trust Considerations

See the memorandum included in the documentation package regarding our analysis on the anti-competitive effects of the proposed transaction. In summary, the acquisition does not present any significant anti-trust issues.

Convenience and Needs

The merger will return to the relevant geographic market a well capitalized, full service thrift institution. This should increase competition within the market thereby benefitting the community. For more information with respect to competition in the relevant market, please refer to the Anti-Trust analysis.

Managerial Aspects

Messrs. Ross and Holland appear to be of the utmost integrity. They are well known and respected within the seventh district not only for their performance record at River Valley, but also for Mr. Holland's assistance in the successful turnaround of Enterprise Savings Bank (formerly Gilldorn Savings) as well as the Exchange National Bank of Chicago.

Their involvement at these institutions has demonstrated to us their ability to operate profitably in the financial services industry. Their performance and management ability is monitored and examined on an ongoing basis by the seventh district. This evaluation process has proven to us that the resulting institution will possess the management ability to operate soundly and profitably.

Financial Aspects

The regulatory capital position of the resulting institution will be enhanced by this transaction. Enhancements will be provided by the issuance of $2 million in subordinated debt as well as the ability to include $5 million of the FSLIC assistance as Regulatory Capital. As previously stated, regulatory capital will be increased to 6.65% of total assets. Additionally, the resulting institution will have only 1% of assets as goodwill, to be amortized at a constant rate over a 10 year period. The applicant has adequately demonstrated that the resulting institution will generate sufficient income to service both the debt and the amortization of goodwill.

We are satisfied that the resulting institution will operate profitably and free of supervisory concern.

Fairness and Disclosure

Inasmuch as this is a FSLIC negotiated and assisted transaction, the plan contemplated herein has been conducted at arms length. As such, the FHLB is aware of all agreements and understandings resulting therefrom. To our knowledge, there will be no change in the compensation structure of their institution, other than in the normal course of business.

Recommendation

The proposed FSLIC-assisted transaction eliminates a severe supervisory case in the least costly manner available to the FSLIC. We find no reason to object to the proposed merger and, therefore, recommend approval by the Bank Board. We also recommend that the Bank Board condition its approval upon submission of a tax opinion regarding the tax treatment of the proposed merger, to the supervisory agent within 30 days after consummation of the transaction.

SUBORDINATED DEBENTURE

Background

The acquirers have requested FHLBB approval for the issuance of a subordinated debenture. The Subordinated Debt Security will be issued to American National Bank and Trust Company of Chicago. The face amount of this security will be $2.0 million and will be purchased at par (no discount or premium). The term of the debenture will be ten years, and it will bear a floating rate of interest at one half of one percent above prime as

established by American National. However, the term of the security shall be automatically extended for successive one year periods unless American National properly informs the issuer of its objection to such extension.

These terms are acceptable, and in fact, compare favorably to similar recent offerings reviewed by this office.

We note that the acquirers have entered into a put agreement with American National Bank. This agreement has the same effect as a personal guarantee on the note. The agreement allows American National to exercise an option requiring Messrs. Ross and Holland to repurchase the debt upon default or failure by the principals to perform their obligations under the Put Option and Purchase Agreement.

Additionally, Messrs. Ross and Holland have each agreed to personally repurchase 50% of the security, beginning on the fourth anniversary date of the issuance. The schedule contained in the agreement calls for repurchase by the principals at the aggregate rate of $286,000 for years four through nine and $284,000 upon maturity.

Review Under 12 C.F.R. Section 563.8-1

Eligibility [Section 563.8-1(b)]

The resulting association is authorized by applicable law and regulation to issue the debenture, and it will not be inconsistent with any provisions of its charter, constitution, or bylaws. The issuance is a part of and is contingent upon approval of the referenced FSLIC-assisted merger/conversion.

The authorization to issue such security, as well as inclusion as regulatory capital, was made a part of the applicant's bid, which was deemed acceptable. In being deemed acceptable, the applicant's overall policies, condition and operation have been considered. It has been determined that such criteria do not afford a basis for supervisory objection.

The applicant's pro forma financial statements project sufficient income to service the debt to be incurred in this transaction. Since the applicant has submitted acceptable pro forma financial statements, we believe the table illustrating income from operations as requested by Item 11(d) of the application form can be submitted by amendment. The applicant has agreed to withdraw its request for waiver of this item and submit such table expeditiously.

As previously stated, the security will be issued to an institutional investor whose accounts are not insured by the FSLIC, which transfers the risk from the Corporation to parties other than FSLIC insured institutions.

Requirements as to Security Form [Section 563.8-1(d)]

The security form contains all the legends and statements required by Section 563.8-1(d)(1).

There being no sinking fund payments, prepayments, or reserve allocation requirements on this ten year security, the issuance conforms to the minimum term limitations of Section 563.8-1(d)(2). Additionally, the Put Option and Purchase Agreement will not affect the term of the security since the principals will be holding it personally.

Recommendation

As the above review has demonstrated, the issuance conforms with all requirements of 12 C.F.R. Section 563.8-1. The issuance is a part of the proposal for the FSLIC-assisted acquisition of the referenced institution. This proposal has been deemed to be the least costly resolution of this FSLIC case. Additionally, due to the relatively small size of the disappearing institution, the district bank is granted authority to process the acquisition. Furthermore, the debt application does not involve a significant issue of law or policy and will not require an offering circular.

Accordingly, we recommend that the Bank Board defer to the PSA for approval of the subordinated debt application pursuant to 12 C.F.R. § 563.8-1(i)(1).

LBB:gw

Federal
Home Loan Bank
Board
111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

## CERTIFICATION MEMORANDUM

From: Leo B. Blaber, Jr. LBB by CBB
Principal Supervisory Agent

To: The Federal Home Loan Bank Board

Subject: The FSLIC-Assisted Acquisition of:

Republic Savings, a Federal Savings and Loan Association, South Beloit, Illinois,
FHLBB No. 08346

By: River Valley Savings Bank, Rock Falls, Illinois
FHLBB No. 06822

This memorandum shall constitute my certification as Principal Supervisory Agent that the final negotiated transaction pertaining to the FSLIC-assisted acquisition of Republic Savings, a Federal Savings and Loan Association ("Republic") by River Valley Savings Bank ("River Valley") is substantially similar to that proposed in the Recommendation Memorandum, dated January 27, 1988, with the following exceptions:

(1) The cash contribution has been decreased to $16,600,000 plus $7,500 per diem for net operating losses from March 31, 1988 to the Effective Date

(2) The closing date has been changed to June 30, 1988;

(3) FSLIC will provide capital loss coverage on real estate owned and certain specified assets on an 80/20 basis until River Valley has absorbed $150,000 of losses. Thereafter the FSLIC will absorb 100% of the losses;

(4) River Valley has dropped its request for indemnification for undisclosed liabilities of Republic's subsidiaries;

(5) River Valley's request for forbearances has been structured to be consistent with SP-37a;



DEPOSITION EXHIBIT 26 Held 8-18-00
PENGAD-Bayonne, N.J.

WON534 0340 F HOLLAND 95-524C RIVER VALLEY SB DOCKET # 06822 TRANS 910401 REPUBLIC SAVINGS A FSLA DOCKET # 08346 TRANS 880729 WIN BOX # WC00017072 ACC # 483- 92-0117 OLD BOX # 4 OF 19 C2228 FSLIC ASSISTED ACQUISITION FILE; BOARD PACKAGE 880629 CONFIDENTIAL MATERIALS -- SUBJECT TO PROTECTIVE ORDER

*Federal Home Loan Bank Board* 111 East Wacker Drive, Chicago, Illinois 60601-4360

*Seventh District Office*

**CERTIFICATION MEMORANDUM**

From: Leo B. Blaber, J
Principal Superv

To: The Federal Home

Subject: The FSLIC-Assist

Republic Savings
Association, Sou
FHLBB No. 08346

By: River Valley Sav
FHLBB No. 06822

Foley's change re reg. capital in A.A. & forbearance ~~letter~~

This memorandum shall con
Supervisory Agent that the final
the FSLIC-assisted acquisition o
and Loan Association ("Republic"
("River Valley") is substantiall
Recommendation Memorandum, dated
exceptions:

(1) The cash contribution has
$7,500 per diem for net c
to the Effective Date

(2) The closing date has beer

(3) FSLIC will provide capit
and certain specified as
Valley has absorbed $150
will absorb 100% of the

(4) River Valley has dropped its request for indemnification for undisclosed liabilities of Republic's subsidiaries;

(5) River Valley's request for forbearances has been structured to be consistent with SP-37a;

Applications (312) 565-5700 / Examinations (312) 353-5777 / Supervision (312) 565-5744

Mailing address: Post Office Box 7809, Chicago, Illinois 60680-7809

(6) All assistance payments made pursuant to the Assistance Agreement will be made on a non-tax-effected basis. The Assistance Agreement provides that any tax benefits that are in fact realized by River Valley for any taxable year will be reimbursed to the FSLIC; and

(7) $5,000,000 of the cash contribution will be credited toward regulatory capital.

LBB:pb

# EXHIBIT 23

Federal
Home Loan Bank 111 East Wacker Drive, Chicago, Illinois 60601-4360
Board

Seventh District Office

July 6, 1988

"S" MEMORANDUM SUPPLEMENT

To: John Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Blaber, Jr. LBB
Principal Supervisory Agent
Federal Home Loan Bank of Chicago

Subject: FSLIC Assisted Supervisory Conversion/Merger of Republic Savings, A Federal Savings and Loan Association with and into River Valley Savings Bank

FINANCIAL VIABILITY

Business Plan

The pending merger of River Valley Savings Bank and Republic Savings will result in an institution with total assets of $182 million and liabilities of $170.3 million. The liabilities include $23.0 million in FHLB advances and $10.8 million in reverse repurchase agreements. Regulatory capital will total $11.7 million and will consist--as proposed--of the $4.7 million in existing capital of River Valley, $2 million in subordinated debt and $5 million of the FSLIC assistance received as a result of the pending transaction.

The acquisition of Republic Savings will result in $7 million of goodwill to be amortized over 25 years. The combined institution will grow by $25 million immediately and then by 15% per year thereafter.

The financial projections in the business plan submitted are contingent upon the following events:

- Investment of the FSLIC assistance and subordinated debt in short term investments. This will keep the one and three year Gap positions below 5% of assets.
- The growth of $25 million immediately is needed to increase the interest margin, increase profitability, and to cover acquired operating expenses.
- Consolidation of offices to eliminate duplication
- Repricing of deposits to market-especially those acquired from Republic.



PLAINTIFF'S EXHIBIT PX 191

"S" Memorandum Supplement
Page 2

- Liquidation of non-earning assets and reinvestment of these proceeds.

Key financial information from the business plan is as follows:

(Amounts in 000's)

| | At Acquisition | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Cash and Investments | $ 80,547 | $105,547 | $121,139 | $128,203 |
| Loans | 89,855 | 94,764 | 100,040 | 105,712 |
| Goodwill | 6,994 | 6,393 | 5,466 | 4,278 |
| Other Assets | 4,594 | 4,189 | 3,885 | 3,652 |
| Total Assets | $181,990 | $210,893 | $230,530 | $241,845 |
| Deposits | $121,630 | $140,927 | $163,285 | $189,190 |
| Other Liabilities | 48,673 | 57,795 | 54,106 | 38,936 |
| Total Liabilities | $170,303 | $198,723 | $217,391 | $228,126 |
| Net Worth | $ 11,687 | $ 12,170 | $ 13,139 | $ 13,719 |
| Total Liabilities & Net Worth | $181,990 | $210,893 | $230,530 | $241,845 |
| Interest Income | | $ 17,362 | $ 18,653 | $ 20,022 |
| Interest Expense | | (14,085) | (14,699) | (15,576) |
| Interest Margin | | $ 3,277 | $ 3,954 | $ 4,446 |
| Other Income | | 600 | 600 | 600 |
| General & Admin. Expense | | (2,602) | (2,469) | (2,339) |
| Goodwill Amortization | | (280) | (280) | (280) |
| Net Income Before Sub Debt Expense | | $ 995 | $ 1,805 | $ 2,427 |
| Debt Service | | (190) | (190) | (190) |
| Net Income Before Taxes | | $ 805 | $ 1,615 | $ 2,337 |
| Charge in Lieu of Taxes | | (322) | (646) | (895) |
| Net Income | | $ 483 | $ 969 | $ 1,342 |
| Net Income to Total Assets | | .23% | .42% | .55% |

If $5 million of FSLIC assistance is credited to regulatory capital, the goodwill account will be proportionally larger than it would be under generally accepted accounting principles. Accordingly, goodwill expense would also be higher by $200,000 per year. Thus, on a GAAP basis net income would also be $200,000 higher than the above figures.

From July 1987 through May 1988, River Valley has generated $466,000 in net income. Given the ability of River Valley to operate profitably prior to the Republic acquisition, we feel this business plan is realistic and achievable. The merger of these two institutions will produce a larger, stronger financial institution with minimal interest rate risk, and one which is in regulatory capital compliance. We do not believe this merger will give cause for any supervisory concern or represent an extraordinary future risk to the FSLIC.

Financial Condition of River Valley

For the twelve month period ended December 31, 1987, River Valley generated $468,000 in net income. The association generated $806,000 in pretax operating income for the same period. Dividends were limited to $200,000 during calendar year 1987.

The acquiring institution's cumulative three year hedged gap to total assets was a negative 15.35% as of March 31, 1988. Also, the acquiring institution's total interest earning assets exceed its interest bearing liabilities, creating an overall positive dollar gap of $3.31 million. Additionally, the institution has a positive interest rate spread between interest earning assets and interest bearing liabilities of 198 basis points.

The disappearing association's (Republic) three year hedged gap position is severely negative. However, this ratio will improve upon acquisition, since the infusion of FSLIC assistance will significantly reduce this negative position. River Valley has indicated that it will invest these funds in short term investments in order to maintain its favorable current GAP position.

With respect to the proceeds from the subordinated debt, the applicant has expressed his intent to invest the funds in adjustable rate mortgage-backed-securities. The previous income figures demonstrate the applicant's ability to service such debt. Furthermore, the net income figure of $468,000 is after taxes and does not reflect earnings generated from the proceeds of the debt.

The following schedule reflects the net income of the applicant after giving consideration to the items mentioned above. It does not reflect the effects of the merger. Proformas of the resulting institution are discussed in the business plan section.

| | River Valley Alone | | Proforma Post Merger |
|---|---|---|---|
| Net Income | $ 468,000 | (1987) | $ 483,000 |
| Total Taxes | 238,000 | (1987) | (322,000)* |
| Net Income Before Taxes | 706,000 | | 805,000 |
| ** Annual Income from Debt | 170,000 | | 170,000 |
| ***Less: Interest Expense on Debt | 190,000 | | 190,000 |
| Net Income Before Taxes | $ 686,000 | | $ 785,000 |

* Expensing of goodwill to represent recapture of NOL carryforwards

** The applicant anticipates a return of 8.5% on the $2 million subordinated debenture, which will be invested in adjustable rate mortgage-backed-securites.

*** The rate on the debenture will be floating at .5% over prime. Prime is currently at 9%, therefore the rate on the debt is 9.5%.

The applicant will not be required to maintain compensating balances with the purchaser of the debt, nor will the debt be collateralized with any assets of River Valley. The principals have agreed to pledge the stock of River Valley as collateral to American National. Additionally, they have agreed to enter into a put option agreement with American National requiring them to personally repurchase the debt upon default or failure by the principals to meet the obligations under the agreement.

Under the terms of the put option, Messrs. Ross and Holland have each agreed to repurchase 50% of the security, beginning on the fourth anniversary date of the issuance. Please refer to the addendum to the "S" Memorandum, dated June 28, 1988, for further discussion of the subordinated debenture.

Assistance Credited to Regulatory Capital

Although historically the Bank Board has been disinclined to allow one hundred percent of the FSLIC assistance to be credited to capital, on a case by case basis, a portion of the assistance has been credited to regulatory capital at the request of the acquirer. This policy is stated and clarified in the Supervisory Procedures Memorandum 37a, which states, that in connection with a supervisory merger, the resulting institution may request that a portion of the cash contribution be credited to regulatory capital for regulatory accounting purposes. It further states

that this forbearance generally will be granted upon the request of the resulting institution in a supervisory merger. The FHLB of Chicago marketed and negotiated a solution to Republic under these guidelines.

The acquirer is also aware that the Bank Board has in the past credited a portion of the cash contribution to regulatory capital. As a result, their proposal was based on the assumption that this forbearance would be available, since the marketing instructions did not state otherwise. In the acquirer's initial proposal, it was requested that the entire cash contribution be credited to regulatory capital. The FHLB of Chicago's staff was able, through long and arduous negotiation, to reduce this request from $16.6 million to $5 million. The negotiations were entered into in good faith, and we believe that a change in the terms of the agreement at this time could jeopardize our credibility in future negotiations and have a dampening effect upon the disposition of FSLIC cases.

Since a tentative agreement had been reached between the acquirer and the FHLB of Chicago, with respect to the terms of this transaction, the acquirer proceeded to present proforma financial statements to American National Bank and Trust Company of Chicago in support of a subordinated debt offering. In these financial statements, the acquirer stated that the resulting institution was projected to have certain capital characteristics. One of these characteristics was the inclusion of $5 million of FSLIC assistance in the regulatory capital of the association. On the basis of these financial statements, American National agreed to purchase the debt securities from River Valley. The acquirer is understandably reluctant to amend the financial statements submitted in support of the offering. He feels that not only may it cast an unfavorable light on him as a businessman, but also perhaps upon the Bank Board, since it may appear that the Bank Board is vacillating in its posture regarding this matter.

The FHLB of Chicago supervisory staff will, through its records, be continuously aware of the $5 million in "soft" RAP capital in analyzing River Valley's financial position in future applications and/or mergers.

Conclusion

Although current policy issues question the use of the accounting forbearance regarding this matter, we emphasize that this transaction was negotiated prior to these policy concerns being brought to the forefront. Therefore, we recommend granting this forbearance. However, if the Bank Board so desires, the acquirer has expressed a willingness to enter into an agreement which

would disallow inclusion of the assistance in capital for purposes of growth, investment limitations, or for declaring dividends. The principal purpose for which the acquirer wishes to receive this credit to capital is in order to be well positioned vis-a-vis his capital with respect to future FSLIC insurance premium assessments. All other benefits of assistance to capital he is willing to forego.

LBB:HKM:DB:DJ:DT

# EXHIBIT 28

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

December 16, 1988

Applications Digest

To: John M. Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Blaber, Jr.
Principal Supervisory Agent, FHLB of Chicago

Subject: Proposed Supervisory Conversion and
FSLIC Assisted Merger of:
Peoria Savings and Loan Association (FHLBB #4867)
Peoria, Illinois
into
River Valley Savings Bank, FSB (FHLBB #8515)
Peoria, Illinois

STRUCTURE

River Valley Savings Bank, FSB ("River Valley"), having been deemed the acceptable bidder for the FSLIC assisted acquisition of Peoria Savings and Loan Association ("PSLA"), has submitted a merger/conversion application. The merger/conversion will be instituted by the Federal Savings and Loan Insurance Corporation ("FSLIC") under the authority of Sections 5(i) and 5(p) of the Home Owners Loan Act of 1933 ("HOLA") and Section 3301-1 of the Illinois Savings and Loan Act of 1985 as amended. These sections empower the Bank Board to authorize such a merger/conversion if, among other things, the "FSLIC" is providing financial assistance in order to resolve the insolvency of an insured institution such as PSLA.

In connection with this conversion/merger, Messrs. Homer J. Holland and Howard R. Ross, the current shareholders of River Valley propose to invest additional capital of $5 million in cash into the institution. The institution in return will issue to them 5000 shares of non voting perpetual preferred stock with a liquidation value of $1000 per share and cummulative dividends of 10%. This will increase the regulatory capital of the merged institution to $22.89 million or 6.59% of total liabilities if merged as of September 30, 1988.

Upon merger the current home office and branch offices of PSLA will be retained as branch offices of River Valley.



PLAINTIFF'S EXHIBIT PX 271

WON424 0026 F HOLLAND 95-524C PEORIA SLA DOCKET # 04867 TRANS 881230 WIN BOX # WC00017371 ACC # 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 OLD BOX # 1 OF 1 C2398 CORRESPONDENCE; EXHIBITS; CERTIFICATE 881299 CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

ACCOUNTING AND TAXES

The submissions by the applicant indicate that the proposed merger/conversion will be accounted for under the purchase method of accounting and will qualify as a tax free reorganization under the provisions of Federal Income Tax Code. An opinion from the accountants to support these conclusions will be submitted by River Valley as an amendment to the application. After discussing these issues with Ron Pykus of River Valley, we have no supervisory objection to the application on these grounds.

AFFILIATED TRANSACTION/MANAGEMENT INTERLOCKS

Messrs. Ross, Holland and Mark S. Kipnis (a director) also serve on the board of directors of River Valley Savings Bank, Rock Falls, Illinois. Since the two institutions are affiliated due to common ownership by Messrs Ross and Holland, the Management Interlocks Act will not be applicable in this situation.

Additionally, Mr. Holland serves on the board of United Services Automobile Association of San Antonio, Texas (USAA), a diversified savings and loan holding company. The two institutions do not maintain offices in the same geographic market and do not meet the asset size test of 12 CFR, Section 563f.3(c). Therefore, this interlock is not prohibited under that Regulation.

COMMUNITY REINVESTMENT ACT (CRA)

The defined lending area of the two institutions involved in the transaction is the same. Therefore, any change in the resulting institution's CRA statement is not neccessary. PSLA had received a CRA rating of '3' in its last examination. River Valley has yet to be examined since it was organized on July 29, 1988.

ANTI-TRUST AND ANTI-COMPETITIVE CONSIDERATIONS

Refer to the memorandum included in the documentation package regarding our analysis on the anti-competitive effects of the proposed transaction. In summary, the proposed transaction does not present any significant anti-trust and/or anti-competitive issues.

FUTURE PROSPECTS

The subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District by combining it with a well capitalized and profitable institution. The services available to both the depositors and the borrowers of PLSA will be enhanced.

River Valley possesses, both the financial and managerial expertise which allows it to provide the products and services at a cost which the PSLA as an independent insured institution could not provide. In return River Valley gets an existing customer base in an area that is still recovering from the economic depression of early 1980's with good potential for future growth. It is anticipated that this will have a positive effect on the local market and the profitability of the institution. We have no supervisory objection to the future prospects of the surviving institution.

MANAGERIAL RESOURCES

The current officers and directors of River Valley will remain the officers and directors of the surviving institution. River Valley will not retain an advisory board or special or legal consultants from the merging institution (PSLA). All the employees of PSLA shall continue to be employed by the resulting institution. The current president, Mr. Roger Kilpatrick and executive vice president, Mr. John Riter of PSLA are expected be retained as executive vice presidents in the surviving institution.

Messrs. Ross and Holland, the chairman and president respectively, are also the main shareholders of River Valley and a take very active part in the day-to-day operations of the institution. That structure will continue after the merger. Both these individuals appear to be of utmost integrity. They are well known and respected within the seventh district not only for their performance at River Valley FSB, Peoria and River Valley Savings Bank, Rock Falls, Illinois, but also for Mr. Holland's assistance in the successful turnaround of Enterprise Savings Bank, Chicago as well as the Exchange National Bank, Chicago, a commercial bank. Involvement of Messrs. Ross and Holland at these institutions has demonstrated their ability to operate profitably in the financial services market.

Asset/Liability and interest rate risk is/will be managed by Holland Partners, Inc., a consulting firm established by Mr. Holland, in 1983 and now a second tier (80% owned) subsidiary of River Valley Savings Bank, Rock Falls, Illinois. Steven Bangert, a former executive vice president of a large Denver thrift, is the director and executive vice president of this firm and is well experienced in asset/liability and interest rate risk management.

The foregoing analysis indicates that River Valley has in place, a good management team with a proven track record. We take no supervisory objection to this aspect.



WON424 0028 HOLLAND 95-524C PEORIA SLA DOCKET # 04867 TRANS 881230 WIN BOX # WC00017371 ACC # 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 OLD BOX # 1 OF 1 C2398 CORRESPONDENCE; EXHIBITS; CERTIFICATE 881299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

FINANCIAL ASPECTS

The investors propose to infuse $5 million in new capital. This will enhance the regulatory capital of the surviving institution to $22.89 million or 6.59% of total liabilities as of September 30, 1988. The assets and liabilities of the merging institution will be marked to market which will either eliminate the non performing assets or book them at their most recent market value. The goodwill so created will be amortized over a period of 25 years. The preferred stock issue of $5 million will involve an annual dividend expense of $500,000.

The surviving institution proposes to compensate this expense through a lower cost of operations and better management of assets and liabilities, and interest rate risk. The applicant has projected that the active management of the asset/liability mix and interest rate risk will result in a net interest rate margin of in the range of 2% and net overhead expense at 1% or less of deposits. The business plan submitted with the application indicates that the surviving institution will be able to inrease the tangible net worth from 1.67% to 1.97% of total liabilities during the first four quarters of operations. The net result of operations will be a net income of $502,961, after dividends and taxes, during the first four quarter period of operations following the proposed merger.

This information, along with other information contained in the recommendations memorandum, indicates that the merged institution will be financially sound. Therefore, we have no supervisory objection on the financial aspects of the proposal.

RECOMMENDATIONS

This conversion/merger will eliminate a severe supervisory case in the least costly manner available to the FSLIC. River Valley will provide safe and sound financial and managerial resources and will remain a viable competitive entity after this merger in the Seventh District. We find no reason to object to the proposed transaction and recommend approval by the Bank Board. Any such approval, however, should be conditioned upon submission of an opinion from independent accountants on the accounting and tax aspects of the conversion/merger.

LBB:BG

cc: Messrs: Brafman, Biedron, Valek



WON424 0029 HOLLAND 95-524C PEORIA SLA DOCKET # 04867 TRANS 881230 WIN BOX # WC00017371 ACC # 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 OLD BOX # 1 OF 1 C2398 CORRESPONDENCE; EXHIBITS; CERTIFICATE 881299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# EXCERPTS OF HOWARD ROSS DEPOSITION FOR USE AT TRIAL

p. 7, lines 6-10, 17-20
p. 11, lines 22-25
p. 12, lines 1-2, 6-9, 15-20
p. 13, lines 14-25
p. 14, lines 1-25
p. 16, lines 1-4, 19-25
p. 17, lines 1-4, 9-12, 25
p. 18, lines 1-5, 23-25
p. 19, lines 1-11
p. 26, lines 10-25
p. 27, lines 1-2
p. 28, lines 12-20
p. 34, lines 3-4, 9-19
p. 38, lines 10-16, 25
p. 39, lines 1-8
p. 40, lines 6-14, 18-22
p. 41, lines 9-20
p. 43, lines 5-8, 11-12, 17-19
p. 44, lines 1-5
p. 77, lines 5-16
p. 82, lines 14-18
p. 104, lines 13-19
p. 105, lines 13-25
p. 106, lines 1-5
p. 118, lines 19-22
p. 119, lines 1-11, 20-25
p. 120, line 1
p. 128, lines 9-25
p. 129, lines 1-6
p. 155, lines 24-25
p. 156, lines 1-24
p. 157, lines 5-12
p. 159, lines 1-10
p. 160, lines 3-8
p. 176, lines 6-10
p. 193, lines 15-25
p. 194, lines 1-20
p. 210, lines 5-11, 16-17
p. 211, lines 7-20
p. 213, lines 10-19
p. 214, lines 2-8, 12-14
p. 215, lines 15-21

**EXCERPTS OF HOWARD ROSS DEPOSITION FOR USE AT TRIAL**

p. 216, lines 9-21
p. 217, lines 5-12, 20-25
p. 218, lines 1-7, 11-25
p. 219, lines 1-11
p. 220, lines 9-14
p. 221, lines 11-22, 25
p. 222, lines 1-5
p. 226, lines 14-21
p. 227, lines 7-17, 21-25
p. 228, lines 1-5
p. 229, lines 2-4, 22-25
p. 230, lines 1-4, 8-16
p. 233, lines 6-25
p. 234, lines 1-21
p. 235, lines 2-20
p. 241, lines 3-7
p. 242, lines 5-7, 11-15, 23-25
p. 243, lines 1-7, 11-25
p. 244, lines 1-13
p. 247, lines 3-25
p. 248, lines 1-3
p. 258, lines 4-25
p. 259, line 1
p. 260, lines 17-25
p. 261, lines 1-14
p. 264, lines 19-25
p. 265, lines 1-7
p. 266, lines 2-25
p. 267, lines 1-25
p. 268, lines 1-9

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and HOWARD R. ROSS,

Plaintiffs,

Case No. 95-524

- versus -

THE UNITED STATES,

Defendant.

August 3, 2000
Washington, D.C.

VIDEOTAPED DEPOSITION OF:

HOWARD R. ROSS,

a Plaintiff in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C. 20004-1206, commencing at 9:05 a.m. before Maria Pugliese, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

DAVID B. BERGMAN, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474
On behalf of the Plaintiffs

PATRICK T. MURPHY, ESQUIRE
PATRICIA A. SMITH, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
On behalf of the Defendant

Also Present: LISA HARDESTY, Consultant to Government

* * * *

C O N T E N T S


| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| Howard R. Ross | Mr. Murphy | 7 |

EXHIBITS

| No.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 1 | S Memorandum Supplement dated July 12, 1988 | 51 |
| 2 | Regulatory capital maintenance and dividend limitation agreement among Howard R. Ross and Homer J. Holland, River Valley Savings Bank, FSB, dated July 29, 1998 | 56 |
| 3 | Assistance agreement by and among Howard R. Ross and Homer J. Holland, River Valley Savings Bank and Federal Savings & Loan Insurance Corporation, dated July 29, 1988 | 58 |
| 4 | Letter to Mr. Holland from Federal Home Loan Bank Board dated July 28, 1988 | 67 |
| 5 | Meeting of board of directors of River Valley Savings Bank, dated August 18, 1988 | 68 |
| 6 | Document on Holland Partners Letterhead dated 21, 1988 to Susan Mooney from Ronald Pikas | 74 |
| 7 | Memorandum dated July 6, 1988 to John Buckley from Leo Blaber on Federal Home Loan Bank Board letterhead | 76 |
| 8 | Assistance agreement between the Federal Savings & Loan Insurance Corporation and River Valley Savings Bank, Rock Falls. | 87 |
| 9 | Letter on Federal Home Loan Bank Board letterhead to Mr. Holland dated May 18, 1989 | 90 |

Exhibits continued

(Continued)
E X H I B I T S

| No.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 10 | Assistance agreement between Federal Savings & Loan Insurance Corporation and River Valley Savings Bank, FSB, dated December 31, 1998 | 93 |
| 11 | Letter on American National Bank Letterhead to Homer J. Holland and Howard R. Ross, dated December 21, 1988 | 96 |
| 12 | Letter on Federal Home Loan Bank Board letterhead to Thomas DeFord dated January 18, 1988, referencing December 30, 1988 assistance agreement relating to Peoria | 100 |
| 13 | Letter on Holland Partners, Inc. letterhead to Susan Mooney from Ronald Pikas, dated July 31, 1989 | 108 |
| 14 | River Valley Savings Bank, FSB, consolidated financial statements, supplementary data, dated December 31, 1989 and 1988 with independent auditor's report | 121 |
| 15 | Letter on Holland Partners letterhead, addressed to Eugene Rudnik at Peerless Federal | 131 |
| 16 | Cover letter on letterhead of United Federal Savings Bank addressed to Stuart Brafman at OTS signed by Richard Johnson of United Federal | 135 |
| 17 | River Valley Savings Bank acquisition and capital plan, dated September 1989 | 139 |

(exhibits continued)

(Continued)
E X H I B I T S

| No.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 18 | River Valley Savings Bank, FSB plan, dated December 1989 | 142 |
| 19 | Minutes of meeting, board of directors, River Valley Savings Bank/executive committee meeting River Valley Savings Bank, FSB, dated February 21, 1990 | 148 |
| 20 | Minutes of meeting, board of directors, River Valley Savings Bank/executive committee of River Valley Savings Bank, FSB, dated June 20, 1990 | 152 |
| 21 | Memorandum on OTS letterhead to Stuart Brafman, dated March 25, 1991 | 161 |
| 22 | Minutes of meeting of River Valley Savings Bank, FSB, executive committee dated June 12, 1991 | 174 |
| 23 | Report of examination, Office of Thrift Supervision, commencing in October of '91/concluded December 24, 1991 | 176 |
| 24 | Cover letter on OTS letterhead/ agreement Dated March 27, 1991 | 180 |
| 25 | Letter on American National Bank letterhead dated August 12, 1991, | 189 |
| 26 | River Valley Savings Bank, FSB executive committee minutes, dated Wednesday April 10, 1991 | 195 |
| 27 | Settlement agreement, River Valley Savings Bank, FSB, dated August 14, 1991 | 200 |

Exhibits retained by counsel

MATERIAL REDACTED

Whereupon,

HOWARD R. ROSS,

a Plaintiff, called for examination by counsel for the Defendant, having first been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. MURPHY:

Q Good morning, Mr. Ross.

A Good morning, Mr. Murphy.

MATERIAL REDACTED

Q So I guess starting with college, just where you went to college and what you majored in --

A I went to college -- I'm sorry.

Illinois Institute of Technology, mechanical engineering. I graduated in 1950.

MATERIAL REDACTED

Q And what did you do after graduating in 1950?

A I joined the firm of Economy Mechanical Industries in Chicago, Illinois.

Q And what was your position there?

A It started out as an engineer and ended up as chairman of the board.

Q And how long were you at Economy?

A 1950 through '62, I think -- I'm sorry. '72. Pardon me. It's been a long time, fellows.

MATERIAL REDACTED

Q And approximately how large of a company was Economy?
A Oh, they were probably the largest mechanical contracting company in the country.
By the time I left, they were booking between forty to fifty million dollars, which in those days was a big deal of money.
Q And do you recall -- strike that.
When you -- when you left in 1972, where did you go?
A I was tired of the engineering business, and I went to a company called House of Vision.

Q And what type of business was House of Vision?
A It was a retail -- optical stores, about 150 some-odd retail optical stores from New York to San Francisco. And the major portion of the business was the ophthalmic instrument business, instruments for ophthalmologists, optometrists, et cetera.
Q And how did you end up at House of Vision?
A In a search through -- a friend of mine came to me and offered me a bag of gold to join the company.
Q And what position did you hold at House of Vision?
A Chairman of the board and CEO.
Q And were you still in -- were you in Chicago at that time or --
A I was in Chicago, yes, sir.
Q And how long were you at House of Vision?
A Until, I believe, 1979. Perhaps it was 1980.
Q And where did you go after that?
A After that, I just did my own investing.

And what sorts of investments were you engaging in?

A Basically real estate investments and development.

MATERIAL REDACTED

Q How did you first become aware of the investment opportunity in the River Valley/Rock Falls institution?

A Let me backtrack. In 1979, I was the principal investor in the Exchange National Bank of Chicago, which we had purchased from a guy named Samuels out of New York.

And it was there I met Homer Holland, who was president of the bank at the time. Actually we induced him to become president of the bank at the time.

MATERIAL REDACTED

Q And was your investment in Exchange National Bank your first investment in the banking industry?

A Yes.

Q Was there anything that you considered

particularly attractive about investing in the banking industry?

A Yeah. It dawned on me that you could literally rent money and leverage it and invest it; and that appealed to me.

MATERIAL REDACTED

Q And how did you become aware of the availability of the Rock Falls institution?

A Homer Holland had left the Exchange Bank

to do other things, other investments, whatever. He came to me one day and said he had a possibility -- there was a possibility of picking up this little bank in Rock Falls, would I be interested. And I said yes, I would be interested.

Q And what was it about that investment that interested you?

A You could actually buy it at par. It was a pretty little bank that -- I don't think it ever lost any money. It never made any money. It looked like an opportunity.

MATERIAL REDACTED

MATERIAL REDACTED

Okay. At the time you increased your investment in the Rock Falls institution, were you -- did you have any anticipated returns coming out of Rock Falls?

A Yes.

Q Okay. And do you recall what those were?

A The normal way to return on investments -- anticipated way to return, between twenty and thirty percent.

Q And is that for all of your investments?

A Yes.

Q Okay. And was Rock Falls, in your view, at the high or low end of the range or was it just somewhere in the range?

A What I recall is we had a two-million

dollar investment that ended up four or five million dollars a few years later.

MATERIAL REDACTED

MATERIAL REDACTED

Q And were you on any committees, or did you have any function other than being on the board?

A I pretty much ran the loan committee.

Q And what was the function of the loan committee?

A To oversee loans, of course, make sure they were made properly and returns -- anticipated returns were proper, and they were safe and sound.

MATERIAL REDACTED

Q At the time you invested in the Rock Falls institution --

Q Were you looking at any other institutions at that time?
A No.
Q Okay. Did you have any discussions with Mr. Holland about possibly acquiring additional institutions in the future?
A Yes.
Q Okay. And do you recall generally what the nature of those discussions were?
A We were going to expand the institutions when we had the capital to do so.

MATERIAL REDACTED

Q Was the nature of Mr. Holland's involvement essentially the same as yours, or was he more or less involved in seeing -- or in overseeing the actual operations of the institution?

A He, at the time, was in charge of the investments portfolio.

Q Do you recall when Mr. Bangert was

brought on board?

A Mr. Bangert was brought on board, I believe, approximately 1987 or 1988.

Q Okay. And what was the nature of his role at Rock Falls?

A He was the asset/liability manager and took over the investment portfolio from Mr. Holland.

MATERIAL REDACTED

MATERIAL REDACTED

Was there any sort of optimal capital position from an operational standpoint with respect to Rock Falls? Were you looking to maintain any particular levels of capital?

A We were looking to maintain regulatory capital.

Q Were you looking to maintain anything -- any sort of cushion above the regulatory minimum?

A We normally did.

Q Okay. Why did the institution normally maintain some form of cushion above the regulatory minimum?

A For liquidity and for the possibility of picking up or negotiating with other institutions.

MATERIAL REDACTED

Q Do you recall when approximately you began to look for additional institutions to acquire?

A To the best of my recollection, it's been a long time. I'm guessing maybe two years after. Possibly less than that. Probably a year after we acquired Rock Falls -- no, it was later than that. I'm sorry.

The first two years we were trying to put Rock Falls -- sift out the old and bring in the new. It was later than that. I don't recall the time.

MATERIAL REDACTED

Q When -- I guess just as a general matter, what was your role in looking for additional institutions to acquire, after the -- after the initial acquisition of Rock Falls?

A Homer and I looked for other institutions, period.

Okay. Were you looking for any particular types of institutions?

A Savings and loans and/or banks.

Q Prior to the acquisition of Galva Home and Mutual, do you have any recollection as to how -- approximately how many institutions you looked at or considered acquiring?

A Maybe ten.

MATERIAL REDACTED

MATERIAL REDACTED

Q Mr. Ross, in connection with the acquisition of Galva Mutual and Home, what is your understanding of what, if any, obligations River Valley had to the government after consummation of the merger?

A To meet our goals; to grow and expand the bank into the proper, safe and sound business practices that we were used to doing.

Q When was -- did you consider it an obligation to grow the bank?

A You have to grow any business to be successful.

MATERIAL REDACTED

Q And I may have asked you this earlier, and if I did, I apologize.

But who was responsible for monitoring the growth rate of the institution?

A It would be Bangert and Holland.

MATERIAL REDACTED

Q My question is: Do you recall why the Republic acquisition or Republic institution was merged into the Rock Falls institution?

A I believe it had to do with two things; number one, capital, and, two, the area is very close to Rock Falls. It's easier supervised that way.

MATERIAL REDACTED

Q Did the merger of Republic into the Rock Falls institution prompt any discussion relating to ultimately merging the combined Rock Falls Republic institution with the institutions centered in Peoria?

A To the best of my recollection, the only time we considered that was after the breach, and capital was needed in River Valley and was covered by Rock Falls.

Q When you say capital was needed in River Valley, you mean River Valley Savings Bank, FSB, centered in Peoria?

A Yeah.

Q Okay.

A Just remember they took away those things, regulatory capital, they took away good will. They took away sub-debt. They took away et cetera, et cetera. They left us in a bind.

MATERIAL REDACTED

MATERIAL REDACTED

Q How did Mr. Bangert come to be employed with the River Valley entities?

A How was he employed?

Q Who -- how did you become aware of him?

A Through the industry.

There was talk in the industry of a gentleman who was an expert in asset and liability management, very good at it, at Empire Savings in Denver.

Homer went to Empire Savings to see the gentleman, and found out it wasn't the gentleman he was talking about, it was the gentleman who worked for him, which was Steve Bangert. And we interviewed -- Steve came to Chicago, we interviewed him and we hired them.

MATERIAL REDACTED

Q I believe you characterized him as an expert in the asset/liability management function.

How would you compare his abilities to other people you have dealt with in the asset/liability function, as the very best or --

A He was the very best, far exceeded my

expectations.

MATERIAL REDACTED

MATERIAL REDACTED

Q Did -- and did the board's view of the institution's profitability change at all over time from the acquisition of the various entities prior to the passage of FIRREA?

A Yeah. At first they were apprehensive, and then they were very happy.

Q And why were they apprehensive at first?

A Well, you take on troubled institutions, there is always a risk of how you feel -- how you do with them.

Q And at what point did the board become happy with the acquisitions?

A Well, we showed the profitability with the banks. I told the board from day one, I expect a hundred to a hundred fifty basis points return on assets, period. And I won't accept anything less than that.

That's what we strived for and shot for, and sometimes we attained it and sometimes we didn't.

Q And why was -- how did you arrive at the hundred to hundred fifty basis point number?

A It was normal in the industry.

MATERIAL REDACTED

MATERIAL REDACTED

Q And earlier when you were mentioning --
back early this morning when you were mentioning

different institutions that you looked at possibly acquiring, I believe you mentioned, some institutions in Grand Junction, Colorado.

A Yes.

Q Do you recall why that acquisition didn't happen?

A I do not. It may have been the breach; it may not have. I don't recall. I don't recall the timing of it. It's just been too long.

Q Do you recall how that or those institutions came to the attention of River Valley?

A It may have been through the regulators. I don't recall.

Q For institutions that were outside of Illinois, would there have been a means for River Valley to identify out-of-state institutions, aside from having the regulators bringing them to your attention?

A Yes.

Q Okay. And how -- how would that have been done?

A You go through a list of banks and pick out those that you think might fit your pro forma and go from there.

MATERIAL REDACTED

MATERIAL REDACTED

Do you recall any institutions, other than the ones that we have already discussed, that River Valley looked at as possible targets of acquisition?

A As a matter of course, I went through lists and lists and lists. That's not a task of lists, but I did it. And I just don't recall which names pop up.

Q And how did the loss of regulatory capital impact, first, the operations of the institutions?

A It couldn't support the assets.

Q And what did the institution do as a result to compensate for the fact that it couldn't support the asset?

A They reduced the asset base. You would have to check with Bangert. Specifically I don't know.

MATERIAL REDACTED

Q Do you recall if the institution sold any branches or specific assets in order to shrink to come into capital compliance?

A I think we sold two branches. One was a branch in South Beloit, and I don't recall the other one because we needed the capital.

MATERIAL REDACTED

MATERIAL REDACTED

Q And who at River Valley would have been responsible for monitoring performances of branches relative to each other, if anyone?

A Well, Homer Holland was in charge of the company.

MATERIAL REDACTED

Q So would -- did River Valley experience harm from the loss of regulatory capital prior to the imposition of the supervisory agreement by the OTS?

A Yes.

Q Okay. And how -- how was that harm you?

A It immediately precludes us from growing. It precluded us from purchasing other institutions, expanding our base, opening branches, et cetera, et cetera.

And reserve capital, if you recall, I

expressed earlier that I demand one hundred to one hundred fifty basis points on assets. Assets are based on your capital, QED.

Q Do you make any distinction between tangible and intangible capital?

A No, I don't. One is earning and one is paper.

Q And the regulatory capital that the institution lost, was that earning or paper?

A Absolutely earning. It was paper that allowed you to earn. It was regulatory capital.

Q The good will component of that regulatory capital, did you consider that paper capital that allowed you to earn?

A We -- I and the regulators both considered that capital.

Q And how would you value that good will?

A It levers the good will that whatever the rate was at the time three, four, five percent, and you can use it to purchase assets.

MATERIAL REDACTED

UNITED STATES COURT OF FEDERAL CLAIMS

---

HOMER J. HOLLAND and HOWARD R. ROSS,

Plaintiffs,

Case No. 95-524

- versus -

COPY

THE UNITED STATES,

Defendant.

---

August 4, 2000

Washington, D.C.

CONTINUED VIDEOTAPED DEPOSITION OF:

HOWARD R. ROSS,

a Plaintiff in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C. 20004-1206, before Jonell Easton, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

DAVID B. BERGMAN, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474
On behalf of the Plaintiffs

PATRICK T. MURPHY, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
On behalf of the Defendant

Also Present: LISA HARDESTY, Consultant to Government

C O N T E N T S

| WITNESS: | EXAMINATION BY: | PAGE: |
| --- | --- | --- |
| Howard R. Ross | Mr. Murphy | 209 |

E X H I B I T S

| Exhibit No. | Description | Page |
| --- | --- | --- |
| 28 | Memo from Bruce Mitchell dated 11/15/99 | 216 |
| 29 | Minutes of Meeting of the Board of Directors of River Valley Savings Bank dated 1/22/92 | 217 |
| 30 | Minutes of the Meeting of the Board of Dirctors of River Valley Savings Bank dated 5/19/93 | 237 |
| 31 | Minutes of Meeting of the River Valley Savings Bank Executive Committee dated 1/15/92 | 241 |

MATERIAL REDACTED

Q. Mr. Ross, Exhibit 28 is a file memo dated November 15, 1989.

It bears an identification number in the lower right hand corner, first page, WOL 817 0887, and it runs through 0890.

I believe it is an internal regulatory document, so I doubt you would have ever seen it.

My questions will focus on the first and second pages.

MATERIAL REDACTED

Q. The paragraph goes, continues on the next page, it was Howard Ross's job to acquire capital, referring to Mr. Holland, it was his job to build up the assets and Steve Bangert's job to manage the interest rate, risk exposure within the assets and liabilities.

Is that, does that statement of the respective jobs of Mr. Holland, Mr. Bangert and yourself, is that accurate?

A. It is a proper job description.

Q. For the job description for yourself, it says it was Howard Ross's job to acquire capital.

What did that entail?

A. I was the contact with American National Bank, which was our primary source for capital.

MATERIAL REDACTED

Q. Following the enactment of FIRREA, did the manner in which River Valley prepared its business plans change at all?

A. I am sure it did, yes.

Q. How would that have been?

A. Affected by the decrease in capital, assets liabilities had to be managed based on the decreased capital.

In addition, we could no longer look for additional S&Ls or banks to acquire.

MATERIAL REDACTED

Q. Who would have been responsible for the assumptions built into the business plans post FIRREA? Would that have been still been Mr. Bangert?

A. Bangert, plus Mr. Holland.

Q. Do you recall whether River Valley's performance in the post FIRREA environment met its projected performance in its business plans?

A. I would have to look at the numbers.

Again, we were always looking for 100 to 150 basis points on assets.

MATERIAL REDACTED

Q. Do you recall the institution in San Antonio, the San Antonio Federal Savings Bank?

A. Yes.

Q. How did you first become aware of that institution?

A. Gentlemen named John Rose brought the information to us.

MATERIAL REDACTED

Q. Do you have any understanding as why San Antonio was available for acquisition?

A. I do.

Q. What is your understanding?

A. San Antonio was under water, Savings & Loan, it could have been a bank. I am not sure.

They had a savings and loan that was part of a bank that was a subsidiary. The bank and/or parent S&L, I believe was dissolved or taken over by whatever agency. And this unit was put out to bid.

Q. When you say it was put out to bid, who put it out to bid?

A. Probably RTC, I believe, I don't know.

MATERIAL REDACTED

Q. Mr. Ross, Exhibit 29 is a document titled minutes of the meeting of the board of director of River Valley Savings Bank, FSB dated January 22, 1992.

There is an identification number, lower right hand corner of the first page of PHO 0542817, and it runs through 2813.

My questions will focus on page 5 of the minutes.

Q. Look at page 5. There is the last paragraph, at the bottom of page begins Homer Holland, do you see that?

A. Yes.

Q. Reads, Homer Holland next reviewed potential acquisition of San Antonio Federal Savings Bank. American National Bank has agreed to finance to acquisition, but

only if the acquisition is totally separate from FSB.
Would you have been responsible for discussing financing with American National Bank?
A. Together with others.
Q. Who would the others have been?
A. The others would have been, I believe, Homer Holland and/or Bangert and John Rose.

MATERIAL REDACTED

Q. That sentence notes that American National would only agreed to finance the acquisition if it was done by an entity totally separate from FSB.
Do you have an understanding as to why that was?
A. FSB did not have enough capital, to the best of my recollection, to satisfy American National Security.
They required a separate company with separate guarantees from each of the individuals.
Q. Do you recall discussing with American National their concerns that FSB did not have enough capital?
A. I don't recall the discussion, but one of the problems we had--a separate company could not use the NOLs.
FSB could use the NOLs, and it was a great concern to us because we thought this would be a very

profitable institution bringing it to FSB would save a great deal in taxes.

It was not the case with a separate company.

Q. NOLs you are referring to are the NOLs of San Antonio?

A. NOLs of FSB.

Q. How are the NOLs of FSB related to the accusation of San Antonio?

A. San Antonio was merged into FSB, and pooling interest at that point because of the NOL offsetting profitability.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could River Valley holdings have borrowed the funds sufficient to acquire San Antonio?

A. Reading the material you have given me, sir, obviously not.

Q. So a separate holding company was established?

A. A separate corporation was established.

MATERIAL REDACTED

Q. Next sentence begins, Although the transaction will now be independent of FSB, a substantial discussion ensued relative to the allocation of management resources.

Do you recall discussing the allocation of management resources in connection with this?

A. I do.

Q. What do you recall was the substance of those discussions?

A. FSB would charge Western Capital a management fee for managing assets and liability of Federal Savings Bank at San Antonio.

Q. Who at FSB would actually be managing the San

Antonio institution?

A. Richard Dalton.

Q. Did that ever change over time or was he there the whole time?

A. No, it did not change.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did the passage of FIRREA have any, and the treatment of regulatory capital subsequent to FIRREA, did that have any impact on the manner in which the San Antonio acquisition was structured?

A. Of course.

Q. How was that?

A. Without the regulatory capital, we did not have necessary capital to make other acquisitions.

MATERIAL REDACTED

Q. Subsequent to the acquisition of San Antonio, what was your involvement, if any, in the operations of the institution?

A. Of San Antonio?

Q. Yes, correct.

A. I was chairman of the board for about a year at which time I turned it over Steve Bangert, who became chairman of the board.

Q. After you ceased being chairman of the board were you still on the board?

A. Yes.

Q. Did there come a time when institution came to be liquidated or sold?

A. Which institution?

Q. San Antonio.

A. Yes.

Q. When was that?

A. I don't recall the date. I think it was somewhere in 1995, perhaps '96.

Q. How did that come about?

A. Board of directors decided to sell the company.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you recall whether the institution was returning the 100 to 150 basis point that you desired?

A. Yes.

Q. Do you recall if the disposition was structured as a liquidation and sale?

A. Best of my recollection, they bought, whoever it might be, bought those deposits. They probably deposit

the purchase.

I don't recall if it was any of the loans, but we had a package of loans that we did have to liquidate.

And the bank went under liquidation mode.

MATERIAL REDACTED

Q. Over what period of time was the package of loans liquidated?

A. Still continuing.

Q. Has it been substantially liquidated?

A. It is substantially. There is some left.

Q. How are the proceeds of the disposition of those loans dealt with in this liquidation mode?

A. Pro rata with the amount of stock that each participant had.

MATERIAL REDACTED

Q. Mr. Ross, before we move on to the next topic, I want to make sure I am clear on a couple of things with respect to the San Antonio acquisition.

A. Please go ahead.

Q. My understanding is American National was unwilling to finance the acquisition through River Valley?

A. Yes.

Q. So you financed through American National, but through another vehicle, Western Capital Holding?

A. Yes.

Q. Did you approach any other potential lenders for purposes of determining whether they would finance the acquisition through River Valley?

A. I did not.

Q. Why not?

A. Why not, I didn't think I would get anyone else involved that would do this based on our balance sheet at the time.

Q. Why is that?

A. If I recall, best of my knowledge, the balance sheet did not support the $10 million loan.

If it had, we could have acquired Western Capital through the banks using NOLs. Onward and upward.

Q. How, if the balance sheet of River Valley would not support a $10 million loan, how is that Western Capital could support the $10 million loan?

A. I could have supported the $10 million loan.

Q. Why didn't you then support the $10 million loan for purposes of financing through River Valley?

A. Because I didn't have $10 million cash at any time. The money is invested elsewhere.

However, that is part of my financial statement banks look to make loans.

Q. How was it different for your purposes to have it through Western Capital as opposed to through River Valley?

A. I wanted it through River Valley so I could utilize the NOLs, grow the bank as we had intended to do, buy other institutions for growth and geographically, assets wise profitability.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Had San Antonio been acquired through River Valley, would River Valley still have been able to acquire further institutions?

A. Depending on the balance sheet, yes.

Q. What factors on the balance sheet play into that calculus?

A. Capital, Western Capital, I should say San Antonio, I'm sorry. They are synonymous in my head.

If I say Western Capital I mean San Antonio. Make that clear.

San Antonio indeed distributed like $30 million over time. The $30 million using the NOLs, if you leverage that on the 20 to one ratio, five percent and go on and on from there, we would have before very, very, very profitable and be able to acquire other institutions, yes.

Q. Would there have been any downside to structuring it through River Valley?

A. To my knowledge, no.

MATERIAL REDACTED

Q. Mr. Ross, Exhibit 31 is minutes of a meeting of River Valley Savings Bank FSB executive committee dated January 25, 1992, identification number of HO 20030098. And it is a two-page document, making the second page 0099.

MATERIAL REDACTED

Q. At this point, early 1992, had there been any discussion about potentially selling River Valley?
A. I don't recollect any.

Q. When was the decision made to sell River Valley?
A. Asking for a date?
Q. Generally.
A. Best of my recollection, four months prior to the actual sale.

Q. Why did you decide ultimately to sell?
A. Couldn't grow the bank in the manner which we wanted to grow the bank, we were tired of the regulators.

If you recall, they went from a three percent capital base requirement to four, then five, who knows whether they would go to six, seven, eight, nine.

We just didn't know.

And you can't manage your bank if you don't know.

It was time to sell.

MATERIAL REDACTED

Q. Were there concerns aside from regulatory issues that impacted the decision to sell?

A. The regulatory issues were such that we could not grow the bank, so it is difficult to answer that question in the manner in you have presented it.

Q. Is it your opinion that the regulatory issues impacted River Valley's ability to compete in the market?

A. That relates to the growth issue again, and had we been able to grow and compete in other markets, yes.

Q. Do you have an opinion as to what sort of growth that would have been?

Would it have been in other geographical markets.

Or would it have been growth in different types of product lines?

Or some combination?

Or something else altogether?

A. The product line was determined by and limited by regulatory issues.

Had we been able to consummate an acquisition of a bank and/or S&L, they are both the same to me, depending on how good the deal was, I am not sure the location was pertinent.

Q. Why wouldn't the location be necessarily pertinent?

A. We are an Illinois bank, could have had a deal in Texas, sent our people gone down there and ran it.

We can run banks anywhere, any location.

MATERIAL REDACTED

Q. Did River Valley conduct any sort of valuation analysis of itself in connection with the sale to First Banks?

A. Yes, we did that internally.

Q. Do you recall what it was internally valued at?

A. Exact number escapes me, but it was a multiple of earnings.

Q. Do you recall whether that was more or less or the same as the amount ultimately paid by First Banks?

A. We, I don't recall. I think we wanted more than we got.

You always want more than you get.

Had we been able to grow the bank, grow the earnings, that number would have been much higher.

Q. Do you know, do you have any way of being to determine the extent to which you could have grown the bank and the earnings?

A. Yes, I had $25 million worth of regulatory capital to be used to grow the bank, which was the original game plan, which was growth profitability, point and a half on assets.

It gets exponential. You take 25 million, five percent capital, regulatory capital requirement, it gets

up there.

If you want me to run numbers, I will be glad to do that.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I know we have discussed generally about impact on the institutions ability to leverage and grow generally.

Are you aware of any specific opportunity that Rock Falls institution or FSB were unable to capitalize on because of a lack of additional regulatory capital?

A. We have discussed a number of institutions that we looked at and had abandoned because we couldn't consummate any deals due to lack of capital.

Q. Which ones were specifically due to lack of capital?

A. San Antonio would have been one, United of Galesberg I believe would have been consummated, there were four in central Illinois we could have bought the deposits and branches, and specifically perhaps that competitor, Standard of Security, looked very hard at that, Security Fed, I am not sure of the exact name.

Q. That is the institution in Peoria?

A. Yes.

Q. Do you believe that all of these institution would have been acquired?

A. Possibly, plus possibly others we never looked

at because no reason to.

MATERIAL REDACTED

REDACTED

Q. Did you have the wherewithal to invest sufficient funds in River Valley to replace the capital that was lost through FIRREA?

A. The 25 million, I don't think so no.

Q. Would you have had sufficient funds to replace a portion of that capital?

A. Possibly.

Q. Do you have any idea to what extent?

A. I would have at look financial statements as of

that time.

Q. Can you give me rough estimate?

A. I don't know, maybe 5 million, 3 million, 2 million, you must remember those dollars were invested elsewhere, you would have had to forego one thing to invest in another.

Q. Did you consider investing the proceeds of the sale of Exchange Bank into River Valley?

A. Never thought about it.

Q. Were there any restrictions you are aware of on your ability to invest those proceeds into River Valley?

A. Don't put all your eggs into one basket.

Q. That is prudent investment strategy?

A. That is correct.

MATERIAL REDACTED

Q. Were you involved in the day-to-day operation of these thrifts?

A. No.

Q. Were you involved directly in discussion with regulators about any potential acquisitions after these troubled thrifts were acquired?

A. That was Holland's route.

Q. Who was involved in the day-to-day operation of the thrifts?

A. Bangert, Pikus, Dalton.

Q. What was Homer Holland's role, if any, in the day-to-day operation?

A. Overseeing day-to-day operations and dealing with the regulators.

MATERIAL REDACTED

MATERIAL REDACTED

Q. A few times over the course of the past couple of days, you have testified you didn't seek out other sources of borrowing other than American National because there wasn't a need.

Did you believe that American National was the best source of borrowing for you?

A. American National Bank was a public company prior to the acquisition by Walter Heller and subsequent acquisition by First National Bank of Chicago, at every stockholders' meeting I acted as proxy of the stockholders. They trusted me. They knew me. I have done a lot of business at the American.

Their rates were always fair. I had no need to go anywhere else. They always took care of my needs. They were always fair with their rates.

Q. Did you believe American National Bank was more likely to provide funding to you than anywhere else?

A. Absolutely.

Q. Did you believe they were more likely to do so on attractive terms?

A. Absolutely.

Q. At the time you negotiated the purchase price of San Antonio Federal Savings Bank, did you believe that you had a good deal?

A. Yes.

Q. Did you believe that San Antonio Federal Savings Bank would generate substantial profits through operations and eventual sales?

A. Yes.

Q. Is that why you wanted to structure the acquisition through River Valley so you could use River Valley's NOLS to shelter that income?

A. Yes.

Q. If you had acquired San Antonio through River Valley, could you have then later decided to sell only the San Antonio operation or San Antonio deposits and keep the remainder of River Valley?

A. Yes, you could sell those deposits not only people we did, but to anybody.

There is always a sale, there is always a need and desire to buy deposits by other institutions.

Q. So if you had acquired San Antonio through River Valley, do you have any reason to believe you could not have sold the San Antonio deposits to the actual buyer on the same terms?

A. I have no reason to believe I could not have done that.

Q. Do you think it is possible you could have done better if San Antonio had been part of River Valley in

terms of the ultimate disposal of those assets?

A. Yes.

Q. How would you rate your investment in Rock Falls from '85 up until mid '88 when you acquired Republic?

A. Great investment.

Q. How did Rock Falls perform in the three-year time period?

A. Went from two million to like four six or four seven, which, it doubled in three years, not bad.

MATERIAL REDACTED

# EXHIBIT 28

November 15, 1989

RECEIVED
FEDERAL HOME LOAN BANK
OF CHICAGO

NOV 16 1989

O.K. to File
Referred to PAG - DRB

**MEMORANDUM**

To: File

From: Bruce Michalski

Subject: Minutes of Management Meeting

River Valley Savings Bank, FSB, #8515 ("Peoria")
Peoria, Illinois

River Valley Savings Bank, #6822 ("Rock Falls")
Rock Falls, Illinois

A meeting was held on November 13, 1989 with Homer Holland and Mark Kipnis, representatives of both Peoria and Rock Falls. Susan Mooney, Larry Ferries, Dan Bagus, and Bruce Michalski represented the Office of Thrift Supervision. Wayne Dyer, of the Office of the Savings and Loan Commission (of Illinois), also attended.

The purpose of the meeting was to discuss the board of directors terms, which, at Peoria, are currently not staggered, and the Class D, E, and F preferred stock, which exists at both associations.

After the introductions, Homer Holland asked if it was possible to not stagger the terms of the board of directors. Presently, the director's terms are one year in length and not staggered.

Dan Bagus stated that it is necessary to stagger the terms of the directors to ensure the continuity of the board. He noted that a board of directors with terms expiring annually may result in a sudden change in management, which could possibly have a negative effect upon the association. He also noted that other associations had applied to not stagger its board and had been denied.

Mr. Holland and Mr. Kipnis agreed to amend the bylaws to stagger the terms of the directors in accordance with 12 CFR 552.6-1.

Mr. Holland noted that they are still in the process of selling the Class C preferred stock (of Peoria) to American National Bank (ANB). The stock will be considered core capital since it will be non-cumulative. Class C stock, as it now exists, is cumulative. In addition, the rate of dividends will be reduced from a rate of 10% fixed to a rate of 90% of prime. This should reduce Peoria's costs.

Mr. Holland then set the stage for his discussion on Class D, E, and F preferred stock. He noted that the reasoning behind the different classes were to compensate himself, Howard Ross, and Steve Bangert equitably. It was Howard Ross's job to acquire capital, it was his

EXHIBIT
Ross 28
8-4-00

job to build up the assets, and it was Steve Bangert's job to manage the interest rate risk exposure within the assets and liabilities. Mr. Holland said that he and Mr. Ross wanted Mr. Bangert to participate in the economic earnings of the associations, but did not want Mr. Bangert to have an ownership interest. That is one of the reasons that Mr. Bangert's incentive is tied to the market value of the associations and not to the GAAP earnings.

He further stated that it was their intent to set up the preferred stock in this manner to:

1. Treat each of them separately;

2. Keep the associations' capital intact;

3. Maximize usage of net operating loss (NOL) carryforwards; and

4. Keep these incentives separate from other existing bonus plans (which are available for other employees).

Mark Kipnis further emphasized that they were surprised to find out that we did not perceive the issue of the preferred dividends as including the operations of 1988. He said that they had always assumed that 1988 operations were also to be included. He said that the preferred stock issuances were established to recognize each of the parties contributions to the associations, and those contributions certainly existed in 1988. He also stated that they wanted to maximize the use of NOL carryforwards, which would, in turn, benefit the FSLIC (now FDIC), since they participate in the use of NOL carryforwards.

Ms. Mooney said that OTS personnel had been equally surprised that dividends were declared and paid before the preferred stock had been approved and issued.

Mr. Kipnis explained that some of the associations' correspondence had used 1988 figures in their examples.

Ms. Mooney noted that there had been bonuses paid to Mr. Holland and Mr. Ross during 1988. If the preferred stock was to compensate them for their efforts, why did they also receive bonuses.

Mr. Kipnis said that the bonuses were a form of back-salary.

He also said that their intent was to distribute 1988's and 1989's economic gain among Mr. Ross, Mr. Holland, and Mr. Bangert. The plan was originally trying to allocate three components, salaries,

capital contribution compensation, and economic gain.

Mr. Holland said that if we were having a problem accepting the preferred stock dividends, they could probably declare common dividends, as long as it was approved by ANB.

Ms. Mooney said that we would have to consider the options open to us and get back to Mr. Holland at a later date.

Ms. Mooney then asked how Peoria and Rock Falls were progressing on the "sharing of management" issue. (There are several officers that allocate their services between the two associations.)

Mr. Holland responded. He said that it was fairly simple allocating the salaries of the people who worked for Holland Partners Inc. (HPI). It was more difficult allocating the salaries of the other officers, such as Roger Kilpatrick. However, he said that they do have methodologies for allocating, on a time-basis, the costs equitably between the two associations.

Mr. Dyer asked whether they had finished combining the two general ledgers of the Peoria shop. Mr. Holland said that the process was now complete.

Ms. Mooney asked if Peoria or Rock Falls were considering any further acquisitions. Mr. Holland said yes. Ms. Mooney said that RTC had indicated that it would not "do deals" with 3,4, or 5 rated shops. Mr. Kipnis asked if it was possible to re-rate Peoria and/or Rock Falls. Mr. Ferries said that it was possible to re-rate shops if a special limited examination was done. Mr. Ferries noted, however, that re-rating a shop was a rare occurrence. And it would be necessary to alleviate the problem areas. In Rock Falls and Peoria's case, it would be necessary to correct all management (M) and capital (C) problems.

Ms. Mooney asked whether Rock Falls and Peoria had "exchanged" any securities pursuant to their asset/liability restructuring. Mr. Holland said no. He said that the reason that they wanted to transfer assets between the two shops was to "level out" their GAP positions. One of the shops was positively hedged and one was negatively hedged. He also noted that Steve Bangert had been discussing the transactions with Larry Kenny. Ms. Mooney indicated that we would need to see if a transfer of assets would need PSA approval. She said she would let Mr. Holland know.

In summarizing the meeting, it was decided that:

Minutes - #8515 & #6822
November 15, 1989
Page Four

1. Peoria would amend its bylaws to provide for a staggered board in accordance with 12 CFR 552.6-1.

2. Ms. Mooney would consider the options available regarding the payment of dividends on Class D, E, and F preferred stock.

3. Ms. Mooney would investigate whether Peoria and Rock Falls would need to seek PSA approval to transfer assets.

The meeting was then adjourned at 11:15.

BM

cc: Esterman
Mooney
Michalski
Docket #6822
Docket #8515
Gerbick

# EXHIBIT 29

MINUTES OF MEETING OF THE
BOARD OF DIRECTORS OF
RIVER VALLEY SAVINGS BANK, FSB

January 22, 1992

The regular meeting of the Board of Directors of River Valley Savings Bank, FSB ("FSB") was held at the offices of Holleb & Coff, 55 E. Monroe, Suite 4100, Chicago, Illinois 60603.

Howard R. Ross chaired the meeting and called the meeting to order at 10:05 a.m. Mark S. Kipnis served as secretary of the meeting and recorded the following members present:

| | |
|---|---|
| Howard R. Ross | Homer J. Holland |
| L. David DeTrempe | Mark S. Kipnis |
| Chester J. Clauden | Robert Powers |
| Noel Rothman | Steven Bangert |
| Michael Rothman | Calvin L. Morgan |
| Fred Tuerk | |

Attending as guests of the board were John D. Weier and Richard F. Johnson, Jr., representativses of the FDIC, Larry Ferries, Lawrence Kenny and Marie Brandt, representatives of OTS, Ronald Pikus, Anne Brody and Kennard Besse.

The OTS and FDIC representatives were present to discuss their respective examination findings. Their reports will be sent to us at a later date, each of which will contain requests for corrective actions.

As an overview, OTS stated that FSB was "well managed, profitable and in capital compliance." OTS considers interest rate risk our most important area and was "overall satisfied", but FSB is held to a higher standard because of our large portfolio. There will be certain specific requests with respect to accounting treatment and documentation, especially because of our investment in Super P.O. securities. Institutions are sometimes asked to value investments at the lower of cost or market when the investments are "actively managed". OTS will request the Board to affirmatively represent that the investments are held for investment purposes, and state the reasons why, and represent that the institution is not actively managing such investments. We will additionally be requested to document the reasons why securities are sold. OTS additionally feels our major risks are prepayment risks and yield curve risks. Consequently, FSB will be asked to investigate new ways to analyze its risk-and not just analyze parallel rate shifts. Because swaps are used to protect

EXHIBIT
Ross 29
8-4-00

H&R-B56-02800
Confidential Material - Subject to Protective Order

risks (again the active management issue), we will be asked to document the reasons why we open or close swaps (after looking at the interest rate risk to the entire institution). In the mortgage banking area, because of our increases in servicing and loans originated and sold, there will be some accounting issues and requests for additional control over servicing bid decisions. Certain elements of our Investment Policy will be requested to be brought current. FDIC stated they have a different policy. FDIC classifies assets at substandard unless certain steps are taken. Effective February 10, 1992, FDIC policy will be the same as OTS on a go forward basis. FDIC will want stricter documentation as to whether an investment is held for trading or for investment; they will also be suggesting certain policy limits.

The regulators acknowledged compliance with our Supervisory Agreement and will look to River Valley Holdings, Inc. to pay the guaranty fee to Messrs. Ross and Holland now that the American National Bank debt is at the holding company level. With respect to bonus plans, if bonuses are based upon a return on equity, instead of performance, the regulators' position is that such bonuses are equivalent to dividends and should be treated as dividends. The regulators want a written tax allocation agreement with River Valley Holdings, Inc. and, with respect thereto, their stated policy is that River Valley Holdings, Inc. can't take a greater allocation than it would otherwise be allowed independently. All regulators felt that management was generally good and capable.

With respect to asset quality, OTS has no supervisory concerns regarding our loan underwriting. OTS policy is different from FDIC; they only have small recommendations. FDIC differs mainly with respect to our high risk investments. With respect to loans and REOs, FDIC stated we are doing an excellent job.

With respect to terminating our Supervisory Agreement, OTS normally likes to see an institution go through two full exam cycles. However, we can consider applying to OTS to rescind the transaction after we maintain the 5% tangible capital ratio for a period of time.

OTS concluded that FSB was well run with capable management, had shown significant improvement and that capital was adequate, being well above their minimums. OTS also agreed that our future projections look reasonable. FDIC concurred that our operations are good. The regulators concluded by answering questions from the board members regarding their rating systems, with OTS hoping to have its report issue in the next two weeks, while FDIC is hoping to have its issue in approximately 60 days.

The regulators left the meeting at approximately 11:15 a.m. and the Board continued with its regular agenda.



H&R-B56-02801
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2818

The Board had been provided with minutes of the November 20, 1991 Board meeting and minutes of the December 11, 1991 and December 18, 1991 Executive Committee meetings. DeTrempe moved, Clauden seconded, to approve such Board and Executive Ccommittee minutes.

Voting: Aye 11 Nay 0

Ron Pikus presented the financial statement review and compared the December 31, 1991 balance sheet with that of December 31, 1990. For December, total assets decreased $2.6 million. FHLB advances grew $10.5 million, while other borrowed funds decreased $14 million as we continue to reduce reverse repurchase borrowings. Our tangible capital ratio increased in December from 4.88% to 4.95%. Our risk-based capital ratio increased from 10.52% to 10.61%. Pre-tax income for December was $452,000.00, of which $410,000.00 was core pre-tax earnings.

Steven Bangert presented the Investment Report. FSB's December 31, 1991 mark-to-market was $49 million. The portfolio activity was reviewed, as was the institution's interest rate sensitivity.

Ron Pikus next reported on lending, loan administration and retail banking/operations. Because of current interest rates, lending activity is extremely high and employee staffing was discussed. Delinquencies were reviewed as was the general reserve reconciliation, employee loans during November and December, the loan modification for Four Seasons Mobile Home Park and the specific request for loan chargeoffs for Perl Williamson in the amount of $8,811.00 and Carrie Carter in the amount of $577.30. With respect to retail banking, we are keeping to our strategy of increasing relationship accounts and we are not as competitive on certificates of deposit. In Peoria we expect the competitive environment to increase as other local institutions have been acquired by regionals.

Homer Holland next reviewed problem assets. Our classified assets were $18 million at December 31, 1991 as compared to $34 million at December 31, 1990. We settled our claims under the Assistance Agreement for $3.2 million and anticipate that we will ultimately profit from that transaction. Mr. Holland reviewed the major assets removed during the year and those major assets that we anticipate resolving in the forthcoming year. As of December 31, 1991, FSB had 13 residential REOs at a value of $227,329.00. These numbers were compared to December 31, 1990 where we had 26 valued at $516,000.00 and December 31, 1989 where we had 126 valued at $3,600,000.00.

After further discussion, Powers moved, Clauden seconded, to approve the adequacy of the general reserve allowance, the amount of classified assets, and the aforesaid loan modification and chargeoffs.



H&R-B56-02802
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2819

Voting: Aye 11 Nay 0

Powers moved, Tuerk seconded, that our rules for changing passbook rates be amended to provide that such rates may be changed by decision of the Executive Committee, without the necessity of full Board approval.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to approve the payment of quarterly Class C dividends for calendar year 1992.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to amend the first sentence of Article IV, Section 2 of the By-laws to read as follows: "The board of directors shall consist of no less than 10 members and no more than 12 members and shall be divided into 3 classes as nearly equal in number as possible."

Voting: Aye 11 Nay 0

Tuerk moved, Clauden seconded, that an annual review of appraisers be required and presented to the board at regularly scheduled meetings.

Voting: Aye 11 Nay 0

Mark Kipnis next reviewed the written Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement attached as Exhibit A to these minutes documenting FSB's and its employees' understandings effective January 1, 1991. After further discussion, Clauden moved, DeTrempe seconded, to approve the written Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement form.

Voting: Aye 11 Nay 0

Bangert moved, Noel Rothman seconded, that all Management Reports be approved.

Voting: Aye 11 Nay 0

Management bonuses were discussed and Mr. Bangert and Mr. Pikus were requested to leave the meeting. Mr. Ross summarized the accomplishments of Messrs. Bangert and Pikus during the 1991 calendar year and recommended a $50,000.00 performance bonus for Mr. Bangert and a 1992 compensation increase from $250,000.00 to $262,500.00 and further recommended a $50,000.00 performance bonus for Mr. Pikus and a compensation increase from $117,750.00 to $123,638.00. After further discussion, Morgan moved, DeTrempe seconded, to approve such bonuses and compensation increase.

H&R-B56-02803
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2820

Voting: Aye 10 Nay 0

Mr. Bangert and Mr. Pikus returned to the meeting and Mr. Pikus next reviewed current salaries, proposed salaries, cash bonuses and stock appreciation right dollar equivalents for senior vice presidents, vice presidents and certain other individuals and further recommended $300.00 bonuses to all other full-time employees and $150.00 bonuses to all other part time employees, all as more fully set forth on Exhibit B attached hereto. After further discussion, Clauden moved, Powers seconded, to award such bonuses, stock appreciation right dollar equivalents and new salaries.

Voting: Aye 11 Nay 0

Mr. Bangert recommended that FSB pay Messrs. Holland and Ross $300,000 and $175,000, respectively, for 1989 accrued but unpaid bonuses. Mr. Bangert also recommended that a common stock dividend be approved to permit River Valley Holdings, Inc. to pay a $420,000 guaranty fee to Messrs. Holland and Ross for their personal guarantees of bank debt. The guaranty fee has also been accrued and such dividend is not to be paid unless FSB will still have a tangible capital ratio in excess of 5.0% after such payment. Mr. Bangert expects payment to occur by the end of January. After further discussion, and with Messrs. Holland and Ross abstaining, Powers moved, Tuerk seconded, to approve such dividend payment.

Voting: Aye 9 Nay 0

The employee loan schedule was again reviewed. With Mr. Kipnis abstaining, Tuerk moved, Holland seconded, that the November and December employee loans be ratified and approved.

Voting: Aye 10 Nay 0

Homer Holland next reviewed the potential acquisition of San Antonio Federal Savings Bank. American National Bank has agreed to finance the acquisition, but only if the acquisition is by an entity totally separate from FSB. It is contemplated that a new entity, Western Capital Holdings, Inc., an entity owned by Messrs. Ross, Holland and Bangert, will acquire 89% of the SAFSB stock, while John Rose, an independent investor who brought the deal to FSB's attention, will acquire 11% of SAFSB. Although the transaction will now be independent of FSB, a substantial discussion ensued relative to the allocation of management resources (and compensation to FSB for management time and asset/liability management services) and the effect on FSB's future earnings as American National Bank is requesting that FSB dividend $6 million to River Valley Holdings, Inc. for the purpose of River Valley Holdings retiring $6 million of its debt to American National Bank. The ensuing discussion covered a wide range of topics including discussions with OTS - Dallas and Western Capital Holdings' business plan. With respect to FSB's

H&R-B56-02804
Confidential Material - Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2821

ability to pay a $6 million dividend, it is contemplated that management will shrink our balance sheet by reducing our Investment portfolio and not our loan portfolio where we have larger spreads. Additional funds will be generated from core earnings and from security sale gains where we would sell part of our fixed rate portfolio that is attractive to sell at this time. It is anticipated that monthly core earnings will decrease by approximately $100,000.00. Any security sales will actually improve our interest rate risk management as we will pay off short-term borrowings. After further discussion, Kipnis moved, Bangert seconded, that provided FSB maintains a 5% tangible capital ratio after the payment of said dividends and OTS approves said payment, that $6 million of common stock dividends be paid to River Valley Holdings, Inc. for the purpose of River Valley Holdings reducing its debt to American National Bank by such amount.

Voting: Aye 11 Nay 0

Mr. Pikus next reported that our CRA/compliance exam will begin next Tuesday.

Mr. Bangert and Mr. Pikus next presented copies of the proposed 1992 Business Plan to the Board for review and discussion at the next meeting.

Mark Kipnis next presented the unfunded deferred compensation plan attached as Exhibit C to these minutes. After further discussion, Holland moved, Ross seconded, that the unfunded deferrred compensation plan be approved.

Voting: Aye 11 Nay 0

Mr. Bangert next recommended that Sharon Kristof, Senior Vice President and Cathy Knapp, Assistant Vice President, each be authorized, along with any FSB officer attesting to their signatures if attestation is required, to execute and deliver any and all conveyance deeds and other ancillary documents to transfer all REO properties to third party buyers. Holland moved, Bangert seconded, to approve such recommendation.

Voting: Aye 11 Nay 0

Mr. Ross next recommended that the fees to directors be increased to a $500.00 retainer for each meeting plus $400.00 for each meeting attended. After further discussion, Holland moved, Ross seconded, that such increase be approved.

Voting: Aye 11 Nay 0

Mr. Pikus next recommended that FSB apply for limited trust powers to act as a FNMA document custodian. Holland moved, Ross seconded, that an application be made by FSB for the written consent of OTS to exercise limited trust powers and that the



H&R-B56-02805
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2822

Statement of Principles of Trust Department Management be adopted, all as more fully set forth in OTS Form 1240 presented to the Board.

Voting: Aye 11 Nay 0

The next scheduled board meeting is March 25, 1992 in Peoria.

There being no further business, Tuerk moved, DeTrempe seconded, to adjourn the meeting.

Voting: Aye 11 Nay 0

The meeting adjourned at 3:10 p.m.

Submitted:

Mark S. Kipnis
Secretary

Approved:

Howard R. Ross
Chairman

H&R-B56-02806
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2823

# EXHIBIT 31

**MINUTES OF MEETING OF
THE RIVER VALLEY SAVINGS
BANK, F.S.B. EXECUTIVE COMMITTEE**

January 15, 1992

The regular meeting of the Executive Committee of River Valley Savings Bank, FSB was held at the offices of Holland Partners, 200 South Wacker, Chicago, Illinois 60606.

Homer J. Holland chaired the meeting and called the meeting to order at 10:00 a.m. Cathryn Wroblewski, a guest of the Executive Committee, served as secretary and recorded the following members present:

Homer J. Holland (via telephone)
Howard R. Ross
Steven Bangert

Ronald Pikus and Mark Kipnis attended as additional guests of the Executive Committee.

Ron Pikus presented a draft of the December 31 financial reports and the committee reviewed same, noting that pre-tax income was expected to exceed $350,000; deposits increased approximately $300,000; mortgage loans were closed in an amount close to $20 million. Final reports will be prepared and submitted for approval at the full board meeting on January 22, 1992.

The current decrease in CD and money market rates was discussed. The Committee recognized the possible need to make a change in passbook rates. It was agreed that a motion will be made to do so at the January 22 board meeting.

Steve Bangert discussed a proposal received from BEI Golembe relative to preparing a valuation of the Bank's deposit base. Howard Ross moved, Homer Holland seconded, to engage BEI G to undertake this project at a fee not to exceed $50,000.

Voting: Aye 3 Nay 0

Steve Bangert and Ron Pikus presented an outline of recommended staff and management bonuses for year end 1991. The Committee approved the recommendations, per attachment, by motion made by Howard Ross and seconded by Steve Bangert.

Voting: Aye 3 Nay 0

Ron Pikus presented a proposed agenda for the January 22 board meeting. The Committee agreed that, due to the scheduling of the OTS/FDIC interview at the beginning of the meeting, the usual committee meetings would not be held. Management reports would be presented by Steve Bangert and Ron Pikus; business plans will be given to the directors but not discussed at the January meeting. The Committee also agreed that dividend approvals would be requested as well as a change to the by-laws regarding the number of directors.

Homer Holland discussed the San Antonio Federal Savings Bank acquisition, mentioning that American National Bank was not willing to provide financing to River Valley for the acquisition, but would provide financing to a separate holding company, if River Valley Holdings, Inc. paid down its loan to $1 million. It was agreed that this topic should be presented to the full Board at its next meeting.

EXHIBIT
PENGAD-Bayonne, N.J.
Ross 31
8-4-00

There being no further business to discuss, the meeting was adjourned at 11:15.

Cathryn L. Wroblewski
Asst. Secretary

Homer J. Holland
Chairman