# RON KARR DEPOSITION EXCERPTS FOR USE AT TRIAL

p. 6, lines 2-3
p. 7, lines 14-20
p. 11, lines 11-25
p. 12, lines 1-5, 19-25
p. 13, lines 1-11
p. 15, line 25
p. 16, lines 1-2, 12-25
p. 17, lines 1-9
p. 18, line 2 - p. 23, line 23
p. 28, line 9 - p. 29, line 18
p. 29, line 19 - p. 31, line 11
p. 31, line 23 - p. 32, line 24
p. 38, lines 2-20, 21-25
p. 39, lines 6-25
p. 40, line 1 - p. 44, line 19
p. 46, line 7 - p. 50, line 22
p. 51, line 18 - p. 53, line 18
p. 54, lines 9-25
p. 55, lines 8-17
p. 66, line 16 - p. 69, line 1
p. 71, line 22 - p. 72, line 2
p. 76, lines 1-11
p. 80, line 3 - p. 81, line 1
p. 81, line 8 - p. 88, line 8
p. 88, line 13 - p. 89, line 14
p. 92, line 2 - p. 95, line 9
p. 96, line 4 - p. 98, line 15
p. 101, line 24 - p. 104, line 1
p. 112, line 17 - p. 113, line 14
p. 149, line 1 - p. 150, line 14
p. 158, line 3 - p. 159, line 13
p. 162, line 21 - p. 163, line 5
p. 164, line 20 - p. 165, line 14
p. 193, line 18 - p. 194, line 10
p. 250, line 17 - p. 252, line 3
p. 255, line 25 - p. 256, line 12
p. 257, lines 3-17
p. 263, line 7 - p. 264, line 2
p. 264, line 23 - p. 266, line 13
p. 269, lines 14-22
p. 278, line 21 - p. 279, line 16
p. 280, lines 4-19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

| | |
|---|---|
| BANK OF AMERICA, FSB, et al., Plaintiffs, vs. UNITED STATES OF AMERICA, Defendant. | Case No. 95-660C |
| HOMER J. HOLLAND and HOWARD R. ROSS, Plaintiffs, vs. THE UNITED STATES OF AMERICA, Defendant. | Case No. 95-524C |

AMERICAN CAPITAL CORPORATION)
and TRANSCAPITAL FINANCIAL )
CORPORATION )
Plaintiff, )
)
vs. ) Case No. 95-523C
)
THE UNITED STATES, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 12, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For Plaintiffs Bank of America and American Capital:

RACHEL L. BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C, 20005
(202) 220-9670

For the U.S. Department of Justice in Case No. 95-660C:

TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.

U.S. Department of Justice, Civil Division

1100 L Street, N.W.

Washington, D.C. 20530

(202) 353-8841

Deposition of RONALD NEAL KARR taken by the Plaintiff at 101 North Wacker Drive, Suite 1600, Chicago, Illinois, on the 12th day of July, 2000, at the hour of 9:00 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

CONTENTS


| The Witness: RONALD NEAL KARR | Examination |
|---|---|
| By Mr. Cayne | 6 |


INDEX OF EXHIBITS


| For the Plaintiff | Page |
|---|---|
| 1 | 78 |
| 2 | 108 |
| 3 | 124 |
| 4 | 124 |
| 5 | 138 |
| 6 | 146 |
| 7 | 154 |
| 8 | 154 |
| 9 | 160 |
| 10 | 162 |
| 11 | 186 |
| 12 | 194 |
| 13 | 201 |
| 14 | 204 |
| 15 | 221 |
| 16 | 238 |
| 17 | 238 |

Whereupon, RONALD NEAL KARR, having been duly sworn, was examined and testified as follows:

MATERIAL REDACTED

MATERIAL REDACTED

Q. What is your current employment, Mr. Karr?

A. I work for the Office of Thrift Supervision. I'm the regional director of the central region.

Q. Is that in Chicago?

A. Yes.

MATERIAL REDACTED

Q. Are savings and loan examiners commissioned, similar to national bank examiners?

A. They are, yes.

Q. When did you receive your commission?

A. Actually, the Federal Home Loan Bank Board didn't begin its commissioning program until I think it was about 1986 -- '85, '86. When they started the program, I became commissioned then.

Q. Back in 1974, when you originally became an examiner, what was your official title?

A. Well, I started as a GS-7. Assistant examiner is what that position was called. I progressed through 1979 to a GS-12.

Q. What were your functions and duties as

an assistant examiner?
A. In doing examinations of savings and loans, I assisted more senior examiners in doing the various programs, in examining various functions of a savings and loan.

MATERIAL REDACTED

Q. And for how long did you hold the position of assistant examiner?
A. For a year.
Q. And then what position did you obtain?
A. I moved to a GS-9, which was examiner, held that for a year. Went to GS-11, held that for a year. Went to GS-12, which is journeyman

examiner.

Q. What were your duties and functions as a journeyman examiner, and when did you begin that position?

A. In 1979. Duties of a journeyman examiner are to be examiner in charge of any kind of an institution, any size; to run the examination, write the examination report, make the conclusions as to what you found at the examination, include those in the report, and transmit that to my superiors.

MATERIAL REDACTED

MATERIAL REDACTED

A. I left the bank board on August 30th of

1984 and began employment with the Federal Home Loan Bank, Seattle, on September 1st, 1984.

MATERIAL REDACTED

Secondly, it was a promotion, and it gave me an opportunity to get more involved with the direct examination and supervision of institutions, as opposed to the administrative functions, which I found more challenging.

Q. And when did you begin your position at the Federal Home Loan Bank?

A. September 1st, '84.

Q. Your title at that time?

A. Initially supervisory analyst. Within a few months I was titled supervisory agent for the Federal Savings and Loan Insurance Corporation.

Q. What were your duties and

responsibilities?
A. I had a caseload of savings institutions that I was responsible for the supervision of.
Q. How many institutions?
A. Approximately 50.
Q. How many of those were problem institutions, approximately?
A. A dozen.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did you report to Mr. Dochow for the remainder of your tenure at the Federal Home Loan Bank, Seattle?

A. No. I believe in the fall of 1987, Mr. Dochow went to Washington, D.C., as director of examinations and supervisions of the Federal Home Loan Bank Board, and Dennis Halvorson was hired by the Federal Home Loan Bank, Seattle, to replace him. I reported to him.

Q. For how long did you report to Mr. Halvorson?

A. Until sometime in the middle of '89, I believe it was. Maybe early '89. I can't remember the exact dates. It was in -- sometime in the early part to the middle part of '89, and then Mr. Halvorson left the Federal Home Loan Bank.

Q. Who did you report to next?

A. I took over his position, and I reported directly to James Faulstich, who was the president of the bank and principal supervisory agent.

Q. And what was your title at that point?

A. Executive vice president, director of

regulatory affairs.
Q. Prior to that promotion, had you been a supervisory agent for the entire period after --
A. I had that title. I was a supervisory agent through all those positions -- through all that time period.
Q. Did you hold any other positions during the interim period, other than supervisory agent?
A. Well, supervisory agent is a designation given by the FSLIC that authorizes you to act on their behalf as an employee of the Federal Home Loan Banks. My title at the Federal Home Loan Bank changed from supervisory agent, assistant vice president, to vice president, to senior vice president, to executive vice president. And at one point -- this would have been about 1986 -- I became manager of the supervisory activities department. I supervised all of the supervisory agents that had caseloads.
We split the supervision responsibilities in 1986 into two groups. One was called the mergers and acquisitions department. One was called the supervisory activities department. I was in charge of the supervisory activities department. Pat McJoynt

was in charge of the mergers and acquisitions department. We split the caseloads so that all of the problem institutions that were near failure or needed rehabilitation were transferred to the mergers and acquisition department, and those people focused specifically on those.

Supervisory activities department kept all of the other cases and did the day-to-day examination and supervision and hopefully prevented them from ever having to be transferred to the mergers and acquisitions department.

Q. So in 1989, was it, you began to report to Mr. Faulstich directly; is that correct?

A. Yes.

Q. How long did you remain in that capacity?

A. Until August 9th, if that's the day that FIRREA was passed. And at that point, FIRREA effectively split all of the regulatory staff of the Federal Home Loan Bank's off and created the Office of Thrift Supervision. I think the actual effective date of the Office of Thrift Supervision was October 9th. It was a transition period.

In that transition period I became the

acting principal supervisory agent in the Seattle district, and I reported directly to Darryl Dochow.

Q. Now, you said for the transition, 60-day transition period?

A. Yeah.

Q. What was your position on and after October 9th, 1989?

A. I was director of agency functions for the Seattle district on October 9th.

Q. What did that position involve?

A. I was in charge of all of the examination and supervisory activities of the district.

Q. How long did you hold that position?

A. For about 20 days.

Q. What happened in 20 days?

A. I was transferred to Topeka, where I took over the same position in charge of the Topeka district.

Q. Who did you report to in Topeka?

A. To Darryl Dochow.

Q. This would have been in?

A. 1989.

Q. November 1989?

A. I think my official date in Topeka was October 25th. So approximately that time period. We moved into our house in Topeka on November 12th. I remember that.

Q. And over what states did the jurisdiction of the Topeka bank for the Topeka office run?

A. We had Oklahoma, Kansas, Nebraska, and Colorado.

Q. Now, were you the primary person within the Topeka office at that time responsible for thrift supervision?

A. Yes, I was.

Q. And at that time what did that involve, the duty of being in charge of thrift supervision?

A. I supervised the activities of that office in conducting examinations and supervision of the thrifts in those four or five states.

Q. Is that both healthy thrifts and problem thrifts?

A. Yes.

Q. Were you involved in the closure of savings and loan associations?

A. Yes.

Q. And at appointment of the RTC as receiver?
A. Yes.
Q. How long did you hold the position in Topeka?
A. Until approximately September of 1991.
Q. And what happened in September 1991?
A. I transferred here to Chicago.
Q. What was your position in Chicago?
A. Initially, when I started here, it was regional deputy director. I reported to Stuart Brafman, who was the regional director.
Q. And how long did you hold that position?
A. Until May of '92, when I became regional director.
Q. And can you describe -- is that the position you hold today?
A. Yes, it is.
Q. Can you describe that position?
A. I'm responsible for supervising the entire examination and supervisory activities of the central region.

MATERIAL REDACTED

A. Supervisory goodwill was goodwill that was allowed in assisted transactions to be accounted as capital.
Q. As regulatory capital, correct?
A. As regulatory capital.
Q. Is supervisory goodwill otherwise allowed to be accounted as regulatory capital during that time period, other than in supervisory acquisitions?
A. I think by definition, supervisory goodwill was allowed to be -- was the only kind that was allowed to be capital; the only kind of goodwill that was allowed to be capital.
Q. Did you ever have occasion to deal with, during your time at Federal Home Loan Bank, Seattle, what is known as capital credits?
A. I don't know what you mean by "capital credits".
Q. When you came to the Federal Home Loan -- it wasn't called the Federal Home Loan Bank, Chicago, when you came to it, correct? You came to the Chicago office of the OTS?
A. Yes.
Q. And how many institutions were under your jurisdiction when you first arrived?

A. I think there were about 580, 590; somewhere in that range.

Q. Can you describe for me when you arrived how the office was organized? You reported to who?

A. When I came here to Chicago, I reported to Stuart Brafman, who was the regional director.

Q. And who did you replace in your position? Who had your position prior to --

A. I didn't replace anyone. It was a new position.

Q. What position did Leo Blaber have? Was he ever with the OTS?

A. No.

Q. He left prior to you?

A. Leo Blaber was the president of the Federal Home Loan Bank, Chicago.

Q. Okay, and he stayed with the Federal Home -- did he stay with the Federal Home Loan Bank, Chicago, subsequent to FIRREA?

A. Yes.

Q. And how was the office organized under you when you first arrived? What position reported to you?

A. When I came to Chicago, it was at the

request of John Downey and Tim Ryan. John Downey was the head of supervision in D.C. Tim Ryan was director of OTS. They had worked out an agreement with Mr. Brafman for his departure in the early part of 1992. Mr. Brafman was going into a new business venture with a partner or an old friend of his.

When I came in, it was to familiarize myself with the region and to prepare for taking over as regional director, upon Mr. Brafman's departure.

MATERIAL REDACTED

A. I was asked to take over when he left. So I came in September. I reported to Mr. Brafman. He and I worked together on various

issues. No one directly reported to me except my secretary during that time period. Once I became regional director, then everybody did.

Q. And when did you begin, the date?

A. It was in May.

Q. Of '92?

A. Of '92.

Q. So can you describe for me your duties during this initial period, from November '91 through May '92?

A. As I said, I worked with Mr. Brafman. He familiarized me with the region, with the people in the region, with the activities that he was -- he was involved with.

I also tried to work with other regional deputies in regard to some of their major issues and some of their major cases to familiarize myself with what those cases were and what they were about.

Q. Now, you were responsible for all thrifts in the Chicago district, correct, not just healthy ones or not just problem ones; is that correct?

A. Right.

MATERIAL RES...

Q. Of the members of your staff who would have briefed you on River Valley, would that have been Mr. Biedron?

A. Yes.

Q. And do you recall your first briefing on River Valley?

A. No, I don't.

Q. What do you first recall learning about River Valley, whenever that briefing might have occurred?

A. I don't have a good recollection of any of the briefings, of any of the institutions. That happened eight years ago. I know that I had them, and this -- what I recall about River Valley is it was a shop that Mr. Biedron had confidence was going to become a well-operated institution and solve its problems. It had some work to do, some issues that had to be resolved, and they were working on those.

Q. Do you recall whether River Valley had supervisory goodwill either when you arrived or prior to the enactment -- when you arrived at the Chicago office or prior to the enactment of FIRREA?

MATERIAL REDACTED

A. I believe it did, yes.
Q. Do you recall how much that was?
A. No, I have no idea.
Q. Do you recall what effect FIRREA had on that supervisory goodwill?
A. Well, FIRREA eliminated supervisory goodwill from being counted as capital. So anybody who had any had that impact by FIRREA.
Q. And do you recall offhand what effect -- what was the immediate effect on River Valley's operations of the enactment of FIRREA?
A. The immediate effect was in 1989. I wasn't in Chicago in 1989. I have no idea what the immediate effect on River Valley was.
In 1991 when I came, and in 1992 when I took over as regional director, they were meeting their capital requirements, as I recall.
Q. Was the institution, during your tenure at the Chicago office of the OTS, subject to any supervisory enforcement actions?

A. I believe there was a supervisory agreement in place on River Valley.
Q. And do you recall why that supervisory agreement was issued?
A. No.
Q. That's too long ago?
A. I didn't issue it.
Q. It was before your --
A. It was before me.
Q. Did you ever meet Mr. Ross and Mr. Holland?
A. Yes.
Q. When did you first meet them?
A. I don't remember specifically, whether it was in the fall of or early winter of '91, or whether it was in '92. It was during my first months in Chicago, that time period.
Q. Do you recall the purpose of the meetings during which you met them?
A. Not specifically. When -- and I -- I know I met with Mr. Holland on more than one occasion. I only remember Mr. Ross maybe once, and I'm not even -- I'm not sure I can remember what he looks like, but I'm pretty sure I met him.

Mr. Holland I met with maybe three or four times over the time span. As I recall, our meetings were usually in regard to talking about what was going on at his institution.

Q. Do you recall, again, before we look at documents to refresh your recollection, issues that were going on with his institution after you arrived at the OTS Chicago office?

A. I don't have a good recollection of the specifics. I have a vague recollection that one of the primary issues at River Valley had to do with a large portfolio of derivative products that exposed them to some substantial amount of interest rate risk and that they were working down that portfolio.

Q. Do you recall at the time dealing with officials at the Federal Deposit Insurance Corporation Chicago office concerning that portfolio?

A. Working with the FDIC?

Q. Dealing with officials in the FDIC, either by phone or correspondence, relating to the portfolio to which you just referred.

A. Yes, vaguely.

Q. Simona Frank?

A. Simona Frank was the regional director at the time, yeah. And I think -- I think -- I think that we had different opinions as to whether or not the portfolio should be classified or not.

Q. What do you remember, sitting here before you look at any documents to refresh your recollection, as to your difference of opinions? And I understand, it was eight years ago.

A. I'm not so sure it's just River Valley. At that time period, we had -- I mean, the FDIC took a position that products that -- derivative products in particular that represented interest rate risks issues to institutions should be classified, and classified meaning that they present safety and soundness risks to the institution that require more capital, other things, okay?

We disagreed that -- with the FDIC that you classify residuals because based on -- based on the fact that they represented interest rate risk. If they represented credit risk, we would agree that they needed to be classified. That our classification policies of both agencies indicated that we should only classify assets

based on credit issues, not interest rate risk issues, and I think we had that same issue with River Valley.

Q. And this was an issue that -- between the -- am I correct this is an issue that was between the agencies, OTS and FDIC, rather than being an issue between you and Ms. Frank?

A. Oh, yeah, it was -- I had it in Topeka. I had it in Chicago. They had it all around the country.

Q. When did this issue first surface?

A. I think in the '90s.

Q. Early '90s?

A. Yes. As soon as the FDIC got involved with the examination of some of these institutions, which was somewhere in the '90s, that was one of the issues that came up as far as our viewpoints on how to examine and how to deal with derivative products.

Q. So when you said --

A. It was a philosophical difference between the agencies.

Q. When you said the FDIC first got involved, you are referring to after August 9, 1989, when the FDIC had a formal examination role

with respect to institutions for which the Office of Thrift Supervision was the primary federal supervisor?

A. That's correct.

Q. So it's probably sometime starting perhaps in late '89 this issue first bubbled to the surface?

A. They didn't actually start doing their examinations until 1990. Until they got in and started taking the positions, it didn't really become an issue. I don't think they did any joint examinations with us -- I don't recall any in 1989.

Q. Perhaps then this issue came to the surface sometime in 1990?

A. That's my recollection.

Q. Do you recall dealing with this issue during your time in Topeka?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I believe you indicated, if I understood, that because the FDIC and the OTS had different views on this specific issue, it could cause the results of an FDIC safety and soundness examination to differ in certain aspects from the results of an Office of Thrift Supervision safety and soundness examination, correct?

A. That's right.

Q. Now I'm asking in what specific ways could the differences between the agencies on this particular issue cause the examination -- safety and soundness examinations conducted by the two agencies to differ?

A. Well, on derivative products we would look -- the OTS would look at those products from two aspects; is there credit risk and is there interest rate risk, and are they being well managed, obviously.

If we didn't find credit risk in the

derivative products, we would only look to the risk -- the interest rate risk that they posed and make a judgment as to how significant that was or not. And we would base our conclusions on interest rate risk.

The FDIC looked at those same products and would, because of the interest rate risk, would classify those assets. We would not. Once they classified the assets, they would view them as having asset quality problems. We did not unless there was credit risk involved. If there was credit risk involved, then we would view them as having asset quality problems.

Now, if you classify an asset, in most cases, based on reserve policies, an institution would be required to add to its general loss reserves because of the additional classifications.

So having classified derivative products could increase the amount of reserves required. And if you add reserves, you're going to impact earnings, because it comes out of earnings or it comes out of capital. And you can have those impacts.

So those are the kinds of things that

can happen in that kind of a situation. So the result could be that we would class- -- just view interest rate risk as an issue and not classify them, and our rating of that area might be adverse or not, depending on the amount of that risk. And we would reflect that only in that part of the CAMELS rating that relates to interest rate risk.

The FDIC would not only impact its rating on interest rate risk but would look at asset quality, and that also could impact capital, and it could impact earnings. So it could have a wider range. And we also have to look at whether or not we were double-hitting for the same issue.

Q. Can you explain to me -- the term you just used was double-hitting?

A. Yes.

Q. I'm not familiar with that term. What do you mean?

A. If you adversely rate one area of an institution's operations, essentially you try not to take that same issue and impact another one with it, unless there is a direct and clear correlation that creates a relationship where you

should use both of them.

For example, interest rate risk; if you don't -- if you classify -- if you hit them for interest rate risk and you say this has an impact on earnings, okay, and then you also take that same asset and say I'm going to classify it because of credit risk when there is no credit risk, and you hit asset quality, and then you make them do GVAs -- general valuation allowances -- and that takes earnings. Now you've hit them twice on the ratings for the same issue. You try not to do that unless there are direct and clear relationships that you need to do it with.

Q. Do I understand correctly, Mr. Karr, then, one of the differences between the FDIC's approach and the approach of the Office of Thrift Supervision is in dealing with these derivative products, correct? We're dealing with derivative products here?

A. Yes.

Q. The OTS approach did not involve double-hitting, but the FDIC approach did result in double-hitting; is that correct?

A. It could.

Q. In your opinion did it?
A. In some cases, yes.
Q. Explain to me, so I'm clear, how in some cases did the FDIC's approach result -- let's make it specific. I think I understand now, based on your explanation, what double-hitting is. Explain to me why the OTS approach did not result in double-hitting, but why the FDIC approach could result in double-hitting?
A. If we don't classify the asset, we're not going to require more GVAs.
Q. "We," the OTS?
A. Right. As soon as you classify that asset, you're going to need more GVAs, and that's going to double-hit the same issue, a derivative product that shows only one kind of risk, interest rate risk. You're going to double-hit an adverse rating on two different factors.
Q. So the report is clear, please give me an example where the approach followed by the FDIC would result in what you call a double-hit.

MATERIAL REDACTED

MATERIAL REDACTED

A. If you classify derivatives for credit risk because of interest rate risk, you're going to give them a different rating for asset quality because you classified them for interest rate risk. You're also going to hit the rating for interest rate risk because you're taking that into consideration, too. So you've taken the same asset and double-hit it in two different

ratings categories.
Q. So in the FDIC approach -- how long did this issue continue for, the issue between the two agencies? Does it continue today, for example?
A. No, it doesn't.
Q. When was it resolved?
A. It sort of evolved out of -- I don't know specifically when it went away. We dealt with it for a few years. We had our position. The FDIC had their position. We agreed to disagree, which we do on some things, and I don't recall that we have this -- I don't -- I haven't had a discussion with my FDIC colleagues on this issue for a long time.
Q. What was the period that you recall the issue being present? Was it approximately '92 to '94 or '95?
A. It was the early '90s.
Q. Early '90s?
A. Yes.
Q. And does the Office of Thrift Supervision continue to follow the same position on this issue or has it changed its position?
A. We will not today classify an asset

because of its interest rate risk. We classify them because of credit risk.

Q. Today, July of 2000, that continues to be the position of OTS?

A. That's right.

Q. And when the Federal Deposit Insurance Corporation examines institutions subject to your supervision, Mr. Karr, does it take that position today, or does it still take its former position?

A. I have no recollection of any differences of opinion on that issue at any of our recent exams over the last few years. We agree.

Q. So the FDIC now agrees with the OTS on this issue?

A. You'll have to ask them if they agree with us. We have not had any differences of opinion with my colleagues.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did you have any discussions with your colleagues at the FDIC concerning this issue?
A. Yes.
Q. With whom did you have discussions concerning this issue?
A. Simona Frank.
Q. And what were the nature of those discussions?
A. We simply explained our positions on each of them. We took the position that we would -- that we dealt with the interest rate risk piece. We would not classify them if there wasn't a credit risk.
Q. And Ms. Frank took what position during your conversations?
A. They took the position that they would classify them for interest rate risk.

MATERIAL REDACTED

Q. Please state your understanding of their position.

A. That they would classify derivatives based on the interest rate risk.

Q. When you say "derivatives," when you use that term, what do you mean by that term?

A. A derivative is a financial product that is derived from another product, like an interest-only strip, a principal-only strip, a cash flow residual; that type of product.

MATERIAL REDACTED

Q. When would your internal policies and procedures call for you to see the reports? For example, the CAMEL rating system you referred to, that's still a 1-to-5 rating system, correct?

A. Yes.

Q. 1 being the best and 5 being the worst?

A. Yes.

Q. In the Office of Thrift Supervision during the period '92 to '95, would problem institutions be institutions that were assigned a

composite rating of 4, 5, or 3, 4, or 5? Do you recall?

A. Say that again.

Q. I'm asking what ratings would designate a problem institution? I know a 5 would be a problem institution, on the verge of failure, and -- is that correct?

A. Yes.

Q. I think I understand that a 4 would designate a problem institution, correct?

A. That's correct.

Q. I'm unclear whether a 3 rating -- an institution receiving a 3, would that be considered a problem?

A. The answer is yes or no -- yes and no. It depends on what the 3 is relative to whether you would consider it a problem. A 3 typically indicates there are issues that need to be resolved, but you expect they be through normal day-to-day management. So it's -- it could be a deterioration, it could be -- someone could be a 3 because they've deteriorated from good. They could be a 3 because they've improved from a 4. So the 3 is relative, based on what the merits of the case are.

Q. So in a particular case -- am I correct, then, in a specific case, you may or may not consider a 3 institution to be a problem institution?

A. That's correct.

Q. And with respect to 4s and 5s, would you in all cases expect to receive a copy of an examination report for a 4 or 5 rating institution?

A. Would I expect to?

Q. Would your internal policies and procedures call for your staff to provide you with a copy of an examination report either in final or draft form for an institution that received a rating of a 4 or a 5?

A. They don't specifically say if it's a 4 or 5, regional director is going to get a copy, but I always do.

Q. What about with respect to a 3?

A. Only if it was something that I needed to see. More likely I would just be briefed on what the issues are that cause a 3, and I probably wouldn't be reading the entire report. I might be given drafts of the comments that relate to the sections that describe why a 3

rating is given, but maybe not a whole report.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you generally consider an institution with a 2 rating to be sound?

A. Yes.

Q. Without significant supervisory

problems?

A. That's correct.

MATERIAL REDACTED

Q. Does your office ever terminate supervisory agreements?

A. Oh, yes.

Q. Under what circumstances will the office terminate a supervisory agreement?

A. When the issue at hand has been resolved and the track record proves they remain resolved.

Q. How long a track record is required?

A. Depends on the case, depends on the issue.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And you see the supervisory criticisms set forth in this letter?

A. Yes.

Q. Do you recall, with respect to Peoria, whether the Office of Thrift Supervision shared these concerns at the time you arrived in the fall of 1991?

A. This document is dated February 13th, 1991. I don't know whether the regional office shared those concerns in February of '91 or not.

Q. No, I was asking whether your office shared those concerns in the fall of 1991, at the time you arrived.

A. My recollection is that when I arrived, there was only one institution; and my recollection is that the issues at that time related to just their derivative portfolio. That was the primary concern. That's my recollection.

Q. That was the issue you discussed earlier in which the Office of Thrift Supervision and FDIC had differences of view?

A. That's my recollection, that we had a difference of opinion as to the classification of

the derivatives, yes.

MATERIAL REDACTED

Q. How did that process interrelate with the examination process conducted by the FDIC with respect to thrift supervisions under the jurisdiction of the Chicago regional office?

A. Following the passage of FIRREA, the FDIC was given the backup examination authority, and they took it upon themselves that they needed to examine each and every savings institution under our jurisdiction as soon as they possibly could. And they did that over a -- I think it was a two-year time frame; so examined each and every one.

Most of the time they tried to do those concurrently with us. If we were doing an exam, they would do it at the same time we did. If schedules didn't work out, they might have done a separate examination.

Once they did that first round of doing

every -- every institution, then they conducted examinations with us on -- essentially on an as-needed kind of basis. There were significant safety and soundness concerns that posed a threat to the insurance fund. They could either do an independent examination on their own, or they could join us for an exam. Typically they joined us for an exam. We did concurrent exams.

Q. In the situation where concurrent exams were performed, would a joint report be issued, or would each agency issue its own separate report relating to that institution?

A. We always -- we did not do joint reports. I can't remember ever doing a joint report.

OTS will issue its own report, and as it's required to do, at the completion of an examination. The FDIC has an option. They can either complete a report of their own or not, and they can either provide it to the institution or not. And they decide that.

Q. When a concurrent report of examination was conducted during this period of '92 through '95, would both agencies have its examiners physically on site at the particular institution

at the same time?

A. On a concurrent exam?

Q. On a concurrent exam.

A. Yes.

Q. And would the examiners of the two agencies divide and share tasks, such as examiner X will look at ten loans, examiner Y will look at ten loans? Or did they separately review loan portfolios and the other operational areas of the bank?

A. It depended. Sometimes it was a complete division with no overlap. Other times there would be some overlap. It depended on what the issues were.

Q. Was one framework more generally used, either sharing resources or separately reviewing each aspect of the institution's operations?

A. Well, it depends on the institution. Since most of them were healthier -- on the healthier institutions, the nonproblem institutions, it was -- I count on the fact there was a division of duties and no overlap. Where there were significant issues, there would be some overlap and continues today. If you're going to register your own opinions, you've got

to look at the documents.

Q. At what level were the examinations coordinated? Was that at the EIC level, field manager level, assistant director level?

A. Where was it coordinated?

Q. Yes.

A. Field manager level.

Q. Is that also the level at which the decision was made, the initial decision was made to conduct a concurrent examination?

A. Typically no. It would have been made at a level above that to do a concurrent examination. In fact, today, in today's world, the FDIC regional director will issue me a written request to join, if they wish to join, and give me the reasons why. Or I will issue a written request to them to join us and tell them why we want them to join us, if -- and it can go either way. But it's between the regional directors.

Now, obviously regional directors are being advised by staff as to whether we need to do that. Typically today the only time we do concurrent examinations is if an institution is rated 4 or worse. On some occasions we will do

3-rated institutions jointly. We don't do many concurrent examinations these days. We used to do lots of them.

Q. In the '92 to '95 period, there were lots of them?

A. Yeah, there were several then.

Q. When a concurrent examination was conducted, did the FDIC and OTS examiners share with each other their draft examination reports?

A. Yes.

Q. Usually in all cases?

A. Yes.

Q. Was there an opportunity or typically dialogue between the agencies, either you're being too harsh or too easy on a particular point? Was there any, for example, negotiation between the agencies on what the reports would state?

A. We always tried to look at things from the same perspective and come to the same conclusions, if possible. That starts at the examiner level and works its way up through the supervisors' levels.

There are some issues that we have differences of opinion on and different

philosophies and policies on, and we come to different conclusions on those, the classification of derivatives being one of those.

Q. You talked -- used a term "CAMEL ratings" earlier.

A. Right.

Q. That stands for capital asset management earnings and liquidity?

A. And now the S is sensitivity.

Q. Each one of those areas would be assigned a rating of 1 to 5, correct?

A. Yes.

Q. Then there would be an overall composite rating?

A. That's correct.

Q. During the period 1992 through 1995, am I correct the OTS and the FDIC use CAMEL ratings?

A. We started with what we used to call MACRO ratings, and then -- I can't remember the exact date, sometime in the early '90s -- went to the CAMELS designation. MACRO means the same thing as CAMELS, just different acronym.

Q. At the time the OTS used the CAMEL rating system, do I understand that although this wasn't necessarily successful in all cases, there

would be an effort to see whether the agencies could agree on the same ratings for the CAMEL factors and the overall composite ratings?

A. According to our interagency agreement on concurrent examinations, it was we were supposed to try to come to a concurrence as to what the findings would be. If we couldn't, we agreed to disagree.

Q. And based on your experience and your position as regional director, were you generally successful in that effort of reaching concurrence with the FDIC in specific examinations as to the CAMEL ratings that would be assigned to the institution under examination?

A. Were we generally successful in coming to the same rating?

Q. Yes.

A. Is that what the question is?

I think there is two things that have to be said to that. One is yes, I think we were generally successful in coming to agreement on the ratings. But secondly, yes, we -- even in those cases where we didn't come to agreement on what the actual rating was, that we were in agreement as to what the supervisory issues were

and how they would be addressed through the supervisory process. And as long as we were comfortable with the actions that were taken, the ratings differences weren't significant to us.

Q. Do I recall correctly that you indicated, before the actual coordination of the examination would occur at the field manager level?

MATERIAL REDACTED

A. Right.

Q. Now, in the situation where it turns out that the agencies were not seeing eye to eye on the CAMEL ratings to be assigned, in that situation, would the level at which the decisions were made as to the CAMEL ratings, would that rise at the two agencies to higher levels?

A. Yes. Ratings -- ratings work like this: The EIC recommends ratings to the field manager. The field manager recommends ratings to the AD. The AD has the authority to finalize those and can do it at that level.

If there is an issue in regard to the

ratings, or a difference between what the field manager has recommended to the AD and what the AD thinks it will be, the AD will usually consult with the regional deputy director to make sure, if there is going to be a difference.

If a rating is ever changed by a senior person in the chain, they go back and get concurrence with those ratings from everyone below. Or if we can't get concurrence, a written description as to why there is no difference. But ultimately it gets to -- the regional deputy director has a final say only subject to my override. I've never overridden a regional deputy director.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Is it always the case that when there is a disagreement on ratings between the two agencies, either composite or individual CAMEL ratings, that the FDIC takes the more adverse view?

A. Is it always the case?

Q. Yes. I'm asking you, as a factual matter, has it proven to always be the case where the two agencies have disagreed as to the appropriate composite or individual component CAMEL ratings to be assigned to a particular agency, that that disagreement has involved a situation where the FDIC has taken a more adverse view as to the appropriate classification than the OTS?

A. I think that's accurate. I can't recall any situation where we've taken the more adverse position.

Q. Do you know why that's the case?

A. My opinions; a couple of thoughts that I have, yes, as to why that is the case.

Q. Why do you believe that to be the case?

A. When FDIC first got its backup authority to examine thrifts, they didn't

understand thrifts. Their whole experience was examination of commercial banks. Thrifts are different. Thrifts have different assets. Thrifts make home loans. Their portfolios are composed primarily of single-family residential loans, and the FDIC initially looked at those portfolios as being concentrations of assets, and that a concentration in real estate assets was bad.

They also looked at the funding of thrifts and found that thrifts used Federal Home Loan Bank advances to a far greater extent than commercial banks. And that was because commercial banks couldn't belong to a Federal Home Loan Bank. And since it was nondeposit funding that they weren't used to, and it was market financing, which they found from their experience with commercial banks having to get market financing, it was less stable and higher cost. Therefore, it wasn't good.

They didn't understand residential lending, home lending, and bank financing. Not understanding the thrift business led them to be more conservative in many of the areas. That was one thing that I think was very obvious.

Secondly, they're the insurer. It's their job to be more conservative. They protect a fund, and any risk to the fund is a risk they have to protect first. The credo of the FDIC, as I see it, is there should be no losses to the insurance fund ever.

So you take supervisory actions to prevent losses to the fund. In reality, they all know that's not always going to work. There will be losses. But their efforts are to prevent it. They're more conservative in their positions than the other regulators. And that includes the OCC and the Fed, as well as the OTS. That's my opinion.

Q. Well, the OTS tends to assign active ratings also, doesn't it?

A. Absolutely.

Q. You just described what you understand the FDIC's primary supervisory goal is. What is, then, your view of the primary supervisory goal of your agency in conducting examinations and assigning ratings also?

A. Our primary goal is to assure they're operating in a safe and sound manner in compliance with their laws and regulations.

Q. Do you believe that the OTS is nonsufficiently rigorous in examining institutions under its jurisdiction in assigning ratings?

A. I believe we do our job very well.

Q. Do you believe that your agency assigns the appropriate rating and examination findings under the given concerns?

A. Yes, I do.

MATERIAL REDACTED

MATERIAL REDACTED

Q. That's all I'm asking.

In the situations where at the end of the day -- and by "the end of the day," I'm referring to the end of the day of a joint examination, the two agencies were not able to reconcile their differing views, is it -- was it most often the case that the agencies would differ by a single numerical factor? For example, the FDIC says capital should be rated a 4, the OTS said 3; the FDIC says earnings should be a 3, the OTS says 2? Did it typically come down to a single-digit difference, or would it typically be a more serious difference of opinion, when the agencies could not reconcile their views, based on your personal experience?

A. My experience -- and there are two things to this, too, okay?

Component ratings aren't as significant as the composite, so far as differences between the agencies. What we try to reconcile at the end of the day is the composite rating. That's what we try to get to. And we may differ on the

components and how we get there, but we try to reconcile to the composite. If that's what we can't reconcile, we can often agree to disagree.

On composite ratings, I don't think you'll find any situations -- I can't think of any situations, put it that way, that the difference would have been more than one level, a 3 versus a 4 or a 4 versus a 5 or a 2 versus a 3.

On the component ratings, there would have been more than one or two. But I think generally the differences are kept to within one.

Q. Was any effort made -- any effort at all made in cases of difference to reconcile component ratings, even if the effort wasn't as large an effort, to reconcile composite ratings?

A. Oh, yeah, we always talk about the component ratings as well. We try to get to agreement there. But that's not as important to us as getting a composite reconciliation.

Q. Not as important, but you'd still try to reconcile them if you could?

A. Yeah. If we had a difference, we want to understand why. "What do you see we don't see?" "Why do you think this way?" And typically I think we would find that the reasons

that there was a difference between a rating on a component basis is because of different philosophies or approaches to those -- to the same issues, not just agency culture and agency policy, agency philosophy.

Q. In the late '90s through today, Mr. Karr, do you find that situations where the agencies are not able to reconcile their view as to the composite rating of a given institution occur less frequently?

A. They're rare today.

Q. For what period --

A. In fact, I don't know of any in the last four or five years that we haven't been able to come to agreement on.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Mr. Karr, prior to the break, do you
recall we were talking about differences in CAMEL

ratings assigned by the FDIC and the OTS, and you testified as to the efforts that would be made to reconcile opinions between the agencies? Do you recall that?

A. Yes.

Q. And the cases in which there were differences, it would be a difference in only one number, 3 to a 4 or a dispute between a 2 and a 3. Do you recall that?

A. That was generally the case, yes.

Q. Why weren't there cases, in light of the thousands of institutions examined, differences would be two numbers, a 4 to 2, for example?

A. Why would that happen?

Q. Why wouldn't that happen?

A. Why wouldn't there be two-grade differences?

Q. Right.

A. If it, in fact, happened that -- I -- why would there be two? I answered the question with why would there be two?

Why wouldn't there be two? We don't get -- when we look at issues, we may have differences of opinion as to our conclusions on

those. We're not that far apart.

Q. What would it indicate to you, as a supervisor, if there was a difference of two in the composite rating on a specific component?

A. What would it indicate to me if there were?

Q. What would it indicate to you with respect to a specific institution if the FDIC were to assign a 4, for example, and the OTS were to assign a 2?

A. Purely hypothetical. What's the merits in why? What are we talking about here? There was a ratings difference of 2. My first question is, why are we so far apart? But I'd need to know the details. Anybody would ask that question. I would hope the examiners would have done that in the first place.

Q. Would you consider that a significant difference in the supervisory judgment, the difference between a 4 and a 2, if it could not be reconciled?

A. I don't think it's -- if you've got a ratings difference of two, I don't think it's in judgment. I think it's in approach and philosophy and policy that would create that

difference, not in judgment.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Sorry. Does this document indicate to you whether or not the OTS and the FDIC had a different view of the supervisory health of River Valley during the period covered by this document?

A. I think what this document indicates to me is we had a difference in the rates that we assigned to the institution.

Q. Does this refresh your recollection,

sir, on a specific point, which is, do you recall this morning I asked you whether you could recall any instance -- any situation where there was a difference of at least two numbers between the composite rating signed by the OTS and the composite rating signed by the FDIC, and I believe you indicated that you could this morning recall no such instance. Do you recall that testimony?

A. That's right.

Q. What does this document indicate, sir?

A. This indicates a composite rating -- that we had a 2 composite rating, and they had a 4.

MATERIAL REDACTED

Q. Who was Larry Kenny?
A. He's our capital market specialist.
Q. What is a capital market specialist?
A. He's our expert on capital markets issues, including investments, portfolios, derivatives, that kind of thing.
Q. Is Mr. Kenny still employed in your office?
A. Yes.
Q. What position does he hold today?
A. He's our capital market specialist.
Q. Same position?
A. Yes.
Q. Does he report directly to you?
A. No.
Q. Who does he report to?
A. He reports to one of my deputy directors, Dan McKee.
Q. Would he have reported to Mr. McKee at the time of this memorandum in 1992?
A. No, Mr. McKee was in -- I'm not even sure he was with us then. If he was, he would have been in Cincinnati.
At that time my recollection is he probably reported to Deputy Director Gerbick,

G-e-r-b-i-c-k, first name Phil.

Q. Is Mr. Kenny a one-man show, or does he have a staff of capital market specialists?

A. He's a one-man show. He has nearly a hundred examiners that all have their own unique expertise in capital markets that assist him.

Q. Who would have made the decision to involve Mr. Kenny in the supervision of River Valley Savings Bank at this time?

A. Who would have made the decision?

Q. Yes. How would he have become involved in this situation?

A. Usually on request of the field manager. In this case Larry Ferries.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you know whether, referring to this Frank letter again, your office ever required -- do you see the reference at the bottom of the second paragraph to a 7 percent tangible capital level?
A. Yes.
Q. Did your office ultimately require such a capital level?
A. I'm not aware that it required 7 percent tangible capital ratio.
Q. Is that something that you likely would have been aware of, if it would have been done?
A. Yes.
Q. Do you know why the decision would have been made not to impose such a capital requirement, based on your understanding of the condition of the bank and issues presented by the bank?
A. Why we wouldn't have done it?
Q. Yes. I read this as a suggestion by the FDIC, to require 7 percent tangible capital level. I'm asking you, based on everything you know on the institution, do you have an

understanding why your office would not have implemented this suggestion?

A. I -- my recollection of the case, institution was meeting its fully phased-in capital requirements at this time. Absent a conclusion on our part that there was significant risk to the capital position of the institution that would reduce that level, we would not require a higher capital level.

Q. And your examiners did not find that type of risk, so you did not require the capital level suggested by the FDIC, correct?

A. That's correct.

MATERIAL REDACTED

Q. Now if you look at Exhibit 10, the second page, Mr. Karr, the third paragraph, second sentence states:

"Our transmittal letter to the OTS again urges that an increased capital level

should be strived for and strongly suggests that appropriate dividend restrictions be established."

Do you see that?

A. Yes.

MATERIAL REDACTED

Q. Let me step back. This letter was, presumably received by you shortly -- "this letter" being Exhibit 9, was presumably received by you shortly after March 9, 1993, and we refer to the suggestion in the letter that "the level of capital protection is still considered

inadequate," and it continues, "We continue to believe that an increased level of capital protection is warranted for this institution."

And my question is simply, in response to that statement, or otherwise, did your office, in response to the receipt of Exhibit 9, direct River Valley Savings Bank to increase its capital level?

A. Not in response to this letter or subsequent to it, I don't believe we did.

Q. You're not aware of --

A. I'm not aware of any action we took in response to this letter to have River Valley increase its capital levels.

MATERIAL REDACTED

With respect to the -- do you believe or do you know whether this information contained in Ms. Frank's letter that this volume of classifications on which the agencies did not agree represents 85 percent of the FDIC's total classifications, do you believe that that fact was a large part of the reason underlying the difference between the 4 composite rating

assigned by the FDIC and the 2 composite rating assigned by the OTS?

A. I believe it was, yes.

Q. And you base that based on your general personal involvement at the time?

A. And these documents that we've reviewed today.

Q. To the extent they refreshed your recollection?

A. Yes.

MATERIAL REDACTED

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BANK OF AMERICA, FSB, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-660C
)
UNITED STATES OF AMERICA, )
)
Defendant. )
------------------------------)
HOMER J. HOLLAND and HOWARD )
R. ROSS, )
)
Plaintiffs, )
)
vs. ) No. 95-524C
THE UNITED STATE OF AMERICA, )
)
Defendant. )

AMERICAN CAPITAL CORPORATION )
and TRANSCAPITAL FINANCIAL )
CORPORATION, )
)
Plaintiffs, )
)
vs. ) No. 95-523C
THE UNITED STATES OF AMERICA, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 13, 2000

Reported by: Melissa Belice, CSR No. 084-003391

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For Plaintiffs Bank of America and American Capital:

RACHEL BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C. 20005
(202) 220-9670

For the U.S. Department of Justice in Case No. 95-660C:

TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 353-8841

For the FDIC in Case No. 95-523C:

BARBARA KATRON, ESQ., (telephonically)
550 17th Street, N.W.
Washington, D.C. 20429
(202) 393-8400

INDEX


| WITNESS | PAGE |
|---|---|
| RONALD N. KARR | |
| By Mr. Cayne (Holland) | 250 |
| By Ms. Brand (AMCAP) | 285 |
| By Ms. Brand (HonFed) | 317 |
| Afternoon Session - 329 | |
| By Mr. Cayne (Bank of America) | 409 |


EXHIBITS


| | |
|---|---|
| Holland-Karr Exhibit | |
| No. 18 | 258 |
| No. 19 | 267 |
| Nos. 20 and 21 | 270 |
| AMCAP-KARR Exhibit | |
| Nos. 1 and 2 | 287 |
| No. 3 | 292 |
| No. 4 | 293 |
| No. 5 | 300 |
| Nos. 6 and 7 | 302 |
| No. 8 | 315 |

EXHIBITS (cont.):

HonFed-Karr Exhibit

| | |
|---|---|
| No. 1 | 322 |
| No. 2 | 329 |
| No. 3 | 338 |
| No. 4 | 339 |
| No. 5 | 348 |
| No. 6 | 353 |
| No. 7 | 358 |
| Nos. 8 and 9 | 363 |
| No. 10 | 372 |
| No. 11 | 373 |
| No. 12 | 376 |
| No. 13 | 378 |
| No. 14 | 380 |
| No. 15 | 381 |
| No. 16 | 384 |
| No. 17 | 390 |
| No. 18 | 395 |
| No. 19 | 395 |
| No. 20 | 400 |
| Nos. 21 and 22 | 402 |
| No. 23 | 438 |

MATERIAL REDACTED

Q. Just for the record, could you identify what Exhibit 2 is.

A. It's a memo to me from Chester Biedron. Subject: FDIC risk-based subgroupings.

Q. Am I correct that that memorandum reflects the CAMEL rating assigned to the management component of River Valley Savings at that time?

A. Yes.

Q. And what is the management rating assigned at that time?

A. Under our rating, it's a 2. Under the FDIC rating, it's a 3.

Q. And under the OTS rating, do I understand correctly from yesterday's testimony that you would consider a 2 a fully satisfactory management rating?

A. Yes.

Q. And you indicated that you were familiar at least with Mr. Ross, correct?

A. Yes.

Q. And was that your view personally that management of River Valley Savings, during the period of your supervision of the institution, was satisfactory?

A. The only management official that I knew well enough to make a personal opinion on was Homer Holland. And I viewed Mr. Holland to be a competent, able, highly respected manager.

Q. And what was the basis of your personal view that you just stated?

A. From conversations with him in regard to how he was managing the institution.

Q. Would the basis of your understanding or

your view also be conversations with your staff or your examiners?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And I understand that in sitting here

today you don't have a recollection whether you specifically or your office was contacted concerning the San Antonio transaction, but let me ask you this, sir, which I think you might be able to answer, and tell me if you can.

Had you been contacted based on your opinions of particularly I believe Mr. Holland, what views would you have given to the I think you said Midwestern district and advise them whether Mr. Holland in particular had the competence or the integrity to acquire an additional thrift institution?

MATERIAL REDACTED

THE WITNESS: I wasn't asked to my recollection, but my guess is that I would have given a favorable opinion of Mr. Holland.

BY MR. CAYNE:

Q. And specifically what would you have said?

A. As I said before, that I believe that he was a competent and highly respected manager.

Q. And you would I take it not have a qualm or a hesitancy in -- you would not have a reason to advise your colleagues that the office considering the application ought not to approve the transaction, not to approve the acquisition?

A. Not based on his management ability, that's correct.

MATERIAL REDAC

Q. I'd like to go two paragraphs down, Mr. Karr. Five, six lines into the paragraph, the text reads the OTS did not classify the investment securities -- and let me just clarify. I'm going to read you a passage, and then you can read as much as you need to put it into context.

But I simply want to ask you whether you agree or disagree with another passage from this memorandum. And the passage I want to ask whether you agree with or disagree with is the following:

The OTS did not classify the investment securities since we determined that the derivative instruments were acceptable investments. Based upon our past experience with the institution, we determined that the management of River Valley had adequate expertise and analytical systems to manage and evaluate the investment portfolio.

My question simply is whether or not you agree or disagree with that statement from

Mr. Biedron.

A. Yes, I do.

MATERIAL REDACTED

Q. Turn, please, Mr. Karr, to Page 3. And I'd like to ask you about the final paragraph on this page. It specifically reads the difference

in the capital adequacy as determined by the FDIC and OTS is attributed to the classified derivative products. The level of adverse classifications, excluding the high risk mortgage derivative products, does not raise significant concern with regards to its impact on River Valley's capital position.

Could I understand correctly, Mr. Karr, based on your previous testimony, that you would also agree with the statement I just read?

A. Yes, I would.

Q. And could I just ask you what would the basis of your agreement with that statement be.

A. I think the statement speaks for itself. I think it's an accurate statement. I agree with it because I believe it's an accurate statement.

Q. And then the next paragraph, Mr. Karr, on Page 4, and I have the same type of question, it states, starting with the second sentence of that paragraph, the primary difference between the FDIC and the OTS's findings is attributed to the treatment of high risk mortgage derivative products set forth in the FDIC and OTS's respective policies.

Do I also understand correctly that you

would agree with that statement, Mr. Karr?

A. I believe that's an accurate statement, yes.

Q. Mr. Karr, my last question on this document, at the end of this paragraph the sentence reads, however, the OTS continues to maintain that the high risk mortgage derivative portfolio does not warrant classification in accordance with OTS regional policy since we do not classify interest rate risk.

Do I also understand correctly that you would agree with that statement, Mr. Karr?

A. Yes.

MATERIAL REDACTED

Q. In the period following enactment of FIRREA, what agency or what office was the primary regulatory power or supervisor of River Valley Savings Bank?

A. OTS.

Q. And was the OTS the primary supervisor of River Valley for the entire period from the enactment of FIRREA until River Valley was sold?

A. Yes.

MATERIAL REDACTED

Q. We spoke briefly yesterday about Larry Kenney. Do you recall that?

A. Yes.

Q. He is your office capital market specialist?

A. Yes.
Q. Can you describe for me your view of his qualifications?
A. He's one of the best in the country.
Q. And on what basis do you give me that view? What is your basis for that view?
A. I've seen his work. Others have seen his work, and they have commented to me on the quality of his work. Institutions have had him come out and help them with their own problems. They have given me their opinion of his work. He's been evaluated not only by his own supervisors but by the industry itself. He's proven himself to be a highly qualified, one of the best capital market specialists in the country.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And we touched on this yesterday, but I want it clear on the record. How, if at all, did Mr. Kenney, during the time period 1992 through 1995, assist in the review and analysis of the investment portfolios of the River Valley Savings Bank?

A. I don't know specifically what his role was. If he participated in the examination, I don't know specifically what he did.

Q. And you believe that the examiner in charge would have requested his participation?

A. That's what I said yesterday, yes.

Q. Would you believe that Mr. Ferries as the field manager would be familiar with the role that Mr. Kenney played back in that time period?

A. That's likely, yes.

# EXHIBIT 2

November 4, 1992

TO: Ronald N. Karr
Central Regional Director

FROM: Chester A. Biedron
Deputy Regional Director

SUBJECT: FDIC Risk-based Subgroupings
River Valley SB, FSB, #08515
Peoria, Illinois

Asset Size: $446,740,00 as of 9/30/92

| | C | M A C R O | DATE |
|---|---|---|---|
| Most Recent OTS Exam Ratings: | 2 | 2 2 2 3 2 | 10/28/91 |

| | C | C A M E L | DATE |
|---|---|---|---|
| Most Recent FDIC Exam Ratings: | 4 | 4 4 3 2 3 | 10/26/91 |

Comments

The FDIC Difference Analysis has assigned River Valley to Supervisory Subgroup C. The primary concern noted in the Analysis concerns the significant volume of high risk mortgage derivative products adversely classified by the FDIC. As a result of the large amount of classified assets and investment activity, the FDIC has determined that River Valley's level of capital is inadequate.

The October 26, 1991 FDIC Report of Examination ("FDIC Report") indicated that adversely classified assets totaled $48,058,000, or 8.95% of total assets and 211.45% of tangible capital. Investments in derivative real estate mortgage-backed products comprised 85% of total adverse classifications.

The FDIC Report cited that management of River Valley failed to document how the mortgage derivatives purchased reduced overall interest rate risk. Further, management did not document how these investments were used to control interest rate risk on identified assets or a well defined group of assets. The FDIC noted that the derivative products purchased were extremely volatile to changing interest rates and exposed the institution to substantial loss. The FDIC believed that the limitations regarding the amount of derivative products the institution may purchase were too high and that these limitations should be reviewed by the board. As a result, the FDIC considered most of these instruments unsuitable investments for a depository institution and were adversely classified.

EXHIBIT
Holland-Karr 8
7-12-00

The October 28, 1991 OTS Report of Examination ("OTS Report") noted that classified assets totaled $8,118,925, or 1.51% of total assets and 31.1% to tangible capital plus general valuation allowances as of September 30, 1991. Classified assets primarily consisted of mortgage loans and real estate owned. Although the OTS did not classify the investment securities, we did agree that they presented a high risk profile.

The OTS Report criticized the investment activity at River Valley with regards primarily to documentation deficiencies and excessive investment limits. Corrective action for these deficiencies was recommended to the board of directors in the Summary section of the OTS Report and all recommendations had been agreed to by management. The OTS did not classify the investment securities since we determined that the derivative instruments were acceptable investments and that the management of River Valley had the expertise to manage the investment portfolio. In their review of investments, the examiners followed the guidelines set forth in Thrift Bulletin 52 which was not yet issued but in the comment stages at the examination. However, the memorandum mirrors the OTS Regional Policy regarding the treatment of derivative investments. The OTS determined that the derivative investments did not warrant classification according to TB 52 and Regional Policy.

As a result of the serious concerns regarding investment activity and the volume of classified assets, the FDIC considered capital protection at River Valley inadequate. The OTS determined that the institution maintained an acceptable level of capital in relation to classified assets and investment activity. At the October 1991 examinations, River Valley reported fully phased-in tangible, core and risk-based capital of 4.5%, 6.0% and 12.6% of tangible, adjusted tangible and risk-weighted assets, respectively. The institution also complied with its March 25, 1991 Supervisory Agreement which required a tangible capital level of 4.0% of tangible assets at September 30, 1991.

As of September 30, 1992, the institution remains in compliance with the Agreement which requires a tangible capital level of 5.0% of tangible assets. River Valley reported tangible, core and risk-based capital of 5.2%, 6.7% and 12.9% of tangible, adjusted tangible and risk-weighted assets, respectively.

Based upon the findings of the most recent FDIC and OTS examinations, the OTS does not agree that River Valley should be assigned to Supervisory Subgroup C. Although we have not classified the high risk derivative investments, we do maintain the same supervisory concerns with regards to the numerous documentation deficiencies noted. Both FDIC and OTS examinations are currently in progress at the institution and the risk management area is being thoroughly reviewed. While this examination may result in increased concerns regarding the investment activity, we do not anticipate an overall rating below "3". Therefore, we believe that River Valley should be in Subgroup A, but no lower than B.

# EXHIBIT 9

FDIC
Federal Deposit Insurance Corporation
Division of Supervision
30 South Wacker Drive, Suite 3100, Chicago, Illinois 60606 • 312-207-0210 Chicago Regional Office

OFFICE OF
THRIFT SUPERVISION
93 MAR 11 AM 11:57

March 9, 1993

Mr. Ronald N. Karr
Regional Director
Office of Thrift Supervision
111 East Wacker Drive - 8th Floor
Chicago, Illinois 60601

EXHIBIT
Holland-Karr #9
7-12-00

Dear Mr. Karr:

SUBJECT: River Valley Savings Bank, F.S.B.
Peoria, Illinois

Enclosed for your review and files is a copy of the Federal Deposit Insurance Corporation's Report of Examination of River Valley Savings Bank, F.S.B. (River Valley), Peoria, Illinois. This Report of Examination was prepared by Examiner Nancy L. Griffin as of October 16, 1992 and was conducted concurrently with examiners from your Agency.

As indicated in our letter of January 12, 1993, while this office acknowledges improvement in River Valley's condition, we continue to have serious concerns with regard to the institution's overall risk profile. Tier 1 leverage capital and tangible capital ratios have increased to 5.06% and 4.04%, respectively, but the level of capital protection is still considered inadequate given the institution's investment practices. We continue to believe that an increased level of capital protection is warranted for this institution and strongly suggest that appropriate dividend restrictions be established to prevent any potential depletion of the current capital position. The institution continues to heavily invest in mortgage derivative products such as Interest Only strips, Principal Only strips, residual tranche Collateralized Mortgage Obligations and excess servicing strips. Such products have reportedly been purchased for hedging and non-hedging purposes; however, documentation in support of the hedge position continues to be lacking. As outlined in the Report, in most instances these instruments are considered unsuitable investments for a depository institution and are subject to adverse classification. Adversely classified assets, centered mainly in derivative products, represent a high 149.5% of tangible capital.

FDIC policy rule, they classify, IRR, we don't

As you are aware, our examination reports utilized the "vector analysis approach" for classification of the derivative products. Subsequent instructions from our Washington Office indicate the regulatory agencies have agreed that this approach is no longer to

River Valley Savings Bank, F.S.B.
Peoria, Illinois

be utilized. Although we did not believe it appropriate to adjust the findings of our report, it is important to note that a calculation of the value of these derivative products using consensus prepayment estimates reflects additional loss of approximately $5 million. If this $5 million were deducted from the institution's capital accounts, the Tier 1 leverage capital ratio would decline to 3.97% and the tangible capital ratio would approximate 2.94%. It is suggested that the institution be promptly informed of the agencies' mutual decision not to accept vector analysis at this time so that they may appropriately account for their mortgage derivative portfolio in the future. who are the "agencies"

It again appears that several of the derivative products have not received appropriate accounting treatment. The Report indicates that management has not always restated the carrying values of residuals in accordance with Emerging Issues Task Force (EITF) 89-4. In addition, the investment policy is in need of revision. The policy currently permits transaction sizes and maximums for the trading account which are considered large and expose the institution to sizeable potential losses at the present stop loss limits. Appropriate limits for the institution's "held for sale" portfolio should also be established. All writedowns required by GAAP have been taken. Loss limits have been established

Although the institution reported an impressive 1.78% return on assets for 1991, it is noted that this earnings performance was boosted by several non-recurring items. The losses detailed in the enclosed Report of Examination will have a substantial adverse impact on 1992 earnings performance. An increase in interest rates would also adversely impact earnings due to the institution's liability sensitive position. Management has established a "stop loss limit" of 15% of tangible capital for a 200 basis point increase in interest rates; however, this limit is considered too high and continues to expose the institution to substantial risk involving interest rate movements. reduced to

As indicated in our January 12, 1993 letter, due to the continued high risk profile of the institution we believe the outstanding Supervisory Agreement continues to be warranted. In addition, based upon the findings of our examination we have assigned a composite 4 rating to the institution under the Uniform Financial Institutions Rating System. Should you have any comments or concerns regarding the above, Assistant Regional Director Susan Madson or Review Examiner Jeffrey Bonham may be contacted.

Sincerely,

Simona L. Frank
Regional Director

Enclosure

# EXHIBIT 10

CHI:JJPoskonka:2-23-93:W:\SA\32600\docs\prb
cc: (original)DOS/SSAS, File 2, Ms. Frank, Ms. Madson, Mr. Reinhardt, JMB, RTL,
Section File, R/F

Rcvd. WO: 3-16-93

CONFIDENTIAL PROBLEM INST MEMORANDUM CERT: 32600 MEMO-DATE: 02 / 23 / 93
CITY:[redacted] ST: IL CLASS: SB RATING: CURRENT 4
FORMER 4
INST:[redacted]
DATE ESTABLISHED: 07 / 28 / 1988 DATE INSURED: 07 / 28 / 1988 FUND ID: SAIF
CONTROLLING OWNER: RIVER VALLEY HOLDINGS, INC PERCENT OWNED: 100. %
DATE ACQUIRED: 09 / 25 / 91
CHAIN IDENTIFICATION: N/A
BHC NUMBER: N/A BANKS CONTROLLED BY BHC/CHAIN: 1 / 0

INSTITUTION EXAMINATION DATA:

| | | | |
|---|---|---|---|
| EXAM DATE/TYPE/SCOPE........ | 10-16-92/C/1 | 10-26-91/C/1 | 08-18-90/C/R |
| EXAMINER-IN-CHARGE.......... | GRIFFIN,N.L | JOHNSON,R.F | JOHNSON,R.F |
| UNIFORM BANK RATING......... | 44333/4 | 44323/4 | 55333/4 |
| TOTAL ASSETS................ | 446,791 | 537,200 | 425,371 |
| TOTAL LOANS................. | 242,704 | 223,916 | 162,371 |
| TOTAL DEPOSITS.............. | 355,528 | 355,850 | 276,076 |
| EQUITY CAPITAL.............. | 27,880 | 24,136 | 11,723 |
| DISALLOWED INTANGIBLES...... | 129 | 93 | 0 |
| LOSS........................ | 5,444 | 2,142 | 1,996 |
| PART 325 TOTAL ASSETS....... | 441,095 | 534,603 | 423,375 |
| TIER 1 CAPITAL/TIER 1 RATIO | 22,307/ 5.1 | 21,901/ 4.1 | 9,727/ 2.2 |
| ADJ TIER 1 CAP/ADJ TIER 1 % | 22,307/ 5.1 | 21,715/ 4.1 | 9,727/ 2.2 |
| TOTAL RISK WEIGHTED ASSETS. | 228,753 | 260,628 | N/A |
| TIER 1/TOT RISK BASED CAP % | 9.8 / 10.3 | 8.4 / 8.9 | N/A / N/A |
| ALLOWANCE FOR LOANS........ | 1,201 | 1,386 | 476 |
| PROVISION NEEDED........... | 0 | 0 | N/A |
| SUBSTANDARD................ | 21,231 | 45,630 | 19,272 |
| DOUBTFUL................... | 0 | 286 | 0 |
| TOTAL CLASSIFICATIONS...... | 26,675 | 48,058 | 21,268 |
| TOT CLASS/TOT CAP & (X) LVR | 113.5 | 206.4 | 174.3 |
| LOAN %:CLAS/OD/NONAC(NOTOD) | 2.1/ 4.4/ N/A | 2.0/ 6.0/ N/A | 2.5/ 3.2/ N/A |
| SPECIAL MENTION/TIER 1 CAP. | 0/ 0.0 | 0/ 0.0 | 595/ 4.9 |
| CONCENTRATION TO TIER 1 CAP | 138.9 | 203.5 | 690.3 |
| CLASS CONCENTRATION/NO..... | 23,537 / 1 | 36,380 / 2 | 86 / 1 |
| LIQUIDITY %/DEPENDENCY %... | 42.9 / 11.0 | 46.5 / 27.6 | 45.3 / 56.1 |
| LRG DEP %/NO LRG/EST INS DE | 0.0 / 0/ 97.0 | 0.0 / 0/ 96.0 | 0.0 / 0/ 99.0 |
| RSA - RSL 3/6/12........... | 53.1/41.2/50.8 | 27.6/30.2/47.6 | 58.6/68.6/72.2 |
| GAP AS % ASSETS 3/6/12..... | 14R/ 27R/ 28R | 29R/ 37R/ 33R | N/A / N/A / N/A |
| % RSA/RSL CAPTURED 3/6/12.. | 31.5/48.9/61.7 | 42.8/55.7/66.4 | N/A / N/A / N/A |
| TANGIBLE/CORE CAP. RATIOS | 4.04/5.06 | 4.06/4.06 | 1.12/2.61 |

INSTITUTION EARNINGS AND RESERVES

| COMPONENT DISPLAYED/PERIOD... | 12-31-92 | 12-31-91 | 12-31-90 | 12-31-89 |
|---|---|---|---|---|
| NET OPERATING INCOME......... | 3,314 | 9,003 | 3,157 | 1,518 |
| CASH DIVIDENDS............... | 509 | 598 | 651 | 767 |
| SALE OF EQUITY CAPITAL....... | 0 | 2,002 | 0 | 0 |
| NET OTH ADDITIONS OR DEDUCTIO | 5,898R | 3,677R | 0 | 0 |
| NET CNG IN EQU CAP ACCNTS.... | 3,093R | 6,730 | 2,506 | N/A |
| NET LOSSES-INT. BEARING ASSET | 1,705 | 1,722R | 502 | 0 |
| PROVISIONS FOR LOSSES........ | 190 | 325R | 1,929 | 409 |

SELECTED RATIOS AND TRENDS:

| SELECTION DISPLAYED/PERIOD. | 09-30-92 | 12-31-91 | 12-31-90 | 12-31-89 |
|---|---|---|---|---|
| ASSET GROWTH RATE.......... | 16.78R | 30.78 | 3.78 | 8.49R |
| CASH DIVD TO NET INCOME.... | 20.12 | 8.61 | 23.79 | 54.17 |
| NET OPER INC TO AVG ASSETS. | 1.21 | 1.80 | 0.78 | 0.37 |
| OVERHEAD EXP/AVG ASSETS.... | 2.58 | 2.23 | 2.13 | 2.55 |
| NET INT INC (TE)/AVG ASSETS | 3.76 | 3.29 | 2.81 | 2.25 |
| NONINT INC/AVG ASSETS...... | 0.72 | 0.34 | 0.56 | 0.39 |
| LOAN RES TO TOTAL LOANS.... | 0.86 | 1.05 | 1.34 | N/A |
| NET LOAN LOSSES TO AVG LNS. | 0.22 | 1.07R | 0.31 | N/A |
| EARN COVG NET LOAN LOSS.... | 19.08 | N/A | 11.13 | N/A |
| AVG EARN ASSETS/AVG ASSETS. | 95.26 | 97.21 | 99.13 | N/A |
| VOLATILE LIAB DEPENDENCE... | 25.50 | 55.31 | 68.29 | N/A |
| BROKER DEPOSITS TO DEPOSITS | 1.44 | 1.38 | 0.00 | 0.00 |

R - Indicates deficit figure NA - Not Available or Not Applicable
(000's omitted in dollar amounts)

EXHIBIT
Holland-Kaie #10
7-12-00

FHO012 2396 HOLLAND 95-524C RIVER VALLEY SB DOCKET # 06822 TRANS 880729 RIVER VALLEY SB FSB DOCKET # 08515 TRANS 881230 WIN BOX # WC00016887 OLD BOX # 3 OF 4 CORRESPONDENCE; REPORTS OF EXAMINATION; SUPERVISORY RESPONSIBILITIES; ANALYSIS 911099-950199 F CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE

CONFIDENTIAL MEMO TO DOS FILES - (S&L)

River Valley Savings Bank, F.S.B.
Peoria, Illinois

Identification and Nature of Problem

Operating with a high volume of unsuitable investments along with inadequate policies and procedures regarding investment strategies and interest rate risk render capital protection inadequate.

Subject is the resultant of the 9-25-91 merger between affiliated River Valley Savings Bank, Rock Falls, IL and River Valley Savings Bank, FSB, Peoria, IL. Simultaneously, River Valley Holdings, Inc. was formed and acquired subject. The parent company is wholly owned by Chairman of the Board Howard R. Ross and Director Homer J. Holland. Messrs. Holland and Ross, along with CEO Bangert, dominate in policy matters. Overall, management is considered knowledgeable but is too willing to take excessive risk through investment practices. Approximately 73% ($19.6 million) of total classifications are represented by mortgage derivative products. The examination report was completed utilizing "vector analysis" rather than "consensus analysis" in estimating the actual market value of the mortgage derivative products. Subsequent to the examination being completed, it is understood that the regulatory agencies have determined that vector analysis is not an acceptable method of market value determination, at this time. While changes to the examination report were not made, using the "consensus analysis" would increase Loss classifications for the derivative securities by approximately $5 million and would cause the institution's Tier 1 and tangible capital ratios to decline to 3.97% and 2.94%, respectively. Derivative products have been purchased for hedging and non-hedging purposes; however, documentation supporting a hedge position is often inadequate. With the types and volume of transactions, it is apparent that management is speculating on interest rates. It was also noted that management was not always restating the carrying values of residuals according to Emerging Issues Task Force 89-4 which requires that the recorded balance not exceed the undiscounted estimated future cash flows. In addition, established limits for the trading account are considered excessive and expose the institution to an undue amount of risk. Our concerns regarding the volume of derivative products held by the institution were detailed in the transmittal letter to the OTS. Follow-up action regarding these investments will be determined based upon the response received from the OTS. Concentrations consist of derivative products and purchased mortgage servicing rights.

Given management's investment activities, the institution's capital position is considered inadequate. Our transmittal letter to the OTS again urges that an increased capital level should be strived for and strongly suggests that appropriate dividend restrictions be established to prevent the unwarranted depletion of the current capital position. The ALLL/total loan ratio of 0.5% was considered adequate by the examiners due to overall sound condition of the loan portfolio. Earnings for both 1990 and 1991 were favorably affected by various one-time accounting adjustments (sale of branches/loans/investments and reverse provision for loan losses).

Liquidity ratio is representative of the high investment in mortgage backed securities and derivative products; however, as the dependency ratio reflects, the institution utilizes a large volume of borrowings to fund these investments. Although still highly liability sensitive, the institution's rate sensitivity is improved over prior years due to an increase in adjustable rate mortgages and a reduction in short-term borrowings from FHLB and reverse repo agreements. While not included in the rate sensitivity analysis, the large holdings of residual products do provide some protection against the potential effects of rising interest rates; however, thrift's mortgage banking activities are unhedged, increasing the exposure to increased interest rates. Significance of the institution's liability sensitive position is further evidenced at the 3 year horizon, where a negative GAP of 43.2% is evident with 85% of all interest bearing liabilities captured.

River Valley Savings Bank, F.S.B.
Peoria, Illinois

Management of the institution does not monitor Gap, but rather manages interest rate risk on a "net bond basis". Net bond represents the difference in duration between asset and liability portfolios. The asset/liability policy also prescribes guidelines, within the limitations set by the OTS, for maximum changes in market value of portfolio equity and net interest income for up to 4% changes in interest rates. Although the institution is presently within these guidelines, the unhedged position of the thrift's mortgage banking activity and the high volume of derivative products present a substantial risk exposure to interest rate movements. Our concerns in this area are included in the transmittal letter to the OTS.

Brokered deposits reflected as of the examination date were acquired through the merger with River Valley Savings Bank, Rock Falls, IL. Maturities of these deposits range from 7-2-93 to 6-6-95. No rollovers or renewals of such deposits have occurred and the thrift has not applied for a waiver to increase or continue the use of these deposits.

Despite concerns over the large volume of volatile mortgage derivative products and the inadequate level of capital protection, the institution is not believed to represent an immediate threat to the insurance fund.

Corrective Action

As a result of the August 18, 1990 examination, the institution entered into a Supervisory Agreement ("SA") with the OTS on March 25, 1991. The SA addressed violations, classifications, capital, investment practices and transactions with affiliates. For the most part, provisions of the SA have been met with the exception of tangible capital maintenance and compliance with applicable laws. This office has informed Chicago OTS that continuation of the SA is believed necessary. Recommendations for further corrective action will be reviewed upon receipt of the OTS' response to our concerns regarding inadequate capital, the substantial volume of mortgage derivative products which are poorly documented, and the significant interest rate risk potential.

While results of the concurrent OTS and FDIC examinations are similar, with the exception of the Substandard classification accorded the derivative products by the FDIC, the agencies continue to assign a different composite rating. A MACRO rating of 32443/3 was assigned by the OTS based upon results of the current examination, a reduction from the composite 2 rating assigned by the OTS following the October 26, 1991 concurrent examination. The significant difference in the component ratings assigned to the thrift's asset quality appears to result from policy differences between the agencies regarding how to reflect the substantial risk presented by the large mortgage derivative product holdings. The OTS reflects this exposure in their "Risk" component, opposed to the FDIC's assignment of such risk in the "Asset" component. The difference in the composite ratings were discussed thoroughly at the field examiner level, were also relayed to OTS Field Manager Larry Ferris, and were clearly detailed in this office's 1-12-93 response to the OTS examination report. The lower FDIC rating continues to reflect our philosophical difference with the OTS in assessing the risk profile of this institution; as has been evident at prior examinations.

General

Peoria, Illinois is located approximately 160 miles southwest of Chicago. Subject operates 11 branches throughout northern Illinois, including an office in downtown Chicago. Five wholly-owned subsidiaries are operated but all are basically inactive, with primary assets being cash. The institution has trust powers; however, examination reports do not mention any problems in that area.

A composite 4 rating is recommended.

Simona L. Frank
Regional Director - Chicago

RIVER VALLEY SAVINGS BANK, F.S.B.
PEORIA, ILLINOIS

Washington Office Addendum:

The Net Other Deductions identified in the 1991 and 1992 earnings display are primarily the result of redemption of the institution's Noncumulative Perpetual Preferred Stock. This stock had been held by the thrift's parent holding company. The Office of Thrift Supervision has notified the thrift that redemption of preferred stock is considered a dividend and has discouraged additional dividends until the institution's dividend to income ratio falls within the safe-harbor limitations pursuant to OTS regulations (no more than a 75% dividend payout ratio). The institution currently has only $1 million of outstanding preferred stock.

The thrift's GAP, at the one year and three year time horizons, declines to 10.25%R and 24.69%R, respectively, when Savings and NOW accounts are excluded from the calculation.

Reviewed 5-5-93:

Kenneth A. Laun
Review Examiner

CONCUR:
Richard D. Heiar, Manager
Special Situations and
Applications Section