# LAWRENCE KENNY DEPOSITION EXCERPTS FOR USE AT TRIAL

p. 4 lines 1-6, 9-25
p. 5 line 1, lines 9-25
p. 6 lines 1-9, 16-25
p. 7 lines 1-4
p. 11 lines 19-25
p. 12 lines 1-24
p. 13 line 25
p. 14 lines 1-20
p. 15 lines 22-25
p. 16 lines 1-18
p. 23 lines 15-25
p. 24 lines 1-25
p. 25 lines 1-25
p. 26 lines 1-25
p. 27 lines 1-25
p. 28 lines 1-25
p. 29 lines 1-25
p. 30 lines 1-25
p. 31 lines 1-25
p. 32 lines 1-9, 11-25
p. 33 lines 1-17
p. 72 lines 23-25 [Kenny Exhibit 1]
p. 73 lines 1-25
p. 74 lines 1-25
p. 75 lines 1-6
p. 77 lines 15-25
p. 78 line 1, 14-19
p. 79 lines 3-25
p. 80 lines 1-12, 18-25
p. 81 lines 1-25
p. 82 lines 1-25
p. 83 lines 1-25
p. 84 lines 1-23
p. 85 lines 13-25
p. 86 lines 1-25
p. 87 lines 1-25
p. 88 lines 1-2
p. 171 lines 21-25
p. 172 line 4-15
p. 173 lines 2-25
p. 174 lines 1-12
p. 199 lines 3-25
p. 200 lines 1-25

p. 201 lines 1-25
p. 202 line 1
p. 204 lines 10-25
p. 205 lines 2-25
p. 206 lines 2-9
p. 217 lines 12-20
p. 218 lines 1-25
p. 219 lines 1-21
p. 220 lines 19-25
p. 221 lines 1-25
p. 222 lines 1-17, 19-25
p. 223 lines 1-11
p. 231 lines 14-16, 24-25
p. 232 lines 1-6
p.236 lines 12-20
p. 237 lines 1-13, 15-25
p. 238 lines 1-21, 23
p. 240 line 25
p. 241 lines 1-4
p. 254 lines 16-20 [Kenny Exhibit 6]
p. 255 lines 2-17, 20-25
p. 256 lines 1-13
p.329 line 25
p. 330 lines 1-3, 5
p. 331 lines 7-12
p. 334 lines 20-25
p. 335 lines 3-5, 18-22, 25
p. 336 lines 1-5

UNITED STATES COURT OF CLAIMS

\- - - - - - - - - - - - - - - - -x

HOMER HOLLAND, HOWARD ROSS, :

Plaintiffs, :

vs. :Case No. 95-524C

UNITED STATES OF AMERICA, :

Defendant. :

\- - - - - - - - - - - - - - - - -x

Washington, D.C.

Wednesday, February 25, 2004

Deposition of LAWRENCE A. KENNY, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, LLP, 555 12th Street, N.W., Washington, D.C. 20004, at 9:06 a.m., Wednesday, February 25, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

CERTIFIED COPY

APPEARANCES:

On behalf of the Plaintiffs:

HOWARD N. CAYNE, ESQ.
MICHAEL A. JOHNSON, ESQ.
DAVID B. BERGMAN, ESQ.
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5656

On behalf of the Defendant:

KENNETH M. DINTZER, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
(202) 616-0385

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| LAWRENCE A. KENNY | | |
| By Mr. Cayne | 4 | |

Afternoon Session - Page 147

E X H I B I T S

| KENNY EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | Transcript | 72 |
| 2 | Ltr dtd 02/13/91 to Brafman | 148 |
| 3 | Transcript | 154 |
| 4 | Memo dtd 04/11/91 fr Brafman | 248 |
| 5 | Memo dtd 06/29/89 to Short fr Martens | 251 |
| 6 | Minutes of meeting | 254 |
| 7 | Report of Examination | 259 |
| 8 | Notices document | 274 |

TELEPHONE CALL TO JUDGE MILLER: 90

P R O C E E D I N G S

Whereupon,

LAWRENCE A. KENNY,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

MATERIAL REDACTED

Q. Good morning, Mr. Kenny.
A. Good morning.
Q. For the record, could you please state and spell your name?
A. Lawrence Kenny, L-a-w-r-e-n-c-e, K-e-n-n-y.
Q. And where do you live?
A. I live in Mt. Prospect, Illinois.
Q. And where are you currently employed?
A. I'm currently employed for the Office of Thrift Supervision.
Q. What is your current business position?
A. I'm a capital markets examiner.
Q. And for how long have you held that position?
A. I have been a capital markets examiner

since May of 2002.

MATERIAL REDACTED

Q. Do you know a Mr. Ronald Karr?
A. Yes.
Q. Did he, was he formerly with the Office of Thrift Supervision?
A. Yes.
Q. What was your relationship in the corporate structure to Mr. Karr?
A. Mr. Karr was the regional director, and I reported to a supervisor who reported to him.
Q. And who was the supervisor you reported to?
A. Are we talking back at that time in nineteen -- when this occurred?
Q. Yes.
A. Oh, okay. I'm sorry. That I believe it was Phil Gerbick. You know, they changed us

around a bit, but I think Phil Gerbick was who I reported to at the time from '88 to '94, thereabouts.

Actually I had -- let me qualify that. From '88 to '94, I believe during that period, there was a couple of years where I reported to Mr. John Valek maybe until '90, '91. I lose track; and then from maybe '91 to '94, Mr. Gerbick.

MATERIAL REDACTED

Q. And who is Mr. Larry Ferries? Is that how you say his name?

A. Larry Ferries, yes. He was the field manager for the River Valley companies.

Q. And how did he relate to you in the corporate structure of the OTS?

A. As the field manager, he was responsible for reviewing my work and my comments in conjunction with the examiner-in-charge.

Usually the way it flowed was the examiner-in-charge would review the information, and then Larry would review the examiner-in-charge's findings.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Now I would take it then from your previous answer that you have taught courses for regulators?

A. Yes, sir. I developed in the '80s a course called financial instruments, futures and options.

It was a course that explained

investments and hedging and derivative instruments to examiners and regulatory people, and taught that class, wrote a manual.

Q. And for how long did you teach that class?

A. You know, I taught off and on for several years.

I think I completely got out of it around 1988 or 1987.

I may have taught it for, off and on for, you know, up to maybe five years.

Q. Have you taught any other courses?

A. Let me think. I, in 1982, I taught new examiner training school for the government, but I have not taught any, any courses outside of the government.

Q. Again, tell me the name of the course you did teach.

A. The course I taught was -- its name changed over time, but it was called at the time I developed it, financial instruments -- and I jointly developed it with another gentleman, Mr. Biedron -- financial instruments, futures and options.

MATERIAL REDACTED

MATERIAL REDACTED

Q. One thing I'm a little confused about

is you indicated that you taught that course in the 1980s, correct?
A. Yes.
Q. But you received the designation as a capital markets specialist in 1992?
A. Well, in nineteen, in 1985, when the Federal Home Loan Bank Board examiners were put under the Federal Home Loan Bank, there was a position created, and I took that position.
It was called security supervisor. Essentially it was a capital market examiner, but it was called securities supervisor, and then when OTS was created in 1989, I became a capital markets examiner or capital markets specialist, and I essentially did the same thing.
Q. So that was just the new name for, or new designation or title for what you had already been active in?
A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Back on, back to your course on financial instruments, to the extent you recall, what were, what did the curriculum of that course involve?

A. The curriculum involved a discussion of the use of derivative instruments for hedging, how to use them, a description of the types of investments and types of instruments, a discussion on various kinds of derivative investments such as CMOs, and the use of various types of borrowings related to reverse repos, dollar reverse repos, and things along those lines.

Q. Any other topics you can recall?

A. You know, that's a pretty broad gamut. I mean it covers, you know, investments. It covers hedging and all the derivative instruments that are used, and it covers borrowings, and it may have also involved, you know, the use of, you know, additional leverage with Federal Home Loan Banks and you know, other kinds of borrowings other than reverse repos.

MATERIAL REDACTED

MATERIAL REDACTED

Q. In the course of your work as a capital market specialist, do you ever perform financial analyses relating to mortgage-backed securities?

A. Yes.

Q. What types of analyses do you perform?

A. It depends on the instruments that I'm analyzing.

Q. Well, give me an example of the instruments you would analyze in the MBS field and what type of analysis you would conduct.

A. Well, I think from the most basic standpoint, if you looked at say a Freddie Mac or Fannie Mae mortgage-backed security, fixed rate 30-year mortgage with a specific interest rate, you would look at the sensitivity of that instrument based on rate changes.

And you would also look at, you know, what the, you know, what the company's initial market value was, and then again, with that analysis, how the market value changes over time and how much they have.

Q. What other types of analyses, if any, in the course of your work would you conduct with respect to mortgage-backed securities?

A. Oh, you would look at the, the characteristics of the underlying collateral, you know, the demographics of them, again, depending on how, how much they have, you do a selective test check of the, of the instruments.

Looked at the QUSIP numbers and look at the prepayment experience on those instruments as well, and what the estimated prepayments on those instruments may be in the future.

Q. QUSIP is Q-U-S-I-P?

A. Yes, it is.
Q. What does that stand for?
A. It's an acronym that, that stands for -- I don't remember the exact, you know, the exact acronym that, that it stands for, but it's a unique identifying number that's widely accepted and makes it easy to access in financial data bases information related to that specific security.
Q. Under what circumstances would you make the decision that it's necessary to conduct the types of analyses you just referred to with respect to mortgage-backed securities?
A. It would depend on the materiality of the holdings of the company, the company's capital position, and their risk profile.
Q. What is the relevance of the capital position?
A. Capital is, is the ability to absorb risk.
Q. And if you found a company that was excessively very highly capitalized, how would that affect whether or not you would conduct such analyses?
A. The analysis would have to be done

regardless.

It would just be the ability to absorb the risk of the holdings, so if a company, you know, had more capital, they could absorb more risk.

Q. And how would that tie into your overall analyses of the portfolio of that company's mortgage-backed securities?

A. Well, you would analyze what the risk of that portfolio was, what their other risks were, and how much capital they had to support those risks, and determine whether it's adequate or not, and determine whether or not the risk that they are assuming is, is acceptable.

Q. So in determining whether risk is acceptable, you would need to know the capital level, is that correct?

A. You would need to know the risk from the investments first, and then you would need to know the capital level.

Q. And why is that?

A. Because capital, if the, if the situation works out unfavorably for the company, then they -- and they take a loss, then that loss, the capital account has to be charged for

that loss.

Q. Now do I take it then that if you -- assume you're examining an institution that you would consider thinly or inadequately capitalized, okay?

A. Yes.

Q. And you went through the analyses of the mortgage-backed securities of the types you just mentioned, and you came to an assessment of the overall risk -- follow that?

A. Yes.

Q. You might well determine that based on the thinness or the inadequacy of the capitalization, the risk was excessive that you had identified, correct?

A. Yes.

Q. And then what would your next step be having determined that the risk was excessive?

A. Two choices probably -- the first choice is that the risk would have to be reduced, or that they would have to get more capital, or a combination of both.

Q. Anything else?

A. No.

Q. Could that cause --

A. Oh, curtail, of course, curtail future activity in that area; in other words, not increase the risk any further.
Q. And how would you communicate your direction or advice to curtail activity?
A. There is a number of forums, but the most common forum is in the Report of Examination.
Q. Would that advice or direction ever take the form of some type of more formal supervisory action?
A. Well, the Report of Examination would only convey the information to the, to the supervisory bodies, and the supervisory bodies may write a letter to the company, directive if you will, to tell them to, you know, citing the examination report, to do this or do that, reduce the risk or increase your capital or combination thereof.
Q. Is it also possible the supervisory authorities would issue an, what you would consider to be an enforcement action with that directive?
A. Yes.
Q. And what kind of enforcement actions

could be issued?
A. Cease and desist orders are the strongest.
That means immediate, you know, could be immediate cease and desist, or divestiture required of holdings, and then also there is supervisory agreements where they, the company agrees to comply with certain provisions.
Q. And have you ever recommended that the OTS issue a cease and desist order with respect to an institution you were examining?
A. Yes.
Q. Under what circumstances?
A. They had excessive holdings of various kinds of investments and unique transactions.
Q. What do you mean by unique transaction?
A. Well, the unique, unique, very unique types of instruments that they were holding.
Q. And why would you need instruments?
A. They were inappropriate for that, for the company based on their capital position.
Q. So the recommendation -- and have you made that type of recommendation more than once?
A. I'm sure I have.

Q. And so what would, what were the key factors you would have looked at in those situations in making the recommendation that a cease and desist order be issued?

A. Analyze the and identify all of the areas that are considered risky, quantify the risk as best as possible, and then explain why that risk is excessive related to their company's operating position, earnings and capital.

Q. And capital; and again, have you also under similar circumstances suggested to the OTS that a supervisor agreement be issued?

A. I have.

Q. And under what circumstances would you make that suggestion?

A. Similar situation where, where the, the risk is high on a particular area that I'm looking at, and it needs to be addressed formally and needs to be cut down, or there has to be a timetable established for divestiture or reduction of borrowings, reduction of leverage.

Q. And if I understood, in both cases, you were comparing risk to -- first you assessed risk through these various financial modeling

techniques, correct?
A. Yes.
Q. And then you measured that level of risk against the adequacy of that institutional capital, correct?
A. Their earnings capacity and capital, yes.
Q. And remember a few moments ago, I asked you to consider a situation where an institution was inadequately capitalized and it had a high level of risk, correct?
A. Yes.
Q. And I think you indicated in that case you may formally or informally suggest that the institution take certain types of actions to reduce that risk, correct?
A. Yes.
Q. Could your advice or recommendation to that same institution be different if it had the same precise level of risk, but it had what you considered to be an abundance of capital?
A. It would be -- it may be different.
Q. And why may it be different?
A. Capital is the, is the capacity to absorb risk.

If you have more capital, you can absorb more risk.

Q. So if you have more capital, your view as to whether or not risk needs to be reduced might be different, correct?

A. Yes.

Q. Might be materially different, correct, depending on the adequacy of the capital?

MATERIAL REDACTED

THE WITNESS: These are, these are very specific instances.

You know, you can't, you can't apply generalities, but if an instance were such that all things being equal, if a company had X degree of risk, the company had more capital, that X degree of risk would be perceived in a better light than if they had, than if they had, than if they had less risk.

BY MR. CAYNE:

Q. When why would the X degree of risk be perceived in a better light if they had more capital?

A. Because the capital is the capacity to absorb losses.

If the risk, the risk, if the situation works out unfavorably for the company, a loss has to be taken, it flows through the operating statement and then through capital, so the more, the more capital the company has, the more capacity they have to take risk.

Q. When you examine an institution, do you first focus on capital or risk?

How do you do that?

A. When I'm preparing to go into an examination, as a rule, I generally look at the company's overall operation, and I look at their capital position, and then I start my analysis on the areas that I work on keeping in mind what, what their, their capital position is and what their other factors, you know, that may, may impact, you know, my analysis.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I'm handing the witness a document marked for identification as Kenny Exhibit No. 1, which is the deposition transcript of a

deposition in a number of cases taken of Mr. Ronald Karr on July 12th, 2000.

Do you have that document before you, Mr. Kenny?

A. Yes.

Q. Have you ever seen this document before?

A. No.

Q. And we discussed Mr. Karr very briefly earlier this morning.

Do you recall that?

A. Yes.

Q. And what would your professional relationship to Mr. Karr have been during the time you were examining River Valley?

A. I believe Mr. Karr took over after Mr. Brafman left, Stuart Brafman, and my position to Mr. Brafman or to Mister, Mr. Karr would have been I reported to Mr. Gerbick. Mr. Gerbick reported to Mr. Karr, and that would have been my relationship with Mr. Karr through my involvement with Mr. Gerbick, my supervisor.

Q. Did you ever speak directly with Mr. Karr?

A. I have spoken with Mr. Karr.

Q. When was the first time you personally were involved in any respect with respect to any of the River Valley institutions?

A. A guess, I believe in the late '80s, and I don't have the exact date, and that's a guess.

I believe, I believe it was the late '80s.

Q. Do you recall whether it was prior to FIRREA, F-I-R-R-E-A?

A. If it was in the late '80s, it would have been prior to FIRREA, yes.

Q. And what was, would the nature of your first involvement have been?

A. I may have reviewed their activities at that point in time as part of a, an examination of one of the River Valley banks.

Q. And from that time, were you continuously involved with the River Valley institutions until a certain date?

A. I believe I was.

Q. And for what period of time did that involvement, over what period of time did that involvement last?

A. If, if my involvement began in the

late '80s, I'm sure that I was involved through 1993, and I can't say that I participated fully in every exam, but I may have, but I'm sure that I -- because there was an exam that I did in 1993 that I signed, and so I'm sure that I did that, that work.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could you turn to page 41 of this deposition?

And if you would, read from the first question on page 41?

A. This starts do you recall?

Q. Yes.

A. Okay.

Q. Through page 44, and let me know when you're complete?

A. Okay.

Q. Thank you.

(The witness reviewed the document.)

MATERIAL REDACTED

Q. Could you start on page 42, lines --
A. Forty-two, sure.
Q. Line 6?
A. Line 6, sure.
Q. Through page 43, line 3, read that question and answer into the record, please.

MATERIAL REDACTED

THE WITNESS: Reading starting on line, starting on page 42, line 6, and reading through which line did you say, sir?

BY MR. CAYNE:

Q. Line 3.

A. Line 3.

Q. On page 43.

A. "What do you remember, sitting here before you look at any documents to refresh your recollection, as to your difference of opinions? And I understand, it was eight years ago."

Answer: "I'm not so sure it's just River Valley. At that time period, we had -- I mean, the FDIC took a position that products that -- derivative products in particular that represented interest rate risks issues to institutions should be classified, and classified meaning that they present safety and soundness risks to the institution that require more capital, other things, okay?

"We disagreed that -- with the FDIC that you classify residuals because based on -- based on the fact that they represented interest

rate risk. If they represented credit risk, we would agree that they needed to be classified. That our classification policies of both agencies indicated that we should only classify assets based on credit issues, not interest rate risk issues, and I think we had that same issue with River Valley."

Q. My question, Mr. Kenny, is do you agree with Mr. Karr's answer on, from lines 10 on page 42 through line 3 on page 43, to my question, which appeared on line 6 through 9 on page 42?

MATERIAL REDACTED

A. I generally agree with Mr. Karr's statement that our position, the OTS' -- and this was, this was pre-'89. It was, it wasn't OTS. It was Federal Home Loan Bank Board and bank, Federal Home Loan Bank, that our position was that generally, if it was credit risk related, we classified it.

If it wasn't credit risk related, we

didn't classify it, whereas the FDIC classified derivative instruments based on their own internal guidance.

Q. Is there any aspect of Mr. Karr's answer with which you don't agree?

A. Let me say that I generally agree with what he said, but it was, at the time, related to derivative instruments, it was evolving treatment, and so we may have had a period there where we actually did classify some of the assets ourselves, the OTS, for one reason or another, you know, and so that, that would not -- qualifier, that there may have been instances within that time period that the OTS did classify certain residuals, and until such time as we had an official position that we would not classify them.

Q. And what time period are you referring to?

A. I'm referring to the period in the late '80s.

Q. What about into the early '90s, '91, say '90 through '92, would Mr. Karr's answer accurately reflect the situation between 1990 and 1992?

A. Here again, I have to qualify it in that I believe generally that was the case, but there may have been -- you know, I can't recall with a hundred percent accuracy, that we may not have classified some part of the derivative portfolio for one reason or another.

Q. Do you recall whether this was an issue in connection with your examinations of River Valley?

A. What issue? What -- an issue between Mr. Karr and myself?

Q. No. No. No. No -- the issue between the OTS and the FDIC with respect to whether or not derivative products should be classified.

A. Yes. That was, that was an issue between the OTS and the FDIC, and it related to River Valley, yes.

Q. And can you describe the issue as it related to River Valley?

A. As best that I can recollect, that the FDIC generally classified I believe all of the, what they perceived as high-risk mortgage derivatives while we did not classify all of them.

Q. Why did the FDIC determine to classify

all the high-risk mortgage derivatives?
A. That was their internal guidance.
Q. Do you recall the basis for that guidance?
A. Vaguely.
Q. And what's your vague recollection?
A. I think that it was a combination of things.
The, there was a policy statement by the FFIEC, and then they may have had some internal, internal guidance that they had written as well.
Q. And did the OTS not subscribe to this FFIEC policy statement?
A. We did ultimately. I don't remember if we did during the entire time period between '90 and '92.
Q. Well, then why did the OTS come to a different conclusion as to whether or not these derivative products should be classified?
A. The OTS felt that classification of assets should be primarily based on credit risk rather than interest rate risk.
Q. Is that what Mr. Karr is saying in his answer?

A. Yes.
Q. So you agree with that answer, correct?
A. That was the philosophy of the agency, and to the extent that that was the philosophy of the agency, I agree with it.
Q. Do you recall whether this difference in philosophy between the FDIC and OTS had a material effect on the total dollar volume of assets classified by the two different agencies?
A. Yes.
Q. And can you describe that material effect?
A. The River Valley institution held a lot of high-risk mortgage derivatives, so the FDIC's classification of the mortgage derivatives was higher than the OTS-classified assets.
Q. How much higher was it?
A. I don't remember the exact amount.
Q. Was it a significant difference?
A. Several million, yes, it was significant.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did you ever have any discussions with Mr. Ferries concerning this issue?

A. I believe we did. I believe we talked about it.

Q. And what is your recollection of those discussions?

A. It was a difference that was, was difficult to reconcile.

We couldn't, we -- you had to accept our position or not accept it, the FDIC's position, and we had our position. It was a difference.

Q. Do you -- what was your professional

relationship with Mr. Ferries in connection with
your work on River Valley?
A. I was a, I did field examination work
and wrote some of the reports throughout the
time, presented those to the examiner-in-charge,
who varied from year to year, and then Mr.
Ferries was responsible for reviewing all of
that information.
Q. And did Mr. Ferries speak with you
concerning his review of your work?
A. Yes. After he looked at my work, he
would probably give me some feedback one way or
another.
Q. Do you recall whether you and Mr.
Ferries had any in-person meetings relating to
your work on River Valley?
A. I believe we had. We met generally
informally I believe. Just he would show up on
a job and review it, or he would be in the
office, and we might go over some of the stuff,
so probably several times that occurred,
numerous times.
Q. Do you recall whether you and Mr.
Ferries were in accord on the proper regulatory
approach to River Valley?

A. Related, as far as OTS' approach?
Q. Yes.
A. Yes, I believe we were in agreement.
Q. Do you recall whether there were any issues on which you and Mr. Ferries disagreed with respect to River Valley?
A. There may have been, but I don't recall what they were.
Let me say that when I write the report, they could ultimately change whatever I did, so if he disagreed in any fashion materially with what I did, they had the right to change it.
Q. Do you know if he made any changes to your report?
A. I don't remember any material changes.
Q. So sitting here today, you believe, would you believe that you and Mr. Ferries were in particular agreement with respect to your findings on River Valley?
A. Yes.
Q. And you were in material agreement as with respect to the proper regulatory approach to take to River Valley?
A. By OTS? By OTS standards?

Q. Yes.
A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

My first question is with respect to Mr. Ferries' answer appearing on line 3 of page 45, did you share his confidence, Mr. Ferries' confidence, in the managerial competence of the Holland and Ross investors?

MATERIAL REDACTED

THE WITNESS: Not in that fashion. I didn't, I didn't view, I didn't view them in that light.

BY MR. CAYNE:

Q. What do you mean by that?

A. Well, I wouldn't, I wouldn't, I wouldn't make that statement that Mr. Ferries made.

As far as their managerial competence, I don't have an opinion about their managerial competence.

I view them as investors.

MATERIAL REDACTED

A. Because my involvement with River Valley was not them as managers, but as investors, so my perception was, is not, I don't have a perception of them as managers.

Q. Did you have a perception of them as investors?

A. Yes, I did.

Q. And what was your perception of them as investors?

A. Savvy investors.

Q. And what was the basis of your perception of them as savvy investors?

A. They seemed to bring in the correct management to, to, to run the activities that, of the company's that they were managing, that they were investing in.

Q. And what was the basis of that conclusion, in your view, that Messrs. Holland and Ross brought in the correct management to run the activities of, in this case, River Valley?

A. Management that I deal with in working on the risk management area seemed to be competent.

Q. And can you recall the names of the management official or officials during your, do you recall the names of the management official or officials to whom you're now referring?

A. As the lead manager, I worked primarily with Mr. Bangert as the lead manager.

Q. Did you also work with a woman, I believe her name was then Susan Vranes, V-r a-n-e-s, now it's Susan Els, E-l-s?

A. Yes.

Q. Did you consider her competent?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. What was your assessment of the River Valley investment portfolios?
A. My assessment was that it was a very risky portfolio.
It was a very illiquid portfolio, yet it was, their management was, was adequate to, you know, to manage it.
Q. What does that mean?
A. Well, what it means is that just what I said.
It was a risky, it was a risky, illiquid portfolio that required an extreme amount of management, and it required an extreme amount of management on the part of OTS.
Q. And did River Valley have, in your opinion, adequate management to manage this portfolio?
A. Yes.
Q. Then what was the basis of your opinion in that regard?
A. My review of their, of the management, their analytics, their documentation.
Q. What do you mean by their analytics?

A. How they, how they reviewed the, their return risk profiles on them, on the instruments that they held.

Q. How did they review them?

A. It varied over time, but they had internal, internal models that they used to analyze them.

Q. Did you think the models they used were appropriate for the assets that were being modeled?

A. I thought, I thought the models were okay, but the, you know, the assumptions were questioned throughout time as well as some of their documentation I believe.

Q. Did you believe that management of River Valley brought a sophisticated approach to the management of these assets?

A. I thought they brought an adequate approach to manage the risky assets.

Q. Did you ever direct River Valley to reduce the volume of the assets to which you are referring?

A. I don't believe I did.

Q. And why didn't you direct River Valley to reduce the volume of assets?

A. Because I believed they, at the time, that they had adequate expertise to manage them.
Q. Did you, in evaluating these asset portfolios, consider the capital, capitalization of River Valley capital levels?
A. Yes.
Q. And what role did the capital levels of River Valley play in your analysis of these asset portfolios?
A. The capital portfolio, the capital position provided the ability to, to hold these instruments.
Q. And you had that view even after the capital position had been reduced following FIRREA, is that correct?
A. Yes.
Q. And how did you make that determination?
A. I looked at the capital at the time I made a review, and looked at their holdings, and made a determination whether, whether the holdings were adequate relative to their capital position.
Q. You said holdings adequate relative to their capital position?

A. Yeah, whatever they invested in.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Would an additional $10 million of capital on the books of River Valley had any effect on your analysis of their, of what is referred to I think in your examination as high-risk investment securities?

A. Yes. Yes. It would have had some impact.

Q. And what would that impact have been?

A. If they had, if they had more capital, we would have been maybe more comfortable with their holdings.

Q. Based on the specific circumstances of River Valley, what effect on your analysis of these portfolios would there have been had the institution had an additional $10 million in capital?

MATERIAL REDACTED

THE WITNESS: We would have felt more comfortable with the risk of these assets, their capacity to absorb risk.

BY MR. CAYNE:

Q. Would that comfort have been reflected in your exam reports?

A. In some fashion, probably.

Q. In what fashion would it have been reflected?

A. I can't speak -- you know, that's the capital section of the report.

I didn't write that. I don't know how, I don't know how the EIC and whoever would be assigned to that area would write that.

Q. But I --

A. It clearly would show it was a higher ratio, you know, in the report regardless of how it was presented, higher ratio of capital, which would be a positive.

Q. Um-hm. Is it possible that -- I'm not going to ask you to quantify this, but is it possible that there would have been some level of capital that if River Valley in the late '80s and early '90s had capital above that level, the

MATERIAL REDACTED

A. I don't think it would have improved beyond a 2, but it may have been improved from a 3 to a 2.

Q. And a 2 would have been considered --

A. This is OTS ratings.

Q. I understand. A 2 OTS rating would have been considered a satisfactory rating?

A. Yes.

MATERIAL REDACTED

Q. Thank you. Have there been, have you conducted examinations of institutions that have had portfolios of high-risk mortgage derivatives in which at the conclusion of the examination, you recommended or directed that the institution reduce or eliminate its portfolio of such investments?

A. I may have. I can't recall specifically which ones.

Q. What would have led you in those cases to issue such a recommendation or directive?

A. Combination of things -- the riskiness of the assets, the ability to manage the assets, the size of the holdings; all of those things would have come into play.

The capital, the position, earnings position of the company, what else they were holding that was risky, all of those decisions would be, all of those would be looked at together to make a final determination.

It's not, it's not the preferred course.

Q. What's not the preferred course?

A. Required, required divestiture.

Q. Why is that?

A. Well, because it's, if the instrument's illiquid, forcing a company to sell it is, you know, could be problematic as far what price they will get for it, so you're forcing them to make kind of a fire sale.

You know, the most reasonable thing to do is not to let them do any more of those kind of investments, to restrict future investments.

Q. Did you restrict future investments at

River Valley?

A. I don't believe we did.

Q. And why did you make the decision not to require the restriction of future investments by River Valley?

A. I didn't think it was necessary.

Q. But specifically for the record, on what basis did you conclude that it was not necessary?

A. That they had, that their -- you know, I can't remember exactly from, because everything changed from period to period, exam to exam, but generally speaking, whatever their internal limits were, we ultimately accepted them, and their holdings, we ultimately accepted them, and we accepted what their promises were for managing them, and we were, we were satisfied with, with those areas.

So their intentions of what they planned to do were acceptable, so we didn't have to restrict the future investments.

MATERIAL REDACTED

MATERIAL REDACTED

Q. You spent, do I understand correctly, a good bit of time dealing with Mr. Bangert?

A. Yes.

Q. What issues would you generally cover with him in those discussions?

A. Things that needed to be corrected.

Q. Such as?

A. Exam reports would have laid out everything that I suggested, but it may be documentation for what they're doing, you know, improvements, and how they may do something, certain regulations that require they do certain things, and they didn't do them.

I mean everything that I would have, I identified as needing correction would have been laid out in the exam reports.

Q. Did you find Mr. Bangert responsive to the concerns or issues you identified in your conversations?

A. Generally.

Q. Did you, in subsequent examinations, seek to determine whether he had followed through with commitments he had made to you?

A. Yes.

Q. And what was your conclusion?

A. Generally, that he honored what he said he would do.

Q. And he would have been the officer in charge of this function in the bank, right?

A. He was the ultimate authority in the bank on that, yes, as far as a line person, line management.

Even though he may not have handled day-to-day operations and day-to-day analysis, he ultimately was the one that made things happen.

Q. Other than Mr. Bangert and Ms. Els, who we spoke about earlier, are there any other individuals you recall in particular who you dealt with at River Valley?

A. I think, I think those two were the ones I primarily dealt with over time.

Those are the ones that come back to memory.

Q. Did you have a view at the time whether they were more sophisticated and knowledgeable in this area than similarly-situated officers of comparably-sized institutions?

MATERIAL REDACTED

THE WITNESS: There were very few companies that had the holdings that River Valley had.

They were very unique, and so it would have been hard to compare the expertise of those individuals to other individuals that didn't have similar holdings.

Q. So those other institutions then would not have had individuals with comparable expertise, is that correct?
A. As best I could tell, or else they would have had all those same kind of investments.
Q. But the, if I understood your earlier answer, the expertise of Mr. Bangert and Mr. Els was appropriate to and adequate to manage the portfolios that you examined, correct?
A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. So you had -- well, were you aware that River Valley had NOLs?

A. Yes.

Q. How was it, how would it have been relevant to your review?

A. It would have been a motivation to generate as high a return as possible from the investment portfolio to use those NOLs before they expired.

Q. And was it such a motivation?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. You did have discussions about certain issues with Mr. Holland and Ross, is that correct?

A. Limited; most of my discussions with them were at those formal meetings that were scheduled, and most of the meetings were, that I had with them were official meetings that were scheduled, as I said, not impromptu meetings, generally speaking.

Q. What was the basis of your conclusion that they were savvy investors?
A. Just, just the feeling based on observations.
Q. Such as?
A. Looking at the company's that they currently operated and what they did.
Q. By what they did, you mean what they accomplished with those company's?
A. The operations of the company's, yes; the direction of the company's.
Q. You thought they were operating in a positive, forward-looking, successful manner?
MATERIAL REDACTED
THE WITNESS: It seemed like they were opportunistic, and the, and, and that's, you know, one of the reasons that I thought they were savvy investors.
BY MR. CAYNE:
Q. When you say opportunistic, what do you mean by that?
A. Attempting to profit from various situations such as, you know, the, the investments that they made, and you know, and the company's that they acquired through the,

you know, with, as you mentioned, the net operating loss, tax carry-forwards, and other motivations, being able to leverage and borrow from the Federal Home Loan Banks and use the deposits as a, as a basis as well.

Q. Those were all factors that lead to your conclusion that they were savvy investors?

A. It seemed like -- I don't know exactly how much they put up, but it seemed like, you know, if, if they were successful in their endeavors, that they would have had a high return on their investment, and it seems like at the time, I thought they had a reasonable chance of achieving success.

Q. What was the basis of that conclusion?

A. Just kind of an overall feeling based on the operations just strictly was my perception. That's all.

Q. But it was your perception based on your personal review of their operations, is that correct?

MATERIAL REDACTED

THE WITNESS: Yes.

MATERIAL REDACTED

Q. Did you believe that Mr. Bangert and

Ms. Els were professionally competent and able to adequately manage the interest rate risk of River Valley?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. The reporter has handed you a document marked for identification as Exhibit 6 bearing Bates numbers 02043 through 02047.

Would you please read this document? And then I'll have a few questions.

MATERIAL REDACTED

THE WITNESS: Okay. I've read it.

BY MR. CAYNE:

Q. Does this exhibit help refresh your recollection concerning the December 16th, 1992 Board of Directors meeting of River Valley Savings Bank?

A. Yes.

Q. And what are your overall principal recollections of that meeting, having reviewed this document?

A. I take, you know, for the most part what was said here, you know, related to this stuff I worked on as, you know, in the ballpark.

Q. Does that mean you believe this memorandum is an accurate summary of the, of that meeting?

THE WITNESS: I mean the management team, you know, the company prepared this, you know, so it's presented from their light.

I don't necessarily disagree with anything that was said in this, in this document.

Nothing stands out as being extremely objectionable.

BY MR. CAYNE:

Q. Does anything stand out as being objectionable at all based on your review?

A. Well, yeah. We, we as regulators don't usually use terminology like the regulators are very satisfied with the competency and corporation of management.

I would never say that.

Q. What would you have said?

A. Well, if I didn't say anything, that's a compliment.

MATERIAL REDACTED

UNITED STATES COURT OF CLAIMS

- - - - - - - - - - - - - - - -x

HOMER HOLLAND, HOWARD ROSS, :

Plaintiffs, :

vs. :Case No. 95-524C

UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Thursday, February 26, 2004

Deposition of LAWRENCE A. KENNY, a witness herein, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, LLP, 555 12th Street, N.W., Washington, D.C. 20004, at 9:24 a.m., Thursday, February 26, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

CERTIFIED COPY

APPEARANCES:

On behalf of the Plaintiffs:

HOWARD N. CAYNE, ESQ.
DAVID B. BERGMAN, ESQ.
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5656

On behalf of the Defendant:

WILLIAM G. KANELLIS, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 515-7300

C O N T E N T S

| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| LAWRENCE A. KENNY | PLAINTIFFS | DEFENDANT |
| By Mr. Cayne | 281 | |

Afternoon Session - Page 372

E X H I B I T S

| KENNY EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 9 | Report of Examination | 337 |
| 10 | Report of Examination | 344 |
| 11 | Report of Examination | 349 |
| 12 | Report of Examination | 352 |
| 13 | Errata sheet | 372 |
| 14 | Errata sheet | 372 |
| 15 | Subpoena | 372 |
| 16 | Report of Examination | 374 |
| 17 | Report of Examination | 410 |
| 18 | Report of Examination | 419 |
| 19 | Ltr dtd 02/18/92 to Directorate fr Ferries w/attachment | 436 |
| 20 | Report of Examination | 428 |
| 21 | Report of Examination | 455 |
| 22 | Report of Examination | 463 |

MATERIAL REDACTED

Q. But do you recall that the capital

markets group had available to it fully adequate resources and capabilities to manage its portfolio of mortgage-backed securities?

MATERIAL REDACTED

THE WITNESS: Yes.

MATERIAL REDACTED

Q. Did River Valley have complex activities?

A. Yes.

Q. Did River Valley have the expertise to manage those complex activities?

A. Yes.

MATERIAL REDACTED

How did the amount of resources and personnel devoted to capital markets by River Valley compare to the amount of resources and personnel devoted by other thrift institutions to capital markets during the time period in which you examined River Valley?

MATERIAL REDACTED

THE WITNESS: River Valley's dedication of resources to capital markets was higher than most thrifts.

Q. Would it have been in the top 10 percent?

A. I don't have that information available.

It could have been.

Q. Is it possible that it was in the top

5 percent?
A. It's possible.
Q. Would you be surprised if you found out it was in the top 5 percent?
A. No.

MATERIAL REDACTED

# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

BANK OF AMERICA, FSB, )
et al., )
)
Plaintiffs, )
)
vs. ) Case No. 95-660C
)
UNITED STATES OF AMERICA, )
)
Defendant. )
---------------------------)
HOMER J. HOLLAND and HOWARD)
R. ROSS, )
)
Plaintiffs, )
)
vs. ) Case No. 95-524C
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

AMERICAN CAPITAL CORPORATION)
and TRANSCAPITAL FINANCIAL )
CORPORATION )
Plaintiff, )
)
vs. ) Case No. 95-523C
)
THE UNITED STATES, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 12, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For Plaintiffs Bank of America and American Capital:

RACHEL L. BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C, 20005
(202) 220-9670

For the U.S. Department of Justice in Case No. 95-660C:

TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.

U.S. Department of Justice, Civil Division

1100 L Street, N.W.

Washington, D.C. 20530

(202) 353-8841

Deposition of RONALD NEAL KARR taken by the Plaintiff at 101 North Wacker Drive, Suite 1600, Chicago, Illinois, on the 12th day of July, 2000, at the hour of 9:00 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

CONTENTS


| The Witness: RONALD NEAL KARR | Examination |
|---|---|
| By Mr. Cayne | 6 |


INDEX OF EXHIBITS


| For the Plaintiff | Page |
|---|---|
| 1 | 78 |
| 2 | 108 |
| 3 | 124 |
| 4 | 124 |
| 5 | 138 |
| 6 | 146 |
| 7 | 154 |
| 8 | 154 |
| 9 | 160 |
| 10 | 162 |
| 11 | 186 |
| 12 | 194 |
| 13 | 201 |
| 14 | 204 |
| 15 | 221 |
| 16 | 238 |
| 17 | 238 |

Mr. Holland I met with maybe three or four times over the time span. As I recall, our meetings were usually in regard to talking about what was going on at his institution.

Q. Do you recall, again, before we look at documents to refresh your recollection, issues that were going on with his institution after you arrived at the OTS Chicago office?

A. I don't have a good recollection of the specifics. I have a vague recollection that one of the primary issues at River Valley had to do with a large portfolio of derivative products that exposed them to some substantial amount of interest rate risk and that they were working down that portfolio.

Q. Do you recall at the time dealing with officials at the Federal Deposit Insurance Corporation Chicago office concerning that portfolio?

A. Working with the FDIC?

Q. Dealing with officials in the FDIC, either by phone or correspondence, relating to the portfolio to which you just referred.

A. Yes, vaguely.

Q. Simona Frank?

A. Simona Frank was the regional director at the time, yeah. And I think -- I think -- I think that we had different opinions as to whether or not the portfolio should be classified or not.

Q. What do you remember, sitting here before you look at any documents to refresh your recollection, as to your difference of opinions? And I understand, it was eight years ago.

A. I'm not so sure it's just River Valley. At that time period, we had -- I mean, the FDIC took a position that products that -- derivative products in particular that represented interest rate risks issues to institutions should be classified, and classified meaning that they present safety and soundness risks to the institution that require more capital, other things, okay?

We disagreed that -- with the FDIC that you classify residuals because based on -- based on the fact that they represented interest rate risk. If they represented credit risk, we would agree that they needed to be classified. That our classification policies of both agencies indicated that we should only classify assets

based on credit issues, not interest rate risk issues, and I think we had that same issue with River Valley.

Q. And this was an issue that -- between the -- am I correct this is an issue that was between the agencies, OTS and FDIC, rather than being an issue between you and Ms. Frank?

A. Oh, yeah, it was -- I had it in Topeka. I had it in Chicago. They had it all around the country.

Q. When did this issue first surface?

A. I think in the '90s.

Q. Early '90s?

A. Yes. As soon as the FDIC got involved with the examination of some of these institutions, which was somewhere in the '90s, that was one of the issues that came up as far as our viewpoints on how to examine and how to deal with derivative products.

Q. So when you said --

A. It was a philosophical difference between the agencies.

Q. When you said the FDIC first got involved, you are referring to after August 9, 1989, when the FDIC had a formal examination role

with respect to institutions for which the Office of Thrift Supervision was the primary federal supervisor?

A. That's correct.

Q. So it's probably sometime starting perhaps in late '89 this issue first bubbled to the surface?

A. They didn't actually start doing their examinations until 1990. Until they got in and started taking the positions, it didn't really become an issue. I don't think they did any joint examinations with us -- I don't recall any in 1989.

Q. Perhaps then this issue came to the surface sometime in 1990?

A. That's my recollection.

Q. Do you recall dealing with this issue during your time in Topeka?

A. Yes.

Q. And in what context did this issue arise while you were at Topeka?

A. I don't remember the specific context. I would be guessing if I would -- what the specific context was. I don't know.

Q. Did you have conversations or dialogue

with FDIC officials, while you were employed at Topeka, concerning this issue?

A. Yes.

Q. And again, it was still an issue once you arrived in Chicago?

A. Yes.

Q. The issue may have been presented by a number of institutions, but it definitely included the River Valley institution?

A. It's my recollection it included River Valley.

Q. Could this issue have effect on examination reports? And by that, Mr. Karr, I mean because your agency and the Federal Deposit Insurance Corporation took a different view on this issue, could it result in different safety and soundness or supervisory ratings of a specific institution being assigned by the FDIC and the Office of Thrift Supervision?

A. Yes.

Q. And specifically how could this issue have impacted on the examination process for a given institution?

A. How would it have impacted the examination process?

Q. What I mean by that, how could it -- could it have caused a difference in results or difference in conclusions between an FDIC exam and an Office of Thrift Supervision examination?

A. How could it effect a difference? I'm not understanding your question.

Q. I believe you indicated, if I understood, that because the FDIC and the OTS had different views on this specific issue, it could cause the results of an FDIC safety and soundness examination to differ in certain aspects from the results of an Office of Thrift Supervision safety and soundness examination, correct?

A. That's right.

Q. Now I'm asking in what specific ways could the differences between the agencies on this particular issue cause the examination -- safety and soundness examinations conducted by the two agencies to differ?

A. Well, on derivative products we would look -- the OTS would look at those products from two aspects; is there credit risk and is there interest rate risk, and are they being well managed, obviously.

If we didn't find credit risk in the

derivative products, we would only look to the risk -- the interest rate risk that they posed and make a judgment as to how significant that was or not. And we would base our conclusions on interest rate risk.

The FDIC looked at those same products and would, because of the interest rate risk, would classify those assets. We would not. Once they classified the assets, they would view them as having asset quality problems. We did not unless there was credit risk involved. If there was credit risk involved, then we would view them as having asset quality problems.

Now, if you classify an asset, in most cases, based on reserve policies, an institution would be required to add to its general loss reserves because of the additional classifications.

So having classified derivative products could increase the amount of reserves required. And if you add reserves, you're going to impact earnings, because it comes out of earnings or it comes out of capital. And you can have those impacts.

So those are the kinds of things that

can happen in that kind of a situation. So the result could be that we would class- -- just view interest rate risk as an issue and not classify them, and our rating of that area might be adverse or not, depending on the amount of that risk. And we would reflect that only in that part of the CAMELS rating that relates to interest rate risk.

The FDIC would not only impact its rating on interest rate risk but would look at asset quality, and that also could impact capital, and it could impact earnings. So it could have a wider range. And we also have to look at whether or not we were double-hitting for the same issue.

Q. Can you explain to me -- the term you just used was double-hitting?

A. Yes.

Q. I'm not familiar with that term. What do you mean?

A. If you adversely rate one area of an institution's operations, essentially you try not to take that same issue and impact another one with it, unless there is a direct and clear correlation that creates a relationship where you

should use both of them.

For example, interest rate risk; if you don't -- if you classify -- if you hit them for interest rate risk and you say this has an impact on earnings, okay, and then you also take that same asset and say I'm going to classify it because of credit risk when there is no credit risk, and you hit asset quality, and then you make them do GVAs -- general valuation allowances -- and that takes earnings. Now you've hit them twice on the ratings for the same issue. You try not to do that unless there are direct and clear relationships that you need to do it with.

Q. Do I understand correctly, Mr. Karr, then, one of the differences between the FDIC's approach and the approach of the Office of Thrift Supervision is in dealing with these derivative products, correct? We're dealing with derivative products here?

A. Yes.

Q. The OTS approach did not involve double-hitting, but the FDIC approach did result in double-hitting; is that correct?

A. It could.

Q. In your opinion did it?
A. In some cases, yes.
Q. Explain to me, so I'm clear, how in some cases did the FDIC's approach result -- let's make it specific. I think I understand now, based on your explanation, what double-hitting is. Explain to me why the OTS approach did not result in double-hitting, but why the FDIC approach could result in double-hitting?
A. If we don't classify the asset, we're not going to require more GVAs.
Q. "We," the OTS?
A. Right. As soon as you classify that asset, you're going to need more GVAs, and that's going to double-hit the same issue, a derivative product that shows only one kind of risk, interest rate risk. You're going to double-hit an adverse rating on two different factors.
Q. So the report is clear, please give me an example where the approach followed by the FDIC would result in what you call a double-hit.
MS. TORNATORE: I'll just object to the extent you're asking Mr. Karr to provide you with testimony regarding FDIC procedures. I think

that's beyond this witness's capability.

BY MR. CAYNE:

Q. You may respond, sir.

A. You want a specific example of where that happened?

Q. No, not -- give me an example. It doesn't have to be attached to a particular institution, just so I understand what you're referring to. Describe to me a situation where the FDIC approach would involve what you call a double-hit.

MS. TORNATORE: You're asking him to come up with a hypothetical.

THE WITNESS: I gave you my example of how it could happen.

BY MR. CAYNE:

Q. What was that?

A. If you classify derivatives for credit risk because of interest rate risk, you're going to give them a different rating for asset quality because you classified them for interest rate risk. You're also going to hit the rating for interest rate risk because you're taking that into consideration, too. So you've taken the same asset and double-hit it in two different

ratings categories.

Q. So in the FDIC approach -- how long did this issue continue for, the issue between the two agencies? Does it continue today, for example?

A. No, it doesn't.

Q. When was it resolved?

A. It sort of evolved out of -- I don't know specifically when it went away. We dealt with it for a few years. We had our position. The FDIC had their position. We agreed to disagree, which we do on some things, and I don't recall that we have this -- I don't -- I haven't had a discussion with my FDIC colleagues on this issue for a long time.

Q. What was the period that you recall the issue being present? Was it approximately '92 to '94 or '95?

A. It was the early '90s.

Q. Early '90s?

A. Yes.

Q. And does the Office of Thrift Supervision continue to follow the same position on this issue or has it changed its position?

A. We will not today classify an asset

because of its interest rate risk. We classify them because of credit risk.

Q. Today, July of 2000, that continues to be the position of OTS?

A. That's right.

Q. And when the Federal Deposit Insurance Corporation examines institutions subject to your supervision, Mr. Karr, does it take that position today, or does it still take its former position?

A. I have no recollection of any differences of opinion on that issue at any of our recent exams over the last few years. We agree.

Q. So the FDIC now agrees with the OTS on this issue?

A. You'll have to ask them if they agree with us. We have not had any differences of opinion with my colleagues.

MR. CAYNE: It's 10:13. Let's take a 10-minute break. Off the record.

(Brief pause.)

MR. CAYNE: Back on the record.

BY MR. CAYNE:

Q. Mr. Karr, referring to the issue we were discussing prior to the break we just took,

# EXHIBIT 6

EXHIBIT
Ferries #19
8-10-00

**MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS OF RIVER VALLEY SAVINGS BANK, F.S.B.**

**DECEMBER 16, 1992**

A special meeting of the board of directors of River Valley Savings Bank, F.S.B. ("FSB") was held at the offices of Holleb & Coff, 55 East Monroe Street, Suite 4100, Chicago, Illinois 60603 to discuss the OTS and FDIC examiners' findings.

Howard R. Ross chaired the meeting and called the meeting to order at 10:10 a.m. Mark S. Kipnis served as secretary and recorded the following members present:

| | |
|---|---|
| Howard R. Ross | Homer J. Holland |
| L. David DeTrempe | Steven Bangert |
| Chester J. Clauden (by telephone) | Mark S. Kipnis |
| Calvin L. Morgan | Fred Tuerk |
| | Ronald Pikus (subject to regulatory confirmation) |

Robert Powers' seat is vacant, Mr. Powers finally having lost his bout with cancer. Attending as guests of the board were Larry Ferries, Ellen Fowler, Gary Curtin, Larry Kenney and David Kalina of the Office of Thrift Supervision, Dean Morse and Nancy Griffin of the Federal Deposit Insurance Corporation and Anne W. Brody of Holleb & Coff.

Mr. Ross turned the meeting over to the Office of Thrift Supervision, our primary regulator.

Mr. Curtin stated that the purpose of the meeting was to discuss the examiners' findings and that a formal request for corrective action will be presented at a later date. Mr. Curtin stated that as part of a joint exam River Valley Holdings, Inc. was also examined. The only holding company issue, a 23(b) violation, was that a certain amount of time spent by Ron Seib was not correctly allocated to and paid for by the holding company. The holding company has already reimbursed FSB for approximately $136.00 of Ron Seib's time and in the future shall reimburse FSB at the rate of $500.00 per quarter, as passed by resolutions of both the holding company and FSB.

Mr. Curtin next reviewed OTS's "Credit Crunch" statement that in evaluating commercial real estate loans, the regulators will look not only to the value of the underlying security but also to the borrowers' ability to pay. Mr. Curtin acknowledged that the Credit Crunch statement was fairly irrelevant to FSB.

PLAINTIFF'S EXHIBIT PX 767

Confidential Material — Subject to Protective Order

Mr. Curtin next explained the new examination procedures whereby there is increased coordination between the FDIC and OTS and that we will only receive a report from OTS.

With respect to management, Mr. Curtin highlighted the following:

1. In contradiction to the by-laws, Ron Pikus has been president without being a member of the board of directors. Such oversight was cured with Ron's election at the November board meeting, subject to regulatory approval.

2. With respect to affiliated transactions, as previously mentioned in connection with the holding company exam, there needs to be a proper allocation of Ron Seib's time. Additionally, although the airplane has been sold, there was an approximate $1,300 reimbursement for gas expense issue. It was further suggested that we look at our credit card policies with respect to business vs. personal use.

3. Pursuant to Regulatory Bulletin 27, in connection with our review of senior management salaries, we need to compare those salaries annually with comparable officers in the market place. The U.S. League prepares such a study and it will be presented to the audit/personnel committee in January.

4. With respect to political contributions, FSB spent $200.00 to attend a dinner sponsored by the Peoria GOP. Although not for a particular candidate, donations of this sort are deemed illegal contributions under 11 C.F.R. 100. This isolated expenditure has already been reimbursed to FSB.

5. With respect to management bonuses, annual bonuses have been paid to senior management without written guidelines. In the future, operating goals will be set forth in our annual business plan or other board statements.

6. With respect to our internal auditor, Trinia Witt's work is monitored by Ron Seib, FSB's CFO. Mr. Seib also evaluates her. Consequently, her independence is questioned. The regulators want to make sure that department heads have no input on internal audit reports, that the internal auditor regularly meets with the audit committee and that the audit committee has input upon the internal auditor's annual evaluation.

With respect to asset quality, Mr. Curtin stated the following:

1. As of September 30, 1992, FSB had $6,314,000 of classified assets of which approximately $3,400,000 was

commercial real estate acquired at the time of acquisition. The amount of classified assets has been steadily going down each and every year and this is a very good trend.

2. Mr. Curtin acknowledged that there is an 18.5 million dollar differential in the OTS/FDIC treatment of classified assets based upon the FDIC's classification of all of our residuals.

3. Our general valuation allowance is adequate.

4. With respect to our lending activities, we lend primarily to single family homeowners and securitize and sell most of those loans. The report is very positive and our underwriting is good.

With respect to operations, Mr. Curtin reported the following:

1. It is difficult for the regulators to analyze our operations because of the effect of our investments. As of September 30, 1992, FSB had a 1.2% return on average assets before write-downs. Income is lower this year than last year because of our shrinkage in assets. We had a 360 basis point interest rate spread as of June 30 and the reduction in hedging expenses will have a large positive effect on future income.

2. Our tangible capital ratio as of September 30 was 5.2% which would be reduced to 4.7% if the regulators were to reduce capital by the isolated residual loss without looking at any of the other gains within the institution. Our ratio, as of November 30, is 5.37% and OTS acknowledges that we are in compliance with the capital requirements of our supervisory agreement. It was noted that as of September 30, the ratios were lower because the bank was unduly large because of our large pipeline. We have subsequently sold 40 million dollars of loans in that pipeline.

3. There were a couple of reporting errors that have been corrected and are generally deemed immaterial.

4. From the regulators standpoint, FSB's primary risk is still its investment portfolio.

Larry Kenney next discussed the regulators' risk management concerns:

1. As of September 30, 1992, we had an approximate $23.5 million balance of high risk mortgage derivatives. They





Confidential Material —
Subject to Protective Order

are very sensitive to prepayments. The regulators want greater documentation relative to our prepayment analyses and estimated cash flows. They would like us to document the thought process used by management in selecting the assumptions (prepays and yields) used to determine market value and sensitivity. Where the assumption is a negative yield, that we write down the differential. The $2.5 million write-down during the last quarter was not unusual as we are writing down approximately $8 million of such derivatives during the course of the year. The FDIC policy, although not the OTS policy, still is to classify all such investments.

2. As of November 30, 1992, our purchase money servicing rights balance is over $7,000,000. At the exam date (September 30), the balance was less than $3,000,000. We are required to have an outside party come in once a year to independently value our purchase money servicing rights. Peat Marwick did the appraisal last year but did not give a clear certification as to value. In March, 1993, the regulators expect to see a clear appraisal with the assumptions documented.

3. With respect to our accounting methodology, the regulators want us to be consistent in our prepayment estimates.

4. With respect to our investment policies, we have had large amounts in our intended for sale investment portfolio. The average duration of such investments is 15 days. The regulators recommend that we set up policy position limits and loss limits. With respect to our trading portfolio, our loss limit of 1% was exceeded in one isolated instance and it was acknowledged that management had promptly brought the matter to the board's attention.

The regulators next spent substantial time answering questions from various members of the board, primarily Messrs. Clauden, Tuerk, DeTrempe and Morgan, concerning the following:

1. Although the regulators are concerned about the high risk derivatives, they acknowledge that River Valley is in a stronger capital position this year than last year, the amount of the derivatives is smaller and that in every aspect of the MACRO Ratings, River Valley is currently as strong or stronger than it was at the last exam.

2. The regulators are very satisfied with the competency and cooperation of management.

Confidential Material —
Subject to Protective Order



H&R-B55-00560

3. The regulators believe that the directors are adequately performing their duties, asking the questions they should be asking and monitoring the subject areas they should be involved in.

4. When asked for areas of improvement or direction that either the management or the board should take, or whether the institution should no longer invest in the derivatives, neither the FDIC nor OTS suggested any alternative course of action.

There being no further business, the meeting adjourned 11:40 a.m.

Submitted: Approved:

Mark S. Kipnis, Secretary Howard R. Ross, Chairman



Confidential Material —
Subject to Protective Order