**DIANA JANUSKA DEPOSITION EXCERPTS FOR USE AT TRIAL**

p. 4, line 2-4
p. 5, line 4 – p. 6, line 2
p. 6, line 10 – p. 10, line 13
p. 11, line 6 – p. 11, line 19
p. 12, line 5 – p. 15, line 2
p. 15, line 15 – p. 17, line 2
p. 18, lines 7 – 24
p. 23, lines 23-25
p. 24, lines 1-25
p. 25, lines 1-21
p. 26, lines 2-12
p. 26, line 23 – p. 27, line 1
p. 30, line 3-16
p. 69, line 22 – p. 75, line 19 [Januska Ex. 5]
p. 75, line 24 – p. 76, line 17 [Januska Ex. 6]
p. 78, line 13 – p. 81, line 13
p. 81, lines 14 – 19, 24
p. 82, line 3 – p. 84, line 20
p. 87, lines 11 – 20 [Januska Ex. 8]
p. 88, line 1 – p. 92, line 14
p. 109, lines 2-25
p. 110, lines 1-6, 15-22

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and HOWARD )
R. ROSS, )
)
Plaintiffs, )
)
vs. ) No. 95-524C
THE UNITED STATES OF AMERICA, )
)
Defendant. )

Deposition of DIANA JANUSKA
(Taken by Plaintiff)
Chicago, Illinois
August 11, 2000

Reported by: Melissa Belice, CSR No. 084-003391

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

DAVID B. BERGMAN, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the U.S. Department of Justice:

PATRICK T. MURPHY, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

I N D E X


| WITNESS | DX | CX | REDX | RECX |
|---|---|---|---|---|
| DIANA JANUSKA | | | | |
| By Mr. Bergman | 4 | | | |
| By Mr. Murphy | | 112 | | |


E X H I B I T S


| Januska Exhibit | |
|---|---|
| No. 1 (4/14/87 memo from C. Biedron to A. Smuzynski) | 46 |
| No. 2 (7/7/87 memo from M. Jaski to D. Januska) | 49 |
| No. 3 (11/13/87 memo from M. Jaski to D. Januska) | 54 |
| No. 4 (11/17/87 memo from M. Jaski to D. Januska) | 68 |
| No. 5 (5/27/88 memo from D. Sabella to E. Bonhomme) | 69 |
| No. 6 ("S" memo) | 75 |
| No. 7 (6/24/88 memo from S. Root to FHLBB) | 85 |
| No. 8 ("S" memo) | 87 |
| No. 9 (Rock Falls S&L Bid Proposal) | 93 |
| No. 10 (River Valley Bid Propsal for Republic) | 93 |
| No. 11 (Liquidation analysis for Republic S&L) | 93 |
| No. 12 (6/29/88 memo) | 93 |
| No. 13 (3/23/89 letter from A. Webber Brody to M. Jaski) | 104 |
| No. 14 (4/18/89 letter from A. Webber Brody to FSLIC) | 105 |
| No. 15 (E-mail from D. Harootuniand) | 106 |

DIANA JANUSKA,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could you please state your full name for the record.
A. Diana Lynn Januska.
Q. And could you spell the last name.
A. J-a-n-u-s-k-a.
Q. Are you taking any medication or is there any other reason why you may not be able to give truthful testimony today?
A. No.
Q. Please tell me about your educational background starting with college and anything beyond.
A. I have an associate's degree from Triton College with a major in business. I have a bachelor's degree from the University of Illinois at Chicago with a major in finance and an MBA from DePaul University with a concentration in finance.
Q. And what years did you achieve those degrees?
A. '82, '85, and '89.
Q. And was the MBA through a night program?
A. Um-hum.

Q. That's a yes?
A. Yes.

MATERIAL REDACTED

And if you could tell me about your professional career beginning with first job after college.
A. I've had two after college. My first one was at a savings and loan. I worked there for nine months. I was a systems analyst.
Then I was hired by the Federal Home Loan Bank of Chicago in April of '86. The first nine months I was an examiner in the field. Then I was a supervisory analyst beginning in January of '87.
I was an analyst until approximately 1990, then I was a financial analyst, and now I have my current title of policy analyst, and I think that changed in '96.
Q. What savings and loan did you work for

for those nine months?

A. MidAmerica Federal Savings Bank.

Q. And what basically were your responsibilities as systems analyst there?

A. I worked with the reports that were generated by the computer system. They had an in-house data system, so I worked for the vice president. I can't remember which vice president he was, but he was in charge of their securities, and the comptroller reported to her.

Q. And so you were working with data relating to the securities portfolio of the savings and loan?

A. Just the overall general, the balance sheet, just reports that came off of the system.

Q. What were your responsibilities as an examiner in the field at the Federal Home Loan Bank of Chicago?

A. I reviewed the books and records of institutions where I was assigned. The first jobs were basically reviewing their loan portfolio, and then some subsequent jobs I was assigned different areas, some reviewing securities, different aspects of the bank.

Q. In your work as an examiner in the

field, do you recall whether you worked on any of the five institutions that were eventually acquired by Holland and Ross? And I'll review them with you now. It's the Home, Mutual, or Galva or Republic or Peoria Federal Savings and Loan.

A. Republic.

Q. And you were an examiner in the field for Republic before Republic was acquired by Holland and Ross?

A. Yes.

Q. At the time that you were working on Republic, it was a troubled institution at the time, is that true?

A. Yes.

Q. Was it insolvent?

A. I believe so. It must have been.

Q. And do you recall anything about the types of problems it was facing?

A. Asset quality problems. There are some large loans that the recent owner caused the institution to make.

Q. Do you recall the name of the recent owner?

A. Timothy Huer.

Q. And he made some loans that turned out in retrospect to be not so good?
A. Correct.
Q. Was he still operating the thrift when you were examining it?
A. No, I didn't meet him.
Q. Had he been removed?
A. I don't remember.
Q. Who was managing the thrift when you reviewed it?
A. A woman. I can't remember her name.
Q. Was the condition improving after the Timothy Huer management was removed?
A. I don't remember.
Q. Do you recall the rough time frame in which you examined Republic?
A. It would have to be early fall of '86.
Q. And do you recall who was the examiner in charge on that examination?
A. I believe Ken Issacson (phonetic).
Q. And when in 1987 did you become a supervisory analyst?
A. January, the first week of January.
Q. What were your responsibilities as a supervisory analyst?

A. I was given a specific caseload with institutions to monitor their operations between exams, review their examination reports. The majority of the institutions in my caseload were insolvent institutions, so once it was determined that they were scheduled for a resolution, then I worked on that as well.

Q. Did this work involve any field work at the locations of the thrifts?

A. No.

Q. It was all in the Federal Home Loan Bank of Chicago office?

A. Correct.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And tell me the whole reporting structure when you were a supervisory analyst beginning in January '87 and if it changed over time through 1990.

A. Helen Mirza was my supervisor. And there was another analyst that also reported to her. Her name was Leslie Sommers. And Helen reported to Chet Biedron. And Chet Biedron reported to Leo Blaber. And probably sometime I think in '88 or the end of '87 Stuart Brafman was hired. And I believe Chet then reported to Stuart who then reported to Leo.

Q. Did anyone report to you?

A. No.

MATERIAL REDACTED

Q. You testified I think that you were monitoring mostly insolvent institutions and when they were scheduled for a resolution you would do work on the resolution. What did you mean scheduled for a resolution?

A. Well, if you had an insolvent institution, you would first see if anybody wanted to merge with them on an unassisted basis. If that wasn't possible, then the Washington office would schedule institutions to be put out for bid on an assisted basis. And a bid conference would be scheduled or you would contact institutions through the mail asking if they were interested in seeing a bid package on a particular institution or a group of institutions.

Then a bid would come in, you look at them, ask them to be cost through a recommendation memo. If that was approved, then Helen and her staff, meaning Leslie and I, would negotiate that, sometimes with the help of Stuart, Stuart Brafman I think in some of the later cases and sometimes

with the assistance of the Washington office. And then if that was approved, then you'd work on the final board package.

Q. And what is contained in a final -- did you say final board package?

A. It's a variety of memoranda. I think the "S" memo. I think there's a legal memo, maybe an executive summary, copy of the draft assistance agreement before it was signed.

Q. And all these materials go to the Federal Home Loan Bank Board in Washington?

A. Yes.

Q. Was it the government's preference to resolve these situations first on an unassisted basis?

A. Yes.

Q. And second choice was on an assisted basis?

A. If it was less than the cost of liquidation.

Q. So if you can't find an unassisted deal, the choices are assisted or liquidation, and you would do whichever is cheaper; is that right?

A. Correct.

Q. And how did you figure out whether an

assisted deal was cheaper than the cost of
liquidation?
A. Mike's area or Dennis and Mike, usually
Mike ran the -- there is a FSLIC model that they
use to determine the cost of liquidation. They
would run that.
Then if we had bids, they would be run
using that model, and they would come out with a
figure, and you would look at them and see which
was less.
Q. And the Mike you referred to is Michael
Jaski?
A. Yes.
Q. Did anyone else do that kind of
analysis?
A. The Washington office also had analysts
that do that.
Q. And how did you decide whether to rely
on Michael's analysis or the Washington office's
analysis?
A. I think they kind of did it
simultaneously. I wasn't in that area.
Q. What was your role in the process of
negotiating with potential acquirers?
A. I was in the meetings, but Helen was the

negotiator or whoever came in from Washington if that was the case. Sometimes they came out.

MATERIAL REDACTED

Q. You worked on the Mutual, Home, Galva acquisition and the Republic acquisition?
A. Yes.
Q. Did you also work on the Peoria acquisition?
A. No.
Q. Do you know who did?
A. No.
Q. How was it determined who would work on which acquisition?
A. Republic, Mutual of Canton, and Home of

Peoria were all in my caseload, so I worked on those. Galva was not in my caseload, it was in Leslie's. So we worked together on the Mutual, Home, and Galva transaction.

Q. So you were responsible for monitoring, between examinations, the operations of Republic and Mutual and Home?

A. Yes.

Q. And Leslie was responsible for monitoring Galva?

A. Correct.

Q. How did it come to be that Mutual, Home, and Galva were aggregated together for the purpose of resolving the institution?

A. All three of the institutions were small. They were not near the Chicago metropolitan area, so they didn't -- none of the institutions had a substantial branch network. So they may not have generated a lot of interest if they were bid alone, stand-alone institutions.

But if you package the three together, they were geographically close to one another, and they may have been attractive to an acquirer as a branch network in the middle of the State of Illinois. I think the idea came from somebody in

the Chicago office, and we recommended it to the Washington office.

MATERIAL REDACTED

MATERIAL REDACTED

Q. How many times did you meet with either Homer Holland or Howard Ross in the course of the negotiations only? Not any operations subsequent but in the course of negotiations.

A. I don't remember.

Q. Was it more than once?

A. Probably.

Q. Do you recall any meeting?

A. I remember meeting them. I remember them bringing Steve Bangert. But I don't remember the number of meetings, no.

Q. Do you recall meeting with anyone other than Homer Holland and Howard Ross and Steve Bangert from that group?

A. No.

Q. Did you ever meet Ron Pikus?

A. His name sounds familiar, but I don't remember him.

MATERIAL REDACTED

Q. You characterized the discussions as negotiations between Homer Holland and Howard Ross and the government, which is principally you and

Helen Mirza in these negotiations; is that right?
A. Probably.
Q. And what was the nature of the negotiations?
A. Well, they submitted a bid. Theirs was the winning bidder. They submitted a bid. And we would try to lower the cost of their bid.
Q. How would you try to do that?
A. Helen would do that.
Q. How did Helen try to do that?
A. Maybe asking them to reduce the cash that they're requesting or lower some other portion of their bid. With these I don't remember what the negotiations would have been.
Q. What were the kinds of inducements that the government was offering that cost the government money that you could work with and try to lower besides cash?
A. I don't remember all of them. One of them was the tax NOLs.
Q. And what do you mean by that?
A. There were -- the institutions had tax carry-forwards that could be used by the acquirer if they were transferred to the acquirer to lessen their tax.

Q. Lessen the acquirer's tax?

A. Um-hum.

Q. And this was something you were aware of at the time?

A. Um-hum.

Q. I'm sorry, is that a yes?

A. Yes.

Q. And the government used this as an inducement or an asset that it could sell to the potential acquirers, is that true?

A. Well, it was a benefit that the acquirer would ultimately have, so that was on the table.

Q. When you say that was on the table, what does that mean?

A. That was considered in the cost of the bid.

Q. Was that a cost for the government?

A. No, but it was a benefit to the acquirer. I mean, they're getting a benefit. They obviously couldn't lower some other portion of their bid if they were getting its benefit.

MATERIAL REDACTED

MATERIAL REDACTED

Q. So in view of the fact that the acquirers get the use of the NOLs, Helen Mirza perhaps or you would argue --

A. Or MAD, Washington, FSLIC.

Q. Someone in the government would argue that to the acquirers because you're getting the benefit of these NOLs maybe you don't need as much cash or loan coverage or some other package of benefits you don't need because you realize you're getting the benefits of these NOLs; is that right?

A. Right.

Q. And the government would then try to use that to lower other amounts of assistance, they had out-of-pocket costs for the government?

A. That's what I remember, yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did you meet with Holland and Ross in connection with the Republic acquisition as well? I've been focusing on the Home, Mutual, and Galva.

A. No, I kind of vaguely remember what they look like. I vaguely remember them coming into the office. I don't remember on which transaction.

Q. Do you have a recollection of the condition of Republic at the time that Holland and Ross agreed to acquire it?

A. You know, it was insolvent. That's all I remember. I don't remember about how much, I don't remember the institution's asset size. I don't remember any detail about the institution.

MATERIAL REDACTED

Q. Ms. Januska, you now have before you a document marked Januska Exhibit 5. It is a letter dated May 27, 1988, with an enclosure from Deborah Sabella, S-a-b-e-l-l-a, to Evelyne, E-v-e-l-y-n-e,

Bonhomme, B-o-n-h-o-m-m-e, at the Federal Home Loan Bank Board. You are shown as a carbon copy recipient. And it is Bates numbered CHO024 0072 through 0075.

A. Okay.

Q. Ms. Januska, you've read through the document. Will you please describe its substance for the record.

A. It appears to be a letter from I would guess the attorneys representing Mr. Ross and Mr. Holland, I don't remember who they were at the time, to an attorney at the Federal Home Loan Bank who was working on drafting the assistance agreement. And it appears to be the changes that Mr. Holland and Mr. Ross wanted to the assistance agreement.

Q. And the changes relate to the issue of the NOLs that we've been discussing; is that correct?

A. They're included in this, yes.

Q. Do you understand that the changes were to clarify that all of the benefits of the net operating loss carry-forwards were to be kept by Mr. Holland and Mr. Ross and were not to be shared with the government in connection with the Home,

Mutual, and Galva acquisition?
A. That's what it says.
Q. Do you recall that that was an issue at this time?
A. No.
Q. I take it you don't have any reason to doubt that that was an issue at this time based on the document, is that true?
A. The document kind of speaks for itself.
Q. Do you have any reason to doubt that the issue of who would get the full benefits of the NOLs was an issue of negotiation at the time of the Home, Mutual, and Galva deal?
A. From this document it appears to have been an item that was discussed, yes.
Q. And that I take it is consistent with your general recollection about the practices of marketing the insolvent institutions like Home, Mutual, and Galva, is that true?
A. I think the NOLs were discussed in other transactions, yes.
Q. And based on the evidence you've seen and based on general practices, do you believe they were also discussed in the Holland and Ross acquisition of Home, Mutual, and Galva?

A. Yes.
Q. And when you say discussed, they were in fact recognized as a benefit of the transaction that the government could offer to the acquirers to induce them to take on these insolvent thrifts, is that true?
A. It was an item that was discussed. Either they'd get the benefit or they wouldn't.
Q. Yes. And if they did get the benefit, that was something good for them and it would hopefully induce them to take on the failing thrifts for less costs than they would otherwise want in terms of government assistance, is that true?
A. I guess that answer would be yes. I mean, the whole thing would depend on whether or not the acquirer was able to use the NOLs. If they weren't able to use them, then, no, it wouldn't.
Q. When you say use them, what do you mean by that?
A. Well, if the acquirer wasn't able to use the NOLs for whatever reason, then they wouldn't be of benefit to them, would they.
Q. Your point being that you have to have

earnings in order to have the NOLs be convertible to cash essentially, is that true?

A. Right.

Q. And if you don't have earnings, you can't use the NOLs, and therefore they don't really have much value?

A. Right.

Q. They don't have any value.

A. Right.

Q. But if one believes that one will in fact have earnings and if business plans project earnings, then presumably you don't want to do a deal unless you think the resulting institution will be profitable and will have earnings, true?

A. Well, if I remember correctly, NOLs have a time limit to them, so you'd have to make the money within the time limit before the NOLs expired. So if the acquirer wasn't able to do that, then they wouldn't be able to use the NOLs, and they wouldn't be of benefit to them.

Q. So your point is that although the NOLs may well be an inducement and a benefit to buyers, there are restrictions on the ability to use them, and the government recognized that at the time, and presumably acquirers recognized that as well,

is that accurate?
A. I would assume so, yes.
Q. And so I take it the benefit of the NOLs is not something that's necessarily easy for you to quantify as you're sitting there assessing the benefits that the government is giving the government in these deals, is that true?
A. Did you just say the government twice. What was your question? Could you repeat your question.
Q. Sure. You made some effort to understand the value of the benefits that the government was offering to acquirers of these insolvent thrifts, correct?
A. Yes.
Q. And you recognize that the NOLs were a benefit that the government could offer to the acquirers of these insolvent thrifts, true?
A. It could be a benefit of the transaction, yes.
Q. And I take it from your testimony that it would be difficult for you to sit here and place a dollar value on the benefit of the NOLs, but you nonetheless recognize that it was a benefit and one that could potentially be very big

or potentially could be small?

A. It could be a potential benefit, yes.

Q. And that I take it was the context of discussions about the NOLs when you had negotiations with acquirers about trying to sell insolvent thrifts to them, true?

A. Yes.

Q. Did you have any understanding as to what kind of value or importance Mr. Holland and Mr. Ross placed on the NOLs in the Home, Mutual, and Galva deal?

A. I don't remember the detail of the transaction.

Q. Seeing the letter that is Januska Exhibit 5 and based on whatever recollection you may have, does this indicate that there was in fact importance to the NOLs to Mr. Holland and Mr. Ross in this deal?

A. It appears to be.

MATERIAL REDACTED

Q. Ms. Januska, you've been provided a copy of a document Bates stamped CHO022 0607 through

0613. It has been marked as Januska Exhibit 6. I'd like you to look through it, and then please if you could describe it for the record.

A. Okay.

Q. Could you describe the document for the record, please.

A. It's an "S" memo supplement, the subject of which is the acquisition and conversion of the Home of Peoria, Galva Federal, Mutual Savings by Mr. Howard and Mr. Ross -- Mr. Ross and Mr. Holland. It discusses the business plan that they submitted and their viability on a going-forward basis if the transaction was pursued.

Q. Is this a memorandum that you wrote?

A. Probably parts of it. I think Helen also probably wrote part of it.

MATERIAL REDACTED

MATERIAL REDACTED

Q. What is an "S" memorandum exactly?
A. Supervisory memoranda. This was a supplement having to do with the proposed acquisition by Mr. Ross and Mr. Holland. Usually the original "S" memorandum would have discussed the financial condition of the institution and possibly whatever marketing efforts had gone on to date. I don't remember what else was in it. It was kind of a standard kind of memo that we used at the time.
Q. And in this supplement, the first big heading here is financial viability on the first page, correct?

A. Viability?
Q. Financial viability.
A. Right, I thought you said liability.
Q. No, viability with a V.
A. Um-hum.
Q. There is a discussion of the amount of regulatory capital that the institution will have. Do you see at the end of the first paragraph?
A. Um-hum.
Q. Again, was that significant in assessing the financial viability of the resulting institution?
A. Probably was at the time. Like I said earlier, I don't remember, regulatory capital, what we thought was a good level at the time. I don't remember that.
Q. But you would have made an effort to be accurate in this memorandum in characterizing the amount of regulatory capital that would result from this deal, is that true?
A. I think, yes, that we would have wanted accurate information in the memo, yes.
Q. Do you believe this is accurate, the information contained in this memorandum?
A. I would believe so.

Q. The second page contains some proforma financial information which appears to be taken from information provided by the acquirers or potential acquirers, is that true?

A. That's what I would guess, yes.

Q. Look at the line that reads retained earnings. Do you see that?

A. Um-hum.

Q. What does that indicate to you from the time of at merger of zero and then other numbers entered in Year 1, Year 2, and Year 3?

A. If I had to guess, I would say those were the profits that they thought they were going to earn in Years 1, 2, and 3.

Q. And why do you say if you had to guess? Are you not familiar with this format?

A. I don't know -- you know, I'd like to see the document that it came from. But based on what's here, that would be my understanding of what it is.

Q. You understand retained earnings to be profits basically?

A. Yes.

Q. And in this memorandum that you may have had a hand in writing, that would be the typical

way that one would view the retained earnings entry here in this memorandum, is that true?

A. Yes.

Q. And this indicates that they are projecting profitability in Year 1, Year 2, and Year 3, correct?

A. Yes, they are projecting it, yes.

Q. Would that suggest to you that there would be value to the NOLs, that if they achieved these expectations, they would be able to convert NOLs to cash by using the NOLs to shield this income?

A. That's what it looks like, yes.

Q. On Page 4 there is a statement in the first full paragraph at the end that says taking into account all of these factors and the proven managerial record of the acquirers, the viability of the resulting association does not appear to be a major concern. Do you see that?

MATERIAL REDACTED

A. Um-hum. I see that.

MATERIAL REDACTED

Q. Do you have any reason to believe it's inaccurate?

A. I don't remember the managerial record of the acquirer. If it was in here, somebody must have written it. I don't know who it was. I don't think I wrote it.

Q. Is it fair to believe that there was an effort to make sure that this memorandum was as accurate as possible --

A. Yes.

Q. -- before it was sent to the Federal Home Loan Bank Board in Washington, D.C.?

A. Yes.

Q. And that in fact there were in fact, by your testimony, four individuals who had input in this memo, Leo Blaber, Helen Mirza, yourself, and Dennis Thomas?

A. I don't think Leo had input. I think he would have read it and signed it. If he didn't agree with something, I think he probably would have changed it, but I don't think he drafted it.

Q. You have three drafters and one person reviewing to make sure he is fully comfortable

with everything in it, is that true?
A. Correct.
Q. I take it if you were uncomfortable with anything at the time it was drafted, you would have expressed that discomfort with someone?
A. I'm at the bottom of the totem pole. That decision would have been made higher up.
Q. Yes, but you would have expressed your discomfort if you believed anything was inaccurate, wouldn't you?
A. Yes.
Q. Do you recall any incident in which you discussed a view that anything in a memo relating to Holland and Ross was inaccurate?
A. Not that I remember.
Q. Do you recall that you and others in your office believed that the viability of the resulting institution would not be a major concern if the deal went forward on this basis?
A. I don't remember any concern about it on a going-forward basis, no.
Q. Do you believe that Holland and Ross would be able to operate the thrift successfully?
A. From what I remember of the transaction, yes.

Q. And successfully means profitably, doesn't it?

A. Yes.

Q. In the next paragraph it states that the analysis and evaluation division of the FSLIC has run a viability analysis as well and that they can concur with the decision that the institution would be viable. Does viable again mean profitable in the future?

A. Yes.

Q. And was it typical for FSLIC to do its own independent viability analysis?

A. Yes.

Q. Why was that?

A. They wanted to make sure.

Q. It was important to you and the other government regulators that any deal that you conclude have a good opportunity for success, is that true?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Ms. Januska, you have before you what's been marked as Januska Exhibit 8. It's a document Bates stamped CHO022 0602 through 0606. Take as much time as you'd like. I'm going to focus on the bottom of Page 1 and the top of Page 2 of the memorandum itself.

A. Okay.

Q. What is this document?

A. It's another addendum to the "S" memo on transaction of Home, Galva, and Mutual of Canton.

Q. The first page of this document is a fax cover sheet; is that correct?
A. Yes.
Q. Is that your handwriting on the fax cover sheet?
A. Yes, it is.
Q. And does this indicate that you in fact sent a memorandum by facsimile to David Adkins in the FSLIC office in Washington?
A. That's what it says, yes.
Q. Any doubt that you did it?
A. No.
Q. There is a discussion in the addendum to the "S" memorandum of the net operating loss carry-forwards; is that correct?
A. Um-hum.
Q. What is the purpose of the discussion?
A. Probably to clarify the NOLs, which would survive the merger and which would not.
Q. And does this indicate to you that the acquirers had done some work and had their accountants do some work to determine exactly how many of the NOLs would survive the merger and would be available for their use after the acquisition is completed?

A. That's what I understand from the paragraph.

Q. Is there any doubt in your mind that the government, in the months and weeks before the acquisition was completed in the summer of 1988, was aware that the net operating loss carry-forwards were a significant inducement to Holland and Ross to go forward with this transaction?

A. I don't know if I'd clarify it as a significant inducement. I would just say it was part of the transaction.

Q. It was part of the transaction, and it was something that was the subject of a back and forth about what the benefits would be and how they would be able to use them, is that true?

A. It's been in a couple documents that you've shown me. I don't know if it was substantial. I don't remember the merits, the details of this transaction. It's in this memo. It was part of the transaction.

Q. Why was it in this memo and who is Linda Plye who is the recipient of the memorandum?

A. The director of corporate activities. I don't know why the memo was written. I don't know

that I was part of the memo. I don't remember the memo. Looks like I sent the memo. I don't remember why.

Q. What was the general practice in determining whether a matter was significant enough to put in an "S" memorandum and send up to the Federal Home Loan Bank Board?

A. Probably if somebody raised questions about it.

Q. And who would be somebody?

A. Anybody in MAD.

Q. What kind of questions would MAD have raised about the NOLs?

A. Maybe which ones would expire. Maybe that's why he wrote the paragraph. I don't know.

Q. Based on your 15 years in this office, can you think of any reason why someone at MAD would be curious about the treatment of the NOLs, when they would expire, the ability to be used by the acquirers?

A. Probably wants to know what the value of it was to the acquirer. That would be my guess.

Q. Again, why would FSLIC want to know if this had value to the acquirer?

A. Because it's part of this transaction.

Either there were something to them or not. I think we talked about that earlier this morning.

Q. I'm just trying to figure out why the Mergers and Acquisition Division of FSLIC would be interested in this fact.

A. I think I said this morning, and maybe she could find it, that if it was a benefit to the acquirer, they would be getting something. And if they're getting a benefit, they shouldn't get it for nothing, it would be offset by something else in a FSLIC assistance.

It's a benefit. Either it has a value or it doesn't. If it has a value, then it should be accounted for in the transaction.

Q. Is it your belief that that actually happened in this case?

A. From the documents you're showing me, yeah. I would think we talked about the value of the NOLs.

Q. And that the government recognized that this was a benefit it could offer to Holland and Ross, Holland and Ross recognized that it was a benefit they would receive, is that true?

A. You know, I have a problem with you saying the government could offer it as a benefit.

It was the NOLs of the institution and the institutions that were being merged, and Homer and Howard were going to acquire them.

And some of them would survive and they thought they were able to use them, so they would have a value. So it was part of the transaction in determining -- they put them in their bid. They could say we didn't want them. But they said in their bid they wanted them, so it became part of the transaction.

Q. When you said they could say they didn't want them, meaning that they could assign to the government any benefits of the NOLs?

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you have any understanding of the effect of FIRREA's eradication of regulatory capital from the books of River Valley and the effect of that occurrence on the operations of River Valley?
A. No, not specifically River Valley, no.
Q. Do you have a general understanding as to the effect on other thrifts similarly situated?
A. The passage of FIRREA required the institutions to immediately write off goodwill and other regulatory capital that didn't conform to GAAP.
Q. And what is your understanding of the effect that that had on the institutions that had to write off the regulatory capital?
A. They would have a one-time hit to their balance sheet.
Q. What do you mean by that?
A. They would have to write off that amount to be a reduction to retained earnings, would offset whatever earnings they made in the quarter that they wrote it off.
Q. And what about the effect on their capital position?

A. On what basis? On a GAAP basis it would probably be the same because on a regulatory capital basis it would be less.

Q. You're saying they would have less regulatory capital?

A. Yes.

MATERIAL REDACTED

Q. And you understand that that effect was disadvantageous?

A. From their point of view, yes.

Q. Yes. That they had to either find capital or replace it or go out of capital compliance, perhaps be ceased, change business plans, all true?

A. That would be true, yes.

# EXHIBIT 5

JONES, DAY, REAVIS & POGUE

AUSTIN HONG KONG
CHICAGO LONDON
CLEVELAND LOS ANGELES
COLUMBUS NEW YORK
DALLAS PARIS
GENEVA RIYADH

METROPOLITAN SQUARE
1450 G STREET, N.W.
WASHINGTON, D.C. 20005-2088

TELEPHONE: 202-879-3939
TELEX: DOMESTIC 892410
TELEX: INTERNATIONAL 64363
CABLE: ATTORNEYS WASHINGTON
TELECOPIER: 202-466-6642
WRITER'S DIRECT NUMBER:
(202) 879-3664

May 27, 1988

VIA MESSENGER

Evelyne Bonhomme, Esq.
Office of the General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

Re: Proposed Acquisition of Home Federal Savings and Loan Association of Peoria, Peoria, Illinois, Galva Federal Savings and Loan Association, Galva, Illinois, and Mutual Savings and Loan Association, Canton, Illinois, by Messrs. Howard R. Ross and Homer J. Holland

Dear Evelyne:

Prior to forwarding to you under cover of May 24 our comments to the Assistance Agreement relating to the above-referenced transaction, we did not have an opportunity to consult with our tax lawyers. After reviewing the Assistance Agreement, our tax lawyers have suggested that two changes be made to clarify that the net operating losses acquired in the transaction are not tax benefits to be paid to FSLIC. Enclosed are pages 46 and 47 of the Assistance Agreement, marked to reflect such changes.

Also enclosed is page 18 of the Assistance Agreement, marked to reflect that the opinion to be delivered by us with respect to the enforceability of the Stock Purchase Agreement must be qualified with respect to the indemnification provisions contained therein.

Please contact me at the above-referenced number or Peter Barnett at (202) 879-3972 with any questions or comments you may have.

Sincerely,

Deborah A. Sabella

Deborah A. Sabella

DAS/pgd
Enclosures
cc: Mr. David Adkins
Peter M. Barnett, Esq.
Mr. Robert A. Cline
Steven Dimmick, Esq.
Ms. Wilvia Galbraith
John P. Harootunian, Esq.
Van E. Holkeboer, Esq.
Mr. Homer J. Holland
Ms. Diana Januska
Ms. Janice Soergel ✓

EXHIBIT
PENGAD-Bayonne, N.J.
Januska 35
8-11-00

except as such enforceability may be limited by

Subordinated Debenture and related Purchase Agreement, and the Stock Purchase Agreement have been duly authorized, executed and delivered by, and constitute valid and binding obligations of RIVER VALLEY and the INVESTORS, enforceable against each of them in accordance with their respective terms, ~~subject to~~ bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting the enforcement of the rights of creditors generally (or the rights of creditors of federal savings banks generally in the case of RIVER VALLEY), and by ~~to~~ general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, ~~;~~ and

(2) The CORPORATION shall receive on or prior to the Effective Date a certified copy of the corporate resolutions of RIVER VALLEY authorizing the Transaction, the execution and delivery of the Acquisition Agreement, this Agreement, the Subordinated Debenture and related Purchase Agreement, and the Stock Purchase Agreement~~,~~ and;

(3) The INVESTORS and RIVER VALLEY, within the time periods specified by the terms of this Agreement or by the Bank Board, (a) shall execute and deliver to the CORPORATION all other agreements, instruments, and documents, including but not limited to the Regulatory Capital Maintenance Agreement, the Irrevocable Proxy, the Stock Issuance Stipulation and the Stock Transfer Stipulation, required to be executed and delivered by the terms of this Agreement and by any action of the Bank Board in approving the Transaction, and

, and except as the rights to indemnity under the Stock Purchase Agreement may be limited by applicable securities laws.

(B) the state income tax liability for such taxable year (taking into account all allowable carryovers and carrybacks to such year) actually incurred by RIVER VALLEY.

(d) <u>Timing of Payment</u>. The Net Tax Benefit shall be credited to the Special Reserve Account or paid to the CORPORATION with thirty (30) days after RIVER VALLEY files its Federal and state income tax returns for the taxable year in which such Net Tax Benefits are realized. ~~[illegible] of carryovers [illegible]~~

(e) <u>Cooperation</u>. RIVER VALLEY shall, upon request of the CORPORATION, provide copies of the tax returns and amended tax returns of RIVER VALLEY and any of its Subsidiaries and Affiliates for any taxable years specified by the CORPORATION. RIVER VALLEY agrees to use its best efforts, cooperate fully with the CORPORATION and take all such actions as are necessary to maximize the Net Tax Benefits realizable by it and to implement the provisions of this § 9.

(f) <u>Disallowed Deductions</u>. In the event Net Tax Benefits are paid with respect to Tax Benefit Items that are subsequently disallowed or that cease to be Tax Benefit Items because it is determined that payments with respect to such Tax Benefit Items are not excludible from gross income, such Net Tax Benefits shall be debited to the Special Reserve Account or paid to RIVER VALLEY.

, to the extent that

(g) Survival. This § 9 shall survive the termination of this Agreement. After the date of this Agreement terminates, RIVER VALLEY shall make immediate payment to the CORPORATION in cash of all amounts that would have been due to the CORPORATION pursuant to this § 9 prior to termination of this Agreement.

**Section 10.** Duplicate Payments. Any cost or expense for which an INVESTOR or RIVER VALLEY has been reimbursed under any section of this Agreement, or any recovery which has been paid over to or retained by the CORPORATION under any section of this Agreement, shall not be reimbursed to an INVESTOR or RIVER VALLEY or paid over to or retained by the CORPORATION, under any other section of this Agreement, even though such cost, expense, or recovery may be described in whole or in part in two or more sections of this Agreement.

**Section 11.** Non-Reimbursable Expenses. Except as specifically provided in § 3(c) with respect to opinion reports required to be filed under § 12(f)(2) and (3), the INVESTORS and RIVER VALLEY shall not seek reimbursement from the CORPORATION for expenses incurred in the administration of this Agreement. For purposes of this § 11, such expenses shall include, but shall not be limited to, compensation paid to employees or agents of the INVESTORS, RIVER VALLEY, or any Affiliates thereof, for services performed in connection with the preparation of reports and supporting documentation required to be filed with the CORPORATION under § 12 of this Agreement.

# EXHIBIT 6

07/12/88 16:11 FHLB CHICAGO OFS 312-565-5823 NO.254 P001/007

FEDERAL HOME LOAN BANK OF CHICAGO
111 E. Wacker Drive

CHICAGO, ILLINOIS 60601
(312) 565-5700

FACSIMILE TRANSMITTAL

MACHINE PHONE #565-5823

FROM: Diana Januska

DEPARTMENT/DIVISION: 081 Supervision

DATE 7/12/88

CONTACT PERSON: Same

PHONE # 312-565-5307

FAX TRANSMITTAL FORM COMPLETED BY: Same

PHONE #

PRIORITY: (CHECK ONE)

- [X] URGENT (WITHIN 15 MINUTES)
- [ ] QUICK (WITHIN 4 HOURS)
- [ ] DELAY (OVERNIGHT)

NOTE: IF ALL PAGES ARE NOT RECEIVED, CALL ROSE FORD IMMEDIATELY AT (312) 565-5822

NAME/DEPARTMENT/COMPANY/CITY & STATE OF RECEIVER: Dave Adkins
MAD, FSLIC
Washington, DC

MACHINE PHONE# 202-254-2563

SPECIAL INSTRUCTIONS: Dave - Please give a copy to Herb.

6 PAGES TO FOLLOW

Form No. 16-037 (REV 11/87) M2067

JUL 12 '88 17:10

PAGE.001

EXHIBIT
PENGAD-Bayonne N.J.
Januska #6
8-11-00

Federal
Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360
Seventh District Office

July 12, 1988

"S" MEMORANDUM SUPPLEMENT

To: John Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Slaber, Jr.
Principal Supervisory Agent
Federal Home Loan Bank of Chicago

LBB by HKM

Subject: Acquisition and Conversion of Home Federal Savings and Loan Association of Peoria, Galva Federal Savings and Loan Association, and Mutual Savings and Loan Association by Messrs. Howard R. Ross and Homer J. Holland

FINANCIAL VIABILITY

Business Plan

The proposed merger of Galva Federal Savings and Loan Association (Galva Federal) and Mutual Savings and Loan Association (Mutual Savings) with and into Home Federal Savings and Loan Association of Peoria (Home Federal) will create a $210 million institution. In order to recapitalize the institution, Messrs. Ross and Holland (the acquirers) have requested an accounting forbearance which would allow $8 million of the $33 million of FSLIC assistance to be credited to regulatory capital. In addition, $5 million in preferred stock will be issued to the FSLIC and a $4.6 million subordinated debt security will be issued, which will be purchased by the American National Bank and Trust Company of Chicago. The total regulatory capital of the institution at the time of merger will total $17.6 million or 8.38% of assets.

The $33 million of FSLIC assistance, proceeds from the preferred stock issue and proceeds from the subordinated debt issue will be invested in FNMA/FHLMC adjustable rate mortgage securities. The institution will then have a one and three year GAP position equal to approximately 5% of assets.

As a result of the merger, the initial goodwill will total $13.3 million or 6.3% of assets. This goodwill amount is $8 million higher than it would be if accounted for under Generally Accepted Accounting Principles (GAAP). Under GAAP the $8 million in FSLIC assistance would not be counted as regulatory capital and would be used to offset the goodwill account.

"S" Memorandum Supplement
Page 2

Liabilities of the resulting institution will total $192.5 million and will consist primarily of the existing deposits of the three institution as well as $6 million in FHLB of Chicago advances. The regulatory capital to total liabilities ratio would be 9.1%.

The following proforma financial information indicates that the new institution will be a viable entity.

(000's omitted)
As of March 31, 1988

| | At Merger | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Cash and Investments | $100,064 | $ 99,968 | $117,105 | $137,206 |
| Loans | 91,177 | 94,654 | 98,304 | 102,137 |
| Goodwill | 13,343 | 12,699 | 11,639 | 10,305 |
| Other Assets | 5,600 | 5,037 | 4,635 | 4,347 |
| Total Assets | $210,184 | $212,358 | $231,683 | $253,995 |
| Deposits | $183,160 | $183,425 | $202,467 | $223,486 |
| FHLB Advances | 6,000 | 7,744 | 7,238 | 7,950 |
| Other Liabilities | 3,424 | 3,424 | 3,424 | 3,424 |
| Total Liabilities | $192,584 | $194,593 | $213,129 | $234,860 |
| Preferred Stock | $ 5,000 | $ 5,000 | $ 5,000 | $ 5,000 |
| Subordinated Debt | 4,600 | 4,600 | 4,600 | 4,600 |
| FSLIC Assistance | 8,000 | 8,000 | 8,000 | 8,000 |
| Retained Earnings | 0 | 165 | 954 | 1,535 |
| Total Regulatory Capital | $ 17,600 | $ 17,765 | $ 18,554 | $ 19,135 |
| Total Liabilities and Capital | $210,184 | $212,358 | $231,683 | $253,995 |
| Regulatory Capital to Total Liabilities | 9.14% | 9.13% | 8.71% | 8.15% |

"S" Memorandum Supplement
Page 3

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Interest Income | $ 17,407 | $ 18,645 | $ 20,605 |
| Interest Expense | (13,566) | (14,152) | (15,527) |
| Interest Margin | $ 3,841 | $ 4,493 | $ 5,078 |
| Other Income | $ 696 | $ 696 | $ 696 |
| General & Administrative Exp. | (2,913) | (2,526) | (2,425) |
| Amortization of Goodwill | (534) | (534) | (534) |
| Net Income Before Tax, Sub-Debt and Preferred Stock | $ 1,090 | $ 2,129 | $ 2,815 |
| Subordinated Debt Expense | 414 | 414 | 414 |
| Preferred Stock Expense | 400 | 400 | 400 |
| Net Income Before Tax | $ 276 | $ 1,315 | $ 2,001 |
| Charge in Lieu of Taxes | (110) | (526) | (800) |
| Net Income | $ 166 | $ 789 | $ 1,201 |
| Net Income to Assets | .08% | .34% | .47% |

Under GAAP, net income would be $320,000 higher in each year due to the amortization of a smaller amount of goodwill. The above financial information appears reasonable and achievable based on the infusion of cash into the association from the issuance of preferred stock, subordinated debt and the $33 million of FSLIC assistance.

During the last three quarters, the three separate associations have reported the following operating results on a combined basis:

| | 9/30/87 | 12/31/87 | 3/31/88 |
|---|---|---|---|
| Net Loss | $ (2,608) | $ (5,564) | $(2,197) |
| Add Adjustments: * | | | |
| Provision for Loan Loss | 1,677 | 4,521 | 1,239 |
| Amort. of Deferred Losses | 175 | 207 | 205 |
| Loss on Investment Securities | | | 978 |
| Adjusted Net Income (Loss) | $ (756) | $ (836) | $ 225 |

* The adjustments to net income reflect extraordinary charges to income that will not recur when the assets and liabilities are marked-to-market.

If the past nine months of operation as adjusted are projected out for one year, the loss from operations would be $1.8 million. The investment of the FSLIC assistance of $33 million at 8.5% will generate $2.9 million. Furthermore, the consolidation of the three institutions will create cost savings and economies of scale that will be realized by the acquirers. Finally, a projected ten percent growth in deposits will be reinvested to yield a net interest spread of 150 basis point. Taking into account all of these factors and the proven managerial record of the acquirers, the viability of the resulting association does not appear to be a major concern.

The Analysis and Evaluation Division of the FSLIC has run a viability analysis of the resulting institution. Based on their analysis, they concur with our conclusion that the institution will be viable. A copy of their analysis accompanies this memorandum.

<u>Assistance Credited to Regulatory Capital</u>

As shown on the projected balance sheet, with the inclusion of $8 million of FSLIC assistance in regulatory capital, the resulting institution would have a regulatory capital to total liabilites ratio of 9.14% at merger. The ratio declines to 8.15% in year three due to ten percent (10%) annual growth in deposits. If the accounting forbearance was not to be granted, the association's regulatory capital would be reduced by $8 million. The regulatory capital to total liabilities ratio under this scenario would be as follows:

| | |
|---|---|
| At Merger | 4.98% |
| Year 1 | 5.02% |
| Year 2 | 4.95% |
| Year 3 | 4.74% |

Although historically the Bank Board has been disinclined to allow one hundred percent of the FSLIC assistance to be credited to capital, on a case by case basis, a portion of the assistance <u>has</u> been credited to regulatory capital at the request of the acquirer. This policy is stated and clarified in the Supervisory Procedures Memorandum 37a, which states, that in connection with a supervisory merger, the resulting institution may request that a portion of the cash contribution be credited to regulatory capital for regulatory accounting purposes. It further states that this forbearance generally will be granted upon the request of the resulting institution in a supervisory merger. The three association were marketed under these guidelines.

The acquirer is also aware that the Bank Board has in the past credited a portion of the cash contribution to regulatory capital. As a result, their proposal was based on the assumption that this forbearance would be available, since the marketing instructions did not state otherwise. The Mergers and Acquisitions Division of the FSLIC (MAD) has negotiated a solution to this case, which involved the granting of an accounting forbearance which would allow the acquirers to credit $8 million of the FSLIC assistance to RAP capital. The negotiations were entered into in good faith, and we believe that a change in the terms of the agreement at this time could jeopardize the credibility of future negotiations and have a dampening effect upon the disposition of FSLIC cases.

Since a tentative agreement has been reached between the acquirer and MAD, with respect to the terms of this transaction, the acquirer proceeded to present proforma financial statements to American National Bank and Trust Company of Chicago in support of a subordinated debt offering. In these financial statements, the acquirer stated that the resulting institution was projected to have certain capital characteristics. One of these characteristics was the inclusion of $8 million of FSLIC assistance in the regulatory capital of the association. On the basis of these financial statements, American National agreed to purchase the debt securities from River Valley. The acquirer is understandably reluctant to amend the financial statements submitted in support of the offering, feeling that this may cast an unfavorable light on him as a businessman.

The FHLB of Chicago supervisory staff will, through its records, be continuously aware of the $8 million in "soft" RAP capital in analyzing the resulting institution's financial position in future applications and/or mergers.

## Conclusion

Although current policy issues question the use of the accounting forbearance regarding this matter, we emphasize that this transaction was negotiated prior to these policy concerns being brought to the forefront. Therefore, we recommend granting this forbearance. However, if the Bank Board so desires, the acquirer has expressed a willingness to enter into an agreement which would disallow inclusion of the assistance in capital for purposes of growth, investment limitations, or for declaring dividends. The principal purpose for which the acquirer wishes to receive this credit to capital is in order to be well positioned vis-a-vis his capital with respect to future FSLIC insurance premium assessments. All other benefits of assistance to capital he is willing to forego.

LBB:HKM:DJ:DT



 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

cc: L. Blaber
S. Brafman
C. Biedron
D. Bagus
D. Januska
H. Mirza
L. Sommers
D. Thomas

D. Adkins, MAD
E. Bonhomme, OGC, FSLIC Div.
R. Cline, ORPOS
D. Dochow, ORPOS
H. Held, MAD

# EXHIBIT 8

06/29/88 12:33 FHLB CHICAGO OFS 312-565-5823 NO.090 P001/005

FEDERAL HOME LOAN BANK OF CHICAGO
111 E. Wacker Drive
CHICAGO, ILLINOIS 60601
(312) 565-5700

FACSIMILE TRANSMITTAL

FROM: Diana Januska

MACHINE PHONE #565-5823

JUN 29 2 43 PM '88
MERGERS & ACQUISITIONS DIVISION

DEPARTMENT/DIVISION: 081 Supervision

DATE 6/29/88

CONTACT PERSON: Same

PHONE # 565-5301

FAX TRANSMITTAL FORM COMPLETED BY: Same

PHONE #

PRIORITY: (CHECK ONE)

☒ URGENT (WITHIN 15 MINUTES)

☐ QUICK (WITHIN 4 HOURS)

☐ DELAY (OVERNIGHT)

NOTE: IF ALL PAGES ARE NOT RECEIVED, CALL ROSE FORD IMMEDIATELY AT (312) 565-5822

NAME/DEPARTMENT/COMPANY/CITY & STATE OF RECEIVER: Dave Adkins MAD Washington DC

MACHINE PHONE# 202-254-2563

SPECIAL INSTRUCTIONS: Discard prior 4th Addendum & Replace with this copy

4 PAGES TO FOLLOW

Form No. 16-037 (REV 11/87) M2067

Call if you have questions.

EXHIBIT
PENGAD-Bayonne N.J.
Januska #8
8-11-00

JUN 29 '88 13:31 PAGE.001

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

June 22, 1988

**FOURTH ADDENDUM TO THE "S" MEMORANDUM**

TO: Linda Plye, Director, Corporate Activities

FROM: Leo B. Blaber, Jr., Principal Supervisory Agent LBB

SUBJECT: Proposed Acquisition of Home FS&LA of Peoria, Illinois, Galva FS&LA, Galva, Illinois and Mutual S&LA, Canton, Illinois, by Messrs. Howard Ross and Homer Holland

**Management Interlock**

This section addresses the waiver of the Management Interlocks Act requested by the applicant for Mr. Chester Claudon.

The waiver is required since Mr. Claudon will be serving on the board of two local financial institutions. The applicant has made its request pursuant to 12 C.F.R. Section 563f.4(b)(3). This section allows a person to serve as a management official of 2 or more depository organizations if one of them faces conditions endangering its safety or soundness.

The resulting institution in this situation will be the combination of three FSLIC cases. Therefore, the applicant's retention of Mr. Claudon for purposes of facilitating the consolidation and integration of operations is justified under the paragraph cited. Additionally, the waiver will only be effective for an eight month period (assuming the transaction can be consummated by the end of this month) due to grandfathered rights set to expire on November 10, 1988. We recommend that the Bank Board grant the waiver as requested in this situation.

**Net Operating Loss Carryforwards**

The applicant has provided a schedule listing the NOL's and their respective expiration dates for each of the referenced institutions. The applicant has also indicated those NOL's that will survive the mergers and those that will not. This information was certified by the applicant's accountants. However, identical schedules and expiration dates were provided in each of the referenced institution's annual audit report, all of which were prepared by Peat Marwick. These findings support the accuracy of the figures and dates provided by the applicant.

As we understand the structure of the transaction Mutual and Galva will be separately but simultaneously merged into Home of Peoria. As we understand the new tax rule regarding retention of NOL benefits, the deposits of each of the separate merging institutions must represent more than 20% of the combined value of the deposits of the resulting institution, after each separate merger. Therefore, it appears that the applicant's calculations are correct (see our calculations below).

(March 31, 1988 data; 000's omitted)

| | |
|---|---|
| (1) Total Deposits: Mutual S&LA | $ 39,063 |
| (2) Total Deposits: Home FS&LA | 129,247 |
| (3) Total Deposits After Merger | $168,310 |
| | x 20% |
| (4) 20% of Combined Value | $ 33,662 |

Since line #1 is greater than line #4 the NOL's of Mutual S&LA will survive the merger.

| | |
|---|---|
| (1) Total Deposits: Galva FS&LA | $ 14,252 |
| (2) Total Deposits: Home FS&LA | 129,247 |
| (3) Total Deposits After Merger | $143,499 |
| | x 20% |
| (4) 20% of Combined Value | $ 28,700 |

Since line #1 is less than line #4 the NOL's of Galva FS&LA will not survive the merger.

We believe the applicant's findings regarding the NOL's are accurate. Therefore, the absence of a supporting tax opinion at this time should not be cause to delay Bank Board approval of this transaction. However, we recommend that the Bank Board condition its approval upon receipt of such an opinion within 90 days after consummation of the transaction, satisfactory to the Supervisory Agent.

Blu-Max Bankruptcy

The bankruptcy of Blu-Max Pigments, Inc. (Blu-Max) was not the result of mismanagement or inability of the investors or management officials. As outlined by counsel it was due to the inability of the company to meet the highly sophisticated technology of the printing ink industry.

Counsel has also stated that there is no continuing litigation and he is aware of no potential liabilities in connection with the liquidation of Blu-Max. Additionally, Mr. Holland's exposure in the case was limited to his investment and limited guarantee on the debt. Counsel has stated that Mr. Holland has fully satisfied his guarantee in this case.



 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Therefore, this bankruptcy should not further impact the personal financial resources of Mr. Holland and will have no effect on the subject transaction. Additionally, it is our opinion that this bankruptcy does not demean the character of Mr. Holland or his ability to successfully manage a financial institution. We refer you to our original addendum to the "S" Memo, dated May 4, 1988, for comments on the acquirors. In that document we concluded that no grounds exist to form a basis for denial and recommended that the Bank Board approve the proposed acquisition.

## Stock Purchase Agreement

In connection with the proposed FSLIC-assisted acquisition, the FSLIC will purchase 50,000 shares of non-voting 8% Cumulative Preferred Stock ("Class A Preferred Stock") to be issued in five series of 10,000 shares per series. Each share will have a par value of $100.00. The FSLIC will pay $5 million in cash for the 50,000 shares of Class A Preferred Stock.

The Class A Preferred Stock is redeemable in whole or in part at the option of River Valley at any time within 30 days of the completion of any fiscal quarter of River Valley. Moreover, River Valley may convert the Class A Preferred Stock into Subordinated Debentures at any time, provided the FSLIC has not given notice to River Valley that it intends to sell its Class A Preferred Stock. Such debentures shall continue under the same terms and conditions as the Class A Preferred Stock and may be sold by the FSLIC.

We have reviewed this agreement from a supervisory perspective and find no reason for objection on that basis. If this agreement is acceptable to the FSLIC we recommend that the Bank Board approve this transaction including execution of this agreement by the FSLIC.

## Charter Supplements

The two supplementary sections to the charter, which are also attached to the Stock Purchase Agreement as exhibits, set forth the rights, terms and privileges of the two classes of preferred stock the resulting institution will be authorized to issue. We have no further comments to add other than those contained in our review of the Stock Purchase Agreement. Again, we have reviewed these documents from a supervisory perspective and find no reason for objection.

**Stock Certificates**

We have reviewed the Common and Preferred Stock Certificates to be issued to the respective holders by the resulting institution. The language contained in these documents is standard and conforms with various terms of this transaction. Therefore, we have no reason to take supervisory objection and recommend that the Bank Board approve the forms of the certificates as submitted.

**Business Plan**

The acquirers have submitted an acceptable business plan consistent with economical home financing and which does not raise a presumption of disqualification under 12 CFR 547.7g(2)(ii). However, as a condition to granting FSLIC assistance pursuant to 12 USC 1729f, we would require that the business plan be supplemented subsequently with certain additional detail. The acquirer has been notified of this requirement and has agreed to provide the necessary subsequent detail within 90 days of the effective date in a form acceptable to the Supervisory Agent.

LBB:DRB