## Larry Ferries Deposition Excerpts

p. 4, lines 1-4, 12-15

p. 6, lines 16-25

p. 7, line 10 – p. 8, line 10

p. 9, lines 6-24

p. 10, line 16 – p. 11, line 19

p. 12, lines 3-22

p. 14, lines 17-23

p. 15, lines 15-25

p. 16, line 7 – p. 23, line 9

p. 24, lines 1-25

p. 28, lines 3-7

p. 29, line 16 – p. 30, line 11

p. 31, line 15 – p. 32, line 16

p. 33, line 2 – p. 37, line 5

p. 37, line 6 – p. 38, line 4

p. 38, lines 18-21

p. 39, line 14 – p. 42, line 8

p. 42, line 13 – p. 43 line 1

p. 43, line 11 – p. 46, line 2

p. 46, lines 8-14

p. 46, line 23 – p. 47, line 11

p. 47, lines 20-23

p. 48, line 6 – p. 49, line 2

p. 49, lines 3-12

p. 49, line 18 – p. 51, line 7

p. 51, line 8 – p. 53, line 15

p. 57, line 25 – p. 60, line 10

p. 63, line 9 – p. 64, line 4

p. 64, line 18 – p. 67, line 13

p. 68, line 3 – p. 69, line 10

p. 69, line 23 – p. 71, line 16

p. 73, line 19 – p. 75, line 13

p. 78, line 19 – p. 79, line 17

p. 82, line 9 – p. 83, line 18

p. 84, line 6 – p. 88, line 25

p. 89, lines 4 – 13

p. 90, line 6 – p. 91, line 7

p. 91, line 25 – p. 93, line 17

p. 94, line 19 – p. 96, line 13

p. 101, line 15 – p. 102, line 6

p. 103, line 20 – p. 104, line 11

p. 105, line 5 – p. 107, line 20

p. 116, line 20 – p. 119, line 23

p. 123, line 14 – p. 128, line 25

p. 129, line 5 – p. 130, line 7

p. 134, lines 16–22

p. 135, lines 10-15

p. 138, line 23 – p. 139, line 15

p. 143, line 12 – p. 145, line 15

p. 146, line 20 – p. 148, line 14

p. 151, line 17 – p. 153, line 5

p. 157, line 12 – p. 158, line 6

p. 159, line 1 – p. 163, line 22

p. 174, line 19 – p. 177, line 22

p. 179, line 22 – p. 181, line 13

p. 185, line 20 – p. 186, line 22

p. 187, line 10 – p. 190, line 23

p. 193, line 15 – p. 195, line 5

p. 195, lines 6 – 15; 21-23

p. 198, line 21 – p. 199, line 20

p. 206, line 12 – p. 208, line 12

p. 209, lines 9–24

p. 213, lines 1-18

p. 214, line 19 – p. 215, line 22

p. 218, line 20 – p. 219, line 25

p. 220, line 1 – p. 221, line 11

p. 222, line 8 – p. 224, line 21

p. 226, line 5 – p. 228, line 11

p. 230, line 1 – p. 231, line 8

p. 236, line 4 – p. 237, line 12

p. 243, line 17 – p. 244, line 5

p. 244, line 23 – p. 247, line 17

p. 251, line 13 – p. 252, line 5

p. 252, line 9 – p. 254, line 14

p. 256, lines 3-7

p. 263, line 23 – p. 264, line 3

p. 265, line 14 – p. 267 line 6

p. 268, line 2 – p. 269, line 17

p. 273, lines 1-18.

p. 284, line 1 -- p. 287, line 13

p. 289, line 20 -25.

p. 291, line 22 -- p. 292, line 10.

p. 294, line 16 -- p.296, line 5.

p. 297, lines 8-20.

p. 329, line 18 -- p.330 line 6

p. 330, lines 11-24

p. 333, lines 6-10, 15-17

p. 334 lines 15-19

p. 334 line 24 -- p.335 line 7

p. 335, lines 15-21

p. 357, lines 16-23

p. 358, lines 7-19

p. 358, line 25 -- p. 359, line 11

p. 359, line 15 -- p. 360, line 25

p. 365, line 14 -- p.366, line 8.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND AND HOWARD )
P. ROSS, )
)
Plaintiff, )
)
VS ) NO.5-524C
)
THE UNITED STATES OF AMERICA,)
)
Defendants. )

CERTIFIED COPY

The deposition of LARRY FERRIES called for examination pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, pertaining to the taking of depositions, taken before Frances I. Okrei, CSR-CM, a notary public within and for the County of Will and State of Illinois, and a Certified Shorthand Reporter in the State of Illinois, Certificate No. 84-1074, at 54 W. Hubbard Street, Chicago, Illinois, on the 10th day of August, A.D., 2000, commencing at the hour of 9:00 o'clock a.m.

APPEARANCES:

ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 42-5656
BY: MR. HOWARD N. CAYNE
and MR. DAVID BERGMEN,
Appeared on behalf of Plaintiffs;

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L. Street
Washington, D.C. 20530
(202) 353-8841
BY: MS. PATRICIA A. SMITH,
Appeared on behalf of Defendants.

I N D E X

WITNESS:

LARRY FERRIES

Direct Examination by MR. CAYNE 4

EXHIBITS:



| | |
|---|---|
| Ferries Exhibit No. 1 | 79 |
| Ferries Exhibit No. 2 | 81 |
| Ferries Exhibit No. 3 | 108 |
| Ferries Exhibit No. 4 | 116 |
| Ferries Exhibit No. 5 | 120 |
| Ferries Exhibit No. 6 | 130 |
| Ferries Exhibit No. 7 | 134 |
| Ferries Exhibit No. 8 | 135 |
| Ferries Exhibit No. 9 | 139 |
| Ferries Exhibit No. 10 | 148 |
| Ferries Exhibit No. 11 | 151 |
| Ferries Exhibit No. 12 | 153 |
| Ferries Exhibit No. 13 | 166 |
| Ferries Exhibit No. 14 | 231 |
| Ferries Exhibit No. 15 | 237 |
| Ferries Exhibit No. 16 | 237 |
| Ferries Exhibit No. 17 | 241 |
| Ferries Exhibit No. 18 | 250 |
| Ferries Exhibit No. 19 | 254 |

LARRY FERRIES,

called as a witness herein, after having been first duly sworn, was examined and testified as follows:

MATERIAL REDACTED

Q For the record, would you state and spell your full name?

A Larry L A R R Y Ferries F E R R I E S.

MATERIAL REDACTED

Q Where are you currently employed?
A The Office of Thrift Supervision.
Q In the Chicago office?
A Chicago office.
Q What is your position?
A I'm a field manager.
Q And where did you go to college?
A University of Wisconsin, LaCross.
Q What did you major in?
A Business administration.

MATERIAL REDACTED

Q What was your first position following your graduation from college?

A I was a field examiner for Federal Home Loan Bank Board.

Q Assigned to what office?

A Chicago.

Q And as field examiner, were you an employee of both the Federal Home Loan Bank Board and the FSLIC or just the Federal Home Loan Bank Board?

A Just the Federal Home Loan Bank Board.

Q Beginning in what year did you hold that position?

A 1975.

Q What did your training for that position involve?

A The standard courses. I mean, you had to meet certain requirements. I don't remember what those were.

You had to have a college degree and have taken certain courses, passed the government test to be even considered and then there was a formal training process.

There were different classes; appraisal classes, examiner training classes. It was a full process and then hands-on experience.

MATERIAL REDACTED

MATERIAL REDACTED

Q Can you describe to me your responsibilities and duties as an examiner when you first became an examiner in 1975?

A In 1975, I was still learning so I would be assigned as an assistant working with a senior examiner.

You go to the various jobs throughout the Chicago and Illinois area. Once in a while Wisconsin but mostly always Chicago and Illinois.

So you learned a lot by just hands-on working with more senior guys that have been on, you know, fifteen, twenty years. And then you took the courses and by the end of your first year, ten or eleven months, you had your first examination where you were first in charge.

Then in that whole process you look at loans, you look at real estate owned, you look at the operations of the bank or thrift. The earnings, the risk and all that.

MATERIAL REDACTED

Q For how long did you hold the title Assistant Examiner?

A We didn't really -- Assistant Examiner. That was your primary job was assisting but you might be assisting for the first -- I was an examiner for ten years.

So you'd be assisting on some jobs and in charge on others. So you might be in charge of a big job one -- you know, for two months and then you go and assist someone else on another job.

That's just the way we operate. You weren't always in charge.

Q Did your title or formal position change during that ten year period?

A The title wasn't officially Assistant Examiner, it was always Examiner. And then sometimes you are Examiner in Charge, sometimes your Assistant Examiner.

Q And did you ever --

A It was grade levels. There was grade levels. And that was probably -- you start at a Grade 7 and then after about a year, you became a Grade 9 and after two years, you were Grade 11 and then it was competitive to Grade 12 or 13.

Q What was the highest grade level you achieved as an examiner?

A As a field examiner a Grade 12, which was a senior examiner. There is only one step higher, which was a Grade 13.

MATERIAL REDACTED

MATERIAL REDACTED

Q Did you examine any institutions that as a result of your examination were subject to an enforcement action?

A Yes.

Q What situations were those; were there a lot of them?.

A There is a lot. It was just common back in the early '80s. There was a lot of problem shops and everything. I can't even remember all the ones that -- but it was routine for a problem institution to have an agreement.

Q So you are familiar with the enforcement process?

A Right; right.

Q And you are familiar with the supervisory agreements?

A Yes.

Q Were you familiar with orders to cease and desist?

A Yes.

MATERIAL REDACTED

Q Can I correctly assume that in your experience as an examiner and as a field manager, you dealt with a significant number of institutions that had -- that were permitted to include supervisory good will as an element of their regulatory capital?

A Yes.

Q You were familiar with the importance of supervisory good will to the institutions that carried it on their books, correct?

A Yes.

Q What did you understand the importance of supervisory good will to be?

A It gave them capital and that was one way FSLIC was able to get people interested in taking over some of the problem shops that we had.

Because they could include the good will in capital.

MATERIAL REDACTED

Q You indicated that supervisory good will was one way FSLIC was able to get people interested in taking over some of the problem shops. Do you recall that?

A Right.

Q Possibly asking why were people interested in taking over insolvent shops if they were allowed to use supervisory good will?

A They needed less -- they needed less capital and it actually -- I don't remember all the aspects, but it was basically they needed less of their money in the deal or they were willing to put less of their money in the deal.

And this was a way that FSLIC could basically sell it because you were amortizing the good will out over 20 years, so it was just a smaller hit to earnings in theory.

Q And it was also important because the supervisory good will could be included as an

element of regulatory capital, correct?
A Right.
Q And you understood as a professional examiner and field manager that regulatory capital was important to a savings and loan association, correct?
A It is. Capital was king was the quote.
Q And why is capital king?
A Because without capital, you can't do anything.
Q What can't you do without capital?
A You just can't operate. You needed the capital to be able to invest in loans, to be able to continue your operations.
Q And you needed regulatory capital, right?
A Right; right.
Q And regulatory capital could be Greenbacks, correct?
A Greenbacks as in cash.
Q Dollars?
A Yes.
Q And regulatory capital could also be supervisory good will.
A Right.

Q And do you know what I mean when I use the term capital credits?
A Yes.
Q What is your understanding of the term?
A Well, they were -- the government -- it was a complicated I don't really remember quite everything that was involved.
But the government would give you credits. You could count them as, you know, as capital but they were future payments, basically.
Q Do you remember the River Valley -- you personally had a lot of hands-on experience with River Valley, correct?
A Right.
Q And River Valley, after their acquisition by Messrs. Holland and Ross, was authorized to include supervisory good will as a component of regulatory capital, correct?
A Right.
Q River Valley was also authorized to include subordinated debt as an element of regulatory capital, correct?
A Correct.
Q River Valley was also authorized to include preferred stock purchased by FSLIC as

regulatory capital; correct?
A Yes.
Q When I use the term capital credit, I'm referring to one more element of River Valley's regulatory capital.
You recall when Messrs. Holland and Ross acquired the institutions that became River Valley, the FSLIC granted financial assistance. Do you recall that?
A Yes.
Q And there was the Rock Falls transaction and the Peoria transaction. Do you recall that?
A Right.
Q And in one case, the Federal Home Loan Bank Board and FSLIC said, of the total dollar amount of cash assistance being provided by the FSLIC, the acquiring institution can include 8 million dollars of that amount as a direct addition to regulatory net worth. Do you recall that?
A Yes.
Q And that's what was referred to at that time as a capital credit?
A Right; right.
Q With respect to the other institution,

the Federal Home Loan Bank Board and FSLIC said of the total dollar amount of financial assistance being granted in this case, River Valley can include five million dollars of that amount as a direct contribution as a direct addition to its regulatory net worth. Do you recall that?

A I can't remember the dollar amounts but in theory.

Q Do you recall the concept?

A The concept, yes. The dollar amounts I don't remember. They were big at the time but --

Q And do you recall that --

A It's been a long time.

Q And do you recall those items which were called capital credits, correct?

A Yes.

Q And the capital credits counted as components of regulatory capital just as supervisory good will did, correct?

A Right.

Q Just as US cash did, correct?

A Right.

Q And all those elements of regulatory capital, am I not correct, were critical to the success and profitability of River Valley, right?

A Yes.

Q And why -- as an examiner, what is your -- I know this is basic but what is your understanding? We need to make a complete record.

What is your understanding of why each of those elements of regulatory capital would have been critical to the profitability and success?

A The more capital you have, the more things you can do. And the more -- if you fall below certain numbers of capital, I can't recall what levels were, you were put in the restrictions you couldn't do certain things and you couldn't expand, you couldn't do different things.

There were penalties depending if the capital fell below certain levels. But basically, you needed the capital to run the Thrift and to expand and grow.

Q Okay. Bottom line is you needed capital to be profitable, didn't you?

A Well, with capital you are going to be profitable, yes.

Q Without capital you are not going to be profitable and you may be out of business, correct?

A True.

Q And you personally had a lot of experience with institutions, from your testimony, that went out of business because they had inadequate capital, correct?

A Yes.

Q And I also take it you personally had a lot of experience with institutions that were not profitable because they had inadequate capital, correct?

A Yes. But some were profitable even with low capital.

Q Were they as profitable had they had a lot of capital?

A No; no.

Q In fact, they were a lot less profitable, weren't they?

A Yes.

Q Correct?

A Correct.

Q What did you mean when you said capital is king?

A That was a theory -- not a theory, that was just a statement that was flying around all the time.

As long as you had capital, you could do

whatever you wanted to, basically. I don't even know who coined it.

It was just a -- you know, a thing -- you need capital, capital is the most important thing. If you've got capital, then you can continue on with business.

Q Without capital, you can't be profitable, right?

A Right.

MATERIAL REDACTED

Q Would you agree with me that capital was important in 1975 when you first became an examiner?
A Yes.
Q Would you also agree with me as a result of various Congressional enactments and regulations adopted by the Federal Home Loan Bank Board and the Office of Thrift Supervision, capital became actually more and more important as time went on?
A Yes.
Q And specifically, FIRREA F I R R E A, emphasized the importance of capital, correct?
A It certainly did.
Q And FIRREA eliminated the ability of a lot of savings associations to include various types of regulatory capital that they had previously been allowed to include, correct?
A That's correct.
Q One type of capital that FIRREA eliminated was supervisory good will, correct?
A Correct.
Q Another type was capital credits, correct?
A Yes.

MATERIAL REDACTED

Q I'd like to go back to your experience as examiner. You were a field examiner until 19 --

A 1985 I was promoted to field manager as I was a field examiner for ten years.

MATERIAL REDACTED

Q 1985 or '86?
A '85 I became a field manager.
Q And can you tell me what does the position of field manager involve?
A A field manager is assigned a caseload of several institutions. You are responsible for the exam when it comes up. You have certain examiners that are assigned to you.
In between exams, you may participate in monitoring. You -- usually you had a -- there is

other people involved with monitoring but you work with them in different things.

But you are kind of responsible for a certain caseload of institutions.

Q And you've held the position of field manager for the past fifteen years?

A In practice, yes. Different titles along the way. Case manager, manager, case manager, field manager.

Now we are back to using the term field manager.

MATERIAL REDACTED

MATERIAL REDACTED

Q But your substantive duties remain the same for that period?

A Right; correct.

Q So you've had now over fifteen years experience in supervising the staff of field examiners, correct?

A Right.

Q And how many examiners would you typically supervise at any given time?

A That has fluctuated probably between seven and fourteen.

Q And were you responsible for a given geographic area or simply specific individual examiners?

A Specific examiners and my caseload was usually in a specific area and that was usually always in Illinois.

Q Did your caseload vary over the years or was it generally the same geographic area?

A No, it's varied over the years. Usually it primarily has been Chicago, western suburbs and northern Illinois and a couple years I had northwest Indiana but then I lost those and I was back to my northern Illinois.

Q All right.

A The furthest south I usually have gone would be Peoria, Champaign, right about there.

MATERIAL REDACTED

Q On a day-to-day basis, what does your position involve? Do you actually go out to the banks and assist in examinations?

A No, I don't assist. Basically, when an exam is in process, I will visit a couple times during the exam and I'm there at the end.

Just reviewing the findings, reviewing the report. Making minor changes to the report, you know, grammatical. If there are problems that come up during the exam, they call me, tell me about it and I might go out and visit a little bit more often.

Q On occasion you suggest substantive changes to reports, don't you?

A Yes.

Q That's part of your job?.

A Yes, that's just part of the job.

Q And do you ever drop parts of the report or do you simply edit and review and edit?

A Simply review and edit. The examiner in charge is responsible for the report. Assistant examiner may write parts of it and then he or she would, you know, make suggestions and improve the comments and then I have the final review of the

report.

Q Does that mean that you individually would have to approve an examination report before it was issued in final form?

A Yes.

Q So in other words, when an examination report is issued final, it means that you personally agree with its contents, correct?

A For the most part.

Q Would you issue examination reports that you did not agree with?

A Over my career, yes, there's been a report that I did not agree with some of the stuff that was in it.

Q Which report was that?

A It's not related to this case.

Q Okay. But all the examination reports that you approved of relating to River Valley, you were in agreement with at the time they were issued?

A Yes; yes.

Q Is that a fair statement?

A Yes.

Q Would you meet, yourself, with management or the board of directors of an

institution under examination?
A Yes.
Q And would that be during the course of an exam?
A We usually have an exit meeting with management that I would attend. And then also we have board meetings at the -- after the report has been issued or before the report is issued to discuss things with the board. That's common.
Q Was that an important part of your job as a field manager?
A Yes.
Q What is the importance of the exit reviews?
A So everyone is on the same page. That they know what our concerns are or that they understand what we feel is the problems with the shop or if there are no concerns, just that everyone is on the same level playing field so there are no surprises.
Q So as a field manager, am I -- would you agree with the statement that you fully familiarize yourself with all of the issues facing the institutions under your supervision?
A Yes. I may not remember everything ten

years later. But at the time, I would.
Q In fact, you couldn't properly carry out your job duties if you were not aware of all the issues, correct?
A Right; correct.
Q Particularly, the important issues, you would have ongoing discussions with your examination staff during the course of the examination?
A Yes.
Q And again, in connection with River Valley, am I correct you would have followed your formal procedures and have discussed with the examiners conducting examinations of River Valley their tentative conclusions and the important issues during the course of the examination?
A Yes.
Q And in the context of River Valley, you would have attended exit reviews?
A Yes, sir.
Q And you would have met with the management of River Valley, correct?
A Yes.
Q And you would have met with the board of directors of River Valley?

A Yes.

Q And you would have considered yourself fully familiar with the specific supervisory issues facing River Valley?

A Yes.

Q When did -- when was River -- let me step back.

You indicated that you examined Galva G A L V A?

A Galva.

Q That was before you became a field manager?

A Yes.

Q What is your recollection of the condition of Galva at the time of your final examination of it?

A I was only there once as an examiner and it was a very, well, clean little place. When I got my first caseload, it was in -- that was one of my shops and in that time period from '76 to '85, it had deteriorated.

Q Significantly?

A Yes. They went through several managing officers and each one got a little bit worse.

Q Did actually it become insolvent?

A Yes.

Q And what was the cause of that insolvency?

A Poor management and bad loans.

Q Did you ever recommend that Galva be placed into receivership?

A I would believe so. I can't remember exactly but I'm sure I did.

MATERIAL REDACTED

Q Do you recall that it took a long time, several years, for the Galva situation to be resolved, even after it became insolvent?

A Yes.

Q Didn't that cause you as a field manager a great level of concern?

A Yes.

Q And why were you concerned?

A Because they didn't have capital. And everything was so busy -- it was a small -- Galva was a very small institution.

Big institutions had priority, you know.

They are big names. Who's heard of Galva, Illinois?

It's just a little podunk town in the boonies. So it wasn't a high priority.

And FSLIC at the time took care of the top priorities, you know, the bigger shops first. And no one was really interested.

There was not much of a perceived interest in this little bank or Thrift.

Q And why as a professional regulator were you concerned that it remained in this condition, insolvent condition for a several year period?

A Because a lot of strange things can happen. We had the institution under an agreement that they couldn't do certain things. They had to come to us.

And for the last -- after the one guy left, I can't remember his name, they basically weren't allowed to do much of anything.

They were strictly just sitting there allowing people to take their deposits out. You know, they were making -- taking deposits. It was just a very sad condition.

It was just -- it was there and then basically after we got rid of the one president, I

can't think of his name -- the flasher -- but the head teller who had only been there like a year, we let her be the -- you know she was kind of running the place.

They weren't allowed to do loans. They weren't allowed to do much of anything. But she was just going there and for several months, I sent an examiner down every Monday or it was every Friday.

But one day a week he would go and look and see that they were abiding by the agreement and that they hadn't issued any big checks and looked at the activity.

So we were sending people down every week just to look at what happened that week so we weren't caught by surprise that some big misappropriation or something like that.

Q But you were dealing with an insolvent institution here and it was effectively being run on a day-to-day basis by a teller?

A Yes.

Q Does that keep you up at nights?

A Yes. But my examiner that went out there every Monday was very good. She would call him during the week or call me if there was

anything unusual.

Q Why did you let that go on --

A I had no control over it. I mean, FSLIC wouldn't take it over or they wouldn't do things.

I mean, they were too busy to -- I personally couldn't go in and take it over. It was up to FSLIC and they were just so busy at the time.

Q In other words, it was insolvent but it wasn't large enough to get their attention because they had so many larger insolvent institutions?

A Right; correct.

Q But it was continuing to lose money, wasn't it?

A It was losing money but, you know -- nothing I could do. It was strictly out of our hands.

It was up to FSLIC and they moved very slow on some deals.

Q By definition, an insolvent institution is going to hemorrhage until it's resolved, right?

A Correct.

Q I assume you periodically would do whatever you could to try to push FSLIC along?

A Right. There was things along the way. They did their bid package and they came up with this, we are going to group this together with a couple other shops and try to bid it that way.

Q At that point, it had already been solvent for a number of years?

A It had been insolvent. But as long as there was cash flow, FSLIC didn't -- as long as there was cash flow, they allowed them to go a while.

There wasn't any perceived -- there was a lot of bad loans but a lot of it was due to local economic trouble. They didn't go out --

there was a lot of unemployment and everything.
Q But even though there was cash flow on a day-to-day basis, this institution was continuing to cost FSLIC money, correct?
A Right.
Q And that hemorrhaging didn't stop until the Holland and Ross investors took it over, correct?
A That's correct.
Q Their acquisition of this institution effectively stopped the hemorrhaging, right?
A Correct.
Q And you have no doubt that the hemorrhaging would have gone on indefinitely had they not come in, correct?
A Correct.
Q So I take it that as professional supervisor, you were enormously relieved when Holland and Ross did come in and took over Galva?
A Yes.
Q And based on -- we'll take some time to look at documents. But based on the documents that I reviewed, that you prepared at the time, I take it it's a fair statement that you had a lot of confidence in the managerial competence of the

Holland and Ross investors. Is that a fair statement?

A Yes.

Q And that confidence panned out to be well-placed in that the Holland and Ross investors resolved this situation and got this insolvent institution out of the FSLIC receivership pool, correct?

A Correct.

Q What about Republic Savings, was that under your --

A No.

Q When did you first deal with Republic Savings?

A I was never involved with Republic Savings. You heard little things, yes, there is problems and this and that. But until they -- I didn't care about that.

I had my own concerns to worry about in my caseload and until Holland and Ross took that over and merged it into Rock Falls, I didn't have any dealings with Republic.

Q Would it surprise you to find out as bad as Galva was, the head of the Chicago office of Federal Home Loan Bank has testified that Republic

was a lot worse?

A Oh, it was a lot, lot worse that Galva.

Q What about Mutual, that was another one of the institutions that --

A Mutual of Canton.

Q Yes. What is your understanding?

A I was never involved with that one at all until the -- they threw it -- threw Galva and them and Home, I think it was, together.

Q But I assume, based on one-on-one conversations with the other field managers, you knew that each of those institutions were deeply

troubled, yes?

A Right.

Q And I assume that field managers didn't simply sit behind their desks all day?

A No, we would have meetings and you knew what was happening in other people's caseloads but not -- we would meet, you know, monthly at least or weekly.

I don't even remember but we would meet and talk about the significant institutions and the significant problems.

Q But each of those institutions, Mutual, Home and Republic were dealt with at the monthly meetings as significant supervisory problems?

A Right; right.

MATERIAL REDACTED

Q What about Peoria Savings?

A I never had anything to do with them either. That was out of my grid.

Q Until they were also --

A Until they were all acquired and put into one.

Q What was -- was Rock Falls, prior to its acquisition of Republic, under your jurisdiction?

A Yes.

Q And Rock Falls was a sound institution, correct?

A Yes, very sound, well-run little shop.

Q And who owned Rock Falls. Am I correct it was Messrs. Holland and Ross?

A They bought it from another group and I had it -- I had Rock Falls. It was the prior group. I don't remember who it was. I just remember Cal Morgan was the president.

Q But you were also -- am I correct that you had Rock Falls in your caseload when it was

acquired by Messrs. Holland and Ross?

A Yes; yes.

Q And were you involved in the -- in processing the change in control application that authorized Messrs. Holland and Ross to acquire Rock Falls?

A No. Because I was -- applications would have handled that and then whoever, the other people would have done a lot of that.

I didn't until after the first exam of Rock Falls, would not have known who Homer and Howard were.

Q So I'm correct, am I not, you would have had several years of experience dealing with Messrs. Holland and Ross prior to the time in 1988 that they engaged in the supervisory acquisitions?

A Right.

Q And I take it that the Federal Home Loan Bank officials would have, among other things, relied upon your assessment of Messrs. Holland and

Ross in making the decision to allow them to acquire five insolvent institutions in 1988, correct?

A Yes.

Q So I take it --

A By 1988, I had had an exam with them, knew what they had done at Rock Falls, how they had run it or -- and everything.

And at that time, I would have been involved with the proposition to acquire these other institutions and they asked us our opinions, you know, of what they were like and everything like that. We would have had input.

Q And do you think there would have been two or three exams by 1988 of Rock Falls that you had personal involvement in?

A No more than two, I wouldn't think.

Q Does two sound like a good estimate?

A I would guess maybe two.

Q And what were your views of the manner in which Messrs. Holland and Ross had been running Rock Falls during the period for which you were responsible for the examination of Rock Falls?

A They did a fine job. I mean, they came in. They didn't do anything crazy. They just

continued doing what it was doing and then looking -- it was their stepping stone, kind of.

In that time, they were looking to acquire other institutions.

Q And you were aware that they were looking to acquire other institutions?

A Yes; yes.

Q Now, remember we were talking quite a bit a few minutes ago about Galva?

A Uh-hum.

Q And the heartache it was causing you. Do you recall that?

A Yes.

Q Did you -- and you were anxious to see Galva resolved, correct?

A Yes, I would have wished it was gone a year or two earlier.

Q And you had special experience with Messrs. Holland and Ross, correct?

A From Rock Falls and also Homer. I had known Homer previously.

Q How did you know Mr. Holland previously?

A He was employed by Enterprise & Gilldorn G I L L D O R N Savings.

Q And you were involved with those

institutions how?
A I was -- I assisted on several exams of Gilldorn.
Q Was that a problem institution?
A Yes.
Q And Enterprise was a problem institution?
A Yes.
Q And you -- in both cases you dealt with Mr. Holland?
A Yes.
Q And what was your assessment of Mr. Holland based on those dealings?
A Very capable, competent individual. The problems at Gilldorn were not of his doing.
Richardson Gilldorn brought him in to help correct -- to help turn around the institution.
Q What about the problems at Enterprise? He was brought in after it was already in trouble, wasn't he?
A Well, Gilldorn became Enterprise.
Q Oh, it's the same institution?
A It's the same institution. Started at Gilldorn and the problems there were basically

Richardson Gilldorn.

And they were having problems, they were going down. I mean, less and less and less. And Homer brought in another investor to help turn around -- they got Richardson Gilldorn out.

He brought in another investor to help turn it around. Buddy Cohen was the other investor.

Q When you made your recommendations in connection with the five supervisory acquisitions in 1988 and you supported the application filed by Messrs. Holland and Ross, was one of the reasons you supported the application, Mr. Holland's experience at Gilldorn and Enterprise?

A Yes.

Q So Messrs. Holland and Ross acquired

Mutual, Home, Galva and Peoria Savings directly, correct?

A Right.

Q And they were all merged together?

A Right.

Q And they acquired Republic Savings through Rock Falls?

A Right.

Q Do you recall whether it would have made a difference to you whether they had acquired them all through Rock Falls?

A I don't think it would have made a difference in my thinking.

Q Would it have made any difference in your thinking if they had acquired them all directly?

A No.

Q Because at the end of the day you saw Messrs. Holland and Ross taking over all the institutions directly?

A Right; right. Instead of having one shop, they had two. So it didn't really matter to me.

Q So that was just a matter of form, correct?

A Right.

Q The substance of it was that Messrs. Holland and Ross were personally acquiring each of these five institutions, correct?

A Correct.

Q And that's what gave you the great level of comfort, correct?

A Correct.

Q And that's why you would have recommended the approval of those acquisitions, correct?

A Yes.

Q Immediately after the closing of the acquisition of Home, Mutual and Galva in July, 1988, I take it the River Valley FSB would have been under your supervisory jurisdiction?

A Right. The decision at that time was made at that time both institutions should be under the same -- in the same case loads.

Because you had -- they had one team of people to report to, I mean, dealing with the institution. And since I don't remember why I was chosen, but I was given the -- I was given that pleasure.

Q Do you think you were chosen because you

already had Galva in your caseload?

A I think it was because I had Rock Falls. I had Rock Falls and I had Galva, so I did have one thing -- Galva was the smallest one of the ones that went into River Valley.

Q Do you think you may have been chosen because you already had significant personal supervisory experience with Messrs. Holland and Ross?

A Probably.

Q Okay. Did you -- how would you decide which examiners on your staff you would assign to examine River Valley FSB and River Valley Savings?

A I would take my examiners in to do it. Actually, I think I took my examiners in at the time but also included that we brought in Larry Kenney who was our -- I can't remember his title, Capital Market Specialist.

He was our investment specialist because they were very active investments and that was his expertise. Although he didn't report to me, I wanted him there because of the investments and the type of stuff that was going on.

Q Is it fair to say that in your view, Mr. Kenney had a very high degree of expertise in the capital markets field?

A Yes.

Q And you relied on Mr. Kenney very heavily in assessing the safety and soundness of River Valley's various investments?

A Yes.

Q And do you recall -- and we'll look at the documents and I'm sure you'll painfully recall when you see the documents -- but do you recall that there were very large disputes between the Office of Thrift Supervision and the Federal Deposit Insurance Corporation relating to the proper assessment of the safety and soundness of River Valley?

A Yes.

Q And do you recall that Mr. Kenney played a large role in formulating the position of the OTS regarding the safety and soundness of River Valley's portfolios.

A Yes. Without him I wouldn't have been able to analyze it.

Q Do you recall that the FDIC took a totally different view of River Valley's assets quality than Mr. Kenney did and the Office of Thrift Supervision did?

A Yes.

Q And you and your staff and superiors, including later on Mr. Karr, relied on Mr. Kenney, correct?

A Correct.

Q And do you recall that these disputes between the Office of Thrift Supervision and the Federal Deposit Insurance Corporation resulted in examination reports issued by the two agencies that reached vastly different conclusions concerning the safety and soundness and capital adequacy of River Valley?

A Yes.

Q In fact, do you recall that in one

instance, your agency, the Office of Thrift Supervision assigned a composite rating of 2 to River Valley when at the same time, the Federal Deposit Insurance Corporation assigned a composite rating of 4?

A Yes.

Q And do you recall that painfully?

A Yes.

Q Was that a very major issue in your office at the time?

A Yes, it was. But FDIC is a -- they always -- routinely always rated institutions one lower, one rating lower than we did.

I think you can go historically -- when they came in by FIRREA when they were required to come into every shop, they came in with a very tainted opinion of the savings and loan industry and savings and loan executives and Federal Home Loan Bank examiners.

Q They didn't think much of the Federal Home Loan Bank examiners?

A They didn't think much of us so they were there to prove a point. Not just River Valley, but the whole theory.

For the first couple years, they had to

come in on every exam with us. And after that, I'd say about a two-year period, after they had made their whole rounds, they had realized that things weren't as bad, not every savings and loan manager wasn't a crook and that the examiners actually did know what we were doing.

And then after that, they just chose to come in on high priority, what they considered high priority institutions.

Q So it wasn't unusual in your experience for there to be one rating difference in the composite rating, correct?

A No; no.

And my question is, other than this situation in River Valley, are you aware of any situation where there was a two level composite rating difference with respect to a specific savings and loan association assigned by the FDIC and the OTS?

A No, I'm not.

Q So this was a very serious matter?

A Yes.

Q Why was the rating difference assigned by the agencies in this case so significantly different?

A Philosophical differences. FDIC does not have to justify what they do. They do whatever the hell they want and they don't listen to reason.

And asked why, they just say, "Because we can."

Q Because we --

A "We can."

Q Why did they not have to justify what they do?

A Because they are God. They have the

insurance fund and they think that they are God. And if they don't like you, they try to make your life hell.

Q Did they ever make your life hell?

A No. I mean, just by rating differences, yes. And if they don't understand something, it is -- if they don't understand something, it is bad.

They don't have to understand it, they don't try to understand it, it is just bad.

TEXT REDACTED

Q Excuse me. River Valley. You indicated you didn't consider it unusual for the FDIC to disagree with you by one rating but other than

this case, it was unheard of to have a two rating difference, correct?

A Uh-hum.

Q What is it about River Valley that resulted in that two rating difference?

A They classified mortgage derivatives. They did not understand the mortgage derivatives, they didn't try to understand them.

They were intimately bad so, therefore, they are a classified asset. So they had classified assets that were way -- you know, way higher than OTS because we did not classify those investments.

Q The FDIC said they were intimately bad, correct?

A In their -- their supervisor who pulled the shots, yes.

Q The Office of Thrift Supervision and specifically Mr. Kenney did not at all agree with that, did they?

A No, we thought -- we think -- we did not have a problem but FDIC didn't really understand mortgage derivatives and didn't -- they didn't try to understand them or this group of examiners, the FDIC examiners.

Q But every examination conducted by even the OTS comes up with certain criticisms of an institution, correct?

A Oh, yes. There is nothing different. We had criticisms.

Q Of River Valley?

A Right.

Q But you didn't have the broad scale -- the OTS did not make the broad scale attack on River Valley's asset portfolios that the FDIC did, correct?

A No.

Q And your agency just absolutely, fundamentally disagreed with the position taken by the FDIC, correct?

A Correct.

MATERIAL REDACTED

MATERIAL REDACTED

Q But you do know that capital was of extreme importance to the FDIC?

A Yes.

Q So when FIRREA came along and wiped out a large portion of River Valley's -- both of the River Valley's regulatory capital, that immediately placed those institutions in hot water

with the FDIC. Isn't that a fair statement?

A Correct; yes.

Q I mean before River -- before FIRREA, these institutions were both solidly capitalized, correct?

A Yes.

Q After FIRREA, they were both in very serious regulatory hot water, correct?

A Correct.

Q And the fact that River Valley had an assest portfolio that the FDIC was uncomfortable with simply exacerbated the problems caused to River Valley by the elimination of a large portion of its regulatory capital as a result of FIRREA, correct?

A Correct.

Q So the River Valley, in other words, would have had enormous problems with the FDIC, even if it didn't have the asset portfolios that Mr. Kenney thought that were sound but the FDIC didn't understand, correct?

A Correct.

Q But when you put those two together, the asset portfolios that the FDIC did not understand and the FIRREA induced impairment of River

Valley's regulatory capital, River Valley was sitting on a regulatory barrel of dynamite, wasn't it?

A Yes. There were serious concerns, yes.

Q And the FDIC was making, frankly, life impossible for River Valley. Wasn't that your personal experience in dealing with them?

A Yes, they were -- there was problems between the two, yes.

Q And there was problems between your agency and the FDIC relating specifically to River Valley?

A Yes; yes.

Q Did River Valley have borrowings?

A Yes.

Q And how did the existance of those borrowings affect the FDIC's view towards River Valley?

A They did -- like I said, they did not like borrowed money because if you needed to

borrow money, it was bad.

Q You and Mr. Kenney did not share that view?

A Right.

Q In fact, you strongly disagreed with that view?

A Right.

Q And again, in the context of River Valley, the existance of these borrowings greatly exacerbated an already difficult situation because the FDIC was very unhappy about River Valley's regulatory capital levels immediately following the enactment of FIRREA, correct?

A Probably in their mind, yes.

Q That would be your best recollection, isn't it?

A Yes.

Q Why did you issue Exhibit 2 and Exhibit 1 in April and May of 1992?

A The Ross and Holland group were trying to acquire another institution, this time in Texas, San Antonio Federal.

Q And you understand that institution ultimately was acquired?

A Yes, it was.

Q Was that institution ultimately named also River Valley, do you recall?

A Yes, it was. I believe it was.

Q And you personally, I assume, dictated this -- these exhibits?

A Yes, I did.

Q And you agreed with their contents when you wrote it?

A With the exception of the typo in the

memo. Yes. Because I did not know Mr. Rose at all.

Q That's why I figured it was a typo. What was the basis for your opinions of Messrs. Holland and Ross that are reflected in Exhibits 1 and 2?

A Could you repeat the question?

Q Yes. On what basis did you draw the opinions, your personal opinions of Messrs. Holland and Ross that you reflect in these two exhibits?

A Just on my personal dealings with them and how they were running River Valley FSB and River Valley Savings Bank.

Q And you thought they were doing quite a nice job in running the institution, correct, at this time?

A Yes.

Q Okay. Do you recall that -- the institution they were attempting to acquire, what was the name again?
A San Antonio Federal Savings Bank.
Q And you have two separate reference letters here. Excuse me, one a letter, one a memorandum, correct?
A Uh-hum.
Q Why did you have to issue basically the same statement on two occasions?
A One was to an applications analyst. I assumed that would be in our Washington office and the other one was to the Resolution Trust Corporation also known as RTC.
Q And why would the Resolution Trust Corporation have wanted your opinion of Messrs. Holland and Ross?
A Because they were trying to get rid of RTC at the time was the -- they were in charge of getting -- cleaning up the savings and loan

crisis.

Q And in preparing, finalizing and signing Exhibit No. 1, were you aware, I assume you were aware that the RTC would rely on your opinion on Messrs. Holland and Ross in making the decision to whether or not to allow them to acquire the San Antonio institution?

A Yes, I believe my opinion would have counted with them.

Q And what was the purpose, to your understanding, of your memorandum to the applications division, Exhibit 2?

A They were just -- they were responsible for San Antonio, Texas. They would have to give their opinions down there and they just wanted to know about these people from Illinois coming down there. What are your dealings with them.

They are an entity, so it's just standard procedure that you contact the people they are coming from and have had dealings with them.

Q You also understood, did you not, that the OTS applications division would be relying on your personal judgment of the integrity and banking experience of Messrs. Holland and Ross in

determining whether or not to authorize them to acquire the San Antonio institution?

A Yes.

Q In both of these exhibits you made the statement, Mr. Ferries, that it also should be noted that they have always met or exceeded every projection that they have ever given to myself or the OTS. Do you see that?

A Yes.

Q To what are you referring and what was the basis for that statement?

A Basically, they -- they had to submit quarterly reports to us and they had -- when they acquired the institution originally, they had a business plan.

And they would file with us various timeframes. We are going to hit this at this point or whatever. At certain capital levels or certain earnings or activities.

Q Profit targets?

A Right.

Q Okay.

A And basically, I guess my opinion was that they had always met those, always on time, and they were always straightforward.

A lot of times over a given period, your business plan changes but they were always up front with us, came in, said, "We want to file an amended business plan because we want to do this now."

And we'd look at it and say, "Okay, that's fine." So there was always a lot of that interplay between exams and over the course of the organization.

Q I take it since you were so positive in making this statement, that all Thrift executives didn't act in the same manner that you dealt with?

A Right.

Q Is that a fair statement?

A Correct.

Q I assume over the years, you've seen all sorts of business plans?

A Yes.

Q Some very good, such as the business plans presented by Messrs. Holland and Ross, correct?

A I've seen a lot of plans, some good, some bad, some people meet their plans, some people don't.

Q And would you agree that the business

plans based on the statements you made here submitted by Messrs. Holland and Ross would have fallen into the good category, the realistic category?

A Yes.

Q You saw a lot of business plans that weren't realistic, did you?

A Correct.

Q I assume some of the business plans you saw you thought were not worth the paper they were written on; is that a fair statement?

A That's a fair statement.

Q That's not a problem you had with these two individuals, is it?

A No.

Q Their plans were conservative. Is that a fair statement, conservative and realistic?

A They were realistic. I don't remember the specifics, you know, conservative, whatever. But based on what I wrote, I stand by that, that they were.

Q Realistic in the sense as you state that they met or exceeded every projection they ever made?

A Right; right.

Q But I assume that there would be very few bankers that you would make that statement about that they met or exceeded every projection they ever made to you. Is that a fair statement?

A Yes.

Q And when you -- we spoke about that you had supervisory jurisdiction over both of the River Valleys immediately following the 1988 supervisory acquisitions, correct?

A Correct.

Q And you understood the capital projections, correct?
A Yes.
Q You understood what their earnings goals were, correct?
A At the time, yes.
Q And you and your staff would have understood at the time that the business plans in 1988, specifically the capital portions of the business plans, were predicated in very large part on the continuing existance of the forebearance capital, correct?
A Correct.
Q And business plans, specifically, would have been predicated in very large part on the continuing includeability in capital of supervisory good will, correct?
A Yes.
Q The capital credits, correct?
A Uh-hum.

Q Subordinated debt, correct?
A Uh-hum.
Q And when you made the two uh-hums a moment ago, you meant to say yes, correct?
A Correct.
Q And preferred stock, correct?
A Correct.

Q With respect to the business plans of

the two River Valleys in 1988 at the time of the supervisory acquisitions, you would have understood when you and your staff reviewed and considered the viability and the realism of those business plans, that the success of those business plans was dependent on the paticular includeability and regulatory capital of subordinated debt, supervisory good will, FSLIC preferred stock and the thirteen million dollars in total capital credits, correct?

A Correct.

Q And you would have understood a year later, when FIRREA was enacted, excluding the includeability of those different elements of regulatory capital, that the business plan as then stated, was no longer workable in its current form, correct?

A Correct.

Q And --

A And they filed the amended plan.

Q And in fact, they had to drastically alter their business plan to take account for the fact that River Valley suddenly lost a very large component of its total regulatory capital, correct?

A Correct.

Q And you as one of the direct supervisors of River Valley, I assume, had no discretion to go up to Messrs. Holland and Ross and say, "I think you guys are great bankers, so I'm going to let you continue to include this forebearance capital." Is that a fair statement?

A Yes, we couldn't have done it.

Q You couldn't have done it even if you wanted to, could you have?

A Right.

Q So a business plan that was viable and had been approved by the Federal Home Loan Bank Board and your staff, staff of Federal Home Loan Bank of Chicago, excuse me, just a year earlier suddenly was no longer workable, correct?

A That's correct.

Q Would you understand that Thrift executives such as Messrs. Holland and Ross would have been upset with the United States government when FIRREA was enacted?

A They had a right to be very upset with it.

Q Why did they in your view have a right

to be very upset with the United States government?

A The only law course I took in college was business law and dealt with contracts and to me a contract is a contract.

Q A deal is a deal.

A They entered the contract with the government, and the government changed the rules afterwards.

Q Your view is they had a deal to include supervisory good will, capital credits, subordinated debt and FSLIC preferred stock as a full-fledged component of their regulatory capital, correct?

A Correct.

Q And the government came along and broke its contractual commitment made personally to Messrs. Holland and Ross, correct?

A In my opinion, yes.

Q And so you believe that they had every reason in the world to be upset about that?

A Yes.

Q So in light of all that, why didn't you cut them some slack?

A I didn't have the authority to do that.

We wouldn't have been able to do it because we had to enforce the new rules.

Q What would have happened if you on your own said, "I am not going to stand for this. I think it's wrong and I'm going to write these bankers a letter saying they are allowed to act as if this regulatory capital is still good capital because I believe a deal is a deal."

What would have happened if you had done that?

A I wouldn't have a job because I'd be overstepping my authority because it wasn't within my authority to do something like that.

Q But you understood with respect to River Valley, in particular, and the other institutions under your supervisory jurisdiction, that although supervisory good will over a 25 year period would be a drag on earnings, that institutions such as River Valley would still be anxious to include it on its books because it counted as regulatory capital?

A Right.

Q But when FIRREA came down the pike, only the bad aspect of supervisory good will was left,

the negative aspect. It would be amortized, correct?

A That's correct.

Q It no longer would count as regulatory capital, correct?

A Correct.

And isn't it correct that FIRREA established three requirements, core, risk base and tangible capital?

A Yes.

Q And immediately after FIRREA was enacted, Holland and Ross, Messrs. Holland and

Rosco did not include a single dollar of the forebearance capital relating to the supervisory good will, the preferred stock, the subordinated debt and the capital credits as a component of their institution's tangible capital, correct?

A Right.

Q So that would make the effect of FIRREA on the tangible capital account of River Valley's -- it would have a drastic immediate affect. Is that a fair characterization?

A Right, I think so.

Q Had the -- in your opinion, as a direct supervisor of River Valley, could the effects of the government's decision to reneg on its deal and no longer allow River Valley to include the forebearance capital as one of the regulatory capital had been rectified had the government replaced that forebearance capital with an equal amount of cash capital. Did you understand?

A Yes.

Q In other words, do you recall that River Valley lost something in excess of 20 million dollars in regulatory capital as a result of the enactment of FIRREA?

A Right.

Q And as we've discussed today, that loss of the regulatory capital had very adverse consequences on River Valley, correct?

A Right.

Q Specifically, including on its ability to remain profitable, correct?

A Correct.

Q And its ability to continually implement business, correct?

A Correct.

Q And I'm simply asking if an officer of the United States or an officer of Federal Home Loan Bank Board on the day after FIRREA said, "I'm sorry that you can no longer count this capital -- these capital forebearances as regulatory capital but a deal is a deal so we are going to make it up to you and we are going to replace that in excess of 20 million dollars of lost forebearance capital with 20 million dollars of hard cold cash."

Would that have rectified the problem?

A Of course it would rectify the problem but there was no such -- that's just theory. There wasn't any offer to do that.

Q Was any consideration given to that by your office in replacing the supervisory good will with cash?

A Not that I recall. I don't think the government -- that would have been way out of our hands. That's all beyond Washington.

Q To your knowledge, was any consideration given to that idea at the higher levels of the Office of Thrift Supervision, replacing River

Valley's lost forebearance capital with cash?

A I wouldn't think so. I wouldn't think so.

Q But that would have cured the adverse consequences had that cash been given River Valley the day after FIRREA, correct?

A Yes, if it was a -- if it was something that was allowed. I mean, if they came up with that to replace it, but that would -- that would have solved everything.

Q Well --

A There was no such offer, so --

Q Was there any other way that the very adverse consequences resulting from the abrogation of the capital forebearances could have been resolved the day after FIRREA was enacted that you are aware of?

A Not that I'm aware of.

Q Other than this lawsuit?

A That's about it.

Q Mr. Ferries, could you please identify for the record an exhibit marked as Exhibit No. 4?

A A letter to the directors at River Valley Savings in Rock Falls dated January 9, 1990.

It's a followup letter to the response

that the directors had written to an exam report -- no, to a supervisory letter.

Q And does this letter contain your signature?

A Yes, it does.

Q And my only question on this is, is this letter representative of correspondence, the type of correspondence you, as on a regular basis, would have with River Valley?

A Yes, normally we do an exam report. The board splits a response. We review their response and in this case, it looks like we had one other something that we wanted them to address. That they wanted addressed.

Q The point I wanted to clarify is you indicated with respect to the examination, the conduct of the examinations of the River Valleys, your staff of examiners would conduct the exams and you'd be involved in editing, reviewing and finalizing the exams, correct?

A Right.

Q But on a -- am I correct, based on this letter on a day-to-day oversight regulatory basis, you had direct contacts and relationships with the management and board of the River Valleys?

A Right. Just to clarify, my title changed here from Field Manager to Manager.

Q I see that.

A We kind of -- early 1990's, we kind of consolidated the old supervisory agent and field manager position into one and we were called managers.

So starting in the early '90s, it was probably right around -- must have been very early 1990 here, I not only had that responsibility but I also had the follow-up responsibility.

Whereas in the past, the supervisory agents would have taken care of that.

Q So you were rarely using the pre-FIRREA designation wearing two hats after the enactment of FIRREA.

You were both the field manager with respect to River Valley and you were also, in effect, River Valley supervisory agent?

A Well, we eliminated the term supervisory agent but yes, I was. Those two people became one.

Q And you were playing both roles after the enactment of FIRREA with respect to River Valley?

A Yes.
Q So there was nothing unusual in you preparing and sending a letter such as Exhibit 4, to the board of directors or the management of River Valley?
A Correct.
Q Because on a day-to-day basis, it was now your responsibility to remain fully apprised of all the issues dealing with River Valley as an institution under your direct supervision, correct?
A Correct.
Q So you would have been aware, again, on a day-to-day basis on issues of loan quality, correct?
A Right.
Q You would have been aware on a day-to-day basis of the effect of the loss of the forebearance capital on River Valley, correct?
A Correct.
Q And you made it your business to be aware of those effects, correct?
A Of course.

Q So you had the most pervasive and extensive contact with River Valley when you were the case manager and then the manager responsible for the valley, correct?

A Yes.

Q And other individuals assisted you in discharging that responsibility, correct?

A Yes.

Q But you had the ultimate supervisory responsibility, correct?

A Correct.

Q And you had that responsibility with

respect to River Valley until the time River Valley was merged out of existance into another institution in the 1994 time period, correct?

A Correct.

Q Do you recall we were looking at Exhibit 1 earlier this morning?

A Yes.

Q And we were discussing your statement that they have always met or exceeded every projection that they have ever given to myself or the OTS. Do you recall that?

A Yes.

Q Our discussion?

A Yes.

Q You recall you indicated you were referring specifically to business plans that Messrs. Holland and Ross had submitted to your office?

A Correct.

Q And you were indicating the statement that they had given you realistic business plans and had complied with those business plans, correct?

A Yes. That they had complied with the business plans.

Q And we also talked about the business plan that was submitted by the -- the business plans that were submitted by the two River Valleys prior to the enactment of FIRREA. Do you recall that?

A Yes.

Q And do you recall that you testified that the two River Valleys had complied with those business plans up until the time that FIRREA had abrogated their forebearance capital. Do you recall that?

A Yes.

Q And do you recall that you indicated at that time their business plans, the business plans of the two River Valleys became unworkable as a result of the abrogation of a very large portion of their regulatory capital.

A They needed to be reworked.

Q Because as they were, then composed, they were no longer achieveable since a big portion of the regulatory capital was gone, correct?

A Correct.

Q And that was because they needed capital to support their assets, correct?

A And their activities, yes.

Q And they needed capital to expand their activities and grow their assets, correct?

A Correct.

Q And when FIRREA abrogated that regulatory capital, they no longer had the necessary ingredients to achieve the goals set forth in the business plan, correct?

A Correct. They would have had to do something else because a big chunk of their plans were changed.

Q They somehow would have to raise cash capital to replace the forebearance capital that had been abrogated, correct?

A Correct.

Q And the government wasn't offering to give them that cash capital, was it?

A Not that I'm aware of.

Q Had FIRREA not been enacted, though, in 1989, just make that assumption, okay.

A Okay.

Q And assume that River Valley had been allowed to continue to include in its regulatory capital all the forebearance capital that it had acquired and contracted for in connection with its

supervisory acquisition of the five insolvent savings and loan associations. Okay.

A Okay.

Q And based on your experience that Messrs. Holland and Ross met or exceeded every projection that they had ever made, do you -- you don't have any reason to believe that had FIRREA not occurred, Messrs. Holland and Ross could have not continued to successfully have implemented their existing business plan, correct?

A It's hard to say.

Q You don't have any reason to believe that they couldn't, correct?

A They should have been able to, but then they could have made a mistake or something else.

It's -- business plans are very fluid. Things can happen. They could have gotten a bad investment or bad something and things would have materially changed.

I can't say that everything would be fine just because --

Q Nothing in this life is certain, correct?

A Correct.

Q And you realized that when you reviewed

any business plan, correct?
A Correct.
Q Nevertheless, you required business plans to be filed, correct?
A Right.
Q And you required that a business plan be realistic, right?
A Yes.
Q Before you would approve it, you required that it be realistic?
A Right.
Q And you had quite a bit of experience dealing with Messrs. Holland and Ross' ability to comply with their business plans, correct?
A Right.
Q And recognizing that nothing in life is certain and recognizing everything in life has risks, don't you believe based on the realism of their business plans, that had FIRREA not been enacted, it is likely that they would have continued to have been able to successfully have implemented the business plan that your office had approved?
A They should have been able to but then again, something else could have happened.

Q Based on your dealings with these two individuals, you would have had, would you have not, in 1989, a significant level of confidence although again nothing is certain, but you would have had a significant level of confidence in their ability to continue to successfully be able to carry out their business plan, correct?

A I was confident that they could handle it. But again, who knows what would have happened.

Q All right. But again, you would have been confident of their ability, correct?

A Yes.

Q You wouldn't have given that same testimony, would you, concerning the ability of all the Thrift executives you supervised their ability to carry out their business plans, correct?

A I wouldn't give it to everyone, no.

Q It would be a case-by-case determination on your part based on the qualifications and

competence of the particular Thrift executive, correct?

A Correct.

Q And as you've testified, these two Thrift executives, you had great confidence in, correct?

A Yes.

MATERIAL REDACTED

Q Mr. Ferries, kindly identify Exhibit 7 for the record.

A It's a letter from Holland Partners to myself dated January 25, 1990. They've sent in a report on the institution sensitivity measurements and also telling us they've hired Ron Pikus as President and Chief Operating Officer.

Q Did you ever deal with Mr. Pikus?
A Many times.
Q Did you find him to be a competent banker?
A Very, very competent. Very conscientious.

Q Okay. We are characterizing FIRREA as a roadblock to the continuing successful implementation of the business plan, correct?

A A hurdle.

Q Okay. Your term is hurdle. So FIRREA was a new hurdle that had to be overcome, correct?

A Correct.

Q And that hurdle had to be overcome by somehow replacing the capital forebearances with cash capital, correct?

A Correct.

Q Now, I'm simply asking, had FIRREA not been enacted, are you aware of any other hurdles that had been placed in front of River Valley that would have imposed substantial impediments to the continuing successful implementation of the business plan?

A I'm not aware of any.

Q Do you recall whether there were discussions between you and your staff and representatives of the FIDC concerning any efforts by the FDIC to impose more rigorous enforcement actions on River Valley?

A I don't remember any such discussions. I know we were worried they may try to do some back up actions.

Every once in a while they kind of threatened things, but I can't remember that happening in this case.

Q In the context of River Valley, why would you have been worried about that?

A Just that you don't like to be second

guessed and have something go up to the board. It makes you look like --

Q Would you have also been worried in the context of River Valley, the FDIC was taking a significantly more adverse regulatory posture as we discussed this morning with respect to River Valley?

A I wasn't about that because I knew that -- I knew that my ratings were right and theirs were wrong and I could support my ratings.

And I think a reasonable third party could assume that my ratings were good and theirs were bad.

Q And at that time, when you entered into the supervisory agreement of River Valley, I assume I'm correct in understanding that at that time, in fashioning the requirements of that supervisory agreement, you gave River Valley absolutely no credit for the supervisory good will, the subordinated debt, the preferred stock and the capital credits. Is that a fair statement?

A Correct.

Q Because again, your main goal in the supervisory agreement, was it not, was to assure

that River Valley maintained adequate regulatory capitalization, correct?
A Correct.
Q And for the reason you testified earlier today, whether or not you agreed with FIRREA wasn't the issue, you were bound yourself to comply with its provisions?
A Correct.
Q And so you couldn't, in making your decision to have River Valley introduced into a supervisory agreement, you were not free to give River Valley any credit, even a dollar credit, for all the capital forebearances that had been abrogated by FIRREA, correct?
A Correct.

Q And again, the -- River Valley had significant capital compliance issues following FIRREA as we discussed because FIRREA wiped out such a large portion of its regulatory capital, correct?

A Correct.

Q Now, you don't have any doubt, do you, that hypothetically, had FIRREA not been enacted, you wouldn't have been pressuring Messrs. Holland and Ross to put in additional capital because the capital already would have been fully adequate, correct?

A Probably. Unless something else had happened.

Q But if something you aren't aware of today hadn't happened, you would not have been, in 1991, interposing a supervisory agreement to require Messrs. Holland and Ross to very promptly infuse their own funds as equity capital into River Valley, correct?

A Correct.

Q And the reason for that's quite simple, isn't it? Because had FIRREA not been enacted, River Valley's regulatory capital would have been fully adequate in March, 1991, correct?

A Should have been, yes.

Q And sitting here today, you are not aware of any reason, are you, why it wouldn't have been fully adequate had FIRREA been enacted, correct?

A Not to my knowledge, would have taken me

to that conclusion.

Q But the fact is, FIRREA was enacted, right?

A Yes.

Q And that's what you had to live with as a regulator, correct?

A Correct.

Q And the fact is, your office and you in particular, in discharging your official responsibilities, placed quite a bit of pressure on Messrs. Holland and Ross to very quickly put in capital that they would not have had to infuse had FIRREA not been enacted, correct?

A Correct.

Q And in fact, in Ferries Exhibit No. 11 which I'm now handing you, Mr. Howard Ross expressed some of his hard feelings concerning your demand that Messrs. Ross and Holland be required to infuse the capital.

Would you agree with that? First, of course, read the letter.

A Yes, this letter is written by Howard.

Q And based on your testimony and your

recollection of these events, you are not surprised that Mr. Ross had the feelings he had that are expressed in Exhibit 11?

A Right.

Q And do I also understand from your testimony, although you had to do what you did, you would have fully understood in August, 1991 why Mr. Ross had the feelings that he had as expressed in Exhibit 11?

A Right. And he -- they also understood where we were coming from. So this was basically a way to vent his frustration.

Q But you wouldn't have considered his frustration at that time to have been unreasonable for the reasons you've already testified to, correct?

A Correct.

Q And he indicates in here that the enactment of FIRREA and the imposition and the -- the imposition of the capital requirements resulting from the exclusion of the supervisory good will and other forebearance capital caused River Valley harm. You saw that?

A Yes. He's basically saying -- that's exactly what he's saying.

Q Base on your testimony this morning, would I be correct in understanding when you read this statement about harm by Mr. Howard Ross, you would not have disagreed with it?

A I would not have disagreed with it.

Q So why did you issue the supervisory agreement against River Valley?
Would it be because in light of the inadequate capital resulting from FIRREA, you really felt you did not have any choice?
A At that time, any institution that was rated a 3 or lower, had to have an agreement.
Q And aren't I correct that the reason River Valley was rated at 3 or lower was because of the deprivation of a very large amount of its regulatory capital as a result of the enactment of FIRREA?
A That was the primary reason, yes.
Q Isn't it fair to say that it is

extremely likely if not a sure thing, that had River Valley not been deprived of its contracted for forebearance capital, it would have been rated a 2?

A It probably would have been rated higher than what it was, yes.

Q What is your recollection of the role American National played in the ultimate survival of River Valley?

A They gave them the financing that they needed to bring in the capital.

Q And do you recall that at that time, Messrs. Holland and Ross were unable to identify any other sources of capital other than American National?

A As I recall, they had looked at other things but Mr. Ross had a very good relationship with American National and that's why they stuck with Holland and Ross.

Q When you say American National stuck with Holland and Ross, do you say that because at that time in the early 1990's, not many financial institutions would want to be involved in extending substantial funds to under-capitalized savings and loan associations such as River Valley?

A Most institutions, big players were not loaning them money and American National lost a lot of money dealing with certain savings and loans in our area.

Q Okay.

A They liked Mr. Ross from his prior dealings with them and they respected him and that was -- they had a good relationship.

Q So it sounds as if they basically had the same feelings toward Messrs. Holland and Ross as your office did, is that a fair statement?

A That is -- they had that opinion of Mr. Ross.

Q And you believe American National also had a favorable opinion of Homer Holland?

A I would assume so or they wouldn't have done it. But I know they were -- Ross and American National went way back.

Q Again, as you understood it from your direct dealing with River Valley, this was a very important relationship for Messrs. Holland and Ross to retain in order to survive through the hard times generated by FIRREA, correct?

A Correct. Mr. Ross had -- in the scheme of things at River Valley, Mr. Ross had the financial backings. Homer ran day-to-day and was more -- got his hands dirty.

Howard was just the financer and he had the connections for the money.

Q So Howard was out there trying to bring

in the capital necessary to replace the capital lost as a result of the enactment of FIRREA, correct?

A That was my understanding and my conclusion.

Q Howard wasn't the day-to-day banker, right?

A No, he was the pot, the money. Homer was the banker.

Q All right. In fact, Howard, you wouldn't expect to be that knowledgeable about the day-to-day events at the bank, would you?

A Not really.

Q He would have a general supervisory --

A Yes, he knew what was going on and would read the reports but he would rely on what Homer and Steve Bangert and people relayed to him.

Q You wouldn't have expected, for example, Howard Ross to know the intracacies of the business plan, would you?

A No, he would know the big picture.

Q The big picture?

A It was up to everyone else to pull it together.

Q But Mr. Holland, on the other hand, you

would expect him to know in excruciating detail everything that was going on at River Valley at all times, would you not?

A Yes. He was the one that liked to get his hands dirty and he was the real reason they got into these deals because he liked the challenge of turning things around.

Q And would you understand that Mr. Ross would have had a general understanding, for example, of the overall negative impact that the FIRREA capital abrogation provisions would have had on River Valley, correct?

A Right.

Q But you wouldn't have expected Mr. Ross to know in detail how the capital abrogation provisions of FIRREA would adversely affect River Valley, correct?

A Not in detail, no.

Q But on the other hand, you would expect Mr. Holland to know in exquisite detail how River Valley would have been adversely affected on a day-to-day going forward basis as a result of the deprivation of the forebearance capital. Is that a fair statement?

A Yes.

Q And again, just to wrap it up and come back to an initial point. In light of the troubled condition of River Valley resulting from the enactment of the capital abrogation provisions of FIRREA, you would have expected, would you have not, that other than the pre-existing excellent relationship between Mr. Howard Ross and American National Bank, it would have been very difficult if not impossible for Messrs. Holland and Ross to bring in some other new third-party lender for the first time to make significant loans in order to provide for the recapitalization of River Valley?

A I don't think that they would have been able to find any other -- if Howard -- Homer didn't have Howard there, River Valley would not have had success.

They would have been -- they would have had to throw in the towel.

Q And wouldn't you say the same thing, if Howard Ross did not have American National there, River Valley would have been down the tubes?

A Probably.

Q What was the basis for the statement by the OTS that River Valley bank FSB was well managed, profitable and in capital compliance?

A I think it's self-explanatory.

Q Just for the record, I need to have it clear what the source of that information was.

That would have been the examination

report?

Q And you personally --

A I'm not sure what date the examination report would have been, but it would have probably been the end of '91, October or November.

Q You personally would have agreed with that assessment at the time it was delivered, correct?

A Right.

Q And well-managed, the statement well-managed, I take it, would have been referring very specifically to the management of Homer Holland and Mr. Pikus, correct?

A And Steve Bangert, yes.

Q I -- Steve Bangert, you dealt with him directly?

A Yes. Well, he would sometimes call or different things. But yes, we were involved -- my examiners talked to him a lot.

He called me several times. He dealt with Larry Kenney a lot.

Q You dealt with Mr. Bangert again for a several year period?

A Yes.

Q You also, as with the case of Mr. Homer

Holland and Mr. Ronald Pikus, you were reasonably impressed with Mr. Bangert?

A Yes, I was.

Q You consider him to be a competent Thrift manager, correct?

A He was very competent in the investments and was very well versed in investments and that type of stuff, securities.

Q And these investments and securities to which you are now referring, would those be the same investments and securities that the Federal Deposit Insurance Corporation was raking River Valley over the coals with respect to?

A Yes.

Q And again, you thought they were just totally off base in that regard, right?

A Right. Larry Kenney and Steve -- that's why we had Larry Kenney look into the investments because he and Steve were -- their understanding -- when they would talk, they are up here and -- it was very confusing listening to those two talk.

Q You are pointing to a place over your head, right?

A They are talking way high and after

Steve would leave, you'd ask Larry, "Exactly what are we talking about here?"

Because they were on the same level. That's why we brought Larry, our specialist, to look at these investments.

Q So Larry Kenney, after meeting with Mr. Steve Bangert who would explain to you in detail what it was what they had just been talking about?

A A lot of times, yes. You knew what they were talking about but they would use terms that were not normally used.

Q And Mr. Kenney would indicate to you in these sessions that he had a high degree of confidence in Mr. Bangert's abilities to effectively purchase and sell and administer these various securities, correct?

A Correct.

Q Notwithstanding the fact that the FDIC was doing everything in its power to force the institution out of that line of business, correct?

A Correct.

MATERIAL REDACTED

Q My question is, I understood that OTS concluded FSB was well-run with capable management.

That was OTS's conclusion, correct?

A Correct; correct.

Q My only question was, was this first reference to all regulators, was that to your recollection, this meeting also referring to FDIC officials or officials outside of the Office of Thrift Supervision?

A I don't have any recollection. Like I said, we have a difference on the opinion on the investments but I don't think they ever questioned management's ability, FDIC.

Q You had no reason to believe, did you, Mr. Ferries, that the FDIC shared your opinions on Mr. Pikus and Mr. Holland and Steve Bangert?

A I think they shared those opinions, but they are coming from -- they didn't like the investments.

But I don't think they thought -- I can't speak for them. But our big disagreements were strictly the investment that they were dealing with.

Q Another way of saying the same thing, is it not, is that the substantial difference in the assigned composite rating of 2 and the 4 rating assigned by the FDIC related to the differences in the analysis of the investment and asset

portfolios and not to differences in analysis and evaluation of the skills of management?

A Correct.

Q According to this, do you recall this Mr. Ferries: Even the FDIC, as harsh as they were to this institution, believed that with respect to loans and real estate owned, the institution was doing an excellent job?

A Yes.

Q Does that statement I just read comport with your personal recollection of the FDIC's views?

A Yes.

Q And you personally relied heavily on Larry Kenney, right?

A Yes.

Q Because he was the expert within the Office of Thrift Supervision when it came to the analysis and understanding of many of the

different types of investment securities held in the portfolio of River Valley, correct?

A Correct.

Q And again, many times you were faced with a situation where Mr. Kenney's judgment was diametrically opposed to the judgment of the Federal Deposit Insurance Corporation on a large volume of securities, correct?

A Correct.

Q And you would, based on your personal dealings with him, you went along with the judgment of Mr. Kenney because it had been your experience that he knew what he was talking about and he was right, correct?

A Correct.

Q And the FDIC were newcomers to Thrift regulations and they didn't know what they were doing in that regard, did they?

A That's pretty similar to what I said this morning, yes.

Q Do you agree with my statement?

A Yes.

Q Now, you also recall this morning in Exhibits 1 and 2, we addressed references that you gave with respect to Messrs. Holland and Ross relating to their proposed acquisition of a financial institution in San Antonio. Do you recall that?

A Yes.

Q That was an institution that ultimately you agreed was named also River Valley?

A Right.

Q And as you testified this morning, based on your personal working experience with Messrs. Holland and Ross over a period of years, you supported that application, did you not?

A Yes.

Q And, in fact, you would have and perhaps

did, support -- you would have supported their proposal to acquire River Valley in San Antonio as a subsidiary of River Valley in Illinois, correct?

A Probably would have supported that. But trying to run one shop out of too many locations is a problem.

I was glad that they did two different institutions.

Q But you would not have interposed any supervisory objection whatsoever, would you have, to merging the San Antonio institution into the Illinois institution, correct?

A Probably not.

Q And do you recall -- you know what nonoperating losses are, don't you, NOL's?

A Uh-hum.

Q And do you recall that as in most such acquisitions, the supervisory acquisition of Home, Mutual, Galva, Republic Savings and Peoria Savings gave rise to a significant level of NOL's?

A Correct.

Q And NOL's basically are an assest that the FSLIC sold in the context of supervisory transactions, correct?

A Right. It was a tax planning tool.

Q And we discussed earlier today, capital forebearances were one way that the FSLIC enticed potential acquirers of insolvent institutions to acquire those institutions, correct?
A Correct.
Q NOL's were another asset that the FSLIC could sell to potential acquirers, correct?
A Correct.
Q And in fact, the FSLIC sold NOL's to Messrs. Holland and Ross in connection with the five supervisory acquisitions that you and I are talking about, correct?
A Correct.
Q But NOL's you can't simply go down the street to the First National Bank of Chicago and exchange them into cash, can you?
A No.
Q You have to convert them into cash, correct?
A Correct.
Q And how do you convert NOL's into cash assets?
A Well, basically, you get -- you can use those to offset your income, the income you are making for tax purposes.

You can offset those NOL's against that so then you pay no taxes or less tax.

Q Which means in order to convert NOL's into cash into assets, an institution has to make income, right?

A Correct.

Q Now, if after FIRREA, River Valley was unable to make income or unable to make as much income as it otherwise would have made, that would have irreparably hindered River Valley's ability to convert its purchased NOL's into hard cash, correct?

A Yes.

Q And again, that's one of the damaging consequences of FIRREA that Mr. Howard Ross would have been referring to in the letter he sent to you of August 28th, I believe it was, 1991 that we looked at a few moments ago, correct?

A I'm sure.

Q You are sure --

A I'm not sure that was the date on the letter right now, but yes, that's one of the things he felt was not fair.

Q But when you and your staff reviewed the plans, you understood that the intent of Messrs. Holland and Ross was to convert the NOL's into cash, correct?

A Their plans were going to be make money and you are going to make more money by not having to pay taxes on it.

Q That would have been your personal understanding back in 1989 on, correct?

A Right.

Q Okay. And you also indicated you

understood that an institution needed to produce income to translate NOL's into cash, correct?

A Correct.

Q And I believe you also indicated that to the extent FIRREA eliminated or lowered the amount of earnings produced by River Valley, it would eliminate or lower or limit the ability to turn those NOL's into cash, correct?

A Yes.

Q In other words, no earnings, the NOL's just stay that, NOL's. They are not a viable asset at that point, correct?

A Correct.

Q And in evaluating back in 1988, and subsequently when you took over the supervision of the institution, the realism of the business plan produced by the River Valleys, one of the factors you and your staff would have looked at is the ability of the River Valleys to produce income adequate to convert the NOL's into cash assets, correct?

A That would be one factor. I mean, we are going to look that they are going to make money on an ongoing basis.

Q Because if you did not believe that they

were going to make money on an ongoing basis, you would have not considered it realistic to project that these NOL's would be converted into cash assets over time. Is that a fair statement, sir?

A That's fair.

Q Now, returning to San Antonio, the San Antonio situation, you indicated, I believe, although it could present some -- I believe you indicated that with respect to the San Antonio institution, if Messrs. Holland and Ross said the only way we can do this deal is through our existing Illinois bank, you would not have had a supervisory basis to interpose an objection to acquiring the San Antonio institution through River Valley in Illinois, correct?

Q Correct, sir?

A I wouldn't have had a problem with them -- with the holding company acquiring and holding the separate Thrift.

Q And does it surprise you that American National Bank was willing to lend Messrs. Holland and Ross the funds necessary to acquire San Antonio but not if they were -- Messrs. Holland and Ross were going to make the San Antonio

institution a subsidiary of or part of River Valley in Illinois?

A No, it doesn't surprise me.

Q And why would that not surprise you, sir?

A American National is looking out for themselves. I mean, they are looking out for what's best for American Nationnal.

If they loan them the money directly, form a new company and then they have another institution, that institution wouldn't have been subject to a supervisory agreement that was in place in River Valley of Illinois.

Q And based on our earlier discussion, do you believe that the supervisory agreement would have at a minimum, made American National uneasy about lending --

A Yes. Because American Nationnal had to be careful what the regulators would and would not do under that agreement.

Q But had American Nationnal been willing to lend the money in such a way so that Messrs. Holland and Ross could have acquired San Antonio through River Valley in Illinois, they could have sent Mr. Richard Dalton down to San Antonio to be the on-site president but have designated him as branch manager as opposed to designating him as president, correct?

A I can't speak for them, but that would have been a possibility.

Q But as the primary supervisor, you don't see any reason as a primary supervisor, you would have not authorized that arrangement, do you?

A Not offhand. I don't know what any of

the problems were. I don't know what any of the problems were at San Antonio, why it was losing money or why it was up for sale. I don't have any recollection of that.

Q But sitting here today, you don't see any reason why you would have declined to approve the acquisition of San Antonio as a subsidiary of or part of River Valley in Illinois, correct?

A I can't think of any reason why we wouldn't have unless it would have been a drain on the earnings of -- unless there was something else, you know, like it would have been we would have perceived it to be a drain on the earnings of River Valley Peoria.

I mean, without knowing that, I don't know what the other conditions were, you know.

Was it bleeding? Was it doing well? There are a lot of factors but not -- I'm not aware of anything.

In theory, I wouldn't have had a problem being here as a branch of my Peoria shop.

Q What if it turned out to be the fact and I'm asking you to assume this for these purposes, that rather than being a cash drain, San Antonio, after the acquisition, produced significant

earnings?

A Well, that would have been good for Peoria so I would have been happy.

Q That's my point. If you knew that San Antonio was going to produce significant earnings, you would have as a supervisor, have -- would you not have affirmatively liked to have seen San Antonio brought into the Illinois operation in order to restore the capital, correct?

A That would have been a positive in my mind, yes.

Q Well, let's talk about that in a minute. Referring back to Exhibit 13. Did you see that in order to structure the transaction as it was, in fact, structured, River Valley in Illinois was required to pay out a 6 million dollar dividend?
A That's what it says here.
Q And your office would have had a say in that, would it not?
A Yes, we would have.
Q In fact, your office would have had the power to approve that or disapprove that?
A Right. We would have looked at that transaction and how much that six million affected the operations of River Valley.
Q That River Valley in Illinois?
A Right.

Q But my question was, if we could identify the specific assets that River Valley disposed of in order to reduce their size as a result of the six million dollars in dividend, six million dollar dividend paid in order to affect the San Antonio transaction, we could determine could we not, with mathematical precision how much in earnings River Valley lost as a result of those of the disposal of those specific assets, correct?

A Probably.

Q Would you see any reason we couldn't, sir?

A Not really.

Q So we could, right?

A Could from a reasonable estimate.

Q Very solid estimate, wouldn't you agree with that?

A Yes.

Do you recall, we -- let me strike that and come back to Exhibit 13.

The portion you've been examining that refers to the six million dollar dividend, correct. The next page. I think the six million dollar dividend is referred to at the top of the next page. Do you see that?

A Uh-hum.

Q That was the dividend payment that you ultimately approved, correct?

A I believe we did.

Q If you continue reading that passage, it indicates the anticipated amount of earnings reduction to be sustained in River Valley in Illinois, correct?

A Right.

Q What does it indicate?

A It estimates that there will be a decrease in earnings of a hundred thousand dollars.

Q And --

A Per month.

Q Aren't I correct, Mr. Ferries, that when you and your staff made the decision to approve that dividend payment, you would have required River Valley Bank in Illinois to advise your office of the anticipated effect of that dividend payment, correct?

A Right. We would have had input on that

Q But you considered the fact that the earnings would have gone down a hundred thousand dollars?

A Right. And if we had a significant problem with that, we wouldn't have allowed the dividend.

Q All right. But you were willing to authorize a reduction of earnings by a hundred thousand dollars so that the San Antonio --

A When the other people in my office looked at it, so we did it.

Q It made sense, even though the six million dollar dividend resulted in a loss of earnings of a hundred thousand dollars a month, correct?

A Right. If we had a problem with it, we haven't allowed them to do it and they would have had to do some other type of deal.

But we felt it was a reasonable request and it made sense when we looked at the big picture and we had no problem with that.

Q Now, had San Antonio been acquired directly by River Valley in Illinois, that six million dollar dividend payment would not have been required to have been made, correct?

A Correct.

Q And then the hundred thousand dollars in earnings produced by that six million dollars that ultimately was paid out would have been retained by River Valley in Illinois, correct?

A Correct.

Q And let's get to the issue of, isn't it all part of the same happy family that you were referring to. Okay?

A Uh-hum.

Q Now, do you recall this afternoon we discussed NOL's?

A Yes.

Q And you remembered from your personal involvement in the River Valley supervision that River Valley had a significant volume of NOL's, correct?

A Correct.

Q And you also understood that to make the NOL's productive, River Valley needed earnings, right?

A Right.

Q And you also understand, don't you, that even if the San Antonio institution was enormously profitable, River Valley Illinois' NOL's were not available to shelter the earnings of River Valley in San Antonio, correct?

A Correct. But there may have been some NOL's from down in Texas that I'm not aware of.

Q You are not aware there are, in fact, any?

Case 1:95-cv-00524-GWM Document 389-5 Filed 09/25/2007 Page 154 of 250



A I don't know anything about that institution.

Q But you do know that the earnings by the San Antonio institution could not be sheltered from taxation through utilization of the NOL's on the books of River Valley in Illinois, correct?

A Of course.

Q But earnings produced by River Valley in Illinois could be insulated from taxation through River Valley of Illinois' NOL's, correct?

A Correct.

I'm asking you, wearing your hat as a professional Thrift regulator, and that's all I need. I'm not asking you to step into the brains of Messrs. Holland and Ross.

But sitting here today, based on everything you know from your years of experience as a regulator and your years of personal experience in regulating River Valley, can you understand why it would be preferable to have earnings produced in River Valley, Illinois as opposed to having those same earnings produced by River Valley in San Antonio to the extent that River Valley, Illinois has available sufficient NOL's to protect those earnings from taxation?

A On the cover, that would make the most sense to use the NOL's merged up here. But there was factors that I'm not aware of that they chose to do it the other way.

And that he gave up that potential for the NOL's by doing it the other way. So whatever caused them to do that, acquisition the way they did, they must have weighed.

They are very smart individuals, they do everything for tax reasons. So they would have considered that on their advice of their consultant and their tax attorneys and stuff, so I don't know why they ultimately did the two separate.

Q Don't you understand based on your testimony today and the documents you reviewed today and the documents you reviewed ten years ago, that they structured the acquisition of San Antonio the way they did because the financial institution financing that acquisition refused to provide the financing for that acquisition if it were to be done through River Valley in Illinois?

A I believe that was the case. American National wanted it done this way so they were the ones with money to give to them to do it so you have to listen to who is giving you -- whoever is holding the money, you have to make sure they are happy.

You have to make sure the regulator is

happy. But more importantly, you've got to make sure your lender is happy and you are going to restructure the deal.

So that -- American National must have had an awful strong impact on that decision because they are giving away the use of those NOL's, yes.

Q Right. And --

A I'm not arguing that point with you but that's their call. I don't know why. But knowing the two individuals, I'm sure that they made the best decision, what was best for themselves under all loan circumstances.

Q Because if they acquired it directly as opposed to River Valley, Illinois, at least they could do the deal on the terms American National mandated, correct?

A Right. Because without the additional capital, they couldn't have done the deal any way.

So whoever is holding that capital is going to call the shots.

Q Okay. Now, we had a lot of conversation today about the adverse impact of FIRREA, correct?

A Correct.

Q And we had a lot of discussion that indicated that River Valley would have been a much sounder, better capitalized and more profitable institution had the breach of the FIRREA -- the breach of contract affected by FIRREA not occurred, do you recall that?

A Yes. It would have been -- they would not have had a cap problem if the government hadn't changed their rules.

Q Okay.

A Sound capital is a different thing.

Q Do you understand --

A Personally, I don't think the good will in everything was solid capital. Okay. To me, cash is capital but it was allowed so, therefore, it was capital.

Q And you as a regulator gave full credit to the forebearance capital, did you not?

A Yes, we did. Did I personally think it was good capital, no. But it was capital because it met the definition.

Q Right. And when that capital was gone, it had all the adverse consequences on River Valley that you've testified to, correct?

A Right. We've established that.

Q And you indicated that those adverse consequences were substantial, do you recall that?

A Yes.

Q Okay. And do you understand -- well, based on your knowledge of the institution and the transaction we are talking about, you understand that River Valley in Illinois would have required additional capital in order to support the acquisition of the assets resulting from an acquisition of the San Antonio Bank, correct?

A Correct.

Q And River Valley in Illinois did not have sufficient capital, correct, to support -- not to acquire another Thrift at that time?

Q They could have had sufficient capital if American National was willing to lend to them but they weren't, correct?

A Correct.

Q But had American Capital lent that money then, as a regulator, you would have seen the capital as being sufficient and as you indicated before, you would not have had a reason to interpose a supervisory objection, correct?

A Not that I'm aware of. It would depend -- we would have looked at the resulting institution and analyzed everything.

Q But sitting here today, you are not aware of any basis for objecting to it, right?

A Right.

Q So under that circumstance, River Valley in Illinois -- had FIRREA not been enacted -- River Valley in Illinois could have directly acquired the San Antonio institution without obtaining additional capital through a loan from American National, correct?

A Probably, yes.

Q And Mr. Ferries, again as we sit here today -- assuming that FIRREA had not been enacted. Okay.

Sitting here today assuming that FIRREA had not been enacted, you are not aware of any reason, are you, that River Valley couldn't have consummated -- River Valley, Illinois couldn't have consummated the acquisition of River Valley, San Antonio in precisely the manner that I just suggested, are you?

A I don't know why they wouldn't have been able to unless there was some -- unless something else happened in that two and a half years.

But as we know -- if nothing else had changed, they probably could have done it directly if they wanted to.

Q And based on your understanding as a savings and loan regulator, you would understand

that had the institution been -- had the acquisition been accomplished in that manner and had River Valley, San Antonio produced positive earnings, those positive earnings could have been shielded from taxation by the NOL's that River Valley had on its books at that time, until such time as those NOL's were used up, correct?

A Correct.

Q Is it fair to state that your personal assessment of the level of risk presented by River Valley increased significantly following the eradication of its forebearance capital?

A Yes, I think we spent more time because of that. If the capital had been always there and the rules hadn't changed, we probably wouldn't have spent as much time.

Q So -- but as a result of that, you knew much more about River Valley than perhaps you would have known about a less capital challenged institution under your jurisdiction at that time, correct?

A Yes. I always tried to know my institutions. Even though the nice clean ones, I can tell -- I know of them and what they do and different things.

Q But in order to carry out your assigned responsibilities, it was incumbent upon you to be extraordinarily familiar with all the particulars of institutions, such as River Valley, that were facing capital challenges, correct?

A Right; right.
Q And you did that?
A Right.
Q You spent most of your time on those institutions?
A Yes.
Q And you expended a large amount of your personal professional supervisory time dealing with River Valley during the period about which you and I have been speaking throughout this deposition, correct?
A Right, correct.

Q Based on the documents we are looking at, is it fair to say that you had a hands-on physical presence at River Valley meetings on a fairly regular basis throughout the early 1990's?

A All the ones relating to the examination reports, yes.

Q Even so, I believe some meetings that you attended that were not -- did not follow an exam report?

A I believe there was some.
Q And you attended those, too?
A Whatever we've talked about so far, yes.
Q So --
A My name is all over this report.

Q And I assume that you personally had or played a substantial role in making the decision to termination of the supervisory agreement?

A Yes, I would have had input on that termination.

Q And do you recall in making that determination, if you based your decision in large part on the fact that Messrs. Holland and Ross had infused additional equity capital into the institution and based on your overall level of confidence in the management team at River Valley?

A Yes, they had complied with the agreement and some of the conditions of that agreement probably were no longer -- you know, they were probably dated.

Just no longer applicable. And full compliance, normally OTS would keep an agreement in place for a couple exam cycles. So when they showed after, you know, routinely after a couple of exams that they were abiding by that, it was a common practice to remove the agreement.

Q On page 2 of this memorandum under section 5, operations, it states: The examiners looked hard at our earnings trends and have no concerns. Especially when they consider our business plan for future operations. Our overall rating is a 2 and OTS is very comfortable with that rating. OTS anticipates that FDIC will adopt

the OTS report and rating for assessment purposes. After further discussions and questions from the directors, the representatives from OTS left the meeting and Mr. Tuerk T U E R K concluded the conference call.

Do you believe that Section 5 accurately sets forth the views of the OTS at the time of this meeting.

A Yes. By this time, I think FDIC wasn't participating on the exams any more. As I had said earlier, FDIC came in on everything right away and each year they went on less and less.

Q Does this statement that OTS anticipates that FDIC will adopt the OTS report, do you see that?

A Uh-hum.

Q Does that indicate that by this time, the FDIC had concluded that Mr. Kenney was right and that it was wrong?

A No. By this time they had concluded that OTS knew what they were doing and they were confident in our report.

We also had an agreement with FDIC after a couple years of them going in on every shop. After that, a formal agreement was signed between

OTS and FDIC that they would accept our report.

And they had a -- we had to present them with a draft copy of the report and they had ten days to make commentary on that if they had any problems with it.

Q But by this time, had the continuing disagreement concerning River Valley Bank been resolved, the disagreement between FDIC and OTS?

A Concerning their reducing those derivatives and getting conservative types of investment. Their concern was lessening because there was stronger capital and, you know, not the high concentration in the derivative product.

Q Again the FDIC, was it your experience, in assessing an institution, put a high weight or a high reliance on the capital level, correct?

A Right.

Q A few documents ago, your office approved Ron Seib as the Chief Financial Officer?

A Senior VP, I think it was.

Q And as we reflect in this minute, Exhibit 18, Mr. Seib fulfilled the role of the bank CFO, correct?

A Okay. Yes.

Q Did you consider Mr. Seib to be a competent and experienced banker?

A He had been working for them for some time as the comptroller and he seemed very cooperative and competent when we were in doing examinations.

Q You didn't have any examination concerns relating to Mr. Seib; is that correct?
A Correct.
Q Am I correct?
A Yes; yes. I had no problems with him.

Q Had the board simply, once again, solicited your advice concerning the issue of proposed board restructuring and you were giving your thoughts on it?
A I believe they -- River Valley always liked to make sure that we were on the same -- they always liked to keep us fully informed of what was happening.
And I think this was -- that was the case here.
Q I assume as a regulator that was something you liked, right?
A Yes. Because we don't like to be surprised and find out two months later -- we would have been very concerned with Steve leaving and finding out about it three months later, just because of his involvement in everything.

Q River Valley did a very good job of making sure that you were not surprised, correct?

A Yes, they were always very straightforward with us and kept us apprised.

Q In the scheme of heavily regulated financial institutions that we operate under, that's a very important feature, correct?

A Yes, it is. You don't want to surprise your regulator.

Q And that assisted -- that provided you another basis for having a significant level of confidence in the management of this institution, correct?

A Right. And I think this meeting was basically their -- they just wanted to -- they called us and asked us to meet so they could, instead of sending it all written, they wanted to do it face-to-face and say, "These are the changes" and "Do you have any problems?" And just keep the open dialogue with us.

Q And I take it, based on your supervisory style, face-to-face meetings were something that you liked to promote and thought were very useful and facilitated your ability to properly supervise River Valley, correct?

A Yes; correct.

Q And by keeping you advised and by apprising you in advance of the board restructuring and that Mr. Bangert was transferring positions, it allowed you to have confidence, did it not, that River Valley had in place the mechanism for an orderly transition of management officials, correct?

A Correct.

Q That's something, again, you felt to be very important in assuring ongoing viability of an institution such as River Valley, correct?

A Right, we like to know things and keep -- be kept apprised of what's happening.

Q And they -- River Valley did an excellent job, again, of always keeping your office fully apprised of everything of interest and note going on at River Valley, correct?

A Correct.

STATE OF ILLINOIS )
) SS:
COUNTY OF WILL )

I, FRANCES I. OKREI, CSR, RPR, CM, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

OFFICIAL SEAL
FRANCES I. OKREI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 12/03/02

Frances I. Okrei
Notary Public in and for the County of Will.

My commission expires: 12-03-02.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

- - - - - - - - - - - - - - X
HOMER J. HOLLAND and :
HOWARD R. ROSS :
Plaintiffs :
v. : No. 95-5240
THE UNITED STATES OF AMERICA :
Defendant. :
- - - - - - - - - - - - - - X

Continued Deposition of LARRY FERRIES
(Taken by Plaintiff)
Chicago, Illinois
August 11, 2000

Reported by: Mary C. Kelly, CSR No. 084-001915

APPEARANCES:

For the Plaintiff:

HOWARD N. CAYNE, ESQ.
ARNOLD & POTTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the Defendant:

PATRICIA A. SMITH, ESQ.
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
1100 L Street, N.W.,
Washington, D.C., 20530
(202) 353-8841

Continued Deposition of LARRY FERRIES taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 11th day of August, 2000, at 9:00 o'clock a.m., before Mary C. Kelly, Certified Shorthand Reporter and Notary Public within and for the County of Cook and State of Illinois, CSR License No. 084-001915.

CONTENTS


| The Witness: LARRY FERRIES | Examination |
|---|---|
| By Mr. Cayne | 263 |
| (Resumed) | 337 |
| (Resumed) | 379 |
| By Ms. Smith | 322 |
| (Resumed) | 376 |


INDEX OF EXHIBITS


| Ferries Deposition Exhibit | | Page |
|---|---|---|
| 20 | (minutes) | 263 |
| 21 | (letter) | 283 |
| 22 | (letter) | 286 |
| 23 | (letter) | 289 |
| 24 | (memorandum) | 292 |
| 25 | (letter) | 297 |
| 26 | (FIRREA's Impact on Regulations) | 307 |
| 27 | (memorandum) | 311 |
| 28 | (letter) | 317 |
| 29 | (letter) | 340 |
| 30 | (report) | 366 |

Q Mr. Ferries, I'm handing you a document marked for identification as Ferries Exhibit Number 20. Kindly identify that document for the record?

A It's copies of Board of Directors Minutes of River Valley dated November 16, 1994, regarding a Board meeting.

Q And what CAMEL rating was assigned to River Valley at the conclusion of this examination?
A CAMEL rating of a 2.
Q And would you have viewed a CAMEL rating of a 2 as a positive rating?
A Yes.
Q It indicates on the first page of Exhibit 20, Mr. Ferries, that River Valley was well capitalized, and that term appears in quotes. Do you see that?
A Right.
Q Did the term well capitalized -- was that a

term of art under FIRREA capital abrogation provisions?

A Yes. That's in the -- Well capitalized is the definition in the regulations. You're either well capitalized, adequately capitalized or under capitalized, and that's why we put it in quotes because it's not our -- just that we're using the term as it relates to the regulation.

Q You are using the term as it relates to the regulation?

A Yes. That's why it's in quotes.

Q And that's as positive a classification as can be assigned to a savings and loan association with respect to capital, correct?

A Yes.

Q And would I be correct in understanding that, at this time in 1994, you would have been quite pleased with River Valley's progress, having progressed from the very damaged condition in which it stood after the enactment of the FIRREA capital abrogation provisions in August, 1989, and to this point in November, 1994, where they had attained the position of well capitalized franchise, correct?

A Yes.

Q To what would you attribute that success?

A Management's ability to infuse capital and to have positive earnings to improve capital ratios.

Q Do these results indicate that your early confidence in the management of River Valley was well placed?

A Yes.

Q You understood, did you not, back in the 1989 time frame when River Valley was following its initial government approved business plan, it was attempting to attain significant growth, correct?
A Yes.
Q And it was attempting to attain significant growth through a number of avenues, correct?
A Correct.
Q Those avenues included increasing deposit levels, correct?
A I don't specifically recall the different avenues, but that could have been one.
Q And you recall River Valley also was attempting to acquire additional branch offices, correct?
A Yes.
Q And they were also in the market looking for other problem and non-problem institutions to acquire to grow through acquisition, correct?
A I don't remember any of the specifics, but I know that they were looking at things.
Q You know that was part of the business plan?
A Right. Right.
Q Just sitting here today, you don't remember

the names of the institutions they were trying to acquire, right?

A No, I don't.

Q But you have no doubt that was a key part of the government approved business plan, correct?

A Right.

Q And as we discussed yesterday, the enactment of FIRREA and capital abrogation provisions of FIRREA put an immediate halt to that aspect of River Valley's business plans, correct?

A Correct.

Q There was simply no way they could grow, correct?

A Without the capital, you couldn't grow.

Q In fact, without the capital, they had to face downsizing, correct?

A Correct.

Q And so it's fair to say that these gentlemen had a very good track record of meeting their business plans, correct?

A Right.

Q And is it fair to say then, again, recognizing that nothing in life is certain, had FIRREA not abrogated the forbearance capital that Messrs. Holland and Ross contracted for with the United States Government, there was a good likelihood, not a certainty, but there was a good likelihood that they would have operated -- been able to continue to operate River Valley in conformance with their business plan and achieve a -- you didn't like the word significant -- let me say substantial level of growth through deposit growth, branch purchases and acquisition of other financial institutions, correct?

A Yes.

BY MR. CAYNE:

Q Mr. Ferries, I'm handing you a document marked for identification as Ferries Exhibit 21. Could you kindly identify that document for the record?

A It's a letter dated May 20, 1992, from River Valley Savings Bank to Simona Frank, Regional Director of FDIC.

Q I'd like to request that you read that entire document. I have a couple questions about it I'd like to ask.

Have you had an opportunity to read the entirety of Exhibit 21?

A Yes.

Q And that exhibit deals, does it not, with a number of the issues you and I discussed yesterday, correct?

A Correct.

Q And is it fair to characterize this letter as this is the bank complaining to the FDIC concerning the FDIC's treatment of the bank's security portfolios?

A Yes.

Q Do you believe that either you or Mr. Kenny or anyone on your staff would have suggested to River

Valley that they send this letter to the FDIC setting forth their position concerning the matters discussed in the letter?

A That is a possibility.

Q Do you believe it's a likelihood?

A It probably is a likelihood. I think I may have -- I don't remember specifically. I think River Valley management asked me and not Larry Kenny if there's anything -- what they could do about the exam rating differences, and I probably told them to, you know, write to -- Since there's the one issue, and you feel you're being treated unfairly, write to the Regional Director and state your case.

Q The next question is then before I go through paragraph by paragraph, let me ask you on the bigger picture, can I understand correctly, based on the testimony you provided yesterday, that you and Mr. Kenny would have agreed with the contents of Exhibit 21?

A I can't speak for Larry Kenny. I agree. I don't really remember the specific numbers, but I would assume that these numbers that Steve is quoting in this response are correct. I would agree with the institution's presentation.

Q As reflected in Exhibit 21?

A Right, because that's the different -- we had a difference of rating on the report.

Q And the positions reflected in Exhibit 21 parallel the positions taken by you and Mr. Kenny and your staff at that time, correct?

A Correct.

(Ferries Exhibit No. 22 was marked for identification.)

BY MR. CAYNE:

Q Mr. Ferries, I'm handing you a document marked for identification as Ferries Number 22. Kindly identify it for the record?

A A letter written to me from Anne Brody of the law firm of Holleb & Coff dated February 2, 1993.

Q Would you have read that letter upon receiving it from Ms. Brody?

A Yes, I would have.

Q And what is the topic of the correspondence reflected by Exhibit 22?

A It's a letter -- They're asking about a correspondent agreement entered into, a correspondent agreement with San Antonio Federal and River Valley where San Antonio would sell mortgage loans to River Valley.

Q And why is Ms. Brody writing about this? To

advise you or to seek some type of approval?

A They're asking for our approval to enter the transaction because of the supervisory agreement that they've entered into with us, River Valley with OTS.

Q If River Valley and San Antonio had been acquired directly by River Valley in Illinois rather than being acquired and held separately by Messrs. Holland and Ross, would Ms. Brody have needed to seek your approval to establish the arrangements referred to in Exhibit 22?

A No, it wouldn't have been -- if they acquired it directly, there wouldn't have been any correspondent agreement.

Q Mr. Ferries, I'm handing you document marked for identification as Exhibit 23. Kindly identify it for the record?

A Letter dated June 20, 1991, from River Valley Savings Bank signed by Steve Bangert to myself.

Q And does this Exhibit, Exhibit 23, refresh your recollection that, in fact, Messrs. Holland and Ross attempted to obtain financing from other sources other than American National and were unsuccessful?

A That's what it says in the letter, that they had tried to obtain financing from LaSalle National, I think, so they couldn't get it from LaSalle so they had to go back to American National.

Q And is what you just read in this letter consistent with your general recollection concerning the difficulties Messrs. Holland and Ross had in obtaining financing from sources other than American National?

A Yes.

Q Mr. Ferries, do you recall yesterday we spoke about or you spoke about issues related to affiliate transactions, and I believe you mentioned Section 23A of the Federal Reserve Act?

A Right, as it was mentioned.

Q And do you recall what you were referring to during that part of your testimony?

A I believe I made the statement that one of the positive -- one of the positives about having River Valley Rock Falls merge with River Valley Peoria was there was a less chance of an inadvertent

error or a violation of Reg. O.
Q And I just want to ask you to explain why is that the case? Why would there have been less of a chance for violation of Reg. O had the transaction been accomplished in that manner?
A Reg. O just details what type of transactions you can have with affiliates, and there's limits to the transactions, and it's a complicated reg, and there's a lot of little nuances, but Reg. O had come in effect in the early '90s for us. It was a new thing, and we already had to watch what we were doing. Here you had similar institutions with the same management or similar management, and there might have been an inadvertent violation that wouldn't look good.
Q In order to avoid an inadvertent violation, it's your understanding that the two River Valleys would have had to put in place various compliance procedures, policies and mechanisms?
A Yes, they would have had to have a management sharing agreement, expense reimbursement agreements, similar things like that.
Q And there are various expenses and time factors involved in complying with that regulation, correct?

A Correct.

Q By expense, I mean the expense of preparing the agreement, correct, the expense of monitoring the compliance with the agreement?

A Correct.

Q And, in fact, on more than one occasion, penalties have been assessed by the administrative agencies, including the OTS, for institutions that run afoul of Regulation O and Section 23A, correct?

A Correct.

Q Now, am I correct that had River Valley San Antonio been acquired directly by River Valley Illinois, those Section 23A, Regulation O agreements and compliance mechanisms and other monitoring devices would not have been necessary for the same reasons they would not have been necessary in the example you gave, correct?

A Correct.

Q Mr. Ferries, would you have reviewed the business plans that were submitted by Homer Holland and/or Howard Ross and/or the River Valley entities prior to the assisted acquisitions taking place?

A Not prior to the assisted. After the assisted is when I would have had input. I would have been responsible for monitoring the business plan because all that was handled by FSLIC at the

time.

Q And with respect to the business plans that were submitted over time and which you reviewed, did you have an understanding, Mr. Ferries, as to whether those business plans were static -- were static or were subject to change over time?

A We reviewed the business plans. Business plans always change because things, you know, from outside forces, but as they amended business plans, we reviewed the new business plans, and they always met their projections on the amended. I stated that in that first thing. We were always happy because they'd always -- I wouldn't have made that statement in 1, and I think it was Exhibit Number 1, that they always met their plans, but the plans always -- I mean, there isn't one business plan that stays the same from Day 1 to -- I mean, Year 1 to Year 5. There's always changes along the way, but they flowed -- they went with the flow and always met their revised plans.

Q Mr. Ferries, do you know whether or not the business plans that were submitted by either of the River Valley institutions specifically indicated that they intended to grow the institutions by acquiring other institutions?

A Their business plan called for growth, and that's the easiest way to get the growth is through acquisitions.

Q Again, Mr. Ferries, the question is do you know whether or not the business plans submitted by either of the River Valley entities specifically identified they intended to grow by acquiring other institutions?

A As I said before, the business plan required growth, and that's the easiest way to get growth so

you would have to have some acquisitions along the way, and I'm sure that's what it was predicated on.

BY MS. SMITH:

Q Do you recall anything specific in the business plans that discussed acquisition opportunities and/or intended growth by virtue of acquiring institutions?

A I don't know how to answer the question other than the way I've answered it. There's nothing -- They don't mention specific names of institutions in there, but the only way to grow is through acquisitions, I mean, to really make a major impact and to grow to the levels that they had wanted to would have been through acquisitions.

Q And, specifically, counsel inquired of you concerning the state of your knowledge with respect to efforts made by Messrs. Holland and Ross to persuade the FDIC to eliminate the cumulative dividend feature of the $5 million issuance of FSLIC preferred stock? Do you recall that line of questioning?

A Yes.

Q And, in fact, if we went back and looked at your testimony, we would see that you indicated you were highly confident that they, in fact, did that? Do you recall that?

A Yes. Like I said, they said they would do it, and I would not doubt that they did.

Q And this wasn't speculation on your part? You had a basis -- And I would appreciate if Counsel does not laugh at my questions. You had a basis in fact, did you not, to know that you could rely on statements and promises made by Messrs. Holland and Ross, correct?

A Right.

Q Correct, sir?

A I've stated in the past that every time they said they would do something, they did it.

Q And it was based on that extensive experience you had with Messrs. Holland and Ross that they always carried out their commitments and promises that you testified to Government Counsel that you were highly confident that Messrs. Holland and Ross did, in fact, attempt to persuade the FDIC to eliminate the cumulative dividend feature of the FSLIC $5 million preferred, correct?

A Correct.

Q And you've testified quite a bit in this deposition concerning the importance of business plans, correct?

A Correct.

Q And you indicated in response to counsel's question that adjustments need to be made at appropriate time, correct?

A Yes. Every business plan always has fine tuning because the first one you do is like a five year plan. You can predict Year 1 pretty darn good. Year 2 and 3 is a little bit fuzzier. But we always

looked at it as a fluid document. We wanted to make sure in the five year plan they overall -- When we would look at the five year plan, we put a lot of confidence in the first year, but we also looked at where they're going to be in the five years, but how they got there sometimes is different than what Year 2, 3, 4 would have indicated, but it was just because of outside conditions so it's always flexible or fluid.

Q And you indicated fine tuning is required, right?

A Right.

Q And for fine tuning to occur successfully, management must have the competence and ability to adjust, correct?

A Correct, and they always were able to adjust no matter what was thrown in front of them.

Q So no matter what fine tuning they had to make during the course of the five year plan, for example, your experience had been that Messrs. Holland and Ross and the management they selected always could make the necessary midcourse fine tuning adjustments in order to continue to successfully implement their overall business plan, correct?

A Correct.

Q And am I not correct, based on your testimony yesterday, to understand that you and your staff concluded that the business plan as it stood at the time of the consummation, as it stood in 1988 following the consummation of the supervisory acquisitions, was realistic, reasonable and achievable assuming that the capital forbearances remained intact, correct?

A We would have determined that it was a feasible plan; and, as I said, at that point, what we knew at that point it was a feasible plan.

Q And when you made the determination it was a

feasible plan, you assumed, did you not, that the capital forbearances would remain in full force and effect for their agreed upon duration, correct?

A At that time, yes.

Q Had you made any other assumption, you would not have found those business plans to have been feasible, correct?

A Correct?

REDACTED

# EXHIBIT 1

**Office of Thrift Supervision**
Department of the Treasury
Central Region
111 East Wacker Drive, Suite 800, Chicago, IL 60601 • (312) 565-5300

May 8, 1992

Ms. Maria Vidales
Resolution Trust Corporation
10100 Reunion Place
San Antonio, Texas 78216

Subject: Background Check Request

Dear Ms. Vidales:

In response to your request dated April 28, 1992 concerning information on Steven Bangert, Homer J. Holland, Howard R. Ross, Ronald Mitchell Pikus, and John Wilson Rose. I am not familiar with Mr. Rose and have no information on him. I am very familiar with the other four individuals and have had many dealings with them over the past several years. In my opinion these four individuals have always been very straight forward in their dealings with River Valley and the OTS. I believe them to be honest and reputable as they have kept every promise that they have made to the OTS. Also, it should be noted that they have always met or exceeded every projection that they have ever given to myself or the OTS. River Valley has been very successful under they control. It should be noted that they have acquired five insolvent S&LAs and turned them into a very well run, profitable institution.

In summary, Messrs. Ross, Holland, Bangert and Pikus are very knowledgeable, competent and trustworthy individuals. If you have any additional questions please call me at (312) 565-5293.

Sincerely,

Larry E. Ferries

Larry E. Ferries
Manager
OTS-Chicago

EXHIBIT
Ferries #1
8-10-00

# EXHIBIT 2

TO: Martha H. Carter, Applications Analyst

FROM: Larry Ferries, Manager

DATE: April 24, 1992

SUBJECT: Candidate Background Check
San Antonio Federal Savings Bank
San Antonio, Texas OTS No. 8367

In response to your request dated April 15, 1992 concerning information on Steven Bangert, Homer J. Holland, Howard R. Ross, Ronald Mitchell Pikus, and John Wilson Rose. I am not familiar with Mr. Rose and have no information on him. I am very familiar with the other four individuals and have had many dealings with them over the past several years. In my opinion these four individuals have always been very straight forward in their dealings with River Valley and the OTS. I believe them to be honest and reputable as they have kept every promise that they have made to the OTS. Also, it should be noted that they have always met or exceeded every projection that they have ever given to myself or the OTS. River Valley has been very successful under they control. It should be noted that they have acquired five insolvent S&LAs and turned them into a very well run, profitable institution.

In summary, Messrs. Rose, Holland, Bangert and Pikus are very knowledgeable, competent and trustworthy individuals. If you have any additional questions please call me at (312) 565-5293.

EXHIBIT
Ferries #2
8-10-00

# EXHIBIT 4

FEB-12-90 MON 11:14

EXHIBIT
Ferries #4
8-10-00

# Office of Thrift Supervision

Department of the Treasury
*Seventh District Office*
111 East Wacker Drive, Chicago, Illinois 60601-4360 • (312) 565-5300

Rec'd 1/10/90

January 9, 1990

mailed H Holland 1/10/90

Board of Directors
River Valley Savings
Bank, #6822
201 First Avenue
Rock Falls, Illinois 61071

Members of the Board:

We have reviewed the board of director's response to the October 10, 1989, supervisory letter. In general, we feel that you have addressed the most significant matters of supervisory concern in a satisfactory manner. However, we would like the board to consider the following.

Interest Rate Risk Management

We request that the board submit, on a quarterly basis, a copy of the in-house report generated by Holland Partners, Inc. regarding the institution's sensitivity measurements. We need this information in order to compare River Valley's estimate of its sensitivity to the results provided in Section H of the Thrift Financial Reports.

This letter should be considered by your board at its next meeting. We shall appreciate your reply, signed by all directors, within 30 days. It should be sent to us in triplicate, and it, together with a copy of this letter should be entered verbatim in the minutes of your next board meeting.

Sincerely,

Larry E. Ferries

Larry E. Ferries
Manager

# EXHIBIT 7

# HOLLAND PARTNERS, INC.

EXHIBIT
Ferries #7
8-10-00

January 25, 1990

Mr. Larry E. Ferries
Manager
Office of Thrift Supervision
Department of the Treasury
111 East Wacker Drive
Chicago, IL 60601

RECEIVED
FEDERAL HOME LOAN BANK
OF CHICAGO
FEB 0 5 1990
OK TO FILE
REFERRED TO LEF, SMS

Dear Larry:

The board of directors of River Valley Savings Bank considered your letter dated January 9, 1990 at their board meeting held January 24, 1990. Enclosed is the in-house report generated by Holland Partners regarding the institution's sensitivity measurements.

I failed to get the signatures of the board of directors at this meeting and will obtain them at our next meeting on February 21.

At the board meeting yesterday of River Valley Savings Bank, FSB, Ron Pikus was appointed president and chief operating officer to succeed me. My new title is vice chairman and chief executive officer.

Enclosed is a copy of Ron's resume and a press release.

Sincerely,

Homer J. Holland

Homer J. Holland
President

HJH/cw
Enclosures

309 West Washington Street, Suite 550, Chicago, Illinois 60606 (312) 419-8040 FAX# 419-1939

RONALD M. PIKUS

General Data:

Date of Birth: June 10, 1947
Marital Status: Married, two children
Residence: 1873 Jahns Drive
Wheaton, Illinois 60187

Education:

Loyola University, Chicago, Illinois BA Sociology - 1969
Loyola University, Chicago, Illinois MBA Finance - 1971
CPA, State of Illinois - 1979

Business History:

1988-Present
Senior Vice President
Holland Partners, Inc.
Chicago, Illinois

HPI is a consulting firm which specializes in the restructuring and management of troubled thrift institutions.

Most recently, I have been involved in the management of the Loan Administration Division of the River Valley Savings Bank group. During the same time period, I served as project coordinator in the investigation of a defunct mortgage banking company as the agent of the Illinois Savings and Loan Commissioner's Office.

1982-1985
1986-1988
Vice President/Chief Financial Officer
The Federation of Financial Institutions
Cicero, Illinois

The Federation is a mortgage servicing and consulting firm which services a $1 billion loan portfolio and provides mortgage-related consulting services.

As Chief Financial Officer, I was responsible for the management of all financial activities of the company. As the head of The Federation's Secondary Marketing Consulting Group, I oversaw several projects involving both local and out-of-state thrifts, banks and mortgage banking companies.

# EXHIBIT 11

RIVER VALLEY
Savings Bank, FSB

EXHIBIT
Ferries #11
8-10-00

August 28, 1991

Mr. Larry E. Ferries
Manager
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Il 60601-4360

Dear Mr. Ferries:

We are in receipt of your letter of August 22, 1991 regarding the infusion of $2 million into River Valley Savings Bank, F.S.B. or it's holding company. It comes as an unwelcome shock as we have, every step of the way, kept your office completely informed as to our actions and intentions to comply. You already know of the American National Bank commitment and our request to form a holding company. The holding company application is in your possession. The additional capital will be promptly infused, subsequent to your approval.

Your move to enforce civil penalties against River Valley Savings Bank, F.S.B. and each of it's directors is an action that is absolutely counterproductive. Many of our directors are also possible investors in River Valley Savings Bank, F.S.B. At a time when it is very difficult for this industry to obtain and retain "the best and the brightest", our board has steered a convervative and extremely profitable course. Your actions against a group that has, in two years, turned five bankrupt thrifts into a dynamic banking force in their communities is unconscionable and unproductive.

This move, together with the actions at the December meeting at which we were treated unfairly by the regulators, is ludicrous. We have molded a $52 million thrift in Rock Falls, Illinois, with a total net worth of $2.6 million, into a thrift with assets in excess of $500 million and a mark-to-market net worth in excess of $42 million. You have caused our institution irreparable harm, instilling doubts of our viability in our officers and directors at a time when it is very difficult to obtain additional capital. You are rendering our efforts impossible. Therefore, we insist that

Confidential Material — Subject to Protective Order

H&R-B55-00420

August 28, 1991
Mr. Larry E. Ferries
Page 2

the third paragraph of your letter dated August 22, 1991, be recinded immediately. We demand that Chester Biedron or those individuals with the authority to remedy this matter, be present at our meeting on Tuesday, September 3, 1991 at 10:00 A.M.

Sincerely,
RIVER VALLEY SAVINGS BANK, FSB

Howard R. Ross
Chairman of the Board of Directors

HRR:sk
cc: Stuart Brafman
Chester Biedron

# EXHIBIT 13

EXHIBIT
Ferrier #13
8-10-00

MINUTES OF MEETING OF THE
BOARD OF DIRECTORS OF
RIVER VALLEY SAVINGS BANK, FSB

January 22, 1992

The regular meeting of the Board of Directors of River Valley Savings Bank, FSB ("FSB") was held at the offices of Holleb & Coff, 55 E. Monroe, Suite 4100, Chicago, Illinois 60603.

Howard R. Ross chaired the meeting and called the meeting to order at 10:05 a.m. Mark S. Kipnis served as secretary of the meeting and recorded the following members present:

| | |
|---|---|
| Howard R. Ross | Homer J. Holland |
| L. David DeTrempe | Mark S. Kipnis |
| Chester J. Clauden | Robert Powers |
| Noel Rothman | Steven Bangert |
| Michael Rothman | Calvin L. Morgan |
| Fred Tuerk | |

Attending as guests of the board were John D. Weier and Richard F. Johnson, Jr., representativses of the FDIC, Larry Ferries, Lawrence Kenny and Marie Brandt, representatives of OTS, Ronald Pikus, Anne Brody and Kennard Besse.

The OTS and FDIC representatives were present to discuss their respective examination findings. Their reports will be sent to us at a later date, each of which will contain requests for corrective actions.

As an overview, OTS stated that FSB was "well managed, profitable and in capital compliance." OTS considers interest rate risk our most important area and was "overall satisfied", but FSB is held to a higher standard because of our large portfolio. There will be certain specific requests with respect to accounting treatment and documentation, especially because of our investment in Super P.O. securities. Institutions are sometimes asked to value investments at the lower of cost or market when the investments are "actively managed". OTS will request the Board to affirmatively represent that the investments are held for investment purposes, and state the reasons why, and represent that the institution is not actively managing such investments. We will additionally be requested to document the reasons why securities are sold. OTS additionally feels our major risks are prepayment risks and yield curve risks. Consequently, FSB will be asked to investigate new ways to analyze its risk-and not just analyze parallel rate shifts. Because swaps are used to protect

active management issue), we will be asked to document the reasons why we open or close swaps (after looking at the interest rate risk to the entire institution). In the mortgage banking area, because of our increases in servicing and loans originated and sold, there will be some accounting issues and requests for additional control over servicing bid decisions. Certain elements of our Investment Policy will be requested to be brought current. FDIC stated they have a different policy. FDIC classifies assets at substandard unless certain steps are taken. Effective February 10, 1992, FDIC policy will be the same as OTS on a go forward basis. FDIC will want stricter documentation as to whether an investment is held for trading or for investment; they will also be suggesting certain policy limits.

The regulators acknowledged compliance with our Supervisory Agreement and will look to River Valley Holdings, Inc. to pay the guaranty fee to Messrs. Ross and Holland now that the American National Bank debt is at the holding company level. With respect to bonus plans, if bonuses are based upon a return on equity, instead of performance, the regulators' position is that such bonuses are equivalent to dividends and should be treated as dividends. The regulators want a written tax allocation agreement with River Valley Holdings, Inc. and, with respect thereto, their stated policy is that River Valley Holdings, Inc. can't take a greater allocation than it would otherwise be allowed independently. All regulators felt that management was generally good and capable.

With respect to asset quality, OTS has no supervisory concerns regarding our loan underwriting. OTS policy is different from FDIC; they only have small recommendations. FDIC differs mainly with respect to our high risk investments. With respect to loans and REOs, FDIC stated we are doing an excellent job.

With respect to terminating our Supervisory Agreement, OTS normally likes to see an institution go through two full exam cycles. However, we can consider applying to OTS to rescind the transaction after we maintain the 5% tangible capital ratio for a period of time.

OTS concluded that FSB was well run with capable management, had shown significant improvement and that capital was adequate, being well above their minimums. OTS also agreed that our future projections look reasonable. FDIC concurred that our operations are good. The regulators concluded by answering questions from the board members regarding their rating systems, with OTS hoping to have its report issue in the next two weeks, while FDIC is hoping to have its issue in approximately 60 days.

The regulators left the meeting at approximately 11:15 a.m. and the Board continued with its regular agenda.



FHO010 0088 HOLLAND 95-524C ACC # 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 8 OF 40 WIN BOX # WC00006693 939999 CORR/APPL FIRST BANK FSB CLAYTON MO 11 OF 11 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

The Board had been provided with minutes of the November 20, 1991 Board meeting and minutes of the December 11, 1991 and December 18, 1991 Executive Committee meetings. DeTrempe moved, Clauden seconded, to approve such Board and Executive Ccommittee minutes.

Voting: Aye 11 Nay 0

Ron Pikus presented the financial statement review and compared the December 31, 1991 balance sheet with that of December 31, 1990. For December, total assets decreased $2.6 million. FHLB advances grew $10.5 million, while other borrowed funds decreased $14 million as we continue to reduce reverse repurchase borrowings. Our tangible capital ratio increased in December from 4.88% to 4.95%. Our risk-based capital ratio increased from 10.52% to 10.61%. Pre-tax income for December was $452,000.00, of which $410,000.00 was core pre-tax earnings.

Steven Bangert presented the Investment Report. FSB's December 31, 1991 mark-to-market was $49 million. The portfolio activity was reviewed, as was the institution's interest rate sensitivity.

Ron Pikus next reported on lending, loan administration and retail banking/operations. Because of current interest rates, lending activity is extremely high and employee staffing was discussed. Delinquencies were reviewed as was the general reserve reconciliation, employee loans during November and December, the loan modification for Four Seasons Mobile Home Park and the specific request for loan chargeoffs for Perl Williamson in the amount of $8,811.00 and Carrie Carter in the amount of $577.30. With respect to retail banking, we are keeping to our strategy of increasing relationship accounts and we are not as competitive on certificates of deposit. In Peoria we expect the competitive environment to increase as other local institutions have been acquired by regionals.

Homer Holland next reviewed problem assets. Our classified assets were $18 million at December 31, 1991 as compared to $34 million at December 31, 1990. We settled our claims under the Assistance Agreement for $3.2 million and anticipate that we will ultimately profit from that transaction. Mr. Holland reviewed the major assets removed during the year and those major assets that we anticipate resolving in the forthcoming year. As of December 31, 1991, FSB had 13 residential REOs at a value of $227,329.00. These numbers were compared to December 31, 1990 where we had 26 valued at $516,000.00 and December 31, 1989 where we had 126 valued at $3,600,000.00.

After further discussion, Powers moved, Clauden seconded, to approve the adequacy of the general reserve allowance, the amount of classified assets, and the aforesaid loan modification and chargeoffs.



FHO010 0089 HOLLAND 95-524C ACC # 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 8 OF 40 WIN BOX # WC00006693 939999 CORR/APPL FIRST BANK FSB CLAYTON MO 11 OF 11 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Voting: Aye 11 Nay 0

Powers moved, Tuerk seconded, that our rules for changing passbook rates be amended to provide that such rates may be changed by decision of the Executive Committee, without the necessity of full Board approval.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to approve the payment of quarterly Class C dividends for calendar year 1992.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to amend the first sentence of Article IV, Section 2 of the By-laws to read as follows: "The board of directors shall consist of no less than 10 members and no more than 12 members and shall be divided into 3 classes as nearly equal in number as possible."

Voting: Aye 11 Nay 0

Tuerk moved, Clauden seconded, that an annual review of appraisers be required and presented to the board at regularly scheduled meetings.

Voting: Aye 11 Nay 0

Mark Kipnis next reviewed the Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement attached as Exhibit A to these minutes. After further discussion, Clauden moved, DeTrempe seconded, to approve the Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement form.

Voting: Aye 11 Nay 0

Bangert moved, Noel Rothman seconded, that all Management Reports be approved.

Voting: Aye 11 Nay 0

Management bonuses were discussed and Mr. Bangert and Mr. Pikus were requested to leave the meeting. Mr. Ross summarized the accomplishments of Messrs. Bangert and Pikus during the 1991 calendar year and recommended a $50,000.00 performance bonus for Mr. Bangert and a 1992 compensation increase from $250,000.00 to $262,500.00 and further recommended a $50,000.00 performance bonus for Mr. Pikus and a compensation increase from $117,750.00 to $123,638.00. After further discussion, Morgan moved, DeTrempe seconded, to approve such bonuses and compensation increase.

Voting: Aye 10 Nay 0

Mr. Bangert and Mr. Pikus returned to the meeting and Mr. Pikus next reviewed current salaries, proposed salaries, cash bonuses and stock appreciation right dollar equivalents for senior vice presidents, vice presidents and certain other individuals and further recommended $300.00 bonuses to all other full-time employees and $150.00 bonuses to all other part time employees, all as more fully set forth on Exhibit B attached hereto. After further discussion, Clauden moved, Powers seconded, to award such bonuses, stock appreciation right dollar equivalents and new salaries.

Voting: Aye 11 Nay 0

Mr. Bangert recommended that FSB pay Messrs. Holland and Ross $300,000 and $175,000, respectively, for 1989 accrued but unpaid bonuses. Mr. Bangert also recommended that a common stock dividend be approved to permit River Valley Holdings, Inc. to pay a $420,000 guaranty fee to Messrs. Holland and Ross for their personal guarantees of bank debt. The guaranty fee has also been accrued and such dividend is not to be paid unless FSB will still have a tangible capital ratio in excess of 5.0% after such payment. Mr. Bangert expects payment to occur by the end of January. After further discussion, and with Messrs. Holland and Ross abstaining, Powers moved, Tuerk seconded, to approve such dividend payment.

Voting: Aye 9 Nay 0

The employee loan schedule was again reviewed. With Mr. Kipnis abstaining, Tuerk moved, Holland seconded, that the November and December employee loans be ratified and approved.

Voting: Aye 10 Nay 0

Homer Holland next reviewed the potential acquisition of San Antonio Federal Savings Bank. American National Bank has agreed to finance the acquisition, but only if the acquisition is by an entity totally separate from FSB. It is contemplated that a new entity, Western Capital Holdings, Inc., an entity owned by Messrs. Ross, Holland and Bangert, will acquire 89% of the SAFSB stock, while John Rose, an independent investor who brought the deal to FSB's attention, will acquire 11% of SAFSB. Although the transaction will now be independent of FSB, a substantial discussion ensued relative to the allocation of management resources (and compensation to FSB for management time and asset/liability management services) and the effect on FSB's future earnings as American National Bank is requesting that FSB dividend $6 million to River Valley Holdings, Inc. for the purpose of River Valley Holdings retiring $6 million of its debt to American National Bank. The ensuing discussion covered a wide range of topics including discussions with OTS - Dallas and Western Capital Holdings' business plan. With respect to FSB's

ability to pay a $6 million dividend, it is contemplated that management will shrink our balance sheet by reducing our Investment portfolio and not our loan portfolio where we have larger spreads. Additional funds will be generated from core earnings and from security sale gains where we would sell part of our fixed rate portfolio that is attractive to sell at this time. It is anticipated that monthly core earnings will decrease by approximately $100,000.00. Any security sales will actually improve our interest rate risk management as we will pay off short-term borrowings. After further discussion, Kipnis moved, Bangert seconded, that provided FSB maintains a 5% tangible capital ratio after the payment of said dividends and OTS approves said payment, that $6 million of common stock dividends be paid to River Valley Holdings, Inc. for the purpose of River Valley Holdings reducing its debt to American National Bank by such amount.

Voting: Aye 11 Nay 0

Mr. Pikus next reported that our CRA/compliance exam will begin next Tuesday.

Mr. Bangert and Mr. Pikus next presented copies of the proposed 1992 Business Plan to the Board for review and discussion at the next meeting.

Mark Kipnis next presented the unfunded deferred compensation plan attached as Exhibit C to these minutes. After further discussion, Holland moved, Ross seconded, that the unfunded deferrred compensation plan be approved.

Voting: Aye 11 Nay 0

Mr. Bangert next recommended that Sharon Kristof, Senior Vice President, and Cathy Knapp, Assistant Vice President, each be authorized, along with any FSB officer attesting to their signatures if attestation is required, to execute and deliver any and all conveyance deeds and other ancillary documents to transfer all REO properties to third party buyers. Holland moved, Bangert seconded, to approve such recommendation.

Voting: Aye 11 Nay 0

Mr. Ross next recommended that the fees to directors be increased to a $500.00 retainer for each meeting plus $400.00 for each meeting attended. After further discussion, Holland moved, Ross seconded, that such increase be approved.

Voting: Aye 11 Nay 0

The next scheduled board meeting is March 25, 1992 in Peoria.

There being no further business, Tuerk moved, DeTrempe seconded, to adjourn the meeting.

Voting: Aye 11 Nay 0

The meeting adjourned at 3:10 p.m.

Submitted: Approved:

Mark S. Kipnis
Secretary

Howard R. Ross
Chairman



FHO010 0093 L HOLLAND 95-524C ACC # 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 8 OF 40 WIN BOX # WC00006693 939999 CORR/APPL FIRST BANK FSB CLAYTON MO 11 OF 11 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 18

EXHIBIT
Ferries 18
8-10-00

RIVER VALLEY
Savings Bank, FSB

LF, EF, MD
Docket # 8515
S ____ F ____
S X ____ L ____
____ LI ____
C ____ I ____
H ____
% —

February 10, 1994

Larry Ferries, Manager
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Illinois 60601

Dear Mr. Ferries:

Enclosed are the minutes of the January 19, 1994 Executive Committee meeting of River Valley Savings Bank which you and Ellen Fowler attended. Since these minutes contain several organizational and board of directors' changes, you asked that we forward the minutes to you and that this would be considered our notice of the changes to the Office of Thrift Supervision.

Please review the minutes and, if you have any questions regarding any of the issues contained therein, do not hesitate to contact me.

Very truly yours,

Ronald M. Pikus

Ronald M. Pikus
President

Enclosure

River Valley Savings Bank, FSB 200 S.W. Jefferson Street, Peoria, Illinois 61602 (309) 673-4405

'ON456 0260 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880728 WIN BOX # WC00017542 OLD
OX # 1 OF 4 MW2044 ACC # 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 GENERAL FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; AREA MAPS;
OPY; MEETING MINUTES; EXHIBITS 940199-940999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

RIVER VALLEY SAVINGS BANK, FSB
EXECUTIVE COMMITTEE MEETING - JANUARY 19, 1994

Committee members in attendance: Homer Holland (Chairman), Howard Ross and Steve Bangert. Also in attendance: Mark Kipnis and Ron Pikus (RVSB); Larry Ferries and Ellen Fowler, Office of Thrift Supervision.

The representatives of the OTS were invited to the meeting to discuss two organizational changes: the resignation of Steve Bangert as CEO of the Bank and the proposed changes in the composition of River Valley's board of directors.

Steve advised the OTS that he will announce his resignation as CEO of the Bank at the board meeting to be held later in the day. Steve explained that his decision was based on the personal wishes of his family to relocate to Denver, Colorado, their original home, and his involvement with financial institutions in Connecticut and Colorado. Steve could no longer devote his full time efforts to the position as CEO of RVSB. At the request of the shareholders, he has agreed to remain on the board of directors and to serve as chairman of the Asset & Liability Committee (ALCO) of the board. In his capacity as ALCO chairman, Steve will provide the Bank with investment advise and continue to provide his input on deposit and mortgage product pricing.

Steve's position as CEO of the Bank will be filled by Ron Pikus, the Bank's current president and COO. Ron's nomination to the CEO position will be presented to the board of directors at the meeting of January 19th.

The status of Susan Vranes and the Bank's Capital Markets Group will also change. In order for this group to provide investment advisory and analytical services to River Valley and directly to Steve Bangert, Susan will form a new company (Summit Financial) with no ownership interest by RVSB, Steve, Homer or Howard. Susan is preparing a proposal which will detail the services to be provided and the fees which will be charged. This proposal will be presented to the full board of directors of RVSB for approval.

Ron Seib, the Bank's CFO, will take on the additional responsibility of overseeing the asset and liability structure of the Bank. While Ron Seib will work with Steve on pricing issues and on investments, and obtain analytical work from Susan's group, he will make the investment decisions for the Bank and report on those decisions to the board of directors and to the regulatory authorities.

Ron Pikus then explained to the group the changes which will take place in the Bank's mortgage lending structure. The position of chief lending officer has been assumed by Steve Bangert since the departure of Richard Dalton to Texas. The decision has been made to name Jordan Lamm, currently Vice President-Secondary Marketing, to become the new Chief Residential Lending Officer. The board of directors will



VON456 0261 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880728 WIN BOX # WC00017542 OLD BOX # 1 OF 4 MW2044 ACC # 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 GENERAL FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; AREA MAPS; COPY; MEETING MINUTES; EXHIBITS 940199-940999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

also be asked to name Jordan a Senior Vice President.

In addition to his current duties as coordinator of secondary marketing activities and mortgage pricing, Jordan will be asked to take on the responsibility for mortgage lending in Peoria and in the Bank's other branches. This move should revitalize mortgage lending in the non-Chicago markets served by the Bank.

In order to better manage the Bank's wholesale and retail (Aurora/Oak Brook) mortgage operations, the decision has been made to move these functions into separate subsidiaries of the Bank. Each subsidiary will be 80% owned by RVSB and 20% owned by Jill Brickman (retail) and Dan Doede (wholesale). Jill and Dan will be named "President" of their respective companies. The board of directors for the wholesale company will be: Homer Holland (Chairman), Dan Doede, Steve Bangert, Ron Pikus and Jordan Lamm. For the retail company, the board will be made up of: Howard Ross (Chairman), Jill Brickman, Steve Bangert, Ron Pikus and Jordan Lamm. Both of these companies will be set up in existing subsidiaries of the Bank which have the authority to originate and close loans. Each company will enter into a written operating agreement with the Bank.

Homer Holland then raised the issue of reconstituting RVSB's board of directors. Homer indicated that the original concept of retaining local directors was to maintain the continuity with the boards of the original entities which make up River Valley Savings Bank: Rock Falls Savings, Mutual Savings of Canton, Peoria Savings and Home Federal of Peoria. With the full integration of the original institutions into River Valley, the issue of continuity no longer exists. Several of the local directors have also expressed concern regarding the personal liability which comes with being a financial institution director. Given these considerations, it is more appropriate to have a board composed of individuals who have a financial stake in the institution. This will be discussed with the following individuals and it is anticipated that they will resign from the board: Cal Morgan, Chester Claudon, Dave DeTrempe and Peter Bynoe. In their place, Scott Ross, son of Howard Ross and Penny Holland, wife of Homer Holland, will be asked to serve on the board. With the remaining board members (Howard Ross, Homer Holland, Steve Bangert, Mark Kipnis and Ron Pikus), the number of directors will be seven. The Audit Committee of the board will be composed of Mark Kipnis and Steve Bangert; neither individual is a member of management nor a principal shareholder. Based on the review of the OTS regulations, the composition of the board meets all regulatory requirements.

Larry Ferries responded that, in his opinion, the restructuring of the board of directors was in compliance

with OTS regulations. Since there is no change in control of the institution nor is RVSB operating under any type of agreement with the OTS, there is no need to request OTS approval of the proposed board changes. Larry asked that, for informational purposes, a copy of the minutes of this meeting be sent to him. The minutes will constitute notification to the OTS regarding the above organizational changes.

Homer Holland asked Ron Pikus to prepare minutes for the meeting and to distribute them to the Committee members for their review prior to forwarding them to the OTS.

Submitted:

Homer J. Holland, Chairman



VON456 0263 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880728 WIN BOX # WC00017542 OLD BOX # 1 OF 4 MW2044 ACC # 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 GENERAL FILE; FINANCIAL STATEMENTS; CORRESPONDENCE; AREA MAPS; COPY; MEETING MINUTES; EXHIBITS 940199-940999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 20

# JOINT MINUTES OF THE REGULAR MEETING OF THE BOARD OF DIRECTORS OF RIVER VALLEY SAVINGS BANK, F.S.B. AND SPECIAL MEETING OF THE BOARD OF DIRECTORS OF RIVER VALLEY HOLDINGS, INC.

**November 16, 1994**

The regular meeting of the Board of Directors of River Valley Savings Bank, F.S.B. ("FSB") and a special meeting of the Board of Directors of River Valley Holdings, Inc. ("Holdings") was held at the executive offices of FSB at 200 South Wacker Drive, Second Mezzanine, Chicago, Illinois 60606.

Howard R. Ross chaired the meeting and called the meeting to order at 10:00 a.m. Mark S. Kipnis served as secretary of the meeting and recorded the following members present:

| | |
|---|---|
| Howard R. Ross (via telephone) | Penny Holland |
| ~~Homer J. Holland~~ | Scott Ross (via telephone) |
| Ronald Pikus | Mark S. Kipnis |

Larry Ferries and Ronald Harvey of the Office of Thrift Supervision attended as guests of the Boards, as did Ronald Seib. Steven Bangert was absent.

Mr. Ross stated that the first order of business was approval of the October 26, 1994 FSB Executive Committee Unanimous Consent. Kipnis moved, Holland seconded, to approve said Unanimous Consent.

Voting: Aye 6 Nay 0

Mr. Ross stated that the next order of business was a presentation by OTS of its Safety and Soundness Examination Findings and turned the meeting over to Larry Ferries. Mr. Ferries stated that the examination report format has changed. All of the regulatory agencies have adopted a new common report of examination. In addition to the new report, OTS has also replaced the familiar MACRO rating with the CAMEL rating used by the other banking agencies. Mr. Ferries then turned the meeting over to Ronald Harvey, FSB's examiner-in-charge. Mr. Harvey stated that FSB's overall financial condition is sound; the institution is managed in a safe and sound manner; classified assets continue to decrease; all minimum capital requirements are exceeded, the institution is a "well-capitalized" institution; OTS has agreed with all classifications of assets; and loan loss reserves have been found to be adequate. The only issue mentioned was valuation of purchase mortgage servicing rights for regulatory capital purposes. We had valued the rights based upon a market value discount rate. New regulations were issued in 1994 that required an initial discount rate to be maintained (for TFR purposes). FSB made the adjustments during the 1994 year. Mr. Harvey concluded that FSB's overall

H&R-B9-01371
Confidential Material -
Subject to Protective Order

EXHIBIT
20
FERRIES
9-11-20

CAMEL rating is a "2", reflective of a fundamentally sound operation, and that Holdings has been assigned a rating of "S", a rating which is considered satisfactory, i.e., Holdings has a neutral effect on FSB. A general discussion ensued and the regulators then left the meeting.

The entire examination reports for both Holdings and FSB were then reviewed by the members and discussed in detail. It was noted that as no significant areas of concern were noted in the reports, no formal reply to OTS is necessary.

Mr. Ross then had to leave the meeting.

Susan Vranes and Jordan Lamm joined the meeting to discuss the status of the sale to First Banks. Closing requirements were discussed, as were plans for portfolio sales, including residuals, and dealing with "built-in gains and losses". Some of the wholesale group may join Regency Savings Bank (with the knowledge and approval of First Banks). Regency may or may not take over our pipeline. This issue will have to be worked out with Regency and First Banks. If Regency does not take over the pipeline, it was determined to stop wholesale loan production. On the retail side, we have still received no direction from First Banks and we are continuing operations as normal. Loan servicing will be transferred to First Banks in St. Louis effective January 1, 1995. Contracts with Fannie Mae and Freddie Mac expire at the end of the year. Jordan Lamm is trying to extend them for at least one month, otherwise there may be a $40,000 to $50,000 pairing-off fee.

Ron Seib next presented the financial statement report. The institution is relatively unchanged from the previous month. Our leverage ratio as of October 31, 1994 was 5.11%, our tier 1 ratio was 12.48% and our risk based ratio was 12.90%.

Mr. Seib continued with an investment report. He followed up on our discussions relative to First Banks with a review of the mark-to-market and the portfolio.

Ron Pikus next presented the lending report, loan service report, problem asset report and retail banking report. Loan charge-off requests included in Mary Lou Janssen's memorandum to the Board and included in the Board package along with those requests set forth in Sharon Kristof's November 16, 1994 memorandum to the Board were approved.

Ron Pikus next gave a short CRA/compliance update.

Ron Pikus next presented a final compensation, bonus and severance pay-out proposal to the Board for Ron Seib and recommended that a bonus be paid to Linda Porter consistent with her contribution even though she is leaving prior to year end. Penny Holland moved, Mark Kipnis seconded, to approve such bonus program.



H&R-B9-01372
Confidential Material -
Subject to Protective Order

Voting: Aye 5 Nay 0

There being no further business, Pikus moved, Homer Holland seconded, to adjourn the meeting.

Voting: Aye 5 Nay 0

The meeting adjourned at 11:40 a.m.

Submitted by: Approved by:

Mark S. Kipnis, Secretary Howard R. Ross, Chairman

5044398.01



H&R-B9-01373
Confidential Material -
Subject to Protective Order

# EXHIBIT 21

EXHIBIT A

RIVER VALLEY
Savings Bank, FSB

May 20, 1992

Simona L. Frank, Regional Director
Federal Deposit Insurance Corporation
Division of Bank Supervision
30 South Wacker Drive, Suite 3100
Chicago, Illinois 60606

EXHIBIT
21
FERRIES 8-11-00

Dear Ms. Frank:

I have been asked by the Board of Directors of River Valley Savings Bank, FSB (the "Board"), to provide you with this response to the FDIC Report of Examination as of October 26, 1991. With the exception of the RVSB's investment activities, the FDIC's examination results closely parallel the OTS findings. I have enclosed a copy of the Board's response to the OTS examination for your consideration. The response includes the actions the Bank has taken regarding the OTS findings.

The FDIC and the OTS examination findings for "classified assets" are substantially different, and consequently, a separate response is necessary to clarify the Board's position on this matter.

The OTS examiners classified $8.1 million of the Bank's assets which is 31.1% of tangible capital and general valuation allowances. This is consistent with management's internal classified assets schedule. The FDIC, however, classified $48 million of the Bank's assets, increasing the classified asset to tangible capital percentage to 211% (using the reduced capital position calculated by the FDIC). The primary difference is the FDIC's approach to classifying the Bank's mortgage-backed derivative securities portfolio.

The FDIC has classified the Bank's derivative portfolio because management did not identify the specific assets that were being hedged with the derivative instruments prior to purchasing the instrument. This approach to hedge classification is not consistent with management's use of interest rate risk management instruments. It is also not consistent with the FFIEC's Statement of Policy on Securities Activities approved by the FFIEC on 12/3/91 and adopted by the FDIC on 12/31/91 and made effective on 2/10/92. The new policy statement allows an institution to use a macro approach and does not require that specific assets be identified. In the Board of Directors meeting held on 1/22/92 and attended by OTS representatives and Senior Banking Analyst John Weier and Examiner Richard Johnson of the FDIC, this inconsistency was emphasized by Management. The FDIC's response was that the

H&R-B56-02857
Confidential Material -
Subject to Protective Order

instruments were purchased prior to the FDIC's adoption of the new policy statement and, therefor, the new policy was not applicable for this portfolio. Mr. Weier acknowledged that the existing portfolio could be replaced today with similar instruments that would then not be classified, but he discouraged management from implementing this strategy. Mr. Weier said the FDIC would take this into consideration when the final report was completed and the FDIC's composite rating was issued. Apparently it was not considered.

The Board of Directors and management also disagree with the examiner's conclusion that the derivative portfolio increases the Bank's interest rate risk. This conclusion was based on information that was extracted from reports provided by management. The examiner used only part of the information provided to reach this conclusion.

The interest rate risk exposure profile prepared by the examiner argues that the risk is greater in a rising rate environment due to the use of derivatives as hedging vehicles. This is based on market value estimates provided by management. The analysis includes the impact of the Bank's Super P.O. portfolio but it does not include the other hedging instruments used in tandem with this portfolio,(e.g., caps and swaps). Also, this analysis does not comment on the impact the hedging instruments have on the net interest income of the Bank. The derivative portfolio's yield profile and the effect the mortgage derivative portfolio have on the Bank's net interest income are better indicators of the hedge value of these instruments. Management uses the yield profile and not the market value estimates when investment decisions are made for these type of instruments. The attached exhibit demonstrate that the market value of the portfolio does in fact increase in a rising rate environment but more importantly, the volatility of the Bank's net interest income is reduced significantly from the use of these instruments.

In conclusion, the Board of Directors and management believe the Bank's use of mortgage derivatives is consistent with the FFIEC's Supervisory Statement on mortgage derivative products and that Management has been able to demonstrate over the last five years that these instruments can be valuable portfolio tools if managed correctly.

Thank you for your consideration on this matter.

Sincerely,

Steven Bangert
Vice Chairman
SB/cw

H&R-B56-02858
Confidential Material -
Subject to Protective Order

# EXHIBIT 22

FILE

HOLLEB & COFF
ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900

WRITER'S DIRECT DIAL (312) ____________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MICHAEL V. CASEY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID I. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOPINGARNER
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ
JEFFREY K. ANDERSON
LYNNE M. BAKER
RICHARD G. BERNET
ALLAN S. BRILLIANT
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
SUSAN WARD COOPER
BRUCE DOPKE
MICHAEL L. ELOWE
KATHRYN J. GERBER
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
KRISTOPHER S. HESTON
PERRI L. IRMER
SHERI A. JORGENSEN
STEVEN P. KAISER
REBECCA L. KENT
BRIAN P. KERWIN
DANIEL L. KRAUS
DAVID A. LISCO
WILLIAM F. LITTLE
JAMES L. LUCARI
JAMES W. MARKS
JAMES T. MARKUS
ALVIN K. MARR
MICHAEL S. MOSTOW
BENJAMIN L. NORTMAN
KATHRYN A. PYSZKA
STUART N. RAPPAPORT
GREGORY G. SCHULER
JULIE L. SCHULZ
THOMAS B. SHAPIRA
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
JANET L. SMERLING
PAUL A. SMITH
JAMES M. SNYDER
GENE S. STERN
GREGG E. SZILAGYI
MICHAEL S. TALBETT
JAMES P. TEUFEL
JOHN C. THEISS
MARK H. VAN DE VOORDE
ROBERT S. WERT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH

February 2, 1993

Mr. Larry E. Ferries
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Illinois 60601

Dear Larry:

As we discussed, River Valley Savings Bank, F.S.B. ("FSB") would like to enter into a correspondent agreement with San Antonio Federal Savings Bank ("SAFSB") whereby SAFSB would sell certain mortgage loans to FSB. The terms of this proposed arrangement are set forth in a letter dated December, 1992, from Ron Pikus, President of FSB to Richard Dalton, President of SAFSB, a copy of which is enclosed for your convenience.

Both institutions understand that any such arrangement is a covered transaction between affiliates and that they must abide by the quantitative and qualitative restrictions of Sections 563.41 and 563.42 of the OTS Regulations. Moreover, since FSB is subject to a supervisory agreement, we hereby request your prior written approval to enter into the proposed transaction.

If you have any questions concerning the proposed transaction, please do not hesitate to contact Ron Pikus at FSB. If you have any other questions, please do not hesitate to contact me.

We appreciate your prompt consideration of our request.

Yours very truly,

Anne W. Brody

Anne Webber Brody

AWB:mf
Enclosure
cc: Steven Bangert
Ronald Pikus
Richard Dalton
Mark S. Kipnis

EXHIBIT 22
FERRIES

Confidential Material — Subject to Protective Order

H&R-B47-00808

December 1992

Mr. Richard Dalton
President
San Antonio Federal Savings Bank
801 Nolana Suite 201
McAllen, TX 78504

Dear Richard:

The following represents an agreement whereby San Antonio Federal Savings Bank (SAFSB) would make and/or arrange mortgage loans on residential real estate for sale to River Valley Savings Bank (RVSB).

1. RVSB is interested in residential mortgage loans which meet the following terms:

   a) Eligible Borrower - Individuals who intend to occupy the subject property as their primary residence and who have majority ownership interest in said property. Such applicants will be credit-qualified per the underwriting guidelines of RVSB. Second homes and investment properties meeting the guidelines of Fannie Mae and Freddie Mac will also be eligible.

   b) Loan Product - First mortgage loans on residential single-use real estate no larger than 4 units in size in Texas and Arizona. This agreement shall cover "conventional" type mortgage loans and agency qualifying community homebuyers loans and shall not cover loans insured or guaranteed by the United States of America or any agency or instrumentality thereof, or mortgage loans processed under any state, county or municipal programs. The following options would be available:

      - Conventional Fixed and Adjustable Rate Mortgages ranging up to 30 years.
      - Jumbo loans which exceed the maximum loan amount of the Federal National Mortgage Association (Fannie Mae).
      - Other loan products subsequently as made available.

   c) Maximum Loan Amount - As established by RVSB per product.

   d) Minimum Loan Amount - N/A

   e) Private Mortgage Insurance - Required on all loans with LTV greater than 80% with coverage of 22% which must reduce RVSB'S exposure to no more than 75%.

Confidential Material —
Subject to Protective Order

f) Product Terms - Price and parameters quoted daily by RVSB. A new rate sheet shall be distributed at least weekly via fax machine or mail delivery.

g) Tax Escrows - Tax escrow is required. A sum equal to1/12 of the yearly taxes will be added to the monthly principal and interest payment

h) Hazard Insurance - At closing, a policy and one year's paid receipt must be presented. Borrowers must also pay 1/12 of the annual insurance premium into escrow at closing, and 1/12 of their premium will be added on each monthly payment. The policy should at least cover the amount of the mortgage, have an expiration date, and the mortgage clause should read, "(your institution's name), its successors and assigns".

i) Flood Insurance - If flood insurance is required, provisions in the above paragraph also apply for flood insurance coverage.

2. For loans SAFSB intends to have purchased by RVSB after closing, the following procedures will apply:

a) RVSB shall make available to SAFSB current price quotations for mortgage loans along with information as to loan programs being offered by RVSB. The points listed refer to fees required by RVSB with the acceptable loan package at the corresponding rate. Any points or fees in excess of those listed shall be compensation retained by SAFSB.

b) Upon receipt of a completed application, SAFSB will register the loan the same day with RVSB. Loans must be closed within 60 days and delivered to RVSB no more than 10 days after closing. Loans not closed or delivered within these time periods will be subject to the current market rate and points.

c) SAFSB will have the responsibility for gathering or preparing all documentation for a complete loan package as required by RVSB and based on secondary market mortgage standards. This includes but is not limited to consumer disclosures, satisfactory appraisal, acceptable credit reports, verification of employment/income, and verification of sufficient funds for closing.

d) SAFSB will prepare a secondary market guidelines worksheet as provided by RVSB. This worksheet will be included with a packet of duplicate copies of all documents. Upon delivery to RVSB for the required prior approval, RVSB will evaluate the completed packet and make an approval/disapproval decision within 2 business days. This decision will be reported to SAFSB by phone. In case of approval, a commitment letter will be sent outlining the conditions.

e) SAFSB has full responsibility for closing loans, including the preparation of all pertinent disclosures and loan document

Confidential Material —
Subject to Protective Order

f) In certain instances, RVSB will fund the loan at closing if the closing takes place at an RVSB approved title company. The following information must be supplied to RVSB: name of mortgage, address of new residence, social security number, tax I.D. of new property, principal amount, monthly payment to include P & I and escrow breakdown, rate, date of first payment, maturity date, date of closing, time of closing, and the contact person at the approved title company. This information and a copy of the disbursement statement to the title company would preferably be supplied to RVSB 3 to 5 business days before closing (a minimum of 24 hours is required). If the date of closing is subsequently delayed, your institution will notify RVSB within 24 hours of the new closing date. The procedures contained in this paragraph will only be applicable to institutions pre-approved by RVSB.

g) At closing, SAFSB is to notify the customer of the loan sale to RVSB and the name of River Valley Savings Bank, FSB as servicer. Payments are due on the first of each month (in arrears) with a grace period of 15 days, otherwise a 5% penalty is assessed on the monthly principal and interest payment due.

3. SAFSB is deemed to make to RVSB and any subsequent purchaser of any mortgage loan originated by you all of the representations and warranties set forth below:

a) SAFSB has no knowledge of any facts and circumstances which would deem the information shown in the loan package to be untrue, inaccurate, or misleading.

b) SAFSB has complied with all applicable Federal and State laws and all consumer credit regulations including equal opportunity, Truth in Lending (Regulation Z), and settlement procedures.

c) The mortgage is a valid, perfected and subsisting lien on the mortgaged property described therein. The mortgage and any security agreements or equivalent documents relating to it have been properly executed, genuine, and what they purport to be, and their terms may be enforced by its successors and assigns.

d) If SAFSB shall breach any of its representations or warranties outlined in paragraph 3 in connection with any mortgage or if any representations or warranties shall otherwise be untrue for any reason, SAFSB shall upon request of RVSB repurchase the mortgage whether or not SAFSB had actual knowledge of the untruthfulness.

Confidential Material —
Subject to Protective Order

4. Termination of this Agreement may occur by either party with 10 days written notice. However, any files that were registered with RVSB and are still in process and any applications received by RVSB during this 10 day period will be purchased, if approved, under the terms of this Agreement.

If this represents our mutual agreement, please indicate so by endorsing and returning a copy of this proposal at your earliest convenience.

Sincerely,

Ronald M. Pikus
President

ACCEPTED:

__________________________ Date: ________________________
Name (Typed)

__________________________
Authorized Signatue

Confidential Material —
Subject to Protective Order

# EXHIBIT 23

Mark Kip...

RIVER VALLEY
Savings Bank, FSB

June 20, 1991

Mr. Larry Ferries 5655293
Manager
Office of Thrift Supervision
111 East Wacker Drive
Suite 800
Chicago, IL 60601

Dear Larry:

We have received your denial of our request to pay preferred stock dividends due American National. As I explained in our phone conversation today, it is unlikely that American National would approve our recent borrowing request if River Valley misses a quarterly dividend payment. As you know, American National is our current and only source for new capital. We believe that our request will be approved, but American has been very sensitive to the current regulatory environment in our industry. I believe it is in both OTS and RVSB's best interest to pay the current dividend and not disrupt the current loan request at American. Our loan is scheduled to go to American's loan committee within 7 to 10 days.

I am aware that we are not in compliance with our management agreement with OTS. We were not able to obtain financing for the $2 million capital infusion from LaSalle National, which was the first bank approached. After it was determined that LaSalle was not going to be able to help us, we approached American National. They have been very positive about our request, but have demanded a holding company structure. This delayed the capital infusion for several reasons. We had to research the holding company regulations and run new financial projections. During this process, our legal counsel (Holleb & Coff) contacted Joe Uson at the OTS to find out what the regulatory process would involve and how long it would take. We were encouraged by the OTS to wait until late July because the paper work and expense would be reduced considerably. Apparently, the process is much less time consuming for institutions in existence for three years or more (July 29, 1991 will be the three year anniversary for RVSB, FSB). If we wait until July, we will still have a 45 day waiting period. This means the holding company will not be formed until the middle of September. At this time, the capital will be put in the holding company and pushed down to the thrift as equity capital.

My most immediate concern is the dividend payment due American National this month. River Valley is ahead of schedule for meeting the higher capital requirements. Our tangible capital will be approximately 3.6% as of June 30, 1991. If we had been able to inject the $2 million this month, we would have exceeded the 4% target in June (90 days ahead of schedule). Our earnings have been strong during the first half of 1991 and are expected to continue. Our operating earnings will exceed $3.5 million during this period and an additional $1.3 million will be earned on the branch sale scheduled to close on Friday, June 21st.

Confidential Material —
Subject to Protective Order

H&R-B55-00357



EXHIBIT
23
FERRIES
8-11-0

Larry Ferries
June 20, 1991
Page 2

Please respond to our request to pay the dividend as quickly as possible. I will be out of the office until next Thursday, but I will try to contact you. If we are unable to contact each other, please contact Mark Kipnis at Holleb & Coff. His number is (312) 807-4656.

Thanks for your consideration.

Respectfully,

Steven Bangert
Vice Chairman

SB/cw

Confidential Material —
Subject to Protective Order