# LEO BLABER DEPOSITION EXCERPTS FOR TRIAL

p. 2, lines 17-21
p. 5, lines13-14, 17-25
p. 6, lines 1-3
p. 7, lines 13-25
p. 8, lines 1-2, 6-16
p. 12, lines 15-21
p. 13, lines 5-23
p. 17, lines 2-14, 17-25
p. 18, lines 1-12
p. 19, lines 10-25
p. 20, lines1-4
p. 21, lines 1-25
p. 22, lines 1-25
p. 23, lines 1-25
p. 24, lines 1-15
p. 26, lines 18-24
p. 29, line 25
p. 30, lines 1-25
p. 31, lines 1-14, 21-25
p. 32, lines 1-5, 18-21
p. 52, lines 2-9, 14-17, 23-25
p. 53, lines 1-18
p. 60, lines 15-25
p. 61, lines 1-2
p. 62, lines 23-25
p. 63, lines 1-15, 22-25
p. 64, lines 1-7
p. 65, lines 3-15
p. 69, lines 4-25
p. 70, lines 1-25
p. 71, lines 1-2, 13-16, 19-21
p. 73, lines 20-25
p. 74, lines 1-2, 11-25
p. 75, lines 1-4, 23-25
p. 76, lines 1-7, 24-25
p. 77, lines 1-3, 17-25
p. 78, lines 1, 24-25
p. 79, lines 1-18
p. 84, lines 20-25
p. 85, lines 1-25
p. 110, lines 21-25
p. 111, lines 1-10

# LEO BLABER DEPOSITION EXCERPTS FOR TRIAL

p. 112, lines 12-25
p. 113, lines 1-7, 18-25
p. 114, lines 1-9
p. 138, lines 7-25
p. 139, lines 1-16
p. 162, lines 7-23
p. 163, lines 4-7
p. 168, lines 10-23
p. 179, lines 5-12
p. 182, lines 9-25
p. 191, lines 19-25
p. 192, lines 1-9
p. 193, lines 24-25
p. 194, lines 1-25
p. 195, lines 1-14
p. 244, lines 14-25
p. 248, lines 10-16
p. 251, lines 18-21
p. 252, lines 4-22
p. 253, lines 3-4
p. 254, lines 20-25
p. 255, lines 1-24
p. 285, lines 22-25
p. 286, lines 1-10, 15-19
p. 287, lines 7-14
p. 289, lines 15-25
p. 290, lines 1-25
p. 291, lines 1-5, 18-25
p. 292, lines 1-11
p. 293, lines 7-25
p. 294, lines 1-23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND and HOWARD)
R. ROSS, )
)
Plaintiffs, )
)
vs. ) Case No. 95-524C
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

Deposition of LEO B. BLABER
(Taken by Plaintiff)
Chicago, Illinois
August 8, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

2

MATERIAL REDACTED

Deposition of LEO B. BLABER taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 8th day of August, 2000, at the hour of 9:09 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

3

MATERIAL REDACTED

4

MATERIAL REDACTED

5

MATERIAL REDACTED

MR. CAYNE: That's fine.

Whereupon, LEO B. BLABER, having been duly sworn, was examined and testified as follows:

Q. Good morning, Mr. Blaber.

A. Good morning.

Q. For the record, could you state and spell your full name?

A. Sure. First name is Leo, middle initial B., last name Blaber, B-l-a-b-e-r.

Q. Mr. Blaber, you've been deposed before?

A. Yes, I have.

Q. On how many occasions?

6

A. More than 1 and less than 50, I guess. I couldn't tell you precisely, but I have been deposed frequently.

MATERIAL REDACTED

7

MATERIAL REDACTED

Q. When did you join the Federal Home Loan Bank Board?
A. November 1980.
Q. And before that, you were a banker?
A. I was the president of St. Paul Federal Savings and Loan Association.
Q. Which is located?
A. 6700 West North Avenue in Chicago. It no longer exists. It has been purchased by Charter One Financial from Cleveland.
Q. St. Paul was a state-chartered --
A. Federally chartered savings and loan association.

8

Q. How long were you president?
A. 12 or 13 years.

Q. When you joined the -- you joined the Federal Home Loan Bank of Chicago or the Federal Home Loan Bank Board?
A. Federal Home Loan Bank of Chicago.
Q. In what position?
A. President.
Q. And you were supervisory agent?
A. I was the principal supervisory agent for the Seventh Federal Home Loan Bank District, which includes the states of Illinois and Wisconsin.

MATERIAL REDACTED

9

MATERIAL REDACTED

10

MATERIAL REDACTED

12

MATERIAL REDACTED

Q. Were you the principal supervisory agent for your entire tenure at the Federal Home Loan Bank of Chicago?
A. Yes.
Q. Until when did you work at the Federal Home Loan Bank of Chicago?
A. September of 1991.
Q. After FIRREA was enacted in August of 1989, did you ever play any role or have any position with the Office of Thrift Supervision?
A. No, I did not.

11

MATERIAL REDACTED

13

MATERIAL REDACTED

Q. What position did you take in September 1991 when you left the Federal Home Loan Bank of Chicago?
A. I took early retirement.
Q. Are you retired today?
A. I am, yes.
Q. Have you been involved in any way in the banking or savings and loan industry since September 1991?
A. Yes, I have.
Q. In what way?
A. I was a consultant for a period of a year and a half, and then for three years -- from January 1st, 1994, until December 31st, 1996 -- I was the president of Regency Savings Bank in Naperville, Illinois.
Q. How large a bank was that when you left?
A. About $2 billion.

14

MATERIAL REDACTED

16

MATERIAL REDACTED

15

MATERIAL REDACTED

17

MATERIAL REDACTED

Q. Mr. Blaber, how did you prepare for today's deposition?

A. I read some memoranda that dealt with the acquisitions by Holland Ross and their entities, and some correspondence in that connection, and met with Ms. Smith yesterday for an hour and a half. That was the preparation.

Q. Did the memoranda and correspondence you reviewed refresh your recollection concerning the events relating to today's deposition, specifically the acquisitions by Messrs. Holland and Ross?

A. No.

Q. When you read them, you had no recollection of any of the events described in those documents?

A. I remembered -- I did not remember the specific components of the various memoranda that were exchanged between the Federal Home Loan Bank of Chicago and the FSLIC in Washington. The signatures, my initials on them were my initials, and in the few instances where Chester Biedron

18

had signed on my behalf, I'm sure that I had given him the authority to sign, but evidently I did very little of the face-to-face negotiation in these cases because I did not remember any of the specifics.

Obviously if -- if you would ask me independently of all of this if I knew that Holland and Ross, or their entities, had acquired troubled thrifts in the late '80s, sure, I remember all of that. But I did not remember any of the specifics that were covered in those memos.

MATERIAL REDACTED

19

MATERIAL REDACTED

Q. But am I correct, Mr. Blaber, you did sign a number of memos and letters relating to the Holland and Ross acquisitions in the late 1980s; is that correct?
A. Yes, that's correct.
Q. At the time you signed those letters and memos, do you believe all the statements in those letters and memos to be correct?
A. Yes.
Q. You wouldn't have signed them if you thought there were any inaccuracies in those letters and memos, correct?
A. That is correct.
Q. And you would have discussed the matters relating to the Holland and Ross acquisitions with your staff at that time,

20

correct?
A. Yes, I would have discussed them if there was anything in there that I didn't understand or anything with which I disagreed.

MATERIAL REDACTED

21

Q. You had indicated that you were well aware of the events leading up to the demise of Republic?
A. Uh-hum.
Q. Can you describe those events to me?
A. Well, Republic of South Beloit was the subject of a change-in-control application filed by an individual named Timothy Heuer, probably in 1983 and 1984.
Q. Were you involved in approving that application?
A. The -- I was involved in recommending the approval of it. We -- the local bank had no jurisdiction to approve or to disapprove a change-in-control application, but I was involved in the -- I was directly involved in the processing of the application.

I met with the principal stockholders. I met with the proposed applicant. So I had a very active role in that, and so I remember those transactions.

I remember the fact that they proposed a switch of some sort of receivables -- I can't remember whether it was house trailer paper or something -- in the seven-and-a-half million

22

dollars for two-and-a-half million dollars cash and five million dollars in capital, proposed recapitalization of the institution.
I remember that we told them that they were -- that was unacceptable, that they should not do it. They went ahead and did it anyway.
I personally, on the telephone, followed the $28 million around the country and got it frozen in a bank in San Francisco, and then turned the matter over to the office of general counsel.
So I was directly involved in that. But contrast that with my involvement in this -- in these particular transactions, and it's dramatically different.
Q. In connection with the change in control of Republic, was it in 1983?
A. It was either '83 or '84. I'm not sure. It was early in the game.
Q. Was it '83? Is that what you're telling me? I was just repeating what --
A. It was '83 or '84, yes.
Q. Was it a healthy institution at the time of that change in control?
A. It was borderline. It -- it was

23

borderline. It was -- it probably was a doomed institution.
Q. Did the institution ultimately fail?
A. Yes.
Q. And do you recall when it failed?
A. Well, let me -- when it failed. Probably -- well, it failed immediately after they transferred two-and-a-half million dollars in connection with this transaction, which turned out a sham. There were no receivables held in trust at a Texas bank -- or there were 3- or 400,000 in receivables held at a Texas bank, and they had transferred something in the neighborhood of two-and-a-half million dollars to that bank.
If you want a date on that, I can't say, but you can refer to one of the memos in there. I think it was '86 we put it in receivership and then formed a new Federal Mutual and put the association in the management consignment program.
Q. And so there was a significant amount of time, was there not, after the institution failed and the time when it was ultimately acquired by Messrs. Holland and Ross?

24

A. Yes. I would say probably two years.
Q. And why did the office -- the Federal Home Loan Bank of Chicago wait so long to resolve Republic, approximately two years, to your recollection?
A. It was hoped with good management we could make it a more salable product for somebody who might acquire it. Initially the hope was that good management could restore the entity to the ability to function on its own. I don't know -- that probably happened once or twice around the country. I don't think it ever happened in our district, but when it got to a point where we thought it was at least salable, then we marketed it.

MATERIAL REDACTED

25

MATERIAL REDACTED

26

MATERIAL REDACTED

Q. After you joined the Federal Home Loan Bank of Chicago, do you recall the first time you again dealt with Mr. Holland?

A. I dealt with him in connection with the acquisition of a thrift called Gilldorn Savings, which was acquired by Mr. Holland and a man name Buddy Cohen (phonetc).

27

was that a local institution in Chicago?

A. Yes.

Q. Was it a troubled institution?

A. It was a troubled institution that -- when they acquired it, yes, it was a troubled institution. It was a change in control. I can't remember the name of the entity that was acquired, but a savings and loan was acquired by a man named Richardson Gill. After he acquired it, he changed the name to Gilldorn Savings and Loan Association and operated it, and that savings and loan association eventually got pretty close to insolve- -- it was a troubled thrift. I can't remember whether they were technically insolvent or not at the time that Holland and Ross acquired them.

Q. Do you remember --

A. I'm sorry, at the time that Holland and Cohen acquired them.

Q. Do you recall how Mr. Holland became involved in that acquisition? Specifically if you recall whether Mr. Holland came to your office, or whether someone within your office contacted Mr. Holland to suggest that this is a transaction he may be interested in looking at?

28

MATERIAL REDACTED

29

MATERIAL REDACTED

Q. Were you satisfied with the performance

of Mr. Holland with respect to Enterprise during the period he was affiliated?
A. Yes, I was.
Q. On that basis, did you make your judgment with respect to Mr. Holland's participation in Enterprise?
A. Well, I closely followed what Enterprise was doing, and the principals, the individuals who were running it were always cooperative, were always responsible, and as far as I could see, they were honest. They didn't make any imprudent investments. Just an overall evaluation of management abilities and also the character of Mr. Holland. I was very satisfied with both of them.
Q. With respect to Mr. Holland specifically, what was your view on the two categories you just mentioned, character and management competence?
A. Good.
Q. You thought he was a professional banker?
A. Yes, sir. Yes, I did.
Q. You considered him a capable banker?
A. Yes.



Q. Did Mr. Holland's experience at the Enterprise factor into your analysis of whether or not to approve his application to acquire Republic a few years later?
A. Yes.
Q. And how did it factor into that analysis?
A. Well, we felt that we were getting capable management for the resulting entity.
Q. Do you recall, in connection with Republic again, whether Mr. Holland contacted you or your office or someone within your office contacted Mr. Holland to see if he was interested in engaging in that transaction?

MATERIAL REDACTED

A. Okay. Republic, I believe, probably that was a bid conference for Republic. We probably sent out bid packages. It's more likely that we contacted him than that they contacted us, one way or another. I think there was a



bidder's conference for Republic. So the FSLIC or the Chicago bank would have acquired individuals and entities that we knew to be potential acquirers or to be interested in acquiring other savings and loan associations.

MATERIAL REDACTED

Q. Do you recall that Mr. Holland and Ross acquired three other -- four other institutions during the same general period?
A. Yes.



MATERIAL REDACTED

50

MATERIAL REDACTED

51

MATERIAL REDACTED

52

MATERIAL REDACTED

Q. Can you explain to me the importance of a business plan in connection with the consideration by your office of acquisitions to acquire savings associations?
A. Yes. Any applicant was required to submit a business plan showing that the acquired entity would be viable for a three-year period subsequent to the acquisition.

Q. Were savings associations required to attempt to comply with their business plans once an acquisition was consummated?
A. Yes.

Q. Did you make a determination whether a business plan was conservative or optimistic, in reviewing a business plan?

53

A. Yes, such a determination would have been made.
Q. And did you require that a business plan be conservative or optimistic in making a determination whether to approve the business plan?
A. We required that it be realistic. So I guess that's my answer. We required it to be realistic. We required the projected volume to be attainable, based upon what our experience told us was attainable. We required that the interest rate forecast be accurate, again, based upon our interest rate projections. And nobody's interest rate projections are that accurate, but at least be in line with them.
Q. Would your office approve a business plan that did not appear to be realistic?
A. No.

MATERIAL REDACTED

58

MATERIAL REDACTED

60

MATERIAL REDACTED

Q. The court reporter has handed you a document marked for identification as Blaber No. 6. Could you please identify this document for the record?

A. It is a recommendation memorandum dated January 27th, 1988, from me as principal supervisory agent of the Federal Home Loan Bank of Chicago to B.J. Brookins, Director of Mergers and Acquisiton Division in FSLIC, and it is a recommendation for negotiation of the FSLIC-assisted merger of Republic Savings of

59

MATERIAL REDACTED

61

South Beloit into Rock Falls Savings and Loan Association of Rock Falls, Illinois.

MATERIAL REDACTED

62

MATERIAL REDACTED

Q. Based on your review of this document and your understanding of the procedures governing the handling of supervisory

63

institutions in 1988, would you and your staff have recommended to the FSLIC that negotiations commence for a FSLIC-assisted merger of Republic Savings at this time?

A. Because we thought the proposal that was given was desirable from the standpoint of FSLIC.

Q. Would you have, prior to making this recommendation, attempted to market or shop Republic Savings on an unassisted basis?

A. Normally, yes, but you've asked me to review the document, and the document indicates that we've considered the condition to be so poor that an unassisted effort would have been unavailing.

MATERIAL REDACTED

Q. What was it about Republic's condition that led your office to the conclusion that shopping efforts would have likely been unavailing?

64

A. The magnitude of the negative net worth relative to the size of the entity.

Q. And what is the magnitude of that --

A. 15 million, as I recall from reading - it, 157 and a half million. $15,522,000 on a 39 and a half million dollar asset entity. No one would have accepted that on an unassisted basis.

MATERIAL REDACTED

65

MATERIAL REDACTED

Q. Does your memorandum indicate that Republic Savings, in 1988, was continuing to lose money on a daily basis?

A. Well, I'd have to -- I didn't get that out of here. If it's in here, I missed it.

(Witness examines document.)

THE WITNESS: It is not jumping out at me one way or another, but based upon my experience, it would have been losing money on a daily basis. When there is only 31 and a half million dollars in assets and $15 million in liabilities, there is no way you could be anything but unprofitable.

66

MATERIAL REDACTED

68

MATERIAL REDACTED

67

MATERIAL REDACTED

69

MATERIAL REDACTED

Q. As principal supervisory agent in 1988, was that a responsibility of yours, to determine whether or not an institution such as Republic could be resolved on an unassisted basis?
A. Yes.
Q. And if you made the determination, such as you did in Republic, that the institution could not be resolved on an unassisted basis, was it your responsibility to make recommendations to the FSLIC concerning the appropriate structuring of a resolution of the institution?
A. Yes.
Q. And it was your responsibility to recommend whether or not FSLIC assistance should be granted in connection with that resolution?
A. Yes.
Q. And was it your responsibility to make a recommendation concerning how much FSLIC assistance should be granted in effecting a resolution?
A. Yes, that was part of the process.
Q. And in processing an institution,

specifically Rock Falls, was it your responsibility to make a recommendation concerning what capital forbearances should be granted in connection with the supervisory transaction?
A. Yes. Generally the applicant would request forbearances, and as part of the recommendation, we would recommend that they be granted them or not.
Q. Would you recommend that all forbearances requested by an applicant, such as Messrs. Holland and Ross, be approved by the Federal Home Loan Bank Board and the FSLIC?
A. Would we recommend that everything they requested be approved?
Q. In the way of capital forbearances.
A. Not necessarily.
Q. How would you decide, specifically in the context of the Holland and Ross acquisition, which capital forbearances to recommend approval of and which capital forbearances not to recommend approval of?
A. It would be a question of which ones we thought were reasonable and which ones we didn't in the context of the negotiation. It's a



negotiation. All of these things, there is always give and take in a negotiation.

MATERIAL REDACTED

Q. And what is your understanding of why Messrs. Holland and Ross requested capital forbearances in connection with their acquisition of Republic Savings?

A. Because it would facilitate their ability to operate profitably in the relatively short run.



MATERIAL REDACTED



MATERIAL REDACTED

Q. And do you understand why Messrs. Holland and Ross wanted to have $5 million of additional capital at the outset of the transaction?
A. Yes.
Q. And why is that?

74

A. Because the more capital you have, the better.

MATERIAL REDACTED

A. It's necessary to meet certain capital standards to operate on an unfettered basis. If your capital is limited, there are regulatory restrictions that can be imposed. Eventually the FSLIC insurance premiums could increase if capital decreased. I'm not sure whether at that time that feature had been imposed or whether it was just something that was clearly on the horizon in 1988, but there just are many more restrictions that can be placed upon a capital-deficient entity that a well-capitalized or adequately capitalized entity does not have to bear up under. So it's important to somebody operating a financial institution that they meet the capital requirements.

75

Q. Did more capital provide the investors with more opportunities to operate their institution in a profitable manner?
A. You could say that, yes.

MATERIAL REDACTED

Q. Because banking is all about leverage, right?
A. Yes.

76

Q. What do you understand leverage to be?
A. Leverage is using -- is making more in the -- more investments relative to your capital than less, right.
Q. And again, we just said that bank leverage is at the heart of banking, right?
A. Yes.

MATERIAL REDACTED

Q. And more capital would allow a banker such as Messrs. Holland and Ross to make more

77

investments, correct?
A. It would allow them to make more investments.

MATERIAL REDACTED

Q. So the more capital Messrs. Holland and Ross had, the more investments could be made, and they obviously would attempt to make prudent investments, correct?
A. Correct.
Q. If they were successful in making prudent investments, the more capital Messrs. Holland and Ross had, the more profitable their institution would be, correct?

78

A. Correct.

MATERIAL REDACTED

Q. My last question simply was, did you understand, based on your view of the documents,

80

MATERIAL REDACTED

79

that Messrs. Holland and Ross also negotiated with your staff for the right to include subordinated debt as a component of regulatory capital?

A. Yes.

Q. And the answer may be the same, but just so the record is clear, what's your understanding of why Mr. Holland and Ross would have negotiated also for the right to include subordinated debt as a component of regulatory capital?

A. To increase the amount of capital.

Q. And it's your understanding that at the conclusion of the negotiations, your office recommended that Messrs. Holland and Ross be allowed to include subordinated debt as a component of regulatory capital?

A. Yes.

MATERIAL REDACTED

81

MATERIAL REDACTED

82

MATERIAL REDACTED

83

MATERIAL REDACTED

84

MATERIAL REDACTED

Q. On page 3 of Exhibit 6, it indicates that one of the features of the transaction would provide for the retention of Republic's net operating loss carryforwards. Do you see that?
A. Yes.
Q. Based on your review of the documents,

85

your general understanding of these transactions, what was the importance to an acquirer, such as Messrs. Holland and Ross, to be able to include operating losses as an asset of the institution following the supervisory transaction?
A. By "asset," you're not talking about something specific in their balance sheet, are you.
Q. I'm talking a more generic sense.
A. Yes. To retain the right to use -- the operating loss carryforwards can reduce the amount of income taxes you have to pay on future profits. You can offset a certain percentage of the losses for a certain period of time against future profits, and that reduces your tax.
Q. Is it your understanding at the time, in 1988, that the existence of nonoperating losses would facilitate the ability of your office to market and resolve insolvent institutions?
A. Did we understand that that was something that was desirable for a potential acquirer? Is that what you're asking me?
Q. Yes. Was it a selling point?
A. Sure, yes.

110

MATERIAL REDACTED

Q. Mr. Blaber, the court reporter has handed you a document marked for identification as Exhibit 8. Could you kindly identify it for the record?
A. It's an April 22nd, 1988, memorandum to

111

John M. Buckley, B-u-c-k-l-e-y, Jr., the secretary of the Federal Home Loan Bank Board, from me. And the subject is the FSLIC-assisted acquisition of Galva Federal, Home Federal Savings of Peoria, and Mutual Savings and Loan Association of Canton by Homer Holland and Howard Ross.
Q. Can you look to see if your signature appears on that letter?
A. My initials are here.

MATERIAL REDACTED

112

MATERIAL REDACTED

Q. And would you have personally reviewed and edited this letter before you signed it --
A. Yes.
Q. (Continuing) -- before you affixed your initials on the front page?
A. Yes.
Q. Would you have agreed with all of its contents before you sent it to Mr. Buckley?
A. Yes.
Q. Would you have understood that Federal Home Loan Bank Board would have relied on this memorandum in making the decision to grant assistance and forbearances in connection with the acquisitions of Galva Federal Savings and

113

Loan Association, Home Federal Savings and Loan Association of Peoria, and Mutual Savings and Loan Association by Messrs. Holland and Ross?
A. Yes.
Q. This document is called an S memorandum, correct?
A. Yes.

MATERIAL REDACTED

Q. And this memorandum contains a summary of the financial condition of each of the three institutions being acquired by Messrs. Holland and Ross, does it not?
A. Yes.
Q. And what would the -- from what sources would you and your staff have derived the information relating to each of those

114

institutions?
A. Financial condition primarily from the examination reports.
Q. And again, you would have assured yourself of the accuracy of the financial information concerning each of those institutions before you forwarded this memorandum on to the bank board in Washington, correct?

MATERIAL REDACTED

116

MATERIAL REDACTED

115

MATERIAL REDACTED

117

MATERIAL REDACTED

138

MATERIAL REDACTED

Q. Is it a fair statement that in light of this reference to subordinated debt significantly bolstering regulatory capital, you viewed that as a positive or significantly positive factor in deciding to recommend the transaction?
A. No question about that.
Q. Why do you have no question about that?
A. Because it's $5 million more in capital. So that's a significant factor.
Q. Significant positive factor?
A. Yes, a significant positive factor.
Q. So the record is clear, why would there have been a significant positive factor?
A. Because it increases the amount of capital that the entity has. The more capital it has, the greater the likelihood of survival.
Q. The greater the likelihood of profitability, also?
A. Sure.

139

Q. Under "character of acquirers," it states, "Messrs. Ross and Holland appeared to be of the utmost integrity." Do you see that?
A. Yes.
Q. Would that have been an important factor in your deliberations concerning whether or not to recommend approval of the supervisory transaction?
A. I think that's already a given in this whole -- I've said that I don't know how many times. The answer is yes. It would have been important, yes.
Q. It was something you relied on?
A. Yes. I mean, that point has been made so often that it seems hardly worth going over again.

MATERIAL REDACTED

140

MATERIAL REDACTED

141

MATERIAL REDACTED

162

MATERIAL REDACTED

Q. Mr. Blaber, would you kindly identify Exhibit 19 for the record?
A. It is a document entitled "Executive Summary." It is from me to the Federal Home Loan Bank Board. It is dated June 28th, 1988. My initials are affixed by Chester Biedron, but I have no doubt that he affixed them strictly in accordance with authority.
Q. Can you briefly review the memorandum and indicate to me why it was issued at the time it was?
A. It's a summary of all of the documentation back and forth on the acquisition of Republic Savings in South Beloit, and it was issued to give a thumbnail sketch to the Federal Home Loan Bank Board, so maybe they wouldn't have to read through everything.

163

Q. And would you have agreed with all the contents of this memorandum at the time it was sent in to Washington?
A. Yes.

MATERIAL REDACTED

164

MATERIAL REDACTED

165

MATERIAL REDACTED

166

MATERIAL REDACTED

167

MATERIAL REDACTED

168

MATERIAL REDACTED

Q. Kindly identify Exhibit 20 for the record, Mr. Blaber.
A. It's a document -- an S memorandum dated June 28th, 1988, to John Buckley, the secretary of the Federal Home Loan Bank Board, from me as principal supervisory agent, initialed on my behalf by CAB, who is Chester A. Biedron, and the subject is the FSLIC-assisted supervisory conversion/merger of Republic Savings with and into River Valley Savings Bank.
Q. Although Mr. Biedron signed this memorandum on your behalf, do you have any doubt that you approved of its contents?
A. No.

169

MATERIAL REDACTED

178

MATERIAL REDACTED

180

MATERIAL REDACTED

179

MATERIAL REDACTED

Q. Mr. Blaber, the court reporter nas handed you Exhibit 21. Identify it.

A. An addendum to the S memorandum, dated June 21, 1988, to John Buckley, Jr., secretary of the Federal Home Loan Bank Board, from me. My initials are affixed, pursuant to authority, by Chester A. Biedron, relative to the proposed FSLIC acquisition of Republic Savings.

181

MATERIAL REDACTED

182

MATERIAL REDACTED

Q. Could you just read it into the record, so the record is clear?

A. "We are satisfied that the resulting institution will operate profitably and free of supervisory concern."

Q. What was the basis of your office's conclusions reflected in that statement?

A. The applicants would have submitted an operating plan showing viability for three years, and we were convinced that the operating plan was reasonable, and so we were satisfied that they'd operate profitably and free of supervisory concern.

Q. Using, I think, the language you used this morning, is it fair to say you would have believed their plans to have been realistic?

A. Yes.

183

MATERIAL REDACTED

184

MATERIAL REDACTED

185

MATERIAL REDACTED

190

MATERIAL REDACTED

192

That's it.
Q. Are you confident you signed off on and approved this memorandum?
A. Yes.
Q. On page 1, you see the reference to, "The acquisition of Republic Savings will result in $7 million goodwill to be amortized over 25 years"?
A. I see that.

MATERIAL REDACTED

191

MATERIAL REDACTED

Q. Kindly identify Exhibit 23 for the record.
A. This is an S memorandum supplement, dated July 6th, 1988, to John Buckley Jr., the Federal Home Loan Bank Board secretary, from me, initialed on my behalf by Chester Biedron, relative to the Republic Savings transaction.

193

MATERIAL REDACTED

Q. Could you explain to me what is meant by the entry on page 1, "The growth of

194

$25 million immediately is needed to increase the interest margin, increase profitability, and to cover acquired operating expenses"?

A. Let's add stuff up. What the language means is that this entity is going to grow $25 million immediately. It's going to -- what I don't know is whether they mean on both sides of the balance sheet. Obviously -- is there anything on the business plan here? Let's take a look.

Yes, this is a -- between acquisition and the end of year one, there is a growth in assets from 181 million to 210 million, which would be $29 million. That's fairly significant growth in one year for an entity this size. It would be in excess of 10 percent. Sure, it would be in excess of 10 percent. That's pretty good growth.

So we are explaining that we need to grow by this amount in order to generate sufficient income to operate profitably. It's really a comment on there.

Q. I take it there was an expectation at the time you prepared this memorandum that the acquirers would be able to utilize that growth in

195

assets in a profitable way?

A. Yes. The business plan indicates a net income of $483,000 in the first year, so the answer to your question is yes.

Q. One of the reasons that the acquirers needed to be able to include the forbearance capital as regulatory capital was to support that immediate growth, correct?

A. Right, unless we had given them some sort of a waiver of the net worth requirements.

Q. Rather than giving them a waiver, you allowed them to include forbearance capital as regulatory capital, correct?

A. Correct, yes.

MATERIAL REDACTED

196

MATERIAL REDACTED

197

MATERIAL REDACTED

APPEARANCES:
For Plaintiffs Homer J. Holland and Howard R. Ross:
HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656
For the U.S. Department of Justice in Case No. 95-524C:
PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Deposition of LEO B. BLABER taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 9th day of August, 2000, at the hour of 9:10 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.



CONTENTS


The Witness: LEO B. BLABER Examination
By Mr. Cayne (Continued) 244
By Ms. Smith 276
By Mr. Cayne By
Mr. Cayne (285


INDEX OF EXHIBITS


For the Plaintiff Page
28 (12/16/88 letter) 244




MATERIAL REDACTED

Q. The court reporter has handed you a document marked for identification as Blaber No. 28. Kindly identify it for the record.
A. It is an applications digest, or a document titled "Applications Digest," dated December 16th, 1988, to John M. Buckley, Jr., secretary to the Federal Home Loan Bank Board, from me as principal supervisory agent, Federal Home Loan Bank of Chicago, bearing my initials. "Subject: Proposed Supervisory Conversion and FSLIC Assisted Merger of Peoria Savings and Loan Association into River Valley Savings Bank."



MATERIAL REDACTED

246

MATERIAL REDACTED

248

MATERIAL REDACTED

Q. And whoever prepared the initial draft of Exhibit 28, you testified you executed it, correct?
A. Yes.
Q. And you would agree with all of its contents at the time you executed it, correct?
A. Yes.

247

MATERIAL REDACTED

249

MATERIAL REDACTED

250

MATERIAL REDACTED

251

MATERIAL REDACTED

Q. Under "Future Prospects," your memorandum states that "the subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District . . . ."

252

MATERIAL REDACTED

Q. And it continues. I'll read the whole thing again to be clear:

"The subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District by combining it with a well capitalized and profitable institution."

By "well capitalized and profitable institution," of course, is referring to River Valley Savings Bank FSB, correct?

A. Yes.

Q. And in making the determination that it was well capitalized, you would have considered the entire amount of River Valley's regulatory capital as of the time of your memorandum, correct?

A. Yes.

Q. And that regulatory capital included the subordinated debt and the capital credit that we discussed yesterday, correct?

253

A. Then the answer to your question is yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. In making your determination to recommend that Messrs. Ross and Holland be allowed to acquire Peoria Savings, would you have considered the information contained in that paragraph concerning their role to be a significant factor in your deliberations?



A. I'm not sure I follow you.
Q. That section of your memorandum --
A. I see it. I see what is there, yes.
Q. (Continuing) -- indicates that Messrs. Ross and Holland were going to take an active role in the day-to-day operations of Peoria Savings, correct?
A. Yes.
Q. And it further indicates, as the document we looked at yesterday indicated, that both of the individuals were, in the view of your office, individuals of the utmost integrity, correct?
A. That's what it says.
Q. It further says that both of the individuals are "known and respected within the seventh district not only for their performance at River Valley" and other institutions, correct?
A. That's what it says.
Q. I'm simply asking you, sir, would those factors have been significant factors in your office's consideration of recommending approval of the acquisition of Peoria Savings?
A. Yes.

MATERIAL REDACTED



MATERIAL REDACTED



MATERIAL REDACTED

282

MATERIAL REDACTED

284

MATERIAL REDACTED

283

MATERIAL REDACTED

285

MATERIAL REDACTED

Q. Was there any exhibit that you reviewed that you needed more time to review than you were provided?

A. No.

Q. Were you able to review as much of every document that you reviewed as you felt you needed to accurately testify?
A. Yes.
Q. And did you review as much of each document as you felt was necessary in order to adequately and accurately testify?
A. I reviewed as much as I thought I needed to review to respond to your questions, yes.

MATERIAL REDACTED

Q. Are you aware of any documents prepared by you or any member of your staff that were inconsistent in any way with the documents at which you looked during your deposition?
A. No.



MATERIAL REDACTED

Q. But you have no doubt, do you, that the events about which you testified actually did occur?
A. None whatsoever.
Q. And you have no doubt that the testimony you've given today and yesterday has been fully accurate and truthful, correct?
A. That's correct.



MATERIAL REDACTED



MATERIAL REDACTED

Q. You indicated that business plans make projections as of the time they are submitted, correct?
A. Based upon -- based upon conditions at the time they are submitted.
Q. But you didn't, as you testified yesterday, simply haphazardly accept any business plan that crosses your desk, correct?
A. Correct.
Q. You would make sure that that business plan was realistic at the time it was submitted,

290

correct?
A. That's correct.
Q. And you said circumstances can change, correct?
A. Circumstances do change, invariably and inevitably, yes.
Q. And you said one of the factors that's important is whether the management in place at an institution has the competency and ability to adjust to changes, correct?
A. That's correct.
Q. Based on the statements made in these documents about Messrs. Holland and Ross, and based upon your own personal dealings with Messrs. -- with Mr. Holland, do you have any doubt that Mr. Holland was a banker capable of adjusting to changes in the market?
A. I believe that he was.
Q. That he was able to adjust to changes in the market?
A. Correct.
Q. And although you did not have supervisory jurisdiction over the institutions acquired by Messrs. Holland and Ross following the enactment of FIRREA, you did understand, as a

291

professional banker and as a professional regulator, the importance of capital to a financial institution, such as the institutions acquired by Messrs. Holland and Ross, correct?
A. Yes.

MATERIAL REDACTED

Q. I'm simply asking, Mr. Blaber, to clarify, that although you did not have direct supervision over these institutions after FIRREA was enacted, because you were aware of the importance of capital to these institutions at the time they were created in these supervisory acquisitions, you had a basis or you have a basis to understand the effect of the provisions of

292

FIRREA, which eliminated portions of the capital of these institutions, correct?
A. Yes; elimination of capital is not good.
Q. And you have a basis to give that testimony?
A. That is correct, yes.
Q. Your decades of experience as a professional banker, a professional regulator, correct?
A. Right.

MATERIAL REDACTED

293

MATERIAL REDACTED

Q. And you were involved in many cases in recommending the approval of capital forbearances, correct?
A. I recommended them in these instances, as a matter of fact.
Q. In these instances, in the acquisitions by Messrs. Holland and Ross, correct?
A. Correct.
Q. You understood the purposes why Mr. Holland and Ross requested the capital forbearances they requested, correct?
A. Yes.
Q. And you understood the importance of these capital forbearances to the ultimate success and the profitability of the institutions acquired by Messrs. Holland and Ross in these supervisory acquisitions, correct?
A. Yes.
Q. And again, what was that importance?

A. Because they needed capital.
Q. Without the capital created by these capital forbearances, these institutions could not have thrived and could not have been successful and could not have been profitable, correct?
A. Unless some other means of increasing the capital were found.
Q. And you're not aware of any other means of increasing capital being found at the time of these supervisory acquisitions, correct?
A. No -- well, unless Holland and Ross had some money that they could put into them. That certainly could have substituted for them.
Q. Right. They could have substituted dollar-for-dollar cash for the capital forbearances, right?
A. Yes, they could have.
Q. And if they had substituted dollar-for-dollar cash, the institutions would have been in as good of condition as they were with the capital forbearances, correct?
A. Correct.

MATERIAL REDACTED



MS. SMITH: No questions.
MR. CAYNE: Deposition is concluded. Thank you for your attendance and patience with me, Mr. Blaber. It's appreciated.
(Whereupon, at 10:23 a.m. the taking of the instant deposition ceased.)

____________________________
Signature of the Witness

SUBSCRIBED AND SWORN
TO before me this_____day
of ___________________________, 2000.

____________________________
Notary Public

My commission expires: __________________________



STATE OF ILLINOIS )
) SS:
COUNTY OF DuPAGE )

I, ROBIN TOKARZ-CHIMNIAK, CSR, RMR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

____________________________
Notary Public in and for the
County of DuPage.

My commission expires: 4/21/04

# EXHIBIT 6

Federal
Home Loan Bank
Board
111 East Wacker Drive, Chicago, Illinois 60601-4360
Seventh District Office

RECOMMENDATION MEMORANDUM

FROM: Leo B. Blaber, Jr.
Principal Supervisory Agent
FHLB of Chicago

Date: January 27, 1988

TO: B.J. Brookins
Director of Mergers and Acquisition Division
FSLIC

Subject: Recommendation for Negotiation of the FSLIC-Assisted Merger of:

| | | (000's) |
|---|---|---|
| Republic Savings, A FS&LA | Assets: | $ 39,523 |
| South Beloit, Illinois | Liabilities: | 55,045 |
| FHLBB No. <u>8346</u> | Net Worth: | (15,522) |
| | NW/Liab.: | (28.20)% |
| | (Data as of 11/30/87) | |

Into:

| | | |
|---|---|---|
| Rock Falls S&LA | Assets: | $112,880 |
| Rock Falls, Illinois | Liabilities: | 108,185 |
| FHLBB No. <u>6822</u> | Net Worth: | 4,695 |
| | NW/Liab.: | 4.34% |
| | (Data as of 11/30/87) | |

1. <u>Background</u>

Republic Savings, A Federal Savings and Loan Association ("Republic") is a $39.5 million federal mutual association with a deficit net worth of $15.5 million as of November 30, 1987. Republic received its insurance of accounts and membership in the Federal Home Loan Bank system in January of 1963. The association's main office is located in South Beloit, Illinois. In addition, it operates a branch office in Roscoe, Illinois.

Mr. Timothy Heuer acquired 96% of the outstanding permanent stock of the association on June 30, 1984. Republic's financial condition deteriorated rapidly under Mr. Heuer's ownership. Within the first ten months of Mr. Heuer's ownership, 87% of all new loans originated were commercial-type real estate loans which represented a major shift in lending activity for Republic.



WOT685 1015 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED
CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

PLAINTIFF'S EXHIBIT
PX 111

This commercial lending activity was centered in the sunbelt states of Florida and Texas. The majority of these loans have since been found to be of substandard quality, with several presently in either a non-earning status or having been determined to represent large indicated losses. The association's negative net worth is directly attributed to the indicated losses on these loans.

On September 2, 1986, the former board of directors entered into an unauthorized transaction intended to recapitalize the association. The transaction was with ParkCrest Consulting, Ltd., a Canadian firm whose principal is Mr. William Grantmyre. The proposal called for the delivery of approximately $7.3 million in privately insured mobile home loans to Republic with $5 million representing a non-cash capital contribution and the remaining $2.5 million to be purchased outright by Republic. Republic wired $2.3 million in funds to ParkCrest, however, delivery of the mobile home loans was not made. This transaction was in violation of an October 30, 1985 Consent Agreement and resulted in a further dissipation of assets beyond the losses stemming from Republic's commericial lending activity.

On September 29, 1986, as a result of the unauthorized transaction, the Federal Home Loan Bank of Chicago recommended the appointment of the FSLIC as Receiver for Republic. The Receivership took place on October 2, 1986. Upon completion of this action, a new federal mutual association was formed with Kenosha Savings and Loan Association, Kenosha, Wisconsin, appointed as the MCP institution. The association was transferred to the FSLIC on October 30, 1986.

## II. Solution Efforts

On November 10, 1987, the Federal Home Loan Bank of Chicago marketed Republic on an in-state, assisted basis. Due to the financial condition of the association, attempts to market the association on an unassisted basis were not conducted. Of the 61 private investors and in-state savings and loans contacted 25 received a copy of the June 30, 1988 bid package. As a result of this solicitation, only one bid was received by the December 28, 1987 due date. The proposal was submitted by Rock Falls Savings and Loan Association ("Rock Falls").



WOT685 1016 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED
CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

III. Background of the Potential Acquirer

Rock Falls is a state chartered, FSLIC-insured, stock savings and loan association located in Rock Falls, Illinois. Mr. Howard Ross and Mr. Homer Holland own 49% and 51% of the outstanding shares of this institution respectively.

As of November 30, 1987, Rock Falls had regulatory capital of $4.7 million, total assets of $112 million, and savings deposits of $66 million. The association's principal business is to serve the Rock Falls, Sterling and surrounding communities of northern Illinois with residential mortgage loan and savings deposit services.

The association's principal subsidiary, Holland Partners, Inc., is located in Chicago, Illinois. It provides executive management as well as asset/liability and investment management services to banks and savings institutions throughout the Midwest.

IV. Structure of the Proposed Acquisition

The proposed form of acquisition is a merger, whereby, Republic would merge with and into Rock Falls Savings and Loan Association. After the consummation of the proposed merger, Rock Falls will continue in its current form and will fully incorporate Republic's assets and operations into its own.

Rock Falls submitted four alternative proposals. Proposal B is the least costly proposal. It requests the following:

1. One-time cash contribution of $17.8 million if the transaction is completed by January 31, 1988;

2. Retention of Republic's net operating loss carryforwards;

3. Indemnification with respect to lawsuits in which Republic is a defendent as of the date of the acquisition and lawsuits subsequently arising on the basis of facts existing prior to the acquisition;

4. Indemnification with respect to any undisclosed liabilities of Republic or any subsidiaries thereof, claims not reserved for or any subsequently asserted against Republic and litigation, including judgments, costs and attorneys' fees challenging the acquisition;

5. Five year forbearance for any failure to meet the regulatory capital requirement arising from a) an increase in Rock Falls contingency factor attributable to the assets of Republic existing as of the acquisition date or b) an increase in Rock Falls liabilities attributable to the liabilities of Republic as of the acquisition date; and;

6. Seven year forbearance from including assets of Republic existing as of the acquisition date that are or become scheduled items, from any computation to determine whether Rock Falls meets the requirement of such regulations.

V. Cost Analysis

The FHLB of Chicago has prepared a cost of liquidation analysis and bid cost analysis. The following table summarizes the results of this analysis (see attachments):

| | Data as of 9/30/87 (000's) |
|---|---|
| Cost of Liquidation | $ 19,054 |
| Cost of Bid Proposal | 17,800 |
| Savings to the FSLIC | $ 1,254 |
| | ====== |
| Cost of Bid/Total Assets | 45.04% |
| Cost of Bid/Cost of Liquidation | 93.42% |

VI. Options

Rock Falls's Proposal

| Pro's | Con's |
|---|---|
| - Only proposal received | - Utilizes a portion of the FSLIC fund |
| - Resolves a FSLIC Case | |
| - Keeps the association within the industry | |



WOT685 1018 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Liquidation

| Pro's | Con's |
| --- | --- |
| - Provides a permanent solution | - Most expensive solution |
| | - Possible negative public response |
| | - Less costly solution is available |

VII. Negotiating Strategies

We propose to attempt to extend the deadline of January 31, 1988 to at least May 31, 1988. In addition, we will try to effect a reduction in the cash requested by discovering how the figure was calculated and whether or not cogent arguments for reduction can be made.

VIII. Recommendation

We recommend that the best course of action is to negotiate an assistance agreement and to close this transaction as soon as possible. Based on the analysis performed by the FHLB of Chicago, Rock Falls' proposal would enable the FSLIC to resolve this case at a cost less than the cost to liquidate the association. Moving forward with this proposal will save the Bank Board the time and expense involved in marketing this association on a nationwide basis. In addition, this proposal will recapitalize the association.

Attachments

DLJ

cc: Held



WOT685 1019 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

**ATTACHMENTS**

1. Rock Falls S&LA Proposal for Republic Savings
2. Cost of Liquidation Analysis
3. Costing Analysis of the Rock Falls Proposals



WOT685 1020 HOLLAND 95-524C REPUBLIC SAVINGS A FSLA TRANS 880727 DOCKET # 08346 OTS BOX 4 OF 35 C249
ACC # 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 TRANSACTION DOCUMENT MARKETING PACKAGE; MERGER AGREEMENT; PROPOSAL AND RELATED
CORRESPONDENCE 879999 TO 889999 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 8

JONES, DAY, REAVIS & POGUE

AUSTIN HONG KONG
CHICAGO LONDON
CLEVELAND LOS ANGELES
COLUMBUS NEW YORK
DALLAS PARIS
GENEVA RIYADH

METROPOLITAN SQUARE
1450 G STREET N.W.
WASHINGTON, D.C. 20005-2088

TELEPHONE 202-879-3939
TELEX DOMESTIC 892410
TELEX INTERNATIONAL 64363
CABLE ATTORNEYS WASHINGTON
TELECOPIER 202-466-8642
WRITER'S DIRECT NUMBER

April 22, 1988

(202) 879-3664

Ms. Wilvia Galbraith
~~Assistant to the Director~~
Federal Savings and Loan Insurance Corporation
801 17th Street, N.W.
Washington, D.C. 20552

Re: Proposed Acquisition of Home Federal Savings and Loan Association of Peoria, Peoria, Illinois, Galva Federal Savings and Loan Association, Galva, Illinois, and Mutual Savings and Loan Association, Canton, Illinois, by Messrs. Howard R. Ross and Homer J. Holland

Dear Ms. Galbraith:

Enclosed is a copy of the term sheet describing the features of the Preferred Stock of River Valley Savings Bank, F.S.B. to be issued to the Federal Savings and Loan Insurance Corporation in connection with the above-referenced transaction. The term sheet has been revised from the copy which you received on April 15 to reflect the floor on the calculation of Net Income in determining the income participation dividend in the event of a merger, and to reflect that .25 is used in the calculation of Average Total Assets, and not .025.

Please contact me at the above-referenced number or Peter Barnett at 202/879-3972 with any questions in this regard.

Sincerely,

Deborah A. Sabella

Enclosure

cc: Mr. Herb Held
Regional Director
Mergers and Acquisitions Division
Federal Savings and Loan Insurance Corporation
801 17th Street, N.W.
Washington, D.C. 20552

Mr. Robert A. Cline
Financial Analyst
Office of Regulatory Policy, Oversight and Supervision
Federal Home Loan Bank Board
900 Nineteenth Street, N.W.
Washington, D.C. 20006

PLAINTIFF'S EXHIBIT
PX 147

Evelyne Bonhomme, Esq.
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

Gregory Brett Smith, Esq.
Deputy Director for Supervisory Transactions
Corporate and Securities Division
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

V. Gerard Comizio, Esq.
Director
Corporate and Securities Division
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

John P. Harootunian, Esq.
Assistant General Counsel
Office of General Counsel
Federal Home Loan Bank Board
1700 G Street, N.W.
Washington, D.C. 20552

Mr. David Adkins
Financial Analyst
Mergers and Acquisition Division
Federal Savings and Loan Insurance Corporation
801 17th Street, N.W.
Washington, D.C. 20552

Ms. Helen Mirza
Supervisory Agent
Federal Home Loan Bank of Chicago
111 East Wacker Drive, Suite 800
Chicago, IL 60601

RIVER VALLEY SAVINGS BANK, F.S.B.

PREFERRED STOCK TO BE ISSUED TO THE
FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION

Term Sheet

| | |
|---|---|
| Amount: | River Valley Savings Bank, F.S.B. ("River Valley") will issue 50,000 shares of preferred stock, par value $100 per share (the "Preferred Stock") to the Federal Savings and Loan Insurance Corporation ("FSLIC") in exchange for a promissory note issued by FSLIC to River Valley in the amount of $5 million. |
| Seniority: | The Preferred Stock will be senior to all other outstanding stock of River Valley as to payment of dividends and upon liquidation of River Valley. River Valley will agree not to issue any capital stock of equal or greater priority in liquidation prior to redemption of the Preferred Stock. |
| Redemption: | The Preferred Stock will be subject to redemption at any time by River Valley at par value plus accrued but unpaid dividends. |
| Purchase Option: | Homer J. Holland and Howard R. Ross (the "Acquirors") will have the option at any time to purchase the Preferred Stock from FSLIC at a purchase price of par value plus any accrued but unpaid dividends on the Preferred Stock at the time of such purchase. |

Voting Rights:

FSLIC shall have no voting rights with respect to the Preferred Stock, except that (1) in the event that more than one year's dividend due to FSLIC on the Preferred Stock remains unpaid, then FSLIC shall have the right to elect one member to River Valley's board of directors, and (2) FSLIC shall have the right to approve any transaction that would result in the Acquirors owning in the aggregate less than ~~51%~~ 90% of the voting stock of River Valley.

Dividends:

Ninety days after the close of each fiscal year of River Valley, FSLIC shall be entitled to receive cumulative dividends on the Preferred Stock equal to 8% per annum. FSLIC also shall be entitled to receive at such time a cumulative Income Participation Dividend ("IPD") on the Preferred Stock, which shall be equal to 25% of the Adjusted Income of River Valley. Adjusted Income for any year shall be defined as River Valley's net income for such year reported in accordance with GAAP ("Net Income"), less the sum of (1) dividends previously paid to FSLIC on the Preferred Stock and (2) 0.4% of River Valley's Average Total Assets (defined as .25 multiplied by the sum of River Valley's total assets as reported at the end of each of the previous four quarters).

IPD Adjustment In The Event of A Merger:

In the event that River Valley is acquired by or merged into another savings and loan association or savings bank (the institution which acquires River Valley or into which River Valley is merged being referred to as the "Acquiring Association" and the resulting institution being referred to as the "Merged Association"), then for purposes of calculating the IPD payable to FSLIC, (1) Net Income shall be defined as the Net Income of the Merged Association multiplied by the greater of (a) a fraction, the numerator of

 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

which shall be the Net Income of River Valley for the previous fiscal year, and the denominator of which shall be the sum of the Net Income of River Valley for the previous fiscal year and the Net Income of the Acquiring Association for the previous fiscal year, or (b) .25 multiplied by a fraction, the numerator of which shall be the total assets of River Valley (reported as of the date of merger or acquisition) and the denominator of which shall be the total assets of the Merged Association (reported as of the date of merger or acquisition), and (2) Average Total Assets shall be defined as the Average Total Assets of the Merged Association multiplied by a fraction, the numerator of which shall be the total assets of River Valley (reported as of the date of merger or acquisition) and the denominator of which shall be the total assets of the Merged Association (reported as of the date of merger or acquisition).

# EXHIBIT 19

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

EXECUTIVE SUMMARY

From: Leo B. Blaber, Jr. LBB by CAB
Principal Supervisory Agent

Control No:

To: Federal Home Loan Bank Board

Date: June 28, 1988

Issue:

Whether to approve the FSLIC-assisted acquisition of Republic Savings, A Federal Savings and Loan Association, South Beloit, Illinois ("Republic") by River Valley Savings Bank, Rock Falls, Illinois ("River Valley") through a supervisory conversion and merger of Republic with and into River Valley.

Background:

Republic is a $39 million mutual savings and loan association with reported deficit regulatory capital of $16.8 million or (43.1%) of assets as of March 31, 1988.

The association has been insolvent on a regulatory basis since June, 1986. The insolvency is attributed to continued operating losses caused by a high level of non-performing commercial loans. The association presently has four large loans on its books with an aggregate total of $5.7 million. This figure is net of established reserves of $3.9 million. Two of the loans have been restructured, one is real estate owned and the other is in the process of foreclosure.

The association was placed into receivership on October 2, 1986 as a result of direct violations of a supervisory agreement and a consent merger resolution. The violations included the prior board of directors' decision to enter into an agreement for a non-cash recapitalization of the institution with Mr. William Grantmyre of ParkCrest. The details of the transaction included the following: Republic was to receive a pool of mobile home loans valued at $7.2 million in exchange for $5 million in association stock and $2.5 million in cash. The loans were to be held in trust at the Republic Bank, Waco, Texas. However, only $497,000 of the loans were found being held in trust for ParkCrest, and they had not been assigned to Republic.



WON534 0343 F HOLLAND 95-524C RIVER VALLEY SB DOCKET # 06822 TRANS 910401 REPUBLIC SAVINGS A FSLA DOCKET # 08346 TRANS 880729 WIN BOX # WC00017072 ACC # 483- 92-0117 OLD BOX # 4 OF 19 C2228 FSLIC ASSISTED ACQUISITION FILE; BOARD PACKAGE 880629 CONFIDENTIAL MATERIALS -- SUBJECT TO PROTECTIVE ORDER

In conjunction with the receivership action, the association was placed into the Management Consignment Program. A new board of directors was appointed and Kenosha Savings and Loan Association, Kenosha, Wisconsin was asked to provide management services for the association.

It is proposed that Republic be converted to a stock institution and merged with and into River Valley. River Valley, the surviving institution, will acquire all of the assets and liabilities of Republic. To facilitate this transaction, FSLIC will make a cash contribution in an amount equal to $16.6 million plus $7,500.00 per diem for each day after March 31, 1988 until the effective date. In addition, the FSLIC will provide capital loss coverage on the four commercial loans, a pool of mobile home loans and an interest account receivable. The last two items are associated with the settlement of the ParkCrest litigation. The losses will be shared on an 80/20 basis until such time as the acquirer has absorbed $150,000 in losses. Once this occurs, the FSLIC will provide 100% loss coverage on these assets. River Valley has also requested indemnifications against litigation challenging the transaction, undisclosed liabilities, unreserved claims and litigation arising on the basis of facts existing prior to the merger. River Valley has requested forbearances with regard to regulatory capital requirements.

River Valley has also submitted an application to issue a $2 million subordinated debt security to American National Bank and Trust Company in exchange for a cash infusion of $2 million. The subordinated debt is to qualify as regulatory capital. The Federal Home Loan Bank of Chicago recommends approval of this application.

The FSLIC assistance has a projected present value cost of $17.8 million, which represents 45.65% of assets and 85.2% of the projected cost of liquidation.

Recommendation:

That the Bank Board approve, by notational vote, the FSLIC assisted conversion/merger of Republic with and into River Valley, subject to the approval of the merger application and plan of merger by the Illinois Savings and Loan Commissioner.

In order to perserve one year of net operating loss tax benefits, it is necessary that Board action take place no later than June 30, 1988.

Staff Contact:

Helen K. Mirza, Supervisory Agent, (312) 565-5737 or
Tracy Wiesen, Attorney, (312) 565-5762

LBB:DLJ

Concurrence: ______________________________
Stuart D. Root
Executive Director,
Federal Savings and Loan
Insurance Corporation

# EXHIBIT 20

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

June 28, 1988

**"S" MEMORANDUM**

To: John M. Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Blaber, Jr.
Principal Supervisory Agent
FHLB of Chicago

Subject: FSLIC Assisted Supervisory Conversion/Merger of:

Republic Savings, A Federal Savings and Loan Association
South Beloit, Illinois
FHLBB No. 8346

With and into

River Valley Savings Bank
Rock Falls, Illinois
FHLBB No. 6822

The Federal Home Loan Bank of Chicago recommends that the Federal Home Loan Bank Board approve the proposal submitted by River Valley Savings Bank ("River Valley") to acquire Republic Savings, A Federal Savings and Loan Association ("Republic") consistent with the terms and conditions set forth in the accompanying "L" memorandum. This recommendation is based on the following: 1) the present value cost of liquidation exceeds the projected present value cost of the River Valley proposal, and 2) River Valley has demonstrated an ability to profitably operate a savings institution in the northern Illinois market.

The following information is in support of the above recommendation:

Republic is a federally chartered mutual savings and loan association maintaining its principal place of business at 640 Blackhawk Boulevard, South Beloit, Illinois. The association operates one branch office in Roscoe, Illinois. Republic does not

PLAINTIFF'S EXHIBIT PX 182

Applications (312) 565-5700 / Examinations (312) 353-5777 / Supervision (312) 565-5744

Mailing address: Post Office Box 7809, Chicago, Illinois 60680-7809

operate a service corporation or a subsidiary. The association is presently a participant in the Management Consignment Program and is currently being managed by Kenosha Savings and Loan Association, Kenosha, Wisconsin.

## I. Financial Condition

Republic has been reporting operating losses since March, 1985 and first reported insolvency in June, 1986. The association's insolvency and operating losses are attributed to a high level of non-performing commercial loans, which led to an increasing level of loan loss reserves and write-offs. The majority of the non-performing loans were comprised of approximately $11.3 million in speculative land development and commercial loans underwritten by the former stockholder, Mr. Timothy Heuer.

After Mr. Heuer's removal, the former board of directors, in an effort to recapitalize Republic, approved and initiated a plan to permit a non-cash recapitalization of the association by ParkCrest Consulting, Ltd. ("ParkCrest"). This transaction was in direct violation of a Supervisory Agreement executed on July 16, 1984 and the Consent Merger Resolution executed on October 30, 1985. The details of the transaction included the following: Republic was to receive a pool of mobile home loans valued at $7,280,234 in exchange for $5,000,000 in association stock and $2,530,824 in cash. The loans were to be held in trust at Republic Bank, Waco, Texas. However, only $497,000 of the loans had been found being held in trust for ParkCrest, and they had not been assigned to Republic.

In February 1988, successful litigation by the FSLIC led to the recovery of approximately $2.1 million of the funds disbursed by the association.

### A. Operating History

As of March 31, 1988, Republic reported total assets of $39.06 million, total liabilities of $55.89 million, and deficit net worth (according to both Regulatory Accounting Principles and Generally Accepted Accounting Principles) of $16.83 million or (43.10% of assets). Real estate owned totaled $4.76 million and represents 12.18% of assets. The association has established valuation reserves of $3.90 million. For the three month period ended March 31, 1988, Republic reported a net loss of $428,000 and a net operating loss of $413,000.

Total assets of the association have declined from a high of $57 million in August, 1986 to $39 million in March, 1988. The decrease in assets is attributed to the sale and/or write-off of non-performing loans and securities. In addition, Republic's savings base has been steadily shrinking. The following table summarizes the quarterly savings flows.

(000's)

| | Quarter | Deposits Received Less Deposits Withdrawn | Interest Credited to Deposits | Net Flow |
|---|---|---|---|---|
| 1985 | March | $ (1,349) | $ 1,148 | $ (201) |
| | June | (1,799) | 1,061 | (738) |
| | September | (1,161) | 978 | (183) |
| | December | (350) | 750 | 400 |
| 1986 | March | (689) | 1,246 | 557 |
| | June | 602 | 740 | (138) |
| | September | (2,090) | 554 | (1,536) |
| | December | (3,255) | 445 | (2,800) |
| 1987 | March | (1,118) | 50 | (1,068) |
| | June | (586) | 44 | (542) |
| | September | (914) | 48 | (866) |
| | December | (202) | 62 | (140) |
| 1988 | March | 379 | 146 | 525 |

B. Service Corporations

Republic had two wholly-owned service corporations, First Financial Centre, Inc. and American Realty Properties, Inc. On September 1, 1987, both of these service corporations were dissolved due to inactivity. At dissolution, assets totaling $691,430 were transferred to Republic, the sole shareholder. The only liability was a $153,060 note payable to the association from First Financial Centre, Inc. The note was repaid at dissolution.

C. Supervisory History

The association has been closely monitored by Supervision since the acquisition of the institution

by Timothy Heuer on June 30, 1984. Immediately after the acquisition, the institution began to concentrate its lending activities in high risk, high yield commercial loans. Due to a lack of staff expertise, these loans were underwritten by stockholder Heuer himself. Conceptually, the loans were supposed to generate greater income and improve Republic's eroding regulatory capital. However, the opposite occurred. The commercial loans, which eventually caused the insolvency of the institution, were poorly under-written and lacked proper documentation.

The September 1, 1984 Report of Examination stated that the association had several loans-to-one borrower and documentation deficiencies. These deficiencies were resolved by management through sale of participation interests and the submission of additional documentation.

Subsequent field visits reported continuing large loan activity. The April 25, 1985 field visit report stated that four additional large loans were granted over a fourteen day period (2/28/85 - 3/13/85). The association already had two such loans on their books. As a result, a supervisory directive was issued on May 1, 1985. The directive restricted Republic's lending activity to loans secured by one-to-four family dwellings.

On May 9, 1985, the District Appraiser reviewed the appraisal reports supporting the six large loans granted by the association. Test appraisals were recommended on three of the six properties. As a result, the scope of the May 11, 1985 limited examination was expanded and a full scope examination was conducted.

The May 11, 1985 Report of Examination revealed violations of the June, 1984 Supervisory Agreement, which was drafted and executed in connection with Mr. Heuer's acquisition of the association. The violations included loan documentation deficiencies and loans-to-one borrower violations.

On September 23, 1985, Supervision received the findings of the District Appraiser's review of the test appraisals performed on the Ocala, Florida

properties. The indicated market value of the property was determined to be $1.1 million. This resulted in a $3.6 million indicated loss on the loan. The write-down of this one loan was sufficient to cause the insolvency of the institution.

The institution was directed to establish the $3.6 million valuation reserve by a supervisory directive issued on October 3, 1985. The establishment of the reserve reduced the association's regulatory capital to a negative $1.5 million. Mr. Heuer was then informed that a cash infusion of $4.5 million would be required by November 13, 1985 to cure the existing default in the security agreement and collateral pledge executed when he acquired the institution.

On October 30, 1985, Republic's board of directors adopted a Consent Merger Resolution conditioned upon their ability to rescind it if Mr. Heuer raised the required capital. Mr. Heuer made several attempts to recapitalize the association; however, he was not able to obtain the cash needed and eventually signed a consent removal and prohibition order on May 22, 1986.

On August 14, 1986, Mr. Heuer contacted the FHLB of Chicago to inform us of the non-cash recapitalization plan involving ParkCrest Ltd. The board of directors and William Grantmyre of ParkCrest were informed that a transaction of this nature would not be approved by the FHLB of Chicago. However, on September 2, 1986, the board of directors entered into an agreement with ParkCrest, Ltd. The association exchanged $5.0 million in association stock and $2.5 million in cash for a pool of mobile home loans supposedly valued at $7.3 million. ParkCrest also received $272,808 in fees for its participation in the transaction.

During September 1986, examiners were sent to Waco, Texas to verify the existence of the loans purchased. They found that only $497,000 in loans were being held in trust for ParkCrest. The custodian, Republic Bank, did not recognize Republic as the new owner.

On September 12, 1986, a supervisory board of directors was held and notice was given that removal action against the board had been initiated.

Due to the recurring losses from poorly underwritten commercial loans and the ParkCrest transaction, Republic was placed into receivership on October 2,

1986. As a result of the receivership, substantially all of the assets and liabilities of the association were transferred to a de novo federal mutual association. The institution is presently in the Management Consignment Program. Management services are being provided by Kenosha Savings and Loan Association.

A Supervisory Chronology is attached as Exhibit S-2.

## II. Condition of the Industry

Seventh District thrifts continue to have earnings problems. District net income for 1987 totaled $199 million compared to $574 million for 1986. The annualized return on average assets ratio for 1987 and 1986 was .24% and .73% respectively. The decrease in net income from 1986 to 1987 is partially attributable to the mandatory write-off of the secondary reserves in May, 1987.

The District's assets grew from $81.1 billion in December, 1986 to $85.3 billion in December, 1987. This represents an asset growth rate of 5.2% as compared to a 9.0% asset growth rate for the nation. As of December, 1987, 7.8% of the District assets were held in institutions with negative regulatory capital. Mortgage loans closed for District Seven thrifts declined nearly 15% from 1986 to 1987.

The slow economy of the Midwest continues to hamper Seventh District thrifts. The unemployment rate for Illinois remains a full percentage point above the national unemployment rate. The District Seven economy is expected to exhibit some improvement in the remainder of 1988.

## III. Solution Efforts

The association was marketed on November 10, 1987, with assistance, to in-state associations and private and corporate investors. Due to the financial condition of the institution, attempts to market the association on an unassisted basis were not conducted. Of the 61 parties contacted, marketing packages were distributed to twenty-five interested parties with proposals being due on or before December 28, 1987.

River Valley was the only party to submit a proposal as a result of this solicitation. The proposal was analyzed by the FHLB of Chicago and reviewed by the FSLIC. It was determined that the proposal was lower than the cost of liquidation.

## IV. Summary of Proposed Acquisition

River Valley, formerly Rock Falls Savings and Loan Association, is an Illinois state-chartered stock association, located in Rock Falls, Illinois. Messrs. Howard Ross and Homer Holland own respectively 49% and 51% of the outstanding shares of stock in this institution. The institution operates one branch office in Sterling, Illinois and two service corporations. Rock Falls Service Corporation is wholly-owned. The principal activity of the service corporation is to offer insurance products to the association's customers. It has also invested $180,000 in Holland Partners, Inc. Holland Partners, Inc. is an 80% owned service corporation. Its principal business is to offer investment consulting and advisory services to financial institutions.

As of March 31, 1988, River Valley had total assets of $119.2 million, and regulatory capital of $4.8 million. The most recent examination of River Valley was conducted as of November 16, 1987. The association received a composite rating of 2. River Valley's board of directors and management have responded adequately to supervisory concerns and continue to exhibit a willingness to cooperate.

River Valley has proposed to acquire Republic through a FSLIC-assisted acquisition, and to merge the acquired institution into River Valley. They have requested the following forms of assistance:

- Cash contribution in an amount equal to $16.6 million plus $7,500.00 per diem for each day after March 31, 1988 until the Effective Date of the transaction.

- Reimbursement for losses resulting from capital losses on Covered Assets, write-down of Covered Assets and for certain related costs and expenses. Covered assets include the following four loans: H&K Development, Hess, Pittway Plaza and Brookside Realty. In addition, the mobile home loans received as partial settlement in the ParkCrest transaction and the interest account receivable

are also identified as covered assets. The losses on the covered assets will be shared on an 80/20 basis until such time as the acquirer has absorbed $150,000 in losses. Once this occurs, the FSLIC shall provide 100% loss coverage on these assets.

- Indemnifications

  River Valley has requested the following standard indemnifications:

  Indemnification from undisclosed liabilities of the acquired association.

  Indemnification from claims not reserved for and asserted against the acquired association.

  Indemnification from litigation challenging the acquisition.

River Valley has submitted an application to issue a $2 million subordinated debt security. The security will be issued to American National Bank and Trust Company and is to qualify as regulatory capital. A further discussion of the subordinated debt application is contained in the addendum to the "S" Memorandum.

## V. Cost Analysis

An analysis performed by the FHLB of Chicago and reviewed by the Analysis and Evaluation Division of the FSLIC resulted in a determination that the proposal submitted by River Valley is lower than the cost to liquidate Republic. The following table represents the present value cost to liquidate the association and cost of the proposal as calculated by the FHLB of Chicago:

As of March 31, 1988
Amounts in (000's)

| | PV Cost | Savings to FSLIC | Percent of Liquidation |
|---|---|---|---|
| Liquidation | $20,925 | N/A | N/A |
| River Valley's Offer | $17,831 | $3,094 | 85.2% |

VII. Community Reinvestment Act

Republic's compliance with the CRA regulations and requirements has been satisfactory.

VIII. Personnel Issues

The board of directors of Republic will submit their written resignations on the effective date of the merger.

The management contract with Kenosha Savings and Loan Association will be terminated on the earlier of the effective date of the merger or June 30, 1988.

IX. Supervisory Forbearances

River Valley has requested the following forbearances, which are standard pursuant to SP 37a:

- Section 563.13 (Regulatory Capital Requirement) of the Rules and Regulations for Federal Savings and Loan Corporation Insured Institutions ("Insurance Regulations") provides no exceptions in the case of acquisitions which permit the exclusion of scheduled items or assets that are or become assets classified as "substandard" or "doubtful," pursuant to Sections 561.16c (Classification of certain Assets), 563.17-2 (Re-evaluation of assets; adjustment of book value; adjustment charges), and 571.1a (Classification of certain assets), and are referred to as "assets acquired in a merger instituted for supervisory reasons," of an institution in computing the regulatory capital requirements of this section.

  Since this merger was instituted for supervisory reasons, River Valley has requested that the FSLIC forbear, for a period of five years from the acquisition date, from exercising its authority, pursuant to Insurance Regulation 563.13. This forbearance applies to the following two conditions: a) An increase in River Valley's contingency factor attributable to the assets of Republic existing at the effective date of the transaction or b) any increase in the net growth of River Valley as of the effective date by reason of River Valley's assumption of Republic's liabilities.

- This transaction has been deemed to be an acquisition instituted for supervisory reasons. Therefore, pursuant to any section of the regulations administered by the FHLBB where scheduled items, or assets that are or become assets classified as "substandard" or "doubtful" pursuant to Section 563.16 c, 563.17-2 and 571.1a and are referred to as "assets acquired in a merger instituted for supervisory reasons", scheduled items and assets classified as "substandard" or "doubtful" attributable to Republic shall be excluded for a period of five years from the computation of scheduled items when determining whether River Valley meets the requirements of such sections.

Based on our review of the transaction, the Federal Home Loan Bank of Chicago believes that these requests for these forbearances are justified and recommends that they be granted to River Valley.

X. Accounting Issues

The acquirer intends to use the purchase method of accounting to account for the acquisition. In connection therewith, River Valley requests the following forbearances identified in SP 37a:

- That $5 million of the FSLIC cash contribution be credited to regulatory capital. Therefore, for regulatory purposes, River Valley may book such contribution as a direct addition to its regulatory capital.

- For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by River Valley over a period not to exceed 25 years by the straight line method.

In connection with the forbearances described above, the acquirer will agree to the following condition:

Not later than 90 days following the effective date of the merger, River Valley shall submit to the Supervisory Agent an independent certified public accountant's opinion that River Valley has accounted for the merger in accordance with generally accepted accounting principles except that as herein provided by the Board for the

purposes of reporting to the FHLBB: a) $5 million of the cash contribution by the FSLIC to River Valley with respect to Republic pursuant to the assistance agreement shall be deemed a contribution to regulatory capital; and b) the value of any resulting intangible assets may be amortized by River Valley over a period of 25 years by the straight line method.

The Federal Home Loan Bank of Chicago recommends that these forbearances be granted to River Valley.

## XI. Net Operating Losses

The acquirer has requested that the net operating loss carryforwards remain with the association. In exchange for this, the acquirer has reduced the amount of FSLIC assistance requested by $900,000.

As of October 2, 1986 the association had $12,769,442 in net operating loss carryforwards available.

## XII. Viability of the Converted Insured Institution

A review of the transaction pursuant to Insurance Regulation 563b.26 has been completed. As of March 31, 1988, River Valley had regulatory capital of $4.7 million. In conjunction with this transaction, $2 million in subordinated debt and $5 million of the FSLIC assistance will be used to increase the resulting institution's regulatory capital. Therefore, the resulting institution will have $177 million in assets and regulatory capital of $11.7 million or 6.6% of assets.

## XIII. Conclusions

The Federal Home Loan Bank of Chicago recommends that the Federal Home Loan Bank Board approve the acquisition and merger of Republic by River Valley based on the facts discussed in this memorandum and consistent with the terms and conditions set forth in the accompanying "L" Memorandum.

Concurrence: ______________________
Office of Regulatory Policy, Oversight and Supervision

LBB:DLJ

# EXHIBIT 21

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360
Seventh District Office

June 28, 1988

ADDENDUM to the "S" Memorandum

TO: John M. Buckley, Jr.
Secretary to the FHLBB

FROM: Leo B. Blaber, Jr. LBB by CGB.
Principal Supervisory Agent, FHLB of Chicago

SUBJECT: Proposed FSLIC-Assisted Acquisition of:
Republic Savings, A FS&LA ("Republic")
South Beloit, Illinois, FHLBB No. 8346
by
River Valley Savings Bank ("River Valley")
Rock Falls, Illinois, FHLBB No. 6822

MERGER APPLICATION

Background

The subject transaction is to be consummated pursuant to a supervisory conversion/merger of Republic with and into River Valley.

In connection with this acquisition, River Valley proposes to issue $2.0 million in subordinated debt (discussed below) to be included as regulatory capital. This, along with the inclusion of $5 million of the assistance as regulatory capital will increase the resulting association's regulatory capital to approximately $11.7 million or 6.65% of assets.

For a history of the referenced institutions, refer to the original "S" memo.

Accounting

The acquisition will be accounted for under the purchase method of accounting. The use of such accounting method is supported by an opinion of an independent CPA. The applicant will submit an additional opinion regarding any tax liability that may result from such merger subsequent to consummation of the merger.

Officers, Directors and Employees

The current officers of River Valley will remain the management officials of the resulting institution. Similarly, the board of directors of the resulting institution will be that of River Valley. River Valley will not retain an advisory board or special or legal consultants from the merging institution. All other employees of Republic shall continue to be employed by the resulting institution subsequent to acquisition.

Applications (312) 565-5700 / Examinations (312) 353-5777 / Supervision (312) 565-5744

Mailing address: Post Office Box 7809, Chicago, Illinois 60680-7809

PLAINTIFF'S EXHIBIT PX 183

Management Interlocks

Messrs. Ross and Holland as well as Mr. Mark S. Kipnis currently serve on the board of directors of River Valley. All three individuals are proposed directors of River Valley Savings Bank, FSB, Peoria, Illinois. River Valley, FSB will be the resulting institution upon consummation of a separate FSLIC-assisted acquisition of three insolvent associations in central Illinois. Upon FHLBB approval of that transaction, the two separate institutions will become "affiliated" due to common ownership by Messrs. Ross and Holland. Therefore, the Management Interlocks Act will not be applicable in this situation.

Additionally, Mr. Holland serves on the board of United Services Automobile Association of San Antonio, Texas ("USAA"), a diversified savings and loan holding company. The two institutions involved do not maintain offices in the same geographic market and they do not meet the asset size test of 12 C.F.R. § 563f.3(c). Therefore, this interlock is not prohibited under 12 C.F.R. § 563f.3.

CRA Statement

The applicant's defined lending area currently includes that of Republic as well. Therefore, no change in the resulting institution's statement will be necessary.

Anti-Trust Considerations

See the memorandum included in the documentation package regarding our analysis on the anti-competitive effects of the proposed transaction. In summary, the acquisition does not present any significant anti-trust issues.

Convenience and Needs

The merger will return to the relevant geographic market a well capitalized, full service thrift institution. This should increase competition within the market thereby benefitting the community. For more information with respect to competition in the relevant market, please refer to the Anti-Trust analysis.

Managerial Aspects

Messrs. Ross and Holland appear to be of the utmost integrity. They are well known and respected within the seventh district not only for their performance record at River Valley, but also for Mr. Holland's assistance in the successful turnaround of Enterprise Savings Bank (formerly Gilldorn Savings) as well as the Exchange National Bank of Chicago.

Their involvement at these institutions has demonstrated to us their ability to operate profitably in the financial services industry. Their performance and management ability is monitored and examined on an ongoing basis by the seventh district. This evaluation process has proven to us that the resulting institution will possess the management ability to operate soundly and profitably.

Financial Aspects

The regulatory capital position of the resulting institution will be enhanced by this transaction. Enhancements will be provided by the issuance of $2 million in subordinated debt as well as the ability to include $5 million of the FSLIC assistance as Regulatory Capital. As previously stated, regulatory capital will be increased to 6.65% of total assets. Additionally, the resulting institution will have only 1% of assets as goodwill, to be amortized at a constant rate over a 10 year period. The applicant has adequately demonstrated that the resulting institution will generate sufficient income to service both the debt and the amortization of goodwill.

We are satisfied that the resulting institution will operate profitably and free of supervisory concern.

Fairness and Disclosure

Inasmuch as this is a FSLIC negotiated and assisted transaction, the plan contemplated herein has been conducted at arms length. As such, the FHLB is aware of all agreements and understandings resulting therefrom. To our knowledge, there will be no change in the compensation structure of their institution, other than in the normal course of business.

Recommendation

The proposed FSLIC-assisted transaction eliminates a severe supervisory case in the least costly manner available to the FSLIC. We find no reason to object to the proposed merger and, therefore, recommend approval by the Bank Board. We also recommend that the Bank Board condition its approval upon submission of a tax opinion regarding the tax treatment of the proposed merger, to the supervisory agent within 30 days after consummation of the transaction.

SUBORDINATED DEBENTURE

Background

The acquirers have requested FHLBB approval for the issuance of a subordinated debenture. The Subordinated Debt Security will be issued to American National Bank and Trust Company of Chicago. The face amount of this security will be $2.0 million and will be purchased at par (no discount or premium). The term of the debenture will be ten years, and it will bear a floating rate of interest at one half of one percent above prime as

established by American National. However, the term of the security shall be automatically extended for successive one year periods unless American National properly informs the issuer of its objection to such extension.

These terms are acceptable, and in fact, compare favorably to similar recent offerings reviewed by this office.

We note that the acquirers have entered into a put agreement with American National Bank. This agreement has the same effect as a personal guarantee on the note. The agreement allows American National to exercise an option requiring Messrs. Ross and Holland to repurchase the debt upon default or failure by the principals to perform their obligations under the Put Option and Purchase Agreement.

Additionally, Messrs. Ross and Holland have each agreed to personally repurchase 50% of the security, beginning on the fourth anniversary date of the issuance. The schedule contained in the agreement calls for repurchase by the principals at the aggregate rate of $286,000 for years four through nine and $284,000 upon maturity.

Review Under 12 C.F.R. Section 563.8-1

Eligibility [Section 563.8-1(b)]

The resulting association is authorized by applicable law and regulation to issue the debenture, and it will not be inconsistent with any provisions of its charter, constitution, or bylaws. The issuance is a part of and is contingent upon approval of the referenced FSLIC-assisted merger/conversion.

The authorization to issue such security, as well as inclusion as regulatory capital, was made a part of the applicant's bid, which was deemed acceptable. In being deemed acceptable, the applicant's overall policies, condition and operation have been considered. It has been determined that such criteria do not afford a basis for supervisory objection.

The applicant's pro forma financial statements project sufficient income to service the debt to be incurred in this transaction. Since the applicant has submitted acceptable pro forma financial statements, we believe the table illustrating income from operations as requested by Item 11(d) of the application form can be submitted by amendment. The applicant has agreed to withdraw its request for waiver of this item and submit such table expeditiously.

As previously stated, the security will be issued to an institutional investor whose accounts are not insured by the FSLIC, which transfers the risk from the Corporation to parties other than FSLIC insured institutions.

Requirements as to Security Form [Section 563.8-1(d)]

The security form contains all the legends and statements required by Section 563.8-1(d)(1).

There being no sinking fund payments, prepayments, or reserve allocation requirements on this ten year security, the issuance conforms to the minimum term limitations of Section 563.8-1(d)(2). Additionally, the Put Option and Purchase Agreement will not affect the term of the security since the principals will be holding it personally.

Recommendation

As the above review has demonstrated, the issuance conforms with all requirements of 12 C.F.R. Section 563.8-1. The issuance is a part of the proposal for the FSLIC-assisted acquisition of the referenced institution. This proposal has been deemed to be the least costly resolution of this FSLIC case. Additionally, due to the relatively small size of the disappearing institution, the district bank is granted authority to process the acquisition. Furthermore, the debt application does not involve a significant issue of law or policy and will not require an offering circular.

Accordingly, we recommend that the Bank Board defer to the PSA for approval of the subordinated debt application pursuant to 12 C.F.R. § 563.8-1(i)(1).

LBB:gw

Federal
Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360
Seventh District Office

# CERTIFICATION MEMORANDUM

From: Leo B. Blaber, Jr. LBB by CLB
Principal Supervisory Agent

To: The Federal Home Loan Bank Board

Subject: The FSLIC-Assisted Acquisition of:

Republic Savings, a Federal Savings and Loan Association, South Beloit, Illinois, FHLBB No. 08346

By: River Valley Savings Bank, Rock Falls, Illinois FHLBB No. 06822

This memorandum shall constitute my certification as Principal Supervisory Agent that the final negotiated transaction pertaining to the FSLIC-assisted acquisition of Republic Savings, a Federal Savings and Loan Association ("Republic") by River Valley Savings Bank ("River Valley") is substantially similar to that proposed in the Recommendation Memorandum, dated January 27, 1988, with the following exceptions:

(1) The cash contribution has been decreased to $16,600,000 plus $7,500 per diem for net operating losses from March 31, 1988 to the Effective Date

(2) The closing date has been changed to June 30, 1988;

(3) FSLIC will provide capital loss coverage on real estate owned and certain specified assets on an 80/20 basis until River Valley has absorbed $150,000 of losses. Thereafter the FSLIC will absorb 100% of the losses;

(4) River Valley has dropped its request for indemnification for undisclosed liabilities of Republic's subsidiaries;

(5) River Valley's request for forbearances has been structured to be consistent with SP-37a;



DEPOSITION EXHIBIT 26 Held 8-18-00
PENGAD-Bayonne, N.J.

WON534 0340 F HOLLAND 95-524C RIVER VALLEY SB DOCKET # 06822 TRANS 910401 REPUBLIC SAVINGS A FSLA DOCKET # 08346 TRANS 880729 WIN BOX # WC00017072 ACC # 483- 92-0117 OLD BOX # 4 OF 19 C2228 FSLIC ASSISTED ACQUISITION FILE; BOARD PACKAGE 880629 CONFIDENTIAL MATERIALS – SUBJECT TO PROTECTIVE ORDER

*Federal Home Loan Bank Board* 111 East Wacker Drive, Chicago, Illinois 60601-4360

*Seventh District Office*

**CERTIFICATION MEMORANDUM**

From: Leo B. Blaber, J
Principal Superv

To: The Federal Home

Subject: The FSLIC-Assist

Republic Savings
Association, Sou
FHLBB No. 08346

By: River Valley Sav
FHLBB No. 06822

Foley's change re reg. capital in A.A. & forbearance ~~lett~~

This memorandum shall con
Supervisory Agent that the final
the FSLIC-assisted acquisition o
and Loan Association ("Republic"
("River Valley") is substantiall
Recommendation Memorandum, dated
exceptions:

(1) The cash contribution has
$7,500 per diem for net c
to the Effective Date

(2) The closing date has beer

(3) FSLIC will provide capit
and certain specified as
Valley has absorbed $150
will absorb 100% of the

(4) River Valley has dropped its request for indemnification for undisclosed liabilities of Republic's subsidiaries;

(5) River Valley's request for forbearances has been structured to be consistent with SP-37a;

Applications (312) 565-5700 / Examinations (312) 353-5777 / Supervision (312) 565-5744

Mailing address: Post Office Box 7809, Chicago, Illinois 60680-7809

(6) All assistance payments made pursuant to the Assistance Agreement will be made on a non-tax-effected basis. The Assistance Agreement provides that any tax benefits that are in fact realized by River Valley for any taxable year will be reimbursed to the FSLIC; and

(7) $5,000,000 of the cash contribution will be credited toward regulatory capital.

LBB:pb

# EXHIBIT 23

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4360

Seventh District Office

July 6, 1988

"S" MEMORANDUM SUPPLEMENT

To: John Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Blaber, Jr. LBB
Principal Supervisory Agent
Federal Home Loan Bank of Chicago

Subject: FSLIC Assisted Supervisory Conversion/Merger of Republic Savings, A Federal Savings and Loan Association with and into River Valley Savings Bank

FINANCIAL VIABILITY

Business Plan

The pending merger of River Valley Savings Bank and Republic Savings will result in an institution with total assets of $182 million and liabilities of $170.3 million. The liabilities include $23.0 million in FHLB advances and $10.8 million in reverse repurchase agreements. Regulatory capital will total $11.7 million and will consist--as proposed--of the $4.7 million in existing capital of River Valley, $2 million in subordinated debt and $5 million of the FSLIC assistance received as a result of the pending transaction.

The acquisition of Republic Savings will result in $7 million of goodwill to be amortized over 25 years. The combined institution will grow by $25 million immediately and then by 15% per year thereafter.

The financial projections in the business plan submitted are contingent upon the following events:

- Investment of the FSLIC assistance and subordinated debt in short term investments. This will keep the one and three year Gap positions below 5% of assets.

- The growth of $25 million immediately is needed to increase the interest margin, increase profitability, and to cover acquired operating expenses.

- Consolidation of offices to eliminate duplication

- Repricing of deposits to market-especially those acquired from Republic.



PLAINTIFF'S EXHIBIT PX 191

"S" Memorandum Supplement
Page 2

- Liquidation of non-earning assets and reinvestment of these proceeds.

Key financial information from the business plan is as follows:

(Amounts in 000's)

| | At Acquisition | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Cash and Investments | $ 80,547 | $105,547 | $121,139 | $128,203 |
| Loans | 89,855 | 94,764 | 100,040 | 105,712 |
| Goodwill | 6,994 | 6,393 | 5,466 | 4,278 |
| Other Assets | 4,594 | 4,189 | 3,885 | 3,652 |
| Total Assets | $181,990 | $210,893 | $230,530 | $241,845 |
| Deposits | $121,630 | $140,927 | $163,285 | $189,190 |
| Other Liabilities | 48,673 | 57,795 | 54,106 | 38,936 |
| Total Liabilities | $170,303 | $198,723 | $217,391 | $228,126 |
| Net Worth | $ 11,687 | $ 12,170 | $ 13,139 | $ 13,719 |
| Total Liabilities & Net Worth | $181,990 | $210,893 | $230,530 | $241,845 |
| Interest Income | | $ 17,362 | $ 18,653 | $ 20,022 |
| Interest Expense | | (14,085) | (14,699) | (15,576) |
| Interest Margin | | $ 3,277 | $ 3,954 | $ 4,446 |
| Other Income | | 600 | 600 | 600 |
| General & Admin. Expense | | (2,602) | (2,469) | (2,339) |
| Goodwill Amortization | | (280) | (280) | (280) |
| Net Income Before Sub Debt Expense | | $ 995 | $ 1,805 | $ 2,427 |
| Debt Service | | (190) | (190) | (190) |
| Net Income Before Taxes | | $ 805 | $ 1,615 | $ 2,337 |
| Charge in Lieu of Taxes | | (322) | (646) | (895) |
| Net Income | | $ 483 | $ 969 | $ 1,342 |
| Net Income to Total Assets | | .23% | .42% | .55% |

If $5 million of FSLIC assistance is credited to regulatory capital, the goodwill account will be proportionally larger than it would be under generally accepted accounting principles. Accordingly, goodwill expense would also be higher by $200,000 per year. Thus, on a GAAP basis net income would also be $200,000 higher than the above figures.

From July 1987 through May 1988, River Valley has generated $466,000 in net income. Given the ability of River Valley to operate profitably prior to the Republic acquisition, we feel this business plan is realistic and achievable. The merger of these two institutions will produce a larger, stronger financial institution with minimal interest rate risk, and one which is in regulatory capital compliance. We do not believe this merger will give cause for any supervisory concern or represent an extraordinary future risk to the FSLIC.

## Financial Condition of River Valley

For the twelve month period ended December 31, 1987, River Valley generated $468,000 in net income. The association generated $806,000 in pretax operating income for the same period. Dividends were limited to $200,000 during calendar year 1987.

The acquiring institution's cumulative three year hedged gap to total assets was a negative 15.35% as of March 31, 1988. Also, the acquiring institution's total interest earning assets exceed its interest bearing liabilities, creating an overall positive dollar gap of $3.31 million. Additionally, the institution has a positive interest rate spread between interest earning assets and interest bearing liabilities of 198 basis points.

The disappearing association's (Republic) three year hedged gap position is severely negative. However, this ratio will improve upon acquisition, since the infusion of FSLIC assistance will significantly reduce this negative position. River Valley has indicated that it will invest these funds in short term investments in order to maintain its favorable current GAP position.

With respect to the proceeds from the subordinated debt, the applicant has expressed his intent to invest the funds in adjustable rate mortgage-backed-securities. The previous income figures demonstrate the applicant's ability to service such debt. Furthermore, the net income figure of $468,000 is after taxes and does not reflect earnings generated from the proceeds of the debt.

The following schedule reflects the net income of the applicant after giving consideration to the items mentioned above. It does not reflect the effects of the merger. Proformas of the resulting institution are discussed in the business plan section.

| | River Valley Alone | | Proforma Post Merger |
|---|---|---|---|
| Net Income | $ 468,000 | (1987) | $ 483,000 |
| Total Taxes | 238,000 | (1987) | (322,000)* |
| Net Income Before Taxes | 706,000 | | 805,000 |
| ** Annual Income from Debt | 170,000 | | 170,000 |
| ***Less: Interest Expense on Debt | 190,000 | | 190,000 |
| Net Income Before Taxes | $ 686,000 | | $ 785,000 |

* Expensing of goodwill to represent recapture of NOL carryforwards

** The applicant anticipates a return of 8.5% on the $2 million subordinated debenture, which will be invested in adjustable rate mortgage-backed-securites.

*** The rate on the debenture will be floating at .5% over prime. Prime is currently at 9%, therefore the rate on the debt is 9.5%.

The applicant will not be required to maintain compensating balances with the purchaser of the debt, nor will the debt be collateralized with any assets of River Valley. The principals have agreed to pledge the stock of River Valley as collateral to American National. Additionally, they have agreed to enter into a put option agreement with American National requiring them to personally repurchase the debt upon default or failure by the principals to meet the obligations under the agreement.

Under the terms of the put option, Messrs. Ross and Holland have each agreed to repurchase 50% of the security, beginning on the fourth anniversary date of the issuance. Please refer to the addendum to the "S" Memorandum, dated June 28, 1988, for further discussion of the subordinated debenture.

## Assistance Credited to Regulatory Capital

Although historically the Bank Board has been disinclined to allow one hundred percent of the FSLIC assistance to be credited to capital, on a case by case basis, a portion of the assistance has been credited to regulatory capital at the request of the acquirer. This policy is stated and clarified in the Supervisory Procedures Memorandum 37a, which states, that in connection with a supervisory merger, the resulting institution may request that a portion of the cash contribution be credited to regulatory capital for regulatory accounting purposes. It further states

that this forbearance generally will be granted upon the request of the resulting institution in a supervisory merger. The FHLB of Chicago marketed and negotiated a solution to Republic under these guidelines.

The acquirer is also aware that the Bank Board has in the past credited a portion of the cash contribution to regulatory capital. As a result, their proposal was based on the assumption that this forbearance would be available, since the marketing instructions did not state otherwise. In the acquirer's initial proposal, it was requested that the entire cash contribution be credited to regulatory capital. The FHLB of Chicago's staff was able, through long and arduous negotiation, to reduce this request from $16.6 million to $5 million. The negotiations were entered into in good faith, and we believe that a change in the terms of the agreement at this time could jeopardize our credibility in future negotiations and have a dampening effect upon the disposition of FSLIC cases.

Since a tentative agreement had been reached between the acquirer and the FHLB of Chicago, with respect to the terms of this transaction, the acquirer proceeded to present proforma financial statements to American National Bank and Trust Company of Chicago in support of a subordinated debt offering. In these financial statements, the acquirer stated that the resulting institution was projected to have certain capital characteristics. One of these characteristics was the inclusion of $5 million of FSLIC assistance in the regulatory capital of the association. On the basis of these financial statements, American National agreed to purchase the debt securities from River Valley. The acquirer is understandably reluctant to amend the financial statements submitted in support of the offering. He feels that not only may it cast an unfavorable light on him as a businessman, but also perhaps upon the Bank Board, since it may appear that the Bank Board is vacillating in its posture regarding this matter.

The FHLB of Chicago supervisory staff will, through its records, be continuously aware of the $5 million in "soft" RAP capital in analyzing River Valley's financial position in future applications and/or mergers.

Conclusion

Although current policy issues question the use of the accounting forbearance regarding this matter, we emphasize that this transaction was negotiated prior to these policy concerns being brought to the forefront. Therefore, we recommend granting this forbearance. However, if the Bank Board so desires, the acquirer has expressed a willingness to enter into an agreement which

would disallow inclusion of the assistance in capital for purposes of growth, investment limitations, or for declaring dividends. The principal purpose for which the acquirer wishes to receive this credit to capital is in order to be well positioned vis-a-vis his capital with respect to future FSLIC insurance premium assessments. All other benefits of assistance to capital he is willing to forego.

LBB:HKM:DB:DJ:DT

# EXHIBIT 28

Federal Home Loan Bank Board 111 East Wacker Drive, Chicago, Illinois 60601-4330

Seventh District Office

December 16, 1988

Applications Digest

To: John M. Buckley, Jr.
Secretary to the FHLBB

From: Leo B. Blaber, Jr.
Principal Supervisory Agent, FHLB of Chicago

Subject: Proposed Supervisory Conversion and
FSLIC Assisted Merger of:
Peoria Savings and Loan Association (FHLBB #4867)
Peoria, Illinois
into
River Valley Savings Bank, FSB (FHLBB #8515)
Peoria, Illinois

STRUCTURE

River Valley Savings Bank, FSB ("River Valley"), having been deemed the acceptable bidder for the FSLIC assisted acquisition of Peoria Savings and Loan Association ("PSLA"), has submitted a merger/conversion application. The merger/conversion will be instituted by the Federal Savings and Loan Insurance Corporation ("FSLIC") under the authority of Sections 5(i) and 5(p) of the Home Owners Loan Act of 1933 ("HOLA") and Section 3301-1 of the Illinois Savings and Loan Act of 1985 as amended. These sections empower the Bank Board to authorize such a merger/conversion if, among other things, the "FSLIC" is providing financial assistance in order to resolve the insolvency of an insured institution such as PSLA.

In connection with this conversion/merger, Messrs. Homer J. Holland and Howard R. Ross, the current shareholders of River Valley propose to invest additional capital of $5 million in cash into the institution. The institution in return will issue to them 5000 shares of non voting perpetual preferred stock with a liquidation value of $1000 per share and cummulative dividends of 10%. This will increase the regulatory capital of the merged institution to $22.89 million or 6.59% of total liabilities if merged as of September 30, 1988.

Upon merger the current home office and branch offices of PSLA will be retained as branch offices of River Valley.

Applications (312) 565-5700 / Examinations (312) 353-5777 / Supervision (312) 565-5744

Mailing address: Post Office Box 7809, Chicago, Illinois 60680-7809

PLAINTIFF'S EXHIBIT PX 271

P.A. 1103

ACCOUNTING AND TAXES

The submissions by the applicant indicate that the proposed merger/conversion will be accounted for under the purchase method of accounting and will qualify as a tax free reorganization under the provisions of Federal Income Tax Code. An opinion from the accountants to support these conclusions will be submitted by River Valley as an amendment to the application. After discussing these issues with Ron Pykus of River Valley, we have no supervisory objection to the application on these grounds.

AFFILIATED TRANSACTION/MANAGEMENT INTERLOCKS

Messrs. Ross, Holland and Mark S. Kipnis (a director) also serve on the board of directors of River Valley Savings Bank, Rock Falls, Illinois. Since the two institutions are affiliated due to common ownership by Messrs Ross and Holland, the Management Interlocks Act will not be applicable in this situation.

Additionally, Mr. Holland serves on the board of United Services Automobile Association of San Antonio, Texas (USAA), a diversified savings and loan holding company. The two institutions do not maintain offices in the same geographic market and do not meet the asset size test of 12 CFR, Section 563f.3(c). Therefore, this interlock is not prohibited under that Regulation.

COMMUNITY REINVESTMENT ACT (CRA)

The defined lending area of the two institutions involved in the transaction is the same. Therefore, any change in the resulting institution's CRA statement is not neccessary. PSLA had received a CRA rating of '3' in its last examination. River Valley has yet to be examined since it was organized on July 29, 1988.

ANTI-TRUST AND ANTI-COMPETITIVE CONSIDERATIONS

Refer to the memorandum included in the documentation package regarding our analysis on the anti-competitive effects of the proposed transaction. In summary, the proposed transaction does not present any significant anti-trust and/or anti-competitive issues.

FUTURE PROSPECTS

The subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District by combining it with a well capitalized and profitable institution. The services available to both the depositors and the borrowers of PLSA will be enhanced.

River Valley possesses, both the financial and managerial expertise which allows it to provide the products and services at a cost which the PSLA as an independent insured institution could not provide. In return River Valley gets an existing customer base in an area that is still recovering from the economic depression of early 1980's with good potential for future growth. It is anticipated that this will have a positive effect on the local market and the profitability of the institution. We have no supervisory objection to the future prospects of the surviving institution.

MANAGERIAL RESOURCES

The current officers and directors of River Valley will remain the officers and directors of the surviving institution. River Valley will not retain an advisory board or special or legal consultants from the merging institution (PSLA). All the employees of PSLA shall continue to be employed by the resulting institution. The current president, Mr. Roger Kilpatrick and executive vice president, Mr. John Riter of PSLA are expected be retained as executive vice presidents in the surviving institution.

Messrs. Ross and Holland, the chairman and president respectively, are also the main shareholders of River Valley and a take very active part in the day-to-day operations of the institution. That structure will continue after the merger. Both these individuals appear to be of utmost integrity. They are well known and respected within the seventh district not only for their performance at River Valley FSB, Peoria and River Valley Savings Bank, Rock Falls, Illinois, but also for Mr. Holland's assistance in the successful turnaround of Enterprise Savings Bank, Chicago as well as the Exchange National Bank, Chicago, a commercial bank. Involvement of Messrs. Ross and Holland at these institutions has demonstrated their ability to operate profitably in the financial services market.

Asset/Liability and interest rate risk is/will be managed by Holland Partners, Inc., a consulting firm established by Mr. Holland, in 1983 and now a second tier (80% owned) subsidiary of River Valley Savings Bank, Rock Falls, Illinois. Steven Bangert, a former executive vice president of a large Denver thrift, is the director and executive vice president of this firm and is well experienced in asset/liability and interest rate risk management.

The foregoing analysis indicates that River Valley has in place, a good management team with a proven track record. We take no supervisory objection to this aspect.



WON424 0028 HOLLAND 95-524C PEORIA SLA DOCKET # 04867 TRANS 881230 WIN BOX # WC00017371 ACC # 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 OLD BOX # 1 OF 1 C2398 CORRESPONDENCE; EXHIBITS; CERTIFICATE 881299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

John M. Buckley, Jr.
December 15, 1988
Page four

FINANCIAL ASPECTS

The investors propose to infuse $5 million in new capital. This will enhance the regulatory capital of the surviving institution to $22.89 million or 6.59% of total liabilities as of September 30, 1988. The assets and liabilities of the merging institution will be marked to market which will either eliminate the non performing assets or book them at their most recent market value. The goodwill so created will be amortized over a period of 25 years. The preferred stock issue of $5 million will involve an annual dividend expense of $500,000.

The surviving institution proposes to compensate this expense through a lower cost of operations and better management of assets and liabilities, and interest rate risk. The applicant has projected that the active management of the asset/liability mix and interest rate risk will result in a net interest rate margin of in the range of 2% and net overhead expense at 1% or less of deposits. The business plan submitted with the application indicates that the surviving institution will be able to inrease the tangible net worth from 1.67% to 1.97% of total liabilities during the first four quarters of operations. The net result of operations will be a net income of $502,961, after dividends and taxes, during the first four quarter period of operations following the proposed merger.

This information, along with other information contained in the recommendations memorandum, indicates that the merged institution will be financially sound. Therefore, we have no supervisory objection on the financial aspects of the proposal.

RECOMMENDATIONS

This conversion/merger will eliminate a severe supervisory case in the least costly manner available to the FSLIC. River Valley will provide safe and sound financial and managerial resources and will remain a viable competitive entity after this merger in the Seventh District. We find no reason to object to the proposed transaction and recommend approval by the Bank Board. Any such approval, however, should be conditioned upon submission of an opinion from independent accountants on the accounting and tax aspects of the conversion/merger.

LBB:BG

cc: Messrs: Brafman, Biedron, Valek



WON424 0029 HOLLAND 95-524C PEORIA SLA DOCKET # 04867 TRANS 881230 WIN BOX # WC00017371 ACC # 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 OLD BOX # 1 OF 1 C2398 CORRESPONDENCE; EXHIBITS; CERTIFICATE 881299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER