# EXCERPTS OF HOWARD ROSS DEPOSITION FOR USE AT TRIAL

p. 7, lines 6-10, 17-20
p. 11, lines 22-25
p. 12, lines 1-2, 6-9, 15-20
p. 13, lines 14-25
p. 14, lines 1-25
p. 16, lines 1-4, 19-25
p. 17, lines 1-4, 9-12, 25
p. 18, lines 1-5, 23-25
p. 19, lines 1-11
p. 26, lines 10-25
p. 27, lines 1-2
p. 28, lines 12-20
p. 34, lines 3-4, 9-19
p. 38, lines 10-16, 25
p. 39, lines 1-8
p. 40, lines 6-14, 18-22
p. 41, lines 9-20
p. 43, lines 5-8, 11-12, 17-19
p. 44, lines 1-5
p. 77, lines 5-16
p. 82, lines 14-18
p. 104, lines 13-19
p. 105, lines 13-25
p. 106, lines 1-5
p. 118, lines 19-22
p. 119, lines 1-11, 20-25
p. 120, line 1
p. 128, lines 9-25
p. 129, lines 1-6
p. 155, lines 24-25
p. 156, lines 1-24
p. 157, lines 5-12
p. 159, lines 1-10
p. 160, lines 3-8
p. 176, lines 6-10
p. 193, lines 15-25
p. 194, lines 1-20
p. 210, lines 5-11, 16-17
p. 211, lines 7-20
p. 213, lines 10-19
p. 214, lines 2-8, 12-14
p. 215, lines 15-21

**EXCERPTS OF HOWARD ROSS DEPOSITION FOR USE AT TRIAL**

p. 216, lines 9-21
p. 217, lines 5-12, 20-25
p. 218, lines 1-7, 11-25
p. 219, lines 1-11
p. 220, lines 9-14
p. 221, lines 11-22, 25
p. 222, lines 1-5
p. 226, lines 14-21
p. 227, lines 7-17, 21-25
p. 228, lines 1-5
p. 229, lines 2-4, 22-25
p. 230, lines 1-4, 8-16
p. 233, lines 6-25
p. 234, lines 1-21
p. 235, lines 2-20
p. 241, lines 3-7
p. 242, lines 5-7, 11-15, 23-25
p. 243, lines 1-7, 11-25
p. 244, lines 1-13
p. 247, lines 3-25
p. 248, lines 1-3
p. 258, lines 4-25
p. 259, line 1
p. 260, lines 17-25
p. 261, lines 1-14
p. 264, lines 19-25
p. 265, lines 1-7
p. 266, lines 2-25
p. 267, lines 1-25
p. 268, lines 1-9

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and HOWARD R. ROSS,

Plaintiffs,

Case No. 95-524

- versus -

THE UNITED STATES,

Defendant.

August 3, 2000
Washington, D.C.

VIDEOTAPED DEPOSITION OF:

HOWARD R. ROSS,

a Plaintiff in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C. 20004-1206, commencing at 9:05 a.m. before Maria Pugliese, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

DAVID B. BERGMAN, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474
On behalf of the Plaintiffs

PATRICK T. MURPHY, ESQUIRE
PATRICIA A. SMITH, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
On behalf of the Defendant

Also Present: LISA HARDESTY, Consultant to Government

* * * *

C O N T E N T S

| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| Howard R. Ross | Mr. Murphy | 7 |

EXHIBITS

| No.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 1 | S Memorandum Supplement dated July 12, 1988 | 51 |
| 2 | Regulatory capital maintenance and dividend limitation agreement among Howard R. Ross and Homer J. Holland, River Valley Savings Bank, FSB, dated July 29, 1998 | 56 |
| 3 | Assistance agreement by and among Howard R. Ross and Homer J. Holland, River Valley Savings Bank and Federal Savings & Loan Insurance Corporation, dated July 29, 1988 | 58 |
| 4 | Letter to Mr. Holland from Federal Home Loan Bank Board dated July 28, 1988 | 67 |
| 5 | Meeting of board of directors of River Valley Savings Bank, dated August 18, 1988 | 68 |
| 6 | Document on Holland Partners Letterhead dated 21, 1988 to Susan Mooney from Ronald Pikas | 74 |
| 7 | Memorandum dated July 6, 1988 to John Buckley from Leo Blaber on Federal Home Loan Bank Board letterhead | 76 |
| 8 | Assistance agreement between the Federal Savings & Loan Insurance Corporation and River Valley Savings Bank, Rock Falls. | 87 |
| 9 | Letter on Federal Home Loan Bank Board letterhead to Mr. Holland dated May 18, 1989 | 90 |

Exhibits continued

(Continued)
E X H I B I T S


| No.: | DESCRIPTION: | PAGE: |
| --- | --- | --- |
| 10 | Assistance agreement between Federal Savings & Loan Insurance Corporation and River Valley Savings Bank, FSB, dated December 31, 1998 | 93 |
| 11 | Letter on American National Bank Letterhead to Homer J. Holland and Howard R. Ross, dated December 21, 1988 | 96 |
| 12 | Letter on Federal Home Loan Bank Board letterhead to Thomas DeFord dated January 18, 1988, referencing December 30, 1988 assistance agreement relating to Peoria | 100 |
| 13 | Letter on Holland Partners, Inc. letterhead to Susan Mooney from Ronald Pikas, dated July 31, 1989 | 108 |
| 14 | River Valley Savings Bank, FSB, consolidated financial statements, supplementary data, dated December 31, 1989 and 1988 with independent auditor's report | 121 |
| 15 | Letter on Holland Partners letterhead, addressed to Eugene Rudnik at Peerless Federal | 131 |
| 16 | Cover letter on letterhead of United Federal Savings Bank addressed to Stuart Brafman at OTS signed by Richard Johnson of United Federal | 135 |
| 17 | River Valley Savings Bank acquisition and capital plan, dated September 1989 | 139 |


(exhibits continued)

(Continued)

E X H I B I T S



| No.: | DESCRIPTION: | PAGE: |
|---|---|---|
| 18 | River Valley Savings Bank, FSB plan, dated December 1989 | 142 |
| 19 | Minutes of meeting, board of directors, River Valley Savings Bank/executive committee meeting River Valley Savings Bank, FSB, dated February 21, 1990 | 148 |
| 20 | Minutes of meeting, board of directors, River Valley Savings Bank/executive committee of River Valley Savings Bank, FSB, dated June 20, 1990 | 152 |
| 21 | Memorandum on OTS letterhead to Stuart Brafman, dated March 25, 1991 | 161 |
| 22 | Minutes of meeting of River Valley Savings Bank, FSB, executive committee dated June 12, 1991 | 174 |
| 23 | Report of examination, Office of Thrift Supervision, commencing in October of '91/concluded December 24, 1991 | 176 |
| 24 | Cover letter on OTS letterhead/ agreement Dated March 27, 1991 | 180 |
| 25 | Letter on American National Bank letterhead dated August 12, 1991, | 189 |
| 26 | River Valley Savings Bank, FSB executive committee minutes, dated Wednesday April 10, 1991 | 195 |
| 27 | Settlement agreement, River Valley Savings Bank, FSB, dated August 14, 1991 | 200 |



Exhibits retained by counsel

MATERIAL REDACTED

Whereupon,

HOWARD R. ROSS,

a Plaintiff, called for examination by counsel for the Defendant, having first been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. MURPHY:

Q Good morning, Mr. Ross.

A Good morning, Mr. Murphy.

MATERIAL REDACTED

Q So I guess starting with college, just where you went to college and what you majored in --

A I went to college -- I'm sorry.

Illinois Institute of Technology, mechanical engineering. I graduated in 1950.

MATERIAL REDACTED

Q And what did you do after graduating in 1950?

A I joined the firm of Economy Mechanical Industries in Chicago, Illinois.

Q And what was your position there?

A It started out as an engineer and ended up as chairman of the board.

Q And how long were you at Economy?

A 1950 through '62, I think -- I'm sorry. '72. Pardon me. It's been a long time, fellows.

MATERIAL REDACTED

Q And approximately how large of a company was Economy?

A Oh, they were probably the largest mechanical contracting company in the country.

By the time I left, they were booking between forty to fifty million dollars, which in those days was a big deal of money.

Q And do you recall -- strike that.

When you -- when you left in 1972, where did you go?

A I was tired of the engineering business, and I went to a company called House of Vision.

Q And what type of business was House of Vision?

A It was a retail -- optical stores, about 150 some-odd retail optical stores from New York to San Francisco. And the major portion of the business was the ophthalmic instrument business, instruments for ophthalmologists, optometrists, et cetera.

Q And how did you end up at House of Vision?

A In a search through -- a friend of mine came to me and offered me a bag of gold to join the company.

Q And what position did you hold at House of Vision?

A Chairman of the board and CEO.

Q And were you still in -- were you in Chicago at that time or --

A I was in Chicago, yes, sir.

Q And how long were you at House of Vision?

A Until, I believe, 1979. Perhaps it was 1980.

Q And where did you go after that?

A After that, I just did my own investing.

And what sorts of investments were you engaging in?

A Basically real estate investments and development.

MATERIAL REDACTED

Q How did you first become aware of the investment opportunity in the River Valley/Rock Falls institution?

A Let me backtrack. In 1979, I was the principal investor in the Exchange National Bank of Chicago, which we had purchased from a guy named Samuels out of New York.

And it was there I met Homer Holland, who was president of the bank at the time. Actually we induced him to become president of the bank at the time.

MATERIAL REDACTED

Q And was your investment in Exchange National Bank your first investment in the banking industry?

A Yes.

Q Was there anything that you considered

particularly attractive about investing in the banking industry?

A Yeah. It dawned on me that you could literally rent money and leverage it and invest it; and that appealed to me.

MATERIAL REDACTED

Q And how did you become aware of the availability of the Rock Falls institution?

A Homer Holland had left the Exchange Bank

to do other things, other investments, whatever. He came to me one day and said he had a possibility -- there was a possibility of picking up this little bank in Rock Falls, would I be interested. And I said yes, I would be interested.

Q And what was it about that investment that interested you?

A You could actually buy it at par. It was a pretty little bank that -- I don't think it ever lost any money. It never made any money. It looked like an opportunity.

MATERIAL REDACTED

MATERIAL REDACTED

Okay. At the time you increased your investment in the Rock Falls institution, were you -- did you have any anticipated returns coming out of Rock Falls?

A Yes.

Q Okay. And do you recall what those were?

A The normal way to return on investments -- anticipated way to return, between twenty and thirty percent.

Q And is that for all of your investments?

A Yes.

Q Okay. And was Rock Falls, in your view, at the high or low end of the range or was it just somewhere in the range?

A What I recall is we had a two-million

dollar investment that ended up four or five million dollars a few years later.

MATERIAL REDACTED

MATERIAL REDACTED

Q And were you on any committees, or did you have any function other than being on the board?

A I pretty much ran the loan committee.

Q And what was the function of the loan committee?

A To oversee loans, of course, make sure they were made properly and returns -- anticipated returns were proper, and they were safe and sound.

MATERIAL REDACTED

Q At the time you invested in the Rock Falls institution --

Q Were you looking at any other institutions at that time?
A No.
Q Okay. Did you have any discussions with Mr. Holland about possibly acquiring additional institutions in the future?
A Yes.
Q Okay. And do you recall generally what the nature of those discussions were?
A We were going to expand the institutions when we had the capital to do so.

MATERIAL REDACTED

Q Was the nature of Mr. Holland's involvement essentially the same as yours, or was he more or less involved in seeing -- or in overseeing the actual operations of the institution?

A He, at the time, was in charge of the investments portfolio.

Q Do you recall when Mr. Bangert was

brought on board?

A Mr. Bangert was brought on board, I believe, approximately 1987 or 1988.

Q Okay. And what was the nature of his role at Rock Falls?

A He was the asset/liability manager and took over the investment portfolio from Mr. Holland.

MATERIAL REDACTED

MATERIAL REDACTED

Was there any sort of optimal capital position from an operational standpoint with respect to Rock Falls? Were you looking to maintain any particular levels of capital?

A We were looking to maintain regulatory capital.

Q Were you looking to maintain anything -- any sort of cushion above the regulatory minimum?

A We normally did.

Q Okay. Why did the institution normally maintain some form of cushion above the regulatory minimum?

A For liquidity and for the possibility of picking up or negotiating with other institutions.

MATERIAL REDACTED

Q Do you recall when approximately you began to look for additional institutions to acquire?

A To the best of my recollection, it's been a long time. I'm guessing maybe two years after. Possibly less than that. Probably a year after we acquired Rock Falls -- no, it was later than that. I'm sorry.

The first two years we were trying to put Rock Falls -- sift out the old and bring in the new. It was later than that. I don't recall the time.

MATERIAL REDACTED

Q When -- I guess just as a general matter, what was your role in looking for additional institutions to acquire, after the -- after the initial acquisition of Rock Falls?

A Homer and I looked for other institutions, period.

Okay. Were you looking for any particular types of institutions?

A Savings and loans and/or banks.

Q Prior to the acquisition of Galva Home and Mutual, do you have any recollection as to how -- approximately how many institutions you looked at or considered acquiring?

A Maybe ten.

MATERIAL REDACTED

MATERIAL REDACTED

Q Mr. Ross, in connection with the acquisition of Galva Mutual and Home, what is your understanding of what, if any, obligations River Valley had to the government after consummation of the merger?

A To meet our goals; to grow and expand the bank into the proper, safe and sound business practices that we were used to doing.

Q When was -- did you consider it an obligation to grow the bank?

A You have to grow any business to be successful.

MATERIAL REDACTED

Q And I may have asked you this earlier, and if I did, I apologize.

But who was responsible for monitoring the growth rate of the institution?

A It would be Bangert and Holland.

MATERIAL REDACTED

Q My question is: Do you recall why the Republic acquisition or Republic institution was merged into the Rock Falls institution?

A I believe it had to do with two things; number one, capital, and, two, the area is very close to Rock Falls. It's easier supervised that way.

MATERIAL REDACTED

Q Did the merger of Republic into the Rock Falls institution prompt any discussion relating to ultimately merging the combined Rock Falls Republic institution with the institutions centered in Peoria?

A To the best of my recollection, the only time we considered that was after the breach, and capital was needed in River Valley and was covered by Rock Falls.

Q When you say capital was needed in River Valley, you mean River Valley Savings Bank, FSB, centered in Peoria?

A Yeah.

Q Okay.

A Just remember they took away those things, regulatory capital, they took away good will. They took away sub-debt. They took away et cetera, et cetera. They left us in a bind.

MATERIAL REDACTED

MATERIAL REDACTED

Q How did Mr. Bangert come to be employed with the River Valley entities?
A How was he employed?
Q Who -- how did you become aware of him?

A Through the industry.

There was talk in the industry of a gentleman who was an expert in asset and liability management, very good at it, at Empire Savings in Denver.

Homer went to Empire Savings to see the gentleman, and found out it wasn't the gentleman he was talking about, it was the gentleman who worked for him, which was Steve Bangert. And we interviewed -- Steve came to Chicago, we interviewed him and we hired them.

MATERIAL REDACTED

Q I believe you characterized him as an expert in the asset/liability management function.

How would you compare his abilities to other people you have dealt with in the asset/liability function, as the very best or --

A He was the very best, far exceeded my

expectations.

MATERIAL REDACTED

MATERIAL REDACTED

Q Did -- and did the board's view of the institution's profitability change at all over time from the acquisition of the various entities prior to the passage of FIRREA?

A Yeah. At first they were apprehensive, and then they were very happy.

Q And why were they apprehensive at first?

A Well, you take on troubled institutions, there is always a risk of how you feel -- how you do with them.

Q And at what point did the board become happy with the acquisitions?

A Well, we showed the profitability with the banks. I told the board from day one, I expect a hundred to a hundred fifty basis points return on assets, period. And I won't accept anything less than that.

That's what we strived for and shot for, and sometimes we attained it and sometimes we didn't.

Q And why was -- how did you arrive at the hundred to hundred fifty basis point number?

A It was normal in the industry.

MATERIAL REDACTED

MATERIAL REDACTED

Q And earlier when you were mentioning --
back early this morning when you were mentioning

different institutions that you looked at possibly acquiring, I believe you mentioned, some institutions in Grand Junction, Colorado.

A Yes.

Q Do you recall why that acquisition didn't happen?

A I do not. It may have been the breach; it may not have. I don't recall. I don't recall the timing of it. It's just been too long.

Q Do you recall how that or those institutions came to the attention of River Valley?

A It may have been through the regulators. I don't recall.

Q For institutions that were outside of Illinois, would there have been a means for River Valley to identify out-of-state institutions, aside from having the regulators bringing them to your attention?

A Yes.

Q Okay. And how -- how would that have been done?

A You go through a list of banks and pick out those that you think might fit your pro forma and go from there.

MATERIAL REDACTED

MATERIAL REDACTED

Do you recall any institutions, other than the ones that we have already discussed, that River Valley looked at as possible targets of acquisition?

A As a matter of course, I went through lists and lists and lists. That's not a task of lists, but I did it. And I just don't recall which names pop up.

Q And how did the loss of regulatory capital impact, first, the operations of the institutions?

A It couldn't support the assets.

Q And what did the institution do as a result to compensate for the fact that it couldn't support the asset?

A They reduced the asset base. You would have to check with Bangert. Specifically I don't know.

MATERIAL REDACTED

Q Do you recall if the institution sold any branches or specific assets in order to shrink to come into capital compliance?

A I think we sold two branches. One was a branch in South Beloit, and I don't recall the other one because we needed the capital.

MATERIAL REDACTED

MATERIAL REDACTED

Q And who at River Valley would have been responsible for monitoring performances of branches relative to each other, if anyone?

A Well, Homer Holland was in charge of the company.

MATERIAL REDACTED

Q So would -- did River Valley experience harm from the loss of regulatory capital prior to the imposition of the supervisory agreement by the OTS?

A Yes.

Q Okay. And how -- how was that harm you?

A It immediately precludes us from growing. It precluded us from purchasing other institutions, expanding our base, opening branches, et cetera, et cetera.

And reserve capital, if you recall, I

expressed earlier that I demand one hundred to one hundred fifty basis points on assets. Assets are based on your capital, QED.

Q Do you make any distinction between tangible and intangible capital?

A No, I don't. One is earning and one is paper.

Q And the regulatory capital that the institution lost, was that earning or paper?

A Absolutely earning. It was paper that allowed you to earn. It was regulatory capital.

Q The good will component of that regulatory capital, did you consider that paper capital that allowed you to earn?

A We -- I and the regulators both considered that capital.

Q And how would you value that good will?

A It levers the good will that whatever the rate was at the time three, four, five percent, and you can use it to purchase assets.

MATERIAL REDACTED

UNITED STATES COURT OF FEDERAL CLAIMS

---

HOMER J. HOLLAND and HOWARD R. ROSS,

Plaintiffs,

Case No. 95-524

- versus -

COPY

THE UNITED STATES,

Defendant.

---

August 4, 2000

Washington, D.C.

CONTINUED VIDEOTAPED DEPOSITION OF:

HOWARD R. ROSS,

a Plaintiff in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C. 20004-1206, before Jonell Easton, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

DAVID B. BERGMAN, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474
On behalf of the Plaintiffs

PATRICK T. MURPHY, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
On behalf of the Defendant

Also Present: LISA HARDESTY, Consultant to Government

C O N T E N T S

| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| Howard R. Ross | Mr. Murphy | 209 |

E X H I B I T S

| Exhibit No. | Description | Page |
|---|---|---|
| 28 | Memo from Bruce Mitchell dated 11/15/99 | 216 |
| 29 | Minutes of Meeting of the Board of Directors of River Valley Savings Bank dated 1/22/92 | 217 |
| 30 | Minutes of the Meeting of the Board of Dirctors of River Valley Savings Bank dated 5/19/93 | 237 |
| 31 | Minutes of Meeting of the River Valley Savings Bank Executive Committee dated 1/15/92 | 241 |

MATERIAL REDACTED

Q. Mr. Ross, Exhibit 28 is a file memo dated November 15, 1989.

It bears an identification number in the lower right hand corner, first page, WOL 817 0887, and it runs through 0890.

I believe it is an internal regulatory document, so I doubt you would have ever seen it.

My questions will focus on the first and second pages.

MATERIAL REDACTED

Q. The paragraph goes, continues on the next page, it was Howard Ross's job to acquire capital, referring to Mr. Holland, it was his job to build up the assets and Steve Bangert's job to manage the interest rate, risk exposure within the assets and liabilities.
Is that, does that statement of the respective jobs of Mr. Holland, Mr. Bangert and yourself, is that accurate?
A. It is a proper job description.
Q. For the job description for yourself, it says it was Howard Ross's job to acquire capital.
What did that entail?
A. I was the contact with American National Bank, which was our primary source for capital.

MATERIAL REDACTED

Q. Following the enactment of FIRREA, did the manner in which River Valley prepared its business plans change at all?

A. I am sure it did, yes.

Q. How would that have been?

A. Affected by the decrease in capital, assets liabilities had to be managed based on the decreased capital.

In addition, we could no longer look for additional S&Ls or banks to acquire.

MATERIAL REDACTED

Q. Who would have been responsible for the assumptions built into the business plans post FIRREA? Would that have been still been Mr. Bangert?

A. Bangert, plus Mr. Holland.

Q. Do you recall whether River Valley's performance in the post FIRREA environment met its projected performance in its business plans?

A. I would have to look at the numbers.

Again, we were always looking for 100 to 150 basis points on assets.

MATERIAL REDACTED

Q. Do you recall the institution in San Antonio, the San Antonio Federal Savings Bank?

A. Yes.

Q. How did you first become aware of that institution?

A. Gentlemen named John Rose brought the information to us.

MATERIAL REDACTED

Q. Do you have any understanding as why San Antonio was available for acquisition?

A. I do.

Q. What is your understanding?

A. San Antonio was under water, Savings & Loan, it could have been a bank. I am not sure.

They had a savings and loan that was part of a bank that was a subsidiary. The bank and/or parent S&L, I believe was dissolved or taken over by whatever agency. And this unit was put out to bid.

Q. When you say it was put out to bid, who put it out to bid?

A. Probably RTC, I believe, I don't know.

MATERIAL REDACTED

Q. Mr. Ross, Exhibit 29 is a document titled minutes of the meeting of the board of director of River Valley Savings Bank, FSB dated January 22, 1992.

There is an identification number, lower right hand corner of the first page of PHO 0542817, and it runs through 2813.

My questions will focus on page 5 of the minutes.

Q. Look at page 5. There is the last paragraph, at the bottom of page begins Homer Holland, do you see that?

A. Yes.

Q. Reads, Homer Holland next reviewed potential acquisition of San Antonio Federal Savings Bank. American National Bank has agreed to finance to acquisition, but

only if the acquisition is totally separate from FSB.
Would you have been responsible for discussing financing with American National Bank?
A. Together with others.
Q. Who would the others have been?
A. The others would have been, I believe, Homer Holland and/or Bangert and John Rose.

MATERIAL REDACTED

Q. That sentence notes that American National would only agreed to finance the acquisition if it was done by an entity totally separate from FSB.
Do you have an understanding as to why that was?
A. FSB did not have enough capital, to the best of my recollection, to satisfy American National Security.
They required a separate company with separate guarantees from each of the individuals.
Q. Do you recall discussing with American National their concerns that FSB did not have enough capital?
A. I don't recall the discussion, but one of the problems we had--a separate company could not use the NOLs.
FSB could use the NOLs, and it was a great concern to us because we thought this would be a very

profitable institution bringing it to FSB would save a great deal in taxes.

It was not the case with a separate company.

Q. NOLs you are referring to are the NOLs of San Antonio?

A. NOLs of FSB.

Q. How are the NOLs of FSB related to the accusation of San Antonio?

A. San Antonio was merged into FSB, and pooling interest at that point because of the NOL offsetting profitability.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could River Valley holdings have borrowed the funds sufficient to acquire San Antonio?

A. Reading the material you have given me, sir, obviously not.

Q. So a separate holding company was established?

A. A separate corporation was established.

MATERIAL REDACTED

Q. Next sentence begins, Although the transaction will now be independent of FSB, a substantial discussion ensued relative to the allocation of management resources.

Do you recall discussing the allocation of management resources in connection with this?

A. I do.

Q. What do you recall was the substance of those discussions?

A. FSB would charge Western Capital a management fee for managing assets and liability of Federal Savings Bank at San Antonio.

Q. Who at FSB would actually be managing the San

Antonio institution?

A. Richard Dalton.

Q. Did that ever change over time or was he there the whole time?

A. No, it did not change.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did the passage of FIRREA have any, and the treatment of regulatory capital subsequent to FIRREA, did that have any impact on the manner in which the San Antonio acquisition was structured?

A. Of course.

Q. How was that?

A. Without the regulatory capital, we did not have necessary capital to make other acquisitions.

MATERIAL REDACTED

Q. Subsequent to the acquisition of San Antonio, what was your involvement, if any, in the operations of the institution?

A. Of San Antonio?

Q. Yes, correct.

A. I was chairman of the board for about a year at which time I turned it over Steve Bangert, who became chairman of the board.

Q. After you ceased being chairman of the board were you still on the board?

A. Yes.

Q. Did there come a time when institution came to be liquidated or sold?

A. Which institution?

Q. San Antonio.

A. Yes.

Q. When was that?

A. I don't recall the date. I think it was somewhere in 1995, perhaps '96.

Q. How did that come about?

A. Board of directors decided to sell the company.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you recall whether the institution was returning the 100 to 150 basis point that you desired?

A. Yes.

Q. Do you recall if the disposition was structured as a liquidation and sale?

A. Best of my recollection, they bought, whoever it might be, bought those deposits. They probably deposit

the purchase.

I don't recall if it was any of the loans, but we had a package of loans that we did have to liquidate.

And the bank went under liquidation mode.

MATERIAL REDACTED

Q. Over what period of time was the package of loans liquidated?

A. Still continuing.

Q. Has it been substantially liquidated?

A. It is substantially. There is some left.

Q. How are the proceeds of the disposition of those loans dealt with in this liquidation mode?

A. Pro rata with the amount of stock that each participant had.

MATERIAL REDACTED

Q. Mr. Ross, before we move on to the next topic, I want to make sure I am clear on a couple of things with respect to the San Antonio acquisition.
A. Please go ahead.
Q. My understanding is American National was unwilling to finance the acquisition through River Valley?
A. Yes.
Q. So you financed through American National, but through another vehicle, Western Capital Holding?
A. Yes.
Q. Did you approach any other potential lenders for purposes of determining whether they would finance the acquisition through River Valley?
A. I did not.
Q. Why not?
A. Why not, I didn't think I would get anyone else involved that would do this based on our balance sheet at the time.
Q. Why is that?

A. If I recall, best of my knowledge, the balance sheet did not support the $10 million loan.

If it had, we could have acquired Western Capital through the banks using NOLs. Onward and upward.

Q. How, if the balance sheet of River Valley would not support a $10 million loan, how is that Western Capital could support the $10 million loan?

A. I could have supported the $10 million loan.

Q. Why didn't you then support the $10 million loan for purposes of financing through River Valley?

A. Because I didn't have $10 million cash at any time. The money is invested elsewhere.

However, that is part of my financial statement banks look to make loans.

Q. How was it different for your purposes to have it through Western Capital as opposed to through River Valley?

A. I wanted it through River Valley so I could utilize the NOLs, grow the bank as we had intended to do, buy other institutions for growth and geographically, assets wise profitability.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Had San Antonio been acquired through River Valley, would River Valley still have been able to acquire further institutions?

A. Depending on the balance sheet, yes.

Q. What factors on the balance sheet play into that calculus?

A. Capital, Western Capital, I should say San Antonio, I'm sorry. They are synonymous in my head.

If I say Western Capital I mean San Antonio. Make that clear.

San Antonio indeed distributed like $30 million over time. The $30 million using the NOLs, if you leverage that on the 20 to one ratio, five percent and go on and on from there, we would have before very, very, very profitable and be able to acquire other institutions, yes.

Q. Would there have been any downside to structuring it through River Valley?

A. To my knowledge, no.

MATERIAL REDACTED

Q. Mr. Ross, Exhibit 31 is minutes of a meeting of River Valley Savings Bank FSB executive committee dated January 25, 1992, identification number of HO 20030098. And it is a two-page document, making the second page 0099.

MATERIAL REDACTED

Q. At this point, early 1992, had there been any discussion about potentially selling River Valley?

A. I don't recollect any.

Q. When was the decision made to sell River Valley?

A. Asking for a date?

Q. Generally.

A. Best of my recollection, four months prior to the actual sale.

Q. Why did you decide ultimately to sell?

A. Couldn't grow the bank in the manner which we wanted to grow the bank, we were tired of the regulators.

If you recall, they went from a three percent capital base requirement to four, then five, who knows whether they would go to six, seven, eight, nine.

We just didn't know.

And you can't manage your bank if you don't know.

It was time to sell.

MATERIAL REDACTED

Q. Were there concerns aside from regulatory issues that impacted the decision to sell?

A. The regulatory issues were such that we could not grow the bank, so it is difficult to answer that question in the manner in you have presented it.

Q. Is it your opinion that the regulatory issues impacted River Valley's ability to compete in the market?

A. That relates to the growth issue again, and had we been able to grow and compete in other markets, yes.

Q. Do you have an opinion as to what sort of growth that would have been?

Would it have been in other geographical markets.

Or would it have been growth in different types of product lines?

Or some combination?

Or something else altogether?

A. The product line was determined by and limited by regulatory issues.

Had we been able to consummate an acquisition of a bank and/or S&L, they are both the same to me, depending on how good the deal was, I am not sure the location was pertinent.

Q. Why wouldn't the location be necessarily pertinent?

A. We are an Illinois bank, could have had a deal in Texas, sent our people gone down there and ran it.

We can run banks anywhere, any location.

REDACTED

MATERIAL REDACTED

Q. Did River Valley conduct any sort of valuation analysis of itself in connection with the sale to First Banks?

A. Yes, we did that internally.

Q. Do you recall what it was internally valued at?

A. Exact number escapes me, but it was a multiple of earnings.

Q. Do you recall whether that was more or less or the same as the amount ultimately paid by First Banks?

A. We, I don't recall. I think we wanted more than we got.

You always want more than you get.

Had we been able to grow the bank, grow the earnings, that number would have been much higher.

Q. Do you know, do you have any way of being to determine the extent to which you could have grown the bank and the earnings?

A. Yes, I had $25 million worth of regulatory capital to be used to grow the bank, which was the original game plan, which was growth profitability, point and a half on assets.

It gets exponential. You take 25 million, five percent capital, regulatory capital requirement, it gets

up there.

If you want me to run numbers, I will be glad to do that.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I know we have discussed generally about impact on the institutions ability to leverage and grow generally.
Are you aware of any specific opportunity that Rock Falls institution or FSB were unable to capitalize on because of a lack of additional regulatory capital?
A. We have discussed a number of institutions that we looked at and had abandoned because we couldn't consummate any deals due to lack of capital.
Q. Which ones were specifically due to lack of capital?
A. San Antonio would have been one, United of Galesberg I believe would have been consummated, there were four in central Illinois we could have bought the deposits and branches, and specifically perhaps that competitor, Standard of Security, looked very hard at that, Security Fed, I am not sure of the exact name.
Q. That is the institution in Peoria?
A. Yes.
Q. Do you believe that all of these institution would have been acquired?
A. Possibly, plus possibly others we never looked

at because no reason to.

REDACTED

Q. Did you have the wherewithal to invest sufficient funds in River Valley to replace the capital that was lost through FIRREA?

A. The 25 million, I don't think so no.

Q. Would you have had sufficient funds to replace a portion of that capital?

A. Possibly.

Q. Do you have any idea to what extent?

A. I would have at look financial statements as of

that time.

Q. Can you give me rough estimate?

A. I don't know, maybe 5 million, 3 million, 2 million, you must remember those dollars were invested elsewhere, you would have had to forego one thing to invest in another.

Q. Did you consider investing the proceeds of the sale of Exchange Bank into River Valley?

A. Never thought about it.

Q. Were there any restrictions you are aware of on your ability to invest those proceeds into River Valley?

A. Don't put all your eggs into one basket.

Q. That is prudent investment strategy?

A. That is correct.

MATERIAL REDACTED

Q. Were you involved in the day-to-day operation of these thrifts?

A. No.

Q. Were you involved directly in discussion with regulators about any potential acquisitions after these troubled thrifts were acquired?

A. That was Holland's route.

Q. Who was involved in the day-to-day operation of the thrifts?

A. Bangert, Pikus, Dalton.

Q. What was Homer Holland's role, if any, in the day-to-day operation?

A. Overseeing day-to-day operations and dealing with the regulators.

MATERIAL REDACTED

MATERIAL REDACTED

Q. A few times over the course of the past couple of days, you have testified you didn't seek out other sources of borrowing other than American National because there wasn't a need.

Did you believe that American National was the best source of borrowing for you?

A. American National Bank was a public company prior to the acquisition by Walter Heller and subsequent acquisition by First National Bank of Chicago, at every stockholders' meeting I acted as proxy of the stockholders. They trusted me. They knew me. I have done a lot of business at the American.

Their rates were always fair. I had no need to go anywhere else. They always took care of my needs. They were always fair with their rates.

Q. Did you believe American National Bank was more likely to provide funding to you than anywhere else?

A. Absolutely.

Q. Did you believe they were more likely to do so on attractive terms?

A. Absolutely.

Q. At the time you negotiated the purchase price of San Antonio Federal Savings Bank, did you believe that you had a good deal?

A. Yes.
Q. Did you believe that San Antonio Federal Savings Bank would generate substantial profits through operations and eventual sales?
A. Yes.
Q. Is that why you wanted to structure the acquisition through River Valley so you could use River Valley's NOLS to shelter that income?
A. Yes.
Q. If you had acquired San Antonio through River Valley, could you have then later decided to sell only the San Antonio operation or San Antonio deposits and keep the remainder of River Valley?
A. Yes, you could sell those deposits not only people we did, but to anybody.
There is always a sale, there is always a need and desire to buy deposits by other institutions.
Q. So if you had acquired San Antonio through River Valley, do you have any reason to believe you could not have sold the San Antonio deposits to the actual buyer on the same terms?
A. I have no reason to believe I could not have done that.
Q. Do you think it is possible you could have done better if San Antonio had been part of River Valley in

terms of the ultimate disposal of those assets?
A. Yes.
Q. How would you rate your investment in Rock Falls from '85 up until mid '88 when you acquired Republic?
A. Great investment.
Q. How did Rock Falls perform in the three-year time period?
A. Went from two million to like four six or four seven, which, it doubled in three years, not bad.

MATERIAL REDACTED

# EXHIBIT 28

November 15, 1989

RECEIVED
FEDERAL HOME LOAN BANK
OF CHICAGO

NOV 16 1989

O.K. to File
Referred to PAG - DRB

**MEMORANDUM**

To: File

From: Bruce Michalski

Subject: Minutes of Management Meeting

River Valley Savings Bank, FSB, #8515 ("Peoria")
Peoria, Illinois

River Valley Savings Bank, #6822 ("Rock Falls")
Rock Falls, Illinois

A meeting was held on November 13, 1989 with Homer Holland and Mark Kipnis, representatives of both Peoria and Rock Falls. Susan Mooney, Larry Ferries, Dan Bagus, and Bruce Michalski represented the Office of Thrift Supervision. Wayne Dyer, of the Office of the Savings and Loan Commission (of Illinois), also attended.

The purpose of the meeting was to discuss the board of directors terms, which, at Peoria, are currently not staggered, and the Class D, E, and F preferred stock, which exists at both associations.

After the introductions, Homer Holland asked if it was possible to not stagger the terms of the board of directors. Presently, the director's terms are one year in length and not staggered.

Dan Bagus stated that it is necessary to stagger the terms of the directors to ensure the continuity of the board. He noted that a board of directors with terms expiring annually may result in a sudden change in management, which could possibly have a negative effect upon the association. He also noted that other associations had applied to not stagger its board and had been denied.

Mr. Holland and Mr. Kipnis agreed to amend the bylaws to stagger the terms of the directors in accordance with 12 CFR 552.6-1.

Mr. Holland noted that they are still in the process of selling the Class C preferred stock (of Peoria) to American National Bank (ANB). The stock will be considered core capital since it will be non-cumulative. Class C stock, as it now exists, is cumulative. In addition, the rate of dividends will be reduced from a rate of 10% fixed to a rate of 90% of prime. This should reduce Peoria's costs.

Mr. Holland then set the stage for his discussion on Class D, E, and F preferred stock. He noted that the reasoning behind the different classes were to compensate himself, Howard Ross, and Steve Bangert equitably. It was Howard Ross's job to acquire capital, it was his

EXHIBIT
Ross 28
8-4-00

job to build up the assets, and it was Steve Bangert's job to manage the interest rate risk exposure within the assets and liabilities. Mr. Holland said that he and Mr. Ross wanted Mr. Bangert to participate in the economic earnings of the associations, but did not want Mr. Bangert to have an ownership interest. That is one of the reasons that Mr. Bangert's incentive is tied to the market value of the associations and not to the GAAP earnings.

He further stated that it was their intent to set up the preferred stock in this manner to:

1. Treat each of them separately;

2. Keep the associations' capital intact;

3. Maximize usage of net operating loss (NOL) carryforwards; and

4. Keep these incentives separate from other existing bonus plans (which are available for other employees).

Mark Kipnis further emphasized that they were surprised to find out that we did not perceive the issue of the preferred dividends as including the operations of 1988. He said that they had always assumed that 1988 operations were also to be included. He said that the preferred stock issuances were established to recognize each of the parties contributions to the associations, and those contributions certainly existed in 1988. He also stated that they wanted to maximize the use of NOL carryforwards, which would, in turn, benefit the FSLIC (now FDIC), since they participate in the use of NOL carryforwards.

Ms. Mooney said that OTS personnel had been equally surprised that dividends were declared and paid before the preferred stock had been approved and issued.

Mr. Kipnis explained that some of the associations' correspondence had used 1988 figures in their examples.

Ms. Mooney noted that there had been bonuses paid to Mr. Holland and Mr. Ross during 1988. If the preferred stock was to compensate them for their efforts, why did they also receive bonuses.

Mr. Kipnis said that the bonuses were a form of back-salary.

He also said that their intent was to distribute 1988's and 1989's economic gain among Mr. Ross, Mr. Holland, and Mr. Bangert. The plan was originally trying to allocate three components, salaries,

capital contribution compensation, and economic gain.

Mr. Holland said that if we were having a problem accepting the preferred stock dividends, they could probably declare common dividends, as long as it was approved by ANB.

Ms. Mooney said that we would have to consider the options open to us and get back to Mr. Holland at a later date.

Ms. Mooney then asked how Peoria and Rock Falls were progressing on the "sharing of management" issue. (There are several officers that allocate their services between the two associations.)

Mr. Holland responded. He said that it was fairly simple allocating the salaries of the people who worked for Holland Partners Inc. (HPI). It was more difficult allocating the salaries of the other officers, such as Roger Kilpatrick. However, he said that they do have methodologies for allocating, on a time-basis, the costs equitably between the two associations.

Mr. Dyer asked whether they had finished combining the two general ledgers of the Peoria shop. Mr. Holland said that the process was now complete.

Ms. Mooney asked if Peoria or Rock Falls were considering any further acquisitions. Mr. Holland said yes. Ms. Mooney said that RTC had indicated that it would not "do deals" with 3,4, or 5 rated shops. Mr. Kipnis asked if it was possible to re-rate Peoria and/or Rock Falls. Mr. Ferries said that it was possible to re-rate shops if a special limited examination was done. Mr. Ferries noted, however, that re-rating a shop was a rare occurrence. And it would be necessary to alleviate the problem areas. In Rock Falls and Peoria's case, it would be necessary to correct all management (M) and capital (C) problems.

Ms. Mooney asked whether Rock Falls and Peoria had "exchanged" any securities pursuant to their asset/liability restructuring. Mr. Holland said no. He said that the reason that they wanted to transfer assets between the two shops was to "level out" their GAP positions. One of the shops was positively hedged and one was negatively hedged. He also noted that Steve Bangert had been discussing the transactions with Larry Kenny. Ms. Mooney indicated that we would need to see if a transfer of assets would need PSA approval. She said she would let Mr. Holland know.

In summarizing the meeting, it was decided that:

1. Peoria would amend its bylaws to provide for a staggered board in accordance with 12 CFR 552.6-1.

2. Ms. Mooney would consider the options available regarding the payment of dividends on Class D, E, and F preferred stock.

3. Ms. Mooney would investigate whether Peoria and Rock Falls would need to seek PSA approval to transfer assets.

The meeting was then adjourned at 11:15.

BM

cc: Esterman
Mooney
Michalski
Docket #6822
Docket #8515
Gerbick

# EXHIBIT 29

MINUTES OF MEETING OF THE
BOARD OF DIRECTORS OF
RIVER VALLEY SAVINGS BANK, FSB

January 22, 1992

The regular meeting of the Board of Directors of River Valley Savings Bank, FSB ("FSB") was held at the offices of Holleb & Coff, 55 E. Monroe, Suite 4100, Chicago, Illinois 60603.

Howard R. Ross chaired the meeting and called the meeting to order at 10:05 a.m. Mark S. Kipnis served as secretary of the meeting and recorded the following members present:

| | |
|---|---|
| Howard R. Ross | Homer J. Holland |
| L. David DeTrempe | Mark S. Kipnis |
| Chester J. Clauden | Robert Powers |
| Noel Rothman | Steven Bangert |
| Michael Rothman | Calvin L. Morgan |
| Fred Tuerk | |

Attending as guests of the board were John D. Weier and Richard F. Johnson, Jr., representativses of the FDIC, Larry Ferries, Lawrence Kenny and Marie Brandt, representatives of OTS, Ronald Pikus, Anne Brody and Kennard Besse.

The OTS and FDIC representatives were present to discuss their respective examination findings. Their reports will be sent to us at a later date, each of which will contain requests for corrective actions.

As an overview, OTS stated that FSB was "well managed, profitable and in capital compliance." OTS considers interest rate risk our most important area and was "overall satisfied", but FSB is held to a higher standard because of our large portfolio. There will be certain specific requests with respect to accounting treatment and documentation, especially because of our investment in Super P.O. securities. Institutions are sometimes asked to value investments at the lower of cost or market when the investments are "actively managed". OTS will request the Board to affirmatively represent that the investments are held for investment purposes, and state the reasons why, and represent that the institution is not actively managing such investments. We will additionally be requested to document the reasons why securities are sold. OTS additionally feels our major risks are prepayment risks and yield curve risks. Consequently, FSB will be asked to investigate new ways to analyze its risk-and not just analyze parallel rate shifts. Because swaps are used to protect

EXHIBIT
Ross 29
8-4-00

H&R-B56-02800
Confidential Material -
Subject to Protective Order

risks (again the active management issue), we will be asked to document the reasons why we open or close swaps (after looking at the interest rate risk to the entire institution). In the mortgage banking area, because of our increases in servicing and loans originated and sold, there will be some accounting issues and requests for additional control over servicing bid decisions. Certain elements of our Investment Policy will be requested to be brought current. FDIC stated they have a different policy. FDIC classifies assets at substandard unless certain steps are taken. Effective February 10, 1992, FDIC policy will be the same as OTS on a go forward basis. FDIC will want stricter documentation as to whether an investment is held for trading or for investment; they will also be suggesting certain policy limits.

The regulators acknowledged compliance with our Supervisory Agreement and will look to River Valley Holdings, Inc. to pay the guaranty fee to Messrs. Ross and Holland now that the American National Bank debt is at the holding company level. With respect to bonus plans, if bonuses are based upon a return on equity, instead of performance, the regulators' position is that such bonuses are equivalent to dividends and should be treated as dividends. The regulators want a written tax allocation agreement with River Valley Holdings, Inc. and, with respect thereto, their stated policy is that River Valley Holdings, Inc. can't take a greater allocation than it would otherwise be allowed independently. All regulators felt that management was generally good and capable.

With respect to asset quality, OTS has no supervisory concerns regarding our loan underwriting. OTS policy is different from FDIC; they only have small recommendations. FDIC differs mainly with respect to our high risk investments. With respect to loans and REOs, FDIC stated we are doing an excellent job.

With respect to terminating our Supervisory Agreement, OTS normally likes to see an institution go through two full exam cycles. However, we can consider applying to OTS to rescind the transaction after we maintain the 5% tangible capital ratio for a period of time.

OTS concluded that FSB was well run with capable management, had shown significant improvement and that capital was adequate, being well above their minimums. OTS also agreed that our future projections look reasonable. FDIC concurred that our operations are good. The regulators concluded by answering questions from the board members regarding their rating systems, with OTS hoping to have its report issue in the next two weeks, while FDIC is hoping to have its issue in approximately 60 days.

The regulators left the meeting at approximately 11:15 a.m. and the Board continued with its regular agenda.



H&R-B56-02801
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2818

The Board had been provided with minutes of the November 20, 1991 Board meeting and minutes of the December 11, 1991 and December 18, 1991 Executive Committee meetings. DeTrempe moved, Clauden seconded, to approve such Board and Executive Ccommittee minutes.

Voting: Aye 11 Nay 0

Ron Pikus presented the financial statement review and compared the December 31, 1991 balance sheet with that of December 31, 1990. For December, total assets decreased $2.6 million. FHLB advances grew $10.5 million, while other borrowed funds decreased $14 million as we continue to reduce reverse repurchase borrowings. Our tangible capital ratio increased in December from 4.88% to 4.95%. Our risk-based capital ratio increased from 10.52% to 10.61%. Pre-tax income for December was $452,000.00, of which $410,000.00 was core pre-tax earnings.

Steven Bangert presented the Investment Report. FSB's December 31, 1991 mark-to-market was $49 million. The portfolio activity was reviewed, as was the institution's interest rate sensitivity.

Ron Pikus next reported on lending, loan administration and retail banking/operations. Because of current interest rates, lending activity is extremely high and employee staffing was discussed. Delinquencies were reviewed as was the general reserve reconciliation, employee loans during November and December, the loan modification for Four Seasons Mobile Home Park and the specific request for loan chargeoffs for Perl Williamson in the amount of $8,811.00 and Carrie Carter in the amount of $577.30. With respect to retail banking, we are keeping to our strategy of increasing relationship accounts and we are not as competitive on certificates of deposit. In Peoria we expect the competitive environment to increase as other local institutions have been acquired by regionals.

Homer Holland next reviewed problem assets. Our classified assets were $18 million at December 31, 1991 as compared to $34 million at December 31, 1990. We settled our claims under the Assistance Agreement for $3.2 million and anticipate that we will ultimately profit from that transaction. Mr. Holland reviewed the major assets removed during the year and those major assets that we anticipate resolving in the forthcoming year. As of December 31, 1991, FSB had 13 residential REOs at a value of $227,329.00. These numbers were compared to December 31, 1990 where we had 26 valued at $516,000.00 and December 31, 1989 where we had 126 valued at $3,600,000.00.

After further discussion, Powers moved, Clauden seconded, to approve the adequacy of the general reserve allowance, the amount of classified assets, and the aforesaid loan modification and chargeoffs.



H&R-B56-02802
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2819

Voting: Aye 11 Nay 0

Powers moved, Tuerk seconded, that our rules for changing passbook rates be amended to provide that such rates may be changed by decision of the Executive Committee, without the necessity of full Board approval.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to approve the payment of quarterly Class C dividends for calendar year 1992.

Voting: Aye 11 Nay 0

Kipnis moved, Holland seconded, to amend the first sentence of Article IV, Section 2 of the By-laws to read as follows: "The board of directors shall consist of no less than 10 members and no more than 12 members and shall be divided into 3 classes as nearly equal in number as possible."

Voting: Aye 11 Nay 0

Tuerk moved, Clauden seconded, that an annual review of appraisers be required and presented to the board at regularly scheduled meetings.

Voting: Aye 11 Nay 0

Mark Kipnis next reviewed the written Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement attached as Exhibit A to these minutes documenting FSB's and its employees' understandings effective January 1, 1991. After further discussion, Clauden moved, DeTrempe seconded, to approve the written Stock Appreciation Rights Plan and Stock Appreciation Rights Agreement form.

Voting: Aye 11 Nay 0

Bangert moved, Noel Rothman seconded, that all Management Reports be approved.

Voting: Aye 11 Nay 0

Management bonuses were discussed and Mr. Bangert and Mr. Pikus were requested to leave the meeting. Mr. Ross summarized the accomplishments of Messrs. Bangert and Pikus during the 1991 calendar year and recommended a $50,000.00 performance bonus for Mr. Bangert and a 1992 compensation increase from $250,000.00 to $262,500.00 and further recommended a $50,000.00 performance bonus for Mr. Pikus and a compensation increase from $117,750.00 to $123,638.00. After further discussion, Morgan moved, DeTrempe seconded, to approve such bonuses and compensation increase.

H&R-B56-02803
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2820

Voting: Aye 10 Nay 0

Mr. Bangert and Mr. Pikus returned to the meeting and Mr. Pikus next reviewed current salaries, proposed salaries, cash bonuses and stock appreciation right dollar equivalents for senior vice presidents, vice presidents and certain other individuals and further recommended $300.00 bonuses to all other full-time employees and $150.00 bonuses to all other part time employees, all as more fully set forth on Exhibit B attached hereto. After further discussion, Clauden moved, Powers seconded, to award such bonuses, stock appreciation right dollar equivalents and new salaries.

Voting: Aye 11 Nay 0

Mr. Bangert recommended that FSB pay Messrs. Holland and Ross $300,000 and $175,000, respectively, for 1989 accrued but unpaid bonuses. Mr. Bangert also recommended that a common stock dividend be approved to permit River Valley Holdings, Inc. to pay a $420,000 guaranty fee to Messrs. Holland and Ross for their personal guarantees of bank debt. The guaranty fee has also been accrued and such dividend is not to be paid unless FSB will still have a tangible capital ratio in excess of 5.0% after such payment. Mr. Bangert expects payment to occur by the end of January. After further discussion, and with Messrs. Holland and Ross abstaining, Powers moved, Tuerk seconded, to approve such dividend payment.

Voting: Aye 9 Nay 0

The employee loan schedule was again reviewed. With Mr. Kipnis abstaining, Tuerk moved, Holland seconded, that the November and December employee loans be ratified and approved.

Voting: Aye 10 Nay 0

Homer Holland next reviewed the potential acquisition of San Antonio Federal Savings Bank. American National Bank has agreed to finance the acquisition, but only if the acquisition is by an entity totally separate from FSB. It is contemplated that a new entity, Western Capital Holdings, Inc., an entity owned by Messrs. Ross, Holland and Bangert, will acquire 89% of the SAFSB stock, while John Rose, an independent investor who brought the deal to FSB's attention, will acquire 11% of SAFSB. Although the transaction will now be independent of FSB, a substantial discussion ensued relative to the allocation of management resources (and compensation to FSB for management time and asset/liability management services) and the effect on FSB's future earnings as American National Bank is requesting that FSB dividend $6 million to River Valley Holdings, Inc. for the purpose of River Valley Holdings retiring $6 million of its debt to American National Bank. The ensuing discussion covered a wide range of topics including discussions with OTS - Dallas and Western Capital Holdings' business plan. With respect to FSB's



H&R-B56-02804
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2821

ability to pay a $6 million dividend, it is contemplated that management will shrink our balance sheet by reducing our Investment portfolio and not our loan portfolio where we have larger spreads. Additional funds will be generated from core earnings and from security sale gains where we would sell part of our fixed rate portfolio that is attractive to sell at this time. It is anticipated that monthly core earnings will decrease by approximately $100,000.00. Any security sales will actually improve our interest rate risk management as we will pay off short-term borrowings. After further discussion, Kipnis moved, Bangert seconded, that provided FSB maintains a 5% tangible capital ratio after the payment of said dividends and OTS approves said payment, that $6 million of common stock dividends be paid to River Valley Holdings, Inc. for the purpose of River Valley Holdings reducing its debt to American National Bank by such amount.

Voting: Aye 11 Nay 0

Mr. Pikus next reported that our CRA/compliance exam will begin next Tuesday.

Mr. Bangert and Mr. Pikus next presented copies of the proposed 1992 Business Plan to the Board for review and discussion at the next meeting.

Mark Kipnis next presented the unfunded deferred compensation plan attached as Exhibit C to these minutes. After further discussion, Holland moved, Ross seconded, that the unfunded deferrred compensation plan be approved.

Voting: Aye 11 Nay 0

Mr. Bangert next recommended that Sharon Kristof, Senior Vice President and Cathy Knapp, Assistant Vice President, each be authorized, along with any FSB officer attesting to their signatures if attestation is required, to execute and deliver any and all conveyance deeds and other ancillary documents to transfer all REO properties to third party buyers. Holland moved, Bangert seconded, to approve such recommendation.

Voting: Aye 11 Nay 0

Mr. Ross next recommended that the fees to directors be increased to a $500.00 retainer for each meeting plus $400.00 for each meeting attended. After further discussion, Holland moved, Ross seconded, that such increase be approved.

Voting: Aye 11 Nay 0

Mr. Pikus next recommended that FSB apply for limited trust powers to act as a FNMA document custodian. Holland moved, Ross seconded, that an application be made by FSB for the written consent of OTS to exercise limited trust powers and that the



H&R-B56-02805
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2822

Statement of Principles of Trust Department Management be adopted, all as more fully set forth in OTS Form 1240 presented to the Board.

Voting: Aye 11 Nay 0

The next scheduled board meeting is March 25, 1992 in Peoria.

There being no further business, Tuerk moved, DeTrempe seconded, to adjourn the meeting.

Voting: Aye 11 Nay 0

The meeting adjourned at 3:10 p.m.

Submitted:

Mark S. Kipnis
Secretary

Approved:

Howard R. Ross
Chairman

H&R-B56-02806
Confidential Material - Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 2823

# EXHIBIT 31

# MINUTES OF MEETING OF THE RIVER VALLEY SAVINGS BANK, F.S.B. EXECUTIVE COMMITTEE

January 15, 1992

The regular meeting of the Executive Committee of River Valley Savings Bank, FSB was held at the offices of Holland Partners, 200 South Wacker, Chicago, Illinois 60606.

Homer J. Holland chaired the meeting and called the meeting to order at 10:00 a.m. Cathryn Wroblewski, a guest of the Executive Committee, served as secretary and recorded the following members present:

Homer J. Holland (via telephone)
Howard R. Ross
Steven Bangert

Ronald Pikus and Mark Kipnis attended as additional guests of the Executive Committee.

Ron Pikus presented a draft of the December 31 financial reports and the committee reviewed same, noting that pre-tax income was expected to exceed $350,000; deposits increased approximately $300,000; mortgage loans were closed in an amount close to $20 million. Final reports will be prepared and submitted for approval at the full board meeting on January 22, 1992.

The current decrease in CD and money market rates was discussed. The Committee recognized the possible need to make a change in passbook rates. It was agreed that a motion will be made to do so at the January 22 board meeting.

Steve Bangert discussed a proposal received from BEI Golembe relative to preparing a valuation of the Bank's deposit base. Howard Ross moved, Homer Holland seconded, to engage BEI G to undertake this project at a fee not to exceed $50,000.

Voting: Aye 3 Nay 0

Steve Bangert and Ron Pikus presented an outline of recommended staff and management bonuses for year end 1991. The Committee approved the recommendations, per attachment, by motion made by Howard Ross and seconded by Steve Bangert.

Voting: Aye 3 Nay 0

Ron Pikus presented a proposed agenda for the January 22 board meeting. The Committee agreed that, due to the scheduling of the OTS/FDIC interview at the beginning of the meeting, the usual committee meetings would not be held. Management reports would be presented by Steve Bangert and Ron Pikus; business plans will be given to the directors but not discussed at the January meeting. The Committee also agreed that dividend approvals would be requested as well as a change to the by-laws regarding the number of directors.

Homer Holland discussed the San Antonio Federal Savings Bank acquisition, mentioning that American National Bank was not willing to provide financing to River Valley for the acquisition, but would provide financing to a separate holding company, if River Valley Holdings, Inc. paid down its loan to $1 million. It was agreed that this topic should be presented to the full Board at its next meeting.

EXHIBIT
Ross 31
8-4-00

There being no further business to discuss, the meeting was adjourned at 11:15.

Cathryn L. Wroblewski
Asst. Secretary

Homer J. Holland
Chairman