# PAUL A. GRIFFIN DEPOSITION EXCERPTS FOR USE AT TRIAL

**February 11 & 12, 2002**

p. 3 lines 1-5
p. 5 lines 2-3
p. 6 lines 7-14
p. 88 lines 9-25
p. 89 lines 1-25
p. 90 lines 1-18
p. 141 lines 8-25
p. 142 lines 1-21
p. 161 lines 7-13
p. 203 lines 3-22
p. 243 lines 4-25
p. 244 lines 1-9
p. 245 lines 12-25
p. 246 line 1
p. 275 lines 11-25
p. 276 lines 1-25
p. 277 lines 1-7, 10-11, 13-17
p. 342 lines 1-10, 13-25 & Exhibit 5
p. 343 lines 1-25
p. 344 lines 1-25
p. 345 lines 1-10
p. 346 lines 19-25
p. 347 lines 1-16
p. 357 lines 17-25
p. 358 line 1
p. 380 lines 12-25
p. 381 lines 1-5, 9-25

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -X
HOMER J. HOLLAND and :
HOWARD R. ROSS, :
Plaintiffs, :
v. : No. 95-524C
UNITED STATES OF AMERICA, : (Senior Judge
Defendant. : Loren A. Smith)
- - - - - - - - - - - - - - -X

Deposition of PAUL A. GRIFFIN
Volume I
(Taken by Plaintiffs)
San Francisco, California
February 11, 2002

Reported by: Jan C. Olivieri, CSR No. 5451

Deposition of PAUL A. GRIFFIN, Volume I, taken by the Plaintiffs at Heller, Ehrman, White & McAuliffe, LLP, 333 Bush Street, 31st Floor, San Francisco, California, on the 11th day of February, 2002, at 9:30 a.m., before Jan C. Olivieri, CSR No. 5451.

P R O C E E D I N G S

Whereupon, PAUL A. GRIFFIN, having been duly sworn, was examined and testified as follows:

Q. Could you please state for the record your full name and address.

A. Paul A. Griffin. G-r-i-f-f-i-n. My address is 3870 Putah Ridge Trail, that's P-u-t-a-h, R-i-d-g-e, Trail, Winters, California, 95694.

Q. And what is your current occupation?

A. I'm a professor at the Graduate School of Management, University of California, Davis.

Q. Did you come to any opinion about the sophistication of Holland and Ross in these kind of tax planning matters?

A. In a general sense, yes, I did.

Q. What was your conclusion?

A. That they were quite sophisticated in the way in which they organized their business transactions to take advantage of tax issues.

Q. Did they use techniques to defer or accelerate taxes?

A. Yes, they did.

Q. When -- when did they do that?

A. Well, I think they did that from the very beginning, which was I believe in 1988, when the various troubled thrifts were acquired. The acquisition of a troubled thrift because it can, if done in the correct way, bring tax benefits to the acquirer, is not a

straightforward exercise, it's somewhat complex, because it relates to the various accounting and tax bases which are attached to the assets that are acquired, and it relates to the kind of transaction which was used to transfer those assets from one -- transfer the tax attributes that are associated with the assets from one institution to another. So right there that was going on. And then depending on what transpires subsequent to that, you may want to change the timing of some of these tax attributes in order that you can get most benefit out of them. And this could be an example of the change in timing was the so-called refreshing of the losses through the use of the STARS transaction, which enabled income to be generated to take advantage of a loss that would otherwise expire, but at the same time produce a loss further down which would have therefore still been available because it would not have expired. So that would be an example where the tax was paid earlier, right, to get the benefit of the otherwise expiring loss, and then the benefit would -- was received at a later point, which is in a sense prepaying the tax, and then getting that tax back through a deduction at a later point, or -- yes.

Q. Let me ask you to step in your role as professor and give Holland and Ross a grade on how they

did in managing their tax attributes in the transactions that are at issue in this litigation and that you've studied in connection with your report.

A. Would I give them a grade?

Q. Yeah. What kind of grade would you give them as -- as tax planners, if that's the right phrase?

A. Well, I think they're very -- very smart people. I have no reason to question that at all. I think that part of what they're able to do was through their experience know when to seek the best quality professional advice to help them understand these particular issues. And that's what I observed most of all, that they were using the services of others who had focused expertise in particular areas, highly detailed expertise, to help them through particular issues of which they may have had a general knowledge, but insufficient knowledge to undergo and complete the transaction in a -- in a minimal tax risk environment.

Q. Okay. And -- well, let me ask sort of the punch line question I think is, do you agree that there would have been a way to structure that acquisition so as to permit River Valley to acquire SAFSB and use the River Valley NOLs to shelter the SAFSB income?

A. There would have been a way, but it need not necessarily have achieved all the results as claimed by Mr. Stokes, it would not necessarily have been of the same structure as assumed by Mr. Stokes. And it would have still been subject to certain IRS tax risk rules that could possibly have denied the use of prior River Valley losses to be offset against current -- current or operating San Antonio income. And also there's the question of whether any so-called prior gains in San Antonio, which we might refer to for sake of discussion as built-in gains, whether they would be available to be used as an offset to River Valley losses. So there's some -- some issues there that there's no bright line

answer on that as to whether they would have been allowable. There's certainly a tax risk on the prior built-in losses. And they may -- there may be some element of risk regarding the tax-motivated nature of that transaction, which could have allowed the commissioner to deny the entire transaction. We don't know that for certain, but there's a risk. And then at the same time, if the tax benefits of the transaction related to the use of San Antonio operating profits, we would have to wait until San Antonio produced operating profits, which would be subsequent to the transaction, that is, into the future, before they could be used to offset against River Valley losses. And then we would have to worry about -- because we're moving into the future, we would have to worry about the potential for River Valley losses to expire. So there's a lot of conditions, all right, a lot of elements that are subject to risk and uncertainty, before -- and they would have to be resolved in a very favorable light before you could come close to agreeing with the conclusions drawn by Mr. Stokes.

Q. Okay. Between 50 and 100 percent chance that River Valley could have acquired SAFSB and the IRS would have blessed it or not objected in any way; is that correct?

A. I'm happy with the view that it would be more likely than not that it would have been a successful transaction.

Q. But focusing now just on whether there's built-in gains or not, you've accepted for your purposes of your report that the GAAP fair market valuation is accurate; is that fair?

A. That's fair.

Q. And that accurately it reflects the true economic value of the SAFSB assets.

A. It reflects the fair value of the San Antonio assets as required under APB 16 and other accounting rules, as attested by the accounting firm.

Q. Yes. Okay.

And if that -- if that GAAP fair market valuation is inaccurate, or maybe inaccurate is the wrong word, if it's proper for GAAP purposes, if it's accurate for GAAP purposes, but does not reflect the true economic value of the assets, then your calculation of the built-in gains is also going to be inaccurate; is that correct?

A. That follows. That's tautological. That follows.

Q. Okay. Let me ask you to assume that Homer Holland and Howard Ross say, "These are great ideas, Professor Griffin, very creative, and we'll consider all of those, but put the ideas that you have that you think are pretty simple for accelerating income, put those to the side and just tell us whether we can use the accrual method for tax purposes as we have for GAAP purposes," and what you have considered in connection with your report is the information that you have in this hypothetical discussion with Homer Holland and Howard Ross, what is your answer to them?

A. My answer would be we, "Are going to have to comply with the tax code."

Now, as you were framing your question, I was thinking perhaps what one could do with respect to these loans in order to accelerate the gains for tax purposes would be to engage some kind of sale transaction followed by a purchase of a similar -- similarly profiled group of loans. Not necessarily the identical ones, because that would -- you would run into some issues there. But if you were to sell some of loans they had on the books, assuming they had gains that were

there, and then -- and purchase on the marketplace a similar portfolio of loans that were not identical, then you could -- then you could recognize the gains perfectly, acceptably, legally for tax purposes, yet still have a similar group of loans on your books perhaps with a similar profile in terms of accretion income that would come later on. So there could be ways of doing that. As I said, I think just to switch accounting methods midstream is a risky way to go here.

Q. Focusing on the option that you were just discussing of selling some bundle of loans and then purchasing a similar bundle of loans in the marketplace so that income has been recognized but the economics of the firm are basically unchanged, is that the goal of that option that you described?

A. That's partly the goal is simply to recognize that income and to put yourself in much the same position were you not to have done that in the first place.

Q. Okay. Thank you. Yes.

And is it your opinion that such a transaction would have been feasible or such a series of transactions would have been feasible?

A. Yes, that's correct.

Q. Thank you.

Okay. Did you do anything to check the work of those who were doing the GAAP valuation of the SAFSB assets and liabilities?

A. I did not do any checking other than review the numbers to ensure to my own satisfaction that the numbers added up to the total aggregate number.

Q. Sort of checking the math.

A. Correct.

Q. But not checking the underlying accuracy of a valuation of a particular asset or class of assets; is that true?

A. That's true.

Q. So you didn't in any sense audit the work of those doing the particular valuations of assets or

classes of assets.

A. No.

Q. I think I spoke over you. Your answer was no, you did not?

A. No.

Q. Thank you.

Is it your belief that the GAAP valuation of the SAFSB assets and liabilities reflects the true economic value of those assets and liabilities as of August 1992?

A. Yes.

Q. What is the basis for that belief?

A. These numbers were prepared as part of a transaction which involved in a sense opposing parties that would have to agree on the nature of that transaction. And my understanding is that there would be an element of diligence analysis completed on a transaction of that kind. I had no reason to doubt these valuations based on any of the evidence that I reviewed.

Q. Is it your experience that GAAP valuations of this kind always reflect the true economic value of the underlying assets?

A. They should to the best extent possible reflect the fair value -- fair market value of those assets,

that's required under the GAAP rules.

Q. And is it your experience that they in fact do reflect the accurate economic value, true economic value of the assets, that these GAAP rules do capture?

A. In general, yes, that's my experience.

Q. Does the market value of most companies equal the GAAP value of the -- of a company?

THE WITNESS: For a company in general, that's typically not the case.

Q. Why is that?

A. Because the GAAP is only in certain instances required to report the market values of the company. In other instances GAAP doesn't attempt to reflect the market value as the GAAP number.

MR. BERGMAN: Okay. Professor Griffin, I'm going to ask the court reporter to mark as Griffin Exhibit 5 a document entitled "Western Capital Holdings, Inc., and Subsidiary," consolidated financial statements for the years ended 1994 and 1993. It's Bates numbers WCH-B75-1603 through 1628. I believe this is a document that you reviewed, but it may show up on your considered list with a different Bates number.

(Griffin Exhibit No. 5 was marked for identification.)

Q. As an initial matter, Professor Griffin, if you could just look through the document and confirm that it is what it appears to be, and also let me know whether that is a document that you believe you did in fact review before.

A. Yes, this is a document that I have seen and reviewed before.

Q. Let me direct your attention, Professor Griffin, if I may, to the pages Bate-stamped 1621 and 1622, which I believe contain the FAS 107 discussion and valuations that we've spoken about.

A. I see that.

Q. What does this document indicate the estimated

fair market value of the San Antonio assets are as compared to their book value as of December 31, 1993?
A. The assets or the -- are you referring to 1622?
Q. I think so, yes, if that's --
A. Well, then the asset -- there is only one asset, that's the loan asset.
Q. Okay. And what is the conclusion with regard to these loans?
A. Well, that as of December 31, '93, the carrying value was 133 million, and the estimated fair value was 158 million.
Q. Does that suggest that had San Antonio sold these loans at the end of 1993 it would have booked a $25 million gain for GAAP purposes?
A. I believe that would be the case, yes.
Q. Are you able to determine using these valuations what kind of gain San Antonio could have booked for tax purposes if it had sold those loans at the end of 1993?
A. Only very approximately.
Q. Tell me how you would do it and what your approximate result is.
A. Well, for tax purposes, assuming that we had sold the loans at the end of '93 for 158 million, and that amount then we would realize for tax purposes.

Now, to get the taxable income, then we would want to subtract from that the tax basis which would be associated with that amount. And to arrive at the tax basis, essentially we would want to know what the original basis for those loans was, which we don't have in these financial statements. However, if you make the assumption that the purchase accounting adjustments that are referred to in note number 9 all relate to those loans, and that those purchase accounting adjustments are -- are not subject to some sort of valuation allowance, then this amount of deferred tax liability would be roughly one third of the -- the accretion income. And so to get the original carrying value, then, I would want to be subtracting roughly, say, 10 million, very roughly, from my carrying value, because that's been incremented by the accretion. So my carrying value would then drop maybe to roughly speaking something close to 100 million. And so my taxable income would be very roughly speaking around 50 million. And again, I have laid a lot of assumptions to get that, but --

Q. Okay.

A. -- that's a sort of initial pass on a way to derive an estimate of what the taxable gain would be.

Q. I thought I was following you, but then I think

now maybe I wasn't. I thought you said you would want to take $10 million off the GAAP carrying value. Is that what you said?

A. Oh, I'm sorry. 10. So that would -- you're right. Then I would drop it down to say 123.

Q. Okay.

A. And then my taxable income would be 158 minus 123, which would be more like say 35.

Q. Okay.

A. You're right. You're absolutely correct.

Q. So based on this FAS 107 valuation and your estimates, is it your understanding that if San Antonio had wanted to sell this bundle of loans, collection of loans, at the end of 1993, it could have done so and booked about a $35 million gain for tax purposes?

A. That would be -- that would be a fair statement, yes.

Q. Now, if in the non-breach world San Antonio had an incentive to book income for tax purposes so that it could use the River Valley NOLs to shelter that income, would -- does this document indicate that there was a fairly easy way to do that, which is to sell some of these loans or all of these loans, if it had wanted to, at their fair market value at the end of 1993?

A. If they -- if they chose to do that, it's not unreasonable that they could have realized taxable income of somewhere I guess in this case 30 to 35 million.

Q. Okay. That's significantly more than the income that in your non-breach world you have San Antonio recognizing in such a way that River Valley can take advantage of its NOLs; correct?

A. That's correct.

Is it true that at the end of 1993 those gains, the 35 million or so over and above accretion, were sitting there easily recognized on the books of San Antonio with a simple transaction of selling some or all of the loans?

A. They were -- these gains were sitting on the books of San Antonio.

Q. And could have been recognized for tax purposes very simply and easily?

A. I believe so.

Q. Do you agree that the breach prevented Holland and Ross from acquiring San Antonio through River Valley at the outset?

A. That was a significant factor, that's correct.

Q. Have you identified other factors?

A. Well, there are a number of issues I think that all in one way or another, directly or indirectly, go back to the environment at that time, which was to a considerable degree affected by FIRREA and post-FIRREA events. But the -- there was an issue of whether there was sufficient capital at that time in the breach world in order that this could be accomplished. There was also an issue in terms of whether the funds could be available within the structure that was proposed versus

the structure that actually occurred as a separate independent audit company. But in that second situation, the concerns of the lender also ultimately led back to issues that related to the post-FIRREA world.

Q. Okay. And is it your understanding that if River Valley had retained its contracted-for capital it could have acquired San Antonio without the necessity of any funding from American National Bank?

A. I think that was a possibility because they would have had additional capital available and could have been able to use that to acquire the net assets of the bank.

Q. Do you have any reason to believe that if River Valley had retained its contracted-for capital it would not have been able to acquire San Antonio without recourse to American National Bank?

A. No, I -- my understanding of the capital position of the River Valley Banks in the non-breach world would be such that they would most likely be in the position to be able to do it without the assistance of an outside lender. But at the same time, we are

Deloitte & Touche LLP

DEPOSITION EXHIBIT 5 GRIFFIN

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

Consolidated Financial Statements for the Years Ended December 31, 1994 and 1993 and Supplemental Consolidating Financial Information and Independent Auditors' Report

Deloitte Touche Tohmatsu International

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

## TABLE OF CONTENTS


| | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| FINANCIAL STATEMENTS: | |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Income | 3 |
| Consolidated Statements of Stockholders' Equity | 4 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 |
| SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION: | |
| Consolidating Statement of Financial Condition | 28 |
| Consolidating Statement of Income | 29 |


CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1604

Deloitte & Touche LLP

Suite 2300
333 Clay Street
Houston, Texas 77002-4196

Telephone: (713) 756-2000
Facsimile: (713) 756-2001

# INDEPENDENT AUDITORS' REPORT

To the Board of Directors and Stockholders of
Western Capital Holdings, Inc.:

We have audited the accompanying consolidated balance sheets of Western Capital Holdings, Inc. and subsidiary (the "Company") as of December 31, 1994 and 1993, and the related consolidated statements of income, stockholders' equity, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Western Capital Holdings, Inc. and subsidiary as of December 31, 1994 and 1993, and the results of their operations and their cash flows for the years then ended in conformity with generally accepted accounting principles.

Our audits were conducted for the purpose of forming an opinion on the basic consolidated financial statements taken as a whole. The additional supplemental consolidating information for 1994 listed in the table of contents is presented for the purpose of additional analysis of the basic consolidated financial statements rather than to present the financial position and results of operations of the individual companies, and is not a required part of the basic consolidated financial statements. This information is the responsibility of the Company's management. Such additional supplemental consolidating information has been subjected to the auditing procedures applied in our audit of the basic consolidated financial statements and, in our opinion, is fairly stated in all material respects when considered in relation to the basic 1994 consolidated financial statements taken as a whole.

As described in Note 1 effective January 1, 1994 the Company adopted Financial Accounting Standards Board Statement of Financial Accounting Standards No. 115, "Accounting for Certain Investments in Debt and Equity Securities."

Deloitte & Touche LLP

March 15, 1995

Deloitte Touche Tohmatsu International



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1605

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

## CONSOLIDATED BALANCE SHEETS, DECEMBER 31, 1994 AND 1993

| ASSETS | 1994 | 1993 |
|---|---|---|
| Cash and cash equivalents | $ 5,969,349 | $ 4,542,803 |
| Securities held to maturity (fair value of $74,984,583 in 1994 and $61,414,960 in 1993) (Note 3) | 81,222,754 | 61,205,420 |
| Securities available for sale (fair value in 1994 and at lower of cost or market in 1993) (Note 3) | 18,700,972 | 15,989,467 |
| Loans receivable, net (Notes 4 and 8) | 135,633,232 | 133,842,259 |
| Loan payments due from servicer (Note 16) | | 1,430,232 |
| Accrued interest receivable (Note 5) | 1,507,960 | 1,522,799 |
| Foreclosed real estate | 2,834,637 | 2,742,611 |
| Premises and equipment, net (Note 6) | 3,677,130 | 2,938,211 |
| Other assets | 1,315,219 | 233,328 |
| TOTAL ASSETS | $250,861,253 | $224,447,130 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| LIABILITIES: | | |
| Deposits (Note 7) | $140,757,207 | $128,825,521 |
| Borrowed funds (Note 8) | 91,185,591 | 81,780,321 |
| Accrued interest payable | 232,795 | 72,270 |
| Accrued expenses and other liabilities | 2,548,349 | 2,898,498 |
| Deferred tax liability, net (Note 9) | 3,994,171 | 2,978,000 |
| Total liabilities | 238,718,113 | 216,554,610 |
| COMMITMENTS (Notes 12 and 14) | | |
| STOCKHOLDERS' EQUITY (Note 10): | | |
| Common stock, $1 per share par value; 1,000 shares authorized, 1,000 shares issued and outstanding | 1,000 | 1,000 |
| Class A common stock, $.01 per share par value; 100,000 shares authorized, issued, and outstanding | 1,000 | 1,000 |
| Paid-in surplus | 49,200 | 49,200 |
| Unrealized losses on securities available for sale, net of taxes of $195,728 | (379,946) | |
| Retained earnings | 12,471,886 | 7,841,320 |
| Total stockholders' equity | 12,143,140 | 7,892,520 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $250,861,253 | $224,447,130 |

See notes to consolidated financial statements.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1606

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

## CONSOLIDATED STATEMENTS OF INCOME
## FOR THE YEARS ENDED DECEMBER 31, 1994 AND 1993

| | 1994 | 1993 |
|---|---|---|
| INTEREST INCOME: | | |
| Loans receivable: | | |
| First mortgage loans | $12,035,595 | $12,880,241 |
| Consumer and other loans | 3,844,175 | 5,093,682 |
| Mortgage backed and related securities | 5,244,213 | 3,530,485 |
| Other investment securities | 313,161 | 294,821 |
| Federal funds sold | | 1,325 |
| Other interest-earning assets | 55,486 | 125,486 |
| Total interest income | 21,492,630 | 21,926,040 |
| INTEREST EXPENSE: | | |
| Deposits (Note 7) | 4,889,700 | 4,255,298 |
| Borrowed funds | 4,758,094 | 3,309,816 |
| Other | 33,104 | 31,259 |
| Total interest expense | 9,680,898 | 7,596,373 |
| NET INTEREST INCOME | 11,811,732 | 14,329,667 |
| PROVISION FOR LOAN LOSSES (Note 4) | | |
| NET INTEREST INCOME AFTER PROVISION FOR LOAN LOSSES | 11,811,732 | 14,329,667 |
| NONINTEREST INCOME: | | |
| Banking service charges and fees | 984,705 | 888,097 |
| Loan fees and service charges | 21,127 | 18,783 |
| Gain from sales of foreclosed real estate | 1,202,685 | 96,509 |
| Net expense from real estate-owned operations | (273,660) | (94,716) |
| Other (Note 13) | 810,618 | 627,202 |
| Total noninterest income | 2,745,475 | 1,535,875 |
| NONINTEREST EXPENSE - General and administrative: | | |
| Compensation and benefits (Note 11) | 2,511,826 | 2,153,843 |
| Occupancy and equipment (Notes 6 and 12) | 582,607 | 527,759 |
| Insurance of deposits expense | 305,003 | 346,712 |
| Other (Note 13) | 2,822,169 | 2,957,676 |
| Total noninterest expense | 6,221,605 | 5,985,990 |
| INCOME BEFORE INCOME TAX EXPENSE | 8,335,602 | 9,879,552 |
| INCOME TAX EXPENSE (Note 9) | 2,430,035 | 3,456,000 |
| NET INCOME | $ 5,905,567 | $ 6,423,552 |

See notes to consolidated financial statements.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1607

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

## CONSOLIDATED STATEMENTS OF CASH FLOWS
## FOR THE YEAR ENDED DECEMBER 31, 1994 AND 1993

| | 1994 | 1993 |
|---|---|---|
| OPERATING ACTIVITIES: | | |
| Net income | $ 5,905,567 | $ 6,423,552 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Net depreciation, amortization, accretion | (6,070,752) | (6,872,441) |
| Provision for deferred income taxes | 1,211,900 | 1,678,000 |
| Net gain on sales of premises | (7,006) | (31,363) |
| Net gain on sales of interest-bearing assets | | (475,372) |
| Net gain on sale of foreclosed real estate | (380,992) | (96,508) |
| Decrease in other assets | 363,179 | 1,960,609 |
| Decrease in accrued expenses and other liabilities | (189,624) | (38,862) |
| Purchase of trading account assets | | (25,053,907) |
| Proceeds from sale of trading accounts assets | | 25,145,313 |
| Net cash provided by operating activities | 832,272 | 2,639,021 |
| INVESTING ACTIVITIES: | | |
| Net change in loans | 1,840,574 | (20,288,735) |
| Purchase of securities held to maturity | (36,337,091) | (34,814,045) |
| Purchase of securities available for sale | (11,769,842) | (23,130,544) |
| Proceeds from maturities and principal repayments of securities held to maturity | 15,793,696 | 22,530,264 |
| Proceeds from maturities and principal repayments of securities available for sale | 8,013,767 | 9,515,476 |
| Proceeds from sales of securities available for sale | | 23,173,245 |
| Realized gain on hedged investments, net | 429,462 | |
| Unrealized loss on hedged investments, net | (67,969) | |
| Proceeds from sale of foreclosed real estate | 1,424,403 | 4,443,045 |
| Purchase of premises and equipment | (1,003,784) | (1,226,711) |
| Proceeds from sale of premises and equipment | 110,171 | 291,499 |
| Net cash used by investing activities | (21,566,613) | (19,506,506) |
| FINANCING ACTIVITIES: | | |
| Net change in deposits | 12,059,745 | (18,567,160) |
| Increase in borrowed funds | 11,376,142 | 34,332,565 |
| Decrease in mortgage escrow funds, net | | 5,236 |
| Dividends paid on common stock | (1,275,000) | (425,000) |
| Net cash provided by financing activities | 22,160,887 | 15,345,641 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 1,426,546 | (1,521,844) |
| CASH AND CASH EQUIVALENTS - Beginning of period | 4,542,803 | 6,064,647 |
| CASH AND CASH EQUIVALENTS - End of period | $ 5,969,349 | $ 4,542,803 |
| NONCASH TRANSACTIONS: | | |
| Transfer of mortgage backed and related securities from held to maturity to held for sale | | $ 17,833,179 |
| Foreclosed real estate from loans | $ 1,135,437 | 1,468,111 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION - Cash paid during the period for: | | |
| Interest on deposits and borrowed funds | 9,520,373 | 7,818,556 |
| Income taxes, net | 785,000 | 1,595,000 |

See notes to consolidated financial statements.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1608

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEARS ENDED DECEMBER 31, 1994 AND 1993

1. SIGNIFICANT ACCOUNTING POLICIES

Western Capital Holdings, Inc. (the "Parent") was organized in 1991 and capitalized in early 1992 for the purpose of acquiring the common stock of San Antonio Federal Savings Bank. On August 14, 1992, the Parent purchased 100% of the common stock of San Antonio Federal Savings Bank from the Resolution Trust Corporation (the "RTC"). Effective March 15, 1993, San Antonio Federal Savings Bank changed its name to River Valley Bank, F.S.B. The accounting and reporting policies of Western Capital Holdings, Inc. and its subsidiary (the "Company") conform to generally accepted accounting principles ("GAAP") and to general practices within the thrift industry. The following is a description of the more significant accounting policies which the Company follows in preparing its consolidated financial statements.

Principles of Consolidation - The accompanying consolidated financial statements include the accounts of the Parent and its wholly owned subsidiary, River Valley Bank, F.S.B. (the "Bank"). The Bank has wholly owned subsidiaries, Valley Real Estate Management, Inc., and River Valley Securities, Inc. All significant intercompany transactions and balances have been eliminated in consolidation.

Cash Equivalents - Cash equivalents consist of cash on hand, due from banks, and interest-bearing deposits. For purposes of the statement of cash flows, the Company considers all highly liquid debt instruments with maturities of three months or less at date of purchase to be cash equivalents.

Investment Securities and Mortgage Backed and Related Securities - In May 1993 the Financial Accounting Standards Board (the "FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 115, "Accounting for Certain Investments in Debt and Equity Securities." This statement requires that only debt securities that the Company has the positive intent and ability to hold to maturity be classified as held to maturity and reported at amortized cost; all other debt securities are reported at market value. SFAS No. 115 further requires that realized and unrealized gains and losses on securities classified as trading account assets be recognized in current operations. Securities not classified as held to maturity or trading are classified as available for sale, with the related unrealized gains and losses excluded from earnings and reported net of tax as a separate component of stockholders' equity until realized. This pronouncement is effective for fiscal years beginning after December 15, 1993. The Company adopted SFAS No. 115 effective January 1, 1994. In accordance with the provisions of this pronouncement the 1993 financial statements were not restated. At January 1, 1994, the adoption of SFAS No. 115 had the effect of increasing stockholders' equity by $262,102.

Investment securities and mortgage backed and related securities held to maturity, including mortgage-derivative instruments, if any, are carried at cost less an allowance for loss, adjusted for the amortization of premiums and the accretion of discounts. Premiums and discounts are amortized and accreted to operations using the level-yield method, adjusted for prepayments as applicable. Management has the intent and the Company has the ability to hold these assets as long-term investments until their estimated



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B75-1609

maturities. Under certain circumstances (including the deterioration of the issuer's creditworthiness or a change in tax law or statutory or regulatory requirements), investment securities and mortgage backed securities held to maturity may be sold or transferred to another portfolio.

At December 31, 1994, investment securities and mortgage backed securities available for sale are carried at fair value. Unrealized gains and losses are excluded from earnings and reported net of tax, as a separate component of stockholders' equity until realized. Investment securities and mortgage backed securities within the available-for-sale portfolios may be used as part of the Company's assets/liability strategy and may be sold in response to changes in interest rate risk, prepayment risk or other similar economic factors. Prior to January 1, 1994, investment securities and mortgage backed securities available for sale were carried at the lower of amortized cost or market value, net unrealized losses were recognized in a valuation allowance by a charge to current operations.

The specific identification method is used to compute gains or losses on the sales of these assets.

Financial Instruments - In October 1994, the FASB issued SFAS No. 119, "Disclosure about Derivative Financial Instruments and Fair Value of Financial Instruments." SFAS No. 119 provides for additional disclosures about derivative financial instruments. The Company implemented SFAS No. 119 as of December 31, 1994. Because this pronouncement required additional disclosures only, implementation did not have an impact on the financial condition or operations of the Company.

The Company enters into future contracts in the normal course of business in an effort to hedge against interest rate risk. Any fees incurred to enter into these financial contracts are amortized over their contractual life as a component of the interest income or expense on the asset or liability hedged by such instruments, except as noted below.

The futures contracts that the Company has entered into are agreements to sell a specific amount of a particular financial instrument at a set price on a stipulated future date and are not entered into for speculation purposes. Changes in the market value of interest rate futures contracts are deferred and recognized into interest income over the maturity period of the hedged asset or at the time the hedged asset is sold.

Loans Receivable - Loans receivable are stated at unpaid principal balances, less unearned discounts, net of deferred loan origination fees and allowance for losses.

Discounts on first mortgage loans are amortized to income using the level-yield method over the remaining period to contractual maturity, adjusted for anticipated prepayments. Discounts on consumer loans are recognized over the lives of the loans using methods that approximate the level-yield method. Discounts cease to be accreted for significant loans where there is doubt as to the future collectibility of principal.

Loan fees and certain direct loan origination costs are deferred, and the net fee or cost is recognized in income using the level-yield method over the contractual life of the loan. Calculation of level-yield is done on a loan-by-loan basis.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1610

Allowance for Loan Losses - The allowance for loan losses is maintained at levels management deems adequate to cover losses on the Company's loans. Losses are charged to the allowance for loan losses when the loss actually occurs or when a determination is made that a loss is likely to occur. Cash recoveries are credited to the allowance for loan losses. The adequacy of the allowance is based on management's periodic evaluation of these portfolios; in determining this allowance, management considers such factors as historical loss experience, delinquency status, adverse situations that may affect the ability of obligors to repay, known and inherent risks in the portfolios, economic conditions, and the estimated value of the underlying collateral, if any. Provisions for losses, if any, are charged to current operations when they are determined to be both probable and estimable.

Foreclosed Real Estate - Foreclosed real estate is recorded at the lower of the outstanding loan amount (including accrued interest, if any) or fair value (less estimated selling cost, as applicable) at the time of foreclosure. The resulting loss, if any, is charged to the allowance for loan losses. Subsequent to foreclosure, the Company's real estate is carried at the lower of its new cost basis or fair value, less estimated selling costs, with any further declines in fair value being charged to current operations. Required development costs associated with foreclosed property under construction are capitalized. Operating expenses of such properties, net of related income, and gains and losses on disposition are included in current operations.

Federal Income Taxes - In February 1992, the FASB issued SFAS No. 109, "Accounting for Income Taxes." The statement adopted a balance sheet approach (the "liability approach") for recording deferred taxes in place of the income statement approach previously required by Accounting Principles Board Opinion No. 11. The liability approach accounts for deferred income taxes by applying statutory tax rates in effect at the statement of financial condition date to differences between the book basis and the tax basis of assets and liabilities. The resulting deferred tax assets and liabilities are adjusted to reflect changes in tax laws or rates. The Company adopted SFAS No. 109 effective August 14, 1992.

The Bank files a consolidated income tax return with the Parent.

Premises and Equipment - Land is carried at cost. Buildings, leasehold improvements, and furniture, fixtures, and equipment are carried at cost, less accumulated depreciation and amortization. Buildings and furniture, fixtures, and equipment are depreciated using the straight-line method over the estimated useful lives of the assets. The cost of leasehold improvements is amortized using the straight-line method over the terms of the related leases.

Premiums on Deposits and Borrowed Funds - Premiums are amortized against interest expense using the level-yield method over the remaining average maturity periods for deposits (by contractual maturity category) and over the remaining actual maturity periods for individual borrowed funds.

Reclassifications - Certain amounts within the accompanying consolidated financial statements and the related notes as of December 31, 1993 have been reclassified for comparative purposes to conform to the 1994 presentation.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1611

3. INVESTMENT SECURITIES

As discussed in Note 1, the Company implemented SFAS No. 115 as of January 1, 1994. As a result, the Company's stockholders' equity was increased by $262,102 representing the amount of net unrealized gains at January 1, 1994 in the available for sale portfolios ($397,123) less an estimated tax liability ($135,021). This increase to stockholders' equity was not reflected in current operations.

The amortized cost and fair values of investment securities are summarized as follows:

| | 1994 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| **HELD TO MATURITY:** | | | | |
| Investment securities: | | | | |
| Stock in Federal Home Loan Bank of Dallas at cost | $ 3,377,600 | $ ______ | ______ | $ 3,377,600 |
| Total investment securities | 3,377,600 | ______ | ______ | 3,377,600 |
| Mortgage backed securities: | | | | |
| Agency: | | | | |
| Fixed rate | 8,571,704 | | $ (410,953) | 8,160,751 |
| Adjustable rate | 11,379,768 | | (191,154) | 11,188,614 |
| CMOs - fixed rate | 5,302,508 | | (300,559) | 5,001,949 |
| Nonagency: | | | | |
| Adjustable rate | 3,396,938 | | (364,318) | 3,032,620 |
| CMOs - fixed rate | 49,194,236 | ______ | (4,971,187) | 44,223,049 |
| Total mortgage backed securities | 77,845,154 | ______ | (6,238,171) | 71,606,983 |
| Total held to maturity | $81,222,754 | $ ______ | $(6,238,171) | $74,984,583 |
| **AVAILABLE FOR SALE:** | | | | |
| Investment securities: | | | | |
| United States government agencies obligations | $ 3,722,818 | | $ (208,559) | $ 3,514,259 |
| Mortgage backed securities, agencies: | | | | |
| Fixed rate | 4,845,864 | | (207,252) | 4,638,612 |
| Adjustable rate | 4,869,494 | | (264,121) | 4,605,373 |
| CMOs - fixed rate | 5,008,735 | ______ | (69,674) | 4,939,061 |
| Total mortgage backed securities | 14,724,093 | ______ | (541,047) | 14,183,046 |
| Mortgage related securities: Residual securities | 829,735 | $173,932 | ______ | 1,003,667 |
| Total available for sale | $19,276,646 | $173,932 | $ (749,606) | $18,700,972 |



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1612

| | 1993 | | | |
|---|---|---|---|---|
| | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
| **HELD TO MATURITY:** | | | | |
| Investment securities: | | | | |
| Stock in Federal Home Loan Bank of Dallas at cost | $ 2,925,700 | | | $ 2,925,700 |
| Federal Home Loan Bank note, at cost | 1,002,030 | $ 626 | | 1,002,656 |
| Total investment securities | 3,927,730 | 626 | | 3,928,356 |
| Mortgage backed securities: | | | | |
| Agency: | | | | |
| Adjustable rate | 2,019,030 | 3,898 | | 2,022,928 |
| CMOs - fixed rate | 8,640,848 | 114,587 | | 8,755,435 |
| Nonagency: | | | | |
| Adjustable rate | 5,318,904 | | $(74,550) | 5,244,354 |
| CMOs - fixed rate | 41,298,908 | 164,979 | | 41,463,887 |
| Total mortgage backed securities | 57,277,690 | 283,464 | (74,550) | 57,486,604 |
| Total held to maturity | $61,205,420 | $284,090 | $(74,550) | $61,414,960 |
| **AVAILABLE FOR SALE:** | | | | |
| Investment securities: | | | | |
| United States government agencies, notes, at amortized cost | $ 3,158,365 | $ 3,002 | $ | $ 3,161,367 |
| Total investment securities | 3,158,365 | 3,002 | | 3,161,367 |
| Mortgage backed securities: | | | | |
| Agency: | | | | |
| Fixed rate | 108,515 | 1,810 | | 110,325 |
| CMOs - fixed rate | 11,556,891 | 94,954 | | 11,651,845 |
| Total mortgage backed securities | 11,665,406 | 96,764 | | 11,762,170 |
| Mortgage related securities: | | | | |
| Residual securities | 1,165,696 | 297,357 | | 1,463,053 |
| Total available for sale | $15,989,467 | $397,123 | $ | $16,386,590 |



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1613

## 4. LOANS RECEIVABLE

Loans receivable are summarized as follows at December 31:

| | 1994 | 1993 |
|---|---|---|
| First mortgage loans: | | |
| Principal balances: | | |
| Secured by one-to-four-family mortgages | $110,374,249 | $126,899,516 |
| Secured by other properties | 30,025,007 | 17,965,992 |
| Construction | 2,565,648 | 369,860 |
| Total | 142,964,904 | 145,235,368 |
| Less: | | |
| Undisbursed portion of loans | (1,699,000) | (500,350) |
| Unearned discounts | (8,160,239) | (12,513,883) |
| Net deferred loan origination fees | (28,494) | (8,223) |
| Total first mortgage loans | 133,077,171 | 132,212,912 |
| Consumer and other loans: | | |
| Principal balances: | | |
| Automobile | 531,200 | 378,174 |
| Loans secured by savings accounts | 1,222,682 | 1,248,646 |
| Commercial | 140,990 | 1,596,524 |
| Home equity and second mortgages | 1,153,793 | 1,585,758 |
| Other | 7,458,949 | 6,609,276 |
| Total | 10,507,614 | 11,418,378 |
| Less unearned discounts | (3,957,773) | (5,549,097) |
| Total consumer and other loans | 6,549,841 | 5,869,281 |
| Less allowance for loan losses | (3,993,780) | (4,239,934) |
| Loans receivable, net | $135,633,232 | $133,842,259 |

The mortgage loans amounts are shown net of participating interests sold to others amounting to approximately $685,000 and $559,000 at December 31, 1994 and 1993, respectively.

Loans on which interest has ceased and/or interest is being substantially reserved at December 31, 1994 and 1993 totaled $1,240,669 and $620,000, respectively. The income foregone on these loans during the years ended December 31, 1994 and 1993 was $24,680 and $54,768, respectively.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1614

7. DEPOSITS

Deposits are summarized as follows at December 31:

| | 1994 | | | 1993 | | |
|---|---|---|---|---|---|---|
| | Weighted Average Rate | Amount | Percent | Weighted Average Rate | Amount | Percent |
| Demand, NOW, and Super Now accounts | 2.13% | $ 18,718,971 | 13.3 | 2.10% | $ 17,471,881 | 13.6 |
| Money market | 3.36 | 24,454,795 | 17.4 | 2.98 | 25,515,598 | 19.8 |
| Passbook savings | 2.78 | 8,488,032 | 6.0 | 2.78 | 8,867,179 | 6.9 |
| Certificates of deposit: | | | | | | |
| Less than 2.75% | | 108,827 | 0.1 | | 206,952 | 0.2 |
| 2.75 - 4.00% | | 2,109,270 | 1.5 | | 47,487,414 | 36.8 |
| 4.01 - 5.00% | | 59,431,676 | 42.2 | | 17,007,788 | 13.2 |
| 5.01 - 6.00% | | 14,141,441 | 10.0 | | 3,964,434 | 3.1 |
| 6.01 - 7.00% | | 6,520,025 | 4.6 | | | |
| 7.01 - 8.00% | | 5,132,632 | 3.7 | | 6,041,692 | 4.7 |
| 8.01 - 9.00% | | | | | | |
| 9.01 - 10.00% | | 1,263,363 | 0.9 | | 1,746,350 | 1.3 |
| 10.01 - 12.25% | | | | | | |
| Unamortized premiums | | 388,175 | 0.3 | | 516,233 | 0.4 |
| Total certificates | | 89,095,409 | 63.3 | | 76,970,863 | 59.7 |
| Total deposits | | $140,757,207 | 100.0 | | $128,825,521 | 100.0 |

The aggregate amount of certificates of deposit with a minimum denomination of $100,000 totaled $16,122,927 and $14,349,741 at December 31, 1994 and 1993, respectively. Scheduled maturities of such certificates of deposits are as follows as of December 31:

| | 1994 | 1993 |
|---|---|---|
| Three months or less | $ 5,023,066 | $ 4,592,349 |
| Four through six months | 2,277,671 | 3,150,389 |
| Seven through twelve months | 3,210,695 | 3,468,076 |
| Thereafter | 5,611,495 | 3,138,927 |
| Total | $16,122,927 | $14,349,741 |

Interest expense on deposits is as follows for the years ended December 31:

| | 1994 | 1993 |
|---|---|---|
| Transaction and insured money fund accounts | $1,028,062 | $ 589,127 |
| Savings accounts | 243,255 | 260,285 |
| Certificates of deposit | 3,618,383 | 3,405,886 |
| Total | $4,889,700 | $4,255,298 |



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B75-1615

8. BORROWED FUNDS

Borrowed funds are summarized as follows at December 31:

| | 1994 | | 1993 | |
|---|---|---|---|---|
| | Interest Rates | Amount | Interest Rates | Amount |
| Line of credit from Federal Home Loan Bank | 6.25% | $ 7,350,000 | | |
| Advances from Federal Home Loan Bank: | | | | |
| Due 1994 | | | 3.21% | $10,649,050 |
| Due 1995 | 5.71% | 20,000,000 | | |
| Due 1998 | | | 8.70% | 10,000,000 |
| Due 2001 | | | 8.56% | 10,000,000 |
| Unamortized premiums on advances | | | | 1,972,954 |
| Federal funds purchased | 5.61% | 18,800,000 | 3.25% | 13,000,000 |
| Securities sold under agreements to repurchase | 5.95-6.43% | 40,797,559 | 3.10-3.25% | 30,109,590 |
| American National Bank of Chicago, Inc., due June 30, 1996 | Prime +2% | 3,881,000 | Prime +2% | 5,691,695 |
| Shareholders, due April 1996 | Prime +1% | 357,032 | Prime +1% | 357,032 |
| Total | | $91,185,591 | | $81,780,321 |

The note with American National Bank of Chicago includes certain restrictive covenants concerning dividend payments, maintenance of capital levels, minimum income levels, and nonperforming asset ratios. Management believes the Company is in compliance with the restrictive covenants at December 31, 1994. The note is secured by all of the common stock of the Bank owned by the Company.

Funds borrowed from the Federal Home Loan Bank (the "FHLB") are secured by a blanket floating lien on the Company's fully disbursed, whole first mortgage loans against one-to-four-family residential properties. The FHLB requires that the amount of funds borrowed not exceed 65% of the aggregate outstanding balances of the pledged loans.

Securities sold under agreements to repurchase involved certain assets delivered to the broker-dealers with agreements to repurchase the same securities. The securities underlying these agreements are held by the broker-dealers in the name of the Bank. Information concerning securities sold under agreements to repurchase is summarized as follows:

| | At or for the Years Ended December 31, | |
|---|---|---|
| | 1994 | 1993 |
| Weighted average interest rate | 6.13% | 3.18% |
| Maturities within thirty days | $40,797,557 | $30,109,590 |
| Assets underlying agreements outstanding - mortgage backed securities: | | |
| Book value, including accrued interest | 40,860,000 | 30,138,923 |
| Estimated market value | 40,797,557 | 30,109,590 |
| Maximum amount outstanding at any month end | 64,433,346 | 55,716,944 |
| Average amount outstanding | 46,776,782 | 29,880,400 |



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1616

9. INCOME TAXES

Income tax expense for the years ended December 31 consists of:

| | 1994 | 1993 |
|---|---|---|
| Current | $1,218,135 | $1,778,000 |
| Deferred | 1,211,900 | 1,678,000 |
| Total | $2,430,035 | $3,456,000 |

The tax effects of temporary differences that give rise to significant portions of deferred tax assets and deferred tax liabilities at December 31, 1994 and 1993 consisted primarily of differences in basis for mortgage backed residual securities caused by the timing of income recognition and purchase accounting income recognition for loans, foreclosed real estate, premises and equipment, deposits, and borrowed funds.

Deferred income taxes and benefits are provided for differences between the financial statement carrying amount of existing assets and liabilities at December 31, 1994 and 1993 as follows:

| | 1994 | 1993 |
|---|---|---|
| Deferred tax assets: | | |
| Allowance for loan losses | $ 103,000 | $1,442,000 |
| SFAS No. 115 tax effect | 196,000 | |
| Total deferred tax assets | 299,000 | 1,442,000 |
| Deferred tax liabilities: | | |
| Purchase accounting | 3,875,000 | 3,620,000 |
| Residual securities | 418,000 | 457,000 |
| Other | | 343,000 |
| Total deferred tax liabilities | 4,293,000 | 4,420,000 |
| Net deferred tax liability | $3,994,000 | $2,978,000 |

If certain conditions are met in determining taxable income, the Company is allowed a special bad debt deduction for tax purposes based on (1) the reserve method using either a percentage of taxable income (presently 8%) or specified experience formulas or (2) the direct charge-off method.

10. REGULATORY CAPITAL

The Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") of 1989 was signed into law on August 9, 1989, enacting regulations for savings institutions' minimum capital requirements effective on December 7, 1989. In addition to its capital requirements, FIRREA includes provisions for changes in the federal regulatory structure for savings institutions including a new deposit insurance system, increased deposit insurance premiums, and restricted investment activities with respect to noninvestment-grade corporate debt and certain other investments. FIRREA also increases the ratio of housing-related assets required in order to qualify as a savings institution.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1617

The regulations require savings institutions to have minimum regulatory tangible capital equal to 1.5% of total assets, a minimum 3% core capital ratio, and a risk-based capital ratio requirement of 8% at December 31, 1994 and 1993. The regulatory authorities can increase the core capital ratio by up to 200 basis points based on a bank's regulatory rating. Following is a comparison of the Bank's capital with its capital requirements as of December 31 (in thousands):

| | Regulatory Capital | | |
|---|---|---|---|
| | Tangible Capital | Core Capital | Risk-Based Capital |
| **1994:** | | | |
| Stockholder's equity | $16,231 | $16,231 | $16,231 |
| Nonallowable capital - unrealized losses on securities available for sale, net of taxes | 380 | 380 | 380 |
| Additional capital items - general valuation allowance | | | 942 |
| Regulatory capital computed | 16,611 | 16,611 | 17,553 |
| Minimum capital requirements | 3,770 | 7,541 | 9,133 |
| Regulatory capital - excess | $12,841 | $ 9,070 | $ 8,420 |
| Regulatory capital percentage computed (A) | 6.61% | 6.61% | 15.38% |
| **1993:** | | | |
| Stockholder's equity | $13,398 | $13,398 | $13,398 |
| Nonallowable capital - none | | | |
| Additional capital items - general valuation allowance | | | 696 |
| Regulatory capital computed | 13,398 | 13,398 | 14,094 |
| Minimum capital requirements | 3,359 | 6,719 | 8,392 |
| Regulatory capital - excess | $10,039 | $ 6,679 | $ 5,702 |
| Regulatory capital percentage computed (A) | 5.98% | 5.98% | 13.44% |

(A) Based upon a percentage of adjusted total assets for tangible and core capital and a percentage of risk-adjusted assets for risk-based capital.

The Bank's net income and stockholders' equity figures are presented in the accompanying consolidated statements of financial condition and income agree with the information included in the Bank's Thrift Financial Report filed with the Office of Thrift Supervision as of December 31, 1994.

11. EMPLOYEE BENEFIT PLANS

The Company has a 401(k) plan which covers substantially all employees. The Company contributes up to 5.25% of the participant's salary. The Company's contributions to the Plan were $42,708 and $34,818 for 1994 and 1993, respectively.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1618

12. COMMITMENTS AND CONTINGENCIES

At December 31, 1994 and 1993, the Company was obligated under noncancelable operating leases for office space. Net rent expense under operating leases, included in occupancy and equipment expense, for the years ended December 31, 1994 and 1993 were $95,976 and $96,012, respectively. The minimum annual rental payments under the terms of the leases at December 31, 1994 are as follows:

| | |
|---|---|
| 1995 | $88,000 |
| 1996 | 81,000 |
| 1997 | 82,575 |
| 1998 | 83,700 |

The Company has entered into a consulting agreement with an individual who was chairman of the board of the Bank prior to its acquisition by the Company. The agreement provides that the individual will serve as a consultant to the Company with regard to the Bank's business. The Company is committed to pay this individual a total of $750,000 over a three-year period which began September 1, 1992.

The Company is a defendant in legal actions arising from transactions conducted in the ordinary course of business. Management, after consultation with legal counsel, considers that the aggregate liabilities, if any, will not be material to the consolidated financial statements.

13. OTHER NONINTEREST INCOME AND EXPENSE

Other noninterest income and expense amounts are summarized as follows for the years ended December 31:

| | 1994 | 1993 |
|---|---|---|
| Other noninterest income: | | |
| Gain on sale of interest-bearing assets | | $ 475,372 |
| Other | $ 810,618 | 151,830 |
| Total | $ 810,618 | $ 627,202 |
| Other noninterest expense: | | |
| Advertising and promotion | $ 264,319 | $ 167,189 |
| Data processing | 508,976 | 577,446 |
| Professional fees | 776,811 | 775,140 |
| Printing, postage, stationery, supplies, and telephone | 403,773 | 426,376 |
| Franchise tax | 105,689 | 297,303 |
| Other | 762,601 | 714,222 |
| Total | $2,822,169 | $2,957,676 |

14. FINANCIAL INSTRUMENTS WITH OFF-BALANCE SHEET RISK

The Company enters into certain financial instruments with off-balance-sheet risk in the ordinary course of business as a part of its asset and liability management, specifically to reduce its exposure to fluctuations in interest rates. The Company's asset and liability management strategy is formulated and



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1619

monitored by the Asset Liability Committee, which is composed of senior officers of the Bank, in accordance with policies approved by the Board of Directors of the Bank. The committee meets regularly to review, among other things, the sensitivity of the Company's assets and liabilities to interest rate changes, the book and market values of assets and liabilities, unrealized gains and losses, including those attributable to hedging transactions. The Company also enters into other financial instruments with off-balance-sheet risk in the normal course of business which include commitments to extend credit.

The financial instruments the Company uses for hedging are financial futures contracts. These financial instruments involve, to varying degrees, elements of credit and market risk in excess of the amount recognized in the consolidated statements of financial condition. Credit risk represents the maximum potential accounting loss due to possible non-performance by obligors and counterparties under the terms of their contracts. The Company manages credit risk by limiting the total amount of arrangements outstanding, both by counterparty and in the aggregate, by monitoring the size and maturity structure of the portfolio, credit assessment of the counterparty, and by applying uniform credit standards maintained for all activities with credit risk. Unless otherwise noted, the Company does not require collateral or other security to support financial instruments with credit risk. Market risk represents the potential loss due to the decrease in the value of the off-balance sheet financial instrument caused primarily by changes in interest rates. By definition, a hedge is a strategy to attempt to avoid or reduce risk by creating a relationship whereby any losses on the hedged asset or liability are expected.

Financial Futures - The Company has outstanding futures contracts at December 31, 1994, with notional principal amounts totaling $45 million, which represent commitments to sell two, five, or ten year U.S. Treasury notes at a future date and at a specified price. These contracts mature as of March 1995. Financial futures contracts are traded through established exchanges which regulate these transactions. As a result of these regulations, most of the risk inherent in such instruments relates to market risk. The Company intends to close out most futures positions prior to settlement, thus limiting the cash receipts or payments to the change in the market value of the underlying instrument. Also, because futures contracts entail daily cash settlement, the credit risk amount represents at most a one-day receivable. The Company has entered into these futures contracts in an effort to hedge loans and certain investments securities and mortgaged backed and related securities. Net gains of $429,000 due to changes in the market value of futures contracts closed as of December 31, 1994 were deferred and included as an adjustment of the carrying amount of the hedged assets and are being amortized into interest income over the expected remaining lives of the hedged asset. The unrealized loss on open financial futures contracts at December 31, 1994 was $67,969.

Commitments to Extend Credit - The Company's exposure to credit loss in the event of nonperformance by the other party to the financial instrument for commitments to extend credit and written financial guarantees is represented by the contractual notional amount of those instruments. The Company uses the same credit policies in making commitments and conditional obligations as it does for on-balance sheet instruments.

Outstanding financial instruments whose contract amounts represent credit risk at December 31, 1994 are as follows:

| | |
|---|---|
| Commitments to extend credit: | |
| Mortgage loans/consumer loans | $ 485,000 |
| Construction loans | 1,214,000 |



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B75-1620

Commitments to extend credit are agreements to lend to a customer as long as there are no violations of any condition established in the contract. Commitments generally have fixed expiration dates or other termination clauses and may require payment of a fee. Since many of the commitments are expected to expire without being drawn upon, the total commitment amounts do not necessarily represent future cash requirements. The Company evaluates each customer's creditworthiness on a case-by-case basis. The amount of collateral obtained, if deemed necessary, by the Company upon extension of credit is based upon management's credit evaluation of the counterparty. Collateral held varies, but includes real estate.

15. FAIR VALUES OF FINANCIAL INSTRUMENTS

SFAS No. 107, "Disclosures About Fair Value of Financial Instruments," requires all entities to disclose estimated fair values of their financial instruments. Many financial instruments lack an available trading market, as characterized by a willing buyer and willing seller engaging in an exchange. Therefore, significant estimations and present value calculations were used by the Bank for purposes of this disclosure.

The following methods and assumptions were used to estimate the fair value of each class of financial instruments for which it is practicable to estimate that value.

Cash and Cash Equivalents, Investment Securities, and Mortgage Backed and Related Securities - For cash and cash equivalents, the carrying value is a reasonable estimate of fair value. For investment securities and mortgage backed securities, fair values are based upon quoted market price, dealer quotes, or values of similar securities. For certain mortgage backed securities for which an active market does not exist, the present value of expected cash flows was used to estimate fair value.

Loans Receivable, Net - Loans are segregated by loan type, fixed and adjustable rate, and maturity. The fair value is calculated by discounting the cash flows at current market rates for similar loans.

Deposits and Borrowed Funds - Under SFAS No. 107, the fair value of deposits with no stated maturity, such as demand, NOW, money market, and savings accounts, is disclosed as the amount payable on demand as of December 31, 1994 and 1993. The fair values of time deposits and borrowed funds are based on the discounted value of contractual cash flows. The discount rate is estimated using rates currently offered for deposits of similar remaining maturities.

Financial Futures - The fair values based on quotations received from securities dealers.

Limitations - Comparability between financial institutions may not be likely due to the wide range of permitted valuation techniques and the numerous estimates which must be made given the absence of active secondary markets for many of the financial instruments. This lack of uniform valuation methodologies also introduces a greater degree of subjectivity to these estimated fair values.

Fair value estimates are made as of a specific point in time, based on relevant market information and information about the financial instruments. These estimates do not reflect any premium or discount that could result from offering for sale at one time the Company's entire holdings of a particular financial instrument. Because no market exists for a significant portion of the Company's financial instruments, fair value estimates are based on management's judgments regarding future loss experience, current economic conditions, risk characteristics of various financial instruments, and other factors. These estimates are subjective in nature and involve uncertainties and matters of significant judgment and, therefore, cannot be determined with precision. Changes in assumptions could significantly affect the estimates.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1621

Fair value estimates are based on existing on-balance sheet and off-balance sheet financial instruments and do not take into account the value of anticipated future business and the value of assets and liabilities that are not considered to be financial instruments. Significant assets and liabilities that are not considered financial instruments include premises and equipment, the benefit that results from the low-cost funding provided by the deposit liabilities compared to the cost of borrowed funds in the market, and the benefit derived from the customer relationship inherent in existing deposits (core deposit intangible).

The carrying and fair values for investment securities and mortgage backed and related securities are disclosed in Note 3. The carrying value and fair value of such other assets and liabilities considered to be financial instruments are as follows:

| | December 31, 1994 | | December 31, 1993 | |
|---|---|---|---|---|
| | Carrying Value | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| Loans receivable, net | $135,633,232 | $148,628,138 | $133,842,259 | $158,412,968 |
| Deposits: | | | | |
| No stated maturity | 51,664,032 | 51,664,032 | 51,854,658 | 51,854,658 |
| Stated maturity | 89,093,175 | 86,494,160 | 76,970,863 | 76,746,000 |
| Borrowed funds | 91,185,591 | 91,135,580 | 75,731,594 | 76,325,640 |
| Instruments with Off-Balance Sheet Risk: | | | | |
| Financial Futures | | 67,969 | | |

16. RELATED PARTY TRANSACTIONS

The Company shared common owners and officers with River Valley Savings Bank, F.S.B. ("River Valley"), headquartered in Peoria, Illinois through December 31, 1994 at which point River Valley was sold. Through November 30, 1994 River Valley provided administrative services, including tax planning and computer support, to the Company under an administrative service agreement. For such services the Company paid River Valley $4,000 per month. Additionally, through July 1994, River Valley subserviced a portion of the Company's loan portfolio. In addition to receiving fees as subservicer approximating $77,000 and $142,000 in 1994 and 1993, respectively, River Valley retained any benefits derived from custodial deposits associated with payments from borrowers for taxes and insurance and any assumption fees and late charges collected.

One member of the Company's Board of Directors is an attorney with a law firm that provides services to the Company. Legal expenses recorded for such services were approximately $8,603 and $39,066 for the years ended December 31, 1994 and 1993, respectively.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B75-1622

17. CONDENSED FINANCIAL INFORMATION OF WESTERN CAPITAL HOLDINGS, INC.

The following condensed financial statements are presented for the Parent alone as of December 31, 1994 and 1993 and for the years then ended.

## WESTERN CAPITAL HOLDINGS, INC. (PARENT ONLY)

### CONDENSED BALANCE SHEETS, DECEMBER 31, 1994 AND 1993

| ASSETS | 1994 | 1993 |
|---|---|---|
| Cash and cash equivalents | $ 210,616 | $ 394,513 |
| Investments in subsidiary | 16,230,485 | 13,397,618 |
| Other assets | 49,764 | 151,887 |
| TOTAL ASSETS | $16,490,865 | $13,944,018 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| LIABILITIES: | | |
| Borrowed funds | $ 4,238,032 | $ 6,048,727 |
| Other liabilities | 109,693 | 2,771 |
| Total liabilities | 4,347,725 | 6,051,498 |
| STOCKHOLDERS' EQUITY: | | |
| Common stock | 1,000 | 1,000 |
| Class A common stock | 1,000 | 1,000 |
| Paid-in surplus | 49,200 | 49,200 |
| Unrealized losses on securities available-for-sale, net of taxes | (379,946) | |
| Retained earnings | 12,471,886 | 7,841,320 |
| Total stockholders' equity | 12,143,140 | 7,892,520 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $16,490,865 | $13,944,018 |



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1623

# WESTERN CAPITAL HOLDINGS, INC. (PARENT ONLY)

## CONDENSED STATEMENTS OF INCOME
## FOR THE YEARS ENDED DECEMBER 31, 1994 AND 1993

| | 1994 | 1993 |
|---|---|---|
| INCOME - Interest income | $ 7,743 | $ 3,432 |
| Total income | 7,743 | 3,432 |
| EXPENSE: | | |
| Interest expense | 567,338 | 762,421 |
| Compensation | 206,358 | 57,431 |
| Other expense | 458,293 | 315,455 |
| Total expense | 1,231,989 | 1,135,307 |
| LOSS BEFORE INCOME TAX BENEFIT AND EQUITY IN INCOME OF SUBSIDIARY | (1,224,246) | (1,131,875) |
| INCOME TAX BENEFIT | 167,000 | 223,000 |
| | (1,057,246) | (908,875) |
| EQUITY IN INCOME OF SUBSIDIARY | 6,962,813 | 7,332,427 |
| NET INCOME | $ 5,905,567 | $6,423,552 |



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1624

# WESTERN CAPITAL HOLDINGS, INC. (PARENT ONLY)

## CONDENSED STATEMENTS OF CASH FLOWS
## FOR THE YEARS ENDED DECEMBER 31, 1994 AND 1993

| | 1994 | 1993 |
|---|---|---|
| OPERATING ACTIVITIES: | | |
| Net income | $ 5,905,567 | $ 6,423,552 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Equity in income of subsidiary | (6,962,813) | (7,332,427) |
| Decrease in other assets | 102,122 | 115,123 |
| Increase (decrease) in other liabilities | 106,922 | (134,934) |
| Net cash used in operating activities | (848,202) | (928,686) |
| INVESTING ACTIVITIES - | | |
| Dividends received from subsidiary | 3,750,000 | 5,000,000 |
| Net cash provided by investing activities | 3,750,000 | 5,000,000 |
| FINANCING ACTIVITIES: | | |
| Principal payments on borrowed funds | (1,810,695) | (3,665,073) |
| Dividends paid on common stock | (1,275,000) | (425,000) |
| Net cash used in financing activities | (3,085,695) | (4,090,073) |
| NET DECREASE IN CASH AND CASH EQUIVALENTS | (183,897) | (18,759) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 394,513 | 413,272 |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 210,616 | $ 394,513 |

* * * * * *



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1625

# SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1626

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

## CONSOLIDATING BALANCE SHEET
## DECEMBER 31, 1994

| ASSETS | Consolidated River Valley Bank, F.S.B. | Western Capital Holdings, Inc. | Eliminations | Consolidated |
|---|---|---|---|---|
| Cash and cash equivalents | $ 5,902,608 | $ 210,616 | $ (143,875) | $ 5,969,349 |
| Securities held to maturity | 81,222,754 | | | 81,222,754 |
| Securities available for sale | 18,700,972 | | | 18,700,972 |
| Loans receivable, net | 135,633,232 | | | 135,633,232 |
| Accrued interest receivable | 1,507,960 | | | 1,507,960 |
| Foreclosed real estate | 2,834,637 | | | 2,834,637 |
| Investment in subsidiary | | 16,230,485 | (16,230,485) | |
| Premises and equipment, net | 3,677,130 | | | 3,677,130 |
| Other assets | 1,265,455 | 49,764 | | 1,315,219 |
| TOTAL ASSETS | $250,744,748 | $16,490,865 | $(16,374,360) | $250,861,253 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| LIABILITIES: | | | | |
| Deposits | $140,901,082 | | $ (143,875) | $140,757,207 |
| Borrowed funds | 86,947,559 | $ 4,238,032 | | 91,185,591 |
| Accrued interest payable | 125,796 | 106,999 | | 232,795 |
| Accrued expenses and other liabilities | 2,545,655 | 2,694 | | 2,548,349 |
| Deferred tax liability, net | 3,994,171 | | | 3,994,171 |
| Total liabilities | 234,514,263 | 4,347,725 | (143,875) | 238,718,113 |
| STOCKHOLDERS' EQUITY: | | | | |
| Common stock | 1,000 | 1,000 | (1,000) | 1,000 |
| Class A common stock | | 1,000 | | 1,000 |
| Paid-in surplus | 10,379,613 | 49,200 | (10,379,613) | 49,200 |
| Unrealized losses on securities available for sale | (379,946) | (379,946) | 379,946 | (379,946) |
| Retained earnings | 6,229,818 | 12,471,886 | (6,229,818) | 12,471,886 |
| Total stockholders' equity | 16,230,485 | 12,143,140 | (16,230,485) | 12,143,140 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $250,744,748 | $16,490,865 | $(16,374,360) | $250,861,253 |



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B75-1627

# WESTERN CAPITAL HOLDINGS, INC. AND SUBSIDIARY

## CONSOLIDATING STATEMENT OF INCOME
## FOR THE YEAR ENDED DECEMBER 31, 1994

| | Consolidated River Valley Bank, F.S.B. | Western Capital Holdings, Inc. | Eliminations | Consolidated |
|---|---|---|---|---|
| INTEREST INCOME: | | | | |
| Loans receivable: | | | | |
| First mortgage loans | $12,035,595 | | | $12,035,595 |
| Consumer and other loans | 3,844,175 | | | 3,844,175 |
| Other investment securities | 313,161 | | | 313,161 |
| Mortgage backed and related securities | 5,244,213 | | | 5,244,213 |
| Other interest-earning assets | 47,743 | $ 7,743 | | 55,486 |
| Total interest income | 21,484,887 | 7,743 | | 21,492,630 |
| INTEREST EXPENSE: | | | | |
| Deposits | 4,889,700 | | | 4,889,700 |
| Borrowed funds | 4,223,860 | 534,234 | | 4,758,094 |
| Other | | 33,104 | | 33,104 |
| Total interest expense | 9,113,560 | 567,338 | | 9,680,898 |
| NET INTEREST INCOME | 12,371,327 | (559,595) | | 11,811,732 |
| PROVISION FOR LOAN LOSSES | | | | |
| NET INTEREST INCOME AFTER PROVISION FOR LOAN LOSSES | 12,371,327 | (559,595) | | 11,811,732 |
| NONINTEREST INCOME: | | | | |
| Banking service charges and fees | 984,705 | | | 984,705 |
| Loan fees and service charges | 21,127 | | | 21,127 |
| Equity in earnings of subsidiary | | 6,962,813 | $(6,962,813) | |
| Gain from sales of foreclosed real estate | 1,202,685 | | | 1,202,685 |
| Net expense from real estate-owned operations | (273,660) | | | (273,660) |
| Other | 810,618 | | | 810,618 |
| Total noninterest income | 2,745,475 | 6,962,813 | (6,962,813) | 2,745,475 |
| NONINTEREST EXPENSE: | | | | |
| General and administrative: | | | | |
| Compensation and benefits | 2,305,468 | 206,358 | | 2,511,826 |
| Occupancy and equipment | 582,607 | | | 582,607 |
| Insurance of deposits expense | 305,003 | | | 305,003 |
| Other | 2,363,876 | 458,293 | | 2,822,169 |
| Total noninterest expense | 5,556,954 | 664,651 | | 6,221,605 |
| INCOME BEFORE INCOME TAX EXPENSE | 9,559,848 | 5,738,567 | (6,962,813) | 8,335,602 |
| INCOME TAX EXPENSE (BENEFIT) | 2,597,035 | (167,000) | | 2,430,035 |
| NET INCOME | $ 6,962,813 | $5,905,567 | $(6,962,813) | $ 5,905,567 |



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B75-1628