# EXHIBIT A

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**LARRY FERRIES DEPOSITION COUNTER DESIGNATIONS**

8/10/2000 Tr. 38:5-17
8/10/2000 Tr. 38:22-39:13
8/10/2000 Tr. 42:9-12
8/10/2000 Tr. 46:3-6
8/10/2000 Tr. 46:15-22
8/10/2000 Tr. 47:12-19
8/10/2000 Tr. 47:24-48:5
8/10/2000 Tr. 49:13-17
8/10/2000 Tr. 54:4-15
8/10/2000 Tr. 64:5-17
8/10/2000 Tr. 67:14-68:2
8/10/2000 Tr. 83:19-23
8/10/2000 Tr. 89:1-3
8/10/2000 Tr. 89:14-90:5
8/10/2000 Tr. 105:14-19
8/10/2000 Tr. 185:16-19
8/10/2000 Tr. 213:19-214:9
8/10/2000 Tr. 214:17-18
8/10/2000 Tr. 215:23-216:2
8/10/2000 Tr. 225:22-226:4

8/11/2000 Tr. 270:17-271:17
8/11/2000 Tr. 322:23-323:11
8/11/2000 Tr. 323:15-18
8/11/2000 Tr. 324:12-16
8/11/2000 Tr. 326:6-19
8/11/2000 Tr. 329:11-17
8/11/2000 Tr. 331:1-6
8/11/2000 Tr. 336:19-23
8/11/2000 Tr. 357:10-15
8/11/2000 Tr. 357:24-358:6
8/11/2000 Tr. 361:1-9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND AND HOWARD P. ROSS, )
Plaintiff, )
VS ) NO.5-524C
THE UNITED STATES OF AMERICA, )
Defendants. )

The deposition of LARRY FERRIES called for examination pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts, pertaining to the taking of depositions, taken before Frances I. Okrei, CSR-CM, a notary public within and for the County of Will and State of Illinois, and a Certified Shorthand Reporter in the State of Illinois, Certificate No. 84-1074, at 54 W. Hubbard Street, Chicago, Illinois, on the 10th day of August, A.D., 2000, commencing at the hour of 9:00 o'clock a.m.

APPEARANCES:

ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 42-5656
BY: MR. HOWARD N. CAYNE
and MR. DAVID BERGMEN,
Appeared on behalf of Plaintiffs;

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L. Street
Washington, D.C. 20530
(202) 353-8841
BY: MS. PATRICIA A. SMITH,
Appeared on behalf of Defendants.

A Yes.
Q And what was the cause of that insolvency?
A Poor management and bad loans.
Q Any criminal conduct?
A Relating to the Thrift, no. But one of the last presidents was arrested for indecent exposure in a swimming pool.
That's why I'm laughing. And I can't even think of his name.
Q But the institution became --
A Is that criminal?
Q But the institution became insolvent, I take it, not as a result of the president's predelictions but as a result of bad loans and the bad economic environment at the time?
A Yes.
Q Did you ever recommend that Galva be placed into receivership?
A I would believe so. I can't remember exactly but I'm sure I did.
Q Would you have recommended that to the extent FSLIC had available funds that Galva should be liquidated?
A Well, we didn't -- we would just -- the

way the process worked, we turned the problems over to FSLIC and then we would do a bid package.

I don't even remember what the -- all the stuff that was involved. Send out the examiners, filled out all the forms. Turned them over to FSLIC and they would do all the analysis, is it better to liquidate or is it better to merge it with somebody or they put it up on the -- you know, for a bid.

And most of the time, there was a bidder. But that was out of our hands. We didn't have anything -- we didn't work on the nickels and dimes and everything.

Q Do you recall that it took a long time, several years, for the Galva situation to be resolved, even after it became insolvent?

A Yes.

Q Didn't that cause you as a field manager a great level of concern?

A Yes.

Q And why were you concerned?

A Because they didn't have capital. And everything was so busy -- it was a small -- Galva was a very small institution.

Big institutions had priority, you know.

anything unusual.

Q Why did you let that go on --

A I had no control over it. I mean, FSLIC wouldn't take it over or they wouldn't do things.

I mean, they were too busy to -- I personally couldn't go in and take it over. It was up to FSLIC and they were just so busy at the time.

Q But I assume --

A It was a perceived -- it wasn't perceived to be an immediate catastrophe or whatever.

Q In other words, it was insolvent but it wasn't large enough to get their attention because they had so many larger insolvent institutions?

A Right; correct.

Q But it was continuing to lose money, wasn't it?

A It was losing money but, you know -- nothing I could do. It was strictly out of our hands.

It was up to FSLIC and they moved very slow on some deals.

Q By definition, an insolvent institution is going to hemorrhage until it's resolved, right?

was a lot worse?

A Oh, it was a lot, lot worse that Galva.

Q How do you know?

A I'm just saying at the time that I remember that there was a lot of problems there. That Galva was smaller. But I didn't know any specifics about Republic.

Q What about Mutual, that was another one of the institutions that --

A Mutual of Canton.

Q Yes. What is your understanding?

A I was never involved with that one at all until the -- they threw it -- threw Galva and them and Home, I think it was, together.

I didn't have any prior knowledge or activities with that.

Q What about Home?

A Nothing whatsoever.

Q So those institutions simply were not in your --

A They were not in my caseload. There were other field managers that had those.

Q But I assume, based on one-on-one conversations with the other field managers, you knew that each of those institutions were deeply

troubled, yes?

A Right.

Q And I assume that field managers didn't simply sit behind their desks all day?

A No, we would have meetings and you knew what was happening in other people's caseloads but not -- we would meet, you know, monthly at least or weekly.

I don't even remember but we would meet and talk about the significant institutions and the significant problems.

Q And during your monthly meetings, was Republic Savings dealt with as a significant problem?

A Yes, they were mentioned. Like I said, I never really paid too much attention to what was going on with those -- with shops that I had never had any dealings with. They were somebody else's problems, so let it be.

Q But each of those institutions, Mutual, Home and Republic were dealt with at the monthly meetings as significant supervisory problems?

A Right; right.

Q And isn't it -- wasn't it your understanding from those meetings, although you

didn't have direct responsibility for those institutions, that each of those institutions were insolvent?

A I would assume that but I don't really recall.

Q What about Peoria Savings?

A I never had anything to do with them either. That was out of my grid.

Q Until they were also --

A Until they were all acquired and put into one.

Q What was -- was Rock Falls, prior to its acquisition of Republic, under your jurisdiction?

A Yes.

Q And Rock Falls was a sound institution, correct?

A Yes, very sound, well-run little shop.

Q And who owned Rock Falls. Am I correct it was Messrs. Holland and Ross?

A They bought it from another group and I had it -- I had Rock Falls. It was the prior group. I don't remember who it was. I just remember Cal Morgan was the president.

Q But you were also -- am I correct that you had Rock Falls in your caseload when it was

acquired by Messrs. Holland and Ross?
A Yes; yes.
Q And were you involved in the -- in processing the change in control application that authorized Messrs. Holland and Ross to acquire Rock Falls?
A No. Because I was -- applications would have handled that and then whoever, the other people would have done a lot of that.
I didn't until after the first exam of Rock Falls, would not have known who Homer and Howard were.
Q And the first exam you just referred to, what would the time period of that have been?
A No, I have no idea.
Q Mid 1980's?
A Yes, somewhere in -- yes, mid 1980's.
Q So I'm correct, am I not, you would have had several years of experience dealing with Messrs. Holland and Ross prior to the time in 1988 that they engaged in the supervisory acquisitions?
A Right.
Q And I take it that the Federal Home Loan Bank officials would have, among other things, relied upon your assessment of Messrs. Holland and

Q But very serious in the -- in light of the problems that it was suffering?

A Yes, right.

Q And did you ever, I'll say, speak to or whisper in Mr. Holland's ear, "Why don't you take a look at Galva."

Do you recall whether you ever had any conversations?

A Never.

Q Do you know how he became aware of Galva?

A I have no idea. But it kind of fit in with the other ones in Peoria. It's not that far from Peoria. Galva, Canton, Peoria were all pretty close together.

Q But I take it you were most or happy when you learned that Mr. Holland had expressed an interest in taking over Galva?

A Yes.

Q And would you have -- when you had heard about that, who would you have conveyed your views to within the Federal Home Loan Bank concerning Mr. Holland? Would it have been to your supervision?

A My supervision.

Q And you relied on Mr. Kenney very heavily in assessing the safety and soundness of River Valley's various investments?
A Yes.
Q And was Mr. Kenney viewed throughout the OTS as being extremely competent?
A Well, Federal Home Loan Bank at the time.
Q Was he viewed as being --
A Yes.
Q Is he still an employee at the office?
A Yes.
Q Does he work in the Chicago office?
A Chicago office. He's our Regional Corporate Security Specialist or whatever. I can't think of his title but he's still in that same position.
Q And do you recall -- and we'll look at the documents and I'm sure you'll painfully recall when you see the documents -- but do you recall that there were very large disputes between the Office of Thrift Supervision and the Federal Deposit Insurance Corporation relating to the proper assessment of the safety and soundness of River Valley?

come in on every exam with us. And after that, I'd say about a two-year period, after they had made their whole rounds, they had realized that things weren't as bad, not every savings and loan manager wasn't a crook and that the examiners actually did know what we were doing.

And then after that, they just chose to come in on high priority, what they considered high priority institutions.

Q So it wasn't unusual in your experience for there to be one rating difference in the composite rating, correct?

A No; no.

Q But are you familiar with any other situations other than River Valley where the rating difference was 2 and that connection -- then I'll let you read this directly.

I will advise you that prior to seeing documents which indicated that there was a 2 rating difference relating to River Valley, which you just confirmed, Mr. Karr testified on July 12, 2000 in this very case as follows: On composite ratings, I don't think you'll find any situations. I can't think of any situations put it that way, that the difference would have been more than one

level, a three versus a four, or a four versus a five or a two versus a three.

And my question is, other than this situation in River Valley, are you aware of any situation where there was a two level composite rating difference with respect to a specific savings and loan association assigned by the FDIC and the OTS?

A No, I'm not.

Q So this was a very serious matter?

A Yes.

Q Why was the rating difference assigned by the agencies in this case so significantly different?

A Philosophical differences. FDIC does not have to justify what they do. They do whatever the hell they want and they don't listen to reason.

And asked why, they just say, "Because we can."

Q Because we --

A "We can."

Q Why did they not have to justify what they do?

A Because they are God. They have the

memo. Yes. Because I did not know Mr. Rose at all.

Q That's why I figured it was a typo. What was the basis for your opinions of Messrs. Holland and Ross that are reflected in Exhibits 1 and 2?

A Could you repeat the question?

Q Yes. On what basis did you draw the opinions, your personal opinions of Messrs. Holland and Ross that you reflect in these two exhibits?

A Just on my personal dealings with them and how they were running River Valley FSB and River Valley Savings Bank.

Q And you thought they were doing quite a nice job in running the institution, correct, at this time?

A Yes.

Q And you had that opinion notwithstanding that the FDIC was rating the institution a 4 at this time, correct?

A I didn't have a problem with them rating it a 4.

Q You didn't have a problem --

A I didn't -- it did not affect my opinion

Q And --

A I don't have if they were conservative. That was the word I was just --

Q But I assume that there would be very few bankers that you would make that statement about that they met or exceeded every projection they ever made to you. Is that a fair statement?

A Yes.

Q And when you -- we spoke about that you had supervisory jurisdiction over both of the River Valleys immediately following the 1988 supervisory acquisitions, correct?

A Correct.

Q And I assume that you would have -- and your staff, would have immediately immersed yourselves in the details of the business plans of the two River Valleys, correct, to familiarize yourselves with them?

A I was familiar with them but actually my analysts, they would get the business plan, go through it, analyze to make sure targets were met and everything and then they would report that to me and give me a little summary.

I mean, the business plans are thick, very detailed and there is no way I could possibly

know every detail in each one of them.

Q But you certainly understood --

A I understand the big picture and understood what was presented to me from my analysts.

Q And you understood the capital projections, correct?

A Yes.

Q You understood what their earnings goals were, correct?

A At the time, yes.

Q And you and your staff would have understood at the time that the business plans in 1988, specifically the capital portions of the business plans, were predicated in very large part on the continuing existance of the forebearance capital, correct?

A Correct.

Q And business plans, specifically, would have been predicated in very large part on the continuing includeability in capital of supervisory good will, correct?

A Yes.

Q The capital credits, correct?

A Uh-hum.

weight on it?

A I would think so.

Q That was your experience, wasn't it?

A Right.

Q Had the -- in your opinion, as a direct supervisor of River Valley, could the effects of the government's decision to reneg on its deal and no longer allow River Valley to include the forebearance capital as one of the regulatory capital had been rectified had the government replaced that forebearance capital with an equal amount of cash capital. Did you understand?

A Yes.

Q In other words, do you recall that River Valley lost something in excess of 20 million dollars in regulatory capital as a result of the enactment of FIRREA?

A Right.

Q And as we've discussed today, that loss of the regulatory capital had very adverse consequences on River Valley, correct?

A Right.

Q Specifically, including on its ability to remain profitable, correct?

A Correct.

A Probably but other people would have had input, too.

Q But isn't it fair to say with respect to River Valley itself during the period from the time Mr. Karr joined the office through the merger of River Valley in 1994 and 1995, that you would have had numerous discussions and meetings with Mr. Karr on a whole range of issues facing River Valley during that period?

A Probably, yes.

Q And isn't it also probably correct, that Mr Karr would have relied on your judgment on those many issues during that time period with respect to River Valley?

A Yes.

Q You believe you have a good working relationship with Mr Karr, don't you?

A Yes. But he would have relied also heavily on Larry Kenney.

Q And you personally relied heavily on Larry Kenney, right?

A Yes.

Q Because he was the expert within the Office of Thrift Supervision when it came to the analysis and understanding of many of the

Q But my question was, if we could identify the specific assets that River Valley disposed of in order to reduce their size as a result of the six million dollars in dividend, six million dollar dividend paid in order to affect the San Antonio transaction, we could determine could we not, with mathematical precision how much in earnings River Valley lost as a result of those of the disposal of those specific assets, correct?
A Probably.
Q Would you see any reason we couldn't, sir?
A Not really.
Q So we could, right?
A Could from a reasonable estimate.
Q Very solid estimate, wouldn't you agree with that?
A Yes.
Q Okay. Now let's turn to the point you just made. By transferring the six million dollars from River Valley in Illinois to River Valley in San Antonio, Messrs. Holland and Ross effectively transferred the earning capacity of that six million dollars to San Antonio, correct?
A I think that could --

Q Repeat -- what was your statement?

A In the big picture, would it matter if the six million -- I mean, if the money is still going to go to Howard and Homer and their earnings potential, because they are the primary ones, so does it matter to them if it's done here in Illinois or done in Texas?

It's still going to come back to them one way or the other.

Q But in giving that testimony, you understand as we discussed this morning, that six million dollars in capital wasn't deployed in a banking enterprise such as either one of the River Valleys, is at the heart of making continuing earnings, correct?

A Correct.

Q And let me suggest why it made a difference and see if you agree.

Do you recall, we -- let me strike that and come back to Exhibit 13.

The portion you've been examining that refers to the six million dollar dividend, correct. The next page. I think the six million dollar dividend is referred to at the top of the next page. Do you see that?

A Uh-hum.
Q That was the dividend payment that you ultimately approved, correct?
A I believe we did.
Q If you continue reading that passage, it indicates the anticipated amount of earnings reduction to be sustained in River Valley in Illinois, correct?
A Right.
Q What does it indicate?
A It estimates that there will be a decrease in earnings of a hundred thousand dollars.
Q And --
A Per month.
Q Aren't I correct, Mr. Ferries, that when you and your staff made the decision to approve that dividend payment, you would have required River Valley Bank in Illinois to advise your office of the anticipated effect of that dividend payment, correct?
A Right. We would have had input on that dividend but also, this further goes on to say that the core earnings were going to decrease but the overall interest rate risk of the institution

was going to improve and that was a key thing, too, in that timeframe was the interest rate risk.

Q That was the point that the FDIC was pressing, correct?

A Well, not just them but we were all concerned about interest rate risk.

Q The FDIC was really jumping down your back on interest rate risk, weren't they?

Is that a fair statement?

A I don't remember. I mean, they just didn't like the type of investments that they were using.

River Valley used many different, unique instruments and that -- they weren't a vanilla type investment and that's why FDIC didn't like them.

They like vanilla, plain, noncreative type of investments.

Q But your capital markets person, as you testified, was comfortable with them; is that correct?

A We were using those type of securities for years to control interest rate risk. OTS, of all of the banking regulators, OTS is the first one and that's because we were involved with the

the Holland and Ross acquisitions, correct?

A Right. I never talked with anyone at American National but it was just -- my thing was that they always financed -- they always financed it and Howard was -- had had a long-term relationship with them.

Q And you understood, you stated before, that American National's refusal to lend the money directly to the Illinois institution had a lot to do with the capital problems of River Valley in Illinois and capital and adequacy problems of River Valley in Illinois and the resulting supervisory enforcement action, right?

A I don't understand the question.

MS. SMITH: Counsel, I would again ask that you direct your questions to things that Mr. Ferries has knowledge of as opposed to asking him to guess as to what everyone else thought, but what Mr. Ferries thought back in the late 1980's or early 1990's.

BY MR. CAYNE:

Q You testified a few moments ago concerning the reasons why American National was unwilling to lend the money necessary to acquire San Antonio, if San Antonio was to be held

directly by River Valley in Illinois. Do you recall that?

A I think that was my assumption but I did not know that for sure.

Q Okay. Now, we had a lot of conversation today about the adverse impact of FIRREA, correct?

A Correct.

Q And we had a lot of discussion that indicated that River Valley would have been a much sounder, better capitalized and more profitable institution had the breach of the FIRREA -- the breach of contract affected by FIRREA not occurred, do you recall that?

A Yes. It would have been -- they would not have had a cap problem if the government hadn't changed their rules.

Q Okay.

A Sound capital is a different thing.

Q Do you understand --

A Personally, I don't think the good will in everything was solid capital. Okay. To me, cash is capital but it was allowed so, therefore, it was capital.

Q And you as a regulator gave full credit to the forebearance capital, did you not?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

\- - - - - - - - - - - - - - - x
HOMER J. HOLLAND and :
HOWARD R. ROSS :
Plaintiffs :
v. : No. 95-5240
THE UNITED STATES OF AMERICA :
Defendant. :
\- - - - - - - - - - - - - - - x

Continued Deposition of LARRY FERRIES
(Taken by Plaintiff)
Chicago, Illinois
August 11, 2000

Reported by: Mary C. Kelly, CSR No. 084-001915

APPEARANCES:

For the Plaintiff:

HOWARD N. CAYNE, ESQ.
ARNOLD & POTTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the Defendant:

PATRICIA A. SMITH, ESQ.
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
1100 L Street, N.W.,
Washington, D.C., 20530
(202) 353-8841

A Correct.
Q But for the five year period or in excess of five year period from November -- excuse me, from August, 1989, through November, 1994, for the reasons you and I have discussed a number of times, River Valley was not able to pursue its initial government approved business plan including the growth aspects of that plan, correct?
A Correct.
Q So although River Valley was in capital compliance in November, 1994, it was a smaller institution, a significantly smaller institution than it would have been had it not lost its forbearance capital and had it been able to grow in accordance with its government approved business plan, correct?
A It's smaller than it could have been.
Q And, again, based on your personal knowledge of the business plan and based upon your personal knowledge of River Valley's growth plans, isn't it fair to state that it was significantly smaller than it would have been had it had the full amount of forbearance capital available for the entire five year period from August, 1989, through November, 1994?
MS. SMITH: I just believe he indicated it could

have been, not it would have been. Your question presumes he indicated it would have been.

BY THE WITNESS:

A It would have been smaller. I don't like the word significant because significant means so much to different people. It is smaller than what it could have been, but maybe they would -- A business plan is a fluid document. It's a plan for five years, but a good business plan you can really only go out one year, and then things change and markets -- The interest rates might have gone crazy in that interim. They may have changed their business plan. Nothing is -- You know. So, I mean, it's smaller, yes, it's smaller, but maybe it never would have reached the size they had wanted to be because of other interior factors -- I mean, other factors.

BY MR. CAYNE:

Q And maybe they would have grown even larger than the business plan called for, correct?

A That's a possibility.

Q And sitting here today, with the benefit of history, we know interest rates didn't go crazy during that time period, don't we?

A Yes, looking 20/20 hindsight, but, at the

A I can definitely say it did not change. They looked at my report like I looked at their report, I'm sure.

Q Mr. Ferries, you'll be pleased to know I have no further questions of you.

Do you have -- With respect to the answers you've given in this deposition, is there anything you would like to clarify or correct or expand upon at this time?

A I've tried to give my best answers throughout that. There may be some minor inconsistencies, but I've tried to do my best.

Q Did you understand the questions I asked you?

A Yes.

Q Did you have adequate time to review the documents about which we spoke?

A Correct.

MR. CAYNE: I have no further questions.

Counsel, you may inquire.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. SMITH:

Q Mr. Ferries, I have a few questions for you.

First, with respect to any exam reports or correspondence from the Office of Thrift Supervision

relating to either River Valley Peoria or River Valley Rock Falls, do you believe any concerns or issues raised by the OTS in those reports and/or letters and/or memos were accurate?
A I believe all the reports that I issued regarding River Valley or Rock Falls or River Valley were accurate.
Q With respect to the differences between the FDIC and the OTS's evaluation of River Valley Peoria and/or Rock Falls, was the main difference the way in which FDIC classified the assets of the institutions?
MR. CAYNE: Objection to leading questions of your own witness.
BY MS. SMITH:
Q You can answer.
A Yes, it was basically they classified -- they didn't like the investments so they classified them, whereas we did not classify investments.
Q Next, Mr. Ferries, Mr. Cayne asked you many questions throughout the deposition with respect to your understanding of the intent of either Homer Holland, Howard Ross and/or River Valley Peoria and/or Rock Falls.
With respect to the testimony that you presented as to your understanding, was that based on

your actual recollection of events or was that based on your guess as to what you think you would have understood to be the case?

MR. CAYNE: Objection to leading question, trying to get the witness to suggest that he was merely guessing when he testified.

BY THE WITNESS:

A I think most of it was on recollection. Some could have been a guess, but it was primarily my recollections.

BY MS. SMITH:

Q Mr. Ferries, were you involved at all in the negotiations relating to the assisted acquisitions which we have been discussing here yesterday and today?

A No, I did not participate in negotiations.

Q And you provided some testimony along the lines of a contract is a contract.

Did you at the time of the assisted acquisitions or at any time since then actually analyze whether, in fact, a contract was created between Homer Holland, Howard Ross and/or either of the River Valleys and the Federal Government?

A That's not for me to determine. That's a lawyer's call.

that was later deemed to be not capital, but I don't recall the exact amount.

Q Do you know whether the amount is above or below 10 million?

A I don't recall the exact numbers.

Q Mr. Cayne also asked you some questions regarding efforts by Homer Holland and/or Howard Ross and/or River Valley to replace the capital which the River Valley institutions were no longer able to count as capital pursuant to FIRREA.

Did you at the time of the passage of FIRREA or any time thereafter ever engage in any analysis of how they could replace the regulatory capital that was eliminated pursuant to the passage of FIRREA?

A That was up to them how they were going to replace it. We didn't say you got to do this or this or this. We said you've got to get capital. They determined how they were going to get it and in what form so we didn't say go do this or that.

Q Both yesterday and today Mr. Cayne asked you some questions relating to the redemption of the FSLIC stock, and there was a -- and you were shown Exhibit 25, which included a December, 1989 business plan, and there was a reference that River Valley intended to discuss with FDIC and/or FSLIC the issue

testified.

BY THE WITNESS:

A I assume that they were going to do it.

BY MS. SMITH:

Q Do you know whether they, in fact, did discuss the issue of switching the cumulative to non-cumulative with the FSLIC/FDIC?

A I don't recall if they did or they didn't, but I would assume because they said they would that they probably did.

Q And with respect to the -- Let me restate that.

And as to the reasons why the stock was not converted from cumulative to non-cumulative, do you have any understanding as to why that did not take place?

A No, I don't.

Q Mr. Ferries, would you have reviewed the business plans that were submitted by Homer Holland and/or Howard Ross and/or the River Valley entities prior to the assisted acquisitions taking place?

A Not prior to the assisted. After the assisted is when I would have had input. I would have been responsible for monitoring the business plan because all that was handled by FSLIC at the

Q Mr. Ferries, did you ever have any discussions with American National Bank regarding any financing they provided to either of the River Valley entities and/or Mr. Holland and/or Mr. Ross?

A I had no personal dealings with American National Bank or discussions with them.

Q And other than the reference that you saw in one of the exhibits to an effort to engage in discussions with LaSalle, do you know one way or the other what other efforts were undertaken by either River Valley institutions to talk with other potential banks and/or investors to raise capital for the thrifts?

MR. CAYNE: Objection to the continuing leading questions. Objection to your effort to get this witness to retract his precise testimony of yesterday when he's already stated that he testified honestly and accurately.

BY THE WITNESS:

A They talked to -- I don't know the specifics, but they did talk -- by that one letter, they did say that they had talked to LaSalle so I wouldn't have questioned that. I mean, they had made that statement that they had talked to LaSalle so they had tried to get others.

the various branches experienced deposit growth or not?
A I don't recall any specifics, but it's routine that there's up and down movements in all deposits.
Q Do you have an understanding as to during what time periods between the time of the acquisitions at the end of 1988 up through the time of 1994 River Valley -- either of the River Valleys may have been interested in growing by acquiring other institutions?
A I think we've -- They wanted to acquire, and I remember some specific institutions that they had talked to, but I don't recall any of the exact details.
Q And that would include the time periods of when that was?
A Yes.
Q Did you ever have any discussions, Mr. Ferries, with First Banks regarding their desire to acquire River Valley?
A No, I wouldn't have. It would not have been up to me to talk to them.
MS. SMITH: I have no further questions, Mr. Ferries.

Q And you're confident that the numbers we have just discussed are the correct numbers?

A Yes, I am. I am under oath.

Q Do you recall in Counsel's examination of you on cross-examination she asked you a series of questions relating to an exhibit we looked at this morning, and, specifically, it was Exhibit 25? Do you recall that line of questions?

A I remember the questions, yes.

Q And, specifically, Counsel was asking you a series of questions relating to Subsection D of Exhibit 25 which appeared on pages 1 and 2 of the revised December, 1989 business plan of River Valley Savings Bank FSB, correct?

A Right.

Q And, specifically, counsel inquired of you concerning the state of your knowledge with respect to efforts made by Messrs. Holland and Ross to persuade the FDIC to eliminate the cumulative dividend feature of the $5 million issuance of FSLIC preferred stock? Do you recall that line of questioning?

A Yes.

Q And do you recall your response to counsel's inquiries?

A I believe I had stated that I had no direct involvement, but they said that they had contacted them. I didn't recall any direct involvement, but they said they had done that so, therefore, I would have assumed they were going to pursue that line of action because they usually did pursue that action.

Q And, in fact, if we went back and looked at your testimony, we would see that you indicated you were highly confident that they, in fact, did that? Do you recall that?

A Yes. Like I said, they said they would do it, and I would not doubt that they did.

Q And this wasn't speculation on your part? You had a basis -- And I would appreciate if Counsel does not laugh at my questions. You had a basis in fact, did you not, to know that you could rely on statements and promises made by Messrs. Holland and Ross, correct?

A Right.

MS. SMITH: Counsel, he specifically indicated he did not recall so it's nothing but speculation. How can you ask it is not speculation when he says he had no recollection is nonsensical.

BY MR. CAYNE:

Q Correct, sir?

Q Government Counsel asked you whether you had any discussions with American National. Do you recall that?

A Yes.

Q And you testified that you didn't have any direct discussions with American National, correct?

A I don't remember. Any direct discussions I would have ever had would have been very unusual and not normally done.

Q And, in fact, you provided the same testimony to me yesterday, didn't you?

A I believe that was the same testimony. It should have been.

Q And although you didn't have direct discussions with American National, you and your staff had direct discussions with Messrs. Holland and Ross where they reported to you as they were required to by law because you were their supervisor, they reported to you on their discussions with American National concerning raising additional capital, correct?

A Yes. They kept us informed of where they were going and what their negotiations with American National -- I don't remember any specifics, but they would have kept us informed of what they were doing