# EXHIBIT B

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**DIANA JANUSKA DEPOSITION COUNTER DESIGNATIONS**

8/11/2000 Tr. 11:20-12:4
8/11/2000 Tr. 19:8-16
8/11/2000 Tr. 22:12-23:11
8/11/2000 Tr. 25:22-26:1
8/11/2000 Tr. 26:13-16
8/11/2000 Tr. 27:2-30:2
8/11/2000 Tr. 31:1-34:14
8/11/2000 Tr. 76:18-77:15
8/11/2000 Tr. 81:20-23
8/11/2000 Tr. 81:25-82:2
8/11/2000 Tr. 87:21-25
8/11/2000 Tr. 92:14
*(listed by plaintiff as designated, but not in copy of deposition they provided)*
8/11/2000 Tr. 110:7-14
8/11/2000 Tr. 110:23-111:7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND and HOWARD )
R. ROSS, )
)
Plaintiffs, )
)
vs. ) No. 95-524C
THE UNITED STATES OF AMERICA, )
)
Defendant. )

ORIGINAL

Deposition of DIANA JANUSKA
(Taken by Plaintiff)
Chicago, Illinois
August 11, 2000

Reported by: Melissa Belice, CSR No. 084-003391

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

DAVID B. BERGMAN, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the U.S. Department of Justice:

PATRICK T. MURPHY, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

been both ways.

Q. Did you meet one on one with management of thrifts, or was it always in the company of Helen Mirza or someone else in your office?

A. Always in the company of someone else.

Q. And tell me the whole reporting structure when you were a supervisory analyst beginning in January '87 and if it changed over time through 1990.

A. Helen Mirza was my supervisor. And there was another analyst that also reported to her. Her name was Leslie Sommers. And Helen reported to Chet Biedron. And Chet Biedron reported to Leo Blaber. And probably sometime I think in '88 or the end of '87 Stuart Brafman was hired. And I believe Chet then reported to Stuart who then reported to Leo.

Q. Did anyone report to you?

A. No.

Q. What was your relationship to Michael Jaski?

A. Michael Jaski was in the accounting area, and he reported to I believe Dennis Thomas. And we would ask him to do some analysis on an as-needed basis.

Q. So he did work that you relied on and you may ask him to do work, but he didn't report to you; is that right?

A. Correct.

Q. You testified I think that you were monitoring mostly insolvent institutions and when they were scheduled for a resolution you would do work on the resolution. What did you mean scheduled for a resolution?

A. Well, if you had an insolvent institution, you would first see if anybody wanted to merge with them on an unassisted basis. If that wasn't possible, then the Washington office would schedule institutions to be put out for bid on an assisted basis. And a bid conference would be scheduled or you would contact institutions through the mail asking if they were interested in seeing a bid package on a particular institution or a group of institutions.

Then a bid would come in, you look at them, ask them to be cost through a recommendation memo. If that was approved, then Helen and her staff, meaning Leslie and I, would negotiate that, sometimes with the help of Stuart, Stuart Brafman I think in some of the later cases and sometimes

let's take them individually, about Homer Holland as a banker or potential acquirer of the thrifts?

A. No.

Q. Did you have any concerns about his abilities as a banker or potential for acquiring the thrifts?

A. No.

Q. Did you come to any conclusion as to whether the acquisition of Home, Mutual, and Galva by Holland and Ross was a good thing in terms of resolving the problems for those thrifts?

A. Well, in hindsight the institution was profitable. He was able to sell it to another institution. I believe it made money. I didn't follow it very closely after the acquisition. It seems like it was a good transaction.

Q. A good transaction for the government.

A. It resolved three cases.

Q. And that's good for the government at this point?

A. You know, I don't know if good for the government is a -- what do you mean by good for the government?

Q. Was the government's goal to resolve these three cases?

Q. And you did that here?
A. Yes.
Q. That's a success and good for the government, true?
A. It was good -- you know, I just don't view it as good for the government or not. But I guess if that's how you're classifying it, then I would say yes.
Q. Did you meet with Leo Blaber in connection with these acquisitions?
A. Probably.
Q. And would you have reviewed memoranda that bore either Helen Mirza or Leo Blaber's signature and went up to the Federal Home Loan Bank Board of Washington?
A. I probably drafted it.
Q. You probably drafted it.
A. Um-hum.
Q. So if there were memoranda that say that Homer Holland and Howard Ross are people of experience in the industry, capable bankers and of great integrity, that's language that you likely drafted?
A. I'd have to see the memo. I drafted "S" memos that Leo signed, I drafted recommendation

memos that Leo signed with consultation of Helen Mirza. I drafted them, she reviewed them, he reviewed them, he signed them. If they wanted changes in there or if they wanted certain sections added, I drafted what they told me to draft.

Q. So substantively either Leo Blaber or Helen Mirza is responsible for the substance of those memos; is that correct?

A. Well, he signed them and Helen reviewed them and I wrote them, so that's the chain.

Q. Do you recall coming to any conclusion about the integrity of Homer Holland or Howard Ross during the course of this process?

A. No, I don't recall.

Q. And if there are statements in the "S" memoranda and the like saying that Homer Holland and Howard Ross appear to be of great integrity, is that something that was your view or was something that was likely added by Helen Mirza or Leo Blaber?

A. I don't remember.

Q. You characterized the discussions as negotiations between Homer Holland and Howard Ross and the government, which is principally you and

Q. Lessen the acquirer's tax?
A. Um-hum.
Q. And this was something you were aware of at the time?
A. Um-hum.
Q. I'm sorry, is that a yes?
A. Yes.
Q. And the government used this as an inducement or an asset that it could sell to the potential acquirers, is that true?
A. Well, it was a benefit that the acquirer would ultimately have, so that was on the table.
Q. When you say that was on the table, what does that mean?
A. That was considered in the cost of the bid.
Q. Was that a cost for the government?
A. No, but it was a benefit to the acquirer. I mean, they're getting a benefit. They obviously couldn't lower some other portion of their bid if they were getting its benefit.
Q. I'm sorry, I just didn't hear you. They obviously couldn't did you say lower?
A. Well, if you're getting a benefit, you shouldn't get a benefit for nothing. It should

balance out something else.
Q. So in view of the fact that the acquirers get the use of the NOLs, Helen Mirza perhaps or you would argue --
A. Or MAD, Washington, FSLIC.
Q. Someone in the government would argue that to the acquirers because you're getting the benefit of these NOLs maybe you don't need as much cash or loan coverage or some other package of benefits you don't need because you realize you're getting the benefits of these NOLs; is that right?
A. Right.
Q. Do you recall if the NOLs were an issue in the Holland and Ross transactions?
A. I don't recall the details of the transaction.
Q. But that was the standard practice when NOLs were floating about the institutions for the government to use this as an inducement or characterize it as a benefit of the deal to the acquirers?
A. That's what I remember, yes.
Q. And the government would then try to use that to lower other amounts of assistance, they had out-of-pocket costs for the government?

A. That's what I remember, yes.

Q. What other kinds of inducements did the government offer in these kinds of acquisitions? Cash assistance, NOLs, what else?

A. The only other one that I really could think of is if you can identify some loans, there might be some -- in some instances, in some transactions after a period of time they might take some loans back. There was some asset coverage depending on the loans. But I haven't worked on this for a very long time. I don't remember.

Q. When you say they might take them back, the government may take back --

A. The FSLIC at the time.

Q. Do you recall any inducements relating to regulatory capital?

A. I don't remember.

Q. Do you recall something known as goodwill?

A. Yes.

Q. What do you recall of goodwill?

A. That goodwill, there was an agreement that goodwill could be amortized over I believe it was 25 years.

Q. And was this viewed as again a benefit of the deal that the government was offering to the acquirers?

A. I never really characterized it as a benefit or not. It was just part of the transaction.

Q. Why was it part of the transaction?

A. I don't remember. Probably there was a hole there to fill. I just really don't remember. I can't give you an answer.

Q. When you say there was a hole there to fill, I'm not sure I followed.

A. You know, I really -- I'm having a difficult time explaining.

Q. Did you understand that the goodwill made the institutions more attractive to a potential purchaser?

A. Yes, I suppose -- they were able to amortize that over 25 years so that they didn't have to take the hit up front, yes.

Q. And that was a benefit to the acquirers?

A. I suppose so.

Q. Do you recall anything that is known as capital credits or the fact that a portion or sometimes all of the cash assistance provided by

FSLIC would be treated as a direct credit to regulatory capital?

A. I don't remember that, no.

Q. Do you recall that in some instances the government promised that subordinated debt could be treated as regulatory capital?

A. Vaguely, but I don't remember the details.

Q. What is your vague recollection of that practice?

A. I just remember a subordinated debt.

Q. And do you remember this as again an inducement to make the insolvent thrifts more attractive to potential acquirers?

A. I just remember that was an issue from the time. I really don't remember the details.

Q. Do you recall that in some instances the FSLIC would purchase preferred stock that was to count as regulatory capital?

A. It could have been. I don't remember.

Q. Do you recall whether that was an element of the dealings with Holland and Ross?

A. No, I don't remember.

Q. Do you recall anything about the terms of the sale of the insolvent institutions at

Holland and Ross?
A. No.
Q. Did you meet with Holland and Ross in connection with the Republic acquisition as well? I've been focusing on the Home, Mutual, and Galva.
A. No, I kind of vaguely remember what they look like. I vaguely remember them coming into the office. I don't remember on which transaction.
Q. Do you have a recollection of the condition of Republic at the time that Holland and Ross agreed to acquire it?
A. You know, it was insolvent. That's all I remember. I don't remember about how much, I don't remember the institution's asset size. I don't remember any detail about the institution.
Q. Do you recall if there were any other bidders for Republic?
A. No, I do not remember.
Q. Republic was not aggregated with any other institutions; is that correct?
A. Not that I remember.
Q. And do you remember why that was the case?
A. No.

Q. What were your responsibilities as a supervisory analyst beginning in 1987 -- I'm sorry.
A. Financial analyst?
Q. Financial analyst beginning in 1990.
A. I moved from having a caseload to working on special projects, was the bank -- public information officer, handled requests from individuals from outside the OTS or the Federal Home Loan Bank of Chicago.
Q. When in 1990 did you start that position?
A. I don't remember exactly.
Q. Do you recall whether it was the first half of the year or the second half?
A. Probably the middle.
Q. And was your employer still the Federal Home Loan Bank of Chicago?
A. What year are we talking, '87?
Q. 1990.
A. No, that would have been OTS.
Q. And that's your current employer as well, OTS?
A. That's correct.
Q. Did you say you were the public

information officer?

A. Um-hum.

Q. And what were your responsibilities in that role?

A. If there were requests from outside the organization for public information, then I would provide that, or if there was questions on publicly-available information, I would answer those questions.

Q. And what types of special projects were you working on independent of this public information role?

A. Mostly requests from Washington that they ask the regions or the area offices to do.

Q. What were the nature of those requests?

A. They just varied. Just internal projects.

Q. Can you give me some examples?

A. You know, maybe soliciting comments from the staff on a policy. They vary. There was a lot of that. If they wanted a list of institutions with a certain characteristic, I'd work on that.

Q. To whom did you report when you were a financial analyst?

A. Philip Gerbick.

Q. And did anyone report to you?

A. No.

Q. What was Philip Gerbick's position?

A. You know, we have gone through so many name changes, I don't remember what it would have been at the time.

Q. What were his responsibilities roughly?

A. I believe he oversaw the applications area at the time.

Q. And you're currently a policy analyst; is that right?

A. Yes.

Q. What does that involve?

A. I still do special projects. I'm still a public information officer. I answer questions from the staff on our internal policies.

If we decide to change a handbook section or a internal policy, Washington usually drafts the first draft, sends it out to the area offices, kind of circulates it for comments, I prepare a response. That goes to Ron Karr, who's our regional director, and it goes back to Washington.

Q. To whom do you report in this role?

A. Nancy Segal.
Q. And what is her position?
A. Regional deputy director.
Q. And does anyone report to you?
A. Michael Jaski.
Q. Did anyone report to you in your position as financial analyst?
A. No.
Q. What was your assessment of the quality of Michael Jaski's work? And let me ask you, if it's changed over time, to let me know that fact, please.
A. He didn't report to me before a year ago, so I can't really answer prior to a year ago.
Q. All right, how about in the last year?
A. He does the work that I ask him to do. I think he knows -- he prepares financial reports and board packages and things. I think he does a good job. He's familiar with our systems, he does the reports that we ask him to do.
Q. Would you characterize him as competent or highly competent or something less than either of those?
A. I think he falls in the middle between competent and highly competent. Depends on what

0613. It has been marked as Januska Exhibit 6. I'd like you to look through it, and then please if you could describe it for the record.

A. Okay.

Q. Could you describe the document for the record, please.

A. It's an "S" memo supplement, the subject of which is the acquisition and conversion of the Home of Peoria, Galva Federal, Mutual Savings by Mr. Howard and Mr. Ross -- Mr. Ross and Mr. Holland. It discusses the business plan that they submitted and their viability on a going-forward basis if the transaction was pursued.

Q. Is this a memorandum that you wrote?

A. Probably parts of it. I think Helen also probably wrote part of it.

Q. Are you going off recollection, or is there something on the document that shows you that that's the case?

A. Well, their initials are down here. Helen's are down here.

Q. What is the significance -- you're pointing to at the bottom of page Bates numbered CHO022 0612, and there are a series of initials

there. What is the significance of those initials?

A. The first ones are Leo Blaber's. He's the one that sent the documents being written for him to sign. HKM is Helen Mirza. DJ would be me. And DT I believe is Dennis Thomas.

Q. And what is the significance of having those initials on the bottom of this memorandum? Does that indicate that each person played a role in drafting it?

A. Or some of the content they worked on, yes.

Q. And which portions of this memorandum did you work on?

A. I don't remember.

Q. The first paragraph describes the business plan I think. I'll let you tell me. But it's under the heading business plan, is that true?

A. It is under the heading business plan, yes.

Q. And is there a description of the business plan? Or some of these facts maybe aren't necessarily from the business plan. I don't know, you tell me.

way that one would view the retained earnings entry here in this memorandum, is that true?
A. Yes.
Q. And this indicates that they are projecting profitability in Year 1, Year 2, and Year 3, correct?
A. Yes, they are projecting it, yes.
Q. Would that suggest to you that there would be value to the NOLs, that if they achieved these expectations, they would be able to convert NOLs to cash by using the NOLs to shield this income?
A. That's what it looks like, yes.
Q. On Page 4 there is a statement in the first full paragraph at the end that says taking into account all of these factors and the proven managerial record of the acquirers, the viability of the resulting association does not appear to be a major concern. Do you see that?
A. Which page?
Q. I'm on Page 4. It's bates numbered CHO022 0611. The last sentence of the first full paragraph.
A. Um-hum. I see that.
Q. Do you know whether you wrote that

sentence?

A. I don't know. I don't know.

Q. Do you have any reason to believe it's inaccurate?

A. I don't remember the managerial record of the acquirer. If it was in here, somebody must have written it. I don't know who it was. I don't think I wrote it.

Q. Is it fair to believe that there was an effort to make sure that this memorandum was as accurate as possible --

A. Yes.

Q. -- before it was sent to the Federal Home Loan Bank Board in Washington, D.C.?

A. Yes.

Q. And that in fact there were in fact, by your testimony, four individuals who had input in this memo, Leo Blaber, Helen Mirza, yourself, and Dennis Thomas?

A. I don't think Leo had input. I think he would have read it and signed it. If he didn't agree with something, I think he probably would have changed it, but I don't think he drafted it.

Q. You have three drafters and one person reviewing to make sure he is fully comfortable

transaction.

I mean, they worked for FSLIC. They were the ones that would ultimately be issuing the check. So they wanted to be familiar with the transaction.

(Recess taken.)

(Whereupon, Januska Exhibit No. 8 was marked for identification.)

BY MR. BERGMAN:

Q. Ms. Januska, you have before you what's been marked as Januska Exhibit 8. It's a document Bates stamped CHO022 0602 through 0606. Take as much time as you'd like. I'm going to focus on the bottom of Page 1 and the top of Page 2 of the memorandum itself.

A. Okay.

Q. What is this document?

A. It's another addendum to the "S" memo on transaction of Home, Galva, and Mutual of Canton.

Q. And there are initials at the bottom, LBB and DRB, bottom of the last page. Do you know whose those are?

A. I have no idea who they are. LBB would be Leo Blaber. I don't know who the other one is.

It was the NOLs of the institution and the institutions that were being merged, and Homer and Howard were going to acquire them.

And some of them would survive and they thought they were able to use them, so they would have a value. So it was part of the transaction in determining -- they put them in their bid. They could say we didn't want them. But they said in their bid they wanted them, so it became part of the transaction.

Q. When you said they could say they didn't want them, meaning that they could assign to the government any benefits of the NOLs?

A. Yeah, they could have not taken them.

Q. Do you recall any instances where the government bargained to receive some of the benefits from the NOLs?

A. No, but it's possible it occurred.

Q. I'm going to hand you four documents in a moment that we'll mark. The first will be Januska Exhibit 9, which is a February 18th, 1988 memorandum from Michael Jaski to you, Bates stamped WOT685 0570.

The second is a June 28th, 1988 memorandum from Michael Jaski to you. This will

A. On what basis? On a GAAP basis it would probably be the same because on a regulatory capital basis it would be less.

Q. You're saying they would have less regulatory capital?

A. Yes.

Q. That I take it is a bad event?

A. Well, it was the law that was passed by Congress, so I can't classify it as a good event or a bad event. It was an event.

Q. You understand that it had an effect on the ability of the thrifts that had to write off the regulatory capital?

A. Yes.

Q. And you understand that that effect was disadvantageous?

A. From their point of view, yes.

Q. Yes. That they had to either find capital or replace it or go out of capital compliance, perhaps be ceased, change business plans, all true?

A. That would be true, yes.

Q. But you have no understanding of the particular effect on River Valley or Mr. Holland or Mr. Ross?

A. I wasn't tracking their institution at the time.

Q. Do you have any understanding of the subject matter of the litigation that's brought you here today in terms of the merits of the claim, the types of claims presented?

A. No.

Q. What did you do to prepare for the deposition today?

A. I met briefly with Mr. Murphy yesterday. I just got introduced to Patricia Smith on Monday.

Q. I'm sorry, on Monday?

A. On Monday. She stopped by my office. They both did. Actually they stopped by and introduced themselves to me.

Q. But you didn't have a subsequent discussion on Monday?

A. No.

Q. And how long did you meet with Mr. Murphy yesterday?

A. About two hours.

Q. Did you review any documents yesterday?

A. He showed me a few documents, yes.

Q. What kind of volume of documents?

A. I don't know, maybe a dozen.