# EXHIBIT C

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**RONALD N. KARR DEPOSITION COUNTER DESIGNATIONS**

7/12/2000 Tr. 10:16-21
7/12/2000 Tr. 28:2-28:25
7/12/2000 Tr. 32:25-34:17
7/12/2000 Tr. 36:20-37:1
7/12/2000 Tr. 65:13-66:1
7/12/2000 Tr. 74:8-13
7/12/2000 Tr. 109:3-8
7/12/2000 Tr. 121:1-123:15
7/12/2000 Tr. 138:11-143:23
7/12/2000 Tr. 145:24-146:16
7/12/2000 Tr. 146:21-147:7
7/12/2000 Tr. 154:3-154:8
7/12/2000 Tr. 157:6-158:2
7/12/2000 Tr. 162:8-162:13
7/12/2000 Tr. 186:15-186:23
7/12/2000 Tr. 187:12-187:24
7/12/2000 Tr. 189:18-190:1

7/13/2000 Tr. 257:18-20
7/13/2000 Tr. 264:3-22

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
BANK OF AMERICA, FSB,        )
et al.,                      )
                             )
          Plaintiffs,        )
                             )
     vs.                     ) Case No. 95-660C
                             )
UNITED STATES OF AMERICA,    )
                             )
          Defendant.         )
-----------------------------)
HOMER J. HOLLAND and HOWARD)
R. ROSS,                     )
                             )
          Plaintiffs,        )
                             )
     vs.                     ) Case No. 95-524C
                             )
THE UNITED STATES OF         )
AMERICA,                     )
                             )
          Defendant.         )
```

AMERICAN CAPITAL CORPORATION)
and TRANSCAPITAL FINANCIAL )
CORPORATION )
Plaintiff, )
)
vs. ) Case No. 95-523C
)
THE UNITED STATES, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 12, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

APPEARANCES:
For Plaintiffs Homer J. Holland and Howard R. Ross:
HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656
For Plaintiffs Bank of America and American
Capital:
RACHEL L. BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C, 20005
(202) 220-9670
For the U.S. Department of Justice in Case No. 95-660C:
TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Deposition of RONALD NEAL KARR taken by the Plaintiff at 101 North Wacker Drive, Suite 1600, Chicago, Illinois, on the 12th day of July, 2000, at the hour of 9:00 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

I was visiting my mother one weekend in Iowa. On the way from Traer, Iowa, back to Kansas City, I stopped in Des Moines to visit my younger brother. My brother worked for the Federal Home Loan Bank of Des Moines. We talked for a while. His neighbor was an assistant director for the Federal Home Loan Bank Board. They were looking for examiners. Talked with him a bit about the position.

Q. Who is that?

A. Don Havens. He suggested that I take the government test. I don't remember what it's called. In those days you had to take a test to get on the government register. Went back to Kansas City, took the test, scored a 93.

In August of that year, I interviewed with the bank board and started to work with them in September, on September 29th, 1974.

Q. Did you start as a field examiner?

A. As a field examiner stationed in Kansas City, Missouri.

Q. What training did you have to take for that position?

A. The requirements for employment to begin with required business degree, 12 hours

question.
Q. When were you first involved in a transaction involving a supervisory acquisition in which assistance was granted by the FSLIC?
A. I was not involved in one of those.
Q. Through your entire period at the Seattle bank?
A. Right.
Q. Did you become familiar with what was known in the industry as supervisory goodwill?
A. Yes.
Q. During your tenure at the Seattle bank?
A. Yes.
Q. How did you become aware of that? In what context did you deal with the issue of supervisory goodwill?
A. Well, certainly I worked with people who dealt with the issue of supervisory goodwill. Our mergers and acquisition department dealt with those troubled institutions and dealt with the transactions that involved it. Certainly I was involved in discussions with those folks, and I understood what supervisory goodwill was.
Q. What is your understanding of what supervisory goodwill was?

issues. No one directly reported to me except my secretary during that time period. Once I became regional director, then everybody did.

Q. And when did you begin, the date?

A. It was in May.

Q. Of '92?

A. Of '92.

Q. So can you describe for me your duties during this initial period, from November '91 through May '92?

A. As I said, I worked with Mr. Brafman. He familiarized me with the region, with the people in the region, with the activities that he was -- he was involved with.

I also tried to work with other regional deputies in regard to some of their major issues and some of their major cases to familiarize myself with what those cases were and what they were about.

Q. Now, you were responsible for all thrifts in the Chicago district, correct, not just healthy ones or not just problem ones; is that correct?

A. Right.

Q. And did you familiarize yourself with

the -- when you first were retained, did you familiarize yourself with all institutions, or did you focus first on healthy or focus first on the problem institutions?

A. I focused first on the problem institutions.

Q. Did you focus on institutions that had been involved in supervisory acquisitions prior to the enactment of FIRREA?

A. A couple of those were involved, yes.

Q. And how many such institutions, approximately, to the extent you recall, were you responsible for when you took over your position at the Chicago district?

A. That were in existence because of a supervisory transaction? Is that what your question is?

Q. Right; at one point or another in the 1980s had been involved in a supervisory acquisition and still were open.

A. How many?

Q. Yes.

A. Five or six, I think.

Q. Was LaSalle Talman one of the institutions you were responsible for?

A. Yes.

Q. What other institutions do you recall at this time that you were responsible for that had involved at some point supervisory transactions?

A. TransOhio; River Valley; there was a shop in Tennessee. I can't remember its name. That's all I recall.

Q. Did you familiarize yourself with those institutions fairly early on after taking your position at the Chicago district office?

A. Yes.

Q. How did you go about learning about those institutions? Did you have a member of your staff or members of your staff formally brief you?

A. That was the primary method, yes.

Q. And who on your staff at that time would have briefed you on these institutions?

A. Jerry Benhum, who was the acting regional deputy director in Cincinnati; Chet Biedron, who was the regional deputy director in Chicago.

Q. Could you spell, if you know, the spelling of that last name?

A. Regional deputy director at the time.
Q. The institutions you just mentioned that involved supervisory goodwill -- LaSalle Talman, River Valley, TransOhio -- were they internally at the OTS, did you classify these all as problem institutions at the time?
A. No.
Q. Do they have a particular classification, for your internal supervisory purposes?
A. Well, as I recall, when I came to Chicago, LaSalle Talman was not considered a problem institution at all. TransOhio was. It was having significant operating problems.
River Valley was recovering and headed in the right direction.
The one in Tennessee needed to raise some capital, which it did -- Franklin, I think, was the name of that shop.
Q. When you say "River Valley was recovering," what do you mean?
A. It had had significant operational problems in its past. And when I got here, it was improving from those. Its ratings were improving, and it was improving its operations

and taking the risk out of its portfolios.
Q. Now, when you say "River Valley," are you referring to one institution or two institutions?
A. I'm referring to one.
Q. Do you recall that there were two institutions that had "River Valley" in their name at that time that were subject to the jurisdiction of the Chicago office?
A. I don't recall that.
Q. Specifically which institution are you referring to when you say "River Valley"?
A. The one in Peoria. That was owned and operated by Homer Holland.
Q. And Howard Ross?
A. And Howard Ross.
Q. And do you recall -- and we will look at some documents to refresh your recollection if you don't. Do you recall whether Homer Holland and Howard Ross also opened and operated another institution in your district at that time?
A. I don't know. I don't recall that.
Q. It would have been an institution that involved the Old Republic Bank and had Rock Falls in the name. Does that ring any bells?

Q. How about to the extent you recall River Valley in the period '92 to '95? What process would have been followed in examining that institution? By "process," I mean what level of involvement would the assistant have had? What level of involvement would the deputy, regional director have had in the examination of that institution?

A. From '92 to '95?

Q. Yes.

A. I don't think it would be different than what I just said.

Q. As regional director, what was your involvement generally in the examination process of the institutions in the Chicago region?

A. I have very little to do with the examination process. If we have large institutions that have significant issues, I'm given final examination reports for review so that I'm aware of what those issues are. If there are unique policy issues in regard to an institution that needs to be dealt with, I'm kept -- I'm briefed and kept informed of those during the process, and I may give guidance and directions on how to resolve those policy issues.

My staff does the work. I oversee the process.
Q. I take it even with respect to soundness institutions, nonproblem institutions, the general process would require that you be delivered a copy of the final report of examination for your review, correct?
A. No.
Q. I thought you had indicated that. I misunderstood that. I thought you indicated you would see all reports. If there was an issue during the process you'd be consulted, otherwise you would receive the report after the examination process was complete.
A. Nonproblem institutions, nonissue situations, I never see the reports.
Q. When would your internal policies and procedures call for you to see the reports? For example, the CAMEL rating system you referred to, that's still a 1-to-5 rating system, correct?
A. Yes.
Q. 1 being the best and 5 being the worst?
A. Yes.
Q. In the Office of Thrift Supervision during the period '92 to '95, would problem institutions be institutions that were assigned a

your understanding of your office's policies -- or under what circumstances would your office seek to impose a supervisory agreement upon an institution in the Chicago region?

A. Every case is different -- every case has its own unique issues. You have to look at each case and the issues that are there.

Supervisory agreements are typically put in a case because there are safety and soundness concerns at that institution that need to be corrected, and you want to make sure that the board of directors is obligated and has made an agreement to do so.

Q. Are supervisory agreements publicly disclosed?

A. They are now, yes, since FIRREA.

Q. Since FIRREA.

Is there any less supervisory action that the office will take, less serious than a supervisory agreement?

A. Is there a less serious action that we would take than a supervisory agreement?

Q. Let me ask it this way --

A. Yes. We ask the board of directors to live up to its fiduciary responsibilities every

was marked for identification.)

BY MR. CAYNE:

Q. Mr. Karr, I'm going to ask the court reporter to hand you Exhibit 2, which is a document dated November 4th, 1992; a memorandum from Chester Biedron to, I believe, yourself; a two-page document, in the bottom corner Bates No. WOL234 0710.

Do you have that document in front of you, sir?

A. Yes, I do.

Q. Have you looked at this document, Mr. Karr, since 1992?

MS. TORNATORE: Let me just -- I think you need to ask the question whether it refreshed the witness's recollection, whether the witness's recollection was refreshed in the review. If the document did not refresh his recollection but was shown to him by counsel, that would not be covered by the court's order.

MR. CAYNE: I didn't ask him if the document was shown to him by counsel. I asked him if he has reviewed this document since 1992.

MS. TORNATORE: And I would caution the witness, then, not to respond, to the extent that

Q. Based on what you were advised in this memorandum and understand, why would the FDIC have viewed -- you would agree with me, right, that a 4 rating on asset quality and a 4 rating on capital, those are substantially more adverse ratings than 2 ratings on those two components, correct?

A. Correct.

Q. And why would the FDIC, based on the facts as you understand them, have assigned those two components of CAMEL and the OTS of MACRO such different ratings? Or why would the FDIC have been so much more adverse?

A. I think that's a question to ask the FDIC, not me.

Q. I'll ask --

A. I can't speak for why the FDIC did it. Our document explains what we believe the differences to be.

Q. Fair enough, sir. Based on your understanding, then, in taking it from an OTS viewpoint, what would the basis have been for the conclusion of your office that the institution should be assigned a rating of 2 for capital and 2 for assets?

A. The document explains those differences.

Q. What is your understanding of the reasons?

A. We did not classify the derivative products is one of the differences. And because we didn't classify them, we didn't have an adverse impact under asset quality, nor did we have an adverse impact under capital, nor did we have an adverse impact under management.

Q. Would your understanding be that the FDIC did classify those assets to which you're referring?

A. That's what the document says.

Q. And do you have an understanding what classification those assets were assigned?

A. I'm sorry?

Q. There are four classification categories, correct? When you indicate that an asset is classified, and you say that it's classified, do you mean to indicate something that is classified or was assigned a particular loan classification? There is a range among classifications, correct?

A. Loan classification means that there

are weaknesses within the asset that put full payment at risk. Those classifications can be substandard, doubtful, or lost. And in some cases there is a classification called "special mention."

Q. When you indicate that the FDIC classified these derivatives, are you meaning to indicate that the FDIC assigned these derivatives to any one particular one of the categories you just mentioned, or simply that it was classified in one of those categories?

A. I believe the document just says they were classified. It doesn't distinguish whether it was classified in one or more of the various categories.

Q. If I could just clarify what I think might be a fine point, the category "Other Assets" especially mentioned, technically an examiner would view that, am I correct, not as a classification but as a criticism? That classifications would be substandard, doubtful, and lost, and an OAM would actually be considered a criticized asset as opposed to a classified asset; am I correct?

A. Special mention or other assets

assign a rating of 4.

A. I'll have to read their document.

Q. Sure, take your time and look at it to see if that refreshes your recollection.

MR. CAYNE: While he reads, let's go off the record.

(Brief pause.)

MR. CAYNE: Let's go back on the record.

BY MR. CAYNE:

Q. Mr. Karr, while you're reading that document, I'm going to ask the court reporter to hand you Exhibit 5, so that you may review it together with Exhibit 3, which you're now examining, also to see if it assists in refreshing your recollection. And Exhibit 5 that the court reporter is going to hand you is a one-page letter from Simona Frank, regional director of the FDIC, dated January 12th, 1993, directed to yourself, Mr. Ronald N. Karr.

(Whereupon Holland-Karr Deposition Exhibit No. 5 was marked for identification.)

THE WITNESS: Based on my quick review, it appears that the FDIC had concerns with regard

to a high level of classified assets, which include a high level of classifications related to residual interest. They have a continuing concern in regard to interest rate risk, associated with the derivative investments and the residuals. And they indicate that the institution's capital level is -- while it has increased since the last exam, is inadequate in relation to the high volume of substandard asset classifications. It appears that those are the issues that would have contributed to their ratings.

BY MR. CAYNE:

Q. And if you look at Exhibit 5, which the court reporter has handed you, if you take just a moment, it's a one-page document to read that, please.

(Witness examines document.)

THE WITNESS: Yes.

BY MR. CAYNE:

Q. Would you have, in 1993, Mr. Karr, reviewed this document contemporaneously with its issuance to you?

A. I have no independent recollection of it, but I probably did, yes.

Q. I mean, it's a letter from the regional director of the Chicago FDIC office, correct?
A. Yes.
Q. So it would be your standard policies and procedures to review such correspondence personally, correct?
A. Yes, especially when it's addressed to me, yes.
Q. And would you, at that time, have made yourself cognizant of the circumstances to which Ms. Frank is referring in her letter?
A. I believe I would have, yes.
Q. And specifically being she refers to the FDIC's October 19th report -- she refers to the OTS report of examination, right, the second line of the letter?
A. Yes, she does. She says that they have received our exam report.
Q. That's the report that the reporter has handed to you as Exhibit 4, correct?
A. Yes.
Q. So at the time you made yourself cognizant of the findings of that report, correct? At the time, in 1993, that would have been your normal policies in dealing with fellow

regulators?

A. I probably was made aware of the issues in the report. I don't know that I actually would have read the report.

Q. But you would have been aware of the issues?

A. Yes.

Q. The FDIC examination that Ms. Frank is referring to, is that not the FDIC examination that you just spent a brief time reviewing, specifically Exhibit No. 3?

A. She doesn't specifically mention the dates, but I'm assuming that that's the one she's referring to when she says she hasn't completed processing of the FDIC examination that was performed currently. So I assume that's what she's referring to.

Q. She says she anticipates that that examination is going to result in a rating of 4; is that correct?

A. Well, her language says:

"Be advised that under the uniform financial institutions rating system which the FDIC utilizes, a composite 4 rating is, again, anticipated."

Q. And, in fact, based on your review of Exhibit 3, the FDIC did, in fact, assign a rating -- composite rating of 4 at the conclusion of the examination to which Ms. Frank is referring, correct?
A. According to the document, yes.
Q. The document being Exhibit 3?
A. 3.
Q. It was assigned for the reasons that you briefly summarized a few moments ago in your testimony, correct?
A. That's my opinion, based on what I read.
Q. And at the time -- and you can refer to any of the documents necessary, Mr. Karr, to refresh your recollection -- did you and your office share the concerns that led Ms. Frank and the FDIC to assign a composite rating of 4?
A. Did we share the concerns?
Q. Yeah, the --
A. That she had?
Q. What I'm asking is, you briefly summarized a few moments ago the concerns that led the FDIC in Exhibit 3 to assign a 4 composite rating, and --

A. Don't put words in my mouth. I don't know what led them to their -- to their rating. I took excerpts from their examination report that implied that that's what their concerns were that probably led them to what their rating is. FDIC is going to have to tell you what led to their rating, not me.

Q. Based on your understanding of what probably led the FDIC to their rating, I'm simply asking you, based on any recollections you have, and based on whatever review of all of these exhibits including Exhibit 4 that you may wish to undertake, my question simply is, at that time in 1993, did the OTS share those concerns?

A. I don't have an independent recollection of what our concerns were in 1993. My best recollection is that we still had -- is that we still had concerns about the level of derivative products that they had on their balance sheet and that we still needed to have some reductions or better management of that portfolio. That's my recollection of what our concerns were.

Q. Do you recall those concerns leading your office to assign a 4 rating to the

A. I don't recall specifically. It would have been our normal procedure, I believe.

Q. Would the normal procedure have been to respond in writing, as opposed to having a meeting or telephone conversation?

A. Yes.

Q. Would it typically be both or typically simply be a letter?

A. It depends on the cases and how we deal with them, individual merits of the case. We might talk -- there is no typical to it. It just depends on the merits of the case.

Q. Could you turn back, Mr. Karr, to Exhibit 2?

A. Okay.

Q. On the first page, you see the very last sentence, "As a result" -- and again, this was the time where the FDIC was assigning a 4 composite and the OTS was assigning a 2 composite. Do you recall that?

A. Yes.

Q. You just looked as this document?

A. Yes.

Q. "As a result, the FDIC considered most of these instruments unsuitable investments for

depository institutions and were adversely classified."

Based on your review of this document, do I understand correctly that you understand these investments to be investment -- the derivative type of investments that you described here today?

A. Yes.

Q. And do you recall whether -- or am I correct that the FD- -- the OTS at this time did not take a similar view, that these instruments were unsuitable, and then proceeded to adversely classify them?

A. That's my understanding.

Q. So my statement is correct, yes?

A. Yes.

Q. We're done with that document.

(Whereupon Holland-Karr Deposition Exhibit No. 6 was marked for identification.)

MR. CAYNE: I'd ask the court reporter to hand you a document marked as Exhibit 6, which is a one-page document from John D. Weire, W-e-i-r-e, to file --

THE WITNESS: It's we're (phonetic).

BY MR. CAYNE:
Q. Weire, thank you, sir.
(Continuing) -- dated December 10th, 1992. Prior to her handing you the document, is he still an employee of the Office of Thrift Supervision?
A. I think he's FDIC.
Q. I'm -- is he FDIC?
A. If you're not referring to John Weire of the FDIC, then I don't know that it's pronounced Weire.
Q. I'll let you get the document.
Would you take a moment to read Exhibit 6, please? It's a one-page document.
(Witness examines document.)
THE WITNESS: Okay.
BY MR. CAYNE:
Q. Were you correct? Is this individual with the FDIC?
A. I believe so. I believe this is an FDIC document.
Q. I assume, then, you had not seen this document before?
A. I've not seen it before.
Q. Is it your understanding that this

Deposition Exhibit No. 7 was
marked for identification.)

MR. CAYNE: At the same time, I'll also ask the court reporter to mark for identification as Exhibit 8 a letter from Simona Frank to Stuart Brafman dated April 23rd, 1992, and ask, Mr. Karr, that you take a moment to review both of these documents.

(Whereupon Holland-Karr
Deposition Exhibit No. 8 was
marked for identification.)

THE WITNESS: Yes.

(Witness examines document.)

BY MR. CAYNE:

Q. You've had a chance to read both documents?

A. Oh, no, just a second.

(Witness examines document.)

THE WITNESS: Okay.

BY MR. CAYNE:

Q. These two documents, Exhibit 7 and 8, refer to an issue concerning whether River Valley Savings Bank should be permitted to make a proposed dividend, correct?

A. Yes.

A. People involved with it were Chet Biedron and Larry Ferries.

Q. So it may have been one of those gentlemen?

A. May have been.

Q. Do you know what action, if any, your office took subsequent to April 23rd with respect to Ms. Frank's letter to Mr. Brafman?

A. No.

Q. Would you expect some writing was ultimately issued to her?

A. As I said, this doesn't -- I'm not aware of this transaction. It doesn't -- I have no recollection of this transaction or anything about it.

Q. You see in the letter it indicates that the bank was reducing -- the two letters refer to a reduction of assets. Did you see that when you read the letters?

A. Yes.

Q. Based on your overall involvement with the bank, are you familiar with why at this time the bank was reducing its assets?

A. My recollection was that it was working down that investment portfolio.

Q. The derivatives?
A. Yes.
Q. Do you know whether, referring to this Frank letter again, your office ever required -- do you see the reference at the bottom of the second paragraph to a 7 percent tangible capital level?
A. Yes.
Q. Did your office ultimately require such a capital level?
A. I'm not aware that it required 7 percent tangible capital ratio.
Q. Is that something that you likely would have been aware of, if it would have been done?
A. Yes.
Q. Do you know why the decision would have been made not to impose such a capital requirement, based on your understanding of the condition of the bank and issues presented by the bank?
A. Why we wouldn't have done it?
Q. Yes. I read this as a suggestion by the FDIC, to require 7 percent tangible capital level. I'm asking you, based on everything you know on the institution, do you have an

do not follow consecutively.

Mr. Karr, if could you hand the court reporter the document.

(Whereupon Holland-Karr Deposition Exhibit No. 10 was marked for identification.)

BY MR. CAYNE:

Q. Mr. Karr, to clarify the record, we now have marked as Exhibit 9 a two-page letter from Simona Frank to you dated March 9th, 1993, and we have marked separately, as Exhibit 10, a four-page document, the first page of which has Bates No. FH00122396 running through FH00122399.

Do you have both those documents in front of you?

A. Yes.

Q. Before the clarification, I believe you testified that you do not recognize the handwriting on Exhibit 9, correct?

A. That's correct.

Q. Now if you look at Exhibit 10, the second page, Mr. Karr, the third paragraph, second sentence states:

"Our transmittal letter to the OTS again urges that an increased capital level

BY MR. CAYNE:

Q. You're not telling me you disagree. You're just telling me you don't know what he's saying?

A. I don't know how to interpret -- I'm not going to interpret what he's doing, so I can't tell you whether I agree or not.

Q. Very good.

MR. CAYNE: If you could mark that as Exhibit 11.

(Whereupon Holland-Karr Deposition Exhibit No. 11 was marked for identification.)

BY MR. CAYNE:

Q. Mr. Karr, the court reporter has handed you a document marked for identification as Exhibit 11, which appears to be a letter dated January 25th, 1993, from Ms. Simona Frank to the board of directors of River Valley Savings Bank. Your name appears to appear under the CC caption at the top left-hand corner of the first page, and request that you take as much time as you need to read this two-page letter.

(Witness examines document.)

THE WITNESS: Yes.

BY MR. CAYNE:

Q. Mr. Karr, do you believe you would have reviewed this letter from Ms. Frank contemporaneously with its issuance?

A. I -- I don't have any independent recollection of doing so, but I would assume that I did, yes.

Q. Do you assume that under the CC line where it says, "Mr. Karr-OTS-Chi," that that refers to you?

A. I'm sure it refers to me, yes.

Q. Are you able to tell me, Mr. Karr, having reviewed this letter and based on the other documents reviewed and based on your general knowledge of River Valley Savings Bank, whether you would agree or not with Ms. Frank's statement in the third paragraph on page 1, where she states that "the above reference reports of examination differ in that the FDIC has classified a significant volume of high risk mortgage derivative securities and the OTS has not. This volume represents 85 percent of total classifications"?

A. I believe that's accurate, yes.

Q. You remember earlier, Mr. Karr, we

wasn't -- that those same classifications weren't included in ours. What I'm comfortable saying is that we wouldn't -- that I'm confident that in our report we said that we did not classify the derivatives, okay? Now, and -- but our -- whether or not our -- the amount, total amount of classifications that the FDIC came up with and the total amount of classifications that we came up with, that we only had -- that those two totals -- that the only differences between those two were this.

What I think she's simply saying here is that of the -- of the total classifications that the FDIC did, 85 percent of them were derivative securities.

Q. But you don't --

A. Isn't that what she's saying?

Q. What I interpret it as saying -- I was asking for you to confirm or tell me I'm wrong -- is that that 85 percent of the classifications to which you just referred relating to derivative securities, they were not -- those same derivative securities were not classified in the OTS examination report.

A. I believe that's accurate. That we did

not classify the derivative securities.
Q. And that struck me as a very significant difference in the total value volume of classifications in the FDIC report as compared with the total volume of classifications in the OTS report. Would you agree with that characterization?
A. That it struck you as a lot?
Q. No, would you agree that it is a substantial volume, a substantial difference in the total volume of classifications between the two reports? I'm not asking you to read my mind.
A. I think that I had -- 85 percent is a high percentage ratio, yes, of difference.
Q. You've been in this field for how many years now? About 25 years?
A. 25 plus.
Q. So you've had substantial supervisory experience. Are you familiar with many or any other situations where there would have been this level of difference between the volume of classifications found by one agency -- i.e., the FDIC -- and the volume of classifications determined by a sister agency, in this case the OTS?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BANK OF AMERICA, FSB, et al., )
)
Plaintiffs, )
)
vs. ) No. 95-660C
)
UNITED STATES OF AMERICA, )
)
Defendant. )
-----------------------------)
HOMER J. HOLLAND and HOWARD )
R. ROSS, )
)
Plaintiffs, )
)
vs. ) No. 95-524C
THE UNITED STATE OF AMERICA, )
)
Defendant. )

AMERICAN CAPITAL CORPORATION )
and TRANSCAPITAL FINANCIAL )
CORPORATION, )
)
Plaintiffs, )
)
vs. ) No. 95-523C
THE UNITED STATES OF AMERICA, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 13, 2000

Reported by: Melissa Belice, CSR No. 084-003391

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For Plaintiffs Bank of America and American Capital:

RACHEL BRAND, ESQ.
Cooper, Carvin & Rosenthal
1500 K Street, N.W.
Washington, D.C. 20005
(202) 220-9670

For the U.S. Department of Justice in Case No. 95-660C:

TONIA J. TORNATORE, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 305-7562

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street
Washington, D.C. 20530
(202) 353-8841

For the FDIC in Case No. 95-523C:

BARBARA KATRON, ESQ., (telephonically)
550 17th Street, N.W.
Washington, D.C. 20429
(202) 393-8400

MR. CAYNE: You can characterize it however you'd like, Counsel, that's my question.

THE WITNESS: I wasn't asked to my recollection, but my guess is that I would have given a favorable opinion of Mr. Holland.

BY MR. CAYNE:

Q. And specifically what would you have said?

A. As I said before, that I believe that he was a competent and highly respected manager.

Q. And you would I take it not have a qualm or a hesitancy in -- you would not have a reason to advise your colleagues that the office considering the application ought not to approve the transaction, not to approve the acquisition?

A. Not based on his management ability, that's correct.

MR. CAYNE: Ask the court reporter to mark this as Exhibit 18. And it's a memorandum to you by Mr. Biedron dated December 2nd, 1992.

I would ask that you take whatever time you need to review this document. And I'll show you the stack of documents we have to go through today is relatively thin. And once you've completed reviewing this document, let me know,

Mr. Biedron.
A. Yes, I do.
Q. Sitting here today, Mr. Karr, do you recall what TB 52 is?
A. Generally it's a document that provides guidance on appropriate policies and procedures in regard to establishing investment portfolios.
Q. So you see the last sentence of this same paragraph states the OTS determined that the derivative investments did not warrant classification according to TB 52 and regional policy.
I'm just trying to understand, does that mean that TB 52 would have set out certain classification guidelines and under those guidelines these assets did not warrant classification?
A. That's what the document says, yes.
Q. So that's what you would understand this to mean?
A. That's what I would understand it to mean.
Q. Turn, please, Mr. Karr, to Page 3. And I'd like to ask you about the final paragraph on this page. It specifically reads the difference