# EXHIBIT D

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**LAWRENCE KENNY DEPOSITION COUNTER DESIGNATIONS**

2/25/2004 Tr. 32:10
2/25/2004 Tr. 33:18-25
2/25/2004 Tr. 34:1-8
2/25/2004 Tr. 75:25
2/25/2004 Tr. 76:1-25
2/25/2004 Tr. 77:1-13
2/25/2004 Tr. 78:2-9, 22-25
2/25/2004 Tr. 79:1-2
2/25/2004 Tr. 80:13-15
2/25/2004 Tr. 84:24-25
2/25/2004 Tr. 85:1-12
2/25/2004 Tr. 172:1-3, 25
2/25/2004 Tr. 173:1
2/25/2004 Tr. 202:11-20
2/25/2004 Tr. 205:1
2/25/2004 Tr. 206:1
2/25/2004 Tr. 222:18
2/25/2004 Tr. 223:12-13
2/25/2004 Tr. 231:17-19
2/25/2004 Tr. 237:14
2/25/2004 Tr. 238:22
2/25/2004 Tr. 255:18-19
2/25/2004 Tr. 256:14-18

2/26/2004 Tr. 330:4
2/26/2004 Tr. 335:1-2
2/26/2004 Tr. 377:20-25
2/26/2004 Tr. 378:3-7

3/03/2004 Tr. 675:22-25
3/03/2004 Tr. 676:1-12, 14-21, 25
3/03/2004 Tr. 677:1-2, 5-12

UNITED STATES COURT OF CLAIMS

- - - - - - - - - - - - - - - -x

HOMER HOLLAND, HOWARD ROSS, :

Plaintiffs, :

vs. :Case No. 95-524C

UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.

Wednesday, February 25, 2004

Deposition of LAWRENCE A. KENNY, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, LLP, 555 12th Street, N.W., Washington, D.C. 20004, at 9:06 a.m., Wednesday, February 25, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

ORIGINAL

APPEARANCES:

On behalf of the Plaintiffs:

HOWARD N. CAYNE, ESQ.
MICHAEL A. JOHNSON, ESQ.
DAVID B. BERGMAN, ESQ.
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5656

On behalf of the Defendant:

KENNETH M. DINTZER, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
(202) 616-0385

C O N T E N T S

If you have more capital, you can absorb more risk.

Q. So if you have more capital, your view as to whether or not risk needs to be reduced might be different, correct?

A. Yes.

Q. Might be materially different, correct, depending on the adequacy of the capital?

MR. DINTZER: Objection -- vague.

THE WITNESS: These are, these are very specific instances.

You know, you can't, you can't apply generalities, but if an instance were such that all things being equal, if a company had X degree of risk, the company had more capital, that X degree of risk would be perceived in a better light than if they had, than if they had, than if they had less risk.

BY MR. CAYNE:

Q. When why would the X degree of risk be perceived in a better light if they had more capital?

A. Because the capital is the capacity to absorb losses.

If the risk, the risk, if the situation works out unfavorably for the company, a loss has to be taken, it flows through the operating statement and then through capital, so the more, the more capital the company has, the more capacity they have to take risk.

Q. When you examine an institution, do you first focus on capital or risk?

How do you do that?

A. When I'm preparing to go into an examination, as a rule, I generally look at the company's overall operation, and I look at their capital position, and then I start my analysis on the areas that I work on keeping in mind what, what their, their capital position is and what their other factors, you know, that may, may impact, you know, my analysis.

Q. So it sounded, if I understood your question, that the first thing you would look at really is what is the capital, and then you figure out through your various modeling and other techniques, what are the risk levels?

A. I look at, I look at capital in conjunction with the overall operations of the company, look at what they do, what their

earnings have been, what their management
profile has been, you know, what their niches
are, and in conjunction with all of that, of
course I look at their capital as well, but I
don't just focus on their capital.

I try to factor in all those things
just keeping them in mind when I start my
analysis.

Q. Do you know who Timothy Ryan is?

A. The former director of OTS?

Q. Yes.

A. Yes.

Q. Did you ever hear, are you aware that
he once made the statement that capital is king?

A. I have heard that statement before.
You know, I've heard a number of people say it.

I didn't know it was attributed to
him, but you know, that was, that was a, an
expression, an expression that, you know, that I
heard many times from many, many different
people.

Q. And what is your understanding of that
expression?

A. My understanding is that it's
important to have enough capital to support your

late '80s, I'm sure that I was involved through 1993, and I can't say that I participated fully in every exam, but I may have, but I'm sure that I -- because there was an exam that I did in 1993 that I signed, and so I'm sure that I did that, that work.

Q. Is it possible your involvement also continued into 1994 and '95?

A. I don't remember. It may have.

Q. You recall the institution was at one point sold, correct?

A. I remember that, yes.

Q. And do you recall whether your involvement with the institution ended prior to the sale of the institution?

A. I believe it ended prior to the sale of the institution.

Q. And do you know why it would have ended at the time it did?

A. Other people took over the work that I did, and their activity diminished in the areas that I work on, so I wasn't necessarily, it wasn't necessary that I be involved later on.

That's a guess.

Q. I would like you to turn to Exhibit 1.

MR. DINTZER: Before you do anything, has this been read and signed?

MR. CAYNE: Whether it's been read and signed?

MR. DINTZER: The version I'm looking at hasn't been.

I'm wanting to know is there an errata sheet for this deposition?

MR. CAYNE: This is the only version I have, and I am unable to answer the question.

MR. DINTZER: Okay. Then I'm going to object to the use of this without some sort of verification that we have it with an errata sheet, if there is one.

If there isn't one, that's fine, but if there is one, I would object to the use of it.

MR. CAYNE: My recollection is, I forget whether or not she's assigned to this case, that Tony Tornatore, T-o-r-n-a-t-o-r-e, was the Department of Justice attorney that defended this deposition, and I presume she would know whether it was signed and whether an errata sheet was produced.

I personally don't know, but if you

determine one was signed, I will be happy -- and an errata sheet was produced, I will, of course, enter it into the record of this deposition.

I personally don't have it.

MR. DINTZER: All right.

MR. CAYNE: If it exists.

MR. DINTZER: I understand. My objection stands, and objection to any portion of the deposition that's read into the record if -- it's a conditional, if there is one with an errata sheet with changes, then I would object to any portions that are read into the record.

BY MR. CAYNE:

Q. Could you turn to page 41 of this deposition?

And if you would, read from the first question on page 41?

A. This starts do you recall?

Q. Yes.

A. Okay.

Q. Through page 44, and let me know when you're complete?

A. Okay.

Q. Thank you.

(The witness reviewed the document.)

MR. DINTZER: I'm going to object to the use of the deposition given that the witness' testimony is that he has never seen it before, and if you could mark that spot, please?

MR. CAYNE: I'm sorry. I didn't hear what you said.

MR. DINTZER: I asked the court reporter to mark the spot.

(The witness reviewed the document.)

THE WITNESS: Okay. I read through page 44.

BY MR. CAYNE:

Q. Could you start on page 42, lines --

A. Forty-two, sure.

Q. Line 6?

A. Line 6, sure.

Q. Through page 43, line 3, read that question and answer into the record, please.

A. Read it out loud?

Q. Please.

MR. DINTZER: I'm going to object to this as, well, both on the basis that this may be an incomplete deposition without the errata sheet, and, and that given the witness'

testimony that he hasn't seen the document before, it has no relevance.

THE WITNESS: Reading starting on line, starting on page 42, line 6, and reading through which line did you say, sir?

BY MR. CAYNE:

Q. Line 3.

A. Line 3.

Q. On page 43.

A. "What do you remember, sitting here before you look at any documents to refresh your recollection, as to your difference of opinions? And I understand, it was eight years ago."

Answer: "I'm not so sure it's just River Valley. At that time period, we had -- I mean, the FDIC took a position that products that -- derivative products in particular that represented interest rate risks issues to institutions should be classified, and classified meaning that they present safety and soundness risks to the institution that require more capital, other things, okay?

"We disagreed that -- with the FDIC that you classify residuals because based on -- based on the fact that they represented interest

rate risk. If they represented credit risk, we would agree that they needed to be classified. That our classification policies of both agencies indicated that we should only classify assets based on credit issues, not interest rate risk issues, and I think we had that same issue with River Valley."

Q. My question, Mr. Kenny, is do you agree with Mr. Karr's answer on, from lines 10 on page 42 through line 3 on page 43, to my question, which appeared on line 6 through 9 on page 42?

MR. DINTZER: Objection. Calls for -- the question is compound, and it assumes facts not in evidence.

BY MR. CAYNE:

Q. You may respond, sir.

A. I generally agree with Mr. Karr's statement that our position, the OTS' -- and this was, this was pre-'89. It was, it wasn't OTS. It was Federal Home Loan Bank Board and bank, Federal Home Loan Bank, that our position was that generally, if it was credit risk related, we classified it.

If it wasn't credit risk related, we

A. Yes.
Q. So you agree with that answer, correct?
A. That was the philosophy of the agency, and to the extent that that was the philosophy of the agency, I agree with it.
Q. Do you recall whether this difference in philosophy between the FDIC and OTS had a material effect on the total dollar volume of assets classified by the two different agencies?
A. Yes.
Q. And can you describe that material effect?
A. The River Valley institution held a lot of high-risk mortgage derivatives, so the FDIC's classification of the mortgage derivatives was higher than the OTS-classified assets.
Q. How much higher was it?
A. I don't remember the exact amount.
Q. Was it a significant difference?
A. Several million, yes, it was significant.
Q. Do you recall whether there were discussions between OTS officials and FDIC

officials concerning this difference in approach?

A. I know it was discussed, but I was not necessarily involved in those discussions because that was a management decision, and I was a technician.

Q. Were you involved in any discussions with FDIC officials relating to this issue?

A. I worked, I worked with the FDIC examiners and understood what they, they said and understood their position of classification of derivatives where we would not classify them.

Q. Did you ever have any discussions with Mr. Ferries concerning this issue?

A. I believe we did. I believe we talked about it.

Q. And what is your recollection of those discussions?

A. It was a difference that was, was difficult to reconcile.

We couldn't, we -- you had to accept our position or not accept it, the FDIC's position, and we had our position. It was a difference.

Q. Do you -- what was your professional

MR. DINTZER: Objection -- mischaracterizes his testimony.
Go ahead.
THE WITNESS: Not in that fashion. I didn't, I didn't view, I didn't view them in that light.
BY MR. CAYNE:
Q. What do you mean by that?
A. Well, I wouldn't, I wouldn't, I wouldn't make that statement that Mr. Ferries made.
As far as their managerial competence, I don't have an opinion about their managerial competence.
I view them as investors.
Q. So am I, would you agree with the following statement -- that you don't disagree with Mr. Ferries' statement, but you don't have a basis to agree or disagree with it, is that what you're saying?
MR. DINTZER: Objection -- vague.
THE WITNESS: I would say that's a true statement.
BY MR. CAYNE:
Q. And why don't you have a basis to

agree or disagree with his statement?

A. Because my involvement with River Valley was not them as managers, but as investors, so my perception was, is not, I don't have a perception of them as managers.

Q. Did you have a perception of them as investors?

A. Yes, I did.

Q. And what was your perception of them as investors?

A. Savvy investors.

Q. And what was the basis of your perception of them as savvy investors?

A. They seemed to bring in the correct management to, to, to run the activities that, of the company's that they were managing, that they were investing in.

Q. And what was the basis of that conclusion, in your view, that Messrs. Holland and Ross brought in the correct management to run the activities of, in this case, River Valley?

A. Management that I deal with in working on the risk management area seemed to be competent.

A. Yeah, whatever they invested in.

Q. My question was did you mean whether the capital was adequate relative to the holdings?

MR. DINTZER: Objection -- vague.

THE WITNESS: The, the holdings, I reviewed, the risk of the holdings are assessed and the capital position is assessed relative to the holdings.

BY MR. CAYNE:

Q. And based on that assessment, even after FIRREA, you concluded that River Valley's capital, capitalization was adequate to support River Valley's holdings of the high-risk investments to which you have been referring, correct?

A. I didn't evaluate the capital. I only evaluated the holdings.

The capital was a different component analyzed by someone else.

Q. But based on the -- but you did not recommend based on the capital structure of River Valley or anything else that River Valley, that River Valley be directed to sell off or eliminate or reduce these assets, correct?

MR. DINTZER: Objection -- vague.

THE WITNESS: We would have felt more comfortable with the risk of these assets, their capacity to absorb risk.

BY MR. CAYNE:

Q. Would that comfort have been reflected in your exam reports?

A. In some fashion, probably.

Q. In what fashion would it have been reflected?

A. I can't speak -- you know, that's the capital section of the report.

I didn't write that. I don't know how, I don't know how the EIC and whoever would be assigned to that area would write that.

Q. But I --

A. It clearly would show it was a higher ratio, you know, in the report regardless of how it was presented, higher ratio of capital, which would be a positive.

Q. Um-hm. Is it possible that -- I'm not going to ask you to quantify this, but is it possible that there would have been some level of capital that if River Valley in the late '80s and early '90s had capital above that level, the

composite rating would have improved?
A. I don't think it would have improved beyond a 2, but it may have been improved from a 3 to a 2.
Q. And a 2 would have been considered --
A. This is OTS ratings.
Q. I understand. A 2 OTS rating would have been considered a satisfactory rating?
A. Yes.
MR. DINTZER: Why don't we, unless you've got something to finish on the topic, it's been an hour and a half.
MR. CAYNE: How long do you want to break?
MR. DINTZER: Ten minutes.
MR. CAYNE: Let's reconvene at 3:05.
MR. DINTZER: Okay.
(A recess was taken.)
MR. DINTZER: I'm going to hand over to you a copy of Mr. Ferries' errata sheet.
I have it only for one day. I believe you said it was a two-day deposition, so I don't have it for the second day, but this is the day I have it, and I would be happy to let you make a copy of it.

Even though he may not have handled day-to-day operations and day-to-day analysis, he ultimately was the one that made things happen.

Q. Other than Mr. Bangert and Ms. Els, who we spoke about earlier, are there any other individuals you recall in particular who you dealt with at River Valley?

A. I think, I think those two were the ones I primarily dealt with over time.

Those are the ones that come back to memory.

Q. Did you have a view at the time whether they were more sophisticated and knowledgeable in this area than similarly-situated officers of comparably-sized institutions?

MR. DINTZER: Objection -- vague.

THE WITNESS: There were very few companies that had the holdings that River Valley had.

They were very unique, and so it would have been hard to compare the expertise of those individuals to other individuals that didn't have similar holdings.

Q. So those other institutions then would not have had individuals with comparable expertise, is that correct?
A. As best I could tell, or else they would have had all those same kind of investments.
Q. But the, if I understood your earlier answer, the expertise of Mr. Bangert and Mr. Els was appropriate to and adequate to manage the portfolios that you examined, correct?
A. Yes.
MR. DINTZER: Just objection -- mischaracterizes earlier testimony.
BY MR. CAYNE:
Q. You may respond.
A. Yes.
Q. Would you have reviewed the business plans of River Valley in any context?
A. I may have looked at them. I don't remember looking at them, but I may have looked at them, maybe not in great detail, but looked at them.
Q. In my examination of Mr. Ferries, we talked quite a bit about business plans.
Would it be your understanding that in

Q. Did you ever discuss such a transaction with Mr. Holland?

A. You know, Mr. Holland may have, I may have been sitting in a meeting and Mr. Holland may have talked about this institution and how profitable it was and how much capital it had, but I don't remember any of the specifics.

It didn't impact any of the review or anything I did. It was -- but I do remember him saying something like that, you know, what a good investment it is, et cetera, but I really didn't pay much attention to it.

Didn't impact what I was doing.

Q. So you had -- well, were you aware that River Valley had NOLs?

A. Yes.

Q. Was that something you would have analyzed in connection with your review?

A. No.

Q. It was irrelevant to your review of the institution?

A. No, it wasn't irrelevant, but it's something I would not have analyzed.

Q. How was it, how would it have been relevant to your review?

Q. What was the basis of your conclusion that they were savvy investors?
A. Just, just the feeling based on observations.
Q. Such as?
A. Looking at the company's that they currently operated and what they did.
Q. By what they did, you mean what they accomplished with those company's?
A. The operations of the company's, yes; the direction of the company's.
Q. You thought they were operating in a positive, forward-looking, successful manner?
MR. DINTZER: Objection -- compound.
THE WITNESS: It seemed like they were opportunistic, and the, and, and that's, you know, one of the reasons that I thought they were savvy investors.
BY MR. CAYNE:
Q. When you say opportunistic, what do you mean by that?
A. Attempting to profit from various situations such as, you know, the, the investments that they made, and you know, and the company's that they acquired through the,

you know, with, as you mentioned, the net operating loss, tax carry-forwards, and other motivations, being able to leverage and borrow from the Federal Home Loan Banks and use the deposits as a, as a basis as well.

Q. Those were all factors that lead to your conclusion that they were savvy investors?

A. It seemed like -- I don't know exactly how much they put up, but it seemed like, you know, if, if they were successful in their endeavors, that they would have had a high return on their investment, and it seems like at the time, I thought they had a reasonable chance of achieving success.

Q. What was the basis of that conclusion?

A. Just kind of an overall feeling based on the operations just strictly was my perception. That's all.

Q. But it was your perception based on your personal review of their operations, is that correct?

MR. DINTZER: Objection -- vague.

THE WITNESS: Yes.

BY MR. CAYNE:

Q. Are you familiar with American

(The witness reviewed the document.)
THE WITNESS: Okay. I've read it.
BY MR. CAYNE:
Q. Does this exhibit help refresh your recollection concerning the December 16th, 1992 Board of Directors meeting of River Valley Savings Bank?
A. Yes.
Q. And what are your overall principal recollections of that meeting, having reviewed this document?
A. I take, you know, for the most part what was said here, you know, related to this stuff I worked on as, you know, in the ballpark.
Q. Does that mean you believe this memorandum is an accurate summary of the, of that meeting?
MR. DINTZER: Objection -- mischaracterizes the document.
THE WITNESS: I mean the management team, you know, the company prepared this, you know, so it's presented from their light.
I don't necessarily disagree with anything that was said in this, in this document.

Nothing stands out as being extremely objectionable.

BY MR. CAYNE:

Q. Does anything stand out as being objectionable at all based on your review?

A. Well, yeah. We, we as regulators don't usually use terminology like the regulators are very satisfied with the competency and corporation of management.

I would never say that.

Q. What would you have said?

A. Well, if I didn't say anything, that's a compliment.

You know, we don't present things in that fashion, you know, so that wouldn't -- if I was writing this document, I wouldn't have said that.

Let's see what else.

Q. But you think that's an unfair summary of the meeting that the regulators were --

A. I would say that we were not dissatisfied with their cooperation or competency.

Q. Anything else you would comment on?

A. Let me see. Let me see if we're

UNITED STATES COURT OF CLAIMS

- - - - - - - - - - - - - - - -x
HOMER HOLLAND, HOWARD ROSS, :
Plaintiffs, :
vs. :Case No. 95-524C
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - -x

Washington, D.C.
Thursday, February 26, 2004

Deposition of LAWRENCE A. KENNY, a witness herein, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, LLP, 555 12th Street, N.W., Washington, D.C. 20004, at 9:24 a.m., Thursday, February 26, 2004, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

ORIGINAL

APPEARANCES:

On behalf of the Plaintiffs:

HOWARD N. CAYNE, ESQ.
DAVID B. BERGMAN, ESQ.
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5656

On behalf of the Defendant:

WILLIAM G. KANELLIS, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 515-7300

C O N T E N T S

markets group had available to it fully adequate resources and capabilities to manage its portfolio of mortgage-backed securities?

MR. KANELLIS: Objection.

THE WITNESS: Yes.

BY MR. CAYNE:

Q. Did other thrifts you examined during the same time period generally have full-time capital market specialists?

A. No.

Q. Did they, were the capital market operations of most thrifts you examined during that time period generally conducted part-time with someone who had a number of other duties?

A. Yes.

Q. Would that person typically be the Chief Financial Officer?

A. Could be.

Q. Would the, would that person often not have had specialized training in capital markets based on your personal experience?

A. Varied. Varied from company to company.

Q. How did it vary?

A. The range of expertise.

MR. KANELLIS: Objection -- foundation.

THE WITNESS: River Valley's dedication of resources to capital markets was higher than most thrifts.

BY MR. CAYNE:

Q. Would you say it was substantially higher than most thrifts?

A. I don't know what substantially means. It was higher.

Q. Significantly higher than most thrifts?

A. It was higher. I don't know what those mean.

MR. KANELLIS: Objection.

THE WITNESS: Higher.

BY MR. CAYNE:

Q. Would it have been in the top 10 percent?

A. I don't have that information available.

It could have been.

Q. Do you think that was likely?

A. It's possible.

Q. Is it possible that it was in the top

Q. Are you certain of that?

A. No.

Q. Is it possible you would have given them a 2?

A. It's possible, but I doubt it.

Q. Would you have considered capital adequacy in evaluating the risk management function?

A. Throughout this report on risk management, numerous references were made for these risky assets as a percentage of capital, so the assets were looked at and viewed from a limited context as far as the concentration or holding relative to capital, but I did not evaluate the capital section of the report.

Q. What effect --

(There was a pause in the proceedings.)

BY MR. CAYNE:

Q. What effect, if any, would it have had, Mr. Kenny, on your evaluation of the riskiness of the institution's investment securities portfolio at this time if the institution had an additional $7 million of capital?

MR. KANELLIS: Objection -- calls for speculation.

THE WITNESS: The activities would have still been viewed as risky, but the, the ratios would have shown a lower ratio of the risky assets to capital, assuming that that capital was defined as tangible capital.

BY MR. CAYNE:

Q. Would the ratios have been significantly lower?

A. I would have to make those calculations, but they would have been noticeably lower.

Q. Is it possible that, under those circumstances, would it have been more likely under those circumstances that you would have assigned a rating of 2 to the risk management function of this institution?

MR. KANELLIS: Objection -- calls for speculation.

THE WITNESS: That's a tough call because we don't, as we talked, we try not to double penalize, but we wouldn't want to give him credit for that, double credit it, either, so the assets were viewed, if the assets were

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

HOMER J. HOLLAND, AND HOWARD P. :
ROSS, :
Plaintiffs, : No. 95-524C
vs. :
THE UNITED STATES OF AMERICA, :
Defendant. : PAGES 478 - 678

\- - - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, March 3, 2004

Continuation of the deposition of LAWRENCE KENNY, held at the offices of Arnold & Porter, LLP, 555 Twelfth Street, N.W., Suite 925, Washington, D.C., commencing at 9:06 a.m., Wednesday, March 3, 2004, before Elizabeth Mingione, Court Reporter and Notary Public.

ORIGINAL

A P P E A R A N C E S   O F   C O U N S E L:

ON BEHALF OF THE PLAINTIFFS:

ARNOLD & PORTER, LLP
BY: HOWARD N. CAYNE, ESQUIRE
DAVID BERGMAN, ESQUIRE
MICHAEL A. JOHNSON, ESQUIRE
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

ON BEHALF OF THE DEFENDANTS:

UNITED STATES DEPARTMENT OF JUSTICE
BY: WILLIAM G. KANELLIS, ESQUIRE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 514-7300

significant decrease in the high risk mortgage derivative portfolio and capital compliance position. And so I think, you know, those may have been the basis for her findings.

Usually in these letters people say what -- they put the reasons for what they state. And I have no reason to doubt those reasons.

Q. So would you agree that the basis for those conclusions appear to be the findings you made at the July 19th examination of River Valley, July 19, 1993?

MR. KANELLIS: Objection, foundation. Calls for speculation.

A. I'm -- not knowing for sure what was in Ellen's mind, you know, I believe she probably placed a good deal of weight on the, on what I reported in my special limited exam.

MR. CAYNE: No further questions. Your witness.

CROSS-EXAMINATION CONDUCTED

BY MR. KANELLIS:

Q. Mr. Kenny, do you recall last week being asked questions regarding recommendations that River Valley -- that River Valley not purchase mortgage-backed securities derivatives until the

institution met certain capital requirements?
A. Yes.
Q. And do you recall being asked the hypothetical question about whether or not you would have made -- those recommendations would have been made if the institution had an additional $17 million in capital? Do you recall that series of questions?
A. Yes.
Q. Does your answer to that hypothetical depend upon the type of capital that comprises that $17 million?
MR. CAYNE: Objection, leading question.
A. Yes. The quality of the capital is extremely important.
Q. Why is that?
A. Well, in the equation assets minus liabilities equal capital, if the asset is goodwill and doesn't earn anything, then the quality of the capital would be less than if the asset was a high-level earning asset.
MR. KANELLIS: No further questions.
REDIRECT EXAMINATION CONDUCTED
BY MR. CAYNE:
Q. One question. What effect would it have

if the capital were deemed to constitute tangible capital?

MR. KANELLIS: Objection. Calls for speculation.

A. My response would be the same in that if the -- in the equation assets minus liabilities, regardless of whether it was defined as loud and tangible capital or not, the fact is, is that if it was goodwill, that goodwill doesn't earn anything, and therefore has -- is a lesser quality of capital than if that asset was an earning, high-quality asset that could be readily sold.

Q. Do you know whether pre-FIRREA your office treated supervisory goodwill -- strike that.

For what time period are you speaking?

A. I'm just answering the questions as they were presented to me. I think that's a -- my response would hold true at any time.

Q. Are you familiar with how your office treated supervisory goodwill prior to FIRREA?

MR. KANELLIS: Objection.

A. Yeah, I don't remember -- I don't remember exactly how we treated it at that time.

MR. CAYNE: No further questions.

- - -