# EXHIBIT E

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**LEO B. BLABER DEPOSITION COUNTER DESIGNATIONS**

8/08/2000 Tr. 5:1-12
8/08/2000 Tr. 12:22-25
8/08/2000 Tr. 18:13-19:9
8/08/2000 Tr. 26:25-27:6
8/08/2000 Tr. 28:5-29:16
8/08/2000 Tr. 31:15-16
8/08/2000 Tr. 32:6-17
8/08/2000 Tr. 32:22-33:1
8/08/2000 Tr. 71:3-12
8/08/2000 Tr. 71:22-72:5
8/08/2000 Tr. 75:5-19
8/08/2000 Tr. 76:8-15
8/08/2000 Tr. 77:4-11
8/08/2000 Tr. 80:4-81:12
8/08/2000 Tr. 106:12-107:1
8/08/2000 Tr. 111:11-15
8/08/2000 Tr. 112:7-11
8/08/2000 Tr. 116:9-118:3
8/08/2000 Tr. 137:20-138:6
8/08/2000 Tr. 142:22-143:1
8/08/2000 Tr. 148:8-15
8/08/2000 Tr. 152:18-153:10
8/08/2000 Tr. 167:23-168:8
8/08/2000 Tr. 170:15-171:7
8/08/2000 Tr. 179:13-180:5
8/08/2000 Tr. 183:1-12
8/08/2000 Tr. 186:17-187:8
8/08/2000 Tr. 192:10-193:7
8/08/2000 Tr. 202:11-24.

8/09/2000 Tr. 245:7-246:7
8/09/2000 Tr. 249:8-250:10
8/09/2000 Tr. 251:22-252:3
8/09/2000 Tr. 263:19-265:6
8/09/2000 Tr. 269:19-270:15
8/09/2000 Tr. 274:3-23
8/09/2000 Tr. 276:17-277:22
8/09/2000 Tr. 279:10-17
8/09/2000 Tr. 280:9-25
8/09/2000 Tr. 286:23-287:6
8/09/2000 Tr. 287:15-288:3
8/09/2000 Tr. 289:6-14
8/09/2000 Tr. 291:6-17
8/09/2000 Tr. 292:22-293:6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND and HOWARD)
R. ROSS, )
)
Plaintiffs, )
)
vs. ) Case No. 95-524C
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

Deposition of LEO B. BLABER
(Taken by Plaintiff)
Chicago, Illinois
August 8, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Deposition of LEO B. BLABER taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 8th day of August, 2000, at the hour of 9:09 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

P R O C E E D I N G S

MS. SMITH: Counsel, before we get started, I just want to have an understanding that all objections are reserved; a stipulation to all objections reserved until the time of trial, consistent with other depositions.

MR. CAYNE: You're referring to Judge Hodges' order?

MS. SMITH: Referring to his order, and just in terms of what we've been doing in prior depositions in this case.

MR. CAYNE: That's fine.

Whereupon, LEO B. BLABER, having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. CAYNE:

Q. Good morning, Mr. Blaber.
A. Good morning.
Q. For the record, could you state and spell your full name?
A. Sure. First name is Leo, middle initial B., last name Blaber, B-l-a-b-e-r.
Q. Mr. Blaber, you've been deposed before?
A. Yes, I have.
Q. On how many occasions?

Federal Home Loan Bank of Chicago?
A. That's all that I recall.
Q. Were you ever involved in any litigation involving the closure or seizure of a savings and loan association under your jurisdiction?
A. No.
Q. You did close institutions during the period which you were working for the Federal Home Loan Bank of Chicago, correct?
A. Yes, we did.
Q. Were you involved in Telegraph?
A. No, I was still with St. Paul Federal when Telegraph was seized.
Q. Were you the principal supervisory agent for your entire tenure at the Federal Home Loan Bank of Chicago?
A. Yes.
Q. Until when did you work at the Federal Home Loan Bank of Chicago?
A. September of 1991.
Q. After FIRREA was enacted in August of 1989, did you ever play any role or have any position with the Office of Thrift Supervision?
A. No, I did not.

had signed on my behalf, I'm sure that I had given him the authority to sign, but evidently I did very little of the face-to-face negotiation in these cases because I did not remember any of the specifics.

Obviously if -- if you would ask me independently of all of this if I knew that Holland and Ross, or their entities, had acquired troubled thrifts in the late '80s, sure, I remember all of that. But I did not remember any of the specifics that were covered in those memos.

Q. But when you read the memos, did it spark any recollection concerning the matters discussed in the memos?

A. It did not. Some collateral sparks were struck. The events that led up to the demise of Republic Savings of South Beloit I remembered very well, because I had hands-on with that one. I handled that one personally. But I didn't handle the Holland and Ross transactions personally, so that I really was just an overseer on those.

Q. By "overseer," do you mean you supervised the staff who directly handled the

Holland and Ross acquisitions?

A. That is correct.

Q. And so you actually, at the time, would have been involved in a supervisory capacity, correct?

A. I was responsible for supervisory. But by "involved" if you mean did I do anything on a day-to-day basis, in the best of my knowledge I did not.

Q. But am I correct, Mr. Blaber, you did sign a number of memos and letters relating to the Holland and Ross acquisitions in the late 1980s; is that correct?

A. Yes, that's correct.

Q. At the time you signed those letters and memos, do you believe all the statements in those letters and memos to be correct?

A. Yes.

Q. You wouldn't have signed them if you thought there were any inaccuracies in those letters and memos, correct?

A. That is correct.

Q. And you would have discussed the matters relating to the Holland and Ross acquisitions with your staff at that time,

Loan Bank of Chicago?
A. Holland, yes; Ross, no.
Q. How did you know Mr. Holland?
A. We had a -- St. Paul Federal and the First National Bank of Chicago, for which Mr. Holland was employed at the time, had a point-of-sale experiment, and Mr. Holland was in charge of that experiment for the First National Bank.
Q. At approximately when was that?
A. Well, let's see. I don't -- I really don't know. I mean, it would be the late '70s sometime.
Q. Did you have any other dealings with Mr. Holland prior to the time you joined Federal Home Loan Bank of Chicago?
A. No.
Q. After you joined the Federal Home Loan Bank of Chicago, do you recall the first time you again dealt with Mr. Holland?
A. I dealt with him in connection with the acquisition of a thrift called Gilldorn Savings, which was acquired by Mr. Holland and a man name Buddy Cohen (phonetc).
Q. Can you describe -- Gilldorn Savings,

was that a local institution in Chicago?

A. Yes.

Q. Was it a troubled institution?

A. It was a troubled institution that -- when they acquired it, yes, it was a troubled institution. It was a change in control. I can't remember the name of the entity that was acquired, but a savings and loan was acquired by a man named Richardson Gill. After he acquired it, he changed the name to Gilldorn Savings and Loan Association and operated it, and that savings and loan association eventually got pretty close to insolve- -- it was a troubled thrift. I can't remember whether they were technically insolvent or not at the time that Holland and Ross acquired them.

Q. Do you remember --

A. I'm sorry, at the time that Holland and Cohen acquired them.

Q. Do you recall how Mr. Holland became involved in that acquisition? Specifically if you recall whether Mr. Holland came to your office, or whether someone within your office contacted Mr. Holland to suggest that this is a transaction he may be interested in looking at?

A. I do not recall that. I don't know.
Q. Do you recall meeting with Mr. Holland in connection with the approval process of this transaction?
A. I met with Mr. Holland many times in connection with Gilldorn, which was renamed Enterprise by Messrs. Holland and Cohen. I couldn't say specifically whether I met with him in connection with the acquisition. I would be inclined to say yes because I handled the -- I handled the transaction. I had -- I had closely supervised Gilldorn, and I would have closely supervised the transfer to Cohen and Holland.
Q. Do you recall approximately when Mr. Holland acquired the institution which was renamed, if I understand your testimony, Enterprise?
A. Right, Enterprise; mid-'80s.
Q. Do you recall the results of that acquisition?
A. It was a very, very difficult institution to run profitably. Gill had made -- it was a statute charter, and Gill had made some bad acquisitions, including a mortgage banking company which was not profitable. He had

overpaid for it, and they had a large goodwill account. So the company was -- it was a tough job for Cohen and for Holland to run that break-even or profitably.

After a couple of years, Holland left, and Cohen continued to operate Enterprise after that, but it was -- it was a tough one, and Enterprise, I believe, eventually failed as well. This was after -- Enterprise was still going in August of 1989 when I ceased to be the principal supervisory agent. So I had no connection with it after that. I believe it eventually failed.

Q. You're sure or you're not sure that it ultimately failed?

A. I'm not sure, but I believe that it did.

Q. Mr. Holland was not affiliated with the institution at that time?

A. No, he was not.

Q. And the other gentleman?

A. Buddy Cohen.

Q. Was he still affiliated with the institution?

A. Yes, he was.

Q. Were you satisfied with the performance

Q. Did Mr. Holland's experience at the Enterprise factor into your analysis of whether or not to approve his application to acquire Republic a few years later?

A. Yes.

Q. And how did it factor into that analysis?

A. Well, we felt that we were getting capable management for the resulting entity.

Q. Do you recall, in connection with Republic again, whether Mr. Holland contacted you or your office or someone within your office contacted Mr. Holland to see if he was interested in engaging in that transaction?

A. You already asked me. I said I do not recall.

Q. Excuse me. Previously, to be clear, I asked you that with respect to Enterprise. Now I was asking you the same question with respect to Republic. I apologize if I was confusing.

A. Okay. Republic, I believe, probably that was a bid conference for Republic. We probably sent out bid packages. It's more likely that we contacted him than that they contacted us, one way or another. I think there was a

bidder's conference for Republic. So the FSLIC or the Chicago bank would have acquired individuals and entities that we knew to be potential acquirers or to be interested in acquiring other savings and loan associations.

Q. Do you recall whether you had any personal conversations or meetings with Mr. Holland in connection with his acquisition of Republic?

A. I do not, no. I do not recall.

Q. Do you recall that Mr. Holland and Mr. Ross acquired, on the same day as they acquired Republic, three other insolvent institutions?

A. On the same day? No, I don't recall that all of those transactions happened simultaneously.

Q. Do you recall that Mr. Holland and Ross acquired three other -- four other institutions during the same general period?

A. Yes.

Q. Do you recall whether you personally spoke with or met with either of those gentlemen in connection with those acquisitions?

A. I do not believe so. I don't think I

have ever met Mr. Ross.

Q. Do you recall whether you have met with or spoken with Mr. Holland at any time after the acquisition of the institutions we just discussed?

A. Yes, I know I met Mr. Holland once in the airport after I retired. I also -- one of my sons is a career Army officer, and Mr. Holland, as you know, is a West Point graduate, and there is a society here, an alumni group I guess it would be. At least it's retired Army officers, whether all West Point -- anyway, he invited me to a lunch where some general was speaking. So I went to lunch with him once in connection with that.

I don't think we spoke specifically about business. I'm sure we've had some general comments, but those are the times that I remember meeting with him after these transactions.

And actually, the luncheon might have been before '88. The airport would have been after.

Q. Do you recall that Mr. Holland acquired another institution in the mid-'90s, I believe in San Antonio, Texas, which was also called River

negotiation. All of these things, there is always give and take in a negotiation.

Q. So who on your staff would negotiate for -- capital forbearances?

A. I believe in this situation it was Helen Mirza.

Q. Is it your understanding or recollection that Ms. Mirza negotiated with Messrs. Holland and Ross concerning which capital forbearances would be approved and which capital forbearances would not be approved?

A. Yes, that's my understanding.

Q. And what is your understanding of why Messrs. Holland and Ross requested capital forbearances in connection with their acquisition of Republic Savings?

A. Why did they request --

Q. Request capital forbearances.

A. Because it would facilitate their ability to operate profitably in the relatively short run.

Q. Specifically, what was your understanding of how capital forbearances would have facilitated the ability of Messrs. Holland and Ross to profitably operate Republic Savings?

A. Well, taking one of the forbearances -- for instance, the amortization of goodwill -- the impact on income of a ten-year goodwill amortization is much greater than the impact of a 25-year-old -- 25-year amortization of goodwill.

Q. So granting or approving a 25-year amortization of goodwill would have made the institution --

A. More profitable in the short run.

Q. Do you recall -- and we'll go through a document if you don't -- that the approval of the acquisition of Republic Savings by Messrs. Holland and Ross included an authorization to include a certain amount of the FSLIC cash contribution as a direct addition to regulatory capital, often referred to as a capital credit?

A. I do not recall it, but I reviewed a document yesterday that indicated that. So I now know that it did.

Q. And do you recall that the Republic Savings transaction involved a capital credit, I believe in the amount of $5 million?

A. I don't recall it, but I read that yesterday, so I do know that now, yes.

Q. And do you recall that that was part of

Q. Did more capital provide the investors with more opportunities to operate their institution in a profitable manner?
A. You could say that, yes.
Q. Why would you agree with that statement?
A. It might be that it also provides them with the opportunity to do -- to make more imprudent investments. So I'm not sure that as a generalization -- that you can do more things relative to investments, if you have more capital.
Q. Not all banks are successful, right?
A. That is correct.
Q. Some banks ultimately make a lot of money over the long term, correct?
A. Right, and some banks go broke.
Q. And some banks go broke, correct?
A. Right.
Q. But wouldn't you agree that bankers would have more capital than less capital, right?
A. I think I started off by saying that.
Q. Because banking is all about leverage, right?
A. Yes.

Q. What do you understand leverage to be?
A. Leverage is using -- is making more in the -- more investments relative to your capital than less, right.
Q. And again, we just said that bank leverage is at the heart of banking, right?
A. Yes.
Q. And again, banks can be successful or unsuccessful.
A. Let me get back -- no, leverage is not necessarily at the heart of banking anymore. Today banks are in all sorts of businesses. They're in fee business. They're in venture capital business. So I don't know whether leverage is at the heart of banking.
Q. Talking about the time at issue in this litigation, in the late 1980s --
A. If you have adequate capital, you can do more things. And more things means more investments. And that's what leverage is.
Q. What bankers attempt to do, isn't it, is make profitable investments, correct?
A. That's correct.
Q. And more capital would allow a banker such as Messrs. Holland and Ross to make more

investments, correct?
A. It would allow them to make more investments.
Q. You simply made the comment a few minutes ago that simply because a banker makes an investment doesn't mean that investment is going to work out well, correct?
A. That's right.
Q. An investment could be successful or unsuccessful?
A. Right.
Q. You agree that bankers, particularly in the time period we're dealing with here, were in business to make investments, correct, with their assets?
A. That's correct.
Q. So the more capital Messrs. Holland and Ross had, the more investments could be made, and they obviously would attempt to make prudent investments, correct?
A. Correct.
Q. If they were successful in making prudent investments, the more capital Messrs. Holland and Ross had, the more profitable their institution would be, correct?

regulatory capital, that American National Bank as opposed to another lender, was involved?

A. No.

Q. Did that bear any relevance in connection with your office's deliberations, that American National Bank as opposed to another lender be involved?

MS. SMITH: Just to be clear, you're asking him to speculate as to what his understanding is, I believe, because he hasn't indicated he has any specific recollection whatsoever in terms of any of these dealings with Messrs. Holland and Ross.

THE WITNESS: I did say based on a review of the documents. I think we understand that.

BY MR. CAYNE:

Q. That's correct.

A. That I have no independent recollection of this, but I have reviewed the documents.

Q. Correct.

A. If Prudential Insurance had bought the subdebt or Cigna -- if any reputable company had purchased the subordinated debt, that would have been an irrelevancy. Whether it's American

National Bank, First National Bank, or you name any investor, no, that was not significant.

The right to include subordinated debt in net worth, that was not a supervisory forbearance. That was a regulation that permitted the inclusion of subordinated debt in net worth, if certain requirements were fulfilled. So this simply was, as far as I know at least, probably a conforming piece of subordinated debt. The American National Bank involvement had no relevance vis-a-vis the approval.

Q. Do you recall, based on your review of the documents, that the negotiations for the amount of regulatory capital with your staff involved a number of factors, correct?

A. Right.

Q. And the negotiations involved how much supervisory goodwill concluded in regulatory capital, correct?

A. The negotiation involved whether or not $5 million of the FSLIC assistance concluded in net worth, yes.

Q. But the transaction also resulted in the -- the FSLIC assistance didn't entirely fill

district, or did you also have personal responsibility for negotiating supervisory acquisitions of institutions located beyond the boundary of the Chicago district office?

A. I participated in a single negotiation for a group of four or five thrifts in the state of Texas. But generally speaking, the Chicago Federal Home Loan Bank and our office had jurisdiction only for savings and loans in the Chicago district, which is Illinois and Wisconsin.

Q. Were you responsible for the Texas situation at the same time you were involved with the Holland and Ross negotiations?

A. Yes.

Q. Why is it you had responsibility for a location outside of the Chicago district?

A. The bank board was attempting to resolve as many of the cases in Texas as they possibly could. Texas was seen as the most troubled state in the country, and they wanted to wind up some cases. And they selected individuals who they thought might be capable negotiators from around the country. So they asked me to participate in one package down

there.

Q. And do you know specifically why you were selected to negotiate for one of the Texas packages?

A. I do not, no.

Q. Do you know who made the decision that you would negotiate one of the Texas packages?

A. The Federal Home Loan Bank Board.

Q. Who advised you of that assignment?

A. I don't recall.

Q. Who would you have reported to in connection with negotiating the Texas transaction? The same people you ordinarily reported to?

A. No, there was -- there was a name for it. I can't remember what it was now. There was an individual who was in charge of this program. It was a fairly massive program, and everything was funneled through him.

Q. But you were conducting those negotiations in Texas at the same time your office was conducting its negotiations with Messrs. Holland and Ross, correct?

A. Yes. I was not in Texas. The negotiations were conducted in Chicago or

John M. Buckley, B-u-c-k-l-e-y, Jr., the secretary of the Federal Home Loan Bank Board, from me. And the subject is the FSLIC-assisted acquisition of Galva Federal, Home Federal Savings of Peoria, and Mutual Savings and Loan Association of Canton by Homer Holland and Howard Ross.

Q. Can you look to see if your signature appears on that letter?

A. My initials are here.

Q. Your initials are here?

A. I don't know if I signed it on the back, but I'll be glad to look.

(Witness examines document.)

THE WITNESS: I did not sign it.

BY MR. CAYNE:

Q. But you affixed your initials on the front page?

A. That is correct.

Q. I have several questions on this document. Could you take a moment to review it?

(Witness examines document.)

BY MR. CAYNE:

Q. You're on page 3 now, correct?

A. Yes.

Q. You see there is black lines going
through some of the text?
A. I do.
Q. Do you know where those black lines
come from?
A. I do not. I don't know.
Q. Do you believe that Ms. Mirza would
have prepared the first draft of this letter?
A. I believe so. Diana Januska's initials
appear at the end of it after mine, so yes, I
believe that her group did prepare it.
Q. And would you have personally reviewed
and edited this letter before you signed it --
A. Yes.
Q. (Continuing) -- before you affixed your
initials on the front page?
A. Yes.
Q. Would you have agreed with all of its
contents before you sent it to Mr. Buckley?
A. Yes.
Q. Would you have understood that Federal
Home Loan Bank Board would have relied on this
memorandum in making the decision to grant
assistance and forbearances in connection with
the acquisitions of Galva Federal Savings and

Q. How would that information have gone to Washington, D.C.? Would your office have made a recommendation at some point that Mr. Pompea's bid go forward?

A. I doubt that. I imagine we probably sent the bids down and probably discussed -- perhaps had reservations ourself about Pompea and discussed it with the FSLIC.

Q. So in other words, before you prepared and issued the S memorandum, Exhibit A, on April 22nd, 1988, recommending the proposal of Messrs. Holland and Ross, you or your staff would have had discussions with FSLIC staff concerning these three institutions in which the information would have been conveyed from Washington that -- of the different bids your office was looking at, you should no longer pursue the bid from Pompea?

A. Yes. The procedure would have been the same here as the ones we previously discussed, with memos going back and forth. We saw the memo from Bobbie Jean Brookins about the other proposal, about going back and negotiating on the tax benefits. So there was a back and forth exchange prior to the finalization of this recommendation.

Q. So is it fair to say when you made this final recommendation, you would have been aware that the Washington office of the FSLIC supported the bid by Messrs. Holland and Ross?

A. Yes.

Q. It says:

"On February 3rd, 1988, River Falls submitted a revised proposal which the FSLIC accepted, and negotiations subsequently began."

Do you see that statement?

A. Yes.

Q. What does that mean? That the FSLIC accepted that proposal? There wasn't a final deal at that time, right?

A. I doubt it. It probably means the same thing -- you could use the Brookins letter as a model for this. I recall she said check your -- check your cost of liquidation analysis, and pointed out the tax benefits, and said go back and try and make a better deal.

So that was the acceptance. We accept this generally, but whether there were any specifics in this, I don't know.

Q. So you understood it to be a general acceptance of the overall parameters proposed by

Messrs. Holland and Ross, with final negotiations of the specific details to be concluded?

A. Correct.

MR. CAYNE: It's 12:02. Let's take a lunch break for an hour.

THE WITNESS: Do you want to try to finish this one?

MR. CAYNE: We're done with this document.

THE WITNESS: You're done with the document? That's good. Let's do it.

MR. CAYNE: Return at 1:00 o'clock.

(Lunch recess.)

(Whereupon Blaber Deposition Exhibit Nos. 9 and 10 were marked for identification.)

BY MR. CAYNE:

Q. Mr. Blaber, the court reporter has handed you documents marked for identification as Exhibits 9 and 10. Do you have those in front of you?

A. Yes, I do.

Q. For the record, could you identify those?

A. It's a news release from the Federal

Q. Does that give you any more insight as to what effect it would have had on your analysis of this transaction, if the acquirers had been unwilling to provide the personal guarantee required by American National, and as a result American National was unwilling to provide the $5 million?

A. No.

Q. Why is that?

A. Because you can't speculate on something like that without doing some analysis. What you're saying, the use of bolster presupposes they were okay already, and this is the icing on the cake.

Nobody writing these memos is so precise that anything they say is going to stand up under questioning at a later date. I don't know whether that's somewhat of an exaggeration or not.

I'm not meaning to imply it would not have been approved without the subordinated debt. All I'm saying in response to your question is I guess I don't know. We would have to go back and look at what the capital level would be without the subordinated debt.

Q. So am I correct that you're not meaning to imply either that the transaction would have been approved without the subordinated debt?
A. Would or would not have, right.
Q. You don't know sitting here today?
A. Right.
Q. Is it a fair statement that in light of this reference to subordinated debt significantly bolstering regulatory capital, you viewed that as a positive or significantly positive factor in deciding to recommend the transaction?
A. No question about that.
Q. Why do you have no question about that?
A. Because it's $5 million more in capital. So that's a significant factor.
Q. Significant positive factor?
A. Yes, a significant positive factor.
Q. So the record is clear, why would there have been a significant positive factor?
A. Because it increases the amount of capital that the entity has. The more capital it has, the greater the likelihood of survival.
Q. The greater the likelihood of profitability, also?
A. Sure.

Q. So when you're dealing, though, with the forbearances that are not standard, such as this $8 million capital credit, because it was not standard, did you have to go through additional regulatory or internal bank board hoops or procedures in order to get that approved?

A. I believe so. I think on a standard forbearance, as probably at our negotiating level, there was a greater likelihood, for instance, that 25-year goodwill amortization would be approved than -- we would, in our recommendation on including a portion of the assistance. The FSLIC directly had to do that.

Q. Does that mean that you or your staff would have to push harder or make more arguments in Washington to get the capital credit approved as opposed to the supervisory goodwill?

A. I don't know. I can't answer that. The analysis -- the final decision and the real deliberation would have been done in Washington.

Q. Ultimately, in the case of the two Holland and Ross acquisitions, the Washington office approved standard capital forbearances and nonstandard capital forbearances, correct?

A. I believe so, yes.

(Whereupon Blaber Deposition Exhibit No. 13 was marked for identification.)

BY MR. CAYNE:

Q. The court reporter has handed you a document marked for identification as Exhibit 13, if you would kindly identify it for the record.

A. It's a second addendum to the S memorandum, dated May 27, 1988, to Linda Plye, director of corporate activities, from me as principal supervisory agent, bearing my initials. The subject is the proposed acquisition of Home Federal Savings and Loan, Galva Federal Savings and Loan, Mutual Savings and Loan by Ross and Holland.

Q. On page 3 of this memorandum, it refers to Mr. Steven Bangert, B-a-n-g-e-r-t, an executive vice president of Holland Partners. Do you recall him?

A. Do I recall him?

Q. Yes.

A. No, I do not.

Q. On the very last line of the third page, you see LBB:DRB?

communications between Washington and my office where questions were raised relative to the bylaws and relative to what is characterized here as minor deviations. And I read this as saying that these deviations are de minimis, and they're not worth further negotiation, so forget about your objections and let's get on with it.

Q. One last question on this. The negotiations, negotiations between whom?

A. This would be between the Federal Home Loan Bank of Chicago, agency representatives, the FSLIC representatives, and the acquirers of these three entities.

Q. Messrs. Holland and Ross?

A. Right.

(Whereupon Blaber Deposition Exhibit No. 15 was marked for identification.)

BY MR. CAYNE:

Q. The court reporter has handed you Exhibit 15.

A. This is a document dated June 22nd, 1988, and it is a fourth addendum to the S memorandum. It's to Linda Plye, director, from me. It bears my initials, and it's relative to

loss portion?
     A.   It was D.R.B. again.  Well, it's the same one.
          No, it probably would have been somebody in Helen Mirza's group.
                    (Witness examines document.)
          THE WITNESS:  Well, reading this, it's -- there was a question relative to whether or not the applicant's calculation of what were and were not the net operating losses were correct, and the conclusion here is that the applicant's findings are accurate.  They evidently were saying that the operating loss carryforwards of Mutual and Home would survive the merger, and the ones of Galva would not.  And someone must have questioned that, so . . .
          BY MR. CAYNE:
     Q.   Do you recall why the issue of operating losses would have been an issue of importance in connection with your office's consideration of a supervisory acquisition, such as the acquisition described in Exhibit 15?
     A.   If they were being shared, they would have become an important consideration.
     Q.   Because?

A. Because -- if the FSLIC was seeking to recapture a portion of them, then obviously it would be an important consideration.

Q. To FSLIC?

A. To FSLIC, right. So there evidently was an analysis submitted, which we don't have here, that made certain allegations. Clearly there was a question about the accuracy of those figures, and our staff's conclusion was that the figures that were submitted were accurate.

Q. You didn't mean allegations, did you, in a pejorative sense? You meant allegations in the sense of assertions, correct?

A. I guess so, yes. Yeah. I don't know that all allegations are pejorative anyway, but . . .

(Whereupon Blaber Deposition Exhibit No. 16 was marked for identification.)

BY MR. CAYNE:

Q. Could you please identify Exhibit 16 for the record, Mr. Blaber?

A. It's a memorandum dated June 27th, 1988, to me from Edward A. Eckert and Daniel R. Bagus, and it's an analysis of the

losses for each day?

A. I don't know what it reflects. It was a negotiated figure, and I can't answer that.

Q. Towards the bottom of page 2, there is a statement that "the FSLIC assistance has a projected present value cost of $17.8 million, which represents 45.65% of assets and 85.2% of the projected cost of liquidation."

Did you see that statement when you read this document?

A. Yes, I did.

Q. The estimate of 85.2 percent of the projected cost of liquidation, that also, does it not, reflect an improvement over the figure set forth in Ms. Brookins' memo that we looked at earlier?

A. By about 8 percent. It was about 83 to 84 percent than the earlier one, yes.

Q. That was the result of your additional negotiations with Messrs. Holland and Ross, right?

A. Presumably, yes.

Q. Do you recall who Mr. John Buckley was?

A. Yes. We already discussed him. He was the secretary of the Federal Home Loan Bank

Board.
Q. Do you recall whether he had substantive input into these applications, or whether he had a procedural role only?
A. Only procedural.
(Whereupon Blaber Deposition Exhibit No. 20 was marked for identification.)
BY MR. CAYNE:
Q. Kindly identify Exhibit 20 for the record, Mr. Blaber.
A. It's a document -- an S memorandum dated June 28th, 1988, to John Buckley, the secretary of the Federal Home Loan Bank Board, from me as principal supervisory agent, initialed on my behalf by CAB, who is Chester A. Biedron, and the subject is the FSLIC-assisted supervisory conversion/merger of Republic Savings with and into River Valley Savings Bank.
Q. Although Mr. Biedron signed this memorandum on your behalf, do you have any doubt that you approved of its contents?
A. No.
Q. And the financial condition set forth in this memorandum of Republic Savings, would

Q. How many institutions -- does it indicate how many institutions --

A. 25 -- 61 parties were contacted. Marketing packages were distributed to 25 interested parties.

Q. And only one submitted bid?

A. Correct.

Q. In your personal experience, is that unusual, that out of -- where you contacted 61 parties and submitted 25 packages, you received only a single bid?

A. You normally get more. I don't know whether unusual -- you normally get at least a couple bids anyway.

Q. Would you attribute the fact that you received only one bid to the severely deteriorated condition of Republic Savings at the time you bid it?

A. Partially. It also, in my view, was not a very good franchise. South Beloit is not a great market area, and as I recall from the documentation, they only had one other office. If this had been a great franchise, it could have been in as bad shape, and more bids would have come in. Just the -- as long as it was assisted,

the condition of the entity is going to be compensated for by the magnitude of the bid, so . . .

Q. Did you understand why Mr. Holland and Ross were interested in acquiring this institution, even though it was in Beloit?

A. No.

Q. Is that something you looked into at the time?

A. No.

Q. Because your staff looked at it or --

A. We don't -- it's none of our business why somebody wants to do something. If -- if their request is something that would raise suspicions in our mind that they had some sort of nefarious motive, we might have concern. But maybe Holland and Ross know more about the franchise value of South Beloit than I do. But no, I don't know why they wanted it. Nobody would have asked.

Q. Is it a fair statement, for your purposes, it was enough to know that Messrs. Holland and Ross were successful businessmen, with integrity, who believed they could make a go of this business?

(Whereupon Blaber Deposition
Exhibit No. 21 was
marked for identification.)

BY MR. CAYNE:

Q. Mr. Blaber, the court reporter has handed you Exhibit 21. Identify it.

A. An addendum to the S memorandum, dated June 21, 1988, to John Buckley, Jr., secretary of the Federal Home Loan Bank Board, from me. My initials are affixed, pursuant to authority, by Chester A. Biedron, relative to the proposed FSLIC acquisition of Republic Savings.

Q. Would you have signed off of and approved of this memorandum, even though Mr. Biedron signed it for you?

A. Yes.

Q. Do you understand or did you understand at the time the purchase method of accounting?

A. I think so, yes.

Q. Do you know why this transaction, the supervisory acquisition of Republic, would have been provided for under the purchase method of accounting?

A. Yes. Whenever there is a change of control, you must use the purchase method of

accounting. If you had a pooling of interest where there is not a change of control, you could just sort of add everything together. The purchase method requires a marked-to-market of assets and liabilities.

Q. Am I correct it's the purchase method of accounting that results in the --

A. You are correct.

Q. That would have been the same with the Home, Mutual, and Galva transaction?

A. That's correct.

Q. That was also accounted for under the purchase method of accounting?

A. Yes.

Q. For the same reasons?

A. Yes.

Q. Could you look at the managerial aspects portion of Exhibit 21?

A. Yes.

Q. Does that contain nearly the same language that you used to describe Messrs. Holland and Ross in connection with the Home, Mutual, and Galva deal?

A. Yes.

Q. Does that surprise you?

Q. Under the "Fairness and Disclosure" section, it states:

"Inasmuch as this is a FSLIC negotiated and assisted transaction, the plan contemplated herein has been conducted arms length."

Do you see that?

A. I see it, yeah.

Q. I don't recall seeing a similar section in the Home, Mutual, Galva recommendation papers. Do you?

A. I do not. And I don't recall ever having seen anything like this before or since.

Q. Looking at the section in its entirety, Mr. Blaber, does that give you any insight as to why that section was included in this memorandum?

A. It does not. I have -- I don't have a clue.

Q. You see under "Recommendation," it refers to this transaction resolving a severe supervisory case.

A. Yes.

Q. Does the use of the term there, "severe," is that a term of art?

A. I don't think precise -- in other words, I don't think if what you're asking is

Exhibit 21?

A. An issues memorandum was something that the predecessor chairman insisted on with every transaction. Instead of substituting it for something else, which is essentially the same, we just kept adding documents. In my mind, it's really -- in substance it's no different than the S memorandums that we've looked at. It's -- it's an analysis of a transaction that goes into the pros and cons but reaches the same conclusion.

Q. And contains much of, if not -- much of identical analysis?

A. Exactly. If you had read through it, there is not much -- well, it's not much more that can be said about the transaction anyway, after all we've read so far.

Q. Under "Recommended Solution," one additional point I notice, it states on March 3 the FHLB of Chicago met with River Valley to discuss and negotiate their proposal. I take it that you would not personally have attended that meeting?

A. No, I don't recall that I did. And I think I would remember if I had attended.

Q. Who do you expect would have attended

that meeting from the Federal Home Loan Bank?

A. Well, Helen Mirza would have attended. I don't know what -- she would have been reporting directly to Stuart Brafman, who was kind of the executive vice president for agency affairs. Stuart might have attended it, Diana Januska probably attended it, and maybe Chester Biedron.

Q. Mr. Brofman reported to you?

A. Yes.

Q. He has since passed away?

A. No, no.

Q. He's still living?

A. Yes.

Q. I must be mixing him up with someone else.

Either based on your specific knowledge of this case or your general understanding, what issues do you expect were discussed at the March 3, 1988, negotiation session between the FHLB of Chicago and the acquirers?

A. Well, I'd have to sort out -- I -- to answer, I'd have to sort out the chronology. But the bid of Holland -- or the bid -- this is Republic we're talking about, right?

That's it.

Q. Are you confident you signed off on and approved this memorandum?

A. Yes.

Q. On page 1, you see the reference to, "The acquisition of Republic Savings will result in $7 million goodwill to be amortized over 25 years"?

A. I see that.

Q. Is that goodwill what you and I have referred to and what you understand to be supervisory goodwill, in that it was goodwill created in the context of this supervisory acquisition and was allowed to be included as an asset of the resulting institution?

A. It -- it is goodwill that was created through the use of the purchase accounting method. The supervisory aspect is the ability to amortize it -- I guess. This is sort of the mythology -- I consider it the mythology of these cases.

There is no such thing as supervisory goodwill. Goodwill is set up pursuant to generally accepted accounting principles. But under generally accepted accounting principles,

you must amortize it over some reasonable time. We won't speculate what that is, but it's certainly not 25 years. The supervisory aspect of this is allowing them to amortize it over 25 years.

With that qualification, the answer is yes, that is what you and I have been discussing.

Q. So it was your understanding that this $7 million could be included as an asset for 25 years, being amortized over the 25-year period?

A. A portion of it would last longer than it would have under -- than if it was amortized under generally accepted accounting principles, and the annual charge against earnings would be less.

Q. Again, that's what you and I have been referring to as supervisory goodwill, correct?

A. You have been referring to it that way.

Q. You understood what I mean?

A. Yes.

Q. You understand this to be covered under that same term?

A. Absolutely.

Q. Could you explain to me what is meant by the entry on page 1, "The growth of

A. I think so. If -- if the parameters of the financial condition changed, we've already seen that that was dependent upon certain performance by River Valley, and perhaps, I don't know, capital levels might have been a part of it. So yes, I'm sure we were concerned.

(Whereupon Blaber Deposition Exhibit No. 24 was marked for identification.)

BY MR. CAYNE:

Q. Would you please identify Exhibit 24?

A. This is S memorandum number 497 -- strike that.

Q. It was 498, wasn't it, sir?

A. This is an S memorandum supplement dated July 12th, 1988, to John Buckley from me signed on my behalf and with my authorization by Helen K. Mirza in this case. This is relative to the acquisition and conversion of Home, Galva, and Mutual.

Q. And you would have agreed with all of the contents of the memorandum at the time it went out?

A. Yes.

Q. Do you know why some of the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND and HOWARD)
R. ROSS, )
)
Plaintiffs, )
)
vs. ) Case No. 95-524C
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

ORIGINAL

Continued Deposition of LEO B. BLABER

(Taken by Plaintiff)

Chicago, Illinois

August 9, 2000

Reported by: Robin Tokarz-Chimniak

CSR No. 084-001999

APPEARANCES:

For Plaintiffs Homer J. Holland and Howard R. Ross:

HOWARD N. CAYNE, ESQ.
Arnold & Potter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5656

For the U.S. Department of Justice in Case No. 95-524C:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Deposition of LEO B. BLABER taken by the Plaintiff at 54 West Hubbard, 4th Floor, Chicago, Illinois, on the 9th day of August, 2000, at the hour of 9:10 a.m., before Robin Tokarz-Chimniak, CSR No. 084-001999.

Q. Do you see there is other writing on the first page of that document?
A. There is a notation there that says, "To Larry Ferries."
Q. Is that your writing?
A. It is not.
Q. Do you know Mr. Ferries?
A. Yes, I do.
Q. Who is he?
A. He's an examiner. He could have been a field manager at that time; senior examiner, at least.
Q. Do you recall when he joined the Federal Home Loan Bank of Chicago?
A. He was a long-term examiner. We -- all of the examiners joined the Federal Home Loan Bank of Chicago simultaneously in about 1986. They were transferred from the office of examinations and supervision. Larry was an examiner at that time. So he's a veteran examiner.
Q. What responsibility did he have in connection with the Peoria Savings transaction that his name would appear on that document, to your knowledge?

A. I don't know.

Q. Do you recall ever meeting with Mr. Ferries on any matters dealing with Messrs. Holland and Ross?

A. No.

Q. At this time or any other time?

A. At this time or any other time.

Q. Exhibit 28 is dated December 16th, 1988, correct?

A. Yes.

Q. And Exhibit 27 we looked at yesterday was dated the day before, December 15th, 1988, correct?

A. Yes.

Q. Take whatever time you need to look at Exhibit 28, and please indicate to me how that exhibit relates to Exhibit 27.

A. I couldn't know. I cannot determine that. I would have to study these at some length. I don't know what the relationship between the two of them is. I would suspect they are just part of a "D" package. Both of them were prepared at the Federal Home Loan Bank of Chicago obviously, but I don't know what the relationship is.

period?

A. No.

Q. You're saying "no" to what?

A. Was your question was the purchase method of accounting used because of the creation of goodwill, which will be amortized over a 25-year period? Wasn't that your question?

Q. Let me clarify. My question is, what is the relationship between the use of the purchase method of accounting and the fact that the goodwill would be amortized over 25 years; the relationship, if any?

A. There is no relationship. We discussed purchase accounting yesterday.

Q. Tell me again what your understanding of purchase accounting is.

A. We went over this at great length. I think in the course of the discussion yesterday, we agreed that all of these cases were handled under purchase accounting because there was a change in control.

Whenever there is a change in control, purchase accounting is used. Purchase accounting applies a marked-to-market. When there is a marked-to-market, usually goodwill is created.

So, number one, purchase accounting is used in this transaction because there was a change in control. It was under generally accepted accounting principles. Under generally accepted accounting principles, goodwill was created. The supervisory aspect of this or the regulatory aspect of this was the fact that the amortization of goodwill was extended from whatever period the accountants said it should be -- let's say 7 to 10 years -- to 25 years.

Q. And page 4 of Exhibit 28 indicates that the Federal Home Loan Bank Board agreed to allow the amortization of the goodwill created in this transaction for a period of 25 years, correct?

A. Yes.

Q. And that is what you referred to yesterday as a capital forbearance, right?

A. No, I didn't -- as capital forbearance? No, I didn't refer to it as capital forbearance. I referred to it as one of the standard forbearances.

Q. My mistake.

A. Okay.

Q. Just so the record is clear, and I didn't speak over you, sir, the standard

forbearance in this case was related to the agreement by the Federal Home Loan Bank Board that Holland and Ross investors could amortize the goodwill created by the acquisition of Peoria Savings for a period of 25 years?

A. Yes. That is a factor in every single one of these cases. I don't know why we have to go over it individually on each case. I mean, I just don't understand this. The point has been made on many, many occasions. You made that point. Why not leave it and go on to something else, if there is anything else?

Q. When you said "every single one of these cases," you're referring to the transactions we discussed yesterday?

A. The subject cases, yes. The triplets, the Republic, and the Peoria.

Q. Under "Future Prospects," your memorandum states that "the subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District . . . ."

Stopping right there, is it your understanding -- what is your understanding concerning whether or not Peoria Savings was ever actually placed in receivership?

A. I have no understanding. I don't recall whether it was or was not actually placed in receivership.

Q. And it continues. I'll read the whole thing again to be clear:

"The subject acquisition will eliminate an unprofitable, insolvent thrift in the Seventh District by combining it with a well capitalized and profitable institution."

By "well capitalized and profitable institution," of course, is referring to River Valley Savings Bank FSB, correct?

A. Yes.

Q. And in making the determination that it was well capitalized, you would have considered the entire amount of River Valley's regulatory capital as of the time of your memorandum, correct?

A. Yes.

Q. And that regulatory capital included the subordinated debt and the capital credit that we discussed yesterday, correct?

A. River Valley -- is this River Valley FSB, which is the combination of Galva, Mutual, and Home? Is that the entity that we're

or Galva had been placed into receivership prior to their supervisory acquisition?

A. That's correct.

Q. Do you recall -- and I will pull out the exhibit if you don't, Mr. Blaber -- that in connection with one of the transactions we looked at yesterday, the FSLIC purchased preferred stock in the amount of $5 million?

A. Yes, I recall that.

Q. And do you recall which transaction that was?

A. I think it was the triplets. I know it wasn't Republic of South Beloit, and since we just looked at Peoria -- we discussed only three transactions, right.

Q. That's correct.

A. My recollection would be it's the triplets.

Q. And do you know Mr. Herb Held?

A. Herb Held?

Q. Yes.

A. Yes, I've met him. I know who he is. He's a -- he was a member of the staff of the Federal Savings and Loan Insurance Corporation in Washington, D.C.

Q. And did you testify yesterday that you were not aware of -- and correct me if I'm wrong -- you were not aware of any other supervisory transactions in which the FSLIC purchased preferred stock, which would have been includable as a component of the resulting institution's regulatory capital?

A. I believe I did, yes.

Q. And do you recall whether you dealt with Mr. Herb Held in connection with the acquisition by Holland and Ross of Home, Mutual, and Galva with respect to the purchase by FSLIC of preferred stock?

A. I do not recall.

Q. Do you understand that the preferred stock was purchased by the FSLIC in that transaction because without that purchase of preferred stock, the regulatory capital would not have been sufficient?

A. I do not understand that. I don't know one way or another.

Q. Do you have any understanding at all why, in the case of Home, Mutual, and Galva, as contrasted with the other cases which you are aware, the FSLIC did purchase preferred stock?

A. No.

Q. Am I correct that your supervisory role with respect to the institutions run by Messrs. Holland and Ross terminated in August 1989?

A. Yes, you are correct.

Q. What is your understanding of how the enactment of FIRREA, particularly the capital provisions of FIRREA, affected the operations of the institutions that Messrs. Holland and Ross acquired in the supervisory transactions we've been discussing yesterday and today?

A. I believe FIRREA required a more rapid amortization of goodwill. I think it phased out the inclusion of -- phased out or eliminated, I'm not sure which -- the inclusion of subordinated debt as net worth.

Let's see, the other item would have been the preferred stock, and I have -- I don't know what impact FIRREA had on preferred stock that was purchased by the FSLIC.

Q. Am I correct that FIRREA established a tangible capital standard?

A. I believe so, yes.

Q. And am I correct that supervisory

the capital from other sources.

Q. We've spent a good deal of time talking about the amortization of supervisory goodwill, correct?

A. I've been talking about the amortization of goodwill.

Q. And you spoke about how in these cases the institution was authorized to amortize it over 25 years, correct?

A. Yes.

Q. Now, the transactions did not, though, provide for the amortization of the capital credits, correct?

A. No -- yes, you're correct.

Q. I'm correct that the institutions were not required to amortize the capital credits, correct?

A. That's correct.

Q. Were you aware at any time that Messrs. Holland and Ross had engaged in negotiations to acquire an institution called United Federal in Galesburg, G-a-l-e-s-b-u-r-g, Illinois?

A. No.

Q. Are you familiar with or were you familiar with United Federal in Galesburg,

Illinois?

A. I think so, yes.

Q. Was that an insolvent institution?

A. I don't believe so.

Q. Was that a healthy institution?

A. So far as I know, yes.

Q. Are you aware whether Messrs. Holland and Ross ever engaged in negotiations to acquire an institution called Security Federal in Peoria, Illinois?

A. No, I have no knowledge of that.

Q. Do you have any knowledge of the institution?

A. Yes, I know the name. Yes, Security Federal is -- it is -- was in the district.

Q. Do you know whether that was a healthy or troubled institution?

A. I don't recall.

Q. What is your opinion concerning what action your office would have taken with respect to Peoria Savings had Messrs. Holland and Ross not gone forward with the supervisory acquisition of Peoria in December 1988?

A. At this point, without a review, I don't know what we would have done. We would

A. I don't know that to be -- are you asking me is that a universal truth?

Q. I'm asking you if you understand that that was the one restriction on the use of the capital credit. That unlike normal capital, the capital credit did not support or could not be used to fund dividend payments.

A. I do not understand that to be the case. There is a reference in one of the multiplicity of documents that I've looked at over the last few days that indicates the Holland and Ross group were willing to only consider that capital credit as net worth for the purposes of not having to pay higher FSLIC insurance premiums. That would have led me to believe that once the capital credit is in net worth, it's capital for all purposes. So maybe I don't know enough about -- do not now and did not then know enough about capital credits.

But my answer to you is, I guess I don't know. But having read that, I think maybe capital credit, once it gets in there, it's capital.

Q. So your understanding is that the capital credits could be used for all purposes of

Savings & Loan Association of Chicago for a period back in the early '80s. So I didn't mention that name when you asked me that question. It had slipped my mind.

So I also knew him in connection with another savings and loan association in the area.

Q. Did you have a favorable impression of him, based on that knowledge or relationship?

A. Yes.

Q. Any other clarifications?

A. I don't think so, no.

MR. CAYNE: I have no further questions. You may inquire.

(Discussion off the record.)

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. SMITH:

Q. Mr. Blaber, I have a few questions for you, just for purposes of making the record clear on a few issues.

First, is it correct that you still have no independent recollection of the three acquisitions that we have been discussing yesterday and today?

A. I have no independent recollection of the various documents we have seen. I have an

independent recollection that those transactions took place --

Q. Other than the fact --

MR. CAYNE: The witness was not done answering.

THE WITNESS: I have an independent recollection that the transactions took place, but I have no recollection of the specific documents that we have reviewed.

BY MS. SMITH:

Q. So other than the fact that the transactions actually took place, you have no independent recollection of any of the specific facts relating to the transactions; is that fair?

A. Yes, that's correct.

Q. And any of the testimony that you have provided yesterday and today relating to the specific issues on the acquisition has solely been based on your review -- quick review with respect to the documents that have been provided to you; is that fair?

A. Yes, that's correct.

Q. To the extent documents which either you did not read in their entirety or which, in fact, you did not see, would indicate something

that the documents I have reviewed, that have been marked as Exhibit 1 through 29 or whatever, were prepared by my staff, and I would accept responsibility for anything that is in those documents.

If there are other documents that contradict them, I don't know how I would react to those, if that's -- if that's your question.

BY MS. SMITH:

Q. Assuming, again, they are documents that are provided -- that were drafted by you and your staff, it's just a matter of them providing additional information with respect to some of the transactions, would you have any reason to argue with whatever is in those documents?

A. I don't think so. If they contain my signature, I would have read them at the time.

Q. Mr. Blaber, there has been some discussion with respect to certain of the business plans prepared in conjunction with the acquisitions, and you have indicated that the Federal Home Loan Bank of Chicago would have believed them reasonable or realistic since they approved the acquisitions; is that fair to say?

A. That's correct.

Q. And just to be clear, your testimony was not an indication that you believed the projections and the business plans ultimately would be realistic, but rather it was a focus at a point in time in terms of when you looked at the business plans; is that fair?

MR. CAYNE: Objection to the leading question again.

THE WITNESS: Any business plan is based upon assumptions that are made at the time; assumptions as to interest rates in the future, volume, mix. All that anybody reviewing a business plan can do is to react to the reasonableness of the assumptions made as of that time.

I doubt that any business plan is ever a hundred percent correct because no one -- very few people, if any, can project interest rates very accurately; mixes change, the market changes, economic conditions change. But you just look at reasonableness, and after that, you hope and you -- if management is good, you figure, well, if things change, they'll be able to adjust to it. A business plan rarely is a hundred percent accurate.

Q. Were you able to review as much of every document that you reviewed as you felt you needed to accurately testify?
A. Yes.
Q. And did you review as much of each document as you felt was necessary in order to adequately and accurately testify?
A. I reviewed as much as I thought I needed to review to respond to your questions, yes.
Q. And you did not feel that I provided you with inadequate time to review the documents, correct?
A. I did not, no.
Q. Are you aware of any documents prepared by you or any member of your staff that were inconsistent in any way with the documents at which you looked during your deposition?
A. No.
Q. Do you have any reason to believe such documents exist?
A. No.
Q. Counsel used the term "independent recollection." Do you recall that?
A. Yes.

Q. What is your understanding of that term?

A. It means do you remember the specifics of -- that occurred at a particular time. In this context I guess it means do I actually remember seeing and reading these documents.

Q. But you have no doubt, do you, that the events about which you testified actually did occur?

A. None whatsoever.

Q. And you have no doubt that the testimony you've given today and yesterday has been fully accurate and truthful, correct?

A. That's correct.

Q. You simply understand the term "independent recollection" in this context to mean these events happened quite a while ago, correct, and they're not fresh in your mind sitting here today?

A. Well, I think I mean more than that. I think I mean that I did not participate in the events leading up to the preparation of these documents, which is to say there obviously were meetings between the principals involved here and members of the staff of the Federal Home Loan

Bank of Chicago, and I mean to say that I did not participate in those meetings, because if I did to any extent, I would remember them.

Q. But you assigned your staff to participate in those meetings, correct?

A. That's correct.

I've testified innumerable times, including to Ms. Smith, that any document in there bearing my initials or signatures I vouch for. So, I mean, that's --

Q. And your staff was performing their assigned duties when they attended those meetings, right?

A. Right. The transactions were all approved, and the resulting entity commenced business, and I'm very happy about that still, so . . .

Q. And although you didn't have or don't have an independent recollection of those meetings because you didn't attend them, your staff, either in person or orally or through writings to you, advised you of what happened in these negotiations, correct?

A. We have the -- we have evidence of that in the 30 exhibits that are sitting before you.

Q. They advised you what happened at those meetings, as you're now testifying, contemporaneously with those meetings, correct?
A. No, I never testified to that. Contemporaneously with those meetings? No.
Q. By "contemporaneously," I mean these documents indicate that when you signed these documents, you had an understanding of what was going on in the negotiations with Messrs. Holland and Ross, correct?
A. I think we made that point dozens of times over the course of this day and a half.
Q. So my statement is correct, right?
A. Yes.
Q. You indicated that business plans make projections as of the time they are submitted, correct?
A. Based upon -- based upon conditions at the time they are submitted.
Q. But you didn't, as you testified yesterday, simply haphazardly accept any business plan that crosses your desk, correct?
A. Correct.
Q. You would make sure that that business plan was realistic at the time it was submitted,

professional banker and as a professional regulator, the importance of capital to a financial institution, such as the institutions acquired by Messrs. Holland and Ross, correct?

A. Yes.

Q. And so you understood, when you testified, what effect the enactment of FIRREA would have on an institution, such as the institutions acquired by Messrs. Holland and Ross, to the extent that FIRREA eliminated portions of the institution's capital, correct?

A. I understood when I testified? You mean just now, what impact -- whatever impact FIRREA -- FIRREA had an impact on them clearly. I mean -- what would have had? It's all over. You know more about the impact of FIRREA on Holland and Ross's entities than I do.

Q. I'm simply asking, Mr. Blaber, to clarify, that although you did not have direct supervision over these institutions after FIRREA was enacted, because you were aware of the importance of capital to these institutions at the time they were created in these supervisory acquisitions, you had a basis or you have a basis to understand the effect of the provisions of

FIRREA, which eliminated portions of the capital of these institutions, correct?

A. Yes; elimination of capital is not good.

Q. And you have a basis to give that testimony?

A. That is correct, yes.

Q. Your decades of experience as a professional banker, a professional regulator, correct?

A. Right.

Q. And you consider yourself quite competent in your field, correct?

A. Well, I don't know -- I do, yes.

Q. And I'm sure you've received plenty of awards over the years, correct, and recognition?

A. I -- I don't know whether I've received plenty of awards and recognition. I refuse to answer that question.

Q. On the grounds of humility?

A. On the grounds of humility, right.

Q. When you testified about the operation of forbearances over the last couple of days, although you did not personally participate in the negotiations with Messrs. Holland and Ross,

based on your many years of experience with the Federal Home Loan Bank of Chicago, you understood the purpose of the capital forbearances that were granted by the Federal Home Loan Bank of Chicago, correct?

A. Yes.

Q. And you were involved in many cases in recommending the approval of capital forbearances, correct?

A. I recommended them in these instances, as a matter of fact.

Q. In these instances, in the acquisitions by Messrs. Holland and Ross, correct?

A. Correct.

Q. You understood the purposes why Mr. Holland and Ross requested the capital forbearances they requested, correct?

A. Yes.

Q. And you understood the importance of these capital forbearances to the ultimate success and the profitability of the institutions acquired by Messrs. Holland and Ross in these supervisory acquisitions, correct?

A. Yes.

Q. And again, what was that importance?