# EXHIBIT F

*HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK*

*v.*

*THE UNITED STATES*

*95-524C*

**HOWARD R. ROSS DEPOSITION COUNTER DESIGNATIONS**

8/03/2000 Tr. 12:3-5
8/03/2000 Tr. 15:1-9
8/03/2000 Tr. 18:6-10
8/03/2000 Tr. 18:15-22
8/03/2000 Tr. 27:11-25
8/03/2000 Tr. 29:9-20
8/03/2000 Tr. 34:20-22
8/03/2000 Tr. 35:9-36:1
8/03/2000 Tr. 36:15-19
8/03/2000 Tr. 37:24-38:9
8/03/2000 Tr. 40:15-17
8/03/2000 Tr. 42:2-20
8/03/2000 Tr. 43:13-16
8/03/2000 Tr. 45:21-46:5
8/03/2000 Tr. 46:9-12
8/03/2000 Tr. 48:13-49:1
8/03/2000 Tr. 56:25-57:4
8/03/2000 Tr. 59:3-20
8/03/2000 Tr. 60:21-61:24
8/03/2000 Tr. 62:14-64:3
8/03/2000 Tr. 75:25-76:4
8/03/2000 Tr. 87:4-13
8/03/2000 Tr. 88:7-89:8
8/03/2000 Tr. 96:21-97:14
8/03/2000 Tr. 98:20-99:1
8/03/2000 Tr. 107:14-21
8/03/2000 Tr. 108:12-19
8/03/2000 Tr. 109:5-8
8/03/2000 Tr. 109:19-110:22
8/03/2000 Tr. 111:15-20
8/03/2000 Tr. 113:6-14
8/03/2000 Tr. 113:20-114:5
8/03/2000 Tr. 114:24-115:25
8/03/2000 Tr. 117:18-118:8
8/03/2000 Tr. 119:12-19
8/03/2000 Tr. 121:16-22
8/03/2000 Tr. 122:10-16
8/03/2000 Tr. 124:21-125:16
8/03/2000 Tr. 126:21-127:6
8/03/2000 Tr. 129:7-17
8/03/2000 Tr. 155:19-23
8/03/2000 Tr. 156:25-157:4
8/03/2000 Tr. 157:23-158:2
8/03/2000 Tr. 159:11-17
8/03/2000 Tr. 159:24-160:2
8/03/2000 Tr. 160:16-21
8/03/2000 Tr. 161:16-162:9
8/03/2000 Tr. 167:10-22
8/03/2000 Tr. 168:4-169:5
8/03/2000 Tr. 170:10-14
8/03/2000 Tr. 174:15-175:18
8/03/2000 Tr. 179:10-180:6
8/03/2000 Tr. 180:13-17
8/03/2000 Tr. 181:8-9
8/03/2000 Tr. 181:19-182:3
8/03/2000 Tr. 183:24-184:2
8/03/2000 Tr. 184:8-18
8/03/2000 Tr. 187:2-12
8/03/2000 Tr. 196:8-11
8/03/2000 Tr. 196:20-197:6

8/04/2000 Tr. 210:12-15
8/04/2000 Tr. 212:23-213:1
8/04/2000 Tr. 214:15-18
8/04/2000 Tr. 215:22-216:1
8/04/2000 Tr. 218:8-18
8/04/2000 Tr. 219:12-15
8/04/2000 Tr. 220:4-8
8/04/2000 Tr. 220:15-221:10
8/04/2000 Tr. 222:6-18
8/04/2000 Tr. 222:25-224:15
8/04/2000 Tr. 225:15-226:7

*HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK*

*v.*

*THE UNITED STATES*

*95-524C*

**HOWARD R. ROSS DEPOSITION COUNTER DESIGNATIONS**

***continued***

8/04/2000 Tr. 226:22-227:3
8/04/2000 Tr. 228:6-21
8/04/2000 Tr. 230:5-7
8/04/2000 Tr. 230:17-21
8/04/2000 Tr. 231:4-12
8/04/2000 Tr. 235:21-236:13
8/04/2000 Tr. 238:16-19
8/04/2000 Tr. 238:24-239:9
8/04/2000 Tr. 240:3-21
8/04/2000 Tr. 248:17-21
8/04/2000 Tr. 252:11-253:9
8/04/2000 Tr. 253:22-254:16
8/04/2000 Tr. 256:5-10
8/04/2000 Tr. 256:15-24
8/04/2000 Tr. 257:19-258:3
8/04/2000 Tr. 268:21-24

UNITED STATES COURT OF FEDERAL CLAIMS ORIGINAL

HOMER J. HOLLAND and HOWARD R. ROSS,

Plaintiffs,

Case No. 95-524

- versus -

THE UNITED STATES,

Defendant.

August 3, 2000
Washington, D.C.

VIDEOTAPED DEPOSITION OF:

HOWARD R. ROSS,

a Plaintiff in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C. 20004-1206, commencing at 9:05 a.m. before Maria Pugliese, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

DAVID B. BERGMAN, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474
On behalf of the Plaintiffs

PATRICK T. MURPHY, ESQUIRE
PATRICIA A. SMITH, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
On behalf of the Defendant

Also Present: LISA HARDESTY, Consultant to Government

* * * *

C O N T E N T S


| WITNESS: | EXAMINATION BY: | PAGE: |
| --- | --- | --- |
| Howard R. Ross | Mr. Murphy | 7 |

Illinois Institute of Technology, mechanical engineering. I graduated in 1950.

Q And then after that, did you attend any graduate school?

A I did not.

Q And what did you do after graduating in 1950?

A I joined the firm of Economy Mechanical Industries in Chicago, Illinois.

THE COURT REPORTER: I joined the firm of --

THE WITNESS: Economy -- E-C-O-N-O-M-Y -- Mechanical Industries in Chicago.

BY MR. MURPHY:

Q And what was your position there?

A It started out as an engineer and ended up as chairman of the board.

Q And how long were you at Economy?

A 1950 through '62, I think -- I'm sorry. '72. Pardon me. It's been a long time, fellows.

Q And when did you become chairman of the board of Economy?

A Oh, I'm going somewhere in the late '60s.

Q And what kind of -- what kind of company

Q And why did you leave House of Vision?
A I did not get along with my board of directors. They had different strategies.
Q How did they differ?
A How -- I'm sorry?
Q How did they differ?
A I wanted to grow the company. They were satisfied with what they had. I'm more of a risk taker, I guess.
Q Now, when you say you wanted to grow the company, was that geographically into new markets, or you wanted to expand in markets in which House of Vision was already operating?
A Basically expand the ophthalmic instrument division.
Q Okay. So then beginning in 1980, you no longer had an employer or you were just investing on your own; is that a fair statement?
A I had a corporate chalet --
Q Okay.
A -- within my home.
Q And did you have anyone assisting you in the investing or were you doing it all on your --
A On my own.
Q -- on your own.

particularly attractive about investing in the banking industry?

A Yeah. It dawned on me that you could literally rent money and leverage it and invest it; and that appealed to me.

Q After your initial investment in Exchange but prior to your investment in the Rock Falls institution, did you invest in any other banking or thrift operations?

A I did not.

Q Okay. And prior to the Rock Falls investment, had you engaged in any investments with Mr. Holland?

A No.

Q What was your role, if any, with respect to Exchange National Bank?

A Strictly a happy investor.

Q So it was a -- were you on the board of directors at all or --

A No.

Q Okay. It was just a passive investment?

A Passive investment.

Q And how did you become aware of the availability of the Rock Falls institution?

A Homer Holland had left the Exchange Bank

dollar investment that ended up four or five million dollars a few years later.

Q Did you recall to what that increase in the investment's value was attributable?

A Good business practice.

Q And when you say good business practice, could you sort of flesh out what you mean by that?

A Well, you can't. It's limiting your risk and investing in very safe securities and safe lending practices.

Q Was the institution growing in size between the time of your initial investment and when you increased the amount of your investment?

A To the best of my recollection, yes.

And may I backtrack?

Q Certainly.

A Growing in which way: Assets? Capital?

Capital, yes. Assets, I don't recall.

Q And how was it growing in capital?

A Earning money.

Q And so those earnings would just be -- were the earnings dividended out to the investors or were they just kept and retained earnings and further invested --

A They were retained earnings.

the board meetings, did that change your role in the institution?

A None.

Q Did you -- were you, at this point in time, still an investor in the Exchange National Bank or had you divested from that when you invested --

A What part of time are you talking about?

Q Okay. When you initially invested in the Rock Falls institution, were you still an investor --

A Yes.

Q -- at Exchange?

And did there come a time when you ceased being an investor in Exchange?

A Change was sold in -- I'm trying to recall. It's 1989, 1990.

Q And so you were an investor up until the time it was sold?

A Yes.

Q And during the years 1985, after your initial investment in Rock Falls up until the time when your investment increased in Rock Falls, how did your returns on your investment in Rock Falls compare to Exchange, if you recall?

A I can't answer your question the way it's structured.
Q At the time you invested in the Rock Falls institution --
A As of that date?
Q Yes.
A As of that date, we bought Rock Falls, period.
Q Were you looking at any other institutions at that time?
A No.
Q Okay. Did you have any discussions with Mr. Holland about possibly acquiring additional institutions in the future?
A Yes.
Q Okay. And do you recall generally what the nature of those discussions were?
A We were going to expand the institutions when we had the capital to do so.
Q And how was the institution going to obtain the capital necessary to --
A Earnings.
Q -- acquire others?
Was there any discussion -- and I'm still back in -- at the time of -- you first

acquired Rock Falls. Any discussion of acquiring the capital necessary to acquire other institutions through means other than earnings, getting, like, going to additional investors or getting a loan from another institution?

A No. We had a pretty good line at the American National Bank. They were to -- assisted us in obtaining other institutions.

Q And you mentioned American National Bank. What was your relationship with American National?

A In what way?

Q When did you first -- when did you first encounter American National and first do business with them?

A Back in the 1950s.

Q Okay. And would that have been when you were at Economy?

A Yes.

Q And had you used American National as your primary source of external funds from that time forward or --

A One of the institutions.

Q Who else did you use?

A First National Bank of Chicago,

Continental Illinois National Bank.
Q Did you use American National while investing in the Exchange Bank? Were they all involved in that relationship?
A No.
Q What about First National?
A No.
Q And Continental Illinois?
A No.
Q And at Rock Falls, did you use First National at all?
A No.
Q And Continental Illinois?
A No.
Q Did you use anyone other than American National at Rock Falls?
A No.
Q And why is that?
A No need.
Q The original loan that was secured for acquisition of Rock Falls, was that through American National?
A To the best of my knowledge, yeah.
Q Okay.
A To the best of my recollection. I'm

sorry.

Q And do you recall who at American National you would have been dealing with in the 1985 time frame?

A One of three people it would have been L. Adims --

THE COURT REPORTER: L. Adims?

THE WITNESS: A-D-I-M.

-- who left that division to go into another division and went over to Brian Daniels. And there was one other guy that -- Larson. A fellow named Larson. Daniels was his boss.

Q Daniels was Larson's boss?

A Yes.

Q And Daniels succeeded Mr. Adims; is that correct?

A Yes.

Q And who originally approached American National about the Rock Falls investment?

A Homer and I jointly.

Q Do you know if Mr. Holland had a previous relationship with American National?

A I don't know that.

Q Did you have any involvement in the actual operations of the Rock Falls institution?

A No.
Q Okay. Who would have been responsible for that?
A The president was.
Q And was that --
A His name escapes me.
Q And what was Mr. Holland's role?
A He overseed the institution, the same as I did.
Q Was the nature of Mr. Holland's involvement essentially the same as yours, or was he more or less involved in seeing -- or in overseeing the actual operations of the institution?
A He, at the time, was in charge of the investments portfolio.
Q And do you recall what the investment portfolio was composed of? Was it primarily securities or was there something else in there?
A I don't recall.
Q Did there come a time when Mr. Holland was no longer in charge of the investment portfolio?
A Not to my recollection.
Q Do you recall when Mr. Bangert was

institution -- that Rock Falls might look to acquire additional institutions when it had sufficient capital to do so. What -- I guess, let me back that up a little bit, and I'll take it in stages.

Was there any sort of optimal capital position from an operational standpoint with respect to Rock Falls? Were you looking to maintain any particular levels of capital?

A We were looking to maintain regulatory capital.

Q Were you looking to maintain anything -- any sort of cushion above the regulatory minimum?

A We normally did.

Q Okay. And do you recall generally how much cushion you kept?

A I do not.

Q Okay. Why did the institution normally maintain some form of cushion above the regulatory minimum?

A For liquidity and for the possibility of picking up or negotiating with other institutions.

Q And of what importance is liquidity?

A It's a regulatory -- it's a regulatory responsibility.

A It was after they left.
Q Okay. Prior to the time of the supervisory acquisitions beginning in 1988, do you recall who Rock Falls' prime competitors were in its market?
A Yeah. I think there was a security federal or some -- I think a security federal. There was a bank down the street, the name of which I can't remember. There were some co-op or what you call organizations. I mean, you know, companies, savings-and-loan type thing. What's the name of those? I can't remember.
Q Okay.
A Because they're nonprofit. They're very tough.
Q Are you referring to the credit unions?
A Pardon me?
Q Are you referring to the credit unions?
A Credit unions, that's it. Credit unions.
Q And where was Rock Falls operating business? Where was the institution?
A Rock Falls, Sterling, that area. That area.
Q And do you recall approximately -- or

how many branches were constituted with Rock Falls institution?

A As far as I can recall, one little branch somewhere.

Q When -- I guess just as a general matter, what was your role in looking for additional institutions to acquire, after the -- after the initial acquisition of Rock Falls?

A I don't understand the question.

Q Did you --

A Homer and I looked for other institutions, period.

Q Did -- was either one of you doing more looking than the other, or was it a joint --

A I can't say.

Q -- effort?

Okay. Were you looking for any particular types of institutions?

A Savings and loans and/or banks.

Q Did either appear more attractive as an investment opportunity?

A Restate that, please.

Q Did -- were you looking more particularly for S&Ls or banks?

A Made no difference.

recall the names of any of them?

A Three in Colorado on the west slope -- Grand Junction, (indicating). I think it was United of Galesberg.

THE COURT REPORTER: Gálesberg?

THE WITNESS: Galesberg, Illinois.

An unnamed one in Champaign, Illinois, one in -- I say one, there may be more in southern Illinois, near Carbondale, that area. Rochelle, and there were a group of three in central Illinois that I can't recall the names of.

Q And --

A It may have been more or less -- not less, but more.

Q And do you recall whether you looked at all of these institutions prior to actually doing the Galva merger or -- or was that list you just gave me encompassing from '85 to --

A I don't remember.

Q Okay. Fair enough.

How did you first become aware of the availability of the Galva Home and Mutual institution?

A To the best of my recollection, Helen Mirza -- M-I-R-Z-A, I think. It could be M-E. I

don't know.

Helen Mirza was the local -- the local savings and loan regulatory board called us and asked us if we were interested in bidding on the institution.

Q Do you recall if she called you or Mr. Holland?

A I don't recall.

Q And then after Ms. Mirza called, what happened next?

A The normal things. They gave us a bid package and we bid.

Q Do you recall approximately when Ms. Mirza first called?

A No.

Q And generally what was in the bid package that they sent you?

A I don't recall.

Q Who would have been responsible for developing the bid that Rock Falls submitted?

A Homer and/or Steve Bangert.

THE COURT REPORTER: What was the first name?

THE WITNESS: Homer, H-O-M-E-R.

Or Steve Bangert and/or Richard

Q Okay. Do you recall if they had substantial bad assets on their books or if it was an interest rate issue?

A Well, they had bad assets on their books.

Q Given that the institutions were under water, why were you interested in submitting a bid for them?

A It was our belief that with our management expertise, we could break -- and make any institution profitable.

Q When the -- excuse me.

When the institutions were acquired, why were they not merged into the Rock Falls institution? Why was it run separately?

A Rock Falls was very low capitalized at the time, and these were stand-alone institutions that were, to say the least, underkept.

Q So was it in an attempt to shield Rock Falls from the problems of the other institutions or were --

A No. Well, it seems to make sense.

Q Okay. At the time of the acquisition, was there any discussion of eventually merging the two institutions?

A No.
Q Was there any one of the three institutions that seemed more attractive than the others or any that seemed particularly less attractive than the others?
A Not that I recall.
Q Okay. And in -- prior to your acquisition of Galva Home and Mutual, did you have any discussions with regulators about the nature of the acquisition?
A I really don't understand your question.
Q Were you involved personally in any discussions with the regulators about the acquisition of Galva Home and Mutual?
A Is that prior to the bid package or subsequent?
Q Subsequent to the bid package and prior to the actual acquisition.
A I may have sat in a meeting.
Q Okay. Do you recall if you had -- if you actually did or --
A I do not recall. I may have.
Q Okay. Who would have been primarily responsible for dealing with the regulators?
A Homer Holland, Steve Bangert.

A Okay.

Q So it's out of your way and so it's readily accessible in case we ever need to go back to the old exhibits.

MR. MURPHY: I'll have the reporter mark the next one, Exhibit 2.

(Whereupon, Exhibit 2 was marked for identification.)

BY MR. MURPHY:

Q Mr. Ross, what has been marked as Exhibit 2 is a document that's titled regulatory capital maintenance and dividend limitation agreement among Howard R. Ross and Homer J. Holland, River Valley Savings Bank, FSB, Peoria Illinois. And it's dated July 29, 1998. It bears an identification number, again, in the very lower right-hand corner of CHO-0170161 and running through 0180.

And if I could just get you to turn to the very last page, the signature page --

A (Complying.)

Q -- there is a signature for you that, I believe, is by Mark Kipnis. Does that look right?

A That I can't tell.

Q Okay. Do you know -- well, who -- I

guess, first of all, who was Mr. Kipnis?
A Kipnis was the attorney for the bank and a director of the company. I believe he served as secretary of the board.
Q And had you had any dealings with Mr. Kipnis prior to his involvement in the River Valley entities?
A Yes.
Q And what was the nature of that?
A He was my attorney.
Q Okay. And when did Mr. Kipnis first become your attorney?
A In the 1970s.
Q Did he have any involvement in the original acquisition of Rock Falls?
A I don't recall.
Q Okay. And do you recall when he first became involved in the River Valley entities?
A I don't.
Q Do you recall this document, Exhibit 2? Do you recall ever having seen it before?
A I've only seen this last page so far.
Q Yes. Go ahead and take a -- and that raises a good point. Any time I give you a document today, I will try to direct you to certain

identification.)

BY MR. MURPHY

Q Okay. Exhibit 3 is a little heftier document. It's entitled assistance agreement by and among Howard R. Ross and Homer J. Holland, River Valley Savings Bank, FSB, Peoria, Illinois, and the Federal Savings & Loan Insurance Corporation. This one is dated July 29, 1988.

Also -- and this particular document bears an identification number in the lower right-hand corner of PHO-01 -- 0010981 through 0 -- or through 1072.

A (Witness perusing document.)

Q Do you recognize this particular document?

A Vaguely.

Q Vaguely. Okay.

Is it something you would have reviewed at the time of acquisition?

A Possibly, yeah.

Q If I can get you to turn to what is on the center of the bottom of the page, page 20 of the assistance agreement, it has the identification number of 1005 on the very lower right-hand corner.

A (Complying.)

Q There is a section there that is numbered 6, and it reads: Each investor shall purchase a number of shares of River Valley's common stock, par value 0.1 dollars per share indicated beside his name below for cash in the amount of par value per share. And then it lists you and Mr. Holland, each acquiring fifty-thousand shares.

What was the purpose, if you recall, of the acquisition of the common stock that is indicated here in paragraph number 6?

A So we would own the institutions.

Q And why was it structured so that both you and Mr. Holland would acquire fifty-thousand shares?

A We were 50/50 partners.

Q Do you recall -- were there any discussions about bringing in other investors for purposes of the Galva Home and Mutual acquisition?

A Not to my recollection.

Q And then if I can get you to turn a few pages to page 30, which is 1015 in the lower right-hand corner --

A (Complying.)

Q -- and there was a heading at the top of

the page, section six, payments and contributions, and then the first paragraph is initial cash contribution noting that the FSLIC would contribute $34,215,888 in cash for purposes of the acquisition.

Do you -- did you have any involvement in arriving at that particular number?

A No.

Q And then the next paragraph states that on the effective date, corporation, FSLIC, will buy fifty thousand shares of preferred stock for five million dollars in cash.

What was the purpose of the FSLIC acquiring preferred stock in this particular acquisition?

A It was offered to us. We did not ask for it.

Q And do you have any understanding as to why it was offered to you?

A Probably to help enhance the capital value of the bank.

Q Would it serve any purpose, aside from enhancing the capital position of the bank?

A Not that I can think of at the moment.

Q Do you recall what the institution did

with the proceeds from the preferred stock?

A It was put into capital, and it was used to operate the business.

Q And would the same be said for the thirty-four million referenced in the preceding paragraph?

A Oh, yes.

Q The preferred stock, was that a -- I believe you indicated that it was offered to you. Was it something that -- that was initially communicated to you or to Mr. Holland, the -- the offer of the preferred stock, or don't you recall?

A I don't recall.

Q Okay. Now, if I could get you to turn to page 31, which is the next page, there is a section down at the -- towards the bottom of the passage, contribution to regulatory capital.

Do you see that?

A Uh-huh. Yes.

Q And -- and it carries over to the next page, and a lot of legalese, and it reads: Purposes of reports to the bank board, and all bank board regulations, eight million dollars of the cash contributions shall be credited to River Valley's net worth account and shall constitute

regulatory capital.

And then there are a number of provisos; provided that for purposes of provisions of the insurance regulations, River Valley shall be deemed to have regulatory capital not exceeding one dollar less than the fully-phased in regulatory capital requirement of the insurance regulations and provided further that River Valley, when determining whether and when to declare a dividend, shall not include in its calculation of available regulatory capital, that particular credit.

Do you have any recollection of the inclusion of these provisos in the assistance agreement?

A I vaguely do, yes.

Q Okay. And what was the reason for their inclusion?

A I think you have to ask the OTS.

Q Why was -- why were you willing to accept these particular limitations on the eight million dollars?

A Because we thought we could exceed the regulatory capital very easily with infusion of capital. You have dollars.

Q And the infusion you're referring to, is

that the cash infusion from the FSLIC?
A Yes, the thirty-seven-million-dollar cash infusion.
Q Did the -- as a practical matter, were the provisos -- did they provide any real limitation on the operations of River Valley?
A I don't believe so.
Q Okay.
A You have to ask the people that ran it, Bangert, Holland.
Q Were you involved in determining the amount and amortization period of any of the good will that was booked as a result of acquisition?
A No, sir.
Q Okay. Who would have been primarily responsible for that?
A It would have to be, again, the people that ran the company, Bangert and Holland.
Q Do you have an understanding as to the difference between GAAP and RAP capital, if any?
A I did at the time.
Q Okay.
A It's been a long time. I really don't know.
Q Now, if I can get you to turn to

bank, it behooved me to take a look.
Q And the letter is addressed to a Susan Mooney. Do you have any recollection of ever having met Ms. Mooney?
A I don't recall at all.
Q Okay. And in connection with your -- when you would review business plans, do you recall, as a general matter, finding any particular elements of the business plans that you found acceptable or unacceptable and that you went back to management ask said oh, well, we can't do this?
A I don't recall, but, you know, I look at this business plan and it made sense to me in 1980, whatever it was. Today it's just a business plan; I can't respond to it.
Q Okay. Do you have any understanding as to the purpose of submitting the business plans to the regulators?
A It's a requirement, sir.
Q And it is a general requirement or it was a requirement in -- solely in connection with acquisitions?
A I can't answer it. It may have been either or both.
Q Who would have been responsible for

developing the assumptions that went into business plans?

A Well, I would think it would be Steve Bangert with assistance from others.

Q And the letter here is from Mr. Pikas. What role, if any, would he have had?

A Pikas was involved in the Peoria institution, and see this is as a senior vice-president.

Q Do you know if -- or do you recall if Mr. Pikas had any involvement with the Rock Falls institution?

A To the best of my recollection, he had no involvement in Rock Falls.

MR. MURPHY: We are about at the end of our tape, so why don't we go off the record briefly so we can flip the tape.

THE VIDEOGRAPHER: This ends tape number 1 in the deposition of Howard Ross.

The time on the screen is 11:09:35.

We are now off the record.

(Whereupon, a discussion was held off the record, and Exhibit 7 was marked for identification.)

THE VIDEOGRAPHER: This begins tape

(Whereupon, Exhibit 8 was marked for identification.)

BY MR. MURPHY.

Q Exhibit 8 is a document titled assistance agreement between the Federal Savings & Loan Insurance Corporation and River Valley Savings Bank, Rock Falls. It bears an identification number in the lower right-hand corner of WOT-6451404 on the first page, and I believe runs through 1473.

Do you recall ever having seen this --

A I don't recall.

Q -- document before? Okay.

I'm going to point you to a couple sections, but, again, if you want to look at anything else, feel free.

A Not yet.

Q The first one is on page 18, which is 1426 in the lower right-hand corner. It's section six of the agreement headed payments and connections, and there is a paragraph, initial cash contribution, which carries over to the next page and notes that the FSLIC will transfer cash equal to 16.6 million plus some additional dollars

depending on time and issues, and five million of that will be credited to the association's regulatory capital account. And then there are a couple of provisos, which are somewhat similar to what we saw in connection with the Galva Home Mutual Acquisition.

Do you recall the -- do you recall any discussions relating to the proviso that the acquiring association shall be deemed to have regulatory capital not exceeding one dollar less than the fully-phased in regulatory capital requirements of the insurance regulations?

A This is the same requirements as the other transactions.

Q Okay. And similarly, the dividend restriction that's --

A Yes.

Q -- noted after?

A Yeah.

Q And was your involvement or understanding any different from the Galva Home Mutual provisions we discussed than the Republic one?

A I'm not sure I can answer that. There is very little difference other than that --

Q Okay.
A -- the numbers are different.
Q Okay. And did your role -- all right. Did you have any different role with -- in connection with the assistance agreement for Republic than you did for the Galva Home Mutual acquisition?
A No.
Q And if I can get you to turn to page 54, which is 1462 in the lower right-hand corner, there is a Section 20 titled termination of agreement.
A Uh-huh.
Q And it has a termination of four years subject to the limitations that are listed in A and B there.
If I asked you the same questions that I did with respect to the Galva Home Mutual --
A Get the same answers.
Q -- I would get the same answers?
A Yes, sir.
Q Okay. Do you have any understanding -- the termination period here is four years whereas with respect to the Galva Home Mutual, it was five years.
Do you have understanding as to why

Q -- which is 1164 in the lower right.
A Okay.
Q There is a section 17, termination of agreement.
If I asked you the same questions that I asked with respect to Galva Home Mutual --
A Same answers.
Q Same answers? Okay.
There is -- in paragraph A, there is a reference to a three-year termination --
A Uh-huh.
Q -- do you have any idea why that is any different from anything that we have seen before?
A At this point, I don't.
Q Okay.
MR. MURPHY: Let's go ahead and mark our next Exhibit 11.
(Whereupon, Exhibit 11 was marked for identification.)
BY MR. MURPHY:
Q Exhibit 11 is a letter on American National Bank letterhead addressed to Homer Holland and Howard Ross, dated December 21, 1988. It's a one-page document with an identification number in the lower right-hand number of PHO-0013205.

A (Witness perusing document.)

Q Do you recall having seen this particular letter.

A I don't recall.

Q Okay. The letter references American National Bank commitment to provide a loan of five million dollars for the purpose of purchasing five million dollars worth of preferred stock of River Valley Savings Bank.

What was the purpose of the preferred stock purchase in connection with the acquisition of Peoria Savings & Loan?

A Preferred stock is used as regulatory capital for the bank.

Q And was there any other purpose, other than for its inclusion as regulatory capital?

A I can't answer that at this time.

Q Do you recall why the loan was secured by the preferred stock and one hundred percent of the common stock of River Valley Savings Bank?

A Could you repeat that?

Q Looking at the -- I guess it's the second sentence, which is in the middle of that first paragraph, it reads: The loan will be secured by five million in preferred stock and one

hundred percent of the common stock of River Valley Savings Bank, FSB, and one hundred percent of the common stock of River Valley Savings Bank.

Do you recall why the security was structured that way?

A Well, he is obviously a very tough negotiator, and we needed the money.

Q Were you -- strike that.

Then the next sentence reads: The rate on the loan will be one-half percent of A and B's prime floating and will be due June 30, 1989. This transaction must be completed by January 31, 1989.

Do you have any recollection of how that -- those particular terms were arrived at?

A I don't, but it probably had to do with the days of the closing of Peoria.

Q Okay.

A I think, or one of the banks.

Q Uh-huh.

Was the debt to A and B serviced through dividends from River Valley, or was that something that you paid personally.

A Dividends from River Valley, I believe. As a matter of fact, there was a debt of River Valley at the time. It was a debt that was paid by

the bank.

Q Do you recall whether there were any discussions of you personally investing any additional funds in any of the River Valley entities in connection with the Peoria Savings & Loan acquisition?

A No.

Q And the cash contribution from the FSLIC, what did River Valley do with those proceeds?

A Used it as regulatory capital and to conduct the business at the bank.

MR. MURPHY: You can put Exhibit 11 to the side, which you have already done.

THE WITNESS: Huh?

MR. MURPHY: I was just saying we're done with Exhibit 11.

Now is a very logical breaking point. It's a couple minutes to twelve. If you want to take an hour for lunch.

THE WITNESS: Sure.

MR. MURPHY: Okay.

THE VIDEOGRAPHER: The time on the screen is 11:56:29. We're off the record.

(Whereupon, a lunch recess was taken

income.

Q Do you recall whether or not you met your goals with respect to River Valley Savings Bank, FSB, in Peoria as well?

A Prior or after?

Q And by prior or after, I presume you're referring to the change in the law in '89?

A I'm referring to the breach of contract that --

Q Okay. Prior?

A Prior?

Q Prior.

A I believe we did, yeah.

Q After the acquisitions that we have been discussing, Republic, Peoria and Galva Mutual Home, did your role change at all with respect to the River Valley entities?

A No.

Q And at that point, you were still operating as chairman of the board?

A That is correct.

Q And following the acquisitions and prior to the enactment of FIRREA, were there any discussions about selling the institutions?

A I believe I did, but I don't recall.

MR. MURPHY: I'm going to go ahead and mark our next exhibit.

THE WITNESS: Through with this one?

(Whereupon, Exhibit 13 was marked for identification.)

BY MR. MURPHY.

Q Mr. Ross, Exhibit 13 is --

A Pardon me?

Q I'm just identifying the exhibit.

A Okay.

Q Exhibit 13 is a letter on Holland Partners, Inc. letterhead. It's another letter to Susan Mooney from Ronald Pikas. It's dated July 31, 1989. It bears an identification number in the lower right-hand corner of the first page of WOL-2750154 running through 0166. And the letter -- the cover letter references a three-year business plan for River Valley savings Bank, FSB.

A (Witness perusing document.)

Q Do you recall ever having seen this particular document before?

A I do not.

Q The cover letter references that it's a three-year business plan that's been updated. And

what was the purpose of preparing a three-year business plan?

A I believe the regulators wanted a three-year business plan.

Q Would a three-year business plan have been used for any internal purposes?

A Probably to meet the goals of the business plan. I don't know.

Q Would -- I'm sorry.

A That's all right.

I don't know whether it actually was, but --

Q Were either shorter or longer projections used more internally?

A You have to ask Bangert.

Q What about Mr. Holland, what would his role have been with respect to --

A Same as mine, probably overseeing them.

Q Okay. If I could get you to turn now to what is 0159, in the lower right-hand corner --

A (Complying.)

Q -- that's a page of text rather than numbers and projections. There is a section entitled balance sheet comparison. Do you see that?

A Uh-huh.
Q In the second paragraph there, it notes that savings deposits decreased by fifty-two million. This reflects planned runoff of jumbo and other above-market CDs. The bank also experienced savings runoff attributable to several other factors; negative S&L industry publicity, lack of River Valley identity and the inability of Peoria customers to do business at any River Valley office until all computer conversions were completed were all contributing factors to the savings outflow. And then it goes on to note that the savings runoff has been stopped.
Do you recall any discussions about savings runoff in the -- in this particular document as for the period ending June 30, 1989? Do you have any discussions about savings runoff?
A We had discussed. Whether it refers to this or not, I can't say. We were going to do some advertising. We had conversion -- conversion of our computer system, which caused us lots of grief and hopefully that came to an end.
Q Who was responsible for the computer conversion?
A Homer Holland. And I don't know who

else, and other people. Whoever it might have been.

Q And they were operating at Mr. Holland's direction.

A Yeah.

THE COURT REPORTER: I didn't hear your answer.

THE WITNESS: Pardon me.

THE COURT REPORTER: I didn't hear your answer.

THE WITNESS: Yes.

THE COURT REPORTER: Thank you.

THE WITNESS: You're welcome.

BY MR. MURPHY:

Q There is a reference there to negative S&L industry publicity. Can you explain your understanding of what it is referring to?

A My understanding was S&Ls were falling out of the sky. And the story on the street was you buy an S&L you get a toaster with it.

Q And what was the -- why were S&Ls falling out of the sky?

A I can go through a long dissertation of that. They just -- the cost of funds exceeded the cost of loan -- in other words, the cost of funds

Q And what were those good business practices?

A Making loans and investments that met our criteria which were standards were soundness and far above the criteria of most other S&Ls.

Q The item that's referenced right after the negative S&L industry publicity is lack of River Valley entity.

Do you have an understanding as to what that is referring to?

A It's a name and an area that had never heard of us before.

Q And how did you go about remedying that?

A We did some advertising.

Q And who was responsible for that?

A I think it was Pikas at the time.

Q And do you have an understanding as to how successful that advertising was?

A I can't recall. It was QED.

Q Then the last item is the inability of Peoria customers to do business at any office until the computer conversions were completed, which we discussed a little bit.

Of those three items that are referenced there, which one was -- if any, was the predominant

factor to which the savings runoff was asbestos attributable?

A I wouldn't begin to rate them one, two or three. Computer problems were really, I think, the main one.

Q Then the next paragraph that begins the asset growths, do you see that? We're still on 1059.

A Which one are you referring to?

Q The paragraph right under the one we were looking at.

A Asset growth?

Q Yes.

That reads: The asset growths and savings outflows were offset by increase in other borrowed funds.

A Uh-huh.

Q Do you recall any discussions about increasing River Valley's borrowed funds?

A No.

Q And who was responsible for those types of determinations?

A Bangert, I believe.

Q Now, if I could get you to turn to 0165 --

A (Complying) 0165.

Q -- which is the second to last page --

A Got you.

Q -- there is a section on savings deposits there. Do you see that; it's paragraph number 5?

A Yes, number 5.

Q The second sentence of that paragraph reads: During the first six months of 1989, the bank experienced difficult price competition from troubled thrifts in the local market. The irrational pricing from local competition appears to be reducing, and as a result the bank deposit base is stabilizing.

Why -- do you have an understanding as to why the irrational pricing was reducing in the latter half of 1989?

A What caused it? I don't know.

Q Do you recall any discussions about irrational pricing from local competition?

A Oh, sure.

Q And what was the nature of those discussions?

A Why are they doing it? We don't know. But they're doing it.

Q And what about asset growth projections? Do you recall --
A I don't recall.
Q Do you recall the extent to which actual results met projections with respect to the composition of the balance sheets and liabilities, deposits as opposed to borrowings?
A No. To me it was meaningless.
Q And why is that?
A If --
Q I'm sorry.
A I'm sorry. I'm saying as far as the bottom line, looking for net income, economic conditions vary, Wall Street pricing varies. You do what you have to do to get to that net income. So your assets or your liability growth decrease projections coming in.
Q And how was, if at all, net income related to the market value of the institution?
A Well, the net income accrued on your balance sheet. Your capital went up, obviously increased, and your values increased.
Q Do you recall regularly looking at the change in the market value of the institution?
A No.

Q Do you know if Mr. Bangert conducted a monthly mark-to-market analysis of the institution?
A Yes, he did.
Q Okay. And what was the purpose of that?
A We also had a duration analysis, it showed what happened if interest rates went up, down or sideways. And that would relate to asset value of the company.
Q And of what value to the board of directors was that duration analysis?
THE WITNESS: Risk. To analyze the risk that we took in whatever we did. If rates go up, you know, what risk you had. If they go down, it would show what risk you have.
You play your balance sheet against that risk. Whether you hedge, whether you -- there's lots of things you can do. And Bangert was an expert in that.
Q How did Mr. Bangert come to be employed with the River Valley entities?
A How was he employed?
Q Who -- how did you become aware of him? How did he come about --
A Through the --
Q -- being hired?

A Through the industry.

There was talk in the industry of a gentleman who was an expert in asset and liability management, very good at it, at Empire Savings in Denver.

Homer went to Empire Savings to see the gentleman, and found out it wasn't the gentleman he was talking about, it was the gentleman who worked for him, which was Steve Bangert. And we interviewed -- Steve came to Chicago, we interviewed him and we hired them.

Q And what was your opinion of Mr. Bangert's performance and qualifications over time?

A Then he became CEO. Does that answer your question?

Q So can I presume from that that they were favorable?

A They were favorable, sir.

Q I believe you characterized him as an expert in the asset/liability management function.

How would you compare his abilities to other people you have dealt with in the asset/liability function, as the very best or --

A He was the very best, far exceeded my

that sort of thing. Less your liabilities which are you deposits, your cost of doing business, your employees -- employees, that sort of thing?

Q And those are all items that would be included?

A Yeah. On your balance sheet, yeah.

Q What about purchase accounting income from the acquisitions, would you include that?

A That I will not answer. I have no -- no knowledge of that.

MR. MURPHY: Okay. Let's go ahead and mark our next exhibit.

(Whereupon, Exhibit 14 was marked for identification.)

BY MR. MURPHY:

Q Exhibit 14 is a document entitled River Valley Savings Bank, FSB, consolidated financial statements and supplementary data, December 31, 1989 and 1988, with independent auditor's report thereon, and it bears an identification number in the lower right-hand corner of WON-2400238 through 0271.

A (Witness perusing document.)

Q As a -- just as a general matter, what was your role, if any, in reviewing the financial

statements?
A I wasn't receiving the final statement, no.
Q Did you ever have any meetings with individuals from Peat Marwick to discuss final statements?
A This statement, I can't tell you that.
Q Just as a general matter.
A Not really, no.
Q Do you recall who from Peat Marwick worked as River Valley's auditors?
A Frank O'Connor is the only contact I've had.
Q And what was the nature of your contact with Mr. O'Connor?
A Tax man and general accounting.
Q What sort of tax matters are you referring to?
A Income tax.
Q Okay.
A And the use, I think, of some NOLs, I see there.
Q Were you the primary contact for KPMG with respect to NOL usage or was that some --
A No.

A No.
Q Okay. And then it goes on to say, as a result, additional assets totalling $2,044,000 were recorded in 1989. And this was accounted for as a reallocation of the original purchase price.
And then skipping down a sentence, this amount was used to eliminate the original good will, reduce long-term assets acquired to zero, and the remainder is reflected as a deferred credit.
Do you have any recollection of discussions relating to eliminating the original good will?
A No.
Q Do you recall any discussions relating generally to the impact of the elimination of good will on the institution's regulatory capital?
A That is not involved in any of the accounting functions.
Q Okay.
A The answer is no.
Q Then, if you turn the page to 253, the second paragraph begins during 1989. Do you see that?
A Uh-huh.
Q And it reads: During 1989, River Valley

expensed the remaining excess of cost over fair value of net assets acquired arising from the acquisition of Peoria Savings & Loan.

And then it goes on to note the additional amortization was based upon the conclusion that the negative publicity within the industry, adverse deposit retention history and adverse regulatory changes have substantially reduced the franchise value.

Now, I know you weren't involved in discussions about the accounting incidents, but do you recall any discussions about the -- what is referred to here as a substantial reduction in the franchise value?

A I believe it had to do with the runoff of deposits.

THE COURT REPORTER: The runoff?

THE WITNESS: Runoff -- uh-huh -- all over the place.

BY MR. MURPHY:

Q Did you recall any discussions about the impact that would have on the institution's regulatory capital position?

A No.

Q Okay. If I can get you to flip a few

pages to 265, there is a note 14 at the top --
A Uh-huh.
Q -- that refers to preferred stock. And then there is a reference to class A, class B and class C, preferred stock issues outstanding.
Can you just briefly explain to me what the difference was between the different classes of preferred stock?
A No.
Q That wasn't your area?
A Not my area. If you said would I, the answer is: I would if I could, but I can't.
Q Whose area would that have been?
A Pardon me?
Q Whose area would that have been?
A Oh, probably Homer and maybe Peat Marwick. I don't know.
Q You can put that to the side for now.
A Through with this one?
Q Yes.
We have discussed a little bit, Mr. Bangert's role in managing the asset/liability function. Was he also responsible for any growth or shrinkage of the balance sheets that went along with that, or was he primarily focused on the

composition of the assets and liabilities.

A As I recall, he was, indeed, in charge of the balance sheet.

Q Okay. So that would have encompassed growth issues as well?

A The entire balance sheet, yes.

Q Okay. Do you recall any discussions with Mr. Bangert about growth of the balance sheet?

A No.

Q Would that have been a general topic of discussion at board meetings or would that not have?

A Basically the board was worried about two things: One is risk they were taking at the bank; two, the profitability at the bank that's -- and the direction the bank is going, of course.

Q And did the board's view of the risk associated with the bank change at all from the time following the acquisitions we have been discussing, but prior to the enactment of FIRREA? Was there any change over that period of time?

A I don't think mark-to-market ever showed us the risk we were involved in.

Q And how did the mark to market show the risk?

That's what we strived for and shot for, and sometimes we attained it and sometimes we didn't.

Q And why was -- how did you arrive at the hundred to hundred fifty basis point number?

A It was normal in the industry.

Q Did the deposit runoff that we talked about a little bit, in connection with that, with the earlier business plan, did that affect the institution's profitability?

A I don't recall, but it affects the ability to loan --

Q I'm sorry.

A It affects your ability to make loans.

Q And how is that?

A You don't have the money, you can't make a loan.

Q Could the institution have replaced no deposits with borrowed funds?

A Possibly.

Q And would that have -- would that still have affected the institution's profitability?

A It could have borrowed though funds with additional deposits. Therefore it's potentially -- you could have achieved a higher asset ratio.

maintain a minimum capital structure, whatever it may be, I don't know. I don't recall.
Q And do you recall who -- it references OTS. Do you recall who at OTS --
A I did not.
Q Do you recall, did you deal with OTS directly on that or --
A No --
Q No.
A -- I did not.
Q Okay. Would that have been Mr. Holland?
A Possibly.
Q Would -- could Mr. Bangert have also --
A Possibly.
Q -- possibly been involved?
Okay. Would anyone else have been involved?
A I don't think so.
Q Okay. Do you believe that in the absence of the enactment of FIRREA, River Valley would have acquired the Mid-Western Canton branch?
A I don't guess those at things. I don't know. That's very subjective, sir.
Q And earlier when you were mentioning -- back early this morning when you were mentioning

different institutions that you looked at possibly acquiring, I believe you mentioned, some institutions in Grand Junction, Colorado.

A Yes.

Q Do you recall why that acquisition didn't happen?

A I do not. It may have been the breach; it may not have. I don't recall. I don't recall the timing of it. It's just been too long.

Q Do you recall how that or those institutions came to the attention of River Valley?

A It may have been through the regulators. I don't recall.

Q For institutions that were outside of Illinois, would there have been a means for River Valley to identify out-of-state institutions, aside from having the regulators bringing them to your attention?

A Yes.

Q Okay. And how -- how would that have been done?

A You go through a list of banks and pick out those that you think might fit your pro forma and go from there.

Q And did -- was anyone at River Valley

charged or tasked with going through different banks and seeing if they -- they fit?

A No.

Q No. Okay.

Do you recall any institutions, other than the ones that we have already discussed, that River Valley looked at as possible targets of acquisition?

A As a matter of course, I went through lists and lists and lists. That's not a task of lists, but I did it. And I just don't recall which names pop up.

Q When did you first become aware of the legislation that ultimately became FIRREA that was passed in August of '89?

A I can't give you a date. I saw it in the press.

Q Do you recall if --

A American Banker, I believe.

Q Okay. Do you recall if it was early in 1989 or fairly before the bill was passed?

A No.

Q Did River Valley, either Rock Falls or Peoria, do anything to alter their operations prior to the passage of FIRREA in anticipation of its

passage?

A I don't recall.

Q Do you know if the institution changed in size at all in anticipation of the passage of the law? Was there any shrinkage of growth on the balance sheet?

A The draft in calculation, numbers, I don't know --

Q Okay.

A -- which you can do at your leisure.

Q Do you recall if the institution altered its -- the composition of its balance sheet putting aside the over-all size?

A Same answer.

Q And the same answers apply for both Rock Falls and Peoria?

A Yes.

Q When did the passage of FIRREA have an impact on the bank? Was it immediately upon passage or was there a lag before the River Valley entities began to feel the impacts of the loss of regulatory capital?

A I don't recall, but I knew it was going to be lost or regulatory capital. Whatever that date was, I don't recall.

Q And how did the loss of regulatory capital impact, first, the operations of the institutions?
A It couldn't support the assets.
Q And what did the institution do as a result to compensate for the fact that it couldn't support the asset?
A They reduced the asset base. You would have to check with Bangert. Specifically I don't know.
Q That's your general recollection that the institution shrank to --
A I believe so. I don't recall dates and I don't recall numbers.
Q But for those, we should rely primarily on Mr. Bangert?
A Yes.
Q Did the loss of regulatory capital impact the extent to which dividends were issued?
A You want to talk dividends?
Q Okay. Do you recall if --
A No. I don't recall any dividends being paid.
Q Do you recall if the passage and implementation of FIRREA affected the salary

structure for management of the institution at all?
A I don't recall. I don't believe so.
Q Do you recall if the institution sold any branches or specific assets in order to shrink to come into capital compliance?
A I think we sold two branches. One was a branch in South Beloit, and I don't recall the other one because we needed the capital.
Q I'm sorry?
A Because we needed the capital that the sale of the branches would give us.
Q So is it your understanding that those branches were sold to help the institution regain its capital position?
A Yes.
Q Do you know if -- if the Rock Falls institution ever fell out of capital compliance with the loss of its regulatory capital?
A I don't recall.
Q And --
A I don't believe so.
Q Same question with respect to Peoria institution. Do you know if that ever fell out of capital compliance?
A Of course they did. Yes.

MR. MURPHY: Okay. Let's go ahead and mark our next exhibit.

(Whereupon, Exhibit 21 was marked for identification.)

BY MR. MURPHY:

Q Exhibit 21 is a memorandum on OTS letterhead to Stuart Brafman from a variety of individuals dated March 25, 1991. It bears an identification number on the bottom of the page of WON-1080032 and it runs through 0039, and it's an internal OTS memorandum, so I don't know if you have ever seen it before.

Do you have any recollection of ever having seen this particular document?

A Not at all.

Q The branches that you mentioned that were sold, were Rosco and South Beloit branches. Were those branches that had been acquired in the Republic acquisition or don't you recall?

A I think they were Republic. I don't recall the specifics.

Q Okay. Were they part of the Rock Falls institution?

A I believe that is correct.

Q And I believe you said the Rock Falls

did not fall out of capital compliance?

A I don't recall their doing that.

Q Okay. Do you have any recollection as to whether or not the sale of the Rosco and South Beloit branches had any affect on net operating loss carry forwards that had been acquired in the Republic acquisition?

A I would have to look at the numbers. I don't recall.

Q The -- on the second page of this particular memorandum, the second paragraph on that page that begins Holland Partners. Do you see that?

A Uh-huh.

Q The second sentence begins for its services, HPI receives monthly fees of seventy-six thousand and twenty-seven thousand per month respectively from RV Peoria and RV Rock Falls under the management consultancy agreements dated July 31, 1990. Mr. Holland receives his salary from Holland Partners, Inc. and Mr. Ross from RV Peoria.

Was there any particular purpose to the structure that your salary came from Peoria as opposed to Rock Falls?

Q Then on the next page, page 4, there is a section in the middle of the page entitled supervisory and CRA issues. Do you see that?

And then it goes on with a subheading examination report, and that paragraph begins, the examiners in their latest examination reports indicate that the assets of the institutions include some high-risk mortgage derivative products including tax motivated residuals.

Do you have any recollection of regulatory concern about the mortgage derivatives in the River Valley portfolio?

A Yes.

Q And what was your understanding?

A The FDIC didn't have an understanding, didn't have a clue. OTS did understand, but didn't give us a problem.

THE COURT REPORTER: And didn't give us --

THE WITNESS: Did not give us a problem with it. Did not concern themselves with it.

BY MR. MURPHY:

Q And do you recall generally when the FDIC began raising the mortgage derivatives as an

issue?

A Date, no. I know it was post-FIRREA, no.

Q And do you view that FDIC concern with respect to the mortgage derivatives as related to the breach that you're alleging in this case?

A I can't answer that.

Q Who -- did you personally have any discussions with the FDIC on the mortgage derivatives issue?

A Yes.

Q And who at the FDIC would that have been, if you recall?

A Who was it?

Q Yes.

A A gentleman named Dickson.

Q And do you recall generally when you first spoke with him?

A Just once.

Q And when was that?

A It was an outfit meeting at the board of directors. I don't recall the date.

Q And what do you recall about the substance of that meeting?

A He was giving us all a hard time about

our derivatives, a hard time about our balance sheet. And I told him he was not up to speed and wasn't really cognizant of the true picture.

Q And did he have a response to that?

A No.

Q Was anyone from OTS present --

A Yes.

Q -- at this meeting?

And who would have been?

A Larry Ferries, I belive.

THE COURT REPORTER: What was his last name?

THE WITNESS: F-A -- I don't know. Ferries was his last name. F-A-I-R-E-S.

MR. BERGMAN: F-E-R-R-I-E-S.

THE WITNESS: Close.

Thank you, counsel.

BY MR. MURPHY:

Q And do you recall whether anyone else from OTS would have been there?

A I don't recall.

Q Okay. And do you recall if Mr. Ferries spoke to the issue of the mortgage derivatives?

A I don't know.

Q Did you have any discussions with

Mr. Ferries on these issues outside of that board meeting?
A There was continuing dialogue on all these issues with Bangert and his crew.
Q But your involvement would have been limited to that particular meeting --
A Yes.
Q -- your direct involvement?
A I was chairman of the board.
Q Did the FDIC express any concern about the size of the balance sheet, or it was strictly composition and the inclusion of the derivatives?
A I think it was the derivatives, but I don't know the particulars. I don't know.
Q And do you know if River Valley ultimately decreased its holdings in derivatives?
A I don't recall.
Q Would that, again, be an issue for Mr. Bangert?
A That is correct.
Q In that same paragraph that I pointed you before -- pointed you to before, there is reference of these -- to tax motivated residuals and in parentheticals that says --
A Whoa. Where are we at?

Q Do you not recall whether any of those discussions --

A Well, you put the question, sir, in a manner in which I can't respond.

Q Did you have any discussions with Mr. Holland along the lines of were it not for the loss of our regulatory capital we would not merge these two institutions?

A I don't recall. I don't think so.

MR. MURPHY: Let's mark our next exhibit.

(Whereupon, Exhibit 22 was marked for identification.)

BY MR. MURPHY 22.

Q Exhibit 22 is a document entitled minutes of the meeting of the River Valley Savings Bank, FSB, executive committee. It bears a date of June 12, 1991. It bears an identification number at bottom of WON-3330795, and it's a two-page document, so the next one is 0796. The -- and it notes that you were present at this particular meeting. There is a paragraph on the first page, third one from the bottom that begins Ron Pikas. Do you see that?

A Uh-huh.

Q The second sentence of that paragraph reads: The anticipated sales of the Rosco and South Beloit branches should add approximately ninety thousand to one-hundred thousand of monthly income beginning in July through the savings and borrowing costs and decrease general and administrative expenses.

Do you recall any discussions relating to how the sales of the Rosco and South Beloit branches would add to River Valley's monthly income?

A I don't recall.

Q Who would have been responsible for running the numbers to determine the affect of the sale on the income statement?

A I was not involved in the numbers. To the best of my knowledge it would have to be Bangert, Holland, whomever.

Q Do you recall any -- just as a general matter, on the board, would there be discussions about the relative performance of particular branches, whether certain branches performed better than others?

A Not normally, no.

Q Do you recall any discussions

A Uh-huh.
Q And it notes that on August 16, 1991 RVH was incorporated, and then it gives the particulars of the transaction. And then the next paragraph reads: On September 4, 1991, the RVH filed an application with the Office of Thrift Supervision to form a savings and loan holding company for the acquisition of the common and preferred stock of RVSB.
Do you recall why River Valley Holdings, Inc. was formed? And just so you know, this particular section carries -- well, the next page has a section on the acquisition of RVSB.
A You would have to refresh my memory.
Q Okay.
A Offhand, I don't remember.
Q Why don't you take a moment to read these two little sections.
A Sure (witness, perusing document).
It was done to refinance the company and pay off the sub-debt.
Q And the sub-debt is the two million dollars --
A Yes.
Q -- that's referred here?

A Yes.
Q And do you know why the institution was -- or do you recall why the institution was interested in paying off the sub-debt?
A I think the rate was too high. I don't recall specifics. I think the rate was too high.
Q Okay. We can put that one aside now.
MR. MURPHY: Okay. Let's go ahead and mark our next exhibit.
(Whereupon, Exhibit 24 was marked for identification.)
BY MR. MURPHY:
Q Exhibit 24 consists of a cover letter OTS letterhead dated March 27, 1991, and then an agreement, that's the pages subsequent. The first page bears an identification number of PHO-0361279 and the total document runs through 1292.
And the first page of the exhibit --
A Pardon me? I'm sorry. Go ahead.
Q That's okay. We'll get to the specifics of the -- what's in the exhibit, but I want to just look at the cover letter for a second, on page 1279. If you would just turn to the first page of the exhibit.
A Oh, this one (indicating)?

Q Yes.
A Okay.
Q It says members of the board, enclosed is your copy of the March 25, 1991 supervisory agreement between River Valley Savings Bank, FSB, and the Office of Thrift Supervision, and this particular letter was from Mr. Ferries.
Do you recall the supervisory agreement?
A I do.
Q Okay. And before we get into the specific terms of the agreement, what is your recollection as to why the supervisory agreement was entered into?
A I would like to read it first and refresh my memory, if I can.
Q Sure. Absolutely. Take your time.
A Thank you (witness peruses document).
Okay.
Q What do you recall about why the supervisory agreement was entered into?
A The OTS was increasing our capital -- regulatory capitals from three percent to four percent, then again to five percent, and they wanted us to meet those requirements.
Q And what is your understanding as to why

the OTS was increasing the regulatory capital requirements?

A Evidently they thought we were at risk.

Q Do you recall if this agreement -- this agreement is between River Valley and the OTS.

Did the FDIC have any involvement in this process?

A I don't know.

Q What role did you have, if any, in discussing the terms of the supervisory agreement of with the OTS?

A None. You would have to ask it to our exploratory board.

Q Who would have been involved directly from River Valley?

A Bangert and possibly Holland.

Q And did the OTS or representatives from the OTS go to a board meeting to explain the supervisory agreement?

A I don't recall.

Q If I could get you to turn to the third page of the exhibit, it's the one that -- the second page of the agreement bearing 1281 in the lower right-hand corner.

A Okay.

Q And there is a heading capital at the front -- or at the front -- at the top.

The first numbered paragraph on that page is paragraph number 2, and that reads: On or before March 30, 1991, the institution shall be in compliance with fully-phased in, open paren, 1994 close paren, tangible and risk-based capital requirements.

Do you recall why the institution was required to be in compliance with the fully-phased in capital requirements by March 30, 1991?

A No.

Q Do you have an understanding as to what impact, if any, that requirement had on River Valley?

A Without looking at the numbers, no.

Q Would you have at the time?

A Conjecture. I don't know.

Q Then the next paragraph down, number 3 reads: Within sixty days, the stockholder shall infuse two million of tangible capital into the institution that is in addition to the capital level required by paragraph two of this agreement.

Do you recall that requirement of the infusion of an additional two million in

tangible capital?
A Vividly.
Q And why was that required?
A The OTS required it.
Q And do you recall what the basis was for that requirement?
A I do not.
Q And do you recall, was the two million dollars in additional capital infused?
A I recall it was.
Q And where did that capital come from?
A American National Bank, to the best of my knowledge.
Q Did you have any discussions -- did you consider any other sources for that capital?
A No.
Q And why not?
A Not necessary.
Q And do you know if that infusion of an additional two million in tangible capital had an impact on the operations of River Valley?
A I don't recall.
Q Then the next paragraph down is paragraph number 4, and it references the tangible capital would be increased to four percent of

A Uh-huh.
Q And paragraph number 11 reads: The institutions high-risk mortgage derivative portfolio shall not exceed fifteen percent of the institution's total assets of which no more than five percent of assets can be invested in derivatives that do not have hedging characteristics.
A Uh-huh.
Q Do you recall any discussions about this particular limitation?
A Yeah, we would have to live with that.
Q And who did you have those discussions with?
A I discussed this internally, with whomever at the time.
Q Okay. With individuals at River Valley?
A That is correct.
Q Okay. And do you know the extent to which this restriction required divestiture of any mortgage derivative product?
A I can't recall.
Q Is that primarily a Bangert issue?
A Yeah.
Q The mortgage derivatives that are

the second page of the exhibit.
A (Complying.)
Q The second to the last paragraph relates to discussions with LaSalle Bank to determine its interest in providing two million of capital, and then it references a Mark Hoppe of LaSalle's correspondent bank group.
Do you recall discussions with LaSalle with respect to providing two million of capital to them?
A No.
Q Do you know who Mr. Hoppe is?
A No.
Q Do you have any idea who at the institution would have been responsible for any such discussions with LaSalle?
A I'm not sure anybody would have been responsible for doing that. It wasn't authorized by me.
Q Do you recall seeking any or having discussions about seeking an alternative lender to ANB?
A No.
Q Would you yourself have considered yourself borrowing money from LaSalle?

A No.
Q Okay. And why not?
A I had no need.
Q And that's because of your relationship with ANB?
A Yes.
Q And then now, shifting gears a little bit, at the top of that page, in the first paragraph, it references a Dan Daily of Heart of Illinois Bank inquiring as to the interest of River Valley in acquiring its offices in Plano, Henry, Princeton, Spring Valley and Peoria?
A Uh-huh.
Q Do you recall any discussions with respect to acquiring Heart of Illinois Bank offices?
A Yeah, vaguely. We were thinking of stock-for-stock kind of an arrangement with them.
Q A sort of a pooling arrangement?
A Kind of a pooling stock arrangement.
Q And were you personally involved in those discussions?
A No, I was not.
Q And why did that deal not happen?
A Evidently they didn't get together. It

UNITED STATES COURT OF FEDERAL CLAIMS

---

HOMER J. HOLLAND and HOWARD R. ROSS,

Plaintiffs,

Case No. 95-524

- versus -

THE UNITED STATES,

Defendant.

---

August 4, 2000

Washington, D.C.

CONTINUED VIDEOTAPED DEPOSITION OF:

HOWARD R. ROSS,

a Plaintiff in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C. 20004-1206, before Jonell Easton, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

DAVID B. BERGMAN, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474
On behalf of the Plaintiffs

PATRICK T. MURPHY, ESQUIRE
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
On behalf of the Defendant

Also Present: LISA HARDESTY, Consultant to Government

MR. MURPHY: Mark Exhibit 28.

(Ross Exhibit No. 28 was marked for identification.)

BY MR. MURPHY:

Q. Mr. Ross, Exhibit 28 is a file memo dated November 15, 1989.

It bears an identification number in the lower right hand corner, first page, WOL 817 0887, and it runs through 0890.

I believe it is an internal regulatory document, so I doubt you would have ever seen it.

It references a meeting at which Mr. Holland and Mr. Kipnis was were in attendance.

It does not indicate you were there.

Take a minute to briefly look it over.

My questions will focus on the first and second pages.

A. (Witness complies.) Okay.

Q. If I could direct your attention to the last paragraph on the first page.

The paragraph reads Mr. Holland then set the stage for his discussion on class B E and F preferred stock. He noted that the reasoning behind different classes were to compensate himself, Howard Ross, and Steve Bangert equitably.

Q. Did it change between '88 and enactment of FIRREA?
A. No.
Q. Did it change at all following the enactment of FIRREA?
A. No.
Q. On the second page, next sentence, Mr. Holland said he and Mr. Ross wanted Mr. Bangert to participate in the economic earnings of the associations, but did not want Mr. Bangert to have an ownership interest.
Why is that?
A. What is what?
Q. Is that an accurate statement?
A. Yes.
Q. Why is it that you did not want Mr. Bangert to have an ownership interest?
A. He had nothing at risk.
Q. What do you mean?
A. When you have a partner, he must have something at risk. In other words, if something goes bad, he can't walk with no loss.
It is just a business philosophy of mine.
Q. Who was responsible for setting Mr. Bangert's compensation? Was that the board?
A. It was the board and basically Homer Holland and

myself.

Q. Do you recall the retirement of 4.6 million in sub debt that had originated in connection with the Galva Home Mutual acquisition?

A. No.

Q. If I represent to you it was retired in the first quarter of 1990, would that refresh your recollection at all?

A. No.

Q. Following the enactment of FIRREA, did the manner in which River Valley prepared its business plans change at all?

A. I am sure it did, yes.

Q. How would that have been?

A. Affected by the decrease in capital, assets liabilities had to be managed based on the decreased capital.

In addition, we could no longer look for additional S&Ls or banks to acquire.

Q. When you say you could no longer look for additional banks or S&Ls to acquire, did River Valley discuss any mergers or acquisitions with any institutions following January 1, 1990?

A. I don't recall the dates, sir.

We talked to many institutions. I do not recall

the dates of the discussions.
Q. Who would have been responsible for the assumptions built into the business plans post FIRREA? Would that have been still been Mr. Bangert?
A. Bangert, plus Mr. Holland.
Q. Do you recall whether River Valley's performance in the post FIRREA environment met its projected performance in its business plans?
A. Speaking of the business plan prepared subsequent?
Q. Yes.
A. I would have to look at the numbers.
Again, we were always looking for 100 to 150 basis points on assets.
Q. So that benchmark didn't change at all with passage of FIRREA?
A. We were lucky to maintain our capital at that time. I just don't recall business plans.
Q. Did there come a time during the 1990s where you no longer felt the effects of the passages of FIRREA?
A. I don't believe we ever did not feel the effects of the breach.
Q. Did there ever come a time where any regulatory, all of the regulatory capital that had been lost through the passage of FIRREA was replaced?

A. Repeat.

Q. Did there come a time at some point in the 1990s where all of the regulatory capital that had been lost as a result of the passage FIRREA had been replaced on the books?

A. The $25 million dollars was never replaced, to the best of my knowledge.

Q. Did you, as the individual responsible for looking for capital, as we discussed in connection with Exhibit 28, discuss replacing the capital that was lost with American National Bank?

A. Possibly.

Q. You don't recall?

A. I don't recall.

Q. Do you recall the institution in San Antonio, the San Antonio Federal Savings Bank?

A. Yes.

Q. How did you first become aware of that institution?

A. Gentlemen named John Rose brought the information to us.

Q. Who is John Rose?

A. John Rose is a banker and investor.

Q. Had you had any dealings with Mr. Rose prior to this?

A. No.
Q. Did he contact you or someone else initially?
A. Someone else.
Q. Was that Mr. Holland?
A. I don't know.
Q. What was the nature of your involvement in connection with the San Antonio acquisition?
A. My involvement was investor and acquirer.
Q. Do you have any understanding as why San Antonio was available for acquisition?
A. I do.
Q. What is your understanding?
A. San Antonio was under water, Savings & Loan, it could have been a bank. I am not sure.
They had a savings and loan that was part of a bank that was a subsidiary. The bank and/or parent S&L, I believe was dissolved or taken over by whatever agency. And this unit was put out to bid.
Q. When you say it was put out to bid, who put it out to bid?
A. Probably RTC, I believe, I don't know.
Q. Do you know if the institution would have been available for acquisition had FIRREA not been implemented?
A. I have no idea.

only if the acquisition is totally separate from FSB.

Would you have been responsible for discussing financing with American National Bank?

A. Together with others.

Q. Who would the others have been?

A. The others would have been, I believe, Homer Holland and/or Bangert and John Rose.

Q. What was Mr. Bangert's involvement, in the acquisition of San Antonio?

A. He is our numbers man and our analyst.

Q. That sentence notes that American National would only agreed to finance the acquisition if it was done by an entity totally separate from FSB.

Do you have an understanding as to why that was?

A. FSB did not have enough capital, to the best of my recollection, to satisfy American National Security.

They required a separate company with separate guarantees from each of the individuals.

Q. Do you recall discussing with American National their concerns that FSB did not have enough capital?

A. I don't recall the discussion, but one of the problems we had--a separate company could not use the NOLs.

FSB could use the NOLs, and it was a great concern to us because we thought this would be a very

profitable institution bringing it to FSB would save a great deal in taxes.

It was not the case with a separate company.

Q. NOLs you are referring to are the NOLs of San Antonio?

A. NOLs of FSB.

Q. How are the NOLs of FSB related to the accusation of San Antonio?

A. San Antonio was merged into FSB, and pooling interest at that point because of the NOL offsetting profitability.

Q. Did American National indicate what capital level would have been sufficient for them to finance the acquisition of River Valley?

A. I don't recall.

MR. BERGMAN: Could you read back the prior answer.

(The court reporter read the record as requested.)

MR. BERGMAN: Read back the question.

(The court reporter read the record as requested.)

THE WITNESS: Answer would be it could offset the tax consequences of the profitability, the anticipated profitability of San Antonio Fed.

Is that correct? Do you accept that?

BY MR. MURPHY:

Q. Here is a second formulation.

Do you have an understanding as to why the fact that River Valley was in capital compliance at this time was not sufficient for American National Bank to be comfortable with the amount of capital?

A. I don't recall our footings at that time.

Q. Could River Valley holdings have borrowed the funds sufficient to acquire San Antonio?

A. Reading the material you have given me, sir, obviously not.

Q. So a separate holding company was established?

A. A separate corporation was established.

Q. The third sentence in that same paragraph reads, It is contemplated that a new entity, Western Capital Holdings, Inc., an entity owned by Mr. Ross, Mr. Holland and Mr. Bangert, will acquire 89 percent of FASSB stock while John Rose, an independent investor who brought the deal to FSB's attention, will acquire 11 percent of FASSB.

Do you recall why it was, why the ownership interest was structured the way it was?

A. That the original deal after we found we had to have a separate company.

Q. How was it determined that Mr. Rose would acquire 11 percent of FASSB?
A. I believe it was part of the requirement when he brought the deal to us.
Q. The 89 percent that was owned by Western Capital Holdings, how was that ownership interest split between you, Mr. Holland and Mr. Bangert?
A. Holland and I each had 30 percent. Mr. Bangert had 25 percent, and he gave five percent of his to Ron Pikus. This is my memory. Don't bank on it.
Q. Next sentence begins, Although the transaction will now be independent of FSB, a substantial discussion ensued relative to the allocation of management resources.
Do you recall discussing the allocation of management resources in connection with this?
A. I do.
Q. What do you recall was the substance of those discussions?
A. FSB would charge Western Capital a management fee for managing assets and liability of Federal Savings Bank at San Antonio.
Q. How was that fee to be determined?
A. I don't remember.
Q. Who at FSB would actually be managing the San

Antonio institution?
A. Richard Dalton.
Q. Did that ever change over time or was he there the whole time?
A. No, it did not change.
Q. That same sentence continues, Although the transaction will now be independent of FSB, substantial discussion ensued relative to the allocation of management resources and the effect on FSB's future earnings as American National Bank is requesting that FSB dividend $6 million to River Valley Holdings, Inc. for purposes of River Valley Holdings retiring $6 million of its debt to American National Bank.
Do you recall discussions related dividend of $6 million to River Valley Holdings?
A. Vaguely.
Q. What do you recall?
A. The bank wanted to be repaid.
Q. Do you recall why?
A. It hung out there too long for them to be comfortable with it.
Q. Do you recall discussing that with anyone in particular at American National?
A. No.
Q. Skipping a sentence, the sentence that carries o

over reads, With respect to FSB's ability to pay 6 mill dividend, it is contemplated that management will shrink our balance sheet by reducing our investment portfolio and not our loan portfolio, where we have larger spreads.

Do you recall any discussions about shrinking the balance sheet in connection with that $6 million dividend?

A. Yes.

Q. What do you recall?

A. What is says, it would shrink our investment portfolio and not loan portfolio.

The loan portfolio is more profitable than the investment portfolio.

Q. Did, in fact, the institution make that $6 million dividend?

A. I'm sorry.

Q. Was that dividend paid?

A. Evidently, yes, I don't recall the transaction.

Q. Do you recall whether or not as a result of that dividend, the balance sheet shrunk?

A. I would have to look at t he numbers. It has been too long.

Q. Who would have been responsible for managing the balance sheet shrink? Would that still have been Mr. Bangert?

A. Yes.
Q. Do you recall why it was determined that investment portfolio rather than the loan portfolio would be shrunk?
A. Less profitable than the loan portfolio.
Q. As a general matter, why would the loan portfolio be more profitable than the investment?
A. Just turned out that way.
Q. Was that generally always the case or did that vary?
A. If you recall, they would not allow us to play with derivatives invest in derivatives over about 15 percent or goods or assets. We made great deal of money on derivatives. Therefore, the loan portfolio was more profitable than the investment portfolio.
Q. Is that because of the, are you saying that is because the investment portfolio was limited.
I want to make sure I am following you.
A. Best of my recollection, a great, yes, we were limited to 15 percent of derivatives, and we would derive great deal of profits from investing in derivatives IOs, POs.
I don't know if your familiar with them.
Dwarfs. Midgets.
Q. Is it your opinion that had the institution not

been limited in its investment portfolio that it would have shrunk its loan portfolio the rather than its investment portfolio?

A. I can't answer that.

Q. Then skipping another sentence, it then reads, It is anticipated that monthly core earning will decrease by approximately 100,000.

Do you recall any discussion about the decrease in core earnings as a results of the shrink of institution's loan portfolio?

A. It could relate to both the loan portfolio and shrinking the balance sheet, the earnings are based on assets as well as investments and loans, that is what happens.

Q. Do you recall any specific discussion about the impact of the $6 million dividend and the subsequent shrinkage on the monthly core earnings of t he institution?

A. No.

Q. Did you consider any alternate lender aside from American National?

A. I did not, no.

Q. The concerns of San Antonio with respect to the capital of River Valley, do you recall if those related to regulatory capital as opposed to GAAP capital?

A. I don't know.
Q. Why didn't you look to any alternate lenders aside from American National?
A. I didn't need to.
Q. Did you have any concerns about the terms that American National was requiring?
A. No.
Q. The shrinkage we were discussing a minute ago, do you recall whether or what impact, if any, that was expected to have on the institution's interest rate risk?
A. I don't recall that was Mr. Bangert's.
Q. You saved me another question.
A. Okay.
Q. Did the passage of FIRREA have any, and the treatment of regulatory capital subsequent to FIRREA, did that have any impact on the manner in which the San Antonio acquisition was structured?
A. Of course.
Q. How was that?
A. Without the regulatory capital, we did not have necessary capital to make other acquisitions.
Q. Was San Antonio's or I mean American National's concerns with respect to the institution's capital position related to its regulatory capital?
A. I can't answer that.

Q. In the absence of FIRREA, how would the acquisition of San Antonio been structured?
A. That is conjecture.
Q. Do you think River Valley holdings would have been formed in the absence of FIRREA?
A. I don't recall.
Q. Subsequent to the acquisition of San Antonio, what was your involvement, if any, in the operations of the institution?
A. Of San Antonio?
Q. Yes, correct.
A. I was chairman of the board for about a year at which time I turned it over Steve Bangert, who became chairman of the board.
Q. After you ceased being chairman of the board were you still on the board?
A. Yes.
Q. Were you on any committees or anything else of that nature?
A. I don't recall.
Q. Did there come a time when institution came to be liquidated or sold?
A. Which institution?
Q. San Antonio.
A. Yes.

Q. When was that?
A. I don't recall the date. I think it was somewhere in 1995, perhaps '96.
Q. How did that come about?
A. Board of directors decided to sell the company.
Q. Why did the board decide to sell the company?
A. Dalton wanted out, the company was not growing, fierce competition in Texas.
Q. What is your understanding as why Mr. Dalton wanted out?
A. Have you lived in south Texas?
Q. Enough said?
A. Brownsville, McAllen, Harlingen, Wexlico.
Q. I believe you said there was fierce competition in Texas.
What was the nature of that?
A. For mortgages, there was mortgage competition down there.
I do recall some earlier dialogue about every now and then one or another company needed deposits badly and dropped their rates, and that is fierce competition.
Q. You said the company was not growing to what do you attribute that lack of growth?
A. I think Dalton can probably tell you that.
Q. You don't recall?

the purchase.

I don't recall if it was any of the loans, but we had a package of loans that we did have to liquidate.

And the bank went under liquidation mode.

Q. Do you recall why they were interested in acquiring deposits and not the loans?

A. No.

Q. Over what period of time was the package of loans liquidated?

A. Still continuing.

Q. Has it been substantially liquidated?

A. It is substantially. There is some left.

Q. How are the proceeds of the disposition of those loans dealt with in this liquidation mode?

A. Pro rata with the amount of stock that each participant had.

Q. Who is responsible for administering all of that?

A. Dalton and/or Bangert.

Q. Western Capital Holdings is still in existence?

A. Yes.

Q. It is contemplated at this time that once the remaining loans are liquidated, Western Capital Holdings will cease to exist or is there any another reason to keep it in existence?

A. It will cease to existence.
Q. Is there any anticipated time that will occur?
A. When the loans are disposed of, sir.
Q. Do you have any opinion as to whether, had San Antonio been acquired through River Valley rather than Western Capital Holdings the institution would have been liquidated and sold?
A. You are asking me if River Valley had acquired San Antonio, would we have sold it and liquidated.
I cannot answer that.
Q. That would be conjecture?
A. Absolutely. I have no way of knowing.
Q. Do you know what sort of return you have received on your investment in the San Antonio institution?
A. To date, I have received about $30 million return in total.
Q. That is the total for the all of the investors or for you personally?
A. For all the investors.
Q. Do you know what sort of rate of return that is?
A. Approximately $30 million was returned over a three- or four-year period. I would have get a calculator to figure what the rate of return on the $10 dollars was.

to Laredo or any other bank that wanted them.

Q. Had San Antonio been acquired through River Valley, would River Valley still have been able to acquire further institutions?

A. Depending on the balance sheet, yes.

Q. What factors on the balance sheet play into that calculus?

A. Capital, Western Capital, I should say San Antonio, I'm sorry. They are synonymous in my head.

If I say Western Capital I mean San Antonio. Make that clear.

San Antonio indeed distributed like $30 million over time. The $30 million using the NOLs, if you leverage that on the 20 to one ratio, five percent and go on and on from there, we would have before very, very, very profitable and be able to acquire other institutions, yes.

Q. Would there have been any downside to structuring it through River Valley?

A. To my knowledge, no.

Q. Did you present that position to American National in asking them toe finance through River Valley?

A. I don't recall.

May I get back to that question?

Q. Sure.

A. American National had no of knowing whether Western Capital was profitable or not.

Q. Whether?

A. Whether San Antonio Federal would have been as profitable as it was.

Q. Did you have any way of knowing that San Antonio would have been as profitable as it was?

A. I don't think anybody had any idea.

That turned out to be a very good deal.

Q. The more profitable it would have been would have impacted the extent to which NOLs would have been able to have been utilized?

A. Yes.

Q. Put Exhibit 29, we are done with that one, so you can put it out of your way.

Do you recall River Valley's adoption of financial accounting standard number 109?

A. You got the wrong guy.

Q. As with the other incident we discussed yesterday, that wasn't your area?

A. Not my area at all.

Q. You don't know what impact that would have had on the institution's regulatory capital?

A. I don't know what 109 is.

I am not familiar with any of those regulations,

Exhibit A is attached following page 6. It is 0536 in the lower right hand corner.

If you just take a second to look over that.

A. (Witness complies.) Okay.

Q. Do you recall any discussions about changing River Valley Savings Bank FSB dividend policy?

A. I don't. It has been too long. I don't.

Q. Do you recall, if I could get you to look at the second paragraph on Exhibit 5.

A. Okay.

Q. Second paragraph reads, It is our policy that the capital ratios of River Valley Savings Bank FSB shall be at or above those required to classify River Valley Savings Bank as a well-capitalized institution as defined by the OTS.

Do you recall any discussion about where River Valley should maintain its capital ratios?

A. It is my position we should have always have our capital ratios above and beyond OTS requirements.

Q. Was there was any particular benefit to being at or above a well-capitalized level?

A. If there was no supervisory objection, we could acquire other institutions, possibly.

Q. Do you recall any discussion as to, again in the post FIRREA environment, optimal capital level above the

regulatory requirements?

A. I don't recall what the regulatory requirements were at that time. I think they were 5%. And I think we stayed well above that.

How much above that, I don't recall.

Somewhere you would find it.

Q. Was there any policy with respect to particular level above or did that fluctuate with the bank's needs?

A. Fluctuated with the needs of the bank.

Q. To the extent there was capital in excess of regulatory requirements, do you recall any discussions about the impact that would have on the bank's ability to leverage?

A. You could leverage based on your capital. Period.

Depending the level above minimum requirements, you leverage the capital you have to that extent.

Q. I believe you said earlier that you didn't recall receiving any dividend.

A. At this date, I still don't recall it.

Q. Do you recall if--you personally didn't receive any dividends, but do you recall if the bank dividend to the holding company aside from what we discussed in connection with the acquisition of San Antonio?

A. I don't recall period.

However, the bank would normally dividend to the holding company to pay off debt.

Q. In what situation would the bank dividend to the holding company to pay off debt?

A. You have to pay debt on the preferred stock if there was any, sub debt if there was, any loans from the bank if there were any.

Q. How were those dividend payments determined?

Were those, were they regular dividend payments that regularly maintained that or were there special dividends to pay off debt or combination?

A. It was Bangert's job.

I don't recall how he allocated those dividends.

Q. To the extent dividends were made to the holding company, did that represent any opportunity cost to the bank?

A. To the bank itself?

Q. Yes.

A. Yes, you leverage capital that went upstairs, those dividends that pay off debt are always factored into your business plan and operating plans.

Q. That would have been, in factoring those into business plans would have been Bangert's responsibility?

A. Yes.

(Ross Exhibit No. 31 was marked for

up there.

If you want me to run numbers, I will be glad to do that.

Q. That 25 million you referred to, do you have any understanding as to the extent to which that would not have decreased in a non FIRREA environment?

A. Part of the goodwill I think was amortized over 25 years, other than that, no.

Q. What sub debt that was paid of?

A. That was paid off.

Q. Would that have not been paid off?

A. It could have required more sub debt, no reason to pay it off at that time.

Q. Following the sale to First Banks, did you have any continued involvement with River Valley?

A. No.

Q. Do you recall what you received in proceeds for the sale to First Banks?

A. Dollar amount?

Q. Yes.

A. About $17 million.

Q. Did you reinvest this money?

A. Certainly.

Q. What sorts of thing did you reinvest that in?

A. Capital market, CDs, investment in Lafayette

A. I met Blake prior to the sale and Dearberg subsequent to the sale.

Q. What were the circumstances of those meetings?

A. Just casual circumstances, that was Dearberg, was Blake doing due diligence and Dearberg just a handshake and wish him well and god bless. He liked my tie, and I gave it to him.

Q. Did you have any discussion with Mr. Blake about operations of institution or anything like that?

A. I did not. That was not my bailiwick.

Q. Do you have an opinion whether or not the price you received for River Valley was a fair price?

A. There is never enough and--bring back a another subject, had we had regulatory capital, it would have been minuscule price comparison to what we should have gotten and would have gotten.

Q. Putting aside the potential for growth and additional earnings and value to the company that you say you lost, for what was actually sold to First Banks do you believe a fair price?

A. That is a hard question to answer.

I settled on a price I thought was fair at the time, but never enough.

Q. When you say "never enough," is that because nothing is ever enough or is there something specific

with respect to sale of River Valley to First Banks that you are referring to?

A. I can't answer that question.

Whatever you receive is never enough. In your mind, you should have gotten more.

Q. Do you recall specifically any particular elements or portions of River Valley for which you should have received more?

A. Unit wise, no.

Q. Were you involved at all in discussion relating to the value of River Valley's NOLs for purposes of the sale to First Banks?

A. That was pretty much Homer and Peat Marwick, Frank O'Connor.

I don't think we got as much as we would have liked to have been paid. That is always the case.

Q. That is with respect to the NOLs?

A. Yes.

Q. Do you know the extent to which First Banks was able to take advantage of the NOLs it acquired?

A. I have no idea.

Q. Do you recall carving out potential recovery from litigation against the government in connection with the loss of regulatory capital?

A. We did not include that matter in the sale to

First Banks of St. Louis.

Q. Why didn't you include it?

A. Because we felt it was valuable.

Q. Was any analysis conducted to determine how much the price received for the sale of River Valley differed because that claim was not included?

A. Yes, we did a number of analysis. I did any on analysis many a time.

And again, if you exponentially take the 25 million, take the NOLs, and play with those numbers you are up to $187 million. I believe that is the number they came up. I can do it again if anybody wants me to.

Q. Did you have any discussion with First Banks about acquiring the claim for $187 million or something less than that?

A. No.

Q. Why not?

A. Wasn't pertinent.

Q. Why do you say "wasn't pertinent?"

Was there no interest in selling the claim?

A. In my opinion, I didn't think the claim was transferable.

Q. Do you know if First Banks inquired whether or not they could acquire the claim?

A. I don't recall the circumstances, no.

through a couple of additional things we may not have gone through to make sure I have an understanding of your opinion on those.

A. Go ahead.

Q. Do you believe the enactment of FIRREA had any impact on the identity and/or quality of management personnel at River Valley?

A. Yes.

Q. How is that?

A. Had we grown, we would have needed more people.

Q. For those who were in place, would there have been any difference?

A. No, other than responsibilities would have been expanded.

Q. Had FIRREA not been enacted and implemented, do you have an opinion as to whether or not the funding mix of the institution would have been any different?

A. Please explain that.

Q. The use of deposits as opposed to borrowings or ratio of deposits to borrowings, do you think that would have been any different?

A. I can't answer that question. I would have to visualize what you are saying, and I am not a numbers guy.

Q. Would the product pricing have been any

different or is that another Bangert question?
A. That is another Bangert Dalton question.
Q. What about the loan underwriting policy?
A. That would not have changed. They were always conservative.
Q. What about the amount of credit losses? Do you think there would have been any change in that?
A. What do you mean credit losses?
Q. Like bad loans would that have--
A. Would the mix have changed, I don't think so.
Q. Would there have been any difference in the lending strategy as it related to retail versus wholesale lending
A. We would have had more dollars to do that post breach, again those are Bangert's department.
Q. What about the institution's management of its interest rate risk?
A. That is strictly Bangert.
Q. The dividend policy, do you think that would have been affected at all?
A. I imagine it would, yes.
Q. How so?
A. More dollars you had, the more profit you had, the greater the dividend possibly.
Q. If there were more dividends, would that have

had an impact on the growth?
A. Less dollars you have for growth, less growth you have.
Q. I know we have discussed generally about impact on the institutions ability to leverage and grow generally.
Are you aware of any specific opportunity that Rock Falls institution or FSB were unable to capitalize on because of a lack of additional regulatory capital?
A. We have discussed a number of institutions that we looked at and had abandoned because we couldn't consummate any deals due to lack of capital.
Q. Which ones were specifically due to lack of capital?
A. San Antonio would have been one, United of Galesberg I believe would have been consummated, there were four in central Illinois we could have bought the deposits and branches, and specifically perhaps that competitor, Standard of Security, looked very hard at that, Security Fed, I am not sure of the exact name.
Q. That is the institution in Peoria?
A. Yes.
Q. Do you believe that all of these institution would have been acquired?
A. Possibly, plus possibly others we never looked

terms of the ultimate disposal of those assets?
A. Yes.
Q. How would you rate your investment in Rock Falls from '85 up until mid '88 when you acquired Republic?
A. Great investment.
Q. How did Rock Falls perform in the three-year time period?
A. Went from two million to like four six or four seven, which, it doubled in three years, not bad.
MR. BERGMAN: That is all the questions I have. Thank you.
Mr. Murphy may have a few limited questions.
MR. MURPHY: Go off the record briefly.
THE VIDEOGRAPHER: Off the record, the time on screen is 11:44 42.
THE VIDEOGRAPHER: On the record, and the time on screen is 11:46 32.
BY MR. MURPHY:
Q. I have a couple follow-up questions relating to the San Antonio institution.
Would a merger between River Valley and the San Antonio institution in the non FIRREA world have required regulatory approval?
A. I am quite sure it would, yes.
Q. After the actual acquisition of San Antonio