# EXHIBIT G

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**PAUL A. GRIFFIN DEPOSITION COUNTER DESIGNATIONS**

2/11/2002 Tr. 150:11 - 158:11
2/11/2002 Tr. 160:3-161:6
2/11/2002 Tr. 161:21 -162:13

2/12/2002 Tr. 246:2-9
2/12/2002 Tr. 277:18-279:24
2/12/2002 Tr. 345:12-346:18
2/12/2002 Tr. 347:17-348:15
2/12/2002 Tr. 358:2 -360:20
2/12/2002 Tr. 381:6-8
2/12/2002 Tr. 382:1-383:23

Certified Copy




UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -X
HOMER J. HOLLAND and :
HOWARD R. ROSS, :
Plaintiffs, :
v. : No. 95-524C
UNITED STATES OF AMERICA, : (Senior Judge
Defendant. : Loren A. Smith)
- - - - - - - - - - - - - - - -X

Deposition of PAUL A. GRIFFIN

Volume I

(Taken by Plaintiffs)

San Francisco, California

February 11, 2002

Reported by: Jan C. Olivieri, CSR No. 5451

APPEARANCES:

For the Plaintiffs:

DAVID B. BERGMAN, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474

For the Defendant:

PATRICK T. MURPHY, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Witness Address:

University of California
Graduate School of Management
Room 139, AOB IV
One Shields Avenue
Davis, CA 95616-8609
(530) 752-7372

that long, we want to go ahead with this transaction," would you say "Don't do it," or would you say "Give it a try"?

A. I would proceed on parallel tracks.

Q. Meaning that you would structure the acquisition in the tax-favored way, and also request a private letter ruling; is that what you mean by parallel tracks?

A. I would have parallel activities, that's correct.

Q. And if the deal is to close before the private letter ruling is issued, what would happen?

A. I would have to look at what I had received on the private letter because that's a -- that's not just a one-step process, that's a multi-step process. So I would have to see what sort of responses I had already received so far. I would also have to look in terms of the flexibility I had on changing the closing date, which is something that is negotiable. And to the extent that -- that an earlier closing might deny you or put at risk certain benefits, it may not be in the seller's interest or the purchaser to actually force that particular date. So there can be a mutually beneficial outcome if the date is -- is pushed back a little bit.

Q. Okay. Let me ask you now, you don't have the benefit of saying I want a private letter. You've got to make a decision. And the question is that the but for world as we've defined it and the acquisition of SAFSB as it existed, you know that one could quantify the benefits, the administrative benefits of about a million dollars, 800-some thousand dollars, you know that there are significant tax savings to be had, you know that it's the same management team, you know that they're going to apply the same management techniques in terms of the capital markets, investments in the institutions, the same personnel, they want to achieve these tax savings, and they say, "Give us a prediction, if we go forward with this acquisition, SAFSB in River Valley, will it stand? What are the odds?" What do you say?

A. I pull out my calculator and I do a probabilistic calculation on going one way versus the other. Going the stand alone holding company route, say using something like Western, is going to give me certain kinds of benefits, certain kinds of pay-offs. I can always, as I indicated in my report, think about a transfer at a later stage. I'm not -- once I go with one kind of holding company, I'm not committed forever in that situation. So I would look at that situation.

And I would weigh out the odds of perhaps not being able to make those offsets or having -- having them denied at a later point. I would also have to think about the timing of the San Antonio income, is it all going to be generated next year or is it going to be generated several years into the future. Because if it was income that was really -- I knew was going to come tomorrow for sure, versus several months from now, I might think differently because of the timing of the present value benefit of having those tax benefits being used up at an earlier point. So there are a number of issues I would have to look at.

I would also have to look at any of the non-tax benefits of using something like a Western arrangement, right, and so there's benefits there that I would have to weigh up on one side against the tax benefits that come directly to River Valley on the other, remembering that for the most part the ultimate beneficiary of all of this are the same people.

Q. I think that's a very sensible answer, probably to the exact question I asked, but not to the question I intended to ask. So let me ask what I intended to ask.

Which is, what are -- not so much an assessment of the various options and what you would recommend, but simply you're asked will -- "We want to acquire SAFSB

through River Valley. We know we want to do that, we have reason to do it, we have our million dollars, close to a million dollars in savings we want to achieve on the administrative level, we have our tax savings we want to achieve, we're going to do it. Now you predict whether the IRS will let it stand." What's your prediction?

A. Well, I would have to give it a probability. I certainly wouldn't give it a probability of 1. On the negative side, I would -- I would worry about the various tax rules against purely tax-motivated transactions. All right? On the other side, I would say, well, we're in the thrift business, and the IRS has been very good to the thrift business, and maybe they'll take a kinder view to this kind of transaction. And so I would really have to balance -- try to balance those and any of these other non-tax issues off. I just don't know where I would be in terms of having to make that final call. I'm working with only some of the facts and figures of the transaction, but I'm not working with the people involved, the various pressures involved, the kinds of intangibles that can go on, these things that go beyond sort of the rational number crunching decisions that one might be led to. So I think -- I think you've got to look at the -- that if you went that

way, you've still got a risk. Although as I said, the IRS had been looking reasonably kindly on the thrift industry as it was working out of, you know, sort of the FIRREA issues. And so I don't know exactly where I would come down. But I would -- I would know it would be decision-making uncertainty.

Q. Okay. And I understand that -- that perhaps you don't have all of the data that you would want. But you have all of the data that you considered in the course of your report. And let me ask, given that -- understanding that that may not be the perfect set of information for you, but it's what we have, do you think there is a 1 in 2 chance that the IRS will reject it, 1 in 10 chance, 1 in 100? Where are we in that scale?

A. Well, I would -- I don't know what the -- you know, the various odds are, but I would say that it's not trivial. It's something that you really have to take seriously.

Another element here that I think it's appropriate to bring it up at this point, and that is that everything looks good with respect to San Antonio with the benefit of hindsight because it turned out to be very profitable. But if we had looked at San Antonio and perhaps we had looked at that as being just modestly profitable or profitable in accordance with other sorts

of banks, it would not have generated the same pre-tax returns that could be used to offset against those -- the losses that were in the River Valley. And so -- so that going -- going forward, going into the -- into that particular arrangement, we wouldn't have known that we were going to generate these tremendous returns. I think the STARS transactions -- well, not the STARS transactions, but certain of their investment transactions turned out, you know, to be very profitable for them. They would not have known that at the time.

Q. And so that means -- well, does that mean that there's less risk that the IRS will frown upon the acquisition of San Antonio through River Valley because it's less obviously tax-motivated? Is that true?

A. That might have been an element of it, that's correct, yeah.

Q. But the flip side is perhaps it makes Holland and Ross less motivated to acquire San Antonio through River Valley; is that true?

A. Because we could do a calculation of the expected benefits of the transaction and then we can do a calculation looking back of what they achieved given perfect 20-20 hindsight. And I think that you can make a case that those two numbers would have been different. In other words, the hindsight numbers would have been

higher than the foresight numbers.

Q. Okay. But -- I understand that. And I will now ask you to put to the side this question of whether Holland and Ross really were motivated to acquire SAFSB in River Valley. That's -- that's a question that we'll revisit at some other point, perhaps. But now with the comments that you've just made, which seem sensible, factor that in again to this analysis of will the transaction stand from the IRS perspective. That is, can SAFSB be acquired through River Valley. There is one other data point that maybe we hadn't focused on. And I'll ask again, what are the probabilities that River Valley can acquire San Antonio and the IRS will not upset the transaction? Are we now in -- I just -- I don't have a sense where we are from 1 to 100 to 99.

A. I know you have asked that question and, you know, maybe a different way. But I think there was a -- from a professional standpoint, I would have to attribute a non-trivial risk associated with that transaction. Again, if I were to formulate an expert report, we would then have to define exactly what that transaction was, exactly what the tax rules that we were dealing with were, and then we would go from that particular point using prior material that we might have on prior tax rulings on those particular issues and

trying to match up to see whether our situation was similar or different from some of those cases that would have been ruled on, you know, prior tax rulings at an earlier point. So -- but I didn't -- I didn't do that, I didn't go that far. And so I can't give you a specific on what that risk is. But if I were to have done those further steps, and which I would have done if I were a professional advising, I think I would have been able to make more clear exactly what that risk was. And perhaps -- perhaps, my research would have indicated that it was minimal, that we -- it would have made good business sense to go forward, knowing that we had some small amount of business purpose that -- and that the expected tax benefits were -- were certainly material, but it was only with hindsight that they might have turned out to be a lot more than they were.

There's -- there's another element of that I talked about, Section 269. There's also the 384 code that could apply here, which is how you and whether you can use prior built-in gains to offset -- from one company to offset accumulated loss carry-forwards from another. And that's an issue which would also raise some additional research. And it turns out from my understanding that that was also raised by one of the accounting firms as they looked at this transaction.

Q. Let me make sure I understand where we are now. Is it beyond the scope of your work to make a judgment about the probability that the IRS would not have presented an obstacle to the acquisition of SAFSB through River Valley in the non-breach world?

A. I have given you my best view as to where those -- where those odds are. The only thing I haven't done is quantify it, which you have requested. I just don't feel that based on what I've done so far I would be professionally responsible in putting a precise number on what that probability is.

Q. Okay. And what about -- if I understand, with further work you feel that you could determine that either there is minimal or zero risk or there's substantial risk, but you haven't done that work yet.

A. I believe that would be the case. I believe that -- that a good tax professional would -- would provide you with that service and provide you with those sorts of quantitative estimates. But as I've indicated earlier, I believe there would also be a lot of additional research that would be required that was beyond the scope of the work that I was doing here.

Q. Okay. Have you in any context ever provided that kind of assessment to a client, litigation context or in the context of ongoing business, about where the

all together. I viewed that as outside the scope of the work for today, however.

Q. Okay. And if you were -- if you were to make an assessment with hindsight now, not going forward, not in real time, but with hindsight now, to make the probabilistic calculation, what are the probabilities that River Valley could have acquired SAFSB and used the NOLs to shelter SAFSB's income, what further steps would you need?

A. I think that there's a good possibility that it could have occurred. But I'm not prepared to say that it would have occurred. As I indicated before, I -- I think the Congress and the IRS, Treasury, were looking quite kindly at the thrift industry. They wanted the thrift industry to get out of the mess. And so that they were, I think, willing to go a little bit further than they might have otherwise gone had there been more normal circumstances.

Q. And I understand that you're not prepared today to say there's 98.6 percent chance of its going forward, or whatever the Dove soap or Ivory soap, whatever it is. But given the constraints that you're not able today to put a precise number on it, I understand that perhaps you could do further work and come to more comfort on that level. Keep in mind that that's a possibility.

But sitting here today, do you have -- are you able to put a range on it? 70 to 80 percent probability? 10 to 20 percent probability? Where -- I just don't understand where we are on that continuum.

A. Well, the range would be greater than 50, less than 100. I can't go beyond that.

Q. Okay. Between 50 and 100 percent chance that River Valley could have acquired SAFSB and the IRS would have blessed it or not objected in any way; is that correct?

A. I'm happy with the view that it would be more likely than not that it would have been a successful transaction.

Q. Okay. And by successful transaction, that means that River Valley is able to acquire SAFSB in the but for world, and use the River Valley NOLs to shelter the San Antonio income, leaving to one side the question of quantifying what that means, but that's -- that's what we've defined as successful outcome, and you think that's more likely than not; is that true?

A. Yes. But that -- but that requires that we make a number of specific assumptions about the events in the but for world. Right? And the specific nature of the transaction that would have -- that would have been used to transfer the particular assets or whatever

it might be, but to transfer the San Antonio into River Valley.

Q. Okay. And those are reasonable assumptions, assumptions you're comfortable with, or something else?

A. Well, in the -- I'm comfortable with those assumptions in the sense that I think we agreed in broad terms what we meant by the but for world. But it is also possible in the but for world that because we didn't have FIRREA, we might not have had the sort of the kind of gentler view of the IRS upon the industry. So they might have taken a different view with respect to interpreting the various rules that would bear upon the transfer of benefits from one company to another.

Q. Any other assumptions?

A. I think that's a broad enough assumption to include.

Q. Okay.

THE REPORTER: I need a minute to change paper.

MR. BERGMAN: Okay.

THE REPORTER: Go ahead.

BY MR. BERGMAN:

Q. Before FIRREA, was the IRS much more stringent with regard to interpreting its rules as they related to thrifts?

A. They -- they had become aware, I think, before

Certified Copy




UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - -X

HOMER J. HOLLAND and :

HOWARD R. ROSS, :

Plaintiffs, :

v. : No. 95-524C

UNITED STATES OF AMERICA, : (Senior Judge

Defendant. : Loren A. Smith)

\- - - - - - - - - - - - - - -X

Deposition of PAUL A. GRIFFIN

Volume II

(Taken by Plaintiffs)

San Francisco, California

February 12, 2002

Reported by: Jan C. Olivieri, CSR No. 5451

APPEARANCES:

For the Plaintiffs:

DAVID B. BERGMAN, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474

For the Defendant:

PATRICK T. MURPHY, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

Witness Address:

University of California
Graduate School of Management
Room 139, AOB IV
One Shields Avenue
Davis, CA 95616-8609
(530) 752-7372

A. Yes, that's correct.

Q. Why is that?

A. I have observed these sorts of transactions to have taken place. Now, there's always again a tax risk that this was solely taking place for tax purposes. And so in -- in establishing something like that, you have to be careful to make sure that it's defined within an overall economic purpose. And the advisors and the accountants work with you in that context.

Q. Okay. Is it your belief that that result could have been achieved if done with proper consultations?

A. I believe so in the sense that you most likely could have -- could have improved some of the risk characteristics by establishing maybe a better more diversified portfolio of loans. So I think it could have been done with the result you get tax benefits, but there is an economic benefit that carries along with those tax benefits.

Q. Okay. So if I'm understanding, which I may not be, but if I am, is it your view that in the but for world, Holland and Ross could have sold the loans that Mr. Stokes has identified in paragraph 30 of his report as giving rise to the accretion income for GAAP purposes of about $9.1 million from 1992 to 1994, Holland and Ross could have sold those loans, recognized income for

that's required under the GAAP rules.

Q. And is it your experience that they in fact do reflect the accurate economic value, true economic value of the assets, that these GAAP rules do capture?

A. In general, yes, that's my experience.

Q. Does the market value of most companies equal the GAAP value of the -- of a company?

MR. MURPHY: I'll object to the form.

You can go ahead.

THE WITNESS: For a company in general, that's typically not the case.

BY MR. BERGMAN:

Q. Why is that?

A. Because the GAAP is only in certain instances required to report the market values of the company. In other instances GAAP doesn't attempt to reflect the market value as the GAAP number.

Q. If you could walk me through the various numbers that -- that appear in paragraph 26. There is the $4.45 million bargain purchase element that I think you've explained how you arrived at. But then there are some other numbers that follow, and I would like you to explain for me, if you could, the derivation of those numbers and their significance.

A. Yes, I could.

I would just add that I am not referring at this point to the bargain purchase element as you indicated. I am referring to built-in gain or built-in loss element of the transaction.

Q. Thank you. Okay.

How are those terms different?

A. Bargain purchase element would be that it would turn out that the fair value of the individual assets and liabilities net exceeded what you paid for them. And in this case, what I am referring to are built-in gains and losses at the time of acquisition as a result of the difference between the aggregate tax base -- basis and the accounting numbers that were established at fair market value.

Q. So -- thank you. And that -- so your $4.45 million number is the result of differences between tax and GAAP valuations, and is not comparable to what Mr. Stokes characterizes as the $29 million bargain purchase element.

A. Not directly comparable, that's correct.

Q. Do you have a number that is comparable to Mr. Stokes' bargain purchase element?

A. Well, in my report I do not refer to the term bargain purchase, but in this particular transaction, if you are willing to agree with me that a bargain purchase

element could be viewed as negative goodwill, that is, that the value of the assets exceeded what was the value that was paid, the negative goodwill in this transaction was I think roughly 300- -- $3- to $400,000. It's a very small amount. And that negative goodwill was recorded as an offset to the shareholders' equity. Well, not an offset. As an addition, I'm sorry, to shareholders' equity. So there was no record at the time of the transaction of negative goodwill of anything like what Mr. Stokes indicates would be equivalent in concept to negative goodwill.

Q. So is it your opinion that to the extent there was any bargain purchase here, that is, that Holland and Ross and the other acquirers of San Antonio received something worth much more than they paid for it, worth more than they paid for it, the bargain purchase element is at most about $300,000?

A. That's correct. And that's based on the calculation in the financial statements that the amount of negative goodwill as a result of the transaction was approximately $3- to $400,000. And that is what in accounting language is viewed as the benefit in the sense that you got more in fair market value than what you paid.

Q. Okay. So nothing to sneeze at, that's a good

now maybe I wasn't. I thought you said you would want to take $10 million off the GAAP carrying value. Is that what you said?

A. Oh, I'm sorry. 10. So that would -- you're right. Then I would drop it down to say 123.

Q. Okay.

A. And then my taxable income would be 158 minus 123, which would be more like say 35.

Q. Okay.

A. You're right. You're absolutely correct.

Q. Thank you.

So on the basis of this FAS 107 valuation, and with the caveats that there may be some imprecision in determining the tax basis of these loans, but based on -- I take it you believe the assumptions you made in doing this are reasonable ones?

A. It's a reasonable first approach, given the information I have in front of me.

Q. Okay. And I should ask, I suppose, is it consistent with your work in performing -- preparing your report that the tax basis of the SAFSB loans, assets, was something close to but less than the GAAP book value of those loans?

A. At what point in time?

Q. At any time from 1992 to 1994.

A. Well, the tax basis and the GAAP basis were approximately the same at the time of the original transaction.

Q. Yes.

A. And then as the accounting accretion takes place, there's going to be a divergence of those two values.

Q. And the GAAP number will get larger.

A. The GAAP number will start to increment, correct.

Q. Okay. So in any event, you would expect that this carrying value of 133.8 million as of December 31, 1993, on page 162 of the document before you, you would expect that that would be something larger than the tax cost basis, and you've done some initial calculations to suggest that it's about 10 million larger; is that correct?

A. That's correct.

Q. So based on this FAS 107 valuation and your estimates, is it your understanding that if San Antonio had wanted to sell this bundle of loans, collection of loans, at the end of 1993, it could have done so and booked about a $35 million gain for tax purposes?

A. That would be -- that would be a fair statement, yes.

Q. Now, if in the non-breach world San Antonio had an incentive to book income for tax purposes so that it could use the River Valley NOLs to shelter that income, would -- does this document indicate that there was a fairly easy way to do that, which is to sell some of these loans or all of these loans, if it had wanted to, at their fair market value at the end of 1993?

A. If they -- if they chose to do that, it's not unreasonable that they could have realized taxable income of somewhere I guess in this case 30 to 35 million.

Q. Okay. That's significantly more than the income that in your non-breach world you have San Antonio recognizing in such a way that River Valley can take advantage of its NOLs; correct?

A. That's correct.

Q. Why didn't you consider the opportunity to sell these loans at this gain as something that should be factored into your report when considering the non-breach River Valley/San Antonio?

A. Well, I think for the -- for the reasons I have indicated earlier, that my assessments of the taxable income of San Antonio in the non-breach world were based on what I observed San Antonio's operations to be. And the other reason that -- that if I were to adopt a

decision in the non-breach setting for San Antonio, then it would only be reasonable and fair that I would adopt the same decision in the breach world for San Antonio. So the two factors in a sense are offsetting, or one factor offsets the other. So to the extent that -- that I would include something like this, it doesn't, you know, have a major bearing on the net result because of the offset.

Q. Let me -- I understand that if you included this in your non-breach scenario you would also feel that you should include it in your breach scenario, and therefore at the end of the day in terms of your own calculation of damages to Holland and Ross, it may be a wash. Is that right?

A. That's correct.

Q. Do you believe that it would be appropriate for you to include this let's call it $35 million of potential income to be recognized by the end of 1993 in both your non-breach and breach scenario?

A. Possibly, yes. We could identify at one point in time, December 31, '93, and we identified potential realizable gains for tax purposes of a certain amount. I would want to look at all the other possibilities for the realization that could have taken place both earlier and later. It may be -- and I don't know -- that at a

A. I believe so.

Again, to reiterate, we're assuming that nothing else was going on in San Antonio that might potentially have offset any of these gains, and we didn't have equivalent gains sitting in the books of River Valley that might have been preferred or might have been equally attractive in terms of using up the loss carry-forwards.

Q. Okay. Let me ask you if you're aware of anything else happening at San Antonio that would have offset these gains.

A. If I could just take a moment to review.

Q. Certainly.

A. Thank you.

Q. Tell me what you're -- which document you're reviewing so I'm with you.

A. I'm looking at the '93 financials.

Q. Okay. Griffin Exhibit 6?

A. That's correct.

Q. Thank you.

A. I've just spent at few moments reviewing the 1993, 1992 financials. The one item that -- that struck me as a possibility -- and I'm still not resolved as to whether it's present or not -- that certain kinds of -- certain kinds of gains and losses to my knowledge

escaped reporting in the fair value disclosures. And in today's environment I think is more likely to be reported. And these would be gains and losses on any derivative positions that the bank may have held. And to the extent that this firm was engaged in that sort of activity, and was engaged in using derivatives for hedging purposes, it's possible that they could be showing a balance sheet gain or a supplementary disclosure gain in the notes, but without having to reflect the fact that they would have incurred any equivalent or roughly equivalent amount of loss on a derivative position which was designed to hedge the market risk associated with those assets. So I didn't see anything in the financials, but that doesn't rule out the possibility that there may have been some activities of that nature. This would be something that potentially would be subject to further investigation, but I didn't consider it in my present analysis.

Q. Okay. And do you have an ability as you sit here to put any dollar figures on the potential impact of those kinds of issues in terms of impact on the ability to recognize income as of the end of 1993?

A. No, I don't.

I would also point out that they did realize some gains anyway apart from selling off some -- selling

off all or a part of their loan portfolio. So that's -- those are recognized already. So --

Q. Would those be additive to the $35 million in gains?

A. They're already there. They were part of the normal operating -- part of their operations in the -- what we call the breach world financials.

Q. Okay. And so this $35 million that you have identified under the FAS 107 valuation would be additive to those?

A. That would be additive subject to the possibility of off balance sheet items which could include off balance sheet losses.

Q. Okay.

A. And off balance sheet meaning off financial statement items.

Q. Okay. And those off financial statement items, to be clear, are ones that you were not able to confirm their existence or quantify at this time; is that true?

A. That's correct.

Q. Okay. In paragraph 45 of your report, Professor, you state that you replicated plaintiffs' analysis. And I believe that to be plaintiffs' analysis of the manner in which First Banks valued NOLs that it received in the acquisition of River Valley. Is that

the structure that actually occurred as a separate independent audit company. But in that second situation, the concerns of the lender also ultimately led back to issues that related to the post-FIRREA world.

Q. Meaning the breach?

A. Meaning -- meaning the world in which the bank operated subsequent to August 1989.

Q. Okay. And is it your understanding that if River Valley had retained its contracted-for capital it could have acquired San Antonio without the necessity of any funding from American National Bank?

A. I think that was a possibility because they would have had additional capital available and could have been able to use that to acquire the net assets of the bank.

Q. Do you have any reason to believe that if River Valley had retained its contracted-for capital it would not have been able to acquire San Antonio without recourse to American National Bank?

A. No, I -- my understanding of the capital position of the River Valley Banks in the non-breach world would be such that they would most likely be in the position to be able to do it without the assistance of an outside lender. But at the same time, we are

going to have to assume something about the various activities they would have taken in a non-breach world to put themselves in a position in the end of '92 to be able to do that. Which would include some ability, you know, to grow following -- or grow in the period that -- absent FIRREA, to produce sufficient capital, to retain sufficient funds within the firm rather than dividending them out to owners. So there would be some assumptions you would need to make in order to make sure there was sufficient capital in order to make an acquisition.

Q. Okay. And do any of those necessary assumptions strike you as unreasonable, improper, inappropriate, in any way?

A. I don't believe so, but I would -- I would have to look at -- at the likelihood of some of those things occurring in the non-breach setting. Just for example, we would want to look at the extent to which the owners, Messrs. Holland and Ross, were withdrawing funds. They were interested in a return on their investment, and there's evidence, particularly with respect to San Antonio, that they were dividending out funds for various reasons, one of which was to pay down the loan, but for other reasons, as well. They wanted a return on investment.

Q. Do you have any reason to believe that in the

non-breach world Holland and Ross would have taken out of River Valley in the form of dividends or otherwise an amount of capital that would have prevented River Valley from acquiring San Antonio without the necessity of taking out a loan from American National Bank?

A. I don't know the answer to that question. I -- what I do know is that there was a period when they were operating River Valley, River Valley Holding, River Valley sub, when it was not known to them that they would be acquiring San Antonio. So it was not clear to me that -- that during that time they were operating River Valley that they were anticipating to have sufficient free capital to be able to buy another bank without having to borrow. I don't know that -- that it would be in their business plan or not that they would -- they would overload -- load themselves up on free capital in order to -- to take advantage of possible opportunity that at that point, those earlier points, was not on their radar screen. So it may be that they would have had some free capital, but I don't know in this but for world pre the emergence of San Antonio that they would have had all of the free capital that they would have needed to do it without a form of borrowing.

Q. Have you made any effort to quantify the amount of capital that River Valley would have had in the