# EXHIBIT H

*HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS,*
*AND FIRST BANK*
*v.*
*THE UNITED STATES*
*95-524C*

**ALLEN BLAKE DEPOSITION DESIGNATIONS**

7/7/2000 Tr. 5:13-15:9
7/7/2000 Tr. 17:8-20:10
7/7/2000 Tr. 20:14-23:22
7/7/2000 Tr. 24:23-31:15
7/7/2000 Tr. 32:1-34:18
7/7/2000 Tr. 35:15-37:2
7/7/2000 Tr. 38:19-39:14
7/7/2000 Tr. 39:18-41:1
7/7/2000 Tr. 43:5-44:22
7/7/2000 Tr. 45:24-47:2
7/7/2000 Tr. 48:22-49:25
7/7/2000 Tr. 51:6-53:25
7/7/2000 Tr. 54:18-24
7/7/2000 Tr. 55:12-57:2
7/7/2000 Tr. 57:22-58:18
7/7/2000 Tr. 62:12-23
7/7/2000 Tr. 68:17-22
7/7/2000 Tr. 84:3-85:4
7/7/2000 Tr. 87:18-88:16
7/7/2000 Tr. 89:1-92:8
7/7/2000 Tr. 101:16-24
7/7/2000 Tr. 110:11-111:4
7/7/2000 Tr. 112:25-118:22
7/7/2000 Tr. 122:24-124:11
7/7/2000 Tr. 128:15-129:6
7/7/2000 Tr. 129:21-130:5
7/7/2000 Tr. 135:16-136:15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Cause No. 95-524C
Chief Judge Smith

HOMER J. HOLLAND and HOWARD B. ROSS,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF ALLEN H. BLAKE

Taken on behalf of the Defendant

July 7, 2000

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Cause No. 95-524C
Chief Judge Smith

HOMER J. HOLLAND and HOWARD B. ROSS,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF ALLEN H. BLAKE, having been produced, sworn and examined, testified on behalf of the Defendant on July 7, 2000, between the hours of 8 o'clock in the forenoon and 5 o'clock in the afternoon of that day at the offices of First Banks, Inc., 135 North Meramec, Clayton, MO 63105 before HAL L. CARR, a Registered Professional Reporter and a Notary Public within and for the State of Missouri.

APPEARANCES

For the Witness and the Plaintiffs:

Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
By Mr. David B. Bergman
Ph. 202-942-5474
Fax 202-942-5999
E-Mail bergmda@aporter.com

For the Defendant:

U.S. Department of Justice, Civil Division
1100L. Street, N.W.
Washington, D.C. 20530
By Mr. Patrick T. Murphy & Ms. Patricia A. Smith
Ph. 202-307-0277
Fax 202-307-0972

Exhibit index at conclusion of transcript.

take a break, let me know and we will do so.
I would ask that you let me finish my question before you start answering and I'll try and let you finish your answer before I ask another question so he can get it all down on the record so everything makes sense.
If I ever ask you questions you want me to clarify or if you want read back just let me know and we'll take care of that.
Do you have any questions before we begin?
A. No.
Q. I guess we can just start by your giving me your educational background starting college.
A. I have a Bachelor's Degree and a Master's Degree in Business Administration from Washington University.
Q. And when did you obtain your Bachelor's Degree?
A. 1964.
Q. And when did you complete your Master's Degree?
A. 1965.
Q. After graduation where did you first

become employed?
A. It was a CPA firm which is now part of Price, Waterhouse, Coopers. At the time it was Lyburn, Ross, Brothers and Montgomery.
Q. And what year was that?
A. 1965.
Q. And what was your position there?
A. I was a staff auditor.
Q. And how long were you at Lyburn?
A. I was there 11 years. It was interrupted by two years in the Army.
Q. And when were those two years in the Army?
A. Late 1965 through 1967.
Q. And what were the various positions that you held at Lyburn?
A. I progressed up, staff auditor, senior auditor, supervisor and finally manager.
Q. And when did you become senior auditor?
A. 1968.
Q. And how did your responsibilities differ from when you were a staff auditor?
A. A staff auditor basically reports to a senior auditor, and a staff auditor does the work that he's instructed to do basically. The senior

auditor runs most engagements.

Q. And when did you become a supervisor?

A. In 1970.

Q. And how did that position differ from senior auditor?

A. That was a position in charge of very larger engagements or it may be a second person on extremely large engagements.

Q. What sort of engagements did you work on?

A. Manufacturing. I did a fair amount of mining companies, some non-profit organizations, school districts, universities, that sort of thing, insurance companies. That's all that comes to mind right now.

Q. And when did you become a manager?

A. In 1973.

Q. And how did your responsibilities as a manager differ from those as a supervisor?

A. There you were in charge of a large number of engagements, so I probably had 20 to 25 during the year that I managed.

Q. Did you obtain your CPA while you were at Lyburn?

A. Yes, I did.

Q. And when was that?
A. 1969.
Q. And when did you leave Lyburn?
A. 1978.
Q. And where did you go from there?
A. From there I went to a small bank holding -- Well, it was a single bank at the time called Manufacturers Bank here in St. Louis.
Q. Were you in St. Louis while you were at Lyburn?
A. Yes, I was.
Q. And why did you go to Manufacturers Bank?
A. I just decided to get away from public accounting.
Q. And how long were you at Manufacturers Bank?
A. Five years.
Q. So until approximately 1983?
A. So it must have been six years. It was 1984.
Q. And where did you go in 1984?
A. First Banks.
Q. And why did you leave Manufacturers Bank for First Banks?

A. They were acquired by another organization.

Q. And which organization was that?

A. At the time it was Amera Bank (phonetic) out of St. Joseph, Missouri. It was later acquired by Mercantile here in St. Louis.

Q. And when you started at First Banks what was your position?

A. Vice President and Chief Financial Officer.

Q. What were your responsibilities as Vice President and CFO?

A. I was in charge of all of the accounting, basically the accounting for the whole organization.

Q. And did there come a time after 1984 when you assumed a different position at First Banks?

A. There has been several instances where it has grown from there.

Q. Okay. Could you walk me through those?

A. I'll try.

About in 1987 I also was responsible for the investments and asset-liability management. In around 1990 I picked up operations and data

processing. In 1992 I was named Senior Vice President. In 1997 I became Executive Vice President and Chief Operating Officer -- excuse me -- in '98 I became Chief Operating Officer, and 1999 I became President.

Q. And in 1987 when you became responsible for investments and assets-liabilities management were you still at that time responsible for all of the accounting?

A. Yes, I was.

Q. And then in 1990 when you assumed the responsibilities for operations and data processing did you retain your responsibilities for everything else?

A. Yes, I did.

Q. So you just kept adding on more work?

A. Yes.

Q. And when did you become responsible for or involved with looking at potential acquisition candidates for First Banks?

A. Really, I have always been involved in that to some degree. I became more involved probably beginning in about 1989.

Q. What was the nature of your role prior

to then?

A. A lot of that was just -- There was another individual that was involved in negotiation, and once that was done I was involved in the application phase and then the accounting for the transaction when it occurred, integrating it into our systems.

Q. And how did your role change in '89?

A. After that point I was involved from due diligence on.

Q. And between 1989 and today has your involvement in that changed?

A. Probably I do more than I did then in the nature that originally Mr. Dierberg was probably more involved with it than he has been since then. Now most of the detail work he leaves to me.

Q. Was that sort of a natural progression, the development of that role, or was there a specific point in time Mr. Dierberg said, 'I want you to be more involved in it and I want to be less involved'?

A. No. I think it was just a progression. We have worked together now for 16 years and I know about what he looks for and what he likes and what he doesn't like and have a rough idea of what he's

going to pay for it. So I can pretty well handle a lot of the transactions and come to him for an overall approval.

Q. And does anyone on your staff or anyone else in the organization work with you in this respect?

A. I am working -- We have a new Chief Financial Officer. I hired in September of last year. I am working to train him. He has been involved in the last two deals we have looked at recently. We haven't even gotten to the contract stage on those yet, but it's new to him. Other than that, like in the due diligence phase, we involve a lot of people. So I accumulate information from a number of different people.

Q. Prior to hiring a new CFO was there any other particular individual that you worked with in the past?

A. No, not really.

Q. Could you just describe for me generally First Banks' acquisition strategy during the mid 1990s, '94 to '96?

A. Okay. Well, starting in 1990 we did a series of acquisitions in that year. I think there was about seven of them. There were several of them

and at least two of them were deals with the Resolution Trust Corporation, and there was a lot of opportunity with thrifts at that point in time. And so we were trying to build, I guess you would call mass in the greater St. Louis regional area and into Illinois. Up until about 1994 we concentrated on eastern Missouri and central and southern Illinois. And gradually -- Prices had started to escalate some in that area so that in order to get prices that what we felt were reasonable for institutions we started to expand that area some. In 1994, early '94, we did our first acquisition in Chicago which was a savings and loan called Proviso up there. So that was the first time we stretched out. Up 'til then the furtherest north we were was Galesburg, which is about halfway to Chicago.

Going through '94 and into '95 the prices in the midwest in general became so high that as a cash buyer we had trouble meeting our criteria as far as return on investment and so forth. So in August of '94 we did a deal in Texas. It was called Banc Texas Group at that time. And then immediately after that we started looking in California, and since then most of our acquisitions have been in California.

Q. Continuing to this day?
A. Yes. We continued to look in both Texas, Missouri and Illinois, but we haven't -- I don't think we've done any in those areas.
Q. Why were the prices in your immediate market area increasing in '93, '94, '95?
A. A series of things. In the early '90s the banking industry generally had had some recessions caused by economic conditions in the country, and by '94 most of the bank that were coming out of it were fairly strong. The ones that were weak had dropped by the wayside. The same way with the thrifts. A lot of thrifts had exited the business and those that survived were strong, so they were looking for acquisition candidates. At the same time the stock market was coming along fairly well. Stock prices were high, so stock acquisitions worked pretty well, and if you're a cash buyer sometimes that's difficult to compete with.
Q. And why was First Banks a cash buyer?
A. It's our ownership structure. We're a closely held corporation so we don't offer stock in a transaction.
Q. And what sort of limit, if any, did

that put on the acquisition strategy?
A. We haven't found it's a real limit. I guess, you know, it's the limit of our size. We can't go out and acquire the Bank of America, obviously, and that's an extreme example, but something large like that. But within a reasonable size frame we can do most acquisitions. It's partly a matter of what the sellers are interested in too. If they want a tax free exchange, it won't work.
Q. And just generally as a relevant matter how often have you found sellers that want a tax free exchange that's hung up a deal?
A. I can't think of too many that have been hung up for that. That's sort of -- I suspect what it is, it's a criteria up front that we find out, and if the seller is only interested in that then we don't pursue it. I don't know how many those are, but I can guess maybe a third of the total. But in terms of those that we get down to seriously talking to we have already passed that hurdle. We tend to find that there are always more deals that we can possibly do.
Q. Has that always been the case?
A. It runs in cycles, but it's frequently the case.

probably contacted half of the banks in the state. That may be an exaggeration, but he's contacted a lot of them.

Q. Do you do any of that direct contact?

A. I haven't in the past. I probably will have to in the future. Right now we've got so many on our plate we don't have time to.

Q. Starting in 1990 and then progressing forward, what sort of characteristics of a potential target do you want?

A. Well, up to the time we went to Texas in August of '94, basically we were looking, I'd say, primarily in the St. Louis area and into Illinois. We really weren't looking in outstate Missouri particularly. I'd say we focused on central Illinois north.

In terms of the characteristics of the institution, obviously you're looking for a healthy institution, a good deposit base, good asset quality, and then you start analyzing it to see if you can make money.

Q. And when you say "a healthy institution," what sort of factors indicate to you that it's a healthy institution?

A. An institution that doesn't exhibit

certain problems, the big one being asset quality. But it can be other things. Poor earnings for one reason or another. Sometimes they have large leases, for example, on buildings that they can't afford or too much staff or maybe there is some strange reason they've acquired a property with environmental problems or it could be anything.

Q. Is there any particular portfolio composition or balance sheet structure that you look for up front?

A. I think probably there is now, but less so in the early '90s. I'd say now, and not so much the asset side as the deposit side, we're looking more for a good mix of deposits as apposed to a heavy mix of CDs. But that wasn't necessarily true in the early '90s.

Q. What about in the '94, '95 time frame?

A. We really didn't focus in on that then.

Q. Has that just been the last couple of years?

A. Yes.

Q. And is there any sort of particular capital structure, capital level in a potential acquisition that you look for?

A. Not really.

Q. What role does the capital structure play in an acquisition?

A. Well, it factors into determining what the balance sheet is worth of the institution may be. You do adjustments to that based on the circumstances, but it's a starting point. We have acquired institutions with almost no capital and we have acquired institution with way too much capital and with different structures of capital.

Q. And how as a general matter, how did you go about valuing an institution you were looking at?

A. Basically two calculations, I call them, that I go through. One is starting with the capital and adjusting for things that may be there that as a buyer we would value differently than they are on the balance sheet. For example, if they have a securities portfolio that the market is less than the book, that would be a factor. If they've got a huge data processing contract to terminate, that would be a factor. The other part of it is taking the earnings stream and I'll call normalize it, which is take out nonrecurring type of items and see what the earnings stream is likely to be once we operate it.

Q. And do you use as a general matter, do you use outside assistance to do your valuation work?

A. We may. I would say for your more routine acquisition, no. We have enough people inside to do most of that. If there is something unusual, I think particularly in the tax area, then we may use outside help.

Q. And has that changed over time?

A. No, that's pretty much consistent.

MR. MURPHY: Let's mark our first exhibit.

[Defendant's Exhibit 1 marked.]

Q. (By Mr. Murphy) Mr. Blake, what we have marked as Exhibit 1 is a printout in terms of the SEC's database of the 10 K file as of 3/27/1997 for the year ended 1996. It should have -- In the lower left-hand corner some page numbers and you should have 1 thru 127.

A. Yes.

Q. I'm not going to ask you to read the whole thing. I will direct you to a couple of sections and will have a few questions. We have already covered some of the material that I wanted to cover.

If I could get you to turn to page 43 of 127, it's part of a section that actually begins on page 37 which just for a little context shows the 1996 Annual Report.

A. Okay.

Q. And then on page 43 there is a section that says "General"?

A. Yes.

Q. And it discusses the expansion through mid 1990s.

Towards the bottom of the last paragraph on that page there is a sentence that begins with "Consequently."

A. Yes.

Q. And it reads: "Consequently, First Banks' acquisition activities are sporadic in which multiple transactions are consummated in a particular period, followed by a relatively inactive period."

Could you sort of explain to me, and it discusses a little bit above, but could you explain to me how or why acquisitions sort of happen in bursts of activities followed by a lack of activity?

A. It's largely a function of opportunity. As I mentioned in 1990 with the thrift problems we

did seven acquisitions that year and we grew from 1.1 billion to 2 billion in a 12-month period, so almost double in size. In '91 through '93 I think we did three acquisitions total, which maybe added a hundred million in assets combined. And a couple of reasons for that is, one is by virtue of expanding as rapidly as we could in one year our systems couldn't accommodate it. We acquired new data processing hardware, new data processing software and converted everything we had onto the new system. We reorganized internally adding management staff and thing like this. There was a lot of work that had to be done.

Then between December of 1993 and about September of '95, a little less than two years, we did 13 more acquisitions with about $2 billion in assets. So we almost doubled again. But then going into '96 we did one acquisition. In '97, I think we did two; '98, maybe two or three. But it looks like this year we will have several again.

So that's what I mean by "sporadic. And it's largely a matter of when you grow that fast in that short a period of time there is a catchup.

If you stop and think of doing 13 acquisition in even two years, that's one every two

months, and that means that's 13 contracts that I have to negotiate, and 13 due diligence that I have to go to, and 13 closings that I have to take care of along with the other people. And then there are 13 data process conversions, 13 product alignments to our method from their products to our products, mapping that over. So it's not just an easy thing to do one.

It's not my preference to do that many acquisitions, but you take the hand that you're dealt. It would be a whole lot easier to do one transaction than to do a million, but it just doesn't work that way.

Q. Who was responsible for implementing the institutions that you acquired?

A. A lot of that work, once we get up to closing, is taken over by operations, by our banking support groups, by our accounting groups on the general ledger side, and other people within the bank. So it's really not directly anything that I'm involved with. My job has been to get it from the initial contact up to closing.

Q. Did Donald Williams have a role in dealing with acquisitions?

A. Don is our Chief Credit Officer. He

joined us in 1993. He became deeply involved in the California acquisitions. In fact, at that time we didn't have any real management out in California, so he was our regional president for California and probably spent two to three weeks every month in California, even though he lives in St. Louis. In '93 I think we only did one or two acquisitions, but in '94 and on he was involved just in the due diligence process on the credit side of it.

Q. And what about John Shriver (phonetic), what role, if any, did he have?

A. Very little. After things were acquired he did participate some in developing a lending staff, recruiting and giving it some direction, but as far as the acquisition itself, not much.

Q. Mark Sturckan?

A. He was in charge of retail at that time and he got involved just prior to closing or shortly thereafter in managing the branches and providing marketing support, banking support systems, branch systems type of support.

Q. Then on the next page of Exhibit 1, page 44, there is in the first full paragraph, there is a discussion with respect to certain patterns in

First Banks' acquisitions, and it notes in, I believe it's the third sentence of that paragraph, that First Banks acquires multiple institutions partly due to constraints imposed by the amount of funds required for larger transactions, which we discussed a little bit, as well as the opportunity to minimize the annual premium required through smaller individual transactions.

How is it that multiple smaller transactions minimizes the annual premiums?

A. There tends to be less competition for smaller institutions. Once you get to a certain size they will have 50 bidders sometimes. I mean, we have been in some where we were 10 out of 11 bidders. So it's a matter of partly competition. They tend to be more receptive to cash, too, where the larger transactions frequently require stock.

Q. Then the next sentence there reads: "Secondly, it may acquire institutions which have some problems which would reduce the attractiveness to other potential acquirers and therefore reduce the amount of acquisition premiums required."

Generally what problems are being referenced here?

A. It could be anything. And it's partly

a matter of our ownership that Jim, being in charge, he can relate to what the situation is.

For example, River Valley with the net operating loss carried forward, many buyers would not appreciate that or any value to that, which Jim Dierberg can. So he's easier to work with. If you had a public company that might more difficult to explain to your shareholders. In California a lot of it was asset quality. We acquired some institutions that were deeply distressed and have turned them around and made relatively good money out of them. We have acquired some where, we acquired one where the problem was a building. They rented the whole building and they could only occupy a part of it, so it was extremely expensive for them. So it could be a number of things, but it's that sort of thing.

Q. Were there particular types of problems that I guess in a sense attracted First Banks? This is a problem we can deal with and we know how to fix it and it will reduce the price that we will have to pay and it's a better deal?

A. Well, as I said in California many of them were asset quality, and so there was a trend there, but that happened to be the market at the

time. All the California banks -- I shouldn't say all, but most of them were troubled at that time. Other than that -- I don't think there is a distinct pattern to it. It's a matter that any time an institution has anything that's unique, that's negative, we'll take a look at it and sometimes it's too bad and we can't fix it.

I probably should point out we look at three or four deals for everyone we do. So we pass up a number of them.

Q. And in looking at acquisitions generally, and again in the mid 1990s timeframe, were you looking more for banks or thrifts or it didn't matter?

A. It really didn't matter.

Q. Were there any comparative benefits to acquiring a thrift as apposed to a bank?

A. The thrifts at that time had some advantage within their charter, but it was not a major attribute as far as we were concerned. We were by nature bankers so we tended to even operate the thrifts like banks.

Q. Now, please just explain a little bit for me how operating a thrift like a bank is different from operating a thrift like a thrift?

A. The thrifts typically have on the deposit side more Certificates of Deposits due to demand, and typically on the asset side have more in mortgage loans, residential mortgage loans than they do commercial loans. By our nature we tend to be people that make commercial loans, real estate or regular commercial/industrial loans, and we tend to be people that tend to emphasize the relationship on the deposit side and try to build demand deposits and savings money market deposits. So that overtime -- For example, this building was the old Clayton Savings Building and was a thrift and we have a group of commercial lenders down in the lobby that make commercial loans. We have commercial deposits coming into this location and so forth. So it tends to evolve into something that is akin to a bank.

Q. And still on page 44 in the last paragraph on that page it begins by stating: "Operating results have also been adversely affected by the lower interest margin by the thrifts acquired by First Banks compared with those generally earned by commercial banks. The lower net interest margin earned by the acquired thrifts, primarily River Valley Holdings, Inc. and First Federal Savings Bank

of Proviso Township, is attributable to their primary source of interest income and the composition of their deposit bases."

Is that related to what we were just discussing with respect to operating a thrift more like a bank?

A. Yes.

Q. And then it goes on to carry over onto page 45. "Their primary source of interest income is their portfolio of residential mortgage loans and residential mortgage-backed securities which typically yield lower interest rates than other types of loans."

When First Banks acquired thrifts would you seek to restructure their balance sheet so it would be less residential mortgage loans or MDS?

A. We would -- There were at that time, and I think there are still some limitations on how much you can do. Thrifts, by their regulation, were required to have a certain amount of their assets in real estate based assets, either mortgage bank securities or resident loans, and I believe commercial real estate loans were added in there. So there were some limitations on what you could do but, yes, we did.

Q. And as a general matter during the 1990s when First Banks was looking at thrifts did you ever suggest that they in anticipation of a deal either sell off some mortgage loans or MDS and do a little pre-acquisition restructuring or did you wait until you had finalized the deal to do any restructuring?

A. I think we always did this after the deal. I think in the case of River Valley we had suggested some swaps, interest rate swaps, because at that time interest rates were moving up fairly quickly. But I would say at the time we suggested it I'm a little nervous about running a bank before we acquire it in that if, you know, the deal falls through, we haven't had any that did, but if it did I didn't want the liability of having managed the organization for a period of time.

Q. Now, you mentioned interest rate swaps. Could you briefly explain what an interest rate swap is?

A. They are contracts that you enter into particularly with a large brokerage, like Goldman Sachs or one of those, where you will agree to pay, for example, pay a fixed rate of interest and receive back a variable rate, or you can go the

other way where you can pay a variable rate and receive back a fixed rate. And I always get them mixed up. I need somebody to explain them to me. But one of them protects you in rising rates and one of them protects you in falling rates. And the thing is it depends on the mix and balance of what you need to have.

At that time River Valley was somewhat exposed to increasing rates. It was a factor of the mortgage lending. Our thrift was also exposed to increasing rates, so we had the same problem.

Q. And when you say "our thrift," what thrift are you referring to?

A. First Banks at that time had one called First Banks, a Savings Bank.

Q. And was that Proviso?

A. It was a combination of -- Originally it was the Clayton Savings, and we had added into that a couple of Resolution Trust Corporation deals we did in 1990, and we also merged in Proviso when we did that.

Q. And the First Banks' thrift, comparing that to the River Valley institution, which one was more exposed to the interest rate risk?

A. I couldn't tell you at this time.

Q. Now, if I could just get you to turn the page over to 46 which gives a listing of the 13 acquisitions made during '94 through '96 and carries over to page 47. Do you see that?

A. Yes.

Q. And on page 47 would be the River Valley acquisition. And there are columns for each of the entities, a column for the date of the acquisition, total assets, loans, net of unearned discount, investment securities, deposits, and a number of banking locations.

The River Valley acquisition, which is in the 1995 section, was the largest by total assets institution that you acquired in this timeframe?

A. Right.

Q. Was there any discussion or concern about the size of River Valley when you were looking at acquiring it as to whether or not you would be able to digest an institution of that size or was that really not an issue?

A. That was not an issue.

Q. Had River Valley been, say, twice the size, would that have presented any problems?

A. No.

Q. And why not?

A. That wasn't an issue. It would probably double the purchase price and double the size. What would have happened is we probably wouldn't have done some of the later acquisitions, which would not have been a bad thing because it was in markets we wanted to be in.

Q. And when you say it was in markets you wanted to be in, you're referring to what?

A. I'm sorry?

Q. And when you say it was in markets you wanted to be in, are you referring to River Valley?

A. Yes. They were in Peoria and they were in Chicago which were markets that we wanted to be in.

Q. Why was First Banks interested in being in Chicago?

A. Because of our acquisition of the Proviso thrift about a year before. And it was a large market. We wanted to establish a commercial lending center there, which we have done.

Q. And did River Valley have a commercial lending program?

A. They had some commercial loans, but it was not a real commercial lending program.

Q. So you were going to use them to get

into the market and bring in your own commercial lending?

A. That's correct. Well, we were in the market. We just wanted to expand.

Q. Fair enough.

And the Proviso institution when you acquired it was it engaged in -- did it have a commercial lending program?

A. No.

Q. And with respect to Peoria, why were you interested in Peoria?

A. They -- Two reasons. They had a nice presence in Peoria and the surrounding communities. The other thing is that we were in Galesburg already by virtue of acquiring Fidelity Federal Savings and Loan in the 1990s. It was an RTC deal. So we were already in the market about 40 miles or so. So it complemented that nicely.

Q. The deals with the RTC at First Banks, how did those come about? How did you become aware that those institutions were available?

A. The RTC pretty well circulated anybody who had any remote interest in an institution, so we got a list all the time on them and it was just a matter of bidding on them.

Q. And were you the person primarily responsible for dealing with the RTC?
A. I had a lot of it, and Jim Dierberg had some, and there was another fellow there at the time named Larry Brost (phonetic), who was our controller.
Q. And how long was Mr. Brost with you?
A. He came with us with Clayton Savings when we acquired that in 1990 and he left about two years ago.
Q. And what was his role in connection with First Banks 13 acquisitions during the 1994 through 1996 timeframe?
A. He really didn't have much.
Q. How did -- Focusing specifically on River Valley, how did you become aware of River Valley's availability for purchase?
A. I received a call from a couple of people at Peat Marwick in St. Louis, who are our auditors and who apparently were the auditors for River Valley.
Q. And who at Peat Marwick called you?
A. It was one of a few people or two of a few people. I think it was Dave Butler and fellow named Dan DeMoss. But it was an audit partner and a

tax partner, so I might be wrong on that.

Q. And you said that Peat Marwick was also working with River Valley?

A. Their Chicago office was the auditors for River Valley and the St. Louis office was our auditor.

Q. And do you know how the -- Do you have any idea how the St. Louis office became aware through the Chicago office of the availability of River Valley?

A. I really don't know.

Q. And when were you first contacted?

A. I'd say it was the Spring of 1994, maybe April or so.

Q. And after that first contact -- Well, basically, what was the nature of that first contact?

A. They just wanted to inquire to see if we had an interest in it, and they gave me a little bit of background, described total assets, a little bit about where they were. They did tell me about the net operating loss carried forward and just wanted to see if we had an interest, and I told them we would.

Q. What specifically about the net

operating loss carried forward interested you?
A. That they existed. I don't know much beyond that.
Q. Did they tell you like a general amount?
A. I don't think so. I think they told me what the capital was, which I think was 23 or 24 million, something like that.
Q. And after that initial contact what happened next?
A. Well, I think then they talked with either their Chicago office or I believe River Valley was represented by Donaldson Lufkin. I think they talked to one of the two, and we later received a confidentiality agreement and some information on it.
Q. And the information that you received, where did that come from that came to you?
A. I believe it came from Donaldson Lufkin.
Q. And what sort of information?
A. I don't know the extent of it right now, but I know there were balance sheets, income statements, general financial information. I don't recall whether they had a formal offering booklet or

not, but generally that's the type of information that you get. They give information on locations, deposits by location, some distribution of the deposits by type and maturity and interest rate, and the same sort of thing on loans, types of loans, what the distribution of interest rates are and maturity schedules.

Q. And what sort of analysis did you conduct on this information?

A. At that point what you can do is really pretty rough and you are making some estimates on past experience as much as anything. But what you can do is go through particularly the audited year-end financials, go through the footnotes and see what is there and come up with a rough idea what their price will be from there. It will just give you a ballpark, but sometimes you can at least get within a range.

Q. Did you have any understanding as to why River Valley was available for sale?

A. Not that I recall.

Q. And do you recall roughly when your first contact with anyone directly at River Valley took place?

A. Normally when you're working with an

investment banker all of your contacts are with the investment banker. I think the first contact we had directly with River Valley was when we did the due diligence, which would have been a couple of months later, say late May, early June of '94.

Q. Now, when you received the information from DLJ and you looked at it then after that is that when you decided to go through the due diligence period or what was the next step?

A. Well, actually we had made some sort of offer, and I don't recall what it was, and there may have been more than one, as a matter of fact. I don't know. But we were apparently somewhere in a range where they would entertain due diligence.

MR. MURPHY: Mark this one. You might as well mark the next one too, which will be No. 3.

[Defendant's Exhibits 2 & 3 marked.]

Q. (By Mr. Murphy) Mr. Blake, first if I could get you to look at what has been marked as Exhibit 2, a letter on River Valley's letterhead dated May 23, 1994, from a Ronald Pikus addressed to you. It bears an identification number in the lower left-hand corner PHO-047 1510. It also bears a Bates number of H&R-B5-1450 on the lower right portion of the page. It's just a one-page document.

If you can, just take a second to briefly look over this letter?

A. (Checking exhibit.)

Q. Do you recall this letter?

A. Now I recall it. I would not have earlier.

Q. Could you just basically explain what it is?

A. It's a letter from to me from Mr. Pikus enclosing certain information which we requested so we could do a better analysis.

Q. And you said enclosing information you requested. How did you go about requesting that information?

A. I probably would have sent him a letter, but I don't recall. I could have called him.

Q. And it notes that there are six different types of schedules or reports there that were sent along with this letter. Why did you request that particular type of information?

A. These are some of the things that I frequently look at that have a bearing on an acquisition. You notice there is nothing actually dealing with asset quality there because typically I

don't look at asset quality.

Q. In the paragraph right below the numbered items it reads: "Information regarding the 'STAR' securities is not available at this time."

Do you recall what that's referring to?

A. STAR is an acronym for Short-term Tax Advantage Residuals, and they are mortgage backed residuals that were structured to have certain attributes.

Q. And do you recall what relevance, if any, the STAR securities had to your analysis of the River Valley acquisition?

A. Well, frankly they are something I had never heard of before, so I was wanting to find out what they were in the first place. What particular attributes they had is they were characterized by a large cash flow on the front end which threw off taxable income which then were offset by losses in later periods which threw off tax losses. And the particular purpose was to refresh the expiring operating losses.

Q. I wonder if we could get you to look at now what we have marked as Exhibit 3, which is a fairly substantial document with a cover page which reads River Valley Board of Directors Meeting, May

acquisitions you did or was this sort of a novelty with respect to the River Valley acquisition?

A. I've seen this sort of thing on a couple of occasions, but it's not a norm.

Q. And did you form at the time any opinion as to the utility or reliability of the mark-to-market information provided from River Valley in conducting your own analysis?

A. Not really. I think it was helpful information to get started from.

Q. And what sort of additional information did you take into consideration?

A. Well, more than anything what I needed was more detail. This doesn't tell you how anything was calculated. So I need to go back and find out what's behind it and then verify that I agreed with it.

Q. And how did you go about finding out what was behind it?

A. That's the process we go through in due diligence.

Q. And how long did the due diligence period last?

A. Actually, except for the asset quality, it was basically one day.

Q. And what was done in that one day?

A. Well, I preface that. We had done some work off site before that, but one day actually where we had gone to Peat Marwick's office and gone through sever boxes of information, and there was a group of probably eight or ten of us.

Q. Now, the work that you had done off site previously, what was the nature of that?

A. A lot of it dealt with looking through this kind of information trying to find, for example, the investment portfolio and what that number represented, just trying to identify what some of these numbers are.

Q. And what was your impression of the investment portfolio at that time?

A. I don't know. It's not a positive or negative impression. It is what it is. I just looked at it to determine what the mark-to-market was and did look -- I have an investment person on staff that looks through to see if there is anything really strange in there. That's when we noticed they had STARS, which we didn't know what they were.

Q. And who is the person on your staff?

A. His name is Ed Furman.

Q. And what is his position with First

Banks or what was it at that time?
A. He is in charge of investments and asset liability management.
At that time there was another person working with him in that capacity named Stan Fares, F-A-R-E-S.
Q. And do both of those gentlemen report to you?
A. Yes.
Q. And the STAR investments that were brought to your attention, did you ultimately determine that those were desirable things for First Banks to acquire or --
A. If we were going to acquire the institution, we were going to acquire them regardless. So it was not a matter that it desirable or undesirable. They served a purpose which once we understood the purpose we could accept them fairly easily. However, the purpose was primarily tax. Then we got tax people involved. We have an on-staff person as well as Peat Marwick.
Q. And who is your on-staff person?
A. It's a lady named Annette Carson.
Q. In conducting your own valuation analysis did you evaluate the institution by

business line or separate units and then add them all altogether or was there more an all encompassing one value thing?

A. The only separate unit we looked at was the manager service center -- or mortgage operation.

Q. And why was the mortgage operation done separately?

A. It's a little separate from the bank. It's a little unique to the bank. And so it doesn't necessarily do exactly the same thing the banks do. Plus there is a little more identifiable market for mortgage servicing. You can value it separately.

Q. And what about it is unique from banks?

A. Well, banks take deposits and makes loans. Mortgage servicing makes loans and they also service those loans. And there is a business just in servicing loans. So it can be associated with a bank or it doesn't have to be.

Q. And why was there a more identifiable market for those?

A. Well, mortgage servicing can be bought and sold.

Q. And has there always been a separate market for servicing or has that developed over time?

A. It's been there for the last 15 or 20 years.

Q. With respect to the NOLs that you mentioned, were those valued separately or how did you take into account whatever value was going to be ascribed to them?

A. Let me explain. We look at each segment, like NOLs, loans, investments, etc., and we come up with our idea of a valuation of it, and then we add them together to come up with the business. And really what we're doing at that point is taking the book value and adjusting it to what we call an adjusted book value.

Q. And do you recall what value was ascribed to the NOLs?

A. I don't recall what value. I do recall that we didn't agree with their value by a large amount.

MR. BERGMAN: Did you answer about the NOLs or the mortgage services?

THE WITNESS: Mortgage services.

Q. (By Mr. Murphy) I'm sorry. Thank you.

My question was specifically directed to mortgage services. Let me back up and I'll ask about the mortgage servicing and then I'll ask about

the NOLs just so we're sure it's perfectly clear.

With respect to the mortgage servicing I believe you indicated that you came up with a different value than they had. What was the basis of that?

A. We had our mortgage person there. I had forgotten about it. Mark Turkin (phonetic), I believe, was there, and he runs our mortgage servicing operation here.

And it's a factor, and I have limited knowledge in the area, but it's a factor of what the servicing rate they receive is, the types of loans, whether they're adjustable, whether they're fixed, what the maturity is, but factoring all that in he felt it was worth about half of what they thought it was worth.

Q. And do you recall how that was resolved?

A. It was resolved when I told Mr. Holland that we weren't going to pay what he wanted to get for it.

Q. And how much, how much back and forth was there on the issue of pricing?

A. Not really a whole lot. We were sitting in a room with all these people and I just

explained to Mr. Holland that we weren't anyplace close to what he though he wanted for the institution, which I think approached this 48 million which he's got in his schedule, and I think we were in the range of about 38 million, and at that time we terminated the discussion.

Q. And the schedule you're referred to is the schedule in what we have marked as Exhibit 3?

A. Yes.

Q. And after you terminated that discussion what happened then with respect to determining pricing? What was the next step on pricing?

A. At that time there was no next step. We left, came home, and I put the papers in a file and went onto the next deal.

Q. And do you recall when that was, that meeting?

A. It was the time of this letter which would have been probably May 26th was our date that we did the due diligence there.

Q. So that meeting was the same day as the due diligence that was conducted at the offices of Peat Marwick?

A. Yes.

recall if anybody else was or not.

Q. Howard Ross?

A. I don't recall.

Q. How about Steve Bangert?

A. I mean, there were a lot of people.

Q. So after that meeting you went home. And at that point did you think that no deal was going to happen?

A. That's right.

Q. Okay. Then what happened next to start up negotiations again?

A. I was in California doing due diligence on another bank, and this was probably early in July, and I got a voice mail message from Mr. Holland basically asking if our offer was still good.

Q. And I presume you called him back?

A. I called him back and I told him I didn't have anything to look at at that point. I'd go back in the office as soon as I got back in St. Louis and take a look at it.

Q. And what was the next contact after that?

A. After I got back in the office and took a look at it, I went through the papers and said,

"Yes, the offer is still good."

Q. Was there anything during -- Were there any other elements of discussion that arose during the course of your due diligence work?

A. With Mr. Holland?

Q. Yes.

A. That was most of my discussion with him. I think the other elements that were being considered for valuation purposes were particularly the NOLs, because we didn't know what the value of what those was initially. It took a lot of work to get there. And, of course, we hadn't done any credit work at that point.

Q. And during that due diligence work I believe you indicated you reviewed a couple of boxes of documents. What was the nature of that documentation?

A. Specifically, I don't recall. It would have included like general corporate information, general ledgers, financial statements, investment portfolio, some of this same sort of information, mark-to-market value and interest rate sensitivity analysis, leases on all of their buildings. I don't recall if they owned any buildings, but if they did it would have included that. Tax returns. There

were boxes and boxes and boxes of information.
Q. Was any of the information relating to the net operating loss?
A. Yes.
Q. And what was the nature of that information?
A. And I was not the one who looked at that particularly.
Q. Who was responsible for primarily looking at it?
A. It would have been Dan DeMoss from Peat Marwick and Annette Carson. And there could have been another person. I'm not sure.
Q. And generally what was the nature of that information?
A. It was a lot of tax information and tax returns, where they originated, and the most recent tax returns. I think -- I don't know much beyond that. I think there may have been some memos. I don't know if they had had it analyzed or not, if River Valley had had it analyzed or not. But there may have been some memos on that. But basically what they were trying to extract from that is what portion of these we could use, over what period of time, the limitations involved.

Q. Do you recall if River Valley ascribed a value to the NOLs that they had at that particular time?

A. I don't recall, no.

MR. MURPHY: It's 10:30. We have been going about an hour and a half. We'll give everybody a break.

(Recess taken by parties.)

Q. (By Mr. Murphy) Mr. Blake, aside from this sort of mark-to-market analysis that's presented in Exhibit 3, was there any other mark-to-market type of data that you received from River Valley in connection with your valuation?

A. The detail behind some of this, like the investment portfolio which contained mark-to-market. I don't recall if I received anything other than that. I'm not sure.

Q. Please put that one aside.

Prior to your contact from KPMG about River Valley had you been aware of the institution?

A. I don't believe so.

Q. Had you ever had any dealings with Mr. Holland or Mr. Ross?

A. No.

Q. And you mentioned before that you

suggested engaging in some swap activity by River Valley. With whom did you have that conversation or those conversations?

A. I didn't directly. Ed Furman had the conversation and probably Stan Fares as well.

Q. Did they, Mr. Furman and/or Mr. Fares, have that conversation at your direction?

A. Yes.

Q. How did that come about?

A. I'm sorry. I'm not following the question.

Q. What in your analysis of River Valley prompted you to have Mr. Furman or Mr. Fares suggest engaging in swap activity to River Valley?

A. It wasn't. It was their analysis. They took information from River Valley. We have a model that we use to analyze interest rate risks. They ran it through our model and there was some exposure to rising rates which we thought might be alleviated some given the fact that rates at that time were increasing fairly rapidly.

Q. And do you know if River Valley -- First let me back up a second.

Do you recall when the suggestion was first made to River Valley with respect to swap

activity?
A. It would have been sometime after we signed the definitive, so I'm guessing it may have been September or October of '94.
Q. And did River Valley subsequently engage in any swap activity?
A. I believe they did.
Q. And do you know if that had any affect on their balance sheet?
A. I'm not sure I understand the question.
Q. What affect, if any, did that swap activity have on River Valley?
A. The only affect of a swap -- There is only two things. One is it will generate an income stream if interest rates go one direction and generate an expense if they go in the other direction. But it's off the balance sheet. The balance sheet per se doesn't change. The market value may change.
Q. And do you know if it had an impact on the market value of River Valley?
A. I believe it did, yes.
Q. And what was that impact?
A. I think the market value of the assets plus the liabilities had decreased some during that

time because the increase in interest rates had offset some of it.

Q. Were you aware of any competition with First Banks for the acquisition of River Valley?

A. I didn't know specifically about any. I assumed there was some because they hired DLJ.

Q. Did you feel any particular time pressure to get a deal done?

A. They always apply time pressure on every deal. The seller is always more anxious to get it done. In this case when I received that phone call in July Mr. Holland indicated there had been some problems with the party they were dealing with, that they had gone to when we had backed out, and then he seemed to want to get moving quickly. So we accommodated him. We moved as fast as we could on it.

Q. And did you have any understanding as to who that other party was that they had been dealing with after you had backed out?

A. I have no idea.

Q. During your analysis of River Valley what was your impression of the manner in which the institution had been run?

A. From everything I saw it was a pretty

well run institution.
Q. Did you identify any specific problems that you can recall?
A. I think in the credit review there are a couple of loan problems, but you find that in every case.
Q. But there was nothing that really stood out?
A. Nothing unusual.
Q. What about the capital structure of River Valley; what was your impression of that?
A. I can't say that I had one one way or the other.
Q. What about their regulatory capital position?
A. Well, we looked to see whether it was adequate or not adequate, but beyond that we're an acquirer so we build our plan around what they have.
Q. And do you recall specifically with respect to River Valley how it affected the building of your plan?
A. Well, in their case I think they had two unique things. One is they had those subordinated debentures, or whatever they were, that served as regulatory capital, and they also had the

Valley was merged with the First Banks institution, would they have taken the lead in developing the appropriate structure or would you or someone else have developed it and said, 'Let's do it this way to get it to work,' or how would that happen?

A. Generally this is part of an ongoing discussion about the whole transaction, and so I don't think anybody specifically proposed anything. We were talking about it and came to a consensus that this was the best way to do it.

Q. In comparing the acquisition of River Valley to some of the other acquisitions that you had engaged in in that same timeframe, was the manner in which First Banks valued the acquisition or valued River Valley different at all from the manner in which you went about valuing their other potential acquisitions or was it pretty much the same way?

A. The method was pretty much the same. As a matter of fact, I was working on one earlier this morning. I'm still using the same method. The specific components can change, like the NOLs here. We run into some others.

Q. And given that the River Valley institution was merged with the other First Banks'

with respect to River Valley?
A. Not that I know of.
Q. In the last sentence at that number point it says: "First Banks will provide any technical or analytical assistance desired by River Valley."
Did First Banks, in fact, provide any of that technical or analytical assistance?
A. I think they had some on their own, but we had some calculations we had made and explained them to them and explained what we were looking at.
Q. Were you involved in that process or was someone else?
A. I was not directly involved in it, no.
Q. Who was?
A. Mr. Furman and Mr. Fares.
Q. Were any acquisition structures, aside from an all cash purchase, discussed at all with River Valley or was it discussed as a cash purchase?
A. You mean in form of consideration?
Q. Yes.
A. No.
Q. Did you have any involvement in First Banks' relationships with its regulators, the OTS?
A. Some. Although in dealing with the OTS

of goodwill that was ultimately booked?
A. That's correct.
Q. And is it the case that pursuant to your analysis the purchase price that First Banks paid for River Valley was approximately $11.5 million more than the fair market value or mark-to-market value of the institution?
A. I'll say it was $11.5 million more than we had calculated as the adjusted book value.
Q. And what you say "the adjusted book value," what do you mean by that?
A. That's taking into consideration the mark-to-market type adjustments, yes.
Q. And why was First Banks willing to pay an acquisition price of approximately 11.5 million more than the adjusted book value?
A. In projecting out the earnings stream that would result from that acquisition with the projected savings that we could put into it and amortizing intangibles and other adjustments it worked within the parameters of what we expect on acquisitions. Given the market at the time it also was in line with what acquisitions were going for at the time.
Q. The savings that you mentioned, is that

the result of operating efficiencies of merging one institution into another eliminating overlapping functions?

A. That sort of thing, yes.

Q. And in the 13 acquisitions that First Banks engaged in in the '94 to '96 timeframe was goodwill booked in any of the other acquisitions?

A. Several of them.

Q. Was the amount of goodwill in the River Valley acquisition larger than any of the others?

A. Dollar amount or percentage?

Q. Good question. Let's start with dollar amount.

A. Dollar amount it was probably larger than the others.

Q. And would that have been a function of the fact that it was a larger institution that you were acquiring?

A. That's right.

Q. And on a percentage basis?

A. On a percentage basis it was larger than most of the California acquisitions we did in '95 and '96. It was probably not as large as some of those we booked earlier here in -- well, in 1994.

Q. Now, if I could get you to turn to page

presumably was used in '95.
Q. Now, why would some of those NOLs not have been available for use by First Banks?
A. Two reasons. Well, they're interrelated. One is because you have got this limitation on how much you can use every year, and the other thing is that as we did that some of them were expiring each year, and so the two working together will limit how much you can use.
Q. And of the 40 million of NOLs that were acquired do you recall how much were not available for First Banks' actual use?
A. I believe it was in the range of around 4 million.
Q. That would have left approximately 36 million?
A. Something like that, yes.
Q. And how did the $36 million or approximately $36 million that was available of NOLs did First Banks factor into the purchase price of approximately $37.5 million that First Banks paid?
A. We factored in an estimate based on that. And obviously there is some risk based with them, so we were conservative.
But first of all, that shields income,

not taxes, so you have to apply a tax rate to come up with a value. That's the first thing you have to do. So if you use 36 million the tax is going to be like 12, 13 million, something in that range, and then you have to make sure you use it all, obviously. And then they are only available to the extent you have income to offset them. So there's the risk that you may not be able to generate income if you have loan losses or interest rates move the wrong direction you have losses that will cause it. You may not be able to use them just because of factors I have not related directly to carryforwards. And I think the third thing that I can think of is the fact that you are looking to pay a dollar today for one you are going to get back over the next 15 years or however long the NOLs go.

Q. Did First Banks ever do a calculous of this percentage of or purchase price for River Valley is what we consider ourselves to be paying for the NOLs?

A. We did it the reverse way.

Q. Okay.

A. We took a look at the NOLs and came up with an estimate of value on those and that factored into the purchase price.

Q. And do you recall what the estimated value of the NOLs was?
A. I don't recall, but I belive it's on the sheet that I gave you this morning.
MR. MURPHY: Why don't we mark that as an exhibit.
[Defendant's Exhibit 8 marked.]
Q. (By Mr. Murphy) Okay. Exhibit 8 is a document that does not bare any Bates identification. It has at the top of the first page, the caption reads River Valley Holdings, Inc., Acquisition Analysis, and the date is 7/22/94, and is a six-page document in total.
I guess it might be easiest if you would explain what Exhibit 8 is.
A. Let me start. This is one of a sequence of calculations like this I go through in any acquisition, and continually we're updating information based on what we find as we go along. So we make some initial estimates and keep refining it and refining it. We'll do that all the way through signing the definition. After that it becomes a matter of waiting until the closing date, and we update the information again because changes may have occurred.

Q. And would an initial analysis be done prior to engaging in due diligence?

A. Yes, there was some prior to this.

Q. And -- I'm sorry. I interrupted your explanation.

A. Basically what the first page is, it starts with their stated shareholders equity right off their general ledger. And at this point we were looking for a closing six months later, so it's looking at June 30th of 1994. And so I guesstimated income through the end of 1994 figuring that would be earned during that interim time period. And then I was working with a purchase price of originally $38 million, which was later adjusted. And then I took a number of adjustments, some of which we knew about, some of which we were still refining, but what we had information at that time as far as adjustments to come up with what the purchase premium was and how it would be allocated. In this case we have a valuation reserve on a pretax asset, which we were looking at a valuation adjustment of about $3.7 million.

Q. And that is on this first page under the heading Potential Premium Allocation (Estimated) as one of those subheading?

A. Yes, it is.

Q. It has a further subheading under it of Adjustment of Valuation Reserve of Deferred Tax Assets?

A. That's correct.

Q. And what is the period of years that's referenced in that middle column?

A. That's the amortization period. I didn't realized it was 17 years. My mind says it should be 15. I don't know why I used 17.

Q. And then what is the remainder of this first page?

A. The remainder of that is I go through a source of funds calculation. It really is a capital calculation, what capital is required to determine, even though we're paying 38 million we may be able to take a dividend later that reduces our investment. In this case it indicates that we have about $4.5 million that we may take out post acquisition.

Q. And that's under the line Additional Capital Required?

A. I'm sorry? No. If you take the difference between the 38 million and the cash required of 33.5 down at the bottom, that's the 4.5

million, and the reason it's different is that of Additional Deferred Taxes Eligible Due to Consolidation, which amounted to about 9 million.

Q. And how is that 9 million derived?

A. Specifically, I don't know. The theory is that by virtue of consolidating we may be able to use taxes at a faster rate than otherwise. I believe that's a number I got from Annette Carson.

Q. And there is some handwriting up in the upper left-hand corner of this first page that reads: "How does excess leasehold improvements affect this as well as lease on 25,000 excess space in downtown Peoria?" Whose handwriting is that?

A. That's Jim Dierberg's.

Q. And do you have any idea what that is referring to?

A. It's two different items. The excess leasehold improvements, I believe, is in the Chicago downtown office in which they had spent a fair amount of money on the facility which might be more than was needed for our purposes. The downtown Peoria offices was an older building in which there was some space which was pretty much vacant on upper floors, and we leased the whole building. So there was some cost of space that wasn't being used.

Q. And I will thank you on the record for having it today and for the opportunity to ask you a few questions about it.

Do you have any -- Approximately how many or what volume of documents do you think you have that may be relevant to your analysis?

A. The stack is probably 2 inches thick, 2 1/2 or 3 inches. Some of it may be repetitive and you may have some earlier versions of this.

Q. If you know, is it material that was all from your analysis of River Valley at or around the time of the acquisition or is some of the information related to First Banks' operation of River Valley from '96 forward?

A. No, it was all acquisition.

Q. Do you have any material related to any other of the investments of or operations of Mr. Holland and Mr. Ross that may or may not be related to River Valley itself?

A. No, I have had nothing to do with that.

Q. Has First Banks engaged in any business transactions with Mr. Holland or Mr. Ross outside of the acquisition of River Valley?

A. No.

Q. Have you had any contact with them

draft come about?

A. I had given Lewis Rice a copy of the Donaldson Lufkin originally. I don't think there was anything objectionable to it as I recall, so I don't think it was an issue. But I think they may have incorporated a couple of items out of there. But basically this is our standard agreement.

MR. MURPHY: Let's put that one to the side.

[Defendant's Exhibit 10 marked.]

Q. (By Mr. Murphy) Exhibit 10 is a document with a cover letter from Barack, Ferrazzano, Kirschbaum & Perlman addressed to Thomas Erb at Lewis Rice, and enclosed is a copy of a marked up version of the Draft Agreement and Plan of Merger. It is a document that bears an identification number running down the right-hand side of the page of HO-KPMG 006481 running through 6514. And the first page is a cover letter, and then there is a page of inserts, and then there is a page of a marked-up draft and it says Draft, and then following that are pages of the draft, including some handwritten comments, edits and some other changes.

As an initial matter on page 6483,

which is the cover page of the draft itself, there is a list of items that says Pending written in. Do you see that?

A. Yes.

Q. Do you have any idea whose handwriting that is?

A. No, I don't recognize it.

Q. Then the page right prior to that that's 6482 there is Insert 1A and Insert 17A under Recitals?

A. Yes.

Q. And take a minute to look them over.

A. (Checking exhibit.)

Q. Do you recall the insert with respect to the recitals?

A. Under 1A?

Q. Yes.

A. I remember it, yes.

Q. And do you remember when you first became aware of the proposed insert with respect to these recitals?

A. It was when one of the attorneys, I suspect it was Tom Erb, discussed it with me.

Q. And it was Tom Erb who was at Lewis Rice who was your attorney; is that correct?

A. Yes.

Q. And I don't want to get into any privileged matters; matters you discussed with Mr. Erb in an attorney-client relationship in anticipation of litigation, those sorts of things, so I would caution you not to start talking about client confidence. You still have an obligation to First Banks in that regard.

But what was your understanding as to why there was a proposal to include these particular recitals?

A. I don't recall a reason why they wanted it in there. I do recall having some limited discussion of it and recall putting it in there.

Q. And the limited discussions you had, were any of those with representatives of River Valley?

A. No.

Q. They were strictly -- Were any of them internally at First Banks?

A. No.

Q. They were all between you and counsel for First Banks?

A. Yes.

Q. The recital, the first one, A, states

that the amount of consideration to be delivered by First Banks to its shareholders of the Company pursuant to the terms of this Agreement did not take into account any claims or causes of action that the Company or its wholly-owned subsidiary, River Valley Savings Bank, may have against one or more of the United States Government, the Office of Thrift Supervision, the FDIC and other agencies and instrumentalities of the United States.

What was your understanding of the claims or causes of actions that are being referred to in this recital page?

A. I knew that they had a form of litigation relating to supervisory goodwill dating back several years, or claims I should say, against the government. I was aware of that and I can't say that I knew a whole lot about it or anything else. I understood from day one it was outside the transaction, so it wasn't something I had to be concerned with.

Q. Did you ever express an interest as to trying to include it in the transaction?

A. No.

Q. Did you ever make any attempt to value what the claim would be worth for purposes of taking

that into account in making a bid?

A. No.

Q. That Recital A also refers to an Assistance Agreement between and among Howard R. Ross and Homer J. Holland, RVSB and FDIC. Did you ever review that Assistance Agreement?

A. No, I did not.

Q. You stated that you were aware from the beginning that the claim or cause of action was not to be part of the transaction. How did you get that understanding?

A. I should say I was aware from the time that we did the due diligence. I think that's when it came up. But I think it was Homer that indicated that they had some kind of claim out there and they wanted to reserve that.

Q. And when Mr. Holland made that indication was that during the one day of meetings and review at Peat Marwick that you conducted?

A. That's right.

Q. And what was -- Basically what do you recall about that discussion?

A. Very little. It was a comment in passing and it meant nothing to me as far as this transaction. I didn't see what the value of the

claim might be or know much about it.

Q. Then the second recital there is Recital B, still on that page, states the amount of consideration to be delivered by First Banks to its shareholders of the Company pursuant to the terms of this Agreement would have been greater if the supervisory goodwill acquired by RVSB had been deemed to constitute capital as provided in the Assistance Agreement described in the preceding paragraph and had been used by RVSB to support increases in its deposits and earnings.

As an initial matter what is your understanding what "supervisory goodwill" was?

A. Well, I did understand there were a number of litigation cases out there, claims, and I understood it to be similar to many other thrifts where a certain amount of goodwill had not been offset against capital for purpose of determining capital ratio for regulatory purposes. I also understood that since FIRREA came along that treatment was discontinued. So I understood what supervisory goodwill was. I knew about the debentures and recognized that there was a value attached to that from the standpoint of operating the thrift.

Q. You know, you stated that there was some sort of a value ascribed to the supervisory goodwill. How would one determine what that value would be?

A. I'm not sure I know because I wasn't there at that time and I didn't really go through it. It was a matter of cash that you do or don't have or have to invest, I should say, in the bank.

Q. Did First Banks do any alternative modeling or valuing of River Valley with assumptions relating to the inclusion of any supervisory goodwill?

A. No.

Q. When discussing supervisory goodwill as included in Recital B, is that meant to be limited to goodwill itself or is that including things like subordinated debentures we discussed or are there other incidents of regulatory capital that are being referred to here or is that just goodwill itself?

A. In this case it seems to strictly address the supervisory goodwill.

Q. Were you aware of any other elements of incidents of River Valleys' regulatory capital that had been impacted by FIRREA?

A. I was aware of the debentures, but I

didn't go into it to any great extent because I believe at that point in time from our standpoint it was moot. It didn't make any difference.

Q. And why was it moot from First Banks' perspective?

A. Well, because I think the enactment of FIRREA made the determination and we just couldn't consider them.

Q. And how did the fact that you could not consider the debentures for capital purposes affect any dividend that First Banks did following this acquisition?

A. Well, this is not a calculation we made because we weren't there, and there is no sense in calculating what isn't there. But just from a logic standpoint if you had some amount of whatever, whether it's goodwill or debentures or whatever that counts as regulatory capital. You have a finite amount of assets. Your capital is higher because they are there, which means you have some ability either not to inject capital or to reduce the amount of capital that's there, which gives you a right to reduce your investment. That's the logic of it.

Q. And the last clause of that paragraph, Recital B reads: "And had been used by RVSB to

support increases in its deposits and earnings."
Did you have any understanding as to whether or not RVSB intended to use the supervisory goodwill it had to increase its deposits or earnings?
A. We didn't have any discussions on that.
Q. And were there any discussions internally at First Banks about that time?
A. About this statement?
Q. Yes, about that statement.
A. No, I don't believe so.
Q. When these recitals were first presented to you did you -- what was your opinion of them? Did you not want them in; did you deem them of no importance to First Banks; or did you say, 'That sounds like a good idea, let's include those'?
A. I viewed them as accurate statements, but not meaning much to us.
Q. Do you know if -- Do you recall if you suggested any changes to the language of the recitals?
A. I don't know on that.
MR. MURPHY: Let's go ahead and mark the next exhibit.
[Defendant's Exhibit 11 marked.]

something where he made a request and First Banks viewed it was simple enough to do?

A. He had called me and we had talked about it. Basically, it didn't matter to us. We just structured it in a way that was acceptable to him. He had specifically requested the letter of credit.

Q. Did that affect the total amount paid at all, the purchase price?

A. No, it didn't, other than we paid interest on the note.

Q. And that's the interest rate that's described here?

A. Yes.

Q. 35 basis points less than the LIBOR rate?

A. Yes. That's correct.

MR. MURPHY: Mr. Blake, I have nothing further at this time.

I understand that Mr. Bergman may have a few questions.

EXAMINATION

QUESTIONS BY MR. BERGMAN:

Q. Mr. Blake, I think I may have understood you to say that the supervisory goodwill

and sub-debt somehow enabled First Banks to dividend more at the close of the deal. Do I have that right?

A. I misspoke myself. It would have if it had existed.

Q. But to your recollection it did not exist at the time?

A. It did not exist.

Q. Explain to me how -- If there had been goodwill, sub-debt, capital credits that were treated as capital for regulatory purposes, how would that have affected First Banks' acquisition?

A. Let me walk you through it.

Their book of stockholders equity was somewhere in the range of $24 million at the time. If they had, say, $10 million of other elements that were available to count as regulatory capital such that their regulatory capital was $34 million and the amount of assets were the same, there would have been excess capital that we could draw out, which would gives us the ability to reduce the amount of cash that we would have had to tie up in a subsidiary and thereby reduce our overall investment. Now, the offset, that is if it had been there, they would have probably wanted to have been

paid for it and so the purchase price would have went up as well.

Q. And you believe you would have been willing to pay a higher purchase price if the regulatory capital had been there?

A. We would have paid a higher purchase price, but probably not every dollar of it.

Q. That's true even if River Valley were of the same asset size or the same size as it was when you acquired it, you would have paid more?

A. Yes; that's correct.

Q. And I think I understood you to say earlier that if River Valley had had a larger balance sheet you would have paid more for it as well; is that correct?

A. Yes.

Q. Did you say that there was more competition from other buyers when a thrift is bigger?

A. Yes.

Q. What is the significance of that?

A. As you introduce more buyers into the bidding the prices tend to get higher.

Q. So the premium to book value tends to get higher?

Q. So if River Valley had been able to use the $40 million of NOLs they would have achieved $14 million after tax saving for themselves and they would no longer have had the NOLs to sell in the deal with First Banks?

A. Right.

Q. And is it likely that you would have paid $3.6 million less for River Valley?

A. Yes.

Q. So the after tax consequence to River Valley or Holland and Ross is they would have had $18.2 million less than they got in the actual sale to First Banks?

A. Something close to that, yes.

Q. Now, since this doesn't have a Bates stamp let me go through some mundane matters with you for me.

Could you confirm for me that Exhibit 8 is six pages?

A. That's correct.

Q. And is this a document that you prepared?

A. Yes, it is.

Q. And in the regular course of business?

A. Yes.

Q. And you have maintained it in the regular course of business?

A. Yes.

Q. And is this a true and correct copy of the document?

A. Yes.

Q. Is it your handwriting on the first page? Anyway, there is some handwriting that crosses out some of the numbers and someone wrote in some new numbers. Is that your handwriting?

A. Yes, it is.

Q. Do you know why the numbers are crossed out?

A. Yes. We did our credit due diligence after we had an oral agreement, and while we were working on the definitive agreement there were some adjustments because there were some credit problems with a few loans, and we agreed to reduce the purchase price from the $38 million down to $37,694,000.

Q. Is this Exhibit 8 the document and the analysis that was used to arrive at the final purchase price?

A. Yes. Well, let me say that we had already arrived at the $38 million, but we were

continuing to refine these numbers, yes.

Q. Is this the last of the analyses that you prepared before entering into the definitive agreement?

A. The last one I found.

Q. Could you just walk me through this again? On Exhibit 8 there is one that says Valuation of Tax Loss Carried Forward. There's that $3.7 million figure we have been talking about, and it says 17 years, and I think at one point you said in your mind you remembered 15 years instead of 17 years. What is the significance of the 15 to 17 year number?

A. Under the tax regulations that existed at that time you had what I thought was a 15 years period which you could carry forward. So if you have a loss you had the next 15 years to offset it. And so that's the maximum period. I don't know why we used 17 there, if there was something unique about that or not.

Q. And you said there was a restriction. So you couldn't use the $40 million in year one, you could only use $2.5 million in year one; is that right?

A. Yes.

Q. And when you finally acquired River Valley you did, in fact, acquire the mortgage servicing operation as well?

A. Yes, we did.

Q. And is it safe to assume then that the purchase price was somewhere between, that you attribute to the mortgage servicing portfolio, was somewhere between 7 1/2 million and 15 million and probably closer to the lower end?

A. It was probably close to the 7 1/2 or use the percentage 1 1/4 percent.

MR. BERGMAN: That's all I have. Thank you.

EXAMINATION

QUESTIONS BY MR. MURPHY:

Q. Mr. Blake, I have two follow-up questions. I'll make my every best effort to leave it at that, too.

Do you have any understanding as to had River Valley remained independent, First Banks had not acquired it, do you have any understanding as to what extent, if at all, River Valley could have used its NOLs in the subsequent years?

A. I'm not sure I understand the question.

Q. If First Banks had not acquired River

Valley and as a result had not acquired River
Valley's operating losses for tax purposes, and
River Valley had remained independent and retained
those NOLs do you have any understanding of the
extent to which, if at all, River Valley could have
used those NOLs?
A. It would have been able to use them to
the extent of their taxable income. I'm not sure if
that's what your asking, but --
Q. Did First Banks do any analysis or
modeling projecting out River Valley's income or
performance in the hypothetical scenario of River
Valley remaining independent and not being acquired
by First Banks?
A. No, we didn't.
Q. And you mentioned Mr. Pikus. How many
times did you meet with Mr. Pikus?
A. I'm not sure I ever met him. I talked
with him a number of times on the phone.
Q. Approximately how many times?
A. Maybe 12 or 15. A lot of the
day-to-day questions that came up I talked to him
about.
Q. And do you recall generally what sorts
of questions you posed to Mr. Pikus?