# EXHIBIT I

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**HOMER J. HOLLAND FACT DEPOSITION DESIGNATIONS**

7/19/2000 Tr. 9:9-10:9
7/19/2000 Tr. 55:7-56:2
7/19/2000 Tr. 58:24-59:9
7/19/2000 Tr. 75:4-11
7/19/2000 Tr. 82:6-13
7/19/2000 Tr. 103:4-104:21
7/19/2000 Tr. 111:3-112:4
7/19/2000 Tr. 120:22-25
7/19/2000 Tr. 144:21-145:3
7/19/2000 Tr. 146:16-147:25
7/19/2000 Tr. 176:11-21
7/19/2000 Tr. 178:24-180:14
7/19/2000 Tr. 190:11-12

7/20/2000 Tr. 36:7-18
7/20/2000 Tr. 45:5-23
7/20/2000 Tr. 72:6-12
7/20/2000 Tr. 97:4-25
7/20/2000 Tr. 101:3-16
7/20/2000 Tr. 124:14-17
7/20/2000 Tr. 149:8-21
7/20/2000 Tr. 150:7-9
7/20/2000 Tr. 164:12-165:7

7/21/2000 Tr. 5:10-14
7/21/2000 Tr. 37:22-38:5
7/21/2000 Tr. 41:11-42:17
7/21/2000 Tr. 45:19-46:23
7/21/2000 Tr. 130:2-16
7/21/2000 Tr. 130:17-131:1

8/6/2000 Tr. 6:9-7:5
8/6/2000 Tr. 37:16-38:4
8/6/2000 Tr. 38:5-14
8/6/2000 Tr. 48:24-50:9
8/6/2000 Tr. 50:10-51:19
8/6/2000 Tr. 56:18-60:18
8/6/2000 Tr. 66:21-68:15
8/6/2000 Tr. 87:11-17
8/6/2000 Tr. 94:17-95:3
8/6/2000 Tr. 104:22-105:20
8/6/2000 Tr. 118:20-120:15
8/6/2000 Tr. 157:4-159:10
8/6/2000 Tr. 169:13-18
8/6/2000 Tr. 170:7-9

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - X

HOMER J. HOLLAND AND :
HOWARD R. ROSS, :
Plaintiffs, :
v. : No. 95-524C
THE UNITED STATES OF :
AMERICA, :
Defendant. :

- - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, July 19, 2000

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by EVADNEY ROGERS KEY, a Notary Public in and for the District of Columbia, taken at the Law Offices of Arnold & Porter 555 Twelfth Street, N.W., Washington, D.C., at 9:53 a.m. on Wednesday, July 19, 2000, and the proceedings being taken down by Stenotype by EVADNEY ROGERS KEY, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:

DAVID B. BERGMAN, ESQUIRE
Law Offices of Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474

On behalf of the Defendant:

PATRICIA A. SMITH, ESQUIRE
PATRICK T. MURPHY, ESQUIRE
JEFF NIELSEN, ESQUIRE
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Q. What type of testimony would you have been providing there?

A. There, I would have made the case for us being able to inspect the property that was the security for the loan.

Q. Other than that trial testimony, have you ever testified at trial before?

A. No.

Q. If you could, Mr. Holland, please just go through your education from high school forward.

A. I went to school at the United States Military Academy at West Point. I graduated there in 1963. While I was in the Army, the Army sent me to school at MIT for two years. I received a master's in physics and a master's in electrical engineering. And then while I was in the Pentagon, I went to school nights at George Washington University and received a doctorate of business administration.

Q. What year would that have been that you received a doctorate in business administration?

A. 1972.

Q. How about high school? Where were you living at that point?

A. I grew up in a small town in Southern Wisconsin called Mukwonago, so I went to Mukwonago Union High School. That's M-u-k-w-o-n-a-g-o.

Q. Other than the education you've just listed, any other type of training, professional certifications, that you've had over the years or received?

A. No.

Q. If you could now just list or identify -- and I may come back and ask you some questions about certain positions -- but if you could just list the various positions you've had since graduating from West Point in 1963.

A. My first two years after West Point, I was a Second Lieutenant and then a First Lieutenant. I was with the 82nd Airborne Division at Ft. Bragg, North Carolina. After Ft. Bragg, I went to MIT for two years. Then I spent a year in Vietnam with the 101st Airborne Division and was a captain there. And then I came to the Pentagon. I was in the Army Chief of Staff's office and was promoted to major when I was there.

Then I joined the First National Bank

A. I seemed to be spending most of my time with respect to Gilldorn.

Q. Who was playing the active role at Rock Falls?

A. Of the three of us, Norm Kost was playing the most active role.

Q. What role did you play in the '85, '86 time frame?

A. As a very interested investor on the board, I reviewed the various decisions that both the president and Norm Kost would be making.

Q. How did your role change towards the end of 1986?

A. At the end of 1986, Howard and I purchased Norm Kost and John Coblentz's stock. And as I had exited from Gilldorn, which was then an Enterprise, I spent a lot of my time at Rock Falls.

Q. Did you hold a specific position at Rock Falls?

A. I don't recall.

Q. Why did you and Howard Ross purchase all of the stock?

A. We -- basically, we decided to go separate ways between Norm and John staying at

Enterprise and my going with Howard and with Rock Falls..

Q. So Norm and John took positions with Enterprise or they were working with Enterprise still with Holland Partners, Inc.?

A. They were working for Enterprise, but then they took positions with Enterprise.

Q. What was the status of Holland Partners, Inc., then?

A. At that point, Holland Partners, Inc., was really doing consulting for Rock Falls.

Q. And who comprised Holland Partners, Inc., at that point?

A. At the end of '86, I believe it was just me.

Q. Did it ever increase in size after that?

A. Yes. In '1987 we hired Steve Bangert and Richard Dalton.

Q. Anyone else that you hired over the years?

A. Ron Pikus, P-i-k-u-s; Sharon Kristof, I believe K-r-i-s-t-o-f; I believe my wife worked for Holland Partners, Penny Holland. I believe Susan Ells, E-l-l-s. Her name was Vranes at that

was Rock Falls the only client of Holland Partners, Inc.?

A. Yes.

Q. Through the time that Mr. Pikus, Sharon Kristof, your wife and Susan Vranes were there, did Holland Partners, Inc., have any clients other than Rock Falls or the River Valley entities?

A. No.

Q. Did Holland Partners attempt to pursue any type of other business?

A. No. Well, I take that back. I do recall that we had some consulting arrangement that Ron Pikus and Sharon Kristof worked on, but I don't think it was -- I think that was more someone came to us than we were actually pursuing the consulting business.

Q. And you ultimately didn't pursue it?

A. We ultimately did the business.

Q. What type of business was that?

A. It had something to do with mortgage servicing. It had something to do in the arena that Sharon and Ron were expert in.

Q. When you hired Mr. Bangert, what did you understand to be his background or expertise

that he was bringing to Holland Partners, Inc.?

A. Asset liability management.

Q. Anything other than that?

A. That's fairly broad.

Q. Were there specific areas of asset and liability management?

A. I was just impressed with the way he approached it where he would do a market to market of the balance sheet on an ongoing basis.

Q. How did you know about Mr. Bangert?

A. Some time prior to that I had looked at Empire Savings in Denver, and I can't remember who it was that had me look at them. It was someone that was interested in investing in Empire Savings. And Steve had been an employee of Empire Savings. As I said, I was very impressed with the way they approached their management of the entire balance sheet.

I subsequently learned that Empire was acquired by another entity. I believe it was a utility. I'm not sure now. And when I learned that he might be available, I approached him and told him what Howard and I were planning to see if he would have an interest in joining us.

Q. What did you tell him in terms of what

anticipated after the end of '88 that we would continue to do that, and so we looked at lots of different opportunities.

We were following FIRREA but I don't think we really appreciated how dramatic an impact that would have on us really until 1991 when the regulators kind of forced us into a supervisory agreement; and really then it was a matter of restructuring and shrinking and doing everything else we could to survive that. Some of that I really don't want to remember.

Q. You indicate that in '87 and '88 and thereafter you were interested in looking into acquisitions. Why was it that you were interested in acquiring other institutions? I'm trying to figure out what the goal was that you had in mind.

A. I guess in a general sense I looked at savings and loans as a balance sheet where you acquire assets, you fund those assets with liabilities, you make a spread on that. The larger we were, the larger the amount of spread, the more income we would make as a whole which is a reasonable goal, in and of itself.

Through the acquisitions in 1988, we

A. I don't remember our capital at this point, but most everything was defined by levels of capital.

Q. You talked earlier about it was the intent or desire to grow what initially was River Valley, Rock Falls. Was there an ultimate size that you anticipated that you might want to grow to?

A. No. We didn't have any limit on what we -- our constraint was capital.

Q. There was no vision of you want to be this large?

A. No.

Q. Generally in the marketplace, would you say there were constraints other than capital that would have limited how large you could have grown?

A. We were reasonably disciplined in terms of making sure that any acquisition we did was a good deal. So we might well not do a deal if we didn't think it was going to -- that we were going to get it at a price that made sense. But other than that, capital was our primary constraint.

Q. Prior to FIRREA, were you and

Q. And do you recall why that deal did not go through?
A. No.
Q. The purchase price you indicated was about $3.7 million?
A. 2.7.
Q. How much did you actually invest?
A. My share of the investment was --
MR. BERGMAN: This is initially?
MS. SMITH: Yes.
THE WITNESS: Let's see. I think I could probably figure it out.
Four-fifths of 1.4, so a little over half a million dollars.
BY MS. SMITH:
Q. And the 4/5 of 1.4, you're basing that on -- what does the 1.4 represent?
A. I said we paid 2.7. Half of that Howard Ross invested, then we -- among Holland Partners, among the three of us it was 2/5 for me, 2/5 for Norm Kost and 1/5 for John Coblentz, which we put in our share in proportion to that. That totalled the 1.4 or 1.35. 2.7 is correct.
You follow that?
Q. Right. So you were 2/5?

A. I was 2/5 of the 1/2, so I guess that's 2/10. Well, that works out easy; if I had just figured that out in the first place. So 5.4, then, or $540,000.

Q. And Howard Ross would have put in half?

A. That's correct.

Q. What was your subsequent investment when you bought out Coblentz and Kost?

A. I remember we paid them -- let me think for a second. We paid them twice what they invested, as I recall. And if I use those same numbers, that would have been approximately a million, six. I'll go through my math again.

Q. 2 X 3/5, then divided by 2 for each of you?

A. Okay.

Q. What amount did you think that was, approximately?

A. Well, I was going to say 1.6. I was going to say that.

Does that work out?

Q. I'm too lazy to do the math right now, but as long as we know where the numbers are coming from.

term prior to the bidding conference?

A. No.

Q. Did you attempt to make a bid through Rock Falls?

A. Our initial expectations that we would use, that it would be a merger of these entities with Rock Falls. And, in fact, it was largely as a result of that that we had the commitment from the American National Bank for the amount of subordinated debt that we could use to add to our capital to be able to acquire these other institutions.

I do not recall whether we made the initial proposal as part of Rock Falls or we ended up choosing not to do it that way in the initial proposal.

At any rate, during the process we concluded that it was better to do it as a separate entity than as a part of Rock Falls.

Q. Do you recall why you concluded that?

A. The tax laws carry forward limitations was based on what percentage of an entity's deposits that had the NOL's were to the total. And since we had three entities of different sizes, if we put the three together, which we

knew we had to do, we would use Galva's NOL's. If we had put all three together with Rock Falls, we would also have lost Mutual of Canton's NOL's, so it was largely driven by the tax rules.

Q. And if you can just describe what happened with the bidding process. You went to the bidding conference and then what happened next?

A. We went to the bidding conference. Since this was relatively new to us, and it was really new to most people in Illinois at that time, I believe. We hired an attorney from Jones Day to guide us through this, and he had been in the general counsel's office of the Federal Home Loan Bank, so we got some help in drafting a proposal.

Q. Do you recall his name?

A. Peter Barnett.

We submitted our proposal on the date it was required. I believe that was in October of '87. And we didn't hear anything back for quite some time. I kept bugging Peter and saying what's happening? He couldn't find out anything.

The next step in that was that I called on Jay Earle and said I was going to be in D.C.;

a deal done in March, now it started like they wanted to renegotiate it again, so we had to go back through many of these same points.

Q. Do you recall specifically what points you had to go back over? And this would have been with Herb Held?

A. This was with Herb Held.

Herb wanted to get out of the preferred stock. He did not want to invest in us in the preferred stock. I don't know whether that was the difference between Jay Earle or Herb Held or it was a difference in the policies of the FSLIC at the time. And I said that was an essential part of this, as far as I was concerned.

But what we did agree on was somewhat of a middle ground in that I agreed that the preferred stock could have an additional dividend rate on it if we were very successful. I don't remember the precise formula, but it was an enhancement of the value of the preferred if we were successful.

Q. Anything else that you can remember having to go back over with Mr. Held?

A. It's funny how your memory is more of emotions than specifics.

I suspect it was with Chicago but I'm not positive. And if it was with Chicago, then Helen Mirza was the one that was handling these transactions.

Q. How involved was Howard Ross with the various dealings with Helen Mirza, Jay Earle, Herb Held and many of the other regulators?

A. Very early on we were together trying to decide what to do on each of these. He and I had the meeting in Washington with Jay Earle, but then I was really the one that did all the follow-up. He and I would go over the terms and debate what was acceptable to us.

I remember in the Republic deal when I said, you know, I really want to take a walk from this. I just don't feel like -- I think we haven't gotten a good deal, I went to him. We talked about it and he concurred. So he was involved from really knowing what was going on, but I did most of the direct negotiations.

Q. Do you recall how it was decided that you would do the direct negotiations and not Howard?

A. I often said that we would kind of split up our roles where Steve would manage the

balance sheet, it was my job to build the balance sheet, and it was Howard's job to help us with the capital as we needed it through this process.

Q. Do you know whether there were any other bidders for the Peoria acquisition?

A. I think that was one that we did hear when we did the due diligence at Peoria Savings, that they hadn't had anyone else come in and do due diligence. But whether others made proposals, I don't know. There may have been some after that.

Q. Do you recall whether from the initial proposal it was determined that you would try and acquire Peoria through River Valley FSB as opposed to River Valley, Rock Falls?

A. We just felt operationally that made the most sense.

Q. And why operationally did that make the most sense?

A. The operational -- all of the management people with respect to FSB were in Peoria. Peoria Savings was in Peoria, so it made the most sense to have the two of them together. That was one of the considerations. I don't really remember the others.

Q. At the time when you realized that Galva Home Mutual would be separate from Rock Falls, did you anticipate that you would merge them together?
A. Yes.
Q. Did you have any kind of an expected period of time when you thought the merger would take place?
A. I thought that it would be as soon as the tax issues were behind us, and I don't remember what it was in the timing that would make that happen.
Q. Was there anything other than the tax issues that you can recall that was making you wait in terms of merging the two institutions?
A. Well, we ultimately got into a -- after FIRREA and after the severity of the breach became clear, we ended up being forced into a supervisory agreement by the regulators. One of the things that we were trying to do to make the best use of our capital was where we were -- the brunt of the impact of FIRREA was on FSB. That's where we had $8 million of capital credit. We had $4.6 million of subordinated debt. We had the $5 million of preferred from the FSLIC and

the $5 million above the preferred that we put in with Peoria Savings. All of that was disallowed as capital, so we really took it on the chin there.

Whereas, with respect to Rock Falls, we had $2 million of subordinated debt and $5 million of capital credits, but we had 6 or 7 million of tangible net worth that was the retained earnings that had come from Rock Falls. So under the new paradigm we were more heavily capitalized in Rock Falls relatively than we were in FSB.

We then went through a number of capital structuring events to be able to keep the total River Valley from being taken over. And one of them was to put the two together so that we would get the benefit of the capital that was in Rock Falls to support the assets in FSB.

Your question had to do with anything else preventing us. As I recall, we had that and a couple of other transactions that we were asking the regulators for approval, and they wouldn't approve it until Howard and I put additional capital into the entities and then they would approve it.

we had anticipated and that they could have wiped out the net worth of the institution.

We hoped that we really understood the risks better than other people and that while in general people would look at S&L's as extremely risky transactions that we would be good enough to understand those balance sheets, operate with those balance sheets and, in fact, we weren't taking on as much risk as most people would perceive.

Q. In hindsight, by taking into account that you had use of the capital and you didn't have to pay out for the subordinated debt and assuming you received guarantee fees, would you still say that that wasn't reasonable compensation, that you didn't receive reasonable compensation, vis-a-vis the guarantee fees?

A. You don't price things based on hindsight. If you could, then there would be no risk. I don't think I agree with your original hypothesis.

Q. Any understanding of what type of a guarantee fee would be fair compensation, how you would determine that measurement?

A. I guess the real answer to that would

necessarily saying one way or the other whether it's fair or not. You're just saying they may have been measuring what was fair to the institution as opposed to what was fair to you?

A. That's correct.

Q. Can you point to anything that you would see as the difference between those two in terms of fairness to the institution versus fairness to you and Mr. Ross in determining what the fee would be?

A. What the Board of Directors had to be sure is that we wouldn't be overcompensated. That doesn't necessarily mean that's what we or anyone else would accept as compensation. We guaranteed it irrespective of the compensation in the form of fees. If you can refresh me on the fees, I can maybe talk a little bit more precisely on it.

Were the fees, from the beginning, was that part of the original contract?

Q. Maybe tomorrow I can show you some documents. I don't want to get into that, delve into that too much right now.

With respect to the Peoria acquisition, was there a cash contribution as part of the

transaction by yourself and Mr. Ross?

A. We proposed that we have infused $5 million of capital, again being provided by the American National Bank. Actually, I don't remember. I don't remember if we borrowed the $5 million and put it in ourselves or whether American has to put it in.

Q. Just so I'm understanding, you're not sure whether there was subordinated debt?

A. I know it was not subordinated debt. I know it was preferred stock. I know at one time American National saw an advantage of holding preferred stock because of the tax benefits that a corporation gets in the holding of preferred stock so that they a would get a higher effective return by holding the preferred stock.

I don't know whether that was done day one with Peoria Savings or if that was done subsequently. My general idea is that we borrowed the money from American National Bank personally and then put it in the form of preferred stock, but I can't be sure.

Q. Do you recall whether the debt was serviced out of your own personal funds or through River Valley?

A. If we had as my first recollection would have it that we borrowed the money, purchased the preferred stock in River Valley, then the dividends from the preferred stock would have been used by us to pay the interest to American National. I do know that at some point -- and I don't remember if we agreed to doing it that way that I just described first and then before the deal was closed we changed it or if subsequent to that we changed it, but I do remember that at some point the preferred stock was held by American National. Instead of us borrowing the money directly, we agreed to a put option, I believe, in this case.

Q. Do you recall how the $5 million amount was determined?

A. I don't. I suspect it had something to do with what American National was willing to do. And, again, it was to -- it was our proposal to the government with respect to Peoria Savings.

Q. Can you point to any specific opportunities that you had to forego because of the $5 million investment with respect to the Peoria acquisition?

A. No.

public announcement, so we had a lot of things going on. Worrying about exactly how to amortize the goodwill in those first few months was not my highest priority.

Later as I looked at it, I realized that we had been too aggressive or too conservative, however you want to look at it, and would have gone back to the original agreement and dealt with the accounting as outlined in the original agreement.

Q. Are you a CPA?

A. No.

Q. Did you discuss this with any accountants, this issue?

A. Well, Ron Pikus was a CPA and he was in our organization at this time. And I don't remember precisely discussing it. I do remember that the accountants in their audits would make essentially two different, provide you with two different balance sheets; one based on GAAP accounting and one based on regulatory accounting.

Q. Do you know whether there are rules and regulations that govern the amortization of capital credits?

UNITED STATES COURT
OF FEDERAL CRIMES

COPY

-----------------------------)
HOMER J. HOLLAND and )
HOWARD R. ROSS, )
)
Plaintiffs, )
)
v. ) No. 95-524C
)
THE UNITED STATES OF AMERICA,)
)
Defendant. )
-----------------------------)

Deposition of HOMER J. HOLLAND, called as an adverse party by and on behalf of the Defendant, pursuant to the Rule 4:5 of the Supreme Court Rules of Virginia, taken before Lori M. Gerczak, Notary Public within and for the State of Virginia, at Large, at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., on Thursday, the 20th day of July, 2000, commencing at 9:36 a.m., pursuant to notice and agreement of Counsel.

APPEARANCES:

David B. Bergman, Esq.
Walter F. Zenner, Esq.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004,

on behalf of Plaintiffs;

Patricia A. Smith, Attorney
Patrick T. Murphy, Esq.
United States Department of Justice
1100 L Street, N.W.
Richmond, VA 20530,

on behalf of Defendant.

ALSO PRESENT: Jeff Nielsen,
Consultant for the Government;

Videography by Alderson Reporting.
Exhibit index at conclusion of transcript.

capital treatment to be afforded to the capital credit with respect to the Republic acquisition?

A My recollection would be that it would be treated as regulatory capital and in the context of all of the discussions, felt that it would be -- would not be amortized.

Q Initially was River Valley Rock Falls amortizing?

A Initially our accountants who were familiar with GAAP and really weren't as closely tied to these assistance agreements and to the overall transaction and the deal that we did with the Government, I believe they used GAAP with respect to all the intangible assets; so that they amortized, as I mentioned to you yesterday, they amortized the regulatory capital and the initial statements. That's my recollection. And they also amortized the goodwill faster than was required under RAP.

Q Could you state all that again --

A Certainly.

Q -- or I can have the court reporter read it back --

A Certainly.

Q -- but I lost you there for a minute.

A It wouldn't have been unusual for an

all of these cases. The incentives with respect to Home Federal, Galva and Canton included them investing $5 million of capital, which clearly we expected to be regulatory capital for the duration.

Q Let me turn now, Mr. Holland, to the sale of River Valley Holdings, Inc. to First Banks. In terms of the proceeds of the sale, who received that money?

A Part of the money came to me and Howard Ross. I don't remember -- I don't remember now how -- well, I guess, in general, it came to me and Howard Ross.

Q Was there anyone else who received any of the proceeds?

A We had -- Howard had a -- an agreement, I believe, with Mark Kipnis to provide him some incentive and I don't recall what that was.

Q Do you recall whether Mr. Pikus received anything?

A I don't recall.

Q And what's your recollection of the amount from the sale?

A Round numbers, $37 million.

Q And why did you obtain a note in lieu of cash with respect to your portion of the proceeds?

is that --

A We opened a branch in Chicago that wasn't related to the acquisitions.

Q Other than that?

A I believe that was all.

Q Did River Valley Peoria or Rock Falls purchase any branches or open any new branches between January 1st, 1989 or January 4th, 1995 other than the Chicago branch you just referenced?

A I remember that we had opportunities to acquire branches, but were precluded by -- because of the capital constraints as a result of the breach.

Q So the only additional branch was the Chicago branch?

A That's correct.

Q When was the branch opened in Chicago?

A I know the location, but I don't know the date. It was at 200 South Wacker. We had another -- it was a location that we were familiar with, another institution had moved out of that location and the landlord was very anxious because it was on the first floor of a major office building in Chicago. He was very anxious to get an institution to come in there an revitalize their first floor.

Q Do you recall approximately when that would

excluding any deposits it may have acquired from Peoria or River Valley Rock Falls -- let me start that again.

Do you know whether or not River Valley achieved the projected growth of approximately $48.5 million for the period of March 31, 1988 to March 31, 1993, excluding any deposits that it achieved from the -- it acquired from either Peoria or River Valley Rock Falls?

A Well, I think as we all know, during that period of time a lot happened. And so, I doubt that we had $231 million from these three institutions in 3-31-93, but I do not know.

Q If you did not meet that projected growth, do you know why not?

A One of the reasons was that we had to shrink the balance sheet rather than grow the balance sheet after the breach by the Government and after we were put under a supervisory agreement as a result of that breach.

Q Any other reason you can point to?

A I believe that was the dominant reason.

Q Did you intentionally shrink the deposit base?

A We intentionally shrunk the asset base.

Exhibit Number 5.)
BY MS. SMITH:
Q Mr. Holland, I'm handing you what the court reporter has just marked as Exhibit Number 5. It's a -- on the top it's from Holland Partners, Inc. and it's written by Ron Pikus to Susan Mooney at Federal Home Loan Bank of Chicago as dated November 21st, 1997, with the bates range WOT 288 0020 through 0026.
And the first paragraph indicates: "Pursuant to the post closing requirements of FHLBB Resolution No. 88-638, I have enclosed a three year business plan for River Valley Savings Bank, FSB."
Did you have an understanding that you needed to submit a business plan as part of the post-closing requirements?
A Yes.
Q What would your role have been in preparing and approving this business plan?
A I would have participated in defining many of the assumptions.
Q How about with respect to approval? Who would have approved this plan?
A I'm sure I would have approved or I would have read it, I would have agreed with it, and I would have -- whether I saw the final version or not,

marketplace that we were in required an interest rate higher than what our alternative sources were, we would -- we would well accept a decline in deposits.

If on the other hand we found that we were in a marketplace where deposit were the more competitive, where we could raise money more inexpensively with the deposits than we could with other sources, then we would emphasize deposits.

Q Who was responsible for making determinations with respect to asset growth?

A At the strategic level, our asset growth was limited by the capital that we had, and so our intention was always to grow our assets. Obviously, the same thing can occur in assets. If you can't find assets that are at attractive yields, they'll be fluctuations in the market and you won't necessarily put assets on at that time.

But, I think that the -- our overall strategy was to grow the assets and to use the sources of funding that are provided with the thrift charter, and with adequately capitalized thrift, to find that with the various sources of funding that were available to us.

Q Who would determine at any given time what source of fundings to use?

areas?

A Not necessarily.

Q And why do you say that?

A I think you can have growth and deposits without necessarily being the premier provider. I think there's a little bit of marketing in here by Ron Pikus.

Q Do you know whether the River Valley network, in fact, became the premier provider of retail banking products and services in its market area?

A I think that was an objective. It's pretty hard to measure whether we were the premier provider or one of our competitors were the premier provider.

Q Which competitor, potentially, was the premier provider?

A We had several excellent competitors in the market. One of the ones was the Credit Union, which had been originally the Caterpillar Credit Union and then it went through some other changes of names, but that was one other of competitors.

Q In your opinion do you believe that River Valley became the premier provider?

A Premier, I don't know how to define that. I think we were a good retail banking operation. I

would say that we weren't always the highest -- we didn't also provide the highest interest rates on deposits.

Q Is there anything other than that factor that you would consider to be something where you would thus somehow not be the premier provider?

A I suppose one definition of premier provider would be having the most market share of retail customers. I doubt that we were that, and I don't think that that was one of the -- I doubt that that was what he necessarily meant. I think he -- it was one of Ron's responsibilities to run a good retail banking operation, and so he would say that he wanted to be the premier provider.

Q Do you know whether the growth projected in the deposit base in this business plan was, in fact, achieved?

A I do not.

Q Turning back to the page that ends bates range 0155, and I'll represent to you that the deposit to deposit plus borrowings ratio for June 30th, 1992 is 67.7 percent. If I was ask you the same series of question that I've asked with respect to that ratio with the other business plans, would your responses be the same?

Q And do you know whether the growth projected in the deposit base out to September 30th, 1992 was achieved excluding the '91 merger with River Valley Rock Falls?
A I do not know.
Q And if I were to ask you the same questions with respect to the deposits to deposit borrowings ratio, which was 63.7 percent as of 9-30-92 in this exhibit, would your responses be the same in terms of your understanding?
A Yes.
Q What's your understanding of the way and manner in which the regulators would pay attention to the River Valley's level of borrowings?
A I don't recall.
Q What's your understanding as to why the regulators would pay attention to River Valley's level of borrowings?
A I -- again, I don't recall.
Q You had indicated before that you did not believe they would allow a 97 percent ratio; is that correct?
A That's what I said.
Q What's your understanding as to why they wouldn't have allowed that?

A I guess that was an off-handed comment. I don't have an understanding as to why they would not have allowed that.

Q Is it your belief that they wouldn't have allowed that?

A I really don't know what they would have allowed.

MR. BERGMAN: It's quarter of 6:00, whenever your good to shut down, we can start again tomorrow.

MS. SMITH: It's either going to be now or 2 minutes. Let me -- I'm going to figure out. Why don't we conclude now.

MR. BERGMAN: Okay.

THE VIDEOGRAPHER: This concludes Tape 6 in the deposition of Homer J. Holland. The time is 17:45 and 36 seconds. We're off the record.

(The deposition concluded for the day and will reconvene the following morning.)

[signature]
Witness signature

Susbcribed and sworn to before me this _____ day of

________________________, 200____.

________________________
Notary Public

My commission expire: ____________________

UNITED STATES COURT
OF FEDERAL CRIMES

COPY

-----------------------------)
HOMER J. HOLLAND and )
HOWARD R. ROSS, )
)
Plaintiffs, )
)
v. ) No. 95-524C
)
THE UNITED STATES OF AMERICA,)
)
Defendant. )
-----------------------------)

Deposition of HOMER J. HOLLAND, called as an adverse party by and on behalf of the Defendant, pursuant to the Rule 4:5 of the Supreme Court Rules of Virginia, taken before Lori M. Gerczak, Notary Public within and for the State of Virginia, at Large, at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., on Thursday, the 21th day of July, 2000, commencing at 9:56 a.m., pursuant to notice and agreement of Counsel.

APPEARANCES:

David B. Bergman, Esq.
Walter F. Zenner, Esq.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004,

on behalf of Plaintiffs;

Patricia A. Smith, Attorney
Patrick T. Murphy, Esq.
United States Department of Justice
1100 L Street, N.W.
Richmond, VA 20530,

on behalf of Defendant.

ALSO PRESENT: Jeff Nielsen,
Consultant for the Government;

Videography by Alderson Reporting.
Exhibit index at conclusion of transcript.

I think that they were reasonably reliable in terms of what our objectives were with respect to growth.

Q Other than interest rates, what other factors could significantly affect how reliable the business plans were?

A Well, the most significant thing was the passages of FIRREA, which dramatically changed the nature of the capital that we had expected through the -- through those projections.

I think we mentioned yesterday that, with respect to the deposits, we had projected, or at least assumed, a growth in deposits that certainly for a period of time we didn't experience; in fact, we experienced a decline in deposits.

And some of those factors were the adverse consequences of the publicity about the S&L crisis. And as I mentioned yesterday, I thought that the Peoria Savings customers were surprised and kind of shocked that the Peoria Savings had failed.

I think the other thing that we talked about was the fact that it takes a while to merge operations, particularly when they're in the same marketplace. That had an impact on people thinking they could do business with River Valley in a new branch, but actually couldn't until the computer

indicates that you were in attendance at the meeting.

And specifically I'm going to refer you to the second page. And the second full sentence in the text after that and it reads:

"It appears that the new federal legislation will be passed on August 9 and that the more sever House version will be passed. Such version currently calls for 3 percent adjusted tangible capital (including goodwill) by June 1, 1990, with goodwill phased out by December 31, 1994.

"Our internal projections, based upon our earnings since acquisition, indicate that we would be able to meet both the June 1, 1990 and the December 31, 1994 standards."

Does this refresh your recollection as to whether prior to the passage of FIRREA you anticipated being able to meet the requirements that were expected?

A I don't have any specific recollection of this discussion, but I assume that's what I said at the time.

Q And this would indicate that as of July 1989, you expected to be able to meet the requirements of the impending legislation; is that fair to say?

A Yes, I believe that in general, and I can't remember the specifics, I believe that at the time that we were following the legislation, I believe that some of the things turned out to be more adverse to us than what we had anticipated at this time.

Q And so is it fair to say, Mr. Holland, that the indication here is that you projected that you'd be able to meet the requirements of the impending legislation based upon your internal projections of earnings as opposed to any extraordinary events?

A I don't -- honestly, I don't know what was included in those internal projections.

Q The last sentence indicates, "Our internal projections, based upon our earnings since acquisition, indicate that we would be able to meet both the June 1, 1990, and the December 31, 1994 standards."

A I don't remember the context in which I made that statement.

Q There's no indications there, at least though, that it relates to any type of extraordinary items; is that fair to say?

A That's fair to say.

(Document was marked for purposes of identification as H. Holland

would still count as goodwill -- I mean, still count as capital.

Q Do you recall whether in -- do you recall whether after the passage of FIRREA and it's implementing regulations were fully known to River Valley and Rock Falls whether -- let me restate that -- River Valley Peoria and River Valley Rock Falls that they both continued to project that they would increase their asset size?

A I don't recall.

Q If you could refer back to Exhibit 9, Mr. Holland. That again is the River Valley Savings Bank's five-year business plan, July 1990. If you can turn to the page which ends with bates 0117.

And this, Mr. Holland, I believe, is the Statement of Conditions for River Valley Savings Bank, Rock Falls, and if you look at the projected projections over time that go from June of '90 to March of 1995, does that indicate that River Valley Rock Falls believed that it was going to increase its asset size?

A That's what it would appear to be.

Q And if you turn to the page which ends with 0121, which is the Statement of Condition for River Valley Savings Bank, FSB, does that as well indicate

that River Valley Savings Bank, FSB believed that it would increase its asset size from the period of June 1990 to December 1994?

A Yes.

Q And do you know whether, in fact, they achieved the growth projected?

A I'm having a hard time keeping dates in mind as we go from one set of plans in '92 and then back to plans in '89, so I really don't remember.

Q So you're not sure whether there was growth from June '90 to the end of '94 and March '95?

A I don't -- I remember that we had, at times, had to shrink the balance sheet. I know that the ultimate constraint on our growth was the size of the capital. But I can't remember the specifics nor the specific dates. But maybe as you show me more documents, it will refresh my memory.

Q Do you recall what the -- we're looking at the two pages preferred to, can you tell where it was anticipated that growth would occur?

A Again, first it occurs on the asset side and then it's funded by a combination of deposits and borrowed funds.

Q And the growth on the asset side appears to primarily be with respect to mortgage backed

this period we had other changes that adversely effected this, and I don't remember where we are in that process. One of them was how the regulations were administered by the regulators.

Q When you say how the regulations were administered, what are you referring to?

A I mean, it's one thing to say that you're fine if you have a 1.5 percent minimum capital or whatever it was time, and then it's another when you're examined to have the regulators come back and say, well, 1.5 is not adequate, you have to have a certain higher level.

Q And it's your testimony that at some point you understood things differently?

A Yes.

Q But you're still not sure exactly what the timing of that was?

A That's correct.

Q Would it be fair to say that as of the data for July 1990, based on what you thought at that point, you were projecting growth and would not yet have had these discussions with regulators you're referring to?

A I think that the -- we were clear -- as this plan shows, we were projecting growth at that

time. It doesn't reflect, I suspect, the size of the institution that we could have been but for FIRREA, but it does show growth based on a certain set of assumptions and an accumulation of capital through retained earnings.

You asked me if we didn't achieve these growth objectives, what were some of the factors, and I said one of the factors was that throughout this process, we kept learning that our worst fears were not sufficiently worse, that things kept getting worse progressively.

And as I told you before, the most overwhelming impact or feeling I had through this whole thing was that we were going to lose virtually everything as a result of this.

Q At what point did you have that fear?

A When the regulators -- when I learned that the regulators were requiring a supervisory agreement. That was actually a negotiation and, in my understanding, between the FDIC and the -- and the OTS. It was my understanding that if the FDIC had their way, we would be either on a cease and desist or declared an insolvent.

Q Later I want to talk more about the supervisory agreement, but how -- how much time prior

redeeming that preferred stock.

Q Do you recall whether the redemption provided River Valley with increased tangible capital?

A If by redeeming -- it would not have increased our tangible capital but for the breach. Had the breach not occurred, our -- that preferred would have continued to count as capital. When they offered us a discount on it, and when the $5 million didn't count as capital at all, by being -- then became simply a liability of River Valley.

When we were able to reduce that liability for less than the face amount of it, that was record as a profit or extraordinary gain or increase in capital. I don't recall how it was counted, but it did increase our tangible capital.

Q Is it your position that this transaction redemption occurred as a result of the alleged breach?

A If we had -- if the breach hadn't occurred, we would have kept the $5 million, I suspect, an used it as capital, although I can't be absolutely sure. But it was as a result of FIRREA that they proposed that change. At the time -- at the time after FIRREA, after the breach, this didn't count as

capital, so it was in our interest to redeem it.
Q And wasn't your opinion with the breach with respect to this cumulative preferred stock?
A I believe the cumulative preferred stock in the amount of $5 million was part of the deal that we had with FSLIC. I believe I recounted this earlier, but it was FSLIC who said, We're concerned that you don't have enough capital in doing this transaction.
We had originally proposed putting $4.6 million of subordinated debt in. It was Jay Earle that came back to me and said, You don't have enough capital. And I don't remember precisely the sequence of all of this, but I do remember it was Jay Earle that said, Well, we put $5 million of capital in for you.
And he -- and I asked him, Well, in what form? And he said, Do you want it in preferred stock?
I said, How about preferred stock with an 8 percent dividend; and he said, Well, that would be fine and put that in your proposal.
So I certainly believed that that was part of the deal, they were providing capital to us in the amount of $5 million.
Q With respect to the redemption of the

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and )
HOWARD R. ROSS, )
Plaintiffs, )
) Case No.
vs. ) 95-524C
THE UNITED STATES OF AMERICA, )
Defendant. )
_______________________________)

VIDEO DEPOSITION OF HOMER J. HOLLAND
Flagstaff, Arizona
Sunday, August 6, 2000
8:38 a.m.

REPORTED BY
NAOLA C. THIMESCH
AZ CSR #50309
CRR, RPR

APPEARANCES OF COUNSEL:

For the Plaintiffs:

LAW OFFICES OF ARNOLD & PORTER
BY: DAVID B. BERGMAN, ATTORNEY
555 Twelfth Street, N.W.
Washington, DC 20004-1202
(202) 942-5474

For the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
BY: PATRICIA A. SMITH, ATTORNEY
1100 L Street, N.W.
Washington, DC 20530
(202) 353-8841

Also Present: Carol L. Shipman, video technician

BY MS. SMITH:
Q. Good morning, Mr. Holland.
A. Good morning, Ms. Smith.
Q. Welcome back.
Have you done anything further in preparation for your deposition since we left your deposition a week or two ago?
A. No, I haven't.
Q. I'd like to start this morning talking about the size of the balance sheet, both generally and specifically over certain periods of time for River Valley Peoria and River Valley Rock Falls.
Do you recall generally, with respect to the balance sheet, whether it grew, shrunk, or went up and down between the periods of 1989 and 1994?
A. I believe -- and these are just general recollections. I believe that during the 1989-1990 period we would have stayed somewhat stable, that there perhaps was some growth during that period. But the most significant recollection I have is the -- after the -- I guess I would say the enforcement of FIRREA that occurred in early 1991 as a result of -- as a follow on to an OTS/FDIC examination, we started the process of restructuring the balance sheet to increase capital or to change -- to increase the

capital to make up for the capital that had been eliminated through FIRREA. And then to start the shrinkage of the balance sheet.

I'd have to -- I don't have much more specific recollection than that.

Q. Okay. So prior to what you're referring to as the enforcement of FIRREA after the OTS/FDIC exam in early '91, you don't recall any specific shifts in the balance sheet, either up or down?

A. I don't remember any major events that occurred during those periods.

Q. And that would be with respect to both River Valley Rock Falls and River Valley Peoria?

A. That's true. And as you know, the two of them were merged sometime during that period as well. My general recollection would have been that that would have been in 1991.

Q. Okay. I'm going to ask you about some specific time periods and generally indicate to you what the shift was, just to see if that brings back any recollection as to why it came about or how it came about.

The first period of time I want to focus on is with respect to River Valley Rock Falls. And the total assets increased from June 30th, 1989, to

A. I can't be sure that it was solely, but that would be my general recollection.

Q. Do you know how this would have impacted River Valley's balance sheet? This being the issue that's being related here with to -- with respect to tax strategies.

A. How would the tax losses have affected River Valley's balance sheet? Were you going back to the fact that we reduced the assets?

Q. Whether or not you know whether an attempt to deal with this issue would have resulted in a decrease in River Valley's total assets.

A. I don't have any recollection of that.

Q. I want to switch topics a little bit now, Mr. Holland.

Do you believe River Valley Peoria or Rock Falls experienced any deposit outflows due to the alleged breach?

A. Seems to me that we discussed this a bit again last time. I can't think right now of any specific deposit outflows that were tied directly to the reduction in our capital that was a result of the breach.

I think I -- I think what I did say before is I thought that the publicity relating to FIRREA and

the hearings and everything like that did not make it -- made it more difficult for thrifts in general. But I can't -- I can't speak to any specific outflow as a result of the breach.

Q. And just to be clear, your prior testimony did indicate that there were some deposit outflows that were not related to the breach; is that fair to say?

A. Yes.

Q. Do you believe River Valley Peoria or Rock Falls experienced any increase deposit rates due to the alleged breach?

A. I don't recall anything that would lead to that.

Q. Do you recall how River Valley Peoria and River Valley Rock Falls set their deposit rates?

A. Generally it was looking at deposits as a source of funding and comparing -- comparing the deposit interest rates to other -- to the other costs that were in the marketplace. But that was tempered by what the -- what the deposit market was in the -- at the offices in which we were operating.

So I guess in general it was understanding what the competitive rates were in the market we were in and also what our alternative source of funding

I don't know you can ever have -- you can never be perfect in having the documentation that they would like to see. But I think in general, again, they didn't express serious concerns about either the documentation or the securities themselves in the examinations we had prior to this.

Q. Do you recall efforts by River Valley to improve the documentation relating to the rational for the investments after the regulators expressed concerns?

A. I'm sure we did.

Q. But you don't recall anything relating to discussions that may have been had within River Valley to improve that?

A. No.

MR. BERGMAN: At a good point, can we take a break? Do you need to stretch your back?

THE DEPONENT: I would.

MS. SMITH: This is actually a good point.

MS. SHIPMAN: We're going off the record at 9:57.

(Recessed from 9:57 a.m. to 10:08 a.m.)

MS. SHIPMAN: We're going back on the record at 10:08.

Q. BY MS. SMITH: Mr. Holland, the pay down of 6 million of River Valley Holding's $7 million

indebtedness to American National Bank, which was done as part of the August 14th, 1992, acquisition of San Antonio Federal Savings Bank, or to allow that acquisition to occur, as you've testified to, would you agree that it was your decision that the efforts to do that, to acquire San Antonio Federal Savings Bank, was, in your opinion, an optimal use of that $6 million?

Did that make any sense or do I need to reask that?

A. No. I think I understand your question.

We had already shown that the -- by eliminating the 6 million of capital from River Valley, we reduced our earnings by a million two. So I was giving up, effectively, a million two of earnings by taking that 6 million out. And could I make that up -- I must have thought I could more than make that up in San Antonio Federal Savings Bank, I think is your question.

Q. Basically probably that it was -- in your opinion it was -- the optimal use of the funds was to acquire San Antonio Federal Savings Bank as to keeping it in River Valley Peoria?

A. I mean, we clearly wouldn't have done it unless we thought it was a better use of our limited

amount of ability to raise capital from American National.

We had projected substantial earnings from San Antonio Federal Savings Bank, in part because of built-in gains by the way we were acquiring the San Antonio Federal Savings Bank. So, you know, we saw that as -- best of all worlds we could have done both, but because of the breach we couldn't do both. So we did it the way that we could do it.

Q. Do you have any understanding as to how, if you'd ever heard about San Antonio -- so you didn't know about it, didn't acquire it separately or didn't acquire it through River Valley.

How the asset size, capital structure and profitability of River Valley would have differed from how it was in actuality? So that would assume that the 6 million of capital stayed in River Valley as opposed to being deployed elsewhere.

A. How it would have deferred if we had not taken the 6 million out?

Q. Yes.

A. You know, I've talked continuously about we would have used -- we -- if we had more capital, we would have used it to grow the balance sheet. We've talked about how we would have grown the balance sheet

by other acquisitions. This was one example. San Antonio Federal Savings Bank was one example of an acquisition that we did do.

And I guess I'm -- I mean, we already saw in the one document that if -- in the immediate time frame what would have happened is that we would have increased our earnings by a million two a year, if we'd left -- if we'd left the 6 million in River Valley. If we had found other acquisitions or other ways to make more than a million two, we would have done that, using that 6 million.

Q. There isn't anything specific that you can think of in terms of how it would have changed or what differences there would have been other than what you believe is the 1.2 million per year in additional earnings?

A. Well, the very specific thing is that we would have put San Antonio in River Valley. We would have --

Q. Well, no. Again, assuming San Antonio -- you didn't know about San Antonio or it didn't exist and there were no attempts to acquire it.

A. You're kind of asking me if I hadn't spent my time and attention on this one, what other one would I have spent my time and attention on. And I

because we didn't have the gunpowder that we had before.

Q. I probably should ask some follow-up questions a little later today in terms of discussing the ultimate sale of River Valley, but I'll kind of switch -- continue on the line I was on at this point for now.

In 1993 do you recall receiving deferred compensation pursuant to the deferred compensation agreement that was in place?

A. I know I received it. I don't know whether it was '93, '94 or just when.

Q. Do you recall that that was -- the way that was funded was that River Valley Holdings, Inc., was indebted to American National Bank?

A. I'll take your word for it, if that's it. I just don't recall.

Q. Just to kind of provide some background there, my understanding is that River Valley Holdings, Inc., took out a $7 million loan from American National Bank, and then that was used to fund deferred compensations for both yourself and Mr. Bangert.

Does that bring back any recollection?

A. Sounds like a lot, but I guess that must be right.

Q. Do you have any understanding as to why, if River Valley Holding was able to obtain those funds, they were not used to infuse into River Valley as opposed to being used to pay you and Mr. Bangert pursuant to the deferred compensation agreements?

A. I think that -- I think at about that time we had started thinking about selling River Valley.

Q. Do you know why prior to that time River Valley Holdings didn't borrow money from American National Bank to infuse into River Valley?

A. I'm sure that we didn't have the ability to do that prior to that period of time. I think that it was -- when we had the opportunity to do San Antonio Federal Savings Bank -- that came about in, I believe, the fall of 1991. It was when we first learned about it. Or I'm pretty sure it was the end of '91. I think it took us until probably the third quarter of '92 to finally close the deal.

During that period of time we -- as I told you before, our preference was to -- our strong preference was to be able to use the NOLs in River Valley and to use -- if we'd have had the capital we would have used the capital. Obviously at that time we didn't have the capital. But even without the capital, our preference would have been to

do it in River Valley.

At that time we had a hard time getting American National to agree to do the deal at all. They had -- as I remember, had suffered some losses on other S&L deals, and they didn't -- it was really a struggle just to get them to finance in that period. They required that we finance it separately from River Valley. However, they took River Valley stock as collateral for the loan on the -- to buy the San Antonio Federal Savings Bank.

I remember also going to La Salle National Bank and Norm Bobbins had been the -- was the president of La Salle. He had previously been under me at Exchange. I had hired him. And Exchange merged with La Salle and he became president of La Salle. And he was always after me to do banking with him.

So when American indicated that they really weren't comfortable doing the San Antonio deal, I went to him and I showed him what a good deal it was.

And he came back to me finally and said, look, I'll -- I'll lend you money on almost anything except savings and loans. Said I just -- I can't go to my Dutch parents and tell them I'm loaning money on a savings and loan deal.

I think it was only later that really --

well, a lot of credit to Howard that we got Brian Daniels and his group at American National to agree to lend us the 10 million. But that was after agreeing to bring the 6 million back.

Now, we're into '93? Is that when we're talking about, when the deferred compensation was paid?

Q. Right.

A. So probably we reached an agreement with River Valley -- with American in the spring of '92, and now we're talking more than 18 months later. Now they've had an opportunity to have part of the loan paid down from San Antonio Federal Savings Bank. I think we paid off like $5 million in the first year at San Antonio Federal Savings Bank. So we reduced our exposure to American National fairly substantially. And with that were then able to borrow money at River Valley.

So I think the long answer to your question as to why wouldn't we have borrowed -- if we could borrow 7 million at the end of '93, why didn't we do that earlier, and we were really always shifting our availability of credit between the various entities.

And, of course, as the -- as American got more comfortable with San Antonio and saw that, in

fact, it was a viable deal, they may have agreed at that point to extend us more credit than the total of -- I guess it was 11 million was the amount that they had extended us as of the time we did at San Antonio. I don't remember what the aggregate total would have been.

Q. Because you paid down 6 out of the 7 million; so there's 10 million there, plus you borrowed another 10 million?

A. Right. Right. I think that would have been the maximum at that point. You said that -- I didn't recall it was 7, but you said that we borrowed 7 in '93. But I remember that we -- I believe that we got the regulatory approval to pay out $5 million a year in dividends out of San Antonio Federal, or maybe more.

But I think we -- I think we had the loan paid off to American in a very short period of time.

Q. You mentioned La Salle. Was that the only time you went to La Salle for funding, or had you visited them at any other points in time to fry to obtain funding with respect to River Valley Peoria or Rock Falls?

A. Well, we felt like -- I mean, fundamentally American National was the -- there were basically two

investment opportunities that were considered as an alternative to the payment of common dividends from River Valley to River Valley Holding, Inc.?

A. To the extent that the dividends were used for servicing the debt, we really didn't have -- and to pay the operating costs of River Valley Holdings, we didn't really have the option of not paying the dividends to the holding company unless Howard and I were to have personally paid the -- had to infuse capital into River Valley Holdings.

So I don't -- I don't think that there was a -- the payment of dividends to River Valley Holdings was part and parcel of maintaining the capital of River Valley Peoria.

Q. Was there a point in time at which you were receiving dividend payments from River Valley Holding?

A. Was I personally receiving --

Q. Right.

A. -- dividend payments?

I don't recall.

(Exhibit 35 marked.)

Q. BY MS. SMITH: Mr. Holland, if you could take a look at what the court reporter has marked as Exhibit 35.

It's the Minutes of the Meetings of the

Board of Directors of River Valley Savings Bank FSB, dated May 19th, 1993, and it indicates you were in attendance. And I'm going to refer you initially to page 4 of the minutes.

It's about the fourth paragraph down, which reads, Steve Bangert next suggested that we modify our dividend policy to specifically acknowledge the need to balance FSB's capital position with its shareholder's need for an adequate rate of return. Mr. Bangert proposed that our dividend policy read as set forth in Exhibit A attached to these minutes. After extended discussion, Clauden moved, Holland seconded, to approve the dividend policy as set forth in Exhibit A to these minutes.

Then if you could turn to Exhibit A, which ends with the Bates range 0536. If you could take a minute to read that.

A. Okay.

Q. Do you recall the development of this dividend policy at all, Mr. Holland?

A. I really don't.

Q. Assuming that funds from River Valley, in fact, went to River Valley Holding, Inc., and then were dividended out to you -- let me reask that.

To the extent it was determined that

dividends should be paid, do you know whether or not that was based on any determination that there were not other opportunities available for River Valley Peoria to pursue?

A. I don't -- I mean, I think that the -- it speaks to the business opportunities and strategic initiatives as one of the considerations. So it doesn't appear to me that this suggests that there weren't other opportunities.

Q. You don't really recall anything relating to --

A. I don't remember the discussion of this policy.

Q. And/or receiving any dividend payments?

A. No, I don't.

Q. At any point in time prior to the sale of River Valley to First Banks, did you have the means to contribute additional capital to River Valley Peoria, Rock Falls? And you being you personally.

A. I'm sure I had the -- some means. I don't recall the amount.

Q. And how about Mr. Ross? Do you know whether he would have had the means to attribute -- contribute additional capital?

A. I don't know.

One can try to reach a comparable number to what you see transactions happening in the marketplace, based on the characteristics of your servicing portfolio versus what you see elsewhere. And try to say, well, gee if I sold things component by component, what would I get. Or am I -- you know, and clearly one -- you always have that as an option. You can always simply liquidate the whole thing and try to sell it in pieces, which is -- which is in some respects what the mark-to-market is.

I don't remember the details. I guess your question was: Who would have done the mark-to-market. It would have been initially done under Steve Bangert's direction. He had a group of people that would do that on a regular basis, and we used that as part of the basis under which we tried to justify various prices for the institution.

Q. Do you recall any adjustments that were made to the mark-to-market value by either yourself or Mr. Bangert or Mr. Ross or anyone else in River Valley in trying to determine how much to sell River Valley for?

A. No.

Q. Do you recall issues relating to the value of the net operating loss carry forwards?

A. My recollection is the decision to sell came first.

Q. Would Mr. Bangert have been aware of that decision to sell?

A. Oh, certainly.

Q. Assuming his understanding is that he decided he was no longer interested in working at River Valley and didn't know that you were contemplating a sale, what are your thoughts on how that would have impacted your decision to sell River Valley?

A. We decided to sell River Valley. I don't -- I don't recall -- you're saying assuming a set of facts that I don't recall. So I don't know how that would have had a different result than the result that we chose.

Q. I guess I'm trying to figure out whether -- based on the role that Mr. Bangert played for River Valley, whether -- if he decided to leave, how that would have then influenced your ability to continue on in whatever form, or whether that would have put you in the direction of, okay, maybe it's time to sell rather than figuring out how to fill that hole from Mr. Bangert.

A. Well, he certainly played a very important

role in building of River Valley, and as I have told you before, on the acquisitions and managing the balance sheet.

By the same token had developed quite a good staff that, you know, could operate River Valley. I don't think that if he had made a choice to leave before we had chosen to sell that would have precipitated us to sell.

I think that the -- the overwhelming feeling I have is this discouragement over how we had been treated by the government and kind of the strain that that put on all of us in kind of almost reaching the brink of losing everything that we had built and everything that we had invested in River Valley.

So to me those -- that was the overwhelming issue with respect to my feeling that we should sell. I think it was also the case that with the -- having lost the window of opportunity to acquire institutions in the late '80s, early '90s, that, you know, they -- the overall game plan that we had originally come together on was -- we just couldn't pursue it.

So I think it was those things that motivated us to -- certainly motivated me to want to sell. And -- well, I don't think that the -- that the loss of a single person within River Valley would have

would be the thing that would be important for them to look at is where do we stand vis-a-vis the regulators in terms of our capital calculations.

If the intangible capital was not counted for regulatory capital, I'm sure that American National saw it as useless, just as we would have.

If the intangible capital was counted as capital, I'm sure they would have given benefit to that. I think that, as we talked about before, the value of the intangible capital was not in terms of the earnings potential of the bank, but in terms of its ability -- directly, in that the intangible capital doesn't earn an interest rate; whereas tangible capital does earn an interest rate.

The value of the intangible capital was to support a balance sheet, as was the tangible capital. So they would have been interested in our capital ratios, and I think would have felt, as we did, as if the intangible capital counted towards the regulatory capital, then it would have been valuable in that context.

Q. Do you have an understanding as to, if San Antonio had been acquired through River Valley Holding or River Valley FSB, what the structure of that actually would have been?

A. Had we had the capital with -- that FIRREA took away, we would have likely been -- we likely would not have had a holding company. We likely would have merged everything together because that's the -- that's the most efficient -- the most efficient way to operate.

Because of the FIRREA, I do know that we did talk about acquiring San Antonio Federal as a subsidiary of River Valley. And the reason for that was we could still compartmentalize the credit for American National's concern and get the benefit of the tax loss carry forwards, if it were a subsidiary of River Valley. I doubt that we would have considered it a sister of River Valley in the holding company because I don't think we would have gotten the tax benefits that way.

I believe we felt that we had to do it as either merged directly into River Valley or as a subsidiary. But I think that that even didn't work because of this cross guarantee issue.

Q. If you had been able to acquire San Antonio through River Valley Holding and/or River Valley Peoria, what's your understanding as to how the $10 million purchase price would have been financed?

A. If we -- absent the breach, the way it would

Q. The interest expense that was eliminated from River Valley Holding, that, in effect, though, would have then been assumed by Western Capital Holding?

A. The interest cost for the 10 million was a -- was assumed by Western Capital Holdings, that's correct.

Q. And to the extent San Antonio had been acquired through River Valley and had made use of the NOLs, then those NOLs would not have been available to an acquirer down the road, such as First Banks; is that fair?

A. That's correct.

Q. Okay.

A. Maybe, again, to just underscore, though, the value of the NOLs was much greater in being able to shelter current income than it was to sell to a purchaser who couldn't take full advantage of them immediately.

Q. Do you have an understanding as to how the accounting was done with respect to the acquisition of San Antonio in terms of the issue of you pay 10 million but the institution was worth approximately 30 million in terms of how that was accounted for with respect to goodwill and whatnot?

A. You're now pretty familiar with purchase accounting. And since we paid 10 million, what we had to do was to have a combination of assets and liabilities equal 10 million. Part of that comes from marking the loans to market, and because these loans -- and we had some credit card receivables in -- that were originated in Albuquerque but being serviced in Phoenix, and so we had a variety of different things that had -- would have had difficulties selling, we were -- we were able to adjust the value of those and make certain assumptions on what the fair market value was to reduce that gap.

But I do believe that there was a -- well, I just -- I don't remember if we ended up with a -- essentially a negative intangible. I know there was a discussion about that, and I just can't remember how it all ended up.

Q. Do you have an understanding that the transaction would have resulted in 20 million in negative goodwill?

A. Well, I use the figure of 30 million as kind of my recollection of what the undiscounted value of the assets compared to the liabilities was. I'm sure that we did not end up with 20 million of negative goodwill.

We may have ended up with some negative goodwill, but a substantial amount of that difference between the 10 million and what would have been a book value of assets was ultimately dealt with through the use of mark-to-market on those assets, and primarily by discounting the loans which we felt had a number of attributes that made them difficult to sell and, therefore, warranted a discount. The credit card receivables that I mentioned. Some of the loans that they -- that San Antonio participated in. They were relatively unfavorable terms on some apartment projects in California.

So there's a lot of justification for looking at discounting the book value of those loans to a different-mark-to market.

Q. I guess that's what I'm trying to understand is it sounds like there's two different mark-to-markets. One where you estimated the value of the institution was 30 million, but another one for purposes of what ultimately was recorded in the books. And I'm trying to figure out what the justification was or how you go about doing a different mark-to-market for purposes of what you're doing for the books.

A. Well, maybe a simple example would be the

through the assisted transactions.

So I guess I would say we were pretty comfortable with the general strategy that we had.

Q. How about with respect to the size of the institutions? How, if at all, do you think that would have been any different in the -- the alleged breach had not occurred?

A. Oh, well, there's no question that we would have been substantially larger. I think that -- we've demonstrated through these discussions that we had the flexibility to increase the size of the balance sheet in two primary ways, through acquisitions and through capital market transactions. And we would continually balance those.

Where there was an attractive acquisition, we would -- if -- we would likely take the acquisition and then pay off borrowings and sell capital market assets to make room in the balance sheet for the acquisition.

And while we were waiting on an acquisition, if our capital grew through retained earnings, we would use the capital markets transactions to fill out the balance sheet.

We had a lot of capital that we lost through the breach. That capital, I can assure you, would

have been fully employed and we would have been substantially larger.

Q. Any idea as to how much larger?

A. Well, I can do some calculations of that, and I have done some. I don't remember the numbers that I looked at. I believe that our -- that River Valley's tangible capital -- well, I can't remember precisely. And so I think that I would rather go back and look at the -- some of the specifics and be able to do a calculation based on that.

Q. What would you look at in order to do the calculation?

A. I would look at the amount of capital, the -- at each point in time, what our expected earnings rate would be as we employed that capital. I believe, as I looked at it, we did better than the 1 percent return on assets. So we would -- I would use those calculations to look at what we would earn on those balance sheets.

We talked about the specific acquisitions that we would have done and -- and how that would have added to the balance sheet as well as added to the spread income that we would have gotten.

But at each point in time, having that additional capital would have compounded itself,

because not only would we have increased the balance sheet but that balance sheet would have earned money. The balance sheet -- the earnings themselves would have been sheltered by the NOLs, and that would have continued to compound.

So that by the time we sold to First Banks, for example, we would have had the benefit not only of the capital but of the earnings that came from that capital that were sheltered by the tax losses that compounded through that period.

Q. How do you believe the asset composition would have been different, if at all, but for the alleged breach?

A. Well, I think that's not unlike the operating strategy question. I think that we -- we were primarily interested in the kinds of loans that were appropriate to thrifts. We -- our loan portfolio consisted of both loans that we had acquired through the other thrifts but also the origination of non-conforming loans. It would have clearly had been compromised of mortgage back securities as a way to fill out the balance sheet.

But I think that the composition would have been characterized, not unlike what we saw, but just simply of substantially a greater size.

because I believe that of the -- I believe that the FDIC and OTS, particularly the FDIC, imposed harsher requirements on us because -- because we were so close at the time, and we didn't -- and we had to live with those, it's possible that we would have been able to operate at the capital levels that were considered standard at that time for the industry, and could have built a balance sheet based on those.

I believe that the breach caused us to have to operate, as I recall seeing in here, at a 5 percent tangible capital requirement. I don't believe that we would have had to do that but for the breach.

But notwithstanding that, we would have operated our capital levels at what we saw as acceptable levels with the regulators, and we would have -- we would have used the capital as efficiently as we could. That is, we would have always had the capital fully employed.

Q. Assuming there was a well-capitalized definition according to regulations, would you have attempted to meet the well-capitalized requirements?

A. I don't remember the -- what those tierings were, and whether the -- it would have been to our economic advantage to operate at that level or at a tier below that. I think that, again, if I sat down

with the facts, I could -- I could have -- could demonstrate -- I can assure you that we would have operated at what we believed was the opportunity to create the greatest amount of earnings and ultimately to receive the greatest amount through the sale of the bank.

Q. Would you have maintained any cushion above whatever the capital requirements were?

A. We may have. Again, I don't remember the -- kind of what the context was at that time and what the specific tiering -- what the specific advantages of the different tiering levels were.

Q. How, if at all, do you believe the dividend policy would have been different if the alleged breach had not occurred?

A. I believe that we would have -- in general, we felt that there was the opportunity to earn venture capital kinds of returns for the capital that was employed in River Valley. And without the breach, we would have most likely have kept all the capital employed to take advantage of those returns.

So I think the -- I think that you asked me previously about what the dividend policy was, and whether we took any dividends out. I do not recall any. You showed me the dividend policy that was, I