**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-524C**
**(Judge George W. Miller)**

---

**HOMER J. HOLLAND, STEVEN BANGERT, Co-Executor of the Estate of HOWARD R. ROSS, and FIRST BANK,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S CONTENTIONS OF FACT AND LAW

---

**MICHAEL HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**JOHN H. ROBERSON**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor, 1100 L Street**
**Washington, D.C. 20530**
**Tele: (202) 353-7972**
**Fax: (202) 514-8640**

**OF COUNSEL:**

**SCOTT D. AUSTIN**
**ELIZABETH A. HOLT**
**WILLIAM G. KANELLIS**
**BRIAN A. MIZOGUCHI**
**AMANDA L. TANTUM**
**JOHN J. TODOR**

**October 26, 2007**

**Attorneys for Defendant**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONTENTIONS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I. THE THRIFT INDUSTRY GENERALLY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. The FHLBB And The FSLIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B. Statutory Restrictions On Thrift Mergers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

C. The Use Of GAAP Accounting In Regulatory Accounting And Certain Specified Exceptions To GAAP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II. FIRREA'S ENACTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III. THRIFTS WERE EXPERIENCING A DOWNWARD TREND IN ASSETS BEFORE 1989, AND THAT TREND CONTINUED UNTIL 1996.. . . . . . . . . . . . . . . . . . 14

IV. THE SUPERVISORY TRANSACTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B. The River Valley I Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1. The River Valley I Assistance Agreement.. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

a. The FSLIC Cash Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

b. The FSLIC's $5 Million Preferred Stock Assistance.. . . . . . . . . . . . . 18

c. The Use Of $4.6 Million Of Subordinated Debt Toward Regulatory Capital Computations. . . . . . . . . . . . . . . . . . . . 21

d. The Restrictions On Transfer To Third Parties. . . . . . . . . . . . . . . . . 22

2. Resolution 88-638. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3. Forbearance Letter. . . . . 23

4. Accounting. . . . . 24

C. The River Valley II Transaction. . . . . 24

1. Background. . . . . 24

2. The River Valley II Assistance Agreement. . . . . 25

3. Resolution 88-612. . . . . 26

4. Forbearance Letters. . . . . 26

5. Issuance Of Subordinated Debt. . . . . 26

6. Accounting. . . . . 27

D. The Peoria Savings Acquisition. . . . . 27

1. Background. . . . . 27

2. The Assistance Agreement. . . . . 28

E. Post Acquisition Payments From The Government. . . . . 29

F. Summary Of Transactions. . . . . 29

V. OPERATION OF THE THRIFTS AFTER THE ACQUISITIONS AT ISSUE. . . . . 31

A. Operations And Projections Before The Enactment Of FIRREA: A Retail Emphasis. . . . . 31

B. Prior To The Passage Of FIRREA, The River Valley Thrifts Made Numerous Errors In Reporting Their Derivative Instruments. . . . . 34

C. Operations And Projections Post-FIRREA. . . . . 35

1. River Valley Thrifts Had Excess Regulatory Capital Following The Passage Of FIRREA. . . . . 35

2. River Valley I's Return On Assets In 1989. . . . . 36

3. Bonus And Deferred Compensation Payments To Messrs. Holland, Ross, And Bangert. . . . 36

4. The Lending Relationship Between ANB And The River Valley Thrifts. . . . 38

D. The Thrifts' Continued Focus Upon Traditional Banking In The Post-FIRREA Period. . . . 38

E. The Investment And Sale Activity Of The River Valley Thrifts In The Late 1980s And Early 1990s. . . . 39

1. The River Valley Thrifts Increase Their High-Risk Derivative Instruments. . . . 39

2. Borrowing Activity. . . . 41

F. Regulatory Criticisms Of The River Valley Thrifts' Capital Market Investments In The Post-FIRREA Period. . . . 43

1. The FDIC's Criticisms Of River Valley I's Capital Market Instruments In August 1990. . . . 43

2. Although The OTS Also Had Concerns With River Valley I's Residual Instruments In 1990, It Did Not Classify These Instruments In The Same Manner As Did The FDIC. . . . 45

a. The OTS's August 1990 Examination Of River Valley I. . . . 45

b. The OTS's November 1990 Examination Of River Valley I. . . . 46

3. As With River Valley I, The FDIC Found Problems With River Valley II's Derivative Mortgage Products In August 1990. . . . 47

4. The OTS's Assessment Of River Valley II's Condition In 1990. . . . 48

G. Other Post-FIRREA Actions Undertaken By The River Valley Thrifts. . . . 49

1. The Runoff And Readjustment Of The River Valley Thrifts' Assets And Liabilities After July 1990. . . . 49

2. 1991 Redemption Of Class A Preferred Stock. . . . . . . . . . . . . . . . . . . . . 51

3. Certain Other Capital Transactions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

4. The Valuation Of The Preferred Stock Provided To The FDIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

5. River Valley III Chose To Sell the Republic Branches In 1991, And Thereby Eliminated The Republic Goodwill. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

H. Operations Following Supervisory Agreement Of March 25, 1991. . . . . . . . . . . 57

1. The Supervisory Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

2. The Merger Of River Valley I And River Valley II. . . . . . . . . . . . . . . . . . 58

3. The Settlement Agreement Between The FDIC And Plaintiffs.. . . . . . . . . 59

4. Regulatory Criticism Of The Thrift's Capital Markets Investments Continued In 1991. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

5. The FDIC's Criticisms Of The Thrift's High-Risk Investments Continued Into 1992. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

6. The OTS's View Of River Valley III In 1992 Contrasted With That Of The FDIC.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

7. The FDIC's Criticisms Continued Into 1993.. . . . . . . . . . . . . . . . . . . . . . 65

8. The Termination Of The Supervisory Agreement In 1993 Following The Thrift's Reduction Of Capital Market Instruments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

I. The Formation Of RV Holdings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

J. The SAFSB Acquisition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

K. The Operation Of SAFSB. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

L. The Value Of The River Valley Thrifts Increased Dramatically Between 1988 And 1994. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

M. The Sale Of RV Holdings To First Banks, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . 79

N. First Bank Was Well Capitalized And Had Little Use For Goodwill. . . . . . . . . . 80

O. SAFSB's Liquidation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

VI. THE NATURE OF RETAINED EARNINGS AND TANGIBLE CAPITAL. . . . . . . . . . 83

CONTENTIONS OF LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

I. PLAINTIFFS' SAFSB-RELATED DAMAGE CLAIMS ARE MERITLESS. . . . . . . . . . 85

A. First Bank's Purported Damages Resulting From WCHI's Acquisition Of SAFSB Were Not Caused By The Government's Purported Breach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

1. The Purported Injury Must Have A Close, Direct, And Inevitable Nexus Between The Breach And The Harm Alleged. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

2. River Valley Mitigated Any Effect Of The Breach With Respect To The SAFSB Opportunity By Facilitating The Acquisition Of SAFSB Through WCHI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

3. First Bank's SAFSB Claim Should Be Denied Because Any Award Would Result In An Improper Windfall Recovery Of Double Profits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

4. First Bank Cannot Show That The Purported Inability Of River Valley III To Obtain SAFSB Was Caused By The Government's Breach Of The Purported Contract.. . . . . . . . . . . . . . . . . . . 94

a. The SAFSB Transaction Was An Independent, Collateral, And Remote Undertaking.. . . . . . . . . . . . . . . . . . . . . . . . 94

b. The Inability Of River Valley To Consummate The SAFSB Transaction Was The Result Of Intervening Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

i. ANB Refused To Loan More Funds To River Valley Due To FIRREA's Cross-Guaranty Provision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

ii. River Valley Made Little Attempt To Find Other Lending Sources. . . . . . . . . . . . . . . . . . . . . . . . . 96

c. The SAFSB-Related Damages Claimed Were Not Caused By The Government's Breach, But By An Increase In The Market Value Of SAFSB's Assets. . . . . . . . . . . . 96

d. Regulators Would Not Have Approved The Acquisition Of SAFSB By River Valley Irrespective Of The Breach. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

B. First Bank's Purported Damages Resulting From The Acquisition Of SAFSB Were Not Foreseeable By The Government. . . . . . . . . . . . . . . . . . . . . 99

C. No Expert Opinion Is Permitted With Respect To Three Of The Four Versions Of SAFSB-Related Damage Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . 101

D. All Of First Bank's SAFSB-Related Damage Claims Are Speculative And Unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

1. First Bank's New Claim For $45 Million In SAFSB-Related Damages Is Speculative And Unreliable. . . . . . . . . . . . . . . . . . . . . . . . . 102

2. First Bank's New Claim For $35 Million In SAFSB-Related Damages Should Be Denied Because It Is Speculative And Unreliable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

3. First Bank's New $29.963 Million SAFSB-Related Damage Claim, And Its Prior $28.6 Million Claim Are Speculative And Unreliable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

II. FIRST BANK'S CLAIM FOR DIMINISHED ECONOMIC VALUE IS MERITLESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

A. Dr. Murphy's Methodology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

B. Dr. Murphy's Methodology Produces Unreliable Results.. . . . . . . . . . . . . . . . . . 111

1. First Bank's Lost Value Calculation Is At Odds With Several Contemporaneous Direct Valuations.. . . . . . . . . . . . . . . . . 111

2. Dr. Murphy's Lost Value Model Is Based Upon FSLIC And FDIC Valuations That Do Not Reflect The Market Value Of The Preferred Stock. . . . . . . . . . . . . . . . . . . . . . . 112

3. Dr. Murphy's Extrapolation To River Valley II Of The Purported Lost Value To River Valley I Is Unreliable.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

C. The Alleged Diminished Value Was Not Caused By The Government's Purported Breach .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

1. Many Other Factors Besides A Loss Of Goodwill Affected The River Valley Thrifts, Which Remained In Capital Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

2. The Thrifts' High-Risk MBS And Other Mortgage-Related Assets Caused The Regulatory Criticisms Of The Thrift. . . . . . . . . . . . 117

3. The Shrinkage Was Caused By Numerous Non-Breach Factors. . . . . . . 118

4. The Purported Diminished Value In The River Valley Thrifts Was Not Foreseeable By The Government. . . . . . . . . . . . . . . . . . . . . . . 119

III. PLAINTIFFS' RETAINED EARNINGS MITIGATION THEORY IS MERITLESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

A. Mr. Holland's Retained Earnings Mitigation Theory. . . . . . . . . . . . . . . . . . . . . 120

1. Mr. Holland's Methodology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

2. Mr. Holland's Damages Are Unreasonable On Their Face. . . . . . . . . . . 121

B. Mr. Holland's Retained Earnings Theory Fails As A Matter Of Law. . . . . . . . . 122

1. Retaining Earnings Did Not Cause Any Harm To River Valley. . . . . . . 122

a. Retained Earnings Are Not Harmful To A Thrift. . . . . . . . . . . . 122

b. Plaintiffs Admit That, But For The Breach, They Would Have Retained Even More Earnings. . . . . . . . . . . . . . . . . . . . . . . 123

c. Mr. Holland Has Not Identified A But-For World. . . . . . . . . . . 125

d. The River Valley Thrifts' Contractual Capital Could Not Have Been Transferred To First Bank, Precluding Retained Earnings Damages After First Bank's Acquisition.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

e. First Bank's Retained Earnings Damages Were Not Reasonably Foreseeable At The Time Of Contracting. . . . . . . . 129

2. First Bank's Measure Of Damages For Retained Earnings Is Not Reasonably Certain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

a. River Valley's *Ex Post* Cost Of Capital Should Be Measured By The Actual Dividends Paid. . . . . . . . . . . . . . . . . . . 131

b. An Award Based Upon Mr. Holland's Retained Earnings Theory Would Result In A Double Recovery To River Valley's Shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

i. Double Recovery With First Bank Purchase Price. . . . . 135

ii. Double Recovery With SAFSB Acquisition. . . . . . . . . . 136

c. Mr. Holland's Retained Earnings Theory Is Tantamount To An Improperly Asserted Lost Profits Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

d. Mr. Holland's Retained Earnings Methodology Is Flawed And Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

i. Mr. Holland's Retained Earnings Theory Is Not Based Upon Actual Dividends Paid Or An Actual Cash Flow . . . . . . . . . . . . . . . . . . . . . . . . . . 139

ii. Mr. Holland's Analysis Is Neither A Proper *Ex Ante* Nor *Ex Post* Analysis .. . . . . . . . . . . . . . . . . . . . 140

iii. Mr. Holland Overstates The Amount Of Contractual Capital To Be Replaced .. . . . . . . . . . . . . . . . 142

iv. Mr. Holland's Analysis Ignores The Differences Between Tangible Capital And Intangible Capital.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142

v. Mr. Holland Effectively Imposes Prejudgment Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . 143

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

Abbott Labs. v. Brennan,
952 F.2d 1346 (Fed. Cir. 1991). . . . . . . . . . 89

Am. Fed. Sav. Bank, FSB v. United States,
72 Fed. Cl. 586 (2006). . . . . . . . . . 91

Am. Fed. Sav. Bank, FSB v. United States,
68 Fed. Cl. 346 (2005). . . . . . . . . . 86

Bank of Am., FSB v. Doumani,
495 F.3d 1366 (Fed. Cir. 2007). . . . . . . . . . *passim*

Bank of Am., FSB v. United States,
67 Fed. Cl. 577 (2005), aff'd sub nom. Bank of Am., FSB v. Doumani,
495 F.3d 1366 (Fed. Cir. 2007). . . . . . . . . . 8, 131, 134 ,135

Bank United of Texas, FSB v. United States,
50 Fed. Cl. 645 (2001), aff'd in part & rev'd in part,
80 Fed. Appx. 663 (Fed. Cir. 2003). . . . . . . . . . 86, 130

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . 89, 91, 93, 109

Bohac v. Dep't. of Agric.,
239 F.3d 1334 (Fed. Cir. 2001). . . . . . . . . . 99

Branch v. United States,
69 F.3d 1571 (Fed. Cir. 1995). . . . . . . . . . 69, 70

Cal Fed Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir. 2005). . . . . . . . . . 85, 88

Cal. Fed. Bank, FSB v. United States ("Cal Fed"),
54 Fed. Cl. 704 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005). . . . . . . . . . 87, 119

Castle v. United States,
48 Fed. Cl. 187 (2000), aff'd in part & rev'd in part,
301 F.3d 1328 (Fed. Cir. 2002). . . . . . . . . . 86, 130

Chain Belt Co. v. United States,
127 Ct. Cl. 38, 115 F. Supp. 701 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85, 100, 123

Cienega Gardens v. United States,
No. 06-5051, __ F.3d __, 2007 WL 2778687 (Fed. Cir. Sept. 29, 2007). . . . . . . . . . . . . . . . . . . . 4

Citizens Fed. Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87, 88, 122, 133

Citizens Fed. Bank v. United States,
66 Fed. Cl. 179 (2005), aff'd 474 F.3d 1314 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 133, 136

Citizens Fin. Serv., FSB. v. United States,
64 Fed. Cl. 498 (2005), aff'd, 170 Fed. Appx. 129,
2006 WL 618792 (Fed. Cir. Mar. 9, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Comm. Fed. Bank, FSB v. United States,
59 Fed. Cl. 338 (2004), aff'd, 125 Fed. Appx. 1013,
2005 WL 857772 (Fed. Cir. Apr. 8, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Daubert v. Merrell Dow Pharm., Inc.,
509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

Dodson Livestock Co. v. United States,
48 Fed. Cl. 551 (2001), rev'd on other grounds,
30 Fed. Appx. 989 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

Estate of Berg v. United States,
231 Ct. Cl. 466, 687 F.2d 377 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 99

Fifth Third Bank of W. Ohio v. United States,
402 F.3d 1221 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 86, 139

Fifth Third Bank of W. Ohio v. United States ("Fifth Third"),
55 Fed. Cl. 223 (2003), aff'd in part, rev'd in part,
402 F.3d 1221 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 87

First Fed. Lincoln Bank v. United States,
73 Fed. Cl. 633 (2006), appeals docketed, No. 07-5044, -5048 (Fed. Cir. 2007). . . . . . . . . . . . . 86

First Fed. Sav. & Loan Ass'n of Rochester v. United States,
76 Fed. Cl. 106 (2007). . . . . . . . . . 86

Glendale Fed. Bank, FSB v. United States ("Glendale II"),
378 F.3d 1308 (Fed. Cir. 2004). . . . . . . . . . 85, 86

Glendale Fed. Bank, FSB v. United States ("Glendale I"),
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . 86, 106, 130

Glendale Fed. Bank, FSB v. United States,
43 Fed. Cl. 390 (1999), aff'd in part, vacated in part,
239 F.3d 1374 (Fed. Cir. 2001). . . . . . . . . . 86, 130

Globe Savings Bank, FSB v. United States,
65 Fed. Cl. 330 (2005), aff'd in part, vacated in part,
189 Fed. Appx. 964, 2006 WL 2045776 (Fed. Cir. Jul. 20, 2006). . . . . . . . . . 86

Granite Mgmt. Corp. v. United States,
74 Fed. Cl. 155 (2006), appeal docketed, No. 2007-5054 (Fed. Cir. 2007). . . . . . . . . . 85, 142

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005). . . . . . . . . . 9, 139

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004). . . . . . . . . . 89, 92, 93, 109

Holland v. United States,
74 Fed. Cl. 225 (2006). . . . . . . . . . 18, 90

Home Sav. of Am., FSB v. United States,
399 F.3d 1341 (Fed. Cir. 2005). . . . . . . . . . 122, 132, 133

Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.,
28 F. Supp. 2d 126 (S.D.N.Y. 1998), aff'd 205 F.3d 1323 (2d Cir. 1999). . . . . . . . . . 95

LaSalle Talman Bank, FSB v. United States,
462 F.3d 1331 (Fed. Cir. 2006). . . . . . . . . . 9, 122

LaSalle Talman Bank, FSB v. United States,
64 Fed. Cl. 90 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006). . . . . . . . . . 86

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed Cir. 2003).. . . . . . . . . . *passim*

Menne v Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988). . . . . . . . . . 88, 89

Myerle v. United States,
33 Ct. Cl. 1 (1897). . . . . . . . . . *passim*

N. Helex Co. v. United States,
207 Ct. Cl. 862, 524 F.2d 707 (1975). . . . . . . . . . 99

Neely v. United States,
285 F.2d 438 (Ct. Cl. 1961). . . . . . . . . . 126

Point Prods. A.G. v. Sony Music Entm't,
215 F. Supp. 2d 336 (S.D.N.Y. 2002). . . . . . . . . . 88, 89

Ramsey v. United States,
121 Ct. Cl. 426, 101 F. Supp. 353 (Ct. Cl. 1951). . . . . . . . . . 87, 95, 98, 129

San Carlos Irrigation and Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . 126

Shyface v. Sec'y of Health and Human Servs.,
165 F.3d 1344 (Fed. Cir. 1999). . . . . . . . . . 88, 89

S. Cal. Fed. Sav. & Loan Ass'n v. United States,
57 Fed. Cl. 598, 622 (2003) aff'd in part, rev'd in part,
422 F.3d 1319 (Fed. Cir. 2005). . . . . . . . . . 86

S. Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003). . . . . . . . . . 86, 87, 89

Suess v. United States,
52 Fed. Cl. 221 (2002), appeals docketed, Nos. 07-5070, -5071 (Fed. Cir. 2007). . . . . . . . 86, 130

Three Crown Ltd. P'ship v. Salomon Bros., Inc.,
906 F. Supp. 876 (S.D.N.Y. 1995). . . . . . . . . . 95

Trustmark Corp. v. Comm'r of Internal Revenue,
1994 WL 159116 (U.S. Tax Court). . . . . . . . . . 79

United States v. Winstar Corp.,
518 U.S. 839 (1996). . . . . . . . . . 12, 117

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**FEDERAL RULES AND REGULATIONS**

47 Fed. Reg. 8152-53 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

47 Fed. Reg. 8152 (1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

47 Fed. Reg. 8152, 8152-54 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Regulatory Capital, OTS, 54 FR 46845, 46848 (Nov. 8, 1989). . . . . . . . . . . . . . . . . . . . . . . . . . 14

57 Fed. Reg. at 44,866 (September 29, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Code of Federal Regulations (Jan. 1, 2007), Chapter 3, § 325.103. . . . . . . . . . . . . . . . . . . . . . . . 81

Federal Deposit Insurance Corp. Improvement Act of 1991 ("FDICIA"),
Publ. L. No. 102-242, 105 Stat. 2236 (1991) § 38.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"),
Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989) §§ 211, 401(a)(1). . . . . . . . . . . . . . . . . . . . . . 14

Pub. L. No. 101-73 (HR 1278) at § 206(e)(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

RCFC 26(a)(2)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

RCFC 37(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

RCFC 37(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

**FEDERAL STATUTES**

12 C.F.R. § 552.6-1(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

12 C.F.R. §§ 561, 563 and 567 (1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 C.F.R. § 561.13(d) (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

12 C.F.R. § 563.13 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12 C.F.R. § 563.13(b)(2) (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12 C.F.R. § 563.13(b)(2) (1983). . . . . . . . . . 10

12 C.F.R. § 563.22 (a) (1988). . . . . . . . . . 11

12 C.F.R. § 563.23-3 (c) (1988).. . . . . . . . . . 12

12 C.F.R. § 567. . . . . . . . . . 13

12 C.F.R. § 567.2 (Jan. 1, 1990 ed.). . . . . . . . . . 14

12 C.F.R. § 571.5(e) (1988). . . . . . . . . . 11

12 U.S.C. § 1464 (1988). . . . . . . . . . 10

12 U.S.C. § 1464(d)(3)(A) (1988). . . . . . . . . . 11

12 U.S.C. § 1464(t) (1989). . . . . . . . . . 13

12 U.S.C. §§ l464(t)(2)(A)-(B), 1464(t)3, 1464(t)(9)(A)-(B) (1989). . . . . . . . . . 13

12 U.S.C. § 1726 (1988). . . . . . . . . . 10

12 U.S.C. § 1730(q) (1988). . . . . . . . . . 11

12 U.S.C. § 1815(e). . . . . . . . . . 30, 69, 95

12 U.S.C. § 1815(e)(1)(A). . . . . . . . . . 69

**MISCELLANEOUS**

1 Dobbs Law of Remedies, § 3.8(2) (2d ed. 1993). . . . . . . . . . 98

W. Page Keeton et al., Prosser and Keeton On Torts, 266-68 (5th ed. 1984). . . . . . . . . . 88

Restatement (Second) of Contracts § 347 cmt b (1981). . . . . . . . . . 89

Restatement (Second) of Contracts § 351 .. . . . . . . . . 129

Restatement (Second) of Contracts § 351 cmt. d.. . . . . . . . . 100

Restatement (Second) of Contracts § 351 cmt. e.. . . . . . . . . 101, 129

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, co-executor of the<br>ESTATE OF HOWARD R. ROSS, and<br>FIRST BANK,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 95-524C<br><br>(Judge George W. Miller) |

**DEFENDANT'S CONTENTIONS OF FACT AND LAW**

Pursuant to Rule 14(b) of the Rules of the Court of Federal Claims ("RCFC"), and this Court's Order dated March 20, 2007, defendant, the United States, respectfully submits its contentions of fact and law.

**INTRODUCTION**

In July and December 1988, five small but troubled Illinois thrifts were acquired from the Government by the plaintiffs in three separate transactions. In connection with the acquisitions, the Federal Savings and Loan Insurance Corporation ("FSLIC") contributed $83 million in cash to the plaintiffs. In addition, in accord with the Assistance Agreements executed between the River Valley thrifts and the FSLIC, regulatory forbearances allowing the inclusion of paper regulatory accounting "capital credits" were permitted to be included toward regulatory capital levels, as was subordinated debt issued by the thrifts.[1] These paper accounting forbearances

---

[1] Definitions of the various entities related to plaintiffs in this case are set forth in the Joint Stipulation of Facts ("JSF") filed on December 31, 2003 at pages 2-3. Those definitions are incorporated by reference here.

totaled just over $20 million. Setting this case apart from numerous other Winstar-related cases, the cash contributions from the FSLIC covered almost all of the accounting shortfall in the purchase transactions, i.e., the net liabilities assumed by the resulting institutions.

Given the large amount of cash contributed to the thrifts, the River Valley thrifts were in compliance with general regulatory capital levels, both before and after the passage of FIRREA. Thus, unlike many other Winstar-related cases, this is not a case where, upon the passage of FIRREA, a thrift was required to enter into a capital plan or where regulators were concerned about the thrift's capacity to meet FIRREA's regulatory capital levels. Indeed, plaintiffs do not even purport to have experienced any effect from FIRREA until almost a year after its passage.

To be sure, the River Valley thrifts had difficulties both before and after FIRREA. For example, prior to FIRREA, deposit runoffs were significant. This was a result of several factors, including: (1) the thrifts were newly formed and had significant difficulties merging their operations, (2) there was intense competition for deposits, and (3) there was widespread shifting of funds by customers out of thrifts and into other depository institutions. After FIRREA, a severe national recession and continued movement of funds out of savings and loans negatively affected the River Valley thrifts.

Despite these operational difficulties, the River Valley thrifts were able to dramatically increase their market value following the acquisitions. For example, based upon the thrifts' own valuations, between July 1988 and January 1991 the thrifts' common stock value increased by more than $21.5 million. By August 1993, the value of the common stock had increased by an additional $16 million.

The River Valley thrifts did, however, encounter regulatory oversight critical of the thrifts' operations. Regulators, particularly the FDIC, criticized the thrifts' investments in a

variety of high-risk mortgage security derivatives or residuals. Indeed, the River Valley thrifts received numerous critical reports of examination ("RoE") by regulators, severely criticizing the volume of these risky instruments. The River Valley thrifts chose to ignore these criticisms, and instead of reducing their holding of these instruments, they increased them. As a result, in March 1991, regulators required the thrifts to enter into a Supervisory Agreement whereby the thrifts became formally obligated to reduce the volume of their residual investments. Furthermore, to protect the thrifts and the insurance fund from actual losses that might result from the thrifts' risky investment strategies, the Supervisory Agreement set forth specific tangible capital requirements well above those set by FIRREA.

Eventually, by 1993, through actual losses in these investments, planned runoffs, and River Valley III's belated recognition that the regulators' safety and soundness concerns would remain until the thrift reduced its level of its high-risk mortgage derivatives, River Valley III reduced the size of that portfolio to acceptable levels. Soon thereafter, regulators lifted the restrictions imposed by the Supervisory Agreement. River Valley enjoyed positive ratings from that point forward.

In January 1995, the River Valley thrifts were sold to First Bank for $37.4 million. With the sale, River Valley's shareholders obtained the benefit of the steady increase in the value of the thrifts over the four-and-a-half years of their ownership. Indeed, River Valley's two key shareholders, Messrs. Holland and Ross, realized an <u>annual</u> rate of return on their investment of almost 30 percent.

Plaintiffs now argue, in large part through the self-interested opinions of plaintiff, Mr. Holland, that, as a result of FIRREA's phase-out of the $20 million in paper regulatory accounting "capital," the River Valley thrift's successor in interest is due more than $65 million.

That is, he claims more than $3 dollars in damages for each dollar of regulatory capital phased out as a result of FIRREA. Mr. Holland's claim for damages is unprecedented in the history of the Winstar cases. We know of no case where a damage award for lost goodwill has exceeded the face dollar amount of intangible regulatory capital, much less exceeded it by more than three times. Plaintiffs' damage claims are unreliable on their face as a matter of both common sense and law. Cf., e.g., Cienega Gardens v. United States, No. 06-5051; __ F.3d __; 2007 WL 2778687 at * 11 n.13 (Fed. Cir. September 25, 2007) ("A determination that damages exceed the value of the property should be indicative that the method of computing damages is flawed.").

Closer scrutiny of plaintiffs' damage claims only further underscores that plaintiffs' damages theories are meritless.

Plaintiffs set forth three categories of purported damages: (a) up to $45 million as a result of a purported inability to acquire a Texas thrift, San Antonio Federal Savings Bank ("SAFSB") in 1992, (b) $21 million in purported diminution in value claims, and (c) $21 million in retained earnings damages.

The SAFSB-related damage claims fail the requisite tests of causation, foreseeability and reasonable certainty. Moreover, even if the breach affected the capacity of River Valley to acquire SAFSB in 1992, a premise with which we disagree, River Valley fully mitigated the breach. River Valley facilitated the transfer of the SAFSB opportunity to an entity, Western Capital Holdings, Inc. ("WCHI"), created by River Valley's shareholders. All of the profits River Valley now claims were lost as a result of the breach, were obtained by WCHI and its successor entity. Thus, Mr. Holland unabashedly admits that, if River Valley were to be awarded any of the damages plaintiffs now seeks, he and the Estate of Mr. Ross would obtain a double recovery. Such a claim betrays common sense and the law. As a matter of law, all

benefits of mitigation must taken into account as well as costs. The $45 million in profits received by River Valley's shareholders through River Valley's mitigation must be offset against the purported lost profit costs now asserted by River Valley. Moreover, plaintiffs cannot be placed in a better position than if the breach had not occurred. As a matter of law, there are no SAFSB-related damages.

Apart from these dispositive considerations, plaintiffs' SAFSB claims fail for other reasons. First, three of four iterations of SAFSB-related damages are made by argument of counsel alone, without any expert report or expert opinion. This Court and the rules governing the Winstar-related cases preclude expert opinion without prior expert reports and disclosure. Thus, plaintiffs' claims (in the alternative) for $45 million, $34 million, and $29 million in SAFSB-related damages cannot properly now be heard.

Furthermore, the SAFSB claim fails because the 1992 SAFSB transaction was an independent, collateral and remote undertaking relative to the 1988 FSLIC Assistance Agreements at issue in this case. River Valley III would have been able to obtain a loan from its favored lender to finance the SAFSB acquisition directly, irrespective of the breach, were it not for the non-breaching cross-guaranty provisions of FIRREA. Those provisions, which held related corporate banking entities mutually liable for capital failures, caused River Valley III's favored lender to decide that it would not lend funds for the SAFSB acquisition directly to the River Valley III, but only to a newly created Texas entity that would not share its liabilities with the Illinois thrifts.

Other causal factors preclude plaintiffs's SAFSB claim. First, all of the damages claimed are based upon SAFSB's increased market value after the date of its acquisition. The increased value was not caused by the Government, and accordingly, the damages based upon the

increased value cannot be attributed to the Government. Second, even if River Valley III had kept all of its regulatory capital, that capital could not have been used toward the fully-phased in capital level required before thrifts were permitted to bid on RTC thrifts such as SAFSB. In addition, regulators would not have permitted River Valley III to bid on another institution while it was under a Supervisory Agreement, which it likely would have been irrespective of the breach because of regulatory criticisms of River Valley III's large portfolio of high-risk mortgage derivatives. Thus, irrespective of the breach, River Valley could not have acquired SAFSB.

Given the foregoing, there can be no foreseeability. Indeed, because plaintiffs' SAFSB claim is for consequential damages whereby they seek $45 million in damages for the loss of $20 million in regulatory capital, their SAFSB claim is unforeseeable as a matter of law.

Finally, plaintiffs' SAFSB- related claim faces insurmountable hurdles with respect to the reasonable certainty of the damages claimed. Plaintiffs' assumption is that, in a nonbreach world, River Valley would have acquired SAFSB, sold it to First Bank in 1995, and yet, once held by First Bank, SAFSB would have been operated in the same fashion, obtaining exactly the same profits, as the actual Texas thrift. On its face this is an implausible assumption.

Plaintiffs' claim for diminished economic value fares no better. Plaintiffs assert that the loss of intangible regulatory capital caused a diminution in the value of the River Valley thrifts relative to their value at the time of contracting in an amount of approximately $21 million. This fundamental premise to plaintiffs' damage claim is incorrect. River Valley's value <u>increased</u> dramatically following the 1988 acquisitions. Indeed, River Valley's own mark-to-market of its balance sheet demonstrates this. Moreover, a third-party investment bank performed an

independent valuation of River Valley's stock and determined that the stock's value increased significantly between 1988 and 1991.

In addition to the dispositive lack of a factual basis for plaintiffs' diminution in value claim, plaintiffs' claim fails because the methodology employed by plaintiffs' expert is flatly unreliable. To begin with, by invoking an improper substantial-factor test for causation, plaintiffs' attempt to obtain damages for the loss of the $5 million in preferred that this Court has found to be non-contractual capital. The test of causation is not that loose.

Second, plaintiffs' valuation methodology is based upon a claim that preferred stock issued by the River Valley I to the FSLIC reflected the true market value of both River Valley I and River Valley II. It did not. Indeed, the FSLIC offered to purchase the preferred stock as a form of assistance in connection with the Assistance Agreement (because, as a matter of then existing regulation, the preferred stock could count toward regulatory capital levels). It was not a true market-based transaction, and it was not meant to serve as a proxy for an extrapolated value of the entire thrift (River Valley I), much less the value of River Valley II.

Even if one were to ignore the factually incorrect premise that the River Valley thrifts' value declined, to the degree there was any decline in those values following the passage of FIRREA, plaintiffs have not shown that the diminution was not caused by the numerous negative factors affecting River Valley's performance, including local and national economic recession, a negative perception of savings and loans, movement of deposits from savings and loans into other depository institutions, an upheaval in the capital markets, and regulatory criticisms of the thrifts' high-risk mortgage backed security ("MBS") derivatives. Plaintiffs cannot show any diminution in value damages.

Plaintiffs third category of damages, a so called retained earnings theory, is likewise without foundation as a matter of fact or law. Plaintiffs argue that, to mitigate the effect of the loss of the intangible regulatory capital, the thrift retained its earnings to replace that lost capital. Plaintiffs' expert, again Mr. Holland, argues that the retained earnings had a cost to the thrift that can be calculated based on a hypothetical 20 percent annual expected cost of capital, resulting in damages of $21 million from 1990 to 2013.

Mr. Holland's retained earnings theory does not withstand scrutiny. First, his $21 million in damages for retaining the $20 million of lost regulatory capital is $1 million more than the face value of the intangible regulatory capital. Actual tangible capital, however, is worth far more, not less, than intangible accounting capital. Further, Mr. Holland claims that this is merely a partial mitigation and that, for full recognition of the purported harm from the loss of goodwill, the SAFSB-related damages must be added. As noted above, this results in an implausible $65 million in damages for the loss of the $20 million of regulatory capital.

Furthermore, a retained earnings theory calculated in the same way that Mr. Holland calculates damages here has been rejected both by this Court and the Court of Appeals for the Federal Circuit. See Bank of America, FSB v. United States, 67 Fed. Cl. 577 (2005), aff'd sub nom., Bank of America, FSB v. Doumani, 495 F.3d 1366 (Fed. Cir. 2007). Here, as in Bank of America, River Valley's shareholders received their "return" upon earnings retained by the thrift (purportedly due to the breach) in the form of the purchase price River Valley obtained upon its sale to First Bank. See Bank of Am., 495 F.3d at 1373. There were no damages resulting from River Valley's retaining of its earnings.

Furthermore, Bank of America instructs that, if the cost of retained earnings were to be calculated, actual dividends paid by a thrift is the proper measure of the cost of retained

earnings. Id. Mr. Holland ignores River Valley's actual dividend payments as a cost of capital, and instead relies upon a hypothetical construct through which he claims a 20 percent cost of capital for River Valley. Thus, just as the plaintiffs' hypothetical retained earnings failed in Bank of America, Mr. Holland's retained earnings theory fails here as a matter of law.

Moreover, given that Mr. Holland's methodology is based upon a hypothetical cost of capital and not River Valley's capital raising costs, his theory is precluded by precedent from the Federal Circuit instructing that replacement of capital damage claims that are hypothetical and do not reflect the thrift's actual experience are barred. See LaSalle Talman Bank v. United States, 462 F.3d 1331, 1375 (Fed. Cir. 2006); see also Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1381-82 (Fed. Cir. 2005); Fifth Third Bank of W. Ohio v. United States, 402 F.3d 1221, 1236-37 (Fed. Cir. 2005).

Apart from the precedent that bars plaintiffs' retained earnings theory, plaintiffs are internally inconsistent with what it is they claim to be Mr. Holland's retained earnings theory. On one hand, plaintiffs claim that their retained earnings is a mitigation theory, that earnings were retained to replace the lost regulatory capital. On the other hand, they claim that, but for the breach, River Valley would have had even more retained earnings. If the thrift would have retained earnings irrespective of the breach, however, the breach cannot be held to have caused the retained earnings. Moreover, this admission only proves the point that retained earnings do not harm a thrift. Mr. Holland's retained earnings theory fails the test of causation.

Mr. Holland's methodology suffers additional flaws. For example, it is neither a proper ex ante or ex post theory of damages. Furthermore, it calculates most of the damages for the period following First Bank's acquisition in 1995, despite the fact that, as a matter of contract, regulatory policy, and accounting, River Valley's regulatory capital could not have transferred to

First Bank, irrespective of the breach. Finally, given that River Valley's shareholders actually realized the return from the retained earnings with the sale of the thrift to First Bank in the form of the share appreciation, to award them the "cost" of retained earnings now would amount to a double recovery.

Accordingly, there is no basis for any award of damages based upon the three damage theories propounded by the plaintiffs.

## CONTENTIONS OF FACT

## I. THE THRIFT INDUSTRY GENERALLY

### A. The FHLBB And The FSLIC

1. Prior to the enactment of the Financial Institutions Reform Recovery, and Enforcement Act ("FIRREA"), Federal regulation of the thrift industry was the primary responsibility of the Federal Home Loan Bank Board ("FHLBB" or "Board"). Joint Stipulation of Facts (Dec. 31, 2003) ("JSF") ¶ 11. See generally 12 U.S.C. § 1464 (1988).

2. The Federal Savings and Loan Insurance Corporation ("FSLIC") administered a fund that insured deposits held by thrift institutions. JSF ¶ 12; 12 U.S.C. § 1726 (1988).

3. To enable the Board and FSLIC to assess and limit the risk institutions posed to the insurance fund, and to protect the stability of the thrift industry, the Board established an elaborate system of regulations governing the financial standards and activities of thrifts. Among other things, the Board promulgated regulations that required thrifts to maintain specified levels of net worth, usually expressed as a ratio of capital against liabilities. JSF ¶ 15; 12 C.F.R. § 563.13(b)(2)(1982); 12 C.F.R. § 563.13(b)(2) (1983).

**B. Statutory Restrictions On Thrift Mergers**

4. By statute, no insured thrift institution could acquire or merge with another insured institution without the Board's approval. JSF ¶ 13; 12 U.S.C. § 1730(q) (1988).

5. In addition, no insured institution could increase its insurable accounts as part of any merger or consolidation without the Board's approval. JSF ¶ 14; see, e.g., 12 C.F.R. § 563.22 (a) (1988).

6. The Board's regulations required that applications for a merger or acquisition describe the accounting method used to record the merger and that the applicants obtain certification from an independent accountant that the method was appropriate in the circumstances. JSF ¶ 17; see, e.g., 12 C.F.R. § 571.5(e) (1988).

7. These disclosures and certifications were necessary so that the Board could assess the true financial condition of the entities involved, consistent with its statutory duty to ensure the safety and soundness of the institutions. JSF ¶ 18; 12 U.S.C. § 1464(d)(3)(A) (1988).

8. When an acquired thrift was experiencing financial difficulties, including asset quality problems, a merger might affect the ability of the resulting institution to satisfy the Board's net worth or other regulatory requirements. To address this situation during the turbulent economic conditions of the 1980s, the Board adopted a policy of "forbear[ing] from taking supervisory action, for a specified period, with respect to certain regulatory requirements that a resulting association might not be able to fulfill" as a result of the acquisition. JSF ¶ 19; 47 Fed. Reg 8152 (1982).

9. Forbearances permitted thrifts to, among other things, exclude, for certain periods of time as set forth in the forbearance instrument, the net worth deficiency of the acquired thrift for purposes of determining compliance with the Board's net worth requirements. JSF ¶ 20; 47 Fed. Reg. 8152-53 (1982).

**C. The Use Of GAAP Accounting In Regulatory Accounting And Certain Specified Exceptions To GAAP**

10. For purposes of determining compliance with net worth requirements and other financial regulations, the Board generally required thrifts to adhere to Generally Accepted Accounting Principles ("GAAP") unless otherwise specified. JSF ¶ 21; see 12 C.F.R. § 563.23-3 (c) (1988).

11. The Board did, however, permit certain forbearances from GAAP for supervisory mergers. JSF ¶ 21. Such forbearances did not, and could not, waive the Board's statutory obligation to take action to ensure an institution's safety and soundness. See 47 Fed. Reg. 8152, 8152-54 (1982).

12. In addition, "a further inducement, described as a 'capital credit' . . . arose when FSLIC itself contributed cash to further a supervisory merger and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital. United States v. Winstar Corp., 518 U.S. 839, 853 (1996) (citations omitted); JSF ¶ 30.

13. The "capital credit" goodwill at issue in this case was to be amortized over no more than 25 years. PX 754 WOT645 0847-0849; PX 200 WOT013 0583-0585; JSF ¶ 31.

14. Mergers and acquisitions were frequently accounted for using the purchase method, and goodwill was created as a result of using that method of accounting. Over time, goodwill would decrease through a charge to earnings. Similarly, the market value of the assets

would be accreted through the income statement to the face amount. The charge to earnings would, however, create a drag on future earnings that was more than offset in the short run by the accretions. Under then-existing regulations, this goodwill could be treated as an asset in the calculation of equity capital, an indicator used by the thrift regulatory authorities to evaluate the financial soundness of the thrift. JSF ¶ 36; PX 2 at 425-66; PX 1 at 223-39; PX 552 at 1231-32; PX 7 at 4779-4796; 12 C.F.R. § 561.13 (1988).

## II. FIRREA'S ENACTMENT

15. Congress responded to the thrift crisis by enacting FIRREA, a comprehensive thrift reform package, which was signed into law on August 9, 1989. JSF ¶ 39; see generally FIRREA.

16. FIRREA strengthened the regulatory capital requirements for thrifts. JSF ¶ 40; 12 U.S.C. § 1464(t) (1989).

17. In general, FIRREA and its implementing regulations limited the amount of goodwill, including "capital credit" goodwill, that could be included in core and risk-based capital and required such qualifying goodwill to be phased out over a five-year period. JSF ¶ 40(a); 12 U.S.C. §§ l464(t)(2)(A)-(B), 1464(t)3, 1464(t)(9)(A)-(B) (1989).

18. The relevant portions of the FIRREA legislation required, among other things, three different measures of capital for thrift institutions: (1) "core capital;" (2) "tangible capital;" and (3) "risk-based capital." 12 C.F.R. §§ 561, 563 and 567 (1990). JSF ¶ 41; 12 C.F.R. § 567.

19. The amount of supervisory goodwill that could be used to meet core capital requirements was gradually phased out over a five-year period, and eliminated as of January 1, 1995. JSF ¶ 42.

20. Tangible capital was required to be one-and-a-half percent of adjusted total assets. Tangible capital generally included items that could be included as core capital. Tangible capital did not include qualifying supervisory goodwill, subordinated debt, or cumulative preferred stock. JSF ¶ 43; 12 CFR § 567.2 (Jan. 1, 1990 ed.).

21. Goodwill, both before and after FIRREA, was an intangible asset. Goodwill earns no income, amortizes over time, and cannot be spent or transferred other than via mergers qualifying as a pooling. Defendant's Proposed Statement of Facts (Dec. 31, 2003) ("DPSF") ¶3; PX 2 at 425-466; PX 1 at 223-229; PX 552 at 1231-32; PX 7 at 4779-4796; DX 1376 at 63.

22. Risk-based capital was required to be eight percent of risk-weighted assets, subject to a phase-in period. Risk-weighted assets were generally determined by multiplying the nominal balance of each asset by the appropriate risk-weight as set forth in the regulations. JSF ¶ 44; Regulatory Capital, OTS, 54 FR 46845, 46848 (Nov. 8, 1989).

23. Following the 1988 acquisitions until the passage of FIRREA, the FSLIC continued to insure the acquired deposits. Subsequent to FIRREA, the FDIC, as successor to FSLIC, insured the acquired deposits. JSF ¶ 45; FIRREA §§ 211, 401(a)(1).

## III. THRIFTS WERE EXPERIENCING A DOWNWARD TREND IN ASSETS BEFORE 1989, AND THAT TREND CONTINUED UNTIL 1996

24. During the late 1980s, the average annual asset growth rate for the savings and loan industry as a whole fell from 9.6 percent in 1985 to 6.2 percent in 1988, the last full year prior to the passage of FIRREA. DX 1414 at Ex. 5; DX 1338 at 21. The general downward trend was driven by several factors such as disintermediation, competition from commercial banks, the emergence of mortgage banking companies, thrift failures, and finite opportunities for profitable investment. JSF ¶ 46.

25. The thrift industry's asset base contracted throughout the period between 1989 and 1996, with the most dramatic declines -- of 13 percent per year -- occurring between 1989 and 1991. DX 1414 at Ex. 5. As in the period prior to FIRREA, the contraction in the thrift industry's asset base was driven by disintermediation, competition from commercial banks, thrifts converting charters, thrift failures, and finite opportunities for profitable investment, among other factors. JSF ¶ 47.

26. Part of the slowdown in the growth of assets for thrifts in the early 1990s can be attributed to the fact that there were lower interest rates in the early 1990s relative to the late 1980s. As part of the asset growth in the savings and loan industry comes from the crediting of accrued interest, periods of higher interest rates tend to affect positively a thrift institution's asset growth rate. DPSF ¶ 28; DX 1414 at 16, Ex. 3.

## IV. THE SUPERVISORY TRANSACTIONS

### A. Background

27. First Bank’s claims revolve around two assisted acquisitions that took place on July 29, 1988: (1) the Galva/Home/Mutual merger into River Valley Savings Bank, F.S.B. (with the resulting entity referred to as River Valley I) (JSF ¶ 74); and (2) the merger of Republic into Rock Falls Savings and Loan Association (“Rock Falls”) (with the resulting entity referred to as River Valley II). JSF ¶ 112. According to plaintiffs, the basis of the River Valley thrifts’ express contracts are a “series of integrated documents” that “comprise a unitary agreement.” Third Am. Compl. ¶¶ 25, 44. Plaintiffs assert that these documents, all of which are dated on or around July 29, 1988, include corresponding assistance agreements with the FSLIC, resolutions issued by the FHLBB, and certain forbearance letters from the FHLBB. Id. Plaintiffs allege that the relevant terms of the alleged express contracts are set forth in these documents. Id.

28. By no later than July 1988, each of the five acquired thrifts involved in this case (Galva Federal Savings and Loan Association of Galva, Illinois ("Galva"); Mutual Savings and Loan Association of Canton, Illinois ("Mutual"); Home Federal Savings and Loan Association of Peoria, Illinois ("Home"); Republic Savings of South Beloit, Illinois ("Republic"); and Peoria Savings and Loan Association, Peoria, IL ("Peoria")) had become insolvent and was operating at a loss. Collectively, the five thrifts had multimillion-dollar net-worth deficits. JSF ¶ 57; PX 62 WON074 1190-92, 1190; PX 172 WOT013 0818-26, 0819-20; DX 1383 at 39-44; PX 79 at JA 208; PX 68 WOT646 0528-0571; DX 128 WOB026 0644-0651; PX 199 WOT013 0775-0792, 0778, 0782; PX 272 WOB026 0006-0017, 0007.

**B. The River Valley I Transaction**

29. FSLIC sought an acquiror for Home, Mutual, and Galva. "In an attempt to achieve some operating economies of scale and to assemble a more attractive commodity from a marketing standpoint, FSLIC senior staff, in consultation with the Federal Home Loan Bank ("FHLB") of Chicago, decided that Galva, Mutual and Home would be offered as a package to interested acquirers." JSF ¶ 59; PX 172 WOT013 0818-0826, 0820.

30. Messrs. Holland and Ross submitted a bid proposal to the FSLIC to acquire Home, Mutual, and Galva, and to merge them into Rock Falls, the thrift they owned. JSF ¶ 73; See PX 601 at 27-28 ¶ 66; DX 1373 at 111.

31. Messrs. Holland and Ross acquired 100 percent of the common stock of the resulting institution (River Valley I) for $1,000 cash. PX 207 WOF016 1512-1603, 1519. This constituted the lone cash investment by Messrs. Holland and Ross at the time of the acquisition.

### 1. The River Valley I Assistance Agreement

32. On July 29, 1988, an Assistance Agreement was entered into by and among plaintiffs, River Valley I and FSLIC relating to the acquisition of Galva, Mutual, and Home. JSF ¶¶ 75-76; PX 207 WOF016 1512-1603, 1598.

#### a. The FSLIC Cash Contributions

33. Pursuant to the Assistance Agreement, FSLIC contributed $34,215,888 to River Valley I, plus $13,000 per diem from April 1, 1988, to, and including, the Agreement's effective date. These payments contributed to the elimination of the thrift's existing net worth deficit. PX 207 WOF016 1512-1603, 1546; PX 393 WOF240 0238-0272, 0250-0252.

34. The Assistance Agreement provided that $8,000,000 of the cash contributions made by FSLIC would be credited to River Valley I's net worth account and would constitute regulatory capital subject to certain restrictions. These restrictions included restrictions that the cash contribution would not be used to calculate the thrift's deemed fully phased-in regulatory capital level, and that the regulatory capital could not be used to determine whether a dividend payment to its stockholders could be made. PX 207 WON016 1512-1603, 1547-1548.

35. These restrictions were consistent with the negotiations that took place between regulators and River Valley I. Leo Blaber, Principal Supervisory Agent of the FHLB of Chicago, recorded that River Valley I had "expressed a willingness to enter into an agreement which would disallow inclusion of the [$8 million cash contribution] assistance in capital for purposes of growth, investment limitations, or for declaring dividends." PX 193 WOF016 2430-2434, 2434. Mr. Blaber further noted that, '[t]he principal purpose for which the acquirer wishes to receive this credit to capital is in order to be well positioned vis-a-vis his capital with

respect to future FSLIC insurance premium assessments. All other benefits of assistance to capital he is willing to forego." Id.

36. In the same memorandum, dated July 12, 1988, Mr. Blaber stated:

> The FHLB of Chicago supervisory staff will, through its records, be continuously aware of the $8 million in 'soft' RAP capital in analyzing the resulting institution's financial position in future applications and/or mergers.

PX 193 WOF016 2430-2434, 2434.

37. The "Accounting Principles" section of the Assistance Agreement provided that GAAP would apply, except where GAAP conflicted with the terms of that Agreement, applicable regulation or the approval documents. JSF ¶ 79; PX 207 WON016 1512-1603, 1591-1592.

**b. The FSLIC's $5 Million Preferred Stock Assistance**

38. The Assistance Agreement provided that the FSLIC would purchase $5 million in preferred stock. JSF ¶¶ 80, 103; PX 207 WON016 1512-1603, 1546, 1549. This preferred stock paid a fixed rate dividend of 8 percent for the first ten years, after which the rate gradually increased to 12 percent. The stock also contained a profit participation component in the form of a supplemental dividend. JSF ¶ 103; PX 202 CHO023 0106-0288, 0167-0174; Holland v. United States, 74 Fed. Cl. 225, 258-63 (2006).

39. At the time of River Valley I's stock issuance to the FSLIC (i.e., July 1988), the average monthly nominal yield for a ten year constant maturity United States Treasury bond was 9.06 percent. See DX 1558 at 8. That is, United States Treasuries were paying a much higher rate (even though they were considered safer) than the rate River Valley I paid in connection with the issuance of its preferred stock to the FSLIC.

40. The inclusion of the preferred stock toward regulatory capital computations was specifically permitted at the time of the acquisition as a matter of regulation, but, as a restriction on its marketability, no redemption could be made if the institution would fail to meet its regulatory capital requirements as a result of the redemption. See 12 C.F.R. § 561.13(d) (1988).

41. As of June 1988, FSLIC estimated that the present value of the fixed rate and supplemental dividend features of the preferred stock totaled $6.52 million. JSF ¶ 109; PX 174 WOF016 2577-2578, 2578. Just two months earlier, in April 1988, FSLIC estimated the present aggregate value to be about ten percent less -- $5.92 million. DPSF ¶ 18; PX 148 WOF016 2572-2575, 2573.[2] In both instances, the FSLIC noted that its figures for the valuation of the preferred stock were "'soft' in that the valuation relied upon assumptions concerning the appropriate discount rates and projected income of the resulting association." JSF ¶ 109; PX 148 WOF016 2572-2575, 2573; PX 174 WOF016 2577-2578, 2578.

42. The FSLIC's estimates were not based upon independent due diligence or an audit of River Valley I performed by the FSLIC. Indeed, Messrs. Holland and Ross provided some of the assumptions FSLIC used in valuing the Series A preferred stock in 1988. JSF ¶ 107; PX 148 WOF016 2572-2575, 2572; PX 174 WOF016 2577-2578, 2577.

43. On July 29, 1988, River Valley I entered into a Stock Purchase Agreement with the FSLIC. JSF ¶ 102; PX 202 at CHO023 0106-0208, 0106, 0165.

---

[2] In April 1988, the FHLBB provided an estimate of $3.371 million for the income-sharing component of the preferred stock (using a 16 percent discount rate), and a range of values from $2.6 million (20 percent discount rate) to $3.85 million (13.91 percent discount rate). JSF ¶ 108; PX 148 WOF016 2572-2575, 2573.

44. The Series A preferred stock was redeemable (subject to restrictions affecting regulatory capital requirements) at the option of River Valley I at par value – plus accrued and unpaid dividends. JSF ¶ 104; PX 202 CHO023 0106-0208, 0171-0172; 12 C.F.R. § 561.13(d) (1988).

45. KPMG Peat Marwick ("KPMG"), River Valley I's auditors, stated that, "River Valley [I]'s common stock investors viewed FSLIC's preferred stock investment as being similar to a 'loan from FSLIC.'" JSF ¶ 105; PX 452 HO-KPMG 000971.

46. According to the analysis of Laurence Barr & Co. ("Laurence Barr") which River Valley I retained to provide an analysis concerning the relative values of River Valley I's common and preferred stock, the estimated value of River Valley I's Series A Preferred Stock, as of July 28, 1988, was $2,800,000, even though the par value of the stock was $5 million. Moreover, Laurence Barr concluded that the market value of the thrift's equity was only between $8 million to $9 million as of July 1988. DX 1452 at ¶¶ 1, 6-7; DX 514 HO2007 0488-0492.

47. J. Richard Earle, a regional director of the FHLBB's mergers and acquisition division was personally involved in discussions regarding the River Valley I transaction. He concluded that the FSLIC's valuation of the preferred stock at $5 million was not a reliable indicator of the thrifts' true market value. DX 1475 at ¶ 4. He reached this conclusion because the FSLIC's analysis of the preferred stock was for the limited purpose of determining, in the larger context of the River Valley I transaction as a whole, whether the paper cost of the acquisition was less than the paper cost of liquidation. As a result, the FSLIC's valuation of the preferred stock contained several limitations that prevented it from measuring the stock's true market value. DX 1475 at ¶¶ 4-7. Indeed, Mr. Earle testified that the AED's assumptions and

methodologies were so flawed that he did not pay attention to them and did not rely upon their valuations. DX 1448 at 128:12-25, 142:19 - 143:3, 143:21-25, 144:14-25.

48. Likewise, Herbert J. Held, who was also a regional director in FSLIC's mergers and acquisitions division in 1988 and who also was personally involved in the discussions regarding the River Valley I transaction, has declared that the AED did not measure how much the preferred stock would actually be worth on the open market. Mr. Held emphasizes that the purpose of the AED's analysis of the preferred stock was not to assess the market value of the stock but simply to determine the cost of the preferred stock to the FSLIC in the larger context of the River Valley I transaction as a whole. DX 1474 at ¶¶ 4-7.

49. FSLIC's purchase of River Valley I's preferred stock represented only one component of the supervisory acquisition of Galva, Mutual, and Home. There were other significant components of the transaction whereby FSLIC provided various forms of assistance. JSF ¶ 106; PX 207 WOF016 1512-1603; PX 201 at CHO023 1087-92, 1088-89; DX 153 WON335 0112-0138.

**c. The Use Of $4.6 Million Of Subordinated Debt Toward Regulatory Capital Computations**

50. The Assistance Agreement provided that a $4.6 million subordinated debenture could be included in River Valley I's regulatory capital. JSF ¶ 81; PX 207 WOF016 1512-1603, 1548-1549.

51. River Valley I issued $4.6 million of subordinated debt to American National Bank ("ANB") on July 29, 1988 at an interest rate equal to prime plus 0.25 percent per annum. PX 204 WOF016 1613-1624.

52. The $4.6 million of subordinated debt issued by River Valley I to ANB had a stated "Maturity Date" of March 31, 1998 (approximately 10 years from the date of the execution of the subordinated debenture agreement). The maturity date could be extended according to the specific terms of the agreement. JSF ¶ 98; PX 204 WOF016 1613-24, 1615-16.

53. The purchase agreement for the subordinated debt prohibited River Valley I from merging or consolidating into or with another entity without ANB's prior written consent. JSF ¶ 100; PX 209 WOF016 1631-33.

54. Separately from River Valley I's obligations, Messrs. Holland and Ross were obligated to purchase the subordinated debt from ANB in $600,000 increments beginning on the 4th anniversary of issuance and continuing on each anniversary date thereafter through the "Maturity Date" (year 10), at which time Messrs. Holland and Ross were obligated to make a $1.0 million purchase, bringing the total of principal payments to $4.6 million. DPSF ¶ 17; PX 201 at CHO023 1087-92, 1087-89.

55. Messrs. Holland and Ross pledged their shares of River Valley II common stock to ANB as collateral for the $4.6 million of subordinated debt. JSF ¶ 101; PX 201 CHO023 1087-92, 1088-89.

**d. <u>The Restrictions On Transfer To Third Parties</u>**

56. The River Valley I Assistance Agreement contained a clause barring the assignment of rights or obligations of the agreement to any other party, including through merger, without the FSLIC's prior written consent. JSF ¶ 83; PX 207 WOF016 1512-1603, 1596-1597 § 25.

57. It further provided that the Agreement was meant for the sole benefit of the parties to the agreement, barring any person other than the parties to the Assistance Agreement from asserting "any legal or equitable right, remedy, or claim under, or in respect to, this Agreement or any of its provisions." JSF ¶ 84; PX 207 WOF016 1512-1603, 1597.

58. Consistent with the Assistance Agreement's plain language, regulators understood that, upon a proposed merger, the thrift would have to obtain a separate regulatory approval with respect to regulatory capital promises in the agreement because the assistance was not intended for another future buyer. DX 1448 at 130-133.

### 2. Resolution 88-638

59. FHLBB Resolution 88-638 provided, in part, that River Valley I was to report to the FHLBB and FSLIC in accordance with GAAP, "as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC," except to the extent that $8 million of the cash contribution could be credited to regulatory capital and goodwill created through the acquisition could be amortized for up to twenty-five years. JSF ¶ 88; PX 199 WOT013 0775- 0792, 0788-0789.

60. FHLBB Resolution 88-638 required River Valley I to furnish an accountant's opinion substantiating the reasonableness of the amount and amortization of the goodwill created through the acquisition. JSF ¶ 89; PX 199 WOT013 0775-0792, 0789.

### 3. Forbearance Letter

61. In a July 28, 1988, letter, FHLBB granted certain regulatory forbearances with respect to the Galva, Mutual, and Home transaction. JSF ¶ 90; PX 200 WOT013 0583-0585.

**4. Accounting**

62. With respect to the Galva, Mutual, and Home acquisition, River Valley I initially recorded $1.136 million of GAAP goodwill; this GAAP goodwill, however, was retroactively eliminated in its entirety during the fourth quarter of 1989 due to a revaluation of the tangible assets acquired. JSF ¶ 97; PX 393 H&R-BX62-00145-49; PX 392 H&R-BX70-2510-2522, 2510; PX 288 SH-HO 0000001-0000371.

**C. The River Valley II Transaction**

**1. Background**

63. On July 29, 1988, FSLIC and Rock Falls, the wholly owned thrift of Messrs. Holland and Ross, entered into an Assistance Agreement relating to Rock Falls's acquisition of Republic. The resulting association was named River Valley II. JSF ¶ 113; PX 205 WOT013 0051-0119.

64. Republic had been reporting operating losses since March 1985. PX 182 WOT013 0194-0203, WOT013 0195. The Government placed the thrift into receivership in October 1986; by March 31, 1988, Republic was reporting a net worth deficit of almost $17 million. JSF ¶ 65; PX 182 at WOT013 0198-0199.

65. As with the River Valley I transaction, Mr. Blaber, Principal Supervisory Agent of the FHLB of Chicago, noted that the acquirors were willing to forego the use of the contractual capital toward regulatory capital computation (with the exception that it be used in calculating insurance premium assessments). PX 191 WOT645 1521-1526, 1525-26.

66. In the same memorandum, Mr. Blaber also noted the “soft” nature of the FSLIC’s cash contribution for regulatory capital purposes:

> The FHLB of Chicago supervisory staff will, through its records, be continuously aware of the $5 million in 'soft' RAP capital in analyzing [Rock Falls'] financial position in future applications and/or mergers.

PX 191 WOT645 1521-26, 1525.

2. **The River Valley II Assistance Agreement**

67. On July 29, 1988, FSLIC and Rock Falls, plaintiffs' wholly owned, state-chartered thrift, entered into an Assistance Agreement relating to the merger of Republic into Rock Falls. JSF ¶¶ 113-14; PX 205 WOT013 0051-0119, 0051, 0056, 0056-0058, 0113.

68. Like the River Valley I Assistance Agreement, the River Valley II Assistance Agreement restricted the benefits of the contract to the parties to the Agreement. PX 205 WOT013 0051-0119, 0112.

69. The Assistance Agreement also restricted the assignment of any rights or obligations under the Agreement. JSF ¶ 121; PX 205 WOT013 0051-0119, 0111-0112.

70. The River Valley II Assistance Agreement provided, among other things, for a cash contribution equal to $16.6 million in cash assistance from the FSLIC. PX 205 WOT013 0051-0119, 0073-74. The FSLIC's cash contributions eliminated all but $1.3 million of the resulting institution's existing net worth deficit. JSF ¶ 116; PX 205 WOT013 0051-0119, 0073, 0074.

71. The Assistance Agreement provided that $5 million of the cash contribution made by FSLIC would be credited to River Valley II's regulatory capital account subject to certain restrictions. Importantly, and consistent with the restrictions noted by Mr. Blaber, the restrictions prevented the thrift from using the cash contribution to meet the thrift's fully phased

in regulatory capital levels, nor could it be used to determine whether a dividend payment could be made by the thrift to its shareholders. PX 205 WOT013 0051- 0119, 0074.

72. The Assistance Agreement's "Accounting Principles" section provided, in part, that GAAP would apply, except where such principles conflicted with the Agreement, regulations, or the FHLBB approval of the transaction. JSF ¶ 117; PX 205 WOT013 0051-0119, 0107.

### 3. Resolution 88-612

73. On July 27, 1988, FHLBB issued Resolution 88-612. JSF ¶ 122; PX 198; WOT645 1171-1179. Resolution 88-612 required that River Valley II demonstrate the sale of $2 million in subordinated debt to ANB. JSF ¶ 124; PX 198 WOT645 1171-1179, 1175.

### 4. Forbearance Letters

74. On July 29, 1988, FHLBB sent a letter to River Valley II, approving the issuance and inclusion in its regulatory capital of the $2 million subordinated debenture. JSF ¶ 127; PX 206 WON534 0109-0110.

75. On May 18, 1989, FHLBB sent a letter to River Valley II granting regulatory forbearances with respect to the acquisition of Republic. JSF ¶ 129; PX 754 WOT645 0847-49.

### 5. Issuance Of Subordinated Debt

76. The purchase agreement for the subordinated debt prohibited River Valley II from merging or consolidating into or with another entity without ANB's prior written consent (provided that such written consent would not be unreasonably withheld or unduly delayed). JSF ¶ 140; DX 152 PHO056 1570-1588, 1576-1578.

77. River Valley II issued $2 million of subordinated debt to ANB on July 29, 1988, at an interest rate equal to prime plus 0.5 percent per annum. PX 208, H&R-B37 00038-0049, 0041.

78. The $2 million of subordinated debt issued by River Valley II to ANB had a "Maturity Date" of March 31, 1998 (approximately 10 years from the date of the execution of the subordinated debenture agreement). PX 208 H&R-B37 0038-0099, 0040-41.

79. In 1991, River Valley III redeemed the $2 million of subordinated debt. At the same time, RVHI obtained $2 million in debt from ANB, which allowed River Valley III to increase its regulatory capital by $2 million. See Pl. Contentions of Fact and Law (Sept. 25, 2007) at ¶ 101.

**6. Accounting**

80. The fiscal year 1989 audited consolidated financial statements for River Valley II show that the application of purchase accounting to the Republic acquisition produced $1.3 million in GAAP goodwill. PX 313, H&R-B43-00559-00589, 00573.

**D. The Peoria Savings Acquisition**

**1. Background**

81. In the fall of 1988, two months after the closing of the Galva/Mutual/Home and Republic acquisitions, the Government marketed Peoria Savings and Loan Association ("Peoria"), another insolvent thrift located in central Illinois. The RoE conducted on Peoria in September 1988 revealed that the thrift was insolvent as of July 31, 1988. JSF ¶ 142; PX 269 WON363 0524-37, 0529.

### 2. <u>The Assistance Agreement</u>

82. On December 31, 1988, FSLIC and River Valley I entered into an Assistance Agreement relating to the acquisition of Peoria. JSF ¶ 145; DX 204 WOT837 0940-1020.

83. Pursuant to the Assistance Agreement, FSLIC contributed $3.3 million in cash to River Valley I. JSF ¶ 147; DX 204 WOT837 0940-1020, 0965-0966.

84. FSLIC's assistance eliminated all but $2.766 million of Peoria's existing net worth deficit. JSF ¶ 148; DX 204 WOT837 0940-1020, 0966; PX 393 H&R-BX62-00134-00168, 00148-00150.

85. During the fourth quarter of 1989, River Valley I "expensed the remaining excess of cost over fair value of net assets acquired arising from the acquisition of [Peoria]," specifically stating that "[t]he additional amortization was based upon the conclusion that the negative publicity within the industry, adverse deposit retention history, and the adverse regulatory changes have substantially reduced the franchise value." JSF ¶ 188; PX 393 H&R-BX62-00134-00168, 00149-00150.

86. As part of the Peoria acquisition, Messrs. Holland and Ross purchased $5 million of Class C cumulative preferred stock from River Valley I, having a liquidation value of $1,000 per share and an annual cumulative dividend rate of 10 percent. JSF ¶ 150; PX 285 H&R-B08 00331-00360, 00352; DX 1375 at 125.

87. Messrs. Holland and Ross funded the purchase of Class C preferred stock by borrowing $5 million from ANB. JSF ¶ 151; PX 372 H&R-BX64 02229-02232; DX 1373 at 179-180; DX 1375 at 125.

88. This $5 million loan had a maturity date of June 30, 1989, and an interest rate equal to prime plus 0.5 percent. As collateral, Messrs. Holland and Ross pledged all of River Valley I's common and preferred stock, plus all of River Valley II's common stock. DX 1538 H&R-B28-01107; PX 372 H&R-BX64 02229-02232.

**E. <u>Post-Acquisition Payments From The Government</u>**

89. Between 1989 and 1990, the FDIC provided River Valley I and River Valley II over $3.8 million to cover excess debt over credit items at the thrifts in accordance with the River Valley I and II Assistance Agreements. JSF ¶¶ 160 - 166.

**F. <u>Summary of Transactions</u>**

90. Altogether, the FSLIC incurred a cost of $83.4 million with the assistance it provided in the River Valley I and River Valley II transactions.[3] DPSF ¶ 20; PX 313 H&R-B43 00559-00589; PX 393 H&R-BX62 00134-00168, 00147-00149; PX 754 WOT645 0847-0849; PX 200 WOT013 0583-0585; PX 1165 HO4002 0001-0010. Considering the assets obtained through the five acquisitions, the "asset shortfall" River Valley I and River Valley II faced after the acquisitions was generally inconsequential, amounting to slightly more than one percent of total assets. Thus, the FSLIC incurred a huge cost in the form of the assistance. DPSF ¶ 20; PX 313 H&R-B43 00559-00589; PX 393 H&R-BX62 00134-00168, 00147-00149; PX 754 WOT645 0847-0849; PX 200 WOT013 0583-85; PX 1165 HO4002 0001-0010.

---

[3] The actual resolution cost to FSLIC related to the subject supervisory transactions was as follows: Republic - $20.3 million, Galva/Mutual/Home - $43.6 million, and Peoria - $19.5 million.

91. There was no provision in either the River Valley I or the River Valley II Assistance Agreement dealing with the so-called cross-guaranty provision (later enacted as part of FIRREA, see 12 U.S.C. § 1815(e) ), whereby a person or entity would be held liable for defaults on loan payments made to a related party (e.g., a subsidiary).

92. Regulators could not have foreseen the effect of the nonbreaching cross-guaranty provision on the thrifts. Specifically, regulators did not foresee, or have reason to foresee, at the time of the River Valley transactions in 1988 that such a cross-guaranty provision would have any effect upon the River Valley thrifts' capacity to borrow funds in order to acquire an unrelated thrift in Texas in 1992.

93. Regulators could not actually foresee, nor did they have reason to foresee, that, if the Government required River Valley II to phase out its use of the regulatory capital, River Valley II would not seek to replace that regulatory capital with new capital. Similarly, regulators did not foresee that, if River Valley II did seek to replace the lost regulatory capital, it would be unable to locate a source of funds to do so in the capital markets, especially if it intended to use that capital to take advantage of valuable and highly profitable investment opportunities.

94. Certainly, regulators did not foresee, nor did they have reason to foresee, that River Valley II would seek to acquire a thrift located in Texas over three years later, which was far beyond River Valley II's location in central and northern Illinois.

95. As of July 1988, regulators did not foresee, nor did they have reason to foresee, that River Valley II would seek to acquire a thrift from the Resolution Trust Corporation ("RTC") over three years later and, soon thereafter, sell it at a substantial profit.

96. It is undisputed that, through the River Valley Assistance Agreements, the Government did not guarantee that the River Valley thrifts use of additional leverage through the utilization of the alleged contract capital would be profitable. JSF ¶ 340.

## V. OPERATION OF THE THRIFTS AFTER THE ACQUISITIONS AT ISSUE

### A. Operations And Projections Before The Enactment Of FIRREA: A Retail Emphasis

97. At the end of 1988, after the five acquisitions, River Valley I and River Valley II had aggregate assets of $620.9 million and regulatory net worth of $34.9 million. JSF ¶ 167; PX 601 at 34 ¶ 81.

98. At the time of the acquisitions, the River Valley thrifts expected to grow modestly in the manner traditional for thrifts – by increasing retail loans and deposits. JSF ¶ 169; PX 249 WOT288 0021; PX 262 at WON339 0093; see PX 601 at 43.

99. They also wanted to grow their thrifts through the acquisition of other thrifts or branches of other thrifts. JSF ¶ 168; PX 601 at 40-41.

100. The FHLB of Chicago required the submission of business plans prior to the Government-assisted transactions for a number of reasons, including to assure itself of (a) the future viability of the resulting institutions, and (b) the institutions' ability to meet capital ratio requirements without taking on undue risk. JSF ¶ 170; DX 1381 at 52-53; PX 199 WOT013 0775-92 at 0781-82; PX 601 at 36 ¶ 86; DX 1374 at 101; PX 193 WOF016 2430-34.

101. River Valley I had the stated goal of "being the premier provider of retail banking products and services in its market areas." DPSF ¶ 21; PX 442 FHO013 83-135 at 101.

102. River Valley I's goal was "to provide retail banking services in communities of Central and Northern Illinois" and "to become one of the largest providers of retail banking services in each of the communities it serves." DPSF ¶ 22; PX 351 H&R-B44-1392-1407 at 1393.

103. The principal assumptions used in the projected financial statements submitted to the FHLB of Chicago in connection with the merger of Peoria and River Valley I were for stable real estate values, continued improvements in operating efficiency, and "increased retail marketing effectiveness." JSF ¶ 171; PX 262 WON339 92-113 at 94.

104. Emphasizing traditional retail banking operations after the acquisitions, River Valley I projected that its asset growth would be funded primarily with deposits rather than borrowings, with deposits favored in a four-to-one ratio over borrowings. DPSF ¶ 23; PX 262 WON339 92-113, 104.

105. In reviewing River Valley I's proposed acquisition of Peoria, FHLBB regulators noted that the key issue was whether the thrift could sustain its deposit growth. Regulators assumed that River I would not engage in any further borrowing activity other than a small increase in FHLB borrowings. DPSF ¶ 24; PX 273 WOT147 0031-0034, 0031.

106. The River Valley thrifts, however, did not succeed in increasing deposits from 1988 to 1994. DPSF ¶ 26. Indeed, as of June 30, 1989, the River Valley thrifts' traditional savings deposits had decreased by $52 million. A planned runoff of above-market loans, a lack of identity in the new River Valley name, and incompatible operations with the newly acquired thrifts caused this reduction in assets and liabilities. JSF ¶ 172; PX 345 WOL275 154-166, 154, 159, 161.

107. In comparing actual results through June 30, 1989, to the business plan dated December 9, 1988, the thrift noted as "a significant variance [from plan]" its "greater reliance on non-savings fundings." DPSF ¶ 25; PX 345 WOL275 154-166, 159.

108. The River Valley entities did not consider their business plans to be reliable indicators of actual performance, in part, because of the thrifts' use of capital markets (where margins were not known going into a given year). This difficulty in forecasting was present as early as 1987, and continued post-FIRREA. DPSF ¶ 27; DX 1377 at 274-277.

109. In June 1989, River Valley I projected no gains on securities sales, "since it was not the Bank's philosophy to make this type of revenue part of its income projection" and that the "revised business plan provides for no securities gains." JSF ¶ 173; PX 345 WOL275 154-66, WOL275 160, WOL275 166.

110. River Valley I also noted that local competition had led to irrational deposit pricing. Even so, the thrift projected a five percent growth rate for deposits. JSF ¶ 174; PX 345 WOL275 154-166, WOL275 165.

111. At the request of FHLB Chicago, on July 31, 1989, River Valley I updated the three year projections in its December 9, 1988 business plan. JSF ¶ 175; PX 345 WOL275 154-166. In comparing its representation of "Actual" results as of September 30, 1989, to its business plan update of July 31, 1989, River Valley I noted that the "areas of significant variance are reflected in the reduced investment in mortgage backed securities and the lower than projected level of savings deposits." JSF ¶ 176; PX 363 WOL275 87-99, WOL275 88.

112. In September 1989, River Valley I noted that it had experienced "savings deposit runoff which accounted for $12 million less in deposits than projected." The reason for this deposit runoff was: "The lack of River Valley identity along with some data processing-related operational problems[.]" JSF ¶ 176a; PX 363 WOL275 87-99, WOL275 88.

113. Furthermore, River Valley I recognized that its projected five percent annual growth in deposits had not been achieved. JSF ¶ 177; PX 363 WOL 275 87-99, WOL275 89.

**B. Prior To The Passage Of FIRREA, The River Valley Thrifts Made Numerous Errors In Reporting Their Derivative Instruments**

114. In their examination of River Valley I dated January 30, 1989, FHLB of Chicago examiners discovered that River Valley I had not correctly reported its investment in interest only and principal only stripped mortgage backed securities and the residual interest in multiple class securities (residuals) in the thrift's quarterly TFR Report. Moreover, regulators noted that Mr. Bangert told them that, due to the complexity of these instruments, management had been confused with respect to how these investments should be reported. JSF ¶ 178; PX 295 WOL275 215-227, WOL275 219.

115. Five months later, in the FHLB of Chicago's June 26, 1989 RoE, the FHLB of Chicago again stated that management had not documented River Valley I's purchase of high risk derivative securities and their effects on the interest rate sensitivity of the mortgage portfolio or balance sheet. JSF ¶ 180; PX 332 FHO012 2831-2865, FHO012 2832. Furthermore, regulators found that certain high-risk mortgage backed derivatives were incorrectly reported by the thrift as impacting upon hedging. In response, Mr. Bangert told regulators that River Valley I would revise its 1989 Quarterly Reports. JSF ¶ 183; PX 332 FHO012 2831-2865, 2845, 2847.

116. Moreover, regulators found that River Valley I failed to document the impact of high-risk mortgage derivative investments on the entire mortgage portfolio and the entire balance sheet under different interest rate and prepayment scenarios as required by regulation. JSF ¶ 184; PX 332 FHO012 2831-2865, 2847.

## C. Operations And Projections Post-FIRREA

### 1. The River Valley Thrifts Had Excess Regulatory Capital Following The Passage Of FIRREA

117. When FIRREA was enacted into law on August 9, 1989, the River Valley thrifts projected that they would be able to meet all new regulatory requirements through 1994. DPSF ¶ 29; PX 601 at 43; DX 1414 at 16; DX 293 PHO041 0924-0928, 0925; DX 376 PHO041 0946-0952, 0946-47; PX 378 WON339 0001-0039, 0007. This proved to be the case. Indeed, the River Valley thrifts had capital in excess of minimum regulatory capital requirements pursuant to FIRREA capital requirements at each quarter-end from March 31, 1990, to December 31, 1994. JSF ¶ 192; DX 1416, Ex. D; PX 288; DX 1492 at ¶ 38.[4]

118. For example, during the quarters-ending September 1993 through December 1994, River Valley III's risk-based capital surplus was the smallest surplus among River Valley III's various regulatory capital requirements; even so, the amount of excess risk-based capital ranged from $15 million to $7.5 million. See PX 288; DX 1445 at Ex. I.D.[5]

---

[4] River Valley I, River Valley II and River Valley III also reported positive net income on a GAAP basis during the period 1990 to 1994, taken as a whole. JSF ¶ 341; DX 402 PHO061 0345-0356, 0352; DX 403 PHO061 0358-0365, 0361; DX 1042 PHO064 2284-2297, 2288; PX 288 SH-HO 0000001-0000371.

[5] During this period, River Valley III included as part of its core and risk-based capital the maximum permissible amount of qualifying supervisory goodwill. DX 1445 at Ex. I.D.

119. River Valley I and River Valley II's combined assets continued growing after the passage of FIRREA until July 1990. JSF ¶ 191; DX 1416 at Ex. C; PX 288. Indeed, Plaintiffs do not allege any impact from the alleged breach until July 1990. (October 10, 2003, Joint Filing at 7). Moreover, Mr. Holland testified that it was not "until 1991 when the regulators forced us into a supervisory agreement" that he appreciated the impact FIRREA would have upon the thrift.[6] DX 1373 at 75:4-8; PX 601 at 43 ¶¶ 101, 102; DX 1414 at 16 ¶ 58.

**2. River Valley I's Return On Assets In 1989**

120. According to River Valley I's December 31, 1989 audit report, security gains of $1,596,000 accounted for approximately 85 percent of before tax income. The return on average assets was 0.40 percent in 1989. Had it not been for the large securities gains, the return on average assets would have been less than 0.10 percent. JSF ¶ 189; PX 454 H&R-BX62 01757-01826, H&R-BX62 01776.

**3. Bonus And Deferred Compensation Payments To Messrs. Holland, Ross, And Bangert**

121. The River Valley thrifts paid substantial dividends, deferred compensation, and significant bonuses to Messrs. Holland, Ross, and Bangert.

122. For example, in 1989, FDIC examiners found that the thrift indirectly paid bonuses of $300,000 and $125,000 to Messrs. Holland and Bangert, respectively. River Valley I paid Mr. Ross a direct $175,000 bonus. The FDIC found that, in view of the thrift's condition, such payments seemed to be unwarranted. JSF ¶ 190.

[6] As noted below, however, the Supervisory Agreement was required by regulators, especially the FDIC, because of the thrifts' poor asset quality, caused by its high-risk mortgage derivative investments.

123. In 1990, the OTS found that River Valley I's approval of management bonuses totaling $262,500 that directly benefitted the members of the executive committee was a violation of the institution's bylaws and 12 C.F.R. § 552.6-1(g). JSF ¶ 230; PX 455 WON034 1059-1141, WON034 1067.

124. River Valley III authorized, and Messrs. Holland and Ross received, annual guarantee fees equal to 3 percent of the preferred stock and subordinated debt they personally guaranteed. DPSF ¶ 45; PX 590 H&R-B02 00699-0703; PX 657 FHO012 2495-2501, FHO012 2496, FHO012 2499; PX 675 H&R-BX68 00726-00730; PX 686 PHO054 2869-2873.

125. In late 1993, River Valley Holdings, Inc. ("RV Holdings") borrowed $6.6 million from ANB to prepay deferred compensation to Messrs. Holland and Bangert. JSF ¶ 337; PX 983 H&R-BX70 2364-2377, 2371; PX 875 WON247 0050-0095, 0059. With those funds, Messrs. Holland and Bangert received deferred compensation payments of $4.3 million and $2.1 million, respectively. JSF ¶ 338; PX 983 H&R-BX70 2364-2377, 2370; DX 1036 WON464 0921-0933, 0926-0927; PX 876 WON247 0050-0095, 0059.

126. Previously, Messrs. Holland and Ross had received $250,000 in dividends from RV Holdings. JSF ¶ 339; PX 983 H&R-BX70 2364-2377, 2371.

127. In addition, Messrs. Holland and Ross received guarantee fees of $420,000 related to their personal guarantees of ANB's $7 million loan to RV Holdings. DPSF ¶ 91; PX 657 FHO012 2495-2501, FHO012 2499.

### 4. The Lending Relationship Between ANB And The River Valley Thrifts

128. ANB was a reliable and ready source of capital to Messrs. Holland and Ross and their thrifts (including their thrift holding companies) from 1988 to 1994. For example, (1) in July 1988, River Valley II borrowed $2 million from ANB in the form of subordinated debt; (2) also in July 1988, River Valley I borrowed $4.6 million from ANB in the form of subordinated debt; (3) in December 1988, Messrs. Holland and Ross funded the purchase of $5 million of Class C preferred stock in River Valley I with a personal loan from ANB; (4) in December 1989, ANB purchased $5 million of Class C preferred stock in River Valley I from Messrs. Holland and Ross; (5) in September 1991, RV Holdings borrowed $7 million from ANB; (6) in August 1992, WCHI borrowed $10.25 million from ANB to fund the purchase of SAFSB; and, as noted above, (7) in December 1993, RV Holdings borrowed $6.6 million from ANB to prepay deferred compensation to Messrs. Holland and Bangert. DPSF ¶ 30; DX 1376 at 114-117; PX 208; PX 204; PX 372; DX 1373 at 179-180; PX 454 H&R-BX-62-01757-01826, H&R-BX-62 01758; PX 727 H&R-B04 593-607, H&R-B04 597; PX 643 H&R-B03-00676-710, H&R-B03-00696; PX 673; PX 876 WON247 0077.

## D. The Thrifts' Continued Focus Upon Traditional Banking In The Post-FIRREA Period

129. After FIRREA, the River Valley thrifts' continued their previous focus upon originating fixed-rate, conforming residential loans that subsequently could be securitized and resold in the secondary markets. The institutions also offered, to a lesser degree, adjustable-rate mortgage loans. The River Valley thrifts also sought to enhance the institutions' profitability through the retention of the loan servicing function on a large portion of the loans the thrifts originated. JSF ¶ 205; PX 442 FHO013 0083-0135, FHO013 0089, FHO013 0094.

130. A key element in the thrift's 1990 five-year business plan was -- as in earlier plans -- to focus upon retail banking services in central and northern Illinois. DPSF ¶ 21; PX 442 FHO013 0083-0135, 0085-90, 0101; PX 455 WON034 1059-1141,

131. River Valley I and River Valley II were primarily engaged in traditional banking services and a majority of their assets and liabilities were connected with those services. Despite their emphasis upon traditional banking services, during the late 1980s and early 1990s, River Valley I and River Valley II purchased high-risk mortgage derivatives. JSF ¶ 208; PX 442 FHO013 0083-0135, FHO013 0094, FHO013 0105; JSF ¶ 249; PX 493 H&R-BX66 00062-00093, 00077; PX 643 H&R-B03 00676-00710, 00691; PX 439 WON158 0017-0045, 0030-0031.

132. River Valley I and River Valley II also provided consumer-lending services. The main products offered by the institutions included auto, home equity, home improvement, and both secured and unsecured personal loans. JSF ¶ 207; PX 442 FHO013 0083-0135, FHO013 0088.

## E. The Investment And Sale Activity Of The River Valley Thrifts In The Late 1980s And Early 1990s

### 1. The River Valley Thrifts Increase Their High-Risk Derivative Instruments

133. From October 31, 1988, to April 30, 1989, River Valley II increased its total holdings of derivative mortgage backed securities ("MBS") by $10.1 million to $29.4 million. The examiners found this increase in derivative MBS to be the most significant change within River Valley II's MBS portfolio during the period from October 31, 1988, to April 30, 1989. In particular, the examiners noted that the amount of one particular type of derivative, collateralized mortgage obligation ("CMO") residuals increased by $10.8 million relative to the amount of

CMOs River Valley II held in 1988. JSF ¶ 250; PX 324 CHO001 0106-0184, CHO001 0121-0122.

134. Regulators criticized the thrifts because of their dramatic increase of capital market investments from 1988 to 1992. DX 278 PHO042 0748-0804, 0756, 0762-0763; JSF ¶ 250.

135. The River Valley thrifts also rapidly increased their holdings in tax motivated residuals (another category of capital markets investments). JSF ¶¶ 251-52; PX 454 H&R-BX62 01757-01826, 01761; PX 456 H&R-BX62 01902A-01965, 01929.

136. The thrifts' decision to pursue capital markets investments came at a cost to traditional assets. For example, River Valley I significantly reduced its adjustable rate mortgage portfolio in order to obtain funds for the purchase of tax motivated residuals. JSF ¶¶ 253-54; PX 455 WON034 1059-1141, 1091-1092; PX 456 H&R-BX62 01902A-01965, 01929.

137. On December 31, 1988, River Valley I had $40.1 million or 17 percent of its assets invested in mortgage derivatives. The unrealized loss on these investments was $398,900. DPSF ¶ 31; PX 295 WOL275 0215-0227, WOL275 0219.

138. During 1990, River Valley I's and River Valley II's total assets temporarily increased by approximately $100 million with the purchase of tax-motivated residuals (also referred to as Short-Term Tax Advantaged Residual Securities, or "STARS"). DPSF ¶ 33; PX 625; PX 479 FHO012 2756-2770, FHO012 2766-2767.

139. By September 1991, only $2 million of the tax-motivated residuals remained upon River Valley III's books (compared to $96,094,000 at July 31, 1990). JSF ¶ 257; PX 625 H&R-BX63-00052-126, H&R-BX63-00078-79.

140. In November 1990, River Valley I sold "interest only" MBS residuals with a book value of $4.6 million for a loss of $185,898. JSF ¶ 255; PX 625 H&R-BX63-00052-126, H&R-BX63-00071.

141. Following the July 1990 RoE, River Valley II reduced the balance of its high-risk mortgage derivatives from $19,543,217 to $14,128,007, or 6.06 percent of assets. The reduction was due to the sale of the interest only stripped MBS in November 1990, for a loss of $159,635. The unrealized losses upon the high-risk mortgage derivatives was $510,027, or 9.98 percent of tangible capital. DPSF ¶ 32; PX 480, H&R-BX60-01451-01461, H&R-BX60-01456.

**2. Borrowing Activity**

142. In addition to regulatory criticisms of the River Valley thrifts' investments in derivatives and other mortgage-related investments, regulators also criticized the thrifts' reliance upon borrowing to fund a significant portion of the thrifts' assets. Again, the FDIC set forth the most pronounced criticism of the thrifts in this regard.

143. As of December 1988, River Valley I had $45.5 million, or 18.7 percent of liabilities in reverse repurchase agreements. JSF ¶ 260; PX 295 WOL 275 0215-0227, WOL275 0220. These wholesale borrowings increased over time. The balance of the reverse repurchase agreements increased to $91.3 million as of May 31, 1989. JSF ¶ 262; PX 332 FHO012 2831-2865, FHO012 2852. Most of the borrowed funds were used to invest in wholesale assets. JSF ¶ 261; PX 324 CHO001 0106-0184, CHO001 0124.

144. The FDIC found the level of borrowings to be excessive at both River Valley I and River Valley II, posing a risk to both institutions. For example, in August 1990, the FDIC found River Valley I's borrowed funds to be excessive, accounting for 32 percent of the institution's total funding liabilities. While the FDIC recognized that River Valley I attempted to

control for the interest rate risk arising from this funding strategy (of using short term borrowings to fund longer term assets), the FDIC nonetheless found that "the high reliance on borrowings to fund a major portion of the bank's assets can have severe consequences." JSF ¶ 263; PX 454 H&R-BX62 01757-01826, 01763.

145. Similarly with respect to River Valley II, the FDIC found, in August 1990, that it had excessive borrowings, concluding that it had a sizeable liability sensitive imbalance, due in large part to its funding strategy. JSF ¶ 264; PX 453 WON158 0209-0270, WON158 0217. The FDIC found that River Valley II had a significant mismatch between rate sensitive assets and rate sensitive liabilities in all time horizons, the result of a strategy of funding long-term investments with short-term liabilities such as reverse repurchase agreements. JSF ¶ 265; PX 453 WON158 0209-0270, WON158 0231.

146. River Valley II continued to rely upon borrowed funds to finance the purchase of mortgage derivative and other investment products in 1990. JSF ¶ 266; PX 456 H&R-BX62 1902A-01965, H&R-BX62-01935.

147. With respect to River Valley I's reliance upon borrowings, the OTS agreed with the FDIC that the borrowings (which constituted nearly a third of the thrifts' funds) were excessive and needed to be reduced. JSF ¶ 267; PX 455 WON034 1059-1141, WON034 1078.

148. Finally, over time, River Valley III reduced its dependency upon borrowed funds. Although River Valley III began using FHLBB borrowings in late 1991 and early 1992, (JSF ¶ 268; PX 649 FHO013 1814-1900, FHO013 1823, FHO013 1826), by September 30, 1992, the OTS noted that River Valley III had reduced its short term borrowing under reverse repurchase agreements by over $100 million. JSF ¶ 269; PX 726 WON387 0007-0068, WON387 0031.

### F. Regulatory Criticisms Of The River Valley Thrifts' Capital Market Investments In The Post-FIRREA Period

#### 1. The FDIC's Criticism Of River Valley I's Capital Market Instruments In August 1990

149. Despite regulatory criticisms, River Valley I increased its capital market investments, triggering unsatisfactory ratings by the FDIC and OTS. The FDIC especially criticized the thrift due to FDIC policy requiring the classification of many mortgage-related residual investments. The OTS did not share that policy, permitting many of the same investments. According to the FDIC, River Valley I's ratio of adversely classified assets (composed primarily of capital markets instruments) more than doubled in the 14 months between June 1989 and August 1990. JSF ¶ 214; PX 454 H&R-BX62 01757-01826, 01766. This resulted in a level of substandard assets that the FDIC determined to be unacceptable, representing a "staggering 410% of tangible capital." JSF ¶ 213; PX 454 H&R-BX62 01757-01826, H&R-BX62 01759; JSF ¶ 216.

150. The FDIC considered the volume and severity of classified assets to be a matter of serious concern. The FDIC informed River Valley I that it was the responsibility of both active management and the board of directors to improve the quality of the institution's assets. JSF ¶ 215; PX 454 H&R-BX62 01757-01826, 01766.

151. The majority of the adverse classifications cited by the FDIC in its August 1990 RoE involved River Valley I's investment in derivative real estate mortgage backed products. Investments in the residual classes of mortgage backed securities accounted for $1,666,000, or 83 percent of the total loss classifications. The FDIC gave another $10.6 million of the residuals a substandard classification. Total adversely classified mortgage derivative products accounted

for 65 percent of the total items adversely classified by the FDIC. JSF ¶ 216; PX 454 H&R-BX62 01757-01826, H&R-BX62 01759.

152. The FDIC found, in its August 1990 RoE of River Valley I, that, after elimination of assets classified loss in its examination report, tangible capital was reduced to $4,699,000, representing 1.1 percent of tangible assets, which the FDIC found was grossly inadequate to support the thrift's high level of poor quality assets. JSF ¶ 218; PX 454 H&R-BX62-01757-01826, 01759.

153. Based upon a policy that preceded FIRREA, the FDIC did not consider some of the River Valley thrifts' derivative instruments (e.g., stripped MBS) as suitable for the vast majority of depository institutions. See JSF ¶ 219; PX 149 FHO016 001-0005, FHO016 0004; PX 454 H&R-BX62-01757-01826, 01760.

154. Thus, the FDIC required that stripped MBS had to be undertaken with proper documentation showing the correlation with interest rate risk. The FDIC also limited the amount of funds that could be invested in these exotic instruments. See JSF ¶ 220; PX 454, H&R-BX62-01757-01826, H&R-BX62-01760.

155. The FDIC determined that River Valley I failed to comply with the required criteria, and thus, the FDIC found that River Valley I's stripped MBS were unsuitable investments. See JSF ¶ 221; PX 454 H&R-BX62-01757-01826, H&R-BX62-01760.

156. In its August 1990 RoE, the FDIC advised River Valley I that until the institution increased its tangible capital to support the inherent risk from purchasing and holding of stripped MBS and residual investments, such activity should be severely curtailed. JSF ¶ 223; PX 454 H&R-BX62-01757-01826, H&R-BX62 01761.

157. The FDIC's criticisms of the thrift's risky derivative and mortgage related assets would have occurred irrespective of the breach, because it was the FDIC's policy to classify these type of assets both before and after FIRREA. Under these circumstances, irrespective of the breach, the FDIC would have demanded tangible capital levels exceeding those required by FIRREA. This is because the FDIC has always been focused upon the relationship between tangible capital and risk in order to protect the insurance fund. Goodwill serves no function in protecting the insurance fund. DX 1447 at 156-57; PX 149.

158. In the August 1990 RoE, the FDIC assigned River Valley I a composite rating of "4," a rating that indicates that an institution has major unsafe or unsound conditions that could impair its future viability. JSF ¶ 224; PX 454 H&R-BX62-01757-01826, H&R-BX62-01764.

**2. Although The OTS Also Had Concerns With River Valley I's Residual Instruments In 1990, It Did Not Classify These Instruments In The Same Manner As Did The FDIC**

**a. The OTS's August 1990 Examination Of River Valley I**

159. The OTS also criticized River Valley I's high-risk mortgage-backed securities and other instruments and, in August 1990, it, too, gave the institution a composite "4" rating. JSF ¶ 234; PX 455 WON034 1066.

160. Although the OTS did not view the derivative instruments as negatively as the FDIC, the OTS stated that the institution should not purchase any additional high-risk mortgage derivatives until the institution improved its capital position. JSF ¶ 225; PX 455 WON034 1059-1141, 1064. The OTS noted a number of losses and unrealized losses resulting from the thrifts' capital markets investments. See JSF ¶ 225a; PX 455 WON034 1059-1141, WON034 1074; JSF ¶ 226; PX 455 WON034 1059-1141, WON034 1081; JSF ¶ 227; PX 455 WON034 1059-1141, WON034 1082; DPSF ¶ 51; PX 455 WON034 1059-1141, 1077 (unrealized losses of $1.548

million on Super Principal Only securities as of August 1990); DPSF ¶ 52; PX 456 H&R-BX62 01902A-01965, 01915 (unrealized loss of $2.9 million on River Valley II's mortgage derivative portfolio as of July 1990); DPSF ¶ 53; PX 456 H&R-BX62 01902A-01965, 01916 ($2.624 million unrealized loss on River Valley II's high risk mortgage derivatives as of July 1990); DPSF ¶ 54 (unrealized loss of $1.494 million on River Valley II's residuals as of July 1990); DPSF ¶ 55; PX 456 H&R-BX62 01902A-01965, 01918 (unrealized losses on River Valley II's collateralized mortgage obligations of $860,000); DPSF ¶ 56; PX 456 H&R-BX62 01902A-01965, 01922 (unrealized loss on River Valley II's super principal only securities of $.726 million); DPSF ¶ 57; PX 456 H&R-BX62 01902A-01965, 01917 (loss of $323,000 on River Valley II's residual interest in CMO Trust); DPSF ¶ 59 (unrealized loss of $1.182 million on River Valley I's balance of super principal only securities).

161. In its RoE dated August 20, 1990, OTS regulators reported that during the corresponding examination of the thrift, Mr. Bangert told them that the primary business objective of River Valley I was to originate and service loans. Mr. Bangert said, however, that there was not sufficient loan demand in the Peoria area. JSF ¶ 228; PX 455 WON034 1059-1141, WON034 1080.

**b. The OTS's November 1990 Examination Of River Valley I**

162. In November 1990, after concluding its August 1990 examination, the OTS began another limited examination of the thrift. In December 1990, the OTS concluded that the thrift's condition had improved, warranting a "3" composite rating. PX 479 FHO012 2756-2770, FHO012 2758. The examination was concentrated upon derivative mortgage products. Id. at FHO012 2762. JSF ¶ 233; PX 479 FHO012 2756-2770, FHO012 2763.

163. Regulators noted, however, that the thrift's investments in high-risk MBS derivatives and its high level of classified assets presented a risk to future capital levels, and that, although the thrift exceeded each of the three minimum capital levels, "the institution's investments in high-risk mortgage derivatives are considered a risk to capital if return assumptions do not materialize and income from these instruments is decreased." PX 479 at FHO012 2758, FHO012 2760-61; see JSF ¶ 231. The OTS stated that the thrift's capital levels should be higher than minimum capital levels established by FIRREA given the risks inherent in its portfolio. JSF ¶ 232; PX 479 FHO012 2756-2770, FHO012 2758, FHO012 2760.

164. Due to River Valley I's projected need for additional capital, the OTS prohibited River Valley I from paying its dividends to the FSLIC Resolution Fund ("FRF") on January 1, 1990. JSF ¶ 235; PX 528 CHO006 0012-0021, CHO006 0015.

### 3. As With River Valley I, The FDIC Found Problems With River Valley II's Derivative Mortgage Products In August 1990

165. The FDIC's August 1990 examination of River Valley II revealed problems similar to those at River Valley I. The FDIC found that the institution's asset quality was unsatisfactory, with substandard classifications representing an inordinately high 342 percent of tangible capital. PX 453 WON158 0212. The FDIC found that adverse classifications totaled $14.4 million and included $2.1 million in items listed as loss. Adverse classifications were centered primarily upon derivative mortgage products. These equaled nearly 78 percent of the classified assets. The FDIC also determined that the volume of adverse classifications had increased markedly since the FHLB of Chicago's May 22, 1989 examination. JSF ¶ 236; PX 453 WON158 0209-0270, WON158 0221.

166. The FDIC also found that River Valley II's capital levels were inadequate in relation to the institution's asset quality, investment activity and earnings performance. JSF ¶ 237; PX 453 WON158 0209-0270, WON158 0215. Accordingly, the FDIC directed River Valley II to reduce the level of mortgage derivative securities, and to increase its capital. JSF ¶ 243; PX 453 WON158 0209-0270, WON0158 0215-0216.

167. The FDIC assigned the thrift a Uniform Composite Rating of "4." JSF ¶ 240; PX 453 WON158 0209-0270, WON158 0220.

**4. The OTS's Assessment Of River Valley II's Condition In 1990**

168. The OTS's report of examination found similar problems requiring writeoffs of River Valley II derivative MBS. The OTS, however, did not consider River Valley II to be as troubled as did the FDIC, assigning it a composite rating of "3." See, e.g., JSF ¶¶ 245, 247; PX 456 H&R-BX62-01902A-01965, H&R-BX62-01907, H&R-BX62 01920 ($680,000 of residuals to be written off); JSF ¶ 246; PX 456 H&R-BX62-01902A-01965, H&R-BX62 01921 ($404,000 of interest only stripped MBS to be written off).

169. According to the OTS, classified assets at River Valley II, as of October 31, 1990, totaled $3,562,342, or 63.7 percent of tangible capital plus general valuation allowances. JSF ¶ 248; PX 480 H&R-BX60-01451-01461, H&R-BX60 01455. In contrast, the FDIC in its RoE, found that substandard classifications constituted 342 percent of tangible capital. PX 453 WON158 0212.

## G. Other Post-FIRREA Actions Undertaken By The River Valley Thrifts

### 1. The Runoff And Readjustment Of The River Valley Thrifts' Assets And Liabilities After July 1990

170. After July 1990, as the result of a reduction in poor quality capital markets investments, and an expected rapid runoff of the "STARS," the River Valley thrifts' asset and liability size began to decline. JSF ¶ 256; PX 480 H&R-BX60 01451-01461; DX 459. Moreover, during late 1990, both River Valley thrifts sold adjustable rate mortgage-backed securities due to concerns about poor credit quality. These sales, which were unrelated to the breach, had the effect of reducing the thrifts' total assets. DPSF ¶ 34; PX 461; PX 462; PX 499A.

171. Further affecting the thrift's performance was the recession from July 1990 to March 1991, which had a nationwide impact upon the financial condition of the banking and thrift industries. DX 1539; DX 1540.

172. To fight the recession, the Federal Reserve dropped borrowing rates significantly. Due to these significant drops in interest rates, mortgage prepayments during the early 1990s were unprecedented. DPSF ¶ 35; DX 1416 at 20; PX 724 WON469 0276-0329, WON469 0278; PX 693 H&R-BX68-01393-01408, H&R-BX68-01399, H&R-BX68-01401; PX 709; PX 775 H&R-BX71-0069-0106, H&R-BX71-0074, H&R-BX71-0076. Mortgage prepayments affected both the loans directly held by River Valley III, as well as MBS investments. JSF ¶ 313; PX 726 WON387 0007-0068, 0021.

173. From 1991 to 1993, River Valley III described prepayment activity as "significant," "extremely heavy," "extremely high," "incredibly high," and having "four refinanc[ing] wave[s]." DX 543 PHO029 2810-2847 at 2813; DX 618 PHO029 0429-0456,

0436; PX 664 H&R-BX68 00832-00865, 00844; DX 704 PHO062 2295-2384, 2304; DX 789 PHO029 2090-2136, 2098; DX 892 PHO011 0516-0546, 0530, 0544.

174. River Valley III was not alone in being caught in the effects of the dramatic prepayment of mortgages. Indeed, the four prepayment surges from late 1991 to early 1994 were the strongest bursts of refinancing and prepayment activity since 1987. Similar to the 1986-1987 cycle, the 1991-1994 cycle caught many market participants off guard. DX 1199 at 128.

175. Refinancings are a negative event for pass-through investors as they are triggered by a fall in market rates and the principal returned must be reinvested at lower yields. Investors who purchase their high-coupon pass-throughs at a premium may experience additional losses, as the principal is repaid at par and must remain outstanding to earn interest sufficient to recover the future value of the premium paid over par. DX 1543 at 36.

176. A further factor affecting the thrifts' balance sheets during the early 1990s was the lack of attractive investment opportunities. For example, in March 1992, River Valley I's management stated that it had "found very few attractive reinvestment opportunities" for the $21 million it had obtained from the sale of three CMO issues. River Valley I's management further stated that "[t]his lack of attractive long term investments is partially the cause for the considerable shrinkage that has taken place in the last few months." DPSF ¶ 36; PX 674.

177. The primary, "non-breach" reasons that River Valley thrifts shrank in the early 1990s included: (1) a planned run-off of tax-motivated residuals (PX 625 H&R-BX63-00052-00126, H&R-BX63 00073; PX 479 FHO012 2756-2770, FHO012 2766-67; DX 616 PHO058 1338-1411, 1358; DX 462 WON335 0058-0073, 0069; DX 1376 at 65-66); (2) the sale of adjustable rate MBS during the latter part of 1990 due to credit quality concerns (PX 461 H&R-

BX70-1710; PX 462 H&R-BX 70-1727; PX 499A H&R-B02-00629); (3) the Individual Minimum Capital Requirement ("IMCR") imposed by the March 25, 1991 Supervisory Agreement, as a result of the regulators' repeated criticisms of River Valley I and River Valley II for their portfolios of high-risk mortgage securities and the institutions' related de-emphasis of their investments in high-risk mortgage derivative securities (PX 521 PHO036 1279-1292, 1281-82; PX 535 H&R-B40-680-725, H&R-B40 692-93; PX 782 FHO012 1742-1813, 1763; PX 836 FHO012 2651-2577; DX 873 WON374 1036-1045, 1039); (4) the sale of the two former Republic branches in June 1991 (PX 643 H&R-B03 00676-00710, H&R-B03 00704 Note 19; PX 576 H&R-BX56-01429-01433; (5) the voluntary $110 million shrinkage undertaken at River Valley III in order to pursue the acquisition of SAFSB (PX 726 WON387 0007-0068, WON387 0020); and (6) a scarcity of suitable investments. PX 674 WON242 0161.

**2. <u>1991 Redemption Of Class A Preferred Stock</u>**

178. As noted above, in connection with the assistance provided by the FSLIC to River Valley I in its acquisition of Home/Galva/Mutual in July 1988, the FSLIC purchased $5 million of preferred class A stock from the institution. See above at 18; JSF ¶¶ 80, 102, 103; PX 207 WOF016 1546; PX 202 CHO023 0106-0208, 0106, 0113, 0165, 0167-0174.

179. The FSLIC preferred stock had a fixed dividend feature and an equity participation feature that was triggered when earnings exceeded a defined level. JSF ¶ 275; PX 606 at 17; PX 202 CHO023 0106-0208, CHO023 0176.

180. In 1990, the Government and River Valley I engaged in discussions regarding a potential redemption of the FSLIC preferred stock at a discount. The Government retained the investment banking firm of Donaldson, Lufkin, & Jenrette to provide advice on the value of the stock. JSF ¶ 276; PX 466 H&R-BX64-02353-02354; PX 606 at 18-19.

181. In a letter dated November 28, 1990, Mr. Holland wrote to the FDIC asserting that River Valley I would not have future earnings sufficient to "trigger the payment of any supplemental dividends." JSF ¶ 279; PX 486A EHO010 0024.

182. On March 28, 1991, River Valley I redeemed $5 million of FSLIC preferred stock at a discount, resulting in a gain of $1.325 million. JSF ¶ 278; PX 526 H&R-BX60-00520-00590; PX 643 H&R-B03 00676-00710, H&R-B03 00681. The discount to the preferred stock as measured by the redemption payment reflects two factors: a value of $585,000 given to the equity participation and a discount rate of 16 percent compounded quarterly applied to the fixed income feature of the FSLIC preferred. JSF ¶ 277; PX 528 CHO006 0012-0021, 0020-21.

183. The purchase and sale of this preferred stock was not a market based transaction. DPSF ¶ 44; PX 202 CHO023 0106-0208; PX 526 H&R-BX60 00520-00590; PX 502 H&R-B30 00230-00232; JSF ¶ 281; DX 1475 at ¶¶ 4-7; DX 1474 at ¶¶ 4-7. Indeed, the issuance of the preferred stock to the FSLIC and the subsequent redemption of that stock from the FDIC were the only transactions involving the stock from 1988 to 1991. JSF ¶ 280; PX 202 CHO023 0106-0208; PX 526 H&R-BX60-00520-00590.

### 3. Certain Other Capital Transactions

184. The River Valley thrifts were involved in a number of capital transactions in the post-FIRREA period.

185. In December 1989, the $5 million of Series C cumulative preferred stock issued to Messrs. Holland and Ross by River Valley I in connection with the Peoria acquisition was converted into non-cumulative preferred stock and purchased by ANB in December 1989. This transaction increased River Valley I's tangible capital by $5 million. JSF ¶ 282; PX 454 H&R-BX62 01757-01826, H&R-BX62 01758; PX 385, H&R-B26 00291-00289.

186. In the first quarter of 1990, River Valley I voluntarily repaid $4.6 million of subordinated debt previously issued in connection with the Galva/Mutual/Home transaction. JSF ¶ 285; PX 454 H&R-BX62 01757-01826, H&R-BX62 01758; PX 392 H&R-BX70 2510-2522, H&R-BX70 2511; PX 288 SH-HO 0000001-0000371.

187. On March 12, 1991, the FDIC, as successor to the FSLIC, repaid the $13.2 promissory note issued to River Valley I in connection with the Peoria acquisition, plus accrued interest, for a total of $13,404,600. JSF ¶ 286; PX 625 H&R-BX63-000 52-126, H&R-BX63-00062.

188. On September 25, 1991, RV Holdings borrowed $7 million from ANB for the purpose of purchasing $7 million in preferred stock. This loan had a stated maturity date of June 30, 1992, and an interest rate equal to prime plus one percent. As collateral, RV Holdings pledged 150,000 shares of River Valley III's common stock and 7,000 shares of River Valley III's Class C preferred stock. JSF ¶ 332; PX 625 H&R-BX63-00052-000126, 00063; PX 615, H&R-B04 1000-1103, 1004.

189. The loan agreement between ANB and RV Holdings prohibited RV Holdings and River Valley III from merging or consolidating or from selling, leasing, transferring, or otherwise disposing of all or a substantial part of their assets. JSF ¶ 333; PX 615 H&R-B04 1000-1103, H&R-B04 1006, H&R-B04 1013, H&R-B04 1014.

190. In September 1991, River Valley III raised capital by issuing preferred stock to RV Holdings at a rate of one percent above prime. See PX 625 H&R-BX63-00063; PX 623 H&R-BX63-000139; PX 724 WON469 0287.

191. At the time of this issuance of preferred stock, a variable rate of prime plus one percent corresponded to a fixed rate of no higher than 13 percent. This relationship is based upon the terms of interest rate swaps, a financial instrument widely used by market participants to exchange fixed rate cash flows for floating rate cash flows and vice versa. See DX 1491 at ¶ 20 n.8.

192. On August 14, 1992, WCHI borrowed $10.25 million from ANB in order to acquire SAFSB's common stock. The loan had a stated maturity date of September 30, 1993, and an interest rate equal to prime plus two percent. This loan was secured by a pledge of 100 percent of the capital stock of SAFSB, hypothecation of 100 percent of the common stock of RV Holdings by Messrs. Holland and Ross, and certain guarantees from them. PX 700, PHO058 2671-2704, 2671-2672.

193. On December 23, 1993, RV Holdings borrowed $6.6 million from ANB to prepay deferred compensation to Messrs. Holland and Bangert. This loan had a stated maturity date of June 30, 1996, and an interest rate equal to prime plus one percent. As collateral, RV Holdings pledged 100 percent of the common stock of River Valley I. JSF ¶ 337; PX 983, H&R-BX70 2364, 2371, 2377; PX 874, H&R-B07-00597-00598.

194. For the period 1990 to 1994, the River Valley entities' actual average annual cost of funds was as follows:

| Average Cost of Funds | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| River Valley I | 7.79% | | | | |
| River Valley II | 8.24% | | | | |
| River Valley III | | 7.04% | 6.19% | 4.27% | 4.10% |

DX 1492 at Ex. 12.

195. The following table represents the River Valley entities' actual annual yield on average interest-earning assets for the period 1990 to 1994.

| Average Investment Yields | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| River Valley I | 10.71% | | | | |
| River Valley II | 8.77% | | | | |
| River Valley III | | 10.79% | 8.70% | 7.18% | 5.38% |

DX 1492 at Ex. 16-19 Backup A.

196. The following table represents the River Valley thrifts' actual annual returns on average shareholders' equity excluding direct investment earnings for the period 1990 to 1994.

| Leverage Returns | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| River Valley I | 14.01% | | | | |
| River Valley II | -16.99% | | | | |
| River Valley III | | 32.32% | 4.92% | 2.81% | -20.7% |

DX 1492 at Ex. 16-19 Backup A and B.

197. For the period 1990 to 1994, the River Valley entities' actual effective tax rates were as follows:

| Effective Tax Rates | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| River Valley I | 3.61% | | | | |
| River Valley II | 0.00% | | | | |
| River Valley III | | 2.32% | 2.12% | 0.00% | 0.00% |

PX 499B, HO-KPMG 004119-004197; DX 396, HO3003 0431-0652; PX 640, HO-KPMG 002640-002783; PX 770 HO-KPMG 002784-002889; DX 925, PHO083 0899-0997; DX 1091 PHO083 1020-1137.

198. The following table represents River Valley's actual average annual ratio of dividends on common stock as a percentage of average common equity for the period 1990 to 1994.

| Average Dividend Ratio | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| River Valley I | 0.00% | | | | |
| River Valley II | 0.00% | | | | |
| River Valley III | | 0.00% | 1.39% | 0.50% | 6.35% |

DX 1492 at Ex. 11.

**4. The Valuation Of The Preferred Stock Provided To The FDIC**

199. On January 23, 1991, KPMG informed Mr. Bangert that it was imperative that River Valley I's management ascertain the thrift's value with an independent appraisal. JSF ¶ 287; DX 486 PHO024 1733-1741, 1733.

200. On March 19, 1991, River Valley I and Laurence Barr entered into an agreement whereby Laurence Barr agreed to value the common and preferred stock of River Valley I as of July 29, 1988. JSF ¶ 288; PX 519.

201. Upon the completion of its analysis, Laurence Barr concluded, on or around March 1991, that, as of July 29, 1988, the "total Common Stock equity capitalization of [River Valley I] was worth approximately $8,000,000 to $9,000,000 at July 29, 1988," and that the preferred stock issued to FSLIC "was worth approximately $2,800,000[.]" DPSF ¶ 47; DX 514 HO2007 0488-0492, 0490, 0492; DX 1452 at ¶ 7.

**5. River Valley III Chose To Sell the Republic Branches In 1991, And Thereby Eliminated The Republic Goodwill**

202. River Valley III eliminated all remaining Republic GAAP goodwill when it sold the two former Republic branches on June 21, 1991, for an accounting gain of $1.1 million. As noted by the OTS, the sale took place because, after the merger of River Valley II into River Valley I, "these branches were no longer considered part of the main market areas serviced by

[River Valley III]." DPSF ¶ 48; PX 643 H&R-B03 00676-00710, H&R-B03 00688, H&R-B03 00704; PX 625 H&R-BX63-000 52-126, H&R-BX63-000 62; DX 616 PHO058 1347.

203. The balance of Republic goodwill at March 31, 1989 was $734,872. PX 313 H&R-B43-00559-89, 00574. Based upon River Valley II's audited financial statements, Mr. Holland overstates the balance of Republic goodwill at March 31, 1989, by approximately $540,000 ($1,275,067 - $734,872 = $540,195). See PX 313 H&R-B43-00574; PX 1096.

204. The balance of Republic goodwill at March 31, 1990 was $545,291. DX 394 FHO013 1665. Based upon River Valley II's audited financial statements, Mr. Holland overstates the balance of Republic goodwill at March 31, 1990, by approximately $677,000 ($1,222,667 - $545,291 = $677,376). See DX 394 FHO013 1665; PX 1096.

205. River Valley III's sale of the two former Republic branches improved the thrift's profitability by $90,000 per month through the savings of borrowing costs and decreased expenses. JSF ¶ 293; PX 576 H&R-BX56 01429-01433; DX 1376 at 170-77.

## H. Operations Following Supervisory Agreement Of March 25, 1991

### 1. The Supervisory Agreement

206. On March 25, 1991, the OTS and River Valley I entered into a Supervisory Agreement whereby River Valley I became subjected to an IMCR, imposed because of the risk inherent in the thrifts' high-risk mortgage derivatives. PX 521 PHO036 1279-1292, PHO036 1282-83.

207. Although the Supervisory Agreement was entered into between River Valley I and the OTS, the agreement was imposed to a significant degree because of the FDIC's classifications of the thrifts' high-risk mortgage derivatives and related investments, coupled with the FDIC's assessment that the thrifts lacked sufficient tangible capital given the FDIC's

policies concerning the risk these instruments presented. Id.; DX 510 WON108 0252-0253; DX 519 WON108 0032-0039, WON108 0036-37. Indeed, the FDIC suggested that the thrift be required to hold tangible capital in excess of the FIRREA-based required minimum levels (i.e. of at least 5 percent tangible capital). DX 519 WON108 0032, WON108 0036; see also Plaintiffs' Proposed Statement of Facts (Dec. 31, 2003) at ¶ 68 (asserting that the FDIC "force[d] Holland and Ross's River Valley thrifts to enter into a supervisory agreement with the OTS on the threat of even more severe sanctions in March 1991").

208. Accordingly, River Valley III increased its tangible capital because the FDIC imposed higher tangible capital requirements on it in 1991, due to its level of high-risk mortgage derivatives. PX 521 PHO036 1279-1292, PHO036 1282-83.

209. The IMCR set minimum capital requirements that were higher than those imposed by FIRREA, requiring tangible capital of four percent by September 1991, and five percent by September 1992. DPSF ¶ 49; PX 521 PHO036 1279-1292, PHO036 1281.

210. Thus, apart from FIRREA's capital requirements, River Valley III was required to maintain excess regulatory capital in order to comply with the IMCR of the Supervisory Agreement. JSF ¶ 290; DPSF ¶ 50; PX 455 WON034 1059-1141, WON034 1077; PX 453 WON158 0209-0270, WON158 0216.

### 2. The Merger Of River Valley I And River Valley II

211. On or about March 31, 1991, River Valley II was merged with and into River Valley I (post-merger, "River Valley III"). PX 643 H&R-B03 00676-00710, H&R-B03 00687. The resulting institution later became a wholly owned subsidiary of RV Holdings. JSF ¶ 289; PX 625 H&R-BX63-000 52-126, H&R-BX63-000 62-63.

### 3. The Settlement Agreement Between The FDIC And Plaintiffs

212. On August 14, 1991, Messrs. Holland Ross, River Valley III, and the FDIC, as the manager of the FRF, entered into a comprehensive settlement agreement ("Settlement Agreement") regarding the River Valley I and River Valley II Assistance Agreements (as well as the Peoria transaction). PX 599 EHO008 0133-0156, 0136-0137 at Recitals ¶¶ A, B, C.

213. The Settlement Agreement included a broadly worded accord and satisfaction provision, which demonstrated the parties' intent to release each other from any claims or causes of action connected with the three assistance agreements. Id. at 0143-0144 § 5 ("any obligation or liability of any kind" – "without limitation" – for "any and all actions, causes of action, suits, . . . damages, . . . claims, and demands whatsoever") (emphasis added).

214. This Court has found that the Settlement Agreement released all claims between the parties and the FDIC with respect to the Assistance Agreements and constitutes a covenant not to sue. Holland v. United States, 75 Fed. Cl. 492, 498 (2007). Accordingly, any breach-related harms arising from the FDIC's oversight of, and regulatory requirements with respect to, the River Valley thrifts cannot now form the basis for any damage claims asserted by plaintiffs at trial.[7]

### 4. Regulatory Criticism Of The Thrift's Capital Markets Investments Continued In 1991

215. Even after the imposition of the Supervisory Agreement, regulators remained dissatisfied with the thrift's continued concentration in capital market investments. For example, in October 1991, the FDIC found that River Valley III's asset quality continued to be

[7] We respectfully disagree with Court with respect to the scope of the Settlement Agreement and believe, instead, that it constituted a complete release of all claims against the United States in this matter. Our assertions here are not a waiver of our right to assert an appeal of the Court's determination.

unsatisfactory and the institution's entire investment portfolio of mortgage-backed securities and residuals remained subject to classification. JSF ¶ 295-96; PX 623 H&R-B63-000 129-227, H&R-B63-000 130. The FDIC concluded that River Valley III's level of capital was still inadequate in relation to the institution's asset quality and investment activity. JSF ¶ 297; PX 623 H&R-BX63-000 129-227, H&R-BX63-000 132.

216. The River Valley thrifts' asset quality worsened after 1990. Indeed, the FDIC determined, in its October 1991 RoE, that $48 million of River Valley III's assets required an adverse classification. This represented an increase of almost 50 percent relative to the total adversely classified assets of the combined institutions (River Valley I and River Valley II) at the FDIC's previous examinations in 1990. These classifications represented in excess of 211 percent of tangible capital. Derivative investments accounted for roughly 85 percent of these total adverse classifications. JSF ¶ 295; PX 623 H&R-BX63-000 129-227, H&R-BX63-000 130.

217. The problems of the River Valley thrifts followed because, despite prior criticisms, the thrifts had purchased stripped mortgage backed securities and/or residuals with an aggregate book value of $23.7 million after the FDIC examination in August 1990. The FDIC noted that the institutions' entire investment portfolios of stripped MBS and residuals were subject to classification in accordance with the appropriate guidelines. JSF ¶ 296; PX 623 H&R-BX63-000 129-227, H&R-BX63-000 131.

218. The FDIC concluded that River Valley III's derivative portfolio was 235 percent of tangible capital or 9.5 percent of total assets as of October 1991. The FDIC found that this level of derivatives presented an inordinate amount of risk to the institution and that the thrift's

policy with respect to allowable levels of these investments remained unacceptable. JSF ¶ 298; PX 623 H&R-BX63-000 129-227, H&R-BX63-000 132.

219. Consequently, because of its level of mortgage backed securities, in its October 1991 report of examination, the FDIC assigned River Valley III a composite rating of "4," the same rating it had assigned the thrift in 1990. JSF ¶ 298-99; PX 623 H&R-BX63-000 129-227, H&R-BX63-000 135.

220. The OTS remained less concerned with the thrift's MBS and mortgage-related investments than the FDIC. For example, as of October 1991, the OTS examiners classified only $8.1 million of River Valley III's assets. In contrast, the FDIC classified $48 million of the thrift's assets. Again, the primary difference between the OTS and the FDIC's approaches was with respect to the classification of River Valley III's mortgage-backed derivative securities portfolio. JSF ¶¶ 302, 304; PX 687 H&R-B56 02857-02858, H&R-B56 02857; PX 625 H&R-BX63-000 52-126, H&R-BX63-000 65.

221. In its RoE dated October 28, 1991, the OTS, while critical of the thrift's capital markets investments, assigned River Valley III a composite rating of "2."[8] JSF ¶ 302-05; PX 625 H&R-BX63 000 52-126, H&R-BX63-000 68, H&R-BX63-00 57-58, H&R-BX63-000 65; PX 687 H&R-B56 02857-02858, H&R-B56 02857. The primary difference between the OTS and the FDIC's approaches concerned the classification of River Valley III's mortgage-backed derivative securities portfolio.

---

[8] Institutions rated a "2," "are fundamentally sound . . . but may reflect modest weaknesses correctable in the normal course of business. Such institutions are stable and also able to withstand business fluctuations quite well[.]" PX 625 H&R-BX63-000 52-126, 57.

### 5. The FDIC's Criticisms Of The Thrift's High-Risk Investments Continued Into 1992

222. The difference between the FDIC and OTS with regard to the thrift's derivative instruments continued into 1992. In February 1992, FDIC wrote the OTS indicating that the FDIC was so concerned with the thrift's continuing activity in mortgage derivative products, that "if the institution continues its activities in mortgage derivative products, a tangible capital ratio of 7 percent should be the goal." The FDIC also indicated that the tangible capital of the thrift, while above minimum requirements at that time, did not "provide sufficient protection given the volume and types of transactions involving mortgage derivative products and the institution's interest rate mismatch." DPSF ¶ 60; PX 665 WON034 0941.

223. In March 1992, the FDIC wrote River Valley III stating that its investment in mortgage derivative products were unsuitable and that those assets were subject to adverse classification. The FDIC found that the thrift's adversely classified assets, centered mainly in derivative products, represented a high 211 percent of tangible capital. Finally, the FDIC stated that, if the institution continued to invest in and hold these types of products without documented hedging strategies, a seven percent tangible capital ratio should be established. DPSF ¶ 61; PX 668 FHO012 2511.

224. On May 20, 1992, Mr. Bangert wrote to the FDIC in Chicago in response to the FDIC's RoE of River Valley III as of October 26, 1991. Mr. Bangert stated that "[t]he FDIC and the OTS examination findings for 'classified assets' are substantially different." He stated that the OTS approach was "consistent with management's internal classified assets schedule[,]" whereas the FDIC's approach was not. JSF ¶ 306; PX 687 H&R-B56 02857-02858.

225. The derivatives remained at a high level through 1992. In its October 1992 RoE, the FDIC identified $26.7 million of adverse classifications, which represented 113 percent of total capital and 149 percent of tangible capital. Classifications included $19.6 million in residual interests in derivative real estate mortgage-backed products, representing 73 percent of total classified assets. JSF ¶ 307; PX 724 WON469 0276-0329, WON469 0278-79.

226. In 1992, events proved prophetic the FDIC's many warnings concerning the derivative instruments. In its October 1992 RoE, the FDIC examiners stated that River Valley III's derivative real estate mortgage-backed products were "extremely sensitive to changes in interest rates" and that, since the last FDIC examination, interest rates had declined, causing prepayment rates to increase dramatically. Consequently, according to the examiners, loss write-offs had exceeded $6 million, while further unrealized losses still existed. Of the $22.6 million in residual interests remaining, nearly 20 percent of the amount was scheduled as losses. JSF ¶ 308; PX 724 WON469 0274-0329, WON469 0278.

227. The FDIC determined that River Valley III's income for the first nine months of 1992 was well below earnings reported for 1991 as a result of substantial securities losses. The FDIC found that the thrift's residual portfolio had deteriorated substantially. This factor, together with the $6 million write-off, contributed to the decline in the book value of residual investments, from $40.413 million in 1991, to $22.657 million as of September 1992. Further negatively affecting the thrift's earnings, the majority of these instruments had current book yields of zero percent. Moreover, the FDIC scheduled another $5.1 million in residual losses. JSF ¶ 309; PX 724 WON469 0276-0329, WON469 0293.

228. In its October 1992 RoE, the FDIC once again criticized River Valley III's management for accepting a large amount of risk in investment and other activities and failing to adequately document these activities despite recommendations to this effect made at the FDIC's prior examination. JSF ¶ 310; PX 724 WON469 0276-0329, WON469 0279.[9]

229. In the October 1992 RoE, the FDIC stated that River Valley III's capital continued to be inadequate due to a continuing large volume of residual interests and their potential for additional losses due to the significant price volatility. Regulators noted that River Valley III's 1991 earnings had improved from the prior year's performance, but that 1992's year-to-date income was well below the earnings reported for 1991. Regulators also noted that the core performance of River Valley III was not easily measured because of the many discretionary and non-recurring sales of assets. JSF ¶ 311; PX 724 WON469 0276-0329, WON469 0293.

### 6. The OTS's View Of River Valley III In 1992 Contrasted With That Of The FDIC

230. In contrast to the FDIC, the OTS noted in its October 19, 1992 RoE, that, as of September 1992, the balance of River Valley III's high-risk mortgage derivative portfolio had been reduced to $23,513,000, or 5.3 percent of assets. The OTS stated that "[t]his significant reduction in this portfolio since the previous examination was due to portfolio sales and the rapid prepayment from the mortgages which underlie the high risk mortgage derivative portfolio." JSF ¶ 313; PX 726 WON387 0007-0068, WON387 0021.

---

[9] The OTS criticized River Valley III for failing to maintain documentation to support the assumptions used to estimate the market values for the securities maintained in the high-risk mortgage derivative portfolio. The OTS also criticized the thrift for failing to provide specific documentation to support the writedown of its high-risk mortgage derivative portfolio. The Supervisory Agreement required this documentation. These failures persisted despite the OTS's 1991 direction to the thrift to prepare specific documentation to support their accounting methodology. DPSF ¶ 62; PX 726 WON387 0007-0068, WON387 0020, WON387 0022.

231. Mr. Bangert told OTS regulators that it was very difficult for the thrift to obtain accurate market value quotes for the residuals because there were very few sales and the individual tax status of each transaction had to be considered. DPSF ¶ 63; PX 726 WON387 0007-0068, 0022.

232. In short, although the OTS noted continued problems in the thrift's high risk capital market investments, it did not find the same level of criticized assets as did the FDIC. JSF ¶ 314-15; PX 726 WON387 0007-0068, WON387 0011, WON387 0019-24.

### 7. The FDIC's Criticisms Continued Into 1993

233. In January 1993, the FDIC wrote River Valley III, stating that, because of the risks embedded in the thrift's derivative portfolio, the thrift's current level of capital was inadequate. JSF ¶ 322; PX 789 FHO002 0002-03.

234. By March 31, 1993, River Valley III reported tangible capital of $23.3 million or 5.6 percent of tangible assets, core capital of $26.4 million or 6.4 percent of adjusted tangible assets, and risk-based capital of $27.4 million or 11.9 percent of risk-based assets. River Valley III's capital levels exceeded those required to be defined as a well capitalized institution under the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"). JSF ¶ 317; 57 Fed. Reg. at 44,866 (September 29, 1992); PX 835 H&R-B02 02466-02476, H&R-B02 02472-73. Importantly, the thrift exceeded the Supervisory Agreement's required five percent tangible capital level JSF ¶ 318; PX 521 PHO036 1279-1292, PHO036 1281-82.

235. Despite these improvements, in a March 1993 letter to the OTS, the FDIC stated that River Valley III's level of capital protection was still inadequate given the institution's investment practices. The FDIC noted that the institution continued to heavily invest in mortgage derivative products and documentation of the purchases continued to be lacking. The

FDIC concluded that, in most instances, these instruments were unsuitable investments for a depository institution and were, as a result, subject to adverse classification. JSF ¶ 319; PX 801 WOL234 0941-0942.

236. The OTS took exception to many of the FDIC's assessments. JSF ¶ 320; PX 803 WOL234 0705-06.

**8. The Termination Of The Supervisory Agreement In 1993 Following The Thrift's Reduction Of Capital Market Instruments**

237. On April 15, 1993, the OTS terminated all of the provisions of the Supervisory Agreement except those provisions addressing River Valley III's high-risk mortgage derivative securities portfolio and capital position. JSF ¶ 324 PX 843 WON469 0016-0017.

238. During May 1993, River Valley III revised its investment policy to include a provision stating that it would no longer purchase high-risk mortgage derivative securities. JSF ¶ 323; PX 843 WON469 0016-17, WON469 0016.

239. As of July 1993, the FDIC found that River Valley III had discontinued its investments in high-risk mortgage derivative products. FDIC examiners concluded that the decline was "due to continued accelerated prepayments and substantial write-downs." DPSF ¶ 65; PX 836 FHO012 2561-77, WON374 1039. The OTS similarly noted River Valley III's reduction in high-risk mortgage derivatives. This reduction was due to loss writedowns required by GAAP and the amortization of the assets due to the continued high level of mortgage prepayments. JSF ¶ 327; PX 857 H&R-B55 00145-176, H&R-B55 00153-154.

240. The OTS subsequently determined that River Valley III's high-risk mortgage derivative securities portfolio and capital position were no longer areas of significant supervisory concern and the entire Supervisory Agreement was terminated on August 16, 1993. JSF ¶ 324; PX 843 WON469 0016-17; DPSF ¶ 67; PX 857 H&R-B55-00145-176, H&R-B55-00151.

241. Thus, after years of regulatory criticism, River Valley III had finally abandoned its high-risk capital markets strategy, obtaining satisfactory examination ratings from its regulators and the lifting of the Supervisory Agreement.

242. The OTS's positive assessment of the thrift continued into 1994, with the OTS assigning River Valley III a composite rating of "2" in its October 1994 RoE. JSF ¶ 328; PX 982 H&R-BX70 2329-2363, H&R-BX70 2333.

**I. The Formation Of RV Holdings**

243. Establishing RV Holdings allowed Messrs. Holland and Ross to increase River Valley III's tangible capital by converting $2 million of subordinated debt held by ANB to $2 million of holding company debt. While the $2 million of subordinated debt held by the thrift did not qualify as tangible regulatory capital, the same $2 million, when borrowed by the holding company, could be downstreamed and treated as tangible capital at the thrift level. JSF ¶ 330; See PX 601 at 48; DX 1375 at 95.

244. On August 16, 1991, RV Holdings was incorporated, and on September 25, 1991, Messrs. Holland and Ross exchanged all of their stock in River Valley III for stock of RV Holdings. JSF ¶ 331; PX 625 H&R-BX63-000 52-126, H&R-BX63-000 62-63.

245. RV Holdings was not wholly owned by Messrs. Holland and Ross. Instead, its shareholders also included Mr. Bangert, and Ronald Pikus, River Valley III's president, and Mark Kipnis, counsel for River Valley III and secretary and director, (who also all became

shareholders of WCHI). Mr. Bangert obtained a 5 percent equity interest in RV Holdings. JSF ¶ 334; PX 629 PHO030 0285-0286; PX 629A PHO030 0247. Mr. Kipnis was granted an interest of 2 percent (JSF ¶ 335; PX 648 H&R-B3-1234-45, H&R-B2-1234-35; PX 1009 PHO047 0182), and Mr. Pikus received a .5 percent interest. JSF ¶ 336; PX 1009 PHO047 0182.

**J. <u>The SAFSB Acquisition</u>**

246. Despite the problems with its capital markets investments, River Valley III retained regulatory capital levels in excess of FIRREA's requirements. DX 1492 at Ex. 6-8.

247. As of September 30, 1991, River Valley III's total assets were $537 million and its tangible capital ratio was 4.48 percent, exceeding the projections in its February 1991 business plan of $529 million and 4.10 percent, respectively. JSF ¶ 342; PX 512 WON107 1612-1653, 1612, WON107 1617.

248. As of September 30, 1991, River Valley III was in compliance with both minimum regulatory requirements and the capital provisions of the March 25, 1991 Supervisory Agreement. As of September 30, 1991, the institution reported tangible capital of $24.1 million (4.5 percent of tangible assets) and core capital of $32.1 million (6 percent of adjusted tangible assets). Each was approximately $15.9 million in excess of the minimum regulatory requirement. Risk based capital was $34.1 million (12.6 percent of risk-weighted assets) and approximately $14.6 million in excess of the minimum regulatory requirement. JSF ¶ 343; PX 625 H&R-BX63-000 52-126, H&R-BX63-000 66.

249. In late 1991, John Rose, who was not previously associated with the River Valley thrifts, presented Messrs. Holland and Ross with an opportunity to acquire SAFSB, which was in receivership with the RTC. JSF ¶ 344; PX 777 WCH-B76 0114-0150, WCH-B76 0127-28.

250. Messrs. Holland and Ross decided to pursue the SAFSB acquisition. JSF ¶ 346; DX 1380 at 48-50.

251. No later than November 20, 1991, Mr. Holland informed River Valley III's board of a potential acquisition of SAFSB. JSF ¶ 345; PX 631 H&R-B03 00126-00130, H&R-B03 00129.

252. To finance the acquisition, Messrs. Holland and Ross attempted to obtain financing from ANB and acquire SAFSB through River Valley III. ANB, however, was unwilling to provide financing due, at least in part, to FIRREA's cross-guarantee provision. DPSF ¶ 70; DX 1389 at 215-216; DX 1380 at 104-105; Pub. L. No. 101-73 (HR 1278) at § 206(e)(I).

253. ANB feared that its investment in River Valley III, RV Holdings, or SAFSB could be threatened by a capital shortfall in either of the two institutions. PX 207 WOF016 1512-1603; DX 1389 at 199-200, 205, 216-19.

254. Prior to FIRREA, the principle of limited corporate liability gave considerable protection to bank holding companies and their member banks when one of those member banks failed. FIRREA eliminated that protection. As the Federal Circuit has found, "[o]ne of the innovations introduced by FIRREA was the so-called "cross-guaranty provision," which is codified at 12 U.S.C. § 1815(e). Branch v. United States, 69 F.3d 1571, 1574 (Fed. Cir. 1995). Under the cross-guarantee provision, any bank owned by a bank holding company became liable for losses to the Bank Insurance Fund caused by the failure of a sister bank owned by the same holding company. Id.; see also 12 U.S.C. § 1815(e)(1)(A). That is, "the cross-guarantee provision of FIRREA requires banks to share liability for losses caused by sister bank failures so

as to protect depositors, secure the soundness of the national banking system, and reduce the impact of bank failures on the Bank Insurance Fund." Branch, 69 F.3d at 1579.

255. ANB was aware of FIRREA's cross-guarantee provision, and ANB determined that it was better off lending to independent entities rather than to entities that were combined or in subsidiary relationships. PX 207 WOF016 1512-1603; DX 1389 at 137-39, 215-16.

256. ANB agreed to finance the acquisition of SAFSB, but only if the acquisition was undertaken by an entity totally separate from River Valley III. PX 657 FHO012 2499-2500; DX 1389 at 198.

257. ANB had other concerns in lending funds to River Valley III as well, including the fact that ANB had lost funds on loans to savings and loans in the past and that the condition of thrifts in Texas was extraordinarily poor. PX 207 WOF016 1512-1603; DX 1389 at 201-02, 229-30; see DX 1448 at 17.

258. ANB also determined that, by lending to an entity separate from River Valley III, it would have a cleaner path toward the repayment of its loan by the separate entity, relative to having repayment from "a holding company, particularly if all the institutions were together in one where you had a supervisory agreement." DX 1389 at 205; see also id. at 216, 218-19. At the same time, ANB obtained a superior collateralization of its loan connected with the SAFSB acquisition by having its loan made to WCHI, while simultaneously obtaining additional security in the form of RV Holdings stock. Id. at 199-200, 204-05, 212-13, 216-217.

259. River Valley III would have acquired SAFSB, but for ANB's determination that it wanted to keep its loan for that acquisition separate from River Valley III. DX 1376 at 130-31.

260. Having approached ANB for a direct loan to River Valley III to acquire SAFSB, Mr. Ross did not approach any other potential lenders to determine whether they would finance the acquisition of SAFSB through River Valley III. DX 1379 at 211-12, 218, 224-26.

261. Mr. Holland testified that he approached LaSalle bank, another Chicago-based bank with respect to a loan to acquire SAFSB through River Valley III. DX 1412 at 272. There is no evidence that Messrs. Holland and Ross approached any other lenders in the United States besides ANB and LaSalle seeking funding for a River Valley III acquisition of SAFSB.

262. At the time that River Valley III claims to have been seeking a loan to enable it to acquire SAFSB directly, its two primary shareholders, Messrs. Holland and Ross, had a collective net worth at that time of $57 million. JSF ¶ 199; PX 599A PHO054 0494; JSF ¶ 204; PX 564 HO1001 0101; PX 597 HO1001 0217; PX 599B PHO054 0506.

263. Ultimately, River Valley III and Messrs. Holland and Ross decided to acquire SAFSB outside of the River Valley III structure, thus satisfying ANB's concerns with regard to the cross-guarantee obligation. JSF ¶ 347; PX 601 at 50; DX 1379 at 233; DX 137 at 130-133, 132. ANB also obtained as collateral a pledge of the RV Holdings stock, thus avoiding the liability of the FIRREA cross-guarantee provision, while gaining security from River Valley III and WCHI, the holding company created by Messrs. Holland and Ross and other investors to acquire SAFSB. As a result, ANB put itself in a superior secured position, relative to the position it would have been in if it had merely made a loan to River Valley III for the SAFSB acquisition. DX 1389 at 205, 216-217; JSF ¶ 350; DX 1380 at 59-61; PX 615 H&R-B04-1000-1103, 1006-36.

264. WCHI was incorporated on January 31, 1992 to purchase SAFSB. Messrs. Holland and Ross each owned 30 percent of WCHI; minority shareholders owned the other 40 percent. As of October 1992, SAFSB's ownership was Mr. Ross 30 percent; Mr. Holland 30 percent; Mr. Bangert 25 percent; Mr. Rose 10 percent; Mr. Pikus 5 percent. JSF ¶ 349; PX 726 WON387 0007-0068, WON387 0015; PX 733 H&R-B06 01130-01177, H&R-B06 01143.

265. ANB loaned WCHI approximately $10 million to finance the purchase of SAFSB. PX 673 PHO058 2397-2400; JSF ¶ 354; PX 700 PHO058 2671-2704. ANB conditioned this loan upon a requirement that RV Holdings pay down a previous ANB $7 million loan to $1 million. JSF ¶ 350; DX 1389 at 209-216; DX 1380 at 59-60; PX 615 H&R-B04-1000-1103, H&R-B04-1006-1033.

266. In order to pay down the $7 million loan, Messrs. Holland and Ross shrank River Valley III's balance sheet through the sale of certain assets. From September 30, 1991, to June 30, 1992, River Valley III's total assets shrunk by approximately $110 million. River Valley III used the capital freed up by this shrinkage to pay a $6 million dividend to RV Holdings. RV Holdings used the $6 million to pay down the ANB loan. In August 1992, ANB lent the $10 million to WCHI, which in turn acquired SAFSB. JSF ¶¶ 351-52; PX 288 SH-HO 0000001-0000371, SH-HO 0000186.

267. WCHI paid $25 million for SAFSB, of which $15 million was paid to the RTC from SAFSB assets as a cash dividend and the remaining $10 million was paid in cash (from the loan obtained from ANB) by WCHI at closing. JSF ¶ 355; PX 733 H&R-B06-01130-01177, 01142, 01145-01146; PX 633 H&R-BX61-00787-00819, 00788; PX 689 H&R-BX61-01052A-01059; DX 612 PHO058 2355. WCHI acquired all of SAFSB's outstanding common stock and

SAFSB became a wholly owned subsidiary. JSF ¶ 355; PX 742 PHO058 2582-2583; PX 733 H&R-B06 01130-01177, H&R-B06 01138.

268. River Valley's $6 million dividend payment facilitated WCHI's acquisition of SAFSB, but reduced River Valley III's tangible capital by a like amount. JSF ¶ 352-53; PX 724 WON469 0276-0329, WON469 0288; PX 657 FHO012 2495-2501, FHO012 2499-2500. Underscoring the related nature of River Valley III and WCHI, WCHI paid no consideration to River Valley III for the SAFSB opportunity.

269. The RTC set forth a number of conditions in considering applications to acquire RTC assets, such as SAFSB. Among these conditions, the RTC required that thrifts comply with the fully phased-in FIRREA capital requirements of three percent core and eight percent risk-based capital (with limited defined exceptions). PX 1166 DOJBU0001785-DOJBU0001791, DOJBU0001787; DPSF ¶ 71.

270. The $13 million in River Valley III capital credits (initially $8 million for River Valley I and $ 5 million for River Valley II) could not, however, be utilized to compute fully phased in regulatory capital requirements. This bar was an express provision of the River Valley thrifts' Assistance Agreements. See DX 143 PHO001 0981-1072, 1016-1017; PX 205 WOT013 0051-0119, WOT013 0074 . Accordingly, under no circumstances (i.e., even in a nonbreach world) could the unamortized balance on the $13 million of capital credits be used to satisfy the fully phased in requirements required of applicants to acquire RTC assets such as SAFSB.

271. At the time it was acquired by WCHI, SAFSB had six retail banking offices located in the Rio Grande Valley in the southernmost part of Texas. JSF ¶ 356; PX 649A PHO040 0895-0931, PHO040 0896, PHO040 0908-0909.

272. Prior to acquiring SAFSB, Messrs. Holland and Ross had never acquired a financial institution outside of Illinois. Indeed, their thrift acquisitions had occurred within a limited geographic area in central and northern Illinois, through acquisition of a number of failing thrifts that they sought to transform into "traditional" savings institutions with "minimal interest rate or credit risk." JSF ¶ 358; PX 351 H&R-B44 1392-1407, H&R-B44 1393.

273. SAFSB was solvent at the time it was acquired. JSF ¶ 359; see PX 777 WCH-B76 0114-0150, WCH-B76 0126-0127.

274. The enactment of FIRREA, which occurred in August 1989, preceded the date on which Mr. Holland introduced the idea of the SAFSB acquisition to River Valley III's board of directors (November 20, 1991), and the date of the Stock Purchase Agreement (December 17, 1991) by more than two years. FIRREA preceded the date on which the transaction was actually consummated (August 14, 1992) by approximately three years. JSF ¶ 360; PX 631 H&R-B03 00126-00130, H&R-B03 00129; PX 733 H&R-B06 01130-01177, H&R-B06 01138.

275. At the time of closing, SAFSB's assets, liabilities, and shareholders' equity on a GAAP, fair market value basis were $189,317,000, $178,936,000, and $10,381,000, respectively, including a small reduction of assets of $328,000 for negative accounting goodwill (the excess of the fair market value of the net assets for accounting purposes over the purchase price). JSF ¶ 361; PX 777 WCH-B76-0114-0150, WCH-B76-0126-0127.

276. Pursuant to purchase accounting, there was an aggregate write down of SAFSB's assets and liabilities from accounting book value to fair market value of shareholders' equity of $27,892,755, primarily because of write-downs from book to fair market value in loans and securities. JSF ¶ 362; PX 777 WCH-B76 0114 0150, WCH-B76 0128.

**K. The Operation Of SAFSB**

277. River Valley III and SAFSB were related entities in terms of commonality in shareholders, as well as employee and management overlap.[10] For example, on August 17, 1992, SAFSB and River Valley III entered into a consulting services agreement whereby River Valley III provided the following services to SAFSB: accounting/regulatory reporting, portfolio management, troubled asset disposition, capital and tax planning, mortgage loan servicing and data processing systems. As compensation for the services rendered, SAFSB paid River Valley III a monthly fee. JSF ¶ 364; PX 724 WON469 0276-0329 0276-0329, WON469 0328.

278. After WCHI's acquisition of SAFSB, Messrs. Holland and Ross considered combining SAFSB with River Valley III or RV Holdings. JSF ¶ 369; PX 723 HO-KPMG 001281-001282. Indeed, in October 1992, River Valley III's accountants, KPMG, discussed a proposal that SAFSB become a member of River Valley III. KPMG also advised River Valley III that certain tax provisions regarding built-in gains would not cause a disallowance of net operating loss carryforwards if SAFSB were merged into River Valley III. DPSF ¶ 77; PX 723 HO-KPMG 001281-001282, HO-KPMG 001281.

279. Again, in 1994, KPMG advised River Valley III about the possibility of merging River Valley III and SAFSB, noting in a January 10, 1994 letter to Mr. Holland, PX 893 HO-KPMG 006369-006379, 006369, that a tax-deferred exchange of SAFSB's assets for RV Holdings voting stock would be the best method of merger to preserve the tax attributes of the assets. Under this treatment, SAFSB would own a single asset (RV Holdings stock), cease

[10] Moreover, they shared similar names. SAFSB changed its name to River Valley Bank, FSB effective March 15, 1993. JSF ¶ 365; PX 1048 H&R-B09-987-1016, 995.

operations as a thrift for regulatory purposes, and continue to be included as a subsidiary in WCHI. DPSF ¶ 78; PX 893 HO-KPMG 006369-006379.

280. The SAFSB transaction proved wildly profitable for WCHI and its shareholders. Cumulative cash dividends paid by SAFSB to WCHI amounted to $35 million from 1992 through 1995. JSF ¶ 366; PX 882 WCH-B771621-1649, WCH-B77 1626; PX 1048 H&R-B09-987-1016, H&R-B09-992.

281. SAFSB's taxable income from the time of its acquisition by WCHI to December 31, 1994 was $5.890 million. DPSF ¶ 75; PX 769 HO-KPMG 005390-005437; PX 880 HO-KPMG 005929-005954; PX 1002 HO-KPMG 005900-005927, HO-KPMG 005962; PX 1067 H&R-B85-0001-0151, H&R-B85-0041-0042; DX 1542 HO3003 1742-1795, 1780. Most of this income ($4.847 million) was realized during the calendar year 1994. DPSF ¶ 74; PX 880 HO-KPMG 005929-HO-KPMG 005954; PX 1002 HO-KPMG 005900-5927, HO-KPMG 005902.

282. The primary explanation for the thrift's profitability of the thrift was the precipitous decline in interest rates, spiking down to 20-year lows. See DX 1477 at ¶¶ 20-23; DX 1479 at ¶ 12.

283. WCHI's consolidated tax returns indicated no significant taxes paid from 1992 to 1996 on built-in gains of approximately $29.9 million. DPSF ¶ 76; PX 612 at 19.

284. WCHI paid off ANB's loan in three years. JSF ¶ 367-68; PX 601 at 51-52; DX 1412 at 277.

### L. The Value Of The River Valley Thrifts Increased Dramatically Between 1988 And 1994

285. The value of the River Valley thrifts increased dramatically in the years following the passage of FIRREA.

286. This can be seen from a number of perspectives. First, the purchase price for the River Valley thrifts by First Bank demonstrates their increased value. The River Valley thrifts were sold to First Bank for $ 37.4 million (JSF ¶ 373, PX 1074 at 93; DX 1298 BBHO 00062-00181, 00159-00161), a value which translates into a return for Messrs. Holland and Ross of 29.5 percent per year. DX 1492 at ¶ 49.

287. One facet of this increased value is reflected in the fact that River Valley I, River Valley II, and River Valley III reported positive net income on a GAAP basis from 1990 to 1994, taken as a whole. JSF ¶ 341; DX 402 PHO061 0345-0356, 0351-52; DX 403 PHO061 0358-0365, 0360-61; DX 1042 PHO064 2284-2297, 2285; PX 288 SH-HO 0000001-0000371, SH-HO 0000112, SH-HO 0000134, SH-HO 0000067.

288. As an important barometer of its increased value over this period, the River Valley thrifts' management marked the balance sheets of River Valley I , River Valley II, and River Valley III to market value on a monthly basis and monitored the institutions' "net adjusted liquidation value" (also referred to as "value of common stock"). DPSF ¶ 79; PX 512 WON107 1612-1653, 1613; DX 223 PHO003 0416-0489, 0448-0450; DX 543 PHO029 2810-2847, 2812.

289. Indeed, River Valley III acknowledged the high importance of its mark to market valuations:

> The mark to market is the single most important determinant of the value of River Valley Savings Bank FSB. We therefore rely on it to judge how well the institution, and management, is performing. It is because of this that management can focus on the bottom line and how to most effectively increase the long-term value of the firm.

DPSF ¶ 80; PX 649 FHO013 1814-1900, FHO013 1827.

290. Mr. Bangert represented to the OTS on February 21, 1991, that the combined market value of River Valley I and River Valley II's common equity had increased by more than $21.5 million from July 1988 to January 1991 - i.e., from approximately $9.5 million at July 1988 to approximately $31.0 million in January 1991. DPSF ¶ 82; PX 512 WON107 1612-53, WON107 1613.

291. According to River Valley III's internal monthly mark-to-market analyses, the "adjusted net liquidation value" (also referred to as "value of common stock") of RV Holdings was approximately $47.3 million as of August 31, 1993 (net of $6.1 million of deferred compensation payments owed to Messrs. Holland and Bangert), which reflected an increase of approximately $16.3 million from January 1991 ($31.0 million). The increase from July 1988 ($9.5 million) was approximately $37.8 million. DPSF ¶ 83; DX 877 PHO011 0428-0515, 0431; PX 512 WON107 1612-53, WON107 1613.[11]

292. According to River Valley III's monthly mark-to-market analyses, by June 30, 1994, the thrift's value had increased to $40.2 million relative to the July 1988 ($9.5 million) figure for the separate entities, an increase of approximately $30.7 million. DPSF ¶ 84; DX 1019 PHO011 0815-0921, 0819; PX 512 WON107 1612-53, WON107 1613.

---

[11] In determining the net adjusted liquidation value (or "value of common stock") of River Valley I, River Valley II, and River Valley III from 1988 to 1994, the institutions' management assigned goodwill a value of $0 because it was not a "real asset" and "ha[d] no resale value." DPSF ¶ 87; DX 1376 at 63; DX 223 PHO003 0416-0489, 0448-0450. Moreover, between 1988 to 1991, the thrifts' management did not ascribe any value to subordinated debt, (DPSF ¶ 88; DX 223 PHO003 0416-0489, 0450; DX 601 PHO029 0690-0799, 0781), or to preferred stock held by third-parties (e.g., FSLIC, ANB). DPSF ¶ 89; DX 543 PHO029 2810-2847, 2812.

**M. <u>The Sale Of RV Holdings To First Banks, Inc.</u>**

293. In 1993, Messrs. Holland and Ross sought a buyer for RV Holdings in 1993. JSF ¶ 370; PX 601 at 52 ¶ 117.

294. Accordingly, Messrs. Holland and Ross retained the services of Donaldson, Lufkin, Jenrette ("DLJ") to identify potential buyers for RV Holdings. JSF ¶ 371; PX 601.

295. On August 26, 1994, RV Holdings entered into a definitive agreement to merge the institution into First Banks, Inc. ("FBI"). JSF ¶¶ 372; DX 1371 at 32; PX 1009 PHO047 0182; PX 601 at 69 ¶ 153; PX 982 H&R-BX70 2329-63, H&R-BX70 2339.

296. The August 1994 FBI acquisition agreement placed certain operating restrictions on River Valley III which required First Bank's prior consent before execution. JSF ¶ 372; PX 982 H&R-BX70 2329-63, H&R-BX70 2339.

297. Messrs. Holland and Ross, as controlling shareholders, sold RV Holdings to FBI on January 4, 1995, for $37.419 million. The payment was distributed as follows: $179,660 to Mr. Pikus; $744,793 to Mr. Kipnis; $18,619,825 to Mr. Holland; and $17,875,032 to Mr. Ross. JSF ¶ 373; PX 1074 at 93; DX 1298 BBHO 00062-00181, 00159-00161; JSF ¶ 374; PX 994 H&R-B05-00155-00165; PX 691 HO-KPMG 006447-06480; PX 1009 PHO047 0182; JSF ¶ 385; PX 648 H&R-B3 1234-1245, H&R-B3 1234-35.[12]

298. Upon its sale to First Bank, River Valley III had a sales price to tangible book equity ratio of approximately 2. <u>See</u> DX 1492 at ¶ 48, Ex. 13.[13]

---

[12] When First Banks paid $37.419 million for River Valley III, it paid more than River Valley III's Net Worth or Book Value. JSF ¶ 375; DX 1371 at 33, 125; PX 1009 PHO047 0182; PX 601 at 69 ¶ 153; <u>Trustmark Corp. v. Comm of Int. Revenue</u>, 1994 WL 159116 (U.S. Tax Court) (premium on purchase of thrift standard in industry).]

[13] For acquisitions of Illinois thrift institutions of a comparable size to River Valley III from 1990 to 2005 (<u>i.e.</u>, approximately $275-$700 million in total assets), the sales price to tangible

299. Also on January 4, 1995, a merger took place between First Bank, a Federal Savings Bank ("First Bank"), a banking subsidiary of FBI, and River Valley III. A simultaneous merger also occurred on this date between another wholly-owned subsidiary of FBI and RV Holdings. Pl. Statement Concerning the Identity of River Valley's Successor in Interest (Feb. 25, 2005) at 3.

300. First Bank contends that River Valley III would have been sold to First Bank on or about January 4, 1995, even without the purported breach by the Government. JSF ¶ 376; PX 601 at 69 ¶ 151, 73 ¶ 173.

301. After January 4, 1995, First Bank was merged with or into various other FBI banking subsidiaries. First, First Bank merged with St. Charles Federal Savings and Loan Association ("St. Charles") on December 12, 1996. Pl. Statement Concerning the Identity of River Valley's Successor in Interest dated Feb. 25, 2005, at 3 and Ex. B1. After the merger, St. Charles changed its name to First Bank. Id. Second, in August 1, 1997, First Bank, Illinois and First Bank were merged into First Bank FSB. Id. at 3-4 and Ex. C2. After the merger, First Bank FSB changed its name to First Bank. Id.

**N. First Bank Was Well Capitalized And Had Little Use For Goodwill**

302. FBI was in capital compliance from September 1990 through September 1997. JSF ¶ 377; DX 1414 at 21 ¶ 75, Ex. 9.

303. At no time between September 1990 and September 1997 was FBI capital constrained. Moreover, its capital ratios exceeded the regulatory requirements throughout the above time frame. This excess over the regulatory requirement ranged from 3.2 percent to 8.32

---

book equity ratio exceeded 1 in all cases. See DX 1492, Thakor 2007 Report at ¶ 48.

percent (tangible), 1.7 percent to 6.82 percent (core), and 1.36 percent to 8.27 percent (risk-based). JSF ¶ 378; DX 1414 at 21 ¶ 75, Ex. 9.

304. In particular, FBI's capital position was strong immediately before and after the acquisition of RV Holdings. As of December 31, 1994, FBI's tangible, core, and risk-based capital ratios were at 8.21 percent, 8.21 percent and 16.15 percent, respectively. As of September 30, 1995, those same ratios stood at 7.15 percent, 7.15 percent and 13.07 percent. JSF ¶ 379; DX 1414 at 22 ¶ 76, Ex. 9.

305. FBI's well-capitalized status was in line with the trend in the thrift industry to maintain excess regulatory capital. For example, as of December 31, 2005, thrift institutions nationwide maintained an average core capital ratio of more than eight percent, while the required level of well-capitalized core capital is just five percent. See DX 1489 HRBB4-000918-000998, HRBB4-000946; see also Code of Federal Regulations (Jan. 1, 2007), Chapter 3, § 325.103.

306. At no quarter-end between March 1995 and September 1997, did First Bank have retained earnings in excess of $3 million. See DX 1175 at WON482 0311; DX 1261 WON492 1299-1332, 1329; DX 1220, DX 1281; DX 1516; PX 605B at Ex. B. Given that Mr. Holland posits that the minimum balance of lost regulatory capital for the quarters-ending March 31, 1995 through September 30, 1997 was $15.9 million, First Bank did not have sufficient retained earnings to replace Mr. Holland's alleged lost regulatory capital for this period.

307. River Valley III's remaining GAAP goodwill was eliminated upon its acquisition by First Banks. JSF ¶ 380; PX 1074 at 93-97, 116; PX 2 at 425-466; PX 1 at 223-229; PX 552 at 1231-32; PX 7 at 4779-96.

308. Mr. Holland recognized that GAAP goodwill would have been calculated anew at the time River Valley III was sold to First Banks. JSF ¶ 381; DX 1413 at 481-482. This is because, pursuant to GAAP, in a purchase accounting transaction, acquirers do not acquire the goodwill, if any, that exists on the books of the acquiree, but rather establish new-basis goodwill equal to the excess, if any, of the purchase price over the fair value of the net assets acquired. GAAP requirements were applicable to RAP accounting, unless there was a specific RAP convention, which there was not with respect to the transfer of goodwill. DPSF ¶ 86; PX 2 at 425-466; PX 1 at 223-39; PX 552 at 1231-1232; PX 7 at 4779-96; DX 1426 at 577-579, 581; PX 164 at 3; PX 67 OGF121 2169-2188, 2183; DX 1427 at 996-97.

309. Indicating the built-in, or unrealized losses present in River Valley III's MBS portfolio at the time of the sale of River Valley III to First Bank, First Bank applied a negative mark-to-market adjustment of $7.2 million to River Valley III's MBS. JSF ¶ 383; PX 960 H&R-ABFB-B72-0043-0048.

**O. <u>SAFSB's Liquidation</u>**

310. In June 1996, WCHI sold certain assets and liabilities of SAFSB to International Bank of Commerce ("IBC"). The acquisition was accounted for as a purchase transaction. IBC recorded intangible assets, goodwill and core deposit premium totaling $6,599,000 on the date of the sale. JSF ¶ 386; PX 1066 1-108, 75-77.

## VI. THE NATURE OF RETAINED EARNINGS AND TANGIBLE CAPITAL

311. Retained earnings are generated in the normal course of a profitable business, and are an accounting concept representing the accumulation of past net income.[14] See DX 1541 at HRAC4 001043 (p. 663); see also DX 1491 at ¶ 8.

312. Any retention of earnings is simply a promise by the institution to pay dividends in the future rather than now. See DX 1492 at ¶ 33.

313. When an institution retains earnings, it is not precluded from investing these retained earnings in any way it sees fit that is permitted by its charter. See DX 1492 at ¶ 34.

314. Retaining earnings are not generally viewed by thrift/bank managers as harmful to an institution. See DX 1490 at ¶ 13.

315. Retaining earnings makes an institution safer and stronger and more capable of withstanding shocks as well as raising additional capital at lower prices. Retaining earnings does not weaken an institution. See DX 1492 at ¶ 33.

316. Every dollar of retained earnings can be viewed as the present value of a stream of future dividends. See DX 1492 at ¶ 33. Given the foregoing, the retention of earnings by River Valley III was not a denial of dividends to its shareholders. Id.

317. Neither regulation nor company policy at River Valley III that required retained earnings to be invested in Treasury securities or kept idle as cash. See DX 1492 at ¶ 34.

318. Tangible capital can be directly invested at a rate of return corresponding to the institution's asset portfolio opportunities, whereas intangible capital cannot. See DX 1492 at ¶ 36.

---

[14] Certain non-income statement items are also captured within retained earnings, such as dividends paid or dividend adjustment.

319. Tangible capital increases the institution's safety and soundness and thereby lowers the costs of all uninsured sources of financing, including equity. Intangible capital does not do this. See DX 1492 at ¶ 36.

320. Tangible assets do not amortize, whereas intangible assets do amortize. See DX 1492 at ¶ 36.

321. Tangible capital can be leveraged to support a larger volume of assets than an equivalent amount of intangible capital. See DX 1492 at ¶ 36.

322. A firm's cost of equity capital is subject to change based on a variety of factors including, but not limited to, the following: changes in interest rates in the economy that alter not only the risk-less rate but yields on a variety of instruments, changes in firm-specific factors that change the firm's risk premium relative to the risk-less rate, changes in industry risk factors, and changes in the firm's financial leverage, size, and business activities. See DX 1492 at ¶ 43.

323. The River Valley thrifts did not raise net external capital from 1990 to 1994. See DX 1491 at ¶ 8.

324. When performing a financial valuation, the value of any project or asset is based on the incremental cash flows directly associated with it, i.e., the cash flows that would not exist absent the project or asset. See DX 1492 at ¶ 28 n. 10.

325. Thrift and bank acquisitions are typically priced as multiples of tangible book equity. See DX 1492 at ¶ 48.

326. An increase in retained earnings leads to an increase in tangible equity, all else being equal, which generally results in a higher sales price. See DX 1492 at ¶ 48.

327. Tangible capital increases the price at which the institution can be sold,

whereas intangible capital does not. DX 1492 at ¶ 36; see Granite Management Corp. v. United States, 74 Fed. Cl. 155 (2006).

328. Based on fundamental principles of finance, Mr. Holland's cost of replacement retained earnings methodology is mathematically equivalent to a lost profits claim. DX 1492 at Ex. 4.

## CONTENTIONS OF LAW

## I. PLAINTIFFS' SAFSB-RELATED DAMAGE CLAIMS ARE MERITLESS

More than 100 years of binding precedent requires that First Bank prove that the claimed expectancy damages under its various models (1) were the "immediate and proximate result of the breach;" (2) were "within the contemplation of the contracting parties" "because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it;" and (3) can be established with "reasonable certainty." Chain Belt Co. v. United States, 115 F. Supp. 701, 714 (1953); Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) (lost profits must flow "inevitably and naturally, not possibly nor even probably" from the breach); accord Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) ("Cal Fed").

First Bank's expectancy damages claims should be examined in light of the ample precedent that exists with regard to expectancy damages claims in Winstar-related cases. This Circuit has recognized the substantial obstacles confronting plaintiffs in Winstar-related cases who have staked claims for "lost profits" – i.e., "establishing what might have been." Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("Glendale I"). The Court of Appeals for the Federal Circuit has observed that, generally, it is a "waste of time and effort" to attempt to prove lost profits in the Winstar-related cases. Glendale Fed. Bank, FSB, v.

United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004) ("Glendale II"). Indeed, the Federal Circuit and this Court have repeatedly rejected expectancy damage claims.[15]

In Glendale II, the Court of Appeals focused upon the lack of reliability of the methodologies underlying lost profits claims – rather than the facts underlying them – underscoring the significant problems with attempting to predict what "would have happened" in a large, complex banking organization in the absence of the breach.

As the Federal Circuit also observed, "[t]he lost profits theory, though not absolutely barred in Winstar-related cases as a matter of law, has not been susceptible of proof due to its speculative nature." Fifth Third, 402 F.3d at 1236. It is in light of these precedents, and the admonition of the Federal Circuit that lost profits claims are "'speculative'" and "'inherently unreliable,'" Glendale II, 378 F.3d at 1313, that we examine First Bank's lost profits claims in this case.

---

[15] Am. Fed. Bank, FSB v. United States, 68 Fed. Cl. 346, 358-59 (2005); see also First Fed. Lincoln Bank v. United States, 73 Fed. Cl. 633, 642-45 (2006), appeal docketed, No. 07-5044, -5048 (Fed. Cir. 2007); Citizens Fin. Servs., FSB. v. United States, 64 Fed. Cl. 498, 514-15 (2005), aff'd, 170 Fed. Appx. 129, 2006 WL 618792 (Fed. Cir. Mar. 9, 2006) (affirmed pursuant to Fed. Cir. R. 36); LaSalle Talman Bank, F.S.B. v. United States, 64 Fed. Cl. 90, 106 (2005), aff'd, 462 F.3d 1331 (Fed. Cir. 2006); Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 125-26 (2004); S. Cal. Fed. Sav. & Loan Ass'n v. United States, 57 Fed. Cl. 598, 622 (2003) aff'd in part, rev'd in part, 422 F.3d 1319 (Fed. Cir. 2005); S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 306 (2003); Fifth Third Bank of W. Ohio v. United States, 55 Fed. Cl. 223, 236-42 (2003) ("Fifth Third"), aff'd in part, rev'd in part, 402 F.3d 1221 (Fed. Cir. 2005); Suess v. United States, 52 Fed. Cl. 221, 228 (2002) appeal docketed Nos. 07-5070, -5071 (Fed. Cir. 2007); Bank United of Tex., FSB v. United States, 50 Fed. Cl. 645, 654 (2001), aff'd in part, rev'd in part, 80 Fed. Appx. 663 (Fed. Cir. 2003); Castle v. United States, 48 Fed. Cl. 187, 206, 214 (2000), aff'd in part, rev'd in part, 301 F.3d 1328 (Fed. Cir. 2002); Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 401-02 (1999), aff'd in part, vacated in part, 239 F.3d 1374 (Fed. Cir. 2001); but see First Fed. Sav. & Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 106 (2007); Commercial Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 338 (2004), aff'd, 125 Fed. Appx. 1013, 2005 WL 857772 (Fed. Cir. Apr. 8, 2005); Globe Savs. Bank, F.S.B. v. United States, 65 Fed. Cl. 330 (2005), aff'd in part, vacated in part, 189 Fed. Appx. 964, 2006 WL 2045776 (Fed. Cir. Jul. 20, 2006).

### A. First Bank's Purported Damages Resulting From WCHI's Acquisition Of SAFSB Were Not Caused By The Government's Purported Breach

#### 1. The Purported Injury Must Have A Close, Direct, And Inevitable Nexus Between The Breach And The Harm Alleged

According to time-tested precedent from this Court, for First Bank to satisfy its burden of proving causation, the alleged damages must flow "inevitably and naturally, not possibly nor even probably" from the breach. Myerle, 33 Ct. Cl. at 27. The Myerle court established the following test for causation that, according to the Federal Circuit, still holds:

> If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

Ramsey v. United States, 101 F. Supp. 353, 357-58 (1951) (quoting Myerle, 33 Ct. Cl. at 26) (cited with approval in Wells Fargo Bank, N.A. v. United States., 88 F.3d 1012, 1022-23 (Fed. Cir. 1996)); S. Nat'l Corp., 57 Fed. Cl. at 304; see also; Cal. Fed. Bank v. United States, 54 Fed. Cl. 704, 712-13 (2002), aff'd, 395 F.3d 1263 (Fed. Cir. 2005); Fifth Third, 55 Fed. Cl. at 237. This test is the appropriate causation test for breach of contract actions and it requires a close, direct, and inevitable nexus between the breach and the harm alleged.

The Federal Circuit has also found that a "substantial factor" test can be applied under certain circumstances when assessing causation. See Citizens Fed. Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007). We point out at the outset that the Citizens Federal panel did not state (nor could it) that it was overruling the previous panel's decision in Cal Fed that the "the

Court of Federal Claims correctly rejected the 'substantial factor' test advocated by CalFed." Cal Fed, 395 F.3d at 1268. The Citizens Federal court also did not hold that the substantial factor test was required to be applied in any case, but only that, "this court has upheld the causation standard for a particular case as within the court's discretion." Citizens Fed., 474 F.3d at 1319. At most, the majority panel decision in Citizens Federal stands for the proposition (with which we respectfully disagree) that the selection of an appropriate causation standard depends upon the facts of a particular case, and lies within the trial court's discretion. Notably, the panel majority cited to no legal support for this proposition.

Moreover, even if the Court were to conclude that Citizens Federal requires it to decide whether to apply the substantial factor" test – a conclusion with which we respectfully disagree - the "substantial factor" test should not yield a different result from the "but for" test. The "substantial factor" test originated in tort law to analyze concurrent cause cases. See W. Page Keeton et al., Prosser and Keeton On Torts, 266-68 (5th ed. 1984). In tort law, the "substantial factor" test requires a showing of "but-for" causation. Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988); Point Prods. A.G. v. Sony Music Entm't, Inc., 215 F. Supp. 2d 336, 341 (S.D.N.Y. 2002); Shyface v. Sec'y of Health and Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999).

When the "substantial factor" test is properly applied, the causation requirement is met when the plaintiff proves that the defendant's conduct was a substantial factor in brining about the injury without which the harm would not have occurred. A plaintiff must prove that the alleged conduct played a substantial part in bringing about the injury, and that the injury was either a direct result or a reasonably probable consequence of the conduct. The substantial factor test has not "replaced the need for each liable defendants to be a but-for and substantial

contributor to the indivisible injury," Menne, 861 F.2d at 1462, and courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish" that the "breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Prods. A.G., 215 F. Supp. 2d at 344. Indeed, to recover damages, plaintiffs must satisfy both the substantial factor and the but-for tests. Shyface, 165 F.3d at 1352. Thus, the "substantial factor" test may only be applied in place of a "but for" test if doing so would "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1353 (Fed. Cir. 1991).

Regardless of the standard of causation, this Circuit has recently reinforced the core causation principle that "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Hansen Bancorp. Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004) (quoting Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003)). "Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement." Id. (citing LaSalle Tallman Bank, F.S.B. v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003)). This rule necessitates segregating those costs realized as a result of the breach from those costs caused by other factors. See Restatement (Second) of Contracts § 347 (1981), cmt b ("If defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered."); S. Nat'l Corp., 57 Fed. Cl. at 305 (rejecting plaintiffs' lost profits claim because it did not reflect "categories of activities, opportunities, or lines of businesses that the thrift would have undertaken in the but-for world").

Thus, even if the substantial factor test were applicable, it cannot be used to assert damages for matters affecting a plaintiff that the Court has found were not caused by the breach. For example, this Court has found that plaintiffs' loss of $5 million in preferred stock toward regulatory capital computations was not caused by the breach because there was no contractual right by plaintiffs in that regard. Holland v. United States, 74 Fed. Cl. 225, 263 (2006). Damage claims cannot be asserted, even under the substantial factor test, in disregard of this holding.[16]

**2. River Valley Mitigated Any Effect Of The Breach With Respect To The SAFSB Opportunity By Facilitating The Acquisition Of SAFSB Through WCHI**

Even assuming the (incorrect) premise that the reason that the SAFSB transaction did not go forward at River Valley was the breaching provisions of FIRREA, plaintiffs' SAFSB-related claims fail for the simple reason that the transfer of the SAFSB-related opportunity from River Valley thrift to WCHI was an act of mitigation for which all of the benefits (i.e., the $45 million in profits actually achieved at SAFSB) must be considered against the costs. Here, the $45 million in benefits of the mitigation enjoyed at an entity (WHCI) created by River Valley's shareholders, fully offset the purported "costs" of the very same $45 million in lost profits. That is, the mitigation was complete. None of the SAFSB profits were "lost" a result of the transfer of the opportunity to WCHI.

The only reason that these profits were obtained at WCHI rather than at River Valley is that River Valley fully cooperated and affirmatively facilitated the acquisition of SAFSB by the River Valley shareholders through the WCHI entity that they created. Indeed, River Valley up-

---

[16] As we discuss below, this has a direct bearing on plaintiffs' recently (and improperly) revised diminution of value claim, because plaintiffs interpret the "substantial factor" test to permit them to, in effect, obtain damages for the loss of the $5 million in preferred stock toward regulatory capital levels, notwithstanding this Court's determination that the $5 million in preferred stock was non-contractual. See below at 105-06.

streamed a dividend of $6 million to RV Holdings for the sole purpose of paying off an ANB loan, which ANB required as a condition of lending funds to WCHI for purchasing SAFSB. JSF ¶ 350-51; PX 601, p 51 at ¶ 115. That dividend was not inconsequential, as it required River Valley to shrink its balance sheet by $110 million. JSF ¶ 351. By shrinking, River Valley freed up enough borrowing capacity so that it could repay $6 million to ANB (through RV Holdings), in order to facilitate WCHI's the purchase of SAFSB. JSF ¶ 351-52.

Underscoring the elective nature of the structuring of the SAFSB transaction, Mr. Holland conceded that the opportunity to acquire SAFSB represented an optimal use of the $6 million, so that, rather than have River Valley retain the funds (and corresponding earnings), he (and the other River Valley shareholders) simply chose to obtain earnings in SAFSB instead. DX 1380, Holland Dep. (Aug. 6, 2000) at 49-50. This only occurred because River Valley understood that its shareholders stood to gain the benefit of the SAFSB transaction regardless of whether the transaction occurred directly through River Valley, or through an entity created by its shareholders for the express purpose of realizing the opportunity.[17]

This Court has stated that "any costs avoided or benefits received as consequence of the breach" must be counted against any costs incurred as a result of the breach. Am. Fed. Bank, FSB v. United States, 72 Fed. Cl.586, 610 (2006) (citing Bluebonnet, 339 F.3d at 1346). The benefits from the mitigation, the $45 million in actual SAFSB profits, must be counted against the $45 million (or less) in lost profits that plaintiffs claim. The mitigation was complete and

[17] At the time River Valley's shareholders included Messrs. Holland, Ross, Bangert, Pikus, and Kipnis. WCHI's shareholders included all of these men, plus John Rose, who brought the SAFSB opportunity to the attention of Messrs. Holland and Ross. Mr. Rose was going to receive his 10 percent "finders fee" ownership right to SAFSB, regardless of whether the deal went forward at River Valley or WCHI. Thus, River Valley's board (acting in the best interests of its shareholders) was willing to facilitate the SAFSB acquisition through its shareholders-created entity, WCHI.

there can be no damages. Indeed, this follows from the bedrock principle that the award of damages for costs incurred to mitigate the alleged breach cannot place plaintiffs in a better position than it would have occupied if the breach had not occurred. Hansen, 367 F.3d at 1315; LaSalle, 317 F.3d at 1371.

In short, this is not a case where the profitable opportunity escaped as a result of the breach, but rather, as a mitigation strategy, was affirmatively funneled, with assistance, into a related and friendly entity. Indeed, recognizing the connected nature of the River Valley and WCHI entities, a KPMG memorandum noted that, even after the acquisition of SAFSB by WCHI, River Valley III was considering merging SAFSB into the thrift. DPSF ¶ 77; PX 723 HO-KPMG 001281-001282, 001281. If WCHI was truly an unrelated, third-party acquirer, this would not have been an ongoing consideration.

Finally, even if River Valley is held not to have mitigated by transferring the SAFSB-opportunity to WCHI, then in that case it failed to mitigate by not facilitating the transfer of SAFSB back to itself within one or two years of the actual SAFSB transaction, as the KPMG analysis indicates it could have done. PX 1133 at ¶¶ 35-41.

#### 3. First Bank's SAFSB Claim Should Be Denied Because Any Award Would Result In An Improper Windfall Recovery Of Double Profits

First Bank's SAFSB claim should also be rejected because it represents an attempt to obtain an improper windfall recovery of double profits. As such, there can be no causation of damages, because there were no damages. Mr. Holland admits that he and Mr. Ross, together with the minority shareholders of SAFSB "obtained the full – obtained the economic benefit" from the SAFSB acquisition. DX 1464 at 187-88. Indeed, Mr. Holland admits that, if he were to receive any damage award based on the SAFSB acquisition, it would result in his obtaining a

double recovery of profits from the SAFSB transaction. Id.[18] It has been established in this case that First Bank will not be the ultimate beneficiary of any award of damages, but is contractually obligated to provide any funds it receives to Messrs. Holland and Ross. PX 1011 H&R-B07 00279-00281, 00280 ("you will pay to us any sum of money received from the Agencies . . . with respect to any of the Corporate Claims"). Thus, there can be no doubt that any award of damages based upon the profits from SAFSB would lead to a double recovery, which, plaintiffs argue, only became possible as a structural matter because River Valley cooperated in transferring the SAFSB opportunity to its shareholders (and their self-created entity, WCHI) as a mitigation strategy.

In short, the entire SAFSB claim is without merit because it reflects an improper attempt to obtain a double recovery of profits from the United States. See Hansen, 367 F.3d at 1315 ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement"); Bluebonnet, 339 F.3d at 1345 ("the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach"); LaSalle, 317 F.3d at 1371.

[18] In fact, Mr. Holland was being modest. He would actually receive more than a double recovery because, while he and Mr. Ross's estate are contractually entitled to 100 percent of any damage award given to First Bank (after any tax considerations), they were collectively never more than 60 percent owners of WCHI. In effect, Mr. Holland and the Ross Estate would get a double recovery for the 60 percent of WCHI profits they have already received, plus a further recovery of the 40 percent of WCHI profits that they did not receive (because they were never entitled to such profits).

### 4. First Bank Cannot Show That The Purported Inability Of River Valley III To Obtain SAFSB Was Caused By The Government's Breach Of The Purported Contract

#### a. The SAFSB Transaction Was An Independent, Collateral, And Remote Undertaking

First Bank cannot show, as a matter of law, that damages resulting from the purported inability of River Valley III to acquire SAFSB were caused by the Government's breach of the purported River Valley contracts. The acquisition of SAFSB in 1992 was an independent and collateral undertaking that was remote – in terms of time, geography, structure, and regulatory environment – from the 1988 transactions involving River Valley I and River Valley II.

In 1988, the goals of the River Valley thrifts were focused upon their operations and business opportunities in Illinois. Indeed, the thrifts' stated objectives (for example, before and at about the time of FIRREA's passage) were to become the leading retail banks in the Illinois markets they served. PX 351 H&R-B44 1392-1407, 1393; PX 345 WOL275 0154-0166, 0163. There was no indication given to Federal regulators that River Valley intended to leverage its regulatory capital in order to pursue thrift acquisitions in other states, especially a state as remote from Illinois as Texas.

The remoteness of First Bank's SAFSB claim from the purported contracts is obvious. The SAFSB transaction was an independent business decision not directly related to the Assistance Agreement contracts, which merely provided that goodwill could be utilized toward regulatory capital computations. The SAFSB claim is, in fact, a classic example of an improper claim for consequential damage, an "'independent and collateral undertaking'" that is "'too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach.'" Myerle, 33 Ct. Cl. at 26 (citation omitted); Wells Fargo, 88 F.3d at 1022-23.

The SAFSB transaction occurred four years after the formation of the purported contracts, based upon independent business decisions of the shareholder plaintiffs to pursue an RTC thrift, seized in Texas, at a time when River Valley was in full compliance with FIRREA-mandated capital standards. Such alleged lost profits "are too uncertain and remote to be taken into consideration." Wells Fargo, 88 F.3d at 1023 (quoting Ramsey, 101 F. Supp. at 357-58 (quoting Myerle, 33 Ct. Cl. at 26)); see also Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, N.V., 28 F. Supp. 2d 126, 132 (S.D.N.Y. 1998), aff'd 205 F.3d 1323 (2d Cir. 1999); Three Crown Ltd. v. Salomon Bros., Inc., 906 F. Supp. 876, 884 (S.D.N.Y. 1995).

**b. The Inability Of River Valley To Consummate The SAFSB Transaction Was The Result Of Intervening Factors**

**i. ANB Refused To Loan More Funds To River Valley Due To FIRREA's Cross-Guaranty Provision**

The River Valley thrifts were fully compliant with FIRREA's capital requirements at the time of the SAFSB acquisition. ANB refused to loan the thrifts money for the SAFSB acquisition because ANB was concerned with the potential for extended liability that it would face pursuant to FIRREA's non-breaching cross-guaranty provision. DX 1416 at 31 ¶ 72; see also 12 U.S.C. § 1815(e); DX 1389 at 137-39, 215-16, 218-19. Accordingly, irrespective of the breach, River Valley would not have been able to obtain a loan from ANB to consummate an acquisition of SAFSB because of the nonbreaching cross-guaranty provision, and but for the cross-guaranty provision, it would have been able to do so. Thus, the intervening cause of River Valley's inability to acquire SAFSB was the cross-guaranty provision of FIRREA.

**ii. River Valley Made Little Attempt To Find Other Lending Sources**

Even though River Valley claims that it was presented with the wildly profitable SAFSB opportunity, once ANB decided that it would only lend to a newly formed entity (by River Valley's shareholders) to fund the SAFSB transaction, River Valley's management took few steps to find another lender. Certainly, plaintiffs cannot establish that no other loan was available and that they could not have made the acquisition within the River Valley thrifts. Accordingly, River Valley's failure to obtain another loan cannot be attributed to the breach.

Moreover, Messrs. Holland and Ross had, cumulatively, over $50 million in net worth between them, yet they made no effort to mitigate by lending or infusing funds into River Valley for the purpose of acquiring SAFSB.

Such inactivity can be considered an intervening cause of the SAFSB-related damages, or, alternatively, as a failure to mitigate. In either event, SAFSB-related damages are foreclosed.

**c. The SAFSB-Related Damages Claimed Were Not Caused By The Government's Breach, But By An Increase In The Market Value Of SAFSB's Assets**

Fundamentally, plaintiffs' SAFSB-related claims fail because the manner in which damages are computed -- which are based upon an increased value of SAFSB's assets as a result of improved market conditions after the date of the acquisition by WCHI -- demonstrates that the claimed harm was not caused by the Government. There is no case of which we are aware that holds that an upswing in the market value of an asset following a breach is compensable by the breaching party in the absence of a showing of proximate cause between the breach and the market improvement.

Indeed, the Federal Circuit's holding in Estate of Berg v. United States, 687 F.2d 377, 379-83 (Ct. Cl. 1982), suggests precisely the contrary. In that case, the Treasury Department refused to redeem bonds at par value but, instead, redeemed them at fair market value. This was ruled to be a breach of the contract. Between the time the Treasury refused to perform the contract and the time it returned substitute bonds to the non-breaching party at the request of that party, the market value of the bonds had increased.

The Treasury Department argued that, in calculating damages, it should benefit from the increase in the market value because the non-breaching party had the bonds and could sell them at the increased market price. The non-breaching party argued that the increase in market value was irrelevant and its damages consisted of the difference between the price at which Treasury had agreed to redeem the bonds and the market price at the time the non-breaching party had sought to redeem the bonds. This Court ruled that the damages had to be measured as of the time of the breach, and the fact that the market value of the bonds increased after the breach was irrelevant to the determination of damages. Id. at 379-82.

Estate of Berg is analogous to this case because, here, River Valley's SAFSB-related damage claims are based upon the increase in the value of SAFSB. Just as the United States Court of Claims in Estate of Berg determined that the increase in market price following the breach was irrelevant to the damages caused by the breach, so, too, in this case, the increase in the price of SAFSB's assets is irrelevant to the damages caused by the breach. In Estate of Berg, the Treasury refused to redeem the bonds at their face value as promised. In this case, the Government promised to allow goodwill to count as regulatory capital. In neither case did the Government promise a guaranteed price if particular assets had to be sold -- or were unable to be obtained as a result of the breach.

Put another way, it is asymmetrical to award damages for upswings in the market following the breach of contract but not downswings in the market. If the market value of SAFSB's assets had decreased following its acquisition, we can know ex post that River Valley would have gained financially from not consummating the transaction. Yet, no one would argue that such a hypothetical avoided loss should be offset against other elements of expectancy damages. See id.

This basic principle of damage recovery demonstrates the folly of awarding damages based upon unforeseen and unforeseeable increases in the market value of assets. See, e.g., Wells Fargo, 88 F.3d at 1023 (plaintiff cannot recover damages that are not the "'direct and immediate result[]'" of the breach) (quoting Ramsey, 101 F. Supp. at 358; LaSalle, 317 F.3d at 1373 ("The general rule is . . . that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong"); 1 Dobbs Law of Remedies, § 3.8(2) (2d ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable").

Here, case law and economic theory align. Indeed, Dr. Carron explains that "[a]s an economic matter, however, actual performance after the acquisition is not relevant to the value of the claim at the time of the acquisition. . . . The value of an asset changes as market conditions change. . . . By claiming damages based on actual subsequent performance [of SAFSB], plaintiffs are asking for something in addition to the value of the asset itself: a free option on the underlying investment." DX 1477 at ¶¶ 5-7.

The market events that caused SAFSB to increase in value were neither caused by the breach nor foreseeable at the time of contracting, and, accordingly, they cannot form the basis for a breach of contract lost profits claim.

**d. Regulators Would Not Have Approved The Acquisition Of SAFSB By River Valley Irrespective Of The Breach**

Plaintiffs' SAFSB-related claims fail the test of causation for other reasons. Even if contractual regulatory capital had been fully restored to River Valley, regulators would not have permitted it to acquire SAFSB. This is because, first, pursuant to the Assistance Agreements, the contractual capital could never be used to count toward the River Valley thrifts' fully-phased in capital requirement. DX 1416 at ¶ 71; PX 207 WON016 1512-1603, WON016 1547-48; PX 205 WOT013 0051-0119, 0074. Having a fully-phased in capital level, however, was a pre-requisite of the RTC's consideration of a bidder's eligibility to bid upon RTC thrifts. DX 1416 at ¶ 70. Accordingly, "River Valley's forgone regulatory capital would have been of no use in qualifying to bid for [SAFSB]." Id. Thus, irrespective of the breach, River Valley would not have been able to bid upon the SAFSB opportunity.

Furthermore, the OTS did not permit institutions that were in a supervisory agreement to bid for the purchase of RTC thrifts. Because of its large portfolio of classified high-risk mortgage related instruments, River Valley would likely have been required to execute a supervisory agreement to reduce the level of those classified instruments irrespective of the breach. Thus, for this reason, too, River Valley would not have been permitted to acquire SAFSB, irrespective of the breach.

**B. First Bank's Purported Damages Resulting From The Acquisition Of SAFSB Were Not Foreseeable By The Government**

First Bank must show the foreseeability of its alleged lost profits. This limitation bars recovery where the breaching party cannot reasonably be said to have contemplated the alleged harm at the time of contracting. Bohac v. Dep't. of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); see N. Helex Co. v. United States, 524 F.2d 707, 714-15 (1975); Estate of Berg, 687 F.2d

at 383. Plaintiffs' SAFSB claim disregards these precedents and instead it is tantamount to a claim that any potential profitable opportunities that arise after a breach are foreseeable lost profitable opportunities. This position is meritless.

If several circumstances, including intervening and superseding causes, give rise to a loss, then all of them must have been foreseeable at the time of contract formation in order for the foreseeability standard to be satisfied. See, e.g., Restatement (Second) of Contracts § 351 & cmt. d; Chain Belt, 115 F. Supp. at 714-15. As noted above, SAFSB's profits and value increased after its acquisition by WCHI. The increase was the result primarily of market factors, most notably, a sharp downward spike in interest rates. DX 1477 at ¶¶ 20-24. These market events were not foreseeable in 1992, when WCHI acquired SAFSB, and they were certainly unforeseeable four years earlier, in July 1988, when plaintiffs contracted with the Government, which, as a matter of law, is the relevant date for a determination of foreseeability.

Further, it betrays common sense to suggest that, at the time of contracting, regulators could have foreseen that the River Valley thrifts would attempt to acquire a thrift located far outside their geographical operations, and soon thereafter be able to sell it for a substantial profit, as First Bank now claims. See DX 1476 at ¶¶ 7-8; see also DX 1475 at ¶ 9-10.

Moreover, it was entirely unforeseeable in 1988 that, years later, a future acquisition of a thrift (i.e. SAFSB) would be prevented due to a lender's unwillingness to make a loan to River Valley (i.e., RV Holdings). DX 1475 at ¶ 11; DX 1476 at ¶ 6. Indeed, in an analogous situation to that here -- where River Valley's purported inability to acquire SAFSB resulted from ANB's decision not to lend funds directly to it for that purpose, the Restatement (Second) of Contracts instructs that, because of the widespread availability of credit, it is unforeseeable as a matter of

law that a lender's breach of a contract to provide funds to a borrower would result in a borrower's inability to obtain funds.

> The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of the breach. . . . In most cases, then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.

Restatement (Second) of Contracts § 351 cmt. e.

Here, River Valley's purported inability to find a loan to fund the SAFSB transaction was not foreseeable. In fact, it is clear that River Valley's decision not to acquire SAFSB directly was a decision made largely because, for the most part, River Valley was indifferent to whether it or its shareholders pursued the acquisition. Once ANB decided that it would only fund a newly formed entity, River Valley's management did little else to find another lender. The fact that loan was not obtained for such a purportedly rich investment opportunity cannot have been foreseen by regulators, nor can the failure to obtain that loan be attributed to the breach.

In short, the remoteness of the 1992 SAFSB transaction from the Illinois acquisitions – in terms of time, geography, structure, and regulatory environment – demonstrates that damages sought by First Bank were undoubtedly unforeseeable, particularly so from the perspective of the Government regulators.

### C. No Expert Opinion Is Permitted With Respect To Three Of The Four Versions Of The SAFSB-Related Damage Claims

First Bank's three new SAFSB-related claims (for $45 million, $34 million and $29 million) are, in fact, new expert theories presented after the close of expert discovery and made without the requisite presentation of a prior expert report and opinion. First Bank sets forth its

damage claims through the mere argument of counsel in plaintiffs' damages briefs, with no affirmative expert testimony to support these claims.

As such, First Bank's new damage claims are an end-run around the discovery procedures with respect to damages mandated by this Court generally, and by the Winstar procedural orders. Given the prohibitions of offering expert opinions that have not previously been disclosed in an expert report, the offering of these new damage theories at trial is improper and prejudicial to us. See RCFC 26(a)(2)(B) and 37(c)(1); Winstar Procedural Order No. 2: Discovery Plan dated August 7, 1997, at § V(A) (barring the presentation of any testimony not previously disclosed).

### D. All Of First Bank's SAFSB-Related Damage Claims Are Speculative And Unreliable

#### 1. First Bank's New Claim For $45 Million In SAFSB-Related Damages Is Speculative And Unreliable

In setting forth its $45 million claim, First Bank argues that SAFSB-related damages can be computed by totaling the net income reported on the tax returns of WCHI and Western Capital Holdings Liquidating Trust ("WCHLT") between 1992 and year-end 2004. Pl. Mem. (Sept. 25, 2007) at 59-60. First Bank, without any supporting testimony or affidavit of any witness or expert, presents three different formulas not previously disclosed, for computing WCHI or WCHLT's pre-tax income, correlating to three different time periods between 1992 and 2004. Pl. Mot. For Summ. J. (Sept. 21, 2005) at 18-20. These calculations result in a total of almost $45 million in SAFSB-related damages, with the majority ($41 million) occurring between 1995 and 2004. See Pl. Mem. (Sept. 25, 2007) at 38-39.

First Bank's claim for $45 million in damages is unreliable for many reasons, not the least of which is that it is based on the premise that the River Valley thrifts would have

continued to own and operate SAFSB (or its assets) through at least 2004. This assumption, however, is contradicted by the parties' stipulated facts filed with this Court. Prior to bringing their claim for $45 million in damages, plaintiffs stipulated that First Bank would have acquired River Valley irrespective of the breach at the same time as it did in the actual world. JSF ¶ 376. Such an acquisition would have precluded River Valley owning SAFSB or its assets past the point of First Bank's acquisition. Thus, in the first instance, First Bank's $45 million SAFSB-related damage claim is counterfactual to the stipulated state of affairs in the nonbreach world.

Second, in calculating this new damage claim, First Bank's counsel makes no attempt to account for the fact that, in the actual world, SAFSB was liquidated in 1996. First Bank presents no evidence or testimony to explain why damages relating to SAFSB should continue to accrue through 2004.

There are other analytical and methodological problems with First Bank's new $45 million damage claim. First, there is no justification for using WCHI and WCHLT's actual performance through 2004 to measure the value of the SAFSB investment opportunity in 1992. In 1992, River Valley could not have known how WCHI and WCHLT would perform in the future. As noted above, First Bank's post-performance claim amounts to a free option on the underlying investment after the favorable ex post outcome (through 2004) is known. DX 1477 at ¶ 7.

Moreover, lost profits calculated upon SAFSB's performance over a period of 12 years depends upon a number of speculative assumptions that cannot form the basis of an award. For example, the lost profits claim depends upon an assessment that the but-for SAFSB owned and managed by River Valley, over this entire period of time, would perform just like the actual SAFSB did. This is an unrealistic assumption, especially given the change in control of

management postulated in the but-for world. DX 1479 at ¶ 7(b). Other assumptions required by plaintiff's calculation include the assumption that First Bank acquired SAFSB as part of the but-for River Valley III on January 4, 1995, and that First Bank would then have sold SAFSB's assets and liabilities in a transaction identical to the actual WCHI sale to IBC in 1996. Id. at ¶ 7(c-e). First Bank offers no evidence to support these assumptions, and, accordingly, they underscore the speculative nature of this damage theory.

### 2. First Bank's New Claim For $35 Million In SAFSB-Related Damages Should Be Denied Because It Is Speculative And Unreliable

Arguing in the alternative, First Bank presents a second, completely hypothetical theory of valuing SAFSB-related damages. First Bank argues that River Valley would have acquired SAFSB in a non-breach world, and then would have sold all of its assets at the end of 1993, realizing a gain of $35 million. This $35 million theory is the result of two fundamental methodological changes from plaintiff's separate $29.9 million claim (discussed below). First, it involves changing the timing of the valuation of WCHI's assets, from August of 1992 to year-end 1993. Second, it shifts the methodology from one based upon the excess of book value over fair value as of the date of the SAFSB acquisition in August 1992, to one based upon the excess of fair value over book value at year-end 1993. This is a completely distinct valuation methodology.

There are, in any event, fundamental problems with the $35 million valuation. First, the $35 million figure is based upon a mark-to-market value of SAFSB's loan portfolio. That value, however, fluctuated wildly, from nearly zero at the time of SAFSB acquisition in August 1992, to $1.75 million in December 1992, to $24.6 million in December 1993, and back down to $13

million in December 1994. See DX 1479 at ¶ 12-13; see also PX 777 WCH-B76 0114-0157, 0126-0128; PX 875 WCH-B79 1242-1277, 1253; PX 1003 WCH-B75 1603-1628, 1622.

As Dr. Carron explains, the value increase of SAFSB after its acquisition by WCHI to $35 million was due to a previously unanticipated sharp decline in interest rates, with the 10-year treasury yields reaching a 26-year low in October 1993. DX 1477 at ¶¶ 20-23. Dr. Carron similarly criticizes First Bank's $45 million claim. Over the twelve year period over which the $45 million claim is calculated, "[t]he market went through several business cycles. . . and the industry performance was affected by events unforeseeable at the time of the [SAFSB] acquisition." Id. at ¶ 24. If SAFSB's future performance was unknowable and unforeseen at the time of its 1992 acquisition, this is all the more true with respect to the foreseeability of the manner and magnitude of these damages by regulators (or River Valley), as of July 1988.

Furthermore, First Bank has presented no evidence indicating that River Valley would have determined, in a hypothetical world, either that it would sell the SAFSB loans at exactly December 31, 1993, or that there would have been a willing buyer on that date. These are mere conclusions of counsel without affirmative supporting expert testimony.

**3. First Bank's New $29.963 Million SAFSB-Related Damage Claim, And Its Prior $28.6 Million Claim Are Speculative And Unreliable**

First Bank presents yet a third new claim for SAFSB-related damages. First Bank starts with $29.963 million, a figure that ostensibly is referenced in Mr. Holland's 2005 report. First Bank, however, now eliminates the $1.3 million deductions for alternative minimum taxes and River Valley interest expenses that had been previously recognized by Mr. Holland as he set forth a $28.609 million SAFSB-related damage claim. See PX 603 at 5. Thus, First Bank's new $29.963 million claim, supported only by counsel's argument, contradicts Mr. Holland's

valuation methodology, adding $1.3 million more in damages than was presented by Mr. Holland in his February 2005 expert report.

In any event, the $29.963 million and $28.6 million figures that First Bank presents as measures of damages represent the excess of the historical book value of the SAFSB assets over their fair value as of August 14, 1992. This conceptual measure of damages is flawed because it is inconsistent with GAAP, and does not, contrary to Mr. Holland's assertion, reflect the excess value over the purchase price paid. See DX 1469 at 17. In fact, as both parties have previously stipulated, at the time of WCHI's purchase of SAFSB, the GAAP accounting of that transaction shows that the fair value of SAFSB's net assets only exceeded the purchase price (of $10 million) by $328,000. DX 1469 at 18; JSF ¶ 361; PX 777 WCH-B76 0114-0157, 0126-0127; DX 1477 at ¶¶ 17-18.[19]

Finally, because the claim for $29 million computes damages at the time of the SAFSB acquisition based upon the immediate accounting mark-to-market of SAFSB's assets and liabilities, the claim is foreclosed by the Federal Circuit. In Glendale Fed. Bank v. United States, 239 F.3d 1374, 1382-83 (Fed. Cir. 2001), the Federal Circuit established that the assumption of net liabilities (i.e., a net purchase discount) does not reflect a cost to the acquirer. Plaintiffs now seek to stretch a purchase discount computation to the opposite extreme, arguing that the net purchase discount reflects a windfall – in this case a windfall of which River Valley was purportedly deprived. The law of this circuit does not support such a contention.

[19] The $29.963 million does not represent the economic value of SAFSB at the time of the acquisition. Instead, the $29.963 million figure reflects the net purchase discount that was recorded to lower the historical book values of SAFSB's assets and liabilities to their fair values at August 14, 1992. DX 1469 at 18; JSF ¶ 361; PX 777 WCH-B76 0114-0157, 0126-0127; DX 1477 at ¶¶ 17-18.

## II. FIRST BANK'S CLAIM FOR DIMINISHED ECONOMIC VALUE IS MERITLESS

Plaintiffs, through another of their experts, Dr. Neil Murphy, offer an alternate measure of expectancy damages that is based upon the purported diminution in the value of both River Valley I and River Valley II between 1988 and 1991. In general, Dr. Murphy premises the thrift's alleged reduction in value upon a purported decline in value of a preferred stock security River Valley issued to FSLIC in 1988.

Dr. Murphy's model, and First Bank's arguments in support of that model, suffer from a number of fatal flaws. Among other things, Dr. Murphy's model uses unreliable assumptions and methodologies, ignores the lack of a causal link between the damages he calculates and the breach, and fails to establish that any purported decline in the thrifts' stock was reasonably foreseeable to the Government at the time of contracting. For all of these reasons, the Court should reject Dr. Murphy's model as a matter of law.

### A. Dr. Murphy's Methodology

We begin by briefly describing the methodology behind Dr. Murphy's model. On July 29, 1988, as part of the FSLIC-assisted acquisition of Galva/Mutual/Home, FSLIC purchased Series A preferred stock in River Valley I for $5 million (par value). JSF ¶¶ 80, 102, 103. Dr. Murphy notes that a contemporaneous internal FSLIC document ascribed a value of $6.5 million to the preferred stock. PX 606 at 17 ¶ 39; JSF ¶ 109. On March 28, 1991, the FDIC sold this preferred stock back to River Valley I for $3.675 million. JSF ¶ 278. Dr. Murphy asserts that the difference between the estimated value of the preferred stock in 1988 and the price at which River Valley I redeemed the stock in 1991 provides a basis for estimating a purported breach-related decline in River Valley I and River Valley II. PX 606 at 17-21.

Following this Court's liability decision in November 2006, in which the Court found that the $5 million in preferred stock was non-contractual capital, plaintiffs sought leave to adjust their damage claims to reflect the Court's opinion. Because of the reduction in contractual regulatory capital, plaintiffs unequivocally stated in their motion to amend their expert reports that they "intend to claim <u>$17.461 million</u> in connection with their lost value claim, <u>rather than</u> the $21.846 million set forth in Dr. Murphy's expert report[.]" Pl. Mot. for Leave to Revise and Supplement Their Damages Claims (Mar. 20, 2007) at 3 (emphasis added). Plaintiffs explained that they "will revise their lost equity value damages claim to seek only the $10.410 million (or 70.365%) of the $14,794,441 decline attributable to Defendant's breach, as the Court has determined it." <u>Id.</u> at 2. Plaintiffs then went on to state that "[b]ecause the revision is wholly computational, and neither affects the methodology supporting Dr. Neil Murphy's expert opinion nor discloses a new theory, this adjustment requires no further expert disclosure or discovery." <u>Id.</u> at 3. In their reply brief, plaintiffs requested that this Court grant their motion to "revise Dr. Murphy's lost value damages analysis <u>in the manner described in Plaintiffs' March 20, 2007 Motion</u>. Pl. Reply (April 10, 2007) at 2 n.2 (emphasis added). The Court granted plaintiffs' motion. Order (April 11, 2007).

Plaintiffs have contradicted their representations to this Court that they would assert a claim for <u>$17.461 million</u> <u>rather than</u> their claim for $21.846 million in order to account for the $5 million in preferred stock. In their contentions of fact and law, plaintiffs now assert, once again, as Dr. Murphy's primary damage claim, a claim for $21.846 million. Plaintiffs now argue (ignoring their motion to amend) that FIRREA caused River Valley I to incur "the entire $14.794 million loss." Pl. Mem. (Sept. 25, 2007) at ¶ 164. Plaintiffs claim that the "breaching actions were a substantial factor in causing a combined total reduction in value of at least $21.846

million in River Valley thrifts." Id. at ¶ 168. The $14.794 million loss figure for River Valley I and $21.846 million combined damage figure for River Valley I and II are the exact figures plaintiffs disavowed in their motion to amend their damage claims.

Thus, plaintiffs are attempting to use a "substantial factor" test as the mechanism by which to ignore the effect of the removal of the $5 million in non-contractual regulatory capital from Dr. Murphy's earlier reports and opinions. This is a fundamental misunderstanding of the law of causation, resulting in an impermissible windfall for plaintiffs. See Hansen, 367 F.3d at 1315; Bluebonnet, 339 F.3d at 1345.

Furthermore, plaintiffs have abandoned altogether the alternative $17.461 million in damages asserted in arguing their motion for leave. Now, for the first time in this litigation, plaintiffs set forth an alternative claim of "at least $18.622 million." Pl. Mem. (Sept. 25, 2007) at ¶ 168. This figure is based upon their new claim that the breach resulted in a $11.572 million loss in economic value (id. at ¶ 165) -- in contrast to the statements in their motion to amend that the lost economic value was $10.4 million. Id. at 2. Plaintiffs make no attempt to explain why an additional $1.1 million in damages should now be permitted without an expert report or declaration, especially given their prior representations concerning the nature and amount of their diminution in value claim.

Given that plaintiffs have improperly amended their diminution damage claim in a manner not consistent with their request for leave to amend that claim, and given that they have offered no declaration to explain the computations in these new claims, we cannot respond to the particular computations found in plaintiffs' current diminution claims. Accordingly, we address the methodology employed by Dr. Murphy with respect to the $21.8 claim originally asserted by him when he assumed that the $5 million of preferred stock was contractual capital. In setting

forth his damage theory under that assumption, Dr. Murphy relied heavily upon the FSLIC's and RTC's assumptions concerning earnings, growth rates, and discount rates for River Valley I in 1988 and 1991. PX 606 at 17-21; PX 607 at 4-13.

The preferred stock sold to the FSLIC had two components: (1) an income participation component that gave FSLIC the right to receive a portion of River Valley I's earnings above a certain earnings threshold, and (2) a fixed dividend of eight percent that was to increase gradually to 12 percent in years 11 through 15. JSF ¶ 103. Ultimately, (as of March 2007), Dr. Murphy concluded that River Valley I's equity value diminished by $14.794 million. Pl. Mot. (March 20, 2007) at 2; PX 607 at 10 ¶ 29.

To estimate what he contends was the breach-related diminution in the value of River Valley II from 1988 to 1991, Dr. Murphy extrapolated to River Valley II what he determined was the lost equity value of River Valley I. Specifically, Dr. Murphy compared the purported loss in River Valley I's total equity between 1988 and 1991 ($14.794 million) with the amount of alleged "lost" contractual capital ($16.872 million) and computed a loss ratio of $0.88 per dollar of "lost" regulatory capital. PX 606 at 20 ¶ 43; PX 607 at 11 ¶ 31. Thus, for every dollar of capital lost, River Valley I allegedly declined in value by $0.88. Dr. Murphy applied this same loss ratio to the amount of purported "lost" contractual capital at River Valley II ($8.041 million). PX 607 at 11 ¶ 32. From this extrapolation, Dr. Murphy concluded that River Valley II lost $7.051 million in equity value between 1988 and 1991. Id. Thus, when he incorrectly assumed that the $5 million in preferred stock was contractual capital, Dr. Murphy's total alleged reduction in value to River Valley I and River Valley II was $21.845 million ($14.794 million plus $7.051 million). Id. at 11 ¶ 33.

### B. Dr. Murphy's Methodology Produces Unreliable Results

The methodology that Dr. Murphy uses to calculate lost value is inherently flawed and wholly unreliable, especially in the context of the facts and circumstances of this case. Because Dr. Murphy's methodology cannot meet the standards for proving causation, certainty, and foreseeability, First Bank's claim based upon lost equity should be rejected entirely.

#### 1. First Bank's Lost Value Calculation Is At Odds With Several Contemporaneous Direct Valuations

Dr. Murphy's conclusion that the River Valley thrifts experienced a diminution in value equal to $21.845 million is directly at odds with contemporaneous, direct valuations, including one by an independent appraiser, Laurance Barr & Co., Ltd. ("Laurence Barr"), that were prepared on behalf of, or by, the River Valley thrifts. First, in 1991, River Valley I hired Laurence Barr to value the thrift's common equity as of July 29, 1988 – the date of the River Valley I Assistance Agreement. Laurence Barr concluded that the market value of the thrift's equity was between $8.0 million and $9.0 million in 1988, a far cry from the $22.724 million estimate Dr. Murphy derives. DPSF ¶ 47; DX 514 HO2007 0488-0492, 0491-0492; DX 1452 at ¶ 7.

Moreover, during the period covered by Dr. Murphy's lost equity value claim (i.e., 1988 to 1991), the management of River Valley I and River Valley II actually determined that the value of the thrifts had increased. The River Valley thrifts marked their balance sheets to market value on a monthly basis. DPSF ¶ 79. River Valley acknowledged that, "[t]he mark to market is the single most important determinant of the value of River Valley [III]." DPSF ¶ 80. In February 1991, Mr. Bangert represented to the OTS that the combined market value of River Valley I and River Valley II's common equity had increased by more than $21.5 million from

July 1988 to January 1991. DPSF ¶ 82. In stark contrast, Dr. Murphy suggests that the value of the shareholder plaintiffs' thrifts declined by $21.845 million during this same period. Dr. Murphy's methodology is unreliable. Accordingly, First Bank's claim for diminished equity value is meritless.

**2. Dr. Murphy's Lost Value Model Is Based Upon FSLIC And FDIC Valuations That Do Not Reflect The Market Value Of The Preferred Stock**

First Bank's lost value model also fails because it is based upon an incorrect assumption that the preferred stock was sold in a "market-based" transaction. It was not, and thus, there is no "market value" assessment of the thrifts that can be derived from the purchase and sale of the preferred stock. The preferred stock was only sold in two transactions, the purchase by the FSLIC in 1988 and the redemption from the FDIC in 1991. In both cases the counter-party was the regulatory agency insuring River Valley I's deposits.

FSLIC's purchase of the preferred stock from River Valley I in 1988 must be viewed in the proper context, as a part of a FSLIC aid package to facilitate the consummation of the River Valley I transaction. The preferred stock represented only one component of a complex, multi-faceted, assisted acquisition, in which FSLIC provided over $34 million in cash assistance to River Valley I, among other forms of assistance. JSF ¶ 106. The valuation of the preferred stock was conducted for the much more limited purpose of determining, in the larger context of the River Valley I transaction as a whole, whether the paper cost of the acquisition was less than the paper cost of liquidation. Reinforcing this assessment, River Valley I's contemporaneous auditors, KPMG, recognized that River Valley shareholders themselves "viewed FSLIC's preferred stock investment as being similar to a 'loan from FSLIC.'" JSF ¶ 105; PX 452 HO-KPMG 000971-000973, 000971. Needless to say, it is meaningless to try to extrapolate the

amount of regulatory capital assistance, or the amount of a loan, to the equity value of a recipient of such assistance or loan.

Given that the purchase of the preferred stock was a form of assistance in itself, it would be entirely speculative to equate the price of the preferred to a bona fide market-based price. As River Valley I could have chosen to sell the preferred stock for its par value of $5 million, the FSLIC's own 1988 purchase price valuation of $6.5 million is inherently at odds with the very notion of market value, i.e., the price at which two or more independent parties, free from duress, would agree to a transaction.

If these facts were not enough to demonstrate the unreliable premise to Dr. Murphy's methodology, the unreliability of an extrapolation of equity value based upon the FSLIC preferred is further underscored by the fact that the preferred had an interest rate that was actually far below the existing rate for United States Treasuries, yet, obviously, was a far riskier investment vehicle.[20]

Furthermore, FSLIC had no means of reliably valuing a thrift's assets. The discount rate FSLIC used to value the preferred stock's fixed dividend was the long-term junk bond rate at that time. Unlike a typical junk bond, however, the River Valley I preferred stock was a very small issue by a company with no track record of performance. As a result, regulators understood that the discount rate was not intended to reflect the preferred stock's true market

[20] The FSLIC preferred stock paid a fixed rate dividend of 8 percent for approximately the first ten years, after which the payments increased gradually to a 12 percent rate. At the time of River Valley I's stock issuance to the FSLIC (i.e., July 1988), the average monthly nominal yield for a ten year constant maturity United States Treasury bond was 9.06 percent. See http://www.federalreserve.gov/releases/h15/data/monthly/H15_TCMNOM_Y10.txt. That is, United States Treasuries were paying a much higher rate (even though they were considered safer), than the rate paid by River Valley I in connection with its preferred stock. See JSF ¶ 103; PX 202 CHO023 0106-0208, 0167-0174.

rate. DX 1475 at ¶ 4-5. The same reasoning applies to the discount rate used for the "profit sharing" portion of the preferred stock; the intent was not to reflect a market value. Id. at ¶¶ 4,7.

Moreover, FSLIC's valuation memo itself points out why the valuation is likely a non-market number. First, FSLIC explicitly noted that its valuation was based upon financial projections provided by the interested shareholder plaintiffs. JSF ¶ 107. There was no audit of the River Valley thrifts performed by the FSLIC. Second, the FSLIC expressly acknowledged that its valuation of the preferred stock was based upon multiple assumptions and was therefore "soft." JSF ¶ 109.

Dr. Murphy's failure to perform any independent analyses of the assumptions underlying his conclusions is fatal to the reliability of his model. Dr. Murphy simply relied upon FSLIC's and FDIC's valuations, when the FSLIC evaluation, in particular, expressly stated that it had to rely upon unproven assumptions. Because Dr. Murphy made no attempt to verify or critically consider the FSLIC or FDIC's assumptions that serve as inputs to his model, he simply cannot speak to what the River Valley thrifts were actually worth in 1988 or 1991.

In addition, Dr. Murphy's adoption of FSLIC's estimated value of the stock in 1988 is undercut by independent, third party analysis. Laurence Barr, an independent investment banking firm retained by the thrifts, concluded that, as of July 29, 1988, the River Valley I's preferred stock was worth only approximately \$2.8 million (in contrast to the \$6.5 million claimed by Dr. Murphy). DPSF ¶ 47; DX 1452 at ¶¶ 4-7.

Where, as here, an expert's analysis is undercut by the thrift's own valuations (or valuations commissioned by it), it offers no meaningful guidance to the Court and should be rejected. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993) ("Proposed

testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known.").

### 3. Dr. Murphy's Extrapolation To River Valley II Of The Purported Lost Value To River Valley I Is Unreliable

Dr. Murphy's analysis concerning the diminution in value to River Valley II is even more dubious than his valuation of River Valley I. Dr. Murphy simply calculates the purported ratio of lost value capital to lost contractual capital for River Valley I and applies that ratio to River Valley II. First Bank argues this methodology produces a reasonably certain result because of the alleged close similarity between the two institutions. The "similarities" that First Bank and Dr. Murphy rely upon, though, are meaningless for the purpose of comparing the effects of a breach upon two separate institutions, located in different areas. Dr. Murphy's calculation for River Valley I was based upon earnings estimates, discount rates, and growth rates (albeit unreliable) particular to that thrift. Dr. Murphy's assumption that River Valley II, a separate institution with its own capital structure and portfolio of assets and liabilities, would be harmed by the purported loss of one dollar of contractual capital in exactly the same way and to exactly the same degree as River Valley I, is entirely speculative. Such a baseless calculation cannot produce a damages estimate with reasonable certainty.

## C. The Alleged Diminished Value Was Not Caused By The Government's Purported Breach

### 1. Many Other Factors Besides A Loss Of Goodwill Affected The River Valley Thrifts, Which Remained In Capital Compliance

Notwithstanding the unreliable nature of Dr. Murphy's valuations, First Bank's lost equity value claim is based upon Dr. Murphy's flawed assumption that any change in the value of River Valley I or River Valley II's equity between 1988 and 1991 was directly and

exclusively attributable to the alleged breach. DX 1408 at 237. First Bank's argument is no more helpful. It claims, without support, that "the breach was the single defining factor causing River Valley's equity value to decline[.]" Pl. Cont. of Law at 57 ¶ 33.

Such naked pronouncements reveal the tenuous logic in First Bank's position. Neither First Bank nor Dr. Murphy even considered the multitude of non-breach factors that affected both the value of the preferred stock and, separately, River Valley's equity. The value of River Valley I and River Valley II, like most institutions, was influenced by myriad institutional factors (e.g., management's decisions related to, among others things, investments of portfolio assets), market factors (e.g., changes in economic conditions and the nature of the thrift marketplace), and non-market factors (e.g., changes in laws and regulations) that were unrelated to the alleged breach.

In fact, the RTC memorandum, upon which Dr. Murphy relies for his post-breach valuation of River Valley I, specifically references some of these factors:

> According to Donaldson, Lufkin and Jenrette Securities Corporation ("DLJ"), an investment banking firm hired to assist the FRF in this transaction, the current market conditions for thrift equity and subordinated debt instruments are severely depressed. This condition is due primarily to a negative perception of the thrift industry as well as the continuing deterioration of the real estate market with its corresponding negative effect on loan portfolio credit quality.

PX 528 CHO006 0012-0021, 0017.

Dr. Murphy, however, fails to account for any institutional, market (with the possible exception of interest rates), or non-market factors in evaluating the purported change in the value of River Valley I and River Valley II between 1988 and 1991. This failure to account for the

effect of factors other than the alleged breach upon the value of River Valley I and River Valley II renders his analysis inherently unreliable.

### 2. The Thrifts' High-Risk MBS And Other Mortgage-Related Assets Caused The Regulatory Criticisms Of The Thrift

Even if (counter-factually) the thrifts declined in value between 1988 and 1991, to the degree that any effect was caused by a regulatory impact on the institution, these impacts were not breach-related, but the result of regulatory criticisms of River Valley's high-risk MBS derivatives and other risky investments. Regulators restrained the thrifts' investment activities pursuant to the FDIC's and OTS's obligation to ensure the safety and soundness of the institution. River Valley had no contractual right to avoid this safety and soundness oversight, and any diminution in value of the thrifts caused by normal regulatory oversight cannot be claimed as breach-related damages.

Thus, for example, the Supervisory Agreement required the thrift to maintain tangible capital levels above those required by FIRREA because of regulatory criticism of River Valley's high-risk MBS derivatives. These requirements are neither a breach of plaintiffs' contracts, nor a causal agent affecting the claimed damages in this case. The breach of contract consisted of River Valley's inability to count its contractual capital goodwill towards its capital requirement – the Government's imposition of higher or different capital requirements did not constitute a breach of contract. See United States v. Winstar Corp., 518 U.S. 839, 870 (1996) (plurality opinion) (defining the inability to count goodwill in regulatory capital as the breach).

Thus, a requirement that the thrift hold tangible capital above the FIRREA-mandated levels for the express purpose of holding concrete capital against the considered likeliness of losses in the thrift's derivative investments has no bearing on the breach, even if the restrictions

on these investments and levels of capital may have affected the value of the thrift, a position with which we disagree. Furthermore, to the extent that excess tangible capital levels were required by the FDIC due to its particular assessments of the thrifts' high-risk MBS derivatives, the 1991 Settlement Agreement between plaintiffs and the FDIC forecloses any damages based upon these heightened tangible capital requirements.

**3. <u>The Shrinkage Was Caused By Numerous Non-Breach Factors</u>**

To the degree that River Valley's diminution in value claim is argued to be related to its shrinkage, that shrinkage was not caused by the breach. Mr. Holland has not identified a single security or asset, or type of security or asset, that was sold as a result of the breach.

The shrinkage that began in July 1990 can be explained, at least in part, by the thrifts' non-replacement of the temporary tax preferred investment vehicles ("STARS") that River Valley I and River Valley II had acquired in large quantities earlier in the year. DX 616 PHO058 1338-1411, 1338, 1342-43, 1353, 1357, 1358, 1363-1364. Their shrinkage also can be explained by voluntary management decisions. For example, as noted above, in 1992 River Valley (under the direction of its shareholders) undertook a voluntary shrinkage of $110 million in assets in order to permit WHCI to acquire SAFSB. PX 726 WON387 0007-0068, 0011, 0015, 0018-0020, 0022, 0029-0031, 0034-0035, 0007, 0021; PX 657 FHO012 2499-2500; JSF ¶ 352; DX 1380 at 50-51. Additionally, in late 1993, RV Holdings chose to prepay more than $6 million in deferred compensation to Messrs. Holland and Bangert, which reduced the amount of capital that otherwise would have been available to support assets in River Valley III. PX 983 H&R-BX 70 2364-2377, H&R-BX70-2369; DX 1062 PHO0360013-0015; DX 1555.

Furthermore, a substantial portion of the thrifts' shrinkage between 1990 and 1993 was related to the thrifts' decision to sell certain mortgage-backed securities due to concerns about

poor credit quality, regulatory concerns that triggered the Supervisory Agreement, and an inability to find wholesale assets with attractive return characteristics. See DPSF ¶ 36; DPSF ¶ 34; PX 674.

**4. The Purported Diminished Value In The River Valley Thrifts Was Not Foreseeable By The Government**

Even assuming that it was foreseeable that the institutions might shrink or forego some amount of potential growth in response to the breach, and even if (counter-factually) there was a diminution in value of the River Valley thrifts following the breach, First Bank cannot show it was foreseeable that the value of the River Valley thrifts would be directly related to their size. See Cal Fed, 54 Fed. Cl. at 713. Thus, the issue in this case is whether it was reasonably foreseeable, in July 1988, that the River Valley thrifts would become less valuable if they lost a certain amount of regulatory capital but nonetheless were able to maintain capital compliance. And the answer to that question is unmistakably "no."

This is because, even assuming that the River Valley thrifts might have been smaller institutions as a result of the breach (which we dispute), it does not necessarily follow that the institutions would be less valuable as a result. Leverage does not automatically result in profits. Nor, as a corollary, does leverage automatically result in increased value. Conversely, it does not follow that decreased leverage results in decreased value.

Thus, the notion that the Government foresaw a decline in River Valley's value in a situation where it would remain in capital compliance is dubious. First Bank, of course, does not cite any evidence that regulators foresaw that the loss of regulatory capital would cause the thrifts' value to decline where the thrift remained in compliance with FIRREA's regulatory capital levels. Indeed, given that the River Valley thrifts actually increased in value following

the passage of FIRREA, such foreseeability could only be counterfactual. Thus, for this reason, too, Dr. Murphy's diminution in value fails.

## III. PLAINTIFFS' RETAINED EARNINGS MITIGATION THEORY IS MERITLESS

### A. Mr. Holland's Retained Earnings Mitigation Theory

First Bank claims that, to mitigate the purported harm from the breach "River Valley took certain actions that partially replaced some of the regulatory capital FIRREA eliminated." Pl. Cont. at 40 ¶ 135. Plaintiffs thus compute damages using a replacement-cost-of-capital approach. DX 1492 at 7 ¶ 15. The replacement capital hypothesized by Mr. Holland is primarily composed of retained earnings, although a small amount of capital is also replaced with the thrift's 1991 conversion of $2 million of subordinated debt into preferred stock. Id.

#### 1. Mr. Holland's Methodology

To compute the costs of the alleged replacement capital, Mr. Holland calculated the quarterly balances of contractual and non-contractual regulatory capital as would have existed in a nonbreach world. DX 1490 at 4-5 ¶ 6. He then set forth a pro-rata allocation of River Valley's retained earnings among each category of contractual and non-contractual capital for each quarter between September 1990 and September 1994. Id.

To determine the alleged gross cost incurred by River Valley as a purported consequence of retaining earnings to replace the contractual capital (as opposed to using them for other purposes), Mr. Holland uses a 20 percent annual expected cost of equity capital. Id. at 5 ¶ 7. This is a hypothetical number that Mr. Holland infers from the estimated expected yields on different components of the preferred stock River Valley issued to the FSLIC. DX 1492 at 13 ¶ 21. He applies this 20 percent cost of capital rate for all quarters until 2013. Id. He then sets forth an offset to this cost of capital by assuming that the benefits of retained earnings to River

Valley should be computed as if the retained earnings were invested in ten-year Treasury bonds, which, as of mid-1990, had a pre-tax rate of 8.8 percent. DX 1492 at 14 ¶ 22. He then reduces that hypothetical benefit to account for hypothetical taxes, arriving at a yield of 5.7 percent for all quarters until 2013. Id.

Finally, to determine the net cost of using retained earnings to replace the lost contractual capital, Mr. Holland multiples the balance of what he determined to be the amount of replacement retained earnings by the difference between the 20 percent expected cost of equity capital and the 5.7 percent after-tax Treasury yield, for a 14.2 percent net cost of replacement capital. DX 1490 at 5-6 ¶ 7. These calculations result in net costs of $20.9 million related to the replacement of the contractual capital with retained earnings. Id. For damages calculated between December 2007 and March 2013, Mr. Holland discounts damages at a 20 percent annual rate. Id. at 7 ¶ 9.

Employing a different methodology for the cost of replacing the $2 million of subordinated debt with preferred stock, Mr. Holland calculates a cost of only $13,000 for the replacement of that capital. Id. at 6-7 ¶ 8.

**2. Mr. Holland's Damages Are Unreasonable On Their Face**

Based upon this methodology, Mr. Holland opines that the total cost of using retained earnings to replace $19.8 million in lost intangible contractual capital is $20.9 million. That is, he proposes that it cost more than a dollar of actual tangible cash to replace a dollar of intangible capital. Indeed, based on the foregoing, Mr. Holland claims that it cost $1.06 to replace each dollar of contractual intangible capital. This claim is unreasonable on its face. The intangible capital lost due to the breach was less valuable by its nature than cash because, among other reasons, the intangible capital could not be invested directly in assets but could only be used to

support leverage. For First Bank to argue, in essence, that the intangible capital was more valuable than cash is unsupportable.

Even worse, Mr. Holland claims that this retained earnings cost was only a partial mitigation, and that the true costs to River Valley as a result of the loss of $19.8 million in intangible contractual capital total as much as $65.8 million, once the SAFSB-related damages claims are added to the claim. First Bank thus essentially argues that every dollar of intangible capital damaged River Valley by more than three dollars. We are unaware of any Winstar decision in which the Federal Circuit has upheld an award of damages from the loss of goodwill that exceeds the dollar amount of goodwill lost, much less that awards damages that exceed the amount of lost goodwill by three times. As a point of comparison, in Home Savings, 399 F.3d 1341, the ratio of damages awarded to total intangible regulatory capital to be replaced was seven cents in damages for every dollar of intangible capital to be replaced. Other replacement of capital claims considered by the Federal Circuit have resulted in similarly low ratios. See Citizens Fed., 474 F.3d 1314; LaSalle, 462 F.3d 1331. First Bank's damages claims have no precedence in the history of Winstar cases and are flatly unreasonable on their face.

## B. Mr. Holland's Retained Earnings Theory Fails As A Matter Of Law

### 1. Retaining Earnings Did Not Cause Any Harm To River Valley

#### a. Retained Earnings Are Not Harmful To A Thrift

Contrary to the premise of plaintiffs' retained earnings damage claim, retained earnings are not viewed by thrift managers as being harmful to a thrift. Indeed, thrift managers routinely decide to retain earnings above and beyond the amount necessary to meet regulatory capital requirements. DX 1490 at 8-9 ¶ 13. For example, thrift institutions currently maintain an

average core capital ratio of more than eight percent, while the required level of "well capitalized" core capital is just five percent. Id.

Moreover, of course, if retained earnings were truly harmful to the River Valley institutions, it would be irrational for these institutions to have voluntarily retained earnings, see DX 1492 at 22 ¶ 38, and it would be irrational for First Bank to claim that, "but for the breach, River Valley . . . would have had even more retained earnings than it accumulated in the real world . . . ." Pl. Cont. at 63 ¶ 55. Nevertheless, River Valley consistently chose to maintain an excess capital position, thus retaining earnings in excess of those required, before and after the breach. See DX 1492 at Ex. 6-9; DX 1490 at Ex. D.

**b. Plaintiffs Admit That, But For The Breach, They Would Have Retained Even More Earnings**

Plaintiffs argue that Mr. Holland does not assume that the breach forced River Valley to retain additional earnings. Pl. Cont. at 63 ¶ 55. That is, the act of mitigation for which they claim damages is an act that would have occurred irrespective of the breach. Indeed, plaintiffs claim that "but for the breach, River Valley would have been larger and more profitable, and would have had even more retained earnings than it accumulated in the real world given the breach." Id.

Plaintiffs' admission is fatal to their claim for mitigation damages. In order for First Bank to satisfy its burden of proof on the cause of the thrifts' shrinkage, it must show that the loss of the contractual regulatory capital directly and inevitably resulted in the retained earnings, to an extent such that a reasonable person would consider the breach – as opposed to all of the other factors (e.g., competition, lack of growth opportunities, etc.) – to be, in fact, the actual cause of First Bank's claimed harm. Wells Fargo, 88 F.3d at 1023; Chain Belt, 115 F. Supp. at

714; Myerle, 33 Ct. Cl. at 26. "[P]recedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party, and those that are directly related to or direct consequences of the breach." LaSalle, 317 F.3d at 1373. The LaSalle Court instructed that only direct consequences of the breach can be considered in evaluating damages. The law "does not attribute remote consequences to a defendant." Id. (quotation omitted). Indeed, the LaSalle Court explained that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." Id. (quotation omitted). Thus, First Bank's retained earnings are dependent upon a finding that River Valley III's retained earnings post-FIRREA were caused by the breach. This premise is demonstrably false.

First, River Valley I and River Valley II did not shrink immediately following the passage of FIRREA in August 1989 or immediately following the publication of the implementing regulations in November 1989. Indeed, the thrifts continued growing until July 1990, almost a year after the passage of FIRREA. Moreover, as demonstrated above, the thrifts' retained earnings were related to numerous voluntary decisions, regulatory concerns about the composition of the River Valley thrifts' mortgage-related investments, and a lack of investment opportunity.

As a matter of finance, one cannot attribute any retained earnings replacement damages to the breach if there was not an incremental increase of retained earnings over that amount that would have existed absent the breach. See DX 1492 at 16 ¶ 28. That is, if the retained earnings would have existed even absent the breach, then the breach did not result in any incremental retained earnings. Thus, the retained earnings did not cause any damages.

We also note that First Bank states that retained earnings affected its growth and that it would have earned higher profits and retained more earnings in the but-for world. See Pl. Cont.

at 31-34, 63. This argument – insofar as it is relevant to First Bank's damages claims – is not supported by any expert testimony. Indeed, First Bank specifically disavowed its earlier lost profits theory in submitting its retained earnings theory. Accordingly, the Court should not consider First Bank's statements regarding higher profits absent the breach to constitute a damages claim. Nevertheless, the fact that First Bank admits that it would have retained the same earnings absent the breach demonstrates the lack of causation for its claims.

River Valley had two options with its earnings: it could either retain them within the thrift or issue them as dividends. If the breach did not cause River Valley to retain more earnings than it would have otherwise (i.e., prevented it from issuing them as dividends), then the breach did not cause any different actions, and, thus, caused no damage even assuming that retained earnings could somehow be considered a source of damage. Because plaintiffs claim that the earnings would have been used to support the existing portfolio rather than being issued as dividends or used to leverage the thrift, there is no basis to conclude that the breach caused any different actions. Thus, there is no basis for claiming that the retained earnings were harmful.

**c. Mr. Holland Has Not Identified A But-For World**

First Bank can not establish causation because Mr. Holland has not identified a but-for world in his analysis. See DX 1492 at 16 ¶ 28. Mr. Holland's failure to identify a but-for world leaves no reliable method to determine whether the retained earnings upon which he computes damages would have existed absent the breach. If such retained earnings would have existed even absent the breach, then the breach did not result in any incremental retained earnings, and, thus, no causation of damages.

#### d. The River Valley Thrifts' Contractual Capital Could Not Have Been Transferred To First Bank, Precluding Retained Earnings Damages After First Bank's Acquisition

Mr. Holland's retained earnings theory, in which he calculates $13 million in damages, fails because the River Valley thrifts' contractual capital could not have transferred to First Bank.

First Bank assumes that, absent FIRREA, River Valley III could have transferred its right to include contractual capital as regulatory capital to First Bank. The ability to transfer contractual capital, however, was entirely dependent upon regulatory approval. Furthermore, as a matter of accounting, River Valley III's contractual capital would not have existed after River Valley's sale to First Bank. For these reasons, First Bank simply cannot meet its burden to prove causation and foreseeability (much less certainty), and, accordingly, its request for damages premised upon a transfer of regulatory capital to First Bank fails.

This Court has rejected damage claims that depend upon contingencies. See Dodson Livestock Co. v. United States, 48 Fed. Cl. 551, 565 (2001) (granting summary judgment, because "[p]laintiff's lost profits depend on events that did not happen and might not have happened"), rev'd on other grounds, 30 Fed. Appx. 989 (Fed. Cir. 2002); see generally Neely v. United States, 285 F.2d 438, 443 (Ct. Cl. 1961) (discussing problem in proving lost profits, because they depend upon events that might not have occurred even in absence of the breach). Moreover, where damages alleged in the real world are wholly dependent upon a favorable act of agency discretion in the non-breach world, the fact of discretion on the part of the agency breaks any causal chain in the alleged damages, requiring summary judgment. See San Carlos Irrigation and Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("Too many

contingencies–including, most importantly, the discretion of the agency to dispose of excess water–exist in the causal chain from the government's breach to the asserted lack of water. . . .").

Here, the transferability of the benefits of the River Valley thrifts' alleged contract with the Government depended upon the Government's discretion. The River Valley Assistance Agreements prohibited the transfer of rights under the agreements to any other party (including through merger) without the FSLIC's prior written consent. PX 207 at WOF016 1596-1597; PX 284 at WOT837 0998-99; see also DX 1475 at ¶¶ 9-10; DX 1448 at 129, 131-132 (stating that the transfer of contractual capital would require regulatory approval and that such capital was not intended to be sold); DX 1476 at ¶ 9. Similarly, both Assistance Agreements indicate that the provisions of the Agreements were for the sole benefit of the parties and for no other person. PX 207 at WOF016 1597; PX 205 at WOT013 0112. They further state that the Agreements were not intended to give any person other than the parties any legal or equitable right, remedy, or claim under, or in respect to, the Agreements or any of their provisions. Id.

First Bank has put forth no evidence contradicting the prohibition in the Assistance Agreements of transferring the benefits of River Valley III's alleged contract without regulatory approval. Moreover, a November 30, 1989 letter from Mr. Holland to the FDIC demonstrates that the shareholder plaintiffs understood that the institution's sale would require Government approval, and that this requirement was integral to the agreement. See PX 372 at H&R-BX64 02230.

The sale of the River Valley thrifts was thus contingent upon Government-imposed conditions. Therefore, First Bank's claims concerning profits to be made by transferring contractual capital from River Valley III to First Bank are based entirely upon hypothetical events.

Finally, given that the acquisition was accounted for under the purchase method of accounting, any goodwill on the books of River Valley III would not have transferred to First Bank. Accounting Principles Bulletin Opinion No. 16, which applied to First Banks' acquisition of River Valley III in 1995, states: "An acquiring corporation should not record as a separate asset the goodwill previously recorded by an acquired company." PX 2 at 460-461; see also DX 1416 at 35 ¶ 81. GAAP applies to all thrift acquisitions except when regulators have granted a specific exception to GAAP. PX 67 at OGF121 2183; DX 1426 at 578-579, 581. No regulatory exception to GAAP existed that would have permitted First Bank to recognize River Valley III's pre-acquisition goodwill.

First Bank assumes that, irrespective of the passage of FIRREA and the purported breach by the Government, the sale of River Valley III to First Bank FSB would have occurred. JSF ¶ 376. By setting forth a but-for world in which, even in the absence of the breach, River Valley is sold to First Bank, plaintiffs have acknowledged that River Valley's sale was not caused by the breach, but, instead, was the result of an independent business decision. Any damages resulting from that independent decision cannot be attributed, therefore, to the Government's breach. See Myerle, 33 Ct. Cl. at 26 (holding that lost profits from "independent and collateral undertakings" are not recoverable, and that evidence of such lost profits is inadmissible); see also Wells Fargo, 88 F.3d at 1021, 1023.

Therefore, even assuming that River Valley's damage claims are valid, it nevertheless would have lost the contractual capital in the but-for world when River Valley was sold to First Bank. River Valley could have chosen to avoid the purported damages from the loss of the contractual capital after 1994 in the but-for world by not agreeing to be sold to First Bank in the actual world, but it has conceded that it would have agreed to the sale in the but-for world as

well. See JSF ¶ 376; PX 603 at 16 & n. 28; PX 602 at 17. Thus, any damages resulting from this independent business decision cannot be attributed to the Government. Wells Fargo, 88 F.3d at 1021, 1023; Ramsey, 101 F. Supp. at 357-58; Myerle, 33 Ct. Cl. at 26.

#### e. First Bank's Retained Earnings Damages Were Not Reasonably Foreseeable At The Time Of Contracting

The damages identified in Mr. Holland's retained earnings claim were not reasonably foreseeable. The River Valley thrifts did not realize the impact of FIRREA upon their operations until 1991, well after the breach. DX 1373 at 75. Thus, the damages could not have been foreseeable at the time of contracting in 1988 -- from the perspective of either the regulators or the thrifts.

Moreover, the factors described above that demonstrate a lack of causation also demonstrate the lack of reasonable foreseeability in Mr. Holland's model. Just as the retention of earnings did not harm River Valley, it was not foreseeable at the time of contracting that retained earnings could harm the thrift.

Also, plaintiffs' alleged damages were not foreseeable because, even assuming that River Valley had additional profitable opportunities that it was unable to pursue due to a lack of capital, its holding company could have borrowed money and downstreamed it to the thrift for the thrift's investment in those opportunities. As the Restatement of Contracts explains, it is not foreseeable in the usual course of business that the non-breaching party would be unable to find replacement credit. See Restatement (Second) of Contracts (1981) § 351 & cmt. e.

River Valley's holding company, RV Holdings, borrowed funds in the actual world. It borrowed $7 million from ANB and used the proceeds to repurchase $5 million in preferred stock and $2 million in subordinated debt from ANB. This transaction resulted in no additional

funding from ANB but increased River Valley III's tangible capital by $2 million. JSF ¶ 332; PX 727 at H&R-B04 597; PX 643 at H&R-B03 00687. Given that River Valley could have, and did, borrow funds through its holding company, any purported harm from the cost of retaining earnings to replace capital was not reasonably foreseeable.

### 2. First Bank's Measure Of Damages For Retained Earnings Is Not Reasonably Certain

The difficulty in meeting the burden of proof placed upon the non-breaching party with respect to lost profits is clear, and usually insurmountable. See Glendale, 239 F.3d at 1380; Glendale, 43 Fed. Cl. at 399 ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."); Castle, 48 Fed. Cl. at 206, 214, (concluding that plaintiff had failed to prove damages with reasonable certainty); Bank United, 50 Fed. Cl. at 654 (plaintiffs' "models are filled with speculation upon speculation and thus do not establish lost profits with reasonable certainty"); Suess, 52 Fed. Cl. at 228 ("plaintiffs' damage model is premised on unrealistic assumptions . . . .").

Even if the Court were to conclude that the breach somehow caused First Bank to retain the earnings for which it now claims damages, First Bank has not established a reasonably certain basis for the cost of those retained earnings. Dr. Thakor has identified numerous methodological deficiencies inherent in Mr. Holland's model, see generally DX 1492, as has Dr. Carron. See DX 1491. Mr. Bankhead, moreover, has detailed accounting deficiencies in Mr. Holland's model. See DX 1490. Moreover, this Court has rejected a retained earnings claim similar to that described in Mr. Holland's model, and the Federal Circuit affirmed that decision,

precluding the viability of plaintiffs' claims as a matter of law. See Bank of Am., 67 Fed. Cl. 577; Bank of Am., 495 F.3d 1366.

**a. River Valley's *Ex Post* Cost Of Capital Should Be Measured By The Actual Dividends Paid**

Even assuming that First Bank is entitled to the cost of retained earnings, this Court and the Federal Circuit rejected a methodology nearly identical to Mr. Holland's in Bank of America. In Bank of America, the thrift affected by the breach claimed damages resulting from the retention of earnings and measured the cost of the retained earnings at 20 percent. Bank of Am., 67 Fed. Cl. at 588.

In response to this theory, this Court concluded that the thrift's cost of retained earnings could not be measured by a calculated market cost of stock but, instead, had to be measured by actual dividends paid because those are the only costs that were realized by the thrift. Bank of Am., 67 Fed. Cl. at 588-89. The Court also ruled that the actual dividends paid were the proper measure of cost of retained earnings because the share appreciation was realized upon the thrift's successful sale. Id. at 589, 589 n.28. This Court specifically held that the unrealized share appreciation costs were borne by the outside institution that acquired the thrift and not the thrift itself. Id. at 589.

The Federal Circuit affirmed this holding. See Bank of Am., 495 F.3d 1366. The Federal Circuit held that this Court "did not abuse its discretion in using the dividend rate to determine the cost of retained earnings" due to the realization upon the sale of the thrift:

> The trial court found it unlikely in the rather short period (two-and-a-half years) between the breach of contract and the sale of HonFed to BoA that HonFed incurred costs above those that it paid out in dividends. Further, the trial court noted that, in Home Savings, this court affirmed the determination of the costs of retained earnings based on the lowest-cost source of capital from

> the thrift's earlier capital raisings as a proxy for what the existing shareholders would demand as a return on retained earnings. Home Sav. of Am., F.S.B., v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005). The trial court did not abuse its discretion in using the dividend rate to determine the cost of retained earnings.

Bank of Am., 495 F.3d at 1373.

Here, as in Bank of America, River Valley was successfully sold to a large, well-capitalized institution, First Bank, shortly after the breach, and the same reasoning should therefore apply. There is no evidentiary support for any claim that First Bank did not provide the shareholder return to River Valley's investors as in Bank of America. Therefore, River Valley's shareholders received their "return" upon the retained earnings in the form of the purchase price from First Bank rather than paying them as a cost in the market. Mr. Holland's methodology is improper.

With respect to this Court's opinion in Bank of America, First Bank argues that this Court:

> grounded [its] rejection of Bank of America's retained earnings claim on a factual determination that Bank of America's calculation "ignore[d]" certain "benefits [the thrift] actually received and in so doing drastically understate[d] the appropriate offset." Specifically, Bank of America sought to compute the costs of retained earnings based on one amount of retained earnings, while computing the associated benefits on a different (smaller) amount.

Pl. Cont. at 63-64 ¶ 56 (citation omitted).

As shown above, this Court's rejection of the cost of retained earnings based upon the market return for common stock went far beyond the distinction drawn by First Bank. Instead, this Court found – and was affirmed by the Federal Circuit – that the cost of retained earnings

was properly measured by actual dividends paid, and that the purchase of the thrift by Bank of America afforded the full return to the thrift's shareholders for the retained earnings.

First Bank's reliance upon the Citizens Federal, Home Savings, and LaSalle decisions to support its claims is similarly unavailing. See Citizens Fed., 474 F.3d at 1321; Home Sav., 399 F.3d at 1354; LaSalle, 317 F.3d at 1374. In Citizens Federal, the Federal Circuit upheld an award of the actual difference in cost, measured by tax consequences, paid after the thrift's exchange of subordinated debt for preferred stock after FIRREA. Citizens Fed., 474 F.3d at 1321. This Court also denied the thrift's claim for a loss of "enterprise value," measured by loss of future cash flow from the exchange, that the plaintiff's expert claimed would be reflected in the purchase price when the thrift was later acquired, analogous to plaintiffs' claim for continued lost cash flow after First Bank acquired River Valley. See Citizens Fed. Bank v. United States, 66 Fed. Cl. 179, 196 (2005), aff'd, 474 F.3d 1314 (Fed. Cir. 2007). Here, by contrast, First Bank seeks not the actual dividends paid but a hypothetical 20 percent market "cost of equity capital," and also claims damages until the conclusion of the contract, long after First Bank acquired River Valley. Citizens Federal thus undermines First Bank's position.

Similarly, Home Savings does not support First Bank's claim for costs of replacing capital based upon a market return for equity. In Home Savings, the Federal Circuit upheld an award based upon "a weighted average of [the thrift]'s various types of financing to calculate the replacement cost [the thrift] incurred." Home Sav., 399 F.3d at 1353. Here, by contrast, First Bank seeks to measure the cost of retained earnings to River Valley not by River Valley's actual dividend costs, but rather by a projection Mr. Holland extrapolates from a FSLIC analysis of the dividend rates for River Valley preferred stock. Pl. Cont. at 41 ¶ 139. This approach is inconsistent with Home Savings and should be rejected.

Furthermore, in Bank of America, the Federal Circuit specifically considered and rejected the plaintiffs' argument that Home Savings supported the 20 percent rate of return on common stock advanced by the expert in that case. See Bank of Am., 495 F.3d at 1373. This Court also rejected plaintiffs' attempt to recharacterize the Federal Circuit's opinion in Home Savings. See Bank of Am., 67 Fed. Cl. at 589 ("[Home Savings] made no mention of retained earnings, and we are unwilling to infer strong support for a proposition that the court was not asked to address.").

First Bank's reliance upon LaSalle is also misplaced. In LaSalle, the Federal Circuit held that "[a]ll capital raised by a corporation has a cost, and it is well established that the payment of dividends is a capital cost." LaSalle, 317 F.3d at 1375 (citation omitted). The LaSalle court was not asked to address the application of such a theory to retained earnings, however. To the contrary, it remanded for a calculation of the cost of the actual dividends paid by the thrift to its parent. Id. The court also affirmed this Court's decision not to use the "hurdle rate" used by LaSalle's parent as a rough expected rate of return in its investment in LaSalle as a measure of damages, "for it does not reflect the actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach." Id. Here, First Bank's calculation of an assumed 20 percent "cost of equity capital" for River Valley's shareholders based upon an earlier FSLIC projection is akin to the "hurdle rate" rejected in LaSalle and should thus be rejected.

**b. An Award Based Upon Mr. Holland's Retained Earnings Theory Would Result In A Double Recovery To River Valley's Shareholders**

The fact that River Valley's shareholders received the share appreciation of the retained earnings in the form of the purchase price from First Bank means that Mr. Holland's retained

earnings theory would result in a double recovery. Mr. Holland's model results in a double recovery from the purchase price paid by First Bank because the 20 percent "cost of equity capital" figure he uses was in effect paid by First Bank to River Valley's shareholders.

Mr. Holland's model also results in a double recovery from the SAFSB acquisition because any actual purchase of SAFSB by River Valley necessarily would have required an additional capital infusion over and above the regulatory capital in River Valley, even absent the breach.

**i. Double Recovery With First Bank Purchase Price**

As this Court held in Bank of America, "[w]ith the exception, then, of the dividends paid, the retention of earnings cannot be said to harbor a cost borne by [the thrift] since the return ultimately came in the form of share appreciation . . . realized only upon the sale of the thrift to a third party." Bank of Am., 67 Fed. Cl. at 589. Here, River Valley's shareholders actually realized this share appreciation when First Bank acquired River Valley. An award of damages based upon the "cost of equity capital" would effectively pay River Valley's shareholders the same return upon the retained earnings for share appreciation twice – once upon the sale to First Bank and again with the damages award.

Furthermore, First Bank argues that the Court should pay this rate of return even after First Bank's acquisition of River Valley, notwithstanding the lack of any evidence that First Bank actually retained any earnings for the purpose of replacing capital lost due to the breach. This result is contrary to this Court's precedent and should be rejected as inconsistent with the economic substance of First Bank's acquisition of River Valley. See, e.g., Bank of Am., 67 Fed. Cl. at 589-90 (damages based upon dividends paid by thrift, no damages after acquisition);

Citizens Fed., 66 Fed. Cl. at 196 (damages based upon tax consequences to thrift, no damages after acquisition).

Furthermore, as Dr. Thakor demonstrates using Mr. Holland's data, any actual "costs" of retained earnings to River Valley accrued to the benefit of its shareholders. Based upon the price/tangible book equity ratios in the acquisitions of Illinois thrifts of comparable size to River Valley, Dr. Thakor concluded that whatever retained earnings were accumulated by River Valley resulted in an increase in River Valley's purchase price and that this increase in price exceeded the corresponding retained earnings accumulation. See DX 1492 at 27 ¶ 48, Ex. 13. Considering the $37.4 million in proceeds received from the sale of River Valley to First Bank in January 1995, Messrs. Holland and Ross realized an annual 29.5 percent rate of return upon their investment in the River Valley thrifts. See DX 1492 at 27 ¶ 49, Ex. 14. These facts demonstrate that River Valley in fact did receive its return upon the retained earnings in the form of the purchase price received from First Bank. Thus, an award of damages would give the River Valley shareholders the same return twice. See also Bank of Am., 495 F.3d at 1373 ("BoA admits that the retained earnings resulted in a dollar-for-dollar increase in the sales price of HonFed. The trial court concluded HonFed did not suffer any damages from the forced retained earnings. This court again discerns no error in the trial court's reasoning or clear error in its findings.").

**ii. Double Recovery With SAFSB Acquisition**

Mr. Holland's model results in a double recovery with the SAFSB claim. Although neither the SAFSB claim nor the retained earnings claim is justified, Mr. Holland's model also results in overlapping damages between the two. River Valley would not have had sufficient capital, even absent the breach, to acquire SAFSB absent an additional capital infusion. See DX

1491 at 9-10 ¶ 27. Because River Valley would have needed to retain additional earnings to fund the SAFSB acquisitions, it is inconsistent for Mr. Holland's model to claim that the cost of those earnings was harmful to River Valley. Plaintiffs therefore should not be permitted to collect upon the SAFSB claim and retained earnings claim simultaneously.

#### c. Mr. Holland's Retained Earnings Theory Is Tantamount To An Improperly Asserted Lost Profits Claim

Mr. Holland submitted his retained earnings damage theory based on the representation that it was not a lost profits claim. Indeed, plaintiffs specifically sought leave to bring their retained earnings on the representation that they would abandon their existing lost profits claims (which had been the subject of three previous reports from Mr. Holland) if they were permitted to bring a retained earnings claim. See Pl. Mot. for Leave to Revise and Supplement Their Damages Claims (Mar. 20, 2007) at 7 ("At the same time, Plaintiffs would reduce the burdens of preparation for the damages trial by setting aside their claim for lost profits based upon growing River Valley's asset portfolio."). After filing his retained earnings report, Mr. Holland continued to assert that he was not presenting a lost profits analysis. See DX 1487 at 214-15.

It is now apparent, however, that Mr. Holland's retained earnings theory is akin to a lost profits claim – albeit a patently defective one. Specifically, under Mr. Holland's model, the cost of River Valley's retained earnings was an "opportunity cost." DX 1488 at 372; see also DX 1487 at 156-58. That is, the alleged cost of retaining earnings was the lost profits those earnings could otherwise have supported. Indeed, both Dr. Thakor and Dr. Carron have identified Mr. Holland's retained earnings theory as an inappropriately devised lost profits claim. DX 1492 at 8, 20 ¶ 35; DX 1491 at 5 ¶ 10.[21]

---

[21] Plaintiffs inappropriately suggest that, notwithstanding their abandonment of lost profits claims, and notwithstanding Dr. Thakor's unequivocal statements that Mr. Holland's retained

The problem from such a tack, however, is that, as a matter of economics, retained earnings and lost profits are based upon contrasting factual scenarios. A lost profits approach attempts to calculate profits that were lost because the regulatory capital needed to generate them was unavailable. A cost-of-replacement of capital approach, however, attempts to compute the net cost of raising the capital that was actually raised to replace lost regulatory capital. DX 1492 at 20 n.16. In an attempt to dodge the binding precedent of the Federal Circuit's opinion in Bank of America, plaintiffs now claim, contradicting Mr. Holland's own report, that he "does not assume that that [sic] the government's breach forced River Valley to retain additional earnings . . . ." Pl. Cont. at 63 ¶ 55.

Furthermore, a lost profits analysis would also require, both as a matter of finance and law, a specific identification of the investment opportunities that River Valley would have pursued if the breach had not occurred. See DX 1492 at 20 ¶ 35; see also DX 1487 at 214-16. No such foregone assets are identified by Mr. Holland with his retained earnings theory. Nor is there any consideration in his methodology of the additional risk to which the thrift would be exposed from an expansion of its balance sheet. DX 1492 at 20 ¶ 35.

**d. Mr. Holland's Retained Earnings Methodology Is Flawed And Unreliable**

In addition to these conceptual flaws, Mr. Holland's retained earnings methodology also suffers from a number of methodological flaws that render it unreliable. Thus, even if the Court concludes that using the "cost of equity capital" for retained earnings is conceptually sound,

---

earnings theory presents an improper basis for a lost profits claim, they will argue at trial that Mr. Holland's retained earnings claim can be now be converted into yet another lost profits theory to be asserted by plaintiffs (without, of course, any supporting expert report from plaintiffs' experts). Pl. Cont. at 45-47 ¶¶ 153-56. The Rules of this Court, and the procedural orders of the Winstar litigation do not permit such a tack. See RCFC 37(c); Winstar Master Proc. Order No. 2 ¶ V(A).

Mr. Holland's model suffers from specific flaws that make it an inappropriate basis for measuring damages.

**i. Mr. Holland's Retained Earnings Theory Is Not Based Upon Actual Dividends Paid Or An Actual Cash Flow**

Mr. Holland's estimated 20 percent "cost of equity capital," which he purports to base upon the FSLIC's analysis of the projected dividend rate for River Valley's preferred stock, is flawed. First, using the 20 percent rate fails as a matter of law because it is the result of a purely hypothetical capital replacement. Mr. Holland's 20 percent cost of equity capital is not traceable to any of River Valley's actual cash flows. See DX 1487 at 122-23. Plaintiffs can offer no evidence that River Valley paid a 20 percent rate for any of its capital.

Hypothetical damage awards are barred by binding precedent from the Federal Circuit. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1381-82 (Fed. Cir. 2005); Fifth Third, 402 F.3d at 1236-37. Indeed, in LaSalle, 317 F.3d at 1375, the Federal Circuit held that a cost of replacement model that did not "reflect the [thrift's] actual experience" was properly rejected by the trial court.

Here, there can be no doubt that River Valley's cost of capital was far lower than the 20 percent claimed by Mr. Holland. Indeed, River Valley paid no higher than 13 percent on the preferred stock it issued in 1991 (DX 1491 at 7 ¶ 20), while its actual dividend rates for its class A and C preferred stock between 1989 and 1993 varied between 5.4 percent and 8.7 percent. DX 1491 at 8 ¶ 21-22, Ex. 4. Dr. Thakor analyzed the cost of funds from various sources actually used by the River Valley institutions from 1990-94 and determined that neither River Valley's actual dividends paid nor its average cost of funds were ever close to 20 percent. See DX 1492 at 25 ¶ 44, Ex. 12. Given these wide disparities with River Valley's and First Bank's

actual experience, and the many changes in the market affecting the cost of equity capital, the constant 20 percent figure is unreasonable. See DX 1492 at 24-25 ¶¶ 43-44, 29-30 ¶¶ 53-54.

Dr. Holland's cost of equity capital projection is doubly unreliable for First Bank. First Bank has not paid a 20 percent dividend rate during the relevant time period. Furthermore, as a larger, better-capitalized institution, it is reasonable to conclude that, as part of First Bank, River Valley's cost of equity capital after 1995 would be lower.

Dr. Holland's assumption that the offsetting benefit of the retained earnings should be based upon the 1990 intermediate-Treasury rate is also unsupported by River Valley's, and later First Bank's, actual experience. As Dr. Thakor explains, Mr. Holland's assumption is not supported by River Valley's or First Bank's actual investment experience. See DX 1492 at 23 ¶ 39, 32-34 ¶¶ 59-62. Dr. Thakor also concluded that the use of the 35 percent tax rate for the Treasury rate was questionable because of River Valley's use of net operating loss carryforwards in its actual experience. DX 1492 at 32 ¶ 58.

Thus, Mr. Holland's 20 percent cost of capital and 5.736 percent Treasury rate are unreliable as a matter of law.

**ii. Mr. Holland's Analysis Is Neither A Proper *Ex Ante* Nor *Ex Post* Analysis**

As a matter of economics, it is possible to use either an ex ante or an ex post approach to assessing damages; however, it is necessary to choose one or the other, especially when dealing with events that have already transpired, to ensure that the method is consistent. DX 1492 at 16-17 ¶ 29. Mr. Holland, however, did not do so here. Instead, Mr. Holland chose certain ex post elements (actual retained earnings figures, actual data related to conversion of $2 million of subordinated debt, no discounting of damages for 1990-2007 period back to date of breach) and

other ex ante elements (hypothetical 20 percent cost of equity capital and hypothetical 5.736 percent Treasury bond rate from 1990 that are not adjusted for future changes in interest rates). This combination results in Mr. Holland drastically overstating the damages due to the breach. DX 1492 at 16-18 ¶¶ 29-31.

To perform a proper ex ante analysis, one must start with the premise that an institution would not deliberately invest capital in negative-net present value ("NPV") projects, which means that putting a dollar of capital on the balance sheet cannot in itself do any harm, other than the transactions costs involved in raising capital. See DX 1492 at 17-18 ¶ 31. With retained earnings, even these transactions costs are absent. Id. With an ex ante analysis, one would compute the cost of equity capital as well as the costs of other claims as expected rates of return investors would demand, given the riskless rate in the economy and the risk to which the claim exposes investors. Id. at 16-17 ¶ 29. One would then compute the rates of return the institution would expect to earn, given the standard assumptions about value-maximizing behavior. Id. Comparison of costs and benefits would proceed in an ex ante manner, with appropriate attention given to isolating incremental cash flows that can be causally linked to the breach as well as issues of rational expectations. Id. Although it is conceivable that such a transaction could result in damage if the transaction was not a fair-market-value transaction or other extenuating circumstances caused an institution to voluntarily to engage in a negative-NPV transaction, Dr. Holland presents no analysis to support such a conclusion. Id. at 17-18 ¶ 31. Mr. Holland's projection of damage based upon the ex ante elements of his model is therefore improper.

With respect to ex post analysis, the proper measure of the cost of equity capital becomes the actual experience of River Valley, i.e., actual dividends paid. DX 1492 at ¶ 30. Mr. Holland

does not base his cost of equity capital upon River Valley's actual dividends paid. Id. Thus, Mr. Holland does not perform a proper ex post analysis either.

#### iii. Mr. Holland Overstates The Amount Of Contractual Capital To Be Replaced

Mr. Holland's model overstates the amount of contractual capital to be replaced during various periods. Mr. Bankhead explained these overstatements in his analysis of Mr. Holland's retained earnings model. See DX 1490 at 9-13 ¶¶ 14-22, Ex. D. Among the mistakes Mr. Holland makes are a failure to account properly for the write-off of goodwill with the Republic branches sale; a failure to recognize that a portion of River Valley's capital credit goodwill counted toward risk-based capital requirements; and a failure to phase-out the inclusion of $4.6 million in subordinated debt toward regulatory capital levels. These errors cause Mr. Holland to overstate damages by at least $3.3 million – even assuming the faulty premise to Mr. Holland's retained earnings claim.

#### iv. Mr. Holland's Analysis Ignores The Differences Between Tangible Capital And Intangible Capital

Mr. Holland's model also does not recognize the many additional advantages that tangible capital, such as retained earnings, give to the thrift relative to the replaced intangible capital. DX 1492 at 21-22 ¶¶ 36-37. For example, both River Valley, as it retained more earnings, and First Bank, during all periods after its 1995 acquisition of River Valley, would have had a lower cost of capital than the 20 percent Mr. Holland projects due to greater tangible capital, but Mr. Holland does not account for this. DX 1492 at 21 ¶ 36; see also Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 168 (2006), appeal docketed, No. 2007-5054 (Fed. Cir. 2007) ("Clearly, the answer to the Federal Circuit's question regarding whether thrifts with goodwill sold for a higher price is 'no.'").

Dr. Thakor accounts for these benefits of tangible capital as opposed to goodwill, and the other methodological flaws he identified in Mr. Holland's analysis, in his report. See DX 1492 at 32-34 ¶¶ 59-62, Ex. 16-19. Although Dr. Thakor does not advance any of these analyses as a separate basis for damages because of the conceptual flaws in viewing retained earnings as a source for damages, his analysis concludes that merely correcting for the methodological flaws in Mr. Holland's model demonstrates that the replacement of intangible capital with tangible retained earnings was a net positive for River Valley.

**v. Mr. Holland Effectively Imposes Prejudgment Interest**

Mr. Holland's model calculates the cost of retained earnings year by year from 1990 to 2013 and applies a discount rate to dates after December 2007 to adjust for the time value of money. However, the choice of date affects the amount of damages. In Mr. Holland's model, the amount of damages increases as the assumed date of judgment recedes, effectively imposing a prohibited prejudgment interest charge against the Government at the annualized rate of 14.3 percent. For example, even assuming Mr. Holland's basic theory to be correct, if damages were discounted to the date Mr. Holland defines as the date of breach (July 1990), the damages from his model would total $7.76 million rather than $21.92 million. See DX 1491 at 11 ¶ 31, Ex. 6.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640
Attorneys for Defendant

Of Counsel:

SCOTT D. AUSTIN
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
BRIAN A. MIZOGUCHI
AMANDA L. TANTUM
JOHN J. TODOR
Trial Attorneys
Department of Justice

October 26, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of October 2007, a copy of the foregoing "DEFENDANT'S CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson