IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOMER J. HOLLAND, STEVEN BANGERT, co-executor of the ESTATE OF HOWARD R. ROSS, AND FIRST BANK, | |
| Plaintiffs, | |
| v. | No. 95-524C |
| | (Judge George W. Miller) |
| THE UNITED STATES, | |
| Defendant. | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE DEFENDANT FROM CALLING AT TRIAL ANY WITNESSES FOR WHOM DEFENDANT HAS DESIGNATED DEPOSITION EXCERPTS, SPECIFICALLY ALLEN BLAKE, HOMER J. HOLLAND, LARRY KENNY, DIANA JANUSKA, LARRY FERRIES, RONALD KARR, AND PAUL GRIFFIN**

Defendant, the United States, respectfully opposes the motion in limine of plaintiffs Homer J. Holland, the estate of Howard R. Ross, and First Bank to preclude us from calling as witnesses for direct examination at trial Allen Blake, Homer J. Holland, Lawrence Kenny, Diana Januska, Larry Ferries, Ronald Karr, and Paul Griffin. Plaintiffs' assertion that we must choose between designating deposition testimony as party admissions and for completeness and calling the deponents at trial contradicts well-settled procedure. See Rule 32(a)(4) of the Rules of the Court of Federal Claims ("RCFC"); Federal Rules of Evidence ("FRE") 106 and 801(d)(2)(A) and (D). Plaintiffs have mischaracterized the Court's procedures in Long Island Savings Bank v. United States, 63 Fed. Cl. 157 (2004), and Globe Savings Bank, F.S.B. v. United States, 61 Fed. Cl. 91 (2004), which do not, in fact, support their argument. Furthermore, the Court should

reject plaintiffs' attempt to revisit its October 5, 2007 decision permitting designations of deposition testimony for witnesses we plan to call at trial.

**A. The Court Should Refuse To Reconsider Its Prior Decision To Allow The Introduction Of Party Admissions And Counter-designations Of The Deposition Testimony Of Witnesses Appearing At Trial.**

Plaintiffs failed to raise the arguments now made in their motion in limine during the October 5, 2007 conference at which the Court allowed us to counter-designate portions of deposition testimony of witnesses appearing at trial in response to deposition designations introduced by plaintiffs. During the conference, plaintiffs' counsel noted that he would attempt to complete his designations of deposition testimony "soon just as a matter of efficiency so that if the Government wants to cross-designate I have no problem with that[.]" Hr'g Tr. 11:6-8 (Oct. 5, 2007). Plaintiffs were aware at that time that Messrs. Kenny, Ferries, Karr, and Griffin and Ms. Januska were on our witness list. Furthermore, the United States made it clear that "we're going to be seeing the live witnesses anyway," Tr. 18:4-5, including Dr. Holland, Tr. 28:6-22, and that we would designate portions of the deposition testimony of Dr. Holland and Mr. Blake: "I can tell you who we would designate would be Homer Holland who is a Plaintiff. So he has party admissions. And then Mr. Blake . . . who [is an] . . . employee of First Bank which is a Plaintiff obviously." Tr. 12:15-19.

The Court contemplated that the deponents would appear at trial when it stated that, by reading the deposition selections, "we would eliminate any necessity for actors or the witnesses themselves to read the admitted portions of their transcripts." Tr. 15:3-5 (emphasis added). The United States noted that without such a review by the Court along with objections, "we won't

know what testimony [came in] when we're rehabilitating or discussing the issue, explaining testimony with . . . a live witness[.]" Tr. 17:12-16.

During the conference, therefore, the Court determined that we could counter-designate deposition testimony and introduce party admissions from deposition testimony without foreclosing the possibility of calling the deponents at trial. The plaintiffs seek a second bite at the apple by asking the Court to reconsider its decision and adopt restrictions on the use of deposition designations.

**B. Plaintiffs' Assertion That The United States Must Choose Between (1) Designating Deposition Testimony As Party Admissions And For Completeness, And (2) Calling The Deponents At Trial Contradicts Well-Settled Procedure.**

Plaintiffs assert that the Court may only grant permission either to introduce portions of Dr. Holland and Mr. Blake's deposition testimony as party admissions or to call these individuals as live witnesses. Plaintiffs' assertion is meritless. A witness clearly may testify despite the fact that portions of the witness's prior deposition have been designated as party admissions.[1]

The admissibility of party admissions "does not depend upon whether the declarant is unavailable, available, or actually testifies." Michael Graham, 30B Fed. Practice & Procedure: FRE § 7015 (2007). "The availability of the declarant is not relevant under Rule 801(d)(2)(D)

---

[1] Defendant's opposition to plaintiffs' motion to introduce the deposition testimony of Messrs. Ferries, Karr, and Kenny and Ms. Januska detailed our concerns with the introduction of large portions of deposition testimony at trial as party admissions in lieu of live testimony. See Def. Opp'n to Pl. Mot. to Introduce at Trial the Dep. Testimony of Certain Gov't Agents (Sept. 27, 2007). We continue to believe that "deposition testimony is only a substitute, not to be resorted to if the witness can appear in person." Banks v. Yokemick, 144 F. Supp. 2d 272, 288 (S.D.N.Y. 2001). In its October 5, 2007 decision, however, this Court allowed plaintiffs to designate deposition testimony and, in response, we requested that the Court allow us to introduce counter-designations, in the interests of fairness, and similar party admissions in deposition testimony.

because under the rule, the statement is not hearsay." White v. Honeywell, Inc., 141 F.3d 1270, 1277 (8th Cir. 1998). In Globe Savings Bank, F.S.B. v. United States, 61 Fed. Cl. 91 (2004), on which plaintiffs rely, the Court noted the importance of the declarant's appearance at trial: "[a]pplication of the unavailability requirement to admissions would turn the theory for classifying admissions as nonhearsay on its head: the availability of the witness is the very means by which the party-opponent may seek to reap, in effect, the benefits of cross-examination." Id. at 95.

In addition, plaintiffs have argued that, should we call Messrs. Kenny, Ferries, Karr, and Griffin and Ms. Januska at trial, we should not be allowed to present counter-designations that, in fairness, the Court should consider with plaintiffs' designated portions of their deposition testimony. RCFC 32(a)(4) permits the introduction of counter-designations in the interests of "fairness" and, like its counterpart in the Federal Rules of Civil Procedure, "requires, at the request of adverse counsel, the introduction of all relevant parts of a deposition when only a portion thereof is read to the jury. This rule is clearly designed to allow explanatory material onto the record[.]" Mangual v. Prudential Lines, Inc., 53 F.R.D. 301, 303 (E.D. Pa. 1971).

FRE 106 also provides that "an adverse party may require the introduction at that time of any other part – or any other writing or recorded statement which ought in fairness be considered contemporaneously with it." "The purpose of this rule is to avoid 'the misleading impression created by taking matters out of context' and 'the inadequacy of repair work when delayed to a point later in the trial.'" Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 443 (2006). Thus, "an omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to

ensure fair and impartial understanding of the admitted portion." United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999), cert. denied, 530 U.S. 1267 (2000). During the October 5, 2007 telephonic conference, this Court agreed, stating that it "believes that the Government should have an opportunity to counterdesignate and . . . say those portions which the Government believes should be included in the interests of fairness." Hr'g Tr. 9:5-9 (Oct. 5, 2007).

Contrary to plaintiffs' assertions, this Court has allowed a party to counter-designate portions of deposition testimony in the interest of fairness, then also call the deponent as a witness at trial. In Pacific Gas & Electric Co., for example, the Court determined that the Government's counter-designations of deposition testimony of Government employee Thomas Pollog helped the Court form a complete understanding of the deponents' testimony and overruled the plaintiff's objections to these designations. See Pac. Gas & Elec. Co., 73 Fed. Cl. at 441-45. The United States later called Mr. Pollog at trial. See Exh. 1 Trial Testimony of Thomas Pollog, Pac. Gas & Elec. Co. v. United States, No. 04-74C, Tr. 2633-2985 (June 14, 2006). In accord with the past practice of this Court, our counterdesignation of portions of the deposition testimony of Messrs. Kenny, Ferries, Karr, and Griffin and Ms. Januska that we believe should be included in the interest of fairness should not preclude us from calling these witnesses at trial.

### C. Plaintiffs Mischaracterize The Court's Decisions In *Long Island Savings Bank, F.S.B. v. United States* And *Globe Savings Bank, F.S.B. v. United States.*

Plaintiffs mischaracterize the Court's decisions in Long Island and Globe. Plaintiffs assert that, in those decisions, the Court permitted the designation of deposition testimony as substantive trial evidence as a "method alternative – not in addition – to the direct examination of

live witnesses." Pl. Mot. in Limine to Preclude Def. from Calling at Trial Any Witnesses (Oct. 31, 2007), at 2 (emphasis omitted). Plaintiffs claim that a statement in a ruling in Long Island supports their claim that we may not call at trial witnesses for whom we have counter-designated deposition testimony. Id. at 3.

In Long Island, the Court stated that "[i]f any of the[] deponents [whose testimony was designated by the plaintiff] are not listed to testify as a live witness at trial, the government may identify additional portions of the appropriate deposition to be admitted[.]" Long Island, 63 Fed. Cl. at 165. This sentence should not be read to suggest that, if the deponents were listed to testify at trial, the Government could not counter-designate deposition testimony, particularly given the Court's subsequent decisions. At a hearing a month later, the Court noted that it had given the United States leave to read into evidence counter-designations of deponents not listed on either party's witness list and approved of the United States' plan to call witnesses for whom we would counter-designate deposition testimony. See Exh. 2 Hr'g, Long Island Savings Bank, F.S.B. v. United States, No. 92-527, Tr. 20:25-22:9 (Jan. 11, 2005). The United States subsequently provided counter-designations for these deponents and also called three of these deponents, Edward J. O'Connell, James Caton, and Angelo Vigna, to testify at trial. See Exh. 3 Def. Designation of Dep. Testimony (Jan. 14, 2005), at 1-4; Exh. 4 Trial Testimony of Edward J. O'Connell, Long Island Savings Bank, F.S.B. v. United States, No. 92-527, Tr. 3792-3841 (Feb. 24, 2005); Exh. 5 Trial Testimony of James Caton, Long Island Savings Bank, F.S.B. v. United States, No. 92-527, Tr. 3844-3898 (Feb. 24, 2005); Exh. 6 Trial Testimony of Angelo Vigna, Long Island Savings Bank, F.S.B. v. United States, No. 92-527, Tr. 4406-4511 (Mar. 15, 2005).

The Court's approval of both their testimony at trial and the introduction of counter-designations demonstrates that plaintiffs' arguments are simply incorrect.

In addition, as support for their baseless procedure, Plaintiffs misquote, and change the import of, a statement by the Court in Globe related to its approval of the plaintiff's use of deposition testimony of a Government agent, Jack Reidhill, as party admissions under FRE 801(d)(2)(D). Taking into account the fact that the Government had not included Mr. Reidhill on its witness list, Globe, 61 Fed. Cl. at 94 n.6, the Court stated: "If Mr. Reidhill does not testify as a live witness at trial, which appears to be a distinct possibility, the government is granted leave to identify other portions of Mr. Reidhill's deposition to be admitted beyond those designated by Globe." Id. at 99 n.13.

The plaintiffs have reworded this statement as "only 'i[f] Mr. Reidhill does not testify at trial, which appears to be a distinct possibility, [is] the government [] entitled to identify other portions of Mr. Reidhill's deposition to be admitted beyond those designated by [plaintiff.]" Pl. Mot. in Limine at 2-3 (emphasis added). Contrary to plaintiffs' assertions, the Court determined at a hearing following this decision that the United States could both cross-designate sections of Mr. Reidhill's deposition testimony and call him as a witness. See Exh. 7 Hr'g, Globe Savings Bank, F.S.B. v. United States, No. 91-1550C, Tr. 32:19-33:7 (July 2, 2004). The United States explained at the hearing that it would cross-designate sections of Mr. Reidhill's testimony, as permitted by the Court, but would likely call Mr. Reidhill as well. Id. Tr. 33:3-4, 33:24-34:4. The Court stated that "that's fine with me if he testifies." Id. Tr. 33:23.

The Court's procedures in Globe and Long Island therefore do not support plaintiffs' argument that we must choose between designating party admissions of Dr. Holland and Mr.

Blake and counter-designating deposition testimony of Messrs. Kenny, Ferries, Karr, and Griffin and Ms. Januska and calling these deponents at trial. Even assuming that the Long Island and Globe decisions did provide support for plaintiffs' argument, a procedure that forces a party to choose between calling a witness and using this witness's party admissions and counter-designating deposition testimony in the interest of fairness and completeness would controvert the purposes of FRE 106, RCFC 32(a)(4), and FRE 801(d)(2)(A) and (D).

## CONCLUSION

For the reasons set forth above, we respectfully request that plaintiffs' motion in limine be denied.

Respectfully submitted,

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

Attorneys for Defendant

Of Counsel:

SCOTT D. AUSTIN
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
AMANDA L. TANTUM
JOHN J. TODOR
SAMEER YERAWADEKAR
Trial Attorneys
Department of Justice

November 5, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of November 2007, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE DEFENDANT FROM CALLING AT TRIAL ANY WITNESSES FOR WHOM DEFENDANT HAS DESIGNATED DEPOSITION EXCERPTS, SPECIFICALLY ALLEN BLAKE, HOMER J. HOLLAND, LARRY KENNY, DIANA JANUSKA, LARRY FERRIES, RONALD KARR, AND PAUL GRIFFIN" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson

# EXHIBIT 1

**Pacific Gas & Electric Company v. U.S No. 04-74C June 14, 2006**

**Heritage Reporting Corporation**

**Page 2633 to Page 2985**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------x

PACIFIC GAS & ELECTRIC COMPANY, : No. 04-74C

Plaintiff, :

vs. :

THE UNITED STATES, :

Defendant. :

-------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, June 14, 2006

VOLUME 8

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT



APPEARANCES:

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000



APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***



P R O C E E D I N G S

- - - - -

THE COURT: We are on the record to continue hearing evidence in the Defendant's case-in-chief. Our witness is Mr. Kouts. The witness continues under oath. Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Mr. Lo Re to continue direct examination.

MR. LO RE: Good morning, Your Honor.

THE COURT: Good morning.

Whereupon--

CHRISTOPHER KOUTS

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION(continued)

BY MR. LO RE:

Q. Mr. Kouts, when we broke yesterday, we were looking at DX-114.

MR. LO RE: Which is admitted as PX-97, Your Honor.

BY MR. LO RE:

Q. Mr. Kouts, do you have that document

Page 2905

Congress.
Q. The MRS would be needed, according to this passage I just read to you, in order to meet the obligation to accept spent fuel by 1998, is that what this conveys to you?
A. No, it does not.
Q. Okay.
A. It conveys in addition to the repositories.
Q. I'm sorry, in addition to the repositories, in addition the MRS, the integrated MRS would be needed in order for DOE to meet its obligation to begin accepting spent fuel by 1998, correct?
A. Either the repository or the MRS, if they were deployed in 1998, would meet the obligation. What the Department was referring to here is that in addition to the repositories, it also would like the transportation network and the MRS available at the same timeframe.
Q. And just to make sure, I only want to ask your understanding of what's being conveyed here, doesn't this say that the repository and certain elements of the system, including, in

Page 2906

addition, the integrated MRS, would be needed in order for DOE to meet its '98 obligation, isn't that what that says?
MR. LO RE: Your Honor, I'm going to object on the grounds that this has been asked and answered several times.
THE COURT: You may nevertheless answer. He's still reading the sentence in.
THE WITNESS: I understand, I'm trying to understand this. If the repository is available in 1998, then the Department's obligation would be met. What is being suggested here in this sentence is that there's a desire, certainly, to have a transportation network in effect.
And also, the concept of the Department, it would be nice also to have a monitored retrievable storage facility, if it's authorized by Congress.
BY MR. STOUCK:
Q. And, again, just like you're not trying –
THE COURT: That's your answer.
MR. STOUCK: Thank you, Your Honor.
No further questions.

Page 2907

THE COURT: I'm going to excuse you as a witness in just a second, but I'm going to give you a directive I'm giving to all the witnesses testifying in the case. The parties have requested, as they are entitled to under the Federal Rules of Evidence, that the witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh without being distracted by others' testimony.
And my order to you, until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness, and if you have any question about who could be a witness, please ask counsel. Thank you for your testimony. You're excused as a witness.
THE WITNESS: Thank you.
THE COURT: You may step down. United States to call its next witness.
MS. SULLIVAN: Yes, Your Honor. Our next witness is Tom Pollog, and we'll have to retrieve him from the anteroom.
THE COURT: Thank you.

Page 2908

MS. SULLIVAN: If you give us a moment?
THE COURT: Of course. Mr. Pollog, if you'll wait there for a second until the area is cleared? Mr. Pollog, you may come to the witness chair, but before you sit down, would you indicate your readiness to take the oath by raising your right hand?
Whereupon–
THOMAS POLLOG
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Thank you. Please state your full name for the record.
THE WITNESS: Thomas Edward Pollog.
THE COURT: Thank you. Please be seated, and pour yourself a glass of water any time. Direct examination of Mr. Pollog by Ms. Sullivan.
MS. SULLIVAN: Thank you very much, Your Honor. Good afternoon.
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q. Good afternoon, Mr. Pollog.
Mr. Pollog, where are you currently employed?

Page 2909

A. I'm employed in the Department of Energy's Office of Civilian Radioactive Waste Management.
Q. And which office within the Office of Civilian Radioactive Waste Management?
A. The waste management office.
Q. And what is your position within that office?
A. I'm a nuclear engineer.
Q. And what are the responsibilities of your current position?
A. I am charged with implementing the terms and conditions of the standard contract between the Department and the contract holders. I also act as a contracting officer's technical representative for the contract.
Q. How long have you served as the contracting officer's technical representative?
A. I believe it's been four or five years.
Q. And what are the responsibilities for the contracting officer's technical representative?
A. To provide technical expertise and advice to the contracting officer.

Page 2910

THE COURT: And we can refer to this responsibility as the COTR?
THE WITNESS: Yes, Your Honor.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. And to whom do you report, Mr. Pollog?
A. Chris Kouts.
Q. Mr. Pollog, would you briefly describe your post high school educational background?
A. Yes. I received a Bachelor of Science in nuclear engineering from Penn State in 1981, and I received a Master's of Science in environmental system engineering from Clemson University in 1988.
Q. After receiving that degree from Clemson University in 1988, where were you employed?
A. I joined the Department of Energy's Office of Civilian Radioactive Waste Management.
Q. And what was your position with the Office of Civilian Radioactive Waste Management at that time?
A. My first position was in the systems development branch as a general engineer, I

Page 2911

believe.
Q. And how long were you in that branch?
A. Approximately six months.
Q. And where did you next go?
A. I was still within the Office of Civilian Radioactive Waste Management, but I was then placed in the systems integration branch.
Q. And how long were you in the systems integration branch?
A. For approximately one year to one-and-a-half years.
Q. And what were your responsibilities in the systems integration branch?
A. We developed a technical baseline, the requirements documents for the waste management system.
Q. And after the systems integration branch, where did you next go in the Office of Civilian Radioactive Waste Management?
A. I joined the utility interface in the logistics branch, which is basically the waste acceptance team.
Q. And what were your responsibilities in that position?

Page 2912

A. I was an engineer providing technical support to Mr. Brownstein, who was the COTR for the contract at that time.
Q. And what time were you in that office, what was the timeframe?
A. From, I believe, the middle of 1990 to the beginning of 1992.
Q. And in 1992, where did you next go?
A. I took a leave of absence from the Department of Energy, and I had accepted a three-year assignment to the International Atomic Energy Agency in Vienna, Austria.
Q. And when you returned from Vienna, did you return to the Department of Energy?
A. Yes, I did.
Q. And what position did you take at that time?
A. I was an engineer in the engineering division in the Office of Civilian Radioactive Waste Management.
Q. And now long were you in the engineering division?
A. Approximately one-and-a-half years.
Q. Okay. And where did you next go after that?

Page 2913

A. I joined, again, rejoined the waste acceptance team in the middle part of 1996, so I had been there since.

Q. Thank you. Mr. Pollog, I'd like to hand you what's been marked as Defendant's Exhibit 187.

MS. SULLIVAN: That has already been admitted as Plaintiff's Exhibit 158, Your Honor.

THE COURT: Thank you.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, would you identify this document for the record, please?

A. It is the 1991 annual capacity report, as we refer to it, the ACR.

Q. Were you involved in the preparation of this document?

A. Yes, I was.

Q. What was your involvement?

A. We first got drafts of this document from our contractors who developed the initial version for us, so I reviewed the drafts, and

Page 2914

after the waste acceptance people were satisfied with the drafts, I was responsible for having the document reviewed, resolve comments, and then getting it approved and published by the Department.

Q. What was the purpose of the 1991 ACR?

A. It was to provide the contract holders with allocations to allow them to fill out their delivery commitment schedules.

Q. Could you please go to page five of this document? And there's a table set forth on that document, table 2-1. What information is set forth in that table?

A. They are the projected waste acceptance rates starting in 1998 and going through 2007.

Q. And what were the rates in the 1991 ACR based upon?

A. They were based upon meeting the limitations or linkages in the 1987 Nuclear Waste Policy Amendments Act. There was a 10,000 metric ton limit on an MRS capacity limit, and it would allow us to meet that limit on the MRS.

Q. Now, go to Defendant's Exhibit 195.

Page 2915

MS. SULLIVAN: Your Honor, my records indicate that that's already been admitted. May I approach?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you recognize this document?

A. Yes, I do.

Q. Would you identify it for the record, please?

A. Yes. It is an action memo seeking approval for publication of the 1991 annual capacity report. It was going from Mr. Milner, who was our associate director at the time, to John Bartlett, who was the director of the program at that time.

Q. And your involvement in the issuance of the 1991 ACR, would you have been involved in the preparation of this document?

A. Yes, I would.

Q. Mr. Pollog, could I ask you to look at the second sentence under, "Background"? If we could bring that up, the second paragraph under, "Background"? And would you please read that paragraph into the record, Mr. Pollog?

Page 2916

A. "The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, APR. However, based on discussions with contract holders and their representatives, the Department elected to continue to publish the ACR. This change in plans was conveyed to contract holders in a May 15th, 1991 letter from the Department's contracting officer."

Q. Mr. Pollog, what do you recall about DOE's decision to continue issuing ACRs after the 1990 ACR was issued?

A. We had discussions with utility representatives, as stated in this paragraph, prior to this, and they expressed a desire for us to continue publishing the ACR. Based upon those discussions, we followed through and did continue publishing it.

Q. Could you now go to the second paragraph under, "Discussion"? Mr. Pollog, would you read that paragraph into the record, please?

A. "The 1991 ACR assumes that Federal Waste Management System operations, FWMS,

Page 2917

commenced in 1998, and the system configuration is that authorized by the Nuclear Waste Policy Act amendments of 1987, specifically a monitored retrievable storage facility with a 10,000 MTU storage limit prior to repository operations."

Q. Thank you, Mr. Pollog. At the time this document was prepared in December of 1991, was DOE planning to accept spent nuclear fuel at a 3,000 MTU rate?

A. No, they were not.

Q. Why not?

A. At this point in time, it was only possible for us to -- if we were going to accept waste in 1998, it would have to be an MRS, and the 3,000 metric ton rate would have been for repository operations, not an MRS.

Q. Thank you. Mr. Pollog, how did the 1991 ACR differ from the previous ACRs issued by DOE?

A. The 1991 ACR had one acceptance rate, where the prior one had two, an upper bounding and lower bounding case. That was the primary difference.

Q. Could I have Plaintiff's Exhibit 142?

Page 2918

MR. STOUCK: 142?

MS. SULLIVAN: 142. May I approach, Your Honor?

THE COURT: You may.

MS. SULLIVAN: Your Honor, we have a different, a new wrinkle on the admitted, not admitted conundrum. A different version of this document was admitted as Defendant's Exhibit 164. There's a reason for my showing this version of the exhibit to Mr. Pollog. This one has not been admitted.

THE COURT: Okay.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you recognize what's been marked as Plaintiff's Exhibit 142?

A. Yes, I do.

Q. Would you identify it for the Court?

A. Yeah. It is an action memo seeking approval for publication of the 1990 annual capacity report, going from Mr. Milner to Dr. Bartlett.

Q. And did you have responsibility for the preparation of this document?

A. Yes, I did.

Q. How do you know that?

Page 2919

A. Two ways. On the far right-hand side of the first page, my name is there, concurrence, this is the first one, and usually, the first person listed is the one who drafts the document. And also, on the second page near the bottom, there is a line, RW432T Pollog, that means it would have been a disk of mine that I gave to one of the secretaries, for them to put this on appropriate letterhead and have it formatted correctly.

Q. Thank you. Mr. Pollog, can I direct your attention to the paragraph, the first paragraph under, "Discussion," on the first page? Could you please read that paragraph into the record?

A. "The ACR is required to project both the annual receiving capacity of the waste management system and annual acceptance ranking of contract holders for 10 years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.

Page 2920

The first two ACRs were published in June 1987 and June 1988, respectively. In April 1990, the Department informed all contract holders that the 1989 ACR would not be published prior to the development of revised waste acceptance schedules, based on the Secretary's reassessment of the program to Congress."

Q. Mr. Pollog, does the paragraph you've just read comport with your understanding of the development of the ACRs that were issued by DOE and culminating in the issuance of the 1991 ACR?

A. Yes, it does.

Q. Can we go back to Defendant's Exhibit 187, which has been admitted as Plaintiff's Exhibit 158, and could we go to page nine of this document, please? Mr. Pollog, do you have page nine in front of you?

A. Yes, I do.

Q. What is the information conveyed on table 3-1 set forth there on page nine?

A. This is a summary of purchasers' annual allocations in metric tons of uranium. Basically, it lists all the purchasers at that

Page 2921

point in time, and it goes from year 1 through year 10 of system operation, and it gives their allocations for each specific year, and it also totals their first 10 years' worth of allocations.

Q. And how is this chart compiled?

A. It's, well, it's compiled by applying the OFF, oldest fuel first methodology to the APR, acceptance priority ranking.

Q. Could you explain to the Court what oldest fuel first or OFF is that you just referred to?

A. Yeah, that is the methodology that the Department uses for allocated acceptance capacity. Essentially, whoever discharges first comes first in the line, and the amount that's picked up by that, at that point in time, is the same as the amount of their discharge.

Q. And why does the Department use OFF as the method for determining the allocation?

A. To be consistent with what the contract says.

Q. Thank you. Could we bring up the line for Pacific Gas & Electric. That's about

Page 2922

three-fifths of the way down the page, very small, but could you explain to the Court what that line is intended to convey for Pacific Gas & Electric?

A. Yes. In year one of system operation, Pacific Gas & Electric would get 7.2 metric tons of allocation, of an allocation or acceptance capacity. In year two, the number would be 6.1; in year three, 2.6; and in year four, 13 metric tons of uranium.

Q. And how many –

A. And the total, excuse me, the total would be 28.9 for all, for their first 10 years.

Q. Thank you. Do you understand this amount of 28.9 to be the total amount of spent nuclear fuel held by PG&E at Humboldt Bay?

A. Yes, I do.

Q. How were the utilities supposed to use the information in table 3-1?

A. They will use that information to fill out their delivery commitment schedules.

Q. And how did DOE communicate to utilities how they were supposed to use this information in table 3-1?

Page 2923

A. It was communicated to the contract holders via the DCS instructions.

Q. And who issued those DCS instructions?

A. They were issued by the Department of Energy under signature of the contracting officer.

Q. And did DOE have any discussions with utilities concerning the instructions prior to the instructions being sent to – formally issued by the contracting officer?

A. Yes, we did. We had several discussions through an EEI/UWASTE group that we had regular discussions on waste acceptance issues with, and that was also conveyed, I believe, in several seminars, conferences, or presentations in nuclear industry trade meetings.

Q. And was a draft of the instructions provided to these utility groups?

A. Yes, they were.

Q. Why does the chart on page 9 present information only for 10 years?

A. The contract says we were to provide in the ACR 10 years' worth of allocations to the contract holders following commencement of

Page 2924

the DOE facility.

Q. Mr. Pollog, could we go to Appendix B of this exhibit, Defendant's Exhibit 187? It begins on page B1, but we can go to B2. Mr. Pollog, what is Appendix B to Defendant's Exhibit 187?

A. This is an extraction or subset of the 1991 APR.

Q. Okay. And could I direct your attention to page B6 of this document? There's an entry there for Pacific Gas & Electric about two-thirds of the way down. Do you see that, Mr. Pollog?

A. Yes, I do.

Q. Okay. Does that allocation tie up with the information we've just been looking at in table 3-1?

A. Yes, it does. It's consistent with, I believe, the year four allocation for PG&E in that table that we just discussed.

Q. Does this table and this line specifically tell you how much fuel DOE has to accept, pursuant to the oldest fuel first queue, in order for DOE to accept all of the fuel from PG&E at Humboldt Bay?

Page 2925

A. Yes, it does. In the last column, you'll see it says, "cumulative total MTU," to the point where PG&E's fuel would be accepted, 1,943 tons would also have been accepted cumulatively at that point in time.

Q. And is that all of the fuel that's depicted on this chart above that entry for Pacific Gas & Electric?

A. Yes, that's correct.

Q. Could we go to Defendant's Exhibit 175? Which my records indicate has been admitted already.

MS. SULLIVAN: Your Honor, may I approach?

THE COURT: You may.

MS. SULLIVAN: And, Your Honor, I did not move for the admission of Plaintiff's Exhibit 142. I'd like to move for the admission of 142. That's the memo that Mr. Pollog discussed. I apologize.

THE COURT: Tell me the distinction before I – is it to get his initials on it?

MS. SULLIVAN: It was just to tie it up that he actually had some knowledge of this document. I don't think the substance is any

Page 2926

different than Defendant's 164.

THE COURT: PX-142 is admitted.

MS. SULLIVAN: Thank you, Your Honor.

(Plaintiff Exhibit Number 142 was received in evidence.)

BY MS. SULLIVAN:

Q. Mr. Pollog, Defendant's 175 is a set of three documents. Do you recognize these documents?

A. Yes, I do.

Q. Would you identify them for the record, please?

A. Yes. The first document is a letter from John Bartlett to Richard Clark, chairman, CEO of Pacific Gas & Electric. The second letter is a letter from Carol Reuter, who's a contracting officer at that time, to Mr. J.E. Barrett, who was a contract administrator for Pacific Gas & Electric, and the third is a draft acceptance priority ranking that's dated May of 1991.

Q. Were you involved in the preparation of these documents?

A. Yes, I was.

Q. Could I direct your attention to the

Page 2927

second to last paragraph of the contracting officer's letter, the third page of the exhibit ending in Bates number 494, the paragraph beginning, "although," could we bring that out? Mr. Pollog, would you read that paragraph, please?

A. "Although the Department had previously indicated that the 1990 annual capacity report would be the final issue published, the Department has elected to continue publication of the ACR for planning purposes. The ACR will use the APR as the basis for the annual allocation for the total waste acceptance capacity to the purchasers. In accordance with the contract, purchasers may submit delivery commitment schedules based on these allocations beginning January 1, 1992 (Additional instructions for completing the DCS will be forthcoming later this year.)."

Q. Thank you. Mr. Pollog, does this paragraph that you've just read, is that the notice that was discussed in the memo to Dr. Bartlett from Mr. Milner, that is Defendant's Exhibit 195, pursuant to the

Page 2928

issuance of the 1991 APR?

A. Yes, I believe so.

Q. Mr. Pollog, were you involved in the preparation of the draft APR?

A. Yes, I was.

Q. How was it prepared?

A. We gather from utilities, we collect data on something called the RW-859 report, which is a nuclear fuel data form, at this point in time being collected, I believe, on a yearly basis. The utilities on that form told us basically what their discharges were, historical discharges were. So we just took the information that they had told us about their discharges, and we ranked them and developed this document.

Q. Why was this draft distributed to contract holders?

A. We thought that this process was extremely important for both parties, for the Department and for the contract holders. Prior to finalizing or issuing a final APR, we wanted to issue a draft one, give them one last chance to say, is the information in this document correct or not.

Page 2929

If it was not correct, please tell us so, and we will try and resolve this issue prior to issuing a final APR.

Q. And why is the information set forth in the APR so important?

A. Because that would form the basis for the allocations in the ACR, which would form the basis for the delivery commitment schedule process.

Q. Were there changes made between the draft and the final 1991 APR?

A. Yes, there were.

Q. What were the nature of those changes?

A. I don't recall very many specifically, but a utility was likely to say the date that we have for an assembly was incorrect, an assembly that they had declared temporarily discharged is now permanently discharged, or an assembly that they had declared permanently discharged had now been reinserted in the core, was no longer permanently discharged, something to the effect – that would affect the status of assemblies that had been historically discharged and how they had been labeled, whether permanently discharged or temporarily

Page 2930

discharged.

Q. Thank you. I'd like to now show you Plaintiff's Exhibit 161, please.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you recognize what's been marked as Plaintiff's Exhibit 161?

A. Yes, I do.

Q. Would you identify it for the record, please?

A. Yes, it is a letter from Mike Detmer, who was the contracting officer at that time, to Mr. Barrett, who was the contract administrator for Pacific Gas & Electric, transmitting the final acceptance priority ranking for 1991.

Q. Could we bring up the second paragraph of the letter? And, Mr. Pollog, could you read that paragraph into the record, please?

A. "The 1991 APR reflects purchaser comments and corrections, as appropriate, to draft APR, which was sent to all owners of SNF on May 15th, 1991. The majority of the

Page 2931

comments on the draft APR involved changes in the status of the SNF from temporarily discharged to permanently discharged, resulting in the SNF's inclusion in the ranking. The proposed changes were incorporated into the ranking when the Department determined the information accurately represented the current SNF designation and the owner of the SNF committed to making the appropriate designation change officially in their next nuclear fuel data form, RW-859, submittal and, when appropriate, revising the standard disposal contract's Annex B to Appendix G form (standard remittance advice for payment of fees), which identified assembly status for all in-core, temporarily, or permanently discharged SNF as of April 7th, 1983."

Q. Thank you. Monitored retrievable storage, the paragraph that you've just read, does that accurately summarize the nature of the changes that you made between the draft APR and the final APR that was issued in 1991?

A. Yes.

MS. SULLIVAN: Your Honor, at this time, we move for admission of Plaintiff's

Page 2932

Exhibit 161.

THE COURT: PX-161 is admitted.

(Plaintiff Exhibit Number 161 was received in evidence.)

BY MS. SULLIVAN:

Q. Mr. Pollog, I'd now like to look at Defendant's Exhibit 189 with you.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 189. Do you recognize this document?

A. Yes, I do.

Q. Would you identify it for the record, please?

A. It is the 1991 acceptance priority ranking.

Q. And I believe you already testified, but were you involved in the preparation of this document?

A. Yes, I was.

Q. And what involvement did you have in preparation of this document?

Page 2933

A. Similar to the 1991 ACR, which I described earlier, that is, I would have reviewed the draft version from our contractor, resolved comments with them, and then after we were satisfied, I would have had it circulated for comments throughout the affected organizations and the Office of Civilian Radioactive Waste Management and other parts of the department.
I would have gotten comments from those organizations and would have resolved those comments and, after that, would have gotten the document approved for publication and then published.
Q. And was 1991 the first time DOE published the APR?
A. Yes.
THE COURT: For the record, the Court will receive briefing on, that relates to this document as PX-159 – PX-157, sorry.
MS. SULLIVAN: Which has been admitted.
THE COURT: Both of those things I just said were incorrect. PX-158, however, would be right.

Page 2934

MS. SULLIVAN: And that has already been admitted, Your Honor.
THE COURT: That's in.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Continue on this, the pagination and everything is the same.
MS. SULLIVAN: Oh, Your Honor –
THE COURT: We're just, hold on for just a second, we'll come to the bottom of this. We are returning to where you started, Ms. Sullivan, which is at DX-189.
MS. SULLIVAN: Very good, Your Honor.
THE COURT: Everything else is, what do we say, inoperative.
MS. SULLIVAN: Very good. Thank you, Your Honor.
MS. SULLIVAN: And just to close it out, I'd like to move for admission of Defendant's Exhibit 189 at this time.
THE COURT: DX-189 is admitted.
MS. SULLIVAN: Thank you, Your Honor.
(Defendant Exhibit Number 189 was received in evidence.)
BY MS. SULLIVAN:
Q. Mr. Pollog, could we go to page four

Page 2935

of this document, and could we bring up the entry for Pacific Gas & Electric? And, Mr. Pollog, could you explain to the Court what information is contained on that line that is highlighted?
A. Yes. In the first column, it's the purchaser, and that would be Pacific Gas & Electric, and this is concerning a discharge that they had made. The fuel originator would be Humboldt Bay. The storage location is also Humboldt Bay. Then the type of fuel would be BWR, or boiling water reactor fuel. Then there would be the discharge date, which would be June 5th of 1971, the number of assemblies, which are 40, the MTU value of those entries, which is 3.054, and in the final column would be cumulative total metric tons of uranium that have been discharged, including this discharge to this point in time, and that would be 126.01 MTUs.
Q. Thank you. And could we go to the next page, page five, and we'll bring out the same, the entry there, the third line down, for Pacific Gas & Electric – no, third line from the top. And, Mr. Pollog, what does that entry

Page 2936

show witn regard to the MTU amount of the discharge on that line?
A. This discharge would be for 4.195 MTUs, and cumulative total at that point in time would be 355.10.
Q. So between – I'm sorry, did you say 4.1?
A. 4.195.
Q. So summing that amount with the amount we just looked at on page four, which is 3.054, it's approximately 7.2?
A. Yes.
Q. And do you recall, does that match PG&E's first allocation in the 1991 ACR, if you want to look at Defendant's Exhibit 187, table 3-1?
A. Yes, it does match with Appendix Exhibit 187, page nine, table 3-1.
Q. Thank you. Could we go to the very end of Defendant's Exhibit 189, page 34? Mr. Pollog, what is the date of the last discharge reflected in this document?
A. April 30th, 1991.
Q. And how much spent nuclear fuel had been discharged by standard contract holders at

Page 2937

this point in time?
A. 22,024.93 MTUs.
Q. Thank you. Can I have Plaintiff's Exhibit 136, please?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: You may.
BY MS. SULLIVAN:
Q. Mr. Pollog, are you familiar with what are known as facility interface capability assessments?
A. Yes, I am.
Q. Or also known as FICA reports?
A. Yes.
Q. And how are you familiar with those assessments?
A. During the time period when I was in the waste acceptance group in 1990, '91, and early '92, I was responsible project manager for this program.
Q. And you've been handed what's been marked as Plaintiff's Exhibit 136. Do you recognize this document?
A. Yes, I do.
Q. Would you identify it for the record,

Page 2938

please?
A. Yes. It is the facility interface capability assessment project report for the Humboldt Bay, cask handling assessment for the Humboldt Bay Power Plant unit 3.
Q. Could I direct your attention to page three of this document, please? And there's a table, two tables set forth on that page. Could you explain the information set forth in those tables?
A. Yes, it is assessment of the Humboldt Bay facility's cask handling capability for a DOE reference cask and second assessment level cask. It gives current status, and it also describes what would happen with revisions to the analysis at the facility and with modifications, physical modifications to the facility.
Q. At the time this report was prepared in 1990, did Pacific Gas & Electric have the ability to accommodate overweight casks at Humboldt Bay?
A. No, they did not.
Q. Did PG&E have the ability to accommodate 100-ton casks at Humboldt Bay?

Page 2939

A. No, they did not.
Q. And at the time this report was prepared in 1990, did Humboldt Bay have the ability to accommodate 125-ton casks at Humboldt Bay?
A. No, they did not.
Q. Mr. Pollog, can I direct your attention to page 10 of this document? Would you please – could we bring up the first paragraph under 4.2.1 at the bottom? Mr. Pollog, would you please read that paragraph into the record?
A. Yes. "Assuming successful completion of the relevant cask-drop analyses and elimination of the height problem, the plant could handle the 25-ton legal weight truck cask and the 40-ton overweight truck cask. In order to handle the 100-ton DOE reference cask, the existing 75-ton design capacity crane must be replaced or upgraded. The crane would either have to be single failure proof up to 100 tons or a cask drop analysis for the 100-ton cask would have to be performed. In addition, either the rail spur would have to be extended into the

Page 2940

receiving area or the cask would have to be transferred on a lowboy trailer to the point where the rails currently end."
Q. Thank you, Mr. Pollog. What does this report say regarding modifications that would be necessary at Humboldt Bay to accept larger casks?
A. They would have to do analyses. They would have to do tension crane upgrades. They would have to do several different things in order to handle those casks.
Q. Thank you. Mr. Pollog, you testified earlier, you mentioned something called the RW-859 form, referencing your testimony about the APR. What is the RW-859 form?
A. It is a nuclear fuel data form that the Department used to collect information from the utilities. We use it to collect historical discharge data and also future projected discharges.
Q. And what responsibilities do you have with regard to the RW-859 forms and the data collected from utilities?
A. I am currently the project manager for DOE for the RW-859 data collections.

Page 2941

Q. What information do utilities provide on the RW-859 report, specifically?

A. They provide historical discharges from their facilities. In addition, they provide characteristics of the fuel when it was discharged, such as the burnup of it, the initial enrichment, whether it's failed or not, whether it's canistered, storage location, whether it's in pool or whether it's in dry storage at the facility, pool capacities at their facility.

They also provide future discharge information, when they expect their next five discharges will be and how much, how many assemblies or metric tons will be in each discharge and what the expected burnup is of those assemblies.

Q. Are utilities required to submit these forms?

A. Yes.

Q. Required pursuant to the contract to submit these forms?

A. Sort of. The contract has an Appendix B, which is future discharge projections. At the time the contract was enacted or signed,

Page 2942

the Department was already collecting similar information on the RW-859.

So in lieu of ever collecting information on the Appendix B to the contract, an agreement – somehow, there was an agreement made between the contract holders and the Department, where the RW-859 would settle, would serve as a replacement for Appendix B of the contract.

Q. Thank you. Prior to 1998, did some utilities report the storage of fuel in dry storage facilities?

A. Yes, they did.

Q. Can you provide me with an example of a utility?

A. Calvert Cliffs or Oconee or Arkansas Nuclear One.

Q. With regard to pool capacity on the RW-859 forms, do utilities report their licensed capacity or their installed capacity?

A. They report both.

Q. And what is the difference between these two capacity figures?

A. License is what they are licensed to store under fuel, according to their license

Page 2943

with the NRC. The installed or available capacity for what – how much of that capacity they could actually use. Not all the cells in their pool, even though they have a license to store them, can be used for different reasons.

They're being used for storage of other materials, there's obstructions reaching those cells, so the installed or available capacity will be usually a little less than what's their licensed capacity.

Q. Do the reported pool capacities change between RW-859 reports?

A. Yes.

Q. And why do those change?

A. Cells that are available from one report to the next report will not be available because they're using them for something else. They have put some other materials that need storage, or for some other reason, they are no longer able to physically access those cells.

Q. Are utilities required to report their full core reserve policies or practices on RW-859 forms?

A. No, they are not; not currently.

Q. Turning to discharge information –

Page 2944

MS. SULLIVAN: Okay. Your Honor, could we take a break here? I'm at a breaking point right here, if that's all right?

THE COURT: Let me just be sure. Why don't we move in, while we're thinking of it, PX-136, which is admitted.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: We'll be in recess for 10 minutes. The witness may step down.

(Plaintiff Exhibit Number 136 was received in evidence.)

(Whereupon, a short recess was taken.)

THE COURT: Direct examination of Mr. Pollog continues. The witness continues under oath.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Pollog, we were talking about the RW-859 forms. With regard to discharge information, what historical discharge information do utilities report on the RW-859 form?

A. They report what fuel was discharged when – such as how much was in the discharged number of assemblies in the MTU, also the date

Page 2945

of the discharge, characteristics of the fuel that had been discharged, such as its burnup and its initial enrichment, other characteristics, such as whether it's failed, whether it's canistered.

Q. What projected discharge information do utilities provide?

A. They provide when their next five discharges will be, the frequency between those discharges, how much is going to be in each discharge, the burnup of the discharges.

Q. What are the typical cycle lengths that utilities report?

A. 18 to 24 months.

Q. Have you had occasion to compare utilities' projected discharges against the actual discharges reported on the next form or next report?

A. Yes, I have. Yes, I have.

Q. And do utility future projections sometimes not match actual discharges?

A. Yes, that's correct.

Q. And why would that be?

A. A utility may shut down for a period of time due to some type of maintenance

Page 2946

situation or equipment malfunction causes them to do a long-term maintenance fix for the problem. They may have regulatory issues with the NRC that causes them to shut down for some extended period of time.

Just in general, we have found they tend to overpredict a little bit the amounts in the burns of their spent fuel, just a slight amount, but it's usually consistently been a little bit of an overprediction.

Q. What fuel characteristics do you ask utilities to report on their RW-859 form?

A. The burnup of it, the enrichment, whether it's failed or not, and whether it's canistered.

Q. When you say, "canistered," what do you mean by that?

A. A single element, a single assembly will sometimes be in a canister.

Q. What is burnup?

A. Burnup is the product of how long an assembly is in a reactor core and how much power is produced for that period of time, so you multiply the power level times the amount of time in the core, and that gives you the

Page 2947

burnup.

Q. And what is enrichment?

A. Enrichment, we usually say enrichment of uranium-235. That is the percentage of uranium-235 compared to total uranium content of the assembly.

Q. The discharge information that is collected on the RW-859 form, is that information maintained in a database?

A. Yes, it is.

Q. Do you have a responsibility for that database?

A. Yes, I do.

Q. How is the discharge information reported by utilities used by DOE?

A. It has various usages by DOE. We take the historical and the projected, and we try and determine what the total amount of spent fuel that will be generated in the history of nuclear power. We do that to basically see if Yucca Mountain is physically capable, large enough of handling all the fuel that will be generated in the history of nuclear power in this country.

Also, we use it for TSLCC, which is

Page 2948

total system life cycle cost. We use it for fee adequacy, our fee adequacy assessment, the 1 mil per kilowatt hour is an adequate amount. We use it for design basis waste stream. We use it to respond to inquiries from the public, from Congress, from DOE management, anyone who has interest in this type of information.

Q. Do you use the information in the database in the preparation of the ACR and the APRs?

A. Yes, we do also for the ACR and APR.

Q. You mentioned the design basis waste stream. What is that?

A. That was an attempt, or is an attempt by a part of our program to predict the incoming waste stream into the Civilian Radioactive Waste Management System. They're trying to predict what fuel will be coming at what given points in time in the future.

Q. And why is that important?

A. It's important for design of facilities, casks, ordering casks, if we will need any type of long-term storage at the facility at Yucca Mountain, basically for design and handling operations at the facility.

Page 2949

Q. Why is the total amount of spent nuclear fuel generated by utilities significant or important to DOE, or determining that amount important or significant to DOE?

A. Well, Yucca Mountain is only so big. We try and determine if it's big enough to hold all spent fuel that may be generated in the history of nuclear power for this country.

Q. Do you have an understanding as to DOE's contract obligation with regard to the total amount of spent fuel generated by nuclear utilities?

A. Yes, I do. We believe we are obligated to accept all fuel generated by utilities under contract.

Q. Could you explain to the Court how you generate future projections?

A. Yes. Utilities in the 859 give us their next five cycles for discharge. That amount of fuel and those discharges correspond to a certain amount of energy that will be produced, they expect to be produced, but another part of the Department, the EIA or Energy Information Administration, also projects how much nuclear energy they expect to

Page 2950

be produced in this country. So when energy balances back, we try and equalize those two amounts, we go from the EIA's projection to what utilities expect, and then we will adjust accordingly, based upon equalizing those amount, what we expect the discharges to be for the next five cycles and beyond. We go through, basically, the end of their operating license, and depending upon the scenario, we may or may not assume license extensions.

Q. What decisions can utilities make that affect the accuracy of DOE's projections as to the total amount of spent fuel that will be generated?

A. Well, basically, again, when they're going to shut down, shut down early, if they're going to shout down for any type of maintenance, long-term issues that need to be resolved at their facility, they'll be the ones to determine how hard they're going to run their fuel, what bumup levels they're going to get.

They'll determine what the capacity factor at their facility is going to be. All

Page 2951

of these factors have an impact on what the amount of fuel generation will be.

Q. You mentioned a capacity factor. What is a capacity factor?

A. A capacity factor is a measure of how much energy was produced in a year compared to the theoretical total amount of energy that a facility could produce.

Q. Is it roughly equivalent to a measure of efficiency?

A. Yeah, roughly.

Q. Thank you. And are you familiar with the term called "up rating"?

A. Yes, I am.

Q. What is up rating?

A. Up rating is utilities are seeking to up rate their licensed power amount. They are licensed by NRC to produce a certain level of power. They are currently operating what they are licensed to produce, so they're going to a couple of percentage higher, were seeking a couple of percentage higher amounts, to produce that much more electricity.

MS. SULLIVAN: Your Honor, we have two demonstratives, two single demonstratives that

Page 2952

we'd like to show Mr. Pollog and have him talk to, and I have two copies for the Court and copies for –

THE COURT: Right. Have these been delivered in our time?

MS. SULLIVAN: Yes, actually. Do you have your copies with you?

MR. STOUCK: Did I get copies?

MS. SULLIVAN: Yes, I faxed them to you.

MR. STOUCK: When?

MS. SULLIVAN: They were faxed by my office to you on Monday, I believe. No, Tuesday, the 13th, at 11:00 a.m.

MR. STOUCK: Okay. May I just take a look at it?

MS. SULLIVAN: Sure.

MR. STOUCK: Your Honor, and before I see that, it's interesting, I don't understand the relevance of this, and I've sort of been hesitating to object.

THE COURT: Well, it's direct examination of case-in-chief, so we'll wait and see what happens.

MR. STOUCK: Can I take a minute to

Page 2953

look at this?

THE COURT: The United States is well within its time, so my statement on relevance generally, for big pieces of relevance like this, is the day is still young.

MS. SULLIVAN: Thank you, Your Honor. Can I get this back? It's my file copy.

MR. STOUCK: Yeah, okay. Can I have just one moment to look at it, Your Honor. And, again, I was here at 11:00 Tuesday. I don't know why it didn't come in.

THE COURT: Certainly.

MR. STOUCK: This says source draft mission plan and 1991 draft mission plan. Is that where this data comes from? I'm just curious.

THE COURT: You can wait to ask your question.

MR. STOUCK: That's fine.

THE COURT: We can wait.

MS. SULLIVAN: I apologize, Your Honor.

THE COURT: There's a question Mr. Stouck asked about the demonstrative. The Court would really like to have one though.

Page 2954

MS. SULLIVAN: Yes, Your Honor. I apologize. There are two copies for the Court.

THE COURT: And there is a question from the Plaintiffs about the source of the information.

MS. SULLIVAN: Yes.

MR. STOUCK: It cites, at least for one page, the source of information as the two draft mission plans. Is that where this – can I find that information?

MS. SULLIVAN: Uh-huh, it's also information taken from Mr. Pollog that Mr. Pollog put together, his knowledge as to these factors.

MR. STOUCK: Okay.

BY MS. SULLIVAN:

Q. Mr. Pollog, can you turn to what's been marked in the lower right-hand corner as Pollog Demonstrative 1, which is also on the screen? Do you recognize this sheet, this demonstrative?

A. Yes, I do.

Q. What is it?

A. It is a summary of industry trends from the early '80s to the present, talking

Page 2955

about different factors which affect spent fuel generation rates and the total amounts of spent fuel that will be generated for nuclear power.

Q. And what is the source of information contained on Pollog Demonstrative 1?

A. The majority comes from the RW-859 report or the data, the license extensions we would have received, gotten from the NRC's website.

Q. Mr. Pollog, could you explain how the factors listed there on the left-hand side, how these factors have changed over time?

A. Yes. In the early '80s, capacity factors at the nuclear plants were running between 50 and 60 percent, and that's currently right around the 90 percentile mark. In those days, the enrichment was approximately two-and-a-half percent, and now, it's ranging from four-and-a-half to five percent. The burnup in the early '80s was approximately 30,000 megawatt days per metric ton of uranium, and now, it's somewhere around 50,000 megawatt days per metric ton. Again, in the early '80s, there were three shutdown reactors, and now, we have 14. There are no

Page 2956

license extensions. There was not even a discussion of license extension in the early '80s, and now, we have 51 reactors, they either received a license extension or applied for one, and then an additional 18 have announced their intention to apply for license extensions.

THE COURT: Before you go on, the enrichment, you mentioned U-235, but how does this factor in and what happens, what's this about?

THE WITNESS: If you have a higher enrichment, initial amount of uranium-235 in your fuel, you'll be able to keep it in your reactor longer and burn it more.

THE COURT: What do those two numbers mean with respect to that population you just made, 2.5 percent and 4.5 to 5 percent?

THE WITNESS: In the early '80s, the uranium-235 content was 2.5 percent of the total uranium content in the fuel. Now, it's somewhere around four-and-a-half to five percent of uranium, so it basically doubled.

THE COURT: How has that occurred? Has someone obtained fuel that has a higher

Page 2957

U-235 content?

THE WITNESS: Yes. I mean, uranium enrichers, uranium fabricators out there and utilities are now seeking uranium from these companies with a higher uranium-235 content.

BY MS. SULLIVAN:

Q. And just to make a correction to the record, Mr. Pollog, I believe you testified that there had been 51 – I'm sorry, 15 license extensions, is that correct?

A. 51, I believe, I hope I said 51, I should have said 51, if I did not.

Q. I think there's just a misspoke. I just want to clear up the record. Mr. Pollog, could we turn to Pollog Demonstrative 2, please? Do you recognize this demonstrative?

A. Yes, I do.

Q. What is this demonstrative intended to convey? What is the information in this demonstrative intended to convey?

A. It conveys how, in '83, we expected to see 140,000 metric tons of uranium produced in the history of nuclear power, and then that number dropped to about 83,000 by the early to mid-'90s, due to early shutdowns, and there was

Page 2958

no talk of license extension.

Currently, the number is back up to about 130,000 of metric tons of uranium, mostly due to the license extension phenomenon, where utilities are getting, seeking from the Nuclear Regulatory Commission a 20-year extension of their license, of their operating license.

Q. And what was the source of the information set forth on Pollog Demonstrative 2?

A. Okay. It's from the 1984 draft mission plan, the 1991 draft mission plan, and then the current number would just be results of our analyses based upon using 859 data for program objectives right now, such as TSLCC or fee adequacy or other systems studies we do.

Q. And do you know what the projected annual discharge rate, projected discharge rate for 1998 was in the 1983 timeframe?

A. Yeah. In that time period, they were projected there would be about 3,000 metric tons of uranium that would be discharged per year. Currently, though, we're seeing approximately 2,000 metric tons of uranium being discharged per year.

Page 2959

Q. Do you have an understanding as to why this annual rate today is lower than it was projected to be in the 1983-1984 timeframe?

A. Yes, and that would be for several reasons, one of those would be, again, the increased enrichment of the fuel uranium-235 content is higher, so you can keep it in the reactor longer and burn it longer.

Also, you're getting increased bumups from the fuel, so it's staying in the reactor longer and producing more power. And also, I think in the '83 timeframe, they were probably envisioning more reactors being in operation than currently are right now.

Q. Given the annual generation rate is lower today than it was projected to be in the 1983-'84 timeframe, why is the total amount of spent nuclear fuel expected to be generated by utilities close to the original estimate of 140,000 MTU?

A. That's just the way the numbers worked out.

Q. Does license extension figure into that?

A. Yeah, license extension is the primary

Page 2960

reason for seeing the increase from 83,000 to 130,000, that's so close to what it was in 1983, the 130 and the 140, it's just by chance.

Q. And do DOE's projections with regard to 130,000 MTU total generation, that amount, do those projections account for the possibility of new reactors coming online?

A. No, they do not.

MS. SULLIVAN: One moment, Your Honor. We have nothing further, Your Honor.

THE COURT: Thank you. The Plaintiffs to cross-examine.

MR. STOUCK: Thank you, Your Honor. Well, I guess on this, let me just say I am sorry that I didn't have my copy with me, but could I just ask someone, would you go in the back room and get me these two documents, which are probably stacked on the table? I just want to ask some questions about the source of the data. I can do that later.

CROSS-EXAMINATION

BY MR. STOUCK:

Q. How you doing, Mr. Pollog?

A. Fine. Thank you.

Q. We have met before, yes?

Page 2961

A. Yes.
Q. You were asked some questions about Plaintiff's Exhibit 136, the facility interface capability assessment report, I guess I'll call it. Do you recall that document? Would you take a look at that, please?
A. Yes.
Q. Now, you mentioned, I think you've said that your involvement was you were the project manager for waste acceptance on these, on this, these FICA things?
A. I was project manager for the FICA study for the period of time I was in the waste acceptance group.
Q. For the entire FICA study?
A. Yes.
Q. Do you remember who the contractor was?
A. Yes.
Q. Who was it?
A. We had contracted through Oak Ridge National Lab, and I believe they subcontracted out to NAC.
Q. Okay. So this, am I correct that this is one of the, this is a report on one

Page 2962

particular plant, correct, which is the Humboldt Bay Plant?
A. Correct.
Q. And do you know whether there was some compilation of these individual reports, in other words, an overall analysis of what the whole number of individual plant reports looked like?
A. Yes.
Q. There was?
A. Yes.
Q. Okay. And if I could, you were asked some questions about page 7 – I'm sorry, page 10, I think. Are you there?
A. Yes.
Q. And I'd just like to follow up on those. Do you know whether spent nuclear fuel has ever been shipped away from the Humboldt Bay facility?
A. Yes.
Q. Yes, you know, or, yes, it has?
A. Yes, I know.
Q. Yes, you know. And has it?
A. I believe it has.
Q. Okay. And what were the circumstances

Page 2963

of that, do you know?
A. I believe it was in the late '60s, early '70s, it was sent to West Valley for processing.
Q. And do you know that those shipments were made by rail?
A. I don't know the mode off the top of my head, no.
Q. You do know that – well, do you know, let me ask that, do you know whether it would be necessary, do you know whether PG&E could rent a crane suitable for lifting these 100-ton casks, rather than upgrading its own casks?
A. I don't know.
Q. Do you know what this, on page 10, bottom of the first paragraph, there's a reference to a lowboy trailer, do you see that?
A. I see it.
Q. In fact, let's read the whole sentence. It says, "In addition, either the rail spur would have to be extended into the receiving area or the cask would have to be transferred on a lowboy trailer to the point where the rails currently end." Do you know what a lowboy trailer is in that context?

Page 2964

A. I believe so.
Q. What is it?
A. I think it's a trailer that is just low to the ground.
Q. Do you know whether it could hold a 100-ton cask?
A. No, I don't.
Q. This study was not an effort to determine the costs of making any modifications to the Humboldt Bay facility that might be necessary to accommodate 100-ton casks, correct?
A. Correct.
Q. And you don't know what costs would be involved in making such modifications?
A. No, I do not.
Q. And do you know whether or not the spent fuel in the Humboldt Bay spent fuel pool could currently be transported away from the site in truck casks?
A. Currently.
Q. Yeah?
A. Or at the time when this report was written?
Q. Let's say at the time the report was

Page 2965

written. Thank you.
A. I think legal – if I remember correctly from reading this, I think it would have difficulty because of the crane issue.
Q. Take a look back on page three. This was the chart you were looking at, right?
A. Yes.
Q. Does anything on this chart help you with the answer to the question about whether or not the Humboldt Bay spent fuel could be shipped away from the site in truck casks?
A. According to this table, the current status was it could not be shipped in either a legal weight truck or overweight truck.
Q. But could, with revision to analysis?
A. Yes.
Q. Do you recall, in the context of this study, what revisions would be needed in that instance to make it suitable for these truck casks?
A. Vaguely.
Q. Okay. What do you recall?
A. I think they had to do a cask drop analysis. There may have been some analysis to the crane itself, but I don't recall the

Page 2966

latter.
Q. Okay. Just a couple of questions about the, about I think what's been introduced as PX-158, which is the 1991 annual capacity report.
A. Can you say the number of that again, please?
Q. Your copy, I believe, has DX-187 on it, but it's the December 1991 annual capacity report. And do you have that?
A. Yes, I have the 1991 annual capacity report in front of me.
Q. Does it say DX-187?
A. Yes, it does.
Q. I think it's been admitted in evidence as Plaintiff's Exhibit 158, so we need to keep that straight. On the bottom of the first page, Mr. Pollog, I just want to make sure we're straight on this, the last sentence that starts on –
A. You're on?
Q. Page one?
A. I or English numeral?
Q. English – I don't know. It's Arabic, I'll call it, is that okay? English would be

Page 2967

fine. It's not Roman.
THE COURT: What's the section? What's the title?
BY MR. STOUCK:
Q. It's 080, please, section 1.1. Excuse me. Are you there?
A. Yes, yes.
Q. Bottom of the page, last sentence starting here, it says, "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." Do you see that?
A. Yes.
Q. And that was certainly your understanding?
A. Yes.
Q. Yes. Now, I just had a question about the relationship. Ms. Sullivan asked you – the relationship between that document on the one hand and the '91 ACR priority ranking, which is DX-189, which I think is also up there.
A. Yes, I have it.
Q. If you look at page nine of the first

Page 2968

document, the ACR, I think she asked you some questions about this table that's entitled, "Summary of Purchases Annual Allocations." Do you recall that?
A. Yes.
Q. And does that data on that table come from this document alone, or do you have to get some of the data for that table from Defendant's 189, the APR?
A. Can you say that again for me, the number?
Q. There's a table on page nine, which has these allocations?
A. Yes.
Q. Let me ask it this way, where does that data come from?
A. It comes from the APR.
Q. Okay. It comes from this other document, DX-189?
A. Well, it comes from that and also comes from Appendix B to this document.
Q. That was really my real question here, which is what's the relationship between the information that's in Appendix B on the one hand and, on the other hand, the information

Page 2969

that is provided in the APR starting on page four, it's Bates number 0430, which is this chronological listing of discharges. Can you just give us an understanding of the relationship?
A. Yes, Appendix B is an extraction for a subset of the APR. The APR goes through all discharges, I believe, until -- I think the last is April 4th, 1991 discharge, by general comments.
Q. Okay.
A. The Appendix B to Defendant's Exhibit 187, the ACR only has discharges for the, I believe, going through 8,200 MTUs, so it stops with a May 17th, 1982 discharge.
Q. Is it otherwise the same data up through '92 -- or to '92?
A. Through '82.
Q. I'm sorry, '82. Thank you.
A. Yes.
Q. Okay. But in order to construct this table on page nine of the ACR, do you need the data from the APR?
A. Yes.
Q. So the two documents were prepared in

Page 2970

conjunction with one another, apparently?
A. Yes.
Q. Okay. Again, just for the record, the APR -- let me not say it that way. Is the APR, in your understanding, also for planning purposes only?
A. I'd have to see what the exact term in the contract says about production of the APR. My understanding, I don't believe so, but I would have to go back and see what the exact text in the contract says regarding the production and use of the APR.
Q. We have that, DX-54 -- PX-54, PX-54, I think we have.
THE COURT: I recommend the next time these parties meet that we, that you provide the Court with the organic documents in the form of JXes.
BY MR. STOUCK:
Q. Did you find the provision in the contract you were looking for?
A. Yes.
Q. What page is it on?
A. It's on two places. It's on page 10 and also page 14.

Page 2971

Q. And what is there on page 14 that refers to the APR that relates to my question?
A. In the middle of the page, there's a heading, "B, acceptance procedures."
Q. Yes.
A. There's a number one under that.
Q. Yes.
A. Acceptance priority ranking.
Q. Yes.
A. That section.
Q. Okay. Well, let me come back to that in a second. The base question is the 1991 acceptance priority ranking is for planning purposes only also, is that correct?
A. I don't think so.
Q. What is your understanding of the use of this document?
A. It's to be used to give us the OFF queue, which is how we allocate acceptance capacity, and it would be the basis through the ACR for purchasers or contract holders submitting their delivery commitment schedules.
Q. Not for planning purposes?
A. Correct.
Q. For what purpose?

Page 2972

A. For committing each party to a certain action, to the purchaser saying, here's the fuel we want to deliver to you, and for DOE to accept or to agree, this is the fuel we're going to take from you in this particular year.
Q. That's your understanding of the purpose of DX-189?
A. It's to provide us with the OFF queue for allocating the acceptance capacity to the purchasers, yes.
Q. And when you look at the contract, and page 10, I guess, you were looking at this paragraph B, is that where you were looking? I'm just --
A. Page 10, I'm on 5A.
Q. 5A?
A. On page 10.
Q. Okay. Got it. That's where you got the understanding, is that where you get the understanding you just gave me about what this document is?
A. Yes.
Q. And what do you learn from page 14 about what this document is?
A. Tells us about the delivery commitment

Page 2973

schedule process or discusses it at least,
delivery commitment schedule may require
proposal, and it talks about the following
acceptance priority ranking will be utilized.
Q. So is it your understanding that the
ranking in the 1981 acceptance priority, if
there were no DCSes, would this be
contractually binding, this ranking on the
parties?
A. No.
Q. That's your understanding, it's this
in conjunction with the DCSes?
A. It's this utilizing the ACR and then
the DCS process.
Q. Thank you. Let me see here. You
said – still with the – I just want to –
MR. STOUCK: May I just confer for a
moment, Your Honor?
THE COURT: Fair enough.
MR. STOUCK: Just want to make sure he
was asked about a subject before I go into it,
Your Honor, so we don't step outside the bounds
of direct. While my colleague is looking for
that, I'll move on.
MR. STOUCK: Let me just ask the

Page 2974

question and see if I draw an objection.
That's probably the easiest way to do it.
BY MR. STOUCK:
Q. Is it your understanding that once the
DCSes are approved, then they become binding on
the parties?
A. Yes.
Q. Okay. Now, do you know whether, I
think you did say this, do you know whether DOE
has an obligation, I believe you did testify to
this, do you know whether DOE has an obligation
to pick up under the contract that we've looked
at here, the spent fuel contract with PG&E,
spent nuclear fuel that PG&E currently has that
is not described in an approved DCS?
A. That we have under the contract an
obligation to accept all fuel that a contract
holder has, yes.
Q. Okay. So that would include fuel
that's not described in an approved delivery
commitment schedule?
A. That's correct.
Q. Okay. So the significance of the
approved delivery commitment schedule is that
it fixes the time of pickup, is that your

Page 2975

understanding?
A. It ties us into a specific obligation
to taking that fuel in a certain year.
Q. So is it your understanding that DOE
does not have any obligation to take the rest
of the spent nuclear fuel at PG&E that's not
described in the delivery commitment schedule
at any particular time?
A. A fixed date for acceptance has not
been set, yes.
Q. Okay. Thank you. When we were
looking at, I just want to ask you now about
the – do we have a copy of this, of the
mission plan? I want to ask you a couple
questions about the demonstratives, if I may.
MS. SULLIVAN: I'm sorry, Counsel,
which exhibit?
MR. STOUCK: It's a demonstrative,
Exhibit Defendant's 183, I think, is cited as
the source of, is one of the sources of data,
and I don't believe Mr. Pollog has that, but if
we have some extra copies around.
BY MR. STOUCK:
Q. I'm just curious specifically which
data comes from this plan that's on your chart,

Page 2976

on your demonstrative, and also, you know, if
you can just show me where it is.
A. Yes.
Q. Counsel has suggested looking at page
one, Mr. Pollog. I'm just passing that on.
THE COURT: Do we also have a PX on
this? By the way, we discussed it with
Mr. Kouts, but I think it may have had a PX at
that time as well.
MR. STOUCK: I believe this first came
up on Mr. Kouts' direct.
THE COURT: Yes, it did. It's PX-155.
Let's just see if that – we're going to look
up here at our desk and see if that's the right
document. They're both on the screen now, so
you can compare and contrast.
MR. STOUCK: Looks the same, Your
Honor. Why don't we go with the Plaintiff –
what's the number?
THE COURT: It's PX-155.
MR. STOUCK: Thank you.
THE COURT: Doesn't make any
difference to the witness you're examining.
Just tell him what page.
MR. STOUCK: Well, I'm asking the

Page 2977

question. His counsel was suggesting, I believe, page one. Is that right?
MS. SULLIVAN: I think he's looking for something else.
MR. STOUCK: He's looking for something else. Okay.
THE WITNESS: Yeah, it's on page one. It also is on page 202.
BY MR. STOUCK:
Q. And page one, again, is – what are we looking? Thanks for going through this with me. We hadn't seen at least the data you'd extracted before, although, apparently, I did get this demonstrative, but what on page one is shown on this chart, and where do you get the information?
A. The second paragraph, estimated total of 84,000 metric tons of uranium will have been generated.
Q. Okay.
A. And if you look on page 202, there's a table B-1.
Q. 202. 202?
A. Yes.
Q. Yes.

Page 2978

A. You look at no new orders case, 2040, year, the amount 84,100.
Q. And the 20,000 metric tons accumulated to-date, do you know where that data comes from?
A. I would, not positive, but I would guess it comes from the RW-859 data.
Q. Thank you. And, again, what data on here, just to see if we can do this generally, what data on this sheet comes from the April '84 draft mission plan?
A. April '84?
Q. April 1984, I think is what's cited on one of the pages here, Demonstrative 2.
A. Yes. That's probably the 140 number.
Q. The 140 number?
A. For projections 1983.
Q. Okay.
A. MTUs, 140,000.
Q. Well, when you say, "probably," is that –
A. Pretty sure.
Q. Did you prepare this chart?
A. I believe so.
Q. You testified about a lot of data with

Page 2979

Ms. Sullivan. Am I correct that you did not talk – or maybe I'm not correct. Tell me if I'm correct. Did you discuss with her in your testimony pool capacities, current pool capacities or pool capacities at any time at commercial nuclear plants?
A. Yes.
Q. Is that data collected on the 859s?
A. Yes.
Q. Okay. And for what purpose?
A. It's always been on the 859 forms. I don't know why it was put there originally, but it has been there, and it's something that's been collected, I believe, since we started doing 859s.
Q. And do you use that in your work?
A. Yes, I do.
Q. For what purpose?
A. It tells us when pools will be filling up, when we project facilities to go into dry storage.
Q. And why is that important for the mission of OCRWM?
A. We get asked that question by our upper management, by Congress, by the public.

Page 2980

MR. STOUCK: Okay. Thank you, Your Honor. I believe I'm just about done. Let me ask one more question about this document, and then if I may confer and I think we can wrap this up.
BY MR. STOUCK:
Q. Back on 202 here, of Defendant's, I guess, Plaintiff's 155, but it's a draft mission plan amendment from 1991, Mr. Pollog?
A. Yes.
Q. Does this mean that DOE was planning on picking up as much as – I mean, the 115, at that time, it was planning on picking up as much as 115,000 MTU?
A. DOE was planning on picking up all, everything under contract, that's all fuel that will be generated, that is the program plan.
Q. Regardless of the 70,000-ton capacity limit in the 1982 Act?
A. Yes.
Q. That's your understanding?
A. Yes.
MR. STOUCK: If I may just have a moment to confer, Your Honor? I think we can, as I say, I think we're done, but I just want

Page 2981

to have a moment, if I may.

THE COURT: Certainly.

MR. STOUCK: Thank you for that, Your Honor. I am indeed finished with Mr. Pollog. I have no further questions.

THE COURT: Are there any questions on redirect?

MS. SULLIVAN: No, Your Honor. We have nothing further. Thank you.

THE COURT: Thank you. Before I discharge you as a witness, which I will do in a moment, sir, I want to give you a directive that I'm giving to all witnesses who testify in the case. The parties have requested, as they are entitled to under the Federal Rules of Evidence, that the witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh without being distracted by others' testimony.

My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness, and if you have any question about who could be called as a witness before

Page 2982

trial concludes, please ask counsel.

Thank you for your testimony. You are excused as a witness. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: We have four minutes left on today's schedule, and 19, if you want to take back the 15 minutes from yesterday.

MS. SULLIVAN: Your Honor, I believe our next witness is not here, so if we could start fresh tomorrow morning with Mr. Zabransky, that would be great.

THE COURT: Mr. Zabransky will then be our first witness. Are there any -- that would be at 9:00, would be our expectation. Are there any housekeeping matters at this time?

MR. STOUCK: No, Your Honor.

THE COURT: Let me just suggest before we have our conference on the exhibits that came in today that I recognize that the likely reason for the disconnect on the changes of the two demonstratives was the compression of the trial schedule, so let me just suggest that if the counsel confer to make sure communication has occurred with respect to any demonstratives that may be used, I mean, we, of course, can

Page 2983

extend trial into Friday afternoon so everybody gets 48 hours.

But that may not be the preferred resolution, so if you just make sure that the faxes and whatever are actually getting into the hands of the people who need them, if you do have demonstratives. We are in recess until 9:00 a.m. tomorrow morning. Good evening.

(Whereupon, at 5:59 p.m., the trial was recessed, to reconvene at 9:00 a.m. on Thursday, June 15, 2006.)

Page 2984

C O N T E N T S

WITNESS DIRECT(continued) CROSS REDIRECT RECROSS
CHRISTOPHER KOUTS 2636 2735 2883 2902
DIRECT CROSS
THOMAS POLLOG 2908 2960

AFTERNOON SESSION: 2791

E X H I B I T S

EXHIBIT NO: MARKED RECEIVED
Plaintiff
96....................................2827
136...................................2944
142...................................2926
145...................................2883
161...................................2932
338...................................2874

EXHIBIT NO: MARKED RECEIVED
Defendant
189...................................2934
307...................................2699
1229..................................2718

CERTIFICATE OF REPORTER

DOCKET NO.: 04-74C

CASE TITLE: Pacific Gas & Electric Co v. U.S

HEARING DATE: 6-14-06

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 6/14/06

Cynthia R. Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

# EXHIBIT 2

**Long Island Savings, FSB v. U.S No.: 92-517C January 11, 2005**

**Heritage Reporting Corporation**

**Page 1 to Page 72**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
LONG ISLAND SAVINGS, FSB )
AND THE LONG ISLAND SAVINGS )
BANK OF CENTERREACH, FSB, )
Plaintiff, )
) Docket No.: 92-517C
v. )
UNITED STATES, )
Defendant. )
Courtroom 6
National Courts Building
717 Madison Place, N.W.
Washington, D.C.
Tuesday,
January 11, 2005

The parties met, pursuant to notice of the Court, at 9:31 a.m.

BEFORE: HONORABLE CHARLES F. LETTOW
Judge

APPEARANCES:
For the Plaintiff:
RICHARD C. TUFARO, Esquire
WILLIAM WALLACE, Esquire
ANDREW LEBLANC, Esquire
Milbank, Tweed, Hadley & McCloy, LLP
1825 Eye Street, N.W.
Washington, D.C. 20006
(202) 835-7569

Page 2

APPEARANCES: (Cont'd.)
For the Defendant:
JEROME A. MADDEN, Esquire
JEFFREY INFELISE, Esquire
TIMOTHY ABRAHAM, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-6503

Page 3

P R O C E E D I N G S
(9:31 a.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Charles F. Lettow presiding.

THE COURT: Good morning. Please be seated. The case before the Court is Long Island Savings Bank and the Long Island Savings Bank of Centerreach v. United States, No. 92-517.

For the record, Mr. Tufaro, would you introduce yourself and your colleagues for Plaintiff?

MR. TUFARO: I will, Your Honor. Richard Tufaro, of counsel from Milbank Tweed; William Wallace, a law partner of Milbank Tweed; Andy Leblanc, an associate.

THE COURT: Mr. Madden, if you would do the same thing as counsel for Defendant?

MR. MADDEN: Good morning, Your Honor. With me today is Jeff Infelise and Mr. Timothy Abraham.

THE COURT: All right. Mr. Infelise, Mr. Abraham, welcome.

Now to start. We have, as far as the Court can tell, one carryover matter from our associated in limines, and that is -- let me find it; here it is -- Defendant's expedited motion to order the production

Page 4

of tax returns, order the redeposition of Anthony DiCostanzo and compel Mr. DiCostanzo – I apologize – to answer questions at his deposition.

I take it from Plaintiff's recently filed response that has been addressed fully to all parties' satisfaction.

MR. WALLACE: I believe so, Your Honor. We produced the tax returns, and we produced the witness, and he has been deposed.

THE COURT: Mr. Madden, is that so?

MR. MADDEN: Yes, sir. He has been deposed. We do have the documents we need, and Mr. Wolf has those documents.

Just so we're clear, we expect him to testify about the rate of tax that would be applied to whatever award was taxable and the taxability itself of any subsequent award, so those two issues would be addressed so we're clear on that and the Plaintiffs are clear on that.

THE COURT: Is your motion now moot? Has it been satisfied?

MR. MADDEN: It has been satisfied, Your Honor.

THE COURT: All right. Thank you.

MR. TUFARO: Your Honor?

Page 17

simply an effort to try and put in context.
I mean, I haven't actually timed it. I did an outline, but my sense was that it might be tight to get it done in 30 minutes.
THE COURT: Let's try.
MR. TUFARO: All right. I'll work with that.
THE COURT: This other trial that took almost as long as this one is going to take had consolidated Plaintiffs in it as well and each separate property with different circumstances, a whole array of temporary takings issues in it really on which there's not a lot of precedence. Counsel managed to get that done in a half an hour quite satisfactorily.
MR. TUFARO: All right.
THE COURT: You just have to focus on what you want to talk about, but that helps because once you focus that will definitely provide a guide to the Court of what's really going to be at issue between the parties.
MR. TUFARO: On Item 4, we are proposing the following dates for posttrial briefing and closing arguments, recognizing that your schedule may require some other dates.

Page 18

I have to say that in part these dates are to accommodate my own personal obligations with graduation and a wedding coming on June 25.
THE COURT: Well, congratulations.
MR. TUFARO: I appreciate the government having accommodated me that way.
THE COURT: Congratulations. The only caveat the Court has is that on the 20th of June the Court is scheduled to begin a trial in a spent nuclear fuel case involving the Tennessee Valley Authority, and I do not think we can count on that case being finished by the 30th. I would hate to break up that trial.
If that is so, do the parties have a date that they would propose besides the 30th that fits with your own schedules?
MR. TUFARO: I think the only issue was the parties thought if they could get it done prior to the Fourth of July weekend rather than rush it up on the Fourth of July, but then after that I think it's probably the Court's convenience as to the next available date.
Is that fair?
THE COURT: Mr. Madden?
MR. MADDEN: Yes, that's fair, Your Honor.

Page 19

I think as you get into August we run into some problems.
THE COURT: Oh, no. We're not going to do that.
MR. MADDEN: Any time in July would be fine with the government.
THE COURT: We're definitely not going to go into August. I see the problem, and it would be nice for counsel and the Court to have this done on the 30th of June or the 1st of July.
Let's leave it at the 30th of June or the 1st of July as a tentative matter. Let me kind of think about that. I have got to talk to counsel in the Tennessee Valley Authority case anyway.
MR. TUFARO: All right.
THE COURT: It will only slip at most – if you're not on vacation in the latter part of the week that begins with the Fourth of July, then we could do it toward the end of that week.
It's really a question. I'm sorry to put it in the form of a statement.
MR. TUFARO: We don't have plans currently, but the 30th was I think the Thursday of that week.
MR. MADDEN: Right.
MR. TUFARO: The 1st is Friday, correct?

Page 20

THE COURT: Right.
MR. MADDEN: I could do it on the 1st. That's not the best date for me, but any time. I can do it on July 1, and I can certainly do it the next week.
MR. TUFARO: And I'm free the next week too.
THE COURT: I hate to put you to the 5th, but at least the 7th or 8th we could do it, I take it?
MR. TUFARO: Yes, Your Honor.
THE COURT: All right. Again, the 30th is perfectly acceptable to the Court if we can get ourselves sorted through in the Tennessee Valley Authority trial.
MR. TUFARO: All right. On Item 5, Your Honor, the parties have agreed to use the rule that's used in these Winstar cases of notifying each other a week in advance, so I owe Mr. Madden our notice for next week's witnesses, which I will provide to him today.
THE COURT: All right. Thank you. Mr. Madden?
MR. MADDEN: Yes, Your Honor. I guess we'll have to wait for that.
MR. TUFARO: I can't deliver it now.
MR. MADDEN: The only issue on that really

Page 21

is that we would like on the list the deposition designations. We would like to know when they propose to read those transcripts into the record just to let us know when they're bringing the witnesses. We'd like them to include the deposition transcripts in the witness order.

THE COURT: That raises the question whether you've worked out among yourselves counterdesignations so that the whole thing can be read at one time –

MR. MADDEN: Right.

THE COURT: – in sequential order.

MR. MADDEN: To the extent that witnesses, and we've got to fine tune this, are our witnesses or are their witnesses, we intend to bring them in our case.

THE COURT: Bring the actual witness forward?

MR. MADDEN: Right. To the extent they're not on either list, we would read those in that situation. We have not counterdesignated them at this point.

THE COURT: You ought to think about that and make sure that you – if I recall correctly, I explicitly gave you leave to do that.

MR. MADDEN: Yes, you did, Your Honor. The

Page 22

witnesses that are not on either list that they propose to introduce through depositions, frankly, I'm not really sure what the relevance of those are.

THE COURT: Right. Okay. If you could make sure that you've thought about the possibility of counterdesignations so we do it at one time and not back and forth.

MR. MADDEN: We will do that.

THE COURT: Thank you.

MR. TUFARO: Your Honor, in terms of the letter, we identify the live witnesses and the order in which we intend to call them. We identify the order in which we propose to read the deposition transcripts, but we're going to try to use them to use the Court's time efficiently as sort of gap filler so that if we finish with an hour left in the day we would try to use the time to read depositions. It's going to be a little bit difficult to say precisely that we're going to read this one. It may be that because of the time that's available we'll use one that's a shorter read or one that's a longer read, but basically what we're doing is up front telling the order in which we currently propose to read the transcripts, all of them, and live witnesses that we intend to call for the coming week.

Page 23

THE COURT: Mr. Madden?

MR. MADDEN: From our standpoint, Your Honor, we'd like to know when they're going to be read because there are many objections to the testimony that we intend to raise.

All the suggestions that were privileged objections were preserved, so there are many objections as to foundation, relevance, former questions that we intend to raise, and we would like to know when they're going to – they can just say within a certain week we intend to use three or four of these depositions as fillers. That would be helpful.

THE COURT: Well, let's try it this way. Messrs. Tufaro and Madden, you've got something shy of five weeks here, but basically five weeks. I think we can adjust back and forth especially between the two week block if necessary by agreement of counsel. But, if you could just get an order and follow your nose through it I think we'll generally be better off even if we have a half an hour testimony or voir dire somebody and then go over to the next morning.

If you can work out a separate agreement among yourselves, that's fine. Otherwise we'll just

Page 24

take it in order and play along with the exercise.

MR. MADDEN: That's acceptable to the government, Your Honor. If I understand what he was saying, he would get the list, and we can have a live witness first, and then we're going to read a deposition, and then a live witness.

THE COURT: Yes. Let's just do that. Then we just don't have any surprises. All right.

MR. TUFARO: Item 6. The parties are invoking the exclusionary rule. We informed Defendant at our meeting on Wednesday that our clients are designating Mark Fuster as their representative. He is a former chief financial officer of the two institutions and currently a consultant to Astoria. Defendant was weighing whether it had any objections. I might note he will be our first witness.

THE COURT: Mr. Madden?

MR. MADDEN: Yes, Your Honor. I think it's always a risk when you have a client representative who's going to be a major fact witness to have at counsel table if he's going to testify, for example, last because he gets to hear all the testimony of everybody before him, and obviously the purpose of sequestration is so that doesn't happen, but they have

# EXHIBIT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LONG ISLAND SAVINGS BANK, FSB, et al., Plaintiffs, | ) | |
| v. | ) | No. 92-517 C |
| THE UNITED STATES, Defendant. | ) | (Trial Judge Lettow) |

## DEFENDANT'S DESIGNATION OF DEPOSITION TESTIMONY

Pursuant to the Court's December 7, 2004 Order and discussions at the pre-trial conference on January 11, 2005, defendant, the United States, respectfully designates the following portions of deposition testimony to be presented at trial along with the deposition testimony previously designated by Long Island Savings Bank, FSB ("Syosset") and the Long Island Savings Bank of Centereach FSB ("Centereach," collectively with Syossett, "Long Island" or "plaintiffs") in the "Declaration of David S. Cohen," attached to plaintiffs' October 5, 2004 "Motion for Leave To Present Substantive Evidence By Way Of Deposition Testimony," and plaintiffs' January 10, 2005 letter supplementing these designations.

We make these deposition designations without prejudice to our right to call any of the below listed witnesses that are also included in "Defendant's Witness List" dated November 2, 2004, for the purpose of substantive testimony or for the purpose of admitting documents at trial.

1. We intend to present at trial the following portions of the deposition transcript of James Caton, dated June 22, 1999: 8:4-9:8; 9:20-10:20; 28:22-25; 32:17-19; 33:14-34:2; 37:6-39:4; 41:11-41:23; 46:17-47:14; 51:24-53:3; 56:21-57:10; 62:7-63:5; 80:13-21; 86:2-17; 90:6-92:19; 95:7-96:1; 102:14-103:16.

2. We intend to present at trial the following portions of the deposition transcript of Fred Cortese, dated July 13, 1999: 29:13-19; 44:20-46:5.

3. We intend to present at trial the following portions of the deposition transcript of Daniel Dionne, dated July 27, 1999: 73:9-74:20; 79:19-81:3; 81:24-82:4, 96:12-13.

4. We intend to present at trial the following portions of the deposition transcript of David Dorgan, dated July 14, 1999 and July 15, 1999: 184:4-16; 189:17-24.

5. We intend to present at trial the following portions of the deposition transcript of Ruth Ann Esposito, dated May 26, 1999: 17:14-18:5; 18:22-19:19; 20:12-18; 29:14-31:7; 33:19-34:16; 35:7-36:1; 44:17-25; 51:3-52:3; 52:10-53:6; 55:1-57:20; 59:7-18; 66:21-67:25; 80:22-81:4; 86:11-19; 91:5-92:1; 96:4-15; 128:22-130:25.

6. We intend to present at trial the following portions of the deposition transcript of Joseph Kehoe, dated April 19, 1999: 168:10-170:17; 220:13-220:25; 225:24-226:4; 226:11-229:4; 240:13-241:14; 239:4-240:4; 240:13-241:14; 265:6-266:23; 267:13-268:10; 271:21-273:15.

7. We intend to present at trial the following portions of the deposition transcript of James A. Meyer, dated February 10, 1999 and February 11, 1999: 215:10-15.

8. We intend to present at trial the following portions of the deposition transcript of Thomas Moore, dated July 8, 1999: 50:6-11; 51:18-24.

9. We intend to present at trial the following portions of the deposition transcript of Edward J. O'Connell, dated January 27, 1999 and January 28, 1999: 10:1-6; 13:6-14; 16:15-28:16; 32:23-39:24; 42:9-45:21; 53:20-54:7; 57:7-25; 59:14-17; 64:13-

66:10; 74:25-75:22; 77:19-22; 79:25-80:6; 89:19-90:10; 92:9-93:4; 100:17-101:5; 102:2-10; 148:24-150:21; 151:8-15; 152:5-154:24; 156:18-159:7; 167:5-20; 187:24-188:6; 235:9-238:7; 255:21-256:15; 258:1-6; 276:11-277:25; 278:8-11; 286:2-4; 312:7-19; 313:2-25; 315:23-316:9; 337:8-17; 338:18-339:21; 340:20-343:22; 346:16-347:23; 359:14-365:13; 376:9-377:9; 384:23-385:2; 390:13-391:18; 395:19-397:9; 399:15-405:15; 414:3-14; 415:6-421:12.

10. We intend to present at trial the following portions of the deposition transcript of John F. Robinson, dated April 26, 1999 and April 27, 1999: 292:20-25; 299:6-19; 356:17-357:5; 375:21-376:1; 376:11-377:2.

11. We intend to present the following portions of the deposition transcript of Stephen Rohrs, dated June 2, 1999 and June 10, 1999: 15:15-22; 28:7-10; 28:22-29:19; 38:9-13; 40:25-41:15; 44:15-22; 60:2-19; 71:4-72:6; 81:2-10; 108:4-7; 143:24-144:3; 190:17-191:23; 245:16-247:2; 284:8-14.

12. We intend to present the following portions of the deposition transcript of Michael Simone, dated June 1, 1999: 25:18-20; 26:18-27:11; 40:23-41:13; 41:17-41:21; 42:3-10; 50:12-51:7; 52:24-53:3, 57:23-58:20; 68:23-69:12; 82:19-83:15.

13. We intend to present the following portions of the deposition transcript of Thomas Smith, dated July 20, 1999: 56:25-58:3.

14. We intend to present the following portions of the deposition transcript of Angelo Vigna, dated February 3, 1999, April 6, 1999, and April 7, 1999: 14:3-34:1; 56:24-58:19; 64:24-65:19 (February 3, 1999); 13:7-9; 16:20-25; 17:1-25; 23:1-26:25; 44:11-14; 60:7-66:13; 73:7-74:21; 75:19-22; 79:23-80:10; 85:12-86:16; 88:10-

89:10; 90:16-91:8; 95:15-98:7; 102:10-21; 103:19-22; 106:12-108:7; 109:13-110:13; 115:9-117:16; 118:10-119:19; 124:10-125:20; 131:18-136:2; 143:18-24; 156:10-157:24; 170:17-171:6; 175:9-177:18; 179:17-182:14; 184:14-192:13; 201:4-202:23; 205:6-206:25; 210:8-12; 228:20-235:12 (April 6, 1999 and April 7, 1999).

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

JEROME A. MADDEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Room 11026
Washington, D.C. 20530
Tel: (202) 353-0503
Fax: (202) 514-7969

Attorneys for Defendant

OF COUNSEL:
Timothy J. Abraham
Cheryl L. Evans
Elizabeth A. Holt
Jeffrey T. Infelise
Brian L. Owsley
John H. Roberson
Lee M. Straus
Commercial Litigation Branch
Civil Division
U.S. Department of Justice

January 14 2005

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 14th day of January, 2005, I caused to be served by hand-delivery, one copy of "DEFENDANT'S DESIGNATION OF DEPOSITION TESTIMONY" addressed as follows:

RICHARD C. TUFARO
MILBANK, TWEED, HADLEY & McCLOY LLP
1825 I Street, N.W.
Suite 1100
Washington, D.C. 20006

Attorney for Plaintiffs

# EXHIBIT 4

**Long Island Savings Bank v. U.S. 92-517 February 24, 2005**

**Heritage Reporting Corporation**

**Page 3678 to Page 3923**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3790

(Whereupon, at 12:34 p.m., the hearing was recessed, to be reconvened at 1:35 p.m. this same day.)

Page 3791

AFTERNOON SESSION (1:45 p.m.)

THE CLERK: All rise. The court is again in session.

THE COURT: Please be seated. We have tried to get an answer to the question you raised, Mr. Tufaro.

MR. TUFARO: Yes, your Honor.

THE COURT: We have a partial answer, and we hope to have the rest by the end of the day. The partial answer is as follows. Yes, the materials have to be removed from this courtroom at the close of the day tomorrow, Friday. The further inquiry is whether the materials might be placed elsewhere on this floor, particularly in either of the two anterooms to courtroom 5, where they can be secured; or in another room, for example, courtroom 7 or courtroom 8. And we don't yet have an answer to that question.

MR. TUFARO: Okay. Thank you, your Honor.

THE COURT: We'll do our best and continue trying. Ms. Evans?

MS. EVANS: Good afternoon, your Honor. I think we're ready to proceed.

THE COURT: Yes.

MS. EVANS: The Government calls Edward O'Connell to the stand. And we'll go ahead and pass out the binders for Mr. O'Connell at this time.

Page 3792

THE COURT: Yes. Let me get Mr. O'Connell sworn first.

MS. EVANS: Certainly.

Whereupon,

EDWARD J. O'CONNELL, III

was called as a witness and, having first been duly sworn, was examined and testified as follows:

THE COURT: Please take a seat in the witness stand and make yourself comfortable. And Mr. O'Connell, I'm going to ask you if you would please state your name for the record.

THE WITNESS: Edward J. O'Connell, III.

THE COURT: Thank you. Ms. Evans, you may proceed.

DIRECT EXAMINATION

BY MS. EVANS:

Q Good afternoon, Mr. O'Connell. Where do you currently reside?

A Midlothian, Virginia.

Q Are you currently employed?

A No, I'm retired.

Q When did you retire?

A 2001.

Q What was your position prior to your retirement?

A I was a project manager.

Page 3793

Q Where did you work?

A Within the Office of Examinations and Supervision, OTS.

Q What degree do you hold?

A I have a BS/BA degree in finance from Boston College.

Q Did you have any accounting certifications?

A No, I do not.

Q Have you had any accounting training?

A Well, what I had in college and materials made available at the place of employment at the Bank Board and OTS.

Q Have you spoken with anyone other than myself about what your testimony might be here today?

A Nothing about the testimony.

Q The Court has already admitted some of your prior deposition testimony, so we're going to skip along to some other things.

In the early 1980s, what was your position with the Federal Home Loan Bank Board?

A I was a regional director in Washington, with supervision over three regions, I believe it was Boston, New York and Cincinnati at that time.

Q And you sort of touched on this, but can you elaborate on your responsibilities in that position?

Page 3794

A Essentially to coordinate the supervision of the savings and loans at the Washington level. That would include processing resolution of problem institutions, monitoring adversely rated institutions, processing certain types of applications and working on special projects, things of that nature.
Q Did you have staff assisting you when you were in that position?
A Yes, I had a deputy regional director and approximately four financial analysts, plus support staff.
Q Did you work on supervisory transactions in the position you've been discussing?
A Yes, I did.
Q And tell us how you would define a supervisory transaction.
A Supervisory transaction essentially was where you had a problem institution of any degree, where you were trying to resolve that problem through either taking correction on their own or through resolution by supervisory merger with – either with or without FSLIC assistance.
Q And how would you define an assisted transaction?
A That was one where the Federal Savings and Loan Insurance Corporation would provide cash or other forms of assistance.
Q And you said that you would work on supervisory

Page 3795

transactions. Did you also work on assisted transactions?
A Yes, I did.
Q And could they have been the same? Could a supervisory transaction have been an assist – had assistance?
A Yes, there would be a specific type.
Q How would you define goodwill as it was used in the savings and loan industry in the early 1980s?
A Well, my vernacular, it would be an intangible item like – that you couldn't sell or earn money on, but it was a result of transactions like where purchase accounting was used in acquisitions and mergers.
Q Do you recall what Financial Accounting Standards Board 72 was at that time?
A I believe it was –
Q Sorry. Did you get my question? I was asking you – I'll re-ask the question, rephrase.
Do you recall what Financial Accounting Standards Board 72 was?
A I believe that was where there was a new announcement which made a further refinement, I think, probably a tightening up on how goodwill was to be accounted.
Q And also do you recall what push-down accounting was, as that term was used in your industry in the early

Page 3796

1980s?
A I believe that was where you had a holding company situation where you could push the net worth at the holding company level down onto the subsidiary.
Q And what were net worth maintenance requirements, as that term may have been used in the industry in the early 1980s?
A Well, certain – certain cases, corporations were required to maintain the level of the net worth of the subsidiary institutions at a certain level. I think it also came into play with – in assistance agreements.
Q And in your experience, did institutions, banking institutions, sometimes seek a particular goodwill treatment when they were involved in an acquisition – a goodwill treatment that varied from the regulations?
MR. TUFARO: Objection, your Honor; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Mr. O'Connell, did you review, as part of your work, particular goodwill accounting treatment requests?
A Yes.
Q And what group would have handled a particular goodwill accounting treatment request?
A Well, that – the request that initiates probably, most likely, with the supervisory agent, but it could be

Page 3797

directly to the FSLIC or I think could well be to the general counsel's office.
Q And you're mentioning various groups. Tell us what groups within the Federal Home Loan Bank Board and related regulatory organizations you worked with on supervisory transactions?
A We worked with the supervisory agents in the district, worked with the office of FSLIC in Washington and with the general counsel's office.
Q And what's your understanding of what the general counsel's office was doing – was the nature of their work, rather, regarding supervisory transactions?
A Well, they would – they would be involved in the transaction, and they would be responsible for writing, like, assistance agreements, and they would draw up the resolutions to effect the transaction.
Q And what's your understanding of what the FSLIC group would do, the work they would do related to supervisory transactions?
A Well, they essentially were the ones that were – they have the final say on doing an assisted agreement, go from such things as to were they satisfied with whatever reasons or the various reasons with the acquirer, the amount of assistance required.
Q And how would you define a regulatory forbearance,

Page 3798

what categories of things?

A Regulatory forbearance? Those would be -- if granted, would be given in a separate forbearance letter.

Q And did the Federal Home Loan Bank Board develop standard forbearances?

A Yes, they did.

Q And let's take a look at one of the documents in your binder. Turn to PX 116. Do you have it?

A Yes, I do.

Q And PX 116 is in evidence. It's dated April 24, 1984. It says "memorandum." It says "SP-37" at the top. Do you recognize this document?

A Yes, I recognize it.

Q And what is it?

A It's the series of forbearance referrals that can be used on particular situations, for granting forbearances if deemed necessary.

Q And did you work on this document?

A Yes, I did. I helped prepare this document.

Q And did you prepare it with anyone's assistance?

A There were people that reviewed and edited what I did.

Q And what did you do to work on this document? What kind of work did you do? What was the nature?

A Initially, it was to collect examples of various

Page 3799

types of forbearances that had been given over a period of time and to collect those and try to put them in a little orderly and convenient fashion.

Q And it says "to EOS professional staff, from William J. Schilling." Who is William J. Schilling?

A At that time, he was the director of the Office of Examination and Supervision.

Q Did you use this document in your work?

A Yes, we did.

Q Turn to page 7. It's in the top center. We're going to look at page 7 and page 8. Under page 7, we're going to look at where it says "forbearance numbers." There's some numbers listed at the bottom. Then above that, it says "supervisory mergers," and it says "accounting." Take a look at SM-2, and the text of that is on page 8.

A Yes.

Q And what's section SM-2?

A Well, this -- this forbearance would allow an institution to report -- oh, the determination of how the goodwill would be amortized, the period of time for amortization.

Q We can put that aside. Are you familiar with the term "bid letter" or "offer letter" in the context of potential supervisory acquisitions or mergers in the savings

Page 3800

and loan industry in 1982 and '83?

A Yes.

Q And what were they?

A As I recall, they were proposals, really, that came in from potential acquirers of -- for failing institutions in response to solicitations from the Bank Board.

Q And did you ever review these bid letters or proposals?

A I'd seen them. I can't say that I reviewed them in every case.

Q Did the Federal Home Loan Bank Board create a list of potential acquirers?

A Yes, they did.

Q And is that something that you looked at in your work?

A I know at some point, I helped in reviewing the initial selections of at least a number of institutions that were put on that list.

Q And what were the factors that you considered when deciding whether an institution would be put on that list?

A Looked at the strength of the company, its quality of its assets, its management, its earnings, the capital position.

Q Did you attend any meetings with Long Island

Page 3801

Savings Bank personnel or their counsel?

A I can recall only meeting with the people with Long Island on one occasion.

Q And what do you recall about that meeting?

A Not -- not a great deal. As I recall, the people came and exchanged pleasantries, I guess, for a while. And then the other people representing the Bank Board and the Long Island representatives, along with their counsel, they went off to, I guess, negotiate the proposal. I didn't participate in that. And as I recall, there was one man from Long Island that didn't either.

The -- one thing that struck me, and I'm not sure about it, was the man that I was left with, he seemed very concerned about, you know, the transaction or its possible effect on Long Island. It kind of surprised me, if they were terribly concerned, you know, why would they be doing the deal?

Q So that's all you recall about the meeting?

A That's -- that's all I recall.

Q Do you recall the date of that meeting?

A No, I do not.

Q Let's take a look at another document, PX 90 in your binder.

A I'm sorry, PX --

Q I'm sorry, it's PX 98, I apologize. Do you

Page 3802

recognize PX 98?
A Yes.
Q And what's this document?
A This is an S-memo – S-memorandum which was prepared by our Office of Examinations and Supervision in connection with the resolution of problem cases that went through, described the failing institution and, to some extent, giving information on it. It gave – then it also gave some information on the proposed acquirer, kind of a supervisory history of the failing institution. I believe we had a section on talking about the industry in general, and we have various other pieces of information which seem pertinent to this case.
Q And turning to the last page, page 21, the very last page in the exhibit, is that your signature?
A Yes.
Q And then it also says "I concur: Francis M. Dorer." Who was Francis Dorer?
A At that time, he was a deputy director. See, it was JCP, John C. Price, who was a regional supervisor or director at that time, signed for him.
Q And there's some initials under that, it looks like some letters. Do you recognize those?
A Yes. They were people that worked in my staff. Let's see. Gary Masters is the first one. B. Alan

Page 3803

Scarborough, David A. Schildren, Walter Gay, William K. Frayeri, and the secretaries, Colleen Hennessey and Connie Casey.
Q Do you know what these initials signify?
A That they all participated in the production of this document.
Q And what was the purpose of the S-memo?
A I'd say the basic purpose of the S-memo was to provide the justification for the board to take action to close the bank or provide for assistance for the acquisition. That was one of the three essential pieces that went to the board, as I recall. The other one was the FSLIC prepared their own documents and – relating to their concerns about the financial costs and the alternatives, I believe. And I believe that was called an A-memo. And then there was an L-memo, which was prepared by the attorneys in the general counsel's office. And then beyond that, we'd have the supervisory agents' information and other – probably some other attachments, the resolution, perhaps the forbearance letter.
Q We're still looking at this S-memo. Turn to internal page 18, it's in the left corner at the top. And look under number 7, which begins with "LISB has agreed to maintain Centereach's net worth." Then underneath that, there's a paragraph that begins with "at a meeting held in

Page 3804

the office of OFSLIC on April 15."
Take a look at those first two sentences there.
Did you have a recollection of an April 15, 1983 meeting, of attending that?
A No, I do not.
Q And similarly, do you have a recollection of attending a July 7, 1983 meeting?
A No.
Q And are you able to tell in any way from looking at this whether either of these two meetings are the meeting that you described attending?
A Could you repeat that, please?
Q Are you able to tell, just from looking at this document, or in any way, whether either of these two meetings dated here refer to the meeting that you believe you attended, that you described previously?
A Could be, but I'm not sure.
Q When we were talking about this document, you referred to other people working on it. I'm not sure what your role was. You signed it. What was your role in working on this S-memo? What did you do?
A I was responsible for the overall memo and that the memo was prepared by those working over me – under me, and I reviewed their work to be satisfied with it.
Q So did you review the entire document, then?

Page 3805

A Yes.
Q And take a look at after the July 7, 1983 meeting, the language here. It refers to further negotiations, it says, "further negotiations were held regarding the forbearances in addition to general terms of the assistance package." What do you believe the "general terms of the assistance package" means?
A The assistance package, that related just to what was in the assistance agreement.
Q Let's turn to PX 5. PX 5 is also in evidence, dated May 13, 1983. What's PX 5?
A This is another S-type memo.
Q And turn to the last page, page 19. Is that your signature?
A Yes.
Q And here it says "I concur: Robert J. Moore." Who was Robert Moore?
A I believe he was a deputy director at that time.
Q Do you know why there were two S-memos for this transaction?
A I'm not entirely sure, but for some reason, the initial plan didn't go through as – as, I guess, scheduled, and I seem to recall being asked to provide an updated S-memo.

Page 3806

Q We can put that aside. Who was the legal counsel for the acquirer in this transaction, the attorneys for the acquirer?
A I believe they were represented by Muldoon and Murphy.
Q And did you know John Hall?
A Yes.
Q How did you know him?
A Well, John previously worked at the Bank Board, and I had worked on a few cases with him.
Q And did you have an opinion about his legal skills and experience?
A I thought he was competent.
Q And also, did you know Doug Faucette?
A Certainly.
Q And how did you know him?
A Well, Doug, he also worked at the Bank Board as an attorney in the general counsel's office.
Q And did he have a particular reputation when you worked with him?
A He had a reputation of being competent and aggressive.
Q Let's look in your binder, we'll turn to another document, which is marked as PX 67. PX 67 is also in evidence. It's a letter on Muldoon Murphy's letterhead

Page 3807

dated August 31, 1982 to Brent Beesley.
Mr. O'Connell, do you believe that you've seen this document before?
A I believe I have.
Q And would you have received it in your work?
A Yes.
Q And within the document, turn to internal page 2 under the – there are three headings on that page. Look under "accounting." And I'm trying to see where I want to direct your attention, where the sentence begins. Just let me pause for a moment.
Take a look at the last sentence on that page that begins with "in lieu of such approval or in the event LISB is unable to utilize such approval," and read that sentence, which continues on the next page.
(Witness reviewed the document.)
Do you recall discussing this sentence, this section, with anyone?
A No.
Q Would you have recommended approval of this type of language for a supervisory transaction?
A No.
MR. TUFARO: Objection, your Honor; calls for speculation.
THE COURT: Well, in light of the circumstances,

Page 3808

the Court will overrule the objection.
BY MS. EVANS:
Q Did you answer? I'm sorry.
MR. TUFARO: Your Honor, could you explain the circumstances for your ruling, so that I can know the basis for it?
THE COURT: Well, in effect, you were a little bit late, Mr. Tufaro. And what I have to do is strike the answer, and I'm not willing to do that.
MR. TUFARO: Could you state the basis, your Honor, so that I know whether I should urge you otherwise?
THE COURT: Well, you're going to ask me for an advisory opinion.
MR. TUFARO: No, I'm asking you what the basis is of denying my – I'll make a motion to strike so that you can act on it, and then I'll ask you the basis for it.
THE COURT: I'm always reluctant to strike an answer, especially if an objection comes in late and I have some – unless it's truly something outlandish, I will not strike the answer.
MR. TUFARO: All right. I'll move on, your Honor.
BY MS. EVANS:
Q Mr. O'Connell, we're going to turn to another document in your binder, DX 1071. DX 1071 is written to Mr. Hall, it's an undated letter signed by Lawrence Hayes.

Page 3809

Have you seen this document before? Do you believe that you have?
A Yes, I –
Q What is this?
A This is a letter from Lawrence Hayes at the general counsel's office, responding to a request from – I guess it was John Hall of Muldoon and Murphy. And I guess essentially explaining the position of OTS in regard to a previous letter by Muldoon and Murphy.
Q Was it the normal practice for this type of letter to be written prior to your S-memo?
A Yes; I would say that a letter like this would go before that.
Q Turn to PX 106.
THE COURT: Now, before we do that, Ms. Evans, may I just note that we have, again, the situation where a more complete copy of DX 1071 had been admitted as PX 6.
MS. EVANS: PX 6.
THE COURT: And I just want the record to reflect that.
MS. EVANS: Certainly, your Honor.
BY MS. EVANS:
Q Mr. O'Connell, turning to PX 106, I think it's toward the back of your binder. This is dated August 18, 1983. It's also in evidence. Do you recognize this

Page 3810

document?
A Yes, I do.
Q What is this?
A This is the forbearance letter. It goes down a whole list of different types of forbearances, and it has one on reserves, and I think the second one has to do with borrowing and liquidity, service corporations. One allows a phase-out of unauthorized activities. And we have one on accounting treatment and the cash contribution. But I notice it doesn't have anything here on the amortization of goodwill.
Q And would you have seen this document in your work?
A Yes.
Q Was it a document that would have come to you for your comments?
A At some phase, it would either come to me or it would be a discussion of what was acceptable or what we thought was acceptable.
Q Let's turn to another document. We'll look at PX 1. Mr. O'Connell, do you recognize PX 1?
A Yes. That's the assistance agreement between the FSLIC and Long Island Savings.
Q And turn to what seems to be the first page of the assistance agreement. It's about four or five pages in.

Page 3811

It's Bates stamped at the bottom LIP 0000437. And the heading is "assistance agreement." It begins with "this agreement, dated August 17, 1983." Take a look at that section under the -- the very first section that begins with "this agreement."
What do you think this paragraph means?
A Well, this to me is a preamble to the whole body of this assistance agreement, and that this is a self-contained document. "Agreement" refers to what's in this agreement.
Q Turn to page 19 of the assistance agreement, which is internal page 19 marked at the bottom in that way. I will turn your attention to section 10, with the heading "accounting principles." Take a moment or two and look at section 10.
(Witness reviewed the document.)
What's your understanding of what section 10 means?
A It states the accounting principles that will be governing with respect to what's in this agreement, this agreement only.
Q And it refers to -- second line says "any computations made for purposes of this agreement." Do you see that?
A Yes, I do.

Page 3812

Q And were computations made under assistance agreements?
A Yes.
Q And let's turn to another page. Turn to page 16. Take a look at section 9, listed as "additional covenants of LISB," then (a), "maintenance of net worth." My question is, did computations need to be made under this section?
MR. TUFARO: Objection, your Honor; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Mr. O'Connell, in looking at section 9 -- let me phrase it -- say something a little different. Would section 10 apply -- the terms of section 10 apply to section 9?
MR. TUFARO: Objection, your Honor. It's leading again, and I think we could have the witness close the exhibit and ask him the question, what computation he made under it. Otherwise, we're just leading by moving him from paragraph to paragraph.
THE COURT: I'll sustain on the ground that it's leading.
MS. EVANS: Your Honor, just for the record, I don't think whether or not something applies is a leading question. I'm not sure how else to get to that information. I don't know another way to phrase a question like that, so

Page 3813

I'm not sure that we're leading the witness to any particular answer. We're asking him, does something apply to something else.
THE COURT: I could give you a suggested form of question, I could give you a couple alternatives to it. The Court would really not do that.
MS. EVANS: Certainly, I'm not asking you to do that, although Mr. Wallace did ask you to help yesterday, your Honor.
(Laughter.)
THE COURT: That's because I thought I was helping Ms. Holt, and I thought I ought to help him too.
BY MS. EVANS:
Q Mr. O'Connell, does section 9 require a computation?
MR. TUFARO: Objection, your Honor; leading.
MS. EVANS: Again, I have the same argument. I can't imagine this would be a leading question. I certainly asked almost the same question of Ms. Moran, and it was allowed in.
THE COURT: Well, hypertechnically, this is leading. On the other hand, it is not so leading that it suggests an answer to the question. You know, I will tell you, anytime, as a direct examining counsel, you ask a question that leads to a yes or no answer, any trial judge

Page 3814

worth his salt is going to look at that and say, hmm, not a good idea.

BY MS. EVANS:

Q Mr. O'Connell, do you know whether or not section 9 requires a computation to be made?

MR. TUFARO: Objection, your Honor.

THE COURT: Well, let's let it pass for the moment, Mr. Tufaro. Go ahead. You may answer, Mr. O'Connell.

THE WITNESS: Yes, it requires a computation.

BY MS. EVANS:

Q Mr. O'Connell, do you have an understanding as to what applicability, if any, section 10 has to section 9 in the agreement?

THE COURT: There you go, Ms. Evans.

THE WITNESS: I'd say that we have the accounting principles in 10 are applicable to what we're doing in 9.

BY MS. EVANS:

Q Mr. O'Connell, do you have an understanding as to whether section 10 – the portion of section 10 that refers to computations would apply to computations made elsewhere outside the assistance agreement?

A No, just the assistance agreement.

Q And Mr. O'Connell, can you estimate for the Court how many assistance agreements you reviewed over the course

Page 3815

of your employment at the Federal Home Loan Bank Board and the OTS?

A Coming up with an exact number may be hard here. I know I looked at these from the mid-'60s through late '80s and probably a few after that. So I'd say there must have been a minimum of 50.

Q Mr. O'Connell, if a specific accounting treatment was permitted by GAAP and a financial entity requested a guaranty that they would be permitted to obtain that regulatory treatment, what would the regulators do?

A They wouldn't give a guaranty to that.

Q Why not?

A Well, basically, the accounting rules are set by the accounting – accounting standards board, and the board essentially followed the accounting rules. The institutions were required to follow GAAP, GAAP rules. The only exceptions I can think of are in specific cases where reports only to the Bank Board that they might have an exception.

Q Excuse me, may I confer just for a moment?

THE COURT: Certainly.

MS. EVANS: No further questions, your Honor.

THE COURT: Mr. Tufaro?

CROSS-EXAMINATION

BY MR. TUFARO:

Page 3816

Q Mr. O'Connell, my name is Richard Tufaro. I represent the Plaintiff banks in this case. Mr. O'Connell, you were never trained as an accountant, were you?

A No.

Q You never practiced as an accountant?

A No.

Q You're not a certified public accountant?

A No, I'm not.

Q You're not a licensed attorney?

A No.

Q You never went to law school?

A Correct.

Q You never had responsibility at the Bank Board for drafting legal documents, did you?

A No.

Q And with respect to the process of having assisted transactions go to the Bank Board for approval, you had no role with respect to the bidding conferences; isn't that correct?

A That's – that's generally correct.

Q You didn't evaluate the bids that were received; isn't that true?

A I certainly wasn't a primary reviewer of those. However, I did make my own judgments on the bid list.

Page 3817

Q I'm not talking about the bid list. I'm talking about the bids. You had no role in reviewing the bids that were received; correct?

A Those were reviewed by the FSLIC.

Q And you were not involved in that review; isn't that true?

A Essentially.

Q Sometimes you didn't even know who the final bidder was until you prepared your S-memo; isn't that true?

A That – on occasion, that was true.

Q And, in fact, you might not have known until the package was ready to go to the board who the other bidders were; isn't that true?

A I'm not sure that's true. I don't think that's true.

Q You don't – you were not – you would agree, you would not be the person qualified to address the criteria used by the FSLIC to evaluate bids; isn't that true?

A No, I didn't do that.

Q And the determination of the assistance to be provided to bidders was not handled by you either, was it?

A That's correct.

Q That was handled by FSLIC; correct?

A Yes, it was.

Q And it was also FSLIC or a part of FSLIC that did

Page 3818

both the quantitative viability analysis and the liquidation analysis; isn't that true?
A That's correct.
Q And you didn't handle those either?
A No, I did not.
Q And, in fact, you didn't have very much interaction with the people who did; isn't that true?
A That's true.
Q And you weren't involved in drafting any of the contract documents; isn't that true?
A That's true.
Q And you weren't involved in negotiating the specific terms and conditions of any of the contractual documents; isn't that true?
A Yes.
Q Do you recall being deposed in a common deposition in which an examiner acting on behalf of the Plaintiff banks in this case examined you back in January of 1999, about six years ago?
A Yes, I remember.
Q Did you read your deposition prior to your testimony today?
A I read part of it.
Q Did you read the part relevant to Long Island Savings Bank?

Page 3819

A I believe I did.
Q And do you recall at the time of that deposition that you recalled a meeting with Long Island Savings Bank but you couldn't recall whether it was in relation to the Suffolk acquisition or perhaps in relation to the Flushing acquisition?
A That's right. I'm still not sure what that meeting was for.
Q You personally were never required to pass on any sophisticated accounting issues; isn't that true?
A True.
Q That was handled by either the deputy director or the director of the Office of Examination and Supervision; isn't that right?
A Not -- I wouldn't say so. I would say that it changed over time. At one point, we had a deputy director, for a long time was a CPA and he did most of that work. Then they set up an accounting section, and there was a CPA in charge of that. And that's pretty much how it went after that. So it would be either this one deputy director or the accounting section who would do that.
Q Who was the deputy director?
A Robert Moore.
Q And he was the deputy director at the time this Suffolk transaction closed, correct, in August of 1983?

Page 3820

A Whether that was his exact title at that time, I'm not entirely sure.
Q But you did report to him; correct?
A I'm not -- at this time, I don't think I did. I think that he may have substituted for somebody else that was in the actual chain of command at that time.
Q Can you look again at Plaintiffs' Exhibit 5. This is the May 13, 1983 S-memo.
A Uh-huh.
Q And the last page that has his signature?
A Yes.
Q Can you explain why he would be adding his concurrence to your recommendation if you didn't report to him?
A Well, he was at a higher level than I was, and there was, I think, a general structure within the next -- the OES director's office that there were one or two or three people that would sign if somebody else wasn't available. And I think that's what the situation is here.
Q You also weren't the person, Mr. O'Connell, were you, who signed off on the forbearances that were granted in a transaction?
A I can't recall doing that, although the forbearances were typically a -- OES was involved in those.
Q But it was really the director or deputy director

Page 3821

who would approve the accounting forbearances, unless they were standard, given in every transaction; right?
A Well, no, I don't know that they would necessarily get into it. I think that they would -- if it was kind of a given pool of what forbearances under certain cases could be given, and it wasn't an action particularly taken by a director or deputy director, you know, in each case.
MR. LEBLANC: May I approach, your Honor?
THE COURT: Yes, certainly.
BY MR. TUFARO:
Q Mr. O'Connell, could you look at the transcript behind tab 1. And this is a transcript of your deposition taken on January 27, 1999, is it not?
A I guess so --
Q It's on the second page in the lower left box, the date and your name.
A Yes, yes. January 27, 1999.
Q And you did appear at this deposition; correct?
A Correct.
Q And you swore to tell the truth, the whole truth and nothing but the truth?
A Yes.
Q And you did so at the time?
A Yes.
Q Would it be fair to say that your recollection at

Page 3822

that time would probably be better than it is today, six years later?
A I'm not sure.
Q All right. Can you take a look at page 233. It's on the page 59 on the bottom right-hand corner. And the 233 is in the box on the lower right. Do you see that?
A I think we're here.
Q Can you read starting – you may want to start at line 3 and read down, but I'm really directing you to the portion that begins at line 17 of 233, and the answer is completed at line 6 on page 234. Can you read that to yourself.
A Okay.
(Witness reviewed the document.)
Yes, I've read it.
Q Does that refresh your recollection that the director of OES would give some sort of approval to forbearances in transactions that you worked on?
A Well, it – I mean, it was – it surely gave approval to all of them, when he signed that – when we have that SP-memo, that was signed by the director, which to me essentially said that if a forbearance was appropriate in a certain case, the ones that are listed in this memorandum are okay.
Q That SP-memo was dated after the date of our

Page 3823

transaction, wasn't it?
A Yes.
Q So it didn't exist in August of 1983; isn't that true?
A Well, the memo may not have existed, but the substance of what was in there, they all existed, because they were – those forbearances were forbearances that had been given on different cases, piecemeal over, you know, some period of time.
Q So to the extent there were piecemeal occasions for giving forbearances, they would go to the director of OES for his approval; correct?
A Let me explain this this way.
Q Can you answer my question first, Mr. O'Connell?
MS. EVANS: Objection, your Honor. He's trying to answer at this point.
BY MR. TUFARO:
Q Well, can you answer it yes or no?
THE COURT: No, let's wait a minute. I think you ought to let Mr. O'Connell, Mr. Tufaro, answer in the way he wants, that is, by way of explanation. And then if you want to come back to it again, you may.
BY MR. TUFARO:
Q Do you have the question in mind or do you need it reread?

Page 3824

A Perhaps you better reread it.
MR. TUFARO: Carmen, could you read the outstanding question?
(The reporter read the record as requested.)
THE WITNESS: The forbearances would be part of the whole package that went to the Bank Board. Now, the part that – for their action. Now, where they were – my section and where the deputy director and the director came in, they would sanction or agree with what we in the staff were recommending. So it was the directors required to get the memo to the board, you had to have the concurrence of the deputy director or a director. So that's how this operated.
And the final – the real approval came when the board acted on the package and accepted the resolution, the financial assistance, the forbearances and you can say we passed through the director, as it passed through the general counsel, as it passed through the director of FSLIC on the way to the board for their action.
BY MR. TUFARO:
Q What was the dollar amount of assistance that was given in this transaction, Mr. O'Connell?
A I think I saw in here a day or so ago. I probably don't recall what it is.
Q What were the total amount of net worth

Page 3825

certificates and income capital certificates that were in this transaction?
MS. EVANS: Objection, your Honor. I think this is outside the scope of our questioning on direct.
THE COURT: Just a moment. Based on your examination of Mr. O'Connell respecting PX 98, overruled; Ms. Evans.
BY MR. TUFARO:
Q Can you answer the question?
A I'm not sure, and I was not involved in the – determining that amount.
Q What other computations besides the one you indicated were made under the assistance agreement, Mr. O'Connell?
A I would assume that there would be computations needed for the paper, the ICCs or whatever the –
Q Do you know?
A Do I know?
Q Do you know whether those computations are made under the terms of the assistance agreement?
A They – I'm not sure. There's a separate – I'm not sure of the answer. May have been under a master agreement.
Q How would you use section 10 of the assistance agreement to compute the net worth maintenance obligation?

Page 3826

A How would I use it?
Q Yes.
A Well, that was the -- I guess you just apply the accounting principles to making your computation.
Q How would you do that?
A I wouldn't do it.
Q You wouldn't know how to do it; right?
A I would not do it.
Q And you also wouldn't know how to do it; isn't that true?
A Probably right.
Q Mr. O'Connell, you were shown a copy of this assistance agreement in connection with your preparation for testimony on the stand today?
MS. EVANS: Objection; your Honor. I think this goes into privileged issues, what he was shown, what we discussed.
THE COURT: Why is this privileged?
MS. EVANS: It goes to our communication. And maybe if he would ask further questions.
THE COURT: I was just trying to figure out why your conversations with a witness before he testifies are privileged.
MS. EVANS: I think any of our conversations, as far as the nature of the conversations are privileged.

Page 3827

THE COURT: What's your legal basis for that?
MS. EVANS: It's in the work product privilege.
THE COURT: Now, that it can be, Attorney-client privilege, I --
MS. EVANS: I'm sorry, did I say attorney --
THE COURT: You can have a work product protection that applies. But that has to be attorney work product, rather than witness work product. Do you see what I'm driving at?
MS. EVANS: I see what you mean. Yes. I mean, to the extent that any of the questions would reveal my mental processes, it would be protected.
THE COURT: That's true. And I thought I covered that aspect fairly extensively in a prior opinion in this case. But do you think that the fact that Mr. O'Connell may or may not -- we don't know as yet -- have been shown a copy of the assistance agreement in this case relates to your work product, that is your mental impressions going in?
MS. EVANS: I mean, it could, your Honor. I think it's going to depend perhaps on subsequent questions.
THE COURT: May I tell you why I have a little difficulty with that? You examined Mr. O'Connell respecting the assistance agreement.
MS. EVANS: Yes. We can see what questions he gets into, which is what I was alluding to, your Honor.

Page 3828

THE COURT: Let's let this question go and see where we go next. Thank you.
BY MR. TUFARO:
Q Do you have the question in mind?
A Did I see the assistance agreement?
Q Were you shown a copy of the assistance agreement in preparation for your testimony?
A Yes.
Q And but for having seen -- when was the last time you had seen a copy of the agreement?
A Probably at the time of this transaction.
Q 22 years ago?
A That sounds right, close to it.
Q And it's your testimony here today that you remember this agreement in particular out of all of the 50 or more agreements that you looked at when you were regional director of OES?
A What I was trying to get across was those 50 or so agreements that I saw never, to the best of my recollection, did I ever see one that had any of the language that went beyond that agreement. It was self-contained, whether it was this one or whether it was another one in California or New England or whatever.
Q And you actually remember, you have a present recollection of having read this agreement at the time of

Page 3829

the transaction?
A I assume I did, but I can't tell you there was a flash of a light in my head.
Q So, Mr. O'Connell, your testimony that the assistance agreement, PX 1 in this case, is a stand-alone agreement is based upon your view that all of the assistance agreements you looked at you believe were stand alone; is that right?
A Uh-huh, that's correct.
MR. TUFARO: I don't have any further questions, your Honor.
THE COURT: Ms. Evans, I'm going to suggest that we take a break now. Is that satisfactory for you?
MS. EVANS: Yes, your Honor.
THE COURT: I know you have redirect coming up, and I want to say that I recall helping you rather than Ms. Holt yesterday, and having Mr. Wallace ask for the same help, so I'm just correcting the record a little bit. It's not that I'm not trying to help you out on occasion, but --
MS. EVANS: Thank you.
THE COURT: -- that's to move things along in a fairly efficient way. In any event, I think we are moving along, and you will have redirect when we come back. We are in recess for 15 minutes.
(Recess.)

Page 3830

THE CLERK: All rise. The Court is again in session.

THE COURT: Please be seated. I'm going to interrupt with a housekeeping matter. I apologize, Mr. O'Connell. This is just a modest matter. The clerk gave us the response that it's possible we could leave the materials in this courtroom, depending on the type of changes that would be made to it. The problem is, I don't think we're assigned this courtroom when we come back in March. I don't think they realized that. So we've got to go back to them again and say –

MR. WALLACE: We could leave them here for now until it's time to move and then go to the new courtroom.

THE COURT: That's possible.

MR. WALLACE: That would be helpful.

THE COURT: That is possible. They are looking into that now. So we will find out. Ms. Evans, redirect.

MS. EVANS: Yes. Just a few questions, your Honor.

REDIRECT EXAMINATION

BY MS. EVANS:

Q Mr. O'Connell, turn to PX 1 in your binder, and turn to page 11.

A I'm sorry, PX 1?

Page 3831

Q PX 1, then page 11. And turn your attention to section 5, "purchase of income capital certificate." Mr. O'Connell, do you know whether or not the provisions of section 10 apply to section 5 here, income capital certificates?

A Yes. Yeah, they would apply.

Q Also, tell us whether or not it was your practice to review assistance agreements when you were working on a supervisory transaction.

A My review of the assistance agreements was probably at the time the matter was submitted to the board. I didn't participate in preparing these. It was as a matter of information for me and everyone else that received a package of the documents.

Q Were you able to provide comments on the assistance agreement?

A No.

Q So it was a document that you – go ahead, sorry.

A No, this was a document prepared without my participation.

MS. EVANS: No further questions, your Honor.

THE COURT: I might have a question or so myself. Let me think about this for a moment. May I ask several questions, Ms. Evans and Mr. Tufaro?

MS. EVANS: Yes, of course.

Page 3832

MR. TUFARO: No objection.

THE COURT: You may object, obviously.

MS. EVANS: No objection.

THE COURT: Pardon?

MS. EVANS: No objection.

THE COURT: You may. When you hear the question, you may.

(Laughter.)

THE COURT: Mr. O'Connell, did you have any role in the implementation of assistance agreements, such as the one that is PX 1?

THE WITNESS: No, I did not.

THE COURT: Mr. O'Connell, I wonder if you would please turn to page 19 of PX 1, which is Bates 0455. And I wonder if you would read to yourself paragraph 10 in its entirety, and then I'd like to ask you a question about paragraph 10.

(Witness reviewed the document.)

Mr. O'Connell, do you see the exception that begins at the bottom of page 19 and runs over to 20?

THE WITNESS: Yes.

THE COURT: It's the Court's job, as a matter of law, to interpret that exception. But what is your understanding what that exception means?

THE WITNESS: Well, basically, I was saying that

Page 3833

they use GAAP accounting if – unless there is some conflict as enumerated with regulations or otherwise.

THE COURT: Well, do you see the structure of the first sentence of section 10? It says "except as otherwise provided in this agreement, any computations made for the purposes of this agreement shall," and it tells you what to do.

Then it says – it has an exception built right into the first sentence. So it kind of says except, X happens, and then there's an exception right away. Do you see that?

THE WITNESS: Yes, I do.

THE COURT: Does that aid your understanding of this provision or not?

THE WITNESS: It's – it seems it's not the best structure of sentencing. That's the one thing I did get out of this.

THE COURT: All right. Well, let me ask you whether you think the third and last sentence of this agreement is entirely consistent with the first sentence.

THE WITNESS: I have trouble understanding how that sentence would ever come into play or would come into play.

THE COURT: Well, I understand. Let's take the middle sentence on page 20, 0456. It says "in case of any

Page 3834

ambiguity in the interpretation or construction of any provision of this agreement, such ambiguity shall be resolved by a third-party, independent accounting firm selected by the corporation and not previously used by LISB or the Bank Board for purposes of auditing LISB or Suffolk County."
Do you see that?
THE WITNESS: Yes, I do.
THE COURT: What does that mean to you?
THE WITNESS: That for purposes of this agreement only, if you did get into the situation of ambiguity, that you would follow this procedure.
THE COURT: Do you recall this procedure being used in any other type of assistance agreement with which you were familiar at the time you were at the Bank Board?
THE WITNESS: No.
THE COURT: No. That's really the reason I asked you whether you had any role in the implementation of the assistance agreements, Mr. O'Connell. Thank you.
Mr. Tufaro and Ms. Evans, in light of the Court's questions, the Court will ensure that you have recross and re-redirect.
Mr. Tufaro?
MR. TUFARO: Shall I go or await Ms. Evans?
THE COURT: Well, Ms. Evans, you may redirect

Page 3835

again.
BY MS. EVANS:
Q Mr. O'Connell, regardless of the language in section 10, is it still your testimony that section 10 applies only to calculations contemplated within the assistance agreement itself?
MR. TUFARO: Objection; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Mr. O'Connell, has your testimony changed in any way regarding your interpretation of section 10 and its meaning?
MR. TUFARO: Objection, your Honor.
MS. EVANS: He can answer yes or no, I think, your Honor.
THE COURT: Well, that's the problem. Change from what? I mean, he was asked a whole set of questions on direct.
MS. EVANS: Your Honor, I'm not sure I agree, respectfully, that these are leading questions. He can answer yes -- if they're yes-or-no questions that contemplate a yes-or-no answer.
THE COURT: Well, but you've got to focus a little bit.
BY MS. EVANS:

Page 3836

Q Mr. O'Connell, has your testimony changed in any way regarding your conclusions about the applicability to section 10 to the assistance agreement itself?
MR. TUFARO: Objection. It's still leading, your Honor.
MS. EVANS: Your Honor, it's my --
THE COURT: I'm hesitating, because if you had a specific area of Mr. O'Connell's prior testimony that you were addressing, you might have a point. But --
MS. EVANS: Well, I think that we do, which is his testimony regarding the fact that section 10 applies to the assistance agreement itself. I mean, that's the part of the testimony.
THE COURT: Well, I'm struggling.
MS. EVANS: I'll try another way.
THE COURT: Thank you.
BY MS. EVANS:
Q Does the interpretation -- Mr. O'Connell, does the interpretation of section 10 affect whether or not it's applicable only to the assistance agreement itself?
MR. TUFARO: Objection, your Honor.
THE COURT: Grounds?
MR. TUFARO: Well, it's compound.
MS. EVANS: Your Honor, I don't think it's a compound question.

Page 3837

THE COURT: All right. I'll allow it. Let's see what happens.
MS. EVANS: Would you like the court reporter to read it back to you?
THE WITNESS: Please.
(The reporter read the record as requested.)
THE WITNESS: It's -- section 10 is only applicable to the assistance agreement.
MS. EVANS: Thank you.
RECROSS-EXAMINATION
BY MR. TUFARO:
Q Mr. O'Connell, do you still have Plaintiffs' Exhibit 1 in front of you, the assistance agreement?
A Are you talking about this?
Q No, it's the document that you were going over with the Court.
A Yes, yes.
Q And could you turn to section 5 on page 11, LIP 447 of the document. Do you see in section A the reference where it says "unless specifically defined in section 1 of this agreement, the terms used in this section shall have the meanings given to them in the master agreement."
Do you see that?
A Uh-huh.
Q What is the master agreement?

Page 3838

A I believe that was a document, I think it was somewhat like a form, like an assistance agreement, but it governed the operation of these various types of paper that would be exchanged, like income capital certificates.
Q So why is the assistance agreement referring to the master agreement, if the assistance agreement is a stand-alone document?
A Well, the master agreement is referenced in here. It seems to me it's just a control feature for it.
Q So it's really not a stand-alone document; right? You have to deal with both the assistance agreement and the master agreement; correct?
A Well, for the ICCs, you have to.
Q What computations are performed under section 5 of the assistance agreement?
MS. EVANS: Objection; asked and answered. I think he's been asked that previously.
THE COURT: Overruled.
THE WITNESS: I'd say you have to compute what the payments are.
BY MR. TUFARO:
Q Where does it say that?
A Well, the section 5 seems to me like it's a preamble cover section, to give the details of the operation of those ICCs, which is then incorporated into the master

Page 3839

agreement.
Q So you have to go to the master agreement to figure out how to do the computations; right?
A I'd say yes.
Q Can you turn to section 17 on page 29. Do you see that section entitled "entire agreement"?
A Uh-huh.
Q And looking at the first sentence, it says "this agreement and the master agreement, together with any interpretation or understanding agreed to in writing by the parties, constitute the entire agreement between the parties." Do you see that? And it continues on.
A Yes, I do.
Q So this isn't a stand-alone document, is it? You have to read both the agreement and the master agreement; right?
MS. EVANS: Objection, your Honor. I believe he's mischaracterizing the witness's testimony. He talked about computations applying to the agreement only. He didn't give this answer.
THE COURT: Well, just a moment. It's a compound question, in the sense that you've actually got two questions pending, Mr. Tufaro. Why don't you reframe that to one.
BY MR. TUFARO:

Page 3840

Q In view of the fact, Mr. O'Connell, that section 17 refers to "the agreement and the master agreement constituting the entire agreement" –
MS. EVANS: Objection, your Honor, Mr. O'Connell is not a lawyer. I think we're now getting into interpretations and legal opinions of the contract.
THE COURT: You were there with your questions.
MR. TUFARO: I move to strike Mr. O'Connell's testimony on this agreement, based on that position of the Government.
THE COURT: One of the reasons the court prefaced its questions to Mr. O'Connell was with the caveat that the interpretation of the language of the agreement actually is a matter of law for the Court, it had to do with exactly what we're tussling over now. And I think everyone with Mr. O'Connell has been asking him about language. And it's entirely fair for Mr. Tufaro to say, in your answer respecting section 10, did you take or to what extent should you take into account section 17? It's that simple. Let's just go forward. Why don't you reframe your question.
MR. TUFARO: All right. I like yours.
(Laughter.)
BY MR. TUFARO:
Q Mr. O'Connell, in giving your response with regard to section 10 of the assistance agreement, to what extent

Page 3841

did you take into account section 17 and its references to the agreement and master agreement?
A My view has been that what's in the agreement is confined to the agreement. Now, you bring up the master agreement. My initial reaction is, well, seeing this is cited in section, what was it, 5, that that was incorporated into this agreement. That's a nonlawyer opinion.
Q Did you even look at section 17 before you came into court today?
A I don't believe I did.
Q How does section 10, which is on pages 19 and 20 of this document, how does it compare with the accounting principles in the other 49 or 50 agreements that you looked at?
A I don't think I saw anything like this.
Q How did they differ?
A Now, that I can't tell you. I just don't remember.
MR. TUFARO: No further questions, your Honor.
THE COURT: Thank you, Mr. Tufaro. Ms. Evans, do you have anything further?
MS. EVANS: Nothing, your Honor.
THE COURT: I know we're getting into re-redirect.
MS. EVANS: Yes. No, I don't, your Honor.
THE COURT: Mr. O'Connell, I may, in a moment,

Page 3842

excuse you. But before I do that, the parties have given me a job to do, and I will like to fulfill my obligations in that respect.
THE WITNESS: Yes, your Honor.
THE COURT: I am obliged to read you an instruction, and I think if I read it, you will understand it. But let's try and see. If you have any questions, you may ask.
The parties have requested, as they are entitled to under the Federal Rule of Evidence 615, and as you know from not being present in the courtroom for the testimony of other witnesses, that witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh, without being distracted by others' testimony.
My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness.
If you have any question about who could be a witness, you may ask counsel. I believe that the last day we're currently scheduled, if we need it, is of all things March 23. So it's a little less than a month away.
Do you understand?
THE WITNESS: Yes. I will not discuss this with anyone.

Page 3843

THE COURT: You can certainly talk with your family about it, assuming they're not likely to be witnesses in the case.
THE WITNESS: I don't think so.
THE COURT: All right. And I thank you very much for appearing here today. I know this is a bad day to travel. I wish you well on your travels back to Midlothian, and with real appreciation for you coming here to testify, you are excused.
THE WITNESS: Thank you most kindly, your Honor.
THE COURT: Thank you.
(Witness excused.)
THE COURT: Before we move to the next witness, the clerk of the Court informs all of us that the parties may leave the book cases here, despite the fact that we'll be in Courtroom 7 in March. I hope that helps.
MR. MADDEN: Thank you, your Honor.
THE COURT: Thank you.
MR. INFELISE: Your Honor, at this time we'd like to call Mr. James Caton to the stand.
THE COURT: Thank you, Mr. Infelise.
Mr. Caton, if you would come forward, and if you would please stand behind the court reporter, and if you would raise your right hand, please, sir, to be sworn as a witness in this case.

Page 3844

Whereupon,
JAMES A. CATON
was called as a witness and, having first been duly sworn, was examined and testified as follows:
THE COURT: Mr. Caton, if you would please take a seat in the witness stand and make yourself comfortable.
THE WITNESS: Okay. Thank you.
MR. INFELISE: Your Honor, at this time we'd like to distribute the witness binders, if we could.
THE COURT: Yes, certainly. And if, while you're doing that, I may ask Mr. Caton to state his full name for the record.
THE WITNESS: My name is James Arthur Caton, Jr.

DIRECT EXAMINATION

BY MR. INFELISE:
Q Mr. Caton, earlier in this proceeding, we read portions of your deposition, but I'm going to ask you some other questions concerning this case.
A Okay.
Q First, sir, could you state whether or not you're presently employed?
A Yes. I'm employed at the Office of Thrift Supervision, or OTS.
Q And what is your position at the OTS?
A Right now I'm the director of financial monitoring

Page 3845

and analysis.
Q And what do the responsibilities or duties of that position entail, sir?
A Reviewing the thrift industry as a whole and individual thrifts to identify any systemic problems, systemic risks or individual risk that may impact the safety and soundness of the thrift industry or individual thrifts.
Q How long have you worked for the OTS?
A I joined OTS and its predecessor in March of 1987.
Q Let me back up a little bit. Could you tell us or give us a brief description of your educational background.
A I have a bachelor's degree in business administration, with a concentration in finance, and I received my undergraduate degree in June of 1980 from George Mason University. I also have a master's in business administration, again with a concentration in finance, that I earned in 1987.
Q Now, between the time you graduated, you got your undergraduate degree, and when you went for your graduate degree, did you work at all?
A Oh, yes.
Q Where did you work?
A During 1980 and while I was going to undergraduate school, I worked at the First American Bank of Virginia, medium-sized commercial bank located in McLean,

# EXHIBIT 5

**Long Island Savings Bank v. U.S. 92-517 February 24, 2005**

**Heritage Reporting Corporation**

**Page 3678 to Page 3923**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3842

excuse you. But before I do that, the parties have given me a job to do, and I will like to fulfill my obligations in that respect.

THE WITNESS: Yes, your Honor.

THE COURT: I am obliged to read you an instruction, and I think if I read it, you will understand it. But let's try and see. If you have any questions, you may ask.

The parties have requested, as they are entitled to under the Federal Rule of Evidence 615, and as you know from not being present in the courtroom for the testimony of other witnesses, that witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh, without being distracted by others' testimony.

My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness.

If you have any question about who could be a witness, you may ask counsel. I believe that the last day we're currently scheduled, if we need it, is of all things March 23. So it's a little less than a month away.

Do you understand?

THE WITNESS: Yes. I will not discuss this with anyone.

Page 3843

THE COURT: You can certainly talk with your family about it, assuming they're not likely to be witnesses in the case.

THE WITNESS: I don't think so.

THE COURT: All right. And I thank you very much for appearing here today. I know this is a bad day to travel. I wish you well on your travels back to Midlothian, and with real appreciation for you coming here to testify, you are excused.

THE WITNESS: Thank you most kindly, your Honor.

THE COURT: Thank you.

(Witness excused.)

THE COURT: Before we move to the next witness, the clerk of the Court informs all of us that the parties may leave the book cases here, despite the fact that we'll be in Courtroom 7 in March. I hope that helps.

MR. MADDEN: Thank you, your Honor.

THE COURT: Thank you.

MR. INFELISE: Your Honor, at this time we'd like to call Mr. James Caton to the stand.

THE COURT: Thank you, Mr. Infelise.

Mr. Caton, if you would come forward, and if you would please stand behind the court reporter, and if you would raise your right hand, please, sir, to be sworn as a witness in this case.

Page 3844

Whereupon,

JAMES A. CATON

was called as a witness and, having first been duly sworn, was examined and testified as follows:

THE COURT: Mr. Caton, if you would please take a seat in the witness stand and make yourself comfortable.

THE WITNESS: Okay. Thank you.

MR. INFELISE: Your Honor, at this time we'd like to distribute the witness binders, if we could.

THE COURT: Yes, certainly. And if, while you're doing that, I may ask Mr. Caton to state his full name for the record.

THE WITNESS: My name is James Arthur Caton, Jr.

DIRECT EXAMINATION

BY MR. INFELISE:

Q Mr. Caton, earlier in this proceeding, we read portions of your deposition, but I'm going to ask you some other questions concerning this case.

A Okay.

Q First, sir, could you state whether or not you're presently employed?

A Yes. I'm employed at the Office of Thrift Supervision, or OTS.

Q And what is your position at the OTS?

A Right now I'm the director of financial monitoring

Page 3845

and analysis.

Q And what do the responsibilities or duties of that position entail, sir?

A Reviewing the thrift industry as a whole and individual thrifts to identify any systemic problems, systemic risks or individual risk that may impact the safety and soundness of the thrift industry or individual thrifts.

Q How long have you worked for the OTS?

A I joined OTS and its predecessor in March of 1987.

Q Let me back up a little bit. Could you tell us or give us a brief description of your educational background.

A I have a bachelor's degree in business administration, with a concentration in finance, and I received my undergraduate degree in June of 1980 from George Mason University. I also have a master's in business administration, again with a concentration in finance, that I earned in 1987.

Q Now, between the time you graduated, you got your undergraduate degree, and when you went for your graduate degree, did you work at all?

A Oh, yes.

Q Where did you work?

A During 1980 and while I was going to undergraduate school, I worked at the First American Bank of Virginia, medium-sized commercial bank located in McLean,

Page 3846

headquartered in McLean. There I was a teller. And then close to my graduation, receiving my undergraduate degree, I was promoted to staff auditor.
Later on in 1980, I left first American to join Freddie Mac, or the Federal Home Loan Mortgage Corporation, as an accountant. And I was at Freddie Mac for two years, from about October 1980 through 1982.
I left Freddie Mac to join Kaplan, Smith & Associates, which was a financial consulting firm, primarily to the thrift industry. I was at Kaplan, Smith for four years, from October 1982 through 1986.
Q When did you then – let me ask you this. Did you – were you going to school working on your graduate degree while you were working?
A Yes, yes, I was.
Q And you said you got your graduate degree in 1987?
A Correct. And then to complete the employment background, from Kaplan, Smith, I went to the FSLIC, or the Federal Savings and Loan Insurance Corporation. And from the FSLIC, I left to join OTS.
Q All right. Let me go back. You said you were at the Freddie Mac. That's the FHLMC?
A Correct.
Q And how long did you stay there?
A Two years.

Page 3847

Q And then after that, you said, I believe, you went to work for Kaplan, Smith; is that correct?
A Correct.
Q When would that have been?
A 1982.
Q All right. What type of work did the firm of Kaplan, Smith do when you joined them?
A A full range of consulting, primarily to the thrift industry. They did mergers and acquisitions, conversion appraisals, which was an appraisal process for thrifts converting from mutual to stock form of ownership. We did asset-liability management, the sale and purchase of bulk assets. That was our primary work.
Q What was your responsibility, or what type of work did you do at Kaplan, Smith?
A A little bit of everything. My specialty was mergers and acquisitions and conversion appraisals.
Q All right. Now, you said that your specialty was mergers and acquisitions?
A Correct.
Q And in that area, what type of responsibilities or what duties did you have?
A Working for both the purchaser and the sellers at different times. That work involved performing what we called due diligence reviews of the thrift, primarily

Page 3848

thrifts. We did have a few commercial bank buyers, but the sellers were primarily from the thrift industry.
So we would actually travel on site to the thrift and look at their major assets, look at how the operation was functioning, interview management and analyze their financial statements. From that we would come up with a – what their strengths and weaknesses were. And then we would talk to the potential buyer to form a strategy that would best suit this institution.
We would then actually do models, simulation models, for the strategy implied –
Q What if – I'm sorry, excuse me. Go ahead, please.
A For a particular strategy or strategies for that particular institution and do stress testing, stress testing for interest rates, different lending volumes, different cash flow scenarios.
Q What, if any, responsibility did you have for making recommendations to these thrifts whether or not they were candidates for a merger or a conversion?
A If they came to us, we would actually go through that process with them and come up with a best – best solution, what we felt was a best solution.
Q During the time you worked at Kaplan, Smith, were you ever involved in any supervisory mergers?

Page 3849

A Oh, yes.
Q Let me ask you this, sir. Can you estimate or do you know how many – in total, how many conversions or mergers you were involved in while at Kaplan, Smith?
A Both conversions and mergers?
Q Yes.
A Conversions, I believe I was directly responsible for about six conversions and maybe 30 mergers.
Q And during the time you were at Kaplan, Smith, did you ever have occasion to work on a supervisory merger involving a failing thrift?
A Oh, yes, probably about 10 times, I would say.
Q And did you have any responsibility in those cases with respect to valuing that thrift?
A Yes, we would go through the same due diligence process.
THE COURT: Mr. Leblanc?
MR. LEBLANC: Your Honor, I'm going to object at this point. This is going beyond the designation that either of the parties had for Mr. Caton's testimony.
MR. INFELISE: That's incorrect. First, your Honor, that's incorrect. But I can address the objection, if you wish.
THE COURT: Just a moment. Could you please, Mr. Infelise?

Page 3850

MR. INFELISE: Well, your Honor, there was a whole line of questions in the deposition concerning these very questions, concerning Mr. Caton's background and the work he had done at Kaplan, Smith with respect to mergers and conversions.

Second, it's my understanding since this is direct exam of our witness, we're not limited necessarily to what was covered in the deposition. That was just a cross-designation of designation of depositions that the Plaintiffs did.

THE COURT: But you would agree that you are limited by your witness designation prior to trial.

MR. INFELISE: Oh, yes, your Honor.

THE COURT: I think that's Mr. Leblanc's point.

MR. LEBLANC: That is, your Honor.

MR. INFELISE: As I understand the designation, it goes to Mr. Caton's work at the OTS with respect to this case. And what I'm doing now is establishing what experience and background he has which would qualify him with respect to the work he did with respect to Long Island.

THE COURT: Mr. Leblanc?

MR. LEBLANC: Your Honor, the designation -- and I think the further foundation needs to be laid that this witness's role with respect to Centereach was limited to the capital plan. That's what the designations are limited to.

Page 3851

To the extent that there are questions regarding conversion, that goes beyond his role with respect to Centereach. So, your Honor, to the extent that they want to move into conversion with this witness, I think there's a lack of foundation for it.

THE COURT: Just a moment. Well, we can go a little farther on the foundation in Mr. Caton's prior work, certainly, but we have to focus on his work with OTS.

MR. INFELISE: And I'm getting there, sir.

BY MR. INFELISE:

Q I had asked you, and I believe my last question was concerning whether or not your work had involved supervisory conversions while you were at Kaplan, Smith. Do you recall those questions?

A Yes.

Q In doing those valuations, how, if at all, would an institution's inability to meet its capital requirements come into play?

MR. LEBLANC: Your Honor, again, I think we're going beyond the foundation of this witness's testimony. He's asking him with respect to work he did with Kaplan, Smith, unrelated to the work that he, in fact, did with Centereach. The depositions bore that out. His work with Centereach -- with respect to Centereach, and it was only with respect to Centereach, dealt with a discrete period of

Page 3852

time dealing with the capital plan, the approval of the capital plan.

THE COURT: Mr. Infelise?

MR. INFELISE: Yes, your Honor. The review of the capital plan, which I intend to get into, involved review of the alternatives which Centereach proposed to come into compliance with capital requirements. One of those, and one which we have discussed at length in this case, is whether or not they could have converted. One of the evaluations done by OTS was whether or not this Centereach had considered all the possible alternatives.

I am attempting to establish that Mr. Caton, who, in fact, personally reviewed those business plans -- or excuse me, the capital plans, has the background and wherewithal and experience to comment on whether he believed that there were other alternatives available to Centereach at the time he reviewed those capital plans. Those certainly are part of his job and his responsibility. Those were certainly issues of whether or not Centereach had, in fact, considered other possibilities or addressed all the potential possibilities in their capital plan.

THE COURT: My recollection is that conversion was not a specific alternative identified in the capital plan.

MR. INFELISE: Exactly, your Honor.

THE COURT: Is that correct?

Page 3853

MR. INFELISE: Exactly. And the question is, why wasn't it. And what has been presented by the Plaintiffs is that it wasn't feasible or possible.

THE COURT: Mr. Leblanc?

MR. LEBLANC: Your Honor, those questions, I suggest Mr. Infelise could move to. The questions he's asking him now, however, I think don't go to those.

THE COURT: Well, I have a small problem with the terminology used, Mr. Infelise, "supervisory conversion." I am familiar with a modified conversion. There were certainly a variety of conversions. I don't think that modified conversion was actually in play at the time Mr. Caton was at -- I'll have to get the name right.

MR. INFELISE: Kaplan, Smith, sir.

THE COURT: Kaplan, Smith. So I don't know exactly what you've asked him, to be blunt about it.

MR. INFELISE: All right. And maybe I can rephrase the question. The one question I was going into was whether or not he had considered thrifts as part of this that had -- did not meet their capital requirements at the time they were compliant for conversion.

THE COURT: At the time?

MR. INFELISE: At the time they were considering conversion.

THE COURT: This is in 1986?

Page 3854

MR. INFELISE: Yes, your Honor.
THE COURT: Well, I'll be interested in Mr. Caton's answer.
BY MR. INFELISE:
Q Mr. Caton, at the time you were at Kaplan, Smith, were there occasions where you considered conversion of thrifts that were not meeting capital requirements?
A Specifically, I don't recall if two institutions particularly met their supervisory capital requirements or not, but two – I worked on two cases where the institutions had negative GAAP capital and actually had successful conversions.
Q And when you say "conversion," do you mean conversion from mutual to stock institution?
A Mutual to stock, yes. They were Atlantic Permanent of Norfolk, Virginia and Frontier Federal of Ponca City, Oklahoma.
THE COURT: Mr. Infelise, may I ask a question?
MR. INFELISE: You may, your Honor.
THE COURT: I usually wait, but since this is all foundation. Did they have negative RAP capital, Mr. Caton?
THE WITNESS: That I don't recall, I'm sorry. But I definitely recall they had negative GAAP capital.
THE COURT: Was there a difference at the time, Mr. Caton?

Page 3855

THE WITNESS: There was a difference at the time.
THE COURT: Thank you.
BY MR. INFELISE:
Q Now, when you left Kaplan, Smith, where did you go to work, sir?
A The FSLIC.
Q And I think you testified you worked there until approximately 1987?
A Correct.
Q And in 1987, who did you begin working for?
A The Office of Regulatory Policy, Oversight and Supervision, which changed its name to the Office of Regulatory Activities, and then eventually became part of OTS.
Q And what were your responsibilities at that point in time?
A I started out as a financial analyst, reviewing applications, specifically from our Dallas district. I was then promoted to executive assistant to the director, and then I was promoted to manager of financial analysis.
Q Let me direct your attention, Mr. Caton, to 1989. What position were you in at the OTS at that point in time?
A At that time, I was deputy director of special supervision.
Q And what did your responsibilities include?

Page 3856

A Reviewing problem cases, reviewing cases that presented some systemic risk to the thrift industry.
Q Now, after the enactment of FIRREA, did you have any responsibility with respect to reviewing capital plans?
A We did. Myself and my group took on, on a voluntary basis, the responsibility of reviewing capital plans, doing a concurrent review of capital plans, concurrent with our district offices' review, to ensure that the capital plans were being reviewed in a consistent manner amongst our 12 district offices.
Q If you would, sir, looking at the binder of documents you have, the very first document in the binder, DX 291. This is a memo dated December 12, 1989, addressed to the district directors from Mr. Darrel Dochow?
A Yes.
Q Do you recall whether or not you received a copy of this memo?
A I did.
Q You did. Now, I notice in the right-hand corner on this, on the front page there is a little cc with a series of initials. Are any of those your initials?
A No, they're not.
Q Are you certain, however, that you would have received a copy of this?
A Yes. In fact, I even – I believe I even prepared

Page 3857

this memo.
Q All right. And was it OTS's regular practice to prepare memos like this to send to the districts to inform them of OTS policy?
A Yes, it was.
Q And were copies of such memos as these maintained in the regular course of business at the OTS?
A Yes, they were.
MR. INFELISE: Your Honor, at this time I would offer into evidence DX 291.
MR. LEBLANC: No objection, your Honor.
THE COURT: Admitted.
(The document referred to, previously identified as Defendant's Exhibit No. DX 291, was received in evidence.)
BY MR. INFELISE:
Q Mr. Caton, what was the purpose of sending this memo to the district offices?
A Primarily twofold, to notify the district directors that there was going to be such a concurrent review done by myself and my group and outlining the parameters of the concurrent review process.
Q All right. Now, if you would look at the page –

Page 3858

and I'm referring to the number in the lower right corner, it's SMO 181511. And we also have it on the screen, sir, if you have any trouble seeing it.
A Thank you.
Q Could you tell me what this is, sir.
A As a first cut for the concurrent review, we identified the largest institutions from each of our district offices for review. We felt that by doing so, we would have a good handle on any systemic risks. And this memo identified, out of each district, offices those capital plans which we wanted to review -- perform a concurrent review in Washington.
Q Was that the only criteria that you used for determining which capital plans would be reviewed?
A No.
MR. LEBLANC: Objection, your Honor; leading.
MR. INFELISE: I'll rephrase if you'd like, sir.
THE COURT: Thank you.
BY MR. INFELISE:
Q What, if any, other criteria did you use for determining what capital plans you would review?
A These, as I said, were the largest institutions out of each district offices. Other types of -- other capital plans could have been sent to Washington for concurrent review, if they raised significant issues of law

Page 3859

or policy, or if the district offices just wanted our concurrent review.
Q Now, looking at this attachment A, does it identify Long Island Savings Bank of Centereach as one of the capital plans you're reviewing?
A Yes, out of our New York district office.
Q Now, as I understand -- well, let me ask you, did your office review all the capital plans that were submitted to OTS?
A No, we did not.
Q Which ones did you actually review?
A We reviewed the largest -- capital plans from the largest institutions, which approximated 120. And I believe there were an additional number, I believe it was 50, that were sent in to us because of the -- they raised policy issues or, again, the district offices just wanted to have our opinion.
Q Do you recall approximately how many capital plans your office reviewed? Did you say 120?
A 120, probably all told about 150 or so.
Q How long was your office responsible for doing this concurrent review?
A It was our primary function for the first six months of 1980. After that time --
Q I'm sorry, sir, did you say 1980?

Page 3860

A 1990, excuse me.
Q Thank you.
A I'm sorry. For the first six months of 1990, after which time, my group's primary responsibilities changed, and we moved on from the capital plan concurrent review process.
Q So after -- I'm sorry, excuse me, sir. Go ahead.
A I'm sorry. After that time, our involvement in the capital plan process would have been sporadic.
Q So after that time, did you have any further involvement in the capital plan review process?
A For certain cases, for -- if the district office wanted our opinion, if a capital plan -- if a thrift fell out of capital compliance, after that point in time. But by and large, our involvement ended.
Q Now, during the course of conducting these concurrent reviews, do you recall whether you reviewed the capital plans or any capital plans submitted by Long Island Savings Bank of Centereach?
A Oh, yes, yes. I remember reviewing that personally.
Q Do you recall how many plans you reviewed?
A I remember at least two plans. Again, the district office did not have to send us every plan, only the ones identified, and they received an approval or they got

Page 3861

our opinion, then they were not under any obligation to ask us for our reviews. But for Long Island, I remember two plans.
Q If you would, sir, in your binder located at the tab marked DX 301. This has been previously admitted. It's capital plan for Long Island Savings Bank of Centereach, dated January 8, 1990. Do you recall, sir, whether or not this was one of the capital plans that you reviewed?
A Yes, I believe it was.
Q Now, since this was submitted in June -- excuse me, January of 1990, would this have been part of the initial concurrent review that was being conducted by your office?
A Yes.
Q Now, sir, if you would turn to the next tab, which is PX 13, which, your Honor, I believe has also been admitted, capital plan for Long Island Savings Bank of Centereach, dated October 25, 1990. Looking at this, Mr. Caton, do you recall whether you reviewed this capital plan?
A Yes, I believe this was their second plan that they filed with us.
Q Now, since it's dated October 25, 1990, would this have been out of the time period during which you were doing the normal concurrent review?

A Yes, it was.
Q Do you recall why it is, then, that you reviewed this capital plan?
A Long Island – the capital plan of Long Island did raise certain policy issues. Their capital plan did not show compliance within our typical time frame of showing compliance within December – by the end of 1994. So this – there were also some issues with the consolidation with its stronger parent, which raised certain policy issues. So this is one that would have been – come back to Washington because of its policy issues.
Q Now, even though you were doing a concurrent review in Washington, who ultimately had the authority to approve a capital plan?
A The district director.
Q Do you have any recollection of when your office sent its approval, if at all, to – concerning the Long Island bank of Centereach's capital plan?
A Sometime after this was filed, there was – I remember even going up to New York, up to speak with the managers of Long Island, as well as our district office supervisors, about this. And there was some negotiations that took place in between October of 1990 and the actual approval, which I think was sometime much later than 19 – October of 1990.



Q All right. Sir, if you would look at PX 231. It would be the last document in your binder. This appears to be a memo dated May 8, 1991. It indicates it's from Jim Caton to Michael Simone.
A Yes.
Q I notice there's some initials by the name Jim Caton. Do you recognize those initials?
A Those are my initials.
Q What is the purpose of putting those initials on this memo?
A Meaning that it came from me, I approved it, and for Michael Simone.
Q And who is Michael Simone?
A Michael Simone was Long Island Savings Bank's direct supervisor up in our New York district office.
Q And Mr. Caton, was it your regular practice to prepare memos like this as part of your responsibilities at OTS during this time frame?
A Yes, it was.
Q Would a copy of a memo such as this be maintained in an ordinary course of business at the OTS?
A Yes.
MR. INFELISE: Your Honor, at this time I would move for admission of PX 231.
THE COURT: Mr. Leblanc?



MR. LEBLANC: No objection.
THE COURT: Admitted.
(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 231, was received in evidence.)
BY MR. INFELISE:
Q Mr. Caton, do you recall or by looking at this, can you tell what the purpose of this memo was?
A To notify Michael that we did perform our concurrent review, and we also agreed with their approval recommendation.
Q Could I direct your attention to the second paragraph of this letter. Specifically the very first sentence, where it indicates "I would recommend that close attention be paid to the time frame projected by LISB for the sale of assets, asset restructuring and capital contributions from LISB's parent."
Why is it that you recommended attention be paid to those items, sir?
A For any capital plan that was dependent on one-time events or specific – a specific happening, we wanted to see certain time frames. And if the time frame was not met, well, then we wanted our examination and



supervision to be aware of that and to take appropriate action, by calling management, seeing what exactly the problem was, seeing if there was some holdup and what they planned to do about it.
Q Was this statement unique for Long Island Savings Bank of Centereach?
A No, it was not.
Q I have one other document I'd like to distribute. It's been marked as Plaintiffs' Exhibit 228, which has been previously admitted, I believe.
May I approach, your Honor?
THE COURT: Certainly.
BY MR. INFELISE:
Q Mr. Caton, you testified earlier that at some point you recall attending a meeting concerning Long Island Savings Bank and its capital plan. This is an internal memo dated April 19, 1991, which the subject is the meeting with management of Long Island Savings Bank to discuss Centereach's capital plan. And it indicates that attendance was – one of the persons was Jim Caton. Do you see that, sir?
A Yes, I do.
Q Is this the meeting to which you referred earlier?
A Yes.
Q I would like to direct your attention to the

Page 3866

second page. The number at the bottom is GTP 45447. And the very last paragraph in it, which mentions "Jim Caton indicated," that paragraph.
A Yes.
Q Would you just take a minute and read that, sir.
(Witness reviewed the document.)
Have you had a chance to read it?
A Yes.
Q The last sentence I would like to direct your attention to, it said "Jim Caton suggested that management make this decision as of June 1993."
To what were you referring when you say "this decision"?
A The decision to -- deciding which capital plan strategy they would implement in order to come into capital compliance.
Q Why is it you suggested or recommended that that decision be made by June of 1993?
A To give the institution some -- some latitude in changing the strategy before the end of 1994. So if their -- if the decision was made sometime in 1993 and it did not work out, it would give them a little bit of cushion, if you will, to try perhaps another plan.
Q Ultimately, did Centereach have to meet capital compliance by the end of 1994?

Page 3867

A Yes.
MR. LEBLANC: Objection, your Honor; leading.
THE COURT: Sustained. On the other hand, we have the answer and I'm not going to strike it.
MR. INFELISE: All right.
BY MR. INFELISE:
Q All right. Now, Mr. Caton, if you would turn to the very next page this document, GTP 45448. And I'm looking at the -- there is an indented paragraph and the next paragraph says "in response." You indicate now that "Jim Caton stated that a decision would need to be made by December of 1993 and Washington would not approve the plan if a decision would not be made by this date."
Does that -- what does that indicate with respect to your recommendation concerning a decision to be made by June of 1993?
A That I'm not a good negotiator?
(Laughter.)
It represented our flexibility that we took with respect to Long Island Savings Bank. Long Island Savings Bank, in my opinion, was a well-run institution, so --
Q All right. Now, the very next paragraph says "Jim Nacos then proposed a time extension of an additional six months to June of 1994."
Do you recall that, sir?

Page 3868

A Yes.
Q Do you recall whether or not that was agreed to by the OTS?
A I believe it was. I believe they were allowed that flexibility.
Q Thank you. Mr. Caton, do you recall whether or not the capital plan which your office approved was demonstrated that Long Island Savings Bank of Centereach would attain capital compliance by the end of 1994?
MR. LEBLANC: Objection; leading.
THE COURT: Sustained.
BY MR. INFELISE:
Q Do you recall what, if anything, the capital plan that your office approved indicated with respect to capital compliance by Long Island bank of Centereach by the end of 1994?
A Well, from all the capital plans that my office reviewed, Long Island's was the only plan that did not show capital compliance within that December 1994 time frame.
Q Why, then, was Long Island Savings Bank of Centereach's capital plan approved?
A It was a well-run institution, it was generating profits, its asset quality was good, had a good franchise value. So it -- we had a good supervisory history with Long Island Savings Bank's management. We felt comfortable

Page 3869

giving them the maximum flexibility.
We also always had the ability to force cross-guaranty provisions with its healthy parent. So we felt somewhat protected, both on the -- because it was a well-run institution and we always had that supervisory flexibility or supervisory power to force a merger or to invoke cross-guaranty provisions.
Q What, if anything, did Centereach have to do to be released from the capital plan that was approved?
A Meet its then capital -- come into then capital compliance.
Q Now, there's been testimony presented that Centereach's capital plan required it to consider alternatives to achieve capital compliance prior to 1994.
MR. LEBLANC: Objection, your Honor. This is a fact witness who is talking about testimony that's been previously presented.
THE COURT: Sustained.
MR. INFELISE: Your Honor, may I respond to that, please?
THE COURT: Yes, certainly.
MR. INFELISE: It was his testimony read by the Plaintiffs, I believe, during the deposition. That's where I obtained it. And I can check that if you'd like, sir.
THE COURT: Would you, please?

Page 3870

MR. LEBLANC: Your Honor, it's still prior testimony presented in this case. Mr. Caton wasn't present for it, based on the exclusion rule --

THE COURT: Well, there was a difference, though, if it's his prior deposition testimony, that's allowed. The Court just doesn't remember that, so I've asked Mr. Infelise to help us out.

MR. INFELISE: Yes, your Honor, it was a portion that we cross-designated at page 62.

"Question: Okay. Do you recall whether Centereach's capital plan stated that it would consider alternatives to coming into capital compliance as 1994 approached?

"Answer: Yes, it did."

THE COURT: Just a moment. Now, based on that, you may ask questions, Mr. Infelise.

MR. INFELISE: Thank you, your Honor.

BY MR. INFELISE:

Q Mr. Caton, as indicated, you previously testified by deposition in this case that Centereach's capital plan required it to consider alternatives to achieving capital compliance prior to 1994. Based upon your review of Centereach's capital plan, did you conclude there was anything else that Centereach could have done or should have considered in attaining capital compliance?

Page 3871

MR. LEBLANC: Objection. Now it's leading, your Honor.

THE COURT: Sustained.

BY MR. INFELISE:

Q Based upon your view of Centereach's capital plan, did you have any opinion concerning whether there was anything else that Centereach could do to attain capital compliance?

MR. LEBLANC: Objection; leading.

THE COURT: Technically, it is. But I don't think it suggests an answer to the witness. So I'm going to allow the question.

MR. INFELISE: Thank you.

BY MR. INFELISE:

Q Do you recall the question, Mr. Caton?

A Could you repeat it, please?

Q I hope so. Based upon your review of Centereach's capital plan, did you have any opinion concerning whether there was anything else that Centereach could do to attain capital compliance?

A Yes.

Q What was that?

A It could have immediately merged with its parent company, Long Island of Syosset. It could have converted from mutual to stock form of ownership.

Page 3872

Q Let's take those one at a time. What would have been the result of Syosset and Centereach merging?

A As I recall, the combined entity would have been very close to capital compliance, much more so than Centereach on a stand-alone basis.

Q Why would that have been a preferable or an option that Centereach should have considered?

A It would have made coming into capital compliance much easier.

Q Why is that?

A Because the money it would have had to have raised would have been much lower.

Q Now, taking your second comment concerning conversion, why do you believe that they should have considered conversion back in, I believe, 1991?

A Well, the conversion would have happened with the combined entity, combined Long Island Savings Bank, Syosset and Centereach. That's just GAAP accounting. So the money they would have had to have raised to come into capital compliance would have been much lower than Centereach on its own.

At that point in time, what we were seeing from the capital plan process was a lot -- or many institutions -- many weak institutions were able to raise money in the capital markets. So Centereach was not, save

Page 3873

for its capital issue, was not in the same league as the other institutions, who were actually raising capital in the capital markets.

By that I mean, Long Island Savings Bank was profitable, it was well-run, it did not have asset quality problems, it had good asset-liability management, it had a good franchise value. It was a retail operation, rather than a wholesale operation. So it was able to generate loans and deposits from its -- from the community, rather than just purchasing them in bulk.

All of those factors would have added to its marketability and its overall value as an ongoing basis, as a going concern.

Q What, if any, impact on Centereach's ability -- or Centereach and Syosset's ability to convert would the fact that Centereach had a negative capital position have been?

MR. LEBLANC: Objection, your Honor; lack of foundation.

THE COURT: Just a moment. Overruled.

BY MR. INFELISE:

Q Could you answer the question?

A Yes. The division between Syosset and Centereach was illusory. It was a bookkeeping entry. The entities were operated under the same management, they operated under the same name. A customer going into Long Island Savings

Page 3874

Bank Centereach did not know that. It was Long Island Savings Bank.
So the division between Centereach and Syosset was just an internal Long Island Savings Bank bookkeeping entry.
So the whole entity would have converted.
And the fact that Centereach had a large capital shortfall would – was not a factor in the conversion process. The conversion would have happened on a consolidated GAAP basis, not on this bookkeeping entry.
Q Okay. Now, I think you mentioned in passing the cross-guaranty provisions of FIRREA?
A Yes.
Q Could you explain what those were?
A In response to some problems that the – in the commercial banking industry, Congress gave us these cross-guaranty powers. The problems that Congress addressed were a bank holding company may have operated different banks, different separate banks. I believe there was one case where the bad assets were transferred to one particular bank in the family of banks, that bank was allowed to fail, being a sacrificial lamb, if you will, and Congress addressed that problem so that a strong holding company or a strong sister banks would have been tapped before the weak bank would have been taken over.
Q And what powers did the cross-guaranty provisions

Page 3875

give to the OTS with respect to parent and subsidiary banks?
A That we would have – we could have gone to the parent for capital infusions into the subsidiary to bring it into capital compliance – bring the weak subsidiary into capital compliance, that the parent institution would not have gotten off scott free, if you will.
Q Would it matter whether or not the parent and subsidiary merged or not with respect to the cross-guaranty provisions?
A If it was – if the entities merged, then the cross-guaranties would be moot, because there would not be any sister banks, there would just be one entity.
Q If the parent and subsidiary did not merge, would OTS – what powers, if any, would OTS have with respect to enforcing the cross-guaranty provisions?
A We could have taken – we would have forced the parent to infuse enough capital to bring the subsidiary into capital compliance.
MR. INFELISE: Could I have one moment, your Honor?
THE COURT: Certainly.
MR. INFELISE: No further questions, your Honor.
THE COURT: Mr. Leblanc?
MR. LEBLANC: Your Honor, we do have one small binder. May I approach, your Honor?

Page 3876

THE COURT: Certainly.
CROSS-EXAMINATION
BY MR. LEBLANC:
Q Good afternoon, Mr. Caton.
A Good afternoon.
Q My name is Andrew Leblanc. I represent the Plaintiffs in this matter, and I just wanted to follow up on some of the questions Mr. Infelise asked you. Let me begin with one of the areas you started with. You described two thrifts that you said converted while you were at Kaplan, Smith with I think what you described as negative – I'm sorry, GAAP-insolvent institutions; is that right?
A That's right.
Q The two institutions you described were Atlantic Permanent and Frontier Federal; is that right?
A That's correct.
Q Those two institutions you said you didn't remember if they were insolvent on a RAP basis; right?
A That's correct.
Q Now, the two conversions, when you testified at your deposition, you identified those as 1983 conversions; correct?
A 1983, 1984 time period, yes.
Q So that's the period of time that those two

Page 3877

conversions occurred?
A Uh-huh.
Q Okay. Now, your involvement in the concurrent review process began in December of 1989; right?
A That's correct.
Q And it ended, you said, sometime in 1990; correct?
A Yes.
Q But for Centereach, it ended sometime later in 1991; right?
A Correct.
Q So your entire involvement while at the OTS with the institution known as Centereach was from December of 1989 to sometime in 1991?
A Today.
Q Until today? And I think actually at your deposition, you said until the time of your deposition; right?
A Yes.
Q One other question with respect to the two converting thrifts that you'd talked about, Atlantic permanent and Frontier Federal. When you say "GAAP insolvent," do you mean negative tangible capital?
A No, I mean negative capital.
Q Negative capital, period?
A Yes.

Page 3878

Q On a GAAP basis, though?
A On a GAAP basis. In other words, their liabilities exceeded their total assets.
Q That includes negative tangible capital; correct?
A No, negative tangible capital would have made them even more insolvent.
Q The OTS's original position with respect to the capital plan for Centereach was that Centereach and Syosset should be consolidated; isn't that true?
A That was one option. That was – that was – that was our belief that that would have been the quickest, most expedient way to bring the institution into – closer to capital compliance.
Q OTS's position with respect to these institutions was originally that they should be consolidated; isn't that correct?
A That's correct.
Q If you could turn with me behind tab 2 in your binder, to the document that's been identified as Plaintiffs' Exhibit 203. This is an interoffice memorandum recording a conversation between you and Joseph Kehoe on April 19, 1990; isn't that right?
A That's correct.
Q Mr. Kehoe was a supervisory agent for New York at the time; right?

Page 3879

A Yes.
Q And Mr. Kehoe was involved for the regional review of the capital plan; correct?
A Yes.
Q And you were working with him in that review as the OTS concurrent review?
A That's right.
Q And the conversation that's reported here between the two of you was a discussion within the scope of your responsibilities and those of Mr. Kehoe; right?
A Yes.
Q And Mr. Kehoe would have recorded this conversation within the scope of – as part of his duties at the region; isn't that right?
A That's right.
MR. LEBLANC: Your Honor, at this time we offer Plaintiffs' Exhibit 203 into evidence.
MR. INFELISE: Objection.
THE COURT: I'm sorry?
MR. INFELISE: Objection; lack of foundation. There's no evidence that Mr. Caton ever even saw this memo until it was shown to him today. It's obviously a memo prepared by Mr. Kehoe, not by Mr. Caton. Or, in fact, that it was ever sent to Mr. Caton.
THE COURT: Mr. Leblanc?

Page 3880

MR. LEBLANC: We're back at the 801(d)(2) issue, your Honor. It was prepared, as the witness testified, within the scope of Mr. Kehoe's duties, it accordingly is an admission pursuant to 801(d)(2). It's an authentic document, pursuant to the master stipulation. Its foundation has been laid.
THE COURT: There are a couple of problems. One is whether or not this would have been kept in the appropriate files. It's OTS's files. And second is whether Mr. Caton can, either independently or by reference to this document, remember. You've got a couple of bridges to cross, Mr. Leblanc.
MR. LEBLANC: With respect to the first one, your Honor, I think that goes to the business record exception.
THE COURT: It does.
MR. LEBLANC: Which this need not be, maintaining it in the files.
THE COURT: That's why I gave you an alternative, Mr. Leblanc.
MR. LEBLANC: Understood, your Honor.
BY MR. LEBLANC:
Q Mr. Caton, if you can take a look at this memorandum. Have you had an opportunity to review it?
A Yes.
Q Does that accurately reflect the conversation

Page 3881

between you and Mr. Kehoe?
A I would assume it does.
Q Do you have any reason to doubt that it does?
A No, I don't.
MR. LEBLANC: Your Honor, we'd offer the document at this time.
THE COURT: Mr. Infelise?
MR. INFELISE: Your Honor, I object and I ask for an opportunity just to voir dire briefly.
THE COURT: Absolutely.
VOIR DIRE EXAMINATION
BY MR. INFELISE:
Q Mr. Caton, Mr. Leblanc asked you have you had an opportunity to review it. Does that accurately reflect the conversation between you and Mr. Kehoe? And you said "I would assume it does."
Mr. Caton, have you ever seen this memo before today?
A No.
Q Ever had a chance to review it?
A No.
Q Ever discussed it at all with Mr. Kehoe?
A No.
Q Did you know that Mr. Kehoe prepared this memo?
A No, I didn't.

Page 3882

MR. INFELISE: No further questions.
THE COURT: Mr. Leblanc?
CROSS-EXAMINATION (Continued)
BY MR. LEBLANC:
Q Mr. Caton, you know who Mr. Kehoe was; correct?
A Yes.
Q And you described him as a supervisory agent for New York at the time?
A Yes.
Q And was the type of memorandum we're looking at here the type of memorandum that would have been kept by Mr. Kehoe?
A That I don't know. This is – it looks like a memo to his own files. I don't know what type of memos he kept in his files.
Q Have you seen interoffice memorandums such as the one that's before you before in your career at the OTS?
A In this exact format, I can't say. Different people had different formats. And yes, different people kept memorandums to their own files.
MR. LEBLANC: Your Honor, I think the foundation has been laid for this. Mr. Kehoe has been identified. It's an admission pursuant to 801(d)(2). Each of the elements of 801(d)(2) have been met through this witness's testimony. It is not a requirement of 801 D 2 that the

Page 3883

witness has previously seen the statement of the other employees of the Defendant for the admissibility of the document.
THE COURT: Mr. Infelise?
MR. INFELISE: Nothing further, your Honor. We're going to maintain our objection.
THE COURT: Mr. Leblanc, are you going to force me to ask questions of Mr. Caton myself?
MR. LEBLANC: I certainly hope not, your Honor.
BY MR. LEBLANC:
Q Can you look at the cc line on this memorandum.
A Yes.
Q Can you identify any of the initials that are indicated there?
A No. I can't say for certain who they refer to.
Q Did you have a conversation with Mr. Kehoe on April – do you recall having a conversation with Mr. Kehoe on April 19, 1990?
A Specifically, no.
Q Does looking at this document refresh your recollection as to whether or not you had a conversation with him?
A I'm – since – since Joe was the supervisor in charge of Centereach and that was the time period about when they filed a capital plan and should have been under

Page 3884

concurrent review, I suspect I did have a conversation with Joseph Kehoe.
Q If you could look back at the cc line on this, do you understand what the word "docket" means at the end of that?
A Yes.
Q What does that mean?
A It's a unique identifier for every thrift institution.
Q So does that, then, indicate, "the docket" in the cc, indicate this memo would have actually been placed in the unique file for Long Island Savings Bank of Centereach?
A For the district office, not in Washington.
Q But for the district office of the Office of Thrift Supervision, it would have been placed in the –
A In New York.
Q In New York?
A Not in Washington.
MR. LEBLANC: Your Honor, we would renew our offer of this document.
THE COURT: I'm attempted to admit it right now, but let me ask one question, if I may, Mr. Infelise and Mr. Leblanc, will you let me?
MR. INFELISE: Yes, your Honor.
MR. LEBLANC: Yes, your Honor.

Page 3885

THE COURT: Thank you.
Mr. Caton, are you familiar with an institution called First Federal of Rochester?
THE WITNESS: Yes, yes, I am.
THE COURT: How did you become familiar with that?
THE WITNESS: In my previous life at Kaplan, Smith, as well as with OTS. And they also filed a capital plan.
THE COURT: Did you work on that capital plan?
THE WITNESS: Specifically, I don't believe so. Personally, I don't believe so. I believe one of my staff did.
THE COURT: I see. Was you or your staff's work on the capital plan filed by First Federal of Rochester contemporaneous with that filed by LISB Centereach?
THE WITNESS: Yes. More than likely, yes.
THE COURT: The document is admitted.
(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 203, was received in evidence.)
BY MR. LEBLANC:
Q Mr. Caton, if you could look at the last sentence on this first paragraph. It reads "he confirmed that OTS's

Page 3886

position with respect to LISB was to require consolidation."
Do you see that sentence?
A Yes, I do.
Q That "he" refers to you; isn't that correct?
A Reading through it, yes.
Q So as of April 19, 1990, the OTS's position was to require consolidation; correct?
A That's -- that's correct. That was our initial -- our initial gut feeling of what should happen.
Q Now, in fact, the capital plan as approved, and I think you testified to this with Mr. Infelise, did not require consolidation of the two institutions; correct?
A That's correct.
Q And that was because Long Island Savings Bank wouldn't agree to consolidate the two institutions; isn't that right?
A Well, no, I think we gave Long Island Savings Bank maximum flexibility because of its good management, good earnings stream, the history of working well with the supervisory staff in New York, good asset quality. So I think all of those factors went into us having more flexibility than what we normally would have, which this sentence indicated.
Q Well, the institution certainly didn't want to consolidate the two banks; correct?

Page 3887

A I don't believe so, no.
Q And they resisted consolidating; correct?
A Yes.
Q And ultimately, OTS did not require them to do so as part of the capital plan?
A That's correct.
Q Now, I think you had mentioned earlier, OTS wasn't giving very much up in agreeing to not require consolidation, because OTS maintained the right to enforce the cross-guaranty provisions of FIRREA; correct?
A That's correct.
Q And so OTS could later just force the merger of the two institutions under those provisions; right?
A Yes. But again, we gave them flexibility to decide when they wanted to do it.
Q Now, the capital plan as approved did, in fact, impose restrictions on Centereach; isn't that correct?
A Yes.
Q It imposed restrictions with respect to their growth that Centereach could do?
A That was not unique to Centereach. That was a statute that --
Q So the capital plan did impose restrictions as to the growth that Centereach could do?
A Not the capital plan. The statute did.

Page 3888

Q Okay. Centereach was limited, however?
A Yes.
Q Okay. Centereach was limited in that it could make no capital distributions or pay dividends; correct?
A That's correct.
Q Centereach agreed to certain asset sales as part of its capital enhancement strategy; correct?
A That's what management proposed to us, yes.
Q Centereach agreed to sell some equity investments, some real estate assets as part of its capital enhancement strategy; correct?
A Yes.
THE COURT: I'm going to caution Mr. Leblanc that historically, the Court has taken a rather dim view of continued questions where you make a statement and then ask "correct" or "is that right." It would be better if you'd ask a question.
MR. LEBLANC: Yes, your Honor.
BY MR. LEBLANC:
Q During this period, you would agree that Centereach was subject to increased regulatory oversight?
A I would -- I would agree to that.
Q Was Centereach -- I'm sorry. Was Syosset required to infuse capital into Centereach under the capital plan?
A "Required" -- you've used the term "required"

Page 3889

throughout these questions. We did not require it. We viewed this capital plan as management's best effort to tell us how they were going to bring the institution into capital compliance. We approved or did not approve their plan. So did we require it? We did not -- OTS did not formulate these capital plans. It was management who formulated the capital plan. We approved what management submitted to us.
Q Once the capital plan was approved, if the institution deviated from the capital plan, it was subject to enforcement actions, right?
A Oh, no, not immediately. If it was -- if it came out of -- if it did not meet its targets, we did not immediately go to enforcement actions. It would have typically involved a phone call from, let's say, Joseph Kehoe to Long Island Savings Bank management, just asking what happened. So it wasn't -- it wasn't an immediate enforcement action.
Q However, wasn't the institution subject to some enforcement in the event that it deviated from its capital plan?
A That I can't say definitively. It would depend on the materiality of its deviation.
Q If a deviation was material enough, then the OTS could enforce -- could go into enforcement actions; correct?

A If they were material enough and management had no good explanation and had no plan of recourse or how they were going to recover, yes, I guess eventually it would have turned into an enforcement action.

Q Now, let's go back to where we were. The capital plan required Syosset to infuse capital into Centereach; right?

A Management's proposal was to infuse capital from Syosset into Centereach.

Q Let me see if I can use the term "called for."

A Okay.

Q Would that be acceptable to you?

A Well, again, I just don't want any confusion. We did not require -- we did not call for it. This was management's plan to us. So management told us they were going to infuse funds from Syosset into Centereach. We did not require it. We did not call for it.

Q Management did a capital plan because the OTS required it, though; isn't that right?

A Correct.

Q Now, under the capital plan, Centereach was to contribute a direct capital contribution of $2 million per year?

A Was to receive?

Q I'm sorry, Syosset was to provide a direct capital



contribution?

A Yes.

Q And the total contributions that Syosset was to make to Centereach totaled $81 million over the term of the capital period; right?

A That's correct.

Q I think you had testified before that Centereach's capital plan didn't show it coming into capital compliance by the end of 1994?

A That's right.

Q Was this a rare exception that Centereach received?

A I think it was the only exception to all of the capital plans that OTS reviewed.

Q What was your recommendation with respect to approval of the second capital plan submitted by Centereach?

A I concurred with the New York district office's approval recommendation.

Q If you could turn to the document behind tab 3 of your binder. This is a letter from you to John Stone at the FDIC dated April 23, 1991; is that right?

A Yes.

Q And in this letter, you're discussing the approval of the -- of Centereach's capital plan?

A Yes.



Q Was this letter written in the scope of your role as head of concurrent review of capital plans?

A Yes, it was. But I should point out that the FDIC had no involvement in the capital plan process. This was done just because the FDIC is the insurer of accounts, and that John Stone, myself, among other supervisors, held informal meetings, even breakfast meetings, to discuss certain issues, not only thrifts but also banks.

Q My question was just was this written in the scope of your employment as the head of concurrent review of capital plans for OTS.

A Well, yes. But I just wanted to point out that the FDIC had no involvement in that process.

MR. LEBLANC: Your Honor, at this time we would offer Plaintiffs' Exhibit 230 into evidence.

MR. INFELISE: No objection.

THE COURT: Admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 230, was received in evidence.)

BY MR. LEBLANC:

Q I think you had testified to this earlier with Mr. Infelise, but the measure of whether a thrift would be



released from a capital plan was simply based on whether they came into capital compliance standards; correct?

A That's correct.

Q Is it fair to say that OTS wanted thrifts to come into compliance sooner rather than later?

A Yes.

Q You talked about the con -- with respect to the consolidation issue, you described the distinction between the two institutions as illusory on your direct examination?

A Yes.

Q Is that the term you used?

A "Illusory" or merely a bookkeeping entry.

Q Now, you're saying this as a layperson, right, not in any legal sense?

A That is correct.

Q And it's true, is it not, that you're not suggesting that they were not legally separate entities?

A That is correct.

Q And you're not suggesting that they didn't respect all the legal requirements of being separate entities; correct?

A That is correct.

Q It's true, is it not, that there are many legal requirements beyond a mere bookkeeping entry to maintain a legal separation; right?

Page 3894

A Legal as well as accounting, yes.
Q Now, as of September 30, 1990, Centereach had approximately $477.5 million worth of goodwill on its books; is that correct?
A Okay. I – that sounds about right, yes.
Q That sounds about right? Okay. As a result of FIRREA, Centereach lost the ability to count supervisory goodwill as regulatory capital; true?
A True.
Q If Centereach's goodwill were counted as an asset for regulatory capital purposes, Centereach would have met all applicable requirements throughout the period of time you were considering their capital plan; isn't that right?
A I believe so, yes.
Q Not withstanding that Centereach lost $477.5 million in regulatory capital as a result of FIRREA, the government did not infuse any money into Centereach under the capital plan, did it?
A No, it did not.
Q The government, in fact, never offered to make any capital infusion to replace any part of the goodwill eliminated by FIRREA.
A I would agree to that. I don't think any offer was made.
MR. LEBLANC: That's all we have, your Honor, at

Page 3895

this time.
THE COURT: Thank you, Mr. Leblanc.
Mr. Inlelise, redirect?
MR. INFELISE: Yes, your Honor.
REDIRECT EXAMINATION
BY MR. INFELISE:
Q Mr. Caton, looking at the black binder that Mr. Leblanc gave you, specifically it was tab 3, PX 230. Do you have that in front of you, sir?
A Yes, I do.
Q I would like to direct your attention to the second paragraph where you state "we wish there was a plethora of capital available in the market for thrifts such as Long Island. Lacking such available capital at this time, we believe the conservative operations outlined in Long Island's capital plan present very little risk to the insurance fund."
I recall you testifying, sir, during my questioning that you believe that Long Island could have converted back in 1991?
A Yes.
MR. LEBLANC: Objection, your Honor; leading.
MR. INFELISE: Merely attempting to set a foundation, your Honor, a frame of reference for the next question.

Page 3896

THE COURT: All right. I'll allow that.
MR. INFELISE: Thank you, your Honor.
THE COURT: Overruled.
BY MR. INFELISE:
Q With respect to that statement, Mr. Caton, what, if anything, did you intend to convey to FDIC with this second paragraph concerning whether or not you believed Long Island could convert?
A Well, I'd like to reiterate that we – that the FDIC had no part of this capital plan approval process. This was part of just letting John Stone know, because we had informally talked about different cases, both bank cases and thrift cases. And Long Island Savings Bank was one thrift that we had discussed, just on an informal basis, because of its unique – its uniqueness. This was letting John know that yes, we did approve the capital plan of Long Island Savings Bank and that we, not – that capital was available in the capital markets for undercapitalized thrifts, and like anything, it's limited. We would have rather seen capital being funneled to more risky cases and more cases that we did not have the confidence in. And we were comfortable in letting Long Island operate as it was, without immediately coming into capital compliance. We were comfortable letting them just go along and operating as they were.

Page 3897

So this was just letting John know that yes, we wished that every undercapitalized thrift could have raised capital immediately, but we had to prioritize our cases. Long Island Savings Bank was one of those cases we had confidence in, because of its conservative operations, its low risk, its ability to generate earnings, its good franchise value, its good management. We had confidence that they would cause the insurance fund no harm by letting them not immediately come into capital compliance.
Q What did this second paragraph indicate with respect to the ability of Long Island to convert if it wished to do so?
A I thought that Long Island Savings Bank was one of the stronger institutions that we were looking at through this capital plan process, that it would have had a much easier time than many other thrifts we saw in the capital markets who were actually – and actually raised money during that time frame. Long Island had, like I said, a much better asset quality. It was well-managed. It was making money, had a good franchise value, all came into play, and all differentiated Long Island from thrifts who were actually making – or raising money in the capital markets during that time frame.
So Long Island certainly could have – just judging from what we were seeing, Long Island could have

Page 3898

raised capital in the capital markets, but it would have siphoned money off of more needy cases during that time frame.
MR. INFELISE: I see, thank you. No further questions, your Honor.
THE COURT: Mr. Leblanc, do you have anything further?
MR. LEBLANC: May I have one moment, your Honor?
THE COURT: Yes, certainly.
MR. LEBLANC: Nothing further, your Honor.
THE COURT: Mr. Caton, happily, I can excuse you.
THE WITNESS: Thank you so much.
THE COURT: Just a moment. It's a small catch, but only small.
I am about to give you a cautionary instruction, and if I read it, I think you will understand, I think you will understand the basis for it. If you've got any questions after I read it, please ask me about it.
THE WITNESS: Okay.
THE COURT: Thank you. This all relates to a provision in the Federal Rules of Evidence. The parties have requested, as they are entitled to under Federal Rule of Evidence 615, and as you know from not having been present in the courtroom during the testimony of any other witness, that witnesses be excluded from the courtroom

Page 3899

during the testimony of others so that each witness can give his or her testimony fresh, without being distracted by others' testimony.
My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness. You may obviously talk with your friends, family, colleagues, if they're not witnesses. But not witnesses.
THE WITNESS: I don't think they will be interested, your Honor, in Long Island Savings Bank and the capital plan process.
THE COURT: What's that?
THE WITNESS: I don't think they will be interested in the capital plan process.
THE COURT: Well, they might. But if you have any questions about who may be a witness, you may ask counsel or you may ask me.
THE WITNESS: Okay.
THE COURT: All right. Thank you.
THE WITNESS: Thank you.
THE COURT: Thank you for coming in today, and thank you for testifying. It's appreciated.
THE WITNESS: Certainly. No problem.
(Witness excused.)

Page 3900

MR. MADDEN: Yes, your Honor. The next witness on our agenda is Mr. Conway, which we are going to show by video. That's about a three hour and some minute video. So we could get started on it. There are some procedural issues we need to address before we do that.
The sole objection that we have, as far as I know of, and I don't know whether Plaintiffs have objections to the testimony that we want to show, has to do with part of the video where I ask Mr. Conway questions about a declaration he had given, and it was included in some motion that was filed in District Court. And I asked him some questions about that. We are opposed to that being shown or that declaration being used because it's hearsay under the rules. It's not a business record. That would be an exception. But it's not a business record.
It is an out-of-court statement offered for the truth, and it's hearsay. So that is the one issue we need to resolve at this point. That is at his deposition, page 224, line 21, through 230, line 14.
THE COURT: You were examining Mr. Conway about that, Mr. Madden?
MR. MADDEN: I asked him questions about a declaration he had filed – he had prepared and signed. He said he didn't write it, but he had signed it. But nevertheless, it's an out-of-court statement, which is

Page 3901

hearsay. And the rule is, hearsay is a statement other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. So I think it would qualify.
THE COURT: Well, the statement itself might qualify as hearsay – the declaration itself, as filed in District Court, certainly would be hearsay, but your examination about it would not be, would it?
MR. MADDEN: Well, the questions and answers wouldn't be. But it's based on what he said, and there's reading of what the declaration says, I'm asking "what did you mean by that." I mean, it's all – that itself –
THE COURT: But that's not hearsay.
MR. MADDEN: Right. That's – it's a mixed problem, your Honor. It's not the question and answers I'm concerned about. It's the declaration itself.
THE COURT: Mr. Cohen?
MR. COHEN: I agree with your Honor's assessment. I think that the declaration itself would not be received into evidence, but the question what did you mean when you say this, is not hearsay.
THE COURT: Or whether he was telling the truth or anything else. It's just like using a document to ask him, does this refresh your recollection, you know, did you tell the truth and so on and so forth.

# EXHIBIT 6

**Long Island Savings Bank v. U.S. No. 92-517 March 15, 2005**

**Heritage Reporting Corporation**

**Page 4326 to Page 4581**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4406

THE COURT: Thank you for appearing and testifying over the last several days.

THE WITNESS: You're welcome. Thank you.

(Witness excused.)

THE COURT: Ms. Evans, do you have the next witness?

MS. EVANS: I do, your Honor. Government calls Angelo Vigna. He's out in the hallway and will be here in a moment.

THE COURT: Thank you. Who will be handling this witness? Mr. Wallace.

Mr. Vigna, will you please take a post behind the court reporter and raise your right hand, please.

Whereupon,

ANGELO VIGNA

was called as a witness and, having first been duly sworn, was examined and testified as follows:

THE COURT: Please take a seat in the witness stand and make yourself comfortable. Once you've made yourself comfortable, would you please state your full name for the record.

THE WITNESS: Good morning. My name is Angelo A. Vigna. That's V-i-g-n-a.

THE COURT: Ms. Evans, you may proceed.

MS. EVANS: Thank you, your Honor.

Page 4407

DIRECT EXAMINATION

BY MS. EVANS:

Q Good morning, Mr. Vigna. Where do you reside?

A I reside in Montclair, New Jersey.

Q What degrees do you hold?

A I have a BS degree in accounting from St. Peters College and a savings and loan graduate degree from Indiana University.

Q What's your occupation?

A Currently employed with Sandler O'Neill and partners, an investment banking firm in New York City.

Q And what's your position there?

A Managing director.

Q How long have you worked there?

A Since 1996.

Q And please describe your employment history after college going forward, listing each – approximately each year and what you did, where you worked.

A I joined the Federal Deposit Insurance Corporation in February of 1964 and worked with them for four years as a field examiner. In 1968, I joined the Federal Home Loan Bank of New York as a supervisory analyst and was with the bank from '68 to 2000, and rose up through the ranks. When I left, I was the senior executive vice president and the director of agency functions for the bank.

Page 4408

In 2000, I transferred, moved over to the Office of Thrift Supervision initially as district director, and after we consolidated districts, I was the Northeast regional director, having regulatory responsibilities for the Northeast segment of the country, all of New England, New Jersey, Pennsylvania, Delaware and West Virginia. I left OTS in 1996 to join Sandler O'Neill and partners as managing director, which is where I am today.

Q And what position did you hold in the time period of 1989 to 1994?

A '89, with the creation of FIRREA, I went from being the senior executive vice president and director of agency functions at the Federal Home Loan Bank of New York to regional director for the Office of Thrift Supervision.

Q Thank you. Do you have any accounting certifications?

A No.

Q And describe your responsibilities during the period of time that you were a supervisory agent.

A I was – well, as supervisory agent, I was designated that back in the '70s. But I think the time period that you're referring to –

Q Right.

A – I was primarily responsible for the day-to-day operations of the regulatory responsibilities of the Federal

Page 4409

Home Loan Bank of New York, which covered at that time the district, which was the states of New York, New Jersey, the commonwealth of Puerto Rico and the Virgin Islands.

Q And during that period of time, the '89 to '94 time period, who was your immediate supervisor?

A My immediate supervisor was Bryce Currie, who was the president of the Federal Home Loan Bank of New York. But in terms of my regulatory responsibilities, I would report in to Mr. Ed O'Connell in Washington, who was the – I guess he was a regional director out of first the Federal Home Loan Bank Board and then OTS.

Q Have you spoken to anyone about this case or any related matter since you left your position with the government?

A None, except the people from the Department of Justice.

Q And did you supervise Syosset and Centereach in the period of 1989 to 1994?

A I did.

Q And did you have ongoing responsibilities to review their capital position during that period of time?

A Yes, I did.

Q Did you have a staff to assist you in dealing with these issues?

A I did.

Page 4410

Q And for purposes of my questions today, I'll be referring to Long Island when I mean Syosset and Centereach, the two institutions.
At some point, did Long Island fall out of capital compliance?
A Yes.
Q And what does that mean generally, to be out of capital compliance?
A That means that their regulatory capital was less than required levels by regulation.
Q Did Long Island file a capital plan?
A Yes, they did.
Q And tell us generally what a capital plan is.
A A capital plan is essentially a plan submitted by a capital deficient institution which demonstrates how and over what period they will come into compliance with the regulatory requirements.
Q And we're going to take a look at a document I think that you have in a binder. I'm not sure if they have been handed out. We'll hand those out now. We're going to be looking at PX 198. PX 198 is dated February 23, 1990. It's written to Mr. Conway, signed "very truly yours, Angelo A. Vigna."
Take a moment and look at that, Mr. Vigna. Have you seen this before?

Page 4411

A Yes.
Q And do you believe that you drafted it?
A I believe I signed it. One of staff might have drafted it for me.
Q So you recognize your signature?
A Yes, I do.
Q And tell us what this is.
A It is a request from Long Island Savings Bank by its CEO – a request that the bank not be considered subject to – not be subject to greater restrictions because of their net worth capital failure.
Q And that's your response?
A Yes, basically we're saying we're not going to subject them to additional restrictions.
Q And looking at the second paragraph, it says "during the period in which your capital plan is under review," and continues on, referring to the level of net interest credited.
Do you recall whether, in fact, you allowed them to do what's stated in this paragraph, to grow to net interest credited – to the level of net interest credited?
A We did.
Q Let's turn to another document, which is DX 317 in your binder. DX 317, for the record, says "internal memorandum" on the top, dated May 1, 1990. It says it's

Page 4412

from Ruth Ann Popielarski?
A Yes.
Q And Mr. Vigna, have you seen this document before?
A Yes.
Q Do you know whether you would have received this in the normal course of your work?
A I would have.
Q And who is Ruth Ann Popielarski?
A Ruth Ann worked for OTS. She was a – I guess she was at that time an analyst.
Q And looking at the document, there are some names on the first page, OTS/New York, and then underneath it, "the Long Island Savings Bank." Obviously, the first name is yours. Do you recognize the other names? Obviously, Ms. Popielarski is there.
A Yes.
Q And there's a reference in the first paragraph, it says "on Friday, April 27, 1990, a meeting was held at the OTS New York." Do you believe that you attended that meeting?
A Yes.
Q Were memos such as these routinely prepared in the normal course of business by the OTS?
A Yes.
Q Was it OTS's policy to keep these memos in their

Page 4413

files in the normal course of business?
A Yes.
MS. EVANS: Your Honor, I'd like to move DX 317 into evidence.
MR. WALLACE: We have no objection, your Honor.
THE COURT: Admitted.
(The document referred to, previously identified as Defendant's Exhibit No. DX 317, was received in evidence.)
MS. EVANS: And your Honor, I realize I neglected to move the previous document, PX 198 into evidence, so I'd like to do that now.
THE COURT: Mr. Wallace?
MR. WALLACE: We have no objection to that either.
THE COURT: Admitted.
(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 198, was received in evidence.)
BY MS. EVANS:
Q Was there an issue with respect to Long Island about consolidation?

Page 4414

A Yes.
Q And what was that in general?
A The people at Long Island, they wanted to keep the two institutions separate, particularly subsequent to the passage of FIRREA. And from a regulatory standpoint, our preference would have been to have them consolidated.
Q And turn to the second page of this document. We're going to look at the third paragraph from the bottom which begins with "the representative of LISB closed the meeting by reiterating the point that it has been to the benefit of the deposit insurance fund," et cetera. And it refers to at the end of the sentence not causing Syosset and Centereach to consolidate.
Did the regulators force Syosset and Centereach to consolidate?
A No.
Q Let's – did they eventually consolidate?
A Yes, they did.
Q Let's turn to PX 212. PX 212 has previously been admitted. It's a one-page document dated August 24, 1990, written to Mr. Viklund, signed "very truly yours, Angelo A. Vigna."
Mr. Vigna, do you recognize your signature?
A Yes, I do.
Q And do you believe this was something that you

Page 4415

drafted?
A Yes.
Q And there's a bcc at the bottom. Who is Mr. Albanese?
A Mr. Albanese was a senior member of the OTS staff in the Northeast region.
Q And does this indicate that you didn't require them to consolidate?
A Yes.
Q Let's turn to another document, which is DX 1571, which is also previously admitted. DX 1571 is dated May 22, 1991. It's written on OTS letterhead, sent to the board of directors of Long Island Savings Bank.
THE COURT: Ms. Evans, would you give me just a moment to catch up with my notes?
MS. EVANS: Certainly. I was just identifying. I wasn't going to start yet.
THE COURT: Thank you.
BY MS. EVANS:
Q Mr. Vigna, have you seen DX 1571 before?
A Yes.
Q And what is this?
A This is the conditional approval of the bank's capital plan.
Q Is that your signature on the second page?

Page 4416

A Yes, it is.
Q And do you recognize the names on the bcc list after your signature?
A Yes.
Q And do you recall whether or not the capital plan was, in fact, condition approved as described here?
A It was.
Q Let's now take a look at another document that looks like –
THE COURT: Now just a moment.
MS. EVANS: I'm sorry.
THE COURT: I'm sorry, Ms. Evans. I'm just not as fast as you.
MS. EVANS: I'm going a little faster than usual, I think, actually.
THE COURT: I have a little trouble keeping up with you. Thank you.
BY MS. EVANS:
Q We'll look at another document that looks like it's related, which is DX 387:DX 387 has also previously been admitted. DX 387 is dated later. It's dated October 30, 1991 on OTS letterhead to the board of directors. It says "re: conditional approval of capital plan." Have you seen this before, Mr. Vigna?
A Yes.

Page 4417

Q And tell us what this is.
A Again, this is the conditional approval, I guess, of a revised – further revised capital plan.
Q And the first paragraph refers to "the capital plan submitted," refers to various dates, October, revised December. It has other dates. Is it your recollection that there were revised capital plans that were, in fact, submitted consistent with this letter?
A Yes.
Q And is that your signature towards the back on page 17 at the top, internal page numbers at the top, LIP 040485?
A Yes, it is.
Q And do you recall the nature of any of the revisions in the capital plan?
A I don't recall what they were.
Q Turn to page 2 in the front of the document and let's look at the paragraph beginning with "approval of an exemption pursuant to Section 5(t)(7)(B), and within that paragraph, it says "as long as the association abides by its capital plan and the terms of this letter, a capital directive will not be sought by the OTS." What does that mean?
A Essentially what it says. As long as the bank operates in accordance with its capital plan, OTS will not

Page 4418

seek to issue a capital directive.
Q And what is a capital directive?
A A capital directive would be an order to the bank to take certain actions consistent with achieving compliance with capital requirements.
Q And did Long Island comply with its capital plan while it was in effect?
A My recollection is that it did.
Q We're finished with that document. Mr. Vigna, at some point, did Long Island become critically undercapitalized?
A Yes.
Q And tell us what critically undercapitalized means, as the term was used in the '80s and '90s.
A My recollection is that any institution that fell below a certain level of capital was critically capitalized. There are different levels of undercapitalized and critically undercapitalized was the most severe.
Q Let's turn to another document in your binder, which is PX 293. PX 293 has previously been admitted. PX 293 is a three-page document dated December 22, 1992, written on OTS letterhead to the board members of Long Island SB of Centereach, FSB. And have you seen this before, Mr. Vigna?
A Yes, I have.

Page 4419

Q And is that your signature on the second page?
A Yes, it is.
Q And looking at the second page, there are some cc names. Can you tell us what those are?
A Mr. Albanese is the – at the time was regional deputy director of OTS, and Mr. Ketcha was the regional director for the Federal Deposit Insurance Corporation.
Q And the first page of this refers to "Prompt Corrective Action (PCA)" provisions. Are you familiar with those provisions?
A Yes.
Q And tell us what those were generally.
A Generally, institutions that fell below the capital requirements were subject to certain prescribed operating conditions while they were in noncompliance.
Q And turning to page 2 of the document, the first full paragraph beginning with "a savings association," take a look at that first sentence. It refers to those being operating under a capital plan approved before December 19, 1991 being exempt from certain PCA restrictions. Generally tell us what that means.
A Basically, what it means is what it says, is that if you had an approved capital plan, some or most of the normal restrictions that are imposed for noncompliance are waived.

Page 4420

Q And looking at the next page, the page after that, the third page, there's some handwriting at the top. Is that your writing?
A No.
Q It says "grandfathered." Do you know what that means?
A In the context with this letter, I can only guess it means that the bank is grandfathered from the number of the PCA corrective actions.
Q Did you ever tell anyone associated with Long Island that you or other regulators might terminate their plan?
MR. WALLACE: Objection; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Did – Mr. Vigna, did you talk with anyone associated with Long Island about the status of their plan?
A I don't recall any such conversations.
MS. EVANS: Just a moment, your Honor?
THE COURT: Yes.
BY MS. EVANS:
Q Would the OTS have taken any action if Long Island fell out of compliance with its approved capital plan?
A Could have, yes.
Q And would it have put it into receivership under

Page 4421

any circumstances?
MR. WALLACE: Objection; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Tell us what actions it could have taken.
A Well, full range of actions, depending upon the severity of the noncompliance with the capital plan.
Q And we have been looking at PX 293, which is dated December 22, 1992. Did Long Island come into capital compliance at some point after this?
A Yes, it did.
Q Let's take a look at another document, PX 332. PX 332 is dated December 3, 1993, and it's also an admitted document, written on OTS letterhead to the board of directors, signed "very truly yours, Angelo A. Vigna, Regional Director."
Mr. Vigna, do you recognize this document?
A Yes, I do.
Q And what is this?
A This is notification to the board of directors of Long Island Savings Bank that they were now in capital compliance and were no longer subject to any of the restrictions of their capital plan or prompt corrective action.
Q And the first paragraph indicates, it says that

Page 4422

"the conditional approval of the capital plan is hereby terminated." What did that mean for Long Island?
A It meant that they were able to operate free of any restrictions imposed by reason of the capital plan.
Q Do you recall whether or not anyone associated with Long Island ever asked you whether they could merge the two institutions and come into capital compliance during the capital plan period?
A I don't recall if they did or not.
Q If you had received a request to merge the institutions and bring them into capital compliance prior to September 3, 1993, would you have granted that or not?
MR. WALLACE: Objection, your Honor; he's asked for speculation.
MS. EVANS: Your Honor, I don't really think it's speculation. Mr. Vigna is certainly qualified to testify as to his views on the capital plan and what Long Island could or could not do during that plan.
MR. WALLACE: Your Honor, the attorney is asking the witness to speculate on what he would have done if a request was made or not made that he doesn't recall whether it was made. Clearly asks him to speculate what he would have done. He doesn't even recall whether the request was made.
MS. EVANS: I'm not sure whether the request was

Page 4423

made should be relevant to him answering the question.
THE COURT: The way the question is asked, it does call for speculation. There are a set of questions you could ask Mr. Vigna, Ms. Evans, that would provide a predicate for an appropriate answer.
BY MS. EVANS:
Q Mr. Vigna, under what circumstances may you have released Long Island from the capital plan?
A Achieving capital compliance.
Q And what things could they have done to achieve capital compliance?
A I believe they could have – they could have consolidated both institutions.
Q Did you ever contact anyone from Long Island or their counsel and threaten to seize Long Island?
MR. WALLACE: Leading, your Honor; objection.
MS. EVANS: Your Honor, I don't think it's a leading question. It doesn't suggest an answer.
THE COURT: Well, it is, but I guess if I had to, I would sustain the objection on the ground that it's vague. Do you see what I'm driving at? You said Long Island, and I don't know if that's really what you mean.
MS. EVANS: Yes. Probably – Centereach would be more accurate. Shall I –
THE COURT: You ought not to ask a leading

Page 4424

question, Ms. Evans.
BY MS. EVANS:
Q Yes. Mr. Vigna, do you recall having conversations with anyone from Centereach about the capital plan?
A I'm sure I had discussions with them about the capital plan. I, at this point in time, can't specifically recall any particular conversation.
Q In any of those conversations, was there any discussions of seizing Centereach?
MR. WALLACE: I'm going to object, your Honor. It's leading and lacks foundation. He just testified, he doesn't remember the conversations.
THE COURT: I really should sustain that objection, but –
MS. EVANS: Yes, I think he said – I don't have it in front of me, but he said that he believes he did have conversations, which is different than –
THE COURT: Yes, but he can't recall any particular conversation. I guess –
BY MS. EVANS:
Q Mr. Vigna, did – are there any circumstances under which you believe that regulators would have seized Centereach during the period of 1989 up to 1994?
A Not as long as they were in compliance with their

Page 4425

capital plan.
Q If there were some technical noncompliance with the capital plan, would you have taken any action?
MR. WALLACE: Objection, your Honor; vague, ambiguous.
THE COURT: It is, but nonetheless, I'm going to overrule the objection and allow Mr. Vigna to answer. Will you please answer, given any caveats that you might want to put on your answer. I don't know exactly what's meant by "technical noncompliance."
THE WITNESS: Could you just read that question back to me, please?
(The reporter read the record as requested.)
THE WITNESS: Probably – I mean, certainly not – we certainly wouldn't seize the institution for a technical violation, but, you know, we would certainly try and, at that point, work with the institution to correct whatever the violation was. But seizure wouldn't be – you know, as long as they were, from a financial standpoint, complying with the conditions and the terms of their capital plan, that wouldn't – that wouldn't constitute a reason to seize the institution.
MS. EVANS: Thank you.
Just a moment, your Honor; just a brief pause.
BY MS. EVANS:

Page 4426

Q . You testified just a moment ago briefly about the possibility of taking some action by the OTS if there was noncompliance with the capital plan. Would you have been able to put it into receivership?

MR. WALLACE: Objection, your Honor; leading.

THE COURT: Well, I don't know the difference between seizing an institution and putting it into receivership. But there might be one. There's got to be a more artful way, Ms. Evans, for you to ask the question.

MS. EVANS: Let me just –

BY MS. EVANS:

Q Where would putting Centereach into receivership fit in the list of actions OTS may have taken for noncompliance with the approved capital plan?

A That would be the most severe action you could take.

Q Did Long Island convert from a mutual to stock form?

A Yes, they did.

Q Do you recall when that occurred?

A I believe that was 1994-95 period.

Q And Mr. Vigna, do you have an opinion as to whether or not Long Island would have converted to stock form absent FIRREA?

MR. WALLACE: Object, your Honor. I think she's

Page 4427

asking for an expert opinion. The witness is here as a fact witness. Otherwise, she's asking the witness to speculate.

MS. EVANS: Your Honor, I don't believe it calls for an expert opinion. Certainly, Mr. Vigna is well-qualified and was constantly monitoring Long Island and is certainly well-qualified to talk about actions that he believed they would take and things going on in the industry.

THE COURT: Well, one of the small problems that we have in evaluating that question, Ms. Evans and Mr. Wallace, is that we don't know the extent to which Mr. Vigna was familiar with the details of Long Island Savings Bank's operation. I'm going to use "Long Island Savings Bank's operation," because by this point, I guess, it was a consolidated institution.

I'm nonetheless going to overrule the objection, but I ask Mr. Vigna if you would testify as to your own personal knowledge. And then if you've got a view, will you please state the bases for any view you might have.

THE WITNESS: My view would be that they would have converted, regardless of FIRREA. Most of their competitors in New York metropolitan area and Long Island converted. Conversion would have given them certainly more flexibility, in terms of acquisitions. I think that they certainly had further designs or wanted to make themselves

Page 4428

available to be an acquirer. And as a public company, then they could offer stock, rather than as a mutual, all they could offer was cash. There are points in time where cash – stock and a combination are more attractive to sellers.

Also, you know, and I think they wanted to create or to set up stock-based incentive plans for their management and board, and I think for those reasons, it's my judgment that they would have converted, regardless of the impact of FIRREA.

MS. EVANS: Your Honor, this may be a good time to take a break and we can come back and continue with Mr. Vigna, since we're past our normal lunchtime. We'll probably continue for about 15 minutes after that, or 20.

THE COURT: Mr. Wallace?

MR. WALLACE: We have no objection, your Honor.

THE COURT: Mr. Vigna, if we take a luncheon break, will that be satisfactory to you?

THE WITNESS: I have no objection, your Honor. Thank you.

THE COURT: All right, thank you. We'll take a one-hour luncheon recess at this time.

(Whereupon, at 12:32 p.m., the hearing was recessed, to be reconvened at 1:32 p.m. this same day.)

Page 4429

AFTERNOON SESSION (1:33 p.m.)

Whereupon,

ANGELO J. VIGNA

resumed the stand and, having been previously duly sworn, was examined and testified further as follows:

THE CLERK: All rise. The Court is again in session.

THE COURT: Please be seated.

Ms. Evans, you may proceed.

MS. EVANS: Thank you, your Honor.

DIRECT EXAMINATION (Continued)

BY MS. EVANS:

Q Mr. Vigna, turn to – in your binder to DX 1841. DX 1841 is dated at the top January 21, 1994 from David A. Permut to Angelo J. Vigna, Douglas J. Cestone and there's some cc's. Mr. Vigna, have you seen this before?

A Yes, I have.

Q Do you believe that this is a document you had received?

A Yes.

Q Would you have reviewed this in the ordinary course of your work?

A Yes, I would.

Q Would the OTS have maintained this in the ordinary course of their business?

Page 4430

A Yes.
MS. EVANS: Your Honor, I would like to move DX 1841 into evidence.
MR. WALLACE: We will not have an objection ultimately, but there's been no foundation for it, I don't think.
MS. EVANS: I'll ask Mr. Vigna a few more questions about it, your Honor.
THE COURT: Thank you.
MS. EVANS: I have a few more questions.
BY MS. EVANS:
Q Mr. Vigna, this is written also to Douglas J. Cestone. Who is Mr. Cestone?
A Mr. Cestone was a staff member at the OTS regional office, and I believe at the time he managed our applications and corporate activities group.
Q And who was David A. Permut?
A David Permut was a lawyer in Washington in the business transactions division.
Q There's two cc names. Do you recognize those?
A Yes.
Q Who were they?
A Mr. Comizio at the time managed the business transactions group in Washington, and J. Larry Fleck was a senior staff member in business transactions.

Page 4431

Q And tell us what this is.
A This is an information memorandum concerning – or discussing the maximum amount of benefit plans that Long Island Savings Bank could establish as part of their conversion.
MS. EVANS: Your Honor, I would like to move it into evidence at this point.
MR. WALLACE: We have no objection, your Honor.
THE COURT: Admitted.
(The document referred to, previously identified as Defendant's Exhibit No. DX 1841, was received in evidence.)
BY MS. EVANS:
Q Mr. Vigna, looking at the first paragraph, second sentence, it begins "since LISB has 5.3 percent tangible capital going into the conversion, they would be eligible for 3 percent for their MRP and 7 percent for their ESOP" Is it your recollection that that's what the situation was at the time?
A Yes.
Q Mr. Vigna, you previously testified looking at the transcript page 103, earlier today you testified you thought Long Island wanted to create or set up stock-based incentive

Page 4432

plans for their management and boards. Did Long Island in fact submit a stock plan for approval by the regulators.
A Yes.
Q What do you recall about the structure of that plan they submitted?
A With regard to – you're talking about the benefit plans?
Q Yes.
A The original submission indicated that, in fact, the board of directors would receive 70 percent of the benefit plans and management 30 percent, which I found to be unacceptable, I so advised them, and they revised the benefit plans, as I recall, basically flipped the percentages, 70 percent to management and 30 percent to the board.
Q And was that structure followed throughout the OTS?
A Well, I guess it subsequently became the standard and eventually was incorporated into the regulations.
Q Let's take a look at a document that I think you have in your binder but I think we're going to hand it out, which is DX 958. I think you might have it inside the front flap of your binder. Do you have it there?
A Okay.
Q Before we do that, let's take one or two more

Page 4433

questions about DX 1841, so put DX 958 aside for a moment. Looking at the third sentence of DX 1841, it begins with "we have allowed 4 and 8 percent when the institution had 10 percent tangible capital" and continuing on. Read that sentence.
(Witness reviewed the document.)
Was there a significance to Long Island reaching 8 percent tangible capital
A Yes, they could then increase the size of the benefit plans.
Q Let's go ahead and turn to DX 958. And Mr. Vigna, have you seen DX 958 before?
A Yes.
Q And what is this?
A It's a thrift bulletin, providing guidelines for institutions filing capital plans and for exemptions and exceptions to those capital plans.
Q Is this a document that you used in your work?
A Yes.
Q And turn to the last page. There's a signature, Darrel, how do you say that, Dochow?
A Dochow.
Q Who was that?
A Mr. Dochow was at that time senior deputy director for supervisory operations in Washington, D.C.

Page 4434

Q And was DX 958 distributed?
A Yes, it was probably sent out at least to all capital-deficient institutions and possibly to all institutions.
Q And was this document kept by OTS in the normal course of business?
A Yes.
MS. EVANS: Your Honor, I'd like to move DX 958 into evidence.
MR. WALLACE: Your Honor, I think you can take judicial notice of it.
THE COURT: Well, just to be on the safe side, I'll do with this one what I did previously with the staff accounting bulletin. It's admitted as an exception to the hearsay rule under 803.8.
(The document referred to, previously identified as Defendant's Exhibit No. DX 958, was received in evidence.)
MS. EVANS: Thank you, your Honor.
BY MS. EVANS:
Q You can put that aside. Mr. Vigna. Did you know Mr. Conway when you worked for the OTS?
A Yes, I did.

Page 4435

Q And who was he?
A Mr. Conway was chairman and CEO of Long Island Savings Bank.
Q And did you have dealings with him in your supervision of Long Island Savings Bank?
A Yes, I did.
Q Did your office conduct an investigation of the activities of Mr. Conway?
A Yes.
Q What was the nature of the investigation?
A It was a review of his relationship to a law firm in which he purported to have a minority interest when, in fact, he was – he had a significant interest and most of the proceeds from the law firm were, in effect, going to his account.
Q And how did this come to your attention?
A As I recall, it came through a – there was a publication, a law publication which presented a case in which a CEO had hired some attorneys to review some – a firm working for the institution as, in effect, the lawyers discover that, in fact, this CEO had a significant relationship with the firm. In looking at it, it appeared that it might be – the firm might be – at least the bank might be Long Island Savings Bank. And we commenced an enforcement review of

Page 4436

those transactions.
Q And what was the result of the enforcement review?
A The review disclosed – it was done in conjunction with the U.S. Attorney's office – that, in fact, Mr. Conway had a material interest in the law firm and that he had failed to disclose that interest and, in fact, had violated the OTS conflict of interest rules and had also engaged in unsafe and unsound practice.
Q And let's take a look at a document in your binder, DX 1858. DX 1858 is dated February 24, 1994, "United States of America, before the Office of Thrift Supervision, Department of the Treasury, in the matter of James J. Conway, Sr.," it says "consent order of prohibition and consent cease and desist order requiring restitution and other affirmative action." Do you recognize this document?
A Yes.
Q And what is this?
A It is essentially what it says. It's a consent order of prohibition prohibiting Mr. Conway from ever engaging – being involved in any insured financial institution. Also, it was his consent to the issuance of a cease and desist order requiring restitution, and I guess there was some other affirmative action that's also involved here too.

Page 4437

Q And turn to page 4. Is that your signature?
A Yes, it is.
MS. EVANS: Your Honor, I'd like to move DX 1858 into evidence.
MR. WALLACE: Your Honor, we may have a relevancy objection. I'd like to ask the Court to reserve on it until cross-examination is complete.
MS. EVANS: Your Honor, the Government's position is that this goes to motivations of the bank, as Mr. Conway was running the bank, and activities that the bank took at various points in time. We believe – related to Mr. Conway's wrongdoing and perhaps the need to cover up certain things.
THE COURT: Well, I don't have any problem with the idea of putting this in, but I don't see any counterpart signature on the part of Mr. Conway.
MS. EVANS: I'm not sure if he ever – this is the only document that I have. Let me confer with Mr. Madden. Mr. Vigna may know what the procedure was.
THE COURT: Ms. Evans, that's why I'm raising it now. I was just trying to figure out whether this is a document that required Mr. Conway's signature. And I can't tell, to be honest about it.
BY MS. EVANS:
Q Mr. Vigna, did this document require Mr. Conway's

Page 4438

signature?
A Apparently not. There's no provision here for his signature. But I think there has to be some acceptance, acknowledgment of his consent.
Q And did he consent to this?
A I believe so.
Q Do you know whether there was – do you have a specific recollection if there was another document that he signed?
A I don't recall.
MS. EVANS: We would still like to move this into evidence. It appears that it didn't require this particular document. There may be something else that he signed that we don't have.
THE COURT: I'm sorry, Mr. Wallace?
MR. WALLACE: I didn't want to interrupt the Court. You can speak first, if you like.
THE COURT: I have a small problem. I don't have any doubt that Mr. Conway was sanctioned, but there ought to be something that indicates his acceptance of this. Otherwise, how can we tell whether it was a consent or not, effective against him?
MS. EVANS: Mr. Vigna has knowledge that he consented. That's –
THE COURT: I don't think he's testified to that.

Page 4439

While you've got him on the stand, it might be prudent for you to address these points.
MS. EVANS: Yes. I think I asked.
BY MS. EVANS:
Q But Mr. Vigna, did Mr. Conway consent to this prohibition?
A My recollection is that he did. And, in fact, paid the financial benefit.
Q To your knowledge, Mr. Vigna, Mr. Conway, was he barred from the industry?
MR. WALLACE: Objection; leading, your Honor.
MS. EVANS: Well, the document clearly says that, so I don't think there's any –
THE COURT: Why don't we just ask what the sanctions were and whether they're still in effect to Mr. Vigna's knowledge, a few questions like that that aren't leading questions.
MS. EVANS: Certainly.
BY MS. EVANS:
Q Mr. Vigna, what were the sanctions imposed upon by Mr. Conway by this document?
A First he was prohibited from participating in any manner in the conduct of affairs of Long Island Savings Bank or any other insured financial institution. And secondly, he was imposed a $1.3 million monetary penalty.

Page 4440

THE COURT: Mr. Wallace?
MR. WALLACE: Your Honor, my objection is somewhat technical but I think perhaps somewhat important, given where we are with this document. There's no doubt that something was agreed to. It is not at all clear that this is what was agreed to by Mr. Conway.
Now, I have no trouble with Mr. Vigna, if he, in fact, recalls of his own independent recollection, testifying what the ultimate sanction was. I have no trouble with that at all.
I also have no trouble with respect to this document says whatever it says. But I think he's blending the two, because I think the witness has testified that he does believe that Mr. Conway signed this, as clearly he would have had to, and the one he signed is the one that he agreed to. And he's either testifying as to this or he's testifying as to the one Mr. Conway actually signed. And that's my objection to the question and the answer. I'd move to strike it.
THE COURT: Well, let's ensure that Mr. Vigna is testifying of his own personal knowledge. I mean, this is something that Mr. Vigna might well remember of his own personal knowledge.
MS. EVANS: Yes. That was going to be my question, your Honor.

Page 4441

BY MS. EVANS:
Q Mr. Vigna, the answer you gave regarding Mr. Conway and the sanctions that were imposed upon him, is that based on your own knowledge of the situation?
A That's based on my best recollection of what occurred.
MS. EVANS: I don't have any further questions about this document. Again, I'm not sure that we have as an exhibit any other document. I mean, we can certainly check, but – we can certainly search our records and if we find one, we can substitute. I'm not sure if it will work quite like that. It's a bit unusual.
THE COURT: Well, you might have an addendum to it that could complete it.
MS. EVANS: Yes.
THE COURT: I could ask some questions now that might help, but I'm reluctant to do that, I really am. When I say "help," I mean clarify the situation. I'm going to wait until after Mr. Wallace is done with his cross-examination. Unless you have something further you care to ask now.
BY MS. EVANS:
Q Mr. Vigna, was Mr. Conway required to sign a document independent of this for this to be in effect?
MR. WALLACE: Your Honor, objection. It's

Page 4442

leading.

THE COURT: Well, it is, but on the other hand, it might help us out. I'm actually going to overlook the fact that it's leading, and we'll ask Mr. Vigna to testify in response of his own personal knowledge.

THE WITNESS: My recollection is that, yes, Mr. Conway had to sign some document acknowledging his consent.

BY MS. EVANS:

Q Consent to what's in this document?

A To the issuance of this order.

MS. EVANS: Your Honor, we will look and see if we have another document and get back to the Court. I have no further questions for Mr. Vigna.

THE COURT: Thank you. Mr. Wallace?

MR. WALLACE: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. WALLACE:

Q Good afternoon, Mr. Vigna.

A Good afternoon.

Q I thought we might start in just trying to clarify, if we can, your direct testimony with respect to when you were with the Federal Home Loan Bank Board and when you left and that sort of thing. I think we might have a

Page 4443

confusing transcript, okay?

A Okay.

Q We're going to go back to that if we can. And I'm going to focus very specifically on the testimony you gave on your direct examination, which we've put up there. And I believe you testified that in 1968, you joined the Federal Home Loan Bank Board of New York as a supervisory analyst; is that correct?

A That's correct, yes.

Q Okay. And then the transcript goes on to say that you were with the bank from '68 to 2000; is that correct?

A Yes, that's correct.

Q Okay. And then it says in the next paragraph, in 2000 you transferred over to the OTS. Do you see that?

A Yes.

Q And is that correct?

A Yes, it is.

Q All right. And then the next paragraph it says you left OTS in 1996. Do you see that?

A Yes. I'm sorry, the 2000 is correct. It should be 1990.

Q So you left OTS in 2000?

A No, I left OTS in 1996. But the transfer occurred in '90, 1990.

Q So where it says "in 2000 you moved over to the

Page 4444

OTS," that should say 1990?

A That should say 1990, yes.

Q So if we made that 1990, that would then be correct?

A Yes, it would.

Q Okay. And –

A Sorry, just – you know, it's too many years.

Q I understand.

A Too many miles and too many years.

Q And you left OTS in 2000 or 1996?

A 1996.

Q 1996, all right. I'm hoping we might, from that point, actually walk through now your responsibilities at your various positions which you did briefly on direct examination. I want to do it in a little bit more detail, if we can, okay?

A Sure.

Q All right. I believe your testimony is that you went to the Federal Home Loan Bank Board, and you were with the Federal Home Loan Bank Board now from 1968 until when?

A 1996 – 1990. 1990.

Q 1990.

A And it wasn't the Federal Home Loan Bank Board. It was the Federal Home Loan Bank of New York.

Q All right. And I believe your testimony during

Page 4445

direct examination was that you started as a supervisory agent; is that correct?

A No, as a supervisory analyst.

Q Analyst, I'm sorry. And you worked your way up to senior executive vice president and director of agency functions; correct?

A Correct.

Q All right. Starting as a supervisory analyst, did you have any responsibilities for Long Island Savings Bank?

A No.

Q Did you have any responsibilities for Syosset?

A No.

Q How about Centereach?

A I might have. As an analyst, my job was to review exam reports and draft letters to the board of directors. Centereach would have been an institution that we would have regulated at that time, and it's possible that I might have reviewed exam reports.

Q And, in fact, you had regulatory responsibility for Suffolk County Federal Savings & Loan and the County Federal Savings & Loan since the mid-1970s; isn't that correct?

A That is correct.

Q Your responsibilities included the creation of the phoenix institution that put those two together; correct?

Page 4446

A Yes, it was.
Q And you assumed responsibility for Long Island Savings Bank Syosset when it converted to a federal savings and loan association; is that correct?
A It converted to a federal savings bank.
Q I'm sorry, federal savings bank, correct.
A I guess that was early '80s, '81, '2, '3.
Q And, in fact, you had some –
THE COURT: Ms. Evans?
MS. EVANS: We didn't ask Mr. Vigna anything about this time period. This is outside the scope of our direct examination.
THE COURT: Mr. Wallace?
MR. WALLACE: She asked very clearly about his responsibilities starting all the way back from before this time period.
THE COURT: Ms. Evans?
MS. EVANS: We asked him to say what job he had. I guess it depends on where he's going, so maybe I'll – I'll withdraw it for now.
THE COURT: Thank you.
BY MR. WALLACE:
Q And, in fact, your responsibilities included a review of the application of LISB of Long Island – of Syosset to acquire the phoenix institution, didn't it?

Page 4447

A Yes, it did.
Q And you were directly involved with that process, weren't you?
A Yes, I was.
Q And did you continue to have responsibility for Long Island Savings Bank, all the way up until the time you left the government?
A Well, up until the time – yes. Yes.
Q And you had no responsibility after that, obviously; correct?
A Obviously.
Q All right. And you're not a lawyer?
A No, I'm not.
Q And you have no legal training?
A No, I haven't.
Q But in connection with the Conway investigation, you did have lawyers, in doing that investigation; correct?
A Yes, we did.
Q Were they reporting to you or were you reporting to them?
A They reported to – they reported to at that time the office of enforcement in Washington.
Q Would your responsibilities have included being involved in the negotiations of the assistance agreement?
MS. EVANS: Objection, your Honor. Again, the

Page 4448

mere fact that we asked him to list his jobs, this is not a category that we went into on direct. And it's improper for Mr. Wallace to begin asking him questions regarding this. Well, certainly they could have called him in their case and, in fact, they did, in fact, do that to a certain extent by reading his deposition transcript into the record, so they had every opportunity to call him in their case-in-chief and, in fact, they did that in their limited way.
MR. WALLACE: Your Honor, the question that was asked was please describe your employment history, after college going forward, listing each approximate year and what you did. And I'm entitled to follow up on that, your Honor, no matter how humorous Government counsel thinks it might be.
MR. MADDEN: Excuse me. I apologize, your Honor.
THE COURT: All right. I don't have any doubt but that we have heard of Mr. Vigna at a number of – on a number of occasions in the over a month now we've been at trial, and we have testimony – deposition testimony that covers these topics. And I don't have any doubt that this has been opened up today. So I'm going to overrule the objection and allow this to go forward.
MR. WALLACE: Could we re-ask the question, please? I'll re-ask it.

Page 4449

BY MR. WALLACE:
Q Mr. Vigna, did your responsibilities include being involved in the negotiation of the assistance agreement?
A Yes.
Q Did your responsibilities also include monitoring compliance with the assistance agreement after it was signed?
A Yes.
Q Did your responsibilities also include generally trying to find a solution to the insolvencies of various savings and loans in the early 1980s?
A Yes.
Q And did your responsibilities also include the consideration of using goodwill as one of the tools for solving the insolvency problems with the savings and loans in the early 1980s?
A Yes.
Q And as part of those responsibilities, were you in favor of using goodwill as a tool for solving the insolvencies of certain insolvent savings and loan associations?
A Are you asking my personal opinion?
Q Your professional opinion, actually, is what I'd prefer.
A It was – my view is it was the lesser of the

Page 4450

evils. You know, we thought this was a way to resolve insolvent institutions and in a manner that would conserve the resources of the Federal Savings and Loan Insurance Corporation. So I was supportive of the goodwill process.

Q And, in fact, it was your understanding that the use of goodwill was a device to solve the problem of the government not having enough money to resolve all of the deficits of the troubled thrifts; isn't that correct?

A That's correct.

Q And you would agree with me that goodwill certainly had value to FSLIC in resolving the supervisory cases; isn't that correct?

A Well, I don't think it had any value to the FSLIC. It allowed – it was a process by which we could keep institutions operating and hopefully over time, through a number of balance sheet and operating factors, could resolve their insolvencies.

Q Do you recall ever expressing the view that goodwill did have value to the FSLIC in resolving supervisory cases?

A I don't have any recollection.

Q But that's not your view today?

A Oh, no, I think – no, that is my view. I mean, you say that it has value to – it has value in a sense that it allowed us to keep the doors open, and we thought that by

Page 4451

keeping the doors open, as long as the losses weren't growing. In some cases as in the phoenixes, it meant putting the institution into better management hands, with the expectation that they could rebuild the balance sheet and hopefully raise capital, either through a sale of the company or raising capital in the capital markets.

Q Would you agree with me that allowing the acquiring institution to use regulatory supervisory capital had huge value to FSLIC, at least in the context of the phoenix program?

A Could you read that question back, please?

Q I'll rephrase it. Would you agree with me that the use – the ability to use supervisory capital by acquiring thrifts had huge value to the FSLIC in the context – at least in the context of the phoenix program?

A I'm not sure I understand your question. What do you mean by "supervisory capital"?

Q Do you have any understanding of that phrase – I'm sorry, supervisory goodwill. I'm sorry.

A Because there's other capital.

Q My mistake. Would you agree with me that the use of supervisory goodwill in the context of the phoenix program at least had huge value to FSLIC?

A Yes. Again, it was – it was the ability to keep the institution open and alive and hopefully with better

Page 4452

management could find a solution to the institution's financial problems.

Q And it was the hope and expectation of FSLIC that allowing the negative capital to be absorbed by the acquiring institution over a long term had value to FSLIC; isn't that correct?

A That's correct.

Q And you also hoped while you were at FSLIC that the acquiring entity could use the franchise, the bank franchise, to build and create enough earnings to write off the amount of goodwill recorded at the time of the acquisition; isn't that correct?

A That's correct.

Q And the use of supervisory goodwill also had value to the acquiring thrift; isn't that correct?

A Again, it allowed it, specifically in the case of Long Island Savings Bank, to maintain this separate entity, you know, with the doors open rather than in some kind of a receivership or conservatorship.

Q You would agree with me, Mr. Vigna, would you not, that the use of supervisory goodwill had significant value to acquiring thrifts such as Long Island Savings Bank?

A Yes.

Q You would also agree with me that the application of GAAP in 1981 and 1982, at least until FAS 72 became

Page 4453

effective, permitted amortization of goodwill for up to 40 years; correct?

A Yes.

Q And another advantage of FAS 72 accounting was that discounted mortgage income accreted faster than the amortization of goodwill; isn't that correct?

A Yes.

Q And you would agree with me that this had the effect of generating income, which is a form of capital?

A At least on paper, yes.

Q Okay. And one of the goals of the supervisory acquisition program was to have troubled thrifts in a position to increase its capital; correct?

A Yes.

Q And you would agree with me that a time difference between the rate of accretion and the rate of amortization allows an institution to leverage its capital and generate earnings from that leverage; isn't that correct?

A Yes.

Q While you were with the Federal Home Loan Bank of New York, you didn't have expertise – accounting expertise within the bank of New York; isn't that correct?

A Well, we did at some point have an accounting expertise within the staff, yes.

Q All right. Would you take a look in your

Page 4454

deposition notebook to the deposition transcript that you gave on February 3 of 1999, which should be behind tab 1. And if you would be good enough to turn to page 77. And looking – if you would focus your attention, although you can read before or after, but if you would focus your attention in reading to yourself, Mr. Vigna, the question and answer that starts at page 8 and going on down to 21 – or 24, actually.

(Witness reviewed the document.)

Are you done?

A Yes.

Q All right. I'd like to ask you again, Mr. Vigna, if you can recall whether or not the Federal Home Loan Bank of New York had specific accounting expertise in New York, as opposed to relying upon that expertise in Washington, D.C.?

A At what period of time? There was a period – at the time – a point in time when we did have accountants on our staff. This is referring to the time of the – a transaction whereby LISB acquired the phoenix –

Q Correct.

A Probably not. But there was a period of time after where we did have an accountant on staff.

Q So up and till the point in time where the assistance agreement was executed, there was not accounting

Page 4455

expertise at the bank of New York; correct?

A Probably not.

Q But at some point in time after the bank of New York did acquire that expertise?

A We did have an accountant on staff, yes.

Q All right. So you certainly had the capability and expertise to determine if LISB was not properly reporting or accounting the amortization of goodwill consistent with the assistance agreement; isn't that correct?

A Yes.

Q Would you look in the big notebook, the larger black notebook – we can put the deposition transcript away. Hopefully we won't need that again. Turn to tab 9, if you would. Behind tab 9 should be Plaintiffs' Exhibit 98 already admitted in evidence. I'll ask you, Mr. Vigna, if you recognize that document.

A Yes.

Q And, in fact, you were involved with the preparation of the document; correct?

A It was – it was created in Washington, but it was probably – it was also reviewed in New York before it was issued – before it went to the board.

Q All right. And, in fact, you provided some of the information and the assistance in the preparation of the

Page 4456

document; isn't that correct?

A Most likely, yes.

Q And you would agree this is what's called an S-memo?

A Yes.

Q Regarding the Syosset/Centereach acquisition?

A Yes.

Q Would you describe what an S-memo is?

A It is a supervisory analysis of a particular transaction and a recommendation.

MS. EVANS: Your Honor, we'd just like to clarify the Court's ruling regarding the scope of Mr. Vigna's testimony. Is it the Court's ruling that Mr. Vigna can be asked questions about anything at all, notwithstanding our limited direct and also our limited selection of deposition transcript, perhaps based on the fact that we asked him what jobs he held? I'm not clear on Mr. Wallace's ability to ask questions in this circumstance.

THE COURT: Mr. Wallace?

MR. WALLACE: Your Honor, the witness reviewed his responsibilities at the bank. He testified as to impact of FIRREA. He testified as to impact of undercapitalization. He testified as to his opinion as to whether or not the company would have converted or not and the basis for that opinion.

Page 4457

I think we are fully entitled to have this witness testify as to his responsibilities, as he did on direct. And this is one of his responsibilities. What they want to run from is this witness's responsibilities in connection with the assistance agreement, because they don't like that part of his responsibility. But I don't think the rules allow him to cleanly and surgically slice the testimony that way.

MS. EVANS: Your Honor, we're entitled to have someone testify based on time, based on any reason that we want. And certainly, they had the opportunity to call him in their case, to ask these questions and, in general, the rules of the Court are that questioning on cross is limited to the scope of direct. And we very clearly limited the scope of our direct. So I don't really see how I have opened the door to every question under the sun by asking him what his responsibilities were.

THE COURT: Let's start with the first principles. Do you have a date which you think provides a beginning trigger for Mr. Vigna's testimony? I'm looking at DX 317. That's dated May 1, 1990. Are you saying nothing before May 1, 1990?

MS. EVANS: We asked him about his supervisory responsibilities regarding the capital plan from 1989 going

Page 4458

forward. But again, I'm not sure if I would say it's limited by date. I think it would be limited by the nature of his testimony, which is generally how things are done.

THE COURT: It wasn't limited just to the capital plans, obviously.

MS. EVANS: It's both, really.

THE COURT: Because you did ask him about other supervisory responsibilities Mr. Vigna had at the time. And he –

MR. WALLACE: They also asked him, your Honor, about his supervisory responsibilities for the Plaintiffs in this case. And this is clearly part of his supervisory responsibilities in this case.

THE COURT: Well, one of the problems I – I must say, I have difficulty limiting Mr. Vigna's testimony by subject matter because he has testified, whether you would or not, Mr. Vigna.

THE WITNESS: I understood I think I testified – and probably –

THE COURT: You did, by way of your deposition testimony or at least having it read into the record.

MS. EVANS: Yes, your Honor. We didn't ask Mr. Vigna any questions regarding the contract, nor did any of our deposition testimony go to that point. I'm not really – I'm still not clear on how this would open the

Page 4459

door to asking questions regarding things related to that –

THE COURT: May I pose one other small problem, Ms. Evans? Would you please look at DX 1858? Fortunately or unfortunately, and I offer no view, that exhibit covers actions by Mr. Conway that reach from December 1982 through May 1992. That's a 10-year period. And that's why I asked you about time and what you thought was happening. I was hoping you'd tell me about this yourself.

MR. WALLACE: In fact, this document, your Honor, reflects an investigation going all the way back to 1983 and the theory of the government and theory of this witness is that Mr. Conway was in breach of his duties and fiduciary responsibilities all the way back to 1983 and at the time of the assistance agreement. They clearly have gone into this.

MS. EVANS: Going into Mr. Conway's breach of his duties is a limited subject matter. This is not – that is not clearly related to the assistance agreement. That's really –

THE COURT: So you say we could look at everything or we could have Mr. Vigna now testify about everything going back to December of 1982 that relates to Mr. Conway but nothing else?

MS. EVANS: Your Honor, I think we think it's limited by the subject matter of our questions as well. In other words, if we'd asked Mr. Vigna, you know, to talk

Page 4460

about something in high school, could we then talk about it something relevant then, going all – I'm not sure how that opens the door to every subject matter.

THE COURT: Well, we have a small relevancy problem there. One of the problems is Mr. Vigna's activities with the Federal Home Loan Bank of New York in the early 1980s are very relevant to this case, there's absolutely no doubt about that. And we've heard from Mr. Vigna in testimony, in testimony previously, and we've heard something that covers this same time period. I'm very reluctant to provide a limitation of the kind that you're describing, because there we'd take the period from 1982 through 1996 and we'd say that's the time period covered, but we would cover out a whole raft of subject matters that go from 1982 through 1989.

I'm not willing to do that.

MS. EVANS: Your Honor, I'm not going to –

THE COURT: I'm sorry?

MS. EVANS: I was going to say something else, but you've made your decision.

THE COURT: Well, I'm always willing to hear another view.

MS. EVANS: It's really essentially the same point, that we didn't think relevance was the issue, we thought the issue was the scope of our direct. And again,

Page 4461

we reiterate that Plaintiffs certainly had the opportunity to call Mr. Vigna. So the Government's position is we don't believe we've opened the door to ask him all these questions.

THE COURT: Well, they did. But you didn't need to call Mr. Vigna either. You could have been satisfied with counterdesignations.

MS. EVANS: Yes, I'm not sure that that – our position is we don't think that opens the door to every question during the time frame, whether or not it's related to what Mr. Vigna has been discussing. So if we could just have that noted for the record.

THE COURT: Thank you.

BY MR. WALLACE:

Q Mr. Vigna, would you turn to page 14 – actually, let me help you with this. Yes, there's a page 14 in the lower center of this document, 14 of 21 it will say. And I'm going to focus your attention, Mr. Vigna, very specifically to the paragraph under "accounting." Do you see that?

A Yes.

Q And I want to draw your attention to the language in there which addresses the fact that the agreement between LISB and the government – proposed agreement between LISB and the government would enable LISB to account for the

Page 4462

acquisition in accordance with GAAP as it existed prior to September 30, 1982. Is that correct?

A Well, let me read this first.

Q Sure.

(Witness reviewed the document.)

A Okay.

Q All right. Do you have a recollection that LISB was, in fact, proposing to account for its acquisition of Centereach with GAAP as it existed prior to September 30 of 1982?

A Yes.

Q And do you also have a recollection or an understanding that that would have permitted a 40-year period of amortization?

A That I don't recall.

Q Well, do you recall that that, in fact, was the agreement that was reached with the government, a 40-year amortization term?

A At this point, I don't have a specific recollection of that.

Q Would you take a look at your deposition transcript for April 6. That will be behind tab number 3. And I'd like to you turn your attention to page 120. Actually, if you want to start at page 119, Mr. Vigna, at line 19, where your testimony begins with this very document

Page 4463

and this very paragraph. And if you would read from there on over to page 120, line 10.

THE COURT: Mr. Vigna, you can read whatever you want here. You aren't limited.

(Witness reviewed the document.)

THE WITNESS: I don't see any mention of a 35 year amortization in this document.

BY MR. WALLACE:

Q Actually, my question –

A Am I missing something here?

Q I'm not sure if you're missing anything or not. But my question is, do you recall that the agreement that was reached with the government, in fact, included a 40 year term for amortization?

MS. EVANS: Asked and answered, your Honor. I think he said he didn't know.

THE COURT: Well, that's precisely the point, Ms. Evans. We're trying to figure out whether Mr. Vigna's recollection is refreshed. Overruled.

BY MR. WALLACE:

Q Mr. Vigna?

A At this point in time, I can't specifically recall whether it was 40 years or 35.

Q All right. You do recall having testified, though, on April 6 of 1999; is that correct?

Page 4464

A I don't recall the deposition, but apparently I did state at that point in time that I was aware of the 40-year amortization.

Q All right. And at that time, you were aware that there was an agreement to amortize goodwill over a period of 40 years; is that correct?

A Based on the deposition, apparently so.

Q All right. And you haven't learned anything since the deposition that would alter the sworn testimony you gave in 1999, have you?

A No.

Q So as far as you know, your understanding of the agreement in 1999 is still your understanding of the agreement; is that correct?

A At this point, I just don't recall specifically. But that's – I said that in 1999, and I – you know, perhaps at that point in time, I had a better recollection.

Q You probably did have a better recollection.

A As you get older and the years go by –

Q I understand.

A Maybe '99 I was a little smarter, I don't know.

(Laughter.)

Q Well, I think you were probably a little closer to the events.

A Perhaps.

Page 4465

Q All right. Would you look at the document behind tab 7, Mr. Vigna. This is the consolidated financial statements for Suffolk County Federal Savings & Loan Association and subsidiaries, dated as of December 31, 1982. You would have reviewed the audited financial statements for Suffolk; isn't that correct?

A Probably not me personally but my office would have, yes.

Q All right. And your office would have had responsibility for reviewing the audited financial statements for what reason?

A As part of our regulatory process.

Q All right. And the Suffolk County Federal Savings & Loan Association would have been required to submit their financial statements to you and your group; is that correct, for review?

A Audit reports, yes.

Q Audit reports. And then they would be maintained in the files of the government?

A Yes.

Q And in 1982, your group did have supervisory responsibility for Suffolk County Federal Savings & Loan; isn't that correct?

A Yes.

Q Do you have any reason to believe that the

Page 4466

document we're looking at as Exhibit 78 is not the Suffolk County Federal Savings & Loan consolidated financial statement for December 31, 1982?

A No.

Q Would you turn to what is going to be page 12, I believe, in the middle – yes, page 12 of 22.

THE COURT: The Bates range at the bottom being 17906; is that correct, Mr. Wallace?

MR. WALLACE: Actually, the number I have is 17898, page 12 of 22.

THE WITNESS: My pages aren't numbered, but I have 17898.

BY MR. WALLACE:

Q All right. 17898.

A The notes?

Q Yes. And we're going to be looking at the fourth note – the fourth paragraph under note number 3.

A Okay.

Q Are you able to explain to me what the last sentence of that paragraph means, and I'll read it, "the excess of cost over fair market value of assets acquired resulting from this merger whereby both associations adjusted their assets and liabilities to fair market value (amounting to $741,656,000) is being amortized principally over 40 years on a straight-line method"? Can you explain

Page 4467

to me what that means?

A Well, it's essentially the goodwill of the combined institutions.

Q Of the phoenix institution?

A Yes.

Q And the amount of goodwill is in excess of $741 million?

A That's correct.

Q And was being amortized over 40 years?

A Yes.

MR. WALLACE: Your Honor, we would like to move into evidence Plaintiffs' Exhibit 78.

MS. EVANS: No objection, your Honor.

THE COURT: Admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 78, was received in evidence.)

BY MR. WALLACE:

Q You would agree with me that Syosset's acquisition of the Suffolk phoenix would not have been possible without the use of goodwill as regulatory capital; correct?

A Yes.

Q And the reason it wouldn't have been possible was that Suffolk would have been hugely insolvent subsequent to

Page 4468

the acquisition; correct?

A Yes.

Q And FSLIC was unwilling to fund the huge capital deficiency because of all of the other problems that FSLIC had at that time; isn't that correct?

A Yes.

Q In reaching agreements for the salvation of troubled thrifts, FSLIC didn't feel constrained by SEC rules and regulations, did it?

A No, because we were basically dealing with mutual institutions.

Q So no matter what the SEC might have required for institutions reporting to it, the FSLIC could reach whatever accommodations it felt was appropriate and consistent with its regulations concerning the amortization of goodwill; isn't that correct?

A Yes.

Q Would you turn to the document behind tab 10, Mr. Vigna. It's Plaintiffs' Exhibit 124. And I'd like you to review it and I'm going to ask you a few questions about it.

(Witness reviewed the document.)

Can you tell me where this document came from

A It came from the district director's office.

Q Can you identify or do you recognize the signature

Page 4469

under "field manager"?

A It looks like Tim Murphy.

Q For Mr. DeAngelis?

A Yes.

Q All right. And who was Mr. Murphy?

A He was an examiner. At this point in time, examination function was under the district director, who was actually a Federal Home Loan Bank Board employee, as you can see by the insignia on the top left.

Q Right. And I notice in the middle of the document, the stamp "received," it says July 23, do you see that, 1984?

A Yes.

Q All right. And it seems to have been received by the federal New York – Federal Home Loan Bank Board of New York, right, supervision?

A Yes.

Q Is that your department?

A Yes.

Q So your department would have received this at or about the time, it looks like, couple days after it was sent; correct?

A Yes.

Q Do you recall having received this?

A Not specifically, no.

Page 4470

Q But this is something that would have been received in the normal course?

A Yes.

Q And there's some handwriting down in the lower left, I believe it says "noted, July 23, 1984." Do you see that?

A Yes.

Q "RED."

A Yes.

Q That's Richard E. Denby; correct?

A Most likely, yes.

Q And Mr. Denby was a supervisory analyst who worked for you; correct?

A Yes, he was.

Q All right. Would examinations of the Long Island Savings Bank and Syosset of New York have been subject to examination at this period of time as suggested in the first paragraph?

A Yes.

Q And do you recall whether or not they, in fact, occurred?

A Yes.

Q Do you recall that they did occur?

A They did occur.

Q Okay. And there is a list of five items, do you

Page 4471

see that, 1 through 5?

A Yes.

Q And are these things that would normally be done in connection with an examination?

A Most institutions, yes. These were based on the last examination and probably review of any other correspondence, information we had. These were the field manager's recommendations to the – specific recommendations to the field examiner. And that's in addition to the normal, you know, exam process.

Q All right. So in connection at least with the Long Island Savings Bank examination that occurred in February of 1983, in addition to the normal things that would occur, these additional five things were to occur?

A The examiner was to look at those issues, yes.

Q All right. And the examiner was to review the FSLIC assistance agreement and determine the bank's basic compliance with the provisions of that agreement; isn't that correct?

A Yes.

Q Do you recall ever learning that Long Island Savings Bank was not in compliance with the provisions of the assistance agreement?

A No.

MR. WALLACE: Your Honor, I would like to move

Page 4472

into evidence Plaintiffs' Exhibit 124.

MS. EVANS: No objection, your Honor.

THE COURT: Admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 124, was received in evidence.)

THE COURT: Now, the Court will just note that the admission of this document removes the reservation that the Court had made on January 18 during the examination of Mr. Fuster.

MR. WALLACE: Thank you, your Honor.

BY MR. WALLACE:

Q Would you turn, Mr. Vigna, to the document behind tab number 13, which should be and hopefully is Plaintiffs' Exhibit 160, already in evidence. Do you recall generally having received this, Mr. Vigna?

A Yes.

Q Would you turn to what is in the middle of the document – middle of my document, 9 of 11, Bates stamped number 8822. It's Bates stamp number 8822. I see the problem. Do you have that?

A Yes.

Q Looking at the first full paragraph, Mr. Vigna,

Page 4473

and specifically the first sentence, which reads "Suffolk and County were acquired on the basis that the goodwill generated would be treated in a certain manner and certain regulatory forbearances granted." Do you see that?

A Yes.

Q Is that consistent with your recollection?

A Yes.

Q It also goes on to say "the accounting treatment of the goodwill created and forbearances were in lieu of more tangible financial assistance such as cash and FSLIC notes." Do you see that?

A Yes.

Q And is that consistent with your recollection?

A Yes.

Q Skipping to the next paragraph, I'm going to skip over the first sentence and go to the next sentence, which says "the LISB agreed to this structure and accounted for the transaction in accordance with GAAP at the time, which permitted the goodwill generated to be carried as an asset and amortized over 40 years." Do you see that?

A Yes.

Q That is also consistent with your recollection; correct?

A Yes. Generally speaking, yes.

Q "Only on that basis was the transaction

Page 4474

economically feasible for LISB." You agree with that too, don't you?

A I could have some difference with the words "economically feasible." They agreed to the process, to treat goodwill in this fashion so they could have the time to work on the balance sheet, restructure and hopefully raise capital, as you said earlier, through retained earnings to eliminate the insolvency.

Q Do you agree with the statement "only on that basis was the transaction economically feasible for LISB"?

A Well, in an economic sense, it was still an insolvent institution. But maybe I'm differing with the word "economically." What I'm saying is they understood that this was an opportunity to take an institution and run with it because of the forbearances and hopefully, you know, make it work over the long haul.

I think their expectation was that if it didn't work, because they kept it in a separate subsidiary, they would just, you know, the FSLIC or whoever the regulator was could take it away from them and they would have no – you know, the impact would not be material to the parent.

Q Mr. Vigna, would you be good enough to go back to your deposition transcript notebook and look at the transcript behind tab number 4, which is the deposition transcript of the deposition you gave on April 7 of 1999.

Page 4475

And if you would be good enough to turn to page 158, perhaps starting on line 10, although you – I'm sorry.

A Where are you?

Q All right. The deposition – this thin notebook with the deposition transcripts.

A Yeah.

Q We're going to tab 4.

A What page? I'm in page 800s.

Q Hold on one second. Hold on, your Honor. Oddly enough – I see what happened.

There's an afternoon session of April 7. If you go through all of the 800s, and I apologize for this, it will begin again at 144. It is the April 7 at 1:00 p.m., and I need to get to page 158. Starting on line 10, as we began discussing the language that I was just asking you about, and if you would read that and anything before and anything after, of course, but I'm going to ask you if between line 9 on that page and line 10 of page 159 refreshes your recollection with respect to the question I just asked, and I will ask it again when you're ready.

(Witness reviewed the document.)

A Yeah, that's what I said in 1999, and I don't contradict that, but at this point, when I look at this again, the word "economically feasible," at least in my feeling right now, that's not appropriate.

Page 4476

Q What did you learn between 1999 and today that would make you want to change your sworn testimony that you gave in 1999?

A Well, I don't think I'm changing my sworn testimony. I think maybe as you get older you're a little smarter. But all I'm saying is, looking at it today –

Q You have a little different reaction?

A A little different reaction. I'm not – from the standpoint of LISB, they needed those forbearances and that accounting treatment to give them the opportunity to take this institution on and try and rehabilitate it.

Q Okay. But you're not asking to retract the sworn testimony you gave back in 1999, are you?

A No.

Q And at that point in time, you did agree with the statement, without qualification and without equivocation; correct?

A Yes.

Q Would you turn to the next page of this document, which bears Bates number 8823. And I'm going to focus on the last sentence, the sentence that reads "the government and its agencies above all have an obligation to honor its commitments, especially when the institution involved has honored its commitments and has assumed and successfully managed some of FSLIC's serious problems."

Page 4477

Do you see that?

A Yes.

Q And do you agree with that?

A Yes.

Q I take it that it was Larry Hayes who was the principal attorney responsible for drafting the assistance agreement documents for FSLIC? Do you recall that?

A Yes.

Q Okay. And at least in 1999, when you gave your deposition testimony, you barely had the faintest recollection of someone by the name of Cathy Moran; is that correct?

A I don't recall.

Q Do you recall Cathy Moran today?

A I do.

Q All right. Would you look in your deposition of November 16, which is the last tab, tab 5, and turn to page 64. And where I'm going to focus your attention, but you can read before or after, is starting on line 18.

A Page 64, Counsel?

Q Yes, page 64 of the deposition at tab 5. Have you found it, Mr. Vigna?

A Yes.

Q Okay. Does that refresh your recollection at least at that point in time in November of 2001, you only

Page 4478

had a faint recollection of Cathy Moran?
A Yes.
Q And your recollection hasn't improved any since?
A A little bit but not – you know, I still – I remember the name, I remember the person. This is 20-some years ago.
Q But it's still your recollection that it was Larry Hayes who was the principal attorney responsible for drafting the assistance agreement for FSLIC; is that correct?
A Yes. I mean, Cathy Moran might have been the staff – the staff attorney who originally drafted it, but Larry Hayes was – that was his responsibility. I'm sure he had a lot of input into the final document.
Q All right. And you were responsible and your group was responsible for receiving and reviewing LISB's financial reports after the acquisition of the Suffolk phoenix; correct?
A Yes.
Q All right. And you never saw any financial reports that you received from LISB reflecting an accounting treatment inconsistent with the assistance agreement; isn't that correct?
A Yes.
Q Were you responsible for preparing any analyses to

Page 4479

show the impact of FIRREA on the elimination of goodwill in the calculation of regulatory capital?
A I don't have any specific recollection. We might have – in fact, we probably did some calculations in the district as to what that impact might be.
Q And you became aware that a number of institutions that were formerly in capital compliance fell out of capital compliance; correct?
A Yes.
Q And, in fact, LISB, I believe you testified, fell out of capital compliance?
A Yes.
Q All right. You testified in your direct examination at the instruction of Government counsel, when she was asking you questions about LISB, she was talking about Centereach and Syosset. Do you recall that?
A No.
Q All right. Did Centereach and Syosset fall out of capital compliance?
A No. It was just Centereach.
Q All right. And did Centereach and Syosset file a capital plan?
A No, I think it was just Centereach.
Q So Centereach fell out of capital compliance, in fact, fell seriously out of capital compliance, because of

Page 4480

FIRREA; isn't that correct?
A Yes.
Q And it was your view that imposing capital requirements requiring netting-out of goodwill was unfair; isn't that correct?
A You know, using the word "unfair," yes. Inequitable. There was a commitment to the institution, and FIRREA changed all that.
Q And you expressed that view to more than one person, haven't you, that you felt it was unfair?
A I have.
Q I'm asking you.
A Yes, I have.
Q Okay. And it was also inconsistent with the understandings that the government made with LISB, isn't it?
A Yes.
Q And you expressed your view that it was unfair and inconsistent with the agreements, you expressed that view to the president of the Federal Home Loan Bank Board, didn't you?
A No. There was no president of the Federal Home Loan Bank Board.
Q There's not a president of the bank, Mr. Dittenhafer?
A That's the bank.

Page 4481

Q Of the bank, I'm sorry, the Bank of New York.
A I probably did, yes.
Q And you were of the understanding that he was of the same mind as you were, that the agreements should have been honored; isn't that correct?
A Yes.
Q And you would agree that Syosset complied with all of its obligations under the assistance agreement; isn't that correct?
A Yes.
Q Would you turn to the document that is behind tab 2 of the big notebook, Mr. Vigna. It should be Plaintiffs' Exhibit 12. Do you recognize that document, Mr. Vigna?
A I don't have specific recollection of it, no.
Q All right. But you do recognize your name on it; correct?
A Yes, I do.
Q And you do see the "received" stamped up in the right-hand side?
A Yes, I do.
Q And the cc's, do you recognize those names?
A Yes.
Q Who were they?
A Timothy Ryan was the director of OTS at that time. Michael Patriarca was a district director out of

Page 4482

San Francisco, but I think at that time he was assigned to Washington. The same with John Downey, and Harris Weinstein was the agency's chief counsel.

Q And looking at the last page – I'm sorry, did you identify Mr. Fiechter?

A Fiechter. Fiechter.

Q Yes, I'm sorry.

A Yes. His title was principal senior deputy director, and that was a Washington office.

Q Do you have any reason to believe that you did not receive this document, Mr. Vigna?

A No.

MR. WALLACE: Your Honor, we would like to move into evidence Plaintiffs' Exhibit 12.

MS. EVANS: No objection.

THE COURT: Admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 12, was received in evidence.)

BY MR. WALLACE:

Q Would you review the section denominated "background," Mr. Vigna. And I want to ask you –

A Excuse me, Counsel. Where are we?

Q We're at tab 2, the one we just – we haven't

Page 4483

moved, same document. On the first page, Plaintiffs' Exhibit 12, there's a section in the middle of the page denominated "background."

A Yes.

Q I would ask if you would be good enough to read that. It goes on to the next page. Just identify for me if there's anything in that paragraph that you don't agree with.

(Witness reviewed the document.)

A How far down do you want me to read?

Q I wanted you to just read the background section. It goes to the next page, just where it stops at "discussion."

(Witness reviewed the document.)

Is there anything you disagree with in that section?

A No.

Q And you would agree with me that ultimately, FSLIC concluded it could not force LISB to consolidate the assets of Centereach; isn't that correct?

A Yes.

Q And despite FSLIC's strong desire for that to happen, it would not compel them to consolidate; correct?

A Yes.

Q You would agree with me that ways in which you've

Page 4484

identified that Centereach could address the elimination of goodwill was to restructure its balance sheet, merge with another institution or raise capital in the public markets; isn't that correct?

A Yes.

Q And by "restructuring the balance sheet," that would mean selling assets at a profit, selling liabilities and selling branches; correct?

A Yes.

Q And you would agree with me that selling assets at a profit was a short-run solution because it brought in current income and increases capital at the expense of future income; correct?

A Yes.

Q And in the case of a merger, the insolvent thrift would have to merge with an institution that had enough excess capital to compensate for the capital eliminated by FIRREA; isn't that correct?

A Yes.

Q And you would agree that the reason that there was so few post-FIRREA acquisitions of insolvent thrifts was because the negative capital that the acquiring thrift would have to put in would exceed the premium that the acquiring thrifts typically would be willing to pay?

A Could you read that question back, please?

Page 4485

Q Would you agree with me that one of the reasons why there were so few, if any, post-FIRREA mergers with insolvent thrifts is because the negative capital that the acquiring thrift would have to compensate for would exceed the premium that it would be willing to pay for the bank?

A Yes.

Q And you would agree that FIRREA imposed strong impediments to restoring capital to required capital levels; correct?

A I would say as a consequence of FIRREA, you know, raising capital for those situations became more difficult because of the deeply negative net worth.

Q Would you agree with me that FIRREA imposed some strong impediments to restoring capital to the required levels?

A Is that the same question you asked?

Q It might be close.

A It's pretty close, and the answer is the same. I think, you know, the new capital requirements, it was certainly more difficult to achieve post-FIRREA than before FIRREA.

Q Are you quarreling with the phrase "strong impediments"?

A Yes.

Q And you don't agree it imposed strong impediments?

Page 4486

A Well, you know, it increased the amount of capital you needed. So if you want to label that an "impediment," then I would agree with you.

Q All right. You would agree with me that one effect of FIRREA's passage and RTC going to full operational mode was that branches and deposits were cheap relative to other periods; correct?

A Yes.

Q Would you turn to the document that is behind tab 3 –

THE COURT: Before we do that, Mr. Wallace, we are just about the time that the Court ordinarily would say, all right, we're ready to break. Is this a bad time, a good time?

MR. WALLACE: It is a particularly convenient time, your Honor.

THE COURT: I thought since you were shifting topics, you might concede.

Mr. Vigna, would you mind if we took a 15-minute recess at this time?

THE WITNESS: Not at all, your Honor. I think we need it.

THE COURT: Okay. Thank you.

Ms. Evans?

MS. EVANS: No objection, your Honor.

Page 4487

THE COURT: We're in recess for 15 minutes.

(Recess.)

THE CLERK: All rise.

The Court is again in session.

THE COURT: Please be seated.

Mr. Wallace, you may proceed.

MR. WALLACE: Thank you, your Honor.

BY MR. WALLACE:

Q Mr. Vigna, would you be good enough to turn to the document behind tab number 3 in the big notebook, it's the capital plan for Centereach. And I'm going to ask you to turn to page 20, which is Bates page number 5608.

A There's something –

Q You don't have 5608?

A No. It goes from 5599 to 5619. You said 56 –

Q 08. It should be page 20 of the capital plan in evidence.

THE COURT: Mr. Wallace, unfortunately, I believe Mr. Vigna is exactly right. Internal pages 12 through 26 are missing.

MR. WALLACE: In the Plaintiffs' exhibit book, we have a good copy of it, and we're going to give the witness ours, your Honor.

THE WITNESS: Thank you.

BY MR. WALLACE:

Page 4488

Q You are generally familiar with the capital plan of Centereach?

A Yes.

Q And if you are on page 20, which bears Bates stamp number 5608, I want to focus on that first complete paragraph that starts with "if Centereach's goodwill no longer counts as an asset for regulatory purposes, Centereach has negative tangible capital of about $178 million." Do you see that?

A Yes.

Q That was consistent with your recollection; correct?

A Generally so, yes.

Q All right. Looking at the next sentence, which says "neither we nor our investment bankers can identify or develop a prudent set of actions to wipe out a hole of that size and bring Centereach into compliance with the new capital requirements by December 31, 1994."

Do you see that?

A Yes.

Q And when you saw this statement, you agreed with it, didn't you?

A I don't think I had any reason to agree or disagree.

Q But you do agree with it as you sit here today?

Page 4489

A No, because, in fact, they did come into compliance.

Q Did you agree with it when you testified in April of 1999?

A I don't recall.

Q All right. Why don't you turn to the deposition transcript that's behind tab 4, and again, it starts in the morning with numbers beginning in the 800s, but if you flip through that and get on to page 183, on page 183, you were asked questions about this very document, that very sentence, starting at the top and then going on down about three quarters of the way through. But please read as much or as little of that as you like.

A I'm sorry, page –

Q 183, where you were asked questions about this very document, this very language, and, in fact, that very sentence.

A I'm sorry, I don't see that here.

Q Are you on page 183?

A That's what it says here.

Q And it says "will you turn your attention to the capital plan and to page 20"?

A No. Behind tab 2?

Q No, you should be behind tab 4.

A I'm sorry.

Page 4490

Q In the back half. It starts with the 800s and then goes into the 100s, the way the transcript was numbered.
A I have it now.
Q Okay.
(Witness reviewed the document.)
Would you agree with me that at least in April of 1999, you agreed with the statement contained in the capital plan that "neither Centereach nor their investment bankers could identify or develop a prudent set of actions to wipe out a hole of that size and bring Centereach into compliance with the new capital requirements by December 31, 1994"?
A At that time, yes.
Q All right. Were you aware of negative publicity that resulted from the passage of FIRREA and FDICIA specifically with respect to Centereach?
A Yes.
Q And do you recall speaking with Mr. Viklund and representatives of Ketz and company for the purposes of speaking to a representative of NBC to state that Centereach was not going to be seized because it had an approved capital plan?
A I have a vague recollection of that conversation, yes.
Q And do you also recall LISB telling you about the

Page 4491

article that appeared in Newsday, which reported that a panic had occurred as a result of a television broadcast about LISB?
A Yes, I have a general recollection of that.
Q And do you also recall that Money Magazine, while reporting that Centereach had an approved capital plan, also listed it as an institution subject to early intervention?
A Again, I have some vague recollections of those situations.
Q And do you also recall being told that there had been a runoff of approximately $37 million in deposits in Centereach the week of Veteran's Day 1992 following the broadcast of a television story and various news reports?
A I don't have a specific recollection of that, but I -- it's probably correct.
Q And would you agree with me that Centereach was experiencing a rather negative turn of events as a result of the media coverage regarding FDICIA and its effect upon Centereach?
A Again, my recollection is that there was negative media coverage that affected them, not only LISB but other institutions that were in comparable situations.
Q And how about the Wall Street Journal? Do you also recall a Wall Street Journal article that listed banks that might be closed?

Page 4492

A Mr. Wallace, there were lots of articles written at the time. Again, I can't recall specifically that one, but I have no reason to doubt the accuracy of what you're saying.
Q All right. Would you be good enough to turn to the document behind tab number 17. Hopefully it's there. It should be Plaintiffs' Exhibit 272.
A No. You say 17?
Q It should be behind tab 17, that's correct. And hopefully it will have a stamp on it that says Plaintiffs' Exhibit 272.
THE COURT: Mr. Wallace --
THE WITNESS: 17.
THE COURT: When Mr. Vigna is saying "17," he's referring both to the tab number and to the Plaintiffs' Exhibit Number. We have behind tab 17, Plaintiffs' Exhibit 17.
THE WITNESS: That's what I have.
MR. WALLACE: Do you have the black book?
THE WITNESS: Oh, I'm using -- this is Plaintiffs' Exhibits. This is --
MR. WALLACE: Right. Wrong exhibit, I'm sorry. Wrong books. Let's take that out of the way.
THE WITNESS: Okay.
BY MR. WALLACE:

Page 4493

Q Were you the Northeast regional director in 1992?
A I was.
Q All right. And Mr. John Downey, you are familiar with him?
A Yes.
Q All right. And this is a document as the Northeast regional director you would have received around October 28, 1992?
A Yes.
Q And if you review that document, can you tell me if there's any reason that you're aware of that you didn't receive it?
(Witness reviewed the document.)
A Is there a question?
Q Yes. Do you have any reason to believe you didn't receive this on or about the date it bears?
A No.
Q And the signature of John Downey on the front, do you recognize that as Mr. Downey's?
A Yes.
MR. WALLACE: Your Honor, we'd like to move into evidence Plaintiffs' Exhibit 272.
MS. EVANS: No objection, your Honor.
THE COURT: Admitted.
(The document referred to,

Page 4494

previously identified as
Plaintiffs' Exhibit No. PX
272, was received in
evidence.)
BY MR. WALLACE:
Q Do you have even a general recollection of the facts set forth herein, focusing specifically on the Wall Street Journal article that's referenced here? Does this refresh your recollection about a Wall Street Journal article?
A Yes.
Q All right. Do you recall having any discussions about The Wall Street Journal article and the impact it was having?
A Yes.
Q And would you tell me with whom you discussed that topic?
A Well, certainly we discussed it internally at the regional office, and we did have some national discussion among all of the regional directors and Washington.
Q And you agree that the negative publicity was, in fact, having serious negative consequences for Centereach as well as other banks?
A I don't recall that it was quite so serious at Centereach. They certainly had more resources than most.

Page 4495

There were several smaller institutions, one or two in New Jersey, that we were very concerned about.
Q Is it your testimony it was having no impact on Centereach?
A I didn't say it had no impact. I said, you know, certainly I don't think it was at the point that we were – that we were, you know, scratching our heads and getting ready to transfer it over to RTC.
Q All right. Would you turn to the exhibit that is behind tab 22, and I'm going to cross my fingers once again and hope it is Plaintiffs' Exhibit 297 that's there, already in evidence.
A That's – I have it.
Q Great. Do you recognize that document, Mr. Vigna?
A No.
Q You do recognize your signature on the second page, though?
A I do.
Q All right. If you will look at the second page, where there's a reference to the fact that you had no objection to the sale of the $271.9 million of fixed-rate assets as requested. Do you see that?
A Yes.
Q Do you recall that generally?
A Yes.

Page 4496

Q And do you recall you, in fact, had no objection to the sale; correct?
A Yes.
Q And you also understood that those assets were being sold in order to resolve, in part, Centereach's capital deficiency; correct?
A Yes.
Q And you would agree with me that FIRREA impacted LISB in particular because it required them to rollback a lot of profitable activities, lending activities, that they otherwise wouldn't have to do?
A At this point, I don't have any specific recollection of what the impact was on LISB. Certainly, they had to, at least at Centereach, conform or restrain their growth, sell some assets. They eventually also sold some deposits. But I don't think there was any impact at the hold – at Syosset.
Q Would you be good enough to – again, the deposition book at tab 4, and again in the second half of the transcript at page 223 and 224. There's a question that starts at line 19 of page 223 that is answered on page 224, but you're entitled to read more to put it in context, if that's necessary. Then I would like to ask you a question when you're ready.
(Witness reviewed the document.)

Page 4497

A Is there a question?
Q Yes. Would you agree with me that FIRREA impacted LISB in particular because it required them to rollback a lot of profitable activities, lending activities, that they normally wouldn't have to do? Do you agree with that?
A Yes, yes.
Q And would you also agree with me that you were enthused that LISB stepped up to the plate and agreed to sell branches because the branch sales would cause them to come into compliance?
A Yes.
Q You testified some on direct examination about the investigation of Jim Conway. Do you recall that?
A Yes.
Q And the investigation focused specifically on Mr. Conway; isn't that correct?
A Yes.
Q And the conclusions reached by the government were that Mr. Conway breached certain fiduciary duties?
A Yes.
Q And he breached certain fiduciary duties to the bank; correct?
A Yes.
Q And I take it that OTS concluded that Mr. Conway was not completely forthcoming to the banks about the

Page 4498

relationship he had with his law firm; is that correct?
A Yes.
Q And I believe you testified that ultimately, a consent order was entered; correct?
A Yes.
Q And the consent order that was entered, whichever one it was ultimately signed, achieved all of the enforcement objectives of the OTS; is that correct?
A Yes.
Q And you would agree that there were no other unsafe practices beyond what is reflected in the consent order; is that correct?
A Yes.
Q And Mr. Conway was ordered to make restitution to the banks by reimbursing the fees expended; is that correct?
A Yes.
Q And is that because the banks were the victim of Mr. Conway's lack of candor?
A My recollection is that it was to compensate the bank for the litigation costs and, you know, the lack – yes, the lack of candor.
Q All right. And that was – the attorneys fees that the bank received from Mr. Conway, by way of restitution, that was the only damage to the bank; correct?
A Yes. There was no financial damage to the bank.

Page 4499

Q And there were no findings adverse to the bank, were there?
A No.
Q And there were no charges brought against the bank, were there?
A No.
Q And the OTS let the branch sales go forward and the merger to go forward, notwithstanding the Conway investigation and the results of that investigation; isn't that correct?
A Yes.
Q And the OTS knew of Mr. Conway's relationship to the law firm before Syosset acquired Centereach; isn't that correct?
A Yes.
Q You came to know the senior management of LISB pretty well over the years, didn't you?
A Yes.
Q You came to know Mr. Viklund?
A Yes.
Q Mr. Nacos?
A Yes.
Q Mr. Fuster?
A Yes.
Q Mr. Conefry?

Page 4500

A Yes.
Q And Mr. Wenk?
A Yes.
Q And you would agree that the Federal Home Loan Bank Board considered the Syosset management team I just identified to be knowledgeable; correct?
A Yes.
Q And you would also agree that the Federal Home Loan Bank Board found them to be, and I quote, "extremely capable"; correct?
A Yes.
Q And it would be fair to say that you considered Mr. Viklund specifically to be competent and a man of integrity; correct?
A Yes.
Q And you also found Mr. Nacos to be a man who was competent and a man of integrity; correct?
A Yes.
Q And you would say the same thing for Mr. Fuster, wouldn't you?
A Yes.
Q And you would say the same thing for Mr. Wenk, wouldn't you?
A Yes.
Q And you would say the same thing about

Page 4501

Mr. Conefry, wouldn't you?
A Yes.
Q And you still consider Messrs. Viklund, Conefry, Fuster and Wenk to be men of integrity, don't you?
A Yes.
Q It's also your view that LISB's senior management team was trustworthy; isn't that correct?
A Yes.
Q Would you turn to the white notebook that the Government lawyers gave you, Mr. Vigna, and if you would be good enough to turn to their Defendant's Exhibit 1841. This is an internal memorandum; correct?
A Yes.
Q And it reflects internal discussions within the government agency; correct?
A Yes.
Q This wasn't shared with LISB, was it?
A No.
Q And you would agree with me that the OTS was pretty active in regulating the amount of stock going to management in connection with the conversion; correct?
A Yes.
Q And, in fact, they objected to what the bank first suggested, and the bank changed it to a plan that was acceptable to OTS; correct?

Page 4502

A Yes.
Q And if the OTS didn't accept it, it wouldn't have happened; isn't that correct?
A Yes.
Q And I believe you testified that the plan that the bank came back with ultimately became essentially the gold plan, it became the standard plan for all of the others; isn't that correct?
A With some modifications, yes.
Q Look at the second sentence of this memorandum, if you would. It says "we have allowed 4 percent and 8 percent when the institution" –
THE COURT: Third sentence, Mr. Wallace.
MR. WALLACE: Yes. Third sentence. Thank you.
BY MR. WALLACE:
Q It reads "we have allowed 4 percent and 8 percent." Do you see that?
A Yes.
Q And there's a reference to "the institution," "when the institution." Do you see that?
A Yes.
Q The institution being referred to there, that's not LISB, is it?
A No, I think they're talking in a general context.
Q What was LISB's tangible capital at the time of

Page 4503

the conversion?
A 5.3 percent.
Q Turn, if you would, to Plaintiffs' Exhibit 293 in the same notebook. You gave some testimony about this document, and specifically the second page, first full paragraph. Do you see that?
A Yes.
Q There is a sentence there about some restrictions not being exempted. Do you see that?
A What paragraph are you referring to?
Q The first full paragraph, first sentence that reads "a savings association operating under a capital plan approved before December 19, 1991 is exempt from certain PCA restrictions."
A Yes.
Q Okay. Not all of them; correct?
A Yes.
Q Can you identify for me the restrictions from which they were exempted and the ones that they were not?
A At this point in time, no.
MR. WALLACE: I have no further questions, your Honor.
THE COURT: Ms. Evans, before you begin, may I ask several questions of Mr. Vigna?
MS. EVANS: Certainly, your Honor.

Page 4504

THE COURT: I would appreciate that. I'll try to be very, very brief, Mr. Vigna. Would you please turn in the white binder to what is DX 1858. Mr. Vigna, if you would examine this document very carefully, and I'm going to ask you whether you actually signed it, and I'm going to make this a compound question, and remember signing it.
THE WITNESS: I did sign it. I can't specifically remember signing it, but I did sign it.
THE COURT: Do you remember signing any other consent order, apart from this one?
THE WITNESS: Relating to LISB?
THE COURT: Yes.
THE WITNESS: No.
THE COURT: What would have happened to the consent order, once you signed it?
THE WITNESS: It would go into the file, the LISB file at the regional office. It would go into the LISB file at Washington. And it would go into legal. To this point, I recall, all these enforcement actions became public documents, so there's a public file somewhere. Frankly, that's where you could find the full document, in the public file.
THE COURT: At the bottom – that relates to the next question I was going to ask you. At the bottom of this particular document it says "confidential material, subject

Page 4505

to protective order." Is that right? On your copy as well as mine?
THE WITNESS: Yes.
THE COURT: Do you know why that's there?
THE WITNESS: No, I don't.
THE COURT: Do you know if this is a public or confidential document or not?
MS. EVANS: Your Honor, I think this is what's on all of our documents, the stamp in the bottom, the Government's documents.
THE COURT: So there's nothing peculiar about this document?
MS. EVANS: Pertaining to this litigation.
THE WITNESS: I don't recall ever seeing that.
THE COURT: So as far as you know, this is a public document?
THE WITNESS: It's an enforcement action, yes.
THE COURT: Now, I wonder if you would please go to the very top of the first page of DX 1858, it says "United States of America, before the Office of Thrift Supervision, Department of the Treasury, in the matter of James J. Conway, Jr.," and then besides the descriptive material regarding Mr. Conway, there is order number, OTS order number NE 94-8.
THE WITNESS: Yes.

Page 4506

THE COURT: How were those assigned?

THE WITNESS: Those are assigned in Washington by the office of enforcement, 94 being the year and 8 I guess might have been the 8th enforcement action in 94. I'm not exactly sure of that, but there's some numbering system that enforcement used.

THE COURT: Did you need Washington's approval to exercise the consent order?

THE WITNESS: Yes.

THE COURT: Did you obtain Washington's approval?

THE WITNESS: I believe so, yes.

THE COURT: Whose approval was necessary?

THE WITNESS: The Office of General Counsel and probably in concurrence with the deputy director for supervision.

THE COURT: Was Mr. Conway represented by counsel throughout the – or any discussions that related to this consent order?

THE WITNESS: I believe he was, yes.

THE COURT: I have no further questions. Ms. Evans?

MS. EVANS: Yes, your Honor.

THE COURT: You may redirect.

MS. EVANS: Thank you. Your Honor, we've found a document which we're going to hand out, which is DX 1858A,

Page 4507

which appears to be the document we were looking for. May I approach?

THE COURT: Yes, certainly.

REDIRECT EXAMINATION

BY MS. EVANS:

Q Mr. Vigna, have you seen DX 1858A?

A Yes.

Q And just for the record, it says "stipulation and consent" at the top, also dated February 24, 1994, OTS order number NE 94-8. Tell us what this is.

A This is the stipulation and consent to the order issued by OTS to James J. Conway, Jr.

Q And there's a signature on the last page. Do you know what the procedure was for signing this?

A I don't recall exact procedure, but it certainly had to be signed by Mr. Conway.

Q Do you recall whether it was – well, I'm going to withdraw that since you said you didn't recall. Look at the last page, signature page, paragraph F. It says "this stipulation and consent shall become effective upon acceptance by the OTS, which acceptance shall be indicated by its issuance of the order." When they refer to "the order," do you know what that means?

A That's the consent order of prohibition and

Page 4508

consent C and D, requiring restitution and other affirmative action.

Q That would be what we looked at as DX 1858?

A Order number 94-8, dated February 24, 1994.

Q Do you believe that these two documents went together?

A Yes.

Q And would DX 1858A have been kept in the normal course of business by the OTS?

A Yes.

MS. EVANS: Your Honor, I'd like to move DX 1858 into evidence as well as 1858A.

THE COURT: Mr. Wallace?

MR. WALLACE: We have no objection to them both coming in, your Honor.

THE COURT: The Court will admit DX 1858 and DX 1858A.

(The documents referred to, previously identified as Defendant's Exhibit Nos. DX 1858 and DX 1858A, were received in evidence.)

BY MS. EVANS:

Q Mr. Vigna, what role, if any, did you play in negotiating the specific language in the assistance

Page 4509

agreement or the Federal Home Loan Bank Board resolution?

A I was part of the – part of the team. The primary negotiation was done by the FSLIC representatives.

Q Was Mr. Conway forthcoming to the government about his conflict of interest violations?

A No.

Q Was the bank damaged by Mr. Conway's actions that were the subject of the stipulation and consent, which are DX 1858 or 1858A?

A I guess to the extent that there was some reputational loss. There was some legal costs that they incurred as a consequence of the Conway issue.

Q What were the legal costs? What did they relate to?

A My recollection is that they hired counsel to protect the bank's interests, which those costs in whole or in part were reimbursed by the civil money penalty that was imposed on Mr. Conway, the restitution – the financial restitution that Mr. Conway provided.

Q And do you know whether or not a class action suit was brought against Long Island based on Mr. Conway's actions?

MR. WALLACE: Relevance, your Honor.

MS. EVANS: It goes to damage to the bank.

THE COURT: Through Mr. Conway's actions?

Page 4510

MS. EVANS: Yes.
THE COURT: I'll allow it, but -- well, let's see what happens. I'll allow a couple of more questions along these lines.
THE WITNESS: I don't recall a class action suit, if there was one.
BY MS. EVANS:
Q Do you know whether or not Mr. Conway's conflict of interest violation affected OTS interests in maintaining public confidence in financial institutions?
MR. WALLACE: Leading, your Honor; objection.
THE COURT: Unfortunately, Ms. Evans, I am bound by the Federal Rules of Evidence to sustain that objection.
BY MS. EVANS:
Q Did Mr. Conway's conflict of interest have any impact on public confidence?
MR. WALLACE: Same objection, your Honor.
THE COURT: Ms. Evans, why don't you try again.
BY MS. EVANS:
Q Mr. Vigna, what is the purpose of the conflict of interest rules that the OTS had during the 1980s and 1990s?
A To prevent insiders from abusing their position for personal gain.
Q Why was that significant?
A It's inconsistent with appropriate conduct of

Page 4511

fiduciaries in a financial government-insured institution.
Q And would that affect public confidence?
A It could.
MS. EVANS: Nothing further.
THE COURT: Mr. Wallace, recross?
MR. WALLACE: We have no recross, your Honor.
THE COURT: Mr. Vigna, I am about to excuse you.
THE WITNESS: Thank you, your Honor. It's a pleasure.
THE COURT: Just a moment.
THE WITNESS: Do you have further questions?
THE COURT: Well, no. Ms. Evans, Mr. Wallace, do I really need to read the what I count as the sequestration instruction at this point? I will.
MS. EVANS: I believe so, your Honor.
THE COURT: All right. I am duty bound, Mr. Vigna, to give you an instruction. I think if I read it, you'll understand it, but if you don't, don't hesitate to ask about it.
The parties have requested, as they are entitled to under rule 615 of the Federal Rules of Evidence, and as you know from not having been present in the courtroom during the testimony of other witnesses, that witnesses, at least fact witnesses, be excluded from the courtroom so that

Page 4512

each such witness can give his or her testimony fresh, without being distracted by others' testimony.
My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness. If you have any question about who could be a witness, you may ask counsel.
At this point, the trial is scheduled to conclude on Tuesday, March 22, if I have it right. That's just a horseback estimate.
Do you understand?
THE WITNESS: Yes.
THE COURT: Thank you very much. And I thank you for appearing and testifying.
THE WITNESS: Thank you, thank you, your Honor.
THE COURT: I really do.
(Witness excused.)
THE COURT: Mr. Madden?
MR. MADDEN: At this time, your Honor, we'd like to continue the Conway video.
THE COURT: Thank you very much. Mr. Madden, I know you're busy, but when you have a moment, I wonder if you or someone on your team could provide introduction on where we are with the video. At an appropriate point.
MR. MADDEN: Yes, your Honor. Your Honor, I

Page 4513

believe we're at page 21, line 24. This is a continuation of Mr. Conway's video deposition transcript which took place in 1999. I forget which day we played the first 20 minutes of it, but I think there's about three hours more to go.
THE COURT: Thank you very much. Now, who -- oh, Mr. Cohen.
(Video played as follows:)
Q How about junk bonds, is that --
A No.
Q -- one of the things that these thrifts were doing?
A No. Oh, yeah, a lot of thrifts were doing it. I thought you meant us. No, we wouldn't touch that with a 10-foot pole.
Q How about going out and buying whole loans from banks outside of the geographic area of the bank?
A I think, but I can't give you time frame, it was late -- it was late that I think we may have done some, but I couldn't even begin to tell you when and how much or anything like that.
Q All right.
A It may have been that at the time when things were slowing down a little bit locally, because of the fact that so many banks had suddenly discovered one-family mortgages were a great investment. It only took them 100 years,

# EXHIBIT 7

**GLOBE SAVINGS BANK v. U.S No. 91-1550C July 2, 2004**

**Heritage Reporting Corporation**

**Page 1 to Page 106**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
GLOBE SAVINGS BANK. et al.., )
Plaintiffs. )
v. ) Docket No.: 91-1550C
UNITED STATES. )
Defendant. )
National Courts Building
717 Madison Place. N.W.
Washington. D.C.
Monday.
July 2. 2004
The parties met. pursuant to notice of the Court. at 9:00 a.m.
BEFORE: HONORABLE CHARLES F. LETTOW
Judge
APPEARANCES:
For the Plaintiffs:
MELVIN C. GARBOW. Esquire
HOWARD N. CAYNE. Esquire
WALTER ZENNER. Esquire
IDA BOSTIAN. Esquire
Arnold & Porter. LLP
555 - 12th Street. N.W.
Washington. D.C. 20004
(202) 942-5000

Page 2

APPEARANCES (continued):
For the Defendant:
LUKE P. LEVASSEUR. Esquire
JOHN KANE. Esquire
SCOTT AUSTIN. Esquire
BRIAN MIZAGUCHI. Esquire
ALEXIA RENGO. Esquire
MICHAEL JOHNSON. Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street. N.W.. 8th Floor
Washington. D.C. 20005
(202) 616-0464

Page 3

PROCEEDINGS
(9:00 a.m.)
THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Charles Lettow presiding.
THE COURT: Good morning. Please be seated.
ALL: Good morning, Your Honor.
THE COURT: The case before the Court this morning is Globe Savings Bank v. United States, No. 91-1550C. It's good to see everyone again. Mr. Garbow, would you introduce yourself and your colleagues for Plaintiff?
MR. GARBOW: Good morning, Your Honor. I'm Melvin Garbow from Arnold & Porter here in Washington, D.C. With me is my partner, Howard Cayne, –
THE COURT: Welcome.
MR. GARBOW: – Water Zenner, –
THE COURT: Mr. Zenner.
MR. GARBOW: – and Ida Bostian.
MR. BOSTIAN: Good morning, Your Honor.
THE COURT: Ms. Bostian.
MR. GARBOW: And Ms. Bostian has been the lead counsel in our group on a number of these pretrial matters, and with the Court's permission, I would like to have Ms. Bostian lead the discussion

Page 4

this morning.
THE COURT: Certainly. Ms. Bostian has been busy, as we can all attest. Mr. Levasseur?
MR. LEVASSEUR: Yes, Your Honor. Good morning.
THE COURT: Good morning.
MR. LEVASSEUR: Luke Levasseur for the United States, and with me this morning are my colleagues, Mr. John Kane, –
MR. KANE: Good morning, Your Honor.
THE COURT: Good to see you again, Mr. Kane.
MR. LEVASSEUR: – Scott Austin, –
MR. AUSTIN: Good morning, Your Honor.
THE COURT: Mr. Austin.
MR. LEVASSEUR: – and Brian Mizaguchi.
THE COURT: Mizaguchi. Okay. Welcome.
MR. GARBOW: Your Honor, because my back was turned, I overlooked two of my colleagues who have been important parts of the case, Alexia Rengo and Michael Johnson.
THE COURT: Welcome, Mr. Johnson, and Ms. Rengo. Is that correct? Thank you.
Have the parties consulted with each other about the pretrial agenda and proposed form that

Page 29

we're trying to avoid having to call her if we can. And we're hoping that we'll be able to lay a foundation and get these documents in through witnesses, but there are a few that we think should be noncontroversial documents, exhibits, that we think we can lay the foundation, the authenticity would be stipulated to, and we could do without a sponsoring witness, in which case we would like to have the opportunity to do that.

Also, I think this is a slightly different point, but it's sort of the same procedural issue as to what procedure we would follow if the Court would allow us to do that, we wanted to inquire, and this did not make it onto the agenda, but wanted to inquire about the procedure for seeking to admit the deposition of Jack Brehill, which the Court has previously ruled on.

THE COURT: Mr. Levasseur?

MR. LEVASSEUR: Your Honor, Ms. Bostian did raise this issue about exhibits without a sponsoring witness, and it's true, I think, that the primary reason that we would call Ms. Renz would just be to sit on the stand and to authenticate documents or try to get them in evidence that way. If they sent us a proposal, we would consider such stipulation, but the

Page 30

Department's view is that the documents need to be sponsored into evidence by witnesses. A foundation needs to be laid for documents before they become evidence in the case.

And the bigger concern is document dumps. It happened in other cases where the plaintiff will try to move in a large number of documents, and occasionally it is allowed, and they come into evidence, and then all of a sudden in a post-trial brief you see a citation to some part of the document that was never raised at trial, never discussed at trial, and then all of a sudden it becomes the key issue. This is not some hypothetical concern that the Department of Justice has. In some of the cases, the appeals have been entirely different than the actual trials, and we think that's improper.

We don't like data dumps, and we don't like document dumps. We don't think they are fair to the Court because the Court isn't being addressed with the actual substance of materials that the parties are going to say is important in the post-trial briefs and in their closing arguments.

So that is our standing opposition to the potential of having large numbers of documents dumped into evidence without a sponsoring witness, and that's

Page 31

our position. That's why we don't approve of admitting documents without a witness. In a proposal, we might consider it, but I don't know what our response would be ultimately. But our general position is that documents need to be sponsored into evidence by a witness.

MS. BOSTIAN: Your Honor?

THE COURT: Yes, Ms. Bostian.

MS. BOSTIAN: Actually, I've just been reminded, one other issue is that at least one potential government witness has died since, not recently, but the offer of the S memo, apparently his dad, Mr. Neuberger, and so those are the types of things that, in reviewing the documents, we had to look at them and thought, oh, we're not sure about getting this in through a witness.

I can assure the Court and the Defendant that we're not thinking about a document dump. We also don't think that's a very good way to make our case, and so that is not our intention. We're talking about if there were no other practical way to get these exhibits in, to have a procedure by which we could do this with some discreet documents.

THE COURT: As Mr. Cayne and Mr. Johnson know, the Court is inclined to be a little bit of a

Page 32

stickler on evidence, in fact, more than a little bit. So I don't think I've yet accepted even a stipulation of the parties as to the admissibility of some documents. It just helps to have the things put in context.

If your witness is dead, if the ordinary person that you would call as the authenticating witness is dead, and the document – I don't even like old documents if they are 20 years' old. We had that discussion in American Federal. I don't just like admitting things because they happen, hypertechnically, to be over 20 years' old.

So if we can avoid having a document come in as – I won't say "unauthenticated" – as an unattested document through a witness who provides a foundation, let's try to do that.

MS. BOSTIAN: We certainly will, Your Honor.

THE COURT: All right.

MR. LEVASSEUR: With respect to the Reed Hill deposition, obviously, we opposed the entry, but it's going to come in, according to the Court's ruling, so exactly how – I don't think they have proposed a specific procedure, but I assume we can work something out.

THE COURT: Now, there, I gave you leave to

Page 33

cross-designate, even though I – to you these are not admissions, to put it mildly.

MR. LEVASSEUR: However they file it, we'll file a set of cross-designations.

THE COURT: Let's talk about that a minute or so because, at a given point in the trial, not at the end of the trial, if we could just have a proffer by the Plaintiff with whatever Mr. Levasseur and his colleagues, Ms. Bostian, have in mind to add, the Court would just take that. If you think it would be helpful to read those, to read the deposition, we'll do that; otherwise, the Court will just take the written materials because that's the form that they are admitted in.

MS. BOSTIAN: That sounds fine to us, Your Honor. I think we would anticipate probably just doing this between two live witnesses.

THE COURT: That's fine. Just work that out with Mr. Levasseur so that you've got – a cross-designation. I'm sorry about the cross-designation, but I'm doing that because, otherwise, I think the parties would be inclined to call Mr. Reed Hill, and that's fine with me if he testifies.

MR. LEVASSEUR: Your Honor, we haven't decided finally, but we may very well call Mr. Reed

Page 34

Hill, so, in a sense, the deposition would become extraneous because they would have an opportunity to cross him if we call him, and that very well may happen.

THE COURT: Well, I anticipate that. But still, the ruling stands. Let's just not take this at the very end of Plaintiffs' case. Let's fit it in.

MS. BOSTIAN: Thank you, Your Honor.

THE COURT: All right. Now, let's see. We've address the orphaned document. Now, if you do have a document, as I said, that you can't really eventually authenticate because you don't have a live witness anymore, let's get that squared away promptly. In fact, let's work on that so we don't do it during the trial. Let's try to do that by Wednesday or Thursday on our little, mini-hearings here if you can. It's completely understandable that there might be some documents that fall in that category, and there might ordinarily be just public records or things like that that you don't need a witness to authenticate. Let's see if we can deal with those there. We've talked about Mr. Reed Hill.

MS. BOSTIAN: Your Honor?

THE COURT: Ms. Bostian.

MS. BOSTIAN: I believe for all of the

Page 35

documents that we have in contemplation, the authenticity has been stipulated under the stipulation and order and under the separate stipulation that we filed in this case.

THE COURT: Right.

MS. BOSTIAN: I don't think that should be a problem. But we will get the Court any such documents by next Wednesday.

THE COURT: Okay. Thank you. Is there anything else in this little bundle under the proposed first item on your pretrial agenda that we haven't covered?

MS. BOSTIAN: No, Your Honor. I believe that's all at this point.

THE COURT: All right. Mr. Levasseur?

MR. LEVASSEUR: I think that's fine, Your Honor.

THE COURT: Okay. Next, Ms. Bostian.

MS. BOSTIAN: Well, Your Honor, if we can proceed to number two, and I'm actually going to defer to my colleague, Walt Zenner, on this motion which I believe the Defendant and the Plaintiffs both would like to resolve at this time, Defendant's motion seeking two procedural orders regarding Mr. Williams's testimony.

Page 36

THE COURT: Now, I deferred ruling on that just to make sure I got all of the papers in. We talked about it tangentially last week, but I think we're in a shape now to address it. Mr. Zenner?

MR. ZENNER: Well, Your Honor, it's the government's motion, so I would suggest that Mr. Levasseur address it first.

THE COURT: But I just want to ask you. You have now – let me find it – let's just talk about what I have. I have the government's motion filed June 14th and your response, Mr. Zenner, filed the 28th. Is that correct?

MR. ZENNER: Yes, Your Honor.

THE COURT: Okay. Thank you. Mr. Levasseur?

MR. LEVASSEUR: Yes, Your Honor. That's correct. Do you want me to address the substance of it?

THE COURT: If you would.

MR. LEVASSEUR: Okay. Your Honor, obviously, the case – we're going to Kansas to hear the testimony largely of Mr. Williams. Mr. Williams is the CEO of the company. He is the principal expert witness. He is the only expert witness who actually calculates a damages claim, purports to calculate a