# EXHIBIT 1

**Pacific Gas & Electric Company v. U.S No. 04-74C June 14, 2006**

**Heritage Reporting Corporation**

**Page 2633 to Page 2985**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x

PACIFIC GAS & ELECTRIC COMPANY, : No. 04-74C

Plaintiff, :

vs. :

THE UNITED STATES, :

Defendant. :

------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, June 14, 2006

VOLUME 8

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT



APPEARANCES:

ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000



APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***



PROCEEDINGS

-----

THE COURT: We are on the record to continue hearing evidence in the Defendant's case-in-chief. Our witness is Mr. Kouts. The witness continues under oath. Good morning, sir.

THE WITNESS: Good morning.

THE COURT: Mr. Lo Re to continue direct examination.

MR. LO RE: Good morning, Your Honor.

THE COURT: Good morning.

Whereupon--

CHRISTOPHER KOUTS

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION(continued)

BY MR. LO RE:

Q. Mr. Kouts, when we broke yesterday, we were looking at DX-114.

MR. LO RE: Which is admitted as PX-97, Your Honor.

BY MR. LO RE:

Q. Mr. Kouts, do you have that document

Page 2905

Congress.
Q. The MRS would be needed, according to this passage I just read to you, in order to meet the obligation to accept spent fuel by 1998, is that what this conveys to you?
A. No, it does not.
Q. Okay.
A. It conveys in addition to the repositories.
Q. I'm sorry, in addition to the repositories, in addition the MRS, the integrated MRS would be needed in order for DOE to meet its obligation to begin accepting spent fuel by 1998, correct?
A. Either the repository or the MRS, if they were deployed in 1998, would meet the obligation. What the Department was referring to here is that in addition to the repositories, it also would like the transportation network and the MRS available at the same timeframe.
Q. And just to make sure, I only want to ask your understanding of what's being conveyed here, doesn't this say that the repository and certain elements of the system, including, in

Page 2906

addition, the integrated MRS, would be needed in order for DOE to meet its '98 obligation, isn't that what that says?
MR. LO RE: Your Honor, I'm going to object on the grounds that this has been asked and answered several times.
THE COURT: You may nevertheless answer. He's still reading the sentence in.
THE WITNESS: I understand, I'm trying to understand this. If the repository is available in 1998, then the Department's obligation would be met. What is being suggested here in this sentence is that there's a desire, certainly, to have a transportation network in effect.
And also, the concept of the Department, it would be nice also to have a monitored retrievable storage facility, if it's authorized by Congress.
BY MR. STOUCK:
Q. And, again, just like you're not trying –
THE COURT: That's your answer.
MR. STOUCK: Thank you, Your Honor.
No further questions.

Page 2907

THE COURT: I'm going to excuse you as a witness in just a second, but I'm going to give you a directive I'm giving to all the witnesses testifying in the case. The parties have requested, as they are entitled to under the Federal Rules of Evidence, that the witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh without being distracted by others' testimony.
And my order to you, until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness, and if you have any question about who could be a witness, please ask counsel. Thank you for your testimony. You're excused as a witness.
THE WITNESS: Thank you.
THE COURT: You may step down. United States to call its next witness.
MS. SULLIVAN: Yes, Your Honor. Our next witness is Tom Pollog, and we'll have to retrieve him from the anteroom.
THE COURT: Thank you.

Page 2908

MS. SULLIVAN: If you give us a moment?
THE COURT: Of course. Mr. Pollog, if you'll wait there for a second until the area is cleared? Mr. Pollog, you may come to the witness chair, but before you sit down, would you indicate your readiness to take the oath by raising your right hand?
Whereupon–
THOMAS POLLOG
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Thank you. Please state your full name for the record.
THE WITNESS: Thomas Edward Pollog.
THE COURT: Thank you. Please be seated, and pour yourself a glass of water any time. Direct examination of Mr. Pollog by Ms. Sullivan.
MS. SULLIVAN: Thank you very much, Your Honor. Good afternoon.
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q. Good afternoon, Mr. Pollog.
Mr. Pollog, where are you currently employed?

Page 2909

A. I'm employed in the Department of Energy's Office of Civilian Radioactive Waste Management.
Q. And which office within the Office of Civilian Radioactive Waste Management?
A. The waste management office.
Q. And what is your position within that office?
A. I'm a nuclear engineer.
Q. And what are the responsibilities of your current position?
A. I am charged with implementing the terms and conditions of the standard contract between the Department and the contract holders. I also act as a contracting officer's technical representative for the contract.
Q. How long have you served as the contracting officer's technical representative?
A. I believe it's been four or five years.
Q. And what are the responsibilities for the contracting officer's technical representative?
A. To provide technical expertise and advice to the contracting officer.

Page 2910

THE COURT: And we can refer to this responsibility as the COTR?
THE WITNESS: Yes, Your Honor.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. And to whom do you report, Mr. Pollog?
A. Chris Kouts.
Q. Mr. Pollog, would you briefly describe your post high school educational background?
A. Yes. I received a Bachelor of Science in nuclear engineering from Penn State in 1981, and I received a Master's of Science in environmental system engineering from Clemson University in 1988.
Q. After receiving that degree from Clemson University in 1988, where were you employed?
A. I joined the Department of Energy's Office of Civilian Radioactive Waste Management.
Q. And what was your position with the Office of Civilian Radioactive Waste Management at that time?
A. My first position was in the systems development branch as a general engineer, I

Page 2911

believe.
Q. And how long were you in that branch?
A. Approximately six months.
Q. And where did you next go?
A. I was still within the Office of Civilian Radioactive Waste Management, but I was then placed in the systems integration branch.
Q. And how long were you in the systems integration branch?
A. For approximately one year to one-and-a-half years.
Q. And what were your responsibilities in the systems integration branch?
A. We developed a technical baseline, the requirements documents for the waste management system.
Q. And after the systems integration branch, where did you next go in the Office of Civilian Radioactive Waste Management?
A. I joined the utility interface in the logistics branch, which is basically the waste acceptance team.
Q. And what were your responsibilities in that position?

Page 2912

A. I was an engineer providing technical support to Mr. Brownstein, who was the COTR for the contract at that time.
Q. And what time were you in that office, what was the timeframe?
A. From, I believe, the middle of 1990 to the beginning of 1992.
Q. And in 1992, where did you next go?
A. I took a leave of absence from the Department of Energy, and I had accepted a three-year assignment to the International Atomic Energy Agency in Vienna, Austria.
Q. And when you returned from Vienna, did you return to the Department of Energy?
A. Yes, I did.
Q. And what position did you take at that time?
A. I was an engineer in the engineering division in the Office of Civilian Radioactive Waste Management.
Q. And now long were you in the engineering division?
A. Approximately one-and-a-half years.
Q. Okay. And where did you next go after that?

Page 2913

A. I joined, again, rejoined the waste acceptance team in the middle part of 1996, so I had been there since.

Q. Thank you. Mr. Pollog, I'd like to hand you what's been marked as Defendant's Exhibit 187.

MS. SULLIVAN: That has already been admitted as Plaintiff's Exhibit 158, Your Honor.

THE COURT: Thank you.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, would you identify this document for the record, please?

A. It is the 1991 annual capacity report, as we refer to it, the ACR.

Q. Were you involved in the preparation of this document?

A. Yes, I was.

Q. What was your involvement?

A. We first got drafts of this document from our contractors who developed the initial version for us, so I reviewed the drafts, and

Page 2914

after the waste acceptance people were satisfied with the drafts, I was responsible for having the document reviewed, resolve comments, and then getting it approved and published by the Department.

Q. What was the purpose of the 1991 ACR?

A. It was to provide the contract holders with allocations to allow them to fill out their delivery commitment schedules.

Q. Could you please go to page five of this document? And there's a table set forth on that document, table 2-1. What information is set forth in that table?

A. They are the projected waste acceptance rates starting in 1998 and going through 2007.

Q. And what were the rates in the 1991 ACR based upon?

A. They were based upon meeting the limitations or linkages in the 1987 Nuclear Waste Policy Amendments Act. There was a 10,000 metric ton limit on an MRS capacity limit, and it would allow us to meet that limit on the MRS.

Q. Now, go to Defendant's Exhibit 195.

Page 2915

MS. SULLIVAN: Your Honor, my records indicate that that's already been admitted. May I approach?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you recognize this document?

A. Yes, I do.

Q. Would you identify it for the record, please?

A. Yes. It is an action memo seeking approval for publication of the 1991 annual capacity report. It was going from Mr. Milner, who was our associate director at the time, to John Bartlett, who was the director of the program at that time.

Q. And your involvement in the issuance of the 1991 ACR, would you have been involved in the preparation of this document?

A. Yes, I would.

Q. Mr. Pollog, could I ask you to look at the second sentence under, "Background"? If we could bring that up, the second paragraph under, "Background"? And would you please read that paragraph into the record, Mr. Pollog?

Page 2916

A. "The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, APR. However, based on discussions with contract holders and their representatives, the Department elected to continue to publish the ACR. This change in plans was conveyed to contract holders in a May 15th, 1991 letter from the Department's contracting officer."

Q. Mr. Pollog, what do you recall about DOE's decision to continue issuing ACRs after the 1990 ACR was issued?

A. We had discussions with utility representatives, as stated in this paragraph, prior to this, and they expressed a desire for us to continue publishing the ACR. Based upon those discussions, we followed through and did continue publishing it.

Q. Could you now go to the second paragraph under, "Discussion"? Mr. Pollog, would you read that paragraph into the record, please?

A. "The 1991 ACR assumes that Federal Waste Management System operations, FWMS,

Page 2917

commenced in 1998, and the system configuration is that authorized by the Nuclear Waste Policy Act amendments of 1987, specifically a monitored retrievable storage facility with a 10,000 MTU storage limit prior to repository operations."

Q. Thank you, Mr. Pollog. At the time this document was prepared in December of 1991, was DOE planning to accept spent nuclear fuel at a 3,000 MTU rate?

A. No, they were not.

Q. Why not?

A. At this point in time, it was only possible for us to -- if we were going to accept waste in 1998, it would have to be an MRS, and the 3,000 metric ton rate would have been for repository operations, not an MRS.

Q. Thank you. Mr. Pollog, how did the 1991 ACR differ from the previous ACRs issued by DOE?

A. The 1991 ACR had one acceptance rate, where the prior one had two, an upper bounding and lower bounding case. That was the primary difference.

Q. Could I have Plaintiff's Exhibit 142?

Page 2918

MR. STOUCK: 142?

MS. SULLIVAN: 142. May I approach, Your Honor?

THE COURT: You may.

MS. SULLIVAN: Your Honor, we have a different, a new wrinkle on the admitted, not admitted conundrum. A different version of this document was admitted as Defendant's Exhibit 164. There's a reason for my showing this version of the exhibit to Mr. Pollog. This one has not been admitted.

THE COURT: Okay.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you recognize what's been marked as Plaintiff's Exhibit 142?

A. Yes, I do.

Q. Would you identify it for the Court?

A. Yeah. It is an action memo seeking approval for publication of the 1990 annual capacity report, going from Mr. Milner to Dr. Bartlett.

Q. And did you have responsibility for the preparation of this document?

A. Yes, I did.

Q. How do you know that?

Page 2919

A. Two ways. On the far right-hand side of the first page, my name is there, concurrence, this is the first one, and usually, the first person listed is the one who drafts the document. And also, on the second page near the bottom, there is a line, RW432T Pollog, that means it would have been a disk of mine that I gave to one of the secretaries, for them to put this on appropriate letterhead and have it formatted correctly.

Q. Thank you. Mr. Pollog, can I direct your attention to the paragraph, the first paragraph under, "Discussion," on the first page? Could you please read that paragraph into the record?

A. "The ACR is required to project both the annual receiving capacity of the waste management system and annual acceptance ranking of contract holders for 10 years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.

Page 2920

The first two ACRs were published in June 1987 and June 1988, respectively. In April 1990, the Department informed all contract holders that the 1989 ACR would not be published prior to the development of revised waste acceptance schedules, based on the Secretary's reassessment of the program to Congress."

Q. Mr. Pollog, does the paragraph you've just read comport with your understanding of the development of the ACRs that were issued by DOE and culminating in the issuance of the 1991 ACR?

A. Yes, it does.

Q. Can we go back to Defendant's Exhibit 187, which has been admitted as Plaintiff's Exhibit 158, and could we go to page nine of this document, please? Mr. Pollog, do you have page nine in front of you?

A. Yes, I do.

Q. What is the information conveyed on table 3-1 set forth there on page nine?

A. This is a summary of purchasers' annual allocations in metric tons of uranium. Basically, it lists all the purchasers at that

Page 2921

point in time, and it goes from year 1 through year 10 of system operation, and it gives their allocations for each specific year, and it also totals their first 10 years' worth of allocations.

Q. And how is this chart compiled?

A. It's, well, it's compiled by applying the OFF, oldest fuel first methodology to the APR, acceptance priority ranking.

Q. Could you explain to the Court what oldest fuel first or OFF is that you just referred to?

A. Yeah, that is the methodology that the Department uses for allocated acceptance capacity. Essentially, whoever discharges first comes first in the line, and the amount that's picked up by that, at that point in time, is the same as the amount of their discharge.

Q. And why does the Department use OFF as the method for determining the allocation?

A. To be consistent with what the contract says.

Q. Thank you. Could we bring up the line for Pacific Gas & Electric. That's about

Page 2922

three-fifths of the way down the page, very small, but could you explain to the Court what that line is intended to convey for Pacific Gas & Electric?

A. Yes. In year one of system operation, Pacific Gas & Electric would get 7.2 metric tons of allocation, of an allocation or acceptance capacity. In year two, the number would be 6.1; in year three, 2.6; and in year four, 13 metric tons of uranium.

Q. And how many –

A. And the total, excuse me, the total would be 28.9 for all, for their first 10 years.

Q. Thank you. Do you understand this amount of 28.9 to be the total amount of spent nuclear fuel held by PG&E at Humboldt Bay?

A. Yes, I do.

Q. How were the utilities supposed to use the information in table 3-1?

A. They will use that information to fill out their delivery commitment schedules.

Q. And how did DOE communicate to utilities how they were supposed to use this information in table 3-1?

Page 2923

A. It was communicated to the contract holders via the DCS instructions.

Q. And who issued those DCS instructions?

A. They were issued by the Department of Energy under signature of the contracting officer.

Q. And did DOE have any discussions with utilities concerning the instructions prior to the instructions being sent to – formally issued by the contracting officer?

A. Yes, we did. We had several discussions through an EEI/UWASTE group that we had regular discussions on waste acceptance issues with, and that was also conveyed, I believe, in several seminars, conferences, or presentations in nuclear industry trade meetings.

Q. And was a draft of the instructions provided to these utility groups?

A. Yes, they were.

Q. Why does the chart on page 9 present information only for 10 years?

A. The contract says we were to provide in the ACR 10 years' worth of allocations to the contract holders following commencement of

Page 2924

the DOE facility.

Q. Mr. Pollog, could we go to Appendix B of this exhibit, Defendant's Exhibit 187? It begins on page B1, but we can go to B2. Mr. Pollog, what is Appendix B to Defendant's Exhibit 187?

A. This is an extraction or subset of the 1991 APR.

Q. Okay. And could I direct your attention to page B6 of this document? There's an entry there for Pacific Gas & Electric about two-thirds of the way down. Do you see that, Mr. Pollog?

A. Yes, I do.

Q. Okay. Does that allocation tie up with the information we've just been looking at in table 3-1?

A. Yes, it does. It's consistent with, I believe, the year four allocation for PG&E in that table that we just discussed.

Q. Does this table and this line specifically tell you how much fuel DOE has to accept, pursuant to the oldest fuel first queue, in order for DOE to accept all of the fuel from PG&E at Humboldt Bay?

Page 2925

A. Yes, it does. In the last column, you'll see it says, "cumulative total MTU," to the point where PG&E's fuel would be accepted, 1,943 tons would also have been accepted cumulatively at that point in time.
Q. And is that all of the fuel that's depicted on this chart above that entry for Pacific Gas & Electric?
A. Yes, that's correct.
Q. Could we go to Defendant's Exhibit 175? Which my records indicate has been admitted already.
MS. SULLIVAN: Your Honor, may I approach?
THE COURT: You may.
MS. SULLIVAN: And, Your Honor, I did not move for the admission of Plaintiff's Exhibit 142. I'd like to move for the admission of 142. That's the memo that Mr. Pollog discussed. I apologize.
THE COURT: Tell me the distinction before I – is it to get his initials on it?
MS. SULLIVAN: It was just to tie it up that he actually had some knowledge of this document. I don't think the substance is any

Page 2926

different than Defendant's 164.
THE COURT: PX-142 is admitted.
MS. SULLIVAN: Thank you, Your Honor.
(Plaintiff Exhibit Number 142 was received in evidence.)
BY MS. SULLIVAN:
Q. Mr. Pollog, Defendant's 175 is a set of three documents. Do you recognize these documents?
A. Yes, I do.
Q. Would you identify them for the record, please?
A. Yes. The first document is a letter from John Bartlett to Richard Clark, chairman, CEO of Pacific Gas & Electric. The second letter is a letter from Carol Reuter, who's a contracting officer at that time, to Mr. J.E. Barrett, who was a contract administrator for Pacific Gas & Electric, and the third is a draft acceptance priority ranking that's dated May of 1991.
Q. Were you involved in the preparation of these documents?
A. Yes, I was.
Q. Could I direct your attention to the

Page 2927

second to last paragraph of the contracting officer's letter, the third page of the exhibit ending in Bates number 494, the paragraph beginning, "although," could we bring that out? Mr. Pollog, would you read that paragraph, please?
A. "Although the Department had previously indicated that the 1990 annual capacity report would be the final issue published, the Department has elected to continue publication of the ACR for planning purposes. The ACR will use the APR as the basis for the annual allocation for the total waste acceptance capacity to the purchasers. In accordance with the contract, purchasers may submit delivery commitment schedules based on these allocations beginning January 1, 1992 (Additional instructions for completing the DCS will be forthcoming later this year.)."
Q. Thank you. Mr. Pollog, does this paragraph that you've just read, is that the notice that was discussed in the memo to Dr. Bartlett from Mr. Milner, that is Defendant's Exhibit 195, pursuant to the

Page 2928

issuance of the 1991 APR?
A. Yes, I believe so.
Q. Mr. Pollog, were you involved in the preparation of the draft APR?
A. Yes, I was.
Q. How was it prepared?
A. We gather from utilities, we collect data on something called the RW-859 report, which is a nuclear fuel data form, at this point in time being collected, I believe, on a yearly basis. The utilities on that form told us basically what their discharges were, historical discharges were. So we just took the information that they had told us about their discharges, and we ranked them and developed this document.
Q. Why was this draft distributed to contract holders?
A. We thought that this process was extremely important for both parties, for the Department and for the contract holders. Prior to finalizing or issuing a final APR, we wanted to issue a draft one, give them one last chance to say, is the information in this document correct or not.

Page 2929

If it was not correct, please tell us so, and we will try and resolve this issue prior to issuing a final APR.

Q. And why is the information set forth in the APR so important?

A. Because that would form the basis for the allocations in the ACR, which would form the basis for the delivery commitment schedule process.

Q. Were there changes made between the draft and the final 1991 APR?

A. Yes, there were.

Q. What were the nature of those changes?

A. I don't recall very many specifically, but a utility was likely to say the date that we have for an assembly was incorrect, an assembly that they had declared temporarily discharged is now permanently discharged, or an assembly that they had declared permanently discharged had now been reinserted in the core, was no longer permanently discharged, something to the effect – that would affect the status of assemblies that had been historically discharged and how they had been labeled, whether permanently discharged or temporarily

Page 2930

discharged.

Q. Thank you. I'd like to now show you Plaintiff's Exhibit 161, please.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, do you recognize what's been marked as Plaintiff's Exhibit 161?

A. Yes, I do.

Q. Would you identify it for the record, please?

A. Yes, it is a letter from Mike Detmer, who was the contracting officer at that time, to Mr. Barrett, who was the contract administrator for Pacific Gas & Electric, transmitting the final acceptance priority ranking for 1991.

Q. Could we bring up the second paragraph of the letter? And, Mr. Pollog, could you read that paragraph into the record, please?

A. "The 1991 APR reflects purchaser comments and corrections, as appropriate, to draft APR, which was sent to all owners of SNF on May 15th, 1991. The majority of the

Page 2931

comments on the draft APR involved changes in the status of the SNF from temporarily discharged to permanently discharged, resulting in the SNF's inclusion in the ranking. The proposed changes were incorporated into the ranking when the Department determined the information accurately represented the current SNF designation and the owner of the SNF committed to making the appropriate designation change officially in their next nuclear fuel data form, RW-859, submittal and, when appropriate, revising the standard disposal contract's Annex B to Appendix G form (standard remittance advice for payment of fees), which identified assembly status for all in-core, temporarily, or permanently discharged SNF as of April 7th, 1983."

Q. Thank you. Monitored retrievable storage, the paragraph that you've just read, does that accurately summarize the nature of the changes that you made between the draft APR and the final APR that was issued in 1991?

A. Yes.

MS. SULLIVAN: Your Honor, at this time, we move for admission of Plaintiff's

Page 2932

Exhibit 161.

THE COURT: PX-161 is admitted.

(Plaintiff Exhibit Number 161 was received in evidence.)

BY MS. SULLIVAN:

Q. Mr. Pollog, I'd now like to look at Defendant's Exhibit 189 with you.

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: You may.

BY MS. SULLIVAN:

Q. Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 189. Do you recognize this document?

A. Yes, I do.

Q. Would you identify it for the record, please?

A. It is the 1991 acceptance priority ranking.

Q. And I believe you already testified, but were you involved in the preparation of this document?

A. Yes, I was.

Q. And what involvement did you have in preparation of this document?

Page 2933

A. Similar to the 1991 ACR, which I described earlier, that is, I would have reviewed the draft version from our contractor, resolved comments with them, and then after we were satisfied, I would have had it circulated for comments throughout the affected organizations and the Office of Civilian Radioactive Waste Management and other parts of the department.
I would have gotten comments from those organizations and would have resolved those comments and, after that, would have gotten the document approved for publication and then published.
Q. And was 1991 the first time DOE published the APR?
A. Yes.
THE COURT: For the record, the Court will receive briefing on, that relates to this document as PX-159 – PX-157, sorry.
MS. SULLIVAN: Which has been admitted.
THE COURT: Both of those things I just said were incorrect. PX-158, however, would be right.

Page 2934

MS. SULLIVAN: And that has already been admitted, Your Honor.
THE COURT: That's in.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Continue on this, the pagination and everything is the same.
MS. SULLIVAN: Oh, Your Honor –
THE COURT: We're just, hold on for just a second, we'll come to the bottom of this. We are returning to where you started, Ms. Sullivan, which is at DX-189.
MS. SULLIVAN: Very good, Your Honor.
THE COURT: Everything else is, what do we say, inoperative.
MS. SULLIVAN: Very good. Thank you, Your Honor.
MS. SULLIVAN: And just to close it out, I'd like to move for admission of Defendant's Exhibit 189 at this time.
THE COURT: DX-189 is admitted.
MS. SULLIVAN: Thank you, Your Honor.
(Defendant Exhibit Number 189 was received in evidence.)
BY MS. SULLIVAN:
Q. Mr. Pollog, could we go to page four

Page 2935

of this document, and could we bring up the entry for Pacific Gas & Electric? And, Mr. Pollog, could you explain to the Court what information is contained on that line that is highlighted?
A. Yes. In the first column, it's the purchaser, and that would be Pacific Gas & Electric, and this is concerning a discharge that they had made. The fuel originator would be Humboldt Bay. The storage location is also Humboldt Bay. Then the type of fuel would be BWR, or boiling water reactor fuel. Then there would be the discharge date, which would be June 5th of 1971, the number of assemblies, which are 40, the MTU value of those entries, which is 3.054, and in the final column would be cumulative total metric tons of uranium that have been discharged, including this discharge to this point in time, and that would be 126.01 MTUs.
Q. Thank you. And could we go to the next page, page five, and we'll bring out the same, the entry there, the third line down, for Pacific Gas & Electric – no, third line from the top. And, Mr. Pollog, what does that entry

Page 2936

show with regard to the MTU amount of the discharge on that line?
A. This discharge would be for 4.195 MTUs, and cumulative total at that point in time would be 355.10.
Q. So between – I'm sorry, did you say 4.1?
A. 4.195.
Q. So summing that amount with the amount we just looked at on page four, which is 3.054, it's approximately 7.2?
A. Yes.
Q. And do you recall, does that match PG&E's first allocation in the 1991 ACR, if you want to look at Defendant's Exhibit 187, table 3-1?
A. Yes, it does match with Appendix Exhibit 187, page nine, table 3-1.
Q. Thank you. Could we go to the very end of Defendant's Exhibit 189, page 34? Mr. Pollog, what is the date of the last discharge reflected in this document?
A. April 30th, 1991.
Q. And how much spent nuclear fuel had been discharged by standard contract holders at

Page 2937

this point in time?
A. 22,024.93 MTUs.
Q. Thank you. Can I have Plaintiff's Exhibit 136, please?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: You may.
BY MS. SULLIVAN:
Q. Mr. Pollog, are you familiar with what are known as facility interface capability assessments?
A. Yes, I am.
Q. Or also known as FICA reports?
A. Yes.
Q. And how are you familiar with those assessments?
A. During the time period when I was in the waste acceptance group in 1990, '91, and early '92, I was responsible project manager for this program.
Q. And you've been handed what's been marked as Plaintiff's Exhibit 136. Do you recognize this document?
A. Yes, I do.
Q. Would you identify it for the record,

Page 2938

please?
A. Yes. It is the facility interface capability assessment project report for the Humboldt Bay, cask handling assessment for the Humboldt Bay Power Plant unit 3.
Q. Could I direct your attention to page three of this document, please? And there's a table, two tables set forth on that page. Could you explain the information set forth in those tables?
A. Yes, it is assessment of the Humboldt Bay facility's cask handling capability for a DOE reference cask and second assessment level cask. It gives current status, and it also describes what would happen with revisions to the analysis at the facility and with modifications, physical modifications to the facility.
Q. At the time this report was prepared in 1990, did Pacific Gas & Electric have the ability to accommodate overweight casks at Humboldt Bay?
A. No, they did not.
Q. Did PG&E have the ability to accommodate 100-ton casks at Humboldt Bay?

Page 2939

A. No, they did not.
Q. And at the time this report was prepared in 1990, did Humboldt Bay have the ability to accommodate 125-ton casks at Humboldt Bay?
A. No, they did not.
Q. Mr. Pollog, can I direct your attention to page 10 of this document? Would you please – could we bring up the first paragraph under 4.2.1 at the bottom? Mr. Pollog, would you please read that paragraph into the record?
A. Yes. "Assuming successful completion of the relevant cask-drop analyses and elimination of the height problem, the plant could handle the 25-ton legal weight truck cask and the 40-ton overweight truck cask. In order to handle the 100-ton DOE reference cask, the existing 75-ton design capacity crane must be replaced or upgraded. The crane would either have to be single failure proof up to 100 tons or a cask drop analysis for the 100-ton cask would have to be performed. In addition, either the rail spur would have to be extended into the

Page 2940

receiving area or the cask would have to be transferred on a lowboy trailer to the point where the rails currently end."
Q. Thank you, Mr. Pollog. What does this report say regarding modifications that would be necessary at Humboldt Bay to accept larger casks?
A. They would have to do analyses. They would have to do tension crane upgrades. They would have to do several different things in order to handle those casks.
Q. Thank you. Mr. Pollog, you testified earlier, you mentioned something called the RW-859 form, referencing your testimony about the APR. What is the RW-859 form?
A. It is a nuclear fuel data form that the Department used to collect information from the utilities. We use it to collect historical discharge data and also future projected discharges.
Q. And what responsibilities do you have with regard to the RW-859 forms and the data collected from utilities?
A. I am currently the project manager for DOE for the RW-859 data collections.

Page 2941

Q. What information do utilities provide on the RW-859 report, specifically?

A. They provide historical discharges from their facilities. In addition, they provide characteristics of the fuel when it was discharged, such as the burnup of it, the initial enrichment, whether it's failed or not, whether it's canistered, storage location, whether it's in pool or whether it's in dry storage at the facility, pool capacities at their facility.

They also provide future discharge information, when they expect their next five discharges will be and how much, how many assemblies or metric tons will be in each discharge and what the expected burnup is of those assemblies.

Q. Are utilities required to submit these forms?

A. Yes.

Q. Required pursuant to the contract to submit these forms?

A. Sort of. The contract has an Appendix B, which is future discharge projections. At the time the contract was enacted or signed,

Page 2942

the Department was already collecting similar information on the RW-859.

So in lieu of ever collecting information on the Appendix B to the contract, an agreement – somehow, there was an agreement made between the contract holders and the Department, where the RW-859 would settle, would serve as a replacement for Appendix B of the contract.

Q. Thank you. Prior to 1998, did some utilities report the storage of fuel in dry storage facilities?

A. Yes, they did.

Q. Can you provide me with an example of a utility?

A. Calvert Cliffs or Oconee or Arkansas Nuclear One.

Q. With regard to pool capacity on the RW-859 forms, do utilities report their licensed capacity or their installed capacity?

A. They report both.

Q. And what is the difference between these two capacity figures?

A. License is what they are licensed to store under fuel, according to their license

Page 2943

with the NRC. The installed or available capacity for what – how much of that capacity they could actually use. Not all the cells in their pool, even though they have a license to store them, can be used for different reasons.

They're being used for storage of other materials, there's obstructions reaching those cells, so the installed or available capacity will be usually a little less than what's their licensed capacity.

Q. Do the reported pool capacities change between RW-859 reports?

A. Yes.

Q. And why do those change?

A. Cells that are available from one report to the next report will not be available because they're using them for something else. They have put some other materials that need storage, or for some other reason, they are no longer able to physically access those cells.

Q. Are utilities required to report their full core reserve policies or practices on RW-859 forms?

A. No, they are not, not currently.

Q. Turning to discharge information –

Page 2944

MS. SULLIVAN: Okay. Your Honor, could we take a break here? I'm at a breaking point right here, if that's all right?

THE COURT: Let me just be sure. Why don't we move in, while we're thinking of it, PX-136, which is admitted.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: We'll be in recess for 10 minutes. The witness may step down.

(Plaintiff Exhibit Number 136 was received in evidence.)

(Whereupon, a short recess was taken.)

THE COURT: Direct examination of Mr. Pollog continues. The witness continues under oath.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Pollog, we were talking about the RW-859 forms. With regard to discharge information, what historical discharge information do utilities report on the RW-859 form?

A. They report what fuel was discharged when – such as how much was in the discharged number of assemblies in the MTU, also the date

Page 2945

of the discharge, characteristics of the fuel
that had been discharged, such as its burnup
and its initial enrichment, other
characteristics, such as whether it's failed,
whether it's canistered.
Q. What projected discharge information
do utilities provide?
A. They provide when their next five
discharges will be, the frequency between those
discharges, how much is going to be in each
discharge, the burnup of the discharges.
Q. What are the typical cycle lengths
that utilities report?
A. 18 to 24 months.
Q. Have you had occasion to compare
utilities' projected discharges against the
actual discharges reported on the next form or
next report?
A. Yes, I have. Yes, I have.
Q. And do utility future projections
sometimes not match actual discharges?
A. Yes, that's correct.
Q. And why would that be?
A. A utility may shut down for a period
of time due to some type of maintenance

Page 2946

situation or equipment malfunction causes them
to do a long-term maintenance fix for the
problem. They may have regulatory issues with
the NRC that causes them to shut down for some
extended period of time.
Just in general, we have found they
tend to overpredict a little bit the amounts in
the burns of their spent fuel, just a slight
amount, but it's usually consistently been a
little bit of an overprediction.
Q. What fuel characteristics do you ask
utilities to report on their RW-859 form?
A. The burnup of it, the enrichment,
whether it's failed or not, and whether it's
canistered.
Q. When you say, "canistered," what do
you mean by that?
A. A single element, a single assembly
will sometimes be in a canister.
Q. What is burnup?
A. Burnup is the product of how long an
assembly is in a reactor core and how much
power is produced for that period of time, so
you multiply the power level times the amount
of time in the core, and that gives you the

Page 2947

burnup.
Q. And what is enrichment?
A. Enrichment, we usually say enrichment
of uranium-235. That is the percentage of
uranium-235 compared to total uranium content
of the assembly.
Q. The discharge information that is
collected on the RW-859 form, is that
information maintained in a database?
A. Yes, it is.
Q. Do you have a responsibility for that
database?
A. Yes, I do.
Q. How is the discharge information
reported by utilities used by DOE?
A. It has various usages by DOE. We take
the historical and the projected, and we try
and determine what the total amount of spent
fuel that will be generated in the history of
nuclear power. We do that to basically see if
Yucca Mountain is physically capable, large
enough of handling all the fuel that will be
generated in the history of nuclear power in
this country.
Also, we use it for TSLCC, which is

Page 2948

total system life cycle cost. We use it for
fee adequacy, our fee adequacy assessment, the
1 mil per kilowatt hour is an adequate amount.
We use it for design basis waste stream. We
use it to respond to inquiries from the public,
from Congress, from DOE management, anyone who
has interest in this type of information.
Q. Do you use the information in the
database in the preparation of the ACR and the
APRs?
A. Yes, we do also for the ACR and APR.
Q. You mentioned the design basis waste
stream. What is that?
A. That was an attempt, or is an attempt
by a part of our program to predict the
incoming waste stream into the Civilian
Radioactive Waste Management System. They're
trying to predict what fuel will be coming at
what given points in time in the future.
Q. And why is that important?
A. It's important for design of
facilities, casks, ordering casks, if we will
need any type of long-term storage at the
facility at Yucca Mountain, basically for
design and handling operations at the facility.

Page 2949

Q. Why is the total amount of spent nuclear fuel generated by utilities significant or important to DOE, or determining that amount important or significant to DOE?

A. Well, Yucca Mountain is only so big. We try and determine if it's big enough to hold all spent fuel that may be generated in the history of nuclear power for this country.

Q. Do you have an understanding as to DOE's contract obligation with regard to the total amount of spent fuel generated by nuclear utilities?

A. Yes, I do. We believe we are obligated to accept all fuel generated by utilities under contract.

Q. Could you explain to the Court how you generate future projections?

A. Yes. Utilities in the 859 give us their next five cycles for discharge. That amount of fuel and those discharges correspond to a certain amount of energy that will be produced, they expect to be produced, but another part of the Department, the EIA or Energy Information Administration, also projects how much nuclear energy they expect to

Page 2950

be produced in this country. So when energy balances back, we try and equalize those two amounts, we go from the EIA's projection to what utilities expect, and then we will adjust accordingly, based upon equalizing those amount, what we expect the discharges to be for the next five cycles and beyond. We go through, basically, the end of their operating license, and depending upon the scenario, we may or may not assume license extensions.

Q. What decisions can utilities make that affect the accuracy of DOE's projections as to the total amount of spent fuel that will be generated?

A. Well, basically, again, when they're going to shut down, shut down early, if they're going to shout down for any type of maintenance, long-term issues that need to be resolved at their facility, they'll be the ones to determine how hard they're going to run their fuel, what burnup levels they're going to get.

They'll determine what the capacity factor at their facility is going to be. All

Page 2951

of these factors have an impact on what the amount of fuel generation will be.

Q. You mentioned a capacity factor. What is a capacity factor?

A. A capacity factor is a measure of how much energy was produced in a year compared to the theoretical total amount of energy that a facility could produce.

Q. Is it roughly equivalent to a measure of efficiency?

A. Yeah, roughly.

Q. Thank you. And are you familiar with the term called "up rating"?

A. Yes, I am.

Q. What is up rating?

A. Up rating is utilities are seeking to up rate their licensed power amount. They are licensed by NRC to produce a certain level of power. They are currently operating what they are licensed to produce, so they're going to a couple of percentage higher, were seeking a couple of percentage higher amounts, to produce that much more electricity.

MS. SULLIVAN: Your Honor, we have two demonstratives, two single demonstratives that

Page 2952

we'd like to show Mr. Pollog and have him talk to, and I have two copies for the Court and copies for –

THE COURT: Right. Have these been delivered in our time?

MS. SULLIVAN: Yes, actually. Do you have your copies with you?

MR. STOUCK: Did I get copies?

MS. SULLIVAN: Yes, I faxed them to you.

MR. STOUCK: When?

MS. SULLIVAN: They were faxed by my office to you on Monday, I believe. No, Tuesday, the 13th, at 11:00 a.m.

MR. STOUCK: Okay. May I just take a look at it?

MS. SULLIVAN: Sure.

MR. STOUCK: Your Honor, and before I see that, it's interesting, I don't understand the relevance of this, and I've sort of been hesitating to object.

THE COURT: Well, it's direct examination of case-in-chief, so we'll wait and see what happens.

MR. STOUCK: Can I take a minute to

Page 2953

look at this?
THE COURT: The United States is well within its time, so my statement on relevance generally, for big pieces of relevance like this, is the day is still young.
MS. SULLIVAN: Thank you, Your Honor. Can I get this back? It's my file copy.
MR. STOUCK: Yeah, okay. Can I have just one moment to look at it, Your Honor. And, again, I was here at 11:00 Tuesday. I don't know why it didn't come in.
THE COURT: Certainly.
MR. STOUCK: This says source draft mission plan and 1991 draft mission plan. Is that where this data comes from? I'm just curious.
THE COURT: You can wait to ask your question.
MR. STOUCK: That's fine.
THE COURT: We can wait.
MS. SULLIVAN: I apologize, Your Honor.
THE COURT: There's a question Mr. Stouck asked about the demonstrative. The Court would really like to have one though.

Page 2954

MS. SULLIVAN: Yes, Your Honor. I apologize. There are two copies for the Court.
THE COURT: And there is a question from the Plaintiffs about the source of the information.
MS. SULLIVAN: Yes.
MR. STOUCK: It cites, at least for one page, the source of information as the two draft mission plans. Is that where this -- can I find that information?
MS. SULLIVAN: Uh-huh, it's also information taken from Mr. Pollog that Mr. Pollog put together, his knowledge as to these factors.
MR. STOUCK: Okay.
BY MS. SULLIVAN:
Q. Mr. Pollog, can you turn to what's been marked in the lower right-hand corner as Pollog Demonstrative 1, which is also on the screen? Do you recognize this sheet, this demonstrative?
A. Yes, I do.
Q. What is it?
A. It is a summary of industry trends from the early '80s to the present, talking

Page 2955

about different factors which affect spent fuel generation rates and the total amounts of spent fuel that will be generated for nuclear power.
Q. And what is the source of information contained on Pollog Demonstrative 1?
A. The majority comes from the RW-859 report or the data, the license extensions we would have received, gotten from the NRC's website.
Q. Mr. Pollog, could you explain how the factors listed there on the left-hand side, how these factors have changed over time?
A. Yes. In the early '80s, capacity factors at the nuclear plants were running between 50 and 60 percent, and that's currently right around the 90 percentile mark. In those days, the enrichment was approximately two-and-a-half percent, and now, it's ranging from four-and-a-half to five percent. The burnup in the early '80s was approximately 30,000 megawatt days per metric ton of uranium, and now, it's somewhere around 50,000 megawatt days per metric ton. Again, in the early '80s, there were three shutdown reactors, and now, we have 14. There are no

Page 2956

license extensions. There was not even a discussion of license extension in the early '80s, and now, we have 51 reactors, they either received a license extension or applied for one, and then an additional 18 have announced their intention to apply for license extensions.
THE COURT: Before you go on, the enrichment, you mentioned U-235, but how does this factor in and what happens, what's this about?
THE WITNESS: If you have a higher enrichment, initial amount of uranium-235 in your fuel, you'll be able to keep it in your reactor longer and burn it more.
THE COURT: What do those two numbers mean with respect to that population you just made, 2.5 percent and 4.5 to 5 percent?
THE WITNESS: In the early '80s, the uranium-235 content was 2.5 percent of the total uranium content in the fuel. Now, it's somewhere around four-and-a-half to five percent of uranium, so it basically doubled.
THE COURT: How has that occurred? Has someone obtained fuel that has a higher

Page 2957

U-235 content?

THE WITNESS: Yes. I mean, uranium enrichers, uranium fabricators out there and utilities are now seeking uranium from these companies with a higher uranium-235 content.

BY MS. SULLIVAN:

Q. And just to make a correction to the record, Mr. Pollog, I believe you testified that there had been 51 – I'm sorry, 15 license extensions, is that correct?

A. 51, I believe, I hope I said 51, I should have said 51, if I did not.

Q. I think there's just a misspoke. I just want to clear up the record. Mr. Pollog, could we turn to Pollog Demonstrative 2, please? Do you recognize this demonstrative?

A. Yes, I do.

Q. What is this demonstrative intended to convey? What is the information in this demonstrative intended to convey?

A. It conveys how, in '83, we expected to see 140,000 metric tons of uranium produced in the history of nuclear power, and then that number dropped to about 83,000 by the early to mid-'90s, due to early shutdowns, and there was

Page 2958

no talk of license extension.

Currently, the number is back up to about 130,000 of metric tons of uranium, mostly due to the license extension phenomenon, where utilities are getting, seeking from the Nuclear Regulatory Commission a 20-year extension of their license, of their operating license.

Q. And what was the source of the information set forth on Pollog Demonstrative 2?

A. Okay. It's from the 1984 draft mission plan, the 1991 draft mission plan, and then the current number would just be results of our analyses based upon using 859 data for program objectives right now, such as TSLCC or fee adequacy or other systems studies we do.

Q. And do you know what the projected annual discharge rate, projected discharge rate for 1998 was in the 1983 timeframe?

A. Yeah. In that time period, they were projected there would be about 3,000 metric tons of uranium that would be discharged per year. Currently, though, we're seeing approximately 2,000 metric tons of uranium being discharged per year.

Page 2959

Q. Do you have an understanding as to why this annual rate today is lower than it was projected to be in the 1983-1984 timeframe?

A. Yes, and that would be for several reasons, one of those would be, again, the increased enrichment of the fuel uranium-235 content is higher, so you can keep it in the reactor longer and burn it longer.

Also, you're getting increased burnups from the fuel, so it's staying in the reactor longer and producing more power. And also, I think in the '83 timeframe, they were probably envisioning more reactors being in operation than currently are right now.

Q. Given the annual generation rate is lower today than it was projected to be in the 1983-'84 timeframe, why is the total amount of spent nuclear fuel expected to be generated by utilities close to the original estimate of 140,000 MTU?

A. That's just the way the numbers worked out.

Q. Does license extension figure into that?

A. Yeah, license extension is the primary

Page 2960

reason for seeing the increase from 83,000 to 130,000, that's so close to what it was in 1983, the 130 and the 140, it's just by chance.

Q. And do DOE's projections with regard to 130,000 MTU total generation, that amount, do those projections account for the possibility of new reactors coming online?

A. No, they do not.

MS. SULLIVAN: One moment, Your Honor. We have nothing further, Your Honor.

THE COURT: Thank you. The Plaintiffs to cross-examine.

MR. STOUCK: Thank you, Your Honor. Well, I guess on this, let me just say I am sorry that I didn't have my copy with me, but could I just ask someone, would you go in the back room and get me these two documents, which are probably stacked on the table? I just want to ask some questions about the source of the data. I can do that later.

CROSS-EXAMINATION

BY MR. STOUCK:

Q. How you doing, Mr. Pollog?

A. Fine. Thank you.

Q. We have met before, yes?

Page 2961

A. Yes.
Q. You were asked some questions about Plaintiff's Exhibit 136, the facility interface capability assessment report, I guess I'll call it. Do you recall that document? Would you take a look at that, please?
A. Yes.
Q. Now, you mentioned, I think you've said that your involvement was you were the project manager for waste acceptance on these, on this, these FICA things?
A. I was project manager for the FICA study for the period of time I was in the waste acceptance group.
Q. For the entire FICA study?
A. Yes.
Q. Do you remember who the contractor was?
A. Yes.
Q. Who was it?
A. We had contracted through Oak Ridge National Lab, and I believe they subcontracted out to NAC.
Q. Okay. So this, am I correct that this is one of the, this is a report on one

Page 2962

particular plant, correct, which is the Humboldt Bay Plant?
A. Correct.
Q. And do you know whether there was some compilation of these individual reports, in other words, an overall analysis of what the whole number of individual plant reports looked like?
A. Yes.
Q. There was?
A. Yes.
Q. Okay. And if I could, you were asked some questions about page 7 – I'm sorry, page 10, I think. Are you there?
A. Yes.
Q. And I'd just like to follow up on those. Do you know whether spent nuclear fuel has ever been shipped away from the Humboldt Bay facility?
A. Yes.
Q. Yes, you know, or, yes, it has?
A. Yes, I know.
Q. Yes, you know. And has it?
A. I believe it has.
Q. Okay. And what were the circumstances

Page 2963

of that, do you know?
A. I believe it was in the late '60s, early '70s, it was sent to West Valley for processing.
Q. And do you know that those shipments were made by rail?
A. I don't know the mode off the top of my head, no.
Q. You do know that – well, do you know, let me ask that, do you know whether it would be necessary, do you know whether PG&E could rent a crane suitable for lifting these 100-ton casks, rather than upgrading its own casks?
A. I don't know.
Q. Do you know what this, on page 10, bottom of the first paragraph, there's a reference to a lowboy trailer, do you see that?
A. I see it.
Q. In fact, let's read the whole sentence. It says, "In addition, either the rail spur would have to be extended into the receiving area or the cask would have to be transferred on a lowboy trailer to the point where the rails currently end." Do you know what a lowboy trailer is in that context?

Page 2964

A. I believe so.
Q. What is it?
A. I think it's a trailer that is just low to the ground.
Q. Do you know whether it could hold a 100-ton cask?
A. No, I don't.
Q. This study was not an effort to determine the costs of making any modifications to the Humboldt Bay facility that might be necessary to accommodate 100-ton casks, correct?
A. Correct.
Q. And you don't know what costs would be involved in making such modifications?
A. No, I do not.
Q. And do you know whether or not the spent fuel in the Humboldt Bay spent fuel pool could currently be transported away from the site in truck casks?
A. Currently.
Q. Yeah?
A. Or at the time when this report was written?
Q. Let's say at the time the report was

Page 2965

written. Thank you.
A. I think legal – if I remember correctly from reading this, I think it would have difficulty because of the crane issue.
Q. Take a look back on page three. This was the chart you were looking at, right?
A. Yes.
Q. Does anything on this chart help you with the answer to the question about whether or not the Humboldt Bay spent fuel could be shipped away from the site in truck casks?
A. According to this table, the current status was it could not be shipped in either a legal weight truck or overweight truck.
Q. But could, with revision to analysis?
A. Yes.
Q. Do you recall, in the context of this study, what revisions would be needed in that instance to make it suitable for these truck casks?
A. Vaguely.
Q. Okay. What do you recall?
A. I think they had to do a cask drop analysis. There may have been some analysis to the crane itself, but I don't recall the

Page 2966

latter.
Q. Okay. Just a couple of questions about the, about I think what's been introduced as PX-158, which is the 1991 annual capacity report.
A. Can you say the number of that again, please?
Q. Your copy, I believe, has DX-187 on it, but it's the December 1991 annual capacity report. And do you have that?
A. Yes, I have the 1991 annual capacity report in front of me.
Q. Does it say DX-187?
A. Yes, it does.
Q. I think it's been admitted in evidence as Plaintiff's Exhibit 158, so we need to keep that straight. On the bottom of the first page, Mr. Pollog, I just want to make sure we're straight on this, the last sentence that starts on –
A. You're on?
Q. Page one?
A. I or English numeral?
Q. English – I don't know. It's Arabic, I'll call it, is that okay? English would be

Page 2967

fine. It's not Roman.
THE COURT: What's the section? What's the title?
BY MR. STOUCK:
Q. It's 080, please, section 1.1. Excuse me. Are you there?
A. Yes, yes.
Q. Bottom of the page, last sentence starting here, it says, "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." Do you see that?
A. Yes.
Q. And that was certainly your understanding?
A. Yes.
Q. Yes. Now, I just had a question about the relationship. Ms. Sullivan asked you – the relationship between that document on the one hand and the '91 ACR priority ranking, which is DX-189, which I think is also up there.
A. Yes, I have it.
Q. If you look at page nine of the first

Page 2968

document, the ACR, I think she asked you some questions about this table that's entitled, "Summary of Purchases Annual Allocations." Do you recall that?
A. Yes.
Q. And does that data on that table come from this document alone, or do you have to get some of the data for that table from Defendant's 189, the APR?
A. Can you say that again for me, the number?
Q. There's a table on page nine, which has these allocations?
A. Yes.
Q. Let me ask it this way, where does that data come from?
A. It comes from the APR.
Q. Okay. It comes from this other document, DX-189?
A. Well, it comes from that and also comes from Appendix B to this document.
Q. That was really my real question here, which is what's the relationship between the information that's in Appendix B on the one hand and, on the other hand, the information

Page 2969

that is provided in the APR starting on page four, it's Bates number 0430, which is this chronological listing of discharges. Can you just give us an understanding of the relationship?
A. Yes, Appendix B is an extraction for a subset of the APR. The APR goes through all discharges, I believe, until -- I think the last is April 4th, 1991 discharge, by general comments.
Q. Okay.
A. The Appendix B to Defendant's Exhibit 187, the ACR only has discharges for the, I believe, going through 8,200 MTUs, so it stops with a May 17th, 1982 discharge.
Q. Is it otherwise the same data up through '92 -- or to '92?
A. Through '82.
Q. I'm sorry, '82. Thank you.
A. Yes.
Q. Okay. But in order to construct this table on page nine of the ACR, do you need the data from the APR?
A. Yes.
Q. So the two documents were prepared in

Page 2970

conjunction with one another, apparently?
A. Yes.
Q. Okay. Again, just for the record, the APR -- let me not say it that way. Is the APR, in your understanding, also for planning purposes only?
A. I'd have to see what the exact term in the contract says about production of the APR. My understanding, I don't believe so, but I would have to go back and see what the exact text in the contract says regarding the production and use of the APR.
Q. We have that, DX-54 -- PX-54, PX-54, I think we have.
THE COURT: I recommend the next time these parties meet that we, that you provide the Court with the organic documents in the form of JXes.
BY MR. STOUCK:
Q. Did you find the provision in the contract you were looking for?
A. Yes.
Q. What page is it on?
A. It's on two places. It's on page 10 and also page 14.

Page 2971

Q. And what is there on page 14 that refers to the APR that relates to my question?
A. In the middle of the page, there's a heading, "B, acceptance procedures."
Q. Yes.
A. There's a number one under that.
Q. Yes.
A. Acceptance priority ranking.
Q. Yes.
A. That section.
Q. Okay. Well, let me come back to that in a second. The base question is the 1991 acceptance priority ranking is for planning purposes only also, is that correct?
A. I don't think so.
Q. What is your understanding of the use of this document?
A. It's to be used to give us the OFF queue, which is how we allocate acceptance capacity, and it would be the basis through the ACR for purchasers or contract holders submitting their delivery commitment schedules.
Q. Not for planning purposes?
A. Correct.
Q. For what purpose?

Page 2972

A. For committing each party to a certain action, to the purchaser saying, here's the fuel we want to deliver to you, and for DOE to accept or to agree, this is the fuel we're going to take from you in this particular year.
Q. That's your understanding of the purpose of DX-189?
A. It's to provide us with the OFF queue for allocating the acceptance capacity to the purchasers, yes.
Q. And when you look at the contract, and page 10, I guess, you were looking at this paragraph B, is that where you were looking? I'm just --
A. Page 10, I'm on 5A.
Q. 5A?
A. On page 10.
Q. Okay. Got it. That's where you got the understanding, is that where you get the understanding you just gave me about what this document is?
A. Yes.
Q. And what do you learn from page 14 about what this document is?
A. Tells us about the delivery commitment

Page 2973

schedule process or discusses it at least,
delivery commitment schedule may require
proposal, and it talks about the following
acceptance priority ranking will be utilized.
Q. So is it your understanding that the
ranking in the 1981 acceptance priority, if
there were no DCSes, would this be
contractually binding, this ranking on the
parties?
A. No.
Q. That's your understanding, it's this
in conjunction with the DCSes?
A. It's this utilizing the ACR and then
the DCS process.
Q. Thank you. Let me see here. You
said – still with the – I just want to –
MR. STOUCK: May I just confer for a
moment, Your Honor?
THE COURT: Fair enough.
MR. STOUCK: Just want to make sure he
was asked about a subject before I go into it,
Your Honor, so we don't step outside the bounds
of direct. While my colleague is looking for
that, I'll move on.
MR. STOUCK: Let me just ask the

Page 2974

question and see if I draw an objection.
That's probably the easiest way to do it.
BY MR. STOUCK:
Q. Is it your understanding that once the
DCSes are approved, then they become binding on
the parties?
A. Yes.
Q. Okay. Now, do you know whether, I
think you did say this, do you know whether DOE
has an obligation, I believe you did testify to
this, do you know whether DOE has an obligation
to pick up under the contract that we've looked
at here, the spent fuel contract with PG&E,
spent nuclear fuel that PG&E currently has that
is not described in an approved DCS?
A. That we have under the contract an
obligation to accept all fuel that a contract
holder has, yes.
Q. Okay. So that would include fuel
that's not described in an approved delivery
commitment schedule?
A. That's correct.
Q. Okay. So the significance of the
approved delivery commitment schedule is that
it fixes the time of pickup, is that your

Page 2975

understanding?
A. It ties us into a specific obligation
to taking that fuel in a certain year.
Q. So is it your understanding that DOE
does not have any obligation to take the rest
of the spent nuclear fuel at PG&E that's not
described in the delivery commitment schedule
at any particular time?
A. A fixed date for acceptance has not
been set, yes.
Q. Okay. Thank you. When we were
looking at, I just want to ask you now about
the – do we have a copy of this, of the
mission plan? I want to ask you a couple
questions about the demonstratives, if I may.
MS. SULLIVAN: I'm sorry, Counsel,
which exhibit?
MR. STOUCK: It's a demonstrative,
Exhibit Defendant's 183, I think, is cited as
the source of, is one of the sources of data,
and I don't believe Mr. Pollog has that, but if
we have some extra copies around.
BY MR. STOUCK:
Q. I'm just curious specifically which
data comes from this plan that's on your chart,

Page 2976

on your demonstrative, and also, you know, if
you can just show me where it is.
A. Yes.
Q. Counsel has suggested looking at page
one, Mr. Pollog. I'm just passing that on.
THE COURT: Do we also have a PX on
this? By the way, we discussed it with
Mr. Kouts, but I think it may have had a PX at
that time as well.
MR. STOUCK: I believe this first came
up on Mr. Kouts' direct.
THE COURT: Yes, it did. It's PX-155.
Let's just see if that – we're going to look
up here at our desk and see if that's the right
document. They're both on the screen now, so
you can compare and contrast.
MR. STOUCK: Looks the same, Your
Honor. Why don't we go with the Plaintiff –
what's the number?
THE COURT: It's PX-155.
MR. STOUCK: Thank you.
THE COURT: Doesn't make any
difference to the witness you're examining.
Just tell him what page.
MR. STOUCK: Well, I'm asking the

Page 2977

question. His counsel was suggesting, I believe, page one. Is that right?

MS. SULLIVAN: I think he's looking for something else.

MR. STOUCK: He's looking for something else. Okay.

THE WITNESS: Yeah, it's on page one. It also is on page 202.

BY MR. STOUCK:

Q. And page one, again, is -- what are we looking? Thanks for going through this with me. We hadn't seen at least the data you'd extracted before, although, apparently, I did get this demonstrative, but what on page one is shown on this chart, and where do you get the information?

A. The second paragraph, estimated total of 84,000 metric tons of uranium will have been generated.

Q. Okay.

A. And if you look on page 202, there's a table B-1.

Q. 202. 202?

A. Yes.

Q. Yes.

Page 2978

A. You look at no new orders case, 2040, year, the amount 84,100.

Q. And the 20,000 metric tons accumulated to-date, do you know where that data comes from?

A. I would, not positive, but I would guess it comes from the RW-859 data.

Q. Thank you. And, again, what data on here, just to see if we can do this generally, what data on this sheet comes from the April '84 draft mission plan?

A. April '84?

Q. April 1984, I think is what's cited on one of the pages here, Demonstrative 2.

A. Yes. That's probably the 140 number.

Q. The 140 number?

A. For projections 1983.

Q. Okay.

A. MTUs, 140,000.

Q. Well, when you say, "probably," is that --

A. Pretty sure.

Q. Did you prepare this chart?

A. I believe so.

Q. You testified about a lot of data with

Page 2979

Ms. Sullivan. Am I correct that you did not talk -- or maybe I'm not correct. Tell me if I'm correct. Did you discuss with her in your testimony pool capacities, current pool capacities or pool capacities at any time at commercial nuclear plants?

A. Yes.

Q. Is that data collected on the 859s?

A. Yes.

Q. Okay. And for what purpose?

A. It's always been on the 859 forms. I don't know why it was put there originally, but it has been there, and it's something that's been collected, I believe, since we started doing 859s.

Q. And do you use that in your work?

A. Yes, I do.

Q. For what purpose?

A. It tells us when pools will be filling up, when we project facilities to go into dry storage.

Q. And why is that important for the mission of OCRWM?

A. We get asked that question by our upper management, by Congress, by the public.

Page 2980

MR. STOUCK: Okay. Thank you, Your Honor. I believe I'm just about done. Let me ask one more question about this document, and then if I may confer and I think we can wrap this up.

BY MR. STOUCK:

Q. Back on 202 here, of Defendant's, I guess, Plaintiff's 155, but it's a draft mission plan amendment from 1991, Mr. Pollog?

A. Yes.

Q. Does this mean that DOE was planning on picking up as much as -- I mean, the 115, at that time, it was planning on picking up as much as 115,000 MTU?

A. DOE was planning on picking up all, everything under contract, that's all fuel that will be generated, that is the program plan.

Q. Regardless of the 70,000-ton capacity limit in the 1982 Act?

A. Yes.

Q. That's your understanding?

A. Yes.

MR. STOUCK: If I may just have a moment to confer, Your Honor? I think we can, as I say, I think we're done, but I just want

Page 2981

to have a moment, if I may.
THE COURT: Certainly.
MR. STOUCK: Thank you for that, Your Honor. I am indeed finished with Mr. Pollog. I have no further questions.
THE COURT: Are there any questions on redirect?
MS. SULLIVAN: No, Your Honor. We have nothing further. Thank you.
THE COURT: Thank you. Before I discharge you as a witness, which I will do in a moment, sir, I want to give you a directive that I'm giving to all witnesses who testify in the case. The parties have requested, as they are entitled to under the Federal Rules of Evidence, that the witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh without being distracted by others' testimony.
My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness, and if you have any question about who could be called as a witness before

Page 2982

trial concludes, please ask counsel.
Thank you for your testimony. You are excused as a witness. You may step down.
THE WITNESS: Thank you, Your Honor.
THE COURT: We have four minutes left on today's schedule, and 19, if you want to take back the 15 minutes from yesterday.
MS. SULLIVAN: Your Honor, I believe our next witness is not here, so if we could start fresh tomorrow morning with Mr. Zabransky, that would be great.
THE COURT: Mr. Zabransky will then be our first witness. Are there any – that would be at 9:00, would be our expectation. Are there any housekeeping matters at this time?
MR. STOUCK: No, Your Honor.
THE COURT: Let me just suggest before we have our conference on the exhibits that came in today that I recognize that the likely reason for the disconnect on the changes of the two demonstratives was the compression of the trial schedule, so let me just suggest that if the counsel confer to make sure communication has occurred with respect to any demonstratives that may be used, I mean, we, of course, can

Page 2983

extend trial into Friday afternoon so everybody gets 48 hours.
But that may not be the preferred resolution, so if you just make sure that the faxes and whatever are actually getting into the hands of the people who need them, if you do have demonstratives. We are in recess until 9:00 a.m. tomorrow morning. Good evening.
(Whereupon, at 5:59 p.m., the trial was recessed, to reconvene at 9:00 a.m. on Thursday, June 15, 2006.)

Page 2984

C O N T E N T S


WITNESS DIRECT(continued) CROSS REDIRECT RECROSS
CHRISTOPHER KOUTS 2636 2735 2883 2902
DIRECT CROSS
THOMAS POLLOG 2908 2960

AFTERNOON SESSION: 2791


E X H I B I T S

| EXHIBIT NO: | MARKED RECEIVED |
|---|---|
| Plaintiff | |
| 96 | 2827 |
| 136 | 2944 |
| 142 | 2926 |
| 145 | 2883 |
| 161 | 2932 |
| 338 | 2874 |

| EXHIBIT NO: | MARKED RECEIVED |
|---|---|
| Defendant | |
| 189 | 2934 |
| 307 | 2699 |
| 1229 | 2718 |

CERTIFICATE OF REPORTER

DOCKET NO.: 04-74C

CASE TITLE: Pacific Gas & Electric Co v. U.S

HEARING DATE: 6-14-06

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 6/14/06

Cynthia R. Ott, RMR, CRR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019