# EXHIBIT 4

**Long Island Savings Bank v. U.S. 92-517 February 24, 2005**

**Heritage Reporting Corporation**

**Page 3678 to Page 3923**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3790

(Whereupon, at 12:34 p.m., the hearing was recessed, to be reconvened at 1:35 p.m. this same day.)

Page 3791

AFTERNOON SESSION (1:45 p.m.)

THE CLERK: All rise. The court is again in session.

THE COURT: Please be seated. We have tried to get an answer to the question you raised, Mr. Tufaro.

MR. TUFARO: Yes, your Honor.

THE COURT: We have a partial answer, and we hope to have the rest by the end of the day. The partial answer is as follows. Yes, the materials have to be removed from this courtroom at the close of the day tomorrow, Friday. The further inquiry is whether the materials might be placed elsewhere on this floor, particularly in either of the two anterooms to courtroom 5, where they can be secured; or in another room, for example, courtroom 7 or courtroom 8. And we don't yet have an answer to that question.

MR. TUFARO: Okay. Thank you, your Honor.

THE COURT: We'll do our best and continue trying. Ms. Evans?

MS. EVANS: Good afternoon, your Honor. I think we're ready to proceed.

THE COURT: Yes.

MS. EVANS: The Government calls Edward O'Connell to the stand. And we'll go ahead and pass out the binders for Mr. O'Connell at this time.

Page 3792

THE COURT: Yes. Let me get Mr. O'Connell sworn first.

MS. EVANS: Certainly.

Whereupon,

EDWARD J. O'CONNELL, III

was called as a witness and, having first been duly sworn, was examined and testified as follows:

THE COURT: Please take a seat in the witness stand and make yourself comfortable. And Mr. O'Connell, I'm going to ask you if you would please state your name for the record.

THE WITNESS: Edward J. O'Connell, III.

THE COURT: Thank you. Ms. Evans, you may proceed.

DIRECT EXAMINATION

BY MS. EVANS:

Q Good afternoon, Mr. O'Connell. Where do you currently reside?

A Midlothian, Virginia.

Q Are you currently employed?

A No, I'm retired.

Q When did you retire?

A 2001.

Q What was your position prior to your retirement?

A I was a project manager.

Page 3793

Q Where did you work?

A Within the Office of Examinations and Supervision, OTS.

Q What degree do you hold?

A I have a BS/BA degree in finance from Boston College.

Q Did you have any accounting certifications?

A No, I do not.

Q Have you had any accounting training?

A Well, what I had in college and materials made available at the place of employment at the Bank Board and OTS.

Q Have you spoken with anyone other than myself about what your testimony might be here today?

A Nothing about the testimony.

Q The Court has already admitted some of your prior deposition testimony, so we're going to skip along to some other things.

In the early 1980s, what was your position with the Federal Home Loan Bank Board?

A I was a regional director in Washington, with supervision over three regions, I believe it was Boston, New York and Cincinnati at that time.

Q And you sort of touched on this, but can you elaborate on your responsibilities in that position?

Page 3794

A Essentially to coordinate the supervision of the savings and loans at the Washington level. That would include processing resolution of problem institutions, monitoring adversely rated institutions, processing certain types of applications and working on special projects, things of that nature.

Q Did you have staff assisting you when you were in that position?

A Yes, I had a deputy regional director and approximately four financial analysts, plus support staff.

Q Did you work on supervisory transactions in the position you've been discussing?

A Yes, I did.

Q And tell us how you would define a supervisory transaction.

A Supervisory transaction essentially was where you had a problem institution of any degree, where you were trying to resolve that problem through either taking correction on their own or through resolution by supervisory merger with – either with or without FSLIC assistance.

Q And how would you define an assisted transaction?

A That was one where the Federal Savings and Loan Insurance Corporation would provide cash or other forms of assistance.

Q And you said that you would work on supervisory

Page 3795

transactions. Did you also work on assisted transactions?

A Yes, I did.

Q And could they have been the same? Could a supervisory transaction have been an assist – had assistance?

A Yes, there would be a specific type.

Q How would you define goodwill as it was used in the savings and loan industry in the early 1980s?

A Well, my vernacular, it would be an intangible item like – that you couldn't sell or earn money on, but it was a result of transactions like where purchase accounting was used in acquisitions and mergers.

Q Do you recall what Financial Accounting Standards Board 72 was at that time?

A I believe it was –

Q Sorry. Did you get my question? I was asking you – I'll re-ask the question, rephrase. Do you recall what Financial Accounting Standards Board 72 was?

A I believe that was where there was a new announcement which made a further refinement, I think, probably a tightening up on how goodwill was to be accounted.

Q And also do you recall what push-down accounting was, as that term was used in your industry in the early

Page 3796

1980s?

A I believe that was where you had a holding company situation where you could push the net worth at the holding company level down onto the subsidiary.

Q And what were net worth maintenance requirements, as that term may have been used in the industry in the early 1980s?

A Well, certain – certain cases, corporations were required to maintain the level of the net worth of the subsidiary institutions at a certain level. I think it also came into play with – in assistance agreements.

Q And in your experience, did institutions, banking institutions, sometimes seek a particular goodwill treatment when they were involved in an acquisition – a goodwill treatment that varied from the regulations?

MR. TUFARO: Objection, your Honor; leading.

THE COURT: Sustained.

BY MS. EVANS:

Q Mr. O'Connell, did you review, as part of your work, particular goodwill accounting treatment requests?

A Yes.

Q And what group would have handled a particular goodwill accounting treatment request?

A Well, that – the request that initiates probably, most likely, with the supervisory agent, but it could be

Page 3797

directly to the FSLIC or I think could well be to the general counsel's office.

Q And you're mentioning various groups. Tell us what groups within the Federal Home Loan Bank Board and related regulatory organizations you worked with on supervisory transactions?

A We worked with the supervisory agents in the district, worked with the office of FSLIC in Washington and with the general counsel's office.

Q And what's your understanding of what the general counsel's office was doing – was the nature of their work, rather, regarding supervisory transactions?

A Well, they would – they would be involved in the transaction, and they would be responsible for writing, like, assistance agreements, and they would draw up the resolutions to effect the transaction.

Q And what's your understanding of what the FSLIC group would do, the work they would do related to supervisory transactions?

A Well, they essentially were the ones that were – they have the final say on doing an assisted agreement, go from such things as to were they satisfied with whatever reasons or the various reasons with the acquirer, the amount of assistance required.

Q And how would you define a regulatory forbearance,

Page 3798

what categories of things?
A Regulatory forbearance? Those would be – if granted, would be given in a separate forbearance letter.
Q And did the Federal Home Loan Bank Board develop standard forbearances?
A Yes, they did.
Q And let's take a look at one of the documents in your binder. Turn to PX 116. Do you have it?
A Yes, I do.
Q And PX 116 is in evidence. It's dated April 24, 1984. It says "memorandum." It says "SP-37" at the top. Do you recognize this document?
A Yes, I recognize it.
Q And what is it?
A It's the series of forbearance referrals that can be used on particular situations, for granting forbearances if deemed necessary.
Q And did you work on this document?
A Yes, I did. I helped prepare this document.
Q And did you prepare it with anyone's assistance?
A There were people that reviewed and edited what I did.
Q And what did you do to work on this document? What kind of work did you do? What was the nature?
A Initially, it was to collect examples of various

Page 3799

types of forbearances that had been given over a period of time and to collect those and try to put them in a little orderly and convenient fashion.
Q And it says "to EOS professional staff, from William J. Schilling." Who is William J. Schilling?
A At that time, he was the director of the Office of Examination and Supervision.
Q Did you use this document in your work?
A Yes, we did.
Q Turn to page 7. It's in the top center. We're going to look at page 7 and page 8. Under page 7, we're going to look at where it says "forbearance numbers." There's some numbers listed at the bottom. Then above that, it says "supervisory mergers," and it says "accounting." Take a look at SM-2, and the text of that is on page 8.
A Yes.
Q And what's section SM-2?
A Well, this – this forbearance would allow an institution to report – oh, the determination of how the goodwill would be amortized, the period of time for amortization.
Q We can put that aside. Are you familiar with the term "bid letter" or "offer letter" in the context of potential supervisory acquisitions or mergers in the savings

Page 3800

and loan industry in 1982 and '83?
A Yes.
Q And what were they?
A As I recall, they were proposals, really, that came in from potential acquirers of – for failing institutions in response to solicitations from the Bank Board.
Q And did you ever review these bid letters or proposals?
A I'd seen them. I can't say that I reviewed them in every case.
Q Did the Federal Home Loan Bank Board create a list of potential acquirers?
A Yes, they did.
Q And is that something that you looked at in your work?
A I know at some point, I helped in reviewing the initial selections of at least a number of institutions that were put on that list.
Q And what were the factors that you considered when deciding whether an institution would be put on that list?
A Looked at the strength of the company, its quality of its assets, its management, its earnings, the capital position.
Q Did you attend any meetings with Long Island

Page 3801

Savings Bank personnel or their counsel?
A I can recall only meeting with the people with Long Island on one occasion.
Q And what do you recall about that meeting?
A Not – not a great deal. As I recall, the people came and exchanged pleasantries, I guess, for a while. And then the other people representing the Bank Board and the Long Island representatives, along with their counsel, they went off to, I guess, negotiate the proposal. I didn't participate in that. And as I recall, there was one man from Long Island that didn't either.
The – one thing that struck me, and I'm not sure about it, was the man that I was left with, he seemed very concerned about, you know, the transaction or its possible effect on Long Island. It kind of surprised me, if they were terribly concerned, you know, why would they be doing the deal?
Q So that's all you recall about the meeting?
A That's – that's all I recall.
Q Do you recall the date of that meeting?
A No, I do not.
Q Let's take a look at another document, PX 90 in your binder.
A I'm sorry, PX –
Q I'm sorry, it's PX 98, I apologize. Do you

Page 3802

recognize PX 98?
A Yes.
Q And what's this document?
A This is an S-memo – S-memorandum which was prepared by our Office of Examinations and Supervision in connection with the resolution of problem cases that went through, described the failing institution and, to some extent, giving information on it. It gave – then it also gave some information on the proposed acquirer, kind of a supervisory history of the failing institution. I believe we had a section on talking about the industry in general, and we have various other pieces of information which seem pertinent to this case.
Q And turning to the last page, page 21, the very last page in the exhibit, is that your signature?
A Yes.
Q And then it also says "I concur: Francis M. Dorer." Who was Francis Dorer?
A At that time, he was a deputy director. See, it was JCP, John C. Price, who was a regional supervisor or director at that time, signed for him.
Q And there's some initials under that, it looks like some letters. Do you recognize those?
A Yes. They were people that worked in my staff. Let's see. Gary Masters is the first one. B. Alan

Page 3803

Scarborough, David A. Schildren, Walter Gay, William K. Frayeri, and the secretaries, Colleen Hennessey and Connie Casey.
Q Do you know what these initials signify?
A That they all participated in the production of this document.
Q And what was the purpose of the S-memo?
A I'd say the basic purpose of the S-memo was to provide the justification for the board to take action to close the bank or provide for assistance for the acquisition. That was one of the three essential pieces that went to the board, as I recall. The other one was the FSLIC prepared their own documents and – relating to their concerns about the financial costs and the alternatives, I believe. And I believe that was called an A-memo. And then there was an L-memo, which was prepared by the attorneys in the general counsel's office. And then beyond that, we'd have the supervisory agents' information and other – probably some other attachments, the resolution, perhaps the forbearance letter.
Q We're still looking at this S-memo. Turn to internal page 18, it's in the left corner at the top. And look under number 7, which begins with "LISB has agreed to maintain Centereach's net worth." Then underneath that, there's a paragraph that begins with "at a meeting held in

Page 3804

the office of OFSLIC on April 15."
Take a look at those first two sentences there.
Did you have a recollection of an April 15, 1983 meeting, of attending that?
A No, I do not.
Q And similarly, do you have a recollection of attending a July 7, 1983 meeting?
A No.
Q And are you able to tell in any way from looking at this whether either of these two meetings are the meeting that you described attending?
A Could you repeat that, please?
Q Are you able to tell, just from looking at this document, or in any way, whether either of these two meetings dated here refer to the meeting that you believe you attended, that you described previously?
A Could be, but I'm not sure.
Q When we were talking about this document, you referred to other people working on it. I'm not sure what your role was. You signed it. What was your role in working on this S-memo? What did you do?
A I was responsible for the overall memo and that the memo was prepared by those working over me – under me, and I reviewed their work to be satisfied with it.
Q So did you review the entire document, then?

Page 3805

A Yes.
Q And take a look at after the July 7, 1983 meeting, the language here. It refers to further negotiations, it says, "further negotiations were held regarding the forbearances in addition to general terms of the assistance package."
What do you believe the "general terms of the assistance package" means?
A The assistance package, that related just to what was in the assistance agreement.
Q Let's turn to PX 5. PX 5 is also in evidence, dated May 13, 1983. What's PX 5?
A This is another S-type memo.
Q And turn to the last page, page 19. Is that your signature?
A Yes.
Q And here it says "I concur: Robert J. Moore."
Who was Robert Moore?
A I believe he was a deputy director at that time.
Q Do you know why there were two S-memos for this transaction?
A I'm not entirely sure, but for some reason, the initial plan didn't go through as – as, I guess, scheduled, and I seem to recall being asked to provide an updated S-memo.

Page 3806

Q We can put that aside. Who was the legal counsel for the acquirer in this transaction, the attorneys for the acquirer?
A I believe they were represented by Muldoon and Murphy.
Q And did you know John Hall?
A Yes.
Q How did you know him?
A Well, John previously worked at the Bank Board, and I had worked on a few cases with him.
Q And did you have an opinion about his legal skills and experience?
A I thought he was competent.
Q And also, did you know Doug Faucette?
A Certainly.
Q And how did you know him?
A Well, Doug, he also worked at the Bank Board as an attorney in the general counsel's office.
Q And did he have a particular reputation when you worked with him?
A He had a reputation of being competent and aggressive.
Q Let's look in your binder, we'll turn to another document, which is marked as PX 67. PX 67 is also in evidence. It's a letter on Muldoon Murphy's letterhead

Page 3807

dated August 31, 1982 to Brent Beesley.
Mr. O'Connell, do you believe that you've seen this document before?
A I believe I have.
Q And would you have received it in your work?
A Yes.
Q And within the document, turn to internal page 2 under the – there are three headings on that page. Look under "accounting." And I'm trying to see where I want to direct your attention, where the sentence begins. Just let me pause for a moment.
Take a look at the last sentence on that page that begins with "in lieu of such approval or in the event LISB is unable to utilize such approval," and read that sentence, which continues on the next page.
(Witness reviewed the document.)
Do you recall discussing this sentence, this section, with anyone?
A No.
Q Would you have recommended approval of this type of language for a supervisory transaction?
A No.
MR. TUFARO: Objection, your Honor; calls for speculation.
THE COURT: Well, in light of the circumstances,

Page 3808

the Court will overrule the objection.
BY MS. EVANS:
Q Did you answer? I'm sorry.
MR. TUFARO: Your Honor, could you explain the circumstances for your ruling, so that I can know the basis for it?
THE COURT: Well, in effect, you were a little bit late, Mr. Tufaro. And what I have to do is strike the answer, and I'm not willing to do that.
MR. TUFARO: Could you state the basis, your Honor, so that I know whether I should urge you otherwise?
THE COURT: Well, you're going to ask me for an advisory opinion.
MR. TUFARO: No, I'm asking you what the basis is of denying my – I'll make a motion to strike so that you can act on it, and then I'll ask you the basis for it.
THE COURT: I'm always reluctant to strike an answer, especially if an objection comes in late and I have some – unless it's truly something outlandish, I will not strike the answer.
MR. TUFARO: All right. I'll move on, your Honor.
BY MS. EVANS:
Q Mr. O'Connell, we're going to turn to another document in your binder, DX 1071. DX 1071 is written to Mr. Hall, it's an undated letter signed by Lawrence Hayes.

Page 3809

Have you seen this document before? Do you believe that you have?
A Yes, I –
Q What is this?
A This is a letter from Lawrence Hayes at the general counsel's office, responding to a request from – I guess it was John Hall of Muldoon and Murphy. And I guess essentially explaining the position of OTS in regard to a previous letter by Muldoon and Murphy.
Q Was it the normal practice for this type of letter to be written prior to your S-memo?
A Yes; I would say that a letter like this would go before that.
Q Turn to PX 106.
THE COURT: Now, before we do that, Ms. Evans, may I just note that we have, again, the situation where a more complete copy of DX 1071 had been admitted as PX 6.
MS. EVANS: PX 6.
THE COURT: And I just want the record to reflect that.
MS. EVANS: Certainly, your Honor.
BY MS. EVANS:
Q Mr. O'Connell, turning to PX 106, I think it's toward the back of your binder. This is dated August 18, 1983. It's also in evidence. Do you recognize this

Page 3810

document?
A Yes, I do.
Q What is this?
A This is the forbearance letter. It goes down a whole list of different types of forbearances, and it has one on reserves, and I think the second one has to do with borrowing and liquidity, service corporations. One allows a phase-out of unauthorized activities. And we have one on accounting treatment and the cash contribution. But I notice it doesn't have anything here on the amortization of goodwill.
Q And would you have seen this document in your work?
A Yes.
Q Was it a document that would have come to you for your comments?
A At some phase, it would either come to me or it would be a discussion of what was acceptable or what we thought was acceptable.
Q Let's turn to another document. We'll look at PX 1. Mr. O'Connell, do you recognize PX 1?
A Yes. That's the assistance agreement between the FSLIC and Long Island Savings.
Q And turn to what seems to be the first page of the assistance agreement. It's about four or five pages in.

Page 3811

It's Bates stamped at the bottom LIP 0000437. And the heading is "assistance agreement." It begins with "this agreement, dated August 17, 1983." Take a look at that section under the -- the very first section that begins with "this agreement."
What do you think this paragraph means?
A Well, this to me is a preamble to the whole body of this assistance agreement, and that this is a self-contained document. "Agreement" refers to what's in this agreement.
Q Turn to page 19 of the assistance agreement, which is internal page 19 marked at the bottom in that way. I will turn your attention to section 10, with the heading "accounting principles." Take a moment or two and look at section 10.
(Witness reviewed the document.)
What's your understanding of what section 10 means?
A It states the accounting principles that will be governing with respect to what's in this agreement, this agreement only.
Q And it refers to -- second line says "any computations made for purposes of this agreement." Do you see that?
A Yes, I do.

Page 3812

Q And were computations made under assistance agreements?
A Yes.
Q And let's turn to another page. Turn to page 16. Take a look at section 9, listed as "additional covenants of LISB," then (a), "maintenance of net worth." My question is, did computations need to be made under this section?
MR. TUFARO: Objection, your Honor, leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Mr. O'Connell, in looking at section 9 -- let me phrase it -- say something a little different. Would section 10 apply -- the terms of section 10 apply to section 9?
MR. TUFARO: Objection, your Honor. It's leading again, and I think we could have the witness close the exhibit and ask him the question, what computation he made under it. Otherwise, we're just leading by moving him from paragraph to paragraph.
THE COURT: I'll sustain on the ground that it's leading.
MS. EVANS: Your Honor, just for the record, I don't think whether or not something applies is a leading question. I'm not sure how else to get to that information. I don't know another way to phrase a question like that, so

Page 3813

I'm not sure that we're leading the witness to any particular answer. We're asking him, does something apply to something else.
THE COURT: I could give you a suggested form of question, I could give you a couple alternatives to it. The Court would really not do that.
MS. EVANS: Certainly, I'm not asking you to do that, although Mr. Wallace did ask you to help yesterday, your Honor.
(Laughter.)
THE COURT: That's because I thought I was helping Ms. Holt, and I thought I ought to help him too.
BY MS. EVANS:
Q Mr. O'Connell, does section 9 require a computation?
MR. TUFARO: Objection, your Honor; leading.
MS. EVANS: Again, I have the same argument. I can't imagine this would be a leading question. I certainly asked almost the same question of Ms. Moran, and it was allowed in.
THE COURT: Well, hypertechnically, this is leading. On the other hand, it is not so leading that it suggests an answer to the question. You know, I will tell you, anytime, as a direct examining counsel, you ask a question that leads to a yes or no answer, any trial judge

Page 3814

worth his salt is going to look at that and say, hmm, not a good idea.

BY MS. EVANS:

Q Mr. O'Connell, do you know whether or not section 9 requires a computation to be made?

MR. TUFARO: Objection, your Honor.

THE COURT: Well, let's let it pass for the moment, Mr. Tufaro. Go ahead. You may answer, Mr. O'Connell.

THE WITNESS: Yes, it requires a computation.

BY MS. EVANS:

Q Mr. O'Connell, do you have an understanding as to what applicability, if any, section 10 has to section 9 in the agreement?

THE COURT: There you go, Ms. Evans.

THE WITNESS: I'd say that we have the accounting principles in 10 are applicable to what we're doing in 9.

BY MS. EVANS:

Q Mr. O'Connell, do you have an understanding as to whether section 10 -- the portion of section 10 that refers to computations would apply to computations made elsewhere outside the assistance agreement?

A No, just the assistance agreement.

Q And Mr. O'Connell, can you estimate for the Court how many assistance agreements you reviewed over the course

Page 3815

of your employment at the Federal Home Loan Bank Board and the OTS?

A Coming up with an exact number may be hard here. I know I looked at these from the mid-'60s through late '80s and probably a few after that. So I'd say there must have been a minimum of 50.

Q Mr. O'Connell, if a specific accounting treatment was permitted by GAAP and a financial entity requested a guaranty that they would be permitted to obtain that regulatory treatment, what would the regulators do?

A They wouldn't give a guaranty to that.

Q Why not?

A Well, basically, the accounting rules are set by the accounting -- accounting standards board, and the board essentially followed the accounting rules. The institutions were required to follow GAAP, GAAP rules. The only exceptions I can think of are in specific cases where reports only to the Bank Board that they might have an exception.

Q Excuse me, may I confer just for a moment?

THE COURT: Certainly.

MS. EVANS: No further questions, your Honor.

THE COURT: Mr. Tufaro?

CROSS-EXAMINATION

BY MR. TUFARO:

Page 3816

Q Mr. O'Connell, my name is Richard Tufaro. I represent the Plaintiff banks in this case. Mr. O'Connell, you were never trained as an accountant, were you?

A No.

Q You never practiced as an accountant?

A No.

Q You're not a certified public accountant?

A No, I'm not.

Q You're not a licensed attorney?

A No.

Q You never went to law school?

A Correct.

Q You never had responsibility at the Bank Board for drafting legal documents, did you?

A No.

Q And with respect to the process of having assisted transactions go to the Bank Board for approval, you had no role with respect to the bidding conferences; isn't that correct?

A That's -- that's generally correct.

Q You didn't evaluate the bids that were received; isn't that true?

A I certainly wasn't a primary reviewer of those. However, I did make my own judgments on the bid list.

Page 3817

Q I'm not talking about the bid list. I'm talking about the bids. You had no role in reviewing the bids that were received; correct?

A Those were reviewed by the FSLIC.

Q And you were not involved in that review; isn't that true?

A Essentially.

Q Sometimes you didn't even know who the final bidder was until you prepared your S-memo; isn't that true?

A That -- on occasion, that was true.

Q And, in fact, you might not have known until the package was ready to go to the board who the other bidders were; isn't that true?

A I'm not sure that's true. I don't think that's true.

Q You don't -- you were not -- you would agree, you would not be the person qualified to address the criteria used by the FSLIC to evaluate bids; isn't that true?

A No, I didn't do that.

Q And the determination of the assistance to be provided to bidders was not handled by you either, was it?

A That's correct.

Q That was handled by FSLIC; correct?

A Yes, it was.

Q And it was also FSLIC or a part of FSLIC that did

Page 3818

both the quantitative viability analysis and the liquidation analysis; isn't that true?
A That's correct.
Q And you didn't handle those either?
A No, I did not.
Q And, in fact, you didn't have very much interaction with the people who did; isn't that true?
A That's true.
Q And you weren't involved in drafting any of the contract documents; isn't that true?
A That's true.
Q And you weren't involved in negotiating the specific terms and conditions of any of the contractual documents; isn't that true?
A Yes.
Q Do you recall being deposed in a common deposition in which an examiner acting on behalf of the Plaintiff banks in this case examined you back in January of 1999, about six years ago?
A Yes, I remember.
Q Did you read your deposition prior to your testimony today?
A I read part of it.
Q Did you read the part relevant to Long Island Savings Bank?

Page 3819

A I believe I did.
Q And do you recall at the time of that deposition that you recalled a meeting with Long Island Savings Bank but you couldn't recall whether it was in relation to the Suffolk acquisition or perhaps in relation to the Flushing acquisition?
A That's right. I'm still not sure what that meeting was for.
Q You personally were never required to pass on any sophisticated accounting issues; isn't that true?
A True.
Q That was handled by either the deputy director or the director of the Office of Examination and Supervision; isn't that right?
A Not -- I wouldn't say so. I would say that it changed over time. At one point, we had a deputy director, for a long time was a CPA and he did most of that work. Then they set up an accounting section, and there was a CPA in charge of that. And that's pretty much how it went after that. So it would be either this one deputy director or the accounting section who would do that.
Q Who was the deputy director?
A Robert Moore.
Q And he was the deputy director at the time this Suffolk transaction closed, correct, in August of 1983?

Page 3820

A Whether that was his exact title at that time, I'm not entirely sure.
Q But you did report to him; correct?
A I'm not -- at this time, I don't think I did. I think that he may have substituted for somebody else that was in the actual chain of command at that time.
Q Can you look again at Plaintiffs' Exhibit 5. This is the May 13, 1983 S-memo.
A Uh-huh.
Q And the last page that has his signature?
A Yes.
Q Can you explain why he would be adding his concurrence to your recommendation if you didn't report to him?
A Well, he was at a higher level than I was, and there was, I think, a general structure within the next -- the OES director's office that there were one or two or three people that would sign if somebody else wasn't available. And I think that's what the situation is here.
Q You also weren't the person, Mr. O'Connell, were you, who signed off on the forbearances that were granted in a transaction?
A I can't recall doing that, although the forbearances were typically a -- OES was involved in those.
Q But it was really the director or deputy director

Page 3821

who would approve the accounting forbearances, unless they were standard, given in every transaction; right?
A Well, no, I don't know that they would necessarily get into it. I think that they would -- if it was kind of a given pool of what forbearances under certain cases could be given, and it wasn't an action particularly taken by a director or deputy director, you know, in each case.
MR. LEBLANC: May I approach, your Honor?
THE COURT: Yes, certainly.
BY MR. TUFARO:
Q Mr. O'Connell, could you look at the transcript behind tab 1. And this is a transcript of your deposition taken on January 27, 1999, is it not?
A I guess so --
Q It's on the second page in the lower left box, the date and your name.
A Yes, yes. January 27, 1999.
Q And you did appear at this deposition; correct?
A Correct.
Q And you swore to tell the truth, the whole truth and nothing but the truth?
A Yes.
Q And you did so at the time?
A Yes.
Q Would it be fair to say that your recollection at

Page 3822

that time would probably be better than it is today, six years later?

A I'm not sure.

Q All right. Can you take a look at page 233. It's on the page 59 on the bottom right-hand corner. And the 233 is in the box on the lower right. Do you see that?

A I think we're here.

Q Can you read starting – you may want to start at line 3 and read down, but I'm really directing you to the portion that begins at line 17 of 233, and the answer is completed at line 6 on page 234. Can you read that to yourself.

A Okay.

(Witness reviewed the document.)

Yes, I've read it.

Q Does that refresh your recollection that the director of OES would give some sort of approval to forbearances in transactions that you worked on?

A Well, it – I mean, it was – it surely gave approval to all of them, when he signed that – when we have that SP-memo, that was signed by the director, which to me essentially said that if a forbearance was appropriate in a certain case, the ones that are listed in this memorandum are okay.

Q That SP-memo was dated after the date of our

Page 3823

transaction, wasn't it?

A Yes.

Q So it didn't exist in August of 1983; isn't that true?

A Well, the memo may not have existed, but the substance of what was in there, they all existed, because they were – those forbearances were forbearances that had been given on different cases, piecemeal over, you know, some period of time.

Q So to the extent there were piecemeal occasions for giving forbearances, they would go to the director of OES for his approval; correct?

A Let me explain this this way.

Q Can you answer my question first, Mr. O'Connell?

MS. EVANS: Objection, your Honor. He's trying to answer at this point.

BY MR. TUFARO:

Q Well, can you answer it yes or no?

THE COURT: No, let's wait a minute. I think you ought to let Mr. O'Connell, Mr. Tufaro, answer in the way he wants, that is, by way of explanation. And then if you want to come back to it again, you may.

BY MR. TUFARO:

Q Do you have the question in mind or do you need it reread?

Page 3824

A Perhaps you better reread it.

MR. TUFARO: Carmen, could you read the outstanding question?

(The reporter read the record as requested.)

THE WITNESS: The forbearances would be part of the whole package that went to the Bank Board. Now, the part that – for their action. Now, where they were – my section and where the deputy director and the director came in, they would sanction or agree with what we in the staff were recommending. So it was the directors required to get the memo to the board, you had to have the concurrence of the deputy director or a director. So that's how this operated.

And the final – the real approval came when the board acted on the package and accepted the resolution, the financial assistance, the forbearances and you can say we passed through the director, as it passed through the general counsel, as it passed through the director of FSLIC on the way to the board for their action.

BY MR. TUFARO:

Q What was the dollar amount of assistance that was given in this transaction, Mr. O'Connell?

A I think I saw in here a day or so ago. I probably don't recall what it is.

Q What were the total amount of net worth

Page 3825

certificates and income capital certificates that were in this transaction?

MS. EVANS: Objection, your Honor. I think this is outside the scope of our questioning on direct.

THE COURT: Just a moment. Based on your examination of Mr. O'Connell respecting PX 98, overruled; Ms. Evans.

BY MR. TUFARO:

Q Can you answer the question?

A I'm not sure, and I was not involved in the – determining that amount.

Q What other computations besides the one you indicated were made under the assistance agreement, Mr. O'Connell?

A I would assume that there would be computations needed for the paper, the ICCs or whatever the –

Q Do you know?

A Do I know?

Q Do you know whether those computations are made under the terms of the assistance agreement?

A They – I'm not sure. There's a separate – I'm not sure of the answer. May have been under a master agreement.

Q How would you use section 10 of the assistance agreement to compute the net worth maintenance obligation?

Page 3826

A How would I use it?
Q Yes.
A Well, that was the – I guess you just apply the accounting principles to making your computation.
Q How would you do that?
A I wouldn't do it.
Q You wouldn't know how to do it; right?
A I would not do it.
Q And you also wouldn't know how to do it; isn't that true?
A Probably right.
Q Mr. O'Connell, you were shown a copy of this assistance agreement in connection with your preparation for testimony on the stand today?
MS. EVANS: Objection; your Honor. I think this goes into privileged issues; what he was shown, what we discussed.
THE COURT: Why is this privileged?
MS. EVANS: It goes to our communication. And maybe if he would ask further questions.
THE COURT: I was just trying to figure out why your conversations with a witness before he testifies are privileged.
MS. EVANS: I think any of our conversations, as far as the nature of the conversations are privileged.

Page 3827

THE COURT: What's your legal basis for that?
MS. EVANS: It's in the work product privilege.
THE COURT: Now, that it can be. Attorney-client privilege, I –
MS. EVANS: I'm sorry, did I say attorney –
THE COURT: You can have a work product protection that applies. But that has to be attorney work product, rather than witness work product. Do you see what I'm driving at?
MS. EVANS: I see what you mean. Yes. I mean, to the extent that any of the questions would reveal my mental processes, it would be protected.
THE COURT: That's true. And I thought I covered that aspect fairly extensively in a prior opinion in this case. But do you think that the fact that Mr. O'Connell may or may not – we don't know as yet – have been shown a copy of the assistance agreement in this case relates to your work product, that is your mental impressions going in?
MS. EVANS: I mean, it could, your Honor. I think it's going to depend perhaps on subsequent questions.
THE COURT: May I tell you why I have a little difficulty with that? You examined Mr. O'Connell respecting the assistance agreement.
MS. EVANS: Yes. We can see what questions he gets into, which is what I was alluding to, your Honor.

Page 3828

THE COURT: Let's let this question go and see where we go next. Thank you.
BY MR. TUFARO:
Q Do you have the question in mind?
A Did I see the assistance agreement?
Q Were you shown a copy of the assistance agreement in preparation for your testimony?
A Yes.
Q And but for having seen – when was the last time you had seen a copy of the agreement?
A Probably at the time of this transaction.
Q 22 years ago?
A That sounds right, close to it.
Q And it's your testimony here today that you remember this agreement in particular out of all of the 50 or more agreements that you looked at when you were regional director of OES?
A What I was trying to get across was those 50 or so agreements that I saw never, to the best of my recollection, did I ever see one that had any of the language that went beyond that agreement. It was self-contained, whether it was this one or whether it was another one in California or New England or whatever.
Q And you actually remember, you have a present recollection of having read this agreement at the time of

Page 3829

the transaction?
A I assume I did, but I can't tell you there was a flash of a light in my head.
Q So, Mr. O'Connell, your testimony that the assistance agreement, PX 1 in this case, is a stand-alone agreement is based upon your view that all of the assistance agreements you looked at you believe were stand alone; is that right?
A Uh-huh, that's correct.
MR. TUFARO: I don't have any further questions, your Honor.
THE COURT: Ms. Evans, I'm going to suggest that we take a break now. Is that satisfactory for you?
MS. EVANS: Yes, your Honor.
THE COURT: I know you have redirect coming up, and I want to say that I recall helping you rather than Ms. Holt yesterday, and having Mr. Wallace ask for the same help, so I'm just correcting the record a little bit. It's not that I'm not trying to help you out on occasion, but –
MS. EVANS: Thank you.
THE COURT: – that's to move things along in a fairly efficient way. In any event, I think we are moving along, and you will have redirect when we come back. We are in recess for 15 minutes.
(Recess.)

Page 3830

THE CLERK: All rise. The Court is again in session.

THE COURT: Please be seated. I'm going to interrupt with a housekeeping matter. I apologize, Mr. O'Connell. This is just a modest matter. The clerk gave us the response that it's possible we could leave the materials in this courtroom, depending on the type of changes that would be made to it. The problem is, I don't think we're assigned this courtroom when we come back in March. I don't think they realized that. So we've got to go back to them again and say –

MR. WALLACE: We could leave them here for now until it's time to move and then go to the new courtroom.

THE COURT: That's possible.

MR. WALLACE: That would be helpful.

THE COURT: That is possible. They are looking into that now. So we will find out. Ms. Evans, redirect.

MS. EVANS: Yes. Just a few questions, your Honor.

REDIRECT EXAMINATION

BY MS. EVANS:

Q Mr. O'Connell, turn to PX 1 in your binder, and turn to page 11.

A I'm sorry, PX 1?

Page 3831

Q PX 1, then page 11. And turn your attention to section 5, "purchase of income capital certificate." Mr. O'Connell, do you know whether or not the provisions of section 10 apply to section 5 here, income capital certificates?

A Yes. Yeah, they would apply.

Q Also, tell us whether or not it was your practice to review assistance agreements when you were working on a supervisory transaction.

A My review of the assistance agreements was probably at the time the matter was submitted to the board. I didn't participate in preparing these. It was as a matter of information for me and everyone else that received a package of the documents.

Q Were you able to provide comments on the assistance agreement?

A No.

Q So it was a document that you – go ahead, sorry.

A No, this was a document prepared without my participation.

MS. EVANS: No further questions, your Honor.

THE COURT: I might have a question or so myself. Let me think about this for a moment. May I ask several questions, Ms. Evans and Mr. Tufaro?

MS. EVANS: Yes, of course.

Page 3832

MR. TUFARO: No objection.

THE COURT: You may object, obviously.

MS. EVANS: No objection.

THE COURT: Pardon?

MS. EVANS: No objection.

THE COURT: You may. When you hear the question, you may.

(Laughter.)

THE COURT: Mr. O'Connell, did you have any role in the implementation of assistance agreements, such as the one that is PX 1?

THE WITNESS: No, I did not.

THE COURT: Mr. O'Connell, I wonder if you would please turn to page 19 of PX 1, which is Bates 0455. And I wonder if you would read to yourself paragraph 10 in its entirety, and then I'd like to ask you a question about paragraph 10.

(Witness reviewed the document.)

Mr. O'Connell, do you see the exception that begins at the bottom of page 19 and runs over to 20?

THE WITNESS: Yes.

THE COURT: It's the Court's job, as a matter of law, to interpret that exception. But what is your understanding what that exception means?

THE WITNESS: Well, basically, I was saying that

Page 3833

they use GAAP accounting if – unless there is some conflict as enumerated with regulations or otherwise.

THE COURT: Well, do you see the structure of the first sentence of section 10? It says "except as otherwise provided in this agreement, any computations made for the purposes of this agreement shall," and it tells you what to do. Then it says – it has an exception built right into the first sentence. So it kind of says except, X happens, and then there's an exception right away. Do you see that?

THE WITNESS: Yes, I do.

THE COURT: Does that aid your understanding of this provision or not?

THE WITNESS: It's – it seems it's not the best structure of sentencing. That's the one thing I did get out of this.

THE COURT: All right. Well, let me ask you whether you think the third and last sentence of this agreement is entirely consistent with the first sentence.

THE WITNESS: I have trouble understanding how that sentence would ever come into play or would come into play.

THE COURT: Well, I understand. Let's take the middle sentence on page 20, 0456. It says "in case of any

Page 3834

ambiguity in the interpretation or construction of any provision of this agreement, such ambiguity shall be resolved by a third-party, independent accounting firm selected by the corporation and not previously used by LISB or the Bank Board for purposes of auditing LISB or Suffolk County."
Do you see that?
THE WITNESS: Yes, I do.
THE COURT: What does that mean to you?
THE WITNESS: That for purposes of this agreement only, if you did get into the situation of ambiguity, that you would follow this procedure.
THE COURT: Do you recall this procedure being used in any other type of assistance agreement with which you were familiar at the time you were at the Bank Board?
THE WITNESS: No.
THE COURT: No. That's really the reason I asked you whether you had any role in the implementation of the assistance agreements, Mr. O'Connell. Thank you.
Mr. Tufaro and Ms. Evans, in light of the Court's questions, the Court will ensure that you have recross and re-redirect.
Mr. Tufaro?
MR. TUFARO: Shall I go or await Ms. Evans?
THE COURT: Well, Ms. Evans, you may redirect

Page 3835

again.
BY MS. EVANS:
Q Mr. O'Connell, regardless of the language in section 10, is it still your testimony that section 10 applies only to calculations contemplated within the assistance agreement itself?
MR. TUFARO: Objection; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Mr. O'Connell, has your testimony changed in any way regarding your interpretation of section 10 and its meaning?
MR. TUFARO: Objection, your Honor.
MS. EVANS: He can answer yes or no, I think, your Honor.
THE COURT: Well, that's the problem. Change from what? I mean, he was asked a whole set of questions on direct.
MS. EVANS: Your Honor, I'm not sure I agree, respectfully, that these are leading questions. He can answer yes -- if they're yes-or-no questions that contemplate a yes-or-no answer.
THE COURT: Well, but you've got to focus a little bit.
BY MS. EVANS:

Page 3836

Q Mr. O'Connell, has your testimony changed in any way regarding your conclusions about the applicability to section 10 to the assistance agreement itself?
MR. TUFARO: Objection. It's still leading, your Honor.
MS. EVANS: Your Honor, it's my --
THE COURT: I'm hesitating, because if you had a specific area of Mr. O'Connell's prior testimony that you were addressing, you might have a point. But --
MS. EVANS: Well, I think that we do, which is his testimony regarding the fact that section 10 applies to the assistance agreement itself. I mean, that's the part of the testimony.
THE COURT: Well, I'm struggling.
MS. EVANS: I'll try another way.
THE COURT: Thank you.
BY MS. EVANS:
Q Does the interpretation -- Mr. O'Connell, does the interpretation of section 10 affect whether or not it's applicable only to the assistance agreement itself?
MR. TUFARO: Objection, your Honor.
THE COURT: Grounds?
MR. TUFARO: Well, it's compound.
MS. EVANS: Your Honor, I don't think it's a compound question.

Page 3837

THE COURT: All right. I'll allow it. Let's see what happens.
MS. EVANS: Would you like the court reporter to read it back to you?
THE WITNESS: Please.
(The reporter read the record as requested.)
THE WITNESS: It's -- section 10 is only applicable to the assistance agreement.
MS. EVANS: Thank you.
RECROSS-EXAMINATION
BY MR. TUFARO:
Q Mr. O'Connell, do you still have Plaintiffs' Exhibit 1 in front of you, the assistance agreement?
A Are you talking about this?
Q No, it's the document that you were going over with the Court.
A Yes, yes.
Q And could you turn to section 5 on page 11, LIP 447 of the document. Do you see in section A the reference where it says "unless specifically defined in section 1 of this agreement, the terms used in this section shall have the meanings given to them in the master agreement."
Do you see that?
A Uh-huh.
Q What is the master agreement?

Page 3838

A I believe that was a document, I think it was somewhat like a form, like an assistance agreement, but it governed the operation of these various types of paper that would be exchanged, like income capital certificates.

Q So why is the assistance agreement referring to the master agreement, if the assistance agreement is a stand-alone document?

A Well, the master agreement is referenced in here. It seems to me it's just a control feature for it.

Q So it's really not a stand-alone document; right? You have to deal with both the assistance agreement and the master agreement; correct?

A Well, for the ICCs, you have to.

Q What computations are performed under section 5 of the assistance agreement?

MS. EVANS: Objection; asked and answered. I think he's been asked that previously.

THE COURT: Overruled.

THE WITNESS: I'd say you have to compute what the payments are.

BY MR. TUFARO:

Q Where does it say that?

A Well, the section 5 seems to me like it's a preamble cover section, to give the details of the operation of those ICCs, which is then incorporated into the master

Page 3839

agreement.

Q So you have to go to the master agreement to figure out how to do the computations; right?

A I'd say yes.

Q Can you turn to section 17 on page 29. Do you see that section entitled "entire agreement"?

A Uh-huh.

Q And looking at the first sentence, it says "this agreement and the master agreement, together with any interpretation or understanding agreed to in writing by the parties, constitute the entire agreement between the parties." Do you see that? And it continues on.

A Yes, I do.

Q So this isn't a stand-alone document, is it? You have to read both the agreement and the master agreement; right?

MS. EVANS: Objection, your Honor. I believe he's mischaracterizing the witness's testimony. He talked about computations applying to the agreement only. He didn't give this answer.

THE COURT: Well, just a moment. It's a compound question, in the sense that you've actually got two questions pending, Mr. Tufaro. Why don't you reframe that to one.

BY MR. TUFARO:

Page 3840

Q In view of the fact, Mr. O'Connell, that section 17 refers to "the agreement and the master agreement constituting the entire agreement" –

MS. EVANS: Objection, your Honor, Mr. O'Connell is not a lawyer. I think we're now getting into interpretations and legal opinions of the contract.

THE COURT: You were there with your questions.

MR. TUFARO: I move to strike Mr. O'Connell's testimony on this agreement, based on that position of the Government.

THE COURT: One of the reasons the court prefaced its questions to Mr. O'Connell was with the caveat that the interpretation of the language of the agreement actually is a matter of law for the Court, it had to do with exactly what we're tussling over now. And I think everyone with Mr. O'Connell has been asking him about language. And it's entirely fair for Mr. Tufaro to say, in your answer respecting section 10, did you take or to what extent should you take into account section 17? It's that simple. Let's just go forward. Why don't you reframe your question.

MR. TUFARO: All right. I like yours.

(Laughter.)

BY MR. TUFARO:

Q Mr. O'Connell, in giving your response with regard to section 10 of the assistance agreement, to what extent

Page 3841

did you take into account section 17 and its references to the agreement and master agreement?

A My view has been that what's in the agreement is confined to the agreement. Now, you bring up the master agreement. My initial reaction is, well, seeing this is cited in section, what was it, 5, that that was incorporated into this agreement. That's a nonlawyer opinion.

Q Did you even look at section 17 before you came into court today?

A I don't believe I did.

Q How does section 10, which is on pages 19 and 20 of this document, how does it compare with the accounting principles in the other 49 or 50 agreements that you looked at?

A I don't think I saw anything like this.

Q How did they differ?

A Now, that I can't tell you. I just don't remember.

MR. TUFARO: No further questions, your Honor.

THE COURT: Thank you, Mr. Tufaro. Ms. Evans, do you have anything further?

MS. EVANS: Nothing, your Honor.

THE COURT: I know we're getting into re-redirect.

MS. EVANS: Yes. No, I don't, your Honor.

THE COURT: Mr. O'Connell, I may, in a moment,

Page 3842

excuse you. But before I do that, the parties have given me a job to do, and I will like to fulfill my obligations in that respect.

THE WITNESS: Yes, your Honor.

THE COURT: I am obliged to read you an instruction, and I think if I read it, you will understand it. But let's try and see. If you have any questions, you may ask.

The parties have requested, as they are entitled to under the Federal Rule of Evidence 615, and as you know from not being present in the courtroom for the testimony of other witnesses, that witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh, without being distracted by others' testimony.

My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness.

If you have any question about who could be a witness, you may ask counsel. I believe that the last day we're currently scheduled, if we need it, is of all things March 23. So it's a little less than a month away.

Do you understand?

THE WITNESS: Yes. I will not discuss this with anyone.

Page 3843

THE COURT: You can certainly talk with your family about it, assuming they're not likely to be witnesses in the case.

THE WITNESS: I don't think so.

THE COURT: All right. And I thank you very much for appearing here today. I know this is a bad day to travel. I wish you well on your travels back to Midlothian, and with real appreciation for you coming here to testify, you are excused.

THE WITNESS: Thank you most kindly, your Honor.

THE COURT: Thank you.

(Witness excused.)

THE COURT: Before we move to the next witness, the clerk of the Court informs all of us that the parties may leave the book cases here, despite the fact that we'll be in Courtroom 7 in March. I hope that helps.

MR. MADDEN: Thank you, your Honor.

THE COURT: Thank you.

MR. INFELISE: Your Honor, at this time we'd like to call Mr. James Caton to the stand.

THE COURT: Thank you, Mr. Infelise.

Mr. Caton, if you would come forward, and if you would please stand behind the court reporter, and if you would raise your right hand, please, sir, to be sworn as a witness in this case.

Page 3844

Whereupon,

JAMES A. CATON

was called as a witness and, having first been duly sworn, was examined and testified as follows:

THE COURT: Mr. Caton, if you would please take a seat in the witness stand and make yourself comfortable.

THE WITNESS: Okay. Thank you.

MR. INFELISE: Your Honor, at this time we'd like to distribute the witness binders, if we could.

THE COURT: Yes, certainly. And if, while you're doing that, I may ask Mr. Caton to state his full name for the record.

THE WITNESS: My name is James Arthur Caton, Jr.

DIRECT EXAMINATION

BY MR. INFELISE:

Q Mr. Caton, earlier in this proceeding, we read portions of your deposition, but I'm going to ask you some other questions concerning this case.

A Okay.

Q First, sir, could you state whether or not you're presently employed?

A Yes. I'm employed at the Office of Thrift Supervision, or OTS.

Q And what is your position at the OTS?

A Right now I'm the director of financial monitoring and analysis.

Page 3845

Q And what do the responsibilities or duties of that position entail, sir?

A Reviewing the thrift industry as a whole and individual thrifts to identify any systemic problems, systemic risks or individual risk that may impact the safety and soundness of the thrift industry or individual thrifts.

Q How long have you worked for the OTS?

A I joined OTS and its predecessor in March of 1987.

Q Let me back up a little bit. Could you tell us or give us a brief description of your educational background.

A I have a bachelor's degree in business administration, with a concentration in finance, and I received my undergraduate degree in June of 1980 from George Mason University. I also have a master's in business administration, again with a concentration in finance, that I earned in 1987.

Q Now, between the time you graduated, you got your undergraduate degree, and when you went for your graduate degree, did you work at all?

A Oh, yes.

Q Where did you work?

A During 1980 and while I was going to undergraduate school, I worked at the First American Bank of Virginia, medium-sized commercial bank located in McLean,