# EXHIBIT 5

**Long Island Savings Bank v. U.S. 92-517 February 24, 2005**

**Heritage Reporting Corporation**

**Page 3678 to Page 3923**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 3842

excuse you. But before I do that, the parties have given me a job to do, and I will like to fulfill my obligations in that respect.

THE WITNESS: Yes, your Honor.

THE COURT: I am obliged to read you an instruction, and I think if I read it, you will understand it. But let's try and see. If you have any questions, you may ask.

The parties have requested, as they are entitled to under the Federal Rule of Evidence 615, and as you know from not being present in the courtroom for the testimony of other witnesses, that witnesses be excluded from the courtroom so that each witness can give his or her testimony fresh, without being distracted by others' testimony.

My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness.

If you have any question about who could be a witness, you may ask counsel. I believe that the last day we're currently scheduled, if we need it, is of all things March 23. So it's a little less than a month away.

Do you understand?

THE WITNESS: Yes. I will not discuss this with anyone.

Page 3843

THE COURT: You can certainly talk with your family about it, assuming they're not likely to be witnesses in the case.

THE WITNESS: I don't think so.

THE COURT: All right. And I thank you very much for appearing here today. I know this is a bad day to travel. I wish you well on your travels back to Midlothian, and with real appreciation for you coming here to testify, you are excused.

THE WITNESS: Thank you most kindly, your Honor.

THE COURT: Thank you.

(Witness excused.)

THE COURT: Before we move to the next witness, the clerk of the Court informs all of us that the parties may leave the book cases here, despite the fact that we'll be in Courtroom 7 in March. I hope that helps.

MR. MADDEN: Thank you, your Honor.

THE COURT: Thank you.

MR. INFELISE: Your Honor, at this time we'd like to call Mr. James Caton to the stand.

THE COURT: Thank you, Mr. Infelise.

Mr. Caton, if you would come forward, and if you would please stand behind the court reporter, and if you would raise your right hand, please, sir, to be sworn as a witness in this case.

Page 3844

Whereupon,

JAMES A. CATON

was called as a witness and, having first been duly sworn, was examined and testified as follows:

THE COURT: Mr. Caton, if you would please take a seat in the witness stand and make yourself comfortable.

THE WITNESS: Okay. Thank you.

MR. INFELISE: Your Honor, at this time we'd like to distribute the witness binders, if we could.

THE COURT: Yes, certainly. And if, while you're doing that, I may ask Mr. Caton to state his full name for the record.

THE WITNESS: My name is James Arthur Caton, Jr.

DIRECT EXAMINATION

BY MR. INFELISE:

Q Mr. Caton, earlier in this proceeding, we read portions of your deposition, but I'm going to ask you some other questions concerning this case.

A Okay.

Q First, sir, could you state whether or not you're presently employed?

A Yes. I'm employed at the Office of Thrift Supervision, or OTS.

Q And what is your position at the OTS?

A Right now I'm the director of financial monitoring

Page 3845

and analysis.

Q And what do the responsibilities or duties of that position entail, sir?

A Reviewing the thrift industry as a whole and individual thrifts to identify any systemic problems, systemic risks or individual risk that may impact the safety and soundness of the thrift industry or individual thrifts.

Q How long have you worked for the OTS?

A I joined OTS and its predecessor in March of 1987.

Q Let me back up a little bit. Could you tell us or give us a brief description of your educational background.

A I have a bachelor's degree in business administration, with a concentration in finance, and I received my undergraduate degree in June of 1980 from George Mason University. I also have a master's in business administration, again with a concentration in finance, that I earned in 1987.

Q Now, between the time you graduated, you got your undergraduate degree, and when you went for your graduate degree, did you work at all?

A Oh, yes.

Q Where did you work?

A During 1980 and while I was going to undergraduate school, I worked at the First American Bank of Virginia, medium-sized commercial bank located in McLean,

Page 3846

headquartered in McLean. There I was a teller. And then close to my graduation, receiving my undergraduate degree, I was promoted to staff auditor.

Later on in 1980, I left first American to join Freddie Mac, or the Federal Home Loan Mortgage Corporation, as an accountant. And I was at Freddie Mac for two years, from about October 1980 through 1982.

I left Freddie Mac to join Kaplan, Smith & Associates, which was a financial consulting firm, primarily to the thrift industry. I was at Kaplan, Smith for four years, from October 1982 through 1986.

Q When did you then – let me ask you this. Did you – were you going to school working on your graduate degree while you were working?

A Yes, yes, I was.

Q And you said you got your graduate degree in 1987?

A Correct. And then to complete the employment background, from Kaplan, Smith, I went to the FSLIC, or the Federal Savings and Loan Insurance Corporation. And from the FSLIC, I left to join OTS.

Q All right. Let me go back. You said you were at the Freddie Mac. That's the FHLMC?

A Correct.

Q And how long did you stay there?

A Two years.

Page 3847

Q And then after that, you said, I believe, you went to work for Kaplan, Smith; is that correct?

A Correct.

Q When would that have been?

A 1982.

Q All right. What type of work did the firm of Kaplan, Smith do when you joined them?

A A full range of consulting, primarily to the thrift industry. They did mergers and acquisitions, conversion appraisals, which was an appraisal process for thrifts converting from mutual to stock form of ownership. We did asset-liability management, the sale and purchase of bulk assets. That was our primary work.

Q What was your responsibility, or what type of work did you do at Kaplan, Smith?

A A little bit of everything. My specialty was mergers and acquisitions and conversion appraisals.

Q All right. Now, you said that your specialty was mergers and acquisitions?

A Correct.

Q And in that area, what type of responsibilities or what duties did you have?

A Working for both the purchaser and the sellers at different times. That work involved performing what we called due diligence reviews of the thrift, primarily

Page 3848

thrifts. We did have a few commercial bank buyers, but the sellers were primarily from the thrift industry.

So we would actually travel on site to the thrift and look at their major assets, look at how the operation was functioning, interview management and analyze their financial statements. From that we would come up with a – what their strengths and weaknesses were. And then we would talk to the potential buyer to form a strategy that would best suit this institution.

We would then actually do models, simulation models, for the strategy implied –

Q What if – I'm sorry, excuse me. Go ahead, please.

A For a particular strategy or strategies for that particular institution and do stress testing, stress testing for interest rates, different lending volumes, different cash flow scenarios.

Q What, if any, responsibility did you have for making recommendations to these thrifts whether or not they were candidates for a merger or a conversion?

A If they came to us, we would actually go through that process with them and come up with a best – best solution, what we felt was a best solution.

Q During the time you worked at Kaplan, Smith, were you ever involved in any supervisory mergers?

Page 3849

A Oh, yes.

Q Let me ask you this, sir. Can you estimate or do you know how many – in total, how many conversions or mergers you were involved in while at Kaplan, Smith?

A Both conversions and mergers?

Q Yes.

A Conversions, I believe I was directly responsible for about six conversions and maybe 30 mergers.

Q And during the time you were at Kaplan, Smith, did you ever have occasion to work on a supervisory merger involving a failing thrift?

A Oh, yes, probably about 10 times, I would say.

Q And did you have any responsibility in those cases with respect to valuing that thrift?

A Yes, we would go through the same due diligence process.

THE COURT: Mr. Leblanc?

MR. LEBLANC: Your Honor, I'm going to object at this point. This is going beyond the designation that either of the parties had for Mr. Caton's testimony.

MR. INFELISE: That's incorrect. First, your Honor, that's incorrect. But I can address the objection, if you wish.

THE COURT: Just a moment. Could you please, Mr. Infelise?

Page 3850

MR. INFELISE: Well, your Honor, there was a whole line of questions in the deposition concerning these very questions, concerning Mr. Caton's background and the work he had done at Kaplan, Smith with respect to mergers and conversions.

Second, it's my understanding since this is direct exam of our witness, we're not limited necessarily to what was covered in the deposition. That was just a cross-designation of designation of depositions that the Plaintiffs did.

THE COURT: But you would agree that you are limited by your witness designation prior to trial.

MR. INFELISE: Oh, yes, your Honor.

THE COURT: I think that's Mr. Leblanc's point.

MR. LEBLANC: That is, your Honor.

MR. INFELISE: As I understand the designation, it goes to Mr. Caton's work at the OTS with respect to this case. And what I'm doing now is establishing what experience and background he has which would qualify him with respect to the work he did with respect to Long Island.

THE COURT: Mr. Leblanc?

MR. LEBLANC: Your Honor, the designation -- and I think the further foundation needs to be laid that this witness's role with respect to Centereach was limited to the capital plan. That's what the designations are limited to.

Page 3851

To the extent that there are questions regarding conversion, that goes beyond his role with respect to Centereach.

So, your Honor, to the extent that they want to move into conversion with this witness, I think there's a lack of foundation for it.

THE COURT: Just a moment. Well, we can go a little farther on the foundation in Mr. Caton's prior work, certainly, but we have to focus on his work with OTS.

MR. INFELISE: And I'm getting there, sir.

BY MR. INFELISE:

Q I had asked you, and I believe my last question was concerning whether or not your work had involved supervisory conversions while you were at Kaplan, Smith. Do you recall those questions?

A Yes.

Q In doing those valuations, how, if at all, would an institution's inability to meet its capital requirements come into play?

MR. LEBLANC: Your Honor, again, I think we're going beyond the foundation of this witness's testimony. He's asking him with respect to work he did with Kaplan, Smith, unrelated to the work that he, in fact, did with Centereach. The depositions bore that out. His work with Centereach -- with respect to Centereach, and it was only with respect to Centereach, dealt with a discrete period of

Page 3852

time dealing with the capital plan, the approval of the capital plan.

THE COURT: Mr. Infelise?

MR. INFELISE: Yes, your Honor. The review of the capital plan, which I intend to get into, involved review of the alternatives which Centereach proposed to come into compliance with capital requirements. One of those, and one which we have discussed at length in this case, is whether or not they could have converted. One of the evaluations done by OTS was whether or not this Centereach had considered all the possible alternatives.

I am attempting to establish that Mr. Caton, who, in fact, personally reviewed those business plans -- or excuse me, the capital plans, has the background and wherewithal and experience to comment on whether he believed that there were other alternatives available to Centereach at the time he reviewed those capital plans. Those certainly are part of his job and his responsibility. Those were certainly issues of whether or not Centereach had, in fact, considered other possibilities or addressed all the potential possibilities in their capital plan.

THE COURT: My recollection is that conversion was not a specific alternative identified in the capital plan.

MR. INFELISE: Exactly, your Honor.

THE COURT: Is that correct?

Page 3853

MR. INFELISE: Exactly. And the question is, why wasn't it. And what has been presented by the Plaintiffs is that it wasn't feasible or possible.

THE COURT: Mr. Leblanc?

MR. LEBLANC: Your Honor, those questions, I suggest Mr. Infelise could move to. The questions he's asking him now, however, I think don't go to those.

THE COURT: Well, I have a small problem with the terminology used, Mr. Infelise, "supervisory conversion." I am familiar with a modified conversion. There were certainly a variety of conversions. I don't think that modified conversion was actually in play at the time Mr. Caton was at -- I'll have to get the name right.

MR. INFELISE: Kaplan, Smith, sir.

THE COURT: Kaplan, Smith. So I don't know exactly what you've asked him, to be blunt about it.

MR. INFELISE: All right. And maybe I can rephrase the question. The one question I was going into was whether or not he had considered thrifts as part of this that had -- did not meet their capital requirements at the time they were compliant for conversion.

THE COURT: At the time?

MR. INFELISE: At the time they were considering conversion.

THE COURT: This is in 1986?

Page 3854

MR. INFELISE: Yes, your Honor.
THE COURT: Well, I'll be interested in Mr. Caton's answer.
BY MR. INFELISE:
Q Mr. Caton, at the time you were at Kaplan, Smith, were there occasions where you considered conversion of thrifts that were not meeting capital requirements?
A Specifically, I don't recall if two institutions particularly met their supervisory capital requirements or not, but two -- I worked on two cases where the institutions had negative GAAP capital and actually had successful conversions.
Q And when you say "conversion," do you mean conversion from mutual to stock institution?
A Mutual to stock, yes. They were Atlantic Permanent of Norfolk, Virginia and Frontier Federal of Ponca City, Oklahoma.
THE COURT: Mr. Infelise, may I ask a question?
MR. INFELISE: You may, your Honor.
THE COURT: I usually wait, but since this is all foundation. Did they have negative RAP capital, Mr. Caton?
THE WITNESS: That I don't recall, I'm sorry. But I definitely recall they had negative GAAP capital.
THE COURT: Was there a difference at the time, Mr. Caton?

Page 3855

THE WITNESS: There was a difference at the time.
THE COURT: Thank you.
BY MR. INFELISE:
Q Now, when you left Kaplan, Smith, where did you go to work, sir?
A The FSLIC.
Q And I think you testified you worked there until approximately 1987?
A Correct.
Q And in 1987, who did you begin working for?
A The Office of Regulatory Policy, Oversight and Supervision, which changed its name to the Office of Regulatory Activities, and then eventually became part of OTS.
Q And what were your responsibilities at that point in time?
A I started out as a financial analyst, reviewing applications, specifically from our Dallas district. I was then promoted to executive assistant to the director, and then I was promoted to manager of financial analysis.
Q Let me direct your attention, Mr. Caton, to 1989. What position were you in at the OTS at that point in time?
A At that time, I was deputy director of special supervision.
Q And what did your responsibilities include?

Page 3856

A Reviewing problem cases, reviewing cases that presented some systemic risk to the thrift industry.
Q Now, after the enactment of FIRREA, did you have any responsibility with respect to reviewing capital plans?
A We did. Myself and my group took on, on a voluntary basis, the responsibility of reviewing capital plans, doing a concurrent review of capital plans, concurrent with our district offices' review, to ensure that the capital plans were being reviewed in a consistent manner amongst our 12 district offices.
Q If you would, sir, looking at the binder of documents you have, the very first document in the binder, DX 291. This is a memo dated December 12, 1989, addressed to the district directors from Mr. Darrel Dochow?
A Yes.
Q Do you recall whether or not you received a copy of this memo?
A I did.
Q You did. Now, I notice in the right-hand corner on this, on the front page there is a little cc with a series of initials. Are any of those your initials?
A No, they're not.
Q Are you certain, however, that you would have received a copy of this?
A Yes. In fact, I even -- I believe I even prepared

Page 3857

this memo.
Q All right. And was it OTS's regular practice to prepare memos like this to send to the districts to inform them of OTS policy?
A Yes, it was.
Q And were copies of such memos as these maintained in the regular course of business at the OTS?
A Yes, they were.
MR. INFELISE: Your Honor, at this time I would offer into evidence DX 291.
MR. LEBLANC: No objection, your Honor.
THE COURT: Admitted.
(The document referred to, previously identified as Defendant's Exhibit No. DX 291, was received in evidence.)
BY MR. INFELISE:
Q Mr. Caton, what was the purpose of sending this memo to the district offices?
A Primarily twofold, to notify the district directors that there was going to be such a concurrent review done by myself and my group and outlining the parameters of the concurrent review process.
Q All right. Now, if you would look at the page --

Page 3858

and I'm referring to the number in the lower right corner, it's SMO 181511. And we also have it on the screen, sir, if you have any trouble seeing it.

A Thank you.

Q Could you tell me what this is, sir.

A As a first cut for the concurrent review, we identified the largest institutions from each of our district offices for review. We felt that by doing so, we would have a good handle on any systemic risks. And this memo identified, out of each district, offices those capital plans which we wanted to review -- perform a concurrent review in Washington.

Q Was that the only criteria that you used for determining which capital plans would be reviewed?

A No.

MR. LEBLANC: Objection, your Honor; leading.

MR. INFELISE: I'll rephrase if you'd like, sir.

THE COURT: Thank you.

BY MR. INFELISE:

Q What, if any, other criteria did you use for determining what capital plans you would review?

A These, as I said, were the largest institutions out of each district offices. Other types of -- other capital plans could have been sent to Washington for concurrent review, if they raised significant issues of law

Page 3859

or policy, or if the district offices just wanted our concurrent review.

Q Now, looking at this attachment A, does it identify Long Island Savings Bank of Centereach as one of the capital plans you're reviewing?

A Yes, out of our New York district office.

Q Now, as I understand -- well, let me ask you, did your office review all the capital plans that were submitted to OTS?

A No, we did not.

Q Which ones did you actually review?

A We reviewed the largest -- capital plans from the largest institutions, which approximated 120. And I believe there were an additional number, I believe it was 50, that were sent in to us because of the -- they raised policy issues or, again, the district offices just wanted to have our opinion.

Q Do you recall approximately how many capital plans your office reviewed? Did you say 120?

A 120, probably all told about 150 or so.

Q How long was your office responsible for doing this concurrent review?

A It was our primary function for the first six months of 1980. After that time --

Q I'm sorry, sir, did you say 1980?

Page 3860

A 1990, excuse me.

Q Thank you.

A I'm sorry. For the first six months of 1990, after which time, my group's primary responsibilities changed, and we moved on from the capital plan concurrent review process.

Q So after -- I'm sorry, excuse me, sir. Go ahead.

A I'm sorry. After that time, our involvement in the capital plan process would have been sporadic.

Q So after that time, did you have any further involvement in the capital plan review process?

A For certain cases, for -- if the district office wanted our opinion, if a capital plan -- if a thrift fell out of capital compliance, after that point in time. But by and large, our involvement ended.

Q Now, during the course of conducting these concurrent reviews, do you recall whether you reviewed the capital plans or any capital plans submitted by Long Island Savings Bank of Centereach?

A Oh, yes, yes. I remember reviewing that personally.

Q Do you recall how many plans you reviewed?

A I remember at least two plans. Again, the district office did not have to send us every plan, only the ones identified, and they received an approval or they got

Page 3861

our opinion, then they were not under any obligation to ask us for our reviews. But for Long Island, I remember two plans.

Q If you would, sir, in your binder located at the tab marked DX 301. This has been previously admitted. It's capital plan for Long Island Savings Bank of Centereach, dated January 8, 1990. Do you recall, sir, whether or not this was one of the capital plans that you reviewed?

A Yes, I believe it was.

Q Now, since this was submitted in June -- excuse me, January of 1990, would this have been part of the initial concurrent review that was being conducted by your office?

A Yes.

Q Now, sir, if you would turn to the next tab, which is PX 13, which, your Honor, I believe has also been admitted, capital plan for Long Island Savings Bank of Centereach, dated October 25, 1990. Looking at this, Mr. Caton, do you recall whether you reviewed this capital plan?

A Yes, I believe this was their second plan that they filed with us.

Q Now, since it's dated October 25, 1990, would this have been out of the time period during which you were doing the normal concurrent review?

Page 3862

A Yes, it was.
Q Do you recall why it is, then, that you reviewed this capital plan?
A Long Island -- the capital plan of Long Island did raise certain policy issues. Their capital plan did not show compliance within our typical time frame of showing compliance within December -- by the end of 1994. So this -- there were also some issues with the consolidation with its stronger parent, which raised certain policy issues. So this is one that would have been -- come back to Washington because of its policy issues.
Q Now, even though you were doing a concurrent review in Washington, who ultimately had the authority to approve a capital plan?
A The district director.
Q Do you have any recollection of when your office sent its approval, if at all, to -- concerning the Long Island bank of Centereach's capital plan?
A Sometime after this was filed, there was -- I remember even going up to New York, up to speak with the managers of Long Island, as well as our district office supervisors, about this. And there was some negotiations that took place in between October of 1990 and the actual approval, which I think was sometime much later than 19 -- October of 1990.

Page 3863

Q All right. Sir, if you would look at PX 231. It would be the last document in your binder. This appears to be a memo dated May 8, 1991. It indicates it's from Jim Caton to Michael Simone.
A Yes.
Q I notice there's some initials by the name Jim Caton. Do you recognize those initials?
A Those are my initials.
Q What is the purpose of putting those initials on this memo?
A Meaning that it came from me, I approved it, and for Michael Simone.
Q And who is Michael Simone?
A Michael Simone was Long Island Savings Bank's direct supervisor up in our New York district office.
Q And Mr. Caton, was it your regular practice to prepare memos like this as part of your responsibilities at OTS during this time frame?
A Yes, it was.
Q Would a copy of a memo such as this be maintained in an ordinary course of business at the OTS?
A Yes.
MR. INFELISE: Your Honor, at this time I would move for admission of PX 231.
THE COURT: Mr. Leblanc?

Page 3864

MR. LEBLANC: No objection.
THE COURT: Admitted.
(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 231, was received in evidence.)
BY MR. INFELISE:
Q Mr. Caton, do you recall or by looking at this, can you tell what the purpose of this memo was?
A To notify Michael that we did perform our concurrent review, and we also agreed with their approval recommendation.
Q Could I direct your attention to the second paragraph of this letter. Specifically the very first sentence, where it indicates "I would recommend that close attention be paid to the time frame projected by LISB for the sale of assets, asset restructuring and capital contributions from LISB's parent."
Why is it that you recommended attention be paid to those items, sir?
A For any capital plan that was dependent on one-time events or specific -- a specific happening, we wanted to see certain time frames. And if the time frame was not met, well, then we wanted our examination and

Page 3865

supervision to be aware of that and to take appropriate action, by calling management, seeing what exactly the problem was, seeing if there was some holdup and what they planned to do about it.
Q Was this statement unique for Long Island Savings Bank of Centereach?
A No, it was not.
Q I have one other document I'd like to distribute. It's been marked as Plaintiffs' Exhibit 228, which has been previously admitted, I believe.
May I approach, your Honor?
THE COURT: Certainly.
BY MR. INFELISE:
Q Mr. Caton, you testified earlier that at some point you recall attending a meeting concerning Long Island Savings Bank and its capital plan. This is an internal memo dated April 19, 1991, which the subject is the meeting with management of Long Island Savings Bank to discuss Centereach's capital plan. And it indicates that attendance was -- one of the persons was Jim Caton. Do you see that, sir?
A Yes, I do.
Q Is this the meeting to which you referred earlier?
A Yes.
Q I would like to direct your attention to the

Page 3866

second page. The number at the bottom is GTP 45447. And the very last paragraph in it, which mentions "Jim Caton indicated," that paragraph.
A Yes.
Q Would you just take a minute and read that, sir.
(Witness reviewed the document.)
Have you had a chance to read it?
A Yes.
Q The last sentence I would like to direct your attention to, it said "Jim Caton suggested that management make this decision as of June 1993."
To what were you referring when you say "this decision"?
A The decision to -- deciding which capital plan strategy they would implement in order to come into capital compliance.
Q Why is it you suggested or recommended that that decision be made by June of 1993?
A To give the institution some -- some latitude in changing the strategy before the end of 1994. So if their -- if the decision was made sometime in 1993 and it did not work out, it would give them a little bit of cushion, if you will, to try perhaps another plan.
Q Ultimately, did Centereach have to meet capital compliance by the end of 1994?

Page 3867

A Yes.
MR. LEBLANC: Objection, your Honor; leading.
THE COURT: Sustained. On the other hand, we have the answer and I'm not going to strike it.
MR. INFELISE: All right.
BY MR. INFELISE:
Q All right. Now, Mr. Caton, if you would turn to the very next page this document, GTP 45448. And I'm looking at the -- there is an indented paragraph and the next paragraph says "In response." You indicate now that "Jim Caton stated that a decision would need to be made by December of 1993 and Washington would not approve the plan if a decision would not be made by this date."
Does that -- what does that indicate with respect to your recommendation concerning a decision to be made by June of 1993?
A That I'm not a good negotiator?
(Laughter.)
It represented our flexibility that we took with respect to Long Island Savings Bank. Long Island Savings Bank, in my opinion, was a well-run institution, so --
Q All right. Now, the very next paragraph says "Jim Nacos then proposed a time extension of an additional six months to June of 1994."
Do you recall that, sir?

Page 3868

A Yes.
Q Do you recall whether or not that was agreed to by the OTS?
A I believe it was. I believe they were allowed that flexibility.
Q Thank you. Mr. Caton, do you recall whether or not the capital plan which your office approved was demonstrated that Long Island Savings Bank of Centereach would attain capital compliance by the end of 1994?
MR. LEBLANC: Objection; leading.
THE COURT: Sustained.
BY MR. INFELISE:
Q Do you recall what, if anything, the capital plan that your office approved indicated with respect to capital compliance by Long Island bank of Centereach by the end of 1994?
A Well, from all the capital plans that my office reviewed, Long Island's was the only plan that did not show capital compliance within that December 1994 time frame.
Q Why, then, was Long Island Savings Bank of Centereach's capital plan approved?
A It was a well-run institution, it was generating profits, its asset quality was good, had a good franchise value. So it -- we had a good supervisory history with Long Island Savings Bank's management. We felt comfortable

Page 3869

giving them the maximum flexibility.
We also always had the ability to force cross-guaranty provisions with its healthy parent. So we felt somewhat protected, both on the -- because it was a well-run institution and we always had that supervisory flexibility or supervisory power to force a merger or to invoke cross-guaranty provisions.
Q What, if anything, did Centereach have to do to be released from the capital plan that was approved?
A Meet its then capital -- come into then capital compliance.
Q Now, there's been testimony presented that Centereach's capital plan required it to consider alternatives to achieve capital compliance prior to 1994.
MR. LEBLANC: Objection, your Honor. This is a fact witness who is talking about testimony that's been previously presented.
THE COURT: Sustained.
MR. INFELISE: Your Honor, may I respond to that, please?
THE COURT: Yes, certainly.
MR. INFELISE: It was his testimony read by the Plaintiffs, I believe, during the deposition. That's where I obtained it. And I can check that if you'd like, sir.
THE COURT: Would you, please?

Page 3870

MR. LEBLANC: Your Honor, it's still prior testimony presented in this case. Mr. Caton wasn't present for it, based on the exclusion rule –

THE COURT: Well, there was a difference, though, if it's his prior deposition testimony, that's allowed. The Court just doesn't remember that, so I've asked Mr. Infelise to help us out.

MR. INFELISE: Yes, your Honor, it was a portion that we cross-designated at page 62.

"Question: Okay. Do you recall whether Centereach's capital plan stated that it would consider alternatives to coming into capital compliance as 1994 approached?

"Answer: Yes, it did."

THE COURT: Just a moment. Now, based on that, you may ask questions, Mr. Infelise.

MR. INFELISE: Thank you, your Honor.

BY MR. INFELISE:

Q Mr. Caton, as indicated, you previously testified by deposition in this case that Centereach's capital plan required it to consider alternatives to achieving capital compliance prior to 1994. Based upon your review of Centereach's capital plan, did you conclude there was anything else that Centereach could have done or should have considered in attaining capital compliance?

Page 3871

MR. LEBLANC: Objection. Now it's leading, your Honor.

THE COURT: Sustained.

BY MR. INFELISE:

Q Based upon your view of Centereach's capital plan, did you have any opinion concerning whether there was anything else that Centereach could do to attain capital compliance?

MR. LEBLANC: Objection; leading.

THE COURT: Technically, it is. But I don't think it suggests an answer to the witness. So I'm going to allow the question.

MR. INFELISE: Thank you.

BY MR. INFELISE:

Q Do you recall the question, Mr. Caton?

A Could you repeat it, please?

Q I hope so. Based upon your review of Centereach's capital plan, did you have any opinion concerning whether there was anything else that Centereach could do to attain capital compliance?

A Yes.

Q What was that?

A It could have immediately merged with its parent company, Long Island of Syosset. It could have converted from mutual to stock form of ownership.

Page 3872

Q Let's take those one at a time. What would have been the result of Syosset and Centereach merging?

A As I recall, the combined entity would have been very close to capital compliance, much more so than Centereach on a stand-alone basis.

Q Why would that have been a preferable or an option that Centereach should have considered?

A It would have made coming into capital compliance much easier.

Q Why is that?

A Because the money it would have had to have raised would have been much lower.

Q Now, taking your second comment concerning conversion, why do you believe that they should have considered conversion back in, I believe, 1991?

A Well, the conversion would have happened with the combined entity, combined Long Island Savings Bank, Syosset and Centereach. That's just GAAP accounting. So the money they would have had to have raised to come into capital compliance would have been much lower than Centereach on its own.

At that point in time, what we were seeing from the capital plan process was a lot – or many institutions – many weak institutions were able to raise money in the capital markets. So Centereach was not, save

Page 3873

for its capital issue, was not in the same league as the other institutions, who were actually raising capital in the capital markets.

By that I mean, Long Island Savings Bank was profitable, it was well-run, it did not have asset quality problems, it had good asset-liability management, it had a good franchise value. It was a retail operation, rather than a wholesale operation. So it was able to generate loans and deposits from its – from the community, rather than just purchasing them in bulk.

All of those factors would have added to its marketability and its overall value as an ongoing basis, as a going concern.

Q What, if any, impact on Centereach's ability – or Centereach and Syosset's ability to convert would the fact that Centereach had a negative capital position have been?

MR. LEBLANC: Objection, your Honor; lack of foundation.

THE COURT: Just a moment. Overruled.

BY MR. INFELISE:

Q Could you answer the question?

A Yes. The division between Syosset and Centereach was illusory. It was a bookkeeping entry. The entities were operated under the same management, they operated under the same name. A customer going into Long Island Savings

Page 3874

Bank Centereach did not know that. It was Long Island Savings Bank.
So the division between Centereach and Syosset was just an internal Long Island Savings Bank bookkeeping entry.
So the whole entity would have converted.
And the fact that Centereach had a large capital shortfall would – was not a factor in the conversion process. The conversion would have happened on a consolidated GAAP basis, not on this bookkeeping entry.
Q Okay. Now, I think you mentioned in passing the cross-guaranty provisions of FIRREA?
A Yes.
Q Could you explain what those were?
A In response to some problems that the – in the commercial banking industry, Congress gave us these cross-guaranty powers. The problems that Congress addressed were a bank holding company may have operated different banks, different separate banks. I believe there was one case where the bad assets were transferred to one particular bank in the family of banks, that bank was allowed to fail, being a sacrificial lamb, if you will, and Congress addressed that problem so that a strong holding company or a strong sister banks would have been tapped before the weak bank would have been taken over.
Q And what powers did the cross-guaranty provisions

Page 3875

give to the OTS with respect to parent and subsidiary banks?
A That we would have – we could have gone to the parent for capital infusions into the subsidiary to bring it into capital compliance – bring the weak subsidiary into capital compliance, that the parent institution would not have gotten off scott free, if you will.
Q Would it matter whether or not the parent and subsidiary merged or not with respect to the cross-guaranty provisions?
A If it was – if the entities merged, then the cross-guaranties would be moot, because there would not be any sister banks, there would just be one entity.
Q If the parent and subsidiary did not merge, would OTS – what powers, if any, would OTS have with respect to enforcing the cross-guaranty provisions?
A We could have taken – we would have forced the parent to infuse enough capital to bring the subsidiary into capital compliance.
MR. INFELISE: Could I have one moment, your Honor?
THE COURT: Certainly.
MR. INFELISE: No further questions, your Honor.
THE COURT: Mr. Leblanc?
MR. LEBLANC: Your Honor, we do have one small binder. May I approach, your Honor?

Page 3876

THE COURT: Certainly.
CROSS-EXAMINATION
BY MR. LEBLANC:
Q Good afternoon, Mr. Caton.
A Good afternoon.
Q My name is Andrew Leblanc. I represent the Plaintiffs in this matter, and I just wanted to follow up on some of the questions Mr. Infelise asked you.
Let me begin with one of the areas you started with. You described two thrifts that you said converted while you were at Kaplan, Smith with I think what you described as negative – I'm sorry, GAAP-insolvent institutions; is that right?
A That's right.
Q The two institutions you described were Atlantic Permanent and Frontier Federal; is that right?
A That's correct.
Q Those two institutions you said you didn't remember if they were insolvent on a RAP basis; right?
A That's correct.
Q Now, the two conversions, when you testified at your deposition, you identified those as 1983 conversions; correct?
A 1983, 1984 time period, yes.
Q So that's the period of time that those two

Page 3877

conversions occurred?
A Uh-huh.
Q Okay. Now, your involvement in the concurrent review process began in December of 1989; right?
A That's correct.
Q And it ended, you said, sometime in 1990; correct?
A Yes.
Q But for Centereach, it ended sometime later in 1991; right?
A Correct.
Q So your entire involvement while at the OTS with the institution known as Centereach was from December of 1989 to sometime in 1991?
A Today.
Q Until today? And I think actually at your deposition, you said until the time of your deposition; right?
A Yes.
Q One other question with respect to the two converting thrifts that you'd talked about, Atlantic permanent and Frontier Federal. When you say "GAAP insolvent," do you mean negative tangible capital?
A No, I mean negative capital.
Q Negative capital, period?
A Yes.

Page 3878

Q On a GAAP basis, though?
A On a GAAP basis. In other words, their liabilities exceeded their total assets.
Q That includes negative tangible capital; correct?
A No, negative tangible capital would have made them even more insolvent.
Q The OTS's original position with respect to the capital plan for Centereach was that Centereach and Syosset should be consolidated; isn't that true?
A That was one option. That was – that was – that was our belief that that would have been the quickest, most expedient way to bring the institution into – closer to capital compliance.
Q OTS's position with respect to these institutions was originally that they should be consolidated; isn't that correct?
A That's correct.
Q If you could turn with me behind tab 2 in your binder, to the document that's been identified as Plaintiffs' Exhibit 203. This is an interoffice memorandum recording a conversation between you and Joseph Kehoe on April 19, 1990; isn't that right?
A That's correct.
Q Mr. Kehoe was a supervisory agent for New York at the time; right?

Page 3879

A Yes.
Q And Mr. Kehoe was involved for the regional review of the capital plan; correct?
A Yes.
Q And you were working with him in that review as the OTS concurrent review?
A That's right.
Q And the conversation that's reported here between the two of you was a discussion within the scope of your responsibilities and those of Mr. Kehoe; right?
A Yes.
Q And Mr. Kehoe would have recorded this conversation within the scope of – as part of his duties at the region; isn't that right?
A That's right.
MR. LEBLANC: Your Honor, at this time we offer Plaintiffs' Exhibit 203 into evidence.
MR. INFELISE: Objection.
THE COURT: I'm sorry?
MR. INFELISE: Objection; lack of foundation. There's no evidence that Mr. Caton ever even saw this memo until it was shown to him today. It's obviously a memo prepared by Mr. Kehoe, not by Mr. Caton. Or, in fact, that it was ever sent to Mr. Caton.
THE COURT: Mr. Leblanc?

Page 3880

MR. LEBLANC: We're back at the 801(d)(2) issue, your Honor. It was prepared, as the witness testified, within the scope of Mr. Kehoe's duties, it accordingly is an admission pursuant to 801(d)(2). It's an authentic document, pursuant to the master stipulation. Its foundation has been laid.
THE COURT: There are a couple of problems. One is whether or not this would have been kept in the appropriate files. It's OTS's files. And second is whether Mr. Caton can, either independently or by reference to this document, remember. You've got a couple of bridges to cross, Mr. Leblanc.
MR. LEBLANC: With respect to the first one, your Honor, I think that goes to the business record exception.
THE COURT: It does.
MR. LEBLANC: Which this need not be, maintaining it in the files.
THE COURT: That's why I gave you an alternative, Mr. Leblanc.
MR. LEBLANC: Understood, your Honor.
BY MR. LEBLANC:
Q Mr. Caton, if you can take a look at this memorandum. Have you had an opportunity to review it?
A Yes.
Q Does that accurately reflect the conversation

Page 3881

between you and Mr. Kehoe?
A I would assume it does.
Q Do you have any reason to doubt that it does?
A No, I don't.
MR. LEBLANC: Your Honor, we'd offer the document at this time.
THE COURT: Mr. Infelise?
MR. INFELISE: Your Honor, I object and I ask for an opportunity just to voir dire briefly.
THE COURT: Absolutely.
VOIR DIRE EXAMINATION
BY MR. INFELISE:
Q Mr. Caton, Mr. Leblanc asked you have you had an opportunity to review it. Does that accurately reflect the conversation between you and Mr. Kehoe? And you said "I would assume it does."
Mr. Caton, have you ever seen this memo before today?
A No.
Q Ever had a chance to review it?
A No.
Q Ever discussed it at all with Mr. Kehoe?
A No.
Q Did you know that Mr. Kehoe prepared this memo?
A No, I didn't.

Page 3882

MR. INFELISE: No further questions.
THE COURT: Mr. Leblanc?
CROSS-EXAMINATION (Continued)
BY MR. LEBLANC:
Q Mr. Caton, you know who Mr. Kehoe was; correct?
A Yes.
Q And you described him as a supervisory agent for New York at the time?
A Yes.
Q And was the type of memorandum we're looking at here the type of memorandum that would have been kept by Mr. Kehoe?
A That I don't know. This is – it looks like a memo to his own files. I don't know what type of memos he kept in his files.
Q Have you seen interoffice memorandums such as the one that's before you before in your career at the OTS?
A In this exact format, I can't say. Different people had different formats. And yes, different people kept memorandums to their own files.
MR. LEBLANC: Your Honor, I think the foundation has been laid for this. Mr. Kehoe has been identified. It's an admission pursuant to 801(d)(2). Each of the elements of 801(d)(2) have been met through this witness's testimony. It is not a requirement of 801 D 2 that the

Page 3883

witness has previously seen the statement of the other employees of the Defendant for the admissibility of the document.
THE COURT: Mr. Infelise?
MR. INFELISE: Nothing further, your Honor. We're going to maintain our objection.
THE COURT: Mr. Leblanc, are you going to force me to ask questions of Mr. Caton myself?
MR. LEBLANC: I certainly hope not, your Honor.
BY MR. LEBLANC:
Q Can you look at the cc line on this memorandum.
A Yes.
Q Can you identify any of the initials that are indicated there?
A No. I can't say for certain who they refer to.
Q Did you have a conversation with Mr. Kehoe on April – do you recall having a conversation with Mr. Kehoe on April 19, 1990?
A Specifically, no.
Q Does looking at this document refresh your recollection as to whether or not you had a conversation with him?
A I'm – since – since Joe was the supervisor in charge of Centereach and that was the time period about when they filed a capital plan and should have been under

Page 3884

concurrent review, I suspect I did have a conversation with Joseph Kehoe.
Q If you could look back at the cc line on this, do you understand what the word "docket" means at the end of that?
A Yes.
Q What does that mean?
A It's a unique identifier for every thrift institution.
Q So does that, then, indicate, "the docket" in the cc, indicate this memo would have actually been placed in the unique file for Long Island Savings Bank of Centereach?
A For the district office, not in Washington.
Q But for the district office of the Office of Thrift Supervision, it would have been placed in the –
A In New York.
Q In New York?
A Not in Washington.
MR. LEBLANC: Your Honor, we would renew our offer of this document.
THE COURT: I'm attempted to admit it right now, but let me ask one question, if I may, Mr. Infelise and Mr. Leblanc, will you let me?
MR. INFELISE: Yes, your Honor.
MR. LEBLANC: Yes, your Honor.

Page 3885

THE COURT: Thank you.
Mr. Caton, are you familiar with an institution called First Federal of Rochester?
THE WITNESS: Yes, yes, I am.
THE COURT: How did you become familiar with that?
THE WITNESS: In my previous life at Kaplan, Smith, as well as with OTS. And they also filed a capital plan.
THE COURT: Did you work on that capital plan?
THE WITNESS: Specifically, I don't believe so. Personally, I don't believe so. I believe one of my staff did.
THE COURT: I see. Was you or your staff's work on the capital plan filed by First Federal of Rochester contemporaneous with that filed by LISB Centereach?
THE WITNESS: Yes. More than likely, yes.
THE COURT: The document is admitted.
(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 203, was received in evidence.)
BY MR. LEBLANC:
Q Mr. Caton, if you could look at the last sentence on this first paragraph. It reads "he confirmed that OTS's

Page 3886

position with respect to LISB was to require consolidation."
Do you see that sentence?
A Yes, I do.
Q That "he" refers to you; isn't that correct?
A Reading through it, yes.
Q So as of April 19, 1990, the OTS's position was to require consolidation; correct?
A That's – that's correct. That was our initial – our initial gut feeling of what should happen.
Q Now, in fact, the capital plan as approved, and I think you testified to this with Mr. Infelise, did not require consolidation of the two institutions; correct?
A That's correct.
Q And that was because Long Island Savings Bank wouldn't agree to consolidate the two institutions; isn't that right?
A Well, no, I think we gave Long Island Savings Bank maximum flexibility because of its good management, good earnings stream, the history of working well with the supervisory staff in New York, good asset quality. So I think all of those factors went into us having more flexibility than what we normally would have, which this sentence indicated.
Q Well, the institution certainly didn't want to consolidate the two banks; correct?

Page 3887

A I don't believe so, no.
Q And they resisted consolidating; correct?
A Yes.
Q And ultimately, OTS did not require them to do so as part of the capital plan?
A That's correct.
Q Now, I think you had mentioned earlier, OTS wasn't giving very much up in agreeing to not require consolidation, because OTS maintained the right to enforce the cross-guaranty provisions of FIRREA; correct?
A That's correct.
Q And so OTS could later just force the merger of the two institutions under those provisions; right?
A Yes. But again, we gave them flexibility to decide when they wanted to do it.
Q Now, the capital plan as approved did, in fact, impose restrictions on Centereach; isn't that correct?
A Yes.
Q It imposed restrictions with respect to their growth that Centereach could do?
A That was not unique to Centereach. That was a statute that –
Q So the capital plan did impose restrictions as to the growth that Centereach could do?
A Not the capital plan. The statute did.

Page 3888

Q Okay. Centereach was limited, however?
A Yes.
Q Okay. Centereach was limited in that it could make no capital distributions or pay dividends; correct?
A That's correct.
Q Centereach agreed to certain asset sales as part of its capital enhancement strategy; correct?
A That's what management proposed to us, yes.
Q Centereach agreed to sell some equity investments, some real estate assets as part of its capital enhancement strategy; correct?
A Yes.
THE COURT: I'm going to caution Mr. Leblanc that historically, the Court has taken a rather dim view of continued questions where you make a statement and then ask "correct" or "is that right." It would be better if you'd ask a question.
MR. LEBLANC: Yes, your Honor.
BY MR. LEBLANC:
Q During this period, you would agree that Centereach was subject to increased regulatory oversight?
A I would – I would agree to that.
Q Was Centereach – I'm sorry. Was Syosset required to infuse capital into Centereach under the capital plan?
A "Required" – you've used the term "required"

Page 3889

throughout these questions. We did not require it. We viewed this capital plan as management's best effort to tell us how they were going to bring the institution into capital compliance. We approved or did not approve their plan. So did we require it? We did not – OTS did not formulate these capital plans. It was management who formulated the capital plan. We approved what management submitted to us.
Q Once the capital plan was approved, if the institution deviated from the capital plan, it was subject to enforcement actions, right?
A Oh, no, not immediately. If it was – if it came out of – if it did not meet its targets, we did not immediately go to enforcement actions. It would have typically involved a phone call from, let's say, Joseph Kehoe to Long Island Savings Bank management, just asking what happened. So it wasn't – it wasn't an immediate enforcement action.
Q However, wasn't the institution subject to some enforcement in the event that it deviated from its capital plan?
A That I can't say definitively. It would depend on the materiality of its deviation.
Q If a deviation was material enough, then the OTS could enforce – could go into enforcement actions; correct?

Page 3890

A If they were material enough and management had no good explanation and had no plan of recourse or how they were going to recover, yes, I guess eventually it would have turned into an enforcement action.
Q Now, let's go back to where we were. The capital plan required Syosset to infuse capital into Centereach; right?
A Management's proposal was to infuse capital from Syosset into Centereach.
Q Let me see if I can use the term "called for."
A Okay.
Q Would that be acceptable to you?
A Well, again, I just don't want any confusion. We did not require -- we did not call for it. This was management's plan to us. So management told us they were going to infuse funds from Syosset into Centereach. We did not require it. We did not call for it.
Q Management did a capital plan because the OTS required it, though; isn't that right?
A Correct.
Q Now, under the capital plan, Centereach was to contribute a direct capital contribution of $2 million per year?
A Was to receive?
Q I'm sorry, Syosset was to provide a direct capital

Page 3891

contribution?
A Yes.
Q And the total contributions that Syosset was to make to Centereach totaled $81 million over the term of the capital period; right?
A That's correct.
Q I think you had testified before that Centereach's capital plan didn't show it coming into capital compliance by the end of 1994?
A That's right.
Q Was this a rare exception that Centereach received?
A I think it was the only exception to all of the capital plans that OTS reviewed.
Q What was your recommendation with respect to approval of the second capital plan submitted by Centereach?
A I concurred with the New York district office's approval recommendation.
Q If you could turn to the document behind tab 3 of your binder. This is a letter from you to John Stone at the FDIC dated April 23, 1991; is that right?
A Yes.
Q And in this letter, you're discussing the approval of the -- of Centereach's capital plan?
A Yes.

Page 3892

Q Was this letter written in the scope of your role as head of concurrent review of capital plans?
A Yes, it was. But I should point out that the FDIC had no involvement in the capital plan process. This was done just because the FDIC is the insurer of accounts, and that John Stone, myself, among other supervisors, held informal meetings, even breakfast meetings, to discuss certain issues, not only thrifts but also banks.
Q My question was just was this written in the scope of your employment as the head of concurrent review of capital plans for OTS.
A Well, yes. But I just wanted to point out that the FDIC had no involvement in that process.
MR. LEBLANC: Your Honor, at this time we would offer Plaintiffs' Exhibit 230 into evidence.
MR. INFELISE: No objection.
THE COURT: Admitted.
(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 230, was received in evidence.)
BY MR. LEBLANC:
Q I think you had testified to this earlier with Mr. Infelise, but the measure of whether a thrift would be

Page 3893

released from a capital plan was simply based on whether they came into capital compliance standards; correct?
A That's correct.
Q Is it fair to say that OTS wanted thrifts to come into compliance sooner rather than later?
A Yes.
Q You talked about the con -- with respect to the consolidation issue, you described the distinction between the two institutions as illusory on your direct examination?
A Yes.
Q Is that the term you used?
A "Illusory" or merely a bookkeeping entry.
Q Now, you're saying this as a layperson, right, not in any legal sense?
A That is correct.
Q And it's true, is it not, that you're not suggesting that they were not legally separate entities?
A That is correct.
Q And you're not suggesting that they didn't respect all the legal requirements of being separate entities; correct?
A That is correct.
Q It's true, is it not, that there are many legal requirements beyond a mere bookkeeping entry to maintain a legal separation; right?

Page 3894

A Legal as well as accounting, yes.
Q Now, as of September 30, 1990, Centereach had approximately $477.5 million worth of goodwill on its books; is that correct?
A Okay. I – that sounds about right, yes.
Q That sounds about right? Okay. As a result of FIRREA, Centereach lost the ability to count supervisory goodwill as regulatory capital; true?
A True.
Q If Centereach's goodwill were counted as an asset for regulatory capital purposes, Centereach would have met all applicable requirements throughout the period of time you were considering their capital plan; isn't that right?
A I believe so, yes.
Q Not withstanding that Centereach lost $477.5 million in regulatory capital as a result of FIRREA, the government did not infuse any money into Centereach under the capital plan, did it?
A No, it did not.
Q The government, in fact, never offered to make any capital infusion to replace any part of the goodwill eliminated by FIRREA.
A I would agree to that. I don't think any offer was made.
MR. LEBLANC: That's all we have, your Honor, at

Page 3895

this time.
THE COURT: Thank you, Mr. Leblanc.
Mr. Inlelise, redirect?
MR. INFELISE: Yes, your Honor.
REDIRECT EXAMINATION
BY MR. INFELISE:
Q Mr. Caton, looking at the black binder that Mr. Leblanc gave you, specifically it was tab 3, PX 230. Do you have that in front of you, sir?
A Yes, I do.
Q I would like to direct your attention to the second paragraph where you state "we wish there was a plethora of capital available in the market for thrifts such as Long Island. Lacking such available capital at this time, we believe the conservative operations outlined in Long Island's capital plan present very little risk to the insurance fund."
I recall you testifying, sir, during my questioning that you believe that Long Island could have converted back in 1991?
A Yes.
MR. LEBLANC: Objection, your Honor; leading.
MR. INFELISE: Merely attempting to set a foundation, your Honor, a frame of reference for the next question.

Page 3896

THE COURT: All right. I'll allow that.
MR. INFELISE: Thank you, your Honor.
THE COURT: Overruled.
BY MR. INFELISE:
Q With respect to that statement, Mr. Caton, what, if anything, did you intend to convey to FDIC with this second paragraph concerning whether or not you believed Long Island could convert?
A Well, I'd like to reiterate that we – that the FDIC had no part of this capital plan approval process. This was part of just letting John Stone know, because we had informally talked about different cases, both bank cases and thrift cases. And Long Island Savings Bank was one thrift that we had discussed, just on an informal basis, because of its unique – its uniqueness. This was letting John know that yes, we did approve the capital plan of Long Island Savings Bank and that we, not – that capital was available in the capital markets for undercapitalized thrifts, and like anything, it's limited. We would have rather seen capital being funneled to more risky cases and more cases that we did not have the confidence in. And we were comfortable in letting Long Island operate as it was, without immediately coming into capital compliance. We were comfortable letting them just go along and operating as they were.

Page 3897

So this was just letting John know that yes, we wished that every undercapitalized thrift could have raised capital immediately, but we had to prioritize our cases. Long Island Savings Bank was one of those cases we had confidence in, because of its conservative operations, its low risk, its ability to generate earnings, its good franchise value, its good management. We had confidence that they would cause the insurance fund no harm by letting them not immediately come into capital compliance.
Q What did this second paragraph indicate with respect to the ability of Long Island to convert if it wished to do so?
A I thought that Long Island Savings Bank was one of the stronger institutions that we were looking at through this capital plan process, that it would have had a much easier time than many other thrifts we saw in the capital markets who were actually – and actually raised money during that time frame. Long Island had, like I said, a much better asset quality. It was well-managed. It was making money, had a good franchise value, all came into play, and all differentiated Long Island from thrifts who were actually making – or raising money in the capital markets during that time frame.
So Long Island certainly could have – just judging from what we were seeing, Long Island could have

Page 3898

raised capital in the capital markets, but it would have siphoned money off of more needy cases during that time frame.

MR. INFELISE: I see, thank you. No further questions, your Honor.

THE COURT: Mr. Leblanc, do you have anything further?

MR. LEBLANC: May I have one moment, your Honor?

THE COURT: Yes, certainly.

MR. LEBLANC: Nothing further, your Honor.

THE COURT: Mr. Caton, happily, I can excuse you.

THE WITNESS: Thank you so much.

THE COURT: Just a moment. It's a small catch, but only small. I am about to give you a cautionary instruction, and if I read it, I think you will understand, I think you will understand the basis for it. If you've got any questions after I read it, please ask me about it.

THE WITNESS: Okay.

THE COURT: Thank you. This all relates to a provision in the Federal Rules of Evidence. The parties have requested, as they are entitled to under Federal Rule of Evidence 615, and as you know from not having been present in the courtroom during the testimony of any other witness, that witnesses be excluded from the courtroom

Page 3899

during the testimony of others so that each witness can give his or her testimony fresh, without being distracted by others' testimony.

My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness. You may obviously talk with your friends, family, colleagues, if they're not witnesses. But not witnesses.

THE WITNESS: I don't think they will be interested, your Honor, in Long Island Savings Bank and the capital plan process.

THE COURT: What's that?

THE WITNESS: I don't think they will be interested in the capital plan process.

THE COURT: Well, they might. But if you have any questions about who may be a witness, you may ask counsel or you may ask me.

THE WITNESS: Okay.

THE COURT: All right. Thank you.

THE WITNESS: Thank you.

THE COURT: Thank you for coming in today, and thank you for testifying. It's appreciated.

THE WITNESS: Certainly. No problem.

(Witness excused.)

Page 3900

MR. MADDEN: Yes, your Honor. The next witness on our agenda is Mr. Conway, which we are going to show by video. That's about a three hour and some minute video. So we could get started on it. There are some procedural issues we need to address before we do that. The sole objection that we have, as far as I know of, and I don't know whether Plaintiffs have objections to the testimony that we want to show, has to do with part of the video where I ask Mr. Conway questions about a declaration he had given, and it was included in some motion that was filed in District Court. And I asked him some questions about that. We are opposed to that being shown or that declaration being used because it's hearsay under the rules. It's not a business record. That would be an exception. But it's not a business record. It is an out-of-court statement offered for the truth, and it's hearsay. So that is the one issue we need to resolve at this point. That is at his deposition, page 224, line 21, through 230, line 14.

THE COURT: You were examining Mr. Conway about that, Mr. Madden?

MR. MADDEN: I asked him questions about a declaration he had filed – he had prepared and signed. He said he didn't write it, but he had signed it. But nevertheless, it's an out-of-court statement, which is

Page 3901

hearsay. And the rule is, hearsay is a statement other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. So I think it would qualify.

THE COURT: Well, the statement itself might qualify as hearsay – the declaration itself, as filed in District Court, certainly would be hearsay, but your examination about it would not be, would it?

MR. MADDEN: Well, the questions and answers wouldn't be. But it's based on what he said, and there's reading of what the declaration says, I'm asking "what did you mean by that." I mean, it's all – that itself –

THE COURT: But that's not hearsay.

MR. MADDEN: Right. That's – it's a mixed problem, your Honor. It's not the question and answers I'm concerned about. It's the declaration itself.

THE COURT: Mr. Cohen?

MR. COHEN: I agree with your Honor's assessment. I think that the declaration itself would not be received into evidence, but the question what did you mean when you say this, is not hearsay.

THE COURT: Or whether he was telling the truth or anything else. It's just like using a document to ask him, does this refresh your recollection, you know, did you tell the truth and so on and so forth.