# EXHIBIT 6

**Long Island Savings Bank v. U.S. No. 92-517 March 15, 2005**

**Heritage Reporting Corporation**

**Page 4326 to Page 4581**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 4406

THE COURT: Thank you for appearing and testifying over the last several days.

THE WITNESS: You're welcome. Thank you.

(Witness excused.)

THE COURT: Ms. Evans, do you have the next witness?

MS. EVANS: I do, your Honor. Government calls Angelo Vigna. He's out in the hallway and will be here in a moment.

THE COURT: Thank you. Who will be handling this witness? Mr. Wallace.

Mr. Vigna, will you please take a post behind the court reporter and raise your right hand, please.

Whereupon,

ANGELO VIGNA

was called as a witness and, having first been duly sworn, was examined and testified as follows:

THE COURT: Please take a seat in the witness stand and make yourself comfortable. Once you've made yourself comfortable, would you please state your full name for the record.

THE WITNESS: Good morning. My name is Angelo A. Vigna. That's V-i-g-n-a.

THE COURT: Ms. Evans, you may proceed.

MS. EVANS: Thank you, your Honor.

Page 4407

DIRECT EXAMINATION

BY MS. EVANS:

Q Good morning, Mr. Vigna. Where do you reside?

A I reside in Montclair, New Jersey.

Q What degrees do you hold?

A I have a BS degree in accounting from St. Peters College and a savings and loan graduate degree from Indiana University.

Q What's your occupation?

A Currently employed with Sandler O'Neill and partners, an investment banking firm in New York City.

Q And what's your position there?

A Managing director.

Q How long have you worked there?

A Since 1996.

Q And please describe your employment history after college going forward, listing each – approximately each year and what you did, where you worked.

A I joined the Federal Deposit Insurance Corporation in February of 1964 and worked with them for four years as a field examiner. In 1968, I joined the Federal Home Loan Bank of New York as a supervisory analyst and was with the bank from '68 to 2000, and rose up through the ranks. When I left, I was the senior executive vice president and the director of agency functions for the bank.

Page 4408

In 2000, I transferred, moved over to the Office of Thrift Supervision initially as district director, and after we consolidated districts, I was the Northeast regional director, having regulatory responsibilities for the Northeast segment of the country, all of New England, New Jersey, Pennsylvania, Delaware and West Virginia. I left OTS in 1996 to join Sandler O'Neill and partners as managing director, which is where I am today.

Q And what position did you hold in the time period of 1989 to 1994?

A '89, with the creation of FIRREA, I went from being the senior executive vice president and director of agency functions at the Federal Home Loan Bank of New York to regional director for the Office of Thrift Supervision.

Q Thank you. Do you have any accounting certifications?

A No.

Q And describe your responsibilities during the period of time that you were a supervisory agent.

A I was – well, as supervisory agent, I was designated that back in the '70s. But I think the time period that you're referring to –

Q Right.

A – I was primarily responsible for the day-to-day operations of the regulatory responsibilities of the Federal

Page 4409

Home Loan Bank of New York, which covered at that time the district, which was the states of New York, New Jersey, the commonwealth of Puerto Rico and the Virgin Islands.

Q And during that period of time, the '89 to '94 time period, who was your immediate supervisor?

A My immediate supervisor was Bryce Currie, who was the president of the Federal Home Loan Bank of New York. But in terms of my regulatory responsibilities, I would report in to Mr. Ed O'Connell in Washington, who was the – I guess he was a regional director out of first the Federal Home Loan Bank Board and then OTS.

Q Have you spoken to anyone about this case or any related matter since you left your position with the government?

A None, except the people from the Department of Justice.

Q And did you supervise Syosset and Centereach in the period of 1989 to 1994?

A I did.

Q And did you have ongoing responsibilities to review their capital position during that period of time?

A Yes, I did.

Q Did you have a staff to assist you in dealing with these issues?

A I did.

Page 4410

Q And for purposes of my questions today, I'll be referring to Long Island when I mean Syosset and Centereach, the two institutions.
At some point, did Long Island fall out of capital compliance?
A Yes.
Q And what does that mean generally, to be out of capital compliance?
A That means that their regulatory capital was less than required levels by regulation.
Q Did Long Island file a capital plan?
A Yes, they did.
Q And tell us generally what a capital plan is.
A A capital plan is essentially a plan submitted by a capital deficient institution which demonstrates how and over what period they will come into compliance with the regulatory requirements.
Q And we're going to take a look at a document I think that you have in a binder. I'm not sure if they have been handed out. We'll hand those out now. We're going to be looking at PX 198. PX 198 is dated February 23, 1990. It's written to Mr. Conway, signed "very truly yours, Angelo A. Vigna."
Take a moment and look at that, Mr. Vigna. Have you seen this before?

Page 4411

A Yes.
Q And do you believe that you drafted it?
A I believe I signed it. One of staff might have drafted it for me.
Q So you recognize your signature?
A Yes, I do.
Q And tell us what this is.
A It is a request from Long Island Savings Bank by its CEO – a request that the bank not be considered subject to – not be subject to greater restrictions because of their net worth capital failure.
Q And that's your response?
A Yes, basically we're saying we're not going to subject them to additional restrictions.
Q And looking at the second paragraph, it says "during the period in which your capital plan is under review," and continues on, referring to the level of net interest credited.
Do you recall whether, in fact, you allowed them to do what's stated in this paragraph, to grow to net interest credited – to the level of net interest credited?
A We did.
Q Let's turn to another document, which is DX 317 in your binder. DX 317, for the record, says "internal memorandum" on the top, dated May 1, 1990. It says it's

Page 4412

from Ruth Ann Popielarski?
A Yes.
Q And Mr. Vigna, have you seen this document before?
A Yes.
Q Do you know whether you would have received this in the normal course of your work?
A I would have.
Q And who is Ruth Ann Popielarski?
A Ruth Ann worked for OTS. She was a – I guess she was at that time an analyst.
Q And looking at the document, there are some names on the first page, OTS/New York, and then underneath it, "the Long Island Savings Bank." Obviously, the first name is yours. Do you recognize the other names? Obviously, Ms. Popielarski is there.
A Yes.
Q And there's a reference in the first paragraph, it says "on Friday, April 27, 1990, a meeting was held at the OTS New York." Do you believe that you attended that meeting?
A Yes.
Q Were memos such as these routinely prepared in the normal course of business by the OTS?
A Yes.
Q Was it OTS's policy to keep these memos in their

Page 4413

files in the normal course of business?
A Yes.
MS. EVANS: Your Honor, I'd like to move DX 317 into evidence.
MR. WALLACE: We have no objection, your Honor.
THE COURT: Admitted.
(The document referred to, previously identified as Defendant's Exhibit No. DX 317, was received in evidence.)
MS. EVANS: And your Honor, I realize I neglected to move the previous document, PX 198 into evidence, so I'd like to do that now.
THE COURT: Mr. Wallace?
MR. WALLACE: We have no objection to that either.
THE COURT: Admitted.
(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 198, was received in evidence.)
BY MS. EVANS:
Q Was there an issue with respect to Long Island about consolidation?

Page 4414

A Yes.
Q And what was that in general?
A The people at Long Island, they wanted to keep the two institutions separate, particularly subsequent to the passage of FIRREA. And from a regulatory standpoint, our preference would have been to have them consolidated.
Q And turn to the second page of this document. We're going to look at the third paragraph from the bottom which begins with "the representative of LISB closed the meeting by reiterating the point that it has been to the benefit of the deposit insurance fund," et cetera. And it refers to at the end of the sentence not causing Syosset and Centereach to consolidate.
Did the regulators force Syosset and Centereach to consolidate?
A No.
Q Let's – did they eventually consolidate?
A Yes, they did.
Q Let's turn to PX 212. PX 212 has previously been admitted. It's a one-page document dated August 24, 1990, written to Mr. Viklund, signed "very truly yours, Angelo A. Vigna."
Mr. Vigna, do you recognize your signature?
A Yes, I do.
Q And do you believe this was something that you

Page 4415

drafted?
A Yes.
Q And there's a bcc at the bottom. Who is Mr. Albanese?
A Mr. Albanese was a senior member of the OTS staff in the Northeast region.
Q And does this indicate that you didn't require them to consolidate?
A Yes.
Q Let's turn to another document, which is DX 1571, which is also previously admitted. DX 1571 is dated May 22, 1991. It's written on OTS letterhead, sent to the board of directors of Long Island Savings Bank.
THE COURT: Ms. Evans, would you give me just a moment to catch up with my notes?
MS. EVANS: Certainly. I was just identifying. I wasn't going to start yet.
THE COURT: Thank you.
BY MS. EVANS:
Q Mr. Vigna, have you seen DX 1571 before?
A Yes.
Q And what is this?
A This is the conditional approval of the bank's capital plan.
Q Is that your signature on the second page?

Page 4416

A Yes, it is.
Q And do you recognize the names on the bcc list after your signature?
A Yes.
Q And do you recall whether or not the capital plan was, in fact, condition approved as described here?
A It was.
Q Let's now take a look at another document that looks like –
THE COURT: Now just a moment.
MS. EVANS: I'm sorry.
THE COURT: I'm sorry, Ms. Evans. I'm just not as fast as you.
MS. EVANS: I'm going a little faster than usual, I think, actually.
THE COURT: I have a little trouble keeping up with you. Thank you.
BY MS. EVANS:
Q We'll look at another document that looks like it's related, which is DX 387:DX 387 has also previously been admitted. DX 387 is dated later. It's dated October 30, 1991 on OTS letterhead to the board of directors. It says "re: conditional approval of capital plan." Have you seen this before, Mr. Vigna?
A Yes.

Page 4417

Q And tell us what this is.
A Again, this is the conditional approval, I guess, of a revised – further revised capital plan.
Q And the first paragraph refers to "the capital plan submitted," refers to various dates, October, revised December. It has other dates. Is it your recollection that there were revised capital plans that were, in fact, submitted consistent with this letter?
A Yes.
Q And is that your signature towards the back on page 17 at the top, internal page numbers at the top, LIP 040485?
A Yes, it is.
Q And do you recall the nature of any of the revisions in the capital plan?
A I don't recall what they were.
Q Turn to page 2 in the front of the document and let's look at the paragraph beginning with "approval of an exemption pursuant to Section 5(t)(7)(B), and within that paragraph, it says "as long as the association abides by its capital plan and the terms of this letter, a capital directive will not be sought by the OTS." What does that mean?
A Essentially what it says. As long as the bank operates in accordance with its capital plan, OTS will not

Page 4418

seek to issue a capital directive.
Q And what is a capital directive?
A A capital directive would be an order to the bank to take certain actions consistent with achieving compliance with capital requirements.
Q And did Long Island comply with its capital plan while it was in effect?
A My recollection is that it did.
Q We're finished with that document. Mr. Vigna, at some point, did Long Island become critically undercapitalized?
A Yes.
Q And tell us what critically undercapitalized means, as the term was used in the '80s and '90s.
A My recollection is that any institution that fell below a certain level of capital was critically capitalized. There are different levels of undercapitalized and critically undercapitalized was the most severe.
Q Let's turn to another document in your binder, which is PX 293. PX 293 has previously been admitted. PX 293 is a three-page document dated December 22, 1992, written on OTS letterhead to the board members of Long Island SB of Centereach, FSB. And have you seen this before, Mr. Vigna?
A Yes, I have.

Page 4419

Q And is that your signature on the second page?
A Yes, it is.
Q And looking at the second page, there are some cc names. Can you tell us what those are?
A Mr. Albanese is the – at the time was regional deputy director of OTS, and Mr. Ketcha was the regional director for the Federal Deposit Insurance Corporation.
Q And the first page of this refers to "Prompt Corrective Action (PCA)" provisions. Are you familiar with those provisions?
A Yes.
Q And tell us what those were generally.
A Generally, institutions that fell below the capital requirements were subject to certain prescribed operating conditions while they were in noncompliance.
Q And turning to page 2 of the document, the first full paragraph beginning with "a savings association," take a look at that first sentence. It refers to those being operating under a capital plan approved before December 19, 1991 being exempt from certain PCA restrictions. Generally tell us what that means.
A Basically, what it means is what it says, is that if you had an approved capital plan, some or most of the normal restrictions that are imposed for noncompliance are waived.

Page 4420

Q And looking at the next page, the page after that, the third page, there's some handwriting at the top. Is that your writing?
A No.
Q It says "grandfathered." Do you know what that means?
A In the context with this letter, I can only guess it means that the bank is grandfathered from the number of the PCA corrective actions.
Q Did you ever tell anyone associated with Long Island that you or other regulators might terminate their plan?
MR. WALLACE: Objection; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Did – Mr. Vigna, did you talk with anyone associated with Long Island about the status of their plan?
A I don't recall any such conversations.
MS. EVANS: Just a moment, your Honor?
THE COURT: Yes.
BY MS. EVANS:
Q Would the OTS have taken any action if Long Island fell out of compliance with its approved capital plan?
A Could have, yes.
Q And would it have put it into receivership under

Page 4421

any circumstances?
MR. WALLACE: Objection; leading.
THE COURT: Sustained.
BY MS. EVANS:
Q Tell us what actions it could have taken.
A Well, full range of actions, depending upon the severity of the noncompliance with the capital plan.
Q And we have been looking at PX 293, which is dated December 22, 1992. Did Long Island come into capital compliance at some point after this?
A Yes, it did.
Q Let's take a look at another document, PX 332. PX 332 is dated December 3, 1993, and it's also an admitted document, written on OTS letterhead to the board of directors, signed "very truly yours, Angelo A. Vigna, Regional Director."
Mr. Vigna, do you recognize this document?
A Yes, I do.
Q And what is this?
A This is notification to the board of directors of Long Island Savings Bank that they were now in capital compliance and were no longer subject to any of the restrictions of their capital plan or prompt corrective action.
Q And the first paragraph indicates, it says that

Page 4422

"the conditional approval of the capital plan is hereby terminated." What did that mean for Long Island?

A It meant that they were able to operate free of any restrictions imposed by reason of the capital plan.

Q Do you recall whether or not anyone associated with Long Island ever asked you whether they could merge the two institutions and come into capital compliance during the capital plan period?

A I don't recall if they did or not.

Q If you had received a request to merge the institutions and bring them into capital compliance prior to September 3, 1993, would you have granted that or not?

MR. WALLACE: Objection, your Honor; he's asked for speculation.

MS. EVANS: Your Honor, I don't really think it's speculation. Mr. Vigna is certainly qualified to testify as to his views on the capital plan and what Long Island could or could not do during that plan.

MR. WALLACE: Your Honor, the attorney is asking the witness to speculate on what he would have done if a request was made or not made that he doesn't recall whether it was made. Clearly asks him to speculate what he would have done. He doesn't even recall whether the request was made.

MS. EVANS: I'm not sure whether the request was

Page 4423

made should be relevant to him answering the question.

THE COURT: The way the question is asked, it does call for speculation. There are a set of questions you could ask Mr. Vigna, Ms. Evans, that would provide a predicate for an appropriate answer.

BY MS. EVANS:

Q Mr. Vigna, under what circumstances may you have released Long Island from the capital plan?

A Achieving capital compliance.

Q And what things could they have done to achieve capital compliance?

A I believe they could have -- they could have consolidated both institutions.

Q Did you ever contact anyone from Long Island or their counsel and threaten to seize Long Island?

MR. WALLACE: Leading, your Honor; objection.

MS. EVANS: Your Honor, I don't think it's a leading question. It doesn't suggest an answer.

THE COURT: Well, it is, but I guess if I had to, I would sustain the objection on the ground that it's vague. Do you see what I'm driving at? You said Long Island, and I don't know if that's really what you mean.

MS. EVANS: Yes. Probably – Centereach would be more accurate. Shall I –

THE COURT: You ought not to ask a leading

Page 4424

question, Ms. Evans.

BY MS. EVANS:

Q Yes. Mr. Vigna, do you recall having conversations with anyone from Centereach about the capital plan?

A I'm sure I had discussions with them about the capital plan. I, at this point in time, can't specifically recall any particular conversation.

Q In any of those conversations, was there any discussions of seizing Centereach?

MR. WALLACE: I'm going to object, your Honor. It's leading and lacks foundation. He just testified, he doesn't remember the conversations.

THE COURT: I really should sustain that objection, but –

MS. EVANS: Yes, I think he said – I don't have it in front of me, but he said that he believes he did have conversations, which is different than –

THE COURT: Yes, but he can't recall any particular conversation. I guess –

BY MS. EVANS:

Q Mr. Vigna, did – are there any circumstances under which you believe that regulators would have seized Centereach during the period of 1989 up to 1994?

A Not as long as they were in compliance with their

Page 4425

capital plan.

Q If there were some technical noncompliance with the capital plan, would you have taken any action?

MR. WALLACE: Objection, your Honor; vague, ambiguous.

THE COURT: It is, but nonetheless, I'm going to overrule the objection and allow Mr. Vigna to answer. Will you please answer, given any caveats that you might want to put on your answer. I don't know exactly what's meant by "technical noncompliance."

THE WITNESS: Could you just read that question back to me, please?

(The reporter read the record as requested.)

THE WITNESS: Probably – I mean, certainly not – we certainly wouldn't seize the institution for a technical violation, but, you know, we would certainly try and, at that point, work with the institution to correct whatever the violation was. But seizure wouldn't be – you know, as long as they were, from a financial standpoint, complying with the conditions and the terms of their capital plan, that wouldn't – that wouldn't constitute a reason to seize the institution.

MS. EVANS: Thank you.

Just a moment, your Honor; just a brief pause.

BY MS. EVANS:

Page 4426

Q . You testified just a moment ago briefly about the possibility of taking some action by the OTS if there was noncompliance with the capital plan. Would you have been able to put it into receivership?

MR. WALLACE: Objection, your Honor; leading.

THE COURT: Well, I don't know the difference between seizing an institution and putting it into receivership. But there might be one. There's got to be a more artful way, Ms. Evans, for you to ask the question.

MS. EVANS: Let me just –

BY MS. EVANS:

Q Where would putting Centereach into receivership fit in the list of actions OTS may have taken for noncompliance with the approved capital plan?

A That would be the most severe action you could take.

Q Did Long Island convert from a mutual to stock form?

A Yes, they did.

Q Do you recall when that occurred?

A I believe that was 1994-95 period.

Q And Mr. Vigna, do you have an opinion as to whether or not Long Island would have converted to stock form absent FIRREA?

MR. WALLACE: Object, your Honor. I think she's

Page 4427

asking for an expert opinion. The witness is here as a fact witness. Otherwise, she's asking the witness to speculate.

MS. EVANS: Your Honor, I don't believe it calls for an expert opinion. Certainly, Mr. Vigna is well-qualified and was constantly monitoring Long Island and is certainly well-qualified to talk about actions that he believed they would take and things going on in the industry.

THE COURT: Well, one of the small problems that we have in evaluating that question, Ms. Evans and Mr. Wallace, is that we don't know the extent to which Mr. Vigna was familiar with the details of Long Island Savings Bank's operation. I'm going to use "Long Island Savings Bank's operation," because by this point, I guess, it was a consolidated institution.

I'm nonetheless going to overrule the objection, but I ask Mr. Vigna if you would testify as to your own personal knowledge. And then if you've got a view, will you please state the bases for any view you might have.

THE WITNESS: My view would be that they would have converted, regardless of FIRREA. Most of their competitors in New York metropolitan area and Long Island converted. Conversion would have given them certainly more flexibility, in terms of acquisitions. I think that they certainly had further designs or wanted to make themselves

Page 4428

available to be an acquirer. And as a public company, then they could offer stock, rather than as a mutual, all they could offer was cash. There are points in time where cash – stock and a combination are more attractive to sellers.

Also, you know, and I think they wanted to create or to set up stock-based incentive plans for their management and board, and I think for those reasons, it's my judgment that they would have converted, regardless of the impact of FIRREA.

MS. EVANS: Your Honor, this may be a good time to take a break and we can come back and continue with Mr. Vigna, since we're past our normal lunchtime. We'll probably continue for about 15 minutes after that, or 20.

THE COURT: Mr. Wallace?

MR. WALLACE: We have no objection, your Honor.

THE COURT: Mr. Vigna, if we take a luncheon break, will that be satisfactory to you?

THE WITNESS: I have no objection, your Honor. Thank you.

THE COURT: All right, thank you. We'll take a one-hour luncheon recess at this time.

(Whereupon, at 12:32 p.m., the hearing was recessed, to be reconvened at 1:32 p.m. this same day.)

Page 4429

AFTERNOON SESSION (1:33 p.m.)

Whereupon,

ANGELO J. VIGNA

resumed the stand and, having been previously duly sworn, was examined and testified further as follows:

THE CLERK: All rise. The Court is again in session.

THE COURT: Please be seated. Ms. Evans, you may proceed.

MS. EVANS: Thank you, your Honor.

DIRECT EXAMINATION (Continued)

BY MS. EVANS:

Q Mr. Vigna, turn to – in your binder to DX 1841. DX 1841 is dated at the top January 21, 1994 from David A. Permut to Angelo J. Vigna, Douglas J. Cestone and there's some cc's. Mr. Vigna, have you seen this before?

A Yes, I have.

Q Do you believe that this is a document you had received?

A Yes.

Q Would you have reviewed this in the ordinary course of your work?

A Yes, I would.

Q Would the OTS have maintained this in the ordinary course of their business?

Page 4430

A Yes.
MS. EVANS: Your Honor, I would like to move DX 1841 into evidence.
MR. WALLACE: We will not have an objection ultimately, but there's been no foundation for it, I don't think.
MS. EVANS: I'll ask Mr. Vigna a few more questions about it, your Honor.
THE COURT: Thank you.
MS. EVANS: I have a few more questions.
BY MS. EVANS:
Q Mr. Vigna, this is written also to Douglas J. Cestone. Who is Mr. Cestone?
A Mr. Cestone was a staff member at the OTS regional office, and I believe at the time he managed our applications and corporate activities group.
Q And who was David A. Permut?
A David Permut was a lawyer in Washington in the business transactions division.
Q There's two cc names. Do you recognize those?
A Yes.
Q Who were they?
A Mr. Comizio at the time managed the business transactions group in Washington, and J. Larry Fleck was a senior staff member in business transactions.

Page 4431

Q And tell us what this is.
A This is an information memorandum concerning – or discussing the maximum amount of benefit plans that Long Island Savings Bank could establish as part of their conversion.
MS. EVANS: Your Honor, I would like to move it into evidence at this point.
MR. WALLACE: We have no objection, your Honor.
THE COURT: Admitted.
(The document referred to, previously identified as Defendant's Exhibit No. DX 1841, was received in evidence.)
BY MS. EVANS:
Q Mr. Vigna, looking at the first paragraph, second sentence, it begins "since LISB has 5.3 percent tangible capital going into the conversion, they would be eligible for 3 percent for their MRP and 7 percent for their ESOP" Is it your recollection that that's what the situation was at the time?
A Yes.
Q Mr. Vigna, you previously testified looking at the transcript page 103, earlier today you testified you thought Long Island wanted to create or set up stock-based incentive

Page 4432

plans for their management and boards. Did Long Island in fact submit a stock plan for approval by the regulators.
A Yes.
Q What do you recall about the structure of that plan they submitted?
A With regard to – you're talking about the benefit plans?
Q Yes.
A The original submission indicated that, in fact, the board of directors would receive 70 percent of the benefit plans and management 30 percent, which I found to be unacceptable, I so advised them, and they revised the benefit plans, as I recall, basically flipped the percentages, 70 percent to management and 30 percent to the board.
Q And was that structure followed throughout the OTS?
A Well, I guess it subsequently became the standard and eventually was incorporated into the regulations.
Q Let's take a look at a document that I think you have in your binder but I think we're going to hand it out, which is DX 958. I think you might have it inside the front flap of your binder. Do you have it there?
A Okay.
Q Before we do that, let's take one or two more

Page 4433

questions about DX 1841, so put DX 958 aside for a moment. Looking at the third sentence of DX 1841, it begins with "we have allowed 4 and 8 percent when the institution had 10 percent tangible capital" and continuing on. Read that sentence.
(Witness reviewed the document.)
Was there a significance to Long Island reaching 8 percent tangible capital
A Yes, they could then increase the size of the benefit plans.
Q Let's go ahead and turn to DX 958. And Mr. Vigna, have you seen DX 958 before?
A Yes.
Q And what is this?
A It's a thrift bulletin, providing guidelines for institutions filing capital plans and for exemptions and exceptions to those capital plans.
Q Is this a document that you used in your work?
A Yes.
Q And turn to the last page. There's a signature, Darrel, how do you say that, Dochow?
A Dochow.
Q Who was that?
A Mr. Dochow was at that time senior deputy director for supervisory operations in Washington, D.C.

Page 4434

Q And was DX 958 distributed?
A Yes, it was probably sent out at least to all capital-deficient institutions and possibly to all institutions.
Q And was this document kept by OTS in the normal course of business?
A Yes.
MS. EVANS: Your Honor, I'd like to move DX 958 into evidence.
MR. WALLACE: Your Honor, I think you can take judicial notice of it.
THE COURT: Well, just to be on the safe side, I'll do with this one what I did previously with the staff accounting bulletin. It's admitted as an exception to the hearsay rule under 803.8.
(The document referred to, previously identified as Defendant's Exhibit No. DX 958, was received in evidence.)
MS. EVANS: Thank you, your Honor.
BY MS. EVANS:
Q You can put that aside. Mr. Vigna. Did you know Mr. Conway when you worked for the OTS?
A Yes, I did.

Page 4435

Q And who was he?
A Mr. Conway was chairman and CEO of Long Island Savings Bank.
Q And did you have dealings with him in your supervision of Long Island Savings Bank?
A Yes, I did.
Q Did your office conduct an investigation of the activities of Mr. Conway?
A Yes.
Q What was the nature of the investigation?
A It was a review of his relationship to a law firm in which he purported to have a minority interest when, in fact, he was – he had a significant interest and most of the proceeds from the law firm were, in effect, going to his account.
Q And how did this come to your attention?
A As I recall, it came through a – there was a publication, a law publication which presented a case in which a CEO had hired some attorneys to review some – a firm working for the institution as, in effect, the lawyers discover that, in fact, this CEO had a significant relationship with the firm. In looking at it, it appeared that it might be – the firm might be – at least the bank might be Long Island Savings Bank. And we commenced an enforcement review of

Page 4436

those transactions.
Q And what was the result of the enforcement review?
A The review disclosed – it was done in conjunction with the U.S. Attorney's office – that, in fact, Mr. Conway had a material interest in the law firm and that he had failed to disclose that interest and, in fact, had violated the OTS conflict of interest rules and had also engaged in unsafe and unsound practice.
Q And let's take a look at a document in your binder, DX 1858. DX 1858 is dated February 24, 1994, "United States of America, before the Office of Thrift Supervision, Department of the Treasury, in the matter of James J. Conway, Sr.," it says "consent order of prohibition and consent cease and desist order requiring restitution and other affirmative action." Do you recognize this document?
A Yes.
Q And what is this?
A It is essentially what it says. It's a consent order of prohibition prohibiting Mr. Conway from ever engaging – being involved in any insured financial institution. Also, it was his consent to the issuance of a cease and desist order requiring restitution, and I guess there was some other affirmative action that's also involved here too.

Page 4437

Q And turn to page 4. Is that your signature?
A Yes, it is.
MS. EVANS: Your Honor, I'd like to move DX 1858 into evidence.
MR. WALLACE: Your Honor, we may have a relevancy objection. I'd like to ask the Court to reserve on it until cross-examination is complete.
MS. EVANS: Your Honor, the Government's position is that this goes to motivations of the bank, as Mr. Conway was running the bank, and activities that the bank took at various points in time. We believe – related to Mr. Conway's wrongdoing and perhaps the need to cover up certain things.
THE COURT: Well, I don't have any problem with the idea of putting this in, but I don't see any counterpart signature on the part of Mr. Conway.
MS. EVANS: I'm not sure if he ever – this is the only document that I have. Let me confer with Mr. Madden. Mr. Vigna may know what the procedure was.
THE COURT: Ms. Evans, that's why I'm raising it now. I was just trying to figure out whether this is a document that required Mr. Conway's signature. And I can't tell, to be honest about it.
BY MS. EVANS:
Q Mr. Vigna, did this document require Mr. Conway's

Page 4438

signature?
A Apparently not. There's no provision here for his signature. But I think there has to be some acceptance, acknowledgment of his consent.
Q And did he consent to this?
A I believe so.
Q Do you know whether there was – do you have a specific recollection if there was another document that he signed?
A I don't recall.
MS. EVANS: We would still like to move this into evidence. It appears that it didn't require this particular document. There may be something else that he signed that we don't have.
THE COURT: I'm sorry, Mr. Wallace?
MR. WALLACE: I didn't want to interrupt the Court. You can speak first, if you like.
THE COURT: I have a small problem. I don't have any doubt that Mr. Conway was sanctioned, but there ought to be something that indicates his acceptance of this. Otherwise, how can we tell whether it was a consent or not, effective against him?
MS. EVANS: Mr. Vigna has knowledge that he consented. That's –
THE COURT: I don't think he's testified to that.

Page 4439

While you've got him on the stand, it might be prudent for you to address these points.
MS. EVANS: Yes. I think I asked.
BY MS. EVANS:
Q But Mr. Vigna, did Mr. Conway consent to this prohibition?
A My recollection is that he did. And, in fact, paid the financial benefit.
Q To your knowledge, Mr. Vigna, Mr. Conway, was he barred from the industry?
MR. WALLACE: Objection; leading, your Honor.
MS. EVANS: Well, the document clearly says that, so I don't think there's any –
THE COURT: Why don't we just ask what the sanctions were and whether they're still in effect to Mr. Vigna's knowledge, a few questions like that that aren't leading questions.
MS. EVANS: Certainly.
BY MS. EVANS:
Q Mr. Vigna, what were the sanctions imposed upon by Mr. Conway by this document?
A First he was prohibited from participating in any manner in the conduct of affairs of Long Island Savings Bank or any other insured financial institution. And secondly, he was imposed a $1.3 million monetary penalty.

Page 4440

THE COURT: Mr. Wallace?
MR. WALLACE: Your Honor, my objection is somewhat technical but I think perhaps somewhat important, given where we are with this document. There's no doubt that something was agreed to. It is not at all clear that this is what was agreed to by Mr. Conway.
Now, I have no trouble with Mr. Vigna, if he, in fact, recalls of his own independent recollection, testifying what the ultimate sanction was. I have no trouble with that at all.
I also have no trouble with respect to this document says whatever it says. But I think he's blending the two, because I think the witness has testified that he does believe that Mr. Conway signed this, as clearly he would have had to, and the one he signed is the one that he agreed to. And he's either testifying as to this or he's testifying as to the one Mr. Conway actually signed. And that's my objection to the question and the answer. I'd move to strike it.
THE COURT: Well, let's ensure that Mr. Vigna is testifying of his own personal knowledge. I mean, this is something that Mr. Vigna might well remember of his own personal knowledge.
MS. EVANS: Yes. That was going to be my question, your Honor.

Page 4441

BY MS. EVANS:
Q Mr. Vigna, the answer you gave regarding Mr. Conway and the sanctions that were imposed upon him, is that based on your own knowledge of the situation?
A That's based on my best recollection of what occurred.
MS. EVANS: I don't have any further questions about this document. Again, I'm not sure that we have as an exhibit any other document. I mean, we can certainly check, but – we can certainly search our records and if we find one, we can substitute. I'm not sure if it will work quite like that. It's a bit unusual.
THE COURT: Well, you might have an addendum to it that could complete it.
MS. EVANS: Yes.
THE COURT: I could ask some questions now that might help, but I'm reluctant to do that, I really am. When I say "help," I mean clarify the situation. I'm going to wait until after Mr. Wallace is done with his cross-examination. Unless you have something further you care to ask now.
BY MS. EVANS:
Q Mr. Vigna, was Mr. Conway required to sign a document independent of this for this to be in effect?
MR. WALLACE: Your Honor, objection. It's

Page 4442

leading.
THE COURT: Well, it is, but on the other hand, it might help us out. I'm actually going to overlook the fact that it's leading, and we'll ask Mr. Vigna to testify in response of his own personal knowledge.
THE WITNESS: My recollection is that, yes, Mr. Conway had to sign some document acknowledging his consent.
BY MS. EVANS:
Q Consent to what's in this document?
A To the issuance of this order.
MS. EVANS: Your Honor, we will look and see if we have another document and get back to the Court. I have no further questions for Mr. Vigna.
THE COURT: Thank you. Mr. Wallace?
MR. WALLACE: Thank you, your Honor.
CROSS-EXAMINATION
BY MR. WALLACE:
Q Good afternoon, Mr. Vigna.
A Good afternoon.
Q I thought we might start in just trying to clarify, if we can, your direct testimony with respect to when you were with the Federal Home Loan Bank Board and when you left and that sort of thing. I think we might have a

Page 4443

confusing transcript, okay?
A Okay.
Q We're going to go back to that if we can. And I'm going to focus very specifically on the testimony you gave on your direct examination, which we've put up there. And I believe you testified that in 1968, you joined the Federal Home Loan Bank Board of New York as a supervisory analyst; is that correct?
A That's correct, yes.
Q Okay. And then the transcript goes on to say that you were with the bank from '68 to 2000; is that correct?
A Yes, that's correct.
Q Okay. And then it says in the next paragraph, in 2000 you transferred over to the OTS. Do you see that?
A Yes.
Q And is that correct?
A Yes, it is.
Q All right. And then the next paragraph it says you left OTS in 1996. Do you see that?
A Yes. I'm sorry, the 2000 is correct. It should be 1990.
Q So you left OTS in 2000?
A No, I left OTS in 1996. But the transfer occurred in '90, 1990.
Q So where it says "in 2000 you moved over to the

Page 4444

OTS," that should say 1990?
A That should say 1990, yes.
Q So if we made that 1990, that would then be correct?
A Yes, it would.
Q Okay. And –
A Sorry, just – you know, it's too many years.
Q I understand.
A Too many miles and too many years.
Q And you left OTS in 2000 or 1996?
A 1996.
Q 1996, all right. I'm hoping we might, from that point, actually walk through now your responsibilities at your various positions which you did briefly on direct examination. I want to do it in a little bit more detail, if we can, okay?
A Sure.
Q All right. I believe your testimony is that you went to the Federal Home Loan Bank Board, and you were with the Federal Home Loan Bank Board now from 1968 until when?
A 1996 – 1990. 1990.
Q 1990.
A And it wasn't the Federal Home Loan Bank Board. It was the Federal Home Loan Bank of New York.
Q All right. And I believe your testimony during

Page 4445

direct examination was that you started as a supervisory agent; is that correct?
A No, as a supervisory analyst.
Q Analyst, I'm sorry. And you worked your way up to senior executive vice president and director of agency functions; correct?
A Correct.
Q All right. Starting as a supervisory analyst, did you have any responsibilities for Long Island Savings Bank?
A No.
Q Did you have any responsibilities for Syosset?
A No.
Q How about Centereach?
A I might have. As an analyst, my job was to review exam reports and draft letters to the board of directors. Centereach would have been an institution that we would have regulated at that time, and it's possible that I might have reviewed exam reports.
Q And, in fact, you had regulatory responsibility for Suffolk County Federal Savings & Loan and the County Federal Savings & Loan since the mid-1970s; isn't that correct?
A That is correct.
Q Your responsibilities included the creation of the phoenix institution that put those two together; correct?

Page 4446

A Yes, it was.
Q And you assumed responsibility for Long Island Savings Bank Syosset when it converted to a federal savings and loan association; is that correct?
A It converted to a federal savings bank.
Q I'm sorry, federal savings bank, correct.
A I guess that was early '80s, '81, '2, '3.
Q And, in fact, you had some –
THE COURT: Ms. Evans?
MS. EVANS: We didn't ask Mr. Vigna anything about this time period. This is outside the scope of our direct examination.
THE COURT: Mr. Wallace?
MR. WALLACE: She asked very clearly about his responsibilities starting all the way back from before this time period.
THE COURT: Ms. Evans?
MS. EVANS: We asked him to say what job he had. I guess it depends on where he's going, so maybe I'll – I'll withdraw it for now.
THE COURT: Thank you.
BY MR. WALLACE:
Q And, in fact, your responsibilities included a review of the application of LISB of Long Island – of Syosset to acquire the phoenix institution, didn't it?

Page 4447

A Yes, it did.
Q And you were directly involved with that process, weren't you?
A Yes, I was.
Q And did you continue to have responsibility for Long Island Savings Bank, all the way up until the time you left the government?
A Well, up until the time – yes. Yes.
Q And you had no responsibility after that, obviously; correct?
A Obviously.
Q All right. And you're not a lawyer?
A No, I'm not.
Q And you have no legal training?
A No, I haven't.
Q But in connection with the Conway investigation, you did have lawyers, in doing that investigation; correct?
A Yes, we did.
Q Were they reporting to you or were you reporting to them?
A They reported to – they reported to at that time the office of enforcement in Washington.
Q Would your responsibilities have included being involved in the negotiations of the assistance agreement?
MS. EVANS: Objection, your Honor. Again, the

Page 4448

mere fact that we asked him to list his jobs, this is not a category that we went into on direct. And it's improper for Mr. Wallace to begin asking him questions regarding this. Well, certainly they could have called him in their case and, in fact, they did, in fact, do that to a certain extent by reading his deposition transcript into the record, so they had every opportunity to call him in their case-in-chief and, in fact, they did that in their limited way.
MR. WALLACE: Your Honor, the question that was asked was please describe your employment history, after college going forward, listing each approximate year and what you did. And I'm entitled to follow up on that, your Honor, no matter how humorous Government counsel thinks it might be.
MR. MADDEN: Excuse me. I apologize, your Honor.
THE COURT: All right. I don't have any doubt but that we have heard of Mr. Vigna at a number of – on a number of occasions in the over a month now we've been at trial, and we have testimony – deposition testimony that covers these topics. And I don't have any doubt that this has been opened up today. So I'm going to overrule the objection and allow this to go forward.
MR. WALLACE: Could we re-ask the question, please? I'll re-ask it.

Page 4449

BY MR. WALLACE:
Q Mr. Vigna, did your responsibilities include being involved in the negotiation of the assistance agreement?
A Yes.
Q Did your responsibilities also include monitoring compliance with the assistance agreement after it was signed?
A Yes.
Q Did your responsibilities also include generally trying to find a solution to the insolvencies of various savings and loans in the early 1980s?
A Yes.
Q And did your responsibilities also include the consideration of using goodwill as one of the tools for solving the insolvency problems with the savings and loans in the early 1980s?
A Yes.
Q And as part of those responsibilities, were you in favor of using goodwill as a tool for solving the insolvencies of certain insolvent savings and loan associations?
A Are you asking my personal opinion?
Q Your professional opinion, actually, is what I'd prefer.
A It was – my view is it was the lesser of the

Page 4450

evils. You know, we thought this was a way to resolve insolvent institutions and in a manner that would conserve the resources of the Federal Savings and Loan Insurance Corporation. So I was supportive of the goodwill process.

Q And, in fact, it was your understanding that the use of goodwill was a device to solve the problem of the government not having enough money to resolve all of the deficits of the troubled thrifts; isn't that correct?

A That's correct.

Q And you would agree with me that goodwill certainly had value to FSLIC in resolving the supervisory cases; isn't that correct?

A Well, I don't think it had any value to the FSLIC. It allowed – it was a process by which we could keep institutions operating and hopefully over time, through a number of balance sheet and operating factors, could resolve their insolvencies.

Q Do you recall ever expressing the view that goodwill did have value to the FSLIC in resolving supervisory cases?

A I don't have any recollection.

Q But that's not your view today?

A Oh, no, I think – no, that is my view. I mean, you say that it has value to – it has value in a sense that it allowed us to keep the doors open, and we thought that by

Page 4451

keeping the doors open, as long as the losses weren't growing. In some cases as in the phoenixes, it meant putting the institution into better management hands, with the expectation that they could rebuild the balance sheet and hopefully raise capital, either through a sale of the company or raising capital in the capital markets.

Q Would you agree with me that allowing the acquiring institution to use regulatory supervisory capital had huge value to FSLIC, at least in the context of the phoenix program?

A Could you read that question back, please?

Q I'll rephrase it. Would you agree with me that the use – the ability to use supervisory capital by acquiring thrifts had huge value to the FSLIC in the context – at least in the context of the phoenix program?

A I'm not sure I understand your question. What do you mean by "supervisory capital"?

Q Do you have any understanding of that phrase – I'm sorry, supervisory goodwill. I'm sorry.

A Because there's other capital.

Q My mistake. Would you agree with me that the use of supervisory goodwill in the context of the phoenix program at least had huge value to FSLIC?

A Yes. Again, it was – it was the ability to keep the institution open and alive and hopefully with better

Page 4452

management could find a solution to the institution's financial problems.

Q And it was the hope and expectation of FSLIC that allowing the negative capital to be absorbed by the acquiring institution over a long term had value to FSLIC; isn't that correct?

A That's correct.

Q And you also hoped while you were at FSLIC that the acquiring entity could use the franchise, the bank franchise, to build and create enough earnings to write off the amount of goodwill recorded at the time of the acquisition; isn't that correct?

A That's correct.

Q And the use of supervisory goodwill also had value to the acquiring thrift; isn't that correct?

A Again, it allowed it, specifically in the case of Long Island Savings Bank, to maintain this separate entity, you know, with the doors open rather than in some kind of a receivership or conservatorship.

Q You would agree with me, Mr. Vigna, would you not, that the use of supervisory goodwill had significant value to acquiring thrifts such as Long Island Savings Bank?

A Yes.

Q You would also agree with me that the application of GAAP in 1981 and 1982, at least until FAS 72 became

Page 4453

effective, permitted amortization of goodwill for up to 40 years; correct?

A Yes.

Q And another advantage of FAS 72 accounting was that discounted mortgage income accreted faster than the amortization of goodwill; isn't that correct?

A Yes.

Q And you would agree with me that this had the effect of generating income, which is a form of capital?

A At least on paper, yes.

Q Okay. And one of the goals of the supervisory acquisition program was to have troubled thrifts in a position to increase its capital; correct?

A Yes.

Q And you would agree with me that a time difference between the rate of accretion and the rate of amortization allows an institution to leverage its capital and generate earnings from that leverage; isn't that correct?

A Yes.

Q While you were with the Federal Home Loan Bank of New York, you didn't have expertise – accounting expertise within the bank of New York; isn't that correct?

A Well, we did at some point have an accounting expertise within the staff, yes.

Q All right. Would you take a look in your

Page 4454

deposition notebook to the deposition transcript that you gave on February 3 of 1999, which should be behind tab 1. And if you would be good enough to turn to page 77. And looking – if you would focus your attention, although you can read before or after, but if you would focus your attention in reading to yourself, Mr. Vigna, the question and answer that starts at page 8 and going on down to 21 – or 24, actually.
(Witness reviewed the document.)
Are you done?
A Yes.
Q All right. I'd like to ask you again, Mr. Vigna, if you can recall whether or not the Federal Home Loan Bank of New York had specific accounting expertise in New York, as opposed to relying upon that expertise in Washington, D.C.?
A At what period of time? There was a period – at the time – a point in time when we did have accountants on our staff. This is referring to the time of the – a transaction whereby LISB acquired the phoenix –
Q Correct.
A Probably not. But there was a period of time after where we did have an accountant on staff.
Q So up and till the point in time where the assistance agreement was executed, there was not accounting

Page 4455

expertise at the bank of New York; correct?
A Probably not.
Q But at some point in time after the bank of New York did acquire that expertise?
A We did have an accountant on staff, yes.
Q All right. So you certainly had the capability and expertise to determine if LISB was not properly reporting or accounting the amortization of goodwill consistent with the assistance agreement; isn't that correct?
A Yes.
Q Would you look in the big notebook, the larger black notebook – we can put the deposition transcript away. Hopefully we won't need that again. Turn to tab 9, if you would. Behind tab 9 should be Plaintiffs' Exhibit 98 already admitted in evidence. I'll ask you, Mr. Vigna, if you recognize that document.
A Yes.
Q And, in fact, you were involved with the preparation of the document; correct?
A It was – it was created in Washington, but it was probably – it was also reviewed in New York before it was issued – before it went to the board.
Q All right. And, in fact, you provided some of the information and the assistance in the preparation of the

Page 4456

document; isn't that correct?
A Most likely, yes.
Q And you would agree this is what's called an S-memo?
A Yes.
Q Regarding the Syosset/Centereach acquisition?
A Yes.
Q Would you describe what an S-memo is?
A It is a supervisory analysis of a particular transaction and a recommendation.
MS. EVANS: Your Honor, we'd just like to clarify the Court's ruling regarding the scope of Mr. Vigna's testimony. Is it the Court's ruling that Mr. Vigna can be asked questions about anything at all, notwithstanding our limited direct and also our limited selection of deposition transcript, perhaps based on the fact that we asked him what jobs he held? I'm not clear on Mr. Wallace's ability to ask questions in this circumstance.
THE COURT: Mr. Wallace?
MR. WALLACE: Your Honor, the witness reviewed his responsibilities at the bank. He testified as to impact of FIRREA. He testified as to impact of undercapitalization. He testified as to his opinion as to whether or not the company would have converted or not and the basis for that opinion.

Page 4457

I think we are fully entitled to have this witness testify as to his responsibilities, as he did on direct. And this is one of his responsibilities. What they want to run from is this witness's responsibilities in connection with the assistance agreement, because they don't like that part of his responsibility. But I don't think the rules allow him to cleanly and surgically slice the testimony that way.
MS. EVANS: Your Honor, we're entitled to have someone testify based on time, based on any reason that we want. And certainly, they had the opportunity to call him in their case, to ask these questions and, in general, the rules of the Court are that questioning on cross is limited to the scope of direct. And we very clearly limited the scope of our direct. So I don't really see how I have opened the door to every question under the sun by asking him what his responsibilities were.
THE COURT: Let's start with the first principles. Do you have a date which you think provides a beginning trigger for Mr. Vigna's testimony? I'm looking at DX 317. That's dated May 1, 1990. Are you saying nothing before May 1, 1990?
MS. EVANS: We asked him about his supervisory responsibilities regarding the capital plan from 1989 going

Page 4458

forward. But again, I'm not sure if I would say it's limited by date. I think it would be limited by the nature of his testimony, which is generally how things are done.

THE COURT: It wasn't limited just to the capital plans, obviously.

MS. EVANS: It's both, really.

THE COURT: Because you did ask him about other supervisory responsibilities Mr. Vigna had at the time. And he –

MR. WALLACE: They also asked him, your Honor, about his supervisory responsibilities for the Plaintiffs in this case. And this is clearly part of his supervisory responsibilities in this case.

THE COURT: Well, one of the problems I – I must say, I have difficulty limiting Mr. Vigna's testimony by subject matter because he has testified, whether you would or not, Mr. Vigna.

THE WITNESS: I understood I think I testified – and probably –

THE COURT: You did, by way of your deposition testimony or at least having it read into the record.

MS. EVANS: Yes, your Honor. We didn't ask Mr. Vigna any questions regarding the contract, nor did any of our deposition testimony go to that point. I'm not really – I'm still not clear on how this would open the

Page 4459

door to asking questions regarding things related to that –

THE COURT: May I pose one other small problem, Ms. Evans? Would you please look at DX 1858? Fortunately or unfortunately, and I offer no view, that exhibit covers actions by Mr. Conway that reach from December 1982 through May 1992. That's a 10-year period. And that's why I asked you about time and what you thought was happening. I was hoping you'd tell me about this yourself.

MR. WALLACE: In fact, this document, your Honor, reflects an investigation going all the way back to 1983 and the theory of the government and theory of this witness is that Mr. Conway was in breach of his duties and fiduciary responsibilities all the way back to 1983 and at the time of the assistance agreement. They clearly have gone into this.

MS. EVANS: Going into Mr. Conway's breach of his duties is a limited subject matter. This is not – that is not clearly related to the assistance agreement. That's really –

THE COURT: So you say we could look at everything or we could have Mr. Vigna now testify about everything going back to December of 1982 that relates to Mr. Conway but nothing else?

MS. EVANS: Your Honor, I think we think it's limited by the subject matter of our questions as well. In other words, if we'd asked Mr. Vigna, you know, to talk

Page 4460

about something in high school, could we then talk about it something relevant then, going all – I'm not sure how that opens the door to every subject matter.

THE COURT: Well, we have a small relevancy problem there. One of the problems is Mr. Vigna's activities with the Federal Home Loan Bank of New York in the early 1980s are very relevant to this case, there's absolutely no doubt about that. And we've heard from Mr. Vigna in testimony, in testimony previously, and we've heard something that covers this same time period. I'm very reluctant to provide a limitation of the kind that you're describing, because there we'd take the period from 1982 through 1996 and we'd say that's the time period covered, but we would cover out a whole raft of subject matters that go from 1982 through 1989.

I'm not willing to do that.

MS. EVANS: Your Honor, I'm not going to –

THE COURT: I'm sorry?

MS. EVANS: I was going to say something else, but you've made your decision.

THE COURT: Well, I'm always willing to hear another view.

MS. EVANS: It's really essentially the same point, that we didn't think relevance was the issue, we thought the issue was the scope of our direct. And again,

Page 4461

we reiterate that Plaintiffs certainly had the opportunity to call Mr. Vigna. So the Government's position is we don't believe we've opened the door to ask him all these questions.

THE COURT: Well, they did. But you didn't need to call Mr. Vigna either. You could have been satisfied with counterdesignations.

MS. EVANS: Yes, I'm not sure that that – our position is we don't think that opens the door to every question during the time frame, whether or not it's related to what Mr. Vigna has been discussing. So if we could just have that noted for the record.

THE COURT: Thank you.

BY MR. WALLACE:

Q Mr. Vigna, would you turn to page 14 – actually, let me help you with this. Yes, there's a page 14 in the lower center of this document, 14 of 21 it will say. And I'm going to focus your attention, Mr. Vigna, very specifically to the paragraph under "accounting." Do you see that?

A Yes.

Q And I want to draw your attention to the language in there which addresses the fact that the agreement between LISB and the government – proposed agreement between LISB and the government would enable LISB to account for the

Page 4462

acquisition in accordance with GAAP as it existed prior to September 30, 1982. Is that correct?

A Well, let me read this first.

Q Sure.

(Witness reviewed the document.)

A Okay.

Q All right. Do you have a recollection that LISB was, in fact, proposing to account for its acquisition of Centereach with GAAP as it existed prior to September 30 of 1982?

A Yes.

Q And do you also have a recollection or an understanding that that would have permitted a 40-year period of amortization?

A That I don't recall.

Q Well, do you recall that that, in fact, was the agreement that was reached with the government, a 40-year amortization term?

A At this point, I don't have a specific recollection of that.

Q Would you take a look at your deposition transcript for April 6. That will be behind tab number 3. And I'd like to you turn your attention to page 120. Actually, if you want to start at page 119, Mr. Vigna, at line 19, where your testimony begins with this very document

Page 4463

and this very paragraph. And if you would read from there on over to page 120, line 10.

THE COURT: Mr. Vigna, you can read whatever you want here. You aren't limited.

(Witness reviewed the document.)

THE WITNESS: I don't see any mention of a 35 year amortization in this document.

BY MR. WALLACE:

Q Actually, my question –

A Am I missing something here?

Q I'm not sure if you're missing anything or not. But my question is, do you recall that the agreement that was reached with the government, in fact, included a 40 year term for amortization?

MS. EVANS: Asked and answered, your Honor. I think he said he didn't know.

THE COURT: Well, that's precisely the point, Ms. Evans. We're trying to figure out whether Mr. Vigna's recollection is refreshed. Overruled.

BY MR. WALLACE:

Q Mr. Vigna?

A At this point in time, I can't specifically recall whether it was 40 years or 35.

Q All right. You do recall having testified, though, on April 6 of 1999; is that correct?

Page 4464

A I don't recall the deposition, but apparently I did state at that point in time that I was aware of the 40-year amortization.

Q All right. And at that time, you were aware that there was an agreement to amortize goodwill over a period of 40 years; is that correct?

A Based on the deposition, apparently so.

Q All right. And you haven't learned anything since the deposition that would alter the sworn testimony you gave in 1999, have you?

A No.

Q So as far as you know, your understanding of the agreement in 1999 is still your understanding of the agreement; is that correct?

A At this point, I just don't recall specifically. But that's – I said that in 1999, and I – you know, perhaps at that point in time, I had a better recollection.

Q You probably did have a better recollection.

A As you get older and the years go by –

Q I understand.

A Maybe '99 I was a little smarter, I don't know.

(Laughter.)

Q Well, I think you were probably a little closer to the events.

A Perhaps.

Page 4465

Q All right. Would you look at the document behind tab 7, Mr. Vigna. This is the consolidated financial statements for Suffolk County Federal Savings & Loan Association and subsidiaries, dated as of December 31, 1982. You would have reviewed the audited financial statements for Suffolk; isn't that correct?

A Probably not me personally but my office would have, yes.

Q All right. And your office would have had responsibility for reviewing the audited financial statements for what reason?

A As part of our regulatory process.

Q All right. And the Suffolk County Federal Savings & Loan Association would have been required to submit their financial statements to you and your group; is that correct, for review?

A Audit reports, yes.

Q Audit reports. And then they would be maintained in the files of the government?

A Yes.

Q And in 1982, your group did have supervisory responsibility for Suffolk County Federal Savings & Loan; isn't that correct?

A Yes.

Q Do you have any reason to believe that the

Page 4466

document we're looking at as Exhibit 78 is not the Suffolk County Federal Savings & Loan consolidated financial statement for December 31, 1982?

A No.

Q Would you turn to what is going to be page 12, I believe, in the middle – yes, page 12 of 22.

THE COURT: The Bates range at the bottom being 17906; is that correct, Mr. Wallace?

MR. WALLACE: Actually, the number I have is 17898, page 12 of 22.

THE WITNESS: My pages aren't numbered, but I have 17898.

BY MR. WALLACE:

Q All right. 17898.

A The notes?

Q Yes. And we're going to be looking at the fourth note – the fourth paragraph under note number 3.

A Okay.

Q Are you able to explain to me what the last sentence of that paragraph means, and I'll read it, "the excess of cost over fair market value of assets acquired resulting from this merger whereby both associations adjusted their assets and liabilities to fair market value (amounting to $741,656,000) is being amortized principally over 40 years on a straight-line method"? Can you explain

Page 4467

to me what that means?

A Well, it's essentially the goodwill of the combined institutions.

Q Of the phoenix institution?

A Yes.

Q And the amount of goodwill is in excess of $741 million?

A That's correct.

Q And was being amortized over 40 years?

A Yes.

MR. WALLACE: Your Honor, we would like to move into evidence Plaintiffs' Exhibit 78.

MS. EVANS: No objection, your Honor.

THE COURT: Admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 78, was received in evidence.)

BY MR. WALLACE:

Q You would agree with me that Syosset's acquisition of the Suffolk phoenix would not have been possible without the use of goodwill as regulatory capital; correct?

A Yes.

Q And the reason it wouldn't have been possible was that Suffolk would have been hugely insolvent subsequent to

Page 4468

the acquisition; correct?

A Yes.

Q And FSLIC was unwilling to fund the huge capital deficiency because of all of the other problems that FSLIC had at that time; isn't that correct?

A Yes.

Q In reaching agreements for the salvation of troubled thrifts, FSLIC didn't feel constrained by SEC rules and regulations, did it?

A No, because we were basically dealing with mutual institutions.

Q So no matter what the SEC might have required for institutions reporting to it, the FSLIC could reach whatever accommodations it felt was appropriate and consistent with its regulations concerning the amortization of goodwill; isn't that correct?

A Yes.

Q Would you turn to the document behind tab 10, Mr. Vigna. It's Plaintiffs' Exhibit 124. And I'd like you to review it and I'm going to ask you a few questions about it.

(Witness reviewed the document.)

Can you tell me where this document came from

A It came from the district director's office.

Q Can you identify or do you recognize the signature

Page 4469

under "field manager"?

A It looks like Tim Murphy.

Q For Mr. DeAngelis?

A Yes.

Q All right. And who was Mr. Murphy?

A He was an examiner. At this point in time, examination function was under the district director, who was actually a Federal Home Loan Bank Board employee, as you can see by the insignia on the top left.

Q Right. And I notice in the middle of the document, the stamp "received," it says July 23, do you see that, 1984?

A Yes.

Q All right. And it seems to have been received by the federal New York – Federal Home Loan Bank Board of New York, right, supervision?

A Yes.

Q Is that your department?

A Yes.

Q So your department would have received this at or about the time, it looks like, couple days after it was sent; correct?

A Yes.

Q Do you recall having received this?

A Not specifically, no.

Page 4470

Q But this is something that would have been received in the normal course?

A Yes.

Q And there's some handwriting down in the lower left, I believe it says "noted, July 23, 1984." Do you see that?

A Yes.

Q "RED."

A Yes.

Q That's Richard E. Denby; correct?

A Most likely, yes.

Q And Mr. Denby was a supervisory analyst who worked for you; correct?

A Yes, he was.

Q All right. Would examinations of the Long Island Savings Bank and Syosset of New York have been subject to examination at this period of time as suggested in the first paragraph?

A Yes.

Q And do you recall whether or not they, in fact, occurred?

A Yes.

Q Do you recall that they did occur?

A They did occur.

Q Okay. And there is a list of five items, do you

Page 4471

see that, 1 through 5?

A Yes.

Q And are these things that would normally be done in connection with an examination?

A Most institutions, yes. These were based on the last examination and probably review of any other correspondence, information we had. These were the field manager's recommendations to the – specific recommendations to the field examiner. And that's in addition to the normal, you know, exam process.

Q All right. So in connection at least with the Long Island Savings Bank examination that occurred in February of 1983, in addition to the normal things that would occur, these additional five things were to occur?

A The examiner was to look at those issues, yes.

Q All right. And the examiner was to review the FSLIC assistance agreement and determine the bank's basic compliance with the provisions of that agreement; isn't that correct?

A Yes.

Q Do you recall ever learning that Long Island Savings Bank was not in compliance with the provisions of the assistance agreement?

A No.

MR. WALLACE: Your Honor, I would like to move

Page 4472

into evidence Plaintiffs' Exhibit 124.

MS. EVANS: No objection, your Honor.

THE COURT: Admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 124, was received in evidence.)

THE COURT: Now, the Court will just note that the admission of this document removes the reservation that the Court had made on January 18 during the examination of Mr. Fuster.

MR. WALLACE: Thank you, your Honor.

BY MR. WALLACE:

Q Would you turn, Mr. Vigna, to the document behind tab number 13, which should be and hopefully is Plaintiffs' Exhibit 160, already in evidence. Do you recall generally having received this, Mr. Vigna?

A Yes.

Q Would you turn to what is in the middle of the document – middle of my document, 9 of 11, Bates stamped number 8822. It's Bates stamp number 8822. I see the problem. Do you have that?

A Yes.

Q Looking at the first full paragraph, Mr. Vigna,

Page 4473

and specifically the first sentence, which reads "Suffolk and County were acquired on the basis that the goodwill generated would be treated in a certain manner and certain regulatory forbearances granted." Do you see that?

A Yes.

Q Is that consistent with your recollection?

A Yes.

Q It also goes on to say "the accounting treatment of the goodwill created and forbearances were in lieu of more tangible financial assistance such as cash and FSLIC notes." Do you see that?

A Yes.

Q And is that consistent with your recollection?

A Yes.

Q Skipping to the next paragraph, I'm going to skip over the first sentence and go to the next sentence, which says "the LISB agreed to this structure and accounted for the transaction in accordance with GAAP at the time, which permitted the goodwill generated to be carried as an asset and amortized over 40 years." Do you see that?

A Yes.

Q That is also consistent with your recollection; correct?

A Yes. Generally speaking, yes.

Q "Only on that basis was the transaction

Page 4474

economically feasible for LISB." You agree with that too, don't you?

A I could have some difference with the words "economically feasible." They agreed to the process, to treat goodwill in this fashion so they could have the time to work on the balance sheet, restructure and hopefully raise capital, as you said earlier, through retained earnings to eliminate the insolvency.

Q Do you agree with the statement "only on that basis was the transaction economically feasible for LISB"?

A Well, in an economic sense, it was still an insolvent institution. But maybe I'm differing with the word "economically." What I'm saying is they understood that this was an opportunity to take an institution and run with it because of the forbearances and hopefully, you know, make it work over the long haul.

I think their expectation was that if it didn't work, because they kept it in a separate subsidiary, they would just, you know, the FSLIC or whoever the regulator was could take it away from them and they would have no – you know, the impact would not be material to the parent.

Q Mr. Vigna, would you be good enough to go back to your deposition transcript notebook and look at the transcript behind tab number 4; which is the deposition transcript of the deposition you gave on April 7 of 1999.

Page 4475

And if you would be good enough to turn to page 158, perhaps starting on line 10, although you – I'm sorry.

A Where are you?

Q All right. The deposition – this thin notebook with the deposition transcripts.

A Yeah.

Q We're going to tab 4.

A What page? I'm in page 800s.

Q Hold on one second. Hold on, your Honor. Oddly enough – I see what happened.

There's an afternoon session of April 7. If you go through all of the 800s, and I apologize for this, it will begin again at 144. It is the April 7 at 1:00 p.m., and I need to get to page 158. Starting on line 10, as we began discussing the language that I was just asking you about, and if you would read that and anything before and anything after, of course, but I'm going to ask you if between line 9 on that page and line 10 of page 159 refreshes your recollection with respect to the question I just asked, and I will ask it again when you're ready.

(Witness reviewed the document.)

A Yeah, that's what I said in 1999, and I don't contradict that, but at this point, when I look at this again, the word "economically feasible," at least in my feeling right now, that's not appropriate.

Page 4476

Q What did you learn between 1999 and today that would make you want to change your sworn testimony that you gave in 1999?

A Well, I don't think I'm changing my sworn testimony. I think maybe as you get older you're a little smarter. But all I'm saying is, looking at it today –

Q You have a little different reaction?

A A little different reaction. I'm not – from the standpoint of LISB, they needed those forbearances and that accounting treatment to give them the opportunity to take this institution on and try and rehabilitate it.

Q Okay. But you're not asking to retract the sworn testimony you gave back in 1999, are you?

A No.

Q And at that point in time, you did agree with the statement, without qualification and without equivocation; correct?

A Yes.

Q Would you turn to the next page of this document, which bears Bates number 8823. And I'm going to focus on the last sentence, the sentence that reads "the government and its agencies above all have an obligation to honor its commitments, especially when the institution involved has honored its commitments and has assumed and successfully managed some of FSLIC's serious problems."

Page 4477

Do you see that?

A Yes.

Q And do you agree with that?

A Yes.

Q I take it that it was Larry Hayes who was the principal attorney responsible for drafting the assistance agreement documents for FSLIC? Do you recall that?

A Yes.

Q Okay. And at least in 1999, when you gave your deposition testimony, you barely had the faintest recollection of someone by the name of Cathy Moran; is that correct?

A I don't recall.

Q Do you recall Cathy Moran today?

A I do.

Q All right. Would you look in your deposition of November 16, which is the last tab, tab 5, and turn to page 64. And where I'm going to focus your attention, but you can read before or after, is starting on line 18.

A Page 64, Counsel?

Q Yes, page 64 of the deposition at tab 5. Have you found it, Mr. Vigna?

A Yes.

Q Okay. Does that refresh your recollection at least at that point in time in November of 2001, you only

Page 4478

had a faint recollection of Cathy Moran?
A Yes.
Q And your recollection hasn't improved any since?
A A little bit but not – you know, I still – I remember the name, I remember the person. This is 20-some years ago.
Q But it's still your recollection that it was Larry Hayes who was the principal attorney responsible for drafting the assistance agreement for FSLIC; is that correct?
A Yes. I mean, Cathy Moran might have been the staff – the staff attorney who originally drafted it, but Larry Hayes was – that was his responsibility. I'm sure he had a lot of input into the final document.
Q All right. And you were responsible and your group was responsible for receiving and reviewing LISB's financial reports after the acquisition of the Suffolk phoenix; correct?
A Yes.
Q All right. And you never saw any financial reports that you received from LISB reflecting an accounting treatment inconsistent with the assistance agreement; isn't that correct?
A Yes.
Q Were you responsible for preparing any analyses to

Page 4479

show the impact of FIRREA on the elimination of goodwill in the calculation of regulatory capital?
A I don't have any specific recollection. We might have – in fact, we probably did some calculations in the district as to what that impact might be.
Q And you became aware that a number of institutions that were formerly in capital compliance fell out of capital compliance; correct?
A Yes.
Q And, in fact, LISB, I believe you testified, fell out of capital compliance?
A Yes.
Q All right. You testified in your direct examination at the instruction of Government counsel, when she was asking you questions about LISB, she was talking about Centereach and Syosset. Do you recall that?
A No.
Q All right. Did Centereach and Syosset fall out of capital compliance?
A No. It was just Centereach.
Q All right. And did Centereach and Syosset file a capital plan?
A No, I think it was just Centereach.
Q So Centereach fell out of capital compliance, in fact, fell seriously out of capital compliance, because of

Page 4480

FIRREA; isn't that correct?
A Yes.
Q And it was your view that imposing capital requirements requiring netting-out of goodwill was unfair; isn't that correct?
A You know, using the word "unfair," yes. Inequitable. There was a commitment to the institution, and FIRREA changed all that.
Q And you expressed that view to more than one person, haven't you, that you felt it was unfair?
A I have.
Q I'm asking you.
A Yes, I have.
Q Okay. And it was also inconsistent with the understandings that the government made with LISB, isn't it?
A Yes.
Q And you expressed your view that it was unfair and inconsistent with the agreements, you expressed that view to the president of the Federal Home Loan Bank Board, didn't you?
A No. There was no president of the Federal Home Loan Bank Board.
Q There's not a president of the bank, Mr. Dittenhafer?
A That's the bank.

Page 4481

Q Of the bank, I'm sorry, the Bank of New York.
A I probably did, yes.
Q And you were of the understanding that he was of the same mind as you were, that the agreements should have been honored; isn't that correct?
A Yes.
Q And you would agree that Syosset complied with all of its obligations under the assistance agreement; isn't that correct?
A Yes.
Q Would you turn to the document that is behind tab 2 of the big notebook, Mr. Vigna. It should be Plaintiffs' Exhibit 12. Do you recognize that document, Mr. Vigna?
A I don't have specific recollection of it, no.
Q All right. But you do recognize your name on it; correct?
A Yes, I do.
Q And you do see the "received" stamped up in the right-hand side?
A Yes, I do.
Q And the cc's, do you recognize those names?
A Yes.
Q Who were they?
A Timothy Ryan was the director of OTS at that time. Michael Patriarca was a district director out of

Page 4482

San Francisco, but I think at that time he was assigned to Washington. The same with John Downey, and Harris Weinstein was the agency's chief counsel.

Q And looking at the last page – I'm sorry, did you identify Mr. Fiechter?

A Fiechter. Fiechter.

Q Yes, I'm sorry.

A Yes. His title was principal senior deputy director, and that was a Washington office.

Q Do you have any reason to believe that you did not receive this document, Mr. Vigna?

A No.

MR. WALLACE: Your Honor, we would like to move into evidence Plaintiffs' Exhibit 12.

MS. EVANS: No objection.

THE COURT: Admitted.

(The document referred to, previously identified as Plaintiffs' Exhibit No. PX 12, was received in evidence.)

BY MR. WALLACE:

Q Would you review the section denominated "background," Mr. Vigna. And I want to ask you –

A Excuse me, Counsel. Where are we?

Q We're at tab 2, the one we just – we haven't

Page 4483

moved, same document. On the first page, Plaintiffs' Exhibit 12, there's a section in the middle of the page denominated "background."

A Yes.

Q I would ask if you would be good enough to read that. It goes on to the next page. Just identify for me if there's anything in that paragraph that you don't agree with.

(Witness reviewed the document.)

A How far down do you want me to read?

Q I wanted you to just read the background section. It goes to the next page, just where it stops at "discussion."

(Witness reviewed the document.)

Is there anything you disagree with in that section?

A No.

Q And you would agree with me that ultimately, FSLIC concluded it could not force LISB to consolidate the assets of Centereach; isn't that correct?

A Yes.

Q And despite FSLIC's strong desire for that to happen, it would not compel them to consolidate; correct?

A Yes.

Q You would agree with me that ways in which you've

Page 4484

identified that Centereach could address the elimination of goodwill was to restructure its balance sheet, merge with another institution or raise capital in the public markets; isn't that correct?

A Yes.

Q And by "restructuring the balance sheet," that would mean selling assets at a profit, selling liabilities and selling branches; correct?

A Yes.

Q And you would agree with me that selling assets at a profit was a short-run solution because it brought in current income and increases capital at the expense of future income; correct?

A Yes.

Q And in the case of a merger, the insolvent thrift would have to merge with an institution that had enough excess capital to compensate for the capital eliminated by FIRREA; isn't that correct?

A Yes.

Q And you would agree that the reason that there was so few post-FIRREA acquisitions of insolvent thrifts was because the negative capital that the acquiring thrift would have to put in would exceed the premium that the acquiring thrifts typically would be willing to pay?

A Could you read that question back, please?

Page 4485

Q Would you agree with me that one of the reasons why there were so few, if any, post-FIRREA mergers with insolvent thrifts is because the negative capital that the acquiring thrift would have to compensate for would exceed the premium that it would be willing to pay for the bank?

A Yes.

Q And you would agree that FIRREA imposed strong impediments to restoring capital to required capital levels; correct?

A I would say as a consequence of FIRREA, you know, raising capital for those situations became more difficult because of the deeply negative net worth.

Q Would you agree with me that FIRREA imposed some strong impediments to restoring capital to the required levels?

A Is that the same question you asked?

Q It might be close.

A It's pretty close, and the answer is the same. I think, you know, the new capital requirements, it was certainly more difficult to achieve post-FIRREA than before FIRREA.

Q Are you quarreling with the phrase "strong impediments"?

A Yes.

Q And you don't agree it imposed strong impediments?

Page 4486

A Well, you know, it increased the amount of capital you needed. So if you want to label that an "impediment," then I would agree with you.
Q All right. You would agree with me that one effect of FIRREA's passage and RTC going to full operational mode was that branches and deposits were cheap relative to other periods; correct?
A Yes.
Q Would you turn to the document that is behind tab 3 –
THE COURT: Before we do that, Mr. Wallace, we are just about the time that the Court ordinarily would say, all right, we're ready to break. Is this a bad time, a good time?
MR. WALLACE: It is a particularly convenient time, your Honor.
THE COURT: I thought since you were shifting topics, you might concede.
Mr. Vigna, would you mind if we took a 15-minute recess at this time?
THE WITNESS: Not at all, your Honor. I think we need it.
THE COURT: Okay. Thank you.
Ms. Evans?
MS. EVANS: No objection, your Honor.

Page 4487

THE COURT: We're in recess for 15 minutes.
(Recess.)
THE CLERK: All rise.
The Court is again in session.
THE COURT: Please be seated.
Mr. Wallace, you may proceed.
MR. WALLACE: Thank you, your Honor.
BY MR. WALLACE:
Q Mr. Vigna, would you be good enough to turn to the document behind tab number 3 in the big notebook, it's the capital plan for Centereach. And I'm going to ask you to turn to page 20, which is Bates page number 5608.
A There's something –
Q You don't have 5608?
A No. It goes from 5599 to 5619. You said 56 –
Q 08. It should be page 20 of the capital plan in evidence.
THE COURT: Mr. Wallace, unfortunately, I believe Mr. Vigna is exactly right. Internal pages 12 through 26 are missing.
MR. WALLACE: In the Plaintiffs' exhibit book, we have a good copy of it, and we're going to give the witness ours, your Honor.
THE WITNESS: Thank you.
BY MR. WALLACE:

Page 4488

Q You are generally familiar with the capital plan of Centereach?
A Yes.
Q And if you are on page 20, which bears Bates stamp number 5608, I want to focus on that first complete paragraph that starts with "if Centereach's goodwill no longer counts as an asset for regulatory purposes, Centereach has negative tangible capital of about $178 million." Do you see that?
A Yes.
Q That was consistent with your recollection; correct?
A Generally so, yes.
Q All right. Looking at the next sentence, which says "neither we nor our investment bankers can identify or develop a prudent set of actions to wipe out a hole of that size and bring Centereach into compliance with the new capital requirements by December 31, 1994."
Do you see that?
A Yes.
Q And when you saw this statement, you agreed with it, didn't you?
A I don't think I had any reason to agree or disagree.
Q But you do agree with it as you sit here today?

Page 4489

A No, because, in fact, they did come into compliance.
Q Did you agree with it when you testified in April of 1999?
A I don't recall.
Q All right. Why don't you turn to the deposition transcript that's behind tab 4, and again, it starts in the morning with numbers beginning in the 800s, but if you flip through that and get on to page 183, on page 183, you were asked questions about this very document, that very sentence, starting at the top and then going on down about three quarters of the way through. But please read as much or as little of that as you like.
A I'm sorry, page –
Q 183, where you were asked questions about this very document, this very language, and, in fact, that very sentence.
A I'm sorry, I don't see that here.
Q Are you on page 183?
A That's what it says here.
Q And it says "will you turn your attention to the capital plan and to page 20"?
A No. Behind tab 2?
Q No, you should be behind tab 4.
A I'm sorry.

Page 4490

Q In the back half. It starts with the 800s and then goes into the 100s, the way the transcript was numbered.
A I have it now.
Q Okay.
(Witness reviewed the document.)
Would you agree with me that at least in April of 1999, you agreed with the statement contained in the capital plan that "neither Centereach nor their investment bankers could identify or develop a prudent set of actions to wipe out a hole of that size and bring Centereach into compliance with the new capital requirements by December 31, 1994"?
A At that time, yes.
Q All right. Were you aware of negative publicity that resulted from the passage of FIRREA and FDICIA specifically with respect to Centereach?
A Yes.
Q And do you recall speaking with Mr. Viklund and representatives of Ketz and company for the purposes of speaking to a representative of NBC to state that Centereach was not going to be seized because it had an approved capital plan?
A I have a vague recollection of that conversation, yes.
Q And do you also recall LISB telling you about the

Page 4491

article that appeared in Newsday, which reported that a panic had occurred as a result of a television broadcast about LISB?
A Yes, I have a general recollection of that.
Q And do you also recall that Money Magazine, while reporting that Centereach had an approved capital plan, also listed it as an institution subject to early intervention?
A Again, I have some vague recollections of those situations.
Q And do you also recall being told that there had been a runoff of approximately $37 million in deposits in Centereach the week of Veteran's Day 1992 following the broadcast of a television story and various news reports?
A I don't have a specific recollection of that, but I -- it's probably correct.
Q And would you agree with me that Centereach was experiencing a rather negative turn of events as a result of the media coverage regarding FDICIA and its effect upon Centereach?
A Again, my recollection is that there was negative media coverage that affected them, not only LISB but other institutions that were in comparable situations.
Q And how about the Wall Street Journal? Do you also recall a Wall Street Journal article that listed banks that might be closed?

Page 4492

A Mr. Wallace, there were lots of articles written at the time. Again, I can't recall specifically that one, but I have no reason to doubt the accuracy of what you're saying.
Q All right. Would you be good enough to turn to the document behind tab number 17. Hopefully it's there. It should be Plaintiffs' Exhibit 272.
A No. You say 17?
Q It should be behind tab 17, that's correct. And hopefully it will have a stamp on it that says Plaintiffs' Exhibit 272.
THE COURT: Mr. Wallace --
THE WITNESS: 17.
THE COURT: When Mr. Vigna is saying "17," he's referring both to the tab number and to the Plaintiffs' Exhibit Number. We have behind tab 17, Plaintiffs' Exhibit 17.
THE WITNESS: That's what I have.
MR. WALLACE: Do you have the black book?
THE WITNESS: Oh, I'm using -- this is Plaintiffs' Exhibits. This is --
MR. WALLACE: Right. Wrong exhibit, I'm sorry. Wrong books. Let's take that out of the way.
THE WITNESS: Okay.
BY MR. WALLACE:

Page 4493

Q Were you the Northeast regional director in 1992?
A I was.
Q All right. And Mr. John Downey, you are familiar with him?
A Yes.
Q All right. And this is a document as the Northeast regional director you would have received around October 28, 1992?
A Yes.
Q And if you review that document, can you tell me if there's any reason that you're aware of that you didn't receive it?
(Witness reviewed the document.)
A Is there a question?
Q Yes. Do you have any reason to believe you didn't receive this on or about the date it bears?
A No.
Q And the signature of John Downey on the front, do you recognize that as Mr. Downey's?
A Yes.
MR. WALLACE: Your Honor, we'd like to move into evidence Plaintiffs' Exhibit 272.
MS. EVANS: No objection, your Honor.
THE COURT: Admitted.
(The document referred to,

Page 4494

previously identified as Plaintiffs' Exhibit No. PX 272, was received in evidence.)

BY MR. WALLACE:

Q Do you have even a general recollection of the facts set forth herein, focusing specifically on the Wall Street Journal article that's referenced here? Does this refresh your recollection about a Wall Street Journal article?

A Yes.

Q All right. Do you recall having any discussions about The Wall Street Journal article and the impact it was having?

A Yes.

Q And would you tell me with whom you discussed that topic?

A Well, certainly we discussed it internally at the regional office, and we did have some national discussion among all of the regional directors and Washington.

Q And you agree that the negative publicity was, in fact, having serious negative consequences for Centereach as well as other banks?

A I don't recall that it was quite so serious at Centereach. They certainly had more resources than most.

Page 4495

There were several smaller institutions, one or two in New Jersey, that we were very concerned about.

Q Is it your testimony it was having no impact on Centereach?

A I didn't say it had no impact. I said, you know, certainly I don't think it was at the point that we were – that we were, you know, scratching our heads and getting ready to transfer it over to RTC.

Q All right. Would you turn to the exhibit that is behind tab 22, and I'm going to cross my fingers once again and hope it is Plaintiffs' Exhibit 297 that's there, already in evidence.

A That's – I have it.

Q Great. Do you recognize that document, Mr. Vigna?

A No.

Q You do recognize your signature on the second page, though?

A I do.

Q All right. If you will look at the second page, where there's a reference to the fact that you had no objection to the sale of the $271.9 million of fixed-rate assets as requested. Do you see that?

A Yes.

Q Do you recall that generally?

A Yes.

Page 4496

Q And do you recall you, in fact, had no objection to the sale; correct?

A Yes.

Q And you also understood that those assets were being sold in order to resolve, in part, Centereach's capital deficiency; correct?

A Yes.

Q And you would agree with me that FIRREA impacted LISB in particular because it required them to rollback a lot of profitable activities, lending activities, that they otherwise wouldn't have to do?

A At this point, I don't have any specific recollection of what the impact was on LISB. Certainly, they had to, at least at Centereach, conform or restrain their growth, sell some assets. They eventually also sold some deposits. But I don't think there was any impact at the hold – at Syosset.

Q Would you be good enough to – again, the deposition book at tab 4, and again in the second half of the transcript at page 223 and 224. There's a question that starts at line 19 of page 223 that is answered on page 224, but you're entitled to read more to put it in context, if that's necessary. Then I would like to ask you a question when you're ready.

(Witness reviewed the document.)

Page 4497

A Is there a question?

Q Yes. Would you agree with me that FIRREA impacted LISB in particular because it required them to rollback a lot of profitable activities, lending activities, that they normally wouldn't have to do? Do you agree with that?

A Yes, yes.

Q And would you also agree with me that you were enthused that LISB stepped up to the plate and agreed to sell branches because the branch sales would cause them to come into compliance?

A Yes.

Q You testified some on direct examination about the investigation of Jim Conway. Do you recall that?

A Yes.

Q And the investigation focused specifically on Mr. Conway; isn't that correct?

A Yes.

Q And the conclusions reached by the government were that Mr. Conway breached certain fiduciary duties?

A Yes.

Q And he breached certain fiduciary duties to the bank; correct?

A Yes.

Q And I take it that OTS concluded that Mr. Conway was not completely forthcoming to the banks about the

Page 4498

relationship he had with his law firm; is that correct?
A Yes.
Q And I believe you testified that ultimately, a consent order was entered; correct?
A Yes.
Q And the consent order that was entered, whichever one it was ultimately signed, achieved all of the enforcement objectives of the OTS; is that correct?
A Yes.
Q And you would agree that there were no other unsafe practices beyond what is reflected in the consent order; is that correct?
A Yes.
Q And Mr. Conway was ordered to make restitution to the banks by reimbursing the fees expended; is that correct?
A Yes.
Q And is that because the banks were the victim of Mr. Conway's lack of candor?
A My recollection is that it was to compensate the bank for the litigation costs and, you know, the lack – yes, the lack of candor.
Q All right. And that was – the attorneys fees that the bank received from Mr. Conway, by way of restitution, that was the only damage to the bank; correct?
A Yes. There was no financial damage to the bank.

Page 4499

Q And there were no findings adverse to the bank, were there?
A No.
Q And there were no charges brought against the bank, were there?
A No.
Q And the OTS let the branch sales go forward and the merger to go forward, notwithstanding the Conway investigation and the results of that investigation; isn't that correct?
A Yes.
Q And the OTS knew of Mr. Conway's relationship to the law firm before Syosset acquired Centereach; isn't that correct?
A Yes.
Q You came to know the senior management of LISB pretty well over the years, didn't you?
A Yes.
Q You came to know Mr. Viklund?
A Yes.
Q Mr. Nacos?
A Yes.
Q Mr. Fuster?
A Yes.
Q Mr. Conefry?

Page 4500

A Yes.
Q And Mr. Wenk?
A Yes.
Q And you would agree that the Federal Home Loan Bank Board considered the Syosset management team I just identified to be knowledgeable; correct?
A Yes.
Q And you would also agree that the Federal Home Loan Bank Board found them to be, and I quote, "extremely capable"; correct?
A Yes.
Q And it would be fair to say that you considered Mr. Viklund specifically to be competent and a man of integrity; correct?
A Yes.
Q And you also found Mr. Nacos to be a man who was competent and a man of integrity; correct?
A Yes.
Q And you would say the same thing for Mr. Fuster, wouldn't you?
A Yes.
Q And you would say the same thing for Mr. Wenk, wouldn't you?
A Yes.
Q And you would say the same thing about

Page 4501

Mr. Conefry, wouldn't you?
A Yes.
Q And you still consider Messrs. Viklund, Conefry, Fuster and Wenk to be men of integrity, don't you?
A Yes.
Q It's also your view that LISB's senior management team was trustworthy; isn't that correct?
A Yes.
Q Would you turn to the white notebook that the Government lawyers gave you, Mr. Vigna, and if you would be good enough to turn to their Defendant's Exhibit 1841. This is an internal memorandum; correct?
A Yes.
Q And it reflects internal discussions within the government agency; correct?
A Yes.
Q This wasn't shared with LISB, was it?
A No.
Q And you would agree with me that the OTS was pretty active in regulating the amount of stock going to management in connection with the conversion; correct?
A Yes.
Q And, in fact, they objected to what the bank first suggested, and the bank changed it to a plan that was acceptable to OTS; correct?

Page 4502

A Yes.
Q And if the OTS didn't accept it, it wouldn't have happened; isn't that correct?
A Yes.
Q And I believe you testified that the plan that the bank came back with ultimately became essentially the gold plan, it became the standard plan for all of the others; isn't that correct?
A With some modifications, yes.
Q Look at the second sentence of this memorandum, if you would. It says "we have allowed 4 percent and 8 percent when the institution" –
THE COURT: Third sentence, Mr. Wallace.
MR. WALLACE: Yes. Third sentence. Thank you.
BY MR. WALLACE:
Q It reads "we have allowed 4 percent and 8 percent." Do you see that?
A Yes.
Q And there's a reference to "the institution," "when the institution." Do you see that?
A Yes.
Q The institution being referred to there, that's not LISB, is it?
A No, I think they're talking in a general context.
Q What was LISB's tangible capital at the time of

Page 4503

the conversion?
A 5.3 percent.
Q Turn, if you would, to Plaintiffs' Exhibit 293 in the same notebook. You gave some testimony about this document, and specifically the second page, first full paragraph. Do you see that?
A Yes.
Q There is a sentence there about some restrictions not being exempted. Do you see that?
A What paragraph are you referring to?
Q The first full paragraph, first sentence that reads "a savings association operating under a capital plan approved before December 19, 1991 is exempt from certain PCA restrictions."
A Yes.
Q Okay. Not all of them; correct?
A Yes.
Q Can you identify for me the restrictions from which they were exempted and the ones that they were not?
A At this point in time, no.
MR. WALLACE: I have no further questions, your Honor.
THE COURT: Ms. Evans, before you begin, may I ask several questions of Mr. Vigna?
MS. EVANS: Certainly, your Honor.

Page 4504

THE COURT: I would appreciate that. I'll try to be very, very brief, Mr. Vigna. Would you please turn in the white binder to what is DX 1858. Mr. Vigna, if you would examine this document very carefully, and I'm going to ask you whether you actually signed it, and I'm going to make this a compound question, and remember signing it.
THE WITNESS: I did sign it. I can't specifically remember signing it, but I did sign it.
THE COURT: Do you remember signing any other consent order, apart from this one?
THE WITNESS: Relating to LISB?
THE COURT: Yes.
THE WITNESS: No.
THE COURT: What would have happened to the consent order, once you signed it?
THE WITNESS: It would go into the file, the LISB file at the regional office. It would go into the LISB file at Washington. And it would go into legal. To this point, I recall, all these enforcement actions became public documents, so there's a public file somewhere. Frankly, that's where you could find the full document, in the public file.
THE COURT: At the bottom – that relates to the next question I was going to ask you. At the bottom of this particular document it says "confidential material, subject

Page 4505

to protective order." Is that right? On your copy as well as mine?
THE WITNESS: Yes.
THE COURT: Do you know why that's there?
THE WITNESS: No, I don't.
THE COURT: Do you know if this is a public or confidential document or not?
MS. EVANS: Your Honor, I think this is what's on all of our documents, the stamp in the bottom, the Government's documents.
THE COURT: So there's nothing peculiar about this document?
MS. EVANS: Pertaining to this litigation.
THE WITNESS: I don't recall ever seeing that.
THE COURT: So as far as you know, this is a public document?
THE WITNESS: It's an enforcement action, yes.
THE COURT: Now, I wonder if you would please go to the very top of the first page of DX 1858, it says "United States of America, before the Office of Thrift Supervision, Department of the Treasury, in the matter of James J. Conway, Jr.," and then besides the descriptive material regarding Mr. Conway, there is order number, OTS order number NE 94-8.
THE WITNESS: Yes.

Page 4506

THE COURT: How were those assigned?
THE WITNESS: Those are assigned in Washington by the office of enforcement,.94 being the year and 8 I guess might have been the 8th enforcement action in 94. I'm not exactly sure of that, but there's some numbering system that enforcement used.
THE COURT: Did you need Washington's approval to exercise the consent order?
THE WITNESS: Yes.
THE COURT: Did you obtain Washington's approval?
THE WITNESS: I believe so, yes.
THE COURT: Whose approval was necessary?
THE WITNESS: The Office of General Counsel and probably in concurrence with the deputy director for supervision.
THE COURT: Was Mr. Conway represented by counsel throughout the – or any discussions that related to this consent order?
THE WITNESS: I believe he was, yes.
THE COURT: I have no further questions. Ms. Evans?
MS. EVANS: Yes, your Honor.
THE COURT: You may redirect.
MS. EVANS: Thank you. Your Honor, we've found a document which we're going to hand out, which is DX 1858A,

Page 4507

which appears to be the document we were looking for. May I approach?
THE COURT: Yes, certainly.
REDIRECT EXAMINATION
BY MS. EVANS:
Q Mr. Vigna, have you seen DX 1858A?
A Yes.
Q And just for the record, it says "stipulation and consent" at the top, also dated February 24, 1994, OTS order number NE 94-8. Tell us what this is.
A This is the stipulation and consent to the order issued by OTS to James J. Conway, Jr.
Q And there's a signature on the last page. Do you know what the procedure was for signing this?
A I don't recall exact procedure, but it certainly had to be signed by Mr. Conway.
Q Do you recall whether it was – well, I'm going to withdraw that since you said you didn't recall. Look at the last page, signature page, paragraph F. It says "this stipulation and consent shall become effective upon acceptance by the OTS, which acceptance shall be indicated by its issuance of the order." When they refer to "the order," do you know what that means?
A That's the consent order of prohibition and

Page 4508

consent C and D, requiring restitution and other affirmative action.
Q That would be what we looked at as DX 1858?
A Order number 94-8, dated February 24, 1994.
Q Do you believe that these two documents went together?
A Yes.
Q And would DX 1858A have been kept in the normal course of business by the OTS?
A Yes.
MS. EVANS: Your Honor, I'd like to move DX 1858 into evidence as well as 1858A.
THE COURT: Mr. Wallace?
MR. WALLACE: We have no objection to them both coming in, your Honor.
THE COURT: The Court will admit DX 1858 and DX 1858A.
(The documents referred to, previously identified as Defendant's Exhibit Nos. DX 1858 and DX 1858A, were received in evidence.)
BY MS. EVANS:
Q Mr. Vigna, what role, if any, did you play in negotiating the specific language in the assistance

Page 4509

agreement or the Federal Home Loan Bank Board resolution?
A I was part of the – part of the team. The primary negotiation was done by the FSLIC representatives.
Q Was Mr. Conway forthcoming to the government about his conflict of interest violations?
A No.
Q Was the bank damaged by Mr. Conway's actions that were the subject of the stipulation and consent, which are DX 1858 or 1858A?
A I guess to the extent that there was some reputational loss. There was some legal costs that they incurred as a consequence of the Conway issue.
Q What were the legal costs? What did they relate to?
A My recollection is that they hired counsel to protect the bank's interests, which those costs in whole or in part were reimbursed by the civil money penalty that was imposed on Mr. Conway, the restitution – the financial restitution that Mr. Conway provided.
Q And do you know whether or not a class action suit was brought against Long Island based on Mr. Conway's actions?
MR. WALLACE: Relevance, your Honor.
MS. EVANS: It goes to damage to the bank.
THE COURT: Through Mr. Conway's actions?

Page 4510

MS. EVANS: Yes.
THE COURT: I'll allow it, but – well, let's see what happens. I'll allow a couple of more questions along these lines.
THE WITNESS: I don't recall a class action suit, if there was one.
BY MS. EVANS:
Q Do you know whether or not Mr. Conway's conflict of interest violation affected OTS interests in maintaining public confidence in financial institutions?
MR. WALLACE: Leading, your Honor; objection.
THE COURT: Unfortunately, Ms. Evans, I am bound by the Federal Rules of Evidence to sustain that objection.
BY MS. EVANS:
Q Did Mr. Conway's conflict of interest have any impact on public confidence?
MR. WALLACE: Same objection, your Honor.
THE COURT: Ms. Evans, why don't you try again.
BY MS. EVANS:
Q Mr. Vigna, what is the purpose of the conflict of interest rules that the OTS had during the 1980s and 1990s?
A To prevent insiders from abusing their position for personal gain.
Q Why was that significant?
A It's inconsistent with appropriate conduct of

Page 4511

fiduciaries in a financial government-insured institution.
Q And would that affect public confidence?
A It could.
MS. EVANS: Nothing further.
THE COURT: Mr. Wallace, recross?
MR. WALLACE: We have no recross, your Honor.
THE COURT: Mr. Vigna, I am about to excuse you.
THE WITNESS: Thank you, your Honor. It's a pleasure.
THE COURT: Just a moment.
THE WITNESS: Do you have further questions?
THE COURT: Well, no. Ms. Evans, Mr. Wallace, do I really need to read the what I count as the sequestration instruction at this point? I will.
MS. EVANS: I believe so, your Honor.
THE COURT: All right. I am duty bound, Mr. Vigna, to give you an instruction. I think if I read it, you'll understand it, but if you don't, don't hesitate to ask about it.
The parties have requested, as they are entitled to under rule 615 of the Federal Rules of Evidence, and as you know from not having been present in the courtroom during the testimony of other witnesses, that witnesses, at least fact witnesses, be excluded from the courtroom so that

Page 4512

each such witness can give his or her testimony fresh, without being distracted by others' testimony.
My order to you is that until this trial concludes, which time you can learn from counsel, that you not discuss your testimony with anyone who either is or could conceivably be a witness. If you have any question about who could be a witness, you may ask counsel.
At this point, the trial is scheduled to conclude on Tuesday, March 22, if I have it right. That's just a horseback estimate.
Do you understand?
THE WITNESS: Yes.
THE COURT: Thank you very much. And I thank you for appearing and testifying.
THE WITNESS: Thank you, thank you, your Honor.
THE COURT: I really do.
(Witness excused.)
THE COURT: Mr. Madden?
MR. MADDEN: At this time, your Honor, we'd like to continue the Conway video.
THE COURT: Thank you very much. Mr. Madden, I know you're busy, but when you have a moment, I wonder if you or someone on your team could provide introduction on where we are with the video. At an appropriate point.
MR. MADDEN: Yes, your Honor. Your Honor, I

Page 4513

believe we're at page 21, line 24. This is a continuation of Mr. Conway's video deposition transcript which took place in 1999. I forget which day we played the first 20 minutes of it, but I think there's about three hours more to go.
THE COURT: Thank you very much. Now, who – oh, Mr. Cohen.
(Video played as follows:)
Q How about junk bonds, is that –
A No.
Q – one of the things that these thrifts were doing?
A No. Oh, yeah, a lot of thrifts were doing it. I thought you meant us. No, we wouldn't touch that with a 10-foot pole.
Q How about going out and buying whole loans from banks outside of the geographic area of the bank?
A I think, but I can't give you time frame, it was late – it was late that I think we may have done some, but I couldn't even begin to tell you when and how much or anything like that.
Q All right.
A It may have been that at the time when things were slowing down a little bit locally, because of the fact that so many banks had suddenly discovered one-family mortgages were a great investment. It only took them 100 years,