**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HOMER J. HOLLAND, STEVEN BANGERT, co-executor of the ESTATE OF HOWARD R. ROSS, AND FIRST BANK | ) | |
| Plaintiffs, | ) | No. 95-524 C |
| v. | ) | (Judge G. Miller) |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF DX 1452, THE DECLARATION OF NICHOLAS C. WILSON**

Plaintiffs respectfully ask the Court to rule that the Declaration of Nicholas C. Wilson, dated February 25, 2004 (DX 1452) (attached hereto as Exhibit A), cannot be admitted into evidence. The declaration is hearsay under FRE 801(c) — "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Under FRE 802, therefore, the declaration is inadmissible unless one of the exceptions provided in Rules 803 and 804 applies. The only plausible exception, the "former testimony" exception of FRE 804(b)(1), is foreclosed — the declaration could only be admitted under that provision if Mr. Wilson were "unavailable" to testify at trial. But Mr. Wilson is not "unavailable" — the defendant has represented that it "will call" Mr. Wilson as a witness. The declaration is inadmissible hearsay.

Moreover, Mr. Wilson's deposition testimony shows that the content of the declaration is so unreliable as to be irrelevant under FRE 401 and inadmissible under FRE

402 and 403, and the language of the declaration itself establishes that Mr. Wilson lacked personal knowledge of the purportedly underlying facts, rendering the document inadmissible under FRE 602.

Mr. Wilson testified at his deposition that when the defendant induced him to make the declaration he was "fairly heavily drugged"[1] because he "had significant health problems."[2] Specifically, Mr. Wilson stated that he "had had quintuple bypass surgery in January [2004], was on dialysis for failed kidneys and had a kidney transplant in March of 2004."[3] He explained further:

> I had end stage kidney failure -- renal failure, and had had a heart attack in September of 2002, and subsequent to that had been diagnosed with the end-stage renal failure, that I have a choice between long-term dialysis or a kidney transplant. As the doctors evaluated me, I needed to have the bypass -- quintuple bypass surgery before they could do the kidney transplant operation in March [2004]. I was on dialysis from December of '03 through the time of the kidney transplant on March 17 of 2004.[4]

Thus, Mr. Wilson's mental state when he signed the declaration in February 2004 was such that, as he testified during his deposition, "if someone had asked me [later], I am not so sure I would have said I knew there was a declaration."[5] In fact, Mr. Wilson was asked at deposition "Do you remember signing [the declaration]" and he responded that "If you would ask me that question, and I did not have the document in front of me, I would not have recalled signing it."[6] Moments later, he acknowledged that "I don't

---

[1] Exhibit B, Wilson Dep. Tr. (Feb. 15, 2006) at 22.
[2] *Id*. at 21.
[3] *Id*.
[4] *Id*. at 23.
[5] *Id*. at 178.
[6] *Id*. at 40.

remember attesting to it," and "I don't even remember signing any document, I guess."[7]

Mr. Wilson also testified in his deposition that he had no recollection of formulating the assertions set forth in the declaration:

> Q: . . . [M]y sense is that you don't remember how this document was created; is that correct?
>
> A: Correct.
>
> Q: So you don't know whether you drafted these statements or the government drafted them?
>
> A: I don't recall.[8]

Mr. Wilson's best recollection, which he described as his "assumption," was that the declaration "was not drafted by me but [was] drafted by the -- whoever I was talking to at th[e] time."[9]

In addition, when asked by Defendant whether he "ha[d] any doubt that when [he] signed th[e] [declaration]," that he "intended to sign [that] document," and not "something else," Mr. Wilson stated that he "d[id]n't recall," and that he "d[id]n't even recall the document."[10] The defendant then asked Mr. Wilson, "But you don't doubt that that is your signature?" Mr. Wilson acknowledged his signature and began to explain that "[a]s the signature page is separate from the other pages --" but the defendant interrupted his explanation and changed the subject.[11]

It is doubtful that Mr. Wilson consciously intended to make the statements attributed to him in the declaration, and it is questionable (and unascertainable) whether he knew what he was signing. Even the critical statements in the declaration itself —

[7] *Id*. at 41.
[8] *Id*. at 41.
[9] *Id*. at 42.
[10] *Id.* at 166.
[11] *Id*.

such as whether Mr. Wilson personally prepared the key "document[] sent to me by the government" — consist of material Mr. Wilson admits in the declaration that he was forced to "assume" because he "d[id] not specifically recall that fact."[12] The declaration acknowledges that Mr. Wilson was "unable to recall from independent memory the details concerning [his] work," and demonstrates that the assertions it contains stem not from Mr. Wilson's actual personal knowledge but instead consist merely of post hoc conjecture as to whether certain "conclusions reached in [a 1991] letter appear to be reasonable."[13]

For these reasons, the assertions in the declaration are so unreliable that they do not "tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be" without the declaration. They are, accordingly, irrelevant under FRE 401 and inadmissible under FRE 402. In addition, the circumstances under which the defendant procured the declaration demonstrate that the danger of unfair prejudice outweighs whatever probative value the declaration might have, and thereby requires exclusion under FRE 403. Finally, Mr. Wilson's statement in the declaration that he lacked "independent memory" of the facts purportedly underlying his conclusions render the declaration inadmissible under FRE 602, which establishes "lack of personal knowledge" as a ground for exclusion.

Mr. Wilson's declaration, which the Defendant procured from a gravely ill and heavily medicated person who cannot recall signing it, is of no evidentiary value to the Court and should be excluded from trial. Defendant has stated that it intends to call Mr. Wilson as a witness in its case-in chief. At that time, the Court may hear whatever

---

[12] Exhibit A, Wilson Dec. (Feb. 24, 2004) at ¶¶3-4.
[13] *Id*. at ¶6.

relevant and admissible testimony Mr. Wilson may be able to provide.

Respectfully submitted,

/s/ David B. Bergman

David B. Bergman
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for plaintiffs
Holland and Ross and First Bank.

*Of Counsel*:
Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

*Co-counsel for First Bank*:
Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
Gunn and Gunn
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, Missouri 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

Dated: November 5, 2007

**CERTIFICATE OF SERVICE**

I certify that on this 5th day of November 2007, I caused the foregoing **PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE ADMISSION OF DX 1452, THE DECLARATION OF NICHOLAS C. WILSON** to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: November 5, 2007 /s/ Joshua P. Wilson
Joshua P. Wilson

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **HOMER J. HOLLAND** | ) | |
| **and** | ) | |
| **HOWARD R. ROSS,** | ) | |
| | ) | **Case No. 95-524C** |
| **Plaintiffs,** | ) | |
| | ) | **(Judge George W. Miller)** |
| **v.** | ) | |
| | ) | **(*Winstar*-Related Case)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF NICHOLAS C. WILSON**

1. I currently am an investment advisor for Jacobus Wealth Management in Milwaukee, Wisconsin. In 1991, I was a financial consultant and performed work as an independent contractor for Laurence Barr & Co., Ltd., a financial advisory and merger and acquisition consulting business in Illinois. Prior to my work for Laurence Barr, I served as a Vice President for Merrill Lynch in the Financial Institution Investment Banking Division. Before that, I worked for 16 years as an investment banker for the Robert Baird Company, where I served as the head of the financial institution group. Prior to that, I was a commercial banker with the Marine Bank of Wisconsin, which is now part of Bank One.

2. In February of 2004, I was contacted by an attorney for the United States Department of Justice who informed me that work I performed in 1991 valuing stock of a thrift called River Valley Savings Bank had become relevant to a case in which the United States was the defendant. The attorney explained to me that the plaintiffs in the case are Homer Holland and Howard Ross, who were affiliated with River Valley.

3. I have reviewed two documents sent to me by the government that pertain to my work for Laurence Barr. Those documents are attached to this declaration. The first document is an agreement between Laurence Barr & Co., Ltd. and River Valley Savings Bank, in which Laurence Barr agreed to provide an analysis concerning the relative values, as of July 29, 1988, of the Common Stock and Series A Preferred Stock of River Valley. I signed this agreement on behalf of Laurence Barr. I recognize my signature at the bottom of the agreement. Homer Holland became a contact of mine while I was working for Merrill Lynch, and it was through my connection with Homer Holland that Laurence Barr received this work.

4. The second document is a draft letter concerning the analysis of common and preferred stock which River Valley hired Laurence Barr to perform. The second page of the letter appears to be missing. Although I do not recall my work in detail at this time, I recall that I was the person who performed the analysis stated in the letter, and I assume that I drafted the

DEFENDANT'S EXHIBIT
DX 1452
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

letter, although I do not specifically recall that fact at this time. To the best of my recollection, the work was completed, because I recall being paid for this project. I therefore believe that we would have sent a final version of my analysis to River Valley.

5. It was my regular practice to maintain documents like the retention agreement and letter to River Valley, including drafts, in my business files after the completion of my consulting work. When my work for Laurence Barr & Co. ended, I took the files related to River Valley with me. For sometime thereafter, I maintained those documents in my business files. I currently do not have any documents related to my work for River Valley, because I have since discarded the files. I cannot recall anyone other than River Valley, Homer Holland, or Steve Bangert of River Valley, who might have copies of my work.

6. I am unable to recall from independent memory the details concerning my work. I understand the draft letter, however, and can explain it generally. The letter indicates that I estimated the value of River Valley's Series A Preferred Stock as of July 28, 1988 to be $2,800,000 million dollars. The letter states that my conclusions were based upon information provided by River Valley and its December 31, 1988 and 1989 audited financial statements. The conclusions reached in the letter appear to be reasonable based upon my current review of the letter and my knowledge of conditions prevailing in the financial markets in 1988.

7. Although the par value of the stock was $5 million, it was my opinion that this stock was worth only approximately $2,800,000 at the time it was sold to the Federal Savings and Loan Insurance Corporation. This valuation assumes that a ready buyer might be available at that price, but does not guarantee that the stock could be sold in the market for even $2,800,000. For such a small, highly leveraged institution that was newly formed from previously troubled institutions, in my opinion, if an investor could be found, the investor likely would require a significantly higher rate of return than the return offered to the Federal Savings and Loan Insurance Corporation. Without a higher rate of return, in my opinion, a buyer likely would purchase the stock only at a significantly discounted price. Based upon my knowledge of market conditions and security values, and to the best of my recollection, these are reasons why I valued the preferred stock at $2,800,000. In addition, largely based upon the same reasoning, I valued the common stock of River Valley between $8,000,000 and $9,000,000.

8. I understand that the trial in this matter is scheduled to commence on March 30, 2004. Since December 17, 2003, I have been on dialysis, and in January of 2004, I underwent bypass surgery. I am scheduled for a kidney transplant on March 17, 2004 and expect to be in the hospital for at least the next two weeks. Thereafter, I have to return to the hospital one day each week and must undergo blood tests three days each week. In addition, my doctor has told me not to drive for four to six weeks after my kidney transplant. It therefore would be very difficult for me to travel to be present at the trial in this case. For this reason, the government has asked me to provide this information in writing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on February 25 2004.

Nicholas C. Wilson

Nicholas C. Wilson

# EXHIBIT B

Page 18

Q Okay.
A And had a good reputation at that time, and had done some very good-sized transactions, and would look like a good spot to spend some time. I had known Larry Barr for two or three years before that.
Q Okay.
A He invited me to come on over and join him.
Q Okay. Did Laurence Barr have any actual employees or partners?
A No, just -- There were other -- There were other private contractors who worked with Larry. I think at that time there were three or four other people who -- who did -- worked on transactions, basically.
Q Okay. And when you say "worked on transactions," I mean, what exactly -- what services did you provide for --
A We were looking for buyers -- buyers for companies and sellers for companies.
Q Okay. And so when you would look -- A seller of a company would hire you to find a buyer, and then what would you do for the seller, how would you find the buyer?
A You would analyze the business and try to determine

Page 19

who you felt would be an appropriate buyer for that business, and go out and find a buyer, and, conversely, worked a great deal with purchasers of businesses.
Q Um-hum.
A Finding out what their acquisition criteria was and made acquisitions.
Q And what sort of criteria, you know, did businesses have? Did it vary very much according to the size and type of the company? I mean, what sort of things did you look at?
A It was a middle market business. I mean, on a size basis. And it was really working with contacts and relationships, as to finding buyers or finding sellers for businesses.
Q Okay. Was that the exclusive business of Laurence Barr? Did it do other kind of services?
A No.
Q Okay. What were you doing apart from the independent contract work for Laurence Barr at that time? Any other work?
A Nothing. I was there, I think, for a few months, I guess is what I would say, and then decided that wanted to come back to Milwaukee.
Q Okay. Does it still exist, Laurence Barr?

Page 20

A No.
Q What happened to it?
A Larry would be probably close to 85 or 90 today, I think --
Q Okay.
A -- so he just, I think -- I haven't had any contact in ten years or so with him. He just sort of retired and closed up the firm, I believe.
Q Okay. All right. Well, I would like to ask you in more detail about some of your work for Laurence Barr as it relates to this case, but let's just, for right now -- I would just like to know a little bit about your familiarity with the case. When did you first hear about this lawsuit?
A I guess in -- And I wasn't even aware that I had provided a declaration back in 19 -- 2004, but I believe I received a phone call from the Department of Justice sometime there before, and who made me aware of the -- of the lawsuit, and asked me for a declaration.
I believe I had said to you on the telephone I hadn't found any files, and I hadn't, other than as I went -- I had been asked in the subpoena whether I had any other documents related to the case, and the only thing I found in looking

Page 21

at my files was the copy of the declaration that I gave and signed in February of 2004, so it was approximately that time.
Q Okay. I'm going to back up a second. Did you say you were not aware that you had given a declaration in the case?
A I had not recalled it.
Q Okay.
A At that time I had significant health problems. I had had quintuple bypass surgery in January, was on dialysis for failed kidneys, and had a kidney transplant in March of 2004, so --
Q Do you now remember having given this declaration, just from independent memory?
A I recall that I gave a declaration upon reading it again. I mean, if you had asked me before I went into my files, I -- I don't recall whether I -- at that time I wouldn't have recalled that I had given this declaration.
Q At what time? When I called you in January?
A Yes.
Q And you attribute that to being ill when you gave the declaration?
A There are many things that I don't remember from 2004 I guess I would say. But, no, I -- whether it

Page 22

was illness -- and at that time I was fairly heavily drugged, I guess I would say --
Q Okay.
A -- and not feeling well, but it had slipped my memory. I didn't recall.
Q Okay. So let's just go back to -- I'm not sure I got a clear answer, because we started talking about the declaration. When did you first hear about the case?
A Shortly before the declaration.
Q Okay. Do you remember that? Do you remember the government contacting you?
A I wouldn't -- I didn't recall it until I was reminded when you first called me, and I don't know whether it was you or someone from the Department of Justice, going into this round, and when I was reminded of it, I recalled that I had given a declaration at that time.
Q Okay. Let's -- I'll get back to the declaration here in a minute.
Do you remember anything about -- Independent of the declaration, do you remember anything that you discussed with the government when they called you?
A No, I don't recall anything.

Page 23

Q Do you remember, when the government called you, were you in the hospital?
A No, I was at home.
Q Okay. And what -- I don't mean to be too intrusive, but what precisely was your medical condition at that time?
A I had end-stage kidney failure -- renal failure, and had had a heart attack in September of 2002, and subsequent to that had been diagnosed with the end-stage renal failure, that I have a choice between long-term dialysis or a kidney transplant.
As the doctors evaluated me, I needed to have the bypass -- quintuple bypass surgery before they could do the kidney transplant operation in March. I was on dialysis from December of '03 through the time of the kidney transplant on March 17th of 2004.
Q Okay. And was that, I assume, a successful operation?
A Yes.
Q I'm glad to hear that.
So you don't recall independently of the declaration any of the discussions that you had with the government at that time?
A I -- I do recall, upon reading the declaration,

Page 24

that I had said I wasn't going to be available to go to Washington --
Q Right.
A -- in March, which was --
Q Right.
A -- when this was all scheduled to be.
Q That seems eminently reasonable.
A Um-hum.
Q So when is the next time, after giving the declaration, that you discussed the case with anybody?
A I believe sometime late last fall or -- late in the -- in the fourth quarter of 2005, and I think -- believe I had -- the first contact was from the Justice Department, indicating -- I think it was John Roberson who contacted me, saying that perhaps I would be deposed on the subject.
Q Was it -- I know you're saying you can't remember very much, and understandably, from the early 2004 time frame, but do you -- was it -- do you remember whether it was John Roberson that contacted you at that time?
A Only in that the declaration was sent to me by a Catherine -- excuse me -- Kichel Janame, who said at the request of the Department of Justice,

Page 25

Attorney John Roberson, this was forwarded to me. This was forwarded on November 4th, 2005, I guess.
Q Can I have a copy of that document? Do you have another copy of it?
A No, I don't.
Q At a break, actually, we'll make a copy, and we'll deal with it at that time.
A Okay.
Q I'm sorry. So you're reading from a document that was sent to you by the government?
A Correct.
Q Okay. We'll put that aside for a moment --
A Okay.
Q -- and we'll make copies of it later.
All right. So you were contacted in the fourth quarter of 2005, and what -- what did you discuss with Mr. Roberson?
A Discussed that this case was moving forward, and that a deposition would be -- they'd be looking to depose me at some time, and I said to him that I really, you know -- at that -- I was surprised by the request because I thought that everything -- I didn't have much recollection of the early 2004 conversations, or the affidavit, or the matter itself going back to 1991, '90.

Page 38

meeting with Mr. Holland or Mr. Bangert, just favorable or unfavorable impressions of them as businessmen or people?
A I think they were well-regarded. I think Homer came out of one of the other banks in Chicago, I can't tell you which one, and Steve was his financial officer of the company, I believe.
Q Um-hum. When you say they're well-regarded, how do you have that impression?
A That -- You know, in the Chicago banking financial community, that they were thought of as people who had an understanding of what they were doing --
Q Okay.
A -- on a business basis.
Q You had heard of them before you --
A Um-hum.
Q -- met with them to do this work?
A Yes.
Q And how, for example, had you heard of them?
MR. WHITMAN: Objection, hearsay.
THE WITNESS: I don't recollect.
BY MR. WILSON:
Q Okay. Did you have any contact with anyone else in the River Valley company besides Mr. Bangert or Mr. Holland? Did you ever meet Susan Ells or Ron

Page 39

Pikus?
A It's interesting you say that, because, as you say that, Susan Ells' husband was in my son's class in high school --
Q Oh.
A -- and I had met them socially on and off over the years. Her husband plays golf, and I've met him playing golf. But I think a couple of times over the years I met Susan, and now that you mention it, I think it was -- I was told that she had worked for Homer Holland in Chicago.
Q Do you have any impression about her work as a banker?
A I never worked with her.
MR. WILSON: Okay. All right. You have got a copy of this already, I know, but I am going to have the court reporter mark as a copy -- or, as an exhibit here your declaration from 2004.
(Exhibit No. 1 was marked.)
BY MR. WILSON:
Q And, Mr. Wilson, I'll hand you, just so we make sure we have all got the same thing, I know this is a photocopy of the exact same document that's been marked as Exhibit 1, which, as I said, is your declaration from February of 2004 -- You said you

Page 40

had a chance to review this prior to your deposition, and we've been talking about it. If you need another minute to review it, go ahead and do that, because I want to talk about it pretty extensively.
When you feel comfortable with it --
A Sure.
Q -- just give me a heads-up, and we'll go forward.
A I have completed the reading of it.
Q Okay. Go ahead and look at Page 3 of the declaration. There's a signature there above your name, and I'd -- just to be clear here, I want to make sure, is that your signature?
A That is my signature.
Q Okay. And it's dated February 25th, 2004; is that correct?
A Correct.
Q When you signed this, you were, you said, not in the hospital, but you were at home --
A Um-hum.
Q -- and on dialysis. Do you remember signing it?
A Other than the -- If you would ask me that question, and I did not have the document in front of me, I would not have recalled signing it.
Q Now, the page where you're signing here, there's a

Page 41

statement above where you're indicating that you're giving sworn statements. It says that you declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct. As you review it now, do you continue to hold that view, that the statements are true and correct?
A To the best of my recollection, yes.
Q But you don't, as you sit here now, and if you weren't looking at the document -- you can't say that when you signed that, you remember attesting to that?
A I don't remember attesting to it.
Q Okay.
A I don't even remember signing any document, I guess.
Q Okay. All right. So my sense, and we don't have to dwell on it -- but my sense is that you don't remember how this document was created; is that correct?
A Correct.
Q So you don't know whether you drafted these statements or whether the government drafted them?
A I don't recall.
Q Do you recall any process of discussion with the

Page 42

government about the content of the statements?
A I don't recall, although upon reading it, I assume we had had some conversations, and, as this looks like a -- a legally formatted document, I assume that -- and this is just my assumption, would be that it was drafted by the -- it was not drafted by me but drafted by the -- whoever I was talking to at that time.
Q Um-hum. But you don't, sitting here, remember independently whether you drafted it --
A No.
Q -- or the government drafted it? Do you remember the content of any of the discussions that you had with the government about this document?
MR. WHITMAN: Objection, asked and answered.
BY MR. WILSON:
Q You can answer.
A Only as to the -- what was declared in the document.
Q In other words, you -- I'm sorry. So -- I just want to be clear about it. Your only memory of what was in this document, and how it was created, is by your review of it now?
A Correct.

Page 43

Q Okay. And you agree now that these statements are -- Do these statements now represent your best recollection of the events that they're describing?
A Yes.
Q All right. In this declaration you indicate that you've reviewed some documents --
A Correct.
Q -- to help create it. Do you have those documents with you?
A No, I do not.
Q Okay. Do you remember what those documents were?
A It was -- Again, with the jogging of my memory, it was a -- an engagement letter and then a -- what appeared to be a draft of a -- of the valuation letter. That it was missing one page, I guess, and was not signed, so I don't know if it was an early draft --
Q Okay.
A -- or a final draft, or not.
Q Okay. But you don't have independent memory --
A No.
Q -- of the documents?
MR. WILSON: I'm going to ask the court reporter to mark as exhibits two documents, and I'm going to ask you to review them to see if these

Page 44

might be the documents that you referred to in the declaration. And I'm going to ask you to go ahead and mark them 2 and 3.
(Exhibit Nos. 2 and 3 were marked.)
(Discussion off the record.)
BY MR. WILSON:
Q Here you go, Mr. Wilson. Go ahead and take your time, and have a look at these, and let me know when you've had a chance to review them.
A I have completed a reading of the two documents.
Q Okay. Let's focus first on -- Well, let me ask you generally. Are these the -- Do you know, are these the documents that you reviewed in connection with your 2004 declaration?
A I don't have complete recollection, but I assume so.
Q Okay. Why do you assume so?
A Because I referred to an engagement letter that was signed by me and a draft of a -- of the -- of the valuation letter.
Q Do the documents refresh your memory at all about the circumstances of the making of the declaration?
A Yes.
Q Okay. And how do they refresh your memory?
A It lays out sort of the time sequence and the

Page 45

background in essence of the -- and the structure, the capital structure, of River Valley at the time of the valuation, and a paragraph talking about the subsequent operation of River Valley.
Q Does it help you remember anything about how the declaration was made?
A I assume I -- I don't recall.
Q Okay.
A Do you want an assumption? I would assume that I reviewed the documents and then must have had a conversation, I assume, from which the declaration was drafted.
Q Okay. But you can't -- It doesn't help you remember anything --
A No.
Q -- about the declaration? Okay. Do you remember at all, or do these documents refresh your memory, about any other documents you might have reviewed in connection with making the declaration?
A No.
Q Okay. And you don't remember making -- reviewing any other documents?
A No, in that I did not have any documents at that time. I didn't have any files of my own at that time.

Page 166

Q Do you have any doubt that when you signed this, you intended to sign this document, that you didn't think you were signing something else, in other words?
A I don't understand. That the signature page was attached to something else? I don't recall. I don't even recall the document.
Q But you don't doubt that that is your signature?
A That is my signature. As the signature page is separate from the other pages --
Q Well, let me ask this. In your professional experience have you been called upon to provide declarations or affidavits with regard to other matters?
A No. In past experience of mine I have done valuations and appraisals for estate and gift tax purposes, and they were presented to the Internal Revenue Service and the State of Wisconsin, but not an affidavit per se.
Q Well, let me ask about those. Regarding those -- Are they reports, or what sort of documents are they?
A They're reports. They were reports.
Q Regarding those reports, you were required to sign them?

Page 167

A Yes.
Q And they were being submitted to the Internal Revenue Service?
A Um-hum.
Q Were they -- Did you submit any reports to any type of court, like, for example, a tax court?
A Yeah.
MR. WILSON: Objection, lack of relevance.
BY MR. WHITMAN:
Q You can answer.
A I think that the underlying reports were subsequently either in the estate tax division at -- I think it used to be called, the -- a lot of it was at the conference level, and then in court on several occasions.
Q Do you recall if those reports were -- when you signed them, you were signing them under penalty of perjury or under oath?
A It was -- No, the reports were the valuations submitted to a law firm, or an accounting firm, or a client. Valuations of common stock of privately held companies or other securities of privately held companies.
Q Before you submitted those reports, was it your

Page 168

normal practice to read those documents thoroughly?
A The report?
Q Yes. I'm sorry, the reports.
A Yes.
Q Before you signed them?
A Yes.
Q Is it your normal practice, just in general, apart from the reports that you sent to the IRS or, you know, to a court -- is it your general practice to read documents thoroughly and carefully before you sign them?
A Normally, yes.
Q Do you have any reason to doubt that you did not follow that normal practice when you signed Exhibit No. 1?
A I would have to review it again before I were to make that comment.
Q Well, please go ahead and take the time. Just let me know when you're done reading it.
A Sure. Okay.
Q Having taken the time to review the declaration now, let me ask you, do you have any reason, sitting here today, to think that you did not follow your normal practice of reviewing documents thoroughly before you signed them?

Page 169

A This being the document?
Q Yes. "This" being the declaration which is Exhibit No. 1.
A I guess I would say on reviewing it, I say that the estimated value of River Valley -- In Paragraph 6 it states -- indicates that -- an estimated value of River Valley as of July 28th, 1988, and I don't know whether that was the valuation date or not, and that the assisted merger took place on July 29th.
Other than that, I guess to the best of my recollection, I reviewed -- and as I said in Chapter 8, my thought processes were perhaps not running at 100 percent at the time, but the -- I believe the rest of the document appears -- appears to be one that I would have signed.
I note in Paragraph 3 that we talk about values as of July 29th, so there's a discrepancy there between Paragraph 3 and Paragraph 6 but --
Q Apart from that discrepancy you just mentioned in Paragraph 6, where it uses July 28th -- apart from that, do you have any -- Let me rephrase that.
Apart from the discrepancy you mention regarding Paragraph 6, regarding the date of July 28th, is there anything else in this declaration

Page 178

A No.
Q Okay.
A This was probably within months after I left Merrill Lynch.
Q Okay. And, finally, Mr. Wilson, I just want to ask you -- and, you know, I know it's a touchy subject when we go back to your health a couple of years ago, but you testified that you -- earlier that you don't remember signing that declaration; is that right?
A Correct. I -- If someone had asked me, I am not so sure I would have said I knew there was a declaration --
Q Okay.
A -- existing.
Q It was news to you when the Department of Justice called you in the fall of 2005?
MR. WHITMAN: Objection.
THE WITNESS: I went back -- Yes.
BY MR. WILSON:
Q Okay.
A And that based upon the cover letter, that they sent a copy of it to me on November 4th, 2005.
MR. WILSON: Okay. All right.
MR. WHITMAN: No further questions.

Page 179

MR. WILSON: Okay.
(Proceedings concluded at 3:32 p.m.)

____________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this____________
day of____________________, 20__

____________________
Notary Public

My Commission Expires:____________________

Page 180

STATE OF WISCONSIN )
) SS:
COUNTY OF MILWAUKEE )

I, KATHLEEN E. CARTER, a Certified Realtime Reporter, Registered Merit Reporter and Notary Public in and for the State of Wisconsin, do hereby certify that the above deposition of NICHOLAS C. WILSON was recorded by me on February 15, 2006, and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof I have hereunder set my hand and affixed my seal of office at Milwaukee, Wisconsin, this 17th day of February, 2006.

____________________
Notary Public
In and for the State of Wisconsin

My Commission Expires: March 16, 2009.