# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **HOMER J. HOLLAND** | ) | |
| **and** | ) | |
| **HOWARD R. ROSS,** | ) | |
| | ) | **Case No. 95-524C** |
| **Plaintiffs,** | ) | |
| | ) | **(Judge George W. Miller)** |
| **v.** | ) | |
| | ) | **(*Winstar*-Related Case)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DECLARATION OF NICHOLAS C. WILSON**

1. I currently am an investment advisor for Jacobus Wealth Management in Milwaukee, Wisconsin. In 1991, I was a financial consultant and performed work as an independent contractor for Laurence Barr & Co., Ltd., a financial advisory and merger and acquisition consulting business in Illinois. Prior to my work for Laurence Barr, I served as a Vice President for Merrill Lynch in the Financial Institution Investment Banking Division. Before that, I worked for 16 years as an investment banker for the Robert Baird Company, where I served as the head of the financial institution group. Prior to that, I was a commercial banker with the Marine Bank of Wisconsin, which is now part of Bank One.

2. In February of 2004, I was contacted by an attorney for the United States Department of Justice who informed me that work I performed in 1991 valuing stock of a thrift called River Valley Savings Bank had become relevant to a case in which the United States was the defendant. The attorney explained to me that the plaintiffs in the case are Homer Holland and Howard Ross, who were affiliated with River Valley.

3. I have reviewed two documents sent to me by the government that pertain to my work for Laurence Barr. Those documents are attached to this declaration. The first document is an agreement between Laurence Barr & Co., Ltd. and River Valley Savings Bank, in which Laurence Barr agreed to provide an analysis concerning the relative values, as of July 29, 1988, of the Common Stock and Series A Preferred Stock of River Valley. I signed this agreement on behalf of Laurence Barr. I recognize my signature at the bottom of the agreement. Homer Holland became a contact of mine while I was working for Merrill Lynch, and it was through my connection with Homer Holland that Laurence Barr received this work.

4. The second document is a draft letter concerning the analysis of common and preferred stock which River Valley hired Laurence Barr to perform. The second page of the letter appears to be missing. Although I do not recall my work in detail at this time, I recall that I was the person who performed the analysis stated in the letter, and I assume that I drafted the

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
DX 1452
Holland v. U.S. 95-524C

letter, although I do not specifically recall that fact at this time. To the best of my recollection, the work was completed, because I recall being paid for this project. I therefore believe that we would have sent a final version of my analysis to River Valley.

5. It was my regular practice to maintain documents like the retention agreement and letter to River Valley, including drafts, in my business files after the completion of my consulting work. When my work for Laurence Barr & Co. ended, I took the files related to River Valley with me. For sometime thereafter, I maintained those documents in my business files. I currently do not have any documents related to my work for River Valley, because I have since discarded the files. I cannot recall anyone other than River Valley, Homer Holland, or Steve Bangert of River Valley, who might have copies of my work.

6. I am unable to recall from independent memory the details concerning my work. I understand the draft letter, however, and can explain it generally. The letter indicates that I estimated the value of River Valley's Series A Preferred Stock as of July 28, 1988 to be $2,800,000 million dollars. The letter states that my conclusions were based upon information provided by River Valley and its December 31, 1988 and 1989 audited financial statements. The conclusions reached in the letter appear to be reasonable based upon my current review of the letter and my knowledge of conditions prevailing in the financial markets in 1988.

7. Although the par value of the stock was $5 million, it was my opinion that this stock was worth only approximately $2,800,000 at the time it was sold to the Federal Savings and Loan Insurance Corporation. This valuation assumes that a ready buyer might be available at that price, but does not guarantee that the stock could be sold in the market for even $2,800,000. For such a small, highly leveraged institution that was newly formed from previously troubled institutions, in my opinion, if an investor could be found, the investor likely would require a significantly higher rate of return than the return offered to the Federal Savings and Loan Insurance Corporation. Without a higher rate of return, in my opinion, a buyer likely would purchase the stock only at a significantly discounted price. Based upon my knowledge of market conditions and security values, and to the best of my recollection, these are reasons why I valued the preferred stock at $2,800,000. In addition, largely based upon the same reasoning, I valued the common stock of River Valley between $8,000,000 and $9,000,000.

8. I understand that the trial in this matter is scheduled to commence on March 30, 2004. Since December 17, 2003, I have been on dialysis, and in January of 2004, I underwent bypass surgery. I am scheduled for a kidney transplant on March 17, 2004 and expect to be in the hospital for at least the next two weeks. Thereafter, I have to return to the hospital one day each week and must undergo blood tests three days each week. In addition, my doctor has told me not to drive for four to six weeks after my kidney transplant. It therefore would be very difficult for me to travel to be present at the trial in this case. For this reason, the government has asked me to provide this information in writing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on February 25 2004.

Nicholas C. Wilson

Nicholas C. Wilson