# EXHIBIT B

Page 18

Q Okay.
A And had a good reputation at that time, and had done some very good-sized transactions, and would look like a good spot to spend some time. I had known Larry Barr for two or three years before that.
Q Okay.
A He invited me to come on over and join him.
Q Okay. Did Laurence Barr have any actual employees or partners?
A No, just -- There were other -- There were other private contractors who worked with Larry. I think at that time there were three or four other people who -- who did -- worked on transactions, basically.
Q Okay. And when you say "worked on transactions," I mean, what exactly -- what services did you provide for --
A We were looking for buyers -- buyers for companies and sellers for companies.
Q Okay. And so when you would look -- A seller of a company would hire you to find a buyer, and then what would you do for the seller, how would you find the buyer?
A You would analyze the business and try to determine

Page 19

who you felt would be an appropriate buyer for that business, and go out and find a buyer, and, conversely, worked a great deal with purchasers of businesses.
Q Um-hum.
A Finding out what their acquisition criteria was and made acquisitions.
Q And what sort of criteria, you know, did businesses have? Did it vary very much according to the size and type of the company? I mean, what sort of things did you look at?
A It was a middle market business. I mean, on a size basis. And it was really working with contacts and relationships, as to finding buyers or finding sellers for businesses.
Q Okay. Was that the exclusive business of Laurence Barr? Did it do other kind of services?
A No.
Q Okay. What were you doing apart from the independent contract work for Laurence Barr at that time? Any other work?
A Nothing. I was there, I think, for a few months, I guess is what I would say, and then decided that wanted to come back to Milwaukee.
Q Okay. Does it still exist, Laurence Barr?

Page 20

A No.
Q What happened to it?
A Larry would be probably close to 85 or 90 today, I think --
Q Okay.
A -- so he just, I think -- I haven't had any contact in ten years or so with him. He just sort of retired and closed up the firm, I believe.
Q Okay. All right. Well, I would like to ask you in more detail about some of your work for Laurence Barr as it relates to this case, but let's just, for right now -- I would just like to know a little bit about your familiarity with the case. When did you first hear about this lawsuit?
A I guess in -- And I wasn't even aware that I had provided a declaration back in 19 -- 2004, but I believe I received a phone call from the Department of Justice sometime there before, and who made me aware of the -- of the lawsuit, and asked me for a declaration.
I believe I had said to you on the telephone I hadn't found any files, and I hadn't, other than as I went -- I had been asked in the subpoena whether I had any other documents related to the case, and the only thing I found in looking

Page 21

at my files was the copy of the declaration that I gave and signed in February of 2004, so it was approximately that time.
Q Okay. I'm going to back up a second. Did you say you were not aware that you had given a declaration in the case?
A I had not recalled it.
Q Okay.
A At that time I had significant health problems. I had had quintuple bypass surgery in January, was on dialysis for failed kidneys, and had a kidney transplant in March of 2004, so --
Q Do you now remember having given this declaration, just from independent memory?
A I recall that I gave a declaration upon reading it again. I mean, if you had asked me before I went into my files, I -- I don't recall whether I -- at that time I wouldn't have recalled that I had given this declaration.
Q At what time? When I called you in January?
A Yes.
Q And you attribute that to being ill when you gave the declaration?
A There are many things that I don't remember from 2004 I guess I would say. But, no, I -- whether it

Page 22

was illness -- and at that time I was fairly heavily drugged, I guess I would say --
Q Okay.
A -- and not feeling well, but it had slipped my memory. I didn't recall.
Q Okay. So let's just go back to -- I'm not sure I got a clear answer, because we started talking about the declaration. When did you first hear about the case?
A Shortly before the declaration.
Q Okay. Do you remember that? Do you remember the government contacting you?
A I wouldn't -- I didn't recall it until I was reminded when you first called me, and I don't know whether it was you or someone from the Department of Justice, going into this round, and when I was reminded of it, I recalled that I had given a declaration at that time.
Q Okay. Let's -- I'll get back to the declaration here in a minute.
Do you remember anything about -- Independent of the declaration, do you remember anything that you discussed with the government when they called you?
A No, I don't recall anything.

Page 23

Q Do you remember, when the government called you, were you in the hospital?
A No, I was at home.
Q Okay. And what -- I don't mean to be too intrusive, but what precisely was your medical condition at that time?
A I had end-stage kidney failure -- renal failure, and had had a heart attack in September of 2002, and subsequent to that had been diagnosed with the end-stage renal failure, that I have a choice between long-term dialysis or a kidney transplant.
As the doctors evaluated me, I needed to have the bypass -- quintuple bypass surgery before they could do the kidney transplant operation in March. I was on dialysis from December of '03 through the time of the kidney transplant on March 17th of 2004.
Q Okay. And was that, I assume, a successful operation?
A Yes.
Q I'm glad to hear that.
So you don't recall independently of the declaration any of the discussions that you had with the government at that time?
A I -- I do recall, upon reading the declaration,

Page 24

that I had said I wasn't going to be available to go to Washington --
Q Right.
A -- in March, which was --
Q Right.
A -- when this was all scheduled to be.
Q That seems eminently reasonable.
A Um-hum.
Q So when is the next time, after giving the declaration, that you discussed the case with anybody?
A I believe sometime late last fall or -- late in the -- in the fourth quarter of 2005, and I think -- believe I had -- the first contact was from the Justice Department, indicating -- I think it was John Roberson who contacted me, saying that perhaps I would be deposed on the subject.
Q Was it -- I know you're saying you can't remember very much, and understandably, from the early 2004 time frame, but do you -- was it -- do you remember whether it was John Roberson that contacted you at that time?
A Only in that the declaration was sent to me by a Catherine -- excuse me -- Kichel Janame, who said at the request of the Department of Justice,

Page 25

Attorney John Roberson, this was forwarded to me. This was forwarded on November 4th, 2005, I guess.
Q Can I have a copy of that document? Do you have another copy of it?
A No, I don't.
Q At a break, actually, we'll make a copy, and we'll deal with it at that time.
A Okay.
Q I'm sorry. So you're reading from a document that was sent to you by the government?
A Correct.
Q Okay. We'll put that aside for a moment --
A Okay.
Q -- and we'll make copies of it later.
All right. So you were contacted in the fourth quarter of 2005, and what -- what did you discuss with Mr. Roberson?
A Discussed that this case was moving forward, and that a deposition would be -- they'd be looking to depose me at some time, and I said to him that I really, you know -- at that -- I was surprised by the request because I thought that everything -- I didn't have much recollection of the early 2004 conversations, or the affidavit, or the matter itself going back to 1991, '90.

Page 38

meeting with Mr. Holland or Mr. Bangert, just favorable or unfavorable impressions of them as businessmen or people?
A I think they were well-regarded. I think Homer came out of one of the other banks in Chicago, I can't tell you which one, and Steve was his financial officer of the company, I believe.
Q Um-hum. When you say they're well-regarded, how do you have that impression?
A That -- You know, in the Chicago banking financial community, that they were thought of as people who had an understanding of what they were doing --
Q Okay.
A -- on a business basis.
Q You had heard of them before you --
A Um-hum.
Q -- met with them to do this work?
A Yes.
Q And how, for example, had you heard of them?
MR. WHITMAN: Objection, hearsay.
THE WITNESS: I don't recollect.
BY MR. WILSON:
Q Okay. Did you have any contact with anyone else in the River Valley company besides Mr. Bangert or Mr. Holland? Did you ever meet Susan Ells or Ron

Page 39

Pikus?
A It's interesting you say that, because, as you say that, Susan Ells' husband was in my son's class in high school --
Q Oh.
A -- and I had met them socially on and off over the years. Her husband plays golf, and I've met him playing golf. But I think a couple of times over the years I met Susan, and now that you mention it, I think it was -- I was told that she had worked for Homer Holland in Chicago.
Q Do you have any impression about her work as a banker?
A I never worked with her.
MR. WILSON: Okay. All right. You have got a copy of this already, I know, but I am going to have the court reporter mark as a copy -- or, as an exhibit here your declaration from 2004.
(Exhibit No. 1 was marked.)
BY MR. WILSON:
Q And, Mr. Wilson, I'll hand you, just so we make sure we have all got the same thing, I know this is a photocopy of the exact same document that's been marked as Exhibit 1, which, as I said, is your declaration from February of 2004 -- You said you

Page 40

had a chance to review this prior to your deposition, and we've been talking about it. If you need another minute to review it, go ahead and do that, because I want to talk about it pretty extensively.
When you feel comfortable with it --
A Sure.
Q -- just give me a heads-up, and we'll go forward.
A I have completed the reading of it.
Q Okay. Go ahead and look at Page 3 of the declaration. There's a signature there above your name, and I'd -- just to be clear here, I want to make sure, is that your signature?
A That is my signature.
Q Okay. And it's dated February 25th, 2004; is that correct?
A Correct.
Q When you signed this, you were, you said, not in the hospital, but you were at home --
A Um-hum.
Q -- and on dialysis. Do you remember signing it?
A Other than the -- If you would ask me that question, and I did not have the document in front of me, I would not have recalled signing it.
Q Now, the page where you're signing here, there's a

Page 41

statement above where you're indicating that you're giving sworn statements. It says that you declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct. As you review it now, do you continue to hold that view, that the statements are true and correct?
A To the best of my recollection, yes.
Q But you don't, as you sit here now, and if you weren't looking at the document -- you can't say that when you signed that, you remember attesting to that?
A I don't remember attesting to it.
Q Okay.
A I don't even remember signing any document, I guess.
Q Okay. All right. So my sense, and we don't have to dwell on it -- but my sense is that you don't remember how this document was created; is that correct?
A Correct.
Q So you don't know whether you drafted these statements or whether the government drafted them?
A I don't recall.
Q Do you recall any process of discussion with the

Page 42

government about the content of the statements?
A I don't recall, although upon reading it, I assume we had had some conversations, and, as this looks like a -- a legally formatted document, I assume that -- and this is just my assumption, would be that it was drafted by the -- it was not drafted by me but drafted by the -- whoever I was talking to at that time.
Q Um-hum. But you don't, sitting here, remember independently whether you drafted it --
A No.
Q -- or the government drafted it? Do you remember the content of any of the discussions that you had with the government about this document?
MR. WHITMAN: Objection, asked and answered.
BY MR. WILSON:
Q You can answer.
A Only as to the -- what was declared in the document.
Q In other words, you -- I'm sorry. So -- I just want to be clear about it. Your only memory of what was in this document, and how it was created, is by your review of it now?
A Correct.

Page 43

Q Okay. And you agree now that these statements are -- Do these statements now represent your best recollection of the events that they're describing?
A Yes.
Q All right. In this declaration you indicate that you've reviewed some documents --
A Correct.
Q -- to help create it. Do you have those documents with you?
A No, I do not.
Q Okay. Do you remember what those documents were?
A It was -- Again, with the jogging of my memory, it was a -- an engagement letter and then a -- what appeared to be a draft of a -- of the valuation letter. That it was missing one page, I guess, and was not signed, so I don't know if it was an early draft --
Q Okay.
A -- or a final draft, or not.
Q Okay. But you don't have independent memory --
A No.
Q -- of the documents?
MR. WILSON: I'm going to ask the court reporter to mark as exhibits two documents, and I'm going to ask you to review them to see if these

Page 44

might be the documents that you referred to in the declaration. And I'm going to ask you to go ahead and mark them 2 and 3.
(Exhibit Nos. 2 and 3 were marked.)
(Discussion off the record.)
BY MR. WILSON:
Q Here you go, Mr. Wilson. Go ahead and take your time, and have a look at these, and let me know when you've had a chance to review them.
A I have completed a reading of the two documents.
Q Okay. Let's focus first on -- Well, let me ask you generally. Are these the -- Do you know, are these the documents that you reviewed in connection with your 2004 declaration?
A I don't have complete recollection, but I assume so.
Q Okay. Why do you assume so?
A Because I referred to an engagement letter that was signed by me and a draft of a -- of the -- of the valuation letter.
Q Do the documents refresh your memory at all about the circumstances of the making of the declaration?
A Yes.
Q Okay. And how do they refresh your memory?
A It lays out sort of the time sequence and the

Page 45

background in essence of the -- and the structure, the capital structure, of River Valley at the time of the valuation, and a paragraph talking about the subsequent operation of River Valley.
Q Does it help you remember anything about how the declaration was made?
A I assume I -- I don't recall.
Q Okay.
A Do you want an assumption? I would assume that I reviewed the documents and then must have had a conversation, I assume, from which the declaration was drafted.
Q Okay. But you can't -- It doesn't help you remember anything --
A No.
Q -- about the declaration? Okay. Do you remember at all, or do these documents refresh your memory, about any other documents you might have reviewed in connection with making the declaration?
A No.
Q Okay. And you don't remember making -- reviewing any other documents?
A No, in that I did not have any documents at that time. I didn't have any files of my own at that time.

Page 166

Q Do you have any doubt that when you signed this, you intended to sign this document, that you didn't think you were signing something else, in other words?
A I don't understand. That the signature page was attached to something else? I don't recall. I don't even recall the document.
Q But you don't doubt that that is your signature?
A That is my signature. As the signature page is separate from the other pages --
Q Well, let me ask this. In your professional experience have you been called upon to provide declarations or affidavits with regard to other matters?
A No. In past experience of mine I have done valuations and appraisals for estate and gift tax purposes, and they were presented to the Internal Revenue Service and the State of Wisconsin, but not an affidavit per se.
Q Well, let me ask about those. Regarding those -- Are they reports, or what sort of documents are they?
A They're reports. They were reports.
Q Regarding those reports, you were required to sign them?

Page 167

A Yes.
Q And they were being submitted to the Internal Revenue Service?
A Um-hum.
Q Were they -- Did you submit any reports to any type of court, like, for example, a tax court?
A Yeah.
MR. WILSON: Objection, lack of relevance.
BY MR. WHITMAN:
Q You can answer.
A I think that the underlying reports were subsequently either in the estate tax division at -- I think it used to be called, the -- a lot of it was at the conference level, and then in court on several occasions.
Q Do you recall if those reports were -- when you signed them, you were signing them under penalty of perjury or under oath?
A It was -- No, the reports were the valuations submitted to a law firm, or an accounting firm, or a client. Valuations of common stock of privately held companies or other securities of privately held companies.
Q Before you submitted those reports, was it your

Page 168

normal practice to read those documents thoroughly?
A The report?
Q Yes. I'm sorry, the reports.
A Yes.
Q Before you signed them?
A Yes.
Q Is it your normal practice, just in general, apart from the reports that you sent to the IRS or, you know, to a court -- is it your general practice to read documents thoroughly and carefully before you sign them?
A Normally, yes.
Q Do you have any reason to doubt that you did not follow that normal practice when you signed Exhibit No. 1?
A I would have to review it again before I were to make that comment.
Q Well, please go ahead and take the time. Just let me know when you're done reading it.
A Sure. Okay.
Q Having taken the time to review the declaration now, let me ask you, do you have any reason, sitting here today, to think that you did not follow your normal practice of reviewing documents thoroughly before you signed them?

Page 169

A This being the document?
Q Yes. "This" being the declaration which is Exhibit No. 1.
A I guess I would say on reviewing it, I say that the estimated value of River Valley -- In Paragraph 6 it states -- indicates that -- an estimated value of River Valley as of July 28th, 1988, and I don't know whether that was the valuation date or not, and that the assisted merger took place on July 29th.
Other than that, I guess to the best of my recollection, I reviewed -- and as I said in Chapter 8, my thought processes were perhaps not running at 100 percent at the time, but the -- I believe the rest of the document appears -- appears to be one that I would have signed.
I note in Paragraph 3 that we talk about values as of July 29th, so there's a discrepancy there between Paragraph 3 and Paragraph 6 but --
Q Apart from that discrepancy you just mentioned in Paragraph 6, where it uses July 28th -- apart from that, do you have any -- Let me rephrase that.
Apart from the discrepancy you mention regarding Paragraph 6, regarding the date of July 28th, is there anything else in this declaration

Page 178

A No.
Q Okay.
A This was probably within months after I left Merrill Lynch.
Q Okay. And, finally, Mr. Wilson, I just want to ask you -- and, you know, I know it's a touchy subject when we go back to your health a couple of years ago, but you testified that you -- earlier that you don't remember signing that declaration; is that right?
A Correct. I -- If someone had asked me, I am not so sure I would have said I knew there was a declaration --
Q Okay.
A -- existing.
Q It was news to you when the Department of Justice called you in the fall of 2005?
MR. WHITMAN: Objection.
THE WITNESS: I went back -- Yes.
BY MR. WILSON:
Q Okay.
A And that based upon the cover letter, that they sent a copy of it to me on November 4th, 2005.
MR. WILSON: Okay. All right.
MR. WHITMAN: No further questions.

Page 179

MR. WILSON: Okay.
(Proceedings concluded at 3:32 p.m.)

______________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ________
day of ______________________, 20__

______________________
Notary Public

My Commission Expires: ______________________

Page 180

STATE OF WISCONSIN )
) SS:
COUNTY OF MILWAUKEE )

I, KATHLEEN E. CARTER, a Certified Realtime Reporter, Registered Merit Reporter and Notary Public in and for the State of Wisconsin, do hereby certify that the above deposition of NICHOLAS C. WILSON was recorded by me on February 15, 2006, and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof I have hereunder set my hand and affixed my seal of office at Milwaukee, Wisconsin, this 17th day of February, 2006.

______________________
Notary Public
In and for the State of Wisconsin

My Commission Expires: March 16, 2009.