# EXHIBIT A

*HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK*

*v.*

*THE UNITED STATES*

*95-524C*

## HOMER J. HOLLAND EXPERT DEPOSITION DESIGNATIONS

10/31/2001 Tr. 7:3–8:7
10/31/2001 Tr. 11:24–12:1
10/31/2001 Tr. 21:8-18
10/31/2001 Tr. 25:5-21
10/31/2001 Tr. 37:8–39:16
10/31/2001 Tr. 59:12-21
10/31/2001 Tr. 67:7-14

11/1/2001 Tr. 169:25–170:6
11/1/2001 Tr. 175:3–180:11
11/1/2001 Tr. 201:1-12
11/1/2001 Tr. 203:8-20
11/1/2001 Tr. 205:11–206:7
11/1/2001 Tr. 208:25–210:16
11/1/2001 Tr. 210:20–212:4
11/1/2001 Tr. 222:25–224:21
11/1/2001 Tr. 237:9–240:24
11/1/2001 Tr. 242:1-4

11/2/2001 Tr. 314:23–315:1
11/2/2001 Tr. 316:7-12
11/2/2001 Tr. 317:21-24
11/2/2001 Tr. 319:18-22
11/2/2001 Tr. 329:4-6
11/2/2001 Tr. 362:20–363:8
11/2/2001 Tr. 382:20–384:4
11/2/2001 Tr. 395:17-24
11/2/2001 Tr. 473:22–484:15
11/2/2001 Tr. 485:3-7
11/2/2001 Tr. 506:1-8

5/11/2005 Tr. 8:9-24
5/11/2005 Tr. 16:5-9
5/11/2005 Tr. 17:4–18:16
5/11/2005 Tr. 24:2-7
5/11/2005 Tr. 73:7–74:22
5/11/2005 Tr. 82:2–83:3
5/11/2005 Tr. 84:13–86:1
5/11/2005 Tr. 157:16-23
5/11/2005 Tr. 175:15-18
5/11/2005 Tr. 178:8-18
5/11/2005 Tr. 183:22-25
5/11/2005 Tr. 187:2–188:7
5/11/2005 Tr. 202:14-19
5/11/2005 Tr. 219:24–221:2

5/12/2005 Tr. 263:13-18
5/12/2005 Tr. 408:7-19
5/12/2005 Tr. 408:24–409:9

5/13/2005 Tr. 580:21–581:11

6/27/0007 Tr. 7:6-9
6/27/0007 Tr. 8:19–12:17
6/27/0007 Tr. 28:6-11
6/27/0007 Tr. 32:14–36:6
6/27/0007 Tr. 55:4-13
6/27/0007 Tr. 57:19–62:2
6/27/0007 Tr. 63:11-19
6/27/0007 Tr. 65:17–68:4
6/27/0007 Tr. 70:9–71:2
6/27/0007 Tr. 71:12–72:11
6/27/0007 Tr. 86:4-13
6/27/0007 Tr. 87:16-19
6/27/0007 Tr. 93:8–94:2
6/27/0007 Tr. 94:19–97:3
6/27/0007 Tr. 98:1–99:4
6/27/0007 Tr. 100:13–101:1
6/27/0007 Tr. 105:8–107:11
6/27/0007 Tr. 107:18-22
6/27/0007 Tr. 121:18-21
6/27/0007 Tr. 122:16–123:5

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**HOMER J. HOLLAND EXPERT DEPOSITION DESIGNATIONS**
***continued***

6/27/0007 Tr. 124:7–125:7
6/27/0007 Tr. 131:14–132:6
6/27/0007 Tr. 134:8–135:8
6/27/0007 Tr. 147:7-19
6/27/0007 Tr. 154:4-10
6/27/0007 Tr. 155:10–157:5
6/27/0007 Tr. 180:5-14
6/27/0007 Tr. 191:10–192:16
6/27/0007 Tr. 198:9-14
6/27/0007 Tr. 204:5–205:20
6/27/0007 Tr. 212:12–213:1
6/27/0007 Tr. 213:19–217:1
6/27/0007 Tr. 218:17-22
6/27/0007 Tr. 221:6–223:4
6/27/0007 Tr. 223:17-20
6/27/0007 Tr. 238:2–239:3

6/28/0007 Tr. 283:8–286:8
6/28/0007 Tr. 286:13–291:9
6/28/0007 Tr. 294:2–295:7
6/28/0007 Tr. 298:10–299:12
6/28/0007 Tr. 300:17–301:3
6/28/0007 Tr. 306:1-6
6/28/0007 Tr. 306:20–307:11
6/28/0007 Tr. 308:6–309:2
6/28/0007 Tr. 314:10-13
6/28/0007 Tr. 315:18-20
6/28/0007 Tr. 332:14-20
6/28/0007 Tr. 339:7–344:6
6/28/0007 Tr. 345:7–346:16
6/28/0007 Tr. 352:2–353:3
6/28/0007 Tr. 372:4–373:4
6/28/0007 Tr. 376:15–377:6
6/28/0007 Tr. 380:4-12
6/28/0007 Tr. 384:14–386:1
6/28/0007 Tr. 392:15–393:9
6/28/0007 Tr. 399:9–400:8
6/28/0007 Tr. 438:21–450:6
6/28/0007 Tr. 451:12–452:2
6/28/0007 Tr. 462:15–463:1
6/28/0007 Tr. 463:17–464:13
6/28/0007 Tr. 471:21–475:9
6/28/0007 Tr. 482:6–484:22
6/28/0007 Tr. 488:18–489:17

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

HOMER J. HOLLAND AND :

HOWARD R. ROSS, :

Plaintiffs, :

vs. : No. 95-524C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - x

Certified Copy

Washington, D.C.

October 31, 2001

Deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by Robert M. Jakupciak, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., 20004-1206, at 9:24 a.m., on Wednesday, October 31, 2001, and the proceedings being taken down by Stenotype by ROBERT M. JAKUPCIAK, and transcribed under his direction.

APPEARANCES:

On behalf of the Plaintiff:

DAVID B. BERGMAN, ESQUIRE
WALTER F. ZENNER, ESQUIRE
ARNOLD & PORTER
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474

On behalf of Defendant:

PATRICIA A. SMITH, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Also Present
Jeff Nielsen
Videographer: T.J. O'Toole

appeared as a witness in any other case?

A. No.

Q. Have you previously ever been qualified to testify as an expert?

A. I have not previously testified as an expert.

Q. Have you previously been hired as an expert in a lawsuit?

A. I was brought on preliminarily as an expert, I didn't testify as an expert, in a case involving a borrower and a commercial bank.

Q. And when was that?

A. That would have been after 1980, but perhaps before the early '90s. I don't really remember the -- I'm trying to think of something that would give me a good indication of the time frame, but it was probably while I was president of the Exchange National Bank, which was 1979 to 1983.

Q. And what was it that you were hired to be an expert for?

A. There was a question about the normal procedures for a bank in dealing with a borrower. As I recall, the borrower was a -- was financing barges or some, some maritime equipment. That's about all I can remember about the case.

Q. Were you actually deposed in that case?
A. No.
Q. Do you recall how the case ended?
A. It was settled.
Q. Other than that one time, have you otherwise been hired as an expert?
A. No.
Q. How was the decision made in this case to have you testify as an expert witness?
A. I think it was last fall that we -- that our law firm introduced me to a number of potential expert witnesses and after discussions with the law firm and with my partner, Howard Ross, I think we, frankly, concluded that I had the, both the academic credentials and certainly the experience and certainly the knowledge of this case to be the best expert that we could think of with respect to the area of damages that I'm going to testify on.
Q. What specifically with respect to your credentials and experience led you to believe that you would be the best one to testify?
A. Well, there is several different elements to it. Academically I do have a doctorate in business with an emphasis on finance. And, of course, this is a case in that general area. I have published

theories.

Q. With respect to the articles which you indicate have been published in peer-reviewed journals, how many articles were there?

A. I published a master's thesis from MIT in a peer-reviewed journal. While I was in the Pentagon, some of the studies that I was responsible for in conjunction with others were published, and not in a journal but published on behalf of the organizations that we were dealing with. The Rand Corporation was the -- no, it wasn't the Rand Corporation. It was the Rack Corporation was the entity, and they had a quasi peer review of the journals that were published.

And then outside the academic area, my career has been spent essentially either reviewing others' business plans, projections, trying to make investment decisions based on that, or alternatively, presenting business plans, projections to potential investors and making sure that those are credible so that I can get someone to make a decision that they would invest in me.

So in some respects I guess I think that the marketplace is another form of peer review.

Q. And any of the articles that you published, were any of those within the last ten years?

A. No.
Q. Did any of those relate to what you are testifying to as an expert here in this case?
A. They were not dealing with finance, but they all had analytical elements that required a mathematical sophistication and a knowledge of the tools that one uses in doing analysis.
Q. And specifically your master's thesis, what did that relate to?
A. The masters thesis was a probabilistic model developed to predict what would happen on a single and multi-lane highway with different volumes of traffic. So it was predicting analytically what would happen and then comparing that with empirical data to validate the model. The objective of the paper was to create a model that was a good predictor.
Q. At what point did you arrive at the opinions that are provided in your expert report?
A. Well, it was over a period of time. I think the opinions that I have in my report, that's a fairly broad set of conclusions. The preparation of the report took place through I believe -- I believe we delivered the report right around the first of August and the preceding months I prepared the report and started thinking about it well before that. But

would not take seriously.

So I think it was these -- it was kind of just reminding me of these, kind of the skill that goes into being in the capital markets arena.

Q. What were the assumptions that Ms. Ells -- that you provided to Ms. Ells regarding -- well, to prepare the spread sheets?

A. Well, the fundamental assumption was that River Valley would not have shrunk its balance sheet from July 1990 through the time that we sold to First Banks; that if the breach in the "but for" world, had the breach not occurred, we would have followed the business plans that we had published, that had been approved by the regulators, that were essentially on file before the breach.

Those -- and so one specific assumption is that as of July 1990 moving forward, we would have grown the liabilities at a rate of 8.3 percent. That was the, the annual rate of growth that was projected in our business plan that was prior to the breach. So I guess that's one assumption.

That led then to a set of -- to an amount of assets and liabilities that one would have put on the balance sheet. Then the next step is to decide, well, what assets and liabilities would those have

would have had the availability in this vast capital market arena to acquire assets with similar characteristics. And then we had the liquidity assets.

On the liability side we assumed that we would fund these assets through a combination of Federal Home Loan Bank advances, jumbo deposits. Jumbo deposits meaning large-sized deposits that are often, carry more of a market rate interest rate, and the kinds of borrowings that one could do on Wall Street, which are in the overall talked about as repos but there is various forms of secured borrowings that one could do on Wall Street, to again simplify the calculations, and to do this on a conservative basis we used the Federal Home Loan Bank advance rates as the proxy for the cost of that funding. Knowing that in reality what we would have done is we would have taken the least cost of those several options at any one point in time, so that using a single index, the Federal Home Loan Bank index, was really conservative, but it was a simplifying assumption.

Then we get into the maturity of the funding. Do you want -- I seem to be on a monologue. Do you want me to keep going?

Q. No. This is good. It prevents us from

leads to a weighted average life of four years. So that was another simplifying assumption. I think I need to stop and think for a minute and see if I can think of other pieces.

Q. Okay.

A. Maybe you have some questions from what I just said.

Q. The assumptions that were utilized in the models then were assumptions that you and Ms. Ells came up with together or you came up with them based on the questions and the back and forth that the two of you had?

A. It was certainly a collaborative process, but at the end of the day they were my assumptions.

Q. And other than what you've just identified and provided the background on, are there any other assumptions that you can think of right now?

A. Well, you had started with what assumptions, what did I -- what did Ms. Ells and I discuss. And her focus, as you can tell from the last few minutes, was on essentially the capital market side of it and how we would -- had used the capital markets. And then -- it's one thing to say verbally that we would have used the same assets and the same liabilities that we did. But now I have got to go

back and translate all of that into what's the -- what would have been the interest earned during that period of time. And that takes a fair number of steps. And I have tried to give you some indication of how we went through those steps and what the primary assumptions were there.

There were other assumptions in my report that weren't just focused on the capital markets section. As you know, there basically are three general elements in the damages that I have calculated here. The first element -- not the first element, but the element that we've just been discussing is if we had not lost the capital, one of the things that we would have done with it is to not shrink the balance sheet but to increase the size of the balance sheet. If we did that, what would have been the consequences in terms of earnings?

And then, of course, the other assumption is that if we had accumulated this, and I believe it was about 23 million dollars of additional earnings, if that had gone into the retained earnings of the bank, then it's certainly my belief and it's been supported by First Banks, that they would have paid us an additional 23 million when we sold First Banks. Or absent that, we would have dividended that out.

Obviously, I have got to get the earnings in the "but for" world to Howard and me to be a damage. So there is that transition there. So that's the -- that's the growth instead of shrinkage aspect of the model.

Another important piece of it, as I have certainly testified in my previous deposition, is that we saw our strategy as really being kind of two fundamental things that we would have done with the additional capital. One is we would have increased the balance sheet, as we said. But an even more profitable way to increase the balance sheet is to acquire other savings and loans. And we showed that once we did the -- once we did the first deals in July of 1988, we kept on that path, and so in December of 1988 we acquired Peoria Savings and we would have continued along those paths.

We did have an opportunity that was, that was, even though we weren't looking for deals at the time, in 1991 was presented with a very attractive acquisition called San Antonio Federal Savings Bank. And as you may recall, both in my deposition and others, our -- we tried to acquired San Antonio in River Valley as either a subsidiary or merge it with River Valley or in some way take advantage of these NOLs that we had bargained for with the government for

subsequently came to realize.

Q. What role when you were at River Valley did you play with respect to the Capital Markets Group?

A. Well, I was in I suppose two or three roles. I was one of the owners with the greatest amount of experience in banking and financial institutions. I was also a director. I was either CEO or chairman of the executive committee during that period of time. So my role was really one of having those activities report to me and in an oversight role.

Q. Did you ever identify a particular mortgage-backed security or mortgage derivative to be purchased by River Valley?

A. When I was at -- before we hired Steve Bangert and set up the Capital Markets Group, and before we acquired the institutions that are the subject of this, I had done -- I had as CEO of Rock Falls I had acquired some mortgage-backed securities. But after we had the Capital Markets Group that was all delegated to that group.

Q. So after the -- after the acquisitions of the institutions you would not have ever have been involved in identifying any specific mortgage-backed securities, mortgage derivatives to purchase; is that

Q. Is Mr. Pikus or Ms. Ells currently assisting in any way on this case?

A. They are available to assist. I have asked them to -- if I run into something that I can't remember or need some help on, I would call them. But there is no work that they are undertaking right now.

Q. With respect to the writing of your report, did you have any assistance in that?

A. It's largely my own hand, substantially my writing. I did ask David Bergman, my counsel, to review it, and made a few, I don't even remember what they were, but made a few suggestions on how I might express some points. But again it's fundamentally my report.

Q. What role did you have in hiring Dr. Murphy and Mr. Stokes as experts in this case?

A. I think I mentioned to you that David Bergman had informed Howard Ross and myself about what the process was in getting expert witnesses, and my recollection is it was last fall that -- I believe it was Susan Ells and myself came and we interviewed three experts. Lynn Stokes was one that I didn't interview. He wasn't available at the time. But he was one that David had -- maybe even -- maybe he interviewed by telephone. I don't remember the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - -X

HOMER HOLLAND and HOWARD :

ROSS, :

Plaintiffs, : No. 95-524C

v. :

UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - - -X

Certified Copy

Washington, D.C.

Thursday, November 1, 2001

Volume 2

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSANNE BERGLING, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., at 9:00 a.m., on Thursday November 1, 2001, and the proceedings being taken down by Stenotype by SUSANNE BERGLING and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiff:

DAVID B. BERGMAN, ESQ.
WALTER F. ZENNER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5475

On behalf of the Defendant:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

Also Present:

T. J. O'TOOLE, Videographer
JEFF NIELSEN, Consultant to Defendant

Earnings is the next issue, and in respect to earnings, obviously by making the assumptions I did that increased the earnings of the institution, that would have been a plus with respect to the safety and soundness.

And finally, liquidity, and liquidity is -- I have in the assumptions assumed the -- that in each month, we had 5 percent liquidity assets, which is one of the principal measures that the regulators would look at, and as I mention in the report, by using that assumption, I'm actually very conservative, because the -- as the other assets pay down, I still add back additional liability each month, so that at the end of the period, I have some -- something significantly in excess of 5 percent in terms of liquidity.

So, I think that the -- I don't have any concerns that there was -- there would be a concern from a safety and soundness standpoint.

Q. What assumptions, if any, did you make regarding the composition of the management team for the no-breach River Valley from 1989 to 1995?

A. I assumed the same management team that we had.

Q. In the no-breach world, how, if at all,

would your role at River Valley have differed from what it was in the actual world?

A. I -- I didn't make -- I didn't make any assumptions that there were changes in anything other than the -- the assumptions that we described earlier.

MR. BERGMAN: Patricia, when you get to a good spot, might we break for lunch?

MS. SMITH: Sure.

We can go ahead and break right now.

VIDEOGRAPHER: Going off the record. The time is 12:12:20.

(Whereupon, at 12:12 p.m., a lunch recess was taken.)

that and you didn't do that.

A. That's correct.

Q. Do you assume in the no-breach world that River Valley would have been held to the same capital requirements set out in FIRREA and its implementing regulations, but it would have been able to include the foregone regulatory capital you identified in your report?

A. What I focused on in terms of capital was really -- the first aspect was that capital was the key ingredient to being able to expand and to acquire San Antonio, and then as I explained, I looked back to see whether after those assumptions were included in the calculations whether or not -- excuse me, whether or not the expanded River Valley was well within what I remembered as the capital requirements.

The constraint that we always had with -- as a result of FIRREA was the -- was the tightest constraint, which was tangible capital. It -- it was the -- the elimination of the various aspects of intangible capital from the definition of tangible capital is in large part what created the problem. So, I always focused on that ratio as to whether the tangible capital, if this

regulatory capital had been included in the tangible capital, would we have met those tests.

I don't -- and those tests were relatively low in terms of the tangible capital compared to what we show, and so we had quite a cushion beyond what the -- what those capital requirements were.

Q. But do you assume in the no-breach world that the capital requirements set out in FIRREA and its implementing regulations existed and that --

A. Well --

Q. -- and that you were able to include the foregone regulatory capital?

A. I think those are contradictory. I think that it was the definitions in the implementing regulations that took away the -- the regulatory capital. So, I couldn't do both -- I couldn't -- I couldn't on the one hand assume that those regulations and their definitions of capital were in place when it was those definitions of capital that created the breach.

Q. What is your understanding regarding what the regulatory capital requirements that applied to a no-breach River Valley would have been?

A. I guess the -- what I assumed is that those definitions which excluded the regulatory capital would not have been in place; that is, that the subordinated debt, the preferred stock, the supervisory goodwill and the -- and the regulatory capital all counted in the -- in the most strict definition of capital, which was tangible capital. Those -- those were the items of capital that we had bargained for that were excluded by virtue of those definitions.

What I assume in the but-for or the no-breach world is that those -- either those definitions were suspended or somehow it was accommodated that what we had -- what we had bargained for was, in fact, in place.

Q. Did you assume everything else would be the same regarding the FIRREA capital requirements?

A. I guess I didn't -- I think that's a reasonable assumption. I didn't really focus on that, again, because as I recall, the FIRREA assumptions -- the FIRREA capital requirements started I believe at 1 and a half percent tangible capital to total liabilities. I think it -- I think under FDICIA, it moved up, but if

we just say FIRREA, I think it was 1 and a half, but that's so -- that's so much lower than what I'm assuming that we achieve and that we maintain in this -- in these scenarios.

I think the -- I think the lowest year-end capital ratio, for example, including all of the growth and including all of the -- including the San Antonio acquisition, the lowest point is 5.82 percent. So, I mean, I don't think it was material to -- to focus explicitly on the FIRREA, but I think that's a reasonable assumption.

Q. Is tangible capital the most limiting requirement for your no-breach River Valley?

A. The other -- the other categories are tangible -- tangible, I believe, core and -- and risk-based capital, and the risk-based generally had a higher base level of capital requirement, but it was modified dramatically by the type of assets, and since the type of assets that we were talking about were all in the -- were generally in the capital markets area, all of those -- I guess I should -- in general, I felt that the -- that the risk-based capital would not be a constraint, that the appropriate constraint to look at was the tangible capital.

And maybe to expand on that further, in -- every time that we looked at projections, business plans, reports on capital, while we did the calculations on -- on tangible, core and risk-based, the one that was the most constraining was the tangible.

Q. And so for your no-breach River Valley, do you consider tangible capital to be the most limiting?

A. I guess I think that given the previous relationships between those that -- that that was the one to look to, and -- and I could go back and look at all three categories, but I'm quite confident that we were not limited in the -- in the damages calculations in any respect by the amount of capital once we're in the no-breach world.

Maybe another way of saying it, the -- we had plenty of capital to execute our business plan. What my assumption was is the -- is the principal constraint on the execution of the business plan was the self-imposed constraint that we said previously that we had an 8.3 percent growth rate. What these calculations show is that we would have had adequate capital

to grow substantially beyond what I calculated, and so my assumptions here produce a very conservative approach to the damages, because I've constrained it by that 8.3 percent growth.

Q. Do you assume that in the no-breach world, River Valley would have been held to the same capital requirements set out by FDICIA and its implementing regulations but that it would have been able to include the foregone regulatory capital you identified in your report?

A. In general, yes.

Q. With respect to Exhibit B to your report, what is the purpose of this exhibit?

A. It's to demonstrate -- it's to test, I guess, it's to test a reasonableness of the projections, would we have -- if we had expanded by acquiring San Antonio and by expanding the balance sheet rather than shrinking the balance sheet at the 8.3 percent growth rate, would we have been comfortably within the capital requirements?

And what I've -- what I've demonstrated here is that, in fact, as I just mentioned before, that Table 8 shows that 5.82 percent is the lowest ratio of capital to liabilities during

Q. Mr. Holland, with respect to Table 8, the capital assets figures that appear there, are you opining that this is the way in which regulatory capital compliance would have been measured in the no-breach world?

A. Am I opining that we -- that capital as a percentage of assets or capital as a percentage of liabilities would have been a measure in the nonbreach world?

Q. Would have been measured this way in the nonbreach world.

A. I believe so, yes.

Q. Did you follow the technical calculations required in TFR filings to determine the -- excuse me, regulatory capital levels of the no-breach River Valley?

A. I didn't go back to the TFRs to do this. This is just a very straightforward calculation of capital divided by total assets or capital divided by total liabilities as I present it here.

Q. And would the same be true of the capital liabilities figures appearing in Table 8?

A. Yes. As I mentioned before, each of those is simply the number above the -- divided by the

capital in doing that calculation. Since I put the capital back in, I thought it would be inconsistent to not also put the asset back in.

And what that does is if you -- if I did it the other way, I would be -- I would end up with a result of a higher capital ratio than what I'm showing.

Q. What risk weighting would be applied to those assets with respect to the risk-based capital requirement?

A. The -- as I explained before, this doesn't -- this isn't a risk-based capital ratio calculation, and I didn't do the risk-based capital calculation because of the substantial cushion in capital here and because of our experience in doing those risk-based capital calculations, that the assets, in particular the assets that were added in this case, always had a very low weighting in that calculation, so that the risk-based capital was never a constraint.

Q. With respect to Table 15, which is part of your Exhibit D, what risk weighting was applied to those items?

A. My recollection is -- is fuzzy. If I -- if I recall, the residential mortgage, a home

THE WITNESS: It looks like this (indicating).

BY MS. SMITH:

Q. The actual --

MR. BERGMAN: Can you just hold on? Maybe I'm on the wrong --

THE WITNESS: You might be in the wrong report.

MR. BERGMAN: Oh, I am. Never mind.

BY MS. SMITH:

Q. Mr. Holland, in the actual world, did River Valley attempt to maintain or target a certain level of capital on certain capital ratios?

A. Originally our -- you're talking about in the actual world, did we have a target?

Q. Yes.

A. Things were so dynamic that I don't -- I can't point to a specific target, certainly not through the whole period. Our -- prior to FIRREA, the -- the required -- well, it changed several times, so -- and I'm going to say this just as a general statement, because I know there were some modifications to the capital requirements during that period, but originally,

as I got into the savings and loan business -- maybe that's a better way to put it -- 3 percent capital to assets was considered adequate capital for the regulators. So, I guess we always thought that 3 percent was a good benchmark, perhaps a bit above 3 percent. That would have been all forms of capital.

Then FIRREA introduced the idea of the tangible capital, and kind of as a result, we would have had a view as to what was a good number for operating capital, we were kind of thrown into a situation where all we were trying to do was to meet the minimums of FIRREA at the time.

And then later, we were put under a supervisory agreement that changed those capital requirements again. So, the -- my view of capital adequacy here is when -- when we -- when I'm demonstrating a -- or where I was doing a test, not so much a reality test on the damages but kind of a feasibility test or an assurance that I wasn't -- I wasn't by making one set of assumptions leading to a result that was not feasible or was not appropriate.

What I did is tried to simply look at that

employ the capital and to use the capital.

Q. Did River Valley in the actual world view it as important to maintain an excess capital cushion above the minimums?

A. The -- did you say in the --

Q. In the actual world.

A. In the actual world. In the actual world, of course, we were -- we had been -- we had gone from a period of anticipating having substantial excess -- having excess capital that we would then use over a period of time, both by expanding the balance sheet and by making acquisitions, to a situation that we never envisioned ourselves in, and that was coming to the brink of being seized and losing everything we had because of the FIRREA capital requirements, as well as the FIRREA disallowance of the capital that we had contracted for, as well as the regulators' interpretation of those capital requirements.

So, were we -- I would -- I guess I would say that we were somewhat more cautious about how to deal with the Government after all this occurred and with that may have been more conservative in terms of capital ratios.

Q. Based on what you said earlier, the ratios

reflected in Table 8 are not what you would view as the target or optimal ratios that River Valley would have sought to maintain in the no-breach world. Is that a fair statement?

A. The -- those ratios were not a target; those ratios were the result of the assumptions that I made that were constrained primarily by the growth projection -- by the statement of what our growth would be in the approved business plans. So, I think my inclination would have been to operate with greater leverage than what I'm showing in this -- in this report.

Q. In the actual world, how much of a cushion did River Valley seek to have? And if that changed over time, which I think according to your earlier testimony it would have, how did that change?

A. We -- I don't believe we ever expressed it as an explicit cushion or expressed -- or explicit target.

Q. Do you have a general understanding of what it may have been prior to the passage of FIRREA?

A. Probably -- I harken back to my pre-FIRREA days and that I felt like a 3 percent was

adequate. A cushion above 3 percent I probably would have -- would have felt like operating in the 3-3 and a half percent range.

Q. And what is your opinion as to how much of a cushion River Valley would have sought to maintain in a no-breach world?

A. I think I just expressed that.

Q. That same percentage?

A. That -- that's what I meant, is that prior to the breach, we -- that's what -- that's kind of the looking back kind of what was in -- what was in our mind. When we acquired the thrifts -- when we acquired Rock Falls originally, we had in mind a 3 percent kind of a capital requirement, and then having some cushion -- some modest cushion above that seemed to be a good way out.

(Holland Expert Deposition Exhibit Number 4 was marked for identification.)

BY MS. SMITH:

Q. Mr. Holland, if you could take a look at what the court reporter has marked as Exhibit 4, it's the October 30th, 1989 business plan submitted to OTS. Specifically, I was going to refer you to the page that ends with the Bates range number of 0429, and the question I had is

whether the net worth liabilities reflected here reflect the target or optimal ratios that you believe River Valley would have sought to maintain in a no-breach world.

A. Well, I don't think this is necessarily a good indication of the no-breach world. Certainly, as you can see in this calculation, we did a tangible net worth and compared it to a total net worth to liabilities. So, there was at least a recognition at that point of the difference between tangible and the -- but I can't be sure without studying this in some greater extent.

I think the other point to be made is that while I made the comment before that I would -- if I had the -- if I wasn't constrained in any other way and I -- and I hadn't been through the full experience of FIRREA and all of that, I think that I was thinking in the 3 and a half percent range as a -- as a good range.

In this particular case, what we're doing is we're also projecting a certain growth rate, so that in our business plans, what we did is took the existing balance sheets and showed a growth rate that we thought was comfortable in

terms of what the regulators would approve, even though that may not have reached the level of leverage that we would ideally like to have achieved.

We always felt that another way of leveraging the capital was through acquisitions and that just as we did in -- in the -- in the Government-assisted transactions, we put in one set of business plans for River Valley Peoria, for example, during 1988 that didn't envision an acquisition, because one never knew exactly what the acquisition might be or when -- when there was -- or what the specifics of an acquisition might be.

So, I would not place a great deal of weight on a set of capital ratio calculations in a business plan. The thing that I used from the business plan in my report, that I think this was the business plan that I used, was the fact that we had projected an increase of 27 percent in growth -- and I would have to go back to be sure, but I think this might be the one -- over this period of time, and it was -- and it was the -- if there was a -- obviously if we showed a capital ratio that was below what was required,

without any supervisory approval. So, there was an example of, well, wow, if I wanted to do that, but that -- you know, it wasn't -- it wouldn't have been worth it to get to that level to have 25 percent without supervisory approval.

Given that if I had the opportunity to grow and felt it was justifiable that I could have gone in specifically to ask for that -- that ability. So, I suppose the best answer is that the capital requirements changed almost -- well, changed many times during the period of time that I was involved with thrifts, and I don't remember exactly which regulation had which characteristics.

Q. In paragraph 83 of your report, you state that the Government's promises increased our regulatory capital by $28.7 million, and then in the footnote you break down this number included $13 million of capital credits, $5 million of preferred stock, $3.6 million of subordinated debt and $1.31 million of supervisory goodwill as of July 31, 1988 for Republic and $2.766 million of supervisory goodwill as of December 31, 1988 for Peoria.

Did you rely on information provided by

Ron Pikus to determine the amount of goodwill qualifying as regulatory capital in the no-breach world?

A. Yes.

Q. Were any specific instructions given to him to create the spreadsheets that have been provided called Goodwill and Capital Credit Reconciliation by Ron Pikus?

A. I think I had mentioned before that because there were some adjustments that we've already talked about at different periods of time for the goodwill, it was difficult to without some study get to what I think is the correct number for the goodwill during that period of time, and so I -- the principal instruction is let's figure it all out. Let's make sure we have a good, supportable worksheet or whatever you want to call it that can -- that can show us what the goodwill should have been or was.

Q. Did you take any steps to verify the accuracy of the balances?

A. The balances came out of the financials, out of both the internal financials and the audited financials, and it wasn't so much a -- there wasn't an opportunity to go back to any --

anything other than -- that I can recall other than the financials themselves, but it was more a matter of looking at the differences from one set of financials to another and trying to understand why those differences were there, and I did review those with Ron and was persuaded that that was a correct determination of goodwill.

Q. Are you saying, then, that you have an independent opinion regarding the accuracy of those amounts, apart from whatever Ron Pikus provided?

A. I have -- I have confidence that what Ron Pikus provided is accurate.

Q. And with respect to the balances as they're projected over time, do you agree with those as well?

A. Yes, those were very straightforward calculations.

Q. And those -- and you reviewed those and checked those for their accuracy as well?

A. Yes.

Q. With respect to the October 30th, 1989 business plan, which is Exhibit 4, is that a GAAP or RAP balance sheet within there?

A. Oh, I -- I'd have to look at it.

assuming is that absent the breach, we would have followed the standard forbearance of writing off the goodwill -- we still write off the goodwill, but we would have written it off over a 25-year period.

(Holland Expert Deposition Exhibit Number 6 was marked for identification.)

BY MS. SMITH:

Q. Mr. Holland, if you could take a look at what the court reporter has marked as Exhibit 6, document number 173 identified on Exhibit A of your report. It's the Goodwill and Capital Credits Chart put together by Ron Pikus that we've discussed already a little bit today.

With respect to the Republic goodwill, is it correct that Mr. Pikus states that this was written off against the gain on the sale of the branches in 1991?

A. That's what it says, yes.

Q. And in your report, you assume that the sale of the South Beloit and Roscoe branches would have occurred at the same time in the no-breach world. Is that correct?

A. That's correct.

Q. And therefore, the gain of $1.1 million

would have been reported in the no-breach world?

A. What we do in the no-breach world is assume that -- I think it was in that footnote, I'm trying to remember which footnote that was -- in footnote 67, and I believe that's the same amount, that -- no, there it is. It conforms to the -- go to the bottom, the next to the bottom line that shows the $1.31 million was the starting goodwill for Republic, and the amortization of that would have started in August of 1988, and that also is consistent with the footnote on page 35.

So, to -- in -- in looking at how much capital we had in the but-for world, the easiest thing to do was to take the tangible capital, which didn't include any goodwill, and add back the amount of goodwill that Ron has identified here as the $1.3 million and the $2.76 million and to amortize each of those over 25 years, even though they started at different times.

Q. But the question that I was asking was a follow-up to the question of whether you assume that the sale of the South Beloit and Roscoe branches would have occurred at the same time in the no-breach world, and I believe you said yes

to that question.
A. That's right.
Q. And then that would mean that the gain of $1.1 million from the sale would have been recorded in the no-breach world. Is that correct?
A. What I'm assuming is that there is no change in terms of many of the things that occurred in the actual world, including the sale of the branches and including the recording of the profit on the sale of the branches, and I think I -- I think that's in the -- I state that in the report.
Q. If that's the case, how could you then assume that the Republic goodwill is not written off?
A. I think -- I think those are independent issues. In the -- in the actual world, the goodwill, whether it was on the books or off the books, had no bearing on tangible capital. Tangible capital was the measure that I was looking at. So, in terms of my calculations, whether I wrote off the Republic goodwill in 1989, 1990 or 1991 had no impact whatsoever on my tangible capital.

What had an impact on my tangible capital was the gain on the sale of the branches, and that -- there's no change between the actual world and the but-for world. The only change as it relates to the Republic goodwill is that I assumed that throughout the but-for world, starting with July 31st, 1988, I start with $1.31 million of additional regulatory capital and amortize that over 25 years.

Q. Is it your opinion that the write-off of the Republic goodwill in 1991 was related to the branch sales?

A. I don't remember -- I don't -- I don't know in particular why we wrote it off at that point in time.

Q. Based on the statement in Exhibit 6 of Mr. Pikus' report, where it says, "Republic goodwill continues until 1991, when it is written off against the gain on the sale of the branches," would you assume that it was written off because of the sale of the branches?

A. I assume it was written -- I mean, it was written off at that time. I don't recall remembering much about the Republic goodwill.

Q. Do you know whether GAAP would have

not say everything. In general, those things that happened in the actual world also happened in the but-for world, except where I have specific assumptions otherwise.

Q. And one of those assumptions was that in the but-for world, River Valley would have used additional NOLs. Is that right?

A. That's correct.

Q. How, if at all, did you adjust your but-for world goodwill balances to reflect the utilization of NOLs in the but-for world?

A. In the but-for world, I assume that we account for the goodwill in accordance with RAP and simply amortize it on a 25-year basis. So, there is no accounting for the use of NOLs against the goodwill as there would be under GAAP.

Q. And what was your basis for doing that?

A. The original concept of supervisory goodwill and the ability to amortize it over 25 years did not also require that one amortized it in addition for NOLs or for other GAAP requirements. It was either -- you either did it by GAAP, as I explained, the auditors basically did it by GAAP, and in some cases, our internal

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

REVISED

Certified Copy

- - - - - - - - - - - - - - - - - - x

HOMER J. HOLLAND and :

HOWARD R. ROSS, :

Plaintiffs, :

v. : Case No. 95-524C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - - x

Washington, D.C.

Friday, November 2, 2001

Continued videotaped deposition of HOMER HOLLAND, a Plaintiff herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D. C., at 9:10 a.m., Friday, November 2, 2001, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RPR, CRR, and MARK T. EAGAN, CVR-CM, and transcribed under their direction.

APPEARANCES:

On behalf of the Plaintiff:

DAVID BERGMAN, ESQ.
WALTER ZENNER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D. C. 20004-1206
(202) 942-5720

On behalf of the Defendant:

PATRICIA SMITH, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C.. 20530
(202) 353-8841

ALSO PRESENT:

JEFF NIELSEN
T.J. O'TOOLE, Videographer

associated with that guarantee than having a guarantee of $10 million where the risk was orders of magnitude less.

Q. In paragraph 124 of your report, you indicate that you did not assume any change in a number of events, including the redemption of FSLIC preferred in 1991.

What is your basis for assuming that FSLIC preferred stock would be redeemed in the no breach world?

A. I think I stated here that my assignment is to present a lost profits based on the but-for world where only a few assumptions are needed and I didn't feel like there was a good rationale as to why I would have not redeemed, why I would not have redeemed the stock at the time redeemed the stock. So I just didn't, I did not add that into the capital. And as you also see during this period, even with redeeming that preferred, we have sufficient capital to complete the business plans or to execute the business plans and the growth that I project.

Q. Do you assume that the redemption of the class A preferred stock would have taken place in the no breach world just as it did in the actual world?

A. Yes.

Q. To the extent the class A preferred stock would have been redeemed in the no breach world would it have been redeemed at par?

A. I assumed that it was redeemed on the same basis it was redeemed.

Q. Why is that?

A. Again I was -- I didn't have any real basis to make an assumption other than what actually occurred.

Q. Why do you believe that your assumption that the class A preferred stock would have been redeemed in the no breach world just as it was in the actual world is a conservative one?

A. If I had in conjunction, if I had made other assumptions that I mention in here that I could have made that we would have continued to grow. We would have acquired other institutions. We wouldn't have sold at the time that we sold, then there would have been, then that 5 million preferred would have been very useful as additional capital for exercising that but I didn't make those assumptions so it didn't seem like it was, that I didn't, I shouldn't necessarily make an assumption that the preferred would have stayed on the books longer.

Q. Looking at the issue of redemption in isolation apart from your other assumptions, why would it be a conservative one?

A. Well, I didn't look at it in isolation.

Q. If you were to look at it in isolation, would you view it as conservative or not?

A. Again, I didn't look at it in isolation. I felt that it was a reasonable assumption based on the fact that I was maintaining as many things in the actual world as actually occurred and only making certain limited assumptions with respect to what happened in the but-for world.

Q. Do you believe it to be reasonable and supportable that in the no breach world the class A preferred stock would have been obtained rather than redeemed?

A. Again, I'd have to think about it. Say that again. Do I think it's reasonable that I would have assumed that that would have stayed on the books?

Q. That in the no breach world, the class A preferred stock would have been retained.

A. I think as I just mentioned, if I had taken less conservative assumptions in the overall balance sheet in the use of capital, then it would

have been a reasonable assumption to maintain that preferred. But since that had been redeemed, it didn't seem to me that I had a basis under which I should change what actually occurred.

Q. Under what circumstances would it have made sense for River Valley to redeem the preferred stock for its face value of 5 million assuming that it counted as capital for all regulatory purposes?

A. You want to state that again, please?

Q. Sure. Under what circumstances would it have made sense for River Valley to redeem the preferred stock for its face value of 5 million, assuming it counted as capital for all regulatory purposes?

A. The preferred had a feature that was somewhat like equity and that under certain circumstances that the dividend rate could have gotten expensive. I didn't go back and look to see in this whether that would have been the case simply because I assumed that the more conservative assumptions that we'd, it seemed to me the more conservative assumption is to make as few assumptions that are different from the actual world as possible. And so the -- so I didn't make that assumption.

Q. Other than the issue of dividend payments,

5 million?

A. You're asking, you're just asking me in another way to think about how to evaluate the preferred and I think that that would take some time. I'd like to have time to think about that.

Q. Are there any other factors as you sit here today that you can think if it would be relevant to making that assessment?

MR. BERGMAN: Objection.

THE WITNESS: As I said before, I didn't focus on that in preparing this report. So, no, I don't have any other things.

BY MS. SMITH:

Q. You've indicated that you were attempting to limit the no breach world differences from the actual world. How did you determine which differences to allow or make?

A. I felt that the -- one of the things that I wanted was to be able to support the assumptions that I did make that were different from the actual world as well as possible and so I wanted to limit those, to those that I thought were very supportable.

For example, I think it was very supportable that we would have acquired San Antonio at River Valley in the no-breach world. I think it

prepare as it relates to River Valley?

Q. We're talking about the no-breach world, so what you believe River Valley --

A. In the no-breach world, as I have shown with this set of assumptions, is that River Valley would have been more profitable.

Q. As of 1991 the projected profitability of River Valley.

A. I -- incomprehensible. I mean, that is, I don't understand exactly what you're asking. Are you saying would my business plans have changed in 1991?

Q. In the no-breach world do you have an opinion as to whether the projected profitability of River Valley would have been the same or different?

A. I am, I am, I am, I'm confused by the context of the question and I guess I would just answer by I'd really have to think about it.

Q. What is confusing? What don't you understand?

A. As I say, I'm just, I'm not clear that I understand the context of the question.

Q. Do you understand that in 1991 when the FDIC was considering the issue they were looking at the projected profitability?

A. I don't know that.

River Valley - Rock Falls. I think I made mention of the ones that I did use in a footnote.

Q. In footnote 70 to paragraph 86 --

A. Yes.

Q. -- you note the various growth rates?

A. Yes.

Q. Assumptions and business plans. Looks like it was 9.3 percent, 5.5 percent, 6.1 percent, 7.1 percent, and 8.3 percent. Was that kind of variation in projected growth rates over a 20-month period typical in forecasting growth in the River Valley?

A. I don't recall why the growth rates were different. I felt that the most pertinent growth rate for this analysis was to use the one in the most current plan.

Q. But you don't recall why any specific increases or decreases in the growth rate occurred?

A. No, I don't.

Q. Do you know whether at the time the plans were prepared a recession was anticipated in 1990 and 1991?

A. I don't recall.

Q. How would the onset of a recession have affected River Valley's ability to meet its growth

projections?

A. I think that, again, because we used the capital markets, that we had quite a bit of flexibility in terms of achieving those growth targets, and I don't think the fact that we had a recession would have, as I think about it right now, would have been material to those growth plans. But I guess it's something I'd be happy to think about.

Q. What was the purpose of the preparation of new business plans?

A. As I said before I think it was a form of communications with the regulators.

Q. And in terms of the updates, would those supersede the previous plans?

A. I think in general, yes.

Q. What caused there to be the need for changes in the business plans?

A. You asked me that before and I said I don't recall.

Q. In paragraph 86 of your report you state that the FHLB Chicago required the business plans to assure itself of the future viability of the resulting institutions, including the institutions' ability to meet capital ratio requirements without taking on undue risk.

Obviously if the earnings are growing, that would imply that the earnings are growing more, I would think, more than 8.3 percent which would mean I was building up the capital which means that we would be providing more protection on the liabilities.

I believe that in the question of capital ratios as I showed in the report, I looked at both capital assets and capital liabilities because at different times, the regulators focused on different, on capital assets and then other times they focused on capital liabilities.

Q. After FIRREA, did the regulators focus on capital or liabilities?

A. Did they focus on capital or liabilities?

Q. The capital ratio as a percentage of liabilities.

A. I don't remember. I'd have to look that up.

Q. In paragraph 138 of your report, in footnote 120, you state, I assume the SAFSB obtains the same results in the but-for world that it did in the actual world.

How, if at all, does the growth of a no-breach SAFSB differ from actual?

A. My assumption was that there wasn't any, that I used the same balance sheet for San Antonio that actually occurred as well as the same earnings for San Antonio that actually occurred, and so none of the balance sheet per se of San Antonio nor its, nor its revenue and expense had any direct -- let me step back for a minute.

I think I should just kind of review what it did so we'll make this clear. I assumed that the assets and liabilities of San Antonio Savings Bank were the same in the but-for world as in the actual world. The principal difference between the but-for world and the actual world was that the San Antonio would be acquired by River Valley from the period August of '92 through November, December of 1994. And at the end of that period, I assumed that San Antonio reverts to being an entity not under River Valley but owned by the shareholders.

Q. The assumed annual compounded liability growth rate of 8.3 percent in your report then just applies to the Illinois thrift, is that correct?

A. What I said was that the 8.3 percent is the growth rate of the total balance sheet starting with July of 1990 up to August of 1992. The total balance sheet which is then comprised of Illinois

plus San Antonio increases by the amount of the San Antonio assets and liabilities. Then I constrained the growth of the entire balance sheet at 8.3 percent through the rest of the period.

Q. To the extent that San Antonio experienced annual compounded liability growth greater than 8 percent, 8.3 percent of a particular year, are you then implying that a no breach San Antonio would have been smaller than the actual San Antonio?

A. No, I'm saying that San Antonio was exactly the same in the breach and in the nonbreach. And if you, and so there is, the fact that a component of the total balance sheet grew faster than the rest of the balance sheet means that the other parts of the balance sheet would grow less fast or might even shrink and in fact in the additional assets and liabilities, you will see that those don't continue to grow at a constant growth rate. They grow and then they start coming down. And the reason they came down is because I constrained them at the top, at the 8.3 percent growth rate while I left San Antonio, I kept constant San Antonio at its actual growth rate.

Q. With respect to your adoption of the 8.3 percent growth rate based on the October '89 business

Does that help to explain some of the absences of purchases in your table 15?

A. I guess the overall point that I would make is that I would still think it is reasonable that we would have been able to find investment opportunities for the additions to the balance sheet that we were talking about, I think in particular because of the fact that we would have been an active purchaser in those marketplaces and as a result would be someone that the investment bankers would come to with their new deals and I still think it's important to put all of this in the context that we were shrinking the balance sheet on purpose during this period of time.

This memorandum doesn't necessarily speak to that but that certainly was the context in 1992.

Q. Do you have any basis to dispute the two sentences that I read from here?

A. The one, do you want to --

Q. Starting with we have found.

A. I don't necessarily dispute it. I think it -- again, I think it needs to be taken into the context of the times and also the relative magnitude of things.

Q. If you look at table 15 of your report,

A. If San Antonio did have expenses that were associated with being an independent bank, they had all of those expenses that were paid at the bank level. I think the conservative assumption is to assume that those expenses did not go away. If I had assumed that San Antonio was not a subsidiary of River Valley, then one could have made some assumptions with respect to those expenses going away. But again, I felt the more conservative assumption was to treat the expenses as if there was no change in the expenses except where it related to a holding company which would not have had -- which would not have been in existence in the but-for world.

MS. SMITH: Let's take a break.

MR. O'TOOLE: Going off the record, the time is 18:43:23.

(Recess from 6:43 p.m. to 6:55 p.m.)

MR. O'TOOLE: We are back on the record. The time is 18:55 exactly.

BY MS. SMITH:

Q. In paragraph 158 of your report, Mr. Holland, page 71, you state that: "At the time of the actual sale to First Banks, River Valley would have had $6.6 subordinated debt and $12.7

million of unamortized goodwill and capital credits qualifying as regulatory capital but for the government's breach."

What is your basis for believing that each of the forms of contractual regulatory capital which you assert were transferable?

A. I'm not assuming that they're transferred. I'm assuming that they stay with River Valley.

Q. So you're not assuming that they're transferred to First Banks?

A. That's correct. I'm assuming that they stay in River Valley.

Q. Do you assume that River Valley -- I'm sorry, excuse me. Do you assume that First Banks would have paid for that regulatory capital?

A. Yes.

Q. But you don't assume that they could be transferred to First Banks through the acquisition?

A. It's not necessary to make that assumption, so I didn't make that assumption. I assumed that, as with the NOL's, the NOL's stay with River Valley. River Valley, the stock

of River Valley was the only thing that was transferred.

Q. Did you perform any kind of analysis or look at any documents to evaluate whether in fact that regulatory capital could have been transferred to First Banks?

A. No, I didn't.

Q. What is your basis, if any, for assuming that the regulatory capital wouldn't have been terminated upon a change of control?

A. I am not aware of any such requirement.

Q. Do you disagree with the testimony of Mr. Bangert that in preparing the mark-to-markets goodwill is valued at zero?

A. I don't necessarily disagree with that. But again, that would depend upon the context in which he said that.

Q. Would you have any basis to disagree with his testimony that it was valued at zero because it had no resale value?

MR. BERGMAN: Objection to form.

THE WITNESS: Again, I don't know the context in which he was making that comment. I think that in the actual world that the goodwill

is a result of a purchase, so that it isn't a form of regulatory -- it isn't the same as the regulatory capital that we had acquired in this particular case.

So I guess I don't believe that the comment is really particularly pertinent to the subject matter of First Banks being willing to pay for the value that would have been acquired.

BY MS. SMITH:

Q. The acquisition of River Valley by First Banks was accounted for as a purchase, correct?

A. I don't recall.

Q. Assuming it was, do you have an understanding regarding what happens to an acquiree's GAAP goodwill when the purchase is consummated?

A. Well, the GAAP goodwill, I guess you're asking about what would happen with a purchase under purchase accounting and how would GAAP goodwill get created in GAAP. I think we have discussed this also earlier.

GAAP goodwill is really an accountant's way under GAAP for treating a difference between liabilities and assets -- I'm

sorry, dealing with the difference between the net asset value, tangible net asset value, and the purchase price.

Q. But do you have an understanding of what happens with GAAP goodwill, with an acquiree's GAAP goodwill, when a purchase is consummated?

A. I think that's what I just said. Maybe I'm not understanding your question. Do I have an understanding? Go ahead.

Q. If a thrift that is being acquired had GAAP goodwill on its books when it's acquired, do you have an understanding of what happens to the GAAP goodwill that was on its books?

A. Under those circumstances, you would go through the same analysis and there would either be more or less goodwill at the end of the day based on the difference between the purchase price and the net tangible assets -- the net assets that were acquired.

Q. But not focusing on what the goodwill will be that results from that later acquisition, but what happens to the GAAP goodwill that was already on the books?

A. I think it is not relevant at the new

purchase. The new mark-to-market is accomplished at that point. At least this would be my understanding, and I don't think that -- I think a new balance for goodwill would be created. So whether or not there was goodwill in the first place wouldn't affect what the new goodwill was.

Q. Do you have a basis for believing that the GAAP goodwill that had been on the books would be valued at anything other than zero?

A. I think -- again, I think the issue is that whatever the goodwill was really doesn't matter because a new calculation is done to determine the goodwill going forward. At least that's the best of my knowledge. I hadn't really thought about this question before.

Q. Would the goodwill, if any, recorded by First Banks in connection with the River Valley acquisition be the same in the actual and the no-breach worlds?

MR. BERGMAN: You're asking about GAAP goodwill or RAP?

BY MS. SMITH:

Q. The goodwill that was recorded by First Banks.

A. In the actual world, if First Banks recorded goodwill -- I have to think about that. Let me set aside any of the assumptions on the lost profits because I just don't want to get caught up in that difference of retained earnings and payments. But I think your question is would -- I guess I come back to, if there's no change between, if there's no change in the balance sheet under GAAP in the real world and in the but-for world, then I wouldn't see any change in the GAAP goodwill.

Q. What about if you look at it in terms of the actual world versus your but-for world, where you do have your various assumptions?

A. The principal assumption that we're talking about is that in the but-for world the subordinated debt and the unamortized goodwill and capital credits would have counted as capital. I would anticipate that those would stay with River Valley and that there would be value to having that additional capital on the part of First Banks.

Q. Would the amount of GAAP goodwill, if any, recorded by First Banks be the same in the actual and no-breach world?

MR. BERGMAN: GAAP or RAP?

THE WITNESS: She said GAAP, I believe.

MS. SMITH: Right.

THE WITNESS: I think if the balance sheet is the same, the goodwill is the same, the GAAP goodwill. The issue that we're talking about is the regulatory capital that is what we've called in another context -- it's not GAAP; it is another form of capital that was provided in the deals that we structured.

BY MS. SMITH:

Q. What differences are you saying would exist because of that?

A. I'm saying that as far as GAAP is concerned, the subordinated debt would have been treated as a liability and there wouldn't have been any of this other regulatory -- there is no recognition of capital credits and there isn't a recognition of this separate form of supervisory goodwill.

Q. Why do you assume that the balance sheets are the same in the actual and the but-for world?

A. I said if they were the same, and I

was trying to get to a point of how does GAAP goodwill change and the only thing that changes GAAP goodwill is the difference between the purchase price and the net assets that are acquired.

I just, I'd have to think about the fact that what differences there were on the balance sheet between the real world when we sold to First Banks and the but-for world. My first reaction is that it wouldn't change the goodwill, the GAAP goodwill, because I'm assuming that we're paying dollar for dollar for the additional retained earnings. So therefore that wouldn't create any difference. Even though they're paying a higher purchase price, the net assets would be higher by the same amount.

Q. Are you aware of any instances pre or post-FIRREA in which an acquiree's goodwill was transferred to an acquiror in connection with a purchase?

A. I think let's for the sake of clarity, let's call one "regulatory capital" and call another "goodwill." As far as a transfer of goodwill, as I said, there is no concept of

transferring goodwill. Goodwill is the result of purchase accounting. There would be purchase accounting at the time. If goodwill was created on the books of an institution, it would have been from purchase accounting at that point.

Once there's a new purchase, you start all over again, so there's no transfer of goodwill.

On your other question, am I aware of one institution acquiring another's regulatory capital, my experience with the regulatory capital is only so short. We only had this regulatory capital for less than two years and I didn't follow anyone else's transactions.

Q. If the regulatory capital were not transferable, would you agree that the value of it to First Banks would be zero?

A. I think, first of all, I have no basis to say it would not be transferable. I know of no basis, but the transaction was not structured so that it was necessary to transfer it. The regulatory capital was an attribute of River Valley, just as the NOL's were an attribute of River Valley.

Q. Are you offering a legal opinion that

First Banks could have acquired the supervisory regulatory capital pursuant to the terms of the respective assistance agreements?

A. I'm not giving you a legal opinion, no.

Q. What is your basis for believing that First Banks would have wanted the subordinated debt of River Valley?

A. The subordinated debt was attractive as a form of capital over other forms of capital, over different forms of capital, and the form of capital that I was aware of and that I believe Dr. Murphy has used in comparing the value of one versus the other was preferred stock.

Preferred stock, as you know, requires a dividend payment and a dividend payment is out of after-tax earnings. So one to make a dividend payment of, let's say, 10 percent on an after-tax basis would have to earn more than 10 percent on a pre-tax basis, would have to pay taxes on that income, and then the remainder would be a 10 percent dividend, whereas in the subordinated debt case the interest expense is a tax deductible expense. So the costs are

generally different just because of the taxes.

Second, the costs are generally different because the subordinated debt has a superior credit characteristic compared to the preferred stock. The preferred stock, the obligor on the preferred stock is only able to pay the dividend out of earnings. If there are no earnings, then the holder of the preferred stock would have a piece of paper that wouldn't be paying on a regular basis.

It's also the case that regulators could come in and stop dividends for one reason or another, whereas the subordinated debt is an obligation of the financial institution, is a direct obligation of the financial institution.

Q. How, if at all, would your and Mr. Ross's personal guarantees have been modified if First Banks had acquired the sub debt?

A. I make the assumption that our guarantees would not be required upon the transfer -- not transfer; upon the acquisition of River Valley with its subordinated debt. Part of the reason I make that assumption is because American National Bank extended substantial credit to First Banks on a non-

guaranteed basis right about the time that we did this transaction.

Q. Are you offering a legal opinion that First Banks could have succeeded to FSLIC's consent to treat the subordinated debt as regulatory capital?

A. I am not offering a legal opinion.

Q. In paragraph 159 of your report you state: "I understand that another expert, Dr. Neil Murphy, has estimated the value to First Banks of the regulatory capital to be $7.964 million." Do you have an independent opinion on that or do you just rely on Dr. Murphy for that?

A. Well, I'm generally aware. I did read his report some time ago and I understand the methodology that he used in doing that. So I am very comfortable with the calculation that he did in terms of estimating the value to First Banks.

Q. In paragraph 151A, page 59, you state that: "First Banks would have paid more when it purchased our stock in River Valley but for the breach."

Was First Banks ever given an opportunity to acquire the rights to the claim

Q. With respect to the claim that you and Mr. Ross have brought against the government, will you be receiving 50 percent of whatever recovery might result?

A. I think the general question is do Howard and I split the hoped-for result?

Q. Any award that might result, yes.

A. Yes.

Q. At this point I have no further questions. I would just reiterate that you provide us the backup information in the areas that we've discussed over the last couple of days that you were going to look into. I also ask that, with respect to the areas where you indicated that you would need to give it some thought, if any of those are ones that you plan to give it some thought and offer an opinion, that you then provide that to us.

A. Certainly.

MS. SMITH: No further questions.

MR. BERGMAN: Nothing from me. Thank you, and thank you for accommodating.

MS. SMITH: Thank you very much, Mr. Holland.

MR. O'TOOLE: This ends tape number 4,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

HOMER J. HOLLAND, HOWARD R. ROSS, )
and FIRST BANKS, INC., ) CASE NO. 95-524C
Plaintiffs, ) Judge George
) Miller
)
THE UNITED STATES, )
Defendant. )

---

Washington, D.C.
Wednesday, May 11, 2005

Deposition of HOMER HOLLAND, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the Department of Justice, 1100 L Street, Northwest, Washington, D.C., at 9:16 a.m., Wednesday, May 11, 2005, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

CERTIFIED COPY

APPEARANCES:

TAKING ATTORNEY:
JOHN H. ROBERSON, ESQ.
1100 L Street, Northwest
Washington, D.C. 20530
(202) 353-7972
(On behalf of Defendant)

DEFENDING ATTORNEY:
MICHAEL A. JOHNSON, ESQ.
DAVID B. BERGMAN, ESQ.
ARNOLD & PORTER, LLP
555 Twelfth Street, Northwest
Washington, D.C. 20004
(202) 942-5783

ALSO PRESENT:
James Laughlin, Videographer
Jeffrey P. Yushchak, Navigant Consulting
Jeff Nielsen, Navigant Consulting

Q. How long did you meet with counsel?
A. I met with them for a good portion of Monday and for a little over half a day yesterday.
Q. And you identified some documents. Were there any other documents that you reviewed in preparation for today's deposition?
A. I don't believe so.
Q. Since appearing for your deposition in 2001, have you written any published articles related to the thrift industry?
A. No.
Q. Have you written any articles related to the thrift industry?
A. No.
Q. Have you written any articles related to finance?
A. No.
Q. Any articles related to mortgage-backed securities?
A. No.
Q. Any articles related to capital market instruments or investments?
A. No.
Q. Have you acted as an expert in any

whether First Bank Missouri will accept your corrected expert report issued in 2001 as issued on its behalf without any changes?

A. No.

Q. Now, today, you've produced five expert reports in this case, isn't that correct?

A. I produced three principal reports, and, yes, two of them had corrections.

Q. Okay. On July 2nd, 2001, you submitted for production an expert report and declaration, isn't that correct?

A. I believe that is the correct date.

Q. I think we're just going to go ahead and get some of these documents introduced into the record, so they'll be here, so let's introduce as the first exhibit your July 2nd, 2001 expert report and declaration.

(Holland Exhibit Number 1 was marked for identification.)

BY MR. ROBERSON:

Q. And then on July 27th, 2001, you submitted for production a corrected expert report and declaration, isn't that correct?

A. Yes.

MR. ROBERSON: And if we could mark that as an exhibit?

(Holland Exhibit Number 2 was marked for identification.)

BY MR. ROBERSON:

Q. Then on October 30th, 2001, you provided materials identifying certain corrections to your July 27th, 2001 report, isn't that correct?

A. That sounds right.

Q. We'll introduce that as an exhibit.

(Holland Exhibit Number 3 was marked for identification.)

BY MR. ROBERSON:

Q. Do you recognize that document?

A. Yes.

Q. And on December 12th, 2001, you provided additional materials, including certain corrections to your July 27th, 2001 report, isn't that correct?

A. I don't recall the date, but I'll be happy to take a look at it.

Q. All right. So let's try this exhibit and see if it refreshes your recollection about it.

MR. ROBERSON: If you'd mark this, please?

(Holland Exhibit Number 4 was marked for identification.)

BY MR. ROBERSON:

Q. Does that refresh your recollection about whether or not you submitted additional materials on December 12th, 2001?

A. Yes.

Q. And that exhibit is, which is exhibit --

A. Exhibit 4, I believe.

Q. 4, is your corrections on December 12th, 2001, is that correct?

A. I think they were responses to questions and some corrections, yes.

Q. And on December 23, 2003, you submitted for production the first supplemental expert report and declaration of yourself, of Dr. Holland, is that correct?

A. That's approximately the correct date.

MR. ROBERSON: Let's mark this as an exhibit.

(Holland Exhibit Number 5 was marked for identification.)

A. Yes.
Q. Does your most recent report, the corrected second supplemental expert report and declaration dated February 22nd, 2005, cause all of your previous reports in this case to be superceded?
A. No.
Q. Now, as you sit here today, does your corrected second supplemental expert report include all of the damages, all of the damage claims and opinions that you expect to present at trial in this case?
A. Repeat the question?
Q. Sure. Does your corrected second supplemental expert report include all of the damage claims and expert opinions that you expect to present at trial in this case?
A. Not necessarily.
Q. And when you say, "not necessarily," why do, why are you qualifying your answer?
A. What I did in the second supplemental report was take some changes, one was the Court's decision to include First Banks as a Plaintiff, and the instructions were to look at the damages from the perspective of First

fact that the damages related to San Antonio were different when you look at it from the River Valley perspective, as compared to the Holland and Ross perspective.

Q. Is there any other difference?

A. I can't think of any at this point.

Q. And just to be clear, it's your position that your prior expert reports, you were calculating damages to Mr. Ross and yourself, rather than to the River Valley thrifts, correct?

A. That's correct.

Q. And in both your July 27th, 2001 and December 2003 reports, you posited damages in the form of an incremental purchase price that you allege would have been paid by First Banks, Incorporated, correct?

A. That's correct.

Q. And you opined that you and Mr. Ross were damaged by the entire amount of that alleged incremental purchase price that you assumed First Banks, Incorporated, would have paid, correct?

A. Correct.

Q. But you and Mr. Ross would not have

been entitled to the entire purchase price, correct?

MR. JOHNSON: Objection, fact question.

THE WITNESS: I mean, you're right that we took the perspective that it was Holland and Ross, and I think that, in general, it's supportable that would be Holland and Ross.

BY MR. ROBERSON:

Q. It's what?

A. I think it's supportable that it would be due to Holland and Ross.

Q. No, but with regard to the entire purchase price?

A. Yes.

Q. You believe that Holland and Ross would be entitled to the entire purchase price?

A. Again, I'd have to go back to -- these are factual questions that I'd have to check on, and I'm sure we covered those sometime ago, but -- and I guess I'd leave it at that.

Q. Well, it's not a factual question because we're talking about your but-for calculation of damages.

BY MR. ROBERSON:

Q. Now, this agreement stated that if FBI received any funds from litigation against the government, it would transfer any sum of money it received, after taking funds for taxes, to you and Mr. Ross, is that correct?

MR. JOHNSON: Objection, beyond the scope, document speaks for itself. You may answer, if you're able, Doctor.

THE WITNESS: I believe you're referring to the sentence that says, "You will pay to us any sum of money received," is that what you're referring to?

BY MR. ROBERSON:

Q. On the second page, there is a specific statement that says, "To eliminate any future confusion or conflicting arguments by any of the agencies, you have also agreed that you will pay to us any sum of money received from the agencies by any of you or RVHI or RVSB or the respective successors, with respect to any of the corporate claims, net of any additional federal, state, or local taxes due as a result of the receipt by any of you or RVHI or RVSB or the respective successors of

such sum of money (tax liability)."
Do you see that?
A. Yes, I do.
Q. And you had no such agreement with First Bank FSB, whereby it or its successor in interest would transfer any proceeds from litigation --
MR. JOHNSON: Objection.
BY MR. ROBERSON:
Q. -- against the government to you and Mr. Ross, is that correct?
MR. JOHNSON: Objection, beyond the scope, instruct not to answer. That has nothing whatsoever to do with his damages calculations.
MR. ROBERSON: It has to do with his incentive and -- his incentive in this litigation is a perfectly appropriate avenue of questioning of the witness.
MR. JOHNSON: The instruction stands.
MR. ROBERSON: Then we'll contact the Court. Can we go off the record, please?
THE VIDEOGRAPHER: Going off the record. The time is 11:03.
(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: Back on the record. The time is 11:47.

MR. JOHNSON: Mr. Roberson, because the Court suggested it, may I offer that in announcing an objection that the scope of your question goes beyond Dr. Holland's damages analyses, that I may just say, objection, scope, and leave it at that, rather than providing a further enunciation?

MR. ROBERSON: That seems like a very good idea. Can we read back the last question that the Plaintiffs objected to?

THE COURT REPORTER: "QUESTION: And you had no such agreement with First Bank FSB, whereby it or its successor in interest would transfer any proceeds from litigation against the government to you and Mr. Ross, is that correct?"

THE WITNESS: I think that I reread this agreement and see where it's my understanding that any successors are covered in this agreement. I think to the, most directly, I have no independent agreement, other than this agreement, with any of the other entities of First Banks.

BY MR. ROBERSON:
Q. And would that be both verbal and written agreements?
A. Yes.
Q. So it's your testimony that you have no other agreements pursuant to which you would be eligible to receive any sum of money with respect to claims that could be asserted by the River Valley thrifts, other than the January 5th, 1995 agreement -- or January 4th, 1995 agreement?
A. Yes, to the best of my knowledge.
Q. And you haven't amended that agreement either, have you?
A. Not to my knowledge.
Q. And have you offered FBI a percentage of any potential recovery that you might be awarded in this case? For instance, even if the money went to you pursuant to the January 4th agreement, do you have a second supplemental agreement whereby funds that you did receive would then also be given to any other person?
A. No.
Q. Or entity?

A. No.
Q. Now, in connection with your, the preparation of your corrected second supplemental report, have you contacted any FBI personnel?
A. No.
Q. And have they contacted you, have you had any communication with them?
A. No.
Q. Do you know whether Dr. Murphy or Mr. Stokes had any discussions with any FBI personnel?
A. I do not know.
MR. JOHNSON: Objection, scope.
THE WITNESS: I do not know.
BY MR. ROBERSON:
Q. Did any persons working for you have any connection -- any communications with FBI personnel in connection with your second supplemental report?
A. No.
Q. Have you requested that FBI provide you with any of its, its First Bank FSB's or First Bank Missouri's documents in connection with this case?

Q. And you view this 29.963 million figure to reflect the value of SAFSB on August 14th, 1992 in excess of the purchase price that was paid, correct?
A. Correct.
Q. So it is your opinion that WCHI purchased SAFSB for 29.963 million less than its actual value, correct?
A. Then, again, as I said before, I think those numbers come from Lynn Stokes' testimony.
Q. But it's in your corrected second supplemental expert report, right?
A. Correct.
Q. Are you standing behind that number?
A. Yes.
Q. And the purchase price that WCHI paid for SAFSB was 10 million, right?
A. Right.
Q. So you believe the actual economic value of SAFSB at August 14th, 1992 was 39.963 million; that is, the 29.963 million plus 10 million, is that correct?
A. Yes.
Q. Is that 39.963 million estimate before or after the 15 million dollar dividend that

question.

MR. JOHNSON: Mr. Roberson, please don't point your finger at me. Please don't point your finger at the witness. Please don't raise your voice in the deposition, or we're going to stop this right now as harassing behavior, which is what it is. I've given you a lot of leeway.

We can continue with the deposition if you can control your behavior. If you can ask questions in a professional tone without pointing your fingers at anyone, let's proceed. If not, maybe we should take a short break.

BY MR. ROBERSON:

Q. Dr. Holland, are you now calling the 29.963 million dollars an economic benefit to the River Valley thrifts?

A. Yes.

Q. And you hadn't asserted that previously, is that correct?

A. I had asserted that the 29.963 million was, at that time, an economic benefit to Western Capital Holdings, which created a tax liability for which it had that -- had River Valley acquired that, had acquired San Antonio,

Q. Are you finished?
A. Yes.
MR. ROBERSON: Can you read back the question and his answer, please?
No, don't go back that far. We'll start over.
BY MR. ROBERSON:
Q. Economic benefit to River Valley is the category, okay?
A. Yes.
Q. You previously did not set forth a claim for 29.963 million dollars as an economic benefit to River Valley in your previous reports, is that correct?
A. That's correct.
Q. And you never called 29.963 million dollars a damage in this case, did you?
A. I did not call it a damage.
Q. Okay. So we're asking about the 29.963 million dollars, where that number comes from as you assert a damage claim now with respect to River Valley thrifts, okay?
A. Okay.
Q. So that's why we're looking at page 13 of the Western Capital's subsidiary's

question. Why did you choose to rely upon a forward looking estimate for the purpose of measuring expectancy damages related to SAFSB?

MR. JOHNSON: Objection, lacks foundation, instruct not to answer. And if you don't move to another subject with the next question, we're going to adjourn the deposition to prevent further harassment of Dr. Holland.

MR. ROBERSON: Okay. Well, we do --

MR. EVANS: Off the record.

THE VIDEOGRAPHER: Off the record. The time is 3:09.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: Back on the record. The time is 4:07.

BY MR. ROBERSON:

Q. Dr. Holland, with regard to River Valley running SAFSB in a but-for world, does the 29.963 million dollar figure that you set forth take into account operating expenses that were necessary to run SAFSB?

A. I think what it simply represents is the fair market value of the net assets above the purchase price, which I believe would be translatable into an economic benefit, and

A. Correct.

Q. And you as -- you and Mr. Ross, along with minority shareholders in WCHI, earned an attractive return on your SAFSB investment, correct?

MR. JOHNSON: Objection, fact testimony, so it's beyond the scope.

THE COURT REPORTER: I can't hear you.

MR. JOHNSON: Objection, it's a fact question, beyond the scope of the expert deposition. Answer if you're able, Dr. Holland.

THE WITNESS: We believe that we did earn a very attractive return.

BY MR. ROBERSON:

Q. So if the Court were to award Plaintiffs the amount of claimed damages relating to SAFSB, you and Mr. Ross would have been compensated for the alleged value of SAFSB twice, isn't that correct?

A. In part, that's correct.

Q. And when you say, "in part," what do you mean?

A. In that Mr. Ross and I did not own SAFSB in total. We owned, as you mentioned, we

owned 60 percent of SAFSB, and the reason that I, in my first report, only attributed to Ross and Holland the damages associated with the taxes is because Ross and Holland, together with the minority shareholders of SAFSB, really obtained the full -- obtained the economic benefit.

MR. ROBERSON: I want to introduce a document.

THE COURT REPORTER: We need to go off the record.

THE VIDEOGRAPHER: This marks the end of videotape number three in the deposition of Mr. Homer Holland. Off the record. The time is 4:14.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: This marks the beginning of videotape number four, in the deposition of Mr. Homer Holland. Back on the record. The time is 4:16.

MR. ROBERSON: If you'd mark the next exhibit as Exhibit 14, it is the WCH expense analysis.

(Holland Exhibit Number 14 was marked for identification.)

Q. And if the 6.4 million dollars were paid?

A. Correct.

Q. Then they would have been paid by River Valley thrifts in the but-for world?

A. That's correct. And in effect, the River Valley thrifts did pay them. They dividended the money up to the River Valley Holdings, and River Valley Holdings paid them out there.

Q. In the nonbreach world, would SAFSB have been acquired by First Banks, Incorporated?

A. If we, if we start with the scenario that River Valley acquired SAFSB, my assumption, my belief would be that First Banks would have in turn acquired River Valley as it existed at that time, which would have included SAFSB.

Q. Well, maybe you've changed your opinion on this issue. Let's look at page 59 of the July 27th expert -- 2001, expert report, paragraph 138.

A. I'm sorry, where are we again, paragraph 138?

stock of that, the principal relationship is that it owns 100 percent of the stock of that company. The cost associated with running that company are the costs that are normally attributable to that, to the subsidiary.

And I didn't -- and to answer your question, I don't now think of any additional costs that River Valley would have had to undertake that were not already undertaken by SAFSB.

Q. Now, let's turn back to the WCH expense analysis, Exhibit Number 14, I believe. And, again, about three-fifths down the page, there is a row entitled, "Total payments to Bo McAllister, $749,988." Do you see that?

A. Yes.

Q. And at about half, about the halfway point on the page, there's a statement, "Payments to Bo McAllister, per agreement of October 6th, 1992, $750,000 to be paid over three years, starting September 1st, 1992." Do you see that?

A. Yes.

Q. In calculating damages, did you consider that if River Valley had acquired

SAFSB and maintained its acquisition of SAFSB, it would have had to pay Bo McAllister a total of $750,000?

A. Well, again, as we talked before, I consider this essentially part of the expenses of SAFSB.

Q. But in a but-for world, these would have been expenses of River Valley; in other words, in a but-for world, River Valley would have had to pay Bo McAllister, correct?

A. Well, in the but-for world, SAFSB would have been the subsidiary, SAFSB would have had operating expenses, these would have been the operating expenses of SAFSB.

Q. So you're saying SAFSB would have been maintained as a separate subsidiary then?

A. In that assumption, yes.

Q. Let's take it, another assumption, since you're playing both cards here. In the assumption where SAFSB is acquired by River Valley and is merged into River Valley, doesn't River Valley have an obligation to pay Bo McAllister $750,000 over a period of three years?

A. If we merged the two together and this

is, this is an obligation of SAFSB, and then it becomes an obligation of River Valley, agreed.

Q. Do you know how to get in contact with Mr. McAllister?

A. No.

Q. Do you know if he's still alive and working?

MR. JOHNSON: Objection, this calls for fact testimony.

THE WITNESS: No, I don't.

MR. JOHNSON: No more Bo McAllister contact information questions, please.

BY MR. ROBERSON:

Q. FBI acquired RVHI on January 4th, 1995, correct?

A. Yes.

Q. And FBI paid approximately 37.4 million for RVHI at that time, correct?

A. Yes.

Q. And you would agree that the transaction between FBI and RVHI took place at fair market value?

A. Yes.

Q. So you believe that you and Mr. Ross, as the majority shareholders in RVHI, got a

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

HOMER J. HOLLAND, HOWARD R. ROSS, )
and FIRST BANKS, INC., ) CASE NO. 95-524C
Plaintiffs,) Judge George
) Miller
)
THE UNITED STATES, )
Defendant.)

---

Washington, D.C.
Thursday, May 12, 2005

Deposition of HOMER HOLLAND, Volume 2, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the Department of Justice, 1100 L Street, Northwest, Washington, D.C., at 9:05 a.m., Thursday, May 12, 2005, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

CERTIFIED COPY

APPEARANCES:

TAKING ATTORNEY:
JOHN H. ROBERSON, ESQ.
JAMES WHITMAN, ESQ.
DEPARTMENT OF JUSTICE
1100 L Street, Northwest
Washington, D.C. 20530
(202) 353-7972
(On behalf of Defendant)

DEFENDING ATTORNEY:
MICHAEL A. JOHNSON, ESQ.
ARNOLD & PORTER, LLP
555 Twelfth Street, Northwest
Washington, D.C. 20004
(202) 942-5783

ALSO PRESENT:
James Laughlin, Videographer
Jeffrey P. Yushchak, Navigant Consulting
Jeff Nielsen, Navigant Consulting

report that -- in fact, I think he says one of the real benefits is all the options River Valley had with respect to SAFSB.

And I guess I -- it isn't necessary for me to make the assumption necessarily, it certainly could be the case, that First Banks would have acquired SAFSB as a part of River Valley. There are, as he points out, there are other options that River Valley would have had to monetize that 29 million.

Q. Do you have anything to add to what Mr. Stokes opined?

A. Simply that it reminded me that I hadn't necessarily made any single assumption with respect to First Banks in my report. You asked me if I had, and I was reminded that I really didn't need to make an assumption that First Banks acquired SAFSB.

Q. Do you know why FBI did not liquidate RVHI in connection with the acquisition transaction?

MR. JOHNSON: Objection, fact testimony.

THE COURT REPORTER: I can't hear you.

MR. JOHNSON: Objection, fact

before that, in this case, I believe Lynn Stokes is the, is the better expert with respect to taxes, but I am not completely unqualified in understanding some of the tax aspects of this.

BY MR. ROBERSON:

Q. Okay. But, I mean, in other words, when we talk about expert opinion, you're not going to proffer yourself, I take it, as an expert on tax issues to the Court?

A. I guess I don't, I don't want to necessarily preclude that, but my -- I believe that the way the expert reports have gone is my focus has been on the lost profits damages, and I have used the tax information that has been provided to me by Mr. Stokes and -- however, if, if there was some reason for me to be, to testify, I have some degree of knowledge of taxes as they apply to River Valley.

Q. Okay. But, again, with respect to your capacity to proffer yourself as an expert on taxes, even with regard to River Valley, if you're going to keep that option open, I have a couple of questions for you. Have you ever taken any tax courses?

A. No.
Q. And you're not a CPA?
A. No.
Q. Never worked in the capacity as a tax advisor?
A. No.
Q. Never worked for a client with respect to providing tax, opinions on tax code?
A. No.
Q. Do you know whether FBI, which was a holding company, would have acquired the River Valley thrifts directly without first requiring that a holding company for the River Valley thrifts be established?
A. No.
Q. And why don't you know that?
A. You're asking me basically a hypothetical question. If something had, had been different, would they have required a holding company? I -- and the answer is, with the amount of information you've given me, I don't know.
Q. Okay. Do you know whether the River Valley thrifts could have been purchased directly by First Bank, a federal savings bank,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

HOMER J. HOLLAND, HOWARD R. ROSS, )
and FIRST BANKS, INC., ) CASE NO. 95-524C
Plaintiffs,) Judge George
) Miller
)
THE UNITED STATES, )
Defendant.)

---

Washington, D.C.
Friday, May 13, 2005

Deposition of HOMER HOLLAND, Volume 3, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the Department of Justice, 1100 L Street, Northwest, Washington, D.C., at 9:06 a.m., Friday, May 13, 2005, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Certified Copy

APPEARANCES:

TAKING ATTORNEY:

JOHN H. ROBERSON, ESQ.
DEPARTMENT OF JUSTICE
1100 L Street, Northwest
Washington, D.C. 20530
(202) 353-7972
(On behalf of Defendant)

DEFENDING ATTORNEY:

MICHAEL A. JOHNSON, ESQ.
DAVID B. BERGMAN, ESQ.
ARNOLD & PORTER, LLP
555 Twelfth Street, Northwest
Washington, D.C. 20004
(202) 942-5783
(On behalf of Plaintiffs)

ALSO PRESENT:

Jeff Laughlin, Videographer
Jeffrey P. Yushchak, Navigant Consulting
Jeff Nielsen, Navigant Consulting

A. Likely, yes.

Q. And do you know who at FBI was receiving that information?

MR. JOHNSON: Objection, scope.

THE WITNESS: The -- my principal point of contact was Alan Blake. He employed Peat Marwick as part of the team that was involved in the due diligence of River Valley. We -- but he had, he had other people. I don't remember their names at this point. As I said, my principal point of contact would have been Alan Blake.

BY MR. ROBERSON:

Q. Now, you remember a while ago, I produced the memo that you had prepared for Mel Garbow back in 1996?

A. Yes.

Q. And you remember I read you a paragraph that referred to Steve Bangert doing a mark to market on a monthly basis?

A. Yes.

Q. Now, you agree that River Valley performed mark to markets on a monthly basis of its entire portfolio, correct?

A. I don't believe it was of the entire portfolio. I believe that -- well, I do know that

the interest rate risk analysis was done on a quarterly basis, and, and I believe that those things that were easily calculated in intermediate months would have potentially been included in a mark to market. I used the term monthly in that recollection. I believe that we would have kept track on a monthly basis of the mark to market.

But I think that the major changes in the mark to market would occur on a quarterly basis when we did the, the heavy analytical work that included running the Wall Street Analytics.

Q. Now, is there a reason why you didn't do a mark to market analysis during, in connection with your original report?

A. I had looked at it, and as I recall, the mark to market was immaterial.

Q. Because?

A. Very small number of change from the mark to market generally would imply a change in the total capital, the net assets would be worth more or less than what the book value of those assets were, and since it, it -- as I recall, that made relatively no difference. I didn't feel like it added anything to the report.

Q. But it does with regard to this report?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x
HOMER J. HOLLAND, HOWARD R. :
ROSS, and FIRST BANKS, INC., :
Plaintiffs, : Case No. 95-524C
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, June 27, 2007

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of United States Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:00 a.m., Wednesday, June 27, 2007, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

Certified Copy

APPEARANCES:

On behalf of the Plaintiffs:

MICHAEL A. JOHNSON, ESQ.
JOSHUA P. WILSON, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5783

On behalf of the Defendant:

JOHN H. ROBERSON, ESQ.
SCOTT D. AUSTIN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-7972

at the present time?

A. I'm not on any medication.

Q. And there is nothing that would affect your memory?

A. No.

Q. Is there any portion of your expert report that was drafted at least in part initially by an attorney?

A. Yes.

Q. Can you tell us what parts of your report -- and actually, why don't we do this. Why don't we go ahead and distribute your report now so you can point us to the parts that were drafted by an attorney. And we'll have to mark this as Exhibit 1.

(Exhibit No. 1 was marked for identification.)

THE WITNESS: Well, let me give you a little background --

MR. JOHNSON: Let me object to the question as vague in the term drafted.

THE WITNESS: The background of this report is that last year, we started in discussions

with counsel with respect to our damages theories, and decided it would be appropriate to look at the retained earnings costs as a measure of damages, as a partial measure of damages. And, with that, we started talking about the forms, the way this would be calculated and together decided to interview Cornerstone Research, who I had interviewed when we first began these cases and chose at that time not to use.

So I used Cornerstone's staff for the calculations in the Excel spreadsheets and the charts under my direction, and used Arnold & Porter services for capturing much of what is on the report in the narrative form. This is a collaborative discussion that we had. The ideas in this are mine. I don't remember whether -- who drafted which pieces of it, but at the end of the day, I am responsible for the entire report.

BY MR. ROBERSON:

Q. Now, I understand you're responsible for the report, but my question was -- and I thought you initially said that, yes, there were portions that

were drafted by Arnold & Porter. Could you point us to any section here that was not drafted by Arnold & Porter?

A. I don't know exactly what you mean by drafted. I mean, I think that I covered orally things with Arnold & Porter as to what I thought should be in the report, they captured that and prepared several drafts of the report.

Q. And so when I meant the word drafted, I meant actually put words to paper. So is it correct that the words being put to paper was -- the words were put on paper by Arnold & Porter and they did several drafts of the report?

A. I would say putting words on paper -- I think that the concepts, the thoughts and many of the words are mine, which I articulated to Arnold & Porter and they created drafts from that.

Q. Are there any ideas in here or any drafts here -- let's get back to the question. Is there any portion of this report that was not given to you in a draft form by Arnold & Porter?

A. I don't remember precisely what things we

changed through the drafting process, but there would have been things that I would have edited and expressed in my own words, but I don't remember precisely which ones.

Q. So there is not any particular point in this document you can point to and say, this is my work solely?

A. Again, I said I take full responsibility for the report. At the end of the day, it's the report that I signed and -- but I did have assistance from Arnold & Porter in the drafting of the report.

Q. And who at Arnold & Porter?

A. Michael Johnson.

Q. Anyone else?

A. I believe Josh might have been involved in some of the discussions.

Q. That's Joshua Wilson?

A. Josh Wilson.

Q. And just for the record, Scott Austin from the Department of Justice has joined us. Let's talk about what Cornerstone did for you. Did they put any input into the drafting of the document?

A. Not really, no. Cornerstone -- well, I'm going back. At the beginning of the discovery process or at the beginning of this case, when we were contemplating various damages approaches, I interviewed Katie Galley with the thought that Cornerstone could operate as a staff to me in preparing damages reports, expert reports.

At that time, I still had in my employ a person who had been with me at River Valley who was expert at preparing projections and business plans. And I chose at that time to use her. This time, as we thought about the use of, or the cost of capital as it pertains to retained earnings as a measure of damages, I no longer have a staff person and went back to -- talked to Katie and one of her associates, Heather Houston, about them providing this same kind of staff role that I had previously with a woman called Susan Ells, named Susan Ells.

Cornerstone, under my direction, prepared the Excel spreadsheets that are part of the exhibits as well as the charts that are in here. We had a number of conversations with counsel going through

the particulars of the capital structure at River Valley and how -- and the decisions one would make in best trying to calculate the costs there.

To the best of my knowledge, Cornerstone was not involved in the narrative of the report, but they were responsible for the exhibits, for those exhibits relating to the Excel spreadsheets.

Q. Can you just tell us what exhibits exactly those are?

A. Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F, Exhibit G, Exhibit H, Exhibit I, Exhibit J, K, L, M, N, O.

Q. And is that all of them except for A?

A. That's correct.

Q. And who prepared Exhibit A?

A. That was part of the drafting of the narrative which was -- for which I got assistance from Arnold & Porter.

Q. Did you provide Arnold & Porter with this list of documents that you considered?

A. This was a list that we discussed and I asked them to compile it.

Q. Okay. But my question was, you say that you issued a new report because you became aware of new damage theories, correct?

A. I think for me personally, it became to the point of appreciating that there seemed to be some appeal -- appeal is maybe the wrong word to use in the legal context. Some acceptance of the concept of retained earnings and cost of capital.

Q. Right. So it was a new theory that you found had a new appeal to you. But there weren't any new facts that you discovered with this case, is that correct?

A. With respect to this report, I don't believe that it was based on new facts.

Q. And so there are no new facts concerning River Valley's operations taken in the broadest possible manner that you've only recently become aware of, correct?

MR. JOHNSON: Objection, vague. You can answer, Dr. Holland.

THE WITNESS: Taken in its broadest sense?

BY MR. ROBERSON:

Q. Yeah, I was just reading you what the statement was.

A. Yes.

Q. And then in plaintiffs' reply motion in support of the motion for leave to allow you to issue a third supplemental report, plaintiff further reiterated -- and I'll just read the statement and then if you want to look at the document, you can. They reiterated that plaintiffs here have a right to present damages claims at trial that adhere to the guidance provided by the Federal Circuit in its Winstar damages decisions. And my question is, are you aware of those representations?

A. I have seen this motion in the past. I don't remember. This is some time ago. So yes, in general, I am aware of this.

Q. And let's look at the justification you set forth for your new report as set forth in your third supplemental report. And what we'll do is look at your report at paragraph 6. And there you state, "Decisions of the Court of Federal Claims and the Federal Circuit in other Winstar-related cases have

endorsed calculations of mitigation costs measured in part by the cost to the plaintiff of retaining earnings to replace the contracted-for regulatory capital." Do you see that?

A. Yes.

Q. And then you have a footnote and in footnote 1, you write, "For example, the Federal Circuit's decisions in both Home Savings and LaSalle Talman affirm damages awards based in part on the costs of retained earnings that replaced contracted-for regulatory capital after the government's breach." Do you see that?

A. Yes.

Q. Did you write that footnote?

A. I think that was -- in this particular case, I think I deferred to counsel expressing this particular point.

Q. Now, are there any other Winstar-related cases, including those at the trial court level, that is, at the Court of Federal Claims, that you considered in coming to your belief that a retained earnings theory presents a viable claim that you

should now set forth?

A. Again, I go back to the discussions I had with counsel where I did not get into all of the cases or I don't remember all of the cases that were discussed, just that the -- I think that the point in paragraph 6 and the point in the plaintiffs' motion for leave to revise seem fairly -- as I recall, that -- as the point I made before, there seemed to be some traction with respect to the endorsing of calculations, as it says here, endorsed calculations of mitigation costs measured, in part, by the cost to the plaintiff of retained earnings.

Q. So you can't recall any other cases?

A. I do not recall at this point.

Q. And do you recall reviewing the LaSalle Talman opinion?

A. I remember quite some time ago reviewing the LaSalle Talman decision, and in part because I knew the people at LaSalle Talman. Ted Roberts, who was the CEO at the same time, was someone that I knew.

Q. Out of Chicago?

A. Out of Chicago. But I have to say that today I don't remember much about the LaSalle Talman opinion that I read at that time.

Q. So you're not sure if there is anything in LaSalle Talman that actually discusses retained earnings?

A. I would say that, again, the reason why LaSalle Talman sticks in my mind is because of my ties to Chicago as well as knowing Ted Roberts. And right now, I can't remember precisely how the specifics of the retained earnings calculations in that case were applied. My discussions of the use of the retained earnings costs as a measure of damages were somewhat abstracted from the specifics of those two cases.

Q. Is it your -- you said that you're not sure how the specifics of the retained earnings calculations, I believe, were set forth in LaSalle Talman. Was that what you just said?

A. I believe that's -- we can see what I just said. I don't know.

Q. I can't, actually, that's why I just

asked. I think what you said was, "I can't remember precisely how the specifics of the retained earnings calculations in that case were applied." Is it your representation that were retained earnings calculations in the LaSalle Talman opinion?

A. Again, I'm not recalling the specifics of LaSalle Talman.

Q. In any respect?

A. No.

Q. Did you review -- I think we have touched on it, but did you review the Long Island Savings Bank opinion from the trial court at 67 Fed Claim 616 which was issued in 2005?

A. You asked me that before, and I said I don't remember the names of these cases.

Q. And so you're not --

A. No, I don't remember that I reviewed that.

Q. And what about the opinion in Bank of America, FSB versus United States which was at 67 Fed Claims at 577, and then there was another opinion that sort of piggybacked on top of that which is 70 Fed Claims 246?

Court were to find that those cost of funds could not have been 20 percent year in and year out for 23 years, is there another source of information you could point us to that would indicate an alternative cost of funds for River Valley, first?

MR. JOHNSON: Objection. There is a fundamental assumption in this question that I think is wrong. And so the question is vague and confusing but answer it if you're able, Dr. Holland.

THE WITNESS: I think you -- excuse me. I think you said two things. One, you talked about First Banks, and so let me address First Banks versus River Valley. My understanding is that my job was to calculate the damages to River Valley and it was appropriate to use River Valley's cost of capital with respect to that. Absent the breach, it's not even clear that First Banks would have acquired River Valley. So I think that I would put First Banks aside with respect to this and focus on River Valley.

The second part of your question would be -- was if the Court finds that a different cost of capital is appropriate, that could be certainly

of capital. I don't know what you intended your question to mean, but if you thought those were supposed to be two different things and there was some confusion here, maybe we ought to try to resolve it.

MR. ROBERSON: No, I didn't intend them to be separate.

THE WITNESS: Excuse me, you meant cost of capital?

BY MR. ROBERSON:

Q. Yes. And I assume your answer was with respect to cost of capital?

A. Yes.

MR. ROBERSON: I understand from the videographer that we're about to run out of tape and this would probably be a good time for a break.

MR. JOHNSON: Absolutely.

THE VIDEOGRAPHER: Here marks the end of videotape number 1. Time on the screen is 10:18:21. We're going off the record.

(Recess.)

THE VIDEOGRAPHER: Here marks the

beginning of tape number 2. Time on the screen is 10:29:41. We're back on the record.

BY MR. ROBERSON:

Q. Dr. Holland, just before we took a break, I think you said that you're not clear that First Bank would have acquired River Valley in a nonbreach world. Do you recall saying that?

A. Yes.

Q. And we were talking about First Bank's cost of capital in connection with the -- at the time you made that comment, correct?

A. Yes.

Q. Now, I understood your mitigation damage claim to be based upon the real world where First Bank did, in fact, acquire River Valley. Am I mistaken?

A. I think that what I said is that I didn't believe that First Bank's cost of capital was relevant, for two reasons. I still think that it is appropriate to say that it's not clear that we would have sold to First Banks but for the breach. That changed things as far as my partner and I and our

thoughts about the future for River Valley.
So I think that's still an accurate statement. And I believe that the damages that we're dealing with here are the damages to River Valley and it would have been River Valley's cost of capital that is the relevant measure.
Q. But to be clear, your mitigation theory is set forth in the actual world, is that correct?
A. It's clear to me that the breach caused damages for River Valley. River Valley was required to shrink as a result of the breach. We couldn't earn as much as we otherwise would have earned. What we are using is actual numbers for the amount of retained earnings that were necessary to offset the loss of the breach as a way to get at a partial measure of the damages. And to the extent that this is the real world, it's the actual amounts of retained earnings during that time.
Q. But in the post-First Bank acquisition period of time, in the actual world, First Bank acquired River Valley in 1995, correct?
A. That's correct.

Q. And in modeling your damages, you assumed that the First Bank acquisition occurs in '95 when it actually did, correct?

A. I don't believe that that is relevant to the calculation of the damages. I mean, I don't think that there is anything in my calculation -- I would have to think about that -- that specifically pertains to the acquisition of River Valley.

Q. Are you asserting, then, that your mitigation claim involves a potential in the First Bank acquisition -- post-First Bank acquisition period, it involves the potential that First Bank didn't acquire River Valley?

A. I don't think that's what I said. I said that the -- I need to think about this, but I don't think that the fact that First Bank did acquire River Valley affects the calculations. In other words, if they had not acquired River Valley, I think the calculations would have been exactly the same.

Q. But just to be clear, what you have done, though, is assumed that, in the actual world, this is the litigation that occurred in the actual world and,

in the actual world, First Bank acquires River Valley exactly when it did?

A. I haven't made that assumption. What I've said is that I think the calculation is the same either way.

Q. So you haven't assumed that First Bank acquires River Valley in January of 1995 in your modeling of damages?

A. What I'm trying to think of is whether there would be any difference in the way I had calculated the damages relating to the fact that River Valley was acquired. River Valley was then a subsidiary of First Bank's.

Q. Now, what world is your model in? Is it in the actual world or the but for world?

A. I would talk about the but for world is when one said that but for the breach, here's what would have happened. And a number of assumptions would have been made in that respect. So I wouldn't put this in the but for world in that sense. We've used but for worlds in the calculation of lost profits. This is not a lost profits damages theory.

This is a calculation of the cost of using retained earnings. Instead of using retained earnings for other purposes, they had to be allocated to keep River Valley alive during this period because of the breach by the government.

I guess I would say it again. I think to that extent, we are talking about the real world, but I don't think that it is necessarily relevant that there was an acquisition by First Banks.

Q. Now, we were discussing the cost of capital and I had proposed to you the notion that if the Court found that your 20 percent cost of capital was inappropriate, whether there were alternative funding sources of capital that you could rely on as information to set forth a cost of capital computation. Are there any alternative sources of capital that you can recollect that River Valley had that you might be able to use as a source of computing the cost of capital?

A. Well, I think, as I said before, if the Court concludes that there would be a different cost of capital, the calculation can be adjusted to that,

but I have not sought to determine a different cost of capital. I felt that the cost of capital that had been already discussed in Dr. Murphy's testimony and in his expert report, and was originally determined by the government, is appropriate. And so I don't believe that -- I haven't looked to other sources for the cost of capital.

Q. So you never considered an alternative cost of capital other than the methodology by which you came up with a 20 percent figure, is that correct?

A. This is the one that I felt was the most appropriate or is the most appropriate. As I said before, I mean, from my experience as both an investor and as one who raises funds from investors, I think the 20 percent figure is a very conservative number.

Q. My question wasn't what you thought was most appropriate. My question was, did you consider an alternative cost of capital, another source of capital to come up with that competition?

A. I wouldn't say that I did, no.

supervisory goodwill, subordinated debt and the retained earnings from Rock Falls.

While there are a number of interest rates -- I'm sorry. And with respect to Peoria Savings, there was also a preferred stock issuance. In all of those cases, other than the government-provided capital, where there was cash provided from an outside source, there was no independent measure of a specific cost of capital because, in all cases, the cash was provided either from the existing Rock Falls in the form of retained earnings or from subordinated debt or preferred stock which was provided by American National Bank.

Those -- and American National Bank would not have provided those but for the personal guarantees of myself and Howard Ross. I believe that the -- coming back to the cost of capital, one needs to look to what return is an investor expecting to get from that investment either from dividends or from appreciation in the value of the company. And as I've said before, I think that 20 percent is a minimal return that investors are expecting to get

and one that was confirmed by the government.
Q. And with respect to the AMB, that's the sub debt?
A. Correct.
Q. And you just said that -- I believe you said that that wouldn't count as an independent measure of the cost of capital?
A. That's correct.
Q. And I believe you said it is because you and Mr. Ross provided personal guarantees with respect to the funds that -- the capital that was obtained, is that correct?
A. That's correct.
Q. Is there any other reason that you believe the AMB sub debt cost of capital is not an independent measure of the cost of capital?
MR. JOHNSON: Objection, vague as to time but answer if you're able, Dr. Holland.
THE WITNESS: I think that my first answer is the one that I would think is primary, that American National would have lent to us as individuals based on our own credit, would have

looked at the credit of River Valley and would have -- as I said, would not have lent to River Valley on its own.

I guess the other thing to be said is that the cost of capital that the government looked at and the cost of capital that I used, since it's tied to retained earnings, is really looking at an equity component of the cost of capital. Subordinated debt also has different characteristics than the equity component. So I think that's also not as appropriate a cost of capital as the equity component.

BY MR. ROBERSON:

Q. Are those the only reasons that you don't believe the AMB sub debt is an independent -- could be an independent measure of the cost of capital?

A. I haven't -- there may be others. Those are the two that I can think of at this time.

Q. When you say there may be others, are you aware of any -- when you think about capital, are you aware of any notions of a characterization of an independent measure with respect to cost of capital?

MR. JOHNSON: Objection, vague and

confusing.

THE WITNESS: I think that the -- my answers are still the most appropriate, that the fact that subordinated debt would not have been provided but for the guarantees, and that subordinated debt has different characteristics than equity. And I believe that when one is talking about retained earnings, one is talking about equity, I think those are the two things that come to mind at this point. If I thought about it more, I might have other points to discuss on that as well.

BY MR. ROBERSON:

Q. Are you aware of any literature, academic studies with respect to considering -- that consider or deal with whether or not a capital cost is properly analyzed as independent, as you characterize that?

MR. JOHNSON: Objection, vague.

THE WITNESS: I think I would ask you to repeat that.

BY MR. ROBERSON:

Q. We were discussing, based on what you

event and ask him what the significance is, that would be appropriate in an expert deposition. Answer if you're able, Dr. Holland.

THE WITNESS: I don't recall additional sources of capital other than transactions that created a profit for River Valley. We sold branches, we sold -- yes, we sold branches for a profit that created a source of capital. I don't remember any others.

BY MR. ROBERSON:

Q. And a minute ago you said that you didn't believe that the acquisition of River Valley by First Bank was relevant to your damage calculations, is that correct?

A. Yes.

Q. Why is it that the acquisition by First Bank is not relevant given that your modeling of retained earnings is in the actual world?

A. Because I'm taking River Valley's retained earnings and I'm measuring the cost of River Valley's retained earnings. At one stage, River Valley was owned by Howard Ross and myself. At another stage,

it was owned by First Banks. But I'm taking the retained earnings during both of those periods. If River Valley had been owned by you in one of those periods, I think the calculation would have been the same.

Q. So it doesn't make any difference what First Bank's actual cost of capital is as far as your modeling of damages in this case?

A. Correct.

Q. Is it your intention to present a retained earnings theory of damages based upon a 20 percent cost of capital and no other costs of capital at trial?

A. At this stage, this is what -- the damages theories that we have presented that does use a 20 percent cost of capital. At this stage, I don't have any other intention to present a different cost of capital.

Q. Now, did you or River Valley ever pay 20 percent interest with respect to any funds obtained for use at the River Valley thrifts?

A. I don't believe that's relevant to the

issue of the cost of capital, but the answer is no.
Q. And did you make any efforts to determine whether First Bank has ever obtained capital from outside parties, including its shareholders?
A. With respect to this analysis, I have not looked at First Banks.
Q. And did you or River Valley ever pay 20 percent interest with respect to any capital obtained for the use of the River Valley thrifts?
A. Again, I don't think that that is -- whether or not we would have paid an interest rate of 20 percent is not the appropriate way to look at the cost of capital, but as I answered before, no, we did not pay 20 percent.
Q. And do you know what First Bank's cost of capital was at any point in time between 1995 and the present time?
A. I do not know.
Q. And what is the basis for your belief, which I think you state at paragraph 44 of your report, that a 20 percent cost of capital for River Valley is conservative?

lost profits that River Valley would have earned by leveraging the breached regulatory capital to add incremental income-earning assets other than San Antonio Federal Savings Bank in the years following the breach?

MR. JOHNSON: Objection, outside the scope.

THE WITNESS: I think that, as far as I'm concerned, I authorized this that says we intend to forego a claim. I don't know what the process is of foregoing a claim, and I don't know what's been done with respect to that.

BY MR. ROBERSON:

Q. Well, do you intend to set forth a lost profits claim at trial, even though you're now going to be issuing a retained earnings theory of damages?

MR. JOHNSON: Objection, outside the scope. It's got nothing to do with the analysis in the report. Let's keep it on what the subject is.

THE WITNESS: I guess I would defer to counsel with respect to what happens at court, but I think the statement here is what I agreed to, that we

intend to forego the claim for lost profits.

BY MR. ROBERSON:

Q. Now, the Court of Federal Claims recently issued an award for damages for increased leveraged lost profits connected with incremental income earning assets in a Winstar-related case in First Federal Savings and Loan Association of Rochester versus the United States at 76 Fed Claim 106. That opinion was issued on April 13, 2007. And in fact, I believe this decision was issued by the same judge, George Miller, who is deciding this case. Are you aware of this decision?

A. I don't recall it.

Q. Well, it's a new decision, so if you had seen it since April 13th, would you have recalled it?

A. Probably.

Q. So you didn't seen it?

A. I don't believe I've seen it.

Q. And given that the Rochester decision is a case that involves an award of lost profits from lost leverage, is there a possibility that you may change your mind again and decide to go ahead and put on at

Bank, is that correct?
A. What I'm saying is that those are damages of River Valley's.
Q. And my question is, it has nothing to do with damages to First Bank?
A. Well, only to the extent that First Bank is the owner of River Valley.
Q. Is that an exception that swallows the rule? I mean, can you explain what you mean by only to the extent that First Bank is the owner of River Valley?
A. I think you asked me to what extent did the retained earnings cost First Banks. They cost River Valley to the extent that -- to the same extent that, in the view of the owner, damages to River Valley would affect your ownership in River Valley.
Q. Simply that you own the claim?
A. You own River Valley.
Q. So is River Valley, as held by First Bank, continuing to retain earnings?
A. I don't know exactly what is happening with respect to River Valley during that period, but

I think that as a measure, it had retained earnings that were in excess of the amount of capital that had been taken away.

Q. So a moment ago you said you're not aware of what's been happening with River Valley during the period that First Bank's been an owner of River Valley, is that correct?

A. I have not taken a look at exactly what First Banks has done with River Valley.

Q. So you can't say -- you've made no analysis at all with respect to River Valley as owned by First Bank, correct?

A. I think that's correct.

Q. Now, I am initially asking, in your opinion, how did retained earnings cause harm to First Bank and we just had that discussion. Now I'm going to ask you, in your opinion, how did retaining earnings cause harm to River Valley?

A. I think that the thing that caused harm to River Valley was the loss of the contract capital. Using retained earnings to replace that capital and having the measure of the cost of the capital is a

way to put a measure on the mitigation of those damages, the cost of mitigating those damages.

Q. I know, but my question is how did the retaining earnings cause harm to River Valley?

A. As I said --

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: How did retaining earnings cause harm? Retaining earnings was -- retained earnings could have been used by River Valley for other opportunities, could have been paid out as dividends. This was a case where, because of the government's breach, those other opportunities couldn't be exploited by River Valley. Using the amount of the retained earnings as a measure of the mitigation of the breach by the government is what this analysis is about.

BY MR. ROBERSON:

Q. And I believe you said that how it was harmed was that there were certain opportunities that it couldn't pursue because they had to retain the earnings, is that correct?

A. Correct.

Q. And what opportunities were those that couldn't be exploited?

A. The balance sheet could have been larger, we could have earned more money on a larger balance sheet. We had to shrink the balance sheet. We had other acquisitions that could have been made that weren't made.

Q. And how would the balance sheet have been larger?

A. The balance sheet had to be reduced by almost 50 percent so had the breach not occurred, I would have expected that the balance sheet would have continued to stay at its present level and grow in accordance with the business plans that have been presented to the government.

Q. And how is that? I mean, how would it have grown?

A. It would have grown in the same way it had grown previous to that. It grew from two principal purposes. It grew through the acquisition of assets financed by liabilities that were allowed if it had

adequate capital. It would also have grown by acquiring other institutions and adding that balance sheet to the River Valley balance sheet.

Q. And what specific institutions would it have acquired?

A. The one that we've already talked about in some detail previously is San Antonio Federal Savings Bank. There was an institution in Galesburg that we had been in discussions with that we were at a letter of intent stage, that we were precluded from acquiring. There were several others that we would talk to from time to time.

Q. Galesburg located in --

A. Illinois.

Q. Is the harm from retaining earnings basically foregoing the value of these lost opportunities?

A. You asked me what the harm was, I believe, and the harm is that we lost capital. That capital would have been available and the capital restricts the size of the organization. So I believe the harm was that, in losing that capital, we lost -- we were

forced to take actions that we didn't want to take, which was shrink the balance sheet and reduce the earnings, and we lost the opportunity to grow the balance sheet.

The retained earnings had to be used simply to meet the minimum capital requirements during that period of time to keep the organization alive. And the measure of the cost of allocating the retained earnings for that purpose, I've calculated is based on the amount of retained earnings that were used for that purpose times the cost of capital.

Q. But in short, the harm to River Valley was foregoing the value of these lost opportunities, correct?

MR. JOHNSON: Objection, mischaracterizes the testimony, asked and answered.

THE WITNESS: The harm was the loss of capital. The loss of capital resulted in two things. It resulted in us losing earnings by virtue of having to reduce the size of the balance sheet and not being able to take advantage of opportunities to grow the balance sheet either through acquisitions or through

other forms of growth.

BY MR. ROBERSON:

Q. And in both of those categories, you lost earnings because you had to reduce the balance sheet and then you lost opportunities to grow the balance sheet. In both cases, you're talking about opportunities that were lost, correct?

A. These were other opportunities where we could have used the retained earnings. Instead, we allocated the retained earnings to meet the minimum capital requirements of the institution. And I have felt that a reasonable measure of the cost of allocating the retained earnings for that purpose was to use the cost of capital times the amount of the retained earnings that were used for that purpose.

Q. Now, what was the reason that retained earnings in River Valley were above the regulatory minimum given that the increased damages -- and we're talking about the period from 1990 to 1993?

A. I think you need to be more specific.

Q. Well, do you show -- do you have a chart in your report that shows what -- maybe you don't. I

don't know -- what the regulatory minimums were for River Valley with respect to capital, do you know what those were for the period 1990 to '93?

A. I don't think that's in --

Q. Yeah, it's probably not in your report, now that I think about it. But are you aware of the fact that River Valley exceeded the regulatory minimums in the period -- with respect to capital in the period from 1990 through 1993?

A. I know there were -- I mean, I think that there were situations where the minimums, as you say, were specific to River Valley which we felt was in part a result of the breach. I think I have testified to that in the past. There were also times when one would feel it appropriate to have a cushion above a minimum. I think I've testified to that in the past.

And because we could not acquire San Antonio Federal directly at River Valley, it was necessary to reduce the balance sheet at River Valley in order to redeem some of the preferred stock or with the retained earnings. And in anticipation of

that, there could have well been times when our capital ratios were above the minimum.

Q. But whenever they were above the minimum, that increases damages, as far as you're concerned?

A. Whenever they were above the minimum, they were -- regardless of where they were relative to the minimum, they were offsetting capital that had been breached by the government. There are reasons why one would want the capital above a minimum. As I have explained, I haven't -- if I went back and looked at the specifics, I could probably remember what the reasons were. But I think there were good business reasons to have that amount of capital.

Q. So even though you were being damaged by having capital -- retained earnings above regulatory minimums, you felt being damaged by that amount was a good business decision?

MR. JOHNSON: Objection, lacks foundation, mischaracterizes the testimony.

THE WITNESS: I think they were good business decisions for having capital above minimums from time to time. A cushion against volatility, a

We're going off the record.

(Recess.)

THE VIDEOGRAPHER: Here marks the beginning of tape number 3. The time on the screen is 11:50:43. We're back on the record.

BY MR. ROBERSON:

Q. Dr. Holland, what do you mean by cost of capital?

A. I think the cost of capital, as I've said before, is the expected return that an investor would require to invest in the company, to invest cash in the company. It is also the discount rate that is used to evaluate the future cash flows from the company to get at the valuation of the company.

Q. Is that it?

A. I think so.

Q. And do you distinguish between the notion of cost of capital and cost of equity capital?

A. In this context, I've used the cost of capital as -- the cost of equity capital as being synonymous since the cost of retained earnings is equity capital.

Q. And between 1990 and 1994, whose cost of equity capital are you measuring?
A. River Valley.
Q. And between 1995 through 2013, whose cost of equity capital are you measuring?
A. I'm using the same cost of capital, River Valley's.
Q. So you're not using First Bank Incorporated's cost of equity capital, correct?
A. I'm using River Valley's.
Q. And not First Bank's, the thrift?
A. That's correct.
Q. And that's despite the fact that River Valley didn't exist after, what, January of 1995 or sometime after the First Bank, FSB acquisition?
A. I'm not -- it's my understanding that they retained the charter of River Valley at First Bank, so it's not my understanding that River Valley failed to exist.
Q. At any point in time?
A. I haven't examined it closely recently, but from my remembering of the transaction, they

acquired River Valley and retained the charter to River Valley.

Q. I know, but then thereafter -- because remember, as you know, there were a number of mergers between different First Banks, Incorporated subsidiaries and related companies. And do you have any awareness or any knowledge of whether the River Valley charter was retained?

A. I haven't looked into that specifically. I would have anticipated that the charter would have been retained for the important attributes of that charter.

Q. But you didn't look into it at all?

A. I have not looked into it.

Q. And is that important to your calculation, the notion that there is a continuing of the River Valley charter?

A. Not necessarily. I think that the -- while I believe that the charter did continue, I believe that the important measure was damages to River Valley. And, again, the damages to River Valley were the loss of the capital by the breach and

associated with that. The retained earnings could have been paid out to the shareholders, could have been used for other purposes, but instead the cash was maintained within the company so, no, there was not a cash outflow.

Q. Did River Valley ever incur a cash outflow with respect to the 20 percent cost of retained earnings?

MR. JOHNSON: Objection, vague.

THE WITNESS: River Valley did pay out retained earnings in 1992, I believe. So, I mean, if the distinction is was there ever cash out? Yes. Was it appropriate to use a 20 percent cost of capital? Yes. But I'm not sure I'm understanding the complete gist of your question.

BY MR. ROBERSON:

Q. Well, you just said retained earnings were paid out in 1992. What did you mean by that?

A. They were paid out in order to redeem preferred stock.

Q. And they were paid out in order to redeem preferred stock for what reason?

A. The 6 million was paid out to redeem preferred stock that was held at the holding company. That preferred stock had been funded by American National Bank. American National Bank agreed to fund, separately for Howard Ross and myself and others, Western Capital Holdings which acquired San Antonio Federal Savings Bank.

Q. Are you finished?

A. I think so.

Q. You say you think so?

A. I think that ended up at the end of my thought. Maybe I've --

Q. So River Valley was paying out its retained earnings in '92 in order to facilitate the SAFSB acquisition through another entity?

A. Yes.

Q. And was there any other time when River Valley incurred a cash outflow?

MR. JOHNSON: Objection, vague.

THE WITNESS: Not that I recall.

BY MR. ROBERSON:

Q. Just to be clear, then, the 20 percent

cost of equity capital was not traceable to an actual cash flow, correct?

A. The 20 percent cost of capital, because we've defined it in several different ways, but for the breach, that cash flow could have been paid out as dividends or a redemption of stock. And the cost of capital is a rate of return that is the rate of return at which the investors choose to either continue putting their money into the company or choose not to take money out of the company.

Q. Okay. But my question was, the 20 percent's not traceable to an actual cash flow, correct?

A. I can't think of a cash flow that would be specifically attributable to that.

Q. And is it your opinion that the 20 percent annual gross cost of retained earnings represents an actual cash flow incurred by First Bank from 1995 through, say, 2007?

A. The 20 percent is not related to First Bank, but I don't have any specific knowledge of the cash flows related to First Bank.

Q. And in your modeling, you propose, I believe, an 8.825 percent annual pretax benefit of the retained earnings, is that correct?

A. I believe that's correct.

Q. And is it also your opinion -- let me ask it this way. Does the 8.8 percent annual pretax benefit of retained earnings represent an actual cash inflow received by River Valley during the 1990 through 1994 time period?

A. That rate is the rate on a 10-year Treasury that is an interest -- I mean, is a risk-free rate. It may well have been the case that River Valley had assets in its portfolio of Treasuries, but it wasn't intended to be tied to a specific asset of River Valley. It was using the same methodology that I believe has been used and accepted in other cases of taking a risk-free Treasury rate.

And I think that the risk-free aspect of it is appropriate given that the foregone capital or the contractual capital was something that had a government guarantee to it, and there wasn't, at

least apparent, a risk associated with that. So I think that's why the risk-free rate has been used.

Q. I guess my question, though, was the 8.825 percent pretax benefit of retained earnings doesn't represent an actual cash inflow received by River Valley during the 1990 through 1994 time period, correct?

A. I think I answered that as to why the 8.82 percent was used. And it's not because an instrument in those amounts was identified. It's simply offsetting the fact that cash is associated with the retained earnings.

Q. Right. So it's a theoretical contract. It doesn't actually represent a cash inflow received by River Valley between 1990 and 1994?

A. I think it's a reasonably accepted way of offsetting the benefit of the cash. I do not -- yes. I mean, it is not intended to replicate exactly any cash flows.

Q. And I take it the same is true with respect to the 8.8 percent benefit of retained earnings with respect to First Bank during the 1995

investments, right?

A. Yes.

Q. Isn't there an additional -- aren't there additional benefits from having retained earnings for a thrift?

A. I don't know what other benefits you have in mind.

Q. Well, let's talk about leverage capacity. Doesn't retaining earnings and having that capital permit the thrift to leverage?

A. Well, certainly. And I think we've talked multiple times about the benefit of having capital and what we're doing here is saying that the benefit of having capital was a benefit that had been bargained for in these transactions. That benefit was taken away and what we're doing is replacing that capital using retained earnings. We are using a measure of the cost of mitigating those damages by looking at the cost of capital net of the cash benefit of the retained earnings.

Q. Well, the notion is that the goodwill, in your mind, permitted you to leverage, correct?

A. That's correct.
Q. And the retained earnings, as it replaces the goodwill, also permits the thrift to leverage, correct, and support other assets?
A. In general, that's true. In this particular case, we had to de-leverage despite the retained earnings. But I grant you that the purpose of capital is to allow the thrift to leverage.
Q. Well, didn't the retained earnings in the actual world in this case actually allow you to leverage?
A. If we hadn't had the retained earnings, we would at some point not have been able to leverage at all, yes.
Q. Well, let's just be clear. The actual retained earnings that you did have, they did permit you to leverage and support other assets, correct?
A. The only distinction I would make is that it wasn't as if the retained earnings at the time of the breach allowed us to increase leverage or add assets. It was only -- it allowed us to maintain a sizable balance sheet that was much smaller than what

Exhibit B, though, I think is where you're going to find that number. Do you see that?

A. The 20 million as of December of '89?

Q. December of '89, the amount of contractual capital to be replaced, $19.8 million.

A. Yes.

Q. So it's your opinion that it cost $21 million to replace basically $19.8 million of contractual capital, correct?

A. This was the accumulation of capital replaced over -- from 1990 through 1994 and then throughout the period. So it is true that the damages that I've calculated are 21 million and that the beginning amount of capital to be replaced was 20 million and the cost relates to the cost of capital for each year during the period that that has been replaced.

Q. And it's also your opinion that even after you're incurring these costs of $21 million to replace the $20 million of contractual capital, that River Valley still lost opportunities of approximately $29 million related to the SAFSB

transaction, correct?

A. That's correct.

Q. So we're seeing, what, $50 million in damages related to the loss of $20 million of -- or $19.8 million of contractual capital?

A. I think the numbers that you have described are accurate. I would be happy to describe how we get to those numbers.

Q. Now, you testified that River Valley began to feel the adverse effects of the government's breach in July of 1990, isn't that correct?

A. That is correct.

Q. And in fact, July 1990 is the period when you assumed the breach has taken place in all of your analyses, isn't that correct?

A. In the lost profits presentation, I did that as of July of 1990. And in this, I've done it in July of 1990.

Q. So the answer is yes?

A. I'm not speaking for other damage presentations done by Dr. Murphy.

Q. Right. But as far as what you've

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I guess I always want to qualify it to say that I am not stating that the total damages were less if the retained earnings was less. I'm saying that in this methodology, I am looking at the cost of mitigating that amount of damages that were mitigated. And to the extent that we couldn't mitigate as many, we wouldn't have had a lower cost.

BY MR. ROBERSON:

Q. And if River Valley had no profits from the period 1990 through 1992, according to your methodology in this report, there would be no retained earnings damages, isn't that correct?

A. No. There were retained earnings before 1990. Those retained earnings had the same impact as retained earnings that were generated from 1990 to 1992.

Q. My question was with respect to retained earnings damages, and I thought we had already established you're not asserting any damages before

to replace the capital, as much capital as we could from the capital that was reduced by the breach.

Q. So your model is just modeling costs. It's not modeling damages, is that correct?

A. My model is measuring the cost associated with the damages that River Valley suffered. I am not stating that damages -- the amount of damages would have gone up. I'm stating that the cost of mitigating damages would have gone up. And it is that measure that we are calculating in this calculation of damages.

Q. So you ended it by saying, "It is that measure that we are calculating in this calculation of damages." Are you calculating damages?

A. No, I don't --

Q. I'm using your words.

A. Yes, I understand.

Q. I don't want to be --

A. I believe that River Valley was damaged -- I use the term X -- by virtue of the loss of capital. A partial measurement of that amount of damages is the costs that River Valley incurred in terms of the

capital that it had to allocate, it had to use, in lieu of the capital that it otherwise had.

Q. So you are setting forth a partial measurement of damages?

A. Correct.

Q. Okay. And let me just try to rephrase this one more time. The more profits that River Valley earned from July of 1990 through 1992, the more costs would result as far as your quantification of costs with respect to the effect of the breach, isn't that correct?

A. That's correct.

Q. Now, you would agree that generally speaking, the objective of the corporation is to maximize shareholder value?

A. I think there can be many discussions of the objectives of a corporation, but certainly that is one of them.

Q. Now, according to your theory, from July of 1990 through 1992, the more successful River Valley was in accumulating retained earnings, the higher the costs of damages you calculate, correct?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I think that is the same question that you've asked before. Is there a difference that you're trying --

BY MR. ROBERSON:

Q. No, I'm just trying to put it in the context of the obligation to shareholder value. So if there is anything you want to add with respect to that notion in the context of that question.

A. I don't believe so.

Q. Now, the redemption of the FSLIC preferred stock in 1991 resulted in a $1.325 million gain to River Valley, isn't that correct?

A. That's correct.

Q. So retained earnings were actually higher in 1991 because of that gain, correct?

A. That's correct.

Q. Therefore, the damages or costs that you calculate are higher in 1991 because of that gain, isn't that correct?

A. I think the causation is that there was

more capital and retained earnings that was able to be used to mitigate the capital loss. The calculation would be then that there was a higher cost because more was being mitigated.

Q. So you would agree, then, with my question that the damages or costs that you calculated are higher in 1991 because of the gain on the sale or the redemption of the preferred stock in 1991?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: The redemption of the preferred stock caused greater retained earnings. The use of the retained earnings to mitigate the damages increased the cost.

BY MR. ROBERSON:

Q. And that increased cost harmed River Valley, is that correct?

A. I'm saying that that set of retained earnings had to be allocated to mitigate the damages. It was retained earnings that would have otherwise been available to River Valley to dividend out to its shareholders or to use for other opportunities. So

generates the returns.
Q. Are you familiar with a return on equity or a return on capital concept?
A. Ask me a more specific question and perhaps I can address it.
Q. What is a return on equity?
A. A return on equity would be -- can be measured by the amount of earnings divided by the equity.
Q. And what's a return on capital?
A. Often used in the same context except that it could be that the total capital would be defined as more than just the equity.
Q. Now, the return on capital or return on equity ultimately made its way to the shareholders of River Valley either through dividends and/or capital appreciation, specifically with regard to the sale of River Valley to First Bank, isn't that correct?
A. That's correct.
Q. And the retained earnings were a part of the equity or capital which generated these returns, correct?

capital. Those damages meant that we lost opportunities and we lost opportunities for acquisition, we lost the opportunity to acquire San Antonio Federal Savings Bank, that is, we, -- I should say River Valley lost those opportunities.

The measure of this damages is what the damages are to River Valley. And I think that it is the case that there are damages that would flow to First Banks and those damages would flow to me and to Howard Ross's estate if the Court agrees with those damages theory. But I do not agree that that's a characterization -- I do not characterize that as getting a return on retained earnings and another return on retained earnings.

Q. Well, the initial time you got your $37 million payment from First Bank, it included -- First Bank's valuation included all the value of River Valley, including its profits over a number of years, correct? The effect of its operations over a number of years?

A. Okay.

Q. And the effect of its operations over a

number of years included the effect from its retained earnings, that is, the earnings generated from retained earnings, correct?

A. Again, I wouldn't say that earnings are generated by retained earnings. I would say that earnings are generated by the thrift, and the amount of capital at the thrift had an impact on the amount of earnings. If we had had more capital, we would have earned more.

One way of measuring the damages, which I have said is just a partial measurement, is the fact that the retained earnings could have been paid out to shareholders at that time. Presumably by replacing that capital, we would have earned the same amount, and we could have earned the same amount without the retained earnings or we could have done something else with the retain earnings. Again, I do not --

Q. We're talking about the real world, so it's not what you could have done with retained earnings, it's not what you would have done with retained earnings, it's what actually happened with

THE VIDEOGRAPHER: Going back on the record. The time is 15:31:24. Here marks the end of videotape number 4. The time on the screen is 15:31:33.

(Recess.)

THE VIDEOGRAPHER: Here marks the beginning of tape number 5. The time on the screen is 15:42:43. We're back on the record.

BY MR. ROBERSON:

Q. Dr. Holland, are you aware of any corporate finance textbook that asserts that when a corporation retains earnings, it presents a cost to either the corporation or its shareholders?

A. Either to the corporation or to the shareholders? I consider -- and I'll get back to the textbook. I consider that the cost to the institution is that it's renting capital from the shareholders. And in the example that you used, it should either return that capital or it should make sure it covers its cost of capital so that the shareholders are not disadvantaged.

I think that that concept of the cost of

discussing San Antonio Federal Savings Bank in this and not the other lost profits calculations?

BY MR. ROBERSON:

Q. No, I'm not talking about the discussion. I'm saying why are you including lost profits damages associated with the SAFSB transaction in conjunction with the replacement mitigation costs in this report and not including the lost profits damages associated with the River Valley, Illinois transactions or institutions?

A. What I am doing is saying that I think the damages from this San Antonio Federal Savings acquisition would be additive to the mitigation costs I discuss here and that's really all I'm saying as an expert witness.

Q. And I'm asking you why you didn't include the lost profits damages associated with the Illinois institutions.

A. I guess from the standpoint of being an expert witness, I was asked to present the mitigation costs here, and to include -- so that there wouldn't be any misunderstanding the fact that counsel would

be taking the position that the San Antonio acquisition would be additive to those costs. I don't think that I was asked to discuss one way or the other whether other lost profits from the Illinois thrifts would be included.

Q. So you have no position on whether or not it's appropriate to overlap replacement damages with lost profits as far as the Illinois institutions are concerned?

MR. JOHNSON: Objection, beyond the scope of the report.

THE WITNESS: I have no opinion, yes.

BY MR. ROBERSON:

Q. Did you ever think about that?

A. No.

Q. Now, in paragraph 11 of your report, you state that -- if you look about the second sentence, you state, "Specifically the River Valley thrifts, one, used retained earnings that would have been available for other purposes to substitute for the eliminated regulatory capital." Do you see that?

A. Yes.

Q. Right.

A. I believe that River Valley's profits would have been higher if it had retained -- if it had used both the retained earnings as well as the contractual capital, yes.

Q. And the same would be true with respect to the First Bank, the period in time after First Bank's acquisition, correct?

MR. JOHNSON: Objection, incomplete hypothetical, but answer if you're able to, Dr. Holland.

THE WITNESS: Either I believe that First Banks would have either had opportunities to earn on the additional capital that was restored in the hypothetical world or it would have used the retained earnings to pay capital back to the shareholders.

BY MR. ROBERSON:

Q. Now, you would agree that one way to improve an institution's capital position would be to shrink the institution, correct?

MR. JOHNSON: Objection, vague, ambiguous. Answer if you understand the question.

THE WITNESS: With the same amount of capital, shrinking the institution increases the ratio of capital to assets, all other things being equal.

BY MR. ROBERSON:

Q. Okay. And it's your opinion that River Valley responded to the breach by intentionally shrinking the deposit base to meet the government's new capital requirements, isn't that correct?

MR. JOHNSON: Objection, outside the scope of this analysis. This was covered in connection with other analyses, but answer if you know, Dr. Holland.

THE WITNESS: River Valley shrunk the balance sheet. It had many ways of shrinking the balance sheet which included not adding assets as assets were paid off and amortized, selling assets and, when it sold assets or reduced the amount of assets, it reduced the amount of liabilities it had. And it did that in a variety of ways, including not as aggressively seeking deposits and using other forms of liabilities such as repos.

BY MR. ROBERSON:

Q. And I take it, then, here -- well, here's the question. Does shrinking an institution have any effect on the institution's retained earnings, assuming there is no gain or loss on the sales on the shrinkage?

A. If I understand your question, if the retained earnings are X and the balance sheet is reduced and that has no impact on income, then I think I would agree that the retained earnings would stay the same assuming that there is no other capital transaction, if there is no other dividends or other capital paid out to shareholders.

Q. So it's your position that the balance of an institution's retained earnings neither go up or down assuming there is no gain or loss on sales when an institution is shrinking?

MR. JOHNSON: Objection, vague as to time frame, but answer if you understand it, Dr. Holland.

THE WITNESS: I think, as I understand your question, that if there is no other impact on capital such as gain or loss and there is no

distribution of capital back to the shareholders, the size of the institution in terms of assets or liabilities does not directly affect the retained earnings. If an institution goes up, retained earnings would still say the same. The thing that affects retained earnings is earnings. It's either earnings or taking in capital or paying out capital.

BY MR. ROBERSON:

Q. Now, in your retained earnings replacement claim, have you identified what specific incremental assets River Valley would have acquired with the use of the retained earnings?

A. Have I identified if -- and in your hypothetical no breach world?

Q. Yes.

A. No.

Q. And have you identified generally how many incremental assets River Valley would have acquired with the use of retained earnings in a nonbreach world?

A. No.

Q. Any rough idea?

A. No.
Q. And have you identified what yields would have been earned on the incremental assets River Valley would have acquired with the use of the retained earnings?
A. No.
Q. And have you identified how the incremental assets would have been funded by River Valley?
A. No. And I guess I would say that this analysis is not trying to measure the lost profits from an increase in the size of the institution in a hypothetical but for world. This is taking the cost of mitigating the damages by virtue of allocating retained earnings, to the extent there were retained earnings, to those lost capital accounts.
Q. And have you identified the costs of the incremental liabilities that River Valley would have acquired?
A. No.
Q. Have you identified what additional noninterest expenses would have been incurred by

River Valley, if any?
A. No.
Q. Have you identified what specific incremental assets First Bank would have acquired with the use of the retained earnings?
A. No.
Q. Have you identified generally how many incremental assets First Bank would have acquired with the use of the retained earnings?
A. No.
Q. Have you identified what yields would have been earned on the incremental assets First Bank would have acquired with the use of the retained earnings?
A. No.
Q. Have you identified how the incremental assets would have been funded by First Bank?
A. No.
Q. Have you identified the costs of the incremental liabilities that First Bank would have acquired?
A. No.

Q. Have you identified what additional noninterest expenses would have been incurred by First Bank, if any?

A. No.

Q. Now, you stated that you used the actual world as the basis for creating your but for world, is that correct?

A. Say that again?

Q. Well, let me ask you. Do you use the actual world as the basis for creating your but for world?

A. In this analysis, I haven't created a but for world.

Q. So it's your opinion that the retained earnings that existed in the actual world would have also existed in a but for world, isn't that correct?

A. The retained earnings were the retained earnings in the actual world. The retained earnings may well have been at a different amount. If River Valley had had the benefit of the additional capital that was breached, taking just the retained earnings that are in this report, those retained earnings, as

question, this was a discussion that I had with Cornerstone and with counsel and felt like this was a reasonable way of getting at the amount of damages. Clearly the capital that was foregone had a life beyond the acquisition by First Banks.

Q. Was it counsel who originated the idea of extending the claim for damages in this case past the point at which First Bank acquired River Valley?

A. I don't remember that it was one or the other. I think it was a consensus that it was the appropriate way to do this.

Q. When you say one or the other, consensus of Cornerstone counsel?

A. Cornerstone counsel and myself.

Q. So it was either Cornerstone or counsel or yourself that originated the idea of extending the claim for damages?

A. I don't think there was ever much question that that was an appropriate way to do it so that there wasn't much discussion with respect to it. I felt like that was appropriate all along.

Q. Well, you didn't previously in this case?

A. And previously in this case, this is a methodology that I think is trying to follow the guidance from the cases. As I understand that, it's appropriate to look at the amount of capital over the contractual period for the capital. The lost profits damages that had been presented previously simply takes a different perspective.

Q. What perspective is that?

A. It looks at the value or the amount that First Banks would have paid in 1994 and 1995 as opposed to -- and with that, does take into account the value of the foregone capital at the time of the sale.

Q. Did you speak to anyone at First Bank in connection with the preparation of your third supplemental expert report?

A. No.

Q. In paragraph 7 of your report, you write, "I have analyzed the cost to the River Valley thrifts and their successors of mitigating some of the effects of the government's breach by replacing contracted-for regulatory capital with retained

earnings and, in one instance explained below, through the exchange of debt securities for equity securities." Do you see that?

A. Yes.

Q. To whom are you referring to when you refer to River Valley successors? First Bank?

A. Yes.

Q. Is it your position that First Bank is mitigating the effect of the 1989 breach affecting River Valley by retaining earnings?

A. I felt like that was a reasonable assumption and that the methodology was consistent with looking at that mitigating effect up until the present time, and then projecting that effect into the future and taking the present value of that.

Q. You say it was a reasonable assumption. And it's based on not talking to anyone at First Bank, correct?

A. That's correct.

Q. And it's based on not looking at any First Bank documents other than I believe in your additional documents considered, you have one single

THE WITNESS: Again, I think the damages are related to River Valley and the purpose of calculating the present value of the costs throughout 2013 is just that, to estimate what that present value of that would be at River Valley.

BY MR. ROBERSON:

Q. Now, if First Bank was not a party to this lawsuit, would you still be seeking damages for River Valley after the point in time at which First Bank acquired ownership of River Valley?

MR. JOHNSON: Objection, calls for speculation.

THE WITNESS: I don't know.

BY MR. ROBERSON:

Q. And there are only two choices. Have you given it any thought?

A. No.

Q. So it's a possibility that you would not be seeking damages for the post-First Bank period if First Bank was not a party?

MR. JOHNSON: Objection, calls for speculation.

THE WITNESS: I haven't given that any thought.

BY MR. ROBERSON:

Q. Well, let's assume that you would seek damages for the post-First Bank period even if First Bank was not a party. Just put that as a posit because there are only two possibilities here. And I want to understand how that would work. Because we know that River Valley would no longer exist, correct?

MR. JOHNSON: What's your question exactly?

BY MR. ROBERSON:

Q. River Valley no longer exists, isn't that correct?

A. River Valley no longer exists, is that correct?

Q. That's my question to you.

A. Is that correct?

Q. I'm asking you.

A. I said before that I haven't followed exactly what has happened to the charter with respect

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

HOMER J. HOLLAND, HOWARD R. :
ROSS, and FIRST BANKS, INC., :
Plaintiffs, : Case No. 95-524C
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, June 28, 2007

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of United States Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:15 a.m., Thursday, June 28, 2007, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

Certified Copy

APPEARANCES:

On behalf of the Plaintiffs:

MICHAEL A. JOHNSON, ESQ.
JOSHUA P. WILSON, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5783

On behalf of the Defendant:

JOHN H. ROBERSON, ESQ.
JOHN J. TODOR, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-7972

ALSO PRESENT:

GOR AGHABEKYAN, Videographer
JEFFREY JACQUES
JEFFREY P. YUSHCHAK, Navigant Consulting
JEFF NIELSEN, Navigant Consulting

believe that First Bank had sufficient earnings, retained earnings, and that those earnings were available, correct?

A. My focus was on River Valley.

Q. You believe --

A. First Banks acquired the stock and River Valley had the retained earnings.

Q. And you believe that once River Valley was in the First Bank family, you have every reason to believe that from 1995 through 2013, it had sufficient retained earnings, correct?

A. Well, of course we're projecting into 2013.

Q. 2007, then.

A. And through 2007, I would -- I would -- I had not done the analysis. I would assume that that would be the case, that there would be every reason -- I mean, they needed capital for the assets and liabilities, River Valley needed the capital for covering its assets and liabilities and I think that, I think that on the one hand, it is very likely that those retained earnings were there to mitigate those

damages.

On the other hand, I'm looking at it from the standpoint of focusing on keeping the same analysis through the period. If -- remember that what we're talking about is the damages are the withdrawal of the capital. What -- I'm using the retained earnings as a measure of what the cost of mitigating that is. And clearly that was the case during the period of time up until the acquisition and consider that that's a reasonable projection from the acquisition thereafter.

Q. Okay. And you say it's a reasonable projection. You say you have every reason to believe. But you also said you've done no analysis, isn't that correct?

A. That's correct.

Q. So in fact, you have no basis upon which to say that you have every reason to believe that there were sufficient retained earnings as a factual basis?

A. As a factual basis. I guess I would say that understanding what First Banks' motives were in

acquiring River Valley, I fully anticipate that they -- as I talked about before, that they retained -- I was quite certain that they would retain the charter of River Valley, in particular, in order to maintain the tax loss carry forwards.

And so I think that, I think I have -- while I haven't done any additional analysis with respect to this particular report, I think that it is -- as I said before, I think it's very reasonable to continue on the analysis through this period.

Q. Well, would it be relevant to determine whether that River Valley institution in the post-First Bank acquisition period had enough retained earnings?

A. It might. But I think one could come back to the initial point that the damages were created at the time of the breach. What we are doing is looking at a set of costs that clearly did occur during one period of time and then projecting in the future the cost of damages based on that same formula.

Q. Well, let's be straight on one thing. The mitigation costs you say clearly did occur but you're

not sure if they really did occur after the First Bank acquisition, isn't that a fact? You're in effect projecting past that since you haven't looked at the actual retained earnings of the River Valley entity once it was acquired by First Bank?

A. I have not looked at the retained earnings of River Valley after it was acquired by First Banks, that's correct.

Q. And let's look at a First Bank audited financial statement. Can we get the December 31st First Bank audited financial statement?

(Conversation off the record.)

MR. ROBERSON: So we'll mark the First Banks, Incorporated and Subsidiaries Consolidated Financial Statements for December 31st, 1995 and 1994. We'll mark that -- who is it, number 6 now?

(Exhibit No. 6 was marked for identification.)

BY MR. ROBERSON:

Q. And you didn't look through this document in preparation for your report, did you?

A. No, I didn't.

Q. Have you ever looked through this document?

A. I probably have, yes.

Q. But you didn't think it was necessary for purposes of your report to look through First Banks' consolidated financial statements for any time after its acquisition of River Valley?

A. I -- I didn't -- I did not look through this.

Q. And you didn't tbink it was necessary for your analysis?

A. No, I didn't.

Q. Because you were just projecting forward River Valley's --

A. I just didn't feel like it was necessary. I was looking -- I was looking at damages to River Valley, not looking at the characteristics of First Banks.

Q. So you were projecting forward from 1994 what River Valley's condition was. You were just projecting through in a straight line amortization and retained earnings of River Valley through the

First Banks period to the present time and then continuing forward to 2013, isn't that correct?

A. The projection from 2007 to 2013 is certainly a projection from the standpoint of having a consistent methodology for looking at the value, the cost of the damages through the period from 1995 on. Again, I wanted to use a consistent methodology through the entire period.

Q. So you projected it. You didn't look at the actual?

A. I did not look at the actual specifics of First Banks.

Q. Now let's look at the page 32 of this document. Now, this has -- if you look down toward the bottom of the page, it has a line called retained earnings?

A. Yes.

Q. And then there are several different First Bank entities that are aligned under columns?

A. Yes.

Q. I take it from your discussion you don't know which one of these entities was the acquirer of

River Valley?

A. That's correct.

Q. I'll represent to you that the acquiring institution at this point in time was First Bank, FSB. And can you see what their retained earnings were?

A. Yes.

Q. And what is that?

A. 2.3.

Q. Million dollars?

A. Yes.

Q. And as of the time that First Banks acquires River Valley in your model, wasn't there about $19 million of contractual capital that you believed would have been remaining?

A. I -- I'd have to go back and look but that seems reasonable.

Q. Well, let's just tie it down. I don't want there to be any uncertainty. If you look at your March 31st, 1995 calculation?

A. And where are you?

Q. I'm -- well, it's your report. I can

steer you through your report if you're not familiar with it.

A. Go ahead -- go ahead, you have something in mind.

Q. Well I'm -- with the -- the total potentially replaced capital is, for what you're calling River Valley institution, although I'll note that you've referenced it as First Bank capital schedule, and I believe that's your Exhibit B?

A. Yes.

Q. And what is the total potentially replaced amount of capital that needs to be replaced by retained earnings?

A. As of September of '94, it's 19.8.

Q. And March '95?

A. It's on a different schedule. 19.7.

Q. 19.7?

A. Did you say March '95?

Q. That's correct.

A. 19.5.

Q. Million dollars?

A. Yes.

Q. So in fact, First Bank did not possess enough in retained earnings to replace that $19 million of contractual capital you believe would have been remaining as of March 31st, 1995, isn't that correct?

A. Well, I think that one needs to look at the entire capital structure here. The entire stockholders equity at First Bank, FSB was 92.8 million.

Q. With the retained earnings, though.

A. Well, I mean --

Q. There is a specific category for retained earnings, correct?

A. There is a specific category for retained earnings but there is stockholders equity of 93 million. I don't know precisely what happened to create the capital surplus but presumably that was because of some reclassification of capital. Capital -- I don't see the distinction between retained earnings and capital surplus for the purpose of this discussion.

MR. JOHNSON: So your answer is complete,

believe that costs did occur, actually occurred before the First Banks, Incorporated acquisition. Do you remember saying that?

A. What I said was that the -- and maybe I did say that. I guess what I would -- but go ahead.

Q. Well, can you show those costs? Do those costs appear anywhere?

A. I think that the -- this goes back to the approach that I've taken to determine what the costs of mitigation are, the cost of mitigation computed by looking at the amount of stockholders equity, retained earnings that had to be used to mitigate the damages from the loss of foreclosed capital.

Those costs are computed by using River Valley's cost of capital times the amount of the retained earnings or, more broadly, the stockholders equity that would have been used, that was used.

Q. But you can't show those costs anywhere?

A. I didn't calculate those costs.

Q. You can't show -- they never appeared in any document?

A. I guess that I would go back to the

principle that there is a cost of capital that one can calculate, the cost to the institution. That capital had to be rented. And it's an accepted aspect of finance that the return that the shareholder is anticipating and the discount rate that's used to discount the future cash flows from the institution is a -- it is the cost of capital.

Q. Okay. But again, you can't show that cost in any document, correct?

A. I can show the cost of capital as calculated in the several documents that the government did to analyze River Valley's cost of capital.

Q. And then those were actually costs that River Valley deducted in the actual world and we could see that on a balance sheet somewhere or in some sort of financial statement?

A. I don't think that it's relevant -- I don't think that it is necessary or relevant to say that it can be shown. It isn't an expense. GAAP would not consider that an expense. This is a financial term that's used to look at, particularly

was sufficient capital to mitigate those damages. I think that -- I think that the calculation is a valid calculation.

BY MR. ROBERSON:

Q. That's not my -- you haven't answered my question. My question was, after the point in time when First Banks acquired the institution -- which is in January of '95, right?

A. Yes.

Q. -- through 2013, approximately $14 million of the total mitigation costs that you calculate occur, isn't that correct?

A. The calculation does take into account from 1995 to 2013 and I've explained before, that this is a way to look at the periods of time at which that capital would have been in play. The damages occurred prior to that time. This is a way to measure what the value of those damages were.

Q. Well, do you believe that First Bank is actually continuing to be damaged today based on the loss of River Valley's contractual capital?

MR. JOHNSON: Objection, beyond the scope,

calls for a legal conclusion. Answer if you know, Dr. Holland.

THE WITNESS: I think that -- I think River Valley was damaged at the time. This is a way to measure the significance of those damages. Clearly the government could have replaced that capital at the time and then there would be no damages.

I mean, it's an accepted practice to look at the value of things by projecting forward and discounting it back and I think that's, that's what we've done here.

I think that with respect to the question is First Bank damaged, certainly had First Bank -- had the breach not occurred and had First Banks acquired River Valley, which as I say, may or may not have happened if the breach had not occurred, there is certainly a difference. And I think that at this stage, it is First Banks' claim as successor to River Valley that we're talking about.

BY MR. ROBERSON:

Q. I know that's what it is. It's First

Banks' claim. We've established that.

MR. JOHNSON: You mean as successor to River Valley. That's what Dr. Holland said. You're not trying to misquote Dr. Holland, are you?

MR. ROBERSON: No, obviously not, Mr. Johnson.

MR. JOHNSON: Okay.

BY MR. ROBERSON:

Q. But my question was, First Bank -- is it your belief that First Bank today is being damaged by the mitigation costs with respect to the River Valley loss of capital?

MR. JOHNSON: Objection, beyond the scope, calls for a legal conclusion.

THE WITNESS: I'm not going to comment on the legal aspects of whether they're damaged or not. I just have to go back and say that the damages occurred at the time of the breach. That could have been mitigated completely by the government at that time. Instead, I'm looking for a way to give a reasonable metric to the amount of the damages. One way is to calculate the cost of mitigation. I use

what I believe is a reasonable method to do that, projecting out to 2013 even though obviously 2013 hasn't occurred.

BY MR. ROBERSON:

Q. In fact, then, I gather what you're saying is that you are not sure or are not going to take a position with respect to whether First Bank is today mitigating the loss of River Valley's contractual capital. Is that -- is that what your position is?

A. I think what you asked me is First Bank currently being damaged and I think I'm coming back to say that I am taking -- that my position is that this is a reasonable methodology for calculating damages that occurred to River Valley at the time of the breach.

Q. Is your reasonable methodology one in which First Bank is -- you're representing that First Bank is actually today mitigating the loss of River Valley's capital?

MR. JOHNSON: Objection, asked and answered. If you have something to add to your prior responses, go ahead, Dr. Holland.

Q. And so your methodology from 1995 through 2007 could be a projection, correct?

A. I said it could either be a projection or it can be using the assumption that there was sufficient earnings to calculate that cost of mitigation.

Q. Is it your opinion that as of today in 2007, First Bank has earmarked $3.5 million in retained earnings as replacing the contractual capital that you and Mr. Ross negotiated in 1988?

A. Uh --

Q. $3.5 million?

A. No, I don't -- I don't think it is part of my analysis to say that an amount was earmarked. I think that the truth is that the -- had -- did you say 3.5 or did you say -- I don't remember.

Q. My question was, is it your opinion as of today --

A. Yes.

Q. -- First Bank had earmarked $3.5 million in retained earnings as replacing the contractual capital that you and Mr. Ross negotiated in 1988?

MR. JOHNSON: Objection, vague as to what you mean by earmark. Answer if you are able, Dr. Holland.

THE WITNESS: I was just looking to see where you got the number 3.5. I don't think it's at all important to my analysis or relevant to my analysis whether an amount of capital is earmarked. The issue is that that amount of capital would have been available to River Valley and so, therefore, an amount of capital that otherwise could have been used for something else is not available to River Valley.

BY MR. ROBERSON:

Q. Now, one of the reasons that you give for issuing a new report was the Court's holding in LaSalle, the Federal Circuit's holding in LaSalle, isn't that correct?

A. I think what I said was that last fall, we began talking about our damages theories and discussions and presentations and I was advised by counsel that there had been developments that suggested that there was traction to the idea of using the cost of mitigating damages with retained

earnings and other capital and that, and that after talking about River Valley's situation and its retained earnings during that period, we concluded that it would be appropriate to present a damage calculation based on that concept.

Q. Yeah. I guess it's not really responsive to my question. My question was that you gave as an explanation for issuing a new expert report that your -- or the decision in LaSalle and I'm actually referring specifically to footnote number 1 in your report.

A. Yes, I see that in number 1 and -- excuse me. I interrupted you.

Q. And it there cites the LaSalle/Talman Federal Circuit decision, correct?

A. And the Home Savings.

Q. Right. And you didn't read either of those opinions, correct?

A. That's correct.

Q. And that language was written by your attorney, correct?

A. They made reference to the Home Savings

and LaSalle/Talman discussion, they discussed it with me, and that footnote expresses what was discussed.

Q. Well, let's look at the LaSalle/Talman opinion. And there have been a number of them so I don't want to represent that there is just one LaSalle/Talman opinion but let's look at -- and there is not a cite here to one of the, particular LaSalle/Talman opinions. So I'll just presume perhaps this was one of the ones you were referencing but maybe not. LaSalle/Talman at 1317 F 3rd 1363.

THE REPORTER: Could you say it again?

MR. ROBERSON. Yes. 1317 F 3rd 1363.

(Exhibit No. 7 was marked for identification.)

BY MR. ROBERSON:

Q. Oh, I'm sorry, I said 1317. It's 317 F 3rd 1375, which is the page I'll be turning to.

Actually, the initial cite of the document, the case cite is 317 F 3rd 1363, but I'm going to ask you to look at page 1375. And it's your understanding that you discussed this case with counsel?

used the one that you did use. My question is why didn't you use the dividends.

A. Well, River Valley is one, was one of those companies that did not pay dividends because it was in a situation where it was employing the capital and the shareholders were looking to an appreciation of the company as opposed to dividends for their return of -- for their return.

Q. Is that the only reason?

A. As I said before, I think there - I think had River Valley paid dividends, that would have been part of the calculation or it could have been a part of the calculation. In this particular case, we had what I considered a very reliable and conservative method of determining the cost of capital and, as I stated in my report, one normally uses the cost of capital as the discount rate to discount future payments, cash flows to shareholders in order to get to the current fair value of the shares.

The government did that for us so it was a reliable method and since it was already accepted by the government, that seemed to be an acceptable and

very reasonable way to get at the cost of capital for River Valley.

Q. Now, you said that if River Valley had paid dividends, it would have been part of the calculation?

A. It could have been part of the calculation.

Q. And that's my only question. You said that, right?

A. Yes.

Q. And First Bank paid dividends, correct?

MR. JOHNSON: Objection, beyond the scope.

THE WITNESS: I think we -- we -- the only thing that we've talked about is that First Bank's paying dividends on its preferred stock. I do not know if it pays dividends on its common stock.

BY MR. ROBERSON:

Q. So you have no idea whether or not First Bank pays dividends?

A. I do not know that.

Q. And you believe that if River Valley paid dividends, it could have been part of your

A. What I was trying to do was to say that I thought that the return of capital comment kind of disappears when one does what is the normal practice to determine a return on investments. And the return on investment is really that internal rate of return which is the present value -- is the discount rate at which cash flows would be discounted to the present value for that, for that investment.

So it's important what that discount rate -- I mean, the discount rate then, that's how the discount rate is kind of the flip side of a cost of capital, or the discount rate is a cost of capital.

Q. Okay. Now, you don't keep up with any academic financial journals or publications, do you?

A. No.

Q. And you don't keep up with financial textbooks or publications of a formal nature at the postgraduate level?

A. No.

Q. And I take it the same is true with respect to even at the undergraduate level, you don't

been mitigated, the calculation would have been less but I don't think that that means there is a methodological difference between using dividends to calculate the return on capital as I've talked about and using retained earnings to calculate the mitigation of damages.

Q. Let's look at your report again. And I ask you to turn to paragraph 46, which is at page 14. Why don't you just take a moment to read paragraph 46.

Ready?

A. Yes.

Q. At the first sentence of paragraph 46, you write, "Because of the breach, in December 1990, River Valley exercised its option to redeem the $4.6 million tranche of subdebt prior to its maturity." Do you see that?

A. Yes.

Q. All right. Now, I want to introduce another document. If we could get the joint stipulation of facts that were filed in this case by both parties on December 31st, 2003. And we will

mark that document as Exhibit Number 8.

(Exhibit No. 8 was
marked for identification.)

BY MR. ROBERSON:

Q. And what I would like you to do is to turn to joint stipulation of fact -- well, let me just ask you, have you seen this document before?

A. The joint stipulation of fact?

Q. Right.

A. Yes.

Q. And I take it at that time it was just you and Mr. Ross who were plaintiffs and that you authorized the filing of this document, correct?

A. I believe so, yes.

Q. Let's look at paragraph 285 of this stipulation which is found on page 92.

A. 285?

Q. Yes. Are you there?

A. Yes.

Q. And paragraph 285 states the following: "In the first quarter of 1990, River Valley 1 voluntarily repaid $4.6 million of subordinated debt

previously issued in connection with the Galva/Mutual/Home transaction." Do you see that?

A. Yes, I do.

Q. And then there are a number of different cites referencing that fact. Do you see that?

A. Yes, I do.

Q. And both parties agreed that this statement was indeed a fact, isn't that correct?

A. I believe so, yes.

Q. And you don't have any reason to dispute this fact, do you?

A. I do not.

Q. And I think you testified previously that you believe that River Valley first began to feel the effects of the breach in July of 1990, correct?

A. Yes.

Q. Now, what is your basis then for saying that, in your expert report that the $4.6 million tranche of subordinated debt was redeemed because of the breach?

A. The breach -- I guess maybe to tie those two statements together, I said before that the

recognition of the full consequences of the breach was really felt by us in July of 1990. The legislation was passed in 1989 and we knew some of the characteristics of that legislation had anticipated that because of our agreements with the government -- and we had just, so recently, had really solved the government's problems with both Republic and Home Federal and Mutual and Galva -- that the OTS was going to exercise its discretion with respect to how it would apply various aspects of the legislation.

It became clear over a period of time that not only were we not going to be given any consideration for what we had done, that when later the FDIC came in, and maybe it was at this period; I don't remember precisely -- I mean it was, not only were we not given any consideration, which we fully had anticipated, but we were actually treated more harshly than we thought was at all warranted, in part I thought because of the lack of capital.

In the --in 1990, it appeared that the subordinated debt would not be counted as capital.

That appeared in 1989 and that was when that piece of it became apparent to us. We voluntarily redeemed our subordinated debt since it no longer counted as capital.

Q. So you're now in effect saying that you, or River Valley began to feel the effects of the breach before July of 1990?

A. I mean, we were certainly very sensitive to the breach from the time -- even during the period that the legislation was being considered. I came to Washington a couple of times with respect to thrift association groups and so forth.

And you know, is there a precise time at which we felt that the breach had its maximum impact? I mean, I've used July of 1990 because that's when we, when we gave up all expectation that there would be any forbearance on the part of the OTS and the FDIC. But the -- the -- it was pretty clear -- and I don't remember precisely but it was pretty clear in the first quarter of 1990 that subordinated debt wouldn't be counted. We -- and so we did repay it. (Coughs.) We did repay it.

Q. And how do you correspond, or how do you reconcile what you just said, your last sentence, with the first sentence on paragraph 46?

A. Oh, there must be a mistake in the one place or the other as to what the exact date was of the redemption.

Q. Okay. Now, on page 6 of your third supplemental report, you state that you relied on the amortization schedule set forth in Dr. Murphy's 2001 and 2003 expert reports --

A. Could you wait a minute? Did you say page 6?

Q. Page 6.

A. Page 6.

Q. And you can look at paragraph 20 and 21.

A. 20 and 21?

Q. Right, right. You'll see what I'm referencing. So in those paragraphs, you state that you relied upon the amortization schedule set forth in Dr. Murphy's 2001 and 2003 expert reports to determine quarter-by-quarter amortization -- quarter-by-quarter amortizing amounts of contractual

goodwill, correct?

A. Correct.

Q. And these balances are consistent with the schedule you've relied upon previously from Ron Pikus, P-i-k-u-s, isn't that correct?

A. I believe that's correct.

Q. I would like to introduce River Valley 2's audited financial statements from March 31st, 1989. Mark that as Exhibit Number 9.

(Exhibit No. 9 was marked for identification.)

BY MR. ROBERSON:

Q. Do you recognize this document as River Valley Savings Bank Consolidated Financial Statements from March 31st, '89 and '88?

A. Yes.

Q. And let's turn to page -- and I'm going to be looking at the Bates ranges on the bottom right-hand corner, PHO 0420693.

A. Yes.

Q. And here on this page, there is an indication of the balance of excess of cost over fair

value of net assets acquired. Do you see that? It's just above the middle of the page.

A. Yes, I do.

Q. Right? And that figure indicates that River Valley 2's goodwill was $734,872?

A. Yes.

Q. As of March 31st, 1989, right?

A. Correct.

Q. And do you have any reason to dispute that figure?

A. I have some recollection that there were some modifications to some of these numbers but go ahead. I don't -- I don't --

Q. Well, this is the audited --

A. Obviously this was the, these were the audited financials that were presented at that time.

Q. Right.

MR. ROBERSON: And now let's look at River Valley's audited financial statements for March 31st, 1990. Can you mark this as Exhibit 10?

(Exhibit No. 10 was marked for identification.)

goodwill.

Q. And these figures in your exhibit and in Mr. Pikus' analysis are less than the amount of -- I'm sorry. Your figures are greater than the amount of goodwill that's shown in the consolidated financial statements, correct?

A. The ones that you've shown me, the -- if I am clear on --

Q. Well, the consolidated financial statement for March 31st, 1989 shows the excess of costs over fair value of goodwill of $734,000 approximately, right?

A. Yes.

Q. And then the following year -- and you would expect there to be amortization; you would expect that number to be smaller. The following year, I know it's a draft but nonetheless the consolidated financial statement draft indicates goodwill has been amortized down to $545,000, correct?

A. Correct.

Q. And in any event, those numbers are

smaller significantly than the goodwill amount shown in your analysis, correct?

A. Yes.

Q. And can you explain why it is that this goodwill was higher in your report than what was actually reported on River Valley's financial statements?

MR. JOHNSON: Let's just be clear here because there is a note for goodwill that explains what Dr. Holland has done and so I think your question is objectionable because it lacks foundation.

MR. ROBERSON: No, I'm asking him why it is. So if he's got an explanation, he can explain it.

THE WITNESS: Well, I think, first of all, they did come -- as I mentioned before, they did come from Dr. Murphy's report.

BY MR. ROBERSON:

Q. And if that's an explanation, then you don't understand what Dr. Murphy did to come up with that number?

and they were willing to do it at a rate that did not reflect what the cost of capital would be to River Valley.

Q. Now, again, it is your opinion that by retaining earnings to replace lost contractual capital, River Valley -- see I'm going too fast. All right, I warned you.

Dr. Holland, it is your opinion that by retaining earnings to replace lost contractural capital, River Valley experienced a cost associated with retaining those earnings, correct?

A. It was an opportunity cost. It was the fact that capital had to be allocated to that purpose which shouldn't have had to have been allocated to that purpose. And I measured that cost by using the cost of capital that the government has analyzed in the FSLIC preferred transaction.

Q. And with respect to your 20 percent cost of equity capital, did you reach that opinion independently or are you relying upon Dr. Murphy?

A. I am using Dr. Murphy's analysis from his expert opinion. I have reviewed those materials

myself. I am very comfortable that his analysis is sound and I think that that is a reliable measure, although a conservative measure of River Valley's cost of capital.

Q. So would it be correct to say that you've relied upon Dr. Murphy and you verify that independently that that was an appropriate cost of equity capital?

A. I have, I have reviewed his work, I have reviewed the documents that it is based on, and I have therefore used that same 20 percent in this analysis.

Q. So you relied upon his work in that respect?

A. Yes.

Q. So I'm going to ask you a few questions related to the '88 and '91 valuations of the FSLIC preferred stock. So let's look at the April 28th, 1988 Federal Home Loan Bank Board memo which we'll mark as 12, I believe?

(Exhibit No. 12 was marked for identification.)

preferred was calculated using the dividend discount model for a perpetuity. The discount rate was assumed to be 12.72 percent which is the long-term junk bond rate as defined in the March 1988 interest rate scenario." Do you see that?
A. Yes.
Q. And then it continues, "The preferred stock has an income sharing feature that was valued in our earlier analysis. Reference is made to the April 22nd, 1988 memorandum. Since the terms of the shared income benefit have not changed, the value of this element was not recalculated at this time." Do you see that language?
A. I do.
Q. So as of the June 1988 FHLBB memorandum, the fixed dividend portion of the FSLIC preferred stock was being discounted at 12.72 percent instead of 13.1 percent, correct?
A. Correct.
Q. And you haven't performed any independent analysis in order to verify the appropriateness of that rate, correct?

A. Of the fixed rate form?
Q. The 12.72 percent.
A. I have not.
Q. And the dividend participation component is still being discounted at 16 percent, correct?
A. Correct.
Q. Now, turn your attention to paragraph -- the second paragraph from the bottom on page 2 which reads, "The above analysis shows that the net benefit to the FSLIC in the exchange of a FSLIC note for preferred stock is approximately $1.5 million. This figure is soft in that the valuation relied upon assumptions concerning the appropriate discount rates and projected income of the resulting institution."
Did I read that right?
"It appears from the viability analysis that the resulting association will be very profitable and cause the income sharing portion of the preferred stock to bring substantial value to the FSLIC." Do you see that?
A. Yes, I do.
Q. Now, you don't have any reason to dispute

the FRF for the potential loss of estimated future supplemental dividend payments." Do you see that?

A. Yes.

Q. So as of this March 1991 memorandum, the fixed dividend portion of the FSLIC preferred stock was effectively being discounted at 17 percent, correct?

A. Correct.

Q. And you haven't performed any independent analysis in order to verify the appropriateness of that rate, correct?

A. Correct.

Q. What in your opinion caused the increase in the discount rate applied to the fixed dividend from 12.7 percent in 1988 to 17 percent in 1991?

A. I think that Dr. Murphy, in his report, felt that the change in circumstances, including the breach, would have been one of the reasons that the government had changed the discount rate used in the fixed dividends from the 12.7 to the 17 percent.

Q. Okay. So you rely on Dr. Murphy for your opinion as to why the discount rate changed between

things that their memorandum talks about.

But you know, I guess that, I guess at the end of the day, that -- that --- that the RTC is making a judgment that a higher discount rate in 1991 for the fixed dividend is more appropriate than the lower discount rate that they used in -- that the government used in 1988.

And I think the rest of it -- for me to try to determine exactly what was on their mind, I mean, it would -- it would suggest to me that it was because of the riskier nature of the stock and the stock had -- and that River Valley had lost value because of the breach.

Q. So based on -- so we go from 12.7 percent in '88 to 17 percent in 1991, correct?

A. Yes.

Q. And that's a 430 basis point increase, right?

A. That's correct.

Q. And based on this 430 basis point increase in the discount rate applied to the fixed dividend of the FSLIC preferred stock, you add 430 basis points

to the 16 percent discount rate applied to the supplemental dividend in 1988, to come up with a discount rate on the supplemental dividend in 1991, correct?

A. The presumption is that if it is warranted to add 430 basis points to the discount rate of the fixed dividend, it would be reasonable to add a similar amount, 430 basis points or more, to the discount rate for the equity component.

Q. And that provided you with a 20.3 percent discount rate on the supplemental dividend of the FSLIC preferred, correct?

A. That -- and that was the implied discount rate on that or at least it was a measure of the cost of capital for the equity of River Valley.

Q. But you didn't perform any independent analysis in order to verify the appropriateness of that rate, correct?

A. I did not perform any independent analysis. I felt that that was a conservative rate. It had been one that had been used in a previous expert report and it seemed to be a very reasonable

rate to use for the cost of capital.

Q. And what in your opinion caused the increase in the discount rate on the supplemental dividend from 16 percent in 1988 to 20.3 percent in 1991?

MR. JOHNSON: Objection, beyond the scope, relevance. Answer if you're able, Dr. Holland.

THE WITNESS: Well, as I said, I'm not necessarily going to speculate on exactly what was in the minds of the RTC. From my perspective, the most dramatic change for River Valley was the breach.

BY MR. ROBERSON:

Q. And other than that being what you considered to be the most dramatic change, that is, the breach, what other factors in your opinion might have caused the increase in the discount rate?

MR. JOHNSON: Objection, calls for speculation, lacks foundation, is beyond the scope and relevance objection.

THE WITNESS: Again, I think that -- I haven't thought further about kind of what caused the RTC to use a higher discount rate. I felt like that

this particular case, River Valley would be buying back the preferred. They bought it back at a discount. As we've discussed, the RTC has concluded that that discount was fair as far as the RTC was concerned.

I think I could have -- one could argue that River Valley was in a position where it was very important for them to redeem the preferred. In other circumstances, we might not have redeemed it for as small a discount as there was, but we were -- we were trying to make up for the lost contractual capital and this did provide a $1.3 million addition to our capital that was, made up for some of the contractual capital.

Q. I didn't hear like, a clear answer as to whether you thought it represented a fair market value. Were the things that you were just describing, in terms of the motivations of the party there, indicative of a fair market value transaction in your mind?

A. Usually a fair market value is where you have a willing buyer, willing seller arriving at a

value for a transaction where there are no extenuating circumstances in terms of either the buyer or the seller.

I think that it was certainly a -- it ended up being a market value that was certainly fair from the government's standpoint. As I said, I could perhaps argue that it should have been a higher discount and would have been a higher discount if River Valley wasn't under pressure to raise capital.

Q. I heard a couple of things. One was that you defined, I think, a fair market transaction as a willing buyer and a willing seller when there's no extenuating circumstances, correct?

A. That's correct.

Q. And then you said that you thought that as far as the government was concerned, there was a fair market -- or there was a fair value obtained in the transaction, correct?

A. I think I said that it was certainly fair -- they would have -- they felt it was fair. There was no extenuating circumstances on the part of the government where they were obligated to make a

that you looked at, the industry it was in, the fact it was privately owned, it was a small institution and then it didn't have access to public markets were all factors that remained the same between 1990 and 2013?

A. Generally, yes.

Q. Each one of those?

A. Yes.

Q. Now, let's talk about the factors that influence an institution's cost of equity capital. Can you tell me what are the factors that influence an institution's cost of equity capital?

A. Well, we've talked about this considerably. I think that the cost of capital is related to the return required for renting that capital. That is, at the end of the day, what the shareholder would require to make an investment in that kind of an -- in an institution.

That is, the factors that the investors would look at would be the risk associated with that, with that investment, the liquidity of that investment, the risk liquidity. I guess risk

encompasses a great many things. And I suppose the -- no, I think those pretty much encompass the two main factors that would affect the expected return that one would require.

Q. When you say the two main factors, what were you referring to in your prior answer that you consider to be the two factors?

A. Risk and liquidity.

Q. Okay. Let's talk about risk for one second. Would industry risk be one of the factors under -- you said risk would encompass a number of things, I believe. Is that correct?

A. Yes.

Q. And would the industry risk be one of the sort of components of risk?

MR. JOHNSON: Objection, vague.

THE WITNESS: I think it -- I think it -- I don't think necessarily an industry per se -- I guess I would say risk is really the degree of certainty that one could predict the return that one would get from that investment and just as a AAA rated bond, which presumably has one of the lowest

exact return that he was anticipating going into that investment. It can be higher and it can be lower.

BY MR. ROBERSON:

Q. Are you finished?

A. Yes.

Q. It really doesn't depend on whether it's the same investor or new investor. If the same investor, all things being equal, and it is the same investor, in year one he makes the investment, year two all things are equal, it's the same investor and the bank is the same except it has increased risk. That same investor will anticipate a greater return on his investment, correct?

MR. JOHNSON: Same objections as before. Asked and answered.

THE WITNESS: I think that the, at that stage, what that existing investor who has already made his investment decision thinks about the expected return isn't really as relevant.

BY MR. ROBERSON:

Q. I don't understand how you can say it's not relevant. I'm talking about two different

investments, the same investor.

A. The same investor is ing two different investments?

Q. Two different investments. In year one, he makes an investment and he's expecting a certain rate of return. In year two, the investor comes back, more capital, he's making an investment. He's going to expect more from his return if in the interim period of time the institution has increased its risk, correct?

A. On his initial investment or on his new investment?

Q. On his new investment.

A. Okay. I think that if the circumstances have changed to make the investment less attractive, more risky, that he would likely not make an investment, all things being equal, unless he was expecting a higher return.

Q. Now, let's talk about how the risk changed, the risks that we've been chatting about changed between 1990 and 1991 with respect to River Valley. Did River Valley's regulatory risk increase

or decrease between 1991?

MR. JOHNSON: Objection, vague.

THE WITNESS: Again, I haven't spent time reviewing the regulatory risk between 1990 and '91 for this purpose so I don't think I can say.

BY MR. ROBERSON:

Q. And with respect to industry risk, did the conditions in the industry change between 1991 with respect to River Valley?

MR. JOHNSON: Objection, vague.

THE WITNESS: I think the same answer. I haven't looked at that.

BY MR. ROBERSON:

Q. And with respect to leverage, the risk with respect to leverage that is relative to the underlying risk of the asset structure, how did that change with respect to River Valley between 1990 and 1991?

MR. JOHNSON: Objection, vague.

THE WITNESS: I would have to look at that. I don't know.

BY MR. ROBERSON:

Q. You didn't look at it?

A. I did not.

Q. And with respect to the capital of the institution, how did that change for River Valley between 1990 and 1991?

MR. JOHNSON: Objection, vague.

THE WITNESS: Again, I would want to be precise. I haven't looked specifically at the -- at the -- at how the capital -- I mean, I don't have in mind how the capital changed between 1990 and '91.

BY MR. ROBERSON:

Q. And how about interest rates that can well affect risk? How did that change between 1990 ask '91 with respect to River Valley?

MR. JOHNSON: Objection, vague.

THE WITNESS: I would have to look. I don't know.

BY MR. ROBERSON:

Q. Nonetheless, it's your opinion that River Valley's cost of equity capital was the same in 1991 as it was in 1990, correct?

A. I used the cost of capital that was

calculated as a post-breach cost of capital for River Valley by the RTC. It may have been that the -- and I felt that it was a reasonable approximation for the time frame at which the breach occurred and to use that cost of capital that was established I believe in 1991.

Q. So it's your opinion that the cost of equity capital was the same in 1991 as it was in 1990?

MR. JOHNSON: Asked and answered.

THE WITNESS: I believe that it was at least 20 percent during that period.

BY MR. ROBERSON:

Q. And I just mentioned these five categories of risk. Let's talk about them from the period 1991 through 1992 with respect to River Valley. Did you look at the effects of regulatory risk or did you look at regulatory risk changing between 1991 and 1992 with respect to River Valley?

MR. JOHNSON: Objection, vague.

THE WITNESS: I did not.

BY MR. ROBERSON:

Q. And that's the same with respect to all the other risks that we were just discussing? You didn't look at those different types of risk and how those conditions or those factors changed between 1991 and 1992, is that correct?

MR. JOHNSON: Objection, vague.

THE WITNESS: That's correct. As I said before, it was my judgment that the 20 percent cost of capital, it was determined by the government, was a conservative figure and was at least -- was at least the cost of capital for River Valley during that period.

BY MR. ROBERSON:

Q. And you're saying that it's your judgment it was least the cost of capital even though the regulatory risk, industry risk, leverage, capital and interest rates are things that you didn't look at with respect to River Valley and changing of those factors with respect to River Valley between 1991 and 1992?

MR. JOHNSON: Objection, vague.

THE WITNESS: I think what I have said is

I have not specifically looked at the factors that you talked about. I was a participant during that period as a shareholder in River Valley and through the period through the end of 1994 and certainly felt that the cost of capital for River Valley during that period of time, from my perspective as a shareholder, was at least 20 percent.

BY MR. ROBERSON:

Q. And that's just based on your own participation as a shareholder?

A. Well, I think what we've said is the expectation of the shareholder is important to the sense of the -- what the shareholder would be willing to invest -- for what kind of return would he be willing to invest in. And as that shareholder, I felt that our cost -- River Valley's cost of capital was at least 20 percent.

Q. You said as that shareholder. Weren't there other shareholders?

A. Howard Ross was the other shareholder.

Q. Right. I take it you can't speak for him with respect to what his cost of capital was at that

point in time?

A. I certainly, I felt that we were in concert with respect to our decisions with respect to River Valley. So I would -- while I certainly can't speak for him, I would anticipate that that would be -- would have been his view as well.

Q. Now let's talk about '92 to '93. Did you make any attempt to determine how regulatory risk changed from 1992 to 1993 with respect to River Valley?

MR. JOHNSON: Objection, vague.

THE WITNESS: For this analysis, I did not examine those factors that you have mentioned.

BY MR. ROBERSON:

Q. And I just want to be clear what the factors are, then. Regulatory risk, industry risk, leverage, capital and interest rates, as we've discussed them, correct?

MR. JOHNSON: Objection, vague.

THE WITNESS: Correct.

BY MR. ROBERSON:

Q. And I take it you didn't look at any of

those factors as to how they changed between 1993 to 1994 for River Valley either, correct?

MR. JOHNSON: Objection, vague.

THE WITNESS: Again, I guess what I relied on is my judgment that the 20 percent that was determined by the government was a reasonable low estimate on the cost of capital for River Valley and that's based on my experience at the time as well as my experience since then.

BY MR. ROBERSON:

Q. I don't think that answered my question.

MR. ROBERSON: Could you read the question back to him?

THE REPORTER: "Question: And I take it you didn't look at any of those factors as to how they changed between 1993 to 1994 for River Valley either, correct?"

THE WITNESS: I did not look at those factors with respect to this analysis.

BY MR. ROBERSON:

Q. And that would be true for years 1994 through 1995 as well?

MR. JOHNSON: Objection, vague.

THE WITNESS: Yes.

MR. JOHNSON: You can do this however you want, but it seems to me there might be some efficiency to consolidating some of these time periods.

BY MR. ROBERSON:

Q. Yeah, I'm happy. You didn't look at those factors -- regulatory risk, industry risk, leverage, capital or interest rates -- how those factors changed at any point in time between, we've covered up through '94, any point in time from 1995 through 2007, correct?

MR. JOHNSON: Objection, vague.

THE WITNESS: That's correct.

BY MR. ROBERSON:

Q. Now, are you aware of any bank or thrift in America whose cost of equity capital has not fluctuated for -- let's take the first period; let's take '90 through the end of '93 period. Are you aware of any bank or thrift in America whose cost of equity capital did not fluctuate for those four

years?

A. I didn't look at that.

Q. And let's talk about that second period between 19 -- well, I said through the end of 1993. Let's do it through the First Bank period. Up until the end of '94, I take it you're not aware of any thrift in America whose cost of equity capital didn't fluctuate between 1990 and '94, correct?

A. I did not look at any other bank's cost of capital during this period of time for this study.

Q. And my question was even broader than that. Just were you aware of -- forget about studying it. Are you aware of any bank or thrift in America whose cost of equity capital did not fluctuate between 1990 and the end of '94?

A. Because I did not look at that, I'm not aware of it.

Q. And I take it -- well, I'll ask the question. Are you aware of any bank or thrift in America whose cost of equity capital has not fluctuated between 1995 and 2007?

A. As I said, I haven't looked at that so I

couldn't be aware of it.

Q. And are you aware of thrifts whose cost of equity capital has indeed fluctuated for the past 23 years?

A. I haven't looked at that so I'm not aware of that.

Q. So you're not aware of whether thrifts' cost of capital has actually fluctuated or not fluctuated for the past 23 years, is that what you just said?

A. I said I didn't analyze fluctuations in banks' cost of capital.

Q. And my question again was even broader because I know you didn't analyze it. But my question was are you aware whether any thrifts in America's cost of equity capital has fluctuated over the past 23 years?

A. Again, I said I haven't looked at that so I'm not aware of it.

Q. Is it your opinion that First Bank's cost of equity capital is the same in 1996 as it was in 1995?

MR. JOHNSON: Objection, beyond the scope.

THE WITNESS: I didn't do any analysis of First Bank's cost of capital. My analysis focused on the damages that were done to River Valley. I used River Valley's cost of capital as analyzed by the RTC throughout the period.

BY MR. ROBERSON:

Q. So -- I mean, I could go through these questions with respect to -- during this whole First Bank period, you didn't look at First Bank's cost of equity capital for any period of time from 1995 to the present, correct?

A. Yes. As I explained, I did not feel that the First Bank's capital structure cost of capital was relevant since I was doing an analysis of the damages at River Valley, damages that were done in 1990, and was seeking a method to give a measure of those damages and the mitigation costs associated with a portion of those damages during this period.

Q. Now, assume River Valley exists today. Do you believe that its cost of equity capital is 20 percent today?

MR. JOHNSON: Objection, incomplete hypothetical.

THE WITNESS: I think what I said is I've used that cost of capital that was defined at the time or relatively shortly after the time that the damages occurred and have used that throughout this period. I do not have an opinion with respect to what it would cost River Valley today because, as you have said, River Valley may not be in its same structure as it was at the time.

BY MR. ROBERSON:

Q. And that would be true -- you don't have an opinion with respect to River Valley's cost of equity capital for any period of time after the First Bank acquisition, is that correct, in 1995?

A. I felt like the -- I felt like that the 20 percent cost of capital was a reasonable metric for the cost of capital for River Valley throughout this period starting at the time of the -- starting as a measure of the time of the damages in 1990. I would -- in terms of the -- in general, I would still believe that 20 percent is a conservative number.

Q. For the entire period?
A. Yes.
Q. And why do you believe that 20 percent cost of capital is conservative for River Valley's cost of funds today assuming that River Valley exists?
MR. JOHNSON: Objection, mischaracterizes the testimony and incomplete hypothetical. Answer if you're able, Dr. Holland.
THE WITNESS: Assuming that River Valley exists and it is owned by a shareholder, I believe that the shareholder would expect a 20 percent or greater return on its equity capital.
BY MR. ROBERSON:
Q. My question is why.
A. River Valley, to the best of my knowledge, does not have access to the public markets, its stock would not be liquid, it would have a set of risks of a private company in a business that has a variety of risks that one would assess. And I don't believe that 20 percent is a -- I think 20 percent is a lower threshold of what people would invest in a privately

its cost of capital?

A. Yes.

Q. Now, you calculate mitigation costs through 2013, correct?

A. Correct.

Q. But you discount the damages from 2008 through 2013 back to 2007, the expected date of the trial, correct?

A. That's correct.

Q. And when you present value those future damages back to 2007, you use the same 20 percent that you believe would be River Valley's cost of equity capital, correct?

A. Correct.

Q. Now, if River Valley was damaged at the time of the breach, shouldn't you be discounting back to the time of the breach?

MR. JOHNSON: Objection, calls for a legal conclusion.

THE WITNESS: The aspect of how to present value future costs and the cost between the time of the breach and the trial is a set of instructions

that I got from counsel.

BY MR. ROBERSON:

Q. As an economic matter, you can't opine on that issue?

A. As an economic matter -- as I said, I've gotten instructions as to how to do that based on my understanding of the precedents or at least I've got those instructions.

As an economic matter, I haven't thought about the question. I think the total amount of damages through 2007 are as presented. I think as an economic matter, it is appropriate to take the present value of future damages, of future costs, I should say, and it was my opinion that the most conservative way to do that was to use the cost of capital as a discount rate.

Q. It's your opinion that River Valley was damaged at the time of the breach?

A. Yes.

Q. And then you got an instruction not to discount back to the time of the breach, is that correct?

A. Correct.
Q. And did Michael Johnson give you that instruction?
A. Yes.
Q. Did anyone else give you that instruction?
A. I don't believe so.
Q. And is that the sole reason, then, that you didn't discount back to the time of the breach?
A. I didn't -- I mean, I agreed with that decision. I think that it does measure the damages through the time of the trial and I think that kind of the -- so I do think it's appropriate but I think it was primarily based on instructions.
Q. Now, if the Court ordered you to measure damages as of July 1990, you would use the same discount rate of 20 percent, isn't that correct?
MR. JOHNSON: Objection, calls for speculation, incomplete hypothetical.
THE WITNESS: I would have to look at that and decide whether that is the appropriate discount rate or not.
BY MR. ROBERSON:

Incorporated, so I take it you didn't make any determination or you haven't analyzed or you have no knowledge or any awareness of how First Bank invested its retained earnings, is that correct?

A. I have not looked at First Bank's retained earnings, no.

Q. Now, isn't it true that River Valley paid very little in the way of taxes during the 1990 through '94 time period?

A. River Valley had bargained for, as part of the assistance agreements, to be able to use the net operating loss carry forwards of the failed institutions that it took over with, in some cases, a requirement to pay the government for a portion of the tax savings.

So it was required to use the tax loss carry forwards in order to meet those obligations to the government. And as a result, the tax loss carry forwards meant that the taxable income did not result in payments to the IRS.

Q. Which is to say that River Valley paid very little in the way of taxes during the 1990 to

'94 time period, correct?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I think I did answer it, that they did use their tax loss carry forwards in lieu of -- and as those were used up, they sheltered the taxable income of River Valley, but for an alternative minimum tax that still was paid.

BY MR. ROBERSON:

Q. And the alternative minimum tax was a very small amount of taxes during the 1990 through 1994 time period? For 1990 through 1994.

A. It was -- I believe that the alternative minimum tax rate was in the 2 percent range.

Q. Now, what is your basis for believing that River Valley actually paid taxes of 35 percent on the investment earnings associated with retained earnings during this period of time?

MR. JOHNSON: Objection, lacks foundation.

THE WITNESS: I don't think that I said that River Valley paid a 35 percent tax rate on the earnings on retained earnings. What I did use is an

after tax rate for the offsetting interest on the interest rate, and the reason for that is that while tax loss -- while, in reality, the income that was earned by River Valley was sheltered by NOLs, the NOLs were a finite resource. As an NOL was used up for income of River Valley, it was then -- it was then not available for the next dollar of income. So at the margin, our effective tax rate was 35 percent.

BY MR. ROBERSON:

Q. And so you're saying that in the actual world, the retained earnings would be in the margin and, therefore, you actually did pay 35 percent tax on those retained earnings?

MR. JOHNSON: Objection, mischaracterizes the testimony.

THE WITNESS: I said that at the margin, the effective tax rate was 35 percent. Once River Valley's earnings -- once the NOLs were used up, the effective tax rate of River Valley was 35 percent. I used that rate to calculate an after tax rate for the Treasury yield that was used in the calculations.

BY MR. ROBERSON:

Q. And just to be clear, you believe that that's accurate with respect to the actual world?

A. I'm saying I think that is the correct methodology for looking at an after tax rate. The fact that the NOLs were -- because the NOLs were a finite resource and also a resource that only had a limited life, that at the margin, one should use a 35 percent tax rate, which is what I did.

Q. Well, why wouldn't you have used the alternative minimum tax rate?

A. Because the NOLs were a finite resource, that the appropriate rate is to use the underlying rate. If the -- once the NOLs are used up, it's a 35 percent rate. If I use the NOLs for the purpose of one set of income, then it's not available for another set of income and so 35 percent I believe is the correct rate to use.

Q. Did you analyze whether the NOLs were completely used up wholly apart from the sheltering of income with respect to retained earnings during this period of time?

MR. JOHNSON: Objection, relevance.

THE WITNESS: I did not look at that in particular. It was my understanding that, again, because the NOLs are a finite resource, that one needs to look at the -- if I, if would use the NOL on one set of assets, then that would -- one set of income, then that would not make it available for another set of income, so the appropriate method is to -- is to use the underlying tax rate to get at an after tax equivalent yield. Equivalent yield.

BY MR. ROBERSON:

Q. I want to turn your attention back to the $4.6 million tranche of subdebt.

A. Yes.

Q. Now, in paragraph 46 of your report, it's on page 14. You state, in the first sentence, "Because of the breach in December 1990, River Valley exercised its option to redeem the $4.6 million tranche of subdebt prior to maturity." Are you with me?

A. Yes, I am.

Q. So according to you, because of the breach, you replaced the subordinated debt with

with respect to that. I don't think there is any -- there is no purpose, in my mind, of discounting and trying to -- in discounting those costs. I just don't see the purpose of that.

BY MR. ROBERSON:

Q. Now, if the trial was delayed until December of 2008, the damages that you have calculated in 2008 would increase with the passage of time by 20 percent per your methodology, isn't that correct?

A. I don't know that the damages would increase by 20 percent. The methodology -- and I would have to look at the tables. We could tell by the table.

But the amount -- and going back to what we've done, what I've done is take the costs from 1990 to the anticipated time of the trial and accumulated those. Then I have taken those projections out beyond the time of the trial and I have discounted those back using the 20 percent rate.

It is true that if the trial went further, then there would be a number of costs that wouldn't

be discounted because they would be in the present time frame and some of the costs that had been discounted -- and those costs would no longer be discounted, those costs that were attributable for the quarters in between 2007 and 2008. I don't know if that is 20 percent.

Q. Well, weren't you discounting at 20 percent?

A. You said the damages would increase by 20 percent.

Q. Right.

A. Are you talking about total damages? What are you talking about?

Q. No, no, I'm talking about the damages for 2008.

A. The damages for 2008, I would have to look at it because it's a quarter-by-quarter analysis and I don't know that it would be a total of 20 percent. There would be some change in those numbers.

Q. Well, wouldn't it be, the 20 percent discount that you now use for 2008 wouldn't be there, accordingly, the calculations for 2008 wouldn't be

discounted and therefore would increase by the 20 percent discount rate that you now apply?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I think the point I'm making is that there are four quarterly costs and those four quarterly costs are discounted at a -- for one quarter, one quarterly cost is discounted for one quarter, the second quarterly cost is discounted for two quarters, the third quarterly cost is discounted for three quarters, the fourth quarterly cost is discounted for four quarters. The result of that may not be a difference of 20 percent.

BY MR. ROBERSON:

Q. It would be close to 20 percent, I take it? You're just talking about sort of fine points?

A. Probably substantially less than 20 percent.

Q. Okay. All right.

A. But I grant you that it would be more than -- the undiscounted amount would be more than the discounted amount.

Q. And so there is not -- in the Court's liability opinions, it didn't refer to Dr. Murphy's expert reports in any fashion, did it?

A. Not to my knowledge, that it looked -- I don't know that the Court has reviewed Dr. Murphy's schedule. I believe the Court has reviewed the documents with respect to the parameters for the amortization and I believe that Dr. Murphy's schedule corresponds to that.

Q. And that's what you refer to as the particular amortization schedule?

A. Yes.

Q. And I take it the same -- your answer would be the same with respect to paragraph 21 where you say the same thing, that the Court has held a particular amortization schedule applies?

A. Yes.

Q. You're saying that you think the Court set forth a particular -- or a set of parameters for the amortization schedule which is consistent with or is followed by Dr. Murphy in his particular amortization schedule?

A. I believe in the various liability motions and so forth, there was material that contained the contracts -- I'll use that -- the contracts with respect to the supervisory goodwill and with respect to capital credits. And I believe that Dr. Murphy's amortization schedule is consistent with that.

Q. So that's a little different than saying that the Court held a particular amortization schedule applied, correct?

A. I guess that -- held that a particular amortization schedule, a schedule is the application of some calculations. I think that the amortization -- maybe scheme would be a different, would be another word that could be used there. Parameters is another word that could be used there. And -- and -- and I think that that follows through in Dr. Murphy's expert report.

Q. When you say that maybe scheme would be another word or parameters would be another word that could be used there, where do you mean it could be used? Where in this sentence?

A. Where it says a particular amortization