# EXHIBIT B

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**NEIL B. MURPHY EXPERT DEPOSITION DESIGNATIONS**

10/11/2001 Tr. 6:2-14
10/11/2001 Tr. 7:21-24
10/11/2001 Tr. 9:18-21
10/11/2001 Tr. 11:1-19
10/11/2001 Tr. 11:24 – 12:4
10/11/2001 Tr. 15:8-16
10/11/2001 Tr. 23:12-17
10/11/2001 Tr. 25:9-11
10/11/2001 Tr. 32:15-17
10/11/2001 Tr. 35:14 – 36:3
10/11/2001 Tr. 36:8-16
10/11/2001 Tr. 53:10 – 54:5
10/11/2001 Tr. 56:14 – 58:3
10/11/2001 Tr. 58:16 – 60:7
10/11/2001 Tr. 65:7-18
10/11/2001 Tr. 98:20 – 99:21
10/11/2001 Tr. 127:9-24
10/11/2001 Tr. 129:3-12
10/11/2001 Tr. 137:13-19
10/11/2001 Tr. 138:22 – 139:1
10/11/2001 Tr. 148:16 – 149:4
10/11/2001 Tr. 150:21 – 152:2
10/11/2001 Tr. 168:23 – 169:6

10/12/2001 Tr. 197:3-9
10/12/2001 Tr. 226:2 – 227:2
10/12/2001 Tr. 237:7-9
10/12/2001 Tr. 237:18 – 238:17
10/12/2001 Tr. 241:18-22
10/12/2001 Tr. 242:17 – 243:11
10/12/2001 Tr. 243:25 – 244:11
10/12/2001 Tr. 249:23-25
10/12/2001 Tr. 252:4-8
10/12/2001 Tr. 252:21 – 253:6
10/12/2001 Tr. 256:14 – 257:7
10/12/2001 Tr. 260:22 – 261:8
10/12/2001 Tr. 261:20-23
10/12/2001 Tr. 262:21 – 263:19
10/12/2001 Tr. 265:2 – 266:25
10/12/2001 Tr. 267:4-8
10/12/2001 Tr. 270:9-20
10/12/2001 Tr. 272:1 – 273:1
10/12/2001 Tr. 273:10-21
10/12/2001 Tr. 275:2-11
10/12/2001 Tr. 276:11-17
10/12/2001 Tr. 321:18 – 322:10
10/12/2001 Tr. 322:16-19
10/12/2001 Tr. 323:2-7
10/12/2001 Tr. 358:10-13

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -X

HOMER J. HOLLAND and :

HOWARD R. ROSS, :

Plaintiffs, :

v. : No. 95-524C

UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - -X

Certified Copy

Washington, D.C.

Thursday, October 11, 2001

Deposition of NEIL B. MURPHY, Ph.D., a Witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by Paul A. Gasparotti, a Notary Public in and for the State of Maryland, taken at the offices of Arnold & Porter, 555 12th Street Northwest, Washington, D.C., at 9:08 a.m., Thursday, October 11, 2001, and the proceedings being taken down by Stenotype by Paul A. Gasparotti, and transcribed under his direction.

APPEARANCES:

On behalf of the Plaintiff:

DAVID B. BERGMAN, ESQ.
WALTER F. ZENNER, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5474

On behalf of the Defendant:

PATRICIA A. SMITH, ESQ.
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-8841

ALSO PRESENT:

JEFF NIELSEN, Consultant
LISA HARDESTY, Consultant
JONATHAN PERRY, Videographer

over some preliminaries to the deposition first. Have you been deposed before?

A. Yes.

Q. How many times?

A. My recollection is once.

Q. And was that as an expert witness in a case?

A. Yes.

Q. How long ago was that?

A. Over 20 years ago.

Q. What was the expertise that you were testifying regarding?

A. It was on an antitrust case having to do with mergers of financial institutions.

Q. Discussing a couple more of the preliminaries, I ask that you respond verbally so the court reporter can get down all your answers.

A. Yes.

Q. Also, that you wait until I finish asking a question before you answer so that the court reporter doesn't have two of us talking at the same time.

A. I will do my best.

Q. I will try as well to do my best. If you don't understand a question at some point,

please let me know and I will try to clarify it. If you think of an answer later in the deposition to an earlier question, please let us know and we can go back. If you need a break at any time, let us know and we can arrange that. Is that all understandable?

A. That's fine, thank you.

Q. Turning back just a minute to your prior deposition, do you recall specifically what regarding the mergers in the antitrust your testimony was?

A. It had to do with market definition in the consumer finance industry.

Q. And by that you mean?

A. I meant the specification of the relevant market in an antitrust case. There are two things in antitrust, one is the relevant product market, and the other is the geographic market, and this had to do with the definition of the product market.

Q. And was your testimony in that deposition in any way related to the testimony you will be providing today?

A. No.

MS. SMITH: I would have the court

operations all over the country, so it was the entire nation.

Q. When did you first learn about this case, Dr. Murphy?

A. This particular case?

Q. Yes.

A. I think it was in December of last year.

Q. And did you have knowledge of any other Winstar related cases prior to this case?

A. I was aware of the existence of the Winstar cases, but only to the extent that some of my colleagues had been expert witnesses and I had some curiosity, but not detailed information.

Q. Colleagues at the university you work at?

A. Yeah, former colleagues.

Q. And who were you first contacted about, regarding becoming an expert in this case?

A. I received a phone call from Homer Holland.

Q. And what did you and Mr. Holland discuss?

A. We didn't discuss anything. He left a message on my answering machine.

Q. What do you recall regarding the substance of the conversations that you had with Homer Holland?

A. Well, first I greeted Mr. Holland because we knew each other many years ago, and I think that was the reason for him contacting me originally. When I worked for the FDIC a number of years ago I taught at George Washington University as an adjunct in the graduate finance program and Mr. Holland was one of my students. He and I struck up a friendship as a consequence of that because frankly, he was as bright a student as I have ever seen in any of my years of teaching, and he had a strong interest in finance, and we maintained contact over the years, although I must say that I think the last time I had any contact with him, he was with Exchange National Bank in Chicago and that probably would have been about 20 years ago.

We then discussed the issues in the case, but most of my contact with the, or my dealings and analysis has been with Mr. Bergman and his associates.

Q. And what did Mr. Holland tell you about the issues in the case?

A. He indicated that there was, this was one of the Winstar cases, and that he and his partner were suing for damages under those cases, as one of those cases.

Q. Did he indicate anything else?

A. I can't remember in detail, but that was the sum and substance I think of our discussions.

Q. What was your knowledge at the time of the Winstar related cases?

A. That there was a legal determination, which is of course beyond my expertise, that the disallowance of the regulatory capital was a breach of contract, and that if that were the case, damages would have to be calculated, and that my job was to try to figure out what those were.

Q. Do you have any understanding whether -- let me rephrase that. When you indicate a legal determination, are you talking about any specific legal decision that you were aware of?

A. My understanding is it was the Winstar case.

Q. From the Supreme Court?

Presidential commission, I have done it at the agency research level, I have done it as a scholar, I have done it as an academic in the private sector, consulting and research. So it's pretty hard for me to say which one is disentangled from my whole career and say which is pertinent, I think it all is.

Q. Have you previously ever attempted to make a determination of damages?

MR. BERGMAN: When you say damages, do you mean in a litigation context?

BY MS. SMITH:

Q. In a litigation context.

A. No. As I say, my -- you asked me before about the litigation and they were mostly antitrust cases.

Q. Did you teach any courses related to FIRREA or the performance of the thrifts in either the 1980s or 1990s?

A. I teach courses in financial institutions and markets, so it's pretty hard not to cover that. I have been working, for example, on the question of other countries implementing deposit insurance programs, so the whole question of deposit insurance and its implementation and

futures contract, all of these are valuation driven, so it's hard for me to, I don't want to be unresponsive, but that's the nature of the discipline.

Q. Are there specific types of financial institutions that you would consider yourself more of an expert in with respect to valuations?

A. I think my study has been in the banking and financial institutions, primarily.

Q. Would that include thrift institutions?

A. Yes.

Q. In the work that you have done over the years, have you ever performed a valuation of a bank or a thrift for any client?

A. An individual bank?

Q. Yes.

A. I can't recall. I would say no.

Q. Have you while working at any of the various places you have worked performed valuation of a thrift or a bank?

A. I have done consulting work that involved thrifts, support for thrift management. I don't know if you would call that valuation. I did work for the Massachusetts Savings Bank that involved a great deal of empirical analysis of

(Pause.)

Q. Dr. Murphy, would you consider, or do you consider the cost study you have just described to be a valuation?

A. No. It assisted people to increase the value of their institutions, and it was not a valuation. It had to do in the end with improving valuation, or that was the intent.

Q. Have you performed valuations of any financial instruments for any clients?

A. No. Let me -- once again, I'm not sure. This summer I worked with the deposit insurance agency in Colombia, in Bogota, to develop a, help them develop a mortgage-backed securities market in which they would provide the guarantee to the investors for the secondary mortgage market or the mortgage-backed securities. I was working on modeling, helping them with modeling the -- well, valuing the mortgages, valuing the portfolio and valuing what fund they would need to provide the guarantee and what assessment they would need to charge to have that be a financially viable operation, so that's what I did. Whether you call that valuation or not, I don't know.

the scope of the report, beyond the scope of the intention of this deposition, and I ask that you restrict your questions to matters on which Mr. Murphy has provided an opinion.

BY MS. SMITH:

Q. Mr. Murphy, I'm sorry, Dr. Murphy, in your opinion, does a breach automatically imply lost profits?

A. I don't -- it's hard for me to answer that, does it automatically? I would think one would have to do what I described and go back and analyze the situation in detail. I feel uncomfortable making broad sweeping statements when we are talking about a specific case, and --

Q. In this case, are you reasonably certain that there were lost profits?

A. Yes.

Q. But you have not undertaken an analysis to determine that?

A. I have not, no.

Q. How can you be reasonably certain there were lost profits if you have not performed an analysis?

MR. BERGMAN: That I think misstates the witness's testimony. I believe he said he

A. Are regularly revised?

Q. Revised, you know, in any given year.

A. Yeah, business plans are working documents.

Q. And do you know whether the regulators provided criticism of the business plans that had been submitted?

A. I would have to go back and review. I have no recollection of that. My recollection of the testimony of the regulators involved in this case is that they were always very supportive of the plaintiffs in their business methods and their business activities.

Q. Why are business plans working documents?

A. Because the environment changes.

Q. What in the environment changes?

A. There could be a number of them. The interest rate scenarios could change, the macroeconomic environment could change, the economy of the local area where the institution is located could change.

Q. Any other environments?

A. The regulatory environment could change as well.

Q. Any other environmental factors that you can think of?

A. The labor markets, the technology.

Q. And these are all factors as well that would affect whether a thrift would meet the goals in its business plan?

A. Yeah.

Q. Any other factors than those that would affect whether a thrift would meet the goal in its business plan?

A. The interest rate scenario, the macro environment, the local environment, the technology, the development of new financial instruments and markets, the productivity, those are the sorts of things that would affect the ability to fulfill the plan.

Q. On page 2 of your report, the second sentence under paragraph 6, you state that you understand that in the course of acquiring five insolvent thrift institutions, Holland and Ross contracted with the government for regulatory capital treatment of capital credits, subordinated debt, preferred stock and supervisory goodwill. What is the basis for your understanding that Holland and Ross contracted with the government

advise a client is that you're not an investment banker?

A. No one has asked me.

Q. If they were to?

A. It's a hypothetical, I can't answer it. Since nobody has done it, it's hard for me to determine what I would say.

Q. Why is that?

A. It's a situation I haven't encountered.

Q. Do you have an opinion as to whether it is more expensive to replace capital than to raise capital?

A. I think it's -- I am not exactly sure what the distinction is between replacing and raising.

Q. Do you draw a distinction between the two?

A. I mean, I am asking you to clarify, if you would.

Q. Well, I'm asking you at this point whether you would distinguish between replacing capital and raising capital, whether you see those as two different things or one?

MR. BERGMAN: What context are you talking about?

BY MS. SMITH:

Q. Generally.

A. Generally, once again, if one is looking at a situation that is going forward from today, I don't think there is a distinction. If you were going to replace capital with some other capital, that you would evaluate the costs and benefits of doing so prospectively into the future and make a decision, and that's not what we're doing here. We're looking back at a situation and saying what is an approach, a logical approach to do a calculation of what it would have cost if they had replaced that capital, given the scenario as it existed at that time. I don't know if that answers your question.

Q. Why would a prospective approach not be appropriate here?

A. Because it's 19, it's 2001 and this occurred in July of 1990.

Q. Why does the methodology that you would use today to look forward, why would that not be applicable to events in the past?

A. I'm not sure that the logical approach would be any different. I'm saying I don't do that, that's not my assignment, it's not something

core of analyzing such a situation, my understanding would be the same. So you know, the answer is, I guess that the approach is the same, but I, in my view, but that, do I do this for a living for people that are raising capital, and the answer is no.

Q. When you're stating just now the approach would be the same, what are you referring to?

A. I'm referring to standard financial analysis, present value analysis, cost of, minimizing the cost of capital analysis, would be the same.

Q. Do you consider cost of raising capital to a thrift to be equal to the transaction costs?

A. That's one part of it.

Q. What other parts are there?

A. One would have to look at the costs of the cash outlay over time, and the cost of the capital that had been replaced, and net them out, and figure their present values. That's basically the approach taken here. It's not just the transactions costs.

Q. Why is it that it's not just the transaction costs?

A. There are substantial outlays of cash over time, and there are substantial, there are -- those effects have to be taken into account. I try to take into account the net costs and the effect of raising cash, tax position, and the transactions costs, that all of these determine the present value cost to the institution of doing a replacement.

Q. If a thrift is raising capital rather than replacing capital in order to pursue profitable opportunities, are there costs to raising the capital other than transaction costs?

A. Yes.

Q. Why is that?

A. Depending on the form of the capital, there are interest costs, dividend costs, there is the cost of equity, all of these costs would have to be considered when any institution is making such a financial decision

Q. Is there a net cost?

A. I think if they were retiring capital in the process, I think they would consider that.

Q. They would consider what?

A. Well, I mean, let's go back. The question had to do if they were issuing new

capital?

Q. Right, would there be a net cost?

A. No.

Q. And why not?

A. Because there is a net addition to the capital position of the organization. What we're talking about here is, if I can use the language of a breach, that there was capital disallowed and for regulatory purposes, that particular form of capital had to be replaced. That capital had, so the cost of the, the net effect of replacing for example debt which has a certain interest cost with dividends which had certain dividend costs, and the tax implications would have to be considered in this case.

Q. Is it fair to say that in your report you have estimated that the net present value cost of raising $27.4 million of preferred stock is $19.386 million?

MR. BERGMAN: What page are you on?

MS. SMITH: It's throughout, but paragraph 38 might give you some of the numbers.

MR. BERGMAN: Can you read the question back for the record, Mr. Court Reporter?

THE REPORTER: Is it fair to say that

in your report you have estimated that the net present value cost of raising $27.4 million of preferred stock is $19.386 million?

MR. BERGMAN: You're asking whether -- I mean, it seems obvious there are two calculations there. One is discounted to time of the breach and one is not.

MS. SMITH: Mr. Bergman, if you could let your witness answer the question.

MR. BERGMAN: Okay. I don't understand the question, I don't believe there is foundation for the question.

THE WITNESS: You asked me about a number on my table that's in paragraph 38 and on Table 6, and the number in both cases is $19,836,000 and that this is however, I hasten to point out that in this particular calculation, that counsel asked me to calculate this as of the date of the breach, which I did. Table 5 I did the same thing as of the date of the, sort of the anticipated date of the trial.

BY MS. SMITH:

Q. But that amount is what you have estimated to be the net present value cost of raising 27.4 million of preferred stock?

MR. BERGMAN: What amount?

THE WITNESS: The 19 or the 27?

BY MS. SMITH:

Q. Yes, the 19.

A. Under the assumption that it's discounted back to the date of the breach, which is July 1990.

Q. But again, that's the net present value cost; is that correct?

A. Yes, it's the present value of the net cost, right.

Q. If a thrift issues $100 million worth of stock on a particular day, and in turn receives $100 million in cash from the investors, what is the net present value of that transaction on that particular day?

A. On that day?

Q. Yes.

A. The net present value, you would have to project out the -- you would have to calculate the cost of the equity and the return on the stock.

Q. For example, if you by $100 million worth of IBM stock, what is the present value of that series of future cash flows?

THE VIDEOGRAPHER: The time is 11:18. This is the beginning of tape number two and we're back on the record.

BY MS. SMITH:

Q. Discussing the IBM hypothetical again, Dr. Murphy, is it fair to say that IBM would record an asset equal to the proceeds it received, presumably the 100 million, from issuing the securities while the new investors would have been an equal and offsetting claim, presumably 100 million, on the equity of the firm?

A. Yeah, accounting 100 on the asset, 100 on the liability and 100 on the assets.

Q. That was yes?

A. Yes.

Q. Under this hypothetical, is IBM any better or worse off financially on the day of the transaction, other than the transaction costs?

A. Again, one would have to assess the investment opportunities, one would have to calculate the costs of issuing the stock, and assess their prospects to determine whether they are better off or not.

Q. On the actual date --

A. It's not -- is IBM worth more as a

assets to equity or assets or earning assets, and because in this situation the funding costs are relatively low, there is positive spread income, positive spread income that is the difference between what they pay to their fund depositors and other fund suppliers and what they earn on their lending and investing.

In the normal, in a noninsured environment, as leverage increased, you don't know what the net outcome is going to be or the net effect is going to be necessarily, because as that happens, their cost of borrowing goes up usually as the cost of capital, but that doesn't exist in the insured depository environment for insured depositors.

Q. Is increased leverage accompanied by higher anticipated returns?

A. In this industry, to -- returns to the owners, to whom?

Q. In general, is increased leverage accompanied by higher anticipated returns?

A. To whom?

Q. Whoever -- to the owners?

A. Yes.

Q. Does increased leverage guarantee an

increased return?

A. No. The only guarantee that's relevant is the guarantee that the federal, that the deposit insurance agency makes, which is central to the analysis.

Q. Does increased leverage also increase the risk?

A. In general?

Q. In general.

A. It depends on the management of the institution, what they do. If they increase their liabilities, they increase their assets, it depends on how they deploy those assets, how shrewdly, and some do, some don't.

Q. So you don't believe that increased leverage will increase the risk necessarily?

A. It could, but you're asking me in this situation or in general?

Q. In general.

A. As I said, it depends on what the owners and managers do with those funds.

Q. You stated in paragraph 14 of your report that the government agency providing the guarantee is concerned with the amount of leverage on the part of the thrift and that one method of

THE VIDEOGRAPHER: The time is now 2:01 p.m. This is the beginning of tape number three, we're back on the record.

BY MS. SMITH:

Q. Dr. Murphy, your replacement cost of capital methodology, does that assume that the capital could be replaced if fully leveraged?

A. No. No, I don't think so.

Q. In paragraph 22 on page 8 of your report, you indicate that in resolving troubled thrifts the FSLIC entered into transactions that allowed thrift acquirers to utilize regulatory capital especially designed and authorized to expand a thrift's balance sheet and to realize enhanced spread income. Are you aware of any guarantee by FSLIC that participating thrifts would enjoy enhanced spread income from such balance sheet expansion?

A. The sentence says it would allow them to, it doesn't say it either required or guaranteed them.

Q. And what I'm asking is are you aware of any guarantee by FSLIC?

A. No.

Q. Are you aware of any thrifts that did

that over time, compared to the cost of liquidation.

Q. Would you agree that FSLIC ultimately bore the risk for thrifts if the resulting thrift was unsuccessful and became insolvent?

A. Yes but that, again, that wasn't the intention, the intention was in hopes that it would not become insolvent, and the question is how did it become insolvent, did it become insolvent as a result of its own action or as a result of the disallowance of the regulatory capital.

Q. In paragraph 22 you also state that, by these transactions, FSLIC authorized acquirers to us assets acquired with insured deposits that did not require collateral to serve as collateral for low cost secured borrowings. What is the basis for that statement?

A. First of all, I would have rewritten entity that and not have the word collateral appear, the three words from each other. Basically the insured depositor does not require the, as a condition of placing the deposit, does not require the bank to, or the thrift to pledge collateral. That being the case, the thrift can

which I familiarized myself with what they did, I looked at the reports, I also reviewed the depositions of the regulators and they were, several were very very favorable in their assessment, and so I concluded from all of this as well as my analysis of the data that that was indeed the case.

MR. BERGMAN: Tricia, when you're at a natural breaking point, if we could break, that would be great.

MS. SMITH: Two minutes.

BY MS. SMITH:

Q. With respect to your statement that you're reasonably certain that River Valley would have achieved substantially greater profits, I just want to make sure again that you haven't attempted to quantify those profits in any way; is that correct?

A. Right.

MS. SMITH: Why don't we break.

THE VIDEOGRAPHER: The time is 2:22, we're going off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 2:39:47. We are back on the record.

BY MS. SMITH:

Q. Dr. Murphy, when you as a regulator approved merger applications that were based on business plans, do you know if the institution whose plans you were reviewing met the projections in their business plans?

A. No, I don't. Let me indicate that when the application was approved, assuming it was, it might have been not approved for a number of reasons, my group's connection to the transaction stopped. Now clearly that institution would have a continuing relationship with the examination staff and division, but I would have no knowledge of how they monitored those. I assume they paid attention to them but I have no knowledge of how or whether, the extent to which they rigorously enforced those, I wouldn't know. As you know, examination reports are confidential documents, I was in a research department so that as a practical matter, the only things I ever saw were the ones that I worked on.

Q. Would you agree that there is no guarantee that any thrift or bank will meet the projections that they set forth in a business plan?

A. That is true of any business plan. I do one myself every year and my boss checks to see whether I did what I said I would do.

Q. Have you ever fully met your projections in a business plan?

A. Occasionally I exceed them.

Q. Let me show you a couple documents relating to the issue of the capital credits. I just wanted to make sure I was clear on what you had indicated earlier. If not, if you would agree with this, that in determining what it would have cost River Valley to replace the capital credits, you did not consider the restrictions that were imposed upon them. Is that fair to say?

MR. BERGMAN: Objection. You can answer if you understand the question.

THE WITNESS: That I, the question is did I did not consider restrictions? I did not. I don't see why I would. No, I did not.

MS. SMITH: I'm going to have the court reporter mark as Exhibit 2 a July 12th, 1988 document entitled S-Memorandum Supplement Regarding the Acquisition of Galva Home Mutual, with a Bates range number of WOF-0162430 through 2434, and also have him mark as Exhibit 3 a

A. Yeah, right.
Q. Are you aware of any restrictions with respect to the regulatory capital, I'm sorry, with respect to capital credits that relate to the acquisition of Republic by Rock Falls?
A. Specifically, no.
Q. And if I were to ask you the same line of questions and show you similar documents with similar language to what we've pointed to in Exhibits 2 and 3, your answers would be the same?
A. Yes.
Q. What was the basis for your amortizing the capital credit?
A. I don't understand what you mean, the basis.
Q. How did you determine the methodology to amortize the capital credit?
A. That was supplied by Mr. Pikus.
Q. Was that from item 261 of the materials considered in your report?
A. That looks like it. I would have to review it, but Mr. Pikus -- in other words, there is a schedule of beginning and ending capital, we averaged it to get the average during the year, and the beginning and ending was based on an

amortization schedule that he provided.

Q. Did you independently attempt to verify the information?

A. No, I had no reason to do that.

Q. Under your methodology, did you assume that the entire amount of River Valley's capital credit would be replaced with a hypothetical preferred stock in July 1990?

A. Right.

Q. So you didn't account for the fact that a portion of it could be utilized after FIRREA?

A. Well, again, I would utilize what Mr. Pikus gave me in terms of determining the amortization and what was replaced and when it was replaced.

Q. But is it, do you know based on what Mr. Pikus gave you, whether any portion of the capital credit continued to be utilized to calculate core or risk-based capital?

A. I would have to go back and review the documents.

Q. Do you know whether some of the, or a portion of the capital credit could be utilized to count towards core and risk-based capital subsequent to FIRREA?

A. Once again, I would have to go back and review all the documents and my -- I don't remember the exact details regarding how long it took for that to phase out.

Q. But you recall generally that there was a phase-out period with respect to FIRREA?

A. That's my recollection.

Q. So you would agree then that a portion of the capital credit would count for core and risk-based capital subsequent to the passage of FIRREA?

MR. BERGMAN: Objection to form.

THE WITNESS: That's my understanding that was the case, about once again, I would want to review it in more detail.

BY MS. SMITH:

Q. Do you know over what period the capital credit was amortized?

A. Other than the period from 1990 to 2013. Well, I'm sorry, 1989 to 2013.

Q. In paragraph 27 of your report you refer to 3.81 one million unamortized supervisory goodwill. Where did you get that number from?

A. From Mr. Pikus.

Q. And did you do anything to

independently verify that number?

A. I had no reason to. I had looked at financial statements, but I had no reason to specifically go and do any further checking on that.

Q. Are you aware that portions of the goodwill were written off the books in '89 and '90?

A. Once again, my, the data for this were supplied by Mr. Pikus and once again, I assume that these are correct and whatever is appropriate in terms of keeping track of this were done properly, was done properly.

Q. Do you know how the amortization period for the Peoria goodwill was determined?

A. In terms of the numbers? Once again, all the numbers and all the tables were supplied by Mr. Pikus and again, I had no reason to question them. I assumed that he was instructed to do something and that he did it.

Q. In terms of the length of time over which the amortization took place, was that also just information you received from Mr. Pikus or did you independently verify what the period time should be?

A. I received the information and assumed it was correct and appropriate.

Q. Would you have any understanding as to what the amortization would be if it should have been amortized in accordance with GAAP?

A. It would have been shorter. I would have to go back an review GAAP as well.

Q. Who provided Mr. Pikus with the instructions for creating the tables that you utilized?

A. I assume it came from -- Mr. Pikus was an employee of the bank, and I assume that the management of the bank or -- I really can't answer that because I don't know how he came to do that. I just, I mean who did it?

Q. The information that he provided to you, do you have an understanding as to whether that was specifically created for your use for preparing your report?

A. I mean, I received the information, I asked for the information and I received it, and actually who did it, when, how and who told, I know it came from Mr. Pikus. Who told him to do it, I can't say, you would have to ask Mr. Pikus.

Q. When you asked for the information,

have been much higher.

Q. But what was the basis for assuming that FSLIC preferred would have been redeemed in the no-breach world?

A. That it was redeemed in the breach world. I mean it was one once again, a conservative working assumption that this was a form of -- well, first of all, it was part of the process of coping with the change in rules. And my recollection is that the cumulative feature was the part that was, that didn't comply with capital standards and that the FDIC would not renegotiate the cumulative feature but did offer to allow them to redeem and they did, so we cut it off at that point.

Q. Do you have an opinion regarding whether the redemption would have taken place at the same discount in the no-breach world?

A. Oh, yeah, I do, that the appropriate discount rate for valuing this was affected by the disallowance, and was, that rate was indeed higher.

Q. So in the no-breach world, would there have been any form of discount in your opinion?

A. You mean that they would have redeemed

it for something less than par value, no, I don't think so.

Q. Do you think they would have, if they were going to redeem it, the assumption is it would have been redeemed for par value?

A. Yes.

Q. If that's the case, would it be appropriate to modify your Table 2 in any way to indicate that?

MR. BERGMAN: To indicate what?

THE WITNESS: To indicate that the --

MS. SMITH: The stock was redeemed at par.

MR. BERGMAN: I'm sorry, I don't follow. Could you repeat that question?

THE WITNESS: This is basically that the amount preferred would be different, the replaced by preferred would be different?

BY MS. SMITH:

Q. Should there be an indication of the reduction, or a reduction of the gain that was recorded in the breach world?

A. Once again, I don't think so, no.

Q. When the stock was redeemed in the breach world, do you have an understanding that

U.S. COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

HOMER J. HOLLAND AND HOWARD :
R. ROSS, :
Plaintiffs, :
v. : Case No. 95-524C
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

**Certified Copy**

Washington, D.C.
Friday, October 12, 2001

Continued videotaped deposition of NEIL B. MURPHY, Ph.D., a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, 9th Floor, Washington, D.C., at 9:04 a.m., Friday, October 12, 2001, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:

DAVID B. BERGMAN, ESQ.
WALTER F. ZENNER, ESQ.
Arnold & Porter
555 12th Street, NW
Washington, D.C. 20004-1206
(202) 942-5474 (Bergman)
(202) 942-5720 (Zenner)

On behalf of the Defendant:

PATRICIA A. SMITH, ESQ.
U.S. DOJ, Civil Division
1100 L Street, NW
Washington, D.C. 20530
(202) 353-8841

ALSO PRESENT:

LISA HARDESTY, Consultant
JONATHAN PERRY, Videographer

Q. Morning, Dr. Murphy.
A. Good morning.
Q. I want to start with a few background questions this morning. Have you held any positions at financial institutions?
A. No. No. Uh, would you consider the FDIC a financial institution?
Q. Not from the regulatory side.
A. No, right.
Q. Okay. Have you served as a board member or anything along those lines?
A. Pardon me. No, no.
Q. No?
A. No.
Q. Okay. Have any of the articles that you have written related to thrift institutions?
A. Yes.
Q. Do you recall which articles?
A. I would have to go back and review, but one comes to mind, "Demand for Savings Deposits in Mutual Savings Banks" which appeared in the Journal of Finance. There was one on liquidity management and savings banks that appeared in the Journal of Financial and Quantitative Analysis. I think there were two articles on liquidity management that

this, and I think it's the right thing to do as well.

Q. Do you believe that the riskiness of the cash flows indicated in your replacement model are risk-free in nature?

A. What I'm saying is that the cash flows in the future have to be discounted back to a present -- to the present value based on the risk -- they are an estimate. And then you take the estimate and discount them back to the present value based on the risk attached to the person that owes the money. And it is just like when we said the cost of capital -- that the selection of that rate was based on, even though we had no actual -- I'm sorry. Even though we had to chose a replacement cost of capital, that was conditioned on the risk perception of the entity issuing the capital.

Here I think what we're talking about is the risk perception of the -- of the entity that is obligated to make the -- make the payment, and that that's the appropriate discount rate.

Q. Is it a principle in finance that have you to match the discount rate to the risk of the cash flow to be discounted?

A. Yeah, yes. But the risk -- the riskiness of the cash flows to some -- is determined by the

financial condition of the entity that is promising the cash flows.

Q. Would the -- did the dividend stream have a riskiness associated with it?

A. The -- once again we're trying to estimate the cost of -- of what the -- the replacement cost. And we're trying to figure out what the outlays would be, and then we're trying to figure out what the present value of those outlays would be, discounting back using a risk-free rate.

Now, there is also, as a matter of law I'm told that the government is not liable for any pre-trial interest and in the calculations we -- we didn't -- we didn't consider that. That's a matter of law in which I think it does make sense. But that's, you know, I just -- it occurs to me that the -- if it is determined that these cost flows are accurate to a reasonable certainty and then you want to discount them back to the present value, I think the government's risk-free rate is the appropriate rate and it is also the rate that I was told to use. Could we take a break?

THE VIDEOGRAPHER: The time is 10:03, we're going off the record.

(Recess.)

So I -- I consider this to be a situation in which the government itself was valuing the institution, pre-breach and post-breach and that the government had expert support and the FDIC an advisor, professional investment banker as an advisor in doing this.

Q. Is it your opinion that the change in value is entirely due to the alleged breach?

A. I can't think of anything else.

Q. If it were proven that certain non-breach factors had an effect on the value, would that change your methodology?

A. I -- I don't -- I'm not aware of any. The -- the owners ran the institution profitably before the breach and more importantly after the breach. Many of the managements of such institutions didn't. They did.

Q. Did you consider changing local, national or global economic conditions?

A. I considered the -- the effect of interest rate changes.

Q. And how would that have affected the value of the stock?

A. I -- that basically -- the interest rates had fallen between the two time periods and that

should have increased the value, rather than decrease it, and it did decrease it.

Q. Any other economic factors that you considered?

A. No.

Q. Did you consider any changes within the thrift industry including negative publicity?

A. In this case, no.

Q. Did you consider any changes within the capital markets?

A. To the extent that interest rates fell.

Q. Anything other than that?

A. No.

Q. Did you consider aspects of the FIRREA legislation that were separate and distinct from the alleged breaching provisions of FIRREA?

A. No.

Q. Did you consider changes in the financial condition in performance of River Valley including the thrift's failure to attract deposits and various non-capital related concerns that may have been addressed in the reports of examination?

A. Yes, I -- I looked at the reports of examination.

Q. Did you consider the changes in the

and they would like to realize as much as possible in the interest of maintaining the value of their fund.

Q. How --

A. Why -- why would they engage the services of a professional investment banker to value these things if they didn't want to maximize the value?

Q. How would the decline in interest rates have affected the discount?

A. Pardon me. The decline in interest rates would -- would have in -- increased and everything else kind of -- if the discount rate applied here, or if the -- the valuation, the appropriate discount rate went down as a consequence of all interest rates falling, the value of the stock would go up.

Q. Did you conduct an analysis of -- to determine how much it would have gone up by?

A. No. I know the direction.

Q. Did you take any steps to independently verify the valuation of the stock in 1988?

A. No, the FSLIC documents indicated how they valued it, I saw no reason to dispute their -- go beyond what they -- what they had indicated.

Q. Are you aware that they had certain qualifiers in their valuation?

A. I'm not -- I mean, I looked at the

document, but I -- I would have to review again.

Q. Assuming that it contained assumptions concerning the appropriate discount rates and projected income of the resulting association, would that cause you to question the validity of the valuation?

A. No, I don't think so, it's their valuation.

Q. Would the change in discount rates and the actual income of resulting association change the value of the stock?

A. Pardon. Pardon me? The change in --

Q. In the -- change in the interest rates which you've already indicated would change the value of the stock?

A. Right.

Q. And with a change in the project -- changed -- let me are rephrase that. The actual income was different than the projected income, would that change the value of the stock?

A. The value -- as of -- as of when?

Q. If the valuation is projecting income out.

A. The valuation on pre-breach was based on a set of assumptions, and if those turned out not to be true then the value would change?

Q. Yes, that's what I'm asking?

A. Yes.

Q. Are you aware that the 1988 valuation of the equity participation component of the preferred stock implied that a distribution would be made to FSLIC based on River Valley's projected performance in year 1?

A. That anything over 40 basis points of assets, any earnings in excess of 40 basis points of assets would be attributable to -- would be paid, yes. That sort of changes the nature of the preferred stock. I mean, all the questions thus far have been kind of implying that the preferred stock is a fixed-income instrument and this is kind of a hybrid between -- between common stock and preferred stock and that is, that should the institution have earnings in excess of 40.4 -- 40 basis points of total assets, that the FSLIC, F-S-L-I-C, would have a claim on such earnings, 25 percent of them would be -- all earnings in excess of that threshold.

Q. Do you know whether or not dividends on the equity participation were paid in year 1?

A. I would have to go back and review the -- the actual documents.

Q. Assuming that no dividends were paid on

the equity participation, do you have an understanding as to why that would be?

A. That the earnings were less than 40 basis points.

Q. Any reason other than that?

A. Well, I mean, that's -- that would be -- no, I don't have any -- any understanding of the great -- of the details. But my understanding was that there was an equity participation and, by FSLIC on any earnings that exceeded 40 basis points of assets.

(Murphy Exhibit No. 5 was marked for identification.)

MS. SMITH: Off the record.

THE VIDEOGRAPHER: We're going off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: The time is 10:52. We're back on the record.

BY MS. SMITH:

Q. Dr. Murphy, we're going to put aside Exhibit 5 for right now, we may talk about it a little later.

You are not sure one way or the other; is that correct, whether or not --

Q. Okay, well assuming that's the case here.

MR. BERGMAN: But may I just say, I'm looking at the last page of Exhibit 5 --

MS. SMITH: Counsel, the questions are to the witness.

MR. BERGMAN: But Patricia, there is a merger year and then there is a year 1.

MS. SMITH: Counsel, the questions are to the witness.

MR. BERGMAN: Where in here does it show profit participation and equity participation in year 1? Are you representing that it does?

MS. SMITH: Counsel, I've asked the witness questions.

THE WITNESS: The terms of the second memorandum has terms for, you know, the 8 percent generally of preferred stock and the shared-income benefit and values to shared-income benefit, and that didn't change from the first memorandum to the second.

But there is nothing in here that says exactly when the scheduled payments were and I'm not sure how -- if the payment wasn't made, I guess I assume that it's because they didn't make 40 basis points on their -- on assets.

determine whether or not -- whether 40 basis points on assets was a high threshold or not in that environment.

Q. Assuming prior to the breach that they did not meet their projected income goals, do you have any understanding as to why they may not have met those?

A. No, I don't.

Q. Do you consider the FSLIC valuations to be market-based?

A. To be -- I'm not sure what you mean by market-based. I think they used -- I look at this, they used market -- market rates. They -- there is reference to market rates at the time.

Q. Should they be considered or would you consider them an appropriate measure of market value?

A. The rates that they used?

Q. Right.

A. I have no reason to dispute their valuation.

Q. With respect to the 1991 valuation, did you attempt to independently verify the validity of that valuation?

A. The -- I'm not exactly what sure what you mean by attempt to. I reviewed the documents that

established that. Beyond that, no. Once again, I assumed that the FDIC and with the support of the Donaldson, Lufkin & Jenrette, or DLJ, that they, that they came to that assessment on -- based on professional advice and their own competence and I have no reason to dispute their valuation.

THE VIDEOGRAPHER: I have about two minutes left on this videotape.

MS. SMITH: Okay.

THE VIDEOGRAPHER: Time is 11:13 a.m.; we're going off the record. This is the end of tape number 1, going on to tape number 2.

(Recess.)

THE VIDEOGRAPHER: The time is 11:22 a.m. This is the beginning of tape number 2 and we're back on the record.

BY MS. SMITH:

Q. Dr. Murphy, what is the Gordon Growth Model and what is its purpose?

A. The Gordon Growth Model is -- it's a standard approach to valuing risky cash flows, and it's basically a discounted cash flow model and it -- as I say, it's standard. You'll find it in the same Brealey & Myers textbook that we've referred to before. It is a way of valuing those cash flows, it

using the model?

A. I think there are problems associated with using any model.

Q. What problems are there associated with using this model, the Gordon Growth Model?

A. Well, it has to -- you must have accurate estimates of all the inputs. It has to be assumed that the growth rate is less than the cost of capital, otherwise that denominator becomes negative and the thing is meaningless. There are adjustments to -- to deal with such situations. But once again, it's a -- it's a disciplined approach to trying to value these cash flows, but it's -- it's like any other model, if you were to apply it you would want to make sure or have comfort with the underlying assumptions and compare it with other -- other estimates or approaches to looking at this -- looking at the question at hand.

Q. Does it require that the dividend growth rate be a constant -- be constant?

A. Yes. As I said, if it's, there are adjustments. I mean if the -- the dividend growth rate is say, very fast for a while and then slows down, it is referred to as a super growth situation, in which case you would have to -- there are methods

to adjust the model until such time as the growth rate gets down to a steady state, a more steady state. But it does assume that growth rate is constant.

Q. And in your model you assumed that the growth rate was constant?

A. Right.

Q. Why do you believe that it's appropriate to use the Gordon Growth Model to estimate the value of the below-threshold earnings?

A. It seems to me that the inputs required are present here, and, you know, they are supplied by documents and individuals who have as part of their job estimated these things. And so it would seem to be -- I mean, I can't think of another way of approaching this valuation.

Q. Does the Gordon Growth Model require that a firm be sufficiently mature?

A. I'm not sure what you mean sufficiently mature. You said before does it require estimates of steady growth, does that imply maturity? I don't know what mature means.

Q. You're not aware of discussions regarding the Gordon Growth Model indicating that a firm has to have a certain maturity?

I -- as I say, I'm not sure exactly what you mean.
Q. Are you --
A. Is this -- is this a -- is this a model with -- that's perfect for everything? And I don't think any model is. Is this an approach, a logical approach that has required inputs to come to some kind of conclusion? And, I think it is.
Q. Are you aware of financial textbooks discussing sufficient maturity of a firm in general?
A. I would have to go back and look at the textbooks as to the use of the term maturity and sufficient maturity.
Q. Is sufficiently mature a term that you've heard before?
A. I don't recollect it in terms of -- in terms of this, I would have to go back and look.
Q. In terms of what? You said you don't recollect it in terms of this.
A. In terms of Gordon Growth Model.
Q. But in other contexts you recognize the term?
A. I -- once again I know what -- I think I know what maturity means, but I'm not sure how it applies to -- to this -- A, to this situation and B, in general how the term is used. But it is -- the

model is used primarily to evaluate companies requiring these inputs and that the extent to which these inputs are in doubt, reduces the usefulness of the model, but that's true of any model.

Q. Do you have any opinion as to how long a firm would need to be in existence before the Gordon Growth Model should be applied to it?

A. No.

Q. Were there any problems with assuming in your model that the growth rate is a constant?

A. I think that's a problem in any model.

Q. With respect to your model, can you identify what the problems are and why?

A. Well, we're talking about a discounted -- this is a discounted cash flow in which the cash flows are assumed to grow. And as in any model that is based on assumptions, the -- the assumptions are, to the extent they are not accurate, then -- then the model is less useful.

Q. Historically for River Valley, do you know whether its growth rate was constant?

A. No. I think its growth rate was affected by a number of factors, including the growth rate of earnings, that it was affected by the -- by the activities of previous management, it was affected by

the general sort of climate for thrift institutions. And, you know, I'm sure that all these factors enter in, you know, entered into their performance.

But if their performance had been pre, you know, owner -- pre -- under previous management had shown growth and earnings, and stable high quality earnings, we wouldn't be here. It don't. So the stability and -- of growth in the past for this institution, I don't think is relevant. I think what is relevant is the outlook as reflected in their overall management -- their overall performance and the assessments of the contemporaneous analysts as to what these -- what the outlook was.

And the one thing I keep remembering is that we -- the gentleman who put the -- the memorandum in Exhibit 5 together, stating that this is a very -- the outlook for this is that this is a very profitable institution. I think that's more relevant than what had happened in the past prior to their acquisition.

Q. Would it be appropriate to use the Gordon Growth Model for a firm that did not have stable growth rates?

A. It would be -- it would be less useful than it would be if you could have a long

demonstrated pattern of stable growth, but -- but the question is how else would you do it.

Q. Would you agree that the Gordon Growth Model assumes that the growth rates in the model will last forever?

A. It is a -- let's go back to the term maturity. In this case there is no fixed maturity on equity and yes, that's the, it goes on into perpetuity. As does the valuation of preferred stock.

Q. Is it fair to say then that because that's the case, the assumed growth rates generally should not materially exceed the economy's growth rate?

A. I think that most firms try to go faster - than the economy's growth rate. What we're talking about here is a -- I, in nominal terms growth of variance of 7 percent. And the economy doesn't grow at 7 percent, but most firms assume that their growth earnings will exceed the economy's growth rate.

Q. What is a typical firm's growth rate?

A. I don't know. I mean it -- it -- growth and earnings can vary greatly from industry to industry. And, you know, one would have to -- to look at the industry in question, but I don't -- to get back to this, I don't consider 7 percent for --

FSLIC."

And I think given that assessment, that, and given the interest rates, growth rates, et cetera at the time, that 7 percent is not an overly enthusiastic assessment at that particular time.

Q. Are you aware of any textbooks that state that the assumed growth rate generally should not materially exceed the economy's growth rate?

A. No.

Q. No?

A. No.

Q. The 7 percent growth rate you utilize, where is that number coming from?

A. I would have -- my recollection is that that was my judgment. The 16 percent came from the -- from the government's document.

Q. Turning to the 7 percent one first, how did you decide on that number?

A. I reviewed the -- my recollection is that I reviewed the various documents at the time and concluded that that was a reasonable and a conservative assumption required for the -- to implement the model.

Q. And why is it reasonable and conservative?

A. Because I -- I think that their growth --

growth and earnings could have been greater than that based once again on my review. And that -- that was my judgment.

Q. Based on your review of what did you think their growth and earnings could be greater than 7 percent?

A. The number - pardon me.

Q. Based on your review of what did you think their growth and earnings could be greater than 7 percent?

A. Based on my -- my review of their, of the documents and the financial statements, the documents that we had -- we have here regarding this transaction, the fact that the institution was, eventually was profitable enough to be attractive to a buyer. I think given all those factors and their, their, their management skills and ability, my -- that's my assessment.

Q. Was this growth rate specific to River Valley or is that a growth rate you think would have been typical for peers of its time?

A. It was based on my assessment of their data or their documents.

Q. River Valley's?

A. River Valley's, right.

Q. The 16 percent figure, where did you take that from?
A. 16 percent is in the April 28th document.
Q. And did you in any way attempt to independently --
A. No, once again I -- I assumed that these -- that these analysts had skills and incentives to -- to be -- to value this accurately.
Q. In paragraph 40 on page 86 of your report you indicate threshold earnings are computed to be $831,644. Where did that number come from, Dr. Murphy?
A. That came from the fact witness. Mr. Pikus.
Q. Mr. Pikus?
A. Yeah.
Q. From the document he provided to you?
A. I think that, my recollection for this case -- in this situation is that the -- I requested what that number was and it was provided.
Q. What did you request in terms of what that number was, what did you ask for?
A. I asked for the threshold -- no, I asked -- pardon me. I asked --
(Witness examines document.)

18, where did you get that number from, Dr. Murphy?

A. On page?

Q. 40 -- on page 18, paragraph 40?

A. Right. My recollection is that that takes the 83164 as the -- as the numerator and the denominator is the .16 minus the .07. The 831,644 is the numerator, the denominator is 16 percent minus 7 percent.

Q. In paragraph 42, Dr. Murphy, on page 19 you refer to a pre-breach discount rate of 12.7 percent. Where is that number coming from?

A. Okay, on Exhibit 6, page 2, fifth line down, the discount rate was assumed to be 12.72 percent.

Q. And that indicates it is 12.72 percent, which is the long-term junk bond rate, is that true?

A. Right. That's correct.

Q. Did you take any steps to independently verify the appropriateness of that rate?

A. No.

Q. What is the basis for your indicating the implied discount rate for redemption is almost 14 percent?

A. The, once again, solving -- taking the future cash flows and discounting them back to the

the above-threshold earnings, and then we used the Gordon Growth Model to determine the valuation of the below-threshold earnings, and that's where the 9 million -- 9,240,489 comes from.

And basically what we're selling is that the government's own action, in their own statements when they redeem the preferred was that the above the threshold now had no value. So that conservatively say, well, all that's left is the below-threshold and how do we value that? And that's the next step.

Q. How did you settle on 150 basis points as the adjustment to the discount rate?

A. Well, I said that the implied discount rate was, for the preferred was almost 14 percent and that the -- the original discount rate was 12.7, so it had gone up by about 130 basis points. And it just seemed to me that it is a conservative assumption to say that well, if the original -- original discount rate applied to earnings, which once again based on contemporaneous documents were 16 percent, then the discount rate attached to preferred was -- went up by more than 100 basis points, that the -- so that the residual -- the discount rate applied to what was left over should be at least 130 basis points, and 150 seems to me to be very

conservative.

Q. Can you cite any studies or treatises or textbooks to support that analysis?

A. To state that the discount rate applied to preferred stock, which has a claim on earnings senior to common stock, all I'm saying is that the discount rate applied to the latter should be higher. I think that almost any -- any -- I can't think of a textbook that would dispute that.

Q. But, in terms of the amount or how much?

A. No, no. I think it is conservative, frankly. I think it -- I would be perfect -- I would be comfortable with a higher number. But I think this is on -- on the distribution of possible appropriate discount rates to apply in this situation, this is near the low end.

Q. If you think that, why did you select that number?

A. Because I didn't -- I thought it was eminently defensible and I couldn't conceive of anybody thinking it was too high.

MR. BERGMAN: Patricia, when you're at a good spot can we --

MS. SMITH: Yeah, it will be a couple more minutes. Yeah.

same way.

Q. Did you compare their financial statements?

A. No.

Q. Did you compare their business plans?

A. No, I didn't. I reviewed business plans, but I can't recall that I compared them specifically, no, one to the other and frankly -- well, no.

Q. Were you relying on anything other than that they were managed by the same people?

A. Using the same approaches, yeah. Not too much beyond that, no.

Q. If San Antonio had lost regulatory capital due it a breach of contract, would you feel comfortable using the analysis you performed with respect to River Valley as a proxy for damage to San Antonio?

A. I don't know enough about San Antonio situation to make that assessment. I'm comfortable stating that these guys owned the -- the plaintiffs owned Rock Falls for some time, and that basically what they were offering to the FSLIC in taking over these other institutions was here's our track record, here's our -- we -- here's our philosophy of management, here's our results, and we're going to sort of export them to this situation and use them and -- as method of resolving this situation, the

distressed thrifts they took over.

And the FSLIC and the Federal Home Loan Bank Board agreed with that, so, you know, I don't think the situations are analogous, frankly. That Rock Falls had a longer track record with a -- with these approaches and philosophies and standards that were basically sold, if you will, or used as a demonstration of why the FSLIC could rely on these individuals to -- that they would want -- want to enter into such a transaction.

Q. Did you consider using growth rates from the River Valley Rock Falls institution for purposes of your analysis?

A. No.

Q. Why not?

A. It didn't occur to me as -- the assumption I used I thought was appropriate and left it at that.

MS. SMITH: Break for lunch?

THE WITNESS: Yeah.

MR. BERGMAN: Sure.

THE VIDEOGRAPHER: The time is 12:09, we're going off the record.

(Whereupon, at 12:09 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:00 p.m., this same day.)

MR. BERGMAN: Objection to form,
incomplete hypothetical, lack of foundation.
THE WITNESS: You're asking what to me
amounts to accounting questions. Net earnings are
derived by certain accounting conventions that don't
include mark-to-market. The adjustments from
mark-to-market to the net earnings figure could make
it higher or lower, so I really don't know whether --
what impact it would have on this calculation.
BY MS. SMITH:
Q. What documents or other information did
you consider, Dr. Murphy, to evaluate if the
regulatory capital would have been transferrable to
an acquirer?
A. I don't know. I didn't -- pardon me, what
documents did I review? I did not review any
documents -- for that assumption.
Q. What's the bas_s for that assumption?
A. The basis of --
Q. That -- I'm sorry, do you need me to
clarify?
A. Yes, would you clarify?
Q. Sure, that the regulatory capital was
transferrable to an acquirer of River Valley.
A. Where did I get that?

Q. Um-hum.

A. I was asked to measure the -- what that would have been worth if it had been transferrable.

Q. Do you have an understanding as to whether it would have been transferrable?

MR. BERGMAN: Calls for conclusion of law.

THE WITNESS: Yes, I don't.

BY MS. SMITH:

Q. You don't?

A. No.

Q. When you were at the FDIC, were you ever aware of regulatory capital being transferred to an acquirer?

A. When I worked for the FDIC, there was no such thing as regulatory capital.

Q. Are you aware of any instances where regulatory capital has been transferred to an acquirer?

A. I am not, I am not aware.

Q. Assuming it's not transferrable, would you agree that it's value to the acquirer would be zero?

MR. BERGMAN: Lack of foundation, contrary to evidence.

THE WITNESS: I have no basis -- could you repeat the question.

BY MS. SMITH:

Q. Sure. If you assume that regulatory capital was not transferrable, would you agree that the value of the regulatory capital to the acquirer would be zero?

A. It's hard to imagine that somebody would -- that -- I would assume so.

Q. What's the basis for your assumption in your report that First Banks was seeking to bring in additional capital at the time it acquired River Valley Holding?

A. Where is that?

Q. I can't find the reference to that right now, Dr. Murphy.

Do you have a recollection of that?

A. Well, this -- going back to my report, I was asked to measure or come up with some method of measuring the value of regulatory capital that would have remained on the books if it had been -- assuming it had been transferrable.

Mr. Blake had indicated that where there he would have paid something for that and hence I performed an analysis to come up with some estimate of what that would have -- what they would have been willing to pay.

A. And they asked me whether I -- the same question he asked, did I know what they were, and I said no, I don't know what they were.

Q. Do you know what caused you to change your mind between the time you were in here answering my questions and then you thought later it might be a good idea?

A. Just as I was -- as I was walking out, I thought to myself that that made sense.

Q. Have you ever seen the Gordon Growth Model utilized when a firm has only been in existence for one year?

A. I don't think so.

Q. Do you know what the shortest period of time a firm has been in existence when you've seen the Gordon Growth Model used?

A. No, no, no. I think that's the value of going to the -- to the -- your suggestion to go to the Rock Falls, because Rock Falls represents the same management style and philosophy and has somewhat longer track record.

Q. Dr. Murphy, I believe in response to some questions from Mr. Bergman that your 7 percent growth rate was based on the numbers on the net income column on Exhibit 5 on the last page of the document,