# EXHIBIT C

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**S. LYNN STOKES EXPERT DEPOSITION DESIGNATIONS**

10/22/2001 Tr. 25:18–28:20
10/22/2001 Tr. 29:16–31:19
10/22/2001 Tr. 32:3-25
10/22/2001 Tr. 33:9-17
10/22/2001 Tr. 34:17-22
10/22/2001 Tr. 37:24–38:18
10/22/2001 Tr. 38:25–39:21
10/22/2001 Tr. 40:5-13
10/22/2001 Tr. 43:4–44:1
10/22/2001 Tr. 102:23–104:17
10/22/2001 Tr. 106:22–108:11
10/22/2001 Tr. 133:1–135:15
10/22/2001 Tr. 137:14-17
10/22/2001 Tr. 141:4-17
10/22/2001 Tr. 149:12-17
10/22/2001 Tr. 150:14-23
10/22/2001 Tr. 165:16–166:8

10/23/2001 Tr. 193:11–195:12
10/23/2001 Tr. 198:9-14
10/23/2001 Tr. 243:6–244:16
10/23/2001 Tr. 250:1–251:5
10/23/2001 Tr. 254:22–255:1
10/23/2001 Tr. 256:12–257:4
10/23/2001 Tr. 271:24–273:21
10/23/2001 Tr. 282:12-17

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - X

HOMER J. HOLLAND AND HOWARD :
R. ROSS, :
Plaintiffs, :
v. : Case No. 95-524C
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - X

Certified Copy

Washington, D.C.

Monday, October 22, 2001

Videotaped deposition of S. LYNN STOKES, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the State of Virginia, taken at the offices of Arnold & Porter, 555 Twelfth Street, 9th Floor, Washington, D.C., at 8:59 a.m., Monday, October 22, 2001, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, RPR, CRR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:

WALTER F. ZENNER, ESQ.
DAVID BERGMAN, ESQ.
Arnold & Porter
555 12th Street, NW
Washington, D.C. 20004-1206
(202) 942-5474

On behalf of the Defendant:

PATRICK T. MURPHY, ESQ.
U.S. DOJ, Civil Division
1100 L Street, NW
Washington, D.C. 20530
(202) 353-8841

ALSO PRESENT:

JEFF NIELSEN
JONATHAN PERRY, Videographer

seemed reasonable and he had done a workmanlike job.

Q. Is there anything in his report that you disagree with?

A. Not that I remember.

Q. Now if I can get you to turn to Exhibit 1, which is your report, in the back of your report, there is a resume?

A. Is it okay if I take this apart?

Q. Yes. Absolutely. So long as we can re-create it, which I think we can.

A. Saving grace of numbering the pages and all that. Okay.

Q. And Exhibit 1 is a resume. Do you have any particular, we have already discussed the cases obviously on Exhibit 3. Do you have any particular updates with respect to the resume itself?

A. No.

Q. In your consulting work, how much of that is done, how much of that is litigation-oriented?

A. It depends on what period of time. Why don't you pick a period of time.

Q. Okay. Let's say the last two years.

A. Somewhere between a third and a half.

Q. And what about the last five years?

A. Probably less than a third, more like a

third.

Q. And do you provide -- well, can you just describe generally what sort of nonlitigation consulting work you provide?

A. I do a lot of strategic planning oriented things for people. I provide a lot of asset liability management input for clients. It really kind of depends on what's happening in the industry. If people are starting banks, I help them start banks. If people are selling banks, I help them sell banks.

Q. Do you provide tax consulting services?

A. Most of the tax work I do these days is M&A oriented.

Q. And by M&A, you mean mergers and acquisitions?

A. Yes.

Q. Okay. And what is the nature of the tax work you provide in that area?

A. Trying to help them structure the transaction in a mergers and acquisitions context.

Q. Structure the transactions to minimize the tax consequences of the merger?

A. Usually.

Q. Okay. And approximately what percentage

of, what percentage of your work is mergers and acquisitions oriented?

A. Again, it depends on the year. It sort of depends on what that, what the life cycle in the industry is at that point in time.

Q. Let's just say last 10 years, what percentage of your work has been M&A related?

A. Probably 15 percent.

Q. And approximately what percentage of your mergers and acquisitions work revolves around tax issues?

A. Well, it's hard to, to describe that because it's always sort of the first place you start out in an M&A engagement. You know, do we want this to be, and it goes to things like how good is the currency of the acquirer, do we really want to own their stock? Are we willing to pay the tax penalty to get cash in the deal? It's hard to parse out the tax work from, from sort of what I would think of as economic or strategic consulting.

Q. In connection with your litigation consulting work, what percentage of that has involved tax issues?

A. I think there is an accountant's malpractice item listed on there. That related to

failed tax advice. There are two accountants' malpractice actions. One was on behalf of the RTC. That related to a thrift failure. Sort of what you think of as a classic PLS RTC action, and the other one would have been failed tax advice.

Q. And by PLS, you mean professional liability?

A. Yes. Sorry about that.

Q. It's okay. I do it all the time. And the, what was the nature of your, your work in the accounting malpractice suit that related to the tax advice?

A. In some ways a lot like what I did at Holland and Ross. The lawyer that hired me sent me a variety of documents to allow me to evaluate the tax matter. There was some archaeology involved, but mostly the issues, most of the issues revolved around whether the matter been handled properly or not, whether the tax advice given by the accountant was good.

Q. And what was the nature of your opinion in that matter?

A. That the tax advice was not as artful as it might have been.

Q. Did you believe that it rose to the level

of malpractice?
A. The case was settled shortly after my deposition.
Q. Did you opine as to whether or not it rose to the level of malpractice?
A. I believe I did.
Q. And did you find that it rose? I'm sorry.
A. The answer is it's a long time ago and I don't remember specifically what the opinion said. But I think my general sense of it is that yes, I thought that they considered malpractice.
Q. Okay. Continuing on your resume, which is attached to your report as Exhibit 1, there is reference to Pelican Financial, Incorporated?
A. Yes.
Q. Can you just generally describe for me what role you have with Pelican, and the extent to which you deal with tax issues at Pelican?
A. I'm chairman of the audit committee of Pelican. I'm a director at Pelican. And the two things that tend to fall into my end of the world -- end of the world, in addition to just dealing with the outside auditors and the internal auditors and that kind of thing, are acquisitions and dealing with the regulators. And the, a lot of the acquisition

issues are tax oriented.

Q. Can you give me a sense of how many acquisitions that were been since '99?

A. I looked at a number, not consummated any.

Q. And were any of those not consummated strictly due to tax reasons?

A. No. I wouldn't say the tax structuring of the transaction was the reason for the failing.

Q. Then your resume goes on to note that you are also the director, the former director of several closely held companies that provide products or services to the financial services industry. How many companies are you currently a director of?

A. One.

Q. Is that in addition to Pelican, or is that --

A. That's one in addition to Pelican.

Q. And what company is that?

A. It's a company that provides software and imaging support to the title insurance industry.

Q. And what's the name of that company?

A. I-Orbit.

Q. And are you on any particular committees with respect to that company?

A. It's a development stage enterprise at the

moment.

Q. Are you dealing with any tax issues?

A. No. Other -- well, let me back up. Sort of my piece in the puzzle there is to negotiate strategic alliances as a company, and in a sense that you would rather do them as an LLC or some tax-transparent form, say, I suppose they are tax oriented a little bit.

Q. And how many companies approximately are you, or were you formerly a member of the board?

A. The one that comes to mind right offhand is the RTC contract.

Q. And is that what's referenced in the next sentence on your resume?

A. Yes. The $9 billion in assets. Yes.

Q. And was there any, did your role in that company relate to tax issues?

A. No. That was mostly evaluation-oriented work.

Q. And approximately when was, when was your involvement with that company?

A. Century Management?

Q. Yes.

A. Started around the time of FIRREA and ran until the company was subsequently dissolved.

Q. And when was it dissolved?
A. I don't remember.
Q. Okay. Did you have any involvement in -- strike that. The next paragraph of your resume relates to your service as the executive vice president of a $1.2 billion savings and loan in Florida. What was that savings and loan?
A. Commonwealth Savings.
Q. And did you have any particular involvement in tax issues in your position at Commonwealth Savings?
A. I provided some tax planning, but that largely rose of the, it was a skill set issue. That is what I did at DeLoitte. When I showed up at Commonwealth, I tended to provide the same sort of tax advice I had when they had been my client, and I also negotiated the joint ventures for Commonwealth for its real estate development activities, and that was obviously tax driven.
Q. Did Commonwealth engage in any investments or other practices that were designed to refresh NOLs?
A. Not that I remember.
Q. Is Commonwealth still around today?
A. No. It failed.

Q. And when did it fail?

A. It failed several years after I left. It turned out that the chairman of the board, board's brother had embezzled approximately $25 million from the institution. The nicest thing anybody from the RTC ever said to me was that they had no interest in what I'd, anything that had transpired while I was there.

Q. The next page of your resume, which is also, conveniently is the next paragraph, references your role as the firm DeLoitte, Haskins & Sells, National Industry Tax Coordinator for Savings and Loan Associations. When did you become the national industry tax coordinator for S&Ls?

A. Sometime in the late '70s.

Q. And how long did you hold that position?

A. Until I left the firm.

Q. And what was the nature of your work as the national industry tax coordinator for S&Ls?

A. Sort of divided into two or three pieces. One was, we were responsible for developing, or I was responsible for developing tax strategies for clients based on evolving court cases and Internal Revenue Service rulings and that sort of thing to develop a technical position for the firm as it related to

evolving tax matters. A lot of that ended up in the Savings & Loan Management Bulletin because much of the stuff we wrote about in the Savings & Loan Management Bulletin was tax oriented.

And then sort of the third leg of the puzzle was that when someone in another office had a tax question, the IRS would show up and go, you know, we want to assess a, you know, assess X many million dollars in additional taxes. Then they would call me up and ask me, you know, what our response to that was. Or conversely if the client wanted to, to do an SPC, special purpose corporation, in order to use a portion of its net operating losses or to undertake some other tax planning type strategy, I provided technical assistance to offices around the country on a sort of as-needed basis.

Q. Did, in your work at DeLoitte, did you have occasion to deal with short-term tax advantage securities, or STARS?

A. I don't remember doing a STARS transaction, but we did a lot of other transactions that had a similar goal.

Q. Then in the text of your report on paragraph 5, you reference a publication entitled Tax Management for Savings and Loan Executives: A

Q. And then why did you leave DeLoitte to go to Commonwealth?

A. The last year I was a DeLoitte partner I traveled 220,000 real air miles. I went out to see the guy who ran Commonwealth. I had gone to California and back in one day in order to have lunch with somebody and get an audit client for the firm. The following Tuesday I went out to visit the client, and Barry had been trying to hire me for a long time anyway, and I had gone to see him about something else. But he opened the meeting by saying I'm tired of dancing around, name a number that it will take to get you to go to work for me.

So I named a number way beyond what I thought Barry would be willing to pay. I asked him to double my salary as a Big Eight partner and his response to that was okay, but you can't start until Monday. And I went, Excuse me? And he said at that level the board will have to approve your contract and they don't meet again until Thursday, but go home and tell Cheryl you quit, so that's what I did.

Q. And you left Commonwealth in '86?

A. Yes.

Q. And why did you leave Commonwealth?

A. It's the only time I have ever been fired

in my adult life. Did wonders for my reputation with the regulators. You just have to be fired by the right guy. Barry ended up being an unindicted co-conspirator in the federal action where his brother embezzled the $25 million. Being fired by him did wonders for my reputation in the industry.

Q. What was his stated reason for the firing?

A. I was fired in a dispute over business morals. You may remember I told you that I was engaged, one of my jobs was to run the real estate subsidiary and negotiate joint ventures. Once I got there I discovered that Barry's theory of negotiating a real estate deal was to string the other side along until they had no choice but to close the deal with him, and then to retrade the terms. I'd sort of grown up in an industry where my word was my bond, and I didn't think that was a very fair way to treat people, so Barry fired me.

Q. And the next paragraph, second page of your resume, which is Exhibit 1 to your expert report which we have marked as Deposition Exhibit 1, it references your work as a contributing editor for the Federal Banking Law Reporter?

A. Yes.

Q. What is the nature of your work as a

contributing editor for the Federal Banking Law Reporter?

A. One of the guys I had gotten to know really well at the U.S. League by the name of Bob Bartlett went over to work for Commerce Clearinghouse and run their financial institutions -- the financial institutions aspects of their publishing division. The Federal Banking Law Reporter had always been a print-based service up to that point, and oriented very much like most CCH services -- code, what I think of as code oriented.

The goal was to make it more topical in character, make it a little easier to access and port it to a CD-ROM type publication. And also there wasn't much in the publication from a, from an audit perspective, if you will, and from a tax perspective. And so Bob asked me to become a contributing editor and help them address the, those kinds of issues, and provide some general advice on how the publication ought to be restructured to make it easier for people like me to use.

Q. And specifically with respect to tax matters, how much -- well, let me, let me back up for a second. How much time have you spent as a contributing editor for the Federal Banking Law

Reporter? How much of your time does that take up?

A. Again it depends on the year. I spent a lot of time in the early going, I spent progressively less over time.

Q. And approximately how many tax articles have you been involved in the capacity as an editor since 1995?

A. Well, you don't really, the way the Banking Law Reporter is oriented, you don't really, it's not article driven. It's more, you know, you know, none of the stuff is written for attribution, I guess is what I would say. None of the stuff is written for attribution.

Q. And how has, the next paragraph references the editorial board of CPA Today. How is the nature of your role as a member of the editorial board of CPA different from what you do for the Federal Banking Law Reporter?

A. I have sat on the editorial board for probably 20 years for the professional journal. It's difference in the sense that the editorial board has sort of two or three functions. One is to develop and continually update the editorial standards for the magazine, try and give it direction. Every year, we have a committee meeting that is designed to

were, where the bottlenecks were and what could be done by our members to make it work better. That kind of thing.

Q. Then there is reference to a task force in 1994 to draft proposed rules for regulating business valuations. Can you describe your role on that task force?

A. There is a variety of, of literature on the topic of valuations -- valuations in general, and business valuations in particular. I guess if you looked at that, sort of the largest single body of literature that's the Uniform Standards of Professional Appraisal Practice, part of the problem in applying the principles of USPAP to business valuations is that many of the things are described in USPAP don't translate well to what CPAs do.

Also, much of what we think of as business valuation from the perspective of practicing CPAs is really what we think of more in the accounting world, as agreed upon procedures engagements. As an example, if you are hired to do an eminent domain matter and calculate business damages, they don't want you calculating damage to the business from the taking just in the abstract, as you would as an economist, as sort of, it might be an intellectual

exercise.

Nobody really cares about that opinion. They care what the case law in Florida says about how business damages ought to be calculated in eminent domain settings. And so there was some concern about many of the practitioners that had valuation oriented elements to their practice, that whatever the Board of Accountancy adopted would recognize these various and sundry differences, and that was what the task force did. It took a lot longer than that for the task force to get to the answer.

Q. And how much of that, how much of the task force work was related to tax incidence of business valuations?

A. Well, again let me give you a long answer to a short question. Another, another aspect of the valuation practice at most CPAs is valuations that are done for tax purposes, ESOP valuations, state tax valuations. So those were all elements that fit into the puzzle as well, because again those are procedure, they are agreed upon procedures engagements, in some respects.

Q. And the next reference is to the FICPA's litigation services committee. When were you a member of that committee?

to whom and by how.

MR. BERGMAN: Same objection. Beyond the scope.

BY MR. MURPHY:

Q. Did you do any analysis with respect to whether or not at the time of Holland and Ross's supervisory acquisitions, either they or the regulators contemplated Holland and Ross engaging in interstate acquisition activity?

A. That's beyond the scope of my report.

Q. Did you do any analysis with respect to whether at the time of FIRREA either Holland and Ross or the regulators had any understanding that Holland and Ross would be looking to acquire institutions in interstate transactions?

A. That was beyond the scope of my report.

Q. Can you just briefly explain how the San Antonio institution came to have all those built-in gains that were available for acquisition by Holland and Ross?

A. Well, I'm not sure what you, I mean, I'm not sure how to answer your question.

Q. There were, in connection with the San Antonio asset purchase, a number of, or approximately 29 million plus --

A. Right.

Q. -- in built-in gains that were ready to be reaped by Holland and Ross?

A. That's correct.

Q. How did those come about? What was the process that resulted in San Antonio institution having that sort of built-in gain that would have been realized, I think you said virtually at will in your report?

A. Well, I didn't go back and make an exhaustive study of the history of the company. My understanding, I guess I have sort of a generalized understanding of how we got to that point in history, and my understanding is that the people marketing the institution were having difficulty finding a qualified bidder and at the end of the day, Holland and Ross were able to make a bargain purchase.

In the process, in the process of analyzing SAFSB's tax returns for some of the other work I was doing, I saw substantial evidence that they were able to reap the gains, in other words, that the $29 million was there. And I think I discuss later, in a later section of my report some of the, some of the ways that they might have been able to control the timing of that, that gain. So

that's -- that's sort of my support for that statement.

Q. Holland and Ross acquired San Antonio's assets from the RTC, is that correct?

A. I believe so.

Q. Do you, did you do any analysis or do you have any understanding as to how the San Antonio institution came to be under the aegis of the RTC?

A. Well, the Texas industry was pretty much a mess. I did some Texas, some work for the Texas commissioner in the period leading up to the Southwest Plan. The real estate economy was dreadful. They have a number of interesting terms in Texas, and they patented a new one, "see throughs," office buildings on the ring roads around Dallas and Houston that you could literally see through because the tenant finish had never been done.

I didn't specifically study how SASA got in trouble or how SAFSB got in trouble or any of that, but the amount of marketing of Texas institutions and assets that went on, it wouldn't surprise me if it was a member of, you know, I didn't find it odd.

Q. What was the, you referenced work that you did for the Texas commissioner. What was the nature

of financial wherewithal were involved, if any?
A. You'll have to forgive me. That's a sort of an accountant's quibble. We are seldom willing to admit that the sun will rise in the east every day.
Q. So did they provide all of the financial wherewithal?
A. That's my understanding.
Q. Okay. And what is your understanding of the structure of the financing for the San Antonio institution?
A. What do you mean by the structuring of the financing?
Q. Well, you note that they guaranteed a loan by American National to the SAFSB holding company, Western Capital, so let's just take that in little steps. What was -- Holland and Ross were not the sole shareholders of Western Capital, were they?
A. No. There were some minority shareholders.
Q. And do you recall how many there were?
A. Three or four, I think.
Q. And do you recall what Holland and Ross's combined ownership stake or percentage ownership in Western Capital was?
A. I think they owned 60 percent or something

like that.

Q. And given the, in the next sentence, you note that the acquisition of SAFSB was plaintiff's deal to structure as they saw fit. Did the presence of minority shareholders have any effect on the structure of the deal?

A. Well, I think that's discussed in the next section of my report at some length. That's, remember when we were talking about overall structure, I told you that I thought this section and the following section went together.

I guess my reaction to the whole Western Capital structure was that most of the, virtually all the money necessary to do the deal came out of the loan guaranteed by Holland and Ross. This is that sort of series of transactions that starts with River Valley not having enough capital to do the deal directly and American National being unwilling to lend additional money to, to River Valley to do the deal. So River Valley paid a dividend to the holding company in order to pay down the American National loan and then American National agreed to make a separate loan for the acquisition by Western Capital, and that loan was guaranteed by Holland and Ross, and I think they pledged their shares in River Valley to

secure the loan as additional collateral.

And since there were minority shareholders, there was probably some, some nominal, some relatively nominal in the overall scheme of things, contribution to the formation of Western Capital by the minority shareholders. But my sense of it from looking at all the documents sort of fit in with what the two depositions that are cited talk about, is the idea that it was basically Holland and Ross that put up the money and it was sort of Holland and Ross's deal to structure as they saw fit.

Q. In the but-for world, would Holland and Ross have still financed the acquisition through American National Bank?

A. Well, in the but-for world, I think that River Valley, if my memory of the numbers serves me, I don't remember if I studied that particular in any great depth. My memory of the numbers was that River Valley would have had enough capital to make the acquisition without additional borrowings from American National.

Q. Is it your opinion that they would have made the acquisition without any additional borrowings from American National?

A. Well, I think, at least somewhere in there

Q. Was it -- no. Assume the San Antonio acquisition happened exactly as it did in the real world. So you have the WCHI exists, River Valley Holdings exists, everything exists as it did in reality. Could Holland and Ross have subsequently merged the San Antonio institution into River Valley?

A. In which world?

Q. In the real world.

A. Well, I have sort of two or three answers to that. You really would have to go back and go through the same analysis that I laid out in my report because in my report I talked about what I think of as real world factors. Were there deal structure issues or were there regulatory reasons or a variety of real world impediments to it, and then you have to look at the tax issues as well. So in essence you have to go back and do the same analysis I did.

If you follow that line of reasoning, sort of the first problem you run into is the fact that American National Bank, who had, who had, who was unwilling to lend them the money in the first place still had a substantial loan outstanding which as I remember it took them like three years to pay off, so presumably, American National Bank wouldn't have let

them consolidate the two companies without getting a loan paid off. So in the period covered by my report, you couldn't have done it until relatively late in the day anyway.

I guess the other observation I would make is that they actually did consider, I think one of the documents they found was a KPMG memo that was done relatively late in the period that I looked at, where they had actually talked about doing it, but decided for a variety of reasons that the transaction was not tax efficient.

Q. And did you do any independent analysis to determine whether or not the transaction was tax inefficient or efficient or are you relying on the KPMG analysis?

A. I saw nothing in the KPMG analysis or in my reading of the facts that would lead me to believe that KPMG's analysis was erroneous.

Q. And do you recall why they concluded it was tax inefficient?

A. Well, I think I talked about that in my report at some length and it basically was the problem with the built-in gains. You may remember that I said earlier when we were talking, first talking about 384, that the, the issue was sort of

when 384 rears its ugly head. In other words, when Holland and Ross could have bought the assets from an unrelated third party effectively in a P&A transaction, 384 has no role to play. Once you bought the SAFSB assets, then the built-in gains inherent in the transaction at that point become an element of any, any subsequent attempt to put the two companies together.

Q. And do you recall -- I presume the KPMG document that you are referring to is listed in your Exhibit 2 of your documents considered?

A. Yes.

Q. Do you recall which one it was?

A. These aren't exactly in here in date order. I think it's item 74.

Q. In your interviews with Mr. Holland, did you discuss at all why River Valley didn't merge San Antonio into it subsequent to the initial acquisition of San Antonio?

A. I don't remember. I might have.

Q. We had jumped right into the various structures delineated in paragraph 18, so we skipped a couple of the other paragraphs. I think we discussed most of the topics that are covered in those, so we don't need to go back through them,

Q. Now if I could get you to turn to the next section of your report which begins on page 13, section D where we were discussing the minority shareholders. You note that it is important to keep in mind that the position of minority shareholders in a privately held company is significantly different from the position of shareholders in a publicly traded company. Why is it important to keep that in mind?

A. Because I think that goes to the, to the overall compensatory nature of the interest granted to the minority shareholders in this transaction, and I think it's an important background fact to keep in mind when you look at that. You may remember I told you earlier that I had attempted to take all the facts as they existed in the real world, and take them into consideration in my nonbreach scenario. The minority shareholders had an interest in Western Capital, in the nonbreach world so I need to look at the nature of that interest and how the same result could have been achieved -- did I say in the nonbreach world, I'm sorry, in the breach world, and how that same interest could have been accommodated in a nonbreach scenario.

And what I was pointing out was, was a

in the hands of related shareholders, then you created a whole raft of planning problems for yourself.

Q. Then in paragraph 21, you state your belief that the interest in the minority shareholders was compensatory in nature. What do you mean by compensatory in nature?

A. That what Holland and Ross were trying to do for the minority shareholders in Western Capital was to give them incentive compensation or if you will a bonus for doing a good job. That's what I meant by compensatory in nature.

Q. Did you speak to any of the minority shareholders?

A. No. Or I should say not on this topic. I may have interviewed to them about something else, but --

Q. Then you go on to note that between '92 and '96, they received their share of approximately $5,351,156 in dividends by WCHI and then you reference Exhibit 9. If I could just get you to turn to Exhibit 9 and walk me through that.

A. Maybe I shouldn't have turned you down so quickly on your offer, Walt. Okay.

Q. If you could just walk me through this

last dog is hung. Yes.

Q. Economically, what is the difference if there is a difference between delaying the recognition of taxable income versus accelerating it and sheltering it with NOLs.

A. It's late in the day. You'll have to try that one on me again.

Q. As a matter of economics, is there a difference between delaying the recognition of income as compared to recognizing the income but sheltering it with NOLs or another mechanism?

A. Well, that's sort of a time value of money type kind. Keep in mind that as I understand, that what my report is trying to do is take all the facts that occurred in the real world and apply them to the tax planning issues that would have arisen in the nonbreach world. If you, as part of that structure, you say that, that the SAFSB branches are going to be sold, that the first, the sale to First Banks will occur as it did in the real world, then deferring a taxable income as opposed to using it against the net operating losses doesn't make any sense, if you will, because the net operating losses would have still been subject to the 382 limitation when you sold them to First Banks, and the tax efficient way to

structure that transaction is to use up as much as a tax net operating losses as you can by accelerating the income from the SAFSB assets. It's odd to hear a tax partner talk about accelerating taxable income but every now and then you get hired to do it.

Q. Do you have an understanding as to when the First Banks acquisition first was proposed?

A. Sometime -- I'd have to go back and look at the documents to be sure but my memory of it is late '93, early '94 kind of time frame.

Q. So sometime after the acquisition of San Antonio had already taken place?

A. That's correct.

Q. Did you do any analysis as to whether or not the acquisition or sale to First Banks would have been any different in the but-for world, or do you again, like some of the other things we were discussing, assume that happens at the same time and in the same manner as it actually did?

A. My general operating premise was to assume that things occurred exactly as they did in the, in the breach world. Let me, let me go back and sort of amplify one thing I said before.

Q. Sure.

A. You raised the issue of the relative

A. So I'll have to ask you which company --

Q. In WCHI, in everything as it actually happened. Could they have rather than have the distributions as they existed, could they have set up the sort of interest that you are referring to in paragraph 25?

A. Well, they actually had a real interest.

Q. So paragraph 25 would be, at least to the extent that you envision a real equity interest, what they could have done parallels what they actually did do in the real world?

A. In effect, except that the thrust of paragraph 25 is that the interest would have been in River Valley in the but-for world because Western Holdings wouldn't have existed.

Q. And then you say that the approach would not have changed the economic outcome for Holland and Ross because they would have retained precisely the same economic value which would have been expressed as a slightly different percentage of a larger economic pie. Why, why is it that the economic pie is larger?

A. Because at that point in the but-for world, River Valley would have the assets of both SAFSB and River Valley.

Q. And the percentages differ because of the addition of the minority shareholders? Is that correct?

A. Yes. If you adopt the approach outlined in 25, they would get, they would get some interest in River Valley which would be less than 40 percent, but greater than zero. They, the minority shareholders.

Q. And then you note that from an economic perspective, this approach is not unlike some of the transactions contemplated by the parties in the breach world but abandoned because of tax inefficiencies. What are the transactions you are referring to in that sentence?

A. That's that same memorandum we looked at earlier, or we talked about earlier.

Q. Then in paragraph 26, you note that another means of compensation would have been to form a breach world analog for WCHI and have that company buy the San Antonio assets if First Banks did not want them and later sell or distribute those assets to its shareholders. Do you have, with respect to the breach world analog that you mentioned in paragraph 26, would that be created at the same time and in the same manner as the actual WCHI that was

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Certified Copy

HOLLAND AND ROSS, )
Plaintiffs, )
- versus - ) No. 95-524C
) Senior Judge Smith
THE UNITED STATES, )
Defendant. )

October 23, 2001
Washington, D.C.

CONTINUED VIDEOTAPED DEPOSITION OF:

S. LYNN STOKES,

a witness in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C., 20004-1206, commencing at 9:12 a.m., before Maria Pugliese, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:

DAVID B. BERGMAN, ESQUIRE
WALTER ZENNER, ESQUIRE
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474
On behalf of the Plaintiffs

PATRICK T. MURPHY, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277
On behalf of the Defendant

Also Present: Jeff Nielsen,
Consultant to Government

Jonathan Perry, Videographer

* * * *

C O N T E N T S


| WITNESS: | CONTINUED EXAMINATION BY: | PAGE: |
|---|---|---|
| S. Lynn Stokes | Mr. Murphy | 183 |

appropriate literature and look at what the ordering rules are. There are probably some accountant's work papers in place that shows you how the calculation was made and what they did in order to determine the values they needed to determine.

Q Just generally, can you give me a brief explanation of how those ordering rules work?

A Not without referring to the literature. It's not something I carry around in my head.

Q Do you know if any negative goodwill was created in connection with the acquisition of San Antonio?

A Well, that depends on your definition of negative goodwill. In effect, the entire discount was negative goodwill, in the most general sense of the word.

Q And why is that?

A Because you bought something for less than its historical carrying value.

For all our efforts to be precise, accountants aren't always completely precise. And we have a tendency to use the same terms to refer to both general and specific concepts.

Q Do you know if there was a line item for negative goodwill on the balance sheet?

A I think I remember seeing, in some of the work papers, a reference to negative goodwill. As I remember, it was a relatively small number.

Q And why would it be a relatively small number given the 29-million-dollar bargain aspect?

A Well, see, that's why I said that we have a tendency to refer to both large concepts and narrow concepts by the same sort of general caption.

Conceptually, if you look at the -- if you look at 16 and 17, I think of the entire bargain purchase as negative goodwill.

Q And when you say 16 and 17, you mean APB --

A APB 16 and 17.

Q -- 16 and 17?

A So when you look at 16 and 17, I think of the whole bargain purchase element as being negative goodwill.

Certainly, if you look at the literature, that's how they would describe

this kind of transaction. I didn't specifically study how the -- how that number described as negative goodwill was arrived at because it wasn't really germane to what I was doing. But my guess would be that they went through the ordering rules under the literature and they had a piece left over. And what the accounting literature says is if you go through all the ordering rules and you have a piece left over, that's negative goodwill. That's my bank president's description of APB 16 and 17.

Q The dividend that was paid to the RTC that we discussed briefly, do you know how that was funded?

A No. It wasn't germane to what I was doing.

Q Now, we discussed the accounting for the transaction itself on a GAAP and a tax basis. When an asset is -- one of the San Antonio assets would be sold to the marketplace, how would they go about accounting for any gain that would be realized for GAAP and tax purposes?

A They kept very detailed records of

loan -- its unpaid principal balance to be more precise -- including any accrued interest and all the other fruit salad.

Q And what is the relationship, if any, between the principal balance and the fair market value for the loan?

A It's certainly an ingredient for calculating the fair market value at any point in time. The fair market value might -- of the loan might -- might vary from its -- its principal -- outstanding principal balance, because of the interest rate fluctuations or credit issues or documentation or a variety of things that might affect it.

Q Now, using that same example, how would that be recorded for tax purposes?

A Essentially the same idea. The difference between the two calculations would arise -- the difference, if any, arising out of the two -- between the two calculations would arise out of the different ordering rules used for tax purposes and for book purposes.

So in my example, the 10,000-dollar loan, you have a 10,000-dollar loan, you come

limitations apply once the built-in losses hit 10 million dollars?
A Because that's what the section says. It's a function of the requirements of the code.
Q And yesterday we spoke a little bit about the optimum amount of NOLs, and you reference them in that same paragraph.
Is the -- and you state that both parties had significant economic motives to want to optimize the amount of NOLs and other tax benefits transferred to First Banks.
Is the optimal amount transferred to First Banks the same from both parties' perspective?
A I have to think about that. I didn't attempt to make an optimization calculation for purposes of my report.
Generally, when you're involved in merger negotiations, what you're trying to do is achieve a win/win result that makes everybody happy. Clearly everybody was on the same side as it related to paying taxes, so -- the answer is I'd have to stop and think about it.

Q And the built-in losses were actually reduced before the sale of First Banks; is that correct?
A There appear to have been attempts to do that. I don't -- I did not study the -- how much of that was done.
Q Did you look at all at what sort of costs would have been incurred in reducing the built-in losses?
A I didn't study the topic of built-in losses.
Q So then you didn't study whether there would be any difference in the but-for world as opposed to what they did in the real world with respect to built-in losses?
A No.
I guess the only observation I would make is that since most of the built-in losses arose out of the STARS transactions, the transaction cost of realizing those losses would be relatively small.
Q And one last question with respect to possible timing differences in the various transactions, did you look at any -- how either speeding up the San Antonio transaction

Q -- and there's -- there's a series of amounts listed, and the last one is the 6.075 million amount. And then under it it says all of the above net operating losses should be allocated to River Valley Savings Bank with the exception of the 6,075,000, which is to be allocated to River Valley Holdings.

Is the fact that that loss was allocated to River Valley Holdings of any consequence to your analysis?

A It's just a function of -- of where the loss arose in a particular year.

Q And do you have any understanding as to what the root cause of that loss was?

A I don't understand what you mean.

Q What -- do you know what gave rise to that loss, if anything in particular?

A No.

Q Are you aware of any deferred compensation agreements between or among Mr. Holland, Mr. Bangert and River Valley?

A I think I remember seeing captions in the various tax returns I looked at that referred to deferred compensation. But I'm not sure I know any more about it than that.

Q Okay. And I take it you assumed that to the extent that any payments were made in the real world they would have been done on the exact same basis in the but-for world?
A That's correct.
Q Then back to Exhibit 11, the next item down you have a 3.277-million-dollar number which you get from Exhibit 12 to the report. And if I could just get you to turn to Exhibit 12 and walk me through that exhibit and where -- how we get the 3.277 million number --
A Okay.
THE VIDEOGRAPHER: We have about five minutes left on this tape.
MR. MURPHY: Okay. Why don't we flip the tape now and go off the record briefly.
THE VIDEOGRAPHER: The time is 11:14. We're going off the record. This is the end of tape number 1, going onto tape number 2.
(Whereupon, a discussion was held off the record.)
THE VIDEOGRAPHER: The time is

Was there any adjustment made for the month of December also or --

A No. This was the last document I could find.

Q Okay.

A The latest document I could find.

Q Okay. I understand.

MR. MURPHY: Okay. I'll just make a request if we can get provided to us what the adjustments were, either if there is any additional documentation -- I don't know if there is or not -- or just some sort of explanation following up from the deposition as to where exactly -- how we can trace the dollars, that's it. But I'm sure we can coordinate with Mr. Bergman on that.

BY MR. MURPHY:

Q Let's see. So then turning back to Exhibit 11, you note that there is a total shelter available of over 66 million dollars, and that's available.

So is your opinion that River Valley would have been able to shelter up to 66-plus million dollars in taxable income in the but-for world; is that correct?

A That's the essence of my opinion, yes.
Q Okay. And do you have an opinion as to how much income River Valley would have actually sheltered in the but-for world?
A Well, I think what I said in my report was that the range was 30 to 40 million dollars. Sort of the low end of that number is the bargain purchase element.

I identify, if you will, sort of three or four things that might have given rise to income that could be used to offset that 66 million dollars. The largest single element is the 30 -- approximately 30 million dollars in bargain purchase that we've talked about already. I pointed to, like, the four million dollar experience-method bad-debt deduction that I thought would have been a potential adjustment.

I think I talked about six million dollars in branch sale gains. Remember when we talked about that? I forget the paragraph number right offhand, but that was one of the topics that sort of went into it. And then I said that there was a category which represented the operating income of the SAFSB

assets, which I didn't have the documents at the time to calculate.

So my 30 or 40 million dollars that's discussed in the report is sort of those first three items. If you only take the bargain purchase element, that's 30 million. If you add the four and the six, that gets you to 40. That gave me the kind of 30- to 40-million dollar kind of range. And then there would be an amount for operating income, whatever that was, once you could figure it out.

Q So is it your opinion that they would have definitely sheltered at least 30 million dollars in operating income -- or I mean, I'm sorry -- just scratch in operating income.

Is it your opinion that they would have sheltered at least 30 million in taxable income?

A Well, let me give you a slightly different opinion and see if that answers your question.

I think where my report really goes is that the goal was to optimize the amount of net operating losses transferred to First Banks, and that there was enough raw material

in order to do that. 30 million dollars of it arises out of the -- out of the bargain purchase element, so that sort of is, if you will, the floor in my but-for world.

Q And the 66 million would be the ceiling?

A No, the 66 million is calculated in a different way.

The 66 million looks at the issue of how much shelter there was available in River Valley.

Q And the one other question on Exhibit 11 with respect to this 1994 NOL that we were talking about in Exhibit 12, how is that available on Exhibit 11 when Exhibit 11 is the summary of NOLs available through the end of 1993?

A Oh, did I miscaption the exhibit?

Q I don't know.

A I must have.

Q Okay.

A I mean, it obviously includes the 1994 number. I guess when I first sat down to start working on that exhibit that's the caption I used 'cause I was working off the -- off the KPMG memo --

whether or not they would have generated sufficient taxable income such that they could have used the AMT credits or NOLs; is that correct?

A That's a different but less precise way of saying what I said.

MR. MURPHY: Why don't we go off the record, take a short break. I will have a couple general conclusory questions and then I'll also see if I have any clean-up and then we can end for the day.

THE VIDEOGRAPHER: The time is 11:47. We're going off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: The time is 12:06 p.m. We're back on the record.

BY MR. MURPHY:

Q Yesterday we discussed the possibility of, in the real world after the initial acquisition of San Antonio, merging it into River Valley.

Do you remember that discussion?

A Yes.

Q And you listed a couple reasons why that may not have or why that wouldn't have

happened. And I believe you listed funding issues with respect to American National and Section 384 of the Internal Revenue code.

Are there any other reasons why River Valley would not merge San Antonio subsequent to the initial acquisition that you can think of?

A It's possibly a function of timing. I mean -- like as an example, I assumed uniformly throughout my report that everything that happened in the real world happened in the but-for world, except that River Valley wasn't breached and, therefore, had enough capital to do the SAFSB acquisition directly.

If you assume that the purchase of the transaction or that the sales would -- the sale, which is a two-branch network, would have occurred as they did, by the time you got the American National Bank loan paid off, the time -- just the transactional time necessary to get the two companies put together, if you could design a tax strategy that would do that, you would probably want to get a private letter ruling. By the time you got the private letter ruling, got the regulatory

permission to put the -- to put the -- the two companies together, it would be about time to sell them to First Banks and to -- to whoever bought the SAFSB branches, and then you'd just have to -- depending on what the timing of those transactions turned out to be, you'd just have to split them apart, take and get another set of rulings and another set of -- I guess, in other words, just because of the time, if you will, necessary to do those kind of transactions, it just takes a long time.

As an example, I just recently helped one of my clients sell itself for 19 bucks a share in cash, and the -- the definitive agreement gives the purchaser all the way until June of next year in order to get regulatory approval and close the transaction, even though it's a -- you know, a garden variety simple transaction that everybody thinks will close in the first quarter. It just sometimes takes a long time.

Q Could San Antonio have sold off some assets to repay the American National loan?

A Well, they have to -- I mean, if you were plotting a particular transaction, you

Q Okay.
A It -- it -- I think that sort of goes back to the last question you asked me.
Q Okay. And are there any other items, other than those that I have just listed that you can think of where the but-for world differs from what happened in the real world?
A Well, your question probably wins the prize for the longest question I've ever been asked, so I'm not sure I remember all of them, but I think that covers the waterfront.
Q Do you believe that the regulatory -- so you assume that the regulatory environment would be the same, in which -- the regulatory environment in which River Valley was operating?
A Yes.
Q Do you have any opinion as to whether or not that would have provided an impediment to River Valley acquiring San Antonio?
A I think I covered the waterfront on that in my report and said that, in my view, if they had had enough capital that there would have been no regulatory impediment to the acquisition.