IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, co-executor of the<br>ESTATE OF HOWARD R. ROSS,<br>AND FIRST BANK<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-524 C<br><br>(Judge G. Miller) |

**PLAINTIFFS' OBJECTIONS AND COUNTER-DESIGNATIONS TO DEFENDANT'S FACT WITNESS DEPOSITION DESIGNATIONS**

## I. Objections To Defendant's Deposition Excerpts

### A. Objections to Defendant's Deposition Designations of Homer Holland

| Transcript Citation | Objection |
|---|---|
| 7/19/00 Tr. 146:16-147:25 | omits question |
| 7/19/00 Tr. 176:11-21 | irrelevant to any damages issue, calls for speculation, assumes facts not in evidence |
| 7/20/00 Tr. 45:5-23 | irrelevant to any damages issue |
| 7/20/00 Tr. 124:14-17 | omits question posed to witness and provides fragment of answer as to mischaracterize testimony |
| 7/20/00 Tr. 150:7-9 | omits question posed to witness and provides fragment of answer as to mischaracterize testimony |
| 7/21/00 Tr. 5:10-14 | omits question posed to witness and provides fragment of answer as to mischaracterize testimony |
| 7/21/00 Tr. 37:22-38:5 | mischaracterizes document and testimony |

| | |
|---|---|
| 8/06/00 Tr. 56:18-23 | lack of foundation |
| 8/06/00 Tr. 57:1-5 | lack of foundation |
| 8/06/00 Tr. 87:11-17 | omits question posed to witness and provides fragment of answer as to mischaracterize testimony |
| 8/06/00 Tr. 94:17-95:3 | omits full answer; mischaracterizes testimony |
| 8/06/00 Tr. 169:13-18 | omits question posed to witness and provides fragment of answer as to mischaracterize testimony |
| 8/06/00 Tr. 170:7-9 | provides fragment of answer as to mischaracterize testimony |

**B. Objections to Defendant's Deposition Designations of Alan Blake**

Plaintiffs object to the Defendant's designations of excerpts from the deposition of Alan Blake only to the extent that Defendant has failed to include the errata sheet corrections corresponding to the relevant excerpts. The errata sheets from Mr. Blake's deposition are attached hereto as Exhibit 1.

**C. Objections to Defendant's Counter-Designations Of Howard Ross**

None.

**D. Objections to Defendant's Counter-Designations Of Leo Blaber**

| Transcript Citation | Objection |
|---|---|
| 8/09/00 Tr. 277:11-22 | leading |
| 8/09/00 Tr. 279:10-17 | leading, calls for speculation |
| 8/09/00 Tr. 280:9-25 | omits question; leading |

### E. Objections to Defendant's Counter-Designations Of Dr. Paul Griffin

| Transcript Citation | Objection |
|---|---|
| 2/11/02 Tr. 161:21-162:13 | omits question |
| 2/12/02 Tr. 246:2-9 | beyond the scope of proper counter-designation |
| 2/12/02 Tr. 277:18-279:24 | beyond the scope of proper counter-designation |

### F. Objections to Defendant's Counter-Designations of Larry Ferries

| Transcript Citation | Objection |
|---|---|
| 8/10/00 Tr. 38:5-17 | beyond scope of proper counter-designation |

### G. Objections to Defendant's Counter-Designations Of Lawrence Kenny

| Transcript Citation | Objection |
|---|---|
| 2/25/04 Tr. 32:10 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 76:1-25 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 77:1-13 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 172:1-3, 25 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 205:1 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 222:18 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 223:12-13 | improper to counter-designate objection rather than testimony |

| | |
|---|---|
| 2/25/04 Tr. 237:14 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 238:22 | improper to counter-designate objection rather than testimony |
| 2/25/04 Tr. 255:18-19 | improper to counter-designate objection rather than testimony |
| 2/26/04 Tr. 330:4 | improper to counter-designate objection rather than testimony |
| 2/26/04 Tr. 335:1-2 | improper to counter-designate objection rather than testimony |
| 3/03/04 Tr. 675:22-25 | leading and beyond scope of proper counter-designation |
| 3/03/04 Tr. 676:1-12, 14-21, 25 | beyond scope of proper counter-designation; all but last line is leading. |
| 3/03/04 Tr. 677:1-2, 5-12 | beyond scope of proper counter-designation |

### H. Objections to Defendant's Counter-Designations Of Ronald Karr

| Transcript Citation | Objection |
|---|---|
| 7/12/00 Tr. 10:16-21 | omits question posed to witness and provides only fragment of answer; beyond scope of proper counter-designation |
| 7/12/00 Tr. 36:20-37:1 | beyond scope of proper counter-designation |
| 7/12/00 Tr. 74:8-13 | omits question posed to witness and provides only fragment of answer |

### I. Objections to Defendant's Counter-Designations Of Diana Januska

| Transcript Citation | Objection |
|---|---|
| 8/11/00 Tr. 19:8-16 | beyond the scope of proper counter-designation |
| 8/11/00 Tr. 31:1-34:14 | beyond the scope of proper counter-designation |

## II. Counter-Designations To Defendant's Deposition Excerpts

### A. Counter-Designations From the Deposition Testimony of Homer Holland

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Dr. Homer J. Holland obtained in this case on July 19, 2000; July 20, 2000; July 21, 2000, and August 6, 2000, be admitted:

7/19/2000

Tr: 54:18-25
Tr: 55:1-5
Tr: 73:23-75:3
Tr: 82:4-5
Tr: 119:14-120:21
Tr: 121:1-25
Tr: 146:1-15

7/20/2000

Tr: 124:9-13, 18-23
Tr: 149:25-150:6
Tr: 150:10-14

7/21/2000

Tr: 5:3-9
Tr: 5:15-6:1
Tr: 36:20-37:21
Tr: 38:6-19

8/6/2000

Tr: 51:20-52:2
Tr: 56:3-17
Tr: 86:15-87:10
Tr: 95:4-96:1
Tr: 168:19-25
Tr: 169:1-12
Tr: 170:10-12

These excerpts are attached hereto as Exhibit 2.

**B. Counter-Designations From The Deposition Testimony of Alan Blake**

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Mr. Alan Blake obtained in this case on July 7, 2000, be admitted:

Tr: 34:19-35:6
Tr: 37:3-38:18
Tr: 41:2-43:4
Tr: 44:23-45:23
Tr: 47:22-48:21
Tr: 50:1-51:1
Tr: 54:25-55:8
Tr: 57:3-17
Tr: 60:4-23
Tr: 62:11
Tr: 62:24 - 63:18
Tr: 76:3-23
Tr: 85:5-87:17
Tr: 88:17-25
Tr: 90:3 - 95:20
Tr: 103:7-104:18
Tr: 111:5-7
Tr: 124:12 - 128:14
Tr: 129:7 - 129:20
Tr: 130:6 - 133:12

These excerpts are attached hereto as Exhibit 3.

**C. Counter-Designations From the Deposition Testimony Of Diana Januska**

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Ms. Diana Januska obtained in this case on August 11, 2000, be admitted: Tr. 19:17-25; 20:1-8. These excerpts are attached hereto as Exhibit 4.

### D. Counter-Designations From the Deposition Testimony Of Ronald Karr

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Mr. Ronald Karr obtained in this case on July 12, 2000, be admitted: Tr. 36:2-19; 37:2-16; 73:21-74:13. These excerpts are attached hereto as Exhibit 5. Plaintiffs also respectfully request that the Court admit the errata sheets that Mr. Karr signed in connection with his deposition testimony. (Attached hereto as Exhibit 8).

### E. Counter-Designations From the Deposition Testimony Of Dr. Paul Griffin

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Dr. Paul Griffin obtained in this case on February 11, 2002, be admitted: Tr. 161:14-20. These excerpts are attached hereto as Exhibit 6.

### F. Counter-Designations From the Deposition Testimony Of Howard Ross

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Howard Ross obtained in this case on August 3, 2000, be admitted: Tr. 108:20-109:4, 111:21-113:5. These excerpts are attached hereto as Exhibit 7.

Respectfully submitted,

/s/ David B. Bergman
David B. Bergman
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for plaintiffs
Holland and Ross and First Bank.

*Of Counsel*:
Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

*Co-counsel for First Bank*:
Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
Gunn and Gunn
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, Missouri 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

Dated: November 9, 2007

**CERTIFICATE OF SERVICE**

I certify that on this 9th day of November 2007, I caused the foregoing **PLAINTIFFS' OBJECTIONS AND COUNTER-DESIGNATIONS TO DEFENDANT'S FACT WITNESS DEPOSITION DESIGNATIONS** to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: November 9, 2007 /s/ Joshua P. Wilson
Joshua P. Wilson

# EXHIBIT 1

ARNOLD & PORTER
555 TWELFTH STREET, N.W.
WASHINGTON, D.C. 20004-1206
(202) 942-5000
FACSIMILE: (202) 942-5999

NEW YORK
DENVER
LOS ANGELES
LONDON

DAVID B. BERGMAN
(202) 942-5474

September 19, 2000

Ms. Mary Woodward
Alderson Reporting Company
1111 14th Street, N.W.
Suite 400
Washington, DC 20005

**Re: Holland & Ross v. U.S.**

Dear Mary:

Enclosed are the errata sheets and signature page from the deposition of Allen Blake taken on July 7, 2000.

Best regards.

Sincerely,

David B. Bergman

Enclosures

cc: Patricia Smith, Esq. (w/encl.)

Page 1 of 5

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 21, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 7, 2000
Deponent: Allen Blake
Place: Clayton MO
Ref. No.: 1638-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 6 | 4 | LYBURN | LYBRAND | MISSPELLED |
| 6 | 9 | LYBURN | LYBRAND | MISSPELLED |
| 6 | 16 | LYBURN | LYBRAND | MISSPELLED |
| 7 | 24 | LYBURN | LYBRAND | MISSPELLED |
| 8 | 3 | LYBURN | LYBRAND | MISSPELLED |
| 8 | 10 | LYBURN | LYBRAND | MISSPELLED |
| 9 | 4 | AMERA BANC | AMERIBANC | MISSPELLED |
| 13 | 13 | PROVISO | FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF PROVISO TOWNSHIP | SHORT NAME REFERENCE |
| 18 | 14 | APPOSED | OPPOSED | MISSPELLED |
| 19 | 4 | IS WORTH | NET WORTH | CLARIFY |
| 23 | 8 | TO DO ONE. | TO DO. | CLARIFY |
| 23 | 18 | A MILLION | SEVERAL | CORRECTION |
| 24 | 10 | SHRIVER | SCHREIBER | CORRECTION |
| 24 | 17 | STURCKAN | TURKCAN | CORRECTION |
| 26 | 5 | OR ANY VALUE | OR ASSIGN ANY VALUE | CORRECTION |

[signature]

Signature of Deponent

9/20/00

Date of Signature

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 21, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 7, 2000
Deponent: Allen Blake
Place: Clayton MO
Ref. No.: 1638-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 27 | 5 | UNIQUE, THAT'S | UNIQUE THAT'S | CORRECT PUNCTUATION |
| 27 | 17 | APPOSED | OPPOSED | MISSPELLED |
| 29 | 21 | MORTGAGE BANK | MORTGAGE BACKED | CORRECTION |
| 30 | 4 | MDS | MBS | CORRECTION |
| 34 | 16 | IN THE 1990s. | IN 1990 | CLARIFY |
| 34 | 17 | MILES OR SO. | MILES OR SO AWAY. | CORRECTION |
| 34 | 22 | CIRCULATED ANYBODY | CIRCULATED TO ANYBODY | CORRECTION |
| 34 | 24 | GOT A LIST | GOT ON THE LIST | CORRECTION |
| 44 | 5 | SEVER | SEVERAL | CORRECTION |
| 46 | 5 | MANAGER SERVICE | MORTGAGE SERVICE | CORRECTION |
| 48 | 7 | TURKIN | TURKCAN | MISSPELLED |
| 71 | 4 | BILLING | BUILT-IN | CORRECTION |
| 75 | 9 | BANC OF TEXAS | BANKTEXAS | CORRECTION |
| 76 | 16 | FRANCHISER | FRANCHISE | CORRECTION |
| 76 | 23 | APPOSED | OPPOSED | MISSPELLED |

[signature]
Signature of Deponent

9/15/00
Date of Signature

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 21, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 7, 2000
Deponent: Allen Blake
Place: Clayton MO
Ref. No.: 1638-2

| Page | Line | Now Reads | CORRECTIONS: Should Read | Reasons Therefore |
|---|---|---|---|---|
| 77 | 4 | NEW INTEREST SPREAD | NET INTEREST SPREAD | CORRECTION |
| 81 | 11 | NEW INTEREST MARGIN | NET INTEREST MARGIN | CORRECTION |
| 86 | 9 | FDA | FBA | CORRECTION |
| 88 | 17 | CALCULOUS | CALCULATION | CORRECTION |
| 89 | 22 | DEFINITION | DEFINITIVE AGREEMENT | CLARIFY |
| 93 | 7-8 | PRESENT A VALUE PACKAGE | PRESENT VALUE PERCENTAGE | CORRECTION |
| 93 | 10-11 | THE SEPARATE CALCULATION COST OF | A SEPARATE CALCULATION THE COST | CLARIFY |
| 94 | 16 | 13.5 MILLION | 33.5 MILLION | CLARIFY |
| 97 | 10 | BEEN ME ON | BEEN ON | CORRECTION |
| 99 | 9 | STURCKAN | TURKCAN | MISSPELLED |
| 100 | 8 | APPOSED | OPPOSED | MISSPELLED |
| 104 | 1 | SAY | SAYS | CORRECTION |
| 104 | 10 | CALCULATION | CALCULATING | CORRECTION |
| 104 | 12 | BY MERGING | OF MERGING | CLARIFY |

[signature]
Signature of Deponent

9/15/00
Date of Signature

Page 4 of 5

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 21, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 7, 2000
Deponent: Allen Blake
Place: Clayton MO
Ref. No.: 1638-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 109 | 9 | RESTRUCTURE | STRUCTURE | CORRECTION |
| 123 | 14 | BOOK OF | BOOK VALUE OF | CORRECTION |
| 126 | 11 | 2½ | $2.5 MILLION | CLARIFY |
| 128 | 12 | $18.2 MILLION LESS | $11.2 MILLION MORE | TRANSCRIPTION INCORRECT |
| 128 | 9 | YES | ATTACHMENT A | TRANSCRIPTION DOES NOT REFLECT ACTUAL TESTIMONY |
| 128 | 14 | SOMETHING CLOSE TO THAT, YES. | ATTACHMENT B | TRANSCRIPTION DOES NOT REFLECT ACTUAL TESTIMONY |

[signature]
Signature of Deponent

9/15/00
Date of Signature

Page 5 of 5

| | |
|---|---|
| Case Name: | Holland & Ross vs. United States |
| Case Number: | 95-524 |
| Dep. Date: | July 7, 2000 |
| Deponent: | Allen Blake |
| Place: | Clayton MO |
| Ref. No. | 1638-2 |

**Attachment A**

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 128 | 9 | Yes | Yes, if the NOLs had been used to shelter earnings before we acquired River Valley, and if the previous owners had dividended out to themselves the $14 million in earnings sheltered by the NOLs, we would have paid about $3.6 million less for River Valley than we did for River Valley with the NOLs. If the previous owners had been able to use the NOLs and then kept the sheltered earnings in the company as retained earnings, we would have paid substantially more for River Valley than we actually did. | Transcription does not reflect actual testimony |

**Attachment B**

| | | | | |
|---|---|---|---|---|
| 128 | 14 | Something close to that, yes. | Something close to that, yes. By selling the NOLs to us for $3.6 million, Holland and Ross probably received about $2.8 million net, after taxes, as opposed to approximately $14 million income after tax they could have achieved if they had been able to use all of the $40 million in NOLs themselves. | Transcription does not reflect actual testimony |

Allen L. Blake
9/10/00

# EXHIBIT 2

ORIGINAL



UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X
HOMER J. HOLLAND AND :
HOWARD R. ROSS, :
Plaintiffs, :
v. : No. 95-524C
THE UNITED STATES OF :
AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, July 19, 2000

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by EVADNEY ROGERS KEY, a Notary Public in and for the District of Columbia, taken at the Law Offices of Arnold & Porter 555 Twelfth Street, N.W., Washington, D.C., at 9:53 a.m. on Wednesday, July 19, 2000, and the proceedings being taken down by Stenotype by EVADNEY ROGERS KEY, and transcribed under her direction.

MATERIAL REDACTED

Q. When the acquisition was finalized which you think was made the second quarter of 1985, what was the role you then played at Rock Falls?

A. From that period until probably the end of '86, I didn't play a very active role with respect to Rock Falls.

Q. Why was that?

A. I seemed to be spending most of my time with respect to Gilldorn.

Q. Who was playing the active role at Rock Falls?

A. Of the three of us, Norm Kost was playing the most active role.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I'm trying to understand what it was that you did on a daily basis, what role you served up until 1994. I know you've identified

some areas here, but it seemed there was a time frame when some of it may have ended in the early 90's. So if you could try and recall what different responsibilities you may have had over time and how they changed from the late 80's until the time River Valley was sold.

A. Well, I think the -- I guess I see it as kind of a continuum. I'm not sure -- the work out of the loans continued to be an area that I felt like I had the best experience within our organization to handle, you know, trying to deal with the various problems. Obviously, things changed dramatically when the breach occurred. Then it was one of really scrambling to try to figure out how we could stay alive having had our capital taken away.

I suppose if I sat down and tried to think through what was occurring within the organization each of those times I could be a little more precise, but I think I would say that the period of time -- as I said before, the period of time from the end of '86 until '88 when we actually consummated the transactions, a good bit of that was in preparation for growth. And in negotiating the transactions, we fully

anticipated after the end of '88 that we would continue to do that, and so we looked at lots of different opportunities.

MATERIAL REDACTED

Q. You talked earlier about it was the
intent or desire to grow what initially was River

MATERIAL REDACTED

MATERIAL REDACTED

Q. After the meeting with Earle and prior to March of '88 when you think it was concluded, how much back and forth was there, that you can recall?

A. Pretty extensive. I wasn't as much directly with Jay Earle at that point. He had someone that was in charge of this working for him. Lots of different people change, so I don't remember who it was at that point. But then I do remember Jay Earle got reassigned to the southwest plan and he was replaced by a man by the name of Herb Held. Whereas I thought we had

a deal done in March, now it started like they wanted to renegotiate it again, so we had to go back through many of these same points.

Q. Do you recall specifically what points you had to go back over? And this would have been with Herb Held?

A. This was with Herb Held.

Herb wanted to get out of the preferred stock. He did not want to invest in us in the preferred stock. I don't know whether that was the difference between Jay Earle or Herb Held or it was a difference in the policies of the FSLIC at the time. And I said that was an essential part of this, as far as I was concerned.

But what we did agree on was somewhat of a middle ground in that I agreed that the preferred stock could have an additional dividend rate on it if we were very successful. I don't remember the precise formula, but it was an enhancement of the value of the preferred if we were successful.

MATERIAL REDACTED

I just felt like I was -- we had been -- I thought almost had a deal. Oh, I do remember now. We then insisted that if they weren't going to close in March then there would be a per diem added to the amount of the cash reflecting what we anticipated were the operating losses of the institutions during that period of time.

Q. Could you state it one more time?

A. These S&L's were continually losing money, so that the capital was eroding. In addition, we felt that we were taking some interest rate risk because we knew that their balance sheets weren't very well matched. So for us to agree in March to how much we're willing to take for them to infuse in cash but if it didn't close until September, that might have been a complete -- it might have been a much worse deal for us. So we said that we would agree on an amount today. That amount had to increase by I think it was $13,000 or thereabouts a day until it actually closed.

Q. And that's something you dealt with Mr. Held on?

A. I believe so.

Q. At the time when you realized that Galva Home Mutual would be separate from Rock Falls, did you anticipate that you would merge them together?

A. Yes.

Q. Did you have any kind of an expected period of time when you thought the merger would take place?

A. I thought that it would be as soon as the tax issues were behind us, and I don't remember what it was in the timing that would make that happen.

Q. Was there anything other than the tax issues that you can recall that was making you wait in terms of merging the two institutions?

MATERIAL REDACTED

ORIGINAL



UNITED STATES COURT
OF FEDERAL CRIMES

------------------------------)
HOMER J. HOLLAND and )
HOWARD R. ROSS, )
)
Plaintiffs, )
)
v. ) No. 95-524C
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )
------------------------------)

Deposition of HOMER J. HOLLAND, called as an adverse party by and on behalf of the Defendant, pursuant to the Rule 4:5 of the Supreme Court Rules of Virginia, taken before Lori M. Gerczak, Notary Public within and for the State of Virginia, at Large, at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., on Thursday, the 20th day of July, 2000, commencing at 9:36 a.m., pursuant to notice and agreement of Counsel.

MATERIAL REDACTED

Q Who was responsible for making determinations with respect to asset growth?

A At the strategic level, our asset growth was limited by the capital that we had, and so our intention was always to grow our assets. Obviously,

But, I think that the -- our overall strategy was to grow the assets and to use the sources of funding that are provided with the thrift charter, and with adequately capitalized thrift, to find that with the various sources of funding that were available to us.

MATERIAL REDACTED

I think we were a good retail banking operation. I

would say that we weren't always the highest -- we didn't also provide the highest interest rates on deposits.

Q Is there anything other than that factor that you would consider to be something where you would thus somehow not be the premier provider?

MATERIAL REDACTED

don't think that that was one of the -- I doubt that that was what he necessarily meant. I think he -- it was one of Ron's responsibilities to run a good retail banking operation, and so he would say that he wanted to be the premier provider.

UNITED STATES COURT

OF FEDERAL CRIMES

------------------------------)

HOMER J. HOLLAND and )

HOWARD R. ROSS, )

)

Plaintiffs, )

)

v. ) No. 95-524C

)

THE UNITED STATES OF AMERICA,)

)

Defendant. )

------------------------------)

Deposition of HOMER J. HOLLAND, called as an adverse party by and on behalf of the Defendant, pursuant to the Rule 4:5 of the Supreme Court Rules of Virginia, taken before Lori M. Gerczak, Notary Public within and for the State of Virginia, at Large, at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., on Thursday, the 21th day of July, 2000, commencing at 9:56 a.m., pursuant to notice and agreement of Counsel.

MATERIAL REDACTED

Q Other than interest rates, what other factors could significantly affect how reliable the business plans were?

A Well, the most significant thing was the passages of FIRREA, which dramatically changed the nature of the capital that we had expected through the -- through those projections.

MATERIAL REDACTED

And some of those factors were the adverse consequences of the publicity about the S&L crisis. And as I mentioned yesterday, I thought that the Peoria Savings customers were surprised and kind of shocked that the Peoria Savings had failed.

I think the other thing that we talked about was the fact that it takes a while to merge operations, particularly when they're in the same marketplace. That had an impact on people thinking they could do business with River Valley in a new branch, but actually couldn't until the computer

conversion was completed.

MATERIAL REDACTED

MATERIAL REDACTED

Q Mr. Holland, if you could take a look at what the court reporter just marked as Exhibit 13. It's the Joint Regular Meeting of the Boards of Directors of River Valley Savings Bank and River Valley Savings Bank, FSB, minutes of July 19, 1989, with a bates range PH0054 1695 through 1698. And it

indicates that you were in attendance at the meeting.

And specifically I'm going to refer you to the second page. And the second full sentence in the text after that and it reads:

"It appears that the new federal legislation will be passed on August 9 and that the more sever House version will be passed. Such version currently calls for 3 percent adjusted tangible capital (including goodwill) by June 1, 1990, with goodwill phased out by December 31, 1994.

"Our internal projections, based upon our earnings since acquisition, indicate that we would be able to meet both the June 1, 1990 and the December 31, 1994 standards."

Does this refresh your recollection as to whether prior to the passage of FIRREA you anticipated being able to meet the requirements that were expected?

A I don't have any specific recollection of this discussion, but I assume that's what I said at the time.

MATERIAL REDACTED

MATERIAL REDACTED

Q And so is it fair to say, Mr. Holland, that the indication here is that you projected that you'd be able to meet the requirements of the impending legislation based upon your internal projections of earnings as opposed to any extraordinary events?

A I don't -- honestly, I don't know what was included in those internal projections.

Q The last sentence indicates, "Our internal projections, based upon our earnings since acquisition, indicate that we would be able to meet both the June 1, 1990, and the December 31, 1994 standards."

A I don't remember the context in which I made that statement.

MATERIAL REDACTED

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and )
HOWARD R. ROSS, )
Plaintiffs, )
) Case No.
vs. ) 95-524C
THE UNITED STATES OF AMERICA, )
Defendant. )
______________________________)

VIDEO DEPOSITION OF HOMER J. HOLLAND
Flagstaff, Arizona
Sunday, August 6, 2000
8:38 a.m.

REPORTED BY
NAOLA C. THIMESCH
AZ CSR #50309
CRR, RPR

MATERIAL REDACTED

Q. Well, no. Again, assuming San Antonio -- you didn't know about San Antonio or it didn't exist and there were no attempts to acquire it.

A. You're kind of asking me if I hadn't spent my time and attention on this one, what other one would I have spent my time and attention on. And I

can't tell you what other one I would have necessarily spent my time and attention on.

MATERIAL REDACTED

Q. I probably should ask some follow-up questions a little later today in terms of discussing the ultimate sale of River Valley, but I'll kind of switch -- continue on the line I was on at this point for now.

In 1993 do you recall receiving deferred compensation pursuant to the deferred compensation agreement that was in place?

A. I know I received it. I don't know whether it was '93, '94 or just when.

Q. Do you recall that that was -- the way that was funded was that River Valley Holdings, Inc., was indebted to American National Bank?

A. I'll take your word for it, if that's it. I just don't recall.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Who within River Valley determined what they believed the value to be of River Valley for purposes of selling it?

A. Well, again, we regularly did a mark-to-market valuation, and in the mark-to-market valuation, you make a number of assumptions. Doesn't necessarily mean that you absolutely know what the market for each component is going to be.

You -- I mentioned the mortgage back securities. Not the mortgage back securities, the servicing portfolio.

One can try to reach a comparable number to what you see transactions happening in the marketplace, based on the characteristics of your servicing portfolio versus what you see elsewhere. And try to say, well, gee if I sold things component by component, what would I get. Or am I -- you know, and clearly one -- you always have that as an option. You can always simply liquidate the whole thing and try to sell it in pieces, which is -- which is in some respects what the mark-to-market is.

MATERIAL REDACTED

MATERIAL REDACTED

By the same token had developed quite a good staff that, you know, could operate River Valley. I don't think that if he had made a choice to leave before we had chosen to sell that would have precipitated us to sell.

I think that the -- the overwhelming feeling I have is this discouragement over how we had been treated by the government and kind of the strain that that put on all of us in kind of almost reaching the brink of losing everything that we had built and everything that we had invested in River Valley.

So to me those -- that was the overwhelming issue with respect to my feeling that we should sell. I think it was also the case that with the -- having lost the window of opportunity to acquire institutions in the late '80s, early '90s, that, you know, they -- the overall game plan that we had originally come together on was -- we just couldn't pursue it.

So I think it was those things that motivated us to -- certainly motivated me to want to sell. And -- well, I don't think that the -- that the loss of a single person within River Valley would have

been the issue that would have prompted a sale.

MATERIAL REDACTED

MATERIAL REDACTED

Q. How, if at all, do you believe the capital ratios would have been different if the alleged breach had not occurred?

A. Well, clearly we went through the Valley of Death here with our capital ratios right after the breach. That wouldn't have occurred.

The -- subsequent to the breach we were --

because I believe that of the -- I believe that the FDIC and OTS, particularly the FDIC, imposed harsher requirements on us because -- because we were so close at the time, and we didn't -- and we had to live with those, it's possible that we would have been able to operate at the capital levels that were considered standard at that time for the industry, and could have built a balance sheet based on those.

I believe that the breach caused us to have to operate, as I recall seeing in here, at a 5 percent tangible capital requirement. I don't believe that we would have had to do that but for the breach.

MATERIAL REDACTED

MATERIAL REDACTED

kind of what the context was at that time and what the specific tiering -- what the specific advantages of the different tiering levels were.

# EXHIBIT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Cause No. 95-524C
Chief Judge Smith

HOMER J. HOLLAND and HOWARD B. ROSS,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF ALLEN H. BLAKE

Taken on behalf of the Defendant

July 7, 2000

MATERIAL REDACTED

Q. The deals with the RTC at First Banks, how did those come about? How did you become aware that those institutions were available?

A. The RTC pretty well circulated anybody who had any remote interest in an institution, so we got a list all the time on them and it was just a matter of bidding on them.

Q. And were you the person primarily responsible for dealing with the RTC?

A. I had a lot of it, and Jim Dierberg had some, and there was another fellow there at the time named Larry Brost (phonetic), who was our controller.

MATERIAL REDACTED

MATERIAL REDACTED

beyond that.

Q. Did they tell you like a general amount?

A. I don't think so. I think they told me what the capital was, which I think was 23 or 24 million, something like that.

Q. And after that initial contact what happened next?

A. Well, I think then they talked with either their Chicago office or I believe River Valley was represented by Donaldson Lufkin. I think they talked to one of the two, and we later received a confidentiality agreement and some information on it.

Q. And the information that you received, where did that come from that came to you?

A. I believe it came from Donaldson Lufkin.

Q. And what sort of information?

A. I don't know the extent of it right now, but I know there were balance sheets, income statements, general financial information. I don't recall whether they had a formal offering booklet or

not, but generally that's the type of information that you get. They give information on locations, deposits by location, some distribution of the deposits by type and maturity and interest rate, and the same sort of thing on loans, types of loans, what the distribution of interest rates are and maturity schedules.

Q. And what sort of analysis did you conduct on this information?

A. At that point what you can do is really pretty rough and you are making some estimates on past experience as much as anything. But what you can do is go through particularly the audited year-end financials, go through the footnotes and see what is there and come up with a rough idea what their price will be from there. It will just give you a ballpark, but sometimes you can at least get within a range.

MATERIAL REDACTED

MATERIAL REDACTED

Q. In the paragraph right below the numbered items it reads: "Information regarding the 'STAR' securities is not available at this time."

Do you recall what that's referring to?

A. STAR is an acronym for Short-term Tax Advantage Residuals, and they are mortgage backed residuals that were structured to have certain attributes.

Q. And do you recall what relevance, if any, the STAR securities had to your analysis of the River Valley acquisition?

A. Well, frankly they are something I had never heard of before, so I was wanting to find out what they were in the first place. What particular attributes they had is they were characterized by a large cash flow on the front end which threw off taxable income which then were offset by losses in later periods which threw off tax losses. And the particular purpose was to refresh the expiring operating losses.

Q. I wonder if we could get you to look at now what we have marked as Exhibit 3, which is a fairly substantial document with a cover page which reads River Valley Board of Directors Meeting, May

18, 1994. It bears an identification number on the very lower right-hand corner of PHO 011 1555, and the document runs through 1701. There is also an H&R Bates number H&R-B45-01552 through 01699.

Can I get you to turn in a few pages to what is 1555 in the very lower right-hand corner of the page? The page is head River Valley Mark-To-Market Valuation April 30, '94, and the next page is for March 31, and the following page is for the change for April 30. Do you recall ever having seen this sort of information in doing your analysis of River Valley?

A. I have seen this sort. I don't know if this is the particular one, though.

Q. And what sort of analysis did you do with respect to the Mark-To-Market Valuations that you were provided?

A. This was a starting point for us but we actually do our own calculations. Many of the adjustments on here are the sort of adjustments we might make.

Q. Did you have any impression -- Let me back up for a second.

Did you receive any sort of mark-to-market information in connection with other

acquisitions you did or was this sort of a novelty
with respect to the River Valley acquisition?
A. I've seen this sort of thing on a
couple of occasions, but it's not a norm.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And who is the person on your staff?
A. His name is Ed Furman.
Q. And what is his position with First

Banks or what was it at that time?
A. He is in charge of investments and asset liability management.
At that time there was another person working with him in that capacity named Stan Fares, F-A-R-E-S.
Q. And do both of those gentlemen report to you?
A. Yes.
Q. And the STAR investments that were brought to your attention, did you ultimately determine that those were desirable things for First Banks to acquire or --
A. If we were going to acquire the institution, we were going to acquire them regardless. So it was not a matter that it desirable or undesirable. They served a purpose which once we understood the purpose we could accept them fairly easily. However, the purpose was primarily tax. Then we got tax people involved. We have an on-staff person as well as Peat Marwick.
Q. And who is your on-staff person?
A. It's a lady named Annette Carson.

MATERIAL REDACTED

MATERIAL REDACTED

Q. (By Mr. Murphy) I'm sorry. Thank you.
My question was specifically directed to mortgage services. Let me back up and I'll ask about the mortgage servicing and then I'll ask about

the NOLs just so we're sure it's perfectly clear.

With respect to the mortgage servicing I believe you indicated that you came up with a different value than they had. What was the basis of that?

A. We had our mortgage person there. I had forgotten about it. Mark Turkin (phonetic), I believe, was there, and he runs our mortgage servicing operation here.

And it's a factor, and I have limited knowledge in the area, but it's a factor of what the servicing rate they receive is, the types of loans, whether they're adjustable, whether they're fixed, what the maturity is, but factoring all that in he felt it was worth about half of what they thought it was worth.

Q. And do you recall how that was resolved?

A. It was resolved when I told Mr. Holland that we weren't going to pay what he wanted to get for it.

MATERIAL REDACTED

Q. And who else was in attendance there, if you recall?
A. I don't recall everybody. As I said, Mark Turkin was there. Jim Dierberg was there. Annette Carson was there. We had at least two people from Peat Marwick. Dan DeMoss was one and I believe Barry Cooper was another one, who was an audit manager in St. Louis. And I'm sure there were a couple more, but I don't recall.
Q. Do you recall if anyone from Peat Marwick Chicago was there?
A. There may have been. I'm not sure.
Q. What about anyone from DLJ?
A. There was a fellow that came in during the discussion. It was late. I don't remember his name.
Q. Was it Mr. Olson?
A. What was the name again?
Q. Olson.
A. No. It was a fellow that worked for him. It was funny because he finally showed up just as we were leaving.
Q. And who from River Valley would have been present?
A. Homer Holland was there, and I don't

recall if anybody else was or not.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And you mentioned before that you

suggested engaging in some swap activity by River Valley. With whom did you have that conversation or those conversations?

A. I didn't directly. Ed Furman had the conversation and probably Stan Fares as well.

Q. Did they, Mr. Furman and/or Mr. Fares, have that conversation at your direction?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Were you aware of any competition with First Banks for the acquisition of River Valley?
A. I didn't know specifically about any. I assumed there was some because they hired DLJ.
Q. Did you feel any particular time pressure to get a deal done?
A. They always apply time pressure on every deal. The seller is always more anxious to get it done. In this case when I received that phone call in July Mr. Holland indicated there had been some problems with the party they were dealing with, that they had gone to when we had backed out, and then he seemed to want to get moving quickly. So we accommodated him. We moved as fast as we could on it.

MATERIAL REDACTED

Q. And how was River Valley merged into the First Banks structure when the deal was consummated?

A. Actually, I believe River Valley was the survivor, so we merged everything into River Valley but then changed the name.

Q. Changed the name to First Banks?

A. First Bank, a Savings Bank.

Q. And when you say you merged everything into River Valley, what would "everything" be?

A. Well, at that time it was First Bank, a Savings Bank. The Proviso had already been merged into that.

Q. So just to make sure that I'm straight on this, with the acquisition what actually was the case was that River Valley was the surviving entity and your other thrift operations were merged into River Valley, but the name was changed to First Banks, a Savings Bank?

A. Correct.

MATERIAL REDACTED

Q. In comparing the acquisition of River

MATERIAL REDACTED

thrifts, Proviso, was the resulting institution accounted for as a combined separate entity or were different books kept for River Valley and Proviso? As a general matter, how was the combined entity accounted for?

A. Ultimately, when we got the data conversion done, it was all accounted for as one institution. We do have a cost reporting system, a branch reporting system where we can break out segments of it. But it was not accounted for as River Valley, First Banks, a Saving Bank, and Proviso separately.

Q. And when was the merging of the reporting function completed?

A. It would have been during '95, but I don't know when. And the same way with the legal merger, I don't know that it happened immediately, but it happened in '95.

MATERIAL REDACTED

MATERIAL REDACTED

Q. In the acquisition of River Valley was First Banks primarily interested in the deposit franchise or was that just one consideration of the overall deal?

A. That obviously has to be a significant consideration, but it was one of several.

Q. What were the others?

A. We had an interested in the mortgage servicing. It was a good acquisition for us from our standpoint. The locations that they had were good, being close to our Galesburg operation and in Chicago, and then the loan portfolio was good.

Q. And the location element, is that related to the deposit franchiser or is that more relevant to some other calculation?

A. I don't think it necessarily factor into any mathematical calculation. It's something I keep in my mind. All things being equal I would rather have something that fits in geographically with where we are in market or close to where we are as apposed to something that is way far away.

MATERIAL REDACTED

Q. And in the 13 acquisitions that First Banks engaged in in the '94 to '96 timeframe was goodwill booked in any of the other acquisitions?

A. Several of them.

Q. Was the amount of goodwill in the River Valley acquisition larger than any of the others?

A. Dollar amount or percentage?

Q. Good question. Let's start with dollar amount.

A. Dollar amount it was probably larger than the others.

Q. And would that have been a function of the fact that it was a larger institution that you were acquiring?

A. That's right.

Q. And on a percentage basis?

A. On a percentage basis it was larger than most of the California acquisitions we did in '95 and '96. It was probably not as large as some of those we booked earlier here in -- well, in 1994.

Q. Now, if I could get you to turn to page

107 of 127 still in Exhibit 1. It begins on 105. There is a heading of Income Taxes, but my questions are going to relate to page 107.

The last paragraph on page 107 notes that at December 31, 1996 and 1995 for Federal income tax purposes First Banks had NOL carryforwards of approximately $60.1 million and $70.6 million respectively, exclusive of the NOL carryforwards available to FDA and FCB as further described below. And then it goes on to the schedule on the next page.

Of the 60.1 million in net operating losses available for income tax purposes on December 31, 1996, do you know how much of those First Banks had received as a result of the acquisition of River Valley?

A. Not specifically. They were part of that.

Q. Do you recall if they were roughly a half of it or a third of it?

A. I don't know at the end of '96. When we acquired River Valley the NOLs were in the range of around $40 million. Not all of those were usable by us, so some of it was lost and would not have been included in this number, and some of it

presumably was used in '95.

Q. Now, why would some of those NOLs not have been available for use by First Banks?

A. Two reasons. Well, they're interrelated. One is because you have got this limitation on how much you can use every year, and the other thing is that as we did that some of them were expiring each year, and so the two working together will limit how much you can use.

Q. And of the 40 million of NOLs that were acquired do you recall how much were not available for First Banks' actual use?

A. I believe it was in the range of around 4 million.

Q. That would have left approximately 36 million?

A. Something like that, yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did First Banks ever do a calculous of this percentage of or purchase price for River Valley is what we consider ourselves to be paying for the NOLs?
A. We did it the reverse way.
Q. Okay.
A. We took a look at the NOLs and came up with an estimate of value on those and that factored into the purchase price.

MATERIAL REDACTED

A. Yes, there was some prior to this.
Q. And -- I'm sorry. I interrupted your explanation.
A. Basically what the first page is, it starts with their stated shareholders equity right off their general ledger. And at this point we were looking for a closing six months later, so it's looking at June 30th of 1994. And so I guesstimated income through the end of 1994 figuring that would be earned during that interim time period. And then I was working with a purchase price of originally $38 million, which was later adjusted. And then I took a number of adjustments, some of which we knew about, some of which we were still refining, but what we had information at that time as far as adjustments to come up with what the purchase premium was and how it would be allocated. In this case we have a valuation reserve on a pretax asset, which we were looking at a valuation adjustment of about $3.7 million.
Q. And that is on this first page under the heading Potential Premium Allocation (Estimated) as one of those subheading?

A. Yes, it is.

Q. It has a further subheading under it of Adjustment of Valuation Reserve of Deferred Tax Assets?

A. That's correct.

Q. And what is the period of years that's referenced in that middle column?

A. That's the amortization period. I didn't realized it was 17 years. My mind says it should be 15. I don't know why I used 17.

Q. And then what is the remainder of this first page?

A. The remainder of that is I go through a source of funds calculation. It really is a capital calculation, what capital is required to determine, even though we're paying 38 million we may be able to take a dividend later that reduces our investment. In this case it indicates that we have about $4.5 million that we may take out post acquisition.

Q. And that's under the line Additional Capital Required?

A. I'm sorry? No. If you take the difference between the 38 million and the cash required of 33.5 down at the bottom, that's the 4.5

million, and the reason it's different is that of Additional Deferred Taxes Eligible Due to Consolidation, which amounted to about 9 million.

Q. And how is that 9 million derived?

A. Specifically, I don't know. The theory is that by virtue of consolidating we may be able to use taxes at a faster rate than otherwise. I believe that's a number I got from Annette Carson.

Q. And there is some handwriting up in the upper left-hand corner of this first page that reads: "How does excess leasehold improvements affect this as well as lease on 25,000 excess space in downtown Peoria?" Whose handwriting is that?

A. That's Jim Dierberg's.

Q. And do you have any idea what that is referring to?

A. It's two different items. The excess leasehold improvements, I believe, is in the Chicago downtown office in which they had spent a fair amount of money on the facility which might be more than was needed for our purposes. The downtown Peoria offices was an older building in which there was some space which was pretty much vacant on upper floors, and we leased the whole building. So there was some cost of space that wasn't being used.

Q. Then the remaining -- I guess the second page of this particular document, what is that?

A. This is basically an income projection of what we think the income could be on a normalized basis over a period of years. What we do is we take a straight income analysis and present a value package and the rate of return on the investment, which the investment is the 33.5 coming from the preceding page. And then we factor in the separate calculation cost of the purchase funds and determine the point which you recover your purchase price. And the last part is with all the amortization of purchase adjustments. And that's factoring in all of the non-cash items.

Q. And how is the 3 percent growth rate assumption arrived at?

A. Well, that's just an estimate that I used.

Q. Is that being used as a standard or was that a particular assumption for River Valley?

A. It's modified some based on what the nature of the institution is. Peoria, as you know, is not a high growth area, so I was a little bit more modest in the assumption there. And that's

where the bulk of their operations were. When I go to California it may be more in the 5 percent range.

Q. Were there any other factors aside from the Peoria location that you factored into the 3 percent growth rate?

A. It wasn't the result of a study.

Q. A best guess?

A. Yes.

Q. Did you do any projections using separate growth rates to compare how they would affect different assumptions?

A. No.

Q. And the present value of cash flow of 14.7 percent, how was that 14.7 arrived at?

A. That's the present value we have to apply to that cash flow to come back with the 13.5 million. This doesn't print the whole thing. I run it out 20 years.

Q. And the Cost of Purchase Funds Rate of 8 percent, was that First Banks' overall cost or was that a number derived at?

A. That's approximately what we were borrowing at at the time.

Q. Did the cost of funds for First Banks differ between its thrift and banking entities or

was that different?
A. Cost of deposits in the banks?
Q. Well, let's answer that question first, the cost.
A. My guess is it was relatively close, but I don't recall.
Q. And as far as outside sources of funding that First Banks used, was there any difference in funding its thrift bank operations?
A. No, because this was borrowed funds at the holding company level, so we go to another bank and borrower it the same anyone else does.
Q. And then it would be downstream?
A. Well, what it does it pays off the old shareholders, so it doesn't actually enter the institution other than we get control of it.
Q. And the 38 percent tax rate, is that just the historic First Banks rate?
A. Yes. That's combined federal and state.

MATERIAL REDACTED

MATERIAL REDACTED

Q. (By Mr. Murphy) Mr. Blake, you indicated off the record that you wanted to explain something in addition with respect to Exhibit 8. So why don't you go ahead and do so.

A. Okay. In an earlier question you had asked me about the line that says Additional Deferred Taxes down at the bottom, the 8 million 9.

Q. And this is on the first page of Exhibit 8?

A. Yes.

And in looking at it real quick I didn't focus on what it was correctly. But what that refers to is under regulatory capital guidelines as they exist now there is limitation on the amount of deferred tax asset that you can count in regulatory capital, and if you have more than that limited amount it is treated similar to goodwill. It's a reduction in capital. And if you see about, oh, eight lines above it there is a line

that say Excess Deferred Tax Asset. There is a number 15 million 4 stuck out to the side, and beside that is 13 million 1. Well, the net deferred tax asset we were calculating was the 15 million 4 and the amount ineligible was 13 million 1. Now, the way that was calculated was 10 percent of the number above, the 22 million 8 was 10 percent. That represents the difference there.

There is another alternative limitation but I didn't have the means of calculation it there so I just used the percent rule. However, by virtue by merging the companies you have a larger capital number and you can count that much more of the deferred tax against regulatory capital, and that's what the 8 million 9 is. It's 10 percent of the additional capital that was created by the merger. So it's not directly related to NOLs or anything like that. It's just what the pretax asset is.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you have any idea whose handwriting that is?

A. No, I don't recognize it.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And I think I understood you to say earlier that if River Valley had had a larger balance sheet you would have paid more for it as well; is that correct?

A. Yes.

Q. Did you say that there was more competition from other buyers when a thrift is bigger?

A. Yes.

Q. What is the significance of that?

A. As you introduce more buyers into the bidding the prices tend to get higher.

Q. So the premium to book value tends to get higher?

A. That's correct.

It's a factor that many of the larger organizations don't want, smaller acquisitions. They prefer to do the larger ones.

Q. If River Valley had been twice the size at the time you acquired it do you believe that you likely would have had to pay a higher premium to book value than the one you had to pay?

A. Probably.

Q. You testified earlier that River Valley had about $40 million in net operating loss carryforwards, NOLs, at the time of First Banks acquisition; is that right?

A. That's correct.

Q. You understand how NOLs work; is that right?

A. Yes.

Q. And you understand their value to a thrift or bank?

A. Yes.

Q. If River Valley had been able to use all 40 million of the NOLs before selling River Valley to First Banks, what would the effect have been for River Valley? What would the benefit have been?

A. They would not have had the limitations that we had. The limitations that come into play are strictly related to change of control. And so when you buy something, that's what triggers the limitations. If they could have used them themselves they would not have had those limitations. For example, if they had $40 million in carryforwards and by some chance in 1995 they could generate $40 million of income they could use them all immediately, whereas if we generate $40 million of income we're still limited to the 2 1/2 or whatever the number is that we can use this year.

Q. So the limitation on First Banks ability to use the NOLs is a function not of the NOLs but a function of the regulations governing the acquisition by First Banks?

A. That's correct.

Q. And your recollection is they limited First Banks ability to use the NOLs to something like $2.5 million a year?

A. It's something in that range.

Q. And you lost you said about $4.5 million up front that you would never be able to use as a schedule write-off and had to disregard?

A. It was about that amount that we knew

that we were going to lose simply because they expired before we had a chance to use them. I think we have been able to use all of the rest of them as we go along, but I'm not sure.

Q. If River Valley had been able to use the $40 million in 1995 or 1994 before selling to First Banks, what benefit would River Valley have achieved? What would that have done to their income?

A. It should be something akin to the $40 million times the statutory tax rate which is about 35 percent.

Q. So they would have had about $14 million in their pocket after taxes?

A. Yes.

Q. And on Exhibit 8 -- let's put that in front of you -- the value to First Banks of these $40 million in NOLs put in the context of the restrictions on First Banks ability to use them was somewhere in the order of 3.6 million. Is that an correct interpretation of page 1 of Exhibit 8?

A. Yes, something in that range. That's, I believe, present value because we would be paying a dollar up front for something we would be receiving over the next 17 years.

Q. So if River Valley had been able to use the $40 million of NOLs they would have achieved $14 million after tax saving for themselves and they would no longer have had the NOLs to sell in the deal with First Banks?

A. Right.

Q. And is it likely that you would have paid $3.6 million less for River Valley?

A. Yes.

Q. So the after tax consequence to River Valley or Holland and Ross is they would have had $18.2 million less than they got in the actual sale to First Banks?

A. Something close to that, yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Is it your handwriting on the first page? Anyway, there is some handwriting that crosses out some of the numbers and someone wrote in some new numbers. Is that your handwriting?

A. Yes, it is.

Q. Do you know why the numbers are crossed out?

A. Yes. We did our credit due diligence after we had an oral agreement, and while we were working on the definitive agreement there were some adjustments because there were some credit problems with a few loans, and we agreed to reduce the purchase price from the $38 million down to $37,694,000.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could you just walk me through this again? On Exhibit 8 there is one that says Valuation of Tax Loss Carried Forward. There's that $3.7 million figure we have been talking about, and it says 17 years, and I think at one point you said in your mind you remembered 15 years instead of 17 years. What is the significance of the 15 to 17 year number?

A. Under the tax regulations that existed at that time you had what I thought was a 15 years period which you could carry forward. So if you have a loss you had the next 15 years to offset it. And so that's the maximum period. I don't know why we used 17 there, if there was something unique about that or not.

Q. And you said there was a restriction. So you couldn't use the $40 million in year one, you could only use $2.5 million in year one; is that right?

A. Yes.

Q. Other than the time value to money that it's better to achieve the savings in year one than year 10, is there any other reason that would make the NOLs less valuable to you if you can only use them trickling through?

A. Well, there is a time value to money, but I'm talking about you may not be able to use them at all. The only way you can use them is if you generate income. And as you know, banking goes through various cycles, although we had a very long favorable cycle recently. But in 1994 we were just coming out of a business cycle in which we did not earn a whole lot of money as an industry. And thrifts, particularly, had some bad times lately, in the late '80s and early '90s. So there is no guaranty that you will earn money every year and be able to use this every year. And some of them could expire because some of them were generated back in say 1990 and maybe only had 10 years to go as apposed to 15. Some of them may have been generated before that.

Q. Earlier you testified about the suggestion that others had made to River Valley to do swaps to address interest rate issues. Do you have a view whether River Valley's exposure to

interest rate risks was greater than that of other thrifts?

A. I don't think it was any greater than other thrifts we looked at or, for that matter, our thrift. I'm not sure how it related.

Swaps are somethings we use routinely on our own balance sheet because we recognize when you have got CDs and you got mortgage loans there is an interest rate risk there. And that's the nature of their business, and so there is a mismatch, and the way we have compensated for it on our own balance sheet is to put swaps on.

Q. Did the fact that you suggested that River Valley enter into the swaps indicate that you had any discomfort with River Valley's management or its investment strategy?

A. No.

Q. Did you come to form a view as to the quality of River Valley's management?

A. Generally I think they were fairly good. I was particularly impressed with Ron Pikus. He was a pretty good operator.

Q. He was the president of the thrifts?

A. Yes.

Q. And did you have a view about Homer

Holland in the way he was engaged in the business?

A. Well, Homer was less, I think, involved in detail running the business. But in general I have seen a lot of people on the other side of the fence, and I get involved with them only in acquisitions, but the thing I would say about Homer is he was an individual that I had confidence that he would do whatever he said he would do and there is no hidden agenda behind it. Sometimes you're never quite sure about some of the people you come in contact with. But I had a lot of respect for him. I think it was a good working relationship.

MATERIAL REDACTED

# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and HOWARD )
R. ROSS, )
)
Plaintiffs, )
)
vs. ) No. 95-524C
THE UNITED STATES OF AMERICA, )
)
Defendant. )

Deposition of DIANA JANUSKA
(Taken by Plaintiff)
Chicago, Illinois
August 11, 2000

Reported by: Melissa Belice, CSR No. 084-003391

MATERIAL REDACTED

Q. A good transaction for the government.

A. It resolved three cases.

Q. And that's good for the government at this point?

A. You know, I don't know if good for the government is a -- what do you mean by good for the government?

Q. Was the government's goal to resolve these three cases?

A. At the time in my position, that was my understanding, yes, it was our goal.
Q. When the government achieves its goal, that is generally a good thing for the government, would you agree with that?
A. I guess, yeah.
Q. So therefore if the sale of these three insolvent thrifts through Holland and Ross

MATERIAL REDACTED

# EXHIBIT 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

BANK OF AMERICA, FSB, )
et al., )
)
Plaintiffs, )
)
vs. ) Case No. 95-660C
)
UNITED STATES OF AMERICA, )
)
Defendant. )
---------------------------)
HOMER J. HOLLAND and HOWARD)
R. ROSS, )
)
Plaintiffs, )
)
vs. ) Case No. 95-524C
)
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )

AMERICAN CAPITAL CORPORATION)
and TRANSCAPITAL FINANCIAL )
CORPORATION )
Plaintiff, )
)
vs. ) Case No. 95-523C
)
THE UNITED STATES, )
)
Defendant. )

Deposition of RONALD NEAL KARR
(Taken by Plaintiff)
Chicago, Illinois
July 12, 2000

Reported by: Robin Tokarz-Chimniak
CSR No. 084-001999

MATERIAL REDACTED

Q. The institutions you just mentioned that involved supervisory goodwill -- LaSalle Talman, River Valley, TransOhio -- were they internally at the OTS, did you classify these all as problem institutions at the time?

A. No.

Q. Do they have a particular classification, for your internal supervisory purposes?

A. Well, as I recall, when I came to Chicago, LaSalle Talman was not considered a problem institution at all. TransOhio was. It was having significant operating problems.

River Valley was recovering and headed in the right direction.

The one in Tennessee needed to raise some capital, which it did -- Franklin, I think, was the name of that shop.

MATERIAL REDACTED

Q. Now, when you say "River Valley," are you referring to one institution or two institutions?

A. I'm referring to one.

Q. Do you recall that there were two institutions that had "River Valley" in their name at that time that were subject to the jurisdiction of the Chicago office?

A. I don't recall that.

Q. Specifically which institution are you referring to when you say "River Valley"?

A. The one in Peoria. That was owned and operated by Homer Holland.

Q. And Howard Ross?

A. And Howard Ross.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Mr. Karr, do you know whether the supervisory agreement on River Valley was still in effect when you joined the office?

A. I believe it was, but I'm not positive.

Q. What is your understanding -- what is

your understanding of your office's policies -- or under what circumstances would your office seek to impose a supervisory agreement upon an institution in the Chicago region?

A. Every case is different -- every case has its own unique issues. You have to look at each case and the issues that are there.

Supervisory agreements are typically put in a case because there are safety and soundness concerns at that institution that need to be corrected, and you want to make sure that the board of directors is obligated and has made an agreement to do so.

MATERIAL REDACTED

# EXHIBIT 6

**Certified Copy**



UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - -X

HOMER J. HOLLAND and :
HOWARD R. ROSS, :
Plaintiffs, :
v. : No. 95-524C
UNITED STATES OF AMERICA, : (Senior Judge
Defendant. : Loren A. Smith)

\- - - - - - - - - - - - - - - -X

Deposition of PAUL A. GRIFFIN
Volume I
(Taken by Plaintiffs)
San Francisco, California
February 11, 2002

Reported by: Jan C. Olivieri, CSR No. 5451

MATERIAL REDACTED

Q. Okay. And by successful transaction, that means that River Valley is able to acquire SAFSB in the but for world, and use the River Valley NOLs to shelter the San Antonio income, leaving to one side the question of quantifying what that means, but that's -- that's what we've defined as successful outcome, and you think that's more likely than not; is that true?

MATERIAL REDACTED

# EXHIBIT 7

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and HOWARD R. ROSS,

Plaintiffs,

Case No. 95-524

- versus -

THE UNITED STATES,

Defendant.

August 3, 2000
Washington, D.C.

VIDEOTAPED DEPOSITION OF:

HOWARD R. ROSS,

a Plaintiff in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C. 20004-1206, commencing at 9:05 a.m. before Maria Pugliese, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

MATERIAL REDACTED

A (Witness perusing document.)
Q Do you recall ever having seen this particular document before?
A I do not.
Q The cover letter references that it's a three-year business plan that's been updated. And

what was the purpose of preparing a three-year business plan?

A I believe the regulators wanted a three-year business plan.

MATERIAL REDACTED

MATERIAL REDACTED

Q And what was the -- why were S&Ls falling out of the sky?

A I can go through a long dissertation of that. They just -- the cost of funds exceeded the cost of loan -- in other words, the cost of funds

exceeded -- in most cases exceeded the rate of maturing on the mortgages. They may have had an eight percent cost of the funds and six percent on rate on the mortgages, that caused the problem.

And there are other factors as well and they have been told far and -- far and wide, you have loans, et cetera, et cetera.

Now, I could take you back to Congress and all the things that they have done, allow S&L to do things they have no right doing because they didn't have the expertise to do it. But we won't do that at this time, with your permission, sir.

Q Are you referring to the congressional made act or --

A I don't remember the name of it.

Q Okay. Did the cost of funds issue that you mentioned affect any of the River Valley entities?

A I'm sure it did, but it was profitable in spite of that.

Q And to what do you attribute the fact that --

A Good business --

Q -- River Valley --

A Good business practices.

Q And what were those good business practices?

A Making loans and investments that met our criteria which were standards were soundness and far above the criteria of most other S&Ls.

MATERIAL REDACTED

# EXHIBIT 8

**U.S. Department of Justice**

Civil Division
Tel: (202) 305-7562

Ht-D

cc M/e

Away Smt n

October 5, 2000

Alderson Reporting Co.
Suite 400
1111 14th Street, NW
Washington, DC 20005

Re: Holland and Ross v. United States, No. 95-524C
Bank of America v. United States, No. 95-660C
American Capital Corp. et al. v. United States, No. 95-523C

Attn: Office Manager

Transmitted with this letter please find copies of the signed errata sheets and signature pages for the deposition transcript of **Ronald Neal Karr** taken on July 12, July 13 and August 4, 2000.

I am also sending copies of these documents to counsel who participated in the deposition.

Please call me if you have questions regarding this matter.

Very truly yours,

Tonia J. Tomatore

Tonia J. Tomatore
Trial Attorney
Commercial Litigation Branch

Enclosures

cc: Howard N. Cayne, Esq., Arnold & Porter
Rachel Brand, Esq., Cooper, Carvin & Rosenthal
Patricia A. Smith, Esq., DOJ

ORIGINAL

FROM: Alderson Reporting Company
1111 14th Street, NW
Washington, DC 20005-5650
1-800-FOR-DEPO / 202-289-2221 FAX

SENT TO: Tonia Tomatore, Esq.
Department of Justice
1100 L Street NW
Rm 7033
Washington, DC 20005

NOTICE REGARDING SIGNING DEPOSITION TRANSCRIPT
ORIGINAL DOCUMENTS ENCLOSED

DATE: July 28, 2000
Case Name: Holland & Ross vs. United States
Dep. Date: July 12, 2000
Deponent: Karr
Place: Chicago IL
Ref. No.: 1682-1

ENCLOSURES: Original Transcript
Errata sheet to be completed

Instructions:

1. The witness should review the deposition transcript and sign the original where indicated in the signature block on the last page of the transcript; this transcript must be signed before a Notary Public.

2. The corrections to the transcript must be made in ink on the errata pages provided; all completed errata pages must be signed by the witness. It is important that the witness use the errata pages rather than making corrections directly to the transcript pages.

3. You are reminded that pursuant to the Federal Rules of Civil Procedure and applicable state Court rules, the witness has thirty days from receipt of the transcript to read and sign it. The signed transcript and any errata pages must be forwarded to the attorney who took the deposition as listed below. A method of delivery which provides the sender with proof of delivery should be selected.

RETURN ENCLOSURES TO:

*By copy of this form to the Attorney who took the Deposition, we are returning any Original Exhibits previously retained by the court reporter.
David Bergman, Esq.
Arnold & Porter
555 12th Street NW

Washington, DC 20004

Page 1 of ____

## ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 28, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 12, 2000
Deponent: Karr
Place: Chicago IL
Ref. No.: 1682-1

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 34 | 20 | Benhum | Benham | Correct Spelling |
| 35 | 6 | B-e-n-h-u-m | Be-n-h-a-m | " " |
| 35 | 7 | Benhum | Benham | " " |
| 35 | 12 | Benhum | Benham | " " |
| 41 | 1 | Holland I | Holland and I | Correct grammar |
| 58 | 22 | has an | have two | Correct meaning |
| 58 | 23 | director | directors | " " |
| 69 | 6 | any | many | correct statement |
| 69 | 19 | any today | any [illegible] today | " " |
| 79 | 23 | FSP | FSB | " Word |
| 87 | 19 | is | are | " grammar |
| 89 | 10 | no | a | " Meaning |
| 94 | 15 | active | adverse | " word |
| 95 | 20 | ever | never | " word |
| 97 | 9 | would | could | " word |

Signature of Deponent

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 28, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 12, 2000
Deponent: Karr
Place: Chicago IL
Ref. No.: 1682-1

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 99 | 25 | the '90s | the early '90s | Clarify statement |
| 100 | 17 | FEFE (phonetic) Act | FFIEC | Correct Acronym |
| 103 | 12 | in | and | " word |
| 112 | 23 | rates | ratings | " " |
| 115 | 14 | Chuck | Chet | " name |
| 117 | 7 | and | of | " word |
| 123 | 3 | lost | loss | " " |
| 123 | 22 | lost | loss | " " |
| 191 | 23 | different | difference | " " |
| 203 | 8 | under | on their | " Statement |
| 215 | 11 | acquisition | application | " Word |
| 221 | 9 | down | done | " " |
| 228 | 3 | industry | institution | " " |

Ronald W. Karr
Signature of Deponent

9-27-'00
Date of Signature

risk"?

A. Yes.

Q. Having read this document, do you have any clearer or better insight or understanding as to what Ms. Frank means with respect to the use of that phrase, in the context of River Valley?

A. I do not.

MR. CAYNE: Off the record -- it's 5:35. We will reconvene at 9:00 a.m. Off the record.

(Whereupon, at 5:35 p.m. the taking of the instant deposition ceased.)

Ronald N. Karr
Signature of the Witness

SUBSCRIBED AND SWORN TO before me this 28th day of September, 2000.

Patrick M Settanni
Notary Public

OFFICIAL SEAL
PATRICK M SETTANNI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/12/04

ORIGINAL

FROM: Alderson Reporting Company
1111 14th Street, NW
Washington, DC 20005-5650
1-800-FOR-DEPO / 202-289-2221 FAX

SENT TO: Tonia Tomatore, Esq.
Department of Justice
1100 L Street NW
Rm 7033
Washington, DC 20005

NOTICE REGARDING SIGNING DEPOSITION TRANSCRIPT
ORIGINAL DOCUMENTS ENCLOSED

DATE: July 28, 2000
Case Name: Holland & Ross vs. United States
Dep. Date: [redacted]
Deponent: Karr
Place: Chicago IL
Ref. No.: 1682-2

ENCLOSURES: Original Transcript
Errata sheet to be completed

Instructions:

1. The witness should review the deposition transcript and sign the original where indicated in the signature block on the last page of the transcript; this transcript must be signed before a Notary Public.

2. The corrections to the transcript must be made in ink on the errata pages provided; all completed errata pages must be signed by the witness. It is important that the witness use the errata pages rather than making corrections directly to the transcript pages.

3. You are reminded that pursuant to the Federal Rules of Civil Procedure and applicable state Court rules, the witness has thirty days from receipt of the transcript to read and sign it. The signed transcript and any errata pages must be forwarded to the attorney who took the deposition as listed below. A method of delivery which provides the sender with proof of delivery should be selected.

RETURN ENCLOSURES TO:

*By copy of this form to the Attorney who took the Deposition, we are returning any Original Exhibits previously retained by the court reporter.
David Bergman, Esq.
Arnold & Porter
555 12th Street NW

Washington, DC 20004

Page 1 of 3

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 28, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 13, 2000
Deponent: Karr
Place: Chicago IL
Ref. No.: 1682-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 251 | 11 | Ross | Holland | correct statement |
| 252 | 7 | Ross | Holland | " " |
| 255 | 21 | various | nefarious | " word |
| 258 | 8 | we | would | " word |
| 281 | 25 | valuate | evaluate | " " |
| 308 | 12 | a premium | a significant premium | " statement |
| 208 | 13 | a premium | a significant premium | " " |
| 310 | 8 | premium | a significant premium | " " |
| 321 | 6 | they | that | " word |
| 323 | 4 | with regulatory affairs | regulatory affairs | " title |
| 330 | 8 | mark to mark | mark to market | " word |
| 334 | 6 | know | knew | " " |
| 338 | 24 | risk | list | " " |
| 346 | 1 | relay | leeway | " " |
| 344 | 19 | he | they | " " |

Donald N. Karr
Signature of Deponent

Page 2 of 3

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 28, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 13, 2000
Deponent: Karr
Place: Chicago IL
Ref. No.: 1682-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 346 | 24 | phasing | phase in | Correct word |
| 347 | 19 | Dubuque | Topeka | Correct city |
| 358 | 4 | acquire | require | " word |
| 362 | 15 | that | then | " word |
| 362 | 17 | they don't have | they have | " statement |
| 369 | 2 | their tangible | their negative tangible | " " |
| 395 | 15 | Chicago | Seattle | " City |
| 417 | 8 | cease | seize | " Word |
| 417 | 16 | cease | seize | " word |
| 418 | 4 | cease | seize | " " |
| 424 | 20 | passed | past | " " |
| 428 | 16 | ceased | seized | " " |
| 433 | 10 | prefer | refer | " " |
| 448 | 10 | and | in | " " |
| 449 | 4 | and | in | " " |

Ronald W. Karr
Signature of Deponent

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: July 28, 2000
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: July 13, 2000
Deponent: Karr
Place: Chicago IL
Ref. No.: 1682-2

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 450 | 3 | act as | ~~[illegible]~~ access | Correct words |
| | | | | |

Signature of Deponent

9-28-'00
Date of Signature

MS. TORNATORE: Mr. Cayne, can you represent how much more time you have?

MR. CAYNE: I would represent, Ms. Tornatore, that I have between one and three hours left.

MS. TORNATORE: Okay.

MR. CAYNE: Off the record.

(Whereupon, said deposition was continued sine die.)

Ronald N Karr
Signature of the Witness

SUBSCRIBED AND SWORN TO before me

this 4th day of October, 2000.

Patrick M Settanni
Notary Public

My commission expires: June 12, 2004

OFFICIAL SEAL
PATRICK M SETTANNI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/12/04

COPY

FROM: Alderson Reporting Company
1111 14th Street, NW
Washington, DC 20005-5650
1-800-FOR-DEPO / 202-289-2221 FAX

SENT TO: Tonia Tornatore, Esq.
Department of Justice
1100 L Street NW
Rm 7033
Washington, DC 20005

NOTICE REGARDING SIGNING DEPOSITION TRANSCRIPT
ORIGINAL DOCUMENTS ENCLOSED

DATE: August 29, 2000
Case Name: Holland & Ross vs. United States
Dep. Date: August 4, 2000
Deponent: Ronald Karr (continued)
Place: Chicago IL
Ref. No.: 1758-2

ENCLOSURES: Original Transcript
Errata sheet to be completed

Instructions:

1. The witness should review the deposition transcript and sign the original where indicated in the signature block on the last page of the transcript; this transcript must be signed before a Notary Public.

2. The corrections to the transcript must be made in ink on the errata pages provided; all completed errata pages must be signed by the witness. It is important that the witness use the errata pages rather than making corrections directly to the transcript pages.

3. You are reminded that pursuant to the Federal Rules of Civil Procedure and applicable state Court rules, the witness has thirty days from receipt of the transcript to read and sign it. The signed transcript and any errata pages must be forwarded to the attorney who took the deposition as listed below. A method of delivery which provides the sender with proof of delivery should be selected.

RETURN ENCLOSURES TO:

*By copy of this form to the Attorney who took the Deposition, we are returning any Original Exhibits previously retained by the court reporter.
Howard Cayne, Esq.
Arnold & Porter
555 12th Street NW

(Whereupon, at 12:16 p.m. the taking of the instant deposition ceased.)

Ronald N. Karr
Signature of the Witness

SUBSCRIBED AND SWORN TO before me this 28th day of September, 2000.

Patrick M Settanni
Notary Public

My commission expires:

OFFICIAL SEAL
PATRICK M SETTANNI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/12/04

# CHANGES/CORRECTIONS

| Page/Line | From | To |
|---|---|---|
| 496 / 10 | 1.7 of | 1.7 billion dollars of |
| 522 / 24 | continued | modified |
| 523 / 2 | continued | modified |
| 535 / 15 | probably | probable |
| 535 / 23 | probably | probable |
| 537 / 1 | passed | it passed |
| 554 / 12 | approvable | approval |

Ronald N. Karr
Witness signature

9-28-00
Date