# EXHIBIT 2

ORIGINAL



UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

HOMER J. HOLLAND AND :
HOWARD R. ROSS, :
Plaintiffs, :
v. : No. 95-524C
THE UNITED STATES OF :
AMERICA, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, July 19, 2000

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by EVADNEY ROGERS KEY, a Notary Public in and for the District of Columbia, taken at the Law Offices of Arnold & Porter 555 Twelfth Street, N.W., Washington, D.C., at 9:53 a.m. on Wednesday, July 19, 2000, and the proceedings being taken down by Stenotype by EVADNEY ROGERS KEY, and transcribed under her direction.

MATERIAL REDACTED

Q. When the acquisition was finalized which you think was made the second quarter of 1985, what was the role you then played at Rock Falls?

A. From that period until probably the end of '86, I didn't play a very active role with respect to Rock Falls.

Q. Why was that?

A. I seemed to be spending most of my time with respect to Gilldorn.

Q. Who was playing the active role at Rock Falls?

A. Of the three of us, Norm Kost was playing the most active role.

MATERIAL REDACTED

MATERIAL REDACTED

Q. I'm trying to understand what it was that you did on a daily basis, what role you served up until 1994. I know you've identified

some areas here, but it seemed there was a time frame when some of it may have ended in the early 90's. So if you could try and recall what different responsibilities you may have had over time and how they changed from the late 80's until the time River Valley was sold.

A. Well, I think the -- I guess I see it as kind of a continuum. I'm not sure -- the work out of the loans continued to be an area that I felt like I had the best experience within our organization to handle, you know, trying to deal with the various problems. Obviously, things changed dramatically when the breach occurred. Then it was one of really scrambling to try to figure out how we could stay alive having had our capital taken away.

I suppose if I sat down and tried to think through what was occurring within the organization each of those times I could be a little more precise, but I think I would say that the period of time -- as I said before, the period of time from the end of '86 until '88 when we actually consummated the transactions, a good bit of that was in preparation for growth. And in negotiating the transactions, we fully

anticipated after the end of '88 that we would continue to do that, and so we looked at lots of different opportunities.

MATERIAL REDACTED

Q. You talked earlier about it was the
intent or desire to grow what initially was River

MATERIAL REDACTED

MATERIAL REDACTED

Q. After the meeting with Earle and prior to March of '88 when you think it was concluded, how much back and forth was there, that you can recall?

A. Pretty extensive. I wasn't as much directly with Jay Earle at that point. He had someone that was in charge of this working for him. Lots of different people change, so I don't remember who it was at that point. But then I do remember Jay Earle got reassigned to the southwest plan and he was replaced by a man by the name of Herb Held. Whereas I thought we had

a deal done in March, now it started like they wanted to renegotiate it again, so we had to go back through many of these same points.

Q. Do you recall specifically what points you had to go back over? And this would have been with Herb Held?

A. This was with Herb Held.

Herb wanted to get out of the preferred stock. He did not want to invest in us in the preferred stock. I don't know whether that was the difference between Jay Earle or Herb Held or it was a difference in the policies of the FSLIC at the time. And I said that was an essential part of this, as far as I was concerned.

But what we did agree on was somewhat of a middle ground in that I agreed that the preferred stock could have an additional dividend rate on it if we were very successful. I don't remember the precise formula, but it was an enhancement of the value of the preferred if we were successful.

MATERIAL REDACTED

I just felt like I was -- we had been -- I thought almost had a deal. Oh, I do remember now. We then insisted that if they weren't going to close in March then there would be a per diem added to the amount of the cash reflecting what we anticipated were the operating losses of the institutions during that period of time.

Q. Could you state it one more time?

A. These S&L's were continually losing money, so that the capital was eroding. In addition, we felt that we were taking some interest rate risk because we knew that their balance sheets weren't very well matched. So for us to agree in March to how much we're willing to take for them to infuse in cash but if it didn't close until September, that might have been a complete -- it might have been a much worse deal for us. So we said that we would agree on an amount today. That amount had to increase by I think it was $13,000 or thereabouts a day until it actually closed.

Q. And that's something you dealt with Mr. Held on?

A. I believe so.

Q. At the time when you realized that Galva Home Mutual would be separate from Rock Falls, did you anticipate that you would merge them together?

A. Yes.

Q. Did you have any kind of an expected period of time when you thought the merger would take place?

A. I thought that it would be as soon as the tax issues were behind us, and I don't remember what it was in the timing that would make that happen.

Q. Was there anything other than the tax issues that you can recall that was making you wait in terms of merging the two institutions?

MATERIAL REDACTED

ORIGINAL



UNITED STATES COURT
OF FEDERAL CRIMES

------------------------------)
HOMER J. HOLLAND and )
HOWARD R. ROSS, )
)
Plaintiffs, )
)
v. ) No. 95-524C
)
THE UNITED STATES OF AMERICA,)
)
Defendant. )
------------------------------)

Deposition of HOMER J. HOLLAND, called as an adverse party by and on behalf of the Defendant, pursuant to the Rule 4:5 of the Supreme Court Rules of Virginia, taken before Lori M. Gerczak, Notary Public within and for the State of Virginia, at Large, at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., on Thursday, the 20th day of July, 2000, commencing at 9:36 a.m., pursuant to notice and agreement of Counsel.

MATERIAL REDACTED

Q Who was responsible for making determinations with respect to asset growth?

A At the strategic level, our asset growth was limited by the capital that we had, and so our intention was always to grow our assets. Obviously,

But, I think that the -- our overall strategy was to grow the assets and to use the sources of funding that are provided with the thrift charter, and with adequately capitalized thrift, to find that with the various sources of funding that were available to us.

MATERIAL REDACTED

I think we were a good retail banking operation. I

would say that we weren't always the highest -- we didn't also provide the highest interest rates on deposits.

Q Is there anything other than that factor that you would consider to be something where you would thus somehow not be the premier provider?

MATERIAL REDACTED

don't think that that was one of the -- I doubt that that was what he necessarily meant. I think he -- it was one of Ron's responsibilities to run a good retail banking operation, and so he would say that he wanted to be the premier provider.

UNITED STATES COURT

OF FEDERAL CRIMES

------------------------------)
HOMER J. HOLLAND and )
HOWARD R. ROSS, )
)
Plaintiffs, )
)
v. ) No. 95-524C
)
THE UNITED STATES OF AMERICA,)
)
Defendant. )
------------------------------)

Deposition of HOMER J. HOLLAND, called as an adverse party by and on behalf of the Defendant, pursuant to the Rule 4:5 of the Supreme Court Rules of Virginia, taken before Lori M. Gerczak, Notary Public within and for the State of Virginia, at Large, at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., on Thursday, the 21th day of July, 2000, commencing at 9:56 a.m., pursuant to notice and agreement of Counsel.

MATERIAL REDACTED

Q Other than interest rates, what other factors could significantly affect how reliable the business plans were?

A Well, the most significant thing was the passages of FIRREA, which dramatically changed the nature of the capital that we had expected through the -- through those projections.

MATERIAL REDACTED

And some of those factors were the adverse consequences of the publicity about the S&L crisis. And as I mentioned yesterday, I thought that the Peoria Savings customers were surprised and kind of shocked that the Peoria Savings had failed.

I think the other thing that we talked about was the fact that it takes a while to merge operations, particularly when they're in the same marketplace. That had an impact on people thinking they could do business with River Valley in a new branch, but actually couldn't until the computer

conversion was completed.

MATERIAL REDACTED

MATERIAL REDACTED

Q Mr. Holland, if you could take a look at what the court reporter just marked as Exhibit 13. It's the Joint Regular Meeting of the Boards of Directors of River Valley Savings Bank and River Valley Savings Bank, FSB, minutes of July 19, 1989, with a bates range PHO054 1695 through 1698. And it

indicates that you were in attendance at the meeting.

And specifically I'm going to refer you to the second page. And the second full sentence in the text after that and it reads:

"It appears that the new federal legislation will be passed on August 9 and that the more sever House version will be passed. Such version currently calls for 3 percent adjusted tangible capital (including goodwill) by June 1, 1990, with goodwill phased out by December 31, 1994.

"Our internal projections, based upon our earnings since acquisition, indicate that we would be able to meet both the June 1, 1990 and the December 31, 1994 standards."

Does this refresh your recollection as to whether prior to the passage of FIRREA you anticipated being able to meet the requirements that were expected?

A I don't have any specific recollection of this discussion, but I assume that's what I said at the time.

MATERIAL REDACTED

MATERIAL REDACTED

Q And so is it fair to say, Mr. Holland, that the indication here is that you projected that you'd be able to meet the requirements of the impending legislation based upon your internal projections of earnings as opposed to any extraordinary events?

A I don't -- honestly, I don't know what was included in those internal projections.

Q The last sentence indicates, "Our internal projections, based upon our earnings since acquisition, indicate that we would be able to meet both the June 1, 1990, and the December 31, 1994 standards."

A I don't remember the context in which I made that statement.

MATERIAL REDACTED

UNITED STATES COURT OF FEDERAL CLAIMS

CERTIFIED COPY

HOMER J. HOLLAND and )
HOWARD R. ROSS, )
Plaintiffs, )
) Case No.
vs. ) 95-524C
THE UNITED STATES OF AMERICA, )
Defendant. )
______________________________________)

VIDEO DEPOSITION OF HOMER J. HOLLAND
Flagstaff, Arizona
Sunday, August 6, 2000
8:38 a.m.

REPORTED BY
NAOLA C. THIMESCH
AZ CSR #50309
CRR, RPR

MATERIAL REDACTED

Q. Well, no. Again, assuming San Antonio -- you didn't know about San Antonio or it didn't exist and there were no attempts to acquire it.

A. You're kind of asking me if I hadn't spent my time and attention on this one, what other one would I have spent my time and attention on. And I

can't tell you what other one I would have necessarily spent my time and attention on.

MATERIAL REDACTED

Q. I probably should ask some follow-up questions a little later today in terms of discussing the ultimate sale of River Valley, but I'll kind of switch -- continue on the line I was on at this point for now.

In 1993 do you recall receiving deferred compensation pursuant to the deferred compensation agreement that was in place?

A. I know I received it. I don't know whether it was '93, '94 or just when.

Q. Do you recall that that was -- the way that was funded was that River Valley Holdings, Inc., was indebted to American National Bank?

A. I'll take your word for it, if that's it. I just don't recall.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Who within River Valley determined what they believed the value to be of River Valley for purposes of selling it?

A. Well, again, we regularly did a mark-to-market valuation, and in the mark-to-market valuation, you make a number of assumptions. Doesn't necessarily mean that you absolutely know what the market for each component is going to be.

You -- I mentioned the mortgage back securities. Not the mortgage back securities, the servicing portfolio.

One can try to reach a comparable number to what you see transactions happening in the marketplace, based on the characteristics of your servicing portfolio versus what you see elsewhere. And try to say, well, gee if I sold things component by component, what would I get. Or am I -- you know, and clearly one -- you always have that as an option. You can always simply liquidate the whole thing and try to sell it in pieces, which is -- which is in some respects what the mark-to-market is.

MATERIAL REDACTED

MATERIAL REDACTED

By the same token had developed quite a good staff that, you know, could operate River Valley. I don't think that if he had made a choice to leave before we had chosen to sell that would have precipitated us to sell.

I think that the -- the overwhelming feeling I have is this discouragement over how we had been treated by the government and kind of the strain that that put on all of us in kind of almost reaching the brink of losing everything that we had built and everything that we had invested in River Valley.

So to me those -- that was the overwhelming issue with respect to my feeling that we should sell. I think it was also the case that with the -- having lost the window of opportunity to acquire institutions in the late '80s, early '90s, that, you know, they -- the overall game plan that we had originally come together on was -- we just couldn't pursue it.

So I think it was those things that motivated us to -- certainly motivated me to want to sell. And -- well, I don't think that the -- that the loss of a single person within River Valley would have

been the issue that would have prompted a sale.

MATERIAL REDACTED

MATERIAL REDACTED

Q. How, if at all, do you believe the capital ratios would have been different if the alleged breach had not occurred?

A. Well, clearly we went through the Valley of Death here with our capital ratios right after the breach. That wouldn't have occurred.

The -- subsequent to the breach we were --

because I believe that of the -- I believe that the FDIC and OTS, particularly the FDIC, imposed harsher requirements on us because -- because we were so close at the time, and we didn't -- and we had to live with those, it's possible that we would have been able to operate at the capital levels that were considered standard at that time for the industry, and could have built a balance sheet based on those.

I believe that the breach caused us to have to operate, as I recall seeing in here, at a 5 percent tangible capital requirement. I don't believe that we would have had to do that but for the breach.

MATERIAL REDACTED

MATERIAL REDACTED

kind of what the context was at that time and what the specific tiering -- what the specific advantages of the different tiering levels were.