# EXHIBIT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Cause No. 95-524C
Chief Judge Smith

HOMER J. HOLLAND and HOWARD B. ROSS,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

DEPOSITION OF ALLEN H. BLAKE

Taken on behalf of the Defendant

July 7, 2000

MATERIAL REDACTED

Q. The deals with the RTC at First Banks, how did those come about? How did you become aware that those institutions were available?

A. The RTC pretty well circulated anybody who had any remote interest in an institution, so we got a list all the time on them and it was just a matter of bidding on them.

Q. And were you the person primarily responsible for dealing with the RTC?

A. I had a lot of it, and Jim Dierberg had some, and there was another fellow there at the time named Larry Brost (phonetic), who was our controller.

MATERIAL REDACTED

MATERIAL REDACTED

beyond that.

Q. Did they tell you like a general amount?

A. I don't think so. I think they told me what the capital was, which I think was 23 or 24 million, something like that.

Q. And after that initial contact what happened next?

A. Well, I think then they talked with either their Chicago office or I believe River Valley was represented by Donaldson Lufkin. I think they talked to one of the two, and we later received a confidentiality agreement and some information on it.

Q. And the information that you received, where did that come from that came to you?

A. I believe it came from Donaldson Lufkin.

Q. And what sort of information?

A. I don't know the extent of it right now, but I know there were balance sheets, income statements, general financial information. I don't recall whether they had a formal offering booklet or

not, but generally that's the type of information that you get. They give information on locations, deposits by location, some distribution of the deposits by type and maturity and interest rate, and the same sort of thing on loans, types of loans, what the distribution of interest rates are and maturity schedules.

Q. And what sort of analysis did you conduct on this information?

A. At that point what you can do is really pretty rough and you are making some estimates on past experience as much as anything. But what you can do is go through particularly the audited year-end financials, go through the footnotes and see what is there and come up with a rough idea what their price will be from there. It will just give you a ballpark, but sometimes you can at least get within a range.

MATERIAL REDACTED

MATERIAL REDACTED

Q. In the paragraph right below the numbered items it reads: "Information regarding the 'STAR' securities is not available at this time."

Do you recall what that's referring to?

A. STAR is an acronym for Short-term Tax Advantage Residuals, and they are mortgage backed residuals that were structured to have certain attributes.

Q. And do you recall what relevance, if any, the STAR securities had to your analysis of the River Valley acquisition?

A. Well, frankly they are something I had never heard of before, so I was wanting to find out what they were in the first place. What particular attributes they had is they were characterized by a large cash flow on the front end which threw off taxable income which then were offset by losses in later periods which threw off tax losses. And the particular purpose was to refresh the expiring operating losses.

Q. I wonder if we could get you to look at now what we have marked as Exhibit 3, which is a fairly substantial document with a cover page which reads River Valley Board of Directors Meeting, May

18, 1994. It bears an identification number on the very lower right-hand corner of PHO 011 1555, and the document runs through 1701. There is also an H&R Bates number H&R-B45-01552 through 01699.

Can I get you to turn in a few pages to what is 1555 in the very lower right-hand corner of the page? The page is head River Valley Mark-To-Market Valuation April 30, '94, and the next page is for March 31, and the following page is for the change for April 30. Do you recall ever having seen this sort of information in doing your analysis of River Valley?

A. I have seen this sort. I don't know if this is the particular one, though.

Q. And what sort of analysis did you do with respect to the Mark-To-Market Valuations that you were provided?

A. This was a starting point for us but we actually do our own calculations. Many of the adjustments on here are the sort of adjustments we might make.

Q. Did you have any impression -- Let me back up for a second.

Did you receive any sort of mark-to-market information in connection with other

acquisitions you did or was this sort of a novelty with respect to the River Valley acquisition?

A. I've seen this sort of thing on a couple of occasions, but it's not a norm.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And who is the person on your staff?

A. His name is Ed Furman.

Q. And what is his position with First

Banks or what was it at that time?
A. He is in charge of investments and asset liability management.
At that time there was another person working with him in that capacity named Stan Fares, F-A-R-E-S.
Q. And do both of those gentlemen report to you?
A. Yes.
Q. And the STAR investments that were brought to your attention, did you ultimately determine that those were desirable things for First Banks to acquire or --
A. If we were going to acquire the institution, we were going to acquire them regardless. So it was not a matter that it desirable or undesirable. They served a purpose which once we understood the purpose we could accept them fairly easily. However, the purpose was primarily tax. Then we got tax people involved. We have an on-staff person as well as Peat Marwick.
Q. And who is your on-staff person?
A. It's a lady named Annette Carson.

MATERIAL REDACTED

MATERIAL REDACTED

Q. (By Mr. Murphy) I'm sorry. Thank you.

My question was specifically directed to mortgage services. Let me back up and I'll ask about the mortgage servicing and then I'll ask about

the NOLs just so we're sure it's perfectly clear.

With respect to the mortgage servicing I believe you indicated that you came up with a different value than they had. What was the basis of that?

A. We had our mortgage person there. I had forgotten about it. Mark Turkin (phonetic), I believe, was there, and he runs our mortgage servicing operation here.

And it's a factor, and I have limited knowledge in the area, but it's a factor of what the servicing rate they receive is, the types of loans, whether they're adjustable, whether they're fixed, what the maturity is, but factoring all that in he felt it was worth about half of what they thought it was worth.

Q. And do you recall how that was resolved?

A. It was resolved when I told Mr. Holland that we weren't going to pay what he wanted to get for it.

MATERIAL REDACTED

Q. And who else was in attendance there, if you recall?
A. I don't recall everybody. As I said, Mark Turkin was there. Jim Dierberg was there. Annette Carson was there. We had at least two people from Peat Marwick. Dan DeMoss was one and I believe Barry Cooper was another one, who was an audit manager in St. Louis. And I'm sure there were a couple more, but I don't recall.
Q. Do you recall if anyone from Peat Marwick Chicago was there?
A. There may have been. I'm not sure.
Q. What about anyone from DLJ?
A. There was a fellow that came in during the discussion. It was late. I don't remember his name.
Q. Was it Mr. Olson?
A. What was the name again?
Q. Olson.
A. No. It was a fellow that worked for him. It was funny because he finally showed up just as we were leaving.
Q. And who from River Valley would have been present?
A. Homer Holland was there, and I don't

recall if anybody else was or not.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And you mentioned before that you

suggested engaging in some swap activity by River Valley. With whom did you have that conversation or those conversations?

A. I didn't directly. Ed Furman had the conversation and probably Stan Fares as well.

Q. Did they, Mr. Furman and/or Mr. Fares, have that conversation at your direction?

A. Yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Were you aware of any competition with First Banks for the acquisition of River Valley?

A. I didn't know specifically about any. I assumed there was some because they hired DLJ.

Q. Did you feel any particular time pressure to get a deal done?

A. They always apply time pressure on every deal. The seller is always more anxious to get it done. In this case when I received that phone call in July Mr. Holland indicated there had been some problems with the party they were dealing with, that they had gone to when we had backed out, and then he seemed to want to get moving quickly. So we accommodated him. We moved as fast as we could on it.

MATERIAL REDACTED

Q. And how was River Valley merged into the First Banks structure when the deal was consummated?

A. Actually, I believe River Valley was the survivor, so we merged everything into River Valley but then changed the name.

Q. Changed the name to First Banks?

A. First Bank, a Savings Bank.

Q. And when you say you merged everything into River Valley, what would "everything" be?

A. Well, at that time it was First Bank, a Savings Bank. The Proviso had already been merged into that.

Q. So just to make sure that I'm straight on this, with the acquisition what actually was the case was that River Valley was the surviving entity and your other thrift operations were merged into River Valley, but the name was changed to First Banks, a Savings Bank?

A. Correct.

MATERIAL REDACTED

Q. In comparing the acquisition of River

MATERIAL REDACTED

thrifts, Proviso, was the resulting institution accounted for as a combined separate entity or were different books kept for River Valley and Proviso? As a general matter, how was the combined entity accounted for?

A. Ultimately, when we got the data conversion done, it was all accounted for as one institution. We do have a cost reporting system, a branch reporting system where we can break out segments of it. But it was not accounted for as River Valley, First Banks, a Saving Bank, and Proviso separately.

Q. And when was the merging of the reporting function completed?

A. It would have been during '95, but I don't know when. And the same way with the legal merger, I don't know that it happened immediately, but it happened in '95.

MATERIAL REDACTED

MATERIAL REDACTED

Q. In the acquisition of River Valley was First Banks primarily interested in the deposit franchise or was that just one consideration of the overall deal?

A. That obviously has to be a significant consideration, but it was one of several.

Q. What were the others?

A. We had an interested in the mortgage servicing. It was a good acquisition for us from our standpoint. The locations that they had were good, being close to our Galesburg operation and in Chicago, and then the loan portfolio was good.

Q. And the location element, is that related to the deposit franchiser or is that more relevant to some other calculation?

A. I don't think it necessarily factor into any mathematical calculation. It's something I keep in my mind. All things being equal I would rather have something that fits in geographically with where we are in market or close to where we are as apposed to something that is way far away.

MATERIAL REDACTED

Q. And in the 13 acquisitions that First Banks engaged in in the '94 to '96 timeframe was goodwill booked in any of the other acquisitions?

A. Several of them.

Q. Was the amount of goodwill in the River Valley acquisition larger than any of the others?

A. Dollar amount or percentage?

Q. Good question. Let's start with dollar amount.

A. Dollar amount it was probably larger than the others.

Q. And would that have been a function of the fact that it was a larger institution that you were acquiring?

A. That's right.

Q. And on a percentage basis?

A. On a percentage basis it was larger than most of the California acquisitions we did in '95 and '96. It was probably not as large as some of those we booked earlier here in -- well, in 1994.

Q. Now, if I could get you to turn to page

107 of 127 still in Exhibit 1. It begins on 105. There is a heading of Income Taxes, but my questions are going to relate to page 107.

The last paragraph on page 107 notes that at December 31, 1996 and 1995 for Federal income tax purposes First Banks had NOL carryforwards of approximately $60.1 million and $70.6 million respectively, exclusive of the NOL carryforwards available to FDA and FCB as further described below. And then it goes on to the schedule on the next page.

Of the 60.1 million in net operating losses available for income tax purposes on December 31, 1996, do you know how much of those First Banks had received as a result of the acquisition of River Valley?

A. Not specifically. They were part of that.

Q. Do you recall if they were roughly a half of it or a third of it?

A. I don't know at the end of '96. When we acquired River Valley the NOLs were in the range of around $40 million. Not all of those were usable by us, so some of it was lost and would not have been included in this number, and some of it

presumably was used in '95.

Q. Now, why would some of those NOLs not have been available for use by First Banks?

A. Two reasons. Well, they're interrelated. One is because you have got this limitation on how much you can use every year, and the other thing is that as we did that some of them were expiring each year, and so the two working together will limit how much you can use.

Q. And of the 40 million of NOLs that were acquired do you recall how much were not available for First Banks' actual use?

A. I believe it was in the range of around 4 million.

Q. That would have left approximately 36 million?

A. Something like that, yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Did First Banks ever do a calculous of this percentage of or purchase price for River Valley is what we consider ourselves to be paying for the NOLs?

A. We did it the reverse way.

Q. Okay.

A. We took a look at the NOLs and came up with an estimate of value on those and that factored into the purchase price.

MATERIAL REDACTED

A. Yes, there was some prior to this.
Q. And -- I'm sorry. I interrupted your explanation.
A. Basically what the first page is, it starts with their stated shareholders equity right off their general ledger. And at this point we were looking for a closing six months later, so it's looking at June 30th of 1994. And so I guesstimated income through the end of 1994 figuring that would be earned during that interim time period. And then I was working with a purchase price of originally $38 million, which was later adjusted. And then I took a number of adjustments, some of which we knew about, some of which we were still refining, but what we had information at that time as far as adjustments to come up with what the purchase premium was and how it would be allocated. In this case we have a valuation reserve on a pretax asset, which we were looking at a valuation adjustment of about $3.7 million.
Q. And that is on this first page under the heading Potential Premium Allocation (Estimated) as one of those subheading?

A. Yes, it is.

Q. It has a further subheading under it of Adjustment of Valuation Reserve of Deferred Tax Assets?

A. That's correct.

Q. And what is the period of years that's referenced in that middle column?

A. That's the amortization period. I didn't realized it was 17 years. My mind says it should be 15. I don't know why I used 17.

Q. And then what is the remainder of this first page?

A. The remainder of that is I go through a source of funds calculation. It really is a capital calculation, what capital is required to determine, even though we're paying 38 million we may be able to take a dividend later that reduces our investment. In this case it indicates that we have about $4.5 million that we may take out post acquisition.

Q. And that's under the line Additional Capital Required?

A. I'm sorry? No. If you take the difference between the 38 million and the cash required of 33.5 down at the bottom, that's the 4.5

million, and the reason it's different is that of Additional Deferred Taxes Eligible Due to Consolidation, which amounted to about 9 million.

Q. And how is that 9 million derived?

A. Specifically, I don't know. The theory is that by virtue of consolidating we may be able to use taxes at a faster rate than otherwise. I believe that's a number I got from Annette Carson.

Q. And there is some handwriting up in the upper left-hand corner of this first page that reads: "How does excess leasehold improvements affect this as well as lease on 25,000 excess space in downtown Peoria?" Whose handwriting is that?

A. That's Jim Dierberg's.

Q. And do you have any idea what that is referring to?

A. It's two different items. The excess leasehold improvements, I believe, is in the Chicago downtown office in which they had spent a fair amount of money on the facility which might be more than was needed for our purposes. The downtown Peoria offices was an older building in which there was some space which was pretty much vacant on upper floors, and we leased the whole building. So there was some cost of space that wasn't being used.

Q. Then the remaining -- I guess the second page of this particular document, what is that?

A. This is basically an income projection of what we think the income could be on a normalized basis over a period of years. What we do is we take a straight income analysis and present a value package and the rate of return on the investment, which the investment is the 33.5 coming from the preceding page. And then we factor in the separate calculation cost of the purchase funds and determine the point which you recover your purchase price. And the last part is with all the amortization of purchase adjustments. And that's factoring in all of the non-cash items.

Q. And how is the 3 percent growth rate assumption arrived at?

A. Well, that's just an estimate that I used.

Q. Is that being used as a standard or was that a particular assumption for River Valley?

A. It's modified some based on what the nature of the institution is. Peoria, as you know, is not a high growth area, so I was a little bit more modest in the assumption there. And that's

where the bulk of their operations were. When I go to California it may be more in the 5 percent range.

Q. Were there any other factors aside from the Peoria location that you factored into the 3 percent growth rate?

A. It wasn't the result of a study.

Q. A best guess?

A. Yes.

Q. Did you do any projections using separate growth rates to compare how they would affect different assumptions?

A. No.

Q. And the present value of cash flow of 14.7 percent, how was that 14.7 arrived at?

A. That's the present value we have to apply to that cash flow to come back with the 13.5 million. This doesn't print the whole thing. I run it out 20 years.

Q. And the Cost of Purchase Funds Rate of 8 percent, was that First Banks' overall cost or was that a number derived at?

A. That's approximately what we were borrowing at at the time.

Q. Did the cost of funds for First Banks differ between its thrift and banking entities or

was that different?
A. Cost of deposits in the banks?
Q. Well, let's answer that question first, the cost.
A. My guess is it was relatively close, but I don't recall.
Q. And as far as outside sources of funding that First Banks used, was there any difference in funding its thrift bank operations?
A. No, because this was borrowed funds at the holding company level, so we go to another bank and borrower it the same anyone else does.
Q. And then it would be downstream?
A. Well, what it does it pays off the old shareholders, so it doesn't actually enter the institution other than we get control of it.
Q. And the 38 percent tax rate, is that just the historic First Banks rate?
A. Yes. That's combined federal and state.

MATERIAL REDACTED

MATERIAL REDACTED

Q. (By Mr. Murphy) Mr. Blake, you indicated off the record that you wanted to explain something in addition with respect to Exhibit 8. So why don't you go ahead and do so.

A. Okay. In an earlier question you had asked me about the line that says Additional Deferred Taxes down at the bottom, the 8 million 9.

Q. And this is on the first page of Exhibit 8?

A. Yes.

And in looking at it real quick I didn't focus on what it was correctly. But what that refers to is under regulatory capital guidelines as they exist now there is limitation on the amount of deferred tax asset that you can count in regulatory capital, and if you have more than that limited amount it is treated similar to goodwill. It's a reduction in capital. And if you see about, oh, eight lines above it there is a line

that say Excess Deferred Tax Asset. There is a number 15 million 4 stuck out to the side, and beside that is 13 million 1. Well, the net deferred tax asset we were calculating was the 15 million 4 and the amount ineligible was 13 million 1. Now, the way that was calculated was 10 percent of the number above, the 22 million 8 was 10 percent. That represents the difference there.

There is another alternative limitation but I didn't have the means of calculation it there so I just used the percent rule. However, by virtue by merging the companies you have a larger capital number and you can count that much more of the deferred tax against regulatory capital, and that's what the 8 million 9 is. It's 10 percent of the additional capital that was created by the merger. So it's not directly related to NOLs or anything like that. It's just what the pretax asset is.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Do you have any idea whose handwriting that is?
A. No, I don't recognize it.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And I think I understood you to say earlier that if River Valley had had a larger balance sheet you would have paid more for it as well; is that correct?

A. Yes.

Q. Did you say that there was more competition from other buyers when a thrift is bigger?

A. Yes.

Q. What is the significance of that?

A. As you introduce more buyers into the bidding the prices tend to get higher.

Q. So the premium to book value tends to get higher?

A. That's correct.
It's a factor that many of the larger organizations don't want, smaller acquisitions. They prefer to do the larger ones.
Q. If River Valley had been twice the size at the time you acquired it do you believe that you likely would have had to pay a higher premium to book value than the one you had to pay?
A. Probably.
Q. You testified earlier that River Valley had about $40 million in net operating loss carryforwards, NOLs, at the time of First Banks acquisition; is that right?
A. That's correct.
Q. You understand how NOLs work; is that right?
A. Yes.
Q. And you understand their value to a thrift or bank?
A. Yes.
Q. If River Valley had been able to use all 40 million of the NOLs before selling River Valley to First Banks, what would the effect have been for River Valley? What would the benefit have been?

A. They would not have had the limitations that we had. The limitations that come into play are strictly related to change of control. And so when you buy something, that's what triggers the limitations. If they could have used them themselves they would not have had those limitations. For example, if they had $40 million in carryforwards and by some chance in 1995 they could generate $40 million of income they could use them all immediately, whereas if we generate $40 million of income we're still limited to the 2 1/2 or whatever the number is that we can use this year.

Q. So the limitation on First Banks ability to use the NOLs is a function not of the NOLs but a function of the regulations governing the acquisition by First Banks?

A. That's correct.

Q. And your recollection is they limited First Banks ability to use the NOLs to something like $2.5 million a year?

A. It's something in that range.

Q. And you lost you said about $4.5 million up front that you would never be able to use as a schedule write-off and had to disregard?

A. It was about that amount that we knew

that we were going to lose simply because they expired before we had a chance to use them. I think we have been able to use all of the rest of them as we go along, but I'm not sure.

Q. If River Valley had been able to use the $40 million in 1995 or 1994 before selling to First Banks, what benefit would River Valley have achieved? What would that have done to their income?

A. It should be something akin to the $40 million times the statutory tax rate which is about 35 percent.

Q. So they would have had about $14 million in their pocket after taxes?

A. Yes.

Q. And on Exhibit 8 -- let's put that in front of you -- the value to First Banks of these $40 million in NOLs put in the context of the restrictions on First Banks ability to use them was somewhere in the order of 3.6 million. Is that an correct interpretation of page 1 of Exhibit 8?

A. Yes, something in that range. That's, I believe, present value because we would be paying a dollar up front for something we would be receiving over the next 17 years.

Q. So if River Valley had been able to use the $40 million of NOLs they would have achieved $14 million after tax saving for themselves and they would no longer have had the NOLs to sell in the deal with First Banks?

A. Right.

Q. And is it likely that you would have paid $3.6 million less for River Valley?

A. Yes.

Q. So the after tax consequence to River Valley or Holland and Ross is they would have had $18.2 million less than they got in the actual sale to First Banks?

A. Something close to that, yes.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Is it your handwriting on the first page? Anyway, there is some handwriting that crosses out some of the numbers and someone wrote in some new numbers. Is that your handwriting?

A. Yes, it is.

Q. Do you know why the numbers are crossed out?

A. Yes. We did our credit due diligence after we had an oral agreement, and while we were working on the definitive agreement there were some adjustments because there were some credit problems with a few loans, and we agreed to reduce the purchase price from the $38 million down to $37,694,000.

MATERIAL REDACTED

MATERIAL REDACTED

Q. Could you just walk me through this again? On Exhibit 8 there is one that says Valuation of Tax Loss Carried Forward. There's that $3.7 million figure we have been talking about, and it says 17 years, and I think at one point you said in your mind you remembered 15 years instead of 17 years. What is the significance of the 15 to 17 year number?

A. Under the tax regulations that existed at that time you had what I thought was a 15 years period which you could carry forward. So if you have a loss you had the next 15 years to offset it. And so that's the maximum period. I don't know why we used 17 there, if there was something unique about that or not.

Q. And you said there was a restriction. So you couldn't use the $40 million in year one, you could only use $2.5 million in year one; is that right?

A. Yes.

Q. Other than the time value to money that it's better to achieve the savings in year one than year 10, is there any other reason that would make the NOLs less valuable to you if you can only use them trickling through?

A. Well, there is a time value to money, but I'm talking about you may not be able to use them at all. The only way you can use them is if you generate income. And as you know, banking goes through various cycles, although we had a very long favorable cycle recently. But in 1994 we were just coming out of a business cycle in which we did not earn a whole lot of money as an industry. And thrifts, particularly, had some bad times lately, in the late '80s and early '90s. So there is no guaranty that you will earn money every year and be able to use this every year. And some of them could expire because some of them were generated back in say 1990 and maybe only had 10 years to go as apposed to 15. Some of them may have been generated before that.

Q. Earlier you testified about the suggestion that others had made to River Valley to do swaps to address interest rate issues. Do you have a view whether River Valley's exposure to

interest rate risks was greater than that of other thrifts?
A. I don't think it was any greater than other thrifts we looked at or, for that matter, our thrift. I'm not sure how it related.
Swaps are somethings we use routinely on our own balance sheet because we recognize when you have got CDs and you got mortgage loans there is an interest rate risk there. And that's the nature of their business, and so there is a mismatch, and the way we have compensated for it on our own balance sheet is to put swaps on.
Q. Did the fact that you suggested that River Valley enter into the swaps indicate that you had any discomfort with River Valley's management or its investment strategy?
A. No.
Q. Did you come to form a view as to the quality of River Valley's management?
A. Generally I think they were fairly good. I was particularly impressed with Ron Pikus. He was a pretty good operator.
Q. He was the president of the thrifts?
A. Yes.
Q. And did you have a view about Homer

Holland in the way he was engaged in the business?

A. Well, Homer was less, I think, involved in detail running the business. But in general I have seen a lot of people on the other side of the fence, and I get involved with them only in acquisitions, but the thing I would say about Homer is he was an individual that I had confidence that he would do whatever he said he would do and there is no hidden agenda behind it. Sometimes you're never quite sure about some of the people you come in contact with. But I had a lot of respect for him. I think it was a good working relationship.

MATERIAL REDACTED