IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND,
STEVEN BANGERT, co-executor of the
ESTATE OF HOWARD R. ROSS,
AND FIRST BANK,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 95-524C

(Judge George W. Miller)

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE ADMISSION OF DX 1452, THE DECLARATION OF NICHOLAS C. WILSON**

Defendant, the United States, respectfully opposes the motion in limine of plaintiffs Homer J. Holland, the estate of Howard R. Ross, and First Bank to preclude admission of DX 1452, the declaration of Nicholas C. Wilson.

Mr. Wilson was an investment banker affiliated with Lawrence Barr & Co. He was engaged by River Valley to perform a valuation of its common and preferred stock as of July 1988. We anticipate that his testimony will contradict the claims of plaintiffs' expert, Dr. Neil Murphy, that the value of the River Valley thrifts declined after the passage of FIRREA. Mr. Wilson's declaration indicates, in conjunction with other relevant evidence, that the value of the thrifts increased significantly from their pre-FIRREA value.

We respectfully submit that plaintiffs' motion is at the least premature, and, in any event, unfounded – because the use of a prior statement at trial will depend, in part, upon the testimony that is sought, and that proves to be available, at trial. Prior to trial, it is not possible to identify

and exclude every possible use of Mr. Wilson's declaration. Although we expect that Mr. Wilson will be able to appear at trial and testify, events beyond our control, including the plaintiffs' examination, may result in our use of Mr. Wilson's prior statement. There are numerous potential uses of a prior statement at trial appropriate under the Federal Rules of Evidence. Further, plaintiffs' attempt to attack the reliability of the statement relies upon mischaracterization of, and selective quotation from, their deposition of Mr. Wilson. Accordingly, we respectfully submit that plaintiffs' motion should be denied.

**1. Plaintiffs Cannot Properly Seek To Exclude In Advance Of Trial Any And All Potential Uses Of A Declaration By Their Former Consultant**

Plaintiffs, in their motion in limine, argue that the declaration of their former consultant is hearsay under Federal Rule of Evidence (FRE) 801(c), and that

> The only plausible exception, the "former testimony" exception of FRE 804(b)(1), is foreclosed – the declaration could only be admitted under that provision if Mr. Wilson were "unavailable" to testify at trial. But Mr. Wilson is not "unavailable" – the defendant has represented that it "will call" Mr. WIlson as a witness.

Pl. Mot. at 1. Plaintiffs' motion is flawed upon several levels. First, plaintiffs appear to be arguing that because we "will call" Mr. Wilson – that proves that he is not going to be "unavailable" at trial. Although we hope and expect that Mr. Wilson will testify at trial, obviously we cannot know that he will do so until in fact he does appear and testifies at trial. In short, plaintiffs' motion is premature and, in any event, is grounded upon an illogical contention that Mr. Wilson has been proven to be available at trial, long before that availability can be ascertained.

Second, FRE 804(b)(1) is not the only plausible use of Mr. Wilson's prior statement. The use of a prior statement at trial will depend, in part, upon the testimony that is sought by the parties, and that proves to be available, at trial. Prior to trial, it is not possible to identify and exclude every possible use of Mr. Wilson's declaration. Although we expect that Mr. Wilson will be able to appear at trial and testify, events beyond our control, including Mr. Wilson's availability, and the nature of his testimony elicited by us and by plaintiffs, may give rise to the use of Mr. Wilson's prior statement. There are numerous potential uses of a prior statement at trial appropriate under the Federal Rules of Evidence. To illustrate, prior inconsistent and consistent statements may be admissible, not as hearsay but as substantive evidence. See FRE 801(d)(1)(A) and (B); Bell v. City of Milwaukee, 746 F.2d 1205, 1274 (7th Cir.1984) (adoption of prior statement defeats hearsay argument), overruled on other grounds, Russ v. Watts, 414 F.3d 783 (7th Cir. 2005). Alternatively, a prior consistent statement may be offered for the limited purpose of rehabilitation. United States v. Simonelli, 237 F.3d 19, 27 (1st Cir. 2001), cert. denied 534 U.S. 821 (2001) ("[w]e now join the majority view, well expressed by the Fourth Circuit in United States v. Ellis, 121 F.3d 908 (4th Cir.1997), cert. denied, 522 U.S. 1068 . . . (1998), that 'where prior consistent statements are not offered for their truth but for the limited purpose of rehabilitation, ... Rule 801(d)(1)(B) and its concomitant restrictions do not apply.' Id. at 919. When the prior statements are offered for credibility, the question is not governed by Rule 801.")

Further, a prior statement may also be admissible under a hearsay exception. See Commercial Contractors, Inc. v. United States, 154 F.3d 1357 (Fed. Cir. 1988) (discussing FRE 801(d)(1(A) admissibility of prior inconsistent statements and admission of declarations under

FRE 807 residual hearsay exception). If, for example, recollection proves insufficient at trial, a prior recollection recorded may be admissible. See FRE 803(5).

In addition, to the extent that plaintiffs make use of a portion of Mr. Wilson's prior statements, including any deposition testimony relating to his declaration, FRE 106 provides that "an adverse party may require the introduction at that time of any other part – or any other writing or recorded statement which ought in fairness be considered contemporaneously with it." "The purpose of this rule is to avoid 'the misleading impression created by taking matters out of context' and 'the inadequacy of repair work when delayed to a point later in the trial.'" Pac. Gas & Elec. Co. v. United States, 73 Fed. Cl. 333, 443 (2006). Thus, "an omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." United States v. Jackson, 180 F.3d 55, 73 (2d Cir. 1999), cert. denied, 530 U.S. 1267 (2000).

Finally, to the extent that the Court would require that a document be disclosed upon an exhibit list prior to its use – whether as substantive evidence, rehabilitation, or simply to refresh recollection – such a requirement would provide another reason not to exclude DX 1452.

**2. Plaintiffs' Mischaracterization And Selective Quotation Does Not Establish That The Declaration Of Their Former Consultant Is Unreliable**

Plaintiffs also allege that Mr. Wilson's declaration should be excluded as unreliable, based principally upon an accusation that the Department of Justice induced the declaration while he was heavily drugged:

> Mr. Wilson testified at his deposition that when the defendant induced him to make the declaration he was "fairly heavily drugged" [n.1 Exhibit A, Wilson Dep. Tr. (Feb. 15, 2006) at 22] . . . .

Pl. Mot. at 2. Plaintiffs repeated this accusation, alleging that Mr. Wilson's declaration was "procured from a gravely ill and heavily medicated person." Pl. Mot. at 4. Plaintiffs selectively cited and quoted snippets from different pages of the deposition. The transcript of plaintiffs' examination of Mr. Wilson reveals that he does <u>not</u> assert that at the time he executed his declaration he was heavily drugged or otherwise not mentally competent:

> Q Do you now remember having given this declaration, just from independent memory?
> A I recall that I gave a declaration upon reading it again. I mean, if you had asked me before I went into my files, I -- I don't recall whether I -- at that time I wouldn't have recalled that I had given this declaration.
> Q At what time? When I called you in January?
> A Yes.
> Q And you attribute that to being ill when you gave the declaration?
> A There are many things that I don't remember from 2004 I guess I would say. But, no, I -- whether it
>
> 00022
>
> was illness -- and at that time I was fairly heavily drugged, I guess I would say –
> Q Okay.
> A -- and not feeling well, but it had slipped my memory. I didn't recall.

Exhibit A, Wilson Dep. Tr. (Feb. 15, 2006) at 21:13-22:5. In portions of Mr. Wilson's deposition that plaintiffs did not select for quotation in their motion in limine, he affirms the declaration that he executed:

Q Now, the page where you're signing here, there's a

00041

statement above where you're indicating that you're giving sworn statements. It says that you declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct. As you review it now, do you continue to hold that view, that the statements are true and correct?
A To the best of my recollection, yes.

[Id. at 41:1-8]

Q Okay. Do you remember River Valley -- Just reaching back into your memory from 1991, do you remember River Valley hiring you to do this engagement?
A At the time that I received these documents in 2004, it -- I had to think for a while about having been engaged at that time.
Q Okay.
A But the documents jarred my memory on that subject, yes.

Id. at 46:10-19.

Following plaintiffs' examination, upon defendant's cross-examination, Mr. Wilson affirms that he has no reason to doubt that he agreed with the statements in his declaration at the time that he signed it:

Q Is it your normal practice, just in general, apart from the reports that you sent to the IRS or, you know, to a court -- is it your general practice to read documents thoroughly and carefully before you sign them?
A Normally, yes.
Q Do you have any reason to doubt that you did not follow that normal practice when you signed Exhibit No. 1?
A I would have to review it again before I were to

make that comment.
Q Well, please go ahead and take the time. Just let me know when you're done reading it.
A Sure. Okay.
Q Having taken the time to review the declaration now, let me ask you, do you have any reason, sitting here today, to think that you did not follow your normal practice of reviewing documents thoroughly before you signed them?

00169
A This being the document?
Q Yes. "This" being the declaration which is Exhibit No. 1.
A I guess I would say on reviewing it, I say that the estimated value of River Valley -- In Paragraph 6 it states -- indicates that -- an estimated value of River Valley as of July 28th, 1988, and I don't know whether that was the valuation date or not, and that the assisted merger took place on July 29th.
Other than that, I guess to the best of my recollection, I reviewed -- and as I said in Chapter 8, my thought processes were perhaps not running at 100 percent at the time, but the -- I believe the rest of the document appears -- appears to be one that I would have signed.
I note in Paragraph 3 that we talk about values as of July 29th, so there's a discrepancy there between Paragraph 3 and Paragraph 6 but –
Q Apart from that discrepancy you just mentioned in Paragraph 6, where it uses July 28th -- apart from that, do you have any -- Let me rephrase that.
Apart from the discrepancy you mention regarding Paragraph 6, regarding the date of July 28th, is there anything else in this declaration

00170
that you find to be inaccurate?
A Not to the best of my recollection.

* * *

> Q And sitting here today, do you have any reason to
> -- Let me rephrase that. Sitting here today, do
> you have any reason to doubt that you agreed with
> the contents of the declaration at the time that
> you signed it?
> MR. WILSON: Objection, asked and
> answered.
> MR. WHITMAN: You can answer.
> MR. WILSON: Objection, lack of
> foundation.
> THE WITNESS: I don't believe so.

Id. at 168-71:13.

In sum, plaintiffs did not establish that Mr. Wilson was incompetent at the time of his declaration. To the contrary, Mr. Wilson testified under oath, and subject to cross-examination, that he had no reason to doubt that at the time he executed his declaration that he agreed with its contents. Id. at 168-71. Further, plaintiffs' counsel elicited from Mr. Wilson his testimony under oath in 2006 regarding his declaration that:

> As you review it now, do you continue to
> hold that view, that the statements are true and
> correct?
> A To the best of my recollection, yes.

Id. at 41:5-8.

## CONCLUSION

For these reasons, we respectfully request that plaintiffs' motion in limine be denied.

Respectfully submitted,

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor,
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

Attorneys for Defendant

Of Counsel:

SCOTT D. AUSTIN
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
BRIAN A. MIZOGUCHI
AMANDA L. TANTUM
JOHN J. TODOR
SAMEER YERAWADEKAR
Trial Attorneys
Department of Justice

November 15, 2007

# EXHIBIT A

Page 18

Q Okay.
A And had a good reputation at that time, and had done some very good-sized transactions, and would look like a good spot to spend some time. I had known Larry Barr for two or three years before that.
Q Okay.
A He invited me to come on over and join him.
Q Okay. Did Laurence Barr have any actual employees or partners?
A No, just -- There were other -- There were other private contractors who worked with Larry. I think at that time there were three or four other people who -- who did -- worked on transactions, basically.
Q Okay. And when you say "worked on transactions," I mean, what exactly -- what services did you provide for --
A We were looking for buyers -- buyers for companies and sellers for companies.
Q Okay. And so when you would look -- A seller of a company would hire you to find a buyer, and then what would you do for the seller, how would you find the buyer?
A You would analyze the business and try to determine

Page 19

who you felt would be an appropriate buyer for that business, and go out and find a buyer, and, conversely, worked a great deal with purchasers of businesses.
Q Um-hum.
A Finding out what their acquisition criteria was and made acquisitions.
Q And what sort of criteria, you know, did businesses have? Did it vary very much according to the size and type of the company? I mean, what sort of things did you look at?
A It was a middle market business. I mean, on a size basis. And it was really working with contacts and relationships, as to finding buyers or finding sellers for businesses.
Q Okay. Was that the exclusive business of Laurence Barr? Did it do other kind of services?
A No.
Q Okay. What were you doing apart from the independent contract work for Laurence Barr at that time? Any other work?
A Nothing. I was there, I think, for a few months, I guess is what I would say, and then decided that wanted to come back to Milwaukee.
Q Okay. Does it still exist, Laurence Barr?

Page 20

A No.
Q What happened to it?
A Larry would be probably close to 85 or 90 today, I think --
Q Okay.
A -- so he just, I think -- I haven't had any contact in ten years or so with him. He just sort of retired and closed up the firm, I believe.
Q Okay. All right. Well, I would like to ask you in more detail about some of your work for Laurence Barr as it relates to this case, but let's just, for right now -- I would just like to know a little bit about your familiarity with the case. When did you first hear about this lawsuit?
A I guess in -- And I wasn't even aware that I had provided a declaration back in 19 -- 2004, but I believe I received a phone call from the Department of Justice sometime there before, and who made me aware of the -- of the lawsuit, and asked me for a declaration.
I believe I had said to you on the telephone I hadn't found any files, and I hadn't, other than as I went -- I had been asked in the subpoena whether I had any other documents related to the case, and the only thing I found in looking

Page 21

at my files was the copy of the declaration that I gave and signed in February of 2004, so it was approximately that time.
Q Okay. I'm going to back up a second. Did you say you were not aware that you had given a declaration in the case?
A I had not recalled it.
Q Okay.
A At that time I had significant health problems. I had had quintuple bypass surgery in January, was on dialysis for failed kidneys, and had a kidney transplant in March of 2004, so --
Q Do you now remember having given this declaration, just from independent memory?
A I recall that I gave a declaration upon reading it again. I mean, if you had asked me before I went into my files, I -- I don't recall whether I -- at that time I wouldn't have recalled that I had given this declaration.
Q At what time? When I called you in January?
A Yes.
Q And you attribute that to being ill when you gave the declaration?
A There are many things that I don't remember from 2004 I guess I would say. But, no, I -- whether it's

Page 22

was illness -- and at that time I was fairly heavily drugged, I guess I would say --
Q Okay.
A -- and not feeling well, but it had slipped my memory. I didn't recall.
Q Okay. So let's just go back to -- I'm not sure I got a clear answer, because we started talking about the declaration. When did you first hear about the case?
A Shortly before the declaration.
Q Okay. Do you remember that? Do you remember the government contacting you?
A I wouldn't -- I didn't recall it until I was reminded when you first called me, and I don't know whether it was you or someone from the Department of Justice, going into this round, and when I was reminded of it, I recalled that I had given a declaration at that time.
Q Okay. Let's -- I'll get back to the declaration here in a minute.
Do you remember anything about -- Independent of the declaration, do you remember anything that you discussed with the government when they called you?
A No, I don't recall anything.

Page 23

Q Do you remember, when the government called you were you in the hospital?
A No, I was at home.
Q Okay. And what -- I don't mean to be too intrusive, but what precisely was your medical condition at that time?
A I had end-stage kidney failure -- renal failure, and had had a heart attack in September of 2002, and subsequent to that had been diagnosed with the end-stage renal failure, that I have a choice between long-term dialysis or a kidney transplant.
As the doctors evaluated me, I needed to have the bypass -- quintuple bypass surgery before they could do the kidney transplant operation in March. I was on dialysis from December of '03 through the time of the kidney transplant on March 17th of 2004.
Q Okay. And was that, I assume, a successful operation?
A Yes.
Q I'm glad to hear that.
So you don't recall independently of the declaration any of the discussions that you had with the government at that time?
A I -- I do recall, upon reading the declaration,

Page 24

that I had said I wasn't going to be available to go to Washington --
Q Right.
A -- in March, which was --
Q Right.
A -- when this was all scheduled to be.
Q That seems eminently reasonable.
A Um-hum.
Q So when is the next time, after giving the declaration, that you discussed the case with anybody?
A I believe sometime late last fall or -- late in the -- in the fourth quarter of 2005, and I think -- believe I had -- the first contact was from the Justice Department, indicating -- I think it was John Roberson who contacted me, saying that perhaps I would be deposed on the subject.
Q Was it -- I know you're saying you can't remember very much, and understandably, from the early 2004 time frame, but do you -- was it -- do you remember whether it was John Roberson that contacted you at that time?
A Only in that the declaration was sent to me by a Catherine -- excuse me -- Kichel Janame, who said at the request of the Department of Justice,

Page 25

Attorney John Roberson, this was forwarded to me. This was forwarded on November 4th, 2005, I guess.
Q Can I have a copy of that document? Do you have another copy of it?
A No, I don't.
Q At a break, actually, we'll make a copy, and we'll deal with it at that time.
A Okay.
Q I'm sorry. So you're reading from a document that was sent to you by the government?
A Correct.
Q Okay. We'll put that aside for a moment --
A Okay.
Q -- and we'll make copies of it later.
All right. So you were contacted in the fourth quarter of 2005, and what -- what did you discuss with Mr. Roberson?
A Discussed that this case was moving forward, and that a deposition would be -- they'd be looking to depose me at some time, and I said to him that I really, you know -- at that -- I was surprised by the request because I thought that everything -- I didn't have much recollection of the early 2004 conversations, or the affidavit, or the matter itself going back to 1991, '90.

Page 38

meeting with Mr. Holland or Mr. Bangert, just favorable or unfavorable impressions of them as businessmen or people?
A I think they were well-regarded. I think Homer came out of one of the other banks in Chicago, I can't tell you which one, and Steve was his financial officer of the company, I believe.
Q Um-hum. When you say they're well-regarded, how do you have that impression?
A That -- You know, in the Chicago banking financial community, that they were thought of as people who had an understanding of what they were doing --
Q Okay.
A -- on a business basis.
Q You had heard of them before you --
A Um-hum.
Q -- met with them to do this work?
A Yes.
Q And how, for example, had you heard of them?
MR. WHITMAN: Objection, hearsay.
THE WITNESS: I don't recollect.
BY MR. WILSON:
Q Okay. Did you have any contact with anyone else in the River Valley company besides Mr. Bangert or Mr. Holland? Did you ever meet Susan Ells or Ron

Page 39

Pikus?
A It's interesting you say that, because, as you say that, Susan Ells' husband was in my son's class in high school --
Q Oh.
A -- and I had met them socially on and off over the years. Her husband plays golf, and I've met him playing golf. But I think a couple of times over the years I met Susan, and now that you mention it, I think it was -- I was told that she had worked for Homer Holland in Chicago.
Q Do you have any impression about her work as a banker?
A I never worked with her.
MR. WILSON: Okay. All right. You have got a copy of this already, I know, but I am going to have the court reporter mark as a copy -- or, as an exhibit here your declaration from 2004.
(Exhibit No. 1 was marked.)
BY MR. WILSON:
Q And, Mr. Wilson, I'll hand you, just so we make sure we have all got the same thing, I know this is a photocopy of the exact same document that's been marked as Exhibit 1, which, as I said, is your declaration from February of 2004 -- You said you

Page 40

had a chance to review this prior to your deposition, and we've been talking about it. If you need another minute to review it, go ahead and do that, because I want to talk about it pretty extensively.
When you feel comfortable with it --
A Sure.
Q -- just give me a heads-up, and we'll go forward.
A I have completed the reading of it.
Q Okay. Go ahead and look at Page 3 of the declaration. There's a signature there above your name, and I'd -- just to be clear here, I want to make sure, is that your signature?
A That is my signature.
Q Okay. And it's dated February 25th, 2004; is that correct?
A Correct.
Q When you signed this, you were, you said, not in the hospital, but you were at home --
A Um-hum.
Q -- and on dialysis. Do you remember signing it?
A Other than the -- If you would ask me that question, and I did not have the document in front of me, I would not have recalled signing it.
Q Now, the page where you're signing here, there's a

Page 41

statement above where you're indicating that you're giving sworn statements. It says that you declare under penalty of perjury of the laws of the United States that the foregoing statements are true and correct. As you review it now, do you continue to hold that view, that the statements are true and correct?
A To the best of my recollection, yes.
Q But you don't, as you sit here now, and if you weren't looking at the document -- you can't say that when you signed that, you remember attesting to that?
A I don't remember attesting to it.
Q Okay.
A I don't even remember signing any document, I guess.
Q Okay. All right. So my sense, and we don't have to dwell on it -- but my sense is that you don't remember how this document was created; is that correct?
A Correct.
Q So you don't know whether you drafted these statements or whether the government drafted them?
A I don't recall.
Q Do you recall any process of discussion with the

Page 46

Q Okay. And you don't remember the government giving you any files --
A No.
Q -- besides these?
A No.
Q Okay. Do you have -- Do you remember anything about the underlying engagement and analysis apart from these documents?
A No, I do not.
Q Okay. Do you remember River Valley -- Just reaching back into your memory from 1991, do you remember River Valley hiring you to do this engagement?
A At the time that I received these documents in 2004, it -- I had to think for a while about having been engaged at that time.
Q Okay.
A But the documents jarred my memory on that subject, yes.
Q Okay. Well, let's talk about this Exhibit 2. Let's talk about the engagement letter.
A Okay.
Q The letter states that you were retained -- The letter, for the purposes of -- to make a clear record here, this is Exhibit 2, and at the top it

Page 47

has a letterhead that says, "Laurence Barr & Company" --
A Um-hum.
Q -- "Limited," and then it has a heading that says, "Agreement with River Valley Savings Bank, FSB."
In the body of the agreement the letter states that, "The consultant," which is Laurence Barr here, "will provide financial advisory services related to the analysis of relative values of the common and Series A preferred stock of River Valley as of July 29th, 1988."
Do you remember what those financial advisory services were?
A The financial advisory services would have been the -- the analysis that was the final -- the final opinion of which Exhibit 3 is a draft.
Q Okay. And what -- Do you remember the -- Do you remember the parameters of the analysis? Do you remember what you were asked to do?
A The engagement letter says that we were asked to opine on the relative values of the common stock and the Class A preferred stock of the bank as of July 29th, which, again, based upon Exhibit 3, I believe, was the closing date of the merger.
Q Okay. Do you -- Do you remember -- or, do you know

Page 48

what the purpose for your work was?
A No, I do not.
Q Okay. So you don't -- Do you know whether it was for some kind of market transaction?
MR. WHITMAN: Objection.
BY MR. WILSON:
Q You can answer.
A No, I don't recall.
Q Okay. You don't know whether it might have been for tax reasons?
A I don't recall.
Q You don't recall?
A (Witness shakes head.)
Q Is it -- Is it a possibility, when you were working at Laurence Barr, that someone would hire you to value stock for a reason other than a market transaction?
A It could be possible. I think that -- And I was at Laurence Barr for only a short period of time, but, you know, valuations were used for gift and estate tax purposes, and valuations for transactions, and --
Q And you don't know that this --
A I have no idea.
Q You have no idea what this was done for?

Page 49

A No.
Q Okay. Do you know why you were asked to analyze the common stock relative to the preferred stock?
A No, I do not.
Q In your experience, you know, valuing sources of capital at savings and loans and other financial institutions, are there reasons why you would look to find the relative values of common and preferred stock?
A That it was requested by -- by a client, I guess, would be my only answer, and neither the engagement letter nor the Exhibit 3 jogs my memory on that subject.
Q Did a client ever ask you to do something like that?
A In mergers and acquisitions there might be a number -- I'm speaking generally now -- there could be two specific classes of securities, or more, and that there -- the transaction would relate to a combination of factors, so -- I can't come up with any specific examples, but it would be possible you would be asked for the relative values of the two.
Q Do you remember ever doing an analysis like that before?
A No, I don't recall.

Page 166

Q Do you have any doubt that when you signed this, you intended to sign this document, that you didn't think you were signing something else, in other words?
A I don't understand. That the signature page was attached to something else? I don't recall. I don't even recall the document.
Q But you don't doubt that that is your signature?
A That is my signature. As the signature page is separate from the other pages --
Q Well, let me ask this. In your professional experience have you been called upon to provide declarations or affidavits with regard to other matters?
A No. In past experience of mine I have done valuations and appraisals for estate and gift tax purposes, and they were presented to the Internal Revenue Service and the State of Wisconsin, but not an affidavit per se.
Q Well, let me ask about those. Regarding those -- Are they reports, or what sort of documents are they?
A They're reports. They were reports.
Q Regarding those reports, you were required to sign them?

Page 167

A Yes.
Q And they were being submitted to the Internal Revenue Service?
A Um-hum.
Q Were they -- Did you submit any reports to any type of court, like, for example, a tax court?
A Yeah.
MR. WILSON: Objection, lack of relevance.
BY MR. WHITMAN:
Q You can answer.
A I think that the underlying reports were subsequently either in the estate tax division at -- I think it used to be called, the -- a lot of it was at the conference level, and then in court on several occasions.
Q Do you recall if those reports were -- when you signed them, you were signing them under penalty of perjury or under oath?
A It was -- No, the reports were the valuations submitted to a law firm, or an accounting firm, or a client. Valuations of common stock of privately held companies or other securities of privately held companies.
Q Before you submitted those reports, was it your

Page 168

normal practice to read those documents thoroughly?
A The report?
Q Yes. I'm sorry, the reports.
A Yes.
Q Before you signed them?
A Yes.
Q Is it your normal practice, just in general, apart from the reports that you sent to the IRS or, you know, to a court -- is it your general practice to read documents thoroughly and carefully before you sign them?
A Normally, yes.
Q Do you have any reason to doubt that you did not follow that normal practice when you signed Exhibit No. 1?
A I would have to review it again before I were to make that comment.
Q Well, please go ahead and take the time. Just let me know when you're done reading it.
A Sure. Okay.
Q Having taken the time to review the declaration now, let me ask you, do you have any reason, sitting here today, to think that you did not follow your normal practice of reviewing documents thoroughly before you signed them?

Page 169

A This being the document?
Q Yes. "This" being the declaration which is Exhibit No. 1.
A I guess I would say on reviewing it, I say that the estimated value of River Valley -- In Paragraph 6 it states -- indicates that -- an estimated value of River Valley as of July 28th, 1988, and I don't know whether that was the valuation date or not, and that the assisted merger took place on July 29th.
Other than that, I guess to the best of my recollection, I reviewed -- and as I said in Chapter 8, my thought processes were perhaps not running at 100 percent at the time, but the -- I believe the rest of the document appears -- appears to be one that I would have signed.
I note in Paragraph 3 that we talk about values as of July 29th, so there's a discrepancy there between Paragraph 3 and Paragraph 6 but --
Q Apart from that discrepancy you just mentioned in Paragraph 6, where it uses July 28th -- apart from that, do you have any -- Let me rephrase that.
Apart from the discrepancy you mention regarding Paragraph 6, regarding the date of July 28th, is there anything else in this declaration

Page 170

that you find to be inaccurate?
A Not to the best of my recollection.
Q You indicated before, in your earlier testimony, that you were on medication at the time you signed this declaration in 2004?
A Correct.
Q And that medication is why you can't recall signing the declaration?
A No, I just -- it's two years ago, and I don't continue -- whether it was the medication or not, there's lots of things I don't recall from the past.
Q Okay. So it's not just the medication?
A Yeah.
Q Okay. Are you -- I hope this isn't too personal. Are you still on that medication today?
A I'm on medication. I don't recall if it's the same medication.
Q Okay.
A Probably not. My medication today relates to the kidney transplant in March of -- March 17th of 2004, so --
Q Okay.
A I have all the antirejection drug medication.
Q Is there any reason that that medication would

Page 171

affect your testimony today?
A I don't believe so.
Q And sitting here today, do you have any reason to -- Let me rephrase that. Sitting here today, do you have any reason to doubt that you agreed with the contents of the declaration at the time that you signed it?
MR. WILSON: Objection, asked and answered.
MR. WHITMAN: You can answer.
MR. WILSON: Objection, lack of foundation.
THE WITNESS: I don't believe so.
MR. WHITMAN: Okay. I think that is all my questions.
MR. WILSON: I have a few more.
MR. WHITMAN: Okay.
MR. WILSON: Just three more.
THE WITNESS: Okay.
MR. WILSON: I think. Well, could be more.

EXAMINATION

BY MR. WILSON:
Q Earlier, Mr. Wilson, you testified that you had no confidence that the equity sharing portion of the

Page 172

preferred stock was included in the 2.8 valuation that you made. And do you have a different opinion from that now?
A The -- I was given a great deal of information today, and I guess that in one of the -- the RTC or the Home Loan Bank documents it talked about the earnings of the company, I think in 1990, or something along that line --
Q Um-hum.
A -- which was information I did not have -- which was not available to me at the time, which is -- you can evaluate two ways.
Yes, the good news was that they were earning money at that time, and generating a profit, but in the same document, that because of the regulatory restrictions, they couldn't pay -- make any distributions on the preferred stock issue, either the fixed dividend or the equity participation.
Q Um-hum. I guess my question, though, is before you said that you didn't have any basis or you didn't know whether or not the equity sharing portion of the preferred stock was a part of your $2.8 million valuation.
A Correct.

Page 173

Q Is there anything in Exhibit 7 that defendant's counsel showed you that makes you change that view?
A I think only the last sentence in the second to last paragraph, that because of the modest amount of common stock, that you were putting up a -- the preferred stock had little common stock support of it, and you were getting -- receiving 25 percent of the profits for bringing in essence the only equity capitalization in the company at that moment.
Q Is there any effort on Page 0489 of Exhibit 7 -- Is there any effort to quantify the equity participation part of the preferred stock?
A No, that was in essence contingent, I think -- in my view it was sort of a contingent possible additional payment on top of the assumed -- I think assumed sale or the redemption of the preferred.
Q Okay. So do you still have -- do you still maintain the view that you don't know and have no confidence in whether or not the $2.8 million figure includes a quantified value of the equity participation?
MR. WHITMAN: Objection, mischaracterization.
BY MR. WILSON:
Q If you think I'm mischaracterizing, tell me.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of November 2007, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE ADMISSION OF DX 1452, THE DECLARATION OF NICHOLAS C. WILSON" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson