IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 95-524C
(Judge George W. Miller)

HOMER J. HOLLAND, STEVEN BANGERT, Co-Executor of the Estate of HOWARD R. ROSS, and FIRST BANK,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# SUPPLEMENTAL JOINT STIPULATION OF FACTS

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

OF COUNSEL:

SCOTT D. AUSTIN
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
BRIAN A. MIZOGUCHI
AMANDA L. TANTUM
JOHN J. TODOR
SAMEER YERAWADEKAR
Attorneys for Defendant

David B. Bergman
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for Plaintiffs

Of Counsel:
Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

Co-counsel for First Bank:

Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
GUNN AND GUNN
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, MO 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

November 15, 2007

# TABLE OF CONTENTS

Page


SUPPLEMENTAL JOINT STIPULATION OF FACTS . . . . . 1

THE THRIFT INDUSTRY GENERALLY . . . . . 1

A. The FHLBB And The FSLIC . . . . . 1

B. Statutory Restrictions On Thrift Mergers . . . . . 1

II. FIRREA'S ENACTMENT . . . . . 3

III. THE SUPERVISORY TRANSACTIONS . . . . . 4

A. Background . . . . . 4

B. The Backgrounds Of Messrs. Holland And Ross . . . . . 6

C. The River Valley I Transaction . . . . . 8

1. The River Valley I Assistance Agreement And Resolution 88-638 . . . . . 9

a. The FSLIC Cash Contributions . . . . . 9

b. The FSLIC's $5 Million Preferred Stock Assistance . . . . .

c. The Use Of $4.6 Million Of Subordinated Debt Toward Regulatory Capital Computations . . . . . 11

d. The Restrictions On Transfer To Third Parties . . . . . 12

2. Forbearance Letter . . . . . 12

3. Accounting . . . . . 12

D. The River Valley II Transaction . . . . . 13

1. The River Valley II Assistance Agreement . . . . . 13

2. Resolution 88-612 . . . . . 13

3. Forbearance Letters . . . . . 14

4. Issuance Of Subordinated Debt . . . . . 14

5. Accounting . . . . . 14

E. The Peoria Savings Acquisition . . . . . 15

1. Background . . . . . 15

2. The Assistance Agreement . . . . . 15

IV. OPERATION OF THE THRIFTS AFTER THE ACQUISITIONS AT ISSUE . . . . . . . . . 16

A. Operations And Projections Before The Enactment Of FIRREA . . . . . . . . . . . . . . 16

B. Post-FIRREA Matters Concerning Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C. The 1991 Redemption Of Class A Preferred Stock . . . . . . . . . . . . . . . . . . . . . . . . 19

D. Operations Following Supervisory Agreement Of March 25, 1991 . . . . . . . . . . . . 20

E. The Formation Of RV Holdings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

F. The SAFSB Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

G. The Operation Of SAFSB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

H. The Sale Of RV Holdings To First Banks, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I. First Bank Was Well Capitalized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

J. SAFSB's Liquidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## SUPPLEMENTAL JOINT STIPULATION OF FACTS[1]

## I. THE THRIFT INDUSTRY GENERALLY

### A. The FHLBB And The FSLIC

1. Prior to the enactment of the Financial Institutions Reform Recovery, and Enforcement Act ("FIRREA"), Federal regulation of the thrift industry was the primary responsibility of the Federal Home Loan Bank Board ("FHLBB" or "Board"). Joint Stipulation of Facts (Dec. 31, 2003) ("JSF") ¶ 11. See generally 12 U.S.C. § 1464 (1988).

2. The Federal Savings and Loan Insurance Corporation ("FSLIC") administered a fund that insured deposits held by thrift institutions. JSF ¶ 12; 12 U.S.C. § 1726 (1988).

3. To enable the Board and FSLIC to assess and limit the risk institutions posed to the insurance fund, and to protect the stability of the thrift industry, the Board established an elaborate system of regulations governing the financial standards and activities of thrifts. Among other things, the Board promulgated regulations that required thrifts to maintain specified levels of net worth, usually expressed as a ratio of capital against liabilities. JSF ¶ 15; 12 C.F.R. § 563.13 (b)(2) (1982); 12 C.F.R. § 563.13(b)(2) (1983).

### B. Statutory Restrictions On Thrift Mergers

4. By statute, no insured thrift institution could acquire or merge with another insured institution without the Board's approval. JSF ¶ 13; 12 U.S.C. § 1730(q) (1988).

5. In addition, no insured institution could increase its insurable accounts as part of any merger or consolidation without the Board's approval. JSF ¶ 14; see, e.g., 12 C.F.R. § 563.22(a) (1988).

6. The Board's regulations required that applications for a merger or acquisition describe the accounting method used to record the merger and that the applicants obtain certification from an independent accountant that the method was appropriate in the circumstances. JSF ¶ 17; see, e.g., 12 C.F.R. § 571.5(e) (1988).

---

1/ The stipulations set forth here do not supersede or replace the pre-existing Joint Stipulations of Fact filed by the parties on December 31, 2003.

7. These disclosures and certifications were necessary so that the Board could assess the true financial condition of the entities involved, consistent with its statutory duty to ensure the safety and soundness of the institutions. JSF ¶ 18; 12 U.S.C. § 1464(d)(3)(A) (1988).

8. When an acquired thrift was experiencing financial difficulties, including asset quality problems, a merger might affect the ability of the resulting institution to satisfy the Board's net worth or other regulatory requirements. To address this situation during the turbulent economic conditions of the 1980s, the Board adopted a policy of "forbear[ing] from taking supervisory action, for a specified period, with respect to certain regulatory requirements that a resulting association might not be able to fulfill" as a result of the acquisition. JSF ¶ 19; 47 Fed. Reg 8152 (1982).

9. Forbearances permitted thrifts to, among other things, exclude, for certain periods of time as set forth in the forbearance instrument, the net worth deficiency of the acquired thrift for purposes of determining compliance with the Board's net worth requirements. JSF ¶ 20; 47 Fed. Reg. 8152-53 (1982).

10. For purposes of determining compliance with net worth requirements and other financial regulations, the Board generally required thrifts to adhere to Generally Accepted Accounting Principles ("GAAP") unless otherwise specified. JSF ¶ 21; see 12 C.F.R. § 563.23-3(c) (1988).

11. In addition, "a further inducement, described as a 'capital credit' . . . arose when FSLIC itself contributed cash to further a supervisory merger and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital. United States v. Winstar Corp., 518 U.S. 839, 853 (1996) (citations omitted); JSF ¶ 30.

12. The "capital credit" goodwill at issue in this case was to be amortized over no more than 25 years. PX 754 WOT645 0847-0849; PX 200 WOT013 0583-0585; JSF ¶ 31.

13. Mergers and acquisitions were frequently accounted for using the purchase method, and goodwill was created as a result of using that method of accounting. Over time, goodwill would decrease through a charge to earnings. Similarly, the market value of the assets

would be accreted through the income statement to the face amount. The charge to earnings would, however, create a drag on future earnings that was more than offset in the short run by the accretions. Under then-existing regulations, this goodwill could be treated as an asset in the calculation of equity capital, an indicator used by the thrift regulatory authorities to evaluate the financial soundness of the thrift. JSF ¶ 36; PX 2 at 425-66; PX 1 at 223-39; PX 552 at 1231-32; PX 7 at 4779-4796; 12 C.F.R. § 561.13 (1988).

## II. FIRREA'S ENACTMENT

14. Congress responded to the thrift crisis by enacting FIRREA, a comprehensive thrift reform package, which was signed into law on August 9, 1989. JSF ¶ 39; see generally FIRREA.

15. FIRREA strengthened the regulatory capital requirements for thrifts. JSF ¶ 40; 12 U.S.C. § 1464(t) (1989).

16. In general, FIRREA and its implementing regulations limited the amount of goodwill, including "capital credit" goodwill, that could be included in core and risk-based capital and required such qualifying goodwill to be phased out over a five-year period. JSF ¶ 40(a); 12 U.S.C. §§ 1464(t)(2)(A)-(B), 1464(t)3, 1464(t)(9)(A)-(B) (1989).

17. The relevant portions of the FIRREA legislation required, among other things, three different measures of capital for thrift institutions: (1) "core capital;" (2) "tangible capital;" and (3) "risk-based capital." 12 C.F.R. §§ 561, 563 and 567 (1990); JSF ¶ 41; 12 C.F.R. § 567.

18. The amount of supervisory goodwill that could be used to meet core capital requirements was gradually phased out over a five-year period, and eliminated as of January 1, 1995. JSF ¶ 42.

19. Risk-based capital was required to be eight percent of risk-weighted assets, subject to a phase-in period. Risk-weighted assets were generally determined by multiplying the nominal balance of each asset by the appropriate risk-weight as set forth in the regulations. JSF

¶ 44; Regulatory Capital, Office of Thrift Supervision ("OTS"), 54 FR 46845, 46848 (Nov. 8, 1989).

20. Following the 1988 acquisitions until the passage of FIRREA, the FSLIC continued to insure the acquired deposits. Subsequent to FIRREA, the FDIC, as successor to FSLIC, insured the acquired deposits. JSF ¶ 45; FIRREA §§ 211, 401(a)(1).

## III. THE SUPERVISORY TRANSACTIONS

### A. Background

21. By 1988, when River Valley made the acquisitions at issue in this case, literally hundreds of savings and loans throughout the country had failed. The "[FSLIC] was itself insolvent by over $50 billion." United States v. Winstar, 518 U.S. 839, 845-47 (1996).

22. In response to the crisis, "FSLIC encouraged private investors . . . to purchase struggling thrifts so that it would not be necessary to liquidate the thrifts using FSLIC funds to reimburse depositors." Landmark Land Co., Inc. v. FDIC, 256 F.3d 1365, 1370 (Fed. Cir. 2001). In many instances, FSLIC promised to treat the difference between the acquired institution's liabilities and assets – goodwill – as an element of the resulting institution's regulatory capital. Id.

23. FSLIC also negotiated arrangements with acquirers of troubled thrifts to allow regulatory capital credit treatment of funds other than FSLIC cash contributions, such as the proceeds of subordinated debt issuances. See Holland v. United States, 57 Fed. Cl. 540, 566 (2003) ("Holland I").

24. By no later than July 1988, each of the five acquired thrifts involved in this case (Galva Federal Savings and Loan Association of Galva, Illinois ("Galva"); Mutual Savings and Loan Association of Canton, Illinois ("Mutual"); Home Federal Savings and Loan Association of Peoria, Illinois ("Home"); Republic Savings of South Beloit, Illinois ("Republic"); and Peoria Savings and Loan Association, Peoria, IL ("Peoria")) had become insolvent and was operating at a loss. Collectively, the five thrifts had multimillion-dollar net-worth deficits. JSF ¶ 57; PX 62 WON074 1190-92, 1190; PX 172 WOT013 0818-26, 0819-20; DX 1383 at 39-44; PX 79 at JA 208;

PX 68 WOT646 0528-0571; DX 128 WOB026 0644-0651; PX 199 WOT013 0775-0792, 0778, 0782; PX 272 WOB026 0006-0017, 0007.

25. As of March 31,1988, FSLIC reported that, on a combined basis, Galva, Mutual, and Home had a tangible net worth deficit of $28.3 million, and a net operating income deficit of $3.47 million for the preceding twelve months. JSF ¶ 63; PX 177 WON534 0346-0365,0346.

26. Republic began reporting operating losses in March 1985, and it first reported, insolvency in June 1986. The Government placed the thrift into receivership in October 1986, and by March 31, 1988, Republic was reporting a net worth deficit of almost $17 million (more than 43 percent of assets). JSF ¶ 65; PX 182 WOT013 0194-0203, 0195, 0198-0199.

27. FSLIC tried to attract potential acquirers for these failing thrifts. Its efforts notwithstanding, FSLIC had attracted few if any prospective acquirers other than Rock Falls. JSF ¶ 70; See Holland I, 57 Fed. Cl. at 547; PX 111 WOT685 1015-20 at 1016; PX 182 WOT013 0194-204 at 0199; PX 172 WOT013 0818-26 at 0820; DX1382 at 39-41; PX 197 WOF016 2391-2402 at 2399; PX 75.

28. Consistent with its growth strategy, Rock Falls responded to FHLB Chicago's invitation to consider acquiring troubled Illinois thrifts. JSF ¶ 70; PX 601 at 25 ¶¶ 60-61.

### B. The Backgrounds Of Messrs. Holland And Ross

29. From 1971 to 1979, Dr. Holland held several positions at the First National Bank of Chicago, from Loan Officer to Senior Vice President. His responsibilities included: Head of Ship Financing; Head of the Information Systems Division; Head of the Retail Banking Department; and Head of the Administrative Department (all of the bank's back office functions). See JSF ¶48; PX 601 at 1-2 ¶¶ 1-3; PX 351 H&R-B44-1392-1407 at 1403, 1405; Holland Dep. (July 19, 2000) ("Holland Dep. I") at 10-12; PX 217 H&R-B44-1290-91.

30. Howard Ross and other investors recapitalized the Exchange International Corporation and its subsidiary, the Exchange National Bank of Chicago, and hired Dr. Holland

as their President in 1979. See JSF ¶ 49; PX 601 at 24 ¶ 58; PX 172 WOT013 0818-26 at 0823; PX 217 H&R-B44-1290-91; PX 351 H&R-B44-1392-1407 at 1403.

31. From 1979 to 1983, Dr. Holland served as President and Director of the Exchange International Corporation and its subsidiary, the Exchange National Bank of Chicago. In that capacity, he directed the turnaround of that previously troubled bank and successfully negotiated the acquisition and turnaround of another troubled bank, the Central National Bank in Chicago. See JSF ¶50; PX 601 at 2 ¶ 4; PX 154 WON436 2326-31 at 2330; PX 172 WOT013 0818-26 at 0823; Holland Dep. I at 8, 11-32 (JA 1947-1947F); PX 217 H&R-B44-1290-91; PX 351 H&R-B44-1392-1407 at 1403.

32. From 1983 to 1986, Dr. Holland provided executive management and consulting services to financial institutions including 1st Interstate Bank, First Federal Savings and Loan Association of Chicago, United Services Automobile Association ("USAA"), and Gilldorn Savings, where he also served as CEO and Director. See JSF ¶51; PX 601 at 2 ¶ 5; PX 518 H&R-B07-00726-32; PX 217 H&R-B44-1290-91; PX 351 H&R-B44-1392-1407 at 1403; PX 154 WON436 2326-31 at 2330; PX 172 WOT013 0818-26 at 0823.

33. Beginning in 1985, Dr. Holland began a ten-year tenure on the Board of Directors of USAA, an insurance and diversified financial services company owning and operating, among other things, a federal savings bank with nationwide credit card operations and serving the military community. See JSF ¶52; PX 601 at 2-3 ¶7; PX 518 H&R-B07-00726-32; PX 505 H&R-B07-00659-690.

34. Dr. Holland and Mr. Ross, along with two additional investors completed the acquisition of Rock Falls Savings & Loan Association, Rock Falls, Illinois ("Rock Falls"), a state chartered stock savings and loan association in April 1985. JSF ¶53; PX 129 WON534 0417-0430, 0430; PX 12 WON394 0077-0080 (PX 12); PX 14 WON394 0067.

35. Dr. Holland became Rock Falls' CEO on November 25, 1986. JSF ¶53; PX 601 at 2 ¶ 6, 24 ¶¶ 59-60; PX 77 H&R-B44-687-700 at 689-90; PX 217 H&R-B44-1290-91; PX 47 WON394 0068-0069; PX 129 WON534 0417-0430, 0430.

36. Net income for Rock Falls for the year ending July 31, 1985 was $128,345, which increased to $957,395 for the year ending July 31, 1986, and was $596,195 for the next year. Rock Falls' net worth increased from $3,346,973 as of April 30, 1985, to $4,449,114 as of July 31, 1987. See JSF ¶56; PX 16 PHO050 0856; PX 76 WOT645 1044, 1047; DX 83 WOT645 1024-1037, 1027; PX 69 at p. 2 H&R-B43-00591-97.

37. Rock Falls grew its portfolio of collateralized mortgage obligations from zero to more than $18 million over the fiscal year ending July 31, 1987. PX 76 WOT645 1044, 1047 at 2.

38. By 1988, before contracting with the Government, Rock Falls carried assets of $120 million, a net worth of almost $5 million. PX 177 WON534 0346-0365, 0351; PX 124 CHO001 0839-0848; see also PX 601 at 34 ¶ 80.

39. At the time of the Home and Republic acquisitions, the FHLBB staff noted:

> Messrs. Ross and Holland appear to be of the utmost integrity. They are well known and respected . . . not only for their current involvement at River Valley, but also for Mr. Holland's assistance in the successful turnaround of Enterprise Savings Bank . . . as well as the Exchange National Bank of Chicago. Their involvement at these institutions has demonstrated to us their ability to operate profitably in the financial services industry.

PX 154 at WON436 2330.

### C. The River Valley I Transaction

40. FSLIC sought an acquiror for Home, Mutual, and Galva. "In an attempt to achieve some operating economies of scale and to assemble a more attractive commodity from a marketing standpoint, FSLIC senior staff, in consultation with the Federal Home Loan Bank ("FHLB") of Chicago, decided that Galva, Mutual and Home would be offered as a package to interested acquirers." JSF ¶ 59; PX 172 WOT013 0818-0826, 0820.

41. Messrs. Holland and Ross submitted a bid proposal to the FSLIC to acquire Home, Mutual, and Galva, and to merge them into Rock Falls, the thrift they owned. JSF ¶ 73; See PX 601 at 27-28 ¶ 66; DX 1373 at 111.

42. The Government recognized that Holland and Ross had a proven track record of success in the savings and loan industry. JSF ¶ 71; Holland I, 57 Fed. Cl. at 545, 548, 558-59; DX 1383 at 49-51, 52, 53, 85-86, 123-24, 273; DX 1381 at 30, 127, 182, 196-97; DX 1382 at 254-55, 273; PX 172 WOT013 0819-26 at 0824, 0825; PX 183 WOT645 1515-20 at 1516; PX 154.

43. Government regulators who worked on the acquisitions maintained a high regard for the character and management abilities of Messrs. Holland and Ross. For example, when recommending that the Government go forward with the Peoria transaction, Leo Blaber, the Principal Supervisory Agent ("PSA") of FHLB Chicago, wrote that "Messrs. Ross and Holland . . . take [a] very active part in the day to day operations of [River Valley,] . . . appear to be of the utmost integrity . . . and are well known and respected within the seventh district . . . for their performance [in the banking industry]." Blaber testified that he "was very satisfied" with the management abilities and character of Mr. Holland, and that "a major influence" in his recommendation of the transactions was "the financial integrity and managerial competence of Messrs. Holland and Ross." Mr. Blaber also confirmed that, based on its owners and managers' history of success, he believed that River Valley's growth projections "were likely achievable." JSF ¶ 72; PX 271 WON424 0026-29 at 0028; accord PX 146 WOL604 0285-0300 at 0285 (Home transaction); PX 154 (Home transaction); PX 183 WOT645 1515-20 at 1516 (PX 183) (Republic transaction). DX 1381 at 30-31, 127, 196-97.

### 1. The River Valley I Assistance Agreement And Resolution 88-638

44. On July 28, 1988, FHLBB issued Resolution 88-638. JSF ¶ 78; PX 199 WOT013 0775-0792.

45. On July 29, 1988, an Assistance Agreement was entered into by and among plaintiffs, River Valley I and FSLIC relating to the acquisition of Galva, Mutual, and Home. JSF ¶¶ 75-76; PX 207 WOF016 1512-1603, 1598.

46. The combination of Galva, Mutual, and Home became known as River Valley Savings Bank, FSB of Peoria, Illinois ("River Valley I"), a Federal stock savings bank. PX 285 H&R-B08-00331-00361 at 00341.

**a. The FSLIC Cash Contributions**

47. Pursuant to the Assistance Agreement, FSLIC contributed $34,215,888 to River Valley I, plus $13,000 per diem from April 1, 1988, to, and including, the Agreement's effective date. These payments contributed to the elimination of the thrift's existing net worth deficit. PX 207 WOF016 1512-1603, 1546; PX 393 WOF240 0238-0272, 0250-0252.

**b. The FSLIC's $5 Million Preferred Stock Assistance**

48. FHLBB Resolution 88-638 authorized River Valley I to issue preferred stock to FSLIC, and FSLIC to purchase preferred stock, "in an amount not to exceed $5,000,000[,]" subject to certain terms and conditions. PX 199 WOT013 0775-0792, 0784. FSLIC purchased 50,000 shares of Series A preferred stock at par value of $100 per share, for a total investment of $5,000,000. JSF ¶ 86; PX 174 WOF016 2577-2578,2578; PX 148 WOF016 2572-2575, 2573.

49. The Assistance Agreement provided that the FSLIC would purchase $5 million in preferred stock. JSF ¶¶ 80, 103; PX 207 WON016 1512-1603, 1546, 1549.

50. On July 29, 1988, River Valley I entered into a Stock Purchase Agreement with the FSLIC. Mr. Holland signed the Agreement on behalf of River Valley I. JSF ¶ 102; PX 202 at CHO023 0106-0208, 0106, 0165.

51. The FSLIC preferred stock had a fixed dividend feature and an equity participation feature that was triggered when earnings exceeded a defined level. JSF ¶ 275; PX 606 at 17; PX 202 CHO023 0106-0208, CHO023 0176.

52. The FSLIC preferred stock paid a fixed rate dividend of 8 percent that was scheduled to remain flat until July 1999 but then to increase steadily to 12 percent in five annual steps. The Series A Preferred also contained a profit participation component in the form of a supplemental dividend equal to 25 percent of "Adjusted Net Income." Adjusted Net Income was determined as the amount of reported net income (pursuant to GAAP), after deducting the fixed rate dividend, that exceeded 0.4 percent of average assets for the first 10 years, declining five basis points a year until it leveled off at 0.15 percent thereafter. See JSF ¶ 103; PX 202 CHO023 0106-0208, 0167-0174; PX 606 at 17 ¶ 39; Holland v. United States, 74 Fed. Cl. 225, 258-63 (2006).

53. The Series A preferred stock was redeemable at the option of River Valley I, in whole or in part, within 30 days of the completion of any fiscal quarter at a redemption price of $100 per share – i.e., at par value – plus accrued and unpaid fixed dividends and supplemental dividends thereon to the date fixed for redemption. See JSF ¶ 104; PX 202 CHO023 0106-0208, 0171-0172.

54. In an April 28, 1988 letter, the FHLBB provided an estimate of $3.371 million for the income-sharing component of the preferred stock (using a 16 percent discount rate), and a range of values from $2.6 million (20 percent discount rate) to $3.85 million (13.91 percent discount rate). JSF ¶ 108; PX 148 WOF016 2572-2575, 2573.

55. KPMG Peat Marwick ("KPMG"), River Valley I's auditors, stated that, "River Valley [I]'s common stock investors viewed FSLIC's preferred stock investment as being similar to a 'loan from FSLIC.'" JSF ¶ 105; PX 452 HO-KPMG 000971.

56. FSLIC's purchase of River Valley I's preferred stock represented only one component of the supervisory acquisition of Galva, Mutual, and Home. There were other significant components of the transaction whereby FSLIC provided various forms of assistance. JSF ¶ 106; PX 207 WOF016 1512-1603; PX 201 at CHO023 1087-92, 1088-89; DX 153 WON335 0112-0138.

**c. The Use Of A $4.6 Million Subordinated Debenture Toward Regulatory Capital Computations**

57. FHLBB Resolution 88-638 approved the issuance of a $4,600,000 subordinated debenture by River Valley I to ANB, "and the inclusion in [River Valley I's] regulatory capital of such subordinated debenture in accordance with § 561.13 of the Insurance Regulations," subject to certain conditions. JSF ¶ 87; PX 199 WOT013 0775-0792, 0784-0785.

58. The Assistance Agreement provided that a $4.6 million subordinated debenture could be included in River Valley I's regulatory capital. JSF ¶ 81; PX 207 WOF016 1512-1603, 1548-1549.

59. The $4.6 million subordinated debenture issued by River Valley I to ANB had a stated "Maturity Date" of March 31, 1998 (approximately 10 years from the date of the execution of the subordinated debenture agreement). The maturity date could be extended according to the specific terms of the agreement. JSF ¶ 98; PX 204 WOF016 1613-24, 1615-16.

60. Messrs. Holland and Ross pledged their shares of River Valley II common stock to ANB as collateral for the $4.6 million subordinated debenture. JSF ¶ 101; PX 201 CHO023 1087-92, 1088-89.

**d. The Restrictions On Transfer To Third Parties**

61. The River Valley I Assistance Agreement contained a clause barring the assignment of rights or obligations of the agreement to any other party, including through merger, without the FSLIC's prior written consent. JSF ¶ 83; PX 207 WOF016 1512-1603, 1596-1597 § 25.

**2. Forbearance Letter**

62. On July 28, 1988, FHLBB sent a letter to Dr. Holland, as President and Chief Executive Officer of River Valley I, granting certain regulatory forbearances with respect to the Galva, Mutual, and Home transaction. JSF ¶ 90; PX 200 WOT013 0583-0585.

63. The forbearance letter provided, among other things, that (1) "[a] portion of the [FSLIC] cash contribution not to exceed $8.0 million may be credited to River Valley I's

regulatory capital; therefore, for regulatory accounting purposes, River Valley I may book such contribution as a direct addition to its regulatory capital . . ." subject to certain limitations; and (2) for purposes of reporting to the FHLBB, "the value of any intangible asset resulting from the application of push-down accounting in accounting for the purchases, may be amortized by River Valley I over a period not to exceed 25 years by the straight line method." JSF ¶ 91; PX 200 WOT013 0583-0585, 0584.

**3. <u>Accounting</u>**

64. As with the forbearance letter, the "Accounting" section of FHLBB Resolution 88-638 provided, in part, that River Valley I was to report to the FHLBB and FSLIC in accordance with GAAP, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC, except to the extent of the following departures:

> (a) Eight million dollars of the initial contribution by the FSLIC to River Valley I, and four million six hundred thousand dollars of the principal amount of the Subordinated Debenture... shall be credited to the regulatory capital account of River Valley I in accordance with the forbearance letter authorized pursuant to this Resolution;
>
> (b) The value of any unidentifiable intangible assets resulting from the application of push-down accounting in accounting for the Mergers and Stock Acquisition may be amortized by River Valley I over a period not in excess of twenty-five (25) years by the straight line method. . . .

JSF ¶ 88; PX 199 WOT013 0775-0792, 0788-0789.

65. With respect to the Galva, Mutual, and Home acquisition, River Valley I initially recorded $1.136 million of GAAP goodwill; this GAAP goodwill, however, was retroactively eliminated in its entirety during the fourth quarter of 1989 due to a revaluation of the tangible assets acquired. JSF ¶ 97; PX 393 H&R-BX62-00145-49; PX 392 H&R-BX70-2510-2522, 2510; PX 288 SH-HO 0000001-0000371.

**D. The River Valley II Transaction**

**1. The River Valley II Assistance Agreement**

66. On December 24, 1987, River Valley II (i.e., Rock Falls) submitted a bid to acquire Republic. JSF ¶ 111.

67. On July 29, 1988, FSLIC and Rock Falls, plaintiffs' wholly owned, state-chartered thrift, entered into an Assistance Agreement relating to the merger of Republic into Rock Falls. JSF ¶¶ 113-14; PX 205 WOT013 0051-0119, 0051, 0056, 0056-0058, 0113.

68. The River Valley II Assistance Agreement provided, among other things, for a cash contribution equal to $16.6 million in cash assistance from the FSLIC. PX 205 WOT013 0051-0119, 0073-74. The FSLIC's cash contributions eliminated all but $1.3 million of the resulting institution's existing net worth deficit. JSF ¶ 116; PX 205 WOT013 0051-0119, 0073, 0074.

**2. Resolution 88-612**

69. On July 27, 1988, FHLBB issued Resolution 88-612. JSF ¶ 122; PX 198; WOT645 1171-1179. Resolution 88-612 required that River Valley II demonstrate the sale of $2 million in subordinated debt to ANB. JSF ¶ 124; PX 198 WOT645 1171-1179, 1175.

**3. Forbearance Letters**

70. On July 29, 1988, FHLBB sent a letter to River Valley II, approving the issuance and inclusion in its regulatory capital of the $2 million subordinated debenture. JSF ¶ 127; PX 206 WON534 0109-0110.

71. On May 18, 1989, FHLBB sent a letter to River Valley II granting regulatory forbearances with respect to the acquisition of Republic. JSF ¶ 129; PX 754 WOT645 0847-49.

72. The forbearance letter dated May 18, 1989, provided, among other things, that (1) "[a] portion of the [FSLIC] cash contribution not to exceed $5.0 million may be credited to [River Valley II's] regulatory capital; therefore, for regulatory accounting purposes, [River Valley II] may book such contribution as a direct addition to its regulatory capital . . ." subject to certain limitations; and (2) for purposes of reporting to the FHLBB, "the value of any intangible

asset resulting from the application of push-down accounting in accounting for the purchase, may be amortized by [River Valley II] over a period not to exceed 25 years by the straight line method." JSF ¶ 130; PX 754 WOT645 0847-0849, 0848; PX 3 at p. 6, OGC049 0378-0404, 0383.

**4. Issuance Of Subordinated Debt**

73. On July 29, 1988, FHLBB sent a letter to River Valley II, approving the issuance and inclusion in its regulatory capital of "a subordinated debenture in the aggregate principal amount not to exceed $2,000,000 as calculated in accordance with 12 C.F.R. §561.13 [,]" subject to certain conditions. JSF ¶ 127; PX 206 WOT645 1256-1257.

**5. Accounting**

74. The "Accounting" section of FHLBB Resolution 88-612 provided, in part, that, in accounting for the merger, River Valley II was to use GAAP,

> as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC except that $5,000,000 of the initial cash contribution by the FSLIC to [River Valley II], pursuant to § 6(a) of the Assistance Agreement, shall be credited to the regulatory capital account of [River Valley II] and shall constitute regulatory capital as defined in § 561.13 of the Insurance Regulation.

JSF ¶ 125; PX 198 WOT645 1171-1179, 1175.

75. The fiscal year 1989 audited consolidated financial statements for River Valley II show that the application of purchase accounting to the Republic acquisition produced $1.3 million in GAAP goodwill. PX 313, H&R-B43-00559-00589, 00573.

76. In connection with both the Home and Republic acquisitions, River Valley negotiated to retain the acquired institutions' net operating losses ("NOLs"). <u>See</u> JSF ¶ 58; Def.'s Response to Plaintiffs' Proposed Statement of Facts (Dec. 31, 2003) ¶29.

**E. The Peoria Savings Acquisition**

**1. Background**

77. In the fall of 1988, two months after the closing of the Galva/Mutual/Home and Republic acquisitions, the Government marketed Peoria Savings and Loan Association ("Peoria"), another insolvent thrift located in central Illinois. The report of examination conducted on Peoria in

September 1988 revealed that the thrift was insolvent as of July 31, 1988. JSF ¶ 142; PX 269 WON363 0524-37, 0529.

**2. The Assistance Agreement**

78. On December 31, 1988, FSLIC and River Valley I entered into an Assistance Agreement relating to the acquisition of another insolvent thrift, Peoria, located in central Illinois. Holland I, 57 Fed. Cl. at 567-69; JSF ¶¶ 142-45; DX 204 WOT837 0940-1020.

79. In the plans submitted after the acquisition of Peoria at the end of 1988, River Valley I's projected capital ratios declined to roughly 5.5 percent, reflecting the growth and leverage from the Peoria acquisition. See PX 249 WOT288 0020-0026, 0026; PX 345 WOL275 0154-0166, at 0155; PX 363 WOL275 0087-0099; see also PX 601 at 36 ¶ 86(b).

80. The pre-acquisition business plan for River Valley II and the December 9, 1988 plan for River Valley I projected an aggregate net income of $3.83 million in the first two years (July 31, 1988 through July 31, 1990), with annual returns on assets of approximately 0.4 percent. See PX 191 WOT645 1521-1526, 1522; PX 193 WOF016 2430-2434, 2432; PX 262 WON339 0092-0113, 0105; PX 601 at 37 ¶ 86(c).

81. Pursuant to the Assistance Agreement, FSLIC contributed $3.3 million in cash to River Valley I. JSF ¶ 147; DX 204 WOT837 0940-1020, 0965-0966.

82. FSLIC's assistance eliminated all but $2.766 million of Peoria's existing net worth deficit. JSF ¶ 148; DX 204 WOT837 0940-1020, 0966; PX 393 H&R-BX62-00134-00168, 00148-00150.

83. During the fourth quarter of 1989, River Valley I "expensed the remaining excess of cost over fair value of net assets acquired arising from the acquisition of [Peoria]," specifically stating that "[t]he additional amortization was based upon the conclusion that the negative publicity within the industry, adverse deposit retention history, and the adverse regulatory changes have substantially reduced the franchise value." JSF ¶ 188; PX 393 H&R-BX62-00134-00168, 00149-00150.

84. As part of the Peoria acquisition, Messrs. Holland and Ross purchased $5 million of Class C cumulative preferred stock from River Valley I, having a liquidation value of $1,000 per share and an annual cumulative dividend rate of 10 percent. JSF ¶ 150; PX 285 H&R-B08 00331-00360, 00352; DX 1375 at 125.

## IV. OPERATION OF THE THRIFTS AFTER THE ACQUISITIONS AT ISSUE

### A. Operations And Projections Before The Enactment Of FIRREA

85. At the beginning of 1988, before contracting with the Government, River Valley II had assets of approximately $120 million, and a net worth of almost $5 million. PX 177 WON534 0346-0365; PX 124 CHO001 0839-0848; see also PX 601 at 34 ¶ 80.

86. Prior to the Home/Mutual/Galva transaction, there was no River Valley I institution.

87. At the end of 1988, after the five acquisitions, River Valley I and River Valley II had aggregate assets of $620.9 million and regulatory net worth of $34.9 million. JSF ¶ 167; PX 601 at 34 ¶ 81.

88. The River Valley thrifts were required to submit business plans prior to each of the Government-assisted transactions and, in the case of River Valley I, regularly after the acquisitions. See JSF ¶ 170; PX 191 WOT645 1521-1526 at 1521; PX 601 at 36 ¶ 86; see also PX 136; PX 249 WOT288 0020-0026 at 0024; PX 262 WON339 0092-0113 at 0099; PX 345 WOL275 0154-0166 at 0155; PX 363 WOL275 0087-0099.

89. The FHLB of Chicago required the submission of business plans prior to the Government-assisted transactions for a number of reasons, including to assure itself of (a) the future viability of the resulting institutions, and (b) the institutions' ability to meet capital ratio requirements without taking on undue risk. JSF ¶ 170; DX 1381 at 52-53; PX 199 WOT013 0775-92 at 0781-82; PX 601 at 36 ¶ 86; DX 1374 at 101; PX 193 WOF016 2430-34.

**B. Post-FIRREA Matters Concerning Capital**

90. On August 9, 1989, then-President George H. W. Bush signed into law FIRREA, a comprehensive thrift reform package.

91. The relevant portions of the FIRREA legislation required, among other things, three different measures of capital for thrift institutions: (1) "core capital;" (2) "tangible capital;" and (3) "risk-based capital." 12 C.F.R. §§ 561, 563 and 567 (1990). The OTS, which succeeded the FHLBB as a result of FIRREA, issued implementing regulations for the new legislation on November 8, 1989, with an effective date of December 7, 1989. 12 C.F.R. § 567; JSF ¶ 41.

92. FIRREA and its implementing regulations limited the amount of goodwill, including "capital credit" goodwill, that could be included in core and risk-based capital and required such qualifying goodwill to be phased out over a five-year period. As an intangible asset, goodwill could not be included in the tangible capital computations. Capital credits, subordinated debt, and cumulative preferred stock could not be included in tangible capital computations. Cumulative preferred stock and subordinated debt could generally be included in risk-based capital, but could not be included in either tangible or core capital. 12 U.S.C. §§ 1464(t)(2)(A)-(B), 1464(t)3, 1464(t)(9)(A)-(B) (1989); JSF ¶ 40a.

95. River Valley I, River Valley II, and River Valley III were in compliance with the FIRREA capital requirements at each quarter-end from March 31, 1990, to December 31, 1994. JSF ¶ 192; DX 1416 Ex. D; PX 288.

93. According to River Valley I's December 31, 1989 audit report, security gains of $1,596,000 accounted for approximately 85 percent of before tax income. The return on average assets was 0.40 percent in 1989. Had it not been for the large securities gains, the return on average assets would have been less than 0.10 percent. JSF ¶ 189; PX 454 H&R-BX62 01757-01826, H&R-BX62 01776.

94. On March 12, 1991, the FDIC, as successor to the FSLIC, repaid the $13.2 promissory note issued to River Valley I in connection with the Peoria acquisition, plus accrued interest, for a total of $13,404,600. JSF ¶ 286; PX 625 H&R-BX63-000 52-126, H&R-BX63-00062.

95. In September 1991, River Valley converted the $2 million tranche of sub-debt into a series of preferred shares that the holding company purchased with funds secured through an issuance of debt at the holding company level. In economic substance, therefore, the River Valley sub-debt was simply converted into holding company sub-debt in such a way as to permit River Valley to recover the associated regulatory capital. PX 605 at ¶ 53. The holder of the notes both before and after the exchange was the same, American National Bank. The preferred dividend rate was established at the level necessary to fund the holding company's payment of the interest on the debt it issued to purchase the preferred, and River Valley in fact paid that level of dividend to the holding company. PX 605 at ¶ 51; PX 625 H&R-BX63-00053 (OTS Exam Report reflecting the conversion).

96. In late 1993, River Valley Holdings, Inc. ("RV Holdings") borrowed $6.6 million from ANB to prepay deferred compensation to Messrs. Holland and Bangert. JSF ¶ 337; PX 983 H&R-BX70 2364-2377, 2371; PX 875 WON247 0050-0095, 0059. With those funds, Messrs. Holland and Bangert received deferred compensation payments of $4.3 million and $2.1 million, respectively. JSF ¶ 338; PX 983 H&R-BX70 2364-2377, 2370; DX 1036 WON464 0921-0933, 0926-0927; PX 876 WON247 0050-0095, 0059.

97. Previously, Messrs. Holland and Ross had received $250,000 in dividends from RV Holdings. JSF ¶ 339; PX 983 H&R-BX70 2364-2377, 2371.

98. According to the OTS, classified assets at River Valley II, as of October 31, 1990, totaled $3,562,342, or 63.7 percent of tangible capital plus general valuation allowances. JSF ¶ 248; PX 480 H&R-BX60-01451-01461, H&R-BX60 01455. In contrast, the FDIC in its report of

examination, found that substandard classifications constituted 342 percent of tangible capital. PX 453 WON158 0212.

### C. The 1991 Redemption Of Class A Preferred Stock

99. In 1990, the Government and River Valley I negotiated over a potential redemption of the FSLIC preferred stock at a discount. The Government retained the investment banking firm of Donaldson, Lufkin, & Jenrette to advise the Government on valuing the stock. See PX 466 H&R-BX-64-02353-54; see also PX 606 at 18-19 ¶ 41.

100. On March 28, 1991, the Government accepted a discounted redemption payment of $3,675,000; in exchange the Government surrendered the shares to River Valley. See PX 606 at 18-19 ¶ 41; PX 526 H&R-BX60-00520 00590; PX 601 at 46-47 ¶ 107(c);JSF ¶ 278.

101. The issuance of the preferred stock to the FSLIC and the subsequent redemption of that stock from the FDIC were the only transactions involving the stock from 1988 to 1991. JSF ¶ 280; PX 202 CHO023 0106-0208; PX 526 H&R-BX60-00520-00590.

### D. Operations Following Supervisory Agreement Of March 25, 1991

102. On May 20, 1992, Mr. Bangert wrote to the FDIC in Chicago in response to the FDIC's report of examination of River Valley III as of October 26, 1991. Mr. Bangert stated that "[t]he FDIC and the OTS examination findings for 'classified assets' are substantially different." He stated that the OTS approach was "consistent with management's internal classified assets schedule[,]" whereas the FDIC's approach was not. JSF ¶ 306; PX 687 H&R-B56 02857-02858.

103. The OTS set forth a composite rating of "2" for River Valley III in its October 1993 report of examination. PX 857 H&R-B55-00145-00176 at 00150; JSF ¶326.

104. The OTS set forth a composite rating of "2" for River Valley III in its October 1994 report of examination. PX 982 H&R-BX70-2329-2363 at 2334; JSF ¶328.

E. **<u>The Formation Of RV Holdings</u>**

105. On or about March 31, 1991, River Valley II was merged with and into River Valley I (post-merger, "River Valley III"). The resulting institution later became a wholly owned subsidiary of River Valley Holdings Inc. ("RV Holdings"). <u>See</u> JSF ¶ 329; PX 601 at 48 ¶ 107(f); PX 781 H&R-BX66-00129-00170 at 00142; PX 643 H&R-B03-00676-00710 at 00687; PX 643 H&R-B03-00676-00710 at 00687; PX 625 H&R-BX63-00052-00126 at 00062.

106. Establishing RV Holdings allowed Messrs. Holland and Ross to increase River Valley III's tangible capital by converting $2 million of subordinated debt held by ANB to $2 million of holding company debt. While the $2 million of subordinated debt held by the thrift did not qualify as tangible regulatory capital, the same $2 million, when borrowed by the holding company, could be downstreamed and treated as tangible capital at the thrift level. JSF ¶ 330; <u>See</u> PX 601 at 48; DX 1375 at 95.

107. On August 16, 1991, RV Holdings was incorporated, and on September 25, 1991, Messrs. Holland and Ross exchanged all of their stock in River Valley III for stock of RV Holdings. JSF ¶ 331; PX 625 H&R-BX63-000 52-126, H&R-BX63-000 62-63.

F. **<u>The SAFSB Acquisition</u>**

108. As of September 30, 1991, River Valley III's total assets were $537 million and its tangible capital ratio was 4.48 percent, exceeding the projections in its February 1991 business plan of $529 million and 4.10 percent, respectively. JSF ¶ 342; PX 512 WON107 1612-1653, 1612, WON107 1617.

109. As of September 30, 1991, River Valley III was in compliance with both minimum regulatory requirements and the capital provisions of the March 25, 1991 Supervisory Agreement. As of September 30, 1991, the institution reported tangible capital of $24.1 million (4.5 percent of tangible assets) and core capital of $32.1 million (6 percent of adjusted tangible assets). Each was approximately $15.9 million in excess of the minimum regulatory requirement. Risk based capital was $34.1 million (12.6 percent of risk-weighted assets) and approximately

$14.6 million in excess of the minimum regulatory requirement. However, the Supervisory Agreement required tangible capital ratios, at September 30, 1991 and 1992 to be 4.0 percent and 5.0 percent, respectively. JSF ¶ 343; PX 625 H&R-BX63-000 52-126, H&R-BX63-000 66.

110. In late 1991, River Valley was presented with an opportunity to acquire San Antonio Federal Savings Bank ("SAFSB") from the RTC, which had seized SAFSB's corporate parent, San Antonio Savings Association ("SASA"). Although SASA was insolvent, SAFSB had a net worth of approximately $60 million. See JSF ¶ 344; PX 777 WCH-B76-0114-0158 at 0127-0128.

111. No later than November 20, 1991, Mr. Holland informed River Valley III's board of a potential acquisition of SAFSB. JSF ¶ 345; PX 631 H&R-B03 00126-00130, H&R-B03 00129.

112. To finance the acquisition, Messrs. Holland and Ross attempted to obtain financing from ANB and acquire SAFSB through River Valley III.

113. ANB agreed to finance the acquisition of SAFSB, but only if the acquisition was undertaken by an entity totally separate from River Valley III. PX 657 FHO012 2499-2500; DX 1389 at 198.

114. Western Capital Holdings, Inc. ("WCHI") was incorporated on January 31, 1992 to purchase SAFSB. Messrs. Holland and Ross each owned 30 percent of WCHI; minority shareholders owned the other 40 percent. As of October 1992, SAFSB's ownership was Mr. Ross 30 percent; Mr. Holland 30 percent; Mr. Bangert 25 percent; Mr. Rose 10 percent; Mr. Pikus 5 percent. JSF ¶ 349; PX 726 WON387 0007-0068, WON387 0015; PX 733 H&R-B06 01130-01177, H&R-B06 01143.

115. On August 14, 1992, WCHI acquired SAFSB from the RTC for $25 million, of which $15 million was paid to the RTC from SAFSB assets prior to closing as a cash dividend, and the remaining $10 million was paid in cash by the new shareholders at closing. All of SAFSB's outstanding common stock was acquired by WCHI and SAFSB became a wholly owned subsidiary

of WCHI. JSF ¶ 355; PX 733 H&R-B06-01130-01177 at 01143; PX 633 H&R-BX61-00787-00819 at 00788; PX 742 H&R-BX61-01068-01069 (PX 742); PX 733 H&R-B06-01130-01177 at 01142.

116. At the time it was acquired by WCHI, SAFSB had six retail banking offices located in the Rio Grande Valley in the southernmost part of Texas. JSF ¶ 356; PX 649A PHO040 0895-0931, PHO040 0896, PHO040 0908-0909.

117. At the time of closing, SAFSB's assets, liabilities, and shareholders' equity on a GAAP, fair market value basis were $189,317,000, $178,936,000, and $10,381,000, respectively, including a small reduction of assets of $328,000 for negative accounting goodwill (the excess of the fair market value of the net assets for accounting purposes over the purchase price). JSF ¶ 361; PX 777 WCH-B76-0114-0150, WCH-B76-0126-0127.

118. Pursuant to purchase accounting, there was an aggregate write down of SAFSB's assets and liabilities from accounting book value to fair market value of shareholders' equity of $27,892,755, primarily because of write-downs from book to fair market value in loans and securities. JSF ¶ 362; PX 777 WCH-B76 0114 0150, WCH-B76 0128.

**G. <u>The Operation Of SAFSB</u>**

119. River Valley III and SAFSB were related entities in terms of commonality in shareholders, as well as employee and management overlap.[2] For example, on August 17, 1992, SAFSB and River Valley III entered into a consulting services agreement whereby River Valley III provided the following services to SAFSB: accounting/regulatory reporting, portfolio management, troubled asset disposition, capital and tax planning, mortgage loan servicing and data processing systems. As compensation for the services rendered, SAFSB paid River Valley III a monthly fee. JSF ¶ 364; PX 724 WON469 0276-0329 0276-0329, WON469 0328.

---

2/ Moreover, they shared similar names. SAFSB changed its name to River Valley Bank, FSB effective March 15, 1993. JSF ¶ 365; PX 1048 H&R-B09-987-1016, 995.

120. The SAFSB transaction proved profitable for WCHI and its shareholders. Cumulative cash dividends paid by SAFSB to WCHI amounted to $35 million from 1992 through 1995. JSF ¶ 366; PX 882 WCH-B771621-1649, WCH-B77 1626; PX 1048 H&R-B09-987-1016, H&R-B09-992.

**H. The Sale Of RV Holdings To First Banks, Inc.**

121. On August 26, 1994, RV Holdings entered into a definitive agreement to merge the institution into First Banks, Inc. ("FBI"). JSF ¶¶ 372; DX 1371 at 32; PX 1009 PHO047 0182; PX 601 at 69 ¶ 153; PX 982 H&R-BX70 2329-63, H&R-BX70 2339.

122. The August 1994 FBI acquisition agreement placed certain operating restrictions on River Valley III which required First Bank's prior consent before execution. JSF ¶ 372; PX 982 H&R-BX70 2329-63, H&R-BX70 2339.

123. Messrs. Holland and Ross, as controlling shareholders, sold RV Holdings to FBI on January 4, 1995, for $37.419 million, a value which translates into a return for Messrs. Holland and Ross of 29.5 percent per year. DX 1492 at ¶ 49. The payment was distributed as follows: $179,660 to Mr. Pikus; $744,793 to Mr. Kipnis; $18,619,825 to Mr. Holland; and $17,875,032 to Mr. Ross. JSF ¶ 373; PX 1074 at 93; DX 1298 BBHO 00062-00181, 00159-00161; JSF ¶ 374; PX 994 H&R-B05-00155-00165; PX 691 HO-KPMG 006447-06480; PX 1009 PHO047 0182; JSF ¶ 385; PX 648 H&R-B3 1234-1245, H&R-B3 1234-35.[3]

**I. First Bank Was Well Capitalized**

124. FBI was in capital compliance from September 1990 through September 1997. JSF ¶ 377; DX 1414 at 21 ¶ 75, Ex. 9.

---

3/ When First Banks paid $37.419 million for River Valley III, it paid more than River Valley III's Net Worth or Book Value. JSF ¶ 375; DX 1371 at 33, 125; PX 1009 PHO047 0182; PX 601 at 69 ¶ 153; Trustmark Corp. v. Comm of Int. Revenue, 1994 WL 159116 (U.S. Tax Court) (premium on purchase of thrift standard in industry).]

125. Its capital ratios exceeded the regulatory requirements throughout the above time frame. This excess over the regulatory requirement ranged from 3.2 percent to 8.32 percent (tangible), 1.7 percent to 6.82 percent (core), and 1.36 percent to 8.27 percent (risk-based).

126. In particular, FBI's capital position was strong immediately before and after the acquisition of RV Holdings. As of December 31, 1994, FBI's tangible, core, and risk-based capital ratios were at 8.21 percent, 8.21 percent and 16.15 percent, respectively. As of September 30, 1995, those same ratios stood at 7.15 percent, 7.15 percent and 13.07 percent. JSF ¶ 379; DX 1414 at 22 ¶ 76, Ex. 9.

127. River Valley III's remaining GAAP goodwill was eliminated upon its acquisition by First Banks. JSF ¶ 380; PX 1074 at 93-97, 116; PX 2 at 425-466; PX 1 at 223-229; PX 552 at 1231-32; PX 7 at 4779-96.

**J. SAFSB's Liquidation**

128. In June 1996, WCHI sold certain assets and liabilities of SAFSB to International Bank of Commerce ("IBC"). The acquisition was accounted for as a purchase transaction. IBC recorded intangible assets, goodwill and core deposit premium totaling $6,599,000 on the date of the sale. JSF ¶ 386; PX 1066 1-108, 75-77.

Respectfully submitted,

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

OF COUNSEL:

SCOTT D. AUSTIN
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
BRIAN A. MIZOGUCHI
AMANDA L. TANTUM
JOHN J. TODOR
SAMEER YERAWADEKAR

Attorneys for Defendant

November 15, 2007

/s/ David B. Bergman
David B. Bergman
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for Plaintiffs

Of Counsel:

Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER, LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

Co-counsel for First Bank:
Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
GUNN AND GUNN
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, MO 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of November 2007, a copy of the foregoing "SUPPLEMENTAL JOINT STIPULATION OF FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson