# EXHIBIT 1

Page 166

Q. Okay. All right. So your view is: Once the -- a given tranche of retained earnings is no longer necessary to replace regulatory capital, because of the amortization of the contract capital, then Dr. Holland still needs to account for the costs and benefits of those retained earnings?

A. Well, I'd put it a little bit differently. I'm saying it's the portion of retained earnings that River Valley put on its books, at least within the context of this analysis, expressly for the purpose of replacing lost regulatory capital; that once you accumulated that, you don't lose it, it doesn't amortize, it stays there. And it has benefits, presumably, perpetuity --

Q. Where did you get --

A. -- and costs.

Q. I'm sorry. Were you done?

A. Yeah.

Q. Where did you get the idea that River Valley accumulated any of its retained

Page 167

earnings solely for the purpose of replacing a contracted-for, but-breached regulatory capital?

MR. TODOR: Objection; form and foundation.

THE WITNESS: I didn't say "solely." What I said was the way Dr. Holland's analysis proceeds for it to make economic sense, he's saying there were retained earnings that the organization accumulated, that presumably -- presumably it would not have done if it still had the regulatory capital, that it was for the purpose of mitigating the loss of regulatory capital, and that created a cost.

BY MR. JOHNSON:

Q. All right. Now, let's look at Paragraph 35. And we discussed this to an exten this morning, but -- but the first two sentences here (indicating) are where you assert that Dr. Holland may be implying that River Valley should have had available to it both the contracted-for regulatory capital and the retained earnings that he analyzes in his report.

Page 168

And then you assert, "However, this would require a lost-profits model."

Why is that? Why would that require a lost-profits model?

A. Well, because if, in fact, the argument is that there's a cost to River Valley because it lost the ability to have both the retained earnings and the regulatory capital, then the question is: Why was that a cost?

So it was a cost because if I had the additional capital, I could have leveraged more; I could have grown more; I could have acquired another bank. Okay. What good is that from a value standpoint? Well, it allows me to generate more profits. And to me, that's a lost-profits argument.

You can't have an argument which says that the loss and value was because of the lost opportunity to make money, to make profits, because we didn't have the ability to leverage, because we lost the regulatory capital, and not do a lost-profits analysis. I just don't see how you

Page 169

can do a damage estimation analysis that is predicated on the notion that the damage comes from losing profits and not have that be a lost-profits analysis.

Q. And -- and as a financial economist, you take issue with the notion that River Valley paid a cost of the retained earnings, but didn't get the benefit of additional leveraged capacity, or other options for how to deploy them, because it had to use them to substitute for the contractual capital; that it does not make sense to you, as a financial economist, that the costs of the retained earnings are, therefore, a cost associated with mitigating the harm of the breach; is that right?

A. What I'm saying is there's nothing wrong, if it's done properly, in saying that the damage is coming from lost profit opportunities. That's not what I'm objecting to. What I'm saying is that if you want to do that, then that requires a lost-profits analysis. Measure the lost profits.

Page 282

Q. Well, if you want to look at that, wouldn't you also have to look at the additional loss of the earnings on the $4.6 million of capital used to redeem the subdebt?
MR. TODOR: Objection; foundation.
THE WITNESS: The additional --
BY MR. JOHNSON:
Q. River Valley actually paid $4.6 million to redeem the subdebt.
A. For subdebt, right.
Q. If they hadn't redeemed the subdebt, that $4.6 million would have stayed in the bank at least earning a direct investment return, right?
A. Yes.
Q. And if you want to look at the financial costs of simply the redemption transaction, not the replacement of the regulatory capital, but just the redemption of the subordinated debentures, one would need to compare the foregone return generated by having the $4.6 million in cash against the avoided cost of paying interest on the $4.6 million loan, right?

Page 283

MR. TODOR: Objection; foundation.
THE WITNESS: Okay. Let me see if I understand what you're saying.
So by redeeming the subdebt, we spent $4.6 million --
BY MR. JOHNSON:
Q. Yes.
A. -- right?
Q. That's correct, yes.
A. We got the subdebt off the books?
Q. Yes.
A. That cost us something because that $4.6 million -- there is some cost.
Q. Right. And we spent $4.6 million -- we relieved ourselves of the $4.6 million obligation -- "we" being River Valley -- and Dr. Holland's view is that's a wash, no -- no benefit, no harm. And I understand your view to be Dr. Holland erred by not taking an offset for the foregone interest payments.
And my question is: If he had taken that offset, wouldn't he have needed to take

Page 284

something I don't even know a name for, but sort of a -- an offset against the offset for the earnings that River Valley would have gleaned -- would have gleaned by virtue of having the $4.6 million over the term of the subdebt, the 4.6 it used to redeem the subdebt?
MR. TODOR: Objection; form and foundation.
THE WITNESS: So you're saying that Dr. Holland is claiming that it was actually $9.2 million that was involved?
BY MR. JOHNSON:
Q. I suppose one could look at it that way, because there's the $4.6 million cash payment, which made in the real world, nobody's disputing that. And Dr. Holland is not treating that as a cost of replacement capital in his analysis. He's saying, in addition to the redemption transaction, you know, look, we -- we had to do something to replace the foregone regulatory capital, and what we did was retain earnings, and that's what I'm -- that's what I'm

Page 285

costing.
I'm, in a sense, ignoring the -- this is Dr. Holland says, I'm, in a sense, ignoring the redemption transaction because it's a wash. We've made a $4.6 million payment and we've been relieved of a $4.6 million obligation.
And so my question is -- to you, Dr. Thakor, is: If that was Dr. Holland's analysis, what's wrong with that?
MR. TODOR: Objection; form and foundation.
THE WITNESS: Can I think about that?
BY MR. JOHNSON:
Q. Of course.
A. Let me think about that.
Q. Okay.
A. And then we can come back to it.
Q. Let's go to Paragraph 58. Tell me what you're getting at here.
A. Well, this is simply saying that Dr. Holland uses a 35 percent tax rate in his calculations, but if you look at River Valley's

actual tax returns or their TFRs, they paid very little in taxes. And, like I said, in most quarters, the tax -- their effective tax rate, because of the NOLs, was zero; the highest number that I saw was a little over 3 percent.

So if you're looking at things on an actual-experience basis, then the 35 percent doesn't seem to be reasonable.

Q. I noticed -- I'll try not to get caught up in semantics too much here, but it struck me that you say "questionable" here. And I've looked at this paragraph a number of times and I don't see you ever taking the position that as a matter of financial economics, you think Dr. Holland's explanation of why he did that is wrong.

Do you hold the view that it was wrong for Dr. Holland to apply the 35 percent effective tax rate?

A. Well, I mean, let me -- I think one has to be careful how one describes what Dr. Holland has done, and I chose my words in the



report very carefully, is if, in fact, I'm looking at an actual-experience analysis, which says, let's look at the taxes that they actually paid and let's assume that given the NOLs that they had, their actual experience was not an unrealistic representation of what would have happened at the margin, the next dollar of profits, then I see no reason why you would use 35 percent. Then, I think that something that approximates the actual experience, which, in this case, was zero, is more reasonable.

Now, I understand the rationale that Dr. Holland has provided, at least in his deposition testimony; he probably said this in his report as well, but it did come out in the deposition testimony where his argument was, yeah, it's true we had 50- to $100 million of NOLs, but these weren't inexhaustible, you know, it's not infinite. So at some point at the margin, we would have had 35 percent.

Well, at some point, yes, but not at the margin given where River Valley was. And the



analysis that we're doing is not on this sort of -- this infinite size space for River Valley; we're doing it at the margin for the institution that existed. In which case, 35 percent, I don't believe, is the right rate.

Q. Well, isn't it true that for each dollar River Valley shielded in the 1990s with a NOL, that meant it would be a dollar River Valley would have to pay tax on at some point in the future if it survived long enough to exhaust the NOLs?

A. Yeah, that's consistent with what I said in my previous answer.

Q. So is the dispute here, really, just one about the time value of the deferral provided by the NOLs in that River Valley's marginal tax rate really was approximately 35 percent, but that just would kick in sometime after, say, 1991?

MR. TODOR: Objection; form and foundation.

THE WITNESS: The question is what happens to the income between now and the time



that the NOLs exhausted, and that income is essentially subject to a zero percent effective tax rate.

BY MR. JOHNSON:

Q. All right. Okay. Why don't we turn to Exhibit 16-A and B in conjunction with Paragraph 59. You can make reference to the narrative as you see fit, but would you walk me through Exhibit 16-A and tell me what's going on here?

A. Okay. So what I do is I'm now using what I view as a consistent ex-post analysis to compute the cost of capital credits, and there is some aspects of Dr. Holland's analysis that I use the way that he uses them and then I make some changes.

The adjustments that I've made are listed, four of them. One is instead of using the hypothetical 20 percent equity cost of capital, I use actual dividends paid as a measure of the cost retained earnings, and then I allocate the dividends based on the fraction of total common