**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, Co-Executor of<br>The Estate Of HOWARD R. ROSS,<br>AND FIRST BANK<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 95-524 C<br><br>(Judge G. Miller) |

**PLAINTIFFS' OBJECTIONS AND COUNTER-DESIGNATIONS TO DEFENDANT'S EXPERT WITNESS DEPOSITION DESIGNATIONS**

## I. Objections to Defendant's Deposition Excerpts

### A. Objections to Defendant's Deposition Designations of Homer Holland

| Transcript Citation | Objection(s)[1] |
|---|---|
| 10/31/01 Tr. 21:8-18 | omits question; lacks context to the point that the excerpt is not understandable; irrelevant because addresses damages calculation that is not being presented |
| 10/31/01 Tr. 25:5-21 | omits question; lacks context to the point that the excerpt is not understandable; irrelevant because addresses damages calculation that is not being presented |
| 1031/01 Tr. 37:8-39:16 | irrelevant because addresses damages calculation that is not being presented |

[1] Plaintiffs preserve all objections that were stated on the record or that are preserved pursuant to the Court's Rules or any governing law.

| | |
|---|---|
| 10/31/01 Tr. 67:7-14 | beyond the permissible scope of the deposition in that it seeks fact testimony in the course of an expert deposition |
| 11/01/01 Tr. 169:25-170:6 | irrelevant because addresses damages calculation that is not being presented |
| 11/01/01 Tr. 175:3-180:11 | irrelevant because addresses damages calculation that is not being presented |
| 11/01/01 Tr. 201:1-12 | irrelevant because addresses damages calculation that is not being presented; lines 10-12 exceed the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition |
| 11/01/01 Tr. 203:8-20 | irrelevant because addresses damages calculation that is not being presented; exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition |
| 11/01/01 Tr. 205:11-206:7 | irrelevant because addresses damages calculation that is not being presented; exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; omits portion of response |
| 11/01/01 Tr. 208:25-210:16 | irrelevant because addresses damages calculation that is not being presented; exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; |
| 11/01/01 Tr. 210:20-212:4 | irrelevant because addresses damages calculation that is not being presented; exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; omits portion of response |
| 11/01/01 Tr. 222:25-224:21 | omits portion of question; irrelevant because addresses damages calculation that is not being presented; |

| | |
|---|---|
| 11/01/01 Tr. 2237:9-240:24 | 240:10-24 exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; |
| 11/01/01 Tr. 242:1-4 | irrelevant because addresses damages calculation that is not being presented; omits question; omits portion of response |
| 11/02/01 Tr. 314:23-315:1 | irrelevant because addresses damages calculation that is not being presented; |
| 11/02/01 Tr. 316:7-12 | irrelevant because addresses damages calculation that is not being presented; omits question |
| 11/02/01 Tr. 317:21-24 | irrelevant because addresses damages calculation that is not being presented; omits question; omits portion of response; |
| 11/02/01 Tr. 319:18-22 | irrelevant because addresses damages calculation that is not being presented; omits question; omits portion of response; |
| 11/02/01 Tr. 329:4-6 | irrelevant because addresses damages calculation that is not being presented; omits question; |
| 11/02/01 Tr. 362:20-363-8 | irrelevant because addresses damages calculation that is not being presented; omits question; exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; |
| 11/02/01 Tr. 382:20-384:4 | irrelevant because addresses damages calculation that is not being presented; |
| 11/02/01 Tr. 395:17-24 | irrelevant because addresses damages calculation that is not being presented; so lacking in context as to be incomprehensible; |
| 11/02/01 Tr. 473:22-484:15 | irrelevant because addresses damages calculation that is not being presented; portions exceed the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; |

| | |
|---|---|
| 11/02/01 Tr. 485:3-7 | irrelevant because addresses damages calculation that is not being presented; irrelevant because witness merely confirms he is offering no legal opinion |
| 5/11/05 Tr. 17:4-18:16 | 17:4-5 are irrelevant notations; entire exchange is irrelevant to any material issue |
| 5/11/05 Tr. 24:2-7 | irrelevant to any material issue |
| 5/11/05 Tr. 73:7-74:22 | irrelevant because addresses damages calculation that is not being presented; |
| 5/11/05 Tr. 82:2-83:3 | irrelevant because addresses damages calculation that is not being presented; irrelevant and not best evidence because witness is asked merely to confirm that he sees a particular statement in a document; |
| 5/11/05 Tr. 84:13-86:1 | exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; |
| 5/11/05 Tr. 175:15-18 | irrelevant because addresses damages calculation that is not being presented; so lacking in context as to make the potential significance of any particular verbal formulation unclear; risk of unfair prejudice outweighs any potential probative value |
| 5/11/05 Tr. 178:8-18 | irrelevant because addresses damages calculation that is not being presented; so lacking in context as to make the potential significance of any particular verbal formulation unclear; risk of unfair prejudice outweighs any potential probative value |
| 5/11/05 Tr. 183:22-25 | omits question; omits portion of response; irrelevant because addresses damages calculation that is not being presented; so lacking in context as to make the potential significance of any particular verbal formulation unclear; risk of unfair prejudice outweighs any potential probative value |

| | |
|---|---|
| 5/11/05 Tr. 187:2-188:7 | irrelevant to any material issue; |
| 5/11/05 Tr. 202:14-19 | omits question; irrelevant because addresses damages calculation that is not being presented; so lacking in context as to be incomprehensible |
| 5/11/05 Tr. 219:24-221:2 | irrelevant because addresses damages calculation that is not being presented; |
| 5/12/05 Tr. 263:13-18 | omits question; so lacking in context as to be incomprehensible |
| 5/12/05 Tr. 408:7-19 | irrelevant to any material issue |
| 5/12/05 Tr. 408:24-409:9 | omits portion of question; irrelevant to any material issue |
| 5/13/05 Tr. 580:21-581:11 | exceeds the permissible scope of the deposition in seeking fact testimony in the course of an expert deposition; |
| 6/27/07 Tr. 7:6-9, 8:19-12:17 | omits material portion of exchange; omits portion of last response; |
| 6/27/07 Tr. 28:6-11 | so lacking in context as to be incomprehensible; begins mid-sentence in a response; ends mid-sentence in a question |
| 6/27/07 Tr. 32:14-36:6 | so lacking in context as to be incomprehensible; omits beginning question; ends mid-sentence in a response |
| 6/27/01 Tr. 55:4-13 | so lacking in context as to be incomprehensible; begins mid-sentence in question; omits most of question; omits most of response |
| 6/27/01 Tr. 57:19-62:2 | so lacking in context as to be incomprehensible; begins mid-sentence in videographer's commentary; omits much of last response |

| | |
|---|---|
| 6/27/01 Tr. 63:11-19 | so lacking in context as to be incomprehensible; omits all but one word of beginning question; ends in mid-question |
| 6/27/07 Tr. 65:17-68:4 | so lacking in context as to be incomprehensible; omits opening question and most of opening response; ends mid-sentence in last response |
| 6/27/07 Tr. 70:9-71:2 | so lacking in context as to be incomprehensible; omits opening question and all but one word of opening response; ends mid-sentence in last response |
| 6/27/07 Tr. 71:12-72:11 | so lacking in context as to be incomprehensible; begins mid-sentence in opening question; ends mid-sentence in last response |
| 6/27/07 Tr. 86:4-13 | so lacking in context as to be incomprehensible; begins mid-sentence in opening question; ends with identification of examining counsel; exceeds the permissible scope of the deposition in seeking non-expert testimony in the course of an expert deposition; |
| 6/27/07 Tr. 87:16-19 | so lacking in context as to be incomprehensible; begins with one-word response “Probably”; ends mid-sentence in last question; |
| 6/27/07 Tr. 93:8-94:2 | so lacking in context as to be incomprehensible; ends mid-sentence in last response; |
| 6/27/07 Tr. 94:19-95:2 | so lacking in context as to be incomprehensible; omits initial question |
| 6/27/07 Tr. 98:1-99:4 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in response; mischaracterizes testimony; ends mid-sentence in question; |

| | |
|---|---|
| 6/27/07 Tr. 100:13-101:1 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in response; ends mid-sentence in response; |
| 6/27/07 Tr. 105:8-107:11 | so lacking in context as to be incomprehensible; begins with one word of initial question; ends mid-sentence in final response; |
| 6/27/07 Tr. 107:18-22 | so lacking in context as to be incomprehensible; omits question; ends mid-sentence in response; |
| 6/27/07 Tr. 121:18-21 | so lacking in context as to be incomprehensible; omits most of initial question; ends mid-sentence in last question; |
| 6/27/07 Tr. 122:16-123:5 | so lacking in context as to be incomprehensible; omits initial question; begins with one word response "Yes"; ends mid-sentence in next response; |
| 6/27/07 Tr. 124:7-125:7 | so lacking in context as to be incomprehensible; begins mid-sentence in initial question; ends with next question; |
| 6/27/07 Tr. 131:14-132: 6 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in initial response; ends mid-sentence in subsequent response; |
| 6/27/07 Tr. 134:8-135:8 | so lacking in context as to be incomprehensible; begins mid-sentence in initial question; |
| 6/27/07 Tr. 147:7-19 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in initial response; |
| 6/27/07 Tr. 154:4-10 | so lacking in context as to be incomprehensible; provides fragments of question and answer |

| | |
|---|---|
| 6/27/07 Tr. 155:10-157:5 | so lacking in context as to be incomprehensible; provides fragments of questions |
| 6/27/07 Tr. 180:5-14 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in initial response; ends mid-sentence in subsequent response |
| 6/27/07 Tr. 191:10-192:16 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in initial response; ends mid-sentence in subsequent response |
| 6/27/07 Tr. 198:9-14 | so lacking in context as to be incomprehensible; includes only one line -- "Either to the corporation or to the" -- of a 14-line response |
| 6/27/07 Tr. 204:5-205:20 | so lacking in context as to be incomprehensible; omits part of initial question; ends mid-sentence in subsequent question |
| 6/27/07 Tr. 212:12-213:1 | so lacking in context as to be incomprehensible; omits initial question; ends mid-sentence in subsequent response |
| 6/27/07 Tr. 213:19-217:1 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in response; ends with subsequent question |
| 6/27/07 Tr. 218:17-22 | so lacking in context as to be incomprehensible; omits initial question; ends mid-sentence in response |
| 6/27/07 Tr. 221:6-223:4 | 222:18 to 223:4 are so lacking in context as to be incomprehensible; witness merely confirms that he sees certain language in a document |
| 6/27/07 Tr. 223:17-20 | so lacking in context as to be incomprehensible; omits part of initial question; ends mid-sentence in subsequent question |

| | |
|---|---|
| 6/27/07 Tr. 238:2-239:3 | so lacking in context as to be incomprehensible; omits initial question; begins mid-sentence in response; ends with identification of examining counsel |
| 6/28/07 Tr. 294:2-295:7 | so lacking in context as to be incomprehensible; omits portion of initial question; |
| 6/28/07 Tr. 298:10-299:12 | so lacking in context as to be incomprehensible; omits portion of initial question; omits portion of subsequent response |
| 6/28/07 Tr. 300:17-301:3 | so lacking in context as to be incomprehensible; omits entire question; omits portion of response; |
| 6/28/07 Tr. 306:20-307:11 | omits portion of question; |
| 6/28/07 Tr. 314:10-13 | so lacking in context as to be incomprehensible; omits entire question; omits most of response; |
| 6/28/07 Tr. 392:15-393:9 | so lacking in context as to be incomprehensible; question refers to prior testimony and asks about the "things you were just describing"; |
| 6/28/07 Tr. 462:15-463:1 | irrelevant; question seeks opinion on a matter of law; |

### B. Objections to Defendant's Deposition Designations of Neil Murphy

| Transcript Citation | Objection |
|---|---|
| 10/11/01 Tr. 58:16-60:7 | irrelevant because addresses damages calculation that is not being presented |
| 10/11/01 Tr. 65:7-18 | provides fragment of question; omits answer to last question; lacks context to the point that the excerpt is not understandable; irrelevant because addresses damages calculation that is not being presented |

| | |
|---|---|
| 10/11/01 Tr. 138:22-139:1 | provides only fragment of answer; lacks context to the point that excerpt is not understandable |
| 10/11/01 Tr. 168:23-169:6 | lacks context to the point that the excerpt is not understandable. |
| 10/12/01 Tr. 226:2-227:2 | irrelevant because excerpt addresses a damages model that is not being presented. |
| 10/12/01 Tr. 249:23-25 | omits question and provides only fragment of answer; lacks context to the point that excerpt is not understandable |
| 10/12/01 Tr. 256:14-257:7 | omits question, provides fragment of answer; lacks context to the point that excerpt is not understandable |
| 10/12/01 Tr. 260:22-261:8 | omits question; lacks context to the point that excerpt is not understandable |
| 10/12/01 Tr. 261:20-23 | provides only fragment of answer |
| 10/12/01 Tr. 265:2-266:25 | omits question, provides fragment of answer |
| 10/12/01 Tr. 267:4-8 | lacks context to the point that the excerpt is not understandable |
| 10/12/01 Tr. 272:1-273:1 | omits question, provides fragment of answer |
| 10/12/01 Tr. 275:2-11 | lacks context to the point that excerpt is not understandable |
| 10/12/01 Tr. 321:18-322:10 | lacks context to the point that excerpt is not understandable; irrelevant because addresses damages theory not being presented |

### C. Objections to Defendant's Deposition Designations of Lynn Stokes

| Transcript Citation | Objection |
|---|---|
| 10/22/01 Tr. 137:14-17 | omits question and most of answer |
| 10/22/01 Tr. 149:12-17 | omits question and most of answer |
| 10/22/01 Tr. 165:16 - 166:8 | omits context to the point that excerpt makes |

| | |
|---|---|
| | no sense; irrelevant because addresses quantification of damages from perspective of Holland and Ross rather than First Bank. |
| 10/23/01 Tr. 198:9-14 | omits question and most of answer; also omits context to the point that excerpt makes no sense. |
| 10/23/01 Tr. 250:1-251:5 | lacks context to the point that excerpt makes no sense. |

Plaintiffs further object to the Defendant's designations of excerpts from the deposition of Lynn Stokes to the extent that Defendant has failed to include the errata sheet corrections corresponding to the relevant excerpts. The errata sheets from Lynn Stokes' deposition are attached hereto as Exhibit 1.

## II. Counter-Designations to Defendant's Deposition Excerpts

### A. Counter-Designations from the Deposition Testimony of Homer Holland

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Homer Holland obtained in this case on October 31, 2001; November 1, 2001; November 2, 2001; May 11, 2005; May 12, 2005; June 27, 2007; and June 28, 2007, be admitted.

From the October 31, 2001 deposition transcript:

8:8-9:11; 11:2-22; 21:18-37:4; 39:16-41:11.

From the November 1, 2001 deposition transcript:

206:8-207:3 (only if 205:11-206:7 are admitted); 212:5-213:9 (only if 210:20-212:4 are admitted); 222:15-24; 241:15-25 (only if 242:1-4 are admitted).

From the November 2, 2001 deposition transcript:

316:1-6 (only if 316:7-12 are admitted); 316:13-317:20 (only if 316:7-12 are admitted); 319:14-320:14 (only if 319:18-22 are admitted); 326:20-331:3 (only if 329 4-6

are admitted); 384:5-23 (only if 382:20-384:4 are admitted); 395:3-14 and 396:18-397:1 (only if 395:17-24 admitted).

From the May 11, 2005 deposition transcript:

157:24-159:6 (only if 157:16-23 are admitted); 183:17-21 and 184:1-3 (only if 183:22-25 are admitted); 202:11-13 and 207:4-19 (only if 202:14-19 are admitted).

From the May 12, 2005 deposition transcript:

262:18-263:12 (only if 263:13-18 are admitted); 408:20-25 (only if 408:24-409:9 are admitted).

From the June 27, 2007 deposition transcript (only if adjacent material in defendant's motion is admitted):

7:17-8:18; 28:1-14; 32:4-13 and 36:7; 54:18-55:19; 64:5-65:16 and 68:5-68:11; 69:17-70:8; 71:10-72:14; 85:22-86:5; 87:3-12; 93:19-94:3; 94:14-18; 97:15-98:4; 99:3-15; 99:21-101:2; 105:7-107:12; 107:15-108:4; 121:17-122:7; 122:13-123:9; 124:5-125:12; 131:8-132:8; 134:7-134:17; 146:14-147:10; 154:3-11; 155:6-157:14; 180:2-19; 190:7-192:18; 198:10-199:5; 212:6-213:4; 213:6-217:1; 218:14-219:3; 223:16-224:3; 237:15-19; 238:1-5.

From the June 28, 2007 deposition transcript (except as noted, all proffered only if adjacent material in defendant's motion is admitted):

293:21-294:3; 298:19-299:20; 300:9-301:3; 311:14-312:1; 313:16-315:2; 333:21-334:14 (if 314:10-13 admitted).

These excerpts are attached hereto as Exhibit 2.

**B. <u>Counter-Designations from the Deposition Testimony of Neil Murphy</u>**

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Neil Murphy obtained in this

case on October 11, 2001 and October 12, 2001, be admitted: Tr. 11:20-23; 14:17-15:7; 15:17-16:21; 23:18-24:5; 25:12-25; 26:1-14; 54:6-15; 58:4-15; 197:15-17; 238:18-239:6; 243:12-243:20; 352:25 - 353:21. These excerpts are attached hereto as Exhibit 3.

**C. <u>Counter-Designations from the Deposition Testimony of Lynn Stokes</u>**

Assuming Defendant's counter-designations are admitted in whole or in part, Plaintiffs respectfully request the following testimony from Lynn Stokes obtained in this case on October 22, 2001, and October 23, 2001, be admitted: Tr. 108:12-21; 244:17-21, 271:18-23, 282:18-283:19. These excerpts are attached hereto as Exhibit 4.

Respectfully submitted,

/s/ David B. Bergman
David B. Bergman
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000 (tel.)
(202) 942-5999 (fax)

Counsel for Plaintiffs
Holland and Ross and First Bank

*Of Counsel*:
Melvin C. Garbow
Howard N. Cayne
Michael A. Johnson
Joshua P. Wilson
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206

*Co-counsel for First Bank*:
Donald J. Gunn, Jr., Esq.
Sharon R. Wice, Esq.
Gunn and Gunn
First Bank Building
Creve Coeur
11901 Olive Blvd., Suite 312
P.O. Box 419002
St. Louis, Missouri 63141
(314) 432-4550 (tel.)
(314) 432-4489 (fax)

Dated: November 20, 2007

**CERTIFICATE OF SERVICE**

I certify that on this 20th day of November 2007, I caused the foregoing **PLAINTIFFS' OBJECTIONS AND COUNTER-DESIGNATIONS TO DEFENDANT'S EXPERT WITNESS DEPOSITION DESIGNATIONS** to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: November 20, 2007 /s/ Joshua P. Wilson
Joshua P. Wilson

# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOLLAND AND ROSS, Plaintiffs, | ) |
| - versus - | ) No. 95-524C Senior Judge Smith |
| THE UNITED STATES, Defendant. | ) |

October 23, 2001
Washington, D.C.

CONTINUED VIDEOTAPED DEPOSITION OF:

S. LYNN STOKES,

a witness in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C., 20004-1206, commencing at 9:12 a.m., before Maria Pugliese, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: November 5, 2001
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: October 22, 2001
Deponent: Lynn Stokes
Place: Washington DC
Ref. No.: 1447-11

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 31 | 18 | evaluation | valuation | |
| 40 | 20 | difference | different | |
| 43 | 15 | things are | things that are | |
| 44 | 5 | about | among | |
| 57 | 15 | links that | length at what | |
| 58 | 24 | the accretive | accreting the | |
| 81 | 11 | went it | went at it | |
| 89 | 6 | marketing | marketed | |
| 98 | 14 | Union | onion | |
| 100 | 12 | mid | Net | |
| 118 | 16 | They | As I | |
| 121 | 11 | to railroad | to run a railroad | |
| 123 | 9 | typing | timing | |
| 131 | 22 | and | in | |

[signature]
Signature of Deponent

12-3-01

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: November 5, 2001
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: October 22, 2001
Deponent: Lynn Stokes
Place: Washington DC
Ref. No.: 1447-11

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 136 | 23 | NOT | Net | |
| 138 | 24 | Rep Prox | Rev Prox | |
| 144 | 14 | in | and | |
| 146 | 13 | a loan | of a loan | |
| 151 | 12 | Carrying | Carrying value of the liabilities | |
| 151 | 15 | extent | event | |
| 155 | 12-23 | The text at this point would seem to indicate that the reporter omitted a shift from Mr Stokes to Mr Murphy. It seems that that should occur at the end of the sentence which carries over to line 15, i.e., after the word point. If this is important someone should review the tapes to see if that is true. | | |

Signature of Deponent

12-3-01

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: November 5, 2001
Case Name: Holland & Ross vs. Uni[illegible]d States
Case Number: 95-524
Dep. Date: October 22, 2001
Deponent: Lynn Stokes
Place: Washington DC
Ref. No.: 1447 1

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 157 | 6 | heard | read | |
| 159 | 3 | they told them to | they sold them to | |
| 170 | 9 | out | up | |
| 176 | 22 | $2 million | $200 million | |

[signature]
Signature of Deponent

12-3-01

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: November 6, 2001
Case Name: Holland & Ross vs. United States
Case Number: 95-524
Dep. Date: October 23, 2001
Deponent: S. Stokes (cont)
Place: Washington DC
Ref. No.: 1447-12

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 202 | 19 | in the | into | |
| 202 | 23 | in the | into | |
| 204 | 19 | in the | into | |
| 219 | 12 | book | tax | |
| 239 | 5 | at | ~~at~~ | |
| 239 | 8 | of | to | |
| 240 | 24 | Purchasing | purchase and | |
| 242 | 10 | is | are | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

12-3-01
Date of Signature

question. Why don't we since it's late in the day and everybody seems to be dragging a little bit, call it quits for today and come back tomorrow and we can finish up. Go off the record.

THE VIDEOGRAPHER: The time is 4:13. We're going off the record. This is the end of tape number 3 and the end of testimony for October 22nd, 2001.

(Whereupon, at 4:13 p.m., the deposition adjourned to be resumed on Tuesday, October 23, 2001, at 9:00 a.m.)

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 3 day of December, 2001.

Karlee Jo Bailey

NOTARY PUBLIC

My Commission expires: June 8 2002

OFFICIAL NOTARY SEAL
KARLEE JO BAILEY
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC749604
MY COMMISSION EXP. JUNE 8,2002

ACKNOWLEDGEMENT OF DEPONENT

I, S. LYNN STOKES, do hereby acknowledge that I have read and examined pages 183 through 284, inclusive, of this transcript of my deposition and that:

(Check appropriate box.)

( ) the same is a true, correct and complete transcript of the answers given by me to the questions therein recorded.

( ) except for the changes noted in this attached Errata sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

S Lynn [signature]

________________ Date

Witness Signature

CERTIFICATE OF NOTARY PUBLIC

Sworn and subscribed to before me this

3 day of December, 2001.

Karlee Jo Bailey
Notary Public
My Commission Expires
June 8 2002

OFFICIAL NOTARY SEAL
KARLEE JO BAILEY
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC749604
MY COMMISSION EXP. JUNE 8,2002

# EXHIBIT 2

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

HOMER J. HOLLAND AND :

HOWARD R. ROSS, :

Plaintiffs, :

vs. : No. 95-524C

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - x

ORIGINAL

Washington, D.C.

October 31, 2001

Deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by Robert M. Jakupciak, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., 20004-1206, at 9:24 a.m., on Wednesday, October 31, 2001, and the proceedings being taken down by Stenotype by ROBERT M. JAKUPCIAK, and transcribed under his direction.

MATERIAL
REDACTED

Q. How was the decision made in this case to have you testify as an expert witness?

A. I think it was last fall that we -- that our law firm introduced me to a number of potential expert witnesses and after discussions with the law firm and with my partner, Howard Ross, I think we, frankly, concluded that I had the, both the academic credentials and certainly the experience and certainly the knowledge of this case to be the best expert that we could think of with respect to the area of damages that I'm going to testify on.

Q. What specifically with respect to your credentials and experience led you to believe that you would be the best one to testify?

A. Well, there is several different elements to it. Academically I do have a doctorate in business with an emphasis on finance. And, of course, this is a case in that general area. I have published

previously in peer-reviewed journals. So I believe I have the, an academic basis.

I think then my entire career has been one of understanding financial institutions, advising financial institutions, being on the boards of financial institutions. So I have had certainly the perspective of a chief executive or director of financial institutions. And as this damages report reveals, it's really a case of integrating a number of elements as I did as a CEO in taking data, information and putting that together and reaching conclusions.

MATERIAL
REDACTED

Q. With respect to the articles which you indicate have been published in peer-reviewed journals, how many articles were there?

A. I published a master's thesis from MIT in a peer-reviewed journal. While I was in the Pentagon, some of the studies that I was responsible for in conjunction with others were published, and not in a journal but published on behalf of the organizations that we were dealing with. The Rand Corporation was the -- no, it wasn't the Rand Corporation. It was the Rack Corporation was the entity, and they had a quasi peer review of the journals that were published.

And then outside the academic area, my career has been spent essentially either reviewing others' business plans, projections, trying to make investment decisions based on that, or alternatively, presenting business plans, projections to potential investors and making sure that those are credible so that I can get someone to make a decision that they would invest in me.

So in some respects I guess I think that

MATERIAL
REDACTED

MATERIAL REDACTED

grown the liabilities at a rate of 8.3 percent. That was the, the annual rate of growth that was projected in our business plan that was prior to the breach. So I guess that's one assumption.

That led then to a set of -- to an amount of assets and liabilities that one would have put on the balance sheet. Then the next step is to decide, well, what assets and liabilities would those have

been? And we again referenced our business plans, which showed that we would -- where we -- both showed that we would use the capital markets both for increases in the balance sheet and our history showed that we in fact used the capital markets for decreases in our balance sheet, that that was where we made the changes at the margin, if you will, in our balance sheet and made very easily because of the size of the capital markets.

So as I said, then the next question was if -- we focused on the capital markets as the way -- I felt that that was the most conservative view of growth for River Valley. While we had always maintained that our strategy was growth through acquisitions and through capital markets, I felt as an expert witness that I should maintain a conservative set of assumptions with respect to acquisitions. And the only acquisition that I assumed in this, and it only had a marginal impact on what Susan Ells was doing, was that the acquisition that we actually accomplished outside of River Valley would have been accomplished inside of River Valley. And even there the only impact, the only significant impact of that was that River Valley would have been able to shelter the taxable income of that acquisition, which was San

Antonio Federal Savings Bank.

Let me get back to then the assumptions with respect to the assets. I felt that the -- that we had quite good support on what types of assets in the capital markets were acquired during the period from 1990 to 1994. We had an active Capital Markets Group both at River Valley and the same Capital Markets Group acquired these assets for San Antonio Federal Savings Bank.

So from the data that she had acquired then we then -- and in kind of, in a somewhat of a -- I'm trying to think of the wording. I would ask questions. She would tell me her experiences on this, and out of that try to come up with assumptions that seemed both highly supportable from the documents and also, as you do in any analysis, you need to simplify it to a certain degree in order to do the calculations.

So, for example, on the asset side there would be in a certain month in actual history that we would have -- we did acquire a certain asset. That asset would have certain characteristics. It would have characteristics in terms of its yield, typically expressed as a spread over the applicable treasury instrument at the time.

We would use that same spread over the same applicable treasury and assume that, that a similar instrument or an instrument with the same characteristics was available in the capital markets at that same time. So then we would assume that we had acquired that asset or an asset with those general characteristics during the period in which we were looking at the "but for" world.

Similarly, we would look at the funding side of the business and look to what some of the rules were at that period of time as to how we could fund. I'm sorry. One of the rules had to do on the asset side. Let me finish the asset side.

One of the rules was that an S&L was required to keep 5 percent of its assets in what were called liquidity assets. And at the time those were defined as assets with a maturity of five years or less. So for relatively simple -- for simplification purposes, we used the five-year treasury in our calculations each month. That was a fairly conservative assumption for a number of reasons, but I will come back to that. So that was the asset side.

We used the characteristics of the assets that both San Antonio and River Valley actually acquired and we assumed in the "but for" world that we

would have had the availability in this vast capital market arena to acquire assets with similar characteristics. And then we had the liquidity assets.

On the liability side we assumed that we would fund these assets through a combination of Federal Home Loan Bank advances, jumbo deposits. Jumbo deposits meaning large-sized deposits that are often, carry more of a market rate interest rate, and the kinds of borrowings that one could do on Wall Street, which are in the overall talked about as repos but there is various forms of secured borrowings that one could do on Wall Street, to again simplify the calculations, and to do this on a conservative basis we used the Federal Home Loan Bank advance rates as the proxy for the cost of that funding. Knowing that in reality what we would have done is we would have taken the least cost of those several options at any one point in time, so that using a single index, the Federal Home Loan Bank index, was really conservative, but it was a simplifying assumption.

Then we get into the maturity of the funding. Do you want -- I seem to be on a monologue. Do you want me to keep going?

Q. No. This is good. It prevents us from

having to ask a lot of questions later on.

A. The next issue is I have the type of assets, those assets have a characteristic of a maturity, and in fact they have a couple of characteristics that are in kind of layman's terms the maturity of the instrument. But we would actually do a calculation of something called the weighted average life and we would also do a calculation of something called the modified duration.

Those are fairly similar concepts, but the idea of a modified duration is that one calculates both the modified duration -- you can have a modified duration on any set of cash flows, and, of course, ultimately, and both an asset and a liability are a set of cash flows. The value of the modified duration is it gave a good measure of how either an asset, a liability or a portfolio would respond to changes of interest rates.

In general terms, an instrument that has a one-year modified duration would change in value by one percent with a one percent change in the -- in the applicable interest rate. So if it were -- if it were a treasury bond that had a one-year duration, if the -- if treasury rates went up by one percent, then the market would say, well, I'm not going to pay as

much for that treasury bond that has a lower interest rate than one I can buy today. And generally that would be a one percent change in the price of that bond.

So having these characteristics for both the assets and the liabilities, then the other assumption was that we would each month fund these new assets with a combination of fixed-term liabilities, Federal Home Loan Bank advances, and short-term liabilities. And in doing that we would follow a pattern that we had followed throughout with River Valley and with San Antonio and that is that we would measure the overall portfolio as a net bond.

And by that I mean we would take the total duration of the assets, net of the total duration of the liabilities, so that I could look from an interest rate standpoint as if that entire portfolio was simply a single bond, because it had a certain duration. And it's simply a mathematical calculation of what the, what those are.

We -- Susan and I talked a lot about how we had used that concept in managing our portfolio on an active basis and managing to that net duration on an ongoing basis in, in anticipating or at least to a certain degree having a bit of a view as to which way

interest rates were going to go.

In general, we felt that a one-year duration of the portfolio was consistent with what we had done in the past, and so we then made the assumptions in terms of how we were funding in the "but for" world to maintain each month a one-year duration on the net of the added assets and the added liabilities. That was another assumption.

Another assumption that was a -- that was both conservative and a simplifying assumption, the kinds of assets that we acquired as we went back and looked and as we knew from our recollection were, as I mentioned before, all mortgage -- residential mortgage instruments. This was the specialty that, of the S&L industry. Well, let me not say that.

This was -- historically the S&Ls were created to fund mortgages, and so this was the area that we got -- there was a thriftiness test, there were other kinds of things within the regulatory environment that where anything that was mortgage-oriented was kind of, kind of -- was prequalified or it was kind of in the sweet spot of what a savings and loan -- maybe that's the easiest way to describe it. So all of these were mortgage-oriented.

And now I need to get into a little bit of discussion of the kinds of assets. Again, I will let you interrupt if I'm going to far on this.

Q. No. Go ahead.

A. The first concept is a mortgage-backed security. In some cases we actually invested just in a package -- in a package. By package I mean a group of residential loans that would have been originated by someone else country-wide. RFC, a number of entities that originate loans will sell those loans to someone like River Valley. They will maintain the servicing. So all we really have is a set of cash flows. And as the mortgages amortize, we will get principal each month and we will get interest each month. As a person buys a new home and refinances, we will get one of those mortgages in that package paid off.

So all of these had generally that set of characteristics. In a mortgage-backed security, there were two general types of mortgage-backed securities. And here I'm talking about a straight pass-through. I'm going to distinguish that from the things that Wall Street did with mortgage-backed securities to create other instruments with different characteristics. But just a straight pass-through was

not unlike a package of mortgages.

It would have -- it would have a set of mortgages in there. Those mortgages that -- one pass-through would be different from another pass-through by virtue of the composition of the mortgages that were in the package. Interest rates, maturities, kind of what went into it.

In a pass-through, the most common would be Fannie Mae or Freddie Mac or Ginnie Mae, where, as you know, are quasi-government agencies and they take these mortgages and put their guarantee on them so that now I don't as an acquirer of a security, what I have got is still an underlying package of cash flows that are going to be principal and interest based on the underlying mortgages, but I have got a guarantee from the, from these quasi-government agencies. And while they don't, I believe, don't have the direct guarantee of the U.S. Government, they -- kind of the marketplace recognizes that the government is going to stand behind them. So they get a very high credit rating.

And they stand behind the payment of the principal and the interest. So if you have a mortgage that's in one of these mortgage-backed securities and you default, it's not my worry as an owner of the

security. That's something that Fannie Mae or Freddie Mac will stand behind. So that's another characteristic.

Alternatively, an originator of these mortgages or an investment bank might instead of getting the Fannie Mae or Freddie Mac guarantee, which has a cost to it. Fannie and Freddie charge for their guarantee. Alternatively, what I might do is I might set up another security that has both a senior and a subordinate piece.

And by that I mean let's say there is a hundred million dollars of mortgages in this security. What I might do is sell a security that says -- for 80 million dollars, and it says that you are going to get the cash flows from all 100 of these mortgages in order to make you whole with respect to the 80 million that you are owed. So that I'm enhancing the value of the senior piece by subordinating the other piece.

And oftentimes, not always, but oftentimes these pieces would then be rated by Standard & Poor's, Moody's, one of the rating agencies, so we could get single A, double A, triple A ratings. So there is kind of a gradation of credit within the securities as well.

Now, I mentioned that they are all

underlying mortgages. Sometimes these mortgages are fixed rate and sometimes they are adjustable rate. And this was -- probably an adjustable rate mortgage was something that grew out of the -- well, it became a whole lot more important after we had the high interest rates in the early '80s. And so there became some standards in terms of how one designs an adjustable rate mortgage.

I believe the most common standard would be one where you take out a mortgage and you agree that each year the rate on that mortgage would adjust from its original rate to a new rate based on how the underlying index -- and again the most common I believe was the one-year treasury -- how the one-year treasury changed during that period of time. But there were other indexes.

Another popular index was the 11th District Cost of Funds, which was a measure of what the -- I believe it was the savings and loans, but I'm not positive, or was it all financial institutions, but the 11th District is the 11th Federal Reserve District, which encompassed California, and with the large volume there, they did a number of loans that were off of that index.

Now, that index wasn't as volatile as the

one-year treasury and often was a higher number than the treasury, but that was another example of an index.

So we have these characteristics. The third kind of category that I need to describe is what was called the collateralized mortgage obligation. And Wall Street in its creative wisdom would keep trying to find ways where it could take a set of cash flows that came off of this underlying package of mortgages and create cash flows that, that hopefully they could find someone that maybe didn't want the characteristics of that entire package of mortgages but wanted a different kind of a security that was still, kind of came out of that.

And as I gave you the example of the subordinate and the senior piece, that would be one example of a, kind of creating two different securities out of one underlying package. And in a CMO they would design other securities, multiple types of securities, from the same package. And they had exotic names like planned amortization, something or other, PACs and TACs and a variety of things.

But the point -- the most important point is that they could essentially design a piece of paper that would have characteristics that were all the way

from being absolute almost like a treasury in terms of knowing exactly what your cash flows are going to be and what the interest rate was going to be over a period of time to other pieces from the same batch of underlying mortgages that could have dramatically different characteristics that would be highly volatile with respect to the underlying interest rates or the prepayments of those underlying mortgages.

What we generally focused on, and this was another part of my discussion with Susan, is that we focused on relatively short-term pieces of paper in the CMO world. Again, we did have some pass-throughs, we did have some whole loans, we did have some ARMs. I'm now focusing on the CMO piece.

In the CMO world we would typically not buy the most plain vanilla piece, because as you had less to understand about it, typically the price or the yield on that would be much lower. But we would generally buy something that had a three to five year kind of weighted average life, so not a real long piece, not a real short piece. Oftentimes they would design it such that there was a very high predictability to the principal in the first two or three years and, in fact, many of them had no principal repayment during the first two or three

years.

And then they would have an amortization of -- they would have a schedule plan, either plan or it would be an obligation to pay principal out over some amortized period of time. Most of them were of that sort where you would have two or three years of interest only and then you would have maybe a year, year and a half of principal payments.

So you can -- I don't know if I -- I like a blackboard. I could show you what that would look like, but maybe you can envision that.

So now with this information, for example, now -- so having talked about those kinds of instruments, now I need to get back to, well, how do we portray those in a model where what we are doing is really using a set of formulas now to both replicate what would have been the cash flows as well as what would have been the interest earned and the interest charged against those.

In the -- with respect to ARMs, that is the adjustable rate mortgages, the simplifying assumption we made here is that all ARMs were indexed off of the treasury. So that we could use treasuries as the underlying index throughout this -- every month we had the treasury yield for that month and we would assume

that an ARM then was indexed off the treasury.

That was a simplifying assumption but it was also a conservative assumption, because the COFI, or the Cost of Funds Index, was higher than the treasury. So we were giving up some yield relative to what happened in actuality, but we felt it was an important -- it was just a useful assumption.

In the CMO world, as I mentioned to you, the -- often the CMOs had a period of time at which you had interest only and then you had an amortization. We would have the information on these in terms of what their weighted average life is and many times we would have, from the historical data, exactly what the period of time was when they started the amortization and we started getting cash flows.

To make again a simplifying assumption, what we did is, looking at all those, felt that a reasonable approximation on average of what happened with the CMOs was that if a CMO had a four-year average life, we would assume that at the end of year three that it started amortizing and it would amortize until the end of year five. So there would be a straight line amortization. By the end of the fourth year it would be half amortized. By the end of the fifth year it would be completely amortized. And that

leads to a weighted average life of four years. So that was another simplifying assumption. I think I need to stop and think for a minute and see if I can think of other pieces.

MATERIAL REDACTED

MATERIAL
REDACTED

continued along those paths.

We did have an opportunity that was, that was, even though we weren't looking for deals at the time, in 1991 was presented with a very attractive acquisition called San Antonio Federal Savings Bank. And as you may recall, both in my deposition and others, our -- we tried to acquired San Antonio in River Valley as either a subsidiary or merge it with River Valley or in some way take advantage of these NOLs that we had bargained for with the government for

another S&L that we were bargaining for from the government -- bargaining for, negotiating with, we were acquiring from the government.

It was a terrible frustration to sit here and know that we were going to have at a minimum some 30 million dollars in taxable income on this one deal and sitting over here with, I don't remember the exact numbers, but at least that much in NOLs, so I could have sheltered all of that to save one to the other.

The specific assumptions I made in the model were that instead of acquiring San Antonio in an independent holding company, which was what we were required to do in order to get the capital to do that, and as a matter of fact, we shrunk the balance sheet in order to get the capital from American National to be able to acquire San Antonio at Western Capital.

Instead of doing that, had we had the capital that we had bargained for and negotiated for in River Valley, we would have simply used the capital there. And so I assume the only -- and again, making fairly, I think, realistic and reasonable and well-documented kinds of assumptions, that we acquired San Antonio at River Valley and that -- and I don't even make the assumption that First Banks would have purchased it. I have just simply assumed that at the

end of that period, that the -- that we would have kept -- that we would have kept San Antonio and done exactly what we did with San Antonio and that some of the ownership value of San Antonio went to our colleagues.

We had three other shareholders in Western Capital other than Howard and me. But that what would have happened is that the taxable income that we -- that was created, that was created by virtue of the way we acquired San Antonio, that that would have all been sheltered by our NOLs.

MATERIAL
REDACTED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -X ORIGINAL

HOMER HOLLAND and HOWARD :
ROSS, :
Plaintiffs, : No. 95-524C
v. :
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - -X

Washington, D.C.
Thursday, November 1, 2001
Volume 2

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSANNE BERGLING, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D.C., at 9:00 a.m., on Thursday November 1, 2001, and the proceedings being taken down by Stenotype by SUSANNE BERGLING and transcribed under her direction.

MATERIAL
REDACTED

Then FIRREA introduced the idea of the tangible capital, and kind of as a result, we would have had a view as to what was a good number for operating capital, we were kind of thrown into a situation where all we were trying to do was to meet the minimums of FIRREA at the time.

And then later, we were put under a supervisory agreement that changed those capital requirements again. So, the -- my view of capital adequacy here is when -- when we -- when I'm demonstrating a -- or where I was doing a test, not so much a reality test on the damages but kind of a feasibility test or an assurance that I wasn't -- I wasn't by making one set of assumptions leading to a result that was not feasible or was not appropriate.

What I did is tried to simply look at that

level, and I concluded that -- that a tangible capital in excess of 5 percent was certainly more than adequate.

MATERIAL REDACTED

MATERIAL REDACTED

We always felt that another way of leveraging the capital was through acquisitions and that just as we did in -- in the -- in the Government-assisted transactions, we put in one set of business plans for River Valley Peoria, for example, during 1988 that didn't envision an acquisition, because one never knew exactly what the acquisition might be or when -- when there was -- or what the specifics of an acquisition might be.

So, I would not place a great deal of weight on a set of capital ratio calculations in a business plan. The thing that I used from the business plan in my report, that I think this was the business plan that I used, was the fact that we had projected an increase of 27 percent in growth -- and I would have to go back to be sure, but I think this might be the one -- over this period of time, and it was -- and it was the -- if there was a -- obviously if we showed a capital ratio that was below what was required,

the regulators would have -- would have pulled us up short on that.

They would also have had -- may have raised concerns, and that's one of the reasons why we did this, about a growth of a -- beyond some point. In this particular case, we showed 8.3 percent. And again, that's why I used 8.3 percent as the constraint. It wasn't targeting a certain net worth-to-liability ratio.

MATERIAL REDACTED

MATERIAL
REDACTED

Q. In paragraph 83 of your report, you state that the Government's promises increased our regulatory capital by $28.7 million, and then in the footnote you break down this number included $13 million of capital credits, $5 million of preferred stock, $3.6 million of subordinated debt and $1.31 million of supervisory goodwill as of July 31, 1988 for Republic and $2.766 million of supervisory goodwill as of December 31, 1988 for Peoria.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. With respect to NOLs, do you assume that any NOLs actually utilized in the actual world would have also been used in the no-breach world?

A. I don't assume any double-counting if that's what you're referring to. You said do I assume that NOLs that were used in the actual world were also used in the but-for world?

Q. Not in a double-counting sense, just in general.

A. Yes, I assume that everything that happened in the actual world -- well, I should

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

REVISED

ORIGINAL

\- - - - - - - - - - - - - - - - x

HOMER J. HOLLAND and :

HOWARD R. ROSS, :

Plaintiffs, :

v. : Case No. 95-524C

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - x

Washington, D.C.

Friday, November 2, 2001

Continued videotaped deposition of HOMER HOLLAND, a Plaintiff herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, N.W., Washington, D. C., at 9:10 a.m., Friday, November 2, 2001, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RPR, CRR, and MARK T. EAGAN, CVR-CM, and transcribed under their direction.

Q. Looking at the issue of redemption in isolation apart from your other assumptions, why would it be a conservative one?

A. Well, I didn't look at it in isolation.

Q. If you were to look at it in isolation, would you view it as conservative or not?

MATERIAL REDACTED

Q. Do you believe it to be reasonable and supportable that in the no breach world the class A preferred stock would have been obtained rather than redeemed?

A. Again, I'd have to think about it. Say that again. Do I think it's reasonable that I would have assumed that that would have stayed on the books?

Q. That in the no breach world, the class A preferred stock would have been retained.

A. I think as I just mentioned, if I had taken less conservative assumptions in the overall balance sheet in the use of capital, then it would

have been a reasonable assumption to maintain that preferred. But since that had been redeemed, it didn't seem to me that I had a basis under which I should change what actually occurred.

Q. Under what circumstances would it have made sense for River Valley to redeem the preferred stock for its face value of 5 million assuming that it counted as capital for all regulatory purposes?

A. You want to state that again, please?

Q. Sure. Under what circumstances would it have made sense for River Valley to redeem the preferred stock for its face value of 5 million, assuming it counted as capital for all regulatory purposes?

A. The preferred had a feature that was somewhat like equity and that under certain circumstances that the dividend rate could have gotten expensive. I didn't go back and look to see in this whether that would have been the case simply because I assumed that the more conservative

MATERIAL REDACTED

MATERIAL
REDACTED

Q. You've indicated that you were attempting to limit the no breach world differences from the actual world. How did you determine which differences to allow or make?

A. I felt that the -- one of the things that I wanted was to be able to support the assumptions that I did make that were different from the actual world as well as possible and so I wanted to limit those, to those that I thought were very supportable.

For example, I think it was very supportable that we would have acquired San Antonio at River Valley in the no-breach world. I think it

was very supportable that we would have used the balance, we would have executed our business plan and grown the balance sheet, so I think I admitted it to the things that I thought both made the most sense in terms of coming up with a conservative range, conservative estimate of damages and a range of possible assumptions that I could have made.

Q. Are there other possible differences that would have been supportable?

A. Certainly there are different, there are other differences that could have been supportable and I made -- I just selected the ones that I thought were the most appropriate as well as being highly supportable.

MATERIAL REDACTED

MATERIAL
REDACTED

Q. Are you aware that in negotiating a redemption of the preferred stock, the FDIC stated that the expected future profitability of River Valley was the most important consideration in valuing the preferred stock?

MR. BERGMAN: Fact question.

THE WITNESS: I don't recall.

BY MS. SMITH:

Q. Would the future projected profitability be the same in the no breach world?

A. Would the future profitability be the same on what?

Q. On the -- of River Valley?

A. Would the future profitability of River Valley be the same?

Q. Yes.

A. I don't understand the question.

Q. The prior question was whether you were aware in negotiating redemption of the preferred stock, the FDIC stated that the expected future profitability of River Valley was the most important consideration in valuing the preferred stock. And you indicated you did not recall that?

A. That's right.

Q. The question that I was following up with was would the projected profitability have been the same in the no-breach world as of 1991?

A. Again I think you're asking me to consider the preferred stock as if it, apparently as if it were in place, when I didn't make that assumption. And I'd have to reflect on it and think through all

the consequences of that assumption.

Q. Do you have an opinion as to whether in the no-breach world the projected profitability would have been the same in 1999?

MR. BERGMAN: Whose projected profitability?

BY MS. SMITH:

Q. Mr. Holland?

MR. BERGMAN: Is it the witness's projected profitability of River Valley or FSLIC's projected profitability of River Valley or something else entirely?

BY MS. SMITH:

Q. Mr. Holland, do you need clarification on that?

A. Yes.

Q. I clarified it already. River Valley.

MR. BERGMAN: Whose projections?

THE WITNESS: River Valley. Would my projections be different?

BY MS. SMITH:

Q. River Valley's.

A. Well, I assume when you say River Valley's you mean the projections that I would have prepared as River Valley, or do you mean that anyone would

prepare as it relates to River Valley?
Q. We're talking about the no-breach world, so what you believe River Valley --
A. In the no-breach world, as I have shown with this set of assumptions, is that River Valley would have been more profitable.
Q. As of 1991 the projected profitability of River Valley.
A. I -- incomprehensible. I mean, that is, I don't understand exactly what you're asking. Are you saying would my business plans have changed in 1991?
Q. In the no-breach world do you have an opinion as to whether the projected profitability of River Valley would have been the same or different?
A. I am, I am, I am, I'm confused by the context of the question and I guess I would just answer by I'd really have to think about it.
Q. What is confusing? What don't you understand?
A. As I say, I'm just, I'm not clear that I understand the context of the question.
Q. Do you understand that in 1991 when the FDIC was considering the issue they were looking at the projected profitability?
A. I don't know that.

Q. Assuming that's the case, does that make sense?

A. Okay, I assume that's the case.

Q. And the only question I have is whether in the no-breach world, do you have an opinion as to whether that projected profitability would have been the same or different?

MR. BERGMAN: The same or different than what?

THE WITNESS: Than what they projected?

BY MS. SMITH:

Q. Than what River Valley had projected.

A. I don't know that I can say how the FDIC would have looked at that preferred as it relates to the profitability of River Valley in both cases. I think that that was not the scope of my report and I, as I said, I haven't spent the time to think about that.

Q. Is it fair to say then you don't have an opinion as to whether or not the projected profitability of River Valley in 1991 would have been the same or different than it was, in the breach world versus the no-breach world?

MR. BERGMAN: Whose projection?

THE WITNESS: I'm going to say because I

haven't thought about this question, I don't believe it was a part of my report, that I don't have a response at this point.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. To the extent that San Antonio experienced annual compounded liability growth greater than 8 percent, 8.3 percent of a particular year, are you then implying that a no breach San Antonio would have been smaller than the actual San Antonio?

A. No, I'm saying that San Antonio was exactly the same in the breach and in the nonbreach. And if you, and so there is, the fact that a component of the total balance sheet grew faster than the rest of the balance sheet means that the other parts of the balance sheet would grow less fast or might even shrink and in fact in the additional assets and liabilities, you will see that those don't continue to grow at a constant growth rate. They grow and then they start coming down. And the reason they came down is because I constrained them at the top, at the 8.3 percent growth rate while I left San Antonio, I kept constant San Antonio at its actual growth rate.

MATERIAL
REDACTED

MATERIAL
REDACTED

A. I guess the overall point that I would make is that I would still think it is reasonable that we would have been able to find investment opportunities for the additions to the balance sheet that we were talking about, I think in particular because of the fact that we would have been an active purchaser in those marketplaces and as a result would be someone that the investment bankers would come to with their new deals and I still think it's important to put all of this in the context that we were shrinking the balance sheet on purpose during this period of time.

MATERIAL
REDACTED

MATERIAL REDACTED

A. I was making the point that I think attractive is a somewhat relative term and I made the point before that one asset, given what you're looking for in a portfolio, can be more attractive than another. So I think that at a time when, and certainly in this period we were not looking to expand, in fact we were looking to shrink, that I think attractive takes on a, it has to be recognized

that it's a relative term.

MATERIAL REDACTED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND, HOWARD R. ROSS,)
and FIRST BANKS, INC., ) CASE NO. 95-524C
Plaintiffs, ) Judge George
) Miller
)
THE UNITED STATES, )
Defendant. )

Washington, D.C.
Wednesday, May 11, 2005

Deposition of HOMER HOLLAND, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the Department of Justice, 1100 L Street, Northwest, Washington, D.C., at 9:16 a.m., Wednesday, May 11, 2005, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

ORIGINAL

MATERIAL
REDACTED

Q. Is that 39.963 million estimate before
or after the 15 million dollar dividend that

had to be paid to the RTC?

A. After.

Q. What is your basis for believing SAFSB had an economic value of 39.963 million as of August 14th, 1992?

A. I think the -- again, I would go back to Lynn Stokes' presentation because he went back to the financial records for that time in his analysis, and as I testified in my factual deposition, the SAFSB was presented to us as an unusually, as a particularly profitable transaction.

And I may have said that in my first report as well, where the, I believe that the book value of SAFSB was on the order of 60 million dollars, where there was a transaction, I think it was maybe 65 million dollars -- or was it 60? I don't remember precisely, but it was a very large book value, and the transaction that the RTC had approved is one where they would sell the stock for 10 million, provided that there was a 15 million dollar dividend prior to that.

After we did the due diligence and analyzed the assets, the value of the assets

and the value of liabilities, there was still a very substantial amount of net asset value above the 10 million we paid for, and Lynn Stokes did the more precise analysis to identify that that was in our records showing a 29 million dollar difference.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Dr. Holland, with regard to River Valley running SAFSB in a but-for world, does the 29.963 million dollar figure that you set forth take into account operating expenses that were necessary to run SAFSB?

MATERIAL
REDACTED

that, above and beyond that initial economic benefit, that ongoing earnings would cover the operating expenses.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. In the nonbreach world, would SAFSB have been acquired by First Banks, Incorporated?

MATERIAL
REDACTED

MATERIAL
REDACTED

THE WITNESS: When you asked me did I assume, do I assume in my second supplemental report that SAFSB was not spun off, I said yes. I said I thought it would have stayed with River Valley. I could, I could consider a number of other possibilities. I mean, another possibility would have been it was sold to someone else at or about that time, but I didn't.

I didn't think it was necessary to go back to a scenario of spinning it off in order to make everybody whole, and I gave that scenario as an example of a way that Holland and Ross could get the tax benefits without changing the relationship with the other shareholders in Western Capital.

MATERIAL
REDACTED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

| | | |
|---|---|---|
| HOMER J. HOLLAND, HOWARD R. ROSS, | ) | |
| and FIRST BANKS, INC., | ) | CASE NO. 95-524C |
| Plaintiffs, | ) | Judge George |
| | ) | Miller |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

---

Washington, D.C.

Thursday, May 12, 2005

Deposition of HOMER HOLLAND, Volume 2, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the Department of Justice, 1100 L Street, Northwest, Washington, D.C., at 9:05 a.m., Thursday, May 12, 2005, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

ORIGINAL

MATERIAL
REDACTED

Q. We're done with it for the time being. We're moving on to a different subject here.
A. I'd like to raise something, as I was reviewing that, yesterday, you asked me a question with respect to SAFSB and related to the assumption regarding SAFSB or San Antonio Federal Savings Bank. As I was reading through Mr. Stokes' report, he made it clear in his

report that -- in fact, I think he says one of the real benefits is all the options River Valley had with respect to SAFSB.

And I guess I -- it isn't necessary for me to make the assumption necessarily, it certainly could be the case, that First Banks would have acquired SAFSB as a part of River Valley. There are, as he points out, there are other options that River Valley would have had to monetize that 29 million.

Q. Do you have anything to add to what Mr. Stokes opined?

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Okay. But, again, with respect to your capacity to proffer yourself as an expert on taxes, even with regard to River Valley, if you're going to keep that option open, I have a couple of questions for you. Have you ever taken any tax courses?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

HOMER J. HOLLAND, HOWARD R. :

ROSS, and FIRST BANKS, INC., :

Plaintiffs, : Case No. 95-524C

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - X

Washington, D.C.

Wednesday, June 27, 2007

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of United States Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:00 a.m., Wednesday, June 27, 2007, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

CERTIFIED COPY

MATERIAL
REDACTED

THE WITNESS: Well, let me give you a little background --

MR. JOHNSON: Let me object to the question as vague in the term drafted.

THE WITNESS: The background of this report is that last year, we started in discussions

with counsel with respect to our damages theories, and decided it would be appropriate to look at the retained earnings costs as a measure of damages, as a partial measure of damages. And, with that, we started talking about the forms, the way this would be calculated and together decided to interview Cornerstone Research, who I had interviewed when we first began these cases and chose at that time not to use.

So I used Cornerstone's staff for the calculations in the Excel spreadsheets and the charts under my direction, and used Arnold & Porter services for capturing much of what is on the report in the narrative form. This is a collaborative discussion that we had. The ideas in this are mine. I don't remember whether -- who drafted which pieces of it, but at the end of the day, I am responsible for the entire report.

MATERIAL REDACTED

Q. Okay. But my question was, you say that you issued a new report because you became aware of new damage theories, correct?

A. I think for me personally, it became to the point of appreciating that there seemed to be some appeal -- appeal is maybe the wrong word to use in the legal context. Some acceptance of the concept of retained earnings and cost of capital.

Q. Right. So it was a new theory that you found had a new appeal to you. But there weren't any new facts that you discovered with this case, is that correct?

A. With respect to this report, I don't believe that it was based on new facts.

MATERIAL
REDACTED

MATERIAL REDACTED

Q. And then in plaintiffs' reply motion in support of the motion for leave to allow you to issue a third supplemental report, plaintiff further reiterated -- and I'll just read the statement and then if you want to look at the document, you can. They reiterated that plaintiffs here have a right to present damages claims at trial that adhere to the guidance provided by the Federal Circuit in its Winstar damages decisions. And my question is, are you aware of those representations?

MATERIAL REDACTED

LaSalle Talman.

MATERIAL
REDACTED

Q. Now, if the Court were to find that your finding that River Valley and First Banks' cost of funds -- I know you take exception to whether it's First Banks' but for the period after First Bank acquires River Valley in the real world, that if the

Court were to find that those cost of funds could not have been 20 percent year in and year out for 23 years, is there another source of information you could point us to that would indicate an alternative cost of funds for River Valley, first?

MR. JOHNSON: Objection. There is a fundamental assumption in this question that I think is wrong. And so the question is vague and confusing but answer it if you're able, Dr. Holland.

THE WITNESS: I think you -- excuse me. I think you said two things. One, you talked about First Banks, and so let me address First Banks versus River Valley. My understanding is that my job was to calculate the damages to River Valley and it was appropriate to use River Valley's cost of capital with respect to that. Absent the breach, it's not even clear that First Banks would have acquired River Valley. So I think that I would put First Banks aside with respect to this and focus on River Valley.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And did River Valley thrifts obtain capital from any source during the period of time that you were -- before the acquisition by First Bank?

A. Are you talking about -- during what period of time are you talking about?

Q. The entire period of time up until River Valley's existence relative to this lawsuit, which would be July of '88, through the acquisition by First Bank.

A. There were a number of capital events that related to River Valley. In 1988 when River Valley, FSB was created, the sources of capital were the FSLIC preferred, the subordinated debt, the capital credits and the supervisory goodwill. At the time of the Republic transaction, there were capital credits, supervisory goodwill, the retained earnings of Rock Falls. Did I say them all? Capital credits,

supervisory goodwill, subordinated debt and the retained earnings from Rock Falls.

While there are a number of interest rates -- I'm sorry. And with respect to Peoria Savings, there was also a preferred stock issuance. In all of those cases, other than the government-provided capital, where there was cash provided from an outside source, there was no independent measure of a specific cost of capital because, in all cases, the cash was provided either from the existing Rock Falls in the form of retained earnings or from subordinated debt or preferred stock which was provided by American National Bank.

Those -- and American National Bank would not have provided those but for the personal guarantees of myself and Howard Ross. I believe that

MATERIAL
REDACTED

MATERIAL
REDACTED

but for the guarantees, and that subordinated debt has different characteristics than equity. And I believe that when one is talking about retained earnings, one is talking about equity, I think those are the two things that come to mind at this point. If I thought about it more, I might have other points to discuss on that as well.

MATERIAL
REDACTED

Q. Now, other than the AMB sub debt, were there other avenues by which River Valley obtained capital after the point in time of the acquisitions in 1988?

MR. JOHNSON: Objection. Calls for fact testimony. If you want to direct him to a specific

event and ask him what the significance is, that would be appropriate in an expert deposition. Answer if you're able, Dr. Holland.

THE WITNESS: I don't recall additional sources of capital other than transactions that created a profit for River Valley. We sold branches, we sold -- yes, we sold branches for a profit that created a source of capital. I don't remember any

MATERIAL REDACTED

MATERIAL
REDACTED

Q. Is it your intention to present a retained earnings theory of damages based upon a 20 percent cost of capital and no other costs of capital at trial?

A. At this stage, this is what -- the damages theories that we have presented that does use a 20 percent cost of capital. At this stage, I don't have any other intention to present a different cost of capital.

Q. Now, did you or River Valley ever pay 20 percent interest with respect to any funds obtained for use at the River Valley thrifts?

A. I don't believe that's relevant to the

issue of the cost of capital, but the answer is no.

Q. And did you make any efforts to determine whether First Bank has ever obtained capital from outside parties, including its shareholders?

A. With respect to this analysis, I have not looked at First Banks.

Q. And did you or River Valley ever pay 20 percent interest with respect to any capital obtained for the use of the River Valley thrifts?

A. Again, I don't think that that is -- whether or not we would have paid an interest rate of 20 percent is not the appropriate way to look at the cost of capital, but as I answered before, no, we did not pay 20 percent.

MATERIAL
REDACTED

MATERIAL REDACTED

Q. Have you now foregone your claim for the

lost profits that River Valley would have earned by leveraging the breached regulatory capital to add incremental income-earning assets other than San Antonio Federal Savings Bank in the years following the breach?

MATERIAL REDACTED

MATERIAL REDACTED

Q. Now, the Court of Federal Claims recently issued an award for damages for increased leveraged lost profits connected with incremental income earning assets in a Winstar-related case in First Federal Savings and Loan Association of Rochester versus the United States at 76 Fed Claim 106. That opinion was issued on April 13, 2007. And in fact, I believe this decision was issued by the same judge, George Miller, who is deciding this case. Are you aware of this decision?

MATERIAL
REDACTED

Q. So is River Valley, as held by First Bank, continuing to retain earnings?

A. I don't know exactly what is happening with respect to River Valley during that period, but

I think that as a measure, it had retained earnings that were in excess of the amount of capital that had been taken away.

MATERIAL REDACTED

Q. Now, I am initially asking, in your opinion, how did retained earnings cause harm to First Bank and we just had that discussion. Now I'm going to ask you, in your opinion, how did retaining earnings cause harm to River Valley?

MATERIAL
REDACTED

Q. Is the harm from retaining earnings basically foregoing the value of these lost opportunities?

A. You asked me what the harm was, I believe, and the harm is that we lost capital. That capital would have been available and the capital restricts the size of the organization. So I believe the harm was that, in losing that capital, we lost -- we were

forced to take actions that we didn't want to take, which was shrink the balance sheet and reduce the earnings, and we lost the opportunity to grow the balance sheet.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. And in both of those categories, you lost earnings because you had to reduce the balance sheet and then you lost opportunities to grow the balance sheet. In both cases, you're talking about opportunities that were lost, correct?

A. These were other opportunities where we could have used the retained earnings. Instead, we allocated the retained earnings to meet the minimum capital requirements of the institution. And I have felt that a reasonable measure of the cost of allocating the retained earnings for that purpose was to use the cost of capital times the amount of the retained earnings that were used for that purpose.

Q. Well, do you show -- do you have a chart in your report that shows what -- maybe you don't. I

don't know -- what the regulatory minimums were for River Valley with respect to capital, do you know what those were for the period 1990 to '93?

A. I don't think that's in --

Q. Yeah, it's probably not in your report, now that I think about it. But are you aware of the fact that River Valley exceeded the regulatory minimums in the period -- with respect to capital in the period from 1990 through 1993?

A. I know there were -- I mean, I think that there were situations where the minimums, as you say, were specific to River Valley which we felt was in part a result of the breach. I think I have testified to that in the past. There were also times when one would feel it appropriate to have a cushion above a minimum. I think I've testified to that in the past.

And because we could not acquire San Antonio Federal directly at River Valley, it was necessary to reduce the balance sheet at River Valley in order to redeem some of the preferred stock or with the retained earnings. And in anticipation of

that, there could have well been times when our capital ratios were above the minimum.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Dr. Holland, what do you mean by cost of capital?

A. I think the cost of capital, as I've said before, is the expected return that an investor would require to invest in the company, to invest cash in the company. It is also the discount rate that is used to evaluate the future cash flows from the company to get at the valuation of the company.

Q. Is that it?

A. I think so.

Q. And do you distinguish between the notion of cost of capital and cost of equity capital?

A. In this context, I've used the cost of capital as -- the cost of equity capital as being synonymous since the cost of retained earnings is equity capital.

Q. And between 1990 and 1994, whose cost of equity capital are you measuring?

A. River Valley.

Q. And between 1995 through 2013, whose cost of equity capital are you measuring?

A. I'm using the same cost of capital, River Valley's.

Q. So you're not using First Bank Incorporated's cost of equity capital, correct?

A. I'm using River Valley's.

Q. And not First Bank's, the thrift?

A. That's correct.

Q. And that's despite the fact that River Valley didn't exist after, what, January of 1995 or sometime after the First Bank, FSB acquisition?

A. I'm not -- it's my understanding that they retained the charter of River Valley at First Bank, so it's not my understanding that River Valley failed to exist.

Q. At any point in time?

A. I haven't examined it closely recently, but from my remembering of the transaction, they

acquired River Valley and retained the charter to River Valley.

Q. I know, but then thereafter -- because remember, as you know, there were a number of mergers between different First Banks, Incorporated subsidiaries and related companies. And do you have any awareness or any knowledge of whether the River Valley charter was retained?

A. I haven't looked into that specifically. I would have anticipated that the charter would have been retained for the important attributes of that charter.

MATERIAL REDACTED

Q. And is that important to your calculation, the notion that there is a continuing of the River Valley charter?

A. Not necessarily. I think that the -- while I believe that the charter did continue, I believe that the important measure was damages to River Valley. And, again, the damages to River Valley were the loss of the capital by the breach and

the consequences of the loss of that capital. We are using the retained earnings as a measure of the partial mitigation of those damages and the cost of capital related to that.

MATERIAL REDACTED

MATERIAL
REDACTED

Q. Well, you just said retained earnings were paid out in 1992. What did you mean by that?

A. They were paid out in order to redeem preferred stock.

Q. And they were paid out in order to redeem preferred stock for what reason?

A. The 6 million was paid out to redeem preferred stock that was held at the holding company. That preferred stock had been funded by American National Bank. American National Bank agreed to fund, separately for Howard Ross and myself and others, Western Capital Holdings which acquired San Antonio Federal Savings Bank.

MATERIAL
REDACTED

Q. So River Valley was paying out its retained earnings in '92 in order to facilitate the SAFSB acquisition through another entity?

A. Yes.

Q. And was there any other time when River Valley incurred a cash outflow?

MR. JOHNSON: Objection, vague.

THE WITNESS: Not that I recall.

BY MR. ROBERSON:

Q. Just to be clear, then, the 20 percent

cost of equity capital was not traceable to an actual cash flow, correct?

A. The 20 percent cost of capital, because we've defined it in several different ways, but for the breach, that cash flow could have been paid out as dividends or a redemption of stock. And the cost of capital is a rate of return that is the rate of return at which the investors choose to either continue putting their money into the company or

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. And is it also your opinion -- let me ask it this way. Does the 8.8 percent annual pretax benefit of retained earnings represent an actual cash inflow received by River Valley during the 1990 through 1994 time period?

A. That rate is the rate on a 10-year Treasury that is an interest -- I mean, is a risk-free rate. It may well have been the case that River Valley had assets in its portfolio of Treasuries, but it wasn't intended to be tied to a specific asset of River Valley. It was using the same methodology that I believe has been used and accepted in other cases of taking a risk-free Treasury rate.

And I think that the risk-free aspect of it is appropriate given that the foregone capital or the contractual capital was something that had a government guarantee to it, and there wasn't, at

least apparent, a risk associated with that. So I think that's why the risk-free rate has been used.

Q. I guess my question, though, was the 8.825 percent pretax benefit of retained earnings doesn't represent an actual cash inflow received by River Valley during the 1990 through 1994 time period, correct?

A. I think I answered that as to why the 8.82 percent was used. And it's not because an instrument in those amounts was identified. It's simply offsetting the fact that cash is associated with the retained earnings.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Well, let's talk about leverage capacity. Doesn't retaining earnings and having that capital permit the thrift to leverage?

A. Well, certainly. And I think we've talked multiple times about the benefit of having capital and what we're doing here is saying that the benefit of having capital was a benefit that had been bargained for in these transactions. That benefit was taken away and what we're doing is replacing that capital using retained earnings. We are using a measure of the cost of mitigating those damages by looking at the cost of capital net of the cash benefit of the retained earnings.

Q. Well, the notion is that the goodwill, in your mind, permitted you to leverage, correct?

A. That's correct.
Q. And the retained earnings, as it replaces the goodwill, also permits the thrift to leverage, correct, and support other assets?
A. In general, that's true. In this particular case, we had to de-leverage despite the retained earnings. But I grant you that the purpose of capital is to allow the thrift to leverage.

MATERIAL REDACTED

MATERIAL REDACTED

Q. So it's your opinion that it cost $21 million to replace basically $19.8 million of contractual capital, correct?

A. This was the accumulation of capital replaced over -- from 1990 through 1994 and then throughout the period. So it is true that the damages that I've calculated are 21 million and that the beginning amount of capital to be replaced was 20 million and the cost relates to the cost of capital for each year during the period that that has been replaced.

MATERIAL REDACTED

Q. And if River Valley had $1,000 less in retained earnings during that time, then it would have even less litigation damages as you model them, correct?

A. I think I've answered that question whether it's a dollar, a thousand.

Q. Or a million?

A. Or a million.

Q. And the answer is that it would, right?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I guess I always want to qualify it to say that I am not stating that the total damages were less if the retained earnings was less. I'm saying that in this methodology, I am looking at the cost of mitigating that amount of damages that were mitigated. And to the extent that we couldn't mitigate as many, we wouldn't have had a lower cost.

MATERIAL REDACTED

Q. So your model is just modeling costs. It's not modeling damages, is that correct?

A. My model is measuring the cost associated with the damages that River Valley suffered. I am not stating that damages -- the amount of damages would have gone up. I'm stating that the cost of mitigating damages would have gone up. And it is that measure that we are calculating in this calculation of damages.

MATERIAL REDACTED

MATERIAL
REDACTED

Q. Okay. And let me just try to rephrase this one more time. The more profits that River Valley earned from July of 1990 through 1992, the more costs would result as far as your quantification of costs with respect to the effect of the breach, isn't that correct?

A. That's correct.

Q. Now, you would agree that generally speaking, the objective of the corporation is to maximize shareholder value?

A. I think there can be many discussions of the objectives of a corporation, but certainly that is one of them.

Q. Now, according to your theory, from July of 1990 through 1992, the more successful River Valley was in accumulating retained earnings, the higher the costs of damages you calculate, correct?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I think that is the same question that you've asked before. Is there a difference that you're trying --

BY MR. ROBERSON:

Q. No, I'm just trying to put it in the context of the obligation to shareholder value. So if there is anything you want to add with respect to that notion in the context of that question.

A. I don't believe so.

Q. Now, the redemption of the FSLIC preferred stock in 1991 resulted in a $1.325 million gain to River Valley, isn't that correct?

A. That's correct.

Q. So retained earnings were actually higher in 1991 because of that gain, correct?

A. That's correct.

Q. Therefore, the damages or costs that you calculate are higher in 1991 because of that gain, isn't that correct?

A. I think the causation is that there was

more capital and retained earnings that was able to be used to mitigate the capital loss. The calculation would be then that there was a higher cost because more was being mitigated.

Q. So you would agree, then, with my question that the damages or costs that you calculated are higher in 1991 because of the gain on the sale or the redemption of the preferred stock in 1991?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: The redemption of the preferred stock caused greater retained earnings. The use of the retained earnings to mitigate the damages increased the cost.

MATERIAL REDACTED

Q. Are you familiar with a return on equity or a return on capital concept?

A. Ask me a more specific question and perhaps I can address it.

Q. What is a return on equity?

A. A return on equity would be -- can be measured by the amount of earnings divided by the equity.

Q. And what's a return on capital?

A. Often used in the same context except that it could be that the total capital would be defined as more than just the equity.

Q. Now, the return on capital or return on equity ultimately made its way to the shareholders of River Valley either through dividends and/or capital appreciation, specifically with regard to the sale of River Valley to First Bank, isn't that correct?

A. That's correct.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Would you collect a return on the same returned earnings twice, that's right. And this is the actual world, obviously, because you have obtained a $37 million return on your investments with the sale of River Valley to First Bank.

A. The 37 million was a return of an investment and a return on investment. And we can parse that into smaller pieces. But aside from that point, it is true that we obtained $37 million for the sale of our stock. The amount of -- the value of the institution was valued by First Banks for a variety of reasons, but at the end of the day, we did receive a return on our capital and a return on our initial investment.

Going back to what I've said before, that there were clearly damages as a result of losing

capital. Those damages meant that we lost opportunities and we lost opportunities for acquisition, we lost the opportunity to acquire San Antonio Federal Savings Bank, that is, we, I should say River Valley lost those opportunities.

The measure of this damages is what the damages are to River Valley. And I think that it is the case that there are damages that would flow to First Banks and those damages would flow to me and to Howard Ross's estate if the Court agrees with those damages theory. But I do not agree that that's a characterization -- I do not characterize that as getting a return on retained earnings and another return on retained earnings.

Q. Well, the initial time you got your $37 million payment from First Bank, it included -- First Bank's valuation included all the value of River Valley, including its profits over a number of years, correct? The effect of its operations over a number of years?

A. Okay.

Q. And the effect of its operations over a

number of years included the effect from its retained earnings, that is, the earnings generated from retained earnings, correct?

A. Again, I wouldn't say that earnings are generated by retained earnings. I would say that earnings are generated by the thrift, and the amount of capital at the thrift had an impact on the amount of earnings. If we had had more capital, we would have earned more.

One way of measuring the damages, which I have said is just a partial measurement, is the fact that the retained earnings could have been paid out to shareholders at that time. Presumably by replacing that capital, we would have earned the same amount, and we could have earned the same amount without the retained earnings or we could have done something else with the retain earnings. Again, I do not --

MATERIAL REDACTED

MATERIAL
REDACTED

Q. Dr. Holland, are you aware of any corporate finance textbook that asserts that when a corporation retains earnings, it presents a cost to either the corporation or its shareholders?

A. Either to the corporation or to the shareholders? I consider -- and I'll get back to the textbook. I consider that the cost to the institution is that it's renting capital from the shareholders. And in the example that you used, it should either return that capital or it should make sure it covers its cost of capital so that the shareholders are not disadvantaged.

I think that that concept of the cost of

capital and the fact that the institution has a cost of capital that relates to the providers of that capital, I think, is well accepted. I do not have any specific examples of textbooks right now that I can think of.

MATERIAL REDACTED

MATERIAL
REDACTED

Q. And the same would be true with respect to the First Bank, the period in time after First Bank's acquisition, correct?

MR. JOHNSON: Objection, incomplete hypothetical, but answer if you're able to, Dr. Holland.

THE WITNESS: Either I believe that First Banks would have either had opportunities to earn on the additional capital that was restored in the hypothetical world or it would have used the retained earnings to pay capital back to the shareholders.

BY MR. ROBERSON:

Q. Now, you would agree that one way to improve an institution's capital position would be to shrink the institution, correct?

MR. JOHNSON: Objection, vague, ambiguous. Answer if you understand the question.

THE WITNESS: With the same amount of capital, shrinking the institution increases the ratio of capital to assets, all other things being equal.

MATERIAL
REDACTED

Q. Okay. And it's your opinion that River Valley responded to the breach by intentionally shrinking the deposit base to meet the government's new capital requirements, isn't that correct?

MR. JOHNSON: Objection, outside the scope of this analysis. This was covered in connection with other analyses, but answer if you know, Dr. Holland.

THE WITNESS: River Valley shrunk the balance sheet. It had many ways of shrinking the balance sheet which included not adding assets as assets were paid off and amortized, selling assets and, when it sold assets or reduced the amount of assets, it reduced the amount of liabilities it had. And it did that in a variety of ways, including not as aggressively seeking deposits and using other forms of liabilities such as repos.

BY MR. ROBERSON:

Q. And I take it, then, here -- well, here's the question. Does shrinking an institution have any effect on the institution's retained earnings, assuming there is no gain or loss on the sales on the shrinkage?

A. If I understand your question, if the retained earnings are X and the balance sheet is reduced and that has no impact on income, then I think I would agree that the retained earnings would stay the same assuming that there is no other capital transaction, if there is no other dividends or other capital paid out to shareholders.

Q. So it's your position that the balance of an institution's retained earnings neither go up or down assuming there is no gain or loss on sales when an institution is shrinking?

MR. JOHNSON: Objection, vague as to time frame, but answer if you understand it, Dr. Holland.

THE WITNESS: I think, as I understand your question, that if there is no other impact on capital such as gain or loss and there is no

distribution of capital back to the shareholders, the size of the institution in terms of assets or liabilities does not directly affect the retained earnings. If an institution goes up, retained earnings would still say the same. The thing that affects retained earnings is earnings. It's either earnings or taking in capital or paying out capital.

BY MR. ROBERSON:

Q. Now, in your retained earnings replacement claim, have you identified what specific incremental assets River Valley would have acquired with the use of the retained earnings?

A. Have I identified if -- and in your hypothetical no breach world?

Q. Yes.

A. No.

Q. And have you identified generally how many incremental assets River Valley would have acquired with the use of retained earnings in a nonbreach world?

A. No.

Q. Any rough idea?

A. No.
Q. And have you identified what yields would have been earned on the incremental assets River Valley would have acquired with the use of the retained earnings?
A. No.
Q. And have you identified how the incremental assets would have been funded by River Valley?
A. No. And I guess I would say that this analysis is not trying to measure the lost profits from an increase in the size of the institution in a hypothetical but for world. This is taking the cost of mitigating the damages by virtue of allocating retained earnings, to the extent there were retained earnings, to those lost capital accounts.
Q. And have you identified the costs of the incremental liabilities that River Valley would have acquired?
A. No.
Q. Have you identified what additional noninterest expenses would have been incurred by

River Valley, if any?

MATERIAL REDACTED

MATERIAL
REDACTED

Q. So it's your opinion that the retained earnings that existed in the actual world would have also existed in a but for world, isn't that correct?

A. The retained earnings were the retained earnings in the actual world. The retained earnings may well have been at a different amount. If River Valley had had the benefit of the additional capital that was breached, taking just the retained earnings that are in this report, those retained earnings, as

I've said, would have been available to the institution to either return capital to the shareholders or to pursue other opportunities.

MATERIAL REDACTED

MATERIAL
REDACTED

Q. You say it was a reasonable assumption. And it's based on not talking to anyone at First Bank, correct?

A. That's correct.

Q. And it's based on not looking at any First Bank documents other than I believe in your additional documents considered, you have one single

First Bank document. I believe it is the First Bank
10-K for December of 1996, is that correct?
A. That's correct.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. And in fact, you assume the damages connected with retained earnings continue through 2013, will continue for First Bank, not for some unnamed entity, but for First Bank continuing through to 2013, correct?

THE WITNESS: Again, I think the damages are related to River Valley and the purpose of calculating the present value of the costs throughout 2013 is just that, to estimate what that present value of that would be at River Valley.

MATERIAL REDACTED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

HOMER J. HOLLAND, HOWARD R. :
ROSS, and FIRST BANKS, INC., :
Plaintiffs, : Case No. 95-524C
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 28, 2007

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of United States Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:15 a.m., Thursday, June 28, 2007, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

CERTIFIED COPY

MATERIAL
REDACTED

Q. Now, again, it's your opinion that River
Valley in its -- you mentioned earlier that you

believe that costs did occur, actually occurred before the First Banks, Incorporated acquisition. Do you remember saying that?

MATERIAL REDACTED

MATERIAL
REDACTED

Q. Well, do you believe that First Bank is actually continuing to be damaged today based on the loss of River Valley's contractual capital?

MR. JOHNSON: Objection, beyond the scope,

calls for a legal conclusion. Answer if you know, Dr. Holland.

THE WITNESS: I think that -- I think River Valley was damaged at the time. This is a way to measure the significance of those damages. Clearly the government could have replaced that capital at the time and then there would be no damages.

I mean, it's an accepted practice to look at the value of things by projecting forward and discounting it back and I think that's, that's what we've done here.

I think that with respect to the question is First Bank damaged, certainly had First Bank -- had the breach not occurred and had First Banks acquired River Valley, which as I say, may or may not have happened if the breach had not occurred, there is certainly a difference. And I think that at this stage, it is First Banks' claim as successor to River Valley that we're talking about.

MATERIAL
REDACTED

Q. But my question was, First Bank -- is it your belief that First Bank today is being damaged by the mitigation costs with respect to the River Valley loss of capital?

MR. JOHNSON: Objection, beyond the scope, calls for a legal conclusion.

THE WITNESS: I'm not going to comment on the legal aspects of whether they're damaged or not. I just have to go back and say that the damages occurred at the time of the breach. That could have been mitigated completely by the government at that time. Instead, I'm looking for a way to give a reasonable metric to the amount of the damages. One way is to calculate the cost of mitigation. I use

what I believe is a reasonable method to do that, projecting out to 2013 even though obviously 2013 hasn't occurred.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Now, you didn't use the actual payment of dividends by River Valley as your cost of retained earnings to River Valley, isn't that correct?

A. That's correct.

Q. And why not?

A. River Valley -- I don't think that the payment of dividends alone is a cost of capital. Certainly when Microsoft for many years didn't pay a dividend, it still had a cost of capital and it still

provided a return to its shareholders.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. And, I guess I'm not quite clear why it is that you didn't use the actual payment of dividends by River Valley as your cost of retained earnings from your answers.

A. Let me see if I can address again why I used the cost of capital I did use.

Q. No, I guess -- my question is not why you

used the one that you did use. My question is why didn't you use the dividends.

A. Well, River Valley is one, was one of those companies that did not pay dividends because it was in a situation where it was employing the capital and the shareholders were looking to an appreciation of the company as opposed to dividends for their return of -- for their return.

Q. Is that the only reason?

A. As I said before, I think there - I think had River Valley paid dividends, that would have been part of the calculation or it could have been a part of the calculation. In this particular case, we had what I considered a very reliable and conservative method of determining the cost of capital and, as I stated in my report, one normally uses the cost of capital as the discount rate to discount future payments, cash flows to shareholders in order to get to the current fair value of the shares.

The government did that for us so it was a reliable method and since it was already accepted by the government, that seemed to be an acceptable and

very reasonable way to get at the cost of capital for
River Valley.

MATERIAL
REDACTED

MATERIAL
REDACTED

Maybe I can make one other point that you picked up before and I think it's consistent with

what I was trying to say that, on this LaSalle document that you showed me. And I thought there were two points that after reading it were important to review.

The one in section III, paragraph 14 I think underscores what I've been saying, that in the middle of that paragraph, "The cost of capital is the required rate of return on various types of financing."

And then I think the other point which I think is also consistent, at the bottom of that paragraph, "Return on investment may take the form of dividends, capital appreciation, or a combination thereof."

MATERIAL
REDACTED

# EXHIBIT 3

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -X

HOMER J. HOLLAND and :

HOWARD R. ROSS, :

Plaintiffs, :

v. : No. 95-524C

UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - -X

ORIGINAL

Washington, D.C.

Thursday, October 11, 2001

Deposition of NEIL B. MURPHY, Ph.D., a Witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by Paul A. Gasparotti, a Notary Public in and for the State of Maryland, taken at the offices of Arnold & Porter, 555 12th Street Northwest, Washington, D.C., at 9:08 a.m., Thursday, October 11, 2001, and the proceedings being taken down by Stenotype by Paul A. Gasparotti, and transcribed under his direction.

MATERIAL
REDACTED

We then discussed the issues in the case, but most of my contact with the, or my dealings and analysis has been with Mr. Bergman and his associates.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. With respect to the report that you have provided to us, which of the various positions that you have held in your career do you think provide you with a basis to provide the testimony that you have provided?

A. All of them. My whole career has been, I have studied financial institutions and markets ever since I got my Ph.D. in economics, and I have done it at the policy level, having worked for a

Presidential commission, I have done it at the agency research level, I have done it as a scholar, I have done it as an academic in the private sector, consulting and research. So it's pretty hard for me to say which one is disentangled from my whole career and say which is pertinent, I think it all is.

MATERIAL REDACTED

Q. Did you teach any courses related to FIRREA or the performance of the thrifts in either the 1980s or 1990s?

A. I teach courses in financial institutions and markets, so it's pretty hard not to cover that. I have been working, for example, on the question of other countries implementing deposit insurance programs, so the whole question of deposit insurance and its implementation and

impact and so forth is something I cover in my classes.

Q. In your courses, did you ever discuss the impact of FIRREA on individual institutions or institutions as a whole?

A. I think mostly the latter.

Q. And in what context would you have done that?

A. Well, when we teach classes at the financial management or the financial institutions management level, we are, if you're going to do this right, you have to cover the regulatory environment in which the financial management decisions occur. So it's, and it's usually helpful for students' understanding to develop the evolution of the financial system as we know it today and how it got there, and FIRREA and FDICIA, among others, would be a building block in that discussion to help our students understand what I a financial institution manager or management has to deal with.

MATERIAL REDACTED

MATERIAL
REDACTED

Q. Have you while working at any of the various places you have worked performed valuation of a thrift or a bank?

A. I have done consulting work that involved thrifts, support for thrift management. I don't know if you would call that valuation. I did work for the Massachusetts Savings Bank that involved a great deal of empirical analysis of

their operating costs and how to manage them efficiently using econometric techniques. I don't know if that answers -- I mean, I did it. Is that valuation in the context of what you're saying, I'm not sure.

MATERIAL
REDACTED

MATERIAL
REDACTED

sure. This summer I worked with the deposit insurance agency in Colombia, in Bogota, to develop a, help them develop a mortgage-backed securities market in which they would provide the guarantee to the investors for the secondary mortgage market or the mortgage-backed securities. I was working on modeling, helping them with modeling the -- well, valuing the mortgages, valuing the portfolio and valuing what fund they would need to provide the guarantee and what assessment they would need to charge to have that be a financially viable operation, so that's what I did. Whether you call that valuation or not, I don't know.

Q. So it was not something already in place, but it was something else?

A. It was design.

Q. Would you consider a cross-study such as that to be valuation?

A. We certainly had to go -- once again, I explained what I did or what we did, and it was a major effort, I was one small part of it, and the intent was to do the work in such a way that they would have a viable fund. In a way it was somewhat similar conceptually to the work in Thailand. Is that valuation, determining the size of a fund necessary, is that valuation, yeah, I think it probably is.

MATERIAL REDACTED

MATERIAL REDACTED

you were going to replace capital with some other capital, that you would evaluate the costs and benefits of doing so prospectively into the future and make a decision, and that's not what we're doing here. We're looking back at a situation and saying what is an approach, a logical approach to do a calculation of what it would have cost if they had replaced that capital, given the scenario as it existed at that time. I don't know if that answers your question.

MATERIAL REDACTED

MATERIAL REDACTED

Q. And why not?

A. Because there is a net addition to the capital position of the organization. What we're talking about here is, if I can use the language of a breach, that there was capital disallowed and for regulatory purposes, that particular form of capital had to be replaced. That capital had, so the cost of the, the net effect of replacing for example debt which has a certain interest cost with dividends which had certain dividend costs, and the tax implications would have to be considered in this case.

MATERIAL REDACTED

U.S. COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - X

HOMER J. HOLLAND AND HOWARD :

R. ROSS, :

Plaintiffs, :

v. : Case No. 95-524C

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - X

ORIGINAL

Washington, D.C.

Friday, October 12, 2001

Continued videotaped deposition of NEIL B. MURPHY, Ph.D., a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by PENNY M. DEAN, a Notary Public in and for the District of Columbia, taken at the offices of Arnold & Porter, 555 Twelfth Street, 9th Floor, Washington, D.C., at 9:04 a.m., Friday, October 12, 2001, and the proceedings being taken down by Stenotype by PENNY M. DEAN, RPR, and transcribed under her direction.

MATERIAL
REDACTED

Q. Okay. Have any of the articles that you have written related to thrift institutions?

A. Yes.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Did you consider changes in the financial condition in performance of River Valley including the thrift's failure to attract deposits and various non-capital related concerns that may have been addressed in the reports of examination?

A. Yes, I -- I looked at the reports of examination.

Q. Did you consider the changes in the

financial condition and performance of River Valley?

A. In general I did, yes.

Q. How did that affect --

A. Well, I was impressed with the fact that the management was able to -- to return to profitability after -- after the breach.

MATERIAL
REDACTED

MATERIAL
REDACTED

preferred stock. I mean, all the questions thus far have been kind of implying that the preferred stock is a fixed-income instrument and this is kind of a hybrid between -- between common stock and preferred stock and that is, that should the institution have earnings in excess of 40.4 -- 40 basis points of total assets, that the FSLIC, F-S-L-I-C, would have a claim on such earnings, 25 percent of them would be -- all earnings in excess of that threshold.

MATERIAL
REDACTED

MATERIAL
REDACTED

Q. Ms. Smith asked you a series of questions

about this growth rate of earnings which you assumed to be 7 percent in your Gordon growth model, do you recall that?

A. Yes.

Q. Ms. Smith I think also asked if it would be been appropriate in using the River Valley Rock Falls growth rate?

A. Right.

Q. As you think about that, is there merit to that suggestion?

A. Yes, it -- there are a number of things that one can look at, once again reviewing the contemporaneous documents, they had some net income what they call the viability analysis, they have some estimate of growth of net income. That would be one source of looking at the growth rate of earnings and the other would be the Rock Falls, the Rock Falls being the institution that they owned for a longer period of time and I think that would be an interesting idea and would be happy to analyze those numbers and see what the effect would be.

MATERIAL
REDACTED

# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

HOMER J. HOLLAND AND HOWARD :
R. ROSS, :
Plaintiffs, :
v. : Case No. 95-524C
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - X

ORIGINAL

Washington, D.C.

Monday, October 22, 2001

Videotaped deposition of S. LYNN STOKES, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the State of Virginia, taken at the offices of Arnold & Porter, 555 Twelfth Street, 9th Floor, Washington, D.C., at 8:59 a.m., Monday, October 22, 2001, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, RPR, CRR, and transcribed under her direction.

MATERIAL
REDACTED

Q. In the but-for world, would Holland and Ross have still financed the acquisition through American National Bank?

A. Well, in the but-for world, I think that River Valley, if my memory of the numbers serves me, I don't remember if I studied that particular in any great depth. My memory of the numbers was that River Valley would have had enough capital to make the acquisition without additional borrowings from American National.

MATERIAL
REDACTED

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOLLAND AND ROSS, )
Plaintiffs, )
- versus - ) No. 95-524C
) Senior Judge Smith
THE UNITED STATES, )
Defendant. )

ORIGINAL

October 23, 2001
Washington, D.C.

CONTINUED VIDEOTAPED DEPOSITION OF:

S. LYNN STOKES,

a witness in the above-entitled cause, called for examination by counsel for the Defendant, pursuant to notice and agreement of counsel as to time and place, held at 555 Twelfth Street, N.W., Washington, D.C., 20004-1206, commencing at 9:12 a.m., before Maria Pugliese, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

MATERIAL REDACTED

I guess the only observation I would make is that since most of the built-in losses arose out of the STARS transactions, the transaction cost of realizing those losses would be relatively small.

MATERIAL REDACTED

MATERIAL REDACTED

Q Yesterday we discussed the possibility of, in the real world after the initial acquisition of San Antonio, merging it into River Valley.

Do you remember that discussion?

A Yes.

MATERIAL
REDACTED

Q Do you have any opinion as to whether or not that would have provided an impediment to River Valley acquiring San Antonio?

A I think I covered the waterfront on that in my report and said that, in my view, if they had had enough capital that there would have been no regulatory impediment to the acquisition.

Q So it's a function of capital?

A That's correct. And that's driven in large part by the fact that the regulators -- the regulators generally have two questions when it comes to are we gonna let you do a deal or not. And one is do we have enough money -- or do you have enough money, do you have enough capital; and the second one is, do we think you're -- you will provide quality management and have a reasonable business plan and not come back to be -- not come back to haunt us in the form of being a supervisory headache for us down the road.

And I think the fact that they allowed Holland and Ross to make the acquisition in the breach world answers that leg of the equation. And, so, the sole remaining issue, at this point in time, would have been a question of capital adequacy.

MATERIAL REDACTED