# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOMER J. HOLLAND,<br>HOWARD R. ROSS, AND<br>FIRST BANK,<br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 95-524C<br>(Judge George W. Miller) |

# DECLARATION OF ANDREW S. CARRON

December 5, 2005

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
DX 1477
Holland v. U.S. 95-524C

I, Andrew S. Carron, hereby declare under penalty of perjury:

1. I submitted an expert report in this matter on December 10, 2001 ("Carron Report"). I submitted a supplemental expert report in this matter on January 21, 2004 in response to supplemental expert reports of Neil B. Murphy and Homer J. Holland. I submitted a rebuttal expert report in this matter on June 1, 2005 (collectively "Carron Reports") in response to Corrected Second Supplemental Expert Report and Declaration of Dr. Holland. Subsequently, I was asked by counsel for defendant to review and comment upon the new estimates of damages in Plaintiff First Bank's Motion for Partial Summary Judgment dated September 21, 2005 ("First Bank's Summary Judgment Motion").

## I. INTRODUCTION

2. I have been asked by counsel for defendant to comment on First Bank's new estimates of damages and to opine on whether, as an economic matter, the actual performance of SAFSB after its acquisition by Western Capital supports plaintiffs' quantification of their damage claim as of the time of the acquisition.

3. In the course of preparing this report, I reviewed the Carron Reports and determined that they continue to represent my opinions. With regard to the First Bank's Summary Judgment Motion, I also conclude as follows:

- As a theoretical matter, based on fundamental principles of economics and finance, the actual performance of SAFSB after the acquisition is, at best, only indirectly related to the value of the claim at the time of the acquisition. Because plaintiffs have not undertaken any of the necessary adjustments or corrections for bias, the performance data provided in First Bank's Summary Judgment Motion to support their damage claims cannot be relied upon.

- Plaintiffs have improperly combined accounting, tax, and economic concepts in support of their contentions. In so doing, they have produced inconsistent and unreliable results.

- Neither the $45 million in taxable income of Western Capital between 1992 and 2004 nor the hypothetical $35 million of gains at the end of 1993, used by plaintiffs to substantiate their damages as of August 1992, are reliable measures because they are derived in large part from events that were not reasonably foreseeable at the time of the acquisition.

4. Materials considered in addition to those listed in the Carron Reports are shown in Exhibit 1.

*Exhibit I. Materials Considered*

## II. HISTORICAL TAXABLE INCOME AS MEASURE OF DAMAGES

### A. Theoretical Critique

5. Plaintiffs have previously claimed damages of $28.609 million,[1] representing the alleged bargain value of SAFSB (adjusted for tax and interest expenses) when acquired by Western Capital in August 1992, thereby denying that value to River Valley. Plaintiffs now say that the actual performance of SAFSB between 1992 and 2004 validates their measure of damages. As an economic matter, however, actual performance after the acquisition is not relevant to the value of the claim at the time of the acquisition.

6. The value of an asset changes as market conditions change. In particular, the future taxable income cited in First Bank's Summary Judgment Motion is not relevant for measuring damages. Nor are future mark-to-market gains caused by changing market conditions relevant for measuring damages. Consider, for example, a share of stock in a publicly traded corporation at a moment in time. It is a well-established principle of finance that the market price of such an instrument is the best estimate, at the time, of the value of that asset. When the share price subsequently changes, it does so because new information has been received, not because the earlier price was incorrect at the time it was quoted.

7. By claiming damages based on actual subsequent performance, plaintiffs are asking for something in addition to the value of the asset itself: a free option on the underlying investment. If the value of the hypothetical investment goes down, then plaintiffs avoid the loss. If the value goes up, plaintiffs file a claim based on the favorable but-for scenarios. Using the previous analogy from the stock market, it is as if plaintiffs were denied the opportunity to purchase a stock, and are asking for damages consisting of a "call" option (bet) on the stock. Call options are separately traded securities with positive market values, so the combination of the stock plus the option is more valuable than the stock alone. What is more, plaintiffs are asking for the value of that option not at the date of acquisition, but after the favorable outcome has become known. Plaintiffs are thereby claiming future performance without having borne

[1] Corrected Second Supplemental Expert Report and Declaration of Dr. Homer J. Holland, dated February 22, 2005, ¶9.

investment risk, while reserving the right to keep the $10 million acquisition cost if performance were to have deteriorated.

8. Furthermore, the value of an asset should not depend on when the trial for contract damages occurs. If this trial were held immediately after the acquisition in August 1992, then claimed damages would have been zero (or $0.328 million at most). The value of SAFSB appears to have peaked in 1993 and declined thereafter.

9. Actual performance may be useful in valuation under limited circumstances (which do not apply in this instance). In any case, actual performance must be adjusted for changes in market conditions and other factors not known at the time of the event. The performance of a savings institution is highly sensitive to market factors such as the level of interest rates, as the history of the industry makes clear. (See Carron Report, ¶¶16-17.) Therefore, income and equity must be adjusted for the effects of market interest rate changes, which plaintiffs have not done here.

### B. Methodological Critique

10. Plaintiffs use accounting- and tax-based measures of income to substantiate their claim for economic damages. While related to each other, these concepts are not equivalent. Book value is an accounting term based on historical cost. Taxable income is income measured for tax purposes only and as such is even more distant from measuring economic gains than accounting income. Cash flow and market value are the relevant economic concepts, and are the appropriate measures for any economic damages.

11. As an illustration of the unreliability of plaintiffs' claims, consider the different measures of Western Capital's annual income during the mid-1990s for years from which all three amounts are currently available. In addition to being irrelevant to the calculation of damages at the time of the acquisition, Western Capital's future income varies substantially depending on whether the tax, accounting, or economic concept is used. See Exhibit 2. In two of the four years shown, the three measures do not even agree as to whether there was a gain or a loss. Using unadjusted tax or accounting data as a measure of economic damages is unreliable.

*Exhibit 2. Western Capital's Income Based on Alternative Definitions, 1992-95*

### C. "Practical" Critique

12. Immediately prior to the closing of the SAFSB acquisition, SAFSB's assets were carried on its books at their historical values (as adjusted per accounting conventions). In most instances, those historical values approximated the par (face) values of the assets. By the time of the closing, however, those assets were actually worth in the market about $30 million less than that amount, because of adverse interest rate moves[2] and deterioration in credit quality. Accounting rules required that, upon closing, the old book values be replaced with the current market values. This is the process known as "marking to market." In particular, the value adjustment for loans is then shown on the institution's balance sheet as an "unearned discount" (in the case of a loan with a below-market coupon rate) or an "allowance for loan losses."[3]

#### 1. Plaintiffs' Continued Mischaracterization of their Own Expert's Testimony

13. Plaintiffs make the following statement in their recent filings: "In the actual SAFSB acquisition, Western Capital's investors *paid $10.381 million* for net marked-to-market assets *worth $40.344 million.*"[4]

14. First, this statement mischaracterizes plaintiffs' own expert Lynn Stokes's description of the $40.344 million valuation of SAFSB's "net assets" (i.e., the market value of its equity). Mr. Stokes actually described the assets as having "a net book value of $40,344,447."[5] As discussed above, market value and book value are different concepts, and should not be used interchangeably.

15. Second, the statement is flatly wrong. The net assets (equity) of SAFSB equaled $40,344,447 *before* the acquisition and *before* the assets and liabilities were marked-to-market. After mark-to-market the equity was $10,708,613.[6]

---

[2] The market values of fixed rate instruments decline when market interest rates rise. See Carron Report ¶¶16-19.

[3] Dr. Holland explained the reason for the discount of the loan portfolio in his deposition dated August 6, 2000 at pp. 119-120. He attributed the marking down of the loan portfolio to credit quality concerns, although the unearned discounts are substantially larger than the allowances for loan losses.

[4] First Bank's Summary Judgment Motion, p. 21 (emphasis in original, citation omitted).

[5] Expert Witness Report by S. Lynn Stokes, ¶28.

[6] Western Capital Holdings, Inc. and Subsidiary, Consolidated Financial Statements, Year Ended December 31, 1992: [WCH-B76-0126 - WCH-B76-0127].

**2. SAFSB's Actual Value at the Time of Purchase Did Not Materially Exceed the Purchase Price**

16. There was no opportunity around the time of the acquisition to realize a market value of $40.344 million, because the market value was only about $10 million, contrary to the statement of Mr. Stokes that is relied upon in First Bank's Summary Judgment Motion.[7] There was no excess value at the time of the purchase. SAFSB was sold almost exactly at fair value.[8]

17. The investors who formed Western Capital paid $10,380,613 for SAFSB, including its $10,708,613 in net equity. So their gain at the time of the acquisition was only $328,000. By the end of 1993, SAFSB was worth approximately $30,000,000 more than Western Capital had paid for it 16½ months earlier, but that gain was a subsequent development and not a natural evolution from the value at the time of the acquisition. The fair value of equity exceeded book value of equity by only $2.4 million at the end of 1992.

18. Exhibit 3 presents these concepts graphically. The net market value of SAFSB at a point in time is represented by the orange bar. Immediately prior to the acquisition, SAFSB's net book value (the dark green bar based on the historical costs of its assets and liabilities) was $29,963,834 greater than its purchase price of $10,380,613. Upon acquisition, the book value was set almost exactly equal to the market value, and the net value to Western Capital's investors (orange bar) was reduced by the amount of their investment (blue bar). It was only with the passage of time that the net value rose to the levels that Plaintiffs now claim were embedded at the time of the acquisition.

*Exhibit 3. Components of SAFSB Equity*

19. Thus we have two points in time, the date of the acquisition and the first year end after that, when mark-to-market gains are negligible or small. Yet plaintiffs choose to measure mark-to-market gains at the end of 1993.

---

[7] First Bank's Summary Judgment Motion, p. 21, citing Stokes Report ¶28.

[8] "At the time of closing, SAFSB's assets, liabilities, and shareholders' equity on a GAAP, fair market value basis were $189,317,000, $178,936,000, and $10,381,000, respectively, including a small reduction of assets of $328,000 for negative accounting goodwill (the excess of the fair market value of the net assets for accounting purposes over the purchase price)." *Joint Stipulation of Facts,* ¶361.

### 3. SAFSB's Income and Value Increased after the Purchase Due to Unanticipated Market Events

20. Actual performance of SAFSB after the acquisition was affected by events not foreseeable at the time of the acquisition. In particular, market interest rates declined and thereby made SAFSB's mortgage portfolio and mortgage lending business more profitable.

21. The 10-year Constant Maturity Treasury Yields reached a 26-year low in October of 1993 and overall declined about 87 basis points during 1993. Home mortgage yields declined by a similar amount. Nobody (including plaintiffs) at the time of the acquisition in August 1992 could have foreseen the future declines in market interest rates to record lows.

22. Plaintiffs claim that SAFSB had "$29.963 million in *actual* embedded gains" at the date of purchase, which was "part and parcel" of $35 million in unrealized gains as of the end of 1993.[9]

23. However, the $35 million claim cannot be a reliable basis for supporting the $29.963 million that plaintiffs allege was the excess value of SAFSB at the time of the purchase. The $35 million in gains by the end of 1993 were due largely to changes in the fair value of SAFSB's assets between the time of the acquisition and year-end 1993. It is the sum of two numbers: $25 million of unrealized (and not booked) gains at the end of 1993 due to the appreciation of assets during 1993 (as presented in the bank's financial statements) plus a $10 million adjustment (as estimated by defendant's expert Paul Griffin). In particular, the gains of $35 million include windfalls due to favorable movements in interest rates as explained above.

24. Similarly, the $45 million in taxable income calculated by the plaintiffs is not related to claims at the time of the acquisition. Among other problems with this number is that it is measured over a very long period of time, from 1992 to 2004. The market went through several business cycles over that period, and the industry performance was affected by events unforeseeable at the time of the acquisition.

[9] First Bank's Summary Judgment Motion, pp. 17, 22.

## III. MISCELLANEOUS

My work is ongoing and my opinions are subject to revision based on new information (including new reports or testimony by plaintiffs' experts or new filings by plaintiffs' counsel), which subsequently may be provided to, or obtained by me.

Respectfully submitted,

Andrew S. Carron

**Exhibit 1**
**Materials Considered**

Defendant's "Motion for Reconsideration of the Court's Order Permitting the Joinder of First Bank, or, in the Alternative, to Strike Portions of First Bank's Motion for Partial Summary Judgment with Respect to Damages and to Stay Defendant's Response to First Bank's Summary Judgment Motion," October 5, 2005

Defendant's Proposed Findings of Uncontroverted Fact, March 2, 2004

Defendant's Reply In Support of its "Motion for Reconsideration of the Court's Order Permitting the Joinder of First Bank, or, in the Alternative, to Strike Portions of First Bank's Motion for Partial Summary Judgment with Respect to Damages and to Stay Defendant's Response to First Bank's Summary Judgment Motion," October 21, 2005

Defendant's Summary Judgment Motion as to Damages, March 2, 2004

Order, October 24, 2005

Plaintiff First Bank's Motion for Partial Summary Judgment, September 21, 2005

Plaintiffs' Motion for Expedited Consideration, October 14, 2005

Plaintiffs' Response to Defendant's Motion to Dismiss, December 17, 2003

Plaintiffs' Supplemental Proposed Findings of Uncontroverted Fact, September 21, 2005

Plaintiffs' Response to Defendant's "Motion for Reconsideration of the Court's Order Permitting the Joinder of First Bank, or, in the Alternative, to Strike Portions of First Bank's Motion for Partial Summary Judgment with Respect to Damages and to Stay Defendant's Response to First Bank's Summary Judgment Motion," October 11, 2005

Third Amended Complaint, May 18, 2005

Western Capital Holdings, Inc. and Subsidiary, Consolidated Financial Statements, Year Ended December 31, 1992: [WCH-B76-0114 - WCH-B76-0158]

Western Capital Holdings, Inc. and Subsidiary, Consolidated Financial Statements, Years Ended December 31, 1994 and 1993: [WCH-B75-1603 - WCH-B75-1628]

Western Capital Holdings, Inc. and Subsidiary, Consolidated Financial Statements, Years Ended December 31, 1995 and 1994: [H&R-SAFSB-B87-0862 - H&R-SAFSB-B87-0894]

**Exhibit 2**

**Western Capital's Income Based on Alternative Definitions**
**(in dollars)**

| | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|
| Taxable Income [1] | (632,056) | 1,200,392 | 3,623,189 | 1,697,900 |
| Net Income [2] | 1,843,768 | 6,423,552 | 5,905,567 | 2,465,040 |
| Increase in Economic Value [3] | 4,234,464 | 28,841,045 | (9,496,861) | 5,696,622 |

**Sources:**

[1] Plaintiff First Bank's Motion for Partial Summary Judgment, September 21, 2005, at 19.

[2] Western Capital Holdings, Inc. and Subsidiary, Consolidated Financial Statements: [WCH-B76-0114 - WCH-B76-0158, WCH-B75-1603 - WCH-B75-1628, H&R-SAFSB-B87-0862 - H&R-SAFSB-B87-0894]

[3] Change in estimated fair value of equity plus dividends paid.

**Exhibit 3**
**Components of SAFSB Equity**




**Source:** Western Capital Holdings, Inc. and Subsidiary, Consolidated Financial Statements: [WCH-B76-0114 - WCH-B76-0158, WCH-B75-1603 - WCH-B75-1628, H&R-SAFSB-B87-0862 - H&R-SAFSB-B87-0894]