# EXHIBIT B

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HOMER J. HOLLAND,<br>HOWARD R. ROSS, and<br>FIRST BANK, | ) | |
| Plaintiffs, | ) | Case No. 95-524C |
| v. | ) | (Judge George W. Miller) |
| THE UNITED STATES | ) | |
| Defendant. | ) | |

DECLARATION OF W. BAREFOOT BANKHEAD

1. I declare under penalty of perjury that the foregoing is true and correct.

2. I am a Managing Director with Navigant Consulting, Inc. ("Navigant Consulting"), a firm that provides professional services to its clients in various areas, including financial, accounting, and economic analysis.[1] I graduated from the University of Texas in December 1976 with a Bachelor of Business Administration degree and a major in accounting. I am a Certified Public Accountant in the State of Texas. From 1977 through early 1987, I worked in public accounting, the last several years of which were with a then "Big Eight"

[1] At the time I submitted my original report in this case on December 10, 2001, I was a Director with Peterson Consulting, a unit of Navigant Consulting, Inc. On March 28, 2003, Peterson Consulting was absorbed into Navigant Consulting and ceased to exist as a separate operating unit.

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
DX 1479
Holland v. U.S. 95-524C

firm, primarily serving clients in the financial services and real estate industries. My resume, which was attached as Exhibit A to my Second Supplemental Expert Report dated June 1, 2005, provides additional information on my professional background.

3. I previously prepared an expert report dated December 10, 2001 ("Original Report"), which addressed certain elements of damages claimed by plaintiffs.[2] Plaintiffs' counsel subsequently deposed me on February 25-28, 2002. In response to supplemental expert reports prepared by plaintiffs' experts, I prepared a supplemental expert report dated January 21, 2004 ("Supplemental Report"). Finally, in response to the corrected second supplemental expert report prepared by Dr. Homer J. Holland ("Corrected Second Supplemental Holland Report"), I prepared a second supplemental expert report dated June 1, 2005 ("Second Supplemental Report"). Plaintiffs' counsel again deposed me on June 21-22, 2005.

4. I have prepared this declaration at counsel's request for two purposes. First, counsel requested that I respond to certain damage claims put forth by plaintiffs' counsel (rather than through plaintiffs' experts or fact witnesses) in their brief entitled "Plaintiff First Bank's Motion for Partial Summary Judgment" dated September 21, 2005 ("Plaintiff's Partial MSJ"). Second, counsel has advised me that it is appropriate to elaborate upon certain criticisms I offered in my previous reports, specifically regarding Dr. Holland's mark-to-market analysis of his hypothetical portfolio in 1994 as well as certain of his assumptions regarding

[2] My understanding through counsel is that the current plaintiffs in this case are Messrs. Holland and Ross and First Bank.

the incremental mortgage-backed securities he contends River Valley Savings Bank, FSB ("River Valley") would have purchased in the no-breach world. I have included as Exhibit A to this declaration a complete list of those materials I have considered in performing this work.[3] As my work on this matter is ongoing, if necessary, I will supplement my findings based on the results of my continuing work or as a result of any new matters raised by plaintiffs.

**Damage Claims per Plaintiff's Partial MSJ**

5. In Plaintiff's Partial MSJ, plaintiffs' counsel presented three damage claims related to a hypothetical acquisition of San Antonio Federal Savings Bank ("San Antonio") by *But for River Valley*.[4] First, plaintiffs' counsel described a new claim for $44.93 million,[5] allegedly representing "[San Antonio]'s actual post-acquisition earnings" from 1992 through 2004.[6] Second, plaintiffs' counsel described a new claim for $35 million, allegedly representing "profits" River Valley "would have earned… through [San Antonio in a no-breach world] prior to [River Valley's] 1995 merger with First Bank[]."[7] Third, plaintiffs' counsel described a claim for $29.963 million, allegedly representing the "bargain purchase" element from the San Antonio acquisition.[8]

---

[3] I have not listed in Exhibit A materials previously disclosed.

[4] *But for River Valley* is used herein to refer to the hypothetical River Valley thrift(s) Dr. Holland assumes would have existed in the absence of the alleged breach. In my previous reports, I used *But for River Valley I*, *But for River Valley II*, *But for River Valley III*, and *But for River Valley IV* to refer to the specific, alternate, *But for River Valleys* Dr. Holland has posited in his various reports. I continue to make those references herein, as appropriate. In the actual world, San Antonio was acquired on August 14, 1992 by Western Capital Holdings, Inc. ("WCH"), which was established for the purpose of acquiring San Antonio. Messrs. Holland and Ross were majority owners of WCH. See JSF ¶ 349.

[5] Plaintiff's calculation includes some simple arithmetic errors. Their calculation, once corrected, should be $44.84 million.

[6] See Plaintiff's Partial MSJ, pp. 18-20.

[7] See Plaintiff's Partial MSJ, pp. 20-22.

[8] See Plaintiff's Partial MSJ, pp. 22-23.

6. The first two of these claims are new. The third claim involves a figure that has previously been used by plaintiffs' experts ($29.963 million);[9] however, the amount of claimed damages derived from that figure has changed again. I address each of these claims in more detail below.

*$44.93 Million San Antonio Claim*

7. Plaintiffs' $44.93 million damages claim, which allegedly represents "[San Antonio]'s actual post-acquisition earnings" from 1992 through 2004, depends upon the occurrence of a number of successive events and is thus speculative (the fact that plaintiffs suggest multiple alternative hypothetical scenarios – as discussed below – compounds the speculative nature of this claim). More specifically, this scenario, as proffered by plaintiffs, requires, among other things, the following conditions:

(a) *But for River Valley acquires San Antonio.* This condition alone is speculative. Whether or not *But for River Valley's* capital structure could support such an acquisition without the infusion of external capital (as plaintiffs suggest) is dependent upon a number of factors, including (1) the layers upon layers of assumptions made by Dr. Holland in forecasting *But for River Valley,*[10] and (2) the extent to which *But for River Valley* would have been subject to the

---

[9] See Expert Witness Report of S. Lynn Stokes dated July 2, 2001 ("Stokes Report"), ¶ 30; Corrected Expert Report and Declaration of Dr. Homer J. Holland dated July 27, 2001 ("Corrected Holland Report"), ¶¶ 116, 137 (footnote 119); Corrected Second Supplemental Holland Report, ¶¶ 7-9.

[10] The flawed nature of these assumptions is described in detail in my prior reports as well as later in this declaration.

same capital requirements as those imposed under the March 25, 1991 Supervisory Agreement, as I believe would have been the case.[11] In the event that external capital would have been required, it is speculative to assume that American National Bank and Trust Company of Chicago ("ANB"), plaintiffs' preferred lender, would have been willing to provide funds for exactly the reasons it chose not to fund the San Antonio acquisition through River Valley in the actual world (specifically, concern over commingled exposure as a result of FIRREA's cross-guarantee provision).[12]

(b) *San Antonio's balance sheet remains the same in both the actual and but-for worlds throughout its existence.* This condition alone is speculative, plus it is further contingent on the preceding condition. It necessarily assumes that *But for River Valley* and then First Bank would have managed San Antonio in the exact same manner that WCH / San Antonio did for more than 10 years. The specific composition of San Antonio's balance sheet at any given time was a function of hundreds of operational decisions, which were influenced by strategic considerations, interest rate risk management, liquidity management, and tax planning, among other factors. To assume that none of these decisions would have been impacted by the hypothesized change in ownership structure is speculative. Plaintiffs themselves have asserted that, had San Antonio been acquired by *But for River Valley*, they would have followed different strategies in operating the thrift. For example,

---

[11] See Original Report, ¶ 34.
[12] See Original Report, ¶¶ 69-73.

Dr. Holland stated that, "in the 'but for' world we would have accelerated the recognition of taxable income" in San Antonio by, among other things, liquidating assets more rapidly.[13]

(c) *First Bank acquires San Antonio as part of But for River Valley on January 4, 1995.* This condition alone is speculative, plus it is further contingent on the preceding conditions. This hypothetical acquisition suggested by plaintiffs contradicts Dr. Holland's opinion that, in the but-for world, the stock of San Antonio would have been distributed to a holding company owned by Messrs. Holland and Ross at or just before the closing of the sale of River Valley.[14]

(d) *In June 1996, First Bank sells certain San Antonio assets and liabilities in a transaction that mirrors WCH's real-world sale to International Bank of Commerce.*[15] This condition alone is speculative, plus it is further contingent on the preceding conditions. Among other things, it is speculative to assume that an entirely different ownership group / management team (i.e., First Bank) would have chosen the identical disposition strategy that WCH did. Indeed, plaintiff and fact witness Howard R. Ross acknowledged during his deposition that the proposition that San Antonio would have been liquidated in the same manner in a but-for world is merely conjecture and that he "would have no way of knowing" whether such a transaction would have occurred.[16]

---

[13] See Corrected Holland Report, p. 60, footnote 122; Stokes Report, ¶ 31.
[14] Corrected Holland Report, p. 59, footnote 120; November 2, 2001 Holland deposition, p. 383.
[15] See JSF ¶ 386.
[16] August 4, 2000 Ross deposition, p. 231.

(e) *After June 1996, First Bank disposes of the San Antonio assets in the exact same manner WCH did (and presumably continues to do) in the actual world.* This condition alone is speculative, plus it is further contingent on the preceding conditions. Among other things, it is speculative to assume that an entirely different ownership group / management team (i.e., First Bank) would have chosen the identical disposition strategy that WCH did.

8. The likelihood that one of the events presented above, much less all five, would have occurred in the but-for world is highly speculative.

*$35 Million San Antonio Claim*

9. Plaintiffs' $35 million claim is purportedly attributed to one of defendant's experts, Dr. Paul Griffin,[17] and essentially reflects the excess of the fair value of San Antonio's loan portfolio over its carrying value at December 31, 1993, plus some additional adjustments. The excess of the fair value of San Antonio's loan portfolio over its carrying value as of December 31, 1993, as reported in WCH's audited financial statements, was $24.6 million.[18]

---

[17] See Plaintiff's Partial MSJ, p. 20.

[18] See Western Capital Holdings, Inc. and Subsidiary Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 1994, WCH-B75-1603 through WCH-B75-1628, 1622. The Estimated Fair Value of Loans Receivable, Net of $158,412,968 less the Carrying Value of Loans Receivable, Net of $133,842,259 at December 31, 1993 is $24,570,709. This amount is then increased by approximately $10 million to get to the $35 million figure. The $10 million adjustment is apparently derived by taking $3,620,000 in deferred tax liabilities associated with purchase accounting adjustments (see WCH-B75-1617) which "would be roughly one third of... the accretion income," and multiplying that number by three to reflect the amount of carrying value "that's been incremented by the accretion." Dr. Griffin termed this $10 million adjustment to be "very rough[]." (February 12, 2002 Griffin deposition, p. 344). I am offering no opinion on this adjustment.

10. Plaintiffs' $35 million claim implies that, contrary to the hypothetical scenario suggested by plaintiffs' $44.93 million claim (discussed above), San Antonio's entire loan portfolio would have been liquidated on one particular day – December 31, 1993. This hypothetical scenario depends upon the occurrence of a number of successive events and is thus speculative. More specifically, this scenario, as proffered by plaintiffs, requires, among other things, the following conditions:

(a) *But for River Valley acquires San Antonio.* This condition alone is speculative. See ¶ 7(a) above.

(b) *San Antonio's loan portfolio remains the same in both the actual and but-for worlds, at least through December 31, 1993.* This condition alone is speculative, plus it is further contingent on the preceding condition. It necessarily assumes that *But for River Valley* would have managed the San Antonio loan portfolio in the exact same manner that WCH / San Antonio did for more than 16 months. The specific composition of the San Antonio loan portfolio at any given time was a function of hundreds of decisions relating to originations, purchases, and sales, which were influenced by strategic considerations, interest rate risk management, liquidity management, and tax planning, among other factors. To assume that none of these decisions would have been impacted by the hypothesized change in ownership structure is speculative. See ¶ 7(b) above.

(c) *But for River Valley decides to liquidate San Antonio's entire loan portfolio as of December 31, 1993.* This condition alone is speculative, plus it is further contingent on the preceding conditions. It

suggests that *But for River Valley* would have chosen to liquidate San Antonio's loan portfolio at what is known with hindsight to be an especially favorable time, given then-existing market conditions (this is discussed in more detail below).

(d) *The net gain to But for River Valley from the hypothetical liquidation of the San Antonio loan portfolio at year-end 1993 would equal the $24.6 million excess of fair value over carrying value, as reflected in WCH's audited financial statements, plus an additional amount approximating $10 million.* This condition alone is speculative, plus it is further contingent on the preceding conditions. Among other things, it assumes there would have been one or more willing buyers for San Antonio's entire loan portfolio at that time. This is speculative, as John Rose, a minority owner of WCH, indicated when he testified as follows:[19]

0063
Q. Was there – were there discussions about
liquidating San Antonio Federal? You know, at

0064
the time it was acquired, was that something
that was ever being thought of potentially
doing down the road?
A. Well, we're financial buyers, and as a result,
everything that we buy, we think about the
strategy going forward, which would include not
only the operating strategy, but the ultimate
exit. And at that time, we didn't know who the
buyers would be, we didn't know – when we made
the purchase, we made it at what we felt was
the most that anybody would pay for it, because

[19] See June 22, 2000 Rose deposition, pp. 63-64.

> there just were no more bidders for it. We
> thought it was a great value, but no one was
> buying thrifts in Texas. They were considered
> black holes. And so we didn't – when we
> bought it, we didn't know who would buy it…

11. The likelihood that one of the events presented above, much less all four, would have occurred in the but-for world is highly speculative.

12. As noted above, plaintiffs' $35 million damage claim assumes that San Antonio's entire loan portfolio would have been liquidated on one particular day – December 31, 1993. With the benefit of hindsight, we know this date to be especially favorable to plaintiffs, given then-existing market conditions. At December 31, 1993, the embedded mark-to-market gain in the San Antonio loan portfolio was estimated to be $24.6 million. This amount represents a substantial increase from August 14, 1992 (the date of the San Antonio acquisition) when the embedded mark-to-market gain approximated zero because San Antonio's portfolio had already been marked to fair value as required by purchase accounting.[20] By December 31, 1992, the embedded mark-to-market gain in the San Antonio loan portfolio was only $1.75 million.[21] The most likely reasons for the increase in the estimated value of the San Antonio loan portfolio from the date of the WCH acquisition, August 14, 1992, to December 31, 1993 were the

---

[20] Under purchase accounting, all identifiable assets and liabilities are recorded at their fair value. See Accounting Principles Bulletin No. 16, *Business Combinations.*

[21] See River Valley Bank, F.S.B. and Subsidiaries Consolidated Financial Statements for Year Ended December 31, 1993, and for the Period from August 14, 1992 to December 31, 1992, WCH-B77-1621 through WCH-B77-1649, 1645. The Estimated Fair Value of Loans Receivable, Net of $109,976,000 less the Carrying Value of Loans Receivable, Net of $108,226,068 at December 31, 1992 is $1,749,932.

decline in interest rates[22] and what were likely different assumptions used by management.

13. The mark-to-market gain embedded within the San Antonio loan portfolio as of December 31, 1993, which, as mentioned above, is the primary component to plaintiffs' $35 million damages claim, continued to fluctuate significantly after that date. Indeed, the Federal Reserve initiated a succession of interest rate hikes in February 1994. As of December 31, 1994 (a point in time that is contemporaneous with the merger of River Valley into First Bank), the implied mark-to-market gain in San Antonio's loan portfolio had declined to approximately $13 million, even though the carrying value had increased from the prior year.[23] The most likely reason for the decrease in the value of the San Antonio loan portfolio from December 31, 1993 to December 31, 1994 was the substantial rise in interest rates.[24]

14. Plaintiffs' $35 million claim also ignores reductions to San Antonio-related damages previously identified by Dr. Holland (specifically incremental borrowing costs to *But for River Valley* and an alternative minimum tax ("AMT") obligation) as well as transaction costs necessary to complete the implied liquidation.

---

[22] For example, the 10-year Constant Maturity Treasury ("CMT") rate fell by 70 basis points, from 6.53 percent on August 14, 1992 to 5.83 percent on December 31, 1993. San Antonio, like most thrifts, held interest-sensitive assets and liabilities.

[23] See Western Capital Holdings, Inc. and Subsidiary Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 1994 at WCH-B75-1622. The Estimated Fair Value of Loans Receivable, Net of $148,628,138 less the Carrying Value of Loans Receivable, Net of $135,633,232 at December 31, 1994 is $12,994,906.

[24] By December 30, 1994, the 10-year CMT rate had increased by approximately 200 basis points, from 5.83 percent at the prior year-end to 7.81 percent.

*$29.963 Million San Antonio Claim*

15. In the Corrected Second Supplemental Holland Report, Dr. Holland included a claim for damages related to the San Antonio acquisition of $28.609 million. Dr. Holland started with what he purported to be the "[v]alue of the bargain purchase" of San Antonio of $29.963 million and then subtracted assumed incremental borrowing costs to *But for River Valley* in the amount of $0.719 million, and an AMT obligation in the amount of $0.635 million.[25] In Plaintiff's Partial MSJ, plaintiffs' counsel has ignored the reductions for incremental borrowing costs and the AMT obligation previously acknowledged by Dr. Holland and instead presents the $29.963 million as a stand-alone damage claim, still (erroneously) characterizing it as the "bargain purchase" element from the San Antonio acquisition.[26]

16. As discussed in my Second Supplemental Report, plaintiffs' characterization of the $29.963 million as the value of the "bargain purchase" of San Antonio is inconsistent with generally accepted accounting principles ("GAAP"), from which that $29.963 million figure was derived. Pursuant to GAAP, the excess of the fair value of the net identifiable assets over the purchase price paid for San Antonio (i.e., the "bargain purchase" alleged by plaintiffs) was only $0.328 million.[27] The $29.963 million figure actually represents the net purchase accounting discount (including a $26.401 million discount on the loan

---

[25] Corrected Second Supplemental Holland Report, ¶¶ 8-9.
[26] See Plaintiff's Partial MSJ, p. 22.
[27] See Second Supplemental Report, ¶ 19, and Western Capital Holdings, Inc. and Subsidiary Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 1992, WCH-B76-0114 through WCH-B76-0158, 0126-0128.

portfolio) that WCH recorded when it purchased San Antonio on August 14, 1992 to record the acquired assets and liabilities at their fair values.[28]

17. WCH spent months determining the appropriate fair values of the acquired assets and liabilities, including the San Antonio loan portfolio, as of the August 14, 1992 acquisition date. In valuing the loans, WCH "obtain[ed] opinions from Wall Street firms… who specialize in such services and liquidate entire or portions of loan portfolios." These specialists "told [WCH] how they would liquidate such portfolios and what yields they would expect given the specific portfolio data, delinquencies, location, RTC ownership, etc." These firms further advised WCH as to the appropriate prepayment speeds to use in valuing the loans.[29] The resulting fair value estimates were presented in WCH's audited financial statements, which were the responsibility of management. Those financial statements make clear that WCH acquired net assets with a market value that was $328,000 greater than the purchase price, not $30 million greater as repeatedly (and erroneously) asserted by plaintiffs.[30]

18. Additionally, plaintiffs' San Antonio-related claims of $29.963 million and $35 million, respectively, reflect a conceptual contradiction. As noted above, the $26.401 million figure (i.e., the primary component to the $29.963 million net purchase accounting discount) represents the *excess of the historical carrying value of the San Antonio loans over their fair value* as of August 14, 1992. In contrast, the $26.4 million figure (i.e., the primary component to the $35 million figure)

---

[28] Second Supplemental Report, ¶¶ 20-24.
[29] See December 29, 1992 correspondence from Ron Seib to Pam Martin, PHO080 1262-1266.
[30] See Western Capital Holdings, Inc. and Subsidiary Consolidated Financial Statements and Other Financial Information for Year Ended December 31, 1992, WCH-B76-0114 through WCH-B76-0158, 0126-0128.

instead reflects the *excess of the fair value of the San Antonio loans over their historical carrying value* as of December 31, 1993. Despite the fact these measures are diametrically opposed, plaintiffs assert that both the $29.963 million and $35 million figures reflect damages to First Bank.

19. The fact that plaintiffs' San Antonio-related damages claims contradict one another further underscores the speculative nature of these claims.

<u>Dr. Holland's Mark-to-Market Analysis</u>

20. Dr. Holland opined in the Corrected Second Supplemental Holland Report that First Banks, Inc.[31] would have paid a net premium of $1.9 million over book value for the incremental securities and liabilities he assumes *But-for River Valley III*[32] would have held.[33] I described in my Second Supplemental Report that Dr. Holland assumes an incorrect valuation date and adopts a flawed methodology for performing his mark-to-market analysis, which cause his computations to be irrelevant.[34] At the request of counsel, I have now made appropriate corrections to Dr. Holland's mark-to-market analysis to quantify (albeit partially) the effects of these flaws. Once corrected, Dr. Holland's mark-to-market analysis shows that First Banks, Inc. would have applied a net *discount* of $8.5 million to the incremental securities and liabilities he assumes would have been held by *But-for River Valley III*, as opposed to Dr. Holland's calculated net *premium* of $1.9 million. This correction reflects a reduction of over $10.4 million

---

[31] First Bank, the successor-in-interest to River Valley, is a second tier subsidiary of First Banks, Inc.

[32] Consistent with my Second Supplemental Report, I am referring to the growth and steady-state no-breach scenarios that Dr. Holland introduces in the Corrected Second Supplemental Holland Report as *But-for River Valley III* and *But-for River Valley IV*, respectively.

[33] Corrected Second Supplemental Holland Report, p. 15.

[34] Second Supplemental Report, pp. 43-48.

($8.5 million + $1.9 million) from Dr. Holland's mark-to-market valuation (this reduction decreases to approximately $9.0 million after correcting for errors previously quantified in my Second Supplemental Report).

21. In order to partially adjust Dr. Holland's mark-to-market analysis, it was necessary to make two corrections. First, for the reasons described in my Second Supplemental Report, the appropriate valuation date is June 30, 1994, rather than the March 31, 1994 date used by Dr. Holland.[35] Second, as further described in my Second Supplemental Report, Dr. Holland's methodology for marking to market his incremental mortgage-backed securities portfolio is fundamentally flawed, and it is unlikely that First Banks, Inc. or River Valley ever relied upon his methodology.[36] Consequently, I have replaced Dr. Holland's flawed methodology with a discounted cash flow approach, which is a widely recognized and generally accepted valuation methodology. Making these two corrections allows me to recalculate the market value of certain incremental securities and liabilities that Dr. Holland asserts would have existed on *But for River Valley's* books as of June 30, 1994.[37]

---

[35] Second Supplemental Report, ¶ 65.
[36] Second Supplemental Report, ¶¶ 67-70.
[37] My calculations use Dr. Holland's projected cash flow and yield/rate assumptions (once corrected for errors previously quantified in my Second Supplemental Report). The only exception relates to projected cash flows for Dr. Holland's proxy CMOs as of June 1994, which were generated by Wall Street Analytics using Dr. Holland's same methodology for determining expected prepayment rates. My use of Dr. Holland's figures does not in any way reflect an endorsement of these figures.

22. Table 1 below shows the effect of making these two corrections.

**Table 1**

*($ in millions)*

| Category | Holland Model III[38] | Corrected | Difference[39] |
|---|---|---|---|
| CMOs | -$0.011 | -$5.616 | -$5.605 |
| Balloons / Pass-throughs | -0.056 | -6.466 | -6.410 |
| ARMs | 1.708 | 1.708 | -- |
| Treasury securities | 0.902 | -0.169 | -1.071 |
| FHLB advances | -2.095 | 2.030 | 4.125 |
| Total | *$0.449* | *-$8.511* | *-$8.960* |

23. I did not recalculate the market value of the incremental ARMs that Dr. Holland asserts *But for River Valley* would have held using a discounted cash flow approach due to a lack of data.[40] Regardless, I continue to hold the opinion that Dr. Holland's assumption that all of his incremental ARMs would have been valued at 101.77 as of March 31, 1994 is implausible.[41]

[38] The "Holland Model III" refers to the financial model that Dr. Holland constructed in support of his hypothetical *But River Valley III*. The corresponding mark-to-market gains / (losses) by category (i.e., the starting point for Table 1) have already been corrected for certain errors previously quantified in my Second Supplemental Report. See Table 6 and ¶ 64 to my Second Supplemental Report. Although not shown above, the amounts that correspond to the "Total" row in Table 1 for the "Holland Model IV," which refers to the financial model that Dr. Holland constructed in support of his hypothetical *But for River Valley IV*, are -$0.348 million (Holland Model IV), -$4.503 million (Corrected), and -$4.154 million (Difference).

[39] Totals may not foot due to rounding.

[40] In addition, there was one CMO, (GE 93-4, CUSIP No. 36157LLL0), for which cash flow projections were not available from Wall Street Analytics as of June 30, 1994; hence, I did not correct Dr. Holland's market value calculation for this security.

[41] Second Supplemental Report, ¶ 69.

24. Table 2 below shows the effect of making these two corrections to Dr. Holland's "Growth vs. Shrinkage" lost profits calculation for both *But for River Valley III* and *But for River Valley IV.*

**Table 2**

*($ in millions)*

| | **Holland Model III**[42] | **Corrected for Mark-to-Market** | **Holland Model IV**[43] | **Corrected for Mark-to-Market** |
|---|---|---|---|---|
| Growth vs. Shrinkage<br>*Change* | $16.815 | $7.855<br>*($8.960)* | $9.731 | $5.576<br>*($4.154)* |

25. As indicated previously, the results shown in Table 2 reflect only a partial correction to Dr. Holland's mark-to-market analysis because I was not able to recalculate the market value of the incremental ARMs and a CMO that Dr. Holland asserts *But-for River Valley* would have held due to a lack of data.

<u>**Dr. Holland's Selection of Incremental CMO Securities**</u>

26. As discussed in my Original Report, Dr. Holland's selection of incremental mortgage-backed securities that he asserts *But for River Valley* would have purchased is inconsistent with River Valley's actual mortgage-backed securities purchases.[44] At the request of counsel, I have quantified the extent to which Dr. Holland's selection methodology is inconsistent, as it relates to just

[42] The starting points for Table 2, which shows the impact of partially correcting Dr. Holland's mark-to-market analyses, are the "Growth vs. Shrinkage" lost profits implied by the Holland Model III and Holland Model IV after making corrections for certain errors previously quantified in my Second Supplemental Report - see Table 6 and ¶ 64 to my Second Supplemental Report.
[43] Id.
[44] See Original Report, ¶¶ 45, 51.

one type of security – CMOs.[45] Dr. Holland's inconsistent selection methodology creates a bias in plaintiffs' favor. In summary, Dr. Holland indicates that *But for River Valley* would have purchased significantly more incremental CMOs that, in hindsight, performed better than expected (i.e., would have earned a higher yield than was expected at the time of purchase) than did the actual thrift.

27. For the CMO securities that River Valley actually purchased (i.e., the CMO securities that Dr. Holland uses as proxies for his *But for River Valley* scenarios), he indicates that River Valley earned a lower yield than expected on more than half of its purchases (54 percent) and a higher yield than expected on the rest (46 percent).[46] On average, this yield differential is approximately 3.7 basis points worse than that which was expected at purchase.

28. In contrast, the Holland Model III indicates that 62 percent of the incremental CMO securities assumed to be purchased by *But for River Valley III* would have performed better than expected at the time of purchase (i.e., would have earned a higher yield than was expected), and only 38 percent of the incremental CMOs would have performed worse than was expected at the time

---

[45] My analysis focuses on CMOs because the Holland Model III and Holland Model IV allow for a comparison of each CMO's expected yield at the time of purchase to the CMO's actual yield, which Dr. Holland calculated with "perfect hindsight." (May 13, 2005 Holland deposition, p. 641). Of the $747 million in incremental mortgage-backed securities that Dr. Holland assumes *But for River Valley III* would have purchased, $337 million (or 45 percent) of those hypothetical purchases are CMOs, which is the largest type of security assumed to be purchased (balloons, which comprise 26 percent of the assumed incremental purchases, represent the next largest category). The Holland Model III and Holland Model IV do not provide both expected and actual yields for Dr. Holland's other proxy securities. Both the expected and "actual" CMO yields used in this analysis are provided by Dr. Holland.

[46] These percentages are based on the total dollar volume of securities purchased rather than the number of securities purchased. Further, the analysis assumes that River Valley continued to hold the subject CMOs (this was not always the case), which is the operative assumption in each of the Holland Models.

of purchase (i.e., would have earned a lower yield than was expected).[47] The average yield differential implied by Dr. Holland for *But for River Valley III* is approximately 5.9 basis points better than expected.[48] In short, Dr. Holland's selection bias causes *But for River Valley's* incremental CMO portfolio to be weighted with more "winners" than was the case with the actual thrift.

---

[47] The corresponding percentages for *But for River Valley IV* are 65 percent (better than expected) and 35 percent (worse than expected), respectively.

[48] The corresponding yield differential for *But for River Valley IV* is approximately 8.7 basis points better than expected.

December 5, 2005

W. Barefoot Bankhead

W. Barefoot Bankhead