# EXHIBIT C

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HOMER J. HOLLAND, HOWARD R. ROSS, AND FIRST BANK, | ] | |
| Plaintiffs, | ] | |
| v. | ] | No. 95-524C |
| UNITED STATES OF AMERICA, | ] | (Judge George W. Miller) |
| Defendant. | ] | |

# DECLARATION OF DR. PAUL A. GRIFFIN

December 5, 2005

DEFENDANT'S EXHIBIT
DX 1478
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

## 1 Scope

1. This declaration responds to two aspects of the reasoning and analysis in First Bank's Motion for Summary Judgment of September 1, 2005 (hereafter, MSJ 2005), namely (1) the amount of additional taxable income that the River Valley companies would have earned had they been able to include San Antonio Federal Savings Bank (SAFSB) as a member of the group and (2) plaintiffs' argument that it is inappropriate to reduce plaintiffs' claim for damages because First Bank would have paid less for River Valley's remaining carryover tax savings in plaintiffs' no-breach world (in which SAFSB is included as a member of the group) than what was actually paid.

2. This declaration supplements my earlier reports–Griffin Expert Report (2002), Griffin Supplement to Expert Report (2004), Griffin 2nd Supplemental Expert Report (2005)–and my deposition testimony–Griffin Deposition (2002), and Griffin Deposition (2005). Section 2 summarizes the opinions in this declaration. Section 3 provides some relevant background. Section 4 discusses the additional taxable income to the River Valley group from SAFSB but for the breach. Section 5 discusses the actual and but-for-the-breach carryover tax savings from River Valley to First Bank.

## 2 Summary of opinions

- River Valley but for the breach could not have had $29.963 million of taxable income from the purchase of San Antonio Savings Bank (SAFSB) in August 1992, and, therefore, this amount as set forth in MSJ (2005) is inappropriate as a basis to measure damages from allegedly lost tax savings.

- The amount of taxable income that River Valley but for the breach could have realized from the potential sale of loans prior to the acquisition by First Bank depends critically on the structure that River Valley would have used to acquire SAFSB. Regardless of the structure assumed, the tax savings that might have been available to River Valley in a no-breach setting would also have been available in the breach setting had River Valley purchased SAFSB subsequent to WCHI but before purchase of River Valley by First Bank.

- My analysis of the actual income tax savings received by First Bank from the use of River Valley's carryover tax attributes is fully consistent with my measure of \$13.322 million of the fair value of the net deferred tax assets purchased by First Bank as of the date its purchase of River Valley. This amount far exceeds plaintiffs' estimate of \$3.7 million.

- First Bank would have paid less for the NOLs and other tax attributes of River Valley but for the breach because, in the no-breach setting, fewer carryover attributes were left to purchase. The excess of the tax savings purchased by First Bank over the amount of tax savings that First Bank, hypothetically, would have purchased but for the breach is qualitatively unchanged when I use the actual income tax savings received by First Bank as a measure of the tax savings purchased.

## 3 Background

3. Plaintiffs' MSJ (2005) sets forth, through argument of counsel, three alternative measures of the amount of additional income that the River Valley companies could have recognized for income tax purposes had they been able to include SAFSB as a member of the group from the date of acquisition by Western Capital Holdings, Inc. (WCHI), as of August 14 1992. The first derives actual SAFSB taxable income from acquisition date to the present as $44.930 million. Plaintiffs base their calculation on the actual tax returns of WCHI, in various corporate forms, from 1992 to 2004. The second refers to $35 million of SAFSB taxable income from possible gains on the hypothetical sale of SAFSB assets in 1993. Plaintiffs obtain this number from Griffin Deposition (2002). The third refers to $29.963 million of future taxable income that plaintiffs contend arose because WCHI underpaid for SAFSB by that amount at the time of its acquisition. The notion of a "bargain purchase" profit was first identified in Stokes Expert Report (2001) but was not presented as a stand-alone damage claim until MSJ (2005).

4. MSJ (2005) also refers to Griffin 2nd Supplemental Expert Report (2005) and disagrees with my conclusion that, had SAFSB's taxable income been included in the tax returns of the River Valley group, which would have enabled River Valley to utilize its NOL and other tax attributes, the consideration that River Valley would have received from First Bank for the carryover tax savings from River Valley would have been less than the carryover tax savings actually purchased by First Bank. That report conservatively estimates the carryover savings purchased as $13.322 million (Griffin 2nd Supplemental Expert Report 2005, 15).

5. That report, further, indicates that an analysis of the actual tax returns of First Bank from the date of acquisition of the River Valley companies in January 1995 would provide a useful check on the reliability of my $13.322 million calculation (Griffin 2nd Supplemental Expert Report 2005, 13). This declaration derives the actual tax savings based on First Bank's tax returns from 1993 to 2003. These were provided in response to an order of the court (Opinion and Order, 2005), although some schedules were missing. See letters from Mr. Roberson to Mr. Bergman (September 1, 2005 and September 9, 2005).

## 4 SAFSB's taxable income

6. This section discusses the three measures, as offered by plaintiffs, of the SAFSB taxable income that they assert could have been available to River Valley but for the breach. I examine them in reverse order. First, as stated in Griffin Expert Report (2002), my calculation of a built-in taxable gain from possible underpayment by WCHI to acquire SAFSB is significantly different from the built-in taxable gain as presented by Mr. Stokes. Thus, I disagree with plaintiffs that $29.963 million of future taxable gain from the "bargain purchase" would have been available to plaintiffs to offset River Valley's net operating loss (NOL) carryforwards had River Valley, rather than WCHI, acquired SAFSB in 1992. My earlier analysis documents those potential taxable built-in gains (the excess of fair value of SAFSB's net assets over their tax basis as of the date of acquisition) as between $1.020 million and $5.725 million (Griffin Expert Report 2002, 14-16).

7. With respect to the second measure, as offered by plaintiffs, the MSJ refers to my deposition testimony as suggesting that SAFSB "could have recognized $35 million at year-end 1993 by selling SAFSB's undervalued loans." (MSJ 2005, 23). Plaintiffs mischaracterize my testimony in this regard, which is based on SAFSB's disclosures of the fair value and carrying value of its financial instruments, including loans. As of December 31, 1993, the excess of fair value over carrying value for loans receivable was $24,570,709, and as of December 31, 1992, the excess of fair value over carrying value for loans receivable was $1,749,932 (WCH379 1268). The difference between the two excess amounts is $22,820,777. This difference can be viewed as an unrealized–and off-balance sheet–accounting gain accruing after December 31, 1992 in the books of SAFSB.

8. However, plaintiffs' amount is not a reliable measure of the additional potential gain that might have been reported in the consolidated tax returns of the River Valley companies had River Valley included SAFSB as a member of the consolidated group for tax purposes (under plaintiffs' no-breach scenario) in those years. The reason is that such additional income but for the breach should be based on the difference between the expected proceeds (assume fair value) and the tax basis in the SAFSB assets sold (now in the books of plaintiffs' no-breach River Valley).

9. Assets' tax bases, however, are typically not disclosed in GAAP financial reports and, therefore, must be estimated or obtained elsewhere. One approach, albeit an approximation, which also reflects my responses to certain deposition questions, considers the tax basis at the time of the actual asset acquisition, which would have approximated cost (fair value) of the assets purchased by WCHI because SAFSB was

purchased as a deemed asset acquisition with an IRC section 338 election (PHO058 2570). This structure treats the assets as sold at the acquisition price, and so the seller records a gain or loss on sale and the buyer (WCHI) records new tax bases based on the cost (fair value) of the purchased assets (also the initial carrying value). The tax bases for such purchased assets would then be lower than a subsequent carrying value if the carrying value were accreted over time to maturity value.

10. Under this approach, it is reasonable to assume that the potential taxable gains to SAFSB (as a member of the WCHI group) upon disposition of the assets at a certain date (e.g., December 31, 1993) would be higher than the potential accounting gain as of the same date by the amount of loan accretion since the date of acquisition. The financial statements of SAFSB report accumulated actual loan accretion from acquisition to December 31, 1993 as $1,552,158 for the period to December 31, 1992 and $6,795,567 for the year to December 31, 1993 (PHO071 1520).

11. On the other hand, in the no-breach setting, which is the relevant setting in this regard, it is unclear that River Valley would have used the same structure to purchase SAFSB, namely, a deemed asset acquisition with an IRC section 338 election, as this would have restated the assets' tax bases to fair value, which was lower, and, thus, unnecessarily increased SAFSB's taxable income from an assumed sale of loans as of December 31, 1993 causing River Valley to eventually pay more taxes.

12. If a non-taxable structure were to have been used, the potential taxable gain upon disposition of any or all of SAFSB assets with unrealized accounting gains at an assumed

date would be *lower* than the potential accounting gains by the amount of loan accretion since the date of acquisition. Those potential taxable gains from the sale of SAFSB assets with unrealized accounting gains could, in fact, be zero, to the extent that tax basis equals expected cash proceeds at the assumed date of disposition. A non-taxable structure, also, since it creates less taxable gain, would pose less risk in terms of IRC Section 269. This section gives the IRS broad power to disallow an NOL carryover deduction if an acquisition were undertaken to obtain tax savings that would not otherwise have been available.

13. Plaintiffs' assertion that SAFSB in the no-breach setting could have realized additional taxable profits from the sale of "undervalued loans" does not consider, however, the possibility that SAFSB in the breach world could have been purchased by the River Valley companies as early as January 1994 (Griffin Expert Report 2002). It is appropriate, therefore, to offset against the no-breach tax savings the lost tax savings in the breach world caused by the failure of River Valley to capitalize on an economically feasible transaction. Griffin Expert Report (2002) calculates an offset of $1.312 million based on SAFSB's *actual* taxable income to December 31, 1993. However, just as plaintiffs assert that SAFSB could have realized taxable gains from the sale of undervalued assets in the no-breach setting, such gains could also have been realized in the breach setting in the event that SAFSB merged with River Valley after the WCHI acquisition (assumed to occur in January 1994 in Griffin Expert Report 2002). In short, the larger the assumed taxable income from undervalued loans in the no-breach setting,

consistent with Griffin Expert Report 2002, the larger the offset for lost tax savings in the breach setting from not undertaking a clearly feasible transaction.

14. I note, finally, with respect to possible SAFSB taxable income from undervalued loans, that any or all the potential taxable gains, based on SAFSB's Statement 107 disclosures, occurred primarily in fiscal year 1993, and after December 31, 1992, and, therefore, could not have been reasonably expected or known at the time of the SAFSB acquisition in August 1992 (see, also, paragraph 9).

15. I have not examined SAFSB's tax returns, in all the various corporate forms, from 1992 to 2004, and, therefore, I do not express an opinion on the accuracy and appropriateness of plaintiffs' calculation based on those returns of the total taxable income that SAFSB would have contributed to the River Valley group during the entire period.

16. In the no-breach setting, however, that is, assuming SAFSB is a member of the River Valley group purchased by First Bank in 1995, as assumed by Dr. Holland, not only would the taxable income of SAFSB, which would be utilized to offset losses by River Valley prior to First Bank's acquisition, have the effect of reducing the fair value of tax savings to First Bank but, also, the post (First Bank) acquisition profits of SAFSB (within the First Bank group of companies) would have the effect of reducing the ability of First Bank's existing/other companies to benefit from tax savings from the River Valley acquisition. As such, in the no-breach setting, First Bank would have paid even less for the River Valley tax savings. My previous expert reports assume that in the no-breach

setting, the River Valley companies would have been able to use SAFSB's taxable profits for years December 31, 1992-1994 to reduce taxable income by $5.890 million (HO3003 1946, 2455, 1780, and 2436). Plaintiffs' MSJ includes a similar amount for SAFSB's taxable earnings from acquisition to December 31, 1994 as part of the total earnings of $44.930 million (MJS, 2005, 19).

## 5 Tax Savings to First Bank

This section describes my calculation of the income tax savings actually received by First Bank as a check on (1) whether this amount is consistent with what First Bank actually paid for those future tax savings when it purchased River Valley (it is) and (2) whether my calculation of damages from lost income tax savings would materially change if based on actual savings received rather than future savings purchased (it does not).

### 5.1 Tax Savings Based on First Bank's Tax Returns

17. This subsection outlines my calculation of the actual tax savings transferred to First Bank from River Valley based on the utilization of tax benefits as reported in First Bank's tax returns from 1995 to 2003. I obtain the actual NOL tax deduction from the schedule that supports line 29a of First Bank's tax returns. For example, I obtain a SRLY NOL deduction of $6,607,173 for 1996 as the sum of $4,780,931 (H&R-FBTR-BX3-1092) and $1,826,242 (H&R-FBTR-BX3-1093). I derive the actual year NOL deductions for the other years similarly. For years 2004-2009, I use the annual amounts per First Bank's reorganization disclosure statement (H&R-FBTR-BX3-1319) of $2,555,739 per year. Total NOL deductions through 2009 under this procedure aggregate

to $40,218,025. I also assume that an alternative minimum tax (AMT) credit carryforward of $810,210 is received, as indicated in the 1996 tax return (H&R-FBTR-BX3-1319), with the remainder spread equally over the remaining years (to 2009). For example, in 1997, First Bank received $31,965 from the utilization of AMT credits (H&R-FBTR-BX3-3016). I assume that these AMT amounts relate only to the AMT credit carryforwards from the River Valley companies.

18. The actual tax returns do not provide information regarding the net built-in losses, as other items in the returns (e.g., net capital gains) would likely include those built-in losses, assuming a deduction were made. I, therefore, use the same measure of net built-in gain as in my earlier reports, that is, $7,483,813 (PHO065 0052) and assume the savings are received ratably over four years. This is a conservative assumption in that it would be more likely, for tax purposes, that First Bank would accelerate the recognition of gross built-in losses (other than "permanent" items, such as the built-in amounts relating to the franchise ($9,735,000) and deposit base ($5,345,000)) relative to the recognition of built-in gains (PHO065 0051).

19. Under this procedure, my calculation of the total tax savings received by First Bank as of the date of the First Bank purchase ranges from $16,688,709 (without discounting) to $9,730,349 (discounted at 10.54%). Both amounts clearly exceed the $3.7 million amount that plaintiffs state as the total value of tax savings purchased by First Bank. This range of tax savings is fully consistent with the amounts in Griffin 2nd Supplemental Expert Report (2005).

5.2 Offset for difference in tax savings

20. This subsection uses the same methodology in Griffin Expert Report (2002/2005) to calculate the amount of offset for the difference in tax savings between the actual tax savings (section 5.1, also Griffin 2nd Supplemental Report 2005) and the hypothetical tax savings assuming that River Valley but for the breach would have acquired SAFSB in August 1992. As stated in my earlier expert reports, this offset reflects the fact that with fewer tax savings available to carryover from River Valley but for the breach, First Bank would have paid less for those tax savings. The amount of offset changes slightly from my earlier reports when I use the actual (after-the-fact) tax savings to First Bank (section 5.1) rather than the fair value of the tax savings (as of the acquisition by First Bank), as used earlier in Griffin 2nd Supplemental Expert Report (2005) to determine damages.

21. Specifically, when I use the actual tax savings to First Bank, the value of the tax savings to First Bank decreases to $7,178,797 for an offset of $9,509,912 (without discounting) and to $5,800,013 for an offset of $3,930,336 (discounted at 10.54%). Simply put, First Bank pays less for the tax savings because River Valley but for the breach has fewer to offer. River Valley, including SAFSB, within the First Bank group, of course, may be a more profitable company. My analysis considers this and assumes, but for the breach, that First Bank utilizes the carryover NOL and other benefits in accordance with IRC section 382 over a shorter period (three years versus 15 years). Section 382 places an annual limitation on the use of loss carryover deductions by an acquirer based on the value of the acquired company times an assumed interest rate.

22. Plaintiffs' MSJ (2005), also, states that "Dr, Griffin argues that because River Valley would have used NOLs to shelter SAFSB's income in the but-for world, fewer tax attributes would have been available to First Banks, *and that First Banks would therefore have reduced the price it was willing to pay for River Valley as a whole*" (italics added). Whereas the first part of this sentence correctly interprets my testimony, the italicized part does not. In fact, my analysis assumes the opposite, namely, that, based on plaintiffs' valuation approach, First Bank would have paid a higher price for the company as a whole, although included in that higher price as a whole would have been a reduced amount (relative to actual) for the tax savings component of that higher price.

23. MSJ (2005) also states per my 2005 deposition that if, in the no-breach world, the River Valley companies had converted additional net built-in losses to NOLs prior to purchase by First Bank, River Valley would have had more NOLs to sell to First Bank, possibly even the same amount as was available in the breach world ($40.466 million) (PHO065 0052). Assuming that to be the case, then, logically, First Bank would have paid more for the NOLs. But because certain built-in losses had been converted to NOLs it also would have paid less for the net built-in losses, with the total value of the tax savings remaining essentially unchanged except for any differences in the timing of utilization of the NOLs versus the net built-in losses. Indeed, because de minimus net built-in losses are not restricted by IRC section 382, such losses can be more valuable to an acquirer. In brief, plaintiffs' motion fails to complete the logic of the hypothetical, that if the entire $40.466 million were kept in tact, the net built-in losses transferred would be reduced dollar for dollar, with no significant overall change.

24. I retain the right to update this declaration should additional information become available.

I, Paul A. Griffin, declare under the penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Paul A. Griffin
Davis, California
December 5, 2005

**Additional Documents Considered**

First Banks, Inc. & Subsidiaries, Corporate Tax Returns, H&R-FBTR-BX2-0001 to 3279, H&R-FBTR-BX3-0001 to 3160, H&R-FBTR-BX4-0001 to 3148, and H&R-FBTR-BX5-0001 to 2991.

Opinion and Order by Judge Miller, August 1, 2005.

Paul A. Griffin, Deposition Testimony, February 11-13, 2002

Paul A. Griffin, 2nd Supplemental Expert Report, June 1, 2005.

Paul A. Griffin, Deposition Testimony, June 24, 2005.

Plaintiff First Bank's Motion for Summary Judgment, September 21, 2005.

River Valley Holdings and River Valley Savings Bank FSB, Corporate Tax Returns, H&R-FBTR-BX1-0001 to 1323 and H&R-FBTR-BX6-0001 to 0589.