# EXHIBIT D

7/27/01

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND AND
HOWARD R. ROSS

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

No. 95-524C

(Senior Judge Smith)

**CORRECTED EXPERT REPORT AND DECLARATION OF DR. HOMER J. HOLLAND**

DEFENDANT'S EXHIBIT
DX 1405
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

each difference. Then the damages equal the sum of the lost profits for each difference. I believe this path is easier to describe.

**J. LOST PROFITS: SAFSB ACQUISITION**

133. As discussed above, we did not acquire SAFSB through River Valley because of the government's breach of contract. Instead, we had no viable option but to acquire SAFSB through WCHI, thereby necessitating the sale of assets of River Valley and the contraction of River Valley's balance sheet. As explained above, we had to shrink River Valley because a smaller balance sheet -- fewer liabilities -- translated into a lower level of capital required by our regulators, and allowed us to use some of River Valley's capital to pay down River Valley's loans from ANB, as ANB required us to do as a condition precedent to financing our acquisition of SAFSB.

134. The asset shrinkage allowed us to pay off $6 million of the ANB loan to RV Holdings. Then, as agreed, ANB loaned $10.25 million to WCHI and WCHI acquired SAFSB.[116]

135. In the "but for" world, we would have acquired SAFSB through River Valley. Absent the government's breach of contract, River Valley would have had ample resources to acquire SAFSB directly and we would not have needed to obtain financing from ANB.[117] River Valley would have simply used its

[116] In addition, Howard Ross and I loaned $430,000 to WCHI.

[117] *See* Exhibit B for a discussion of capital levels in the "but for" world.

ready ability to borrow $10.25 million in the capital markets to fund the acquisition.[118]

136. In the "but for" world, we would not have formed and operated the holding company, WCHI.

137. River Valley would have used its tax losses to shelter SAFSB's taxable income. We also would have taken steps to maximize the use of River Valley's tax losses before we sold River Valley to First Banks.[119]

138. We would have saved tax, interest, and administrative expenses (paid by WCHI and funded by SAFSB in the actual world), while giving the original WCHI shareholders the same return that they obtained in the actual world.[120]

---

118 For simplicity in the lost profits calculations, I have minimized the number of differences between the "but for" world and actual events. Therefore, I assume the loan from Howard Ross and me to WCHI is merely made to River Valley.

119 By acquiring SAFSB in River Valley we would have been able to shelter SAFSB taxable income. Since NOLs expire over time, we would have accelerated the recognition of the taxable income as much as possible in order to utilize River Valley's losses as quickly as possible. Because we purchased SAFSB for $29.963 million less than the value of its net assets, we could have realized $29.963 million of income during 1992 through 1994. See Expert Report of S. Lynn Stokes.

120 Our acquisition of SAFSB through River Valley need not have resulted in any less financial gain for the minority shareholders of WCHI. For simplicity's sake, I have assumed that but for the breach we would have given the WCHI minority shareholders the same returns they obtained in the breach world. We could have accomplished this objective by having River Valley acquire SAFSB in August 1992 and operate it as a subsidiary of River Valley until River Valley was sold to First Banks. I assume that SAFSB obtains the same results in the "but for" world that it did in the actual world, and establishes a phantom stock incentive program to compensate the WCHI minority shareholders as if they were 40% owners of a holding company that owned SAFSB. In this scenario, we distribute the stock of SAFSB to a holding company owned by Howard Ross and me at or just before the closing of the sale of River Valley, giving SAFSB and the new holding company the same balance sheets, except for the timing of tax payments, that they had at that time in the actual world. In this fashion, Howard Ross and I could have had full use of River Valley's NOLs while still compensating the WCHI minority shareholders fully. I should emphasize that Howard Ross and I were sophisticated investors from a tax perspective, and we always made it a point to hire competent tax counsel to review the structure of our transactions prior to implementing them. Therefore, if this particular structure would have created any problems for us, we would have relied on our tax advisors to design a structure that achieved the same economic goals in the most tax efficient manner possible.

139. The lost profits from the SAFSB acquisition are the expense savings from having River Valley as the acquirer, rather than WCHI. As the holding company for SAFSB, WCHI incurred specific expenses that would have been either eliminated or reduced in the "but for" world.[121]

(a) WCHI incurred $1.708 million of interest expense on its loans at an interest rate of Prime + 2%, and

(b) WCHI incurred administrative expenses of $0.317 million.

(c) WCHI filed a consolidated tax return (including SAFSB's income) and incurred federal income tax expenses.[122]

140. River Valley would pay interest at its borrowing rate in lieu of the interest incurred on WCHI loans.[123] Table 2 shows the calculation of net interest savings, which equals $0.671 million ($0.657 million after tax).

---

[121] WCHI's only source of income was dividends from SAFSB. Dividends from SAFSB were used to pay WCHI expenses, to pay down the principal of the ANB loan, and to pay dividends to WCHI shareholders.

[122] *See* Western Capital Holdings, Inc. and Subsidiary Audit Reports: December 31, 1992, Ernest & Young, WCH-B76-0114-0158; December 31, 1993 and 1992, Unidentified Preparer, WCH-B79-1242-1277; December 31, 1994 and 1993, Deloitte & Touche, WCH-B75-1603-1628. Without NOLs to shelter the tax liabilities, it was in our best interest to defer and delay recognition of these liabilities even though all of the deferred and unrecognized liabilities would ultimately be paid. In the "but for" world, however, we would never have to pay those taxes that we could shelter. Therefore, in the "but for" world we would have accelerated the recognition of taxable income rather than defer or delay the recognition. *See* Expert Report of Lynn Stokes for a full discussion of WCHI's tax situation.

[123] WCHI made principal payments funded by dividends from SAFSB. I assume in the "but for" world that SAFSB funds the same payments to pay down the River Valley borrowings. Therefore, there is no difference from principal payments.

**Table 2**

| **Interest Expense Savings (millions)** | | | | |
|---|---|---|---|---|
| (annual average) | 8/92-12/92 | 1993 | 1994 | Total |
| Loan Principal | $ 10.250 | $ 7.928 | $ 4.856 | |
| ANB interest rate | 8.05% | 8.03% | 9.01% | |
| ANB interest expense | $ 0.317 | $ 0.636 | $ 0.437 | $ 1.390 |
| River Valley borrowing rate | 4.00% | 4.00% | 5.00% | |
| River Valley interest expense | $ 0.159 | $ 0.317 | $ 0.243 | $ 0.719 |
| Interest expense savings (income) | $ 0.158 | $ 0.319 | $ 0.194 | $ 0.671 |
| After-tax income | $ 0.155 | $ 0.312 | $ 0.190 | $ 0.657 |

141. WCHI incurred expenses to maintain a separate holding company, including the costs for an annual audit, an annual tax return, regulatory filings and examinations. These expenses would not have been incurred without the separate holding company, and would not have been incurred at River Valley in the "but for" world. The elimination of these expenses produces a savings of $0.317 million for the period, or after-tax income for River Valley of $0.310 million.

142. River Valley would use its NOLs to offset the obligation to pay taxes on SAFSB's taxable income. Taxable income of $29.963 million would have been recognized by River Valley during this period and sheltered by River Valley's tax losses.[124]

[124] *See* Expert Report of Lynn Stokes.

143. The tax savings from the acquisition of SAFSB by River Valley is equal to:

(a) \$29.963 million times 34% = \$10.188 million.

(b) Less an Alternative Minimum Tax (" AMT") payment equal to 2.12% times \$29.963 million, the amount of NOLs used (also the taxable income sheltered), or \$0.635 million.[125]

(c) Thus River Valley obtains a net tax savings of \$9.553 million.

144. The lost profits from the SAFSB acquisition would have accumulated to increase the River Valley Retained Earnings and would have been paid to Howard Ross and me as an increase in the purchase price for River Valley, as shown below.

| | (millions) |
|---|---|
| Net Tax Savings | \$ 9.553 |
| Net Interest and Administrative Expense Savings | \$ 0.967 |
| Total | \$10.520 |

K. **LOST PROFITS: GROWTH VERSUS SHRINKAGE**

145. We were required to shrink River Valley due to the government's breach.

146. From July 1988, when we entered into the first two contracts pursuant to which the government sold us regulatory capital, until July 1990, when we began to feel the adverse effects of the government's breach, River Valley increased its assets and liabilities by over 22% and grew from the acquisition of Peoria Savings.

[125] *See* Expert Report of Lynn Stokes for a full discussion of AMT. For the rest of my report, I calculate the after-tax income as after-AMT income, which is equal to 97.88% of the income before taxes.