# EXHIBIT 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **HOMER J. HOLLAND,<br>HOWARD R. ROSS, and<br>FIRST BANK,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **Case No. 95-524C**<br><br>**(Judge George W. Miller)**<br><br>**(*Winstar*-Related Case)**<br><br>**Declaration of Herb Held<br>Pursuant to 28 U.S.C. § 1746** |

HERBERT J. HELD, of full age, hereby deposes and says:

1. I am currently employed at the Federal Deposit Insurance Corporation, 17th St., N.W., Washington, DC, 20249. I have personal knowledge of the facts set forth in this affidavit.

2. For approximately five years, between 1984 and 1989, I was a regional director in the mergers and acquisitions division ("M&A Division") of the Federal Savings and Loan Insurance Corporation ("FSLIC") in Washington, DC. Since then, I have held various positions and titles at the FDIC and the Resolution Trust Corporation.

3. As part of my responsibilities as a regional director of the M&A Division, I was involved in discussions regarding the merger and acquisition of Galva Federal Savings and Loan Association of Galva, Illinois, Home Federal Savings and Loan Association of Peoria, Illinois, and Mutual Savings and Loan Association of Canton, Illinois, with and into River Valley Savings Bank, F.S.B., of Peoria, Illinois, which took place on July 29, 1988 (referred to, in combination, as "River Valley I").

DEFENDANT'S EXHIBIT
DX 1474
Holland v. U.S. 95-524C

4. As part of the River Valley I transaction, the FSLIC agreed to purchase a certain amount of class A preferred stock from River Valley I, which, at the time, the analysis and evaluation division ("AED") of the FSLIC valued as being worth $6.516 million and which the FSLIC purchased for $5 million. It was my understanding, however, that the AED did not, and did not intend to, calculate the market value of the preferred stock purchased by the FSLIC at a particular point in time. Instead, the AED's valuation of the preferred stock was for the much more limited purpose of determining, in the larger context of the River Valley I transaction as a whole, the cost to the FSLIC of the acquisition. The AED did not measure how much the preferred stock would actually be worth on the open market. This is borne out by several observations about the AED's analysis.

5. For example, the discount rate used to value the "fixed dividend" portion of the preferred stock (12.72 percent) was the long term junk bond rate at the time. Unlike a typical junk bond, however, the River Valley I preferred stock was a very small issue and was issued by a company with no track record of performance. Thus, this discount rate was not intended to reflect the true market rate for the River Valley I preferred stock but, again, was used solely to determine the cost of the preferred stock to the FSLIC in the larger context of the River Valley I transaction as a whole.

6. In addition, the AED's valuation of the thrift's discounted cash flows, which was critical to its valuation of the preferred stock, was based, to a large extent, upon numerous assumptions derived from the thrift's own business plan. But because River Valley I was, again, a new firm with no track record of performance, the AED's forecast of the thrift's viability and profitability ten years into the future, which was based upon those very assumptions supplied by

the thrift itself, was speculative. This speculation, in turn, caused a great deal of uncertainty in the cash flows predicted by the AED when valuing the preferred stock. This uncertainty further confirms that the AED's analysis in general, and the discount rate it used for the fixed dividend portion of the preferred stock in particular, while sufficient for the limited purpose of determining the cost of the preferred stock in the larger context of the River Valley I transaction as a whole, was not intended to value how much the stock would be worth on the open market.

7. For all of these same reasons, the discount rate used for the "profit sharing" portion of the preferred stock (16 percent) also did not reflect the rate that would have applied if AED had tried to determine the stock's market value. This is especially true because the profit sharing component was entirely dependent upon the thrift's future cash flows, which, as discussed above, contained a great deal of uncertainty. Once again, the AED's analysis was not meant to reflect a market value of the discount rate, but simply to calculate the preferred stock's cost to the FSLIC as part of a larger overall transaction.

8. It was also my understanding at the time of the River Valley I transaction that whether the preferred stock issued to the FSLIC could be included in River Valley I's regulatory capital was determined by regulations that existed at the time. See 12 C.F.R. § 561.13(d) (1988). For this reason, we did not include any mention of the preferred stock in the River Valley I assistance agreement. It was our policy at that time that, if the regulations allowed a thrift to count certain items towards regulatory capital, we would not put that in an assistance agreement.

I declare, upon this 29 day of November, 2005, under penalty of perjury that the foregoing is true and correct.

Herbert J. Held

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOMER J. HOLLAND, HOWARD R. ROSS, and FIRST BANK, Plaintiffs, v. THE UNITED STATES, Defendant. | Case No. 95-524C<br>(Judge George W. Miller)<br>(Winstar-Related Case)<br>Declaration of J. Richard Earle Pursuant to 28 U.S.C. § 1746 |

J. RICHARD EARLE, of full age, hereby deposes and says:

1. I currently reside at 373 Woodhurst Dr., Hartwell, GA, 30643. I have personal knowledge of the facts set forth in this affidavit.

2. For approximately four years, between 1984 and early 1988, I was the regional director in the mergers and acquisitions division ("M&A Division") of the Federal Savings and Loan Insurance Corporation ("FSLIC") in Washington, D.C. I then became the "Southwest Plan Coordinator" for the FSLIC for a brief period, after which I returned to the FSLIC as the director of the M&A Division. I subsequently held various other positions and titles with the Resolution Trust Corporation ("RTC") and the Federal Deposit Insurance Corporation ("FDIC") until my retirement in 1996.

3. As part of my responsibilities as a regional director, and then director, of the M&A Division, I was involved in discussions regarding the merger and acquisition of Galva Federal Savings and Loan Association of Galva, Illinois, Home Federal Savings and Loan Association of Peoria, Illinois, and Mutual Savings and Loan Association of Canton, Illinois,

DEFENDANT'S EXHIBIT
DX 1475
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

with and into River Valley Savings Bank, F.S.B., of Peoria, Illinois, which took place on July 29, 1988 (referred to, in combination, as "River Valley I").

4. As part of the River Valley I transaction, the FSLIC agreed to purchase a certain amount of class A preferred stock from River Valley I, which, at the time, the analysis and evaluation division ("AED") of the FSLIC valued as being worth $6.516 million. It was my understanding, however, that the AED did not, and did not intend to, place a true market value on the preferred stock purchased by the FSLIC at a particular point in time. Instead, the AED's valuation of the preferred stock was for the much more limited purpose of determining, in the larger context of the River Valley I transaction as a whole, whether the paper cost of the acquisition was less than the paper cost of liquidation. As a result, the AED's valuation of the preferred stock contained several important limitations that prevented it from measuring the true market value of the stock.

5. For example, it was my understanding at the time that the AED valued a thrift's liabilities (i.e., its deposits) only within a ten percent range. Such a large margin of error is particularly noteworthy, considering that valuing a thrift's liabilities is a relatively straightforward and objective exercise, unlike valuing its assets (i.e., the various loans on its books), which requires a great deal of subjectivity.

6. Similarly, AED had no means of reliably valuing a thrift's assets. Specifically, it was virtually impossible for AED to put an accurate price on a troubled thrift's classified loans due to the uncertainty of whether those loans ultimately would default.

7. This unreliability in valuing River Valley I's assets and liabilities would have caused a corresponding inaccuracy in valuing the thrift as a whole and, by necessity, the thrift's

preferred stock. The balance sheet of a thrift, as of any other business, can be expressed as follows: assets equals liabilities plus capital. It is also elementary that a thrift leverages its capital to support its assets, such that a relatively small amount of capital can be used to support a proportionately larger amount of assets. If, however, a valuation of a thrift's assets overestimates the recovery value of those assets by, for example, just one percent, that would cause a significant reduction in the amount of capital available to the thrift. Again, if a thrift's liabilities were underestimated by ten percent, this would result in a substantial reduction in the thrift's capital position. And all of this, in turn, would have a direct impact on how much value would have been placed on River Valley I's preferred stock.

8. It was also my understanding at the time of the River Valley I transaction that whether the preferred stock issued to the FSLIC could be included in River Valley I's regulatory capital was determined by regulations that existed at the time. See 12 C.F.R. § 561.13(d) (1988). For this reason, we did not include any mention of the preferred stock in the River Valley I assistance agreement. It was our policy at that time that, if the regulations allowed a thrift to count certain items towards regulatory capital, we would not put that in an assistance agreement.

9. In July 1988, at the time of the River Valley I transaction, I did not actually foresee, nor would I have had reason to foresee, that River Valley I would seek to use the net operating losses ("NOLs") it acquired in connection with the River Valley I assistance agreement with a third party entity acquired by way of merger. In fact, the River Valley I assistance agreement specifically prohibited any rights under that agreement from transferring or vesting in any other party through merger, consolidation, or otherwise, without the prior written consent of the FSLIC. River Valley I Assistance Agreement § 25. The assistance agreement further

specified that all of the conditions and provisions under that agreement were for the sole benefit of the parties to the agreement and "for the benefit of no other person or persons." Id. § 26. In accordance with these provisions, we viewed the River Valley I transaction as a stand alone deal and did not intend or expect that River Valley I would use the NOLs it acquired through the assistance agreement to shelter the profits of third-party companies that it might acquire afterwards, at least not without the FSLIC's prior written consent.

10. More generally, we took the principles embodied in the "Successors and Assigns" and the "Sole Benefit" clauses, like those found in sections 25 and 26 of the River Valley I assistance agreement, very seriously and viewed them as indispensable to any assistance agreement. I can recall occasions in which a potential assistance agreement was aborted when the signatories insisted that the "Successor and Assigns" and "Sole Benefit" clauses be removed from the agreement. We were adamant that only the signatories to an assistance agreement could use the benefits obtained under such an agreement, and that those benefits could not be shared with any other party – even related entities such as subsidiaries, holding companies, or other entities formed through merger, acquisition, consolidation, or otherwise.

11. In July 1988, at the time of the River Valley I transaction, I did not actually foresee, nor would I have had reason to foresee, that, if the Government required River Valley I to phase out its use of the regulatory capital associated with the River Valley I assistance agreement, a so-called cross-guaranty provision (enacted as part of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989)), which holds a person or entity liable for defaults on loan payments made by a related party, such as a subsidiary, would have any effect upon River Valley I's capacity to borrow funds to acquire

an unrelated thrift in Texas. My only concern with the River Valley I assistance agreement was whether River Valley I would be viable as a stand alone institution; I therefore had no reason to contemplate whether a lender would be unwilling to make a loan to River Valley I to acquire an unrelated thrift in the future because of the potential that River Valley I would be legally responsible for that other thrift's liabilities.

I declare, upon this 29th day of November, 2005, under penalty of perjury that the foregoing is true and correct.

J. Richard Earle

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

DEFENDANT'S EXHIBIT
DX 1476
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

| | |
|---|---|
| **HOMER J. HOLLAND, HOWARD R. ROSS, and FIRST BANK,** | **Case No. 95-524C** |
| **Plaintiffs,** | **(Judge George W. Miller)** |
| **v.** | **(Winstar-Related Case)** |
| **THE UNITED STATES,** | **Declaration of Helen K. Mirza Pursuant to 28 U.S.C. § 1746** |
| **Defendant.** | |

HELEN K. MIRZA, of full age, hereby deposes and says:

1. I currently work at the Federal Reserve Bank, 230 S. LaSalle St., Chicago, IL, 60604. I have personal knowledge of the facts set forth in this affidavit.

2. For approximately 4 years, between 1986 and 1989, I was employed as a supervisory agent and, for a portion of that time, the Vice-President of mergers and acquisitions by the Federal Home Loan Bank of Chicago ("FHLB-Chicago"), a portion of which was renamed as the Office of Thrift Supervision, Chicago office, in 1989. As a supervisory agent, I was directly responsible for a caseload of savings and loan institutions under the jurisdiction of the FHLB-Chicago. As the Vice-President of mergers and acquisitions, I was responsible for setting up, and then running, the mergers and acquisitions program of the FHLB-Chicago, pursuant to the delegated authority of the Federal Savings and Loan Insurance Corporation ("FSLIC").

3. As part of my responsibilities with the FHLB-Chicago, I reviewed the application and related materials regarding the merger and assisted acquisition of River Valley Savings Bank of Rock Falls, Illinois, with and into Republic Savings, A Federal Savings and Loan Association

of South Beloit, Illinois (referred to, in combination, as "River Valley II"), which took place on July 29, 1988.

4. In July 1988, at the time of the River Valley II transaction, I did not actually foresee, nor would I have had reason to foresee, the passage of a law such as the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989), in general or, more particularly, that the Government would not allow River Valley II to continue to use the regulatory capital associated with the River Valley II assistance agreement towards its regulatory capital requirements.

5. In July 1988, at the time of the River Valley II transaction, I did not actually foresee, nor would I have had reason to foresee, that, if the Government required River Valley II to phase out its use of the regulatory capital associated with the River Valley II assistance agreement, River Valley II would not seek to replace that regulatory capital with new capital. Similarly, I did not actually foresee, nor would I have had reason to foresee, in 1988 that, if River Valley II actually sought to replace any such lost regulatory capital, it would be unable to locate a source of funds to do so in the capital markets. In particular, as of July 1988, I did not actually foresee, nor would I have had reason to foresee, that River Valley II, at a time of future need of capital, would be restricted, or consider itself to be restricted, to seeking capital from a single lender. All of this is especially true if River Valley II intended to use that capital to take advantage of valuable and highly profitable investment opportunities.

6. In July 1988, at the time of the River Valley II transaction, I did not actually foresee, nor would I have had reason to foresee, that, if the Government required River Valley II to phase out its use of the regulatory capital associated with the River Valley II assistance

agreement, a so-called cross-guaranty provision (enacted as part of FIRREA), Pub. L. No. 101-73, 103 Stat. 183 (1989)), which holds a person or entity liable for defaults on loan payments made by a related party, such as a subsidiary, would have any effect upon River Valley II's capacity to borrow funds to acquire an unrelated thrift in Texas. As I state below, my only concern with the River Valley II assistance agreement was whether River Valley II would be viable as a stand alone institution; I therefore had no reason to contemplate whether a lender would be unwilling to make a loan to River Valley II to acquire an unrelated thrift in the future because of the potential that River Valley II would be legally responsible for the acquired thrift's liabilities, or vice-versa.

7. In July 1988, at the time of the River Valley II transaction, I did not actually foresee, nor would I have had reason to foresee, that River Valley II would seek to acquire a thrift located in Texas over three years later, in January 1992, which was far beyond River Valley II's location in central and northern Illinois and three and one-half years after the effective date of the assistance agreement. To the best of my recollection, neither Mr. Holland nor Mr. Ross had shown interest, as of July 1988, in acquiring thrifts outside of Illinois or Wisconsin.

8. In July 1988, at the time of the River Valley II transaction, I did not actually foresee, nor would I have had reason to foresee, that River Valley II would seek to acquire a thrift from the Resolution Trust Corporation over three years later, and, soon thereafter, sell it at a substantial profit. Again, my only concern with the River Valley II assistance agreement was whether River Valley II itself would be a viable institution, not whether it could acquire insolvent thrifts that had been seized from a Government agency that did not yet exist.

9. It was my understanding that the River Valley II assistance agreement specifically prohibited any rights under that agreement from transferring or vesting in any other party through merger, consolidation, or otherwise, without the prior written consent of the FSLIC. River Valley II Assistance Agreement § 25. The assistance agreement further specified that all of the conditions and provisions under that agreement were for the sole benefit of the parties to the agreement and "for the benefit of no other person or persons." Id. § 26. In accordance with these provisions, we viewed the River Valley II transaction as a stand alone deal and did not intend or expect that River Valley II would use the assistance it acquired through the assistance agreement to shelter the profits of third-party companies that it might acquire afterwards, at least not without the FSLIC's prior written consent.

I declare, upon this 30th day of November, 2005, under penalty of perjury that the foregoing is true and correct.

Helen K. Mirza
Helen K. Mirza

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **HOMER J. HOLLAND, HOWARD R. ROSS, AND FIRST BANK,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 95-524C** |
| | ) | **(Judge George W. Miller)** |
| **THE UNITED STATES,** | ) | **Declaration of Charles A. Fulton Pursuant to 28 U.S.C. § 1746** |
| **Defendant.** | ) | |

CHARLES A. FULTON, of full age, hereby deposes and says:

1. I reside at 5826 Oregon Avenue, N.W., Washington, D.C. 20015. I have personal knowledge of the facts set forth in this declaration.

2. I am a 1980 graduate of the Marshall-Wythe School of Law, College of William and Mary. I have been employed as an attorney at the Federal Deposit Insurance Corporation ("FDIC") since April 1989. My current title is Counsel, Special Issues Group.

3. In 1991, my title at the FDIC was Counsel, Thrift Agreement Administration and Oversight Section. In April 1991, I became the principal legal advisor in the Resolution Trust Corporation ("RTC") with respect to the effort to modify, renegotiate, and restructure the assistance agreements entered into by the former Federal Savings and Loan Insurance Corporation ("FSLIC") in 1988 in its "Southwest Plan." Between 1991 and approximately 1997, first in the RTC, and later in the FDIC, I developed legal policy for, and participated in, the modification, renegotiation, restructuring, and termination of more than a dozen FSLIC assistance agreements.

DEFENDANT'S EXHIBIT
DX 1482
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

4. In August 1991, I assisted in the FDIC's settlement of certain assistance agreements entered into in 1988 between the FSLIC and River Valley Savings Bank, F.S.B. of Peoria, Illinois, and the FSLIC and River Valley Savings Bank of Rock Falls, Illinois. See Tabs 1 and 2 respectively.

5. On or about August 12, 1991, I sent River Valley Savings Bank, F.S.B., and its attorneys, Holleb & Coff, a copy of a proposed Settlement Agreement between River Valley Savings Bank, F.S.B., et al., and the FDIC. See Tab 3. At pages 8-9 of that proposed Settlement Agreement, at Section 5, a broad accord and satisfaction clause was set forth.

6. On or about August 13, 1991, I received a letter from Mark S. Kipnis, counsel for Holleb & Coff, in which he enclosed, among other things, a draft legal opinion letter concerning the validity of the Settlement Agreement and the capacity of the thrift to enter into that agreement. See Tab 4. At page 2 of that opinion, at paragraph 3, Holleb & Coff opined that the Settlement Agreement "is a legal, valid, and binding obligation of [the] bank, enforceable against such bank in accordance with its terms."

7. On or about August 14, 1991, I received, among other things, an executed version of the Settlement Agreement and the Holleb & Coff opinion letter. See Tab 5.

8. On or about August 14, 1991, the Settlement Agreement was executed by River Valley Savings Bank, F.S.B., in its own right and as successor by merger to River Valley Savings Bank, Homer J. Holland, Howard R. Ross, and the FDIC. See Tab 6. The broad accord and satisfaction clause, identical to that in the draft Settlement Agreement referenced above, was set forth at pages 8-9 at Section 5 of the agreement.

9. As the language of the Settlement Agreement states, it was the intent of the FDIC in entering into the Settlement Agreement to "effect a complete accord and satisfaction of any and all obligations and liabilities" of the parties "under the Assistant Agreements." See Tab 6 at pages 8-9 at § 5. This included "without limitation, any and all actions, causes of action, suits, debts, sums of money, bonds, covenants, agreements, promises, damages, judgments, claims, and demands whatsoever, known or unknown, suspected or unsuspected, at law or in equity." Id.

10. It was the intent of the FDIC that the agreements that permitted the River Valley thrifts to utilize certain regulatory capital contributions and subordinated debt issuances toward their regulatory capital computations, contained within the River Valley Assistance Agreements, would be subject to the 1991 Settlement Agreement's accord and satisfaction clause.[1]

11. Specifically, it was our intent that the right to utilize $8 million of the cash contributions toward regulatory capital computations, as set forth at page 31-32 of the Assistance Agreement with River Valley Savings Bank, F.S.B., and the right to include $4.6 million of the subordinated debenture toward its regulatory capital computations, as set forth at pages 32-33 of that agreement (see Tab 1 at 31-33), would be subject to the accord and satisfaction provision in the Settlement Agreement. Similarly, it was our intent that the right to utilize $5 million of the cash contribution toward regulatory capital computations, as set forth at pages 18-19 of the Assistance Agreement with River Valley Savings Bank (see Tab 2 at 18-19) would be subject to the accord and satisfaction provision in the Settlement Agreement.

---

[1] Based on my experience, it was relatively unusual for the terms of regulatory capital assistance to be set forth within assistance agreements themselves, as they were in the River Valley assistance agreements.

12. In short, in executing the Settlement Agreement, it was the FDIC's intent that the River Valley thrifts and the FDIC would effect a complete conclusion to the Assistance Agreements and that the parties would completely settle and walk away from each other with respect to any rights or obligations connected with those agreements, including the assistance with regard to regulatory capital computations set forth in the Assistance Agreements as detailed above.

13. The FDIC's settlement of the Assistance Agreements in its capacity as the Manager of the FSLIC Resolution Fund bound the FDIC to the terms of the Settlement Agreement.

I declare, upon this 14th day of February 2006, under penalty of perjury that the foregoing is true and correct.

Charles A. Fulton

CHARLES A FULTON