# EXHIBIT A

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**HOMER J. HOLLAND EXPERT DEPOSITION DESIGNATIONS**
***(incorrect preliminary draft deposition citations)***

6/27/2007 Tr. 7:6-9
6/27/2007 Tr. 8:19–12:17
6/27/2007 Tr. 28:6-11
6/27/2007 Tr. 32:14–36:6
6/27/2007 Tr. 55:4-13
6/27/2007 Tr. 57:19–62:2
6/27/2007 Tr. 63:11-19
6/27/2007 Tr. 65:17–68:4
6/27/2007 Tr. 70:9–71:2
6/27/2007 Tr. 71:12–72:11
6/27/2007 Tr. 86:4-13
6/27/2007 Tr. 87:16-19
6/27/2007 Tr. 93:8–94:2
6/27/2007 Tr. 94:19–97:3
6/27/2007 Tr. 98:1–99:4
6/27/2007 Tr. 100:13–101:1
6/27/2007 Tr. 105:8–107:11
6/27/2007 Tr. 107:18-22
6/27/2007 Tr. 121:18-21
6/27/2007 Tr. 122:16–123:5
6/27/2007 Tr. 124:7–125:7
6/27/2007 Tr. 131:14–132:6
6/27/2007 Tr. 134:8–135:8
6/27/2007 Tr. 147:7-19
6/27/2007 Tr. 154:4-10
6/27/2007 Tr. 155:10–157:5
6/27/2007 Tr. 180:5-14
6/27/2007 Tr. 191:10–192:16
6/27/2007 Tr. 198:9-14
6/27/2007 Tr. 204:5–205:20
6/27/2007 Tr. 212:12–213:1
6/27/2007 Tr. 213:19–217:1
6/27/2007 Tr. 218:17-22
6/27/2007 Tr. 221:6–223:4
6/27/2007 Tr. 223:17-20
6/27/2007 Tr. 238:2–239:3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x
HOMER J. HOLLAND, HOWARD R. :
ROSS, and FIRST BANKS, INC., :
Plaintiffs, : Case No. 95-524C
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, June 27, 2007

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of United States Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:00 a.m., Wednesday, June 27, 2007, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:
MICHAEL A. JOHNSON, ESQ.
JOSHUA P. WILSON, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5783

On behalf of the Defendant:
JOHN H. ROBERSON, ESQ.
SCOTT D. AUSTIN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-7972

ALSO PRESENT:
GOR AGHABEKYAN, Videographer
JEFF JACQUES, ^ CHK
JEFFREY P. YUSHCHAK, Navigant Consulting

3

examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. ROBERSON:

Q. Good morning, Dr. Holland.

A. Good morning.

Q. You've been deposed a number of times in this case, correct?

A. That's correct.

Q. So you sort of know the drill of the things that we do in the beginning of the deposition as to if you need a break, be sure to ask us for one; if you need a question clarified, you'll ask for that; verbal responses instead of a nod of the head, that sort of thing?

A. Yes, sir.

Q. Are you comfortable with that? And just to make sure there is no -- you're not on any medication or anything that would affect your memory

7

at the present time?

A. I'm not on any medication.

Q. And there is nothing that would affect your memory?

A. No.

Q. Is there any portion of your expert report that was drafted at least in part initially by an attorney?

A. Yes.

Q. Can you tell us what parts of your report -- and actually, why don't we do this. Why don't we go ahead and distribute your report now so you can point us to the parts that were drafted by an attorney. And we'll have to mark this as Exhibit 1.

(Exhibit No. 1 was marked for identification.)

THE WITNESS: Well, let me give you a little --

MR. JOHNSON: Let me object to the question as vague in the term drafted.

THE WITNESS: The background of this report is that last year we started in discussions



with counsel with respect to our damages theories and decided it would be appropriate to look at the retained earnings costs as a measure of damages, as a partial measure of damages and, with that, we started talking about the forms, the way this would be calculated and together decided to interview Cornerstone Research who I had interviewed when we

first began these cases and chose at that time not to use. So I used cornerstone as staff for the calculations ^ and the ^ in the Excel spreadsheets and the charts under my direction and used Arnold & Porter services for capturing much of what is on the report in the narrative form. This is a collaborative discussion that we had. The ideas in this are mine. I don't remember whether -- who drafted which pieces of it but at the end of the day, I am responsible for the entire report.

BY MR. ROBERSON:

Q. Now, I understand you're responsible for the report but my question was -- and I thought you initially said that, yes, there were portions that were drafted by Arnold & Porter. Could you point us



to any section here that was not drafted by Arnold & Porter?

A. I don't know exactly what you mean by drafted. I mean, I think that I covered orally things with Arnold & Porter as to what I thought should be in the report, they captured that and prepared several drafts of the report.

Q. And so when I meant the word drafted, I

meant actually put words to paper. So is it correct that the words being put to paper was -- the words were put on paper by Arnold & Porter and they did several drafts of the report?

A. I would say putting words on paper ^ . , I think that the concepts, the thoughts and many of the words are mine which I articulated to Arnold & Porter and they created drafts from that.

Q. Are there any ideas in here or any drafts here -- let's get back to the question. Is there any portion of this report that was not given to you in a draft form by Arnold & Porter?

A. I don't remember precisely what things we changed through the drafting process but there would



have been things that I have edited and expressed in my own words but I don't remember precisely which ones.

Q. So there is not any particular point in this document you can point to and say, this is my work solely?

A. Again, I said I take full responsibility for the report. At the end of the day, it's the report that I signed and -- but I did have assistance from Arnold & Porter in the drafting of the report.

Q. And who at Arnold & Porter?

A. Michael Johnson.

Q. Anyone else?

A. I believe Josh might have been involved in some of the discussions.

Q. That's Joshua Wilson?

A. Josh Wilson.

Q. And just for the record, Scott Austin from the Department of Justice has joined us. Let's talk about what cornerstone did for you. Did they put any input into the drafting of the document?

A. Not really, no. Cornerstone -- well, I'm



going back. At the beginning of the discovery process or at the beginning of this case when we were contemplating various damages approaches, I ^ interviewed ^ contacted Katie Galley with the thought that cornerstone could operate as a staff to me in preparing damages reports, expert reports. At that time, I still had in my employ a person who had been with me at River Valley who was expert at preparing projections and business plans and I chose at that time to use her. This time, as we thought about the use of ^ or the cost of capital as it

pertains to retained earnings as a monsieur of damages, I no longer have a staff person and went back to -- talked to Katie and one of her associates, Heather Houston, about them providing this same kind of staff role that I had previously with a woman called Susan Ells, named Susan Ells. Cornerstone, under my direction, prepared the Excel spreadsheets that are part of the exhibits as well as the charts that are in here. We had a number of conversations with counsel going through the particulars of the capital structure at River Valley and how -- and the

12

decisions one would make in best trying to calculate the costs there.

To the best of my knowledge, Cornerstone was not involved in the narrative of the report but they were responsible for the exhibits, for those exhibits relating to the Excel spreadsheets.

Q. Can you just tell us what exhibits exactly those are?

A. Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F, Exhibit G, Exhibit H, Exhibit I, Exhibit J, K, L, M, N, O.

Q. And is that all of them except for A?

A. That's correct.

Q. And who prepared Exhibit A?

A. That was part of the drafting of the narrative which was -- for which I got assistance from Arnold & Porter.

Q. Did you provide Arnold & Porter with this list of documents that you considered?

A. This was a list that we discussed and I asked them to compile it.

Q. And a moment ago you said it was to the



best of your knowledge that cornerstone wasn't involved in the drafting of the narrative. Are you 100 percent certain that cornerstone wasn't involved in drafting the narrative?

A. I'm not 100 percent certain but that's my best recollection.

Q. And you're not 100 percent certain because the draft was coming to you from Arnold & Porter?

A. There were several discussions between myself, cornerstone and Arnold & Porter. There were other discussions where cornerstone was getting data from Arnold & Porter. There would have been discussions between Arnold & Porter and cornerstone but to the best of my knowledge, cornerstone did not

were presented to the Court and I -- I guess that my general response would be that I -- it's my understanding that the Court has authorized this damages presentation to be made so I think that probably settles it as far as I'm concerned.

Q. Okay. Well, would you agree that your new report is not based upon newly discovered factual evidence?

A. I would say it's as I described to you. At the end of last quarter, we discussed different damages theories and those that had gained some traction or at least had seemed to have been affirmed by the court of appeals and that seemed appropriate for us to consider that as a damage calculation for River Valley.

Q. Okay. But my question was, you say that you issued a new report because you became aware of new damage theories, correct?

28

A. I think for me personally, it became to the point of appreciating that there seemed to be some appeal -- appeal is maybe the wrong word to use in the legal context. Some acceptance of the concept of retained earnings and cost of capital.

Q. Right. So it was a new theory that you found had a new appeal to you. But there weren't any new facts that you discovered with this case, is that correct?

A. With respect to this report, I don't believe that it was based on new facts.

Q. And so there are no new facts concerning River Valley's operations taken in the broadest possible matter that you've only recently become aware of, correct?

MR. JOHNSON: Objection, vague. You can answer, Dr. Holland.

THE WITNESS: Taken in its broadest sense?

BY MR. ROBERSON:

Q. I'm not holding anything back. In other words, I'm saying there is nothing new concerning River Valley's operations that you just discovered

29

that led you to believe that, well, now I need to look at a retained earnings theory. You didn't learn anything new about River Valley's operations. There were no facts hidden from you previously?

A. I don't -- again, I think my motivation to prepare this report was as I've said. I haven't based it on any new facts that were available to me.

begins, "Further."

A. Further, plaintiffs seek to leave -- seek leave?

Q. Yes, if you could just read that.

MR. JOHNSON: Dr. Holland, take as much time as you need to get familiar with the document so you can understand the context of that quote.

THE WITNESS: Okay.

BY MR. ROBERSON:

Q. Yeah, I was just reading you what the statement was.

A. Yes.



Q. And then in plaintiffs' reply motion in support of the motion for leave to allow you to issue a third supplemental report, plaintiff further reiterated -- and I'll just read the statement and then if you want to look at the document, you can. They reiterated that plaintiffs here have a right to present damages claims at trial that adhere to the guidance provided by the Federal Circuit in its Winstar damages decisions. And my question is, are you aware of those representations?

A. I have seen this motion in the past. I

don't remember. This is some time ago. So yes, in general, I am aware of this.

Q. And let's look at the justification you set forth for your new report as set forth in your third supplemental report and what we'll do is look at your report at paragraph 6 and there you state, "Decisions of the Court of Federal Claims and the Federal Circuit in other Winstar-related cases have endorsed calculations of mitigation costs measured in part by the cost to the plaintiff of retaining earnings to replace the contracted for regulatory



capital." Do you see that?

A. Yes.

Q. And then you have a footnote and in footnote 1, you write, "For example, the Federal Circuit's decisions in both Home Savings and LaSalle Talman affirm damages awards based in part on the costs of retained earnings that replaced contracted-for regulatory capital after the government's breach." Do you see that?

A. Yes.

Q. Did you write that footnote?

A. I think that was -- in this particular case, I think I deferred to counsel expressing this

particular point.

Q. Now, are there any other Winstar-related cases, including those at the trial court level, that is, at the Court of Federal Claims, that you considered in coming to your belief that a retained earnings theory presents a viable claim that you should now set forth?

A. Again, I go back to the discussions I had with counsel where I did not get into all of the



cases or I don't remember all of the cases that were discussed, just that the -- I think that the point in paragraph 6 and the point in the plaintiffs' motion for leave to revise seem fairly -- as I recall, that, as the point I made before, there seem to be some traction with respect to the endorsing of calculations, as it says here, endorsed calculations of mitigation costs measured, in part, by the cost to the plaintiff of retained earnings.

Q. So you can't recall any other cases?

A. I do not recall at this point.

Q. And do you recall reviewing the LaSalle Talman opinion?

A. I remember quite some time ago reviewing

the LaSalle Talman decision and in part because I knew the people at LaSalle Talman. Ted Roberts, who was the CEO at the same time, was someone that I knew.

Q. Out of Chicago?

A. Out of Chicago. But I have to say that today I don't remember much about the LaSalle Talman opinion that I read at that time.



Q. So you're not sure if there is anything in LaSalle Talman that actually discusses retained earnings?

A. I would say that, again, the reason why LaSalle Talman sticks in my mind is because of my ties to Chicago as well as knowing Ted Roberts and right now, I can't remember precisely how the specifics of the retained earnings calculations in that case were applied. My discussions of the use of the retained earnings costs as a measure of damages were somewhat abstracted from the specifics of those two cases.

Q. Is it your -- you said that you're not sure how the specifics of the retained earnings calculations, I believe, were set forth in LaSalle Talman. Was that what you just said?

A. I believe that's -- we can see what I just said. I don't know.

Q. I can't, actually, that's why I just asked. I think what you said was, "I can't remember how the specifics of the retained earnings calculations in that case were applied." Is it your



representation that were retained earnings calculations in the LaSalle Talman opinion?

A. Again, I'm not recalling the specifics of LaSalle Talman.

Q. In any respect?

A. No.

Q. Did you review -- I think we have touched on it but did you review the Long Island Savings bank opinion from the trial court at 67 Fed Claim 616 which was issued in 2005?

A. You asked me that before and I said I don't remember the names of these cases.

Q. And so you're not --

A. No, I don't remember that I reviewed that.

Q. What about the opinion in Bank of America, FSB versus United States which was 67 fed claims at 577 and then there was another opinion that sort of

piggybacked on top of that which is 70 Fed Claims 246?

A. I may have read those over the last several years but I relied primarily on counsel to provide the highlights of these decisions and their



applicability to River Valley.

Q. Are you aware of any opinions in the Court of Federal Claims rejecting a retained earnings theory of damages?

A. No, I'm not.

Q. Now, let's look at Exhibit A. And this is a list of your additional documents considered, correct?

A. Correct.

Q. And what is your understanding of the purpose of this list of additional documents considered?

A. Primarily these financials of Rock Falls, River Valley 1, River Valley 2, River Valley holdings, San Antonio Federal Savings Bank, River Valley, FSB and Western Capital Holdings all relate to the underlying financial records of the companies. The other documents are somewhat related -- are referred to in here. The FHLBB resolution would have

funds -- I know you take exception to whether it's First Banks' but for the period after First Bank acquires River Valley in the real world, that if the Court were to find that those cost of funds could not have been 20 percent year in and year out for 23 years, is there another source of information you could point us to that would indicate an alternative cost of funds for River Valley first?

MR. JOHNSON: Objection. There is a



fundamental assumption in this question that I think is wrong and so the question is vague and confusing but answer it if you're able, Dr. Holland.

THE WITNESS: I think you -- excuse me. I think you said two things. One, you talked about First Banks and so let me address First Banks versus River Valley. My understanding is that my job was to calculate the damages to River Valley and it was appropriate to use River Valley's cost of capital with respect to that. Absent the breach, it's not even clear that First Banks would have acquired River Valley so I think that I would put First Banks aside with respect to this and focus on River Valley.

The second part of your question would

be -- was if the Court finds that a different cost of capital is appropriate, that could be certainly calculated. I think you said are there other sources that could be used to calculate, to get at a cost of capital. I have not considered that. I would have to think about what other sources were appropriate. I think that here we have the analysis that was conducted by the government in essentially a -- not

56

an adversarial but at least in a buyer/seller mode where they came up with the discount rate that they would use to value River Valley based on their earnings, which of course is the accepted method of looking at cost of capital. I think that's a very reasonable way to start. And as I've said, I've been involved with both investments and investors with organizations of the size and type of River Valley for many years, including currently, and 20 percent is certainly, in my opinion, a conservative cost of capital.

MR. JOHNSON: Mr. Roberson, I just want to try to fete clarity on something. I think in your question, you used the term cost of funds and then in Dr. Holland's response, he answered in terms of cost of capital. I don't know what you intended your

question to mean but if you thought those were supposed to be two different things and there was some confusion here, maybe we ought to try to resolve it.

MR. ROBERSON: No, I didn't intend them to be separate.



THE WITNESS: Excuse me, you meant cost of capital?

BY MR. ROBERSON:

Q. Yes. And I assume your answer was with respect to cost of capital?

A. Yes.

MR. ROBERSON: I understand from the videographer that we're about to run out of tape and this would probably be a good time for a break.

MR. JOHNSON: Absolutely.

THE VIDEOGRAPHER: Here marks the end of videotape number 1. Time on the screen is 10:18:21. We're going off the record.

(Recess.)

THE VIDEOGRAPHER: Here marks the beginning of tape number 2. Time on the screen is 10:29:41. We're back on the record.

BY MR. ROBERSON:

Q. Dr. Holland, just before we took a break, I think you said that you're not clear that First Bank would have acquired River Valley in a nonbreach world. Do you recall saying that?



A. Yes.

Q. And we were talking about First Bank's cost of capital in connection with the -- at the time you made that comment, correct?

A. Yes.

Q. Now, I understood your mitigation damage claim to be based upon the real world where First Bank did in fact acquire River Valley. Am I mistaken?

A. I think that what I said is that I didn't believe that First Bank's cost of capital was relevant, for two reasons. I still think that it is appropriate to say that it's not clear that we would have sold to First Banks but for the breach. That changed things as far as my partner and I and our thoughts about the future for River Valley. So I think that's still an accurate statement. And I believe that the damages that we're dealing with here are the damages to River Valley and it would have

been River Valley's cost of capital that is the relevant measure.

Q. But to be clear, your mitigation theory is



set forth in the actual world, is that correct?

A. It's clear to me that the breach caused damages for River Valley. River Valley was required to shrink as a result of the breach. We couldn't earn as much as we otherwise would have earned. What we are using is actual numbers for the amount of retained earnings that were necessary to offset the loss of the breach as a way to get at a partial measure of the damages. And to the extent that this is the real world, it's the actual amounts of retained earnings during that time.

Q. But in the post-First Bank acquisition period of time, in the actual world, First Bank acquired River Valley in 1995, correct?

A. That's correct.

Q. And your modeling your damages, you assumed the First Bank acquisition occurs in '95 when it actually did, correct?

A. I don't believe that is relevant to the calculation of the damages. I mean, I don't think

that there is anything in my calculation -- I would have to think about that -- that specifically



pertains to the acquisition of River Valley.

Q. Are you asserting, then, that your mitigation claim involves a potential in the First Bank acquisition -- post-First Bank acquisition period, it involves the potential that First Bank didn't acquire River Valley?

A. I don't think that's what I said. I said that the -- I need to think about this but I don't think that the fact that First Bank did acquire River Valley affects the calculations. In other words, if they had not acquired River Valley, I think the calculations would have been exactly the same.

Q. But just to be clear, what you have done, though, is assumed that, in the actual world, this is the litigation that occurred in the actual world and, in the actual world, First Bank acquires River Valley exactly when it did?

A. I haven't made that assumption. What I've said is that I think the calculation is the same either way.

Q. So you haven't assumed that First Bank acquires River Valley in January of 1995 in your

^ modeling your damages?

A. What I'm trying to think of is whether there would be any difference in the way I had calculated the damages relating to the fact that River Valley was acquired. River Valley was then a subsidiary of First Bank's.

Q. Now, what world is your model in? Is it in the actual world or the but for world?

A. I would talk about the but for world is when one said that but for the breach, here's what would have happened, and a number of assumptions would have been made in that respect. So I wouldn't put this in the but for world in that sense. We've used but for worlds in the calculation of lost profits. This is not a lost profits damages theory. This is a calculation of the cost of using retained earnings. Instead of using retained earnings for other purposes, they had to be allocated to keep the River Valley alive during this period because of the breach by the government.

I guess I would say it again. I think to that extent, we are talking about the real world but

I don't think that it is necessarily relevant that there was an acquisition by First Banks.

Q. Now, we were discussing the cost of capital and I had proposed to you the notion that if the Court found that your 20 percent cost of capital was inappropriate, whether there were alternative funding sources of capital that you could rely on as information to set forth a cost of capital computation. Are there any alternative sources of capital that you can recollect that River Valley had that you might be able to use as a source of computing the cost of capital?

A. Well, I think, as I said before, if the Court concludes that there would be a different cost of capital, the calculation can be adjusted to that but I have not sought to determine a difference cost of capital. I felt that the cost of capital that had been already discussed in Dr. Murphy's testimony and in his expert report and was originally determined by the government is appropriate and so I don't believe that -- I haven't looked to other sources for the cost of capital.

Q. So you never considered an alternative cost of capital other than the methodology by which you came up with a 20 percent figure, is that correct?

A. This is the one that I felt was the most appropriate or is the most appropriate. As I said before, I mean, from my experience as both an investor and as one who raises funds from investors, I think the 20 percent figure is a very conservative one.

Q. My question wasn't what you thought was most appropriate. My question was, did you consider an alternative cost of capital, a source of capital to come up with that competition?

A. I wouldn't say that I did, no.

Q. You didn't consider any other alternative costs of capital?

A. I did not consider other alternative -- another alternative cost of capital.

Q. And did River Valley thrifts obtain capital from any source during the period of time that you were -- before the acquisition by First

provided from an outside source, there was no independent measure of a specific cost of capital because, in all cases, the cash was provided either from the existing Rock Falls in the form of retained earnings or from subordinated debt or preferred stock which was provided by American National Bank. Those -- and American national bank would not have provided those but for the personal guarantees of myself and Howard Ross. I believe that the -- coming back to the cost of capital, one needs to look for what return is an investor expecting to get from that investment either from dividends or from appreciation in the value of the company and. And as I've said before, I think that 20 percent is a minimal return that investors are expecting to get and one that was confirmed by the government.

Q. And with respect to the AMB, that's the subdebt?

A. Correct.

Q. You just said that -- I believe you said that that wouldn't count as an independent measure of the cost of capital?

A. That's correct.
Q. And I believe you said it is because you and Mr. Ross provided personal guarantees with respect to the fund that -- the capital that was obtained, is that correct?
A. That's correct.
Q. Is there any other reason that you believe the AMB subdebt cost of capital is not an independent measure of the cost of capital?
MR. JOHNSON: Objection, vague as to time but answer if you're able, Dr. Holland.
THE WITNESS: I think that my first answer is the one that I would think is primary, that American National would have lent to us as individuals based on our own credit, would have looked at the credit of River Valley and would have -- as I said, would not have lent to River Valley on its own.
I guess the other thing to be said is that the cost of capital that the government looked at and the cost of capital that I used, since it's tied to retained earnings, is really looking at an equity



component of the cost of capital. Subordinated debt

also has different characteristics ^ than the equity component so I also think that's not as appropriate cost of capital as the equity component.

BY MR. ROBERSON:

Q. Are those the only reasons that you don't believe the AMB subdebt is an independent -- could be an independent measure of the cost of capital?

A. I haven't -- there may be others. Those are the two that I can think of at this time.

Q. When you say there may be others, are you aware of any -- when you think about capital, are you aware of any notions of a characterization of an independent measure with respect to costs of capital?

MR. JOHNSON: Objection, vague and confusing.

THE WITNESS: I think that the -- my answers are still the most appropriate, that the fact that subordinated debt would not have been provided but for the guarantees and that subordinated debt has different characteristics ^ than ^ in equity and I believe that when one is talking about retained

68

earnings, one is talking about equity, I think those are the two things that come to mind at this point.

If I thought about it more, I might have other points to discuss on that as well.

BY MR. ROBERSON:

Q. Are you aware of any literature, academic studies with respect to considering -- that consider or deal with whether or not a capital cost is properly analyzed as independent, as you characterize that?

MR. JOHNSON: Objection, vague.

THE WITNESS: I think I would ask you to repeat that.

BY MR. ROBERSON:

Q. We were discussing, based on what you said, that you believe certain types of capital couldn't be considered to represent an independent measure of the costs of capital, I think specifically with respect to River Valley, correct?

A. What I meant by independent measure is that I don't think that the interest rate on subordinated debt or the dividend rate on the

69

preferred stock captured the entire cost of capital.

Q. And are you aware of any literature, academic literature or otherwise, in finance journals of any kind that deal with whether capital costs can

be considered to be an independent measure as you just characterized it?

MR. JOHNSON: Objection, vague.

THE WITNESS: No.

BY MR. ROBERSON:

Q. Now, other than the AMB subdebt, were there other avenues by which River Valley obtained capital after the point in time of the acquisitions in 1988?

MR. JOHNSON: Objection. Calls for fact testimony. If you want to direct him to a specific event and ask him what the significance is, that would be appropriate in an expert deposition. Answer if you're able, Dr. Holland.

THE WITNESS: I don't recall additional sources of capital other than transactions that created a profit for River Valley. We sold branches, we sold -- yes, we sold branches for a profit that

70

created a source of capital. I don't remember any others.

BY MR. ROBERSON:

Q. And a minute ago you said that you didn't believe that the acquisition of River Valley by First

Bank was relevant to your damage calculations, is that correct?

A. Yes.

Q. Why is it that the acquisition by First Bank is not relevant given that your modeling of retained earnings is in the actual world?

A. Because I'm taking River Valley's retained earnings and I'm measuring the cost of River Valley's retained earnings. At one stage, River Valley was owned by Howard Ross and myself. At another stage, it was owned by First Banks. But I'm taking the retained earnings during both of those periods. If River Valley had been owned by you in one of those periods, I think the calculation would have been the same.

Q. So it doesn't make any difference what First Bank's actual cost of capital is as far as your



modeling of damages in this case?

A. Correct.

Q. Is it your intention to present a retained earnings theory of damages based upon a 20 percent cost of capital and no other costs of capital at trial?

A. At this stage, this is what -- the damages

theories that we have presented that does use a 20 percent cost of capital. At this stage, I don't have any other intention to present a different cost of capital.

Q. Now, did you or River Valley ever pay 20 percent interest with respect to any funds obtained for use at the River Valley thrifts?

A. I don't believe that's relevant to the issue of the cost of capital but the answer is no.

Q. And did you make any efforts to determine whether First Bank has ever obtained capital from outside parties, including its shareholders?

A. With respect to this analysis, I have not looked at First Banks.

Q. And did you or River Valley ever pay 20



percent interest with respect to any capital obtained for the use of the River Valley thrifts?

A. Again, I don't think that that is -- whether or not we would have paid an interest rate of 20 percent is not the appropriate way to look at the cost of capital but as I answered before, no, we did not pay 20 percent.

Q. And do you know what First Bank's cost of

capital was at any point in time between 1995 and the present time?

A. I do not know.

Q. And what is the basis for your belief, which I think you state at paragraph 44 of your report, that a 20 percent cost of capital for River Valley is conservative?

A. During the time that I was an owner at River Valley and subsequent to that, I have been an investor in a number of privately held companies and, in all of those cases, the expectation as an investor in those companies would be that the investors would earn a return in excess of 20 percent. And I think that River Valley's risk profile warranted a rate of

73

return in excess of 20 percent and I think that the -- and that's, in my mind, how the cost of capital gets derived is from the return expectations of investors. It is also the appropriate measure to discount future dividends on future cash. And I think even the government's analysis would imply somewhat greater than 20 percent cost of capital.

Q. Do you have anything else to add to that answer?

A. No.

foregoing a claim and I don't know what's been done with respect to that.

BY MR. ROBERSON:

Q. Well, do you intend to set forth a lost profits claim at trial even though you're now going to be issuing a retained earnings theory of damages?

MR. JOHNSON: Objection, outside the scope. It's got nothing to do with the analysis in the report. Let's keep it on what the subject is.

THE WITNESS: I guess I would defer to counsel with respect to what happens at court but I think the statement here is what I agreed to, that we intend to forego the claim for lost profits.

BY MR. ROBERSON:

Q. Now, the Court of Federal Claims recently issued an award for damages for increased leveraged lost profits connected with incremental income earning assets in a Winstar-related case in First Federal Savings and Loan Association of Rochester versus the United States at 76 Fed Claim 106. That opinion was issued on April 13, 2007. And in fact, I believe this decision was issued by the same judge,

George Miller, who is deciding this case. Are you aware of this decision?

A. I don't recall it.

Q. Well, it's a new decision so if you had seen it since April 13th, would you have recalled it?

A. Probably.

Q. So you haven't seen it?

A. I don't believe I've seen it.

Q. And given that the Rochester decision is a case that involves an award of lost profits from lost leverage, is there a possibility that you may change your mind again and decide to go ahead and put on at trial your lost leverage/lost profits claim?

MR. JOHNSON: Objection, beyond the scope.

THE WITNESS: I don't remember what the rulings were based on this motion. I know we are absolutely precluded from putting on lost profits but I stand by the statement, our intention is to forego the claim for lost profits.

BY MR. ROBERSON:

Q. And are you still pursuing Dr. Murphy's claim for the value of the residual capital of the



date of the sale to First Bank?

has acquired the thrift, correct?
A. Correct.
Q. But you're saying that that modeling of River Valley's -- of the damages in that post-First Bank period has nothing to do with damages to First Bank, is that correct?
A. What I'm saying is that those are damages of River Valley's.
Q. And my question is, it has nothing to do with damages to First Bank?
A. Well, only to the extent that First Bank is the owner of River Valley.
Q. Is that an exception that swallows the rule? Can you explain what you mean by only to the extent that First Bank is the owner of River Valley?

93

A. I think you asked me to what extent did the retained earnings cost First Banks. They cost River Valley to the extent that -- to the same extent that the ^ view of the owner of damages to River Valley would affect your ownership in River Valley.
Q. Simply that you own the claim?
A. You own River Valley.
Q. So is River Valley, as held by First Bank,

continuing to retain earnings?

A. I don't know exactly what was happening with respect to River Valley during that period but I think that as a measure, it had retained earnings that were in excess of the amount of capital that had been taken away.

Q. So a moment ago you said you're not aware of what's been happening with River Valley during the period that First Bank's been an owner of River Valley, is that correct?

A. I have not taken a look at exactly what First Banks has done with River Valley.

Q. So you can't say -- you've made no analysis at all with respect to River Valley as owned

94

by First Bank, correct?

A. I think that's correct.

Q. Now, I am initially asking in your opinion how did retained earnings cause harm to First Bank and we just had that discussion. Now I'm going to ask you, in your opinion, how did retaining earnings cause harm to River Valley?

A. I think that the thing that caused harm to River Valley was the loss of the contract capital. Using retained earnings to replace that capital and

having the measure of the cost of the capital is a way to put a measure on the mitigation of those damages, the cost of mitigating those damages.

Q. I know but my question is how did the retaining earnings cause harm to River Valley?

A. As I said --

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: How did retaining earnings cause harm? Retaining earnings was -- retained earnings could have been used by River Valley for other opportunities, could have been paid out as

95

dividends. This was a case where, because of the government's breach, those other opportunities couldn't be exploited by River Valley. Using the amount of the retained earnings as a measure of the mitigation of the breach by the government is what this analysis is about.

BY MR. ROBERSON:

Q. And I believe you said that how it was harmed is that there were certain opportunities that it couldn't pursue because they had to retain the earnings, is that correct?

A. Correct.

Q. And what opportunities were those that couldn't be exploited?

A. The balance sheet could have been larger, we could have earned more money on a larger balance sheet. We had to shrink the balance sheet. We had other acquisitions that could have been made that weren't made.

Q. And how would the balance sheet have been larger?

A. The balance sheet had to be reduced by



almost 50 percent so had the breach not occurred, I would have expected that the balance sheet would have continued to stay at its present level and grow in accordance with the business plans that have been presented to the government.

Q. And how is that? I mean, how would it have grown?

A. It would have grown in the same way it had grown previous to that. It grew from two principal purposes. It grew through the acquisition of assets financed by liabilities that were allowed if it had adequate capital. It would also have grown by acquiring other institutions and adding that balance

sheet to the River Valley balance sheet.

Q. And what specific institutions would it have acquired?

A. The one that we've already talked about in some detail previously is San Antonio Federal Savings Bank. There was an institution in Galesburg that we had been in discussions with that we were at a letter of intent stage that were precluded from acquiring. There were several others that we would talk to from

97

time to time.

Q. Galesburg located in --

A. Illinois.

Q. Is the harm from the retained earnings basically foregoing the value of these lost opportunities?

A. You asked me what the harm was, I believe, and the harm is that we lost capital. That capital would have been available and the capital restricts the size of the organization so I believe the harm was that, in losing that capital, we lost -- we were forced to take actions that we didn't want to take which was shrink the balance sheet and reduce the earnings, and we lost the opportunity to grow the

balance sheet. The retained earnings had to be used simply to meet the minimum capital requirements during that period of time to keep the organization alive. And the measure of the cost of the allocating the retained earnings for that purpose I've calculated is based on the amount of retained earnings that were used for that purpose times the cost of capital.



Q. But in short, the harm to River Valley was foregoing the value of these lost opportunities, correct?

MR. JOHNSON: Objection, mischaracterizes the testimony, asked and answered.

THE WITNESS: The harm was the loss of capital. The loss of capital resulted in two things. It resulted in us losing earnings by virtue of having to reduce the size of the balance sheet and not being able to take advantage of opportunities to grow the balance sheet either through acquisitions or through other forms of growth.

BY MR. ROBERSON:

Q. And in both of those categories, you lost earnings because you had to reduce the balance sheet and then you lost opportunities to grow the balance

sheet. In both cases, you're talking about opportunities that were lost, correct?

A. These were other opportunities where we could have used the retained earnings. Instead, we allocated the retained earnings to meet the minimum capital requirements of the institution and I have



felt that a reasonable measure of the cost of allocating the retained earnings for that purpose was to use the cost of capital times the amount of the retained earnings that were used for that purpose.

Q. Now, what was the reason that retained earnings in River Valley were above the regulatory minimum given that the increased damages -- and we're talking about the period from 1990 to 1993?

A. I think you need to be more specific.

Q. Well, do you show -- do you have a chart in your report that shows what -- maybe you don't. I don't know -- what the regulatory minimums were for River Valley with respect to capital, do you know what those were for the period 1990 to '93?

A. I don't think that's in --

Q. Yeah, it's probably not in your report, now that I think about it. But are you aware of the

fact that River Valley exceeded the regulatory minimums in the period -- with respect to capital in the period from 1990 through 1993?

A. I know there were -- I mean, I think that there were situations where the minimums, if you



said, were specific to River Valley which we felt was in part a result of the breach. I think I have testified to that in the past. There were also times when one would feel it appropriate to have a cushion above a minimum. I think I've testified to that in the past. And because we could not acquire San Antonio Federal directly at River Valley, it was necessary to reduce the balance sheet at River Valley in order to redeem some of the preferred stock or with the retained earnings and in anticipation of that, there could have well been times when our capital ratios were above the minimum.

Q. But whenever they were above the minimum, that increases damages, as far as you're concerned?

A. Whenever they were above the minimum, they were -- regardless of where they were relative to the minimum, they were offsetting capital that had been breached by the government. There are reasons why one would want the capital above a minimum. As I

explained, I haven't -- if I went back and looked at the specifics, I could probably remember what the reasons were but I think they were good business



reasons to have that amount of capital.

Q. So even though you were being damaged by having capital -- retained earnings above regulatory minimums, you felt being damaged by that amount was a good business decision?

MR. JOHNSON: Objection, lacks foundation, mischaracterizes the testimony.

THE WITNESS: I think they were good business decisions for having capital above minimums from time to time. A cushion against volatility, a cushion against losses and those were always reflected in our business plan as never operating right at the minimum. I think that the -- I think that it was -- I don't think anyone has criticized our business decisions for when we had capital that was above the minimums, as I said. Certainly the government always wanted us to have as much capital to protect the insurance fund.

BY MR. ROBERSON:

Q. So if you're saying the government wanted

you to have as much possible capital as possible to protect the insurance fund, are you saying in the



context of the breach that the government wanted you to have increased capital above the regulatory minimums even though that was going to be damages that would be brought against the government?

A. I don't know that the government, the right hand and the left hand were together with respect to damages versus capital but we had a memorandum of understanding with the government that they wanted us to achieve a 5 percent capital ratio which in one interpretation you would say was above the minimum. So there was a very explicit requirement on our part to get our capital above 5 percent.

Q. It's your opinion that the retained earnings would have been the same in the actual world and in no breach worlds, correct?

A. Not necessarily, no.

Q. When you say not necessarily, what do you mean by that?

A. I think that the retained earnings are just that. They are the retention of earnings that could be paid out as dividends, could be used to

A. I think so.
Q. And do you distinguish between the notion of cost of capital and cost of equity capital?
A. In this context, I've used the cost of capital as -- the cost of equity capital as being synonymous since the cost of retained earnings is equity capital.
Q. And between 1990 and 1994, who is cost of equity capital are you measuring?
A. River Valley.
Q. And between 1995 through 2013, whose cost of equity capital are you measuring?
A. I'm using the same cost of capital, River Valley's.
Q. So you're not using First Bank incorporated's cost of equity capital, corrects?
A. I'm using River Valley's.
Q. And not First Bank's, the thrift?
A. That's correct.
Q. And that's despite the fact that River Valley didn't exist after, what, January of 1995 or sometime after the the First Bank, FSB acquisition?

A. I'm not -- it's my understanding that they retained the charter of River Valley at First Bank so it's not my understanding that River Valley failed to exist.

Q. At any point in time?

A. I haven't examined it closely recently but from my remembering of the transaction, they acquired River Valley and retained the charter to River Valley.

Q. I know, but then thereafter, because, as you know, there were a number of mergers between different First Banks, Incorporated, some subsidiaries and related companies ^ R, and do you have any awareness of any knowledge of whether the River Valley charter was retained?

A. I haven't looked into that specifically. I would have anticipated that the charter would have been retained for the important attributes of that charter.

Q. But you didn't look into it at all?

A. I have not looked into it.

Q. And is that important to your calculation,

the notion that there is a continuing of the River Valley charter?

A. Not necessarily. I think that the -- while I believe that the charter did continue, I believe that the important measure was damages to River Valley and, again, the damages to River Valley were the loss of the capital by the breach and the consequences of the loss of that capital. We are using the retained earnings as a measure of the partial mitigation of those damages and the cost of capital related to that.

Q. Between 1995 and 2013, whose cost of equity capital are you measuring?

A. As I said, I'm using the River Valley's cost of capital as determined by the government in its analysis.

Q. And that's regardless of the fact that River Valley and its charter may not even exist at some point in time after First Bank's acquisition?

A. I do not know that it does not exist. I would expect that it still does exist but I don't know that for sure.

108

was it appropriate to use a 20 percent cost of capital? Yes. But I'm not sure I'm understanding the complete gist of your question.

BY MR. ROBERSON:

Q. Well, you just said retained earnings were



paid out in 1992. What did you mean by that?

A. They were paid out in order to redeem preferred stock.

Q. And they were paid out in order to redeem preferred stock for what reason?

A. The 6 million was paid out to redeem preferred stock that was held at the holding company. That preferred stock had been funded by American National Bank. American National Bank agreed to fund, separately for Howard Ross and myself and others, Western Capital Holdings which acquired San Antonio Federal Savings Bank.

Q. Are you finished?

A. I think so.

Q. You say you think so?

A. I think that ended up at the end of my thought. Maybe I've --

Q. So River Valley was paying out its retained earnings in '92 in order to facilitate the

SAFSB acquisition through another entity?

A. Yes.

Q. And was there any other time when River



Valley incurred a cash outflow?

MR. JOHNSON: Objection, vague.

THE WITNESS: Not that I recall.

BY MR. ROBERSON:

Q. Just to be clear, then, the 20 percent cost of equity capital was not traceable to an actual cash flow, correct?

A. The 20 percent cost of capital, because we've defined it in several different ways, but for the breach, that cash flow could have been paid out as dividends or a redemption of stock and the cost of capital is a rate of return that is the rate of return at which the investors choose to either continue putting their money into the company or choose not to take money out of the company.

Q. Okay. But my question was, the 20 percent's not traceable to an actual cash flow, correct?

A. I can't think of a cash flow that would be specifically attributable to that.

Q. And is it your opinion that the 20 percent annual gross cost of retained earnings represents an



actual cash flow incurred by First Bank from 1995 through, say, 2007?

A. The 20 percent is not related to First Bank but I don't have any specific knowledge of the cash flows related to First Bank.

Q. And in your modeling, you propose, I believe, an 8.825 percent annual pretax benefit of the retained earnings, is that correct?

A. I believe that's correct.

Q. And is it also your opinion -- let me ask it this way. Does the 8.8 percent annual pretax benefit of retained earnings represent an actual cash inflow received by River Valley during the 1990 through 1994 time period?

A. That rate is the rate on a 10-year treasury that is an interest -- I mean, is a risk-free rate. It may well have been the case that River Valley had assets in its portfolio of treasuries but it wasn't intended to be tied to a specific asset of River Valley. It was using the same methodology that I believe has been used and accepted in other cases of taking a risk-free

treasury rate. And I think that the risk-free aspect of it is appropriate given that the foregone capital or the contractual capital was something that had a government guarantee to it and there wasn't at least apparent a risk associated with that. So I think that's why the risk-free rate has been used.

Q. I guess my question, though, was the 8.825 percent pretax benefit of retained earnings doesn't represent an actual cash inflow received by River Valley during the 1990 through 1994 time period, correct?

A. I think I answered that as to why the 8.82 percent was used and it's not because an instrument in those amounts was identified. It's simply offsetting the fact that cash is associated with the retained earnings.

Q. Right. So it's a theoretical contract. It doesn't actually represent a cash inflow received by River Valley between 1990 and 1994?

A. I think it's a reasonably accepted way of offsetting the benefit of the cash. I do not -- yes. I mean, it is not intended to replicate exactly any

cash flows.

Q. And I take it the same is true with respect to the 8.8 percent benefit of retained earnings with respect to First Bank during the 1995 to 2007 period, it's not modeled by you to reflect an actual cash inflow received by First Bank, correct?

A. Correct.

Q. Do you want to take a break now?

A. That sounds good.

Q. Is now a good time?

A. Sounds good to me.

THE VIDEOGRAPHER: Going off the record. The time on the screen is 12:23:46.

(Whereupon, at TIME ^ a.m. ^ p.m., the ^ deposition ^ hearing ^ trial in the above-entitled matter was recessed, to reconvene at TIME ^ a.m. ^ p.m., this same day.)

Q. Isn't there an additional -- aren't there additional benefits from having retained earnings for a thrift?

A. I don't know what other benefits you have in mind.

Q. Well, let's talk about leverage capacity. Doesn't retaining earnings and having that capital permit the thrift to leverage?

A. Well, certainly. And I think we've talked multiple times about the benefit of having capital and what we're doing here is saying that the benefit of having capital was a benefit that had been bargained for in these transactions. That benefit was taken away and what we're doing is replacing that capital using retained earnings. We are using a measure of the cost of mitigating those damages by looking at the cost of capital net of the cash benefit of the retained earnings.

Q. Well, the notion is that the goodwill, in your mind, permitted you to leverage, correct?

A. That's correct.

131

Q. And the retained earnings, as it replaces the goodwill, also permits the thrift to leverage,

correct, and support other assets?
A. In general, that's true. In this particular case, we had to de-leverage despite the retained earnings. But I grant you that the purpose of capital is to allow the thrift to leverage.
Q. Well, didn't the retained earnings in the actual world in this case actually allow you to leverage?
A. If we hadn't had the retained earnings, we would at some point not have been able to leverage at all, yes.
Q. Well, let's just be clear. The actual retained earnings that you did have, they did permit you to leverage and support other assets, correct?
A. The only distinction I would make is that it wasn't as if the retained earnings at the time of the breach allowed us to increase leverage or add assets. It was only -- it allowed us to maintain a sizable balance sheet that was much smaller than what we had started with.

132

Q. But nonetheless, it allowed you to support assets that River Valley never actually held, correct?
A. Capital did, yes.

Q. And the retained earnings?

A. And the retained earnings, yes.

Q. Now, with respect to your mitigation damages, do I understand it correctly that it's your opinion that it costs $21 million -- that meaning your $20.9 million of mitigation damages -- to replace $20 million in contractual capital?

A. The damages are the 20 million and I have to look at the contractual capital. 20 million sounds correct.

Q. Aren't you claiming litigation averages of 21 million, that is, $20.9 million?

A. Yes.

Q. And the balance of the contractual capital replaced as of June 1990 is $19.8 million?

A. Could you point me to where that is?

Q. I'm not sure if I can right off the bat. Exhibit B, though, I think is where you're going to

133

find that number. Do you see that?

A. The 20 million as of December of '89?

Q. December of '89, the amount of contractual capital to be replaced, $19.8 million.

A. Yes.

Q. So it's your opinion that it cost $21 million to replace basically $19.8 million of contractual capital, correct?

A. This was the cumulation of capital replaced over -- from 1990 through 1994 and then throughout the period so it is true that the damages that I've calculated are 21 million and that the beginning amount of capital to be replaced was 20 million and the cost relates to the cost of capital for each year during the period that that has been replaced.

Q. And it's also your opinion that even after you're incurring these costs of $21 million to replace the $21 million of contractual capital, that River Valley still lost opportunities of approximately $29 million related to the SAFSB transaction, correct?



A. That's correct.

Q. So we're seeing, what, $50 million in damages related to the lost of $20 million of -- or $19.8 million of contractual capital?

A. I think the numbers that you have described are accurate. I would be happy to describe how we get to those numbers.

Q. Now, you testified that River Valley began to feel the adverse effects of the government's breach in July of 1990, isn't that correct?

A. That is correct.

Q. And in fact, July 1990 is the period when you assumed the breach has taken place in all of your analyses, isn't that correct?

A. In the lost profits presentation, I did that as of July of 1990 and in this, I've done it in July of 1990.

Q. So the answer is yes?

A. I'm not speaking for other damage presentations done by Dr. Murphy.

Q. Right. But as far as what you've calculated, it's all as of July 1990?

135

A. That's correct.

Q. And you've calculated no damages prior to July of 1990, correct?

A. That's correct.

Q. And so you're not offering any opinion regarding damages to River Valley prior to July of 1990, correct?

A. That's correct.

Q. Now, in your third supplemental report, you calculate litigation damages based on the earnings that River Valley retained from 1990 through 1994 and that First Bank held from 1995 through 2006 and will presumably hold until 2013, correct?

A. These numbers are based on the amount of contractual capital that had to be replaced and as it was amortized and would have been amortized out through 2013, that's correct. The calculation of the cost is as we've described. For the future years, those numbers are discounted back at the cost of capital as is, I think, a well-accepted standard for looking at the value of a future stream of earnings or a future stream of cash flows.



Q. So according to your model, the damages incurred by River Valley are directly related to the earnings that River Valley and First Bank retained over time, isn't that correct?

A. The calculation -- I'm going to repeat myself but the damages occurred at the time of the breach, which as we just talked about, I measured as beginning in July of 1990. The effect of that breach took place over the entire period up until today and would take place going forward. The method of

use of retained earnings from July of 1990 onward. Retained earnings -- there were retained earnings as of July of 1990. If River Valley had earned nothing from 1990 to 1992, it still would have had some retained earnings to use to mitigate the damages. It still had some to use to mitigate the damages.

Q. Well, let's put it this way, then. If River Valley had no profits from the period of July 1990 through 1992, according to your methodology, there would have been no additional retained earnings damages, correct?

A. No additional in addition to the existing retained earnings as of July 1990?

Q. Correct.

A. That's correct. As I've said, calculating the cost relates to the amount of retained earnings that were there that was used to mitigate the damages.

Q. So the more profits that River Valley earned between July of 1990 and 1992, the more damages that would result in your damage calculations, correct?

not stating that damages -- the amount of damages would have gone up. I'm stating that the cost of mitigating damages would have gone up. And it is that measure that we are calculating in this calculation of damages.

Q. So you ended by saying, "It is that measure that we are calculating in this calculation of damages." Are you calculating damages?

A. No, I don't --

Q. I'm using your words.

A. Yes, I understand.

Q. I don't want to be --

A. I believe that River Valley was damaged -- I use the term X -- by virtue of the loss of capital. A partial measurement of that amount of damages is the costs that River Valley incurred in terms of the capital that it had to allocate, it had to use, in lieu of the capital that it otherwise held.



Q. So you are setting forth a partial measurement of damages?

A. Correct.

Q. Okay. And let me just try to rephrase this one more time. The more profits that River

Valley earned from July of 1990 through 1992, the more costs would result as far as your quantification of costs with respect to the effect of the breach, is that correct?

A. That's correct.

Q. Now, you would agree that generally speaking, the objective of the corporation is to maximize shareholder value?

A. I think there can be many discussions of the objectives of a corporation but certainly that is one of them.

Q. Now, according to your theory, from July of 1990 through 1992, the more successful River Valley was in accumulating retained earnings, the higher the costs of damages you calculate, correct?

MR. JOHNSON: Objection, asked and answered.

155

THE WITNESS: I think that is the same question that you've asked before. Is there a difference that you're trying --

BY MR. ROBERSON:

Q. No, I'm just trying to put it in the contest of the obligation to a shareholder value. So if there is anything you want to add with respect to

that notion in the context of that question.

A. I don't believe so.

Q. Now, the redemption of the FSLIC preferred stock in 1991 resulted in a $1.325 million gain to River Valley, isn't that correct?

A. That's correct.

Q. So retained earnings were actually higher in 1991 because of that gain, correct?

A. That's correct.

Q. Therefore the damages or costs that you calculate are higher in 1991 because of that gain, isn't that correct?

A. I think the causation is that there was more capital and retained earnings that was able to be used to mitigate the capital loss. The

156

calculation would be then that there was a higher cost because more was being mitigated.

Q. So you would agree, then, with my question that the damages or costs that you calculated are higher in 1991 because of the gain on the sale or the redemption of the preferred stock in 1991?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: The redemption of the preferred stock caused greater retained earnings. The use of the retained earnings to mitigate the damages increased the cost.

BY MR. ROBERSON:

Q. And that increased cost harmed River Valley, is that correct?

A. I'm saying that that set of retained earnings had to be allocated to mitigate the damages. It was retained earnings that would have otherwise been available to River Valley to dividend out to its shareholders or to use for other opportunities. So it was an opportunity lost that -- by virtue of being obligated to mitigate the damages.

157

Q. And so going to our earlier discussion, retained earnings in effect represent opportunities lost, correct?

A. Allocating retained earnings to replace capital that had been taken is an opportunity lost.

Q. I believe our videographer is informing us that it's time for a tape change.

THE VIDEOGRAPHER: Here marks the end of videotape number 3. The time on the screen is 14:22:01. We're going off the record.

(Recess.)

(Exhibit No. 4 was marked for identification.)

THE VIDEOGRAPHER: Here marks the beginning of tape number 4. The time on the screen is 2:36:26. We're back on the record.

BY MR. ROBERSON:

Q. I've asked to have marked as Exhibit Number 4 a River Valley Savings Bank, FSB and subsidiary consolidated financial statements as of December 31st, 1993 and 1992 and I want to sort of explore again the issue of retained earnings and

158

discussion that in connection with this document.

If you look at page 11 of this document, at the third paragraph under income taxes, do you see that?

A. Yes.

Q. It states, "Effective January 1st, 1993, River Valley adopted SFAS Number 109 and has reported the cumulative effect of that change in the method of accounting for income taxes in the 1993 consolidated statement of income." Do you see that?

A. Yes.

River Valley either through dividends and/or capital appreciation, specifically with regard to the sale of River Valley to First Bank, isn't that correct?

A. That's correct.

Q. And the retained earnings were a part of the equity or capital which generated these returns, correct?

A. Again, I'm not comfortable saying that the retained earnings generated the return. The retained earnings were part of the capital structure. The capital structure was necessary for the thrift to



operate. It was generally operating at a different size depending upon the amount of capital. Generally you get a higher amount of earnings with a larger amount of capital and/or a larger amount of assets.

Q. Now, with respect to River Valley's actual retained earnings from 1990 through 1994, you and Mr. Ross, the plaintiffs in this case, have already received a return on those particular retained earnings, correct?

A. We have received a return on our investment, the retained earnings. Our investment compounded by virtue of the operations of the thrift and increasing the value so a return was earned by

Mr. Ross and myself.

Q. The answer is yes, then?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I keep objecting to the use of the retained earnings generating the return.

BY MR. ROBERSON:

Q. And what precisely was your financial investment on which you earned a return?

181

A. We had an initial investment starting in 1985. I believe it was $3 million that was increased to roughly four and a half million dollars by 1986. Through these transactions, we personally guaranteed the 6.6 million in subordinated debt and initially 5 million of the preferred stock. I believe we invested $2 million in 1991. Those are the amounts that I recall.

Q. Well, let's be clear. You didn't invest the 6.6 and $5 million that you guaranteed. That was invested by another entity, wasn't it?

A. Well, I think it's the -- since we were taking a risk on that, it was equivalent to a capital risk. It was not any different than if we had

have earned more. One way of measuring the damages, which I have said is just a partial measurement, is the fact that the retained earnings could have been paid out to shareholders at that time. Presumably by replacing that capital, we would have earned the same amount and we could have earned the same amount without the retained earnings or we could have done something else with the retain earnings. Again, I do not --

Q. We're talking about the real world so it's not what you could have done with retained earnings, it's what you would have done with retained earnings, it's what actually happened with retained earnings. The retained earnings were a part of the thrift that was acquired by First Bank and the earnings that were generated over a period of years by the River Valley retained earnings was in fact valued by First Bank when it acquired River Valley, correct?

A. Correct.

Q. And so there was a price paid for the effect of the retained earnings and the earnings generated from the retained earnings as far as the

192

effect on the River Valley thrifts, correct?

A. And I believe First Banks would have paid more had we had more capital.

Q. But that's a different situation. That's a would have, could have or a but for situation. Here we're talking about an actual situation where the actual retained earnings were actually part of the thrift that was valued and appraised and bought by First Bank, correct?

A. I think that -- I don't disagree that the actual retained earnings were a part of the thrift that First Banks acquired and they put a value on the entire institution. The point is that there were damages that occurred with the breach and the retain earnings were allocated to mitigate those damages. I believe that is a cost to the institution.

Q. Now, suppose I have $100 in equity capital in a bank that is considered to be well capitalized by regulators and suppose that the regulators announce a decrease in capital requirements and now the bank is going to be well capitalized with just $80 in capital, okay?



A. All right.

should either return that capital or it should make sure it covers its cost of capital so that the shareholders are not disadvantaged. I think that that concept of the cost of capital and the fact that the institution has a cost of capital that relates to the providers of that capital I think is well accepted. I do not have any specific examples of textbooks right now that I can think of.

Q. At the graduate course level, have you ever studied the notion of the relationship between a corporation's retained earnings and its cost of capital?

A. It's been some time since I had my finance courses here. My general recollection is that the cost of capital is as I have stated and that I see

198

retaining capital or distributing it to the shareholders as a decision to either rent more capital or to return the capital to the shareholders.

Q. I guess my question was at the graduate course level, have you ever studied the notion of the relationship between a corporation's retained earnings and its cost of capital?

A. I don't remember.

Q. And I take it you've never taught any corporate finance courses?
A. No.
Q. And you've never written or published any articles on topics of corporate finance, correct?
A. No.
Q. Did you ever take any graduate level courses in corporate finance?
A. Yes.
Q. What courses?
A. It was when I was working on my doctorate at GWU, I took graduate level courses in finance, corporate finance. I do not remember at this stage what the names of those courses were.

199

Q. And your Ph.D. was in what subject again?
A. My Ph.D. -- it's actually a doctorate of business administration and it was in finance. In GW's case, they had areas. They didn't have a single focus. It was finance, economics, and I can't remember the third one but most of what I took was related to finance.
Q. And your dissertation wasn't related to finance, was it?
A. No.

Q. So you have no position on whether or not it's appropriate to overlap replacement damages with lost profits as far as the Illinois institutions are concerned?

MR. JOHNSON: Objection, beyond the scope of the report.

204

THE WITNESS: I have no opinion, yes.

BY MR. ROBERSON:

Q. Did you ever think about that?

A. No.

Q. Now, in paragraph 11 of your report, you state that -- if you look about the second sentence, state, "Specifically the River Valley thrifts, one, used retained earnings that would have been available for other purposes to substitute for the eliminated regulatory capital." Do you see that?

A. Yes.

Q. What do you mean by that language, "other purposes"?

A. Those retained earnings could have been paid back to the shareholders as a return of capital. They could have been used for other opportunities. So those would be the other purposes.

Q. And what other opportunities?

MR. JOHNSON: Objection, asked and answered. We've spent an awful lot of time on this, John. It's starting to get repetitive and harassing.

THE WITNESS: The other opportunities



would have been to grow the balance sheet and earn more and to obtain more earnings either from normal operations or from the acquisition of other thrifts.

BY MR. ROBERSON:

Q. Is there anything else you meant by that in your report?

A. I think the other purposes I mentioned are the twofold, return it to the shareholders or use it to obtain a return for the shareholders that would be at least equivalent to their cost of -- to the cost of capital.

Q. Is there anything else you meant by other purposes? Is that it?

A. That's it.

Q. So I take it your position is that if River Valley had its contractual capital, its retained earnings would have been free to use for some other purposes as you've discussed here, correct?

A. That's correct.

Q. Similarly, if First Bank had River Valley's contractual capital, its retained earnings



would have also been free to use for some other purposes, correct?

A. Again, I am looking at it from the perspective of River Valley and not from First Banks.

Q. Well, in the actual world, First Bank actually acquires River Valley, right?

A. And in at least my context, First Bank becomes the shareholder of River Valley and what we're looking at is the damages to River Valley.

Q. Well, you said First Bank becomes the shareholder of River Valley. Didn't First Bank Missouri merge with, become the ultimate successor, is not really the shareholder -- isn't First Banks the shareholder of First Bank Missouri?

A. No, I'm not completely familiar with the transactions occurring within River Valley and within First Banks with respect to River Valley. I know initially River Valley was maintained as a subsidiary of First Banks. They may have had other mergers but at the end of the day, First Banks becomes a

Dr. Holland.

THE WITNESS: River Valley shrunk the balance sheet. It had many ways of shrinking the balance sheet which included not adding assets as assets were paid off and amortized, selling assets and, when it sold assets or reduced the amount of assets, it reduced the amount of liabilities it had and it did that in a variety of ways, including not as aggressively seeking deposits and using other forms of liabilities such as repos.

BY MR. ROBERSON:

Q. And I take it, then, here -- well, here's the question. Does shrinking an institution have any effect on the institution's retained earnings, assuming there is no gain or loss on the sales on the shrinkage?

A. If I understand your question, if the retained earnings are X and the balance sheet is reduced and that has no impact on income, then I - - think I would agree that the retained earnings would stay the same assuming that there is no other capital transaction, if there is no other dividends or other

213

capital paid out to shareholders.

Q. So it's your position that the balance of an institution's retained earnings neither go up or down assuming there is no gain or loss on sales when an institution is shrinking?

MR. JOHNSON: Objection, vague as to time frame but answer if you understand it, Dr. Holland.

THE WITNESS: I think, as I understand your question, that if there is no other impact on capital such as gain or loss and there is no distribution of capital back to the shareholders, the size of the institution in terms of assets or liabilities does not directly affect the retained earnings. If an institution goes up, retained earnings would still say the same. The thing that affects retained earnings is earnings. It's either earnings or taking in capital or paying out capital.

BY MR. ROBERSON:

Q. Now, in your retained earnings replacement claim, have you identified what specific incremental assets River Valley would have acquired with the use of the retained earnings?

214

A. Have I identified if -- and in your

hypothetical no breach world?

Q. Yes.

A. No.

Q. And have you identified generally how many incremental assets River Valley would have acquired with the use of retained earnings in a nonbreach world?

A. No.

Q. Any rough idea?

A. No.

Q. And have you identified what yields would have been earned on the incremental assets River Valley would have acquired with the use of the retained earnings?

A. No.

Q. And have you identified how the incremental assets would have been funded by River Valley?

A. No. And I guess I would say that this analysis is not trying to measure the lost profits from an increase in the size of the institution in a

215

hypothetical but for world. This is taking the cost of mitigating the damages by virtue of allocating

retained earnings, to the extent there were retained earnings, to those lost capital accounts.

Q. And have you identified the costs of the incremental liabilities that River Valley would have acquired?

A. No.

Q. Have you identified what additional noninterest expenses would have been incurred by River Valley, if any?

A. No.

Q. Have you identified what specific incremental assets First Bank would have acquired with the use of the retained earnings?

A. No.

Q. Have you identified generally how many incremental assets First Bank would have acquired with the use of the retained earnings?

A. No.

Q. Have you identified what yields would have been earned on the incremental assets First Bank

216

would have acquired with the use of the retained earnings?

A. No.

Q. Have you identified how the incremental

assets would have been funded by First Bank?

A. No.

Q. Have you identified the costs of the incremental liabilities that First Bank would have acquired?

A. No.

Q. Have you identified what additional noninterest expenses would have been incurred by First Bank, if any?

A. No.

Q. Now, you stated that you used the actual world as the basis for creating your but for world, is that correct?

A. Say that again.

Q. Well, let me ask you. Do you use the actual world as the basis for creating your but for world?

A. In this analysis, I haven't created a but

217

for world.

Q. So it's your opinion that the retained earnings that existed in the actual world would have also existed in a but for world, isn't that correct?

A. The retained earnings were the retained

earnings in the actual world. The retained earnings may well have been at a different amount. If River Valley had had the benefit of the additional capital that was breached, taking just the retained earnings that are in this report, those retained earnings, as I've said, would have been available to the institution to either return capital to the shareholders or to pursue other opportunities.

Q. Well, at the very least, the very same retained earnings that existed in your -- that exist in the actual world would have existed in a nonbreach world, correct?

A. They would have existed either in the institution or they would have been repaid to the shareholders.

Q. And just so I'm clear about this, by definition, what you're saying about retained



earnings, they're not incremental to the but for world, correct, to a nonbreach world?

A. Again, I go back to a hypothetical that there is a nonbreach.

Q. Right.

A. I think that it's a reasonable position to say that the retained -- that the earnings of the

institution would have been greater than the earnings actually were in the real world. To the extent that those earnings were retained, retained earnings would have been greater than the actual retained earnings but it also was possible that the institution would choose to pay those accumulated earnings out to the shareholders. If that were the case, it is possible the retained earnings would be less than was the case actually.

Q. Right. But at least the amount of retained earnings that were in the actual world would have been in the nonbreach world and then subsequently maybe they were paid out as dividends or maybe not?

A. I think I agree with that, yes.

219

Q. Now, who originate the idea of extending the claim for damages in this case past the point at which First Bank acquired River Valley?

A. Well, I think the question in all of these cases is how does one measure the extent of the damages. Since one can either identify a stream of earnings or a stream of costs that would go out for some period of time, it's necessary to project those

A. And previously in this case, this is a methodology that I think is trying to follow the guidance from the cases. As I understand that, it's appropriate to look at the amount of capital over the contractual period for the capital. The lost profits damages that had been presented previously simply takes a different perspective.

Q. What perspective is that?

A. It looks at the value or the amount that First Banks would have paid in 1994 and 1995 as opposed to -- and with that, does take into account the value of the foregone capital at the time of the



sale.

Q. Did you speak to anyone at First Bank in connection with the preparation of your third supplemental expert report?

A. No.

Q. In paragraph 7 of your report, you write, "I have analyzed the cost to the River Valley thrifts and their successors of mitigating some of the effects of the government's breach by replacing contracted-for regulatory capital with retained earnings and, in one instance explained below,

through the exchange of debt securities for equity securities." Do you see that?

A. Yes.

Q. To whom are you referring to when you refer to River Valley successors? First Bank?

A. Yes.

Q. Is it your position that First Bank is ^ ___ mitigating the effect of the 1989 breach affecting River Valley by retaining earnings?

A. I felt like that was a reasonable assumption and that the methodology was consistent



with looking at that mitigating effect up until the present time and then projecting that effect into the future and taking the present value of that.

Q. You say it was a reasonable assumption. And it's based on not talking to anyone at First Bank, correct?

A. That's correct.

Q. And it's based on not looking at any First Bank documents other than I believe in your additional documents considered, you have a one single First Bank document. I believe it is the First Bank 10-K for December of 1996, is that correct?

A. That's correct.

Q. It's your assumption that First Bank is currently mitigating the effect of the 1989 breach but you haven't done any analysis with respect to First Bank's actual operations, correct?

A. That's correct.

Q. And it's your potion that First Bank will continue to mitigate the effects of the 1989 breach affecting River Valley be retaining earnings straight

223

through until 2013, correct?

A. Either that or it's appropriate to use the present value of what the costs would have been to determine a cost to the damages going forward.

Q. And this would be based on an assumption that First Bank was going to indeed continue mitigating the effects of the 1989 breach by retaining earnings, correct?

A. I believe that the cost of mitigating the damages is a reasonable approximation for partially identifying the damages. The damages occurred really by virtue of the breach that occurred in 1990. I think it's a reasonable approach as to use a projection of those costs out over time or to take a

present value of those costs that would represent those damages.

Q. Did you ever look at any First Bank document to determine that it was in fact retaining earnings to mitigate the River Valley breach?

A. No.

Q. And I take it since you didn't discuss any issue on this report with anyone at First Bank, that



you didn't ask anyone at First Bank whether they projected that they would continue to retain earnings through 2013 in order to mitigate the breach of the River Valley contract, correct?

A. I did not ask -- I did not have a discussion with First Banks.

Q. So in your list of additional documents considered, there is one First Bank document, which is the one I alluded to a few moments ago, and I believe it's on the last page of your Exhibit A which is page 23 and it's at number 33. It's First Banks' 10-K as of December 31st of 1996?

A. Yes.

Q. What did you find to be important from First Banks' 10-K?

MR. JOHNSON: Objection, assumes facts.

A. No.

Q. So it's a possibility that you would not be seeking damages for the post-First Bank period if First Bank was not a party?

MR. JOHNSON: Objection, calls for speculation.

THE WITNESS: I haven't given that any thought.

BY MR. ROBERSON:

Q. Well, let's assume that you would seek damages for the post-First Bank period even if First Bank was not a party. Just put that as a posit because there are only two possibilities here. And I want to understand how that would work. Because we know that River Valley would no longer exist, correct?

MR. JOHNSON: What's your question exactly?

238

BY MR. ROBERSON:

Q. River Valley no longer exists, isn't that correct?

A. River Valley no longer exists, is that correct?

Q. That's my question to you.

A. Is that correct?

Q. I'm asking you.

A. I said before that I haven't followed exactly what has happened to the charter with respect to River Valley within the First Bank structures.

Q. So you don't know whether River Valley exists or not?

A. I do not know the current corporate structure of what was River Valley. I'm sure that in substance, there is a set of assets and liabilities and other things that originally were associated with River Valley. I do not know and I have not sought to look into exactly what the ownership structure is for River Valley at this time or if River Valley has been merged, as you had suggested, and what impact that would have had.

239

Q. So you don't know whether River Valley as a corporation exists?

A. I do not.

Q. And you don't know as of any point in time after 1995 whether River Valley existed as a corporation, is that correct?

A. What I do recall is at the time of the

acquisition, that for a variety of reasons, that it was First Bank's intention to retain the charter of River Valley. I do not know who if anything -- what if anything was merged into River Valley. But at the time of the acquisition, First Banks was the shareholder of River Valley.

Q. No, I understand that. I'm saying whether you know anything about the corporate existence of River Valley after the time of the acquisition.

A. I have not looked into that.

Q. Now, is there, in your mind, some way that you could still posit damages for the post-First Bank period where First Bank is not a party to this lawsuit?

MR. JOHNSON: Objection, calls for

240

speculation.

THE WITNESS: I would have to think about that and I have not given that a thought.

BY MR. ROBERSON:

Q. So right now, you have no understanding about that issue at all?

A. No.

Q. Are you aware, just as a matter of, like,