# EXHIBIT B

***HOMER J. HOLLAND, THE ESTATE OF HOWARD R. ROSS, AND FIRST BANK***
***v.***
***THE UNITED STATES***
***95-524C***

**HOMER J. HOLLAND EXPERT DEPOSITION DESIGNATIONS**
***(corrected deposition citations from DX 1487)***

6/27/2007 Tr. 7:6-9
6/27/2007 Tr. 8:19–12:18
6/27/2007 Tr. 28:9-14
6/27/2007 Tr. 32:17–36:9
6/27/2007 Tr. 55:10-19
6/27/2007 Tr. 58:4–62:9
6/27/2007 Tr. 63:18-64:4
6/27/2007 Tr. 66:2–68:11
6/27/2007 Tr. 70:16–71:9
6/27/2007 Tr. 71:19–72:18
6/27/2007 Tr. 86:14-87:1
6/27/2007 Tr. 88:4-7
6/27/2007 Tr. 93:19–94:13
6/27/2007 Tr. 95:3–97:14
6/27/2007 Tr. 98:12–99:15
6/27/2007 Tr. 101:3-13
6/27/2007 Tr. 106:1–108:4
6/27/2007 Tr. 108:10-15
6/27/2007 Tr. 122:13-16
6/27/2007 Tr. 123:11–22
6/27/2007 Tr. 125:3–126:3
6/27/2007 Tr. 132:15–133:7
6/27/2007 Tr. 135:9–136:9
6/27/2007 Tr. 148:9-20
6/27/2007 Tr. 155:6-12
6/27/2007 Tr. 156:12–158:7
6/27/2007 Tr. 181:10-19
6/27/2007 Tr. 192:19–194:4
6/27/2007 Tr. 199:21-200:4
6/27/2007 Tr. 205:16–207:9
6/27/2007 Tr. 214:2-13
6/27/2007 Tr. 215:9–218:13
6/27/2007 Tr. 220:7-12
6/27/2007 Tr. 222:18–224:15
6/27/2007 Tr. 225:6-9
6/27/2007 Tr. 239:14–240:15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - x

HOMER J. HOLLAND, HOWARD R. :
ROSS, and FIRST BANKS, INC., :
Plaintiffs, : Case No. 95-524C
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, June 27, 2007

Videotaped deposition of HOMER J. HOLLAND, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of United States Department of Justice, 1100 L Street, N.W., Washington, D.C., at 9:00 a.m., Wednesday, June 27, 2007, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
DX 1487
Holland v. U.S. 95-524C

Page 2

APPEARANCES:

On behalf of the Plaintiffs:
MICHAEL A. JOHNSON, ESQ.
JOSHUA P. WILSON, ESQ.
Arnold & Porter
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5783

On behalf of the Defendant:
JOHN H. ROBERSON, ESQ.
SCOTT D. AUSTIN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-7972

Page 3

ALSO PRESENT:
GOR AGHABEKYAN, Videographer
JEFF JACQUES
JEFFREY P. YUSHCHAK, Navigant Consulting
JEFF NIELSEN, Navigant Consulting

Page 4

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR DEFENDANT |
|---|---|
| HOMER J. HOLLAND | |
| By Mr. Roberson | 6 |

Afternoon Session - Page 127


EXHIBITS


| EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Third Supplemental Expert Report and Declaration of Dr. Homer J. Holland | 7 |
| 2 - Plaintiffs' Motion for Leave to Revise and Supplement Their Damages Claims | 30 |
| 3 - Westlaw excerpt | 42 |
| 4 - River Valley Savings Bank, FSB and subsidiaries consolidated financial statements as of December 31st, 1993 and 1992 | 158 |


Page 5

PROCEEDINGS

THE VIDEOGRAPHER: Good morning, ladies and gentlemen. This is the video deposition of Homer Holland taken by counsel for the defendant in the matter of Homer Holland, Howard Ross and First Banks, Incorporated versus the United States in the United States Court of Federal Claims. The case number is 95-524C held in Department of Justice. The address is 1100 L Street, Northwest, Washington, D.C. 20530, on June 27, 2007, at the time indicated on the video screen, 9:04:43. My name is Gor Aghabekyan and I'm the legal video specialist. The court reporter is Mary Grace Castleberry. We're employed by Alderson Reporting.

Counsel will now introduce themselves and the parties they represent, after which the court reporter will administer the oath to the witness.

MR. ROBERSON: John Roberson for the Department of Justice.

MR. JOHNSON: Michael Johnson of Arnold & Porter for plaintiffs and the witness. With me is my colleague, Joshua Wilson.

Page 6

Whereupon,
HOMER J. HOLLAND,
was called as a witness by counsel for Defendant, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. ROBERSON:
Q. Good morning, Dr. Holland.
A. Good morning.
Q. You've been deposed a number of times in this case, correct?
A. That's correct.
Q. So you sort of know the drill of the things that we do in the beginning of the deposition as to if you need a break, be sure to ask us for one; if you need a question clarified, you'll ask for that; verbal responses instead of a nod of the head, that sort of thing?
A. Yes, sir.
Q. Are you comfortable with that? And just to make sure there is no -- you're not on any medication or anything that would affect your memory

Page 7

at the present time?
A. I'm not on any medication.
Q. And there is nothing that would affect your memory?
A. No.
Q. Is there any portion of your expert report that was drafted at least in part initially by an attorney?
A. Yes.
Q. Can you tell us what parts of your report -- and actually, why don't we do this. Why don't we go ahead and distribute your report now so you can point us to the parts that were drafted by an attorney. And we'll have to mark this as Exhibit 1.
(Exhibit No. 1 was marked for identification.)
THE WITNESS: Well, let me give you a little background --
MR. JOHNSON: Let me object to the question as vague in the term drafted.
THE WITNESS: The background of this report is that last year, we started in discussions

Page 8

with counsel with respect to our damages theories, and decided it would be appropriate to look at the retained earnings costs as a measure of damages, as a partial measure of damages. And, with that, we started talking about the forms, the way this would be calculated and together decided to interview Cornerstone Research, who I had interviewed when we first began these cases and chose at that time not to use.
So I used Cornerstone's staff for the calculations in the Excel spreadsheets and the charts under my direction, and used Arnold & Porter services for capturing much of what is on the report in the narrative form. This is a collaborative discussion that we had. The ideas in this are mine. I don't remember whether -- who drafted which pieces of it, but at the end of the day, I am responsible for the entire report.
BY MR. ROBERSON:
Q. Now, I understand you're responsible for the report, but my question was -- and I thought you initially said that, yes, there were portions that

Page 9

were drafted by Arnold & Porter. Could you point us to any section here that was not drafted by Arnold & Porter?
A. I don't know exactly what you mean by drafted. I mean, I think that I covered orally things with Arnold & Porter as to what I thought should be in the report, they captured that and prepared several drafts of the report.
Q. And so when I meant the word drafted, I meant actually put words to paper. So is it correct that the words being put to paper was -- the words were put on paper by Arnold & Porter and they did several drafts of the report?
A. I would say putting words on paper -- I think that the concepts, the thoughts and many of the words are mine, which I articulated to Arnold & Porter and they created drafts from that.
Q. Are there any ideas in here or any drafts here -- let's get back to the question. Is there any portion of this report that was not given to you in a draft form by Arnold & Porter?
A. I don't remember precisely what things we

Page 10

changed through the drafting process, but there would have been things that I would have edited and expressed in my own words, but I don't remember precisely which ones.
Q. So there is not any particular point in this document you can point to and say, this is my work solely?
A. Again, I said I take full responsibility for the report. At the end of the day, it's the report that I signed and -- but I did have assistance from Arnold & Porter in the drafting of the report.
Q. And who at Arnold & Porter?
A. Michael Johnson.
Q. Anyone else?
A. I believe Josh might have been involved in some of the discussions.
Q. That's Joshua Wilson?
A. Josh Wilson.
Q. And just for the record, Scott Austin from the Department of Justice has joined us. Let's talk about what Cornerstone did for you. Did they put any input into the drafting of the document?

Page 11

A. Not really, no. Cornerstone -- well, I'm going back. At the beginning of the discovery process or at the beginning of this case, when we were contemplating various damages approaches, I interviewed Katie Galley with the thought that Cornerstone could operate as a staff to me in preparing damages reports, expert reports.
At that time, I still had in my employ a person who had been with me at River Valley who was expert at preparing projections and business plans. And I chose at that time to use her. This time, as we thought about the use of, or the cost of capital as it pertains to retained earnings as a measure of damages, I no longer have a staff person and went back to -- talked to Katie and one of her associates, Heather Houston, about them providing this same kind of staff role that I had previously with a woman called Susan Ells, named Susan Ells.
Cornerstone, under my direction, prepared the Excel spreadsheets that are part of the exhibits as well as the charts that are in here. We had a number of conversations with counsel going through

Page 12

the particulars of the capital structure at River Valley and how -- and the decisions one would make in best trying to calculate the costs there.
To the best of my knowledge, Cornerstone was not involved in the narrative of the report, but they were responsible for the exhibits, for those exhibits relating to the Excel spreadsheets.
Q. Can you just tell us what exhibits exactly those are?
A. Exhibit B, Exhibit C, Exhibit D, Exhibit E, Exhibit F, Exhibit G, Exhibit H, Exhibit I, Exhibit J, K, L, M, N, O.
Q. And is that all of them except for A?
A. That's correct.
Q. And who prepared Exhibit A?
A. That was part of the drafting of the narrative which was -- for which I got assistance from Arnold & Porter.
Q. Did you provide Arnold & Porter with this list of documents that you considered?
A. This was a list that we discussed and I asked them to compile it.

Page 13

Q. And a moment ago you said it was to the best of your knowledge that Cornerstone wasn't involved in the drafting of the narrative. Are you 100 percent certain that Cornerstone wasn't involved in drafting the narrative?
A. I'm not 100 percent certain, but that's my best recollection.
Q. And you're not 100 percent certain because the draft was coming to you from Arnold & Porter?
A. There were several discussions between myself, Cornerstone and Arnold & Porter. There were other discussions where Cornerstone was getting data from Arnold & Porter. There would have been discussions between Arnold & Porter and Cornerstone, but to the best of my knowledge, Cornerstone did not participate in drafting any of the narrative.
Q. But again, you can't say that with 100 percent certainty?
A. That's correct.
Q. And when did you first talk to Cornerstone -- what was the woman's name that you first spoke to? If you could just spell it for the

Page 26

MR. JOHNSON: Objection, asked and answered.
THE WITNESS: As I mentioned, I do not remember whether I edited that sentence or that was something that they drafted.
BY MR. ROBERSON:
Q. Do you know how plaintiffs' contract may have superseded that regulation?
A. I think that's probably more of a legal question than a damages question, but I'll try to answer that the -- and this probably goes back to the liability question as to how subordinated debt is part of the breach capital. The question would be, did the contract with the government require that the subordinated debt be amortized or not. And I don't really know. I think that's -- the point is that that contract may have superseded that amortization requirement.
Q. But you're not sure?
A. I'm not sure. I said it may have.
Q. Now, I know you touched on it, but I want to ask you a few questions about why you chose to

Page 27

issue another expert report, which is your third supplemental expert report and the fourth expert report in this case. First, are you aware of representations First Banks' counsel has made with its filings with the Court as to why you were issuing another expert report?
A. I was copied on most of the things that were presented to the Court, and I -- I guess that my general response would be that I -- it's my understanding that the Court has authorized this damages presentation to be made, so I think that probably settles it as far as I'm concerned.
Q. Okay. Well, would you agree that your new report is not based upon newly discovered factual evidence?
A. I would say it's as I described to you. At the end of last quarter, we discussed different damages theories, and those that had gained some traction or at least had seemed to have been affirmed by the court of appeals. And that seemed appropriate for us to consider that as a damage calculation for River Valley.

Page 28

Q. Okay. But my question was, you say that you issued a new report because you became aware of new damage theories, correct?
A. I think for me personally, it became to the point of appreciating that there seemed to be some appeal -- appeal is maybe the wrong word to use in the legal context. Some acceptance of the concept of retained earnings and cost of capital.
Q. Right. So it was a new theory that you found had a new appeal to you. But there weren't any new facts that you discovered with this case, is that correct?
A. With respect to this report, I don't believe that it was based on new facts.
Q. And so there are no new facts concerning River Valley's operations taken in the broadest possible manner that you've only recently become aware of, correct?
MR. JOHNSON: Objection, vague. You can answer, Dr. Holland.
THE WITNESS: Taken in its broadest sense?
BY MR. ROBERSON:

Page 29

Q. I'm not holding anything back. I'm saying there is nothing new concerning River Valley's operations that you just discovered that led you to believe that, well, now I need to look at a retained earnings theory. You didn't learn anything new about River Valley's operations. There were no facts hidden from you previously?
A. I don't -- again, I think my motivation to prepare this report was as I've said. I haven't based it on any new facts that were available to me.
Q. And the same is true, there weren't any new facts concerning First Banks' operations, again taken as broadly as possible, that you've only recently become aware of, correct?
A. I don't think this has anything particular to do with First Banks' operations, so no.
Q. Now, let's take a look at what your counsel said with respect to your reason for the presentation of the retained earnings theory of damages. In plaintiffs' motion for leave to revise and supplement their damage claims filed on March 20th, 2007, plaintiff indicated that your new

retained earnings theory of damages should be permitted because such a theory has been supported by Federal Circuit decisions rendered during the two years elapsed since plaintiffs last updated their damages claims?

MR. JOHNSON: Can we --

MR. WILSON: Can we see what you're reading from?

MR. ROBERSON: I'm reading from my outline but if you would like to see your filing, I would be happy to give it to you.

MR. JOHNSON: I would like Dr. Holland to be able to see the context of the lengthy quotation you're making.

MR. ROBERSON: My quotation started with the word supported, so it wasn't that -- the quotation said, "Supported by Federal Circuit decisions rendered during the two years elapsed since plaintiffs last updated their damages claims" but I'm happy to give you the filing, so why don't we do that. And I guess we'll mark that as Exhibit 2.

(Exhibit No. 2 was



marked for identification.)

BY MR. ROBERSON:

Q. And taking a look again at the first paragraph -- the second paragraph, actually, it says, "Further, plaintiffs seek leave to present a supplemental mitigation damages analysis supported by Federal Circuit decisions rendered during the two years elapsed since plaintiffs last updated their damages claims for trial." Do you see that?

A. I'm sorry, I was reading the rest of it. Would you go back to where you were?

Q. Yes. I was in the middle of the second paragraph on the first page, with the sentence that begins, "Further."

A. Further, plaintiffs seek to leave -- seek leave?

Q. Yes, if you could just read that.

MR. JOHNSON: Dr. Holland, take as much time as you need to get familiar with the document so you can understand the context of that quote.

THE WITNESS: Okay.

BY MR. ROBERSON:



Q. Yeah, I was just reading you what the statement was.

A. Yes.

Q. And then in plaintiffs' reply motion in support of the motion for leave to allow you to issue a third supplemental report, plaintiff further reiterated -- and I'll just read the statement and then if you want to look at the document, you can. They reiterated that plaintiffs here have a right to present damages claims at trial that adhere to the guidance provided by the Federal Circuit in its Winstar damages decisions. And my question is, are you aware of those representations?

A. I have seen this motion in the past. I don't remember. This is some time ago. So yes, in general, I am aware of this.

Q. And let's look at the justification you set forth for your new report as set forth in your third supplemental report. And what we'll do is look at your report at paragraph 6. And there you state, "Decisions of the Court of Federal Claims and the Federal Circuit in other Winstar-related cases have



endorsed calculations of mitigation costs measured in part by the cost to the plaintiff of retaining earnings to replace the contracted-for regulatory capital." Do you see that?

A. Yes.

Q. And then you have a footnote and in footnote 1, you write, "For example, the Federal Circuit's decisions in both Home Savings and LaSalle Talman affirm damages awards based in part on the costs of retained earnings that replaced contracted-for regulatory capital after the government's breach." Do you see that?

A. Yes.

Q. Did you write that footnote?

A. I think that was -- in this particular case, I think I deferred to counsel expressing this particular point.

Q. Now, are there any other Winstar-related cases, including those at the trial court level, that is, at the Court of Federal Claims, that you considered in coming to your belief that a retained earnings theory presents a viable claim that you

should now set forth?
A. Again, I go back to the discussions I had with counsel where I did not get into all of the cases or I don't remember all of the cases that were discussed, just that the -- I think that the point in paragraph 6 and the point in the plaintiffs' motion for leave to revise seem fairly -- as I recall, that -- as the point I made before, there seemed to be some traction with respect to the endorsing of calculations, as it says here, endorsed calculations of mitigation costs measured, in part, by the cost to the plaintiff of retained earnings.
Q. So you can't recall any other cases?
A. I do not recall at this point.
Q. And do you recall reviewing the LaSalle Talman opinion?
A. I remember quite some time ago reviewing the LaSalle Talman decision, and in part because I knew the people at LaSalle Talman. Ted Roberts, who was the CEO at the same time, was someone that I knew.
Q. Out of Chicago?



A. Out of Chicago. But I have to say that today I don't remember much about the LaSalle Talman opinion that I read at that time.
Q. So you're not sure if there is anything in LaSalle Talman that actually discusses retained earnings?
A. I would say that, again, the reason why LaSalle Talman sticks in my mind is because of my ties to Chicago as well as knowing Ted Roberts. And right now, I can't remember precisely how the specifics of the retained earnings calculations in that case were applied. My discussions of the use of the retained earnings costs as a measure of damages were somewhat abstracted from the specifics of those two cases.
Q. Is it your -- you said that you're not sure how the specifics of the retained earnings calculations, I believe, were set forth in LaSalle Talman. Was that what you just said?
A. I believe that's -- we can see what I just said. I don't know.
Q. I can't, actually, that's why I just



asked. I think what you said was, "I can't remember precisely how the specifics of the retained earnings calculations in that case were applied." Is it your representation that there were retained earnings calculations in the LaSalle Talman opinion?
A. Again, I'm not recalling the specifics of LaSalle Talman.
Q. In any respect?
A. No.
Q. Did you review -- I think we have touched on it, but did you review the Long Island Savings Bank opinion from the trial court at 67 Fed Claim 616 which was issued in 2005?
A. You asked me that before, and I said I don't remember the names of these cases.
Q. And so you're not --
A. No, I don't remember that I reviewed that.
Q. And what about the opinion in Bank of America, FSB versus United States which was at 67 Fed Claims at 577, and then there was another opinion that sort of piggybacked on top of that which is 70 Fed Claims 246?



A. I may have read those over the last several years, but I relied primarily on counsel to provide the highlights of these decisions and their applicability to River Valley.
Q. Are you aware of any opinions in the Court of Federal Claims rejecting a retained earnings theory of damages?
A. No, I'm not.
Q. Now, let's look at Exhibit A. And this is a list of your additional documents considered, correct?
A. Correct.
Q. And what is your understanding of the purpose of this list of additional documents considered?
A. Primarily these financials of Rock Falls, River Valley 1, River Valley 2, River Valley Holdings, San Antonio Federal Savings Bank, River Valley, FSB, and Western Capital Holdings all relate to the underlying financial records of the companies.
The other documents are somewhat related -- are referred to in here. The FHLBB

Page 54

responses, and you finish your questions before you each try to continue a different interaction.

THE WITNESS: I probably would want to read the expert report that was behind the decision. Sometimes the decisions are somewhat summarized by the expert report. This looks like a very extensive decision. I don't know.

And so I would want to spend the time to analyze the analysis that was done in the Home Savings case in order to try to make those comparisons. I did not do that. What I did was take the parameters that I felt were very appropriate to River Valley and, in particular, the issue is what's the cost of capital for River Valley. I believe that's a conservative figure that was based on analysis that the government had done in 1991.

BY MR. ROBERSON:

Q. Now, if the Court were to find that your finding that River Valley and First Banks' cost of funds -- I know you take exception to whether it's First Banks' but for the period after First Bank acquires River Valley in the real world, that if the

Page 55

Court were to find that those cost of funds could not have been 20 percent year in and year out for 23 years, is there another source of information you could point us to that would indicate an alternative cost of funds for River Valley, first?

MR. JOHNSON: Objection. There is a fundamental assumption in this question that I think is wrong. And so the question is vague and confusing but answer it if you're able, Dr. Holland.

THE WITNESS: I think you -- excuse me. I think you said two things. One, you talked about First Banks, and so let me address First Banks versus River Valley. My understanding is that my job was to calculate the damages to River Valley and it was appropriate to use River Valley's cost of capital with respect to that. Absent the breach, it's not even clear that First Banks would have acquired River Valley. So I think that I would put First Banks aside with respect to this and focus on River Valley.

The second part of your question would be -- was if the Court finds that a different cost of capital is appropriate, that could be certainly

Page 56

calculated. I think you said, are there other sources that could be used to calculate, to get at a cost of capital. I have not considered that. I would have to think about what other sources were appropriate.

I think that here we have the analysis that was conducted by the government in essentially a -- not an adversarial but at least in a buyer/seller mode, where they came up with the discount rate that they would use to value River Valley based on their earnings, which of course is the accepted method of looking at cost of capital.

I think that's a very reasonable way to start. And as I've said, I've been involved with both investments and investors with organizations of the size and type of River Valley for many years, including currently, and 20 percent is certainly, in my opinion, a conservative cost of capital.

MR. JOHNSON: Mr. Roberson, I just want to try to get clarity on something. I think in your question, you used the term cost of funds and then in Dr. Holland's response, he answered in terms of cost

Page 57

of capital. I don't know what you intended your question to mean, but if you thought those were supposed to be two different things and there was some confusion here, maybe we ought to try to resolve it.

MR. ROBERSON: No, I didn't intend them to be separate.

THE WITNESS: Excuse me, you meant cost of capital?

BY MR. ROBERSON:

Q. Yes. And I assume your answer was with respect to cost of capital?

A. Yes.

MR. ROBERSON: I understand from the videographer that we're about to run out of tape and this would probably be a good time for a break.

MR. JOHNSON: Absolutely.

THE VIDEOGRAPHER: Here marks the end of videotape number 1. Time on the screen is 10:18:21. We're going off the record.

(Recess.)

THE VIDEOGRAPHER: Here marks the

Page 58

beginning of tape number 2. Time on the screen is 10:29:41. We're back on the record.

BY MR. ROBERSON:

Q. Dr. Holland, just before we took a break, I think you said that you're not clear that First Bank would have acquired River Valley in a nonbreach world. Do you recall saying that?

A. Yes.

Q. And we were talking about First Bank's cost of capital in connection with the -- at the time you made that comment, correct?

A. Yes.

Q. Now, I understood your mitigation damage claim to be based upon the real world where First Bank did, in fact, acquire River Valley. Am I mistaken?

A. I think that what I said is that I didn't believe that First Bank's cost of capital was relevant, for two reasons. I still think that it is appropriate to say that it's not clear that we would have sold to First Banks but for the breach. That changed things as far as my partner and I and our

Page 59

thoughts about the future for River Valley.

So I think that's still an accurate statement. And I believe that the damages that we're dealing with here are the damages to River Valley and it would have been River Valley's cost of capital that is the relevant measure.

Q. But to be clear, your mitigation theory is set forth in the actual world, is that correct?

A. It's clear to me that the breach caused damages for River Valley. River Valley was required to shrink as a result of the breach. We couldn't earn as much as we otherwise would have earned. What we are using is actual numbers for the amount of retained earnings that were necessary to offset the loss of the breach as a way to get at a partial measure of the damages. And to the extent that this is the real world, it's the actual amounts of retained earnings during that time.

Q. But in the post-First Bank acquisition period of time, in the actual world, First Bank acquired River Valley in 1995, correct?

A. That's correct.

Page 60

Q. And in modeling your damages, you assumed that the First Bank acquisition occurs in '95 when it actually did, correct?

A. I don't believe that that is relevant to the calculation of the damages. I mean, I don't think that there is anything in my calculation -- I would have to think about that -- that specifically pertains to the acquisition of River Valley.

Q. Are you asserting, then, that your mitigation claim involves a potential in the First Bank acquisition -- post-First Bank acquisition period, it involves the potential that First Bank didn't acquire River Valley?

A. I don't think that's what I said. I said that the -- I need to think about this, but I don't think that the fact that First Bank did acquire River Valley affects the calculations. In other words, if they had not acquired River Valley, I think the calculations would have been exactly the same.

Q. But just to be clear, what you have done, though, is assumed that, in the actual world, this is the litigation that occurred in the actual world and,

Page 61

in the actual world, First Bank acquires River Valley exactly when it did?

A. I haven't made that assumption. What I've said is that I think the calculation is the same either way.

Q. So you haven't assumed that First Bank acquires River Valley in January of 1995 in your modeling of damages?

A. What I'm trying to think of is whether there would be any difference in the way I had calculated the damages relating to the fact that River Valley was acquired. River Valley was then a subsidiary of First Bank's.

Q. Now, what world is your model in? Is it in the actual world or the but for world?

A. I would talk about the but for world is when one said that but for the breach, here's what would have happened. And a number of assumptions would have been made in that respect. So I wouldn't put this in the but for world in that sense. We've used but for worlds in the calculation of lost profits. This is not a lost profits damages theory.

Page 62

This is a calculation of the cost of using retained earnings. Instead of using retained earnings for other purposes, they had to be allocated to keep River Valley alive during this period because of the breach by the government.

I guess I would say it again. I think to that extent, we are talking about the real world, but I don't think that it is necessarily relevant that there was an acquisition by First Banks.

Q. Now, we were discussing the cost of capital and I had proposed to you the notion that if the Court found that your 20 percent cost of capital was inappropriate, whether there were alternative funding sources of capital that you could rely on as information to set forth a cost of capital computation. Are there any alternative sources of capital that you can recollect that River Valley had that you might be able to use as a source of computing the cost of capital?

A. Well, I think, as I said before, if the Court concludes that there would be a different cost of capital, the calculation can be adjusted to that,

Page 63

but I have not sought to determine a different cost of capital. I felt that the cost of capital that had been already discussed in Dr. Murphy's testimony and in his expert report, and was originally determined by the government, is appropriate. And so I don't believe that -- I haven't looked to other sources for the cost of capital.

Q. So you never considered an alternative cost of capital other than the methodology by which you came up with a 20 percent figure, is that correct?

A. This is the one that I felt was the most appropriate or is the most appropriate. As I said before, I mean, from my experience as both an investor and as one who raises funds from investors, I think the 20 percent figure is a very conservative number.

Q. My question wasn't what you thought was most appropriate. My question was, did you consider an alternative cost of capital, another source of capital to come up with that competition?

A. I wouldn't say that I did, no.

Page 64

Q. You didn't consider any other alternative costs of capital?

A. I did not consider other alternative -- another alternative cost of capital.

Q. And did River Valley thrifts obtain capital from any source during the period of time that you were -- before the acquisition by First Bank?

A. Are you talking about -- during what period of time are you talking about?

Q. The entire period of time up until River Valley's existence relative to this lawsuit, which would be July of '88, through the acquisition by First Bank.

A. There were a number of capital events that related to River Valley. In 1988 when River Valley, FSB was created, the sources of capital were the FSLIC preferred, the subordinated debt, the capital credits and the supervisory goodwill. At the time of the Republic transaction, there were capital credits, supervisory goodwill, the retained earnings of Rock Falls. Did I say them all? Capital credits,

Page 65

supervisory goodwill, subordinated debt and the retained earnings from Rock Falls.

While there are a number of interest rates -- I'm sorry. And with respect to Peoria Savings, there was also a preferred stock issuance. In all of those cases, other than the government-provided capital, where there was cash provided from an outside source, there was no independent measure of a specific cost of capital because, in all cases, the cash was provided either from the existing Rock Falls in the form of retained earnings or from subordinated debt or preferred stock which was provided by American National Bank.

Those -- and American National Bank would not have provided those but for the personal guarantees of myself and Howard Ross. I believe that the -- coming back to the cost of capital, one needs to look to what return is an investor expecting to get from that investment either from dividends or from appreciation in the value of the company. And as I've said before, I think that 20 percent is a minimal return that investors are expecting to get

Page 66

and one that was confirmed by the government.
Q: And with respect to the AMB, that's the sub debt?
A. Correct.
Q: And you just said that -- I believe you said that that wouldn't count as an independent measure of the cost of capital?
A. That's correct.
Q. And I believe you said it is because you and Mr. Ross provided personal guarantees with respect to the funds that -- the capital that was obtained, is that correct?
A. That's correct.
Q. Is there any other reason that you believe the AMB sub debt cost of capital is not an independent measure of the cost of capital?
MR. JOHNSON: Objection, vague as to time but answer if you're able, Dr. Holland.
THE WITNESS: I think that my first answer is the one that I would think is primary, that American National would have lent to us as individuals based on our own credit, would have

Page 67

looked at the credit of River Valley and would have -- as I said, would not have lent to River Valley on its own.
I guess the other thing to be said is that the cost of capital that the government looked at and the cost of capital that I used, since it's tied to retained earnings, is really looking at an equity component of the cost of capital. Subordinated debt also has different characteristics than the equity component. So I think that's also not as appropriate a cost of capital as the equity component.
BY MR. ROBERSON:
Q. Are those the only reasons that you don't believe the AMB sub debt is an independent -- could be an independent measure of the cost of capital?
A. I haven't -- there may be others. Those are the two that I can think of at this time.
Q. When you say there may be others, are you aware of any -- when you think about capital, are you aware of any notions of a characterization of an independent measure with respect to cost of capital?
MR. JOHNSON: Objection, vague and

Page 68

confusing.
THE WITNESS: I think that the -- my answers are still the most appropriate, that the fact that subordinated debt would not have been provided but for the guarantees, and that subordinated debt has different characteristics than equity. And I believe that when one is talking about retained earnings, one is talking about equity, I think those are the two things that come to mind at this point. If I thought about it more, I might have other points to discuss on that as well.
BY MR. ROBERSON:
Q. Are you aware of any literature, academic studies with respect to considering -- that consider or deal with whether or not a capital cost is properly analyzed as independent, as you characterize that?
MR. JOHNSON: Objection, vague.
THE WITNESS: I think I would ask you to repeat that.
BY MR. ROBERSON:
Q. We were discussing, based on what you

Page 69

said, that you believe certain types of capital couldn't be considered to represent an independent measure of the costs of capital, I think specifically with respect to River Valley, correct?
A. What I meant by independent measure is that I don't think that the interest rate on subordinated debt or the dividend rate on the preferred stock captured the entire cost of capital.
Q. And are you aware of any literature, academic literature or otherwise, in finance journals of any kind that deal with whether capital costs can be considered to be an independent measure as you just characterized it?
MR. JOHNSON: Objection, vague.
THE WITNESS: No.
BY MR. ROBERSON:
Q. Now, other than the AMB sub debt, were there other avenues by which River Valley obtained capital after the point in time of the acquisitions in 1988?
MR. JOHNSON: Objection. Calls for fact testimony. If you want to direct him to a specific

Page 70

event and ask him what the significance is, that would be appropriate in an expert deposition. Answer if you're able, Dr. Holland.

THE WITNESS: I don't recall additional sources of capital other than transactions that created a profit for River Valley. We sold branches, we sold -- yes, we sold branches for a profit that created a source of capital. I don't remember any others.

BY MR. ROBERSON:

Q. And a minute ago you said that you didn't believe that the acquisition of River Valley by First Bank was relevant to your damage calculations, is that correct?

A. Yes.

Q. Why is it that the acquisition by First Bank is not relevant given that your modeling of retained earnings is in the actual world?

A. Because I'm taking River Valley's retained earnings and I'm measuring the cost of River Valley's retained earnings. At one stage, River Valley was owned by Howard Ross and myself. At another stage,

Page 71

it was owned by First Banks. But I'm taking the retained earnings during both of those periods. If River Valley had been owned by you in one of those periods, I think the calculation would have been the same.

Q. So it doesn't make any difference what First Bank's actual cost of capital is as far as your modeling of damages in this case?

A. Correct.

Q. Is it your intention to present a retained earnings theory of damages based upon a 20 percent cost of capital and no other costs of capital at trial?

A. At this stage, this is what -- the damages theories that we have presented that does use a 20 percent cost of capital. At this stage, I don't have any other intention to present a different cost of capital.

Q. Now, did you or River Valley ever pay 20 percent interest with respect to any funds obtained for use at the River Valley thrifts?

A. I don't believe that's relevant to the

Page 72

issue of the cost of capital, but the answer is no.

Q. And did you make any efforts to determine whether First Bank has ever obtained capital from outside parties, including its shareholders?

A. With respect to this analysis, I have not looked at First Banks.

Q. And did you or River Valley ever pay 20 percent interest with respect to any capital obtained for the use of the River Valley thrifts?

A. Again, I don't think that that is -- whether or not we would have paid an interest rate of 20 percent is not the appropriate way to look at the cost of capital, but as I answered before, no, we did not pay 20 percent.

Q. And do you know what First Bank's cost of capital was at any point in time between 1995 and the present time?

A. I do not know.

Q. And what is the basis for your belief, which I think you state at paragraph 44 of your report, that a 20 percent cost of capital for River Valley is conservative?

Page 73

A. During the time that I was an owner at River Valley, and subsequent to that, I have been an investor in a number of privately held companies, and in all of those cases, the expectation as an investor in those companies would be that the investors would earn a return in excess of 20 percent.

And I think that River Valley's risk profile warranted a rate of return in excess of 20 percent. And I think that the -- and that's, in my mind, how the cost of capital gets derived is from the return expectations of investors. It is also the appropriate measure to discount future dividends on future cash. And I think even the government's analysis would imply somewhat greater than 20 percent cost of capital.

Q. Do you have anything else to add to that answer?

A. No.

Q. Let me just see if I understood sort of the general categories of your answer. The first, I think you said that you believe it was conservative -- and these are all reasons why you

Page 86

lost profits that River Valley would have earned by leveraging the breached regulatory capital to add incremental income-earning assets other than San Antonio Federal Savings Bank in the years following the breach?

MR. JOHNSON: Objection, outside the scope.

THE WITNESS: I think that, as far as I'm concerned, I authorized this that says we intend to forego a claim. I don't know what the process is of foregoing a claim, and I don't know what's been done with respect to that.

BY MR. ROBERSON:

Q. Well, do you intend to set forth a lost profits claim at trial, even though you're now going to be issuing a retained earnings theory of damages?

MR. JOHNSON: Objection, outside the scope. It's got nothing to do with the analysis in the report. Let's keep it on what the subject is.

THE WITNESS: I guess I would defer to counsel with respect to what happens at court, but I think the statement here is what I agreed to, that we

Page 87

intend to forego the claim for lost profits.

BY MR. ROBERSON:

Q. Now, the Court of Federal Claims recently issued an award for damages for increased leveraged lost profits connected with incremental income earning assets in a Winstar-related case in First Federal Savings and Loan Association of Rochester versus the United States at 76 Fed Claim 106. That opinion was issued on April 13, 2007. And in fact, I believe this decision was issued by the same judge, George Miller, who is deciding this case. Are you aware of this decision?

A. I don't recall it.

Q. Well, it's a new decision, so if you had seen it since April 13th, would you have recalled it?

A. Probably.

Q. So you didn't seen it?

A. I don't believe I've seen it.

Q. And given that the Rochester decision is a case that involves an award of lost profits from lost leverage, is there a possibility that you may change your mind again and decide to go ahead and put on at

Page 88

trial your lost leverage/lost profits claim?

MR. JOHNSON: Objection, beyond the scope.

THE WITNESS: I don't remember what the rulings were based on this motion. And you know, if we are absolutely precluded from putting on lost profits. But I stand by the statement, our intention is to forego the claim for lost profits.

BY MR. ROBERSON:

Q. And are you still pursuing Dr. Murphy's claim for the value of the residual capital of the date of the sale to First Bank?

MR. JOHNSON: Objection. Dr. Holland, you don't need to answer that question because that's not addressed to you as an expert witness. You're not sitting as a fact witness today, so don't answer that question.

MR. ROBERSON: It's not a fact question. It's a question of what expert damages theories are going to be at trial.

MR. JOHNSON: Right. And you might properly put that question to Dr. Murphy, but the only way Dr. Holland could answer that question is as

Page 89

a plaintiff, not as an expert witness. And today's deposition is of Dr. Holland as an expert witness. So Dr. Holland, you don't need to answer that question. Let's move on.

BY MR. ROBERSON:

Q. Have you had any discussions with Dr. Murphy since issuing your retained earnings theory of damages?

A. No.

Q. And did you have any discussions with Dr. Murphy in the last year, that is, while you were preparing the retained earnings theory of damages?

A. No, I did not.

Q. Does Dr. Murphy -- are you aware of any communications to Dr. Murphy with respect to the damage claims that will be presented at trial?

A. I am not.

Q. And are you still pursuing your claim for the increased value that the net operating losses would have had upon the sale to First Bank?

MR. JOHNSON: Objection, beyond the scope. John, let's try to focus this on the subject that's

Page 90

relevant at hand, the analysis in the third supplemental report. Dr. Holland is here as an expert to testify about that, not as a plaintiff to testify about what might happen at trial.

BY MR. ROBERSON:

Q. Are you refusing to answer the question, Dr. Holland?

A. Yes.

Q. Under what basis?

A. Advice of counsel.

Q. Is that the only basis?

A. Again, I think that what — I'll repeat what he said, that I'm here to be deposed as an expert witness.

Q. You're no longer offering any opinion regarding any lost value to River Valley as a result of it inability to use net operating losses, isn't that correct?

MR. JOHNSON: Objection, beyond the scope. Today's deposition is about the analysis here.

THE WITNESS: Again, I'm prepared to answer questions with respect to this report, not

Page 91

previous reports.

BY MR. ROBERSON:

Q. Now — you're refusing to answer that question?

A. I'll be happy to answer questions with respect to this report, and I'm not prepared to answer questions with respect to previous reports.

Q. And I guess this is not a question about the previous reports. It is a question about the upcoming trial.

A. I'm not prepared to answer questions about the upcoming trial, other than with respect to this report.

Q. How did retaining earnings cause harm to First Bank?

MR. JOHNSON: Objection, relevance. Answer if you're able, Dr. Holland.

THE WITNESS: I think the cost of retained earnings, as I've said before — first of all, I think that the breach of the contract reduced the amount of capital that was available to River Valley. River Valley had to shrink its assets and suffered

Page 92

damages as a result of the loss of that capital. And I am not looking to — I'm using the cost of the retained earnings as a partial measure of damages to River Valley. First Bank is the successor to River Valley.

BY MR. ROBERSON:

Q. I understand First Bank is the successor to River Valley. My question was, did retaining — or how and if retaining earnings caused any harm to First Bank.

A. Did retaining earnings cause the harm to First Banks?

Q. Right.

A. I'm not opining on damages to First Banks. I'm looking at damages to River Valley.

Q. Is it your opinion thet the — so you model retained earnings in the period that First Bank has acquired the thrift, correct?

A. Correct.

Q. But you're saying that that modeling of River Valley's — of the damages in that post-First Bank period has nothing to do with damages to First

Page 93

Bank; is that correct?

A. What I'm saying is that those are damages of River Valley's.

Q. And my question is, it has nothing to do with damages to First Bank?

A. Well, only to the extent that First Bank is the owner of River Valley.

Q. Is that an exception that swallows the rule? I mean, can you explain what you mean by only to the extent that First Bank is the owner of River Valley?

A. I think you asked me to what extent did the retained earnings cost First Banks. They cost River Valley to the extent that — to the same extent that, in the view of the owner, damages to River Valley would affect your ownership in River Valley.

Q. Simply that you own the claim?

A. You own River Valley.

Q. So is River Valley, as held by First Bank, continuing to retain earnings?

A. I don't know exactly what is happening with respect to River Valley during that period, but

Page 94

I think that as a measure, it had retained earnings that were in excess of the amount of capital that had been taken away.
Q. So a moment ago you said you're not aware of what's been happening with River Valley during the period that First Bank's been an owner of River Valley, is that correct?
A. I have not taken a look at exactly what First Banks has done with River Valley.
Q. So you can't say -- you've made no analysis at all with respect to River Valley as owned by First Bank, correct?
A. I think that's correct.
Q. Now, I am initially asking, in your opinion, how did retained earnings cause harm to First Bank and we just had that discussion. Now I'm going to ask you, in your opinion, how did retaining earnings cause harm to River Valley?
A. I think that the thing that caused harm to River Valley was the loss of the contract capital. Using retained earnings to replace that capital and having the measure of the cost of the capital is a

Page 95

way to put a measure on the mitigation of those damages, the cost of mitigating those damages.
Q. I know, but my question is how did the retaining earnings cause harm to River Valley?
A. As I said --
MR. JOHNSON: Objection, asked and answered.
THE WITNESS: How did retaining earnings cause harm? Retaining earnings was -- retained earnings could have been used by River Valley for other opportunities, could have been paid out as dividends. This was a case where, because of the government's breach, those other opportunities couldn't be exploited by River Valley. Using the amount of the retained earnings as a measure of the mitigation of the breach by the government is what this analysis is about.
BY MR. ROBERSON:
Q. And I believe you said that how it was harmed was that there were certain opportunities that it couldn't pursue because they had to retain the earnings, is that correct?

Page 96

A. Correct.
Q. And what opportunities were those that couldn't be exploited?
A. The balance sheet could have been larger, we could have earned more money on a larger balance sheet. We had to shrink the balance sheet. We had other acquisitions that could have been made that weren't made.
Q. And how would the balance sheet have been larger?
A. The balance sheet had to be reduced by almost 50 percent so had the breach not occurred, I would have expected that the balance sheet would have continued to stay at its present level and grow in accordance with the business plans that have been presented to the government.
Q. And how is that? I mean, how would it have grown?
A. It would have grown in the same way it had grown previous to that. It grew from two principal purposes. It grew through the acquisition of assets financed by liabilities that were allowed if it had

Page 97

adequate capital. It would also have grown by acquiring other institutions and adding that balance sheet to the River Valley balance sheet.
Q. And what specific institutions would it have acquired?
A. The one that we've already talked about in some detail previously is San Antonio Federal Savings Bank. There was an institution in Galesburg that we had been in discussions with that we were at a letter of intent stage, that we were precluded from acquiring. There were several others that we would talk to from time to time.
Q. Galesburg located in --
A. Illinois.
Q. Is the harm from retaining earnings basically foregoing the value of these lost opportunities?
A. You asked me what the harm was, I believe, and the harm is that we lost capital. That capital would have been available and the capital restricts the size of the organization. So I believe the harm was that, in losing that capital, we lost -- we were

Page 98

forced to take actions that we didn't want to take, which was shrink the balance sheet and reduce the earnings, and we lost the opportunity to grow the balance sheet.

The retained earnings had to be used simply to meet the minimum capital requirements during that period of time to keep the organization alive. And the measure of the cost of allocating the retained earnings for that purpose, I've calculated is based on the amount of retained earnings that were used for that purpose times the cost of capital.

Q. But in short, the harm to River Valley was foregoing the value of these lost opportunities, correct?

MR. JOHNSON: Objection, mischaracterizes the testimony, asked and answered.

THE WITNESS: The harm was the loss of capital. The loss of capital resulted in two things. It resulted in us losing earnings by virtue of having to reduce the size of the balance sheet and not being able to take advantage of opportunities to grow the balance sheet either through acquisitions or through

Page 99

other forms of growth.

BY MR. ROBERSON:

Q. And in both of those categories, you lost earnings because you had to reduce the balance sheet and then you lost opportunities to grow the balance sheet. In both cases, you're talking about opportunities that were lost, correct?

A. These were other opportunities where we could have used the retained earnings. Instead, we allocated the retained earnings to meet the minimum capital requirements of the institution. And I have felt that a reasonable measure of the cost of allocating the retained earnings for that purpose was to use the cost of capital times the amount of the retained earnings that were used for that purpose.

Q. Now, what was the reason that retained earnings in River Valley were above the regulatory minimum given that the increased damages -- and we're talking about the period from 1990 to 1993?

A. I think you need to be more specific.

Q. Well, do you show -- do you have a chart in your report that shows what -- maybe you don't. I

Page 100

don't know -- what the regulatory minimums were for River Valley with respect to capital, do you know what those were for the period 1990 to '93?

A. I don't think that's in --

Q. Yeah, it's probably not in your report, now that I think about it. But are you aware of the fact that River Valley exceeded the regulatory minimums in the period -- with respect to capital in the period from 1990 through 1993?

A. I know there were -- I mean, I think that there were situations where the minimums, as you say, were specific to River Valley which we felt was in part a result of the breach. I think I have testified to that in the past. There were also times when one would feel it appropriate to have a cushion above a minimum. I think I've testified to that in the past.

And because we could not acquire San Antonio Federal directly at River Valley, it was necessary to reduce the balance sheet at River Valley in order to redeem some of the preferred stock or with the retained earnings. And in anticipation of

Page 101

that, there could have well been times when our capital ratios were above the minimum.

Q. But whenever they were above the minimum, that increases damages, as far as you're concerned?

A. Whenever they were above the minimum, they were -- regardless of where they were relative to the minimum, they were offsetting capital that had been breached by the government. There are reasons why one would want the capital above a minimum. As I have explained, I haven't -- if I went back and looked at the specifics, I could probably remember what the reasons were. But I think there were good business reasons to have that amount of capital.

Q. So even though you were being damaged by having capital -- retained earnings above regulatory minimums, you felt being damaged by that amount was a good business decision?

MR. JOHNSON: Objection, lacks foundation, mischaracterizes the testimony.

THE WITNESS: I think they were good business decisions for having capital above minimums from time to time. A cushion against volatility, a

Page 106

Q. And between 1990 and 1994, whose cost of equity capital are you measuring?
A. River Valley.
Q. And between 1995 through 2013, whose cost of equity capital are you measuring?
A. I'm using the same cost of capital, River Valley's.
Q. So you're not using First Bank Incorporated's cost of equity capital, correct?
A. I'm using River Valley's.
Q. And not First Bank's, the thrift?
A. That's correct.
Q. And that's despite the fact that River Valley didn't exist after, what, January of 1995 or sometime after the First Bank, FSB acquisition?
A. I'm not -- it's my understanding that they retained the charter of River Valley at First Bank, so it's not my understanding that River Valley failed to exist.
Q. At any point in time?
A. I haven't examined it closely recently, but from my remembering of the transaction, they

Page 107

acquired River Valley and retained the charter to River Valley.
Q. I know, but then thereafter -- because remember, as you know, there were a number of mergers between different First Banks, Incorporated subsidiaries and related companies. And do you have any awareness or any knowledge of whether the River Valley charter was retained?
A. I haven't looked into that specifically. I would have anticipated that the charter would have been retained for the important attributes of that charter.
Q. But you didn't look into it at all?
A. I have not looked into it.
Q. And is that important to your calculation, the notion that there is a continuing of the River Valley charter?
A. Not necessarily. I think that the -- while I believe that the charter did continue, I believe that the important measure was damages to River Valley. And, again, the damages to River Valley were the loss of the capital by the breach and

Page 108

the consequences of the loss of that capital. We are using the retained earnings as a measure of the partial mitigation of those damages and the cost of capital related to that.
Q. Between 1995 and 2013, whose cost of equity capital are you measuring?
A. As I said, I'm using the River Valley's cost of capital as determined by the government in its analysis.
Q. And that's regardless of the fact that River Valley and its charter may not even exist at some point in time after the First Banks acquisition?
A. I do not know that it does not exist. I would expect that it still does exist, but I don't know that for sure.
Q. But would you answer my question?
A. Ask the question again.
MR. ROBERSON: Do you have it?
THE REPORTER: "Question: And that's regardless of the fact that River Valley and its charter may not even exist at some point in time after the First Banks acquisition?"

Page 109

THE WITNESS: Again, the damages were the loss of capital. Clearly during the period from '90 to '94, retained earnings was used to mitigate the damages from that loss of capital. And so therefore what we're using is a measure of the litigation of the damages using the cost of capital that was determined by the government. I guess I'm maybe not getting directly to your question again. Maybe you --
BY MR. ROBERSON:
Q. In other words, in the period between 1990 and '94, you're using what you consider to be River Valley's cost of capital, correct?
A. I'm using River Valley's cost of capital, correct.
Q. And in the period 1995 through 2013, you continue to use River Valley's cost of equity capital, even though it was acquired by First Bank, the charter may or may not exist, and the -- well, leave it at that.
A. I guess the answer is yes. I used River Valley's cost of capital throughout the period of the

Page 122

A. The 6 million was paid out to redeem preferred stock that was held at the holding company. That preferred stock had been funded by American National Bank. American National Bank agreed to fund, separately for Howard Ross and myself and others, Western Capital Holdings which acquired San Antonio Federal Savings Bank.
Q. Are you finished?
A. I think so.
Q. You say you think so?
A. I think that ended up at the end of my thought. Maybe I've --
Q. So River Valley was paying out its retained earnings in '92 in order to facilitate the SAFSB acquisition through another entity?
A. Yes.
Q. And was there any other time when River Valley incurred a cash outflow?
MR. JOHNSON: Objection, vague.
THE WITNESS: Not that I recall.
BY MR. ROBERSON:
Q. Just to be clear, then, the 20 percent

Page 123

cost of equity capital was not traceable to an actual cash flow, correct?
A. The 20 percent cost of capital, because we've defined it in several different ways, but for the breach, that cash flow could have been paid out as dividends or a redemption of stock. And the cost of capital is a rate of return that is the rate of return at which the investors choose to either continue putting their money into the company or choose not to take money out of the company.
Q. Okay. But my question was, the 20 percent's not traceable to an actual cash flow, correct?
A. I can't think of a cash flow that would be specifically attributable to that.
Q. And is it your opinion that the 20 percent annual gross cost of retained earnings represents an actual cash flow incurred by First Bank from 1995 through, say, 2007?
A. The 20 percent is not related to First Bank, but I don't have any specific knowledge of the cash flows related to First Bank.

Page 124

Q. And in your modeling, you propose, I believe, an 8.825 percent annual pretax benefit of the retained earnings, is that correct?
A. I believe that's correct.
Q. And is it also your opinion -- let me ask it this way. Does the 8.8 percent annual pretax benefit of retained earnings represent an actual cash inflow received by River Valley during the 1990 through 1994 time period?
A. That rate is the rate on a 10-year Treasury that is an interest -- I mean, is a risk-free rate. It may well have been the case that River Valley had assets in its portfolio of Treasuries, but it wasn't intended to be tied to a specific asset of River Valley. It was using the same methodology that I believe has been used and accepted in other cases of taking a risk-free Treasury rate.
And I think that the risk-free aspect of it is appropriate given that the foregone capital or the contractual capital was something that had a government guarantee to it, and there wasn't, at

Page 125

least apparent, a risk associated with that. So I think that's why the risk-free rate has been used.
Q. I guess my question, though, was the 8.825 percent pretax benefit of retained earnings doesn't represent an actual cash inflow received by River Valley during the 1990 through 1994 time period, correct?
A. I think I answered that as to why the 8.82 percent was used. And it's not because an instrument in those amounts was identified. It's simply offsetting the fact that cash is associated with the retained earnings.
Q. Right. So it's a theoretical contract. It doesn't actually represent a cash inflow received by River Valley between 1990 and 1994?
A. I think it's a reasonably accepted way of offsetting the benefit of the cash. I do not -- yes. I mean, it is not intended to replicate exactly any cash flows.
Q. And I take it the same is true with respect to the 8.8 percent benefit of retained earnings with respect to First Bank during the 1995

Page 126

to 2007 period, it's not modeled by you to reflect an actual cash inflow received by First Bank, correct?
A. Correct.
Q. Do you want to take a break now?
A. That sounds good.
Q. Is now a good time?
A. Sounds good to me.
THE VIDEOGRAPHER: Going off the record. The time on the screen is 12:20:46.
(Whereupon, at 12:20 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:39 p.m., this same day.)

Page 127

AFTERNOON SESSION
(1:39 p.m.)
Whereupon,
HOMER J, HOLLAND,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)
THE VIDEOGRAPHER: Going back on the record. The time is 13:40:02.
BY MR. ROBERSON:
Q. Dr. Holland, what is your basis for using a Treasury yield of 8.825 percent to measure the incremental benefit associated with replacement capital throughout the entire time period?
A. The basis relates to using an interest free rate. The 8.8 -- I would have to look at the exact percentage. Is it 8.5?
Q. 8.825.
A. 8.825 was, I think as explained in the report, was derived from the 1990 time frame as the 10-year Treasury at that time.

Page 128

Q. In response to my question, you said that the basis relates to using an interest free rate?
A. I meant a risk free rate.
Q. Okay. Now, is it your opinion that once River Valley replaced the contractual capital with retained earnings, the only incremental benefit was the ability to invest that capital and earn a direct yield?
A. Well, in terms of a benefit, I think it was -- if we're talking about calculating a net cost of capital, then we would take the benefit which is the after tax rate on the risk free Treasury less -- and subtract that from the cost of capital on an after tax basis. That was the net cost, I think, in getting at a cost. And what you deducted from the cost, I think that's the appropriate incremental benefit.
Clearly from a global perspective, the benefit or the -- what we were doing was mitigating the damages and that allowed the thrift to continue to operate and continue to survive. So I think I used benefit as related to a financial reduction in

Page 129

the cost. I think the 8.8 percent is the appropriate pretax number to use. I'm not sure if you're trying to determine -- you said is that the only benefit. I think the -- the only other thing I would say in that respect is that I suppose you could define a reduction of an injury as a benefit and, to that extent, there were other benefits.
Q. What other benefits?
A. Keeping the thrift alive.
Q. So the benefits, as I see from what you've said so far, from the retained earnings was that there is this after tax rate with respect to the Treasuries, right?
A. Yes.
Q. And then you say there is the benefit of staying alive, in effect?
A. Yes.
Q. Is there any other benefit associated with what is in effect substituting tangible capital for intangible capital?
A. I think the tangible aspect of it relates to the earnings or the interest value of the

Page 130

Treasury. The intangible capital of course had an amortization, but that's been taken into account in the calculations, so I can't think of other benefits that you might be referring to.
Q. So let me just try to take this from one other angle. What was the gross benefit associated with the retained earnings that River Valley realized in the actual world?
MR. JOHNSON: Objection, vague.
THE WITNESS: I was calculating the net cost. Now you're defining something different in terms of --
BY MR. ROBERSON:
Q. We're talking about the gross benefit so you retained the earnings, right?
A. Right.
Q. And in your actual world, when River Valley retained its earnings, it received a number of benefits, right? And I want to make sure that we're going to discuss all those benefits from retaining earnings. So we talked about keeping the institution alive and we talked about the benefit from the

Page 131

investments, right?
A. Yes.
Q. Isn't there an additional -- aren't there additional benefits from having retained earnings for a thrift?
A. I don't know what other benefits you have in mind.
Q. Well, let's talk about leverage capacity. Doesn't retaining earnings and having that capital permit the thrift to leverage?
A. Well, certainly. And I think we've talked multiple times about the benefit of having capital and what we're doing here is saying that the benefit of having capital was a benefit that had been bargained for in these transactions. That benefit was taken away and what we're doing is replacing that capital using retained earnings. We are using a measure of the cost of mitigating those damages by looking at the cost of capital net of the cash benefit of the retained earnings.
Q. Well, the notion is that the goodwill, in your mind, permitted you to leverage, correct?

Page 132

A. That's correct.
Q. And the retained earnings, as it replaces the goodwill, also permits the thrift to leverage, correct, and support other assets?
A. In general, that's true. In this particular case, we had to de-leverage despite the retained earnings. But I grant you that the purpose of capital is to allow the thrift to leverage.
Q. Well, didn't the retained earnings in the actual world in this case actually allow you to leverage?
A. If we hadn't had the retained earnings, we would at some point not have been able to leverage at all, yes.
Q. Well, let's just be clear. The actual retained earnings that you did have, they did permit you to leverage and support other assets, correct?
A. The only distinction I would make is that it wasn't as if the retained earnings at the time of the breach allowed us to increase leverage or add assets. It was only -- it allowed us to maintain a sizable balance sheet that was much smaller than what

Page 133

we had started with.
Q. But nonetheless, it allowed you to support assets that River Valley never actually held, correct?
A. Capital did, yes.
Q. And the retained earnings?
A. And the retained earnings, yes.
Q. Now, with respect to your mitigation damages, do I understand it correctly that it's your opinion that it costs $21 million -- that meaning your $20.9 million of mitigation damages -- to replace $20 million in contractual capital?
A. The damages are the 20 million and I have to look at the contractual capital. 20 million sounds correct.
Q. Aren't you claiming litigation averages of 21 million, that is, $20.9 million?
A. Yes.
Q. And the balance of the contractual capital replaced as of June 1990 is $19.8 million?
A. Could you point me to where that is?
Q. I'm not sure if I can right off the bat.

Page 134

Exhibit B, though, I think is where you're going to find that number. Do you see that?
A. The 20 million as of December of '89?
Q. December of '89, the amount of contractual capital to be replaced, $19.8 million.
A. Yes.
Q. So it's your opinion that it cost $21 million to replace basically $19.8 million of contractual capital, correct?
A. This was the accumulation of capital replaced over -- from 1990 through 1994 and then throughout the period. So it is true that the damages that I've calculated are 21 million and that the beginning amount of capital to be replaced was 20 million and the cost relates to the cost of capital for each year during the period that that has been replaced.
Q. And it's also your opinion that even after you're incurring these costs of $21 million to replace the $20 million of contractual capital, that River Valley still lost opportunities of approximately $29 million related to the SAFSB

Page 135

transaction, correct?
A. That's correct.
Q. So we're seeing, what, $50 million in damages related to the loss of $20 million of -- or $19.8 million of contractual capital?
A. I think the numbers that you have described are accurate. I would be happy to describe how we get to those numbers.
Q. Now, you testified that River Valley began to feel the adverse effects of the government's breach in July of 1990, isn't that correct?
A. That is correct.
Q. And in fact, July 1990 is the period when you assumed the breach has taken place in all of your analyses, isn't that correct?
A. In the lost profits presentation, I did that as of July of 1990. And in this, I've done it in July of 1990.
Q. So the answer is yes?
A. I'm not speaking for other damage presentations done by Dr. Murphy.
Q. Right. But as far as what you've

Page 136

calculated, it's all as of July 1990?
A. That's correct.
Q. And you've calculated no damages prior to July of 1990, correct?
A. That's correct.
Q. And so you're not offering any opinion regarding damages to River Valley prior to July of 1990, correct?
A. That's correct.
Q. Now, in your third supplemental report, you calculate litigation damages based on the earnings that River Valley retained from 1990 through 1994 and that First Bank held from 1995 through 2006 and will presumably hold until 2013, correct?
A. These numbers are based on the amount of contractual capital that had to be replaced and as it was amortized and would have been amortized out through 2013, that's correct. The calculation of the cost is as we've described. For the future years, those numbers are discounted back at the cost of capital as is, I think, a well-accepted standard for looking at the value of a future stream of earnings

Page 137

or a future stream of cash flows.
Q. So according to your model, the damages incurred by River Valley are directly related to the earnings that River Valley and First Bank retained over time, isn't that correct?
A. The calculation -- I'm going to repeat myself, but the damages occurred at the time of the breach, which as we just talked about, I measured as beginning in July of 1990. The effect of that breach took place over the entire period up until today and would take place going forward. The method of calculating the damages is to look to the amount of retained earnings that River Valley was able to accumulate and was able to use to replace the contractual capital that was lost. However, that was only a partial measure of the damages, in my opinion.
Q. Is it your opinion that the mitigation damages all occurred in July of 1990?
A. It's my opinion that the damages were caused by the effect of the reduction in capital. That effect was then -- had an effect throughout the period that that capital would have been available.

Page 146

According to your methodology, if River Valley had $1 less in retained earnings during that time, then it would have less damages as you calculate them, isn't that correct?

MR. JOHNSON: Asked and answered. Dr. Holland, you're not required to buy into these misleading assumptions.

THE WITNESS: As long as it's clear that this is the -- what we're doing is calculating the cost of mitigating damages. And to the extent that we could not mitigate as many damages, clearly the cost would have been less.

BY MR. ROBERSON:

Q. And if River Valley had $1,000 less in retained earnings during that time, then it would have even less litigation damages as you model them, correct?

A. I think I've answered that question whether it's a dollar, a thousand.

Q. Or a million?

A. Or a million.

Q. And the answer is that it would, right?

Page 147

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I guess I always want to qualify it to say that I am not stating that the total damages were less if the retained earnings was less. I'm saying that in this methodology, I am looking at the cost of mitigating that amount of damages that were mitigated. And to the extent that we couldn't mitigate as many, we wouldn't have had a lower cost.

BY MR. ROBERSON:

Q. And if River Valley had no profits from the period 1990 through 1992, according to your methodology in this report, there would be no retained earnings damages, isn't that correct?

A. No. There were retained earnings before 1990. Those retained earnings had the same impact as retained earnings that were generated from 1990 to 1992.

Q. My question was with respect to retained earnings damages, and I thought we had already established you're not asserting any damages before

Page 148

July of 1990, right?

A. What I am calculating is the effect of the use of retained earnings from July of 1990 onward. Retained earnings -- there were retained earnings as of July of 1990. If River Valley had earned nothing from 1990 to 1992, it still would have had some retained earnings to use to mitigate the damages. It still had some to use to mitigate the damages.

Q. Well, let's put it this way, then. If River Valley had no profits from the period of July 1990 through 1992, according to your methodology, there would have been no additional retained earnings damages, correct?

A. No additional in addition to the existing retained earnings as of July 1990?

Q. Correct.

A. That's correct. As I've said, calculating the cost relates to the amount of retained earnings that were there that was used to mitigate the damages.

Q. So the more profits that River Valley earned between July of 1990 and 1992, the more

Page 149

damages that would result in your damage calculations, correct?

A. I'm not necessarily saying more damages would have occurred. I'm saying that the cost of mitigating those damages would have been higher.

Q. And thus the damages to the thrift?

MR. JOHNSON: Objection, asked and answered.

THE WITNESS: I think that the calculation is the cost of mitigating damages. To the extent that we could mitigate more damages, the cost would have been higher. To the extent that we would mitigate less damages, that cost would be lower. That doesn't necessarily change the -- mean that the amount of damages that actually occurred to River Valley was less or more in those circumstances..

BY MR. ROBERSON:

Q. And when you say it doesn't necessarily change the amount of damages that actually occurred to River Valley, are you talking damages other than the ones that are modeled in your report?

A. As I've said before, I think there are

Page 154

to replace the capital, as much capital as we could from the capital that was reduced by the breach.
Q. So your model is just modeling costs. It's not modeling damages, is that correct?
A. My model is measuring the cost associated with the damages that River Valley suffered. I am not stating that damages -- the amount of damages would have gone up. I'm stating that the cost of mitigating damages would have gone up. And it is that measure that we are calculating in this calculation of damages.
Q. So you ended it by saying, "It is that measure that we are calculating in this calculation of damages." Are you calculating damages?
A. No, I don't --
Q. I'm using your words.
A. Yes, I understand.
Q. I don't want to be --
A. I believe that River Valley was damaged -- I use the term X -- by virtue of the loss of capital. A partial measurement of that amount of damages is the costs that River Valley incurred in terms of the

Page 155

capital that it had to allocate, it had to use, in lieu of the capital that it otherwise had.
Q. So you are setting forth a partial measurement of damages?
A. Correct.
Q. Okay. And let me just try to rephrase this one more time. The more profits that River Valley earned from July of 1990 through 1992, the more costs would result as far as your quantification of costs with respect to the effect of the breach, isn't that correct?
A. That's correct.
Q. Now, you would agree that generally speaking, the objective of the corporation is to maximize shareholder value?
A. I think there can be many discussions of the objectives of a corporation, but certainly that is one of them.
Q. Now, according to your theory, from July of 1990 through 1992, the more successful River Valley was in accumulating retained earnings, the higher the costs of damages you calculate, correct?

Page 156

MR. JOHNSON: Objection, asked and answered.
THE WITNESS: I think that is the same question that you've asked before. Is there a difference that you're trying --
BY MR. ROBERSON:
Q. No, I'm just trying to put it in the context of the obligation to shareholder value. So if there is anything you want to add with respect to that notion in the context of that question.
A. I don't believe so.
Q. Now, the redemption of the FSLIC preferred stock in 1991 resulted in a $1.325 million gain to River Valley, isn't that correct?
A. That's correct.
Q. So retained earnings were actually higher in 1991 because of that gain, correct?
A. That's correct.
Q. Therefore, the damages or costs that you calculate are higher in 1991 because of that gain, isn't that correct?
A. I think the causation is that there was

Page 157

more capital and retained earnings that was able to be used to mitigate the capital loss. The calculation would be then that there was a higher cost because more was being mitigated.
Q. So you would agree, then, with my question that the damages or costs that you calculated are higher in 1991 because of the gain on the sale or the redemption of the preferred stock in 1991?
MR. JOHNSON: Objection, asked and answered.
THE WITNESS: The redemption of the preferred stock caused greater retained earnings. The use of the retained earnings to mitigate the damages increased the cost.
BY MR. ROBERSON:
Q. And that increased cost harmed River Valley, is that correct?
A. I'm saying that that set of retained earnings had to be allocated to mitigate the damages. It was retained earnings that would have otherwise been available to River Valley to dividend out to its shareholders or to use for other opportunities. So

Page 158

it was an opportunity lost that -- by virtue of being obligated to mitigate the damages.

Q. And so going to our earlier discussion, retained earnings in effect represent opportunities lost, correct?

A. Allocating retained earnings to replace capital that had been taken is an opportunity lost.

Q. I believe our videographer is informing us that it's time for a tape change.

THE VIDEOGRAPHER: Here marks the end of videotape number 3. The time on the screen is 14:22:01. We're going off the record.

(Recess.)

(Exhibit No. 4 was marked for identification.)

THE VIDEOGRAPHER: Here marks the beginning of tape number 4. The time on the screen is 14:32:10. We're back on the record.

BY MR. ROBERSON:

Q. I've asked to have marked as Exhibit Number 4, a River Valley Savings Bank, FSB and subsidiaries consolidated financial statements as of

Page 159

December 31st, 1993 and 1992. And I want to sort of explore again the issue of retained earnings and discuss that in connection with this document.

If you look at page 11 of this document, at the third paragraph under income taxes, do you see that?

A. Yes.

Q. It states, "Effective January 1st, 1993, River Valley adopted SFAS Number 109 and has reported the cumulative effect of that change in the method of accounting for income taxes in the 1993 consolidated statement of income." Do you see that?

A. Yes.

Q. So River Valley voluntarily adopted this SFAS or FASB 109 accounting standard, isn't that correct?

A. River Valley adopted it. I assume it was voluntary.

Q. And then looking at what the effect of that is, if you look at page 4 of the document, it's a continuation of the consolidated statements of income. Do you see that for 1992 and 1993?

Page 160

A. Yes.

Q. And toward the bottom of this chart, there is a line, "Cumulative effect of change in accounting for income taxes, note 13."

A. Yes.

Q. And it's $6.161 million. Do you see that?

A. I do.

Q. So that was an increase in the thrift's retained earnings of $6.161 million, correct?

A. Well, it was an increase in the amount of their earnings.

Q. And it was retained too, right?

A. I would have to look at the balance sheet to be sure.

Q. Why don't we go there. We're going to go now to page 2.

(Interruption.)

MR. ROBERSON: Can we go off the record for a moment?

THE VIDEOGRAPHER: Going off the record. The time is 14:34:58.

(Discussion off the record.)

Page 161

THE VIDEOGRAPHER: Going back on the record. The time on the screen is 14:36:26.

BY MR. ROBERSON:

Q. We were talking about whether the $6.1 million from the accounting change in the adoption of FAS 109 resulted in an increase of retained earnings of -- resulted in the increase of retained earnings obviously of the $6.1 million. And you said you wanted to look at the balance sheets to sort of confirm that.

And if you look at -- we were on page 2 of the document, the consolidated balance sheets for 1993, and what you see is, under the category, retained earnings toward the bottom of the page, do you see that?

A. Yes.

Q. You see an increase of between $20.121 million in '92 to $28.9 million in '93. Do you see that?

A. I do.

Q. And it makes sense and it follows that the $6.1 million we were talking about from the adoption

Page 178

through this. So when I asked you about whether the retained earnings generated a return, I think you said, well, let's look at the total capital of the thrift, correct?
A. Okay.
Q. Well, regardless of whether -- the fact you're looking at the total capital of the thrift, the fact of the matter is that this total portion of the total capital, that is, the retained earnings, generate a portion of the return that's generated by the total capital, correct?
A. Okay.
Q. You agree with that?
A. Well, I'm not sure where this is going. I'm not sure whether I'm ready to agree to all of it. But one can -- I guess my point was that retained earnings per se doesn't generate a return. Its capital is important to generate a return. That return is generated by the operations of the thrift.
Q. And that occurred in the actual world?
A. That's correct.
Q. In other words, the retained earnings is

Page 179

part of the total capital that River Valley had and River Valley's total capital, including the retained earnings, generated returns in the actual world?
A. I think River Valley generated returns and I'm not comfortable saying retained earnings generated returns. River Valley generated returns. It was necessary to generate those returns to have capital. Had it had more capital, it would have generated higher returns.
Q. I understand it would have had higher returns if it had more capital. I'm talking about the actual retained earnings that existed in River Valley. That retained earnings, that capital was put to use in the whole context of the entire thrift -- I'm not asking you to identify specific investments right now. We're just talking about as a general theory, the retained earnings are part of the total capital and they are a part of what generated the return for River Valley, correct?
A. The retained earnings are part of the total capital and the total capital is important in terms of being able to operate the thrift which

Page 180

generates the returns.
Q. Are you familiar with a return on equity or a return on capital concept?
A. Ask me a more specific question and perhaps I can address it.
Q. What is a return on equity?
A. A return on equity would be -- can be measured by the amount of earnings divided by the equity.
Q. And what's a return on capital?
A. Often used in the same context except that it could be that the total capital would be defined as more than just the equity.
Q. Now, the return on capital or return on equity ultimately made its way to the shareholders of River Valley either through dividends and/or capital appreciation, specifically with regard to the sale of River Valley to First Bank, isn't that correct?
A. That's correct.
Q. And the retained earnings were a part of the equity or capital which generated these returns, correct?

Page 181

A. Again, I'm not comfortable saying that the retained earnings generated the return. The retained earnings were part of the capital structure. The capital structure was necessary for the thrift to operate. It was generally operating at a different size, depending upon the amount of capital. Generally, you get a higher amount of earnings with a larger amount of capital and/or a larger amount of assets.
Q. Now, with respect to River Valley's actual retained earnings from 1990 through 1994, you and Mr. Ross, the plaintiffs in this case, have already received a return on those particular retained earnings, correct?
A. We have received a return on our investment, the retained earnings. Our investment compounded by virtue of the operations of the thrift and increasing the value, so a return was earned by Mr. Ross and myself.
Q. The answer is yes, then?
MR. JOHNSON: Objection, asked and answered.

Page 190

MR. JOHNSON: Objection, vague, beyond the scope.
THE WITNESS: I think you asked whether I would be receiving a return twice on the same returned earnings. Is that your question?
BY MR. ROBERSON:
Q. Would you collect a return on the same returned earnings twice, that's right. And this is the actual world, obviously, because you have obtained a $37 million return on your investments with the sale of River Valley to First Bank.
A. The 37 million was a return of an investment and a return on investment. And we can parse that into smaller pieces. But aside from that point, it is true that we obtained $37 million for the sale of our stock. The amount of -- the value of the institution was valued by First Banks for a variety of reasons, but at the end of the day, we did receive a return on our capital and a return on our initial investment.
Going back to what I've said before, that there were clearly damages as a result of losing

Page 191

capital. Those damages meant that we lost opportunities and we lost opportunities for acquisition, we lost the opportunity to acquire San Antonio Federal Savings Bank, that is, we, I should say River Valley lost those opportunities.
The measure of this damages is what the damages are to River Valley. And I think that it is the case that there are damages that would flow to First Banks and those damages would flow to me and to Howard Ross's estate if the Court agrees with those damages theory. But I do not agree that that's a characterization -- I do not characterize that as getting a return on retained earnings and another return on retained earnings.
Q. Well, the initial time you got your $37 million payment from First Bank, it included -- First Bank's valuation included all the value of River Valley, including its profits over a number of years, correct? The effect of its operations over a number of years?
A. Okay.
Q. And the effect of its operations over a

Page 192

number of years included the effect from its retained earnings, that is, the earnings generated from retained earnings, correct?
A. Again, I wouldn't say that earnings are generated by retained earnings. I would say that earnings are generated by the thrift, and the amount of capital at the thrift had an impact on the amount of earnings. If we had had more capital, we would have earned more.
One way of measuring the damages, which I have said is just a partial measurement, is the fact that the retained earnings could have been paid out to shareholders at that time. Presumably by replacing that capital, we would have earned the same amount, and we could have earned the same amount without the retained earnings or we could have done something else with the retain earnings. Again, I do not --
Q. We're talking about the real world, so it's not what you could have done with retained earnings, it's not what you would have done with retained earnings, it's what actually happened with

Page 193

retained earnings. The retained earnings were a part of the thrift that was acquired by First Bank and the earnings that were generated over a period of years by the River Valley retained earnings was in fact valued by First Bank when it acquired River Valley, correct?
A. Correct.
Q. And so there was a price paid for the effect of the retained earnings and the earnings generated from the retained earnings as far as the effect on the River Valley thrifts, correct?
A. And I believe First Banks would have paid more had we had more capital.
Q. But that's a different situation. That's a would have, could have or a but for situation. Here we're talking about an actual situation, where the actual retained earnings were actually part of the thrift that was valued and appraised and bought by First Bank, correct?
A. I think that -- I don't disagree that the actual retained earnings were a part of the thrift that First Banks acquired and they put a value on the

Page 194

entire institution. The point is that there were damages that occurred with the breach and the retain earnings were allocated to mitigate those damages. I believe that is a cost to the institution.

Q. Now, suppose I have $100 in equity capital in a bank that is considered to be well-capitalized by regulators. And suppose that the regulators announce a decrease in capital requirements and now the bank is going to be well-capitalized with just $80 in capital, okay?

A. All right.

Q. The bank has two choices. One, it can return $20 to its shareholders in the form of a special dividend or, two, it can keep the $20 in the bank on which it would seek to earn a return. Is there any cost or benefit to this bank from either one or two?

A. In the case of the dividend, I would say that it is not -- it is only -- it is paying back a return to its shareholders. And, in the case of retaining the $20 in the bank, it's implicitly agreeing to rent that $20 from the shareholders at

Page 195

their cost of capital.

Q. Right. So are either one of those a cost or benefit to the thrift, one versus the other?

A. I would say the second is a cost to the thrift.

Q. So if it keeps the $20 in the bank on which it seeks to earn a return, it has, in effect, a $20 cost, is that right?

A. No, it has a cost of -- let's assume a 20 percent cost of capital in your scenario. That bank would have to make $4 million a year to meet its cost of capital or meet the expectations of its shareholders.

Q. Okay. So it has a cost with number 2, keeping the money in the bank. And how about with number 1, where it's returning the $20 to the shareholders in terms of a special dividend. Is that a cost to the bank?

A. No.

Q. Why not?

A. If is a return -- it's making that capital that belongs to the shareholder by virtue of the

Page 196

return that they were expecting, it's making that capital available back to the shareholder. At that point, the bank has no obligation to return -- to provide a return on that $20 back to the shareholder.

Q. So we're talking about number 2, then, where you're saying that if they kept the $20 in the bank and they have a 20 percent cost of capital, that the bank's cost would be then the $4 in profits that it generates from that money?

A. It would be renting that capital, if you will, at a cost of capital of $4. And it would be -- it would only make sense for the institution to retain that $20 if it believed that it could meet that cost of capital.

Q. And so, in other words, the $4 -- if you have an expected 20 percent cost of capital, you have an expected 20 percent return, right?

A. Correct.

Q. So the bank is expecting to make $4 in profits, right?

A. Well, or to have an appreciation in the value of the stock by $4 per year.

Page 197

Q. Right. And that would constitute a cost, as far as you're concerned, or your analysis, correct?

A. I think from the institution's standpoint, I think it's useful to look at it as if it's either borrowing the capital from -- borrowing money from one source or borrowing capital or renting capital from investors. When one takes on capital, there is an obligation on the part of the shareholder -- on the part of the management, on the part of the institution, on the part of the organization, to look at that as a cost of business. And in this particular case, it's an after tax cost.

MR. ROBERSON: Is this a good time?

MR. JOHNSON: Any time.

BY MR. ROBERSON:

Q. Do you want to take a break?

A. Sure.

MR. ROBERSON: Okay. Let's do that.

THE VIDEOGRAPHER: Going off the record. Time on the screen is 15:30:18.

(Pause.)

Page 198

THE VIDEOGRAPHER: Going back on the record. The time is 15:31:24. Here marks the end of videotape number 4. The time on the screen is 15:31:33.
(Recess.)
THE VIDEOGRAPHER: Here marks the beginning of tape number 5. The time on the screen is 15:42:43. We're back on the record.
BY MR. ROBERSON:
Q. Dr. Holland, are you aware of any corporate finance textbook that asserts that when a corporation retains earnings, it presents a cost to either the corporation or its shareholders?
A. Either to the corporation or to the shareholders? I consider -- and I'll get back to the textbook. I consider that the cost to the institution is that it's renting capital from the shareholders. And in the example that you used, it should either return that capital or it should make sure it covers its cost of capital so that the shareholders are not disadvantaged.
I think that that concept of the cost of

Page 199

capital and the fact that the institution has a cost of capital that relates to the providers of that capital, I think, is well accepted. I do not have any specific examples of textbooks right now that I can think of.
Q. At the graduate course level, have you ever studied the notion of the relationship between a corporation's retained earnings and its cost of capital?
A: It's been some time since I had my finance courses here. My general recollection is that the cost of capital is as I have stated and that I see retaining capital or distributing it to the shareholders as a decision to either rent more capital or to return the capital to the shareholders.
Q. I guess my question was at the graduate course level, have you ever studied the notion of the relationship between a corporation's retained earnings and its cost of capital?
A. I don't remember.
Q. And I take it you've never taught any corporate finance courses?

Page 200

A. No.
Q. And you've never written or published any articles on topics of corporate finance, correct?
A. No.
Q. Did you ever take any graduate level courses in corporate finance?
A. Yes.
Q. What courses?
A. It was when I was working on my doctorate at GWU, I took graduate level courses in finance, corporate finance. I do not remember at this stage what the names of those courses were.
Q. And your Ph.D. was in what subject again?
A. My Ph.D. -- it's actually a doctorate of business administration and it was in finance. In GW's case, they had areas. They didn't have a single focus. It was finance, economics, and I can't remember the third one but most of what I took was related to finance.
Q. And your dissertation wasn't related to finance, was it?
A. No.

Page 201

Q. Now, in paragraph 9 of your report, page 3, you state the following: "Because the government's" -- let's see. Actually, it trails over. It's going to be on -- yeah, the top of page 3, that section of paragraph 9. You write, "Because the government's breach caused River Valley, one, to incur the mitigation costs I discuss in this report and, two, to forego the SAFSB acquisition, the damages corresponding to those two sets of events must be added to each other in order to compensate plaintiffs properly." Do you see that?
A. Yes.
Q. So you're suggesting that plaintiffs in this case should receive both the $21 million in replacement damages you detail in this report and then an additional sum related to the SAFSB transaction, correct?
A. That's correct.
Q. And you think it is an appropriate measure of damages for plaintiff to claim mitigation replacement costs and the SAFSB damages, correct?
A. That's correct.

Page 202

Q. And what is the basis for your claiming that it's appropriate for plaintiffs to claim both the mitigation replacement costs and the SAFSB damages?
A. I think as I discussed previously, I feel that the mitigation costs are only a partial measure of the damages to River Valley. I think that despite mitigating, that to the extent that was possible with retained earnings, River Valley was still precluded from acquiring San Antonio Federal Savings Bank which I believe would have been allowed if it had the total amount of capital from the breach.
The additional capital from the breach would have generated returns above and beyond that which was generated by the retained earnings and would have resulted in the ability for River Valley to acquire San Antonio Federal Savings Bank.
Q. So you're asserting claims for both replacement costs, mitigation replacement costs of the lost contractual capital and lost profits in the form of the SAFSB acquisition, correct?
A. What this report is doing is reporting on

Page 203

the mitigation costs, but pointing out, as it said, I expect plaintiffs to prove that the profits River Valley lost because of the breach made it impossible for River Valley to acquire San Antonio Federal Savings Bank.
Q. So the answer is yes. You're asserting both the costs for replacement and a lost profits claim?
A. I think this document in and of itself is not the full discussion of San Antonio Federal Savings Bank, but I do believe that those two damage calculations are additive.
Q. And why are you including the lost profits damages associated with the SAFSB transaction when you're not including the lost profits damages associated with the Illinois and River Valley, Illinois institutions?
MR. JOHNSON: Objection, beyond the scope, not related to the work he does here. Answer if you're able, Dr. Holland, as the expert, not as the plaintiff.
THE WITNESS: Your question is why am I

Page 204

discussing San Antonio Federal Savings Bank in this and not the other lost profits calculations?
BY MR. ROBERSON:
Q. No, I'm not talking about the discussion. I'm saying why are you including lost profits damages associated with the SAFSB transaction in conjunction with the replacement mitigation costs in this report and not including the lost profits damages associated with the River Valley, Illinois transactions or institutions?
A. What I am doing is saying that I think the damages from this San Antonio Federal Savings acquisition would be additive to the mitigation costs I discuss here and that's really all I'm saying as an expert witness.
Q. And I'm asking you why you didn't include the lost profits damages associated with the Illinois institutions.
A. I guess from the standpoint of being an expert witness, I was asked to present the mitigation costs here, and to include -- so that there wouldn't be any misunderstanding the fact that counsel would

Page 205

be taking the position that the San Antonio acquisition would be additive to those costs. I don't think that I was asked to discuss one way or the other whether other lost profits from the Illinois thrifts would be included.
Q. So you have no position on whether or not it's appropriate to overlap replacement damages with lost profits as far as the Illinois institutions are concerned?
MR. JOHNSON: Objection, beyond the scope of the report.
THE WITNESS: I have no opinion, yes.
BY MR. ROBERSON:
Q. Did you ever think about that?
A. No.
Q. Now, in paragraph 11 of your report, you state that -- if you look about the second sentence, you state, "Specifically the River Valley thrifts, one, used retained earnings that would have been available for other purposes to substitute for the eliminated regulatory capital." Do you see that?
A. Yes.

Page 206

Q. What do you mean by that language, "other purposes"?
A. Those retained earnings could have been paid back to the shareholders as a return of capital. They could have been used for other opportunities. So those would be the other purposes.
Q. And what other opportunities?
MR. JOHNSON: Objection, asked and answered. We've spent an awful lot of time on this, John. It's starting to get repetitive and harassing.
THE WITNESS: The other opportunities would have been to grow the balance sheet and earn more and to obtain more earnings either from normal operations or from the acquisition of other thrifts.
BY MR. ROBERSON:
Q. Is there anything else you meant by that in your report?
A. I think the other purposes I mentioned are the twofold, return it to the shareholders or use it to obtain a return for the shareholders that would be at least equivalent to their cost of -- to the cost of capital.

Page 207

Q. Is there anything else you meant by other purposes? Is that it?
A. That's it.
Q. So I take it your position is that if River Valley had its contractual capital, its retained earnings would have been free to use for some other purposes as you've discussed here, correct?
A. That's correct.
Q. Similarly, if First Bank had River Valley's contractual capital, its retained earnings would have also been free to use for some other purposes, correct?
A. Again, I am looking at it from the perspective of River Valley and not from First Banks.
Q. Well, in the actual world, First Bank actually acquires River Valley, right?
A. And in at least my context, First Bank becomes the shareholder of River Valley and what we're looking at is the damages to River Valley.
Q. Well, you said First Bank becomes the shareholder of River Valley. Didn't First Bank

Page 208

Missouri merge with, become the ultimate successor, is not really the shareholder -- isn't First Banks the shareholder of First Bank Missouri?
A. No, I'm not completely familiar with the transactions occurring within River Valley and within First Banks with respect to River Valley. I know initially River Valley was maintained as a subsidiary of First Banks. They may have had other mergers, but at the end of the day, First Banks becomes a shareholder either of River Valley or of a River Valley that has also had a merger.
Q. When you say First Banks, what are you referring to?
A. The holding company.
Q. First Banks, Incorporated?
A. Right.
Q. And so the fact that First Banks, Incorporated is a shareholder of River Valley's successor to you means that we don't need to look at First Bank Missouri's cost of capital and opportunities that it would have had with respect to retained earnings?

Page 209

A. I guess I could come back to -- I mean, we're discussing both First Banks and First Bank Missouri and I think getting them a little bit mixed up. I think stepping back from all that, I think that we start with the fact that there are damages that occurred to River Valley as a result of the breach. The consequences of that breach are the fact that contractual capital is not there. A measure of the cost to River Valley is the capital cost of those retained earnings that would have been available for other purposes. I think that's kind of the gist of this.
Q. And so then we don't -- you don't look beyond what happens once First Bank acquires the institution?
A. I did not look significantly beyond that.
Q. Now, you would agree that any scenario by which River Valley's contractual capital is restored is by definition the no breach world, correct?
A. Would you repeat that?
Q. Any scenario by which River Valley's contractual capital is restored is by definition the

Page 214

BY MR. ROBERSON:
Q. And I take it, then, here -- well, here's the question. Does shrinking an institution have any effect on the institution's retained earnings, assuming there is no gain or loss on the sales on the shrinkage?
A. If I understand your question, if the retained earnings are X and the balance sheet is reduced and that has no impact on income, then I think I would agree that the retained earnings would stay the same assuming that there is no other capital transaction, if there is no other dividends or other capital paid out to shareholders.
Q. So it's your position that the balance of an institution's retained earnings neither go up or down assuming there is no gain or loss on sales when an institution is shrinking?
MR. JOHNSON: Objection, vague as to time frame, but answer if you understand it, Dr. Holland.
THE WITNESS: I think, as I understand your question, that if there is no other impact on capital such as gain or loss and there is no

Page 215

distribution of capital back to the shareholders, the size of the institution in terms of assets or liabilities does not directly affect the retained earnings. If an institution goes up, retained earnings would still say the same. The thing that affects retained earnings is earnings. It's either earnings or taking in capital or paying out capital.
BY MR. ROBERSON:
Q. Now, in your retained earnings replacement claim, have you identified what specific incremental assets River Valley would have acquired with the use of the retained earnings?
A. Have I identified if -- and in your hypothetical no breach world?
Q. Yes.
A. No.
Q. And have you identified generally how many incremental assets River Valley would have acquired with the use of retained earnings in a nonbreach world?
A. No.
Q. Any rough idea?

Page 216

A. No.
Q. And have you identified what yields would have been earned on the incremental assets River Valley would have acquired with the use of the retained earnings?
A. No.
Q. And have you identified how the incremental assets would have been funded by River Valley?
A. No. And I guess I would say that this analysis is not trying to measure the lost profits from an increase in the size of the institution in a hypothetical but for world. This is taking the cost of mitigating the damages by virtue of allocating retained earnings, to the extent there were retained earnings, to those lost capital accounts.
Q. And have you identified the costs of the incremental liabilities that River Valley would have acquired?
A. No.
Q. Have you identified what additional noninterest expenses would have been incurred by

Page 217

River Valley, if any?
A. No.
Q. Have you identified what specific incremental assets First Bank would have acquired with the use of the retained earnings?
A. No.
Q. Have you identified generally how many incremental assets First Bank would have acquired with the use of the retained earnings?
A. No.
Q. Have you identified what yields would have been earned on the incremental assets First Bank would have acquired with the use of the retained earnings?
A. No.
Q. Have you identified how the incremental assets would have been funded by First Bank?
A. No.
Q. Have you identified the costs of the incremental liabilities that First Bank would have acquired?
A. No.

Page 218

Q. Have you identified what additional noninterest expenses would have been incurred by First Bank, if any?
A. No.
Q. Now, you stated that you used the actual world as the basis for creating your but for world, is that correct?
A. Say that again?
Q. Well, let me ask you. Do you use the actual world as the basis for creating your but for world?
A. In this analysis, I haven't created a but for world.
Q. So it's your opinion that the retained earnings that existed in the actual world would have also existed in a but for world, isn't that correct?
A. The retained earnings were the retained earnings in the actual world. The retained earnings may well have been at a different amount. If River Valley had had the benefit of the additional capital that was breached, taking just the retained earnings that are in this report, those retained earnings, as

Page 219

I've said, would have been available to the institution to either return capital to the shareholders or to pursue other opportunities.
Q. Well, at the very least, the very same retained earnings that existed in your — that exist in the actual world would have existed in a nonbreach world, correct?
A. They would have existed either in the institution or they would have been repaid to the shareholders.
Q. And just so I'm clear about this, by definition, what you're saying about retained earnings, they're not incremental to the but for world, correct, to a nonbreach world?
A. Again, I go back to a hypothetical that there is a nonbreach.
Q. Right.
A. I think that it's a reasonable position to say that the retained — that the earnings of the institution would have been greater than the earnings actually were in the real world. To the extent that those earnings were retained, retained earnings would

Page 220

have been greater than the actual retained earnings, but it also was possible that the institution would choose to pay those accumulated earnings out to the shareholders. If that were the case, it is possible the retained earnings would be less than was the case actually.
Q. Right. But at least the amount of retained earnings that were in the actual world would have been in the nonbreach world and then subsequently maybe they were paid out as dividends or maybe not?
A. I think I agree with that, yes.
Q. Now, who originated the idea of extending the claim for damages in this case past the point at which First Bank acquired River Valley?
A. Well, I think the question in all of these cases is how does one measure the extent of the damages. Since one can either identify a stream of earnings or a stream of costs that would go out for some period of time, it's necessary to project those out.
And I think that getting back to your

Page 221

question, this was a discussion that I had with Cornerstone and with counsel and felt like this was a reasonable way of getting at the amount of damages. Clearly the capital that was foregone had a life beyond the acquisition by First Banks.
Q. Was it counsel who originated the idea of extending the claim for damages in this case past the point at which First Bank acquired River Valley?
A. I don't remember that it was one or the other. I think it was a consensus that it was the appropriate way to do this.
Q. When you say one or the other, consensus of Cornerstone counsel?
A. Cornerstone counsel and myself.
Q. So it was either Cornerstone or counsel or yourself that originated the idea of extending the claim for damages?
A. I don't think there was ever much question that that was an appropriate way to do it so that there wasn't much discussion with respect to it. I felt like that was appropriate all along.
Q. Well, you didn't previously in this case?

Page 222

A. And previously in this case, this is a methodology that I think is trying to follow the guidance from the cases. As I understand that, it's appropriate to look at the amount of capital over the contractual period for the capital. The lost profits damages that had been presented previously simply takes a different perspective.
Q. What perspective is that?
A. It looks at the value or the amount that First Banks would have paid in 1994 and 1995 as opposed to -- and with that, does take into account the value of the foregone capital at the time of the sale.
Q. Did you speak to anyone at First Bank in connection with the preparation of your third supplemental expert report?
A. No.
Q. In paragraph 7 of your report, you write, "I have analyzed the cost to the River Valley thrifts and their successors of mitigating some of the effects of the government's breach by replacing contracted-for regulatory capital with retained

Page 223

earnings and, in one instance explained below, through the exchange of debt securities for equity securities." Do you see that?
A. Yes.
Q. To whom are you referring to when you refer to River Valley successors? First Bank?
A. Yes.
Q. Is it your position that First Bank is mitigating the effect of the 1989 breach affecting River Valley by retaining earnings?
A. I felt like that was a reasonable assumption and that the methodology was consistent with looking at that mitigating effect up until the present time, and then projecting that effect into the future and taking the present value of that.
Q. You say it was a reasonable assumption. And it's based on not talking to anyone at First Bank, correct?
A. That's correct.
Q. And it's based on not looking at any First Bank documents other than I believe in your additional documents considered, you have one single

Page 224

First Bank document. I believe it is the First Bank 10-K for December of 1996, is that correct?
A. That's correct.
Q. It's your assumption that First Bank is currently mitigating the effect of the 1989 breach but you haven't done any analysis with respect to First Bank's actual operations, correct?
A. That's correct.
Q. And it's your position that First Bank will continue to mitigate the effects of the 1989 breach affecting River Valley by retaining earnings straight through until 2013, correct?
A. Either that or it's appropriate to use the present value of what the costs would have been to determine a cost to the damages going forward.
Q. And this would be based on an assumption that First Bank was going to indeed continue mitigating the effects of the 1989 breach by retaining earnings, correct?
A. I believe that the cost of mitigating the damages is a reasonable approximation for partially identifying the damages. The damages occurred really

Page 225

by virtue of the breach that occurred in 1990. I think it's a reasonable approach to use a projection of those costs out over time or to take a present value of those costs that would represent those damages.
Q. Did you ever look at any First Bank document to determine that it was, in fact, retaining earnings to mitigate the River Valley breach?
A. No.
Q. And I take it since you didn't discuss any issue on this report with anyone at First Bank, that you didn't ask anyone at First Bank whether they projected that they would continue to retain earnings through 2013 in order to mitigate the breach of the River Valley contract, correct?
A. I did not ask -- I did not have a discussion with First Banks.
Q. So in your list of additional documents considered, there is one First Bank document, which is the one I alluded to a few moments ago, and I believe it's on the last page of your Exhibit A which is page 23 and it's at number 33. It's First Banks'

Page 238

THE WITNESS: Again, I think the damages are related to River Valley and the purpose of calculating the present value of the costs throughout 2013 is just that, to estimate what that present value of that would be at River Valley.

BY MR. ROBERSON:

Q. Now, if First Bank was not a party to this lawsuit, would you still be seeking damages for River Valley after the point in time at which First Bank acquired ownership of River Valley?

MR. JOHNSON: Objection, calls for speculation.

THE WITNESS: I don't know.

BY MR. ROBERSON:

Q. And there are only two choices. Have you given it any thought?

A. No.

Q. So it's a possibility that you would not be seeking damages for the post-First Bank period if First Bank was not a party?

MR. JOHNSON: Objection, calls for speculation.

Page 239

THE WITNESS: I haven't given that any thought.

BY MR. ROBERSON:

Q. Well, let's assume that you would seek damages for the post-First Bank period even if First Bank was not a party. Just put that as a posit because there are only two possibilities here. And I want to understand how that would work. Because we know that River Valley would no longer exist, correct?

MR. JOHNSON: What's your question exactly?

BY MR. ROBERSON:

Q. River Valley no longer exists, isn't that correct?

A. River Valley no longer exists, is that correct?

Q. That's my question to you.

A. Is that correct?

Q. I'm asking you.

A. I said before that I haven't followed exactly what has happened to the charter with respect

Page 240

to River Valley within the First Bank structures.

Q. So you don't know whether River Valley exists or not?

A. I do not know the current corporate structure of what was River Valley. I'm sure that in substance, there is a set of assets and liabilities and other things that originally were associated with River Valley. I do not know and I have not sought to look into exactly what the ownership structure is for River Valley at this time, or if River Valley has been merged, as you had suggested, and what impact that would have had.

Q. So you don't know whether River Valley as a corporation exists?

A. I do not.

Q. And you don't know as of any point in time after 1995 whether River Valley existed as a corporation, is that correct?

A. What I do recall is at the time of the acquisition, that for a variety of reasons, that it was First Bank's intention to retain the charter of River Valley. I do not know who if anything -- what

Page 241

if anything was merged into River Valley. But at the time of the acquisition, First Banks was the shareholder of River Valley.

Q. No, I understand that. I'm saying whether you know anything about the corporate existence of River Valley after the time of the acquisition.

A. I have not looked into that.

Q. Now, is there, in your mind, some way that you could still posit damages for the post-First Bank period where First Bank is not a party to this lawsuit?

MR. JOHNSON: Objection, calls for speculation.

THE WITNESS: I would have to think about that and I have not given that a thought.

BY MR. ROBERSON:

Q. So right now, you have no understanding about that issue at all?

A. No.

Q. Are you aware, just as a matter of, like, finance and understanding of corporations, sort of as an expert, are you aware of how it is that if you