**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, co-executor of the<br>ESTATE OF HOWARD R. ROSS,<br>AND FIRST BANK,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 95-524C<br><br>(Judge George W. Miller) |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO QUASH TRIAL SUBPOENA DIRECTED AT MARK KIPNIS**

Defendant, the United States, respectfully opposes plaintiffs' motion to quash the trial subpoena directed at Mark Kipnis. Plaintiffs assert that testifying at trial places an undue burden upon Mr. Kipnis, requiring this Court to quash the subpoena under Rule 45(c)(3)(A)(iv) of the Rules of the Court of Federal Claims ("RCFC"). Traveling from Chicago to Washington, D.C., to testify at trial does not present an undue burden upon Mr. Kipnis, who will provide relevant, non-duplicative testimony on a number of issues of importance to our case. Alternatively, Mr. Kipnis' testimony could be presented by remote videoconferencing, pursuant to RCFC 43(a).

## ARGUMENT

### I. Traveling To Provide Testimony Before The Court Will Impose No Undue Burden Upon Mr. Kipnis

Plaintiffs contend that traveling between Chicago and Washington, D.C., while awaiting incarceration would place an undue burden upon Mr. Kipnis. "The burden of proving that a subpoena is oppressive is on the party moving to quash and is a heavy one." Heat & Control,

Inc. v. Hester Indus., Inc., 785 F.2d 1017, 1025 (Fed. Cir. 1986). For the Court to accept plaintiffs' explanation for Mr. Kipnis's inability to fulfill his duty to testify at trial "would offend the time-honored principle that under our system of justice every litigant is entitled to another person's relevant and non-privileged testimony in a judicial proceeding." Owens v. QVC, 221 F.R.D. 430, 432 (E.D. Pa. 2004).

"[W]hether a subpoena is burdensome depends on the facts of the case." Hussey v. State Farm Lloyds Ins. Co., 216 F.R.D. 591, 596 (E.D. Tex. 2003). "Being placed in an 'awkward position'" does not constitute an undue burden. Owens, 221 F.R.D. at 432. Plaintiffs' brief description of the "stressful and difficult time" for Mr. Kipnis does not satisfy their heavy burden to demonstrate that testifying will unduly burden him. See, e.g., Green v. Baca, 226 F.R.D. 624, 653 (C.D. Cal. 2005) (determining, in dicta, that a witness had made a strong showing that trial testimony would be an undue burden when the witness's arms and feet were paralyzed, he was unable to move without assistance, and he received extensive medical treatment each day).

Furthermore, the Court should not give deference to Mr. Kipnis simply because he is a convicted felon, when all other witnesses bear the burden of appearing at trial. It is our understanding that Mr. Kipnis will be sentenced on December 10, 2007, but that he will likely not be committed to prison until January 2008, which provides sufficient time for him to appear at trial.

## II. Mr. Kipnis Will Provide Relevant, Non-Duplicative Testimony Regarding His Personal Involvement In The Matters At Issue

Plaintiffs assert that Mr. Kipnis should not testify because he has "little relevant – and no non-duplicative – testimony to provide." Pl. Mot. at 2. Plaintiffs claim that Mr. Kipnis "had few

responsibilities [as Secretary of River Valley] other than to sign all of River Valley's official documents." Id. at 1. Numerous documents and his own deposition testimony, however, show that Mr. Kipnis played a more prominent role at River Valley and became involved in many of the matters at issue in this case.

**A. Mr. Kipnis Will Testify About His Involvement With River Valley**

In his roles as corporate counsel, Secretary, director, and shareholder of River Valley, Mr. Kipnis was more than just a scrivener. Mr. Kipnis first became a shareholder in Rock Falls Savings and Loan Association ("Rock Falls"), later River Valley I, when Howard Ross, "a good client and friend[,]" offered to sell Mr. Kipnis a percentage of his interest in the institution. Kipnis Dep. Tr. 26:3-8 (Aug. 14, 2000) (annexed as Exhibit A). Mr. Kipnis purchased five percent. Id. Tr. 26:17-18. Mr. Kipnis later sold three percent back to Mr. Ross, leaving him the owner of two percent of the various River Valley institutions. Id. Tr. 16:14-21. Mr. Kipnis became the Secretary and a director of River Valley I and River Valley II and, later, Western Capital Holdings, Inc. ("WCHI"). Id. Tr. 12:19-22; 15:18-22. Also, he was a member of the audit committee. See, e.g., DX 377 (Minutes of the January 24, 1990 Audit/Personnel/ Administrative Committee Meeting) (annexed as Exhibit B); see also Kipnis Dep. Tr. 20:6-8 (Aug. 14, 2000). Upon the sale of River Valley to First Bank, Kipnis received $744,793 from First Bank, which further belies plaintiffs' claim that he was a mere scrivener. DX 1098 at PHO065 0123 (annexed as Exhibit C).

Mr. Kipnis also was involved in a variety of regulatory issues at the heart of this case. For example, Mr. Kipnis met with the OTS to discuss River Valley I's preferred stock issuances and dividends. PX 368 at WOL275 0079 (annexed as Exhibit D). Mr. Kipnis also requested that

the OTS "re-rate" River Valley I and River Valley II to allow further acquisitions. PX 368 at WOL275 0080. In addition, Mr. Kipnis reviewed River Valley's 1991 settlement agreement with the FDIC regarding loans. Kipnis Dep. Tr. 79-80:10 (Aug. 14, 2000). Indeed, the FDIC sent Mr. Kipnis their proposed Settlement Agreement with River Valley. DX 586 at PHO054 0750 (annexed as Exhibit E). Mr. Kipnis responded with drafts of certified resolutions, a certificate of incumbency, and an opinion letter from his law firm, Holleb & Coff, DX 588 at PHO049 0703 (annexed as Exhibit F), and followed up the next day with executed copies of these documents and the Settlement Agreement. PHO049 0701-702 (annexed as Exhibit G). In his correspondence with the FDIC, Mr. Kipnis stated that he would respond to any questions that the FDIC had. DX 588 at PHO049 0703 (annexed as Exhibit F); PHO049 0702 (annexed as Exhibit G).

Furthermore, Mr. Kipnis closed WCHI's acquisition of San Antonio Federal Savings Bank ("SAFSB") in San Antonio. Kipnis Dep. Tr. 15:5-9 (Aug. 14, 2000). These activities on behalf of River Valley and WCHI demonstrate Mr. Kipnis's significant personal involvement in its dealings with regulators.

## B. Mr. Kipnis Will Testify About His Involvement With SAFSB

### 1. Mr. Kipnis Will Testify About The Acquisition Of SAFSB Through A Vehicle Created By River Valley Shareholders

Plaintiffs base their SAFSB lost profits claims on the assertion that, when River Valley III could not obtain funding to acquire SAFSB, it was purchased by an institution unaffiliated with River Valley III. Plaintiffs' counsel stated that

> [t]he acquisition had to go through another vehicle, and that's what it did. The profits that would have accrued to River Valley accrued

> to the other vehicle – the entity is called Western Capital Holdings – instead. As to reasonable certainty, Your Honor, as I said, we're not looking at mere reasonable certainty here; we're looking at almost mathematical certainty. These are actual traceable profits from the very same investment that River Valley should have made. <u>Somebody else</u> got that opportunity. <u>Somebody else</u> got those profits.

Hrg. Tr. 32:9-20 (Sept. 6, 2007) (annexed as Exhibit H) (emphasis added). Plaintiffs' counsel also asserted that, as a result of the breach,

> San Antonio [SAFSB] was acquired by a <u>separate institution</u>, a third party that is not a Plaintiff in this case, and that is therefore not relevant to the damages claims except insofar as it operated SAFSB as a <u>separate, wholly owned institution</u> that allowed us to now trace the actual, real profits, the cashflows in, the cashflows out, the resulting net economic effects of SAFSB's operations, operations that should have been within the River Valley structure but instead accrued to somebody else who is not a Plaintiff here.

<u>Id.</u> Tr. 28:11-21 (emphasis added). Several documents, however, belie these claims and demonstrate that Mr. Kipnis can provide testimony contradicting the claims of plaintiffs' counsel and demonstrating that the River Valley shareholders, as the shareholders of WCHI, did not lose any of the SAFSB profits as a result of the transfer of the opportunity to WCHI.

Mr. Kipnis closed WCHI's acquisition of SAFSB in San Antonio and did "some review and comments of the acquisition agreement, preparation of closing documents, and ma[d]e sure that monies were wire transferred and that documents were received." Kipnis Dep. Tr. 15:5-9 (Aug. 14, 2000). Thus, Mr. Kipnis was intimately involved in the transaction and may testify regarding the SAFSB acquisition.

**2. Mr. Kipnis Will Testify About Affiliated Party Transactions Between River Valley and SAFSB**

This cohesion among River Valley, WCHI, and SAFSB led to a conclusion by Mr. Kipnis's law firm, Holleb & Coff, that transactions between River Valley and SAFSB were affiliated party transactions. Indeed, Mr. Kipnis and Holleb & Coff played an important role in facilitating regulatory approval of transactions between SAFSB and River Valley needed because they were "affiliated parties."

For example, in an August 24, 1992 memorandum, River Valley's Ronald Pikus concluded that "[t]he most efficient flow of SAFSB's conforming loan production to the secondary market would be the incorporation of Texas and Illinois production into the same MBS's. This does, however, raise a regulatory issue regarding affiliated party transactions." DX 1017 at PHO068 1782 (annexed as Exhibit I). Mr. Pikus stated that he and Mr. Bangert would "work with Mark Kipnis of Holleb & Coff to draft agreements which will meet regulatory scrutiny." Id. at PHO068 1783.

Holleb & Coff attorneys later corresponded with Larry Ferries of the OTS regarding an agreement for the sale of mortgage loans by SAFSB to River Valley III. PX 794 at H&R-B47-00808 (annexed as Exhibit J). Holleb & Coff then sent the OTS a draft letter memorializing a conversation regarding these affiliated transactions. HO2002 1027 (annexed as Exhibit K). Thus, Mr. Kipnis had knowledge of the affiliated party transactions between River Valley and SAFSB and is expected to testify about them at trial.

**3. Mr. Kipnis Has Information Regarding River Valley's Purported Inability To Raise Funding To Acquire SAFSB And American National Bank's Loan To WCHI**

Plaintiffs have asserted that they were unable to acquire SAFSB through River Valley due to their inability to obtain funding through American National Bank ("ANB"). Messrs. Holland and Ross, however, had a collective net worth of $57 million. PX 599A PHO054 0494 (annexed as Exhibit L); PX 599B PHO054 0506 (annexed as Exhibit M). Mr. Kipnis was familiar with Mr. Ross's financial situation. Kipnis Dep. Tr. 65:3-23 (Aug. 14, 2000).

Mr. Kipnis can also provide relevant testimony about ANB's loan of $10 million to WCHI to finance the purchase of SAFSB, which ANB conditioned upon a requirement that RV Holdings pay down a previous ANB $7 million loan to $1 million. JSF ¶ 350, 354; Kipnis Dep. Tr. 53:11-19 (Aug. 14, 2000).

On October 24, 1991, Holleb & Coff requested that the OTS process an amendment to River Valley III's Stock Charter to "modify the dividend rate authorized for the Class C Preferred Stock." HO2001 2768 FL-2769 FL (annexed as Exhibit N). Mr. Kipnis attended a meeting with the OTS on March 19, 1992, at which River Valley requested an exception from its supervisory agreement to allow it to pay down the loan to ANB. DX 677 at WON034 0611 (annexed as Exhibit O). Mr. Kipnis is expected to testify about that meeting and regarding other aspects of the ANB loan.

**C. Mr. Kipnis Was Involved In The Payment Of Preferred Stock Dividends And Bonuses To Messrs. Holland, Ross, And Bangert**

The River Valley thrifts paid substantial dividends, deferred compensation, and significant bonuses to Messrs. Holland, Ross, and Bangert. Mr. Kipnis recalled a deferred compensation agreement with Mr. Bangert. Kipnis Dep. Tr. 62:11-14 (Aug. 14, 2000). In fact,

he signed the December 1, 1991 agreement to provide $3.5 million in deferred compensation to Dr. Holland, DX 626 at PHO030 0355-256 (annexed as Exhibit P), and the November 1, 1991 agreement to provide $2.1 million in deferred compensation to Mr. Bangert. PX 629 at PHO030 0285-286 (annexed as Exhibit Q). Mr. Kipnis and other members of the Board of River Valley Holdings, Inc., allowed a payout of $4.6 million in deferred compensation to Messrs. Holland and Bangert on December 31, 1993. DX 1555 at PHO036 0005-6 (annexed as Exhibit R).

Additionally, River Valley's Board approved further payments to Messrs. Holland, Ross, and Bangert. PX 351 at H&R-B44-1396 (annexed as Exhibit S). Mr. Kipnis determined when dividends were payable under the Class "D," Class "E," and Class "F" preferred stock, designed to compensate Messrs. Ross, Holland, and Bangert. DX 194 at PHO003 0457 (annexed as Exhibit T); PX 351 at H&R-B44-1396 (annexed as Exhibit S). Mr. Kipnis is expected to testify about these payments, which were later criticized by the OTS. PX 455 at WON034 1059 (annexed as Exhibit U).

Given his substantial involvement in and knowledge of River Valley's dealings and discussions with regulators, Mr. Kipnis will provide relevant, non-duplicative testimony necessary to our case. The Court should deny plaintiffs' motion to quash the subpoena.

## III. Alternatively, Mr. Kipnis Can Provide Testimony By Remote Videoconferencing

Should the U.S. District Court for the Northern District of Illinois restrict Mr. Kipnis's movement out of Illinois or should this Court conclude that travel to Washington, D.C., would create an undue burden, Mr. Kipnis may testify by remote videoconferencing. Under RCFC 43(a), the court may "permit presentation of testimony in open court by contemporaneous transmission from a different location." RCFC 43(a).

## CONCLUSION

For the reasons set forth above, we respectfully request that the Court deny plaintiffs' motion to quash the subpoena directed at Mark Kipnis, or, in the alternative, that Mr. Kipnis provide testimony by remote videoconferencing.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

Attorneys for Defendant

Of Counsel:

SCOTT D. AUSTIN
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
AMANDA L. TANTUM
JOHN J. TODOR
SAMEER YERAWADEKAR
Trial Attorneys
Department of Justice

December 5, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of December 2007, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO QUASH TRIAL SUBPOENA DIRECTED AT MARK KIPNIS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson

# EXHIBIT A

UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND AND HOWARD R. ROSS, Plaintiffs,

vs. No. 95-524C

THE UNITED STATES OF AMERICA, Defendant.

The deposition of MARK KIPNIS, called by the Defendant The United States of America for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Laura A. Czubak, Certified Shorthand Reporter and Notary Public, at 205 West Randolph Street, Suite 510, Chicago, Illinois, commencing at 9:01 a.m. on the 14th day of August, A.D., 2000.



APPEARANCES:

Mr. David B. Bergman
(Arnold & Porter)
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Phone: (202) 942-5474

On behalf of the Plaintiffs;

Ms. Patricia A. Smith
Mr. Patrick T. Murphy
(United States Department of Justice)
1100 L Street, NW
Washington, D.C. 20530
Phone: (202) 353-8841

On behalf of the Defendant.

ALSO PRESENT: Mr. Jeff Nielsen

* * * * * *

DEFENDANT'S EXHIBIT
DX 1553
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.



INDEX


| WITNESS | PAGE |
|---|---|
| MARK KIPNIS | |
| Direct Examination by Ms. Smith | 4 |


EXHIBITS


| KIPNIS DEPOSITION EXHIBIT | PAGE |
|---|---|
| No. 1 | 21 |
| No. 2 | 41 |
| No. 3 | 54 |




(Witness sworn.)

WHEREUPON:

MARK KIPNIS,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SMITH:

Q. Good morning, Mr. Kipnis. We just met off the record, but, again, my name is Patricia Smith. I'm representing the United States in the case Holland and Ross versus the United States.

I realize you're an attorney, Mr. Kipnis. Have you actually ever been deposed before?

A. No, I haven't.

Q. Okay. Have you taken depositions?

A. No, I haven't.

Q. Okay. I will go over some of the preliminary instructions, then. First, I ask that you respond verbally to all the questions so that the court reporter can get down your answers as opposed to a nod of the head.

If you don't understand a question, please ask me to clarify and I will attempt to do

Page 5

so.

If you think of an answer to a question later in the deposition, please let me know and we can go back and let you expand on whatever your earlier answer was. If you think of a document that might help you answer a question, you can let us know. We have a lot of documents here, and we may be able to come up with a document that will help you answer the question.

If you need a break at any time, please let us know. We just ask that you respond to whatever question is pending, and then we can take a break.

Is all of that clear to you, Mr. Kipnis?

A. Yes.

MR. BERGMAN: Trisha, before we start, let me just state for the record that there may be instances in this deposition, more than others, where attorney-client privilege is an issue; and there is no intention of waiving attorney-client privilege. There may be instances where we need to break when a question is pending to discuss privilege issues, and I ask that you be sensitive as well when asking questions not to ask for

Page 6

information that would intrude on attorney-client privilege matters.

Other than that, I also would ask that we agree that all objections to form are preserved for trial.

MS. SMITH: That's fine.

BY MS. SMITH:

Q. And, Mr. Kipnis, my questions are not intended to ask you any attorney-client privilege. So to the extent they're going that way, obviously your counsel -- Counsel may be instructing you not to answer if it looks like the questions are going that way.

Finally, are you on any medication or drugs, or is there any other reason that would make it difficult for you to understand and answer my questions here today?

A. No.

Q. Mr. Kipnis, could you provide your educational background from high school onward, please?

A. I graduated Niles West High School in 1965. I graduated the University of Illinois in 1969, and I graduated Northwestern University

Page 7

School of Law in 1974.

Q. Any courses or any kind of educational training after your law degree at Northwestern?

A. I sat for a couple of master of tax classes at DePaul University School of Law.

Q. Anything other than that, Mr. Kipnis?

A. No.

Q. And if you could provide your employment from the time you graduated from the University of Illinois?

A. From June of 1969 until August of 1972, I was an accountant with what was then known as Price, Waterhouse & Company. It's now Price, Waterhouse, Coopers. From 1974, when I graduated law school, until January of 1998, I was with a single law firm that was under various names, but at the time I left was called Holleb & Coff.

From January 1998 to the present, I'm vice president-general counsel of Hollinger International, Inc., and each of its U.S. subsidiaries.

Q. And what was your degree in at the University of Illinois?

A. Accounting.

Page 8

Q. And during the time you were at Holleb & Coff, what kind of law did you practice?

A. Transactional. I would vary between the real estate department and the corporate department based upon the economy and where people were most needed.

Q. And did get your CPA?

A. I did.

Q. When was that?

A. 1969.

Q. When did you first start working with either Howard Ross or Homer Holland?

A. I would have begun working with Howard Ross in the mid '70s, maybe '74 to '76. He was a client of the Holleb firm.

Q. And what type of work were you doing for him?

A. The first work with Howard was in the real estate area. He was part of a team that had developed numerous high-rises along the outer drive of Chicago and other areas, and I believe we were working on sales of one or more of those properties.

Q. How did you come to be involved with

Homer Holland and Howard Ross with respect to the River Valley entities?

A. I don't know how Howard and Homer first met, but they decided to strike an arrangement where they were going to collectively acquire River Valley; and I, in effect, represented Howard in his negotiations with Homer, shareholder agreements, things like that.

Q. Was that with respect to the acquisition of Rock Falls, or was that with respect to the acquisition of Galva, Home, and Mutual?

A. It was with respect to the acquisition of Rock Falls.

Q. After representing Mr. Ross with respect to those dealings, what was your next involvement with respect to either of the River Valley entities?

A. Either immediately or shortly after the acquisition -- Homer Holland appreciated the way I represented Howard, and I wound up then doing some ongoing general corporate work for the Rock Falls institution, eventually became an officer and director of that institution.

Q. Do you recall when that was?



A. No.

Q. Do you know if it was within one year or two years of the time when they acquired Rock Falls?

A. I believe it was.

Q. What was the officer position that you held?

A. Secretary. I had to sign all the documents.

Q. Other than signing the documents, what were your responsibilities?

A. None.

Q. And as a director, what were your responsibilities?

A. Fiduciary duties of loyalty and care, just general outside director, sit at board meetings.

Q. What involvement did you have with respect to Rock Falls's acquisition of Republic?

A. Either none or very little at the closing to assist in getting documentation done at the end. Neither I nor any member of my firm were regulatory attorneys, so we weren't involved in either -- in any of the negotiations.



Q. And when you indicated either "none or very little" in terms of obtaining documents, what did that involve in terms of obtaining documents?

A. Certificates of good standing, closing resolutions, closing certificates, things like that.

Q. As a member of the board of directors, what information did you receive regarding the negotiations relating to the acquisition of Republic?

A. The board would always receive a board package of information, and Homer, Howard, the other executives would keep us apprised from time to time of what they were doing and what the status of those negotiations were.

Q. Do you recall anything regarding those negotiations?

A. Nothing in particular.

Q. I'm going to ask you some general questions later, but --

A. Yeah.

Q. What was your involvement with respect to the acquisition of Galva, Home, and Mutual by Homer Holland and Howard Ross?



A. Pretty much the same thing. Again, we weren't regulatory attorneys. I think they involved -- Is that the one that they involved Jones, Day for the most part? I think they assisted them on that, but primary negotiations were Homer Holland and the management team.

Q. Were you involved at all with respect to the negotiations with any regulators?

A. I don't believe so.

Q. And how about with respect to the acquisition of Peoria? What was your involvement?

A. The same thing.

Q. And with respect to the acquisition of Galva, Home, and Mutual and Peoria, is there anything specific that you can recall about those negotiations that you learned as a member of the board of directors?

A. No.

Q. Did you become a member of the board of directors once River Valley was formed by the acquisition of Galva, Home, and Mutual?

A. Yes.

Q. Who else from Holleb & Coff worked with the River Valley entities?

Page 13

A. I'm sure over the course of time there were a number of people, but my primary assistant was -- second person was Anne Webber Brody.
Q. Do you know where she is now, Mr. Kipnis?
A. Living in Chicago, retired mother with two children, should be in the directory. She lives on the South Side on Kimbark.
Q. I'm sorry. Where?
A. Kimbark, K-i-m-b-a-r-k.
Q. And that's a Chicago --
A. Yes.
Q. It's in Chicago, okay.
What positions did you hold at River Valley in Peoria?
A. Again, secretary and director.
Q. Were you secretary and director at Rock Falls and what then became River Valley Rock Falls until the time it was merged into River Valley of Peoria?
A. Yes.
Q. And were you secretary and a director at River Valley Peoria until the time it was acquired by First Banks?
A. Yes.

Page 14

Q. Any other positions you've held at either of the River Valley institutions?
A. I don't believe so.
Q. How about Holland Partners, Inc.? Did you hold any positions there?
A. No.
Q. How about River Valley Holding, Inc.? Did you hold any positions there?
A. River Valley what?
Q. Holding, Incorporated.
A. I don't even remember what that was, but I'll assume I was the secretary of that.
Q. Can you recall any other related River Valley entities that you served on -- served any positions on or served as a board of directors on?
A. If there were special purpose entities that we created, I was probably a secretary of one of them to just help facilitate signatures; but I don't remember the particular names of any of them at all.
Q. Did you have any involvement with the acquisition of San Antonio Federal Savings Bank in Texas?
A. Yes. I went down to San Antonio to close

Page 15

that one; but, again, I was not involved in the negotiations of that transaction.
Q. And what was your involvement in terms of closing that deal?
A. There would have been some review and comments of the acquisition agreement, preparation of closing documents, and make sure that monies were wire transferred and that documents were received.
Q. Were you ever aware that an attempt was made to acquire San Antonio through River Valley?
A. Yes.
Q. Were you at all involved in any discussions with the regulators or American National Bank regarding the attempt to acquire San Antonio Federal through River Valley?
A. No.
Q. Did you hold any positions with what became River Valley Bank in Texas and/or with Western Capital Holding, Inc.?
A. Yes. Essentially the same positions as with the Illinois, secretary and director.
Q. Did your position as secretary and director vary at all for any of the institutions

Page 16

for which you held those positions?
A. No.
Q. What is your current involvement with Homer Holland or Howard Ross?
A. I have no current involvement with Homer Holland. With Howard Ross, I am a director of Colorado Business Bank Shares, an institution that is controlled by Howard and Steve Bangert and other people.
Q. Do you own any portion of that?
A. I do.
Q. What percentage do you own?
A. Less than one.
Q. Did you own any percentage of any of the River Valley institutions?
A. I did.
Q. And what percentage for the various institutions?
A. I believe they were about 2 percent.
Q. For each of them?
A. I think so.
Q. What other investment opportunities, if any, have you had with either Homer Holland or Howard Ross?

Page 17

A. I believe I've had some with -- some opportunities with Homer, but I don't know if I ever -- I don't believe I ever accepted any of those or any of those went forward.
I've had a number of opportunities with Howard, some good, some bad. There was an oil drilling called Modern Explorations. There was an institution in Connecticut called Lafayette. There was something called Hawthorne Colorado. There was even something called Taco Nuggets.
Q. Taco Nuggets?
A. Taco Nuggets. I think Western Capital Holdings, which I think was just a successor to the Texas bank.
Did I mention Hawthorne Colorado?
Q. Yes, uh-huh.
A. I think those are them.
Q. Are you still receiving any proceeds from Western Capital Holding, Inc.?
A. No.
Q. And when did your interest in Western Capital Holding, Inc., come to an end?
A. Probably a couple years ago.
Q. And what type of investment opportunity

Page 18

was Lafayette in Connecticut?
A. It was just an opportunity to purchase some shares as part of a capital raise.
Q. Was that a certain type of business?
A. Banking.
Q. Banking, okay.
And how about Hawthorne Colorado? Was that also banking?
A. It was the purchase -- It was a single-purpose purchase of some assets from a large bank in Colorado. I forget the name. And it consisted of -- There was some notes securing a shopping center and, I think, a real estate -- a separate real estate parcel.
Q. And how about Taco Nuggets? What kind of an investment opportunity was that?
A. A bad one. It was -- And it wasn't Howard's fault. It was brought to us by someone else. Somebody was marketing a new product, and we liked the guy and thought it would be fun; so we invested a little with him. It never made shelf space.
Q. So the only current investment is with Colorado Business Bank Shares in terms of your

Page 19

involvement with either Homer or Howard?
A. Investments, yes.
Q. Okay. Do you have other business relationships with either Homer Holland or Howard Ross?
A. None with Homer. Howard from time to time lends me funds for various investments if I don't want to cash in a particular investment for liquidity, and as of right now I have a hundred-thousand-dollar loan with him.
Q. What type of business is Hollinger International, Inc.?
A. It is a newspaper publisher.
Q. And what are your responsibilities there?
A. As general counsel -- Hollinger is a New York Stock Exchange company, so I have general overview of their securities law filings. We, over the last couple of years, have sold or are in the process of selling about three and a half billion dollars of newspaper assets. And I've been actively involved in that because I'm located here in Chicago. One of our properties is the Chicago Sun Times, and I actively get involved in various

Page 20

aspects of the Chicago Sun Times's legal issues along with the other Chicago papers that we own.
Q. When you indicated that Howard Ross lends you funds, is that for personal investments, then?
A. Yes.
Q. Can you recall any committees that you served on at any of the River Valley entities?
A. I may have been on an audit committee. I don't remember whether we had them or not.
Q. Do you recall doing any work on what may have been a committee at any of the institutions?
A. No.
Q. Mr. Kipnis, how did you prepare for today's deposition?
A. I didn't.
Q. You didn't review any documents?
A. I don't have any.
Q. You didn't meet with counsel?
A. Counsel came by and introduced himself when he came into town last week and just told me a little bit of what the day would be like. And I told counsel it wouldn't last as long as it would take to verify exactly how much I forgot or didn't know to begin with.

Page 21

Q. Did you review the subpoena that was issued for this deposition?
A. I did.
Q. Mr. Kipnis, if you could take a look at what the court reporter has marked as Exhibit 1, it's a subpoena that was issued for your deposition here today. Specifically, I was going to refer you to the -- about the middle of the document, first page, where it indicates that you were requested to produce any documents in your personal possession related to your work or employment, if any, and it lists the various River Valley entities and related entities.
Do you have any such documents, Mr. Kipnis?
A. I do not.
Q. What is your understanding, Mr. Kipnis, as to what this case is about, the Holland and Ross versus United States case?
A. My understanding is that during the savings and loan crisis, the government wound up with a number of undercapitalized institutions. It negotiated with various parties, Messrs. Holland and Ross included, to acquire those institutions in

Page 22

return for various capital contributions and regulatory credits that the government would promise, and the acquisitions were consummated later on; that the year of FIRREA, '89, the laws changed and a number of institutions who were sound institutions now found themselves either undercapitalized -- or the threat of undercapitalizing. Some went under; others weren't able to do all the business that they anticipated. And I think that's what it's all about.
Q. And what's the basis for that understanding which you provided?
A. Memory, just general memory.
Q. With respect to the lawsuits, in general, that are ongoing against the United States relating to the savings and loan cases?
A. That, and just general memory of discussions at the time of the transactions and living with Holland, Ross, Bangert, and the others and their complaints at that time because of the changes.
Q. Do you know when you first became aware that they were going to file a lawsuit against the United States?

Page 23

A. No.
Q. Were you involved at all in any analysis of whether or not they should bring a lawsuit against the United States?
A. No, from the legal standpoint as far as doing any research as a lawyer. Yes, in terms of just general discussions of the pros and cons of suing the government. It's not something they took lightly or wanted to do.
Q. And that would be based on discussions in board of director meetings or general discussions?
A. Both.
Q. And what do you recall with respect to those discussions as to any pros and cons of suing the government?
A. They felt they were wronged, but no one wanted to sue the government for reasons that are pretty obvious. They were afraid that it might harm future business dealings with the government. They were afraid that the government has more resources than they have in litigation. A lot of just general business reasons of "Did it make sense?"
Q. Do you recall any other specific reasons

Page 24

that were identified, either pro or con, of suing the government?
A. No.
Q. Do you know when those discussions occurred in terms of was it right at the time FIRREA was passed, a year or two later?
A. I believe it was ongoing discussions from right at the time that FIRREA was passed all the way through the sales and after.
Q. Were you involved at all in discussions regarding Homer Holland and Howard Ross retaining the rights to the claim when they sold River Valley to First Banks?
A. Could you rephrase the -- Or could you repeat the question?
Q. Sure. Were you involved at all in any discussions with respect to Homer Holland and Howard Ross retaining the rights to the claim against the government when it sold River Valley to First Banks?
MR. BERGMAN: Mr. Kipnis, if you were involved as a lawyer, please keep your answer limited to a yes or no and do not reveal the substance of attorney-client communications.

Page 25

BY THE WITNESS:
A. Yes. And the results, I believe, found their way into the agreement.
Q. Were you involved in those discussions in any way other than as a lawyer with respect to what they should do?
A. No.
Q. Were you involved in any board meetings where there were discussions regarding maintaining the claim?
A. I don't believe so.
(Brief pause.)
BY THE WITNESS:
A. I take that back. Other than there would have probably been a reporting by Holland or Ross or Bangert as to the outline of the transaction at a board meeting, and I'll assume that that might have been one of the items that was brought up.
Q. Do you know what would have been brought up at the board meeting as to in terms of the outline of what it was?
A. No. There would be board packages that if you had those, the material would be in there.
Q. How did it come about that you had a

Page 26

percentage interest in the various River Valley entities?
A. Howard Ross asked me if I'd like to purchase a percentage of his interest.
Q. And do you have an understanding as to why he asked you that?
A. Clients and -- We -- He's a good client and friend.
Q. And do you know how the 2 percent or so that you believe you had with the different River Valley entities, how that amount was determined?
A. He asked me how much I would like in the initial Rock Falls litigation -- or --
Q. Acquisition?
A. -- organization, acquisition, and I believe I said based upon the amount of money that it would cost that I would like to try for 5 percent and I acquired that. And then some time later -- I think it was when I was moving into a new house -- I sold him back 3 percent, and that got down to 2 percent of the Illinois institution. And then when we were not able to acquire the Texas institution as part of the Illinois institution and had to form a new institution, essentially all the

Page 27

shareholders's then percentages -- everybody just acquired the Texas institution in the same percentages.
Q. When you purchased and/or sold percentages, how was the value determined?
A. I don't remember specifically. But I believe that as part of the board packages for River Valley, they would prepare market -- mark-to-market analyses of the valuation. And at the time of the sale, I think we just took the percentage of what we viewed as the market value of the institution.
Q. With respect to the acquisition of Republic by Rock Falls, do you recall any of the terms of the acquisition pursuant to your role on the board of directors?
A. No.
Q. Do you know whether at the time you were aware of the various terms of the acquisition?
A. In a general sense, yes.
Q. Would you have actually reviewed the acquisition documents?
A. Yes.
Q. Do you recall whether or not you had any

Page 28

input into any of the terms of the acquisition?
A. Not the business terms, the legal terms. If there was an agreement, I would be reviewing it as a lawyer and asking the management team whether -- is this what they really meant, is this what they wanted based upon their telling me what they thought the agreement was.
Q. Are there any specific issues that you can recall where there was some issues of what they meant or didn't mean when choosing any of the agreements?
A. No.
MR. BERGMAN: Again -- Let me again caution you. I think we're getting into an area where this is -- Ms. Smith is asking you about the substance of discussions you had with clients in the role as a lawyer. So I would ask you to be very careful not to reveal the substance of those discussions.
BY MS. SMITH:
Q. And with respect to the acquisition of Galva, Home, and Mutual by Mr. Holland and Mr. Ross, at what point did you become involved with what became River Valley of Peoria?
A. (No verbal response.)

Page 29

Q. I guess what I'm trying to get at first is were you involved at all up until the time that River Valley was formed while the negotiation was ongoing to acquire Galva, Home, and Mutual?
A. I'm assuming that from time to time they would report to us as directors, just that negotiations were ongoing and they were hopefully acquiring it. After the business deal was struck, I would have been involved in any legal documentation of it.
Q. Do you recall whether they attempted to acquire Galva, Home, and Mutual through Rock Falls initially?
A. Yes.
Q. And do you recall why, in fact, they did not acquire Galva/Home/Mutual through Rock Falls?
A. No.
Q. Did they report to the Rock Falls board of directors as to the negotiations that were ongoing with respect to the acquisition of Galva, Home, and Mutual?
A. Yes.
Q. Do you know if that was the case even after it was determined that Galva, Home, and

Page 30

Mutual would be acquired separately by Homer Holland and Howard Ross?
A. Yes.
Q. And do you recall anything at all relating to the discussions that they had with the board of directors relating to the acquisition of Galva, Home, and Mutual?
A. No.
Q. Do you recall anything at all relating to any discussions had with the board of directors of River Valley Peoria relating to the acquisition of Peoria Federal Savings?
A. No.
Q. Do you have any understanding as to whether the terms of any of the acquisitions are the same or different?
A. No.
Q. What was your understanding, Mr. Kipnis, as to what could be counted as regulatory capital following the acquisitions?
A. I'm going to give you some terms that I don't remember that well, but I think there was some — there was some goodwill and there was some credits and there were some capital contributions

Page 31

of some nature along with our regular existing capital.
Q. As you sit here today, do you have an understanding of the term "goodwill"?
A. From a general accounting sense, yes.
Q. And what is your understanding?
A. It's an intangible that more often than not represents the difference between maybe the fair market value and the book value or — that generally gets written off over a substantial period of time.
Q. Do you have any understanding as to how the term "goodwill" as used with respect to the acquisitions is the same or different than the definition you just gave?
A. No.
Q. You also referred to credits. What is your recollection of credits in terms of how they counted towards regulatory capital?
A. I have none.
Q. You also referred to capital, I believe. You said credits, and then you said capital credits. I don't know if those were two different things —

Page 32

A. No.
Q. — that you were identifying.
A. I thought — Again, maybe memory of the question; but I thought as part of the transaction there were some actual capital contributions in the form of cash that was given as part of those agreements.
Q. Cash that was given by the government?
A. Right.
Q. Okay.
A. Either straight out or through the purchase of some preferred stock in some fashion.
Q. And what, other than those items, is your general recollection of what may have counted as regulatory capital?
A. I really don't know.
Q. Other than what would have been discussed at board meetings and reported in minutes of the board meetings, would you have had any knowledge with respect to issues relating to goodwill or capital credits or cash contributions by the government, whether it be straight cash or through the purchase of preferred stock?
A. Yes.

Page 33

Q. And what would your understanding have been or knowledge have been?
A. I thought you -- the question was referring to the timing of what I've learned anything other than at the meetings. I mean, Howard Ross, Homer Holland, Steve Bangert all were friends, so I might see them for dinner or I might see them for lunch and we would talk -- we would always talk about the bank and institutions like that. So I can't confine the discussions just to the official board meetings.
Q. Is there anything as you sit here today that you can think of that you learned outside of what would have been reported in the minutes of board of directors meetings?
A. No.
Q. Do you recall what the differences are between GAAP goodwill and RAP goodwill?
A. No.
Q. What is your recollection of any contributions by Homer Holland or Howard Ross with respect to the acquisitions?
A. With respect to what?
Q. The acquisitions.

Page 34

A. At the time of acquisition, I'm assuming that they had to make some as a condition; but I don't know what they were. I don't remember what amounts were or anything like that.
Q. Do you or did you have any understanding as to how any contributions by them would count towards capital?
A. None that I remember now.
Q. Do you recall that there was some subordinated debt issue with respect to certain of the acquisitions?
A. Yes. I remember that there was some on the books, but I don't remember what was which particular transaction or who was the holder. I can't remember whether it was the government or whether it was American National or whether it was Howard or Homer for that matter.
Q. I'll represent to you that it was issued to American National Bank. Do you have any recollection as to how the subordinated debt counted towards regulatory capital?
A. No.
Q. Do you recall whether Homer Holland and Howard Ross purchased any stock themselves with

Page 35

respect to any of the acquisitions?
A. Because -- Well, because we weren't able to use Rock Falls, I'm sure we had to form a new institution and they had to purchase stock; but I don't remember the particulars.
Q. Do you recall their acquiring some preferred stock with respect to the acquisition of Peoria Federal?
A. No.
Q. What do you recall, Mr. Kipnis, regarding the pursuit of additional acquisition opportunities by either River Valley Rock Falls or River Valley Peoria?
A. I know that they were always interested in expanding and they were always looking for additional opportunities.
Q. Do you recall any of the specific entities or institutions that they may have attempted to acquire at any point in time?
A. No. There might be some discussions in the board packages, but independently I don't recall.
Q. Do you recall why they never acquired any other institutions or entities?

Page 36

A. No.
Q. You indicated that they were always interested in acquiring. Are you saying from the time of 1985 when Rock Falls was first acquired up until the time of 1994 when River Valley was sold, or would there be differences in that time period?
A. My guess is there were differences during the time period based upon whether they had sufficient regulatory capital to acquire or not, but nothing more specific than that.
Q. Do you recall anything as you sit here today that you would have learned outside of what's contained in the board minutes regarding any acquisition opportunities that they were seeking during the time 1985 to 1994?
A. No.
Q. Do you know whether or not they were interested in pursuing just troubled institutions?
A. No. I believe that they looked at both, but I don't -- I'm trying to recall a specific, but I can't.
Q. Do you know what their philosophy was -- the board of directors's philosophy was in terms of what it was that they were hoping or seeking to

Page 37

acquire?
A. Fashionably, anything that they thought they could get a sufficient rate of return on.
Q. Do you recall what they considered a sufficient rate of return?
A. No.
Q. Do you recall why they were interested in growing by acquisition?
A. Not specifically.
Q. Do you generally recall anything?
A. Basically they were good businessmen. They understood banking operations. They felt that the more assets and capital that they had under control, the more money they could make.
Q. Do you recall anything relating to the proposed acquisition of Peerless Federal Savings and Loan Association in Chicago?
A. No.
Q. Do you recall that there was even a proposed acquisition of Peerless?
A. Yes. For personal reasons that when I was a 10-year-old I played little league baseball, and my team was Peerless Federal Savings so that the name rang a bell for me; and I knew the family

Page 38

that primarily owned it.
Q. So other than recalling that it was, in fact, a potential acquisition, that's all you recall?
A. Correct.
Q. Do you recall that there was an interest in acquiring three thrifts in Grand Junction, Colorado?
A. No.
Q. Do you recall that there was a proposed acquisition of United Federal Savings Bank in Galesburg, Illinois?
A. Yes.
Q. Do you recall why they were interested in acquiring United Federal?
A. No.
Q. Do you recall why that deal didn't go through?
A. No.
Q. Do you recall anything at all relating to United in terms of what type of institution it was or whether it was troubled or not?
A. No.
Q. Do you recall if there was an institution

Page 39

United Federal?
A. The name rings a bell. I can't tell you whether that's the exact name or not.
Q. Do you recall having any discussions with anyone at United Federal?
A. No. In fact, I'm sure I didn't.
Q. Okay. Do you recall a proposed acquisition of Security Federal in Peoria, Illinois?
A. Yes.
Q. And what do you recall about that proposed acquisition?
A. Nothing. Purely it's another name that rings a bell.
Q. Do you recall anything about Security Federal?
A. No. Again, it wasn't my role. The business people negotiated the deals.
Q. You had no discussions with anyone at Security Federal?
A. No.
Q. Do you recall an interest in acquiring Household branches and Midwestern Canton branch?
A. Which ones?

Page 40

Q. Household branches and Midwestern Canton branch.
A. Canton, I remember as a name. Household doesn't ring a bell to me.
Q. What do you recall about Canton?
A. Only that I remember the name.
Q. And, again, you had no discussions with anyone at Midwestern Canton regarding a proposed acquisition?
A. No. I don't even remember it as Midwestern Canton. I only remember Canton.
Q. Do you recall an interest in acquiring the Heart of Illinois Bank branches?
A. No.
Q. Is that a name that is familiar to you?
A. No.
Q. Have any other proposed acquisitions come to your mind in the last few minutes while we've been identifying some others?
A. No.
Q. Do you have any sense of how many proposed acquisitions there may have been from the time 1985 to 1994?
A. No.

Page 41

Q. If an acquisition was likely to be consummated, would you have had any role?
A. Probably, depending upon whether they were using other regulatory counsel or not. Sometimes we would stop in at the end; sometimes we'd take a more active role in reviewing an acquisition agreement. I wouldn't have been shut out altogether.
Q. Do you know whether you ever actually did have any involvement in any proposed acquisitions?
A. The ones that were consummated.
Q. Other than the ones that were consummated?
A. No, I don't think so.
(Kipnis Deposition Exhibit No. 2 marked as requested.)
BY MS. SMITH:
Q. Mr. Kipnis, if you could take a look at what the court reporter has marked as Exhibit 2, it's an April 19th, 1990 letter on Holleb & Coff letterhead from Anne Brody, and you're identified as a cc, and Steve Bangert, and it's directed to Michelle Heider at Household Bank FSB. If you could just skim the letter real quick and see if

Page 42

that brings back any recollection.
(Witness viewing document.)
BY MS. SMITH:
Q. Have you had a chance to skim that, Mr. Kipnis?
A. I have.
Q. Does it bring back any recollection?
A. No.
Q. And if you could turn to the page that ends with Bates range 1630 down in the right-hand corner.
A. I'm sorry. What?
Q. It ends with 1630 down in the right-hand corner.
MS. SMITH: For the record, the whole document is Bates range PHO012 1608 through 1633, and then also attached to the back is PHO012 1075 through 1093.
BY MS. SMITH:
Q. On the page that ends with Bates range 1630, it indicates copies should be sent to your attention. Do you recall anything about copies being sent to your attention?
A. Generally on all documents copies would

Page 43

be sent to my attention because the other parties -- the businessmen -- knew that generally I was always in town and that if something came across that came to me, I would at least -- that they wouldn't just throw something on their desk and let it go. I would be the one that says, "Hey, guys ..." But I think you'll find that I would be copied on most agreements of all types that River Valley would have entered into, not just acquisition agreements.
Q. But you still don't recall anything about the Household branches?
A. No.
Q. How would Anne Webber Brody's role have differed from your role?
A. It would be less. Say, in a situation like this, Steve would have probably have been the one to have reviewed the agreement and told us the business terms. Anne and I would have reviewed from a general corporate standpoint the representations and warranties, and we would have said as lawyers, "Steve, we think you should have this language or that language."
He would say yes or no.

Page 44

Anne would have joined either Steve and me in a meeting or I would have reported to her the end results of the meetings, and she would have, in this instance, served as scrivener for the markup of the document and the transmittal of the cover letter.
Q. Do you believe you would have greater knowledge than her with respect to any information relating to the River Valley entities?
A. I know you'll find this hard to believe after how this deposition is going, but absolutely.
MS. SMITH: I know we haven't been going very long, but why don't we just take a quick 10-minute break.
(A short break was had.)
BY MS. SMITH:
Q. Mr. Kipnis, what do you recall regarding any attempts to raise capital following the passage of FIRREA?
A. Nothing specifically.
Q. Do you recall generally whether or not there were efforts undertaken to raise capital?
A. I believe there were, and it was just

Page 45

difficult under that type of regulatory environment. People weren't sure what was going to happen.

Q. When you say it was "difficult," why was it difficult?

A. No specific memories other than FIRREA and the imposition of various regulations. It just put -- It put the institutions under a cloud. It just made it harder. When people have money they have different investment alternatives, and many investors selected alternatives that were not regulated like this. It was harder to get people to invest in the institutions.

Q. Do you recall specifically whether the River Valley entities had any difficulty in raising funds, raising capital?

A. I believe they did, yes, but I do not recall the specifics.

Q. Do you recall discussions either at the board meetings or outside the board meetings on ways to replace the supervisory capital that was no longer counted as regulatory capital after FIRREA?

A. I recall there were discussions, yes.

Q. Do you recall anything specifically or

Page 46

generally regarding those discussions?

A. No.

Q. Do you recall whether there were any discussions of Mr. Holland or Mr. Ross infusing additional capital into the thrifts?

A. Yes.

Q. And what do you recall regarding those discussions?

A. I don't recall the specifics.

Q. Do you generally recall whether it was a serious discussion or not in terms of them infusing additional capital into the thrifts or whether it was just brought up and easily discounted -- quickly discounted?

A. I do not recall the specifics or the times. But at certain times it was very serious because I know at least at one point -- I think I recall -- that one of the regulatory bodies imposed that they were either going to have to get some additional capital -- a requirement that they would get some additional capital in or there were going to be severe restrictions on them. I don't remember what the nature of those restrictions were.

Page 47

Q. Would that have been a two-million-dollar capital infusion that was required pursuant to a supervisory agreement that was entered in '91? Would that sound right?

A. That would probably sound right.

Q. Other than serious discussions regarding, potentially, it was, that infusion of capital, do you recall any other discussion at any time regarding any -- serious discussion at any time regarding infusions of capital by Mr. Holland or Mr. Ross?

A. Yes, there would have been discussions. But I don't recall the timing or the specifics.

Q. Do you recall whether they would have been before or after the one that you do remember?

A. No.

Q. Do you recall any of the discussions relating to the replacement of nonqualifying cumulative preferred stock with -- I'm sorry -- nonqual- -- Let me restate that whole question.

Do you recall any discussions regarding the replacement of nonqualifying cumulative preferred stock with noncumulative preferred stock?

A. I recall there were discussions, but I do

Page 48

not recall the specifics.

Q. Do you recall whether the cumulative preferred stock was, in fact, replaced with the noncumulative preferred stock?

A. No, I do not recall.

Q. Do you recall whether that transaction was intended to raise the capital of River Valley Peoria?

A. No, I don't recall.

Q. Do you recall anything relating to a redemption of 5 million in cumulative preferred stock that had been issued to FSLIC?

A. Vague recollections.

Q. Do you recall whether that redemption took place?

A. I believe it did along with -- if I'm remembering the transaction. I think it was a redemption and a settlement of various issues under one of the agreements that wound up in something called like a termination agreement, if that's the transaction. I think there were pools of receivables or something like that.

Q. Do you recall the purpose for the redemption of the FSLIC stock?

Page 49

A. No.
Q. Do you recall whether that was something that was sought by River Valley or by FSLIC?
A. I believe it was sought by River Valley as just part of resolving a couple of issues with FSLIC and just having less involvement with the government.
Q. Did you ever talk to anyone at FSLIC or at the FDIC?
A. On that transaction?
Q. In general.
A. Yeah, once or twice. One that I remember.
Q. And what one do you remember?
A. I think it was in connection with the supervisory agreement that you referred to where I was in a meeting -- I believe they met with all of the directors. And we were presented this agreement, and my memory is that they told us that they had their bad-guy agreement and their good-guy agreement; and we were given their good-guy agreement and we were to sign it then.
Q. Do you recall anything else regarding that meeting?

Page 50

A. No.
Q. Do you recall who the FDIC or FSLIC person or maybe OTS person --
A. No.
Q. -- who they were at the meeting?
A. No.
Q. Other than that one meeting with any regulators -- You think there may have just been one other meeting where you spoke with regulators?
A. Well, the regulators would come in -- they would report to the board as part of annual exams. But as counsel I wasn't really involved with the regulators at all, so, no, I'm not remembering meetings.
Q. Other than the regulators attending the board of directors meetings, did you have any contact with any of the regulators?
A. None that I recall.
Q. What is your recollection of the reason for the imposition of a supervisory agreement?
A. I believe that as a result of FIRREA and the regulations imposed thereunder, it changed us from being -- from whatever benchmark of adequate capitalization that we needed to not be adequately

Page 51

capitalized, and so there were restrictions imposed upon us.
Q. Do you recall any issues relating to the high level of mortgage derivatives by River Valley -- held by River Valley?
A. Yes.
Q. What do you recall regarding that issue?
A. I recall that Steve Bangert was -- did a number of transactions that I couldn't explain to you from Adam from things that were called -- from stars to gnomes to I'm not even sure what else; that the regulators did not understand them either; that he and other members of management worked real hard with the regulators to help them understand. And there were a couple sets of regulators, one of which -- and I don't remember which ones -- ultimately came to an understanding and saw how good he was with it, and I think we were fine with them. And another set of regulators that never did or could understand, and so we were -- they were never happy with our doing the derivatives.
Q. Do you recall whether the supervisory agreement was imposed by the regulators which you indicated understood or by the regulators that you

Page 52

indicated didn't understand what was going on?
A. Well, I'll assume it was the ones who didn't understand, but I don't remember.
Q. Do you recall whether the regulators which you've indicated did understand, whether they had any concerns with the River Valley institutions?
A. I don't think they did once they became comfortable.
Q. So you don't recall whether they required River Valley to reduce their level -- the level of mortgage derivatives even if they weren't as concerned as the other regulators?
A. No, I don't recall.
Q. I know I asked you about your positions before with respect to River Valley Holding, Inc., and you didn't seem to recall that such an entity existed. Do you --
A. In retrospect I think it might have been a holding company.
Q. Do you recall anything relating to the creation of River Valley Holding, Inc.?
A. It might have -- I don't know if I'm recalling or if I'm guessing, but when we could not

Page 53

acquire whichever institution it was as part of Rock Falls and had to set up another institution because we weren't changing the essential business deals of the shareholders, we might have created a holding company that owned both of them. But I don't know if I'm recalling or guessing.

Q. Do you recall whether the creation of the holding company resulted in additional capital for River Valley following the passage of FIRREA?

A. No, I don't recall.

Q. Do you recall anything relating to the paydown of a loan to River Valley Holding, Inc., by River Valley so that the acquirers of San Antonio Federal Savings Bank could then take out a loan from River Valley Holding, Inc.?

A. Yes, I think so. I believe it was a condition of American National Bank that to make the loan to the entity acquiring Texas that there would have to be a paydown of the Illinois. Yeah, I think that was the case.

Q. Do you have any understanding as to why American National Bank would have required the paydown of the loan?

A. I don't recall any of the specifics. I

Page 54

wasn't part of those discussions.

(Kipnis Deposition Exhibit No. 3 marked as requested.)

BY MS. SMITH:

Q. Mr. Kipnis, if you could take a look at what the court reporter has marked as Exhibit 3, the first page indicates it's an Office of Thrift Supervision memorandum dated April 10th, 1992, from Larry Ferries to Chester Biedron, and the Bates range on the document is WON034 0611 through 0616. And if you could take a quick look at the document.

(Witness viewing document.)

BY MS. SMITH:

Q. Does this refresh your recollection about anything relating to the six-million-dollar dividend referenced in this document?

A. Nope.

Q. Do you recall the March 19th, 1992 meeting with the OTS which the memo indicates you were in attendance at?

A. No.

Q. Based on your review of this document, what is your understanding as to the purpose of the

Page 55

six-million-dollar dividend?

A. Let me reread.

Q. Okay.

A. Apparently the supervisory agreement was with the OTS, and we were requesting an exception from one of the terms in order to dividend out that money to redeem $6 million of preferred stock held by American National.

Q. Do you recall anything relating to any shrinking or shrinkage that occurred at River Valley Peoria as a result of the payment of the dividend referenced in the memo?

A. No.

Q. Do you recall generally River Valley of Peoria or River Valley Rock Falls going through periods of shrinkage?

A. Yes.

Q. Do you have a general recollection as to whether that occurred at one specific time or whether it occurred at various times from 1985 to 1994?

A. It would occur at the end of various quarters to get -- to get on the right side of whatever regulatory compliance capital that they

Page 56

had to be. Basically they wanted to grow. They could make money by making investments, but they were limited to the amount of what they could do because of the amount of capital that they had; so from time to time they had to sell off good investments to get to their capital requirements.

Q. Do you recall why they determined that the six-million-dollar dividend payment should be made that's referenced in this letter?

A. No. No, I don't remember the context at all.

Q. Do you recall whether there were any discussions relating to whether the money would better be utilized in the acquisition of San Antonio Federal than staying within River Valley?

A. No recollection.

Q. Do you have any recollection or understanding of any guaranties provided by either Mr. Holland or Mr. Ross with respect to the subordinated debt that was issued to American National Bank?

A. I believe in general that Ross and Holland guaranteed all of the obligations to the institution regardless of what form.

Q. Do you recall them receiving any fees for that?
A. At some point I believe they did receive something called a guaranty fee.
Q. Do you recall how it was determined what the amount of the fee would be?
A. No.
Q. If the board of directors had approved the fee -- Let me restate that.
Do you recall whether or not the board of directors had to approve whatever guaranty fee was received by Mr. Holland and Mr. Ross?
A. I believe the board did.
Q. How would the board have determined what amount that fee should be?
A. I believe that the board -- probably other than Ross and Bangert -- would have determined whether it was fair and reasonable because -- remembering that the board members for the most part were shareholders so anything that we gave to them was not available for the rest of us.
Q. And you indicated the term was fair and reasonable. Would that be with respect to the institutions or with respect to Mr. Holland and



Ross or with respect to all of them, the institution and Mr. Holland and Mr. Ross?
A. Probably all, but more with respect to the institution and the other shareholders who had the benefit of not having to execute the guaranties and what were we willing to pay them for stepping up to the plate when the others really did not want to.
Q. Do you recall whether, with respect to the acquisition of San Antonio, anyone else issued any guaranties?
A. I believe on San Antonio, everyone -- I think we might have all executed pro rata several guaranties. Theirs may have been joint and several, but -- The other shareholders may have executed several guaranties in lieu of making cash capital contributions of our respective percentages.
Q. Were any guaranties received in conjunction with that?
A. I don't recall.
Q. Have any capital replacement initiatives come to mind in the last few minutes or hour or so as we've been talking?



A. No.
Q. Do you recall any restructuring of River Valley's risk-weighted assets and how that may have impacted on capital?
A. No. I understand the concept in general, but I don't remember things that we specifically did.
Q. Do you recall whether anything was done to increase the risk-based capital ratio?
A. No.
Q. What is your understanding as to why River Valley Peoria and River Valley Rock Falls merged?
A. I have no recollection. I can guess, but I have no recollection.
Q. Do you recall that the two did merge?
A. I think they did, yes.
Q. What would be your guess as to why they merged?
A. My guess is that there were -- we wanted them to be together to begin with, and we couldn't. And then when we could, I think we did. And I think part of the reason was that Rock Falls had substantial NOLs, net operating losses, that we



wanted to take advantage of by netting some income from the Peoria institution with the Rock Falls institution.
Q. Do you recall when you first knew that there was an interest in merging the two entities?
A. No.
Q. Do you know whether that would have been from day one, from when Galva/Home/Mutual was acquired and became River Valley Peoria?
A. I think the answer is yes from day one in the sense of I think they always wanted it to be part of Rock Falls.
Q. What is your understanding of what the impact was of the merger between River Valley Rock Falls and River Valley Peoria, in terms of how it benefitted --
A. No recollection.
Q. Do you recall that two branches of River Valley Rock Falls were sold in 1991 to Amcore Financial?
A. Yes.
Q. Do you recall why they were sold?
A. No.
Q. Do you recall what the impact was of the

sale of those two branches of River Valley Rock Falls?
A. No.
Q. Do you know whether or not the two branches that were sold -- they were Roscoe and South Beloit -- whether they were the least efficient of the River Valley Rock Falls and River Valley Peoria branches?
A. I don't recall.
Q. Do you recall anything relating to the adoption of SFAS 109?
A. I don't know what SFAS 109 is.
Q. No recollection of any discussions relating to it?
A. If it had an impact on the institutions, I'm sure there would have just been some discussions to let us know what it was. But I have no recollection.
Q. Do you recall the retirement of 4.6 million of subordinated debt that was held by American National Bank?
A. No specific recollection.
Q. Do you have a general recollection of retirement of subordinating debt?



A. No, other than it was done.
Q. Any understanding as to why it would have been retired?
A. I can only assume that it made financial sense to the institution.
Q. Do you know how it would have made financial sense?
A. No recollection.
(Brief pause.)
BY MS. SMITH:
Q. Do you recall deferred compensation agreements with Mr. Holland and Mr. Bangert?
A. I don't recall one with Mr. Holland. I think I do recall one with Mr. Bangert.
Q. Do you recall anything relating to the payout of the deferred compensation agreement with Mr. Bangert?
A. No.
Q. Do you recall any discussions relating to utilizing funds of River Valley Holding to pay out the deferred compensation agreement?
A. No.
Q. Do you have any understanding as to why funds of River Valley Holding, Inc., would have



been used to pay out deferred compensation agreements with Mr. Bangert and Mr. Holland as opposed to being infused into River Valley?
A. And then paid out?
Q. Utilized as capital in River Valley for River Valley to use for whatever purpose.
A. No recollection.
Q. Do you recall at what time River Valley stopped considering acquiring other institutions or entities?
A. No.
Q. Do you know whether it was within one year, two years, three years, four years, or more of when River Valley was sold to First Banks?
A. I mean, I don't even recall the premise.
Q. Okay. So you don't recall any point in time when they were --
A. Until the point that they decided to sell, I don't recall a premise of stopping to acquire. I mean, I just don't know -- no bright line that I can remember of anything like that.
Q. What do you recall regarding how it was determined what dividends should be paid from River Valley to River Valley Holding?



A. I don't know if I recall or if I'm guessing. I'll assume if there were some obligations at the River Valley Holdings level, either in the way of preferred stock or debt, there was probably dividends sent up in an amount necessary to retire whatever those obligations were. And if that's not the answer, I have no recollection.
Q. So you don't recall any dividend payments other than what might have been paid to retire the debt?
A. If there was debt -- Yeah, I would have no other recollection.
Q. Do you have any understanding as to whether Mr. Holland and/or Mr. Ross had additional funds that they could infuse into River Valley Peoria or River Valley Rock Falls anywhere during the period of 1985 through 1994?
A. Only from having some vague -- some recollections of what their financial statements were, I'll assume the answer was yes, they could have.
Q. Are there any times -- Let me rephrase that.

Page 65

A. Mr. Ross more than Mr. Holland would be my recollection during those years.
Q. Would there have been anytime within 1985 to 1994 that you believe Mr. Holland or Mr. Ross would not have had additional money to infuse into the thrifts?
A. I don't know Mr. Holland's situation that well. Mr. Ross could have at all times done it.
Q. Do you have any understanding as to the maximum amount that Mr. Ross would have been able to infuse into either River Valley Peoria or River Valley Rock Falls?
MR. BERGMAN: Are you asking what was liquid or something different?
MS. SMITH: Just if he has some general understanding of what Mr. Ross may have had available to invest at any given point in time.
BY THE WITNESS:
A. Nothing other than that Mr. Ross is a man of substantial means and could have put in substantial funds at any point in time. However you want to define "substantial," he would have had access to it, I believe.
Q. How long have you been borrowing funds

Page 66

from Mr. Ross?
A. 10 or 15 years, not continually, short terms.
Q. When you say "short terms," what period of --
A. Six months to a couple of years. Generally I pay him an interest rate that is more than he can earn on CDs or treasuries or other -- those types of investments. So it works out for both of us.
Q. And what amounts have you borrowed from him?
A. Currently I owe him a hundred thousand dollars at 8 percent. In the past I think there was a loan for $50,000, and there was another loan for -- I don't remember the amount. I think it was more than a hundred thousand dollars, but it was paid off a number of years ago.
Q. So there's just been three loans?
A. I would have to check records to tell you.
Q. And why have you borrowed from him as opposed to from a bank?
A. In the earlier loans, it was -- I think

Page 67

the first loan was to acquire the River Valley stock and -- younger, liquid and something that he offered. As of right now, it was just simply easy and a convenience to both of us that worked well for both of us. Mr. Ross has, as I said, substantial sums, and he frequently lends money to a number of his acquaintances.
Q. Are the loans that you have had secured or unsecured?
A. Both.
Q. And is the current loan secured or unsecured?
A. Unsecured.
Q. What is your understanding, Mr. Kipnis, of why River Valley was sold to First Banks?
A. I think they received a good offer.
Q. Do you recall when it was decided that they would sell River Valley?
A. No.
Q. Do you recall whether they went out looking for acquirers or whether acquirers came to them?
A. I believe from time to time acquirers came to them, but I believe that in First Banks's

Page 68

situation, they went out and looked at the market. I think that they hired an investment banking firm at that time.
Q. Would that be Donaldson, Lufkin, and Jenrette? Do you recall?
A. Yes.
Q. Do you recall how it was determined to hire Donaldson, Lufkin, and Jenrette?
A. No. I wasn't part of that.
Q. Do you have an understanding as to what the work was that Donaldson, Lufkin, and Jenrette did?
A. I believe that they worked with Messrs. Holland, Ross, Bangert in analyzing the institution and trying to place a value on it. I know that they did due diligence with respect to the company. My memory is that our office had to provide them with corporate documentation -- leases, et cetera, things like that -- to help them review and conduct their analysis.
Q. Did you have any discussions with anyone from Donaldson, Lufkin, and Jenrette?
A. None that I remember.
Q. Do you recall whether there were other

Page 69

potential acquirers of River Valley?
A. I know that they were speaking to more than one party, yes.
Q. Do you recall anything relating to why those other acquisitions didn't go through -- or sale didn't go through?
A. No.
Q. Do you recall anything relating to First Financial Corp of Stevens Point, Wisconsin?
A. I remember that they were one of the potential acquirers, yes.
Q. Do you recall anything relating to any discussions with First Financial?
A. I believe that that was an institution that was primarily -- majority-owned by their president, who was very difficult to negotiate with, and I think that one might have also have been a stock transaction, that there were questions on the stock valuations; but nothing more than that.
Q. Do you recall why that deal didn't go through?
A. Nothing other than what I just said.
Q. Do you recall whether it may have been a

Page 70

better offer than the offer from First Banks?
A. No.
Q. Do you recall how Donaldson, Lufkin, Jenrette and/or River Valley determined what the appropriate purchase price would be?
A. No. I wasn't part of those discussions. They would have reported to us as a board of what they came up with generally. But the methodology that they used, no, I don't recall.
Q. Do you have a general recollection of what the components were of the purchase price?
A. No.
Q. Do you have any general recollection of what the sale price ultimately was to First Banks?
A. I ought to -- I received a percentage of it -- but I don't.
Q. Do you recall any discussions relating to the transfer of net operating loss carry forwards to First Banks?
A. No recollection of any specifics other than -- I'll assume that it was something that would have been transferred and given some value based upon the time value that they thought that they could use it or not, but no specific

Page 71

recollection.
Q. In your indication that it would be based on the time value in which they could use it, what's the basis for that understanding?
A. It might be recollection. It might just be just general knowledge that if -- that net operating losses have a greater value to anybody if they can be used today rather than 10 years from now. Just present value of being able to use something.
Q. Do you recall any shrinkage of the River Valley balance sheet that occurred in anticipation of the closing on the sale to First Banks?
A. No recollection.
Q. Do you recall whether there was such shrinkage?
A. No recollection, no.
Q. And was the payment that you received on the -- upon the sale to First Banks based purely on a -- whatever your percentage was, you received that percentage of whatever the sale price was?
A. No, I don't think so. There would have -- That would -- I'm assuming that was a sale of assets. And so then we would have had to pay

Page 72

off whatever obligations that we had, and then it would have been a distribution of the net proceeds after -- of what was left as a pot for the shareholders after payment of DLJ and all other expenses that the corporation had. It wouldn't have been just a percentage of the sale price.
Q. So whatever the net proceeds were and whatever percentage you held, you would have received that percentage of the net proceeds?
A. I think so.
Q. Do you recall how the -- Let me restate that.
With respect to San Antonio Federal, do you recall how it became known that it was available to be acquired?
A. No.
Q. Do you recall why it was determined that it should be acquired?
A. I believe that they thought that they were acquiring assets that had substantially more value than the purchase price that the government was asking, in their minds, and that they could then also take those institutions and run them profitably, grow them, and create more value. So

Page 73

they bought it for two reasons, I think.
Q. Do you recall why they wanted to initially acquire it through River Valley Peoria?
A. I'll again have to guess that it would have been for maybe the NOLs, but I don't really recall.
Q. How did it come about that you also owned a percentage of either Western Capital Holding, Inc., or River Valley Bank Texas?
A. Well, as I stated before, Howard Ross first offered me an interest in the initial, and then everything after that stayed pro rata among the shareholders. It's my memory, nobody was being shut out or not willing to participate simply because the structure of the transaction would have taken it outside of the original shareholding. So if we were all -- had our interest in the original institution, we would have our -- the same percentage in the new institution, which in effect would have put us in the same position that we were had the Illinois institution wound up being the acquirer.
Q. With respect to River Valley Peoria, is it your understanding that there are other

Page 74

shareholders other than yourself and Mr. Ross?
A. Yeah.
MR. BERGMAN: Just Mr. Ross and --
BY MS. SMITH:
Q. I mean yourself and Mr. Ross and Mr. Holland.
A. Yeah. I'm trying to figure out what -- I don't know if Bangert's interest was as a shareholder or just that he had an option agreement. At one point there were gentlemen named Kost and Coblentz, but they were bought out. I don't know if Mr. Pikus had an interest.
But there was a small team that either through actual shareholdings or through a shareholder agreement had the equivalent of a shareholder return. But there was about 5, 6 of us maybe who had an equitable interest in the institutions with Ross and Holland having the primary economic benefit and burden.
Q. Do you recall Mr. Rose having an investment interest in Western Capital Holding, Inc.?
A. Now that you raise that -- A couple questions before, you asked me how did they know of

Page 75

Western Capital; it may have been through Mr. Rose. And I don't think he had an interest in Illinois, but I think he may have had an interest in Texas because I think he had a relationship, I think, primarily with Mr. Holland. And I think he was the one that brought the Texas institution situation to the team.
Q. Do you recall him holding a position at River Valley Peoria or Holland Partners, Inc.?
A. No, I don't recall.
Q. I take it, then, you don't recall what -- if he did have a position, what his role was?
A. No, I don't.
Q. Do you know whether or not Mr. Holland and Mr. Ross explored obtaining financing from someone other than American National Bank in order to acquire San Antonio Federal Savings?
A. I do not recall. They may have spoken to Noel Rothman about becoming an additional investor. They may have spoken to others, but I don't recall any specifics.
Q. And what makes you think they may have spoken to Noel Rothman?
A. Howard has done investments with the

Page 76

Rothman family from time to time and may have thought -- They get along well together, and they invest well together. They trust each other. And he may have thought that this was something appropriate for him.
Q. But you don't recall whether he actually did speak with him?
A. No, I don't recall.
Q. Do you recall any discussions regarding merging the River Valley Bank in Texas with River Valley in Peoria after River Valley Bank in Texas was formed?
A. I recall that there were discussions, but I don't recall any of the specifics.
Q. Do you recall if they were at one specific time or whether they continued over time?
A. No recollection.
Q. I take it you don't recall why the merger never occurred, then?
A. No.
Q. Do you recall why River Valley Bank in Texas was sold?
A. I think there were a couple of reasons. One, I think we received a good offer. But,

Page 77

secondly, I think they found it difficult to
administer -- It was harder to get to. And it's
harder to -- It's harder to administer an asset
that you have to take two airplanes to than one
airplane to, I think might have set the stage for
it a little bit; but I don't think that that had
bearing, a whole lot. But in my mind, for me, I
didn't like going down there for board meetings
because it's just hard.
Q. Do you recall whether the institution was
doing well or not?
A. I think it was doing well.
Q. Do you recall why the transaction was
structured as a liquidation and a closing?
A. No.
(Brief pause.)
BY THE WITNESS:
A. I take that back. I don't remember the
name of the buyer, but it was an asset sale. And I
believe they wanted all the branches -- I think
there were pools of assets, some investments that
we made that they really didn't want to buy. So I
think that we thought -- and the assets we
thought -- Let's say you had -- one of the pools

Page 78

was, say, a million dollars of loans, but because
they weren't very marketable, because we were just
a participant, we might have thought that they
would ultimately prove out to have a million
dollars of value; but to sell them in the
marketplace because they were minority interest and
not marketable, you couldn't sell them in the
marketplace for that. So I think we just kept
those in the pot, didn't sell it; and that's where
Western Capital came about to just, in effect,
continue to keep the runoff of those assets as they
would liquidate over time.
Q. How soon after the liquidation closing
did you sell your percentage of Western Capital?
A. I don't remember.
Q. Would it have been within a year? Do you
know?
A. I hate to say this. When did the closing
occur?
Q. June of '96.
A. I would say it's probably within a year,
then.
Q. Okay.
MS. SMITH: Why don't we take another

Page 79

10-minute break, and then we may not have very much
at all.
MR. BERGMAN: Okay.
(A short break was had.)
BY MS. SMITH:
Q. Mr. Kipnis, you made a reference earlier
in the deposition to what you believe is a
settlement of a pool of receivables. Would that
have been a settlement agreement in conjunction --
in relationship to the acquisition agreements? Do
you know?
A. Which one now?
Q. You made a reference -- When I asked you
about the redemption of FSLIC stuff --
A. Okay.
Q. -- you brought up that you recalled
something about that, and then you thought it may
have been also dealing with a settlement agreement
regarding a pool of receivables.
A. I know -- It wasn't receivables. It was
loans, I believe.
Q. Okay.
A. And there were some questions as to the
value of those loans when they were doing the

Page 80

acquisition, so I think there was some continuing
obligation on FSLIC's part that they were settling
up as part of that agreement.
Q. Were you involved at all with that
settlement agreement?
A. Only at the very end on maybe -- again,
acquisition agreements, just reviewing the
language, you know, and talking it over with my
guys a little bit, but not the negotiations with
FSLIC.
Q. Do you know whether at that time
Mr. Holland and Mr. Ross were considering bringing
a claim against the United States with respect to
issues stemming from the passage of FIRREA?
A. I know that they knew as soon as FIRREA
passed that it was going to create burdens for
them. And then as things went on a regulatory
process, it became more and more onerous; but I
don't know at what point they decided that
litigation was a viable alternative or not.
Q. What was the decision-making authority of
the board of directors as opposed to the executive
committee?
A. Could you repeat your question?

Page 81

Q. Sure. What was your decision-making authority of the board of directors as opposed to the executive committee for River Valley Peoria?
A. There really wasn't. The executive committee was set up for administrative convenience. But the reality was, this was a closely knit corporation controlled by Ross and Holland, and other than minor related party-type situations that I mentioned before, like on the guaranty fees -- Pretty much they gave us their recommendations as management and majority owners, and we said yes.
Q. Do you recall ever saying no?
A. No.
Q. What do you recall regarding the relationship between River Valley Peoria and River Valley Rock Falls with American National Bank?
A. Other than the fact that American National Bank strongly believed in Howard's and Homer's ability to make money for themselves and for the bank, nothing. They were very good customers. American National enjoyed -- if that could be the right word -- lending money to them because they knew they were going to get paid

Page 82

back.
Q. Do you know to what extent Homer Holland and Howard Ross talked to other banks when they were looking to obtain funds?
A. No, I do not know.
Q. What is your opinion of Homer Holland as a thrift manager?
A. I believe that Homer is extremely bright and knows his business.
Q. What is your opinion regarding his performance in running River Valley following the passage of FIRREA?
A. I believe Homer, along with the rest of the management team, did very well.
Q. And who would be the rest of the management team that you're including in that?
A. Howard Ross, Steve Bangert were the primary people; at various times, Richard Dalton, Ron Seib, Ron Pikus. And the latter three were really in secondary roles. It was primarily Holland, Ross, Bangert.
Q. And with respect to Pikus, Dalton, and Seib, what is your view of them generally as thrift managers?

Page 83

A. I believe that they are all very good business people, and even more importantly to me as an investor, honest, good people.
Q. Can you recall any specific opportunities that River Valley wished to pursue but was precluded from doing so because of the provisions in FIRREA that eliminated certain items --
A. I'm sure there were. But my knowledge both of FIRREA and the investments at the time, I just don't have that memory.
Q. Do you feel that you suffered any diminution in the value of your investment in River Valley due to the provisions of FIRREA that eliminated certain items to be included in regulatory capital?
A. Yes.
Q. And how so?
A. My recollection is that we all thought that we got a good price from First Banks for the assets we were able to sell, but without FIRREA we would have had much more to sell.
Q. Do you have any understanding as to what more you would have had to sell?
A. No, I don't have the specifics. I just

Page 84

remember the general tenor of the discussions.
Q. Did you make a decision whether or not to sue the government?
A. Did I personally?
Q. Yes.
A. No, I did not. I was a 2-percent shareholder. I go along with the team.
Q. Do you have the potential for any material gain from the outcome of the lawsuit by Holland and Ross against the United States?
A. I'll assume that after the payment of all expenses and everything else, if there is an ultimate pool, I'll probably get 2 percent of that. I'll let you decide whether it's material or not.
Q. Have you had discussions with Mr. Holland or Mr. Ross with respect to that issue?
A. Absolutely none. It is so far out of my mind and nothing that I'm going to spend today or tomorrow.
MS. SMITH: That's all I have for you, Mr. Kipnis. Thank you.
THE WITNESS: Thank you.
MR. BERGMAN: No questions for me.

THE REPORTER: Signature?

MR. BERGMAN: We will sign.

(Witness excused.)



UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND AND HOWARD R. ROSS, Plaintiffs,

vs. No. 95-524C

THE UNITED STATES OF AMERICA, Defendants.

I, MARK KIPNIS, state that I have read the foregoing transcript of the testimony given by me at my deposition on the 14th day of August, 2000, and that said transcript constitutes a true and correct record of the testimony given by me at the said deposition except as I have so indicated on the errata sheets provided herein.

______________________
MARK KIPNIS

No corrections (Please initial) ________
Number of errata sheets submitted ________ (pgs.)

SUBSCRIBED AND SWORN to before me this ________ day of ________________, 2000.

______________________
NOTARY PUBLIC



UNITED STATES OF AMERICA )
STATE OF ILLINOIS ) SS.
COUNTY OF COOK )

I, LAURA A. CZUBAK, Certified Shorthand Reporter and Notary Public, do hereby certify that MARK KIPNIS was first duly sworn by me to testify the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the time and place specified and that the taking of said deposition commenced on the 14th day of August, A.D., 2000, at 9:01 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor financially interested directly or indirectly in this action.



In witness whereof, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 7th day of September, A.D., 2000.

LAURA A. CZUBAK, CSR
205 West Randolph Street
Suite 510
Chicago, Illinois 60606
Phone: (312) 236-6936

CSR No. 084-004041

KEYWORD INDEXING

$50,000 [1] 66:15
$6 [1] 55:7
'70s [1] 8:14
'74 [1] 8:14
'76 [1] 8:14
'89 [1] 22:4
'91 [1] 47:3
'96 [1] 78:20
01 [2] 1:20 87:15
0611 [1] 54:10
0616 [1] 54:10
084-004041 [1] 88:13
1 [2] 3:9 21:5
10 [2] 66:2 71:8
10-minute [2] 44:14 79:1
10-year-old [1] 37:22
1075 [1] 42:17
109 [2] 61:11 61:12
1093 [1] 42:18
10th [1] 54:8
1100 [1] 2:8
14th [3] 1:21 86:12 87:14
15 [1] 66:2
1608 [1] 42:16
1630 [3] 42:10 42:13 42:21
1633 [1] 42:16
1965 [1] 6:23
1969 [3] 6:24 7:11 8:10
1972 [1] 7:11
1974 [2] 7:1 7:14
1985 [6] 36:4 36:15 40:23 55:20 64:18 65:3
1990 [1] 41:20
1991 [1] 60:19
1992 [2] 54:8 54:19
1994 [6] 36:5 36:15 40:23 55:21 64:18 65:4
1998 [2] 7:15 7:18
19th [2] 41:20 54:19
2 [7] 3:10 16:19 26:9 26:21 41:16 41:19 84:13
2-percent [1] 84:6
2000 [5] 1:21 86:13 86:21 87:14 88:3
20004-1206 [1] 2:3
202 [2] 2:4 2:9
205 [2] 1:19 88:11
20530 [1] 2:8
21 [1] 3:9
236-6936 [1] 88:12
3 [4] 3:11 26:20 54:3 54:6
312 [1] 88:12
353-8841 [1] 2:9
4 [2] 3:4
4.6 [1] 61:19
41 [1] 3:10
5 [3] 26:18 48:11 74:16
510 [2] 1:19 88:11
54 [1] 3:11
555 [1] 2:3
6 [1] 74:16
60606 [1] 88:12
7th [1] 88:3
8 [1] 66:14
9 [2] 1:20 87:15
942-5474 [1] 2:4
95-524C [2] 1:5 86:5
A.D [3] 1:21 87:14 88:3
a.m [2] 1:20 87:15
ability [1] 81:20
able [7] 5:8 22:9 26:22 35:2 65:10 71:9 83:20
above [1] 87:8
absolutely [2] 44:12 84:18
accepted [1] 17:3
access [1] 65:23
accountant [1] 7:12
accounting [2] 7:24 31:5
acquaintances [1] 67:7
acquire [16] 9:5 15:11 15:15 21:24 26:22 29:4 29:12 29:16 35:19 36:9 37:1 53:1 63:20 67:1 73:3 75:17
acquired [10] 10:3 13:22 26:18 27:2 30:1 35:23 36:4 60:9 72:15 72:18
acquirer [1] 73:22
acquirers [6] 53:13 67:21 67:21 67:23 69:1 69:11
acquiring [10] 29:8 35:6 36:3 38:7 38:15 39:22 40:12 53:18 63:9 72:20
acquisition [43] 9:9 9:11 9:12 9:19 10:19 11:9 11:23 12:11 12:13 12:21 14:22 15:6 26:14 26:15 27:13 27:15 27:19 27:22 28:1 28:20 29:20 30:6 30:11 34:1 35:7 35:11 36:14 37:8 37:16 37:20 38:3 38:11 39:8 39:12 40:9 41:1 41:7 43:10 56:14 58:10 79:10 80:1 80:7
acquisitions [12] 22:3 30:15 30:20 31:14 33:22 33:24 34:11 35:1 40:17 40:22 41:10 69:5
action [1] 87:20
active [1] 41:6
actively [2] 19:22 19:24
actual [2] 32:5 74:14
Adam [1] 51:10
additional [10] 35:11 35:16 46:5 46:12 46:20 46:21 53:8 64:15 65:5 75:19
adequate [1] 50:23
adequately [1] 50:24
administer [2] 77:2 77:3
administrative [1] 81:5
adoption [1] 61:11
advantage [1] 60:1
affixed [1] 88:2
afraid [2] 23:18 23:20
again [11] 4:9 12:1 13:15 15:1 28:13 28:13 32:3 39:17 40:7 73:4 80:6
against [6] 22:15 22:23 23:4 24:19 80:13 84:10
ago [2] 17:23 66:18
agree [1] 6:4
agreement [24] 15:6 25:3 28:3 28:7 41:7 43:18 47:3 48:20 49:16 49:19 49:20 49:21 49:22 50:20 51:23 55:4 62:16 62:21 74:10 74:15 79:9 79:18 80:3 80:5
agreements [10] 9:7 28:11 32:7 43:8 43:10 48:19 62:12 63:2 79:10 80:7
airplane [1] 77:5
airplanes [1] 77:4
along [7] 8:20 20:2 31:1 48:16 76:2 82:13 84:7
alternative [1] 80:20
alternatives [2] 45:10 45:11
altogether [1] 41:8
always [7] 11:11 33:9 35:14 35:15 36:2 43:3 60:11
Amcore [1] 60:19
America [4] 1:6 1:13 86:6 87:1
American [12] 15:14 34:16 34:19 53:17 53:22 55:8 56:20 61:21 75:16 81:17 81:18 81:22
among [1] 73:12
amount [9] 26:11 26:16 56:3 56:4 57:6 57:15 64:5 65:10 66:16
amounts [2] 34:4 66:11
analyses [1] 27:9
analysis [2] 23:2 68:20
analyzing [1] 68:14
Anne [5] 13:3 41:21 43:14 43:19 44:1
annual [1] 50:11
answer [10] 5:2 5:5 5:6 5:9 6:12 6:16 24:22 60:10 64:7 64:21
answers [1] 4:21
anticipated [1] 22:9
anticipation [1] 71:12
Antonio [10] 14:22 14:24 15:11 15:16 53:13 56:15 58:10 58:12 72:13 75:17
anytime [1] 65:3
APPEARANCES [1] 2:1
appreciated [1] 9:19
apprised [1] 11:13
appropriate [2] 70:5 76:5
approve [1] 57:11
approved [1] 57:8
April [2] 41:20 54:8
area [2] 8:19 28:14
areas [1] 8:21
Arnold [1] 2:2
arrangement [1] 9:4
aspects [1] 20:1
asset [2] 77:3 77:19
assets [10] 18:10 19:21 37:13 59:3 71:24 72:20 77:21 77:23 78:11 83:20
assist [1] 10:21
assistant [1] 13:2
assisted [1] 12:5
Association [1] 37:17
assume [8] 14:12 25:17 52:2 62:4 64:2 64:21 70:21 84:11
assuming [3] 29:5 34:1 71:23
attached [1] 42:17
attempt [3] 4:24 15:10 15:15
attempted [2] 29:11 35:19
attempts [1] 44:19
attendance [1] 54:21
attending [1] 50:15
attention [3] 42:22 42:23 43:1
attorney [3] 4:12 87:17 87:19
attorney-client [5] 5:19 5:20 6:1 6:9 24:24
attorneys [2] 10:23 12:2
audit [1] 20:8
August [4] 1:21 7:11 86:12 87:14
authority [2] 80:21 81:2
available [3] 57:21 65:17 72:15
aware [3] 15:10 22:22 27:19
B [2] 2:2 3:7
background [1] 6:20
bad [2] 17:6 18:17
bad-guy [1] 49:20
balance [1] 71:12
Bangert [14] 16:8 22:19 25:16 33:6 41:22 51:8 57:17 62:12 62:14 62:17 63:2 68:14 82:17 82:21
Bangert's [1] 74:8
bank [26] 14:22 15:15 15:19 16:7 17:14 18:11 18:24 33:9 34:19 38:11 40:13 41:23 53:14 53:17 53:22 56:21 61:21 66:23 73:9 75:16 76:10 76:11 76:21 81:17 81:19 81:21
banking [5] 18:5 18:6 18:8 37:12 68:2
banks [12] 13:23 24:13 24:20 63:14 67:15 70:1 70:14 70:19 71:13 71:19 82:3 83:19
Banks's [1] 67:24
baseball [1] 37:22
based [9] 8:5 23:10 26:16 28:6 36:8 54:23 70:23 71:2 71:19
basis [2] 22:11 71:4
Bates [4] 42:10 42:16 42:20 54:9
bearing [1] 77:7
became [9] 9:22 13:17 15:19 22:22 28:23 52:8 60:9 72:14 80:18
become [2] 12:19 28:22

becoming [1] 75:19
begin [2] 20:24 59:21
begun [1] 8:13
behalf [2] 2:5 2:10
bell [4] 37:24 39:2 39:14 40:4
Beloit [1] 61:6
benchmark [1] 50:23
benefit [2] 58:5 74:19
benefitted [1] 60:16
Bergman [9] 2:2 5:16 24:21 28:13 65:13 74:3 79:3 84:24 85:2
better [2] 56:14 70:1
between [5] 8:3 31:8 33:18 60:14 81:16
Biedron [1] 54:9
billion [1] 19:20
bit [3] 20:21 77:6 80:9
board [38] 10:16 11:7 11:11 11:11 12:17 12:19 14:15 23:11 25:8 25:17 25:20 25:22 27:7 27:16 29:18 30:6 30:10 32:18 32:19 33:11 33:15 35:21 36:13 36:23 45:20 45:20 50:11 50:16 57:8 57:10 57:13 57:14 57:16 57:19 70:7 77:8 80:22 81:2
bodies [1] 46:18
book [1] 31:9
books [1] 34:13
borrowed [2] 66:11 66:22
borrowing [1] 65:24
bought [2] 73:1 74:11
branch [2] 39:23 40:2
branches [9] 39:23 40:1 40:13 43:12 60:18 61:1 61:5 61:8 77:20
break [7] 5:10 5:13 5:22 44:15 44:16 79:1 79:4
Brief [3] 25:12 62:9 77:16
bright [2] 63:20 82:8
bring [2] 23:3 42:7
bringing [1] 80:12
brings [1] 42:1
Brody [2] 13:3 41:21
Brody's [1] 43:14
brought [6] 18:18 25:18 25:19 46:13 75:6 79:16
burden [1] 74:19
burdens [1] 80:16
business [15] 16:7 18:4 18:24 19:3 19:11 22:9 23:19 23:22 28:2 29:8 39:18 43:19 53:3 82:9 83:2
businessmen [2] 37:11 43:2
buy [1] 77:22
buyer [1] 77:19
Canton [7] 39:23 40:1 40:3 40:5 40:8 40:11 40:11
capital [47] 15:20 17:12 17:19 17:22 18:3 22:1 30:19 30:24 31:2 31:19 31:21 31:22 32:5 32:15 32:21 34:7 34:21 36:9 37:13 44:19 44:23 45:16 45:21 45:22 46:5 46:12 46:20 46:21 47:2 47:7 47:10 48:7 53:8 55:24 56:4 56:6 58:17 58:22 59:4 59:9 63:5 73:8 74:21 75:1 78:10 78:14 83:15
capitalization [1] 50:24
capitalized [1] 51:1
care [1] 10:15
careful [1] 28:17
carry [1] 70:18
case [5] 4:11 21:18 21:19 29:23 53:20
cases [1] 22:16
cash [6] 19:8 32:6 32:8 32:21 32:22 58:16
caution [1] 28:13
cc [1] 41:22
CDs [1] 66:8
center [1] 18:13
certain [5] 18:4 34:10 46:16 83:7 83:14
certificates [2] 11:4 11:5
Certified [2] 1:18 87:5
certify [3] 87:6 87:11 87:16
cetera [1] 68:19
chance [1] 42:4
changed [2] 22:5 50:22
changes [1] 22:21
changing [1] 53:3
check [1] 66:20
Chester [1] 54:9
Chicago [12] 1:20 8:21 13:5 13:10 13:12 19:23 19:23 20:1 20:2 37:17 88:2 88:12
children [1] 13:6
choosing [1] 28:10
Civil [1] 1:15
claim [4] 24:12 24:18 25:10 80:13
CLAIMS [2] 1:1 86:1
clarify [1] 4:24
classes [1] 7:5
clear [1] 5:14
client [2] 8:15 26:7
clients [2] 26:7 28:16
close [1] 14:24
closely [1] 81:7
closing [9] 10:20 11:4 11:5 15:4 15:7 71:13 77:14 78:13 78:18
cloud [1] 45:8
Coblentz [1] 74:11
Coff [4] 7:17 8:2 12:23 41:20
collectively [1] 9:5
Colorado [7] 16:7 17:9 17:15 18:7 18:11 18:24 38:8
comfortable [1] 52:9
commenced [1] 87:14
commencing [1] 1:20
comments [1] 15:6
committee [5] 20:8 20:11 80:23 81:3 81:5
committees [1] 20:6
communications [1] 24:24
company [6] 7:13 19:17 52:20 53:5 53:8 68:17
compensation [4] 62:11 62:16 62:21 63:1
complaints [1] 22:20
compliance [1] 55:24
components [1] 70:11
con [1] 24:1
concept [1] 59:5
concerned [1] 52:13
concerns [1] 52:6
condition [2] 34:2 53:17
conduct [1] 68:20
confine [1] 33:10
conjunction [2] 58:20 79:9
Connecticut [2] 17:8 18:1
connection [1] 49:15
cons [2] 23:7 23:14
considered [1] 37:4
considering [2] 63:9 80:12
consisted [1] 18:12
constitutes [1] 86:13
consummated [4] 22:3 41:2 41:11 41:13
contact [1] 50:17
contained [1] 36:13
context [1] 56:10
continually [1] 66:2
continue [1] 78:11
continued [1] 76:16
continuing [1] 80:1
contributions [7] 22:1 30:24 32:5 32:21 33:21 34:6 58:17
control [1] 37:14
controlled [2] 16:8 81:7
convenience [2] 67:4 81:6
COOK [1] 87:2
Coopers [1] 7:14
copied [1] 43:8
copies [3] 42:21 42:22 42:24
corner [2] 42:11 42:14
Corp [1] 69:9
corporate [4] 8:4 9:21 43:20 68:18
corporation [2] 72:5 81:7
correct [2] 38:5 86:14
corrections [1] 86:19
cost [1] 26:17
counsel [11] 6:11 6:11 7:19 19:16 20:18 20:19 20:22 41:4 50:12 87:17 87:19
count [1] 34:6
counted [5] 30:19 31:19 32:14 34:21 45:22
COUNTY [1] 87:2
couple [8] 7:4 17:23 19:19 49:5 51:15 66:6 74:23 76:23
course [1] 13:1
courses [1] 7:2
court [6] 1:1 4:21 21:5 41:19 54:6 86:1
Courts [1] 1:16
cover [1] 44:5
CPA [1] 8:7
create [2] 72:24 80:16
created [2] 14:17 53:4
creation [2] 52:22 53:7
credits [7] 22:2 30:24 31:17 31:18 31:22 31:23 32:21
crisis [1] 21:21
CSR [2] 88:10 88:13
cumulative [4] 47:19 47:22 48:2 48:11
current [4] 16:3 16:5 18:23 67:11
customers [1] 81:22
Czubak [3] 1:18 87:5 88:10
D [1] 3:1
D.C [2] 2:3 2:8
Dalton [2] 82:18 82:22
dated [1] 54:8
David [1] 2:2
deal [4] 15:4 29:8 38:17 69:21
dealing [1] 79:18
dealings [2] 9:15 23:19
deals [2] 39:18 53:4
debt [8] 34:10 34:20 56:20 61:20 61:24 64:4 64:11 64:12
decide [1] 84:14
decided [4] 9:4 63:18 67:17 80:19
decision [1] 84:2
decision-making [2] 80:21 81:1
Defendant [3] 1:7 1:13 2:10
Defendants [1] 86:7
deferred [4] 62:11 62:16 62:21 63:1
define [1] 65:22
definition [1] 31:15
degree [2] 7:3 7:22
department [3] 2:7 8:4 8:4
DePaul [1] 7:5
depending [1] 41:3
deposed [1] 4:13
deposition [16] 1:12 3:8 5:3 5:18 20:14 21:2 21:6 41:15 44:11 54:2 79:7 86:12 86:15 87:8 87:12 87:13
depositions [2] 1:17 4:16
derivatives [3] 51:4

51:21 52:12
desk [1] 43:5
determined [11] 26:11 27:5 29:24 56:7 57:5 57:14 57:18 63:23 68:7 70:4 72:17
developed [1] 8:20
differed [1] 43:15
difference [1] 31:8
differences [3] 33:17 36:6 36:7
different [6] 26:10 30:16 31:14 31:23 45:10 65:14
difficult [6] 6:16 45:1 45:4 45:5 69:16 77:1
difficulty [1] 45:15
diligence [1] 68:16
diminution [1] 83:12
dinner [1] 33:7
Direct [2] 3:4 4:6
directed [1] 41:22
direction [1] 87:10
directly [1] 87:20
director [10] 9:23 10:13 10:16 13:15 13:16 13:21 15:22 15:24 16:6 23:11
directors [16] 11:7 12:17 12:20 14:15 27:16 29:6 29:19 30:6 30:10 33:15 49:18 50:16 57:8 57:11 80:22 81:2
directors's [1] 36:23
directory [1] 13:6
discounted [2] 46:13 46:14
discuss [1] 5:22
discussed [1] 32:17
discussion [3] 46:11 47:8 47:9
discussions [44] 15:14 22:18 23:7 23:10 23:11 23:14 24:4 24:7 24:10 24:17 25:4 25:9 28:16 28:18 30:5 30:10 33:10 35:20 39:4 39:19 40:7 45:19 45:23 46:1 46:4 46:8 47:6 47:12 47:17 47:21 47:24 54:1 56:13 61:13 61:17 62:19 68:21 69:13 70:6 70:17 76:9 76:13 84:1 84:16
distribution [1] 72:2
District [1] 1:16
dividend [6] 54:17 55:1 55:6 55:12 56:8 64:9
dividends [2] 63:23 64:5
DLJ [1] 72:4
document [11] 5:5 5:8 21:8 42:2 42:15 44:5 54:10 54:12 54:13 54:17 54:23
documentation [3] 10:21 29:10 68:18
documents [12] 5:7 10:9 10:10 11:2 11:3 15:7 15:8 20:16 21:10 21:14 27:22 42:24
doesn't [1] 40:4
dollars [5] 19:21 66:14 66:17 78:1 78:5
Donaldson [5] 68:4 68:8 68:11 68:22 70:3
done [5] 10:21 59:8 62:1 65:8 75:24
down [6] 4:21 14:24 26:21 42:10 42:13 77:8
drilling [1] 17:7
drive [1] 8:20
drugs [1] 6:15
due [2] 68:16 83:13
duly [2] 4:4 87:7
during [6] 8:1 21:20 36:7 36:15 64:17 65:2
duties [1] 10:15
E [2] 3:1 3:7
earn [1] 66:8
easily [1] 46:13
easy [1] 67:3
economic [1] 74:19
economy [1] 8:5
educational [2] 6:20 7:2
effect [3] 9:6 73:19 78:10
efficient [1] 61:7
efforts [1] 44:23
either [23] 8:12 9:16 9:18 10:20 10:24 11:1 14:1 16:23 19:1 19:4 22:6 24:1 32:11 35:12 44:1 45:19 46:19 51:12 56:18 64:4 65:11 73:8 74:13
eliminated [2] 83:7 83:14
employee [2] 87:17 87:18
employment [2] 7:8 21:11
end [6] 10:22 17:22 41:5 44:3 55:22 80:6
ends [3] 42:10 42:13 42:20
enjoyed [1] 81:22
entered [2] 43:9 47:3
entities [16] 9:2 9:17 12:24 14:14 14:16 20:7 21:12 21:13 26:2 26:11 35:18 35:24 44:9 45:15 60:5 63:10
entity [2] 52:17 53:18
environment [1] 45:2
equitable [1] 74:17
equivalent [1] 74:15
errata [2] 86:16 86:19
essential [1] 53:3
essentially [2] 15:21 26:24
estate [4] 8:4 8:19 18:13 18:14
et [1] 68:19
eventually [1] 9:22
everybody [1] 27:1
exact [1] 39:3
exactly [1] 20:23
examination [3] 1:14 3:4 4:6
examined [1] 4:5
exams [1] 50:12
except [1] 86:15
exception [1] 55:5
Exchange [1] 19:17
excused [1] 85:3
execute [1] 58:5
executed [2] 58:13 58:16
executive [3] 80:22 81:3 81:4
executives [1] 11:13
Exhibit [6] 3:8 21:5 41:15 41:19 54:2 54:6
existed [1] 52:18
existing [1] 31:1
expand [1] 5:4
expanding [1] 35:15
expenses [2] 72:5 84:12
explain [1] 51:9
Explorations [1] 17:7
explored [1] 75:15
extent [2] 6:10 82:2
extremely [1] 82:8
facilitate [1] 14:18
fact [5] 29:15 38:3 39:6 48:3 81:18
fair [3] 31:9 57:18 57:22
Falls [27] 9:10 9:13 9:21 10:4 13:17 13:17 26:13 27:14 29:12 29:16 29:18 35:3 35:12 36:4 53:2 55:15 59:12 59:23 60:2 60:12 60:15 60:19 61:2 61:7 64:17 65:12 81:17
Falls's [1] 10:19
familiar [1] 40:15
family [2] 37:24 76:1
far [2] 23:5 84:18
fashion [1] 32:12
Fashionably [1] 37:2
fault [1] 18:18
FDIC [2] 49:9 50:2
Federal [20] 1:1 1:15 14:22 15:16 30:12 35:8 37:16 37:23 38:11 38:15 39:1 39:5 39:8 39:16 39:20 53:14 56:15 72:13 75:17 86:1
fee [5] 57:4 57:6 57:9 57:11 57:15
fees [2] 57:1 81:10
felt [2] 23:16 37:12
Ferries [1] 54:9
few [2] 40:18 58:23
Fiduciary [1] 10:15
figure [1] 74:7
file [1] 22:23
filings [1] 19:18
Finally [1] 6:14
financial [6] 60:20 62:4 62:7 64:20 69:9 69:13
financially [1] 87:19
financing [1] 75:15
fine [2] 6:6 51:18
firm [4] 7:16 8:15 10:22 68:2
FIRREA [15] 22:4 24:6 24:8 44:20 45:6 45:22 50:21 53:9 80:14 80:15 82:12 83:7 83:9 83:13 83:20
first [28] 4:4 4:19 8:11 8:18 9:3 13:23 21:8 22:22 24:13 24:20 29:1 36:4 54:7 60:4 63:14 67:1 67:15 67:24 69:8 69:13 70:1 70:14 70:19 71:13 71:19 73:11 83:19 87:7
following [4] 30:20 44:19 53:9 82:11
follows [1] 4:5
foregoing [1] 86:11
forget [1] 18:11
forgot [1] 20:23
form [5] 6:4 26:24 32:6 35:3 56:24
formed [3] 12:20 29:3 76:12
forward [1] 17:4
forwards [1] 70:18
found [3] 22:6 25:2 77:1
four [1] 63:13
frequently [1] 67:6
friend [1] 26:8
friends [1] 33:7
FSB [1] 41:23
FSLIC [8] 48:12 48:24 49:3 49:6 49:8 50:2 79:14 80:10
FSLIC's [1] 80:2
fun [1] 18:20
funds [9] 19:7 20:4 45:16 62:20 62:24 64:16 65:21 65:24 82:4
future [1] 23:19
GAAP [1] 33:18
gain [1] 84:9
Galesburg [1] 38:12
Galva [10] 9:11 11:23 12:14 12:21 28:21 29:4 29:12 29:20 29:24 30:7
Galva/Home/Mutual [2] 29:16 60:8
general [25] 9:21 10:16 11:19 19:16 19:17 22:13 22:14 22:17 23:7 23:11 23:22 27:20 31:5 32:14 43:20 49:11 55:18 56:22 59:5 61:23 65:15 70:10 70:13 71:6 84:1
generally [11] 31:10 37:10 42:24 43:2 44:22 46:1 46:10 55:14 66:7 70:8 82:23
gentlemen [1] 74:10
given [7] 32:6 32:8 49:21 65:17 70:22 86:11 86:14
gnomes [1] 51:11
good [13] 4:8 11:4 17:6 26:7 37:11 51:18 56:5 67:16 76:24 81:21 83:1 83:3 83:19
good-guy [2] 49:20 49:21
goodwill [6] 30:23 31:4 31:13 32:20 33:18 33:18
government [15] 21:21 22:2 23:8 23:15

23:17 23:19 23:20 24:2 24:19 32:8 32:22 34:15 49:7 72:21 84:3
graduated [5] 6:22 6:23 6:24 7:9 7:14
Grand [1] 38:7
greater [2] 44:7 71:7
grow [2] 56:1 72:24
growing [1] 37:8
guaranteed [1] 56:23
guaranties [6] 56:18 58:5 58:11 58:14 58:16 58:19
guaranty [3] 57:4 57:11 81:10
guess [6] 29:1 36:7 59:14 59:18 59:20 73:4
guessing [3] 52:24 53:6 64:2
guy [1] 18:20
guys [2] 43:7 80:9
H [1] 3:7
half [1] 19:20
hand [1] 88:2
happy [1] 51:21
hard [3] 44:10 51:14 77:9
harder [5] 45:9 45:12 77:2 77:3 77:3
harm [1] 23:19
hate [1] 78:18
Hawthorne [3] 17:9 17:15 18:7
head [1] 4:22
Heart [1] 40:13
Heider [1] 41:23
held [7] 10:7 14:1 16:1 51:5 55:7 61:20 72:8
help [5] 5:6 5:9 14:18 51:14 68:19
hereby [1] 87:6
herein [2] 4:4 86:16
hereunto [1] 88:1
Hey [1] 43:6
high [3] 6:20 6:22 51:4
high-rises [1] 8:20
himself [1] 20:19
hire [1] 68:8
hired [1] 68:2
hold [4] 13:13 14:5 14:8 15:18
holder [1] 34:14
holding [18] 14:7 14:10 15:20 17:19 17:22 52:16 52:20 52:22 53:5 53:8
53:12 53:15 62:20 62:24 63:24 73:8 74:21 75:8
Holdings [2] 17:13 64:3
Holland [50] 1:2 4:11 8:12 9:1 9:19 11:24 12:6 14:4 16:4 16:6 16:23 19:4 21:18 21:23 22:19 24:11 24:17 25:15 28:21 30:2 33:6 33:21 34:23 46:4 47:10 56:19 56:23 57:12 57:24 58:2 62:12 62:13 63:2 64:15 65:1 65:4 68:14 74:6 74:18 75:5 75:9 75:14 80:12 81:8 82:2 82:6 82:21 84:10 84:16 86:3
Holland's [1] 65:7
Holleb [5] 7:17 8:1 8:15 12:23 41:20
Hollinger [3] 7:19 19:11 19:16
Home [10] 9:11 11:23 12:14 12:21 28:21 29:4 29:12 29:21 29:24 30:7
Homer [28] 1:2 8:12 9:1 9:3 9:7 9:19 11:12 11:23 12:6 16:4 16:5 16:23 17:2 19:1 19:4 19:6 24:11 24:17 30:1 33:6 33:21 34:17 34:23 82:2 82:6 82:8 82:13 86:3
Homer's [1] 81:20
honest [1] 83:3
hopefully [1] 29:7
hoping [1] 36:24
hour [1] 58:23
house [1] 26:20
Household [5] 39:23 40:1 40:3 41:23 43:12
Howard [32] 1:3 8:12 8:13 8:18 9:1 9:3 9:6 9:20 11:12 11:24 16:4 16:6 16:8 16:24 17:6 19:1 19:4 19:6 20:3 24:11 24:18 26:3 30:2 33:6 33:21 34:17 34:24 73:10 75:24 82:3 82:17 86:3
Howard's [2] 18:18 81:19
hundred [2] 66:13 66:17
hundred-thousand-dollar [1] 19:10
identified [2] 24:1 41:21
identifying [2] 32:2 40:19
Illinois [16] 1:20 6:23 7:10 7:23 15:22 26:21 26:23 38:12 39:9 40:13 53:19 73:21 75:3 87:1 88:3 88:12
immediately [1] 9:18
impact [3] 60:14 60:24 61:15
impacted [1] 59:4
importantly [1] 83:2
imposed [4] 46:18 50:22 51:1 51:23
imposition [2] 45:7 50:20
Inc [6] 7:20 17:22 52:16 53:12 62:24 73:9
Inc. [9] 14:4 14:7 15:20 17:19 19:12 52:22 53:15 74:22 75:9
included [2] 21:24 83:14
including [1] 82:16
income [1] 60:1
Incorporated [1] 14:10
increase [1] 59:9
independently [1] 35:21
indicated [8] 11:1 20:3 36:2 51:24 52:1 52:5 57:22 86:15
indicates [4] 21:9 42:21 54:7 54:20
indication [1] 71:2
indirectly [1] 87:20
information [4] 6:1 11:8 11:12 44:8
infuse [3] 64:16 65:6 65:11
infused [1] 63:3
infusing [2] 46:4 46:11
infusion [2] 47:2 47:7
infusions [1] 47:10
initial [3] 26:13 73:11 86:19
initiatives [1] 58:22
input [1] 28:1
instance [1] 44:4
instances [2] 5:18 5:21
institution [28] 9:22 9:23 16:7 17:8 26:21 26:23 26:23 26:24 27:2 27:12
35:4 38:21 38:24 53:1 53:2 56:24 58:2 58:4 60:2 60:3 62:5 68:14 69:14 73:18 73:19 73:21 75:6 77:10
institutions [21] 14:2 15:24 16:15 16:18 20:11 21:22 21:24 22:5 22:6 33:9 35:18 35:24 36:18 45:8 45:13 52:7 57:24 61:15 63:9 72:23 74:18
instructing [1] 6:11
instructions [1] 4:19
intangible [1] 31:7
intended [2] 6:9 48:7
intention [1] 5:20
interest [17] 17:21 26:1 26:4 38:6 39:22 40:12 60:5 66:7 73:11 73:17 74:8 74:12 74:17 74:21 75:2 75:3 78:6
interested [6] 35:14 36:3 36:18 37:7 38:14 87:19
International [2] 7:20 19:12
introduced [1] 20:19
intrude [1] 6:1
invest [3] 45:13 65:17 76:3
invested [1] 18:21
investment [9] 16:22 17:24 18:16 18:23 19:8 45:10 68:2 74:21 83:12
investments [9] 19:2 19:7 20:4 56:2 56:6 66:9 75:24 77:21 83:9
investor [2] 75:20 83:3
investors [1] 45:11
involve [1] 11:3
involved [20] 8:24 10:23 12:3 12:3 12:7 15:1 15:13 19:22 19:24 23:2 24:10 24:16 24:21 25:4 25:8 28:22 29:2 29:9 50:12 80:4
involvement [11] 9:15 10:18 11:22 12:11 14:21 15:3 16:3 16:5 19:1 41:10 49:6
issue [4] 5:19 34:10 51:7 84:17
issued [6] 21:2 21:6 34:18 48:12 56:20 58:10
issues [9] 5:23
20:1 28:8 28:9 32:20 48:18 49:5 51:3 80:14
items [4] 25:18 32:13 83:7 83:14
J [2] 1:2 86:3
January [2] 7:15 7:18
Jeff [1] 2:11
Jenrette [5] 68:5 68:8 68:11 68:22 70:4
joined [1] 44:1
joint [1] 58:14
Jones [1] 12:4
Junction [1] 38:7
June [2] 7:11 78:20
Justice [1] 2:7
K-i-m-b-a-r-k [1] 13:9
keep [3] 11:13 24:22 78:11
kept [1] 78:8
Kimbark [2] 13:7 13:9
kind [3] 7:2 8:2 18:15
Kipnis [30] 1:12 3:3 3:8 4:3 4:8 4:13 5:14 6:8 6:19 7:6 13:4 20:13 21:4 21:15 21:17 24:21 30:18 35:10 41:15 41:18 42:5 44:18 54:2 54:5 67:14 79:6 84:22 86:10 86:18 87:7
knew [5] 37:24 43:2 60:4 80:15 81:24
knit [1] 81:7
knowledge [5] 32:19 33:2 44:8 71:6 83:8
known [2] 7:12 72:14
knows [1] 82:9
Kost [1] 74:11
L [1] 2:8
Lafayette [2] 17:8 18:1
language [3] 43:23 43:23 80:8
large [1] 18:10
Larry [1] 54:9
last [5] 19:19 20:20 20:22 40:18 58:23
latter [1] 82:19
Laura [3] 1:17 87:5 88:10
law [7] 7:1 7:3 7:5 7:15 7:16 8:2 19:18
laws [1] 22:4
lawsuit [3] 22:23

23:3 84:9
lawsuits [1] 22:14
lawyer [5] 23:6 24:22 25:5 28:4 28:17
lawyers [1] 43:22
league [1] 37:22
learned [4] 12:16 33:4 33:13 36:12
leases [1] 68:19
least [3] 43:4 46:17 61:6
left [2] 7:17 72:3
legal [4] 20:1 23:5 28:2 29:9
lending [1] 81:23
lends [3] 19:7 20:3 67:6
less [3] 16:13 43:16 49:6
letter [4] 41:20 41:24 44:6 56:9
letterhead [1] 41:21
level [4] 51:4 52:11 52:11 64:3
lieu [1] 58:16
lightly [1] 23:9
liked [1] 18:20
likely [1] 41:1
limited [2] 24:22 56:3
line [1] 63:21
liquid [2] 65:13 67:2
liquidate [1] 78:12
liquidation [2] 77:14 78:13
liquidity [1] 19:9
lists [1] 21:12
litigation [3] 23:21 26:13 80:20
lives [1] 13:7
living [2] 13:5 22:19
loan [12] 19:10 21:21 22:16 37:17 53:12 53:14 53:18 53:23 66:15 66:15 67:1 67:11
loans [6] 66:19 66:24 67:8 78:1 79:21 79:24
located [1] 19:22
longer [1] 45:22
look [4] 21:4 41:18 54:5 54:11
looked [2] 36:19 68:1
looking [3] 35:15 67:21 82:4
looks [1] 6:12
loss [1] 70:18
losses [2] 59:24 71:7
loyalty [1] 10:15
Lufkin [5] 68:4 68:8 68:11 68:22 70:3
lunch [1] 33:8
maintaining [1] 25:9
majority [1] 81:11
majority-owned [1] 69:15
makes [1] 75:22
man [1] 65:19
management [6] 12:6 28:4 51:13 81:11 82:14 82:16
manager [1] 82:7
managers [1] 82:24
March [1] 54:19
MARK [6] 1:12 3:3 4:3 86:10 86:18 87:7
mark-to-market [1] 27:9
marked [5] 21:5 41:16 41:19 54:3 54:6
market [4] 27:8 27:11 31:9 68:1
marketable [2] 78:2 78:7
marketing [1] 18:19
marketplace [2] 78:6 78:8
markup [1] 44:4
master [1] 7:4
material [3] 25:23 84:9 84:14
matter [1] 34:17
matters [1] 6:2
maximum [1] 65:10
may [24] 5:8 5:17 5:21 6:11 20:8 20:10 32:14 35:18 40:22 50:8 58:14 58:15 59:3 65:16 69:24 75:1 75:3 75:18 75:20 75:22 76:1 76:4 79:1 79:17
mean [5] 28:10 33:5 63:15 63:20 74:5
means [1] 65:20
meant [2] 28:5 28:10
medication [1] 6:14
meet [1] 20:18
meeting [9] 25:17 25:20 44:2 49:17 49:24 50:5 50:7 50:9 54:20
meetings [14] 10:17 23:11 25:8 32:18 32:19 33:5 33:11 33:15 44:3 45:20 45:20 50:14 50:16 77:8
member [4] 10:22 11:7 12:16 12:19
members [2] 51:13 57:19
memo [2] 54:20 55:12
memorandum [1] 54:8
memories [1] 45:6
memory [8] 22:13 22:13 22:17 32:3 49:19 68:17 73:13 83:10
mention [1] 17:15
mentioned [1] 81:9
merge [1] 59:16
merged [3] 13:18 59:13 59:19
merger [2] 60:14 76:18
merging [2] 60:5 76:10
Messrs [2] 21:23 68:13
met [3] 4:8 9:4 49:17
methodology [1] 70:8
Michelle [1] 41:23
mid [1] 8:14
middle [1] 21:8
Midwestern [4] 39:23 40:1 40:8 40:11
might [16] 5:6 23:18 25:17 33:7 33:7 35:20 52:19 52:23 53:4 58:13 64:10 69:17 71:5 71:5 77:5 78:3
million [5] 48:11 55:7 61:20 78:1 78:4
mind [4] 40:18 58:23 77:7 84:19
minds [1] 72:22
minor [1] 81:8
minority [1] 78:6
minutes [5] 32:18 33:14 36:13 40:18 58:23
Modern [1] 17:7
money [10] 26:16 37:14 45:9 55:7 56:2 56:13 65:5 67:6 81:20 81:23
monies [1] 15:7
months [1] 66:6
morning [1] 4:8
mortgage [2] 51:4 52:12
most [4] 8:5 12:4 43:8 57:20
mother [1] 13:5
moving [1] 26:19
Ms [21] 2:6 3:4 4:7 6:6 6:7 28:15 28:19 41:17 42:3 42:15 42:19 44:13 44:17 54:4 54:14 62:10 65:15 74:4 78:24 79:5 84:21
Murphy [1] 2:7
Mutual [10] 9:11 11:23 12:14 12:21 28:21 29:4 29:12 29:21 30:1 30:7
N [1] 3:1
N.W [1] 2:3
name [10] 4:9 18:11 37:24 39:2 39:3 39:13 40:3 40:6 40:15 77:19
named [1] 74:10
names [2] 7:16 14:19
National [12] 15:15 34:16 34:19 53:17 53:22 55:8 56:21 61:21 75:16 81:17 81:19 81:22
nature [2] 31:1 46:23
necessary [1] 64:6
need [2] 5:10 5:21
needed [2] 8:6 50:24
negotiate [1] 69:16
negotiated [2] 21:23 39:18
negotiation [1] 29:3
negotiations [12] 9:7 10:24 11:9 11:15 11:17 12:5 12:8 12:16 15:2 29:7 29:19 80:9
Neither [1] 10:22
net [6] 59:24 70:18 71:6 72:2 72:7 72:9
netting [1] 60:1
never [5] 18:21 35:23 51:19 51:21 76:19
new [6] 18:19 19:17 26:20 26:24 35:3 73:19
newspaper [2] 19:13 19:21
next [1] 9:15
Nielsen [1] 2:11
Niles [1] 6:22
nobody [1] 73:13
nod [1] 4:22
Noel [2] 75:19 75:23
NOLs [2] 59:24 73:5
noncumulative [2] 47:23 48:4
none [9] 10:12 10:20 11:1 19:6 31:20 34:8 50:18 68:23 84:18
nonqual [1] 47:20
nonqualifying [2] 47:18 47:22
Nope [1] 54:18
nor [3] 10:22 87:18 87:19
Northwestern [2] 6:24 7:3
Notary [3] 1:18 86:23 87:6
notes [1] 18:12
nothing [9] 11:18 36:10 39:13 44:21 65:19 69:19 69:23 81:21 84:19
notice [1] 1:14
now [9] 7:13 13:4 19:9 22:6 34:8 67:3 71:9 74:23 79:12
Nuggets [4] 17:10 17:11 17:12 18:15
number [8] 13:2 17:5 21:22 22:5 51:9 66:18 67:7 86:19
numerous [1] 8:20
NW [1] 2:8
objections [1] 6:4
obligation [1] 80:2
obligations [4] 56:23 64:3 64:6 72:1
obtain [1] 82:4
obtaining [3] 11:2 11:3 75:15
obvious [1] 23:18
obviously [1] 6:10
occur [2] 55:22 78:19
occurred [6] 24:5 55:10 55:19 55:20 71:12 76:19
off [5] 4:9 31:10 56:5 66:18 72:1
offer [4] 67:16 70:1 70:1 76:24
offered [2] 67:3 73:11
office [3] 54:7 68:17 88:2
officer [2] 9:22 10:6
official [1] 33:11
often [1] 31:7
oil [1] 17:6
once [3] 12:20 49:12 52:8
one [38] 8:22 10:2 12:3 14:17 15:1 16:13 18:17 19:23 23:16 25:18 43:6 43:18 46:17 46:18 47:15 48:19 49:12 49:14 50:7 50:9 51:15 55:6 55:19 60:8 60:10 62:13 62:14 63:12 69:3

69:10 69:17 74:10 75:6 76:15 76:24 77:4 77:24 79:12
onerous [1] 80:18
ones [5] 39:24 41:11 41:12 51:16 52:2
ongoing [6] 9:21 22:15 24:7 29:4 29:7 29:20
onward [1] 6:20
operating [3] 59:24 70:18 71:7
operations [1] 37:12
opinion [2] 82:6 82:10
opportunities [7] 16:22 17:2 17:5 35:11 35:16 36:14 83:4
opportunity [3] 17:24 18:2 18:16
opposed [5] 4:22 63:3 66:23 80:22 81:2
option [1] 74:9
order [2] 55:6 75:16
organization [1] 26:15
original [2] 73:16 73:17
OTS [3] 50:3 54:20 55:5
ought [1] 70:15
outcome [1] 84:9
outer [1] 8:20
outline [2] 25:16 25:21
outside [5] 10:16 33:13 36:12 45:20 73:16
overview [1] 19:18
owe [1] 66:13
own [4] 16:10 16:12 16:14 20:2
owned [3] 38:1 53:5 73:7
owners [1] 81:11
package [1] 11:12
packages [3] 25:22 27:7 35:21
page [6] 3:2 3:8 21:9 42:9 42:20 54:7
paid [5] 63:4 63:23 64:10 66:18 81:24
papers [1] 20:2
parcel [1] 18:14
part [18] 8:19 12:4 18:3 26:23 27:7 32:4 32:6 49:5 50:11 53:1 54:1 57:20 59:23 60:12 68:9 70:6 80:2 80:3
participant [1] 78:3
participate [1] 73:14
particular [4] 11:18 14:19 19:8 34:14
particulars [1] 35:5
parties [3] 21:23 43:2 87:18
Partners [2] 14:4 75:9
party [1] 69:3
party-type [1] 81:8
passage [4] 44:19 53:9 80:14 82:12
passed [3] 24:6 24:8 80:16
past [1] 66:14
Patricia [2] 2:6 4:9
Patrick [1] 2:7
pause [3] 25:12 62:9 77:16
pay [5] 58:6 62:20 63:1 66:7 71:24
paydown [3] 53:12 53:19 53:23
payment [5] 55:11 56:8 71:18 72:4 84:11
payments [1] 64:9
payout [1] 62:16
Peerless [3] 37:16 37:20 37:23
pending [2] 5:12 5:22
people [10] 8:5 13:2 16:9 39:18 45:2 45:9 45:12 82:18 83:2 83:3
Peoria [27] 12:11 12:14 13:14 13:19 13:22 28:23 30:11 30:12 35:8 35:13 39:8 48:8 55:11 55:15 59:12 60:2 60:9 60:15 61:8 64:17 65:11 73:3 73:23 75:9 76:11 81:3 81:16
percent [7] 16:19 26:9 26:18 26:20 26:21 66:14 84:13
percentage [15] 16:12 16:14 16:17 26:1 26:4 27:11 70:15 71:20 71:21 72:6 72:8 72:9 73:8 73:19 78:14
percentages [4] 27:1 27:3 27:5 58:18
performance [1] 82:11
period [5] 31:11 36:6 36:8 64:18 66:4
periods [1] 55:16
person [3] 13:3 50:3 50:3
personal [4] 20:4 21:10 37:21 87:10
personally [1] 84:4
pertaining [1] 1:16
pgs [1] 86:19
philosophy [2] 36:22 36:23
PHO012 [2] 42:16 42:17
Phone [3] 2:4 2:9 88:12
Pikus [3] 74:12 82:19 82:22
place [3] 48:15 68:15 87:12
Plaintiffs [3] 1:4 2:5 86:4
plate [1] 58:7
played [1] 37:22
point [11] 28:22 35:19 46:17 57:3 63:16 63:18 65:17 65:21 69:9 74:10 80:19
pool [3] 79:8 79:19 84:13
pools [3] 48:21 77:21 77:24
Porter [1] 2:2
portion [1] 16:10
position [5] 10:6 15:23 73:20 75:8 75:12
positions [9] 13:13 14:1 14:5 14:8 14:15 15:18 15:21 16:1 52:15
possession [1] 21:10
pot [2] 72:3 78:9
potential [4] 38:3 69:1 69:11 84:8
potentially [1] 47:7
practice [1] 8:2
precluded [1] 83:6
preferred [11] 32:12 32:23 35:7 47:19 47:23 47:23 48:3 48:4 48:11 55:7 64:4
preliminary [1] 4:19
premise [2] 63:15 63:19
preparation [1] 15:6
prepare [2] 20:13 27:8
present [3] 2:11 7:18 71:9
presented [1] 49:18
preserved [1] 6:4
president [1] 69:16
president-general [1] 7:19
pretty [3] 12:1 23:18 81:10
price [9] 7:13 7:13 70:5 70:11 70:14 71:21 72:6 72:21 83:19
primarily [4] 38:1 69:15 75:5 82:20
primary [4] 12:5 13:2 74:19 82:18
privilege [5] 5:19 5:21 5:23 6:2 6:9
pro [3] 24:1 58:13 73:12
Procedure [1] 1:15
proceeds [4] 17:18 72:2 72:7 72:9
process [2] 19:20 80:18
produce [1] 21:10
product [1] 18:19
profitably [1] 72:24
promise [1] 22:3
properties [2] 8:23 19:23
proposed [9] 37:16 37:20 38:10 39:7 39:12 40:8 40:17 40:22 41:10
pros [2] 23:7 23:14
prove [1] 78:4
provide [3] 6:19 7:8 68:18
provided [3] 22:12 56:18 86:16
provisions [2] 83:6 83:13
Public [3] 1:19 86:23 87:6
publisher [1] 19:13
purchase [10] 18:2 18:9 18:10 26:4 32:12 32:23 35:4 70:5 70:11 72:21
purchased [2] 27:4 34:24
purely [2] 39:13 71:19
purpose [4] 14:16 48:23 54:24 63:6
pursuant [4] 1:14 1:14 27:15 47:2
pursue [1] 83:5
pursuing [1] 36:18
pursuit [1] 35:11
put [4] 45:8 45:8 65:20 73:20
quarters [1] 55:23
questions [10] 4:20 5:24 6:8 6:12 6:17 11:20 69:18 74:24 79:23 84:24
quick [3] 41:24 44:14 54:11
quickly [1] 46:14
R [2] 1:3 86:3
raise [5] 18:3 44:19 44:23 48:7 74:23
raising [2] 45:15 45:16
Randolph [2] 1:19 88:11
rang [1] 37:24
range [4] 42:10 42:16 42:20 54:10
RAP [1] 33:18
rata [2] 58:13 73:12
rate [3] 37:3 37:5 66:7
rather [1] 71:8
ratio [1] 59:9
read [1] 86:10
real [6] 8:4 8:19 18:13 18:14 41:24 51:13
reality [1] 81:6
realize [1] 4:12
really [8] 28:5 32:16 50:12 58:7 73:5 77:22 81:4 82:20
reason [3] 6:15 50:19 59:23
reasonable [2] 57:18 57:23
reasons [6] 23:17 23:22 23:24 37:21 73:1 76:23
recalled [1] 79:16
recalling [3] 38:2 52:24 53:6
receivables [4] 48:22 79:8 79:19 79:20
receive [3] 11:8 11:11 57:3
received [9] 15:9 57:12 58:19 67:16 70:15 71:18 71:20 72:9 76:24
receiving [2] 17:18 57:1
recollection [32] 31:18 32:14 33:20 34:20 42:1 42:7 50:19 54:15 55:18 56:16 56:17 59:14 59:15 60:17 61:13 61:18 61:22 61:23 62:8 63:7 64:8 64:13 65:2 70:10 70:13 70:20 71:1 71:5 71:14 71:17 76:17 83:18
recollections [2] 48:13 64:20
recommendations [1] 81:11
record [4] 4:9 5:17 42:15 86:14
records [1] 66:20
redeem [1] 55:7
redemption [5] 48:11 48:14 48:18 48:24 79:14
reduce [1] 52:11
reduced [1] 87:9

refer [1] 21:7
reference [2] 79:6 79:13
referenced [3] 54:17 55:12 56:9
referred [3] 31:17 31:21 49:16
referring [1] 33:4
refresh [1] 54:15
regarding [22] 11:8 11:16 15:15 24:11 25:9 35:10 36:13 40:8 44:18 46:1 46:7 47:6 47:9 47:10 47:21 49:23 51:7 63:22 76:9 79:19 81:15 82:10
regardless [1] 56:24
regular [1] 31:1
regulated [1] 45:12
regulations [2] 45:7 50:22
regulators [16] 12:8 15:14 50:8 50:9 50:10 50:13 50:15 50:17 51:12 51:14 51:15 51:19 51:23 51:24 52:4 52:13
regulatory [15] 10:23 12:2 22:2 30:19 31:19 32:15 34:21 36:9 41:4 45:1 45:22 46:18 55:24 80:17 83:15
related [4] 14:13 21:11 21:12 81:8
relating [26] 11:9 22:15 30:5 30:6 30:9 30:11 32:20 37:15 38:20 44:9 47:18 48:10 51:3 52:21 53:11 54:16 55:9 56:13 61:10 61:14 62:15 62:19 69:4 69:8 69:12 70:17
relationship [3] 75:4 79:10 81:16
relationships [1] 19:4
relative [2] 87:17 87:18
remember [30] 14:11 14:19 20:9 27:6 30:22 34:3 34:8 34:12 34:13 34:15 35:5 40:3 40:6 40:10 40:11 46:23 47:15 49:13 49:14 51:16 52:3 56:10 59:6 63:21 66:16 68:23 69:10 77:18 78:15 84:1
remembering [3] 48:17 50:14 57:19
repeat [2] 24:15 80:24
rephrase [2] 24:14 64:23
replace [1] 45:21
replaced [1] 48:3
replacement [3] 47:18 47:22 58:22
report [3] 29:6 29:18 50:11
reported [5] 32:18 33:14 44:2 70:7 87:9
reporter [7] 1:18 4:21 21:5 41:19 54:6 85:1 87:6
reporting [1] 25:15
represent [1] 34:18
representations [1] 43:21
represented [2] 9:6 9:20
representing [2] 4:10 9:14
represents [1] 31:8
Republic [3] 10:19 11:10 27:14
requested [3] 21:9 41:16 54:3
requesting [1] 55:5
required [3] 47:2 52:10 53:22
requirement [1] 46:20
requirements [1] 56:6
reread [1] 55:2
research [1] 23:6
resolutions [1] 11:5
resolving [1] 49:5
resources [1] 23:21
respect [39] 9:1 9:9 9:10 9:12 9:14 9:16 10:19 11:22 12:7 12:10 12:13 22:14 23:13 24:17 25:5 27:13 28:20 29:20 31:13 32:20 33:22 33:23 34:10 35:1 35:7 44:8 52:16 56:19 57:23 57:24 58:1 58:3 58:9 68:16 72:13 73:23 80:13 82:22 84:17
respective [1] 58:17
respond [2] 4:20 5:11
response [1] 28:24
responsibilities [3] 10:11 10:14 19:14
rest [3] 57:21 82:13 82:15
restate [3] 47:20 57:9 72:11
restrictions [3] 46:22 46:23 51:1
restructuring [1] 59:2
result [2] 50:21 55:11
resulted [1] 53:8
results [2] 25:2 44:3
retaining [2] 24:11 24:18
retire [2] 64:6 64:10
retired [2] 13:5 62:3
retirement [2] 61:19 61:24
retrospect [1] 52:19
return [4] 22:1 37:3 37:5 74:16
reveal [2] 24:23 28:18
review [5] 15:5 20:16 21:1 54:23 68:20
reviewed [3] 27:21 43:18 43:19
reviewing [3] 28:3 41:6 80:7
Richard [1] 82:18
right [9] 19:9 24:5 24:8 32:9 47:4 47:5 55:23 67:3 81:23
right-hand [2] 42:10 42:13
rights [2] 24:12 24:18
ring [1] 40:4
rings [2] 39:2 39:14
risk-based [1] 59:9
risk-weighted [1] 59:3
River [94] 9:2 9:5 9:16 12:20 12:24 13:13 13:17 13:18 13:22 14:2 14:7 14:9 14:13 15:11 15:16 15:19 16:15 20:7 21:12 24:12 24:19 26:1 26:10 27:8 28:23 29:3 30:11 35:12 35:12 36:5 43:8 44:9 45:15 48:7 49:3 49:4 51:4 51:5 52:6 52:11 52:16 52:22 53:9 53:12 53:13 53:15 55:10 55:14 55:15 56:15 59:2 59:12 59:12 60:9 60:14 60:15 60:18 61:1 61:7 61:7 62:20 62:24 63:3 63:5 63:6 63:8 63:14 63:23 63:24 64:3 64:16 64:17 65:11 65:11 67:1 67:15 67:18 69:1 70:4 71:11 73:3 73:9 73:23 75:9 76:10 76:10 76:11 76:21 81:3 81:16 81:16 82:11 83:5 83:12
Rock [28] 9:10 9:13 9:21 10:3 10:19 13:16 13:17 26:13 27:14 29:12 29:16 29:18 35:3 35:12 36:4 53:2 55:15 59:12 59:23 60:2 60:12 60:14 60:19 61:1 61:7 64:17 65:12 81:17
role [8] 27:15 28:16 39:17 41:2 41:6 43:14 43:15 75:12
roles [1] 82:20
Ron [2] 82:19 82:19
Roscoe [1] 61:5
Rose [2] 74:20 75:2
Ross [56] 1:3 4:11 8:12 8:14 9:1 9:14 11:24 16:4 16:6 16:24 19:5 20:3 21:18 21:24 22:19 24:11 24:18 25:15 26:3 28:22 30:2 33:6 33:21 34:24 46:4 47:11 56:19 56:22 57:12 57:17 58:1 58:2 64:15 65:1 65:5 65:8 65:10 65:16 65:19 66:1 67:5 68:14 73:10 74:1 74:3 74:5 74:18 75:15 80:12 81:7 82:3 82:17 82:21 84:10 84:17 86:3
Rothman [3] 75:19 75:23 76:1
Rules [1] 1:15
run [1] 72:23
running [1] 82:11
runoff [1] 78:11
S [1] 3:7
sale [10] 27:10 61:1 69:6 70:14 71:13 71:19 71:21 71:23 72:6 77:19
sales [2] 8:22 24:9
San [10] 14:22 14:24 15:11 15:16 53:13 56:14 58:10 58:12 72:13 75:17
sat [1] 7:4
savings [9] 14:22 21:21 22:16 30:12 37:16 37:23 38:11 53:14 75:17
saw [1] 51:17
says [1] 43:6
school [5] 6:20 6:22 7:1 7:5 7:15
scrivener [1] 44:4
seal [1] 88:2
second [1] 13:3
secondary [1] 82:20
secondly [1] 77:1
secretary [8] 10:8 13:15 13:16 13:21 14:12 14:17 15:22 15:23
secured [2] 67:8 67:11
securing [1] 18:12
securities [1] 19:18
Security [3] 39:8 39:15 39:20
see [3] 33:7 33:8 41:24
seeking [2] 36:14 36:24
seem [1] 52:17
Seib [2] 82:19 82:23
selected [1] 45:11
sell [10] 56:5 63:19 67:18 78:5 78:7 78:9 78:14 83:20 83:21 83:23
selling [1] 19:20
sense [7] 23:23 27:20 31:5 40:21 60:11 62:5 62:7
sensitive [1] 5:23
sent [4] 42:21 42:23 43:1 64:5
separate [1] 18:14
separately [1] 30:1
September [1] 88:3
serious [4] 46:11 46:16 47:6 47:9
served [5] 14:14 14:14 14:15 20:7 44:4
set [5] 51:19 53:2 77:5 81:5 88:1
sets [1] 51:15
settlement [5] 48:18 79:8 79:9 79:18 80:5
settling [1] 80:2
several [3] 58:13 58:15 58:16
severe [1] 46:22
SFAS [2] 61:11 61:12
shareholder [5] 9:7 74:9 74:15 74:16 84:7
shareholders [7] 53:4 57:20 58:4 58:15 72:4 73:13 74:1
shareholders's [1] 27:1
shareholding [1] 73:16
shareholdings [1] 74:14
shares [3] 16:7 18:3 18:24
sheet [1] 71:12
sheets [2] 86:16 86:19

**shelf** [1] 18:21
**shopping** [1] 18:13
**short** [4] 44:16 66:2 66:4 79:4
**Shorthand** [2] 1:18 87:5
**shortly** [1] 9:18
**shrinkage** [4] 55:10 55:16 71:11 71:16
**shrinking** [1] 55:10
**shut** [2] 41:7 73:14
**side** [2] 13:7 55:23
**sign** [3] 10:8 49:22 85:2
**Signature** [1] 85:1
**signatures** [1] 14:18
**signing** [1] 10:10
**simply** [2] 67:3 73:14
**single** [1] 7:16
**single-purpose** [1] 18:10
**sit** [4] 10:16 31:3 33:12 36:11
**situation** [4] 43:16 65:7 68:1 75:7
**situations** [1] 81:9
**Six** [1] 66:6
**six-million-dollar** [3] 54:16 55:1 56:8
**skim** [2] 41:24 42:4
**small** [1] 74:13
**Smith** [22] 2:6 3:4 4:7 4:10 6:6 6:7 28:15 28:19 41:17 42:3 42:15 42:19 44:13 44:17 54:4 54:14 62:10 65:15 74:4 78:24 79:5 84:21
**sold** [12] 19:19 24:12 24:19 26:20 27:4 36:5 60:19 60:22 61:5 63:14 67:15 76:22
**someone** [2] 18:18 75:16
**sometimes** [2] 41:5 41:5
**soon** [2] 78:13 80:15
**sorry** [3] 13:8 42:12 47:19
**sought** [2] 49:3 49:4
**sound** [3] 22:5 47:4 47:5
**South** [2] 13:7 61:6
**space** [1] 18:22
**speak** [1] 76:7
**speaking** [1] 69:2
**special** [1] 14:16
**specific** [12] 12:15 23:24 28:8 35:17 36:10 36:20 45:6 55:19 61:22 70:24 76:16 83:4
**specifically** [7] 21:7 27:6 37:9 44:21 45:14 45:24 59:6
**specifics** [10] 45:18 46:9 46:15 47:13 48:1 53:24 70:20 75:21 76:14 83:24
**specified** [1] 87:13
**spend** [1] 84:19
**spoke** [1] 50:9
**spoken** [3] 75:18 75:20 75:23
**SS** [1] 87:1
**stage** [1] 77:5
**standing** [1] 11:4
**standpoint** [2] 23:5 43:20
**stars** [1] 51:11
**start** [2] 5:16 8:11
**state** [3] 5:17 86:10 87:1
**statements** [1] 64:20
**States** [16] 1:1 1:6 1:13 1:16 2:7 4:10 4:11 21:19 22:15 22:24 23:4 80:13 84:10 86:1 86:6 87:1
**status** [1] 11:14
**stayed** [1] 73:12
**staying** [1] 56:15
**stemming** [1] 80:14
**stenographically** [1] 87:9
**stepping** [1] 58:6
**Steve** [8] 16:8 33:6 41:22 43:17 43:22 44:1 51:8 82:17
**Stevens** [1] 69:9
**still** [2] 17:18 43:11
**stock** [18] 19:17 32:12 32:23 34:24 35:4 35:7 47:19 47:23 47:23 48:3 48:4 48:12 48:24 55:7 64:4 67:2 69:18 69:19
**stop** [1] 41:5
**stopped** [1] 63:9
**stopping** [1] 63:19
**straight** [2] 32:11 32:22
**Street** [4] 1:19 2:3 2:8 88:11
**strike** [1] 9:4
**strongly** [1] 81:19
**struck** [1] 29:8
**structure** [1] 73:15
**structured** [1] 77:14
**stuff** [1] 79:14
**submitted** [1] 86:19
**subordinated** [4] 34:10 34:20 56:20 61:20
**subordinating** [1] 61:24
**subpoena** [2] 21:1 21:6
**SUBSCRIBED** [1] 86:20
**subsidiaries** [1] 7:21
**substance** [3] 24:23 28:15 28:18
**substantial** [6] 31:10 59:24 65:20 65:21 65:22 67:6
**substantially** [1] 72:20
**successor** [1] 17:13
**such** [4] 21:14 52:17 71:15 87:18
**sue** [2] 23:17 84:3
**suffered** [1] 83:11
**sufficient** [3] 36:9 37:3 37:5
**suing** [3] 23:8 23:14 24:1
**Suite** [2] 1:19 88:11
**sums** [1] 67:6
**Sun** [2] 19:24 20:1
**Supervision** [1] 54:8
**supervisory** [6] 45:21 47:3 49:16 50:20 51:22 55:4
**sworn** [4] 4:1 4:5 86:20 87:7
**T** [2] 2:7 3:7
**Taco** [4] 17:10 17:11 17:12 18:15
**taking** [2] 1:17 87:13
**tax** [1] 7:4
**team** [9] 8:19 12:6 28:4 37:23 74:13 75:7 82:14 82:16 84:7
**telling** [1] 28:6
**tenor** [1] 84:1
**term** [3] 31:4 31:13 57:22
**termination** [1] 48:20
**terms** [23] 11:2 11:3 15:3 18:24 23:6 24:5 25:20 27:15 27:19 28:1 28:2 28:2 30:15 30:21 31:18 36:23 38:21 43:19 46:11 55:6 60:15 66:3 66:4
**testified** [1] 4:5
**testify** [1] 87:7
**testimony** [2] 86:11 86:14
**Texas** [12] 14:23 15:19 17:14 26:22 27:2 53:18 73:9 75:4 75:6 76:10 76:11 76:22
**Thank** [2] 84:22 84:23
**Theirs** [1] 58:14
**themselves** [3] 22:6 34:24 81:20
**thereunder** [1] 50:22
**thought** [15] 18:20 28:7 32:3 32:4 33:3 37:2 70:23 72:19 76:2 76:4 77:23 77:24 78:3 79:17 83:18
**thousand** [2] 66:13 66:17
**threat** [1] 22:7
**three** [5] 19:20 38:7 63:13 66:19 82:19
**thrift** [3] 54:7 82:7 82:23
**thrifts** [4] 38:7 46:5 46:12 65:6
**through** [20] 15:11 15:16 24:9 29:12 29:16 32:11 32:22 38:18 42:16 42:17 54:10 55:15 64:18 69:5 69:6 69:22 73:3 74:14 74:14 75:1
**throw** [1] 43:5
**times** [7] 19:24 46:16 46:16 55:20 64:23 65:8 82:18
**Times's** [1] 20:1
**timing** [2] 33:4 47:13
**today** [7] 6:17 21:7 31:3 33:12 36:12 71:8 84:19
**today's** [1] 20:14
**together** [3] 59:21 76:2 76:3
**tomorrow** [1] 84:20
**took** [3] 23:8 27:10 48:15
**towards** [3] 31:19 34:7 34:21
**town** [2] 20:20 43:3
**training** [1] 7:3
**transaction** [11] 15:2 25:16 32:4 34:14 48:6 48:17 48:21 49:10 69:18 73:15 77:13
**Transactional** [1] 8:3
**transactions** [2] 22:18 51:9
**transcript** [2] 86:11 86:13
**transfer** [1] 70:18
**transferred** [2] 15:8 70:22
**transmittal** [1] 44:5
**treasuries** [1] 66:8
**trial** [1] 6:5
**Trisha** [1] 5:16
**troubled** [2] 36:18 38:22
**true** [1] 86:13
**trust** [1] 76:3
**truth** [1] 87:8
**try** [1] 26:17
**trying** [4] 29:1 36:20 68:15 74:7
**turn** [1] 42:9
**Twelfth** [1] 2:3
**twice** [1] 49:12
**two** [12] 10:3 13:6 24:6 31:23 59:16 60:5 60:18 61:1 61:4 63:13 73:1 77:4
**two-million-dollar** [1] 47:1
**type** [6] 8:16 17:24 18:4 19:11 38:21 45:1
**types** [2] 43:8 66:9
**typewriting** [1] 87:10
**U.S** [1] 7:20
**ultimate** [1] 84:13
**ultimately** [3] 51:17 70:14 78:4
**under** [7] 7:16 22:8 37:13 45:1 45:8 48:18 87:10
**undercapitalized** [2] 21:22 22:7
**undercapitalizing** [1] 22:8
**understand** [9] 4:23 6:16 51:12 51:14 51:20 52:1 52:3 52:5 59:5
**understood** [2] 37:12 51:24
**undertaken** [1] 44:23
**United** [21] 1:1 1:6 1:13 1:16 2:7 4:10 4:11 21:19 22:15 22:24 23:4 38:11 38:15 38:21 39:1 39:5 80:13 84:10 86:1 86:6 87:1
**University** [5] 6:23 6:24 7:5 7:9 7:23
**unsecured** [3] 67:9 67:12 67:13
**up** [17] 5:8 9:20 21:21 25:18 25:20 29:2 36:4 46:13 48:19 53:2 58:7 64:5 70:8 73:21 79:16 80:3 81:5
**used** [4] 31:13 63:1 70:9 71:8
**using** [1] 41:4

utilized [2] 56:14 63:5
utilizing [1] 62:20
vague [2] 48:13 64:19
Valley [93] 9:2 9:6 9:16 12:20 12:24 13:14 13:17 13:18 13:22 14:2 14:7 14:9 14:14 15:11 15:16 15:19 16:15 20:7 21:12 24:12 24:19 26:1 26:11 27:8 28:23 29:3 30:11 35:12 35:12 36:5 43:9 44:9 45:15 48:7 49:3 49:4 51:5 51:5 52:6 52:11 52:16 52:22 53:9 53:12 53:13 53:15 55:11 55:14 55:15 56:15 59:12 59:12 60:9 60:14 60:15 60:19 61:1 61:7 61:8 62:20 62:24 63:3 63:5 63:6 63:8 63:14 63:24 63:24 64:3 64:16 64:17 65:11 65:12 67:1 67:15 67:18 69:1 70:4 71:12 73:3 73:9 73:23 75:9 76:10 76:11 76:11 76:21 81:3 81:16 81:17 82:11 83:5 83:13
Valley's [1] 59:3
valuation [1] 27:9
valuations [1] 69:19
value [15] 27:5 27:11 31:9 31:9 68:15 70:22 70:23 71:3 71:7 71:9 72:21 72:24 78:5 79:24 83:12
various [14] 7:16 16:17 19:7 19:24 21:12 21:23 22:1 26:1 27:19 45:7 48:18 55:20 55:22 82:18
vary [2] 8:3 15:24
verbal [1] 28:24
verbally [1] 4:20
verify [1] 20:23
versus [2] 4:11 21:19
viable [1] 80:20
vice [1] 7:19
view [1] 82:23
viewed [1] 27:11
viewing [2] 42:2 54:13
vs [2] 1:5 86:5
waiving [1] 5:20
warranties [1] 43:21
Washington [2] 2:3 2:8
Waterhouse [2] 7:13 7:14
ways [1] 45:21
Webber [2] 13:3 43:14
week [1] 20:20
West [3] 1:19 6:22 88:11
Western [9] 15:20 17:12 17:19 17:21 73:8 74:21 75:1 78:10 78:14
whereof [1] 88:1
whichever [1] 53:1
whole [4] 42:15 47:20 77:7 87:8
willing [2] 58:6 73:14
wire [1] 15:8
Wisconsin [1] 69:9
wished [1] 83:5
within [6] 10:2 56:15 63:12 65:3 78:16 78:21
without [1] 83:20
witness [12] 3:2 4:1 4:4 25:1 25:13 42:2 54:13 65:18 77:17 84:23 85:3 88:1
WON034 [1] 54:10
word [1] 81:23
worked [4] 12:23 51:13 67:4 68:13
works [1] 66:9
wound [4] 9:20 21:21 48:19 73:21
written [1] 31:10
wronged [1] 23:16
X [2] 3:1 3:7
year [6] 10:2 22:4 24:6 63:13 78:16 78:21
years [11] 10:3 17:23 19:19 63:13 63:13 63:13 65:2 66:2 66:6 66:18 71:8
York [1] 19:17
younger [1] 67:2
yourself [2] 74:1 74:5

# EXHIBIT B

AUDIT/PERSONNEL/ADMINISTRATIVE COMMITTEE

JANUARY 24, 1990

The Audit Committee of the Board of Directors of River Valley Savings Bank, FSB met in committee session at 10:30 AM on January 24, 1990, at the offices of River Valley Savings Bank at 200 S.W. Jefferson, Peoria, Illinois.

The following members were present: Chairman, David DeTrempe, John Lawrence, and Mark Kipnis. Also present was Roger Kilpatrick.

The Committee reviewed the proposed changes in the management structure of the company. After discussion the committee members determined to recommend that Homer Holland be named Vice Chairman and Chief Executive Officer of River Valley, FSB and that Ron Pikus be named President and Chief Operating Officer of the Bank.

The Committee then reviewed an amendment to the Holland Partners Consulting Agreement and determined to recommend to the Board of Directors that Howard Ross be paid a bonus of $175,000 and that Holland Partners be paid a bonus of $425,000 based upon 1989 results.

In addition to the above items the Committee determined that bonuses should be paid to certain employees for their contributions and efforts for 1989. The amount to be recommended to the Board was $36,500 in the aggregate to be distributed per the detail schedule.

The committee members also discussed a change in the structure of the compensation of members of the Board of Directors. After review and discussion it was decided that a change be recommended to the Board of an annual retainer of $2000 be paid to each director of River Valley, FSB. In addition each director would be paid $350 for each board meeting attended.

Mr. DeTrempe then updated the Committee on his meeting with Mr. Kilpatrick, Ms. Witt, and the staff of Peat Marwick Mitchell regarding the timing of audit work to be completed and the progress made to date. Mr. DeTrempe noted that the audit process was on schedule and that the report would be available for the board meeting in April. Prior to the board meeting Mr. DeTrempe recommended that the Audit Committee meet with the Peat Marwick staff to review the audit report for the Committee to present to the Board.

The Committee then discussed the letters from Sue Mooney and

DEFENDANT'S EXHIBIT DX 377
Holland v. U.S. 95-524C

Larry Ferries from the Office of Thrift Supervision of December 26, 1989, and January 9, 1990, respectively. The Committee reviewed the letters and the recommended responses. After discussion the committee members proposed that the responses be adopted by the Board.

There being no further business to be discussed, the Committee adjourned.

[signature]
Chairman

# EXHIBIT C

January 4, 1995

First Banks, Inc.
135 North Meramec Avenue
Clayton, Missouri 63105
Attention: Mr. Allen Blake

Dear Mr. Blake:

With respect to the consideration to be delivered by First Banks, Inc., a Missouri corporation ("First Banks"), to the shareholders of River Valley Holdings, Inc., an Illinois corporation (the "Company"), pursuant to the terms of the Agreement and Plan of Merger dated July 26, 1994, as amended on August 31, 1994 (the "Agreement"), among the Company, First Banks and RVH Acquisition Company, an Illinois corporation and wholly owned subsidiary of First Banks, you are hereby directed to make the payments or deliveries to the individuals all as described below:

| Recipient | Amount | Payment Method |
|---|---|---|
| Ronald M. Pikus | $179,660 | Wire transfer of immediately available funds as follows: River Valley Savings Bank<br>Account Name: Ronald M. and Christine A. Pikus<br>Account No.: 1670000099<br>ABA No.: 271173083 |
| Homer J. Holland | $18,619,825 | Promissory note payable on January 3, 1996, bearing interest at a rate equal to 35 basis points less than the LIBOR rate, secured by an irrevocable letter of credit in an equal amount issued by The Boatmen's National Bank of St. Louis |
| Howard R. Ross | $17,875,032✓ | Wire transfer of immediately available funds as follows: American National Bank<br>Account Name: Howard R. Ross<br>Account No.: 14332884<br>ABA No.: 071000770 |
| Mark S. Kipnis | $744,793 | Wire transfer of immediately available funds as follows: River Valley Savings Bank<br>Account Name: Mark S. Kipnis<br>Account No.: 1680000360<br>ABA No.: 271173083 |
| Total proceeds | $37,419,310 | |

6,253,682.19 Loan #75 American

Homer J. Holland

Howard R. Ross

Being all of the shareholders of River Valley ~~Savings~~ Holdings, Inc.

DEFENDANT'S EXHIBIT
DX 1098
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

KAXIDKWARVHRPROCPAY.LET

12/29/94

Confidential Material - Subject to Protective Order

H&R-ABFB-B72-0122

January 4, 1995

First Banks, Inc.
135 North Meramec Avenue
Clayton, Missouri 63105
Attention: Mr. Allen Blake

Dear Mr. Blake:

With respect to the consideration to be delivered by First Banks, Inc., a Missouri corporation ("First Banks"), to the shareholders of River Valley Holdings, Inc., an Illinois corporation (the "Company"), pursuant to the terms of the Agreement and Plan of Merger dated July 26, 1994, as amended on August 31, 1994 (the "Agreement"), among the Company, First Banks and RVH Acquisition Company, an Illinois corporation and wholly owned subsidiary of First Banks, you are hereby directed to make the payments or deliveries to the individuals all as described below:

| Recipient | Amount | Payment Method |
|---|---|---|
| Ronald M. Pikus | $179,660 | Wire transfer of immediately available funds as follows:<br>River Valley Savings Bank<br>Account Name: Ronald M. and Christine A. Pikus<br>Account No.: 1670000099<br>ABA No.: 271173083 |
| Homer J. Holland | $18,619,825 | Promissory note payable on January 3, 1996, bearing interest at a rate equal to 35 basis points less than the LIBOR rate, secured by an irrevocable letter of credit in an equal amount issued by The Boatmen's National Bank of St. Louis |
| Howard R. Ross | $17,875,032 | Wire transfer of immediately available funds as follows:<br>American National Bank<br>Account Name: Howard R. Ross<br>Account No.: 14332884<br>ABA No.: 071000770 |
| Mark S. Kipnis | $744,793 | Wire transfer of immediately available funds as follows:<br>River Valley Savings Bank<br>Account Name: Mark S. Kipnis<br>Account No.: 1680000360<br>ABA No.: 271173083 |
| Total proceeds | $37,419,310 | |

Homer J. Holland

Homer J. Holland

Howard R. Ross

Being all of the shareholders of River Valley ~~Savings~~ Holdings, Inc.

XAX\DRW\RVH\PROCPAY.LE1 12/29/94

Confidential Material - Subject to Protective Order H&R-ABFB-B72-0123

TOTAL P.03

# EXHIBIT D

8515

November 15, 1989

EXHIBIT
Ferrias #3
8-10-00

**MEMORANDUM**

To: File

From: Bruce Michalski

Subject: Minutes of Management Meeting

River Valley Savings Bank, FSB, #8515 ("Peoria")
Peoria, Illinois

River Valley Savings Bank, #6822 ("Rock Falls")
Rock Falls, Illinois

A meeting was held on November 13, 1989 with Homer Holland and Mark Kipnis, representatives of both Peoria and Rock Falls. Susan Mooney, Larry Ferries, Dan Bagus, and Bruce Michalski represented the Office of Thrift Supervision. Wayne Dyer, of the Office of the Savings and Loan Commission (of Illinois), also attended.

The purpose of the meeting was to discuss the board of directors terms, which, at Peoria, are currently not staggered, and the Class D, E, and F preferred stock, which exists at both associations.

After the introductions, Homer Holland asked if it was possible to not stagger the terms of the board of directors. Presently, the director's terms are one year in length and not staggered.

Dan Bagus stated that it is necessary to stagger the terms of the directors to ensure the continuity of the board. He noted that a board of directors with terms expiring annually may result in a sudden change in management, which could possibly have a negative effect upon the association. He also noted that other associations had applied to not stagger its board and had been denied.

Mr. Holland and Mr. Kipnis agreed to amend the bylaws to stagger the terms of the directors in accordance with 12 CFR 552.6-1.

Mr. Holland noted that they are still in the process of selling the Class C preferred stock (of Peoria) to American National Bank (ANB). The stock will be considered core capital since it will be non-cumulative. Class C stock, as it now exists, is cumulative. In addition, the rate of dividends will be reduced from a rate of 10% fixed to a rate of 90% of prime. This should reduce Peoria's costs.

Mr. Holland then set the stage for his discussion on Class D, E, and F preferred stock. He noted that the reasoning behind the different classes were to compensate himself, Howard Ross, and Steve Bangert equitably. It was Howard Ross's job to acquire capital, it was his

PLAINTIFF'S EXHIBIT PX 168

job to build up the assets, and it was Steve Bangert's job to manage the interest rate risk exposure within the assets and liabilities. Mr. Holland said that he and Mr. Ross wanted Mr. Bangert to participate in the economic earnings of the associations, but did not want Mr. Bangert to have an ownership interest. That is one of the reasons that Mr. Bangert's incentive is tied to the market value of the associations and not to the GAAP earnings.

He further stated that it was their intent to set up the preferred stock in this manner to:

1. Treat each of them separately;

2. Keep the associations' capital intact;

3. Maximize usage of net operating loss (NOL) carryforwards; and

4. Keep these incentives separate from other existing bonus plans (which are available for other employees).

Mark Kipnis further emphasized that they were surprised to find out that we did not perceive the issue of the preferred dividends as including the operations of 1988. He said that they had always assumed that 1988 operations were also to be included. He said that the preferred stock issuances were established to recognize each of the parties contributions to the associations, and those contributions certainly existed in 1988. He also stated that they wanted to maximize the use of NOL carryforwards, which would, in turn, benefit the FSLIC (now FDIC), since they participate in the use of NOL carryforwards.

Ms. Mooney said that OTS personnel had been equally surprised that dividends were declared and paid before the preferred stock had been approved and issued.

Mr. Kipnis explained that some of the associations' correspondence had used 1988 figures in their examples.

Ms. Mooney noted that there had been bonuses paid to Mr. Holland and Mr. Ross during 1988. If the preferred stock was to compensate them for their efforts, why did they also receive bonuses.

Mr. Kipnis said that the bonuses were a form of back-salary.

He also said that their intent was to distribute 1988's and 1989's economic gain among Mr. Ross, Mr. Holland, and Mr. Bangert. The plan was originally trying to allocate three components, salaries,


CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

capital contribution compensation, and economic gain.

Mr. Holland said that if we were having a problem accepting the preferred stock dividends, they could probably declare common dividends, as long as it was approved by ANB.

Ms. Mooney said that we would have to consider the options open to us and get back to Mr. Holland at a later date.

Ms. Mooney then asked how Peoria and Rock Falls were progressing on the "sharing of management" issue. (There are several officers that allocate their services between the two associations.)

Mr. Holland responded. He said that it was fairly simple allocating the salaries of the people who worked for Holland Partners Inc. (HPI). It was more difficult allocating the salaries of the other officers, such as Roger Kilpatrick. However, he said that they do have methodologies for allocating, on a time-basis, the costs equitably between the two associations.

Mr. Dyer asked whether they had finished combining the two general ledgers of the Peoria shop. Mr. Holland said that the process was now complete.

Ms. Mooney asked if Peoria or Rock Falls were considering any further acquisitions. Mr. Holland said yes. Ms. Mooney said that RTC had indicated that it would not "do deals" with 3,4, or 5 rated shops. Mr. Kipnis asked if it was possible to re-rate Peoria and/or Rock Falls. Mr. Ferries said that it was possible to re-rate shops if a special limited examination was done. Mr. Ferries noted, however, that re-rating a shop was a rare occurrence. And it would be necessary to alleviate the problem areas. In Rock Falls and Peoria's case, it would be necessary to correct all management (M) and capital (C) problems.

Ms. Mooney asked whether Rock Falls and Peoria had "exchanged" any securities pursuant to their asset/liability restructuring. Mr. Holland said no. He said that the reason that they wanted to transfer assets between the two shops was to "level out" their GAP positions. One of the shops was positively hedged and one was negatively hedged. He also noted that Steve Bangert had been discussing the transactions with Larry Kenny. Ms. Mooney indicated that we would need to see if a transfer of assets would need PSA approval. She said she would let Mr. Holland know.

In summarizing the meeting, it was decided that:

1. Peoria would amend its bylaws to provide for a staggered board in accordance with 12 CFR 552.6-1.

2. Ms. Mooney would consider the options available regarding the payment of dividends on Class D, E, and F preferred stock.

3. Ms. Mooney would investigate whether Peoria and Rock Falls would need to seek PSA approval to transfer assets.

The meeting was then adjourned at 11:15.

BM

cc: Esterman
Mooney
Michalski
Docket #6822
Docket #8515
Gerbick

# EXHIBIT E

**FDIC**
Federal Deposit Insurance Corporation
Washington, D.C. 20429

Thrift Agreement Administration
and Oversight Section - Legal Division

Writer's Direct Dial No. (202) 736-0304

Telecopier (202) 736-0382

River Valley Saving Bank, F.S.B.
c/o Holland Partners
200 Wacker Drive
Chicago, Illinois 60606
Attention: Homer J. Holland

AUG 12 1991

Holleb & Coff
55 East Monroe Street
Suite 4100
Chicago, Illinois 60603
Attention: Mark S. Kipnis, Esq.

Re: Settlement Agreement; Form of Legal Opinion

Dear Sirs:

Please find enclosed a proposed Settlement Agreement between River Valley Savings Bank, F.S.B., et al., and the Federal Deposit Insurance Corporation as Manager of the FSLIC Resolution Fund. Also enclosed is a form of legal opinion on behalf of Holleb & Coff.

If you have any questions, please contact me at the above address.

Sincerely,

Charles A. Fulton
Counsel

DEFENDANT'S EXHIBIT
DX 586
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

SETTLEMENT AGREEMENT

among

RIVER VALLEY SAVINGS BANK, F.S.B.

RIVER VALLEY SAVINGS BANK,

HOMER J. HOLLAND,

HOWARD R. ROSS

and

FEDERAL DEPOSIT INSURANCE CORPORATION

As Manager of the

FSLIC RESOLUTION FUND

Dated as of __________, 1991

TABLE OF CONTENTS

Page

Recitals........................................................

Section 1 Transactions to be Consummated at the Closing.......

(a) FRF Cash Payment....................................
(b) River Valley Federal Cash Payment...................

Section 2 Tax Benefits..........................................

Section 3 Treatment of Special Reserve Accounts...............

Section 4 Audit.................................................

Section 5 Accord and Satisfaction.............................

Section 6 Conditions............................................

(a) Accuracy of Representations and Warranties; Performance..............................
(b) Certified Resolutions...............................
(c) Incumbency Certificate..............................
(d) Legal Opinion.......................................
(e) Proceedings.........................................
(f) Approvals and Consents..............................

Section 7.1 Representations and Warranties of the River Valley Banks.........................

(a) Corporate Existence.................................
(b) Due Authorization...................................
(c) Binding Agreement...................................
(d) Compliance with Law.................................
(e) Compliance with Obligations.........................
(f) Approvals and Consents..............................
(g) Litigation..........................................

Section 7.2 Representations and Warranties of the Manager.....

(a) Power and Authorization.............................
(b) Binding Agreement...................................

Section 8 Miscellaneous.........................................

(a) Amendments..........................................
(b) Notices.............................................
(c) Waiver..............................................
(d) Governing Law.......................................
(e) Inseverability......................................
(f) Successors and Assigns..............................
(g) Headings............................................

H&R-B56-00753
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0752

(h) Entire Agreement....................................
(i) Exhibits............................................
(j) Specific Performance................................
(k) Third Party Beneficiaries...........................
(l) Further Assurances..................................
(m) Execution in Counterparts...........................
(n) Costs and Expenses..................................
(o) Termination.........................................

Signature Page..............................................

Exhibits

Exhibit A -- Form of Legal Opinion

SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement"), is entered into as of ______________, 1991, by and among the FEDERAL DEPOSIT INSURANCE CORPORATION (the "FDIC"), in its capacity as manager of the FSLIC Resolution Fund (the "FRF"), RIVER VALLEY SAVINGS BANK, F.S.B., Peoria, Illinois ("River Valley ~~Federal~~ Bank"), or RIVER VALLEY SAVINGS BANK, Rock Falls, Illinois ("River Valley"), HOMER J. HOLLAND, and HOWARD R. ROSS. ~~River Valley Federal and River Valley are referred to collectively herein as the "River Valley Banks".~~

Recitals

A. River Valley ~~Federal~~ BK, Homer J. Holland, Howard R. Ross, and the Federal Savings and Loan Insurance Corporation (the "FSLIC") entered into an assistance agreement, dated July 29, 1988, in connection with the FSLIC-assisted acquisition of Galva Federal Savings and Loan Association, Galva, Illinois, Mutual Savings and Loan Association, Canton, Illinois, and Home Federal Savings and Loan Association, Peoria, Illinois (the "Home Agreement").

B. River Valley and the FSLIC entered into an assistance agreement, dated July 29, 1988, in connection with the FSLIC-assisted acquisition of Republic Savings, A Federal Savings and Loan Association, South Beloit, Illinois (the "Republic Agreement").

C. River Valley Federal and the FSLIC entered into an assistance agreement, dated December 31, 1988, in connection with the FSLIC-assisted acquisition of Peoria Savings and Loan


H&R-B58-00755
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0754

Association, Peoria, Illinois (the "Peoria Agreement"). The Home Agreement, the Republic Agreement, and the Peoria Agreement are referred to collectively herein as the "Assistance Agreements".

D. Section 11A(a)(1) of the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. § 1821a(a)(1) (Supp. I 1989), established a separate fund designated as the FSLIC Resolution Fund to be managed by the FDIC and separately maintained and not commingled. The FDIC in its capacity as manager of the FRF is referred to herein as the "Manager". Pursuant to section 11A(a)(2) of the FDI Act, except as provided in section 21A of the Federal Home Loan Bank Act, 12 U.S.C. § 1441a (Supp. I 1989), all assets and liabilities of the FSLIC on the day before the date of the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 were transferred to the FRF. The Assistance Agreements and the rights and obligations of the FSLIC thereunder were transferred to the FRF pursuant to section 11A(a)(2) of the FDI Act.

E. The parties hereto wish to provide for the early termination of the Assistance Agreements on the terms set forth below.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and, notwithstanding anything to the contrary under

the terms of the Assistance Agreements or any other related agreements, the parties hereby agree as follows:

Settlement Agreement

Section 1 Transactions to be Consummated at the Closing. The consummation of the transactions contemplated by this Settlement Agreement (hereinafter the "Closing") shall be effected as set forth below.

(a) River Valley Federal Cash Payment. At the Closing, in exchange for the performance by the Manager of its obligations under section 1(b) of this Settlement Agreement, River Valley shall pay to the Manager the sum of Fifty Thousand Dollars ($50,000) in lawful money of the United States of America (hereinafter the "River Valley Federal Cash Payment"). The River Valley Federal Cash Payment shall constitute full satisfaction of River Valley Federal's obligation to share tax benefits attributable to net operating losses under sections 3 and 7 of the Peoria Agreement and shall fully discharge River Valley Federal from any obligation or liability in connection therewith.

(b) FRF Cash Payment. At the Closing, subject to the conditions set forth in section 6 of this Settlement Agreement, and in exchange for the performance by River Valley Federal of its obligations under section 1(a) of this Settlement Agreement, the Manager shall pay to River Valley Federal the sum of Three Million, Two-Hundred Seventy-Six Thousand, Nine-Hundred Two Dollars and Ninety Cents ($3,276,902.90) in lawful money of the



H&R-B56-00757
Confidential Material -
Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0756

United States of America, by wire transfer of immediately available funds (hereinafter the "FRF Cash Payment"). River Valley Federal shall receive the FRF Cash Payment on behalf of each of the River Valley Banks and payment thereof by the Manager shall constitute a reimbursement to each of the River Valley Banks for purposes of section 2(a) of this Settlement Agreement. The parties hereto agree that the FRF Cash Payment shall constitute full satisfaction of any and all remaining payments or contributions due or to become due under the Assistance Agreements, and shall fully discharge the Manager and the FRF from any obligation or liability in connection therewith, including, without limitation, any obligation or liability with respect to (i) payments for capital losses, (ii) indemnifications for undisclosed liabilities, unreserved for claims, challenges to the transaction, and related claims, and (iii) claims for accrued but uncollected interest. In order to effectuate the River Valley Federal Cash Payment, the Manager may offset the amount of the FRF Cash Payment by the amount of the River Valley Federal Cash Payment ("Offset Amount"). Payment of the Offset Amount by the Manager shall constitute full satisfaction of River Valley Federal's obligations under section 1(a) of this Settlement Agreement.

Section 2 Tax Benefits.

(a) Relinquishment. In order to satisfy any and all obligations of the River Valley Banks to share tax benefits with

the FRF that are attributable to deductions for any loss or expense reimbursed or reimbursable by the FRF, pursuant to sections 3 and 9 of the Home Agreement and the Republic Agreement and sections 3 and 7 of the Peoria Agreement, each of the River Valley Banks hereby covenants and agrees that it shall not claim as a deduction on any federal or state tax returns any loss or expense for which it has been reimbursed, in whole or in part, by means of the FRF Cash Payment. Each of the River Valley Banks further covenants and agrees that it shall (1) reduce, for federal and state purposes, the tax basis of each asset that is a Covered Asset as defined in the Assistance Agreements, by amounts of the FRF Cash Payment stated in Exhibit II, (2) treat the reduction in basis, in its bad debt reserve, as a charge-off pursuant to Income Tax Regulation 1.166-2(d) or any amendment thereof, and (3) treat the FRF Cash Payment as a recovery of bad debts pursuant to Income Tax Regulation 1.593-7(c)(3) or any amendment thereof. It is agreed that the recovery of bad debts will neither adjust the tax basis of any asset nor create any asset. It is further agreed that such adjustment shall be reflected in the next federal and state tax returns filed by the River Valley Banks.

(b) Compliance.

(1) Each of the River Valley Banks hereby covenants and agrees that it shall cause the independent accounting firm that certifies its financial accounting

statements to certify annually, for a period of seven (7) years, in writing to the Manager, or any other agency of the federal government designated by the Manager, in such form and with such information as the Manager, or any other such designated agency may prescribe, that such bank has filed its federal and state tax returns in compliance with the requirements of this Settlement Agreement. In the event of any failure to make the foregoing certification as required, each of the River Valley Banks hereby covenants and agrees to pay the Manager penalties equivalent to those that could be imposed by the Internal Revenue Service (the "IRS") for failure to file federal tax returns as required pursuant to section 6651(a)(1) of the Internal Revenue Code of 1986 (the "IRC"), 26 U.S.C. § 6651(a)(1) (Supp. I 1989), or any amendments thereof. For purposes of assessing the penalties set forth in the preceding sentence, the amount of the River Valley Cash Payment shall be considered the amount of tax required to be shown on a return described in section 6651(a)(1) of the IRC.

(2) In order to assist the Manager or any other agency of the federal government designated by the Manager, in monitoring compliance with the requirements of Section 2 of this Settlement Agreement, each of the River Valley Banks hereby covenants and agrees that it shall provide the Manager, and any other agency of the federal government designated by the Manager, a copy of the federal and state tax returns, which reflect the adjustments described in Section 2(a) of this Settlement

Agreement, within 30 days after filing its federal and/or state tax returns. Each of the River Valley Banks further covenants and agrees that it shall provide the Manager, and any other agency of the federal government designated by the Manager, access to copies of its federal and state tax returns, amended tax returns, tax work papers, and other related documents for any tax year requested by the Manager or such other agency.

(3) Each of the River Valley Banks hereby covenants and agrees that, in the event that it claims any deduction that it has agreed to forego pursuant to section 2(a) of this Settlement Agreement, it shall pay to the Manager, or any other agency of the federal government designated by the Manager, an amount equivalent to the interest and penalties that could be imposed by the IRS if any tax benefits attributable to such deduction constituted an underpayment of federal taxes pursuant to sections 6601, 6621, 6622, and 6651(a)(3) of the IRC, 26 U.S.C. §§ 6601, 6621, 6622, and 6651(a)(3) (Supp. I 1989), or any amendments thereof.

Section 3 <u>Treatment of Special Reserve Account</u>. The River Valley Banks and the Manager hereby acknowledge and agree that the FRF Cash Payment includes amounts that otherwise would be debited to the respective Special Reserve Accounts of the Assistance Agreements (as defined therein) for the quarter ending July 31, 1991. The River Valley Banks and the Manager further agree that, if the Settlement Agreement is duly executed by all

H&R-B56-00761
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0760

parties on or before August 15, 1991, no debits shall be made to any of the respective Special Reserve Accounts of the Assistance Agreements for the quarter ending July 31, 1991, nor shall any quarterly reports for such quarter be submitted.

Section 4 Audit. Each of the River Valley Banks hereby agrees that, notwithstanding the termination of the Assistance Agreements pursuant to this Settlement Agreement, the Manager shall have the right to audit the River Valley Banks' books and records for 180 days after the Closing date hereunder and to make adjustments to (1) any amounts credited or debited to any of the respective Special Reserve Accounts of the Assistance Agreements and/or (2) any report, audit, or accounting document submitted pursuant to any of the Assistance Agreements, if it appears that such credit or debit or such report, audit, or accounting document is in error or has not been prepared in accordance with the accounting principles prescribed by the Assistance Agreements. Each of the River Valley Banks agrees to cooperate fully with the Manager in connection with any such audit. Upon expiration of the 180-day period described above, the River Valley Banks and the Manager agree to pay each other, as the case may be, any and all amounts that are determined to be due and owing as a result of the audit.

Section 5 Accord and Satisfaction. Except as otherwise specifically provided herein, performance by each party of its respective obligations under this Settlement Agreement shall

effect a complete accord and satisfaction of any and all obligations and liabilities of such party under the Assistance Agreements and, thenceforth, such party shall be fully discharged from any obligation or liability of any kind in connection therewith, including, without limitation, any and all actions, causes of action, suits, debts, sums of money, bonds, covenants, agreements, promises, damages, judgments, claims, and demands whatsoever, known or unknown, suspected or unsuspected, at law or in equity.

Section 6 Conditions. The obligations of the Manager under this Settlement Agreement are subject to the prior or contemporaneous satisfaction of each of the following conditions:

(a) Accuracy of Representations and Warranties; Performance. The representations and warranties of the River Valley Banks shall be true and correct on and as of the Closing date with the same effect as if made on and as of the Closing date and the River Valley Banks shall have performed or complied with all covenants, agreements, and conditions herein that they are required to perform or comply with on or prior to the Closing date.

(b) Certified Resolutions. The Manager shall have received a certificate from each of the River Valley Banks, signed by its respective corporate secretary and dated as of the Closing date, which shall certify that (1) its board of directors has duly adopted resolutions, copies of which shall be attached

to such certificate, (i) approving this Settlement Agreement and authorizing the consummation of the transactions contemplated herein and (ii) authorizing one or more of its officers to execute and deliver this Settlement Agreement; (2) all of such resolutions are in full force and effect; and (3) none of such resolutions has been amended or modified.

(c) Incumbency Certificate. The Manager shall have received a certificate from each of the River Valley Banks, signed by its respective corporate secretary and dated as of the Closing date, which shall certify as to each person executing this Settlement Agreement on its behalf that such person is an officer of such bank holding the office or offices specified therein and that the signature of each such person set forth on such certificate is his or her genuine signature.

(d) Legal Opinion. The Manager shall have received a signed opinion addressed to the Manager from the law firm of Holleb & Coff, Chicago, Illinois, dated the Closing date and substantially in the form of Exhibit A hereto, with such changes as the FDIC's Legal Division ("Legal Division") may approve.

(e) Proceedings. All corporate and other proceedings taken in connection with the transactions contemplated by this Settlement Agreement, and all documents incident thereto, including, without limitation, all documents referred to in section 6 of this Settlement Agreement, shall be satisfactory in form and substance to the Manager and the Legal Division, and the

H&R-B56-00764
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0763

Manager shall have received such counterpart originals or certified or other copies of such documents as the Manager may request.

(f) Approvals and Consents. The Manager shall have received satisfactory evidence that any and all governmental approvals or other third party consents have been given that may be required in connection with the execution, delivery, and performance of this Settlement Agreement by the River Valley Banks.

Section 7.1 Representations and Warranties of the River Valley Banks. To induce the Manager to enter into this Settlement Agreement and to consummate the transactions contemplated herein, each of the River Valley Banks makes the following representations and warranties to the Manager, all of which shall survive the execution and delivery of this Settlement Agreement and the consummation of such transactions:


Confidential Material - Subject to Protective Order

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0764

(a) Corporate Existence.

(1) With respect to River Valley Federal, such bank is a stock savings bank duly organized, chartered, validly existing, and in good standing under the laws of the United States and has full power and authority to own and operate its properties and conduct its business as now conducted by it.

(2) With respect to River Valley, such bank is a stock savings bank duly organized, chartered, validly existing, and in good standing under the laws of the State of Illinois and has full power and authority to own and operate its properties and conduct its business as now conducted by it.

(b) Due Authorization. Such bank has full power and authority to execute and deliver this Settlement Agreement, and to perform its obligations hereunder, and it has taken all necessary action to authorize the execution, delivery, and performance of this Settlement Agreement.

(c) Binding Agreement. This Settlement Agreement has been duly executed and delivered by such bank, and, assuming due authorization, execution, and delivery by the other parties hereto, this Settlement Agreement is a legal, valid, and binding obligation of such bank, enforceable against such bank in accordance with its terms.

(d) Compliance with Law.

(1) Such bank is not, and its subsidiaries are not, in violation of any statute, regulation, order, decision,

judgment, or decree of, or any restriction imposed by, the United States of America, any state, municipality, or other political subdivision, or any agency of the foregoing, or any court or other competent tribunal having jurisdiction over such bank or its subsidiaries or any of their assets, or any foreign government or agency thereof having jurisdiction over such bank or its subsidiaries or any of their assets, or any securities exchange or securities quotation system on which such bank's or any of its subsidiaries' securities are listed or quoted, in respect of the conduct of their business or the ownership of their properties, which violation, either individually or in the aggregate with all such other violations, would materially and adversely affect such bank's ability to observe or perform the terms of this Settlement Agreement.

(2) The execution, delivery, and performance by such bank of this Settlement Agreement will not violate or conflict with any provision of any applicable law or regulation, or any order, writ, judgment, or decree of any court or governmental authority.

(e) Compliance with Obligations.

(1) Such bank is not, and its subsidiaries are not, in violation or breach of or in default under any obligation, agreement, covenant, or condition contained in its articles of association or organization or bylaws or charter, and such bank is not, and its subsidiaries are not, in violation or



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0766

breach of or in default under any contract, lease or other instrument to which such bank or any of its subsidiaries is a party (or that is binding on it or any of its subsidiaries or on its assets or the assets of any of its subsidiaries), which violation, breach, or default, either individually or in the aggregate with all such other violations, breaches, and defaults, would affect materially and adversely such bank's ability to observe or perform the terms of this Settlement Agreement.

(2) The execution, delivery, and performance by such bank of this Settlement Agreement does not and will not (i) violate or conflict with any provision of the articles of association or organization, charter, or bylaws of such bank, (ii) result in a violation, breach of, or default under any contract, lease, or other instrument to which such bank is a party (or that is binding on it or any of its assets), or (iii) result in, or require the creation of, any lien on or security interest in any asset of such bank other than in favor of the Manager.

(f) Approvals and Consents. All governmental approvals and other third party consents (including, without limitation, licenses, registrations, or declarations) that are required in connection with the execution, delivery, or performance of this Settlement Agreement by such bank, if any, have been obtained.

OTS?

(g) Litigation. There is no legal action, suit, investigation, or proceeding (whether or not such bank is a party thereto) pending or threatened against or affecting such bank or any of its subsidiaries or their assets that either questions the validity of this Settlement Agreement or any of the transactions contemplated herein, or that would be reasonably expected, either individually or in the aggregate with all such other actions, suits, investigations, or proceedings, to affect materially and adversely such bank's ability to perform, satisfy, or observe any obligation or condition under this Settlement Agreement.

Section 7.2 Representations and Warranties of the Manager. To induce the other parties hereto to enter into this Settlement Agreement and to consummate the transactions contemplated herein, the Manager hereby makes the following representations and warranties to such parties, all of which shall survive the execution and delivery of this Settlement Agreement and the consummation of such transactions:

(a) Power and Authorization. The execution, delivery, and performance of this Settlement Agreement are within the legal power and authority of the Manager, and have been duly authorized by all necessary action on the part of the Manager.

(b) Binding Agreement. This Settlement Agreement has been duly executed and delivered by the Manager, and assuming due authorization, execution, and delivery by the other parties hereto, this Settlement Agreement is a legal, valid, and binding

H&R-B56-00769
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0768

obligation of the Manager and the FRF and is enforceable against the Manager and the FRF in accordance with its terms.

Section 8 Miscellaneous.

(a) Amendments. No amendment, modification, or waiver of any provision of this Settlement Agreement, nor any consent to any departure therefrom by any party hereto, shall in any event be effective unless the same shall be embodied in a writing signed by all parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

(b) Notices. Any notice, request, claim, demand, consent, approval, or other communication to any party hereto shall be deemed effective when received and shall be given in writing and delivered in person against receipt therefor, or sent by certified mail, postage prepaid, to such party (with copies as indicated below) at its address set forth below or at such other address as such party shall hereafter furnish in writing to the other parties.

(1) If to the River Valley Banks, Homer J. Holland, or Howard R. Ross:

River Valley Saving Bank, F.S.B.
c/o Holland Partners
200 Wacker Drive
Chicago, Illinois 60606
Attention: Homer J. Holland

H&R-856-00770
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0769

With a copy to:

Holleb & Coff
55 East Monroe Street
Suite 4100
Chicago Illinois 60603
Attention: Mark S. Kipnis, Esq.

(2) If to the Manager:

Resolution Trust Corporation
Division of FSLIC Operations
801 17th Street, N.W.
Washington, D.C. 20006
Attention: Associate Director

(c) Waiver. No failure or delay on the part of any party hereto in exercising any right, privilege, power, or remedy under this Settlement Agreement and no course of dealing among the parties shall operate as a waiver of such right, privilege, power, or remedy; nor shall any single or partial exercise of any right, privilege, power, or remedy under this Settlement Agreement preclude any other or further exercise of any other right, privilege, power, or remedy. The rights, privileges, powers, and remedies available to the parties hereto are cumulative and not exclusive of any other rights, privileges, powers, or remedies provided by statute, at law, in equity, or otherwise. No notice to or demand on any party hereto shall entitle such party to any other or further notice or demand in any similar or other circumstances or constitute a waiver of the right of the party giving such notice or making such demand to

take any other or further action in any circumstances without notice or demand.

(d) Governing Law. This Settlement Agreement shall be governed by and construed in accordance with the federal law of the United States of America and, in the absence of controlling federal law, in accordance with the laws of the State of Illinois.

(e) Inseverability. Whenever possible, each provision of this Settlement Agreement shall be interpreted in such a manner as to be effective and valid under all applicable laws. However, in the event that any provision of this Settlement Agreement shall be held to be prohibited or invalid under any applicable law, or declared unenforceable, then this Settlement Agreement shall be voidable at the option of the Manager.

(f) Successors and Assigns. This Settlement Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that, except as otherwise expressly provided in this Settlement Agreement, the parties hereto and their respective successors and assigns may not assign or transfer any of their rights, privileges, or powers under this Settlement Agreement, or delegate any of their duties or obligations hereunder, without the mutual written consent of all of the parties or their successors or assigns.

(g) Headings. The headings contained in this Settlement Agreement are for convenience only and shall not affect the construction of any provision of this Settlement Agreement.

(h) Entire Agreement. This Settlement Agreement embodies the entire Settlement Agreement among the parties hereto with respect to the subject matters herein and supersedes all prior agreements and understandings among the parties, oral or written, concerning such matters.

(i) Exhibits. All Exhibits attached hereto are an integral part of and are hereby incorporated in this Settlement Agreement.

(j) Specific Performance. Each party's obligations under this Settlement Agreement are unique. If any party should default in any of its obligations under this Settlement Agreement, the parties hereto each acknowledge that it would be extremely impracticable to measure the resulting damages. Accordingly, the non-defaulting parties, in addition to any other available rights or remedies, may sue in equity for specific performance, and each party expressly waives the defense that a remedy in damages will be adequate.

(k) Third Party Beneficiaries. Except as expressly provided in this Settlement Agreement, no provision of this Settlement Agreement is intended to benefit any persons other than the parties hereto.

H&R-B56-00773
Confidential Material -
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0772

(l) Further Assurances. Each party shall execute and deliver to each other party such other and further instruments and shall take such corporate action, obtain such approvals, and take such other and further actions as any of the other parties hereto may reasonably request to effectuate the transactions contemplated by this Settlement Agreement.

(m) Execution in Counterparts. This Settlement Agreement may be executed in separate counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which taken together shall constitute one and the same agreement.

(n) Costs and Expenses. Except to the extent otherwise specifically provided herein, each party hereto agrees to pay all costs and expenses incurred by it in connection with or incidental to the matters contained in this Settlement Agreement, including, without limitation, any fees and disbursements to attorneys, accountants, and investment banking consultants.

(o) Termination. If the transactions contemplated by this Settlement Agreement have not been consummated by 11:59 p.m. E.D.T., on August 15, 1991, this Settlement Agreement shall terminate, unless an extension of this Settlement Agreement is mutually agreed upon by the parties hereto. Termination of this Settlement Agreement shall not affect any claim or liability of

any party with respect to any breach of this Settlement Agreement, regardless of when discovered.

IN WITNESS WHEREOF, the parties have caused this Settlement Agreement to be duly executed by themselves or their respective officers, as the case may be, as of the day and year first above written.

HOMER J. HOLLAND

______________________

RIVER VALLEY SAVINGS BANK, F.S.B., Peoria, Illinois

By: ______________________

Name: ______________________

Title: ______________________

HOWARD R. ROSS

______________________

RIVER VALLEY SAVINGS BANK, Rock Falls, Illinois

By: ______________________

Name: ______________________

Title: ______________________

Concurrence:

RESOLUTION TRUST CORPORATION

By: ______________________

Name: ______________________

Title: ______________________

FEDERAL DEPOSIT INSURANCE CORPORATION in its capacity as Manager of the FSLIC RESOLUTION FUND

By: ______________________

Name: ______________________

Title: ______________________



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0774

# EXHIBIT F

# HOLLEB & COFF
ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900
TELECOPIER (312) 807-3971
WRITER'S DIRECT DIAL (312)________



LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MORRIS I. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM J. GOLDBERG
IRA GOULD
DAVID I. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
MARK D. OLSON
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT R. STIGGER
TOM WECHTER
JEROME B. WEXLER
EDWARD E. YALOWITZ
DAVID E. ADELSON
LYNNE M. BAKER
MICHAEL A. BERMAN
RICHARD G. BERNET
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
PETER A. DAUZVARDIS
DENISE A. DeLAURENT
BRUCE DOPKE
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
JAMES C. HAFT
MICHAEL D. HAYES
KRISTOPHER S. HESTON
KIRK A. HOOPINGARNER
AARON C. HOROWITZ
REBECCA L. KENT
DANIEL L. KRAUS
JAMES W. MARKS
ALVIN K. MARR
STUART N. RAPPAPORT
SUSAN A. RICHMAN
GREGORY G. SCHULER
KENNETH L. SEROTA
KATHRYN BABCOCK SHAFFER
MICHAEL J. SILVERMAN
JANET L. SMERLING
PAUL A. SMITH
KATHLEEN C. SPEARS
GENE S. STERN
GREGG E. SZILAGYI
MARK H. VAN DE VOORDE
SUSAN E. WARD
ROBERT S. WEIRT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSHANCER
MARTIN H. REDISH*
*ADMITTED IN NEW YORK ONLY


August 13, 1991

VIA TELECOPY

Charles A. Fulton, Esq.
Counsel
Federal Deposit Insurance Corporation
Washington, D.C. 20429

RE: River Valley Savings Bank, FSB
Settlement Agreement

Dear Mr. Fulton:

Enclosed are drafts of the following:

1. River Valley Savings Bank, FSB Certified Resolutions;

2. River Valley Savings Bank, FSB Certificate of Incumbency; and

3. Holleb & Coff Opinion Letter.

Please feel free to give me a call if you have any questions or comments.

Very truly yours,

Mark S. Kipnis

Mark S. Kipnis

MSK:rf
Enclosure

Confidential Material —
Subject to Protective Order

H&R-B39-00680

DEFENDANT'S EXHIBIT
DX 588
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

CERTIFICATE

I, Mark S. Kipnis, Secretary of RIVER VALLEY SAVINGS BANK, F.S.B. ("FSB"), do hereby certify that the Executive Committee of the Board of Directors of FSB has duly adopted the following resolutions at its August 14, 1991 meeting, all of which resolutions are in full force and effect and none of such resolutions have been altered, amended or modified:

WHEREAS, FSB and the Federal Deposit Insurance Corporation, in its capacity as manager of the FSLIC Resolution Fund, have negotiated an early termination of the two (2) July 29, 1988 Assistance Agreements and the December 31, 1988 Assistance Agreement (collectively, the "Assistance Agreements") under which FSB has been operating, all pursuant to the terms and conditions more fully set forth in that certain Settlement Agreement presented to the Executive Committee for its approval;

NOW, THEREFORE, BE IT RESOLVED, that the Settlement Agreement substantially in the form presented to the Executive Committee and the consummation of the transactions contemplated therein be and hereby is ratified and approved;

FURTHER RESOLVED, that each of the Chairman of the Board, Chairman of the Executive Committee, Chief Executive Officer or Secretary, acting alone, be and hereby is authorized and directed to execute such Settlement Agreement, including any changes as the officer executing the same may determine with advice of counsel, and such other agreements as may be necessary or desirable to consummate the transactions contemplated therein;

FURTHER RESOLVED, that each of the Chairman of the Board, the Chairman of the Executive Committee, the Chief Executive Officer or the Secretary, acting alone, be and hereby is authorized and directed to take any and all actions, do any and all things and to execute and deliver any and all instruments, contracts, agreements, certificates, forms and documents of any kind as may be necessary, convenient, desirable or proper for the carrying out of the transactions contemplated by the foregoing resolutions.

IN WITNESS WHEREOF, I have signed this Certificate on behalf



Confidential Material — Subject to Protective Order

of FSB on this _____ day of August, 1991.

Mark S. Kipnis, Secretary
RIVER VALLEY SAVINGS BANK, FSB

Confidential Material —
Subject to Protective Order

H&R-B39-00682

CERTIFICATE OF INCUMBENCY

I, Mark S. Kipnis, Secretary of RIVER VALLEY SAVINGS BANK, F.S.B. ("FSB"), do hereby certify that the below named persons are the duly elected and acting officers of FSB holding the respective offices set opposite their names, and the signatures below set opposite their names are their genuine signatures.

| Name | Office | Specimen Signature |
|---|---|---|
| Howard R. Ross | Chairman of the Board | ____________ |
| Homer J. Holland | Chairman of the Executive Committee | ____________ |
| Steven Bangert | Chief Executive Officer | ____________ |

IN WITNESS WHEREOF, I have signed this Certificate on behalf of FSB on this ____ day of August, 1991.

______________________
Mark S. Kipnis, Secretary
RIVER VALLEY SAVINGS BANK, FSB

Confidential Material — Subject to Protective Order

H&R-B39-00683

# HOLLEB & COFF

ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900
TELECOPIER (312) 807-3971
WRITER'S DIRECT DIAL (312)________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL Y. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
DAVID L. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NIEMAN
MARK D. OLSON
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME R. WEXLER
EDWARD R. YALOWITZ
DAVID E. ADELSON
LYNNE M. BAKER
MICHAEL A. BERMAN
RICHARD G. BERNET
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
PETER A. DAUZVARDIS
DENISE A. DeLAURENT
BRUCE DOPKE
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
JAMES G. HAFT
MICHAEL D. HAYES
KRISTOPHER S. HESTON
KIRK A. HOOPINGARNER
AARON C. HOROWITZ
REBECCA L. KENT
DANIEL L. KRAUS
JAMES W. MARKS
ALVIN K. MARR
STUART N. RAPPAPORT
SUSAN A. RICHMAN
GREGORY G. SCHULER
KENNETH L. SEROTA
KATHRYN BABCOCK SHAFFER
MICHAEL J. SILVERMAN
JANET L. SMERLING
PAUL A. SMITH
KATHLEEN C. SPEARS
GENE S. STERN
GREGG E. SZILAGYI
MARK H. VAN DE VOORDE
SUSAN K. WARD
ROBERT S. WEST
THOMAS F. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH*
*ADMITTED IN NEW YORK ONLY

August ____, 1991

Resolution Trust Corporation
3000 K Street, N.W.
Washington, D.C. 20429

Gentlemen:

We have acted as counsel to River Valley Savings Bank, F.S.B., Peoria, Illinois ("River Valley") in connection with the Settlement Agreement dated August ____, 1991 (the "Agreement"), among River Valley, Homer J. Holland, Howard R. Ross, and the Federal Deposit Insurance Corporation, in its capacity as manager of the FSLIC Resolution Fund (the "Manager"). All capitalized terms used herein without definition have the respective meanings specified in the Agreement. This opinion is being delivered to you on the Closing date pursuant to Section 6(d) of the Agreement and is effective as of the date of the Agreement.

In connection with this opinion, we have examined and relied upon the originals or copies (certified or otherwise identified to our satisfaction) of such records, documents, certificates and other instruments, and have made such other investigations as we have deemed necessary to enable us to render the opinions set forth herein. In such examination we have assumed, without independent verification, the genuineness of all signatures, the authenticity of all documents submitted to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to all questions of fact material to the opinions set forth herein, we have relied, without independent verification, upon the representations and warranties set forth in the Agreement, upon the information set forth in the records and documents referred to hereinabove and upon statements and certificates of public officials and officers and other representatives of River Valley.

Confidential Material —
Subject to Protective Order

H&R-B39-00684

HOLLEB & COFF
ATTORNEYS AT LAW



Based upon the foregoing, and having regard to the legal considerations which we deem relevant, we are of the opinion that, as to River Valley:

1. Such bank is a stock savings bank duly organized, chartered, validly existing, and in good standing under the laws of the United States and has full power and authority to own and operate its properties and conduct its business as now conducted by it.

2. Such bank has full power and authority to execute and deliver the Agreement, and to perform its obligations thereunder, and it has taken all necessary action to authorize the execution, delivery, and performance of the Agreement.

3. The Agreement has been duly executed and delivered by such bank, and, assuming due authorization, execution, and delivery by the other parties thereto, the Agreement is a legal, valid, and binding obligation of such bank, enforceable against such bank in accordance with its terms.

4. The exection, delivery, and performance by such bank of the Agreement will not violate or conflict with any provision of any applicable law or regulation, or any order, writ, judgment, or decree of any court or governmental authority.

5. The execution, delivery, and performance by such bank of the Agreement does not and will not (i) violate or conflict with any provision of the articles of association or organization, charter, or bylaws of such bank, (ii) result in a violation, breach of, or default under any contract, lease or other instrument to which such bank is a party (or that is binding on it or any of its assets), or (iii) result in, or require the creation of, any lien on or security interest in any asset of such bank other than in favor of the Manager.

6. All governmental approvals and other third party consents (including, without limitation, licenses, registrations, or declarations) that are required in connection with the execution, delivery, or performance of the Agreement by such bank, if any, have been obtained.

7. There is no legal action, suit, investigation, or proceeding (whether or not such bank is a party thereto) pending or to our knowledge threatened against or affecting such bank or any of its subsidiaries or their assets that either questions the validity of the Agreement or any of the transactions contemplated

Confidential Material —
Subject to Protective Order 

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER 

HOLLEB & COFF
ATTORNEYS AT LAW



therein, or that would be reasonably expected, either individually or in the aggregate with all such other actions, suits, investigations, or proceedings, to affect materially and adversely such bank's ability to perform, satisfy, or observe any obligation or condition under the Agreement.

Our opinions expressed in paragraph 3 above are qualified to the extent that the enforceability of the Agreement is subject to the effect of any applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, or other similar law relating to or affecting creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Our opinions expressed herein are limited solely to the laws of the United States of America and the State of Illinois, and no opinion is expressed herein as to matters governed by the laws of any other jurisdiction.

Our opinions expressed herein are furnished to you solely in satisfaction of Section 6(d) of the Agreement and are not to be considered or relied upon by any other governmental agency or any other person or entity.

Very truly yours,

HOLLEB & COFF

BY:________________________________

Confidential Material —
Subject to Protective Order



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER L PHO049 0709

# EXHIBIT G

HOLLEB & COFF
ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900
TELECOPIER (312) 807-3971
WRITER'S DIRECT DIAL (312)________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
DAVID L. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG

ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
MARK D. OLSON
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD B. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ

DAVID E. ADELSON
LYNNE M. BAKER
MICHAEL A. BERMAN
RICHARD G. BERNET
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
PETER A. DAUZVARDIS
DENISE A. DeLAURENT
BRUCE DOPKE
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
JAMES G. HAFT
MICHAEL D. HAYES
KRISTOPHER S. HESTON
KIRK A. HOOPINGARNER
AARON C. HOROWITZ
REBECCA L. KENT
DANIEL L. KRAUS
JAMES W. MARKS
ALVIN K. MAER
STUART N. RAPPAPORT
SUSAN A. RICHMAN

GREGORY G. SCHULER
KENNETH L. SEROTA
KATHRYN BABCOCK SHAFFER
MICHAEL J. SILVERMAN
JANET L. SMERLING
PAUL A. SMITH
KATHLEEN C. SPEARS
GENE S. STERN
GREGG E. SZILAGYI
MARK H. VAN DE VOORDE
SUSAN K. WARD
ROBERT E. WERT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH*
*ADMITTED IN NEW YORK ONLY

August 14, 1991

VIA FEDERAL EXPRESS

Charles A. Fulton, Esq.
Federal Deposit Insurance Corp.
1717 H Street, N.W.
10th Floor, Room #10069
Washington, D.C. 20006

Re: River Valley Savings Bank, F.S.B. Settlement Agreement

Dear Chuck:

Enclosed please find the following executed documents:

1. Settlement Agreement, in duplicate;
2. Certificate of Incumbancy;
3. Certificate;
4. Holleb & Coff Opinion.

Please return one fully executed conterpart of the Settlement Agreement to me at your earliest convenience.

Please also call to confirm that $3,226,902.90 has been wired transferred to the account of River Valley Savings Bank, F.S.B. The wire transfer instructions are:

River Valley Savings Bank, F.S.B.
ABA No. 27173083 Attention: Nadine
(The account number is the same as the ABA number)

Confidential Material —
Subject to Protective Order

H&R-B39-00678

HOLLEB & COFF
ATTORNEYS AT LAW

Charles A. Fulton, Esq.
August 14, 1991
Page -2-

If you have any questions, please feel free to give me a call.

Very truly yours,

Mark S. Kipnis

MSK/jm
Enclosure

cc: Homer J. Holland, w/enclosure

Confidential Material —
Subject to Protective Order

H&R-B39-00679

# EXHIBIT H

**Holland & Ross v. U.S No. 95-524C September 6, 2007**

**Heritage Reporting Corporation**

**Page 1 to Page 107**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND, )
STEVEN BANGERT, CO-EXECUTOR )
OF THE ESTATE OF HOWARD R. )
ROSS, AND FIRST BANK, )
Plaintiffs, )
)
v. ) Docket No.: 95-524C
UNITED STATES, )
Defendant. )

Courtroom 6, Room 507
National Courts Building
717 Madison Place NW
Washington, D.C.
Thursday,
September 6, 2007

The parties met, pursuant to notice of the Court, at 9:00 a.m.

BEFORE: HONORABLE GEORGE W. MILLER
Judge

APPEARANCES:
For the Plaintiffs:
DAVID B. BERGMAN, Esquire
MICHAEL A. JOHNSON, Esquire
HOWARD N. CAYNE, Esquire
Arnold & Porter, LLP
555 - 12th Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474 / 942-5783

Page 2

APPEARANCES: (Cont'd)
For the Defendant:
JOHN H. ROBERSON, Esquire
JOHN J. TODER, Esquire
AMANDA L. TANTUM, Esquire
BRIAN A. MIZOGUCHI, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-7972

Page 3

P R O C E E D I N G S

(9:00 a.m.)

THE CLERK: All rise. Oyez, oyez, oyez. The United States Court of Federal Claims is now in session, the Honorable George W. Miller presiding. All persons having business before the Court, draw nigh and you shall be heard. God save the United States, and God save this Honorable Court.

THE COURT: Please be seated. We are here for a preliminary status conference in the case of Homer J. Holland and Steven Bangert, Co-Executor of the Estate of Howard R. Ross; and First Bank v. The United States, Docket No. 95-524C. Would counsel please identify themselves for the record?

MR. BERGMAN: Good morning, Your Honor.

THE COURT: Good morning.

MR. BERGMAN: David Bergman from Arnold & Porter for Plaintiffs. With me are Michael Johnson and Howard Cayne.

THE COURT: Thank you, gentlemen. Welcome.

MR. ROBERSON: Good morning, Your Honor. John Roberson from the Department of Justice.

MR. MIZOGUCHI: Brian Mizoguchi, Your Honor.

MS. TANTUM: Amanda Tantum, Your Honor.

MR. TODER: And John Toder.

Page 4

THE COURT: Welcome, welcome. I thought the first order of business might properly be the draft order governing what I would describe as logistical matters in preparation for the trial. That order is dated August 14, and the Court invited the parties to comment and suggest any changes or additions that they thought were appropriate. So, at this time, I would welcome discussion of that August 14 draft. Mr. Bergman?

MR. BERGMAN: Your Honor?

THE COURT: Can I make a suggestion? It might be better for getting the transcript if you would remain seated or speak at the podium, either one. Which is more comfortable for you?

MR. BERGMAN: Thank you, Your Honor. I don't have a lot to say, so I'll just stay in place. All of the procedures are acceptable and sensible from our perspective. The one addition or clarification I would seek is it's my understanding that the Plaintiffs and Defendant would have an equivalent amount of time during the trial. I want to make sure that that understanding is correct.

THE COURT: Well, that is one of the issues which actually I think we deferred until this morning. I guess my initial reaction was that the case was

Page 5

sufficiently focused that we really didn't need to impose specific time limits on each side, and therefore, the draft does not contain a time limit, but I'm open to suggestion on that.

MR. BERGMAN: Your Honor, I would urge not so much a time limit perhaps, although it would be easy to come up with an outer bound based on the number of hours per day and extend it out. My expectation is that the trial will finish before January 18. So that kind of outer limit maybe isn't very meaningful.

What I would suggest, though, is that we keep track of the time that each side devotes to examination. We've done this in several of the cases. I don't know if Your Honor has followed this procedure in the past, but in several of our Winstar-related cases, and I know the Department of Justice has participated obviously in this and it's worked well, either the Court's clerk or the parties have kept track of the time that's been devoted, and it has been agreed that it would be an equal amount.

So, for example, if we can finish our case in 60 hours, that would be the outer bound on the government's time. If it's 40 hours, 40 hours. That strikes me as fair anyway, Your Honor. I can't

Page 6

envision the scenario whereby, and the Plaintiffs have the burden of proof, the Defendant should get more time than Plaintiffs. I worry that if we don't have any bounds, we'll for sure be here on January 18, which I don't think is the most efficient way to try the case.

THE COURT: Okay. Mr. Roberson, what's your thought?

MR. ROBERSON: Your Honor, I have a few issues, but with respect to the last one –

THE COURT: Yes. Let's talk about that one first.

MR. ROBERSON: – I don't mind having equal amounts of time. My caution would be that there needs to be a certain minimum to that. In other words, if the Plaintiffs put Homer Holland on and he can do his case in three days, we shouldn't be limited to a three-day defense. I think actually from their point of view since he is going to be their fact witness and their expert for almost all of their claims that they are going to be able to present a much more focused claim.

From our perspective, for instance, if we're going to talk about the OTS exam on one year and the FDIC exam the next year, there's two witnesses getting

Page 7

involved right there. So we don't have as much overlap with the entire fact pattern. We have regulators that are only involved in, for instance, the deal getting done, and that would be applicable to some of the issues with respect to possible transfer of goodwill to third parties, to First Bank, where they calculate damages.

So I think the principle is okay in principle, but I want to make sure that there is a certain amount of a floor there that we have at least X amount of hours, and if it's a four-week trial, then let's say at least two weeks of that available. So if they want to put their case on in one week, that shouldn't preclude us from putting on a two-week case.

THE COURT: Let me make a suggestion. Would it make sense to remit this at least initially to discussions among counsel, with a view toward hopefully counsel coming into agreement on the appropriate time limit that we would set? Mr. Roberson?

MR. ROBERSON: I think that discussions are always beneficial, Your Honor. I think that may be wise. Maybe they have an Idea now of how long they think their case is going to take, so that may be part of it.

Page 8

THE COURT: Well, why don't you two gentlemen or your colleagues spend some time on this subject and let the Court know say by Monday of next week if that wouldn't be too rushed what your position, hopefully agreed position, would be.

MR. ROBERSON: Your Honor, could we move that? I don't think it's going to be critical at this stage.

THE COURT: No.

MR. ROBERSON: I have obligations. I know all of us have the obligations on Tuesday to file our App A order and have our exchange, so if we could do that on Wednesday, that might be a better day.

THE COURT: Okay. Well, why don't we say that the parties will advise the Court say by 5 p.m. on Wednesday whether they are able to reach agreement on this subject, and if they are not, let us know what the proposals of each side are and maybe a brief statement of the reasons for each party's position if the parties are not able to reach agreement. But I would hope that on something like this, they would be able to reach agreement. Is that satisfactory, Mr. Bergman?

MR. BERGMAN: Yes. Thank you, Your Honor.

THE COURT: Okay. Now, Mr. Roberson, you

Page 9

said you had some additional matters you wanted to talk about.

MR. ROBERSON: Correct. With respect to paragraph 5 on your pretrial order –

THE COURT: Yes.

MR. ROBERSON: – there is the notion that each trial exhibit would be separately and consecutively numbered, and I think that all of the documents, as you know, are Bates-stamped in consecutive fashion now, and for us to have to go back and re-Bates them would be quite burdensome. I think that where the problems come up in my experience in these trials is where sometimes there are composite documents where somebody has got a letter enclosing another letter enclosing something else, and you suddenly have one exhibit that has a different page 1 and 2 on the first two pages and then again page 1 and 2 on the next two pages. So my suggestion would be that where there are composite exhibits that then the parties consecutively number separately from the Bates numbers that are already existent.

THE COURT: What is a "composite document" in that context?

MR. ROBERSON: Well, for instance, a letter

Page 10

from the OTS to the bank where they are enclosing a separate document. It might be an analysis, and the analysis has a separate –

THE COURT: Enclosure, you mean?

MR. ROBERSON: – yes, enclosures, those sort of things. Occasionally you see some documents that are board minutes where there might be a series of documents that have separate numbers within them that can sometimes be misleading.

THE COURT: Together they form a package and would be offered en masse, so to speak.

MR. ROBERSON: Correct, correct.

THE COURT: Mr. Bergman, what's your thought?

MR. BERGMAN: Your Honor, we're happy to do whatever is easiest for the Court. I agree with Mr. Roberson that there is a burden to going back and restamping each of the documents in the way that the Court –

THE COURT: Well, then why don't we accept Mr. Roberson's suggestion that we limit that requirement to so-called "composite documents".

MR. BERGMAN: Thank you, Your Honor. That's terrific.

THE COURT: Mr. Roberson, what else?

Page 11

MR. ROBERSON: The paragraph 10 for the opening argument –

THE COURT: Yes.

MR. ROBERSON: – the Court has allotted 30 minutes. I do think that this case is complex enough. I think we're going to find that when we get into the expert analyses, it is quite complex, and I think that in 30 minutes, the most we can do, if we're going to talk anything about the facts at all, we're going to simply at the highest level possible allude to the potential issues, and I don't think it would be as informative as if we stretch that out. My suggestion would be an hour would make a huge difference. Between 30 minutes and an hour I don't think would be much of a burden on the Court, but an hour would give us a little bit of time at least on each one of these separate issues to get a little bit more detail and inform the Court about the potential issues.

THE COURT: Mr. Bergman, what do you think about an hour for an opening statement?

MR. BERGMAN: I don't strongly oppose it, but I don't think it's necessary either. The Court is going to hear the evidence come in through the witnesses, and the Court seems quite educated in the

Page 12

case at this point.

THE COURT: I guess my inclination would be that if Mr. Roberson wants to give an opening statement of an hour rather than a half-hour, I'm inclined to permit him to do so, and obviously the Plaintiffs would have an hour for opening statement and rebuttal, if any.

MR. BERGMAN: Thank you.

THE COURT: Mr. Roberson?

MR. ROBERSON: My only other comment about the pretrial, and I know the dates have been set for some time now, but I just want to alert the Court to the fact that December 21 is the Friday before the Christmas holiday, which is on the Tuesday. And not for my purpose, but I think most of these witnesses will be traveling. I don't think there are very many witnesses that are going to be local. So that Friday before Christmas is going to be a very tight travel day, and as the Court is aware, particularly as you're late into a trial, schedules are going to be changing. Just as a matter of convenience to the witnesses, if we either don't have trial on the 21st or cut off at noon, something that gives somebody, if they lose a flight, if there is a delay or something, they are actually able to get home

Page 13

for the holidays. I think if you miss a flight the Friday before Christmas, you may be stuck in D.C. for some time.
THE COURT: Why don't we see where we are as we get closer to December 21. I am very sympathetic to the point you raise, and it would seem to me that depending upon where we are in the trial, we might naturally have a break at around that time, and we could decide then exactly how to deal with the situation that you describe.
But I think the idea, for example, of stopping at noon on that Friday would make eminent good sense, and we might even depending on sort of where we are in the trial decide that we wanted to wrap up on Thursday and leave Friday open for people to return presumably to their homes and so forth.
Mr. Bergman, what do you think about that?
MR. BERGMAN: Sounds good, Your Honor.
THE COURT: Okay. Now the Court has also given some thought to revisions or actually I think additions to the preliminary pretrial order or the order dealing with logistics, and there are at least two items that I think we should consider in that regard.
The first, and I'm simply going to read this

Page 14

to you, but it relates to a mode of keeping track of exhibits and through whom they were introduced and whether they were admitted or not or perhaps admitted in part or some other disposition, and that language would be substantially as follows: "The parties shall provide to the Court at the outset of the trial two copies of a list containing the following three columns: (1) the identifying number for each exhibit; (2) a blank space for the Court to enter the name of the witness through whom the exhibit is sought to be admitted; and (3) a blank space for the Court to enter the disposition of any requests to admit that exhibit."
Obviously that shifts to the parties a burden which the Court has on earlier occasions assumed itself, and obviously we would be prepared to do that if necessary, but this would be a help to the Court. Any thoughts, gentlemen?
MR. ROBERSON: I think that's easily done by our part and entirely reasonable, Your Honor.
THE COURT: Mr. Bergman?
MR. BERGMAN: The same here, Your Honor. That's fine.
THE COURT: All right. Good. We'll make that addition. Bear with me just a second here.

Page 15

One of the matters which our draft deals with, and it's in our paragraph 4, is the matter of number of copies of documentary exhibits and how they should be dealt with. And upon reflection, I think a somewhat different provision would make sense, and again, I'm going to read this and invite your comments. This would be substantially in lieu of our paragraph 4. Is everybody following along? Okay.
"During trial, the original 'stickered' version of exhibits shall be provided to the witnesses, and thereafter exhibits admitted into evidence shall be maintained by the reporter as part of the official record of the trial. The Court shall be provided with two copies of each exhibit proffered to a witness at trial for use at trial by the Court and clerk during the examination of the pertinent witnesses and thereafter."
I think that procedure is a little less cumbersome than the one that was in our initial draft. Mr. Bergman?
MR. BERGMAN: Yes. Thank you. That's very good for us.
THE COURT: Mr. Roberson?
MR. ROBERSON: Perfectly acceptable.
THE COURT: Okay. Good. I think that is

Page 16

it.
One really quite detailed matter, and that is the question of exclusion of witnesses. Actually, I guess if one reads that rule closely, that should be done by the Court if the parties request it or if a party requests it. The Court's earlier draft assumed that the parties would request that. Is that a safe assumption or not?
MR. BERGMAN: I think it is a safe assumption, Your Honor.
MR. ROBERSON: Yes.
THE COURT: Thank you. All right. I think that covers the additions and revisions which the Court had in mind. What the Court intends to do is to now prepare a revised order governing these matters, and hopefully that will coincide with the discussion we've had this morning about changes to the draft which was circulated previously.
Now the Court also indicated in its order setting up this preliminary pretrial conference that it believed it would be useful to the Court if counsel were prepared to give an overview of his case, and the Court might take the liberty of posing questions during that presentation, with a view toward the Court getting a little better handle on exactly what issues

Page 17

are going to be tried in the trial on damages and also some sense of what the applicable legal theories are. The Court has read the expert witnesses' reports, that is, the report of Dr. Holland and the three reports of the Defendant's experts. A number of questions have arisen in the Court's mind as a result of that review, not the least of which is what sort of documentary support or related documents to the experts' testimony do the parties contemplate offering in evidence.

I could see a situation where the parties might be able to stipulate to a large body of the documents that the several experts rely upon and thereby avoid the necessity for, if the parties contemplated this, introducing in evidence a vast quantity of documents one by one, which it seems to me would be unduly time-consuming given the nature of what I think the issues are in the case.

So I would like the parties to think about that, but first I would be very interested in hearing an overview of the Plaintiff's case. Mr. Bergman, are you going to be the speaker in that regard?

MR. BERGMAN: Your Honor, with the Court's permission, Mr. Johnson will take the lead on that.

THE COURT: Fine. That's perfectly fine.

Page 18

Mr. Johnson, if you're ready, I would be happy to hear you.

MR. JOHNSON: Thank you, Your Honor. Good morning, and may it please the Court. As the Court is aware, the Plaintiffs in this action are Dr. Homer Holland, a distinguished veteran, one of the original Plaintiffs in this case, an experienced and successful banker and investor. Dr. Holland is here because he is an original Plaintiff in the case, not because he stands to recover directly on his claims. The Court, as you know, has ruled that First Bank is the Plaintiff that stands to recover a judgment in the action here.

Another Plaintiff is, as the Court recounted in its introduction, Steven Bangert as the co-executor of the Estate of Howard Ross. Of course, Mr. Ross passed away recently. He was also an original Plaintiff, contract party, as was Dr. Holland. That's why his estate is present as a Plaintiff in the case, and like Dr. Holland, he no longer stands to recover a judgment directly. First Bank is as successor to River Valley the Plaintiff presenting the claims here.

Mr. Ross is also a prominent and successful banker and businessman, or he was before he passed away, and also a distinguished veteran of the U.S.

Page 19

military.

Now Mr. Bangert appears before the Court largely in an administrative capacity, not his personal capacity. He is here as the executor of Mr. Ross's estate, but in another sense, Mr. Bangert's presence in the action is illustrative of the deep and significant relationships that these men formed and honed during their years running these institutions and how significant the River Valley experience was in the lives of these people and that bank.

First Bank, the third Plaintiff, stands before the Court as a plaintiff, but really only as a successor to River Valley. First Bank does not present any independent claim of its own. It does not claim it was independently harmed and does not stand to recover in its own right because First Bank acquired River Valley in 1994, years after the breach, in a transaction that's really remote from the breach and which under binding precedent therefore must not affect the damages calculations. The claims presented here, Your Honor, are those of River Valley, and they will be presented from River Valley's perspective.

Now I think it would be useful before we talk about what the theories are of the harm to spend a little time discussing how we got here, because much

Page 20

of that history is significant to a proper view of the damages claims and the extent of the harm the government's breach worked on River Valley.

I think the appropriate place to start is in the mid-1980s, some years before the acquisitions and some years before the breach, at Rockfall Savings and Loan Association in Illinois. This is an institution that Dr. Holland and Mr. Ross owned. Both participated actively in managing the institution, Dr. Holland probably more so than Mr. Ross, but Mr. Ross was important in many of the business activities.

Now the Court is aware that during this time period, the thrift industry was in crisis. Other thrifts around the country were hemorrhaging money, becoming insolvent, being seized by the government, being marketed as takeover candidates, not as acquirers. But that's not the Rockfalls story, Your Honor.

Rockfalls was growing, with solid and stable profits. In 1987, just before the events leading up to this case began to be set in motion, Rockfalls became really a pioneer in a mortgage-backed securities investment program, ramping up to a sizable portfolio, implementing sophisticated risk controls and doing it very successfully, Your Honor.

Page 21

Dr. Holland and Mr. Ross showed their skills. They grew that institution substantially, safely and profitably. They built a track record of profit and success that attracted the regulators' attention when it came time to dispose of other thrifts that had not met that standard of success.
So, in 1988, the regulators approached Rockfalls and its ownership to gauge their interest in acquiring many of the troubled thrifts in the same area. By mid-1988, in July, the regulators and Holland and Ross had come to an agreement that three institutions, Home, Mutual and Galva, would be combined in a supervisory-assisted merger to form what has been often called in the papers "the River Valley One institution."
The government promised substantial regulatory assistance in addition to a significant cash payment that while important to the ultimate success of the institution is not part of this case here because the cash of course was delivered and not revoked, whereas some of the other considerations were promised but delivered only temporarily.
We're talking about essentially three significant elements: an $8 million capital credit; $4.6 million of subordinated debentures that the

Page 22

government promised, although they were debt securities, to treat as capital for regulatory purposes; and in addition, in what I view as an expression of the government's confidence in River Valley, the Federal Savings and Loan Insurance Corporation desired not only to be the institution's regulator but also to be a part owner, to have a tangible economic stake in the success of the institution, the anticipated success, the planned success, the profits and growth of River Valley One.
The parties negotiated over the terms of FSLIC's purchase of securities in the institution and eventually reached an agreement whereby FSLIC would buy preferred shares in exchange for a payment of $5 million.
Now, of course, this was an economic transaction. This is something in addition to the cash assistance FSLIC paid. Unlike cash assistance, which came essentially with no strings attached, this was an exchange of economic equivalents. FSLIC was paying money to purchase securities just like any other investor would pay money to purchase shares in a company.
That's what the FSLIC did, and just like most investors, they were very careful about how they

Page 23

did it. They undertook a rigorous analysis to determine whether they were getting a good deal, whether they were paying the right price and decided that they were.
Now the Court has held that the $5 million that the FSLIC exchanged for the preferred shares was not guaranteed by contract to treat as regulatory capital. So what we're left with is $12.6 million of contractual capital, the capital credit portion of which would have amortized according to a linear, 25-year schedule.
At the close of the transaction, that promised contract capital accounted for more than two-thirds of River Valley's regulatory capital, and therefore, I think it's safe to say everyone involved in the transaction understood that the government's regulatory capital promises were indispensable to the future success of the institution.
Now also in July 1988, the regulators, having come to Rockfalls previously with an offer relating to Republic to gauge Rockfalls' interest in acquiring another troubled thrift, Republic Savings and Loan, the parties reached an agreement in July 1988 that in broad strokes was similar to the Home/Mutual/Galva deal. It involved a capital credit

Page 24

in the amount of $5 million. It involved a promise to treat subordinated debentures as regulatory capital in the amount of $2 million.
Unlike the Home/Mutual/Galva deal, the Republic deal also involved some supervisory goodwill that the government promised would be an element of the resulting institution's regulatory capital.
All told, and this would be a separate institution at the outset, the preexisting Rockfalls thrift would acquire Republic and continue to operate separately as what we call "River Valley Two."
At closing, the promised regulatory capital accounted for the majority of the institution's regulatory capital, and so, again, I think it's fair to say that all parties understood and intended the government's promises to be indispensable to the future viability, profitability and success of the resulting institution.
Now I think it's significant to note, Your Honor, that the regulators, having come to River Valley with proposals for these deals, must have understood that River Valley intended to grow in part by acquiring other institutions and in part by internal growth.
But if we want further assurance of that,

Page 25

Your Honor, the evidence will show that the regulators came back after the deal, came back to River Valley and said, hey, we've got another one, Peoria. Do you want this? Do you want to grow more? Do you want to do another acquisition? And River Valley said, yes, we'll do it. We'll work out a deal with you to make that happen.

So we've got a track record of success and growth by acquisition here, Your Honor. At all times, the plan was to grow, to grow profitably, to grow safely, to grow internally and to grow by acquiring other institutions.

Consistent with those plans and intentions, Your Honor, River Valley One and River Valley Two together did grow substantially, did earn sizable profits and did have a track record of success in the period before FIRREA.

So, all told, looking at Rockfalls and the River Valley institutions together, we've got a track record of some four years, three or four years, before the breach, substantial growth, substantial profits, substantial success, substantial acquisitions.

Now, in 1989, the government breached; took away the regulatory capital. It took it away entirely, all of it, for purposes of one of the three

Page 26

FIRREA capital standards, the tangible capital standard. It limited it severely for other purposes.

The other two capital standards, as the Court may be aware, the core- and risk-based standards, some of the regulatory goodwill was permitted to remain on the books for a short time. This portion was a rapidly declining fraction, and so I think it's fair to say that the government's breach eliminated all of the promised regulatory capital for tangible purposes and limited it severely for other purposes.

This forced a sudden curtailment of River Valley's growth, a rapid and severe shrinkage of its asset-and-liability portfolio, with predictable results, Your Honor. It was difficult. It changed everyone's life at the institution. The evidence will show that this period was extraordinary turmoil, extraordinary difficulty for the institution. The breach really turned things upside down.

Notwithstanding that upheaval, Your Honor, River Valley managed to continue to operate profitably and successfully, to earn a modicum of success, much less than it should have, of course on a much smaller scale, much lower profits and a much less valuable institution. Those are the consequences of the

Page 27

breach.

Now River Valley continued to monitor the market for potential acquisitions, and in 1994, it identified a very attractive target, San Antonio Federal Savings Bank, a healthy institution in Texas that was in the hands of the Resolution Trust Corporation. It was in RTC hands not because it was a failed institution or had had significant regulatory problems or was considered a threat to the safety and soundness of the banking system but instead because it was a subsidiary of another institution that had had some troubles.

The RTC decided to separate the parent from the sub. The sub, SAFSB, San Antonio Federal Savings Bank, was healthy and in good shape, and that's the institution River Valley wanted to purchase.

Your Honor, the evidence will show that River Valley intended to purchase San Antonio, that River Valley attempted to purchase San Antonio and that but for the breach, River Valley would have had ample capital to purchase San Antonio on its own, without any outside financing, and that there would have been no regulatory impediment to that proposed and attempted acquisition.

I'm sorry, Your Honor. I'm informed I had a

Page 28

slip of the tongue about the date. I think the SAFSB acquisition took place in 1992, not 1994. I apologize for that mistake.

So because of the breach, Your Honor, however, River Valley could not and did not acquire San Antonio. The acquisition was thwarted by the breach. The evidence will show that it was breach-caused concerns that made it impossible for River Valley to get the financing required to do the acquisition internally.

As a result, San Antonio was acquired by a separate institution, a third party that is not a Plaintiff in this case, and that is therefore not relevant to the damages claims except insofar as it operated SAFSB as a separate, wholly owned institution that allowed us to now trace the actual, real profits, the cashflows in, the cashflows out, the resulting net economic effects of SAFSB's operations, operations that should have been within the River Valley structure but instead accrued to somebody else who is not a Plaintiff here. We can trace those essentially dollar for dollar for the entire period during which SAFSB should have been inside River Valley but was not.

So, Your Honor, that's the preamble. That's

Page 29

how we got here. That's the chronology.
The damages claims, Your Honor, are three.
Before I enumerate them, let me say just a brief word about the governing law. Under Bluebonnet, Locke and a host of other decisions where the fact of damages is established, the Court's duty is to award a fair and reasonable estimate of the harm the plaintiff suffered. Damages must of course be reasonably certain, but mathematical precision is not required in this Court or in this case.
We present three theories. The first, lost profits relating to the thwarted SAFSB acquisition. That will be in the amount of approximately $45 million, Your Honor. As I said, these are actual traceable cashflows. These are the SAFSB profits that were diverted from River Valley to the nonparty acquirer of SAFSB.
These damages can be proven not just with reasonable certainty but probably with something as close to mathematical certainty as a lost-profits case could ever achieve. They are real cashflows, real world, traceable gains and losses.
Our second theory is the loss in economic value. That is, the breach caused diminution in the value of the River Valley institutions as of the time

Page 30

of the breach. That will be in the approximate amount of $21.8 million, and it's essentially determined by the government's own calculations, as I'll describe in a little bit, Your Honor.
The third theory we intend to present is cost of mitigation, reflecting River Valley's allocation of its retained earnings to do the job the contractual regulatory capital should have done but did not because the government took it away. It will be in the amount of approximately $20.9 million, and it applies the simple legal framework of all cost-of-replacement-capital decisions, such as Home Savings and LaSalle Talman.
All three, as I'll discuss in more detail in my remaining time, comfortably meet the standards of foreseeability, causation and reasonable certainty.
Your Honor, the SAFSB lost-profits claim will be presented largely through fact witnesses. There may be some expert testimony, but I think the significant numbers will come from fact witnesses, from evidentiary documents rather than computations and calculations presented by an expert.
As to foreseeability, Your Honor, the legal standard is that it must have been reasonably foreseeable at the time of the contract, that the type

Page 31

and magnitude of damages, not the particular transactions, not the exact amount of the loss, but the type and magnitude of the loss was reasonably foreseeable to the parties.
Here, Your Honor, the evidence will show that the government knew River Valley intended to grow by acquisition. Indeed, the government negotiated another deal, Peoria, with River Valley in the months after the River Valley One deal first closed.
The government knew of the Rockfalls track record of growth and profitability. The government knew Holland and Ross's interest in acquiring other institutions. And, of course, the River Valley managers were constantly looking for acquisitions.
That was the plan, Your Honor. That was the plan: to grow, succeed and profit, some internally, some by acquisition.
Now, as to causation, Your Honor, the evidence will show that but for the breach, as I described, River Valley could and would have acquired San Antonio, would have had the necessary capital. It wouldn't have needed to go to a third-party source of funds, as it did in the real world. So there is really no question that but for the breach, River Valley could have done it. The evidence will show

Page 32

River Valley would have done it.
Now why didn't River Valley do it in the real world? Well, the evidence will show through River Valley's side and perhaps from the American National Bank's side American National Bank looked at the consequences of the breach, looked at the regulatory attitude the breach thrusted upon River Valley and decided it couldn't make it happen that way. The acquisition had to go through another vehicle, and that's what it did. The profits that would have accrued to River Valley accrued to the other vehicle – the entity is called Western Capital Holdings – instead.
As to reasonable certainty, Your Honor, as I said, we're not looking at mere reasonable certainty here; we're looking at almost mathematical certainty. These are actual traceable profits from the very same investment that River Valley should have made. Somebody else got that opportunity. Somebody else got those profits. Under Neely and other similar decisions, that is more than reasonable certainty, more than adequate to support a lost-profits award.
Our second theory, Your Honor, is a diminution in the economic value of the River Valley institutions. This will be presented largely through

Page 33

Plaintiffs' expert, Dr. Neil Murphy, a distinguished professor of finance at Virginia Commonwealth.
Now River Valley was privately held, and so we don't have some of the sources from which one could look at economic value for other institutions. It's not publicly traded, so you can't just look at stock trading price or market capitalization and do a simple event study the day before and the day after FIRREA or some other event that would be deemed to be significant to the breach.
That doesn't mean it's impossible to determine what River Valley's value was before and after, however. Dr. Murphy has done that. He has done it because, in substance, FSLIC did it. The government did it. They put a value on their ownership interest in River Valley One at the time of the acquisition, in 1988, before the breach, and the RTC put a value on that same preferred stock, that same ownership in River Valley One in 1991, after the breach.
Unsurprisingly, given the breach, the value in 1991 was less than the value in 1998, and in fact, although FSLIC had purchased the preferred interest for $5 million in 1988, it was willing to sell it back, the government was willing to have River Valley

Page 34

redeem it, for only $3.675 million in 1991. Now, in and of itself, that shows that the value of the institution declined because the value of a slice of its equity was worth less after than it was before.
So what Dr. Murphy's task is is to determine from that change what was the diminution in the value of the institution as a whole. I think the Court will appreciate hearing the details of those calculations from Dr. Murphy, and I'm certain that Dr. Murphy can explain it much more clearly and concisely than I could. But Dr. Murphy analyzed the structure of the FSLIC preferred security, which has essentially two features. It has a bond-like feature, and it has an equity-like feature.
By applying well-accepted, reliable and frankly simple financial principles and equations to the two pieces of the FSLIC preferred security, Dr. Murphy was able to determine that based on the parameters the FSLIC used in determining the value it would pay for this security in 1988, the value of the entire River Valley institution was $22.7 million in 1988.
Based on the parameters the RTC applied in evaluating the economics of the proposed redemption transaction in 1991, the value of River Valley One in

Page 35

its entirety was only $7.9 million at that time. Doing a simple subtraction, Dr. Murphy determined that there was a loss of the difference, $14.8 million, between the 1988 sale and 1991 redemption.
Your Honor, that's River Valley One. FSLIC had an ownership interest in River Valley One, did not have an ownership interest in River Valley Two. So, in order to determine the extent of the total loss to the entire River Valley enterprise, Dr. Murphy looked at the change in the economic value of River Valley One, the $14.8 million loss that I just described, and said, okay, how much regulatory capital was lost that resulted in the diminution? He simply figured out what the effect was per dollar of regulatory capital eliminated by the breach.
He then looked at River Valley Two, the Rockfalls institution that had acquired Republic, and applied the same ratio. The institutions were similarly managed, common ownership, and so he felt that that was financially reliable. We think that's well within the ambit of the reasonable certainty standard. In applying that ratio, Dr. Murphy determined that the value of River Valley Two was diminished by about $7 million.
Now the Court may wonder, what's the effect

Page 36

of the loss of the $5 million in FSLIC preferred? Shouldn't that affect the calculation somehow? Isn't that part of what contributed to the $14.8 million decline in the value of River Valley One?
Your Honor, the answer is perhaps, but the standard here is substantial factor. Was the breach a substantial factor in causing the entire $14.8 million loss? Yes, it was a substantial factor because the breach eliminated much more regulatory capital than the loss of the FSLIC preferred.
If the Court were to disagree and apply a different standard, surely the breach was the but-for cause of the economic loss associated with the contractual regulatory capital, and Dr. Murphy will be prepared to do a ratable adjustment that would have a small but material effect on the bottom line.
We're not talking about changing the total economic loss from around $20 million to five. This may reduce it a million or two, but really, Your Honor, the broader point is a substantial factor is the governing causation standard. The breach was a substantial factor in causing the entire economic loss.
Finally, Your Honor, the cost of mitigation analysis. Plaintiffs will present this analysis

Page 37

largely through the expert testimony of Homer Holland, supported of course by factual evidence largely in the form of documents, as the Court's earlier comments anticipated.

What's the basis for the claim? After the breach left a hole in the River Valley balance sheet where the contractual capital used to be, something filled the hole. It didn't leave a vacuum. Something came in to take the place of the contractual capital, to do the job the contract capital should have done: supporting a portion of the River Valley balance sheet.

River Valley used its own retained earnings, its own internal capital, to do that job. So since the retained earnings had to be allocated to do the job the contractual capital would have done, they couldn't do the job the retained earnings would have done had there been no breach. So it's an allocation of retained earnings to do a job the contractual capital should have done.

Your Honor, the governing principle here is one that's really not legitimately in dispute any longer. It's that all capital has a cost, and retained earnings are a form of capital that comes with a cost. The capital is not free.

Page 38

So to compute the cost of mitigation, we really only need to determine two things: the amount of replacement capital, how much retained earnings was serving this function of replacement for each period, and how much did the retained earnings cost for each period.

Now I should note that the mitigation, because of the extent of the breach, because of the sheer amount of regulatory capital the breach eliminated, the mitigation was not complete. It was not immediate.

It took River Valley some period of years to build up sufficient retained earnings to fully replace the regulatory capital that the breach eliminated, and, of course, but for the breach, it should have had both the contract capital and the earnings it retained so it could choose whether to use those retained earnings to support even more growth, even more profit, or to pay them out as dividends if that's what River Valley determined the highest and best use of its retained earnings would have been.

But, of course, because of the breach, River Valley didn't get to make that choice. They had to use their increasing retained earnings to do the job the contract capital should have done.

Page 39

Because it took some time to fully replace, the mitigation was not complete, and this is really, Your Honor, frankly, an incomplete and viewed in and of itself an inadequate remedy for River Valley. Just by definition, because it took some time to fill the hole, there are periods where River Valley will recover nothing on this theory for a portion of the regulatory capital that the breach eliminated.

Now how did Dr. Holland perform these calculations? Well, as I said, he applied the simple framework that's been accepted a number of times: Simply determine the amount of replacement capital in the institution. To do that, he took the lesser of either the amount of contract capital that should have been available in each period or the accumulated retained earnings. He was taking the lesser. That's what leaves the gap we just talked about. He did that because it wouldn't be appropriate to do a costing on mitigation that River Valley was unable to do because it hadn't had the opportunity to build its retained earnings to that level yet.

There is a refinement to that determination of what we might call the "base" for the calculation, the amount of replacement capital, that results from the fact that FIRREA eliminated some regulatory

Page 40

capital that was not covered by a contractual guarantee. Dr. Holland accounted for that appropriately. He takes the retained earnings and he ratably allocates them to all of the eliminated regulatory capital, but he only figures the cost on the retained earnings that he allocates to the breached capital. So that's how he gets his base.

How does he determine the net cost of the retained earnings that functioned to replace the contract capital for each period? Well, as in the standard replacement-cost models, it's a spread between the cost of the capital and the return on the tangible, investible funds represented by the retained earnings. There needs to be a difference because much of the contract capital was intangible, not directly investible, whereas the retained earnings are cash that can be invested to earn a return.

Dr. Holland figures the spread using the government's determination of the cost of River Valley's capital in 1991. Postbreach cost of capital, what did the RTC's analysis show River Valley's cost of equity capital to have been after the breach? Dr. Holland looks at Dr. Murphy's analysis, endorses it and agrees that the RTC's valuation shows that River Valley's cost of equity capital in 1991 was at least

Page 41

20 percent.
Dr. Holland draws on his experience as an investor. He says, is that reasonable? Is that really what the required rate of return would be for an institution like this over the '90s? He says, yes, in his experience, that's really a lower bound. He thinks required rates of return of 25 to 30 percent would be more reasonable. So this calculation in Dr. Holland's view is conservative.
THE COURT: Does this mean that Dr. Holland's view is that the replacement capital would have had to have a yield of 20 percent or pay a dividend of 20 percent?
MR. JOHNSON: No, Your Honor.
THE COURT: Okay. The 20 percent then is of what?
MR. JOHNSON: The 20 percent is the required rate of return for the investment. It's what the capital costs the institution.
There are two ways one can look at returns on a stock. One can look prospectively when making the investment: What do I need to get out of this in order to justify the funds I'm putting in? Dr. Holland says, well, if you look at what the government was willing to take to have its investment redeemed,

Page 42

the government must have thought 20 percent was the right amount, and he says, based on what I know about the institution and my experience investing in banks over decades, that seems, if anything, conservative to me.
One can also look retrospectively if one wants a confirmatory view and say, what returns did the investor get over a period? And Dr. Thacker, one of the government's experts, has done that calculation for us, and he says, over the period of time Dr. Holland had an investment in River Valley, he got actual economic returns of almost 30 percent -- I think the number is 29.5 or 29.7 -- and that encompasses dividends and appreciation in the share price, but that's what the economic return to the investor is. That's what the cost of the institution's capital is.
Now the government does make the argument that, no, no, no, you can't look at the 20 percent; you can only look at the actual dividends paid. There are several reasons why that's not correct, and I think the Court would probably benefit from hearing many of them from Dr. Holland, but in brief, this isn't an institution, River Valley, that could just pay dividends whenever and in whatever amount it

Page 43

wanted. There were significant restrictions, both contractual and regulatory, on River Valley's ability to pay dividends.
Second of all, during the early periods, River Valley was attempting to replace the contractual regulatory capital, paying dividends, which would have the effect of increasing the cost of mitigation because we're actually paying more dividends. If the cost of the capital is based on the payment of dividends, then paying an additional dividend is going to increase the cost.
So paying dividends which would increase the cost of the mitigation would make the mitigation less complete and less successful. So it had the factual effect, Your Honor, the need to replace the capital had the factual effect of inhibiting dividends, and it has the financial effect of demonstrating why it just can't be that the only cost is the cost of actual cash disbursements, because if River Valley had done it as the government suggests maybe it should have, if the government had done that, it would be recovering a greater amount of damages for less successful mitigation, and, Your Honor, that makes no sense.
THE COURT: Does Dr. Holland cover this aspect in some earlier report as distinct from the

Page 44

most recent one which was furnished to chambers?
MR. JOHNSON: No, Your Honor, and this is really in part a reaction to the government's recent expert reports where they make this argument against Dr. Holland's analysis.
THE COURT: So this is in essence a summary of Dr. Holland's anticipated rebuttal of the government's, what shall we say, critique of his analysis.
MR. JOHNSON: Yes, Your Honor. Also, it's frankly a summary of what we expect to address in part in our examination of the government's experts.
So that's where the 20 percent comes from and why it's valid. The offset rate I think is much more familiar. It's the safe rate on Treasury securities which has been accepted in other cases that have been affirmed by the Federal Circuit.
Now the mitigation analysis, although it's not really a benefit of the bargain-type expectancy theory, it does need to meet the foreseeability, causation and reasonable certainty standards, and I think the Court is sufficiently familiar with the nature of the computations that we don't need to spend a lot of time on that.
But as to foreseeability, it's really a

Page 45

simple cover theory. It's essentially always foreseeable that when a breach causes a failure to deliver goods or service, the breached-against party is likely to go out and attempt to procure a substitute. That's what happened here.

Causation, Your Honor, it's really very simple. The breach left a hole in the regulatory capital account. Something had to fill that space. The retained earnings are what ended up actually doing the job that the contractually promised regulatory capital should have done, and that is but-for causation. It's direct. It's irrefutable. It's just simple logic. The job needed to be done. The retained earnings are what stepped in to do the job.

As to reasonable certainty, Your Honor, it's a straightforward calculation. It adopts a parameter that the government endorsed in its 1991 analysis, and other than that, it's just a straightforward application of the standard cost-of-replacement capital analysis.

Now we've got three separate theories of damages, and I should address how they relate to each other. Dr. Murphy's lost-value analysis is a time-of-breach analysis, and it seeks to establish an estimate, probably a conservative estimate, of the

Page 46

total effect of the breach as of that date, and so that is a free-standing damages analysis that could not appropriately be combined with either of the other two.

Your Honor, but for the breach, River Valley would not have incurred the cost of mitigation, and it would have acquired SAFSB. So those two elements of damage complement each other, and Plaintiff should be entitled and is entitled to recover both.

THE COURT: Is it the Plaintiffs' contention that it's entitled to recover all three?

MR. JOHNSON: No, Your Honor. Dr. Murphy's lost-value analysis is in the alternative to either or both of the other two.

THE COURT: Okay.

MR. JOHNSON: The SAFSB lost profits and the cost of mitigation are conceptually additive to each other.

THE COURT: Okay.

MR. JOHNSON: Your Honor, I thank the Court for its attention. If you have additional questions, I would be happy to answer them. Otherwise, I think I've said what I think needs to be said.

THE COURT: I think it's been very helpful to the Court, and I appreciate your presentation. And

Page 47

let's hear from Mr. Roberson.

MR. JOHNSON: Thank you.

THE COURT: Thank you.

(Pause.)

MR. ROBERSON: May it please the Court, Your Honor, I want to start just briefly by discussing some facts that are important to consider here.

The first thing is that the stance of the Plaintiffs here is a little bit atypical from a typical Winstar plaintiff. With the typical Winstar plaintiff, there is a breach, there is a significant loss of capital where suddenly the institution has failed their capital requirements or is required to enter into a capital plan, something to meet the FIRREA capital standards.

Here, the River Valley thrifts were never capital-deficient related to FIRREA. They had no need to shed assets when FIRREA was passed because the thrift met all of FIRREA's capital levels. It's Joint Stipulated Fact 241.192. So this is not a case where FIRREA was passed and the thrift had insufficient capital and was required to produce and follow a capital plan.

This corresponds with Plaintiffs' assertion that the purported damaging effect of FIRREA did not

Page 48

occur with the passage of FIRREA or the publication of regulations implementing FIRREA. Indeed, Plaintiffs claim no effect until mid-1990 or later, but what they have done is obfuscate the fact that the regulatory concern with the thrift was not with respect to its ability to meet FIRREA capital levels.

THE COURT: Is it the Plaintiffs' contention, though, that even assuming it was in compliance with the FIRREA capital requirements after the enactment of FIRREA that it customarily had more capital than was required by the applicable regulations, and therefore, to that extent, it was damaged and was entitled to replace the thereafter missing capital?

MR. ROBERSON: If you're talking about a capital cushion, like a –

THE COURT: Yes, exactly.

MR. ROBERSON: – capital cushion, I haven't seen an express representation. What I do know is – a damaging effect in that regard. I don't think they calculated their damages that way at all.

What I have seen is that Dr. Holland has stated what his preference was with respect to a capital cushion, and what you're going to see is what happens is the regulatory effect is that they are

Page 49

required to have capital far above that, but it's not because of FIRREA; it's because of their mortgage-backed-security derivative problems.

So what we have here is almost a year after FIRREA has passed, for instance, in July of 1990, the River Valley thrifts were still projecting significant growth over the next five years, and that's at Joint Stipulated Fact 209.

So, instead of being related to FIRREA, where the capital criticisms of the River Valley thrifts arose, they arose in connection with the FDIC's concerns relating to the investments in mortgage-backed-security derivatives. The adverse classifications of the River Valley thrifts' assets doubled between June of 1989 and August of 1990.

THE COURT: But did the passage of FIRREA then throw them out of compliance with the standards to which you are alluding that are related to the mortgage-backed securities?

MR. ROBERSON: No, Your Honor. For this case specific, an individual capital requirement created by the FDIC specifically related to this case that was crafted specifically because of their involvement in risky, mortgage-backed-security derivatives.

Page 50

As Your Honor may understand, mortgage-backed securities, that's one thing, but when you get derivatives, you're chopping and slicing different tranches or risk, and what the FDIC did was they classified, when you were getting involved in those kinds of investments, the FDIC looked upon those negatively, always did, and was following FDIC policy, and they said, that is improper. We want you to get out of that, and because they are so risky, we want you to have up to a 5 percent tangible capital level. So the problems that they had with regulators were with respect to their involvement in risky, mortgage-backed-security derivatives.

Now, if you look at the classifications that you see where suddenly they have these huge increases in classifications, the majority of these were the mortgage-backed-security derivatives. To the degree that the classifications totaled 410 percent of tangible capital, an increase to that level by August of 1990, and for River Valley Two, the classifications totaled 342 percent of tangible capital, when you have that kind of level of classifications far exceeding tangible capital levels, basically what the regulators are looking at is that you are putting your entire institution at risk, because if you have 400 percent

Page 51

classified, if even a portion of that fails, if a portion of those classifications fail, your institution is going to be underwater.

So, as a result of the massive increase in classified assets, the FDIC required the thrift to increase its tangible capital levels. So they entered into a supervisory agreement with the regulators in 1991, and this called for, like I said, tangible capital of 5 percent. It stepped up from 4 percent to 5 percent, well above FIRREA's limits, and it was because of the supervisory agreement that River Valley was required to maintain regulatory capital relative to FIRREA. That's Joint Stipulated Fact 290.

The FDIC focused upon tangible capital both before and after FIRREA and its oversight of depository institutions. Why? To protect the insurance fund. That's the only thing that's going to protect the insurance fund is tangible capital. So we're going to have testimony from the FDIC witnesses who will explain the importance to the insurer of tangible capital.

Now the supervisory agreements calling for a reduction in the mortgage-backed-security derivative portfolio were driven by the FDIC's criticisms of the derivative instruments. There was a significant

Page 52

difference between the FDIC and the OTS on how to view River Valley's derivative portfolio, the FDIC holding that derivative must be classified and the OTS finding that derivatives need not necessarily be classified.

So what happens is they finally reduced their level of derivatives by 1993, and in August of 1993, the supervisory agreement was terminated because they had finally reduced their level of mortgage-backed-security derivatives.

Now I want to discuss for a moment the significance of the fact that River Valley's regulatory concerns were primarily in relation to the FDIC and the FDIC's criticisms of River Valley's mortgage-backed-security derivatives.

This Court has found that the Plaintiffs effected complete settlement with the FDIC with the August 1991 settlement agreement and that the settlement agreement did not affect the liability of the OTS. While we respectfully disagree with that decision, it does require that we parse the effects upon the River Valley thrifts for which Plaintiffs claim damages between those caused by the FDIC and those caused by the OTS.

There can be no damages where, for instance, regulatory capital levels are demanded by the FDIC

Page 53

above the levels provided in the assistance agreements, as any and all claims relating to the assistance agreements, including the right to include goodwill toward regulatory capital levels, are barred.

The differences between the OTS and the FDIC's oversight were significant, and you can see this by following the composite MACRO ratings given by the OTS versus the FDIC. I know you've had a few Winstar trials, and I'm assuming you recall what the MACRO rating and CAMEL ratings are.

THE COURT: Right. I don't think we need to go into that.

MR. ROBERSON: Okay. So between 1990 and 1993, the OTS rated the River Valley thrifts as either a two or a three, with one brief exception of literally just a couple of months. The FDIC, however, rated the thrifts as a three or four in 1990 and a four in 1991, 1992 and in 1993.

Another way to view the difference between the OTS and the FDIC is to look at the levels of classifications found by each agency. In October of 1991, for example, the FDIC classified $48 million of assets, representing at that time 211 percent of tangible capital, while the OTS only classified $8 million or 37 percent of tangible capital.

Page 54

THE COURT: Could you explain to me again why it is we care about the breakdown between the FDIC and OTS?

MR. ROBERSON: Because the regulatory effect of this institution in the post-FIRREA period, the regulatory criticisms were not in relation to FIRREA; they were in relationship to the lack of tangible capital relative to mortgage-backed-security derivatives.

What that means is that any restriction on activities caused by the mortgage-backed-security derivatives and the lack of tangible capital in relation to that is seen by the FDIC. Then we have the settlement agreement with the FDIC where those effects cannot be the source of a complaint in the Court given that there has been a settlement with all effects with respect to the assistance agreements, which would be the FIRREA tangible capital levels.

Now I'll turn to a discussion of the damage theories that are currently in play in this case, and let me begin, however, by describing my understanding of potential damage theories that are not in play and will not be part of trial or any posttrial briefing.

The first thing of course is we understand that lost profits based on lost leverage relating to

Page 55

foregone growth or a steady-state thrift is off the table. I'm referring to Dr. Holland's incremental growth claim set forth in his 2001, 2003 and 2005 expert reports. As you may recall, Your Honor, the Plaintiffs said that if they were given permission to present a retained-earnings theory, they would abandon those claims.

So that's our understanding. We need to have this absolutely certain now that that is indeed the case. It was in their pleadings. I know Mr. Bergman said it repeatedly during our hearing some time ago, but I just need to make it absolutely certain we're not going to see that because if we're going to have that, we need to prepare for it right now. But I do think it would be entirely improper given the representations.

The second thing is it's my understanding that there is no tax gross-up claim. Plaintiff had earlier indicated that it might bring such a claim connected with its retained earnings theory, but no report or analysis was provided concerning any such claim. And when we asked Dr. Hall during his deposition if he was aware of any such claim, Plaintiffs' counsel said that we were asking questions about a dog that didn't bark.

Page 56

Just a moment ago, of course, Plaintiffs made no mention of a tax gross-up claim. So, again, if there is a claim, we want to be able to respond to it with an expert opinion. If there isn't a claim, so be it. But what we don't want to see is a tax gross-up claim get added in the posttrial briefing by argument of counsel when we have expert opinion that can respond to it.

Dr. Griffin, as you know, is our tax expert in this case, and he has opined on tax gross-up matters in other cases, so we couldn't issue an opinion with respect to a tax gross-up claim that hasn't been made. It's our understanding that there is no tax gross-up claim, but I want to make sure that the Court understands that that's the case so that we are all on the same page.

Now I just want to hand out a couple of charts showing what our understanding is of the claims the Plaintiffs have and have not abandoned and our understanding of Plaintiffs' current claims. I'm going to have probably a quick addition to this because from what Mr. Johnson said, we may have to clarify and maybe eliminate some more of the current claims. So if Your Honor would permit, I'll approach and distribute a couple of slides that simply indicate

Page 57

our understanding of where we are in this case.
THE COURT: You may do so, Mr. Roberson. Mr. Roberson, do you have one additional copy by chance?
MR. ROBERSON: Certainly.
THE COURT: Why don't we give the court reporter a set as well. And these are labeled at the bottom II-1 and II-2, is that correct?
MR. ROBERSON: Yes, Your Honor.
THE COURT: Okay.
MR. ROBERSON: So, if you look at II-1, what you see is the claims that we understand the Plaintiffs have abandoned. Originally, they had a series of claims with lost profits, lost value, cost of replacement capital and restitution. My understanding is all those have now been eliminated. Then we go to December '03 when Dr. Holland issued a new expert report, and we see that the Plaintiffs have now abandoned all those. That's the full growth and the steady state lost leverage claims. And again, Dr. Murphy had an adjustment with respect to lost value that was originally $21 million. My understanding is that that's been adjusted, and we'll talk about that in just a moment. Then we go to February 2005 when Dr. Holland

Page 58

issued his second supplemental report, and here we had a full growth and a steady state lost leverage claim. And again, the growth versus shrinkage part of that has been abandoned is our understanding. The residual capital claim, which was what they claim First Bank would have paid for the River Valley residual goodwill, has been abandoned. The net operating loss claim has been abandoned. That would have been what they claimed First Bank would have paid for River Valley's net operating loss carryforwards. So our understanding is the only thing that was left from that particular iteration of Dr. Holland's expert reports is the $28.61 million SAFSB acquisition. So we have the SAFSB acquisition there and then we have three other SAFSB acquisitions underneath that. And I think I'll just address the SAFSB just generally right now. I'm going to come to it in a lot more detail in a moment, but Mr. Johnson just referred to the SAFSB claim and referred really only to one figure, which is a $45 million figure. And actually there have been four different damage theories that Plaintiffs have set forth with regard to SAFSB. So we're uncertain now. I assumed going into this hearing that they were going to be asserting four possible theories with regard to SAFSB.

Page 59

What I'm hearing now is that they're really only going to assert one possible theory, which is the $45 million claim, which you can see in September 5 was not made by an expert, wasn't made by Dr. Holland but instead was made by Plaintiffs' counsel. As you recall, Your Honor, in the summary judgment briefing on damages, we moved to strike those theories because of just that fact. They were made by Plaintiffs' counsel and they weren't made by an expert, and there has been no expert testimony from the Plaintiffs. But what we did was we moved to strike, saying that's improper under the rules. Rule 26 requires and the rules of the Winstar cases require that expert reports be issued with respect to any expert theory that's going to be presented at trial. That's not the case with regard to the $45 million claim. Dr. Holland never made a $45 million claim. It's never been presented in an expert report. Instead, it was only by argument of counsel. What we did was we responded to it, as you may recall, with declarations in our response to the summary judgment briefing where we first moved to strike the theories made by argument of counsel because they were improper under the rules, but

Page 60

secondly, if they were going to be admitted, we needed to be able to respond to it because we weren't going to argue by counsel to respond to an expert theory made by counsel. It's totally improper. So I think that's one thing we should try to clear up where we are right now, because I'm personally a little confused. We do need to prepare for trial and we need to discuss that. I'm going to discuss that in a little bit more detail in a moment, Your Honor. The other thing is we have the –
THE COURT: Can I just for a minute pause on that?
MR. ROBERSON: Sure.
THE COURT: Let us assume that the Plaintiff, consistent with Mr. Johnson's statement, is seeking to recover with respect to the SAFSB acquisition the $45 million figure approximately to which you alluded. What is the government's basic defense to that claim?
MR. ROBERSON: Well, Your Honor, there's a whole slew of issues with it, and it goes into the substance of the SAFSB claim entirely. Now I can go into that right now if you wanted to. I wanted to wait just a few more minutes to clear up these things.

Page 61

THE COURT: You mean you're going to get to that I assume?

MR. ROBERSON: Yes, I'm going to discuss the substance of it. Because there are different kinds of claims with regard to the SAFSB, there are some arguments of course we have specific for the $45 million claim and then there are some that are specific for the other variations. I can give you the short answer on the large part of it.

THE COURT: Why don't we put the other variations aside for the moment and focus on the theory which Mr. Johnson spelled out in his remarks.

MR. ROBERSON: Then if you'd just give me a moment, Your Honor?

THE COURT: Sure.

MR. ROBERSON: And the one thing I wanted to just finish up on my thoughts before I move on, on the issue of the damage theory being presented without an expert opinion on it. What I heard Mr. Johnson say was that there may be some expert testimony concerning the $45 million SAFSB claim. Your Honor, that's totally improper. There's been no expert report with respect to the $45 million SAFSB claim. So that is entirely improper. Dr. Holland cannot come to this Court and now opine on the $45 million SAFSB claim.

Page 62

He never opined on it in any of his expert reports.

THE COURT: Let's assume for the sake of argument that the SAFSB claim is presented through nonexpert testimony, through fact witnesses.

MR. ROBERSON: Right. Returning to the substance of the SAFSB claim, I think the first thing to do is to step back for a moment and take a look at the facts of the SAFSB claim.

In late 1991, Dr. Holland was approached by a man by the name of John Rose, who had connections with the RTC's sale of assets down in Texas, and he approached Dr. Holland with the SAFSB opportunity, saying, I will give you this opportunity, you give me 10 percent of the opportunity and you can do it through River Valley or I assume however you want to structure the deal. It's basically a finder's fee and opportunity.

So what happened was Holland and Ross approached American National Bank about borrowing funds in order to acquire SAFSB through River Valley. However, American National Bank, or ANB, was unwilling to do that because of the cross guarantee provisions of FIRREA. Your Honor, the cross guarantee provisions of FIRREA are noncontractual. There's not a breaching provision.

Page 63

What those provisions were were that with FIRREA, institutions that were related institutions where, for instance, a subsidiary might fail, the holding or related institution had financial obligations with respect to the failed thrift if it was within the failing. What that meant as far as lenders were concerned was that their potential liabilities with respect to a loan became much greater, because if they loaned to –

THE COURT: So is this essentially an argument that ANB declined to finance the acquisition for reasons that have nothing to do with the breach?

MR. ROBERSON: That's exactly what that argument is.

THE COURT: Okay.

MR. ROBERSON: And so then what happens is to facilitate the acquisition, Dr. Holland and Mr. Ross created Western Capital Holdings, Inc., WCHI. And the ownership was Mr. Ross, 30 percent, Mr. Holland, 30 percent. Mr. Bangert, who you may know I think he became CEO of River Valley Thrifts. He certainly was the main hands-on individual running the River Valley Thrifts. And then Mr. Rose with 10 percent and then Mr. Pikus, who was also a River Valley employee at a upper level at 5 percent. So the

Page 64

notion that this is an unrelated institution is of course just incorrect.

Now ANB required the payoff of River Valley Holdings loans before it would lend to Western Capital Holdings. So what happens is River Valley shrinks the institution by $110 million from September of 1991 through June of 1992, and it pays a $6 million dividend to River Valley Holdings so that River Valley Holdings could then pay down its $7 million loan from ANB to $1 million. So what happens is ANB then provides WCHI with a $10 million loan to finance the purchase of SAFSB.

So, as we argued, I think it's just a matter of law, Your Honor. There was mitigation. River Valley, even assuming that it lost the opportunity due to FIRREA, it mitigated. And how did it mitigate? It mitigated by handing the corporate opportunity that was given to it to a related institution whose shareholders were its own shareholders for the most part, and it permitted that corporate opportunity to be handed off.

And not only did it permit it to be handed off, Your Honor, it facilitated by shrinking itself and upstreaming the income. So, under the notion of mitigation, where you receive a benefit, there was no

Page 65

lost opportunity. The SAFSB opportunity simply was not lost. River Valley mitigated any perceived effect of the breach by facilitating the consummation of the SAFSB deal by River Valley's own shareholders.
Secondly, River Valley facilitated the deal by paying off the ANB loan to River Valley Holdings so that ANB would loan the funds to WCHI. And it facilitated by passing the corporate opportunity to its shareholders. The benefit of the SAFSB deal, whatever profits actually obtained, this would be in this instance the $45 million that they're claiming, went to River Valley shareholders as WCHI shareholders, and this torrent of events was facilitated by River Valley.
As we argued in our summary judgment brief, Your Honor, the mitigation ended any effect of damages. You can't just simply create a separate institution and say, oh, by the way, that institution is totally separate and we didn't have anything to do with it even though we facilitated the whole deal going to the other institution. That's just simply incorrect as a matter of law. There was mitigation.
THE COURT: What if the River Valley entity had facilitated the acquisition by say General Motors? What would the government's position be then?

Page 66

MR. ROBERSON: Well, in other words, I think the distinction you're drawing is General Motors is owned by different sets of shareholders, and I think that the notion might be a little bit different, but the notion would be if they got consideration from General Motors from that, that benefit would certainly be part of the consideration in that situation, right.
And here, we don't even have to go there because the benefit was – River Valley's own shareholders are making the decision, by the way. It's Homer Holland and Howard Ross are making the decision that River Valley will mitigate by giving the opportunity to Homer, Holland, and Howard Ross as 60 percent owners of WCHI. So this instance is different. But I think in the example you gave, Your Honor, I think there would be something you would have to consider as a benefit there even if it went to General Motors. None of that's considered here.
The other thing is to think about with the SAFSB claim just as a matter of law that there is double recovery being sought here. Dr. Holland has admitted in deposition that if any recovery is obtained as part of the SAFSB deal, he would obtain a double recovery.
And, Your Honor, it's a question I asked Dr.

Page 67

Holland, and, of course, you understand why, Your Honor. The notion is is that sure, First Bank is the nominal Plaintiff in this case. But as you know from our past experience in this case, there was a contract between First Bank and Homer Holland and Howard Ross where any recovery from First Bank would be provided to Holland and Ross. So, with that background, I asked Dr. Holland the following:
"Q Sir, if the Court were to award Plaintiffs the amount of claimed damages relating to SAFSB, you and Mr. Ross would have been compensated for the alleged value of SAFSB twice, isn't that correct?
"A In part, that's correct.
"Q And when you say 'in part,' what do you mean?
"A In that Mr. Ross and I did not own SAFSB in total. As you mentioned, we owned 60 percent of SAFSB, and the reason that I in my first report only attributed to Ross and Holland the damages associated with the taxes is because Ross and Holland, together with the minority shareholders of SAFSB, really obtained the full – obtained the economic benefit."
So he's admitted that Holland and Ross obtained the full $45 million or whatever it is, and he admits that it's only in part. And when he says

Page 68

it's only in part, what he means is he actually would get more than double recovery, because he would get not 60 percent of the earnings from WCHI, he'd get the 100 percent. So it's even more than a double recovery.
And, Your Honor, this is a matter of common sense. There is no corporate structure, no lawyer's sleight of hand that can permit a plaintiff in this Court to get a double recovery, stand in front of this Court and ask of the United States to give him profits that he's already obtained. Just as a matter of common sense, it absolutely can't be.
As a matter of law, too. And I think if you look at it as a matter of law, you look at the mitigation. You have to go to the mitigation to understand what really happened here. The corporate opportunity was handed off.
I honestly don't think that we should have a trial with respect to the SAFSB claim, because again, I think that if there's a focus on what happened in this deal, it can't be a claim for the SAFSB deal. They've already got the damages. They've already got the lost profits. And they admit it. It would just be astonishing honestly if Holland was able to stand up and say, I earned $45 million from WCHI, and, Your

Page 69

Honor, the United States should give me $45 million in effect.

THE COURT: I think I understand the argument with respect to SAFSB.

MR. ROBERSON: Okay. I'm sorry, Your Honor.

THE COURT: No, no. And that's one of three damage theories that the Plaintiff is going to pursue. Can we talk about the second?

MR. ROBERSON: Sure, Your Honor. I'm shifting my outline, so if you could give me a moment. What I'll do next is talk about the diminution in value of Dr. Murphy.

THE COURT: Yes. Okay.

MR. ROBERSON: What we have here is, as you can see, and if you just refer back to the charts that I gave you, I and II, we did run across a difference, and I'm assuming that maybe Plaintiffs just misspoke or couldn't remember what the representations have been in the past. And as you can see, what we have is a $17.46 million figure for the current diminution in value claim.

THE COURT: Yes. That's on II-2.

MR. ROBERSON: Yes. It's also in II-1 too, Your Honor.

THE COURT: Show me where it is on II-1.

Page 70

MR. ROBERSON: II-1, it's on the bottom of the page. If you see under lost value the yellow figure.

THE COURT: I see. Okay.

MR. ROBERSON: And what happened was, it was $20.9 million and then they adjusted with the December 2003 change where they were taking out the Peoria part of it. And now, with the Court's ruling on damages that the preferred stock was not contractual, they indicated specifically a $17.461 million figure with respect to what Dr. Murphy, his current opinion is. That's why I was surprised when Mr. Johnson was talking and he said that the claim was for $21 million and that, otherwise, if there was some other decision with regard to substantial causation that the figure might be reduced by 1 or 2 million dollars. Your Honor, that flatly contradicts the filings of Plaintiffs on – let me just give you the date, Your Honor – March 20, 2007, in Plaintiff's motion for leave to revise and supplement their damage claims. At page 2 to 3, the Plaintiffs state the following: "Thus the loss of the $5 million of FSLIC preferred stock disqualified by the government for use as capital at River Valley I cannot form the basis for a damage claim. Accordingly, Plaintiffs will revise

Page 71

their lost equity value damages claim to seek only the $10.4 million or 70.365 percent of the $14.7 million decline attributed to Defendant's breach as the Court has determined." That's on page 2.

Then if you look on page 3, it says, "In sum, Plaintiffs intend to claim $17.461 million in connection with their lost value claim rather than the $21.846 million claim set forth in Dr. Murphy's expert report and in Plaintiffs' motion for partial summary judgment."

THE COURT: Okay. I understand that, and that goes to the magnitude of the diminution in value claim.

MR. ROBERSON: Right.

THE COURT: Let's assume that we settle the matter of magnitude. What would be the government's defense on the merits of that claim?

MR. ROBERSON: And before I move on, are we going to decide that today, or is that something that we're going to decide at trial?

THE COURT: I don't think we're going to decide it today. So why don't we talk about what the response would be on that.

MR. ROBERSON: Okay. All right. Just give me a moment, Your Honor, to find my place in my

Page 72

outline. With respect to Dr. Murphy's claim of diminished economic value, our first response is that there's a lack of causation. Contrary to Plaintiff's claim, there was no diminished economic value for the River Valley Thrifts between 1988 and March of 1991.

THE COURT: Is that an argument of causation, or is that an argument that there was in fact no diminution in value?

MR. ROBERSON: Well, it's both.

THE COURT: Okay.

MR. ROBERSON: Right.

THE COURT: So the first argument is the breach of contract did not cause any diminished economic value?

MR. ROBERSON: Correct.

THE COURT: And in 25 words or less, what's the basic argument there?

MR. ROBERSON: The basic argument is is that what Plaintiffs have said is, well, we can't really measure the economic value directly. This wasn't a publicly traded thrift, so we had to use this proxy that Dr. Murphy comes up with for FSLIC preferred stock. There's a proxy that you then take a slice of the institution and then extrapolate and so forth. Well, there is actually some direct evidence

Page 73

of what the River Valley Thrifts values were, and actually those valuations were performed by River Valley themselves. They did a monthly mark to market of their institution, and that shows that between December of 1988 and September of 1990, the thrifts' value actually doubled from $8 million to about $16 million. So that's the first answer is that they actually by their own analyses show that their value increased during that period of time.

The second thing is is that the value that's attributed to the preferred stock is an entirely unreliable figure. What they say is is that the FSLIC preferred stock, well, Dr. Murphy says, was worth $6.5 million even though it was par $5 million the date of issuance. So, by itself, if they were to redeem it the next day, it would have only been worth $5 million. So that figure is unreliable to begin with. Secondly, we also know it's unreliable because there was an independent certified public accountant who did an estimate of the value of the institution, I think of I should say the preferred, as of July 1988, and he valued that preferred stock at a much lesser amount. So we have both the institution's own mark to market and a CPA saying that analysis is incorrect.

Page 74

Then if you look at the actual mechanism that FSLIC had with regard to the issuance, you see that that was never intended to be a marker of the institution's net worth or equity.

THE COURT: All of that it seems to me has to do with the methodology for computing the diminished economic value, these arguments that you've just been spelling out.

MR. ROBERSON: Well, I would say causation, because if the notion is that there isn't a decline, there's actually an increase, that that doesn't show there was any cost.

THE COURT: Let me try it another way. Let's assume for the sake of argument that the Court were to reject the computational arguments that we've just been talking about and let's assume the Court were to find that there was in fact a diminution in value of, just to pick a number, call it $22 million. Does the government argue that on that assumption, the Plaintiff has failed to prove that the diminution in value was caused by the breach?

MR. ROBERSON: Well, Your Honor, it may be circular from what I'm hearing. If Your Honor were to find that there was a decrease in value, we would say that not only does it not show it on terms of what we

Page 75

just discussed, but we'd also say that if there was a decline, there were other factors that need to be considered.

Of course, there was a huge recession at that point in time. You have capital markets that were going wild, and that would certainly affect anything with respect to anyone who was heavily involved in capital markets, as this institution was. You have perception of the savings and loan. And basically those kinds of factors were actually noted by the FDIC when it does the redemption, that these are the kind of problems that existed in the savings and loan industry writ large at that point in time.

THE COURT: Who is the government's anticipated witness on that argument?

MR. ROBERSON: Well, I think James Meyer. He was involved with the negotiations with regard to the conclusion of that preferred stock. So, with regard to the tail end of it in terms of causation, I think he probably can speak to that document.

Now there are other problems with that diminution in value theory. One, as I was just mentioning, was that on its face, it's unreliable, because you've got a $6.5 million value given to something that's par $5 million. So the next day they

Page 76

could have redeemed it for $5 million. It's clearly not a $6.5 million figure.

The other thing is is that regulators have testified, and we've provided the Court the declarations of Mr. Earle and Mr. Held from the FSLIC, that these FSLIC valuations of preferred stock did not provide a reliable means for valuing the entire thrift. It was never part of that, the whole notion that this preferred stock was part of an entire aid package.

THE COURT: It seems to me that that point is again a return to the contention that the Plaintiffs' computation of the diminution in value is flawed. And if you do the computation correctly, you come to the conclusion that there either was no diminution in value or it was dramatically less than what the Plaintiff contends.

MR. ROBERSON: Right.

THE COURT: That I think I have in mind.

MR. ROBERSON: Okay.

THE COURT: And you're saying as I understand it that the government also contends that even assuming that there was some diminution in value, the government will contend that that diminution in value was not caused by the breach.

Page 77

MR. ROBERSON: Correct.
THE COURT: It was rather caused by changing economic conditions between date one and date two.
MR. ROBERSON: Right. Right. And if we were to say that there was any regulatory effect on the institution, we go back to the fact that it was the FDIC that was saying you need to increase your tangible capital level and you've settled with the FDIC. So we go to that. Even if we were to get into that, we run into that piece of the puzzle too. And, Your Honor, frankly, there are a slew of other methodological problems that I'm not going to address here.
THE COURT: Yes. We don't need to.
MR. ROBERSON: Right. It does get quite into the minutiae, but that would certainly be a matter for trial.
THE COURT: Okay. We've identified then the computational issues and we've identified the causation defense basically by the government to this claim. Are there any other defenses that the government would advance with respect to this diminution in value claim?
MR. ROBERSON: Well, we probably would run into foreseeability issues too, but I think I can

Page 78

discuss those foreseeability issues in a moment because they're going to be similar to the retained earnings kind of issue. So if you don't mind, I'm not going to say that we don't have a foreseeability argument. We do have one. I'll just discuss it in just a moment, because I think it applies to both the retained earnings and the diminution in value.
THE COURT: So foreseeability is another leg that the government's defense would stand on.
MR. ROBERSON: Sure. Of course. Right. And then of course all the methodological problems that our experts would address.
THE COURT: Can we move then to the replacement capital?
MR. ROBERSON: Yes. Yes, Your Honor.
THE COURT: Okay.
MR. ROBERSON: And I want to start my discussion of Plaintiffs' retained earnings theory by – just one moment, Your Honor. Your Honor, before I move on, if I could just introduce one slide, because I just wanted to get it in front of the Court. I think it was about the SAFSB claim and there were these different potential claims. I just want to present this slide so that Your Honor understands that there are differences in the four different SAFSB

Page 79

claims and maybe at some other point in time if we're not going to decide today, at least have some other discussion about what those claims are and are they going to go to trial or not. So, Your Honor, if I could, I could just provide that. I'm not going to discuss it, just provide it for Your Honor's information and then we could just move on.
THE COURT: We could also submit that following the hearing this morning.
MR. ROBERSON: Absolutely, Your Honor.
THE COURT: Why don't we do that, with an appropriate notice of filing and maybe explain what the chart shows, okay?
MR. ROBERSON: Sure. Yes.
THE COURT: Okay. Let's talk about retained earnings.
MR. ROBERSON: So I'm going to start my discussion of Plaintiffs' retained earnings by discussing the flaw in the theory as a matter of law, because, as you know, Your Honor, there was no summary judgment briefing with respect to the retained earnings theory. But there's been guidance recently issued by the Federal Circuit in Bank of America affirming the denial of the type of retained earnings brought by Plaintiffs here. I don't know if Your

Page 80

Honor is familiar with that opinion.
THE COURT: That's the very recent opinion?
MR. ROBERSON: Very recent, Your Honor.
THE COURT: Judge Wiese was the trial judge?
MR. ROBERSON: Judge Wiese was the trial court judge. And interestingly, Dr. Thacker was our expert in that case, as he is here.
THE COURT: Okay. And how does that case affect the Plaintiffs' theory on retained earnings?
MR. ROBERSON: So what Bank of America instructs is that there are no damages for retained earnings when the selling institution received at least a dollar-for-dollar compensation in the sale price for retained earnings.
In Bank of America, there was a thrift called HonFed. That was the thrift with the goodwill contract, and it was sold to Bank of America. We have a similar situation here. River Valley was sold to First Bank, and River Valley received more than a dollar-for-dollar on its retained earnings on its sale to First Bank.
So, if we go back to what happened in Bank of America at the trial court level, the trial court found the following: "With the exception then of the dividends which were actually paid, the retention of

Page 81

earnings cannot be said to harbor a cost borne by HonFed since the return ultimately came in the form of share appreciation. Plaintiffs admit that the retained earnings likely resulted in a dollar-for-dollar increase in the sale price, a value realized only upon the sale of the thrift to a third party."

THE COURT: This is Judge Wiese you're quoting?

MR. ROBERSON: Judge Wiese. I'm quoting from Judge Wiese's opinion, Your Honor. "To the extent then that the purchase of the thrift by Bank of America curtailed HonFed's payment of dividends, any unrealized costs we believe were shouldered by Bank of America." That's at 67 Fed. Cl. 577 at 589.

And the Federal Circuit affirmed, stating, "The trial court, however, found that HonFed's stop price increases mirrored those retained earnings. Indeed, Bank of America admits that the retained earnings resulted in a dollar-for-dollar increase in the sales price of HonFed. The trial court concluded HonFed did not suffer any damages from the forced retained earnings. This court again discerns no error in the trial court's reasoning or clear error in its findings." That's from the July 26, 2007, slip opinion at page 9.

Page 82

Now here, River Valley was sold to First Bank, and River Valley shareholders received close to $2 for every $1 of retained earnings. Indeed, Dr. Thacker noted that any actual cost of retained earnings to River Valley accrued to the benefit of its shareholders. Indeed, considering the $37.4 million in proceeds received from the sale of River Valley in January of 1995, Messrs. Holland and Ross realized an annual rate of return of 29.5 percent on their investment in the thrifts. So just as in Bank of America, there can be no retained earnings damages here.

There's additional guidance that was given from Bank of America. The Federal Circuit in Bank of America also affirmed that costs of retained earnings should be calculated in reference to the smallest dividend actually paid by the thrift, as reflective of the cost that shareholders required from the use of their funds at retained earnings.

Now, in Bank of America, the plaintiffs sought damages based upon a hypothetical 20 percent cost of capital. What do you know? It's exactly the same 20 percent that Dr. Holland comes up with here. The court stated, though, that in the actual world, where the thrift recorded $90 million in retained

Page 83

earnings and paid out $1.9 million in dividends, and this is the quote, "It does not appear from these figures that HonFed paid a return of 20 percent on the earnings it retained," 67 Fed. Cl. at 589.

The trial court went on to say that in Home Savings, "The Court employed the lowest cost source of capital from the thrift's earlier capital raisings, a subordinated debt issue, as a proxy for what existing shareholders would demand as a return on retained earnings." Now that's the difference between Home Savings and Bank of America. In Home Savings, there was actual replacement of the goodwill that was lost, and there was a track record with it. So there's a big difference there.

Furthermore, the trial court noted that, and this is the quotation, "Significantly, however, the Federal Circuit in Home Savings made no mention of retained earnings, and we are unwilling to infer strong support for a proposition that the court is not asked to address. We thus conclude that the cost associated with HonFed's retention of earnings are limited to the dividends actually paid out and do not include hypothetical costs of capital that the thrift never realized," 67 Fed. Cl. at 589-90.

And the Federal Circuit affirmed the court's

Page 84

reasoning. Moreover, the Federal Circuit explained that the Home Savings decision was based upon the "cost of retained earnings based on the lowest cost source of capital from the thrift's earlier capital raisings as a proxy for what the existing shareholders would demand as a return on retained earnings," again, slip opinion at page 9.

Here, Dr. Thacker has found that River Valley's actual cost of capital, that is, its actual payment of dividends on its common stock, was less than 2 percent – that's at Dr. Thacker's Exhibit 11 – whereas Dr. Holland calculates a hypothetical cost of 20 percent for its cost of capital.

And to be clear, Dr. Holland's 20 percent cost is hypothetical, purely hypothetical. He admitted that the 20 percent cost does not reflect an actual cashflow cost. The question to Dr. Holland in his deposition: "Okay. But my question was, the 20 percent is not traceable to an actual cashflow, correct?"

THE COURT: I saw that in the expert's –

MR. ROBERSON: Okay. I'll move on. So basically what we have here is the Federal Circuit has instructed that hypothetical cost replacements are barred, and that's what this is. Moreover, if you

Page 85

look at the methodology here and the fact that the retained earnings were realized with the sale of the institution, the Federal Circuit further instructs that this claim is not viable.
Now setting that aside, if we just look at the 20 percent cost of capital that Dr. Holland claims was River Valley's cost, he keeps that cost going after the First Bank acquisition.
There was no basis for First Bank having a 20 percent cost of capital, and that's really where the majority of his damages come in. There's $13 million of the $21 million in the post-First Bank acquisition period. There's no basis, though, for continuing a 20 percent cost capital for First Bank. It's an entirely different institution, entirely different capital structure, entirely different capabilities.
The interesting thing is that Dr. Holland at his deposition admitted he made no effort whatsoever to ascertain First Bank's actual cost of capital. He just had an ex ante, I'm going to take 20 percent for River Valley's cost of capital and I'm going to extrapolate that to 2013. I don't care if First Bank is the acquirer, regardless of the breach. It just makes the calculation entirely unreliable.

Page 86

And the second thing is, when you talk about the First Bank period, his theory is based on an assumption that the goodwill would have transferred to First Bank. But as has occurred in a number of cases, I think there was a decision in Granite where the court recognized that the goodwill couldn't transfer.
There's two reasons why the goodwill doesn't transfer to a third party. One is in the assistance agreements themselves, they say there has to be approval from the FDIC, and I don't know of any case where any regulator has ever testified they would have approved the transfer of goodwill to another institution. The second thing is of course under GAAP, the goodwill has to be written off with a new acquirer. So the methodology is entirely unreliable.
Now I'll talk a moment about foreseeability.
According to the Restatement of Contracts, First Bank's retained earnings theory, and I think this is going to apply to the diminution in value claim, too, these are classic textbook examples of an unforeseeable claim. But basically – no, I'll just talk about the retained earnings theory. What Plaintiff says is that it had retained earnings because of the breach and in so doing, it lost opportunity costs or the capacity to pay dividends.

Page 87

THE COURT: But it's not seeking to recover those opportunity costs I take it.
MR. ROBERSON: Well, I think that Dr. Thacker's analysis is that actually stripped away, the retained earnings theory really is an opportunity cost. And in fact, if you look at Dr. Holland's testimony, he basically admits it was the opportunity costs.
THE COURT: You're referring to Dr. Holland's deposition testimony?
MR. ROBERSON: Correct. And I'd happy to read you a couple excerpts if you'd like, or I can move on.
THE COURT: Well, actually I was going to ask the parties whether there would be any objection to the parties providing the Court with a copy of Dr. Holland's deposition and the related exhibits.
MR. ROBERSON: I'm certainly happy to provide those to you, Your Honor.
MR. BERGMAN: Fine, Your Honor.
THE COURT: Well, in that event, let's pass on, and we'll give the Court a chance to review those materials.
MR. ROBERSON: Okay.
THE COURT: I appreciate that very much,

Page 88

because I think it will facilitate our preparation for the conduct of the trial.
MR. ROBERSON: Now I'm going to get back to my foreseeability argument. But basically Plaintiffs' claim is that with more capital to restore goodwill, River Valley and then First Bank would have earned more through leveraging up and pursuing opportunities or would have dividended out its excess capital. The retained earnings theory doesn't stand by itself. It says, well, we would have done one of two things. If we didn't have to retain our earnings, we would have then pursued other opportunities or we would have dividended out the money.
THE COURT: But you're not saying and one of those opportunities would have been X.
MR. ROBERSON: Right. Correct.
THE COURT: And we didn't get to pursue X, and therefore, we lost Y.
MR. ROBERSON: Right.
THE COURT: You're not saying that?
MR. ROBERSON: Correct. But the analysis of the proposition on retained earnings is actually analogous. In fact, Dr. Thacker shows as a matter of financial certainty in a formula that the retained earnings theory really is a lost opportunity cost

Page 89

argument. And you'll see in one of his exhibits, he shows mathematically how that works out. And so the notion is that the opportunity cost is there, but it's embedded and it's silent. And the reason why that's a problem is because the Federal Circuit instructs that opportunity costs or lost profits on opportunity costs have to be specified. So it's a roundabout way to get around the problems with proving a lost profits claim, and that's going to be Dr. Thacker's testimony in this regard. And it's important, but it also ties to foreseeability.

So the notion is that the restatement says that a lost opportunity cost involving, and that's the important thing, its capital here, that kind of problem is not foreseeable, and let me just go into this in a little bit more detail.

If the thrift had profitable opportunities regulators would have permitted it to pursue with more capital, River Valley Holdings Company could have borrowed money and downstreamed it to the thrift and the thrift's investment. And if the holding company could not have obtained funds where there was such a profit loss investment, that fact could not be foreseeable.

It simply is not foreseeable in the usual

Page 90

course of business that the nonbreaching party would be unable to find replacement funds. And this is stated in the Restatement of Contracts at Section 351, Comment E. "The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money," and that's what is unique about the Winstar cases. This is not about lending a service or a product. It's capital at issue here. So the analogy to lending money is totally appropriate.

I'll just repeat the Restatement of Contracts says that, "The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of the breach." In most cases then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.

So similarly, if the thrift couldn't have dividended out -- well, I'll just leave the argument there. I see Your Honor looking at the clock.

THE COURT: Well, I think we have a pretty good idea of the Defendant's position on that point.

Page 91

We've given you a little more time than Mr. Johnson had. So I was inclined to suggest that unless there's some further devastating point that we should consider at this juncture that we consider whether a brief rebuttal is desired.

MR. ROBERSON: Yes, Your Honor. And I do have one question that's not on the argument. So when we're through with it, I just want to bring that up with you. Just note that there is just one other issue that I want to discuss with the Court.

THE COURT: All right. Now, as I said, we've taken more time than I had anticipated. I would be happy to take a brief recess, Mr. Johnson, if you would like us to do so or not.

MR. JOHNSON: I would appreciate that.

THE COURT: Okay. Why don't we take a 10-minute recess, and then we'll pick up with any rebuttal you may care to make.

MR. JOHNSON: Thank you.

(Whereupon, a short recess was taken.)

THE COURT: Please be seated. Mr. Johnson, we're all ears.

MR. JOHNSON: Thank you, Your Honor. I appreciate all of the ears and I'll try to be as easy on them as I can be.

Page 92

With regard to the SAFSB lost profits claim, Your Honor, we heard an awful lot about double recovery, but I didn't catch a single word about double recovery by the entity that's actually pursuing that claim, Your Honor.

This is River Valley's claim. River Valley did not get the benefits of the SAFSB acquisition. River Valley is a separate entity from any of the other entities or individuals Mr. Roberson mentioned in his presentation. So the double recovery issue is just a red herring, Your Honor. This claim is permitted, it's appropriate, and it's well proven with actual traceable cashflows.

As to Dr. Murphy's lost value analysis, Your Honor, the government says there was no loss. Well, that's just contradicted by the price at which the FSLIC actually bought and sold its ownership interest in the institution.

Now the government tries to impugn that actual transactional data with some other factors, but let's think about what we would actually expect to see if the government were right, if the value of the institution hadn't been diminished by the breach. Well, for one thing, the preferred security had a feature to it that was essentially an escalation

Page 93

in the dividend rate that was to occur some period of years out from issuance. So, as we move forward in time, the escalation in the FSLIC's return is getting closer. That alone would affect the value of the stock upward if nothing changed about the institution. So the further we move forward in time, the more valuable the preferred stock instrument should become, not the less valuable.

Second, Your Honor, the government says economic conditions may have changed. Well, indeed, they may have. And in fact, the interest rate environment did change. It changed in a way that was very favorable to River Valley. Given River Valley's interest rate risk management strategy, the change in the interest rate environment between 1988 and 1991 enhanced River Valley's expected profitability, and that should have improved the value of FSLIC's ownership interest, not caused it to decline.

And third, Your Honor, between 1988 and 1991, FSLIC itself had an additional period of exposure to River Valley's management. And do you know what the regulators determined? They loved them. They determined River Valley met or exceeded every projection it ever gave to the regulators.

So FSLIC, more familiar with an institution

Page 94

operating in a more favorable macro environment with an instrument and ownership interest that automatically should be becoming more valuable, decides to redeem it for less, Your Honor. That demonstrates that there was a diminution in value of the entire institution here.

Your Honor, there are ample reasons why the portfolio mark to markets do not reflect the value of the institution as a whole, as we explained in the summary judgment briefing. If the Court's interested, I'm happy to go plow that ground again now. Otherwise, I would perhaps leave that for explanation at trial. The same goes for the Lawrence Barr analysis, not transaction-driven, not an attempt to measure the value of the institution, not something that provided the basis of the purchase or sale –

THE COURT: I do think that those aspects are a little more detailed than I had anticipated at this stage.

MR. JOHNSON: All right. Your Honor, with regard to the mitigation claim, Mr. Roberson cites a section of the Restatement that I think very accurately describes what Dr. Holland did.

The section Mr. Roberson described says when a borrower contracts to get a loan and the lender

Page 95

fails to fund it, the borrower can't go out and say, your failure to lend me the money caused me to miss out on this gazillion dollar opportunity, you owe me a gazillion dollars. Instead, the borrower needs to go out and show, well, you wouldn't lend me the money at 8 percent, but Bank B down the street lent it to me at 20 percent, you owe me 12 percent times the amount of the loan times the number of years the loan was outstanding. Your Honor, that's what Dr. Holland did here.

If the Court has other questions, I'd be glad to answer them. Otherwise, again, I think I've said my piece.

THE COURT: The one question that I had is with respect to the Bank of America decision to which Mr. Roberson alluded.

MR. JOHNSON: Yes, Your Honor.

THE COURT: I don't know whether you've had a chance to study that or not, but if you have, I'd be interested in your reactions.

MR. JOHNSON: Well, Your Honor, we are studying it. I think that there are important differences, and it is not any kind of legal preclusion to the claims we're making here. I'd prefer to address that in greater detail at another time.

Page 96

THE COURT: Yes. Right.

MR. JOHNSON: But the underlying theories as to why there is a cost associated with the retained earnings in the two cases are different, and Judge Wiese's reasoning does not apply to Dr. Holland's reasoning.

THE COURT: And I assume that we will get into that in more detail in the Appendix A filings in terms of memorandum of facts and law. At least I would hope to see that issue discussed in that context. And it might make more sense to deal with it after the parties have put their views on paper in a considered way rather than try to do it at this juncture.

MR. JOHNSON: Absolutely, Your Honor.

THE COURT: There was a mention I believe of an expert report by Dr. Murphy, am I correct, which supports at least one of the damage theories of the Plaintiff?

MR. JOHNSON: Yes, Your Honor. Dr. Murphy is the sponsor of the lost value theory.

THE COURT: Would it be possible to provide a copy of that report to the Court?

MR. JOHNSON: Yes, Your Honor. And if memory serves, Dr. Murphy supplemented that either by

Page 97

a supplemental report or by a declaration, and we'll get you as complete an explanation as there is in the report format.

THE COURT: Good. That again would help the Court in its preparation. I take it, Mr. Roberson, you don't have any objection to the Court looking at that material?

MR. ROBERSON: Your Honor, I do have an objection with the exception that if we're permitted to provide the Court with the expert reports that the Defendant's expert prepared in response to that, we'd be happy to provide that to you.

THE COURT: Sure.

MR. JOHNSON: Without objection.

THE COURT: No objection to that, and I think that's something that would be of interest to the Court. Mr. Johnson, with that, as far as I'm concerned, I think we've ventilated the issues adequately.

MR. JOHNSON: Thank you, Your Honor, and I appreciate the Court's attention. One very minor housekeeping matter that relates to the meeting of counsel.

THE COURT: Yes.

MR. JOHNSON: Mr. Roberson graciously

Page 98

acceded to a request we made to defer the exchange of disclosures relating to Rule 1006, summary exhibits, until Friday, the 21st. So the meeting of counsel's other obligations will be discharged on Tuesday. Summary exhibits have been carved out to take place on or before Friday, the 21st.

THE COURT: And this is a matter that counsel have worked out among themselves?

MR. JOHNSON: Yes, Your Honor. We're in agreement.

THE COURT: Sure.

MR. ROBERSON: Yes, Your Honor. The only thing I would add to it is, and we didn't discuss this expressly, but I would just ask the same courtesy, that if they're going to extend to the 21st, to issue or provide the summary exhibits that we be given the same deadline.

MR. JOHNSON: Absolutely, Your Honor.

THE COURT: Okay. Well, that settles that matter. Thank you very much, Mr. Johnson.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: Mr. Roberson, I think you said you had a point you wanted to raise that did not go to the substantive discussion.

MR. ROBERSON: Right, Your Honor. You may

Page 99

recall we amended our answer and we have asserted a counterclaim for breach of the covenant not to sue, as the Court sees.

THE COURT: Yes.

MR. ROBERSON: And as part of our motion, we asked that the Court require Plaintiffs to identify the co-executor. We know that Steven Bangert is one executor of the Ross estate. And since we do have a counterclaim against it, my understanding is that the requirement is is that the executors be notified of the existence of the counterclaim, because obviously they're going to need to wrap up or do whatever they need to do with the estate.

And my concern is is that either we need to get a representation from the Plaintiff that Mr. Bangert has notified the co-executor, whoever he is, we don't know who he is or she, that the counterclaim exists so that there's proper consideration given to that or that we be given that information directly.

And my concern is is that, Your Honor, I suspect what the notion is is that Mr. Bangert lives in Colorado and Mr. Ross had a lot of business entities in Colorado. He also had a lot in Chicago and Illinois, and I would assume that there is a co-executor that's probably doing the Illinois versus the

Page 100

Colorado. But we just need for the fact that there's been a counterclaim asserted that the executor be made aware, the co-executor, whoever he is, be made aware of it. We looked at the law, and I didn't see an actual obligation.

THE COURT: Well, I was going to ask that. What is your source of the obligation to inform the co-executor?

MR. ROBERSON: Well, it was uncertain. We didn't get a firm legal ruling that said that if Mr. Bangert knows of the counterclaim that he has an ethical or fiduciary obligation to inform its co-executor. And again, I assume that they're in different states and that's why we may have some problem.

So my only request is that either we get a representation by the Plaintiff that the co-executor does know of the existence of the counterclaim or that we be provided the address information so we can provide notice of the existence of the counterclaim.

THE COURT: The notice that has been given, you have given notice to Mr. Bangert, is that correct?

MR. ROBERSON: Well, no. I mean, he has it since he's appeared in this case. So, in that respect, I don't think we need to provide him with

Page 101

something literal. I just want to make sure that the co-executor, whoever and wherever they are, are also aware of the counterclaim.

THE COURT: The idea being that if there is a body of funds under the control of the co-executor, he should be aware that he shouldn't disburse them down to zero while the counterclaim is pending?

MR. ROBERSON: Yes, sir. There is that fiduciary duty, Your Honor.

THE COURT: Mr. Bergman or Mr. Johnson, do you have a view on this subject?

MR. BERGMAN: Your Honor, I'm not in a position to either make the representation requested or to give the information requested, and I'm happy to talk to Mr. Roberson more about what the real obligation is. I don't know what Department of Justice's obligation is. I assume that Mr. Bangert is carrying out his duties as he believes is appropriate. If Department of Justice has a further obligation, I'm happy to try to figure out what it is.

THE COURT: Let me just maybe pursue this one step further. What would be the reason not to advise the co-executor?

MR. BERGMAN: I can't think of a reason. I've only spoken with Mr. Bangert about it. It may be

Page 102

that he's immediately picked up the phone and called his co-executor. It wouldn't surprise me at all. But I don't know that that's happened.

THE COURT: Do you contemplate ascertaining whether that has happened?

MR. BERGMAN: I certainly can do that.

THE COURT: And then speaking with Mr. Roberson?

MR. BERGMAN: I'd be happy to do that as well.

THE COURT: And let's assume just for the sake of argument that Mr. Bangert has not communicated with his co-executor. What then would if you know the Plaintiff's position be?

MR. BERGMAN: Your Honor, I don't know.

THE COURT: Okay.

MR. BERGMAN: I would be surprised if it hasn't been communicated. I would be surprised if there was a reason not to communicate it. If there is, I'd certainly report that.

THE COURT: Well, why don't we let Mr. Bergman consult with Mr. Bangert and report to Mr. Roberson, and then you gentlemen discuss what, if anything, further either of you thinks needs to be done, and give chambers a call, and if necessary,

Page 103

we'll do a telephonic status conference. How would that be?

MR. BERGMAN: That's fine, Your Honor.

MR. ROBERSON: Your Honor, I'm assuming that this is probably going to be worked out pretty quickly, that they'll just say, yes, we communicated with the co-executor and he has knowledge of it. What we would need, though, is some written representation to that effect. So my suggestion would be at least anticipating where we would be given communication that I'm anticipating we would get just to ask that the Plaintiff file a notice to the Court as a written record that Plaintiff has identified the co-executor and provided notice of this lawsuit so that there is a written record of the status of that notice.

THE COURT: I would again remit that to discussions between the two of you. And if there is some dispute about what the Plaintiff in the government's view should provide, we can discuss that and the Court can make an appropriate ruling if we get to that point let us say.

Now if Mr. Bergman represents that the co-executor has been made aware of the lawsuit and the government requests some written confirmation and for

Page 104

some reason that is not forthcoming, we could then get into what exactly the obligation of one in either the Plaintiffs' position or the Defendant's position is with respect to giving notice.

You would have to get into that I think before resolving a request of that nature if there were an objection. Maybe there wouldn't be an objection and the whole thing would be moot. But before we get into those other interesting but possibly unnecessary questions, I think the suggestion that counsel confer among themselves with a view toward reaching agreement is a very helpful one. And if for some reason counsel remain at an impasse over some particular point, the Court would appreciate it if counsel would call chambers, and the Court would set up a telephonic status conference and hopefully resolve the issue promptly.

MR. BERGMAN: I hope we won't have to impose on the Court, Your Honor. I didn't really view this as impasse at this point.

THE COURT: I may be seeing impasses where none exist. That wouldn't be the first time. But in any event, let's leave it at the point where counsel will confer and if there is any problem or need to involve the Court that counsel will notify the Court

Page 105

and we can resume this discussion if we need to. Anything further on either side? Mr. Roberson?

MR. ROBERSON: Your Honor, I just wanted to recap if we could what our obligations are. My understanding right now is that we're to provide you with our rebuttal expert reports with regard to Dr. Murphy's diminution in value claims.

THE COURT: I believe that's right.

MR. ROBERSON: And also provide you with the deposition transcripts, and I take it you're only interested in the retained earnings deposition that was taken recently.

THE COURT: Of?

MR. ROBERSON: I'm sorry. Dr. Holland.

THE COURT: Dr. Holland, right. That's correct.

MR. ROBERSON: Okay. I think that's where I'm at on the obligations.

THE COURT: Any disagreement on that? I think that's a common understanding.

MR. JOHNSON: Your Honor, that's our understanding, and we will provide Dr. Murphy's reports.

THE COURT: Great. If there is no other business to come before the house, we will stand

Page 106

adjourned. And thank you all very much.

MR. ROBERSON: Thank you, Your Honor.

(Whereupon, at 11:30 a.m., the hearing in the above-entitled matter was concluded.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

Page 107

REPORTER'S CERTIFICATE

DOCKET NO.: 95-524C
CASE TITLE: Holland v. United States
HEARING DATE: September 6, 2007
LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: September 6, 2007

Tammy Brodsky
Heritage Reporting Corporation
1220 L Street, N.W.
Washington, D.C. 20005

**Look-See Concordance Report**

---

UNIQUE WORDS: 2,099
TOTAL OCCURRENCES: 8,255
NOISE WORDS: 384
TOTAL WORDS IN FILE: 20,569

---

SINGLE FILE CONCORDANCE

---

CASE SENSITIVE

---

COVER PAGES = 3

---

INCLUDES ALL TEXT OCCURRENCES

---

DATES ON

---

INCLUDES PURE NUMBERS

---

POSSESSIVE FORMS ON

## – DATES –


**August, 1991** [1]
*52:17*
**August 14** [2]
*4:5, 9*
**August of 1990** [2]
*49:15; 50:19*
**August of 1993** [1]
*52:6*
**December, 2003** [1]
*70:6*
**December 03** [1]
*57:17*
**December 21** [2]
*12:13; 13:5*
**December of 1988** [1]
*73:5*
**February, 2005** [1]
*57:25*
**January 18** [2]
*5:10; 6:4*
**January of 1995** [1]
*82:8*
**July** [1]
*21:10*
**July, 1988** [3]
*23:19, 23; 73:22*
**July 26, 2007** [1]
*81:24*
**July of 1990** [1]
*49:5*
**June of 1989** [1]
*49:15*
**June of 1992** [1]
*64:7*
**March 20, 2007** [1]
*70:19*
**March of 1991** [1]
*72:5*
**May** [1]
*47:5*
**October of 1991** [1]
*53:21*
**September 5** [1]
*59:3*
**September 6, 2007** [2]
*107:5, 14*
**September of 1990** [1]
*73:5*
**September of 1991** [1]
*64:6*

## – $ –

**$1** [2]
*64:10; 82:3*
**$1.9** [1]
*83:1*
**$10** [1]
*64:11*
**$10.4** [1]
*71:2*
**$110** [1]
*64:6*
**$12.6** [1]
*23:8*
**$13** [1]
*85:11*
**$14.7** [1]
*71:2*
**$14.8** [4]
*35:3, 11; 36:3, 7*
**$16** [1]
*73:6*
**$17.46** [1]
*69:20*
**$17.461** [2]
*70:10; 71:6*
**$2** [2]
*24:3; 82:3*
**$20** [1]
*36:18*
**$20.9** [2]
*30:10; 70:6*
**$21** [3]
*57:22; 70:13; 85:12*
**$21.8** [1]
*30:2*
**$21.846** [1]
*71:8*
**$22** [1]
*74:18*
**$22.7** [1]
*34:21*
**$28.61** [1]
*58:13*
**$3.675** [1]
*34:1*
**$37.4** [1]
*82:6*
**$4.6** [1]
*21:25*
**$45** [14]
*29:13; 58:20; 59:2, 17, 18; 60:18; 61:6, 21, 23, 25; 65:11; 67:24; 68:25; 69:1*
**$48** [1]
*53:22*
**$5** [10]
*22:14; 23:5; 24:1; 33:24; 36:1; 70:22; 73:14, 16; 75:25; 76:1*
**$6** [1]
*64:7*
**$6.5** [3]
*73:13; 75:24; 76:2*
**$7** [2]
*35:24; 64:9*
**$7.9** [1]
*35:1*
**$8** [3]
*21:24; 53:24; 73:6*
**$90** [1]
*82:25*

## – 0 –

**03** [1]
*57:17*

## – 1 –

**1** [4]
*9:17, 18; 14:8; 70:16*
**10** [3]
*11:1; 62:14; 63:23*
**10-minute** [1]
*91:16*
**100** [1]
*68:4*
**1006** [1]
*98:2*
**11** [1]
*84:12*
**11:30** [1]
*106:3*
**12** [1]
*95:7*
**1220** [1]
*107:18*
**14** [2]
*4:5, 9*
**18** [2]
*5:10; 6:4*
**1987** [1]
*20:20*
**1988** [13]
*21:7; 23:19, 24; 33:17, 24; 34:20, 22; 35:4; 72:5; 73:5, 22; 93:15, 19*
**1989** [2]
*25:23; 49:15*
**1990** [6]
*49:5, 15; 50:20; 53:13, 17; 73:5*
**1991** [17]
*33:19, 22; 34:1, 25; 35:4; 40:20, 25; 45:17; 51:8; 52:17; 53:18, 22; 62:9; 64:6; 72:5; 93:15, 20*
**1992** [3]
*28:2; 53:18; 64:7*
**1993** [4]
*52:6, 7; 53:14, 18*
**1994** [3]
*19:17; 27:3; 28:2*
**1995** [1]
*82:8*
**1998** [1]
*33:22*

## – 2 –

**2** [7]
*9:17, 18; 14:9; 70:16, 21; 71:4; 84:11*
**20** [21]
*41:1, 12, 13, 15, 17; 42:1, 19; 44:13; 70:19; 82:21, 23; 83:3; 84:13, 14, 16, 18; 85:6, 10, 14, 21; 95:7*
**20005** [1]
*107:19*
**2001** [1]
*55:3*
**2003** [2]
*55:3; 70:7*
**2005** [2]
*55:3; 57:25*
**2007** [4]
*70:19; 81:24; 107:5, 14*
**2013** [1]
*85:23*
**209** [1]
*49:8*
**21** [2]
*12:13; 13:5*
**211** [1]
*53:23*
**21st** [4]
*12:23; 98:3, 6, 15*
**241.192** [1]
*47:20*
**25** [2]
*41:7; 72:16*
**25-year** [1]
*23:10*
**26** [2]
*59:13; 81:24*
**29.5** [2]
*42:13; 82:9*
**29.7** [1]
*42:13*
**290** [1]
*51:13*

## – 3 –

**3** [3]
*14:11; 70:21; 71:5*
**30** [7]
*11:4, 8, 14; 41:7; 42:12; 63:19, 20*
**342** [1]
*50:21*
**351** [1]
*90:3*
**37** [1]
*53:25*

## – 4 –

**4** [3]
*15:2, 8; 51:9*
**40** [2]
*5:24*
**400** [1]
*50:25*
**410** [1]
*50:18*

## – 5 –

**5** [7]
*8:15; 9:4; 50:10; 51:9, 10; 59:3; 63:25*
**577** [1]
*81:14*
**589** [2]
*81:14; 83:4*
**589-90** [1]
*83:24*

## – 6 –

**6** [2]
*107:5, 14*
**60** [4]
*5:23; 66:13; 67:17; 68:3*
**67** [3]
*81:14; 83:4, 24*

## – 7 –

**70.365** [1]
*71:2*

## – 8 –

**8** [1]
*95:6*

## – 9 –

**9** [2]
*81:25; 84:7*
**90s** [1]
*41:5*
**95-524C** [1]
*107:3*

## – A –

**a.m.** [1]
*106:3*
**abandon** [1]
*55:6*
**abandoned** [6]
*56:19; 57:13, 19; 58:4, 7, 8*
**ability** [2]
*43:2; 48:6*
**able** [10]
*6:21; 8:16, 20, 22; 12:25; 17:12; 34:18; 56:3; 60:2; 68:24*

above-entitled [1]
106:4
Absolutely [3]
79:10; 96:15; 98:18
absolutely [3]
55:9, 12; 68:12
acceded [1]
98:1
accept [1]
10:20
acceptable [2]
4:17; 15:24
accepted [2]
39:11; 44:16
According [1]
86:17
according [1]
23:10
account [1]
45:8
accountant [1]
73:20
accounted [3]
23:13; 24:13; 40:2
accrued [4]
28:20; 32:11; 82:5
accumulated [1]
39:15
accurately [2]
94:23; 107:9
achieve [1]
29:21
acquire [3]
24:10; 28:5; 62:20
acquired [5]
19:17; 28:11; 31:20; 35:17; 46:7
acquirer [3]
29:17; 85:24; 86:15
acquirers [1]
20:17
acquiring [5]
21:9; 23:22; 24:23; 25:11; 31:12
acquisition [20]
25:5, 9; 27:24; 28:2, 6, 10; 29:12; 31:7, 17; 32:9; 33:17; 58:14; 60:18; 63:11, 17; 65:24; 85:8, 13; 92:7
acquisitions [5]
20:5; 25:22; 27:3; 31:14; 58:15
action [3]
18:5, 13; 19:6
actions [2]
90:5, 12
actively [1]
20:9
activities [2]
20:11; 54:11
actual [18]
28:16; 29:14; 32:17; 42:12, 20; 43:18; 74:1; 82:4, 24; 83:12; 84:9, 17, 19; 85:20; 92:13, 20; 100:5
add [1]
98:13
added [1]
56:6
addition [6]
4:18; 14:25; 21:17; 22:3, 17; 56:21
additional [7]
9:1; 43:10; 46:21; 57:3; 82:13; 90:19; 93:20
additions [3]
4:7; 13:21; 16:13
additive [1]
46:17
address [8]
44:11; 45:22; 58:16; 77:13; 78:12; 83:20; 95:25; 100:19
adequate [1]
32:22
adequately [1]
97:19
adjourned [1]
106:1
adjusted [2]
57:23; 70:6
adjustment [2]
36:15; 57:21
administrative [1]
19:3
admit [3]
14:12; 68:23; 81:3
admits [3]
67:25; 81:18; 87:7
admitted [9]
14:3, 11; 15:11; 60:1; 66:22; 67:23; 84:16; 85:19
adopts [1]
45:16
advance [1]
77:22
adverse [1]
49:13
advise [2]
8:15; 101:23
affect [6]
19:20; 36:2; 52:18; 75:6; 80:9; 93:4
affirmed [4]
44:17; 81:15; 82:15; 83:25
affirming [1]
79:24
agency [1]
53:21
agree [1]
10:16
agreed [2]
5:21; 8:5
agreement [15]
7:18; 8:16, 20, 22; 21:11; 22:13; 23:23; 51:7, 11; 52:7, 17, 18; 54:14; 98:10; 104:12
agreements [5]
51:22; 53:2, 3; 54:17; 86:9
agrees [1]
40:24
aid [1]
76:9
alert [1]
12:12
alleged [1]
67:12
allocated [1]
37:15
allocates [2]
40:4, 6
allocation [2]
30:7; 37:18
allotted [1]
11:4
allowed [1]
28:16
allude [1]
11:10
alluded [2]
60:19; 95:16
alluding [1]
49:18
alone [1]
93:4
alternative [1]
46:13
ambit [1]
35:21
amended [1]
99:1
America [14]
79:23; 80:10, 15, 17, 23; 81:12, 14, 18; 82:11, 14, 15, 20; 83:11; 95:15
American [4]
32:4, 5; 62:19, 21
amortized [1]
23:10
amount [22]
4:21; 5:21; 7:10, 11; 24:1, 3; 29:13; 30:1, 10; 31:2; 38:2, 9; 39:12, 14, 24; 42:2, 25; 43:22; 67:10; 73:23; 90:19; 95:7
amounts [1]
6:14
ample [2]
27:21; 94:7
analogous [1]
88:23
analogy [1]
90:9
analyses [2]
11:7; 73:8
analysis [22]
10:2, 3; 23:1; 36:25; 40:21, 23; 44:5, 9, 18; 45:17, 20, 23, 24; 46:2, 13; 55:21; 73:24; 87:4; 88:21; 92:14; 94:14
analyzed [1]
34:11
ANB [7]
62:21; 63:11; 64:3, 10; 65:6, 7
annual [1]
82:9
answer [6]
36:5; 46:22; 61:9; 73:7; 95:12; 99:1
ante [1]
85:21
anticipated [6]
22:9; 37:4; 44:7; 75:15; 91:12; 94:18
anticipating [2]
103:10, 11
Antonio [8]
27:4, 14, 18, 19, 21; 28:6, 11; 31:21
anyway [1]
5:25
apologize [1]
28:2
App [1]
8:12
appear [1]
83:2
appeared [1]
100:24
appears [1]
19:2
Appendix [1]
96:8
applicable [3]
7:4; 17:2; 48:11
application [1]
45:19
applied [5]
34:23; 35:18; 39:10; 90:5, 12
applies [2]
30:11; 78:6
apply [3]
36:11; 86:19; 96:5
applying [2]
34:15; 35:22
appreciate [7]
34:8; 46:25; 87:25; 91:15, 24; 97:21; 104:15
appreciation [2]
42:14; 81:3
approach [1]
56:24
approached [4]
21:7; 62:9, 12, 19
appropriate [9]
4:7; 7:19; 20:4; 39:18; 79:12; 90:9; 92:12; 101:18; 103:21
appropriately [2]
40:3; 46:3
approval [1]
86:10
approved [1]
86:12
approximate [1]
30:1
approximately [3]
29:13; 30:10; 60:18
area [1]
21:10
argue [2]
60:3; 74:19
argued [2]
64:13; 65:15
argument [23]
11:2; 42:18; 44:4; 56:7; 59:19, 24; 62:3; 63:11, 14; 69:4; 72:6, 7, 12, 17, 18; 74:14; 75:15; 78:5; 88:4; 89:1; 90:22; 91:7; 102:12
arguments [3]
61:6; 74:7, 15
arisen [1]
17:6
arose [2]
49:11
arrangements [1]
90:16
ascertain [1]
85:20
ascertaining [1]
102:4
aside [2]
61:11; 85:5
asking [1]
55:24
aspect [1]
43:25
aspects [1]
94:17
assert [1]
59:2
asserted [2]
99:1; 100:2
asserting [1]
58:25
assertion [1]
47:24
asset-and-liability [1]
26:14
assets [5]
47:18; 49:14; 51:5; 53:23; 62:11
assistance [7]
21:17; 22:18; 53:1, 3; 54:17; 86:8
associated [4]
36:13; 67:19; 83:21; 96:3
Association [1]
20:7
assume [12]
60:15; 61:2; 62:2, 15; 71:15; 74:14, 16; 96:7; 99:24; 100:13; 101:17; 102:11
assumed [3]
14:16; 16:6; 58:23
assuming [6]
48:8; 53:9; 64:15; 69:17; 76:23; 103:4
assumption [4]
16:8, 10; 74:19; 86:3
assurance [1]
24:25
astonishing [1]
68:24
attached [1]
22:19
attempt [2]
45:4; 94:14
attempted [2]
27:19, 24
attempting [1]

43:5
attention [3]
21:5; 46:21; 97:21
attitude [1]
32:7
attracted [1]
21:4
attractive [1]
27:4
attributed [3]
67:19; 71:3; 73:11
atypical [1]
47:9
August [6]
4:5, 9; 49:15; 50:19; 52:6, 17
automatically [1]
94:3
available [3]
7:12; 39:15; 90:14
avoid [1]
17:14
award [3]
29:6; 32:22; 67:9
aware [10]
12:19; 18:5; 20:12; 26:4; 55:23; 100:3; 101:3, 6; 103:24
awful [1]
92:2

– B –

background [1]
67:7
balance [2]
37:6, 11
Bangert [12]
18:15; 19:2; 63:20; 99:7, 16, 21; 100:11, 22; 101:17, 25; 102:12, 22
Bangert's [1]
19:5
Bank [42]
7:6; 18:11, 21; 19:11, 13, 16; 27:5, 15; 32:5; 58:5, 9; 62:19, 21; 67:2, 5, 6; 79:23; 80:10, 15, 17, 19, 21, 22; 81:11, 13, 18; 82:2, 10, 14, 20; 83:11; 85:8, 9, 12, 14, 23; 86:2, 4; 88:6; 95:6, 15
bank [2]
10:1; 19:10
Bank's [3]
32:5; 85:20; 86:18
banker [2]
18:8, 24
banking [1]
27:10
banks [1]
42:3
bargain-type [1]
44:19
bark [1]
55:25
Barr [1]
94:13
barred [2]
53:4; 84:25
base [2]
39:23; 40:7
Based [1]
34:23
based [9]
5:7; 34:18; 42:2; 43:9; 54:25; 82:21; 84:2, 3; 86:2
basic [3]
60:19; 72:17, 18
basically [8]
50:23; 62:16; 75:10; 77:20; 84:23; 86:21; 87:7; 88:4
basis [5]
37:5; 70:24; 85:9, 13; 94:16
Bates [1]
9:21
Bates-stamped [1]
9:9
Bear [1]
14:25
becoming [2]
20:15; 94:3
believe [3]
81:13; 96:16; 105:8
believed [1]
16:21
believes [1]
101:18
beneficial [1]
7:22
benefit [9]
42:22; 44:19; 64:25; 65:9; 66:6, 9, 17; 67:22; 82:5
benefits [1]
92:7
BERGMAN [22]
4:10, 15; 5:5; 8:24; 10:15, 23; 11:22; 12:8; 13:18; 14:22; 15:21; 16:9; 17:23; 87:20; 101:12, 24; 102:6, 9, 15, 17; 103:3; 104:18
Bergman [12]
4:9; 8:23; 10:13; 11:20; 13:17; 14:21; 15:20; 17:21; 55:11; 101:10; 102:22; 103:23
binding [1]
19:19
bit [7]
11:16, 18; 30:4; 47:9; 60:9; 66:4; 89:16
blank [2]
14:9, 11
Bluebonnet [1]
29:4
board [1]
10:7
body [2]
17:12; 101:5
bond-like [1]
34:13
books [1]
26:6
borne [1]
81:1
borrowed [1]
89:20
borrower [4]
90:15; 94:25; 95:1, 4
borrowing [1]
62:19
bought [1]
92:17
bound [3]
5:7, 23; 41:6
bounds [1]
6:4
breach [53]
19:17, 18; 20:3, 6; 25:21; 26:8, 19; 27:1, 20; 28:4, 7; 29:24; 30:1; 31:19, 24; 32:6, 7; 33:10, 17, 20, 21; 35:15; 36:6, 9, 12, 21; 37:6, 18; 38:8, 9, 14, 15, 22; 39:8; 40:22; 45:2, 7; 46:1, 5; 47:11; 63:12; 65:3; 71:3; 72:13; 74:21; 76:25; 85:24; 86:24; 90:5, 12, 17; 92:23; 99:2
breach-caused [1]
28:7
breached [2]
25:23; 40:7
breached-against [1]
45:3
breaching [1]
62:24
break [1]
13:8
breakdown [1]
54:2
brief [7]
8:18; 29:3; 42:23; 53:15; 65:15; 91:4, 13
briefing [6]
54:23; 56:6; 59:7, 23; 79:21; 94:10
briefly [1]
47:6
broad [1]
23:24
broader [1]
36:20
Brodsky [1]
107:16
build [2]
38:13; 39:21
built [1]
21:3
burden [4]
6:2; 10:17; 11:15; 14:15
burdensome [1]
9:11
business [5]
4:2; 20:11; 90:1; 99:22; 105:25
businessman [1]
18:24
but-for [2]
36:12; 45:11
buy [1]
22:14

– C –

calculate [1]
7:7
calculated [2]
48:21; 82:16
calculates [1]
84:12
calculation [6]
36:2; 39:23; 41:8; 42:9; 45:16; 85:25
calculations [5]
19:20; 30:3, 22; 34:8; 39:10
call [5]
24:11; 39:23; 74:18; 102:25; 104:15
calling [1]
51:22
CAMEL [1]
53:10
candidates [1]
20:16
capabilities [1]
85:17
capacity [3]
19:3, 4; 86:25
Capital [3]
32:12; 63:18; 64:4
capital [121]
21:24; 22:2; 23:8, 9, 13, 14, 17, 25; 24:2, 7, 12, 14; 25:24; 26:1, 3, 9; 27:21; 30:8; 31:21; 35:12, 14; 36:9, 14; 37:7, 9, 10, 14, 16, 20, 23, 24, 25; 38:3, 9, 14, 16, 25; 39:8, 12, 14, 24; 40:1, 5, 7, 10, 12, 15, 20, 22, 25; 41:11, 19; 42:17; 43:6, 9, 15; 45:8, 11; 47:12, 13, 14, 15, 19, 22, 23; 48:6, 9, 11, 14, 16, 18, 24; 49:1, 10, 21; 50:10, 19, 21, 23; 51:6, 9, 12, 14, 18, 21; 52:25; 53:4, 24, 25; 54:8, 12, 18; 57:15; 58:5; 70:24; 75:5, 8; 77:8; 78:14; 82:22; 83:7, 23; 84:4, 9, 13; 85:6, 10, 14, 16, 20, 22; 88:5, 8; 89:14, 19; 90:8
capital-deficient [1]
47:17
capitalization [1]
33:7
care [3]
54:2; 85:23; 91:18
careful [1]
22:25
carryforwards [1]
58:10
carrying [1]
101:18
carved [1]
98:5
CASE [1]
107:4
case [36]
4:25; 5:22; 6:6, 17; 7:13, 14, 24; 11:5; 12:1; 16:22; 17:18, 21; 18:7, 9, 19; 20:21; 21:19; 28:13; 29:10, 20; 47:20; 49:21, 22; 54:20; 55:10; 56:10, 15; 57:1; 59:16; 67:3, 4; 80:7, 8; 86:10; 100:24; 107:11
cases [9]
5:14, 17; 44:16; 56:11; 59:14; 86:4; 90:7, 17; 96:4
cash [6]
21:18, 20; 22:18; 40:16; 43:18
cashflow [2]
84:17, 19
cashflows [5]
28:17; 29:15, 21; 92:13
catch [1]
92:3
Causation [1]
45:6
causation [11]
30:16; 31:18; 36:21; 44:21; 45:12; 70:15; 72:3, 7; 74:9; 75:19; 77:20
caused [9]
29:24; 52:22, 23; 54:11; 74:21; 76:25; 77:2; 93:18; 95:2
caution [1]
6:14
CEO [1]
63:21
certainty [11]
29:19, 20; 30:16; 32:14, 15, 16, 21; 35:21; 44:21; 45:15; 88:24
CERTIFICATE [1]
107:1
certified [1]
73:19
certify [1]
107:8
chambers [3]
44:1; 102:25; 104:15
chance [3]
57:4; 87:22; 95:19
change [5]
34:6; 35:10; 70:7; 93:12, 14
changed [4]
26:15; 93:5, 10, 12
changes [2]
4:6; 16:17
changing [3]
12:21; 36:17; 77:2
chart [1]
79:13
charts [2]
56:18; 69:15
Chicago [1]
99:23
choice [1]
38:23
choose [1]
38:17
chopping [1]
50:3
Christmas [3]
12:14, 18; 13:2

chronology [1]
29:1
Circuit [10]
44:17; 79:23; 81:15; 82:14; 83:17, 25; 84:1, 23; 85:3; 89:6
circular [1]
74:23
circulated [1]
16:18
cites [1]
94:21
Cl [3]
81:14; 83:4, 24
claim [62]
6:22; 19:14, 15; 30:17; 37:5; 48:3; 52:22; 55:3, 18, 19, 22, 23; 56:2, 3, 4, 6, 12, 14; 58:2, 5, 8, 19; 59:3, 17, 18; 60:20, 23; 61:7, 21, 23, 25; 62:3, 6, 8; 66:20; 68:19, 21; 69:21; 70:13, 25; 71:1, 6, 7, 8, 13, 17; 72:1, 4; 77:21, 23; 78:22; 85:4; 86:19, 21; 88:5; 89:9; 92:1, 5, 6, 11; 94:21
claimed [2]
58:9; 67:10
claiming [1]
65:11
Claims [1]
107:12
claims [23]
6:20; 18:10, 22; 19:20; 20:2; 28:14; 29:2; 53:2; 55:7; 56:18, 20, 24; 57:12, 14, 20; 61:5; 70:21; 78:23; 79:1, 3; 85:6; 95:24; 105:7
clarification [1]
4:18
clarify [1]
56:23
classic [1]
86:20
classifications [8]
49:14; 50:14, 16, 18, 20, 22; 51:2; 53:21
classified [7]
50:5; 51:1, 5; 52:3, 4; 53:22, 24
clear [4]
60:6, 25; 81:23; 84:14
clerk [2]
5:19; 15:16
clock [1]
90:23
closed [1]
31:9
closer [2]
13:5; 93:4
closing [1]
24:12
co-executor [16]
18:15; 99:7, 16, 24; 100:3, 8, 12, 17; 101:2, 5, 23; 102:2, 13; 103:7, 14, 23
coincide [1]
16:16
colleagues [1]
8:2
Colorado [3]
99:22, 23; 100:1
columns [1]
14:8
combined [2]
21:13; 46:3
comfortable [1]
4:14
comfortably [1]
30:15
coming [1]
7:18
Comment [1]
90:4
comment [2]
4:6; 12:10
comments [2]
15:7; 37:3
common [5]
35:19; 68:6, 12; 84:10; 105:20
Commonwealth [1]
33:2
communicate [1]
102:19
communicated [3]
102:12, 18; 103:6
communication [1]
103:11
Company [1]
89:19
company [2]
22:23; 89:21
compensated [1]
67:11
compensation [1]
80:13
complaint [1]
54:15
complement [1]
46:8
complete [5]
38:10; 39:2; 43:14; 52:16; 97:2
complex [2]
11:5, 7
compliance [2]
48:9; 49:17
composite [5]
9:14, 19, 23; 10:22; 53:7
computation [2]
76:13, 14
computational [2]
74:15; 77:19
computations [2]
30:21; 44:23
compute [1]
38:1
computing [1]
74:6
conceptually [1]
46:17
concern [3]
48:5; 99:14, 20
concerned [2]
63:7; 97:18
concerning [2]
55:21; 61:20
concerns [3]
28:8; 49:12; 52:12
concisely [1]
34:10
conclude [1]
83:20
concluded [2]
81:20; 106:4
conclusion [2]
75:18; 76:15
conditions [2]
77:3; 93:10
conduct [1]
88:2
confer [2]
104:11, 24
conference [3]
16:20; 103:1; 104:16
confidence [1]
22:4
confirmation [1]
103:25
confirmatory [1]
42:7
confused [1]
60:7
connected [1]
55:20
connection [2]
49:11; 71:7
connections [1]
62:10
consecutive [1]
9:10
consecutively [2]
9:8, 20
consequences [2]
26:25; 32:6
conservative [3]
41:9; 42:4; 45:25
consider [5]
13:23; 47:7; 66:17; 91:3, 4
consideration [3]
66:5, 7; 99:18
considerations [1]
21:21
considered [4]
27:9; 66:18; 75:3; 96:13
considering [1]
82:6
Consistent [1]
25:13
consistent [1]
60:16
constantly [1]
31:14
consult [1]
102:22
consummation [1]
65:3
contain [1]
5:3
contained [1]
107:9
containing [1]
14:7
contemplate [2]
17:9; 102:4
contemplated [1]
17:15
contend [1]
76:24
contends [2]
76:17, 22
contention [3]
46:10; 48:8; 76:12
context [2]
9:24; 96:11
continue [2]
24:10; 26:21
continued [1]
27:2
continuing [1]
85:14
contract [14]
18:18; 23:7, 13; 30:25; 37:10; 38:16, 25; 39:14; 40:10, 15; 67:4; 72:13; 80:17; 90:15
Contracts [3]
86:17; 90:3, 11
contracts [3]
90:5, 13; 94:25
contractual [11]
23:9; 30:8; 36:14; 37:7, 9, 16, 19; 40:1; 43:2, 5; 70:9
contractually [1]
45:10
contradicted [1]
92:16
contradicts [1]
70:17
Contrary [1]
72:3
contributed [1]
36:3
control [1]
101:5
controls [1]
20:24
convenience [1]
12:22
copies [3]
14:7; 15:3, 14
copy [3]
57:3; 87:16; 96:23
core [1]
26:4
corporate [5]
64:17, 20; 65:8; 68:7, 16
Corporation [3]
22:6; 27:7; 107:17
correctly [1]
76:14
corresponds [1]
47:24
cost [52]
30:6; 36:24; 37:23, 25; 38:1, 5; 40:5, 8, 12, 19, 20, 21, 25; 42:16; 43:7, 9, 11, 13, 18; 46:6, 17; 57:14; 74:12; 81:1; 82:4, 18, 22; 83:6, 20; 84:3, 9, 13, 15, 16, 17, 24; 85:6, 7, 10, 14, 20, 22; 87:6; 88:25; 89:4, 13; 90:19; 96:3
cost-of-replacement-capital [2]
30:11; 45:19
costing [1]
39:19
costs [9]
41:19; 81:13; 82:15; 83:23; 86:25; 87:2, 8; 89:6, 7
counsel [18]
7:17, 18; 16:21; 55:24; 56:7; 59:5, 9, 20, 24; 60:3, 4; 97:23; 98:8; 104:11, 13, 15, 23, 25
counsel's [1]
98:3
counterclaim [10]
99:2, 9, 11, 17; 100:2, 11, 18, 20; 101:3, 7
country [1]
20:14
couple [4]
53:16; 56:17, 25; 87:12
course [19]
18:16; 21:20; 22:16; 26:23; 29:8; 31:13; 37:2; 38:15, 22; 54:24; 56:1; 61:6; 64:2; 67:1; 75:4; 78:10, 11; 86:13; 90:1
COURT [133]
4:1, 11, 23; 6:7, 11; 7:15; 8:1, 9, 14, 25; 9:5, 23; 10:4, 10, 13; 20, 25; 11:3, 20; 12:2, 9; 13:4, 19; 14:21, 24; 15:23, 25; 16:12; 17:25; 41:10, 15; 43:24; 44:6; 46:10, 15, 19, 24; 47:3; 48:7, 17; 49:16; 53:11; 54:1; 57:2, 6, 10; 60:12, 15; 61:1, 10, 15; 62:2; 63:10, 15; 65:23; 69:3, 6, 13, 22, 25; 70:4; 71:11, 15, 21; 72:6, 10, 12, 16; 74:5, 13; 75:14; 76:11, 19, 21; 77:2, 14, 18; 78:8, 13, 16; 79:8, 11, 15; 80:2, 4, 8; 81:7; 84:21; 87:1, 9, 14, 21, 25; 88:14, 17, 20; 90:24; 91:11, 16, 21; 94:17; 95:14, 18; 96:1, 7, 16, 22; 97:4, 13, 15, 24; 98:7, 11, 19, 22; 99:4; 100:6, 21; 101:4, 10, 21; 102:4, 7, 11, 16, 21; 103:17; 104:21; 105:8, 13, 15, 19, 24
Court [78]
4:5; 8:3, 15; 10:16, 19; 11:4, 15, 18, 23, 25; 12:12, 19; 13:19; 14:6, 9, 11, 15, 18; 15:13, 15; 16:5, 14, 19, 21, 23, 24; 17:3; 18:4, 10, 14; 19:2, 12; 20:12; 23:5; 26:4; 29:10; 34:7; 35:25; 36:11; 42:22; 44:22; 46:20, 25; 47:5; 52:15; 54:16; 56:15; 61:25; 67:9; 68:9, 10; 71:3; 74:14, 16; 76:4; 78:21; 83:6; 87:16, 22;

91:10; 95:11; 96:23; 97:5, 6, 10, 17; 99:3, 6; 103:12, 21; 104:14, 16, 19, 25; 107:11
court [12]
57:6; 80:6, 23; 81:16, 20, 22; 82:24; 83:5, 15, 19; 86:6
Court's [9]
5:19; 16:6; 17:6, 23; 29:6; 37:3; 70:8; 94:10; 97:21
court's [2]
81:23; 83:25
courtesy [1]
98:14
covenant [1]
99:2
cover [2]
43:24; 45:1
covered [1]
40:1
covers [1]
16:13
CPA [1]
73:24
crafted [1]
49:23
create [1]
65:17
created [2]
49:22; 63:18
credit [4]
21:24; 23:9, 25; 90:13
crisis [1]
20:13
critical [1]
8:7
criticisms [4]
49:10; 51:24; 52:13; 54:6
critique [1]
44:8
cross [2]
62:22, 23
cumbersome [1]
15:19
current [4]
56:20, 23; 69:20; 70:11
currently [1]
54:20
curtailed [1]
81:12
curtailment [1]
26:12
cushion [3]
48:16, 18, 24
customarily [1]
48:10
cut [1]
12:23

– D –

D.C. [3]
13:2; 107:6, 19
damage [9]
46:8; 54:19, 22; 58:22; 61:18; 69:7; 70:20, 25; 96:18
damaged [1]
48:13
Damages [1]
29:8
damages [29]
7:7; 17:1; 19:20; 20:2; 28:14; 29:2, 5, 18; 31:1; 43:22; 45:22; 46:2; 48:21; 52:22, 24; 59:7; 65:17; 67:10, 19; 68:22; 70:8; 71:1; 80:11; 81:21; 82:11, 21; 85:11; 90:5, 12
damaging [2]
47:25; 48:20
data [1]
92:20
DATE [1]
107:5
Date [1]
107:14
date [6]
28:1; 46:1; 70:19; 73:14; 77:3
dated [1]
4:5
dates [1]
12:11
day [7]
5:8; 8:13; 12:19; 33:8; 73:16; 75:25
days [1]
6:17
deadline [1]
98:17
deal [19]
7:4; 13:9; 23:2, 25; 24:4, 5; 25:2, 6; 31:8, 9; 62:16; 65:4, 5, 9, 20; 66:23; 68:21; 96:11
dealing [1]
13:22
deals [2]
15:1; 24:21
dealt [1]
15:4
debentures [2]
21:25; 24:2
debt [2]
22:1; 83:8
decades [1]
42:4
December [5]
12:13; 13:5; 57:17; 70:6; 73:5
decide [6]
13:9, 14; 71:19, 20, 22; 79:2
decided [3]
23:3; 27:13; 32:8
decides [1]
94:4
decision [7]
52:20; 66:10, 12; 70:15; 84:2; 86:5; 95:15
decisions [3]
29:5; 30:12; 32:21
declaration [1]
97:1
declarations [2]
59:22; 76:5
decline [5]
36:4; 71:3; 74:10; 75:2; 93:18
declined [2]
34:3; 63:11
declining [1]
26:7
decrease [1]
74:24
deemed [1]
33:9
deep [1]
19:6
Defendant [2]
4:20; 6:2
Defendant's [5]
17:5; 71:3; 90:25; 97:11; 104:3
defense [5]
6:18; 60:20; 71:17; 77:20; 78:9
defenses [1]
77:21
defer [1]
98:1
deferred [1]
4:24
definition [1]
39:5
degree [1]
50:17
delay [1]
12:25
deliver [1]
45:3
delivered [2]
21:20, 22
demand [2]
83:9; 84:6
demanded [1]
52:25
demonstrates [1]
94:5
demonstrating [1]
43:17
denial [1]
79:24
Department [3]
5:17; 101:16, 19
depending [2]
13:7, 13
deposition [8]
55:23; 66:22; 84:18; 85:19; 87:10, 17; 105:10, 11
depository [1]
51:16
derivative [5]
49:3; 51:23, 25; 52:2, 3
derivatives [11]
49:13, 25; 50:3, 13, 17; 52:4, 6, 9, 14; 54:9, 12
describe [3]
4:4; 13:10; 30:3
described [3]
31:20; 35:11; 94:24
describes [1]
94:23
describing [1]
54:21
desired [2]
22:6; 91:5
detail [7]
11:18; 30:14; 58:18; 60:9; 89:16; 95:25; 96:8
detailed [2]
16:2; 94:18
details [1]
34:8
determination [2]
39:22; 40:19
determine [8]
23:2; 33:12; 34:5, 18; 35:8; 38:2; 39:12; 40:8
determined [7]
30:2; 35:2, 23; 38:20; 71:4; 93:22, 23
determining [1]
34:19
devastating [1]
91:3
devoted [1]
5:20
devotes [1]
5:13
difference [8]
11:14; 35:3; 40:14; 52:1; 53:19; 69:16; 83:10, 14
differences [3]
53:5; 78:25; 95:23
difficult [1]
26:15
difficulty [1]
26:18
diminished [6]
35:24; 72:2, 4, 13; 74:7; 92:23
diminution [20]
29:24; 32:24; 34:6; 35:13; 69:11, 20; 71:12; 72:8; 74:17, 20; 75:22; 76:13, 16, 23, 24; 77:23; 78:7; 86:19; 94:5; 105:7
direct [2]
45:12; 72:25
disagree [2]
36:11; 52:19
disagreement [1]
105:19
disburse [1]
101:6
disbursements [1]
43:19
discerns [1]
81:22
discharged [1]
98:4
disclosures [1]
98:2
discuss [12]
30:14; 52:10; 60:8, 9; 61:3; 78:1, 5; 79:6; 91:10; 98:13; 102:23; 103:20
discussed [2]
75:1; 96:10
discussing [3]
19:25; 47:6; 79:19
discussion [8]
4:8; 16:16; 54:19; 78:18; 79:3, 18; 98:24; 105:1
discussions [3]
7:17, 21; 103:18
dispose [1]
21:5
disposition [2]
14:4, 12
dispute [2]
37:22; 103:19
disqualified [1]
70:23
distinct [1]
43:25
distinction [1]
66:2
distinguished [3]
18:6, 25; 33:1
distribute [1]
56:25
diverted [1]
29:16
dividend [5]
41:13; 43:10; 64:8; 82:17; 93:1
dividended [3]
88:8, 13; 90:22
dividends [16]
38:19; 42:14, 20, 25; 43:3, 6, 8, 10, 12, 16; 80:25; 81:12; 83:1, 22; 84:10; 86:25
DOCKET [1]
107:3
document [3]
9:23; 10:2; 75:20
documentary [2]
15:3; 17:8
documents [11]
9:9, 14; 10:6, 8, 18, 22; 17:8, 13, 16; 30:21; 37:3
doesn't [4]
33:11; 74:11; 86:7; 88:9
dog [1]
55:25
dollar [4]
28:22; 35:14; 95:3
dollar-for-dollar [4]
80:13, 20; 81:4, 19
dollars [2]
70:16; 95:4
double [8]
66:21, 24; 68:2, 4, 9; 92:2, 4, 10
doubled [2]
49:15; 73:6
downstreamed [1]
89:20
Dr [86]
17:4; 18:5, 8, 18, 20; 20:8, 9; 21:1; 33:1, 13; 34:5, 9, 11, 17; 35:2, 9, 22; 36:14; 39:9; 40:2, 18, 22, 23; 41:2, 8, 10, 23; 42:8, 10, 23; 43:24; 44:5, 7; 45:23; 46:12; 48:22; 55:2, 22; 56:9;

57:17, 21, 25; 58:12; 59:4, 17; 61:24; 62:9, 12; 63:17; 66:21, 25; 67:8; 69:12; 70:11; 71:8; 72:1, 22; 73:13; 80:6; 82:3, 23; 84:8, 11, 12, 14, 17; 85:6, 18; 87:3, 6, 9, 16; 88:23; 89:10; 92:14; 94:23; 95:9; 96:5, 17, 20, 25; 105:6, 14, 15, 22
**draft** [7]
4:3, 9; 5:3; 15:1, 19; 16:6, 17
**dramatically** [1]
76:16
**drawing** [1]
66:2
**draws** [1]
41:2
**driven** [1]
51:24
**due** [1]
64:15
**duties** [1]
101:18
**duty** [2]
29:6; 101:9

**– E –**

**Earle** [1]
76:5
**early** [1]
43:4
**earn** [3]
25:15; 26:22; 40:17
**earned** [2]
68:25; 88:6
**earnings** [63]
30:7; 37:13, 15, 17, 19, 24; 38:3, 5, 13, 16, 18, 21, 24; 39:16, 21; 40:3, 6, 9, 14, 16; 45:9, 14; 55:20; 68:3; 78:3, 7, 18; 79:16, 18, 22, 24; 80:9, 12, 14, 20; 81:1, 4, 17, 19, 22; 82:3, 5, 11, 15, 19; 83:1, 4, 10, 18, 21; 84:3, 6; 85:2; 86:18, 22, 23; 87:5; 88:9, 11, 22, 25; 96:4; 105:11
**ears** [2]
91:22, 24
**easiest** [1]
10:16
**easily** [1]
14:19
**easy** [2]
5:7; 91:24
**economic** [21]
22:8, 16, 20; 28:18; 29:23; 32:24; 33:5; 35:10; 36:13, 18, 22; 42:12, 15; 67:22; 72:2, 4, 14, 20; 74:7; 77:3; 93:10
**economics** [1]
34:24
**educated** [1]
11:25
**effect** [18]
35:14, 25; 36:16; 43:7, 15, 16, 17; 46:1; 47:25; 48:3, 20, 25; 54:4; 65:2, 16; 69:2; 77:5; 103:9
**effected** [1]
52:16
**effects** [4]
28:18; 52:20; 54:15, 17
**efficient** [1]
6:5
**effort** [1]
85:19
**element** [1]
24:6
**elements** [2]
21:24; 46:7
**eliminate** [1]
56:23
**eliminated** [9]
26:9; 35:15; 36:9; 38:10, 14; 39:8, 25; 40:4; 57:16
**embedded** [1]
89:4
**eminent** [1]
13:12
**employed** [1]
83:6
**employee** [1]
63:25
**en** [1]
10:11
**enactment** [1]
48:10
**enclosing** [3]
9:15; 10:1
**Enclosure** [1]
10:4
**enclosures** [1]
10:5
**encompasses** [1]
42:14
**end** [1]
75:19
**ended** [2]
45:9; 65:16
**endorsed** [1]
45:17
**endorses** [1]
40:23
**enhanced** [1]
93:16
**enter** [3]
14:9, 11; 47:14
**entered** [1]
51:6
**enterprise** [1]
35:9
**entirety** [1]
35:1
**entities** [2]
92:9; 99:23
**entitled** [4]
46:9, 11; 48:13
**entity** [4]
32:12; 65:23; 92:4, 8
**enumerate** [1]
29:3
**environment** [3]
93:12, 15; 94:1
**envision** [1]
6:1
**equal** [2]
5:21; 6:13
**equations** [1]
34:16
**equity** [5]
34:4; 40:22, 25; 71:1; 74:4
**equity-like** [1]
34:14
**equivalent** [1]
4:20
**equivalents** [1]
22:20
**error** [2]
81:22, 23
**escalation** [2]
92:25; 93:3
**essence** [1]
44:6
**essentially** [8]
21:23; 22:19; 28:21; 30:2; 34:12; 45:1; 63:10; 92:25
**establish** [1]
45:24
**established** [1]
29:6
**Estate** [1]
18:16
**estate** [4]
18:19; 19:5; 99:8, 13
**estimate** [4]
29:7; 45:25; 73:20
**ethical** [1]
100:12
**evaluating** [1]
34:24
**event** [5]
33:8, 9; 87:21; 90:16; 104:23
**events** [2]
20:20; 65:13
**eventually** [1]
22:13
**everybody** [1]
15:8
**everyone's** [1]
26:16
**evidence** [15]
11:24; 15:12; 17:10, 15; 25:1; 26:16; 27:17; 28:7; 31:5, 19, 25; 32:3; 37:2; 72:25; 107:9
**evidentiary** [1]
30:21
**ex** [1]
85:21
**exact** [1]
31:2
**exactly** [6]
13:9; 16:25; 48:17; 63:13; 82:22; 104:2
**exam** [2]
6:24, 25
**examination** [3]
5:14; 15:16; 44:12
**example** [4]
5:22; 13:11; 53:22; 66:15
**examples** [1]
86:20
**exceeded** [1]
93:23
**exceeding** [1]
50:22
**except** [1]
28:14
**exception** [3]
53:15; 80:24; 97:9
**excerpts** [1]
87:12
**excess** [1]
88:8
**exchange** [4]
8:12; 22:14, 20; 98:1
**exchanged** [1]
23:6
**exclusion** [1]
16:3
**executor** [3]
19:4; 99:8; 100:2
**executors** [1]
99:10
**Exhibit** [1]
84:11
**exhibit** [6]
9:7, 16; 14:8, 10, 13; 15:14
**exhibits** [10]
9:20; 14:2; 15:3, 10, 11; 87:17; 89:1; 98:2, 5, 16
**exist** [1]
104:22
**existed** [1]
75:12
**existence** [3]
99:11; 100:18, 20
**existent** [1]
9:22
**existing** [2]
83:8; 84:5
**exists** [1]
99:18
**expect** [2]
44:11; 92:21
**expectancy** [1]
44:19
**expectation** [1]
5:9
**expected** [1]
93:16
**experience** [6]
9:13; 19:9; 41:2, 6; 42:3; 67:4
**experienced** [1]
18:7
**expert** [31]
6:20; 11:7; 17:3; 30:19, 22; 33:1; 37:1; 44:4; 55:4; 56:4, 7, 9; 57:18; 58:13; 59:4, 10, 14, 15, 19; 60:3; 61:19, 20, 22; 62:1; 71:8; 80:7; 96:17; 97:10, 11; 105:6
**expert's** [1]
84:21
**experts** [6]
17:5, 9, 13; 42:9; 44:12; 78:12
**explain** [4]
34:10; 51:20; 54:1; 79:12
**explained** [2]
84:1; 94:9
**explanation** [2]
94:12; 97:2
**exposure** [1]
93:21
**express** [1]
48:19
**expression** [1]
22:4
**expressly** [1]
98:14
**extend** [2]
5:8; 98:15
**extent** [5]
20:2; 35:8; 38:8; 48:12; 81:11
**extraordinary** [2]
26:17, 18
**extrapolate** [2]
72:24; 85:23

**– F –**

**face** [1]
75:23
**facilitate** [2]
63:17; 88:1
**facilitated** [6]
64:23; 65:5, 8, 14, 20, 24
**facilitating** [1]
65:3
**Fact** [3]
47:20; 49:8; 51:13
**fact** [21]
6:19; 7:2; 12:13; 29:5; 30:18, 20; 33:22; 39:25; 48:4; 52:11; 59:8; 62:4; 72:8; 74:17; 77:6; 85:1; 87:6; 88:23; 89:23; 93:11; 100:1
**factor** [5]
36:6, 7, 8, 20, 22
**factors** [3]
75:2, 10; 92:20
**facts** [4]
11:9; 47:7; 62:8; 96:9
**factual** [3]
37:2; 43:14, 16
**fall** [2]
51:2; 63:3
**failed** [4]
27:8; 47:13; 63:5; 74:20
**failing** [1]
63:6
**fails** [2]
51:1; 95:1
**failure** [2]
45:2; 95:2
**fair** [4]
5:25; 24:14; 26:8; 29:6
**familiar** [4]

44:15, 22; 80:1; 93:25
fashion [1]
9:10
favorable [2]
93:13; 94:1
FDIC [25]
6:25; 49:22; 50:4, 6, 7; 51:5, 14, 19; 52:1, 2, 13, 16, 22, 25; 53:8, 16, 20, 22; 54:2, 13, 14; 75:11; 77:7, 9; 86:10
FDIC's [4]
49:12; 51:24; 52:13; 53:6
feature [3]
34:13, 14; 92:25
features [1]
34:13
February [1]
57:25
Fed [3]
81:14; 83:4, 24
Federal [14]
22:5; 27:5, 14; 44:17; 79:23; 81:15; 82:14; 83:17, 25; 84:1, 23; 85:3; 89:5; 107:11
fee [1]
62:16
felt [1]
35:19
fiduciary [2]
100:12; 101:9
figure [11]
58:20; 60:18; 69:20; 70:3, 10, 16; 73:12, 17; 76:2; 101:20
figured [1]
35:13
figures [3]
40:5, 18; 83:3
file [2]
8:11; 103:12
filing [1]
79:12
filings [2]
70:18; 96:8
fill [2]
39:5; 45:8
filled [1]
37:8
finance [3]
33:2; 63:11; 64:11
financial [4]
34:16; 43:17; 63:4; 88:24
financially [1]
35:20
financing [2]
27:22; 28:9
find [5]
11:6; 71:25; 74:17, 24; 90:2
finder's [1]
62:16
finding [1]
52:3
findings [1]
81:24
Fine [2]
17:25; 87:20
fine [3]
14:23; 17:25; 103:3
finish [3]
5:9, 22; 61:17
firm [1]
100:10
FIRREA [26]
25:17; 26:1; 33:8; 39:25; 47:15, 17, 18, 21, 25; 48:1, 2, 6, 9, 10; 49:2, 5, 9, 16; 51:13, 15; 54:6, 18; 62:23, 24; 63:2; 64:16
FIRREA's [2]
47:19; 51:10
First [23]
7:6; 18:11, 21; 19:11, 13, 16; 58:5, 9; 67:2, 5, 6; 80:19, 21; 82:1; 85:8, 9, 14, 20, 23; 86:2, 4, 17; 88:6
first [16]
4:2; 6:12; 9:17; 13:25; 17:20; 29:11; 31:9; 47:8; 54:24; 59:23; 62:6; 67:18; 72:2, 12; 73:7; 104:22
five [2]
36:18; 49:7
flatly [1]
70:17
flaw [1]
79:19
flawed [1]
76:14
flight [2]
12:24; 13:1
floor [1]
7:10
focus [2]
61:11; 68:20
focused [3]
5:1; 6:21; 51:14
follow [1]
47:22
followed [1]
5:15
following [8]
14:7; 15:8; 50:7; 53:7; 67:8; 70:22; 79:9; 80:24
follows [1]
14:5
forced [2]
26:12; 81:21
foregone [1]
55:1
foresee [1]
90:14
foreseeability [13]
30:16, 23; 44:20, 25; 77:25; 78:1, 4, 8; 86:16; 88:4; 89:11; 90:4, 11
foreseeable [6]
30:25; 31:4; 45:2; 89:15, 24, 25
form [6]
10:10; 21:13; 37:3, 24; 70:24; 81:2
format [1]
97:3
formed [1]
19:7
formula [1]
88:24
forth [5]
13:16; 55:3; 58:22; 71:8; 72:24
forthcoming [1]
104:1
forward [2]
93:2, 6
found [5]
52:15; 53:21; 80:24; 81:16; 84:8
four [7]
25:20; 53:17, 18; 58:21, 25; 78:25
four-week [1]
7:11
fraction [1]
26:7
framework [2]
30:11; 39:11
frankly [4]
34:16; 39:3; 44:11; 77:11
free [1]
37:25
free-standing [1]
46:2
Friday [7]
12:13, 18; 13:2, 12, 15; 98:3, 6
front [2]
68:9; 78:21
FSLIC [22]
22:13, 18, 20, 24; 23:6; 33:14, 23; 34:12, 17, 19; 35:5; 36:1, 10; 70:22; 72:22; 73:12; 74:2; 76:5, 6; 92:17; 93:20, 25
FSLIC's [3]
22:12; 93:3, 17
full [4]
57:20; 58:2; 67:22, 24
fully [3]
38:13; 39:1; 107:9
function [1]
38:4
functioned [1]
40:9
fund [3]
51:17, 18; 95:1
funds [9]
31:23; 40:13; 41:23; 62:20; 65:7; 82:19; 89:22; 90:2; 101:5
furnished [1]
44:1
future [2]
23:18; 24:17

## – G –

GAAP [1]
86:14
gains [1]
29:22
Galva [3]
21:12; 23:25; 24:4
gap [1]
39:17
gauge [2]
21:8; 23:21
gave [3]
66:15; 69:16; 93:24
gazillion [2]
95:3, 4
gentlemen [3]
8:2; 14:18; 102:23
gets [1]
40:7
give [16]
11:16; 12:3; 16:22; 57:6; 61:8, 13; 62:13; 68:10; 69:1, 10; 70:18; 71:24; 87:22; 101:14; 102:25
Given [1]
93:13
given [17]
13:20; 17:17; 33:21; 53:7; 54:16; 55:5, 16; 64:18; 75:24; 82:13; 91:1; 98:16; 99:18, 19; 100:21, 22; 103:10
gives [1]
12:24
giving [2]
66:12; 104:4
glad [1]
95:12
goes [3]
60:22; 71:12; 94:13
goods [1]
45:3
goodwill [13]
7:6; 24:5; 26:5; 53:4; 58:7; 80:16; 83:12; 86:3, 6, 7, 12, 14; 88:5
governing [5]
4:3; 16:15; 29:4; 36:21; 37:21
government [29]
20:15; 21:16; 22:1; 24:6; 25:23; 30:9; 31:6, 7, 10, 11; 33:15, 25; 41:24; 42:1, 18; 43:20, 21; 45:17; 70:23; 74:19; 76:22, 24; 77:20, 22; 92:15, 19, 22; 93:9; 103:25
government's [18]
5:24; 20:3; 22:4; 23:16; 24:16; 26:8; 30:3; 40:19; 42:9; 44:3, 8, 12; 60:19; 65:25; 71:16; 75:14; 78:9; 103:20
graciously [1]
97:25
Granite [1]
86:5
Great [1]
105:24
greater [3]
43:22; 63:9; 95:25
grew [1]
21:2
Griffin [1]
56:9
gross-up [6]
55:18; 56:2, 5, 10, 12, 14
ground [1]
94:11
grow [10]
24:22; 25:4, 10, 11, 15; 31:6, 16
growing [1]
20:19
growth [13]
22:10; 24:24; 25:9, 21; 26:13; 31:11; 38:18; 49:7; 55:1, 3; 57:20; 58:2, 3
guarantee [3]
40:2; 62:22, 23
guaranteed [1]
23:7
guess [3]
4:25; 12:2; 16:4
guidance [2]
79:22; 82:13

## – H –

hadn't [2]
39:20; 92:23
half-hour [1]
12:4
Hall [1]
55:22
hand [2]
56:17; 68:8
handed [3]
64:21, 22; 68:17
handing [1]
64:17
handle [1]
16:25
hands [2]
27:6, 7
hands-on [1]
63:22
happens [5]
48:25; 52:5; 63:16; 64:5, 10
happy [11]
10:15; 18:1; 46:22; 87:11, 18; 91:13; 94:11; 97:12; 101:14, 20; 102:9
harbor [1]
81:1
harm [3]
19:24; 20:2; 29:7
harmed [1]
19:15
hasn't [2]
56:13; 102:18
haven't [1]
48:18
he'd [1]
68:3
he's [4]
67:23; 68:11; 100:24; 102:1
healthy [2]
27:5, 15
hear [3]
11:24; 18:1; 47:1
heard [2]

61:19; 92:2
HEARING [1]
107:5
hearing [10]
17:20; 34:8; 42:22; 55:11; 58:24; 59:1; 74:23; 79:9; 106:3; 107:10
heavily [1]
75:7
Held [1]
76:5
held [2]
23:5; 33:3
help [2]
14:17; 97:4
helpful [2]
46:24; 104:12
hemorrhaging [1]
20:14
hereby [1]
107:8
Heritage [1]
107:17
herring [1]
92:11
hey [1]
25:3
highest [2]
11:10; 38:20
history [1]
20:1
holding [3]
52:2; 63:4; 89:21
Holdings [8]
32:13; 63:18; 64:4, 5, 8, 9; 65:6; 89:19
hole [4]
37:6, 8; 39:6; 45:7
holiday [1]
12:14
holidays [1]
13:1
Holland [54]
6:16; 17:4; 18:6, 8, 18, 20; 20:8, 10; 21:1, 11; 31:12; 37:1; 39:9; 40:2, 18, 23; 41:2, 24; 42:11, 23; 43:24; 48:22; 57:17, 25; 59:4, 17; 61:24; 62:9, 12, 18; 63:17, 20; 66:11, 13, 21; 67:1, 5, 7, 8, 19, 20, 23; 68:24; 82:8, 23; 84:12, 17; 85:6, 18; 94:23; 95:9; 105:14, 15; 107:4
Holland's [11]
41:9, 11; 44:5, 7; 55:2; 58:13; 84:14; 87:6, 10, 17; 96:5
Home [9]
21:12; 23:25; 24:4; 30:12; 83:5, 10, 11, 17; 84:2
home [1]
12:25
Homer [6]
6:16; 18:5; 37:1; 66:11, 13; 67:5
homes [1]
13:16
honed [1]
19:8
honestly [2]
68:18, 24
HonFed [5]
80:16; 81:2, 20, 21; 83:3
HonFed's [3]
81:12, 16; 83:21
Honor [132]
4:10, 15; 5:5, 15, 25; 6:9; 7:22; 8:6, 24; 10:15, 23; 13:18; 14:20, 22; 16:10; 17:23; 18:3; 19:21; 20:18, 25; 24:20; 25:1, 9, 14; 26:15, 20; 27:17, 25; 28:4, 25; 29:2, 14; 30:4, 17, 23; 31:5, 15, 18; 32:14, 23; 35:5; 36:5, 20, 24; 37:21; 39:3; 41:14; 43:15, 23; 44:2, 10; 45:6, 15; 46:5, 12, 20; 47:6; 49:20; 50:1; 55:4; 56:24; 57:9; 59:6; 60:10, 21; 61:14, 21; 62:23; 64:14, 23; 65:16; 66:16, 25; 67:2; 68:6; 69:1, 5, 9, 24; 70:17, 19; 71:25; 74:22, 23; 77:11; 78:15, 19, 24; 79:4, 10, 20; 80:1, 3; 81:10; 87:19, 20; 90:23; 91:6, 23; 92:2, 5, 11, 15; 93:9, 19; 94:4, 7, 20; 95:9, 17, 21; 96:15, 20, 24; 97:8, 20; 98:9, 12, 18, 21, 25; 99:20; 101:9, 12; 102:15; 103:3, 4; 104:19; 105:3, 21; 106:2
Honor's [1]
79:6
hope [3]
8:21; 96:10; 104:18
hopefully [4]
7:18; 8:5; 16:16; 104:17
host [1]
29:5
hour [6]
11:13, 14, 16, 21; 12:4, 6
hours [5]
5:8, 23, 24; 7:11
house [1]
105:25
housekeeping [1]
97:22
Howard [4]
18:16; 66:11, 13; 67:5
huge [3]
11:14; 50:15; 75:4
hypothetical [6]
82:21; 83:23; 84:12, 15, 24

- I -

I'd [6]
87:11; 95:11, 19, 24; 102:9, 20
I've [3]
46:23; 95:12; 101:25
idea [4]
7:23; 13:11; 90:25; 101:4
identified [4]
27:4; 77:18, 19; 103:13
identify [1]
99:6
identifying [1]
14:8
II [1]
69:16
II-1 [5]
57:8, 11; 69:23, 25; 70:1
II-2 [2]
57:8; 69:22
Illinois [3]
20:7; 99:24, 25
illustrative [1]
19:6
immediate [1]
38:11
immediately [1]
102:1
impasse [2]
104:14, 20
impasses [1]
104:21
impediment [1]
27:23
implementing [2]
20:24; 48:2
importance [1]
51:20
important [6]
20:11; 21:18; 47:7; 89:11, 14; 95:22
impose [2]
5:2; 104:18
impossible [2]
28:8; 33:11
improper [7]
50:8; 55:15; 59:12, 25; 60:4; 61:22, 24
improved [1]
93:17
impugn [1]
92:19
inadequate [1]
39:4
Inc [1]
63:18
inclination [1]
12:2
inclined [2]
12:5; 91:2
include [2]
53:3; 83:23
income [1]
64:24
incomplete [1]
39:3
incorrect [3]
64:2; 65:22; 73:25
increase [9]
43:11, 12; 50:19; 51:4, 6; 74:11; 77:7; 81:5, 19
increased [1]
73:9
increases [2]
50:15; 81:17
increasing [2]
38:24; 43:7
incremental [1]
55:2
incurred [1]
46:6
independent [2]
19:14; 73:19
independently [1]
19:15
indicate [1]
56:25
indicated [3]
16:19; 55:19; 70:10
indispensable [2]
23:17; 24:16
individual [2]
49:21; 63:22
individuals [1]
92:9
industry [2]
20:13; 75:13
infer [1]
83:18
inform [3]
11:18; 100:7, 12
information [4]
79:7; 99:19; 100:19; 101:14
informative [1]
11:12
informed [1]
27:25
inhibiting [1]
43:16
initial [2]
4:25; 15:19
initially [1]
7:16
inside [1]
28:23
insofar [1]
28:14
insolvent [1]
20:15
instance [8]
6:23; 7:3; 9:25; 49:5; 52:24; 63:3; 65:11; 66:14
institution [55]
20:7, 9; 21:2, 15, 19; 22:9, 12; 23:18; 24:9, 18; 26:16, 18, 25; 27:5, 8, 11, 16; 28:12, 15; 34:3, 7, 21; 35:17; 39:13; 41:5, 19; 42:3, 24; 47:12; 50:25; 51:3; 54:5; 63:4; 64:1, 6, 18; 65:18, 21; 72:24; 73:4, 21; 75:8; 77:6; 80:12; 85:3, 15; 86:13; 92:18, 23; 93:5, 25; 94:6, 9, 15
institution's [6]
22:6; 24:7, 13; 42:17; 73:23; 74:4
institutions [13]
19:8; 21:12; 24:23; 25:12, 19; 29:25; 31:13; 32:25; 33:5; 35:18; 51:16; 63:2
instructed [1]
84:24
instructs [3]
80:11; 85:3; 89:6
instrument [2]
93:7; 94:2
instruments [1]
51:25
insufficient [1]
47:21
Insurance [1]
22:5
insurance [2]
51:17, 18
insurer [1]
51:20
intangible [1]
40:15
intend [2]
30:5; 71:6
intended [5]
24:15, 22; 27:18; 31:6; 74:3
intends [1]
16:14
intentions [1]
25:13
interest [14]
21:8; 23:21; 31:12; 33:16, 23; 35:6, 7; 92:17; 93:11, 14, 15, 18; 94:2; 97:16
interested [4]
17:20; 94:10; 95:20; 105:11
interesting [2]
85:18; 104:9
interestingly [1]
80:6
internal [2]
24:24; 37:14
internally [3]
25:11; 28:10; 31:16
introduce [1]
78:20
introduced [1]
14:2
introducing [1]
17:15
introduction [1]
18:15
invested [1]
40:17
investible [2]
40:13, 16
investing [1]
42:3
investment [9]
20:23; 32:18; 41:18, 22, 25; 42:11; 82:10; 89:21, 23
investments [2]
49:12; 50:6
investor [5]
18:8; 22:22; 41:3; 42:8, 16
investors [1]
22:25
invite [1]
15:6
invited [1]
4:6
involve [1]

104:25
Involved [9]
7:1, 3; 23:15, 25; 24:1, 5; 50:5; 75:8, 17
Involvement [2]
49:24; 50:12
involving [1]
89:13
irrefutable [1]
45:12
issuance [3]
73:15; 74:2; 93:2
issue [10]
56:11; 61:18; 78:3; 83:8; 90:8; 91:10; 92:10; 96:10; 98:15; 104:17
issued [4]
57:18; 58:1; 59:14; 79:23
issues [13]
4:23; 6:10; 7:5; 11:11, 17, 19; 16:25; 17:18; 60:22; 77:19, 25; 78:1; 97:18
items [1]
13:23
iteration [1]
58:12

– J –

James [1]
75:16
January [3]
5:10; 6:4; 82:8
job [10]
30:7; 37:10, 14, 16, 17, 19; 38:24; 45:10, 13, 14
John [1]
62:10
JOHNSON [26]
18:3; 41:14, 17; 44:2, 10; 46:12, 16, 20; 47:2; 91:15, 19, 23; 94:20; 95:17, 21; 96:2, 15, 20, 24; 97:14, 20, 25; 98:9, 18, 21; 105:21
Johnson [13]
17:24; 18:1; 56:22; 58:18; 61:12, 19; 70:12; 91:1, 13, 21; 97:17; 98:20; 101:10
Johnson's [1]
60:16
Joint [3]
47:19; 49:7; 51:13
Judge [6]
80:4, 5; 81:7, 9, 10; 96:4
judge [2]
80:4, 6
judgment [8]
18:12, 21; 59:7, 23; 65:15; 71:10; 79:21; 94:10
July [6]
21:10; 23:19, 23; 49:5; 73:22; 81:24
juncture [2]
91:4; 96:14
June [2]
49:15; 64:7
Justice [2]
5:17; 101:19
Justice's [1]
101:17
justify [1]
41:23

– K –

keep [1]
5:13
keeping [1]
14:1
keeps [1]
85:7
kept [1]
5:19
kinds [3]
50:6; 61:4; 75:10
knowledge [1]
103:7

– L –

labeled [1]
57:7
lack [3]
54:7, 12; 72:3
language [1]
14:4
large [3]
17:12; 61:9; 75:13
largely [5]
19:3; 30:18; 32:25; 37:1, 2
LaSalle [1]
30:13
last [1]
6:10
late [2]
12:20; 62:9
law [9]
29:4; 64:14; 65:22; 66:20; 68:13, 14; 79:19; 96:9; 100:4
Lawrence [1]
94:13
lawsuit [2]
103:14, 24
lawyer's [1]
68:7
lead [1]
17:24
leading [1]
20:20
leave [6]
13:15; 37:8; 70:20; 90:22; 94:12; 104:23
leaves [1]
39:17
leg [1]
78:8
legal [5]
17:2; 30:11, 23; 95:23; 100:10
legitimately [1]
37:22
lend [5]
64:4; 90:6, 13; 95:2, 5
lender [3]
90:14, 20; 94:25
lender's [1]
90:17
lenders [1]
63:7
lending [2]
90:7, 9
lent [1]
95:6
lesser [3]
39:13, 16; 73:23
Let's [5]
6:11; 62:2; 71:15; 74:14; 79:15
let's [7]
7:12; 47:1; 74:16; 87:21; 92:21; 102:11; 104:23
letter [3]
9:15, 25
level [10]
11:10; 39:21; 50:10, 19, 22; 52:6, 8; 63:25; 77:8; 80:23
levels [9]
47:19; 48:6; 50:23; 51:6; 52:25; 53:1, 4, 20; 54:18
leverage [3]
54:25; 57:20; 58:2
leveraging [1]
88:7
liabilities [1]
63:8
liability [2]
52:18; 90:18
liberty [1]
16:23
lieu [1]
15:7
life [1]
26:16
limit [5]
5:3, 6, 10; 7:19; 10:21
limitation [2]
90:4, 11
limited [5]
6:17; 26:2, 10; 83:22; 90:18
limits [2]
5:2; 51:10
line [1]
36:16
linear [1]
23:10
list [1]
14:7
literal [1]
101:1
literally [1]
53:16
lives [2]
19:10; 99:21
Loan [3]
20:7; 22:5; 23:23
loan [11]
63:8; 64:9, 11; 65:6, 7; 75:9, 13; 90:20; 94:25; 95:8
loaned [1]
63:9
loans [1]
64:4
local [1]
12:17
LOCATION [1]
107:6
Locke [1]
29:4
logic [1]
45:13
logistical [1]
4:4
logistics [1]
13:22
looks [1]
40:23
lose [1]
12:24
loss [18]
29:23; 31:2, 3; 35:3, 8, 11; 36:1, 8, 10, 13, 18, 23; 47:12; 58:7, 10; 70:22; 89:23; 92:15
losses [1]
29:22
lost [27]
29:11; 35:12; 46:16; 54:25; 57:14, 20, 22; 58:2; 64:15; 65:1, 2; 68:23; 70:2; 71:1, 7; 83:12; 86:24; 88:18, 25; 89:6, 9, 13; 92:1, 14; 96:21
lost-profits [3]
29:20; 30:17; 32:22
lost-value [2]
45:23; 46:13
lot [6]
4:16; 44:24; 58:18; 92:2; 99:22, 23
loved [1]
93:22
lower [2]
26:24; 41:6
lowest [2]
83:6; 84:3

– M –

MACRO [2]
53:7, 10
macro [1]
94:1
magnitude [4]
31:1, 3; 71:12, 16
main [1]
63:22
maintain [1]
51:12
maintained [1]
15:12
majority [3]
24:13; 50:16; 85:11
man [1]
62:10
managed [2]
26:21; 35:19
management [2]
93:14, 21
managers [1]
31:14
managing [1]
20:9
March [2]
70:19; 72:5
mark [3]
73:3, 24; 94:8
marker [1]
74:3
market [4]
27:3; 33:7; 73:3, 24
marketed [1]
20:16
markets [3]
75:5, 8; 94:8
masse [1]
10:11
massive [1]
51:4
material [2]
36:16; 97:7
materials [1]
87:23
mathematical [3]
29:9, 20; 32:16
mathematically [1]
89:2
matter [18]
12:21; 15:2; 16:2; 64:13; 65:22; 66:20; 68:6, 11, 13, 14; 71:16; 77:17; 79:19; 88:23; 97:22; 98:7, 20; 106:4
matters [5]
4:4; 9:1; 15:1; 16:15; 56:11
May [1]
47:5
mean [6]
10:4; 33:11; 41:10; 61:1; 67:15; 100:23
meaningful [1]
5:11
means [3]
54:10; 68:1; 76:7
meant [1]
63:6
measure [2]
72:20; 94:15
mechanism [1]
74:1
meet [4]
30:15; 44:20; 47:14; 48:6
meeting [2]
97:22; 98:3
memorandum [1]
96:9
memory [1]
96:25
men [1]

19:7
mention [3]
56:2; 83:17; 96:16
mentioned [2]
67:17; 92:9
mentioning [1]
75:23
mere [1]
32:15
merger [1]
21:13
merits [1]
71:17
Messrs [1]
82:8
methodological [2]
77:12; 78:11
methodology [3]
74:6; 85:1; 86:15
Meyer [1]
75:16
mid-1980s [1]
20:5
mid-1988 [1]
21:10
mid-1990 [1]
48:3
military [1]
19:1
million [69]
21:24, 25; 22:15; 23:5, 8; 24:1, 3; 29:14; 30:2, 10; 33:24; 34:1, 21; 35:1, 3, 11, 24; 36:1, 3, 7, 18, 19; 53:22, 25; 57:22; 58:13, 20; 59:3, 17, 18; 60:18; 61:7, 21, 23, 25; 64:6, 7, 9, 10, 11; 65:11; 67:24; 68:25; 69:1, 20; 70:6, 10, 14, 16, 22; 71:2, 6, 8; 73:6, 7, 14, 17; 74:18; 75:24, 25; 76:1, 2; 82:6, 25; 83:1; 85:12
mind [5]
6:13; 16:14; 17:6; 76:19; 78:3
minimum [1]
6:15
minor [1]
97:21
minority [1]
67:21
minute [1]
60:12
minutes [5]
10:7; 11:5, 8, 14; 60:25
minutiae [1]
77:16
mirrored [1]
81:17
misleading [1]
10:9
miss [2]
13:1; 95:2
missing [1]
48:14
misspoke [1]
69:17
mistake [1]
28:3
mitigate [2]
64:16; 66:12
mitigated [3]
64:16, 17; 65:2
mitigation [21]
30:6; 36:24; 38:1, 7, 10; 39:2, 19; 43:7, 13, 23; 44:18; 46:6, 17; 64:14, 25; 65:16, 22; 68:15; 94:21
mode [1]
14:1
models [1]
40:11
modicum [1]
26:22
moment [14]
52:10; 56:1; 57:24; 58:18; 60:9; 61:11, 14; 62:7; 69:10; 71:25; 78:1, 6, 19; 86:16
Monday [1]
8:3
money [10]
20:14; 22:21, 22; 88:13; 89:20; 90:6, 9, 13; 95:2, 5
monitor [1]
27:2
monthly [1]
73:3
months [2]
31:8; 53:16
moot [1]
104:8
morning [4]
4:24; 16:17; 18:4; 79:9
mortgage-backed [3]
20:22; 49:19; 50:1
mortgage-backed-security [10]
49:2, 13, 24; 50:12, 17; 51:23; 52:8, 14; 54:8, 11
motion [4]
20:21; 70:20; 71:9; 99:5
Motors [4]
65:24; 66:2, 6, 18
move [10]
8:6; 61:17; 71:18; 78:13, 20; 79:7; 84:22; 87:13; 93:2, 6
moved [3]
59:7, 11, 23
MR [137]
4:10, 15; 5:5; 6:9, 13; 7:21; 8:6, 10, 24; 9:3, 6, 25; 10:5, 12, 15, 23; 11:1, 4, 22; 12:8, 10; 13:18; 14:19, 22; 15:21, 24; 16:9, 11; 17:23; 18:3; 41:14, 17; 44:2, 10; 46:12, 16, 20; 47:2, 5; 48:15, 18; 49:20; 53:13; 54:4; 57:5, 9, 11; 60:14, 21; 61:3, 13, 16; 62:5; 63:13, 16; 66:1; 69:5, 9, 14, 23; 70:1, 5; 71:14, 18, 24; 72:9, 11, 15, 18; 74:9, 22; 75:16; 76:18, 20; 77:1, 4, 15, 24; 78:10, 15, 17; 79:10, 14, 17; 80:3, 5, 10; 81:9; 84:22; 87:3, 11, 18, 20, 24; 88:3, 16, 19, 21; 91:6, 15, 19, 23; 94:20; 95:17, 21; 96:2, 15, 20, 24; 97:8, 14, 20, 25; 98:9, 12, 18, 21, 25; 99:5; 100:9, 23; 101:8, 12, 24; 102:6, 9, 15, 17; 103:3, 4; 104:18; 105:3, 9, 14, 17, 21; 106:2
Mr [77]
4:9; 6:7; 7:19; 8:22, 25; 10:13, 16, 21, 25; 11:20; 12:3, 9; 13:17; 14:21; 15:20, 23; 17:21, 24; 18:1, 16, 23; 19:2, 4, 5; 20:8, 10; 21:1; 47:1; 55:10; 56:22; 57:2, 3; 58:18; 60:16; 61:12, 19; 63:17, 19, 20, 23, 24; 67:11, 16; 70:12; 76:5; 91:1, 13, 21; 92:9; 94:21, 24; 95:16; 97:5, 17, 25; 98:20, 22; 99:15, 21, 22; 100:10, 22; 101:10, 15, 17, 25; 102:7, 12, 21, 22; 103:23; 105:2
Murphy [18]
33:1, 13; 34:9, 11, 18; 35:2, 9, 22; 36:14; 57:21; 69:12; 70:11; 72:22; 73:13; 96:17, 20, 25
Murphy's [9]
34:5; 40:23; 45:23; 46:12; 71:8; 72:1; 92:14; 105:7, 22
Mutual [3]
21:12; 23:25; 24:4

– N –

N.W. [1]
107:18
name [2]
14:9; 62:10
National [4]
32:5; 62:19, 21
naturally [1]
13:8
nature [3]
17:17; 44:23; 104:6
necessity [1]
17:14
needs [5]
6:14; 40:14; 46:23; 95:4; 102:24
Neely [1]
32:20
negatively [1]
50:7
negotiated [2]
22:11; 31:7
negotiations [1]
75:17
Neil [1]
33:1
net [5]
28:17; 40:8; 58:7, 10; 74:4
nominal [1]
67:3
nonbreaching [1]
90:1
noncontractual [1]
62:24
nonexpert [1]
62:4
nonparty [1]
29:16
noon [2]
12:23; 13:12
note [3]
24:19; 38:7; 91:9
noted [3]
75:10; 82:4; 83:15
notes [1]
107:10
notice [8]
79:12; 100:20, 21, 22; 103:12, 14, 16; 104:4
notified [2]
99:10, 16
notify [1]
104:25
notion [11]
9:6; 64:1, 24; 66:4, 5; 67:2; 74:10; 76:8; 89:3, 12; 99:21
Notwithstanding [1]
26:20
number [10]
5:8; 9:20; 14:8; 15:3; 17:5; 39:11; 42:13; 74:18; 86:4; 95:8
numbered [1]
9:8
numbers [3]
9:21; 10:8; 30:20

– O –

obfuscate [1]
48:4
objection [7]
87:15; 97:6, 9, 14, 15; 104:7, 8
obligation [7]
100:5, 7, 12; 101:16, 17, 19; 104:2
obligations [6]
8:10, 11; 63:5; 98:4; 105:4, 18
obtain [1]
66:23
obtained [7]
65:10; 66:23; 67:22, 24; 68:11; 89:22
Obviously [1]
14:14
obviously [4]
5:18; 12:5; 14:16; 99:11
Occasionally [1]
10:6
occasions [1]
14:15
occur [2]
48:1; 93:1
occurred [1]
86:4
October [1]
53:21
offer [1]
23:20
offered [1]
10:11
offering [1]
17:9
official [1]
15:13
offset [1]
44:14
oh [1]
65:18
Okay [30]
6:7; 8:14, 25; 13:19; 15:8, 25; 41:15; 46:15, 19; 53:13; 57:10; 63:15; 69:5, 13; 70:4; 71:11, 24; 72:10; 76:20; 77:18; 78:16; 79:15; 80:8; 84:18, 22; 87:24; 91:16; 98:19; 102:16; 105:17
okay [3]
7:8; 35:12; 79:13
open [2]
5:4; 13:15
opening [4]
11:2, 21; 12:3, 6
operate [2]
24:10; 26:21
operated [1]
28:15
operating [3]
58:7, 10; 94:1
operations [2]
28:18
opine [1]
61:25
opined [2]
56:10; 62:1
opinion [10]
56:4, 7, 12; 61:19; 70:11; 80:1, 2; 81:10, 25; 84:7
opportunities [4]
88:7, 12, 15; 89:17
opportunity [24]
32:19; 39:20; 62:12, 13, 14, 17; 64:15, 17, 20; 65:1, 8; 66:13; 68:17; 86:25; 87:2, 5, 7; 88:25; 89:3, 6, 7, 13; 95:3
oppose [1]
11:22
order [12]
4:2, 3, 5; 8:12; 9:4; 13:21, 22; 16:15, 19; 35:8; 41:23; 62:20
ordinarily [1]
90:19
original [4]
15:9; 18:6, 9, 17
Originally [1]
57:13
originally [1]
57:22
OTS [12]
6:24; 10:1; 52:1, 3, 19, 23; 53:5, 8, 14, 20, 24; 54:3
outer [3]
5:7, 10, 23
outline [2]
69:10; 72:1
outset [2]
14:6; 24:9

**outside** [1]
27:22
**outstanding** [1]
95:9
**overlap** [1]
7:2
**oversight** [2]
51:15; 53:6
**overview** [2]
16:22; 17:21
**owe** [2]
95:3, 7
**owned** [4]
20:8; 28:15; 66:3; 67:17
**owner** [1]
22:7
**owners** [1]
66:14
**ownership** [10]
21:8; 33:16, 19; 35:6, 7, 19; 63:19; 92:17; 93:18; 94:2

**– P –**

**p.m.** [1]
8:15
**package** [2]
10:10; 76:10
**page** [9]
9:17, 18; 56:16; 70:2, 21; 71:4, 5; 81:25; 84:7
**pages** [2]
9:17, 18
**paid** [9]
22:18; 42:20; 58:6, 9; 80:25; 82:17; 83:1, 3, 22
**paper** [1]
96:12
**papers** [1]
21:14
**par** [2]
73:14; 75:25
**paragraph** [4]
9:4; 11:1; 15:2, 8
**parameter** [1]
45:16
**parameters** [2]
34:19, 23
**parent** [1]
27:13
**parse** [1]
52:20
**part** [25]
7:24; 14:4, 20; 15:12; 21:19; 22:7; 24:22, 23; 36:3; 44:3, 11; 54:23; 58:3; 61:9; 64:20; 66:7, 23; 67:13, 14, 25; 68:1; 70:7; 76:8, 9; 99:5
**partial** [1]
71:9
**participated** [2]
5:18; 20:9
**parties** [21]
4:6; 5:19; 7:6; 8:15, 20; 9:20; 14:5, 14; 16:5, 7; 17:9, 11, 14, 19; 22:11; 23:23; 24:15; 31:4; 87:15, 16; 96:12
**party** [7]
16:6; 18:18; 28:12; 45:3; 81:6; 86:8; 90:1
**party's** [1]
8:19
**pass** [1]
87:21
**passage** [2]
48:1; 49:16
**passed** [5]
18:17, 24; 47:18, 21; 49:5
**passing** [1]
65:8
**pattern** [1]
7:2
**Pause** [1]
47:4
**pause** [1]
60:12
**pay** [8]
22:22; 34:20; 38:19; 41:12, 42:25; 43:3; 64:9; 86:25
**paying** [7]
22:21; 23:3; 43:6, 8, 10, 12; 65:6
**payment** [5]
21:18; 22:14; 43:9; 81:12; 84:10
**payoff** [1]
64:3
**pays** [1]
64:7
**pending** [1]
101:7
**people** [2]
13:15; 19:10
**Peoria** [3]
25:3; 31:8; 70:7
**perceived** [1]
65:2
**percent** [45]
41:1, 7, 12, 13, 15, 17; 42:1, 12, 19; 44:13; 50:10, 18, 21, 25; 51:9, 10; 53:23, 25; 62:14; 63:19, 20, 24, 25; 66:14; 67:17; 68:3, 4; 71:2; 82:9, 21, 23; 83:3; 84:11, 13, 14, 16, 19; 85:6, 10, 14, 21; 95:6, 7
**perception** [1]
75:9
**Perfectly** [1]
15:24
**perfectly** [1]
17:25
**perform** [1]
39:9
**performed** [1]
73:2
**period** [17]
20:13; 25:17; 26:17; 28:22; 38:4, 6, 12; 39:15; 40:10; 42:8, 10; 54:5; 73:9; 85:13; 86:2; 93:1, 20
**periods** [2]
39:6; 43:4
**permission** [2]
17:24; 55:5
**permit** [4]
12:5; 56:24; 64:22; 68:8
**permitted** [5]
26:6; 64:20; 89:18; 92:12; 97:9
**personal** [1]
19:4
**personally** [1]
60:7
**perspective** [3]
4:18; 6:23; 19:22
**pertinent** [1]
15:16
**phone** [1]
102:1
**pick** [2]
74:18; 91:17
**picked** [1]
102:1
**piece** [2]
77:10; 95:13
**pieces** [1]
34:17
**Pikus** [1]
63:24
**pioneer** [1]
20:22
**place** [6]
4:16; 20:4; 28:2; 37:9; 71:25; 98:5
**Plaintiff** [23]
18:9, 12, 14, 18, 19, 22; 19:11; 28:13, 21; 46:8; 55:18; 60:16; 67:3; 69:7; 74:20; 76:17; 86:23; 96:19; 99:15; 100:17; 103:12, 13, 19
**plaintiff** [5]
19:12; 29:7; 47:10, 11; 68:8
**Plaintiff's** [4]
17:21; 70:19; 72:3; 102:14
**Plaintiffs** [44]
4:20; 6:1, 3, 16; 12:6; 18:5, 7; 33:1; 36:25; 46:10; 47:9, 24; 48:2, 7; 52:15, 21; 55:5, 24; 56:1, 19, 20; 57:13, 19; 58:22; 59:5, 9, 11; 67:9; 69:17; 70:18, 21, 25; 71:6, 9; 72:19; 76:13; 78:18; 79:18, 25; 80:9; 81:3; 88:4; 99:6; 104:3
**plaintiffs** [1]
82:20
**plan** [5]
25:10; 31:15; 47:14, 23
**planned** [1]
22:9
**plans** [1]
25:13
**play** [2]
54:20, 22
**pleadings** [1]
55:10
**Please** [1]
91:21
**please** [2]
18:4; 47:5
**plow** [1]
94:11
**podium** [1]
4:13
**point** [15]
6:18; 12:1; 13:6; 36:20; 75:5, 13; 76:11; 79:1; 90:25; 91:3; 98:23; 103:22; 104:14, 20, 23
**policy** [1]
50:7
**portfolio** [5]
20:24; 26:14; 51:24; 52:2; 94:8
**portion** [6]
23:9; 26:7; 37:11; 39:7; 51:1, 2
**posing** [1]
16:23
**position** [9]
8:5, 19; 65:25; 90:25; 101:13; 102:14; 104:3
**post-FIRREA** [1]
54:5
**post-First** [1]
85:12
**Postbreach** [1]
40:20
**posttrial** [2]
54:23; 56:6
**potential** [6]
11:11, 19; 27:3; 54:22; 63:7; 78:23
**preamble** [1]
28:25
**precedent** [1]
19:19
**precision** [1]
29:9
**preclude** [1]
7:14
**preclusion** [1]
95:24
**predictable** [1]
26:14
**preexisting** [1]
24:9
**prefer** [1]
95:25
**preference** [1]
48:23
**preferred** [20]
22:14; 23:6; 33:18, 23; 34:12, 17; 36:1, 10; 70:9, 23; 72:22; 73:11, 13, 21, 22; 75:18; 76:6, 9; 92:24; 93:7
**preliminary** [2]
13:21; 16:20
**preparation** [3]
4:4; 88:1; 97:5
**prepare** [3]
16:15; 55:14; 60:7
**prepared** [4]
14:16; 16:22; 36:15; 97:11
**presence** [1]
19:6
**present** [8]
6:21; 18:19; 19:14; 29:11; 30:5; 36:25; 55:6; 78:24
**presentation** [3]
16:24; 46:25; 92:10
**presented** [9]
19:20, 22; 30:18, 22; 32:25; 59:16, 18; 61:18; 62:3
**presenting** [1]
18:22
**presumably** [1]
13:16
**pretrial** [4]
9:4; 12:11; 13:21; 16:20
**pretty** [2]
90:24; 103:5
**previously** [2]
16:18; 23:20
**price** [8]
23:3; 33:7; 42:15; 80:14; 81:5, 17, 20; 92:16
**primarily** [1]
52:12
**principle** [3]
7:8, 9; 37:21
**principles** [1]
34:16
**privately** [1]
33:3
**problem** [4]
89:5, 15; 100:15; 104:24
**problems** [9]
9:12; 27:9; 49:3; 50:11; 75:12, 21; 77:12; 78:11; 89:8
**procedure** [2]
5:15; 15:18
**procedures** [1]
4:17
**proceedings** [1]
107:8
**proceeds** [1]
82:7
**procure** [1]
45:4
**produce** [1]
47:22
**product** [1]
90:8
**professor** [1]
33:2
**proffered** [1]
15:14
**profit** [4]
21:4; 31:16; 38:19; 89:23
**profitability** [3]
24:17; 31:11; 93:16
**profitable** [1]
89:17
**profitably** [3]
21:3; 25:10; 26:21
**profits** [20]
20:20; 22:10; 25:16, 21; 26:24; 28:16; 29:12, 15; 32:10, 17, 20; 46:16; 54:25; 57:14; 65:10; 68:10, 23; 89:7, 9; 92:1
**program** [1]

20:23
projecting [1]
49:6
projection [1]
93:24
prominent [1]
18:23
promise [1]
24:1
promised [8]
21:16, 22; 22:1; 23:13; 24:6, 12; 26:9; 45:10
promises [2]
23:17; 24:16
promptly [1]
104:17
proof [1]
6:2
proper [2]
20:1; 99:18
properly [1]
4:3
proposals [2]
8:18; 24:21
proposed [2]
27:23; 34:24
proposition [2]
83:19; 88:22
prospectively [1]
41:21
protect [2]
51:16, 18
prova [1]
74:20
proven [2]
29:18; 92:12
provide [15]
14:6; 76:7; 79:5, 6; 87:19; 96:22; 97:10, 12; 98:16; 100:20, 25; 103:20; 105:5, 9, 22
provided [9]
15:10, 14; 53:1; 55:21; 67:6; 76:4; 94:16; 100:19; 103:14
provides [1]
64:11
providing [1]
87:16
proving [1]
89:9
provision [2]
15:5; 62:25
provisions [3]
62:22, 23; 63:1
proxy [4]
72:21, 23; 83:8; 84:5
public [1]
73:19
publication [1]
48:1
publicly [2]
33:6; 72:21
purchase [10]
22:12, 21, 22; 27:16, 18, 19, 21; 64:12; 81:11; 94:16
purchased [1]
33:23
purely [1]
84:15
purported [1]
47:25
purpose [1]
12:15
purposes [5]
22:3; 25:25; 26:2, 10, 11
pursue [4]
69:7; 88:17; 89:18; 101:21
pursued [1]
88:12
pursuing [2]
88:7; 92:4
putting [3]
7:14; 41:23; 50:24
puzzle [1]
77:10

– Q –

quantity [1]
17:16
question [7]
16:3; 31:24; 66:25; 84:17, 18; 91:7; 95:14
questions [6]
16:23; 17:6; 46:21; 55:24; 95:11; 104:10
quick [1]
56:21
quickly [1]
103:6
quotation [1]
83:16
quote [1]
83:2
quoting [2]
81:8, 9

– R –

raise [2]
13:6; 98:23
raisings [2]
83:7; 84:5
ramping [1]
20:23
rapid [1]
26:13
rapidly [1]
26:7
ratable [1]
36:15
ratably [1]
40:4
rate [9]
41:4, 18; 44:14, 15; 82:9; 93:1, 11, 14, 15
rated [2]
53:14, 17
rates [1]
41:7
rating [1]
53:10
ratings [2]
53:7, 10
ratio [2]
35:18, 22
re-Bates [1]
9:11
reach [3]
8:16, 20, 22
reaction [2]
4:25; 44:3
reactions [1]
95:20
read [4]
13:25; 15:6; 17:3; 87:12
reads [1]
16:4
real [6]
28:16; 29:21; 31:23; 32:3; 101:15
realized [4]
81:5; 82:8; 83:24; 85:2
reason [8]
67:18; 89:5; 90:14; 101:22, 24; 102:19; 104:1, 13
reasonable [12]
14:20; 29:7, 19; 30:16; 32:14, 15, 21; 35:21; 41:3, 8; 44:21; 45:15
reasonably [3]
29:8; 30:24; 31:3
reasoning [4]
81:23; 84:1; 96:5, 6
reasons [5]
8:19; 42:21; 63:12; 86:7; 94:7
rebuttal [5]
12:7; 44:7; 91:5, 18; 105:6
recall [5]
53:9; 55:4; 59:6, 22; 99:1
recap [1]
105:4
receive [1]
64:25
received [4]
80:12, 19; 82:2, 7
recent [4]
44:1, 3; 80:2, 3
recently [3]
18:17; 79:22; 105:12
recess [3]
91:13, 17, 20
recession [1]
75:4
recognized [1]
86:6
record [9]
15:13; 21:3; 25:8, 16, 20; 31:11; 83:13; 103:13, 15
recorded [1]
82:25
recounted [1]
18:14
recover [9]
18:10, 12, 20; 19:16; 39:7; 46:9, 11; 60:17; 87:1
recovering [1]
43:21
recovery [10]
66:21, 22, 24; 67:6; 68:2, 5, 9; 92:3, 4, 10
red [1]
92:11
redeem [3]
34:1; 73:15; 94:4
redeemed [2]
41:25; 76:1
redemption [3]
34:24; 35:4; 75:11
reduce [1]
36:19
reduced [3]
52:5, 8; 70:16
reduction [1]
51:23
refer [1]
69:15
reference [1]
82:16
referred [2]
58:19
referring [2]
55:2; 87:9
refinement [1]
39:22
reflect [2]
84:16; 94:8
reflecting [1]
30:6
reflection [1]
15:4
reflective [1]
82:17
regard [15]
13:24; 17:22; 48:20; 58:23, 25; 59:16; 61:5; 70:15; 74:2; 75:17, 19; 89:10; 92:1; 94:21; 105:6
regardless [1]
85:24
regulations [2]
48:2, 12
regulator [2]
22:7; 86:11
regulators [14]
7:3; 21:4, 7, 10; 23:19; 24:20; 25:1; 50:11, 23; 51:7; 76:3; 89:18; 93:22, 24
regulatory [38]
21:17; 22:2; 23:7, 14, 17; 24:2, 7, 12, 14; 25:24; 26:5, 9; 27:8, 23; 30:8; 32:7; 35:12, 14; 36:9, 14; 38:9, 14; 39:8, 25; 40:5; 43:2, 6; 45:7, 10; 48:4, 25; 51:12; 52:12, 25; 53:4; 54:4, 6; 77:5
reject [1]
74:15
relate [1]
45:22
related [9]
17:8; 47:17; 49:9, 18, 22; 63:2, 4; 64:18; 87:17
relates [2]
14:1; 97:22
relating [7]
23:21; 29:12; 49:12; 53:2; 54:25; 67:10; 98:2
relation [3]
52:12; 54:6, 13
relationship [1]
54:7
relationships [1]
19:7
relative [2]
51:12; 54:8
relatively [1]
90:18
relevant [1]
28:14
reliable [3]
34:15; 35:20; 76:7
rely [1]
17:13
remain [3]
4:13; 26:6; 104:13
remaining [1]
30:15
remarks [1]
61:12
remedy [1]
39:4
remember [1]
69:18
remit [2]
7:16; 103:17
remote [1]
19:18
repeat [1]
90:10
repeatedly [1]
55:11
replace [6]
38:13; 39:1; 40:9; 43:5, 15; 48:13
replacement [9]
38:3, 4; 39:12, 24; 41:11; 57:15; 78:14; 83:12; 90:2
replacement-cost [1]
40:11
replacements [1]
84:24
report [15]
17:4; 43:25; 55:21; 57:18; 58:1; 59:19; 61:22; 67:18; 71:9; 96:17, 23; 97:1, 3; 102:20, 22
reported [1]
107:10
reporter [2]
15:12; 57:7
REPORTER'S [1]
107:1
Reporting [1]
107:17
reports [10]
17:4, 5; 44:4; 55:4; 58:13; 59:14;

62:1; 97:10; 105:6, 23
representation [5]
48:19; 99:15; 100:17; 101:13; 103:9
representations [2]
55:16; 69:18
represented [1]
40:13
representing [1]
53:23
represents [1]
103:23
Republic [5]
23:21, 22; 24:5, 10; 35:17
request [5]
16:5, 7; 98:1; 100:16; 104:6
requested [2]
101:13, 14
requests [3]
14:12; 16:6; 103:25
require [3]
52:20; 59:14; 99:6
required [13]
28:9; 29:9; 41:4, 7, 17; 47:13, 22; 48:11; 49:1; 51:5, 12; 64:3; 82:18
requirement [3]
10:22; 49:21; 99:10
requirements [2]
47:13; 48:9
requires [1]
59:13
residual [2]
58:4, 6
Resolution [1]
27:6
resolve [1]
104:17
resolving [1]
104:6
respect [24]
6:10; 7:5; 9:3; 48:5, 23; 50:12; 54:17; 56:12; 57:21; 59:15; 60:17; 61:23; 63:5, 8; 68:19; 69:4; 70:11; 72:1; 75:7; 77:22; 79:21; 95:15; 100:25; 104:4
respectfully [1]
52:19
respond [4]
56:3, 8; 60:2, 3
responded [1]
59:21
response [4]
59:22; 71:23; 72:2; 97:11
restamping [1]
10:18
Restatement [4]
86:17; 90:3, 10; 94:22
restatement [1]
89:12
restitution [1]
57:15
restore [1]
88:5
restriction [1]
54:10
restrictions [1]
43:1
result [3]
17:6; 28:11; 51:4
resulted [3]
35:13; 81:4, 19
resulting [3]
24:7, 18; 28:17
results [2]
26:15; 39:24
resume [1]
105:1
retain [1]
88:11
retained [59]
30:7; 37:13, 15, 17, 19, 24; 38:3, 5, 13, 16, 17, 21, 24; 39:16, 21; 40:3, 6, 9, 13, 16; 45:9, 14; 55:20; 78:2, 7, 18; 79:15, 18, 21, 24; 80:9, 11, 14, 20; 81:4, 17, 18, 22; 82:3, 4, 11, 15, 19, 25; 83:4, 9, 18; 84:3, 6; 85:2; 86:18, 22, 23; 87:5; 88:9, 22, 24; 96:3; 105:11
retained-earnings [1]
55:6
retention [2]
80:25; 83:21
retrospectively [1]
42:6
return [14]
13:16; 40:12, 17; 41:4, 7, 18; 42:15; 76:12; 81:2; 82:9; 83:3, 9; 84:6; 93:3
Returning [1]
62:5
returns [3]
41:20; 42:7, 12
review [2]
17:7; 87:22
revise [2]
70:20, 25
revised [1]
16:15
revisions [2]
13:20; 16:13
revoked [1]
21:21
Right [13]
53:11; 62:5; 71:14; 72:11; 76:18; 77:4, 15; 78:10; 88:16, 19; 96:1; 98:25
right [19]
7:1; 14:24; 16:12; 19:16; 23:3; 42:2; 53:3; 55:14; 58:17; 60:6, 24; 66:7; 71:24; 91:11; 92:22; 94:20; 105:5, 8, 15
rigorous [1]
23:1
risk [4]
20:24; 50:4, 25; 93:14
risk-based [1]
26:4
risky [3]
49:24; 50:9, 12
River [134]
18:22; 19:9, 13, 17, 21, 22; 20:3; 21:14; 22:4, 10; 23:14; 24:11, 20, 22; 25:2, 5, 14, 19; 26:12, 21; 27:2, 16, 18, 19, 20; 28:5, 8, 19, 23; 29:16, 25; 30:6; 31:6, 8, 9, 13, 20, 24; 32:1, 2, 4, 7, 11, 18, 24; 33:3, 12, 16, 19, 25; 34:21, 25; 35:5, 6, 7, 9, 10, 16, 23; 36:4; 37:6, 11, 13; 38:12, 20, 22; 39:4, 6, 19; 40:19, 21, 24; 42:11, 24; 43:2, 5, 19; 46:5; 47:16; 49:6, 10, 14; 50:20; 51:11; 52:2, 11, 13, 21; 53:14; 58:6, 9; 62:15, 20; 63:21, 23, 24; 64:3, 5, 8, 14; 65:2, 4, 5, 6, 12, 14, 23; 66:9, 12; 70:24; 72:5; 73:1, 2; 80:18, 19; 82:1, 2, 5, 7; 84:8; 85:7, 22; 88:6; 89:19; 92:6, 8; 93:13, 16, 21, 23
ROBERSON [89]
6:9, 13; 7:21; 8:6, 10; 9:3, 6, 25; 10:5, 12; 11:1, 4; 12:10; 14:19; 15:24; 16:11; 47:5; 48:15, 18; 49:20; 53:13; 54:4; 57:5, 9, 11; 60:14, 21; 61:3, 13, 16; 62:5; 63:13, 16; 66:1; 69:5, 9, 14, 23; 70:1, 5; 71:14, 18, 24; 72:9, 11, 15, 18; 74:9, 22; 75:16; 76:18, 20; 77:1, 4, 15, 24; 78:10, 15, 17; 79:10, 14, 17; 80:3, 5, 10; 81:9; 84:22; 87:3, 11, 18, 24; 88:3, 16, 19, 21; 91:6; 97:8; 98:12, 25; 99:5; 100:9, 23; 101:8; 103:4; 105:3, 9, 14, 17; 106:2
Roberson [22]
6:7; 7:20; 8:25; 10:17, 25; 12:3, 9; 15:23; 47:1; 57:2, 3; 92:9; 94:21, 24; 95:16; 97:5, 25; 98:22; 101:15; 102:8, 23; 105:2
Roberson's [1]
10:21
Rockfall [1]
20:6
Rockfalls [10]
20:17, 19, 21; 21:8; 23:20, 21; 24:9; 25:18; 31:10; 35:17
Rose [2]
62:10; 63:23
Ross [23]
18:16, 23; 20:8, 10; 21:1, 11; 62:18; 63:18, 19; 66:11, 13; 67:5, 7, 11, 16, 19, 20, 23; 82:8; 99:8, 22
Ross's [2]
19:5; 31:12
roundabout [1]
89:8
RTC [4]
27:7, 13; 33:18; 34:23
RTC's [3]
40:21, 24; 62:11
Rule [2]
59:13; 98:2
rule [1]
16:4
ruled [1]
18:11
rules [3]
59:12, 13, 25
ruling [3]
70:8; 100:10; 103:21
run [3]
69:16; 77:10, 24
running [2]
19:8; 63:22
rushed [1]
8:4

## – S –

safe [4]
16:7, 9; 23:15; 44:15
safely [2]
21:3; 25:11
safety [1]
27:9
SAFSB [46]
27:14; 28:1, 15, 23; 29:12, 15, 17; 30:17; 46:7, 16; 58:13, 14, 15, 17, 19, 23, 25; 60:17, 23; 61:5, 21, 23, 25; 62:3, 6, 8, 12, 20; 64:12; 65:1, 4, 9; 66:20, 23; 67:10, 12, 16, 18, 21; 68:19, 21; 69:4; 78:22, 25; 92:1, 7
SAFSB's [1]
28:18
sake [3]
62:2; 74:14; 102:12
sale [9]
35:4; 62:11; 80:13, 20; 81:5, 6; 82:7; 85:2; 94:16
sales [1]
81:20
San [8]
27:4, 14, 18, 19, 21; 28:6, 11; 31:21
satisfactory [1]
8:22
Savings [11]
20:6; 22:5; 23:22; 27:5, 14; 30:12; 83:6, 11, 17; 84:2
savings [2]
75:9, 12
saying [7]
59:12; 62:13; 73:24; 76:21; 77:7; 88:14, 20
scale [1]
26:24
scenario [1]
6:1
schedule [1]
23:11
schedules [1]
12:20
seated [2]
4:13; 91:21
Second [2]
43:4; 93:9
second [9]
14:25; 29:23; 32:23; 55:17; 58:1; 69:8; 73:10; 86:1, 13
Secondly [2]
65:5; 73:18
secondly [1]
60:1
Section [1]
90:3
section [2]
94:22, 24
securities [7]
20:23; 22:2, 12, 21; 44:16; 49:19; 50:2
security [4]
34:12, 17, 20; 92:24
seek [2]
4:19; 71:1
seeking [2]
60:17; 87:1
seeks [1]
45:24
sees [1]
99:3
seized [1]
20:15
sell [1]
33:24
selling [1]
80:12
sense [9]
7:16; 13:13; 15:5; 17:2; 19:5; 43:23; 68:7, 12; 96:11
sensible [1]
4:17
separate [12]
10:2, 3, 8; 11:17; 24:8; 27:13; 28:12, 15; 45:21; 65:17, 19; 92:8
separately [3]
9:7, 21; 24:11
September [5]
59:3; 64:6; 73:5; 107:5, 14
series [2]
10:7; 57:14
serves [1]
96:25
service [2]
45:3; 90:7
serving [1]
38:4
sets [1]
66:3
setting [2]
16:20; 85:5
settle [1]
71:15
settled [1]
77:8
settlement [5]
52:16, 17, 18; 54:14, 16
settles [1]
98:19
severe [1]

26:13
severely [2]
26:2, 10
shape [1]
27:15
share [2]
42:14; 81:3
shareholders [14]
64:19; 65:4, 9, 12, 13; 66:3, 10; 67:21; 82:2, 6, 18; 83:9; 84:5
shares [3]
22:14, 22; 23:6
shed [1]
47:18
sheer [1]
38:9
sheet [2]
37:6, 12
shifting [1]
69:10
shifts [1]
14:14
shouldered [1]
81:13
Show [1]
69:25
show [13]
25:1; 26:17; 27:17; 28:7; 31:5, 19, 25; 32:3; 40:21; 73:8; 74:11, 25; 95:5
showing [1]
56:18
shows [6]
34:2; 40:24; 73:4; 79:13; 88:23; 89:2
shrinkage [2]
26:13; 58:3
shrinking [1]
64:23
shrinks [1]
64:5
significance [1]
52:11
significant [14]
19:7, 9; 20:1; 21:17, 24; 24:19; 27:8; 30:20; 33:10; 43:1; 47:11; 49:6; 51:25; 53:6
Significantly [1]
83:16
silent [1]
89:4
simple [8]
30:11; 33:7; 34:16; 35:2; 39:10; 45:1, 7, 13
single [1]
92:3
Sir [1]
67:9
sir [1]
101:8
situation [4]
13:10; 17:11; 66:7; 80:18
sizable [2]
20:23; 25:15
skills [1]
21:2
sleight [1]
68:8
slew [2]
60:22; 77:11
slice [2]
34:3; 72:23
slicing [1]
50:3
slide [2]
78:20, 24
slides [1]
56:25
slip [3]
28:1; 81:24; 84:7
smaller [1]
26:23
smallest [1]
82:16
so-called [1]
10:22
sold [4]
80:17, 18; 82:1; 92:17
solid [1]
20:19
Somebody [2]
32:19
somebody [3]
9:14; 12:24; 28:20
somehow [1]
36:2
somewhat [1]
15:5
sophisticated [1]
20:24
sorry [3]
27:25; 69:5; 105:14
sort [3]
10:6; 13:13; 17:7
sought [3]
14:10; 66:21; 82:21
soundness [1]
27:10
Sounds [1]
13:18
source [5]
31:22; 54:15; 83:6; 84:4; 100:7
sources [1]
33:4
space [3]
14:9, 11; 45:8
speak [3]
4:13; 10:11; 75:20
speaker [1]
17:22
speaking [1]
102:7
specific [4]
5:2; 49:21; 61:6, 8
specifically [3]
49:22, 23; 70:10
specified [1]
89:7
spelled [1]
61:12
spelling [1]
74:8
spend [3]
8:2; 19:24; 44:23
spoken [1]
101:25
sponsor [1]
96:21
spread [2]
40:11, 18
stable [1]
20:19
stage [2]
8:8; 94:19
stake [1]
22:8
stance [1]
47:8
stand [6]
19:15; 68:9, 24; 78:9; 88:9; 105:25
standard [9]
21:6; 26:2; 30:24; 35:22; 36:6, 12, 21; 40:11; 45:19
standards [7]
26:1, 3, 5; 30:15; 44:21; 47:15; 49:17
stands [4]
18:10, 12, 20; 19:11
start [4]
20:4; 47:6; 78:17; 79:17
state [3]
57:20; 58:2; 70:21
stated [3]
48:23; 82:24; 90:3
statement [5]
8:19; 11:21; 12:4, 6; 60:16
States [4]
68:10; 69:1; 107:4, 11
states [1]
100:14
stating [1]
81:15
status [3]
103:1, 15; 104:16
stay [1]
4:16
steady [2]
57:20; 58:2
steady-state [1]
55:1
step [2]
62:7; 101:22
stepped [2]
45:14; 51:9
Steven [2]
18:15; 99:7
stickered [1]
15:9
stipulate [1]
17:12
Stipulated [3]
47:20; 49:8; 51:13
stock [15]
33:6, 18; 41:21; 70:9, 23; 72:23; 73:11, 13, 22; 75:18; 76:6, 9; 84:10; 93:5, 7
stop [1]
81:16
stopping [1]
13:12
story [1]
20:17
straightforward [2]
45:16, 18
strategy [1]
93:14
Street [1]
107:18
street [1]
95:6
stretch [1]
11:12
strike [3]
59:7, 12, 24
strikes [1]
5:25
strings [1]
22:19
stripped [1]
87:4
strokes [1]
23:24
strong [1]
83:19
strongly [1]
11:22
structure [5]
28:20; 34:11; 62:16; 68:7; 85:16
stuck [1]
13:2
study [2]
33:8; 95:19
studying [1]
95:22
sub [2]
27:14
subject [3]
8:3, 17; 101:11
submit [1]
79:8
subordinated [3]
21:25; 24:2; 83:8
subsidiary [2]
27:11; 63:3
substance [4]
33:14; 60:23; 61:4; 62:6
substantial [11]
21:16; 25:21, 22; 36:6, 7, 8, 20, 22; 70:15
substantially [4]
14:5; 15:7; 21:2; 25:15
substantive [1]
98:24
substitute [2]
45:5; 90:16
subtraction [1]
35:2
succeed [1]
31:16
success [12]
21:4, 6, 19; 22:8, 9, 10; 23:18; 24:17; 25:8, 16, 22; 26:22
successful [4]
18:7, 23; 43:14, 22
successfully [2]
20:25; 26:22
successor [2]
18:21; 19:13
sudden [1]
26:12
sue [1]
99:2
suffer [1]
81:21
suffered [1]
29:8
sufficient [1]
38:13
sufficiently [2]
5:1; 44:22
suggest [3]
4:6; 5:12; 91:2
suggestion [8]
4:11; 5:4; 7:15; 9:19; 10:21; 11:13; 103:9; 104:10
suggests [1]
43:20
sum [1]
71:6
Summary [1]
98:5
summary [10]
44:6, 11; 59:6, 23; 65:15; 71:9; 79:20; 94:10; 98:2, 16
supervisory [5]
24:5; 51:7, 11, 22; 52:7
supervisory-assisted [1]
21:13
supplement [1]
70:20
supplemental [2]
58:1; 97:1
supplemented [1]
96:25
support [4]
17:8; 32:22; 38:18; 83:19
supported [1]
37:2
supporting [1]
37:11
supports [1]
96:18
surely [1]
36:12
surprise [1]
102:2
surprised [3]
70:12; 102:17, 18
suspect [1]
99:21
sympathetic [1]
13:5
system [1]

27:10

– T –

table [1]
55:2
tail [1]
75:19
takeover [1]
20:16
takes [1]
40:3
talk [14]
6:11, 24; 9:2; 11:9; 19:24; 57:24; 69:8, 11; 71:22; 79:15; 86:1, 16, 22; 101:15
talked [1]
39:17
talking [5]
21:23; 36:17; 48:15; 70:13; 74:16
Talman [1]
30:13
Tammy [1]
107:16
tangible [19]
22:8; 26:1, 10; 40:13; 50:10, 19, 21, 23; 51:6, 8, 14, 18, 21; 53:24, 25; 54:7, 12, 18; 77:8
tapes [1]
107:10
target [1]
27:4
task [1]
34:5
tax [7]
55:18; 56:2, 5, 9, 10, 12, 14
taxes [1]
67:20
telephonic [2]
103:1; 104:16
temporarily [1]
21:22
terminated [1]
52:7
terms [4]
22:11; 74:25; 75:19; 96:9
terrific [1]
10:24
testified [2]
76:4; 86:11
testimony [10]
17:9; 30:19; 37:1; 51:19; 59:10; 61:20; 62:4; 87:7, 10; 89:10
Texas [2]
27:5; 62:11
textbook [1]
86:20
Thacker [5]
42:8; 80:6; 82:4; 84:8; 88:23
Thacker's [3]
84:11; 87:4; 89:10
Thank [15]
4:15; 8:24; 10:23; 12:8; 15:21; 16:12; 18:3; 47:2, 3; 91:19, 23; 97:20; 98:20, 21; 106:2
thank [2]
46:20; 106:1
theories [13]
17:2; 19:24; 29:11; 45:21; 54:20, 22; 58:22, 25; 59:8, 24; 69:7; 96:2, 18
theory [25]
29:23; 30:5; 32:23; 39:7; 44:20; 45:1; 55:6, 20; 59:2, 15; 60:3; 61:12, 18; 75:22; 78:18; 79:19, 22; 80:9; 86:2, 18, 22; 87:5; 88:9, 25; 96:21
There's [7]
61:22; 62:24; 72:23; 82:13; 85:11, 13; 86:7
there's [10]
6:25; 60:21; 68:20; 72:3; 74:11; 79:22; 83:13; 91:2; 99:18; 100:1
thereafter [3]
15:11, 17; 48:13
thereby [1]
17:14
they'll [1]
103:6
they're [6]
59:1; 65:11; 78:2; 98:15; 99:12; 100:13
They've [2]
68:22
third [7]
7:6; 19:11; 28:12; 30:5; 81:6; 86:8; 93:19
third-party [1]
31:22
thoughts [2]
14:18; 61:17
threat [1]
27:9
three [16]
6:17; 14:7; 17:5; 21:11, 23; 25:20, 25; 29:2, 11; 30:14; 45:21; 46:11; 53:15, 17; 58:15; 69:6
three-day [1]
6:18
thrift [21]
20:13; 23:22; 24:10; 47:19, 21; 48:5; 51:5; 55:1; 63:5; 72:21; 76:8; 80:15, 16; 81:6, 11; 82:17, 25; 83:23; 89:17, 20; 90:21
thrift's [3]
83:7; 84:4; 89:21
Thrifts [4]
63:21, 23; 72:5; 73:1
thrifts [12]
20:14; 21:6, 9; 47:16; 49:6, 11, 14; 52:21; 53:14, 17; 73:5; 82:10
throw [1]
49:17
thrusted [1]
32:7
Thursday [1]
13:15
thwarted [2]
28:6; 29:12
ties [1]
89:11
tight [1]
12:19
time-consuming [1]
17:17
time-of-breach [1]
45:23
times [4]
25:9; 39:11; 95:7, 8
TITLE [1]
107:4
tongue [1]
28:1
torrent [1]
65:13
total [4]
35:8; 36:17; 46:1; 67:17
totaled [2]
50:18, 21
totally [4]
60:4; 61:22; 65:19; 90:9
trace [2]
28:16, 21
traceable [5]
29:15, 22; 32:17; 84:19; 92:13
track [9]
5:13, 20; 14:1; 21:3; 25:8, 16, 19; 31:10; 83:13
traded [2]
33:6; 72:21
trading [1]
33:7
tranches [1]
50:4
transaction [5]
19:18; 22:17; 23:12, 16; 34:25
transaction-driven [1]
94:14
transactional [1]
92:20
transactions [1]
31:2
transcript [1]
4:12
transcripts [1]
105:10
transfer [4]
7:5; 86:6, 8, 12
transferred [1]
86:3
travel [1]
12:19
traveling [1]
12:16
Treasury [1]
44:15
treat [3]
22:2; 23:7; 24:2
trial [33]
4:5, 21; 5:9; 7:11; 9:7; 12:20, 23; 13:7, 14; 14:6; 15:9, 13, 15; 17:1; 54:23; 59:16; 60:8; 68:19; 71:20; 77:17; 79:4; 80:4, 5, 23; 81:16, 20, 23; 83:5, 15; 88:2; 94:13
trials [2]
9:13; 53:9
tries [1]
92:19
troubled [2]
21:9; 23:22
troubles [1]
27:12
Trust [1]
27:6
Tuesday [3]
8:11; 12:14; 98:4
turmoil [1]
26:17
twice [1]
67:12
two-thirds [1]
23:13
two-week [1]
7:14
type [3]
30:25; 31:3; 79:24
typical [2]
47:10

– U –

U.S. [1]
18:25
ultimate [1]
21:18
ultimately [1]
81:2
unable [3]
39:20; 90:2, 16
uncertain [2]
58:23; 100:9
underlying [1]
96:2
underneath [1]
58:16
understand [8]
50:1; 54:24; 57:12; 67:1; 68:16; 69:3; 71:11; 76:22
understanding [17]
4:19, 22; 54:21; 55:8, 17; 56:13, 18, 20; 57:1, 16, 23; 58:4, 11; 99:9; 105:5, 20, 22
understands [2]
56:15; 78:24
understood [3]
23:16; 24:15, 22
undertook [1]
23:1
underwater [1]
51:3
unduly [1]
17:17
unforeseeable [1]
86:21
unique [1]
90:6
United [4]
68:10; 69:1; 107:4, 11
Unlike [2]
22:18; 24:4
unnecessary [1]
104:10
unrealized [1]
81:13
unrelated [1]
64:1
unreliable [6]
73:12, 17, 18; 75:23; 85:25; 86:15
Unsurprisingly [1]
33:21
unwilling [2]
62:21; 83:18
upheaval [1]
26:20
upper [1]
63:25
upside [1]
26:19
upstreaming [1]
64:24
upward [1]
93:5
urge [1]
5:5
useful [2]
16:21; 19:23
usual [1]
89:25

– V –

vacuum [1]
37:8
valid [1]
44:14
Valley [111]
18:22; 19:9, 13, 17, 21; 20:3; 21:14; 22:5, 10; 24:11, 21, 22; 25:2, 5, 14, 19; 26:21; 27:2, 16, 18, 19, 20; 28:5, 9, 19, 23; 29:16, 25; 31:6, 8, 9, 13, 20, 25; 32:1, 2, 8, 11, 18, 24; 33:3, 16, 19, 25; 34:21, 25; 35:5, 6, 7, 9, 10, 16, 23; 36:4; 37:6, 11, 13; 38:12, 20, 23; 39:4, 6, 19; 42:11, 24; 43:5, 19; 46:5; 47:16; 49:6, 10, 14; 50:20; 51:11; 52:21; 53:14; 58:6; 62:15, 20; 63:21, 23, 25; 64:3, 5, 8, 15; 65:2, 5, 6, 12, 14, 23; 66:12; 70:24; 72:5; 73:1, 3; 80:18, 19; 82:1, 2, 5, 7; 88:6; 89:19; 92:6, 8; 93:13, 23
Valley's [23]
19:22; 23:14; 26:13; 30:6; 32:4; 33:12; 40:20, 21, 25; 43:2; 52:2, 11, 13; 58:10; 65:4; 66:9; 84:9; 85:7, 22; 92:6; 93:13, 16, 21
valuable [4]
26:24; 93:7, 8; 94:3
valuation [1]

40:24
valuations [2]
73:2; 76:6
value [59]
29:24, 25; 32:24; 33:5, 12, 15, 18, 21, 22; 34:2, 3, 6, 19, 20, 25; 35:10, 23; 36:4; 57:14, 22; 67:12; 69:12, 21; 70:2; 71:1, 7, 12; 72:2, 4, 8, 14, 20; 73:6, 8, 10, 20; 74:7, 18, 21, 24; 75:22, 24; 76:13, 16, 23, 25; 77:23; 78:7; 81:5; 86:19; 92:14, 22; 93:4, 17; 94:5, 8, 15; 96:21; 105:7
valued [1]
73:22
values [1]
73:1
valuing [1]
76:7
variations [2]
61:8, 11
vast [1]
17:15
vehicle [2]
32:10, 12
ventilated [1]
97:18
version [1]
15:10
versus [3]
53:8; 58:3; 99:25
veteran [2]
18:6, 25
viability [1]
24:17
viable [1]
85:4
view [14]
6:19; 7:17; 16:24; 20:1; 22:3; 41:9, 11; 42:7; 52:1; 53:19; 101:11; 103:20; 104:11, 19
viewed [1]
39:3
views [1]
96:12
Virginia [1]
33:2

– W –

wait [1]
60:25
wanted [10]
9:1; 13:14; 27:16; 43:1; 60:24; 61:16; 78:21; 98:23; 105:3
wants [2]
12:3; 42:7
Washington [2]
107:6, 19
ways [1]
41:20
WCHI [7]
63:18; 64:11; 65:7, 12; 66:14; 68:3, 25
we'd [2]
75:1; 97:11
We'll [2]
14:24; 25:6
we'll [7]
6:4; 25:6; 57:23; 87:22; 91:17; 97:1; 103:1
We're [3]
21:23; 36:17; 98:9
we're [21]
6:23; 10:15; 11:6, 8, 9; 23:8; 32:15, 16; 43:8; 51:19; 55:13; 58:23; 71:20, 21; 79:1; 91:8, 22; 95:24; 97:9; 105:5
We've [3]
5:14; 77:18; 91:1
we've [10]
16:17; 25:3, 8, 19; 45:21; 74:15; 76:4; 77:19; 91:12; 97:18
Wednesday [2]
8:13, 16
week [2]
7:13; 8:4
weeks [1]
7:12
Welcome [1]
4:1
welcome [2]
4:1, 8
well-accepted [1]
34:15
weren't [2]
59:9; 60:2
Western [3]
32:12; 63:18; 64:4
What's [1]
37:5
what's [4]
6:7; 10:13; 35:25; 72:16
whatsoever [1]
85:19
whenever [1]
42:25
whereas [3]
21:21; 40:16; 84:12
whereby [2]
6:1; 22:13
Whereupon [2]
91:20; 106:3
wherever [1]
101:2
whoever [3]
99:16; 100:3; 101:2
wholly [1]
28:15
widely [1]
90:13
Wiese [4]
80:4, 5; 81:7, 9
Wiese's [2]
81:10; 96:5
wild [1]
75:6
willing [3]
33:24, 25; 41:25
Winstar [5]
47:10; 53:9; 59:14; 90:7
Winstar-related [1]
5:16
wise [1]
7:23
witness [4]
6:19; 14:10; 15:15; 75:15
witnesses [13]
6:25; 11:25; 12:15, 17, 22; 15:11, 17; 16:3; 17:3; 30:18, 20; 51:19; 62:4
won't [1]
104:18
wonder [1]
35:25
word [2]
29:3; 92:3
words [3]
6:15; 66:1; 72:16
work [1]
25:6
worked [4]
5:18; 20:3; 98:8; 103:5
works [1]
89:2
world [4]
29:22; 31:23; 32:3; 82:24
worry [1]
6:3
worth [4]
34:4; 73:13, 16; 74:4
wouldn't [7]
8:4; 31:22; 39:18; 95:5; 102:2; 104:7, 22
wrap [2]
13:15; 99:12
writ [1]
75:13
written [5]
86:14; 103:8, 13, 15, 25

– Y –

year [3]
6:24, 25; 49:4
years [10]
19:8, 17; 20:5, 6; 25:20; 38:12; 49:7; 93:2; 95:8
yellow [1]
70:2
yield [1]
41:12
you'd [2]
61:13; 87:12
you'll [1]
89:1
you've [5]
53:8; 74:7; 75:24; 77:8; 95:18

– Z –

zero [1]
101:7

# EXHIBIT I

To: Jim Batsell
Connie de la Garza
Jim Pressler

From: Ron Pikus

Subject: SAFSB Organizational Structure

Date: August 24, 1992

I was pleased to learn that you have agreed to continue on the board of directors of San Antonio Federal Savings. Your input as to how SAFSB can enhance its role in your respective communities will be invaluable.

So that each of you has a better understanding of how SAFSB's new management plans to operate, I have enclosed two reports for your review:

1). BUSINESS PLAN - This is the plan which was submitted to the Office of Thrift Supervision as part of Western Capital Holdings' application to acquire SAFSB. This should give you a general overview of how WCHI's investors view the thrift business and the long term plan for the Bank. Please keep in mind that the financial projections indicate the Bank's anticipated performance from a starting point of January, 1992. Given SAFSB's positive operating results during 1992, the Bank's capital position should even be stronger than projected.

2). ORGANIZATIONAL STRUCTURE - This report contains the rationale behind the management restructuring, WCHI's plan to expand the Bank's Rio Grande Valley presence and an explanation of how the Bank's Valley staff will be utilized.

I hope that you find these materials informative and that they give you some insight into management's plans for the Bank. I look forward to meeting all of you at our September 17, 1992 board meeting and working with you in the future.

Ron

DEFENDANT'S EXHIBIT
DX 1017
Holland v. U.S. 95-524C

cc: Richard Dalton

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1764

San Antonio Federal Savings Bank
Organizational Structure

OVERVIEW

The acquisition of San Antonio Federal Savings Bank (SAFSB) by Western Capital Holdings, Inc. (WCHI) will bring about several changes in the organizational structure of SAFSB. The following is a presentation of what the new organization will look like. Some decisions on personnel and other matters can only be made after the acquisition takes place. Those cases will be noted in the presentation.

EXECUTIVE MANAGEMENT -

It is understood that BO McALLISTER will have no ongoing management role with SAFSB. Homer Holland and Howard Ross will discuss this issue with Bo.

JIM DELOACH, the current president, will not be kept on by SAFSB. Even though Jim has expressed interest in heading up a mortgage origination/processing group for SAFSB, the concensus is that he does not have the capabilities to manage such a function in a manner satisfactory to WCHI. Therefore, Jim will be told immediately after the deal has closed that he will not have a role with SAFSB. The recommendation is that Jim be asked to leave the Bank immediately. A agreement has been developed which makes the payment of his severance and a bonus contingent upon his cooperation until November 30, 1992 and will not be payable until then.

Because the San Antonio office will be phased out completely (see below), it is necessary to have someone from the current management staff to provide a Texas presence for the coordination of the wind-down. JACK SUKMANN will be asked to remain with SAFSB to manage this task. Provided Jack fulfills his duties satisfactorily, he will be guaranteed employment until the end of the year, granted severance pay in accordance with a formula which will apply to all staff members and a performance bonus. Jack's severance and bonus will not be paid until the end of the year.

RICHARD DALTON has already agreed to take on responsibilities as the President of SAFSB. Richard will set up his office in the Valley (see below). In addition to being the local "person-in-charge", Richard will spend a significant portion of his time establishing a mortgage origination and processing function which will be located in and concentrate its efforts in the Valley.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1765

SAN ANTONIO ADMINISTRATIVE OFFICE -

Given WCHI's operating philosophy that SAFSB is to be run as a community-oriented thrift institution and given SAFSB's apparent excellent coverage of the Rio Grande Valley market, there will be no retail banking presence by SAFSB in the city of San Antonio. Investments, mortgage servicing and some accounting functions will be handled by RVSB out of Chicago and Peoria under a management agreement. The residual accounting/accounts payable tasks would better be handled closer to the source of the transactions - the Valley. The consumer loan servicing and collection functions, which are now handled both in San Antonio and the Valley, can all be centralized in the Valley. Retail banking, operations and administrative services are already located in the Valley. Since this leaves no functions remaining to be run out of San Antonio, the is no need to maintain an office in San Antonio.

None of the functions, except Investments, can be transferred to the Valley immediately. A transition period is required to either relocate current employees who live in San Antonio to new jobs in the Valley or transfer tasks (mortgage loan servicing and accounting) to Illinois. The longest lead-time item will be the transfer of mortgage servicing. This is planned for the middle to end of November, 1992. It is reported that the building management is anxious to have SAFSB either sign a new lease or move out of the building at the end of the current lease period, November 1, 1992. This issue will be discussed with the building management and a deal will be put in place which allows SAFSB to remain in the building until November 30, 1992. Contrary to the impressions given by current SAFSB management, it is difficult to believe that the building management would not be agreeable to this proposal.

What will now follow is a description of how the principal divisions within SAFSB will be structured.

RETAIL BANKING -

LINDA BALLI, the current branch coordinator, has impressed the WCHI group as someone who is well suited to run SAFSB's branch network in the Valley. She also appears to have a good working knowledge of SAFSB's current service bureau system, FPS.

There is no reason to make any immediate changes in the retail banking or the operations group. While it appears that the branches are over-staffed, given the deposit base



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1766

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1780

and the number of transactions which each office processes. operating efficiencies would best be introduced gradually into the branch system.

Face-to-face meetings with all of the branch managers have left the impression that they are all well suited to their jobs. A more focused approach to product sales, performance tracking and lending opportunities is necessary. However, there will be no changes made to the branch system immediately after acquisition.

The cursory review of the operations group was not sufficient to draw any conclusions as to the efficiency of the staff or the soundness of the operating procedures. Shortly after closing, Bob Redden of RVSB will be asked to make an analysis of this function and come back with recommendations for improvement. Again, no changes will be made to this group for the near term.

Several issues, many of which cannot be resolved at this time, center around SAFSB's data processing system and the FPS contract. It is our understanding that WCHI's acquisition does not trigger an escape clause in the agreement which deals with the prospect of SAFSB's being acquired by another financial institution. Jay Holland has been asked to review the agreement and summarize key issues. A face-to-face meeting with the management of FPS is anticipated once RVSB's data processing management outlines issues which the acquisition and transfer of functions creates.

Another data processing issue involves the management of the Bank's PC-based systems. The San Antonio office operates its PC system from a local area network (LAN). It has to be determined whether there are LAN operating in the Valley. Since the current PC expert for SAFSB, Al Smith, is located in San Antonio, the extent of PC use in the Valley will determine whether Smith will be asked to relocate to the Valley. Jay Holland will be ready to act as a systems consultant to SAFSB for the implementation and maintenance of PC based systems if it is determined that this is the best approach to the matter.

LENDING -

Several functions come under the heading of Lending: mortgage production, processing/underwriting, consumer lending (both processing and servicing) and the Phoenix office. Each function will be addressed separately.

SAFSB has no MORTGAGE PRODUCTION capabilities at this time. Since the Bank's business plan calls for it to be an active originator of conforming and portfolio loans in Texas ...

production capability must be developed. While there has been some issue as to whether the Bank should concentrate its lending efforts in both the Valley and San Antonio or some combination thereof, the initial mortgage production strategy will be to focus on retail originations only in the Valley. Not until a centralized mortgage processing operation has been established in the Valley and a core of commission-only originators are in place will consideration be given to establishing a retail and wholesale presence in San Antonio.

Richard Dalton will have the responsibility of recruiting a cadre of mortgage originators. Richard must determine whether he will attempt to attract seasoned originators from local mortgage bankers or whether he will attempt to grow his own talent. It is our understanding that there are some current SAFSB staff members who are interested in becoming originators.

A MORTGAGE LOAN PROCESSING AND UNDERWRITING function must also be created. It is possible that some current Valley and San Antonio employees have had previous processing or underwriting experience. Kathy Fuller handles this function at this time. She will be approached to determine if she has the capabilities and the interest to relocate to the Valley to manage the processing department. There may also be individuals in the mortgage servicing department who may have background and/or interest to relocate to the Valley to become part of the processing group. Answers regarding the San Antonio staff will be obtained during the interview process which Ron Pikus will conduct in San Antonio immediately after the deal is closed. One of the top priorities on Richard Dalton's list will be to assemble a processing staff in the Valley.

The plan is to use RVSB's FIS document preparation and tracking system in SAFSB's mortgage processing department. Jay Holland and Richard Dalton will explore what must be done both in terms of licensing agreements and equipment to make this happen.

A more fundamental issue regarding mortgage production which must be addressed prior to closing is the flow of conforming and non-conforming production to RVSB, and how servicing rights to these loans will be treated. The most efficient flow of SAFSB's conforming loan production to the secondary market would be the incorporation of Texas and Illinois production into the same MBS's. This does, however, raise a regulatory issue regarding affiliated party transactions.

Larry Ferries of the OTS has been advised that we would like his assistance in working with the Dallas OTS regarding the affiliated party transaction issue. Since many of the functions which would normally be handled by SAFSB will be taken over by RVSB, it is important that the Dallas OTS

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1768



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1782

understand this operating strategy and give their approval of it. In order to minimize any opposition which Dallas may have, it is imperative that RVSB and SAFSB have written agreements regarding loan purchases/sales, loan servicing purchase or subservicing, investment management and other management services. Ron Pikus and Steve Bangert will address these issues and work with Mark Kipnis of Holleb & Coff to draft agreements which will meet regulatory scrutiny.

The processing and underwriting aspects of CONSUMER LENDING are currently handled out of the Weslaco office of SAFSB. Collection of Valley-based consumer loans is also done in the Valley. However, all consumer loan files are maintained in San Antonio and "consumer loan servicing" -- payoffs, insurance tracking, etc.-- is handled in San Antonio. The plan is to have the Valley consumer loan processors and collectors take over all consumer loan processing and servicing functions for the Bank. Shortly after closing, an assessment must be made of the personnel in the Valley to determine their capabilities of handling all consumer loan tasks. This will determine whether any of the consumer servicing staff from San Antonio are offered positions in the Valley.

With regard to CONSUMER LOAN ORIGINATIONS, the branch offices are the delivery vehicle for consumer loan product. Since SAFSB has not been a very aggressive consumer lender, Richard Dalton will need to work with Linda Balli to assess the mix of products currently being offered and what changes must be made to the product offerings. Even though the branch managers have all said that they could sell more consumer loans, it was not clear whether the issue was one of pricing or products. It may be necessary, in order to generate enthusiasm among the staff as well as customers, to take an aggressive pricing stance for some period after acquisition.

The PHOENIX OFFICE operates as the servicer and workout agent for the ABQ second mortgages. Since the two staff members, Sue Rhoads and Jan White, have a long track record with these loans, keeping them in place makes sense. Since the quantity of servicing does not make this a very cost effective operation, the suggestion has been made that the Phoenix staff also become a first mortgage origination arm of SAFSB in the Phoenix market. Based on interviews with the staff, it appears that this idea should be given a chance. Sue Rhoads is anxious to make first mortgage loans and indicates that she has the real estate broker contacts needed to do this. Sharon Kristof believes that, with some training on conforming loan guidelines, that Sue could be successful. Since Jan White handles most of the backroom operations now, Sue would have the time to solicit mortgage business.

The plan would be to have Sue Rhoads handle her current



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1769

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1783

duties and attempt to set up a retail first mortgage network. This production would be processed in the Valley. This effort may require the addition of a part time person to assist with the servicing and origination paperwork. Richard Dalton (production management) and Sharon Kristof (training) would work with Sue Rhoads to get this operation running.

ACCOUNTING -

A review by Ron Seib indicates that the day-to-day maintenance of the general ledger and the accounts payable function can be managed by two individuals located in the Valley. The remainder of the accounting work -- financial statement preparation, OTS reporting, investment accounting, fixed asset management -- would best be the responsibility of RVSB's accounting department. The transition would take place prior to the November 30, 1992 phaseout of the San Antonio office.

All of the San Antonio accounting staff will be interviewed by Ron Seib as part of the announcement proceedings. The staff will be advised of the two positions in the Valley and their level of interest in relocating will be determined. Since Ron Seib has already met all of the accounting personnel, he will be in a good position to choose who will be kept. Should no one be willing to move to the Valley, a search for qualified people will be started immediately thereafter. This would necessitate someone from RVSB spending time in San Antonio learning the accounting and data processing system so that there is some degree of continuity and so that there is backup for training the new staff.

An issue to be resolved after closing is where the accounting staff members will office. Since much of what they do deals with the retail banking and operations group, keeping accounting close to these groups may be beneficial. The building that houses the operations center in Weslaco should be able to accommodate two more people. (See below for other space considerations.)

A systems issue deals with the access to the FPS general ledger by the RVSB Accounting Department in Peoria. Ron Seib believes that this is essential if the Peoria group is to oversee the general ledger input by the Valley accounting staff. Jay Holland and Ron Seib must research how feasible the communications hookup would be. This is both a technology and cost issue.



CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1770

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1784

San Antonio Federal Savings Bank
Organizational Structure

TREASURY -

As mentioned above, the treasury or investments function will be run out of the RVSB-Chicago office by the Capital Markets group. Susan Vranes and Chris Huss will be in San Antonio on announcement day and thereafter to learn how SAFSB handles investment related functions. Susan and Ron Seib must coordinate how things such as wire transfers and bank accounts will be managed among the Valley and Peoria staffs and the Chicago-based Capital Markets Group. Since Ron Seib and his management team have already developed a written plan for incorporating accounting and investment duties within RVSB, the implementation of this transition should not be difficult.

The current staff will be told about the status of their positions on announcement day. A very short transition period is being planned. Susan expects to be handling all investment functions within a week after announcement. Based on their backgrounds and interest, the treasury staff will be considered for the newly created Valley positions.

A management services agreement will be prepared between RVSB and SAFSB for investment and accounting functions. A monthly fixed-dollar fee, based on the estimated cost to RVSB for handling these functions, will be determined. The importance of getting OTS-Dallas' prior approval to the agreement is critical. Susan Vranes and Ron Seib will develop the fees for their respective areas.

MORTGAGE SERVICING -

The SAFSB portfolio of approximately 2,000 first mortgage loans presents nothing which is unique. Since RVSB currently services loans in Texas, the economics of mortgage servicing dictate that these loans be serviced by RVSB at its Lombard servicing center. The plan is for this to be accomplished during the month of November, 1992. Sharon Kristof and her Acquisitions Group will be responsible for the conversion which she will coordinate with Gary Brandes, RVSB's servicing manager.

On announcement day, Ron Pikus will advise Bobby Calvillo, the current SAFSB servicing manager, of the decision to transfer servicing. Because of the long lead time to accomplish the transfer, Bobby will be offered an incentive to stay on until the end of November. He will also be given a chance to be considered for another position in the Valley. The remaining servicing staff will also be given a chance to be considered for other SAFSB Valley-based jobs. The hope is that several of these individuals can become part of the mortgage loan processing staff. (This would ensure a smoother servicing transfer than if none of the staff were to remain.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER WCH-B76-1771

It will be important to incent Calvillo to remain with SAFSB until the servicing transfer because of his knowledge of the FPS system.

SAFSB has a significant number of performing commercial real estate and business loans which will have to be serviced. Any loan which acts like a mortgage loan will be converted to the CPI system and serviced by RVSB. Those loans which act like a consumer loan will be serviced in the Valley by the Consumer Loan Department. It will be Cathy Knapp's responsibility, as the coordinator of problem assets, to see that all performing commercial real estate and business loan files are kept in order and that financial statements, etc. are obtained and reviewed.

With regard to the transfer of servicing functions to RVSB, a monthly per-loan fee will be charged by RVSB to SAFSB for the servicing of SAFSB's current, non-conforming mortgage loan portfolio. The same arrangement will cover newly generated non-conforming loans by SAFSB. Ownership of the servicing rights to new conforming loan production will be transferred to RVSB as part of the correspondent relationship which RVSB will have with SAFSB. (In essence, SAFSB will become another wholesale correspondent of RVSB.) Gary Brandes will be asked to propose a monthly per-loan servicing fee for the non-conforming loans. Susan Vranes and Jordan Lamm will provide SAFSB with RVSB's wholesale rate sheets.

PROBLEM ASSETS -

Management of the problem asset process will be overseen by Ron Pikus and coordinated on a daily basis by Cathy Knapp. The area will be divided into three segments:

I. Major Loan Workout:
The Bank's problem assets have been divided into categories and have been assigned to a case manager.

1) Texas commercial real estate - Steve Bangert and Howard Ross

2) Commercial real estate outside of Texas - Homer Holland

3) Business loans - John Rose

4) Residential REO - Cathy Knapp

Each case manager will be responsible for developing a workout strategy, implementing that strategy and seeing each asset through disposition. Cathy Knapp, as coordinator, will be a resource for each case manager in working with attorneys, brokers, etc. Ron Pikus, as problem asset

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1772



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1786

manager, will see that SAFSB's classified asset reports are prepared on a timely basis and distributed to all concerned parties. He will also manage problem asset issues with the regulators and American National Bank. Ron will convene the Bank's Problem Asset Committee so that everyone is updated on the status of asset workouts and so that the Committee can give the respective case managers direction on how to proceed with workout strategies and negotiations.

Since all of the case managers will be located in the Chicago area and since Cathy Knapp will be responsible for keeping these files up-to-date, the original files will be moved to RVSB's Lombard facility shortly after closing. An abbreviated file (copies of the note; mortgage, title policy, appraisal, assignments, etc.) will be created and sent to the Valley for storage. Ron Pikus will arrange for this process to start shortly after closing.

II. REO Management:
While Cathy Knapp is the case manager for residential REO's. Cloyce Bennett, who is located at the Weslaco office, will be asked to continue with the Bank and be the Bank's Texas-based workout representative. He will take direction from Cathy regarding major asset followup, REO property management, etc. Cloyce will also be available to do property and insurance inspections for the loan servicing group. Jan White and Sue Rhoads will continue to manage REO responsibilities in the Phoenix area.

III. Business and Commercial Real Estate Loan Followup:
Given the significant number of performing commercial real estate and business loans, Cloyce Bennett, under the direction of Cathy Knapp, will take on the task of keeping the Bank's files current with financial statements, tax and insurance data, etc. A matter to be decided is where the commercial real estate and business loan files will be kept. At this point, it appears that the files will be kept at RVSB's loan servicing facility in Lombard, where Cathy Knapp will office. Some type of abbreviated file will also be kept in the Valley for Cloyce Bennett.

A decision must also be made as to where Cloyce Bennett will office. If Cloyce will be responsible for consumer loan servicing in addition to problem assets, space must be available for Cloyce and a group of three people. The preference would be remove Cloyce and his group from the Weslaco retail/operations environment and move them to where central loan processing and administration will office. This would allow Richard Dalton to provide oversight for the activities of this group. This decision is dependent on whether SAFSB can arrange for a swap of its Harlingen land with the First National Bank of Harlingen for their building.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1773

San Antonio Federal Savings Bank
Organizational Structure

ADMINISTRATION -

Three functions come under the heading of Administration:

I) Human Resources
II) Facilities/Purchasing
III) Marketing

FLO LASATER will continue on as the head of SAFSB's Human Resources Department. Her group is responsible for payroll processing, benefits administration, recruiting, and personnel policies. There are three other individuals who make up this department. Flo and her group will be asked to take on the facilities management and purchasing functions for the Bank.

Purchasing is de-centralized at this time. This will be centralized for the entire Bank. The same is true for facilities management. There should be no problem for this group to assume these additional responsibilities.

Flo Lasater will continue to be the direct liaison with the Bank's advertising agency, Johnson-Meade of Harlingen. Marketing and advertising decisions will now be directed by a committee comprised of Steve Bangert, Ron Pikus, Richard Dalton, Linda Balli and Flo Lasater.

SAFSB's management committed to a multi-media advertising campaign to begin in September, 1992. Since most of the creative work has already been done, the campaign will be allowed to run as scheduled. Since the program is part image and part "transaction account" product sales, it is in keeping with WCHI's business plan for retail banking. One of the first tasks of the Marketing Committee will be to review the program and the media schedule to determine if the schedule should be altered.

Location for the Administration Group is also an issue. If the Harlingen bank building swap takes place, this group would move into that building. If not, then the space on the second floor in the McAllen branch would be sufficient to house this group for some interim period. Since the same space would also house central loan processing and consumer loan servicing, there is some question whether the second floor space would be sufficient for the long term. Since the answer to the question is dependent on how quickly the Bank's mortgage loan function develops, the long term space issue would not have to be dealt with immediately.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1774

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1788

San Antonio Federal Savings Bank
Organizational Structure

INTERNAL AUDIT/COMPLIANCE -

The restructuring plan calls for the internal audit and compliance positions to be the responsibility of one person. At this time, SAFSB has an internal auditor who is supported by one individual. The internal auditor, however, handles many tasks which have nothing to do with internal audit (business loan workout and special projects). The compliance function is the responsibility of several individuals.

Because of the success which RVSB has had in centering its compliance efforts into one individual, the same approach will be taken with SAFSB.

The first post-closing task in this area will be to determine if either Linda Fresquez or Mark Brell, her assistant, are interested in relocating to the Valley. If both are, a determination will be made as to who has the best background to take on both the internal audit and compliance responsibilities. Since neither of these two people handle compliance at this time, these responsibilities will be kept by current Valley staff until a transition can be made. If none of the current staff is willing to relocate, a new internal auditor/compliance officer will be recruited in the Valley.

SAFSB's current internal audit program and compliance guidelines will be reviewed for adequacy. If they are found lacking, they will be supplemented by the internal audit program and compliance manual/review schedule developed for RVSB.

BRANCH OFFICES and OTHER SPACE:

Several decisions will have to be made regarding branch facilities and space for the administrative and mortgage processing functions.

1) The Harlingen branch is located in a trailer. First National Bank of Harlingen has reportedly approached SAFSB regarding a swap of their branch for the Bank's piece of land. On the surface this appears to be a win-win situation for both institutions. However, several things need to be done very quickly after closing:

   a) Meet with the First National management and determine the specifics of a deal.
   b) Perform a walk-through in the building to determine its physical layout and how it might be adapted to SAFSB's operations.

   c) Obtain a floor plan of the entire building.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1775

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1776



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1789

# SAN ANTONIO FEDERAL BUSINESS PLAN

## OUTLINE


1) Business Objective

2) Asset & Liability Management

3) Retail Banking

4) Lending

5) Non-Earning Asset Management

6) Management and Board of Directors

7) Economic Environment and Local Factors

8) Community Reinvestment Activities

9) Pro Forma Financial Statements

10) Organization Chart


As of 03/23/92

Mailed - 6/25/92
Battell
de la Garza
Prusser

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1777

## I. INTRODUCTION

The acquisition of San Antonio Federal Savings Bank by Western Capital Holdings, Inc. from the Resolution Trust Corporation will result in several positive contributions to the institution and the communities which it serves:

* Asset & Liability Management
* Problem Asset Workout
* Residential Lending Presence
* Retail Banking Opportunities
* Community Reinvestment Activities
* Local Board Representation and Management

## II. ASSET & LIABILITY MANAGEMENT

The ownership group has demonstrated the ability to re-structure the balance sheet of a financial institution, reduce both interest rate and credit risk, improve its duration gap while maintaining a healthy interest rate margin during various interest rate environments. A comprehensive asset & liability management strategy effects every facet of the Bank, from pricing of loan and deposit products to active participation in the capital markets. The Bank's performance is monitored not only by monthly operating performance but also by a mark-to-market of the balance sheet. Increase in value, rather than short term profits, is the primary measuring tool of the Bank's performance.

## III. PROBLEM ASSET WORKOUT

SAF's balance sheet contains approximately $13 million of non-performing assets. At the top on the new group's priority list will be the development of a three-year strategy for the workout of the Bank's current non-performing assets. The group will draw on its many years of experience in real estate workout along with the working knowledge of current management to accomplish this goal.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-876-1778



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1791

## IV. RESIDENTIAL LENDING PRESENCE

SAF will resume residential lending activities within the context of today's secondary-market-driven environment. Using its retail banking facilities as a base, supplemented by an aggressive wholesale lending operation, the Bank will strive to compete with the national lending firms for residential loan business in the Rio Grande Valley. The Bank will build its lending business with competitive pricing, excellent processing service, and an understanding of how to deliver loans to the secondary market agencies in a timely and efficient manner. Lending profits are generated not through fee income, but from the value of the loan servicing which its production function creates.

## V. RETAIL BANKING OPPORTUNITIES

Given its excellent branch network in the Rio Grande Valley, ownership is confident that the Bank can grow along with the economy of the Valley. Deposits are projected to grow at a compound rate of two percent. Emphasis will be placed on growing the deposit base through transaction or "relationship" accounts – checking, money market and passbook accounts. Since people are the key to developing a strong retail banking presence, management will devote the resources necessary to ensure that it has the most professional and service-oriented staff possible.

## VI. COMMUNITY REINVESTMENT ACTIVITIES

SAF will take a pro-active approach to meeting the credit and banking needs of the communities which it serves. Special assistance will be given to those groups which have traditionally been shut out of the mainstream of housing credit and other banking services. Before any action is taken, however, the Bank's management will solicit input from its own staff and the community-at-large to determine where its energy and resources should be devoted. The ownership group firmly believes that community reinvestment is not only good public policy but also good business practice.

## VII. LOCAL BOARD REPRESENTATION AND MANAGEMENT

Since SAF has been a basically sound and well-run organization, the ownership group sees no need for across-the-board changes in management. The combination of the



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1779

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1792

thrift-management specialties of the ownership group together with the operating knowledge of local management provides the Bank with the "critical mass" needed to add franchise value to the SAF operation. Outside directors from Texas and the Rio Grande Valley will be sought who are interested in making a positive contribution to the institution and who can serve as spokespersons for SAF in its local communities.

## VIII. CONCLUDING REMARKS

The thrift industry, in general, and Texas thrifts, in particular, have come upon very difficult times recently. Yet, despite all that has taken place, the general public has not abandoned their local thrift institution for their banking or home financing needs. SAF, its ownership and management are prepared to continue the fine tradition which the thrift industry has established of promoting savings habits and providing a reliable and consistent source for home finance. This business plan will explain, in detail, how those goals will be accomplished.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1780

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1793

## I. INTRODUCTION

The basic premise of a thrift institution is to make loans to residential home buyers and fund them with retail deposits. This is SAF's core business and it is the goal of the new ownership group to do this as profitably as possible. The Bank's asset & liability management will focus on a few basic principles:

1) the capital market is the keystone of asset & liability management;
2) monthly mark-to-market analysis is the most important measure of a successful operation (and how well management is performing);
3) the institution is managed using what is called a "Net Bond" or "Net Duration" approach.

Asset & liability management is involved, either directly or indirectly, with every facet of the Bank's operations.

## II. ASSET & LIABILITY MANAGEMENT: A DEFINITION

Capital is the single most important determinant of the size and composition of the institution's balance sheet. Asset & liability management is comprised of two related processes: pricing and allocation.

The pricing of assets and liabilities is the first step in successful asset & liability management. All assets and liabilities will be priced off the "Treasury Curve". The Treasury Curve is commonly defined as the most actively traded government securities and is the basis for pricing all fixed income securities traded in the capital markets. There are about ten issues with maturities ranging from one month to thirty years. A curve is constructed by plotting the yield and maturity of each security to define a curve that represents Treasury securities of all maturities.

Pricing – Loans:

When loans are priced for retail customers, there are a number of considerations beyond the credit of the customer. The first issue is whether the loan is conforming or non conforming. This refers to the ability to securitize a loan through one of the quasi-governmental agencies, Freddie Mac or Fannie Mae. All conforming loans, approximately 70 to 80% of all production, will be priced as mortgage-backed securities. When pricing a conforming loan, the following factors are considered: the price of the MBS that the loan would be put into, the costs involved with originating and



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1781

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1794

securitizing the loan, and the value of the servicing.

The pricing of non conforming loans will be of much more consequence since theses loans will be held in the Bank's portfolio. These loans will not be securitized because of their size, type or status of the borrower. Non conforming loans will be priced at 225-300 basis points above a similar duration Treasury. Typically, this is 50-100 basis points above conforming loans. Regardless of the conforming/non conforming status of a loan, the servicing rights is the valuable aspect of origination.

Pricing - Liabilities:

Liabilities will also be priced off the current Treasury yield curve. For example, a three-year certificate of deposit (CD) is priced in relation to the current three-year Treasury. Typically, all deposits are priced at yields less than a similar Treasury. When pricing CD's, a distinction is made between "retail" CD's and "jumbo" CD's. Since jumbo money is less stable than retail money, it is priced to yield 5-20 basis points less than retail CD's. Money market and passbooks are priced off short term rates but tend to lag movements in the market. Even though savings rates should, by formula, move weekly, they tend to be quite stable. As a retail bank, SAF cannot hope to sell its savings products which have large and frequent rate swings. NOW and passbook rates are changed less frequently than money market rates.

Allocation:

When all of the assets and liabilities are priced correctly, allocating resources (ie, capital) is relatively simple. Allocation is a four step process:

1) what are the choices;
2) is the spread between the assets and liabilities sufficient;
3) what are management's goals for the Bank;
4) how do capital constraints impede optimal selection.

There are always many asset alternatives. Although the majority of the Bank's assets will be mortgage-related, there are many types of mortgages - 30- and 15-year fixed, 5-and 7-year balloons, and various types of ARMs. An alternative to the Bank originating its own assets is the purchase of investment securities. Investment securities are often attractive for a number of reasons. Loans can be bought which the Bank could not otherwise originate. Some assets (CMO's) provide the institution with specific characteristics. Securitized instruments are valuable because of their liquidity characteristics.

Liabilities also provide many alternatives. Retail deposits are only one alternative. Even with retail deposits, the



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER WCH-B76-1782

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1795

Bank can choose the type of deposits it wishes to attract.

Wall Street is a source of liabilities in the form of reverse repurchase agreements. Reverse/repos allow the Bank to use its investment portfolio as collateral. Repos are priced off of short term interest rates, tend to be short term (usually between one and three months) and are usually relatively cheap as compared to other borrowings.

Recently, the use of Federal Home Loan Bank borrowings has become a more attractive source of liabilities. With many of the burdens of borrowing having been removed by the FHLB, products such as puttable advances have become quite attractive.

Using a mixture of short term and long term borrowings, the Bank should be able to keep its costs of borrowing low while still maintaining protection should interest rates increase. Borrowing long can be protected through the structuring of interest rate swaps and the purchase of caps. Management anticipates an average spread between assets and liabilities of about 250-300 basis points. Since a significant portion of the Bank's expenses are fixed, any decrease in this spread will directly cut into earnings.

Each category of assets and liabilities has advantages and disadvantages regarding term and size of flexibility, cost, ease of execution and liquidity. This is where asset & liability management becomes as much of an art as a science. No perfect mix of assets and liabilities exists. Therefore, it is important to know and consider all the alternatives, and know how each compares to the other. The relative advantages are important as well as the relative cost/benefit of each option.

The fourth consideration of allocation is capital. Capital is one of the most important aspects of managing a thrift. Each type of asset held by the Bank is categorized in one of five risk-based groups. The capital group that each type of asset is put into ranges from 0% to 200%; the other groups are 20%, 50% and 100%. All decisions regarding asset and liability allocation must consider the amount of capital required.

## IV. NET DURATION

Once the pre-acquisition balance sheet of SAF has been restructured (see below), it will be managed on a "Net Bond" basis. This concept treats the balance sheet as one bond. This bond is comprised of the weighted average duration of all of the assets (positive duration) and all of the liabilities (negative duration). Thus, if the assets have a three (3) year duration and the liabilities have a two (2)



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1783

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1796

year duration, the institution or net bond has a positive one (1) year duration. This is considered to be the most effective way to manage a mortgage portfolio and the prepayment risk inherent in it. Prepayment risk always works against the Bank. When interest rates decrease, borrowers refinance their mortgages at a lower rate, but a significant portion of the liabilities are still fixed at higher rates. When interest rates rise, the value of the fixed rate assets, the majority of the asset composition, decrease but the overall liability costs increase due to short duration of much of the Bank's funding. Because of this, it is imperative that the Bank have a variety of assets and liabilities working together. The ability to look at how all of the assets and liabilities work together is what makes the "Net Bond" approach so attractive.

## V. MARK-TO-MARKET

The monthly mark-to-market is the single most important determinant of the value of the Bank. It will be used to judge how well the institution, and management, is performing. This measuring tool focuses management on the bottom line and how to most effectively increase the long-term value of the institution.

Monthly, the entire balance sheet will be reduced to its liquidation value. The composition of the balance sheet will be easily valued relative to the capital markets. Since the asset composition will almost exclusively be made up of mortgage-related instruments - mortgages, MBS's, and MBS derivatives - and because an active market exists for mortgage-backed securities, it is relatively easy to value these assets.

The majority of the Bank's liabilities will be classified in two groups. The more difficult to value will be the retail deposits. This is because there is a relatively small market for deposits and each institution's deposits have their own characteristics. However, given the new ownerships exposure to deposit sales and with the emphasis that will be placed on building transaction accounts.

Reverse/repurchase agreements, the second category of liabilities, are much easier to value because the market is very active and liquid, and closely correlates to the capital markets. The balance sheet will be structured with typically less than three (3) month reverses. With this composition, the reverse/repo portfolio is anticipated to closely track the Treasury market.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1784

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1797

## VI. HEDGING

The Asset & Liability Management group will be responsible for hedging the prepayment and interest rate risk for SAF. The market value and earnings of the Bank can be severely damaged when interest rates move drastically. Interest rate risk is significant with fixed rate bonds. When interest rates increase, the value of the fixed rate mortgage portfolio decreases. As costs of funds increases, spread gets squeezed. As new assets are added and liabilities refunded, the spread trends back to wider levels. However, in the short term, earnings are hurt.

In addition to interest rate risk, prepayment risk on mortgages occurs also. Prepayments always work against the owner of the fixed-rate mortgage. As interest rates increase, prepayments decrease and the below market asset stays on the books longer than anticipated. When rates rise, prepayments increase and the above-market asset amortizes faster than anticipated.

Another risk to the Bank, and the risk that is potentially the most damaging, is an "inverted yield curve". This is when long-term rates (which have the most effect on the value of fixed rate mortgages) are lower than short term rates (which have the most effect on the Bank's borrowing costs). In this situation, the value of the majority of the Bank's assets -longer term mortgages - decrease in value and the funding costs increase.

A variety of instruments are used to hedge the various risks of the Bank, including Interest Only Strips, residuals, caps, swaps, options and futures. Interest Only Strips and residuals are the most effective medium to hedge mortgages, since they perform better as interest rates increase and prepayments decrease. Interest rate swaps and caps permit the institution to lock in a borrowing cost and do not appear on the balance sheet. The maturity of both caps and swaps vary, but both are more expensive as the maturity increases.

Put options are most useful to hedge the mortgage pipeline. Loan fallout, particularly during a heavy refinance period, is better hedged using put options than selling the loans forward in the market.

Hedging is a necessary function, even though it hurts current earnings, with the exception of IO's and residuals. However, hedging is analogous to an insurance premium. Given SAF's operating philosophy - focus on market value instead of monthly or quarterly earnings - a hedging program is a necessity.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1785

## VII. RESTRUCTURING THE BALANCE SHEET

The restructuring of SAF's portfolio will be accomplished over approximately a 24 month period. The primary focus will be on the asset portfolio, although efforts will also be under way to change the composition of the deposit portfolio.

Investment activities will focus on single family mortgages (whole loans) and/or securities backed by single family mortgages (MBSs). Portfolio loans will typically be one, three or five year adjustable rate mortgages with margins of 275 basis points or more over similar term treasury instruments. To help build this portfolio, management intends to originate and purchase mortgages.

Management also intends to use the capital markets as an alternative for investing in quality, rate sensitive assets. Capital market acquisitions will most likely focus on AA or AAA rated securities instead of FNMA, FHLMC or GNMA securities. These types of investments usually offer spreads 25 to 50 basis points greater than agency securities and the credit quality is excellent.

Over time, as the existing consumer, commercial and commercial loan portfolio is liquidated or paid off, the concentration of single family mortgage investments should increase significantly. Management intends to increase the percentage in these types of investments from 40% of total assets (01/31/92) to over 80% of the portfolio.

Composition of the liability portfolio will not change dramatically. Management intends to place increased emphasis on obtaining and retaining low cost transaction accounts. Reverse repurchase agreements and FHLB borrowings will be utilized when they prove to be cost efficient.

Management also intends to utilize the interest rate swap and cap markets to reduce the Bank's interest rate exposure.

## VIII. THE ASSET & LIABILITY MANAGEMENT GROUP

Because of his extensive experience in asset & liability management, Steve Bangert will take on the task of implementing the strategy presented in this plan. After he has had an opportunity to evaluate the aptitude and expertise level of the current SAF staff, he will appoint a group to handle the day-to-day monitoring and execution of the program. It may be necessary to use staff resources outside the Bank in order to carry out this plan.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1786



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1799

## I. INTRODUCTION

Retail Banking is often considered the lifeblood of the thrift business. Yet, of all the functions within a thrift, it is probably the least understood in terms of product costs and profitability. The new ownership of SAF believes that, unless all these elements are understood, it is impossible to run a profitable institution.

At SAF, Retail Banking will be defined as that function which provides transaction and time deposit accounts, consumer loan products and other services which are traditionally associated with a person's "banking" needs. These products and services are delivered through the Bank's branch office network of six locations, primarily in the Texas' Rio Grande Valley. Based on the ownership group's assessment of current operations, very little will be changed in terms of personnel and facilities.

Because people often identify "their bank" with the institution which holds their checking account, SAF's emphasis will be to promote transaction accounts (checking, money market, passbooks) and services (ATM, direct deposit) and de-emphasize reliance on time deposits. A simple, yet convenient, front-office delivery system built around transactions accounts, supported by an efficient back-office operation, will ensure a stable and relatively inexpensive deposit base and an array of fee-producing opportunities. This is the manner in which SAF will operate its Retail Banking network.

## II. ECONOMICS OF RETAIL BANKING

SAF will focus on net general and administrative operating expenses (Net G & A) as the specific control target for measuring profitability at its retail offices. The formula to be used is a follows:

Salaries and Related Expenses
\+ Other Direct Operating Expenses
\+ Allocated Overhead
\- Fee Income

= Net G & A

Expressed as an operating expense ratio, SAF will strive to attain Net G & A of 122.5 BP (or less) of total deposits.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1787

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1800

That operating expense ratio provides for:

* a 100 BP return on deposits and

* a 20 to 25% annual return to shareholders based on a 4 to 5% capital requirement.

Those benchmarks are reflected in the following equation:

| | | |
|---|---|---|
| | 275.0 BP | -- gross profit margin on retail deposits |
| - | 25.0 BP | -- servicing fees (internal allocation) |
| - | 2.5 BP | -- credit loss estimate |
| - | 25.0 BP | -- FDIC insurance premium |
| - | 122.5 BP | -- Net G & A requirement |
| = | 100.0 BP | -- return on deposits |

Inasmuch as retail banking activities are not directly responsible for generating assets and do not have any control over the interest income spread on those assets, interest income is not allocated to the Retail Banking group. The responsibility for interest income management rests with the Asset & Liability Management group, which is confident in their ability to -- over a period of time -- invest retail deposits in residential lending products and realize an interest spread of 275 BP or more. (Refer to the Asset & Liability Management section of the plan.)

The Retail Banking group's role in contributing to the overall profitability of the organization as a whole is to:

* manage direct operating expenses in accordance with management guidelines;

* maximize fee income through profitable product pricing, effective product management and fee-oriented sales activities.

In implementing this economic approach to retail banking, the emphasis is clearly on expense management and fee generation. While deposit growth is not unimportant, neither is it the deciding factor in the Bank's bottom-line profitability for the long term. It is entirely conceivable that the Bank's deposit base could shrink without having an adverse affect on net operating income.

## IV. MODEL BRANCH OPERATING STATEMENT

SAF's six branch offices all have unique operating characteristics and deposit bases. However, with an emphasis on transaction accounts as the desired deposit product, an

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-876-1788



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1801

operating profile can be generated for SAF's "typical" branch office. A profile, expressed as a ratio of net operating expenses to deposits, has been created.

Model Branch Cost Analysis

| Expenses: | % of Deposits |
|---|---|
| Salaries and Related | 46 BP |
| Other Direct Operating | 51 BP |
| Total Direct Operating | 97 BP |
| Allocated Overhead | 46 BP |
| Total Operating Expenses | 142 BP |
| Fee Income | ( 20 BP ) |
| NET G & A EXPENSE | 122 BP |

SAF's branches currently operate at approximately 124 BP of deposits. It should not be difficult to bring the overall operating ratio down to the 122 BP target within one year after the acquisition.

## V. STRATEGY FOR GROWING TRANSACTION ACCOUNT BASE

Before a strategy for growing the transaction account base can be developed and implemented, it is essential that there be a clear understanding of the present products. Once the current offerings have been analyzed in terms of competitiveness, features and pricing, a determination can be made as to what changes must be made to make the products both more appealing and more profitable. These concepts - appealing and profitable - are together not mutually exclusive. There is nothing to say that a customer will not pay more for a package of features/services which he or she perceives to meet their needs and offer value.

Since no two financial markets are the same, it is imprudent to assume that what appeals to customers in the Midwest would have the same appeal to customers in the Rio Grande Valley. However, certain account characteristics have been found to have universal appeal:

* Convenience
* Simplicity
* Flexibility

One of the first tasks for retail banking's senior management will be to listen to their branch managers and determine what they perceive the needs of their customers and their

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1789



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1802

competitors' customers to be. Once this is done, the needs-list will be compared to the product-features list as a starting point for product revamping. Since a multiplicity of products tends to confuse everyone - customers and staff-and also increases the back-office support costs, a relatively short list of transaction products will be offered.

The next step in the process is to determine the cost to provide the features/services on a per account basis and to establish pricing, either through fees or minimum balance requirements. Because SAF's branch profitability analysis is geared to Net G & A, a model branch will be built using assumptions relative to the desired transaction account mix. Using the current deposit base and model expense ratios, along with assumptions as to CD runoff rate and replacement transaction accounts, pricing for the mix of transaction accounts can be established. At this point, discretion must be used to establish pricing which will be competitive yet stay within the model's cost parameters.

Often, fee income is not given sufficient emphasis in the pricing analysis for transaction products. Yet, as mentioned earlier, customers are not always adverse to the payment of fees. In addition to monthly services charges on checking accounts and NSF fees, overdraft protection fees, ATM transaction charges, and telephone transfer fees are all looked upon as "convenience" charges by customers and meet little resistance from those customers.

It is understood that, regardless of the new transaction account features and pricing, it will take time to receive the desired product mix within each branch. Until that time, the offices will not necessarily meet the Bank's Net G & A targets.

## VI. DEPOSIT PROJECTIONS

The ownership group is comfortable with the location of its retail offices and the physical plant at each branch location. There are no intentions, at this time, to either close any of the offices or to expand into new markets. However, the newly structured SAF will closely monitor the profitability performance of each office. Should new markets present themselves as opportunities whereby the Bank can make both a contribution to the community and add to the profitability of the Bank, such opportunities will be considered.

Assuming that the Bank will operate from its current branch offices, a projection has been made as to both the level of deposits at each office and the mix of transaction and time

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-876-1790



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1803

deposits within each branch. Since SAF's strategy for profitability does not call for it to be a rate leader in its markets, modest, yet steady, deposit growth has been projected at approximately two percent per annum. Included in this projection is the change in deposit mix over a three year period.

| | At Acquisition (millions) | | | Year 1 (millions) | | |
|---|---|---|---|---|---|---|
| Office | Trans | Time | Total | Trans | Time | Total |
| Weslaco | 22.4 | 54.9 | 77.3 | 21.1 | 52.6 | 73.7 |
| McAllen | 11.4 | 25.0 | 36.4 | 12.0 | 26.5 | 38.5 |
| Brownsville | 5.5 | 18.2 | 23.7 | 6.5 | 18.0 | 24.5 |
| Harlingen | 4.2 | 10.1 | 14.3 | 5.0 | 11.0 | 16.0 |
| Port Isabel | 5.1 | 8.7 | 13.8 | 6.5 | 9.0 | 15.5 |
| San Juan | 2.8 | 6.7 | 9.5 | 2.9 | 6.5 | 9.4 |
| Totals | 51.4 | 123.6 | 175.0 | 54.0 | 123.6 | 177.6 |

| | Year 2 | | | Year 3 | | |
|---|---|---|---|---|---|---|
| Office | Trans | Time | Total | Trans | Time | Total |
| Weslaco | 21.8 | 46.9 | 68.7 | 21.6 | 38.4 | 60.0 |
| McAllen | 13.0 | 28.0 | 41.0 | 13.5 | 30.7 | 44.2 |
| Brownsville | 6.7 | 20.5 | 27.2 | 7.2 | 22.5 | 29.7 |
| Harlingen | 5.5 | 12.5 | 18.0 | 6.0 | 16.0 | 22.0 |
| Port Isabel | 6.7 | 9.5 | 16.2 | 8.0 | 10.0 | 18.0 |
| San Juan | 3.0 | 6.2 | 9.2 | 3.2 | 6.0 | 9.2 |
| Totals | 56.7 | 123.6 | 180.3 | 59.5 | 123.6 | 183.1 |

The assumptions for the deposit growth for each branch are:

* Weslaco - Because of competitive market, a slight decrease in deposits is projected.

* McAllen - Healthy growth in total deposits and checking due to the recent addition of a drive-through facility and the strength of the McAllen market.

* Brownsville - Projected steady checking growth due to its



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1791

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1804

excellent location. Recent introduction of a full service branch at this location is expected to bring significant deposit growth.

* Harlingen - Growth in the city is the basis for the projected growth and excellent branch management.

* Port Isabel - Recent upgrade in its facility should increase deposits.

* San Juan - Slight decrease in deposits is projected. This is considered a marginal branch operation..

Based on these projections, deposits would grow from $ 175.0 million to $ 183.1 million over three years. The deposit mix would change to:

| Account Type: | Acquisition $ (millions) | % | Year 3 (millions) | % |
|---|---|---|---|---|
| Transaction | 51.4 | 29 | 59.5 | 33 |
| Time | 123.6 | 71 | 123.6 | 67 |
| Total Deposits | 175.0 | 100 | 183.1 | 100 |

Over a five year period, the migration to transactions accounts is more pronounced. More than 35% of deposits are projected to be in transaction accounts by Year 5.

## VI. CONCLUSION

Despite a great deal of mystique which has recently been attached to retail banking in terms of "sales cultures" and "cross selling", SAF's ownership believes that it is a relatively simple business. Providing customers with the products and services which they desire at a competitive price coupled with personal service delivered in a comfortable atmosphere is what wins over customers. The key elements to success are friendly and knowledgeable staff who make customers feel welcomed and who instill confidence with their personal banking knowledge. Management will devote both time and resources to the training of the retail staff so that the above qualities are reflected in each branch employee.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1792



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1805

SAN ANTONIO FEDERAL BUSINESS PLAN
Lending Division

## I. INTRODUCTION

San Antonio Federal (SAF) currently is not originating mortgage or consumer loans. It is the intent of the new owners to have the Bank become active again in originating mortgage loans within the areas serviced by its retail banking facilities. Consumer loans will become one of the products marketed by the retail banking group and will be considered more as "accommodation" products than as products which are aggressively marketed. Activities relating to consumer loans will be presented in the Retail Banking section of this plan.

MORTGAGE LOAN ORIGINATION:

There are two objectives for mortgage loan origination at SAF:

* create residential mortgage loans which are saleable into the secondary market;
* originate quality portfolio loans.

Secondary Market Loans -

Interest-rate-risk management dictates that fixed rate mortgage loans be originated for sale into the secondary market and not to be held in the portfolio. Due to the very competitive nature of the conforming mortgage market, the Bank anticipates that it will lose approximately 50 BP on every newly originated loan. Although this type of competitive pricing appears to be unprofitable, it does create value in the form of servicing rights. The servicing rights value is worth three to four times the loss experienced in originating a mortgage.

Conforming loans will be originated, primarily for Freddie Mac and Fannie Mae, securitized and sold in the secondary market. Because SAF does not now service for any of the agencies, the immediate plan will be to sell the servicing rights in the secondary market for cash. Once secondary market origination/processing/underwriting/shipping functions are in place and working, an evaluation will be made as to whether it makes economic sense for SAF to establish a secondary market-oriented servicing operation.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1793

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1806

SAN ANTONIO FEDERAL BUSINESS PLAN
Lending Division

The Bank anticipates that about 70% of its loan produ
will be sold into the secondary market. Conforming l
volume and servicing value projections are as follow

| Year | $ Originations (000) | $ Value of Servicing ~~(000)~~ |
|---|---|---|
| 1 | 42,000 | 787,500 |
| 2 | 46,000 | 865,500 |
| 3 | 50,000 | 937,500 |

Portfolio Loans -

Most portfolio origination will be put into Adjustable Rate Mortgage (ARM) product or 15-year fixed rate mortgages with interest margins of 225 to 300 BP over the Bank's similar-term cost of funds. The servicing of portfolio loans will remain within the Bank. The above margins are net of an internally attributed servicing fee of 25 BP.

The Bank anticipates that 30% of its loan production will be portfolio loans. The portfolio volume projections are as follows:

| Year | $ Originations (000) |
|---|---|
| 1 | 18,000 |
| 2 | 20,000 |
| 3 | 22,600 |

## II. LENDING DIVISION STRUCTURE

The lending area will be organized as follows:

A) Retail Operations
B) Wholesale Operations
C) Central Loan Processing

All of these functions will be under the direction of the Bank's head of residential lending.

A) RETAIL OPERATIONS:

The Bank will originate loans through a retail network operating from its branch offices. Full time, commissioned loan originators will be located within the McAllen, Weslaco and Bronwsville offices. The Bank will recruit



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1794

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1807

experienced originators with an established book of realtor-based business. As an incentive to join the SAF group, these originators will be offered an array of benefits, commission-draws and bonus participations. Since realtor-referred business is the key to a successful and sustainable mortgage origination effort, obtaining experienced originators is the preferred approach to building this business.

For those offices which will not have a full time originator, the branch manager will be trained to take a conforming loan application for walk-in business. All branch managers will receive similar training and will be encouraged and incented to make loan origination part of their cross-selling program.

B) WHOLESALE OPERATIONS:

Since SAF will be a well-capitalized institution, approved to do business with Freddie Mac and Fannie Mae, an attempt will be made to establish a wholesale origination function both within and outside the markets served by the Bank's branch network. With the demise of many thrifts, commercial banks and mortgage banking companies in Texas, management perceives that there may be a void for competitively priced mortgage loans through local commercial banks, thrifts and mortgage brokers which are not geared to originate and sell into the secondary market.

The group will provide a higher level of service and faster turn-around time to correspondents than the national mortgage conduits. Direct access by the correspondent to the group's underwriters and additional "hand holding" should allow the Wholesale group to charge 50 BP above other wholesalers.

Wholesale origination will be handled under two formats. The most common structure will be for the correspondent to process the file and present it to SAF's Wholesale group for underwriting approval. Once approved, the correspondent will close the loan with its own funds and present the closed loan package for purchase. Pricing will be set so that there is a price advantage for self-funding of approximately 100 BP.

A less prevalent form of correspondent relationship will be for the originator to complete the initial application and disclosures and then turn the file over for processing, underwriting and closing to the Wholesale group. While the correspondent's pricing is not as favorable, they are not required to have the level of processing and closing sophistication nor the credit lines to do self-funding.

An added cost element to the Bank for handling wholesale originations will be the additional quality control procedures which must be in place. Since the Bank controls

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1795



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1808

less of the processing and underwriting than in retail originations, prudence dictates close QC scrutiny. The secondary market agencies have specific QC guidelines which relate strictly to corespondent production. The Bank will not compromise or short-cut on its QC procedures.

C) CENTRAL LOAN PROCESSING:

A key to operating retail and wholesale mortgage origination activities profitably is an efficient centralized loan processing function. Under "loan processing" comes the following tasks: processing, underwriting, closing. Because the Bank will be an active seller in the secondary market, a high level of agency-related technical expertise must be present within the Central Loan Processing group. For that reason, centralization of this function is absolutely necessary.

The group will be organized on a team concept, with two members in each team. Each team will handle processing, submission, closing and shipping of all files assigned to them. Separate teams will specialize in either wholesale or retail originations. However, each team will be able to cross-over to assist with the workload as needed.

An automated document preparation system will be used to provide standardize loan documents. The system will also track the pipeline and provide reports to management on pipeline status. These reports will be used by the Asset & Liability Management group, the Loan Shipping department and by Central Loan Processing.

## III. PROFITABILITY ANALYSIS

While projections on loan volume were provided earlier in this plan, it is impossible to determine precisely when the Bank will reach any of the projected levels. Since regional and national economic variables have as much bearing on the level of business as internally controlled factors, it is important to understand the underlying economics of the mortgage origination process.

Contrary to the conventional thinking of most financial institutions which originate residential mortgages, the ownership of SAF does not believe that it will "make money" from this activity. However, the function does add value to the Bank through its production of quality loan servicing. This value can be realized immediately through the sale of the servicing or it can be realized over time as the



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1796

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1809

organization services the loans. While the decision to sell or retain will be made at a later time, the value exits regardless of the approach.

As will be seen, the profitability level from retail and wholesale operations differs. Since both groups perform different tasks for their customers, it is logical that their costs to operate are different and that the pricing for their products will be different.

The analysis below has been derived from the ownership group's experience in originating in both wholesale and retail structures and processing in a centralized environment. The per loan revenues and costs are considered to be valid within the $50 to $60 million production range projected for the Bank. Management is confident that, after an initial start-up period, the per loan profit numbers shown below are attainable.

| | $ per loan closed | |
|---|---|---|
| | Wholesale | Retail |
| Revenue: | | |
| Origination Fees | $ 879 | $1,034 |
| Float Income | 96 | 85 |
| Revenue per loan | 975 | 1,120 |
| Costs: | | |
| Originator Costs | 0 | 793 |
| Processing Costs | | |
| - Personnel | 760 | 682 |
| - Occupancy | 107 | 148 |
| - Incentives | 84 | 105 |
| Cost per loan | 951 | 1,726 |
| Net Income (Loss) from originations | 24 | (607) |
| Hedging Costs | (176) | (103) |
| Securt/OC | ( 91) | ( 58) |
| Value of Servicing | 1,172 | 1,034 |
| Profitability | 928 | 266 |

The average balance of the loans originated for the Wholesale

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1797



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1810

group were assumed to be $65,000. Whereas, the average retail loan was slightly lower at $55,000. Originators are to be paid 50 BP per loan along with a 15% profit sharing incentive. Servicing is valued at 100 BP. Since servicing ordinarily trades for around four to five times servicing fees, this attributed value is considered reasonable.

To further demonstrate the profitability from both types of originations, an incremental cost analysis comparison was prepared. Should the Bank exceed the $50 to $60 million production benchmark, its origination efforts will become even more profitable.

| | | Wholesale | | Retail |
|---|---|---|---|---|
| Cost to Originate (from above) | | $ 951 | | $1,726 |
| Incremental Costs | | 755 | | 802 |
| Incremental Profitability | | $ 196 | | $ 924 |
| Total Profitability per loan | 928<br>196 | $1,124 | 266<br>924 | $1,190 |

IV. CONCLUSION

None of the above can be accomplished without a great deal of staff training, originator recruitment and diligent effort. However, because the ownership group has been able to create the above described lending operation from the ground up, it is confident that it has the expertise to do so again. While the Texas market may present challenges which were not previously encountered, none of these should significantly alter the profitability analysis which has been presented.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1798



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1811

San Antonio Federal Business Plan
Non-Earning Asset Management

## I. INTRODUCTION

At time of acquisition, the institution will have approximately $ 13.4 million of real-estate-based non-performing assets. One of the new ownership group's first tasks will be to assess SAF's problem assets as follows:

a) Identify all non-performing assets and those which are in jeopardy of becoming non-performing.
b) Prepare a written assessment of each asset after gathering and reviewing all relevant information.
c) Create a priority list as to the order in which assets will be worked.
d) Develop a detailed action plan for each asset.
e) Designate a workout team and assign responsibilities.

## II. IDENTIFY NON-PERFORMING ASSETS

The Bank's quarterly classified asset report and monthly delinquency report will be used as the source documents for compiling a problem asset listing. SAF's assets break out into eight (8) categories:

1) Conventional Mortgages
2) Commercial Real Estate (serviced by others)
3) Commercial Business Loans
4) Consumer Loans
5) Consumer Loans Acquired from Travis Savings
6) Consumer Loans Acquired from Commerce Bank
7) Second Mortgage Acquired from Albuquerque Savings
8) Real Estate Owned
   - Single Family/Condos
   - Commercial Real Estate
   - Multi-family
   - Land

Management will also be asked to compile a listing of those loans which have characteristics or circumstances that would indicate that they may become non-performing in the near future.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1799



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1812

## III. PREPARE A WRITTEN ASSESSMENT

Critical to the success of any loan workout is a thorough understanding of all the facts pertaining to the asset. Therefore, each loan/asset file will be reviewed for loan documentation, most recent appraisal, operating statement (if income producing property), guarantees by borrower(s), status of title, bankruptcy proceedings (if applicable) and any other information which would be useful in determining a workout strategy.

Once the facts have been gathered, a narrative will be prepared which summarizes the important facts relating to the asset. In addition, the narrative will contain recommendations for action which became apparent to the reviewer. An example of such recommendations would be the obtaining of a current appraisal, payment of past due real estate taxes or other outstanding liens, request for a current operating statement or ordering a current title report. Noting such actions will save time when the actual workout process begins as well as minimize a potential monetary loss to the institution.

## IV. PREPARE A PRIORITY LIST

Since the monetary exposure to the Bank varies by asset and since experienced workout resources will be limited, a priority list will be compiled as to the order in which the assets will be worked. Not only will the assets be listed in order of importance but any actions recommended in the preliminary asset review (see III above) will be listed also.

Because asset workout is as much of an art as a science, the prioritization will take into account which assets can be resolved relatively quickly. Since the management of non-performing assets is both time consuming and costly, the goal will be the quick disposition of some assets, even if holding them might earn a better price. In this way, they will not continue to be a distraction from those assets which require a greater amount of workout creativity and which put more of the Bank's capital at risk.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-876-1800

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1813

## V. CREATE DETAILED PLANS OF ACTION

With each asset (or groups of assets) prioritized, a strategy for workout will be developed for each . Whether "workout" means disposition of the asset, recasting of the loan terms, or close supervision of operating statements, a specific plan will be prepared. During the due diligence review performed by the new ownership, discussions were held with several groups as to their interest in acquiring segments of SAF's problem assets. Whenever possible, opportunities for disposing of entire segments of the non-performing portfolio will be pursued.

Since a significant portion of the Bank's non-performing portfolio are assets being serviced by others, an important element of the workout effort will be the evaluation of the performance of the servicer. Face-to-face meetings will be held with the servicers so that SAF's management can become comfortable with the level of expertise of the servicer. When deemed in the best interest of the Bank, management will be instructed to pull servicing from the current servicer and either place it with another servicing agent or the Bank may decide to service the asset itself.

Another critical workout step is the evaluation of the efforts being made by the various law firms which have been engaged to represent SAF. Legal fees can become a very costly part of a workout. Unless the firms engaged are both technically competent to handle the representation and managed diligently, legal costs can go beyond reasonable limits. Each of the firms representing the Bank will be evaluated very early on in the workout process.

## VI. DESIGNATE A TEAM AND ASSIGN RESPONSIBILITIES

The ownership group has extensive experience in the workout of problem assets. Homer Holland has been asked to designate an asset workout team and to serve as the group leader. A significant portion of Mr. Holland's time will be spent on this effort. Since both James De Loach and Jack Sukmann will be retained as part of management, they will also contr[illegible] their knowledge of what has transpired in the past many of the assets and will be involved in the wo tasks.

Subject to the approval of the SAF's board of dire Homer Holland will establish the workout strategy asset and will assign the various responsibilities management and the Bank's staff. So that the actic subsequent activities relative to workout for each

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1801

maintained, a log book will be created which will contain a write up for each asset which is being worked. A fact sheet will be created for each asset which will contain information such as current balance, reserves, market value, pertinent dates, listing of attorneys, brokers, etc. In addition, a running narrative of all workout actions will be maintained for each asset. In this way, anyone will be able to review the log book regarding a particular asset and can become familiar with every workout action in chronological order.

## VII. CONCLUSION

The disposition and workout of the Bank's non-performing assets will have the highest level of attention from the new ownership group. Since the group has had extensive experience and a great deal of success in similar efforts with other financial institutions, there is no reason to believe that it cannot replicate previous successes. An estimated workout period of three years has been set for the liquidation and/or resolution of the bulk of the non-performing assets.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-876-1802

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1815

## I. INTRODUCTION

Critical to the success of any business venture, especially to a thrift institution in these changing times, are knowledgeable and involved directors and technically competent and professional managers. The ownership group of SAF will do its best to ensure that its directors and senior managers possess these characteristics.

## II. BOARD OF DIRECTORS

SAF's board of directors will have five members from Western Capital Holdings, Inc. (WCH), the thrift holding company which will own 100% of SAF's common stock, and five local (Rio Grande Valley or Texas) representatives. The five members of WCH will be Howard Ross, Homer Holland, Steven Bangert, John Rose and Ronald Pikus. SAF's current outside directors from the Rio Grande Valley will be asked to remain on the board. Their input for additional local individuals to serve on the board will be sought.

Biographies of the five holding company directors follow.

Howard Ross: Chairman of the Board and Owner
River Valley Savings Bank, FSB
Peoria, Illinois

Has spent most of his business life organizing and directing entrepreneurial ventures in commercial banking, real estate development and oil and gas exploration. Because of his many contacts in the investment banking field, he has devoted significant efforts toward raising capital for River Valley Holdings, Inc., the parent of River Valley Savings Bank.

Homer Holland: Chairman, Executive Committee and Owner
River Valley Savings Bank, FSB
Peoria, Illinois

Extensive senior management experience in the commercial banking and thrift industries. As CEO of a major commercial bank in Chicago, he directed the turn around which significantly enhanced earnings and shareholder value. Acquired five insolvent thrift institutions and successfully merged them into his existing thrift to form River Valley Savings Bank. Has devoted a substantial amount of time to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1803

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1816

real estate loan workouts of assets acquired through merger.

Steven Bangert: Vice Chairman and CEO
River Valley Savings Bank, FSB
Peoria, Illinois

Has developed a national reputation in the area of financial institution asset and liability management. Developed the strategic business plan and implemented the balance sheet restructuring for the acquired institutions which became River Valley Savings Bank. This restructuring resulted in a two percent return on assets for the latest fiscal year.

John Rose: Senior Vice President
Holland Partners, Inc.
Chicago, Illinois

Over fourteen years of management experience in the commercial and investment banking industries. Currently directs merger and acquisition activities of a company which specializes in the acquisition and turn around of troubled financial institutions.

Ronald Pikus: President and Chief Operating Officer
River Valley Savings Bank, FSB
Peoria, Illinois.

Manages day-to-day operations for the Peoria-based thrift which has eleven retail branches and over two hundred employees throughout Illinois. He has twenty years of experience in the thrift and mortgage banking industries, having served as chief financial officer/controller and mortgage servicing manager for several institutions.

## III. MANAGEMENT

An Executive Committee comprised of Homer Holland, Steve Bangert and Ron Pikus will provide direction to the Bank's senior managers and act on behalf of the Board of Directors between formal board meetings.

With respect to the senior management of the Bank, no changes in the current management structure are anticipated. Both James DeLoach and John Sukmann will be relied upon to maintain continuity to the Bank's operations, provide insights as to the staff's strengths and weaknesses, bring an understanding of the characteristics of the retail markets

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1804

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1817

which and Bank's serves and assistance with loan workouts.

Because several directors, namely Holland, Bangert and Pikus, have extensive experience in thrift management and are specialists in areas critical to the restructuring of the Bank, they will be called upon to provide management with assistance in several areas. Their efforts will focus on the following:

Homer Holland: He possesses extensive real estate loan workout experience and will devote a significant amount of his time to SAF's non performing loans. Holland, together with current senior management, will prioritize the assets and develop a plan for either restructuring or liquidation.

Steven Bangert: He will assist management with developing an overall balance sheet management strategy, determine which segments need restructuring and assist in the creation of a loan and deposit pricing model.

Ronald Pikus: He will advise management in several areas:
a) review of the operating structure of the Bank to determine where operating efficiencies might be improved;
b) creation of a residential loan, secondary market-oriented origination/processing/underwriting/shipping function;
c) determine the feasibility of establishing a loan servicing function within the Bank.

## IV. CONCLUSION

It is not the intention of the new ownership group to inject upheaval and apprehension within an institution which appears to be both prudently managed and operationally sound. However, as with the introduction of any new owners, a different operating philosophy and style is inevitable. The goal will be to maintain all that is now working well and, drawing from the new owners' expertise, add to the Bank's capabilities.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1805



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1818

## I. INTRODUCTION

SAF's six retail banking offices are located in the Rio Grande Valley. Traditional thrift deposit and transaction accounts are currently being offered in this area along with consumer loan products. Because of the bright economic future for the Valley, the new ownership group believes that the area provides excellent opportunities for new deposit products along with a significantly expanded residential home loan program. The remainder of this section will detail the regional and local economic makeup of the Rio Grande Valley.

## II. REGIONAL ECONOMIC FACTORS

The Rio Grande Valley is located along the north bank of the Rio Grande River in the southernmost part of Texas. The four south Texas counties comprising the region are Cameron and Willacy counties along the Gulf of Mexico and Hidalgo and Starr counties to the west. At the time of the 1990 U.S. Census, these counties had a combined population of 701,888, the larger portion of which was concentrated in 38 towns ranging in size from Brownsville (population 98,962) and McAllen (population 84,021) to Progresso Lakes (population 154). Population in the Rio Grande Valley has grown from 28,000 in 1880 to 701,888 in 1990. The compound growth rate of this 101 year period is around 3.0% annual growth in population. The "Metro Facts 1991" report compiled by the Rio Grande Valley Chamber of Commerce projects total population of 973,000 by the year 2000. This implies a population growth rate of around 3.3% per year for the ten year period from 1990 to 2000.

One factor significantly influencing the Valley is Mexico. The neighboring border cities of Reynosa, Matamoros, and Rio Bravo have a combined population estimated at 1.3 million. Including northern Mexico, the total population of the Rio Grande Valley market area is in excess of 2 million. Access to Mexico is provided by six international bridges. Two of these are located in Brownsville, one in Progresso south of Weslaco, one in the city of Hidalgo south of McAllen, one in Rio Grande City and one in Roma. A new bridge is under construction south of Harlingen.

Basic industries in the Valley include agriculture such as cotton, sugar cane, row crops, citrus, cattle and livestock; oil and gas production; fishing, shrimping, and seafood processing; tourism and manufacturing.

The Valley is one of the nations leading food producing areas, with a sub-tropical climate that provides a 330 day growing season. The primary crops in terms of dollar volumes



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1806

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1819

are fruits and vegetables (47%), cotton (23%), feed crops (10%), livestock (8%), sugar cane (5%), nursery crops (4%), and other crops comprising the remaining 3% of dollar volume. Supporting industries and services for these products include canning and quick freezing plants, juice concentrate plants, packaging and container manufacturers, equipment distributors, fertilizer and chemical distributors, truckers, seedsmen, aerial applicators and farm workers. The total dollar volume from agriculture and livestock income is estimated to range from $500 to $600 million annually.

A growing segment of the manufacturing base in the Valley results from the "Maquiladora" or twin plant operations. The Maquila system usually works with a highly automated or technology-oriented plant in the U.S. and a labor-intensive sister plant on the Mexican side. U.S. Customs law allows a U.S. owned company to assemble products in a foreign country and return the finished products to the U.S., paying duty only on the amount of labor or value added in the foreign country. The program is ideal for manufacturers of highly labor-intensive products. This concept fits well with Mexico's National Plan of Industrialization. Under this plan, companies may be 100% foreign owned and must export all of the products assembled in the plants. Industries that provide a particularly good fit for this type of operation are electronics, garments, and communications equipment. In 1991, Maquiladora operations accounted for 68,268 jobs in northern Mexico with employment spread over 165 plants.

An expanding area of the Valley economy is tourism, primarily from "Winter Texans". These are semi-permanent residents from northern portions of the country who reside in the Valley during the winter season. Of the estimated 100,000 to 125,000 Winter Texans visiting the Valley, approximately 70% choose Hidalgo County as their place of residence during their winter stay. The average length of stay for these temporary residents is 17 to 20 weeks with an estimated $192.5 million spent for living expenses and one-time expenditures. Housing for the winter guests is primarily provided by mobile home and recreational vehicle parks with over 90% of the Winter Texans choosing this type of residency for their stay. The local economy benefits from these visitors in many diverse ways: Restaurants and retailers benefit from increased sales during the winter months. Landowners benefit due to agricultural land transitioning to use for mobile home and recreational vehicle and retirement communities. Developers and contractors of all types are involved in the construction of the retirement communities. Golf course developers, maintenance and operating personnel are involved in building and maintaining the golf courses which are often located within the various retirement communities. Financial institutions, in general, and SAF, in particular, benefit since the temporary residents usually establish a local banking relationship to care for their

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-876-1807



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1820

banking needs during their Texas stay. The beneficial impact to the local economy from Winter Texans is projected to continue and increase over the coming years.

The Valley's semi-tropical climate and diverse economic base provides a unique and desirable area to accommodate the anticipated increase in the population base for the foreseeable future. Expansion of the economy is predicted for agricultural products, services, manufacturing and trade with Mexico, and tourism due to increases in both native and Winter Texan visitors.

If negotiations with Mexico lead to free trade between the two countries, the impact on the Rio Grande Valley could be very significant in terms of economic growth. Short term potential problem areas include major devaluations of the Mexican Peso and a general lack of stability for international and domestic oil prices.

## III. LOCAL FACTORS

A brief description of the local market for each of SAF's branch offices will now be presented.

* McAllen - The city of McAllen reflects the basic industries of the Rio Grande Valley. Primary sources of income arise from agriculture, trade, tourism and manufacturing.

  McAllen dominates the economic and cultural life of the upper Valley area. The city has twelve commercial banks and S&L's, with additional financial service companies. Excellent medical facilities are available with two new general hospitals providing comprehensive medical care, a new veterans' administration outpatient clinic, and a psychiatric hospital. A new civic center site has been purchased by the city with 180 acres available for civic center development.

  Steadily increasing growth is forecast for both the region and the city of McAllen. As of 1990, the total population of McAllen was 84,021 and total bank deposits were $1.7 billion.

* San Juan - The city is located between McAllen and Weslaco. The primary source of income is agriculture. There is very little manufacturing or industrial presence.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER WCH-B76-1808

The San Juan area has experienced growth in tourism due to the Winter Texan traffic. Population has risen from 5,070 in 1970 to 10,815 in 1990. Total bank deposits approach $34 million.

* Weslaco - Situated halfway between McAllen and Harlingen, the city of Weslaco has its economy firmly tied to the agriculture life of the area. The urban heart of the community is located on the north and south sides of U.S. Highway 83.

  Population has risen from 15,313 in 1970 to 21,877 in 1990. Cotton, row crops and citrus production are a stable part of the area economy. The packing, shipping and processing of these items form part of the basis of the Weslaco economic system. Local businesses, retail stores, light industrial enterprises and service institutions also help strengthen the payroll picture. The new industrial area contains several clothing manufacturing plants. Total bank deposits in Weslaco are in excess of $115 million.

* Harlingen - The town is located at the intersection of U.S. Highway 77 and U.S. Highway 83, which are two of the Valley's main transportation routes. Harlingen's economic base is balanced between agri-business, manufacturing, trade, services, government and tourism.

  The economic outlook for Harlingen was improved by new businesses which located recently in the city's industrial parks. In late 1988, General Dynamics located in the Harlingen Industrial Airpark, a 640 acre complex located northeast of the city. This complex offers new industries the opportunity to take advantage of the industrial start-up training programs offered by nearby Texas State Technical Institute. Recently, Fruit of the Loom completed the building of a $38 million textile mill in Harlingen Industrial Park, a 120 acre publicly owned industrial park. The plant employs 1,100 now and is projected to produce 1,700 jobs, $100 million in sales and a payroll of $20 million within three years. New developments include the new foreign trade zone and the start of construction of an international bridge.

  As of 1990, the total population of Harlingen was 48,735 with total bank deposits in excess of $475 million.

* Brownsville - It is the county seat of Cameron County and is a major international port of entry between Mexico and the United States. The economy is based primarily on retail trade, shipping, and tourism.

  Across the river in Mexico is Brownsville's sister city, Matamoros, with an estimated population of 650,000. According to Mexican demographics, the population of



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1809

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1822

Matamoros is expected to increase to 1.5 million by the year 2000. Matamoros has over 100 Maquiladora that employ approximately 40,000 people.

Brownsville has the distinction of being the largest city in the Rio Grande Valley with a 1990 population of nearly 100,000. Total bank deposits are in excess of $1 billion.

* Port Isabel - This city is the southern terminus of the Gulf Intracoastal Waterway system and, as a result, is the home of one of the largest shrimping fleets in the United States. As a coastal resort center, the area relies heavily on the boating and fishing industries. The city has remained stable over the years and provides adequate housing, educational and shopping facilities for its residents. It is noted that the fishing industry has suffered problems at times, but the construction boom on Padre Island has tended to offset fishing losses.

The economy of the subject area is affected largely by the resort and recreational resources on South Padre Island. South Padre Island and Port Isabel are connected by the Queen Isabella Causeway, the longest bridge in Texas. A new convention center will open soon in South Padre Island that will attract many new activities to the area.

Total population of the two towns is slightly more than 6,000 with total bank deposits in excess of $60 million.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1810

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1823

San Antonio Federal Business Plan
CRA Program

## I. INTRODUCTION

The ownership group of SAF is a strong proponent of a pro-active community re-investment program. Community reinvestment is looked upon more as an activity which benefits both the community and the institution than as a regulatory necessity. The Bank is prepared to make a commitment of not only its lending resources but, even more importantly, its "people talents" to promote CRA.

## II. PROGRAM DEFINITION

An effective CRA program begins first with self assessment. Since SAF has not been active in the loan origination business prior to the acquisition, a self assessment review will have to take on a different form. Rather than performing a statistical analysis, the Bank will gather a CRA Advisory Board from among its branch and lending staff to determine the credit and housing needs of the communities which the Bank serves.

The staff will also be asked to identify local community leaders who would be invited to become public members of the Bank's CRA Advisory Board. Together, Bank staff and public members will work together to implement the institution's CRA policies and programs.

## III. EDUCATION

Since many of the problems which low income applicants have with the mortgage process have to do with their lack of familiarity with the process, the Bank will be prepared to conduct an educational program geared to alleviate the confusion and fears which applicants tend to have.

Affordable housing seminars will be held at convenient locations within the Bank's lending areas. Loan officers, credit bureau representatives and realtors will be asked to participate in the seminars. Through these resources, potential home buyers and loan applicants will be guided through each step of the home buying and mortgage application process. In this way, applicants will understand what questions they will be asked and what documents they will need in order to apply for a loan. Special emphasis will be placed on the credit review process and counseling will be given to those individuals who have had past credit problems.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1811

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1824

A portion of the seminar will be set aside to discuss the responsibilities of home ownership and how owning differs from renting. Advice will be given as what steps the borrower should take with their lending institution should they encounter financial difficulties.

The goal of the seminar program will be to make the applicant more comfortable with what they will encounter when they buy a home and make application for a loan. This should put them in a better position to assist either SAF or any lender in determining their qualifications to handle a mortgage loan.

## IV. AFFORDABLE HOUSING PROGRAM

The Bank will attempt to become an approved lender under the Fannie Mae Affordables Program. The program, which is run in cooperation with several national private mortgage insurance companies, provides relaxed down payment and underwriting standards to low and moderate income families under special Fannie Mae guidelines. Since these loans can be securitized with Fannie Mae, it allows an institution to re-cycle its funds through a secondary market program for borrowers who would not otherwise qualify for a Fannie Mae loan.

Attendance at the Bank's seminar series will meet the educational requirements under the Fannie Mae Affordables and GEMICO lending programs. Certificates of completion will be distributed upon completion of the series and can be used at SAF or with any other participating lender.

## V. CONCLUSION

While there are many different ways to address the housing needs of the community, the ownership group has had success with the above approach. Since each community is different, the Bank will pay close attention to its staff and the public members of its CRA Advisory Board to determine what would be the most effective approach within SAF's markets.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1812

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1825

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Balance Sheet

| | | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | |
| Cash | 50,000 | 602,312 | 1,099,233 | 1,679,637 | 2,626,837 | 3,574,037 |
| Investment in SAFSB | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| Capitalized Organization Expenses | 667,500 | 445,000 | 222,500 | 0 | 0 | 0 |
| Total Assets | 10,717,500 | 13,994,388 | 16,792,825 | 20,256,853 | 25,309,833 | 29,420,291 |
| **LIABILITIES & CAPITAL:** | | | | | | |
| American National Bank | 10,250,000 | 6,385,248 | 2,240,436 | 0 | 0 | 0 |
| Other Liabilities | 417,500 | 278,333 | 139,165 | 0 | 0 | 0 |
| Total Liabilities | 10,667,500 | 6,663,581 | 2,379,601 | 0 | 0 | 0 |
| Capital: | | | | | | |
| Paid in Capital | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Retained Earnings | | 7,280,807 | 14,363,224 | 20,206,853 | 25,259,833 | 29,370,291 |
| Total Capital | 50,000 | 7,330,807 | 14,413,224 | 20,256,853 | 25,309,833 | 29,420,291 |
| Liabilities & Capital | 10,717,500 | 13,994,388 | 16,792,825 | 20,256,853 | 25,309,833 | 29,420,291 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1813

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Income Statement

| | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| Increase in equity of SAFSB | 7,947,076 | 7,524,017 | 6,106,124 | 5,105,780 | 4,163,258 |
| Expense | | | | | |
| Interest Expense | 706,998 | 366,592 | 95,219 | 0 | 0 |
| Amortization of Org Costs | 222,500 | 222,500 | 222,500 | 0 | 0 |
| Other Expense | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| Pretax Earnings | 6,937,578 | 6,854,925 | 5,708,405 | 5,025,780 | 4,083,258 |
| Tax Treaty | 343,229 | 227,491 | 135,224 | 27,200 | 27,200 |
| Net Earnings | 7,280,807 | 7,082,416 | 5,843,630 | 5,052,980 | 4,110,458 |
| Cash Flow Statement | | | | | |
| Cash In: | | | | | |
| Dividends Received | 5,000,000 | 5,000,000 | 3,000,000 | 1,000,000 | 1,000,000 |
| Tax Treaty | 343,229 | 227,491 | 135,224 | 27,200 | 27,200 |
| Total Cash In | 5,343,229 | 5,227,491 | 3,135,224 | 1,027,200 | 1,027,200 |
| Cash Out: | | | | | |
| Interest Expense | 706,998 | 366,592 | 95,219 | 0 | 0 |
| Organization Expenses | 139,167 | 139,168 | 139,166 | 0 | 0 |
| Other Expenses | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| Principal Repayment | 3,864,752 | 4,144,812 | 2,240,436 | 0 | 0 |
| Total Cash Out | 4,790,917 | 4,730,571 | 2,554,820 | 80,000 | 80,000 |
| Net Cash | 552,313 | 496,920 | 580,404 | 947,200 | 947,200 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1814

SAFSB - Purchase Accounting and Negative Goodwill Allocations
Balance Sheet as of January 31, 1992

| | Net Balance 01/31/92 | Yield Current | WAM Current | Required Yield | Prepay Factor | PA Discount | Totals |
|---|---|---|---|---|---|---|---|
| Auto Loans Rio Grande Valley - Variable | 5,000 | 9.63% | 15 | 19.00% | 18.00% | 285 | |
| Unsecured Loans San Antonio - Fixed | 4,000 | 10.50% | 16 | 25.00% | 18.00% | 320 | |
| Unsecured Loans San Antonio - Variable | 16,000 | 11.50% | 140 | 25.00% | 18.00% | 4,000 | |
| Unsecured Loans Rio Grande Valley - Fixed | 110,000 | 16.88% | 20 | 25.00% | 18.00% | 6,050 | |
| Unsecured Loans Rio Grande Valley - Variable | 6,000 | 10.50% | 14 | 25.00% | 18.00% | 420 | |
| Mortgage Secured Rio Grande Valley - Fixed | 181,000 | 12.87% | 77 | 25.00% | 18.00% | 33,465 | |
| Mortgage Secured Rio Grande Valley - Variable | 124,000 | 12.43% | 106 | 19.00% | 18.00% | 15,748 | |
| Other Secured Loans Rio Grande Valley - Variable | 8,000 | 10.46% | 16 | 19.00% | 18.00% | 432 | |
| Consumer Loans Purchased from Commerce Savings | 544,000 | 11.64% | 114 | Pur Disc | | 395,000 | |
| Consumer Loans Purchased from Travis Savings | 3,261,000 | 13.45% | 122 | Pur Disc | | 1,100,000 | |
| Other Variable-Rate Consumer Loans | 29,000 | 11.75% | 240 | 19.00% | 18.00% | 4,814 | |
| Phoenix Swimming Pool Loans - Fixed (ABQ) | 8,961,000 | 12.25% | 143 | 35% Disc | 12.00% | 3,136,350 | |
| Phoenix Swimming Pool Loans - Variable (ABQ) | 3,740,000 | 11.94% | NA | 35% Disc | 12.00% | 1,309,000 | |
| Loans on Savings Accounts | 1,340,000 | 8.92% | 12 | | | 0 | |
| | | | | | | | 9,360,081 |
| | 38,353,000 | | | | | | |
| Grand Total - Loans | 164,447,000 | | | | | | 24,622,569 |

| Investment Portfolio | | | | | | Premium | |
|---|---|---|---|---|---|---|---|
| Investment Securities | 30,326,000 | 7.85% | | Mkt Quote | 24.00% | (110,000) | |
| Mortgage-Backed Securities | 39,207,000 | 6.65% | | Mkt Quote | 24.00% | (613,000) | (723,000) |

| Liabilities | Bal as of 01/31/92 | WA Rate 01/31/92 | WA Term 01/31/92 | Yield Adj | PA Premium Allocation | |
|---|---|---|---|---|---|---|
| Deposits - CD's | | | | | | |
| 0-6mos maturities | 69,333,000 | 5.72% | 3 | 3.75% | 0 | |
| +6-12 mos maturities | 36,127,000 | 5.54% | 9 | 4.05% | (362,634) | |
| +1yr-3yr maturities | 15,705,000 | 6.99% | 24 | 4.55% | (685,948) | |
| +3yr-5yr maturities | 514,000 | 8.77% | 48 | 4.90% | (70,435) | |
| +5yr maturities | 1,951,000 | 9.21% | 60 | 4.90% | (449,387) | 1,568,404 |
| FHLB Advances | | | | | | |
| Due 3/16/98 | 10,000,000 | 8.70% | 72 | 7.42% | (574,393) | |
| Due 2/26/01 | 10,000,000 | 8.56% | 108 | 7.85% | (421,849) | 996,242 |
| | | | | | | 26,464,215 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1815

SAFSB - Purchase Accounting and Negative Goodwill Allocations
Balance Sheet as of January 31, 1992

| | Net Balance 01/31/92 | Yield Current | WAM Current | Required Yield | Prepay Factor | PA Discount | Totals |
|---|---|---|---|---|---|---|---|
| Mortgages & Other Real Estate Loans | | | | | | | |
| Residential - Fixed | 10,957,000 | 10.69% | 166 | 11.73% | 12.00% | 465,673 | |
| Residential - ARMs | 53,559,000 | 9.49% | 275 | 9% Disc | 72mos | 4,820,310 | |
| Condominium - Fixed | 1,001,000 | 10.46% | 210 | 4.5% Disc | 12.00% | 45,045 | |
| Condominium - ARMs | 6,344,000 | 9.40% | 258 | 9% Disc | 72mos | 570,960 | |
| Servd by Others-Commercial RE Fixed | 113,000 | 6.00% | 95 | 11.73% | 21.00% | 15,820 | |
| Servd by Others-Residential ARMs | 149,000 | 8.27% | 163 | 9% Disc | 72mos | 13,410 | |
| Servd by Others-MultiFamily ARMs | 23,930,000 | 8.52% | 179 | 15% Disc | 72mos | 3,589,500 | |
| Servd by Others-Commercial RE ARMs | 10,025,000 | 8.22% | 123 | 9% Disc | 72mos | 902,250 | |
| 2-4 Family Residential - Fixed | 49,000 | 11.49% | 106 | 11.73% | 21.00% | 490 | |
| 2-4 Family Residential - ARMs | 1,042,000 | 9.80% | 202 | 9% Disc | 72mos | 93,780 | |
| MultiFamily - Fixed | 4,599,000 | 10.00% | 149 | 15% Disc | 12.00% | 689,850 | |
| MultiFamily - ARMs | 3,516,000 | 9.51% | 233 | 15% Disc | 72mos | 527,400 | |
| Commercial RE/Land/Other - Fixed | 2,341,000 | 10.13% | 137 | 36% Disc | 60mos | 837,300 | |
| Commercial RE/Land/Other - ARMs | 5,402,000 | 10.62% | 130 | 32% Disc | 60mos | 1,695,600 | 14,267,388 |
| | 123,027,000 | | | | | | |
| Commercial Business Loans | 3,067,000 | 9.00% | 70 | 32% Disc | 70mos | 995,100 | 995,100 |
| Consumer: | | | | | | | |
| Home Improvement-1st Mgt San Antonio - Fixed | 875,000 | 12.51% | 99 | 25.00% | 18.00% | 192,063 | |
| Home Improvement-1st Mgt San Antonio - Variable | 4,636,000 | 11.25% | 109 | 19.00% | 18.00% | 704,520 | |
| Home Improvement-1st Mgt Rio Grande Valley - Fixed | 364,000 | 12.55% | 79 | 25.00% | 18.00% | 69,633 | |
| Home Improvement-1st Mgt Rio Grande Valley - Variable | 192,000 | 12.16% | 124 | 19.00% | 18.00% | 26,880 | |
| Home Improvement-2nd Mgt San Antonio - Fixed | 4,310,000 | 12.07% | 100 | 25.00% | 18.00% | 937,425 | |
| Home Improvement-2nd Mgt San Antonio - Variable | 8,413,000 | 11.32% | 113 | 19.00% | 18.00% | 1,278,776 | |
| Home Improvement-2nd Mgt Rio Grande Valley - Fixed | 614,000 | 12.70% | 74 | 25.00% | 18.00% | 71,838 | |
| Home Improvement-2nd Mgt Rio Grande Valley - Variable | 114,000 | 12.02% | 75 | 19.00% | 18.00% | 13,338 | |
| Mobile Home Loans Rio Grande Valley - Fixed | 11,000 | 15.00% | 26 | 25.00% | 18.00% | 880 | |
| Mobile Home Loans Rio Grande Valley - Variable | 19,000 | 12.50% | 74 | 19.00% | 18.00% | 2,062 | |
| Auto Loans Rio Grando Valley - Fixed | 477,000 | 12.37% | 33 | 25.00% | 18.00% | 56,763 | |

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1816

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1829

Negative Goodwill Allocation

| | Bal as of 01/31/92 | Neg GW Allocation | Carrying Value |
|---|---|---|---|
| Fixed Assets | 2,567,000 | (1,323,280) | 1,243,720 |
| REO: | | | |
| Residential Properties | 1,064,000 | (548,488) | 515,512 |
| Condominiums | 173,000 | (89,181) | 83,819 |
| Commercial Property | 2,133,000 | (1,099,554) | 1,033,446 |
| Land | 2,479,000 | (1,277,916) | 1,201,084 |
| Apartments | 1,411,000 | (727,366) | 683,634 |
| Total | 7,260,000 | (3,742,505) | 3,517,495 |
| | 9,827,000 | (5,065,785) | 4,761,215 |

Reconciliation:

26,464,215 Purchase Accounting Discounts/Premiums
(2,339,000)Other Purchase Accounting Adjustments
29,191,000 Total Excess to be Allocated
5,065,785 Negative Goodwill

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1817

San Antonio Federal Savings Bank
Pro Forma Balance Sheets

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | |
| Cash | 1,843,000 | | | 1,843,000 | 2,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Investments | 30,326,000 | | | 30,326,000 | 8,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| MBS | 39,207,000 | | | 39,207,000 | 42,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 |
| PA Discount | | 723,000 | | 723,000 | 382,081 | 259,113 | 196,555 | 148,674 | 112,093 |
| Total Cash & Inv | 71,376,000 | | | 72,099,000 | 52,382,081 | 63,259,113 | 63,196,555 | 63,148,674 | 63,112,093 |
| Loans: | | | | | | | | | |
| SFR-ARM's New | | | | | 31,173,317 | 38,686,844 | 57,249,877 | 76,451,158 | 96,786,116 |
| SFR-Fixed | 12,007,000 | | | 12,007,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | | | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 4,599,000 | | | 4,599,000 | 3,500,000 | 3,000,000 | 2,500,000 | 2,000,000 | 1,500,000 |
| Multi-Family ARMs | 27,870,000 | | | 27,870,000 | 23,000,000 | 19,000,000 | 15,000,000 | 11,000,000 | 7,000,000 |
| Commercial RE-Fixed | 2,904,000 | | | 2,904,000 | 2,400,000 | 1,800,000 | 1,200,000 | 600,000 | 0 |
| Commercial RE-ARMs | 15,677,000 | | | 15,677,000 | 12,000,000 | 9,000,000 | 6,000,000 | 3,000,000 | 0 |
| Commercial non-RE | 3,317,000 | | | 3,317,000 | 2,500,000 | 1,500,000 | 500,000 | 0 | 0 |
| Consumer | 39,618,000 | | | 39,618,000 | 32,000,000 | 25,000,000 | 18,000,000 | 11,000,000 | 4,000,000 |
| Mark-to-Mkt Disct | (201,000) | 201,000 | | 0 | 0 | 0 | 0 | 0 | 0 |
| PA Discount | | (24,622,569) | | (24,622,569) | (19,470,341) | (15,286,514) | (11,925,972) | (9,269,266) | (7,237,990) |
| Total Loans Gross | 166,885,000 | | | 142,463,431 | 160,196,976 | 155,794,330 | 161,617,905 | 167,875,892 | 175,142,126 |
| Less: | | | | | | | | | |
| Loans in Process | (8,000) | | | (8,000) | (500,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) |
| Loan Disc & Def Fees | (1,495,000) | 1,495,000 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Reserve for Losses | (6,662,000) | | | (6,862,000) | (6,875,000) | (6,888,000) | (6,901,000) | (6,914,000) | (7,292,000) |
| | (8,365,000) | | | (6,870,000) | (7,375,000) | (7,888,000) | (7,901,000) | (7,914,000) | (8,292,000) |
| Total Loans Net | 158,520,000 | | | 135,593,431 | 152,821,976 | 147,906,330 | 153,716,905 | 159,961,892 | 166,850,126 |
| Accrued Interest | 2,005,000 | | | 2,005,000 | 2,205,000 | 2,405,000 | 2,605,000 | 2,805,000 | 3,005,000 |
| Fixed Assets (Net of Dep) | 2,567,000 | | (1,323,280) | 1,243,720 | 1,088,255 | 952,223 | 833,195 | 729,046 | 637,915 |
| REO | 7,260,000 | | (3,742,505) | 3,517,495 | 2,517,495 | 1,767,495 | 1,267,495 | 1,017,495 | 892,495 |
| Other Assets | 2,465,000 | | | 2,465,000 | 1,978,000 | 1,819,450 | 1,656,611 | 1,489,377 | 1,682,636 |
| Total-Fixed & Other | | | | 9,231,215 | 7,788,750 | 6,944,168 | 6,362,301 | 6,040,918 | 6,218,046 |
| Current Earnings | | | | | 2,947,076 | 2,524,017 | 3,106,124 | 4,105,780 | 3,163,258 |
| Total Assets | 244,193,000 | | | 216,923,646 | 215,939,883 | 220,633,627 | 226,381,885 | 233,257,264 | 239,343,522 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1818

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|---|---|---|
| LIABILITIES & CAPITAL: | | | | | | | | | |
| Deposits-Trans Accts | 51,414,000 | | | 51,414,000 | 53,984,700 | 56,683,935 | 59,518,132 | 62,494,038 | 65,618,740 |
| PA Discount-Dep | | | | | | | | | |
| Deposits-CD's Old | 123,630,000 | | | 123,630,000 | 18,170,000 | 8,170,000 | 2,670,000 | 1,335,000 | 0 |
| PA Discount-Dep | | 1,568,404 | | 1,568,404 | 1,134,068 | 679,968 | 572,218 | 459,883 | 362,634 |
| Deposits-CD's New | | | | | 105,460,000 | 115,460,000 | 120,960,000 | 122,295,000 | 123,630,000 |
| PA Discount-Dep | | | | | | | | | |
| FHLB Advances | 26,000,000 | | | 26,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | | 996,242 | | 996,242 | 878,099 | 750,733 | 613,422 | 465,391 | 305,800 |
| Reverse Repo's | | | | | | | | | |
| Escrow | 768,000 | | | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 3,190,000 | (643,000) | | 2,547,000 | 2,597,940 | 2,649,899 | 2,702,897 | 2,756,955 | 2,812,094 |
| Total Liabilities | 205,002,000 | | | 206,923,646 | 202,992,807 | 205,162,535 | 207,804,669 | 210,574,267 | 213,497,268 |
| Net Worth | 39,191,000 | (29,191,000) | | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| Liabilities & Capital | 244,193,000 | | | 216,923,646 | 215,939,883 | 220,633,627 | 226,381,885 | 233,257,264 | 239,343,522 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1819

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Income Statement

| | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| INTEREST INCOME: | | | | | |
| SFR-ARMs New | 1,052,099 | 2,357,780 | 3,237,864 | 4,512,410 | 5,846,758 |
| SFR-Fixed | 1,281,974 | 1,281,600 | 1,281,600 | 1,281,600 | 1,281,600 |
| SFR-ARMS | 5,791,711 | 5,791,711 | 5,791,711 | 5,791,711 | 5,791,711 |
| Multi-Family Fixed | 404,950 | 325,000 | 275,000 | 225,000 | 175,000 |
| Multi-Family ARMs | 2,182,323 | 1,801,800 | 1,458,600 | 1,115,400 | 772,200 |
| Commercial RE-Fixed | 264,935 | 209,790 | 149,850 | 89,910 | 29,970 |
| Commercial RE-ARMs | 1,256,536 | 953,400 | 681,000 | 408,600 | 136,200 |
| Commercial non-RE | 261,765 | 180,000 | 90,000 | 22,500 | 0 |
| Consumer | 4,175,329 | 3,323,100 | 2,506,900 | 1,690,700 | 874,500 |
| Non-Accrual Adjustment | (300,000) | (250,000) | (200,000) | (150,000) | (150,000) |
| | 16,371,622 | 15,974,182 | 15,272,526 | 14,987,831 | 14,757,939 |
| Investments | 1,168,943 | 549,000 | 610,000 | 610,000 | 510,000 |
| MBS | 2,773,219 | 3,141,800 | 3,415,000 | 3,415,000 | 3,415,000 |
| Subtotal Interest Income | 20,313,784 | 19,664,982 | 19,297,526 | 19,012,831 | 18,782,939 |
| PA Discount-Investments | (340,919) | (122,968) | (62,558) | (47,881) | (36,581) |
| PA Discount-Loans | 5,152,228 | 4,183,827 | 3,360,542 | 2,656,706 | 2,031,276 |
| Total Interest Income | 25,125,093 | 23,725,841 | 22,595,510 | 21,621,656 | 20,777,634 |
| Deposits-Trans | 2,213,373 | 2,324,041 | 2,440,243 | 2,562,256 | 2,690,368 |
| Deposits-CD's Old | 4,176,010 | 775,713 | 319,238 | 117,947 | 39,316 |
| Deposits-CD's New | 2,109,200 | 4,418,400 | 4,728,400 | 4,865,100 | 4,918,500 |
| FHLB Advances | 1,984,900 | 1,726,000 | 1,726,000 | 1,726,000 | 1,726,000 |
| Subtotal Interest Expense | 10,483,483 | 9,244,154 | 9,213,881 | 9,271,303 | 9,374,184 |
| PA Premium-Deposit | (434,336) | (454,100) | (107,750) | (112,335) | (97,249) |
| PA Premium-Advances | (118,143) | (127,366) | (137,311) | (148,031) | (159,591) |
| Total Interest Expense | 9,931,004 | 8,662,688 | 8,968,820 | 9,010,937 | 9,117,344 |
| Net Margin | 15,194,090 | 15,063,152 | 13,626,689 | 12,610,719 | 11,660,290 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1820

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Income Statement

| | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| Provision for Loan Losses | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| NET INTEREST INCOME AFTER PROVISION | 14,694,090 | 14,563,152 | 13,126,689 | 12,110,719 | 11,160,290 |
| OTHER INCOME | | | | | |
| Gain(loss) on investments | 0 | 0 | 0 | 0 | 0 |
| Other fees and charges | 600,000 | 618,000 | 636,540 | 655,636 | 675,305 |
| Other income | 100,000 | 103,000 | 106,090 | 109,273 | 112,551 |
| Total other income | 700,000 | 721,000 | 742,630 | 764,909 | 787,856 |
| OTHER EXPENSES | | | | | |
| Salaries and employee benefits | 2,280,000 | 2,348,400 | 2,418,852 | 2,491,418 | 2,566,160 |
| Office occupancy, furniture, equipment | 548,000 | 564,440 | 581,373 | 598,814 | 616,779 |
| Depreciation | 155,465 | 136,032 | 119,028 | 104,149 | 91,131 |
| FDIC Premium | 445,073 | 458,425 | 472,178 | 486,343 | 500,934 |
| Advertising | 100,000 | 103,000 | 106,090 | 109,273 | 112,551 |
| Loss from real estate operations | 200,000 | 206,000 | 212,180 | 218,545 | 225,102 |
| Other general and administrative | 2,388,000 | 2,459,640 | 2,533,429 | 2,609,432 | 2,687,715 |
| Total other expenses | 6,116,538 | 6,275,937 | 6,443,130 | 6,617,975 | 6,800,371 |
| EARNINGS BEFORE INCOME TAXES | 9,277,552 | 9,008,215 | 7,426,189 | 6,257,653 | 5,147,775 |
| FEDERAL INCOME TAXES | 1,330,476 | 1,484,199 | 1,320,065 | 1,151,873 | 984,518 |
| NET EARNINGS | 7,947,076 | 7,524,017 | 6,106,124 | 5,105,780 | 4,163,258 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1821

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Capital Accounts

| | Post PA Balances | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|
| Capital at beginning of period | | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 |
| Earnings for the period | | 7,947,076 | 7,524,017 | 6,106,124 | 5,105,780 | 4,163,258 |
| Dividends Paid | | (5,000,000) | (5,000,000) | (3,000,000) | (1,000,000) | (1,000,000) |
| Capital at end of period | | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| General Valuation Allowance | | 500,000 | 1,000,000 | 1,500,000 | 2,000,000 | 2,500,000 |
| Regulatory Capital | | 13,447,076 | 16,471,093 | 20,077,217 | 24,682,997 | 28,346,254 |
| Tangible Capital: | | | | | | |
| Required @ 3.0% | 6,507,709 | 6,478,198 | 6,619,009 | 6,791,457 | 6,997,718 | 7,180,306 |
| Actual | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| Excess Capital | 3,492,291 | 6,468,880 | 8,852,084 | 11,785,760 | 15,685,279 | 18,665,949 |
| Ratio | 4.61% | 6.00% | 7.01% | 8.21% | 9.72% | 10.80% |
| Risk-Based Capital: | | | | | | |
| Required @ 8% | 8,803,000 | 9,288,000 | 8,768,000 | 8,611,000 | 8,537,000 | 8,311,000 |
| Actual | 10,000,000 | 13,447,076 | 16,471,093 | 20,077,217 | 24,682,997 | 28,346,254 |
| Excess Capital | 1,197,000 | 4,159,076 | 7,703,093 | 11,466,217 | 16,145,997 | 20,035,254 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1822

San Antonio Federal Savings Bank
Pro Forma Financial Statements

| Rate Table: | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| SFR-ARMs New | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% |
| SFR-Fixed | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% |
| SFR-ARMs | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% |
| Multi-Family Fixed | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Multi-Family ARMs | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% |
| Commercial RE-Fixed | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% |
| Commercial RE-ARMs | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% |
| Commercial non-RE | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% |
| Consumer | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% |
| | | | | | |
| Investments | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% |
| MBS | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% |
| | | | | | |
| Deposits-Trans | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% |
| Deposits-CD's Old | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% |
| Deposits-CD's New | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| | | | | | |
| FHLB Advances | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% |
| Inflation/growth factor | | 3.00% | 3.00% | 3.00% | 3.00% |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1823

San Antonio Federal Savings Bank
Pro Forma Quarterly Balance Sheets

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1- 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | | | | |
| Cash. | 1,813,000 | | | 1,843,000 | 1,882,250 | 1,921,500 | 1,960,750 | 2,000,000 | 2,250,000 | 2,500,000 | 2,750,000 | 3,000,000 |
| Investments | 30,326,000 | | | 30,326,000 | 24,744,500 | 19,163,000 | 13,581,500 | 8,000,000 | 8,500,000 | 9,000,000 | 9,500,000 | 10,000,000 |
| MBS | 39,207,000 | | | 39,207,000 | 39,905,250 | 40,603,500 | 41,301,750 | 42,000,000 | 44,000,000 | 46,000,000 | 48,000,000 | 50,000,000 |
| PA Discount | | 723,000 | | 723,000 | 637,770 | 552,541 | 467,311 | 382,081 | 351,339 | 320,597 | 289,855 | 259,113 |
| Total Cash & Inv | 71,376,000 | | | 72,099,000 | 67,169,770 | 62,210,541 | 57,311,311 | 52,382,081 | 55,101,339 | 57,820,597 | 60,539,855 | 63,259,113 |
| Loans: | | | | | | | | | | | | |
| SFR-ARM's New | | | | | 7,793,329 | 15,586,659 | 23,379,988 | 31,173,317 | 33,051,699 | 34,930,080 | 36,808,462 | 38,686,844 |
| SFR-Fixed | 12,007,000 | | | 12,007,000 | 12,005,250 | 12,003,500 | 12,001,750 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | | | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 4,599,000 | | | 4,599,000 | 4,324,250 | 4,049,500 | 3,774,750 | 3,500,000 | 3,375,000 | 3,250,000 | 3,125,000 | 3,000,000 |
| Multi-Family ARMs | 27,870,000 | | | 27,870,000 | 26,652,500 | 25,435,000 | 24,217,500 | 23,000,000 | 22,000,000 | 21,000,000 | 20,000,000 | 19,000,000 |
| Commercial RE-Fixed | 2,904,000 | | | 2,904,000 | 2,778,000 | 2,652,000 | 2,526,000 | 2,400,000 | 2,250,000 | 2,100,000 | 1,950,000 | 1,800,000 |
| Commercial RE-ARMs | 15,677,000 | | | 15,677,000 | 14,757,750 | 13,838,500 | 12,919,250 | 12,000,000 | 11,250,000 | 10,500,000 | 9,750,000 | 9,000,000 |
| Commercial non-RE | 3,317,000 | | | 3,317,000 | 3,112,750 | 2,908,500 | 2,704,250 | 2,500,000 | 2,250,000 | 2,000,000 | 1,750,000 | 1,500,000 |
| Consumer | 39,618,000 | | | 39,618,000 | 37,713,500 | 35,809,000 | 33,904,500 | 32,000,000 | 30,250,000 | 28,500,000 | 26,750,000 | 25,000,000 |
| Mark-to-Mkt Disct | (201,000) | 201,000 | | 0 | | | | 0 | 0 | 0 | 0 | 0 |
| PA Discount | | (24,622,569) | | (24,622,569) | (23,334,512) | (22,046,455) | (20,758,398) | (19,470,341) | (18,424,384) | (17,378,428) | (16,332,471) | (15,286,514) |
| Total Loans Gross | 166,885,000 | | | 142,463,431 | 146,896,817 | 151,330,204 | 155,763,590 | 160,196,976 | 159,096,314 | 157,995,653 | 156,894,991 | 155,794,330 |
| Less: | | | | | | | | | | | | |
| Loans in Process | (8,000) | | | (8,000) | (131,000) | (254,000) | (377,000) | (500,000) | (625,000) | (750,000) | (875,000) | (1,000,000) |
| Loan Disc & Def Fees | (1,495,000) | 1,495,000 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Reserve for Losses | (6,862,000) | | | (6,862,000) | (6,865,250) | (6,868,500) | (6,871,750) | (6,875,000) | (6,878,250) | (6,881,500) | (6,884,750) | (6,888,000) |
| | (8,365,000) | | | (6,870,000) | (6,996,250) | (7,122,500) | (7,248,750) | (7,375,000) | (7,503,250) | (7,631,500) | (7,759,750) | (7,888,000) |
| Total Loans Net | 158,520,000 | | | 135,593,431 | 139,900,567 | 144,207,704 | 148,514,840 | 152,821,976 | 151,593,064 | 150,364,153 | 149,135,241 | 147,906,330 |
| Accrued Interest | 2,005,000 | | | 2,005,000 | 2,055,000 | 2,105,000 | 2,155,000 | 2,205,000 | 2,255,000 | 2,305,000 | 2,355,000 | 2,405,000 |
| Fixed Assets (Net of Dep) | 2,567,000 | | (1,323,280) | 1,243,720 | 1,204,854 | 1,165,988 | 1,127,121 | 1,088,255 | 1,054,247 | 1,020,239 | 986,231 | 952,223 |
| REO | 7,260,000 | | (3,742,505) | 3,517,495 | 3,267,495 | 3,017,495 | 2,767,495 | 2,517,495 | 2,329,995 | 2,142,495 | 1,954,995 | 1,767,495 |
| Other Assets | 2,465,000 | | | 2,465,000 | 2,343,250 | 2,221,500 | 2,099,750 | 1,978,000 | 1,938,363 | 1,898,725 | 1,859,088 | 1,819,450 |
| Total-Fixed & Other | | | | 9,231,215 | 8,870,599 | 8,509,983 | 8,149,366 | 7,788,750 | 7,577,605 | 7,366,459 | 7,155,314 | 6,944,168 |
| Current Earnings | | | | | 736,769 | 1,473,538 | 2,210,307 | 2,947,076 | 2,841,311 | 2,735,546 | 2,629,781 | 2,524,017 |
| Total Assets | 241,193,000 | | | 216,923,646 | 216,477,705 | 216,431,765 | 216,183,824 | 215,939,883 | 217,115,319 | 218,286,755 | 219,460,191 | 220,633,627 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1824

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LIABILITIES & CAPITAL: | | | | | | | | | | | | |
| Deposits-Trans Accts | 51,414,000 | | | 51,414,000 | 52,056,675 | 52,699,350 | 53,342,025 | 53,984,700 | 54,659,309 | 55,334,318 | 56,009,126 | 56,683,935 |
| PA Discount-Dep | | | | | 0 | 0 | 0 | | 0 | 0 | 0 | |
| Deposits-CD's Old | 123,630,000 | | | 123,630,000 | 97,265,000 | 70,900,000 | 44,535,000 | 18,170,000 | 15,670,000 | 13,170,000 | 10,670,000 | 8,170,000 |
| PA Discount-Dep | | 1,568,404 | | 1,568,404 | 1,459,820 | 1,351,236 | 1,242,652 | 1,134,068 | 1,020,553 | 907,038 | 793,493 | 679,948 |
| Deposits-CD's New | | | | | 76,365,000 | 52,730,000 | 79,095,000 | 105,460,000 | 107,960,000 | 110,460,000 | 112,960,000 | 115,460,000 |
| PA Discount-Dep | | | | | 0 | 0 | 0 | | 0 | 0 | 0 | |
| FHLB Advances | 26,000,000 | | | 26,000,000 | 24,500,000 | 23,000,000 | 21,500,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | | 996,242 | | 996,242 | 966,706 | 937,171 | 907,635 | 878,099 | 846,258 | 814,456 | 782,575 | 750,733 |
| Reverse Repo's | | | | | 0 | 0 | 0 | | 0 | 0 | 0 | |
| Escrow | 768,000 | | | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 3,190,000 | (643,000) | | 2,547,000 | 2,696,760 | 2,755,169 | 2,722,230 | 2,597,940 | 2,575,254 | 2,576,351 | 2,601,233 | 2,649,899 |
| Total Liabilities | 205,002,000 | | | 206,923,646 | 206,077,961 | 205,140,925 | 204,112,542 | 202,992,807 | 203,499,563 | 204,030,103 | 204,584,427 | 205,162,535 |
| Net Worth | 39,191,000 | (29,191,000) | | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| Liabilities & Capital | 244,193,000 | | | 216,923,646 | 216,677,705 | 216,431,765 | 216,185,824 | 215,939,883 | 217,113,319 | 218,286,755 | 219,460,191 | 220,633,627 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1825

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | | | | |
| Cash | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Investments | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| MBS | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 |
| PA Discount | 213,474 | 227,834 | 212,193 | 196,555 | 184,385 | 172,615 | 160,444 | 148,674 | 139,529 | 130,384 | 121,238 | 112,093 |
| Total Cash & Inv | 63,213,474 | 63,227,834 | 63,212,193 | 63,196,555 | 63,184,385 | 63,172,615 | 63,160,444 | 63,148,674 | 63,139,529 | 63,130,384 | 63,121,238 | 63,112,093 |
| Loans: | | | | | | | | | | | | |
| SFR-ARM's New | 43,327,602 | 47,968,360 | 52,609,119 | 57,249,877 | 62,050,197 | 66,850,517 | 71,650,838 | 76,451,158 | 81,534,897 | 86,618,637 | 91,702,376 | 96,786,116 |
| SFR-Fixed | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 2,875,000 | 2,750,000 | 2,625,000 | 2,500,000 | 2,375,000 | 2,250,000 | 2,125,000 | 2,000,000 | 1,875,000 | 1,750,000 | 1,625,000 | 1,500,000 |
| Multi-Family ARMs | 18,000,000 | 17,000,000 | 16,000,000 | 15,000,000 | 14,000,000 | 13,000,000 | 12,000,000 | 11,000,000 | 10,000,000 | 9,000,000 | 8,000,000 | 7,000,000 |
| Commercial RE-Fixed | 1,650,000 | 1,500,000 | 1,350,000 | 1,200,000 | 1,050,000 | 900,000 | 750,000 | 600,000 | 450,000 | 300,000 | 150,000 | 0 |
| Commercial RE-ARMs | 8,250,000 | 7,500,000 | 6,750,000 | 6,000,000 | 5,250,000 | 4,500,000 | 3,750,000 | 3,000,000 | 2,250,000 | 1,500,000 | 750,000 | 0 |
| Commercial non-RE | 1,250,000 | 1,000,000 | 750,000 | 500,000 | 375,000 | 250,000 | 125,000 | 0 | 0 | 0 | 0 | 0 |
| Consumer | 23,250,000 | 21,500,000 | 19,750,000 | 18,000,000 | 16,250,000 | 14,500,000 | 12,750,000 | 11,000,000 | 9,250,000 | 7,500,000 | 5,750,000 | 4,000,000 |
| Mark-to-Mkt Disct | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PA Discount | (14,446,379) | (13,606,243) | (12,766,108) | (11,925,972) | (11,261,794) | (10,597,619) | (9,933,443) | (9,269,266) | (8,761,447) | (8,253,628) | (7,745,809) | (7,237,990) |
| Total Loans Gross | 157,250,224 | 158,706,117 | 160,162,011 | 161,617,905 | 163,182,402 | 164,746,890 | 166,311,395 | 167,875,892 | 169,692,450 | 171,509,009 | 173,325,567 | 175,142,126 |
| Less: | | | | | | | | | | | | |
| Loans In Process | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) |
| Loan Disc & Def Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Reserve for Losses | (6,891,250) | (6,894,500) | (6,897,750) | (6,901,000) | (6,904,250) | (6,907,500) | (6,910,750) | (6,914,000) | (7,008,500) | (7,103,000) | (7,197,500) | (7,292,000) |
| | (7,891,250) | (7,894,500) | (7,897,750) | (7,901,000) | (7,904,250) | (7,907,500) | (7,910,750) | (7,914,000) | (8,008,500) | (8,103,000) | (8,197,500) | (8,292,000) |
| Total Loans Net | 149,358,974 | 150,811,617 | 152,264,261 | 153,716,905 | 155,278,152 | 156,839,398 | 158,400,645 | 159,961,892 | 161,683,950 | 163,406,009 | 165,128,067 | 166,850,126 |
| Accrued Interest | 2,455,000 | 2,505,000 | 2,555,000 | 2,605,000 | 2,655,000 | 2,705,000 | 2,755,000 | 2,805,000 | 2,855,000 | 2,905,000 | 2,955,000 | 3,005,000 |
| Fixed Assets (Net of Dep) | 922,466 | 892,709 | 862,952 | 833,195 | 807,158 | 781,121 | 755,083 | 729,046 | 706,263 | 683,480 | 660,698 | 637,915 |
| REO | 1,642,495 | 1,517,495 | 1,392,495 | 1,267,495 | 1,204,995 | 1,142,495 | 1,079,995 | 1,017,495 | 986,245 | 954,995 | 923,745 | 892,495 |
| Other Assets | 1,778,740 | 1,738,031 | 1,697,321 | 1,656,611 | 1,614,803 | 1,572,994 | 1,531,186 | 1,489,377 | 1,537,892 | 1,586,007 | 1,634,321 | 1,682,636 |
| Total-Fixed & Other | 6,798,701 | 6,653,235 | 6,507,768 | 6,362,301 | 6,281,955 | 6,201,610 | 6,121,264 | 6,040,918 | 6,085,200 | 6,129,482 | 6,173,764 | 6,218,046 |
| Current Earnings | 2,669,343 | 2,815,070 | 2,960,597 | 3,106,124 | 3,356,038 | 3,605,952 | 3,855,866 | 4,105,780 | 3,870,150 | 3,634,519 | 3,398,889 | 3,163,258 |
| Total Assets | 222,070,692 | 223,507,756 | 224,944,820 | 226,381,885 | 228,100,730 | 229,819,575 | 231,538,419 | 233,257,264 | 234,778,828 | 236,300,393 | 237,821,958 | 239,343,522 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1826

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt |
|---|---|---|---|---|
| Deposits-Trans Accts | 57,392,484 | 58,101,033 | 58,809,583 | 59,518,132 |
| PA Discount-Dep | 0 | 0 | 0 | |
| Deposits-CD's Old | 6,795,000 | 5,420,000 | 4,045,000 | 2,670,000 |
| PA Discount-Dep | 653,031 | 626,093 | 599,156 | 572,218 |
| Deposits-CD's New | 116,835,000 | 118,210,000 | 119,585,000 | 120,960,000 |
| PA Discount-Dep | 0 | 0 | 0 | |
| FHLB Advances | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | 716,405 | 682,078 | 647,750 | 613,422 |
| Reverse Repo's | 0 | 0 | 0 | |
| Escrow | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 2,626,227 | 2,627,170 | 2,652,726 | 2,702,897 |
| Total Liabilities | 205,786,147 | 206,434,374 | 207,107,214 | 207,804,669 |
| Net Worth | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 |
| Liabilities & Capital | 222,070,692 | 223,507,756 | 224,944,820 | 226,381,885 |

| | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt |
|---|---|---|---|---|
| Deposits-Trans Accts | 60,267,108 | 61,006,085 | 61,750,062 | 62,494,038 |
| PA Discount-Dep | 0 | 0 | 0 | |
| Deposits-CD's Old | 2,336,250 | 2,002,500 | 1,668,750 | 1,335,000 |
| PA Discount-Dep | 544,134 | 516,051 | 487,967 | 459,883 |
| Deposits-CD's New | 121,293,750 | 121,627,500 | 121,961,250 | 122,295,000 |
| PA Discount-Dep | 0 | 0 | 0 | |
| FHLB Advances | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | 576,414 | 539,407 | 502,399 | 465,391 |
| Reverse Repo's | 0 | 0 | 0 | |
| Escrow | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 2,679,810 | 2,681,125 | 2,706,839 | 2,756,955 |
| Total Liabilities | 208,460,467 | 209,140,667 | 209,845,266 | 210,574,267 |
| Net Worth | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 |
| Liabilities & Capital | 228,100,730 | 229,819,575 | 231,538,419 | 233,257,264 |

| | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|
| Deposits-Trans Accts | 63,275,214 | 64,056,389 | 64,837,565 | 65,618,740 |
| PA Discount-Dep | 0 | 0 | 0 | |
| Deposits-CD's Old | 1,001,250 | 667,500 | 333,750 | 0 |
| PA Discount-Dep | 435,571 | 411,259 | 386,946 | 362,634 |
| Deposits-CD's New | 122,628,750 | 122,962,500 | 123,296,250 | 123,630,000 |
| PA Discount-Dep | 0 | 0 | 0 | |
| FHLB Advances | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | 425,493 | 385,596 | 345,698 | 305,800 |
| Reverse Repo's | 0 | 0 | 0 | |
| Escrow | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 2,771,815 | 2,785,959 | 2,799,386 | 2,822,094 |
| Total Liabilities | 211,279,223 | 212,001,376 | 212,740,725 | 213,497,268 |
| Net Worth | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| Liabilities & Capital | 234,778,828 | 236,300,393 | 237,821,958 | 239,343,522 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1827

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Quarterly Income Statements

| | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 1 Total | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt | Yr 2 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| INTEREST INCOME: | | | | | | | | | | |
| SFR-ARMs New | 65,756 | 197,269 | 328,781 | 460,294 | 1,052,099 | 541,899 | 573,596 | 605,294 | 636,992 | 2,357,780 |
| SFR-Fixed | 320,364 | 320,317 | 320,470 | 320,423 | 1,281,574 | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 |
| SFR-ARMs | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 |
| Multi-Family Fixed | 111,341 | 104,672 | 97,803 | 90,934 | 404,950 | 85,938 | 82,813 | 79,688 | 76,563 | 325,000 |
| Multi-Family ARMs | 384,756 | 558,638 | 332,323 | 506,408 | 2,182,323 | 482,625 | 461,175 | 439,725 | 418,275 | 1,801,800 |
| Commercial RE-Fixed | 70,956 | 67,807 | 64,660 | 61,513 | 264,935 | 58,067 | 54,321 | 50,574 | 46,828 | 209,790 |
| Commercial RE-ARMs | 345,436 | 324,567 | 303,700 | 282,833 | 1,256,536 | 263,888 | 246,863 | 229,838 | 212,813 | 953,400 |
| Commercial non-RE | 72,335 | 67,739 | 63,143 | 58,548 | 261,765 | 53,438 | 47,813 | 42,188 | 36,563 | 180,000 |
| Consumer | 1,127,107 | 1,071,590 | 1,016,074 | 960,558 | 4,175,329 | 907,294 | 856,281 | 805,269 | 754,256 | 3,325,100 |
| Non-Accrual Adjustment | (75,000) | (75,000) | (75,000) | (75,000) | (300,000) | (62,500) | (62,500) | (62,500) | (62,500) | (250,000) |
| | 4,071,372 | 4,085,728 | 4,100,084 | 4,114,440 | 16,371,622 | 4,098,974 | 4,028,688 | 3,958,402 | 3,888,116 | 15,974,182 |
| Investments | 119,913 | 334,795 | 249,677 | 164,559 | 1,168,943 | 125,813 | 133,438 | 141,063 | 148,688 | 549,000 |
| ABS | 675,421 | 687,343 | 699,266 | 711,189 | 2,773,219 | 734,225 | 768,375 | 802,525 | 836,675 | 3,141,800 |
| Subtotal Interest Income | 5,166,705 | 5,107,866 | 5,049,026 | 4,990,187 | 20,313,784 | 4,959,012 | 4,930,501 | 4,901,990 | 4,873,479 | 19,664,982 |
| PA Discount-Investments | (85,230) | (85,230) | (85,230) | (85,230) | (340,919) | (30,742) | (30,742) | (30,742) | (30,742) | (122,968) |
| PA Discount-Loans | 1,288,057 | 1,288,057 | 1,288,057 | 1,288,057 | 5,152,228 | 1,045,957 | 1,045,957 | 1,045,957 | 1,045,957 | 4,183,827 |
| Total Interest Income | 6,369,532 | 6,310,693 | 6,251,854 | 6,193,014 | 25,125,093 | 5,974,227 | 5,945,716 | 5,917,205 | 5,888,694 | 23,725,841 |
| Deposits-Trans | 543,221 | 549,969 | 556,717 | 563,465 | 2,213,373 | 570,382 | 577,468 | 584,553 | 591,639 | 2,324,041 |
| Deposits-CD's Old | 1,426,339 | 1,238,115 | 849,890 | 661,666 | 4,176,010 | 249,147 | 212,335 | 175,522 | 138,710 | 775,713 |
| Deposits-CD's New | 131,825 | 395,475 | 659,125 | 922,775 | 2,109,200 | 1,067,100 | 1,092,100 | 1,117,100 | 1,142,100 | 4,418,400 |
| FHLB Advances | 544,769 | 512,406 | 480,044 | 447,681 | 1,984,900 | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 |
| Subtotal Interest Expense | 2,846,154 | 2,695,965 | 2,545,776 | 2,395,587 | 10,483,483 | 2,318,129 | 2,313,402 | 2,308,675 | 2,303,948 | 9,244,154 |
| PA Premium-Deposit | (108,584) | (108,584) | (108,584) | (108,584) | (434,336) | (113,525) | (113,525) | (113,525) | (113,525) | (454,100) |
| PA Premium-Advances | (29,536) | (29,536) | (29,536) | (29,536) | (118,143) | (31,842) | (31,842) | (31,842) | (31,842) | (127,366) |
| Total Interest Expense | 2,708,034 | 2,557,845 | 2,407,656 | 2,257,467 | 9,931,004 | 2,172,763 | 2,168,036 | 2,163,309 | 2,158,582 | 8,662,688 |
| Net Margin | 3,661,498 | 3,752,848 | 3,844,197 | 3,935,547 | 15,194,090 | 3,801,464 | 3,777,680 | 3,753,896 | 3,730,112 | 15,063,152 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1828

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1841

| Quarterly Income Statements | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 3 Total | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 4 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| INTEREST INCOME: | | | | | | | | | | |
| SFR-ARMs New | 691,997 | 710,310 | 848,422 | 926,935 | 3,237,844 | 1,006,594 | 1,087,600 | 1,168,605 | 1,249,611 | 4,512,410 |
| SFR-Fixed | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 |
| SFR-ARMs | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 |
| Multi-Family Fixed | 73,438 | 70,313 | 67,188 | 64,063 | 275,000 | 60,938 | 57,813 | 54,688 | 51,563 | 225,000 |
| Multi-Family ARMs | 376,825 | 373,375 | 353,925 | 332,475 | 1,458,600 | 311,025 | 289,575 | 268,125 | 246,675 | 1,115,400 |
| Commercial RE-Fixed | 43,082 | 39,336 | 35,589 | 31,843 | 149,850 | 28,097 | 24,351 | 20,604 | 16,858 | 89,910 |
| Commercial RE-ARMs | 195,788 | 178,763 | 161,738 | 144,713 | 681,000 | 127,688 | 110,663 | 93,638 | 76,613 | 408,600 |
| Commercial non-RE | 30,938 | 25,313 | 19,688 | 14,063 | 90,000 | 9,844 | 7,031 | 4,219 | 1,406 | 22,500 |
| Consumer | 703,244 | 652,231 | 601,219 | 550,206 | 2,506,900 | 499,194 | 448,181 | 397,169 | 346,156 | 1,690,700 |
| Non-Accrual Adjustment | (50,000) | (50,000) | (50,000) | (50,000) | (200,000) | (37,500) | (37,500) | (37,500) | (37,500) | (150,000) |
| | 3,853,638 | 3,829,967 | 3,806,296 | 3,782,625 | 15,272,526 | 3,774,207 | 3,756,041 | 3,737,875 | 3,719,709 | 14,987,831 |
| Investments | 152,500 | 152,500 | 152,500 | 152,500 | 610,000 | 152,500 | 152,500 | 152,500 | 152,500 | 610,000 |
| MBS | 853,750 | 853,750 | 853,750 | 853,750 | 3,415,000 | 853,750 | 853,750 | 853,750 | 853,750 | 3,415,000 |
| Subtotal Interest Income | 4,859,888 | 4,836,217 | 4,812,546 | 4,788,875 | 19,297,526 | 4,780,457 | 4,762,291 | 4,744,125 | 4,725,959 | 19,012,831 |
| PA Discount-Investments | (15,640) | (15,640) | (15,640) | (15,640) | (62,558) | (11,970) | (11,970) | (11,970) | (11,970) | (47,881) |
| PA Discount-Loans | 840,136 | 840,136 | 840,136 | 840,136 | 3,360,542 | 664,177 | 664,177 | 664,177 | 664,177 | 2,656,706 |
| Total Interest Income | 5,684,384 | 5,660,713 | 5,637,042 | 5,613,371 | 22,595,510 | 5,432,663 | 5,414,497 | 5,396,331 | 5,378,165 | 21,621,656 |
| Deposits-Trans | 598,901 | 606,341 | 613,781 | 621,221 | 2,440,243 | 628,616 | 636,658 | 644,470 | 652,282 | 2,562,256 |
| Deposits-CD's Old | 110,180 | 89,933 | 69,686 | 49,439 | 319,238 | 36,859 | 31,944 | 27,030 | 22,115 | 117,947 |
| Deposits-CD's New | 1,161,675 | 1,175,225 | 1,188,775 | 1,202,725 | 4,728,400 | 1,211,269 | 1,214,606 | 1,217,944 | 1,221,281 | 4,865,100 |
| FHLB Advances | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 |
| Subtotal Interest Expense | 2,302,056 | 2,302,999 | 2,303,942 | 2,304,885 | 9,213,881 | 2,308,474 | 2,314,708 | 2,320,943 | 2,327,178 | 9,271,303 |
| PA Premium-Deposit | (26,938) | (26,938) | (26,938) | (26,938) | (107,750) | (28,084) | (28,084) | (28,084) | (28,084) | (112,335) |
| PA Premium-Advances | (34,328) | (34,328) | (34,328) | (34,328) | (137,311) | (37,008) | (37,008) | (37,008) | (37,008) | (148,031) |
| Total Interest Expense | 2,240,791 | 2,241,734 | 2,242,677 | 2,243,619 | 8,968,820 | 2,243,382 | 2,249,617 | 2,255,852 | 2,262,086 | 9,010,937 |
| Net Margin | 3,443,593 | 3,418,979 | 3,394,365 | 3,369,752 | 13,626,689 | 3,189,281 | 3,164,880 | 3,140,480 | 3,116,079 | 12,610,719 |

| Quarterly Income Statements | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt | Yr 5 Total |
|---|---|---|---|---|---|
| INTEREST INCOME: | | | | | |
| SFR-ARMs New | 1,333,007 | 1,418,795 | 1,504,584 | 1,590,372 | 5,846,758 |
| SFR-Fixed | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 |
| SFR-ARMs | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 |
| Multi-Family Fixed | 48,438 | 45,313 | 42,188 | 39,063 | 175,000 |
| Multi-Family ARMs | 225,225 | 203,775 | 182,325 | 160,875 | 772,200 |
| Commercial RE-Fixed | 13,112 | 9,366 | 5,619 | 1,873 | 29,970 |
| Commercial RE-ARMs | 59,588 | 42,563 | 25,538 | 8,513 | 136,200 |
| Commercial non-RE | 0 | 0 | 0 | 0 | 0 |
| Consumer | 295,144 | 244,131 | 193,119 | 142,106 | 874,500 |
| Non-Accrual Adjustment | (37,500) | (37,500) | (37,500) | (37,500) | (150,000) |
| | 3,705,341 | 3,694,770 | 3,684,199 | 3,673,628 | 14,757,939 |
| Investments | 152,500 | 152,500 | 152,500 | 152,500 | 610,000 |
| MBS | 853,750 | 853,750 | 853,750 | 853,750 | 3,415,000 |
| Subtotal Interest Income | 4,711,591 | 4,701,020 | 4,690,449 | 4,679,879 | 18,782,939 |
| PA Discount-Investments | (9,145) | (9,145) | (9,145) | (9,145) | (36,581) |
| PA Discount-Loans | 507,819 | 507,819 | 507,819 | 507,819 | 2,031,276 |
| Total Interest Income | 5,210,265 | 5,199,694 | 5,189,123 | 5,178,553 | 20,777,634 |
| Deposits-Trans | 660,289 | 668,491 | 676,693 | 684,896 | 2,690,368 |
| Deposits-CD's Old | 17,201 | 12,286 | 7,372 | 2,457 | 39,316 |
| Deposits-CD's New | 1,224,619 | 1,227,956 | 1,231,294 | 1,234,631 | 4,918,500 |
| FHLB Advances | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 |
| Subtotal Interest Expense | 2,333,608 | 2,340,233 | 2,346,859 | 2,353,484 | 9,374,184 |
| PA Premium-Deposit | (24,312) | (24,312) | (24,312) | (24,312) | (97,249) |
| PA Premium-Advances | (39,898) | (39,898) | (39,898) | (39,898) | (159,591) |
| Total Interest Expense | 2,269,398 | 2,276,023 | 2,282,649 | 2,289,274 | 9,117,344 |
| Net Margin | 2,940,867 | 2,923,671 | 2,906,475 | 2,889,278 | 11,660,290 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1829

| Quarterly Income Statements | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 1 Total | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt | Yr 2 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Provision for Loan Losses | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 |
| NET INTEREST INCOME AFTER PROVISION | 3,536,498 | 3,627,848 | 3,719,197 | 3,810,547 | 14,694,090 | 3,676,464 | 3,652,680 | 3,628,896 | 3,605,112 | 14,563,152 |
| OTHER INCOME | | | | | | | | | | |
| Gain(loss) on Investments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other fees and charges | 150,000 | 150,000 | 150,000 | 150,000 | 600,000 | 154,500 | 154,500 | 154,500 | 154,500 | 618,000 |
| Other income | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 | 25,750 | 25,750 | 25,750 | 25,750 | 103,000 |
| Total other income | 175,000 | 175,000 | 175,000 | 175,000 | 700,000 | 180,250 | 180,250 | 180,250 | 180,250 | 721,000 |
| OTHER EXPENSES | | | | | | | | | | |
| Salaries and employee benefits | 570,000 | 570,000 | 570,000 | 570,000 | 2,280,000 | 587,100 | 587,100 | 587,100 | 587,100 | 2,348,400 |
| Office occupancy, furniture, equipment | 137,000 | 137,000 | 137,000 | 137,000 | 548,000 | 141,110 | 141,110 | 141,110 | 141,110 | 564,440 |
| Depreciation | 38,866 | 38,866 | 38,866 | 38,866 | 155,465 | 34,008 | 34,008 | 34,008 | 34,008 | 136,032 |
| FDIC Premium | 111,268 | 111,268 | 111,268 | 111,268 | 445,073 | 114,606 | 114,606 | 114,606 | 114,606 | 458,425 |
| Advertising | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 | 25,750 | 25,750 | 25,750 | 25,750 | 103,000 |
| Loss from real estate operations | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 | 51,500 | 51,500 | 51,500 | 51,500 | 206,000 |
| Other general and administrative | 597,000 | 597,000 | 597,000 | 597,000 | 2,388,000 | 614,910 | 614,910 | 614,910 | 614,910 | 2,459,640 |
| Total other expenses | 1,529,135 | 1,529,135 | 1,529,135 | 1,529,135 | 6,116,538 | 1,568,984 | 1,568,984 | 1,568,984 | 1,568,984 | 6,275,937 |
| EARNINGS BEFORE INCOME TAXES | 2,182,363 | 2,273,713 | 2,365,063 | 2,456,413 | 9,277,552 | 2,287,730 | 2,263,946 | 2,240,162 | 2,216,378 | 9,008,215 |
| FEDERAL INCOME TAXES | 332,619 | 332,619 | 332,619 | 332,619 | 1,330,476 | 371,050 | 371,050 | 371,050 | 371,050 | 1,484,199 |
| NET EARNINGS | 1,849,744 | 1,941,094 | 2,032,444 | 2,123,794 | 7,947,076 | 1,916,680 | 1,892,896 | 1,869,112 | 1,845,328 | 7,524,017 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1830

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 3 Total | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 4 Total | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt | Yr 5 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Provision for Loan Losses | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 |
| NET INTEREST INCOME AFTER PROVISION | 3,318,593 | 3,293,979 | 3,269,365 | 3,244,752 | 13,126,689 | 3,064,281 | 3,039,880 | 3,015,480 | 2,991,079 | 12,110,719 | 2,815,867 | 2,798,671 | 2,781,475 | 2,764,278 | 11,160,290 |
| OTHER INCOME | | | | | | | | | | | | | | | |
| Gain(loss) on investments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other fees and charges | 159,135 | 159,135 | 159,135 | 159,135 | 636,540 | 163,909 | 163,909 | 163,909 | 163,909 | 655,636 | 168,826 | 168,826 | 168,826 | 168,826 | 675,305 |
| Other income | 26,523 | 26,523 | 26,523 | 26,523 | 106,090 | 27,318 | 27,318 | 27,318 | 27,318 | 109,273 | 28,138 | 28,138 | 28,138 | 28,138 | 112,551 |
| Total other income | 185,658 | 185,658 | 185,658 | 185,658 | 742,630 | 191,227 | 191,227 | 191,227 | 191,227 | 764,909 | 196,964 | 196,964 | 196,964 | 196,964 | 787,856 |
| OTHER EXPENSES | | | | | | | | | | | | | | | |
| Salaries and employee benefits | 604,713 | 604,713 | 604,713 | 604,713 | 2,418,852 | 622,854 | 622,854 | 622,854 | 622,854 | 2,491,418 | 641,540 | 641,540 | 641,540 | 641,540 | 2,566,160 |
| Office occupancy, furniture, equipment | 145,343 | 145,343 | 145,343 | 145,343 | 581,373 | 149,704 | 149,704 | 149,704 | 149,704 | 598,814 | 154,195 | 154,195 | 154,195 | 154,195 | 616,779 |
| Depreciation | 29,757 | 29,757 | 29,757 | 29,757 | 119,028 | 26,037 | 26,037 | 26,037 | 26,037 | 104,149 | 22,783 | 22,783 | 22,783 | 22,783 | 91,131 |
| FDIC Premium | 118,044 | 118,044 | 118,044 | 118,044 | 472,178 | 121,586 | 121,586 | 121,586 | 121,586 | 486,343 | 125,233 | 125,233 | 125,233 | 125,233 | 500,934 |
| Advertising | 26,523 | 26,523 | 26,523 | 26,523 | 106,090 | 27,318 | 27,318 | 27,318 | 27,318 | 109,273 | 28,138 | 28,138 | 28,138 | 28,138 | 112,551 |
| Loss from real estate operations | 53,045 | 53,045 | 53,045 | 53,045 | 212,180 | 54,636 | 54,636 | 54,636 | 54,636 | 218,545 | 56,275 | 56,275 | 56,275 | 56,275 | 225,102 |
| Other general and administrative | 633,357 | 633,357 | 633,357 | 633,357 | 2,533,429 | 652,358 | 652,358 | 652,358 | 652,358 | 2,609,432 | 671,929 | 671,929 | 671,929 | 671,929 | 2,687,715 |
| Total other expenses | 1,610,783 | 1,610,783 | 1,610,783 | 1,610,783 | 6,443,130 | 1,654,494 | 1,654,494 | 1,654,494 | 1,654,494 | 6,617,975 | 1,700,093 | 1,700,093 | 1,700,093 | 1,700,093 | 6,800,371 |
| EARNINGS BEFORE INCOME TAXES | 1,893,468 | 1,868,854 | 1,844,240 | 1,819,626 | 7,426,189 | 1,601,014 | 1,576,614 | 1,552,213 | 1,527,812 | 6,257,653 | 1,312,738 | 1,295,542 | 1,278,346 | 1,261,150 | 5,147,775 |
| FEDERAL INCOME TAXES | 330,016 | 330,016 | 330,016 | 330,016 | 1,320,065 | 287,968 | 287,968 | 287,968 | 287,968 | 1,151,873 | 246,130 | 246,130 | 246,130 | 246,130 | 984,518 |
| NET EARNINGS | 1,563,452 | 1,538,838 | 1,514,224 | 1,489,610 | 6,106,124 | 1,313,046 | 1,288,645 | 1,264,245 | 1,239,844 | 5,105,780 | 1,066,608 | 1,049,412 | 1,032,216 | 1,015,020 | 4,163,257 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1831

San Antonio Federal Savings Bank
Pro Forma Financial Statements

Quarterly Rate Tables

| | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|
| SFR-ARMs New | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% |
| SFR-Fixed | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% |
| SFR-ARMs | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% |
| Multi-Family Fixed | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Multi-Family ARMs | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% |
| Commercial RE-Fixed | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% |
| Commercial RE-ARMs | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% |
| Commercial non-RE | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% |
| Consumer | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% |
| | | | | | | | | |
| Investments | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% |
| MBS | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% |
| | | | | | | | | |
| Deposits-Trans | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% |
| Deposits-CD's Old | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% |
| Deposits-CD's New | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| | | | | | | | | |
| FHLB Advances | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% |
| Inflation/growth factor | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1832

| Quarterly Rate Tables | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SFR-ARMs New | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% |
| SFR-Fixed | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% |
| SFR-ARMs | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% |
| Multi-Family Fixed | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Multi-Family ARMs | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% |
| Commercial RE-Fixed | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% |
| Commercial RE-ARMs | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% |
| Commercial non-RE | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% |
| Consumer | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% |
| Investments | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% |
| MBS | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% |
| Deposits-Trans | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% |
| Deposits-CD's Old | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% |
| Deposits-CD's New | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| FHLB Advances | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% |
| Inflation/growth factor | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1833

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Quarterly Capital Accounts

| | Post PA Balances | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|
| Capital at beginning of period | | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 |
| Earnings for the period | | 1,849,744 | 1,941,094 | 2,032,444 | 2,123,794 | 1,916,680 | 1,892,896 | 1,869,112 | 1,845,328 |
| Dividends Paid | | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) |
| Capital at end of period | | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| General Valuation Allowance | | 125,000 | 250,000 | 375,000 | 500,000 | 625,000 | 750,000 | 875,000 | 1,000,000 |
| Regulatory Capital | | 10,724,744 | 11,540,839 | 12,448,282 | 13,447,076 | 14,238,756 | 15,006,652 | 15,750,765 | 16,471,093 |
| Tangible Capital: | | | | | | | | | |
| Required @ 3.0% | 6,507,709 | 6,500,331 | 6,492,953 | 6,485,575 | 6,478,196 | 6,513,400 | 6,548,603 | 6,583,806 | 6,619,009 |
| Actual | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| Excess Capital | 3,492,291 | 4,099,413 | 4,797,886 | 5,587,708 | 6,468,880 | 7,100,357 | 7,708,050 | 8,291,959 | 8,852,084 |
| Ratio | 4.61% | 4.89% | 5.22% | 5.58% | 6.00% | 6.27% | 6.53% | 6.78% | 7.01% |
| Risk-Based Capital: | | | | | | | | | |
| Required @ 8% | 8,803,000 | 8,924,250 | 9,045,500 | 9,166,750 | 9,288,000 | 9,158,000 | 9,028,000 | 8,898,000 | 8,768,000 |
| Actual | 10,000,000 | 10,861,769 | 11,723,538 | 12,585,307 | 13,447,076 | 14,203,080 | 14,959,084 | 15,715,089 | 16,471,093 |
| Excess Capital | 1,197,000 | 1,937,519 | 2,678,038 | 3,418,557 | 4,159,076 | 5,045,080 | 5,931,084 | 6,817,089 | 7,703,093 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1834

| Quarterly Capital Accounts | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capital at beginning of period | 15,471,093 | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 | 23,499,605 | 24,299,018 | 25,081,234 |
| Earnings for the period | 1,563,452 | 1,538,838 | 1,514,224 | 1,489,610 | 1,313,046 | 1,288,645 | 1,264,245 | 1,239,844 | 1,066,608 | 1,049,412 | 1,032,216 | 1,015,020 |
| Dividends Paid | (750,000) | (750,000) | (750,000) | (750,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) |
| Capital at end of period | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| General Valuation Allowance | 1,125,000 | 1,250,000 | 1,375,000 | 1,500,000 | 1,625,000 | 1,750,000 | 1,875,000 | 2,000,000 | 2,125,000 | 2,250,000 | 2,375,000 | 2,500,000 |
| Regulatory Capital | 17,409,544 | 18,323,382 | 19,212,606 | 20,077,217 | 21,265,263 | 22,428,908 | 23,568,153 | 24,682,997 | 25,624,605 | 26,549,018 | 27,456,234 | 28,346,254 |
| Tangible Capital: | | | | | | | | | | | | |
| Required @ 3.0% | 6,667,121 | 6,705,233 | 6,748,345 | 6,791,457 | 6,843,022 | 6,894,587 | 6,946,153 | 6,997,718 | 7,043,345 | 7,089,012 | 7,134,659 | 7,180,306 |
| Actual | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| Excess Capital | 9,622,424 | 10,368,150 | 11,089,262 | 11,785,760 | 12,797,241 | 13,784,321 | 14,747,000 | 15,685,279 | 16,456,260 | 17,210,006 | 17,946,575 | 18,665,948 |
| Ratio | 7.33% | 7.64% | 7.93% | 8.21% | 8.61% | 9.00% | 9.37% | 9.72% | 10.01% | 10.28% | 10.55% | 10.80% |
| Risk-Based Capital: | | | | | | | | | | | | |
| Required @ 8% | 8,728,750 | 8,689,500 | 8,650,250 | 8,611,000 | 8,592,500 | 8,574,000 | 8,555,500 | 8,537,000 | 8,480,500 | 8,424,000 | 8,367,500 | 8,311,000 |
| Actual | 17,372,624 | 18,274,155 | 19,175,686 | 20,077,217 | 21,228,662 | 22,380,307 | 23,531,552 | 24,682,997 | 25,598,811 | 26,514,625 | 27,430,440 | 28,346,254 |
| Excess Capital | 8,643,874 | 9,584,655 | 10,525,436 | 11,466,217 | 12,636,162 | 13,806,107 | 14,976,052 | 16,145,997 | 17,118,311 | 18,090,625 | 19,062,940 | 20,035,254 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1835

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Quarterly Balance Sheets

| | | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | |
| Cash | 50,000 | 155,382 | 282,561 | 431,538 | 602,312 | 689,005 | 800,721 | 937,463 | 1,099,232 |
| Investment in SAFSB | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| Capitalized Organization Expenses | 667,500 | 611,875 | 556,250 | 500,625 | 445,000 | 389,375 | 333,750 | 278,125 | 222,500 |
| Total Assets | 10,717,500 | 11,367,001 | 12,129,650 | 13,005,445 | 13,994,388 | 14,692,135 | 15,391,123 | 16,091,352 | 16,792,825 |
| LIABILITIES & CAPITAL: | | | | | | | | | |
| American National Bank | 10,250,000 | 9,283,812 | 8,317,624 | 7,351,436 | 6,385,248 | 5,419,045 | 4,312,842 | 3,276,639 | 2,240,436 |
| Other Liabilities | 417,500 | 382,708 | 347,916 | 313,124 | 278,332 | 243,540 | 208,748 | 173,956 | 139,164 |
| Total Liabilities | 10,667,500 | 9,666,520 | 8,665,540 | 7,664,560 | 6,663,580 | 5,592,585 | 4,521,590 | 3,450,595 | 2,379,600 |
| Capital: | | | | | | | | | |
| Paid in Capital | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Retained Earnings | | 1,650,481 | 3,414,109 | 5,290,884 | 7,280,807 | 9,049,549 | 10,819,532 | 12,590,756 | 14,363,223 |
| Total Capital | 50,000 | 1,700,481 | 3,464,109 | 5,340,884 | 7,330,807 | 9,099,549 | 10,869,532 | 12,640,756 | 14,413,224 |
| Liabilities & Capital | 10,717,500 | 11,367,001 | 12,129,650 | 13,005,445 | 13,994,388 | 14,692,135 | 15,391,123 | 16,091,352 | 16,792,825 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1836

| Quarterly Balance Sheets | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | | | | |
| Cash | 1,220,328 | 1,357,693 | 1,510,730 | 1,679,637 | 1,916,437 | 2,153,237 | 2,390,037 | 2,626,837 | 2,863,637 | 3,100,437 | 3,337,237 | 3,574,037 |
| Investment in SAFSB | 16,284,744 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,882,997 | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| Capitalized Organization Expenses | 166,875 | 111,250 | 55,625 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Assets | 17,671,947 | 18,542,325 | 19,403,960 | 20,256,853 | 21,556,700 | 22,832,145 | 24,083,189 | 25,309,833 | 26,363,242 | 27,399,455 | 28,418,470 | 29,420,291 |
| LIABILITIES & CAPITAL: | | | | | | | | | | | | |
| American National Bank | 1,680,327 | 1,120,218 | 360,109 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Liabilities | 104,372 | 69,580 | 36,788 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Liabilities | 1,784,699 | 1,189,798 | 396,898 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital: | | | | | | | | | | | | |
| Paid in Capital | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Retained Earnings | 15,837,248 | 17,302,525 | 18,759,061 | 20,206,853 | 21,506,699 | 22,782,144 | 24,033,189 | 25,259,833 | 26,313,241 | 27,349,454 | 28,368,470 | 29,370,290 |
| Total Capital | 15,887,247 | 17,352,526 | 18,809,061 | 20,256,853 | 21,556,700 | 22,832,145 | 24,083,188 | 25,309,833 | 26,363,242 | 27,399,455 | 28,418,469 | 29,420,291 |
| Liabilities & Capital | 17,671,947 | 18,542,325 | 19,403,960 | 20,256,853 | 21,556,700 | 22,832,145 | 24,083,189 | 25,309,833 | 26,363,242 | 27,399,455 | 28,418,470 | 29,420,291 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1837

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Quarterly Income Statements

| | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|
| Increase in equity of SAFSB | 1,849,744 | 1,941,094 | 2,032,444 | 2,123,794 | 1,914,680 | 1,892,896 | 1,869,112 | 1,845,328 |
| Expense | | | | | | | | |
| Interest Expense | 209,446 | 187,648 | 165,851 | 144,053 | 129,187 | 104,161 | 79,135 | 54,109 |
| Amortization of Org Costs | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 |
| Other Expense | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Pretax Earnings | 1,564,674 | 1,677,821 | 1,790,968 | 1,904,115 | 1,711,869 | 1,713,110 | 1,714,352 | 1,715,594 |
| Tax Treaty | 85,807 | 85,807 | 85,807 | 85,807 | 56,873 | 56,873 | 56,873 | 56,873 |
| Net Earnings | 1,650,481 | 1,763,628 | 1,876,775 | 1,989,923 | 1,768,741 | 1,769,983 | 1,771,225 | 1,772,466 |
| Cash Flow Statement | | | | | | | | |
| Cash In: | | | | | | | | |
| Dividends Received | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 |
| Tax Treaty | 85,807 | 85,807 | 85,807 | 85,807 | 56,873 | 56,873 | 56,873 | 56,873 |
| Total Cash In | 1,335,807 | 1,335,807 | 1,335,807 | 1,335,807 | 1,306,873 | 1,306,873 | 1,306,873 | 1,306,873 |
| Cash Out: | | | | | | | | |
| Interest Expense | 209,446 | 187,648 | 165,851 | 144,053 | 129,187 | 104,161 | 79,135 | 54,109 |
| Organization Expenses | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 |
| Other Expenses | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Principal Repayment | 966,188 | 966,188 | 966,188 | 966,188 | 1,036,203 | 1,036,203 | 1,036,203 | 1,036,203 |
| Total Cash Out | 1,230,426 | 1,208,628 | 1,186,830 | 1,165,033 | 1,220,181 | 1,195,156 | 1,170,130 | 1,145,104 |
| Net Cash | 105,382 | 127,179 | 148,977 | 170,774 | 86,691 | 111,717 | 136,743 | 161,769 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1838

stern Capital Holdings, Inc.
o Forma Financial Statements
arterly Income Statements

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| crease in equity of SAFSB | 1,563,452 | 1,538,838 | 1,514,224 | 1,489,610 | 1,313,046 | 1,288,645 | 1,264,245 | 1,239,844 | 1,066,608 | 1,049,412 | 1,032,216 | 1,015,020 |
| pense | | | | | | | | | | | | |
| terest Expense | 47,610 | 31,740 | 15,869 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ortization of Org Costs | 55,625 | 55,625 | 55,625 | 55,625. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| her Expense | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| etax Earnings | 1,440,217 | 1,431,473 | 1,422,730 | 1,413,985 | 1,293,046 | 1,268,645 | 1,244,245 | 1,219,844 | 1,046,608 | 1,029,412 | 1,012,216 | 995,020 |
| x Treaty | 33,806 | 33,806 | 33,806 | 33,806 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 |
| t Earnings | 1,474,023 | 1,465,279 | 1,456,536 | 1,447,791 | 1,299,846 | 1,275,445 | 1,251,045 | 1,226,644 | 1,053,408 | 1,036,212 | 1,019,016 | 1,001,820 |
| sh Flow Statement | | | | | | | | | | | | |
| sh Ins | | | | | | | | | | | | |
| vidends Received | 750,000 | 750,000 | 750,000 | 750,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| x Treaty | 33,806 | 33,806 | 33,806 | 33,806 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 |
| al Cash In | 783,806 | 783,806 | 783,806 | 783,806 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 |
| st Expense | 47,610 | 31,740 | 15,869 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ganization Expenses | 34,792 | 34,792 | 34,792 | 34,792 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| her Expenses | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| incipal Repayment | 560,109 | 560,109 | 560,109 | 560,109 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| otal Cash Out | 662,510 | 646,640 | 630,770 | 614,901 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| t Cash | 121,296 | 137,166 | 153,036 | 168,905 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1839

# EXHIBIT J

FILE

# HOLLEB & COFF
ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900

WRITER'S DIRECT DIAL (312) ____________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MICHAEL V. CASEY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID I. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOFINGARNER
MARK I. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY

MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE H. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN F. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ

JEFFREY K. ANDERSON
LYNNE M. BAKER
RICHARD G. BERNEY
ALLAN S. BRILLIANT
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
SUSAN WARD COOPER
BRUCE DOPKE
MICHAEL L. ELOWE
KATHRYN J. GERBER
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
KRISTOPHER S. HESTON
PERRI L. IRMER
SHERI A. JORGENSEN
STEVEN P. KAISER
REBECCA L. KENT
BRIAN P. KERWIN
DANIEL L. KRAUS
DAVID A. LISCO
WILLIAM F. LITTLE
JAMES L. LUCARI
JAMES W. MARKS
JAMES T. MARKUS
ALVIN K. MARR
MICHAEL S. MOSTOW

BENJAMIN L. NORTMAN
KATHRYN A. PYSZKA
STUART H. RAPPAPORT
GREGORY G. SCHULER
JULIE L. SCHULZ
THOMAS R. SHAPIRA
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
JANET L. SMERLING
PAUL A. SMYTH
JAMES H. SNYDER
GENE S. STERN
GREGG E. SZILAGYI
MICHAEL S. TAUBETT
JAMES P. TEUFEL
JOHN C. THEISS
MARK H. VAN DE VOORDE
ROBERT S. WEIRT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH

February 2, 1993

Mr. Larry E. Ferries
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Illinois 60601

Dear Larry:

As we discussed, River Valley Savings Bank, F.S.B. ("FSB") would like to enter into a correspondent agreement with San Antonio Federal Savings Bank ("SAFSB") whereby SAFSB would sell certain mortgage loans to FSB. The terms of this proposed arrangement are set forth in a letter dated December, 1992, from Ron Pikus, President of FSB to Richard Dalton, President of SAFSB, a copy of which is enclosed for your convenience.

Both institutions understand that any such arrangement is a covered transaction between affiliates and that they must abide by the quantitative and qualitative restrictions of Sections 563.41 and 563.42 of the OTS Regulations. Moreover, since FSB is subject to a supervisory agreement, we hereby request your prior written approval to enter into the proposed transaction.

If you have any questions concerning the proposed transaction, please do not hesitate to contact Ron Pikus at FSB. If you have any other questions, please do not hesitate to contact me.

We appreciate your prompt consideration of our request.

Yours very truly,

Anne Webber Brody

Anne Webber Brody

AWB:mf
Enclosure
cc: Steven Bangert
Ronald Pikus
Richard Dalton
Mark S. Kipnis

PLAINTIFF'S EXHIBIT
PX 794

Confidential Material — Subject to Protective Order

December 1992

Mr. Richard Dalton
President
San Antonio Federal Savings Bank
801 Nolana Suite 201
McAllen, TX 78504

Dear Richard:

The following represents an agreement whereby San Antonio Federal Savings Bank (SAFSB) would make and/or arrange mortgage loans on residential real estate for sale to River Valley Savings Bank (RVSB).

1. RVSB is interested in residential mortgage loans which meet the following terms:

   a) Eligible Borrower - Individuals who intend to occupy the subject property as their primary residence and who have majority ownership interest in said property. Such applicants will be credit-qualified per the underwriting guidelines of RVSB. Second homes and investment properties meeting the guidelines of Fannie Mae and Freddie Mac will also be eligible.

   b) Loan Product - First mortgage loans on residential single-use real estate no larger than 4 units in size in Texas and Arizona. This agreement shall cover "conventional" type mortgage loans and agency qualifying community homebuyers loans and shall not cover loans insured or guaranteed by the United States of America or any agency or instrumentality thereof, or mortgage loans processed under any state, county or municipal programs. The following options would be available:

      - Conventional Fixed and Adjustable Rate Mortgages ranging up to 30 years.
      - Jumbo loans which exceed the maximum loan amount of the Federal National Mortgage Association (Fannie Mae).
      - Other loan products subsequently as made available.

   c) Maximum Loan Amount - As established by RVSB per product.

   d) Minimum Loan Amount - N/A

   e) Private Mortgage Insurance - Required on all loans with LTV greater than 80% with coverage of 22% which must reduce RVSB'S exposure to no more than 75%.

Confidential Material —
Subject to Protective Order

f) Product Terms - Price and parameters quoted daily by RVSB. A new rate sheet shall be distributed at least weekly via fax machine or mail delivery.

g) Tax Escrows - Tax escrow is required. A sum equal to1/12 of the yearly taxes will be added to the monthly principal and interest payment

h) Hazard Insurance - At closing, a policy and one year's paid receipt must be presented. Borrowers must also pay 1/12 of the annual insurance premium into escrow at closing, and 1/12 of their premium will be added on each monthly payment. The policy should at least cover the amount of the mortgage, have an expiration date, and the mortgage clause should read, "(your institution's name), its successors and assigns".

i) Flood Insurance - If flood insurance is required, provisions in the above paragraph also apply for flood insurance coverage.

2. For loans SAFSB intends to have purchased by RVSB after closing, the following procedures will apply:

a) RVSB shall make available to SAFSB current price quotations for mortgage loans along with information as to loan programs being offered by RVSB. The points listed refer to fees required by RVSB with the acceptable loan package at the corresponding rate. Any points or fees in excess of those listed shall be compensation retained by SAFSB.

b) Upon receipt of a completed application, SAFSB will register the loan the same day with RVSB. Loans must be closed within 60 days and delivered to RVSB no more than 10 days after closing. Loans not closed or delivered within these time periods will be subject to the current market rate and points.

c) SAFSB will have the responsibility for gathering or preparing all documentation for a complete loan package as required by RVSB and based on secondary market mortgage standards. This includes but is not limited to consumer disclosures, satisfactory appraisal, acceptable credit reports, verification of employment/income, and verification of sufficient funds for closing.

d) SAFSB will prepare a secondary market guidelines worksheet as provided by RVSB. This worksheet will be included with a packet of duplicate copies of all documents. Upon delivery to RVSB for the required prior approval, RVSB will evaluate the completed packet and make an approval/disapproval decision within 2 business days. This decision will be reported to SAFSB by phone. In case of approval, a commitment letter will be sent outlining the conditions.

e) SAFSB has full responsibility for closing loans, including the preparation of all pertinent disclosures and loan document

Confidential Material —
Subject to Protective Orde

f) In certain instances, RVSB will fund the loan at closing if the closing takes place at an RVSB approved title company. The following information must be supplied to RVSB: name of mortgage, address of new residence, social security number, tax I.D. of new property, principal amount, monthly payment to include P & I and escrow breakdown, rate, date of first payment, maturity date, date of closing, time of closing, and the contact person at the approved title company. This information and a copy of the disbursement statement to the title company would preferably be supplied to RVSB 3 to 5 business days before closing (a minimum of 24 hours is required). If the date of closing is subsequently delayed, your institution will notify RVSB within 24 hours of the new closing date. The procedures contained in this paragraph will only be applicable to institutions pre-approved by RVSB.

g) At closing, SAFSB is to notify the customer of the loan sale to RVSB and the name of River Valley Savings Bank, FSB as servicer. Payments are due on the first of each month (in arrears) with a grace period of 15 days, otherwise a 5% penalty is assessed on the monthly principal and interest payment due.

3. SAFSB is deemed to make to RVSB and any subsequent purchaser of any mortgage loan originated by you all of the representations and warranties set forth below:

a) SAFSB has no knowledge of any facts and circumstances which would deem the information shown in the loan package to be untrue, inaccurate, or misleading.

b) SAFSB has complied with all applicable Federal and State laws and all consumer credit regulations including equal opportunity, Truth in Lending (Regulation Z), and settlement procedures.

c) The mortgage is a valid, perfected and subsisting lien on the mortgaged property described therein. The mortgage and any security agreements or equivalent documents relating to it have been properly executed, genuine, and what they purport to be, and their terms may be enforced by its successors and assigns.

d) If SAFSB shall breach any of its representations or warranties outlined in paragraph 3 in connection with any mortgage or if any representations or warranties shall otherwiso be untrue for any reason, SAFSB shall upon request of RVSB repurchase the mortgage whether or not SAFSB had actual knowledge of the untruthfulness.

Confidential Material—
Subject to Protective Order

4. Termination of this Agreement may occur by either party with 10 days written notice. However, any files that were registered with RVSB and are still in process and any applications received by RVSB during this 10 day period will be purchased, if approved, under the terms of this Agreement.

If this represents our mutual agreement, please indicate so by endorsing and returning a copy of this proposal at your earliest convenience.

Sincerely,

Ronald M. Pikus
President

ACCEPTED:

______________________ Date: ______________________
Name (Typed)

______________________
Authorized Signatue

Confidential Material —
Subject to Protective Order

# EXHIBIT K

HOLLEB & COFF COPY

ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900

WRITER'S DIRECT DIAL (312)

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MICHAEL V. CASEY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM L. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID L. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOPINGARNER
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ
JEFFREY K. ANDERSON
LYNNE M. BAKER
RICHARD G. BERNET
ALLAN S. BRILLIANT
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
SUSAN WARD COOPER
BRUCE DOPKE
MICHAEL L. ELOWE
KATHRYN J. GERBER
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
KRISTOPHER S. HESTON
PERRI L. IRMER
SHERI A. JORGENSEN
STEVEN P. KAISER
REBECCA L. KENT
BRIAN P. KERWIN
DANIEL L. KRAUS
DAVID A. LISCO
WILLIAM F. LITTLE
JAMES L. LUCARI
JAMES W. MARKS
JAMES T. MARKUS
ALVIN K. MARR
MICHAEL S. MOSTOW
BENJAMIN L. NORTMAN
KATHRYN A. PYSZKA
STUART N. RAPPAPORT
GREGORY G. SCHULER
JULIE L. SCHULTZ
THOMAS B. SHAPIRA
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
JANET L. SMERLING
PAUL A. SMITH
JAMES M. SNYDER
GENE S. STERN
GREGG E. SZILAGYI
MICHAEL S. TALBETT
JAMES P. TEUFEL
JOHN C. THEISS
MARK H. VAN DE VOORDE
ROBERT S. WERT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH

February 2, 1993

Mr. Marion G. "Chip" Kiesewetter
Office of Thrift Supervision
Department of the Treasury
122 West John Carpenter Freeway
Suite 600
Irving, Texas 75039

**VIA FEDERAL EXPRESS**

Dear Chip:

Attached is a draft letter for you to sign memorializing our conversation regarding affiliated transactions between San Antonio Federal Savings Bank and River Valley Savings Bank, F.S.B. If you have any questions or would like to make any changes, do not hesitate to call me or to make the changes. Otherwise, I would appreciate receiving a signed copy of this letter as soon as possible.

Yours very truly,

Anne Webber Brody

AWB:mf

Enclosure

cc: Steven Bangert
Homer J. Holland
Ronald Pikus
Richard Dalton
Mark S. Kipnis

# EXHIBIT L

# BIOGRAPHICAL AND FINANCIAL REPORT

## FINANCIAL STATEMENT

as of August 15, 19 91

### ASSETS

NOTE: If any asset is not owned outright or is recorded as owned in other than your own name solely, please attach a signed explanatory schedule.

| | |
|---|---|
| CASH ON HAND AND IN BANKS | $ 70,000 |
| U.S. GOVERNMENT BONDS | |
| OTHER CREDITOR SECURITIES | |
| STOCKS - SCHEDULE A | 18,830,000 |
| OTHER PROPRIETARY INTERESTS (including Closely Held Corporations) - SCHEDULE A | |
| CASH SURRENDER VALUE OF LIFE INSURANCE | |
| NOTES AND OTHER DEBTS RECEIVABLE | |
| REAL ESTATE OWNED - SCHEDULE B | 1,405,000 |
| OTHER ASSETS - SCHEDULE C | 225,000 |
| TOTAL ASSETS | $ 20,530,000 |

### LIABILITIES

| | |
|---|---|
| NOTES AND ACCOUNTS PAYABLE | $ |
| REAL ESTATE MORTGAGE PAYABLE | 164,000 |
| OTHER DEBTS SECURED BY ASSETS OWNED | |
| OBLIGATIONS - SCHEDULE D | |
| OTHER LIABILITIES | |
| TOTAL LIABILITIES | $ 164,000 |
| NET WORTH | $ 20,366,000 |
| TOTAL LIABILITIES AND NET WORTH | $ 20,530,000 |
| CONTINGENT LIABILITIES - SCHEDULE F | $ 3,865,000 |

List and describe any substantial changes in the above anticipated within the next year:

OTS Form 1393
Rev. January 1991



PLAINTIFF'S EXHIBIT PX 599 A

H&R-B56-00495
Confidential Material - Subject to Protective Order

JA 5452

# EXHIBIT M

# BIOGRAPHICAL AND FINANCIAL REPORT

## FINANCIAL STATEMENT

as of 4-30, 19 91

### ASSETS

NOTE: If any asset is not owned outright or is recorded as owned in other than your own name solely, please attach a signed explanatory schedule.

| | |
|---|---|
| CASH ON HAND AND IN BANKS | $ 2,769,356 |
| U.S. GOVERNMENT BONDS | 246,818 |
| OTHER CREDITOR SECURITIES | -0- |
| STOCKS - SCHEDULE A | 1,315,393 |
| OTHER PROPRIETARY INTERESTS (including Closely Held Corporations) - SCHEDULE A | 14,809,050 |
| CASH SURRENDER VALUE OF LIFE INSURANCE | 150,000 |
| NOTES AND OTHER DEBTS RECEIVABLE | 560,287 |
| REAL ESTATE OWNED - SCHEDULE B | 400,000 |
| OTHER ASSETS - SCHEDULE C | 16,380,000 |
| TOTAL ASSETS | $ 36,630,904 |

### LIABILITIES

| | |
|---|---|
| NOTES AND ACCOUNTS PAYABLE | $ -0- |
| REAL ESTATE MORTGAGE PAYABLE | -0- |
| OTHER DEBTS SECURED BY ASSETS OWNED | -0- |
| OBLIGATIONS - SCHEDULE D | -0- |
| OTHER LIABILITIES | -0- |
| TOTAL LIABILITIES | $ -0- |
| NET WORTH | $ 36,630,904 |
| TOTAL LIABILITIES AND NET WORTH | $ 36,630,904 |
| CONTINGENT LIABILITIES - SCHEDULE F | $ 6,000,000 |

List and describe any substantial changes in the above anticipated within the next year:

PLAINTIFF'S EXHIBIT PX 599-B

OTS Form 1513
Rev. January 1991



H&R-B56-00507
Confidential Material - Subject to Protective Order

JA 5460

# EXHIBIT N

# HOLLEB & COFF

ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900
TELECOPIER (312) 807-3971
WRITER'S DIRECT DIAL (312)________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MORRIS J. COFF
CHRISTOPHER B. COHEN
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM L. GOLDBERG
IRA GOULD
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
MARK D. OLSON
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ
DAVID E. ADELSON
LYNNE M. BAKER
MICHAEL A. BERMAN
RICHARD G. BERNET
BRADLEY S. BLOCK
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
PETER A. DAUZVARDIS
DENISE A. DeLAURENT
BRUCE DOPKE
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
JAMES G. HAFT
MICHAEL D. HAYES
KRISTOPHER S. HESTON
KIRK A. HOOPINGARNER
AARON C. HOROWITZ
DANIEL L. KRAUS
ROGELIO A. LASSO
JAMES W. MARKS
ALVIN K. MARR
STUART N. RAPPAPORT
SUSAN A. RICHMAN
GREGORY G. SCHULER
KENNETH L. SEROKA
KATHRYN BABCOCK SHAFFER
MICHAEL J. SILVERMAN
JANET L. SMERLING
KATHLEEN C. SPEARS
GENE S. STERN
GREGG E. SZILAGYI
MARK H. VAN DE VOORDE
SUSAN K. WARD
ROBERT S. WERT
THOMAS F. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH*

*ADMITTED IN NEW YORK ONLY

October 24, 1991

**VIA MESSENGER**

Mr. Philip A. Gerbick
Deputy Director
Office of Thrift Supervision
Chicago District Office
111 East Wacker Drive
Suite 800
Chicago, Illinois 60601

Re: Amendment to Charter of River Valley Savings Bank, F.S.B. ("River Valley")

Dear Mr. Gerbick:

I am enclosing an original and two (2) conformed copies of the Third Amendment to the Second Supplementary Section of the River Valley Stock Charter certified by Mark Kipnis as Secretary. This Amendment seeks only to modify the dividend rate authorized for the Class C Preferred Stock, One Thousand Dollar ($1,000) par value issued by River Valley. Previously dividends were awarded at a rate of ninety percent (90%) of American National Bank's prime.

We believe that this Amendment is eligible for processing under delegated authority to the District Director in that the proposed Amendment merely changes the dividend rate and as such, the Amendment does not render more difficult or discourage a merger, tender offer, or proxy contest, the assumption of control by a holder of a large block of River Valley's stock, or the removal of incumbent management; nor does it involve a significant issue of law or policy.

HOLLEB & COFF
ATTORNEYS AT LAW



River Valley respectfully requests your prompt consideration and approval of this Amendment. As always, please do not hesitate to contact me if you have any questions concerning this matter.

Yours very truly,

Anne Webber Brody

AWB:mf

Enclosures

cc: Larry E. Ferries w/enclosures
Steven Bangert w/enclosures
Homer J. Holland w/enclosures
Howard R. Ross w/enclosures
Ronald Pikus w/enclosures
Mark S. Kipnis w/enclosures

# EXHIBIT O

**Office of Thrift Supervision**
Department of the Treasury
Central Region
111 East Wacker Drive, Suite 800, Chicago, IL 60601 • (312) 565-5300

**MEMORANDUM**

| | |
|---|---|
| TO: | Chester A. Biedron<br>Deputy Regional Director |
| FROM: | Larry Ferries<br>Manager |
| DATE: | April 10, 1992 |
| SUBJECT: | River Valley Savings Bank, FSB<br>Peoria, Illinois<br>(OTS 08515) |

Notice of Common Stock Dividend

River Valley Savings Bank, FSB ("River Valley") has submitted a notice, pursuant to 12 C.F.R. Section 563.134(c), advising us of its intent to pay a $6 million dividend on its common stock. The following information was provided by River Valley:

| | |
|---|---|
| Dividend Payment Date | May 1, 1992 |
| Amount of Dividend | $6,000,000 |
| Nature of Dividend | Special Dividend on Common Stock for the Redemption of 6,000 shares of Class C preferred stock at par value |

The Supervisory Agreement, dated March 25, 1991, requires that tangible capital be increased to 4.0% of tangible assets at September 30, 1991 and increased to 5.0% of tangible assets at September 30, 1992. As of February 29, 1992, River Valley's tangible capital was 5.17% of tangible assets.

On March 19, 1992, a meeting was held at OTS. In attendance from River Valley were Director, CEO and Treasurer Steven Bangart and Director and Secretary Mark S. Kipnis. Larry Ferries and Ruth Allwardt represented OTS. The meeting was held primarily to discuss the purpose of the proposed $6 million dividend.

Messrs. Bangart and Kipnis explained that River Valley will reduce its assets from the sale of $40 million U.S. treasuries and the sale of $25 million CMO investments. The projected results of this down-sizing, an approximate $350,000 gain on the sales, and operating income during the month of March of approximately $550,000 will increase tangible capital to 6.53% of tangible assets as of March 31, 1992. Subsequently, we have received the actual March numbers and the assets have been reduced to $430 million.

DEFENDANT'S EXHIBIT
DX 677
Holland v. U.S. 95-524C

Dividends

3/0

10-19-92



Messrs. Bangart and Kipnis further stated that the holding company would use the dividend to redeem $6 million of the $7 million preferred stock held by American National Bank ("ANB") as collateral for a $7 million loan from ANB. The preferred stock would be retired. As a result, the loan from ANB would be reduced to $1 million.

Messrs. Bangart and Kipnis submitted a pro forma statement of condition (See attachment). The pro forma indicates that River Valley will maintain a tangible capital ratio in excess of 5.0% through December 1992. The projection was based on $375,000 net income per month or $1,125,000 per quarter. Based on River Valley's past performance, this is a conservative estimate of earnings. For the quarter ended March 31, 1992, River Valley reported net income of $2,138,000.

Pursuant to 12 C.F.R. Section 563.134(b)(2)(i), a Tier 2 institution may make a capital distribution up to 75 percent of its net income over the most recent four-quarter period, if the institution's current capital satisfies the risk-based capital standard that would be applicable to it on January 1, 1993. As shown below, the institution meets the requirements of the regulation.

Dividend and Net Income Analysis:

| Dividends Paid - 12 months | | Net Income Per Quarter | |
|---|---|---|---|
| 03-01-92 | $ 157,000 | 03-31-92 | $2,138,000 |
| 12-31-91 | 177,000 | 12-31-91 | 1,719,000 |
| 09-30-91 | 96,688 | 09-30-91 | 2,974,000 |
| | | 06-30-91 | 2,012,000 |
| Total | $ 430,688 | Total | $8,843,000 |

Capital Ratio Analysis, February 29, 1992:

| | | |
|---|---|---|
| Tangible Capital | $ 26,818 | 5.16% |
| Core Capital | 26,818 | 5.16% |
| Risk-Based Capital* | 34,665 | 13.25% |

*As of December 31, 1991

vl

310

Recommendations

The total of the proposed $6,000,000 capital distribution and dividends paid during the period represents 72.72% of the most recent four-quarter income.

In view of the institution's compliance with the Supervisory Agreement, the capital regulations and recorded profits for the past four quarters, we are of the opinion that the proposed distribution would not have any adverse affect on the financial condition of River Valley. As a result, we recommend that River Valley's capital distribution, on May 1, 1992, be approved. A letter of approval is enclosed for your signature.

Attachments (2)

LEF:ra

APR-09-1992 12:49 FROM RVSB CORPORATE TO 13125655350 P.02

#8515
10-19-92

RIVER VALLEY
Savings Bank FSB

April 9, 1992

Via Fax
Mr. Larry Ferries
Office of Thrift Supervision
111 E. Wacker Drive, Suite 800
Chicago, IL 60601

Dear Mr. Ferries:

You will find River Valley Savings Bank, FSB's March, 1992 financial statements attached.

Our current tangible ratio is 6.4%. If the proposed preferred stock redemption is paid out from available cash, our tangible ratio would be 5.1%.

| Quarter Ended | Income |
|---|---|
| 6/30/91 | 2,012,170 |
| 9/30/91 | 2,973,828 |
| 12/31/91 | 1,718,776 |
| 3/31/92 | 2,138,663 |
| Total | 8,843,437 |

| Quarter Ended | Dividends Paid |
|---|---|
| 6/30/91 | 102,375 |
| 9/30/91 | 96,688 |
| 12/31/91 | 177,000 |
| 3/31/92 | 141,153 |
| Proposed Redemption | 6,000,000 |
| Total | 6,517,216 |

Percentage paid out 73.70%

I believe FSB meets all the benchmarks necessary to allow the redemption of the preferred stock.

Please call me if you have any questions at (309)673-4400, extension 204.

Very truly yours,

Ronald W. Seib

Ronald W. Seib
Senior Vice President
& Chief Financial Officer



Dividends

3/6

RIVER VALLEY SAVINGS BANK, FSB
FINANCIAL STATEMENTS
MARCH, 1992

| | MARCH | FEBRUARY | JANUARY | DECEMBER | NOVEMBER | OCTOBER |
|---|---|---|---|---|---|---|
| ASSETS: | | | | | | |
| CASH & OVERNITE DEPOSITS | 19,413,522 | 12,050,751 | 8,889,505 | 9,429,882 | 10,464,403 | 7,578,015 |
| INVESTMENT SECURITIES | 20,694,884 | 65,725,123 | 40,019,613 | 25,162,424 | 18,919,353 | 19,918,493 |
| FSLIC NOTE | | | | 0 | 0 | 0 |
| MORTGAGE-BACKED SECURITIES | 129,366,012 | 183,226,353 | 204,868,802 | 233,569,121 | 241,463,826 | 257,082,829 |
| LOANS RECEIVABLE: | | | | | | |
| MORTGAGE LOANS | 233,129,008 | 227,893,726 | 225,120,933 | 220,895,944 | 219,792,303 | 220,691,481 |
| OTHER LOANS | 9,378,970 | 9,964,035 | 10,374,831 | 10,562,949 | 11,136,565 | 11,348,083 |
| PROPERTY & EQUIPMENT, NET OF DEPRECIATION | 3,728,682 | 3,622,014 | 3,587,631 | 3,356,287 | 3,226,034 | 3,251,370 |
| REO/REJ, NET OF RESERVES | 2,256,463 | 3,357,915 | 3,387,471 | 3,386,439 | 3,366,009 | 3,316,858 |
| ACCRUED INTEREST - INVESTMENTS | 3,348,532 | 3,951,229 | 3,823,472 | 4,176,050 | 4,810,078 | 4,257,836 |
| ACCRUED INTEREST - LOANS | 3,715,696 | 3,835,291 | 3,792,661 | 3,575,167 | 3,622,589 | 3,163,730 |
| PREPAID & OTHER ASSETS | 5,394,929 | 5,717,848 | 5,435,719 | 2,928,633 | 2,833,525 | 3,030,697 |
| GOODWILL | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL ASSETS | 430,426,690 | 519,344,285 | 509,300,638 | 517,042,896 | 519,634,685 | 533,659,392 |
| LIABILITIES: | | | | | | |
| SAVINGS DEPOSITS | 342,826,584 | 344,015,451 | 345,488,569 | 346,382,315 | 346,061,040 | 345,232,741 |
| BORROWERS' ESCROW | 6,585,403 | 5,927,475 | 6,993,124 | 5,999,597 | 4,872,516 | 3,593,157 |
| FHLB ADVANCES | 25,000,000 | 38,000,000 | 31,000,000 | 40,500,000 | 30,000,000 | 35,000,000 |
| OTHER BORROWED FUNDS | 17,841,990 | 93,255,849 | 90,757,933 | 88,816,056 | 102,804,317 | 116,285,037 |
| ACCRUED EXPENSES & OTHER LIAB. | 10,501,114 | 11,303,029 | 8,944,790 | 9,670,840 | 10,427,311 | 8,947,833 |
| TOTAL LIABILITIES | 402,755,091 | 492,501,804 | 483,184,416 | 491,368,808 | 494,165,184 | 509,058,768 |
| NET WORTH: | | | | | | |
| PREFERRED STOCK | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 | 0 | 0 |
| CAPITAL STOCK & PAID-IN-CAPITAL | 1,459,775 | 1,459,775 | 1,459,775 | 1,459,775 | 1,459,775 | 1,459,775 |
| RETAINED EARNINGS | 17,073,161 | 17,214,314 | 17,214,314 | 8,211,135 | 8,388,135 | 8,388,135 |
| UNDISTRIBUTED PROFIT | 2,138,663 | 1,168,392 | 442,133 | 9,003,178 | 8,621,591 | 7,752,714 |
| TOTAL NET WORTH | 27,671,599 | 26,842,481 | 26,116,222 | 25,674,088 | 25,469,501 | 24,600,624 |
| TOTAL LIABILTIES & NET WORTH | 430,426,690 | 519,344,285 | 509,300,638 | 517,042,896 | 519,634,685 | 533,659,392 |

30

APR-09-1992 12:51 FROM RVSB CORPORATE TO 13125655350 P.04

RIVER VALLEY SAVINGS BANK, FSB
FINANCIAL STATEMENTS
MARCH, 1992

| | MARCH | ANNUALIZED % OF TOTAL ASSETS | FEBRUARY | ANNUALIZED % OF TOTAL ASSETS | YTD 1992 | ANNUALIZED % OF TOTAL ASSETS | YTD 1991 | ANNUALIZED % OF TOTAL ASSETS |
|---|---|---|---|---|---|---|---|---|
| INTEREST INCOME | 4,333,178 | 10.87% | 4,681,394 | 11.17% | 12,793,367 | 10.26% | 14,854,421 | 10.31% |
| INTEREST EXPENSE - DEPOSITS | 1,627,774 | 4.08% | 1,611,071 | 3.84% | 5,056,513 | 4.05% | 6,548,623 | 4.55% |
| INTEREST EXP. - BORR. FUNDS | 1,025,961 | 2.57% | 788,173 | 1.88% | 2,683,787 | 2.15% | 3,369,391 | 2.34% |
| TOTAL INTEREST EXPENSE | 2,653,735 | 6.66% | 2,399,244 | 5.73% | 7,740,300 | 6.21% | 9,918,014 | 6.89% |
| GROSS INTEREST MARGIN | 1,679,443 | 4.21% | 2,282,150 | 5.45% | 5,053,067 | 4.05% | 4,936,407 | 3.43% |
| PROVISION FOR LOAN LOSS | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | (450,000) | -0.31% |
| NET INTEREST MARGIN | 1,679,443 | 4.21% | 2,282,150 | 5.45% | 5,053,067 | 4.05% | 4,486,407 | 3.11% |
| OTHER INCOME | 176,269 | 0.44% | 201,223 | 0.48% | 740,250 | 0.59% | 398,820 | 0.28% |
| OTHER NON-OPERATING INC. | 15,949 | 0.04% | 869 | 0.00% | 20,724 | 0.02% | 128,752 | 0.09% |
| SECURITIES GAINS (LOSSES) | 215,415 | 0.54% | (654,722) | -1.56% | (413,716) | -0.33% | 512,791 | 0.36% |
| TOTAL OTHER INCOME | 407,633 | 1.02% | (452,630) | -1.08% | 347,258 | 0.28% | 1,040,363 | 0.72% |
| SALARY & RELATED EXPENSE | 492,028 | 1.23% | 520,924 | 1.24% | 1,557,142 | 1.25% | 1,199,769 | 0.83% |
| OCCUPANCY & EQUIPMENT | 177,393 | 0.45% | 156,968 | 0.37% | 501,777 | 0.40% | 380,257 | 0.26% |
| REO | 26,539 | 0.07% | 35,686 | 0.09% | 73,338 | 0.06% | 60,019 | 0.04% |
| SAIF & OTS PREMIUMS | 74,392 | 0.19% | 74,392 | 0.18% | 223,176 | 0.18% | 232,699 | 0.16% |
| OUTSIDE SERVICES & EXAMS | 144,410 | 0.36% | 105,721 | 0.25% | 353,378 | 0.28% | 597,929 | 0.42% |
| OTHER OPERATING EXPENSE | 148,696 | 0.37% | 145,223 | 0.35% | 477,511 | 0.38% | 465,289 | 0.32% |
| SUBTOTAL OTHER EXPENSE | 1,063,458 | 2.67% | 1,038,914 | 2.48% | 3,186,322 | 2.56% | 2,935,962 | 2.04% |
| OPERATING EARNINGS | 1,023,618 | 2.57% | 790,606 | 1.89% | 2,214,003 | 1.78% | 2,590,808 | 1.80% |
| PA - GOODWILL | 5,653 | 0.01% | 5,653 | 0.01% | 16,959 | 0.01% | (10,224) | -0.01% |
| NET INCOME BEFORE TAXES | 1,029,271 | 2.58% | 796,259 | 1.90% | 2,230,962 | 1.79% | 2,580,584 | 1.79% |
| INCOME TAXES | (59,000) | -0.15% | (70,000) | -0.17% | (92,299) | -0.07% | 282,180 | 0.20% |
| NET INCOME | 970,271 | 2.43% | 726,259 | 1.73% | 2,138,663 | 1.71% | 2,298,404 | 1.60% |

TOTAL P.04

Dividends

3/0

# EXHIBIT P

COPY

DEFERRED COMPENSATION AGREEMENT

AGREEMENT made as of December 1, 1991, between River Valley Holdings, Inc. ("the Corporation"), an Illinois corporation, and Homer J. Holland, Chairman of the Board of Directors of the Corporation ("the Employee").

The Employee has rendered, and will be rendering, valuable services to the Corporation and its subsidiaries, including, but not limited to, River Valley Savings Bank, F.S.B. ("FSB"), and it is the desire of the Corporation to have the benefit of the Employee's continued loyalty, service and counsel and also to assist the Employee in providing for the contingencies of death and old-age dependency. Therefore, it is agreed:

Section 1. Deferred Compensation. In consideration of the past and continuing performance of service by the Employee on the Corporation's behalf, the Corporation shall establish an account on its books in the Employee's name in the amount of $3,505,673.00 payable in the manner and subject to the conditions set forth below.

Section 2. Interest to be Accrued. Interest shall accrue on the amount set forth in the Employee's account, from time to time, at a rate equal to the highest interest rate FSB is then paying for borrowed funds in amounts in excess of One Million and No/100 Dollars ($1,000,000.00).

Section 3. Payment of Deferred Compensation. The Corporation shall pay, to the Employee (or the Employee's estate in the event of the Employee's death) monies from the account established in Section 1 upon the first to occur of the following:

a) the Employee's death; or
b) the sale or transfer of all or substantially all of the Employee's stock in the Corporation; or
c) the sale or transfer of all or substantially all of the stock or assets of the Corporation or all or substantially all of the stock or assets of FSB.

The Corporation shall make payments in five equal annual principal installments (interest shall continue to accrue on the unpaid balance) beginning on the first day of the month subsequent to the occurrence of (a) or (b) and all in cash on (c). The Corporation may prepay without premium or penalty. Any event described in (c) shall immediately accelerate all payments due and owing under (a) or (b).

For the purposes of this Section, "substantially all" is defined as eighty percent (80%). Should the Employee's ownership interest fall below ten percent (10%) of the Corporation's issued and outstanding stock at any one time, not necessarily resulting from one

DEFENDANT'S EXHIBIT
DX 626
Holland v. U.S. 95-524C

H&R-B03-00247

transaction, he will be deemed to have sold substantially all of his stock.

Section 4. Life Insurance Acceleration of Payment. The Corporation may, in it sole discretion, elect to purchase life insurance on the life of the Employee, the proceeds of which, if and only if the Corporation so designates, shall be applied to the first installments as soon as received, and if these life insurance proceeds equal or exceed what would otherwise constitute the first installment under Section 3, the life insurance proceeds shall be paid over (to the extent of the full amount payable), and any balance due shall be paid in four equal annual installments beginning on the first day of the month one year subsequent to the Employee's death.

Section 5. Alienation. No interest created by this Agreement may be sold, assigned, transferred, conveyed, hypothecated, encumbered, anticipated, or otherwise disposed of, and such interest shall not be subject to any liability or obligation of the Employee or his spouse, nor to attachment, garnishment, execution, or other legal process for payment of any claim against any such person or his property.

Section 6. No Employment Contract. This Agreement is not an employment contract and nothing contained herein shall require the Corporation to employ the Employee or prohibit the adjustment from time to time of the terms of employment of the Employee, including his then current compensation and other benefits to which he may otherwise then be entitled.

Section 7. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties.

Section 8. Entire Agreement. This Agreement supersedes all other agreements previously made between the parties or FSB relating to its subject matter. There are no other understandings or agreements.

Section 9. Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have signed and sealed this Agreement.

Corporate Seal

Attest:

Secretary

RIVER VALLEY HOLDINGS, INC.

By: ____________________

Homer Holland

H&R-B03-00248

# EXHIBIT Q

DEFERRED COMPENSATION AGREEMENT

AGREEMENT made as of November 1, 1991, between River Valley Holdings, Inc. ("the Corporation"), an Illinois corporation, and Steven Bangert, President of the Corporation ("the Employee").

The Employee has rendered, and will be rendering, valuable services to the Corporation and its subsidiaries, including, but not limited to, River Valley Savings Bank, F.S.B. ("FSB"), and it is the desire of the Corporation to have the benefit of the Employee's continued loyalty, service and counsel and also to assist the Employee in providing for the contingencies of death and old-age dependency. Therefore, it is agreed:

Section 1. Deferred Compensation. In consideration of the past and continuing performance of service by the Employee on the Corporation's behalf, the Corporation shall establish an account on its books in the Employee's name in the amount of $2,123,059.00 payable in the manner and subject to the conditions set forth below.

Section 2. Interest to be Accrued. Interest shall accrue on the amount set forth in the Employee's account, from and after the time the first installment is due, at a rate equal to the highest interest rate FSB is then paying for borrowed funds in amounts in excess of One Million and No/100 Dollars ($1,000,000.00).

Section 3. Payment of Deferred Compensation. The Corporation shall pay to the Employee (or the Employee's estate in the event of the Employee's death) monies from the account established in Section 1 upon the first to occur of the following:

a) termination of Employee's employment; or
b) the Employee's death; or
c) the sale or transfer of all or substantially all of the Employee's stock or option rights to acquire stock in the Corporation; or
d) the sale or transfer of all or substantially all of the stock or assets of the Corporation or all or substantially all of the stock or assets of FSB.

The Corporation shall make payments in five equal annual principal installments (interest shall accrue on the unpaid balance, as provided in Section 2 above) beginning on the first day of the month subsequent to the occurrence of (a), (b) or (c) and all in cash on (d). The Corporation may prepay without premium or penalty. Any event described in (d) shall immediately accelerate all payments due and owing under (a), (b) or (c).

For the purposes of this Section, "substantially all" is defined as eighty percent (80%). Should the Employee's ownership interest or option rights to acquire stock fall below one percent (1%) of

PLAINTIFF'S EXHIBIT PX 629

H&R-B03-00277

JA 5647

the Corporation's issued and outstanding stock at any one time, not necessarily resulting from one transaction, he will be deemed to have sold substantially all of his stock or option rights to acquire stock.

Section 4. Life Insurance Acceleration of Payment. The Corporation may, in it sole discretion, elect to purchase life insurance on the life of the Employee, the proceeds of which, if and only if the Corporation so designates, shall be applied to the first installments as soon as received, and if these life insurance proceeds equal or exceed what would otherwise constitute the first installment under Section 3, the life insurance proceeds shall be paid over (to the extent of the full amount payable), and any balance due shall be paid in four equal annual installments beginning on the first day of the month one year subsequent to the Employee's death.

Section 5. Alienation. No interest created by this Agreement may be sold, assigned, transferred, conveyed, hypothecated, encumbered, anticipated, or otherwise disposed of, and such interest shall not be subject to any liability or obligation of the Employee or his spouse, nor to attachment, garnishment, execution, or other legal process for payment of any claim against any such person or his property.

Section 6. No Employment Contract. This Agreement is not an employment contract and nothing contained herein shall require the Corporation to employ the Employee or prohibit the adjustment from time to time of the terms of employment of the Employee, including his then current compensation and other benefits to which he may otherwise then be entitled.

Section 7. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties.

Section 8. Entire Agreement. This Agreement supersedes all other agreements previously made between the parties or FSB relating to its subject matter. There are no other understandings or agreements.

Section 9. Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have signed and sealed this Agreement.

Corporate Seal

Attest:

Secretary

RIVER VALLEY HOLDINGS, INC.

By:

Steven Bangert

H&R-B03-00278

JA 5648

# EXHIBIT R

HOLLEB & COFF
ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900
WRITER'S DIRECT DIAL (312) 807-4618

MORRIS J. COFF (1924-1993)

LEWIS R. BARON
NORMAN B. BERGER
ALLAN S. BRILLIANT
ANNE WEBBER BRODY
MICHAEL V. CASEY
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE L. DAVIDSON
PAUL R. DIAMOND
BRUCE DOPKE
ERIC M. FOGEL
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD M. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID I. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOPINGARNER
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
DANIEL L. KRAUS
JEFFREY KUTA
JEWEL LAFONTANT-MANKARIOUS
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN F. LEV
IRVING B. LEVINSON
KENNETH P. LORCH
NICHOLAS J. LYNN
PETER R. MANIS
STEPHEN A. MARCUS
JAMES W. MARKS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
BEVERLY FUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT B. STIGGER
TOM WECHTER
JEROME B. WEXLER
THOMAS P. WHITE
J. MICHAEL WILLIAMS
ALLAN A. WULFSTAT
EDWARD E. YALOWITZ

AIDA M. ALAKA
LYNNE M. BAKER
RICHARD G. BERNETT
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
ROBERT A. COHEN
JUDITH M. FELLER
ANDREW J. FIELKEN
PAUL A. GILMAN
LORI A. GOLDSTEIN
EDWARD J. GREEN
PAMELA A. GREGORY
STEVEN P. GROSSFIELD
TRICIA J. HARTMAN*
KRISTOPHER S. HISTON
PERRI L. IRMER
SCOTT H. KENIG
REBECCA L. KENT
BRIAN P. KERWIN
ANNA E. KONDELL
ANNE E. LINK
DONALD R. LORENZEN
JAMES L. LUCARI
*ALVIN K. MARR
MICHAEL S. MOSTOW
BENJAMIN L. NORTMAN
DAVID A. O'TOOLE
NANCY A. PETERMAN
KATHRYN A. PYSZKA
EDWARD D. RICKERT
KENNETH B. ROLLIN
KENNETH CLARK SCHIRLE
GREGORY C. SCHULER
JULIE L. SCHULZ
JEFFREY M. SCHWARTZ
THOMAS B. SHAPIRA
STEVEN H. SHAPIRO
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
PAUL A. SMITH
JAMES M. SNYDER
GENE S. STERN
MICHAEL S. TALBERT
JAMES P. TEUFEL
SUSAN K. WARD
ROBERT S. WEST

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
JILL A. OLSWANGER
MARTIN H. REDISH

*ADMITTED IN CALIFORNIA ONLY

December 27, 1994

**VIA FEDERAL EXPRESS**

Homer J. Holland
c/o Curtis H. Stewart
1916 Janelle Way
Sandpoint, Idaho 83864

Re: Deferred Compensation Agreement Payment

Dear Homer:

Pursuant to Frank O'Connor's suggestion, enclosed please find a Unanimous Written Consent.

Please execute same where indicated and return in the enclosed Federal Express envelope. I will then obtain Howard and Ron's signatures and have the fully executed counterpart filed in the Holdings minute book.

Very truly yours,

[signature]

Mark S. Kipnis

MSK/aw
Enclosures

DEFENDANT'S EXHIBIT
DX 1555
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.

H&R-B04-1
Confidential Material
Subject to Protective Order

UNANIMOUS WRITTEN CONSENT
OF THE SHAREHOLDERS OF
RIVER VALLEY HOLDINGS, INC.

The undersigned, being all of the shareholders and beneficial owners of River Valley Holdings, Inc. ("Holdings"), hereby consent to and adopt the following resolutions in lieu of an annual or special meeting:

WHEREAS, Holdings has previously paid Steven Bangert and Homer Holland certain lumpsum payments in full and complete settlement of all obligations of Holdings under certain deferred compensation agreements entered into by and between Holdings and Bangert and Holland, respectively; and

WHEREAS, the shareholders have received certain Notices regarding the payments in the forms collectively attached as Exhibit A to this Consent;

BE IT RESOLVED, that the shareholders acknowledge receipt of the Notices and that the shareholders approve of the right of Bangert and Holland to retain their respective payments (Mr. Holland abstaining with respect to his own payment).

Homer J. Holland

Howard R. Ross

Being all of the shareholders of Holdings

Ronald Pikus

Mark S. Kipnis

(Being respective holders of minority beneficial interest in Holdings)

5048741.WP

H&R-B04-2
Confidential Material
Subject to Protective Order

EXHIBIT A

**NOTICE TO SHAREHOLDERS OF RIVER VALLEY HOLDINGS, INC. REGARDING PAYMENTS PURSUANT TO VARIOUS DEFERRED COMPENSATION AGREEMENTS**

River Valley Holdings, Inc. ("RVH") entered into an agreement with Homer J. Holland ("Holland") on December 1, 1991 to provide for the payment of $3,505,673. Under the agreement, Holland would be entitled to payment upon (1) death, (2) sale or transfer of all or substantially all of his stock in RVH, or (3) sale or transfer of all or substantially all of the stock or assets of RVH or substantially all of the stock or assets of River Valley Savings Bank, FSB ("RVB"). In the case of the first two events, the amount was to be paid in five annual installments with interest. In the case of the last event, the amount was to be paid in a lumpsum payment.

On December 20, 1993, the agreement was amended by the Board of Directors of RVH to provide for an immediate payout in December, 1993 of the entire $3,505,673. Holland was paid the $3,505,673 on December 31, 1993.

Pursuant to section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), certain payments to disqualified individuals are treated as parachute payments. A parachute payment is any payment that is in the nature of compensation (made to a disqualified individual) which is contingent on a change in the ownership or control of a corporation or in the ownership of a substantial portion of the assets of a corporation. A payment made pursuant to an amendment that modifies a previous agreement in any significant respect (if the amendment is made within one year before the date of a change in ownership or control) is presumed to be contingent on such change unless the contrary is established by clear and convincing evidence.

Section 280G further provides that to the extent that excess parachute payments are made to a disqualified individual, then no deduction shall be permitted to the corporation for any parachute amounts made in excess of a base amount.

It would appear that all or a portion of the $3,505,673 payment to Holland may be treated as a parachute payment. However, if 75 percent of the shareholders approve Holland retaining the payment, then none of the $3,505,673 would be treated as a parachute payment.

Therefore, RVH requests that the shareholders approve of the right of Holland to retain the $3,505,673 paid to him on December 31, 1993.

5048713.01

H&R-B04-3
Confidential Material
Subject to Protective Order

EXHIBIT A

**NOTICE TO SHAREHOLDERS OF RIVER VALLEY HOLDINGS, INC.
REGARDING PAYMENTS PURSUANT TO VARIOUS
DEFERRED COMPENSATION AGREEMENTS**

River Valley Holdings, Inc. ("RVH") entered into an agreement with Steven Bangert ("Bangert") on November 1, 1991 to provide for the payment of $2,123,059. Under the agreement, Bangert would be entitled to payment upon (1) termination of employment, (2) death, (3) sale or transfer of all or substantially all of his stock or option rights to acquire stock in RVH, or (4) sale or transfer of all or substantially all of the stock or assets of River Valley Savings Bank, FSB ("RVB"). In the case of the first three events, the amount was to be paid in five annual installments with interest. In the case of the last event, the amount was to be paid in a lumpsum payment.

On December 20, 1993, the agreement was amended by the Board of Directors of RVH to provide for an immediate payout in December, 1993 of the entire $2,123,059. Bangert was paid the $2,123,059 on December 31, 1993.

Pursuant to section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), certain payments to disqualified individuals are treated as parachute payments. A parachute payment is any payment that is in the nature of compensation (made to a disqualified individual) which is contingent on a change in the ownership or control of a corporation or in the ownership of a substantial portion of the assets of a corporation. A payment made pursuant to an amendment that modifies a previous agreement in any significant respect (if the amendment is made within one year before the date of a change in ownership or control) is presumed to be contingent on such change unless the contrary is established by clear and convincing evidence.

Section 280G further provides that to the extent that excess parachute payments are made to a disqualified individual, then no deduction shall be permitted to the corporation for any parachute amounts made in excess of a base amount.

It would appear that all or a portion of the $2,123,059 payment to Bangert may be treated as a parachute payment. However, if 75 percent of the shareholders approve Bangert retaining the payment, then none of the $2,123,059 would be treated as a parachute payment.

Therefore, RVH requests that the shareholders approve of the right of Bangert to retain the $2,123,059 paid to him on December 31, 1993.

5048709.01

H&R-B04-4
Confidential Material
Subject to Protective Order

# EXHIBIT S

# RIVER VALLEY SAVINGS BANK
# ACQUISITION AND CAPITAL PLAN
# SEPTEMBER, 1989

## Purpose

The purpose of this paper is to describe River Valley Savings Bank's plan to acquire an insolvent savings institution with assistance from the Resolution Trust Corporation ("RTC"). The plan includes the sale of $7.5 million common stock in order to augment River Valley's capital structure.

## Background

Homer Holland and Howard Ross own 100% of the common stock of two savings institutions: River Valley Savings Bank, Rock Falls, Illinois; and River Valley Savings Bank, F.S.B, Peoria, Illinois. As of July 31, 1989, River Valley Savings Bank, Rock Falls had total assets of $214 million, while River Valley Savings Bank, F.S.B., Peoria had assets of $414 million. The two River Valley Savings Banks are the result of the merger of six institutions in 1988:

**Rock Falls Savings & Loan Association** - This healthy, state-chartered stock association was acquired by Ross and Holland in 1985. In 1987, the Association's name was changed to River Valley Savings Bank.

**Republic Savings of South Beloit** - This insolvent institution was merged into River Valley Savings Bank in July, 1988. FSLIC provided a cash infusion of $17 million and 80% capital loss coverage on selected assets.

**Home Federal Savings & Loan of Peoria, Mutual Savings & Loan Association of Canton, and Galva Federal Savings and Loan Association** - These three insolvent institutions were merged together in July, 1988 as River Valley Savings Bank, F.S.B., Peoria. The FSLIC provided a cash infusion of $36 million, 90% loss coverage on selected assets, and invested $5 million in F.S.B.'s Series A Preferred Stock.

**Peoria Savings and Loan Association** - This insolvent institution was merged into River Valley Savings Bank, F.S.B. in December, 1988. The FSLIC provided $3.3 million in cash and a $13.2 million, ten-year note, paying LIBOR + 1.75%.

Holland and Ross intend to merge the two River Valley's upon the acquisition of another institution, or at year end 1989, whichever is sooner. (For simplicity, we shall refer to River Valley as if it were a single entity and that the merger of the two River Valleys had already been accomplished.)



PLAINTIFF'S EXHIBIT PX-5

P.A. 1372

H&R-B44-1392
Confidential Material
Subject to Protective Order

## River Valley's Business Strategy

River Valley's strategy is to provide retail banking services in communities of Central and Northern Illinois, excluding the Chicago SMSA. (See Exhibit 1 for a description of River Valley branches and offices.) River Valley seeks to become one of the largest providers of retail banking services in each of the communities it serves. Currently, River Valley is the largest savings institution headquartered in Peoria, Illinois.

A principal tenet of River Valley's philosophy is to operate with minimal interest rate or credit risk. River Valley has demonstrated that a savings institution can operate profitably with minimal risk. Credit risk is minimized by focusing on relatively low risk residential mortgages and mortgage backed securities. With some minor exceptions, River Valley does not originate or purchase commercial and industrial loans or commercial real estate loans. Fifty-nine percent of total earning assets are in government-backed or investment grade mortgage-backed and other securities.

Among the whole loans in the portfolio, credit risk is further reduced through diversification including the purchase of loans from outside River Valley's local communities. As a result, River Valley's loan portfolio has only limited concentration in any single community.

River Valley operates under a number of disciplines to insure minimal interest rate risk. Asset and liability decisions, including pricing of loans and deposits, are centralized in a special purpose management subsidiary, Holland Partners, Inc. Holland Partners constantly monitors the potential effects of interest rate changes on net interest income spreads and balance sheet values. Holland Partners has been able to meet the objective of maintaining River Valley's one-year interest rate gap within plus or minus 5% with a duration gap of less than six months. Holland Partners measures its performance by the increase in the mark-to-market value of River Valley's net assets. (See Exhibit 2 for a description of Holland Partners, Inc.)



H&R-B44-1393
Confidential Material
Subject to Protective Order

**River Valley's Financial Performance**

The acquisitions negotiated with FSLIC and River Valley's operating strategy have produced excellent results. The same mark-to-market discipline used in the negotiation of the acquisitions has been used to operate the thrifts. As a result, balance sheet restructuring to achieve River Valley's risk profile was accomplished quickly and only modest goodwill was created.

Table 1 below summarizes River Valley's combined earnings performance through July 31, 1989 and estimates total earnings for 1989. Since River Valley enjoys the benefit of approximately $57 million of pre-acquisition tax loss carryforwards, GAAP accounting requires a charge in lieu of taxes, which reduces goodwill. Thus, the most meaningful measure of financial performance for River Valley is not Net Income, but Operating Earnings (which could also be termed Change in Tangible Net Worth).

TABLE 1

River Valley
Earnings Performance
(000)
Seven Months Ending

| | Actual 1/1/89 to 7/31/89 | % of Assets | Projected 1/1/89 to 12/21/89 | % of Assets |
|---|---|---|---|---|
| Net Interest Income | $ 7,830 | 2.11% | $12,946 | 2.04% |
| Other Income | 2,746 | 0.74% | 4,652 | 0.73% |
| Total Income | 10,576 | 2.85% | 17,598 | 2.77% |
| Operating Expense Net Before Interest on Subordinated Debt | (6,442) | -1.73% | (11,156) | -1.76% |
| Interest on Sub Debt | (444) | -0.12% | (742) | -0.12% |
| Operating Earnings | 3,690 | 1.00% | 5,700 | 0.89% |
| Amortization of Goodwill, including Charge in Lieu of Taxes | (1,658) | -.45% | (2,605) | -.41% |
| Net Income | $ 2,032 | 0.55% | 3,095 | 0.48% |
| Preferred Dividends | | | (1,500) | -0.24% |
| Change in Retained Earnings | | | $ 1,595 | 0.24% |





H&R-B44-1394
Confidential Material
Subject to Protective Order

**Balance Sheet and Capital Structure**

River Valley's balance sheet and capital structure are outlined in Table 3. (See Exhibit 3 for audited financial statements.)

TABLE 2

River Valley
Balance Sheet and Capital Structure
(000)
July 31, 1989

| | |
|---|---|
| ASSETS | |
| Cash | $26,873 |
| Investment Securities | 33,346 |
| FDIC Note | 13,200 |
| Mortgage-backed Securities | 282,375 |
| Loans | 244,673 |
| Property & Equipment | 4,001 |
| REO/REJ | 4,812 |
| Other Assets | 15,125 |
| Goodwill | 3,721 |
| Total Assets | $628,126 |
| LIABILITIES | |
| Deposits | $381,054 |
| FHLB Advances | 36,778 |
| Other Borrowings | 171,356 |
| Other Liabilities | 15,388 |
| Total Liabilities | $604,576 |
| CAPITAL | |
| Subordinated Debt | $6,600 |
| Preferred Stock | 10,006 |
| Common Stockholder's Equity | 6,944 |
| Total Capital | $23,550 |

A description of the subordinated debt and preferred stock components of River Valley's capital structure follows:

**Subordinated Debt:** $6.6 million of subordinated debt, balloon payment due July 1998, interest floats at prime + .33%. Held by American National Bank of Chicago. Ross and Holland granted put options to American National of $3.3 million each.

**Preferred Stock**

**Series A:** $5 million of non-voting, perpetual, preferred, callable at par, held by the FDIC. Cumulative dividends equal to 8% plus .25 times an amount equal to GAAP net income less .004 of total assets and less $400 thousand.



H&R-B44-1395
Confidential Material
Subject to Protective Order

Series C: $5 million of non-voting, perpetual, 10% cumulative preferred stock. Held by Ross and Holland. (American National Corporation has agreed to purchase the Series C preferred modified with a non-cumulative dividend equal to 90% of prime and a put option to Ross and Holland, subject to regulatory approval.)

Series D,E,F: $6 thousand par value issued to management in lieu of bonuses or stock options.

Series D: Pays $175 thousand annual dividend to Ross.

Series E: Pays $300 thousand annual dividend to Holland. Accrues supplemental dividends equal to 30% of annual increase in mark-to-market value above $2 million. Supplemental dividend capped at $750 thousand annually.

Series F: Pays annual dividend up to $125 thousand to Steve Bangert, Executive Vice President, Holland Partners, Inc. Accrues supplemental dividend equal to 5% of annual increase in mark-to-market value (less the cash portion paid).



H&R-B44-1396
Confidential Material
Subject to Protective Order

**Planned Acquisition**

River Valley will propose to the RTC the acquisition of an insolvent savings institution in River Valley's market area. For planning purposes, the target institution, after the infusion of cash from the RTC, has the following assets and liabilities:

TABLE 3

Balance Sheet of Target Institution
After RTC Assistance
(000)

| | |
|---|---|
| Assets | |
| Cash | $ 20,000 |
| Securities | 179,500 |
| Loans | 130,000 |
| Other Assets | 8,000 |
| Goodwill | 2,500 |
| Total Assets | $340,000 |
| Liabilities | |
| Deposits | $230,000 |
| Borrowings | 100,000 |
| Other Liabilities | 10,000 |
| Total Liabilities | $340,000 |

River Valley's proposal will seek an RTC cash infusion sufficient to make up the target institution's deficit net worth on a marked-to-market basis, less a 1% deposit premium. The deposit premium of $2.5 million is reflected in the balance sheet as goodwill.

The target institution operates with annual operating expenses equal to $5.3 million and annual fee income (service charges, loan fees, and other non interest income) of $1.5 million.



H&R-B44-1397
Confidential Material
Subject to Protective Order

## Projected Results of the Combination

The following planning assumptions are used to project income statement and balance sheet results of the combined River Valley for the next five years.

**Borrowings Repaid:** $200 million of borrowings will be repaid from the liquidation of assets and the FDIC cash infusion; $100 million at River Valley and $100 million at Target.

**Net Interest Income Increases:** It is assumed that Net Interest Income increases immediately by $4.425 million as a net result of $2.25% earned on $230 million of Target Deposits and Other Liabilities less .75% on $100 million of River Valley borrowings reduced.

**Operating Expenses Are Reduced:** It is assumed that the consolidation of activities will produce operating efficiencies allowing a reduction from 2.10% on total assets in 1990 to 1.95% in 1991 and 1.75% in 1992 and thereafter.

**Deposits Grow at 7% Annually After an Initial Decline:** It is assumed that deposits grow at 7% annually after a 7% decline in 1990 and no growth in 1991. Deposit growth provides an improvement in net interest income equal to 1.25% on new deposits.

**Asset Growth Controlled by Capital Levels:** Asset growth will be constrained to insure compliance with regulatory capital to asset ratios while also allowing for the redemption of Series A and Series C preferred stock.

**New Capital of $7.5 Million Infused:** It is assumed that common stockholder's equity is increased by $7.5 million pursuant to a stock offering to close simultaneous with the merger. Net Interest Income increases by $750 thousand (10% on $7.5 million).



H&R-B44-1398
Confidential Material
Subject to Protective Order

The above planning assumptions lead to the following projected balance sheet snd income statements for the combined institution:

TABLE 4

**Projected Balance Sheet**
**Assumes Acquisition of**
**Target on January 1, 1990**

**As of January 1**
**(000's**

| | 1990 | 1991 | [illegible]992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|
| **ASSETS:** | | | | | | |
| Cash | $ 33,926 | $ 36,301 | $ [illegible]342 | $ 41,561 | $ 44,470 | $ 47,583 |
| FDIC Note | 13,200 | 13,200 | [illegible]3,200 | 13,200 | 13,200 | 13,200 |
| Securities | 315,721 | 374,266 | 3[illegible]22 | 368,090 | 395,114 | 424,014 |
| Loans | 374,673 | 400,900 | 42[illegible]63 | 458,991 | 491,120 | 525,493 |
| Other Tangible Assets | 31,938 | 34,174 | 3[illegible]586 | 39,125 | 41,864 | 44,795 |
| Goodwill | 5,581 | 2,300 | [illegible]100 | 1,900 | 1,700 | 1,500 |
| Total Assets | $775,039 | $861,141 | $82[illegible]493 | $922,867 | $987,468 | $1,056,590 |
| **LIABILITIES:** | | | | | | |
| Deposits | $ 611,054 | $568,280 | $5[illegible]280 | $608,060 | $650,624 | $ 696,168 |
| Other borrowed Funds | 108,134 | 233,769 | 2[illegible]747 | 250,343 | 262,313 | 275,277 |
| Other Liabilitites | 25,388 | 26,657 | [illegible]990 | 29,390 | 30,859 | 32,402 |
| Total Liabilities | $744,576 | $828,706 | $8[illegible]018 | $887,792 | $943,796 | $1,003,847 |
| **CAPITAL:** | | | | | | |
| Sub. Debt | $ 6,600 | $ 6,600 | $ [illegible]500 | $ 6,600 | $ 6,600 | $ 6,600 |
| Preferred Stock | 10,006 | 10,006 | [illegible]006 | 6 | 6 | 6 |
| Common Stock | 7,635 | 7,635 | [illegible]535 | 7,635 | 7,635 | 7,635 |
| Retained Earnings | 6,222 | 8,193 | [illegible]234 | 20,834 | 29,431 | 38,502 |
| TOTAL CAPITAL | $ 30,463 | $ 32,434 | $ [illegible]2,475 | $ 35,075 | $ 43,672 | $ 52,743 |
| TOTAL LIABILITIES & CAPITAL | $775,039 | $861,141 | $82[illegible]493 | $922,867 | $987,468 | $1,056,590 |





H&R-B44-1399
Confidential Material
Subject to Protective Order

TABLE 5

Projected
Income Statement
for years ending December 31
(000,000)

| | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Net Interest Income | $17,371 | $17,665 | $17,665 | $18,726 | $19,803 |
| Other Income | 6,152 | 6,583 | 7,043 | 7,536 | 8,064 |
| Total Income | $23,523 | $24,248 | $24,708 | $26,262 | $27,867 |
| Operating Expense Before Interest) on Sub. Debt | ($16,456) | ($16,792) | ($15,093) | ($16,150 | ($17,280) |
| Interest on Sub. Debt | (715) | (715) | (715) | (715) | (715) |
| Operating Earnings | $ 6,352 | $ 6,741 | $ 8,900 | $ 9,397 | $ 9,872 |
| Amortization of Goodwill, including Charge in Lieu of Taxes | (2,881) | (200) | (200) | (200) | (200) |
| Net Income | 3,471 | 6,541 | 8,700 | 9,197 | 9,672 |
| Preferred Dividends | (1,500) | (1,500) | (1,100) | (600) | (600) |
| Increase in Retained Earnings | $ 1,971 | $ 5,041 | $ 7,600 | $ 8,597 | $ 9,072 |





H&R-B44-1400
Confidential Material
Subject to Protective Order

**SUMMARY**

River Valley Savings Bank will propose to the RTC a plan to acquire an insolvent institution in River Valley's market area. The plan includes the sale of $7.5 million of common stock.

Assuming a continuation of River Valley's business strategy and the benefit of certain operating efficiencies from the merger, the combined institution is projected to earn $10.4 million by calendar year 1994 and to accumulate a total book value of $46.1 million.



H&R-B44-1401
Confidential Material
Subject to Protective Order

# EXHIBIT 1

## RIVER VALLEY LOCATIONS

| Branches | Deposits (000,000) |
|---|---|
| Jefferson Street, Peoria | $ 49.1 |
| Sterling Ave., Peoria | 44.6 |
| Adams Street, Peoria | 43.5 |
| University Ave., Peoria | 38.1 |
| Canton | 35.5 |
| Rock Falls | 34.7 |
| Knoxville Ave., Peoria | 28.1 |
| South Beloit | 22.2 |
| Sterling | 20.6 |
| Bartonville | 20.0 |
| Roscoe | 18.7 |
| Galva | 10.4 |

**Other Offices**

Aurora - River Valley Mortgage Services
Washington Street, Chicago - Holland Partners, Inc.
Michigan Avenue, Chicago - Loan Office



H&R-B44-1402
Confidential Material
Subject to Protective Order

EXHIBIT 2

## HOLLAND PARTNERS, INC.

Holland Partners, Inc. was founded in 1983 by Homer J. Holland (formerly President, Exchange National Bank of Chicago and Senior Vice President, First National Bank of Chicago) as a bank management consulting firm to provide executive level management services to banks and savings and loan associations. Through 1986, the firm focused primarily on chief executive/chief operating officer assignments for thrifts in Illinois and neighboring states together with a limited number of financial strategy studies. These first three years provided the firm with the opportunity to work closely with the thrift regulators and to become particularly sensitive to the challenges facing the savings and loan industry. These assignments have also presented the individual partners with a number of opportunities, as each of the original partners has gone on to take ownership interests and management positions in former client institutions.

In 1987, Holland Partners acquired additional skills to address the investment and asset/liability management functions for financial services institutions. With these additional resources, the firm now provides one of the most critical areas of expertise required for the success and survival of financial institutions.

In 1988, Holland Partners acquired skills in residential loan servicing, loan administration, and residential mortgage securitization. In 1989, a marketing senior vice president was hired to provide another facet of bank management capability for Holland Partners' client organizations.

## ASSET/LIABILITY MANAGEMENT

Volatile interest rates place financial institutions in the position of no longer being able to accept the risk inherent in their portfolios. The ability to effectively manage assets and liabilities, as well as the always onerous interest rate risk, is essential. Ever changing interest rates, continued deregulation of the industry, securitization of mortgage products, shrinking of net interest margin and an constantly growing array of investment products present continuing challenges. However, these also offer multiple opportunities for improved profitability.

The key to survival lies in the ability of the institution to adapt to the realities of the marketplace. The ability to minimize risk, while maximizing return, becomes more challenging as higher cost liabilities and lower yielding quality assets continue to erode the net interest margin. The need for active portfolio management and an understanding of the effects of changing market conditions upon the value of both the portfolio and the institution is essential.

At Holland Partners, an understanding of and the importance of the preservation of value, not only in the investment portfolio but of the institution as a whole, is the foundation of our investment philosophy and strategy. By evaluating the institution from a "net bond" perspective, we feel that we can structure the institution's balance sheet in a manner which allows for a comfortable level of interest rate risk while affording the maximum net interest margin. The "net bond" represents the difference in duration between the asset and liability portfolios, and is a key measurement for estimating the institution's future performance over a wide range of intermediate and long term interest rate cycles. By effectively managing the net bond portfolio mismatch, we are able to quickly and efficiently increase or decrease the duration mismatch for rapidly changing conditions. Pricing of both assets and liabilities at comfortable levels off of the Treasury yield curve, coupled with prudent use of the secondary markets and tools such as swaps, CAP and Collars, affords the institution the ability to continue to profitably do business in all interest rate scenarios. The effective use of hedging tools to offset pricing inefficiencies in the market is essential to successful net bond portfolio management. Hedging tools give an active portfolio manager the ability to react quickly to changes in market conditions.

Holland Partners works with the client's management team in developing objectives for the client's institution as well as the portfolio. We work to incorporate the client's management philosophy into the operating plan and evaluate the portfolio potential for the institution.. After review and approval of the proposed operating strategy, we will implement the strategy within predetermined constraints. Trading activity will be updated orally on a daily basis and in writing on a weekly basis. We encourage input/feedback from the client's management team and highly recommend monthly meetings to discuss and modify operating strategy.

Our primary concern is the protection of the value of the institution with an emphasis on long-term profitability. We feel that the quality of the asset does not have to suffer in an effort to maintain net interest margin. Through the prudent use of the ever changing instruments and markets, we at Holland Partners can improve the profitability of your Institution. As the marketplace continues to evolve, the opportunities to profit from these changes increase. To ignore change is to ignore opportunity. To effectively exploit change requires prudent use of the instruments and the technology which accompany change, as well as a thorough understanding of both. HPI offers an experienced personnel staff who are continually updating their expertise through attendance at seminars, the utilization of research literature and services of brokerage firms, acedemic coursework and subscriptions to professional and trade journals and periodicals. We have in-house access to state-of-the-art analystics systems which allows us to evaluate trading opportunities and financial instruments from a historical perspective as well as the forecasted results.



H&R-B44-1404
Confidential Material
Subject to Protective Order

HOLLAND PARTNERS MANAGEMENT

**HOMER J. HOLLAND**, President: Holland founded Holland Partners in 198_ to provide financial and executive level management services for financial service institututions. He has over sixteen years of senior level management experience in the financial service industry and brings extensive experience in the management and operations areas.

Significant assignments since founding Holland Partners have included: CEO (and 50% owner) of two savings banks with assets of $650 million; COO of a $_ billion savings and loan under FSLIC supervision and pending sale to a bank holding company; CEO for a $500 million savings bank and a $2.5 billion mortgage banking company.

Prior to founding Holland Partners, Holland was president of the Exchange National Bank of Chicago, where he directed a significant turnaround and engineered the largest bank merger in Chicago in 20 years. Earlier he was Senior Vice President of the First National Bank of Chicago with responsibilities including: Senior Vice President, Head of Administrative Department; Vice President, Head of Retail Banking; Vice President, Head of Data Processing; and Assistant Vice President, Head of Ship Financing.

Holland's military career culminated in the Office of the Chief of Staff of the Pentagon. His educational achievements include a doctorate in Business Administration from George Washington University, Masters of Science in Physics and in Electrical Engineering from Massachusetts Institute of Technology, and a Bachelor of Science degree from the U.S. Military Academy at West Point where he graduated first in his class.

**STEVEN BANGERT**, Executive Vice President: Mr. Bangert joined Holland Partners in March, 1987 to enhance the expertise in the asset/liability management and investment portfolio management areas. His responsibilities include interest rate risk management, hedging, investment strategies and management, balance sheet and investment portfolio structure, as well as asset and liability pricing. Mr. Bangert brings expertise in the areas of mortgage-backed securities, whole loans, risk controlled arbitrages, interest rate swaps, caps and locks, as well as synthetic and derivative securities.

Mr. Bangert came from a $2 billion savings and loan in Denver where he was Vice President of Rate Risk Management and Loan Marketing. He played an integral part in the creation and development of the Rate Risk Management Department which was key to the profitability of the institution. In recognition of his achievements in the area of interest rate risk management, Mr. Bangert has been a keynote speaker at seminars sponsored by the FHLB in Topeka and San Francisco, the Financial Managers Society National Convention, and the American Bankers Convention. Other responsibilities in Denver included the management of the asset/liability department, the loan marketing department and the money desk.



H&R-B44-1405
Confidential Material
Subject to Protective Order

Mr. Bangert received a Bachelor of Science, with an emphasis in Finance, from the University of Nebraska. He has over ten years of financial and managerial experience in the savings and loan industry.

**RONALD M. PIKUS**, Senior Vice President: Mr. Pikus, who joined Holland Partners in August, 1988, is responsible for the coordination of financial and regulatory reporting for the savings banks and also oversees the loan administration function. The Bank has defined "loan administration" to encompass the operational areas of loan servicing, quality control, and secondary market loan packaging. As Vice President of The Federation of Financial Institutions, a $1 billion loan servicing/consulting company, he had day-to-day management responsibilities for loan servicing and investor reporting. In addition, he established and managed the secondary marketing division of The Federation which assisted in the sale/securitization of over $700 million of mortgages during 1987/1988.

Mr. Pikus holds both MS and MBA degrees and is also a Certified Public Accountant. He has over eighteen years of experience in the thrift and mortgage banking industries.

**DENNIS SCHREIBER**, Senior Vice President - Marketing: Mr. Schreiber joined Holland Partners in June, 1989 in order to expand the marketing program for the savings banks.

Mr. Schreiber came to Holland Partners with extensive experience in the marketing and advertising areas. His twenty-four year career in communications and financial management includes sixteen years with The First National Bank of Chicago, as Advertising Manager (most recently), Banking Center Manager and Director of Customer Relations. As Advertising Manager, Mr. Schreiber was responsible for all aspects television, radio, print, and outdoor media advertising, as well as direct mail campaigns, collateral materials, sales promotions, and point-of purchase displays. While at First Chicago, he developed and executed advertising strategies and tactics to preserve and grow the Bank's market share, and was responsible for the conceptual development and management of an integrated project to standardize the environments of the Bank's 40+ branches.

During a nine-year career with the United States Navy, Mr. Schreiber, as Lieutenant Commander, served as Assistant to the Assistant Secretary of the Navy for Financial Management, and functioned as liaison with congressional staffs and executives at the highest level of the Department of Defense.

Mr. Schreiber holds a Master of Business Administration Degree, Financial Management from the George Washington University, and a Bachelor of Arts Degree, Psychology from Miami University.

**RICHARD J. DALTON**, Vice President: Mr. Dalton joined Holland Partners in April, 1987, in the continuing effort to expand the asset/liability management and investment portfolio areas. His responsibilities include investment strategy, execution, and management. He is also responsible for support work in interest rate risk management and portfolio structure, as well as analytical



H&R-B44-1406
Confidential Material
Subject to Protective Order

support work. Mr. Dalton brings expertise in mortgage-backed securities, interest rate swaps, locks and caps, as well as extensive computer modeling experience.

Mr. Dalton came from a $2 billion savings and loan in Denver where he was actively involved in the rate risk mangement department. His responsibilities included mortgage backed securities trading, arbitrage trading activities and interest rate risk management reporting.

Mr. Dalton received his Masters of Business Administration, with an emphasis in Finance, from the University of Colorado and a Bachelor of Science from the University of Southern Colorado. He has over six years of experience in the savings and loan industry.

**SHARON KRISTOF**, Vice President: Sharon Kristof joined the management group of Holland Partners, Inc. in August, 1988. Ms. Kristof develops and implements mortgage banking functions at savings and loan associations, including underwriting for second markets, quality control and securitization.

Prior to joining Holland Partners, Ms. Kristof spent three years at The Federation of Financial Institutions, Inc., in Cicero, Illinois. Responsibilities at The Federation included investor reporting, mortgage loan quality control review for various client institutions, purchase and sale of servicing rights, securitization of approximately one-half billion dollars of mortgage loans to FHLMC, FNMA, and private investors, and various aspects of general loan servicing.

Ms. Kristof received a Bachelor of Arts degree with a major in accounting from Governors State University, Illinois and is also a Certified Public Accountant. She has four years of experience in the savings and loan/mortgage banking industry.




Confidential Material
Subject to Protective Order

# EXHIBIT T

REGULAR MEETING OF THE BOARD OF DIRECTORS

RIVER VALLEY SAVINGS BANK

The regular meeting of the Board of Directors of River Valley Savings Bank was held at the offices of the Sterling Branch Office of River Valley Savings Bank, 215 Third Avenue, Sterling, Illinois, on Tuesday, December 20, 1988.

Chairman Ross called the meeting to order at 3:20 P.M. and Secretary Marcele Waldschmidt recorded the following members present:

| | |
|---|---|
| HOWARD R. ROSS | HOMER J. HOLLAND |
| CALVIN L. MORGAN | JOHN A. LAWRENCE |
| MARK S. KIPNIS | HARVEY HADDON |

Also present were Kennard Besse, Steve Bangert, Peter Church, and Marcele Waldschmidt.

Haddon moved, Lawrence seconded, to approve the minutes of the November 16, 1988, regular board meeting.

Voting: Aye 6 Nay 0

Kipnis moved, Morgan seconded, to approve the November 30, 1988, report to the Commissioner of Savings and Loans, Balance Sheet, and Income and Expense Report.

Voting: Aye 6 Nay 0

The Board reviewed the Portfolio Overview as of November 30, 1988.

Holland reported on the status of the possible merger of River Valley Savings Bank FSB and Peoria Savings.

After discussion, Kipnis moved, Holland seconded, a resolution to accept a bid from Peat Marwick Main & Co., Peoria, Illinois, to do the auditing and tax accounting for all offices of River Valley Savings Banks.(copy attached)

Voting: Aye 6 Nay 0

Holland presented a report on the status of work being done on benefits for River Valley Savings Bank employees.

Haddon excused himself at 4:35 P.M.

Holland moved, Lawrence seconded, to approve loans and releases as shown on the November 30, 1988, loan report for Rock Falls.

Voting: Aye 5 Nay 0

DEFENDANT'S EXHIBIT
DX 194
Holland v. U.S. 95-524C

H&R-B51-757
Confidential Material
Subject to Protective Order

Morgan presented the delinquent loan report for Rock Falls and contents were noted. He also reviewed real estate owned and in judgement.

Kipnis moved, Holland seconded, to approve loans and releases as shown on the November 30, 1988, loan report for South Beloit.

Voting: Aye 5 Nay 0

Church presented the delinquent loan report for South Beloit and contents were noted. He also reviewed real estate owned and in judgement.

Motion by Morgan, seconded by Lawrence, to adopt the following resolution effective as of November 29, 1988, in lieu of a special meeting. (copy attached)

Voting: Aye 5 Nay 0

Mr. Kipnis next reported that dividends were due and payable under the Class "D" Preferred Stock, Class "E" Preferred Stock, and Class "F" Preferred Stock. The institution's Net Adjusted Liquidation Value as of November 30, 1988, before payment of dividends, was $9,451,000 of which $3,451,000 (9,451,000-6,000,000) constitutes Earnings for Class "E" Preferred Stock and Class "F" Preferred Stock purposes. After review and extended discussion, Morgan moved, Lawrence seconded, that the following dividends be paid January 3, 1989:

Class "D" Preferred Stock: $ 75,000;

Class "E" Preferred Stock: $500,000, of which $125,000 is payable in cash and $375,000 accrues as provided in said Class "E" Preferred Stock;

Class "F" Preferred Stock: 5% of Earnings, being $172,550, as defined in the Class "F" Preferred Stock, $62,500 of which is currently payable and $110,000 accrues as provided in said Class "F" Preferred Stock;

and that the beginning Net Adjusted Liquidation Value for computation purposes for determining Class "E" Preferred Stock and Class "F" Preferred Stock Earnings for the fiscal year ending November 30, 1989, is $8,703,000 (9,451,000 - 262,500 cash dividends - 485,050 accrued dividends).

Voting: Aye 5 Nay 0

The Board next considered that certain November 29, 1988, Agreement providing additional compensation to Steven Bangert under certain circumstances. After extended discussion, Kipnis moved, Morgan seconded, that the Agreement be ratified and confirmed by this institution and that the existing common stock certificates have notations affixed on the reverse sides respectively thereof that reflect the existence of said agreement.

Voting: Aye 5 Nay 0

H&R-B51-758
Confidential Material
Subject to Protective Order

Morgan moved, Lawrence seconded, a resolution for the next Board of Directors Meeting to be held at Jumers Castle Lodge, 117 North Western, Peoria, Illinos, on Thursday January 26, 1989, at 10:00 A.M.

Voting Aye 5 Nay 0

Meeting adjourned at 6:05 P.M.

Calvin L. Morgan
PRESIDENT

[signature]
SECRETARY

H&R-B51-759
Confidential Material
Subject to Protective Order

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PHO003 0458

# EXHIBIT U

REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION
CHICAGO DISTRICT OFFICE

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| RIVER VALLEY SAVINGS BANK, FSB<br>200 Southwest Jefferson Street<br>Peoria, Illinois 61602 | 7 | 08515 |
| | Type of Examination | |
| | Federal Regular | |

Examination commenced: August 20, 1990
Examination concluded: November 8, 1990

Service Corporations and Other Affiliates Which Are a Part of This Report:
Peoria Savers Development Inc.
River Valley Insurance Services, Inc.
River Valley Financial Services, Inc.
P.S. Capital Corporation

Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor.

If a subpoena or other legal process is received calling for production of this document, the District Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 505 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, should review this report thoroughly. This report should not be considered an audit report.

EXHIBIT
PENGAD-Bayonne N.J.
Burgert 2
CRK 7-27-00

PLAINTIFF'S EXHIBIT PX 457

8-20-90

EF-6

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER F WON034 1059

REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION
CHICAGO DISTRICT OFFICE

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| RIVER VALLEY SAVINGS BANK, FSB | 7 | 08515 |
| 200 Southwest Jefferson Street | Type of Examination | |
| Peoria, Illinois 61602 | Federal Regular | |

Examination commenced: August 20, 1990

Members of the Board:

As required by the Rules and Regulations for Insurance of Accounts, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends which impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate.

/s/Gary J. Curtin, F.T.R.
Examiner-in-Charge
Office of Thrift Supervision

8-20-90

BF-6

Date: August 20, 19 Docket No.: 08515

INDEX AND ABBREVIATIONS

Page

Report Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 - 4

Management, Asset Quality, Capital, Risk Management, Operating Results, and Miscellaneous . . . . . . . . . . . . . . . . . . . . . 5 - 35

APPENDIX

Outstanding Enforcement Actions . . . . . . . . . . . . . . None . . A - 1.1

Directors, Principal Officers and Attorneys . . . . . . . . . . . . . A - 2.1

Principal Operating Committees . . . . . . . . . . . . . . . . . . . A - 3.1

Statement of Condition . . . . . . . . . . . . . . . . . . . . . . . A - 4.1

Statement of Operations. . . . . . . . . . . . . . . . . . . . . . . A - 5.1

Key Ratios . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 6.1

Deposit/Liability Page . . . . . . . . . . . . . . . . . . . . . . . A - 7.1

Deposit from Other Financial Institutions . . . . . . . . . None . . A - 8.1

Summary of Criticized Assets . . . . . . . . . . . . . . . . . . . . A - 9.1

Summary of Action Required by Criticized Assets . . . . . . . . . . A - 11.1

Classified Assets . . . . . . . . . . . . . . . . . . . . . . . . . A - 12.1

Assets Subject to Special Mention . . . . . . . . . . . . . . . . . A - 13.1

Loans in Process and Commitments . . . . . . . . . . . . . . . . . . A - 14.1

Concentrations . . . . . . . . . . . . . . . . . . . . . Omitted . . A - 15.1

Gap Report Assumptions. . . . . . . . . . . . . . . . . . . . . . . A - 16.1



8-20-90 EPL

Date: August 20, 199                                        Docket No.: 08515

## INDEX AND ABBREVIATIONS


| | Page |
|---|---|
| Interest Rate Risk Exposure Report . . . . . . . . . . . . . . . . . . . . . | A - 17.1 |
| Service Corporations . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A - 23.1 |
| Other Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | A - 24.1 |
| Financial Reporting Errors . . . . . . . . . . . . . . . . . . . . . . . . . | A - 25.1 |
| Violations of Laws or Regulations . . . . . . . . . . . . . . . . . . . . . | A - 26.1 |


## ABBREVIATIONS USED IN THIS REPORT

P = President
EVP = Executive Vice President
VP = Vice President
CB. = Chairman of the Board
MO = Managing Officer
CEO = Chief Executive Officer
COO = Chief Operations Officer
SVP = Senior Vice President
AVP = Assistant Vice President
S = Secretary
AS = Assistant Secretary
T = Treasurer
AT = Assistant Treasurer
C = Controller
D = Director
AD = Advisory Director
DE = Director Emeritus
A = Attorney
FVP = First Vice President
SO = Savings Officer
* = Omitted, no items of concern
# = Not applicable or none



8-20-90                                        EFB

WON034 1062 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 - CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

REPORT SUMMARY

A comprehensive report of examination ("Report") of the institution was begun on August 20, 1990, using financial data as of July 31, 1990. A review of the wholly-owned service corporation was included in the examination process.

Overview

The comments in the Report of Examination discuss several major areas of concern which require immediate corrective action by the Board. Losses disclosed during the examination have rendered the institution a capital failure at July 31, 1990. Other major areas of concern were the level of classified assets and transactions between affiliates.

Compliance with Capital Regulations

The institution was not in compliance with the capital requirement of 12 C.F.R. Section 567.2 at July 31, 1990. Tangible capital was $4,428,000 or 1.1% of tangible assets at July 31, 1990, after losses identified during the examination are recognized. The tangible requirement was $6,250,000 at July 31, 1990. After capital was adjusted by losses contained in this report core and risk-based capital were short of the required levels by $1,822,000 and $147,000, respectively.

The continued operation of this institution without an adequate level of capital is an unacceptable practice that must be corrected immediately. The board is directed to submit to this office a plan detailing management's strategy to maintain capital at adequate levels.

Compensation

Ross

Salaries and bonuses paid to Messers. Holland and Rose appear to be excessive. The board is directed to review the salaries and bonuses of Messrs. Holland and Ross to determine if they are reasonable and in compliance with 12 C.F.R. section 563.161(b). The findings of that review will be submitted to OTS manager for review.



8-20-90 E-P-6

WON034 1063 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Investment Activity

The investment portfolio is managed by an affiliated company, Holland Partners, Inc. (HI). HPI maintains financial modeling capabilities for all of the mortgage derivatives. Individual files are maintained for each investment including updated scenario analyses. Mortgage derivatives are accounted for under Financial Accounting Standards 91 (SFAS 91). However, the minutes of the board of directors meetings did not contain any written rationale for the investment in high risk mortgage derivatives. The institution must document that the board is fully informed. The rationale for the investment in these instruments should be included in the presentation to the board and documented accordingly. In addition, the hedging characteristics of these investments need to be established prior to investment and on a regular basis thereafter. The board is directed to keep this office informed of activity in this area through the use of reports being developed for this purpose.

In the future, residual and interest only stripped mortgage backed securities which do not have hedge value should be accounted for at the Lower of Cost or Market (LOCOM). The examiners recommend that the institution not purchase any additional high risk mortgage derivatives until the institution is in compliance with the fully phased-in capital requirements.

The institution had an investment of $65.3 million in residuals purchased for tax purposes (Phantoms). These assets were purchased to take advantage of tax-loss carryforwards. The institution has not identified the regular portion of these residuals for its hedge value nor has it analyzed the returns under different interest rate scenarios. The examiners recommend that the institution prepare a quarterly estimate of the expected phantom income and loss for all phantom residuals. This estimate should also show the expected phantom income and loss over the life of the collateralized mortgage obligation (CMO). In addition, management should review the assets for potential unidentified risks.

Borrowings

As of July 31, 1990, borrowing under reverse repurchase agreements and fixed coupon dollar reverse repurchase agreements totaled $125.3 million or 30.2% of liabilities. This amount is excessive. The examiners recommend that the balance of these borrowings be reduced. In addition, it is required that the underlying securities be retained in portfolio unencumbered for 35 consecutive days in each 12 month period. — why?

Futures

In April and May 1990, the institution entered into various Treasury note futures contracts matched against fixed rate private pass-through securities maintained in portfolio. These positions were open for periods ranging from five to 22 days. The examiners recommend that losses from futures positions open for short time periods be recognized over the time period for which they offer protection against interest rate changes, not the life of the matched asset or liability.



8-20-90

EF-6

WON034 1064 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Classified Assets

At July 31, 1990, the institution's level of classified assets totaled $7,152,228 or 95.6% of the sum of tangible capital and general valuation allowances. After classified losses were applied against reserves, the result was $6,532,804 or 125.7% of the tangible capital and general valuation total.

Due to the above mentioned items and other lending-related problems discussed elsewhere in this report, the Board is directed to provide this office with its plan to reduce the level of classified assets. In addition, the Board is directed to submit to this office a revised commercial lending policy. These items should be provided to this office within 60 days.

Executive Committee Minutes

The examination revealed that the full board of directors had not approved minutes of the executive committee in all instances. It is the responsibility of the Board to implement procedures to ensure that proper oversight is conducted. The Board is directed to institute procedures to ensure that actions of the principal operating committees are ratified by the directorate. The Board, as part of its response to this report, should provide a detail of these procedures.

Board of Director Expense Accounts

Directors' expense accounts are not brought to the attention of the full Board. Presently, these expense accounts receive the approval of President Ronald Pikus. The expense account activity becomes noteworthy on occasion. ← ?? Expense account activity should receive periodic approval by the board of directors. The Board is directed to submit to this office planned revisions to current approval procedures.

Chairman Ross' Chicago Office

It is inappropriate for the institution to pay for the rental on the office which is not used exclusively on the business of the institution. Please provide this office with an explanation of why this expense has been assumed by the institution. Also provide this office with a detail of what will be done to correct this situation. Although this was discussed at the examiners' meetings with management and the board, a written response is required to clarify this issue and formalize your position.



8-20-90

5F6

WON034 1065 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990

Docket No.: 08515

Federal Reserve Act Sections 23A, 23B and 22h

The institution engaged in transactions with affiliated parties which resulted in violations of the Federal Reserve Act. These transactions if continued without remedy, could result in the assessment of civil money penalties. It was noted that some of these exceptions will be corrected by the merger of the two River Valley institutions. The Board is directed to submit to this office a description of actions taken to address the requirements of the above noted regulations.

Based on the analysis performed during this examination, your institution has been assigned a composite rating of "4". The composite rating is a qualitative assessement of all the MACRO performance factors. Institutions in this group generally have an inadequate level of capital, or a combination of other conditions that are unsatisfactory. Major and serious problems or unsafe and unsound conditions may exist which are not being satisfactorily resolved by the institution. Unless prompt action is taken to correct these conditions, they could reasonably develop into a situation that could impair future viability. A potential for failure is present but is not pronounced. Institutions in this category require close supervisory attention and financial surveillance. Institutions with a positive net worth but that do not meet regulatory required minimal capital requirements would normally be assigned this rating. Also, profitable institutions that meet regulatory capital requirements, but have negative tangible capital, may be assigned this rating. (Tangible capital is defined as capital, less intangible assets such as goodwill and deferred losses.)



8-20-90

EPG

Date: August 20, 1990 Docket No.: 08515

## MANAGEMENT

A comprehensive review of the management area was performed to evaluate the supervision and administration performed by the directors and management. This review included an analysis of established objectives, policies, and the effectiveness of management's implementation of those policies and objectives. Reports to the board and internal review systems were assessed.

The institution's full board has not been sufficiently informed of all significant decisions affecting the institution. Transactions with affiliated organizations have resulted in violations of Sections 23A and 23B of the Federal Reserve Act. Board member expense account activity has not received approval. On January 24, 1990, a new managing officer assumed responsibilities. The directorate experienced numerous changes during the review period.

1. Executive Committee Minutes

Executive committee actions have not always received approval from the board of directors. The full directorate, comprised of 12 members, meets on a quarterly basis. The institution's executive committee holds meetings on the intervening months that the full board does not meet. The committee, which consists of Homer J. Holland, Howard R. Ross and Steven Bangert, was empowered by the board with extensive authority. According to the institution's bylaws, the executive committee shall have all of the authority of the board of directors with the exception of declaring dividends, amending the charter or bylaws, and disposition of substantial assets of the institution. The committee minutes were sporadically reviewed and approved.

A review of the quarterly board packets revealed that the executive committee minutes reviewed were only for the meetings immediately preceding the regular board meeting. The examiners note that it is the responsibility of the board members to be informed of all decisions affecting the safety and soundness of the institution.

The executive committee approved management bonuses totaling $262,500 that directly benefited the members of the committee. This is a violation of the institution's bylaws and 12 C.F.R. Section 552.6-1(g).

Mr. Ronald Pikus said that management has not been as attentive as it should have been to insure that all executive committee minutes were included in each quarterly board package, approved and the approval so noted in the minutes of that Board of Directors' meeting. Mr. Pikus said that all executive committee minutes will be compiled and presented to the board for their approval at the October 1990 meeting. He added, that to insure that all future committee minutes are presented to the board, the minutes of all meetings will become an agenda item and approval so noted in the meeting.



8-20-90 EF-6

WON034 1067 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Mr. Pikus said that the executive committee was not aware of the regulation regarding beneficial approvals. He said that the bonuses in question have received full board approval. Mr. Pikus added that bonuses or management fees directly benefiting Howard Ross, Homer Holland or Steven Bangert will be initiated and approved by the full board of directors.

2. Affiliated Transactions

The institution engaged in transactions with affiliated parties, River Valley SB, Rock Falls and Holland Partners Inc. (HPI), that resulted in violations of Sections 23A and 23B of the Federal Reserve Act. HPI is a wholly-owned subsidiary of River Valley Savings Bank, Rock Falls. In addition, a loan to an institution officer was granted at favorable terms and constituted a violation of Section 22(h) of the Federal Reserve Act (12 U.S.C. Section 375b). Specifically, the following violations were noted:

A. Competitive bids were not obtained prior to the signing of a consulting service agreement between HPI and the institution [Section 23B(a)(1)(A)]. HPI has performed executive management functions for the institution since its inception. A consulting agreement between HPI and the institution was executed on July 31, 1990. Among the services performed by HPI according to the agreement are marketing, pipeline management, portfolio management, mergers and acquisitions. The current monthly fee is approximately $76,000. Prior to the July 31, 1990 agreement the monthly fee was $97,500.

Mr. Pikus said that the value of the consulting services provided by HPI to the institution is tied to the unique levels of expertise which each segment of the HPI group possess. He said that management is not aware of any one consulting firm which combines the executive, asset/liability and marketing management talent specializing in the thrift business as the HPI group does.

Mr. Pikus added that the pricing structure of the consulting agreement was developed in such a way that would allow HPI to devote virtually its full efforts to River Valley while maintaining the company's profitability at a break even level. He said that the issue will be a moot point if the proposed merger is consummated. Mr. Pikus said, however, that efforts will be made to obtain the requested market quotes.



8-20-98

EF-6

Date: August 20, 1990 Docket No.: 08515

B. Escrow funds were kept at River Valley Savings, Rock Falls, after mortgage loan servicing was transferred to River Valley, Peoria in April 1990. At the time of the transfer, an accounts receivable for the funds of $1,217,000 was established on Peoria's general ledger. A corresponding liability account for the escrow funds was established. On June 7, 1989, payments made by Rock Falls reduced this amount to approximately $861,000. In August 1989, the escrow account for Rock Falls loans was $819,193, indicating a difference between the escrow account and the account receivable account of $41,800. This amount represents funds advanced by the servicer in excess of the amount collected in cash. The advancement of these funds is considered an unsecured extension of credit to Rock Falls. Section 23A(c)(1) of the Federal Reserve Act requires that all extensions of credit to an affiliate be secured at the time of the transaction by collateral having a market value meeting the requirements further described in that section.

Mr. Pikus said that the agreement between Rock Falls and Peoria regarding loan servicing does not transfer the servicing rights to Peoria. He said that it is management's position that the escrow funds are among the assets of Rock Falls and that it has the right to maintain those deposits notwithstanding the servicing agreement. Mr. Pikus said that management may request that Rock Falls transfer the funds to Peoria.

C. A loan to Vice President Jill Brickman, dated May 24, 1990, was granted with terms more favorable than those available to the general public. The favorable treatment involved the institution waiving one point. According to the institution's rate sheet, the applicable mortgage loan terms at the time of the loan closing were 10.0% with 2.25 points. Ms. Brickman was charged only 1.25 points. Other loan terms appear to be similar to comparable transactions.

Mr. Ronald Pikus said that the board of directors adopted a loan policy for directors, officers and employees in October 1989. The policy states that loans to affiliates will be granted at terms similar to the general public. He stated that an internal loan pricing sheet states that one point will be waived for all loans to employees and affiliates. Mr. Pikus said that the pricing sheet will be changed to conform to the current loan policy. He added that the employee would be approached to pay the additional point.



8-20-90 EF-6

WON034 1069 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

3. Directors' Expense Accounts

The institution's board of directors does not currently approve officer or board member expense account activity. The institution is presently incurring full expenses to maintain an office for a director, however, a determination was not available as to the time allocated to institution business.

Directors' expenses are currently approved by President Ronald Pikus. The expenses are not brought to the attention of the full board of directors. The examiners note that the board members incur expenses for meals and entertainment that on occasion become noteworthy. For the months of June and July 1990, Chairman Howard Ross' meal expenses totaled $2,281. These expenses received Mr. Pikus' approval.

Mr. Pikus said that he believes a formal policy addressing approval of directors' and officers' expense accounts should be adopted. He said that he will make that recommendation to the audit committee.

The examiners noted that the institution has been maintaining a Chicago office for Chairman Ross since May 1990. The monthly rental fee is $4,055. In addition, a full-time secretary is employed at the office at an annual salary of $27,000.

Mr. Ross has had an office at the Chicago location since 1980. The original lease was signed by Ross & Stone. The examiners noted in their review that lease payments continue to be addressed to Ross & Stone. Mr. Stone is a former business associate of Mr. Ross. It could not be determined by the review the amount of time Mr. Ross devotes to institution business. In addition, it was unclear, what amount of time the full-time secretary devotes to the institution. The examiners note that the office space rental did not receive approval of the full board.

Mr. Pikus said that Howard Ross' office expenses were paid because the board believed that the Chairman should have an office to conduct institution business. He stated that due to Mr. Ross' varied business interests, it is difficult to quantify the time devoted to institution business. Mr. Pikus said that because the institution is one of Mr. Ross' most recent business acquisitions, a great deal of his attention has recently been focused on institution operations. The board will request that Chairman Ross make an attempt to quantify his time devoted to the institution. At meetings with Mr. Ross at the end of the examination, it was indicated that approximately 95% of his time is related to River Valley business. He also explained that HPI and other River Valley entities had previously occupied space in that office.

4. Newly Appointed President

The board of directors appointed Ronald Pikus to succeed Homer Holland as President of the institution on January 24, 1990. Prior to his being appointed president, Mr. Pikus was a consultant with HPI. Mr. Pikus' responsibilities included coordinating the loan servicing staffs of Peoria and Rock Falls and assisting in the merger activities of the two institutions. Mr. Pikus has been associated with the banking industry since 1979.



8-20-90 EF-6

WON034 1070 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

5. Directorate Composition

The directorate has experienced numerous changes in composition since the previous examination of June 26, 1989. Harvey Hadden and John Lawrence respectively submitted their resignations in April and May 1990. Michael Rothman was elected to fill a vacancy in June 1990. Due to a technical violation, he resigned in July 1990, however, was reinstated in August 1990. Thomas Ladd was elected to the board at the March 1990 meeting. Currently, there are 11 board members. The institution's bylaws require 12 members.

Mr. Ronald Pikus said that a recommendation will be made to the board at the October 1990 meeting to amend the bylaws. The recommendation will be to have a board consisting of a minimum of 10 and no more than 12 directors.

6. Officer's Bonuses

The review revealed that Messrs. Holland and Ross received the following compensation for the year-ended 1989. Also included is a detail of the present salary schedule for the two shareholders of the institution:

| | 1990 | | 1989 | |
|---|---|---|---|---|
| | Bonus | Salary | Bonus | Salary |
| Homer Holland | $300,000 | $ 0 | $300,000 | 0 |
| Howard Ross | 175,000 | 75,000 | 175,000 | 0 |
| Totals | $475,000 | $75,000 | $475,000 | 0 |

The 1990 bonus totals are anticipated amounts for the year. The amount is based on the institution's current monthly accrual of $50,000 per month. Management stated that the accrual account was established in anticipation of paying out bonuses similar to those in 1989. Bonuses totaling $600,000 were paid out in 1989. The remaining $125,000 was paid to Steven Bangert of BPI.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

## ASSET QUALITY

The review of asset quality focused primarily upon credit risks associated with the institution's lending and investment decisions. Also given significant attention were reviews of problem assets and the adequacy of loss allowances.

The overall conclusion was that management has established sound operating policies and procedures, and maintained substantial compliance with the Board of Directors' approved policies and procedures. The institution's present lending activity does not contain credit risks that would warrant material concern. The examiners made recommendations with regard to the institution's present classification of asset policy and the commercial lending policy. The classification of two investment securities caused the institution to exceed assets classified at the previous examination of June 26, 1989.

1. Assets Covered Under FSLIC Assistance Agreement

As part of the assistance agreement dated July 29, 1988, FSLIC agreed to cover losses on certain assets which were acquired by the institution through the merger.

There are three groups of loans specified in the agreement. The three groups of loans total $7.8 million down from the $29 million at the previous examination. This decrease is attributed to the payoff of some of the larger loans and some of the performing loans no longer being covered. Any of the loans that had not been 90 days or more delinquent prior to January 1990 had their coverage expire. Two of the pools have their coverage expire in July 1991 and the third pool coverage expires in July 1993. Of the remaining $7.8 million of covered assets, $350,000 were considered classified.



8-20-90 EF-6

WON034 1072 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER.

Date: August 20, 1990 Docket No.: 08515

2. Classified Assets

Classified assets at July 31, 1990, were $7,152,228 or 123.0% of the tangible capital and general valuation total. The July 31, 1990, classified asset total consists of losses of $619,424 and $6,532,804 considered substandard. The losses are comprised of $619,424 of loan and real estate owned (REO) unreserved losses. In addition, $1,665,573 of losses resulting from the lower of cost or market markdown of two investment securities were required by the new OTS policy. Specific allowances for the indicated loan and REO losses were established in August and September 1990. (See pages 12.1 through 12.7 and the Risk Management section for additional details.)

The classified asset total at July 31, 1990 represents an approximate decrease of $786,000 from the previous examination. Our initial review disclosed a significant increase attributable to the classification of investment securities and a contingent liability. A credit enhancement issued to RESCORP accounted for $2 million of the total. (See page A-12.7 for details.) The asset for which the enhancement was issued was classified at the June 11, 1990 examination of RESCORP.

Management agreed to classify the assets considered substandard and loss by the examiners. Management had not been classifying REO as substandard. Senior Vice President Gary Richardson stated that in the future REO would be classified.

3. New Lending

A. Real Estate Loans

Since the previous examination, the institution has granted 1,828 loans totaling approximately $64 million. Of that amount, $56 million are loans secured by real estate, with $34 million subsequently sold to FNMA and FHLMC. The remaining loans in portfolio are variable rate loans, commercial real estate loans or loans that do not meet the underwriting guidelines of FNMA or FHLMC. The majority of the loans that do not meet the underwriting guidelines are a result of the loans having principal balances higher than the amount currently being purchased by FNMA or FHLMC. The institution currently underwrites loans according to FHLMC standards. Presently, the institution has an outstanding commitment to sell $5 million of loans to FHLMC.

Of the 181 loans kept in portfolio, 18 files were reviewed. The review disclosed documentation deficiencies, however, none of the exceptions were considered to be material or represent a trend. The exceptions were discussed with the lending department and steps were taken to correct them. Since the majority of the originated loans are sold to FNMA or FHLMC, management has instituted procedures to ensure proper documentation.

A review of the appraisal policy indicated that the policy did not conform to the requirements of 12 C.F.R. Section 563.171. Senior Vice President Sharon Kristof stated that a new appraisal policy would be adopted and implemented by the board.



8-20-90 EP-6

Date: August 20, 1990 Docket No.: 08515

B. Commercial Loans

Since the previous examination, 56 commercial non-real estate loans were granted of which 17 were reviewed. Minor exceptions were noted and discussed with the the lending department. The review revealed that the institution's commercial loan policy needs enhancement. The policy as written states that "the institution will not make loans to anyone who did not have a business relationship prior to April 1, 1989 and that the loans would be case by case by designated management."

The examiners recommended the following additions to the policy:

1. Types of loans to be granted. (Secured and Unsecured)
2. Downpayment requirements.
3. Loan maturities for the various types of loans.
4. Sources of repayment.
5. Minimum credit and documentation required for underwriting.

Mr. Gary Richardson stated that the commercial loan policy would be updated to include the underwriting requirements presented above.

## CAPITAL

A comprehensive review of the institution's capital adequacy and composition was performed. The review included the effectiveness of the board of directors, monitoring and capital adequacy planning by management, and accounting practices as they relate to the capital accounts. Current and projected earnings, current and proposed activities, and risks inherent in the institution's current balance sheet structure were reviewed. Compliance with the minimum requirements for tangible, core and risk based capital were also reviewed.

At July 31, 1990, prior to the losses identified during the examination, the institution met each of the three capital requirements. However, the $2,284,997 ($1,665,573 of residual LOCOM adjustments and $619,424 of classified assets) of identified losses reduced capital to deficient levels. (12 C.F.R. Section 567.2) The institution's GAAP and tangible capital at July 31, 1990 was reduced to $4,428,000 or 1.1% of tangible assets. The institution's capital structure was modified during the review period. The institution's classified asset total, after adjustments, of $6,532,804 or 125.7% of the tangible capital plus general valuation allowance total presents a significant risk to future capital levels.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

1. Capital Adequacy

At the onset of the examination, the institution was in compliance with each of its three capital requirements at July 31, 1990. GAAP and tangible capital totaled $6,713,000. However, the $2,285,000 of losses identified at the examination caused the institution to be a capital failure for each of the requirements at July 31, 1990.

The institution's tangible assets of $416,662,000 at June 30, 1990 required capital of $6,250,000. Tangible capital totaled $4,428,000 at July 31, 1990, or 1.1% of tangible assets at June 30, 1990.

The core capital requirement was $12,500,000 at June 30, 1990. The institution was allowed to include supervisory goodwill of $6,250,000 as core capital. Accordingly, core capital totaled $10,678,000 at July 31, 1990.

At June 30, 1990, the risk weighted assets of $259,245,000 required risk-based capital of $16,592,000 to meet the 6.4% requirement. Risk-based capital was $16,445,000 at July 31, 1990.

2. Capital Accounts

During the review period capital account items were redeemed and modified. Details of the changes in capital composition since the previous examination, prior to the losses identified at the examination, follow:

| Account Description | Balance at May 31, 1989 | Balance at July 31, 1990 |
|---|---|---|
| Subordinated Note Payable | $ 4,600,000 | $ 0 |
| Common Stock | 1,000 | 1,000 |
| Preferred Stock: | | |
| Class A - 50,000 shares authorized and issued; 8% cumulative | 5,000,000 | 5,000,000 |
| Class C - 5,000 shares authorized and issued; $100 cumulative | 5,000,000 | 0 |
| Class C - 5,000 shares authorized and issued; $100 non-cumulative | 0 | 5,000,000 |
| Class D - 100,000 shares authorized and issued; .75% cumulative | 1,000 | 0 |
| Class E - 100,000 shares authorized and issued | 1,000 | 0 |
| Class F - 100,000 shares authorized | 1,000 | 0 |
| FSLIC Assistance | 8,000,000 | 0 |
| Retained Earnings | 736,000 | 1,712,000 |
| Total Capital | $23,340,000 | $11,713,000 |



8-20-90 EF-6

WON034 1075 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The $4.6 million subordinated debt was retired on December 21, 1990. The Class C preferred stock was sold to American National Bank (ANB) of Chicago, Illinois in the first quarter of 1990 and the stock converted to non-cumulative. The D,E and F stock classes were redeemed in the first quarter of 1990. This was in part due to a Supervisory Directive issued at the previous examination. It was noted that dividends were declared and paid on the stock prior to their issuance.

The FSLIC Assistance total equals the amount of goodwill recorded that was in excess of GAAP goodwill. The amount, which totals $7,268,000 at July 31, 1990 after amortization during the period, is included in the institution's core capital total.

3. Preferred Dividend Payments

For the period June 1, 1989, through July 31, 1990, the institution's board of directors declared and paid out dividends totaling $877,688. Supervisory approval is pending for third quarter dividend payouts of approximately $220,000 on the two preferred stock issues.

A. Dividend Calculations

The holders of Classes A, B, and C are paid dividends in accordance with the supplementary section to the federal stock charter. Class A preferred dividends, 8% cumulative, are paid on a quarterly basis in the fixed amount of $100,000. Class B preferred dividends, 8% cumulative (currently no shares are outstanding) are also paid on a quarterly basis. Class C preferred dividends, based on 90% of American National Bank's prime rate at the quarter end, are payable quarterly.

B. Redemption Provision

Classes A and B are redeemable at the option of the institution. Class C is not redeemable by the institution except upon the prior written consent of the institution's board of directors. The institution has made an offer to the FDIC to redeem the Class A stock for $3,034,000. There has been no response as to whether this offer will be accepted.

4. Capital Maintenance Agreement

In concurrence with the assistance agreement dated July 29, 1988, Messrs. Ross and Holland and the institution entered into a Regulatory Capital Maintenance and Dividend Agreement with the FSLIC. Messrs. Ross and Holland agreed to maintain the institution's regulatory capital at the level required per Section 563.13(b) of the insurance regulations. The institution requested that the agreement be terminated due to the capital infusion of $5.0 million by Messrs. Ross and Holland thereby satisfying Section 7(c) of the agreement. On July 18, 1990, Supervision determined that Messrs. Ross and Holland's capital infusion did constitute a satisfaction of the agreement and the Capital Maintenance Agreement was terminated.



8-20-90. EF-6

Date: August 20, 1990 Docket No.: 08515

RISK MANAGEMENT

A comprehensive review of the risk section was performed to evaluate the adequacy of established policies and procedures to manage the investment and interest rate risk areas. Emphasis was placed on determining the risks the institution's investment activities and interest rate risk position present to capital. Board reports were reviewed to determine the adequacy of the current reporting system.

The review revealed several areas of concern that pose risks to the institution's future capital position. A summary of the different areas of review and an expanded analysis of each follows.

Summary

The residual interests in two collateralized mortgage obligations (CMOs) with a balance of $8,067,044 or 1.89% of assets and 120.2% of tangible capital have required a LOCOM writedown of $1,665,573. As a result of the LOCOM writedown, the institution was not in compliance with the tangible and core capital requirements. The examiners recommend that the institution not purchase any additional high risk mortgage derivatives until the institution can demonstrate that it will be in compliance with the fully phased-in capital requirements.

The balance of high risk mortgage derivatives was $23,472,594 or 5.49% of total assets with a weighted average estimated economic yield of 8.87%. The unrealized losses on these investments were $1,946,846 or 29% of tangible capital before adjustment for any specific reserves recommended by the examiners. The examiners have not required LOCOM adjustments for residuals with a book value of $2,372,785 and securitized excess servicing of $1,563,386 for a total of $3,936,171 or 58.64% of tangible capital because these investments were considered to have hedging characteristics. If the potential return characteristics from these investments changed and were deemed not to have hedge value, these assets could require application of LOCOM adjustments.

The minutes of the board of directors meeting did not contain any written rationale for the investment in high risk mortgage derivatives but did contain the expected returns from these investment under different interest rate and prepayment scenarios. The examiners recommend that the rationale for the investment of all high risk mortgage derivatives be included in the board minutes.

The balance of Super Principal Only (Super POs) securities was $8,475,814 or 1.98% of assets. The unrealized losses on these investments totaled $1,548,405 or 23.07% of tangible capital. The expected accounting yield on these investments was 4.29% or 3.65% less than the cost of funds at July 31, 1990. The examiners recommend that the institution voluntarily writedown the Super POs by an amount between $1,548,405, the unrealized loss at July 31, 1990, and $2,327,913, the amount necessary to increase the yield on the investment to equal the expected yield at purchase. This writedown would not be required by generally accepted accounting principles or the Asset Classification Regulation.



8-20-90 EF-6

WON034 1077 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

As of July 31, 1990, borrowing under reverse repurchase agreements and fixed coupon dollar reverse repurchase agreements totaled $125.3 million or 30.2% of liabilities, an increase of $34 million since the previous examination. The amount borrowed under these agreements was excessive and the examiners recommend that the balance of these borrowings be reduced.

The institution's market value of portfolio equity (MVPE) decreased by 104.5% in an interest rate scenario of +4.0%. This percentage decrease would be higher and the institution would have exceeded the board limits for percentage decreases in MVPE under the +2.0 interest rate scenario if the examiners' estimated values for the residuals were used by the institution in the base case calculation. The examiners recommend that the potential decrease in MVPE should not exceed a percentage decrease of 50% and 100% in interest rate scenarios of +2.0% and +4.0%, respectively.

The balance of tax motivated residuals (phantom residuals) was $65,294,098 or 15.3% of assets at July 31, 1990. These investments were recorded in the 20% risk category rather than the 100% risk category as required by the Capital Regulation. The institution was in compliance with the risk based capital requirements at July 31, 1990 when these investments were included in the 100% risk category. Most of these tax motivated residuals will be repaid in one year or less. However, one issue has a regular residual component in the approximate amount of $1.8 million. This residual has not been identified as a hedging vehicle nor have the expected returns been documented under different interest rate scenarios.

The primary concern with the hedging activities involved Treasury note futures which were open for short time periods. These positions were matched against long term fixed rate mortgage backed securities (MBS). The deferred losses from these positions totaled $167,579 or 2.5% of tangible capital before the losses required by this examination are applied. Although the correlation between these futures losses and the change in value of the matched assets was high, the futures positions only provided protection against increasing interest rates during the period the futures positions were open. The futures losses were deferred over the expected life of the matched assets which was approximately seven years. The examiners recommend prospectively that any futures positions open for short time periods which are matched against assets or liabilities be recognized in conjunction with the economics of the transactions.

The institution has maintained MBS on dollar roll for over one year without removing these securities from dollar roll and retaining these securities in portfolio unencumbered for 35 consecutive days. There was no recommended adjustment at July 31, 1990 as a result of these transactions.



8-20-90 OF-6

Date: August 20, 1990 Docket No.: 08515

The investment portfolio was managed by HPI, a wholly owned subsidiary of River Valley Savings Bank, Rock Falls and an affiliate of River Valley Savings Bank, F.S.B. Management had financial modeling capabilities for all of the mortgage derivatives. Individual files were maintained for each investment including updated scenario analysis. HPI estimated the yield for each mortgage derivative quarterly based on an appropriate estimated prepayment rate. These estimates were used to account for these investments under Statement of Financial Accounting Standard 91 (SFAS 91). Treasurer and Executive Vice President of HPI, Steven Bangert, said all mortgage investments were reviewed at the end of each year to determine that these investments were recorded in accordance with SFAS 91.

1. Investment Portfolio

As of July 31, 1990, the investment portfolio totaled $227,460,034 or 53.23% of assets. The weighted average yield on the portfolio was 11.63%. However, if the yield from the phantom residuals, which were expected to be repaid in less than one year, were excluded, the portfolio yield would decline to 9.73% or 1.79% greater than the cost of funds. The investment portfolio was comprised of the following securities:

| Description | 7-31-90 Book Value | (%) Yield | 5-31-89 Book Value |
|---|---|---|---|
| Liquidity Investments | $ 15,188,225 | 8.88 | $ 15,679,658 |
| Phantom Residuals | 65,294,098 | 16.35 | 0 |
| High Risk | | | |
| Mortgage Derivatives | 23,472,593 | 8.70 | 42,292,878 |
| Securitized ARMs | 72,479,944 | 10.00 | 119,839,965 |
| Fixed Rate MBS | 29,061,334 | 9.87 | 34,533,978 |
| Private Pass Through | 15,854,258 | 9.83 | 0 |
| Agency Multi Family | 3,939,045 | 9.05 | 300,000 |
| Corporate Notes | 2,110,536 | 14.89 | 2,000,000 |
| Other Investments | 60,000 | 6.60 | 60,000 |
| Totals | $227,460,033 | 11.63 | $214,706,479 |

The primary changes in the mortgage related securities portfolio since the previous examination were the purchases of the phantom residuals, the reduction in the ARM portfolio and the sale of a portion of the high risk mortgage derivatives.



8-20-90 EF-6

WON034 1079 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The institution has used portions of the gains realized from the sales of high risk mortgage derivatives to reduce the book values of high risk mortgage derivatives retained in portfolio. In December 1989, the institution sold two IOs with an aggregate book value of $4.5 million for a loss of $315,967. This loss was offset by a gain from the sale of a Super PO. In May 1990, Interest Only Strips (IOs) with an aggregate book value of $9.9 million were sold for gains of $158,895. These gains were used to reduce the book value of the Super POs. In August 1990, the remaining portion of the IO portfolio was sold and the gains of $229,470 were used to reduce the book value of the Super POs. The unrealized gains for IOs at July 31, 1990 was $232,330.

Mr. Bangert said the primary business objective of the institution is to originate and service loans. He said however, there is not sufficient loan demand in the Peoria area. He said the investment portfolio is used to support the deposit base and maintain current earnings. He also said the securities in portfolio were all identified for investment.

2. Mortgage Derivative Portfolio

At July 31, 1990, the mortgage derivative portfolio totaled $88,766,691 or 20.77% of assets. Of this total, high risk mortgage derivatives totaled $23,472,594 or 5.49% of assets and the weighted average yield for these investments was 8.87% or .93% in excess of the cost of funds. The unrealized losses on these investments were $1,946,846 or 29% of tangible capital before adjustments for the specific reserves recommended by the examiners. The following tabulation recaps each of the components of the portfolio:

| Description | Book Value 7-31-90 | Weighted Average Yield (%) | Unrealized Gain (Loss) |
|---|---|---|---|
| Phantom Residuals | $ 65,294,098 | 16.35% | |
| Residuals | 10,439,829 | 9.72% | ($ 535,144 ) |
| Super POs | 8,475,814 | 4.83% | (1,548,405 ) |
| Interest Only Strips Securitized | 2,993,564 | 12.07% | |
| Excess Servicing# | 1,563,386 | 18.96% | 136,703 |
| Total | $ 88,766,691 | 14.44% | ($1,946,846)* |

# Securitized

* The unrealized gains from the IOs which totaled $232,330 were not included in the total unrealized losses because the IOs were sold in August 1990.



8-20-90 EF-6

WON034 1080 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

3. Non-Tax Related Residuals

The residuals and the estimated accounting yield (far right-hand column) which differs from the expected economic yield indicated in prior tabulations for these residuals at July 31, 1990 were as follows:

| | 7-31-90 | | Assumptions | | | |
|---|---|---|---|---|---|---|
| Description | Book Value | Estimated Value | Yield(%) | PSA(%) | Unrealized Gain/(Loss) | Estimated Yield |
| ML Trust 36 | $ 5,468,380 | $4,289,595 | 14 | 143 | $(1,178,785) | 3.5% |
| CMOT 54 | 2,598,664 | 2,111,876 | 14 | 310 | (486,788) | 2.0% |
| DBL Series E | 2,372,785 | 3,503,214 | 14 | 170 | 1,130,429 | 10.0% |
| Total | $10,439,829 | $9,904,685 | | | $ (535,144) | 4.6% |

The following table summarizes the residuals which under OTS policy require a LOCOM adjustment because they were not deemed to show hedging characteristics.

| Description | Book Value | Market Value | Loss |
|---|---|---|---|
| ML Trust 36 | $5,468,380 | $4,289,595 | $1,178,785 |
| CMOT 54 | 2,598,664 | 2,111,876 | 486,788 |
| | $8,067,044 | $6,401,471 | $1,665,573 |

a. Merrill Lynch Trust 36 (MLT 36 Class I Residual)

In October 1988, the institution purchased a 66.7% interest in the Class I residual of MLT 36. As of July 31, 1990, the book value of the this residual was $5,468,380 or 1.28% of assets and the weighted average life was approximately 4.5 years. The estimated value of the residual was $4,289,595 based on a yield of 14% and an estimated prepayment rate of 143% of the Public Securities Association Prepayment Model (PSA). Since this residual was not purchased for hedging purposes and the institution may not recapture the full amount of its principal investment, the examiners have determined that $1,178,785 should be recognized as a loss under a LOCOM adjustment.

The CMO issued under the Real Estate Mortgage Investment Conduit (REMIC) authority is comprised of nine classes including the residual which was offered as a regular class of the CMO. The classes were delineated as follows: four planned amortization classes (PAC); two fixed rate tranches, a zero coupon tranche and a floating rate class indexed to the 30-day London Interbank Offered Rate (LIBOR). The underlying collateral was fixed rate GNMA 10% MBS. The return from the residual varies inversely with the prepayment speed from the underlying collateral and to lesser extent increases in the interest rate for 30-day LIBOR. The LIBOR return attribute of the residual was due to the floating rate class which was 14% of the total CMO issue of $200.2 million.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

The weighted average yield recorded since the previous examination was 6.41% based on an expected weighted average prepayment rate of 164% PSA. The actual prepayment rate was 151% PSA. The prepayment experience for the last 12 months and life to date was 153% and 144% PSA, respectively. The estimated yield at purchase was 9.9% based on a PSA of 125%.

The following tabulation illustrates the return characteristics of this residual at July 31, 1990:

| Change in Interest Rates | Estimated Prepayment Rates | Estimated Yield(%) |
|---|---|---|
| +400 basis points | 85 PSA | 6.35 |
| +200 basis points | 100 PSA | 7.06 |
| No Change | 135 PSA | 8.35 |
| -200 basis points | 350 PSA | -8.19 |
| -400 basis points | 475 PSA | -12.15 |

Mr. Bangert said the MLT-36 residual when considered individually does not appear to have hedge value but when combined with the Residential Resource Super Principal Only security and a modest interest rate swap position, becomes a very effective hedging transaction. The original purpose of the combined transaction was to provide a yield profile that improved in both an increasing and decreasing interest rate environment. This transaction still provides this objective. He said the MLT 36 residual has not met the return objectives and concurs that a writedown of the investment is appropriate. He said the institution intended to writedown the asset to provide the expected purchase yield of 9.9%. Mr. Bangert said the estimated writedown would be $857,295 if a discount rate of 14% were used to estimate the value at September 30, 1990. He said this investment should not be classified as substandard (after the write down) because the structured transaction has substantial hedge value and the MLT 36 will be writtendown to a very conservative value.

b. Collateralized Mortgage Obligation Trust 54 Residual (CMOT 54)

In October 1988, the institution purchased a 22.1% interest in the CMOT 54 Class R Residual. The expected yield at purchase was 11.21% based on an estimated prepayment rate of 290% PSA. As of July 31, 1990, the book value was $2,598,664 and the expected weighted average life was 4 years. The estimated market value was $2,111,876 based on an estimated yield and prepayment rate of 14% and 310% PSA. The examiners have determined that $486,788 should be recognized as a LOCOM loss since this residual did not provide any significant increase in yield when interest rates increased.



8-20-90 LF-6

WON034 1082 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The CMO had four classes, two of which were fixed rate, one was a floating rate class indexed to 30 day LIBOR and the residual class. The residual was comprised of an interest only component and an inverted floater portion. The return profile of the residual will vary inversely with increases in prepayment rates and increases in the interest rate for 30-day LIBOR. The underlying collateral was GNMA graduated payment mortgages with an interest rate of 11.5% and remaining maturity of 22.6 years.

Since the previous examination, the institution has recorded a yield of 6.89% based on a weighted average PSA of 311%. The actual prepayment experience was 323% PSA. The actual prepayment experience for the last 12 months and the life to date was 340% and 335 PSA, respectively.

At July 31, 1990, the yield on the residual does vary directly with increases in interest rates. However, the estimated return caps out at between 14% and 15% as indicated in the following table:

| Change in Interest Rates | Estimated Prepayment Rates as % of PSA | Estimated Yield(%) |
|---|---|---|
| +400 basis points | 125 | 14.3 |
| +200 basis points | 150 | 14.8 |
| No Change | 310 | 5.6 |
| -200 basis points | 425 | .1 |
| -400 basis points | 490 | -2.0 |

As of September 30, 1990, the balance of the asset was reduced to $2,306,228, a reduction of $292,436 from July 31, 1990. The reduction in the asset value included writedowns of the asset which totaled $200,000 with the remaining portion of the reduced balance due to amortization.

Mr. Bangert said a writedown of the CMOT 54 residual was not appropriate. He said this residual was purchased for its hedge value. He said the underlying collateral for the CMO was fixed rate GNMAs with a coupon rate of 11.5%. The prepayments from the underlying collateral would be expected to slow in an increasing interest rate environment, thus resulting in an increase in the yield from this residual. He also said the expected yield for this residual was 17.3% based on the book value of the residual and the consensus prepayment forecast at September 30, 1990. He estimated that the unrealized gain for the investment ranged from $300,000 to $400,000 based on similarly structured residuals. He added the expected yield on this investment increases to a 20% annual yield in a rising rate environment and the yield remains positive in interest rate scenarios of plus or minus 4.0% in increments of 1.0%.



8-20-90 EF-6

WON034 1083 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

c. Drexel Burnham Lambert CMO Trust Series E Residual (DBL)

In January 1989, the institution purchased a 27.22% interest in the DBL Series E Class 3 Residual. As of July 31, 1990, the balance of the residual was $2,372,785 and the expected weighted average life was 4.5 years. The estimated value was $3,503,214 based on discount rate of 14% and 170% PSA. The CMO has two fixed rate classes and a Z-bond (accrual bond). The residual was not a regular class of the CMO. The CMO was collateralized by Federal National Mortgage Association (FNMA) MBS with a coupon rate of 10% backed by mortgages with a gross weighted average interest rate of of 10.61% and a remaining maturity of 25.7 years. Since the previous examination, the institution recorded a weighted average book yield of 9.58% based on an weighted average expected prepayment rate of 215% PSA. The actual weighted average PSA was 179%.

As of July 31, 1990, the return characteristics of this residual were as follows:

| Change in Interest Rates | Estimated Prepayment Rates as % of PSA | Estimated Yield(%) |
|---|---|---|
| +4.0 | 125 | 22.1 |
| +2.0 | 130 | 21.6 |
| No Change | 170 | 17.4 |
| -2.0 | 430 | -10.4 |
| -4.0 | 495 | -18.4 |

4. Super Principal Only Securities (Super POs)

As of July 31, 1990, the balance of the Super POs was $8,475,814 or 1.98% of assets. The unrealized losses on these investments were $1,548,405 or 23.07% of tangible capital. The expected accounting yield on these investments was 4.29% or 3.65% less than the cost of funds at July 31, 1990. The examiners recommend that the institution voluntarily writedown the Super POs by an amount between $1,548,405, the unrealized loss at July 31, 1990, and $2,327,913, the amount necessary to increase the yield on the investment to equal the expected yield at purchase. This writedown would not be required by generally accepted accounting principles or the classified assets regulation because the institution will ultimately recapture the full investment amount.

In August 1989 for settlement in October 1989, the institution purchased Class C of the FNMA REMIC Trust 1988-27 CMO. The Class C was a support class for the PAC and TAC Classes. The underlying collateral for the CMO was FNMA principal only securities with a coupon rate of 10% backed by mortgages with weighted average interest rate of 10.58%. The expected yield at purchase was 4.48% based on an expected prepayment rate of 190% PSA. The institution would have to writedown this investment by $429,505 to receive the purchase yield based on a 170% PSA. The Class C is known as a Super PO because the return increases significantly when prepayments from the underlying collateral accelerate.



8-20-90 CP-6

Date: August 20, 1990 Docket No.: 08515

The institution also purchased in August 1989 the Super PO Class D of the FNMA REMIC Trust 1989-28 CMO. This four class CMO was also backed by principal only MBS with coupon rate of 10% and mortgages with a weighted average interest rate of 10.58% and a remaining maturity of 25.5 years. The expected yield at purchase was 6.05% based on an expected prepayment rate of 190% PSA. At July 31, 1990, the investment would have to be writtendown by $260,814 in order to realize the purchase yield based on 170% PSA.

The expected yield at purchase for the FHLMC 18-E and the Residential Resources 9-F were 8.85% and 6.24%, respectively. These assets would have to be writtendown by $1,304,676 and $332,918 at July 31,1990 based on PSAs of 170% and 135% to realize the expected yield at purchase.

The board minutes did not contain a description of the rationale for the purchase of the Super POs. However, in the financial information reported to the board at the September 1989 meeting was a table listing the expected yield for the Super POs under various interest rate scenarios.

The following tabulation details the investment in Super POs and the weighted average yield recorded since the last examination and the estimated accounting yield at July 31, 1990:

| Description | Date Purchased | Book Value | Unrealized Gain/(Loss) | Weighted Average Yield | Weighted Average PSA | Estimated Yield | Estimated PSA |
|---|---|---|---|---|---|---|---|
| FNMA 1988-27-C | 8-89 | $2,593,838 | ($1,076,657) | 3.97 | 186 | 3.00 | 170 |
| FNMA 1989 28-D | 8-89 | 1,106,746 | (202,427) | 5.30 | 184 | 4.00 | 170 |
| FHLMC 18-E | 10-88 | 2,320,904 | (649,744) | 8.27 | 203 | 3.00 | 170 |
| Res. Resources 9-F | 9-88 | 2,454,326 | 380,423 | 8.02 | 143 | 7.00 | 135 |
| Totals | | $8,475,814 | ($1,548,405)# | 6.50 | | 4.29 | |

#The unrealized gains and losses were based on quotes obtained from brokers.

The following tabulation details the interest rate sensitivities for each of the Super POs.

| Description | Expected Yield's and PSA's Under the Following Interest Rate Scenario: +4.0% PSA/Yield | +2.0% PSA/Yield | Base Case PSA/Yield | -2.0% PSA/Yield | -4.0% PSA/Yield |
|---|---|---|---|---|---|
| FNMA 1988-27-C | 125/3.0% | 130/3.0% | 170/3.5% | 430/146% | 495/203% |
| FNMA 1989 28-D | 125/3.2% | 130/3.3% | 170/4.6% | 430/86% | 495/119% |
| FHLMC 18-E | 125/2.2% | 130/2.2% | 170/3.5% | 430/176% | 495/230% |
| Res. Resources 9-F | 85/5.6% | 100/6.0% | 135/7.6% | 350/153% | 475/337% |



8-20-90 EF-6

In November 1989, Super POs with an aggregate book value of $8,350,400 were sold for net gains of $1,303,553. The gain was used to offset the loss from two IOs sold for a loss of $490,010 in November 1989. The remaining portion of the gain of $828,660 was used to reduce the book value of the IOs, the securitized excess servicing and the residuals.

Mr. Bangert said the Super POs were purchased for protection from an acceleration of mortgage prepayments. He said the Super POs were not intended for speculative purposes. He said the Super POs provide management with the additional flexibility to execute interest rate swaps and caps against the liability portfolio without undue concern that the mortgage portfolio would prepay faster than expected. He said without the Super POs, the institution would be exposed to the retention of high cost liabilities if rates decreased significantly and prepayments from the mortgage portfolio accelerated.

Mr. Bangert said the rationale for purchasing the Super POs has been discussed at the board meeting each time this type of investment was acquired. He said the board understood the low expected yield was the cost of hedging an acceleration of the mortgage prepayments.

Mr. Bangert said the Super POs were sold because the overall profile of the institution's portfolio had changed. He said a conservative approach was used by matching the gain with securities whose returns directly related to changes in interest rates (IOs and residuals). He also said Super POs purchased in 1989 were backed by FNMA MBS with a coupon rate of 10% providing a good match with securities in portfolio.

5. Securitized Excess Servicing

In November 1989, the institution purchased the B-3 Class of the Guaranteed Mortgage Backed Securities (GMBS), Inc. multiple class security. At the time of purchase, the weighted average interest rate received was 41.6 basis points on loans with a principal balance of $88,948,498. The weighted average interest rate for the fixed rate loans underlying the security was 10.74% and the remaining maturity was 29.9 years.

As of July 31, 1990, the balance was $1,081,467. The estimated value was $1,191,034 based on a 16% yield and a 300% PSA. The yield at purchase was 19.4% based on prepayment rate of 207% PSA. The institution has recorded a weighted yield of 11.31% based on an assumed weighted average prepayment rate of 250% PSA. The actual PSA was 99% PSA. The interest rate for the B-3 class will vary based on the outstanding balance of loans with the following interest rates:

| Mortgage Pool B Securities | Interest Rate Received |
|---|---|
| 10.13% to 10.5% | 0.0 |
| 10.625% to 11% | .5 |
| 11.125% to 11.75% | 1.0 |



8-20-90 EF-6

WON034 1086 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Over 90% of the loans were secured by properties located in California and 93.5% of the loans had loan to value ratios of less than 80%. Each class was insured by the Financial Security Assurance Corporation and the classes were rated triple A by Standard and Poors and Moody's rating services. The "AAA" rating does not measure prepayment risk. The high rating only ensures that the institution will receive cash flows based on the outstanding balance of the loans.

In 1988, the institution purchased the Home Owners Federal Savings and Loan Association Senior Mortgage Pass-Through Certificates Series 1988-8 Class A-2 (Homeowners). This is an interest only class which receives 25 basis points based on an initial notional amount of $107.4 million. The underlying loans were adjustable rate mortgages indexed to the One Year Constant Maturity Treasury (CMT) Index. As of July 31, 1990, the balance of the underlying loans was $58.8 million of which the institution's portion was $29.3 million. The security was rated "Aa2" by Moody's Investor Service. As of July 31, 1990, the balance was $191,848 and the estimated value was $196,354 based a yield of 16% and an expected prepayment rate of 300% PSA. The weighted average yield recorded since the previous examination was 5.71% based on an assumed prepayment rate of 311% while the actual was 654% PSA.

Also purchased in 1988 was the Shearson Lehman Pass-Through Securities Inc. Asset Trust Pass-Through Certificates Series 1988-2 Class A-2 (Shearson). This class received 25 basis points based on an initial notional amount of $52.4 million. The underlying collateral for the security was ARMs indexed to the National Median Cost of Funds. As of July 31, 1990, the balance of the underlying loans was $42.2 million. The book value of these securities was $290,071 at July 31, 1990. The estimated value was $312,701 based on a 16% yield and a 250% PSA. The weighted average yield recorded since the previous examination was 7.79% based on an assumed prepayment rate of 239% PSA while the actual was 164% PSA.

The following table illustrates the return profile of the securitized excess servicing under different interest rate scenarios:

| Description | +4.0% PSA/Yield | +2.0% PSA/Yield | Stable PSA/Yield | -2.0% PSA/Yield | -4.0% PSA/Yield |
|---|---|---|---|---|---|
| GMBS | 110/27.9% | 130/26.7% | 250/19.4% | 380/11.3% | 450/ 6.8% |
| Homeowners | 125/30.0% | 180/26.0% | 300/16.9% | 425/ 7.0% | 540/-2.6% |
| Shearson | 110/29.0% | 130/27.6% | 250/18.7% | 380/ 8.7% | 450/ 3.1% |



8-20-90 EF-6

WON034 1087 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

6. Residuals Purchased for Tax Purposes (Phantom Residuals)

The institution has purchased the residual interest in specifically structured multiple class securities for the purpose of utilizing net operating losses (NOLs) carry-forwards before their expiration. The book value of these residuals was $65,294,098 or 15.3% of assets at July 31, 1990. The weighted average pre-tax yield and average life at July 31, 1990 were 16.35% and .51 years. At September 30, 1990, the balance of the residuals was $76,937,470 or 17.9% of assets. As of December 31, 1989, the institution had tax loss carryforwards of $47,862,100. Of this amount, $24,763,600 will expire prior to December 31, 1993.

The following tabulation details the investment in phantom residuals at July 31, 1990:

| Date Purchased | Description | Dollar Amount Purchased | Book Balance 7-31-90 |
|---|---|---|---|
| 2-28-90 | FNMA 1989-56R# | $ 4,000,000 | $ 3,625,205 |
| 4-27-90 | FNMA 1990-43R | 13,000,000 | 10,743,243 |
| 4-30-90 | FNMA 1990-41R | 10,000,000 | 5,408,605 |
| 5-29-90 | FNMA 1990-171R | 8,500,000 | 7,143,937 |
| 6-28-90 | ML Trust 43R | 6,200,000 | 2,686,282 |
| 6-29-90 | FHLMC 1990-174R | 10,500,000 | 10,175,290 |
| 6-29-90 | FNMA 1990-59R | 6,300,000 | 5,724,856 |
| 6-29-90 | FNMA 1990-64R | 11,000,000 | 10,668,966 |
| 7-19-90 | FNMA 1990-65R | 10,300,000 | 9,117,714 |
| Totals | | $ 79,800,000 | $65,294,098 |

\# Only 55% of the economic cash flows will be recaptured in the first year. The remaining portion of the residual not recaptured in the first year will have the characteristics of a regular residual. The institution has not identified the regular portion of the residual for its hedge value nor have the returns been analyzed under different interest rate scenarios.

The phantom residuals were included in the 20% risk weighting for the risk based capital requirement. These investments must be included in the 100% risk category [12 C.F.R. Section 567.6(a)(1)(iv)(N)]. As of July 31, 1990, the institution was $434,369 in excess of the risk based capital requirement when the phantom residuals were included in 100% risk category and the specific reserves required for the non-tax related residual were considered.

The examiners recommend that the institution prepare a quarterly estimate of the expected phantom income and loss for all phantom residuals. This estimate should also show the expected phantom income and loss over the life of the CMO for interest rate scenarios of plus or minus 2.0%.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

The pre-tax yield on the residuals ranged from 14% to 18.5%. For most of these residuals, the institution will recapture the principal investment in less than one year. The residuals normally generate phantom income in the first four years from issuance of the CMO which means that the institution incurs tax liability for income not actually received. Normally after year four, the institution incurs phantom expenses which equates to losses not actually incurred. The phantom income and expense (loss) result from the difference between the level yield method used to record income for book purposes and the method used by the trustee for the REMIC. The trustee assumes that income is recorded based on the yield from the underlying securities based on the assumed PSA at the time of issuance. The expense is based on the effective interest rate paid to the holders of each class in the REMIC at issuance. The phantom income and loss net to zero over the life of the REMIC. However, the amount of the phantom income and loss will vary each year based on the structure of the REMIC and actual prepayment experience from the underlying collateral.

The primary risks of these transactions were that the phantom income would not be allowable as an offset against the NOLs and future phanton losses would not be deductible against future income. These risk could come to fruition if the REMIC tax law was changed or the current tax law was reinterpreted or clarified. The institution discussed this matter with their independent auditors and various experts on REMIC tax legislation. At the current time, there were no indications that phantom income would not be allowed as an offset against the NOLs.

The following tabulation shows the estimated book income (economic income), phantom income and loss for FNMA 1990-64R:

| Years | Book Income | Phantom Income/<Expense> |
|---|---|---|
| 1 | $1,009,986 | $ 408,417 |
| 2 | 155,239 | 589,316 |
| 3 thru 5 | -0- | 779,815 |
| 6 thru 7 | -0- | 48,019 |
| 8 | -0- | <117,939> |
| 9 thru 15 | -0- | <1,268,606> |
| 16 thru 30 | -0- | <439,022> |
| | $1,165,225 | $ -0- |



8-20-90 EF 6

Date: August 20, 1990 Docket No.: 08515

Based on the institution's most recent estimate at September 30, 1990, the following was the projected phantom income and losses through 2005:

| Year | ($In Millions) Phantom Income (Loss) |
|---|---|
| 1990 | $ 3.7 |
| 1991 | 12.3 |
| 1992 | 10.1 |
| 1993 thru 1996 | 13.4 |
| 1997 thru 2005 | ($17.4) |

Mr. Bangert said the institution did not intend to purchase any additional phantom residuals subsequent to September 30, 1990. He also said subsequent to the recapture of the principal investment, the phantom income and losses were treated as off-balance sheet transactions. He said the institution will estimate the projected phantom income and expense semiannually and the expected changes in this income and expense under interest rate scenarios of plus or minus 2.0%. He said this report would be updated quarterly if interest rates changed significantly. Mr. Bangert said the phantom residuals were reported in the 20% risk category (except those with IO component) because their characteristics were similar to reporting instructions for low risk mortgage derivatives. He said the institution would report these investments in the 100% risk category. He also said the regular residual interest was analyzed but not documented. He said this analysis would be prepared and presented to the board.

7. Interest Rate Risk

The institution estimates the changes in the market value of portfolio equity (MVPE) and net interest income (NII) quarterly with an internally developed model. The expected change in the MVPE in an interest rate scenario of +4.0% exceeded the board's limits. The limits would have also been exceeded in the +2.0% scenario if the estimated values used by the examiners for the residuals were used for the base case calculations.

The following tabulation details the institution's estimated change in MVPE and NII as compared to the board's limits at June 30, 1990:

| | MVPE | | | NII | | |
|---|---|---|---|---|---|---|
| Interest Rate Scenario | ($ Millions) Estimated Change Dollar Value | Percent Change From Base | Board Limit | ($ Millions) Estimated Change Dollar Value | Percent Change From Base | Board Limit |
| +4.0% | -$26.0 | -104.6 | 100 | -$4.3 | -43.8 | 90 |
| +2.0% | - 12.2 | -49.2 | 40 | -1.2 | -12.7 | 45 |
| No Change | | | | | | |
| -2.0% | 8.0 | 32.2 | 40 | 6.1 | 61.9 | 45 |
| -4.0% | 10.5 | 42.1 | 100 | 9.2 | 94.4 | 90 |



8-20-90 CF6

The change in the MVPE in an increasing interest environment is primarily attributed to the investment in principal only securities which decreased $3.9 million in the plus 2.0% scenario.

As of December 31, 1989, the one year and three year negative cumulative gaps were 3.3% of assets and 6.2% of assets based on the Office of Thrift Supervision's assumptions for mortgage prepayments and decay assumptions for passbook, transaction, and money market deposit account (MMDA). As of December 31, 1988, the one and three year negative cumulative gaps were 17.9% and 17% of assets, respectively. The reason for the decrease in the gap ratios from December 1988 to December 1989 was primarily attributed to the method used by OTS to treat the mortgage derivatives as compared to a decrease in the interest rate risk. The institution's interest rate risk can change significantly quarterly due to the use of off-balance sheet hedging techniques which included futures, options, and interest swaps and caps.

Mr. Bangert said the board has set December 31, 1990 as an objective for compliance with the limits. He said the Super POs were purchased to provide additional interest income in a decreasing interest rate environment when mortgage prepayments were expected to decrease as indicated in his response detailed in comments for Super POs. He said the drawback with Super POs was that their market value decreases significantly when interest rates increase and mortgage prepayments slow.

8. Adjustable Rate Mortgage Backed Securities (ARMS)

At July 31, 1990, the balance of the ARM portfolio was $72,479,944 or 17% of assets as compared to $119,839,965 at the previous examination. The board minutes did not contain the rationale for sales of the ARMs.

At July 31, 1990, the portfolio included $61,042,778 of private ARMS rated "AA" by Standard and Poor's which had unrealized gains of $671,664. The private ARMS were indexed primarily to the 11th District Cost of Funds (38%) and the 1-year Constant Maturity Treasury (CMT) index CMT (31.5%). The remaining "AA" ARMS were indexed to the six month CMT and the three year CMT. The margins for the "AA" ARMs ranged from 1.70% to 2.38%.

The remaining portion of the portfolio was comprised of $11,437,166 in securitized Federal Home Loan Mortgage Corporation (FHLMC) and Federal National Mortgage Association (FNMA) ARMS with unrealized gains of $307,014. All of the FHLMC and FNMA ARMs were indexed to the one year CMT. The margins for securitized FHLMC and FNMA ARMS ranged from 2.00% to 2.25%.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

The following table details the ARM sales since the previous examination:

| | ($In Millions) Dollar Amount | Gain |
|---|---|---|
| 6-89 | $12.7 | $ 29,080 |
| 7-89 | 8.0 | 7,399 |
| 11-89 | 7.9 | 32,623 |
| 4-90 | 17.3 | 167,800 |
| 5-90 | 3.0 | 13,603 |
| 6-90 | 4.1 | 41,195 |
| Totals | $53.0 | $291,700 |

Mr. Bangert said the ARMs were sold to provide funding for the purchase of the phantom residuals. He said large dollar amounts of ARM sales were not expected in the future.

9. Fixed Rate MBS Sold

Since the previous examination, most of the sales activity of fixed rate MBS resulted from the origination, securitization and sale of 30 year fixed loans. In January 1990, the board of directors approved a mortgage banking policy which indicated that the institution would sell all 30 year fixed rate loans and retain for portfolio fixed rate 15 year loans and ARMs. The policy also identified limits for the maximum interest rate exposure which was the greater of two months tangible earnings or $500,000.

The following tabulation details the sale of fixed rate MBS since the previous examination:

| | ($ Millions) Dollar Amount | Gain/ (Loss) |
|---|---|---|
| 6-89 | $ 3.2 | $ 31,211 |
| 7-89 | 3.4 | 72,965 |
| 8-89 | 4.1 | 34,026 |
| 9-89 | 3.0 | (10,541) |
| 10-89 | 3.1 | (25,106) |
| 11-89 | 2.0 | (5,804) |
| 12-89 | 8.2 | 406,211 |
| 1-90 | 2.0 | (9,402) |
| 4-90 | 4.0 | (60,801) |
| 5-90 | | |
| 6-90 | 3.0 | 6,634 |
| Totals | $36.0 | $439,393 |



8-20-90 EF-6

WON034 1092 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Of the above total, $28.6 million with gains of $81,590 related to the origination, securitization and sale of mortgages/MBS. The largest portion of the gain ($328,597) resulted from the sale from portfolio of $4.2 million of FHLMC MBS with a coupon rate of 8.25%.

10. Futures and Options

In April and May 1990, the institution entered into various Treasury note futures contracts matched against fixed rate private pass-through securities maintained in portfolio. The positions were open for periods ranging from five days to 22 days. As of July 31, 1990, the deferred loss from these positions was $167,579. The deferred loss was amortized over the estimated life of the matched assets which was a period approximating seven years. Although the correlation between the futures positions and the change in value of the private pass-through securities was over 80%, the futures positions only provided protection against increasing interest rates while open. The examiners recommend that any losses from futures positions open for short time periods and matched against assets or liabilities intended for portfolio be recognized over the time period the protection against increasing interest rates was provided.

The institution entered into the following positions:

(In $Millions)

| Description | Maximum Open Position | Maximum Open Premium | Overall Gain or (Loss) | Deferred Gain or(Loss) |
| --- | --- | --- | --- | --- |
| Eurodollar Options | $175 | $53,125 | ($ 67,625) | |
| Options on T-Bond Futures | 16 | 55,516 | (11,171) | |
| Options on MBS | 3 | 19,688 | | |
| Eurodollar Futures | 75 | | ( 137,708) | ($118,750) |
| Treasury Bond Futures | 2 | | (5,000) | |
| Treasury Note Futures | 5.5 | | ( 171,063) | ( 167,579) |
| Covered Call Options | 5.0 | $33,594 | 26,875 | |

The institution had written calls with par values of $5 million and $3 million matched against MBS in portfolio. The $5 million call was offset at a gain of $6,250. The call, with a par value of $3 million, was exercised at a net overall gain of $6,094. The institution did not identify the matched securities as intended for sale which would require the lower or cost of market (LOCOM) accounting method.

Mr. Bangert said the Treasury note futures provided protection against interest rate risk at a highly uncertain time. He said he did not anticipate entering into any other futures position which would be open for a short time period and would be matched against long term assets. He said other means of interest rate risk protection would be reviewed including put options. He also said any matched securities for covered calls would be identified for sale and recorded under LOCOM.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

11. Reverse Repurchase and Fixed Coupon Dollar Reverse Repurchase (Dollar Rolls) Agreements

Borrowings under reverse repurchase agreements totaled $117.1 million with a weighted average interest rate of 8.3% and borrowings under dollar rolls totaled $8.2 million at a weighted average interest rate of 7.8%. The total amount borrowed under these agreements was $125.3 million, or 30.2% of total liabilities. Borrowings under these agreements have increased by approximately $34 million since the previous examination. Borrowing under these agreements was excessive and the examiners recommend that the balance of these borrowings be reduced.

The institution continuously rolled-over at maturity fixed coupon dollar reverse repurchase agreements (dollar rolls) from May 1989 to July 1990. The transaction was collateralized by MBS with a book value of $2.3 million. The institution was required to retain these securities in portfolio unencumbered for 35 consecutive days each 12-month period. If this requirement was not met, the securities should be recorded at the lower of cost or market until the 35 day time period was satisfied. The securities on continuous dollar roll had an unrealized gain of $21,642 at July 31, 1990. The securities were removed from dollar rolls in August 1990 (12 C.F.R. Section 571.16 (d)(2)(i)) and Statement of Position 85-2).

In April 1989, the institution established the following collateralization ratios: Treasury and Agency collateral (105%); government or government sponsored MBS (110%); high risk mortgage derivatives (125%). The examiners reviewed 32 of the 363 reverse repurchase and dollar roll transactions and concluded that the institution had complied with the board limits.

Mr. Bangert said the balance of borrowings under reverse repurchase and dollar rolls would be reduced. He said prospectively securities assigned under dollar roll will meet the 35 day requirement.

12. Interest Rate Swaps and Caps

At July 31, 1990, the notional amount of swaps outstanding was $40 million with a weighted average fixed interest rate paid and maturity of 8.31% and 1.6 years, respectively. The swaps were matched against reverse repurchase agreements. Swaps with a notional amount of $35 million were entered into in July and August of 1989 with Salomon Brothers. The institution received the variable rate based on 90 day LIBOR for swaps with a $35 million and 180 day LIBOR ($5 million). At July 31, 1990, 90-day and 180-day LIBOR approximated 8.23%.

At July 31, 1990, the balance of outstanding caps which were also matched against the reverse repurchase agreements was $55 million with a weighted average interest rate and maturity of 9.05% and 2.1 years. The cap rate was indexed to 90-day LIBOR. Caps with a notional amount of $30 million were entered into in July 1990 for a cost of $380,000. As of July 31, 1990, the unamortized balance of cap fees was $428,445 and the monthly amortization expense was $15,201.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

OPERATING RESULTS

Our review of operations included an analysis of the level, trend, and stability of earnings. In addition, we reviewed several key operating ratios and compared the results to peer group data.

Net income for the month of July 1990 was $134,000. For the six month period ended June 30, 1990, net income was $1.2 million which on an annualized basis would total $2.4 million. For the fiscal year ended December 31, 1989, net income totaled $1.5 million. Per the July 1990 business plan, net income is projected to be $2.5 million for the year ending December 1990. Recent income is being generated primarily from operating sources.

Net interest income was $4,257,000 for the six month period ended June 30, 1990. Net non-operating income for the six month period ended June 30, 1990 was $487,000 and this non-operating income is being generated primarily from the sale of mortgage loans and real estate owned. There was a net non-interest operating loss of $3,581,000 for the six month period ended June 30, 1990, which is attributable primarily to compensation, legal, and marketing expenses.

The institution's high interest earning investment portfolio has contributed favorably to recent operating results. At July 31, 1990, the $227,460,033 investment portfolio had an weighted average yield of 11.3%. The high portfolio yield was primarily due to the $65,294,098 investment in phantom residuals, which were yielding an average of 16.35%. The average yield of the investment portfolio, excluding the phantom residual income, would be 9.7% at July 31, 1990. Accordingly, the phantom residual income has had a substantial positive effect on net income results since the first residual was purchased in February 1990. Future income results will be lessened as the funds from the phantom residual paydowns are reinvested in lower yielding investments or used to payoff outstanding reverse repurchase agreements. (See the Risk Management section for additional details.)

It was noted during the previous examination that the benefits of purchase accounting have had a favorable effect on operations. The mortgage loans and other assets acquired through the mergers were marked to market and discounted on an individual basis. The accretion of the discount was computed using the level yield method over the remaining weighted average life of the asset and adjusted for prepayments. Goodwill amortization was computed on a straight line method over 25 years. Accretion of the discount has had a positive effect on operations.

At May 31, 1989, the remaining GAAP goodwill was approximately $3,990,000. This was net of a $8.0 million FSLIC assistance, recorded as capital for regulatory purposes, and a $319,079 income tax offset at December 31, 1988. Discounts totaled $11,502,753 at May 31, 1989. Purchase accounting discounts of $7,752,188 remained at May 31, 1990.



8-20-90 EF-6

WON034 1095 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The following was noted in the independent auditor's report as of December 31, 1989:

"During 1989, certain provisions of the assistance agreement relating to the original FSLIC assisted merger and conversion were clarified. As a result, additional assets totaling $2,044,000 were recorded in 1989. This was accounted for as a reallocation of the original purchase price. This resulted in an excess of fair value over the cost of net assets acquired. This amount was used to eliminate the original goodwill, reduce long-term fixed assets acquired to zero and the remainder is reflected as a deferred credit. This resulted in an increase in 1989 income of $341,254 to record as income the goodwill amortization and tax expense originally recorded in 1988."

"During 1989, River Valley expensed the remaining excess of cost over fair value of net assets acquired arising from the acquisition of Peoria Savings and Loan. The additional amortization was based upon the conclusion that the negative publicity within the industry, adverse deposit retention history, and the adverse regulatory changes have substantially reduced the franchise value."

Non-operating results were favorably affected during the six month period ended June 30, 1990 by a decline in other non-interest operating expense due to the elimination of the goodwill amortization expense, while the purchase accounting discounts continue to be accreted to income.

A review of the April 18, 1990 Board of Directors meeting revealed that there was excess funding of Home Federal Savings pension plan that will allow the institution to realize a profit of approximately $421,000 in 1990. Senior Vice President Jerry Pini said the overfunding is attributed to very conservative accrual assumptions and the plan did not have a turnover assumption. Pension Funds accumulated in the plan and management anticipates reversion of the funds prior to the end of the year.

Business Plan

The institution's five year business plan, dated July 31, 1990, was reviewed. The following summary is provided.

The plan provides for a gradual improvement in operating results over the five year period. The business plan projects a return on assets of 0.6% for the year ended 1990 and approximately 0.7% for years 1991 through 1994. These projections are based on a conservative annual growth of approximately 1% to 2%. The institution plans on maintaining minimal interest rate risk, which will be accomplished through strategies implemented at HPI.

Operating activities and much of the management expertise will continue to be consolidated and shared by both the Peoria and Rock Falls institutions. Loan servicing is expected to be one of the more important profit centers. The primary lending focus is to be on fixed-rate, secondary-market saleable residential mortgage loans. Under study is a program to centralize all processing and underwriting functions at the Jefferson Street office in Peoria. The accounting function for the Rock Falls institution is now being provided on a contract basis by the Peoria institution.



8-20-90 EFL

Date: August 20, 1990 Docket No.: 08515

The institution has contracted with HPI wherein HPI provides asset/liability management, marketing, and executive management.

The institutions intend to build their capital structure to meet the fully-phased in requirements before they are implemented on December 31, 1994. Operating earnings are expected to average between 65 and 75 basis points, as a percent of assets, allowing the institution's to exceed 3% tangible capital by the end of fiscal 1991.

MISCELLANEOUS

1. Merger Plans

Since the previous examination of June 26, 1989, management had been negotiating for the merger of the two institutions, River Valley, FSB and River Valley Savings, Rock Falls. The approval was pending a ruling from the Internal Revenue Service (IRS) regarding whether the preferred stock held by the FDIC has the characteristics of common stock. If the stock was proved to ~~be considered common, then the mergers would constitute a change in control,~~ and the institution's would lose the benefits of net operating loss carryforwards.

A favorable ruling was received from the IRS in September 1990. Mr. Pikus said that with the ruling from the IRS received, management is anticipating a merger by March 31, 1991. Mr. Pikus said that a decision has not been made yet as to whether the surviving institution will have a federal or state charter.

2. Surety Bond Coverage

Regulation 12 C.F.R. Section 563.190(a) requires institutions to maintain Standard Form 22 surety bond coverage or its equivalent. The institution currently maintains coverage for the two institutions in the aggregate amount of $4,560,000 from the Cincinnati Insurance Company. This policy is considered an equivalent to Standard Form 22; however, River Valley, FSB is lacking adequate coverage. River Valley, FSB requires a minimum of $3,000,000 in coverage and River Valley Savings Bank, Rock Falls requires a minimum of $1,755,000 in coverage; indicating a total requirement of $4,755,000. Current coverage for River Valley, FSB and River Valley Savings Bank, Rock Falls consists of $1,965,000 and $2,595,000, respectively. Accordingly, a deficiency of $195,000 exists.

Vice President Roger L. Kilpatrick stated that the policy coverages will be changed to increase the amount for River Valley, FSB and additional coverage will be added to meet the requirements for FSB. The institution received a letter from their insurance agent, dated September 21, 1990, indicating that the surety bond coverage had been increased to required levels.



8-20-90 EF6

WON034 1097 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

APPENDIX

8-20-70

EF 6

Date: August 20, 1990 Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS

Number of Directors Meetings Held During Past 12 Months: 4
Number of Directors Authorized: 12
Number of Vacancies: 1

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 mos. | Tenure as Director<br>Year Appt.<br>Year Exp. | Current Annual Salary<br>Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| ROSS, Howard R.<br>950 N. Michigan Avenue<br>Chicago, IL 60606 | D,CB<br>05-11-26 | 3 | 1988<br>1993 | $ 75,000<br>175,000 1/<br>2,424 2/ |
| HOLLAND, Homer J.<br>360 E. Randolph #2404<br>Chicago, IL 60601<br>Pres. - Holland Partners | D,VCB,,CEO<br>11-30-41 | 4 | 1988<br>1993 | ** |
| BANGERT, Steven<br>20245 W. Indian Creek<br>Mundelein, IL 60060<br>EVP - Holland Partners | D,T<br>01-13-57 | 4 | 1989<br>1993 | ** |
| > KIPNIS, Mark S.<br>3012 Reenes Court<br>Northbrook, IL 60062<br>Attorney | D,S<br>08-04-47 | 4 | 1988<br>1993 | 3,400 3/ |
| CLAUDON, Chester J.<br>62 Redwood Circle<br>Canton, IL 61520<br>Attorney | D<br>06-17-22 | 3 | 1988<br>1991 | 3,050 3/ |
| DETHEMPE, L. David<br>6226 N. Jamestown Road<br>Peoria, IL 61615<br>Retired VP.- P.A. Bergner & Co. | D<br>03-15-24 | 4 | 1988<br>1991 | 3,400 3/<br>5,250 4/ |
| LADD, Thomas P.<br>1842 N. Larrabee<br>Chicago, IL 60614<br>VP - CNA Insurance | D<br>03-20-44 | 1 | 1990<br>1992 | 850 3/ |
| POWERS, Robert L.<br>3316 W. Glouchester Ct.<br>Peoria, IL 61615<br>Pres. - Caterpillar Venture | D<br>06-29-45 | 3 | 1989<br>1992 | 3,050 3/ |



8-20-90 LP-6

WON034 1099 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS (Continued)

| Name— Mailing Address Occupation | Title Date of Birth | Meetings Attended 12 mos. | Tenure as Director Year Appt. Year Exp. | Current Annual Salary Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| ROTHMAN, Noel W.<br>2738 Euclid Park Place<br>Evanston, IL 60201<br>Pres. - Nantor | D<br>01-16-30 | 2 | 1989<br>1992 | $ 2,700 3/ |
| ROTHMAN, Michael *<br>208 South LaSalle<br>Chicago, Illinois 60606 | D<br>06-04-57 | 1 | 1990<br>1992 | |
| TUERK, Fred J.<br>3228 Prince George Ct.<br>Peoria, IL 61615<br>Retired Illinois<br>State Representative | D<br>07-19-22 | 4 | 1989<br>1991 | 3,400 3/ |
| PIKUS, Ronald<br>1873 Jahns<br>Wheaton, IL 60187 | P,HO<br>06-10-47 | Housing association in Peoria? | | 108,000<br>2,700 2/ |
| KILPATRICK, Roger L.<br>117 Northaven<br>Peoria, IL 61614 | EVP<br>08-07-50 | | | 70,400<br>15,000 1/<br>2,288 2/ |
| BEALE, John<br>465 Rosewood<br>Canton, IL 61520 | Div. President<br>04-03-28 | | | 49,050<br>1,595 2/ |
| KRISTOF, Sharon<br>6430 W. 94th Place<br>Oak Lawn, IL 60453 | SVP<br>11-14-48 | | | 59,000<br>1,770 2/ |
| MORSCH, Susan<br>200 4th<br>Pekin, IL 61564 | SVP<br>05-14-38 | | | 29,000<br>2,500 1/<br>798 2/ |
| PINI, Gerald O.<br>3520 N. Missouri<br>Peoria, IL 61603 | SVP<br>03-13-40 | | | 39,400<br>1,576 2/ |



8-10-90 EF-6

Date: August 20, 1990 Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS (Continued)

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 mos. | Tenure as Director<br>Year Appt.<br>Year Exp. | Current Annual Salary<br>Other Remuneration<br>From Association<br>(Annual Amount) |
|---|---|---|---|---|
| PORTER, Linda L.<br>5626 Talison<br>Peoria, Illinois 61614 | SVP<br>07-04-41 | | | 37,000<br>4,000 1/<br>925 2/ |
| RICHARDSON, Gary L.<br>5027 W. Woodfern<br>Peoria, IL 61607 | SVP<br>04-30-51 | | | $ 37,000<br>7,500 1/<br>1,100 2/ |
| WITT, Trinia M.<br>127 W. Glen<br>Peoria, IL 61614 | SVP<br>10-03-41 | | | 38,500<br>2,500 1/<br>1,058 2/ |
| SEIB, Ronald<br>1740 N. Lakeview<br>East Peoria, IL 61611 | VP,C<br>07-11-57 | | | 58,500 |

Footnotes and Comments:

1/ Bonus paid in 1990.
2/ 401 K contributions.
3/ Directors' fees are $500 per quarter plus $350 per meeting attended.
4/ $750 monthly fee paid for accounting functions performed during the first seven months of 1990.

* Michael Rothman was elected to fill a vacancy in June 1990, however, due to a technical violation he resigned in July 1990. Mr. Rothman was reinstated to the Board in August 1990.

** Messrs. Holland and Bangert are paid through Holland Partners, which receives a management fee from River Valley Savings, FSB.

Directors DeTrempe, Kipnis, Ladd, Holland, and Ross are also directors at River Valley Savings Bank (Rock Falls).



8-20-90 LF-b

Date: August 20, 1990 Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS (Continued)

River Valley Savings Bank, F.S.B.
Organization Structure






8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

PRINCIPAL OPERATING COMMITTEES

| Name of Committee and Description of Functions | Frequency of Meetings | Members of Committee | Amounts of Fees Received |
|---|---|---|---|
| EXECUTIVE Reviews business of institution. | Monthly | Homer J. Holland<br>Howard R. Ross<br>Steven Bangert | None |
| AUDIT/PERSONNEL Reviews internal audit procedures, acts as personnel committee, recommends administrative changes. | Quarterly/ as needed | L. David DeTrempe<br>Homer Holland<br>Mark Kipnis | None |
| MARKETING/LOAN Reviews loan policies and practices. Approves and reviews loans made under the lending policies. | Quarterly/ as needed | Fred J. Tuerk<br>Howard R. Ross<br>Chester J. Claudon | None |
| ASSET/LIABILITY Reviews asset/liability management policies and interest rate risk policy. | Quarterly/ as needed | Steven Bangert<br>Robert L. Powers<br>Noel W. Rothman | None |



8-20-90 EF-6

Date: August 20, 1990 Docket: 08515

COMPARATIVE STATEMENTS OF FINANCIAL CONDITION (1)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| **ASSETS** | | | |
| Mortgage Loans, Contracts, and Mortgage Pool Securities | 334,378 | 274,110 | 300,737 |
| Memo: | | | |
| MORTGAGE POOL SECURITIES | 145,697 | 120,503 | 155,839 |
| Less: | | | |
| Loans in Process.......... | 0 | 345 | 139 |
| Other Contra Accounts..... | 10,364 | 10,094 | 12,424 |
| Non-Mortgage Loans............ | 10,769 | 18,191 | 23,366 |
| Memo: | | | |
| Com. Loans and Leases....... | 3,500 | 3,542 | 2,815 |
| Cons. Loans and Leases...... | 7,053 | 14,455 | 20,415 |
| Accrued Interest............ | 216 | 194 | 136 |
| Less: | | | |
| Contra Accounts........... | 623 | 480 | 938 |
| Repossessed Property.......... | 6,112 | 6,192 | 10,022 |
| Real Estate Investments....... | 0 | 0 | 0 |
| Less: | | | |
| Contra Accounts........ | 2,222 | 1,993 | 4,700 |
| Cash & Investment Securities.. | 68,630 | 85,558 | 75,549 |
| Investment in Subsidiaries Service Corporations........ | 2,256 | 2,255 | 2,226 |
| Fixed Assets - Net............ | 2,488 | 1,633 | 2,800 |
| Deferrals Pursuant to 563c.14. | 0 | 0 | 0 |
| Goodwill & Other Intangibles.. | 0 | 0 | 12,006 |
| Other Assets.................. | 4,933 | 5,413 | 7,247 |
| TOTAL ASSETS.................. | 416,357 | 380,440 | 415,732 |
| **LIABILITIES AND MODIFIED EQUITY CAPITAL** | | | |
| Liabilities: | | | |
| Deposits...................... | 270,816 | 277,158 | 310,533 |
| Advances from FHLB............ | 10,500 | 10,500 | 17,225 |
| Other Borrowed Money.......... | 112,854 | 71,196 | 58,823 |
| Unamortized Yield Adjustmts on Purchsd Deposits & Borrowings | 0 | 22 | 61 |
| Other Liabilities............. | 10,608 | 6,112 | 6,386 |
| Definitional Capital.......... | 0 | 4,600 | 4,600 |
| Less: FSLIC Notes Captl Instr | 0 | 0 | 0 |
| TOTAL LIABILITIES............. | 404,778 | 369,588 | 397,628 |



8-20-90 EF-6

WON034 1104 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 199[redacted] [redacted] Docket: 08515

COMPARATIVE STATEMENTS OF FINANCIAL CONDITION (1)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| MODIFIED EQUITY CAPITAL: | | | |
| Perpetual Preferred Stock..... | 10,000 | 10,000 | 10,003 |
| Common Stock - Par Value...... | 1 | 1 | 1 |
| Paid in Excess of Par......... | 0 | 0 | 8,000 |
| Retained Earnings ............ | 1,578 | 851 | 100 |
| TOTAL MODIFIED EQUITY CAPITAL. | 11,579 | 10,852 | 18,104 |
| TOTAL LIABILITIES AND MODIFIED EQUITY CAPITAL.............. | 416,357 | 380,440 | 415,732 |
| MEMO: TOTAL REGULATORY CAPITAL ... | 0 | 0 | 28,318 |



8-20-90

BF-6

Date: Auguest 20, 19[illegible] Docket: 08515

[illegible]MPARATIVE STATEMENTS OF OPERATI[illegible]S (1)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| INTEREST INCOME | | | |
| Mtg Loans & Mtg Pool Sec.... | 16,745 | 30,506 | 21,866 |
| Nonmortgage Loans........... | 968 | 2,431 | 2,183 |
| Investments and Deposits.... | 1,663 | 6,880 | 4,408 |
| TOTAL INTEREST INCOME......... | 19,376 | 39,817 | 28,457 |
| Net Effect of Asset Hedges.. | 1 | -2 | -2 |
| ADJUSTED INTEREST INCOME...... | 19,377 | 39,815 | 28,455 |
| INTEREST EXPENSE | | | |
| Deposits.................... | 9,864 | 20,347 | 20,923 |
| Advances, Borrowed Money and Definitional Capital Instu. | 4,539 | 10,367 | 3,373 |
| TOTAL INTEREST EXPENSE........ | 14,403 | 30,714 | 24,296 |
| Net Effect of Liab. Hedges.. | -3 | -77 | -91 |
| Less: Capitalized Interest. | 0 | 0 | 0 |
| ADJUSTED INTEREST EXPENSE..... | 14,400 | 30,637 | 24,205 |
| PROVISION FOR LOSSES ON ASSETS | 720 | 409 | 260 |
| NET INTEREST INCOME........... | 4,257 | 8,769 | 3,990 |
| NONINTEREST OPERATING INCOME | | | |
| Loan Servicing & Other Fees. * (4) | 452 | 923 | 660 |
| Net Income from Service Corp | 58 | 187 | -65 |
| Oth Noninterest Oper Income. | 234 | 250 | 200 |
| TOTAL NONINTER OTH OPER INCOME | 744 | 1,360 | 795 |
| NONINTEREST OPERATING EXPENSE | | | |
| Compensation................ | 1,612 | 2,980 | 2,691 |
| Directors' Fees............. | 13 | 24 | 85 |
| Dirs, Off & Empl Expense.... | 38 | 92 | 50 |
| Office Occup & Equip Expense | 596 | 1,300 | 1,428 |
| Marketing................... | 1,044 | 342 | 198 |
| Oth Noninterest Oper Expense | 1,022 | 5,654 | 2,789 |
| TOTAL NONINTEREST OPER EXPENSE | 4,325 | 10,392 | 7,241 |
| NET OPERATING INCOME.......... | 676 | -263 | -2,436 |



8-20-90 EP6

WON034 1106 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: Auguest 20, 1990 Docket: 08515

COMPARATIVE STATEMENTS OF OPERATIONS (1)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| NONOPERATING INCOME | | | |
| Nonoperating Income......... | 865 | 2,392 | 1,474 |
| Nonoperating Expense........ | 378 | 260 | 3,813 |
| NET NONOPERATING INCOME....... | 487 | 2,132 | -2,339 |
| NET INCOME BEFORE TAXES AND ADJUSTMENTS TO NET INCOME... | 1,163 | 1,869 | -4,795 |
| Income Taxes................ | 0 | 351 | 319 |
| Net Income (Loss)........... | 1,163 | 1,518 | -5,114 |
| Less: | | | |
| Cash Dividends on: | | | |
| Perpetual Preferred Stock | 436 | 767 | 433 |
| Common Stock........... | 0 | 0 | 0 |
| SFAS No 12 Adj Mkt Eqty Sec. | 0 | 0 | 0 |
| Oth Adj to Retained Earnings | 0 | 0 | -199 |
| NET CHANGE RETAINED EARNINGS.. | 727 | 751 | -5,746 |



8-20-90 EP-6

WON034 1107 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2036 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 199[illegible] Docket: 08515

SUMMARY OF KEY OPERATING RATIOS AND TRENDS (1) (2) (3)

| | Period Ended 30-JUN-1990 | | Year Ended 31-DEC-1989 | | Year Ended 31-DEC-1988 | |
|---|---|---|---|---|---|---|
| | ASSN. | PEER GROUP | ASSN. | PEER GROUP | ASSN. | PEER GROUP |
| Asset Growth *................ | 9.4 | N/A | -8.5 | -7.3 | 35.7 | 4.0 |
| Liability Growth *............ | 9.5 | N/A | -7.1 | -5.8 | 15.9 | 3.9 |
| Regulatory Capital / Total Assets ............... | 0.0 | N/A | 0.0 | 0.0 | 6.9 | 4.9 |
| GAAP Capital / Total Assets................. | 2.8 | N/A | 2.9 | 2.1 | 4.4 | 2.9 |
| Net Income / Average Assets *. | 0.6 | N/A | 0.4 | -0.8 | -2.7 | -0.1 |
| Net Income / Total Income..... | 5.5 | N/A | 3.5 | -8.6 | -16.6 | -0.8 |
| Total Income/Average Assets *. | 10.5 | N/A | 10.7 | 9.8 | 16.5 | 9.2 |
| Gross Operating Income / Average Assets *............ | 10.1 | N/A | 10.1 | 9.5 | 15.7 | 9.0 |
| Net Operating Income / Gross Operating Income...... | 5.8 | N/A | -0.6 | -6.5 | -8.4 | 2.0 |
| Net Interest Income / Average Assets *............ | 2.2 | N/A | 2.1 | 1.2 | 2.1 | 1.6 |
| Hedged Net Interest Income / Average Assets *............ | 2.2 | N/A | 2.2 | 1.8 | 2.3 | 1.9 |
| Total Interest Cost / Gross Operating Income...... | 70.5 | N/A | 74.4 | 75.9 | 82.8 | 72.1 |
| Total Interest Costs / Avg. Deposits and Borrow. Money * | 7.5 | N/A | 8.0 | 7.6 | 13.2 | 6.8 |
| Interest Earning Assets / Interest-Bearing Liabilities | 100.3 | N/A | 90.2 | 94.7 | 102.3 | 97.7 |
| Operating Expense / Average Assets *............ | 2.2 | N/A | 2.5 | 2.3 | 3.9 | 2.0 |
| Operating Expense / Gross Operating Income...... | 21.5 | N/A | 25.2 | 24.5 | 24.7 | 22.0 |



8-20-90 5F-6

WON034 1108 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: Augusdt 20, 1990 Docket: 08515

CLASSIFIED ASSETS AND REPOSSESSED ASSETS (1) (3)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| Assets Classified Substandard | | | |
| Assn. $ amount........ | 542 | 275 | 3,502 |
| Assn. % to assets..... | 0.1 | 0.0 | 0.8 |
| Peer Group % to assets | N/A | 1.7 | 1.0 |
| Assets Classified Doubtful | | | |
| Assn. $ amount........ | 3,898 | 1,365 | 0 |
| Assn. % to assets..... | 0.9 | 0.3 | 0.0 |
| Peer Group % to assets | N/A | 0.2 | 0.2 |
| Assets Classified Loss | | | |
| Assn. $ amount........ | 0 | 0 | 0 |
| Assn. % to assets..... | 0.0 | 0.0 | 0.0 |
| Peer Group % to assets | N/A | 0.7 | 0.2 |
| TOTAL Classified Assets | | | |
| Assn. $ amount........ | 4,440 | 1,640 | 3,502 |
| Assn. % to assets..... | 1.1 | 0.4 | 0.8 |
| Peer Group % to assets | N/A | 2.6 | 1.4 |
| Repossessed Assets | | | |
| Assn. $ amount........ | 167 | 4,199 | 5,322 |
| Assn. % to assets..... | 0.0 | 1.1 | 1.2 |
| Peer Group % to assets | N/A | 0.7 | 0.5 |
| Slow Loans and Contracts * (5) | | | |
| Assn. $ amount........ | 1,062 | 0 | 6,750 |
| Assn. % to assets..... | 0.3 | 0.0 | 1.6 |
| Peer Group % to assets | N/A | 0.0 | 0.5 |
| Loan/Contract to Facilitate Sale of REO | | | |
| Assn. $ amount........ | 369 | 2,826 | 5,523 |
| Assn. % to assets..... | 0.1 | 0.7 | 1.3 |
| Peer Group % to assets | N/A | 0.2 | 0.3 |



8-20-90 EF-6

Date: August 20, 1990 Docket: 08515

FOOTNOTES

(1) All ratios identified with an asterisk have been annualized in the stub period.

(2) Peer Group information has been generated for the periods below as follows:

31-DEC-1989

Peer Group information has been calculated using all District 7 institutions within the state of Illinois with total assets between $250 mill - $750 mill.

31-DEC-1988

Peer Group information has been calculated using all District 7 institutions within the state of Illinois with total assets between $250 mill - $750 mill.

31-DEC-1987

Peer Group information has not been calculated because data was unavailable for this docket.

(3) Financial Data reported under "RAP" for periods prior to January 1, 1989 have been restated to conform to the 1989 TFR specifications which are adjusted for "GAAP" reporting.

(4) Loan Fees, which were reported prior to January 1, 1989 in TFR line D080 are now reported in this category in TFR line D100. This presentation, however, does not adjust for FASB No. 91 and overstates "LOAN SERVICING AND OTHER FEES" and understates "TOTAL INTEREST INCOME".

(5) Due to the new capital regulation that is in effect beginning December 7, 1989, zeros will appear in this equation for the December 1989 cycle.



8-20-90 BP-6

WON034 1110 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

DEPOSIT/LIABILITY SCHEDULE

| | | |
|---|---|---|
| I. | BROKERED FUNDS* | |
| | Total Amount | $ 0 |
| | % of Deposits | -% |
| | Interest Rate Range | -% |

*Amounts included herein should not be included in subsequent items II and III.

| | | |
|---|---|---|
| II. | JUMBO CERTIFICATES OF DEPOSIT (=>$80,000) | |
| | Total Amount | $ 9,864,075 |
| | % of Deposits | 3.5% |
| | Interest Rate Range | 7.7% - 10.0% |
| III. | CERTIFICATES OF DEPOSIT (<$80,000) | |
| | Total Amount | $191,014,510 |
| | % of Deposits | 68.2% |
| | Interest Rate Range | 5.9% - 11.9% |
| IV. | NOW, SUPER NOW AND OTHER TRANSACTION ACCOUNTS | |
| | Total Amount | $ 18,793,060 |
| | % of Deposits | 6.7% |
| | Interest Rate Range | 5.3% - 5.8% |
| V. | MONEY MARKET DEPOSIT ACCOUNTS | |
| | Total Amount | $ 17,170,173 |
| | % of Deposits | 6.1% |
| | Interest Rate Range | 5.3% - 5.8% |
| VI. | PASSBOOK ACCOUNTS | |
| | Total Amount | $ 30,967,928 |
| | % of Deposits | 11.1% |
| | Interest Rate Range | 5.3% - 5.5% |
| VII. | ESTIMATE OF UNINSURED DEPOSITS | |
| | Total Amount | $ 12,304,590 |
| | % of Deposits | 4.4% |
| VIII. | BORROWINGS (INCLUDING FHLB ADVANCES) | |
| | Total Amount | $131,761,787 |
| | % of Total Liabilities | 32.6% |
| | Interest Rate Range | 7.8% - 8.9% |

This information reconciles to total deposits and borrowings as of July 31, 1990.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

SUMMARY OF CRITICIZED ASSETS

| | |
|---|---|
| 1. Classified Assets | |
| Portion classified "Substandard" | $6,532,804 |
| Portion classified "Doubtful" | -- |
| Portion classified "Loss" | 619,424 |
| 1A. Total Classified Assets | $7,152,228 |
| Memo--Portion not classified | -- |
| 2. Assets Subject to Special Mention | $ 595,000 |
| Grand Total - Criticized Assets(1A+2) | $7,747,228 |
| % to Total Assets | 1.9% |



8-20-90 BF-6

Date: August 20, 1990 Docket No.: 08515

SUMMARY OF ACTION REQUIRED BY CRITICIZED ASSETS

Action Required

| | | |
|---|---|---|
| 1. | Total General Valuation Allowance Prior to Start Date of Exam | $ 767,983 |
| 2. | Adjustment Required Due to Assets Classified Loss for Which No Specific Reserve Has Been Established | $2,284,997 |
| 3. | Remaining Valuation Allowance (1 - 2) (Examiner should determine adequacy of Remaining Valuation Allowance in Relationship to the Total Assets in the Institution's Portfolio.) | ($1,517,014) |

Comment on Sufficiency of Remaining Valuation Allowance

The institution's current general reserves are based upon a formula covering all of the outstanding loans. Management is currently reserving 10% of all substandard assets and reserving all of the nonclassified loans from .10% to 1.0% based upon the perceived degree of risk.

Based upon the institution's policy for establishing reserves and using the assets classified by the examiners, the institution would need a general reserve of $864,000. Of the $2,284,997 classified as loss, approximately $516,000 was reserved in August 1990. Management has indicated that the general valuation shortfalls will be satisfied by year-end.

The majority of the institution's losses, $1,665,573, are due to the institution's interest in two collateralized mortgage obligations which required a LOCOM adjustment. The remainder of the losses are due to loans that were originated prior to the 1988 merger which were secured by large commercial real estate projects and from the sale of real estate owned properties. Once the large losses are realized, management intends on establishing a $300,000 monthly accrual to increase the general valuation allowance amount.



8-20-90 BF-6

WON034 1113 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

## CLASSIFIED ASSETS

Assets have been classified as Substandard, Doubtful and/or Loss in accord with Insurance Regulation 561.16(c).

Classified assets are grouped as follows:

A. Mortgage loans and contracts

B. Consumer loans

C. Other non-mortgage loans

D. Real estate and other repossessed assets

E. Investment Securities

F. Other assets

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | Substandard | Doubtful | Loss |
|---|---|---|---|---|

A. Mortgage loans and contracts

| | | | | |
|---|---|---|---|---|
| $3,846,352 | | $3,679,125 | | $518,892 |

The above represents 15 loans with 11 of the loans representing $220,000 being on 1-4 family residences. Four of the loans totaling approximately $4 million are discussed in detail later in this section.

B. Consumer loans

| | | | | |
|---|---|---|---|---|
| $31,617 | | $20,269 | | $11,348 |

The above represents eight loans with various collateral. The loans classified loss are over 120 days delinquent.

C. Other non-mortgage loans

None



8-20-90 EF16

WON034 1114 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | Substandard | Doubtful | Loss |
|---|---|---|---|---|
| **D. Real estate and other repossessed assets** | | | | |
| $483,227 | | $444,339 | | $38,888 |
| The above represents 22 properties primarily single family residences in the immediate lending area. The losses represent the net book balance in excess of the fair market value. | | | | |
| $13,373 | | $9,210 | | $4,163 |
| The above represents four repossessed autos that the institution is holding in inventory. | | | | |
| **E. Investment Securities** | | | | |
| $30,000 | | $30,000 | | |
| The above represents the institution's investment in On-Line Financial which has no market value. | | | | |
| **F. Other assets** | | | | |
| $24,000 | | | | $24,000 |
| The above represents 94 accounts which have been overdrawn for over 90 days. | | | | |
| $20,730 | | | | $20,730 |
| The above represents accounts that have had deficiency judgments filed against them. Payments are irregular and not guaranteed. | | | | |
| $2,000,000 | | $2,000,000 | | |
| Credit enhancement classified by recent examination of Savings and Loan Network. A detailed write-up is presented later in this section. | | | | |



8-20-90 EF-6

WON034 1115 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount<br>Past<br>Due | CLASSIFICATION<br>Substandard | <br>Doubtful | <br>Loss |
|---|---|---|---|---|
| Covered Assets | | | | |
| $351,264 | | $349,861 | | $1,403 |

The above represent the classified loans and REO properties that remain as covered assets under the 1988 merger agreements. The above amount is the institution's 10% exposure under the agreement. Only one large property (Village Point) remains under the covered assets. This property is currently REO and has a net book balance of $2.5 million. The examiners concluded that 10% of this balance be classified substandard due to being a non-earning asset.

| | | | | |
|---|---|---|---|---|
| Totals | | $6,532,804 | | $619,424 |

Details on some of the larger classified assets follow:



8-20-90 EF-6

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | CLASSIFICATION<br>Substandard | Doubtful | Loss |
|---|---|---|---|---|
| $1,047,227<br>22 individual borrowers<br>Lexington Hills condos | | $880,000 | | $167,227 |

All 22 of these loans are in the process of being foreclosed upon due to nonpayment by the borrowers. The loss is based on an August 1988, appraisal of $880,000.

This participation loan was entered into in 1983 with the institution having 22 individual loans in a 54 unit condominium complex in St. Paul, Minnesota. The lead lender was Knutson Mortgage Co. which was later purchased by Meritor Financial. The majority of these condos were purchased as tax shelters by wealthy investors and were leased out by the owners. Problems began with the project after the 1986 change in the tax laws which made income properties a less desirable investment.

The problem with the payments began after it was discovered that the individual borrowers had formed a partnership on the day of the closing and had assigned their ownership to the partnership. This partnership was formed without the knowledge or consent of the lenders. The general partner was to manage the property and remit the mortgage payments. However, when the institution refused to renegotiate the interest rate on the loans, the general partner stopped sending payments. The institution has initiated foreclosure proceedings against the individual borrowers.

The individual borrowers on each loan, appear to have assets that could be used to satisfy any deficiencies. The borrowers are contending that they were only in this project as investors and did not realize that they were personally guaranteeing the loans. The institution's attorneys do not feel that this is a valid defense and would not hold up in court.

Each of these loans has 25% MGIC mortgage insurance, however, MGIC notified the lenders that the coverage was canceled due to fraud and misrepresentations made by the lead lender.

The institution plans to sell the properties after foreclosure and then to proceed against the individual guarantors and the lead lender for any deficiencies. The institution also plans to file legal action against Knutson Mortgage based upon the Racketeer Influenced and Corrupt Organizations Act (RICO).



8-20-90 EF-6

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | Substandard | Doubtful | Loss |
|---|---|---|---|---|
| $991,562<br><361,562> Specific valuation allowance | | | | |
| $630,000<br>Peppertree Ltd.<br>Gordon Oates, Robert Buchanan general partners<br>110 unit apartment complex<br>Hattiesburg, Mississippi | | $630,000 | | |

The above represents the institution's 45% participation interest based upon an appraisal of $1.4 million dated November 1989. This loan continues to run delinquent due to the fact that the cash flow, even at 100% occupancy, cannot service the debt. This loan was classified at the previous examination.

In 1983, the original purpose of this loan was to build student housing for a local college, however, the market was over-built and the projects will not generate sufficient cash flow.

The loan was assumed by the general partners in 1987 and limited personal guarantees were given, however, these guarantees expired December 31, 1988. Two of the three participants have agreed to write the loan down to the appraised value of $1.4 million and finance it for 20 years. The general partners have agreed to that amount. Due to the other participant being under the control of the RTC, the final approval must come from the regional RTC office. At the time of the examination the approval has not been received.

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | Substandard | Doubtful | Loss |
|---|---|---|---|---|
| $596,665<br>Four Seasons Limited Partnership<br>220 pad Mobile Home park<br>Peoria, Illinois | | $245,000 | | 351,665 |

A recent appraisal valued the land at $245,000 and indicated no value to the business due to the project operating at a deficit. Presently, the mobile home park has a vacancy rate of 63%. The loss amount is based upon this appraisal. A specific allowance for the loss was established in August.



8-20-90 EF6

WON034 1118 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | CLASSIFICATION Substandard | Doubtful | Loss |
|---|---|---|---|---|

This property had been in REO and was sold and financed 100% prior to the previous examination. There are no personal guarantees from any of the partners involved. This property is experiencing cash flow problems due to a high number of vacant spaces in the mobile home park. The borrowers have injected over $200,000 of their own money into the project for improvements, however, the economy for mobile home parks is not as strong as projected.

The institution has modified this loan with monthly payments of insurance and taxes only for a period of 12 months. The borrowers are to provide the institution with monthly operating statements. This modification is due for review at the end of six months and the institution has the option to change the agreement at that time.

| | | | | |
|---|---|---|---|---|
| $1,703,733<br>Kingspark Mobile Estates Inc.<br>566 pad mobile home park<br>Peoria Illinois | | $1,703,733 | | |

This loan has been classified by the institution due to the payments being modified to interest only. This loan had an original balance of $2,750,000 in 1973. This loan has been modified several times since its inception. This mobile home park has experienced operating losses every year since 1986.

This loan is experiencing cash flow problems due to a 50% occupancy rate in the trailer park. Computations show that another 50 pads have to be rented to be able to service the debt.

A net realizable value calculation of the property by the institution indicated a value of $1,778,000. The most recent financial statement on the partnership shows a net worth of a negative $1.2 million.



8-20-90 EF-6

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | CLASSIFICATION<br>Substandard | Doubtful | Loss |
|---|---|---|---|---|
| $2,000,000<br>Century Point Apartments<br>228 unit rental development<br>Glendale Heights, Il. | | $2,000,000 | | |

The June 11, 1990 examination of the Savings and Loan Network (RESCORP) classified this loan as substandard. This institution has a contingent liability in this project through a credit enhancement entered into in November 1985. This credit enhancement involves six institutions and represents $11,000,000. The following information is taken from the recent report of examination.

Century Point is a multi-family rental development located in the Village of Glendale heights, Illinois. This 228-unit rental development consists of 14 three story buildings on 11.5 acres. The property is owned by the estate of Thomas J. Origer. Thomas Origer, the original borrower who executed the financing agreement and various other documents in connection with the project, died on January 23, 1987. Messrs. Robert W. Reninger and Warren R. Filler were appointed executors of the estate of the borrower. All actions of the borrower connected with the project, including a personal guarantee to fund operating deficits, were accepted by the estate.

Although the project generated marginal profits for the year ended December 31, 1989, the status of the property has somewhat declined. The debt service ratio was 1.04 with an occupancy rate of 98%. At April 30, 1990, the debt service ratio decreased to .97 while occupancy increased to 99%. For the first four months of calendar year 1990, the project incurred an operating deficit of $12,650. The project manager indicates that operating deficits will continue for three of the next five years. Although the borrower, which is the estate of the original borrower, has funded the operating deficits to date, it is uncertain that this will continue. There is no financial information available on the estate to substantiate ability to fund. The existing reserves and certificate of deposit do not provide enough additional support at this time.



8-20-90 EP-6

WON034 1120 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

Shorewood Builders, which is owned by the estate and manages the property, expects the project to incur a minimal operating deficit in three of the net five years. Beginning in 1991, the bonds are scheduled to be redeemed, initially at $130,000, and increasing $10,000 to $45,000 annually thereafter. To provide for the increase in debt service payments, there is an estimated 8% increase in rental revenues in 1991. Even with the increase, the project would incur a $13,000 deficit. If the rental increase is a more reasonable 4%, the estimated deficit would rise to approximately $85,000 for the 1991 fiscal year.

The project has three reserves as follows: Debt Service $592,856, Taxes and Insurance $176,989, Replacement $137,845. The reserves are specific in nature and may not be used for purposes other than those specified by their titles, except in the event of default when all reserves may be used to fund the debt service. To date, the only withdrawals have been from the replacement reserves and the taxes and insurance reserve for ordinary operating expenses. In addition, a $330,000 certificate of deposit has been pledged for working capital at Irving Federal.

The bonds were issued on December 4, 1985 at a variable rate of interest adjusting monthly and maturing in 2009. The executors of the estate elected to convert the interest rate on the bonds to a fixed rate of 7.70% for the period commencing July 1, 1987 through April 30, 1997.



8-20-90 EF-6

WON034 1121 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

ASSETS SUBJECT TO SPECIAL MENTION

| Total Dollar Amount<br>Name of Borrower<br>Description<br>Comments | Amount Criticized |
|---|---|
| $400,000<br>Tara Air Corporation<br>Airplane | $400,000 |

The above debt consists of a $400,000 single-pay note dated May 1, 1990, and due May 1, 1991. This loan represents a renewal of a $400,000 single-pay loan that was originated in May 1989. The original purpose of this loan was to purchase a 1976 Rockwell 690B Aircraft that had a sales price of $484,000. The airplane serves as the sole collateral on this debt and management indicated that repayment of the debt will come from the sale of the collateral. This loan also has three separate guarantees for $400,000. Management indicated that the guarantors individual net income could serve as an additional source of debt reduction. Outdated financials indicated that the guarantors all had substantial net worth and adequate net income to service the debt. The corporation's only asset is the airplane. Management could not estimate the value of the airplane, but indicated that the value usually increases due to limited production of these types of airplanes.



8-20-90 BFL

Date: August 20, 1990 Docket No.: 08515

ASSETS SUBJECT TO SPECIAL MENTION (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description<br>Comments | Amount Criticized |
|---|---|
| $90,000<br>Kalrob Enterprises, Inc.<br>Guaranteed by Howard Levinson | $90,000 |
| $105,000<br>Howard Levinson | $105,000 |

The above debt consists of two single-pay notes that were originated in April 1990, and mature in April 1991. Proceeds of the loans were used to purchase a 1975 Cessna C421 Airplane and to pay-off a $75,000 unsecured note at this institution. Collateral for this debt consists of the airplane (purchase price $110,000) and a mortgage on vacant land in Chicago with an appraised value of $117,750 in May 1990. No financial information on the corporation was in the credit file and reportedly the only asset of the corporation is the airplane. A personal financial statement of Mr. Levinson indicates a net worth of approximately $4 million with the majority of the net worth being equity in real estate. Mr. Levinson's financial statement indicates an annual income of $127,000 for the year ending September 30, 1989. Management indicated that the main source of repayment would come from the sale of the airplane and the sale of the real estate.

Both lines of credit are listed as special mention due to the lack of a specific repayment program. While all loans appear to be adequately secured through the collateral and the financial strengths of the borrowers, the lack of a sound repayment program contradicts prudent lending practices. In addition, the institution's lending policy does not specifically address acceptable guidelines concerning aircraft lending.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

LOANS IN PROCESS AND COMMITMENTS

Instructions: The following are outstanding loans in process and commitments considered to be of supervisory interest or concern. Describe cause of concern, such as potential liquidity effects or cost of liabilities to fund commitment, credit concerns or market risk with respect to the type of loan/project financed. In addition, all individual loans in process and commitments (fee paid or other) in excess of 1% of the association's assets must be listed here.

The institution has a $3 million credit enhancement on the following project. The following excerpts were taken from the June 11, 1990 examination of the Savings and Loan Network (RESCORP).

Arlington Country Club Apartments consists of 430 apartment units on 38.7 acres of land located in Wheeling, Illinois. This complex was constructed in January 1988 by Lexington Homes, Inc. and First American Management, Inc. First American is the managing agent. This project was financed by the sale of $22.4 million of tax-exempt multi-family housing bonds issued by the Village of Wheeling. The bonds mature December 1, 2009. The project was appraised in 1985, when the loan was originated, at a value of $23,750,000.

The borrower is Arlington Club Partners, an Illinois general partnership. The general partner is the Benach Family Partnership and the beneficiary is Ronald Benach, a former principal owner of Lexington Homes, Inc.

During the period that the bond interest is a variable rate, the credit institution shall receive an annual fee of 2% of the face amount of the collateralized credit instrument. In the event that the bond interest rate converted to a fixed rate, the annual fee will be reduced to 1.5%. As of May 31, 1990, the project's financial statements indicate that these fees are paid on a monthly basis. The enhancement includes 10 financial institutions.

The project has three reserves as follows: Debt Service $1,174,272; Tax & Insurance $312,455; and Replacement $84,838. In addition, there is a working capital letter of credit for $1 million and a variable rate letter of credit for $1,120,000. The latter is to be used to pay all conversion costs in the event the bonds are converted and remarketed as fixed rate.

As of May 31, 1990, the borrower's obligations to the trustee and participating institutions were current but the project had a year-to-date net operating deficit of $77,464. According to the financial records and past audit reports maintained at the Network, the borrowers have been supporting the property since the project originated in 1985. Despite administrative, maintenance and operating expenses being higher than projected for the first five months of 1990, the project's financial viability appears to have been overestimated when the loan was originated in 1985.



8-20-90 EP-6

WON034 1124 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

LOANS IN PROCESS AND COMMITMENTS

A review of the project's limited marketing records indicated an average occupancy rate of 90% during 1989. This project does not meet debt service. As of May 31, 1990, debt service coverage was .91. However, our analysis of the project's most current operating statements indicate that even at 100% occupancy, a negative cash flow would still exist. This cash flow problem will increase when the payments of both principal and interest begin in 1991. Principal payments of $265,000 are scheduled annually beginning December 1, 1991, and increase each year thereafter until 2009.

A seven year financial projection beginning with this current fiscal year indicates a positive cash flow, after debt service, of $76,021 for 1990. However, negative cash flows are projected for 1991 through 1994 and again positive in 1995 through 1997. Annual rental income and total expenses are projected to increase 4.5% and 5.3%, respectively, through 1997.

The examiners noted that the management company at Arlington Club Apartments does not submit financial statements to Network on a monthly basis. In addition, there was no current financial information on the borrower. The audit for the fiscal year ended December 31, 1989 had not been completed during the examination.

After several requests by the network loan servicing personnel to the management company, the examiners were furnished monthly operating statements, occupancy reports and a 1988 audit report. In addition, a financial statement was obtained on the borrower. Mr. Benach's unaudited financial statement dated December 31, 1989 indicates a net worth of approximately $20 million.



8-20-90 EF-6

WON034 1125 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

DATE: August 20, 1990

DOCKET NO: 08515

GAP REPORT ASSUMPTIONS

CYCLE: DEC 1989

| | 3 MONTHS OR LESS | 3 MONTHS TO 6 MTHS | 6 MONTHS TO 1 YR | 1 TO 3 YEARS |
|---|---|---|---|---|
| | ***** PREPAYMENT RATES BY REMAING TERM ****** (ANNUAL PERCENTAGE RATES) | | | |
| *** ASSETS *** | | | | |
| MORTGAGE LOANS AND CONTRACTS | | | | |
| First Mortgage Loans: | | | | |
| Adjustable-Rate: 1-4 Dwelling Units | | | | |
| Current Mkt Indices (Treas.,etc.) | 12.00 | 12.00 | 12.00 | 12.00 |
| Lagging Mkt Indices (COFI) | 12.00 | 12.00 | 12.00 | 12.00 |
| Fixed-Rate: 1-4 Dwelling Units | 8.00 | 8.00 | 8.00 | 8.00 |
| Mortgage Coupon Rate: | | | | |
| Less than 8.00% | | | | |
| 8.00% to 8.99% | | | | |
| 9.00% to 9.99% | | | | |
| 10.00% to 10.99% | | | | |
| 11.00% to 11.99% | | | | |
| 12.00% to 13.99% | | | | |
| 14.00% or more | | | | |
| Other Residential and All Nonresidential | | | | |
| Adjustable Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Fixed Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Second Mortgage Loans | 14.00 | 14.00 | 14.00 | 14.00 |
| *** LIABILITIES *** | *** OTHER ASSUMPTIONS (ANNUAL PCTG RATE) *** (PER PERIOD) | | | |
| DEPOSIT | | | | |
| Interest Bearing Deposits | | | | |
| Fixed Mat. Deposits: | | | | |
| Early Withdrawals | 0.00 | 0.00 | 0.00 | 0.00 |
| Passbook Accounts: Decay Rate | 27.00 | 27.00 | 27.00 | 14.00 |
| BORROWINGS | | | | |
| FHLB Advances: Prepayments | 0.00 | 0.00 | 0.00 | 0.00 |



8-20-90 EP-6

WON034 1126 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

DATE: August 20, 1990

DOCKET NO: 08515

GAP REPORT ASSUMPTIONS

CYCLE: DEC 1989

| | 3 TO 5 YEARS | 5 TO 10 YEARS | 10 TO 20 YEARS | >20 YEARS |
|---|---|---|---|---|
| | ***** PREPAYMENT RATES BY REMAING TERM ****** (ANNUAL PERCENTAGE RATES) | | | |
| *** ASSETS ***. | | | | |
| MORTGAGE LOANS AND CONTRACTS | | | | |
| First Mortgage Loans: | | | | |
| Adjustable-Rate: 1-4 Dwelling Units | | | | |
| Current Mkt Indices (Treas.,etc.) | 12.00 | 12.00 | 12.00 | 12.00 |
| Lagging Mkt Indices (COFI) | 12.00 | 12.00 | 12.00 | 12.00 |
| Fixed-Rate: 1-4 Dwelling Units | 8.00 | | | |
| Mortgage Coupon Rate: | | | | |
| Less than 8.00% | | 8.00 | 8.00 | 8.00 |
| 8.00% to 8.99% | | 8.50 | 8.50 | 8.50 |
| 9.00% to 9.99% | | 9.50 | 9.50 | 9.50 |
| 10.00% to 10.99% | | 11.00 | 11.00 | 11.00 |
| 11.00% to 11.99% | | 20.00 | 20.00 | 20.00 |
| 12.00% to 13.99% | | 30.00 | 30.00 | 30.00 |
| 14.00% or more | | 45.00 | 45.00 | 45.00 |
| Other Residential and All Nonresidential | | | | |
| Adjustable Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Fixed Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Second Mortgage Loans | 14.00 | 14.00 | 14.00 | 14.00 |
| *** LIABILITIES *** | *** OTHER ASSUMPTIONS (ANNUAL PCTG RATE) *** (PER PERIOD) | | | |
| DEPOSIT | | | | |
| Interest Bearing Deposits | | | | |
| Fixed Mat. Deposits: | | | | |
| Early Withdrawals | 0.00 | 0.00 | 0.00 | 0.00 |
| Passbook Accounts: Decay Rate | 14.00 | 12.00 | 12.00 | 12.00 |
| BORROWINGS | | | | |
| FHLB Advances: Prepayments | 0.00 | 0.00 | 0.00 | 0.00 |



8-20-90

EP-6

WON034 1127 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

DATE: August 20, 1990

DOCKET NO: 08515

INTEREST RATE RISK EXPOSURE REPORT - DEC 1989

MATURITY GAPS AS PERCENT OF ASSETS

| | 12/31/89 | 09/31/89 | 12/31/88 |
|---|---|---|---|
| 0 - 1 YEAR MATURITY GAP | | | |
| UNHEDGED | -13.2% | -22.6% | -19.9% |
| HEDGED | -2.7% | -4.4% | -17.9% |
| ALL INCLUSIVE | -3.3% | -8.3% | NA |
| 0 - 3 YEAR MATURITY GAP | | | |
| UNHEDGED | -12.3% | -19.0% | -17.2% |
| HEDGED | -5.7% | -12.9% | -17.0% |
| ALL INCLUSIVE | -6.2% | -15.9% | NA |

NOTE: MATURITY GAPS FOR PERIODS 6/30/89 MAY NOT BE COMPARABLE WITH PRIOR PERIODS

**********************************************************************************

INTEREST RATE SENSITIVITY OF 4 QUARTER NET INTEREST INCOME
ASSUMING THE FOLLOWING CHANGES IN INTEREST RATES

| DATA AS OF: | 12/31/89 $ | % CHG FR BASE CASE | 09/31/89 $ | % CHG FR BASE CASE | 12/31/88 $ | % CHG FR BASE CASE |
|---|---|---|---|---|---|---|
| 400 B.P | | | | | | |
| +300 B.P | | | | | | |
| +200 B.P | | | | | | |
| +100 B.P | | | DATA NOT YET AVAILABLE | | | |
| 0 B.P | | | | | | |
| -100 B.P | | | | | | |
| -200 B.P | | | | | | |
| -300 B.P | | | | | | |
| -400 B.P | | | | | | |

**********************************************************************************

INTEREST RATE SENSITIVITY OF MARKET VALUE OF PORTFOLIO EQUITY
ASSUMING THE FOLLOWING CHANGES IN INTEREST RATES

| DATA AS OF: | 12/31/89 $ | % CHG FR BASE CASE | 09/31/89 $ | % CHG FR BASE CASE | 12/31/88 $ | % CHG FR BASE CASE |
|---|---|---|---|---|---|---|
| 400 B.P | | | | | | |
| +300 B.P | | | | | | |
| +200 B.P | | | | | | |
| +100 B.P | | | DATA NOT YET AVAILABLE | | | |
| 0 B.P | | | | | | |
| -100 B.P | | | | | | |
| -200 B.P | | | | | | |
| -300 B.P | | | | | | |
| -400 B.P | | | | | | |

**********************************************************************************

CAPITAL POSITION

| DATA AS OF: | 12/31/89 $ | % OF TOT ASSETS | 09/31/89 $ | % OF TOT ASSETS | 12/31/88 $ | % OF TOT ASSETS |
|---|---|---|---|---|---|---|
| REGULATORY | 0 | 0.0 | 23,770 | 5.8 | 28,518 | 6.9 |
| GAAP | 10,852 | 2.9 | 11,170 | 2.7 | 18,104 | 4.4 |



8-20-90

BP-6

WON034 1128 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

**SERVICE CORPORATIONS**

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

---

Name and Address of Service Corporation:
PEORIA SAVERS DEVELOPMENT, INC.
200 Southwest Jefferson Street
Peoria, Illinois 61602

Location of Offices: Same

Principal Business (Insurance, Construction, Etc.): Rental property, land development, insurance and loan origination.

Percent Association Ownership: 100%

Association Investment:

| | Amount | Percent to Total Association Assets |
|---|---|---|
| Stock (at cost) | $1,510,000 | .4% |
| Secured Loans | - | - |
| Unsecured Loans | - | - |
| Other | | |
| TOTAL | $1,510,000 | .4% |

Description of Activities:

The activities of the service corporation consist of ownership and rental of three office buildings in the Knoxville Executive Plaza, as well as 50 percent ownership under a joint venture agreement of two office buildings in an adjacent area. Other activities include general insurance sales, developed lot sales, and acquisition, development and construction of office buildings in Peoria, Illinois.

Officers, Directors and Major Employees:

| Name | Title | Annual Salary | Relationship With Insured Institution |
|---|---|---|---|
| HOLLAND, Homer J. | D,CB | None | D,VCB,CEO |
| KILPATRICK, Roger L. | D,P | None | EVP |
| BANGERT, Steven | D,VP | None | D,T |
| RICHARDSON, Gary L. | D,T,S | None | SVP |
| PIKUS, Ronald | D | None | P,MO |



8-20-90 EF-6

WON034 1129 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Comments:

This service corporation is a direct result of the merger of Peoria Savings in December 1988. Net income for the year ended December 31, 1989 totaled $47,322. For the seven months ended July 31, 1990, net income totaled $38,330. Assets totaled $2,970,543 at July 31, 1990.

As of the examination date, the service corporation is in the process of being dissolved. This is being accomplished through the sale of real estate owned, which represents the majority of the assets of the service corporation. Details of the service corporation activities are as follows:

1. Knoxville Executive Plaza/Knoxville Partners Joint Venture

The service corporation owns three commercial office buildings located within the Knoxville Executive Plaza in Peoria, Illinois (Tract 1). In addition, the service corporation has a 50 percent ownership interest under a joint venture agreement in two additional commercial office buildings located on property immediately adjacent to the Knoxville Executive Plaza (Tract 2). Charles Rock, a local Peoria realtor, currently owns the other 50 percent interest in the joint venture. One of the buildings in Tract 2 is under construction, and is being funded through the joint venture.

An offer to purchase both properties was made by Charles Rock and Associates, Inc. on March 19, 1990 for $1,035,000. The offer includes the purchase of all three buildings in Tract 1, as well as the purchase of the service corporation's 50 percent interest in the joint venture, which is sole owner of the two buildings in Tract 2. Under the terms of the purchase offer, mortgages secured by the buildings in Tract 2 which are obligations of the joint venture will be paid in full at the time of closing.

The service corporation has accepted the offer of Charles Rock and Associates, Inc. for purchase of these properties. The purchase, which is expected to close on September 14, 1990, will be financed through an outside source. As of July 31, 1990, the book value of the Knoxville Executive Plaza less depreciation plus the equity interest in the joint venture totaled approximately $833,875 resulting in a potential net gain on the sale of approximately $201,125.



8-20-90 CFr6

WON034 1130 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

2. Lynnhurst Woods Development Lots

The service corporation owns 15 undeveloped lots with a book value of $136,960 at July 31, 1990. The lots are located in the Lynnhurst and Yorkshire subdivision in Peoria, Illinois. Since the previous examination, 20 lots have been sold at an average price of $7,450 a lot. An allowance for losses on lots totaled $92,372 at July 31, 1990.

An offer to purchase 10 of the remaining 15 lots was received on July 26, 1990. This offer is from an investors trust which is independent of the institution and the service corporation. The offer to purchase is for $75,000, and is expected to close in September 1990.

Mr. Kilpatrick stated that the remaining five lots will be difficult to sell due to a less desirable location. He indicated that the valuation allowance should be sufficient to cover the value of these lots.



8-20-90 EP-6

WON034 1131 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS
Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Peoria Savers Development, Inc.
Comparative Statement of Condition

| | Month Ended 07/31/90 | Year Ended 12/31/89 | Year Ended 12/31/88 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash | $1,388,850 | $1,258,566 | $ 816,094 |
| Account Receivable | 9,845 | 28,000 | 27,348 |
| Note Receivables | 0 | 0 | 4,507 |
| Contract for deed | 17,394 | 18,803 | 40,391 |
| Prepaid Expenses | (3,030) | 658 | 1,651 |
| Office building- Knoxville Plaza | 715,775 | 715,775 | 715,775 |
| Furniture and Fixtures | 1,185 | 1,185 | 0 |
| Land- Knoxville Plaza | 152,775 | 152,775 | 152,775 |
| Office building improvements | 237,791 | 237,791 | 236,591 |
| Land- Lynnhurst | 136,960 | 210,660 | 295,960 |
| Spec. Construction | 0 | 0 | 80,469 |
| Building- revaluation | 300,000 | 300,000 | 300,000 |
| Equity in PSD Insurance | 0 | 0 | 237,860 |
| Equity in Knoxville Partners JV. | 12,998 | 16,681 | 220 |
| TOTAL ASSETS | $2,970,543 | $2,940,894 | $2,909,641 |
| **LIABILITIES** | | | |
| Accounts payable | $ 0 | $ 172 | $ 1,285 |
| Mortgage loans payable | 0 | 0 | 70,700 |
| Accrued expenses | 6,704 | 4,458 | 2,883 |
| Accrued Federal/State taxes | 0 | 28,079 | 28,079 |
| Escrow-Lynnhurst lots | 900 | 2,700 | 0 |
| Lots- revaluation Lynnhurst | 92,372 | 91,000 | 91,000 |
| Accrued real estate taxes | 14,750 | 24,881 | 23,255 |
| Allowance for depreciation | 554,168 | 536,989 | 507,165 |
| Allowance- Amortization Bldg. | 31,296 | 15,648 | 0 |
| Reserve for losses on lots | 0 | 9,474 | 26,103 |
| Accrued Space & Usage Fees | 24,500 | 21,000 | 0 |
| Accrued Franchise Tax | 1,030 | 0 | 0 |
| TOTAL LIABILITIES | $ 725,720 | $ 734,401 | $ 750,470 |



8-20-90 EF-6

WON034 1132 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 . CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990

Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Peoria Savers Development, Inc.
Comparative Statement of Condition

| | Month Ended 07/31/90 | Year Ended 12-31-89 | Year Ended 12-31-88 |
|---|---|---|---|
| NET WORTH | | | |
| Common stock | $1,510,000 | $1,510,000 | $1,510,000 |
| Retained earnings | 487,493 | 487,493 | 440,171 |
| Appraised equity capital | 0 | 0 | 0 |
| Purchase accounting equity | 209,000 | 209,000 | 209,000 |
| Undistributed income | 38,330 | | |
| TOTAL NET WORTH | $2,244,823 | $2,206,493 | $2,159,171 |
| TOTAL LIABILITIES AND NET WORTH | $2,970,543 | $2,940,894 | $2,909,641 |

A - 23.5

8-20-90

BF-6

Date: August 20, 1990 : Docket No.: 08515

**SERVICE CORPORATIONS**

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

**Peoria Savers Development, Inc.**
**Comparative Statement of Operations**

| | Seven Months Ended 07-31-90 | Year Ended 12-31-89 | Year Ended 12-31-88 |
|---|---|---|---|
| **INCOME** | | | |
| Rental income | $ 73,302 | $ 140,127 | $ 134,285 |
| Interest income-loans | 878 | 2,000 | 8,653 |
| Interest income-investments | 1,544 | 0 | 0 |
| Investment income | 32,520 | 44,917 | 35,098 |
| PSD Insurance income | 0 | 10,364 | 68,858 |
| PSD Mortgage income (loss) | 0 | 0 | (186,967) |
| Income from lot sales | 0 | 17,300 | 27,171 |
| Miscellaneous income | 0 | 132 | 337 |
| Profit from sale- spec. | 0 | 2,468 | 15,689 |
| TOTAL INCOME | $ 108,244 | $ 217,308 | $ 103,124 |
| **EXPENSES** | | | |
| Officer's/Directors fees | $ 2,703 | $ 0 | $ 10,800 |
| Management fees | 24,500 | 42,000 | 42,000 |
| Audit fees | 2,246 | 4,025 | 4,004 |
| State and Fed. inc. tax exp. | (28,079) | 0 | 0 |
| Franchise tax expense | 1,030 | 1,765 | 1,765 |
| Depreciation expense | 17,180 | 29,824 | 29,923 |
| Building expense | 16,639 | 31,556 | 37,735 |
| Real estate taxes | 8,473 | 12,354 | 7,741 |
| Lynnhurst expenses | 0 | 7,612 | 822 |
| Leasing commissions | 0 | 0 | 721 |
| Loss on lots- reserve | 13,150 | 8,395 | 14,395 |
| Loss on loans | (13,150) | 0 | 0 |
| Expenses from lot sales | 6,023 | 13,218 | 20,916 |
| Amortization of Bldg. revaluation | 15,648 | 15,648 | 0 |
| Knoxville Partners JV loss | 3,682 | 1,289 | 17,280 |
| Loss from spec. sale | 0 | 0 | 1,267 |
| Miscellaneous expenses | (131) | 2,300 | 3,774 |
| Dividend expense | 0 | 0 | 31,918 |
| TOTAL EXPENSES | $ 69,914 | $ 169,986 | $ 225,061 |
| NET INCOME (LOSS) | $ 38,330 | $ 47,322 | $ (121,937) |



8-20-90 EP-6

WON034 1134 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Name and Address of Service Corporation:
RIVER VALLEY INSURANCE SERVICES, INC.
7625 North University Avenue
Peoria, Illinois 61614

Location of Offices: Same

Principal Business (Insurance, Construction, Etc.): Insurance

Percent Association Ownership: 50%

Association Investment:

| | Amount | Percent to Total Association Assets |
|---|---|---|
| Stock (at cost) | $1,000 | -% |
| Secured Loans | | |
| Unsecured Loans | | |
| Other | | |
| TOTAL | $1,000 | -% |

Description of Activities: General insurance sales

Officers, Directors and Major Employees:

| Name | Title | Annual Salary | Relationship With Insured Institution |
|---|---|---|---|
| HOLLAND, Homer J. | D,P | None | D,VCB,CEO |
| ROSS, Howard R. | D | None | CB,D |
| BANGERT, Steven | D,S | None | D,T |
| RICHARDSON,Gary L. | AS | None | SV |

Comments:

This service corporation is a result of the merger of Home Federal. Its only activity is insurance sales. For the seven months ended July 31, 1990, the service corporation had net income of $1,275. For the year ended December 31, 1989, net income totaled $3,269. Assets totaled $15,461.

The other 50% owner is Vic Hefner Insurance Agency which manages the operation of the insurance business.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Name and Address of Service Corporation:
RIVER VALLEY FINANCIAL SERVICES, INC.
200 Southwest Jefferson Street
Peoria, Illinois 61602

Location of Offices: Same

Principal Business (Insurance, Construction, Etc.): Annuity Sales

Percent Association Ownership: 100%

Association Investment:

| | Amount | Percent to Total Association Assets |
|---|---|---|
| Stock (at cost) | $ 1,000 | -% |
| Secured Loans | 5,000 | - |
| Unsecured Loans | | |
| Other | | |
| TOTAL | $ 6,000 | -% |

Description of Activities: Acts as a conduit for annuity sales.

Officers, Directors and Major Employees:

| Name | Title | Annual Salary | Relationship With Insured Institution |
|---|---|---|---|
| HOLLAND, Homer J. | D,P | None | D,VCB,CEO |
| ROSS, Howard R. | D | None | CB,D |
| BANGERT, Steven | D;S | None | D,T |
| RICHARDSON, Gary L. | AS | None | SVP |

Comments:

This service corporation is a result of the merger of Home Federal. For the seven months ended July 31, 1990 and the 12 months ended December 31, 1989, net income was $65,790 and $83,942 respectively. Assets totaled $189,123 on July 31, 1990.



8-20-90 EF-6

WON034 1136 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729.WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

OTHER AFFILIATES

Section 2(b) of the Banking Act of 1933 (12 USC 221a(b))

Name and Address of Affiliate:
P.S. CAPITAL CORP.
1100 North Market Street
Wilmington, Delaware 19801

Date Last Examined: June 26, 1989

Principal Business (Insurance, Real Estate, Etc.): Finance subsidiary

Other Businesses: None

Officers, Directors and Principals:

| Name<br>Title | Annual Salary | No. of Shares Owned | % of Total Outstanding Shares | Insured Institution |
|---|---|---|---|---|
| KILPATRICK, Roger L.<br>D,P | None | None | None | EVP |
| HOLLAND, Homer J.<br>D | None | None | None | D,VCB,CEO |
| BANGERT, Steven<br>D | None | None | None | D,T |

Comments:

On December 5, 1986, this wholly-owned finance subsidiary of Peoria Savings (insured institution) was formed for the limited purpose of issuing short-term market auction rate non-voting preferred stock ("MAPS"). According to Mr. Kilpatrick, the stock issue was done in order to raise funds at an economical cost because of net operating loss carryforwards of the parent institution. The finance subsidiary was phased out during 1989, and currently has assets consisting only of $10,000 cash. Mr. Kilpatrick said that the dividend cost at periodic auctions increased during 1989 to the extent that the finance subsidiary was no longer an effective means of raising funds. In order to phase out the finance subsidiary, the preferred stock was redeemed at par value, and the collateral (primarily mortgage backed securities) was transferred to the parent institution at book value.

Mr. Kilpatrick stated that additional activity within the finance subsidiary is not projected. He added, however, that minimal amounts of cash will be maintained on the books of the subsidiary, in order to offer management the option of reactivating the subsidiary in the future.



8-20-90 EP-6

Date: August 20, 1990 Docket No.: 08515

OTHER AFFILIATES
Section 2(b) of the Banking Act of 1933 (12 USC 221a(b))

P.S. Capital Corp.
Comparative Statement of Condition

| | Year Ended 12-31-89 | 12-31-88 | 12-31-87 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash | $ 19,544 | $ 618 | $ 0 |
| Marketable securities | 242,139 | 30,671,981 | 28,267,934 |
| Short-term securities | 0 | 4,178,120 | 5,073,301 |
| Accrued interest receivable | 159,349 | 415,852 | 404,671 |
| Other assets | 0 | 1,864 | 7,706 |
| TOTAL ASSETS | $ 421,032 | $35,268,435 | $33,753,612 |
| **LIABILITIES** | | | |
| Dividends payable | $ 0 | $ 169,531 | $ 86,411 |
| Accounts payable | 13,439 | 542 | 10,050 |
| TOTAL LIABILITIES | $ 13,439 | $ 170,073 | $ 96,461 |
| **NET WORTH** | | | |
| Common stock | $ 10,000 | $ 100 | $ 100 |
| Preferred stock (MAPS) | 0 | 17,194,158 | 17,194,158 |
| Paid in capital | 0 | 14,817,167 | 14,817,167 |
| Retained earnings | 397,593 | 3,086,937 | 1,645,726 |
| TOTAL NET WORTH | $ 407,593 | $35,098,362 | $33,657,151 |
| TOTAL LIABILITIES AND NET WORTH | $ 421,032 | $35,268,435 | $33,753,612 |

A - 24.2

8-20-90 EF-4

WON034 1138 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 199[illegible]

Docket No.: 08515

OTHER AFFILIATES
Section 2(b) of the Banking Act of 1933 (12 USC 221a(b))

Reconciliation of Net Worth

| | | | |
|---|---|---|---|
| Beginning balance | $ 35,098,362 | $33,657,151 | $32,063,699 |
| Capitalization | 0 | 0 | 0 |
| Income for period | 1,078,208 | 2,591,681 | 2,518,074 |
| Preferred Stock Redemption | (17,194,158) | 0 | 0 |
| Trsf. of Marketable Sec. | (14,807,267) | 0 | 0 |
| Dividends on Common Stock | (3,767,552) | 0 | 0 |
| Dividends on MAPS | 0 | (1,150,470) | (924,622) |
| Ending net worth | $ 407,593 | $35,098,362 | $33,657,151 |

P.S. Capital Corp.
Comparative Statement of Operations

| | Year Ended 12-31-89 | 12-31-88 | 12-31-87 |
|---|---|---|---|
| INCOME | | | |
| Mortgage backed-securities | $ 2,282,263 | $ 2,433,851 | $ 2,451,269 |
| Investments | 566,773 | 300,808 | 174,237 |
| Amortization of loan premium | 12,110 | (26,772) | 0 |
| TOTAL INCOME | $ 2,861,146 | $ 2,707,887 | $ 2,625,506 |
| EXPENSES | | | |
| Preferred Stock Dividend | $ 1,371,111 | $ 0 | $ 0 |
| Loss-Retir. of Pref. Stk. | 305,842 | 0 | 0 |
| Administrative Expenses | $ 105,985 | $ 116,206 | $ 107,432 |
| TOTAL EXPENSES | $ 1,782,938 | $ 116,206 | $ 107,432 |
| NET INCOME | $ 1,078,208 | $ 2,591,681 | $ 2,518,074 |



8-20-90 EF-6

WON034 1139 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 : CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

FINANCIAL REPORTING ERRORS

| Report Date | Line Item | Correct Amount | Reported As |
|---|---|---|---|
| 6-30-90 | SC 210 | 100,448 | 100,427 |
| 6-30-90 | SC 215 | 83,265 | 83,286 |
| 6-30-90 | SC 240 | 1,456 | 1,447 |
| 6-30-90 | SC 272 | 3,348 | 3,357 |
| 6-30-90 | SC 32 | 886 | 3,500 |
| 6-30-90 | SC 300 | 827 | 3,441 |
| 6-30-90 | SC 34 | 9,664 | 7,050 |
| 6-30-90 | SC 329 | 5,879 | 3,265 |
| 6-30-90 | SC 330 | 889 | 886 |
| 6-30-90 | SC34B | 216 | 219 |
| 6-30-90 | SC 780 | 1,990 | 2,019 |
| 6-30-90 | SC 793 | 0 | <29> |



8-20-90 CP 16

Date: August 20, 1990 Docket No: 08515

VIOLATIONS OF LAWS OR REGULATIONS

Instructions: Describe below all violations of laws or regulations discovered during the examination. Note with an asterisk those referred previously and which remain uncorrected.

| Law or Regulation Violated | # of Violations/ Amount of Loss Incurred, If Any | Description of Circumstances Surrounding Violation |
|---|---|---|
| 12 C.F.R. Section | | |
| 567.2 | 3/None | Failed all three capital requirements. |
| 552.6-1(g) | 1/None | Bonuses were approved by those who benefit from them. |
| 563.171 | 1/None | Appraisal policy does not conform. |
| 567.6(a)(1)(iv)(N) | 1/None | Included residuals in 20% risk category instead of 100%. |
| 571.16(d)(2)(i) | 1/None | Securities collateralizing borrowings should be held unencumbered for 35 days in 12 month period. |
| 563.190(a) | 1/None | Surety bond coverage was inadequate. |
| Federal Reserve Act | | |
| Section 22(h)/ 12 U.S.C. Section 375b | 1/None | Loan granted at favorable terms. |
| Section 23B(a)(1)(A) | 1/None | Consulting agreement signed with a related entity without first obtaining competitive bids. |
| Section 23A(c)(1) | 1/None | Unsecured extension to affiliate. |



8-20-90

EF-6

WON034 1141 L HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER