# EXHIBIT A

UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND AND HOWARD R. ROSS, )
Plaintiffs, )
vs. ) No. 95-524C
THE UNITED STATES OF AMERICA, )
Defendant. )

The deposition of MARK KIPNIS, called by the Defendant The United States of America for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Laura A. Czubak, Certified Shorthand Reporter and Notary Public, at 205 West Randolph Street, Suite 510, Chicago, Illinois, commencing at 9:01 a.m. on the 14th day of August, A.D., 2000.



APPEARANCES:

Mr. David B. Bergman
(Arnold & Porter)
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Phone: (202) 942-5474

On behalf of the Plaintiffs;

Ms. Patricia A. Smith
Mr. Patrick T. Murphy
(United States Department of Justice)
1100 L Street, NW
Washington, D.C. 20530
Phone: (202) 353-8841

On behalf of the Defendant.

ALSO PRESENT: Mr. Jeff Nielsen

* * * * * *

DEFENDANT'S EXHIBIT
DX 1553
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.



I N D E X


| WITNESS | PAGE |
|---|---|
| MARK KIPNIS | |
| Direct Examination by Ms. Smith | 4 |

E X H I B I T S

| KIPNIS DEPOSITION EXHIBIT | PAGE |
|---|---|
| No. 1 | 21 |
| No. 2 | 41 |
| No. 3 | 54 |




(Witness sworn.)

WHEREUPON:

MARK KIPNIS,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SMITH:

Q. Good morning, Mr. Kipnis. We just met off the record, but, again, my name is Patricia Smith. I'm representing the United States in the case Holland and Ross versus the United States.

I realize you're an attorney, Mr. Kipnis. Have you actually ever been deposed before?

A. No, I haven't.

Q. Okay. Have you taken depositions?

A. No, I haven't.

Q. Okay. I will go over some of the preliminary instructions, then. First, I ask that you respond verbally to all the questions so that the court reporter can get down your answers as opposed to a nod of the head.

If you don't understand a question, please ask me to clarify and I will attempt to do

Page 5

so.

If you think of an answer to a question later in the deposition, please let me know and we can go back and let you expand on whatever your earlier answer was. If you think of a document that might help you answer a question, you can let us know. We have a lot of documents here, and we may be able to come up with a document that will help you answer the question.

If you need a break at any time, please let us know. We just ask that you respond to whatever question is pending, and then we can take a break.

Is all of that clear to you, Mr. Kipnis?

A. Yes.

MR. BERGMAN: Trisha, before we start, let me just state for the record that there may be instances in this deposition, more than others, where attorney-client privilege is an issue; and there is no intention of waiving attorney-client privilege. There may be instances where we need to break when a question is pending to discuss privilege issues, and I ask that you be sensitive as well when asking questions not to ask for

Page 6

information that would intrude on attorney-client privilege matters.

Other than that, I also would ask that we agree that all objections to form are preserved for trial.

MS. SMITH: That's fine.

BY MS. SMITH:

Q. And, Mr. Kipnis, my questions are not intended to ask you any attorney-client privilege. So to the extent they're going that way, obviously your counsel -- Counsel may be instructing you not to answer if it looks like the questions are going that way.

Finally, are you on any medication or drugs, or is there any other reason that would make it difficult for you to understand and answer my questions here today?

A. No.

Q. Mr. Kipnis, could you provide your educational background from high school onward, please?

A. I graduated Niles West High School in 1965. I graduated the University of Illinois in 1969, and I graduated Northwestern University

Page 7

School of Law in 1974.

Q. Any courses or any kind of educational training after your law degree at Northwestern?

A. I sat for a couple of master of tax classes at DePaul University School of Law.

Q. Anything other than that, Mr. Kipnis?

A. No.

Q. And if you could provide your employment from the time you graduated from the University of Illinois?

A. From June of 1969 until August of 1972, I was an accountant with what was then known as Price, Waterhouse & Company. It's now Price, Waterhouse, Coopers. From 1974, when I graduated law school, until January of 1998, I was with a single law firm that was under various names, but at the time I left was called Holleb & Coff.

From January 1998 to the present, I'm vice president-general counsel of Hollinger International, Inc., and each of its U.S. subsidiaries.

Q. And what was your degree in at the University of Illinois?

A. Accounting.

Page 8

Q. And during the time you were at Holleb & Coff, what kind of law did you practice?

A. Transactional. I would vary between the real estate department and the corporate department based upon the economy and where people were most needed.

Q. And did get your CPA?

A. I did.

Q. When was that?

A. 1969.

Q. When did you first start working with either Howard Ross or Homer Holland?

A. I would have begun working with Howard Ross in the mid '70s, maybe '74 to '76. He was a client of the Holleb firm.

Q. And what type of work were you doing for him?

A. The first work with Howard was in the real estate area. He was part of a team that had developed numerous high-rises along the outer drive of Chicago and other areas, and I believe we were working on sales of one or more of those properties.

Q. How did you come to be involved with

Homer Holland and Howard Ross with respect to the River Valley entities?
A. I don't know how Howard and Homer first met, but they decided to strike an arrangement where they were going to collectively acquire River Valley; and I, in effect, represented Howard in his negotiations with Homer, shareholder agreements, things like that.
Q. Was that with respect to the acquisition of Rock Falls, or was that with respect to the acquisition of Galva, Home, and Mutual?
A. It was with respect to the acquisition of Rock Falls.
Q. After representing Mr. Ross with respect to those dealings, what was your next involvement with respect to either of the River Valley entities?
A. Either immediately or shortly after the acquisition -- Homer Holland appreciated the way I represented Howard, and I wound up then doing some ongoing general corporate work for the Rock Falls institution, eventually became an officer and director of that institution.
Q. Do you recall when that was?



A. No.
Q. Do you know if it was within one year or two years of the time when they acquired Rock Falls?
A. I believe it was.
Q. What was the officer position that you held?
A. Secretary. I had to sign all the documents.
Q. Other than signing the documents, what were your responsibilities?
A. None.
Q. And as a director, what were your responsibilities?
A. Fiduciary duties of loyalty and care, just general outside director, sit at board meetings.
Q. What involvement did you have with respect to Rock Falls's acquisition of Republic?
A. Either none or very little at the closing to assist in getting documentation done at the end. Neither I nor any member of my firm were regulatory attorneys, so we weren't involved in either -- in any of the negotiations.



Q. And when you indicated either "none or very little" in terms of obtaining documents, what did that involve in terms of obtaining documents?
A. Certificates of good standing, closing resolutions, closing certificates, things like that.
Q. As a member of the board of directors, what information did you receive regarding the negotiations relating to the acquisition of Republic?
A. The board would always receive a board package of information, and Homer, Howard, the other executives would keep us apprised from time to time of what they were doing and what the status of those negotiations were.
Q. Do you recall anything regarding those negotiations?
A. Nothing in particular.
Q. I'm going to ask you some general questions later, but --
A. Yeah.
Q. What was your involvement with respect to the acquisition of Galva, Home, and Mutual by Homer Holland and Howard Ross?



A. Pretty much the same thing. Again, we weren't regulatory attorneys. I think they involved -- Is that the one that they involved Jones, Day for the most part? I think they assisted them on that, but primary negotiations were Homer Holland and the management team.
Q. Were you involved at all with respect to the negotiations with any regulators?
A. I don't believe so.
Q. And how about with respect to the acquisition of Peoria? What was your involvement?
A. The same thing.
Q. And with respect to the acquisition of Galva, Home, and Mutual and Peoria, is there anything specific that you can recall about those negotiations that you learned as a member of the board of directors?
A. No.
Q. Did you become a member of the board of directors once River Valley was formed by the acquisition of Galva, Home, and Mutual?
A. Yes.
Q. Who else from Holleb & Coff worked with the River Valley entities?

Page 13

A. I'm sure over the course of time there were a number of people, but my primary assistant was – second person was Anne Webber Brody.
Q. Do you know where she is now, Mr. Kipnis?
A. Living in Chicago, retired mother with two children, should be in the directory. She lives on the South Side on Kimbark.
Q. I'm sorry. Where?
A. Kimbark, K-i-m-b-a-r-k.
Q. And that's a Chicago –
A. Yes.
Q. It's in Chicago, okay.
What positions did you hold at River Valley in Peoria?
A. Again, secretary and director.
Q. Were you secretary and director at Rock Falls and what then became River Valley Rock Falls until the time it was merged into River Valley of Peoria?
A. Yes.
Q. And were you secretary and a director at River Valley Peoria until the time it was acquired by First Banks?
A. Yes.

Page 14

Q. Any other positions you've held at either of the River Valley institutions?
A. I don't believe so.
Q. How about Holland Partners, Inc.? Did you hold any positions there?
A. No.
Q. How about River Valley Holding, Inc.? Did you hold any positions there?
A. River Valley what?
Q. Holding, Incorporated.
A. I don't even remember what that was, but I'll assume I was the secretary of that.
Q. Can you recall any other related River Valley entities that you served on – served any positions on or served as a board of directors on?
A. If there were special purpose entities that we created, I was probably a secretary of one of them to just help facilitate signatures; but I don't remember the particular names of any of them at all.
Q. Did you have any involvement with the acquisition of San Antonio Federal Savings Bank in Texas?
A. Yes. I went down to San Antonio to close

Page 15

that one; but, again, I was not involved in the negotiations of that transaction.
Q. And what was your involvement in terms of closing that deal?
A. There would have been some review and comments of the acquisition agreement, preparation of closing documents, and make sure that monies were wire transferred and that documents were received.
Q. Were you ever aware that an attempt was made to acquire San Antonio through River Valley?
A. Yes.
Q. Were you at all involved in any discussions with the regulators or American National Bank regarding the attempt to acquire San Antonio Federal through River Valley?
A. No.
Q. Did you hold any positions with what became River Valley Bank in Texas and/or with Western Capital Holding, Inc.?
A. Yes. Essentially the same positions as with the Illinois, secretary and director.
Q. Did your position as secretary and director vary at all for any of the institutions

Page 16

for which you held those positions?
A. No.
Q. What is your current involvement with Homer Holland or Howard Ross?
A. I have no current involvement with Homer Holland. With Howard Ross, I am a director of Colorado Business Bank Shares, an institution that is controlled by Howard and Steve Bangert and other people.
Q. Do you own any portion of that?
A. I do.
Q. What percentage do you own?
A. Less than one.
Q. Did you own any percentage of any of the River Valley institutions?
A. I did.
Q. And what percentage for the various institutions?
A. I believe they were about 2 percent.
Q. For each of them?
A. I think so.
Q. What other investment opportunities, if any, have you had with either Homer Holland or Howard Ross?

Page 17

A. I believe I've had some with -- some opportunities with Homer, but I don't know if I ever -- I don't believe I ever accepted any of those or any of those went forward.

I've had a number of opportunities with Howard, some good, some bad. There was an oil drilling called Modern Explorations. There was an institution in Connecticut called Lafayette. There was something called Hawthorne Colorado. There was even something called Taco Nuggets.

Q. Taco Nuggets?

A. Taco Nuggets. I think Western Capital Holdings, which I think was just a successor to the Texas bank.

Did I mention Hawthorne Colorado?

Q. Yes, uh-huh.

A. I think those are them.

Q. Are you still receiving any proceeds from Western Capital Holding, Inc.?

A. No.

Q. And when did your interest in Western Capital Holding, Inc., come to an end?

A. Probably a couple years ago.

Q. And what type of investment opportunity

Page 18

was Lafayette in Connecticut?

A. It was just an opportunity to purchase some shares as part of a capital raise.

Q. Was that a certain type of business?

A. Banking.

Q. Banking, okay.

And how about Hawthorne Colorado? Was that also banking?

A. It was the purchase -- It was a single-purpose purchase of some assets from a large bank in Colorado. I forget the name. And it consisted of -- There was some notes securing a shopping center and, I think, a real estate -- a separate real estate parcel.

Q. And how about Taco Nuggets? What kind of an investment opportunity was that?

A. A bad one. It was -- And it wasn't Howard's fault. It was brought to us by someone else. Somebody was marketing a new product, and we liked the guy and thought it would be fun; so we invested a little with him. It never made shelf space.

Q. So the only current investment is with Colorado Business Bank Shares in terms of your

Page 19

involvement with either Homer or Howard?

A. Investments, yes.

Q. Okay. Do you have other business relationships with either Homer Holland or Howard Ross?

A. None with Homer. Howard from time to time lends me funds for various investments if I don't want to cash in a particular investment for liquidity, and as of right now I have a hundred-thousand-dollar loan with him.

Q. What type of business is Hollinger International, Inc.?

A. It is a newspaper publisher.

Q. And what are your responsibilities there?

A. As general counsel -- Hollinger is a New York Stock Exchange company, so I have general overview of their securities law filings. We, over the last couple of years, have sold or are in the process of selling about three and a half billion dollars of newspaper assets. And I've been actively involved in that because I'm located here in Chicago. One of our properties is the Chicago Sun Times, and I actively get involved in various

Page 20

aspects of the Chicago Sun Times's legal issues along with the other Chicago papers that we own.

Q. When you indicated that Howard Ross lends you funds, is that for personal investments, then?

A. Yes.

Q. Can you recall any committees that you served on at any of the River Valley entities?

A. I may have been on an audit committee. I don't remember whether we had them or not.

Q. Do you recall doing any work on what may have been a committee at any of the institutions?

A. No.

Q. Mr. Kipnis, how did you prepare for today's deposition?

A. I didn't.

Q. You didn't review any documents?

A. I don't have any.

Q. You didn't meet with counsel?

A. Counsel came by and introduced himself when he came into town last week and just told me a little bit of what the day would be like. And I told counsel it wouldn't last as long as it would take to verify exactly how much I forgot or didn't know to begin with.

Q. Did you review the subpoena that was issued for this deposition?
A. I did.
Q. Mr. Kipnis, if you could take a look at what the court reporter has marked as Exhibit 1, it's a subpoena that was issued for your deposition here today. Specifically, I was going to refer you to the -- about the middle of the document, first page, where it indicates that you were requested to produce any documents in your personal possession related to your work or employment, if any, and it lists the various River Valley entities and related entities.
Do you have any such documents, Mr. Kipnis?
A. I do not.
Q. What is your understanding, Mr. Kipnis, as to what this case is about, the Holland and Ross versus United States case?
A. My understanding is that during the savings and loan crisis, the government wound up with a number of undercapitalized institutions. It negotiated with various parties, Messrs. Holland and Ross included, to acquire those institutions in



return for various capital contributions and regulatory credits that the government would promise, and the acquisitions were consummated later on; that the year of FIRREA, '89, the laws changed and a number of institutions who were sound institutions now found themselves either undercapitalized -- or the threat of undercapitalizing. Some went under; others weren't able to do all the business that they anticipated. And I think that's what it's all about.
Q. And what's the basis for that understanding which you provided?
A. Memory, just general memory.
Q. With respect to the lawsuits, in general, that are ongoing against the United States relating to the savings and loan cases?
A. That, and just general memory of discussions at the time of the transactions and living with Holland, Ross, Bangert, and the others and their complaints at that time because of the changes.
Q. Do you know when you first became aware that they were going to file a lawsuit against the United States?



A. No.
Q. Were you involved at all in any analysis of whether or not they should bring a lawsuit against the United States?
A. No, from the legal standpoint as far as doing any research as a lawyer. Yes, in terms of just general discussions of the pros and cons of suing the government. It's not something they took lightly or wanted to do.
Q. And that would be based on discussions in board of director meetings or general discussions?
A. Both.
Q. And what do you recall with respect to those discussions as to any pros and cons of suing the government?
A. They felt they were wronged, but no one wanted to sue the government for reasons that are pretty obvious. They were afraid that it might harm future business dealings with the government. They were afraid that the government has more resources than they have in litigation. A lot of just general business reasons of "Did it make sense?"
Q. Do you recall any other specific reasons



that were identified, either pro or con, of suing the government?
A. No.
Q. Do you know when those discussions occurred in terms of was it right at the time FIRREA was passed, a year or two later?
A. I believe it was ongoing discussions from right at the time that FIRREA was passed all the way through the sales and after.
Q. Were you involved at all in discussions regarding Homer Holland and Howard Ross retaining the rights to the claim when they sold River Valley to First Banks?
A. Could you rephrase the -- Or could you repeat the question?
Q. Sure. Were you involved at all in any discussions with respect to Homer Holland and Howard Ross retaining the rights to the claim against the government when it sold River Valley to First Banks?
MR. BERGMAN: Mr. Kipnis, if you were involved as a lawyer, please keep your answer limited to a yes or no and do not reveal the substance of attorney-client communications.

Page 25

BY THE WITNESS:
A. Yes. And the results, I believe, found their way into the agreement.
Q. Were you involved in those discussions in any way other than as a lawyer with respect to what they should do?
A. No.
Q. Were you involved in any board meetings where there were discussions regarding maintaining the claim?
A. I don't believe so.
(Brief pause.)
BY THE WITNESS:
A. I take that back. Other than there would have probably been a reporting by Holland or Ross or Bangert as to the outline of the transaction at a board meeting, and I'll assume that that might have been one of the items that was brought up.
Q. Do you know what would have been brought up at the board meeting as to in terms of the outline of what it was?
A. No. There would be board packages that if you had those, the material would be in there.
Q. How did it come about that you had a

Page 26

percentage interest in the various River Valley entities?
A. Howard Ross asked me if I'd like to purchase a percentage of his interest.
Q. And do you have an understanding as to why he asked you that?
A. Clients and -- We -- He's a good client and friend.
Q. And do you know how the 2 percent or so that you believe you had with the different River Valley entities, how that amount was determined?
A. He asked me how much I would like in the initial Rock Falls litigation -- or --
Q. Acquisition?
A. -- organization, acquisition, and I believe I said based upon the amount of money that it would cost that I would like to try for 5 percent and I acquired that. And then some time later -- I think it was when I was moving into a new house -- I sold him back 3 percent, and that got down to 2 percent of the Illinois institution. And then when we were not able to acquire the Texas institution as part of the Illinois institution and had to form a new institution, essentially all the

Page 27

shareholders's then percentages -- everybody just acquired the Texas institution in the same percentages.
Q. When you purchased and/or sold percentages, how was the value determined?
A. I don't remember specifically. But I believe that as part of the board packages for River Valley, they would prepare market -- mark-to-market analyses of the valuation. And at the time of the sale, I think we just took the percentage of what we viewed as the market value of the institution.
Q. With respect to the acquisition of Republic by Rock Falls, do you recall any of the terms of the acquisition pursuant to your role on the board of directors?
A. No.
Q. Do you know whether at the time you were aware of the various terms of the acquisition?
A. In a general sense, yes.
Q. Would you have actually reviewed the acquisition documents?
A. Yes.
Q. Do you recall whether or not you had any

Page 28

input into any of the terms of the acquisition?
A. Not the business terms, the legal terms. If there was an agreement, I would be reviewing it as a lawyer and asking the management team whether -- is this what they really meant, is this what they wanted based upon their telling me what they thought the agreement was.
Q. Are there any specific issues that you can recall where there was some issues of what they meant or didn't mean when choosing any of the agreements?
A. No.
MR. BERGMAN: Again -- Let me again caution you. I think we're getting into an area where this is -- Ms. Smith is asking you about the substance of discussions you had with clients in the role as a lawyer. So I would ask you to be very careful not to reveal the substance of those discussions.
BY MS. SMITH:
Q. And with respect to the acquisition of Galva, Home, and Mutual by Mr. Holland and Mr. Ross, at what point did you become involved with what became River Valley of Peoria?
A. (No verbal response.)

Page 29

Q. I guess what I'm trying to get at first is were you involved at all up until the time that River Valley was formed while the negotiation was ongoing to acquire Galva, Home, and Mutual?
A. I'm assuming that from time to time they would report to us as directors, just that negotiations were ongoing and they were hopefully acquiring it. After the business deal was struck, I would have been involved in any legal documentation of it.
Q. Do you recall whether they attempted to acquire Galva, Home, and Mutual through Rock Falls initially?
A. Yes.
Q. And do you recall why, in fact, they did not acquire Galva/Home/Mutual through Rock Falls?
A. No.
Q. Did they report to the Rock Falls board of directors as to the negotiations that were ongoing with respect to the acquisition of Galva, Home, and Mutual?
A. Yes.
Q. Do you know if that was the case even after it was determined that Galva, Home, and

Page 30

Mutual would be acquired separately by Homer Holland and Howard Ross?
A. Yes.
Q. And do you recall anything at all relating to the discussions that they had with the board of directors relating to the acquisition of Galva, Home, and Mutual?
A. No.
Q. Do you recall anything at all relating to any discussions had with the board of directors of River Valley Peoria relating to the acquisition of Peoria Federal Savings?
A. No.
Q. Do you have any understanding as to whether the terms of any of the acquisitions are the same or different?
A. No.
Q. What was your understanding, Mr. Kipnis, as to what could be counted as regulatory capital following the acquisitions?
A. I'm going to give you some terms that I don't remember that well, but I think there was some -- there was some goodwill and there was some credits and there were some capital contributions

Page 31

of some nature along with our regular existing capital.
Q. As you sit here today, do you have an understanding of the term "goodwill"?
A. From a general accounting sense, yes.
Q. And what is your understanding?
A. It's an intangible that more often than not represents the difference between maybe the fair market value and the book value or -- that generally gets written off over a substantial period of time.
Q. Do you have any understanding as to how the term "goodwill" as used with respect to the acquisitions is the same or different than the definition you just gave?
A. No.
Q. You also referred to credits. What is your recollection of credits in terms of how they counted towards regulatory capital?
A. I have none.
Q. You also referred to capital, I believe. You said credits, and then you said capital credits. I don't know if those were two different things --

Page 32

A. No.
Q. -- that you were identifying.
A. I thought -- Again, maybe memory of the question; but I thought as part of the transaction there were some actual capital contributions in the form of cash that was given as part of those agreements.
Q. Cash that was given by the government?
A. Right.
Q. Okay.
A. Either straight out or through the purchase of some preferred stock in some fashion.
Q. And what, other than those items, is your general recollection of what may have counted as regulatory capital?
A. I really don't know.
Q. Other than what would have been discussed at board meetings and reported in minutes of the board meetings, would you have had any knowledge with respect to issues relating to goodwill or capital credits or cash contributions by the government, whether it be straight cash or through the purchase of preferred stock?
A. Yes.

Page 33

Q. And what would your understanding have been or knowledge have been?
A. I thought you -- the question was referring to the timing of what I've learned anything other than at the meetings. I mean, Howard Ross, Homer Holland, Steve Bangert all were friends, so I might see them for dinner or I might see them for lunch and we would talk -- we would always talk about the bank and institutions like that. So I can't confine the discussions just to the official board meetings.
Q. Is there anything as you sit here today that you can think of that you learned outside of what would have been reported in the minutes of board of directors meetings?
A. No.
Q. Do you recall what the differences are between GAAP goodwill and RAP goodwill?
A. No.
Q. What is your recollection of any contributions by Homer Holland or Howard Ross with respect to the acquisitions?
A. With respect to what?
Q. The acquisitions.

Page 34

A. At the time of acquisition, I'm assuming that they had to make some as a condition; but I don't know what they were. I don't remember what amounts were or anything like that.
Q. Do you or did you have any understanding as to how any contributions by them would count towards capital?
A. None that I remember now.
Q. Do you recall that there was some subordinated debt issue with respect to certain of the acquisitions?
A. Yes. I remember that there was some on the books, but I don't remember what was which particular transaction or who was the holder. I can't remember whether it was the government or whether it was American National or whether it was Howard or Homer for that matter.
Q. I'll represent to you that it was issued to American National Bank. Do you have any recollection as to how the subordinated debt counted towards regulatory capital?
A. No.
Q. Do you recall whether Homer Holland and Howard Ross purchased any stock themselves with

Page 35

respect to any of the acquisitions?
A. Because -- Well, because we weren't able to use Rock Falls, I'm sure we had to form a new institution and they had to purchase stock; but I don't remember the particulars.
Q. Do you recall their acquiring some preferred stock with respect to the acquisition of Peoria Federal?
A. No.
Q. What do you recall, Mr. Kipnis, regarding the pursuit of additional acquisition opportunities by either River Valley Rock Falls or River Valley Peoria?
A. I know that they were always interested in expanding and they were always looking for additional opportunities.
Q. Do you recall any of the specific entities or institutions that they may have attempted to acquire at any point in time?
A. No. There might be some discussions in the board packages, but independently I don't recall.
Q. Do you recall why they never acquired any other institutions or entities?

Page 36

A. No.
Q. You indicated that they were always interested in acquiring. Are you saying from the time of 1985 when Rock Falls was first acquired up until the time of 1994 when River Valley was sold, or would there be differences in that time period?
A. My guess is there were differences during the time period based upon whether they had sufficient regulatory capital to acquire or not, but nothing more specific than that.
Q. Do you recall anything as you sit here today that you would have learned outside of what's contained in the board minutes regarding any acquisition opportunities that they were seeking during the time 1985 to 1994?
A. No.
Q. Do you know whether or not they were interested in pursuing just troubled institutions?
A. No. I believe that they looked at both, but I don't -- I'm trying to recall a specific, but I can't.
Q. Do you know what their philosophy was -- the board of directors's philosophy was in terms of what it was that they were hoping or seeking to

Page 37

acquire?
A. Fashionably, anything that they thought they could get a sufficient rate of return on.
Q. Do you recall what they considered a sufficient rate of return?
A. No.
Q. Do you recall why they were interested in growing by acquisition?
A. Not specifically.
Q. Do you generally recall anything?
A. Basically they were good businessmen. They understood banking operations. They felt that the more assets and capital that they had under control, the more money they could make.
Q. Do you recall anything relating to the proposed acquisition of Peerless Federal Savings and Loan Association in Chicago?
A. No.
Q. Do you recall that there was even a proposed acquisition of Peerless?
A. Yes. For personal reasons that when I was a 10-year-old I played little league baseball, and my team was Peerless Federal Savings so that the name rang a bell for me; and I knew the family

Page 38

that primarily owned it.
Q. So other than recalling that it was, in fact, a potential acquisition, that's all you recall?
A. Correct.
Q. Do you recall that there was an interest in acquiring three thrifts in Grand Junction, Colorado?
A. No.
Q. Do you recall that there was a proposed acquisition of United Federal Savings Bank in Galesburg, Illinois?
A. Yes.
Q. Do you recall why they were interested in acquiring United Federal?
A. No.
Q. Do you recall why that deal didn't go through?
A. No.
Q. Do you recall anything at all relating to United in terms of what type of institution it was or whether it was troubled or not?
A. No.
Q. Do you recall if there was an institution

Page 39

United Federal?
A. The name rings a bell. I can't tell you whether that's the exact name or not.
Q. Do you recall having any discussions with anyone at United Federal?
A. No. In fact, I'm sure I didn't.
Q. Okay. Do you recall a proposed acquisition of Security Federal in Peoria, Illinois?
A. Yes.
Q. And what do you recall about that proposed acquisition?
A. Nothing. Purely it's another name that rings a bell.
Q. Do you recall anything about Security Federal?
A. No. Again, it wasn't my role. The business people negotiated the deals.
Q. You had no discussions with anyone at Security Federal?
A. No.
Q. Do you recall an interest in acquiring Household branches and Midwestern Canton branch?
A. Which ones?

Page 40

Q. Household branches and Midwestern Canton branch.
A. Canton, I remember as a name. Household doesn't ring a bell to me.
Q. What do you recall about Canton?
A. Only that I remember the name.
Q. And, again, you had no discussions with anyone at Midwestern Canton regarding a proposed acquisition?
A. No. I don't even remember it as Midwestern Canton. I only remember Canton.
Q. Do you recall an interest in acquiring the Heart of Illinois Bank branches?
A. No.
Q. Is that a name that is familiar to you?
A. No.
Q. Have any other proposed acquisitions come to your mind in the last few minutes while we've been identifying some others?
A. No.
Q. Do you have any sense of how many proposed acquisitions there may have been from the time 1985 to 1994?
A. No.

Q. If an acquisition was likely to be consummated, would you have had any role?
A. Probably, depending upon whether they were using other regulatory counsel or not. Sometimes we would stop in at the end; sometimes we'd take a more active role in reviewing an acquisition agreement. I wouldn't have been shut out altogether.
Q. Do you know whether you ever actually did have any involvement in any proposed acquisitions?
A. The ones that were consummated.
Q. Other than the ones that were consummated?
A. No, I don't think so.
(Kipnis Deposition Exhibit No. 2 marked as requested.)
BY MS. SMITH:
Q. Mr. Kipnis, if you could take a look at what the court reporter has marked as Exhibit 2, it's an April 19th, 1990 letter on Holleb & Coff letterhead from Anne Brody, and you're identified as a cc, and Steve Bangert, and it's directed to Michelle Heider at Household Bank FSB. If you could just skim the letter real quick and see if



that brings back any recollection.
(Witness viewing document.)
BY MS. SMITH:
Q. Have you had a chance to skim that, Mr. Kipnis?
A. I have.
Q. Does it bring back any recollection?
A. No.
Q. And if you could turn to the page that ends with Bates range 1630 down in the right-hand corner.
A. I'm sorry. What?
Q. It ends with 1630 down in the right-hand corner.
MS. SMITH: For the record, the whole document is Bates range PHO012 1608 through 1633, and then also attached to the back is PHO012 1075 through 1093.
BY MS. SMITH:
Q. On the page that ends with Bates range 1630, it indicates copies should be sent to your attention. Do you recall anything about copies being sent to your attention?
A. Generally on all documents copies would



be sent to my attention because the other parties -- the businessmen -- knew that generally I was always in town and that if something came across that came to me, I would at least -- that they wouldn't just throw something on their desk and let it go. I would be the one that says, "Hey, guys ..." But I think you'll find that I would be copied on most agreements of all types that River Valley would have entered into, not just acquisition agreements.
Q. But you still don't recall anything about the Household branches?
A. No.
Q. How would Anne Webber Brody's role have differed from your role?
A. It would be less. Say, in a situation like this, Steve would have probably have been the one to have reviewed the agreement and told us the business terms. Anne and I would have reviewed from a general corporate standpoint the representations and warranties, and we would have said as lawyers, "Steve, we think you should have this language or that language."
He would say yes or no.



Anne would have joined either Steve and me in a meeting or I would have reported to her the end results of the meetings, and she would have, in this instance, served as scrivener for the markup of the document and the transmittal of the cover letter.
Q. Do you believe you would have greater knowledge than her with respect to any information relating to the River Valley entities?
A. I know you'll find this hard to believe after how this deposition is going, but absolutely.
MS. SMITH: I know we haven't been going very long, but why don't we just take a quick 10-minute break.
(A short break was had.)
BY MS. SMITH:
Q. Mr. Kipnis, what do you recall regarding any attempts to raise capital following the passage of FIRREA?
A. Nothing specifically.
Q. Do you recall generally whether or not there were efforts undertaken to raise capital?
A. I believe there were, and it was just

difficult under that type of regulatory environment. People weren't sure what was going to happen.

Q. When you say it was "difficult," why was it difficult?

A. No specific memories other than FIRREA and the imposition of various regulations. It just put -- It put the institutions under a cloud. It just made it harder. When people have money they have different investment alternatives, and many investors selected alternatives that were not regulated like this. It was harder to get people to invest in the institutions.

Q. Do you recall specifically whether the River Valley entities had any difficulty in raising funds, raising capital?

A. I believe they did, yes, but I do not recall the specifics.

Q. Do you recall discussions either at the board meetings or outside the board meetings on ways to replace the supervisory capital that was no longer counted as regulatory capital after FIRREA?

A. I recall there were discussions, yes.

Q. Do you recall anything specifically or



generally regarding those discussions?

A. No.

Q. Do you recall whether there were any discussions of Mr. Holland or Mr. Ross infusing additional capital into the thrifts?

A. Yes.

Q. And what do you recall regarding those discussions?

A. I don't recall the specifics.

Q. Do you generally recall whether it was a serious discussion or not in terms of them infusing additional capital into the thrifts or whether it was just brought up and easily discounted -- quickly discounted?

A. I do not recall the specifics or the times. But at certain times it was very serious because I know at least at one point -- I think I recall -- that one of the regulatory bodies imposed that they were either going to have to get some additional capital -- a requirement that they would get some additional capital in or there were going to be severe restrictions on them. I don't remember what the nature of those restrictions were.



Q. Would that have been a two-million-dollar capital infusion that was required pursuant to a supervisory agreement that was entered in '91? Would that sound right?

A. That would probably sound right.

Q. Other than serious discussions regarding, potentially, it was, that infusion of capital, do you recall any other discussion at any time regarding any -- serious discussion at any time regarding infusions of capital by Mr. Holland or Mr. Ross?

A. Yes, there would have been discussions. But I don't recall the timing or the specifics.

Q. Do you recall whether they would have been before or after the one that you do remember?

A. No.

Q. Do you recall any of the discussions relating to the replacement of nonqualifying cumulative preferred stock with -- I'm sorry -- nonqual- -- Let me restate that whole question.

Do you recall any discussions regarding the replacement of nonqualifying cumulative preferred stock with noncumulative preferred stock?

A. I recall there were discussions, but I do



not recall the specifics.

Q. Do you recall whether the cumulative preferred stock was, in fact, replaced with the noncumulative preferred stock?

A. No, I do not recall.

Q. Do you recall whether that transaction was intended to raise the capital of River Valley Peoria?

A. No, I don't recall.

Q. Do you recall anything relating to a redemption of 5 million in cumulative preferred stock that had been issued to FSLIC?

A. Vague recollections.

Q. Do you recall whether that redemption took place?

A. I believe it did along with -- if I'm remembering the transaction. I think it was a redemption and a settlement of various issues under one of the agreements that wound up in something called like a termination agreement, if that's the transaction. I think there were pools of receivables or something like that.

Q. Do you recall the purpose for the redemption of the FSLIC stock?

A. No.
Q. Do you recall whether that was something that was sought by River Valley or by FSLIC?
A. I believe it was sought by River Valley as just part of resolving a couple of issues with FSLIC and just having less involvement with the government.
Q. Did you ever talk to anyone at FSLIC or at the FDIC?
A. On that transaction?
Q. In general.
A. Yeah, once or twice. One that I remember.
Q. And what one do you remember?
A. I think it was in connection with the supervisory agreement that you referred to where I was in a meeting -- I believe they met with all of the directors. And we were presented this agreement, and my memory is that they told us that they had their bad-guy agreement and their good-guy agreement; and we were given their good-guy agreement and we were to sign it then.
Q. Do you recall anything else regarding that meeting?



A. No.
Q. Do you recall who the FDIC or FSLIC person or maybe OTS person --
A. No.
Q. -- who they were at the meeting?
A. No.
Q. Other than that one meeting with any regulators -- You think there may have just been one other meeting where you spoke with regulators?
A. Well, the regulators would come in -- they would report to the board as part of annual exams. But as counsel I wasn't really involved with the regulators at all, so, no, I'm not remembering meetings.
Q. Other than the regulators attending the board of directors meetings, did you have any contact with any of the regulators?
A. None that I recall.
Q. What is your recollection of the reason for the imposition of a supervisory agreement?
A. I believe that as a result of FIRREA and the regulations imposed thereunder, it changed us from being -- from whatever benchmark of adequate capitalization that we needed to not be adequately



capitalized, and so there were restrictions imposed upon us.
Q. Do you recall any issues relating to the high level of mortgage derivatives by River Valley -- held by River Valley?
A. Yes.
Q. What do you recall regarding that issue?
A. I recall that Steve Bangert was -- did a number of transactions that I couldn't explain to you from Adam from things that were called -- from stars to gnomes to I'm not even sure what else; that the regulators did not understand them either; that he and other members of management worked real hard with the regulators to help them understand. And there were a couple sets of regulators, one of which -- and I don't remember which ones -- ultimately came to an understanding and saw how good he was with it, and I think we were fine with them. And another set of regulators that never did or could understand, and so we were -- they were never happy with our doing the derivatives.
Q. Do you recall whether the supervisory agreement was imposed by the regulators which you indicated understood or by the regulators that you



indicated didn't understand what was going on?
A. Well, I'll assume it was the ones who didn't understand, but I don't remember.
Q. Do you recall whether the regulators which you've indicated did understand, whether they had any concerns with the River Valley institutions?
A. I don't think they did once they became comfortable.
Q. So you don't recall whether they required River Valley to reduce their level -- the level of mortgage derivatives even if they weren't as concerned as the other regulators?
A. No, I don't recall.
Q. I know I asked you about your positions before with respect to River Valley Holding, Inc., and you didn't seem to recall that such an entity existed. Do you --
A. In retrospect I think it might have been a holding company.
Q. Do you recall anything relating to the creation of River Valley Holding, Inc.?
A. It might have -- I don't know if I'm recalling or if I'm guessing, but when we could not

Page 53

acquire whichever institution it was as part of Rock Falls and had to set up another institution because we weren't changing the essential business deals of the shareholders, we might have created a holding company that owned both of them. But I don't know if I'm recalling or guessing.
Q. Do you recall whether the creation of the holding company resulted in additional capital for River Valley following the passage of FIRREA?
A. No, I don't recall.
Q. Do you recall anything relating to the paydown of a loan to River Valley Holding, Inc., by River Valley so that the acquirers of San Antonio Federal Savings Bank could then take out a loan from River Valley Holding, Inc.?
A. Yes, I think so. I believe it was a condition of American National Bank that to make the loan to the entity acquiring Texas that there would have to be a paydown of the Illinois. Yeah, I think that was the case.
Q. Do you have any understanding as to why American National Bank would have required the paydown of the loan?
A. I don't recall any of the specifics. I

Page 54

wasn't part of those discussions.
(Kipnis Deposition Exhibit No. 3 marked as requested.)
BY MS. SMITH:
Q. Mr. Kipnis, if you could take a look at what the court reporter has marked as Exhibit 3, the first page indicates it's an Office of Thrift Supervision memorandum dated April 10th, 1992, from Larry Ferries to Chester Biedron, and the Bates range on the document is WON034 0611 through 0616. And if you could take a quick look at the document.
(Witness viewing document.)
BY MS. SMITH:
Q. Does this refresh your recollection about anything relating to the six-million-dollar dividend referenced in this document?
A. Nope.
Q. Do you recall the March 19th, 1992 meeting with the OTS which the memo indicates you were in attendance at?
A. No.
Q. Based on your review of this document, what is your understanding as to the purpose of the

Page 55

six-million-dollar dividend?
A. Let me reread.
Q. Okay.
A. Apparently the supervisory agreement was with the OTS, and we were requesting an exception from one of the terms in order to dividend out that money to redeem $6 million of preferred stock held by American National.
Q. Do you recall anything relating to any shrinking or shrinkage that occurred at River Valley Peoria as a result of the payment of the dividend referenced in the memo?
A. No.
Q. Do you recall generally River Valley of Peoria or River Valley Rock Falls going through periods of shrinkage?
A. Yes.
Q. Do you have a general recollection as to whether that occurred at one specific time or whether it occurred at various times from 1985 to 1994?
A. It would occur at the end of various quarters to get -- to get on the right side of whatever regulatory compliance capital that they

Page 56

had to be. Basically they wanted to grow. They could make money by making investments, but they were limited to the amount of what they could do because of the amount of capital that they had; so from time to time they had to sell off good investments to get to their capital requirements.
Q. Do you recall why they determined that the six-million-dollar dividend payment should be made that's referenced in this letter?
A. No. No, I don't remember the context at all.
Q. Do you recall whether there were any discussions relating to whether the money would better be utilized in the acquisition of San Antonio Federal than staying within River Valley?
A. No recollection.
Q. Do you have any recollection or understanding of any guaranties provided by either Mr. Holland or Mr. Ross with respect to the subordinated debt that was issued to American National Bank?
A. I believe in general that Ross and Holland guaranteed all of the obligations to the institution regardless of what form.

Q. Do you recall them receiving any fees for that?
A. At some point I believe they did receive something called a guaranty fee.
Q. Do you recall how it was determined what the amount of the fee would be?
A. No.
Q. If the board of directors had approved the fee -- Let me restate that.
Do you recall whether or not the board of directors had to approve whatever guaranty fee was received by Mr. Holland and Mr. Ross?
A. I believe the board did.
Q. How would the board have determined what amount that fee should be?
A. I believe that the board -- probably other than Ross and Bangert -- would have determined whether it was fair and reasonable because -- remembering that the board members for the most part were shareholders so anything that we gave to them was not available for the rest of us.
Q. And you indicated the term was fair and reasonable. Would that be with respect to the institutions or with respect to Mr. Holland and



Ross or with respect to all of them, the institution and Mr. Holland and Mr. Ross?
A. Probably all, but more with respect to the institution and the other shareholders who had the benefit of not having to execute the guaranties and what were we willing to pay them for stepping up to the plate when the others really did not want to.
Q. Do you recall whether, with respect to the acquisition of San Antonio, anyone else issued any guaranties?
A. I believe on San Antonio, everyone -- I think we might have all executed pro rata several guaranties. Theirs may have been joint and several, but -- The other shareholders may have executed several guaranties in lieu of making cash capital contributions of our respective percentages.
Q. Were any guaranties received in conjunction with that?
A. I don't recall.
Q. Have any capital replacement initiatives come to mind in the last few minutes or hour or so as we've been talking?



A. No.
Q. Do you recall any restructuring of River Valley's risk-weighted assets and how that may have impacted on capital?
A. No. I understand the concept in general, but I don't remember things that we specifically did.
Q. Do you recall whether anything was done to increase the risk-based capital ratio?
A. No.
Q. What is your understanding as to why River Valley Peoria and River Valley Rock Falls merged?
A. I have no recollection. I can guess, but I have no recollection.
Q. Do you recall that the two did merge?
A. I think they did, yes.
Q. What would be your guess as to why they merged?
A. My guess is that there were -- we wanted them to be together to begin with, and we couldn't. And then when we could, I think we did. And I think part of the reason was that Rock Falls had substantial NOLs, net operating losses, that we



wanted to take advantage of by netting some income from the Peoria institution with the Rock Falls institution.
Q. Do you recall when you first knew that there was an interest in merging the two entities?
A. No.
Q. Do you know whether that would have been from day one, from when Galva/Home/Mutual was acquired and became River Valley Peoria?
A. I think the answer is yes from day one in the sense of I think they always wanted it to be part of Rock Falls.
Q. What is your understanding of what the impact was of the merger between River Valley Rock Falls and River Valley Peoria, in terms of how it benefitted --
A. No recollection.
Q. Do you recall that two branches of River Valley Rock Falls were sold in 1991 to Amcore Financial?
A. Yes.
Q. Do you recall why they were sold?
A. No.
Q. Do you recall what the impact was of the

Page 61

sale of those two branches of River Valley Rock Falls?
A. No.
Q. Do you know whether or not the two branches that were sold -- they were Roscoe and South Beloit -- whether they were the least efficient of the River Valley Rock Falls and River Valley Peoria branches?
A. I don't recall.
Q. Do you recall anything relating to the adoption of SFAS 109?
A. I don't know what SFAS 109 is.
Q. No recollection of any discussions relating to it?
A. If it had an impact on the institutions, I'm sure there would have just been some discussions to let us know what it was. But I have no recollection.
Q. Do you recall the retirement of 4.6 million of subordinated debt that was held by American National Bank?
A. No specific recollection.
Q. Do you have a general recollection of retirement of subordinating debt?

Page 62

A. No, other than it was done.
Q. Any understanding as to why it would have been retired?
A. I can only assume that it made financial sense to the institution.
Q. Do you know how it would have made financial sense?
A. No recollection.
(Brief pause.)
BY MS. SMITH:
Q. Do you recall deferred compensation agreements with Mr. Holland and Mr. Bangert?
A. I don't recall one with Mr. Holland. I think I do recall one with Mr. Bangert.
Q. Do you recall anything relating to the payout of the deferred compensation agreement with Mr. Bangert?
A. No.
Q. Do you recall any discussions relating to utilizing funds of River Valley Holding to pay out the deferred compensation agreement?
A. No.
Q. Do you have any understanding as to why funds of River Valley Holding, Inc., would have

Page 63

been used to pay out deferred compensation agreements with Mr. Bangert and Mr. Holland as opposed to being infused into River Valley?
A. And then paid out?
Q. Utilized as capital in River Valley for River Valley to use for whatever purpose.
A. No recollection.
Q. Do you recall at what time River Valley stopped considering acquiring other institutions or entities?
A. No.
Q. Do you know whether it was within one year, two years, three years, four years, or more of when River Valley was sold to First Banks?
A. I mean, I don't even recall the premise.
Q. Okay. So you don't recall any point in time when they were --
A. Until the point that they decided to sell, I don't recall a premise of stopping to acquire. I mean, I just don't know -- no bright line that I can remember of anything like that.
Q. What do you recall regarding how it was determined what dividends should be paid from River Valley to River Valley Holding?

Page 64

A. I don't know if I recall or if I'm guessing. I'll assume if there were some obligations at the River Valley Holdings level, either in the way of preferred stock or debt, there was probably dividends sent up in an amount necessary to retire whatever those obligations were. And if that's not the answer, I have no recollection.
Q. So you don't recall any dividend payments other than what might have been paid to retire the debt?
A. If there was debt -- Yeah, I would have no other recollection.
Q. Do you have any understanding as to whether Mr. Holland and/or Mr. Ross had additional funds that they could infuse into River Valley Peoria or River Valley Rock Falls anywhere during the period of 1985 through 1994?
A. Only from having some vague -- some recollections of what their financial statements were, I'll assume the answer was yes, they could have.
Q. Are there any times -- Let me rephrase that.

Page 65

A. Mr. Ross more than Mr. Holland would be my recollection during those years.
Q. Would there have been anytime within 1985 to 1994 that you believe Mr. Holland or Mr. Ross would not have had additional money to infuse into the thrifts?
A. I don't know Mr. Holland's situation that well. Mr. Ross could have at all times done it.
Q. Do you have any understanding as to the maximum amount that Mr. Ross would have been able to infuse into either River Valley Peoria or River Valley Rock Falls?
MR. BERGMAN: Are you asking what was liquid or something different?
MS. SMITH: Just if he has some general understanding of what Mr. Ross may have had available to invest at any given point in time.
BY THE WITNESS:
A. Nothing other than that Mr. Ross is a man of substantial means and could have put in substantial funds at any point in time. However you want to define "substantial," he would have had access to it, I believe.
Q. How long have you been borrowing funds

Page 66

from Mr. Ross?
A. 10 or 15 years, not continually, short terms.
Q. When you say "short terms," what period of --
A. Six months to a couple of years. Generally I pay him an interest rate that is more than he can earn on CDs or treasuries or other -- those types of investments. So it works out for both of us.
Q. And what amounts have you borrowed from him?
A. Currently I owe him a hundred thousand dollars at 8 percent. In the past I think there was a loan for $50,000, and there was another loan for -- I don't remember the amount. I think it was more than a hundred thousand dollars, but it was paid off a number of years ago.
Q. So there's just been three loans?
A. I would have to check records to tell you.
Q. And why have you borrowed from him as opposed to from a bank?
A. In the earlier loans, it was -- I think

Page 67

the first loan was to acquire the River Valley stock and -- younger, liquid and something that he offered. As of right now, it was just simply easy and a convenience to both of us that worked well for both of us. Mr. Ross has, as I said, substantial sums, and he frequently lends money to a number of his acquaintances.
Q. Are the loans that you have had secured or unsecured?
A. Both.
Q. And is the current loan secured or unsecured?
A. Unsecured.
Q. What is your understanding, Mr. Kipnis, of why River Valley was sold to First Banks?
A. I think they received a good offer.
Q. Do you recall when it was decided that they would sell River Valley?
A. No.
Q. Do you recall whether they went out looking for acquirers or whether acquirers came to them?
A. I believe from time to time acquirers came to them, but I believe that in First Banks's

Page 68

situation, they went out and looked at the market. I think that they hired an investment banking firm at that time.
Q. Would that be Donaldson, Lufkin, and Jenrette? Do you recall?
A. Yes.
Q. Do you recall how it was determined to hire Donaldson, Lufkin, and Jenrette?
A. No. I wasn't part of that.
Q. Do you have an understanding as to what the work was that Donaldson, Lufkin, and Jenrette did?
A. I believe that they worked with Messrs. Holland, Ross, Bangert in analyzing the institution and trying to place a value on it. I know that they did due diligence with respect to the company. My memory is that our office had to provide them with corporate documentation -- leases, et cetera, things like that -- to help them review and conduct their analysis.
Q. Did you have any discussions with anyone from Donaldson, Lufkin, and Jenrette?
A. None that I remember.
Q. Do you recall whether there were other

potential acquirers of River Valley?
A. I know that they were speaking to more than one party, yes.
Q. Do you recall anything relating to why those other acquisitions didn't go through -- or sale didn't go through?
A. No.
Q. Do you recall anything relating to First Financial Corp of Stevens Point, Wisconsin?
A. I remember that they were one of the potential acquirers, yes.
Q. Do you recall anything relating to any discussions with First Financial?
A. I believe that that was an institution that was primarily -- majority-owned by their president, who was very difficult to negotiate with, and I think that one might have also have been a stock transaction, that there were questions on the stock valuations; but nothing more than that.
Q. Do you recall why that deal didn't go through?
A. Nothing other than what I just said.
Q. Do you recall whether it may have been a



better offer than the offer from First Banks?
A. No.
Q. Do you recall how Donaldson, Lufkin, Jenrette and/or River Valley determined what the appropriate purchase price would be?
A. No. I wasn't part of those discussions. They would have reported to us as a board of what they came up with generally. But the methodology that they used, no, I don't recall.
Q. Do you have a general recollection of what the components were of the purchase price?
A. No.
Q. Do you have any general recollection of what the sale price ultimately was to First Banks?
A. I ought to -- I received a percentage of it -- but I don't.
Q. Do you recall any discussions relating to the transfer of net operating loss carry forwards to First Banks?
A. No recollection of any specifics other than -- I'll assume that it was something that would have been transferred and given some value based upon the time value that they thought that they could use it or not, but no specific



recollection.
Q. In your indication that it would be based on the time value in which they could use it, what's the basis for that understanding?
A. It might be recollection. It might just be just general knowledge that if -- that net operating losses have a greater value to anybody if they can be used today rather than 10 years from now. Just present value of being able to use something.
Q. Do you recall any shrinkage of the River Valley balance sheet that occurred in anticipation of the closing on the sale to First Banks?
A. No recollection.
Q. Do you recall whether there was such shrinkage?
A. No recollection, no.
Q. And was the payment that you received on the -- upon the sale to First Banks based purely on a -- whatever your percentage was, you received that percentage of whatever the sale price was?
A. No, I don't think so. There would have -- That would -- I'm assuming that was a sale of assets. And so then we would have had to pay



off whatever obligations that we had, and then it would have been a distribution of the net proceeds after -- of what was left as a pot for the shareholders after payment of DLJ and all other expenses that the corporation had. It wouldn't have been just a percentage of the sale price.
Q. So whatever the net proceeds were and whatever percentage you held, you would have received that percentage of the net proceeds?
A. I think so.
Q. Do you recall how the -- Let me restate that.
With respect to San Antonio Federal, do you recall how it became known that it was available to be acquired?
A. No.
Q. Do you recall why it was determined that it should be acquired?
A. I believe that they thought that they were acquiring assets that had substantially more value than the purchase price that the government was asking, in their minds, and that they could then also take those institutions and run them profitably, grow them, and create more value. So

Page 73

they bought it for two reasons, I think.
Q. Do you recall why they wanted to initially acquire it through River Valley Peoria?
A. I'll again have to guess that it would have been for maybe the NOLs, but I don't really recall.
Q. How did it come about that you also owned a percentage of either Western Capital Holding, Inc., or River Valley Bank Texas?
A. Well, as I stated before, Howard Ross first offered me an interest in the initial, and then everything after that stayed pro rata among the shareholders. It's my memory, nobody was being shut out or not willing to participate simply because the structure of the transaction would have taken it outside of the original shareholding. So if we were all -- had our interest in the original institution, we would have our -- the same percentage in the new institution, which in effect would have put us in the same position that we were had the Illinois institution wound up being the acquirer.
Q. With respect to River Valley Peoria, is it your understanding that there are other

Page 74

shareholders other than yourself and Mr. Ross?
A. Yeah.
MR. BERGMAN: Just Mr. Ross and --
BY MS. SMITH:
Q. I mean yourself and Mr. Ross and Mr. Holland.
A. Yeah. I'm trying to figure out what -- I don't know if Bangert's interest was as a shareholder or just that he had an option agreement. At one point there were gentlemen named Kost and Coblentz, but they were bought out. I don't know if Mr. Pikus had an interest.
But there was a small team that either through actual shareholdings or through a shareholder agreement had the equivalent of a shareholder return. But there was about 5, 6 of us maybe who had an equitable interest in the institutions with Ross and Holland having the primary economic benefit and burden.
Q. Do you recall Mr. Rose having an investment interest in Western Capital Holding, Inc.?
A. Now that you raise that -- A couple questions before, you asked me how did they know of

Page 75

Western Capital; it may have been through Mr. Rose. And I don't think he had an interest in Illinois, but I think he may have had an interest in Texas because I think he had a relationship, I think, primarily with Mr. Holland. And I think he was the one that brought the Texas institution situation to the team.
Q. Do you recall him holding a position at River Valley Peoria or Holland Partners, Inc.?
A. No, I don't recall.
Q. I take it, then, you don't recall what -- if he did have a position, what his role was?
A. No, I don't.
Q. Do you know whether or not Mr. Holland and Mr. Ross explored obtaining financing from someone other than American National Bank in order to acquire San Antonio Federal Savings?
A. I do not recall. They may have spoken to Noel Rothman about becoming an additional investor. They may have spoken to others, but I don't recall any specifics.
Q. And what makes you think they may have spoken to Noel Rothman?
A. Howard has done investments with the

Page 76

Rothman family from time to time and may have thought -- They get along well together, and they invest well together. They trust each other. And he may have thought that this was something appropriate for him.
Q. But you don't recall whether he actually did speak with him?
A. No, I don't recall.
Q. Do you recall any discussions regarding merging the River Valley Bank in Texas with River Valley in Peoria after River Valley Bank in Texas was formed?
A. I recall that there were discussions, but I don't recall any of the specifics.
Q. Do you recall if they were at one specific time or whether they continued over time?
A. No recollection.
Q. I take it you don't recall why the merger never occurred, then?
A. No.
Q. Do you recall why River Valley Bank in Texas was sold?
A. I think there were a couple of reasons. One, I think we received a good offer. But,

Page 77

secondly, I think they found it difficult to administer -- It was harder to get to. And it's harder to -- It's harder to administer an asset that you have to take two airplanes to than one airplane to, I think might have set the stage for it a little bit; but I don't think that that had bearing, a whole lot. But in my mind, for me, I didn't like going down there for board meetings because it's just hard.
Q. Do you recall whether the institution was doing well or not?
A. I think it was doing well.
Q. Do you recall why the transaction was structured as a liquidation and a closing?
A. No.
(Brief pause.)
BY THE WITNESS:
A. I take that back. I don't remember the name of the buyer, but it was an asset sale. And I believe they wanted all the branches -- I think there were pools of assets, some investments that we made that they really didn't want to buy. So I think that we thought -- and the assets we thought -- Let's say you had -- one of the pools

Page 78

was, say, a million dollars of loans, but because they weren't very marketable, because we were just a participant, we might have thought that they would ultimately prove out to have a million dollars of value; but to sell them in the marketplace because they were minority interest and not marketable, you couldn't sell them in the marketplace for that. So I think we just kept those in the pot, didn't sell it; and that's where Western Capital came about to just, in effect, continue to keep the runoff of those assets as they would liquidate over time.
Q. How soon after the liquidation closing did you sell your percentage of Western Capital?
A. I don't remember.
Q. Would it have been within a year? Do you know?
A. I hate to say this. When did the closing occur?
Q. June of '96.
A. I would say it's probably within a year, then.
Q. Okay.
MS. SMITH: Why don't we take another

Page 79

10-minute break, and then we may not have very much at all.
MR. BERGMAN: Okay.
(A short break was had.)
BY MS. SMITH:
Q. Mr. Kipnis, you made a reference earlier in the deposition to what you believe is a settlement of a pool of receivables. Would that have been a settlement agreement in conjunction -- in relationship to the acquisition agreements? Do you know?
A. Which one now?
Q. You made a reference -- When I asked you about the redemption of FSLIC stuff --
A. Okay.
Q. -- you brought up that you recalled something about that, and then you thought it may have been also dealing with a settlement agreement regarding a pool of receivables.
A. I know -- It wasn't receivables. It was loans, I believe.
Q. Okay.
A. And there were some questions as to the value of those loans when they were doing the

Page 80

acquisition, so I think there was some continuing obligation on FSLIC's part that they were settling up as part of that agreement.
Q. Were you involved at all with that settlement agreement?
A. Only at the very end on maybe -- again, acquisition agreements, just reviewing the language, you know, and talking it over with my guys a little bit, but not the negotiations with FSLIC.
Q. Do you know whether at that time Mr. Holland and Mr. Ross were considering bringing a claim against the United States with respect to issues stemming from the passage of FIRREA?
A. I know that they knew as soon as FIRREA passed that it was going to create burdens for them. And then as things went on a regulatory process, it became more and more onerous; but I don't know at what point they decided that litigation was a viable alternative or not.
Q. What was the decision-making authority of the board of directors as opposed to the executive committee?
A. Could you repeat your question?

Page 81

Q. Sure. What was your decision-making authority of the board of directors as opposed to the executive committee for River Valley Peoria?
A. There really wasn't. The executive committee was set up for administrative convenience. But the reality was, this was a closely knit corporation controlled by Ross and Holland, and other than minor related party-type situations that I mentioned before, like on the guaranty fees -- Pretty much they gave us their recommendations as management and majority owners, and we said yes.
Q. Do you recall ever saying no?
A. No.
Q. What do you recall regarding the relationship between River Valley Peoria and River Valley Rock Falls with American National Bank?
A. Other than the fact that American National Bank strongly believed in Howard's and Homer's ability to make money for themselves and for the bank, nothing. They were very good customers. American National enjoyed -- if that could be the right word -- lending money to them because they knew they were going to get paid

Page 82

back.
Q. Do you know to what extent Homer Holland and Howard Ross talked to other banks when they were looking to obtain funds?
A. No, I do not know.
Q. What is your opinion of Homer Holland as a thrift manager?
A. I believe that Homer is extremely bright and knows his business.
Q. What is your opinion regarding his performance in running River Valley following the passage of FIRREA?
A. I believe Homer, along with the rest of the management team, did very well.
Q. And who would be the rest of the management team that you're including in that?
A. Howard Ross, Steve Bangert were the primary people; at various times, Richard Dalton, Ron Seib, Ron Pikus. And the latter three were really in secondary roles. It was primarily Holland, Ross, Bangert.
Q. And with respect to Pikus, Dalton, and Seib, what is your view of them generally as thrift managers?

Page 83

A. I believe that they are all very good business people, and even more importantly to me as an investor, honest, good people.
Q. Can you recall any specific opportunities that River Valley wished to pursue but was precluded from doing so because of the provisions in FIRREA that eliminated certain items --
A. I'm sure there were. But my knowledge both of FIRREA and the investments at the time, I just don't have that memory.
Q. Do you feel that you suffered any diminution in the value of your investment in River Valley due to the provisions of FIRREA that eliminated certain items to be included in regulatory capital?
A. Yes.
Q. And how so?
A. My recollection is that we all thought that we got a good price from First Banks for the assets we were able to sell, but without FIRREA we would have had much more to sell.
Q. Do you have any understanding as to what more you would have had to sell?
A. No, I don't have the specifics. I just

Page 84

remember the general tenor of the discussions.
Q. Did you make a decision whether or not to sue the government?
A. Did I personally?
Q. Yes.
A. No, I did not. I was a 2-percent shareholder. I go along with the team.
Q. Do you have the potential for any material gain from the outcome of the lawsuit by Holland and Ross against the United States?
A. I'll assume that after the payment of all expenses and everything else, if there is an ultimate pool, I'll probably get 2 percent of that. I'll let you decide whether it's material or not.
Q. Have you had discussions with Mr. Holland or Mr. Ross with respect to that issue?
A. Absolutely none. It is so far out of my mind and nothing that I'm going to spend today or tomorrow.
MS. SMITH: That's all I have for you, Mr. Kipnis. Thank you.
THE WITNESS: Thank you.
MR. BERGMAN: No questions for me.

Page 85

THE REPORTER: Signature?
MR. BERGMAN: We will sign.
(Witness excused.)

Page 86

UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND AND HOWARD R. ROSS, Plaintiffs,

vs. No. 95-524C

THE UNITED STATES OF AMERICA, Defendants.

I, MARK KIPNIS, state that I have read the foregoing transcript of the testimony given by me at my deposition on the 14th day of August, 2000, and that said transcript constitutes a true and correct record of the testimony given by me at the said deposition except as I have so indicated on the errata sheets provided herein.

____________________
MARK KIPNIS

No corrections (Please initial) ________
Number of errata sheets submitted ________ (pgs.)

SUBSCRIBED AND SWORN to before me this _______ day of ____________, 2000.

____________________
NOTARY PUBLIC

Page 87

UNITED STATES OF AMERICA )
STATE OF ILLINOIS ) SS.
COUNTY OF COOK )

I, LAURA A. CZUBAK, Certified Shorthand Reporter and Notary Public, do hereby certify that MARK KIPNIS was first duly sworn by me to testify the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said deposition was taken at the time and place specified and that the taking of said deposition commenced on the 14th day of August, A.D., 2000, at 9:01 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor financially interested directly or indirectly in this action.

Page 88

In witness whereof, I have hereunto set my hand and affixed my seal of office at Chicago, Illinois, this 7th day of September, A.D., 2000.

____________________
LAURA A. CZUBAK, CSR
205 West Randolph Street
Suite 510
Chicago, Illinois 60606
Phone: (312) 236-6936
CSR No. 084-004041

KEYWORD INDEXING

$50,000 [1] 66:15
$6 [1] 55:7
'70s [1] 8:14
'74 [1] 8:14
'76 [1] 8:14
'89 [1] 22:4
'91 [1] 47:3
'96 [1] 78:20
01 [2] 1:20 87:15
0611 [1] 54:10
0616 [1] 54:10
084-004041 [1] 88:13
1 [2] 3:9 21:5
10 [2] 66:2 71:8
10-minute [2] 44:14 79:1
10-year-old [1] 37:22
1075 [1] 42:17
109 [2] 61:11 61:12
1093 [1] 42:18
10th [1] 54:8
1100 [1] 2:8
14th [3] 1:21 86:12 87:14
15 [1] 66:2
1608 [1] 42:16
1630 [3] 42:10 42:13 42:21
1633 [1] 42:16
1965 [1] 6:23
1969 [3] 6:24 7:11 8:10
1972 [1] 7:11
1974 [2] 7:1 7:14
1985 [6] 36:4 36:15 40:23 55:20 64:18 65:3
1990 [1] 41:20
1991 [1] 60:19
1992 [2] 54:8 54:19
1994 [6] 36:5 36:15 40:23 55:21 64:18 65:4
1998 [2] 7:15 7:18
19th [2] 41:20 54:19
2 [7] 3:10 16:19 26:9 26:21 41:16 41:19 84:13
2-percent [1] 84:6
2000 [5] 1:21 86:13 86:21 87:14 88:3
20004-1206 [1] 2:3
202 [2] 2:4 2:9
205 [2] 1:19 88:11
20530 [1] 2:8
21 [1] 3:9
236-6936 [1] 88:12
3 [4] 3:11 26:20 54:3 54:6
312 [1] 88:12
353-8841 [1] 2:9
4 [2] 3:4
4.6 [1] 61:19
41 [1] 3:10
5 [3] 26:18 48:11 74:16
510 [2] 1:19 88:11
54 [1] 3:11
555 [1] 2:3
6 [1] 74:16
60606 [1] 88:12
7th [1] 88:3
8 [1] 66:14
9 [2] 1:20 87:15
942-5474 [1] 2:4
95-524C [2] 1:5 86:5
A.D [3] 1:21 87:14 88:3
a.m [2] 1:20 87:15
ability [1] 81:20
able [7] 5:8 22:9 26:22 35:2 65:10 71:9 83:20
above [1] 87:8
absolutely [2] 44:12 84:18
accepted [1] 17:3
access [1] 65:23
accountant [1] 7:12
accounting [2] 7:24 31:5
acquaintances [1] 67:7
acquire [16] 9:5 15:11 15:15 21:24 26:22 29:4 29:12 29:16 35:19 36:9 37:1 53:1 63:20 67:1 73:3 75:17
acquired [10] 10:3 13:22 26:18 27:2 30:1 35:23 36:4 60:9 72:15 72:18
acquirer [1] 73:22
acquirers [6] 53:13 67:21 67:21 67:23 69:1 69:11
acquiring [10] 29:8 35:6 36:3 38:7 38:15 39:22 40:12 53:18 63:9 72:20
acquisition [43] 9:9 9:11 9:12 9:19 10:19 11:9 11:23 12:11 12:13 12:21 14:22 15:6 26:14 26:15 27:13 27:15 27:19 27:22 28:1 28:20 29:20 30:6 30:11 34:1 35:7 35:11 36:14 37:8 37:16 37:20 38:3 38:11 39:8 39:12 40:9 41:1 41:7 43:10 56:14 58:10 79:10 80:1 80:7
acquisitions [12] 22:3 30:15 30:20 31:14 33:22 33:24 34:11 35:1 40:17 40:22 41:10 69:5
action [1] 87:20
active [1] 41:6
actively [2] 19:22 19:24
actual [2] 32:5 74:14
Adam [1] 51:10
additional [10] 35:11 35:16 46:5 46:12 46:20 46:21 53:8 64:15 65:5 75:19
adequate [1] 50:23
adequately [1] 50:24
administer [2] 77:2 77:3
administrative [1] 81:5
adoption [1] 61:11
advantage [1] 60:1
affixed [1] 88:2
afraid [2] 23:18 23:20
again [11] 4:9 12:1 13:15 15:1 28:13 28:13 32:3 39:17 40:7 73:4 80:6
against [6] 22:15 22:23 23:4 24:19 80:13 84:10
ago [2] 17:23 66:18
agree [1] 6:4
agreement [24] 15:6 25:3 28:3 28:7 41:7 43:18 47:3 48:20 49:16 49:19 49:20 49:21 49:22 50:20 51:23 55:4 62:16 62:21 74:10 74:15 79:9 79:18 80:3 80:5
agreements [10] 9:7 28:11 32:7 43:8 43:10 48:19 62:12 63:2 79:10 80:7
airplane [1] 77:5
airplanes [1] 77:4
along [7] 8:20 20:2 31:1 48:16 76:2 82:13 84:7
alternative [1] 80:20
alternatives [2] 45:10 45:11
altogether [1] 41:8
always [7] 11:11 33:9 35:14 35:15 36:2 43:3 60:11
Amcore [1] 60:19
America [4] 1:6 1:13 86:6 87:1
American [12] 15:14 34:16 34:19 53:17 53:22 55:8 56:20 61:21 75:16 81:17 81:18 81:22
among [1] 73:12
amount [9] 26:11 26:16 56:3 56:4 57:6 57:15 64:5 65:10 66:16
amounts [2] 34:4 66:11
analyses [1] 27:9
analysis [2] 23:2 68:20
analyzing [1] 68:14
Anne [5] 13:3 41:21 43:14 43:19 44:1
annual [1] 50:11
answer [10] 5:2 5:5 5:6 5:9 6:12 6:16 24:22 60:10 64:7 64:21
answers [1] 4:21
anticipated [1] 22:9
anticipation [1] 71:12
Antonio [10] 14:22 14:24 15:11 15:16 53:13 56:15 58:10 58:12 72:13 75:17
anytime [1] 65:3
APPEARANCES [1] 2:1
appreciated [1] 9:19
apprised [1] 11:13
appropriate [2] 70:5 76:5
approve [1] 57:11
approved [1] 57:8
April [2] 41:20 54:8
area [2] 8:19 28:14
areas [1] 8:21
Arnold [1] 2:2
arrangement [1] 9:4
aspects [1] 20:1
asset [2] 77:3 77:19
assets [10] 18:10 19:21 37:13 59:3 71:24 72:20 77:21 77:23 78:11 83:20
assist [1] 10:21
assistant [1] 13:2
assisted [1] 12:5
Association [1] 37:17
assume [8] 14:12 25:17 52:2 62:4 64:2 64:21 70:21 84:11
assuming [3] 29:5 34:1 71:23
attached [1] 42:17
attempt [3] 4:24 15:10 15:15
attempted [2] 29:11 35:19
attempts [1] 44:19
attendance [1] 54:21
attending [1] 50:15
attention [3] 42:22 42:23 43:1
attorney [3] 4:12 87:17 87:19
attorney-client [5] 5:19 5:20 6:1 6:9 24:24
attorneys [2] 10:23 12:2
audit [1] 20:8
August [4] 1:21 7:11 86:12 87:14
authority [2] 80:21 81:2
available [3] 57:21 65:17 72:15
aware [3] 15:10 22:22 27:19
B [2] 2:2 3:7
background [1] 6:20
bad [2] 17:6 18:17
bad-guy [1] 49:20
balance [1] 71:12
Bangert [14] 16:8 22:19 25:16 33:6 41:22 51:8 57:17 62:12 62:14 62:17 63:2 68:14 82:17 82:21
Bangert's [1] 74:8
bank [26] 14:22 15:15 15:19 16:7 17:14 18:11 18:24 33:9 34:19 38:11 40:13 41:23 53:14 53:17 53:22 56:21 61:21 66:23 73:9 75:16 76:10 76:11 76:21 81:17 81:19 81:21
banking [5] 18:5 18:6 18:8 37:12 68:2
banks [12] 13:23 24:13 24:20 63:14 67:15 70:1 70:14 70:19 71:13 71:19 82:3 83:19
Banks's [1] 67:24
baseball [1] 37:22
based [9] 8:5 23:10 26:16 28:6 36:8 54:23 70:23 71:2 71:19
basis [2] 22:11 71:4
Bates [4] 42:10 42:16 42:20 54:9
bearing [1] 77:7
became [9] 9:22 13:17 15:19 22:22 28:23 52:8 60:9 72:14 80:18
become [2] 12:19 28:22

becoming [1] 75:19
begin [2] 20:24 59:21
begun [1] 8:13
behalf [2] 2:5 2:10
bell [4] 37:24 39:2 39:14 40:4
Beloit [1] 61:6
benchmark [1] 50:23
benefit [2] 58:5 74:19
benefitted [1] 60:16
Bergman [9] 2:2 5:16 24:21 28:13 65:13 74:3 79:3 84:24 85:2
better [2] 56:14 70:1
between [5] 8:3 31:8 33:18 60:14 81:16
Biedron [1] 54:9
billion [1] 19:20
bit [3] 20:21 77:6 80:9
board [38] 10:16 11:7 11:11 11:11 12:17 12:19 14:15 23:11 25:8 25:17 25:20 25:22 27:7 27:16 29:18 30:6 30:10 32:18 32:19 33:11 33:15 35:21 36:13 36:23 45:20 45:20 50:11 50:16 57:8 57:10 57:13 57:14 57:16 57:19 70:7 77:8 80:22 81:2
bodies [1] 46:18
book [1] 31:9
books [1] 34:13
borrowed [2] 66:11 66:22
borrowing [1] 65:24
bought [2] 73:1 74:11
branch [2] 39:23 40:2
branches [9] 39:23 40:1 40:13 43:12 60:18 61:1 61:5 61:8 77:20
break [7] 5:10 5:13 5:22 44:15 44:16 79:1 79:4
Brief [3] 25:12 62:9 77:16
bright [2] 63:20 82:8
bring [2] 23:3 42:7
bringing [1] 80:12
brings [1] 42:1
Brody [2] 13:3 41:21
Brody's [1] 43:14
brought [6] 18:18 25:18 25:19 46:13 75:6 79:16
burden [1] 74:19
burdens [1] 80:16
business [15] 16:7 18:4 18:24 19:3 19:11 22:9 23:19 23:22 28:2 29:8 39:18 43:19 53:3 82:9 83:2
businessmen [2] 37:11 43:2
buy [1] 77:22
buyer [1] 77:19
Canton [7] 39:23 40:1 40:3 40:5 40:8 40:11 40:11
capital [47] 15:20 17:12 17:19 17:22 18:3 22:1 30:19 30:24 31:2 31:19 31:21 31:22 32:5 32:15 32:21 34:7 34:21 36:9 37:13 44:19 44:23 45:16 45:21 45:22 46:5 46:12 46:20 46:21 47:2 47:7 47:10 48:7 53:8 55:24 56:4 56:6 58:17 58:22 59:4 59:9 63:5 73:8 74:21 75:1 78:10 78:14 83:15
capitalization [1] 50:24
capitalized [1] 51:1
care [1] 10:15
careful [1] 28:17
carry [1] 70:18
case [5] 4:11 21:18 21:19 29:23 53:20
cases [1] 22:16
cash [6] 19:8 32:6 32:8 32:21 32:22 58:16
caution [1] 28:13
cc [1] 41:22
CDs [1] 66:8
center [1] 18:13
certain [5] 18:4 34:10 46:16 83:7 83:14
certificates [2] 11:4 11:5
Certified [2] 1:18 87:5
certify [3] 87:6 87:11 87:16
cetera [1] 68:19
chance [1] 42:4
changed [2] 22:5 50:22
changes [1] 22:21
changing [1] 53:3
check [1] 66:20
Chester [1] 54:9
Chicago [12] 1:20 8:21 13:5 13:10 13:12 19:23 19:23 20:1 20:2 37:17 88:2 88:12
children [1] 13:6
choosing [1] 28:10
Civil [1] 1:15
claim [4] 24:12 24:18 25:10 80:13
CLAIMS [2] 1:1 86:1
clarify [1] 4:24
classes [1] 7:5
clear [1] 5:14
client [2] 8:15 26:7
clients [2] 26:7 28:16
close [1] 14:24
closely [1] 81:7
closing [9] 10:20 11:4 11:5 15:4 15:7 71:13 77:14 78:13 78:18
cloud [1] 45:8
Coblentz [1] 74:11
Coff [4] 7:17 8:2 12:23 41:20
collectively [1] 9:5
Colorado [7] 16:7 17:9 17:15 18:7 18:11 18:24 38:8
comfortable [1] 52:9
commenced [1] 87:14
commencing [1] 1:20
comments [1] 15:6
committee [5] 20:8 20:11 80:23 81:3 81:5
committees [1] 20:6
communications [1] 24:24
company [6] 7:13 19:17 52:20 53:5 53:8 68:17
compensation [4] 62:11 62:16 62:21 63:1
complaints [1] 22:20
compliance [1] 55:24
components [1] 70:11
con [1] 24:1
concept [1] 59:5
concerned [1] 52:13
concerns [1] 52:6
condition [2] 34:2 53:17
conduct [1] 68:20
confine [1] 33:10
conjunction [2] 58:20 79:9
Connecticut [2] 17:8 18:1
connection [1] 49:15
cons [2] 23:7 23:14
considered [1] 37:4
considering [2] 63:9 80:12
consisted [1] 18:12
constitutes [1] 86:13
consummated [4] 22:3 41:2 41:11 41:13
contact [1] 50:17
contained [1] 36:13
context [1] 56:10
continually [1] 66:2
continue [1] 78:11
continued [1] 76:16
continuing [1] 80:1
contributions [7] 22:1 30:24 32:5 32:21 33:21 34:6 58:17
control [1] 37:14
controlled [2] 16:8 81:7
convenience [2] 67:4 81:6
COOK [1] 87:2
Coopers [1] 7:14
copied [1] 43:8
copies [3] 42:21 42:22 42:24
corner [2] 42:11 42:14
Corp [1] 69:9
corporate [4] 8:4 9:21 43:20 68:18
corporation [2] 72:5 81:7
correct [2] 38:5 86:14
corrections [1] 86:19
cost [1] 26:17
counsel [11] 6:11 6:11 7:19 19:16 20:18 20:19 20:22 41:4 50:12 87:17 87:19
count [1] 34:6
counted [5] 30:19 31:19 32:14 34:21 45:22
COUNTY [1] 87:2
couple [8] 7:4 17:23 19:19 49:5 51:15 66:6 74:23 76:23
course [1] 13:1
courses [1] 7:2
court [6] 1:1 4:21 21:5 41:19 54:6 86:1
Courts [1] 1:16
cover [1] 44:5
CPA [1] 8:7
create [2] 72:24 80:16
created [2] 14:17 53:4
creation [2] 52:22 53:7
credits [7] 22:2 30:24 31:17 31:18 31:22 31:23 32:21
crisis [1] 21:21
CSR [2] 88:10 88:13
cumulative [4] 47:19 47:22 48:2 48:11
current [4] 16:3 16:5 18:23 67:11
customers [1] 81:22
Czubak [3] 1:18 87:5 88:10
D [1] 3:1
D.C [2] 2:3 2:8
Dalton [2] 82:18 82:22
dated [1] 54:8
David [1] 2:2
deal [4] 15:4 29:8 38:17 69:21
dealing [1] 79:18
dealings [2] 9:15 23:19
deals [2] 39:18 53:4
debt [8] 34:10 34:20 56:20 61:20 61:24 64:4 64:11 64:12
decide [1] 84:14
decided [4] 9:4 63:18 67:17 80:19
decision [1] 84:2
decision-making [2] 80:21 81:1
Defendant [3] 1:7 1:13 2:10
Defendants [1] 86:7
deferred [4] 62:11 62:16 62:21 63:1
define [1] 65:22
definition [1] 31:15
degree [2] 7:3 7:22
department [3] 2:7 8:4 8:4
DePaul [1] 7:5
depending [1] 41:3
deposed [1] 4:13
deposition [16] 1:12 3:8 5:3 5:18 20:14 21:2 21:6 41:15 44:11 54:2 79:7 86:12 86:15 87:8 87:12 87:13
depositions [2] 1:17 4:16
derivatives [3] 51:4

51:21 52:12
desk [1] 43:5
determined [11] 26:11 27:5 29:24 56:7 57:5 57:14 57:18 63:23 68:7 70:4 72:17
developed [1] 8:20
differed [1] 43:15
difference [1] 31:8
differences [3] 33:17 36:6 36:7
different [6] 26:10 30:16 31:14 31:23 45:10 65:14
difficult [6] 6:16 45:1 45:4 45:5 69:16 77:1
difficulty [1] 45:15
diligence [1] 68:16
diminution [1] 83:12
dinner [1] 33:7
Direct [2] 3:4 4:6
directed [1] 41:22
direction [1] 87:10
directly [1] 87:20
director [10] 9:23 10:13 10:16 13:15 13:16 13:21 15:22 15:24 16:6 23:11
directors [16] 11:7 12:17 12:20 14:15 27:16 29:6 29:19 30:6 30:10 33:15 49:18 50:16 57:8 57:11 80:22 81:2
directors's [1] 36:23
directory [1] 13:6
discounted [2] 46:13 46:14
discuss [1] 5:22
discussed [1] 32:17
discussion [3] 46:11 47:8 47:9
discussions [44] 15:14 22:18 23:7 23:10 23:11 23:14 24:4 24:7 24:10 24:17 25:4 25:9 28:16 28:18 30:5 30:10 33:10 35:20 39:4 39:19 40:7 45:19 45:23 46:1 46:4 46:8 47:6 47:12 47:17 47:21 47:24 54:1 56:13 61:13 61:17 62:19 68:21 69:13 70:6 70:17 76:9 76:13 84:1 84:16
distribution [1] 72:2
District [1] 1:16
dividend [6] 54:17 55:1 55:6 55:12 56:8 64:9
dividends [2] 63:23 64:5
DLJ [1] 72:4
document [11] 5:5 5:8 21:8 42:2 42:15 44:5 54:10 54:12 54:13 54:17 54:23
documentation [3] 10:21 29:10 68:18
documents [12] 5:7 10:9 10:10 11:2 11:3 15:7 15:8 20:16 21:10 21:14 27:22 42:24
doesn't [1] 40:4
dollars [5] 19:21 66:14 66:17 78:1 78:5
Donaldson [5] 68:4 68:8 68:11 68:22 70:3
done [5] 10:21 59:8 62:1 65:8 75:24
down [6] 4:21 14:24 26:21 42:10 42:13 77:8
drilling [1] 17:7
drive [1] 8:20
drugs [1] 6:15
due [2] 68:16 83:13
duly [2] 4:4 87:7
during [6] 8:1 21:20 36:7 36:15 64:17 65:2
duties [1] 10:15
E [2] 3:1 3:7
earn [1] 66:8
easily [1] 46:13
easy [1] 67:3
economic [1] 74:19
economy [1] 8:5
educational [2] 6:20 7:2
effect [3] 9:6 73:19 78:10
efficient [1] 61:7
efforts [1] 44:23
either [23] 8:12 9:16 9:18 10:20 10:24 11:1 14:1 16:23 19:1 19:4 22:6 24:1 32:11 35:12 44:1 45:19 46:19 51:12 56:18 64:4 65:11 73:8 74:13
eliminated [2] 83:7 83:14
employee [2] 87:17 87:18
employment [2] 7:8 21:11
end [6] 10:22 17:22 41:5 44:3 55:22 80:6
ends [3] 42:10 42:13 42:20
enjoyed [1] 81:22
entered [2] 43:9 47:3
entities [16] 9:2 9:17 12:24 14:14 14:16 20:7 21:12 21:13 26:2 26:11 35:18 35:24 44:9 45:15 60:5 63:10
entity [2] 52:17 53:18
environment [1] 45:2
equitable [1] 74:17
equivalent [1] 74:15
errata [2] 86:16 86:19
essential [1] 53:3
essentially [2] 15:21 26:24
estate [4] 8:4 8:19 18:13 18:14
et [1] 68:19
eventually [1] 9:22
everybody [1] 27:1
exact [1] 39:3
exactly [1] 20:23
examination [3] 1:14 3:4 4:6
examined [1] 4:5
exams [1] 50:12
except [1] 86:15
exception [1] 55:5
Exchange [1] 19:17
excused [1] 85:3
execute [1] 58:5
executed [2] 58:13 58:16
executive [3] 80:22 81:3 81:4
executives [1] 11:13
Exhibit [6] 3:8 21:5 41:15 41:19 54:2 54:6
existed [1] 52:18
existing [1] 31:1
expand [1] 5:4
expanding [1] 35:15
expenses [2] 72:5 84:12
explain [1] 51:9
Explorations [1] 17:7
explored [1] 75:15
extent [2] 6:10 82:2
extremely [1] 82:8
facilitate [1] 14:18
fact [5] 29:15 38:3 39:6 48:3 81:18
fair [3] 31:9 57:18 57:22
Falls [27] 9:10 9:13 9:21 10:4 13:17 13:17 26:13 27:14 29:12 29:16 29:18 35:3 35:12 36:4 53:2 55:15 59:12 59:23 60:2 60:12 60:15 60:19 61:2 61:7 64:17 65:12 81:17
Falls's [1] 10:19
familiar [1] 40:15
family [2] 37:24 76:1
far [2] 23:5 84:18
fashion [1] 32:12
Fashionably [1] 37:2
fault [1] 18:18
FDIC [2] 49:9 50:2
Federal [20] 1:1 1:15 14:22 15:16 30:12 35:8 37:16 37:23 38:11 38:15 39:1 39:5 39:8 39:16 39:20 53:14 56:15 72:13 75:17 86:1
fee [5] 57:4 57:6 57:9 57:11 57:15
fees [2] 57:1 81:10
felt [2] 23:16 37:12
Ferries [1] 54:9
few [2] 40:18 58:23
Fiduciary [1] 10:15
figure [1] 74:7
file [1] 22:23
filings [1] 19:18
Finally [1] 6:14
financial [6] 60:20 62:4 62:7 64:20 69:9 69:13
financially [1] 87:19
financing [1] 75:15
fine [2] 6:6 51:18
firm [4] 7:16 8:15 10:22 68:2
FIRREA [15] 22:4 24:6 24:8 44:20 45:6 45:22 50:21 53:9 80:14 80:15 82:12 83:7 83:9 83:13 83:20
first [28] 4:4 4:19 8:11 8:18 9:3 13:23 21:8 22:22 24:13 24:20 29:1 36:4 54:7 60:4 63:14 67:1 67:15 67:24 69:8 69:13 70:1 70:14 70:19 71:13 71:19 73:11 83:19 87:7
following [4] 30:20 44:19 53:9 82:11
follows [1] 4:5
foregoing [1] 86:11
forget [1] 18:11
forgot [1] 20:23
form [5] 6:4 26:24 32:6 35:3 56:24
formed [3] 12:20 29:3 76:12
forward [1] 17:4
forwards [1] 70:18
found [3] 22:6 25:2 77:1
four [1] 63:13
frequently [1] 67:6
friend [1] 26:8
friends [1] 33:7
FSB [1] 41:23
FSLIC [8] 48:12 48:24 49:3 49:6 49:8 50:2 79:14 80:10
FSLIC's [1] 80:2
fun [1] 18:20
funds [9] 19:7 20:4 45:16 62:20 62:24 64:16 65:21 65:24 82:4
future [1] 23:19
GAAP [1] 33:18
gain [1] 84:9
Galesburg [1] 38:12
Galva [10] 9:11 11:23 12:14 12:21 28:21 29:4 29:12 29:20 29:24 30:7
Galva/Home/Mutual [2] 29:16 60:8
general [25] 9:21 10:16 11:19 19:16 19:17 22:13 22:14 22:17 23:7 23:11 23:22 27:20 31:5 32:14 43:20 49:11 55:18 56:22 59:5 61:23 65:15 70:10 70:13 71:6 84:1
generally [11] 31:10 37:10 42:24 43:2 44:22 46:1 46:10 55:14 66:7 70:8 82:23
gentlemen [1] 74:10
given [7] 32:6 32:8 49:21 65:17 70:22 86:13 86:14
gnomes [1] 51:11
good [13] 4:8 11:4 17:6 26:7 37:11 51:18 56:5 67:16 76:24 81:21 83:1 83:3 83:19
good-guy [2] 49:20 49:21
goodwill [6] 30:23 31:4 31:13 32:20 33:18 33:18
government [15] 21:21 22:2 23:8 23:15

23:17 23:19 23:20 24:2 24:19 32:8 32:22 34:15 49:7 72:21 84:3
graduated [5] 6:22 6:23 6:24 7:9 7:14
Grand [1] 38:7
greater [2] 44:7 71:7
grow [2] 56:1 72:24
growing [1] 37:8
guaranteed [1] 56:23
guaranties [6] 56:18 58:5 58:11 58:14 58:16 58:19
guaranty [3] 57:4 57:11 81:10
guess [6] 29:1 36:7 59:14 59:18 59:20 73:4
guessing [3] 52:24 53:6 64:2
guy [1] 18:20
guys [2] 43:7 80:9
H [1] 3:7
half [1] 19:20
hand [1] 88:2
happy [1] 51:21
hard [3] 44:10 51:14 77:9
harder [5] 45:9 45:12 77:2 77:3 77:3
harm [1] 23:19
hate [1] 78:18
Hawthorne [3] 17:9 17:15 18:7
head [1] 4:22
Heart [1] 40:13
Heider [1] 41:23
held [7] 10:7 14:1 16:1 51:5 55:7 61:20 72:8
help [5] 5:6 5:9 14:18 51:14 68:19
hereby [1] 87:6
herein [2] 4:4 86:16
hereunto [1] 88:1
Hey [1] 43:6
high [3] 6:20 6:22 51:4
high-rises [1] 8:20
himself [1] 20:19
hire [1] 68:8
hired [1] 68:2
hold [4] 13:13 14:5 14:8 15:18
holder [1] 34:14
holding [18] 14:7 14:10 15:20 17:19 17:22 52:16 52:20 52:22 53:5 53:8 53:12 53:15 62:20 62:24 63:24 73:8 74:21 75:8
Holdings [2] 17:13 64:3
Holland [50] 1:2 4:11 8:12 9:1 9:19 11:24 12:6 14:4 16:4 16:6 16:23 19:4 21:18 21:23 22:19 24:11 24:17 25:15 28:21 30:2 33:6 33:21 34:23 46:4 47:10 56:19 56:23 57:12 57:24 58:2 62:12 62:13 63:2 64:15 65:1 65:4 68:14 74:6 74:18 75:5 75:9 75:14 80:12 81:8 82:2 82:6 82:21 84:10 84:16 86:3
Holland's [1] 65:7
Holleb [5] 7:17 8:1 8:15 12:23 41:20
Hollinger [3] 7:19 19:11 19:16
Home [10] 9:11 11:23 12:14 12:21 28:21 29:4 29:12 29:21 29:24 30:7
Homer [28] 1:2 8:12 9:1 9:3 9:7 9:19 11:12 11:23 12:6 16:4 16:5 16:23 17:2 19:1 19:4 19:6 24:11 24:17 30:1 33:6 33:21 34:17 34:23 82:2 82:6 82:8 82:13 86:3
Homer's [1] 81:20
honest [1] 83:3
hopefully [1] 29:7
hoping [1] 36:24
hour [1] 58:23
house [1] 26:20
Household [5] 39:23 40:1 40:3 41:23 43:12
Howard [32] 1:3 8:12 8:13 8:18 9:1 9:3 9:6 9:20 11:12 11:24 16:4 16:6 16:8 16:24 17:6 19:1 19:4 19:6 20:3 24:11 24:18 26:3 30:2 33:6 33:21 34:17 34:24 73:10 75:24 82:3 82:17 86:3
Howard's [2] 18:18 81:19
hundred [2] 66:13 66:17
hundred-thousand-dollar [1] 19:10
identified [2] 24:1 41:21
identifying [2] 32:2 40:19
Illinois [16] 1:20 6:23 7:10 7:23 15:22 26:21 26:23 38:12 39:9 40:13 53:19 73:21 75:3 87:1 88:3 88:12
immediately [1] 9:18
impact [3] 60:14 60:24 61:15
impacted [1] 59:4
importantly [1] 83:2
imposed [4] 46:18 50:22 51:1 51:23
imposition [2] 45:7 50:20
Inc [6] 7:20 17:22 52:16 53:12 62:24 73:9
Inc. [9] 14:4 14:7 15:20 17:19 19:12 52:22 53:15 74:22 75:9
included [2] 21:24 83:14
including [1] 82:16
income [1] 60:1
Incorporated [1] 14:10
increase [1] 59:9
independently [1] 35:21
indicated [8] 11:1 20:3 36:2 51:24 52:1 52:5 57:22 86:15
indicates [4] 21:9 42:21 54:7 54:20
indication [1] 71:2
indirectly [1] 87:20
information [4] 6:1 11:8 11:12 44:8
infuse [3] 64:16 65:6 65:11
infused [1] 63:3
infusing [2] 46:4 46:11
infusion [2] 47:2 47:7
infusions [1] 47:10
initial [3] 26:13 73:11 86:19
initiatives [1] 58:22
input [1] 28:1
instance [1] 44:4
instances [2] 5:18 5:21
institution [28] 9:22 9:23 16:7 17:8 26:21 26:23 26:23 26:24 27:2 27:12 35:4 38:21 38:24 53:1 53:2 56:24 58:2 58:4 60:2 60:3 62:5 68:14 69:14 73:18 73:19 73:21 75:6 77:10
institutions [21] 14:2 15:24 16:15 16:18 20:11 21:22 21:24 22:5 22:6 33:9 35:18 35:24 36:18 45:8 45:13 52:7 57:24 61:15 63:9 72:23 74:18
instructing [1] 6:11
instructions [1] 4:19
intangible [1] 31:7
intended [2] 6:9 48:7
intention [1] 5:20
interest [17] 17:21 26:1 26:4 38:6 39:22 40:12 60:5 66:7 73:11 73:17 74:8 74:12 74:17 74:21 75:2 75:3 78:6
interested [6] 35:14 36:3 36:18 37:7 38:14 87:19
International [2] 7:20 19:12
introduced [1] 20:19
intrude [1] 6:1
invest [3] 45:13 65:17 76:3
invested [1] 18:21
investment [9] 16:22 17:24 18:16 18:23 19:8 45:10 68:2 74:21 83:12
investments [9] 19:2 19:7 20:4 56:2 56:6 66:9 75:24 77:21 83:9
investor [2] 75:20 83:3
investors [1] 45:11
involve [1] 11:3
involved [20] 8:24 10:23 12:3 12:3 12:7 15:1 15:13 19:22 19:24 23:2 24:10 24:16 24:21 25:4 25:8 28:22 29:2 29:9 50:12 80:4
involvement [11] 9:15 10:18 11:22 12:11 14:21 15:3 16:3 16:5 19:1 41:10 49:6
issue [4] 5:19 34:10 51:7 84:17
issued [6] 21:2 21:6 34:18 48:12 56:20 58:10
issues [9] 5:23 20:1 28:8 28:9 32:20 48:18 49:5 51:3 80:14
items [4] 25:18 32:13 83:7 83:14
J [2] 1:2 86:3
January [2] 7:15 7:18
Jeff [1] 2:11
Jenrette [5] 68:5 68:8 68:11 68:22 70:4
joined [1] 44:1
joint [1] 58:14
Jones [1] 12:4
Junction [1] 38:7
June [2] 7:11 78:20
Justice [1] 2:7
K-i-m-b-a-r-k [1] 13:9
keep [3] 11:13 24:22 78:11
kept [1] 78:8
Kimbark [2] 13:7 13:9
kind [3] 7:2 8:2 18:15
Kipnis [30] 1:12 3:3 3:8 4:3 4:8 4:13 5:14 6:8 6:19 7:6 13:4 20:13 21:4 21:15 21:17 24:21 30:18 35:10 41:15 41:18 42:5 44:18 54:2 54:5 67:14 79:6 84:22 86:10 86:18 87:7
knew [5] 37:24 43:2 60:4 80:15 81:24
knit [1] 81:7
knowledge [5] 32:19 33:2 44:8 71:6 83:8
known [2] 7:12 72:14
knows [1] 82:9
Kost [1] 74:11
L [1] 2:8
Lafayette [2] 17:8 18:1
language [3] 43:23 43:23 80:8
large [1] 18:10
Larry [1] 54:9
last [5] 19:19 20:20 20:22 40:18 58:23
latter [1] 82:19
Laura [3] 1:17 87:5 88:10
law [7] 7:1 7:3 7:5 7:15 7:16 8:2 19:18
laws [1] 22:4
lawsuit [3] 22:23

23:3 84:9
**lawsuits** [1] 22:14
**lawyer** [5] 23:6 24:22 25:5 28:4 28:17
**lawyers** [1] 43:22
**league** [1] 37:22
**learned** [4] 12:16 33:4 33:13 36:12
**leases** [1] 68:19
**least** [3] 43:4 46:17 61:6
**left** [2] 7:17 72:3
**legal** [4] 20:1 23:5 28:2 29:9
**lending** [1] 81:23
**lends** [3] 19:7 20:3 67:6
**less** [3] 16:13 43:16 49:6
**letter** [4] 41:20 41:24 44:6 56:9
**letterhead** [1] 41:21
**level** [4] 51:4 52:11 52:11 64:3
**lieu** [1] 58:16
**lightly** [1] 23:9
**liked** [1] 18:20
**likely** [1] 41:1
**limited** [2] 24:22 56:3
**line** [1] 63:21
**liquid** [2] 65:13 67:2
**liquidate** [1] 78:12
**liquidation** [2] 77:14 78:13
**liquidity** [1] 19:9
**lists** [1] 21:12
**litigation** [3] 23:21 26:13 80:20
**lives** [1] 13:7
**living** [2] 13:5 22:19
**loan** [12] 19:10 21:21 22:16 37:17 53:12 53:14 53:18 53:23 66:15 66:15 67:1 67:11
**loans** [6] 66:19 66:24 67:8 78:1 79:21 79:24
**located** [1] 19:22
**longer** [1] 45:22
**look** [4] 21:4 41:18 54:5 54:11
**looked** [2] 36:19 68:1
**looking** [3] 35:15 67:21 82:4
**looks** [1] 6:12
**loss** [1] 70:18
**losses** [2] 59:24 71:7
**loyalty** [1] 10:15
**Lufkin** [5] 68:4 68:8 68:11 68:22 70:3
**lunch** [1] 33:8
**maintaining** [1] 25:9
**majority** [1] 81:11
**majority-owned** [1] 69:15
**makes** [1] 75:22
**man** [1] 65:19
**management** [6] 12:6 28:4 51:13 81:11 82:14 82:16
**manager** [1] 82:7
**managers** [1] 82:24
**March** [1] 54:19
**MARK** [6] 1:12 3:3 4:3 86:10 86:18 87:7
**mark-to-market** [1] 27:9
**marked** [5] 21:5 41:16 41:19 54:3 54:6
**market** [4] 27:8 27:11 31:9 68:1
**marketable** [2] 78:2 78:7
**marketing** [1] 18:19
**marketplace** [2] 78:6 78:8
**markup** [1] 44:4
**master** [1] 7:4
**material** [3] 25:23 84:9 84:14
**matter** [1] 34:17
**matters** [1] 6:2
**maximum** [1] 65:10
**may** [24] 5:8 5:17 5:21 6:11 20:8 20:10 32:14 35:18 40:22 50:8 58:14 58:15 59:3 65:16 69:24 75:1 75:3 75:18 75:20 75:22 76:1 76:4 79:1 79:17
**mean** [5] 28:10 33:5 63:15 63:20 74:5
**means** [1] 65:20
**meant** [2] 28:5 28:10
**medication** [1] 6:14
**meet** [1] 20:18
**meeting** [9] 25:17 25:20 44:2 49:17 49:24 50:5 50:7 50:9 54:20
**meetings** [14] 10:17 23:11 25:8 32:18 32:19 33:5 33:11 33:15 44:3 45:20 45:20 50:14 50:16 77:8
**member** [4] 10:22 11:7 12:16 12:19
**members** [2] 51:13 57:19
**memo** [2] 54:20 55:12
**memorandum** [1] 54:8
**memories** [1] 45:6
**memory** [8] 22:13 22:13 22:17 32:3 49:19 68:17 73:13 83:10
**mention** [1] 17:15
**mentioned** [1] 81:9
**merge** [1] 59:16
**merged** [3] 13:18 59:13 59:19
**merger** [2] 60:14 76:18
**merging** [2] 60:5 76:10
**Messrs** [2] 21:23 68:13
**met** [3] 4:8 9:4 49:17
**methodology** [1] 70:8
**Michelle** [1] 41:23
**mid** [1] 8:14
**middle** [1] 21:8
**Midwestern** [4] 39:23 40:1 40:8 40:11
**might** [16] 5:6 23:18 25:17 33:7 33:7 35:20 52:19 52:23 53:4 58:13 64:10 69:17 71:5 71:5 77:5 78:3
**million** [5] 48:11 55:7 61:20 78:1 78:4
**mind** [4] 40:18 58:23 77:7 84:19
**minds** [1] 72:22
**minor** [1] 81:8
**minority** [1] 78:6
**minutes** [5] 32:18 33:14 36:13 40:18 58:23
**Modern** [1] 17:7
**money** [10] 26:16 37:14 45:9 55:7 56:2 56:13 65:5 67:6 81:20 81:23
**monies** [1] 15:7
**months** [1] 66:6
**morning** [1] 4:8
**mortgage** [2] 51:4 52:12
**most** [4] 8:5 12:4 43:8 57:20
**mother** [1] 13:5
**moving** [1] 26:19
**Ms** [21] 2:6 3:4 4:7 6:6 6:7 28:15 28:19 41:17 42:3 42:15 42:19 44:13 44:17 54:4 54:14 62:10 65:15 74:4 78:24 79:5 84:21
**Murphy** [1] 2:7
**Mutual** [10] 9:11 11:23 12:14 12:21 28:21 29:4 29:12 29:21 30:1 30:7
**N** [1] 3:1
**N.W** [1] 2:3
**name** [10] 4:9 18:11 37:24 39:2 39:3 39:13 40:3 40:6 40:15 77:19
**named** [1] 74:10
**names** [2] 7:16 14:19
**National** [12] 15:15 34:16 34:19 53:17 53:22 55:8 56:21 61:21 75:16 81:17 81:19 81:22
**nature** [2] 31:1 46:23
**necessary** [1] 64:6
**need** [2] 5:10 5:21
**needed** [2] 8:6 50:24
**negotiate** [1] 69:16
**negotiated** [2] 21:23 39:18
**negotiation** [1] 29:3
**negotiations** [12] 9:7 10:24 11:9 11:15 11:17 12:5 12:8 12:16 15:2 29:7 29:19 80:9
**Neither** [1] 10:22
**net** [6] 59:24 70:18 71:6 72:2 72:7 72:9
**netting** [1] 60:1
**never** [5] 18:21 35:23 51:19 51:21 76:19
**new** [6] 18:19 19:17 26:20 26:24 35:3 73:19
**newspaper** [2] 19:13 19:21
**next** [1] 9:15
**Nielsen** [1] 2:11
**Niles** [1] 6:22
**nobody** [1] 73:13
**nod** [1] 4:22
**Noel** [2] 75:19 75:23
**NOLs** [2] 59:24 73:5
**noncumulative** [2] 47:23 48:4
**none** [9] 10:12 10:20 11:1 19:6 31:20 34:8 50:18 68:23 84:18
**nonqual** [1] 47:20
**nonqualifying** [2] 47:18 47:22
**Nope** [1] 54:18
**nor** [3] 10:22 87:18 87:19
**Northwestern** [2] 6:24 7:3
**Notary** [3] 1:18 86:23 87:6
**notes** [1] 18:12
**nothing** [9] 11:18 36:10 39:13 44:21 65:19 69:19 69:23 81:21 84:19
**notice** [1] 1:14
**now** [9] 7:13 13:4 19:9 22:6 34:8 67:3 71:9 74:23 79:12
**Nuggets** [4] 17:10 17:11 17:12 18:15
**number** [8] 13:2 17:5 21:22 22:5 51:9 66:18 67:7 86:19
**numerous** [1] 8:20
**NW** [1] 2:8
**objections** [1] 6:4
**obligation** [1] 80:2
**obligations** [4] 56:23 64:3 64:6 72:1
**obtain** [1] 82:4
**obtaining** [3] 11:2 11:3 75:15
**obvious** [1] 23:18
**obviously** [1] 6:10
**occur** [2] 55:22 78:19
**occurred** [6] 24:5 55:10 55:19 55:20 71:12 76:19
**off** [5] 4:9 31:10 56:5 66:18 72:1
**offer** [4] 67:16 70:1 70:1 76:24
**offered** [2] 67:3 73:11
**office** [3] 54:7 68:17 88:2
**officer** [2] 9:22 10:6
**official** [1] 33:11
**often** [1] 31:7
**oil** [1] 17:6
**once** [3] 12:20 49:12 52:8
**one** [38] 8:22 10:2 12:3 14:17 15:1 16:13 18:17 19:23 23:16 25:18 43:6 43:18 46:17 46:18 47:15 48:19 49:12 49:14 50:7 50:9 51:15 55:6 55:19 60:8 60:10 62:13 62:14 63:12 69:3

69:10 69:17 74:10 75:6 76:15 76:24 77:4 77:24 79:12
onerous [1] 80:18
ones [5] 39:24 41:11 41:12 51:16 52:2
ongoing [6] 9:21 22:15 24:7 29:4 29:7 29:20
onward [1] 6:20
operating [3] 59:24 70:18 71:7
operations [1] 37:12
opinion [2] 82:6 82:10
opportunities [7] 16:22 17:2 17:5 35:11 35:16 36:14 83:4
opportunity [3] 17:24 18:2 18:16
opposed [5] 4:22 63:3 66:23 80:22 81:2
option [1] 74:9
order [2] 55:6 75:16
organization [1] 26:15
original [2] 73:16 73:17
OTS [3] 50:3 54:20 55:5
ought [1] 70:15
outcome [1] 84:9
outer [1] 8:20
outline [2] 25:16 25:21
outside [5] 10:16 33:13 36:12 45:20 73:16
overview [1] 19:18
owe [1] 66:13
own [4] 16:10 16:12 16:14 20:2
owned [3] 38:1 53:5 73:7
owners [1] 81:11
package [1] 11:12
packages [3] 25:22 27:7 35:21
page [6] 3:2 3:8 21:9 42:9 42:20 54:7
paid [5] 63:4 63:23 64:10 66:18 81:24
papers [1] 20:2
parcel [1] 18:14
part [18] 8:19 12:4 18:3 26:23 27:7 32:4 32:6 49:5 50:11 53:1 54:1 57:20 59:23 60:12 68:9 70:6 80:2 80:3
participant [1] 78:3
participate [1] 73:14
particular [4] 11:18 14:19 19:8 34:14
particulars [1] 35:5
parties [3] 21:23 43:2 87:18
Partners [2] 14:4 75:9
party [1] 69:3
party-type [1] 81:8
passage [4] 44:19 53:9 80:14 82:12
passed [3] 24:6 24:8 80:16
past [1] 66:14
Patricia [2] 2:6 4:9
Patrick [1] 2:7
pause [3] 25:12 62:9 77:16
pay [5] 58:6 62:20 63:1 66:7 71:24
paydown [3] 53:12 53:19 53:23
payment [5] 55:11 56:8 71:18 72:4 84:11
payments [1] 64:9
payout [1] 62:16
Peerless [3] 37:16 37:20 37:23
pending [2] 5:12 5:22
people [10] 8:5 13:2 16:9 39:18 45:2 45:9 45:12 82:18 83:2 83:3
Peoria [27] 12:11 12:14 13:14 13:19 13:22 28:23 30:11 30:12 35:8 35:13 39:8 48:8 55:11 55:15 59:12 60:2 60:9 60:15 61:8 64:17 65:11 73:3 73:23 75:9 76:11 81:3 81:16
percent [7] 16:19 26:9 26:18 26:20 26:21 66:14 84:13
percentage [15] 16:12 16:14 16:17 26:1 26:4 27:11 70:15 71:20 71:21 72:6 72:8 72:9 73:8 73:19 78:14
percentages [4] 27:1 27:3 27:5 58:18
performance [1] 82:11
period [5] 31:11 36:6 36:8 64:18 66:4
periods [1] 55:16
person [3] 13:3 50:3 50:3
personal [4] 20:4 21:10 37:21 87:10
personally [1] 84:4
pertaining [1] 1:16
pgs [1] 86:19
philosophy [2] 36:22 36:23
PHO012 [2] 42:16 42:17
Phone [3] 2:4 2:9 88:12
Pikus [3] 74:12 82:19 82:22
place [3] 48:15 68:15 87:12
Plaintiffs [3] 1:4 2:5 86:4
plate [1] 58:7
played [1] 37:22
point [11] 28:22 35:19 46:17 57:3 63:16 63:18 65:17 65:21 69:9 74:10 80:19
pool [3] 79:8 79:19 84:13
pools [3] 48:21 77:21 77:24
Porter [1] 2:2
portion [1] 16:10
position [5] 10:6 15:23 73:20 75:8 75:12
positions [9] 13:13 14:1 14:5 14:8 14:15 15:18 15:21 16:1 52:15
possession [1] 21:10
pot [2] 72:3 78:9
potential [4] 38:3 69:1 69:11 84:8
potentially [1] 47:7
practice [1] 8:2
precluded [1] 83:6
preferred [11] 32:12 32:23 35:7 47:19 47:23 47:23 48:3 48:4 48:11 55:7 64:4
preliminary [1] 4:19
premise [2] 63:15 63:19
preparation [1] 15:6
prepare [2] 20:13 27:8
present [3] 2:11 7:18 71:9
presented [1] 49:18
preserved [1] 6:4
president [1] 69:16
president-general [1] 7:19
pretty [3] 12:1 23:18 81:10
price [9] 7:13 7:13 70:5 70:11 70:14 71:21 72:6 72:21 83:19
primarily [4] 38:1 69:15 75:5 82:20
primary [4] 12:5 13:2 74:19 82:18
privilege [5] 5:19 5:21 5:23 6:2 6:9
pro [3] 24:1 58:13 73:12
Procedure [1] 1:15
proceeds [4] 17:18 72:2 72:7 72:9
process [2] 19:20 80:18
produce [1] 21:10
product [1] 18:19
profitably [1] 72:24
promise [1] 22:3
properties [2] 8:23 19:23
proposed [9] 37:16 37:20 38:10 39:7 39:12 40:8 40:17 40:22 41:10
pros [2] 23:7 23:14
prove [1] 78:4
provide [3] 6:19 7:8 68:18
provided [3] 22:12 56:18 86:16
provisions [2] 83:6 83:13
Public [3] 1:19 86:23 87:6
publisher [1] 19:13
purchase [10] 18:2 18:9 18:10 26:4 32:12 32:23 35:4 70:5 70:11 72:21
purchased [2] 27:4 34:24
purely [2] 39:13 71:19
purpose [4] 14:16 48:23 54:24 63:6
pursuant [4] 1:14 1:14 27:15 47:2
pursue [1] 83:5
pursuing [1] 36:18
pursuit [1] 35:11
put [4] 45:8 45:8 65:20 73:20
quarters [1] 55:23
questions [10] 4:20 5:24 6:8 6:12 6:17 11:20 69:18 74:24 79:23 84:24
quick [3] 41:24 44:14 54:11
quickly [1] 46:14
R [2] 1:3 86:3
raise [5] 18:3 44:19 44:23 48:7 74:23
raising [2] 45:15 45:16
Randolph [2] 1:19 88:11
rang [1] 37:24
range [4] 42:10 42:16 42:20 54:10
RAP [1] 33:18
rata [2] 58:13 73:12
rate [3] 37:3 37:5 66:7
rather [1] 71:8
ratio [1] 59:9
read [1] 86:10
real [6] 8:4 8:19 18:13 18:14 41:24 51:13
reality [1] 81:6
realize [1] 4:12
really [8] 28:5 32:16 50:12 58:7 73:5 77:22 81:4 82:20
reason [3] 6:15 50:19 59:23
reasonable [2] 57:18 57:23
reasons [6] 23:17 23:22 23:24 37:21 73:1 76:23
recalled [1] 79:16
recalling [3] 38:2 52:24 53:6
receivables [4] 48:22 79:8 79:19 79:20
receive [3] 11:8 11:11 57:3
received [9] 15:9 57:12 58:19 67:16 70:15 71:18 71:20 72:9 76:24
receiving [2] 17:18 57:1
recollection [32] 31:18 32:14 33:20 34:20 42:1 42:7 50:19 54:15 55:18 56:16 56:17 59:14 59:15 60:17 61:13 61:18 61:22 61:23 62:8 63:7 64:8 64:13 65:2 70:10 70:13 70:20 71:1 71:5 71:14 71:17 76:17 83:18
recollections [2] 48:13 64:20
recommendations [1] 81:11
record [4] 4:9 5:17 42:15 86:14
records [1] 66:20
redeem [1] 55:7
redemption [5] 48:11 48:14 48:18 48:24 79:14
reduce [1] 52:11
reduced [1] 87:9

refer [1] 21:7
reference [2] 79:6 79:13
referenced [3] 54:17 55:12 56:9
referred [3] 31:17 31:21 49:16
referring [1] 33:4
refresh [1] 54:15
regarding [22] 11:8 11:16 15:15 24:11 25:9 35:10 36:13 40:8 44:18 46:1 46:7 47:6 47:9 47:10 47:21 49:23 51:7 63:22 76:9 79:19 81:15 82:10
regardless [1] 56:24
regular [1] 31:1
regulated [1] 45:12
regulations [2] 45:7 50:22
regulators [16] 12:8 15:14 50:8 50:9 50:10 50:13 50:15 50:17 51:12 51:14 51:15 51:19 51:23 51:24 52:4 52:13
regulatory [15] 10:23 12:2 22:2 30:19 31:19 32:15 34:21 36:9 41:4 45:1 45:22 46:18 55:24 80:17 83:15
related [4] 14:13 21:11 21:12 81:8
relating [26] 11:9 22:15 30:5 30:6 30:9 30:11 32:20 37:15 38:20 44:9 47:18 48:10 51:3 52:21 53:11 54:16 55:9 56:13 61:10 61:14 62:15 62:19 69:4 69:8 69:12 70:17
relationship [3] 75:4 79:10 81:16
relationships [1] 19:4
relative [2] 87:17 87:18
remember [30] 14:11 14:19 20:9 27:6 30:22 34:3 34:8 34:12 34:13 34:15 35:5 40:3 40:6 40:10 40:11 46:23 47:15 49:13 49:14 51:16 52:3 56:10 59:6 63:21 66:16 68:23 69:10 77:18 78:15 84:1
remembering [3] 48:17 50:14 57:19
repeat [2] 24:15 80:24
rephrase [2] 24:14 64:23
replace [1] 45:21
replaced [1] 48:3
replacement [3] 47:18 47:22 58:22
report [3] 29:6 29:18 50:11
reported [5] 32:18 33:14 44:2 70:7 87:9
reporter [7] 1:18 4:21 21:5 41:19 54:6 85:1 87:6
reporting [1] 25:15
represent [1] 34:18
representations [1] 43:21
represented [2] 9:6 9:20
representing [2] 4:10 9:14
represents [1] 31:8
Republic [3] 10:19 11:10 27:14
requested [3] 21:9 41:16 54:3
requesting [1] 55:5
required [3] 47:2 52:10 53:22
requirement [1] 46:20
requirements [1] 56:6
reread [1] 55:2
research [1] 23:6
resolutions [1] 11:5
resolving [1] 49:5
resources [1] 23:21
respect [39] 9:1 9:9 9:10 9:12 9:14 9:16 10:19 11:22 12:7 12:10 12:13 22:14 23:13 24:17 25:5 27:13 28:20 29:20 31:13 32:20 33:22 33:23 34:10 35:1 35:7 44:8 52:16 56:19 57:23 57:24 58:1 58:3 58:9 68:16 72:13 73:23 80:13 82:22 84:17
respective [1] 58:17
respond [2] 4:20 5:11
response [1] 28:24
responsibilities [3] 10:11 10:14 19:14
rest [3] 57:21 82:13 82:15
restate [3] 47:20 57:9 72:11
restrictions [3] 46:22 46:23 51:1
restructuring [1] 59:2
result [2] 50:21 55:11
resulted [1] 53:8
results [2] 25:2 44:3
retaining [2] 24:11 24:18
retire [2] 64:6 64:10
retired [2] 13:5 62:3
retirement [2] 61:19 61:24
retrospect [1] 52:19
return [4] 22:1 37:3 37:5 74:16
reveal [2] 24:23 28:18
review [5] 15:5 20:16 21:1 54:23 68:20
reviewed [3] 27:21 43:18 43:19
reviewing [3] 28:3 41:6 80:7
Richard [1] 82:18
right [9] 19:9 24:5 24:8 32:9 47:4 47:5 55:23 67:3 81:23
right-hand [2] 42:10 42:13
rights [2] 24:12 24:18
ring [1] 40:4
rings [2] 39:2 39:14
risk-based [1] 59:9
risk-weighted [1] 59:3
River [94] 9:2 9:5 9:16 12:20 12:24 13:13 13:17 13:18 13:22 14:2 14:7 14:9 14:13 15:11 15:16 15:19 16:15 20:7 21:12 24:12 24:19 26:1 26:10 27:8 28:23 29:3 30:11 35:12 35:12 36:5 43:8 44:9 45:15 48:7 49:3 49:4 51:4 51:5 52:6 52:11 52:16 52:22 53:9 53:12 53:13 53:15 55:10 55:14 55:15 56:15 59:2 59:12 59:12 60:9 60:14 60:15 60:18 61:1 61:7 61:7 62:20 62:24 63:3 63:5 63:6 63:8 63:14 63:23 63:24 64:3 64:16 64:17 65:11 65:11 67:1 67:15 67:18 69:1 70:4 71:11 73:3 73:9 73:23 75:9 76:10 76:10 76:11 76:21 81:3 81:16 81:16 82:11 83:5 83:12
Rock [28] 9:10 9:13 9:21 10:3 10:19 13:16 13:17 26:13 27:14 29:12 29:16 29:18 35:3 35:12 36:4 53:2 55:15 59:12 59:23 60:2 60:12 60:14 60:19 61:1 61:7 64:17 65:12 81:17
role [8] 27:15 28:16 39:17 41:2 41:6 43:14 43:15 75:12
roles [1] 82:20
Ron [2] 82:19 82:19
Roscoe [1] 61:5
Rose [2] 74:20 75:2
Ross [56] 1:3 4:11 8:12 8:14 9:1 9:14 11:24 16:4 16:6 16:24 19:5 20:3 21:18 21:24 22:19 24:11 24:18 25:15 26:3 28:22 30:2 33:6 33:21 34:24 46:4 47:11 56:19 56:22 57:12 57:17 58:1 58:2 64:15 65:1 65:5 65:8 65:10 65:16 65:19 66:1 67:5 68:14 73:10 74:1 74:3 74:5 74:18 75:15 80:12 81:7 82:3 82:17 82:21 84:10 84:17 86:3
Rothman [3] 75:19 75:23 76:1
Rules [1] 1:15
run [1] 72:23
running [1] 82:11
runoff [1] 78:11
S [1] 3:7
sale [10] 27:10 61:1 69:6 70:14 71:13 71:19 71:21 71:23 72:6 77:19
sales [2] 8:22 24:9
San [10] 14:22 14:24 15:11 15:16 53:13 56:14 58:10 58:12 72:13 75:17
sat [1] 7:4
savings [9] 14:22 21:21 22:16 30:12 37:16 37:23 38:11 53:14 75:17
saw [1] 51:17
says [1] 43:6
school [5] 6:20 6:22 7:1 7:5 7:15
scrivener [1] 44:4
seal [1] 88:2
second [1] 13:3
secondary [1] 82:20
secondly [1] 77:1
secretary [8] 10:8 13:15 13:16 13:21 14:12 14:17 15:22 15:23
secured [2] 67:8 67:11
securing [1] 18:12
securities [1] 19:18
Security [3] 39:8 39:15 39:20
see [3] 33:7 33:8 41:24
seeking [2] 36:14 36:24
seem [1] 52:17
Seib [2] 82:19 82:23
selected [1] 45:11
sell [10] 56:5 63:19 67:18 78:5 78:7 78:9 78:14 83:20 83:21 83:23
selling [1] 19:20
sense [7] 23:23 27:20 31:5 40:21 60:11 62:5 62:7
sensitive [1] 5:23
sent [4] 42:21 42:23 43:1 64:5
separate [1] 18:14
separately [1] 30:1
September [1] 88:3
serious [4] 46:11 46:16 47:6 47:9
served [5] 14:14 14:14 14:15 20:7 44:4
set [5] 51:19 53:2 77:5 81:5 88:1
sets [1] 51:15
settlement [5] 48:18 79:8 79:9 79:18 80:5
settling [1] 80:2
several [3] 58:13 58:15 58:16
severe [1] 46:22
SFAS [2] 61:11 61:12
shareholder [5] 9:7 74:9 74:15 74:16 84:7
shareholders [7] 53:4 57:20 58:4 58:15 72:4 73:13 74:1
shareholders's [1] 27:1
shareholding [1] 73:16
shareholdings [1] 74:14
shares [3] 16:7 18:3 18:24
sheet [1] 71:12
sheets [2] 86:16 86:19

shelf [1] 18:21
shopping [1] 18:13
short [4] 44:16 66:2 66:4 79:4
Shorthand [2] 1:18 87:5
shortly [1] 9:18
shrinkage [4] 55:10 55:16 71:11 71:16
shrinking [1] 55:10
shut [2] 41:7 73:14
side [2] 13:7 55:23
sign [3] 10:8 49:22 85:2
Signature [1] 85:1
signatures [1] 14:18
signing [1] 10:10
simply [2] 67:3 73:14
single [1] 7:16
single-purpose [1] 18:10
sit [4] 10:16 31:3 33:12 36:11
situation [4] 43:16 65:7 68:1 75:7
situations [1] 81:9
Six [1] 66:6
six-million-dollar [3] 54:16 55:1 56:8
skim [2] 41:24 42:4
small [1] 74:13
Smith [22] 2:6 3:4 4:7 4:10 6:6 6:7 28:15 28:19 41:17 42:3 42:15 42:19 44:13 44:17 54:4 54:14 62:10 65:15 74:4 78:24 79:5 84:21
sold [12] 19:19 24:12 24:19 26:20 27:4 36:5 60:19 60:22 61:5 63:14 67:15 76:22
someone [2] 18:18 75:16
sometimes [2] 41:5 41:5
soon [2] 78:13 80:15
sorry [3] 13:8 42:12 47:19
sought [2] 49:3 49:4
sound [3] 22:5 47:4 47:5
South [2] 13:7 61:6
space [1] 18:22
speak [1] 76:7
speaking [1] 69:2
special [1] 14:16
specific [12] 12:15 23:24 28:8 35:17 36:10 36:20 45:6 55:19 61:22 70:24 76:16 83:4
specifically [7] 21:7 27:6 37:9 44:21 45:14 45:24 59:6
specifics [10] 45:18 46:9 46:15 47:13 48:1 53:24 70:20 75:21 76:14 83:24
specified [1] 87:13
spend [1] 84:19
spoke [1] 50:9
spoken [3] 75:18 75:20 75:23
SS [1] 87:1
stage [1] 77:5
standing [1] 11:4
standpoint [2] 23:5 43:20
stars [1] 51:11
start [2] 5:16 8:11
state [3] 5:17 86:10 87:1
statements [1] 64:20
States [16] 1:1 1:6 1:13 1:16 2:7 4:10 4:11 21:19 22:15 22:24 23:4 80:13 84:10 86:1 86:6 87:1
status [1] 11:14
stayed [1] 73:12
staying [1] 56:15
stemming [1] 80:14
stenographically [1] 87:9
stepping [1] 58:6
Steve [8] 16:8 33:6 41:22 43:17 43:22 44:1 51:8 82:17
Stevens [1] 69:9
still [2] 17:18 43:11
stock [18] 19:17 32:12 32:23 34:24 35:4 35:7 47:19 47:23 47:23 48:3 48:4 48:12 48:24 55:7 64:4 67:2 69:18 69:19
stop [1] 41:5
stopped [1] 63:9
stopping [1] 63:19
straight [2] 32:11 32:22
Street [4] 1:19 2:3 2:8 88:11
strike [1] 9:4
strongly [1] 81:19
struck [1] 29:8
structure [1] 73:15
structured [1] 77:14
stuff [1] 79:14
submitted [1] 86:19
subordinated [4] 34:10 34:20 56:20 61:20
subordinating [1] 61:24
subpoena [2] 21:1 21:6
SUBSCRIBED [1] 86:20
subsidiaries [1] 7:21
substance [3] 24:23 28:15 28:18
substantial [6] 31:10 59:24 65:20 65:21 65:22 67:6
substantially [1] 72:20
successor [1] 17:13
such [4] 21:14 52:17 71:15 87:18
sue [2] 23:17 84:3
suffered [1] 83:11
sufficient [3] 36:9 37:3 37:5
suing [3] 23:8 23:14 24:1
Suite [2] 1:19 88:11
sums [1] 67:6
Sun [2] 19:24 20:1
Supervision [1] 54:8
supervisory [6] 45:21 47:3 49:16 50:20 51:22 55:4
sworn [4] 4:1 4:5 86:20 87:7
T [2] 2:7 3:7
Taco [4] 17:10 17:11 17:12 18:15
taking [2] 1:17 87:13
tax [1] 7:4
team [9] 8:19 12:6 28:4 37:23 74:13 75:7 82:14 82:16 84:7
telling [1] 28:6
tenor [1] 84:1
term [3] 31:4 31:13 57:22
termination [1] 48:20
terms [23] 11:2 11:3 15:3 18:24 23:6 24:5 25:20 27:15 27:19 28:1 28:2 28:2 30:15 30:21 31:18 36:23 38:21 43:19 46:11 55:6 60:15 66:3 66:4
testified [1] 4:5
testify [1] 87:7
testimony [2] 86:11 86:14
Texas [12] 14:23 15:19 17:14 26:22 27:2 53:18 73:9 75:4 75:6 76:10 76:11 76:22
Thank [2] 84:22 84:23
Theirs [1] 58:14
themselves [3] 22:6 34:24 81:20
thereunder [1] 50:22
thought [15] 18:20 28:7 32:3 32:4 33:3 37:2 70:23 72:19 76:2 76:4 77:23 77:24 78:3 79:17 83:18
thousand [2] 66:13 66:17
threat [1] 22:7
three [5] 19:20 38:7 63:13 66:19 82:19
thrift [3] 54:7 82:7 82:23
thrifts [4] 38:7 46:5 46:12 65:6
through [20] 15:11 15:16 24:9 29:12 29:16 32:11 32:22 38:18 42:16 42:17 54:10 55:15 64:18 69:5 69:6 69:22 73:3 74:14 74:14 75:1
throw [1] 43:5
times [7] 19:24 46:16 46:16 55:20 64:23 65:8 82:18
Times's [1] 20:1
timing [2] 33:4 47:13
today [7] 6:17 21:7 31:3 33:12 36:12 71:8 84:19
today's [1] 20:14
together [3] 59:21 76:2 76:3
tomorrow [1] 84:20
took [3] 23:8 27:10 48:15
towards [3] 31:19 34:7 34:21
town [2] 20:20 43:3
training [1] 7:3
transaction [11] 15:2 25:16 32:4 34:14 48:6 48:17 48:21 49:10 69:18 73:15 77:13
Transactional [1] 8:3
transactions [2] 22:18 51:9
transcript [2] 86:11 86:13
transfer [1] 70:18
transferred [2] 15:8 70:22
transmittal [1] 44:5
treasuries [1] 66:8
trial [1] 6:5
Trisha [1] 5:16
troubled [2] 36:18 38:22
true [1] 86:13
trust [1] 76:3
truth [1] 87:8
try [1] 26:17
trying [4] 29:1 36:20 68:15 74:7
turn [1] 42:9
Twelfth [1] 2:3
twice [1] 49:12
two [12] 10:3 13:6 24:6 31:23 59:16 60:5 60:18 61:1 61:4 63:13 73:1 77:4
two-million-dollar [1] 47:1
type [6] 8:16 17:24 18:4 19:11 38:21 45:1
types [2] 43:8 66:9
typewriting [1] 87:10
U.S [1] 7:20
ultimate [1] 84:13
ultimately [3] 51:17 70:14 78:4
under [7] 7:16 22:8 37:13 45:1 45:8 48:18 87:10
undercapitalized [2] 21:22 22:7
undercapitalizing [1] 22:8
understand [9] 4:23 6:16 51:12 51:14 51:20 52:1 52:3 52:5 59:5
understood [2] 37:12 51:24
undertaken [1] 44:23
United [21] 1:1 1:6 1:13 1:16 2:7 4:10 4:11 21:19 22:15 22:24 23:4 38:11 38:15 38:21 39:1 39:5 80:13 84:10 86:1 86:6 87:1
University [5] 6:23 6:24 7:5 7:9 7:23
unsecured [3] 67:9 67:12 67:13
up [17] 5:8 9:20 21:21 25:18 25:20 29:2 36:4 46:13 48:19 53:2 58:7 64:5 70:8 73:21 79:16 80:3 81:5
used [4] 31:13 63:1 70:9 71:8
using [1] 41:4

utilized [2] 56:14 63:5
utilizing [1] 62:20
vague [2] 48:13 64:19
Valley [93] 9:2 9:6 9:16 12:20 12:24 13:14 13:17 13:18 13:22 14:2 14:7 14:9 14:14 15:11 15:16 15:19 16:15 20:7 21:12 24:12 24:19 26:1 26:11 27:8 28:23 29:3 30:11 35:12 35:12 36:5 43:9 44:9 45:15 48:7 49:3 49:4 51:5 51:5 52:6 52:11 52:16 52:22 53:9 53:12 53:13 53:15 55:11 55:14 55:15 56:15 59:12 59:12 60:9 60:14 60:15 60:19 61:1 61:7 61:8 62:20 62:24 63:3 63:5 63:6 63:8 63:14 63:24 63:24 64:3 64:16 64:17 65:11 65:12 67:1 67:15 67:18 69:1 70:4 71:12 73:3 73:9 73:23 75:9 76:10 76:11 76:11 76:21 81:3 81:16 81:17 82:11 83:5 83:13
Valley's [1] 59:3
valuation [1] 27:9
valuations [1] 69:19
value [15] 27:5 27:11 31:9 31:9 68:15 70:22 70:23 71:3 71:7 71:9 72:21 72:24 78:5 79:24 83:12
various [14] 7:16 16:17 19:7 19:24 21:12 21:23 22:1 26:1 27:19 45:7 48:18 55:20 55:22 82:18
vary [2] 8:3 15:24
verbal [1] 28:24
verbally [1] 4:20
verify [1] 20:23
versus [2] 4:11 21:19
viable [1] 80:20
vice [1] 7:19
view [1] 82:23
viewed [1] 27:11
viewing [2] 42:2 54:13
vs [2] 1:5 86:5
waiving [1] 5:20
warranties [1] 43:21
Washington [2] 2:3 2:8
Waterhouse [2] 7:13 7:14
ways [1] 45:21
Webber [2] 13:3 43:14
week [1] 20:20
West [3] 1:19 6:22 88:11
Western [9] 15:20 17:12 17:19 17:21 73:8 74:21 75:1 78:10 78:14
whereof [1] 88:1
whichever [1] 53:1
whole [4] 42:15 47:20 77:7 87:8
willing [2] 58:6 73:14
wire [1] 15:8
Wisconsin [1] 69:9
wished [1] 83:5
within [6] 10:2 56:15 63:12 65:3 78:16 78:21
without [1] 83:20
witness [12] 3:2 4:1 4:4 25:1 25:13 42:2 54:13 65:18 77:17 84:23 85:3 88:1
WON034 [1] 54:10
word [1] 81:23
worked [4] 12:23 51:13 67:4 68:13
works [1] 66:9
wound [4] 9:20 21:21 48:19 73:21
written [1] 31:10
wronged [1] 23:16
X [2] 3:1 3:7
year [6] 10:2 22:4 24:6 63:13 78:16 78:21
years [11] 10:3 17:23 19:19 63:13 63:13 63:13 65:2 66:2 66:6 66:18 71:8
York [1] 19:17
younger [1] 67:2
yourself [2] 74:1 74:5

# EXHIBIT B

AUDIT/PERSONNEL/ADMINISTRATIVE COMMITTEE

JANUARY 24, 1990

The Audit Committee of the Board of Directors of River Valley Savings Bank, FSB met in committee session at 10:30 AM on January 24, 1990, at the offices of River Valley Savings Bank at 200 S.W. Jefferson, Peoria, Illinois.

The following members were present: Chairman, David DeTrempe, John Lawrence, and Mark Kipnis. Also present was Roger Kilpatrick.

The Committee reviewed the proposed changes in the management structure of the company. After discussion the committee members determined to recommend that Homer Holland be named Vice Chairman and Chief Executive Officer of River Valley, FSB and that Ron Pikus be named President and Chief Operating Officer of the Bank.

The Committee then reviewed an amendment to the Holland Partners Consulting Agreement and determined to recommend to the Board of Directors that Howard Ross be paid a bonus of $175,000 and that Holland Partners be paid a bonus of $425,000 based upon 1989 results.

In addition to the above items the Committee determined that bonuses should be paid to certain employees for their contributions and efforts for 1989. The amount to be recommended to the Board was $36,500 in the aggregate to be distributed per the detail schedule.

The committee members also discussed a change in the structure of the compensation of members of the Board of Directors. After review and discussion it was decided that a change be recommended to the Board of an annual retainer of $2000 be paid to each director of River Valley, FSB. In addition each director would be paid $350 for each board meeting attended.

Mr. DeTrempe then updated the Committee on his meeting with Mr. Kilpatrick, Ms. Witt, and the staff of Peat Marwick Mitchell regarding the timing of audit work to be completed and the progress made to date. Mr. DeTrempe noted that the audit process was on schedule and that the report would be available for the board meeting in April. Prior to the board meeting Mr. DeTrempe recommended that the Audit Committee meet with the Peat Marwick staff to review the audit report for the Committee to present to the Board.

The Committee then discussed the letters from Sue Mooney and

DEFENDANT'S EXHIBIT DX 377 Holland v. U.S. 95-524C

Larry Ferries from the Office of Thrift Supervision of December 26, 1989, and January 9, 1990, respectively. The Committee reviewed the letters and the recommended responses. After discussion the committee members proposed that the responses be adopted by the Board.

There being no further business to be discussed, the Committee adjourned.

Chairman

# EXHIBIT C

January 4, 1995

First Banks, Inc.
135 North Meramec Avenue
Clayton, Missouri 63105
Attention: Mr. Allen Blake

Dear Mr. Blake:

With respect to the consideration to be delivered by First Banks, Inc., a Missouri corporation ("First Banks"), to the shareholders of River Valley Holdings, Inc., an Illinois corporation (the "Company"), pursuant to the terms of the Agreement and Plan of Merger dated July 26, 1994, as amended on August 31, 1994 (the "Agreement"), among the Company, First Banks and RVH Acquisition Company, an Illinois corporation and wholly owned subsidiary of First Banks, you are hereby directed to make the payments or deliveries to the individuals all as described below:

| Recipient | Amount | Payment Method |
|---|---|---|
| Ronald M. Pikus | $179,660 | Wire transfer of immediately available funds as follows: River Valley Savings Bank<br>Account Name: Ronald M. and Christine A. Pikus<br>Account No.: 1670000099<br>ABA No.: 271173083 |
| Homer J. Holland | $18,619,825 | Promissory note payable on January 3, 1996, bearing interest at a rate equal to 35 basis points less than the LIBOR rate, secured by an irrevocable letter of credit in an equal amount issued by The Boatmen's National Bank of St. Louis |
| Howard R. Ross | $17,875,032 ✓ | Wire transfer of immediately available funds as follows: American National Bank<br>Account Name: Howard R. Ross<br>Account No.: 14332884<br>ABA No.: 071000770 |
| Mark S. Kipnis | $744,793 | Wire transfer of immediately available funds as follows: River Valley Savings Bank<br>Account Name: Mark S. Kipnis<br>Account No.: 1680000360<br>ABA No.: 271173083 |
| Total proceeds | $37,419,310 | |

6,253,682.19 Loan # 75 American

Homer J. Holland

Howard R. Ross

Being all of the shareholders of River Valley ~~Savings~~ Holdings, Inc.

DEFENDANT'S EXHIBIT
DX 1098
Holland v. U.S. 95-524C
PENGAD-Bayonne, N.J.
12/29/94

KAXDKWARVHRPROCPAY.LE1

Confidential Material - Subject to Protective Order H&R-ABFB-B72-0122

January 4, 1995

First Banks, Inc.
135 North Meramec Avenue
Clayton, Missouri 63105
Attention: Mr. Allen Blake

Dear Mr. Blake:

With respect to the consideration to be delivered by First Banks, Inc., a Missouri corporation ("First Banks"), to the shareholders of River Valley Holdings, Inc., an Illinois corporation (the "Company"), pursuant to the terms of the Agreement and Plan of Merger dated July 26, 1994, as amended on August 31, 1994 (the "Agreement"), among the Company, First Banks and RVH Acquisition Company, an Illinois corporation and wholly owned subsidiary of First Banks, you are hereby directed to make the payments or deliveries to the individuals all as described below:

| Recipient | Amount | Payment Method |
|---|---|---|
| Ronald M. Pikus | $179,660 | Wire transfer of immediately available funds as follows: River Valley Savings Bank<br>Account Name: Ronald M. and Christine A. Pikus<br>Account No.: 1670000099<br>ABA No.: 271173083 |
| Homer J. Holland | $18,619,825 | Promissory note payable on January 3, 1996, bearing interest at a rate equal to 35 basis points less than the LIBOR rate, secured by an irrevocable letter of credit in an equal amount issued by The Boatmen's National Bank of St. Louis |
| Howard R. Ross | $17,875,032 | Wire transfer of immediately available funds as follows: American National Bank<br>Account Name: Howard R. Ross<br>Account No.: 14332884<br>ABA No.: 071000770 |
| Mark S. Kipnis | $744,793 | Wire transfer of immediately available funds as follows: River Valley Savings Bank<br>Account Name: Mark S. Kipnis<br>Account No.: 1680000360<br>ABA No.: 271173083 |
| Total proceeds | $37,419,310 | |

Homer J. Holland [signature]
Homer J. Holland

Howard R. Ross

Being all of the shareholders of River Valley ~~Savings~~ Holdings, Inc.

KAXIDRWRVHRPROCPAY.LEI 12/29/94

Confidential Material - Subject to Protective Order H&R-ABFB-B72-0123

TOTAL P.03

# EXHIBIT D

8515

November 15, 1989

EXHIBIT
Ferris #3
8-10-00

**MEMORANDUM**

To: File

From: Bruce Michalski

Subject: Minutes of Management Meeting

River Valley Savings Bank, FSB, #8515 ("Peoria")
Peoria, Illinois

River Valley Savings Bank, #6822 ("Rock Falls")
Rock Falls, Illinois

A meeting was held on November 13, 1989 with Homer Holland and Mark Kipnis, representatives of both Peoria and Rock Falls. Susan Mooney, Larry Ferries, Dan Bagus, and Bruce Michalski represented the Office of Thrift Supervision. Wayne Dyer, of the Office of the Savings and Loan Commission (of Illinois), also attended.

The purpose of the meeting was to discuss the board of directors terms, which, at Peoria, are currently not staggered, and the Class D, E, and F preferred stock, which exists at both associations.

After the introductions, Homer Holland asked if it was possible to not stagger the terms of the board of directors. Presently, the director's terms are one year in length and not staggered.

Dan Bagus stated that it is necessary to stagger the terms of the directors to ensure the continuity of the board. He noted that a board of directors with terms expiring annually may result in a sudden change in management, which could possibly have a negative effect upon the association. He also noted that other associations had applied to not stagger its board and had been denied.

Mr. Holland and Mr. Kipnis agreed to amend the bylaws to stagger the terms of the directors in accordance with 12 CFR 552.6-1.

Mr. Holland noted that they are still in the process of selling the Class C preferred stock (of Peoria) to American National Bank (ANB). The stock will be considered core capital since it will be non-cumulative. Class C stock, as it now exists, is cumulative. In addition, the rate of dividends will be reduced from a rate of 10% fixed to a rate of 90% of prime. This should reduce Peoria's costs.

Mr. Holland then set the stage for his discussion on Class D, E, and F preferred stock. He noted that the reasoning behind the different classes were to compensate himself, Howard Ross, and Steve Bangert equitably. It was Howard Ross's job to acquire capital, it was his

PLAINTIFF'S EXHIBIT PX 168

WOL275 0078 F HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 881230 WIN BOX # WC00019164
OLD BOX # DC 2021 ACC # 483920026 16 O F16 # 8515899999 FILE; CORRESPONDENCE; CHECK COPIES; HANDWRITTEN NOTES; FINANCIAL STATEMENTS; REGULATORY PLANS; AGREEMENTS; REPORTS; ARTICLES; MAPS 890199-891299
CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

job to build up the assets, and it was Steve Bangert's job to manage the interest rate risk exposure within the assets and liabilities. Mr. Holland said that he and Mr. Ross wanted Mr. Bangert to participate in the economic earnings of the associations, but did not want Mr. Bangert to have an ownership interest. That is one of the reasons that Mr. Bangert's incentive is tied to the market value of the associations and not to the GAAP earnings.

He further stated that it was their intent to set up the preferred stock in this manner to:

1. Treat each of them separately;

2. Keep the associations' capital intact;

3. Maximize usage of net operating loss (NOL) carryforwards; and

4. Keep these incentives separate from other existing bonus plans (which are available for other employees).

Mark Kipnis further emphasized that they were surprised to find out that we did not perceive the issue of the preferred dividends as including the operations of 1988. He said that they had always assumed that 1988 operations were also to be included. He said that the preferred stock issuances were established to recognize each of the parties contributions to the associations, and those contributions certainly existed in 1988. He also stated that they wanted to maximize the use of NOL carryforwards, which would, in turn, benefit the FSLIC (now FDIC), since they participate in the use of NOL carryforwards.

Ms. Mooney said that OTS personnel had been equally surprised that dividends were declared and paid before the preferred stock had been approved and issued.

Mr. Kipnis explained that some of the associations' correspondence had used 1988 figures in their examples.

Ms. Mooney noted that there had been bonuses paid to Mr. Holland and Mr. Ross during 1988. If the preferred stock was to compensate them for their efforts, why did they also receive bonuses.

Mr. Kipnis said that the bonuses were a form of back-salary.

He also said that their intent was to distribute 1988's and 1989's economic gain among Mr. Ross, Mr. Holland, and Mr. Bangert. The plan was originally trying to allocate three components, salaries,


CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

capital contribution compensation, and economic gain.

Mr. Holland said that if we were having a problem accepting the preferred stock dividends, they could probably declare common dividends, as long as it was approved by ANB.

Ms. Mooney said that we would have to consider the options open to us and get back to Mr. Holland at a later date.

Ms. Mooney then asked how Peoria and Rock Falls were progressing on the "sharing of management" issue. (There are several officers that allocate their services between the two associations.)

Mr. Holland responded. He said that it was fairly simple allocating the salaries of the people who worked for Holland Partners Inc. (HPI). It was more difficult allocating the salaries of the other officers, such as Roger Kilpatrick. However, he said that they do have methodologies for allocating, on a time-basis, the costs equitably between the two associations.

Mr. Dyer asked whether they had finished combining the two general ledgers of the Peoria shop. Mr. Holland said that the process was now complete.

Ms. Mooney asked if Peoria or Rock Falls were considering any further acquisitions. Mr. Holland said yes. Ms. Mooney said that RTC had indicated that it would not "do deals" with 3,4, or 5 rated shops. Mr. Kipnis asked if it was possible to re-rate Peoria and/or Rock Falls. Mr. Ferries said that it was possible to re-rate shops if a special limited examination was done. Mr. Ferries noted, however, that re-rating a shop was a rare occurrence. And it would be necessary to alleviate the problem areas. In Rock Falls and Peoria's case, it would be necessary to correct all management (M) and capital (C) problems.

Ms. Mooney asked whether Rock Falls and Peoria had "exchanged" any securities pursuant to their asset/liability restructuring. Mr. Holland said no. He said that the reason that they wanted to transfer assets between the two shops was to "level out" their GAP positions. One of the shops was positively hedged and one was negatively hedged. He also noted that Steve Bangert had been discussing the transactions with Larry Kenny. Ms. Mooney indicated that we would need to see if a transfer of assets would need PSA approval. She said she would let Mr. Holland know.

In summarizing the meeting, it was decided that:

1. Peoria would amend its bylaws to provide for a staggered board in accordance with 12 CFR 552.6-1.

2. Ms. Mooney would consider the options available regarding the payment of dividends on Class D, E, and F preferred stock.

3. Ms. Mooney would investigate whether Peoria and Rock Falls would need to seek PSA approval to transfer assets.

The meeting was then adjourned at 11:15.

BM

cc: Esterman
Mooney
Michalski
Docket #6822
Docket #8515
Gerbick