# EXHIBIT H

**Holland & Ross v. U.S No. 95-524C September 6, 2007**

**Heritage Reporting Corporation**

**Page 1 to Page 107**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HOMER J. HOLLAND, )
STEVEN BANGERT, CO-EXECUTOR )
OF THE ESTATE OF HOWARD R. )
ROSS, AND FIRST BANK, )
Plaintiffs, )
)
v. ) Docket No.: 95-524C
UNITED STATES, )
Defendant. )

Courtroom 6, Room 507
National Courts Building
717 Madison Place NW
Washington, D.C.
Thursday,
September 6, 2007

The parties met, pursuant to notice of the Court, at 9:00 a.m.

BEFORE: HONORABLE GEORGE W. MILLER
Judge

APPEARANCES:
For the Plaintiffs:
DAVID B. BERGMAN, Esquire
MICHAEL A. JOHNSON, Esquire
HOWARD N. CAYNE, Esquire
Arnold & Porter, LLP
555 - 12th Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5474 / 942-5783

Page 2

APPEARANCES: (Cont'd)
For the Defendant:
JOHN H. ROBERSON, Esquire
JOHN J. TODER, Esquire
AMANDA L. TANTUM, Esquire
BRIAN A. MIZOGUCHI, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-7972

Page 3

P R O C E E D I N G S

(9:00 a.m.)

THE CLERK: All rise. Oyez, oyez, oyez. The United States Court of Federal Claims is now in session, the Honorable George W. Miller presiding. All persons having business before the Court, draw nigh and you shall be heard. God save the United States, and God save this Honorable Court.

THE COURT: Please be seated. We are here for a preliminary status conference in the case of Homer J. Holland and Steven Bangert, Co-Executor of the Estate of Howard R. Ross; and First Bank v. The United States, Docket No. 95-524C. Would counsel please identify themselves for the record?

MR. BERGMAN: Good morning, Your Honor.

THE COURT: Good morning.

MR. BERGMAN: David Bergman from Arnold & Porter for Plaintiffs. With me are Michael Johnson and Howard Cayne.

THE COURT: Thank you, gentlemen. Welcome.

MR. ROBERSON: Good morning, Your Honor. John Roberson from the Department of Justice.

MR. MIZOGUCHI: Brian Mizoguchi, Your Honor.

MS. TANTUM: Amanda Tantum, Your Honor.

MR. TODER: And John Toder.

Page 4

THE COURT: Welcome, welcome. I thought the first order of business might properly be the draft order governing what I would describe as logistical matters in preparation for the trial. That order is dated August 14, and the Court invited the parties to comment and suggest any changes or additions that they thought were appropriate. So, at this time, I would welcome discussion of that August 14 draft. Mr. Bergman?

MR. BERGMAN: Your Honor?

THE COURT: Can I make a suggestion? It might be better for getting the transcript if you would remain seated or speak at the podium, either one. Which is more comfortable for you?

MR. BERGMAN: Thank you, Your Honor. I don't have a lot to say, so I'll just stay in place. All of the procedures are acceptable and sensible from our perspective. The one addition or clarification I would seek is it's my understanding that the Plaintiffs and Defendant would have an equivalent amount of time during the trial. I want to make sure that that understanding is correct.

THE COURT: Well, that is one of the issues which actually I think we deferred until this morning. I guess my initial reaction was that the case was

Page 5

sufficiently focused that we really didn't need to impose specific time limits on each side, and therefore, the draft does not contain a time limit, but I'm open to suggestion on that.

MR. BERGMAN: Your Honor, I would urge not so much a time limit perhaps, although it would be easy to come up with an outer bound based on the number of hours per day and extend it out. My expectation is that the trial will finish before January 18. So that kind of outer limit maybe isn't very meaningful.

What I would suggest, though, is that we keep track of the time that each side devotes to examination. We've done this in several of the cases. I don't know if Your Honor has followed this procedure in the past, but in several of our Winstar-related cases, and I know the Department of Justice has participated obviously in this and it's worked well, either the Court's clerk or the parties have kept track of the time that's been devoted, and it has been agreed that it would be an equal amount.

So, for example, if we can finish our case in 60 hours, that would be the outer bound on the government's time. If it's 40 hours, 40 hours. That strikes me as fair anyway, Your Honor. I can't

Page 6

envision the scenario whereby, and the Plaintiffs have the burden of proof, the Defendant should get more time than Plaintiffs. I worry that if we don't have any bounds, we'll for sure be here on January 18, which I don't think is the most efficient way to try the case.

THE COURT: Okay. Mr. Roberson, what's your thought?

MR. ROBERSON: Your Honor, I have a few issues, but with respect to the last one –

THE COURT: Yes. Let's talk about that one first.

MR. ROBERSON: – I don't mind having equal amounts of time. My caution would be that there needs to be a certain minimum to that. In other words, if the Plaintiffs put Homer Holland on and he can do his case in three days, we shouldn't be limited to a three-day defense. I think actually from their point of view since he is going to be their fact witness and their expert for almost all of their claims that they are going to be able to present a much more focused claim.

From our perspective, for instance, if we're going to talk about the OTS exam on one year and the FDIC exam the next year, there's two witnesses getting

Page 7

involved right there. So we don't have as much overlap with the entire fact pattern. We have regulators that are only involved in, for instance, the deal getting done, and that would be applicable to some of the issues with respect to possible transfer of goodwill to third parties, to First Bank, where they calculate damages.

So I think the principle is okay in principle, but I want to make sure that there is a certain amount of a floor there that we have at least X amount of hours, and if it's a four-week trial, then let's say at least two weeks of that available. So if they want to put their case on in one week, that shouldn't preclude us from putting on a two-week case.

THE COURT: Let me make a suggestion. Would it make sense to remit this at least initially to discussions among counsel, with a view toward hopefully counsel coming into agreement on the appropriate time limit that we would set? Mr. Roberson?

MR. ROBERSON: I think that discussions are always beneficial, Your Honor. I think that may be wise. Maybe they have an idea now of how long they think their case is going to take, so that may be part of it.

Page 8

THE COURT: Well, why don't you two gentlemen or your colleagues spend some time on this subject and let the Court know say by Monday of next week if that wouldn't be too rushed what your position, hopefully agreed position, would be.

MR. ROBERSON: Your Honor, could we move that? I don't think it's going to be critical at this stage.

THE COURT: No.

MR. ROBERSON: I have obligations. I know all of us have the obligations on Tuesday to file our App A order and have our exchange, so if we could do that on Wednesday, that might be a better day.

THE COURT: Okay. Well, why don't we say that the parties will advise the Court say by 5 p.m. on Wednesday whether they are able to reach agreement on this subject, and if they are not, let us know what the proposals of each side are and maybe a brief statement of the reasons for each party's position if the parties are not able to reach agreement. But I would hope that on something like this, they would be able to reach agreement. Is that satisfactory, Mr. Bergman?

MR. BERGMAN: Yes. Thank you, Your Honor.

THE COURT: Okay. Now, Mr. Roberson, you

Page 9

said you had some additional matters you wanted to talk about.

MR. ROBERSON: Correct. With respect to paragraph 5 on your pretrial order –

THE COURT: Yes.

MR. ROBERSON: – there is the notion that each trial exhibit would be separately and consecutively numbered, and I think that all of the documents, as you know, are Bates-stamped in consecutive fashion now, and for us to have to go back and re-Bates them would be quite burdensome. I think that where the problems come up in my experience in these trials is where sometimes there are composite documents where somebody has got a letter enclosing another letter enclosing something else, and you suddenly have one exhibit that has a different page 1 and 2 on the first two pages and then again page 1 and 2 on the next two pages. So my suggestion would be that where there are composite exhibits that then the parties consecutively number separately from the Bates numbers that are already existent.

THE COURT: What is a "composite document" in that context?

MR. ROBERSON: Well, for instance, a letter

Page 10

from the OTS to the bank where they are enclosing a separate document. It might be an analysis, and the analysis has a separate –

THE COURT: Enclosure, you mean?

MR. ROBERSON: – yes, enclosures, those sort of things. Occasionally you see some documents that are board minutes where there might be a series of documents that have separate numbers within them that can sometimes be misleading.

THE COURT: Together they form a package and would be offered en masse, so to speak.

MR. ROBERSON: Correct, correct.

THE COURT: Mr. Bergman, what's your thought?

MR. BERGMAN: Your Honor, we're happy to do whatever is easiest for the Court. I agree with Mr. Roberson that there is a burden to going back and restamping each of the documents in the way that the Court –

THE COURT: Well, then why don't we accept Mr. Roberson's suggestion that we limit that requirement to so-called "composite documents".

MR. BERGMAN: Thank you, Your Honor. That's terrific.

THE COURT: Mr. Roberson, what else?

Page 11

MR. ROBERSON: The paragraph 10 for the opening argument –

THE COURT: Yes.

MR. ROBERSON: – the Court has allotted 30 minutes. I do think that this case is complex enough. I think we're going to find that when we get into the expert analyses, it is quite complex, and I think that in 30 minutes, the most we can do, if we're going to talk anything about the facts at all, we're going to simply at the highest level possible allude to the potential issues, and I don't think it would be as informative as if we stretch that out. My suggestion would be an hour would make a huge difference. Between 30 minutes and an hour I don't think would be much of a burden on the Court, but an hour would give us a little bit of time at least on each one of these separate issues to get a little bit more detail and inform the Court about the potential issues.

THE COURT: Mr. Bergman, what do you think about an hour for an opening statement?

MR. BERGMAN: I don't strongly oppose it, but I don't think it's necessary either. The Court is going to hear the evidence come in through the witnesses, and the Court seems quite educated in the

Page 12

case at this point.

THE COURT: I guess my inclination would be that if Mr. Roberson wants to give an opening statement of an hour rather than a half-hour, I'm inclined to permit him to do so, and obviously the Plaintiffs would have an hour for opening statement and rebuttal, if any.

MR. BERGMAN: Thank you.

THE COURT: Mr. Roberson?

MR. ROBERSON: My only other comment about the pretrial, and I know the dates have been set for some time now, but I just want to alert the Court to the fact that December 21 is the Friday before the Christmas holiday, which is on the Tuesday. And not for my purpose, but I think most of these witnesses will be traveling. I don't think there are very many witnesses that are going to be local. So that Friday before Christmas is going to be a very tight travel day, and as the Court is aware, particularly as you're late into a trial, schedules are going to be changing. Just as a matter of convenience to the witnesses, if we either don't have trial on the 21st or cut off at noon, something that gives somebody, if they lose a flight, if there is a delay or something, they are actually able to get home

Page 13

for the holidays. I think if you miss a flight the Friday before Christmas, you may be stuck in D.C. for some time.

THE COURT: Why don't we see where we are as we get closer to December 21. I am very sympathetic to the point you raise, and it would seem to me that depending upon where we are in the trial, we might naturally have a break at around that time, and we could decide then exactly how to deal with the situation that you describe.

But I think the idea, for example, of stopping at noon on that Friday would make eminent good sense, and we might even depending on sort of where we are in the trial decide that we wanted to wrap up on Thursday and leave Friday open for people to return presumably to their homes and so forth.

Mr. Bergman, what do you think about that?

MR. BERGMAN: Sounds good, Your Honor.

THE COURT: Okay. Now the Court has also given some thought to revisions or actually I think additions to the preliminary pretrial order or the order dealing with logistics, and there are at least two items that I think we should consider in that regard.

The first, and I'm simply going to read this

Page 14

to you, but it relates to a mode of keeping track of exhibits and through whom they were introduced and whether they were admitted or not or perhaps admitted in part or some other disposition, and that language would be substantially as follows: "The parties shall provide to the Court at the outset of the trial two copies of a list containing the following three columns: (1) the identifying number for each exhibit; (2) a blank space for the Court to enter the name of the witness through whom the exhibit is sought to be admitted; and (3) a blank space for the Court to enter the disposition of any requests to admit that exhibit."

Obviously that shifts to the parties a burden which the Court has on earlier occasions assumed itself, and obviously we would be prepared to do that if necessary, but this would be a help to the Court. Any thoughts, gentlemen?

MR. ROBERSON: I think that's easily done by our part and entirely reasonable, Your Honor.

THE COURT: Mr. Bergman?

MR. BERGMAN: The same here, Your Honor. That's fine.

THE COURT: All right. Good. We'll make that addition. Bear with me just a second here.

Page 15

One of the matters which our draft deals with, and it's in our paragraph 4, is the matter of number of copies of documentary exhibits and how they should be dealt with. And upon reflection, I think a somewhat different provision would make sense, and again, I'm going to read this and invite your comments. This would be substantially in lieu of our paragraph 4. Is everybody following along? Okay.

"During trial, the original 'stickered' version of exhibits shall be provided to the witnesses, and thereafter exhibits admitted into evidence shall be maintained by the reporter as part of the official record of the trial. The Court shall be provided with two copies of each exhibit proffered to a witness at trial for use at trial by the Court and clerk during the examination of the pertinent witnesses and thereafter."

I think that procedure is a little less cumbersome than the one that was in our initial draft. Mr. Bergman?

MR. BERGMAN: Yes. Thank you. That's very good for us.

THE COURT: Mr. Roberson?

MR. ROBERSON: Perfectly acceptable.

THE COURT: Okay. Good. I think that is

Page 16

it.

One really quite detailed matter, and that is the question of exclusion of witnesses. Actually, I guess if one reads that rule closely, that should be done by the Court if the parties request it or if a party requests it. The Court's earlier draft assumed that the parties would request that. Is that a safe assumption or not?

MR. BERGMAN: I think it is a safe assumption, Your Honor.

MR. ROBERSON: Yes.

THE COURT: Thank you. All right. I think that covers the additions and revisions which the Court had in mind. What the Court intends to do is to now prepare a revised order governing these matters, and hopefully that will coincide with the discussion we've had this morning about changes to the draft which was circulated previously.

Now the Court also indicated in its order setting up this preliminary pretrial conference that it believed it would be useful to the Court if counsel were prepared to give an overview of his case, and the Court might take the liberty of posing questions during that presentation, with a view toward the Court getting a little better handle on exactly what issues

Page 17

are going to be tried in the trial on damages and also some sense of what the applicable legal theories are. The Court has read the expert witnesses' reports, that is, the report of Dr. Holland and the three reports of the Defendant's experts. A number of questions have arisen in the Court's mind as a result of that review, not the least of which is what sort of documentary support or related documents to the experts' testimony do the parties contemplate offering in evidence.

I could see a situation where the parties might be able to stipulate to a large body of the documents that the several experts rely upon and thereby avoid the necessity for, if the parties contemplated this, introducing in evidence a vast quantity of documents one by one, which it seems to me would be unduly time-consuming given the nature of what I think the issues are in the case.

So I would like the parties to think about that, but first I would be very interested in hearing an overview of the Plaintiff's case. Mr. Bergman, are you going to be the speaker in that regard?

MR. BERGMAN: Your Honor, with the Court's permission, Mr. Johnson will take the lead on that.

THE COURT: Fine. That's perfectly fine.

Page 18

Mr. Johnson, if you're ready, I would be happy to hear you.

MR. JOHNSON: Thank you, Your Honor. Good morning, and may it please the Court. As the Court is aware, the Plaintiffs in this action are Dr. Homer Holland, a distinguished veteran, one of the original Plaintiffs in this case, an experienced and successful banker and investor. Dr. Holland is here because he is an original Plaintiff in the case, not because he stands to recover directly on his claims. The Court, as you know, has ruled that First Bank is the Plaintiff that stands to recover a judgment in the action here.

Another Plaintiff is, as the Court recounted in its introduction, Steven Bangert as the co-executor of the Estate of Howard Ross. Of course, Mr. Ross passed away recently. He was also an original Plaintiff, contract party, as was Dr. Holland. That's why his estate is present as a Plaintiff in the case, and like Dr. Holland, he no longer stands to recover a judgment directly. First Bank is as successor to River Valley the Plaintiff presenting the claims here.

Mr. Ross is also a prominent and successful banker and businessman, or he was before he passed away, and also a distinguished veteran of the U.S.

Page 19

military.

Now Mr. Bangert appears before the Court largely in an administrative capacity, not his personal capacity. He is here as the executor of Mr. Ross's estate, but in another sense, Mr. Bangert's presence in the action is illustrative of the deep and significant relationships that these men formed and honed during their years running these institutions and how significant the River Valley experience was in the lives of these people and that bank.

First Bank, the third Plaintiff, stands before the Court as a plaintiff, but really only as a successor to River Valley. First Bank does not present any independent claim of its own. It does not claim it was independently harmed and does not stand to recover in its own right because First Bank acquired River Valley in 1994, years after the breach, in a transaction that's really remote from the breach and which under binding precedent therefore must not affect the damages calculations. The claims presented here, Your Honor, are those of River Valley, and they will be presented from River Valley's perspective.

Now I think it would be useful before we talk about what the theories are of the harm to spend a little time discussing how we got here, because much

Page 20

of that history is significant to a proper view of the damages claims and the extent of the harm the government's breach worked on River Valley.

I think the appropriate place to start is in the mid-1980s, some years before the acquisitions and some years before the breach, at Rockfall Savings and Loan Association in Illinois. This is an institution that Dr. Holland and Mr. Ross owned. Both participated actively in managing the institution, Dr. Holland probably more so than Mr. Ross, but Mr. Ross was important in many of the business activities.

Now the Court is aware that during this time period, the thrift industry was in crisis. Other thrifts around the country were hemorrhaging money, becoming insolvent, being seized by the government, being marketed as takeover candidates, not as acquirers. But that's not the Rockfalls story, Your Honor.

Rockfalls was growing, with solid and stable profits. In 1987, just before the events leading up to this case began to be set in motion, Rockfalls became really a pioneer in a mortgage-backed securities investment program, ramping up to a sizable portfolio, implementing sophisticated risk controls and doing it very successfully, Your Honor.

Page 21

Dr. Holland and Mr. Ross showed their skills. They grew that institution substantially, safely and profitably. They built a track record of profit and success that attracted the regulators' attention when it came time to dispose of other thrifts that had not met that standard of success.

So, in 1988, the regulators approached Rockfalls and its ownership to gauge their interest in acquiring many of the troubled thrifts in the same area. By mid-1988, in July, the regulators and Holland and Ross had come to an agreement that three institutions, Home, Mutual and Galva, would be combined in a supervisory-assisted merger to form what has been often called in the papers "the River Valley One institution."

The government promised substantial regulatory assistance in addition to a significant cash payment that while important to the ultimate success of the institution is not part of this case here because the cash of course was delivered and not revoked, whereas some of the other considerations were promised but delivered only temporarily.

We're talking about essentially three significant elements: an $8 million capital credit; $4.6 million of subordinated debentures that the

Page 22

government promised, although they were debt securities, to treat as capital for regulatory purposes; and in addition, in what I view as an expression of the government's confidence in River Valley, the Federal Savings and Loan Insurance Corporation desired not only to be the institution's regulator but also to be a part owner, to have a tangible economic stake in the success of the institution, the anticipated success, the planned success, the profits and growth of River Valley One.

The parties negotiated over the terms of FSLIC's purchase of securities in the institution and eventually reached an agreement whereby FSLIC would buy preferred shares in exchange for a payment of $5 million.

Now, of course, this was an economic transaction. This is something in addition to the cash assistance FSLIC paid. Unlike cash assistance, which came essentially with no strings attached, this was an exchange of economic equivalents. FSLIC was paying money to purchase securities just like any other investor would pay money to purchase shares in a company.

That's what the FSLIC did, and just like most investors, they were very careful about how they

Page 23

did it. They undertook a rigorous analysis to determine whether they were getting a good deal, whether they were paying the right price and decided that they were.

Now the Court has held that the $5 million that the FSLIC exchanged for the preferred shares was not guaranteed by contract to treat as regulatory capital. So what we're left with is $12.6 million of contractual capital, the capital credit portion of which would have amortized according to a linear, 25-year schedule.

At the close of the transaction, that promised contract capital accounted for more than two-thirds of River Valley's regulatory capital, and therefore, I think it's safe to say everyone involved in the transaction understood that the government's regulatory capital promises were indispensable to the future success of the institution.

Now also in July 1988, the regulators, having come to Rockfalls previously with an offer relating to Republic to gauge Rockfalls' interest in acquiring another troubled thrift, Republic Savings and Loan, the parties reached an agreement in July 1988 that in broad strokes was similar to the Home/Mutual/Galva deal. It involved a capital credit

Page 24

in the amount of $5 million. It involved a promise to treat subordinated debentures as regulatory capital in the amount of $2 million.

Unlike the Home/Mutual/Galva deal, the Republic deal also involved some supervisory goodwill that the government promised would be an element of the resulting institution's regulatory capital.

All told, and this would be a separate institution at the outset, the preexisting Rockfalls thrift would acquire Republic and continue to operate separately as what we call "River Valley Two."

At closing, the promised regulatory capital accounted for the majority of the institution's regulatory capital, and so, again, I think it's fair to say that all parties understood and intended the government's promises to be indispensable to the future viability, profitability and success of the resulting institution.

Now I think it's significant to note, Your Honor, that the regulators, having come to River Valley with proposals for these deals, must have understood that River Valley intended to grow in part by acquiring other institutions and in part by internal growth.

But if we want further assurance of that,

Page 25

Your Honor, the evidence will show that the regulators came back after the deal, came back to River Valley and said, hey, we've got another one, Peoria. Do you want this? Do you want to grow more? Do you want to do another acquisition? And River Valley said, yes, we'll do it. We'll work out a deal with you to make that happen.

So we've got a track record of success and growth by acquisition here, Your Honor. At all times, the plan was to grow, to grow profitably, to grow safely, to grow internally and to grow by acquiring other institutions.

Consistent with those plans and intentions, Your Honor, River Valley One and River Valley Two together did grow substantially, did earn sizable profits and did have a track record of success in the period before FIRREA.

So, all told, looking at Rockfalls and the River Valley institutions together, we've got a track record of some four years, three or four years, before the breach, substantial growth, substantial profits, substantial success, substantial acquisitions.

Now, in 1989, the government breached; took away the regulatory capital. It took it away entirely, all of it, for purposes of one of the three

Page 26

FIRREA capital standards, the tangible capital standard. It limited it severely for other purposes. The other two capital standards, as the Court may be aware, the core- and risk-based standards, some of the regulatory goodwill was permitted to remain on the books for a short time. This portion was a rapidly declining fraction, and so I think it's fair to say that the government's breach eliminated all of the promised regulatory capital for tangible purposes and limited it severely for other purposes.

This forced a sudden curtailment of River Valley's growth, a rapid and severe shrinkage of its asset-and-liability portfolio, with predictable results, Your Honor. It was difficult. It changed everyone's life at the institution. The evidence will show that this period was extraordinary turmoil, extraordinary difficulty for the institution. The breach really turned things upside down.

Notwithstanding that upheaval, Your Honor, River Valley managed to continue to operate profitably and successfully, to earn a modicum of success, much less than it should have, of course on a much smaller scale, much lower profits and a much less valuable institution. Those are the consequences of the

Page 27

breach.

Now River Valley continued to monitor the market for potential acquisitions, and in 1994, it identified a very attractive target, San Antonio Federal Savings Bank, a healthy institution in Texas that was in the hands of the Resolution Trust Corporation. It was in RTC hands not because it was a failed institution or had had significant regulatory problems or was considered a threat to the safety and soundness of the banking system but instead because it was a subsidiary of another institution that had had some troubles.

The RTC decided to separate the parent from the sub. The sub, SAFSB, San Antonio Federal Savings Bank, was healthy and in good shape, and that's the institution River Valley wanted to purchase.

Your Honor, the evidence will show that River Valley intended to purchase San Antonio, that River Valley attempted to purchase San Antonio and that but for the breach, River Valley would have had ample capital to purchase San Antonio on its own, without any outside financing, and that there would have been no regulatory impediment to that proposed and attempted acquisition.

I'm sorry, Your Honor. I'm informed I had a

Page 28

slip of the tongue about the date. I think the SAFSB acquisition took place in 1992, not 1994. I apologize for that mistake.

So because of the breach, Your Honor, however, River Valley could not and did not acquire San Antonio. The acquisition was thwarted by the breach. The evidence will show that it was breach-caused concerns that made it impossible for River Valley to get the financing required to do the acquisition internally.

As a result, San Antonio was acquired by a separate institution, a third party that is not a Plaintiff in this case, and that is therefore not relevant to the damages claims except insofar as it operated SAFSB as a separate, wholly owned institution that allowed us to now trace the actual, real profits, the cashflows in, the cashflows out, the resulting net economic effects of SAFSB's operations, operations that should have been within the River Valley structure but instead accrued to somebody else who is not a Plaintiff here. We can trace those essentially dollar for dollar for the entire period during which SAFSB should have been inside River Valley but was not.

So, Your Honor, that's the preamble. That's

Page 29

how we got here. That's the chronology.
The damages claims, Your Honor, are three. Before I enumerate them, let me say just a brief word about the governing law. Under Bluebonnet, Locke and a host of other decisions where the fact of damages is established, the Court's duty is to award a fair and reasonable estimate of the harm the plaintiff suffered. Damages must of course be reasonably certain, but mathematical precision is not required in this Court or in this case.
We present three theories. The first, lost profits relating to the thwarted SAFSB acquisition. That will be in the amount of approximately $45 million, Your Honor. As I said, these are actual traceable cashflows. These are the SAFSB profits that were diverted from River Valley to the nonparty acquirer of SAFSB.
These damages can be proven not just with reasonable certainty but probably with something as close to mathematical certainty as a lost-profits case could ever achieve. They are real cashflows, real world, traceable gains and losses.
Our second theory is the loss in economic value. That is, the breach caused diminution in the value of the River Valley institutions as of the time

Page 30

of the breach. That will be in the approximate amount of $21.8 million, and it's essentially determined by the government's own calculations, as I'll describe in a little bit, Your Honor.
The third theory we intend to present is cost of mitigation, reflecting River Valley's allocation of its retained earnings to do the job the contractual regulatory capital should have done but did not because the government took it away. It will be in the amount of approximately $20.9 million, and it applies the simple legal framework of all cost-of-replacement-capital decisions, such as Home Savings and LaSalle Talman.
All three, as I'll discuss in more detail in my remaining time, comfortably meet the standards of foreseeability, causation and reasonable certainty.
Your Honor, the SAFSB lost-profits claim will be presented largely through fact witnesses. There may be some expert testimony, but I think the significant numbers will come from fact witnesses, from evidentiary documents rather than computations and calculations presented by an expert.
As to foreseeability, Your Honor, the legal standard is that it must have been reasonably foreseeable at the time of the contract, that the type

Page 31

and magnitude of damages, not the particular transactions, not the exact amount of the loss, but the type and magnitude of the loss was reasonably foreseeable to the parties.
Here, Your Honor, the evidence will show that the government knew River Valley intended to grow by acquisition. Indeed, the government negotiated another deal, Peoria, with River Valley in the months after the River Valley One deal first closed. The government knew of the Rockfalls track record of growth and profitability. The government knew Holland and Ross's interest in acquiring other institutions. And, of course, the River Valley managers were constantly looking for acquisitions. That was the plan, Your Honor. That was the plan: to grow, succeed and profit, some internally, some by acquisition.
Now, as to causation, Your Honor, the evidence will show that but for the breach, as I described, River Valley could and would have acquired San Antonio, would have had the necessary capital. It wouldn't have needed to go to a third-party source of funds, as it did in the real world. So there is really no question that but for the breach, River Valley could have done it. The evidence will show

Page 32

River Valley would have done it.
Now why didn't River Valley do it in the real world? Well, the evidence will show through River Valley's side and perhaps from the American National Bank's side American National Bank looked at the consequences of the breach, looked at the regulatory attitude the breach thrusted upon River Valley and decided it couldn't make it happen that way. The acquisition had to go through another vehicle, and that's what it did. The profits that would have accrued to River Valley accrued to the other vehicle – the entity is called Western Capital Holdings – instead.
As to reasonable certainty, Your Honor, as I said, we're not looking at mere reasonable certainty here; we're looking at almost mathematical certainty. These are actual traceable profits from the very same investment that River Valley should have made. Somebody else got that opportunity. Somebody else got those profits. Under Neely and other similar decisions, that is more than reasonable certainty, more than adequate to support a lost-profits award.
Our second theory, Your Honor, is a diminution in the economic value of the River Valley institutions. This will be presented largely through

Page 33

Plaintiffs' expert, Dr. Neil Murphy, a distinguished professor of finance at Virginia Commonwealth. Now River Valley was privately held, and so we don't have some of the sources from which one could look at economic value for other institutions. It's not publicly traded, so you can't just look at stock trading price or market capitalization and do a simple event study the day before and the day after FIRREA or some other event that would be deemed to be significant to the breach.

That doesn't mean it's impossible to determine what River Valley's value was before and after, however. Dr. Murphy has done that. He has done it because, in substance, FSLIC did it. The government did it. They put a value on their ownership interest in River Valley One at the time of the acquisition, in 1988, before the breach, and the RTC put a value on that same preferred stock, that same ownership in River Valley One in 1991, after the breach.

Unsurprisingly, given the breach, the value in 1991 was less than the value in 1998, and in fact, although FSLIC had purchased the preferred interest for $5 million in 1988, it was willing to sell it back, the government was willing to have River Valley

Page 34

redeem it, for only $3.675 million in 1991. Now, in and of itself, that shows that the value of the institution declined because the value of a slice of its equity was worth less after than it was before.

So what Dr. Murphy's task is is to determine from that change what was the diminution in the value of the institution as a whole. I think the Court will appreciate hearing the details of those calculations from Dr. Murphy, and I'm certain that Dr. Murphy can explain it much more clearly and concisely than I could. But Dr. Murphy analyzed the structure of the FSLIC preferred security, which has essentially two features. It has a bond-like feature, and it has an equity-like feature.

By applying well-accepted, reliable and frankly simple financial principles and equations to the two pieces of the FSLIC preferred security, Dr. Murphy was able to determine that based on the parameters the FSLIC used in determining the value it would pay for this security in 1988, the value of the entire River Valley institution was $22.7 million in 1988.

Based on the parameters the RTC applied in evaluating the economics of the proposed redemption transaction in 1991, the value of River Valley One in

Page 35

its entirety was only $7.9 million at that time. Doing a simple subtraction, Dr. Murphy determined that there was a loss of the difference, $14.8 million, between the 1988 sale and 1991 redemption.

Your Honor, that's River Valley One. FSLIC had an ownership interest in River Valley One, did not have an ownership interest in River Valley Two. So, in order to determine the extent of the total loss to the entire River Valley enterprise, Dr. Murphy looked at the change in the economic value of River Valley One, the $14.8 million loss that I just described, and said, okay, how much regulatory capital was lost that resulted in the diminution? He simply figured out what the effect was per dollar of regulatory capital eliminated by the breach.

He then looked at River Valley Two, the Rockfalls institution that had acquired Republic, and applied the same ratio. The institutions were similarly managed, common ownership, and so he felt that that was financially reliable. We think that's well within the ambit of the reasonable certainty standard. In applying that ratio, Dr. Murphy determined that the value of River Valley Two was diminished by about $7 million.

Now the Court may wonder, what's the effect

Page 36

of the loss of the $5 million in FSLIC preferred? Shouldn't that affect the calculation somehow? Isn't that part of what contributed to the $14.8 million decline in the value of River Valley One?

Your Honor, the answer is perhaps, but the standard here is substantial factor. Was the breach a substantial factor in causing the entire $14.8 million loss? Yes, it was a substantial factor because the breach eliminated much more regulatory capital than the loss of the FSLIC preferred.

If the Court were to disagree and apply a different standard, surely the breach was the but-for cause of the economic loss associated with the contractual regulatory capital, and Dr. Murphy will be prepared to do a ratable adjustment that would have a small but material effect on the bottom line.

We're not talking about changing the total economic loss from around $20 million to five. This may reduce it a million or two, but really, Your Honor, the broader point is a substantial factor is the governing causation standard. The breach was a substantial factor in causing the entire economic loss.

Finally, Your Honor, the cost of mitigation analysis. Plaintiffs will present this analysis

Page 37

largely through the expert testimony of Homer Holland, supported of course by factual evidence largely in the form of documents, as the Court's earlier comments anticipated.

What's the basis for the claim? After the breach left a hole in the River Valley balance sheet where the contractual capital used to be, something filled the hole. It didn't leave a vacuum. Something came in to take the place of the contractual capital, to do the job the contract capital should have done: supporting a portion of the River Valley balance sheet.

River Valley used its own retained earnings, its own internal capital, to do that job. So since the retained earnings had to be allocated to do the job the contractual capital would have done, they couldn't do the job the retained earnings would have done had there been no breach. So it's an allocation of retained earnings to do a job the contractual capital should have done.

Your Honor, the governing principle here is one that's really not legitimately in dispute any longer. It's that all capital has a cost, and retained earnings are a form of capital that comes with a cost. The capital is not free.

Page 38

So to compute the cost of mitigation, we really only need to determine two things: the amount of replacement capital, how much retained earnings was serving this function of replacement for each period, and how much did the retained earnings cost for each period.

Now I should note that the mitigation, because of the extent of the breach, because of the sheer amount of regulatory capital the breach eliminated, the mitigation was not complete. It was not immediate.

It took River Valley some period of years to build up sufficient retained earnings to fully replace the regulatory capital that the breach eliminated, and, of course, but for the breach, it should have had both the contract capital and the earnings it retained so it could choose whether to use those retained earnings to support even more growth, even more profit, or to pay them out as dividends if that's what River Valley determined the highest and best use of its retained earnings would have been.

But, of course, because of the breach, River Valley didn't get to make that choice. They had to use their increasing retained earnings to do the job the contract capital should have done.

Page 39

Because it took some time to fully replace, the mitigation was not complete, and this is really, Your Honor, frankly, an incomplete and viewed in and of itself an inadequate remedy for River Valley. Just by definition, because it took some time to fill the hole, there are periods where River Valley will recover nothing on this theory for a portion of the regulatory capital that the breach eliminated.

Now how did Dr. Holland perform these calculations? Well, as I said, he applied the simple framework that's been accepted a number of times: Simply determine the amount of replacement capital in the institution. To do that, he took the lesser of either the amount of contract capital that should have been available in each period or the accumulated retained earnings. He was taking the lesser. That's what leaves the gap we just talked about. He did that because it wouldn't be appropriate to do a costing on mitigation that River Valley was unable to do because it hadn't had the opportunity to build its retained earnings to that level yet.

There is a refinement to that determination of what we might call the "base" for the calculation, the amount of replacement capital, that results from the fact that FIRREA eliminated some regulatory

Page 40

capital that was not covered by a contractual guarantee. Dr. Holland accounted for that appropriately. He takes the retained earnings and he ratably allocates them to all of the eliminated regulatory capital, but he only figures the cost on the retained earnings that he allocates to the breached capital. So that's how he gets his base.

How does he determine the net cost of the retained earnings that functioned to replace the contract capital for each period? Well, as in the standard replacement-cost models, it's a spread between the cost of the capital and the return on the tangible, investible funds represented by the retained earnings. There needs to be a difference because much of the contract capital was intangible, not directly investible, whereas the retained earnings are cash that can be invested to earn a return.

Dr. Holland figures the spread using the government's determination of the cost of River Valley's capital in 1991. Postbreach cost of capital, what did the RTC's analysis show River Valley's cost of equity capital to have been after the breach? Dr. Holland looks at Dr. Murphy's analysis, endorses it and agrees that the RTC's valuation shows that River Valley's cost of equity capital in 1991 was at least

Page 41

20 percent.
Dr. Holland draws on his experience as an investor. He says, is that reasonable? Is that really what the required rate of return would be for an institution like this over the '90s? He says, yes, in his experience, that's really a lower bound. He thinks required rates of return of 25 to 30 percent would be more reasonable. So this calculation in Dr. Holland's view is conservative.
THE COURT: Does this mean that Dr. Holland's view is that the replacement capital would have had to have a yield of 20 percent or pay a dividend of 20 percent?
MR. JOHNSON: No, Your Honor.
THE COURT: Okay. The 20 percent then is of what?
MR. JOHNSON: The 20 percent is the required rate of return for the investment. It's what the capital costs the institution.
There are two ways one can look at returns on a stock. One can look prospectively when making the investment: What do I need to get out of this in order to justify the funds I'm putting in? Dr. Holland says, well, if you look at what the government was willing to take to have its investment redeemed,

Page 42

the government must have thought 20 percent was the right amount, and he says, based on what I know about the institution and my experience investing in banks over decades, that seems, if anything, conservative to me.
One can also look retrospectively if one wants a confirmatory view and say, what returns did the investor get over a period? And Dr. Thacker, one of the government's experts, has done that calculation for us, and he says, over the period of time Dr. Holland had an investment in River Valley, he got actual economic returns of almost 30 percent -- I think the number is 29.5 or 29.7 -- and that encompasses dividends and appreciation in the share price, but that's what the economic return to the investor is. That's what the cost of the institution's capital is.
Now the government does make the argument that, no, no, no, you can't look at the 20 percent; you can only look at the actual dividends paid. There are several reasons why that's not correct, and I think the Court would probably benefit from hearing many of them from Dr. Holland, but in brief, this isn't an institution, River Valley, that could just pay dividends whenever and in whatever amount it

Page 43

wanted. There were significant restrictions, both contractual and regulatory, on River Valley's ability to pay dividends.
Second of all, during the early periods, River Valley was attempting to replace the contractual regulatory capital, paying dividends, which would have the effect of increasing the cost of mitigation because we're actually paying more dividends. If the cost of the capital is based on the payment of dividends, then paying an additional dividend is going to increase the cost.
So paying dividends which would increase the cost of the mitigation would make the mitigation less complete and less successful. So it had the factual effect, Your Honor, the need to replace the capital had the factual effect of inhibiting dividends, and it has the financial effect of demonstrating why it just can't be that the only cost is the cost of actual cash disbursements, because if River Valley had done it as the government suggests maybe it should have, if the government had done that, it would be recovering a greater amount of damages for less successful mitigation, and, Your Honor, that makes no sense.
THE COURT: Does Dr. Holland cover this aspect in some earlier report as distinct from the

Page 44

most recent one which was furnished to chambers?
MR. JOHNSON: No, Your Honor, and this is really in part a reaction to the government's recent expert reports where they make this argument against Dr. Holland's analysis.
THE COURT: So this is in essence a summary of Dr. Holland's anticipated rebuttal of the government's, what shall we say, critique of his analysis.
MR. JOHNSON: Yes, Your Honor. Also, it's frankly a summary of what we expect to address in part in our examination of the government's experts. So that's where the 20 percent comes from and why it's valid. The offset rate I think is much more familiar. It's the safe rate on Treasury securities which has been accepted in other cases that have been affirmed by the Federal Circuit.
Now the mitigation analysis, although it's not really a benefit of the bargain-type expectancy theory, it does need to meet the foreseeability, causation and reasonable certainty standards, and I think the Court is sufficiently familiar with the nature of the computations that we don't need to spend a lot of time on that.
But as to foreseeability, it's really a

Page 45

simple cover theory. It's essentially always foreseeable that when a breach causes a failure to deliver goods or service, the breached-against party is likely to go out and attempt to procure a substitute. That's what happened here.

Causation, Your Honor, it's really very simple. The breach left a hole in the regulatory capital account. Something had to fill that space. The retained earnings are what ended up actually doing the job that the contractually promised regulatory capital should have done, and that is but-for causation. It's direct. It's irrefutable. It's just simple logic. The job needed to be done. The retained earnings are what stepped in to do the job.

As to reasonable certainty, Your Honor, it's a straightforward calculation. It adopts a parameter that the government endorsed in its 1991 analysis, and other than that, it's just a straightforward application of the standard cost-of-replacement-capital analysis.

Now we've got three separate theories of damages, and I should address how they relate to each other. Dr. Murphy's lost-value analysis is a time-of-breach analysis, and it seeks to establish an estimate, probably a conservative estimate, of the

Page 46

total effect of the breach as of that date, and so that is a free-standing damages analysis that could not appropriately be combined with either of the other two.

Your Honor, but for the breach, River Valley would not have incurred the cost of mitigation, and it would have acquired SAFSB. So those two elements of damage complement each other, and Plaintiff should be entitled to and is entitled to recover both.

THE COURT: Is it the Plaintiffs' contention that it's entitled to recover all three?

MR. JOHNSON: No, Your Honor. Dr. Murphy's lost-value analysis is in the alternative to either or both of the other two.

THE COURT: Okay.

MR. JOHNSON: The SAFSB lost profits and the cost of mitigation are conceptually additive to each other.

THE COURT: Okay.

MR. JOHNSON: Your Honor, I thank the Court for its attention. If you have additional questions, I would be happy to answer them. Otherwise, I think I've said what I think needs to be said.

THE COURT: I think it's been very helpful to the Court, and I appreciate your presentation. And

Page 47

let's hear from Mr. Roberson.

MR. JOHNSON: Thank you.

THE COURT: Thank you.

(Pause.)

MR. ROBERSON: May it please the Court, Your Honor, I want to start just briefly by discussing some facts that are important to consider here.

The first thing is that the stance of the Plaintiffs here is a little bit atypical from a typical Winstar plaintiff. With the typical Winstar plaintiff, there is a breach, there is a significant loss of capital where suddenly the institution has failed their capital requirements or is required to enter into a capital plan, something to meet the FIRREA capital standards.

Here, the River Valley thrifts were never capital-deficient related to FIRREA. They had no need to shed assets when FIRREA was passed because the thrift met all of FIRREA's capital levels. It's Joint Stipulated Fact 241.192. So this is not a case where FIRREA was passed and the thrift had insufficient capital and was required to produce and follow a capital plan.

This corresponds with Plaintiffs' assertion that the purported damaging effect of FIRREA did not

Page 48

occur with the passage of FIRREA or the publication of regulations implementing FIRREA. Indeed, Plaintiffs claim no effect until mid-1990 or later, but what they have done is obfuscate the fact that the regulatory concern with the thrift was not with respect to its ability to meet FIRREA capital levels.

THE COURT: Is it the Plaintiffs' contention, though, that even assuming it was in compliance with the FIRREA capital requirements after the enactment of FIRREA that it customarily had more capital than was required by the applicable regulations, and therefore, to that extent, it was damaged and was entitled to replace the thereafter missing capital?

MR. ROBERSON: If you're talking about a capital cushion, like a --

THE COURT: Yes, exactly.

MR. ROBERSON: -- capital cushion, I haven't seen an express representation. What I do know is -- a damaging effect in that regard. I don't think they calculated their damages that way at all.

What I have seen is that Dr. Holland has stated what his preference was with respect to a capital cushion, and what you're going to see is what happens is the regulatory effect is that they are

Page 49

required to have capital far above that, but it's not because of FIRREA; it's because of their mortgage-backed-security derivative problems.

So what we have here is almost a year after FIRREA has passed, for instance, in July of 1990, the River Valley thrifts were still projecting significant growth over the next five years, and that's at Joint Stipulated Fact 209.

So, instead of being related to FIRREA, where the capital criticisms of the River Valley thrifts arose, they arose in connection with the FDIC's concerns relating to the investments in mortgage-backed-security derivatives. The adverse classifications of the River Valley thrifts' assets doubled between June of 1989 and August of 1990.

THE COURT: But did the passage of FIRREA then throw them out of compliance with the standards to which you are alluding that are related to the mortgage-backed securities?

MR. ROBERSON: No, Your Honor. For this case specific, an individual capital requirement created by the FDIC specifically related to this case that was crafted specifically because of their involvement in risky, mortgage-backed-security derivatives.

Page 50

As Your Honor may understand, mortgage-backed securities, that's one thing, but when you get derivatives, you're chopping and slicing different tranches or risk, and what the FDIC did was they classified, when you were getting involved in those kinds of investments, the FDIC looked upon those negatively, always did, and was following FDIC policy, and they said, that is improper. We want you to get out of that, and because they are so risky, we want you to have up to a 5 percent tangible capital level. So the problems that they had with regulators were with respect to their involvement in risky, mortgage-backed-security derivatives.

Now, if you look at the classifications that you see where suddenly they have these huge increases in classifications, the majority of these were the mortgage-backed-security derivatives. To the degree that the classifications totaled 410 percent of tangible capital, an increase to that level by August of 1990, and for River Valley Two, the classifications totaled 342 percent of tangible capital, when you have that kind of level of classifications far exceeding tangible capital levels, basically what the regulators are looking at is that you are putting your entire institution at risk, because if you have 400 percent

Page 51

classified, if even a portion of that fails, if a portion of those classifications fail, your institution is going to be underwater.

So, as a result of the massive increase in classified assets, the FDIC required the thrift to increase its tangible capital levels. So they entered into a supervisory agreement with the regulators in 1991, and this called for, like I said, tangible capital of 5 percent. It stepped up from 4 percent to 5 percent, well above FIRREA's limits, and it was because of the supervisory agreement that River Valley was required to maintain regulatory capital relative to FIRREA. That's Joint Stipulated Fact 290.

The FDIC focused upon tangible capital both before and after FIRREA and its oversight of depository institutions. Why? To protect the insurance fund. That's the only thing that's going to protect the insurance fund is tangible capital. So we're going to have testimony from the FDIC witnesses who will explain the importance to the insurer of tangible capital.

Now the supervisory agreements calling for a reduction in the mortgage-backed-security derivative portfolio were driven by the FDIC's criticisms of the derivative instruments. There was a significant

Page 52

difference between the FDIC and the OTS on how to view River Valley's derivative portfolio, the FDIC holding that derivative must be classified and the OTS finding that derivatives need not necessarily be classified.

So what happens is they finally reduced their level of derivatives by 1993, and in August of 1993, the supervisory agreement was terminated because they had finally reduced their level of mortgage-backed-security derivatives.

Now I want to discuss for a moment the significance of the fact that River Valley's regulatory concerns were primarily in relation to the FDIC and the FDIC's criticisms of River Valley's mortgage-backed-security derivatives.

This Court has found that the Plaintiffs effected complete settlement with the FDIC with the August 1991 settlement agreement and that the settlement agreement did not affect the liability of the OTS. While we respectfully disagree with that decision, it does require that we parse the effects upon the River Valley thrifts for which Plaintiffs claim damages between those caused by the FDIC and those caused by the OTS.

There can be no damages where, for instance, regulatory capital levels are demanded by the FDIC

Page 53

above the levels provided in the assistance agreements, as any and all claims relating to the assistance agreements, including the right to include goodwill toward regulatory capital levels, are barred.

The differences between the OTS and the FDIC's oversight were significant, and you can see this by following the composite MACRO ratings given by the OTS versus the FDIC. I know you've had a few Winstar trials, and I'm assuming you recall what the MACRO rating and CAMEL ratings are.

THE COURT: Right. I don't think we need to go into that.

MR. ROBERSON: Okay. So between 1990 and 1993, the OTS rated the River Valley thrifts as either a two or a three, with one brief exception of literally just a couple of months. The FDIC, however, rated the thrifts as a three or four in 1990 and a four in 1991, 1992 and in 1993.

Another way to view the difference between the OTS and the FDIC is to look at the levels of classifications found by each agency. In October of 1991, for example, the FDIC classified $48 million of assets, representing at that time 211 percent of tangible capital, while the OTS only classified $8 million or 37 percent of tangible capital.

Page 54

THE COURT: Could you explain to me again why it is we care about the breakdown between the FDIC and OTS?

MR. ROBERSON: Because the regulatory effect of this institution in the post-FIRREA period, the regulatory criticisms were not in relation to FIRREA; they were in relationship to the lack of tangible capital relative to mortgage-backed-security derivatives.

What that means is that any restriction on activities caused by the mortgage-backed-security derivatives and the lack of tangible capital in relation to that is seen by the FDIC. Then we have the settlement agreement with the FDIC where those effects cannot be the source of a complaint in the Court given that there has been a settlement with all effects with respect to the assistance agreements, which would be the FIRREA tangible capital levels.

Now I'll turn to a discussion of the damage theories that are currently in play in this case, and let me begin, however, by describing my understanding of potential damage theories that are not in play and will not be part of trial or any posttrial briefing.

The first thing of course is we understand that lost profits based on lost leverage relating to

Page 55

foregone growth or a steady-state thrift is off the table. I'm referring to Dr. Holland's incremental growth claim set forth in his 2001, 2003 and 2005 expert reports. As you may recall, Your Honor, the Plaintiffs said that if they were given permission to present a retained-earnings theory, they would abandon those claims.

So that's our understanding. We need to have this absolutely certain now that that is indeed the case. It was in their pleadings. I know Mr. Bergman said it repeatedly during our hearing some time ago, but I just need to make it absolutely certain we're not going to see that because if we're going to have that, we need to prepare for it right now. But I do think it would be entirely improper given the representations.

The second thing is it's my understanding that there is no tax gross-up claim. Plaintiff had earlier indicated that it might bring such a claim connected with its retained earnings theory, but no report or analysis was provided concerning any such claim. And when we asked Dr. Hall during his deposition if he was aware of any such claim, Plaintiffs' counsel said that we were asking questions about a dog that didn't bark.

Page 56

Just a moment ago, of course, Plaintiffs made no mention of a tax gross-up claim. So, again, if there is a claim, we want to be able to respond to it with an expert opinion. If there isn't a claim, so be it. But what we don't want to see is a tax gross-up claim get added in the posttrial briefing by argument of counsel when we have expert opinion that can respond to it.

Dr. Griffin, as you know, is our tax expert in this case, and he has opined on tax gross-up matters in other cases, so we couldn't issue an opinion with respect to a tax gross-up claim that hasn't been made. It's our understanding that there is no tax gross-up claim, but I want to make sure that the Court understands that that's the case so that we are all on the same page.

Now I just want to hand out a couple of charts showing what our understanding is of the claims the Plaintiffs have and have not abandoned and our understanding of Plaintiffs' current claims. I'm going to have probably a quick addition to this because from what Mr. Johnson said, we may have to clarify and maybe eliminate some more of the current claims. So if Your Honor would permit, I'll approach and distribute a couple of slides that simply indicate

Page 57

our understanding of where we are in this case.

THE COURT: You may do so, Mr. Roberson. Mr. Roberson, do you have one additional copy by chance?

MR. ROBERSON: Certainly.

THE COURT: Why don't we give the court reporter a set as well. And these are labeled at the bottom II-1 and II-2, is that correct?

MR. ROBERSON: Yes, Your Honor.

THE COURT: Okay.

MR. ROBERSON: So, if you look at II-1, what you see is the claims that we understand the Plaintiffs have abandoned. Originally, they had a series of claims with lost profits, lost value, cost of replacement capital and restitution. My understanding is all those have now been eliminated. Then we go to December '03 when Dr. Holland issued a new expert report, and we see that the Plaintiffs have now abandoned all those. That's the full growth and the steady state lost leverage claims. And again, Dr. Murphy had an adjustment with respect to lost value that was originally $21 million. My understanding is that that's been adjusted, and we'll talk about that in just a moment. Then we go to February 2005 when Dr. Holland

Page 58

issued his second supplemental report, and here we had a full growth and a steady state lost leverage claim. And again, the growth versus shrinkage part of that has been abandoned is our understanding. The residual capital claim, which was what they claim First Bank would have paid for the River Valley residual goodwill, has been abandoned. The net operating loss claim has been abandoned. That would have been what they claimed First Bank would have paid for River Valley's net operating loss carryforwards. So our understanding is the only thing that was left from that particular iteration of Dr. Holland's expert reports is the $28.61 million SAFSB acquisition. So we have the SAFSB acquisition there and then we have three other SAFSB acquisitions underneath that. And I think I'll just address the SAFSB just generally right now. I'm going to come to it in a lot more detail in a moment, but Mr. Johnson just referred to the SAFSB claim and referred really only to one figure, which is a $45 million figure. And actually there have been four different damage theories that Plaintiffs have set forth with regard to SAFSB. So we're uncertain now. I assumed going into this hearing that they were going to be asserting four possible theories with regard to SAFSB.

Page 59

What I'm hearing now is that they're really only going to assert one possible theory, which is the $45 million claim, which you can see in September 5 was not made by an expert, wasn't made by Dr. Holland but instead was made by Plaintiffs' counsel. As you recall, Your Honor, in the summary judgment briefing on damages, we moved to strike those theories because of just that fact. They were made by Plaintiffs' counsel and they weren't made by an expert, and there has been no expert testimony from the Plaintiffs. But what we did was we moved to strike, saying that's improper under the rules. Rule 26 requires and the rules of the Winstar cases require that expert reports be issued with respect to any expert theory that's going to be presented at trial. That's not the case with regard to the $45 million claim. Dr. Holland never made a $45 million claim. It's never been presented in an expert report. Instead, it was only by argument of counsel. What we did was we responded to it, as you may recall, with declarations in our response to the summary judgment briefing where we first moved to strike the theories made by argument of counsel because they were improper under the rules, but

Page 60

secondly, if they were going to be admitted, we needed to be able to respond to it because we weren't going to argue by counsel to respond to an expert theory made by counsel. It's totally improper. So I think that's one thing we should try to clear up where we are right now, because I'm personally a little confused. We do need to prepare for trial and we need to discuss that. I'm going to discuss that in a little bit more detail in a moment, Your Honor. The other thing is we have the –

THE COURT: Can I just for a minute pause on that?

MR. ROBERSON: Sure.

THE COURT: Let us assume that the Plaintiff, consistent with Mr. Johnson's statement, is seeking to recover with respect to the SAFSB acquisition the $45 million figure approximately to which you alluded. What is the government's basic defense to that claim?

MR. ROBERSON: Well, Your Honor, there's a whole slew of issues with it, and it goes into the substance of the SAFSB claim entirely. Now I can go into that right now if you wanted to. I wanted to wait just a few more minutes to clear up these things.

Page 61

THE COURT: You mean you're going to get to that I assume?

MR. ROBERSON: Yes, I'm going to discuss the substance of it. Because there are different kinds of claims with regard to the SAFSB, there are some arguments of course we have specific for the $45 million claim and then there are some that are specific for the other variations. I can give you the short answer on the large part of it.

THE COURT: Why don't we put the other variations aside for the moment and focus on the theory which Mr. Johnson spelled out in his remarks.

MR. ROBERSON: Then if you'd just give me a moment, Your Honor?

THE COURT: Sure.

MR. ROBERSON: And the one thing I wanted to just finish up on my thoughts before I move on, on the issue of the damage theory being presented without an expert opinion on it. What I heard Mr. Johnson say was that there may be some expert testimony concerning the $45 million SAFSB claim. Your Honor, that's totally improper. There's been no expert report with respect to the $45 million SAFSB claim. So that is entirely improper. Dr. Holland cannot come to this Court and now opine on the $45 million SAFSB claim.

Page 62

He never opined on it in any of his expert reports.

THE COURT: Let's assume for the sake of argument that the SAFSB claim is presented through nonexpert testimony, through fact witnesses.

MR. ROBERSON: Right. Returning to the substance of the SAFSB claim, I think the first thing to do is to step back for a moment and take a look at the facts of the SAFSB claim.

In late 1991, Dr. Holland was approached by a man by the name of John Rose, who had connections with the RTC's sale of assets down in Texas, and he approached Dr. Holland with the SAFSB opportunity, saying, I will give you this opportunity, you give me 10 percent of the opportunity and you can do it through River Valley or I assume however you want to structure the deal. It's basically a finder's fee and opportunity.

So what happened was Holland and Ross approached American National Bank about borrowing funds in order to acquire SAFSB through River Valley. However, American National Bank, or ANB, was unwilling to do that because of the cross guarantee provisions of FIRREA. Your Honor, the cross guarantee provisions of FIRREA are noncontractual. There's not a breaching provision.

Page 63

What those provisions were were that with FIRREA, institutions that were related institutions where, for instance, a subsidiary might fail, the holding or related institution had financial obligations with respect to the failed thrift if it was within the failing. What that meant as far as lenders were concerned was that their potential liabilities with respect to a loan became much greater, because if they loaned to –

THE COURT: So is this essentially an argument that ANB declined to finance the acquisition for reasons that have nothing to do with the breach?

MR. ROBERSON: That's exactly what that argument is.

THE COURT: Okay.

MR. ROBERSON: And so then what happens is to facilitate the acquisition, Dr. Holland and Mr. Ross created Western Capital Holdings, Inc., WCHI. And the ownership was Mr. Ross, 30 percent, Mr. Holland, 30 percent. Mr. Bangert, who you may know I think he became CEO of River Valley Thrifts. He certainly was the main hands-on individual running the River Valley Thrifts. And then Mr. Rose with 10 percent and then Mr. Pikus, who was also a River Valley employee at a upper level at 5 percent. So the

Page 64

notion that this is an unrelated institution is of course just incorrect.

Now ANB required the payoff of River Valley Holdings loans before it would lend to Western Capital Holdings. So what happens is River Valley shrinks the institution by $110 million from September of 1991 through June of 1992, and it pays a $6 million dividend to River Valley Holdings so that River Valley Holdings could then pay down its $7 million loan from ANB to $1 million. So what happens is ANB then provides WCHI with a $10 million loan to finance the purchase of SAFSB.

So, as we argued, I think it's just a matter of law, Your Honor. There was mitigation. River Valley, even assuming that it lost the opportunity due to FIRREA, it mitigated. And how did it mitigate? It mitigated by handing the corporate opportunity that was given to it to a related institution whose shareholders were its own shareholders for the most part, and it permitted that corporate opportunity to be handed off.

And not only did it permit it to be handed off, Your Honor, it facilitated by shrinking itself and upstreaming the income. So, under the notion of mitigation, where you receive a benefit, there was no

Page 65

lost opportunity. The SAFSB opportunity simply was not lost. River Valley mitigated any perceived effect of the breach by facilitating the consummation of the SAFSB deal by River Valley's own shareholders.

Secondly, River Valley facilitated the deal by paying off the ANB loan to River Valley Holdings so that ANB would loan the funds to WCHI. And it facilitated by passing the corporate opportunity to its shareholders. The benefit of the SAFSB deal, whatever profits actually obtained, this would be in this instance the $45 million that they're claiming, went to River Valley shareholders as WCHI shareholders, and this torrent of events was facilitated by River Valley.

As we argued in our summary judgment brief, Your Honor, the mitigation ended any effect of damages. You can't just simply create a separate institution and say, oh, by the way, that institution is totally separate and we didn't have anything to do with it even though we facilitated the whole deal going to the other institution. That's just simply incorrect as a matter of law. There was mitigation.

THE COURT: What if the River Valley entity had facilitated the acquisition by say General Motors? What would the government's position be then?

Page 66

MR. ROBERSON: Well, in other words, I think the distinction you're drawing is General Motors is owned by different sets of shareholders, and I think that the notion might be a little bit different, but the notion would be if they got consideration from General Motors from that, that benefit would certainly be part of the consideration in that situation, right.

And here, we don't even have to go there because the benefit was -- River Valley's own shareholders are making the decision, by the way. It's Homer Holland and Howard Ross are making the decision that River Valley will mitigate by giving the opportunity to Homer, Holland, and Howard Ross as 60 percent owners of WCHI. So this instance is different. But I think in the example you gave, Your Honor, I think there would be something you would have to consider as a benefit there even if it went to General Motors. None of that's considered here.

The other thing is to think about with the SAFSB claim just as a matter of law that there is double recovery being sought here. Dr. Holland has admitted in deposition that if any recovery is obtained as part of the SAFSB deal, he would obtain a double recovery.

And, Your Honor, it's a question I asked Dr.

Page 67

Holland, and, of course, you understand why, Your Honor. The notion is is that sure, First Bank is the nominal Plaintiff in this case. But as you know from our past experience in this case, there was a contract between First Bank and Homer Holland and Howard Ross where any recovery from First Bank would be provided to Holland and Ross. So, with that background, I asked Dr. Holland the following:

"Q Sir, if the Court were to award Plaintiffs the amount of claimed damages relating to SAFSB, you and Mr. Ross would have been compensated for the alleged value of SAFSB twice, isn't that correct?

"A In part, that's correct.

"Q And when you say 'in part,' what do you mean?

"A In that Mr. Ross and I did not own SAFSB in total. As you mentioned, we owned 60 percent of SAFSB, and the reason that I in my first report only attributed to Ross and Holland the damages associated with the taxes is because Ross and Holland, together with the minority shareholders of SAFSB, really obtained the full -- obtained the economic benefit."

So he's admitted that Holland and Ross obtained the full $45 million or whatever it is, and he admits that it's only in part. And when he says

Page 68

it's only in part, what he means is he actually would get more than double recovery, because he would get not 60 percent of the earnings from WCHI, he'd get the 100 percent. So it's even more than a double recovery.

And, Your Honor, this is a matter of common sense. There is no corporate structure, no lawyer's sleight of hand that can permit a plaintiff in this Court to get a double recovery, stand in front of this Court and ask of the United States to give him profits that he's already obtained. Just as a matter of common sense, it absolutely can't be.

As a matter of law, too. And I think if you look at it as a matter of law, you look at the mitigation. You have to go to the mitigation to understand what really happened here. The corporate opportunity was handed off.

I honestly don't think that we should have a trial with respect to the SAFSB claim, because again, I think that if there's a focus on what happened in this deal, it can't be a claim for the SAFSB deal. They've already got the damages. They've already got the lost profits. And they admit it. It would just be astonishing honestly if Holland was able to stand up and say, I earned $45 million from WCHI, and, Your

Page 69

Honor, the United States should give me $45 million in effect.

THE COURT: I think I understand the argument with respect to SAFSB.

MR. ROBERSON: Okay. I'm sorry, Your Honor.

THE COURT: No, no. And that's one of three damage theories that the Plaintiff is going to pursue. Can we talk about the second?

MR. ROBERSON: Sure, Your Honor. I'm shifting my outline, so if you could give me a moment. What I'll do next is talk about the diminution in value of Dr. Murphy.

THE COURT: Yes. Okay.

MR. ROBERSON: What we have here is, as you can see, and if you just refer back to the charts that I gave you, I and II, we did run across a difference, and I'm assuming that maybe Plaintiffs just misspoke or couldn't remember what the representations have been in the past. And as you can see, what we have is a $17.46 million figure for the current diminution in value claim.

THE COURT: Yes. That's on II-2.

MR. ROBERSON: Yes. It's also in II-1 too, Your Honor.

THE COURT: Show me where it is on II-1.

Page 70

MR. ROBERSON: II-1, it's on the bottom of the page. If you see under lost value the yellow figure.

THE COURT: I see. Okay.

MR. ROBERSON: And what happened was, it was $20.9 million and then they adjusted with the December 2003 change where they were taking out the Peoria part of it. And now, with the Court's ruling on damages that the preferred stock was not contractual, they indicated specifically a $17.461 million figure with respect to what Dr. Murphy, his current opinion is. That's why I was surprised when Mr. Johnson was talking and he said that the claim was for $21 million and that, otherwise, if there was some other decision with regard to substantial causation that the figure might be reduced by 1 or 2 million dollars. Your Honor, that flatly contradicts the filings of Plaintiffs on – let me just give you the date, Your Honor – March 20, 2007, in Plaintiff's motion for leave to revise and supplement their damage claims. At page 2 to 3, the Plaintiffs state the following: "Thus the loss of the $5 million of FSLIC preferred stock disqualified by the government for use as capital at River Valley I cannot form the basis for a damage claim. Accordingly, Plaintiffs will revise

Page 71

their lost equity value damages claim to seek only the $10.4 million or 70.365 percent of the $14.7 million decline attributed to Defendant's breach as the Court has determined." That's on page 2.

Then if you look on page 3, it says, "In sum, Plaintiffs intend to claim $17.461 million in connection with their lost value claim rather than the $21.846 million claim set forth in Dr. Murphy's expert report and in Plaintiffs' motion for partial summary judgment."

THE COURT: Okay. I understand that, and that goes to the magnitude of the diminution in value claim.

MR. ROBERSON: Right.

THE COURT: Let's assume that we settle the matter of magnitude. What would be the government's defense on the merits of that claim?

MR. ROBERSON: And before I move on, are we going to decide that today, or is that something that we're going to decide at trial?

THE COURT: I don't think we're going to decide it today. So why don't we talk about what the response would be on that.

MR. ROBERSON: Okay. All right. Just give me a moment, Your Honor, to find my place in my

Page 72

outline. With respect to Dr. Murphy's claim of diminished economic value, our first response is that there's a lack of causation. Contrary to Plaintiff's claim, there was no diminished economic value for the River Valley Thrifts between 1988 and March of 1991.

THE COURT: Is that an argument of causation, or is that an argument that there was in fact no diminution in value?

MR. ROBERSON: Well, it's both.

THE COURT: Okay.

MR. ROBERSON: Right.

THE COURT: So the first argument is the breach of contract did not cause any diminished economic value?

MR. ROBERSON: Correct.

THE COURT: And in 25 words or less, what's the basic argument there?

MR. ROBERSON: The basic argument is is that what Plaintiffs have said is, well, we can't really measure the economic value directly. This wasn't a publicly traded thrift, so we had to use this proxy that Dr. Murphy comes up with for FSLIC preferred stock. There's a proxy that you then take a slice of the institution and then extrapolate and so forth. Well, there is actually some direct evidence

of what the River Valley Thrifts values were, and actually those valuations were performed by River Valley themselves. They did a monthly mark to market of their institution, and that shows that between December of 1988 and September of 1990, the thrifts' value actually doubled from $8 million to about $16 million. So that's the first answer is that they actually by their own analyses show that their value increased during that period of time.

The second thing is is that the value that's attributed to the preferred stock is an entirely unreliable figure. What they say is is that the FSLIC preferred stock, well, Dr. Murphy says, was worth $6.5 million even though it was par $5 million the date of issuance. So, by itself, if they were to redeem it the next day, it would have only been worth $5 million. So that figure is unreliable to begin with.

Secondly, we also know it's unreliable because there was an independent certified public accountant who did an estimate of the value of the institution. I think of I should say the preferred, as of July 1988, and he valued that preferred stock at a much lesser amount. So we have both the institution's own mark to market and a CPA saying that analysis is incorrect.



Then if you look at the actual mechanism that FSLIC had with regard to the issuance, you see that that was never intended to be a marker of the institution's net worth or equity.

THE COURT: All of that it seems to me has to do with the methodology for computing the diminished economic value, these arguments that you've just been spelling out.

MR. ROBERSON: Well, I would say causation, because if the notion is that there isn't a decline, there's actually an increase, that that doesn't show there was any cost.

THE COURT: Let me try it another way. Let's assume for the sake of argument that the Court were to reject the computational arguments that we've just been talking about and let's assume the Court were to find that there was in fact a diminution in value of, just to pick a number, call it $22 million. Does the government argue that on that assumption, the Plaintiff has failed to prove that the diminution in value was caused by the breach?

MR. ROBERSON: Well, Your Honor, it may be circular from what I'm hearing. If Your Honor were to find that there was a decrease in value, we would say that not only does it not show it on terms of what we



just discussed, but we'd also say that if there was a decline, there were other factors that need to be considered.

Of course, there was a huge recession at that point in time. You have capital markets that were going wild, and that would certainly affect anything with respect to anyone who was heavily involved in capital markets, as this institution was. You have perception of the savings and loan. And basically those kinds of factors were actually noted by the FDIC when it does the redemption, that these are the kind of problems that existed in the savings and loan industry writ large at that point in time.

THE COURT: Who is the government's anticipated witness on that argument?

MR. ROBERSON: Well, I think James Meyer. He was involved with the negotiations with regard to the conclusion of that preferred stock. So, with regard to the tail end of it in terms of causation, I think he probably can speak to that document.

Now there are other problems with that diminution in value theory. One, as I was just mentioning, was that on its face, it's unreliable, because you've got a $6.5 million value given to something that's par $5 million. So the next day they



could have redeemed it for $5 million. It's clearly not a $6.5 million figure.

The other thing is is that regulators have testified, and we've provided the Court the declarations of Mr. Earle and Mr. Held from the FSLIC, that these FSLIC valuations of preferred stock did not provide a reliable means for valuing the entire thrift. It was never part of that, the whole notion that this preferred stock was part of an entire aid package.

THE COURT: It seems to me that that point is again a return to the contention that the Plaintiffs' computation of the diminution in value is flawed. And if you do the computation correctly, you come to the conclusion that there either was no diminution in value or it was dramatically less than what the Plaintiff contends.

MR. ROBERSON: Right.

THE COURT: That I think I have in mind.

MR. ROBERSON: Okay.

THE COURT: And you're saying as I understand it that the government also contends that even assuming that there was some diminution in value, the government will contend that that diminution in value was not caused by the breach.

Page 77

MR. ROBERSON: Correct.

THE COURT: It was rather caused by changing economic conditions between date one and date two.

MR. ROBERSON: Right. Right. And if we were to say that there was any regulatory effect on the institution, we go back to the fact that it was the FDIC that was saying you need to increase your tangible capital level and you've settled with the FDIC. So we go to that. Even if we were to get into that, we run into that piece of the puzzle too. And, Your Honor, frankly, there are a slew of other methodological problems that I'm not going to address here.

THE COURT: Yes. We don't need to.

MR. ROBERSON: Right. It does get quite into the minutiae, but that would certainly be a matter for trial.

THE COURT: Okay. We've identified then the computational issues and we've identified the causation defense basically by the government to this claim. Are there any other defenses that the government would advance with respect to this diminution in value claim?

MR. ROBERSON: Well, we probably would run into foreseeability issues too, but I think I can

Page 78

discuss those foreseeability issues in a moment because they're going to be similar to the retained earnings kind of issue. So if you don't mind, I'm not going to say that we don't have a foreseeability argument. We do have one. I'll just discuss it in just a moment, because I think it applies to both the retained earnings and the diminution in value.

THE COURT: So foreseeability is another leg that the government's defense would stand on.

MR. ROBERSON: Sure. Of course. Right. And then of course all the methodological problems that our experts would address.

THE COURT: Can we move then to the replacement capital?

MR. ROBERSON: Yes. Yes, Your Honor.

THE COURT: Okay.

MR. ROBERSON: And I want to start my discussion of Plaintiffs' retained earnings theory by -- just one moment, Your Honor. Your Honor, before I move on, if I could just introduce one slide, because I just wanted to get it in front of the Court. I think it was about the SAFSB claim and there were these different potential claims. I just want to present this slide so that Your Honor understands that there are differences in the four different SAFSB

Page 79

claims and maybe at some other point in time if we're not going to decide today, at least have some other discussion about what those claims are and are they going to go to trial or not. So, Your Honor, if I could, I could just provide that. I'm not going to discuss it, just provide it for Your Honor's information and then we could just move on.

THE COURT: We could also submit that following the hearing this morning.

MR. ROBERSON: Absolutely, Your Honor.

THE COURT: Why don't we do that, with an appropriate notice of filing and maybe explain what the chart shows, okay?

MR. ROBERSON: Sure. Yes.

THE COURT: Okay. Let's talk about retained earnings.

MR. ROBERSON: So I'm going to start my discussion of Plaintiffs' retained earnings by discussing the flaw in the theory as a matter of law, because, as you know, Your Honor, there was no summary judgment briefing with respect to the retained earnings theory. But there's been guidance recently issued by the Federal Circuit in Bank of America affirming the denial of the type of retained earnings brought by Plaintiffs here. I don't know if Your

Page 80

Honor is familiar with that opinion.

THE COURT: That's the very recent opinion?

MR. ROBERSON: Very recent, Your Honor.

THE COURT: Judge Wiese was the trial judge?

MR. ROBERSON: Judge Wiese was the trial court judge. And interestingly, Dr. Thacker was our expert in that case, as he is here.

THE COURT: Okay. And how does that case affect the Plaintiffs' theory on retained earnings?

MR. ROBERSON: So what Bank of America instructs is that there are no damages for retained earnings when the selling institution received at least a dollar-for-dollar compensation in the sale price for retained earnings.
In Bank of America, there was a thrift called HonFed. That was the thrift with the goodwill contract, and it was sold to Bank of America. We have a similar situation here. River Valley was sold to First Bank, and River Valley received more than a dollar-for-dollar on its retained earnings on its sale to First Bank.
So, if we go back to what happened in Bank of America at the trial court level, the trial court found the following: "With the exception then of the dividends which were actually paid, the retention of

Page 81

earnings cannot be said to harbor a cost borne by HonFed since the return ultimately came in the form of share appreciation. Plaintiffs admit that the retained earnings likely resulted in a dollar-for-dollar increase in the sale price, a value realized only upon the sale of the thrift to a third party."

THE COURT: This is Judge Wiese you're quoting?

MR. ROBERSON: Judge Wiese. I'm quoting from Judge Wiese's opinion, Your Honor. "To the extent then that the purchase of the thrift by Bank of America curtailed HonFed's payment of dividends, any unrealized costs we believe were shouldered by Bank of America." That's at 67 Fed. Cl. 577 at 589.

And the Federal Circuit affirmed, stating, "The trial court, however, found that HonFed's stop price increases mirrored those retained earnings. Indeed, Bank of America admits that the retained earnings resulted in a dollar-for-dollar increase in the sales price of HonFed. The trial court concluded HonFed did not suffer any damages from the forced retained earnings. This court again discerns no error in the trial court's reasoning or clear error in its findings." That's from the July 26, 2007, slip opinion at page 9.

Page 82

Now here, River Valley was sold to First Bank, and River Valley shareholders received close to $2 for every $1 of retained earnings. Indeed, Dr. Thacker noted that any actual cost of retained earnings to River Valley accrued to the benefit of its shareholders. Indeed, considering the $37.4 million in proceeds received from the sale of River Valley in January of 1995, Messrs. Holland and Ross realized an annual rate of return of 29.5 percent on their investment in the thrifts. So just as in Bank of America, there can be no retained earnings damages here.

There's additional guidance that was given from Bank of America. The Federal Circuit in Bank of America also affirmed that costs of retained earnings should be calculated in reference to the smallest dividend actually paid by the thrift, as reflective of the cost that shareholders required from the use of their funds at retained earnings.

Now, in Bank of America, the plaintiffs sought damages based upon a hypothetical 20 percent cost of capital. What do you know? It's exactly the same 20 percent that Dr. Holland comes up with here. The court stated, though, that in the actual world, where the thrift recorded $90 million in retained

Page 83

earnings and paid out $1.9 million in dividends, and this is the quote, "It does not appear from these figures that HonFed paid a return of 20 percent on the earnings it retained," 67 Fed. Cl. at 589.

The trial court went on to say that in Home Savings, "The Court employed the lowest cost source of capital from the thrift's earlier capital raisings, a subordinated debt issue, as a proxy for what existing shareholders would demand as a return on retained earnings." Now that's the difference between Home Savings and Bank of America. In Home Savings, there was actual replacement of the goodwill that was lost, and there was a track record with it. So there's a big difference there.

Furthermore, the trial court noted that, and this is the quotation, "Significantly, however, the Federal Circuit in Home Savings made no mention of retained earnings, and we are unwilling to infer strong support for a proposition that the court is not asked to address. We thus conclude that the cost associated with HonFed's retention of earnings are limited to the dividends actually paid out and do not include hypothetical costs of capital that the thrift never realized," 67 Fed. Cl. at 589-90.

And the Federal Circuit affirmed the court's

Page 84

reasoning. Moreover, the Federal Circuit explained that the Home Savings decision was based upon the "cost of retained earnings based on the lowest cost source of capital from the thrift's earlier capital raisings as a proxy for what the existing shareholders would demand as a return on retained earnings," again, slip opinion at page 9.

Here, Dr. Thacker has found that River Valley's actual cost of capital, that is, its actual payment of dividends on its common stock, was less than 2 percent – that's at Dr. Thacker's Exhibit 11 – whereas Dr. Holland calculates a hypothetical cost of 20 percent for its cost of capital.

And to be clear, Dr. Holland's 20 percent cost is hypothetical, purely hypothetical. He admitted that the 20 percent cost does not reflect an actual cashflow cost. The question to Dr. Holland in his deposition: "Okay. But my question was, the 20 percent is not traceable to an actual cashflow, correct?"

THE COURT: I saw that in the expert's –

MR. ROBERSON: Okay. I'll move on. So basically what we have here is the Federal Circuit has instructed that hypothetical cost replacements are barred, and that's what this is. Moreover, if you

Page 85

look at the methodology here and the fact that the retained earnings were realized with the sale of the institution, the Federal Circuit further instructs that this claim is not viable.

Now setting that aside, if we just look at the 20 percent cost of capital that Dr. Holland claims was River Valley's cost, he keeps that cost going after the First Bank acquisition.

There was no basis for First Bank having a 20 percent cost of capital, and that's really where the majority of his damages come in. There's $13 million of the $21 million in the post-First Bank acquisition period. There's no basis, though, for continuing a 20 percent cost capital for First Bank. It's an entirely different institution, entirely different capital structure, entirely different capabilities.

The interesting thing is that Dr. Holland at his deposition admitted he made no effort whatsoever to ascertain First Bank's actual cost of capital. He just had an ex ante, I'm going to take 20 percent for River Valley's cost of capital and I'm going to extrapolate that to 2013. I don't care if First Bank is the acquirer, regardless of the breach. It just makes the calculation entirely unreliable.

Page 86

And the second thing is, when you talk about the First Bank period, his theory is based on an assumption that the goodwill would have transferred to First Bank. But as has occurred in a number of cases, I think there was a decision in Granite where the court recognized that the goodwill couldn't transfer.

There's two reasons why the goodwill doesn't transfer to a third party. One is in the assistance agreements themselves, they say there has to be approval from the FDIC, and I don't know of any case where any regulator has ever testified they would have approved the transfer of goodwill to another institution. The second thing is of course under GAAP, the goodwill has to be written off with a new acquirer. So the methodology is entirely unreliable.

Now I'll talk a moment about foreseeability. According to the Restatement of Contracts, First Bank's retained earnings theory, and I think this is going to apply to the diminution in value claim, too, these are classic textbook examples of an unforeseeable claim. But basically – no, I'll just talk about the retained earnings theory. What Plaintiff says is that it had retained earnings because of the breach and in so doing, it lost opportunity costs or the capacity to pay dividends.

Page 87

THE COURT: But it's not seeking to recover those opportunity costs I take it.

MR. ROBERSON: Well, I think that Dr. Thacker's analysis is that actually stripped away, the retained earnings theory really is an opportunity cost. And in fact, if you look at Dr. Holland's testimony, he basically admits it was the opportunity costs.

THE COURT: You're referring to Dr. Holland's deposition testimony?

MR. ROBERSON: Correct. And I'd happy to read you a couple excerpts if you'd like, or I can move on.

THE COURT: Well, actually I was going to ask the parties whether there would be any objection to the parties providing the Court with a copy of Dr. Holland's deposition and the related exhibits.

MR. ROBERSON: I'm certainly happy to provide those to you, Your Honor.

MR. BERGMAN: Fine, Your Honor.

THE COURT: Well, in that event, let's pass on, and we'll give the Court a chance to review those materials.

MR. ROBERSON: Okay.

THE COURT: I appreciate that very much,

Page 88

because I think it will facilitate our preparation for the conduct of the trial.

MR. ROBERSON: Now I'm going to get back to my foreseeability argument. But basically Plaintiffs' claim is that with more capital to restore goodwill, River Valley and then First Bank would have earned more through leveraging up and pursuing opportunities or would have dividended out its excess capital. The retained earnings theory doesn't stand by itself. It says, well, we would have done one of two things. If we didn't have to retain our earnings, we would have then pursued other opportunities or we would have dividended out the money.

THE COURT: But you're not saying and one of those opportunities would have been X.

MR. ROBERSON: Right. Correct.

THE COURT: And we didn't get to pursue X, and therefore, we lost Y.

MR. ROBERSON: Right.

THE COURT: You're not saying that?

MR. ROBERSON: Correct. But the analysis of the proposition on retained earnings is actually analogous. In fact, Dr. Thacker shows as a matter of financial certainty in a formula that the retained earnings theory really is a lost opportunity cost

Page 89

argument. And you'll see in one of his exhibits, he shows mathematically how that works out. And so the notion is that the opportunity cost is there, but it's embedded and it's silent. And the reason why that's a problem is because the Federal Circuit instructs that opportunity costs or lost profits on opportunity costs have to be specified. So it's a roundabout way to get around the problems with proving a lost profits claim, and that's going to be Dr. Thacker's testimony in this regard. And it's important, but it also ties to foreseeability.

So the notion is that the restatement says that a lost opportunity cost involving, and that's the important thing, its capital here, that kind of problem is not foreseeable, and let me just go into this in a little bit more detail.

If the thrift had profitable opportunities regulators would have permitted it to pursue with more capital, River Valley Holdings Company could have borrowed money and downstreamed it to the thrift and the thrift's investment. And if the holding company could not have obtained funds where there was such a profit loss investment, that fact could not be foreseeable.

It simply is not foreseeable in the usual

Page 90

course of business that the nonbreaching party would be unable to find replacement funds. And this is stated in the Restatement of Contracts at Section 351, Comment E. "The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money," and that's what is unique about the Winstar cases. This is not about lending a service or a product. It's capital at issue here. So the analogy to lending money is totally appropriate.

I'll just repeat the Restatement of Contracts says that, "The limitation of foreseeability is often applied in actions for damages for breach of contracts to lend money. Because credit is so widely available, a lender often has no reason to foresee at the time the contract is made that the borrower will be unable to make substitute arrangements in the event of the breach." In most cases then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.

So similarly, if the thrift couldn't have dividended out -- well, I'll just leave the argument there. I see Your Honor looking at the clock.

THE COURT: Well, I think we have a pretty good idea of the Defendant's position on that point.

Page 91

We've given you a little more time than Mr. Johnson had. So I was inclined to suggest that unless there's some further devastating point that we should consider at this juncture that we consider whether a brief rebuttal is desired.

MR. ROBERSON: Yes, Your Honor. And I do have one question that's not on the argument. So when we're through with it, I just want to bring that up with you. Just note that there is just one other issue that I want to discuss with the Court.

THE COURT: All right. Now, as I said, we've taken more time than I had anticipated. I would be happy to take a brief recess, Mr. Johnson, if you would like us to do so or not.

MR. JOHNSON: I would appreciate that.

THE COURT: Okay. Why don't we take a 10-minute recess, and then we'll pick up with any rebuttal you may care to make.

MR. JOHNSON: Thank you.

(Whereupon, a short recess was taken.)

THE COURT: Please be seated. Mr. Johnson, we're all ears.

MR. JOHNSON: Thank you, Your Honor. I appreciate all of the ears and I'll try to be as easy on them as I can be.

Page 92

With regard to the SAFSB lost profits claim, Your Honor, we heard an awful lot about double recovery, but I didn't catch a single word about double recovery by the entity that's actually pursuing that claim, Your Honor.

This is River Valley's claim. River Valley did not get the benefits of the SAFSB acquisition. River Valley is a separate entity from any of the other entities or individuals Mr. Roberson mentioned in his presentation. So the double recovery issue is just a red herring, Your Honor. This claim is permitted, it's appropriate, and it's well proven with actual traceable cashflows.

As to Dr. Murphy's lost value analysis, Your Honor, the government says there was no loss. Well, that's just contradicted by the price at which the FSLIC actually bought and sold its ownership interest in the institution.

Now the government tries to impugn that actual transactional data with some other factors, but let's think about what we would actually expect to see if the government were right, if the value of the institution hadn't been diminished by the breach. Well, for one thing, the preferred security had a feature to it that was essentially an escalation

Page 93

in the dividend rate that was to occur some period of years out from issuance. So, as we move forward in time, the escalation in the FSLIC's return is getting closer. That alone would affect the value of the stock upward if nothing changed about the institution. So the further we move forward in time, the more valuable the preferred stock instrument should become, not the less valuable.

Second, Your Honor, the government says economic conditions may have changed. Well, indeed, they may have. And in fact, the interest rate environment did change. It changed in a way that was very favorable to River Valley. Given River Valley's interest rate risk management strategy, the change in the interest rate environment between 1988 and 1991 enhanced River Valley's expected profitability, and that should have improved the value of FSLIC's ownership interest, not caused it to decline.

And third, Your Honor, between 1988 and 1991, FSLIC itself had an additional period of exposure to River Valley's management. And do you know what the regulators determined? They loved them. They determined River Valley met or exceeded every projection it ever gave to the regulators.

So FSLIC, more familiar with an institution

Page 94

operating in a more favorable macro environment with an instrument and ownership interest that automatically should be becoming more valuable, decides to redeem it for less, Your Honor. That demonstrates that there was a diminution in value of the entire institution here.

Your Honor, there are ample reasons why the portfolio mark to markets do not reflect the value of the institution as a whole, as we explained in the summary judgment briefing. If the Court's interested, I'm happy to go plow that ground again now. Otherwise, I would perhaps leave that for explanation at trial. The same goes for the Lawrence Barr analysis, not transaction-driven, not an attempt to measure the value of the institution, not something that provided the basis of the purchase or sale –

THE COURT: I do think that those aspects are a little more detailed than I had anticipated at this stage.

MR. JOHNSON: All right. Your Honor, with regard to the mitigation claim, Mr. Roberson cites a section of the Restatement that I think very accurately describes what Dr. Holland did.

The section Mr. Roberson described says when a borrower contracts to get a loan and the lender

Page 95

fails to fund it, the borrower can't go out and say, your failure to lend me the money caused me to miss out on this gazillion dollar opportunity, you owe me a gazillion dollars. Instead, the borrower needs to go out and show, well, you wouldn't lend me the money at 8 percent, but Bank B down the street lent it to me at 20 percent, you owe me 12 percent times the amount of the loan times the number of years the loan was outstanding. Your Honor, that's what Dr. Holland did here.

If the Court has other questions, I'd be glad to answer them. Otherwise, again, I think I've said my piece.

THE COURT: The one question that I had is with respect to the Bank of America decision to which Mr. Roberson alluded.

MR. JOHNSON: Yes, Your Honor.

THE COURT: I don't know whether you've had a chance to study that or not, but if you have, I'd be interested in your reactions.

MR. JOHNSON: Well, Your Honor, we are studying it. I think that there are important differences, and it is not any kind of legal preclusion to the claims we're making here. I'd prefer to address that in greater detail at another time.

Page 96

THE COURT: Yes. Right.

MR. JOHNSON: But the underlying theories as to why there is a cost associated with the retained earnings in the two cases are different, and Judge Wiese's reasoning does not apply to Dr. Holland's reasoning.

THE COURT: And I assume that we will get into that in more detail in the Appendix A filings in terms of memorandum of facts and law. At least I would hope to see that issue discussed in that context. And it might make more sense to deal with it after the parties have put their views on paper in a considered way rather than try to do it at this juncture.

MR. JOHNSON: Absolutely, Your Honor.

THE COURT: There was a mention I believe of an expert report by Dr. Murphy, am I correct, which supports at least one of the damage theories of the Plaintiff?

MR. JOHNSON: Yes, Your Honor. Dr. Murphy is the sponsor of the lost value theory.

THE COURT: Would it be possible to provide a copy of that report to the Court?

MR. JOHNSON: Yes, Your Honor. And if memory serves, Dr. Murphy supplemented that either by

Page 97

a supplemental report or by a declaration, and we'll get you as complete an explanation as there is in the report format.

THE COURT: Good. That again would help the Court in its preparation. I take it, Mr. Roberson, you don't have any objection to the Court looking at that material?

MR. ROBERSON: Your Honor, I do have an objection with the exception that if we're permitted to provide the Court with the expert reports that the Defendant's expert prepared in response to that, we'd be happy to provide that to you.

THE COURT: Sure.

MR. JOHNSON: Without objection.

THE COURT: No objection to that, and I think that's something that would be of interest to the Court. Mr. Johnson, with that, as far as I'm concerned, I think we've ventilated the issues adequately.

MR. JOHNSON: Thank you, Your Honor, and I appreciate the Court's attention. One very minor housekeeping matter that relates to the meeting of counsel.

THE COURT: Yes.

MR. JOHNSON: Mr. Roberson graciously

Page 98

acceded to a request we made to defer the exchange of disclosures relating to Rule 1006, summary exhibits, until Friday, the 21st. So the meeting of counsel's other obligations will be discharged on Tuesday. Summary exhibits have been carved out to take place on or before Friday, the 21st.

THE COURT: And this is a matter that counsel have worked out among themselves?

MR. JOHNSON: Yes, Your Honor. We're in agreement.

THE COURT: Sure.

MR. ROBERSON: Yes, Your Honor. The only thing I would add to it is, and we didn't discuss this expressly, but I would just ask the same courtesy, that if they're going to extend to the 21st, to issue or provide the summary exhibits that we be given the same deadline.

MR. JOHNSON: Absolutely, Your Honor.

THE COURT: Okay. Well, that settles that matter. Thank you very much, Mr. Johnson.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: Mr. Roberson, I think you said you had a point you wanted to raise that did not go to the substantive discussion.

MR. ROBERSON: Right, Your Honor. You may

Page 99

recall we amended our answer and we have asserted a counterclaim for breach of the covenant not to sue, as the Court sees.

THE COURT: Yes.

MR. ROBERSON: And as part of our motion, we asked that the Court require Plaintiffs to identify the co-executor. We know that Steven Bangert is one executor of the Ross estate. And since we do have a counterclaim against it, my understanding is that the requirement is is that the executors be notified of the existence of the counterclaim, because obviously they're going to need to wrap up or do whatever they need to do with the estate.

And my concern is is that either we need to get a representation from the Plaintiff that Mr. Bangert has notified the co-executor, whoever he is, we don't know who he is or she, that the counterclaim exists so that there's proper consideration given to that or that we be given that information directly.

And my concern is is that, Your Honor, I suspect what the notion is is that Mr. Bangert lives in Colorado and Mr. Ross had a lot of business entities in Colorado. He also had a lot in Chicago and Illinois, and I would assume that there is a co-executor that's probably doing the Illinois versus the

Page 100

Colorado. But we just need for the fact that there's been a counterclaim asserted that the executor be made aware, the co-executor, whoever he is, be made aware of it. We looked at the law, and I didn't see an actual obligation.

THE COURT: Well, I was going to ask that. What is your source of the obligation to inform the co-executor?

MR. ROBERSON: Well, it was uncertain. We didn't get a firm legal ruling that said that if Mr. Bangert knows of the counterclaim that he has an ethical or fiduciary obligation to inform its co-executor. And again, I assume that they're in different states and that's why we may have some problem.

So my only request is that either we get a representation by the Plaintiff that the co-executor does know of the existence of the counterclaim or that we be provided the address information so we can provide notice of the existence of the counterclaim.

THE COURT: The notice that has been given, you have given notice to Mr. Bangert, is that correct?

MR. ROBERSON: Well, no. I mean, he has it since he's appeared in this case. So, in that respect, I don't think we need to provide him with

Page 101

something literal. I just want to make sure that the co-executor, whoever and wherever they are, are also aware of the counterclaim.

THE COURT: The idea being that if there is a body of funds under the control of the co-executor, he should be aware that he shouldn't disburse them down to zero while the counterclaim is pending?

MR. ROBERSON: Yes, sir. There is that fiduciary duty, Your Honor.

THE COURT: Mr. Bergman or Mr. Johnson, do you have a view on this subject?

MR. BERGMAN: Your Honor, I'm not in a position to either make the representation requested or to give the information requested, and I'm happy to talk to Mr. Roberson more about what the real obligation is. I don't know what Department of Justice's obligation is. I assume that Mr. Bangert is carrying out his duties as he believes is appropriate. If Department of Justice has a further obligation, I'm happy to try to figure out what it is.

THE COURT: Let me just maybe pursue this one step further. What would be the reason not to advise the co-executor?

MR. BERGMAN: I can't think of a reason. I've only spoken with Mr. Bangert about it. It may be

Page 102

that he's immediately picked up the phone and called his co-executor. It wouldn't surprise me at all. But I don't know that that's happened.

THE COURT: Do you contemplate ascertaining whether that has happened?

MR. BERGMAN: I certainly can do that.

THE COURT: And then speaking with Mr. Roberson?

MR. BERGMAN: I'd be happy to do that as well.

THE COURT: And let's assume just for the sake of argument that Mr. Bangert has not communicated with his co-executor. What then would if you know the Plaintiff's position be?

MR. BERGMAN: Your Honor, I don't know.

THE COURT: Okay.

MR. BERGMAN: I would be surprised if it hasn't been communicated. I would be surprised if there was a reason not to communicate it. If there is, I'd certainly report that.

THE COURT: Well, why don't we let Mr. Bergman consult with Mr. Bangert and report to Mr. Roberson, and then you gentlemen discuss what, if anything, further either of you thinks needs to be done, and give chambers a call, and if necessary,

Page 103

we'll do a telephonic status conference. How would that be?

MR. BERGMAN: That's fine, Your Honor.

MR. ROBERSON: Your Honor, I'm assuming that this is probably going to be worked out pretty quickly, that they'll just say, yes, we communicated with the co-executor and he has knowledge of it. What we would need, though, is some written representation to that effect. So my suggestion would be at least anticipating where we would be given communication that I'm anticipating we would get just to ask that the Plaintiff file a notice to the Court as a written record that Plaintiff has identified the co-executor and provided notice of this lawsuit so that there is a written record of the status of that notice.

THE COURT: I would again remit that to discussions between the two of you. And if there is some dispute about what the Plaintiff in the government's view should provide, we can discuss that and the Court can make an appropriate ruling if we get to that point let us say.

Now if Mr. Bergman represents that the co-executor has been made aware of the lawsuit and the government requests some written confirmation and for

Page 104

some reason that is not forthcoming, we could then get into what exactly the obligation of one in either the Plaintiffs' position or the Defendant's position is with respect to giving notice.

You would have to get into that I think before resolving a request of that nature if there were an objection. Maybe there wouldn't be an objection and the whole thing would be moot. But before we get into those other interesting but possibly unnecessary questions, I think the suggestion that counsel confer among themselves with a view toward reaching agreement is a very helpful one.

And if for some reason counsel remain at an impasse over some particular point, the Court would appreciate it if counsel would call chambers, and the Court would set up a telephonic status conference and hopefully resolve the issue promptly.

MR. BERGMAN: I hope we won't have to impose on the Court, Your Honor. I didn't really view this as impasse at this point.

THE COURT: I may be seeing impasses where none exist. That wouldn't be the first time. But in any event, let's leave it at the point where counsel will confer and if there is any problem or need to involve the Court that counsel will notify the Court

Page 105

and we can resume this discussion if we need to. Anything further on either side? Mr. Roberson?

MR. ROBERSON: Your Honor, I just wanted to recap if we could what our obligations are. My understanding right now is that we're to provide you with our rebuttal expert reports with regard to Dr. Murphy's diminution in value claims.

THE COURT: I believe that's right.

MR. ROBERSON: And also provide you with the deposition transcripts, and I take it you're only interested in the retained earnings deposition that was taken recently.

THE COURT: Of?

MR. ROBERSON: I'm sorry. Dr. Holland.

THE COURT: Dr. Holland, right. That's correct.

MR. ROBERSON: Okay. I think that's where I'm at on the obligations.

THE COURT: Any disagreement on that? I think that's a common understanding.

MR. JOHNSON: Your Honor, that's our understanding, and we will provide Dr. Murphy's reports.

THE COURT: Great. If there is no other business to come before the house, we will stand

Page 106

adjourned. And thank you all very much.

MR. ROBERSON: Thank you, Your Honor.

(Whereupon, at 11:30 a.m., the hearing in the above-entitled matter was concluded.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

Page 107

REPORTER'S CERTIFICATE

DOCKET NO.: 95-524C
CASE TITLE: Holland v. United States
HEARING DATE: September 6, 2007
LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: September 6, 2007

Tammy Brodsky
Heritage Reporting Corporation
1220 L Street, N.W.
Washington, D.C. 20005

Look-See Concordance Report

---

UNIQUE WORDS: 2,099
TOTAL OCCURRENCES: 8,255
NOISE WORDS: 384
TOTAL WORDS IN FILE: 20,569

---

SINGLE FILE CONCORDANCE

---

CASE SENSITIVE

---

COVER PAGES = 3

---

INCLUDES ALL TEXT OCCURRENCES

---

DATES ON

---

INCLUDES PURE NUMBERS

---

POSSESSIVE FORMS ON

## – DATES –


August, 1991 [1] 52:17
August 14 [2] 4:5, 9
August of 1990 [2] 49:15; 50:19
August of 1993 [1] 52:6
December, 2003 [1] 70:6
December 03 [1] 57:17
December 21 [2] 12:13; 13:5
December of 1988 [1] 73:5
February, 2005 [1] 57:25
January 18 [2] 5:10; 6:4
January of 1995 [1] 82:8
July [1] 21:10
July, 1988 [3] 23:19, 23; 73:22
July 26, 2007 [1] 81:24
July of 1990 [1] 49:5
June of 1989 [1] 49:15
June of 1992 [1] 64:7
March 20, 2007 [1] 70:19
March of 1991 [1] 72:5
May [1] 47:5
October of 1991 [1] 53:21
September 5 [1] 59:3
September 6, 2007 [2] 107:5, 14
September of 1990 [1] 73:5
September of 1991 [1] 64:6


## – $ –


$1 [2] 64:10; 82:3
$1.9 [1] 83:1
$10 [1] 64:11
$10.4 [1] 71:2
$110 [1] 64:6
$12.6 [1] 23:8
$13 [1] 85:11
$14.7 [1] 71:2
$14.8 [4] 35:3, 11; 36:3, 7
$16 [1] 73:6
$17.46 [1] 69:20
$17.461 [2] 70:10; 71:6
$2 [2] 24:3; 82:3
$20 [1] 36:18
$20.9 [2] 30:10; 70:6
$21 [3] 57:22; 70:13; 85:12
$21.8 [1] 30:2
$21.846 [1] 71:8
$22 [1] 74:18
$22.7 [1] 34:21
$28.61 [1] 58:13
$3.675 [1] 34:1
$37.4 [1] 82:6
$4.6 [1] 21:25
$45 [14] 29:13; 58:20; 59:2, 17, 18; 60:18; 61:6, 21, 23, 25; 65:11; 67:24; 68:25; 69:1
$48 [1] 53:22
$5 [10] 22:14; 23:5; 24:1; 33:24; 36:1; 70:22; 73:14, 16; 75:25; 76:1
$6 [1] 64:7
$6.5 [3] 73:13; 75:24; 76:2
$7 [2] 35:24; 64:9
$7.9 [1] 35:1
$8 [3] 21:24; 53:24; 73:6
$90 [1] 82:25


## – 0 –


03 [1] 57:17


## – 1 –


1 [4] 9:17, 18; 14:8; 70:16
10 [3] 11:1; 62:14; 63:23
10-minute [1] 91:16
100 [1] 68:4
1006 [1] 98:2
11 [1] 84:12
11:30 [1] 106:3
12 [1] 95:7
1220 [1] 107:18
14 [2] 4:5, 9
18 [2] 5:10; 6:4
1987 [1] 20:20
1988 [13] 21:7; 23:19, 24; 33:17, 24; 34:20, 22; 35:4; 72:5; 73:5, 22; 93:15, 19
1989 [2] 25:23; 49:15
1990 [6] 49:5, 15; 50:20; 53:13, 17; 73:5
1991 [17] 33:19, 22; 34:1, 25; 35:4; 40:20, 25; 45:17; 51:8; 52:17; 53:18, 22; 62:9; 64:6; 72:5; 93:15, 20
1992 [3] 28:2; 53:18; 64:7
1993 [4] 52:6, 7; 53:14, 18
1994 [3] 19:17; 27:3; 28:2
1995 [1] 82:8
1998 [1] 33:22


## – 2 –


2 [7] 9:17, 18; 14:9; 70:16, 21; 71:4; 84:11
20 [21] 41:1, 12, 13, 15, 17; 42:1, 19; 44:13; 70:19; 82:21, 23; 83:3; 84:13, 14, 16, 18; 85:6, 10, 14, 21; 95:7
20005 [1] 107:19
2001 [1] 55:3
2003 [2] 55:3; 70:7
2005 [2] 55:3; 57:25
2007 [4] 70:19; 81:24; 107:5, 14
2013 [1] 85:23
209 [1] 49:8
21 [2] 12:13; 13:5
211 [1] 53:23
21st [4] 12:23; 98:3, 6, 15
241.192 [1] 47:20
25 [2] 41:7; 72:16
25-year [1] 23:10
26 [2] 59:13; 81:24
29.5 [2] 42:13; 82:9
29.7 [1] 42:13
290 [1] 51:13


## – 3 –


3 [3] 14:11; 70:21; 71:5
30 [7] 11:4, 8, 14; 41:7; 42:12; 63:19, 20
342 [1] 50:21
351 [1] 90:3
37 [1] 53:25


## – 4 –


4 [3] 15:2, 8; 51:9
40 [2] 5:24
400 [1] 50:25
410 [1] 50:18


## – 5 –


5 [7] 8:15; 9:4; 50:10; 51:9, 10; 59:3; 63:25
577 [1] 81:14
589 [2] 81:14; 83:4
589-90 [1] 83:24


## – 6 –


6 [2] 107:5, 14
60 [4] 5:23; 66:13; 67:17; 68:3
67 [3] 81:14; 83:4, 24


## – 7 –


70.365 [1] 71:2


## – 8 –


8 [1] 95:6


## – 9 –


9 [2] 81:25; 84:7
90s [1] 41:5
95-524C [1] 107:3


## – A –


a.m. [1] 106:3
abandon [1] 55:6
abandoned [6] 56:19; 57:13, 19; 58:4, 7, 8
ability [2] 43:2; 48:6
able [10] 6:21; 8:16, 20, 22; 12:25; 17:12; 34:18; 56:3; 60:2; 68:24

above-entitled [1]
106:4
Absolutely [3]
79:10; 96:15; 98:18
absolutely [3]
55:9, 12; 68:12
acceded [1]
98:1
accept [1]
10:20
acceptable [2]
4:17; 15:24
accepted [2]
39:11; 44:16
According [1]
86:17
according [1]
23:10
account [1]
45:8
accountant [1]
73:20
accounted [3]
23:13; 24:13; 40:2
accrued [4]
28:20; 32:11; 82:5
accumulated [1]
39:15
accurately [2]
94:23; 107:9
achieve [1]
29:21
acquire [3]
24:10; 28:5; 62:20
acquired [5]
19:17; 28:11; 31:20; 35:17; 46:7
acquirer [3]
29:17; 85:24; 86:15
acquirers [1]
20:17
acquiring [5]
21:9; 23:22; 24:23; 25:11; 31:12
acquisition [20]
25:5, 9; 27:24; 28:2, 6, 10; 29:12; 31:7, 17; 32:9; 33:17; 58:14; 60:18; 63:11, 17; 65:24; 85:8, 13; 92:7
acquisitions [5]
20:5; 25:22; 27:3; 31:14; 58:15
action [3]
18:5, 13; 19:6
actions [2]
90:5, 12
actively [1]
20:9
activities [2]
20:11; 54:11
actual [18]
28:16; 29:14; 32:17; 42:12, 20; 43:18; 74:1; 82:4, 24; 83:12; 84:9, 17, 19; 85:20; 92:13, 20; 100:5
add [1]
98:13
added [1]
56:6
addition [6]
4:18; 14:25; 21:17; 22:3, 17; 56:21
additional [7]
9:1; 43:10; 46:21; 57:3; 82:13; 90:19; 93:20
additions [3]
4:7; 13:21; 16:13
additive [1]
46:17
address [8]
44:11; 45:22; 58:16; 77:13; 78:12; 83:20; 95:25; 100:19
adequate [1]
32:22
adequately [1]
97:19
adjourned [1]
106:1
adjusted [2]
57:23; 70:6
adjustment [2]
36:15; 57:21
administrative [1]
19:3
admit [3]
14:12; 68:23; 81:3
admits [3]
67:25; 81:18; 87:7
admitted [9]
14:3, 11; 15:11; 60:1; 66:22; 67:23; 84:16; 85:19
adopts [1]
45:16
advance [1]
77:22
adverse [1]
49:13
advise [2]
8:15; 101:23
affect [6]
19:20; 36:2; 52:18; 75:6; 80:9; 93:4
affirmed [4]
44:17; 81:15; 82:15; 83:25
affirming [1]
79:24
agency [1]
53:21
agree [1]
10:16
agreed [2]
5:21; 8:5
agreement [15]
7:18; 8:16, 20, 22; 21:11; 22:13; 23:23; 51:7, 11; 52:7, 17, 18; 54:14; 98:10; 104:12
agreements [5]
51:22; 53:2, 3; 54:17; 86:9
agrees [1]
40:24
aid [1]
76:9
alert [1]
12:12
alleged [1]
67:12
allocated [1]
37:15
allocates [2]
40:4, 6
allocation [2]
30:7; 37:18
allotted [1]
11:4
allowed [1]
28:16
allude [1]
11:10
alluded [2]
60:19; 95:16
alluding [1]
49:18
alone [1]
93:4
alternative [1]
46:13
ambit [1]
35:21
amended [1]
99:1
America [14]
79:23; 80:10, 15, 17, 23; 81:12, 14, 18; 82:11, 14, 15, 20; 83:11; 95:15
American [4]
32:4, 5; 62:19, 21
amortized [1]
23:10
amount [22]
4:21; 5:21; 7:10, 11; 24:1, 3; 29:13; 30:1, 10; 31:2; 38:2, 9; 39:12, 14, 24; 42:2, 25; 43:22; 67:10; 73:23; 90:19; 95:7
amounts [1]
6:14
ample [2]
27:21; 94:7
analogous [1]
88:23
analogy [1]
90:9
analyses [2]
11:7; 73:8
analysis [22]
10:2, 3; 23:1; 36:25; 40:21, 23; 44:5, 9, 18; 45:17, 20, 23, 24; 46:2, 13; 55:21; 73:24; 87:4; 88:21; 92:14; 94:14
analyzed [1]
34:11
ANB [7]
62:21; 63:11; 64:3, 10; 65:6, 7
annual [1]
82:9
answer [6]
36:5; 46:22; 61:9; 73:7; 95:12; 99:1
ante [1]
85:21
anticipated [6]
22:9; 37:4; 44:7; 75:15; 91:12; 94:18
anticipating [2]
103:10, 11
Antonio [8]
27:4, 14, 18, 19, 21; 28:6, 11; 31:21
anyway [1]
5:25
apologize [1]
28:2
App [1]
8:12
appear [1]
83:2
appeared [1]
100:24
appears [1]
19:2
Appendix [1]
96:8
applicable [3]
7:4; 17:2; 48:11
application [1]
45:19
applied [5]
34:23; 35:18; 39:10; 90:5, 12
applies [2]
30:11; 78:6
apply [3]
36:11; 86:19; 96:5
applying [2]
34:15; 35:22
appreciate [7]
34:8; 46:25; 87:25; 91:15, 24; 97:21; 104:15
appreciation [2]
42:14; 81:3
approach [1]
56:24
approached [4]
21:7; 62:9, 12, 19
appropriate [9]
4:7; 7:19; 20:4; 39:18; 79:12; 90:9; 92:12; 101:18; 103:21
appropriately [2]
40:3; 46:3
approval [1]
86:10
approved [1]
86:12
approximate [1]
30:1
approximately [3]
29:13; 30:10; 60:18
area [1]
21:10
argue [2]
60:3; 74:19
argued [2]
64:13; 65:15
argument [23]
11:2; 42:18; 44:4; 56:7; 59:19, 24; 62:3; 63:11, 14; 69:4; 72:6, 7, 12, 17, 18; 74:14; 75:15; 78:5; 88:4; 89:1; 90:22; 91:7; 102:12
arguments [3]
61:6; 74:7, 15
arisen [1]
17:6
arose [2]
49:11
arrangements [1]
90:16
ascertain [1]
85:20
ascertaining [1]
102:4
aside [2]
61:11; 85:5
asking [1]
55:24
aspect [1]
43:25
aspects [1]
94:17
assert [1]
59:2
asserted [2]
99:1; 100:2
asserting [1]
58:25
assertion [1]
47:24
asset-and-liability [1]
26:14
assets [5]
47:18; 49:14; 51:5; 53:23; 62:11
assistance [7]
21:17; 22:18; 53:1, 3; 54:17; 86:8
associated [4]
36:13; 67:19; 83:21; 96:3
Association [1]
20:7
assume [12]
60:15; 61:2; 62:2, 15; 71:15; 74:14, 16; 96:7; 99:24; 100:13; 101:17; 102:11
assumed [3]
14:16; 16:6; 58:23
assuming [6]
48:8; 53:9; 64:15; 69:17; 76:23; 103:4
assumption [4]
16:8, 10; 74:19; 86:3
assurance [1]
24:25
astonishing [1]
68:24
attached [1]
22:19
attempt [2]
45:4; 94:14
attempted [2]
27:19, 24
attempting [1]

43:5
attention [3]
21:5; 46:21; 97:21
attitude [1]
32:7
attracted [1]
21:4
attractive [1]
27:4
attributed [3]
67:19; 71:3; 73:11
atypical [1]
47:9
August [6]
4:5, 9; 49:15; 50:19; 52:6, 17
automatically [1]
94:3
available [3]
7:12; 39:15; 90:14
avoid [1]
17:14
award [3]
29:6; 32:22; 67:9
aware [10]
12:19; 18:5; 20:12; 26:4; 55:23; 100:3; 101:3, 6; 103:24
awful [1]
92:2

– B –

background [1]
67:7
balance [2]
37:6, 11
Bangert [12]
18:15; 19:2; 63:20; 99:7, 16, 21; 100:11, 22; 101:17, 25; 102:12, 22
Bangert's [1]
19:5
Bank [42]
7:6; 18:11, 21; 19:11, 13, 16; 27:5, 15; 32:5; 58:5, 9; 62:19, 21; 67:2, 5, 6; 79:23; 80:10, 15, 17, 19, 21, 22; 81:11, 13, 18; 82:2, 10, 14, 20; 83:11; 85:8, 9, 12, 14, 23; 86:2, 4; 88:6; 95:6, 15
bank [2]
10:1; 19:10
Bank's [3]
32:5; 85:20; 86:18
banker [2]
18:8, 24
banking [1]
27:10
banks [1]
42:3
bargain-type [1]
44:19
bark [1]
55:25
Barr [1]
94:13
barred [2]
53:4; 84:25
base [2]
39:23; 40:7
Based [1]
34:23
based [9]
5:7; 34:18; 42:2; 43:9; 54:25; 82:21; 84:2, 3; 86:2
basic [3]
60:19; 72:17, 18
basically [8]
50:23; 62:16; 75:10; 77:20; 84:23; 86:21; 87:7; 88:4
basis [5]
37:5; 70:24; 85:9, 13; 94:16
Bates [1]
9:21
Bates-stamped [1]
9:9
Bear [1]
14:25
becoming [2]
20:15; 94:3
believe [3]
81:13; 96:16; 105:8
believed [1]
16:21
believes [1]
101:18
beneficial [1]
7:22
benefit [9]
42:22; 44:19; 64:25; 65:9; 66:6, 9, 17; 67:22; 82:5
benefits [1]
92:7
BERGMAN [22]
4:10, 15; 5:5; 8:24; 10:15, 23; 11:22; 12:8; 13:18; 14:22; 15:21; 16:9; 17:23; 87:20; 101:12, 24; 102:6, 9, 15, 17; 103:3; 104:18
Bergman [12]
4:9; 8:23; 10:13; 11:20; 13:17; 14:21; 15:20; 17:21; 55:11; 101:10; 102:22; 103:23
binding [1]
19:19
bit [7]
11:16, 18; 30:4; 47:9; 60:9; 66:4; 89:16
blank [2]
14:9, 11
Bluebonnet [1]
29:4
board [1]
10:7
body [2]
17:12; 101:5
bond-like [1]
34:13
books [1]
26:6
borne [1]
81:1
borrowed [1]
89:20
borrower [4]
90:15; 94:25; 95:1, 4
borrowing [1]
62:19
bought [1]
92:17
bound [3]
5:7, 23; 41:6
bounds [1]
6:4
breach [53]
19:17, 18; 20:3, 6; 25:21; 26:8, 19; 27:1, 20; 28:4, 7; 29:24; 30:1; 31:19, 24; 32:6, 7; 33:10, 17, 20, 21; 35:15; 36:6, 9, 12, 21; 37:6, 18; 38:8, 9, 14, 15, 22; 39:8; 40:22; 45:2, 7; 46:1, 5; 47:11; 63:12; 65:3; 71:3; 72:13; 74:21; 76:25; 85:24; 86:24; 90:5, 12, 17; 92:23; 99:2
breach-caused [1]
28:7
breached [2]
25:23; 40:7
breached-against [1]
45:3
breaching [1]
62:24
break [1]
13:8
breakdown [1]
54:2
brief [7]
8:18; 29:3; 42:23; 53:15; 65:15; 91:4, 13
briefing [6]
54:23; 56:6; 59:7, 23; 79:21; 94:10
briefly [1]
47:6
broad [1]
23:24
broader [1]
36:20
Brodsky [1]
107:16
build [2]
38:13; 39:21
built [1]
21:3
burden [4]
6:2; 10:17; 11:15; 14:15
burdensome [1]
9:11
business [5]
4:2; 20:11; 90:1; 99:22; 105:25
businessman [1]
18:24
but-for [2]
36:12; 45:11
buy [1]
22:14

– C –

calculate [1]
7:7
calculated [2]
48:21; 82:16
calculates [1]
84:12
calculation [6]
36:2; 39:23; 41:8; 42:9; 45:16; 85:25
calculations [5]
19:20; 30:3, 22; 34:8; 39:10
call [5]
24:11; 39:23; 74:18; 102:25; 104:15
calling [1]
51:22
CAMEL [1]
53:10
candidates [1]
20:16
capabilities [1]
85:17
capacity [3]
19:3, 4; 86:25
Capital [3]
32:12; 63:18; 64:4
capital [121]
21:24; 22:2; 23:8, 9, 13, 14, 17, 25; 24:2, 7, 12, 14; 25:24; 26:1, 3, 9; 27:21; 30:8; 31:21; 35:12, 14; 36:9, 14; 37:7, 9, 10, 14, 16, 20, 23, 24, 25; 38:3, 9, 14, 16, 25; 39:8, 12, 14, 24; 40:1, 5, 7, 10, 12, 15, 20, 22, 25; 41:11, 19; 42:17; 43:6, 9, 15; 45:8, 11; 47:12, 13, 14, 15, 19, 22, 23; 48:6, 9, 11, 14, 16, 18, 24; 49:1, 10, 21; 50:10, 19, 21, 23; 51:6, 9, 12, 14, 18, 21; 52:25; 53:4, 24, 25; 54:8, 12, 18; 57:15; 58:5; 70:24; 75:5, 8; 77:8; 78:14; 82:22; 83:7, 23; 84:4, 9, 13; 85:6, 10, 14, 16, 20, 22; 88:5, 8; 89:14, 19; 90:8
capital-deficient [1]
47:17
capitalization [1]
33:7
care [3]
54:2; 85:23; 91:18
careful [1]
22:25
carryforwards [1]
58:10
carrying [1]
101:18
carved [1]
98:5
CASE [1]
107:4
case [36]
4:25; 5:22; 6:6, 17; 7:13, 14, 24; 11:5; 12:1; 16:22; 17:18, 21; 18:7, 9, 19; 20:21; 21:19; 28:13; 29:10, 20; 47:20; 49:21, 22; 54:20; 55:10; 56:10, 15; 57:1; 59:16; 67:3, 4; 80:7, 8; 86:10; 100:24; 107:11
cases [9]
5:14, 17; 44:16; 56:11; 59:14; 86:4; 90:7, 17; 96:4
cash [6]
21:18, 20; 22:18; 40:16; 43:18
cashflow [2]
84:17, 19
cashflows [5]
28:17; 29:15, 21; 92:13
catch [1]
92:3
Causation [1]
45:6
causation [11]
30:16; 31:18; 36:21; 44:21; 45:12; 70:15; 72:3, 7; 74:9; 75:19; 77:20
caused [9]
29:24; 52:22, 23; 54:11; 74:21; 76:25; 77:2; 93:18; 95:2
caution [1]
6:14
CEO [1]
63:21
certainty [11]
29:19, 20; 30:16; 32:14, 15, 16, 21; 35:21; 44:21; 45:15; 88:24
CERTIFICATE [1]
107:1
certified [1]
73:19
certify [1]
107:8
chambers [3]
44:1; 102:25; 104:15
chance [3]
57:4; 87:22; 95:19
change [5]
34:6; 35:10; 70:7; 93:12, 14
changed [4]
26:15; 93:5, 10, 12
changes [2]
4:6; 16:17
changing [3]
12:21; 36:17; 77:2
chart [1]
79:13
charts [2]
56:18; 69:15
Chicago [1]
99:23
choice [1]
38:23
choose [1]
38:17
chopping [1]
50:3
Christmas [3]
12:14, 18; 13:2

chronology [1]
29:1
Circuit [10]
44:17; 79:23; 81:15; 82:14; 83:17, 25; 84:1, 23; 85:3; 89:6
circular [1]
74:23
circulated [1]
16:18
cites [1]
94:21
CI [3]
81:14; 83:4, 24
claim [62]
6:22; 19:14, 15; 30:17; 37:5; 48:3; 52:22; 55:3, 18, 19, 22, 23; 56:2, 3, 4, 6, 12, 14; 58:2, 5, 8, 19; 59:3, 17, 18; 60:20, 23; 61:7, 21, 23, 25; 62:3, 6, 8; 66:20; 68:19, 21; 69:21; 70:13, 25; 71:1, 6, 7, 8, 13, 17; 72:1, 4; 77:21, 23; 78:22; 85:4; 86:19, 21; 88:5; 89:9; 92:1, 5, 6, 11; 94:21
claimed [2]
58:9; 67:10
claiming [1]
65:11
Claims [1]
107:12
claims [23]
6:20; 18:10, 22; 19:20; 20:2; 28:14; 29:2; 53:2; 55:7; 56:18, 20, 24; 57:12, 14, 20; 61:5; 70:21; 78:23; 79:1, 3; 85:6; 95:24; 105:7
clarification [1]
4:18
clarify [1]
56:23
classic [1]
86:20
classifications [8]
49:14; 50:14, 16, 18, 20, 22; 51:2; 53:21
classified [7]
50:5; 51:1, 5; 52:3, 4; 53:22, 24
clear [4]
60:6, 25; 81:23; 84:14
clerk [2]
5:19; 15:16
clock [1]
90:23
closed [1]
31:9
closer [2]
13:5; 93:4
closing [1]
24:12
co-executor [16]
18:15; 99:7, 16, 24; 100:3, 8, 12, 17; 101:2, 5, 23; 102:2, 13; 103:7, 14, 23
coincide [1]
16:16
colleagues [1]
8:2
Colorado [3]
99:22, 23; 100:1
columns [1]
14:8
combined [2]
21:13; 46:3
comfortable [1]
4:14
comfortably [1]
30:15
coming [1]
7:18
Comment [1]
90:4
comment [2]
4:6; 12:10
comments [2]
15:7; 37:3
common [5]
35:19; 68:6, 12; 84:10; 105:20
Commonwealth [1]
33:2
communicate [1]
102:19
communicated [3]
102:12, 18; 103:6
communication [1]
103:11
Company [1]
89:19
company [2]
22:23; 89:21
compensated [1]
67:11
compensation [1]
80:13
complaint [1]
54:15
complement [1]
46:8
complete [5]
38:10; 39:2; 43:14; 52:16; 97:2
complex [2]
11:5, 7
compliance [2]
48:9; 49:17
composite [5]
9:14, 19, 23; 10:22; 53:7
computation [2]
76:13, 14
computational [2]
74:15; 77:19
computations [2]
30:21; 44:23
compute [1]
38:1
computing [1]
74:6
conceptually [1]
46:17
concern [3]
48:5; 99:14, 20
concerned [2]
63:7; 97:18
concerning [2]
55:21; 61:20
concerns [3]
28:8; 49:12; 52:12
concisely [1]
34:10
conclude [1]
83:20
concluded [2]
81:20; 106:4
conclusion [2]
75:18; 76:15
conditions [2]
77:3; 93:10
conduct [1]
88:2
confer [2]
104:11, 24
conference [3]
16:20; 103:1; 104:16
confidence [1]
22:4
confirmation [1]
103:25
confirmatory [1]
42:7
confused [1]
60:7
connected [1]
55:20
connection [2]
49:11; 71:7
connections [1]
62:10
consecutive [1]
9:10
consecutively [2]
9:8, 20
consequences [2]
26:25; 32:6
conservative [3]
41:9; 42:4; 45:25
consider [5]
13:23; 47:7; 66:17; 91:3, 4
consideration [3]
66:5, 7; 99:18
considerations [1]
21:21
considered [4]
27:9; 66:18; 75:3; 96:13
considering [1]
82:6
Consistent [1]
25:13
consistent [1]
60:16
constantly [1]
31:14
consult [1]
102:22
consummation [1]
65:3
contain [1]
5:3
contained [1]
107:9
containing [1]
14:7
contemplate [2]
17:9; 102:4
contemplated [1]
17:15
contend [1]
76:24
contends [2]
76:17, 22
contention [3]
46:10; 48:8; 76:12
context [2]
9:24; 96:11
continue [2]
24:10; 26:21
continued [1]
27:2
continuing [1]
85:14
contract [14]
18:18; 23:7, 13; 30:25; 37:10; 38:16, 25; 39:14; 40:10, 15; 67:4; 72:13; 80:17; 90:15
Contracts [3]
86:17; 90:3, 11
contracts [3]
90:5, 13; 94:25
contractual [11]
23:9; 30:8; 36:14; 37:7, 9, 16, 19; 40:1; 43:2, 5; 70:9
contractually [1]
45:10
contradicted [1]
92:16
contradicts [1]
70:17
Contrary [1]
72:3
contributed [1]
36:3
control [1]
101:5
controls [1]
20:24
convenience [1]
12:22
copies [3]
14:7; 15:3, 14
copy [3]
57:3; 87:16; 96:23
core [1]
26:4
corporate [5]
64:17, 20; 65:8; 68:7, 16
Corporation [3]
22:6; 27:7; 107:17
correctly [1]
76:14
corresponds [1]
47:24
cost [52]
30:6; 36:24; 37:23, 25; 38:1, 5; 40:5, 8, 12, 19, 20, 21, 25; 42:16; 43:7, 9, 11, 13, 18; 46:6, 17; 57:14; 74:12; 81:1; 82:4, 18, 22; 83:6, 20; 84:3, 9, 13, 15, 16, 17, 24; 85:6, 7, 10, 14, 20, 22; 87:6; 88:25; 89:4, 13; 90:19; 96:3
cost-of-replacement-capital [2]
30:11; 45:19
costing [1]
39:19
costs [9]
41:19; 81:13; 82:15; 83:23; 86:25; 87:2, 8; 89:6, 7
counsel [18]
7:17, 18; 16:21; 55:24; 56:7; 59:5, 9, 20, 24; 60:3, 4; 97:23; 98:8; 104:11, 13, 15, 23, 25
counsel's [1]
98:3
counterclaim [10]
99:2, 9, 11, 17; 100:2, 11, 18, 20; 101:3, 7
country [1]
20:14
couple [4]
53:16; 56:17, 25; 87:12
course [19]
18:16; 21:20; 22:16; 26:23; 29:8; 31:13; 37:2; 38:15, 22; 54:24; 56:1; 61:6; 64:2; 67:1; 75:4; 78:10, 11; 86:13; 90:1
COURT [133]
4:1, 11, 23; 6:7, 11; 7:15; 8:1, 9, 14, 25; 9:5, 23; 10:4, 10, 13; 20, 25; 11:3, 20; 12:2, 9; 13:4, 19; 14:21, 24; 15:23, 25; 16:12; 17:25; 41:10, 15; 43:24; 44:6; 46:10, 15, 19, 24; 47:3; 48:7, 17; 49:16; 53:11; 54:1; 57:2, 6, 10; 60:12, 15; 61:1, 10, 15; 62:2; 63:10, 15; 65:23; 69:3, 6, 13, 22, 25; 70:4; 71:11, 15, 21; 72:6, 10, 12, 16; 74:5, 13; 75:14; 76:11, 19, 21; 77:2, 14, 18; 78:8, 13, 16; 79:8, 11, 15; 80:2, 4, 8; 81:7; 84:21; 87:1, 9, 14, 21, 25; 88:14, 17, 20; 90:24; 91:11, 16, 21; 94:17; 95:14, 18; 96:1, 7, 16, 22; 97:4, 13, 15, 24; 98:7, 11, 19, 22; 99:4; 100:6, 21; 101:4, 10, 21; 102:4, 7, 11, 16, 21; 103:17; 104:21; 105:8, 13, 15, 19, 24
Court [78]
4:5; 8:3, 15; 10:16, 19; 11:4, 15, 18, 23, 25; 12:12, 19; 13:19; 14:6, 9, 11, 15, 18; 15:13, 15; 16:5, 14, 19, 21, 23, 24; 17:3; 18:4, 10, 14; 19:2, 12; 20:12; 23:5; 26:4; 29:10; 34:7; 35:25; 36:11; 42:22; 44:22; 46:20, 25; 47:5; 52:15; 54:16; 56:15; 61:25; 67:9; 68:9, 10; 71:3; 74:14, 16; 76:4; 78:21; 83:6; 87:16, 22;

91:10; 95:11; 96:23; 97:5, 6, 10, 17; 99:3, 6; 103:12, 21; 104:14, 16, 19, 25; 107:11
court [12]
57:6; 80:6, 23; 81:16, 20, 22; 82:24; 83:5, 15, 19; 86:6
Court's [9]
5:19; 16:6; 17:6, 23; 29:6; 37:3; 70:8; 94:10; 97:21
court's [2]
81:23; 83:25
courtesy [1]
98:14
covenant [1]
99:2
cover [2]
43:24; 45:1
covered [1]
40:1
covers [1]
16:13
CPA [1]
73:24
crafted [1]
49:23
create [1]
65:17
created [2]
49:22; 63:18
credit [4]
21:24; 23:9, 25; 90:13
crisis [1]
20:13
critical [1]
8:7
criticisms [4]
49:10; 51:24; 52:13; 54:6
critique [1]
44:8
cross [2]
62:22, 23
cumbersome [1]
15:19
current [4]
56:20, 23; 69:20; 70:11
currently [1]
54:20
curtailed [1]
81:12
curtailment [1]
26:12
cushion [3]
48:16, 18, 24
customarily [1]
48:10
cut [1]
12:23

**– D –**

D.C. [3]
13:2; 107:6, 19
damage [9]
46:8; 54:19, 22; 58:22; 61:18; 69:7; 70:20, 25; 96:18
damaged [1]
48:13
Damages [1]
29:8
damages [29]
7:7; 17:1; 19:20; 20:2; 28:14; 29:2, 5, 18; 31:1; 43:22; 45:22; 46:2; 48:21; 52:22, 24; 59:7; 65:17; 67:10, 19; 68:22; 70:8; 71:1; 80:11; 81:21; 82:11, 21; 85:11; 90:5, 12
damaging [2]
47:25; 48:20
data [1]
92:20
DATE [1]
107:5
Date [1]
107:14
date [6]
28:1; 46:1; 70:19; 73:14; 77:3
dated [1]
4:5
dates [1]
12:11
day [7]
5:8; 8:13; 12:19; 33:8; 73:16; 75:25
days [1]
6:17
deadline [1]
98:17
deal [19]
7:4; 13:9; 23:2, 25; 24:4, 5; 25:2, 6; 31:8, 9; 62:16; 65:4, 5, 9, 20; 66:23; 68:21; 96:11
dealing [1]
13:22
deals [2]
15:1; 24:21
dealt [1]
15:4
debentures [2]
21:25; 24:2
debt [2]
22:1; 83:8
decades [1]
42:4
December [5]
12:13; 13:5; 57:17; 70:6; 73:5
decide [6]
13:9, 14; 71:19, 20, 22; 79:2
decided [3]
23:3; 27:13; 32:8
decides [1]
94:4
decision [7]
52:20; 66:10, 12; 70:15; 84:2; 86:5; 95:15
decisions [3]
29:5; 30:12; 32:21
declaration [1]
97:1
declarations [2]
59:22; 76:5
decline [5]
36:4; 71:3; 74:10; 75:2; 93:18
declined [2]
34:3; 63:11
declining [1]
26:7
decrease [1]
74:24
deemed [1]
33:9
deep [1]
19:6
Defendant [2]
4:20; 6:2
Defendant's [5]
17:5; 71:3; 90:25; 97:11; 104:3
defense [5]
6:18; 60:20; 71:17; 77:20; 78:9
defenses [1]
77:21
defer [1]
98:1
deferred [1]
4:24
definition [1]
39:5
degree [1]
50:17
delay [1]
12:25
deliver [1]
45:3
delivered [2]
21:20, 22
demand [2]
83:9; 84:6
demanded [1]
52:25
demonstrates [1]
94:5
demonstrating [1]
43:17
denial [1]
79:24
Department [3]
5:17; 101:16, 19
depending [2]
13:7, 13
deposition [8]
55:23; 66:22; 84:18; 85:19; 87:10, 17; 105:10, 11
depository [1]
51:16
derivative [5]
49:3; 51:23, 25; 52:2, 3
derivatives [11]
49:13, 25; 50:3, 13, 17; 52:4, 6, 9, 14; 54:9, 12
describe [3]
4:4; 13:10; 30:3
described [3]
31:20; 35:11; 94:24
describes [1]
94:23
describing [1]
54:21
desired [2]
22:6; 91:5
detail [7]
11:18; 30:14; 58:18; 60:9; 89:16; 95:25; 96:8
detailed [2]
16:2; 94:18
details [1]
34:8
determination [2]
39:22; 40:19
determine [8]
23:2; 33:12; 34:5, 18; 35:8; 38:2; 39:12; 40:8
determined [7]
30:2; 35:2, 23; 38:20; 71:4; 93:22, 23
determining [1]
34:19
devastating [1]
91:3
devoted [1]
5:20
devotes [1]
5:13
difference [8]
11:14; 35:3; 40:14; 52:1; 53:19; 69:16; 83:10, 14
differences [3]
53:5; 78:25; 95:23
difficult [1]
26:15
difficulty [1]
26:18
diminished [6]
35:24; 72:2, 4, 13; 74:7; 92:23
diminution [20]
29:24; 32:24; 34:6; 35:13; 69:11, 20; 71:12; 72:8; 74:17, 20; 75:22; 76:13, 16, 23, 24; 77:23; 78:7; 86:19; 94:5; 105:7
direct [2]
45:12; 72:25
disagree [2]
36:11; 52:19
disagreement [1]
105:19
disburse [1]
101:6
disbursements [1]
43:19
discerns [1]
81:22
discharged [1]
98:4
disclosures [1]
98:2
discuss [12]
30:14; 52:10; 60:8, 9; 61:3; 78:1, 5; 79:6; 91:10; 98:13; 102:23; 103:20
discussed [2]
75:1; 96:10
discussing [3]
19:25; 47:6; 79:19
discussion [8]
4:8; 16:16; 54:19; 78:18; 79:3, 18; 98:24; 105:1
discussions [3]
7:17, 21; 103:18
dispose [1]
21:5
disposition [2]
14:4, 12
dispute [2]
37:22; 103:19
disqualified [1]
70:23
distinct [1]
43:25
distinction [1]
66:2
distinguished [3]
18:6, 25; 33:1
distribute [1]
56:25
diverted [1]
29:16
dividend [5]
41:13; 43:10; 64:8; 82:17; 93:1
dividended [3]
88:8, 13; 90:22
dividends [16]
38:19; 42:14, 20, 25; 43:3, 6, 8, 10, 12, 16; 80:25; 81:12; 83:1, 22; 84:10; 86:25
DOCKET [1]
107:3
document [3]
9:23; 10:2; 75:20
documentary [2]
15:3; 17:8
documents [11]
9:9, 14; 10:6, 8, 18, 22; 17:8, 13, 16; 30:21; 37:3
doesn't [4]
33:11; 74:11; 86:7; 88:9
dog [1]
55:25
dollar [4]
28:22; 35:14; 95:3
dollar-for-dollar [4]
80:13, 20; 81:4, 19
dollars [2]
70:16; 95:4
double [8]
66:21, 24; 68:2, 4, 9; 92:2, 4, 10
doubled [2]
49:15; 73:6
downstreamed [1]
89:20
Dr [86]
17:4; 18:5, 8, 18, 20; 20:8, 9; 21:1; 33:1, 13; 34:5, 9, 11, 17; 35:2, 9, 22; 36:14; 39:9; 40:2, 18, 22, 23; 41:2, 8, 10, 23; 42:8, 10, 23; 43:24; 44:5, 7; 45:23; 46:12; 48:22; 55:2, 22; 56:9;

57:17, 21, 25; 58:12; 59:4, 17; 61:24; 62:9, 12; 63:17; 66:21, 25; 67:8; 69:12; 70:11; 71:8; 72:1, 22; 73:13; 80:6; 82:3, 23; 84:8, 11, 12, 14, 17; 85:6, 18; 87:3, 6, 9, 16; 88:23; 89:10; 92:14; 94:23; 95:9; 96:5, 17, 20, 25; 105:6, 14, 15, 22
draft [7] 4:3, 9; 5:3; 15:1, 19; 16:6, 17
dramatically [1] 76:16
drawing [1] 66:2
draws [1] 41:2
driven [1] 51:24
due [1] 64:15
duties [1] 101:18
duty [2] 29:6; 101:9

– E –

Earle [1] 76:5
early [1] 43:4
earn [3] 25:15; 26:22; 40:17
earned [2] 68:25; 88:6
earnings [63] 30:7; 37:13, 15, 17, 19, 24; 38:3, 5, 13, 16, 18, 21, 24; 39:16, 21; 40:3, 6, 9, 14, 16; 45:9, 14; 55:20; 68:3; 78:3, 7, 18; 79:16, 18, 22, 24; 80:9, 12, 14, 20; 81:1, 4, 17, 19, 22; 82:3, 5, 11, 15, 19; 83:1, 4, 10, 18, 21; 84:3, 6; 85:2; 86:18, 22, 23; 87:5; 88:9, 11, 22, 25; 96:4; 105:11
ears [2] 91:22, 24
easiest [1] 10:16
easily [1] 14:19
easy [2] 5:7; 91:24
economic [21] 22:8, 16, 20; 28:18; 29:23; 32:24; 33:5; 35:10; 36:13, 18, 22; 42:12, 15; 67:22; 72:2, 4, 14, 20; 74:7; 77:3; 93:10
economics [1] 34:24
educated [1] 11:25
effect [18] 35:14, 25; 36:16; 43:7, 15, 16, 17; 46:1; 47:25; 48:3, 20, 25; 54:4; 65:2, 16; 69:2; 77:5; 103:9
effected [1] 52:16
effects [4] 28:18; 52:20; 54:15, 17
efficient [1] 6:5
effort [1] 85:19
element [1] 24:6
elements [2] 21:24; 46:7
eliminate [1] 56:23
eliminated [9] 26:9; 35:15; 36:9; 38:10, 14; 39:8, 25; 40:4; 57:16
embedded [1] 89:4
eminent [1] 13:12
employed [1] 83:6
employee [1] 63:25
en [1] 10:11
enactment [1] 48:10
enclosing [3] 9:15; 10:1
Enclosure [1] 10:4
enclosures [1] 10:5
encompasses [1] 42:14
end [1] 75:19
ended [2] 45:9; 65:16
endorsed [1] 45:17
endorses [1] 40:23
enhanced [1] 93:16
enter [3] 14:9, 11; 47:14
entered [1] 51:6
enterprise [1] 35:9
entirety [1] 35:1
entities [2] 92:9; 99:23
entitled [4] 46:9, 11; 48:13
entity [4] 32:12; 65:23; 92:4, 8
enumerate [1] 29:3
environment [3] 93:12, 15; 94:1
envision [1] 6:1
equal [2] 5:21; 6:13
equations [1] 34:16
equity [5] 34:4; 40:22, 25; 71:1; 74:4
equity-like [1] 34:14
equivalent [1] 4:20
equivalents [1] 22:20
error [2] 81:22, 23
escalation [2] 92:25; 93:3
essence [1] 44:6
essentially [8] 21:23; 22:19; 28:21; 30:2; 34:12; 45:1; 63:10; 92:25
establish [1] 45:24
established [1] 29:6
Estate [1] 18:16
estate [4] 18:19; 19:5; 99:8, 13
estimate [4] 29:7; 45:25; 73:20
ethical [1] 100:12
evaluating [1] 34:24
event [5] 33:8, 9; 87:21; 90:16; 104:23
events [2] 20:20; 65:13
eventually [1] 22:13
everybody [1] 15:8
everyone's [1] 26:16
evidence [15] 11:24; 15:12; 17:10, 15; 25:1; 26:16; 27:17; 28:7; 31:5, 19, 25; 32:3; 37:2; 72:25; 107:9
evidentiary [1] 30:21
ex [1] 85:21
exact [1] 31:2
exactly [6] 13:9; 16:25; 48:17; 63:13; 82:22; 104:2
exam [2] 6:24, 25
examination [3] 5:14; 15:16; 44:12
example [4] 5:22; 13:11; 53:22; 66:15
examples [1] 86:20
exceeded [1] 93:23
exceeding [1] 50:22
except [1] 28:14
exception [3] 53:15; 80:24; 97:9
excerpts [1] 87:12
excess [1] 88:8
exchange [4] 8:12; 22:14, 20; 98:1
exchanged [1] 23:6
exclusion [1] 16:3
executor [3] 19:4; 99:8; 100:2
executors [1] 99:10
Exhibit [1] 84:11
exhibit [6] 9:7, 16; 14:8, 10, 13; 15:14
exhibits [10] 9:20; 14:2; 15:3, 10, 11; 87:17; 89:1; 98:2, 5, 16
exist [1] 104:22
existed [1] 75:12
existence [3] 99:11; 100:18, 20
existent [1] 9:22
existing [2] 83:8; 84:5
exists [1] 99:18
expect [2] 44:11; 92:21
expectancy [1] 44:19
expectation [1] 5:9
expected [1] 93:16
experience [6] 9:13; 19:9; 41:2, 6; 42:3; 67:4
experienced [1] 18:7
expert [31] 6:20; 11:7; 17:3; 30:19, 22; 33:1; 37:1; 44:4; 55:4; 56:4, 7, 9; 57:18; 58:13; 59:4, 10, 14, 15, 19; 60:3; 61:19, 20, 22; 62:1; 71:8; 80:7; 96:17; 97:10, 11; 105:6
expert's [1] 84:21
experts [6] 17:5, 9, 13; 42:9; 44:12; 78:12
explain [4] 34:10; 51:20; 54:1; 79:12
explained [2] 84:1; 94:9
explanation [2] 94:12; 97:2
exposure [1] 93:21
express [1] 48:19
expression [1] 22:4
expressly [1] 98:14
extend [2] 5:8; 98:15
extent [5] 20:2; 35:8; 38:8; 48:12; 81:11
extraordinary [2] 26:17, 18
extrapolate [2] 72:24; 85:23

– F –

face [1] 75:23
facilitate [2] 63:17; 88:1
facilitated [6] 64:23; 65:5, 8, 14, 20, 24
facilitating [1] 65:3
Fact [3] 47:20; 49:8; 51:13
fact [21] 6:19; 7:2; 12:13; 29:5; 30:18, 20; 33:22; 39:25; 48:4; 52:11; 59:8; 62:4; 72:8; 74:17; 77:6; 85:1; 87:6; 88:23; 89:23; 93:11; 100:1
factor [5] 36:6, 7, 8, 20, 22
factors [3] 75:2, 10; 92:20
facts [4] 11:9; 47:7; 62:8; 96:9
factual [3] 37:2; 43:14, 16
fall [2] 51:2; 63:3
failed [4] 27:8; 47:13; 63:5; 74:20
failing [1] 63:6
fails [2] 51:1; 95:1
failure [2] 45:2; 95:2
fair [4] 5:25; 24:14; 26:8; 29:6
familiar [4]

44:15, 22; 80:1; 93:25
fashion [1]
9:10
favorable [2]
93:13; 94:1
FDIC [25]
6:25; 49:22; 50:4, 6, 7; 51:5, 14, 19; 52:1, 2, 13, 16, 22, 25; 53:8, 16, 20, 22; 54:2, 13, 14; 75:11; 77:7, 9; 86:10
FDIC's [4]
49:12; 51:24; 52:13; 53:6
feature [3]
34:13, 14; 92:25
features [1]
34:13
February [1]
57:25
Fed [3]
81:14; 83:4, 24
Federal [14]
22:5; 27:5, 14; 44:17; 79:23; 81:15; 82:14; 83:17, 25; 84:1, 23; 85:3; 89:5; 107:11
fee [1]
62:16
felt [1]
35:19
fiduciary [2]
100:12; 101:9
figure [11]
58:20; 60:18; 69:20; 70:3, 10, 16; 73:12, 17; 76:2; 101:20
figured [1]
35:13
figures [3]
40:5, 18; 83:3
file [2]
8:11; 103:12
filing [1]
79:12
filings [2]
70:18; 96:8
fill [2]
39:5; 45:8
filled [1]
37:8
finance [3]
33:2; 63:11; 64:11
financial [4]
34:16; 43:17; 63:4; 88:24
financially [1]
35:20
financing [2]
27:22; 28:9
find [5]
11:6; 71:25; 74:17, 24; 90:2
finder's [1]
62:16
finding [1]
52:3
findings [1]
81:24
Fine [2]
17:25; 87:20
fine [3]
14:23; 17:25; 103:3
finish [3]
5:9, 22; 61:17
firm [1]
100:10
FIRREA [26]
25:17; 26:1; 33:8; 39:25; 47:15, 17, 18, 21, 25; 48:1, 2, 6, 9, 10; 49:2, 5, 9, 16; 51:13, 15; 54:6, 18; 62:23, 24; 63:2; 64:16
FIRREA's [2]
47:19; 51:10
First [23]
7:6; 18:11, 21; 19:11, 13, 16; 58:5, 9; 67:2, 5, 6; 80:19, 21; 82:1; 85:8, 9, 14, 20, 23; 86:2, 4, 17; 88:6
first [16]
4:2; 6:12; 9:17; 13:25; 17:20; 29:11; 31:9; 47:8; 54:24; 59:23; 62:6; 67:18; 72:2, 12; 73:7; 104:22
five [2]
36:18; 49:7
flatly [1]
70:17
flaw [1]
79:19
flawed [1]
76:14
flight [2]
12:24; 13:1
floor [1]
7:10
focus [2]
61:11; 68:20
focused [3]
5:1; 6:21; 51:14
follow [1]
47:22
followed [1]
5:15
following [8]
14:7; 15:8; 50:7; 53:7; 67:8; 70:22; 79:9; 80:24
follows [1]
14:5
forced [2]
26:12; 81:21
foregone [1]
55:1
foresee [1]
90:14
foreseeability [13]
30:16, 23; 44:20, 25; 77:25; 78:1, 4, 8; 86:16; 88:4; 89:11; 90:4, 11
foreseeable [6]
30:25; 31:4; 45:2; 89:15, 24, 25
form [6]
10:10; 21:13; 37:3, 24; 70:24; 81:2
format [1]
97:3
formed [1]
19:7
formula [1]
88:24
forth [5]
13:16; 55:3; 58:22; 71:8; 72:24
forthcoming [1]
104:1
forward [2]
93:2, 6
found [5]
52:15; 53:21; 80:24; 81:16; 84:8
four [7]
25:20; 53:17, 18; 58:21, 25; 78:25
four-week [1]
7:11
fraction [1]
26:7
framework [2]
30:11; 39:11
frankly [4]
34:16; 39:3; 44:11; 77:11
free [1]
37:25
free-standing [1]
46:2
Friday [7]
12:13, 18; 13:2, 12, 15; 98:3, 6
front [2]
68:9; 78:21
FSLIC [22]
22:13, 18, 20, 24; 23:6; 33:14, 23; 34:12, 17, 19; 35:5; 36:1, 10; 70:22; 72:22; 73:12; 74:2; 76:5, 6; 92:17; 93:20, 25
FSLIC's [3]
22:12; 93:3, 17
full [4]
57:20; 58:2; 67:22, 24
fully [3]
38:13; 39:1; 107:9
function [1]
38:4
functioned [1]
40:9
fund [3]
51:17, 18; 95:1
funds [9]
31:23; 40:13; 41:23; 62:20; 65:7; 82:19; 89:22; 90:2; 101:5
furnished [1]
44:1
future [2]
23:18; 24:17

## – G –

GAAP [1]
86:14
gains [1]
29:22
Galva [3]
21:12; 23:25; 24:4
gap [1]
39:17
gauge [2]
21:8; 23:21
gave [3]
66:15; 69:16; 93:24
gazillion [2]
95:3, 4
gentlemen [3]
8:2; 14:18; 102:23
gets [1]
40:7
give [16]
11:16; 12:3; 16:22; 57:6; 61:8, 13; 62:13; 68:10; 69:1, 10; 70:18; 71:24; 87:22; 101:14; 102:25
Given [1]
93:13
given [17]
13:20; 17:17; 33:21; 53:7; 54:16; 55:5, 16; 64:18; 75:24; 82:13; 91:1; 98:16; 99:18, 19; 100:21, 22; 103:10
gives [1]
12:24
giving [2]
66:12; 104:4
glad [1]
95:12
goes [3]
60:22; 71:12; 94:13
goods [1]
45:3
goodwill [13]
7:6; 24:5; 26:5; 53:4; 58:7; 80:16; 83:12; 86:3, 6, 7, 12, 14; 88:5
governing [5]
4:3; 16:15; 29:4; 36:21; 37:21
government [29]
20:15; 21:16; 22:1; 24:6; 25:23; 30:9; 31:6, 7, 10, 11; 33:15, 25; 41:24; 42:1, 18; 43:20, 21; 45:17; 70:23; 74:19; 76:22, 24; 77:20, 22; 92:15, 19, 22; 93:9; 103:25
government's [18]
5:24; 20:3; 22:4; 23:16; 24:16; 26:8; 30:3; 40:19; 42:9; 44:3, 8, 12; 60:19; 65:25; 71:16; 75:14; 78:9; 103:20
graciously [1]
97:25
Granite [1]
86:5
Great [1]
105:24
greater [3]
43:22; 63:9; 95:25
grew [1]
21:2
Griffin [1]
56:9
gross-up [6]
55:18; 56:2, 5, 10, 12, 14
ground [1]
94:11
grow [10]
24:22; 25:4, 10, 11, 15; 31:6, 16
growing [1]
20:19
growth [13]
22:10; 24:24; 25:9, 21; 26:13; 31:11; 38:18; 49:7; 55:1, 3; 57:20; 58:2, 3
guarantee [3]
40:2; 62:22, 23
guaranteed [1]
23:7
guess [3]
4:25; 12:2; 16:4
guidance [2]
79:22; 82:13

## – H –

hadn't [2]
39:20; 92:23
half-hour [1]
12:4
Hall [1]
55:22
hand [2]
56:17; 68:8
handed [3]
64:21, 22; 68:17
handing [1]
64:17
handle [1]
16:25
hands [2]
27:6, 7
hands-on [1]
63:22
happens [5]
48:25; 52:5; 63:16; 64:5, 10
happy [11]
10:15; 18:1; 46:22; 87:11, 18; 91:13; 94:11; 97:12; 101:14, 20; 102:9
harbor [1]
81:1
harm [3]
19:24; 20:2; 29:7
harmed [1]
19:15
hasn't [2]
56:13; 102:18
haven't [1]
48:18
he'd [1]
68:3
he's [4]
67:23; 68:11; 100:24; 102:1
healthy [2]
27:5, 15
hear [3]
11:24; 18:1; 47:1
heard [2]

61:19; 92:2
HEARING [1]
107:5
hearing [10]
17:20; 34:8; 42:22; 55:11; 58:24; 59:1; 74:23; 79:9; 106:3; 107:10
heavily [1]
75:7
Held [1]
76:5
held [2]
23:5; 33:3
help [2]
14:17; 97:4
helpful [2]
46:24; 104:12
hemorrhaging [1]
20:14
hereby [1]
107:8
Heritage [1]
107:17
herring [1]
92:11
hey [1]
25:3
highest [2]
11:10; 38:20
history [1]
20:1
holding [3]
52:2; 63:4; 89:21
Holdings [8]
32:13; 63:18; 64:4, 5, 8, 9; 65:6; 89:19
hole [4]
37:6, 8; 39:6; 45:7
holiday [1]
12:14
holidays [1]
13:1
Holland [54]
6:16; 17:4; 18:6, 8, 18, 20; 20:8, 10; 21:1, 11; 31:12; 37:1; 39:9; 40:2, 18, 23; 41:2, 24; 42:11, 23; 43:24; 48:22; 57:17, 25; 59:4, 17; 61:24; 62:9, 12, 18; 63:17, 20; 66:11, 13, 21; 67:1, 5, 7, 8, 19, 20, 23; 68:24; 82:8, 23; 84:12, 17; 85:6, 18; 94:23; 95:9; 105:14, 15; 107:4
Holland's [11]
41:9, 11; 44:5, 7; 55:2; 58:13; 84:14; 87:6, 10, 17; 96:5
Home [9]
21:12; 23:25; 24:4; 30:12; 83:5, 10, 11, 17; 84:2
home [1]
12:25
Homer [6]
6:16; 18:5; 37:1; 66:11, 13; 67:5
homes [1]
13:16
honed [1]
19:8
honestly [2]
68:18, 24
HonFed [5]
80:16; 81:2, 20, 21; 83:3
HonFed's [3]
81:12, 16; 83:21
Honor [132]
4:10, 15; 5:5, 15, 25; 6:9; 7:22; 8:6, 24; 10:15, 23; 13:18; 14:20, 22; 16:10; 17:23; 18:3; 19:21; 20:18, 25; 24:20; 25:1, 9, 14; 26:15, 20; 27:17, 25; 28:4, 25; 29:2, 14; 30:4, 17, 23; 31:5, 15, 18; 32:14, 23; 35:5; 36:5, 20, 24; 37:21; 39:3; 41:14; 43:15, 23; 44:2, 10; 45:6, 15; 46:5, 12, 20; 47:6; 49:20; 50:1; 55:4; 56:24; 57:9; 59:6; 60:10, 21; 61:14, 21; 62:23; 64:14, 23; 65:16; 66:16, 25; 67:2; 68:6; 69:1, 5, 9, 24; 70:17, 19; 71:25; 74:22, 23; 77:11; 78:15, 19, 24; 79:4, 10, 20; 80:1, 3; 81:10; 87:19, 20; 90:23; 91:6, 23; 92:2, 5, 11, 15; 93:9, 19; 94:4, 7, 20; 95:9, 17, 21; 96:15, 20, 24; 97:8, 20; 98:9, 12, 18, 21, 25; 99:20; 101:9, 12; 102:15; 103:3, 4; 104:19; 105:3, 21; 106:2
Honor's [1]
79:6
hope [3]
8:21; 96:10; 104:18
hopefully [4]
7:18; 8:5; 16:16; 104:17
host [1]
29:5
hour [6]
11:13, 14, 16, 21; 12:4, 6
hours [5]
5:8, 23, 24; 7:11
house [1]
105:25
housekeeping [1]
97:22
Howard [4]
18:16; 66:11, 13; 67:5
huge [3]
11:14; 50:15; 75:4
hypothetical [6]
82:21; 83:23; 84:12, 15, 24

– I –

I'd [6]
87:11; 95:11, 19, 24; 102:9, 20
I've [3]
46:23; 95:12; 101:25
idea [4]
7:23; 13:11; 90:25; 101:4
identified [4]
27:4; 77:18, 19; 103:13
identify [1]
99:6
identifying [1]
14:8
II [1]
69:16
II-1 [5]
57:8, 11; 69:23, 25; 70:1
II-2 [2]
57:8; 69:22
Illinois [3]
20:7; 99:24, 25
illustrative [1]
19:6
immediate [1]
38:11
immediately [1]
102:1
impasse [2]
104:14, 20
impasses [1]
104:21
impediment [1]
27:23
implementing [2]
20:24; 48:2
importance [1]
51:20
important [6]
20:11; 21:18; 47:7; 89:11, 14; 95:22
impose [2]
5:2; 104:18
impossible [2]
28:8; 33:11
improper [7]
50:8; 55:15; 59:12, 25; 60:4; 61:22, 24
improved [1]
93:17
impugn [1]
92:19
inadequate [1]
39:4
Inc [1]
63:18
inclination [1]
12:2
inclined [2]
12:5; 91:2
include [2]
53:3; 83:23
income [1]
64:24
incomplete [1]
39:3
incorrect [3]
64:2; 65:22; 73:25
increase [9]
43:11, 12; 50:19; 51:4, 6; 74:11; 77:7; 81:5, 19
increased [1]
73:9
increases [2]
50:15; 81:17
increasing [2]
38:24; 43:7
incremental [1]
55:2
incurred [1]
46:6
independent [2]
19:14; 73:19
independently [1]
19:15
indicate [1]
56:25
indicated [3]
16:19; 55:19; 70:10
indispensable [2]
23:17; 24:16
individual [2]
49:21; 63:22
individuals [1]
92:9
industry [2]
20:13; 75:13
infer [1]
83:18
inform [3]
11:18; 100:7, 12
information [4]
79:7; 99:19; 100:19; 101:14
informative [1]
11:12
informed [1]
27:25
inhibiting [1]
43:16
initial [2]
4:25; 15:19
initially [1]
7:16
inside [1]
28:23
insofar [1]
28:14
insolvent [1]
20:15
instance [8]
6:23; 7:3; 9:25; 49:5; 52:24; 63:3; 65:11; 66:14
institution [55]
20:7, 9; 21:2, 15, 19; 22:9, 12; 23:18; 24:9, 18; 26:16, 18, 25; 27:5, 8, 11, 16; 28:12, 15; 34:3, 7, 21; 35:17; 39:13; 41:5, 19; 42:3, 24; 47:12; 50:25; 51:3; 54:5; 63:4; 64:1, 6, 18; 65:18, 21; 72:24; 73:4, 21; 75:8; 77:6; 80:12; 85:3, 15; 86:13; 92:18, 23; 93:5, 25; 94:6, 9, 15
institution's [6]
22:6; 24:7, 13; 42:17; 73:23; 74:4
institutions [13]
19:8; 21:12; 24:23; 25:12, 19; 29:25; 31:13; 32:25; 33:5; 35:18; 51:16; 63:2
instructed [1]
84:24
instructs [3]
80:11; 85:3; 89:6
instrument [2]
93:7; 94:2
instruments [1]
51:25
insufficient [1]
47:21
Insurance [1]
22:5
insurance [2]
51:17, 18
insurer [1]
51:20
intangible [1]
40:15
intend [2]
30:5; 71:6
intended [5]
24:15, 22; 27:18; 31:6; 74:3
intends [1]
16:14
intentions [1]
25:13
interest [14]
21:8; 23:21; 31:12; 33:16, 23; 35:6, 7; 92:17; 93:11, 14, 15, 18; 94:2; 97:16
interested [4]
17:20; 94:10; 95:20; 105:11
interesting [2]
85:18; 104:9
interestingly [1]
80:6
internal [2]
24:24; 37:14
internally [3]
25:11; 28:10; 31:16
introduce [1]
78:20
introduced [1]
14:2
introducing [1]
17:15
introduction [1]
18:15
invested [1]
40:17
investible [2]
40:13, 16
investing [1]
42:3
investment [9]
20:23; 32:18; 41:18, 22, 25; 42:11; 82:10; 89:21, 23
investments [2]
49:12; 50:6
investor [5]
18:8; 22:22; 41:3; 42:8, 16
investors [1]
22:25
invite [1]
15:6
invited [1]
4:6
involve [1]

104:25
involved [9]
7:1, 3; 23:15, 25; 24:1, 5; 50:5; 75:8, 17
involvement [2]
49:24; 50:12
involving [1]
89:13
irrefutable [1]
45:12
issuance [3]
73:15; 74:2; 93:2
issue [10]
56:11; 61:18; 78:3; 83:8; 90:8; 91:10; 92:10; 96:10; 98:15; 104:17
issued [4]
57:18; 58:1; 59:14; 79:23
issues [13]
4:23; 6:10; 7:5; 11:11, 17, 19; 16:25; 17:18; 60:22; 77:19, 25; 78:1; 97:18
items [1]
13:23
iteration [1]
58:12

– J –

James [1]
75:16
January [3]
5:10; 6:4; 82:8
job [10]
30:7; 37:10, 14, 16, 17, 19; 38:24; 45:10, 13, 14
John [1]
62:10
JOHNSON [26]
18:3; 41:14, 17; 44:2, 10; 46:12, 16, 20; 47:2; 91:15, 19, 23; 94:20; 95:17, 21; 96:2, 15, 20, 24; 97:14, 20, 25; 98:9, 18, 21; 105:21
Johnson [13]
17:24; 18:1; 56:22; 58:18; 61:12, 19; 70:12; 91:1, 13, 21; 97:17; 98:20; 101:10
Johnson's [1]
60:16
Joint [3]
47:19; 49:7; 51:13
Judge [6]
80:4, 5; 81:7, 9, 10; 96:4
judge [2]
80:4, 6
judgment [8]
18:12, 21; 59:7, 23; 65:15; 71:10; 79:21; 94:10
July [6]
21:10; 23:19, 23; 49:5; 73:22; 81:24
juncture [2]
91:4; 96:14
June [2]
49:15; 64:7
Justice [2]
5:17; 101:19
Justice's [1]
101:17
justify [1]
41:23

– K –

keep [1]
5:13
keeping [1]
14:1
keeps [1]
85:7
kept [1]
5:19
kinds [3]
50:6; 61:4; 75:10
knowledge [1]
103:7

– L –

labeled [1]
57:7
lack [3]
54:7, 12; 72:3
language [1]
14:4
large [3]
17:12; 61:9; 75:13
largely [5]
19:3; 30:18; 32:25; 37:1, 2
LaSalle [1]
30:13
last [1]
6:10
late [2]
12:20; 62:9
law [9]
29:4; 64:14; 65:22; 66:20; 68:13, 14; 79:19; 96:9; 100:4
Lawrence [1]
94:13
lawsuit [2]
103:14, 24
lawyer's [1]
68:7
lead [1]
17:24
leading [1]
20:20
leave [6]
13:15; 37:8; 70:20; 90:22; 94:12; 104:23
leaves [1]
39:17
leg [1]
78:8
legal [5]
17:2; 30:11, 23; 95:23; 100:10
legitimately [1]
37:22
lend [5]
64:4; 90:6, 13; 95:2, 5
lender [3]
90:14, 20; 94:25
lender's [1]
90:17
lenders [1]
63:7
lending [2]
90:7, 9
lent [1]
95:6
lesser [3]
39:13, 16; 73:23
Let's [5]
6:11; 62:2; 71:15; 74:14; 79:15
let's [7]
7:12; 47:1; 74:16; 87:21; 92:21; 102:11; 104:23
letter [3]
9:15, 25
level [10]
11:10; 39:21; 50:10, 19, 22; 52:6, 8; 63:25; 77:8; 80:23
levels [9]
47:19; 48:6; 50:23; 51:6; 52:25; 53:1, 4, 20; 54:18
leverage [3]
54:25; 57:20; 58:2
leveraging [1]
88:7
liabilities [1]
63:8
liability [2]
52:18; 90:18
liberty [1]
16:23
lieu [1]
15:7
life [1]
26:16
limit [5]
5:3, 6, 10; 7:19; 10:21
limitation [2]
90:4, 11
limited [5]
6:17; 26:2, 10; 83:22; 90:18
limits [2]
5:2; 51:10
line [1]
36:16
linear [1]
23:10
list [1]
14:7
literal [1]
101:1
literally [1]
53:16
lives [2]
19:10; 99:21
Loan [3]
20:7; 22:5; 23:23
loan [11]
63:8; 64:9, 11; 65:6, 7; 75:9, 13; 90:20; 94:25; 95:8
loaned [1]
63:9
loans [1]
64:4
local [1]
12:17
LOCATION [1]
107:6
Locke [1]
29:4
logic [1]
45:13
logistical [1]
4:4
logistics [1]
13:22
looks [1]
40:23
lose [1]
12:24
loss [18]
29:23; 31:2, 3; 35:3, 8, 11; 36:1, 8, 10, 13, 18, 23; 47:12; 58:7, 10; 70:22; 89:23; 92:15
losses [1]
29:22
lost [27]
29:11; 35:12; 46:16; 54:25; 57:14, 20, 22; 58:2; 64:15; 65:1, 2; 68:23; 70:2; 71:1, 7; 83:12; 86:24; 88:18, 25; 89:6, 9, 13; 92:1, 14; 96:21
lost-profits [3]
29:20; 30:17; 32:22
lost-value [2]
45:23; 46:13
lot [6]
4:16; 44:24; 58:18; 92:2; 99:22, 23
loved [1]
93:22
lower [2]
26:24; 41:6
lowest [2]
83:6; 84:3

– M –

MACRO [2]
53:7, 10
macro [1]
94:1
magnitude [4]
31:1, 3; 71:12, 16
main [1]
63:22
maintain [1]
51:12
maintained [1]
15:12
majority [3]
24:13; 50:16; 85:11
man [1]
62:10
managed [2]
26:21; 35:19
management [2]
93:14, 21
managers [1]
31:14
managing [1]
20:9
March [2]
70:19; 72:5
mark [3]
73:3, 24; 94:8
marker [1]
74:3
market [4]
27:3; 33:7; 73:3, 24
marketed [1]
20:16
markets [3]
75:5, 8; 94:8
masse [1]
10:11
massive [1]
51:4
material [2]
36:16; 97:7
materials [1]
87:23
mathematical [3]
29:9, 20; 32:16
mathematically [1]
89:2
matter [18]
12:21; 15:2; 16:2; 64:13; 65:22; 66:20; 68:6, 11, 13, 14; 71:16; 77:17; 79:19; 88:23; 97:22; 98:7, 20; 106:4
matters [5]
4:4; 9:1; 15:1; 16:15; 56:11
May [1]
47:5
mean [6]
10:4; 33:11; 41:10; 61:1; 67:15; 100:23
meaningful [1]
5:11
means [3]
54:10; 68:1; 76:7
meant [1]
63:6
measure [2]
72:20; 94:15
mechanism [1]
74:1
meet [4]
30:15; 44:20; 47:14; 48:6
meeting [2]
97:22; 98:3
memorandum [1]
96:9
memory [1]
96:25
men [1]

19:7
mention [3]
56:2; 83:17; 96:16
mentioned [2]
67:17; 92:9
mentioning [1]
75:23
mere [1]
32:15
merger [1]
21:13
merits [1]
71:17
Messrs [1]
82:8
methodological [2]
77:12; 78:11
methodology [3]
74:6; 85:1; 86:15
Meyer [1]
75:16
mid-1980s [1]
20:5
mid-1988 [1]
21:10
mid-1990 [1]
48:3
military [1]
19:1
million [69]
21:24, 25; 22:15; 23:5, 8; 24:1, 3; 29:14; 30:2, 10; 33:24; 34:1, 21; 35:1, 3, 11, 24; 36:1, 3, 7, 18, 19; 53:22, 25; 57:22; 58:13, 20; 59:3, 17, 18; 60:18; 61:7, 21, 23, 25; 64:6, 7, 9, 10, 11; 65:11; 67:24; 68:25; 69:1, 20; 70:6, 10, 14, 16, 22; 71:2, 6, 8; 73:6, 7, 14, 17; 74:18; 75:24, 25; 76:1, 2; 82:6, 25; 83:1; 85:12
mind [5]
6:13; 16:14; 17:6; 76:19; 78:3
minimum [1]
6:15
minor [1]
97:21
minority [1]
67:21
minute [1]
60:12
minutes [5]
10:7; 11:5, 8, 14; 60:25
minutiae [1]
77:16
mirrored [1]
81:17
misleading [1]
10:9
miss [2]
13:1; 95:2
missing [1]
48:14
misspoke [1]
69:17
mistake [1]
28:3
mitigate [2]
64:16; 66:12
mitigated [3]
64:16, 17; 65:2
mitigation [21]
30:6; 36:24; 38:1, 7, 10; 39:2, 19; 43:7, 13, 23; 44:18; 46:6, 17; 64:14, 25; 65:16, 22; 68:15; 94:21
mode [1]
14:1
models [1]
40:11
modicum [1]
26:22
moment [14]
52:10; 56:1; 57:24; 58:18; 60:9; 61:11, 14; 62:7; 69:10; 71:25; 78:1, 6, 19; 86:16
Monday [1]
8:3
money [10]
20:14; 22:21, 22; 88:13; 89:20; 90:6, 9, 13; 95:2, 5
monitor [1]
27:2
monthly [1]
73:3
months [2]
31:8; 53:16
moot [1]
104:8
morning [4]
4:24; 16:17; 18:4; 79:9
mortgage-backed [3]
20:22; 49:19; 50:1
mortgage-backed-security [10]
49:2, 13, 24; 50:12, 17; 51:23; 52:8, 14; 54:8, 11
motion [4]
20:21; 70:20; 71:9; 99:5
Motors [4]
65:24; 66:2, 6, 18
move [10]
8:6; 61:17; 71:18; 78:13, 20; 79:7; 84:22; 87:13; 93:2, 6
moved [3]
59:7, 11, 23
MR [137]
4:10, 15; 5:5; 6:9, 13; 7:21; 8:6, 10, 24; 9:3, 6, 25; 10:5, 12, 15, 23; 11:1, 4, 22; 12:8, 10; 13:18; 14:19, 22; 15:21, 24; 16:9, 11; 17:23; 18:3; 41:14, 17; 44:2, 10; 46:12, 16, 20; 47:2, 5; 48:15, 18; 49:20; 53:13; 54:4; 57:5, 9, 11; 60:14, 21; 61:3, 13, 16; 62:5; 63:13, 16; 66:1; 69:5, 9, 14, 23; 70:1, 5; 71:14, 18, 24; 72:9, 11, 15, 18; 74:9, 22; 75:16; 76:18, 20; 77:1, 4, 15, 24; 78:10, 15, 17; 79:10, 14, 17; 80:3, 5, 10; 81:9; 84:22; 87:3, 11, 18, 20, 24; 88:3, 16, 19, 21; 91:6, 15, 19, 23; 94:20; 95:17, 21; 96:2, 15, 20, 24; 97:8, 14, 20, 25; 98:9, 12, 18, 21, 25; 99:5; 100:9, 23; 101:8, 12, 24; 102:6, 9, 15, 17; 103:3, 4; 104:18; 105:3, 9, 14, 17, 21; 106:2
Mr [77]
4:9; 6:7; 7:19; 8:22, 25; 10:13, 16, 21, 25; 11:20; 12:3, 9; 13:17; 14:21; 15:20, 23; 17:21, 24; 18:1, 16, 23; 19:2, 4, 5; 20:8, 10; 21:1; 47:1; 55:10; 56:22; 57:2, 3; 58:18; 60:16; 61:12, 19; 63:17, 19, 20, 23, 24; 67:11, 16; 70:12; 76:5; 91:1, 13, 21; 92:9; 94:21, 24; 95:16; 97:5, 17, 25; 98:20, 22; 99:15, 21, 22; 100:10, 22; 101:10, 15, 17, 25; 102:7, 12, 21, 22; 103:23; 105:2
Murphy [18]
33:1, 13; 34:9, 11, 18; 35:2, 9, 22; 36:14; 57:21; 69:12; 70:11; 72:22; 73:13; 96:17, 20, 25
Murphy's [9]
34:5; 40:23; 45:23; 46:12; 71:8; 72:1; 92:14; 105:7, 22
Mutual [3]
21:12; 23:25; 24:4

– N –

N.W. [1]
107:18
name [2]
14:9; 62:10
National [4]
32:5; 62:19, 21
naturally [1]
13:8
nature [3]
17:17; 44:23; 104:6
necessity [1]
17:14
needs [5]
6:14; 40:14; 46:23; 95:4; 102:24
Neely [1]
32:20
negatively [1]
50:7
negotiated [2]
22:11; 31:7
negotiations [1]
75:17
Neil [1]
33:1
net [5]
28:17; 40:8; 58:7, 10; 74:4
nominal [1]
67:3
nonbreaching [1]
90:1
noncontractual [1]
62:24
nonexpert [1]
62:4
nonparty [1]
29:16
noon [2]
12:23; 13:12
note [3]
24:19; 38:7; 91:9
noted [3]
75:10; 82:4; 83:15
notes [1]
107:10
notice [8]
79:12; 100:20, 21, 22; 103:12, 14, 16; 104:4
notified [2]
99:10, 16
notify [1]
104:25
notion [11]
9:6; 64:1, 24; 66:4, 5; 67:2; 74:10; 76:8; 89:3, 12; 99:21
Notwithstanding [1]
26:20
number [10]
5:8; 9:20; 14:8; 15:3; 17:5; 39:11; 42:13; 74:18; 86:4; 95:8
numbered [1]
9:8
numbers [3]
9:21; 10:8; 30:20

– O –

obfuscate [1]
48:4
objection [7]
87:15; 97:6, 9, 14, 15; 104:7, 8
obligation [7]
100:5, 7, 12; 101:16, 17, 19; 104:2
obligations [6]
8:10, 11; 63:5; 98:4; 105:4, 18
obtain [1]
66:23
obtained [7]
65:10; 66:23; 67:22, 24; 68:11; 89:22
Obviously [1]
14:14
obviously [4]
5:18; 12:5; 14:16; 99:11
Occasionally [1]
10:6
occasions [1]
14:15
occur [2]
48:1; 93:1
occurred [1]
86:4
October [1]
53:21
offer [1]
23:20
offered [1]
10:11
offering [1]
17:9
official [1]
15:13
offset [1]
44:14
oh [1]
65:18
Okay [30]
6:7; 8:14, 25; 13:19; 15:8, 25; 41:15; 46:15, 19; 53:13; 57:10; 63:15; 69:5, 13; 70:4; 71:11, 24; 72:10; 76:20; 77:18; 78:16; 79:15; 80:8; 84:18, 22; 87:24; 91:16; 98:19; 102:16; 105:17
okay [3]
7:8; 35:12; 79:13
open [2]
5:4; 13:15
opening [4]
11:2, 21; 12:3, 6
operate [2]
24:10; 26:21
operated [1]
28:15
operating [3]
58:7, 10; 94:1
operations [2]
28:18
opine [1]
61:25
opined [2]
56:10; 62:1
opinion [10]
56:4, 7, 12; 61:19; 70:11; 80:1, 2; 81:10, 25; 84:7
opportunities [4]
88:7, 12, 15; 89:17
opportunity [24]
32:19; 39:20; 62:12, 13, 14, 17; 64:15, 17, 20; 65:1, 8; 66:13; 68:17; 86:25; 87:2, 5, 7; 88:25; 89:3, 6, 7, 13; 95:3
oppose [1]
11:22
order [12]
4:2, 3, 5; 8:12; 9:4; 13:21, 22; 16:15, 19; 35:8; 41:23; 62:20
ordinarily [1]
90:19
original [4]
15:9; 18:6, 9, 17
Originally [1]
57:13
originally [1]
57:22
OTS [12]
6:24; 10:1; 52:1, 3, 19, 23; 53:5, 8, 14, 20, 24; 54:3
outer [3]
5:7, 10, 23
outline [2]
69:10; 72:1
outset [2]
14:6; 24:9

outside [1]
27:22
outstanding [1]
95:9
overlap [1]
7:2
oversight [2]
51:15; 53:6
overview [2]
16:22; 17:21
owe [2]
95:3, 7
owned [4]
20:8; 28:15; 66:3; 67:17
owner [1]
22:7
owners [1]
66:14
ownership [10]
21:8; 33:16, 19; 35:6, 7, 19; 63:19; 92:17; 93:18; 94:2

– P –

p.m. [1]
8:15
package [2]
10:10; 76:10
page [9]
9:17, 18; 56:16; 70:2, 21; 71:4, 5; 81:25; 84:7
pages [2]
9:17, 18
paid [9]
22:18; 42:20; 58:6, 9; 80:25; 82:17; 83:1, 3, 22
paper [1]
96:12
papers [1]
21:14
par [2]
73:14; 75:25
paragraph [4]
9:4; 11:1; 15:2, 8
parameter [1]
45:16
parameters [2]
34:19, 23
parent [1]
27:13
parse [1]
52:20
part [25]
7:24; 14:4, 20; 15:12; 21:19; 22:7; 24:22, 23; 36:3; 44:3, 11; 54:23; 58:3; 61:9; 64:20; 66:7, 23; 67:13, 14, 25; 68:1; 70:7; 76:8, 9; 99:5
partial [1]
71:9
participated [2]
5:18; 20:9
parties [21]
4:6; 5:19; 7:6; 8:15, 20; 9:20; 14:5, 14; 16:5, 7; 17:9, 11, 14, 19; 22:11; 23:23; 24:15; 31:4; 87:15, 16; 96:12
party [7]
16:6; 18:18; 28:12; 45:3; 81:6; 86:8; 90:1
party's [1]
8:19
pass [1]
87:21
passage [2]
48:1; 49:16
passed [5]
18:17, 24; 47:18, 21; 49:5
passing [1]
65:8
pattern [1]
7:2
Pause [1]
47:4
pause [1]
60:12
pay [8]
22:22; 34:20; 38:19; 41:12; 42:25; 43:3; 64:9; 86:25
paying [7]
22:21; 23:3; 43:6, 8, 10, 12; 65:6
payment [5]
21:18; 22:14; 43:9; 81:12; 84:10
payoff [1]
64:3
pays [1]
64:7
pending [1]
101:7
people [2]
13:15; 19:10
Peoria [3]
25:3; 31:8; 70:7
perceived [1]
65:2
percent [45]
41:1, 7, 12, 13, 15, 17; 42:1, 12, 19; 44:13; 50:10, 18, 21, 25; 51:9, 10; 53:23, 25; 62:14; 63:19, 20, 24, 25; 66:14; 67:17; 68:3, 4; 71:2; 82:9, 21, 23; 83:3; 84:11, 13, 14, 16, 19; 85:6, 10, 14, 21; 95:6, 7
perception [1]
75:9
Perfectly [1]
15:24
perfectly [1]
17:25
perform [1]
39:9
performed [1]
73:2
period [17]
20:13; 25:17; 26:17; 28:22; 38:4, 6, 12; 39:15; 40:10; 42:8, 10; 54:5; 73:9; 85:13; 86:2; 93:1, 20
periods [2]
39:6; 43:4
permission [2]
17:24; 55:5
permit [4]
12:5; 56:24; 64:22; 68:8
permitted [5]
26:6; 64:20; 89:18; 92:12; 97:9
personal [1]
19:4
personally [1]
60:7
perspective [3]
4:18; 6:23; 19:22
pertinent [1]
15:16
phone [1]
102:1
pick [2]
74:18; 91:17
picked [1]
102:1
piece [2]
77:10; 95:13
pieces [1]
34:17
Pikus [1]
63:24
pioneer [1]
20:22
place [6]
4:16; 20:4; 28:2; 37:9; 71:25; 98:5
Plaintiff [23]
18:9, 12, 14, 18, 19, 22; 19:11; 28:13, 21; 46:8; 55:18; 60:16; 67:3; 69:7; 74:20; 76:17; 86:23; 96:19; 99:15; 100:17; 103:12, 13, 19
plaintiff [5]
19:12; 29:7; 47:10, 11; 68:8
Plaintiff's [4]
17:21; 70:19; 72:3; 102:14
Plaintiffs [44]
4:20; 6:1, 3, 16; 12:6; 18:5, 7; 33:1; 36:25; 46:10; 47:9, 24; 48:2, 7; 52:15, 21; 55:5, 24; 56:1, 19, 20; 57:13, 19; 58:22; 59:5, 9, 11; 67:9; 69:17; 70:18, 21, 25; 71:6, 9; 72:19; 76:13; 78:18; 79:18, 25; 80:9; 81:3; 88:4; 99:6; 104:3
plaintiffs [1]
82:20
plan [5]
25:10; 31:15; 47:14, 23
planned [1]
22:9
plans [1]
25:13
play [2]
54:20, 22
pleadings [1]
55:10
Please [1]
91:21
please [2]
18:4; 47:5
plow [1]
94:11
podium [1]
4:13
point [15]
6:18; 12:1; 13:6; 36:20; 75:5, 13; 76:11; 79:1; 90:25; 91:3; 98:23; 103:22; 104:14, 20, 23
policy [1]
50:7
portfolio [5]
20:24; 26:14; 51:24; 52:2; 94:8
portion [6]
23:9; 26:7; 37:11; 39:7; 51:1, 2
posing [1]
16:23
position [9]
8:5, 19; 65:25; 90:25; 101:13; 102:14; 104:3
post-FIRREA [1]
54:5
post-First [1]
85:12
Postbreach [1]
40:20
posttrial [2]
54:23; 56:6
potential [6]
11:11, 19; 27:3; 54:22; 63:7; 78:23
preamble [1]
28:25
precedent [1]
19:19
precision [1]
29:9
preclude [1]
7:14
preclusion [1]
95:24
predictable [1]
26:14
preexisting [1]
24:9
prefer [1]
95:25
preference [1]
48:23
preferred [20]
22:14; 23:6; 33:18, 23; 34:12, 17; 36:1, 10; 70:9, 23; 72:22; 73:11, 13, 21, 22; 75:18; 76:6, 9; 92:24; 93:7
preliminary [2]
13:21; 16:20
preparation [3]
4:4; 88:1; 97:5
prepare [3]
16:15; 55:14; 60:7
prepared [4]
14:16; 16:22; 36:15; 97:11
presence [1]
19:6
present [8]
6:21; 18:19; 19:14; 29:11; 30:5; 36:25; 55:6; 78:24
presentation [3]
16:24; 46:25; 92:10
presented [9]
19:20, 22; 30:18, 22; 32:25; 59:16, 18; 61:18; 62:3
presenting [1]
18:22
presumably [1]
13:16
pretrial [4]
9:4; 12:11; 13:21; 16:20
pretty [2]
90:24; 103:5
previously [2]
16:18; 23:20
price [8]
23:3; 33:7; 42:15; 80:14; 81:5, 17, 20; 92:16
primarily [1]
52:12
principle [3]
7:8, 9; 37:21
principles [1]
34:16
privately [1]
33:3
problem [4]
89:5, 15; 100:15; 104:24
problems [9]
9:12; 27:9; 49:3; 50:11; 75:12, 21; 77:12; 78:11; 89:8
procedure [2]
5:15; 15:18
procedures [1]
4:17
proceedings [1]
107:8
proceeds [1]
82:7
procure [1]
45:4
produce [1]
47:22
product [1]
90:8
professor [1]
33:2
proffered [1]
15:14
profit [4]
21:4; 31:16; 38:19; 89:23
profitability [3]
24:17; 31:11; 93:16
profitable [1]
89:17
profitably [3]
21:3; 25:10; 26:21
profits [20]
20:20; 22:10; 25:16, 21; 26:24; 28:16; 29:12, 15; 32:10, 17, 20; 46:16; 54:25; 57:14; 65:10; 68:10, 23; 89:7, 9; 92:1
program [1]

20:23
projecting [1] 49:6
projection [1] 93:24
prominent [1] 18:23
promise [1] 24:1
promised [8] 21:16, 22; 22:1; 23:13; 24:6, 12; 26:9; 45:10
promises [2] 23:17; 24:16
promptly [1] 104:17
proof [1] 6:2
proper [2] 20:1; 99:18
properly [1] 4:3
proposals [2] 8:18; 24:21
proposed [2] 27:23; 34:24
proposition [2] 83:19; 88:22
prospectively [1] 41:21
protect [2] 51:16, 18
prova [1] 74:20
proven [2] 29:18; 92:12
provide [15] 14:6; 76:7; 79:5, 6; 87:19; 96:22; 97:10, 12; 98:16; 100:20, 25; 103:20; 105:5, 9, 22
provided [9] 15:10, 14; 53:1; 55:21; 67:6; 76:4; 94:16; 100:19; 103:14
provides [1] 64:11
providing [1] 87:16
proving [1] 89:9
provision [2] 15:5; 62:25
provisions [3] 62:22, 23; 63:1
proxy [4] 72:21, 23; 83:8; 84:5
public [1] 73:19
publication [1] 48:1
publicly [2] 33:6; 72:21
purchase [10] 22:12, 21, 22; 27:16, 18, 19, 21; 64:12; 81:11; 94:16
purchased [1] 33:23
purely [1] 84:15
purported [1] 47:25
purpose [1] 12:15
purposes [5] 22:3; 25:25; 26:2, 10, 11
pursue [4] 69:7; 88:17; 89:18; 101:21
pursued [1] 88:12
pursuing [2] 88:7; 92:4
putting [3] 7:14; 41:23; 50:24
puzzle [1] 77:10

– Q –

quantity [1] 17:16
question [7] 16:3; 31:24; 66:25; 84:17, 18; 91:7; 95:14
questions [6] 16:23; 17:6; 46:21; 55:24; 95:11; 104:10
quick [1] 56:21
quickly [1] 103:6
quotation [1] 83:16
quote [1] 83:2
quoting [2] 81:8, 9

– R –

raise [2] 13:6; 98:23
raisings [2] 83:7; 84:5
ramping [1] 20:23
rapid [1] 26:13
rapidly [1] 26:7
ratable [1] 36:15
ratably [1] 40:4
rate [9] 41:4, 18; 44:14, 15; 82:9; 93:1, 11, 14, 15
rated [2] 53:14, 17
rates [1] 41:7
rating [1] 53:10
ratings [2] 53:7, 10
ratio [2] 35:18, 22
re-Bates [1] 9:11
reach [3] 8:16, 20, 22
reaction [2] 4:25; 44:3
reactions [1] 95:20
read [4] 13:25; 15:6; 17:3; 87:12
reads [1] 16:4
real [6] 28:16; 29:21; 31:23; 32:3; 101:15
realized [4] 81:5; 82:8; 83:24; 85:2
reason [8] 67:18; 89:5; 90:14; 101:22, 24; 102:19; 104:1, 13
reasonable [12] 14:20; 29:7, 19; 30:16; 32:14, 15, 21; 35:21; 41:3, 8; 44:21; 45:15
reasonably [3] 29:8; 30:24; 31:3
reasoning [4] 81:23; 84:1; 96:5, 6
reasons [5] 8:19; 42:21; 63:12; 86:7; 94:7
rebuttal [5] 12:7; 44:7; 91:5, 18; 105:6
recall [5] 53:9; 55:4; 59:6, 22; 99:1
recap [1] 105:4
receive [1] 64:25
received [4] 80:12, 19; 82:2, 7
recent [4] 44:1, 3; 80:2, 3
recently [3] 18:17; 79:22; 105:12
recess [3] 91:13, 17, 20
recession [1] 75:4
recognized [1] 86:6
record [9] 15:13; 21:3; 25:8, 16, 20; 31:11; 83:13; 103:13, 15
recorded [1] 82:25
recounted [1] 18:14
recover [9] 18:10, 12, 20; 19:16; 39:7; 46:9, 11; 60:17; 87:1
recovering [1] 43:21
recovery [10] 66:21, 22, 24; 67:6; 68:2, 5, 9; 92:3, 4, 10
red [1] 92:11
redeem [3] 34:1; 73:15; 94:4
redeemed [2] 41:25; 76:1
redemption [3] 34:24; 35:4; 75:11
reduce [1] 36:19
reduced [3] 52:5, 8; 70:16
reduction [1] 51:23
refer [1] 69:15
reference [1] 82:16
referred [2] 58:19
referring [2] 55:2; 87:9
refinement [1] 39:22
reflect [2] 84:16; 94:8
reflecting [1] 30:6
reflection [1] 15:4
reflective [1] 82:17
regard [15] 13:24; 17:22; 48:20; 58:23, 25; 59:16; 61:5; 70:15; 74:2; 75:17, 19; 89:10; 92:1; 94:21; 105:6
regardless [1] 85:24
regulations [2] 48:2, 12
regulator [2] 22:7; 86:11
regulators [14] 7:3; 21:4, 7, 10; 23:19; 24:20; 25:1; 50:11, 23; 51:7; 76:3; 89:18; 93:22, 24
regulatory [38] 21:17; 22:2; 23:7, 14, 17; 24:2, 7, 12, 14; 25:24; 26:5, 9; 27:8, 23; 30:8; 32:7; 35:12, 14; 36:9, 14; 38:9, 14; 39:8, 25; 40:5; 43:2, 6; 45:7, 10; 48:4, 25; 51:12; 52:12, 25; 53:4; 54:4, 6; 77:5
reject [1] 74:15
relate [1] 45:22
related [9] 17:8; 47:17; 49:9, 18, 22; 63:2, 4; 64:18; 87:17
relates [2] 14:1; 97:22
relating [7] 23:21; 29:12; 49:12; 53:2; 54:25; 67:10; 98:2
relation [3] 52:12; 54:6, 13
relationship [1] 54:7
relationships [1] 19:7
relative [2] 51:12; 54:8
relatively [1] 90:18
relevant [1] 28:14
reliable [3] 34:15; 35:20; 76:7
rely [1] 17:13
remain [3] 4:13; 26:6; 104:13
remaining [1] 30:15
remarks [1] 61:12
remedy [1] 39:4
remember [1] 69:18
remit [2] 7:16; 103:17
remote [1] 19:18
repeat [1] 90:10
repeatedly [1] 55:11
replace [6] 38:13; 39:1; 40:9; 43:5, 15; 48:13
replacement [9] 38:3, 4; 39:12, 24; 41:11; 57:15; 78:14; 83:12; 90:2
replacement-cost [1] 40:11
replacements [1] 84:24
report [15] 17:4; 43:25; 55:21; 57:18; 58:1; 59:19; 61:22; 67:18; 71:9; 96:17, 23; 97:1, 3; 102:20, 22
reported [1] 107:10
reporter [2] 15:12; 57:7
REPORTER'S [1] 107:1
Reporting [1] 107:17
reports [10] 17:4, 5; 44:4; 55:4; 58:13; 59:14;

62:1; 97:10; 105:6, 23
representation [5]
48:19; 99:15; 100:17; 101:13; 103:9
representations [2]
55:16; 69:18
represented [1]
40:13
representing [1]
53:23
represents [1]
103:23
Republic [5]
23:21, 22; 24:5, 10; 35:17
request [5]
16:5, 7; 98:1; 100:16; 104:6
requested [2]
101:13, 14
requests [3]
14:12; 16:6; 103:25
require [3]
52:20; 59:14; 99:6
required [13]
28:9; 29:9; 41:4, 7, 17; 47:13, 22; 48:11; 49:1; 51:5, 12; 64:3; 82:18
requirement [3]
10:22; 49:21; 99:10
requirements [2]
47:13; 48:9
requires [1]
59:13
residual [2]
58:4, 6
Resolution [1]
27:6
resolve [1]
104:17
resolving [1]
104:6
respect [24]
6:10; 7:5; 9:3; 48:5, 23; 50:12; 54:17; 56:12; 57:21; 59:15; 60:17; 61:23; 63:5, 8; 68:19; 69:4; 70:11; 72:1; 75:7; 77:22; 79:21; 95:15; 100:25; 104:4
respectfully [1]
52:19
respond [4]
56:3, 8; 60:2, 3
responded [1]
59:21
response [4]
59:22; 71:23; 72:2; 97:11
restamping [1]
10:18
Restatement [4]
86:17; 90:3, 10; 94:22
restatement [1]
89:12
restitution [1]
57:15
restore [1]
88:5
restriction [1]
54:10
restrictions [1]
43:1
result [3]
17:6; 28:11; 51:4
resulted [3]
35:13; 81:4, 19
resulting [3]
24:7, 18; 28:17
results [2]
26:15; 39:24
resume [1]
105:1
retain [1]
88:11
retained [59]
30:7; 37:13, 15, 17, 19, 24; 38:3, 5, 13, 16, 17, 21, 24; 39:16, 21; 40:3, 6, 9, 13, 16; 45:9, 14; 55:20; 78:2, 7, 18; 79:15, 18, 21, 24; 80:9, 11, 14, 20; 81:4, 17, 18, 22; 82:3, 4, 11, 15, 19, 25; 83:4, 9, 18; 84:3, 6; 85:2; 86:18, 22, 23; 87:5; 88:9, 22, 24; 96:3; 105:11
retained-earnings [1]
55:6
retention [2]
80:25; 83:21
retrospectively [1]
42:6
return [14]
13:16; 40:12, 17; 41:4, 7, 18; 42:15; 76:12; 81:2; 82:9; 83:3, 9; 84:6; 93:3
Returning [1]
62:5
returns [3]
41:20; 42:7, 12
review [2]
17:7; 87:22
revise [2]
70:20, 25
revised [1]
16:15
revisions [2]
13:20; 16:13
revoked [1]
21:21
Right [13]
53:11; 62:5; 71:14; 72:11; 76:18; 77:4, 15; 78:10; 88:16, 19; 96:1; 98:25
right [19]
7:1; 14:24; 16:12; 19:16; 23:3; 42:2; 53:3; 55:14; 58:17; 60:6, 24; 66:7; 71:24; 91:11; 92:22; 94:20; 105:5, 8, 15
rigorous [1]
23:1
risk [4]
20:24; 50:4, 25; 93:14
risk-based [1]
26:4
risky [3]
49:24; 50:9, 12
River [134]
18:22; 19:9, 13, 17, 21, 22; 20:3; 21:14; 22:4, 10; 23:14; 24:11, 20, 22; 25:2, 5, 14, 19; 26:12, 21; 27:2, 16, 18, 19, 20; 28:5, 8, 19, 23; 29:16, 25; 30:6; 31:6, 8, 9, 13, 20, 24; 32:1, 2, 4, 7, 11, 18, 24; 33:3, 12, 16, 19, 25; 34:21, 25; 35:5, 6, 7, 9, 10, 16, 23; 36:4; 37:6, 11, 13; 38:12, 20, 22; 39:4, 6, 19; 40:19, 21, 24; 42:11, 24; 43:2, 5, 19; 46:5; 47:16; 49:6, 10, 14; 50:20; 51:11; 52:2, 11, 13, 21; 53:14; 58:6, 9; 62:15, 20; 63:21, 23, 24; 64:3, 5, 8, 14; 65:2, 4, 5, 6, 12, 14, 23; 66:9, 12; 70:24; 72:5; 73:1, 2; 80:18, 19; 82:1, 2, 5, 7; 84:8; 85:7, 22; 88:6; 89:19; 92:6, 8; 93:13, 16, 21, 23
ROBERSON [89]
6:9, 13; 7:21; 8:6, 10; 9:3, 6, 25; 10:5, 12; 11:1, 4; 12:10; 14:19; 15:24; 16:11; 47:5; 48:15, 18; 49:20; 53:13; 54:4; 57:5, 9, 11; 60:14, 21; 61:3, 13, 16; 62:5; 63:13, 16; 66:1; 69:5, 9, 14, 23; 70:1, 5; 71:14, 18, 24; 72:9, 11, 15, 18; 74:9, 22; 75:16; 76:18, 20; 77:1, 4, 15, 24; 78:10, 15, 17; 79:10, 14, 17; 80:3, 5, 10; 81:9; 84:22; 87:3, 11, 18, 24; 88:3, 16, 19, 21; 91:6; 97:8; 98:12, 25; 99:5; 100:9, 23; 101:8; 103:4; 105:3, 9, 14, 17; 106:2
Roberson [22]
6:7; 7:20; 8:25; 10:17, 25; 12:3, 9; 15:23; 47:1; 57:2, 3; 92:9; 94:21, 24; 95:16; 97:5, 25; 98:22; 101:15; 102:8, 23; 105:2
Roberson's [1]
10:21
Rockfall [1]
20:6
Rockfalls [10]
20:17, 19, 21; 21:8; 23:20, 21; 24:9; 25:18; 31:10; 35:17
Rose [2]
62:10; 63:23
Ross [23]
18:16, 23; 20:8, 10; 21:1, 11; 62:18; 63:18, 19; 66:11, 13; 67:5, 7, 11, 16, 19, 20, 23; 82:8; 99:8, 22
Ross's [2]
19:5; 31:12
roundabout [1]
89:8
RTC [4]
27:7, 13; 33:18; 34:23
RTC's [3]
40:21, 24; 62:11
Rule [2]
59:13; 98:2
rule [1]
16:4
ruled [1]
18:11
rules [3]
59:12, 13, 25
ruling [3]
70:8; 100:10; 103:21
run [3]
69:16; 77:10, 24
running [2]
19:8; 63:22
rushed [1]
8:4

– S –

safe [4]
16:7, 9; 23:15; 44:15
safely [2]
21:3; 25:11
safety [1]
27:9
SAFSB [46]
27:14; 28:1, 15, 23; 29:12, 15, 17; 30:17; 46:7, 16; 58:13, 14, 15, 17, 19, 23, 25; 60:17, 23; 61:5, 21, 23, 25; 62:3, 6, 8, 12, 20; 64:12; 65:1, 4, 9; 66:20, 23; 67:10, 12, 16, 18, 21; 68:19, 21; 69:4; 78:22, 25; 92:1, 7
SAFSB's [1]
28:18
sake [3]
62:2; 74:14; 102:12
sale [9]
35:4; 62:11; 80:13, 20; 81:5, 6; 82:7; 85:2; 94:16
sales [1]
81:20
San [8]
27:4, 14, 18, 19, 21; 28:6, 11; 31:21
satisfactory [1]
8:22
Savings [11]
20:6; 22:5; 23:22; 27:5, 14; 30:12; 83:6, 11, 17; 84:2
savings [2]
75:9, 12
saying [7]
59:12; 62:13; 73:24; 76:21; 77:7; 88:14, 20
scale [1]
26:24
scenario [1]
6:1
schedule [1]
23:11
schedules [1]
12:20
seated [2]
4:13; 91:21
Second [2]
43:4; 93:9
second [9]
14:25; 29:23; 32:23; 55:17; 58:1; 69:8; 73:10; 86:1, 13
Secondly [2]
65:5; 73:18
secondly [1]
60:1
Section [1]
90:3
section [2]
94:22, 24
securities [7]
20:23; 22:2, 12, 21; 44:16; 49:19; 50:2
security [4]
34:12, 17, 20; 92:24
seek [2]
4:19; 71:1
seeking [2]
60:17; 87:1
seeks [1]
45:24
sees [1]
99:3
seized [1]
20:15
sell [1]
33:24
selling [1]
80:12
sense [9]
7:16; 13:13; 15:5; 17:2; 19:5; 43:23; 68:7, 12; 96:11
sensible [1]
4:17
separate [12]
10:2, 3, 8; 11:17; 24:8; 27:13; 28:12, 15; 45:21; 65:17, 19; 92:8
separately [3]
9:7, 21; 24:11
September [5]
59:3; 64:6; 73:5; 107:5, 14
series [2]
10:7; 57:14
serves [1]
96:25
service [2]
45:3; 90:7
serving [1]
38:4
sets [1]
66:3
setting [2]
16:20; 85:5
settle [1]
71:15
settled [1]
77:8
settlement [5]
52:16, 17, 18; 54:14, 16
settles [1]
98:19
severe [1]

26:13
severely [2]
26:2, 10
shape [1]
27:15
share [2]
42:14; 81:3
shareholders [14]
64:19; 65:4, 9, 12, 13; 66:3, 10; 67:21; 82:2, 6, 18; 83:9; 84:5
shares [3]
22:14, 22; 23:6
shed [1]
47:18
sheer [1]
38:9
sheet [2]
37:6, 12
shifting [1]
69:10
shifts [1]
14:14
shouldered [1]
81:13
Show [1]
69:25
show [13]
25:1; 26:17; 27:17; 28:7; 31:5, 19, 25; 32:3; 40:21; 73:8; 74:11, 25; 95:5
showing [1]
56:18
shows [6]
34:2; 40:24; 73:4; 79:13; 88:23; 89:2
shrinkage [2]
26:13; 58:3
shrinking [1]
64:23
shrinks [1]
64:5
significance [1]
52:11
significant [14]
19:7, 9; 20:1; 21:17, 24; 24:19; 27:8; 30:20; 33:10; 43:1; 47:11; 49:6; 51:25; 53:6
Significantly [1]
83:16
silent [1]
89:4
simple [8]
30:11; 33:7; 34:16; 35:2; 39:10; 45:1, 7, 13
single [1]
92:3
Sir [1]
67:9
sir [1]
101:8
situation [4]
13:10; 17:11; 66:7; 80:18
sizable [2]
20:23; 25:15
skills [1]
21:2
sleight [1]
68:8
slew [2]
60:22; 77:11
slice [2]
34:3; 72:23
slicing [1]
50:3
slide [2]
78:20, 24
slides [1]
56:25
slip [3]
28:1; 81:24; 84:7
smaller [1]
26:23
smallest [1]
82:16
so-called [1]
10:22
sold [4]
80:17, 18; 82:1; 92:17
solid [1]
20:19
Somebody [2]
32:19
somebody [3]
9:14; 12:24; 28:20
somehow [1]
36:2
somewhat [1]
15:5
sophisticated [1]
20:24
sorry [3]
27:25; 69:5; 105:14
sort [3]
10:6; 13:13; 17:7
sought [3]
14:10; 66:21; 82:21
soundness [1]
27:10
Sounds [1]
13:18
source [5]
31:22; 54:15; 83:6; 84:4; 100:7
sources [1]
33:4
space [3]
14:9, 11; 45:8
speak [3]
4:13; 10:11; 75:20
speaker [1]
17:22
speaking [1]
102:7
specific [4]
5:2; 49:21; 61:6, 8
specifically [3]
49:22, 23; 70:10
specified [1]
89:7
spelled [1]
61:12
spelling [1]
74:8
spend [3]
8:2; 19:24; 44:23
spoken [1]
101:25
sponsor [1]
96:21
spread [2]
40:11, 18
stable [1]
20:19
stage [2]
8:8; 94:19
stake [1]
22:8
stance [1]
47:8
stand [6]
19:15; 68:9, 24; 78:9; 88:9; 105:25
standard [9]
21:6; 26:2; 30:24; 35:22; 36:6, 12, 21; 40:11; 45:19
standards [7]
26:1, 3, 5; 30:15; 44:21; 47:15; 49:17
stands [4]
18:10, 12, 20; 19:11
start [4]
20:4; 47:6; 78:17; 79:17
state [3]
57:20; 58:2; 70:21
stated [3]
48:23; 82:24; 90:3
statement [5]
8:19; 11:21; 12:4, 6; 60:16
States [4]
68:10; 69:1; 107:4, 11
states [1]
100:14
stating [1]
81:15
status [3]
103:1, 15; 104:16
stay [1]
4:16
steady [2]
57:20; 58:2
steady-state [1]
55:1
step [2]
62:7; 101:22
stepped [2]
45:14; 51:9
Steven [2]
18:15; 99:7
stickered [1]
15:9
stipulate [1]
17:12
Stipulated [3]
47:20; 49:8; 51:13
stock [15]
33:6, 18; 41:21; 70:9, 23; 72:23; 73:11, 13, 22; 75:18; 76:6, 9; 84:10; 93:5, 7
stop [1]
81:16
stopping [1]
13:12
story [1]
20:17
straightforward [2]
45:16, 18
strategy [1]
93:14
Street [1]
107:18
street [1]
95:6
stretch [1]
11:12
strike [3]
59:7, 12, 24
strikes [1]
5:25
strings [1]
22:19
stripped [1]
87:4
strokes [1]
23:24
strong [1]
83:19
strongly [1]
11:22
structure [5]
28:20; 34:11; 62:16; 68:7; 85:16
stuck [1]
13:2
study [2]
33:8; 95:19
studying [1]
95:22
sub [2]
27:14
subject [3]
8:3, 17; 101:11
submit [1]
79:8
subordinated [3]
21:25; 24:2; 83:8
subsidiary [2]
27:11; 63:3
substance [4]
33:14; 60:23; 61:4; 62:6
substantial [11]
21:16; 25:21, 22; 36:6, 7, 8, 20, 22; 70:15
substantially [4]
14:5; 15:7; 21:2; 25:15
substantive [1]
98:24
substitute [2]
45:5; 90:16
subtraction [1]
35:2
succeed [1]
31:16
success [12]
21:4, 6, 19; 22:8, 9, 10; 23:18; 24:17; 25:8, 16, 22; 26:22
successful [4]
18:7, 23; 43:14, 22
successfully [2]
20:25; 26:22
successor [2]
18:21; 19:13
sudden [1]
26:12
sue [1]
99:2
suffer [1]
81:21
suffered [1]
29:8
sufficient [1]
38:13
sufficiently [2]
5:1; 44:22
suggest [3]
4:6; 5:12; 91:2
suggestion [8]
4:11; 5:4; 7:15; 9:19; 10:21; 11:13; 103:9; 104:10
suggests [1]
43:20
sum [1]
71:6
Summary [1]
98:5
summary [10]
44:6, 11; 59:6, 23; 65:15; 71:9; 79:20; 94:10; 98:2, 16
supervisory [5]
24:5; 51:7, 11, 22; 52:7
supervisory-assisted [1]
21:13
supplement [1]
70:20
supplemental [2]
58:1; 97:1
supplemented [1]
96:25
support [4]
17:8; 32:22; 38:18; 83:19
supported [1]
37:2
supporting [1]
37:11
supports [1]
96:18
surely [1]
36:12
surprise [1]
102:2
surprised [3]
70:12; 102:17, 18
suspect [1]
99:21
sympathetic [1]
13:5
system [1]

27:10

## – T –

table [1]
55:2
tail [1]
75:19
takeover [1]
20:16
takes [1]
40:3
talk [14]
6:11, 24; 9:2; 11:9; 19:24; 57:24; 69:8, 11; 71:22; 79:15; 86:1, 16, 22; 101:15
talked [1]
39:17
talking [5]
21:23; 36:17; 48:15; 70:13; 74:16
Talman [1]
30:13
Tammy [1]
107:16
tangible [19]
22:8; 26:1, 10; 40:13; 50:10, 19, 21, 23; 51:6, 8, 14, 18, 21; 53:24, 25; 54:7, 12, 18; 77:8
tapes [1]
107:10
target [1]
27:4
task [1]
34:5
tax [7]
55:18; 56:2, 5, 9, 10, 12, 14
taxes [1]
67:20
telephonic [2]
103:1; 104:16
temporarily [1]
21:22
terminated [1]
52:7
terms [4]
22:11; 74:25; 75:19; 96:9
terrific [1]
10:24
testified [2]
76:4; 86:11
testimony [10]
17:9; 30:19; 37:1; 51:19; 59:10; 61:20; 62:4; 87:7, 10; 89:10
Texas [2]
27:5; 62:11
textbook [1]
86:20
Thacker [5]
42:8; 80:6; 82:4; 84:8; 88:23
Thacker's [3]
84:11; 87:4; 89:10
Thank [15]
4:15; 8:24; 10:23; 12:8; 15:21; 16:12; 18:3; 47:2, 3; 91:19, 23; 97:20; 98:20, 21; 106:2
thank [2]
46:20; 106:1
theories [13]
17:2; 19:24; 29:11; 45:21; 54:20, 22; 58:22, 25; 59:8, 24; 69:7; 96:2, 18
theory [25]
29:23; 30:5; 32:23; 39:7; 44:20; 45:1; 55:6, 20; 59:2, 15; 60:3; 61:12, 18; 75:22; 78:18; 79:19, 22; 80:9; 86:2, 18, 22; 87:5; 88:9, 25; 96:21
There's [7]
61:22; 62:24; 72:23; 82:13; 85:11, 13; 86:7
there's [10]
6:25; 60:21; 68:20; 72:3; 74:11; 79:22; 83:13; 91:2; 99:18; 100:1
thereafter [3]
15:11, 17; 48:13
thereby [1]
17:14
they'll [1]
103:6
they're [6]
59:1; 65:11; 78:2; 98:15; 99:12; 100:13
They've [2]
68:22
third [7]
7:6; 19:11; 28:12; 30:5; 81:6; 86:8; 93:19
third-party [1]
31:22
thoughts [2]
14:18; 61:17
threat [1]
27:9
three [16]
6:17; 14:7; 17:5; 21:11, 23; 25:20, 25; 29:2, 11; 30:14; 45:21; 46:11; 53:15, 17; 58:15; 69:6
three-day [1]
6:18
thrift [21]
20:13; 23:22; 24:10; 47:19, 21; 48:5; 51:5; 55:1; 63:5; 72:21; 76:8; 80:15, 16; 81:6, 11; 82:17, 25; 83:23; 89:17, 20; 90:21
thrift's [3]
83:7; 84:4; 89:21
Thrifts [4]
63:21, 23; 72:5; 73:1
thrifts [12]
20:14; 21:6, 9; 47:16; 49:6, 11, 14; 52:21; 53:14, 17; 73:5; 82:10
throw [1]
49:17
thrusted [1]
32:7
Thursday [1]
13:15
thwarted [2]
28:6; 29:12
ties [1]
89:11
tight [1]
12:19
time-consuming [1]
17:17
time-of-breach [1]
45:23
times [4]
25:9; 39:11; 95:7, 8
TITLE [1]
107:4
tongue [1]
28:1
torrent [1]
65:13
total [4]
35:8; 36:17; 46:1; 67:17
totaled [2]
50:18, 21
totally [4]
60:4; 61:22; 65:19; 90:9
trace [2]
28:16, 21
traceable [5]
29:15, 22; 32:17; 84:19; 92:13
track [9]
5:13, 20; 14:1; 21:3; 25:8, 16, 19; 31:10; 83:13
traded [2]
33:6; 72:21
trading [1]
33:7
tranches [1]
50:4
transaction [5]
19:18; 22:17; 23:12, 16; 34:25
transaction-driven [1]
94:14
transactional [1]
92:20
transactions [1]
31:2
transcript [1]
4:12
transcripts [1]
105:10
transfer [4]
7:5; 86:6, 8, 12
transferred [1]
86:3
travel [1]
12:19
traveling [1]
12:16
Treasury [1]
44:15
treat [3]
22:2; 23:7; 24:2
trial [33]
4:5, 21; 5:9; 7:11; 9:7; 12:20, 23; 13:7, 14; 14:6; 15:9, 13, 15; 17:1; 54:23; 59:16; 60:8; 68:19; 71:20; 77:17; 79:4; 80:4, 5, 23; 81:16, 20, 23; 83:5, 15; 88:2; 94:13
trials [2]
9:13; 53:9
tries [1]
92:19
troubled [2]
21:9; 23:22
troubles [1]
27:12
Trust [1]
27:6
Tuesday [3]
8:11; 12:14; 98:4
turmoil [1]
26:17
twice [1]
67:12
two-thirds [1]
23:13
two-week [1]
7:14
type [3]
30:25; 31:3; 79:24
typical [2]
47:10

## – U –

U.S. [1]
18:25
ultimate [1]
21:18
ultimately [1]
81:2
unable [3]
39:20; 90:2, 16
uncertain [2]
58:23; 100:9
underlying [1]
96:2
underneath [1]
58:16
understand [8]
50:1; 54:24; 57:12; 67:1; 68:16; 69:3; 71:11; 76:22
understanding [17]
4:19, 22; 54:21; 55:8, 17; 56:13, 18, 20; 57:1, 16, 23; 58:4, 11; 99:9; 105:5, 20, 22
understands [2]
56:15; 78:24
understood [3]
23:16; 24:15, 22
undertook [1]
23:1
underwater [1]
51:3
unduly [1]
17:17
unforeseeable [1]
86:21
unique [1]
90:6
United [4]
68:10; 69:1; 107:4, 11
Unlike [2]
22:18; 24:4
unnecessary [1]
104:10
unrealized [1]
81:13
unrelated [1]
64:1
unreliable [6]
73:12, 17, 18; 75:23; 85:25; 86:15
Unsurprisingly [1]
33:21
unwilling [2]
62:21; 83:18
upheaval [1]
26:20
upper [1]
63:25
upside [1]
26:19
upstreaming [1]
64:24
upward [1]
93:5
urge [1]
5:5
useful [2]
16:21; 19:23
usual [1]
89:25

## – V –

vacuum [1]
37:8
valid [1]
44:14
Valley [111]
18:22; 19:9, 13, 17, 21; 20:3; 21:14; 22:5, 10; 24:11, 21, 22; 25:2, 5, 14, 19; 26:21; 27:2, 16, 18, 19, 20; 28:5, 9, 19, 23; 29:16, 25; 31:6, 8, 9, 13, 20, 25; 32:1, 2, 8, 11, 18, 24; 33:3, 16, 19, 25; 34:21, 25; 35:5, 6, 7, 9, 10, 16, 23; 36:4; 37:6, 11, 13; 38:12, 20, 23; 39:4, 6, 19; 42:11, 24; 43:5, 19; 46:5; 47:16; 49:6, 10, 14; 50:20; 51:11; 52:21; 53:14; 58:6; 62:15, 20; 63:21, 23, 25; 64:3, 5, 8, 15; 65:2, 5, 6, 12, 14, 23; 66:12; 70:24; 72:5; 73:1, 3; 80:18, 19; 82:1, 2, 5, 7; 88:6; 89:19; 92:6, 8; 93:13, 23
Valley's [23]
19:22; 23:14; 26:13; 30:6; 32:4; 33:12; 40:20, 21, 25; 43:2; 52:2, 11, 13; 58:10; 65:4; 66:9; 84:9; 85:7, 22; 92:6; 93:13, 16, 21
valuable [4]
26:24; 93:7, 8; 94:3
valuation [1]

40:24
valuations [2]
73:2; 76:6
value [59]
29:24, 25; 32:24; 33:5, 12, 15, 18, 21, 22; 34:2, 3, 6, 19, 20, 25; 35:10, 23; 36:4; 57:14, 22; 67:12; 69:12, 21; 70:2; 71:1, 7, 12; 72:2, 4, 8, 14, 20; 73:6, 8, 10, 20; 74:7, 18, 21, 24; 75:22, 24; 76:13, 16, 23, 25; 77:23; 78:7; 81:5; 86:19; 92:14, 22; 93:4, 17; 94:5, 8, 15; 96:21; 105:7
valued [1]
73:22
values [1]
73:1
valuing [1]
76:7
variations [2]
61:8, 11
vast [1]
17:15
vehicle [2]
32:10, 12
ventilated [1]
97:18
version [1]
15:10
versus [3]
53:8; 58:3; 99:25
veteran [2]
18:6, 25
viability [1]
24:17
viable [1]
85:4
view [14]
6:19; 7:17; 16:24; 20:1; 22:3; 41:9, 11; 42:7; 52:1; 53:19; 101:11; 103:20; 104:11, 19
viewed [1]
39:3
views [1]
96:12
Virginia [1]
33:2

– W –

wait [1]
60:25
wanted [10]
9:1; 13:14; 27:16; 43:1; 60:24; 61:16; 78:21; 98:23; 105:3
wants [2]
12:3; 42:7
Washington [2]
107:6, 19
ways [1]
41:20
WCHI [7]
63:18; 64:11; 65:7, 12; 66:14; 68:3, 25
we'd [2]
75:1; 97:11
We'll [2]
14:24; 25:6
we'll [7]
6:4; 25:6; 57:23; 87:22; 91:17; 97:1; 103:1
We're [3]
21:23; 36:17; 98:9
we're [21]
6:23; 10:15; 11:6, 8, 9; 23:8; 32:15, 16; 43:8; 51:19; 55:13; 58:23; 71:20, 21; 79:1; 91:8, 22; 95:24; 97:9; 105:5
We've [3]
5:14; 77:18; 91:1
we've [10]
16:17; 25:3, 8, 19; 45:21; 74:15; 76:4; 77:19; 91:12; 97:18
Wednesday [2]
8:13, 16
week [2]
7:13; 8:4
weeks [1]
7:12
Welcome [1]
4:1
welcome [2]
4:1, 8
well-accepted [1]
34:15
weren't [2]
59:9; 60:2
Western [3]
32:12; 63:18; 64:4
What's [1]
37:5
what's [4]
6:7; 10:13; 35:25; 72:16
whatsoever [1]
85:19
whenever [1]
42:25
whereas [3]
21:21; 40:16; 84:12
whereby [2]
6:1; 22:13
Whereupon [2]
91:20; 106:3
wherever [1]
101:2
whoever [3]
99:16; 100:3; 101:2
wholly [1]
28:15
widely [1]
90:13
Wiese [4]
80:4, 5; 81:7, 9
Wiese's [2]
81:10; 96:5
wild [1]
75:6
willing [3]
33:24, 25; 41:25
Winstar [5]
47:10; 53:9; 59:14; 90:7
Winstar-related [1]
5:16
wise [1]
7:23
witness [4]
6:19; 14:10; 15:15; 75:15
witnesses [13]
6:25; 11:25; 12:15, 17, 22; 15:11, 17; 16:3; 17:3; 30:18, 20; 51:19; 62:4
won't [1]
104:18
wonder [1]
35:25
word [2]
29:3; 92:3
words [3]
6:15; 66:1; 72:16
work [1]
25:6
worked [4]
5:18; 20:3; 98:8; 103:5
works [1]
89:2
world [4]
29:22; 31:23; 32:3; 82:24
worry [1]
6:3
worth [4]
34:4; 73:13, 16; 74:4
wouldn't [7]
8:4; 31:22; 39:18; 95:5; 102:2; 104:7, 22
wrap [2]
13:15; 99:12
writ [1]
75:13
written [5]
86:14; 103:8, 13, 15, 25

– Y –

year [3]
6:24, 25; 49:4
years [10]
19:8, 17; 20:5, 6; 25:20; 38:12; 49:7; 93:2; 95:8
yellow [1]
70:2
yield [1]
41:12
you'd [2]
61:13; 87:12
you'll [1]
89:1
you've [5]
53:8; 74:7; 75:24; 77:8; 95:18

– Z –

zero [1]
101:7