# EXHIBIT I

To: Jim Batsell
Connie de la Garza
Jim Pressler

From: Ron Pikus

Subject: SAFSB Organizational Structure

Date: August 24, 1992

I was pleased to learn that you have agreed to continue on the board of directors of San Antonio Federal Savings. Your input as to how SAFSB can enhance its role in your respective communities will be invaluable.

So that each of you has a better understanding of how SAFSB's new management plans to operate, I have enclosed two reports for your review:

1). BUSINESS PLAN - This is the plan which was submitted to the Office of Thrift Supervision as part of Western Capital Holdings' application to acquire SAFSB. This should give you a general overview of how WCHI's investors view the thrift business and the long term plan for the Bank. Please keep in mind that the financial projections indicate the Bank's anticipated performance from a starting point of January, 1992. Given SAFSB's positive operating results during 1992, the Bank's capital position should even be stronger than projected.

2). ORGANIZATIONAL STRUCTURE - This report contains the rationale behind the management restructuring, WCHI's plan to expand the Bank's Rio Grande Valley presence and an explanation of how the Bank's Valley staff will be utilized.

I hope that you find these materials informative and that they give you some insight into management's plans for the Bank. I look forward to meeting all of you at our September 17, 1992 board meeting and working with you in the future.

Ron

DEFENDANT'S EXHIBIT
DX 1017
Holland v. U.S. 95-524C

cc: Richard Dalton

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1764

San Antonio Federal Savings Bank
Organizational Structure

## OVERVIEW

The acquisition of San Antonio Federal Savings Bank (SAFSB) by Western Capital Holdings, Inc. (WCHI) will bring about several changes in the organizational structure of SAFSB. The following is a presentation of what the new organization will look like. Some decisions on personnel and other matters can only be made after the acquisition takes place. Those cases will be noted in the presentation.

## EXECUTIVE MANAGEMENT –

It is understood that BO McALLISTER will have no ongoing management role with SAFSB. Homer Holland and Howard Ross will discuss this issue with Bo.

JIM DELOACH, the current president, will not be kept on by SAFSB. Even though Jim has expressed interest in heading up a mortgage origination/processing group for SAFSB, the concensus is that he does not have the capabilities to manage such a function in a manner satisfactory to WCHI. Therefore, Jim will be told immediately after the deal has closed that he will not have a role with SAFSB. The recommendation is that Jim be asked to leave the Bank immediately. A agreement has been developed which makes the payment of his severance and a bonus contingent upon his cooperation until November 30, 1992 and will not be payable until then.

Because the San Antonio office will be phased out completely (see below), it is necessary to have someone from the current management staff to provide a Texas presence for the coordination of the wind-down. JACK SUKMANN will be asked to remain with SAFSB to manage this task. Provided Jack fulfills his duties satisfactorily, he will be guaranteed employment until the end of the year, granted severance pay in accordance with a formula which will apply to all staff members and a performance bonus. Jack's severance and bonus will not be paid until the end of the year.

RICHARD DALTON has already agreed to take on responsibilities as the President of SAFSB. Richard will set up his office in the Valley (see below). In addition to being the local "person-in-charge", Richard will spend a significant portion of his time establishing a mortgage origination and processing function which will be located in and concentrate its efforts in the Valley.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1765

San Antonio Federal Savings Bank
Organizational Structure

SAN ANTONIO ADMINISTRATIVE OFFICE -

Given WCHI's operating philosophy that SAFSB is to be run as a community-oriented thrift institution and given SAFSB's apparent excellent coverage of the Rio Grande Valley market, there will be no retail banking presence by SAFSB in the city of San Antonio. Investments, mortgage servicing and some accounting functions will be handled by RVSB out of Chicago and Peoria under a management agreement. The residual accounting/accounts payable tasks would better be handled closer to the source of the transactions - the Valley. The consumer loan servicing and collection functions, which are now handled both in San Antonio and the Valley, can all be centralized in the Valley. Retail banking, operations and administrative services are already located in the Valley. Since this leaves no functions remaining to be run out of San Antonio, the is no need to maintain an office in San Antonio.

None of the functions, except Investments, can be transferred to the Valley immediately. A transition period is required to either relocate current employees who live in San Antonio to new jobs in the Valley or transfer tasks (mortgage loan servicing and accounting) to Illinois. The longest lead-time item will be the transfer of mortgage servicing. This is planned for the middle to end of November, 1992. It is reported that the building management is anxious to have SAFSB either sign a new lease or move out of the building at the end of the current lease period, November 1, 1992. This issue will be discussed with the building management and a deal will be put in place which allows SAFSB to remain in the building until November 30, 1992. Contrary to the impressions given by current SAFSB management, it is difficult to believe that the building management would not be agreeable to this proposal.

What will now follow is a description of how the principal divisions within SAFSB will be structured.

RETAIL BANKING -

LINDA BALLI, the current branch coordinator, has impressed the WCHI group as someone who is well suited to run SAFSB's branch network in the Valley. She also appears to have a good working knowledge of SAFSB's current service bureau system, FPS.

There is no reason to make any immediate changes in the retail banking or the operations group. While it appears that the branches are over-staffed, given the deposit base



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1766

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1780

and the number of transactions which each office processes. operating efficiencies would best be introduced gradually into the branch system.

Face-to-face meetings with all of the branch managers have left the impression that they are all well suited to their jobs. A more focused approach to product sales, performance tracking and lending opportunities is necessary. However, there will be no changes made to the branch system immediately after acquisition.

The cursory review of the operations group was not sufficient to draw any conclusions as to the efficiency of the staff or the soundness of the operating procedures. Shortly after closing, Bob Redden of RVSB will be asked to make an analysis of this function and come back with recommendations for improvement. Again, no changes will be made to this group for the near term.

Several issues, many of which cannot be resolved at this time, center around SAFSB's data processing system and the FPS contract. It is our understanding that WCHI's acquisition does not trigger an escape clause in the agreement which deals with the prospect of SAFSB's being acquired by another financial institution. Jay Holland has been asked to review the agreement and summarize key issues. A face-to-face meeting with the management of FPS is anticipated once RVSB's data processing management outlines issues which the acquisition and transfer of functions creates.

Another data processing issue involves the management of the Bank's PC-based systems. The San Antonio office operates its PC system from a local area network (LAN). It has to be determined whether there are LAN operating in the Valley. Since the current PC expert for SAFSB, Al Smith, is located in San Antonio, the extent of PC use in the Valley will determine whether Smith will be asked to relocate to the Valley. Jay Holland will be ready to act as a systems consultant to SAFSB for the implementation and maintenance of PC based systems if it is determined that this is the best approach to the matter.

LENDING -

Several functions come under the heading of Lending: mortgage production, processing/underwriting, consumer lending (both processing and servicing) and the Phoenix office. Each function will be addressed separately.

SAFSB has no MORTGAGE PRODUCTION capabilities at this time. Since the Bank's business plan calls for it to be an active originator of conforming and portfolio loans in Texas

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1767

production capability must be developed. While there has been some issue as to whether the Bank should concentrate its lending efforts in both the Valley and San Antonio or some combination thereof, the initial mortgage production strategy will be to focus on retail originations only in the Valley. Not until a centralized mortgage processing operation has been established in the Valley and a core of commission-only originators are in place will consideration be given to establishing a retail and wholesale presence in San Antonio.

Richard Dalton will have the responsibility of recruiting a cadre of mortgage originators. Richard must determine whether he will attempt to attract seasoned originators from local mortgage bankers or whether he will attempt to grow his own talent. It is our understanding that there are some current SAFSB staff members who are interested in becoming originators.

A MORTGAGE LOAN PROCESSING AND UNDERWRITING function must also be created. It is possible that some current Valley and San Antonio employees have had previous processing or underwriting experience. Kathy Fuller handles this function at this time. She will be approached to determine if she has the capabilities and the interest to relocate to the Valley to manage the processing department. There may also be individuals in the mortgage servicing department who may have background and/or interest to relocate to the Valley to become part of the processing group. Answers regarding the San Antonio staff will be obtained during the interview process which Ron Pikus will conduct in San Antonio immediately after the deal is closed. One of the top priorities on Richard Dalton's list will be to assemble a processing staff in the Valley.

The plan is to use RVSB's FIS document preparation and tracking system in SAFSB's mortgage processing department. Jay Holland and Richard Dalton will explore what must be done both in terms of licensing agreements and equipment to make this happen.

A more fundamental issue regarding mortgage production which must be addressed prior to closing is the flow of conforming and non-conforming production to RVSB, and how servicing rights to these loans will be treated. The most efficient flow of SAFSB's conforming loan production to the secondary market would be the incorporation of Texas and Illinois production into the same MBS's. This does, however, raise a regulatory issue regarding affiliated party transactions.

Larry Ferries of the OTS has been advised that we would like his assistance in working with the Dallas OTS regarding the affiliated party transaction issue. Since many of the functions which would normally be handled by SAFSB will be taken over by RVSB, it is important that the Dallas OTS

understand this operating strategy and give their approval of it. In order to minimize any opposition which Dallas may have, it is imperative that RVSB and SAFSB have written agreements regarding loan purchases/sales, loan servicing purchase or subservicing, investment management and other management services. Ron Pikus and Steve Bangert will address these issues and work with Mark Kipnis of Holleb & Coff to draft agreements which will meet regulatory scrutiny.

The processing and underwriting aspects of CONSUMER LENDING are currently handled out of the Weslaco office of SAFSB. Collection of Valley-based consumer loans is also done in the Valley. However, all consumer loan files are maintained in San Antonio and "consumer loan servicing" -- payoffs, insurance tracking, etc.-- is handled in San Antonio. The plan is to have the Valley consumer loan processors and collectors take over all consumer loan processing and servicing functions for the Bank. Shortly after closing, an assessment must be made of the personnel in the Valley to determine their capabilities of handling all consumer loan tasks. This will determine whether any of the consumer servicing staff from San Antonio are offered positions in the Valley.

With regard to CONSUMER LOAN ORIGINATIONS, the branch offices are the delivery vehicle for consumer loan product. Since SAFSB has not been a very aggressive consumer lender, Richard Dalton will need to work with Linda Balli to assess the mix of products currently being offered and what changes must be made to the product offerings. Even though the branch managers have all said that they could sell more consumer loans, it was not clear whether the issue was one of pricing or products. It may be necessary, in order to generate enthusiasm among the staff as well as customers, to take an aggressive pricing stance for some period after acquisition.

The PHOENIX OFFICE operates as the servicer and workout agent for the ABQ second mortgages. Since the two staff members, Sue Rhoads and Jan White, have a long track record with these loans, keeping them in place makes sense. Since the quantity of servicing does not make this a very cost effective operation, the suggestion has been made that the Phoenix staff also become a first mortgage origination arm of SAFSB in the Phoenix market. Based on interviews with the staff, it appears that this idea should be given a chance. Sue Rhoads is anxious to make first mortgage loans and indicates that she has the real estate broker contacts needed to do this. Sharon Kristof believes that, with some training on conforming loan guidelines, that Sue could be successful. Since Jan White handles most of the backroom operations now, Sue would have the time to solicit mortgage business.

The plan would be to have Sue Rhoads handle her current



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1769

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1783

duties and attempt to set up a retail first mortgage network. This production would be processed in the Valley. This effort may require the addition of a part time person to assist with the servicing and origination paperwork. Richard Dalton (production management) and Sharon Kristof (training) would work with Sue Rhoads to get this operation running.

ACCOUNTING -

A review by Ron Seib indicates that the day-to-day maintenance of the general ledger and the accounts payable function can be managed by two individuals located in the Valley. The remainder of the accounting work -- financial statement preparation, OTS reporting, investment accounting, fixed asset management -- would best be the responsibility of RVSB's accounting department. The transition would take place prior to the November 30, 1992 phaseout of the San Antonio office.

All of the San Antonio accounting staff will be interviewed by Ron Seib as part of the announcement proceedings. The staff will be advised of the two positions in the Valley and their level of interest in relocating will be determined. Since Ron Seib has already met all of the accounting personnel, he will be in a good position to choose who will be kept. Should no one be willing to move to the Valley, a search for qualified people will be started immediately thereafter. This would necessitate someone from RVSB spending time in San Antonio learning the accounting and data processing system so that there is some degree of continuity and so that there is backup for training the new staff.

An issue to be resolved after closing is where the accounting staff members will office. Since much of what they do deals with the retail banking and operations group, keeping accounting close to these groups may be beneficial. The building that houses the operations center in Weslaco should be able to accommodate two more people. (See below for other space considerations.)

A systems issue deals with the access to the FPS general ledger by the RVSB Accounting Department in Peoria. Ron Seib believes that this is essential if the Peoria group is to oversee the general ledger input by the Valley accounting staff. Jay Holland and Ron Seib must research how feasible the communications hookup would be. This is both a technology and cost issue.

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1770



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1784

San Antonio Federal Savings Bank
Organizational Structure

TREASURY -

As mentioned above, the treasury or investments function will be run out of the RVSB-Chicago office by the Capital Markets group. Susan Vranes and Chris Huss will be in San Antonio on announcement day and thereafter to learn how SAFSB handles investment related functions. Susan and Ron Seib must coordinate how things such as wire transfers and bank accounts will be managed among the Valley and Peoria staffs and the Chicago-based Capital Markets Group. Since Ron Seib and his management team have already developed a written plan for incorporating accounting and investment duties within RVSB, the implementation of this transition should not be difficult.

The current staff will be told about the status of their positions on announcement day. A very short transition period is being planned. Susan expects to be handling all investment functions within a week after announcement. Based on their backgrounds and interest, the treasury staff will be considered for the newly created Valley positions.

A management services agreement will be prepared between RVSB and SAFSB for investment and accounting functions. A monthly fixed-dollar fee, based on the estimated cost to RVSB for handling these functions, will be determined. The importance of getting OTS-Dallas' prior approval to the agreement is critical. Susan Vranes and Ron Seib will develop the fees for their respective areas.

MORTGAGE SERVICING -

The SAFSB portfolio of approximately 2,000 first mortgage loans presents nothing which is unique. Since RVSB currently services loans in Texas, the economics of mortgage servicing dictate that these loans be serviced by RVSB at its Lombard servicing center. The plan is for this to be accomplished during the month of November, 1992. Sharon Kristof and her Acquisitions Group will be responsible for the conversion which she will coordinate with Gary Brandes, RVSB's servicing manager.

On announcement day, Ron Pikus will advise Bobby Calvillo, the current SAFSB servicing manager, of the decision to transfer servicing. Because of the long lead time to accomplish the transfer, Bobby will be offered an incentive to stay on until the end of November. He will also be given a chance to be considered for another position in the Valley. The remaining servicing staff will also be given a chance to be considered for other SAFSB Valley-based jobs. The hope is that several of these individuals can become part of the mortgage loan processing staff. (This would ensure a smoother servicing transfer than if none of the staff were to remain.)



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1771

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1785

San Antonio Federal Savings Bank
Organizational Structure

It will be important to incent Calvillo to remain with SAFSB until the servicing transfer because of his knowledge of the FPS system.

SAFSB has a significant number of performing commercial real estate and business loans which will have to be serviced. Any loan which acts like a mortgage loan will be converted to the CPI system and serviced by RVSB. Those loans which act like a consumer loan will be serviced in the Valley by the Consumer Loan Department. It will be Cathy Knapp's responsibility, as the coordinator of problem assets, to see that all performing commercial real estate and business loan files are kept in order and that financial statements, etc. are obtained and reviewed.

With regard to the transfer of servicing functions to RVSB, a monthly per-loan fee will be charged by RVSB to SAFSB for the servicing of SAFSB's current, non-conforming mortgage loan portfolio. The same arrangement will cover newly generated non-conforming loans by SAFSB. Ownership of the servicing rights to new conforming loan production will be transferred to RVSB as part of the correspondent relationship which RVSB will have with SAFSB. (In essence, SAFSB will become another wholesale correspondent of RVSB.) Gary Brandes will be asked to propose a monthly per-loan servicing fee for the non-conforming loans. Susan Vranes and Jordan Lamm will provide SAFSB with RVSB's wholesale rate sheets.

PROBLEM ASSETS -

Management of the problem asset process will be overseen by Ron Pikus and coordinated on a daily basis by Cathy Knapp. The area will be divided into three segments:

I. Major Loan Workout:
The Bank's problem assets have been divided into categories and have been assigned to a case manager.

1) Texas commercial real estate - Steve Bangert and Howard Ross

2) Commercial real estate outside of Texas - Homer Holland

3) Business loans - John Rose

4) Residential REO - Cathy Knapp

Each case manager will be responsible for developing a workout strategy, implementing that strategy and seeing each asset through disposition. Cathy Knapp, as coordinator, will be a resource for each case manager in working with attorneys, brokers, etc. Ron Pikus, as problem asset

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1772



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1786

manager, will see that SAFSB's classified asset reports are prepared on a timely basis and distributed to all concerned parties. He will also manage problem asset issues with the regulators and American National Bank. Ron will convene the Bank's Problem Asset Committee so that everyone is updated on the status of asset workouts and so that the Committee can give the respective case managers direction on how to proceed with workout strategies and negotiations.

Since all of the case managers will be located in the Chicago area and since Cathy Knapp will be responsible for keeping these files up-to-date, the original files will be moved to RVSB's Lombard facility shortly after closing. An abbreviated file (copies of the note; mortgage, title policy, appraisal, assignments, etc.) will be created and sent to the Valley for storage. Ron Pikus will arrange for this process to start shortly after closing.

II. REO Management:
While Cathy Knapp is the case manager for residential REO's. Cloyce Bennett, who is located at the Weslaco office, will be asked to continue with the Bank and be the Bank's Texas-based workout representative. He will take direction from Cathy regarding major asset followup, REO property management, etc. Cloyce will also be available to do property and insurance inspections for the loan servicing group. Jan White and Sue Rhoads will continue to manage REO responsibilities in the Phoenix area.

III. Business and Commercial Real Estate Loan Followup:
Given the significant number of performing commercial real estate and business loans, Cloyce Bennett, under the direction of Cathy Knapp, will take on the task of keeping the Bank's files current with financial statements, tax and insurance data, etc. A matter to be decided is where the commercial real estate and business loan files will be kept. At this point, it appears that the files will be kept at RVSB's loan servicing facility in Lombard, where Cathy Knapp will office. Some type of abbreviated file will also be kept in the Valley for Cloyce Bennett.

A decision must also be made as to where Cloyce Bennett will office. If Cloyce will be responsible for consumer loan servicing in addition to problem assets, space must be available for Cloyce and a group of three people. The preference would be remove Cloyce and his group from the Weslaco retail/operations environment and move them to where central loan processing and administration will office. This would allow Richard Dalton to provide oversight for the activities of this group. This decision is dependent on whether SAFSB can arrange for a swap of its Harlingen land with the First National Bank of Harlingen for their building.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1773

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1787

San Antonio Federal Savings Bank
Organizational Structure

ADMINISTRATION -

Three functions come under the heading of Administration:

I) Human Resources
II) Facilities/Purchasing
III) Marketing

FLO LASATER will continue on as the head of SAFSB's Human Resources Department. Her group is responsible for payroll processing, benefits administration, recruiting, and personnel policies. There are three other individuals who make up this department. Flo and her group will be asked to take on the facilities management and purchasing functions for the Bank.

Purchasing is de-centralized at this time. This will be centralized for the entire Bank. The same is true for facilities management. There should be no problem for this group to assume these additional responsibilities.

Flo Lasater will continue to be the direct liaison with the Bank's advertising agency, Johnson-Meade of Harlingen. Marketing and advertising decisions will now be directed by a committee comprised of Steve Bangert, Ron Pikus, Richard Dalton, Linda Balli and Flo Lasater.

SAFSB's management committed to a multi-media advertising campaign to begin in September, 1992. Since most of the creative work has already been done, the campaign will be allowed to run as scheduled. Since the program is part image and part "transaction account" product sales, it is in keeping with WCHI's business plan for retail banking. One of the first tasks of the Marketing Committee will be to review the program and the media schedule to determine if the schedule should be altered.

Location for the Administration Group is also an issue. If the Harlingen bank building swap takes place, this group would move into that building. If not, then the space on the second floor in the McAllen branch would be sufficient to house this group for some interim period. Since the same space would also house central loan processing and consumer loan servicing, there is some question whether the second floor space would be sufficient for the long term. Since the answer to the question is dependent on how quickly the Bank's mortgage loan function develops, the long term space issue would not have to be dealt with immediately.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1774



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1788

INTERNAL AUDIT/COMPLIANCE -

The restructuring plan calls for the internal audit and compliance positions to be the responsibility of one person. At this time, SAFSB has an internal auditor who is supported by one individual. The internal auditor, however, handles many tasks which have nothing to do with internal audit (business loan workout and special projects). The compliance function is the responsibility of several individuals.

Because of the success which RVSB has had in centering its compliance efforts into one individual, the same approach will be taken with SAFSB.

The first post-closing task in this area will be to determine if either Linda Fresquez or Mark Brell, her assistant, are interested in relocating to the Valley. If both are, a determination will be made as to who has the best background to take on both the internal audit and compliance responsibilities. Since neither of these two people handle compliance at this time, these responsibilities will be kept by current Valley staff until a transition can be made. If none of the current staff is willing to relocate, a new internal auditor/compliance officer will be recruited in the Valley.

SAFSB's current internal audit program and compliance guidelines will be reviewed for adequacy. If they are found lacking, they will be supplemented by the internal audit program and compliance manual/review schedule developed for RVSB.

BRANCH OFFICES and OTHER SPACE:

Several decisions will have to be made regarding branch facilities and space for the administrative and mortgage processing functions.

1) The Harlingen branch is located in a trailer. First National Bank of Harlingen has reportedly approached SAFSB regarding a swap of their branch for the Bank's piece of land. On the surface this appears to be a win-win situation for both institutions. However, several things need to be done very quickly after closing:

    a) Meet with the First National management and determine the specifics of a deal.
    b) Perform a walk-through in the building to determine its physical layout and how it might be adapted to SAFSB's operations.

    c) Obtain a floor plan of the entire building.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1775



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1776



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1789

# SAN ANTONIO FEDERAL BUSINESS PLAN

## OUTLINE

1) Business Objective
2) Asset & Liability Management
3) Retail Banking
4) Lending
5) Non-Earning Asset Management
6) Management and Board of Directors
7) Economic Environment and Local Factors
8) Community Reinvestment Activities
9) Pro Forma Financial Statements
10) Organization Chart

As of 03/23/92

Mailed - 6/25/92
Bartell
de la Garza
Prusser

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1777

## I. INTRODUCTION

The acquisition of San Antonio Federal Savings Bank by Western Capital Holdings, Inc. from the Resolution Trust Corporation will result in several positive contributions to the institution and the communities which it serves:

* Asset & Liability Management
* Problem Asset Workout
* Residential Lending Presence
* Retail Banking Opportunities
* Community Reinvestment Activities
* Local Board Representation and Management

## II. ASSET & LIABILITY MANAGEMENT

The ownership group has demonstrated the ability to restructure the balance sheet of a financial institution, reduce both interest rate and credit risk, improve its duration gap while maintaining a healthy interest rate margin during various interest rate environments. A comprehensive asset & liability management strategy effects every facet of the Bank, from pricing of loan and deposit products to active participation in the capital markets. The Bank's performance is monitored not only by monthly operating performance but also by a mark-to-market of the balance sheet. Increase in value, rather than short term profits, is the primary measuring tool of the Bank's performance.

## III. PROBLEM ASSET WORKOUT

SAF's balance sheet contains approximately $13 million of non-performing assets. At the top on the new group's priority list will be the development of a three-year strategy for the workout of the Bank's current non-performing assets. The group will draw on its many years of experience in real estate workout along with the working knowledge of current management to accomplish this goal.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-876-1778



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1791

## IV. RESIDENTIAL LENDING PRESENCE

SAF will resume residential lending activities within the context of today's secondary-market-driven environment. Using its retail banking facilities as a base, supplemented by an aggressive wholesale lending operation, the Bank will strive to compete with the national lending firms for residential loan business in the Rio Grande Valley. The Bank will build its lending business with competitive pricing, excellent processing service, and an understanding of how to deliver loans to the secondary market agencies in a timely and efficient manner. Lending profits are generated not through fee income, but from the value of the loan servicing which its production function creates.

## V. RETAIL BANKING OPPORTUNITIES

Given its excellent branch network in the Rio Grande Valley, ownership is confident that the Bank can grow along with the economy of the Valley. Deposits are projected to grow at a compound rate of two percent. Emphasis will be placed on growing the deposit base through transaction or "relationship" accounts - checking, money market and passbook accounts. Since people are the key to developing a strong retail banking presence, management will devote the resources necessary to ensure that it has the most professional and service-oriented staff possible.

## VI. COMMUNITY REINVESTMENT ACTIVITIES

SAF will take a pro-active approach to meeting the credit and banking needs of the communities which it serves. Special assistance will be given to those groups which have traditionally been shut out of the mainstream of housing credit and other banking services. Before any action is taken, however, the Bank's management will solicit input from its own staff and the community-at-large to determine where its energy and resources should be devoted. The ownership group firmly believes that community reinvestment is not only good public policy but also good business practice.

## VII. LOCAL BOARD REPRESENTATION AND MANAGEMENT

Since SAF has been a basically sound and well-run organization, the ownership group sees no need for across-the-board changes in management. The combination of the



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1779

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1792

thrift-management specialties of the ownership group together with the operating knowledge of local management provides the Bank with the "critical mass" needed to add franchise value to the SAF operation. Outside directors from Texas and the Rio Grande Valley will be sought who are interested in making a positive contribution to the institution and who can serve as spokespersons for SAF in its local communities.

## VIII. CONCLUDING REMARKS

The thrift industry, in general, and Texas thrifts, in particular, have come upon very difficult times recently. Yet, despite all that has taken place, the general public has not abandoned their local thrift institution for their banking or home financing needs. SAF, its ownership and management are prepared to continue the fine tradition which the thrift industry has established of promoting savings habits and providing a reliable and consistent source for home finance. This business plan will explain, in detail, how those goals will be accomplished.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1780



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1793

## I. INTRODUCTION

The basic premise of a thrift institution is to make loans to residential home buyers and fund them with retail deposits. This is SAF's core business and it is the goal of the new ownership group to do this as profitably as possible. The Bank's asset & liability management will focus on a few basic principles:

1) the capital market is the keystone of asset & liability management;
2) monthly mark-to-market analysis is the most important measure of a successful operation (and how well management is performing);
3) the institution is managed using what is called a "Net Bond" or "Net Duration" approach.

Asset & liability management is involved, either directly or indirectly, with every facet of the Bank's operations.

## II. ASSET & LIABILITY MANAGEMENT: A DEFINITION

Capital is the single most important determinant of the size and composition of the institution's balance sheet. Asset & liability management is comprised of two related processes: pricing and allocation.

The pricing of assets and liabilities is the first step in successful asset & liability management. All assets and liabilities will be priced off the "Treasury Curve". The Treasury Curve is commonly defined as the most actively traded government securities and is the basis for pricing all fixed income securities traded in the capital markets. There are about ten issues with maturities ranging from one month to thirty years. A curve is constructed by plotting the yield and maturity of each security to define a curve that represents Treasury securities of all maturities.

Pricing - Loans:

When loans are priced for retail customers, there are a number of considerations beyond the credit of the customer. The first issue is whether the loan is conforming or non conforming. This refers to the ability to securitize a loan through one of the quasi-governmental agencies, Freddie Mac or Fannie Mae. All conforming loans, approximately 70 to 80% of all production, will be priced as mortgage-backed securities. When pricing a conforming loan, the following factors are considered: the price of the MBS that the loan would be put into, the costs involved with originating and



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1781

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1794

securitizing the loan, and the value of the servicing.

The pricing of non conforming loans will be of much more consequence since theses loans will be held in the Bank's portfolio. These loans will not be securitized because of their size, type or status of the borrower. Non conforming loans will be priced at 225-300 basis points above a similar duration Treasury. Typically, this is 50-100 basis points above conforming loans. Regardless of the conforming/non conforming status of a loan, the servicing rights is the valuable aspect of origination.

Pricing - Liabilities:

Liabilities will also be priced off the current Treasury yield curve. For example, a three-year certificate of deposit (CD) is priced in relation to the current three-year Treasury. Typically, all deposits are priced at yields less than a similar Treasury. When pricing CD's, a distinction is made between "retail" CD's and "jumbo" CD's. Since jumbo money is less stable than retail money, it is priced to yield 5-20 basis points less than retail CD's. Money market and passbooks are priced off short term rates but tend to lag movements in the market. Even though savings rates should, by formula, move weekly, they tend to be quite stable. As a retail bank, SAF cannot hope to sell its savings products which have large and frequent rate swings. NOW and passbook rates are changed less frequently than money market rates.

Allocation:

When all of the assets and liabilities are priced correctly, allocating resources (ie, capital) is relatively simple. Allocation is a four step process:

1) what are the choices;
2) is the spread between the assets and liabilities sufficient;
3) what are management's goals for the Bank;
4) how do capital constraints impede optimal selection.

There are always many asset alternatives. Although the majority of the Bank's assets will be mortgage-related, there are many types of mortgages - 30- and 15-year fixed, 5-and 7-year balloons, and various types of ARMs. An alternative to the Bank originating its own assets is the purchase of investment securities. Investment securities are often attractive for a number of reasons. Loans can be bought which the Bank could not otherwise originate. Some assets (CMO's) provide the institution with specific characteristics. Securitized instruments are valuable because of their liquidity characteristics.

Liabilities also provide many alternatives. Retail deposits are only one alternative. Even with retail deposits, the



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER WCH-B76-1782

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1795

Bank can choose the type of deposits it wishes to attract.

Wall Street is a source of liabilities in the form of reverse repurchase agreements. Reverse/repos allow the Bank to use its investment portfolio as collateral. Repos are priced off of short term interest rates, tend to be short term (usually between one and three months) and are usually relatively cheap as compared to other borrowings.

Recently, the use of Federal Home Loan Bank borrowings has become a more attractive source of liabilities. With many of the burdens of borrowing having been removed by the FHLB, products such as puttable advances have become quite attractive.

Using a mixture of short term and long term borrowings, the Bank should be able to keep its costs of borrowing low while still maintaining protection should interest rates increase. Borrowing long can be protected through the structuring of interest rate swaps and the purchase of caps. Management anticipates an average spread between assets and liabilities of about 250-300 basis points. Since a significant portion of the Bank's expenses are fixed, any decrease in this spread will directly cut into earnings.

Each category of assets and liabilities has advantages and disadvantages regarding term and size of flexibility, cost, ease of execution and liquidity. This is where asset & liability management becomes as much of an art as a science. No perfect mix of assets and liabilities exists. Therefore, it is important to know and consider all the alternatives, and know how each compares to the other. The relative advantages are important as well as the relative cost/benefit of each option.

The fourth consideration of allocation is capital. Capital is one of the most important aspects of managing a thrift. Each type of asset held by the Bank is categorized in one of five risk-based groups. The capital group that each type of asset is put into ranges from 0% to 200%; the other groups are 20%, 50% and 100%. All decisions regarding asset and liability allocation must consider the amount of capital required.

## IV. NET DURATION

Once the pre-acquisition balance sheet of SAF has been restructured (see below), it will be managed on a "Net Bond" basis. This concept treats the balance sheet as one bond. This bond is comprised of the weighted average duration of all of the assets (positive duration) and all of the liabilities (negative duration). Thus, if the assets have a three (3) year duration and the liabilities have a two (2)



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1783

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1796

year duration, the institution or net bond has a positive one (1) year duration. This is considered to be the most effective way to manage a mortgage portfolio and the prepayment risk inherent in it. Prepayment risk always works against the Bank. When interest rates decrease, borrowers refinance their mortgages at a lower rate, but a significant portion of the liabilities are still fixed at higher rates. When interest rates rise, the value of the fixed rate assets, the majority of the asset composition, decrease but the overall liability costs increase due to short duration of much of the Bank's funding. Because of this, it is imperative that the Bank have a variety of assets and liabilities working together. The ability to look at how all of the assets and liabilities work together is what makes the "Net Bond" approach so attractive.

## V. MARK-TO-MARKET

The monthly mark-to-market is the single most important determinant of the value of the Bank. It will be used to judge how well the institution, and management, is performing. This measuring tool focuses management on the bottom line and how to most effectively increase the long-term value of the institution.

Monthly, the entire balance sheet will be reduced to its liquidation value. The composition of the balance sheet will be easily valued relative to the capital markets. Since the asset composition will almost exclusively be made up of mortgage-related instruments - mortgages, MBS's, and MBS derivatives - and because an active market exists for mortgage-backed securities, it is relatively easy to value these assets.

The majority of the Bank's liabilities will be classified in two groups. The more difficult to value will be the retail deposits. This is because there is a relatively small market for deposits and each institution's deposits have their own characteristics. However, given the new ownerships exposure to deposit sales and with the emphasis that will be placed on building transaction accounts.

Reverse/repurchase agreements, the second category of liabilities, are much easier to value because the market is very active and liquid, and closely correlates to the capital markets. The balance sheet will be structured with typically less than three (3) month reverses. With this composition, the reverse/repo portfolio is anticipated to closely track the Treasury market.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1784

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1797

## VI. HEDGING

The Asset & Liability Management group will be responsible for hedging the prepayment and interest rate risk for SAF. The market value and earnings of the Bank can be severely damaged when interest rates move drastically. Interest rate risk is significant with fixed rate bonds. When interest rates increase, the value of the fixed rate mortgage portfolio decreases. As costs of funds increases, spread gets squeezed. As new assets are added and liabilities refunded, the spread trends back to wider levels. However, in the short term, earnings are hurt.

In addition to interest rate risk, prepayment risk on mortgages occurs also. Prepayments always work against the owner of the fixed-rate mortgage. As interest rates increase, prepayments decrease and the below market asset stays on the books longer than anticipated. When rates rise, prepayments increase and the above-market asset amortizes faster than anticipated.

Another risk to the Bank, and the risk that is potentially the most damaging, is an "inverted yield curve". This is when long-term rates (which have the most effect on the value of fixed rate mortgages) are lower than short term rates (which have the most effect on the Bank's borrowing costs). In this situation, the value of the majority of the Bank's assets -longer term mortgages - decrease in value and the funding costs increase.

A variety of instruments are used to hedge the various risks of the Bank, including Interest Only Strips, residuals, caps, swaps, options and futures. Interest Only Strips and residuals are the most effective medium to hedge mortgages, since they perform better as interest rates increase and prepayments decrease. Interest rate swaps and caps permit the institution to lock in a borrowing cost and do not appear on the balance sheet. The maturity of both caps and swaps vary, but both are more expensive as the maturity increases.

Put options are most useful to hedge the mortgage pipeline. Loan fallout, particularly during a heavy refinance period, is better hedged using put options than selling the loans forward in the market.

Hedging is a necessary function, even though it hurts current earnings, with the exception of IO's and residuals. However, hedging is analogous to an insurance premium. Given SAF's operating philosophy - focus on market value instead of monthly or quarterly earnings - a hedging program is a necessity.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1785



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1798

## VII. RESTRUCTURING THE BALANCE SHEET

The restructuring of SAF's portfolio will be accomplished over approximately a 24 month period. The primary focus will be on the asset portfolio, although efforts will also be under way to change the composition of the deposit portfolio.

Investment activities will focus on single family mortgages (whole loans) and/or securities backed by single family mortgages (MBSs). Portfolio loans will typically be one, three or five year adjustable rate mortgages with margins of 275 basis points or more over similar term treasury instruments. To help build this portfolio, management intends to originate and purchase mortgages.

Management also intends to use the capital markets as an alternative for investing in quality, rate sensitive assets. Capital market acquisitions will most likely focus on AA or AAA rated securities instead of FNMA, FHLMC or GNMA securities. These types of investments usually offer spreads 25 to 50 basis points greater than agency securities and the credit quality is excellent.

Over time, as the existing consumer, commercial and commercial loan portfolio is liquidated or paid off, the concentration of single family mortgage investments should increase significantly. Management intends to increase the percentage in these types of investments from 40% of total assets (01/31/92) to over 80% of the portfolio.

Composition of the liability portfolio will not change dramatically. Management intends to place increased emphasis on obtaining and retaining low cost transaction accounts. Reverse repurchase agreements and FHLB borrowings will be utilized when they prove to be cost efficient.

Management also intends to utilize the interest rate swap and cap markets to reduce the Bank's interest rate exposure.

## VIII. THE ASSET & LIABILITY MANAGEMENT GROUP

Because of his extensive experience in asset & liability management, Steve Bangert will take on the task of implementing the strategy presented in this plan. After he has had an opportunity to evaluate the aptitude and expertise level of the current SAF staff, he will appoint a group to handle the day-to-day monitoring and execution of the program. It may be necessary to use staff resources outside the Bank in order to carry out this plan.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1786



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1799

San Antonio Federal Business Plan
Retail Banking

## I. INTRODUCTION

Retail Banking is often considered the lifeblood of the thrift business. Yet, of all the functions within a thrift, it is probably the least understood in terms of product costs and profitability. The new ownership of SAF believes that, unless all these elements are understood, it is impossible to run a profitable institution.

At SAF, Retail Banking will be defined as that function which provides transaction and time deposit accounts, consumer loan products and other services which are traditionally associated with a person's "banking" needs. These products and services are delivered through the Bank's branch office network of six locations, primarily in the Texas' Rio Grande Valley. Based on the ownership group's assessment of current operations, very little will be changed in terms of personnel and facilities.

Because people often identify "their bank" with the institution which holds their checking account, SAF's emphasis will be to promote transaction accounts (checking, money market, passbooks) and services (ATM, direct deposit) and de-emphasize reliance on time deposits. A simple, yet convenient, front-office delivery system built around transactions accounts, supported by an efficient back-office operation, will ensure a stable and relatively inexpensive deposit base and an array of fee-producing opportunities. This is the manner in which SAF will operate its Retail Banking network.

## II. ECONOMICS OF RETAIL BANKING

SAF will focus on net general and administrative operating expenses (Net G & A) as the specific control target for measuring profitability at its retail offices. The formula to be used is a follows:

  Salaries and Related Expenses
+ Other Direct Operating Expenses
+ Allocated Overhead
− Fee Income

= Net G & A

Expressed as an operating expense ratio, SAF will strive to attain Net G & A of 122.5 BP (or less) of total deposits.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1787

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1800

That operating expense ratio provides for:

* a 100 BP return on deposits and

* a 20 to 25% annual return to shareholders based on a 4 to 5% capital requirement.

Those benchmarks are reflected in the following equation:

| | | |
|---|---|---|
| | 275.0 BP | -- gross profit margin on retail deposits |
| - | 25.0 BP | -- servicing fees (internal allocation) |
| - | 2.5 BP | -- credit loss estimate |
| - | 25.0 BP | -- FDIC insurance premium |
| - | 122.5 BP | -- Net G & A requirement |
| = | 100.0 BP | -- return on deposits |

Inasmuch as retail banking activities are not directly responsible for generating assets and do not have any control over the interest income spread on those assets, interest income is not allocated to the Retail Banking group. The responsibility for interest income management rests with the Asset & Liability Management group, which is confident in their ability to -- over a period of time -- invest retail deposits in residential lending products and realize an interest spread of 275 BP or more. (Refer to the Asset & Liability Management section of the plan.)

The Retail Banking group's role in contributing to the overall profitability of the organization as a whole is to:

* manage direct operating expenses in accordance with management guidelines;

* maximize fee income through profitable product pricing, effective product management and fee-oriented sales activities.

In implementing this economic approach to retail banking, the emphasis is clearly on expense management and fee generation. While deposit growth is not unimportant, neither is it the deciding factor in the Bank's bottom-line profitability for the long term. It is entirely conceivable that the Bank's deposit base could shrink without having an adverse affect on net operating income.

## IV. MODEL BRANCH OPERATING STATEMENT

SAF's six branch offices all have unique operating characteristics and deposit bases. However, with an emphasis on transaction accounts as the desired deposit product, an

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-875-1788



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1801

operating profile can be generated for SAF's "typical" branch office. A profile, expressed as a ratio of net operating expenses to deposits, has been created.

Model Branch Cost Analysis

| Expenses: | % of Deposits |
|---|---|
| Salaries and Related | 46 BP |
| Other Direct Operating | 51 BP |
| Total Direct Operating | 97 BP |
| Allocated Overhead | 46 BP |
| Total Operating Expenses | 142 BP |
| Fee Income | ( 20 BP ) |
| NET G & A EXPENSE | 122 BP |

SAF's branches currently operate at approximately 124 BP of deposits. It should not be difficult to bring the overall operating ratio down to the 122 BP target within one year after the acquisition.

## V. STRATEGY FOR GROWING TRANSACTION ACCOUNT BASE

Before a strategy for growing the transaction account base can be developed and implemented, it is essential that there be a clear understanding of the present products. Once the current offerings have been analyzed in terms of competitiveness, features and pricing, a determination can be made as to what changes must be made to make the products both more appealing and more profitable. These concepts - appealing and profitable - are together not mutually exclusive. There is nothing to say that a customer will not pay more for a package of features/services which he or she perceives to meet their needs and offer value.

Since no two financial markets are the same, it is imprudent to assume that what appeals to customers in the Midwest would have the same appeal to customers in the Rio Grande Valley. However, certain account characteristics have been found to have universal appeal:

* Convenience
* Simplicity
* Flexibility

One of the first tasks for retail banking's senior management will be to listen to their branch managers and determine what they perceive the needs of their customers and their

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1789



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1802

competitors' customers to be. Once this is done, the needs-list will be compared to the product-features list as a starting point for product revamping. Since a multiplicity of products tends to confuse everyone - customers and staff-and also increases the back-office support costs, a relatively short list of transaction products will be offered.

The next step in the process is to determine the cost to provide the features/services on a per account basis and to establish pricing, either through fees or minimum balance requirements. Because SAF's branch profitability analysis is geared to Net G & A, a model branch will be built using assumptions relative to the desired transaction account mix. Using the current deposit base and model expense ratios, along with assumptions as to CD runoff rate and replacement transaction accounts, pricing for the mix of transaction accounts can be established. At this point, discretion must be used to establish pricing which will be competitive yet stay within the model's cost parameters.

Often, fee income is not given sufficient emphasis in the pricing analysis for transaction products. Yet, as mentioned earlier, customers are not always adverse to the payment of fees. In addition to monthly services charges on checking accounts and NSF fees, overdraft protection fees, ATM transaction charges, and telephone transfer fees are all looked upon as "convenience" charges by customers and meet little resistance from those customers.

It is understood that, regardless of the new transaction account features and pricing, it will take time to receive the desired product mix within each branch. Until that time, the offices will not necessarily meet the Bank's Net G & A targets.

## VI. DEPOSIT PROJECTIONS

The ownership group is comfortable with the location of its retail offices and the physical plant at each branch location. There are no intentions, at this time, to either close any of the offices or to expand into new markets. However, the newly structured SAF will closely monitor the profitability performance of each office. Should new markets present themselves as opportunities whereby the Bank can make both a contribution to the community and add to the profitability of the Bank, such opportunities will be considered.

Assuming that the Bank will operate from its current branch offices, a projection has been made as to both the level of deposits at each office and the mix of transaction and time

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-876-1790



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1803

deposits within each branch. Since SAF's strategy for profitability does not call for it to be a rate leader in its markets, modest, yet steady, deposit growth has been projected at approximately two percent per annum. Included in this projection is the change in deposit mix over a three year period.

| | At Acquisition (millions) | | | Year 1 (millions) | | |
|---|---|---|---|---|---|---|
| Office | Trans | Time | Total | Trans | Time | Total |
| Weslaco | 22.4 | 54.9 | 77.3 | 21.1 | 52.6 | 73.7 |
| McAllen | 11.4 | 25.0 | 36.4 | 12.0 | 26.5 | 38.5 |
| Brownsville | 5.5 | 18.2 | 23.7 | 6.5 | 18.0 | 24.5 |
| Harlingen | 4.2 | 10.1 | 14.3 | 5.0 | 11.0 | 16.0 |
| Port Isabel | 5.1 | 8.7 | 13.8 | 6.5 | 9.0 | 15.5 |
| San Juan | 2.8 | 6.7 | 9.5 | 2.9 | 6.5 | 9.4 |
| Totals | 51.4 | 123.6 | 175.0 | 54.0 | 123.6 | 177.6 |

| | Year 2 | | | Year 3 | | |
|---|---|---|---|---|---|---|
| Office | Trans | Time | Total | Trans | Time | Total |
| Weslaco | 21.8 | 46.9 | 68.7 | 21.6 | 38.4 | 60.0 |
| McAllen | 13.0 | 28.0 | 41.0 | 13.5 | 30.7 | 44.2 |
| Brownsville | 6.7 | 20.5 | 27.2 | 7.2 | 22.5 | 29.7 |
| Harlingen | 5.5 | 12.5 | 18.0 | 6.0 | 16.0 | 22.0 |
| Port Isabel | 6.7 | 9.5 | 16.2 | 8.0 | 10.0 | 18.0 |
| San Juan | 3.0 | 6.2 | 9.2 | 3.2 | 6.0 | 9.2 |
| Totals | 56.7 | 123.6 | 180.3 | 59.5 | 123.6 | 183.1 |

The assumptions for the deposit growth for each branch are:

* Weslaco - Because of competitive market, a slight decrease in deposits is projected.

* McAllen - Healthy growth in total deposits and checking due to the recent addition of a drive-through facility and the strength of the McAllen market.

* Brownsville - Projected steady checking growth due to its



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1791

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1804

excellent location. Recent introduction of a full service branch at this location is expected to bring significant deposit growth.

* Harlingen - Growth in the city is the basis for the projected growth and excellent branch management.

* Port Isabel - Recent upgrade in its facility should increase deposits.

* San Juan - Slight decrease in deposits is projected. This is considered a marginal branch operation..

Based on these projections, deposits would grow from $ 175.0 million to $ 183.1 million over three years. The deposit mix would change to:

| Account Type: | Acquisition $ (millions) | % | Year 3 (millions) | % |
|---|---|---|---|---|
| Transaction | 51.4 | 29 | 59.5 | 33 |
| Time | 123.6 | 71 | 123.6 | 67 |
| Total Deposits | 175.0 | 100 | 183.1 | 100 |

Over a five year period, the migration to transactions accounts is more pronounced. More than 35% of deposits are projected to be in transaction accounts by Year 5.

## VI. CONCLUSION

Despite a great deal of mystique which has recently been attached to retail banking in terms of "sales cultures" and "cross selling", SAF's ownership believes that it is a relatively simple business. Providing customers with the products and services which they desire at a competitive price coupled with personal service delivered in a comfortable atmosphere is what wins over customers. The key elements to success are friendly and knowledgeable staff who make customers feel welcomed and who instill confidence with their personal banking knowledge. Management will devote both time and resources to the training of the retail staff so that the above qualities are reflected in each branch employee.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1792



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1805

SAN ANTONIO FEDERAL BUSINESS PLAN
Lending Division

# 1. INTRODUCTION

San Antonio Federal (SAF) currently is not originating mortgage or consumer loans. It is the intent of the new owners to have the Bank become active again in originating mortgage loans within the areas serviced by its retail banking facilities. Consumer loans will become one of the products marketed by the retail banking group and will be considered more as "accommodation" products than as products which are aggressively marketed. Activities relating to consumer loans will be presented in the Retail Banking section of this plan.

## MORTGAGE LOAN ORIGINATION:

There are two objectives for mortgage loan origination at SAF:

* create residential mortgage loans which are saleable into the secondary market;
* originate quality portfolio loans.

### Secondary Market Loans -

Interest-rate-risk management dictates that fixed rate mortgage loans be originated for sale into the secondary market and not to be held in the portfolio. Due to the very competitive nature of the conforming mortgage market, the Bank anticipates that it will lose approximately 50 BP on every newly originated loan. Although this type of competitive pricing appears to be unprofitable, it does create value in the form of servicing rights. The servicing rights value is worth three to four times the loss experienced in originating a mortgage.

Conforming loans will be originated, primarily for Freddie Mac and Fannie Mae, securitized and sold in the secondary market. Because SAF does not now service for any of the agencies, the immediate plan will be to sell the servicing rights in the secondary market for cash. Once secondary market origination/processing/underwriting/shipping functions are in place and working, an evaluation will be made as to whether it makes economic sense for SAF to establish a secondary market-oriented servicing operation.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1793

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1806

SAN ANTONIO FEDERAL BUSINESS PLAN
Lending Division

The Bank anticipates that about 70% of its loan produ will be sold into the secondary market. Conforming l volume and servicing value projections are as follow:

| Year | $ Originations (000) | $ Value of Servicing ~~(000)~~ |
|---|---|---|
| 1 | 42,000 | 787,500 |
| 2 | 46,000 | 865,500 |
| 3 | 50,000 | 937,500 |

Portfolio Loans -

Most portfolio origination will be put into Adjustable Rate Mortgage (ARM) product or 15-year fixed rate mortgages with interest margins of 225 to 300 BP over the Bank's similar-term cost of funds. The servicing of portfolio loans will remain within the Bank. The above margins are net of an internally attributed servicing fee of 25 BP.

The Bank anticipates that 30% of its loan production will be portfolio loans. The portfolio volume projections are as follows:

| Year | $ Originations (000) |
|---|---|
| 1 | 18,000 |
| 2 | 20,000 |
| 3 | 22,600 |

## II. LENDING DIVISION STRUCTURE

The lending area will be organized as follows:

A) Retail Operations
B) Wholesale Operations
C) Central Loan Processing

All of these functions will be under the direction of the Bank's head of residential lending.

### A) RETAIL OPERATIONS:

The Bank will originate loans through a retail network operating from its branch offices. Full time, commissioned loan originators will be located within the McAllen, Weslaco and Bronwsville offices. The Bank will recruit



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1794

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1807

experienced originators with an established book of realtor-based business. As an incentive to join the SAF group, these originators will be offered an array of benefits, commission-draws and bonus participations. Since realtor-referred business is the key to a successful and sustainable mortgage origination effort, obtaining experienced originators is the preferred approach to building this business.

For those offices which will not have a full time originator, the branch manager will be trained to take a conforming loan application for walk-in business. All branch managers will receive similar training and will be encouraged and incented to make loan origination part of their cross-selling program.

B) WHOLESALE OPERATIONS:

Since SAF will be a well-capitalized institution, approved to do business with Freddie Mac and Fannie Mae, an attempt will be made to establish a wholesale origination function both within and outside the markets served by the Bank's branch network. With the demise of many thrifts, commercial banks and mortgage banking companies in Texas, management perceives that there may be a void for competitively priced mortgage loans through local commercial banks, thrifts and mortgage brokers which are not geared to originate and sell into the secondary market.

The group will provide a higher level of service and faster turn-around time to correspondents than the national mortgage conduits. Direct access by the correspondent to the group's underwriters and additional "hand holding" should allow the Wholesale group to charge 50 BP above other wholesalers.

Wholesale origination will be handled under two formats. The most common structure will be for the correspondent to process the file and present it to SAF's Wholesale group for underwriting approval. Once approved, the correspondent will close the loan with its own funds and present the closed loan package for purchase. Pricing will be set so that there is a price advantage for self-funding of approximately 100 BP.

A less prevalent form of correspondent relationship will be for the originator to complete the initial application and disclosures and then turn the file over for processing, underwriting and closing to the Wholesale group. While the correspondent's pricing is not as favorable, they are not required to have the level of processing and closing sophistication nor the credit lines to do self-funding.

An added cost element to the Bank for handling wholesale originations will be the additional quality control procedures which must be in place. Since the Bank controls

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1795



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1808

less of the processing and underwriting than in retail originations, prudence dictates close QC scrutiny. The secondary market agencies have specific QC guidelines which relate strictly to corespondent production. The Bank will not compromise or short-cut on its QC procedures.

C) CENTRAL LOAN PROCESSING:

A key to operating retail and wholesale mortgage origination activities profitably is an efficient centralized loan processing function. Under "loan processing" comes the following tasks: processing, underwriting, closing. Because the Bank will be an active seller in the secondary market, a high level of agency-related technical expertise must be present within the Central Loan Processing group. For that reason, centralization of this function is absolutely necessary.

The group will be organized on a team concept, with two members in each team. Each team will handle processing, submission, closing and shipping of all files assigned to them. Separate teams will specialize in either wholesale or retail originations. However, each team will be able to cross-over to assist with the workload as needed.

An automated document preparation system will be used to provide standardize loan documents. The system will also track the pipeline and provide reports to management on pipeline status. These reports will be used by the Asset & Liability Management group, the Loan Shipping department and by Central Loan Processing.

## III. PROFITABILITY ANALYSIS

While projections on loan volume were provided earlier in this plan, it is impossible to determine precisely when the Bank will reach any of the projected levels. Since regional and national economic variables have as much bearing on the level of business as internally controlled factors, it is important to understand the underlying economics of the mortgage origination process.

Contrary to the conventional thinking of most financial institutions which originate residential mortgages, the ownership of SAF does not believe that it will "make money" from this activity. However, the function does add value to the Bank through its production of quality loan servicing. This value can be realized immediately through the sale of the servicing or it can be realized over time as the



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1796

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1809

organization services the loans. While the decision to sell or retain will be made at a later time, the value exits regardless of the approach.

As will be seen, the profitability level from retail and wholesale operations differs. Since both groups perform different tasks for their customers, it is logical that their costs to operate are different and that the pricing for their products will be different.

The analysis below has been derived from the ownership group's experience in originating in both wholesale and retail structures and processing in a centralized environment. The per loan revenues and costs are considered to be valid within the $50 to $60 million production range projected for the Bank. Management is confident that, after an initial start-up period, the per loan profit numbers shown below are attainable.

| | $ per loan closed | |
|---|---|---|
| | Wholesale | Retail |
| Revenue: | | |
| Origination Fees | $ 879 | $1,034 |
| Float Income | 96 | 85 |
| Revenue per loan | 975 | 1,120 |
| Costs: | | |
| Originator Costs | 0 | 793 |
| Processing Costs | | |
| - Personnel | 760 | 682 |
| - Occupancy | 107 | 148 |
| - Incentives | 84 | 105 |
| Cost per loan | 951 | 1,726 |
| Net Income (Loss) from originations | 24 | (607) |
| Hedging Costs | (176) | (103) |
| Securt/OC | ( 91) | ( 58) |
| Value of Servicing | 1,172 | 1,034 |
| Profitability | 928 | 266 |

The average balance of the loans originated for the Wholesale

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1797

group were assumed to be $65,000. Whereas, the average retail loan was slightly lower at $55,000. Originators are to be paid 50 BP per loan along with a 15% profit sharing incentive. Servicing is valued at 100 BP. Since servicing ordinarily trades for around four to five times servicing fees, this attributed value is considered reasonable.

To further demonstrate the profitability from both types of originations, an incremental cost analysis comparison was prepared. Should the Bank exceed the $50 to $60 million production benchmark, its origination efforts will become even more profitable.

| | | Wholesale | | Retail |
|---|---|---|---|---|
| Cost to Originate (from above) | | $ 951 | | $1,726 |
| Incremental Costs | | 755 | | 802 |
| Incremental Profitability | | $ 196 | | $ 924 |
| Total Profitability per loan | 928<br>196 | $1,124 | 266<br>924 | $1,190 |

## IV. CONCLUSION

None of the above can be accomplished without a great deal of staff training, originator recruitment and diligent effort. However, because the ownership group has been able to create the above described lending operation from the ground up, it is confident that it has the expertise to do so again. While the Texas market may present challenges which were not previously encountered, none of these should significantly alter the profitability analysis which has been presented.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1798



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1811

San Antonio Federal Business Plan
Non-Earning Asset Management

## I. INTRODUCTION

At time of acquisition, the institution will have approximately $ 13.4 million of real-estate-based non-performing assets. One of the new ownership group's first tasks will be to assess SAF's problem assets as follows:

a) Identify all non-performing assets and those which are in jeopardy of becoming non-performing.
b) Prepare a written assessment of each asset after gathering and reviewing all relevant information.
c) Create a priority list as to the order in which assets will be worked.
d) Develop a detailed action plan for each asset.
e) Designate a workout team and assign responsibilities.

## II. IDENTIFY NON-PERFORMING ASSETS

The Bank's quarterly classified asset report and monthly delinquency report will be used as the source documents for compiling a problem asset listing. SAF's assets break out into eight (8) categories:

1) Conventional Mortgages
2) Commercial Real Estate (serviced by others)
3) Commercial Business Loans
4) Consumer Loans
5) Consumer Loans Acquired from Travis Savings
6) Consumer Loans Acquired from Commerce Bank
7) Second Mortgage Acquired from Albuquerque Savings
8) Real Estate Owned
   - Single Family/Condos
   - Commercial Real Estate
   - Multi-family
   - Land

Management will also be asked to compile a listing of those loans which have characteristics or circumstances that would indicate that they may become non-performing in the near future.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1799



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1812

## III. PREPARE A WRITTEN ASSESSMENT

Critical to the success of any loan workout is a thorough understanding of all the facts pertaining to the asset. Therefore, each loan/asset file will be reviewed for loan documentation, most recent appraisal, operating statement (if income producing property), guarantees by borrower(s), status of title, bankruptcy proceedings (if applicable) and any other information which would be useful in determining a workout strategy.

Once the facts have been gathered, a narrative will be prepared which summarizes the important facts relating to the asset. In addition, the narrative will contain recommendations for action which became apparent to the reviewer. An example of such recommendations would be the obtaining of a current appraisal, payment of past due real estate taxes or other outstanding liens, request for a current operating statement or ordering a current title report. Noting such actions will save time when the actual workout process begins as well as minimize a potential monetary loss to the institution.

## IV. PREPARE A PRIORITY LIST

Since the monetary exposure to the Bank varies by asset and since experienced workout resources will be limited, a priority list will be compiled as to the order in which the assets will be worked. Not only will the assets be listed in order of importance but any actions recommended in the preliminary asset review (see III above) will be listed also.

Because asset workout is as much of an art as a science, the prioritization will take into account which assets can be resolved relatively quickly. Since the management of non-performing assets is both time consuming and costly, the goal will be the quick disposition of some assets, even if holding them might earn a better price. In this way, they will not continue to be a distraction from those assets which require a greater amount of workout creativity and which put more of the Bank's capital at risk.



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-876-1800

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1813

## V. CREATE DETAILED PLANS OF ACTION

With each asset (or groups of assets) prioritized, a strategy for workout will be developed for each . Whether "workout" means disposition of the asset, recasting of the loan terms, or close supervision of operating statements, a specific plan will be prepared. During the due diligence review performed by the new ownership, discussions were held with several groups as to their interest in acquiring segments of SAF's problem assets. Whenever possible, opportunities for disposing of entire segments of the non-performing portfolio will be pursued.

Since a significant portion of the Bank's non-performing portfolio are assets being serviced by others, an important element of the workout effort will be the evaluation of the performance of the servicer. Face-to-face meetings will be held with the servicers so that SAF's management can become comfortable with the level of expertise of the servicer. When deemed in the best interest of the Bank, management will be instructed to pull servicing from the current servicer and either place it with another servicing agent or the Bank may decide to service the asset itself.

Another critical workout step is the evaluation of the efforts being made by the various law firms which have been engaged to represent SAF. Legal fees can become a very costly part of a workout. Unless the firms engaged are both technically competent to handle the representation and managed diligently, legal costs can go beyond reasonable limits. Each of the firms representing the Bank will be evaluated very early on in the workout process.

## VI. DESIGNATE A TEAM AND ASSIGN RESPONSIBILITIES

The ownership group has extensive experience in the workout of problem assets. Homer Holland has been asked to designate an asset workout team and to serve as the group leader. A significant portion of Mr. Holland's time will be spent on this effort. Since both James De Loach and Jack Sukmann will be retained as part of management, they will also contr[illegible] their knowledge of what has transpired in the past many of the assets and will be involved in the wo tasks.

Subject to the approval of the SAF's board of dire Homer Holland will establish the workout strategy asset and will assign the various responsibilities management and the Bank's staff. So that the actic subsequent activities relative to workout for each

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1801

maintained, a log book will be created which will contain a write up for each asset which is being worked. A fact sheet will be created for each asset which will contain information such as current balance, reserves, market value, pertinent dates, listing of attorneys, brokers, etc. In addition, a running narrative of all workout actions will be maintained for each asset. In this way, anyone will be able to review the log book regarding a particular asset and can become familiar with every workout action in chronological order.

## VII. CONCLUSION

The disposition and workout of the Bank's non-performing assets will have the highest level of attention from the new ownership group. Since the group has had extensive experience and a great deal of success in similar efforts with other financial institutions, there is no reason to believe that it cannot replicate previous successes. An estimated workout period of three years has been set for the liquidation and/or resolution of the bulk of the non-performing assets.

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-876-1802



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1815

## I. INTRODUCTION

Critical to the success of any business venture, especially to a thrift institution in these changing times, are knowledgeable and involved directors and technically competent and professional managers. The ownership group of SAF will do its best to ensure that its directors and senior managers possess these characteristics.

## II. BOARD OF DIRECTORS

SAF's board of directors will have five members from Western Capital Holdings, Inc. (WCH), the thrift holding company which will own 100% of SAF's common stock, and five local (Rio Grande Valley or Texas) representatives. The five members of WCH will be Howard Ross, Homer Holland, Steven Bangert, John Rose and Ronald Pikus. SAF's current outside directors from the Rio Grande Valley will be asked to remain on the board. Their input for additional local individuals to serve on the board will be sought.

Biographies of the five holding company directors follow.

Howard Ross: Chairman of the Board and Owner
River Valley Savings Bank, FSB
Peoria, Illinois

Has spent most of his business life organizing and directing entrepreneurial ventures in commercial banking, real estate development and oil and gas exploration. Because of his many contacts in the investment banking field, he has devoted significant efforts toward raising capital for River Valley Holdings, Inc., the parent of River Valley Savings Bank.

Homer Holland: Chairman, Executive Committee and Owner
River Valley Savings Bank, FSB
Peoria, Illinois

Extensive senior management experience in the commercial banking and thrift industries. As CEO of a major commercial bank in Chicago, he directed the turn around which significantly enhanced earnings and shareholder value. Acquired five insolvent thrift institutions and successfully merged them into his existing thrift to form River Valley Savings Bank. Has devoted a substantial amount of time to

real estate loan workouts of assets acquired through merger.

Steven Bangert: Vice Chairman and CEO
River Valley Savings Bank, FSB
Peoria, Illinois

Has developed a national reputation in the area of financial institution asset and liability management. Developed the strategic business plan and implemented the balance sheet restructuring for the acquired institutions which became River Valley Savings Bank. This restructuring resulted in a two percent return on assets for the latest fiscal year.

John Rose: Senior Vice President
Holland Partners, Inc.
Chicago, Illinois

Over fourteen years of management experience in the commercial and investment banking industries. Currently directs merger and acquisition activities of a company which specializes in the acquisition and turn around of troubled financial institutions.

Ronald Pikus: President and Chief Operating Officer
River Valley Savings Bank, FSB
Peoria, Illinois.

Manages day-to-day operations for the Peoria-based thrift which has eleven retail branches and over two hundred employees throughout Illinois. He has twenty years of experience in the thrift and mortgage banking industries, having served as chief financial officer/controller and mortgage servicing manager for several institutions.

## III. MANAGEMENT

An Executive Committee comprised of Homer Holland, Steve Bangert and Ron Pikus will provide direction to the Bank's senior managers and act on behalf of the Board of Directors between formal board meetings.

With respect to the senior management of the Bank, no changes in the current management structure are anticipated. Both James DeLoach and John Sukmann will be relied upon to maintain continuity to the Bank's operations, provide insights as to the staff's strengths and weaknesses, bring an understanding of the characteristics of the retail markets

which and Bank's serves and assistance with loan workouts.

Because several directors, namely Holland, Bangert and Pikus, have extensive experience in thrift management and are specialists in areas critical to the restructuring of the Bank, they will be called upon to provide management with assistance in several areas. Their efforts will focus on the following:

Homer Holland: He possesses extensive real estate loan workout experience and will devote a significant amount of his time to SAF's non performing loans. Holland, together with current senior management, will prioritize the assets and develop a plan for either restructuring or liquidation.

Steven Bangert: He will assist management with developing an overall balance sheet management strategy, determine which segments need restructuring and assist in the creation of a loan and deposit pricing model.

Ronald Pikus: He will advise management in several areas:

a) review of the operating structure of the Bank to determine where operating efficiencies might be improved;
b) creation of a residential loan, secondary market-oriented origination/processing/underwriting/shipping function;
c) determine the feasibility of establishing a loan servicing function within the Bank.

## IV. CONCLUSION

It is not the intention of the new ownership group to inject upheaval and apprehension within an institution which appears to be both prudently managed and operationally sound. However, as with the introduction of any new owners, a different operating philosophy and style is inevitable. The goal will be to maintain all that is now working well and, drawing from the new owners' expertise, add to the Bank's capabilities.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1805

## I. INTRODUCTION

SAF's six retail banking offices are located in the Rio Grande Valley. Traditional thrift deposit and transaction accounts are currently being offered in this area along with consumer loan products. Because of the bright economic future for the Valley, the new ownership group believes that the area provides excellent opportunities for new deposit products along with a significantly expanded residential home loan program. The remainder of this section will detail the regional and local economic makeup of the Rio Grande Valley.

## II. REGIONAL ECONOMIC FACTORS

The Rio Grande Valley is located along the north bank of the Rio Grande River in the southernmost part of Texas. The four south Texas counties comprising the region are Cameron and Willacy counties along the Gulf of Mexico and Hidalgo and Starr counties to the west. At the time of the 1990 U.S. Census, these counties had a combined population of 701,888, the larger portion of which was concentrated in 38 towns ranging in size from Brownsville (population 98,962) and McAllen (population 84,021) to Progresso Lakes (population 154). Population in the Rio Grande Valley has grown from 28,000 in 1880 to 701,888 in 1990. The compound growth rate of this 101 year period is around 3.0% annual growth in population. The "Metro Facts 1991" report compiled by the Rio Grande Valley Chamber of Commerce projects total population of 973,000 by the year 2000. This implies a population growth rate of around 3.3% per year for the ten year period from 1990 to 2000.

One factor significantly influencing the Valley is Mexico. The neighboring border cities of Reynosa, Matamoros, and Rio Bravo have a combined population estimated at 1.3 million. Including northern Mexico, the total population of the Rio Grande Valley market area is in excess of 2 million. Access to Mexico is provided by six international bridges. Two of these are located in Brownsville, one in Progresso south of Weslaco, one in the city of Hidalgo south of McAllen, one in Rio Grande City and one in Roma. A new bridge is under construction south of Harlingen.

Basic industries in the Valley include agriculture such as cotton, sugar cane, row crops, citrus, cattle and livestock; oil and gas production; fishing, shrimping, and seafood processing; tourism and manufacturing.

The Valley is one of the nations leading food producing areas, with a sub-tropical climate that provides a 330 day growing season. The primary crops in terms of dollar volumes



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1806

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1819

are fruits and vegetables (47%), cotton (23%), feed crops (10%), livestock (8%), sugar cane (5%), nursery crops (4%), and other crops comprising the remaining 3% of dollar volume. Supporting industries and services for these products include canning and quick freezing plants, juice concentrate plants, packaging and container manufacturers, equipment distributors, fertilizer and chemical distributors, truckers, seedsmen, aerial applicators and farm workers. The total dollar volume from agriculture and livestock income is estimated to range from $500 to $600 million annually.

A growing segment of the manufacturing base in the Valley results from the "Maquiladora" or twin plant operations. The Maquila system usually works with a highly automated or technology-oriented plant in the U.S. and a labor-intensive sister plant on the Mexican side. U.S. Customs law allows a U.S. owned company to assemble products in a foreign country and return the finished products to the U.S., paying duty only on the amount of labor or value added in the foreign country. The program is ideal for manufacturers of highly labor-intensive products. This concept fits well with Mexico's National Plan of Industrialization. Under this plan, companies may be 100% foreign owned and must export all of the products assembled in the plants. Industries that provide a particularly good fit for this type of operation are electronics, garments, and communications equipment. In 1991, Maquiladora operations accounted for 68,268 jobs in northern Mexico with employment spread over 165 plants.

An expanding area of the Valley economy is tourism, primarily from "Winter Texans". These are semi-permanent residents from northern portions of the country who reside in the Valley during the winter season. Of the estimated 100,000 to 125,000 Winter Texans visiting the Valley, approximately 70% choose Hidalgo County as their place of residence during their winter stay. The average length of stay for these temporary residents is 17 to 20 weeks with an estimated $192.5 million spent for living expenses and one-time expenditures. Housing for the winter guests is primarily provided by mobile home and recreational vehicle parks with over 90% of the Winter Texans choosing this type of residency for their stay. The local economy benefits from these visitors in many diverse ways. Restaurants and retailers benefit from increased sales during the winter months. Landowners benefit due to agricultural land transitioning to use for mobile home and recreational vehicle and retirement communities. Developers and contractors of all types are involved in the construction of the retirement communities. Golf course developers, maintenance and operating personnel are involved in building and maintaining the golf courses which are often located within the various retirement communities. Financial institutions, in general, and SAF, in particular, benefit since the temporary residents usually establish a local banking relationship to care for their

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-876-1807



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1820

banking needs during their Texas stay. The beneficial impact to the local economy from Winter Texans is projected to continue and increase over the coming years.

The Valley's semi-tropical climate and diverse economic base provides a unique and desirable area to accommodate the anticipated increase in the population base for the foreseeable future. Expansion of the economy is predicted for agricultural products, services, manufacturing and trade with Mexico, and tourism due to increases in both native and Winter Texan visitors.

If negotiations with Mexico lead to free trade between the two countries, the impact on the Rio Grande Valley could be very significant in terms of economic growth. Short term potential problem areas include major devaluations of the Mexican Peso and a general lack of stability for international and domestic oil prices.

## III. LOCAL FACTORS

A brief description of the local market for each of SAF's branch offices will now be presented.

* McAllen - The city of McAllen reflects the basic industries of the Rio Grande Valley. Primary sources of income arise from agriculture, trade, tourism and manufacturing.

  McAllen dominates the economic and cultural life of the upper Valley area. The city has twelve commercial banks and S&L's, with additional financial service companies. Excellent medical facilities are available with two new general hospitals providing comprehensive medical care, a new veterans' administration outpatient clinic, and a psychiatric hospital. A new civic center site has been purchased by the city with 180 acres available for civic center development.

  Steadily increasing growth is forecast for both the region and the city of McAllen. As of 1990, the total population of McAllen was 84,021 and total bank deposits were $1.7 billion.

* San Juan - The city is located between McAllen and Weslaco. The primary source of income is agriculture. There is very little manufacturing or industrial presence.

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1808



CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1821

The San Juan area has experienced growth in tourism due to the Winter Texan traffic. Population has risen from 5,070 in 1970 to 10,815 in 1990. Total bank deposits approach $34 million.

* Weslaco - Situated halfway between McAllen and Harlingen, the city of Weslaco has its economy firmly tied to the agriculture life of the area. The urban heart of the community is located on the north and south sides of U.S. Highway 83.

  Population has risen from 15,313 in 1970 to 21,877 in 1990. Cotton, row crops and citrus production are a stable part of the area economy. The packing, shipping and processing of these items form part of the basis of the Weslaco economic system. Local businesses, retail stores, light industrial enterprises and service institutions also help strengthen the payroll picture. The new industrial area contains several clothing manufacturing plants. Total bank deposits in Weslaco are in excess of $115 million.

* Harlingen - The town is located at the intersection of U.S. Highway 77 and U.S. Highway 83, which are two of the Valley's main transportation routes. Harlingen's economic base is balanced between agri-business, manufacturing, trade, services, government and tourism.

  The economic outlook for Harlingen was improved by new businesses which located recently in the city's industrial parks. In late 1988, General Dynamics located in the Harlingen Industrial Airpark, a 640 acre complex located northeast of the city. This complex offers new industries the opportunity to take advantage of the industrial start-up training programs offered by nearby Texas State Technical Institute. Recently, Fruit of the Loom completed the building of a $38 million textile mill in Harlingen Industrial Park, a 120 acre publicly owned industrial park. The plant employs 1,100 now and is projected to produce 1,700 jobs, $100 million in sales and a payroll of $20 million within three years. New developments include the new foreign trade zone and the start of construction of an international bridge.

  As of 1990, the total population of Harlingen was 48,735 with total bank deposits in excess of $475 million.

* Brownsville - It is the county seat of Cameron County and is a major international port of entry between Mexico and the United States. The economy is based primarily on retail trade, shipping, and tourism.

  Across the river in Mexico is Brownsville's sister city, Matamoros, with an estimated population of 650,000. According to Mexican demographics, the population of



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1809

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1822

Matamoros is expected to increase to 1.5 million by the year 2000. Matamoros has over 100 Maquiladora that employ approximately 40,000 people.

Brownsville has the distinction of being the largest city in the Rio Grande Valley with a 1990 population of nearly 100,000. Total bank deposits are in excess of $1 billion.

* Port Isabel - This city is the southern terminus of the Gulf Intracoastal Waterway system and, as a result, is the home of one of the largest shrimping fleets in the United States. As a coastal resort center, the area relies heavily on the boating and fishing industries. The city has remained stable over the years and provides adequate housing, educational and shopping facilities for its residents. It is noted that the fishing industry has suffered problems at times, but the construction boom on Padre Island has tended to offset fishing losses.

The economy of the subject area is affected largely by the resort and recreational resources on South Padre Island. South Padre Island and Port Isabel are connected by the Queen Isabella Causeway, the longest bridge in Texas. A new convention center will open soon in South Padre Island that will attract many new activities to the area.

Total population of the two towns is slightly more than 6,000 with total bank deposits in excess of $60 million.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER WCH-B76-1810

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1823

San Antonio Federal Business Plan
CRA Program

## I. INTRODUCTION

The ownership group of SAF is a strong proponent of a pro-active community re-investment program. Community reinvestment is looked upon more as an activity which benefits both the community and the institution than as a regulatory necessity. The Bank is prepared to make a commitment of not only its lending resources but, even more importantly, its "people talents" to promote CRA.

## II. PROGRAM DEFINITION

An effective CRA program begins first with self assessment. Since SAF has not been active in the loan origination business prior to the acquisition, a self assessment review will have to take on a different form. Rather than performing a statistical analysis, the Bank will gather a CRA Advisory Board from among its branch and lending staff to determine the credit and housing needs of the communities which the Bank serves.

The staff will also be asked to identify local community leaders who would be invited to become public members of the Bank's CRA Advisory Board. Together, Bank staff and public members will work together to implement the institution's CRA policies and programs.

## III. EDUCATION

Since many of the problems which low income applicants have with the mortgage process have to do with their lack of familiarity with the process, the Bank will be prepared to conduct an educational program geared to alleviate the confusion and fears which applicants tend to have.

Affordable housing seminars will be held at convenient locations within the Bank's lending areas. Loan officers, credit bureau representatives and realtors will be asked to participate in the seminars. Through these resources, potential home buyers and loan applicants will be guided through each step of the home buying and mortgage application process. In this way, applicants will understand what questions they will be asked and what documents they will need in order to apply for a loan. Special emphasis will be placed on the credit review process and counseling will be given to those individuals who have had past credit problems.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1811

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1824

A portion of the seminar will be set aside to discuss the responsibilities of home ownership and how owning differs from renting. Advice will be given as what steps the borrower should take with their lending institution should they encounter financial difficulties.

The goal of the seminar program will be to make the applicant more comfortable with what they will encounter when they buy a home and make application for a loan. This should put them in a better position to assist either SAF or any lender in determining their qualifications to handle a mortgage loan.

## IV. AFFORDABLE HOUSING PROGRAM

The Bank will attempt to become an approved lender under the Fannie Mae Affordables Program. The program, which is run in cooperation with several national private mortgage insurance companies, provides relaxed down payment and underwriting standards to low and moderate income families under special Fannie Mae guidelines. Since these loans can be securitized with Fannie Mae, it allows an institution to re-cycle its funds through a secondary market program for borrowers who would not otherwise qualify for a Fannie Mae loan.

Attendance at the Bank's seminar series will meet the educational requirements under the Fannie Mae Affordables and GEMICO lending programs. Certificates of completion will be distributed upon completion of the series and can be used at SAF or with any other participating lender.

## V. CONCLUSION

While there are many different ways to address the housing needs of the community, the ownership group has had success with the above approach. Since each community is different, the Bank will pay close attention to its staff and the public members of its CRA Advisory Board to determine what would be the most effective approach within SAF's markets.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1812

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1825

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Balance Sheet

| | | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|
| ASSETS: | | | | | | |
| Cash | 50,000 | 602,312 | 1,099,233 | 1,679,637 | 2,626,837 | 3,574,037 |
| Investment in SAFSB | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| Capitalized Organization Expenses | 667,500 | 445,000 | 222,500 | 0 | 0 | 0 |
| Total Assets | 10,717,500 | 13,994,388 | 16,792,825 | 20,256,853 | 25,309,833 | 29,420,291 |
| LIABILITIES & CAPITAL: | | | | | | |
| American National Bank | 10,250,000 | 6,385,248 | 2,240,436 | 0 | 0 | 0 |
| Other Liabilities | 417,500 | 278,333 | 139,165 | 0 | 0 | 0 |
| Total Liabilities | 10,667,500 | 6,663,581 | 2,379,601 | 0 | 0 | 0 |
| Capital: | | | | | | |
| Paid in Capital | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Retained Earnings | | 7,280,807 | 14,363,224 | 20,206,853 | 25,259,833 | 29,370,291 |
| Total Capital | 50,000 | 7,330,807 | 14,413,224 | 20,256,853 | 25,309,833 | 29,420,291 |
| Liabilities & Capital | 10,717,500 | 13,994,388 | 16,792,825 | 20,256,853 | 25,309,833 | 29,420,291 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1813

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1826

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Income Statement

| | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| Increase in equity of SAFSB | 7,947,076 | 7,524,017 | 6,106,124 | 5,105,780 | 4,163,258 |
| Expense | | | | | |
| Interest Expense | 706,998 | 366,592 | 95,219 | 0 | 0 |
| Amortization of Org Costs | 222,500 | 222,500 | 222,500 | 0 | 0 |
| Other Expense | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| Pretax Earnings | 6,937,578 | 6,854,925 | 5,708,405 | 5,025,780 | 4,083,258 |
| Tax Treaty | 343,229 | 227,491 | 135,224 | 27,200 | 27,200 |
| Net Earnings | 7,280,807 | 7,082,416 | 5,843,630 | 5,052,980 | 4,110,458 |

Cash Flow Statement

| | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| Cash In: | | | | | |
| Dividends Received | 5,000,000 | 5,000,000 | 3,000,000 | 1,000,000 | 1,000,000 |
| Tax Treaty | 343,229 | 227,491 | 135,224 | 27,200 | 27,200 |
| Total Cash In | 5,343,229 | 5,227,491 | 3,135,224 | 1,027,200 | 1,027,200 |
| Cash Out: | | | | | |
| Interest Expense | 706,998 | 366,592 | 95,219 | 0 | 0 |
| Organization Expenses | 139,167 | 139,168 | 139,166 | 0 | 0 |
| Other Expenses | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| Principal Repayment | 3,864,752 | 4,144,812 | 2,240,436 | 0 | 0 |
| Total Cash Out | 4,790,917 | 4,730,571 | 2,554,820 | 80,000 | 80,000 |
| Net Cash | 552,313 | 496,920 | 580,404 | 947,200 | 947,200 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1814

SAFSB - Purchase Accounting and Negative Goodwill Allocations
Balance Sheet as of January 31, 1992

| | Net Balance 01/31/92 | Yield Current | WAM Current | Required Yield | Prepay Factor | PA Discount | Totals |
|---|---|---|---|---|---|---|---|
| Auto Loans Rio Grande Valley - Variable | 5,000 | 9.63% | 15 | 19.00% | 18.00% | 285 | |
| Unsecured Loans San Antonio - Fixed | 4,000 | 10.50% | 16 | 25.00% | 18.00% | 320 | |
| Unsecured Loans San Antonio - Variable | 16,000 | 11.50% | 140 | 25.00% | 18.00% | 4,000 | |
| Unsecured Loans Rio Grande Valley - Fixed | 110,000 | 16.88% | 20 | 25.00% | 18.00% | 6,050 | |
| Unsecured Loans Rio Grande Valley - Variable | 6,000 | 10.50% | 14 | 25.00% | 18.00% | 420 | |
| Mortgage Secured Rio Grande Valley - Fixed | 181,000 | 12.87% | 77 | 25.00% | 18.00% | 33,485 | |
| Mortgage Secured Rio Grande Valley - Variable | 124,000 | 12.43% | 106 | 19.00% | 18.00% | 15,748 | |
| Other Secured Loans Rio Grande Valley - Variable | 8,000 | 10.46% | 16 | 19.00% | 18.00% | 432 | |
| Consumer Loans Purchased from Commerce Savings | 544,000 | 11.64% | 114 | Pur Disc | | 395,000 | |
| Consumer Loans Purchased from Travis Savings | 3,261,000 | 13.45% | 122 | Pur Disc | | 1,100,000 | |
| Other Variable-Rate Consumer Loans | 29,000 | 11.75% | 240 | 19.00% | 18.00% | 4,814 | |
| Phoenix Swimming Pool Loans - Fixed (ABQ) | 8,961,000 | 12.25% | 143 | 35% Disc | 12.00% | 3,136,350 | |
| Phoenix Swimming Pool Loans - Variable (ABQ) | 3,740,000 | 11.94% | NA | 35% Disc | 12.00% | 1,309,000 | |
| Loans on Savings Accounts | 1,340,000 | 8.92% | 12 | | | 0 | |
| | | | | | | | 9,360,081 |
| | 38,353,000 | | | | | | |
| Grand Total - Loans | 164,447,000 | | | | | | 24,622,569 |
| Investment Portfolio | | | | | | Premium | |
| Investment Securities | 30,326,000 | 7.85% | | Mkt Quote | 24.00% | (110,000) | |
| Mortgage-Backed Securities | 39,207,000 | 6.65% | | Mkt Quote | 24.00% | (613,000) | (723,000) |

| Liabilities | Bal as of 01/31/92 | WA Rate 01/31/92 | WA Term 01/31/92 | Yield Adj | PA Premium Allocation | |
|---|---|---|---|---|---|---|
| Deposits - CD's | | | | | | |
| 0-6mos maturities | 69,333,000 | 5.72% | 3 | 3.75% | 0 | |
| +6-12 mos maturities | 36,127,000 | 5.54% | 9 | 4.05% | (362,634) | |
| +1yr-3yr maturities | 15,705,000 | 6.99% | 24 | 4.55% | (685,948) | |
| +3yr-5yr maturities | 514,000 | 8.77% | 48 | 4.90% | (70,435) | |
| +5yr maturities | 1,951,000 | 9.21% | 60 | 4.90% | (449,387) | 1,568,404 |
| FHLB Advances | | | | | | |
| Due 3/16/98 | 10,000,000 | 8.70% | 72 | 7.42% | (574,393) | |
| Due 2/26/01 | 10,000,000 | 8.56% | 108 | 7.85% | (421,849) | 996,242 |
| | | | | | | 26,464,215 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1815

SAFSB - Purchase Accounting and Negative Goodwill Allocations
Balance Sheet as of January 31, 1992

| | Net Balance 01/31/92 | Yield Current | WAM Current | Required Yield | Prepay Factor | PA Discount | Totals |
|---|---|---|---|---|---|---|---|
| Mortgages & Other Real Estate Loans | | | | | | | |
| Residential - Fixed | 10,957,000 | 10.69% | 166 | 11.73% | 12.00% | 465,673 | |
| Residential - ARMs | 53,559,000 | 9.49% | 275 | 9% Disc | 72mos | 4,820,310 | |
| Condominium - Fixed | 1,001,000 | 10.46% | 210 | 4.5% Disc | 12.00% | 45,045 | |
| Condominium - ARMs | 6,344,000 | 9.40% | 258 | 9% Disc | 72mos | 570,960 | |
| Servd by Others-Commercial RE Fixed | 113,000 | 6.00% | 95 | 11.73% | 21.00% | 15,820 | |
| Servd by Others-Residential ARMs | 149,000 | 8.27% | 163 | 9% Disc | 72mos | 13,410 | |
| Servd by Others-MultiFamily ARMs | 23,930,000 | 8.52% | 179 | 15% Disc | 72mos | 3,589,500 | |
| Servd by Others-Commercial RE ARMs | 10,025,000 | 8.22% | 123 | 9% Disc | 72mos | 902,250 | |
| 2-4 Family Residential - Fixed | 49,000 | 11.49% | 106 | 11.73% | 21.00% | 490 | |
| 2-4 Family Residential - ARMs | 1,042,000 | 9.80% | 202 | 9% Disc | 72mos | 93,780 | |
| MultiFamily - Fixed | 4,599,000 | 10.00% | 149 | 15% Disc | 12.00% | 689,850 | |
| MultiFamily - ARMs | 3,516,000 | 9.51% | 233 | 15% Disc | 72mos | 527,400 | |
| Commercial RE/Land/Other - Fixed | 2,341,000 | 10.13% | 137 | 36% Disc | 60mos | 837,300 | |
| Commercial RE/Land/Other - ARMs | 5,402,000 | 10.62% | 130 | 32% Disc | 60mos | 1,695,600 | 14,267,388 |
| | 123,027,000 | | | | | | |
| Commercial Business Loans | 3,067,000 | 9.00% | 70 | 32% Disc | 70mos | 995,100 | 995,100 |
| Consumer: | | | | | | | |
| Home Improvement-1st Mgt San Antonio - Fixed | 875,000 | 12.51% | 99 | 25.00% | 18.00% | 192,063 | |
| Home Improvement-1st Mgt San Antonio - Variable | 4,636,000 | 11.25% | 109 | 19.00% | 18.00% | 704,520 | |
| Home Improvement-1st Mgt Rio Grande Valley - Fixed | 364,000 | 12.55% | 79 | 25.00% | 18.00% | 69,633 | |
| Home Improvement-1st Mgt Rio Grande Valley - Variable | 192,000 | 12.16% | 124 | 19.00% | 18.00% | 26,880 | |
| Home Improvement-2nd Mgt San Antonio - Fixed | 4,310,000 | 12.07% | 100 | 25.00% | 18.00% | 937,425 | |
| Home Improvement-2nd Mgt San Antonio - Variable | 8,413,000 | 11.32% | 113 | 19.00% | 18.00% | 1,278,776 | |
| Home Improvement-2nd Mgt Rio Grande Valley - Fixed | 614,000 | 12.70% | 74 | 25.00% | 18.00% | 71,838 | |
| Home Improvement-2nd Mgt Rio Grande Valley - Variable | 114,000 | 12.02% | 75 | 19.00% | 18.00% | 13,338 | |
| Mobile Home Loans Rio Grande Valley - Fixed | 11,000 | 15.00% | 26 | 25.00% | 18.00% | 880 | |
| Mobile Home Loans Rio Grande Valley - Variable | 19,000 | 12.50% | 74 | 19.00% | 18.00% | 2,062 | |
| Auto Loans Rio Grande Valley - Fixed | 477,000 | 12.37% | 33 | 25.00% | 18.00% | 56,763 | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1816

Negative Goodwill Allocation

| | Bal as of 01/31/92 | Neg GW Allocation | Carrying Value |
|---|---|---|---|
| Fixed Assets | 2,567,000 | (1,323,280) | 1,243,720 |
| REO: | | | |
| Residential Properties | 1,064,000 | (548,488) | 515,512 |
| Condominiums | 173,000 | (89,181) | 83,819 |
| Commercial Property | 2,133,000 | (1,099,554) | 1,033,446 |
| Land | 2,479,000 | (1,277,916) | 1,201,084 |
| Apartments | 1,411,000 | (727,366) | 683,634 |
| Total | 7,260,000 | (3,742,505) | 3,517,495 |
| | 9,827,000 | (5,065,785) | 4,761,215 |

Reconciliation:

26,464,215 Purchase Accounting Discounts/Premiums
(2,339,000)Other Purchase Accounting Adjustments
29,191,000 Total Excess to be Allocated
5,065,785 Negative Goodwill

CONFIDENTIAL -'SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1817

San Antonio Federal Savings Bank
Pro Forma Balance Sheets

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | |
| Cash | 1,843,000 | | | 1,843,000 | 2,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Investments | 30,326,000 | | | 30,326,000 | 8,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| MBS | 39,207,000 | | | 39,207,000 | 42,000,000 | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 |
| PA Discount | | 723,000 | | 723,000 | 382,081 | 259,113 | 196,555 | 148,674 | 112,093 |
| Total Cash & Inv | 71,376,000 | | | 72,099,000 | 52,382,081 | 63,259,113 | 63,196,555 | 63,148,674 | 63,112,093 |
| Loans: | | | | | | | | | |
| SFR-ARM's New | | | | | 31,173,317 | 38,686,844 | 57,249,877 | 76,451,158 | 96,786,116 |
| SFR-Fixed | 12,007,000 | | | 12,007,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | | | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 4,599,000 | | | 4,599,000 | 3,500,000 | 3,000,000 | 2,500,000 | 2,000,000 | 1,500,000 |
| Multi-Family ARMs | 27,870,000 | | | 27,870,000 | 23,000,000 | 19,000,000 | 15,000,000 | 11,000,000 | 7,000,000 |
| Commercial RE-Fixed | 2,904,000 | | | 2,904,000 | 2,400,000 | 1,800,000 | 1,200,000 | 600,000 | 0 |
| Commercial RE-ARMs | 15,677,000 | | | 15,677,000 | 12,000,000 | 9,000,000 | 6,000,000 | 3,000,000 | 0 |
| Commercial non-RE | 3,317,000 | | | 3,317,000 | 2,500,000 | 1,500,000 | 500,000 | 0 | 0 |
| Consumer | 39,618,000 | | | 39,618,000 | 32,000,000 | 25,000,000 | 18,000,000 | 11,000,000 | 4,000,000 |
| Mark-to-Mkt Disct | (201,000) | 201,000 | | 0 | 0 | 0 | 0 | 0 | 0 |
| PA Discount | | (24,622,569) | | (24,622,569) | (19,470,341) | (15,286,514) | (11,925,972) | (9,269,266) | (7,237,990) |
| Total Loans Gross | 166,885,000 | | | 142,463,431 | 160,196,976 | 155,794,330 | 161,617,905 | 167,875,892 | 175,142,126 |
| Less: | | | | | | | | | |
| Loans in Process | (8,000) | | | (8,000) | (500,000) | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) |
| Loan Disc & Def Fees | (1,495,000) | 1,495,000 | | 0 | 0 | 0 | 0 | 0 | 0 |
| Reserve for Losses | (6,862,000) | | | (6,862,000) | (6,875,000) | (6,888,000) | (6,901,000) | (6,914,000) | (7,292,000) |
| | (8,365,000) | | | (6,870,000) | (7,375,000) | (7,888,000) | (7,901,000) | (7,914,000) | (8,292,000) |
| Total Loans Net | 158,520,000 | | | 135,593,431 | 152,821,976 | 147,906,330 | 153,716,905 | 159,961,892 | 166,850,126 |
| Accrued Interest | 2,005,000 | | | 2,005,000 | 2,205,000 | 2,405,000 | 2,605,000 | 2,805,000 | 3,005,000 |
| Fixed Assets (Net of Dep) | 2,567,000 | | (1,323,280) | 1,243,720 | 1,088,255 | 952,223 | 833,195 | 729,046 | 637,915 |
| REO | 7,260,000 | | (3,742,505) | 3,517,495 | 2,517,495 | 1,767,495 | 1,267,495 | 1,017,495 | 892,495 |
| Other Assets | 2,465,000 | | | 2,465,000 | 1,978,000 | 1,819,450 | 1,656,611 | 1,489,377 | 1,682,636 |
| Total-Fixed & Other | | | | 9,231,215 | 7,788,750 | 6,944,168 | 6,362,301 | 6,040,918 | 6,218,046 |
| Current Earnings | | | | | 2,947,076 | 2,524,017 | 3,106,124 | 4,105,780 | 3,163,258 |
| Total Assets | 244,193,000 | | | 216,923,646 | 215,939,883 | 220,633,627 | 226,381,885 | 233,257,264 | 239,343,522 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
WCH-B76-1818

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|---|---|---|
| LIABILITIES & CAPITAL: | | | | | | | | | |
| Deposits-Trans Accts | 51,414,000 | | | 51,414,000 | 53,984,700 | 56,683,935 | 59,518,132 | 62,494,038 | 65,618,740 |
| PA Discount-Dep | | | | | | | | | |
| Deposits-CD's Old | 123,630,000 | | | 123,630,000 | 18,170,000 | 8,170,000 | 2,670,000 | 1,335,000 | 0 |
| PA Discount-Dep | | 1,568,404 | | 1,568,404 | 1,134,068 | 679,968 | 572,218 | 459,883 | 362,634 |
| Deposits-CD's New | | | | | 105,460,000 | 115,460,000 | 120,960,000 | 122,295,000 | 123,630,000 |
| PA Discount-Dep | | | | | | | | | |
| FHLB Advances | 26,000,000 | | | 26,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | | 996,242 | | 996,242 | 878,099 | 750,733 | 613,422 | 465,391 | 305,800 |
| Reverse Repo's | | | | | | | | | |
| Escrow | 768,000 | | | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 3,190,000 | (643,000) | | 2,547,000 | 2,597,940 | 2,649,899 | 2,702,897 | 2,756,955 | 2,812,094 |
| Total Liabilities | 205,002,000 | | | 206,923,646 | 202,992,807 | 205,162,535 | 207,804,669 | 210,574,267 | 213,497,268 |
| Net Worth | 39,191,000 | (29,191,000) | | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| Liabilities & Capital | 244,193,000 | | | 216,923,646 | 215,939,883 | 220,633,627 | 226,381,885 | 233,257,264 | 239,343,522 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1819

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Income Statement

| | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| INTEREST INCOME: | | | | | |
| SFR-ARHs New | 1,052,099 | 2,357,780 | 3,237,864 | 4,512,410 | 5,846,758 |
| SFR-Fixed | 1,281,974 | 1,281,600 | 1,281,600 | 1,281,600 | 1,281,600 |
| SFR-ARHS | 5,791,711 | 5,791,711 | 5,791,711 | 5,791,711 | 5,791,711 |
| Multi-Family Fixed | 404,950 | 325,000 | 275,000 | 225,000 | 175,000 |
| Multi-Family ARMs | 2,182,323 | 1,801,800 | 1,458,600 | 1,115,400 | 772,200 |
| Commercial RE-Fixed | 264,935 | 209,790 | 149,850 | 89,910 | 29,970 |
| Commercial RE-ARHs | 1,256,536 | 953,400 | 681,000 | 408,600 | 136,200 |
| Commercial non-RE | 261,765 | 180,000 | 90,000 | 22,500 | 0 |
| Consumer | 4,175,329 | 3,323,100 | 2,506,900 | 1,690,700 | 874,500 |
| Non-Accrual Adjustment | (300,000) | (250,000) | (200,000) | (150,000) | (150,000) |
| | 16,371,622 | 15,974,182 | 15,272,526 | 14,987,831 | 14,757,939 |
| Investments | 1,168,943 | 549,000 | 610,000 | 610,000 | 510,000 |
| MBS | 2,773,219 | 3,141,800 | 3,415,000 | 3,415,000 | 3,415,000 |
| Subtotal Interest Income | 20,313,784 | 19,664,982 | 19,297,526 | 19,012,831 | 18,782,939 |
| PA Discount-Investments | (340,919) | (122,968) | (62,558) | (47,881) | (36,581) |
| PA Discount-Loans | 5,152,228 | 4,183,827 | 3,360,542 | 2,656,706 | 2,031,276 |
| Total Interest Income | 25,125,093 | 23,725,841 | 22,595,510 | 21,621,656 | 20,777,634 |
| Deposits-Trans | 2,213,373 | 2,324,041 | 2,440,243 | 2,562,256 | 2,690,368 |
| Deposits-CD's Old | 4,176,010 | 775,713 | 319,238 | 117,947 | 39,316 |
| Deposits-CD's New | 2,109,200 | 4,418,400 | 4,728,400 | 4,865,100 | 4,918,500 |
| FHLB Advances | 1,984,900 | 1,726,000 | 1,726,000 | 1,726,000 | 1,726,000 |
| Subtotal Interest Expense | 10,483,483 | 9,244,154 | 9,213,881 | 9,271,303 | 9,374,184 |
| PA Premium-Deposit | (434,336) | (454,100) | (107,750) | (112,335) | (97,249) |
| PA Premium-Advances | (118,143) | (127,366) | (137,311) | (148,031) | (159,591) |
| Total Interest Expense | 9,931,004 | 8,662,688 | 8,968,820 | 9,010,937 | 9,117,344 |
| Net Margin | 15,194,090 | 15,063,152 | 13,626,689 | 12,610,719 | 11,660,290 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1820

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Income Statement

| | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| Provision for Loan Losses | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| NET INTEREST INCOME AFTER PROVISION | 14,694,090 | 14,563,152 | 13,126,689 | 12,110,719 | 11,160,290 |
| OTHER INCOME | | | | | |
| Gain(loss) on investments | 0 | 0 | 0 | 0 | 0 |
| Other fees and charges | 600,000 | 618,000 | 636,540 | 655,636 | 675,305 |
| Other income | 100,000 | 103,000 | 106,090 | 109,273 | 112,551 |
| Total other income | 700,000 | 721,000 | 742,630 | 764,909 | 787,856 |
| OTHER EXPENSES | | | | | |
| Salaries and employee benefits | 2,280,000 | 2,348,400 | 2,418,852 | 2,491,418 | 2,566,160 |
| Office occupancy, furniture, equipment | 548,000 | 564,440 | 581,373 | 598,814 | 616,779 |
| Depreciation | 155,465 | 136,032 | 119,028 | 104,149 | 91,131 |
| FDIC Premium | 445,073 | 458,425 | 472,178 | 486,343 | 500,934 |
| Advertising | 100,000 | 103,000 | 106,090 | 109,273 | 112,551 |
| Loss from real estate operations | 200,000 | 206,000 | 212,180 | 218,545 | 225,102 |
| Other general and administrative | 2,388,000 | 2,459,640 | 2,533,429 | 2,609,432 | 2,687,715 |
| Total other expenses | 6,116,538 | 6,275,937 | 6,443,130 | 6,617,975 | 6,800,371 |
| EARNINGS BEFORE INCOME TAXES | 9,277,552 | 9,008,215 | 7,426,189 | 6,257,653 | 5,147,775 |
| FEDERAL INCOME TAXES | 1,330,476 | 1,484,199 | 1,320,065 | 1,151,873 | 984,518 |
| NET EARNINGS | 7,947,076 | 7,524,017 | 6,106,124 | 5,105,780 | 4,163,258 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1821

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Capital Accounts

| | Post PA Balances | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|---|
| Capital at beginning of period | | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 |
| Earnings for the period | | 7,947,076 | 7,524,017 | 6,106,124 | 5,105,780 | 4,163,258 |
| Dividends Paid | | (5,000,000) | (5,000,000) | (3,000,000) | (1,000,000) | (1,000,000) |
| Capital at end of period | | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| General Valuation Allowance | | 500,000 | 1,000,000 | 1,500,000 | 2,000,000 | 2,500,000 |
| Regulatory Capital | | 13,447,076 | 16,471,093 | 20,077,217 | 24,682,997 | 28,346,254 |
| Tangible Capital: | | | | | | |
| Required @ 3.0% | 6,507,709 | 6,478,196 | 6,619,009 | 6,791,457 | 6,997,718 | 7,180,306 |
| Actual | 10,000,000 | 12,947,076 | 15,471,093 | 18,577,217 | 22,682,997 | 25,846,254 |
| Excess Capital | 3,492,291 | 6,468,880 | 8,852,084 | 11,785,760 | 15,685,279 | 18,665,949 |
| Ratio | 4.61% | 6.00% | 7.01% | 8.21% | 9.72% | 10.80% |
| Risk-Based Capital: | | | | | | |
| Required @ 8% | 8,803,000 | 9,288,000 | 8,768,000 | 8,611,000 | 8,537,000 | 8,311,000 |
| Actual | 10,000,000 | 13,447,076 | 16,471,093 | 20,077,217 | 24,682,997 | 28,346,254 |
| Excess Capital | 1,197,000 | 4,159,076 | 7,703,093 | 11,466,217 | 16,145,997 | 20,035,254 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1822

San Antonio Federal Savings Bank
Pro Forma Financial Statements

| Rate Table: | Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 |
|---|---|---|---|---|---|
| SFR-ARMs New | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% |
| SFR-Fixed | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% |
| SFR-ARMs | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% |
| Multi-Family Fixed | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Multi-Family ARMs | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% |
| Commercial RE-Fixed | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% |
| Commercial RE-ARMs | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% |
| Commercial non-RE | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% |
| Consumer | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% |
| | | | | | |
| Investments | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% |
| MBS | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% |
| | | | | | |
| Deposits-Trans | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% |
| Deposits-CD's Old | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% |
| Deposits-CD's New | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| | | | | | |
| FHLB Advances | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% |
| Inflation/growth factor | | 3.00% | 3.00% | 3.00% | 3.00% |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1823

San Antonio Federal Savings Bank
Pro Forma Quarterly Balance Sheets

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | | | | |
| Cash. | 1,813,000 | | | 1,813,000 | 1,882,250 | 1,921,500 | 1,960,750 | 2,000,000 | 2,250,000 | 2,500,000 | 2,750,000 | 3,000,000 |
| Investments | 30,326,000 | | | 30,326,000 | 24,744,500 | 19,163,000 | 13,381,500 | 8,000,000 | 8,500,000 | 9,000,000 | 9,500,000 | 10,000,000 |
| MBS | 39,207,000 | | | 39,207,000 | 39,905,250 | 40,603,500 | 41,301,750 | 42,000,000 | 44,000,000 | 46,000,000 | 48,000,000 | 50,000,000 |
| PA Discount | | 723,000 | | 723,000 | 637,770 | 552,541 | 467,311 | 382,081 | 351,339 | 320,597 | 289,855 | 259,113 |
| Total Cash & Inv | 71,376,000 | | | 72,099,000 | 67,169,770 | 62,210,541 | 57,311,311 | 52,382,081 | 55,101,339 | 57,820,597 | 60,539,855 | 63,259,113 |
| Loans: | | | | | | | | | | | | |
| SFR-ARM's New | | | | | 7,793,329 | 15,586,659 | 23,379,988 | 31,173,317 | 33,051,699 | 34,930,080 | 36,808,462 | 38,686,844 |
| SFR-Fixed | 12,007,000 | | | 12,007,000 | 12,005,250 | 12,003,500 | 12,001,750 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | | | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 4,599,000 | | | 4,599,000 | 4,324,250 | 4,049,500 | 3,774,750 | 3,500,000 | 3,375,000 | 3,250,000 | 3,125,000 | 3,000,000 |
| Multi-Family ARMs | 27,870,000 | | | 27,870,000 | 26,652,500 | 25,435,000 | 24,217,500 | 23,000,000 | 22,000,000 | 21,000,000 | 20,000,000 | 19,000,000 |
| Commercial RE-Fixed | 2,904,000 | | | 2,904,000 | 2,778,000 | 2,652,000 | 2,526,000 | 2,400,000 | 2,250,000 | 2,100,000 | 1,950,000 | 1,800,000 |
| Commercial RE-ARMs | 15,677,000 | | | 15,677,000 | 14,757,250 | 13,838,500 | 12,919,250 | 12,000,000 | 11,250,000 | 10,500,000 | 9,750,000 | 9,000,000 |
| Commercial non-RE | 3,317,000 | | | 3,317,000 | 3,112,750 | 2,908,500 | 2,704,250 | 2,500,000 | 2,250,000 | 2,000,000 | 1,750,000 | 1,500,000 |
| Consumer | 39,618,000 | | | 39,618,000 | 37,713,500 | 35,809,000 | 33,904,500 | 32,000,000 | 30,250,000 | 28,500,000 | 26,750,000 | 25,000,000 |
| Mark-to-Mkt Disct | (201,000) | 201,000 | | 0 | | | | 0 | 0 | 0 | 0 | 0 |
| PA Discount | | (24,622,569) | | (24,622,569) | (23,334,512) | (22,046,455) | (20,758,398) | (19,470,341) | (18,424,384) | (17,378,428) | (16,332,471) | (15,286,514) |
| Total Loans Gross | 166,885,000 | | | 142,463,431 | 146,896,817 | 151,330,204 | 155,763,590 | 160,196,976 | 159,096,314 | 157,995,653 | 156,894,991 | 155,794,330 |
| Less: | | | | | | | | | | | | |
| Loans in Process | (8,000) | | | (8,000) | (131,000) | (254,000) | (377,000) | (500,000) | (625,000) | (750,000) | (875,000) | (1,000,000) |
| Loan Disc & Def Fees | (1,495,000) | 1,495,000 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Reserve for Losses | (6,862,000) | | | (6,862,000) | (6,865,250) | (6,868,500) | (6,871,750) | (6,875,000) | (6,878,250) | (6,881,500) | (6,884,750) | (6,888,000) |
| | (8,365,000) | | | (6,870,000) | (6,996,250) | (7,122,500) | (7,248,750) | (7,375,000) | (7,503,250) | (7,631,500) | (7,759,750) | (7,888,000) |
| Total Loans Net | 158,520,000 | | | 135,593,431 | 139,900,567 | 144,207,704 | 148,514,840 | 152,821,976 | 151,593,064 | 150,364,153 | 149,135,241 | 147,906,330 |
| Accrued Interest | 2,005,000 | | | 2,005,000 | 2,055,000 | 2,105,000 | 2,155,000 | 2,205,000 | 2,255,000 | 2,305,000 | 2,355,000 | 2,405,000 |
| Fixed Assets (Net of Dep) | 2,567,000 | | (1,323,280) | 1,243,720 | 1,204,854 | 1,165,988 | 1,127,121 | 1,088,255 | 1,054,247 | 1,020,239 | 986,231 | 952,223 |
| REO | 7,260,000 | | (3,742,505) | 3,517,495 | 3,267,495 | 3,017,495 | 2,767,495 | 2,517,495 | 2,329,995 | 2,142,495 | 1,954,995 | 1,767,495 |
| Other Assets | 2,465,000 | | | 2,465,000 | 2,343,250 | 2,221,500 | 2,099,750 | 1,978,000 | 1,938,363 | 1,898,725 | 1,859,088 | 1,819,450 |
| Total-Fixed & Other | | | | 9,231,215 | 8,870,599 | 8,509,983 | 8,149,366 | 7,788,750 | 7,577,605 | 7,366,459 | 7,155,314 | 6,944,168 |
| Current Earnings | | | | | 736,769 | 1,473,538 | 2,210,307 | 2,947,076 | 2,841,311 | 2,735,546 | 2,629,781 | 2,524,017 |
| Total Assets | 244,193,000 | | | 216,923,646 | 216,677,705 | 216,431,765 | 216,185,824 | 215,939,883 | 217,113,319 | 218,286,755 | 219,460,191 | 220,633,627 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1824

| | 01/31/92 Balances | PA Adjustments | Negative Goodwill | Post PA Balances | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LIABILITIES & CAPITAL: | | | | | | | | | | | | |
| Deposits-Trans Accts | 51,414,000 | | | 51,414,000 | 52,056,675 | 52,699,350 | 53,342,025 | 53,984,700 | 54,659,309 | 55,334,318 | 56,009,126 | 56,683,935 |
| PA Discount-Dep | | | | | 0 | 0 | 0 | | 0 | 0 | 0 | |
| Deposits-CD's Old | 123,630,000 | | | 123,630,000 | 97,265,000 | 70,900,000 | 44,535,000 | 18,170,000 | 15,670,000 | 13,170,000 | 10,670,000 | 8,170,000 |
| PA Discount-Dep | | 1,568,404 | | 1,568,404 | 1,459,820 | 1,351,236 | 1,242,652 | 1,134,068 | 1,020,563 | 907,018 | 793,493 | 679,948 |
| Deposits-CD's New | | | | | 26,365,000 | 52,730,000 | 79,095,000 | 105,460,000 | 107,960,000 | 110,460,000 | 112,960,000 | 115,460,000 |
| PA Discount-Dep | | | | | 0 | 0 | 0 | | 0 | 0 | 0 | |
| FHLB Advances | 26,000,000 | | | 26,000,000 | 24,500,000 | 23,000,000 | 21,500,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | | 996,242 | | 996,242 | 966,706 | 937,171 | 907,635 | 878,099 | 846,258 | 814,416 | 782,575 | 750,733 |
| Reverse Repo's | | | | | 0 | 0 | 0 | | 0 | 0 | 0 | |
| Escrow | 768,000 | | | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 3,190,000 | (643,000) | | 2,547,000 | 2,696,760 | 2,755,169 | 2,722,230 | 2,597,940 | 2,575,254 | 2,576,351 | 2,601,233 | 2,649,899 |
| Total Liabilities | 205,002,000 | | | 206,923,646 | 206,077,961 | 205,140,925 | 204,112,542 | 202,992,807 | 203,499,563 | 204,030,103 | 204,584,427 | 205,162,535 |
| Net Worth | 39,191,000 | (29,191,000) | | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| Liabilities & Capital | 244,193,000 | | | 216,923,646 | 216,677,705 | 216,431,765 | 216,185,824 | 215,939,883 | 217,113,319 | 218,286,755 | 219,460,191 | 220,633,627 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1825

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1838

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt |
|---|---|---|---|---|
| ASSETS: | | | | |
| Cash | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Investments | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| MBS | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 |
| PA Discount | 243,474 | 227,834 | 212,193 | 196,555 |
| Total Cash & Inv | 63,243,474 | 63,227,834 | 63,212,193 | 63,196,555 |
| Loans: | | | | |
| SFR-ARM's New | 43,377,602 | 47,958,380 | 52,609,119 | 57,249,877 |
| SFR-Fixed | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 2,875,000 | 2,750,000 | 2,625,000 | 2,500,000 |
| Multi-Family ARMs | 18,000,000 | 17,000,000 | 16,000,000 | 15,000,000 |
| Commercial RE-Fixed | 1,650,000 | 1,500,000 | 1,350,000 | 1,200,000 |
| Commercial RE-ARMs | 8,250,000 | 7,500,000 | 6,750,000 | 6,000,000 |
| Commercial non-RE | 1,250,000 | 1,000,000 | 750,000 | 500,000 |
| Consumer | 23,250,000 | 21,500,000 | 19,750,000 | 18,000,000 |
| Mark-to-Mkt Disct | 0 | 0 | 0 | 0 |
| PA Discount | (14,446,379) | (13,606,243) | (12,766,108) | (11,925,972) |
| Total Loans Gross | 157,250,224 | 158,706,117 | 160,162,011 | 161,617,905 |
| Less: | | | | |
| Loans in Process | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) |
| Loan Disc & Def Fees | 0 | 0 | 0 | 0 |
| Reserve for Losses | (6,891,250) | (6,894,500) | (6,897,750) | (6,901,000) |
| | (7,891,250) | (7,894,500) | (7,897,750) | (7,901,000) |
| Total Loans Net | 149,358,974 | 150,811,617 | 152,264,261 | 153,716,905 |
| Accrued Interest | 2,455,000 | 2,505,000 | 2,555,000 | 2,605,000 |
| Fixed Assets (Net of Dep) | 922,466 | 892,709 | 862,952 | 833,195 |
| REO | 1,642,495 | 1,517,495 | 1,392,495 | 1,267,495 |
| Other Assets | 1,778,740 | 1,738,031 | 1,697,321 | 1,656,611 |
| Total-Fixed & Other | 6,798,701 | 6,653,235 | 6,507,768 | 6,362,301 |
| Current Earnings | 2,669,343 | 2,815,070 | 2,960,597 | 3,106,124 |
| Total Assets | 222,070,692 | 223,507,756 | 224,944,820 | 226,381,885 |

| | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt |
|---|---|---|---|---|
| ASSETS: | | | | |
| Cash | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Investments | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| MBS | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 |
| PA Discount | 184,585 | 172,615 | 160,644 | 148,674 |
| Total Cash & Inv | 63,184,585 | 63,172,615 | 63,160,644 | 63,148,674 |
| Loans: | | | | |
| SFR-ARM's New | 62,050,197 | 66,850,517 | 71,650,838 | 76,451,158 |
| SFR-Fixed | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 2,375,000 | 2,250,000 | 2,125,000 | 2,000,000 |
| Multi-Family ARMs | 14,000,000 | 13,000,000 | 12,000,000 | 11,000,000 |
| Commercial RE-Fixed | 1,050,000 | 900,000 | 750,000 | 600,000 |
| Commercial RE-ARMs | 5,250,000 | 4,500,000 | 3,750,000 | 3,000,000 |
| Commercial non-RE | 375,000 | 250,000 | 125,000 | 0 |
| Consumer | 16,250,000 | 14,500,000 | 12,750,000 | 11,000,000 |
| Mark-to-Mkt Disct | 0 | 0 | 0 | 0 |
| PA Discount | (11,261,796) | (10,597,619) | (9,933,443) | (9,269,266) |
| Total Loans Gross | 163,182,402 | 164,746,890 | 166,311,395 | 167,875,892 |
| Less: | | | | |
| Loans in Process | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) |
| Loan Disc & Def Fees | 0 | 0 | 0 | 0 |
| Reserve for Losses | (6,904,250) | (6,907,500) | (6,910,750) | (6,914,000) |
| | (7,904,250) | (7,907,500) | (7,910,750) | (7,914,000) |
| Total Loans Net | 155,278,152 | 156,839,398 | 158,400,645 | 159,961,892 |
| Accrued Interest | 2,655,000 | 2,705,000 | 2,755,000 | 2,805,000 |
| Fixed Assets (Net of Dep) | 807,158 | 781,121 | 755,083 | 729,046 |
| REO | 1,204,995 | 1,142,495 | 1,079,995 | 1,017,495 |
| Other Assets | 1,614,803 | 1,572,994 | 1,531,186 | 1,489,377 |
| Total-Fixed & Other | 6,281,955 | 6,201,610 | 6,121,264 | 6,040,918 |
| Current Earnings | 3,356,038 | 3,605,952 | 3,855,866 | 4,105,780 |
| Total Assets | 228,100,730 | 229,819,575 | 231,538,419 | 233,257,264 |

| | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|
| ASSETS: | | | | |
| Cash | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Investments | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| MBS | 50,000,000 | 50,000,000 | 50,000,000 | 50,000,000 |
| PA Discount | 139,529 | 130,384 | 121,238 | 112,093 |
| Total Cash & Inv | 63,139,529 | 63,130,384 | 63,121,238 | 63,112,093 |
| Loans: | | | | |
| SFR-ARM's New | 81,534,897 | 86,618,637 | 91,702,376 | 96,786,116 |
| SFR-Fixed | 12,000,000 | 12,000,000 | 12,000,000 | 12,000,000 |
| SFR-ARMs | 61,094,000 | 61,094,000 | 61,094,000 | 61,094,000 |
| Multi-Family Fixed | 1,875,000 | 1,750,000 | 1,625,000 | 1,500,000 |
| Multi-Family ARMs | 10,000,000 | 9,000,000 | 8,000,000 | 7,000,000 |
| Commercial RE-Fixed | 450,000 | 300,000 | 150,000 | 0 |
| Commercial RE-ARMs | 2,250,000 | 1,500,000 | 750,000 | 0 |
| Commercial non-RE | 0 | 0 | 0 | 0 |
| Consumer | 9,250,000 | 7,500,000 | 5,750,000 | 4,000,000 |
| Mark-to-Mkt Disct | 0 | 0 | 0 | 0 |
| PA Discount | (8,761,447) | (8,253,628) | (7,745,809) | (7,237,990) |
| Total Loans Gross | 169,692,450 | 171,509,009 | 173,325,567 | 175,142,126 |
| Less: | | | | |
| Loans in Process | (1,000,000) | (1,000,000) | (1,000,000) | (1,000,000) |
| Loan Disc & Def Fees | 0 | 0 | 0 | 0 |
| Reserve for Losses | (7,008,500) | (7,103,000) | (7,197,500) | (7,292,000) |
| | (8,008,500) | (8,103,000) | (8,197,500) | (8,292,000) |
| Total Loans Net | 161,683,950 | 163,406,009 | 165,128,067 | 166,850,126 |
| Accrued Interest | 2,855,000 | 2,905,000 | 2,955,000 | 3,005,000 |
| Fixed Assets (Net of Dep) | 706,283 | 683,480 | 660,678 | 637,915 |
| REO | 986,245 | 954,995 | 923,745 | 892,495 |
| Other Assets | 1,537,892 | 1,586,007 | 1,634,321 | 1,682,636 |
| Total-Fixed & Other | 6,085,200 | 6,129,482 | 6,173,764 | 6,218,046 |
| Current Earnings | 3,870,150 | 3,634,519 | 3,398,889 | 3,163,258 |
| Total Assets | 234,778,828 | 236,300,393 | 237,821,958 | 239,343,522 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1826

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt |
|---|---|---|---|---|
| Deposits-Trans Accts | 57,392,484 | 58,101,033 | 58,809,583 | 59,518,132 |
| PA Discount-Dep | 0 | 0 | 0 | |
| Deposits-CD's Old | 6,795,000 | 5,420,000 | 4,045,000 | 2,670,000 |
| PA Discount-Dep | 653,031 | 626,093 | 599,156 | 572,218 |
| Deposits-CD's New | 116,835,000 | 118,210,000 | 119,585,000 | 120,960,000 |
| PA Discount-Dep | 0 | 0 | 0 | |
| FHLB Advances | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | 716,405 | 682,078 | 647,750 | 613,422 |
| Reverse Repo's | 0 | 0 | 0 | |
| Escrow | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 2,626,227 | 2,627,170 | 2,652,726 | 2,702,897 |
| Total Liabilities | 205,786,147 | 206,434,374 | 207,107,214 | 207,804,669 |
| Net Worth | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 |
| Liabilities & Capital | 222,070,692 | 223,507,756 | 224,944,820 | 226,381,885 |

| | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt |
|---|---|---|---|---|
| Deposits-Trans Accts | 60,267,108 | 61,006,085 | 61,750,062 | 62,494,038 |
| PA Discount-Dep | 0 | 0 | 0 | |
| Deposits-CD's Old | 2,336,250 | 2,002,500 | 1,668,750 | 1,335,000 |
| PA Discount-Dep | 544,134 | 516,051 | 487,967 | 459,883 |
| Deposits-CD's New | 121,293,750 | 121,627,500 | 121,961,250 | 122,295,000 |
| PA Discount-Dep | 0 | 0 | 0 | |
| FHLB Advances | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | 574,414 | 539,407 | 502,399 | 465,391 |
| Reverse Repo's | 0 | 0 | 0 | |
| Escrow | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 2,679,810 | 2,681,125 | 2,706,839 | 2,756,955 |
| Total Liabilities | 208,460,467 | 209,140,667 | 209,845,266 | 210,574,267 |
| Net Worth | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 |
| Liabilities & Capital | 228,100,730 | 229,819,575 | 231,538,419 | 233,257,264 |

| | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|
| Deposits-Trans Accts | 63,275,214 | 64,056,389 | 64,837,565 | 65,618,740 |
| PA Discount-Dep | 0 | 0 | 0 | |
| Deposits-CD's Old | 1,001,250 | 667,500 | 333,750 | 0 |
| PA Discount-Dep | 435,571 | 411,259 | 386,946 | 362,634 |
| Deposits-CD's New | 122,628,750 | 122,962,500 | 123,296,250 | 123,630,000 |
| PA Discount-Dep | 0 | 0 | 0 | |
| FHLB Advances | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| PA Discount-Adv | 425,493 | 385,596 | 345,698 | 305,800 |
| Reverse Repo's | 0 | 0 | 0 | |
| Escrow | 768,000 | 768,000 | 768,000 | 768,000 |
| Other Liabilities | 2,771,815 | 2,785,959 | 2,799,386 | 2,822,094 |
| Total Liabilities | 211,279,223 | 212,001,376 | 212,740,725 | 213,497,268 |
| Net Worth | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| Liabilities & Capital | 234,778,828 | 236,300,393 | 237,821,958 | 239,343,522 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1827

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Quarterly Income Statements

| | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 1 Total | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt | Yr 2 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| INTEREST INCOME: | | | | | | | | | | |
| SFR-ARMs New | 65,756 | 197,269 | 328,781 | 460,294 | 1,052,099 | 541,899 | 573,596 | 605,294 | 636,992 | 2,357,780 |
| SFR-Fixed | 320,564 | 320,517 | 320,470 | 320,423 | 1,281,974 | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 |
| SFR-ARMs | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 |
| Multi-Family Fixed | 111,541 | 104,672 | 97,803 | 90,934 | 404,950 | 85,938 | 82,813 | 79,688 | 76,563 | 325,000 |
| Multi-Family ARMs | 584,756 | 558,638 | 532,523 | 506,408 | 2,182,325 | 487,625 | 461,175 | 439,725 | 418,275 | 1,801,800 |
| Commercial RE-Fixed | 70,954 | 67,807 | 64,660 | 61,513 | 264,935 | 58,067 | 54,321 | 50,574 | 46,828 | 209,790 |
| Commercial RE-ARMs | 345,434 | 324,567 | 303,700 | 282,833 | 1,256,536 | 263,888 | 246,863 | 229,838 | 212,813 | 953,400 |
| Commercial non-RE | 72,335 | 67,739 | 63,143 | 58,548 | 261,765 | 53,438 | 47,813 | 42,188 | 36,563 | 180,000 |
| Consumer | 1,127,307 | 1,071,590 | 1,016,074 | 960,558 | 4,175,529 | 907,294 | 856,281 | 805,269 | 754,256 | 3,323,100 |
| Non-Accrual Adjustment | (75,000) | (75,000) | (75,000) | (75,000) | (300,000) | (62,500) | (62,500) | (62,500) | (62,500) | (250,000) |
| | 4,071,372 | 4,065,728 | 4,100,084 | 4,124,440 | 16,371,622 | 4,098,974 | 4,028,688 | 3,958,402 | 3,888,116 | 15,974,182 |
| Investments | 419,913 | 334,795 | 249,677 | 164,559 | 1,168,943 | 125,813 | 133,438 | 141,063 | 148,688 | 549,000 |
| MBS | 675,421 | 687,343 | 699,266 | 711,189 | 2,773,219 | 734,225 | 768,375 | 802,525 | 836,675 | 3,141,800 |
| Subtotal Interest Income | 5,166,705 | 5,107,866 | 5,049,026 | 4,990,187 | 20,313,784 | 4,959,012 | 4,930,501 | 4,901,990 | 4,873,479 | 19,664,982 |
| PA Discount-Investments | (85,230) | (85,230) | (85,230) | (85,230) | (340,919) | (30,742) | (30,742) | (30,742) | (30,742) | (122,968) |
| PA Discount-Loans | 1,288,057 | 1,288,057 | 1,288,057 | 1,288,057 | 5,152,228 | 1,045,957 | 1,045,957 | 1,045,957 | 1,045,957 | 4,183,827 |
| Total Interest Income | 6,369,532 | 6,310,693 | 6,251,854 | 6,193,014 | 25,125,093 | 5,974,227 | 5,945,716 | 5,917,205 | 5,888,694 | 23,725,841 |
| Deposits-Trans | 543,221 | 549,969 | 556,717 | 563,465 | 2,213,373 | 570,382 | 577,468 | 584,553 | 591,639 | 2,324,041 |
| Deposits-CD's Old | 1,626,339 | 1,238,115 | 849,890 | 461,666 | 4,176,010 | 249,147 | 212,335 | 175,522 | 138,710 | 775,713 |
| Deposits-CD's New | 131,825 | 395,475 | 659,125 | 922,775 | 2,109,200 | 1,067,100 | 1,092,100 | 1,117,100 | 1,142,100 | 4,418,400 |
| FHLB Advances | 544,769 | 512,406 | 480,044 | 447,681 | 1,984,900 | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 |
| Subtotal Interest Expense | 2,846,154 | 2,695,965 | 2,545,776 | 2,395,587 | 10,483,483 | 2,318,129 | 2,313,402 | 2,308,675 | 2,303,948 | 9,244,154 |
| PA Premium-Deposit | (108,584) | (108,584) | (108,584) | (108,584) | (434,336) | (113,525) | (113,525) | (113,525) | (113,525) | (454,100) |
| PA Premium-Advances | (29,536) | (29,536) | (29,536) | (29,536) | (118,143) | (31,842) | (31,842) | (31,842) | (31,842) | (127,366) |
| Total Interest Expense | 2,708,034 | 2,557,845 | 2,407,656 | 2,257,467 | 9,931,004 | 2,172,763 | 2,168,036 | 2,163,309 | 2,158,582 | 8,662,688 |
| Net Margin | 3,661,498 | 3,752,848 | 3,844,197 | 3,935,547 | 15,194,090 | 3,801,464 | 3,777,680 | 3,753,896 | 3,730,112 | 15,063,152 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1828

| Quarterly Income Statements | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 3 Total | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 4 Total | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt | Yr 5 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| INTEREST INCOMEs | | | | | | | | | | | | | | | |
| SFR-ARMs New | 691,997 | 710,310 | 848,422 | 926,935 | 3,237,844 | 1,006,594 | 1,087,600 | 1,168,605 | 1,249,611 | 4,512,410 | 1,333,007 | 1,418,795 | 1,504,584 | 1,590,372 | 5,846,758 |
| SFR-Fixed | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 | 320,400 | 320,400 | 320,400 | 320,400 | 1,281,600 |
| SFR-ARMs | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 | 1,447,928 | 1,447,928 | 1,447,928 | 1,447,928 | 5,791,711 |
| Multi-Family Fixed | 73,438 | 70,313 | 67,188 | 64,063 | 275,000 | 60,938 | 57,813 | 54,688 | 51,563 | 225,000 | 48,438 | 45,313 | 42,188 | 39,063 | 175,000 |
| Multi-Family ARMs | 376,825 | 375,375 | 353,925 | 332,475 | 1,438,600 | 311,025 | 289,575 | 268,125 | 246,675 | 1,115,400 | 225,225 | 203,775 | 182,325 | 160,875 | 772,200 |
| Commercial RE-Fixed | 43,082 | 39,336 | 35,589 | 31,843 | 149,850 | 28,097 | 24,351 | 20,604 | 16,858 | 89,910 | 13,112 | 9,366 | 5,619 | 1,873 | 29,970 |
| Commercial RE-ARMs | 195,788 | 178,763 | 161,738 | 144,713 | 681,000 | 127,688 | 110,663 | 93,638 | 76,613 | 408,600 | 59,588 | 42,563 | 25,538 | 8,513 | 136,200 |
| Commercial non-RE | 30,938 | 25,313 | 19,688 | 14,063 | 90,000 | 9,844 | 7,031 | 4,219 | 1,406 | 22,500 | 0 | 0 | 0 | 0 | 0 |
| Consumer | 703,244 | 652,231 | 601,219 | 550,206 | 2,506,900 | 499,194 | 448,181 | 397,169 | 346,156 | 1,690,700 | 295,144 | 244,131 | 193,119 | 142,106 | 874,500 |
| Non-Accrual Adjustment | (50,000) | (50,000) | (50,000) | (50,000) | (200,000) | (37,500) | (37,500) | (37,500) | (37,500) | (150,000) | (37,500) | (37,500) | (37,500) | (37,500) | (150,000) |
| | 3,853,638 | 3,829,967 | 3,806,296 | 3,782,625 | 15,272,526 | 3,774,207 | 3,756,041 | 3,737,875 | 3,719,709 | 14,987,831 | 3,705,341 | 3,694,770 | 3,684,199 | 3,673,628 | 14,757,939 |
| Investments | 152,500 | 152,500 | 152,500 | 152,500 | 610,000 | 152,500 | 152,500 | 152,500 | 152,500 | 610,000 | 152,500 | 152,500 | 152,500 | 152,500 | 610,000 |
| MBS | 853,750 | 853,750 | 853,750 | 853,750 | 3,415,000 | 853,750 | 853,750 | 853,750 | 853,750 | 3,415,000 | 853,750 | 853,750 | 853,750 | 853,750 | 3,415,000 |
| Subtotal Interest Income | 4,859,888 | 4,836,217 | 4,812,546 | 4,788,875 | 19,297,526 | 4,780,457 | 4,762,291 | 4,744,125 | 4,725,959 | 19,012,831 | 4,711,591 | 4,701,020 | 4,690,449 | 4,679,879 | 18,782,939 |
| PA Discount-Investments | (15,640) | (15,640) | (15,640) | (15,640) | (62,558) | (11,970) | (11,970) | (11,970) | (11,970) | (47,881) | (9,145) | (9,145) | (9,145) | (9,145) | (36,581) |
| PA Discount-Loans | 840,136 | 840,136 | 840,136 | 840,136 | 3,360,542 | 664,177 | 664,177 | 664,177 | 664,177 | 2,656,706 | 507,819 | 507,819 | 507,819 | 507,819 | 2,031,276 |
| Total Interest Income | 5,684,384 | 5,660,713 | 5,637,042 | 5,613,371 | 22,595,510 | 5,432,663 | 5,414,497 | 5,396,331 | 5,378,165 | 21,621,656 | 5,210,265 | 5,199,694 | 5,189,123 | 5,178,553 | 20,777,634 |
| Deposits-Trans | 598,901 | 606,341 | 613,781 | 621,221 | 2,440,243 | 628,616 | 636,658 | 644,470 | 652,282 | 2,562,256 | 660,289 | 668,491 | 676,693 | 684,896 | 2,690,368 |
| Deposits-CD's Old | 110,180 | 89,933 | 69,686 | 49,439 | 319,238 | 36,859 | 31,944 | 27,030 | 22,115 | 117,947 | 17,201 | 12,286 | 7,372 | 2,457 | 39,316 |
| Deposits-CD's New | 1,161,675 | 1,175,225 | 1,188,975 | 1,202,725 | 4,728,400 | 1,211,269 | 1,214,606 | 1,217,944 | 1,221,281 | 4,865,100 | 1,224,619 | 1,227,956 | 1,231,294 | 1,234,631 | 4,918,500 |
| FHLB Advances | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 | 431,500 | 431,500 | 431,500 | 431,500 | 1,726,000 |
| Subtotal Interest Expense | 2,302,056 | 2,302,999 | 2,303,942 | 2,304,885 | 9,213,881 | 2,308,474 | 2,314,708 | 2,320,943 | 2,327,178 | 9,271,303 | 2,333,608 | 2,340,233 | 2,346,859 | 2,353,484 | 9,374,184 |
| PA Premium-Deposit | (26,938) | (26,938) | (26,938) | (26,938) | (107,750) | (28,084) | (28,084) | (28,084) | (28,084) | (112,335) | (24,312) | (24,312) | (24,312) | (24,312) | (97,249) |
| PA Premium-Advances | (34,328) | (34,328) | (34,328) | (34,328) | (137,311) | (37,008) | (37,008) | (37,008) | (37,008) | (148,031) | (39,898) | (39,898) | (39,898) | (39,898) | (159,591) |
| Total Interest Expense | 2,240,791 | 2,241,734 | 2,242,677 | 2,243,619 | 8,968,820 | 2,243,382 | 2,249,617 | 2,255,852 | 2,262,086 | 9,010,937 | 2,269,398 | 2,276,023 | 2,282,649 | 2,289,274 | 9,117,344 |
| Net Margin | 3,443,593 | 3,418,979 | 3,394,365 | 3,369,752 | 13,626,689 | 3,189,281 | 3,164,880 | 3,140,480 | 3,116,079 | 12,610,719 | 2,940,867 | 2,923,671 | 2,906,475 | 2,889,278 | 11,660,290 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-876-1829

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO068 1842

| Quarterly Income Statements | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 1 Total | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt | Yr 2 Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Provision for Loan Losses | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 |
| NET INTEREST INCOME AFTER PROVISION | 3,536,498 | 3,627,848 | 3,719,197 | 3,810,547 | 14,494,090 | 3,676,464 | 3,652,680 | 3,628,896 | 3,605,112 | 14,563,152 |
| OTHER INCOME | | | | | | | | | | |
| Gain(loss) on investments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other fees and charges | 150,000 | 150,000 | 150,000 | 150,000 | 600,000 | 154,500 | 154,500 | 154,500 | 154,500 | 618,000 |
| Other income | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 | 25,750 | 25,750 | 25,750 | 25,750 | 103,000 |
| Total other income | 175,000 | 175,000 | 175,000 | 175,000 | 700,000 | 180,250 | 180,250 | 180,250 | 180,250 | 721,000 |
| OTHER EXPENSES | | | | | | | | | | |
| Salaries and employee benefits | 570,000 | 570,000 | 570,000 | 570,000 | 2,280,000 | 587,100 | 587,100 | 587,100 | 587,100 | 2,348,400 |
| Office occupancy, furniture, equipment | 137,000 | 137,000 | 137,000 | 137,000 | 548,000 | 141,110 | 141,110 | 141,110 | 141,110 | 564,440 |
| Depreciation | 38,866 | 38,866 | 38,866 | 38,866 | 155,465 | 34,008 | 34,008 | 34,008 | 34,008 | 136,032 |
| FDIC Premium | 111,268 | 111,268 | 111,268 | 111,268 | 445,073 | 114,606 | 114,606 | 114,606 | 114,606 | 458,425 |
| Advertising | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 | 25,750 | 25,750 | 25,750 | 25,750 | 103,000 |
| Loss from real estate operations | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 | 51,500 | 51,500 | 51,500 | 51,500 | 206,000 |
| Other general and administrative | 597,000 | 597,000 | 597,000 | 597,000 | 2,388,000 | 614,910 | 614,910 | 614,910 | 614,910 | 2,459,640 |
| Total other expenses | 1,529,135 | 1,529,135 | 1,529,135 | 1,529,135 | 6,116,538 | 1,568,984 | 1,568,984 | 1,568,984 | 1,568,984 | 6,275,937 |
| EARNINGS BEFORE INCOME TAXES | 2,182,363 | 2,273,713 | 2,365,063 | 2,456,413 | 9,277,552 | 2,287,730 | 2,263,946 | 2,240,162 | 2,216,378 | 9,008,215 |
| FEDERAL INCOME TAXES | 332,619 | 332,619 | 332,619 | 332,619 | 1,330,476 | 371,050 | 371,050 | 371,050 | 371,050 | 1,484,199 |
| NET EARNINGS | 1,849,744 | 1,941,094 | 2,032,444 | 2,123,794 | 7,947,076 | 1,916,680 | 1,892,896 | 1,869,112 | 1,845,328 | 7,524,017 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1830

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 3 Total | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 4 Total | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt | Yr 5 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Provision for Loan Losses | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 | 125,000 | 125,000 | 125,000 | 125,000 | 500,000 |
| NET INTEREST INCOME AFTER PROVISION | 3,318,593 | 3,293,979 | 3,269,365 | 3,244,752 | 13,126,689 | 3,064,281 | 3,039,880 | 3,015,480 | 2,991,079 | 12,110,719 | 2,815,867 | 2,798,671 | 2,781,475 | 2,764,278 | 11,160,290 |
| OTHER INCOME | | | | | | | | | | | | | | | |
| Gain(loss) on investments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other fees and charges | 159,135 | 159,135 | 159,135 | 159,135 | 636,540 | 163,909 | 163,909 | 163,909 | 163,909 | 655,636 | 168,826 | 168,826 | 168,826 | 168,826 | 675,305 |
| Other income | 26,523 | 26,523 | 26,523 | 26,523 | 106,090 | 27,318 | 27,318 | 27,318 | 27,318 | 109,273 | 28,138 | 28,138 | 28,138 | 28,138 | 112,551 |
| Total other income | 185,658 | 185,658 | 185,658 | 185,658 | 742,630 | 191,227 | 191,227 | 191,227 | 191,227 | 764,909 | 196,964 | 196,964 | 196,964 | 196,964 | 787,856 |
| OTHER EXPENSES | | | | | | | | | | | | | | | |
| Salaries and employee benefits | 604,713 | 604,713 | 604,713 | 604,713 | 2,418,852 | 622,854 | 622,854 | 622,854 | 622,854 | 2,491,418 | 641,540 | 641,540 | 641,540 | 641,540 | 2,566,160 |
| Office occupancy, furniture, equipment | 145,343 | 145,343 | 145,343 | 145,343 | 581,373 | 149,704 | 149,704 | 149,704 | 149,704 | 598,814 | 154,195 | 154,195 | 154,195 | 154,195 | 616,779 |
| Depreciation | 29,757 | 29,757 | 29,757 | 29,757 | 119,028 | 26,037 | 26,037 | 26,037 | 26,037 | 104,149 | 22,783 | 22,783 | 22,783 | 22,783 | 91,131 |
| FDIC Premium | 118,044 | 118,044 | 118,044 | 118,044 | 472,178 | 121,586 | 121,586 | 121,586 | 121,586 | 486,343 | 125,233 | 125,233 | 125,233 | 125,233 | 500,934 |
| Advertising | 26,523 | 26,523 | 26,523 | 26,523 | 106,090 | 27,318 | 27,318 | 27,318 | 27,318 | 109,273 | 28,138 | 28,138 | 28,138 | 28,138 | 112,551 |
| Loss from real estate operations | 53,045 | 53,045 | 53,045 | 53,045 | 212,180 | 54,636 | 54,636 | 54,636 | 54,636 | 218,543 | 56,275 | 56,275 | 56,275 | 56,275 | 225,102 |
| Other general and administrative | 633,357 | 633,357 | 633,357 | 633,357 | 2,533,429 | 652,358 | 652,358 | 652,358 | 652,358 | 2,609,432 | 671,929 | 671,929 | 671,929 | 671,929 | 2,687,715 |
| Total other expenses | 1,610,783 | 1,610,783 | 1,610,783 | 1,610,783 | 6,443,130 | 1,654,494 | 1,654,494 | 1,654,494 | 1,654,494 | 6,617,975 | 1,700,093 | 1,700,093 | 1,700,093 | 1,700,093 | 6,800,371 |
| EARNINGS BEFORE INCOME TAXES | 1,893,468 | 1,868,854 | 1,844,240 | 1,819,626 | 7,426,189 | 1,601,014 | 1,576,614 | 1,552,213 | 1,527,812 | 6,257,653 | 1,312,738 | 1,295,542 | 1,278,346 | 1,261,150 | 5,147,775 |
| FEDERAL INCOME TAXES | 330,016 | 330,016 | 330,016 | 330,016 | 1,320,065 | 287,968 | 287,968 | 287,968 | 287,968 | 1,151,873 | 246,130 | 246,130 | 246,130 | 246,130 | 984,518 |
| NET EARNINGS | 1,563,452 | 1,538,838 | 1,514,224 | 1,489,610 | 6,106,124 | 1,313,046 | 1,288,645 | 1,264,245 | 1,239,844 | 5,105,780 | 1,066,608 | 1,049,412 | 1,032,216 | 1,015,020 | 4,163,257 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1831

San Antonio Federal Savings Bank
Pro Forma Financial Statements

Quarterly Rate Tables

| Quarterly Rate Tables | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|
| SFR-ARMs New | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% |
| SFR-Fixed | 10.68% | 10.68% | 10.69% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% |
| SFR-ARMs | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% |
| Multi-Family Fixed | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Multi-Family ARMs | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% |
| Commercial RE-Fixed | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% |
| Commercial RE-ARMs | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% |
| Commercial non-RE | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% |
| Consumer | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% |
| Investments | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% |
| MBS | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% |
| Deposits-Trans | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% |
| Deposits-CD's Old | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% |
| Deposits-CD's New | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| FHLB Advances | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% |
| Inflation/growth factor | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1832

| Quarterly Rate Tables | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SFR-ARMs New | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% | 6.75% |
| SFR-Fixed | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% | 10.68% |
| SFR-ARMs | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% | 9.48% |
| Multi-Family Fixed | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Multi-Family ARMs | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% | 8.58% |
| Commercial RE-Fixed | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% | 9.99% |
| Commercial RE-ARMs | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% | 9.08% |
| Commercial non-RE | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% | 9.00% |
| Consumer | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% | 11.66% |
| Investments | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% | 6.10% |
| MBS | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% | 6.83% |
| Deposits-Trans | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% | 4.20% |
| Deposits-CD's Old | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% | 5.89% |
| Deposits-CD's New | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% |
| FHLB Advances | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% | 8.63% |
| Inflation/growth factor | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1833

San Antonio Federal Savings Bank
Pro Forma Financial Statements
Quarterly Capital Accounts

| | Post PA Balances | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|
| Capital at beginning of period | | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 |
| Earnings for the period | | 1,849,744 | 1,941,095 | 2,032,444 | 2,123,794 | 1,916,680 | 1,892,896 | 1,869,112 | 1,845,328 |
| Dividends Paid | | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) | (1,250,000) |
| Capital at end of period | | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| General Valuation Allowance | | 125,000 | 250,000 | 375,000 | 500,000 | 625,000 | 750,000 | 875,000 | 1,000,000 |
| Regulatory Capital | | 10,724,744 | 11,540,839 | 12,448,282 | 13,447,076 | 14,238,756 | 15,006,652 | 15,750,765 | 16,471,093 |
| Tangible Capital: | | | | | | | | | |
| Required @ 3.0% | 6,507,709 | 6,500,331 | 6,492,953 | 6,485,575 | 6,478,196 | 6,513,400 | 6,548,603 | 6,583,806 | 6,619,009 |
| Actual | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| Excess Capital | 3,492,291 | 4,099,413 | 4,797,886 | 5,587,708 | 6,468,880 | 7,100,357 | 7,708,050 | 8,291,959 | 8,852,084 |
| Ratio | 4.61% | 4.89% | 5.22% | 5.58% | 6.00% | 6.27% | 6.53% | 6.78% | 7.01% |
| Risk-Based Capital: | | | | | | | | | |
| Required @ 8% | 8,803,000 | 8,924,250 | 9,045,500 | 9,166,750 | 9,288,000 | 9,158,000 | 9,028,000 | 8,898,000 | 8,768,000 |
| Actual | 10,000,000 | 10,861,769 | 11,723,538 | 12,585,307 | 13,447,076 | 14,203,080 | 14,959,084 | 15,715,089 | 16,471,093 |
| Excess Capital | 1,197,000 | 1,937,519 | 2,678,038 | 3,418,557 | 4,159,076 | 5,045,080 | 5,931,084 | 6,817,089 | 7,703,093 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1834

| Quarterly Capital Accounts | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capital at beginning of period | 15,471,093 | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 | 23,499,605 | 24,299,018 | 25,081,234 |
| Earnings for the period | 1,563,452 | 1,538,838 | 1,514,224 | 1,489,610 | 1,313,046 | 1,288,645 | 1,264,245 | 1,239,844 | 1,066,608 | 1,049,412 | 1,032,216 | 1,013,020 |
| Dividends Paid | (750,000) | (750,000) | (750,000) | (750,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) | (250,000) |
| Capital at end of period | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| General Valuation Allowance | 1,125,000 | 1,250,000 | 1,375,000 | 1,500,000 | 1,625,000 | 1,750,000 | 1,875,000 | 2,000,000 | 2,125,000 | 2,250,000 | 2,375,000 | 2,500,000 |
| Regulatory Capital | 17,409,544 | 18,323,382 | 19,212,606 | 20,077,217 | 21,265,263 | 22,428,908 | 23,568,153 | 24,682,997 | 25,624,605 | 26,549,018 | 27,456,234 | 28,346,254 |
| Tangible Capital: | | | | | | | | | | | | |
| Required @ 3.0% | 6,667,121 | 6,705,233 | 6,748,345 | 6,791,457 | 6,843,022 | 6,894,587 | 6,946,153 | 6,997,718 | 7,043,365 | 7,089,012 | 7,134,659 | 7,180,306 |
| Actual | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| Excess Capital | 9,622,424 | 10,368,150 | 11,089,262 | 11,785,760 | 12,797,241 | 13,784,321 | 14,747,000 | 15,685,279 | 16,456,240 | 17,210,006 | 17,946,575 | 18,665,948 |
| Ratio | 7.33% | 7.64% | 7.93% | 8.21% | 8.61% | 9.00% | 9.37% | 9.72% | 10.01% | 10.28% | 10.55% | 10.80% |
| Risk-Based Capital: | | | | | | | | | | | | |
| Required @ 8% | 8,728,750 | 8,689,500 | 8,650,250 | 8,611,000 | 8,592,500 | 8,574,000 | 8,555,500 | 8,537,000 | 8,480,500 | 8,424,000 | 8,367,500 | 8,311,000 |
| Actual | 17,372,624 | 18,274,155 | 19,175,686 | 20,077,217 | 21,228,662 | 22,380,107 | 23,531,552 | 24,682,997 | 25,598,818 | 26,514,625 | 27,430,440 | 28,346,254 |
| Excess Capital | 8,643,874 | 9,584,655 | 10,525,436 | 11,466,217 | 12,636,162 | 13,806,107 | 14,976,052 | 16,145,997 | 17,118,318 | 18,090,625 | 19,062,940 | 20,035,254 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1835

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Quarterly Balance Sheets

| | | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | |
| Cash | 50,000 | 155,382 | 282,561 | 431,538 | 602,312 | 689,005 | 800,721 | 937,463 | 1,099,232 |
| Investment in SAFSB | 10,000,000 | 10,599,744 | 11,290,839 | 12,073,282 | 12,947,076 | 13,613,756 | 14,256,652 | 14,875,765 | 15,471,093 |
| Capitalized Organization Expenses | 667,500 | 611,875 | 556,250 | 500,625 | 445,000 | 389,375 | 333,750 | 278,125 | 222,500 |
| Total Assets | 10,717,500 | 11,367,001 | 12,129,650 | 13,005,445 | 13,994,388 | 14,692,135 | 15,391,123 | 16,091,352 | 16,792,825 |
| LIABILITIES & CAPITAL: | | | | | | | | | |
| American National Bank | 10,250,000 | 9,283,812 | 8,317,624 | 7,351,436 | 6,385,248 | 5,349,045 | 4,312,842 | 3,276,639 | 2,240,436 |
| Other Liabilities | 417,500 | 382,708 | 347,916 | 313,124 | 278,332 | 243,540 | 208,748 | 173,956 | 139,164 |
| Total Liabilities | 10,667,500 | 9,666,520 | 8,665,540 | 7,664,560 | 6,663,580 | 5,592,585 | 4,521,590 | 3,450,595 | 2,379,600 |
| Capital: | | | | | | | | | |
| Paid in Capital | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Retained Earnings | | 1,650,481 | 3,414,109 | 5,290,884 | 7,280,807 | 9,049,549 | 10,819,532 | 12,590,756 | 14,363,223 |
| Total Capital | 50,000 | 1,700,481 | 3,464,109 | 5,340,884 | 7,330,807 | 9,099,549 | 10,869,532 | 12,640,756 | 14,413,224 |
| Liabilities & Capital | 10,717,500 | 11,367,001 | 12,129,650 | 13,005,445 | 13,994,388 | 14,692,135 | 15,391,123 | 16,091,352 | 16,792,825 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1836

| Quarterly Balance Sheets | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS: | | | | | | | | | | | | |
| Cash | 1,220,528 | 1,357,693 | 1,510,730 | 1,679,637 | 1,916,437 | 2,153,237 | 2,390,037 | 2,626,837 | 2,863,637 | 3,100,437 | 3,337,237 | 3,574,037 |
| Investment in SAFSB | 16,284,544 | 17,073,382 | 17,837,606 | 18,577,217 | 19,640,263 | 20,678,908 | 21,693,153 | 22,682,997 | 23,499,605 | 24,299,018 | 25,081,234 | 25,846,254 |
| Capitalized Organization Expenses | 166,875 | 111,250 | 55,625 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Assets | 17,671,947 | 18,542,325 | 19,403,960 | 20,256,853 | 21,556,700 | 22,832,145 | 24,083,189 | 25,309,833 | 26,363,242 | 27,399,455 | 28,418,470 | 29,420,291 |
| LIABILITIES & CAPITAL: | | | | | | | | | | | | |
| American National Bank | 1,680,327 | 1,120,218 | 560,109 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Liabilities | 104,372 | 69,580 | 34,788 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Liabilities | 1,784,699 | 1,189,798 | 594,898 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Capital: | | | | | | | | | | | | |
| Paid In Capital | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| Retained Earnings | 15,837,248 | 17,302,525 | 18,759,061 | 20,206,853 | 21,506,699 | 22,782,144 | 24,033,189 | 25,259,833 | 26,313,241 | 27,349,454 | 28,368,470 | 29,370,290 |
| Total Capital | 15,887,247 | 17,352,526 | 18,809,061 | 20,256,853 | 21,556,700 | 22,832,145 | 24,083,188 | 25,309,833 | 26,363,242 | 27,399,455 | 28,418,469 | 29,420,291 |
| Liabilities & Capital | 17,671,947 | 18,542,325 | 19,403,960 | 20,256,853 | 21,556,700 | 22,832,145 | 24,083,189 | 25,309,833 | 26,363,242 | 27,399,455 | 28,418,470 | 29,420,291 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
WCH-B76-1837

Western Capital Holdings, Inc.
Pro Forma Financial Statements
Quarterly Income Statements

| | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|
| Increase in equity of SAFSB | 1,849,744 | 1,941,094 | 2,032,444 | 2,123,794 | 1,914,680 | 1,892,896 | 1,869,112 | 1,845,328 |
| Expense | | | | | | | | |
| Interest Expense | 209,446 | 187,648 | 165,851 | 144,053 | 129,187 | 104,161 | 79,135 | 54,109 |
| Amortization of Org Costs | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 | 55,625 |
| Other Expense | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Pretax Earnings | 1,564,674 | 1,677,821 | 1,790,968 | 1,904,115 | 1,711,869 | 1,713,110 | 1,714,352 | 1,715,594 |
| Tax Treaty | 85,807 | 85,807 | 85,807 | 85,807 | 56,873 | 56,873 | 56,873 | 56,873 |
| Net Earnings | 1,650,481 | 1,763,628 | 1,876,775 | 1,989,923 | 1,768,741 | 1,769,983 | 1,771,225 | 1,772,466 |

Cash Flow Statement

| | Yr 1 1st Qt | Yr 1 2nd Qt | Yr 1 3rd Qt | Yr 1 4th Qt | Yr 2 1st Qt | Yr 2 2nd Qt | Yr 2 3rd Qt | Yr 2 4th Qt |
|---|---|---|---|---|---|---|---|---|
| Cash In: | | | | | | | | |
| Dividends Received | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 | 1,250,000 |
| Tax Treaty | 85,807 | 85,807 | 85,807 | 85,807 | 56,873 | 56,873 | 56,873 | 56,873 |
| Total Cash In | 1,335,807 | 1,335,807 | 1,335,807 | 1,335,807 | 1,306,873 | 1,306,873 | 1,306,873 | 1,306,873 |
| Cash Out: | | | | | | | | |
| Interest Expense | 209,446 | 187,648 | 165,851 | 144,053 | 129,187 | 104,161 | 79,135 | 54,109 |
| Organization Expenses | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 | 34,792 |
| Other Expenses | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Principal Repayment | 966,188 | 966,188 | 966,188 | 966,188 | 1,036,203 | 1,036,203 | 1,036,203 | 1,036,203 |
| Total Cash Out | 1,230,426 | 1,208,628 | 1,186,830 | 1,165,033 | 1,220,181 | 1,195,156 | 1,170,130 | 1,145,104 |
| Net Cash | 105,382 | 127,179 | 148,977 | 170,774 | 86,691 | 111,717 | 136,743 | 161,769 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1838

stern Capital Holdings, Inc.
o Forma Financial Statements
arterly Income Statements

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| crease in equity of SAFSB | 1,563,452 | 1,538,838 | 1,514,224 | 1,489,610 | 1,313,046 | 1,288,645 | 1,264,245 | 1,239,844 | 1,066,608 | 1,049,412 | 1,032,216 | 1,015,020 |
| pense | | | | | | | | | | | | |
| terest Expense | 47,610 | 31,740 | 15,869 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ortization of Org Costs | 55,625 | 55,625 | 55,625 | 55,625. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| her Expense | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| etax Earnings | 1,440,217 | 1,431,473 | 1,422,730 | 1,413,985 | 1,293,046 | 1,268,645 | 1,244,245 | 1,219,844 | 1,046,608 | 1,029,412 | 1,012,216 | 995,020 |
| x Treaty | 33,806 | 33,806 | 33,806 | 33,806 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 |
| t Earnings | 1,474,023 | 1,465,279 | 1,456,536 | 1,447,791 | 1,299,846 | 1,275,445 | 1,251,045 | 1,226,644 | 1,053,408 | 1,036,212 | 1,019,016 | 1,001,820 |

sh Flow Statement

| | Yr 3 1st Qt | Yr 3 2nd Qt | Yr 3 3rd Qt | Yr 3 4th Qt | Yr 4 1st Qt | Yr 4 2nd Qt | Yr 4 3rd Qt | Yr 4 4th Qt | Yr 5 1st Qt | Yr 5 2nd Qt | Yr 5 3rd Qt | Yr 5 4th Qt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| sh Ins | | | | | | | | | | | | |
| vidends Received | 750,000 | 750,000 | 750,000 | 750,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| x Treaty | 33,806 | 33,806 | 33,806 | 33,806 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 | 6,800 |
| al Cash In | 783,806 | 783,806 | 783,806 | 783,806 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 | 256,800 |
| st Expense | 47,610 | 31,740 | 15,869 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ganization Expenses | 34,792 | 34,792 | 34,792 | 34,792 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| her Expenses | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| incipal Repayment | 560,109 | 560,109 | 560,109 | 560,109 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| otal Cash Out | 662,510 | 646,640 | 630,770 | 614,901 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| t Cash | 121,296 | 137,166 | 153,036 | 168,905 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 | 236,800 |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
WCH-B76-1839

# EXHIBIT J

FILE

# HOLLEB & COFF

ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900

WRITER'S DIRECT DIAL (312) ________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MICHAEL V. CASEY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID L. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOFINGARNER
MARK I. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ
JEFFREY K. ANDERSON
LYNNE M. BAKER
RICHARD G. BERNCY
ALLAN S. BRILLIANT
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
SUSAN WARD COOPER
BRUCE DOPKE
MICHAEL L. ELOWE
KATHRYN J. GERBER
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
KRISTOPHER S. HESTON
PERRI L. IRMER
SHERI A. JORGENSEN
STEVEN P. KAISER
REBECCA L. KENT
BRIAN P. KERWIN
DANIEL L. KRAUS
DAVID A. LISCO
WILLIAM F. LITTLE
JAMES L. LUCARI
JAMES W. MARKS
JAMES T. MARKUS
ALVIN K. MARR
MICHAEL S. MOSTOW
BENJAMIN L. NORTMAN
KATHRYN A. PYSZKA
STUART H. RAPPAPORT
GREGORY G. SCHULER
JULIE L. SCHULZ
THOMAS K. SHAPIRA
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
JANET L. SMERLING
PAUL A. SMITH
JAMES M. SNYDER
GENE S. STERN
GREGG E. SZILAGYI
MICHAEL S. TAUBETT
JAMES P. TEUFEL
JOHN C. THEISS
MARK H. VAN DE VOORDE
ROBERT S. WEXT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH

February 2, 1993

Mr. Larry E. Ferries
Office of Thrift Supervision
111 East Wacker Drive
Chicago, Illinois 60601

Dear Larry:

As we discussed, River Valley Savings Bank, F.S.B. ("FSB") would like to enter into a correspondent agreement with San Antonio Federal Savings Bank ("SAFSB") whereby SAFSB would sell certain mortgage loans to FSB. The terms of this proposed arrangement are set forth in a letter dated December, 1992, from Ron Pikus, President of FSB to Richard Dalton, President of SAFSB, a copy of which is enclosed for your convenience.

Both institutions understand that any such arrangement is a covered transaction between affiliates and that they must abide by the quantitative and qualitative restrictions of Sections 563.41 and 563.42 of the OTS Regulations. Moreover, since FSB is subject to a supervisory agreement, we hereby request your prior written approval to enter into the proposed transaction.

If you have any questions concerning the proposed transaction, please do not hesitate to contact Ron Pikus at FSB. If you have any other questions, please do not hesitate to contact me.

We appreciate your prompt consideration of our request.

Yours very truly,

Anne W. Brody

Anne Webber Brody

AWB:mf
Enclosure
cc: Steven Bangert
Ronald Pikus
Richard Dalton
Mark S. Kipnis

PLAINTIFF'S EXHIBIT
PX 794

Confidential Material — Subject to Protective Order

December 1992

Mr. Richard Dalton
President
San Antonio Federal Savings Bank
801 Nolana Suite 201
McAllen, TX 78504

Dear Richard:

The following represents an agreement whereby San Antonio Federal Savings Bank (SAFSB) would make and/or arrange mortgage loans on residential real estate for sale to River Valley Savings Bank (RVSB).

1. RVSB is interested in residential mortgage loans which meet the following terms:

a) Eligible Borrower - Individuals who intend to occupy the subject property as their primary residence and who have majority ownership interest in said property. Such applicants will be credit-qualified per the underwriting guidelines of RVSB. Second homes and investment properties meeting the guidelines of Fannie Mae and Freddie Mac will also be eligible.

b) Loan Product - First mortgage loans on residential single-use real estate no larger than 4 units in size in Texas and Arizona. This agreement shall cover "conventional" type mortgage loans and agency qualifying community homebuyers loans and shall not cover loans insured or guaranteed by the United States of America or any agency or instrumentality thereof, or mortgage loans processed under any state, county or municipal programs. The following options would be available:

- Conventional Fixed and Adjustable Rate Mortgages ranging up to 30 years.
- Jumbo loans which exceed the maximum loan amount of the Federal National Mortgage Association (Fannie Mae).
- Other loan products subsequently as made available.

c) Maximum Loan Amount - As established by RVSB per product.

d) Minimum Loan Amount - N/A

e) Private Mortgage Insurance - Required on all loans with LTV greater than 80% with coverage of 22% which must reduce RVSB'S exposure to no more than 75%.

Confidential Material —
Subject to Protective Order

f) Product Terms - Price and parameters quoted daily by RVSB. A new rate sheet shall be distributed at least weekly via fax machine or mail delivery.

g) Tax Escrows - Tax escrow is required. A sum equal to1/12 of the yearly taxes will be added to the monthly principal and interest payment

h) Hazard Insurance - At closing, a policy and one year's paid receipt must be presented. Borrowers must also pay 1/12 of the annual insurance premium into escrow at closing, and 1/12 of their premium will be added on each monthly payment. The policy should at least cover the amount of the mortgage, have an expiration date, and the mortgage clause should read, "(your institution's name), its successors and assigns".

i) Flood Insurance - If flood insurance is required, provisions in the above paragraph also apply for flood insurance coverage.

2. For loans SAFSB intends to have purchased by RVSB after closing, the following procedures will apply:

a) RVSB shall make available to SAFSB current price quotations for mortgage loans along with information as to loan programs being offered by RVSB. The points listed refer to fees required by RVSB with the acceptable loan package at the corresponding rate. Any points or fees in excess of those listed shall be compensation retained by SAFSB.

b) Upon receipt of a completed application, SAFSB will register the loan the same day with RVSB. Loans must be closed within 60 days and delivered to RVSB no more than 10 days after closing. Loans not closed or delivered within these time periods will be subject to the current market rate and points.

c) SAFSB will have the responsibility for gathering or preparing all documentation for a complete loan package as required by RVSB and based on secondary market mortgage standards. This includes but is not limited to consumer disclosures, satisfactory appraisal, acceptable credit reports, verification of employment/income, and verification of sufficient funds for closing.

d) SAFSB will prepare a secondary market guidelines worksheet as provided by RVSB. This worksheet will be included with a packet of duplicate copies of all documents. Upon delivery to RVSB for the required prior approval, RVSB will evaluate the completed packet and make an approval/disapproval decision within 2 business days. This decision will be reported to SAFSB by phone. In case of approval, a commitment letter will be sent outlining the conditions.

e) SAFSB has full responsibility for closing loans, including the preparation of all pertinent disclosures and loan document

Confidential Material —
Subject to Protective Ordc

f) In certain instances, RVSB will fund the loan at closing if the closing takes place at an RVSB approved title company. The following information must be supplied to RVSB: name of mortgage, address of new residence, social security number, tax I.D. of new property, principal amount, monthly payment to include P & I and escrow breakdown, rate, date of first payment, maturity date, date of closing, time of closing, and the contact person at the approved title company. This information and a copy of the disbursement statement to the title company would preferably be supplied to RVSB 3 to 5 business days before closing (a minimum of 24 hours is required). If the date of closing is subsequently delayed, your institution will notify RVSB within 24 hours of the new closing date. The procedures contained in this paragraph will only be applicable to institutions pre-approved by RVSB.

g) At closing, SAFSB is to notify the customer of the loan sale to RVSB and the name of River Valley Savings Bank, FSB as servicer. Payments are due on the first of each month (in arrears) with a grace period of 15 days, otherwise a 5% penalty is assessed on the monthly principal and interest payment due.

3. SAFSB is deemed to make to RVSB and any subsequent purchaser of any mortgage loan originated by you all of the representations and warranties set forth below:

a) SAFSB has no knowledge of any facts and circumstances which would deem the information shown in the loan package to be untrue, inaccurate, or misleading.

b) SAFSB has complied with all applicable Federal and State laws and all consumer credit regulations including equal opportunity, Truth in Lending (Regulation Z), and settlement procedures.

c) The mortgage is a valid, perfected and subsisting lien on the mortgaged property described therein. The mortgage and any security agreements or equivalent documents relating to it have been properly executed, genuine, and what they purport to be, and their terms may be enforced by its successors and assigns.

d) If SAFSB shall breach any of its representations or warranties outlined in paragraph 3 in connection with any mortgage or if any representations or warranties shall otherwise be untrue for any reason, SAFSB shall upon request of RVSB repurchase the mortgage whether or not SAFSB had actual knowledge of the untruthfulness.

Confidential Material—
Subject to Protective Order

4. Termination of this Agreement may occur by either party with 10 days written notice. However, any files that were registered with RVSB and are still in process and any applications received by RVSB during this 10 day period will be purchased, if approved, under the terms of this Agreement.

If this represents our mutual agreement, please indicate so by endorsing and returning a copy of this proposal at your earliest convenience.

Sincerely,

Ronald M. Pikus
President

ACCEPTED:

______________________________ Date: ______________________________
Name (Typed)

______________________________
Authorized Signatue

Confidential Material —
Subject to Protective Order

# EXHIBIT K

COPY

# HOLLEB & COFF

ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900

WRITER'S DIRECT DIAL (312)________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MICHAEL V. CASEY
MORRIS J. COFF
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE I. DAVIDSON
PAUL R. DIAMOND
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM L. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID L. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOPINGARNER
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ
JEFFREY K. ANDERSON
LYNNE M. BAKER
RICHARD G. BERNET
ALLAN S. BRILLIANT
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
SUSAN WARD COOPER
BRUCE DOPKE
MICHAEL L. ELOWE
KATHRYN J. GERBER
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
KRISTOPHER S. HESTON
PERRI L. IRMER
SHERI A. JORGENSEN
STEVEN P. KAISER
REBECCA L. KENT
BRIAN P. KERWIN
DANIEL L. KRAUS
DAVID A. LISCO
WILLIAM F. LITTLE
JAMES L. LUCARI
JAMES W. MARKS
JAMES T. MARKUS
ALVIN K. MARR
MICHAEL S. MOSTOW
BENJAMIN L. NORTMAN
KATHRYN A. PYSZKA
STUART N. RAPPAPORT
GREGORY G. SCHULER
JULIE L. SCHULZ
THOMAS B. SHAPIRA
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
JANET L. SMERLING
PAUL A. SMITH
JAMES M. SNYDER
GENE S. STERN
GREGG E. SZILAGYI
MICHAEL S. TALBETT
JAMES P. TEUFEL
JOHN C. THEISS
MARK H. VAN DE VOORDE
ROBERT S. WERT
THOMAS P. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH

February 2, 1993

Mr. Marion G. "Chip" Kiesewetter
Office of Thrift Supervision
Department of the Treasury
122 West John Carpenter Freeway
Suite 600
Irving, Texas 75039

**VIA FEDERAL EXPRESS**

Dear Chip:

Attached is a draft letter for you to sign memorializing our conversation regarding affiliated transactions between San Antonio Federal Savings Bank and River Valley Savings Bank, F.S.B. If you have any questions or would like to make any changes, do not hesitate to call me or to make the changes. Otherwise, I would appreciate receiving a signed copy of this letter as soon as possible.

Yours very truly,

Anne Webber Brody

AWB:mf

Enclosure

cc: Steven Bangert
Homer J. Holland
Ronald Pikus
Richard Dalton
Mark S. Kipnis

# EXHIBIT L

# BIOGRAPHICAL AND FINANCIAL REPORT

## FINANCIAL STATEMENT

as of August 15, 19 91

### ASSETS

NOTE: If any asset is not owned outright or is recorded as owned in other than your own name solely, please attach a signed explanatory schedule.

| | |
|---|---|
| CASH ON HAND AND IN BANKS | $ 70,000 |
| U.S. GOVERNMENT BONDS | |
| OTHER CREDITOR SECURITIES | |
| STOCKS - SCHEDULE A | 18,830,000 |
| OTHER PROPRIETARY INTERESTS (including Closely Held Corporations) - SCHEDULE A | |
| CASH SURRENDER VALUE OF LIFE INSURANCE | |
| NOTES AND OTHER DEBTS RECEIVABLE | |
| REAL ESTATE OWNED - SCHEDULE B | 1,405,000 |
| OTHER ASSETS - SCHEDULE C | 225,000 |
| TOTAL ASSETS | $ 20,530,000 |

### LIABILITIES

| | |
|---|---|
| NOTES AND ACCOUNTS PAYABLE | $ |
| REAL ESTATE MORTGAGE PAYABLE | 164,000 |
| OTHER DEBTS SECURED BY ASSETS OWNED | |
| OBLIGATIONS - SCHEDULE D | |
| OTHER LIABILITIES | |
| TOTAL LIABILITIES | $ 164,000 |
| NET WORTH | $ 20,366,000 |
| TOTAL LIABILITIES AND NET WORTH | $ 20,530,000 |
| CONTINGENT LIABILITIES - SCHEDULE E | $ 3,865,000 |

List and describe any substantial changes in the above anticipated within the next year:

OTS Form 1393
Rev January 1991



PLAINTIFF'S EXHIBIT PX 599 A

H&R-B56-00495
Confidential Material - Subject to Protective Order

JA 5452

# EXHIBIT M

# BIOGRAPHICAL AND FINANCIAL REPORT

## FINANCIAL STATEMENT

as of 4-30, 19 91

### ASSETS

NOTE: If any asset is not owned outright or is recorded as owned in other than your own name solely, please attach a signed explanatory schedule.

| | |
|---|---|
| CASH ON HAND AND IN BANKS | $ 2,769,356 |
| U.S. GOVERNMENT BONDS | 246,818 |
| OTHER CREDITOR SECURITIES | -0- |
| STOCKS - SCHEDULE A | 1,315,393 |
| OTHER PROPRIETARY INTERESTS (including Closely Held Corporations) - SCHEDULE A | 14,809,050 |
| CASH SURRENDER VALUE OF LIFE INSURANCE | 150,000 |
| NOTES AND OTHER DEBTS RECEIVABLE | 560,287 |
| REAL ESTATE OWNED - SCHEDULE B | 400,000 |
| OTHER ASSETS - SCHEDULE C | 16,380,000 |
| TOTAL ASSETS | $ 36,630,904 |

### LIABILITIES

| | |
|---|---|
| NOTES AND ACCOUNTS PAYABLE | $ -0- |
| REAL ESTATE MORTGAGE PAYABLE | -0- |
| OTHER DEBTS SECURED BY ASSETS OWNED | -0- |
| OBLIGATIONS - SCHEDULE D | -0- |
| OTHER LIABILITIES | -0- |
| TOTAL LIABILITIES | $ -0- |
| NET WORTH | $ 36,630,904 |
| TOTAL LIABILITIES AND NET WORTH | $ 36,630,904 |
| CONTINGENT LIABILITIES - SCHEDULE F | $ 6,000,000 |

List and describe any substantial changes in the above anticipated within the next year:

PLAINTIFF'S EXHIBIT PX 599-B

OTS Form 1313
Rev. January 1991



H&R-B56-00507
Confidential Material - Subject to Protective Order

JA 5460

CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER PHO054 0506

# EXHIBIT N

# HOLLEB & COFF

ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900
TELECOPIER (312) 807-3971
WRITER'S DIRECT DIAL (312)________

LEWIS R. BARON
NORMAN B. BERGER
ANNE WEBBER BRODY
MORRIS J. COFF
CHRISTOPHER B. COHEN
LAWRENCE L DAVIDSON
PAUL R. DIAMOND
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD N. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM L GOLDBERG
IRA GOULD
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
JEFFREY KUTA
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
KENNETH F. LORCH
NICHOLAS J. LYNN
PETER E. MANIS
STEPHEN A. MARCUS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NEIMAN
MARK D. OLSON
BEVERLY SUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
TOM WECHTER
JEROME E. WEXLER
EDWARD E. YALOWITZ
DAVID E. ADELSON
LYNNE M. BAKER
MICHAEL A. BERMAN
RICHARD G. BERNET
BRADLEY S. BLOCK
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
PETER A. DAUZVARDIS
DENISE A. DeLAURENT
BRUCE DOPKE
PAUL A. GILMAN
LORI A. GOLDSTEIN
DANIEL R. GREGUS
JAMES G. HAFT
MICHAEL D. HAYES
KRISTOPHER S. HESTON
KIRK A. HOOPINGARNER
AARON C. HOROWITZ
DANIEL L. KRAUS
ROGELIO A. LASSO
JAMES W. MARKS
ALVIN K. MARR
STUART N. RAPPAPORT
SUSAN A. RICHMAN
GREGORY G. SCHULER
KENNETH L. SEROTA
KATHRYN BABCOCK SHAFFER
MICHAEL J. SILVERMAN
JANET L. SMERLING
KATHLEEN C. SPEARS
GENE S. STERN
GREGG E. SZILAGYI
MARK H. VAN DE VOORDE
SUSAN K. WARD
ROBERT S. WERT
THOMAS F. WHITE
J. MICHAEL WILLIAMS

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
ALEX H. DOLNICK
JILL A. OLSWANGER
MARTIN H. REDISH*

*ADMITTED IN NEW YORK ONLY

October 24, 1991

VIA MESSENGER

Mr. Philip A. Gerbick
Deputy Director
Office of Thrift Supervision
Chicago District Office
111 East Wacker Drive
Suite 800
Chicago, Illinois 60601

Re: Amendment to Charter of River Valley Savings Bank, F.S.B. ("River Valley")

Dear Mr. Gerbick:

I am enclosing an original and two (2) conformed copies of the Third Amendment to the Second Supplementary Section of the River Valley Stock Charter certified by Mark Kipnis as Secretary. This Amendment seeks only to modify the dividend rate authorized for the Class C Preferred Stock, One Thousand Dollar ($1,000) par value issued by River Valley. Previously dividends were awarded at a rate of ninety percent (90%) of American National Bank's prime.

We believe that this Amendment is eligible for processing under delegated authority to the District Director in that the proposed Amendment merely changes the dividend rate and as such, the Amendment does not render more difficult or discourage a merger, tender offer, or proxy contest, the assumption of control by a holder of a large block of River Valley's stock, or the removal of incumbent management; nor does it involve a significant issue of law or policy.

HOLLEB & COFF
ATTORNEYS AT LAW



River Valley respectfully requests your prompt consideration and approval of this Amendment. As always, please do not hesitate to contact me if you have any questions concerning this matter.

Yours very truly,

Anne Webber Brody

AWB:mf

Enclosures

cc: Larry E. Ferries w/enclosures
Steven Bangert w/enclosures
Homer J. Holland w/enclosures
Howard R. Ross w/enclosures
Ronald Pikus w/enclosures
Mark S. Kipnis w/enclosures

# EXHIBIT O

**Office of Thrift Supervision**
Department of the Treasury

Central Region

111 East Wacker Drive, Suite 800, Chicago, IL 60601 • (312) 565-5300

**MEMORANDUM**

TO: Chester A. Biedron
Deputy Regional Director

FROM: Larry Ferries
Manager

DATE: April 10, 1992

SUBJECT: River Valley Savings Bank, FSB
Peoria, Illinois
(OTS 08515)

Notice of Common Stock Dividend

River Valley Savings Bank, FSB ("River Valley") has submitted a notice, pursuant to 12 C.F.R. Section 563.134(c), advising us of its intent to pay a $6 million dividend on its common stock. The following information was provided by River Valley:

| | |
|---|---|
| Dividend Payment Date | May 1, 1992 |
| Amount of Dividend | $6,000,000 |
| Nature of Dividend | Special Dividend on Common Stock for the Redemption of 6,000 shares of Class C preferred stock at par value |

The Supervisory Agreement, dated March 25, 1991, requires that tangible capital be increased to 4.0% of tangible assets at September 30, 1991 and increased to 5.0% of tangible assets at September 30, 1992. As of February 29, 1992, River Valley's tangible capital was 5.17% of tangible assets.

On March 19, 1992, a meeting was held at OTS. In attendance from River Valley were Director, CEO and Treasurer Steven Bangart and Director and Secretary Mark S. Kipnis. Larry Ferries and Ruth Allwardt represented OTS. The meeting was held primarily to discuss the purpose of the proposed $6 million dividend.

Messrs. Bangart and Kipnis explained that River Valley will reduce its assets from the sale of $40 million U.S. treasuries and the sale of $25 million CMO investments. The projected results of this down-sizing, an approximate $350,000 gain on the sales, and operating income during the month of March of approximately $550,000 will increase tangible capital to 6.53% of tangible assets as of March 31, 1992. Subsequently, we have received the actual March numbers and the assets have been reduced to $430 million.

DEFENDANT'S EXHIBIT
DX 677
Holland v. U.S. 95-524C

Dividends

310

10-19-92

-2-

Messrs. Bangart and Kipnis further stated that the holding company would use the dividend to redeem $6 million of the $7 million preferred stock held by American National Bank ("ANB") as collateral for a $7 million loan from ANB. The preferred stock would be retired. As a result, the loan from ANB would be reduced to $1 million.

Messrs. Bangart and Kipnis submitted a pro forma statement of condition (See attachment). The pro forma indicates that River Valley will maintain a tangible capital ratio in excess of 5.0% through December 1992. The projection was based on $375,000 net income per month or $1,125,000 per quarter. Based on River Valley's past performance, this is a conservative estimate of earnings. For the quarter ended March 31, 1992, River Valley reported net income of $2,138,000.

Pursuant to 12 C.F.R. Section 563.134(b)(2)(i), a Tier 2 institution may make a capital distribution up to 75 percent of its net income over the most recent four-quarter period, if the institution's current capital satisfies the risk-based capital standard that would be applicable to it on January 1, 1993. As shown below, the institution meets the requirements of the regulation.

Dividend and Net Income Analysis:

| Dividends Paid - 12 months | | Net Income Per Quarter | |
|---|---|---|---|
| 03-01-92 | $ 157,000 | 03-31-92 | $2,138,000 |
| 12-31-91 | 177,000 | 12-31-91 | 1,719,000 |
| 09-30-91 | 96,688 | 09-30-91 | 2,974,000 |
| | | 06-30-91 | 2,012,000 |
| Total | $ 430,688 | Total | $8,843,000 |

Capital Ratio Analysis, February 29, 1992:

| | | |
|---|---|---|
| Tangible Capital | $ 26,818 | 5.16% |
| Core Capital | 26,818 | 5.16% |
| Risk-Based Capital* | 34,665 | 13.25% |

*As of December 31, 1991

yl

310

Recommendations

The total of the proposed $6,000,000 capital distribution and dividends paid during the period represents 72.72% of the most recent four-quarter income.

In view of the institution's compliance with the Supervisory Agreement, the capital regulations and recorded profits for the past four quarters, we are of the opinion that the proposed distribution would not have any adverse affect on the financial condition of River Valley. As a result, we recommend that River Valley's capital distribution, on May 1, 1992, be approved. A letter of approval is enclosed for your signature.

Attachments (2)

LEF:ra

APR-09-1992 12:49 FROM RVSB CORPORATE TO 13125655350 P.02

#8515
10-19-92

RIVER VALLEY
Savings Bank FSB

April 9, 1992

Via Fax
Mr. Larry Ferries
Office of Thrift Supervision
111 E. Wacker Drive, Suite 800
Chicago, IL 60601

Dear Mr. Ferries:

You will find River Valley Savings Bank, FSB's March, 1992 financial statements attached.

Our current tangible ratio is 6.4%. If the proposed preferred stock redemption is paid out from available cash, our tangible ratio would be 5.1%.

| Quarter Ended | Income |
|---|---|
| 6/30/91 | 2,012,170 |
| 9/30/91 | 2,973,828 |
| 12/31/91 | 1,718,776 |
| 3/31/92 | 2,138,663 |
| Total | 8,843,437 |

| Quarter Ended | Dividends Paid |
|---|---|
| 6/30/91 | 102,375 |
| 9/30/91 | 96,688 |
| 12/31/91 | 177,000 |
| 3/31/92 | 141,153 |
| Proposed Redemption | 6,000,000 |
| Total | 6,517,216 |

Percentage paid out 73.70%

I believe FSB meets all the benchmarks necessary to allow the redemption of the preferred stock.

Please call me if you have any questions at (309)673-4400, extension 204.

Very truly yours,

Ronald W. Seib

Ronald W. Seib
Senior Vice President
& Chief Financial Officer

River Valley Savings Bank 200 S.W. Jefferson Street, Peoria, Illinois 61602 (309) 673-4405

Dividends

#
30

APR-09-1992 12:50 FROM RVSB CORPORATE TO 13125655350 P.03

RIVER VALLEY SAVINGS BANK, FSB
FINANCIAL STATEMENTS
MARCH, 1992

| | MARCH | FEBRUARY | JANUARY | DECEMBER | NOVEMBER | OCTOBER |
|---|---|---|---|---|---|---|
| ASSETS: | | | | | | |
| CASH & OVERNITE DEPOSITS | 19,413,522 | 12,050,751 | 8,889,505 | 9,429,882 | 10,464,403 | 7,578,015 |
| INVESTMENT SECURITIES | 20,694,884 | 65,725,123 | 40,019,613 | 25,162,424 | 18,919,353 | 19,918,493 |
| FSLIC NOTE | | | | 0 | 0 | 0 |
| MORTGAGE-BACKED SECURITIES | 129,366,012 | 183,226,353 | 204,868,802 | 233,569,121 | 241,463,826 | 257,082,829 |
| LOANS RECEIVABLE: | | | | | | |
| MORTGAGE LOANS | 233,129,008 | 227,893,726 | 225,120,933 | 220,895,944 | 219,792,303 | 220,691,481 |
| OTHER LOANS | 9,378,970 | 9,964,035 | 10,374,831 | 10,562,949 | 11,136,565 | 11,348,083 |
| PROPERTY & EQUIPMENT, NET OF DEPRECIATION | 3,728,682 | 3,622,014 | 3,587,631 | 3,356,287 | 3,226,034 | 3,251,370 |
| REO/REJ, NET OF RESERVES | 2,256,463 | 3,357,915 | 3,387,471 | 3,386,439 | 3,366,009 | 3,316,858 |
| ACCRUED INTEREST - INVESTMENTS | 3,348,532 | 3,951,229 | 3,823,472 | 4,176,050 | 4,810,078 | 4,257,836 |
| ACCRUED INTEREST - LOANS | 3,715,696 | 3,835,291 | 3,792,661 | 3,575,167 | 3,622,589 | 3,163,730 |
| PREPAID & OTHER ASSETS | 5,394,929 | 5,717,848 | 5,435,719 | 2,928,633 | 2,833,525 | 3,030,697 |
| GOODWILL | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL ASSETS | 430,426,690 | 519,344,285 | 509,300,638 | 517,042,896 | 519,634,685 | 533,659,392 |
| LIABILITIES: | | | | | | |
| SAVINGS DEPOSITS | 342,826,584 | 344,015,451 | 345,488,569 | 346,382,315 | 346,061,040 | 345,232,741 |
| BORROWERS' ESCROW | 6,585,403 | 5,927,475 | 6,993,124 | 5,999,597 | 4,872,516 | 3,593,157 |
| FHLB ADVANCES | 25,000,000 | 38,000,000 | 31,000,000 | 40,500,000 | 30,000,000 | 35,000,000 |
| OTHER BORROWED FUNDS | 17,841,990 | 93,255,849 | 90,757,933 | 88,816,056 | 102,804,317 | 116,285,037 |
| ACCRUED EXPENSES & OTHER LIAB. | 10,501,114 | 11,303,029 | 8,944,790 | 9,670,840 | 10,427,311 | 8,947,833 |
| TOTAL LIABILITIES | 402,755,091 | 492,501,804 | 483,184,416 | 491,368,808 | 494,165,184 | 509,058,768 |
| NET WORTH: | | | | | | |
| PREFERRED STOCK | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 | 7,000,000 |
| SUBORDINATED DEBT | 0 | 0 | 0 | 0 | 0 | 0 |
| CAPITAL STOCK & PAID-IN-CAPITAL | 1,459,775 | 1,459,775 | 1,459,775 | 1,459,775 | 1,459,775 | 1,459,775 |
| RETAINED EARNINGS | 17,073,161 | 17,214,314 | 17,214,314 | 8,211,135 | 8,388,135 | 8,388,135 |
| UNDISTRIBUTED PROFIT | 2,138,663 | 1,168,392 | 442,133 | 9,003,178 | 8,621,591 | 7,752,714 |
| TOTAL NET WORTH | 27,671,599 | 26,842,481 | 26,116,222 | 25,674,088 | 25,469,501 | 24,600,624 |
| TOTAL LIABILTIES & NET WORTH | 430,426,690 | 519,344,285 | 509,300,638 | 517,042,896 | 519,634,685 | 533,659,392 |

30

RIVER VALLEY SAVINGS BANK, FSB
FINANCIAL STATEMENTS
MARCH, 1992

| | MARCH | ANNUALIZED % OF TOTAL ASSETS | FEBRUARY | ANNUALIZED % OF TOTAL ASSETS | YTD 1992 | ANNUALIZED % OF TOTAL ASSETS | YTD 1991 | ANNUALIZED % OF TOTAL ASSETS |
|---|---|---|---|---|---|---|---|---|
| INTEREST INCOME | 4,333,178 | 10.87% | 4,681,394 | 11.17% | 12,793,367 | 10.26% | 14,854,421 | 10.31% |
| INTEREST EXPENSE - DEPOSITS | 1,627,774 | 4.08% | 1,611,071 | 3.84% | 5,056,513 | 4.05% | 6,548,623 | 4.55% |
| INTEREST EXP. - BORR. FUNDS | 1,025,961 | 2.57% | 788,173 | 1.88% | 2,683,787 | 2.15% | 3,369,391 | 2.34% |
| TOTAL INTEREST EXPENSE | 2,653,735 | 6.66% | 2,399,244 | 5.73% | 7,740,300 | 6.21% | 9,918,014 | 6.89% |
| GROSS INTEREST MARGIN | 1,679,443 | 4.21% | 2,282,150 | 5.45% | 5,053,067 | 4.05% | 4,936,407 | 3.43% |
| PROVISION FOR LOAN LOSS | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% | (450,000) | -0.31% |
| NET INTEREST MARGIN | 1,679,443 | 4.21% | 2,282,150 | 5.45% | 5,053,067 | 4.05% | 4,486,407 | 3.11% |
| OTHER INCOME | 176,269 | 0.44% | 201,223 | 0.48% | 740,250 | 0.59% | 398,820 | 0.28% |
| OTHER NON-OPERATING INC. | 15,949 | 0.04% | 869 | 0.00% | 20,724 | 0.02% | 128,752 | 0.09% |
| SECURITIES GAINS (LOSSES) | 215,415 | 0.54% | (654,722) | -1.56% | (413,716) | -0.33% | 512,791 | 0.36% |
| TOTAL OTHER INCOME | 407,633 | 1.02% | (452,630) | -1.08% | 347,258 | 0.28% | 1,040,363 | 0.72% |
| SALARY & RELATED EXPENSE | 492,028 | 1.23% | 520,924 | 1.24% | 1,557,142 | 1.25% | 1,199,769 | 0.83% |
| OCCUPANCY & EQUIPMENT | 177,393 | 0.45% | 156,968 | 0.37% | 501,777 | 0.40% | 380,257 | 0.26% |
| REO | 26,539 | 0.07% | 35,686 | 0.09% | 73,338 | 0.06% | 60,019 | 0.04% |
| SAIF & OTS PREMIUMS | 74,392 | 0.19% | 74,392 | 0.18% | 223,176 | 0.18% | 232,699 | 0.16% |
| OUTSIDE SERVICES & EXAMS | 144,410 | 0.36% | 105,721 | 0.25% | 353,378 | 0.28% | 597,929 | 0.42% |
| OTHER OPERATING EXPENSE | 148,696 | 0.37% | 145,223 | 0.35% | 477,511 | 0.38% | 465,289 | 0.32% |
| SUBTOTAL OTHER EXPENSE | 1,063,458 | 2.67% | 1,038,914 | 2.48% | 3,186,322 | 2.56% | 2,935,962 | 2.04% |
| OPERATING EARNINGS | 1,023,618 | 2.57% | 790,606 | 1.89% | 2,214,003 | 1.78% | 2,590,808 | 1.80% |
| PA - GOODWILL | 5,653 | 0.01% | 5,653 | 0.01% | 16,959 | 0.01% | (10,224) | -0.01% |
| NET INCOME BEFORE TAXES | 1,029,271 | 2.58% | 796,259 | 1.90% | 2,230,962 | 1.79% | 2,580,584 | 1.79% |
| INCOME TAXES | (59,000) | -0.15% | (70,000) | -0.17% | (92,299) | -0.07% | 282,180 | 0.20% |
| NET INCOME | 970,271 | 2.43% | 726,259 | 1.73% | 2,138,663 | 1.71% | 2,298,404 | 1.60% |

TOTAL P.04

Dividends

3/6

# EXHIBIT P

COPY

DEFERRED COMPENSATION AGREEMENT

AGREEMENT made as of December 1, 1991, between River Valley Holdings, Inc. ("the Corporation"), an Illinois corporation, and Homer J. Holland, Chairman of the Board of Directors of the Corporation ("the Employee").

The Employee has rendered, and will be rendering, valuable services to the Corporation and its subsidiaries, including, but not limited to, River Valley Savings Bank, F.S.B. ("FSB"), and it is the desire of the Corporation to have the benefit of the Employee's continued loyalty, service and counsel and also to assist the Employee in providing for the contingencies of death and old-age dependency. Therefore, it is agreed:

Section 1. Deferred Compensation. In consideration of the past and continuing performance of service by the Employee on the Corporation's behalf, the Corporation shall establish an account on its books in the Employee's name in the amount of $3,505,673.00 payable in the manner and subject to the conditions set forth below.

Section 2. Interest to be Accrued. Interest shall accrue on the amount set forth in the Employee's account, from time to time, at a rate equal to the highest interest rate FSB is then paying for borrowed funds in amounts in excess of One Million and No/100 Dollars ($1,000,000.00).

Section 3. Payment of Deferred Compensation. The Corporation shall pay, to the Employee (or the Employee's estate in the event of the Employee's death) monies from the account established in Section 1 upon the first to occur of the following:

a) the Employee's death; or
b) the sale or transfer of all or substantially all of the Employee's stock in the Corporation; or
c) the sale or transfer of all or substantially all of the stock or assets of the Corporation or all or substantially all of the stock or assets of FSB.

The Corporation shall make payments in five equal annual principal installments (interest shall continue to accrue on the unpaid balance) beginning on the first day of the month subsequent to the occurrence of (a) or (b) and all in cash on (c). The Corporation may prepay without premium or penalty. Any event described in (c) shall immediately accelerate all payments due and owing under (a) or (b).

For the purposes of this Section, "substantially all" is defined as eighty percent (80%). Should the Employee's ownership interest fall below ten percent (10%) of the Corporation's issued and outstanding stock at any one time, not necessarily resulting from one

DEFENDANT'S EXHIBIT
DX 626
Holland v. U.S. 95-524C

H&R-B03-00247

transaction, he will be deemed to have sold substantially all of his stock.

Section 4. Life Insurance Acceleration of Payment. The Corporation may, in it sole discretion, elect to purchase life insurance on the life of the Employee, the proceeds of which, if and only if the Corporation so designates, shall be applied to the first installments as soon as received, and if these life insurance proceeds equal or exceed what would otherwise constitute the first installment under Section 3, the life insurance proceeds shall be paid over (to the extent of the full amount payable), and any balance due shall be paid in four equal annual installments beginning on the first day of the month one year subsequent to the Employee's death.

Section 5. Alienation. No interest created by this Agreement may be sold, assigned, transferred, conveyed, hypothecated, encumbered, anticipated, or otherwise disposed of, and such interest shall not be subject to any liability or obligation of the Employee or his spouse, nor to attachment, garnishment, execution, or other legal process for payment of any claim against any such person or his property.

Section 6. No Employment Contract. This Agreement is not an employment contract and nothing contained herein shall require the Corporation to employ the Employee or prohibit the adjustment from time to time of the terms of employment of the Employee, including his then current compensation and other benefits to which he may otherwise then be entitled.

Section 7. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties.

Section 8. Entire Agreement. This Agreement supersedes all other agreements previously made between the parties or FSB relating to its subject matter. There are no other understandings or agreements.

Section 9. Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have signed and sealed this Agreement.

Corporate Seal

Attest:

Secretary

RIVER VALLEY HOLDINGS, INC.

By: ______________________

Homer Holland

H&R-B03-00248

# EXHIBIT Q

DEFERRED COMPENSATION AGREEMENT

AGREEMENT made as of November 1, 1991, between River Valley Holdings, Inc. ("the Corporation"), an Illinois corporation, and Steven Bangert, President of the Corporation ("the Employee").

The Employee has rendered, and will be rendering, valuable services to the Corporation and its subsidiaries, including, but not limited to, River Valley Savings Bank, F.S.B. ("FSB"), and it is the desire of the Corporation to have the benefit of the Employee's continued loyalty, service and counsel and also to assist the Employee in providing for the contingencies of death and old-age dependency. Therefore, it is agreed:

Section 1. Deferred Compensation. In consideration of the past and continuing performance of service by the Employee on the Corporation's behalf, the Corporation shall establish an account on its books in the Employee's name in the amount of $2,123,059.00 payable in the manner and subject to the conditions set forth below.

Section 2. Interest to be Accrued. Interest shall accrue on the amount set forth in the Employee's account, from and after the time the first installment is due, at a rate equal to the highest interest rate FSB is then paying for borrowed funds in amounts in excess of One Million and No/100 Dollars ($1,000,000.00).

Section 3. Payment of Deferred Compensation. The Corporation shall pay to the Employee (or the Employee's estate in the event of the Employee's death) monies from the account established in Section 1 upon the first to occur of the following:

a) termination of Employee's employment; or
b) the Employee's death; or
c) the sale or transfer of all or substantially all of the Employee's stock or option rights to acquire stock in the Corporation; or
d) the sale or transfer of all or substantially all of the stock or assets of the Corporation or all or substantially all of the stock or assets of FSB.

The Corporation shall make payments in five equal annual principal installments (interest shall accrue on the unpaid balance, as provided in Section 2 above) beginning on the first day of the month subsequent to the occurrence of (a), (b) or (c) and all in cash on (d). The Corporation may prepay without premium or penalty. Any event described in (d) shall immediately accelerate all payments due and owing under (a), (b) or (c).

For the purposes of this Section, "substantially all" is defined as eighty percent (80%). Should the Employee's ownership interest or option rights to acquire stock fall below one percent (1%) of

PLAINTIFF'S EXHIBIT PX 629

H&R-B03-00277

JA 5647

the Corporation's issued and outstanding stock at any one time, not necessarily resulting from one transaction, he will be deemed to have sold substantially all of his stock or option rights to acquire stock.

Section 4. Life Insurance Acceleration of Payment. The Corporation may, in it sole discretion, elect to purchase life insurance on the life of the Employee, the proceeds of which, if and only if the Corporation so designates, shall be applied to the first installments as soon as received, and if these life insurance proceeds equal or exceed what would otherwise constitute the first installment under Section 3, the life insurance proceeds shall be paid over (to the extent of the full amount payable), and any balance due shall be paid in four equal annual installments beginning on the first day of the month one year subsequent to the Employee's death.

Section 5. Alienation. No interest created by this Agreement may be sold, assigned, transferred, conveyed, hypothecated, encumbered, anticipated, or otherwise disposed of, and such interest shall not be subject to any liability or obligation of the Employee or his spouse, nor to attachment, garnishment, execution, or other legal process for payment of any claim against any such person or his property.

Section 6. No Employment Contract. This Agreement is not an employment contract and nothing contained herein shall require the Corporation to employ the Employee or prohibit the adjustment from time to time of the terms of employment of the Employee, including his then current compensation and other benefits to which he may otherwise then be entitled.

Section 7. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties.

Section 8. Entire Agreement. This Agreement supersedes all other agreements previously made between the parties or FSB relating to its subject matter. There are no other understandings or agreements.

Section 9. Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of Illinois.

IN WITNESS WHEREOF, the parties have signed and sealed this Agreement.

Corporate Seal

Attest:

Secretary

RIVER VALLEY HOLDINGS, INC.

By:

Steven Bangert

H&R-B03-00278

JA 5648

# EXHIBIT R

HOLLEB & COFF
ATTORNEYS AT LAW

55 EAST MONROE STREET
SUITE 4100
CHICAGO, ILLINOIS 60603-5896
(312) 807-4600

TELECOPIER (312) 807-3900
WRITER'S DIRECT DIAL (312) 807-4618

MORRIS J. COFF (1924-1993)

LEWIS R. BARON
NORMAN B. BERGER
ALLAN S. BRILLIANT
ANNE WEBBER BRODY
MICHAEL V. CASEY
CHRISTOPHER B. COHEN
RONALD A. DAMASHEK
LAWRENCE L DAVIDSON
PAUL R. DIAMOND
BRUCE DOPKE
ERIC M. FOGEL
H. JAMES FOX
PAUL T. FOX
ROBERT H. GERSTEIN
HOWARD M. GILBERT
STANFORD L. GLASS
STUART H. GLICKEN
WILLIAM I. GOLDBERG
IRA GOULD
JAMES G. HAFT
MICHAEL D. HAYES
DAVID I. HERBST
HOWARD M. HOFFMANN
MARSHALL M. HOLLEB
KIRK A. HOOPINGARNER
MARK J. HORNE
JEFFREY H. HORNSTEIN
CHRISTOPHER J. HORVAY
JEANNE DOYLE KELLY
MARK S. KIPNIS
THEODORE L. KOENIG
ROBERT E. KOLEK
DANIEL L. KRAUS
JEFFREY KUTA
JEWEL LAFONTANT-MANKARIOUS
STEPHEN J. LANDES
JANINE M. LANDOW-ESSER
KENNETH A. LATIMER
ALLEN P. LEV
IRVING B. LEVINSON
KENNETH P. LORCH
NICHOLAS J. LYNN
PETER R. MANIS
STEPHEN A. MARCUS
JAMES W. MARKS
JOSEPH L. MATZ
ARTHUR R. MILLER
HERBERT B. NECHIN
ROBERT K. NIEMAN
BEVERLY FUSLER PARKHURST
MICHAEL A. REITER
RICHARD S. RHODES
KEITH J. SHAPIRO
HOWARD J. STEIN
CHARLES A. STERN
ROBERT E. STIGGER
TOM WICHTER
JEROME B. WEXLER
THOMAS P. WHITE
J. MICHAEL WILLIAMS
ALLAN A. WULFSTAT
EDWARD E. YALOWITZ

AIDA M. ALAKA
LYNNE M. BAKER
RICHARD G. BERNET
LAWRENCE B. BRODSKY
WILLIAM A. BUZOGANY
ROBERT A. COHEN
JUDITH M. FELLER
ANDREW J. FEUREN
PAUL A. GILMAN
LORI A. GOLDSTEIN
EDWARD J. GREEN
PAMELA A. GREGORY
STEVEN P. GROSSFELD
TRICIA J. HARTMAN*
KRISTOPHER E. HIXSON
FERN L. JAMES
SCOTT H. KENIG
REBECCA L. KENT
BRIAN P. KERWIN
ANNA K. KONDELL
ANNE E. LINK
DONALD R. LORENZEN
JAMES L. LUCARI
*ALVIN K. MARR
MICHAEL S. MOSTOW
BENJAMIN L. NORTMAN
DAVID A. O'TOOLE
NANCY A. PETERMAN
KATHRYN A. PYSZKA
EDWARD D. RICKERT
KENNETH B. ROLLIN
KENNETH CLARK SCHIRLE
GREGORY C. SCHULER
JULIE L. SCHULZ
JEFFREY M. SCHWARTZ
THOMAS B. SHAPIRA
STEVEN H. SHAPIRO
MICHAEL J. SILVERMAN
CATHERINE A. SIMMONS
PAUL A. SMITH
JAMES M. SNYDER
GENE S. STERN
MICHAEL S. TALBERT
JAMES P. TEUFEL
SUSAN K. WARD
ROBERT E. WEST

OF COUNSEL
JOSEPH W. BERNSTEIN
WILLIAM R. COTTLE
JILL A. OLSWANGER
MARTIN H. REDISH

*ADMITTED IN CALIFORNIA ONLY

December 27, 1994

**VIA FEDERAL EXPRESS**

Homer J. Holland
c/o Curtis H. Stewart
1916 Janelle Way
Sandpoint, Idaho 83864

Re: Deferred Compensation Agreement Payment

Dear Homer:

Pursuant to Frank O'Connor's suggestion, enclosed please find a Unanimous Written Consent.

Please execute same where indicated and return in the enclosed Federal Express envelope. I will then obtain Howard and Ron's signatures and have the fully executed counterpart filed in the Holdings minute book.

Very truly yours,

[signature]

Mark S. Kipnis

MSK/aw
Enclosures

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
DX 1555
Holland v. U.S. 95-524C

H&R-B04-1
Confidential Material
Subject to Protective Order

UNANIMOUS WRITTEN CONSENT
OF THE SHAREHOLDERS OF
RIVER VALLEY HOLDINGS, INC.

The undersigned, being all of the shareholders and beneficial owners of River Valley Holdings, Inc. ("Holdings"), hereby consent to and adopt the following resolutions in lieu of an annual or special meeting:

WHEREAS, Holdings has previously paid Steven Bangert and Homer Holland certain lumpsum payments in full and complete settlement of all obligations of Holdings under certain deferred compensation agreements entered into by and between Holdings and Bangert and Holland, respectively; and

WHEREAS, the shareholders have received certain Notices regarding the payments in the forms collectively attached as Exhibit A to this Consent;

BE IT RESOLVED, that the shareholders acknowledge receipt of the Notices and that the shareholders approve of the right of Bangert and Holland to retain their respective payments (Mr. Holland abstaining with respect to his own payment).

Homer J. Holland

Howard R. Ross

Being all of the shareholders of Holdings

Ronald Pikus

Mark S. Kipnis

(Being respective holders of minority beneficial interest in Holdings)

5048741.WP

H&R-B04-2
Confidential Material
Subject to Protective Order

EXHIBIT A

**NOTICE TO SHAREHOLDERS OF RIVER VALLEY HOLDINGS, INC. REGARDING PAYMENTS PURSUANT TO VARIOUS DEFERRED COMPENSATION AGREEMENTS**

River Valley Holdings, Inc. ("RVH") entered into an agreement with Homer J. Holland ("Holland") on December 1, 1991 to provide for the payment of $3,505,673. Under the agreement, Holland would be entitled to payment upon (1) death, (2) sale or transfer of all or substantially all of his stock in RVH, or (3) sale or transfer of all or substantially all of the stock or assets of RVH or substantially all of the stock or assets of River Valley Savings Bank, FSB ("RVB"). In the case of the first two events, the amount was to be paid in five annual installments with interest. In the case of the last event, the amount was to be paid in a lumpsum payment.

On December 20, 1993, the agreement was amended by the Board of Directors of RVH to provide for an immediate payout in December, 1993 of the entire $3,505,673. Holland was paid the $3,505,673 on December 31, 1993.

Pursuant to section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), certain payments to disqualified individuals are treated as parachute payments. A parachute payment is any payment that is in the nature of compensation (made to a disqualified individual) which is contingent on a change in the ownership or control of a corporation or in the ownership of a substantial portion of the assets of a corporation. A payment made pursuant to an amendment that modifies a previous agreement in any significant respect (if the amendment is made within one year before the date of a change in ownership or control) is presumed to be contingent on such change unless the contrary is established by clear and convincing evidence.

Section 280G further provides that to the extent that excess parachute payments are made to a disqualified individual, then no deduction shall be permitted to the corporation for any parachute amounts made in excess of a base amount.

It would appear that all or a portion of the $3,505,673 payment to Holland may be treated as a parachute payment. However, if 75 percent of the shareholders approve Holland retaining the payment, then none of the $3,505,673 would be treated as a parachute payment.

Therefore, RVH requests that the shareholders approve of the right of Holland to retain the $3,505,673 paid to him on December 31, 1993.

5048713.01

H&R-B04-3
Confidential Material
Subject to Protective Order

EXHIBIT A

**NOTICE TO SHAREHOLDERS OF RIVER VALLEY HOLDINGS, INC.**
**REGARDING PAYMENTS PURSUANT TO VARIOUS**
**DEFERRED COMPENSATION AGREEMENTS**

River Valley Holdings, Inc. ("RVH") entered into an agreement with Steven Bangert ("Bangert") on November 1, 1991 to provide for the payment of $2,123,059. Under the agreement, Bangert would be entitled to payment upon (1) termination of employment, (2) death, (3) sale or transfer of all or substantially all of his stock or option rights to acquire stock in RVH, or (4) sale or transfer of all or substantially all of the stock or assets of River Valley Savings Bank, FSB ("RVB"). In the case of the first three events, the amount was to be paid in five annual installments with interest. In the case of the last event, the amount was to be paid in a lumpsum payment.

On December 20, 1993, the agreement was amended by the Board of Directors of RVH to provide for an immediate payout in December, 1993 of the entire $2,123,059. Bangert was paid the $2,123,059 on December 31, 1993.

Pursuant to section 280G of the Internal Revenue Code of 1986, as amended (the "Code"), certain payments to disqualified individuals are treated as parachute payments. A parachute payment is any payment that is in the nature of compensation (made to a disqualified individual) which is contingent on a change in the ownership or control of a corporation or in the ownership of a substantial portion of the assets of a corporation. A payment made pursuant to an amendment that modifies a previous agreement in any significant respect (if the amendment is made within one year before the date of a change in ownership or control) is presumed to be contingent on such change unless the contrary is established by clear and convincing evidence.

Section 280G further provides that to the extent that excess parachute payments are made to a disqualified individual, then no deduction shall be permitted to the corporation for any parachute amounts made in excess of a base amount.

It would appear that all or a portion of the $2,123,059 payment to Bangert may be treated as a parachute payment. However, if 75 percent of the shareholders approve Bangert retaining the payment, then none of the $2,123,059 would be treated as a parachute payment.

Therefore, RVH requests that the shareholders approve of the right of Bangert to retain the $2,123,059 paid to him on December 31, 1993.

5048709.01

H&R-B04-4
Confidential Material
Subject to Protective Order