# EXHIBIT S

# RIVER VALLEY SAVINGS BANK
# ACQUISITION AND CAPITAL PLAN
# SEPTEMBER, 1989

## Purpose

The purpose of this paper is to describe River Valley Savings Bank's plan to acquire an insolvent savings institution with assistance from the Resolution Trust Corporation ("RTC"). The plan includes the sale of $7.5 million common stock in order to augment River Valley's capital structure.

## Background

Homer Holland and Howard Ross own 100% of the common stock of two savings institutions: River Valley Savings Bank, Rock Falls, Illinois; and River Valley Savings Bank, F.S.B, Peoria, Illinois. As of July 31, 1989, River Valley Savings Bank, Rock Falls had total assets of $214 million, while River Valley Savings Bank, F.S.B., Peoria had assets of $414 million. The two River Valley Savings Banks are the result of the merger of six institutions in 1988:

**Rock Falls Savings & Loan Association** - This healthy, state-chartered stock association was acquired by Ross and Holland in 1985. In 1987, the Association's name was changed to River Valley Savings Bank.

**Republic Savings of South Beloit** - This insolvent institution was merged into River Valley Savings Bank in July, 1988. FSLIC provided a cash infusion of $17 million and 80% capital loss coverage on selected assets.

**Home Federal Savings & Loan of Peoria, Mutual Savings & Loan Association of Canton, and Galva Federal Savings and Loan Association** - These three insolvent institutions were merged together in July, 1988 as River Valley Savings Bank, F.S.B., Peoria. The FSLIC provided a cash infusion of $36 million, 90% loss coverage on selected assets, and invested $5 million in F.S.B.'s Series A Preferred Stock.

**Peoria Savings and Loan Association** - This insolvent institution was merged into River Valley Savings Bank, F.S.B. in December, 1988. The FSLIC provided $3.3 million in cash and a $13.2 million, ten-year note, paying LIBOR + 1.75%.

Holland and Ross intend to merge the two River Valley's upon the acquisition of another institution, or at year end 1989, whichever is sooner. (For simplicity, we shall refer to River Valley as if it were a single entity and that the merger of the two River Valleys had already been accomplished.)

PLAINTIFF'S EXHIBIT PX-5



H&R-B44-1392
Confidential Material
Subject to Protective Order

River Valley's Business Strategy

River Valley's strategy is to provide retail banking services in communities of Central and Northern Illinois, excluding the Chicago SMSA. (See Exhibit 1 for a description of River Valley branches and offices.) River Valley seeks to become one of the largest providers of retail banking services in each of the communities it serves. Currently, River Valley is the largest savings institution headquartered in Peoria, Illinois.

A principal tenet of River Valley's philosophy is to operate with minimal interest rate or credit risk. River Valley has demonstrated that a savings institution can operate profitably with minimal risk. Credit risk is minimized by focusing on relatively low risk residential mortgages and mortgage backed securities. With some minor exceptions, River Valley does not originate or purchase commercial and industrial loans or commercial real estate loans. Fifty-nine percent of total earning assets are in government-backed or investment grade mortgage-backed and other securities.

Among the whole loans in the portfolio, credit risk is further reduced through diversification including the purchase of loans from outside River Valley's local communities. As a result, River Valley's loan portfolio has only limited concentration in any single community.

River Valley operates under a number of disciplines to insure minimal interest rate risk. Asset and liability decisions, including pricing of loans and deposits, are centralized in a special purpose management subsidiary, Holland Partners, Inc. Holland Partners constantly monitors the potential effects of interest rate changes on net interest income spreads and balance sheet values. Holland Partners has been able to meet the objective of maintaining River Valley's one-year interest rate gap within plus or minus 5% with a duration gap of less than six months. Holland Partners measures its performance by the increase in the mark-to-market value of River Valley's net assets. (See Exhibit 2 for a description of Holland Partners, Inc.)





H&R-B44-1393
Confidential Material
Subject to Protective Order

**River Valley's Financial Performance**

The acquisitions negotiated with FSLIC and River Valley's operating strategy have produced excellent results. The same mark-to-market discipline used in the negotiation of the acquisitions has been used to operate the thrifts. As a result, balance sheet restructuring to achieve River Valley's risk profile was accomplished quickly and only modest goodwill was created.

Table 1 below summarizes River Valley's combined earnings performance through July 31, 1989 and estimates total earnings for 1989. Since River Valley enjoys the benefit of approximately $57 million of pre-acquisition tax loss carryforwards, GAAP accounting requires a charge in lieu of taxes, which reduces goodwill. Thus, the most meaningful measure of financial performance for River Valley is not Net Income, but Operating Earnings (which could also be termed Change in Tangible Net Worth).

TABLE 1

River Valley
Earnings Performance
(000)
Seven Months Ending

| | Actual 1/1/89 to 7/31/89 | % of Assets | Projected 1/1/89 to 12/21/89 | % of Assets |
|---|---|---|---|---|
| Net Interest Income | $ 7,830 | 2.11% | $12,946 | 2.04% |
| Other Income | 2,746 | 0.74% | 4,652 | 0.73% |
| Total Income | 10,576 | 2.85% | 17,598 | 2.77% |
| Operating Expense Net Before Interest on Subordinated Debt | (6,442) | -1.73% | (11,156) | -1.76% |
| Interest on Sub Debt | (444) | -0.12% | (742) | -0.12% |
| Operating Earnings | 3,690 | 1.00% | 5,700 | 0.89% |
| Amortization of Goodwill, including Charge in Lieu of Taxes | (1,658) | -.45% | (2,605) | -.41% |
| Net Income | $ 2,032 | 0.55% | 3,095 | 0.48% |
| Preferred Dividends | | | (1,500) | -0.24% |
| Change in Retained Earnings | | | $ 1,595 | 0.24% |





H&R-B44-1394
Confidential Material
Subject to Protective Order

## Balance Sheet and Capital Structure

River Valley's balance sheet and capital structure are outlined in Table 3. (See Exhibit 3 for audited financial statements.)

TABLE 2

River Valley
Balance Sheet and Capital Structure
(000)
July 31, 1989

| | |
|---|---|
| **ASSETS** | |
| Cash | $26,873 |
| Investment Securities | 33,346 |
| FDIC Note | 13,200 |
| Mortgage-backed Securities | 282,375 |
| Loans | 244,673 |
| Property & Equipment | 4,001 |
| REO/REJ | 4,812 |
| Other Assets | 15,125 |
| Goodwill | 3,721 |
| Total Assets | $628,126 |
| **LIABILITIES** | |
| Deposits | $381,054 |
| FHLB Advances | 36,778 |
| Other Borrowings | 171,356 |
| Other Liabilities | 15,388 |
| Total Liabilities | $604,576 |
| **CAPITAL** | |
| Subordinated Debt | $6,600 |
| Preferred Stock | 10,006 |
| Common Stockholder's Equity | 6,944 |
| Total Capital | $23,550 |

A description of the subordinated debt and preferred stock components of River Valley's capital structure follows:

**Subordinated Debt:** $6.6 million of subordinated debt, balloon payment due July 1998, interest floats at prime + .33%. Held by American National Bank of Chicago. Ross and Holland granted put options to American National of $3.3 million each.

**Preferred Stock**

**Series A:** $5 million of non-voting, perpetual, preferred, callable at par, held by the FDIC. Cumulative dividends equal to 8% plus .25 times an amount equal to GAAP net income less .004 of total assets and less $400 thousand.



H&R-B44-1395
Confidential Material
Subject to Protective Order

Series C: $5 million of non-voting, perpetual, 10% cumulative preferred stock. Held by Ross and Holland. (American National Corporation has agreed to purchase the Series C preferred modified with a non-cumulative dividend equal to 90% of prime and a put option to Ross and Holland, subject to regulatory approval.)

Series D,E,F: $6 thousand par value issued to management in lieu of bonuses or stock options.

Series D: Pays $175 thousand annual dividend to Ross.

Series E: Pays $300 thousand annual dividend to Holland. Accrues supplemental dividends equal to 30% of annual increase in mark-to-market value above $2 million. Supplemental dividend capped at $750 thousand annually.

Series F: Pays annual dividend up to $125 thousand to Steve Bangert, Executive Vice President, Holland Partners, Inc. Accrues supplemental dividend equal to 5% of annual increase in mark-to-market value (less the cash portion paid).



H&R-B44-1396
Confidential Material
Subject to Protective Order

**Planned Acquisition**

River Valley will propose to the RTC the acquisition of an insolvent savings institution in River Valley's market area. For planning purposes, the target institution, after the infusion of cash from the RTC, has the following assets and liabilities:

TABLE 3

Balance Sheet of Target Institution
After RTC Assistance
(000)

| | |
|---|---|
| Assets | |
| Cash | $ 20,000 |
| Securities | 179,500 |
| Loans | 130,000 |
| Other Assets | 8,000 |
| Goodwill | 2,500 |
| Total Assets | $340,000 |
| Liabilities | |
| Deposits | $230,000 |
| Borrowings | 100,000 |
| Other Liabilities | 10,000 |
| Total Liabilities | $340,000 |

River Valley's proposal will seek an RTC cash infusion sufficient to make up the target institution's deficit net worth on a marked-to-market basis, less a 1% deposit premium. The deposit premium of $2.5 million is reflected in the balance sheet as goodwill.

The target institution operates with annual operating expenses equal to $5.3 million and annual fee income (service charges, loan fees, and other non interest income) of $1.5 million.



H&R-B44-1397
Confidential Material
Subject to Protective Order

Projected Results of the Combination

The following planning assumptions are used to project income statement and balance sheet results of the combined River Valley for the next five years.

**Borrowings Repaid:** $200 million of borrowings will be repaid from the liquidation of assets and the FDIC cash infusion; $100 million at River Valley and $100 million at Target.

**Net Interest Income Increases:** It is assumed that Net Interest Income increases immediately by $4.425 million as a net result of $2.25% earned on $230 million of Target Deposits and Other Liabilities less .75% on $100 million of River Valley borrowings reduced.

**Operating Expenses Are Reduced:** It is assumed that the consolidation of activities will produce operating efficiencies allowing a reduction from 2.10% on total assets in 1990 to 1.95% in 1991 and 1.75% in 1992 and thereafter.

**Deposits Grow at 7% Annually After an Initial Decline:** It is assumed that deposits grow at 7% annually after a 7% decline in 1990 and no growth in 1991. Deposit growth provides an improvement in net interest income equal to 1.25% on new deposits.

**Asset Growth Controlled by Capital Levels:** Asset growth will be constrained to insure compliance with regulatory capital to asset ratios while also allowing for the redemption of Series A and Series C preferred stock.

**New Capital of $7.5 Million Infused:** It is assumed that common stockholder's equity is increased by $7.5 million pursuant to a stock offering to close simultaneous with the merger. Net Interest Income increases by $750 thousand (10% on $7.5 million).



H&R-B44-1398
Confidential Material
Subject to Protective Order

The above planning assumptions lead to the following projected balance sheet snd income statements for the combined institution:

TABLE 4

Projected Balance Sheet
Assumes Acquisition of
Target on January 1, 1990

As of January 1
(000's

| | 1990 | 1991 | [illegible]992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|
| ASSETS: | | | | | | |
| Cash | $ 33,926 | $ 36,301 | $ [illegible]342 | $ 41,561 | $ 44,470 | $ 47,5[illegible]3 |
| FDIC Note | 13,200 | 13,200 | [illegible]3,200 | 13,200 | 13,200 | 13,200 |
| Securities | 315,721 | 374,266 | 3[illegible]522 | 368,090 | 395,114 | 424,014 |
| Loans | 374,673 | 400,900 | 42[illegible]63 | 458,991 | 491,120 | 525,4[illegible]3 |
| Other Tangible Assets | 31,938 | 34,174 | 3[illegible]586 | 39,125 | 41,864 | 44,7[illegible]5 |
| Goodwill | 5,581 | 2,300 | [illegible]100 | 1,900 | 1,700 | 1,500 |
| Total Assets | $775,039 | $861,141 | $8[illegible]493 | $922,867 | $987,468 | $1,056,5[illegible]0 |
| LIABILITIES: | | | | | | |
| Deposits | $ 611,054 | $568,280 | $5[illegible]280 | $608,060 | $650,624 | $ 696,168 |
| Other borrowed Funds | 108,134 | 233,769 | 2[illegible]3,747 | 250,343 | 262,313 | 275,277 |
| Other Liabilitites | 25,388 | 26,657 | [illegible]990 | 29,390 | 30,859 | 32,402 |
| Total Liabilities | $744,576 | $828,706 | $8[illegible]018 | $887,792 | $943,796 | $1,003,847 |
| CAPITAL: | | | | | | |
| Sub. Debt | $ 6,600 | $ 6,600 | $ [illegible]600 | $ 6,600 | $ 6,600 | $ 6,600 |
| Preferred Stock | 10,006 | 10,006 | [illegible],006 | 6 | 6 | 6 |
| Common Stock | 7,635 | 7,635 | [illegible]635 | 7,635 | 7,635 | 7,635 |
| Retained Earnings | 6,222 | 8,193 | [illegible]234 | 20,834 | 29,431 | 38,502 |
| TOTAL CAPITAL | $ 30,463 | $ 32,434 | $ [illegible]2,475 | $ 35,075 | $ 43,672 | $ 52,743 |
| TOTAL LIABILITIES & CAPITAL | $775,039 | $861,141 | $8[illegible]493 | $922,867 | $987,468 | $1,056,5[illegible]0 |



H&R-B44-1399
Confidential Material
Subject to Protective Order

TABLE 5

Projected
Income Statement
for years ending December 31
(000,000)

| | 1990 | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|---|
| Net Interest Income | $17,371 | $17,665 | $17,665 | $18,726 | $19,803 |
| Other Income | 6,152 | 6,583 | 7,043 | 7,536 | 8,064 |
| Total Income | $23,523 | $24,248 | $24,708 | $26,262 | $27,867 |
| Operating Expense Before Interest) on Sub. Debt | ($16,456) | ($16,792) | ($15,093) | ($16,150 | ($17,280) |
| Interest on Sub. Debt | (715) | (715) | (715) | (715) | (715) |
| Operating Earnings | $ 6,352 | $ 6,741 | $ 8,900 | $ 9,397 | $ 9,872 |
| Amortization of Goodwill, including Charge in Lieu of Taxes | (2,881) | (200) | (200) | (200) | (200) |
| Net Income | 3,471 | 6,541 | 8,700 | 9,197 | 9,672 |
| Preferred Dividends | (1,500) | (1,500) | (1,100) | (600) | (600) |
| Increase in Retained Earnings | $ 1,971 | $ 5,041 | $ 7,600 | $ 8,597 | $ 9,072 |





H&R-B44-1400
Confidential Material
Subject to Protective Order

SUMMARY

River Valley Savings Bank will propose to the RTC a plan to acquire an insolvent institution in River Valley's market area. The plan includes the sale of $7.5 million of common stock.

Assuming a continuation of River Valley's business strategy and the benefit of certain operating efficiencies from the merger, the combined institution is projected to earn $10.4 million by calendar year 1994 and to accumulate a total book value of $46.1 million.



H&R-B44-1401
Confidential Material
Subject to Protective Order

# EXHIBIT 1

## RIVER VALLEY LOCATIONS

| Branches | Deposits (000,000) |
|---|---|
| Jefferson Street, Peoria | $ 49.1 |
| Sterling Ave., Peoria | 44.6 |
| Adams Street, Peoria | 43.5 |
| University Ave., Peoria | 38.1 |
| Canton | 35.5 |
| Rock Falls | 34.7 |
| Knoxville Ave., Peoria | 28.1 |
| South Beloit | 22.2 |
| Sterling | 20.6 |
| Bartonville | 20.0 |
| Roscoe | 18.7 |
| Galva | 10.4 |

**Other Offices**

Aurora - River Valley Mortgage Services
Washington Street, Chicago - Holland Partners, Inc.
Michigan Avenue, Chicago - Loan Office

EXHIBIT 2

## HOLLAND PARTNERS, INC.

Holland Partners, Inc. was founded in 1983 by Homer J. Holland (formerly President, Exchange National Bank of Chicago and Senior Vice President, First National Bank of Chicago) as a bank management consulting firm to provide executive level management services to banks and savings and loan associations. Through 1986, the firm focused primarily on chief executive/chief operating officer assignments for thrifts in Illinois and neighboring states together with a limited number of financial strategy studies. These first three years provided the firm with the opportunity to work closely with the thrift regulators and to become particularly sensitive to the challenges facing the savings and loan industry. These assignments have also presented the individual partners with a number of opportunities, as each of the original partners has gone on to take ownership interests and management positions in former client institutions.

In 1987, Holland Partners acquired additional skills to address the investment and asset/liability management functions for financial services institutions. With these additional resources, the firm now provides one of the most critical areas of expertise required for the success and survival of financial institutions.

In 1988, Holland Partners acquired skills in residential loan servicing, loan administration, and residential mortgage securitization. In 1989, a marketing senior vice president was hired to provide another facet of bank management capability for Holland Partners' client organizations.

## ASSET/LIABILITY MANAGEMENT

Volatile interest rates place financial institutions in the position of no longer being able to accept the risk inherent in their portfolios. The ability to effectively manage assets and liabilities, as well as the always onerous interest rate risk, is essential. Ever changing interest rates, continued deregulation of the industry, securitization of mortgage products, shrinking of net interest margin and an constantly growing array of investment products present continuing challenges. However, these also offer multiple opportunities for improved profitability.

The key to survival lies in the ability of the institution to adapt to the realities of the marketplace. The ability to minimize risk, while maximizing return, becomes more challenging as higher cost liabilities and lower yielding quality assets continue to erode the net interest margin. The need for active portfolio management and an understanding of the effects of changing market conditions upon the value of both the portfolio and the institution is essential.



H&R-B44-1403
Confidential Material
Subject to Protective Order

At Holland Partners, an understanding of and the importance of the preservation of value, not only in the investment portfolio but of the institution as a whole, is the foundation of our investment philosophy and strategy. By evaluating the institution from a "net bond" perspective, we feel that we can structure the institution's balance sheet in a manner which allows for a comfortable level of interest rate risk while affording the maximum net interest margin. The "net bond" represents the difference in duration between the asset and liability portfolios, and is a key measurement for estimating the institution's future performance over a wide range of intermediate and long term interest rate cycles. By effectively managing the net bond portfolio mismatch, we are able to quickly and efficiently increase or decrease the duration mismatch for rapidly changing conditions. Pricing of both assets and liabilities at comfortable levels off of the Treasury yield curve, coupled with prudent use of the secondary markets and tools such as swaps, CAP and Collars, affords the institution the ability to continue to profitably do business in all interest rate scenarios. The effective use of hedging tools to offset pricing inefficiencies in the market is essential to successful net bond portfolio management. Hedging tools give an active portfolio manager the ability to react quickly to changes in market conditions.

Holland Partners works with the client's management team in developing objectives for the client's institution as well as the portfolio. We work to incorporate the client's management philosophy into the operating plan and evaluate the portfolio potential for the institution.. After review and approval of the proposed operating strategy, we will implement the strategy within predetermined constraints. Trading activity will be updated orally on a daily basis and in writing on a weekly basis. We encourage input/feedback from the client's management team and highly recommend monthly meetings to discuss and modify operating strategy.

Our primary concern is the protection of the value of the institution with an emphasis on long-term profitability. We feel that the quality of the asset does not have to suffer in an effort to maintain net interest margin. Through the prudent use of the ever changing instruments and markets, we at Holland Partners can improve the profitability of your Institution. As the marketplace continues to evolve, the opportunities to profit from these changes increase. To ignore change is to ignore opportunity. To effectively exploit change requires prudent use of the instruments and the technology which accompany change, as well as a thorough understanding of both. HPI offers an experienced personnel staff who are continually updating their expertise through attendance at seminars, the utilization of research literature and services of brokerage firms, acedemic coursework and subscriptions to professional and trade journals and periodicals. We have in-house access to state-of-the-art analystics systems which allows us to evaluate trading opportunities and financial instruments from a historical perspective as well as the forecasted results.



H&R-B44-1404
Confidential Material
Subject to Protective Order

HOLLAND PARTNERS MANAGEMENT

**HOMER J. HOLLAND**, President: Holland founded Holland Partners in 19[illegible] to provide financial and executive level management services for financial service institututions. He has over sixteen years of senior level management experience in the financial service industry and brings extensive experience in the management and operations areas.

Significant assignments since founding Holland Partners have included: CEO (and 50% owner) of two savings banks with assets of $650 million; COO of a [illegible] billion savings and loan under FSLIC supervision and pending sale to a bank holding company; CEO for a $500 million savings bank and a $2.5 billion mortgage banking company.

Prior to founding Holland Partners, Holland was president of the Exchange National Bank of Chicago, where he directed a significant turnaround and engineered the largest bank merger in Chicago in 20 years. Earlier he was Senior Vice President of the First National Bank of Chicago with responsibilities including: Senior Vice President, Head of Administrative Department; Vice President, Head of Retail Banking; Vice President, Head of Data Processing; and Assistant Vice President, Head of Ship Financing.

Holland's military career culminated in the Office of the Chief of Staff of the Pentagon. His educational achievements include a doctorate in Business Administration from George Washington University, Masters of Science in Physics and in Electrical Engineering from Massachusetts Institute of Technology, and a Bachelor of Science degree from the U.S. Military Academy at West Point where he graduated first in his class.

**STEVEN BANGERT**, Executive Vice President: Mr. Bangert joined Holland Partners in March, 1987 to enhance the expertise in the asset/liability management and investment portfolio management areas. His responsibilities include interest rate risk management, hedging, investment strategies and management, balance sheet and investment portfolio structure, as well as asset and liability pricing. Mr. Bangert brings expertise in the areas of mortgage-backed securities, whole loans, risk controlled arbitrages, interest rate swaps, caps and locks, as well as synthetic and derivative securities.

Mr. Bangert came from a $2 billion savings and loan in Denver where he was Vice President of Rate Risk Management and Loan Marketing. He played an integral part in the creation and development of the Rate Risk Management Department which was key to the profitability of the institution. In recognition of his achievements in the area of interest rate risk management, Mr. Bangert has been a keynote speaker at seminars sponsored by the FHLB in Topeka and San Francisco, the Financial Managers Society National Convention, and the American Bankers Convention. Other responsibilities in Denver included the management of the asset/liability department, the loan marketing department and the money desk.

Mr. Bangert received a Bachelor of Science, with an emphasis in Finance, from the University of Nebraska. He has over ten years of financial and managerial experience in the savings and loan industry.

**RONALD M. PIKUS**, Senior Vice President: Mr. Pikus, who joined Holland Partners in August, 1988, is responsible for the coordination of financial and regulatory reporting for the savings banks and also oversees the loan administration function. The Bank has defined "loan administration" to encompass the operational areas of loan servicing, quality control, and secondary market loan packaging. As Vice President of The Federation of Financial Institutions, a $1 billion loan servicing/consulting company, he had day-to-day management responsibilities for loan servicing and investor reporting. In addition, he established and managed the secondary marketing division of The Federation which assisted in the sale/securitization of over $700 million of mortgages during 1987/1988.

Mr. Pikus holds both MS and MBA degrees and is also a Certified Public Accountant. He has over eighteen years of experience in the thrift and mortgage banking industries.

**DENNIS SCHREIBER**, Senior Vice President - Marketing: Mr. Schreiber joined Holland Partners in June, 1989 in order to expand the marketing program for the savings banks.

Mr. Schreiber came to Holland Partners with extensive experience in the marketing and advertising areas. His twenty-four year career in communications and financial management includes sixteen years with The First National Bank of Chicago, as Advertising Manager (most recently), Banking Center Manager and Director of Customer Relations. As Advertising Manager, Mr. Schreiber was responsible for all aspects television, radio, print, and outdoor media advertising, as well as direct mail campaigns, collateral materials, sales promotions, and point-of purchase displays. While at First Chicago, he developed and executed advertising strategies and tactics to preserve and grow the Bank's market share, and was responsible for the conceptual development and management of an integrated project to standardize the environments of the Bank's 40+ branches.

During a nine-year career with the United States Navy, Mr. Schreiber, as Lieutenant Commander, served as Assistant to the Assistant Secretary of the Navy for Financial Management, and functioned as liaison with congressional staffs and executives at the highest level of the Department of Defense.

Mr. Schreiber holds a Master of Business Administration Degree, Financial Management from the George Washington University, and a Bachelor of Arts Degree, Psychology from Miami University.

**RICHARD J. DALTON**, Vice President: Mr. Dalton joined Holland Partners in April, 1987, in the continuing effort to expand the asset/liability management and investment portfolio areas. His responsibilities include investment strategy, execution, and management. He is also responsible for support work in interest rate risk management and portfolio structure, as well as analytical



H&R-B44-1406
Confidential Material
Subject to Protective Order

support work. Mr. Dalton brings expertise in mortgage-backed securities, interest rate swaps, locks and caps, as well as extensive computer modeling experience.

Mr. Dalton came from a $2 billion savings and loan in Denver where he was actively involved in the rate risk mangement department. His responsibilities included mortgage backed securities trading, arbitrage trading activities and interest rate risk management reporting.

Mr. Dalton received his Masters of Business Administration, with an emphasis in Finance, from the University of Colorado and a Bachelor of Science from the University of Southern Colorado. He has over six years of experience in the savings and loan industry.

**SHARON KRISTOF**, Vice President: Sharon Kristof joined the management group of Holland Partners, Inc. in August, 1988. Ms. Kristof develops and implements mortgage banking functions at savings and loan associations, including underwriting for second markets, quality control and securitization.

Prior to joining Holland Partners, Ms. Kristof spent three years at The Federation of Financial Institutions, Inc., in Cicero, Illinois. Responsibilities at The Federation included investor reporting, mortgage loan quality control review for various client institutions, purchase and sale of servicing rights, securitization of approximately one-half billion dollars of mortgage loans to FHLMC, FNMA, and private investors, and various aspects of general loan servicing.

Ms. Kristof received a Bachelor of Arts degree with a major in accounting from Governors State University, Illinois and is also a Certified Public Accountant. She has four years of experience in the savings and loan/mortgage banking industry.


Confidential Material
Subject to Protective Order

# EXHIBIT T

REGULAR MEETING OF THE BOARD OF DIRECTORS

RIVER VALLEY SAVINGS BANK

The regular meeting of the Board of Directors of River Valley Savings Bank was held at the offices of the Sterling Branch Office of River Valley Savings Bank, 215 Third Avenue, Sterling, Illinois, on Tuesday, December 20, 1988.

Chairman Ross called the meeting to order at 3:20 P.M. and Secretary Marcele Waldschmidt recorded the following members present:

| | |
|---|---|
| HOWARD R. ROSS | HOMER J. HOLLAND |
| CALVIN L. MORGAN | JOHN A. LAWRENCE |
| MARK S. KIPNIS | HARVEY HADDON |

Also present were Kennard Besse, Steve Bangert, Peter Church, and Marcele Waldschmidt.

Haddon moved, Lawrence seconded, to approve the minutes of the November 16, 1988, regular board meeting.

Voting: Aye 6 Nay 0

Kipnis moved, Morgan seconded, to approve the November 30, 1988, report to the Commissioner of Savings and Loans, Balance Sheet, and Income and Expense Report.

Voting: Aye 6 Nay 0

The Board reviewed the Portfolio Overview as of November 30, 1988.

Holland reported on the status of the possible merger of River Valley Savings Bank FSB and Peoria Savings.

After discussion, Kipnis moved, Holland seconded, a resolution to accept a bid from Peat Marwick Main & Co., Peoria, Illinois, to do the auditing and tax accounting for all offices of River Valley Savings Banks.(copy attached)

Voting: Aye 6 Nay 0

Holland presented a report on the status of work being done on benefits for River Valley Savings Bank employees.

Haddon excused himself at 4:35 P.M.

Holland moved, Lawrence seconded,to approve loans and releases as shown on the November 30, 1988, loan report for Rock Falls.

Voting: Aye 5 Nay 0

DEFENDANT'S EXHIBIT DX 194 Holland v. U.S. 95-524C

H&R-BSI-757 Confidential Material Subject to Protective Order

Morgan presented the delinquent loan report for Rock Falls and contents were noted. He also reviewed real estate owned and in judgement.

Kipnis moved, Holland seconded, to approve loans and releases as shown on the November 30, 1988, loan report for South Beloit.

Voting: Aye 5 Nay 0

Church presented the delinquent loan report for South Beloit and contents were noted. He also reviewed real estate owned and in judgement.

Motion by Morgan, seconded by Lawrence, to adopt the following resolution effective as of November 29, 1988, in lieu of a special meeting. (copy attached)

Voting: Aye 5 Nay 0

Mr. Kipnis next reported that dividends were due and payable under the Class "D" Preferred Stock, Class "E" Preferred Stock, and Class "F" Preferred Stock. The institution's Net Adjusted Liquidation Value as of November 30, 1988, before payment of dividends, was $9,451,000 of which $3,451,000 (9,451,000-6,000,000) constitutes Earnings for Class "E" Preferred Stock and Class "F" Preferred Stock purposes. After review and extended discussion, Morgan moved, Lawrence seconded, that the following dividends be paid January 3, 1989:

Class "D" Preferred Stock: $ 75,000;

Class "E" Preferred Stock: $500,000, of which $125,000 is payable in cash and $375,000 accrues as provided in said Class "E" Preferred Stock;

Class "F" Preferred Stock: 5% of Earnings, being $172,550, as defined in the Class "F" Preferred Stock, $62,500 of which is currently payable and $110,000 accrues as provided in said Class "F" Preferred Stock;

and that the beginning Net Adjusted Liquidation Value for computation purposes for determining Class "E" Preferred Stock and Class "F" Preferred Stock Earnings for the fiscal year ending November 30, 1989, is $8,703,000 (9,451,000 - 262,500 cash dividends - 485,050 accrued dividends).

Voting: Aye 5 Nay 0

The Board next considered that certain November 29, 1988, Agreement providing additional compensation to Steven Bangert under certain circumstances. After extended discussion, Kipnis moved, Morgan seconded, that the Agreement be ratified and confirmed by this institution and that the existing common stock certificates have notations affixed on the reverse sides respectively thereof that reflect the existence of said agreement.

Voting: Aye 5 Nay 0

H&R-B51-758
Confidential Material
Subject to Protective Order

CONFIDENTIAL MATERIAL- SUBJECT TO PROTECTIVE ORDER PHO003 0457

Morgan moved, Lawrence seconded, a resolution for the next Board of Directors Meeting to be held at Jumers Castle Lodge, 117 North Western, Peoria, Illinos, on Thursday January 26, 1989, at 10:00 A.M.

Voting Aye 5 Nay 0

Meeting adjourned at 6:05 P.M.

PRESIDENT SECRETARY

H&R-B51-759
Confidential Material
Subject to Protective Order

# EXHIBIT U

# REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION
CHICAGO DISTRICT OFFICE

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| RIVER VALLEY SAVINGS BANK, FSB<br>200 Southwest Jefferson Street<br>Peoria, Illinois 61602 | 7 | 08515 |
| | Type of Examination: Federal Regular | |

Examination commenced: August 20, 1990
Examination concluded: November 8, 1990

Service Corporations and Other Affiliates Which Are a Part of This Report:
Peoria Savers Development Inc.
River Valley Insurance Services, Inc.
River Valley Financial Services, Inc.
P.S. Capital Corporation

## Prohibition of Disclosure or Release

This document is the property of the Office of Thrift Supervision and is furnished to the institution for its confidential use. Under no circumstances shall the institution, or any of its directors, officers, or employees, disclose in any manner the report or any portion thereof to any person or organization not officially connected with the institution as officer, director, employee, attorney, or auditor.

If a subpoena or other legal process is received calling for production of this document, the District Director should be notified immediately. The attorney at whose instance the process was issued, and, if necessary, the court which issued the process, should be advised of the above prohibition, and, referred to Part 505 of the General Regulations of the Office of Thrift Supervision.

Directors, in keeping with their responsibilities, should review this report thoroughly. This report should not be considered an audit report.

EXHIBIT Barpert 2 CRK 7-27-00

PLAINTIFF'S EXHIBIT PX 457

8-20-90

EF-6

REPORT OF EXAMINATION

OFFICE OF THRIFT SUPERVISION
CHICAGO DISTRICT OFFICE

| Name and Address of Institution | District No. | Docket No. |
|---|---|---|
| RIVER VALLEY SAVINGS BANK, FSB<br>200 Southwest Jefferson Street<br>Peoria, Illinois 61602 | 7<br>Type of Examination<br>Federal Regular | 08515 |

Examination commenced: August 20, 1990

Members of the Board:

As required by the Rules and Regulations for Insurance of Accounts, we have conducted an examination of the above-named institution on the date shown above and submit herewith the results of our findings.

Information contained in the supporting schedules of this report is from the institution's books and records. The examiner's comments and conclusions are based on an analysis of information obtained from the institution's records and from other authoritative sources. This report has been prepared for supervisory purposes and should not be considered an audit report.

The comments that follow summarize conditions, policies, practices, and trends which impact on the institution's financial condition. Other major items of concern, not necessarily related to financial condition, are also summarized where appropriate.

/s/Gary J. Curtin, F.T.R.
Examiner-in-Charge
Office of Thrift Supervision

8-20-90

BF-6

Date: August 20, 19

Docket No.: 08515

**INDEX AND ABBREVIATIONS**


| | | Page |
|---|---|---|
| Report Summary | | 1 - 4 |
| Management, Asset Quality, Capital, Risk Management, Operating Results, and Miscellaneous | | 5 - 35 |


APPENDIX


| | | |
|---|---|---|
| Outstanding Enforcement Actions | None | A - 1.1 |
| Directors, Principal Officers and Attorneys | | A - 2.1 |
| Principal Operating Committees | | A - 3.1 |
| Statement of Condition | | A - 4.1 |
| Statement of Operations | | A - 5.1 |
| Key Ratios | | A - 6.1 |
| Deposit/Liability Page | | A - 7.1 |
| Deposit from Other Financial Institutions | None | A - 8.1 |
| Summary of Criticized Assets | | A - 9.1 |
| Summary of Action Required by Criticized Assets | | A - 11.1 |
| Classified Assets | | A - 12.1 |
| Assets Subject to Special Mention | | A - 13.1 |
| Loans in Process and Commitments | | A - 14.1 |
| Concentrations | Omitted | A - 15.1 |
| Gap Report Assumptions | | A - 16.1 |




8-20-90

EPL

WON034 1061 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 199 Docket No.: 08515

## INDEX AND ABBREVIATIONS

Page


Interest Rate Risk Exposure Report . . . . . . . . . . . . . . . . . . . . . A - 17.1

Service Corporations . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 23.1

Other Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A - 24.1

Financial Reporting Errors . . . . . . . . . . . . . . . . . . . . . . . . A - 25.1

Violations of Laws or Regulations . . . . . . . . . . . . . . . . . . . . A - 26.1


## ABBREVIATIONS USED IN THIS REPORT

P = President
EVP = Executive Vice President
VP = Vice President
CB. = Chairman of the Board
MO = Managing Officer
CEO = Chief Executive Officer
COO = Chief Operations Officer
SVP = Senior Vice President
AVP = Assistant Vice President
S = Secretary
AS = Assistant Secretary
T = Treasurer
AT = Assistant Treasurer
C = Controller
D = Director
AD = Advisory Director
DE = Director Emeritus
A = Attorney
IVP = First Vice President
SO = Savings Officer
* = Omitted, no items of concern
# = Not applicable or none



8-20-90 EFrb

WON034 1062 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 - CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

## REPORT SUMMARY

A comprehensive report of examination ("Report") of the institution was begun on August 20, 1990, using financial data as of July 31, 1990. A review of the wholly-owned service corporation was included in the examination process.

### Overview

The comments in the Report of Examination discuss several major areas of concern which require immediate corrective action by the Board. Losses disclosed during the examination have rendered the institution a capital failure at July 31, 1990. Other major areas of concern were the level of classified assets and transactions between affiliates.

### Compliance with Capital Regulations

The institution was not in compliance with the capital requirement of 12 C.F.R. Section 567.2 at July 31, 1990. Tangible capital was $4,428,000 or 1.1% of tangible assets at July 31, 1990, after losses identified during the examination are recognized. The tangible requirement was $6,250,000 at July 31, 1990. After capital was adjusted by losses contained in this report core and risk-based capital were short of the required levels by $1,822,000 and $147,000, respectively.

The continued operation of this institution without an adequate level of capital is an unacceptable practice that must be corrected immediately. The board is directed to submit to this office a plan detailing management's strategy to maintain capital at adequate levels.

### Compensation

Ross

Salaries and bonuses paid to Messers. Holland and Rose appear to be excessive. The board is directed to review the salaries and bonuses of Messrs. Holland and Ross to determine if they are reasonable and in compliance with 12 C.F.R. section 563.161(b). The findings of that review will be submitted to OTS manager for review.



8-20-90 E-R-6

WON034 1063 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Investment Activity

The investment portfolio is managed by an affiliated company, Holland Partners, Inc. (HI). HPI maintains financial modeling capabilities for all of the mortgage derivatives. Individual files are maintained for each investment including updated scenario analyses. Mortgage derivatives are accounted for under Financial Accounting Standards 91 (SFAS 91). However, the minutes of the board of directors meetings did not contain any written rationale for the investment in high risk mortgage derivatives. The institution must document that the board is fully informed. The rationale for the investment in these instruments should be included in the presentation to the board and documented accordingly. In addition, the hedging characteristics of these investments need to be established prior to investment and on a regular basis thereafter. The board is directed to keep this office informed of activity in this area through the use of reports being developed for this purpose.

In the future, residual and interest only stripped mortgage backed securities which do not have hedge value should be accounted for at the Lower of Cost or Market (LOCOM). The examiners recommend that the institution not purchase any additional high risk mortgage derivatives until the institution is in compliance with the fully phased-in capital requirements.

The institution had an investment of $65.3 million in residuals purchased for tax purposes (Phantoms). These assets were purchased to take advantage of tax-loss carryforwards. The institution has not identified the regular portion of these residuals for its hedge value nor has it analyzed the returns under different interest rate scenarios. The examiners recommend that the institution prepare a quarterly estimate of the expected phantom income and loss for all phantom residuals. This estimate should also show the expected phantom income and loss over the life of the collateralized mortgage obligation (CMO). In addition, management should review the assets for potential unidentified risks.

Borrowings

As of July 31, 1990, borrowing under reverse repurchase agreements and fixed coupon dollar reverse repurchase agreements totaled $125.3 million or 30.2% of liabilities. This amount is excessive. The examiners recommend that the balance of these borrowings be reduced. In addition, it is required that the underlying securities be retained in portfolio unencumbered for 35 consecutive days in each 12 month period. — why?

Futures

In April and May 1990, the institution entered into various Treasury note futures contracts matched against fixed rate private pass-through securities maintained in portfolio. These positions were open for periods ranging from five to 22 days. The examiners recommend that losses from futures positions open for short time periods be recognized over the time period for which they offer protection against interest rate changes, not the life of the matched asset or liability.



8-20-90

EF-6

WON034 1064 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Classified Assets

At July 31, 1990, the institution's level of classified assets totaled $7,152,228 or 95.6% of the sum of tangible capital and general valuation allowances. After classified losses were applied against reserves, the result was $6,532,804 or 125.7% of the tangible capital and general valuation total.

Due to the above mentioned items and other lending-related problems discussed elsewhere in this report, the Board is directed to provide this office with its plan to reduce the level of classified assets. In addition, the Board is directed to submit to this office a revised commercial lending policy. These items should be provided to this office within 60 days.

Executive Committee Minutes

The examination revealed that the full board of directors had not approved minutes of the executive committee in all instances. It is the responsibility of the Board to implement procedures to ensure that proper oversight is conducted. The Board is directed to institute procedures to ensure that actions of the principal operating committees are ratified by the directorate. The Board, as part of its response to this report, should provide a detail of these procedures.

Board of Director Expense Accounts

Directors' expense accounts are not brought to the attention of the full Board. Presently, these expense accounts receive the approval of President Ronald Pikus. The expense account activity becomes noteworthy on occasion. ?? Expense account activity should receive periodic approval by the board of directors. The Board is directed to submit to this office planned revisions to current approval procedures.

Chairman Ross' Chicago Office

It is inappropriate for the institution to pay for the rental on the office which is not used exclusively on the business of the institution. Please provide this office with an explanation of why this expense has been assumed by the institution. Also provide this office with a detail of what will be done to correct this situation. Although this was discussed at the examiners' meetings with management and the board, a written response is required to clarify this issue and formalize your position.



8-20-90

5F6

Date: August 20, 1990

Docket No.: 08515

Federal Reserve Act Sections 23A, 23B and 22h

The institution engaged in transactions with affiliated parties which resulted in violations of the Federal Reserve Act. These transactions if continued without remedy, could result in the assessment of civil money penalties. It was noted that some of these exceptions will be corrected by the merger of the two River Valley institutions. The Board is directed to submit to this office a description of actions taken to address the requirements of the above noted regulations.

Based on the analysis performed during this examination, your institution has been assigned a composite rating of "4". The composite rating is a qualitative assessment of all the MACRO performance factors. Institutions in this group generally have an inadequate level of capital, or a combination of other conditions that are unsatisfactory. Major and serious problems or unsafe and unsound conditions may exist which are not being satisfactorily resolved by the institution. Unless prompt action is taken to correct these conditions, they could reasonably develop into a situation that could impair future viability. A potential for failure is present but is not pronounced. Institutions in this category require close supervisory attention and financial surveillance. Institutions with a positive net worth but that do not meet regulatory required minimal capital requirements would normally be assigned this rating. Also, profitable institutions that meet regulatory capital requirements, but have negative tangible capital, may be assigned this rating. (Tangible capital is defined as capital, less intangible assets such as goodwill and deferred losses.)



8-20-90

EPG

WON034 1066 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990

Docket No.: 08515

MANAGEMENT

A comprehensive review of the management area was performed to evaluate the supervision and administration performed by the directors and management. This review included an analysis of established objectives, policies, and the effectiveness of management's implementation of those policies and objectives. Reports to the board and internal review systems were assessed.

The institution's full board has not been sufficiently informed of all significant decisions affecting the institution. Transactions with affiliated organizations have resulted in violations of Sections 23A and 23B of the Federal Reserve Act. Board member expense account activity has not received approval. On January 24, 1990, a new managing officer assumed responsibilities. The directorate experienced numerous changes during the review period.

1. Executive Committee Minutes

Executive committee actions have not always received approval from the board of directors. The full directorate, comprised of 12 members, meets on a quarterly basis. The institution's executive committee holds meetings on the intervening months that the full board does not meet. The committee, which consists of Homer J. Holland, Howard R. Ross and Steven Bangert, was empowered by the board with extensive authority. According to the institution's bylaws, the executive committee shall have all of the authority of the board of directors with the exception of declaring dividends, amending the charter or bylaws, and disposition of substantial assets of the institution. The committee minutes were sporadically reviewed and approved.

A review of the quarterly board packets revealed that the executive committee minutes reviewed were only for the meetings immediately preceding the regular board meeting. The examiners note that it is the responsibility of the board members to be informed of all decisions affecting the safety and soundness of the institution.

The executive committee approved management bonuses totaling $262,500 that directly benefited the members of the committee. This is a violation of the institution's bylaws and 12 C.F.R. Section 552.6-1(g).

Mr. Ronald Pikus said that management has not been as attentive as it should have been to insure that all executive committee minutes were included in each quarterly board package, approved and the approval so noted in the minutes of that Board of Directors' meeting. Mr. Pikus said that all executive committee minutes will be compiled and presented to the board for their approval at the October 1990 meeting. He added, that to insure that all future committee minutes are presented to the board, the minutes of all meetings will become an agenda item and approval so noted in the meeting.



8-20-90

EF-6

WON034 1067 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Mr. Pikus said that the executive committee was not aware of the regulation regarding beneficial approvals. He said that the bonuses in question have received full board approval. Mr. Pikus added that bonuses or management fees directly benefiting Howard Ross, Homer Holland or Steven Bangert will be initiated and approved by the full board of directors.

2. Affiliated Transactions

The institution engaged in transactions with affiliated parties, River Valley SB, Rock Falls and Holland Partners Inc. (HPI), that resulted in violations of Sections 23A and 23B of the Federal Reserve Act. HPI is a wholly-owned subsidiary of River Valley Savings Bank, Rock Falls. In addition, a loan to an institution officer was granted at favorable terms and constituted a violation of Section 22(h) of the Federal Reserve Act (12 U.S.C. Section 375b). Specifically, the following violations were noted:

A. Competitive bids were not obtained prior to the signing of a consulting service agreement between HPI and the institution [Section 23B(a)(1)(A)]. HPI has performed executive management functions for the institution since its inception. A consulting agreement between HPI and the institution was executed on July 31, 1990. Among the services performed by HPI according to the agreement are marketing, pipeline management, portfolio management, mergers and acquisitions. The current monthly fee is approximately $76,000. Prior to the July 31, 1990 agreement the monthly fee was $97,500.

Mr. Pikus said that the value of the consulting services provided by HPI to the institution is tied to the unique levels of expertise which each segment of the HPI group possess. He said that management is not aware of any one consulting firm which combines the executive, asset/liability and marketing management talent specializing in the thrift business as the HPI group does.

Mr. Pikus added that the pricing structure of the consulting agreement was developed in such a way that would allow HPI to devote virtually its full efforts to River Valley while maintaining the company's profitability at a break even level. He said that the issue will be a moot point if the proposed merger is consummated. Mr. Pikus said, however, that efforts will be made to obtain the requested market quotes.



8-20-91

EF-6

B. Escrow funds were kept at River Valley Savings, Rock Falls, after mortgage loan servicing was transferred to River Valley, Peoria in April 1990. At the time of the transfer, an accounts receivable for the funds of $1,217,000 was established on Peoria's general ledger. A corresponding liability account for the escrow funds was established. On June 7, 1989, payments made by Rock Falls reduced this amount to approximately $861,000. In August 1989, the escrow account for Rock Falls loans was $819,193, indicating a difference between the escrow account and the account receivable account of $41,800. This amount represents funds advanced by the servicer in excess of the amount collected in cash. The advancement of these funds is considered an unsecured extension of credit to Rock Falls. Section 23A(c)(1) of the Federal Reserve Act requires that all extensions of credit to an affiliate be secured at the time of the transaction by collateral having a market value meeting the requirements further described in that section.

Mr. Pikus said that the agreement between Rock Falls and Peoria regarding loan servicing does not transfer the servicing rights to Peoria. He said that it is management's position that the escrow funds are among the assets of Rock Falls and that it has the right to maintain those deposits notwithstanding the servicing agreement. Mr. Pikus said that management may request that Rock Falls transfer the funds to Peoria.

C. A loan to Vice President Jill Brickman, dated May 24, 1990, was granted with terms more favorable than those available to the general public. The favorable treatment involved the institution waiving one point. According to the institution's rate sheet, the applicable mortgage loan terms at the time of the loan closing were 10.0% with 2.25 points. Ms. Brickman was charged only 1.25 points. Other loan terms appear to be similar to comparable transactions.

Mr. Ronald Pikus said that the board of directors adopted a loan policy for directors, officers and employees in October 1989. The policy states that loans to affiliates will be granted at terms similar to the general public. He stated that an internal loan pricing sheet states that one point will be waived for all loans to employees and affiliates. Mr. Pikus said that the pricing sheet will be changed to conform to the current loan policy. He added that the employee would be approached to pay the additional point.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

3. Directors' Expense Accounts

The institution's board of directors does not currently approve officer or board member expense account activity. The institution is presently incurring full expenses to maintain an office for a director, however, a determination was not available as to the time allocated to institution business.

Directors' expenses are currently approved by President Ronald Pikus. The expenses are not brought to the attention of the full board of directors. The examiners note that the board members incur expenses for meals and entertainment that on occasion become noteworthy. For the months of June and July 1990, Chairman Howard Ross' meal expenses totaled $2,281. These expenses received Mr. Pikus' approval.

Mr. Pikus said that he believes a formal policy addressing approval of directors' and officers' expense accounts should be adopted. He said that he will make that recommendation to the audit committee.

The examiners noted that the institution has been maintaining a Chicago office for Chairman Ross since May 1990. The monthly rental fee is $4,055. In addition, a full-time secretary is employed at the office at an annual salary of $27,000.

Mr. Ross has had an office at the Chicago location since 1980. The original lease was signed by Ross & Stone. The examiners noted in their review that lease payments continue to be addressed to Ross & Stone. Mr. Stone is a former business associate of Mr. Ross. It could not be determined by the review the amount of time Mr. Ross devotes to institution business. In addition, it was unclear, what amount of time the full-time secretary devotes to the institution. The examiners note that the office space rental did not receive approval of the full board.

Mr. Pikus said that Howard Ross' office expenses were paid because the board believed that the Chairman should have an office to conduct institution business. He stated that due to Mr. Ross' varied business interests, it is difficult to quantify the time devoted to institution business. Mr. Pikus said that because the institution is one of Mr. Ross' most recent business acquisitions, a great deal of his attention has recently been focused on institution operations. The board will request that Chairman Ross make an attempt to quantify his time devoted to the institution. At meetings with Mr. Ross at the end of the examination, it was indicated that approximately 95% of his time is related to River Valley business. He also explained that HPI and other River Valley entities had previously occupied space in that office.

4. Newly Appointed President

The board of directors appointed Ronald Pikus to succeed Homer Holland as President of the institution on January 24, 1990. Prior to his being appointed president, Mr. Pikus was a consultant with HPI. Mr. Pikus' responsibilities included coordinating the loan servicing staffs of Peoria and Rock Falls and assisting in the merger activities of the two institutions. Mr. Pikus has been associated with the banking industry since 1979.



8-20-90 EF-6

WON034 1070 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

5. Directorate Composition

The directorate has experienced numerous changes in composition since the previous examination of June 26, 1989. Harvey Hadden and John Lawrence respectively submitted their resignations in April and May 1990. Michael Rothman was elected to fill a vacancy in June 1990. Due to a technical violation, he resigned in July 1990, however, was reinstated in August 1990. Thomas Ladd was elected to the board at the March 1990 meeting. Currently, there are 11 board members. The institution's bylaws require 12 members.

Mr. Ronald Pikus said that a recommendation will be made to the board at the October 1990 meeting to amend the bylaws. The recommendation will be to have a board consisting of a minimum of 10 and no more than 12 directors.

6. Officer's Bonuses

The review revealed that Messrs. Holland and Ross received the following compensation for the year-ended 1989. Also included is a detail of the present salary schedule for the two shareholders of the institution:

| | 1990 | | 1989 | |
|---|---|---|---|---|
| | Bonus | Salary | Bonus | Salary |
| Homer Holland | $300,000 | $ 0 | $300,000 | 0 |
| Howard Ross | 175,000 | 75,000 | 175,000 | 0 |
| Totals | $475,000 | $75,000 | $475,000 | 0 |

The 1990 bonus totals are anticipated amounts for the year. The amount is based on the institution's current monthly accrual of $50,000 per month. Management stated that the accrual account was established in anticipation of paying out bonuses similar to those in 1989. Bonuses totaling $600,000 were paid out in 1989. The remaining $125,000 was paid to Steven Sangert of BPI.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

ASSET QUALITY

The review of asset quality focused primarily upon credit risks associated with the institution's lending and investment decisions. Also given significant attention were reviews of problem assets and the adequacy of loss allowances.

The overall conclusion was that management has established sound operating policies and procedures, and maintained substantial compliance with the Board of Directors' approved policies and procedures. The institution's present lending activity does not contain credit risks that would warrant material concern. The examiners made recommendations with regard to the institution's present classification of asset policy and the commercial lending policy. The classification of two investment securities caused the institution to exceed assets classified at the previous examination of June 26, 1989.

1. Assets Covered Under FSLIC Assistance Agreement

As part of the assistance agreement dated July 29, 1988, FSLIC agreed to cover losses on certain assets which were acquired by the institution through the merger.

There are three groups of loans specified in the agreement. The three groups of loans total $7.8 million down from the $29 million at the previous examination. This decrease is attributed to the payoff of some of the larger loans and some of the performing loans no longer being covered. Any of the loans that had not been 90 days or more delinquent prior to January 1990 had their coverage expire. Two of the pools have their coverage expire in July 1991 and the third pool coverage expires in July 1993. Of the remaining $7.8 million of covered assets, $350,000 were considered classified.



8-20-90 EF-6

WON034 1072 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER.

Date: August 20, 1990 Docket No.: 08515

2. Classified Assets

Classified assets at July 31, 1990, were $7,152,228 or 123.0% of the tangible capital and general valuation total. The July 31, 1990, classified asset total consists of losses of $619,424 and $6,532,804 considered substandard. The losses are comprised of $619,424 of loan and real estate owned (REO) unreserved losses. In addition, $1,665,573 of losses resulting from the lower of cost or market markdown of two investment securities were required by the new OTS policy. Specific allowances for the indicated loan and REO losses were established in August and September 1990. (See pages 12.1 through 12.7 and the Risk Management section for additional details.)

The classified asset total at July 31, 1990 represents an approximate decrease of $786,000 from the previous examination. Our initial review disclosed a significant increase attributable to the classification of investment securities and a contingent liability. A credit enhancement issued to RESCORP accounted for $2 million of the total. (See page A-12.7 for details.) The asset for which the enhancement was issued was classified at the June 11, 1990 examination of RESCORP.

Management agreed to classify the assets considered substandard and loss by the examiners. Management had not been classifying REO as substandard. Senior Vice President Gary Richardson stated that in the future REO would be classified.

3. New Lending

A. Real Estate Loans

Since the previous examination, the institution has granted 1,828 loans totaling approximately $64 million. Of that amount, $56 million are loans secured by real estate, with $34 million subsequently sold to FNMA and FHLMC. The remaining loans in portfolio are variable rate loans, commercial real estate loans or loans that do not meet the underwriting guidelines of FNMA or FHLMC. The majority of the loans that do not meet the underwriting guidelines are a result of the loans having principal balances higher than the amount currently being purchased by FNMA or FHLMC. The institution currently underwrites loans according to FHLMC standards. Presently, the institution has an outstanding commitment to sell $5 million of loans to FHLMC.

Of the 181 loans kept in portfolio, 18 files were reviewed. The review disclosed documentation deficiencies, however, none of the exceptions were considered to be material or represent a trend. The exceptions were discussed with the lending department and steps were taken to correct them. Since the majority of the originated loans are sold to FNMA or FHLMC, management has instituted procedures to ensure proper documentation.

A review of the appraisal policy indicated that the policy did not conform to the requirements of 12 C.F.R. Section 563.171. Senior Vice President Sharon Kristof stated that a new appraisal policy would be adopted and implemented by the board.



8-20-90 EP-6

Date: August 20, 1990 Docket No.: 08515

B. Commercial Loans

Since the previous examination, 56 commercial non-real estate loans were granted of which 17 were reviewed. Minor exceptions were noted and discussed with the the lending department. The review revealed that the institution's commercial loan policy needs enhancement. The policy as written states that "the institution will not make loans to anyone who did not have a business relationship prior to April 1, 1989 and that the loans would be case by case by designated management."

The examiners recommended the following additions to the policy:

1. Types of loans to be granted. (Secured and Unsecured)
2. Downpayment requirements.
3. Loan maturities for the various types of loans.
4. Sources of repayment.
5. Minimum credit and documentation required for underwriting.

Mr. Gary Richardson stated that the commercial loan policy would be updated to include the underwriting requirements presented above.

CAPITAL

A comprehensive review of the institution's capital adequacy and composition was performed. The review included the effectiveness of the board of directors, monitoring and capital adequacy planning by management, and accounting practices as they relate to the capital accounts. Current and projected earnings, current and proposed activities, and risks inherent in the institution's current balance sheet structure were reviewed. Compliance with the minimum requirements for tangible, core and risk based capital were also reviewed.

At July 31, 1990, prior to the losses identified during the examination, the institution met each of the three capital requirements. However, the $2,284,997 ($1,665,573 of residual LOCOM adjustments and $619,424 of classified assets) of identified losses reduced capital to deficient levels. (12 C.F.R. Section 567.2) The institution's GAAP and tangible capital at July 31, 1990 was reduced to $4,428,000 or 1.1% of tangible assets. The institution's capital structure was modified during the review period. The institution's classified asset total, after adjustments, of $6,532,804 or 125.7% of the tangible capital plus general valuation allowance total presents a significant risk to future capital levels.



8-20-90 BF-6

WON034 1074 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

1. Capital Adequacy

At the onset of the examination, the institution was in compliance with each of its three capital requirements at July 31, 1990. GAAP and tangible capital totaled $6,713,000. However, the $2,285,000 of losses identified at the examination caused the institution to be a capital failure for each of the requirements at July 31, 1990.

The institution's tangible assets of $416,662,000 at June 30, 1990 required capital of $6,250,000. Tangible capital totaled $4,428,000 at July 31, 1990, or 1.1% of tangible assets at June 30, 1990.

The core capital requirement was $12,500,000 at June 30, 1990. The institution was allowed to include supervisory goodwill of $6,250,000 as core capital. Accordingly, core capital totaled $10,678,000 at July 31, 1990.

At June 30, 1990, the risk weighted assets of $259,245,000 required risk-based capital of $16,592,000 to meet the 6.4% requirement. Risk-based capital was $16,445,000 at July 31, 1990.

2. Capital Accounts

During the review period capital account items were redeemed and modified. Details of the changes in capital composition since the previous examination, prior to the losses identified at the examination, follow:

| Account Description | Balance at May 31, 1989 | Balance at July 31, 1990 |
|---|---|---|
| Subordinated Note Payable | $ 4,600,000 | $ 0 |
| Common Stock | 1,000 | 1,000 |
| Preferred Stock: | | |
| Class A - 50,000 shares authorized and issued; 8% cumulative | 5,000,000 | 5,000,000 |
| Class C - 5,000 shares authorized and issued; $100 cumulative | 5,000,000 | 0 |
| Class C - 5,000 shares authorized and issued; $100 non-cumulative | 0 | 5,000,000 |
| Class D - 100,000 shares authorized and issued; .75% cumulative | 1,000 | 0 |
| Class E - 100,000 shares authorized and issued | 1,000 | 0 |
| Class F - 100,000 shares authorized | 1,000 | 0 |
| FSLIC Assistance | 8,000,000 | 0 |
| Retained Earnings | 736,000 | 1,712,000 |
| Total Capital | $23,340,000 | $11,713,000 |



8-20-90 EF-6

WON034 1075 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The $4.6 million subordinated debt was retired on December 21, 1990. The Class C preferred stock was sold to American National Bank (ANB) of Chicago, Illinois in the first quarter of 1990 and the stock converted to non-cumulative. The D,E and F stock classes were redeemed in the first quarter of 1990. This was in part due to a Supervisory Directive issued at the previous examination. It was noted that dividends were declared and paid on the stock prior to their issuance.

The FSLIC Assistance total equals the amount of goodwill recorded that was in excess of GAAP goodwill. The amount, which totals $7,268,000 at July 31, 1990 after amortization during the period, is included in the institution's core capital total.

3. Preferred Dividend Payments

For the period June 1, 1989, through July 31, 1990, the institution's board of directors declared and paid out dividends totaling $877,688. Supervisory approval is pending for third quarter dividend payouts of approximately $220,000 on the two preferred stock issues.

A. Dividend Calculations

The holders of Classes A, B, and C are paid dividends in accordance with the supplementary section to the federal stock charter. Class A preferred dividends, 8% cumulative, are paid on a quarterly basis in the fixed amount of $100,000. Class B preferred dividends, 8% cumulative (currently no shares are outstanding) are also paid on a quarterly basis. Class C preferred dividends, based on 90% of American National Bank's prime rate at the quarter end, are payable quarterly.

B. Redemption Provision

Classes A and B are redeemable at the option of the institution. Class C is not redeemable by the institution except upon the prior written consent of the institution's board of directors. The institution has made an offer to the FDIC to redeem the Class A stock for $3,034,000. There has been no response as to whether this offer will be accepted.

4. Capital Maintenance Agreement

In concurrence with the assistance agreement dated July 29, 1988, Messrs. Ross and Holland and the institution entered into a Regulatory Capital Maintenance and Dividend Agreement with the FSLIC. Messrs. Ross and Holland agreed to maintain the institution's regulatory capital at the level required per Section 563.13(b) of the insurance regulations. The institution requested that the agreement be terminated due to the capital infusion of $5.0 million by Messrs. Ross and Holland thereby satisfying Section 7(c) of the agreement. On July 18, 1990, Supervision determined that Messrs. Ross and Holland's capital infusion did constitute a satisfaction of the agreement and the Capital Maintenance Agreement was terminated.



8-20-90. EF-6

Date: August 20, 1990 Docket No.: 08515

RISK MANAGEMENT

A comprehensive review of the risk section was performed to evaluate the adequacy of established policies and procedures to manage the investment and interest rate risk areas. Emphasis was placed on determining the risks the institution's investment activities and interest rate risk position present to capital. Board reports were reviewed to determine the adequacy of the current reporting system.

The review revealed several areas of concern that pose risks to the institution's future capital position. A summary of the different areas of review and an expanded analysis of each follows.

Summary

The residual interests in two collateralized mortgage obligations (CMOs) with a balance of $8,067,044 or 1.89% of assets and 120.2% of tangible capital have required a LOCOM writedown of $1,665,573. As a result of the LOCOM writedown, the institution was not in compliance with the tangible and core capital requirements. The examiners recommend that the institution not purchase any additional high risk mortgage derivatives until the institution can demonstrate that it will be in compliance with the fully phased-in capital requirements.

The balance of high risk mortgage derivatives was $23,472,594 or 5.49% of total assets with a weighted average estimated economic yield of 8.87%. The unrealized losses on these investments were $1,946,846 or 29% of tangible capital before adjustment for any specific reserves recommended by the examiners. The examiners have not required LOCOM adjustments for residuals with a book value of $2,372,785 and securitized excess servicing of $1,563,386 for a total of $3,936,171 or 58.64% of tangible capital because these investments were considered to have hedging characteristics. If the potential return characteristics from these investments changed and were deemed not to have hedge value, these assets could require application of LOCOM adjustments.

The minutes of the board of directors meeting did not contain any written rationale for the investment in high risk mortgage derivatives but did contain the expected returns from these investment under different interest rate and prepayment scenarios. The examiners recommend that the rationale for the investment of all high risk mortgage derivatives be included in the board minutes.

The balance of Super Principal Only (Super POs) securities was $8,475,814 or 1.98% of assets. The unrealized losses on these investments totaled $1,548,405 or 23.07% of tangible capital. The expected accounting yield on these investments was 4.29% or 3.65% less than the cost of funds at July 31, 1990. The examiners recommend that the institution voluntarily writedown the Super POs by an amount between $1,548,405, the unrealized loss at July 31, 1990, and $2,327,913, the amount necessary to increase the yield on the investment to equal the expected yield at purchase. This writedown would not be required by generally accepted accounting principles or the Asset Classification Regulation.



8-20-90 EF-6

WON034 1077 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

As of July 31, 1990, borrowing under reverse repurchase agreements and fixed coupon dollar reverse repurchase agreements totaled $125.3 million or 30.2% of liabilities, an increase of $34 million since the previous examination. The amount borrowed under these agreements was excessive and the examiners recommend that the balance of these borrowings be reduced.

The institution's market value of portfolio equity (MVPE) decreased by 104.5% in an interest rate scenario of +4.0%. This percentage decrease would be higher and the institution would have exceeded the board limits for percentage decreases in MVPE under the +2.0 interest rate scenario if the examiners' estimated values for the residuals were used by the institution in the base case calculation. The examiners recommend that the potential decrease in MVPE should not exceed a percentage decrease of 50% and 100% in interest rate scenarios of +2.0% and +4.0%, respectively.

The balance of tax motivated residuals (phantom residuals) was $65,294,098 or 15.3% of assets at July 31, 1990. These investments were recorded in the 20% risk category rather than the 100% risk category as required by the Capital Regulation. The institution was in compliance with the risk based capital requirements at July 31, 1990 when these investments were included in the 100% risk category. Most of these tax motivated residuals will be repaid in one year or less. However, one issue has a regular residual component in the approximate amount of $1.8 million. This residual has not been identified as a hedging vehicle nor have the expected returns been documented under different interest rate scenarios.

The primary concern with the hedging activities involved Treasury note futures which were open for short time periods. These positions were matched against long term fixed rate mortgage backed securities (MBS). The deferred losses from these positions totaled $167,579 or 2.5% of tangible capital before the losses required by this examination are applied. Although the correlation between these futures losses and the change in value of the matched assets was high, the futures positions only provided protection against increasing interest rates during the period the futures positions were open. The futures losses were deferred over the expected life of the matched assets which was approximately seven years. The examiners recommend prospectively that any futures positions open for short time periods which are matched against assets or liabilities be recognized in conjunction with the economics of the transactions.

The institution has maintained MBS on dollar roll for over one year without removing these securities from dollar roll and retaining these securities in portfolio unencumbered for 35 consecutive days. There was no recommended adjustment at July 31, 1990 as a result of these transactions.



8-20-90 CF-6

WON034 1078 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND CF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The investment portfolio was managed by HPI, a wholly owned subsidiary of River Valley Savings Bank, Rock Falls and an affiliate of River Valley Savings Bank, F.S.B. Management had financial modeling capabilities for all of the mortgage derivatives. Individual files were maintained for each investment including updated scenario analysis. HPI estimated the yield for each mortgage derivative quarterly based on an appropriate estimated prepayment rate. These estimates were used to account for these investments under Statement of Financial Accounting Standard 91 (SFAS 91). Treasurer and Executive Vice President of HPI, Steven Bangert, said all mortgage investments were reviewed at the end of each year to determine that these investments were recorded in accordance with SFAS 91.

1. Investment Portfolio

As of July 31, 1990, the investment portfolio totaled $227,460,034 or 53.23% of assets. The weighted average yield on the portfolio was 11.63%. However, if the yield from the phantom residuals, which were expected to be repaid in less than one year, were excluded, the portfolio yield would decline to 9.73% or 1.79% greater than the cost of funds. The investment portfolio was comprised of the following securities:

| Description | 7-31-90 Book Value | (%) Yield | 5-31-89 Book Value |
|---|---|---|---|
| Liquidity Investments | $ 15,188,225 | 8.88 | $ 15,679,658 |
| Phantom Residuals | 65,294,098 | 16.35 | 0 |
| High Risk | | | |
| Mortgage Derivatives | 23,472,593 | 8.70 | 42,292,878 |
| Securitized ARMs | 72,479,944 | 10.00 | 119,839,965 |
| Fixed Rate MBS | 29,061,334 | 9.87 | 34,533,978 |
| Private Pass Through | 15,854,258 | 9.83 | 0 |
| Agency Multi Family | 3,939,045 | 9.05 | 300,000 |
| Corporate Notes | 2,110,536 | 14.89 | 2,000,000 |
| Other Investments | 60,000 | 6.60 | 60,000 |
| Totals | $227,460,033 | 11.63 | $214,706,479 |

The primary changes in the mortgage related securities portfolio since the previous examination were the purchases of the phantom residuals, the reduction in the ARM portfolio and the sale of a portion of the high risk mortgage derivatives.



8-20-90 EF-6

WON034 1079 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The institution has used portions of the gains realized from the sales of high risk mortgage derivatives to reduce the book values of high risk mortgage derivatives retained in portfolio. In December 1989, the institution sold two IOs with an aggregate book value of $4.5 million for a loss of $315,967. This loss was offset by a gain from the sale of a Super PO. In May 1990, Interest Only Strips (IOs) with an aggregate book value of $9.9 million were sold for gains of $158,895. These gains were used to reduce the book value of the Super POs. In August 1990, the remaining portion of the IO portfolio was sold and the gains of $229,470 were used to reduce the book value of the Super POs. The unrealized gains for IOs at July 31, 1990 was $232,330.

Mr. Bangert said the primary business objective of the institution is to originate and service loans. He said however, there is not sufficient loan demand in the Peoria area. He said the investment portfolio is used to support the deposit base and maintain current earnings. He also said the securities in portfolio were all identified for investment.

2. Mortgage Derivative Portfolio

At July 31, 1990, the mortgage derivative portfolio totaled $88,766,691 or 20.77% of assets. Of this total, high risk mortgage derivatives totaled $23,472,594 or 5.49% of assets and the weighted average yield for these investments was 8.87% or .93% in excess of the cost of funds. The unrealized losses on these investments were $1,946,846 or 29% of tangible capital before adjustments for the specific reserves recommended by the examiners. The following tabulation recaps each of the components of the portfolio:

| Description | Book Value 7-31-90 | Weighted Average Yield (%) | Unrealized Gain (Loss) |
|---|---|---|---|
| Phantom Residuals | $ 65,294,098 | 16.35% | |
| Residuals | 10,439,829 | 9.72% | ($ 535,144 ) |
| Super POs | 8,475,814 | 4.83% | (1,548,405 ) |
| Interest Only Strips Securitized | 2,993,564 | 12.07% | |
| Excess Servicing# | 1,563,386 | 18.96% | 136,703 |
| Total | $ 88,766,691 | 14.44% | ($1,946,846)* |

\# Securitized

* The unrealized gains from the IOs which totaled $232,330 were not included in the total unrealized losses because the IOs were sold in August 1990.



8-20-90

EF-6

WON034 1080 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

3. Non-Tax Related Residuals

The residuals and the estimated accounting yield (far right-hand column) which differs from the expected economic yield indicated in prior tabulations for these residuals at July 31, 1990 were as follows:

| | 7-31-90 | | Assumptions | | | |
|---|---|---|---|---|---|---|
| Description | Book Value | Estimated Value | Yield(%) | PSA(%) | Unrealized Gain/(Loss) | Estimated Yield |
| ML Trust 36 | $ 5,468,380 | $4,289,595 | 14 | 143 | $(1,178,785) | 3.5% |
| CMOT 54 | 2,598,664 | 2,111,876 | 14 | 310 | (486,788) | 2.0% |
| DBL Series E | 2,372,785 | 3,503,214 | 14 | 170 | 1,130,429 | 10.0% |
| Total | $10,439,829 | $9,904,685 | | | $ (535,144) | 4.6% |

The following table summarizes the residuals which under OTS policy require a LOCOM adjustment because they were not deemed to show hedging characteristics.

| Description | Book Value | Market Value | Loss |
|---|---|---|---|
| ML Trust 36 | $5,468,380 | $4,289,595 | $1,178,785 |
| CMOT 54 | 2,598,664 | 2,111,876 | 486,788 |
| | $8,067,044 | $6,401,471 | $1,665,573 |

a. Merrill Lynch Trust 36 (MLT 36 Class I Residual)

In October 1988, the institution purchased a 66.7% interest in the Class I residual of MLT 36. As of July 31, 1990, the book value of the this residual was $5,468,380 or 1.28% of assets and the weighted average life was approximately 4.5 years. The estimated value of the residual was $4,289,595 based on a yield of 14% and an estimated prepayment rate of 143% of the Public Securities Association Prepayment Model (PSA). Since this residual was not purchased for hedging purposes and the institution may not recapture the full amount of its principal investment, the examiners have determined that $1,178,785 should be recognized as a loss under a LOCOM adjustment.

The CMO issued under the Real Estate Mortgage Investment Conduit (REMIC) authority is comprised of nine classes including the residual which was offered as a regular class of the CMO. The classes were delineated as follows: four planned amortization classes (PAC); two fixed rate tranches, a zero coupon tranche and a floating rate class indexed to the 30-day London Interbank Offered Rate (LIBOR). The underlying collateral was fixed rate GNMA 10% MBS. The return from the residual varies inversely with the prepayment speed from the underlying collateral and to lesser extent increases in the interest rate for 30-day LIBOR. The LIBOR return attribute of the residual was due to the floating rate class which was 14% of the total CMO issue of $200.2 million.



8-20-90 EF-6

WON034 1081 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The weighted average yield recorded since the previous examination was 6.41% based on an expected weighted average prepayment rate of 164% PSA. The actual prepayment rate was 151% PSA. The prepayment experience for the last 12 months and life to date was 153% and 144% PSA, respectively. The estimated yield at purchase was 9.9% based on a PSA of 125%.

The following tabulation illustrates the return characteristics of this residual at July 31, 1990:

| Change in Interest Rates | Estimated Prepayment Rates | Estimated Yield(%) |
|---|---|---|
| +400 basis points | 85 PSA | 6.35 |
| +200 basis points | 100 PSA | 7.06 |
| No Change | 135 PSA | 8.35 |
| -200 basis points | 350 PSA | -8.19 |
| -400 basis points | 475 PSA | -12.15 |

Mr. Bangert said the MLT-36 residual when considered individually does not appear to have hedge value but when combined with the Residential Resource Super Principal Only security and a modest interest rate swap position, becomes a very effective hedging transaction. The original purpose of the combined transaction was to provide a yield profile that improved in both an increasing and decreasing interest rate environment. This transaction still provides this objective. He said the MLT 36 residual has not met the return objectives and concurs that a writedown of the investment is appropriate. He said the institution intended to writedown the asset to provide the expected purchase yield of 9.9%. Mr. Bangert said the estimated writedown would be $857,295 if a discount rate of 14% were used to estimate the value at September 30, 1990. He said this investment should not be classified as substandard (after the write down) because the structured transaction has substantial hedge value and the MLT 36 will be writtendown to a very conservative value.

b. Collateralized Mortgage Obligation Trust 54 Residual (CMOT 54)

In October 1988, the institution purchased a 22.1% interest in the CMOT 54 Class R Residual. The expected yield at purchase was 11.21% based on an estimated prepayment rate of 290% PSA. As of July 31, 1990, the book value was $2,598,664 and the expected weighted average life was 4 years. The estimated market value was $2,111,876 based on an estimated yield and prepayment rate of 14% and 310% PSA. The examiners have determined that $486,788 should be recognized as a LOCOM loss since this residual did not provide any significant increase in yield when interest rates increased.



8-20-90 LF-6

Date: August 20, 1990 Docket No.: 08515

The CMO had four classes, two of which were fixed rate, one was a floating rate class indexed to 30 day LIBOR and the residual class. The residual was comprised of an interest only component and an inverted floater portion. The return profile of the residual will vary inversely with increases in prepayment rates and increases in the interest rate for 30-day LIBOR. The underlying collateral was GNMA graduated payment mortgages with an interest rate of 11.5% and remaining maturity of 22.6 years.

Since the previous examination, the institution has recorded a yield of 6.89% based on a weighted average PSA of 311%. The actual prepayment experience was 323% PSA. The actual prepayment experience for the last 12 months and the life to date was 340% and 335 PSA, respectively.

At July 31, 1990, the yield on the residual does vary directly with increases in interest rates. However, the estimated return caps out at between 14% and 15% as indicated in the following table:

| Change in Interest Rates | Estimated Prepayment Rates as % of PSA | Estimated Yield(%) |
|---|---|---|
| +400 basis points | 125 | 14.3 |
| +200 basis points | 150 | 14.8 |
| No Change | 310 | 5.6 |
| -200 basis points | 425 | .1 |
| -400 basis points | 490 | -2.0 |

As of September 30, 1990, the balance of the asset was reduced to $2,306,228, a reduction of $292,436 from July 31, 1990. The reduction in the asset value included writedowns of the asset which totaled $200,000 with the remaining portion of the reduced balance due to amortization.

Mr. Bangert said a writedown of the CMOT 54 residual was not appropriate. He said this residual was purchased for its hedge value. He said the underlying collateral for the CMO was fixed rate GNMAs with a coupon rate of 11.5%. The prepayments from the underlying collateral would be expected to slow in an increasing interest rate environment, thus resulting in an increase in the yield from this residual. He also said the expected yield for this residual was 17.3% based on the book value of the residual and the consensus prepayment forecast at September 30, 1990. He estimated that the unrealized gain for the investment ranged from $300,000 to $400,000 based on similarly structured residuals. He added the expected yield on this investment increases to a 20% annual yield in a rising rate environment and the yield remains positive in interest rate scenarios of plus or minus 4.0% in increments of 1.0%.



8-20-90 EF-6

WON034 1083 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

c. Drexel Burnham Lambert CMO Trust Series E Residual (DBL)

In January 1989, the institution purchased a 27.22% interest in the DBL Series E Class 3 Residual. As of July 31, 1990, the balance of the residual was $2,372,785 and the expected weighted average life was 4.5 years. The estimated value was $3,503,214 based on discount rate of 14% and 170% PSA. The CMO has two fixed rate classes and a Z-bond (accrual bond). The residual was not a regular class of the CMO. The CMO was collateralized by Federal National Mortgage Association (FNMA) MBS with a coupon rate of 10% backed by mortgages with a gross weighted average interest rate of of 10.61% and a remaining maturity of 25.7 years. Since the previous examination, the institution recorded a weighted average book yield of 9.58% based on an weighted average expected prepayment rate of 215% PSA. The actual weighted average PSA was 179%.

As of July 31, 1990, the return characteristics of this residual were as follows:

| Change in Interest Rates | Estimated Prepayment Rates as % of PSA | Estimated Yield(%) |
|---|---|---|
| +4.0 | 125 | 22.1 |
| +2.0 | 130 | 21.6 |
| No Change | 170 | 17.4 |
| -2.0 | 430 | -10.4 |
| -4.0 | 495 | -18.4 |

4. Super Principal Only Securities (Super POs)

As of July 31, 1990, the balance of the Super POs was $8,475,814 or 1.98% of assets. The unrealized losses on these investments were $1,548,405 or 23.07% of tangible capital. The expected accounting yield on these investments was 4.29% or 3.65% less than the cost of funds at July 31, 1990. The examiners recommend that the institution voluntarily writedown the Super POs by an amount between $1,548,405, the unrealized loss at July 31, 1990, and $2,327,913, the amount necessary to increase the yield on the investment to equal the expected yield at purchase. This writedown would not be required by generally accepted accounting principles or the classified assets regulation because the institution will ultimately recapture the full investment amount.

In August 1989 for settlement in October 1989, the institution purchased Class C of the FNMA REMIC Trust 1988-27 CMO. The Class C was a support class for the PAC and TAC Classes. The underlying collateral for the CMO was FNMA principal only securities with a coupon rate of 10% backed by mortgages with weighted average interest rate of 10.58%. The expected yield at purchase was 4.48% based on an expected prepayment rate of 190% PSA. The institution would have to writedown this investment by $429,505 to receive the purchase yield based on a 170% PSA. The Class C is known as a Super PO because the return increases significantly when prepayments from the underlying collateral accelerate.



8-20-90 CP-6

Date: August 20, 1990 Docket No.: 08515

The institution also purchased in August 1989 the Super PO Class D of the FNMA REMIC Trust 1989-28 CMO. This four class CMO was also backed by principal only MBS with coupon rate of 10% and mortgages with a weighted average interest rate of 10.58% and a remaining maturity of 25.5 years. The expected yield at purchase was 6.05% based on an expected prepayment rate of 190% PSA. At July 31, 1990, the investment would have to be writtendown by $260,814 in order to realize the purchase yield based on 170% PSA.

The expected yield at purchase for the FHLMC 18-E and the Residential Resources 9-F were 8.85% and 6.24%, respectively. These assets would have to be writtendown by $1,304,676 and $332,918 at July 31,1990 based on PSAs of 170% and 135% to realize the expected yield at purchase.

The board minutes did not contain a description of the rationale for the purchase of the Super POs. However, in the financial information reported to the board at the September 1989 meeting was a table listing the expected yield for the Super POs under various interest rate scenarios.

The following tabulation details the investment in Super POs, and the weighted average yield recorded since the last examination and the estimated accounting yield at July 31, 1990:

| Description | Date Purchased | Book Value | Unrealized Gain/(Loss) | Weighted Average Yield | Weighted Average PSA | Estimated Yield | Estimated PSA |
|---|---|---|---|---|---|---|---|
| FNMA 1988-27-C | 8-89 | $2,593,838 | ($1,076,657) | 3.97 | 186 | 3.00 | 170 |
| FNMA 1989 28-D | 8-89 | 1,106,746 | (202,427) | 5.30 | 184 | 4.00 | 170 |
| FHLMC 18-E | 10-88 | 2,320,904 | (649,744) | 8.27 | 203 | 3.00 | 170 |
| Res. Resources 9-F | 9-88 | 2,454,326 | 380,423 | 8.02 | 143 | 7.00 | 135 |
| Totals | | $8,475,814 | ($1,548,405)# | 6.50 | | 4.29 | |

#The unrealized gains and losses were based on quotes obtained from brokers.

The following tabulation details the interest rate sensitivities for each of the Super POs.

| Description | +4.0% PSA/Yield | +2.0% PSA/Yield | Base Case PSA/Yield | -2.0% PSA/Yield | -4.0% PSA/Yield |
|---|---|---|---|---|---|
| | Expected Yield's and PSA's Under the Following Interest Rate Scenario | | | | |
| FNMA 1988-27-C | 125/3.0% | 130/3.0% | 170/3.5% | 430/146% | 495/203% |
| FNMA 1989 28-D | 125/3.2% | 130/3.3% | 170/4.6% | 430/86% | 495/119% |
| FHLMC 18-E | 125/2.2% | 130/2.2% | 170/3.5% | 430/176% | 495/230% |
| Res. Resources 9-F | 85/5.6% | 100/6.0% | 135/7.6% | 350/153% | 475/337% |



8-20-90 EF-6

WON034 1085 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

In November 1989, Super POs with an aggregate book value of $8,350,400 were sold for net gains of $1,303,553. The gain was used to offset the loss from two IOs sold for a loss of $490,010 in November 1989. The remaining portion of the gain of $828,660 was used to reduce the book value of the IOs, the securitized excess servicing and the residuals.

Mr. Bangert said the Super POs were purchased for protection from an acceleration of mortgage prepayments. He said the Super POs were not intended for speculative purposes. He said the Super POs provide management with the additional flexibility to execute interest rate swaps and caps against the liability portfolio without undue concern that the mortgage portfolio would prepay faster than expected. He said without the Super POs, the institution would be exposed to the retention of high cost liabilities if rates decreased significantly and prepayments from the mortgage portfolio accelerated.

Mr. Bangert said the rationale for purchasing the Super POs has been discussed at the board meeting each time this type of investment was acquired. He said the board understood the low expected yield was the cost of hedging an acceleration of the mortgage prepayments.

Mr. Bangert said the Super POs were sold because the overall profile of the institution's portfolio had changed. He said a conservative approach was used by matching the gain with securities whose returns directly related to changes in interest rates (IOs and residuals). He also said Super POs purchased in 1989 were backed by FNMA MBS with a coupon rate of 10% providing a good match with securities in portfolio.

5. Securitized Excess Servicing

In November 1989, the institution purchased the B-3 Class of the Guaranteed Mortgage Backed Securities (GMBS), Inc. multiple class security. At the time of purchase, the weighted average interest rate received was 41.6 basis points on loans with a principal balance of $88,948,498. The weighted average interest rate for the fixed rate loans underlying the security was 10.74% and the remaining maturity was 29.9 years.

As of July 31, 1990, the balance was $1,081,467. The estimated value was $1,191,034 based on a 16% yield and a 300% PSA. The yield at purchase was 19.4% based on prepayment rate of 207% PSA. The institution has recorded a weighted yield of 11.31% based on an assumed weighted average prepayment rate of 250% PSA. The actual PSA was 99% PSA. The interest rate for the B-3 class will vary based on the outstanding balance of loans with the following interest rates:

| Mortgage Pool B Securities | Interest Rate Received |
|---|---|
| 10.13% to 10.5% | 0.0 |
| 10.625% to 11% | .5 |
| 11.125% to 11.75% | 1.0 |



8-20-90 EF-6

WON034 1086 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Over 90% of the loans were secured by properties located in California and 93.5% of the loans had loan to value ratios of less than 80%. Each class was insured by the Financial Security Assurance Corporation and the classes were rated triple A by Standard and Poore and Moody's rating services. The "AAA" rating does not measure prepayment risk. The high rating only ensures that the institution will receive cash flows based on the outstanding balance of the loans.

In 1988, the institution purchased the Home Owners Federal Savings and Loan Association Senior Mortgage Pass-Through Certificates Series 1988-8 Class A-2 (Homeowners). This is an interest only class which receives 25 basis points based on an initial notional amount of $107.4 million. The underlying loans were adjustable rate mortgages indexed to the One Year Constant Maturity Treasury (CMT) Index. As of July 31, 1990, the balance of the underlying loans was $58.8 million of which the institution's portion was $29.3 million. The security was rated "Aa2" by Moody's Investor Service. As of July 31, 1990, the balance was $191,848 and the estimated value was $196,354 based a yield of 16% and an expected prepayment rate of 300% PSA. The weighted average yield recorded since the previous examination was 5.71% based on an assumed prepayment rate of 311% while the actual was 654% PSA.

Also purchased in 1988 was the Shearson Lehman Pass-Through Securities Inc. Asset Trust Pass-Through Certificates Series 1988-2 Class A-2 (Shearson). This class received 25 basis points based on an initial notional amount of $52.4 million. The underlying collateral for the security was ARMs indexed to the National Median Cost of Funds. As of July 31, 1990, the balance of the underlying loans was $42.2 million. The book value of these securities was $290,071 at July 31, 1990. The estimated value was $312,701 based on a 16% yield and a 250% PSA. The weighted average yield recorded since the previous examination was 7.79% based on an assumed prepayment rate of 239% PSA while the actual was 164% PSA.

The following table illustrates the return profile of the securitized excess servicing under different interest rate scenarios:

| Description | +4.0% PSA/Yield | +2.0% PSA/Yield | Stable PSA/Yield | -2.0% PSA/Yield | -4.0% PSA/Yield |
|---|---|---|---|---|---|
| GMBS | 110/27.9% | 130/26.7% | 250/19.4% | 380/11.3% | 450/ 6.8% |
| Homeowners | 125/30.0% | 180/26.0% | 300/16.9% | 425/ 7.0% | 540/-2.6% |
| Shearson | 110/29.0% | 130/27.6% | 250/18.7% | 380/ 8.7% | 450/ 3.1% |



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

6. Residuals Purchased for Tax Purposes (Phantom Residuals)

The institution has purchased the residual interest in specifically structured multiple class securities for the purpose of utilizing net operating losses (NOLs) carry-forwards before their expiration. The book value of these residuals was $65,294,098 or 15.3% of assets at July 31, 1990. The weighted average pre-tax yield and average life at July 31, 1990 were 16.35% and .51 years. At September 30, 1990, the balance of the residuals was $76,937,470 or 17.9% of assets. As of December 31, 1989, the institution had tax loss carryforwards of $47,862,100. Of this amount, $24,763,600 will expire prior to December 31, 1993.

The following tabulation details the investment in phantom residuals at July 31, 1990:

| Date Purchased | Description | Dollar Amount Purchased | Book Balance 7-31-90 |
|---|---|---|---|
| 2-28-90 | FNMA 1989-56R# | $ 4,000,000 | $ 3,625,205 |
| 4-27-90 | FNMA 1990-43R | 13,000,000 | 10,743,243 |
| 4-30-90 | FNMA 1990-41R | 10,000,000 | 5,408,605 |
| 5-29-90 | FNMA 1990-171R | 8,500,000 | 7,143,937 |
| 6-28-90 | ML Trust 43R | 6,200,000 | 2,686,282 |
| 6-29-90 | FHLMC 1990-174R | 10,500,000 | 10,175,290 |
| 6-29-90 | FNMA 1990-59R | 6,300,000 | 5,724,856 |
| 6-29-90 | FNMA 1990-64R | 11,000,000 | 10,668,966 |
| 7-19-90 | FNMA 1990-65R | 10,300,000 | 9,117,714 |
| Totals | | $ 79,800,000 | $65,294,098 |

# Only 55% of the economic cash flows will be recaptured in the first year. The remaining portion of the residual not recaptured in the first year will have the characteristics of a regular residual. The institution has not identified the regular portion of the residual for its hedge value nor have the returns been analyzed under different interest rate scenarios.

The phantom residuals were included in the 20% risk weighting for the risk based capital requirement. These investments must be included in the 100% risk category [12 C.F.R. Section 567.6(a)(1)(iv)(N)]. As of July 31, 1990, the institution was $434,369 in excess of the risk based capital requirement when the phantom residuals were included in 100% risk category and the specific reserves required for the non-tax related residual were considered.

The examiners recommend that the institution prepare a quarterly estimate of the expected phantom income and loss for all phantom residuals. This estimate should also show the expected phantom income and loss over the life of the CMO for interest rate scenarios of plus or minus 2.0%.



8-20-90 EP-6

WON034 1088 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The pre-tax yield on the residuals ranged from 14% to 18.5%. For most of these residuals, the institution will recapture the principal investment in less than one year. The residuals normally generate phantom income in the first four years from issuance of the CMO which means that the institution incurs tax liability for income not actually received. Normally after year four, the institution incurs phantom expenses which equates to losses not actually incurred. The phantom income and expense (loss) result from the difference between the level yield method used to record income for book purposes and the method used by the trustee for the REMIC. The trustee assumes that income is recorded based on the yield from the underlying securities based on the assumed PSA at the time of issuance. The expense is based on the effective interest rate paid to the holders of each class in the REMIC at issuance. The phantom income and loss net to zero over the life of the REMIC. However, the amount of the phantom income and loss will vary each year based on the structure of the REMIC and actual prepayment experience from the underlying collateral.

The primary risks of these transactions were that the phantom income would not be allowable as an offset against the NOLs and future phantom losses would not be deductible against future income. These risk could come to fruition if the REMIC tax law was changed or the current tax law was reinterpreted or clarified. The institution discussed this matter with their independent auditors and various experts on REMIC tax legislation. At the current time, there were no indications that phantom income would not be allowed as an offset against the NOLs.

The following tabulation shows the estimated book income (economic income), phantom income and loss for FNMA 1990-64R:

| Years | Book Income | Phantom Income/<Expense> |
|---|---|---|
| 1 | $1,009,986 | $ 408,417 |
| 2 | 155,239 | 589,316 |
| 3 thru 5 | -0- | 779,815 |
| 6 thru 7 | -0- | 48,019 |
| 8 | -0- | <117,939> |
| 9 thru 15 | -0- | <1,268,606> |
| 16 thru 30 | -0- | <439,022> |
| | $1,165,225 | $ -0- |



8-20-90 EF 6

Date: August 20, 1990 Docket No.: 08515

Based on the institution's most recent estimate at September 30, 1990, the following was the projected phantom income and losses through 2005:

| Year | ($In Millions) Phantom Income (Loss) |
|---|---|
| 1990 | $ 3.7 |
| 1991 | 12.3 |
| 1992 | 10.1 |
| 1993 thru 1996 | 13.4 |
| 1997 thru 2005 | ($17.4) |

Mr. Bangert said the institution did not intend to purchase any additional phantom residuals subsequent to September 30, 1990. He also said subsequent to the recapture of the principal investment, the phantom income and losses were treated as off-balance sheet transactions. He said the institution will estimate the projected phantom income and expense semiannually and the expected changes in this income and expense under interest rate scenarios of plus or minus 2.0%. He said this report would be updated quarterly if interest rates changed significantly. Mr. Bangert said the phantom residuals were reported in the 20% risk category (except those with IO component) because their characteristics were similar to reporting instructions for low risk mortgage derivatives. He said the institution would report these investments in the 100% risk category. He also said the regular residual interest was analyzed but not documented. He said this analysis would be prepared and presented to the board.

7. Interest Rate Risk

The institution estimates the changes in the market value of portfolio equity (MVPE) and net interest income (NII) quarterly with an internally developed model. The expected change in the MVPE in an interest rate scenario of +4.0% exceeded the board's limits. The limits would have also been exceeded in the +2.0% scenario if the estimated values used by the examiners for the residuals were used for the base case calculations.

The following tabulation details the institution's estimated change in MVPE and NII as compared to the board's limits at June 30, 1990:

| | MVPE | | | NII | | |
|---|---|---|---|---|---|---|
| Interest Rate Scenario | ($ Millions) Estimated Change Dollar Value | Percent Change From Base | Board Limit | ($ Millions) Estimated Change Dollar Value | Percent Change From Base | Board Limit |
| +4.0% | -$26.0 | -104.6 | 100 | -$4.3 | -43.8 | 90 |
| +2.0% | - 12.2 | -49.2 | 40 | -1.2 | -12.7 | 45 |
| No Change | | | | | | |
| -2.0% | 8.0 | 32.2 | 40 | 6.1 | 61.9 | 45 |
| -4.0% | 10.5 | 42.1 | 100 | 9.2 | 94.4 | 90 |



8-20-90 CF6

Date: August 20, 1990 Docket No.: 08515

The change in the MVPE in an increasing interest environment is primarily attributed to the investment in principal-only securities which decreased $3.9 million in the plus 2.0% scenario.

As of December 31, 1989, the one year and three year negative cumulative gaps were 3.3% of assets and 6.2% of assets based on the Office of Thrift Supervision's assumptions for mortgage prepayments and decay assumptions for passbook, transaction, and money market deposit account (MMDA). As of December 31, 1988, the one and three year negative cumulative gaps were 17.9% and 17% of assets, respectively. The reason for the decrease in the gap ratios from December 1988 to December 1989 was primarily attributed to the method used by OTS to treat the mortgage derivatives as compared to a decrease in the interest rate risk. The institution's interest rate risk can change significantly quarterly due to the use of off-balance sheet hedging techniques which included futures, options, and interest swaps and caps.

Mr. Bangert said the board has set December 31, 1990 as an objective for compliance with the limits. He said the Super POs were purchased to provide additional interest income in a decreasing interest rate environment when mortgage prepayments were expected to decrease as indicated in his response detailed in comments for Super POs. He said the drawback with Super POs was that their market value decreases significantly when interest rates increase and mortgage prepayments slow.

8. <u>Adjustable Rate Mortgage Backed Securities (ARMS)</u>

At July 31, 1990, the balance of the ARM portfolio was $72,479,944 or 17% of assets as compared to $119,839,965 at the previous examination. The board minutes did not contain the rationale for sales of the ARMs.

At July 31, 1990, the portfolio included $61,042,778 of private ARMS rated "AA" by Standard and Poor's which had unrealized gains of $671,664. The private ARMS were indexed primarily to the 11th District Cost of Funds (38%) and the 1-year Constant Maturity Treasury (CMT) index CMT (31.5%). The remaining "AA" ARMS were indexed to the six month CMT and the three year CMT. The margins for the "AA" ARMs ranged from 1.70% to 2.38%.

The remaining portion of the portfolio was comprised of $11,437,166 in securitized Federal Home Loan Mortgage Corporation (FHLMC) and Federal National Mortgage Association (FNMA) ARMS with unrealized gains of $307,014. All of the FHLMC and FNMA ARMs were indexed to the one year CMT. The margins for securitized FHLMC and FNMA ARMS ranged from 2.00% to 2.25%.



8-20-90 EF-6

WON034 1091 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The following table details the ARM sales since the previous examination:

| | ($In Millions) Dollar Amount | Gain |
|---|---|---|
| 6-89 | $12.7 | $ 29,080 |
| 7-89 | 8.0 | 7,399 |
| 11-89 | 7.9 | 32,623 |
| 4-90 | 17.3 | 167,800 |
| 5-90 | 3.0 | 13,603 |
| 6-90 | 4.1 | 41,195 |
| Totals | $53.0 | $291,700 |

Mr. Bangert said the ARMs were sold to provide funding for the purchase of the phantom residuals. He said large dollar amounts of ARM sales were not expected in the future.

9. Fixed Rate MBS Sold

Since the previous examination, most of the sales activity of fixed rate MBS resulted from the origination, securitization and sale of 30 year fixed loans. In January 1990, the board of directors approved a mortgage banking policy which indicated that the institution would sell all 30 year fixed rate loans and retain for portfolio fixed rate 15 year loans and ARMs. The policy also identified limits for the maximum interest rate exposure which was the greater of two months tangible earnings or $500,000.

The following tabulation details the sale of fixed rate MBS since the previous examination:

| | ($ Millions) Dollar Amount | Gain/ (Loss) |
|---|---|---|
| 6-89 | $ 3.2 | $ 31,211 |
| 7-89 | 3.4 | 72,965 |
| 8-89 | 4.1 | 34,026 |
| 9-89 | 3.0 | (10,541) |
| 10-89 | 3.1 | (25,106) |
| 11-89 | 2.0 | (5,804) |
| 12-89 | 8.2 | 406,211 |
| 1-90 | 2.0 | (9,402) |
| 4-90 | 4.0 | (60,801) |
| 5-90 | | |
| 6-90 | 3.0 | 6,634 |
| Totals | $36.0 | $439,393 |



8-20-90 EF-6

WON034 1092 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

Of the above total, $28.6 million with gains of $81,590 related to the origination, securitization and sale of mortgages/MBS. The largest portion of the gain ($328,597) resulted from the sale from portfolio of $4.2 million of FHLMC MBS with a coupon rate of 8.25%.

10. Futures and Options

In April and May 1990, the institution entered into various Treasury note futures contracts matched against fixed rate private pass-through securities maintained in portfolio. The positions were open for periods ranging from five days to 22 days. As of July 31, 1990, the deferred loss from these positions was $167,579. The deferred loss was amortized over the estimated life of the matched assets which was a period approximating seven years. Although the correlation between the futures positions and the change in value of the private pass-through securities was over 80%, the futures positions only provided protection against increasing interest rates while open. The examiners recommend that any losses from futures positions open for short time periods and matched against assets or liabilities intended for portfolio be recognized over the time period the protection against increasing interest rates was provided.

The institution entered into the following positions:

(In $Millions)

| Description | Maximum Open Position | Maximum Open Premium | Overall Gain or (Loss) | Deferred Gain or(Loss) |
|---|---|---|---|---|
| Eurodollar Options | $175 | $53,125 | ($ 67,625) | |
| Options on T-Bond Futures | 16 | 53,516 | (11,171) | |
| Options on MBS | 3 | 19,688 | | |
| Eurodollar Futures | 75 | | ( 137,708) | ($118,750) |
| Treasury Bond Futures | 2 | | (5,000) | |
| Treasury Note Futures | 5.5 | | ( 171,063) | ( 167,579) |
| Covered Call Options | 5.0 | $33,594 | 26,875 | |

The institution had written calls with par values of $5 million and $3 million matched against MBS in portfolio. The $5 million call was offset at a gain of $6,250. The call, with a par value of $3 million, was exercised at a net overall gain of $6,094. The institution did not identify the matched securities as intended for sale which would require the lower or cost of market (LOCOM) accounting method.

Mr. Bangert said the Treasury note futures provided protection against interest rate risk at a highly uncertain time. He said he did not anticipate entering into any other futures position which would be open for a short time period and would be matched against long term assets. He said other means of interest rate risk protection would be reviewed including put options. He also said any matched securities for covered calls would be identified for sale and recorded under LOCOM.



8-23-90 EF-6

WON034 1093 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

11. Reverse Repurchase and Fixed Coupon Dollar Reverse Repurchase (Dollar Rolls) Agreements

Borrowings under reverse repurchase agreements totaled $117.1 million with a weighted average interest rate of 8.3% and borrowings under dollar rolls totaled $8.2 million at a weighted average interest rate of 7.8%. The total amount borrowed under these agreements was $125.3 million, or 30.2% of total liabilities. Borrowings under these agreements have increased by approximately $34 million since the previous examination. Borrowing under these agreements was excessive and the examiners recommend that the balance of these borrowings be reduced.

The institution continuously rolled-over at maturity fixed coupon dollar reverse repurchase agreements (dollar rolls) from May 1989 to July 1990. The transaction was collateralized by MBS with a book value of $2.3 million. The institution was required to retain these securities in portfolio unencumbered for 35 consecutive days each 12-month period. If this requirement was not met, the securities should be recorded at the lower of cost or market until the 35 day time period was satisfied. The securities on continuous dollar roll had an unrealized gain of $21,642 at July 31, 1990. The securities were removed from dollar rolls in August 1990 (12 C.F.R. Section 571.16 (d)(2)(i)) and Statement of Position 85-2).

In April 1989, the institution established the following collateralization ratios: Treasury and Agency collateral (105%); government or government sponsored MBS (110%); high risk mortgage derivatives (125%). The examiners reviewed 32 of the 363 reverse repurchase and dollar roll transactions and concluded that the institution had complied with the board limits.

Mr. Bangert said the balance of borrowings under reverse repurchase and dollar rolls would be reduced. He said prospectively securities assigned under dollar roll will meet the 35 day requirement.

12. Interest Rate Swaps and Caps

At July 31, 1990, the notional amount of swaps outstanding was $40 million with a weighted average fixed interest rate paid and maturity of 8.31% and 1.6 years, respectively. The swaps were matched against reverse repurchase agreements. Swaps with a notional amount of $35 million were entered into in July and August of 1989 with Salomon Brothers. The institution received the variable rate based on 90 day LIBOR for swaps with a $35 million and 180 day LIBOR ($5 million). At July 31, 1990, 90-day and 180-day LIBOR approximated 8.23%.

At July 31, 1990, the balance of outstanding caps which were also matched against the reverse repurchase agreements was $55 million with a weighted average interest rate and maturity of 9.05% and 2.1 years. The cap rate was indexed to 90-day LIBOR. Caps with a notional amount of $30 million were entered into in July 1990 for a cost of $380,000. As of July 31, 1990, the unamortized balance of cap fees was $428,445 and the monthly amortization expense was $15,201.



8-20-90 EF-6

WON034 1094 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

OPERATING RESULTS

Our review of operations included an analysis of the level, trend, and stability of earnings. In addition, we reviewed several key operating ratios and compared the results to peer group data.

Net income for the month of July 1990 was $134,000. For the six month period ended June 30, 1990, net income was $1.2 million which on an annualized basis would total $2.4 million. For the fiscal year ended December 31, 1989, net income totaled $1.5 million. Per the July 1990 business plan, net income is projected to be $2.5 million for the year ending December 1990. Recent income is being generated primarily from operating sources.

Net interest income was $4,257,000 for the six month period ended June 30, 1990. Net non-operating income for the six month period ended June 30, 1990 was $487,000 and this non-operating income is being generated primarily from the sale of mortgage loans and real estate owned. There was a net non-interest operating loss of $3,581,000 for the six month period ended June 30, 1990, which is attributable primarily to compensation, legal, and marketing expenses.

The institution's high interest earning investment portfolio has contributed favorably to recent operating results. At July 31, 1990, the $227,460,033 investment portfolio had an weighted average yield of 11.3%. The high portfolio yield was primarily due to the $65,294,098 investment in phantom residuals, which were yielding an average of 16.35%. The average yield of the investment portfolio, excluding the phantom residual income, would be 9.7% at July 31, 1990. Accordingly, the phantom residual income has had a substantial positive effect on net income results since the first residual was purchased in February 1990. Future income results will be lessened as the funds from the phantom residual paydowns are reinvested in lower yielding investments or used to payoff outstanding reverse repurchase agreements. (See the Risk Management section for additional details.)

It was noted during the previous examination that the benefits of purchase accounting have had a favorable effect on operations. The mortgage loans and other assets acquired through the mergers were marked to market and discounted on an individual basis. The accretion of the discount was computed using the level yield method over the remaining weighted average life of the asset and adjusted for prepayments. Goodwill amortization was computed on a straight line method over 25 years. Accretion of the discount has had a positive effect on operations.

At May 31, 1989, the remaining GAAP goodwill was approximately $3,990,000. This was net of a $8.0 million FSLIC assistance, recorded as capital for regulatory purposes, and a $319,079 income tax offset at December 31, 1988. Discounts totaled $11,502,753 at May 31, 1989. Purchase accounting discounts of $7,752,188 remained at May 31, 1990.



8-20-90 EF-6

WON034 1095 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

The following was noted in the independent auditor's report as of December 31, 1989:

"During 1989, certain provisions of the assistance agreement relating to the original FSLIC assisted merger and conversion were clarified. As a result, additional assets totaling $2,044,000 were recorded in 1989. This was accounted for as a reallocation of the original purchase price. This resulted in an excess of fair value over the cost of net assets acquired. This amount was used to eliminate the original goodwill, reduce long-term fixed assets acquired to zero and the remainder is reflected as a deferred credit. This resulted in an increase in 1989 income of $341,254 to record as income the goodwill amortization and tax expense originally recorded in 1988."

"During 1989, River Valley expensed the remaining excess of cost over fair value of net assets acquired arising from the acquisition of Peoria Savings and Loan. The additional amortization was based upon the conclusion that the negative publicity within the industry, adverse deposit retention history, and the adverse regulatory changes have substantially reduced the franchise value."

Non-operating results were favorably affected during the six month period ended June 30, 1990 by a decline in other non-interest operating expense due to the elimination of the goodwill amortization expense, while the purchase accounting discounts continue to be accreted to income.

A review of the April 18, 1990 Board of Directors meeting revealed that there was excess funding of Home Federal Savings pension plan that will allow the institution to realize a profit of approximately $421,000 in 1990. Senior Vice President Jerry Pini said the overfunding is attributed to very conservative accrual assumptions and the plan did not have a turnover assumption. Pension Funds accumulated in the plan and management anticipates reversion of the funds prior to the end of the year.

Business Plan

The institution's five year business plan, dated July 31, 1990, was reviewed. The following summary is provided.

The plan provides for a gradual improvement in operating results over the five year period. The business plan projects a return on assets of 0.6% for the year ended 1990 and approximately 0.7% for years 1991 through 1994. These projections are based on a conservative annual growth of approximately 1% to 2%. The institution plans on maintaining minimal interest rate risk, which will be accomplished through strategies implemented at HPI.

Operating activities and much of the management expertise will continue to be consolidated and shared by both the Peoria and Rock Falls institutions. Loan servicing is expected to be one of the more important profit centers. The primary lending focus is to be on fixed-rate, secondary-market saleable residential mortgage loans. Under study is a program to centralize all processing and underwriting functions at the Jefferson Street office in Peoria. The accounting function for the Rock Falls institution is now being provided on a contract basis by the Peoria institution.



8-20-90 EFL

Date: August 20, 1990 Docket No.: 08515

The institution has contracted with HPI wherein HPI provides asset/liability management, marketing, and executive management.

The institutions intend to build their capital structure to meet the fully-phased in requirements before they are implemented on December 31, 1994. Operating earnings are expected to average between 65 and 75 basis points, as a percent of assets, allowing the institution's to exceed 3% tangible capital by the end of fiscal 1991.

## MISCELLANEOUS

### 1. Merger Plans

Since the previous examination of June 26, 1989, management had been negotiating for the merger of the two institutions, River Valley, FSB and River Valley Savings, Rock Falls. The approval was pending a ruling from the Internal Revenue Service (IRS) regarding whether the preferred stock held by the FDIC has the characteristics of common stock. If the stock was proved to ~~be considered common, then the mergers would constitute a change in control,~~ and the institution's would lose the benefits of net operating loss carryforwards.

A favorable ruling was received from the IRS in September 1990. Mr. Pikus said that with the ruling from the IRS received, management is anticipating a merger by March 31, 1991. Mr. Pikus said that a decision has not been made yet as to whether the surviving institution will have a federal or state charter.

### 2. Surety Bond Coverage

Regulation 12 C.F.R. Section 563.190(a) requires institutions to maintain Standard Form 22 surety bond coverage or its equivalent. The institution currently maintains coverage for the two institutions in the aggregate amount of $4,560,000 from the Cincinnati Insurance Company. This policy is considered an equivalent to Standard Form 22; however, River Valley, FSB is lacking adequate coverage. River Valley, FSB requires a minimum of $3,000,000 in coverage and River Valley Savings Bank, Rock Falls requires a minimum of $1,755,000 in coverage; indicating a total requirement of $4,755,000. Current coverage for River Valley, FSB and River Valley Savings Bank, Rock Falls consists of $1,965,000 and $2,595,000, respectively. Accordingly, a deficiency of $195,000 exists.

Vice President Roger L. Kilpatrick stated that the policy coverages will be changed to increase the amount for River Valley, FSB and additional coverage will be added to meet the requirements for FSB. The institution received a letter from their insurance agent, dated September 21, 1990, indicating that the surety bond coverage had been increased to required levels.



8-20-90 EF-6

WON034 1097 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

APPENDIX

8-20-90

EF 6

Date: August 20, 1990 Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS

Number of Directors Meetings Held During Past 12 Months: 4
Number of Directors Authorized: 12
Number of Vacancies: 1

| Name<br>Mailing Address<br>Occupation | Title<br>Date of Birth | Meetings Attended 12 mos. | Tenure as Director<br>Year Appt.<br>Year Exp. | Current Annual Salary<br>Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| ROSS, Howard R.<br>950 N. Michigan Avenue<br>Chicago, IL 60606 | D,CB<br>05-11-26 | 3 | 1988<br>1993 | $ 75,000<br>175,000 1/<br>2,424 2/ |
| HOLLAND, Homer J.<br>360 E. Randolph #2404<br>Chicago, IL 60601<br>Pres. - Holland Partners | D,VCB,,CEO<br>11-30-41 | 4 | 1988<br>1993 | ** |
| BANGERT, Steven<br>20245 W. Indian Creek<br>Mundelein, IL 60060<br>EVP - Holland Partners | D,T<br>01-13-57 | 4 | 1989<br>1993 | ** |
| > KIPNIS, Mark S.<br>3012 Reenes Court<br>Northbrook, IL 60062<br>Attorney | D,S<br>08-04-47 | 4 | 1988<br>1993 | 3,400 3/ |
| CLAUDON, Chester J.<br>62 Redwood Circle<br>Canton, IL 61520<br>Attorney | D<br>06-17-22 | 3 | 1988<br>1991 | 3,050 3/ |
| DETHEMPE, L. David<br>6226 N. Jamestown Road<br>Peoria, IL 61615<br>Retired VP.- P.A. Bergner & Co. | D<br>03-15-24 | 4 | 1988<br>1991 | 3,400 3/<br>5,250 4/ |
| LADD, Thomas P.<br>1842 N. Larrabee<br>Chicago, IL 60614<br>VP - CNA Insurance | D<br>03-20-44 | 1 | 1990<br>1992 | 850 3/ |
| POWERS, Robert L.<br>3316 W. Glouchester Ct.<br>Peoria, IL 61615<br>Pres. - Caterpillar Venture | D<br>06-29-45 | 3 | 1989<br>1992 | 3,050 3/ |



8-20-90 ESF-6

WON034 1099 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS (Continued)

| Name Mailing Address Occupation | Title Date of Birth | Meetings Attended 12 mos. | Tenure as Director Year Appt. Year Exp. | Current Annual Salary Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| ROTHMAN, Noel W.<br>2738 Euclid Park Place<br>Evanston, IL 60201<br>Pres. - Namtor | D<br>01-16-30 | 2 | 1989<br>1992 | $ 2,700 3/ |
| ROTHMAN, Michael *<br>208 South LaSalle<br>Chicago, Illinois 60606 | D<br>06-04-57 | 1 | 1990<br>1992 | |
| TUERK, Fred J.<br>3228 Prince George Ct.<br>Peoria, IL 61615<br>Retired Illinois<br>State Representative | D<br>07-19-22 | 4 | 1989<br>1991 | 3,400 3/ |
| PIKUS, Ronald<br>1873 Jahns<br>Wheaton, IL 60187 | P,MO<br>06-10-47 | Housing association in Peoria? | | 108,000<br>2,700 2/ |
| KILPATRICK, Roger L.<br>117 Northaven<br>Peoria, IL 61614 | EVP<br>08-07-50 | | | 70,400<br>15,000 1/<br>2,288 2/ |
| BEALE, John<br>465 Rosewood<br>Canton, IL 61520 | Div. President<br>04-03-28 | | | 49,050<br>1,595 2/ |
| KRISTOF, Sharon<br>6430 W. 94th Place<br>Oak Lawn, IL 60453 | SVP<br>11-14-48 | | | 59,000<br>1,770 2/ |
| MORSCH, Susan<br>200 4th<br>Pekin, IL 61564 | SVP<br>05-14-38 | | | 29,000<br>2,500 1/<br>798 2/ |
| PINI, Gerald O.<br>3520 N. Missouri<br>Peoria, IL 61603 | SVP<br>03-13-40 | | | 39,400<br>1,576 2/ |



8-10-90 EP-6

WON034 1100 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS (Continued)

| Name Mailing Address Occupation | Title Date of Birth | Meetings Attended 12 mos. | Tenure as Director Year Appt. Year Exp. | Current Annual Salary Other Remuneration From Association (Annual Amount) |
|---|---|---|---|---|
| PORTER, Linda L.<br>5626 Talison<br>Peoria, Illinois 61614 | SVP<br>07-04-41 | | | 37,000<br>4,000 1/<br>925 2/ |
| RICHARDSON, Gary L.<br>5027 W. Woodfern<br>Peoria, IL 61607 | SVP<br>04-30-51 | | | $ 37,000<br>7,500 1/<br>1,100 2/ |
| WITT, Trinia M.<br>127 W. Glen<br>Peoria, IL 61614 | SVP<br>10-03-41 | | | 38,500<br>2,500 1/<br>1,058 2/ |
| SEIB, Ronald<br>1740 N. Lakeview<br>East Peoria, IL 61611 | VP,C<br>07-11-57 | | | 58,500 |

Footnotes and Comments:

1/ Bonus paid in 1990.
2/ 401 K contributions.
3/ Directors' fees are $500 per quarter plus $350 per meeting attended.
4/ $750 monthly fee paid for accounting functions performed during the first seven months of 1990.

* Michael Rothman was elected to fill a vacancy in June 1990, however, due to a technical violation he resigned in July 1990. Mr. Rothman was reinstated to the Board in August 1990.

** Messrs. Holland and Bangert are paid through Holland Partners, which receives a management fee from River Valley Savings, FSB.

Directors DeTrempe, Kipnis, Ladd, Holland, and Ross are also directors at River Valley Savings Bank (Rock Falls).



8-20-90 LFL

Date: August 20, 1990

Docket No.: 08515

DIRECTORS, PRINCIPAL OFFICERS AND ATTORNEYS (Continued)

River Valley Savings Bank, F.S.B.
Organization Structure






8-20-90

EF-6

WON034 1102 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

PRINCIPAL OPERATING COMMITTEES

| Name of Committee and Description of Functions | Frequency of Meetings | Members of Committee | Amounts of Fees Received |
|---|---|---|---|
| EXECUTIVE<br>Reviews business of institution. | Monthly | Homer J. Holland<br>Howard R. Ross<br>Steven Bangert | None |
| AUDIT/PERSONNEL<br>Reviews internal audit procedures, acts as personnel committee, recommends administrative changes. | Quarterly/ as needed | L. David DeTrempe<br>Homer Holland<br>Mark Kipnis | None |
| MARKETING/LOAN<br>Reviews loan policies and practices. Approves and reviews loans made under the lending policies. | Quarterly/ as needed | Fred J. Tuerk<br>Howard R. Ross<br>Chester J. Claudon | None |
| ASSET/LIABILITY<br>Reviews asset/liability management policies and interest rate risk policy. | Quarterly/ as needed | Steven Bangert<br>Robert L. Powers<br>Noel W. Rothman | None |



8-20-90 EF-6

Date: August 20, 1990 Docket: 08515

COMPARATIVE STATEMENTS OF FINANCIAL CONDITION (I)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| **ASSETS** | | | |
| Mortgage Loans, Contracts, and Mortgage Pool Securities | 334,378 | 274,110 | 300,737 |
| Memo: | | | |
| MORTGAGE POOL SECURITIES | 145,697 | 120,503 | 155,839 |
| Less: | | | |
| Loans in Process.......... | 0 | 345 | 139 |
| Other Contra Accounts..... | 10,364 | 10,094 | 12,424 |
| Non-Mortgage Loans............ | 10,769 | 18,191 | 23,366 |
| Memo: | | | |
| Com. Loans and Leases....... | 3,500 | 3,542 | 2,815 |
| Cons. Loans and Leases...... | 7,053 | 14,455 | 20,415 |
| Accrued Interest............ | 216 | 194 | 136 |
| Less: | | | |
| Contra Accounts........... | 623 | 480 | 938 |
| Repossessed Property.......... | 6,112 | 6,192 | 10,022 |
| Real Estate Investments....... | 0 | 0 | 0 |
| Less: | | | |
| Contra Accounts....... | 2,222 | 1,993 | 4,700 |
| Cash & Investment Securities.. | 68,630 | 85,558 | 75,549 |
| Investment in Subsidiaries Service Corporations........ | 2,256 | 2,255 | 2,226 |
| Fixed Assets - Net............ | 2,488 | 1,633 | 2,800 |
| Deferrals Pursuant to 563c.14. | 0 | 0 | 0 |
| Goodwill & Other Intangibles.. | 0 | 0 | 12,006 |
| Other Assets.................. | 4,933 | 5,413 | 7,247 |
| TOTAL ASSETS.................. | 416,357 | 380,440 | 415,732 |
| **LIABILITIES AND MODIFIED EQUITY CAPITAL** | | | |
| Liabilities: | | | |
| Deposits...................... | 270,816 | 277,158 | 310,533 |
| Advances from FHLB............ | 10,500 | 10,500 | 17,225 |
| Other Borrowed Money.......... | 112,854 | 71,196 | 58,823 |
| Unamortized Yield Adjustmts on Purchsd Deposits & Borrowings | 0 | 22 | 61 |
| Other Liabilities............. | 10,608 | 6,112 | 6,386 |
| Definitional Capital.......... | 0 | 4,600 | 4,600 |
| Less: FSLIC Notes Captl Instr | 0 | 0 | 0 |
| TOTAL LIABILITIES............. | 404,778 | 369,588 | 397,628 |



8-20-90 EF-6

Date: August 20, 199[redacted] [redacted] Docket: 08515

COMPARATIVE STATEMENTS OF FINANCIAL CONDITION (1)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| MODIFIED EQUITY CAPITAL: | | | |
| Perpetual Preferred Stock..... | 10,000 | 10,000 | 10,003 |
| Common Stock - Par Value...... | 1 | 1 | 1 |
| Paid in Excess of Par......... | 0 | 0 | 8,000 |
| Retained Earnings ............ | 1,578 | 851 | 100 |
| TOTAL MODIFIED EQUITY CAPITAL. | 11,579 | 10,852 | 18,104 |
| TOTAL LIABILITIES AND MODIFIED EQUITY CAPITAL.............. | 416,357 | 380,440 | 415,732 |
| MEMO: TOTAL REGULATORY CAPITAL ... | 0 | 0 | 28,318 |



8-20-90

BF-6

WON034 1105 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: Auguest 20, 19[illegible] Docket: 08515

[illegible]PARATIVE STATEMENTS OF OPERATI[illegible]S (1)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| INTEREST INCOME | | | |
| Mtg Loans & Mtg Pool Sec.... | 16,745 | 30,506 | 21,866 |
| Nonmortgage Loans........... | 968 | 2,431 | 2,183 |
| Investments and Deposits.... | 1,663 | 6,880 | 4,408 |
| TOTAL INTEREST INCOME......... | 19,376 | 39,817 | 28,457 |
| Net Effect of Asset Hedges.. | 1 | -2 | -2 |
| ADJUSTED INTEREST INCOME...... | 19,377 | 39,815 | 28,455 |
| INTEREST EXPENSE | | | |
| Deposits.................... | 9,864 | 20,347 | 20,923 |
| Advances, Borrowed Money and Definitional Capital Instu. | 4,539 | 10,367 | 3,373 |
| TOTAL INTEREST EXPENSE........ | 14,403 | 30,714 | 24,296 |
| Net Effect of Liab. Hedges.. | -3 | -77 | -91 |
| Less: Capitalized Interest. | 0 | 0 | 0 |
| ADJUSTED INTEREST EXPENSE..... | 14,400 | 30,637 | 24,205 |
| PROVISION FOR LOSSES ON ASSETS | 720 | 409 | 260 |
| NET INTEREST INCOME........... | 4,257 | 8,769 | 3,990 |
| NONINTEREST OPERATING INCOME | | | |
| Loan Servicing & Other Fees. * (4) | 452 | 923 | 660 |
| Net Income from Service Corp | 58 | 187 | -65 |
| Oth Noninterest Oper Income. | 234 | 250 | 200 |
| TOTAL NONINTER OTH OPER INCOME | 744 | 1,360 | 795 |
| NONINTEREST OPERATING EXPENSE | | | |
| Compensation................ | 1,612 | 2,980 | 2,691 |
| Directors' Fees............. | 13 | 24 | 85 |
| Dirs, Off & Empl Expense.... | 38 | 92 | 50 |
| Office Occup & Equip Expense | 596 | 1,300 | 1,428 |
| Marketing................... | 1,044 | 342 | 198 |
| Oth Noninterest Oper Expense | 1,022 | 5,654 | 2,789 |
| TOTAL NONINTEREST OPER EXPENSE | 4,325 | 10,392 | 7,241 |
| NET OPERATING INCOME.......... | 676 | -263 | -2,456 |



8-20-90

EP6

WON034 1106 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: Auguset 20, 1990 Docket: 08515

[illegible]PARATIVE STATEMENTS OF OPERATI[illegible] (1)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| NONOPERATING INCOME | | | |
| Nonoperating Income......... | 865 | 2,392 | 1,474 |
| Nonoperating Expense........ | 378 | 260 | 3,813 |
| NET NONOPERATING INCOME....... | 487 | 2,132 | -2,339 |
| NET INCOME BEFORE TAXES AND ADJUSTMENTS TO NET INCOME... | 1,163 | 1,869 | -4,795 |
| Income Taxes................ | 0 | 351 | 319 |
| Net Income (Loss)........... | 1,163 | 1,518 | -5,114 |
| Less: | | | |
| Cash Dividends on: | | | |
| Perpetual Preferred Stock | 436 | 767 | 433 |
| Common Stock........... | 0 | 0 | 0 |
| SFAS No 12 Adj Mkt Eqty Sec. | 0 | 0 | 0 |
| Oth Adj to Retained Earnings | 0 | 0 | -199 |
| NET CHANGE RETAINED EARNINGS.. | 727 | 751 | -5,746 |



8-20-90 EP-6

Date: August 20, 199[illegible] Docket: 08515

**SUMMARY OF KEY OPERATING RATIOS AND TRENDS (1) (2) (3)**

| | Period Ended 30-JUN-1990 | | Year Ended 31-DEC-1989 | | Year Ended 31-DEC-1988 | |
|---|---|---|---|---|---|---|
| | ASSN. | PEER GROUP | ASSN. | PEER GROUP | ASSN. | PEER GROUP |
| Asset Growth *................ | 9.4 | N/A | -8.5 | -7.3 | 35.7 | 4.0 |
| Liability Growth *............ | 9.5 | N/A | -7.1 | -5.8 | 15.9 | 3.9 |
| Regulatory Capital / Total Assets ............... | 0.0 | N/A | 0.0 | 0.0 | 6.9 | 4.9 |
| GAAP Capital / Total Assets................. | 2.8 | N/A | 2.9 | 2.1 | 4.4 | 2.9 |
| Net Income / Average Assets *. | 0.6 | N/A | 0.4 | -0.8 | -2.7 | -0.1 |
| Net Income / Total Income..... | 5.5 | N/A | 3.5 | -8.6 | -16.6 | -0.8 |
| Total Income/Average Assets *. | 10.5 | N/A | 10.7 | 9.8 | 16.5 | 9.2 |
| Gross Operating Income / Average Assets *............ | 10.1 | N/A | 10.1 | 9.5 | 15.7 | 9.0 |
| Net Operating Income / Gross Operating Income...... | 5.8 | N/A | -0.6 | -6.5 | -8.4 | 2.0 |
| Net Interest Income / Average Assets *............ | 2.2 | N/A | 2.1 | 1.2 | 2.1 | 1.6 |
| Hedged Net Interest Income / Average Assets *............ | 2.2 | N/A | 2.2 | 1.8 | 2.3 | 1.9 |
| Total Interest Cost / Gross Operating Income...... | 70.5 | N/A | 74.4 | 75.9 | 82.8 | 72.1 |
| Total Interest Costs / Avg. Deposits and Borrow. Money * | 7.5 | N/A | 8.0 | 7.6 | 13.2 | 6.8 |
| Interest Earning Assets / Interest-Bearing Liabilities | 100.3 | N/A | 90.2 | 94.7 | 102.3 | 97.7 |
| Operating Expense / Average Assets *............ | 2.2 | N/A | 2.5 | 2.3 | 3.9 | 2.0 |
| Operating Expense / Gross Operating Income...... | 21.5 | N/A | 25.2 | 24.5 | 24.7 | 22.0 |



8-20-90 GF-6

Date: Augusdt 20, 1990 Docket: 08515

CLASSIFIED ASSETS AND REPOSSESSED ASSETS (1) (3)

| (In Thousands) | Period Ended 30-JUN-1990 | Year Ended 31-DEC-1989 | Year Ended 31-DEC-1988 |
|---|---|---|---|
| **Assets Classified Substandard** | | | |
| Assn. $ amount........ | 542 | 275 | 3,502 |
| Assn. % to assets..... | 0.1 | 0.0 | 0.8 |
| Peer Group % to assets | N/A | 1.7 | 1.0 |
| **Assets Classified Doubtful** | | | |
| Assn. $ amount........ | 3,898 | 1,365 | 0 |
| Assn. % to assets..... | 0.9 | 0.3 | 0.0 |
| Peer Group % to assets | N/A | 0.2 | 0.2 |
| **Assets Classified Loss** | | | |
| Assn. $ amount........ | 0 | 0 | 0 |
| Assn. % to assets..... | 0.0 | 0.0 | 0.0 |
| Peer Group % to assets | N/A | 0.7 | 0.2 |
| **TOTAL Classified Assets** | | | |
| Assn. $ amount........ | 4,440 | 1,640 | 3,502 |
| Assn. % to assets..... | 1.1 | 0.4 | 0.8 |
| Peer Group % to assets | N/A | 2.6 | 1.4 |
| **Repossessed Assets** | | | |
| Assn. $ amount........ | 167 | 4,199 | 5,322 |
| Assn. % to assets..... | 0.0 | 1.1 | 1.2 |
| Peer Group % to assets | N/A | 0.7 | 0.5 |
| **Slow Loans and Contracts * (5)** | | | |
| Assn. $ amount........ | 1,062 | 0 | 6,750 |
| Assn. % to assets..... | 0.3 | 0.0 | 1.6 |
| Peer Group % to assets | N/A | 0.0 | 0.5 |
| **Loan/Contract to Facilitate Sale of REO** | | | |
| Assn. $ amount........ | 369 | 2,826 | 5,523 |
| Assn. % to assets..... | 0.1 | 0.7 | 1.3 |
| Peer Group % to assets | N/A | 0.2 | 0.3 |



8-20-90 EF-6

WON034 1109 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket: 08515

FOOTNOTES

(1) All ratios identified with an asterisk have been annualized in the stub period.

(2) Peer Group information has been generated for the periods below as follows:

31-DEC-1989

Peer Group information has been calculated using all District 7 institutions within the state of Illinois with total assets between $250 mill - $750 mill.

31-DEC-1988

Peer Group information has been calculated using all District 7 institutions within the state of Illinois with total assets between $250 mill - $750 mill.

31-DEC-1987

Peer Group information has not been calculated because data was unavailable for this docket.

(3) Financial Data reported under "RAP" for periods prior to January 1, 1989 have been restated to conform to the 1989 TFR specifications which are adjusted for "GAAP" reporting.

(4) Loan Fees, which were reported prior to January 1, 1989 in TFR line D080 are now reported in this category in TFR line D100. This presentation, however, does not adjust for FASB No. 91 and overstates "LOAN SERVICING AND OTHER FEES" and understates "TOTAL INTEREST INCOME".

(5) Due to the new capital regulation that is in effect beginning December 7, 1989, zeros will appear in this equation for the December 1989 cycle.



8-20-90 BP-6

WON034 1110 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

DEPOSIT/LIABILITY SCHEDULE

| | | |
|---|---|---|
| I. | BROKERED FUNDS* | |
| | Total Amount | $ 0 |
| | % of Deposits | -% |
| | Interest Rate Range | -% |
| | *Amounts included herein should not be included in subsequent items II and III. | |
| II. | JUMBO CERTIFICATES OF DEPOSIT (=>$80,000) | |
| | Total Amount | $ 9,864,075 |
| | % of Deposits | 3.5% |
| | Interest Rate Range | 7.7% - 10.0% |
| III. | CERTIFICATES OF DEPOSIT (<$80,000) | |
| | Total Amount | $191,014,510 |
| | % of Deposits | 68.2% |
| | Interest Rate Range | 5.9% - 11.9% |
| IV. | NOW, SUPER NOW AND OTHER TRANSACTION ACCOUNTS | |
| | Total Amount | $ 18,793,060 |
| | % of Deposits | 6.7% |
| | Interest Rate Range | 5.3% - 5.8% |
| V. | MONEY MARKET DEPOSIT ACCOUNTS | |
| | Total Amount | $ 17,170,173 |
| | % of Deposits | 6.1% |
| | Interest Rate Range | 5.3% - 5.8% |
| VI. | PASSBOOK ACCOUNTS | |
| | Total Amount | $ 30,967,928 |
| | % of Deposits | 11.1% |
| | Interest Rate Range | 5.3% - 5.5% |
| VII. | ESTIMATE OF UNINSURED DEPOSITS | |
| | Total Amount | $ 12,304,590 |
| | % of Deposits | 4.4% |
| VIII. | BORROWINGS (INCLUDING FHLB ADVANCES) | |
| | Total Amount | $131,761,787 |
| | % of Total Liabilities | 32.6% |
| | Interest Rate Range | 7.8% - 8.9% |

This information reconciles to total deposits and borrowings as of July 31, 1990.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

SUMMARY OF CRITICIZED ASSETS

| | |
|---|---|
| 1. Classified Assets | |
| Portion classified "Substandard" | $6,532,804 |
| Portion classified "Doubtful" | |
| Portion classified "Loss" | 619,424 |
| 1A. Total Classified Assets | $7,152,228 |
| Memo--Portion not classified | -- |
| 2. Assets Subject to Special Mention | $ 595,000 |
| Grand Total - Criticized Assets(1A+2) | $7,747,228 |
| % to Total Assets | 1.9% |



8-20-90 BF-6

WON034 1112 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SUMMARY OF ACTION REQUIRED BY CRITICIZED ASSETS

Action Required

| | |
|---|---|
| 1. Total General Valuation Allowance Prior to Start Date of Exam | $ 767,983 |
| 2. Adjustment Required Due to Assets Classified Loss for Which No Specific Reserve Has Been Established | $2,284,997 |
| 3. Remaining Valuation Allowance (1 - 2) (Examiner should determine adequacy of Remaining Valuation Allowance in Relationship to the Total Assets in the Institution's Portfolio.) | ($1,517,014) |

Comment on Sufficiency of Remaining Valuation Allowance

The institution's current general reserves are based upon a formula covering all of the outstanding loans. Management is currently reserving 10% of all substandard assets and reserving all of the nonclassified loans from .10% to 1.0% based upon the perceived degree of risk.

Based upon the institution's policy for establishing reserves and using the assets classified by the examiners, the institution would need a general reserve of $864,000. Of the $2,284,997 classified as loss, approximately $516,000 was reserved in August 1990. Management has indicated that the general valuation shortfalls will be satisfied by year-end.

The majority of the institution's losses, $1,665,573, are due to the institution's interest in two collateralized mortgage obligations which required a LOCOM adjustment. The remainder of the losses are due to loans that were originated prior to the 1988 merger which were secured by large commercial real estate projects and from the sale of real estate owned properties. Once the large losses are realized, management intends on establishing a $300,000 monthly accrual to increase the general valuation allowance amount.



8-20-90 BF-6

WON034 1113 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS

Assets have been classified as Substandard, Doubtful and/or Loss in accord with Insurance Regulation 561.16(c).

Classified assets are grouped as follows:

A. Mortgage loans and contracts

B. Consumer loans

C. Other non-mortgage loans

D. Real estate and other repossessed assets

E. Investment Securities

F. Other assets

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | Substandard | Doubtful | Loss |
|---|---|---|---|---|
| **A. Mortgage loans and contracts** | | | | |
| $3,846,352 | | $3,679,125 | | $518,892 |
| **B. Consumer loans** | | | | |
| $31,617 | | $20,269 | | $11,348 |

CLASSIFICATION

A. Mortgage loans and contracts

The above represents 15 loans with 11 of the loans representing $220,000 being on 1-4 family residences. Four of the loans totaling approximately $4 million are discussed in detail later in this section.

B. Consumer loans

The above represents eight loans with various collateral. The loans classified loss are over 120 days delinquent.

C. Other non-mortgage loans

None



8-20-90 EF/b

WON034 1114 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS.880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | CLASSIFICATION<br>Substandard | Doubtful | Loss |
|---|---|---|---|---|
| **D. Real estate and other repossessed assets** | | | | |
| $483,227 | | $444,339 | | $38,888 |
| The above represents 22 properties primarily single family residences in the immediate lending area. The losses represent the net book balance in excess of the fair market value. | | | | |
| $13,373 | | $9,210 | | $4,163 |
| The above represents four repossessed autos that the institution is holding in inventory. | | | | |
| **E. Investment Securities** | | | | |
| $30,000 | | $30,000 | | |
| The above represents the institution's investment in On-Line Financial which has no market value. | | | | |
| **F. Other assets** | | | | |
| $24,000 | | | | $24,000 |
| The above represents 94 accounts which have been overdrawn for over 90 days. | | | | |
| $20,730 | | | | $20,730 |
| The above represents accounts that have had deficiency judgments filed against them. Payments are irregular and not guaranteed. | | | | |
| $2,000,000 | | $2,000,000 | | |
| Credit enhancement classified by recent examination of Savings and Loan Network. A detailed write-up is presented later in this section. | | | | |



8-20-90 EF-6

WON034 1115 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 .Docket No: 08515

CLASSIFIED ASSETS

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount<br>Past<br>Due | CLASSIFICATION<br>Substandard | <br>Doubtful | <br>Loss |
|---|---|---|---|---|
| Covered Assets | | | | |
| $351,264 | | $349,861 | | $1,403 |

The above represent the classified loans and REO properties that remain as covered assets under the 1988 merger agreements. The above amount is the institution's 10% exposure under the agreement. Only one large property (Village Point) remains under the covered assets. This property is currently REO and has a net book balance of $2.5 million. The examiners concluded that 10% of this balance be classified substandard due to being a non-earning asset.

| | | | | |
|---|---|---|---|---|
| Totals | | $6,532,804 | | $619,424 |

Details on some of the larger classified assets follow:



8-20-90 EF-6

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | CLASSIFICATION<br>Substandard | Doubtful | Loss |
|---|---|---|---|---|
| $1,047,227<br>22 individual borrowers<br>Lexington Hills condos | | $880,000 | | $167,227 |

All 22 of these loans are in the process of being foreclosed upon due to nonpayment by the borrowers. The loss is based on an August 1988, appraisal of $880,000.

This participation loan was entered into in 1983 with the institution having 22 individual loans in a 54 unit condominium complex in St. Paul, Minnesota. The lead lender was Knutson Mortgage Co. which was later purchased by Meritor Financial. The majority of these condos were purchased as tax shelters by wealthy investors and were leased out by the owners. Problems began with the project after the 1986 change in the tax laws which made income properties a less desirable investment.

The problem with the payments began after it was discovered that the individual borrowers had formed a partnership on the day of the closing and had assigned their ownership to the partnership. This partnership was formed without the knowledge or consent of the lenders. The general partner was to manage the property and remit the mortgage payments. However, when the institution refused to renegotiate the interest rate on the loans, the general partner stopped sending payments. The institution has initiated foreclosure proceedings against the individual borrowers.

The individual borrowers on each loan, appear to have assets that could be used to satisfy any deficiencies. The borrowers are contending that they were only in this project as investors and did not realize that they were personally guaranteeing the loans. The institution's attorneys do not feel that this is a valid defense and would not hold up in court.

Each of these loans has 25% MGIC mortgage insurance, however, MGIC notified the lenders that the coverage was canceled due to fraud and misrepresentations made by the lead lender.

The institution plans to sell the properties after foreclosure and then to proceed against the individual guarantors and the lead lender for any deficiencies. The institution also plans to file legal action against Knutson Mortgage based upon the Racketeer Influenced and Corrupt Organizations Act (RICO).



8-20-90 EF-6

WON034 1117 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount<br>Past<br>Due | CLASSIFICATION<br>Substandard | Doubtful | Loss |
|---|---|---|---|---|
| $991,562<br><361,562> Specific valuation allowance | | | | |
| $630,000<br>Peppertree Ltd.<br>Gordon Oates, Robert Buchanan general partners<br>110 unit apartment complex<br>Hattiesburg, Mississippi | | $630,000 | | |

The above represents the institution's 45% participation interest based upon an appraisal of $1.4 million dated November 1989. This loan continues to run delinquent due to the fact that the cash flow, even at 100% occupancy, cannot service the debt. This loan was classified at the previous examination.

In 1983, the original purpose of this loan was to build student housing for a local college, however, the market was over-built and the projects will not generate sufficient cash flow.

The loan was assumed by the general partners in 1987 and limited personal guarantees were given, however, these guarantees expired December 31, 1988. Two of the three participants have agreed to write the loan down to the appraised value of $1.4 million and finance it for 20 years. The general partners have agreed to that amount. Due to the other participant being under the control of the RTC, the final approval must come from the regional RTC office. At the time of the examination the approval has not been received.

| | | | | |
|---|---|---|---|---|
| $596,665<br>Four Seasons Limited Partnership<br>220 pad Mobile Home park<br>Peoria, Illinois | | $245,000 | | 351,665 |

A recent appraisal valued the land at $245,000 and indicated no value to the business due to the project operating at a deficit. Presently, the mobile home park has a vacancy rate of 63%. The loss amount is based upon this appraisal. A specific allowance for the loss was established in August.



8-20-90 EF6

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount Past Due | CLASSIFICATION Substandard | Doubtful | Loss |
|---|---|---|---|---|

This property had been in REO and was sold and financed 100% prior to the previous examination. There are no personal guarantees from any of the partners involved. This property is experiencing cash flow problems due to a high number of vacant spaces in the mobile home park. The borrowers have injected over $200,000 of their own money into the project for improvements, however, the economy for mobile home parks is not as strong as projected.

The institution has modified this loan with monthly payments of insurance and taxes only for a period of 12 months. The borrowers are to provide the institution with monthly operating statements. This modification is due for review at the end of six months and the institution has the option to change the agreement at that time.

| | | | | |
|---|---|---|---|---|
| $1,703,733<br>Kingspark Mobile Estates Inc.<br>566 pad mobile home park<br>Peoria Illinois | | $1,703,733 | | |

This loan has been classified by the institution due to the payments being modified to interest only. This loan had an original balance of $2,750,000 in 1973. This loan has been modified several times since its inception. This mobile home park has experienced operating losses every year since 1986.

This loan is experiencing cash flow problems due to a 50% occupancy rate in the trailer park. Computations show that another 50 pads have to be rented to be able to service the debt.

A net realizable value calculation of the property by the institution indicated a value of $1,778,000. The most recent financial statement on the partnership shows a net worth of a negative $1.2 million.



8-20-90 EF-6

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description of Assets<br>Comments | Amount<br>Past<br>Due | CLASSIFICATION<br>Substandard | Doubtful | Loss |
|---|---|---|---|---|
| $2,000,000<br>Century Point Apartments<br>228 unit rental development<br>Glendale Heights, Il. | | $2,000,000 | | |

The June 11, 1990 examination of the Savings and Loan Network (RESCORP) classified this loan as substandard. This institution has a contingent liability in this project through a credit enhancement entered into in November 1985. This credit enhancement involves six institutions and represents $11,000,000. The following information is taken from the recent report of examination.

Century Point is a multi-family rental development located in the Village of Glendale heights, Illinois. This 228-unit rental development consists of 14 three story buildings on 11.5 acres. The property is owned by the estate of Thomas J. Origer. Thomas Origer, the original borrower who executed the financing agreement and various other documents in connection with the project, died on January 23, 1987. Messrs. Robert W. Reninger and Warren R. Filler were appointed executors of the estate of the borrower. All actions of the borrower connected with the project, including a personal guarantee to fund operating deficits, were accepted by the estate.

Although the project generated marginal profits for the year ended December 31, 1989, the status of the property has somewhat declined. The debt service ratio was 1.04 with an occupancy rate of 98%. At April 30, 1990, the debt service ratio decreased to .97 while occupancy increased to 99%. For the first four months of calendar year 1990, the project incurred an operating deficit of $12,650. The project manager indicates that operating deficits will continue for three of the next five years. Although the borrower, which is the estate of the original borrower, has funded the operating deficits to date, it is uncertain that this will continue. There is no financial information available on the estate to substantiate ability to fund. The existing reserves and certificate of deposit do not provide enough additional support at this time.



8-20-90 EP-6

WON034 1120 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

CLASSIFIED ASSETS (Continued)

Shorewood Builders, which is owned by the estate and manages the property, expects the project to incur a minimal operating deficit in three of the net five years. Beginning in 1991, the bonds are scheduled to be redeemed, initially at $130,000, and increasing $10,000 to $45,000 annually thereafter. To provide for the increase in debt service payments, there is an estimated 8% increase in rental revenues in 1991. Even with the increase, the project would incur a $13,000 deficit. If the rental increase is a more reasonable 4%, the estimated deficit would rise to approximately $85,000 for the 1991 fiscal year.

The project has three reserves as follows: Debt Service $592,856, Taxes and Insurance $176,989, Replacement $137,845. The reserves are specific in nature and may not be used for purposes other than those specified by their titles, except in the event of default when all reserves may be used to fund the debt service. To date, the only withdrawals have been from the replacement reserves and the taxes and insurance reserve for ordinary operating expenses. In addition, a $330,000 certificate of deposit has been pledged for working capital at Irving Federal.

The bonds were issued on December 4, 1985 at a variable rate of interest adjusting monthly and maturing in 2009. The executors of the estate elected to convert the interest rate on the bonds to a fixed rate of 7.70% for the period commencing July 1, 1987 through April 30, 1997.



8-20-90 EF-6

WON034 1121 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

ASSETS SUBJECT TO SPECIAL MENTION

| Total Dollar Amount<br>Name of Borrower<br>Description<br>Comments | Amount Criticized |
|---|---|
| $400,000<br>Tara Air Corporation<br>Airplane | $400,000 |

The above debt consists of a $400,000 single-pay note dated May 1, 1990, and due May 1, 1991. This loan represents a renewal of a $400,000 single-pay loan that was originated in May 1989. The original purpose of this loan was to purchase a 1976 Rockwell 690B Aircraft that had a sales price of $484,000. The airplane serves as the sole collateral on this debt and management indicated that repayment of the debt will come from the sale of the collateral. This loan also has three separate guarantees for $400,000. Management indicated that the guarantors individual net income could serve as an additional source of debt reduction. Outdated financials indicated that the guarantors all had substantial net worth and adequate net income to service the debt. The corporation's only asset is the airplane. Management could not estimate the value of the airplane, but indicated that the value usually increases due to limited production of these types of airplanes.



8-20-90 BF6

Date: August 20, 1990 Docket No.: 08515

ASSETS SUBJECT TO SPECIAL MENTION (Continued)

| Total Dollar Amount<br>Name of Borrower<br>Description<br>Comments | Amount Criticized |
|---|---|
| $90,000<br>Kairob Enterprises, Inc.<br>Guaranteed by Howard Levinson | $90,000 |
| $105,000<br>Howard Levinson | $105,000 |

The above debt consists of two single-pay notes that were originated in April 1990, and mature in April 1991. Proceeds of the loans were used to purchase a 1975 Cessna C421 Airplane and to pay-off a $75,000 unsecured note at this institution. Collateral for this debt consists of the airplane (purchase price $110,000) and a mortgage on vacant land in Chicago with an appraised value of $117,750 in May 1990. No financial information on the corporation was in the credit file and reportedly the only asset of the corporation is the airplane. A personal financial statement of Mr. Levinson indicates a net worth of approximately $4 million with the majority of the net worth being equity in real estate. Mr. Levinson's financial statement indicates an annual income of $127,000 for the year ending September 30, 1989. Management indicated that the main source of repayment would come from the sale of the airplane and the sale of the real estate.

Both lines of credit are listed as special mention due to the lack of a specific repayment program. While all loans appear to be adequately secured through the collateral and the financial strengths of the borrowers, the lack of a sound repayment program contradicts prudent lending practices. In addition, the institution's lending policy does not specifically address acceptable guidelines concerning aircraft lending.



8-20-90 EF-6

WON034 1123 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 [redacted] Docket No.: 08515

LOANS IN PROCESS AND COMMITMENTS

Instructions: The following are outstanding loans in process and commitments considered to be of supervisory interest or concern. Describe cause of concern, such as potential liquidity effects or cost of liabilities to fund commitment, credit concerns or market risk with respect to the type of loan/project financed. In addition, all individual loans in process and commitments (fee paid or other) in excess of 1% of the association's assets must be listed here.

The institution has a $3 million credit enhancement on the following project. The following excerpts were taken from the June 11, 1990 examination of the Savings and Loan Network (RESCORP).

Arlington Country Club Apartments consists of 430 apartment units on 38.7 acres of land located in Wheeling, Illinois. This complex was constructed in January 1988 by Lexington Homes, Inc. and First American Management, Inc. First American is the managing agent. This project was financed by the sale of $22.4 million of tax-exempt multi-family housing bonds issued by the Village of Wheeling. The bonds mature December 1, 2009. The project was appraised in 1985, when the loan was originated, at a value of $23,750,000.

The borrower is Arlington Club Partners, an Illinois general partnership. The general partner is the Benach Family Partnership and the beneficiary is Ronald Benach, a former principal owner of Lexington Homes, Inc.

During the period that the bond interest is a variable rate, the credit institution shall receive an annual fee of 2% of the face amount of the collateralized credit instrument. In the event that the bond interest rate converted to a fixed rate, the annual fee will be reduced to 1.5%. As of May 31, 1990, the project's financial statements indicate that these fees are paid on a monthly basis. The enhancement includes 10 financial institutions.

The project has three reserves as follows: Debt Service $1,174,272; Tax & Insurance $312,455; and Replacement $84,838. In addition, there is a working capital letter of credit for $1 million and a variable rate letter of credit for $1,120,000. The latter is to be used to pay all conversion costs in the event the bonds are converted and remarketed as fixed rate.

As of May 31, 1990, the borrower's obligations to the trustee and participating institutions were current but the project had a year-to-date net operating deficit of $77,464. According to the financial records and past audit reports maintained at the Network, the borrowers have been supporting the property since the project originated in 1985. Despite administrative, maintenance and operating expenses being higher than projected for the first five months of 1990, the project's financial viability appears to have been overestimated when the loan was originated in 1985.



8-20-90 EP-6

WON034 1124 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

LOANS IN PROCESS AND COMMITMENTS

A review of the project's limited marketing records indicated an average occupancy rate of 90% during 1989. This project does not meet debt service. As of May 31, 1990, debt service coverage was .91. However, our analysis of the project's most current operating statements indicate that even at 100% occupancy, a negative cash flow would still exist. This cash flow problem will increase when the payments of both principal and interest begin in 1991. Principal payments of $265,000 are scheduled annually beginning December 1, 1991, and increase each year thereafter until 2009.

A seven year financial projection beginning with this current fiscal year indicates a positive cash flow, after debt service, of $76,021 for 1990. However, negative cash flows are projected for 1991 through 1994 and again positive in 1995 through 1997. Annual rental income and total expenses are projected to increase 4.5% and 5.3%, respectively, through 1997.

The examiners noted that the management company at Arlington Club Apartments does not submit financial statements to Network on a monthly basis. In addition, there was no current financial information on the borrower. The audit for the fiscal year ended December 31, 1989 had not been completed during the examination.

After several requests by the network loan servicing personnel to the management company, the examiners were furnished monthly operating statements, occupancy reports and a 1988 audit report. In addition, a financial statement was obtained on the borrower. Mr. Benach's unaudited financial statement dated December 31, 1989 indicates a net worth of approximately $20 million.



8-20-90 EF-6

DATE: August 20, 1990 DOCKET NO: 08515

GAP REPORT ASSUMPTIONS

CYCLE: DEC 1989

| | 3 MONTHS OR LESS | 3 MONTHS TO 6 MTHS | 6 MONTHS TO 1 YR | 1 TO 3 YEARS |
|---|---|---|---|---|
| | ***** PREPAYMENT RATES BY REMAING TERM ****** (ANNUAL PERCENTAGE RATES) | | | |
| *** ASSETS *** | | | | |
| MORTGAGE LOANS AND CONTRACTS | | | | |
| First Mortgage Loans: | | | | |
| Adjustable-Rate: 1-4 Dwelling Units | | | | |
| Current Mkt Indices (Treas.,etc.) | 12.00 | 12.00 | 12.00 | 12.00 |
| Lagging Mkt Indices (COFI) | 12.00 | 12.00 | 12.00 | 12.00 |
| Fixed-Rate: 1-4 Dwelling Units | 8.00 | 8.00 | 8.00 | 8.00 |
| Mortgage Coupon Rate: | | | | |
| Less than 8.00% | | | | |
| 8.00% to 8.99% | | | | |
| 9.00% to 9.99% | | | | |
| 10.00% to 10.99% | | | | |
| 11.00% to 11.99% | | | | |
| 12.00% to 13.99% | | | | |
| 14.00% or more | | | | |
| Other Residential and All Nonresidential | | | | |
| Adjustable Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Fixed Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Second Mortgage Loans | 14.00 | 14.00 | 14.00 | 14.00 |
| *** LIABILITIES *** | *** OTHER ASSUMPTIONS (ANNUAL PCTG RATE) *** (PER PERIOD) | | | |
| DEPOSIT | | | | |
| Interest Bearing Deposits | | | | |
| Fixed Mat. Deposits: | | | | |
| Early Withdrawals | 0.00 | 0.00 | 0.00 | 0.00 |
| Passbook Accounts: Decay Rate | 27.00 | 27.00 | 27.00 | 14.00 |
| BORROWINGS | | | | |
| FHLB Advances: Prepayments | 0.00 | 0.00 | 0.00 | 0.00 |



8-20-90 EP-6

WON034 1126 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

DATE: August 20, 1990

DOCKET NO: 08515

GAP REPORT ASSUMPTIONS

CYCLE: DEC 1989

| | 3 TO 5 YEARS | 5 TO 10 YEARS | 10 TO 20 YEARS | >20 YEARS |
|---|---|---|---|---|
| | ***** PREPAYMENT RATES BY REMAING TERM ****** (ANNUAL PERCENTAGE RATES) | | | |
| *** ASSETS ***. | | | | |
| MORTGAGE LOANS AND CONTRACTS | | | | |
| First Mortgage Loans: | | | | |
| Adjustable-Rate: 1-4 Dwelling Units | | | | |
| Current Mkt Indices (Treas.,etc.) | 12.00 | 12.00 | 12.00 | 12.00 |
| Lagging Mkt Indices (COFI) | 12.00 | 12.00 | 12.00 | 12.00 |
| Fixed-Rate: 1-4 Dwelling Units | 8.00 | | | |
| Mortgage Coupon Rate: | | | | |
| Less than 8.00% | | 8.00 | 8.00 | 8.00 |
| 8.00% to 8.99% | | 8.50 | 8.50 | 8.50 |
| 9.00% to 9.99% | | 9.50 | 9.50 | 9.50 |
| 10.00% to 10.99% | | 11.00 | 11.00 | 11.00 |
| 11.00% to 11.99% | | 20.00 | 20.00 | 20.00 |
| 12.00% to 13.99% | | 30.00 | 30.00 | 30.00 |
| 14.00% or more | | 45.00 | 45.00 | 45.00 |
| Other Residential and All Nonresidential | | | | |
| Adjustable Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Fixed Rate | 10.00 | 10.00 | 10.00 | 10.00 |
| Second Mortgage Loans | 14.00 | 14.00 | 14.00 | 14.00 |
| *** LIABILITIES *** | *** OTHER ASSUMPTIONS (ANNUAL PCTG RATE) *** (PER PERIOD) | | | |
| DEPOSIT | | | | |
| Interest Bearing Deposits | | | | |
| Fixed Mat. Deposits: | | | | |
| Early Withdrawals | 0.00 | 0.00 | 0.00 | 0.00 |
| Passbook Accounts: Decay Rate | 14.00 | 12.00 | 12.00 | 12.00 |
| BORROWINGS | | | | |
| FHLB Advances: Prepayments | 0.00 | 0.00 | 0.00 | 0.00 |

A-16.2

8-20-90 EP-6

WON034 1127 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

DATE: August 20, 1990 DOCKET NO: 08515

INTEREST RATE RISK EXPOSURE REPORT - DEC 1989

MATURITY GAPS AS PERCENT OF ASSETS

| | 12/31/89 | 09/31/89 | 12/31/88 |
|---|---|---|---|
| 0 - 1 YEAR MATURITY GAP | | | |
| UNHEDGED | -13.2% | -22.6% | -19.9% |
| HEDGED | -2.7% | -4.4% | -17.9% |
| ALL INCLUSIVE | -3.3% | -8.3% | NA |
| 0 - 3 YEAR MATURITY GAP | | | |
| UNHEDGED | -12.3% | -19.0% | -17.2% |
| HEDGED | -5.7% | -12.9% | -17.0% |
| ALL INCLUSIVE | -6.2% | -15.9% | NA |

NOTE: MATURITY GAPS FOR PERIODS 6/30/89 MAY NOT BE COMPARABLE WITH PRIOR PERIODS

************************************************************************

INTEREST RATE SENSITIVITY OF 4 QUARTER NET INTEREST INCOME
ASSUMING THE FOLLOWING CHANGES IN INTEREST RATES

| DATA AS OF: | 12/31/89 $ | % CHG FR BASE CASE | 09/31/89 $ | % CHG FR BASE CASE | 12/31/88 $ | % CHG FR BASE CASE |
|---|---|---|---|---|---|---|
| 400 B.P | | | | | | |
| +300 B.P | | | | | | |
| +200 B.P | | | | | | |
| +100 B.P | | | DATA NOT YET AVAILABLE | | | |
| 0 B.P | | | | | | |
| -100 B.P | | | | | | |
| -200 B.P | | | | | | |
| -300 B.P | | | | | | |
| -400 B.P | | | | | | |

************************************************************************

INTEREST/RATE SENSITIVITY OF MARKET VALUE OF PORTFOLIO EQUITY
ASSUMING THE FOLLOWING CHANGES IN INTEREST RATES

| DATA AS OF: | 12/31/89 $ | % CHG FR BASE CASE | 09/31/89 $ | % CHG FR BASE CASE | 12/31/88 $ | % CHG FR BASE CASE |
|---|---|---|---|---|---|---|
| 400 B.P | | | | | | |
| +300 B.P | | | | | | |
| +200 B.P | | | | | | |
| +100 B.P | | | DATA NOT YET AVAILABLE | | | |
| 0 B.P | | | | | | |
| -100 B.P | | | | | | |
| -200 B.P | | | | | | |
| -300 B.P | | | | | | |
| -400 B.P | | | | | | |

************************************************************************

CAPITAL POSITION

| DATA AS OF: | 12/31/89 $ | % OF TOT ASSETS | 09/31/89 $ | % OF TOT ASSETS | 12/31/88 $ | % OF TOT ASSETS |
|---|---|---|---|---|---|---|
| REGULATORY | 0 | 0.0 | 23,770 | 5.8 | 28,518 | 6.9 |
| GAAP | 10,852 | 2.9 | 11,170 | 2.7 | 18,104 | 4.4 |



8-20-90 BP-6

WON034 1128 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Name and Address of Service Corporation:
PEORIA SAVERS DEVELOPMENT, INC.
200 Southwest Jefferson Street
Peoria, Illinois 61602

Location of Offices: Same

Principal Business (Insurance, Construction, Etc.): Rental property, land development, insurance and loan origination.

Percent Association Ownership: 100%

Association Investment:

| | Amount | Percent to Total Association Assets |
|---|---|---|
| Stock (at cost) | $1,510,000 | .4% |
| Secured Loans | - | - |
| Unsecured Loans | - | - |
| Other | | |
| TOTAL | $1,510,000 | .4% |

Description of Activities:

The activities of the service corporation consist of ownership and rental of three office buildings in the Knoxville Executive Plaza, as well as 50 percent ownership under a joint venture agreement of two office buildings in an adjacent area. Other activities include general insurance sales, developed lot sales, and acquisition, development and construction of office buildings in Peoria, Illinois.

Officers, Directors and Major Employees:

| Name | Title | Annual Salary | Relationship With Insured Institution |
|---|---|---|---|
| HOLLAND, Homer J. | D,CB | None | D,VCB,CEO |
| KILPATRICK, Roger L. | D,P | None | EVP |
| BANGERT, Steven | D,VP | None | D,T |
| RICHARDSON, Gary L. | D,T,S | None | SVP |
| PIKUS, Ronald | D | None | P,MO |



8-20-90 EF-6

Date: August 20, 1990

Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Comments:

This service corporation is a direct result of the merger of Peoria Savings in December 1988. Net income for the year ended December 31, 1989 totaled $47,322. For the seven months ended July 31, 1990, net income totaled $38,330. Assets totaled $2,970,543 at July 31, 1990.

As of the examination date, the service corporation is in the process of being dissolved. This is being accomplished through the sale of real estate owned, which represents the majority of the assets of the service corporation. Details of the service corporation activities are as follows:

1. Knoxville Executive Plaza/Knoxville Partners Joint Venture

The service corporation owns three commercial office buildings located within the Knoxville Executive Plaza in Peoria, Illinois (Tract 1). In addition, the service corporation has a 50 percent ownership interest under a joint venture agreement in two additional commercial office buildings located on property immediately adjacent to the Knoxville Executive Plaza (Tract 2). Charles Rock, a local Peoria realtor, currently owns the other 50 percent interest in the joint venture. One of the buildings in Tract 2 is under construction, and is being funded through the joint venture.

An offer to purchase both properties was made by Charles Rock and Associates, Inc. on March 19, 1990 for $1,035,000. The offer includes the purchase of all three buildings in Tract 1, as well as the purchase of the service corporation's 50 percent interest in the joint venture, which is sole owner of the two buildings in Tract 2. Under the terms of the purchase offer, mortgages secured by the buildings in Tract 2 which are obligations of the joint venture will be paid in full at the time of closing.

The service corporation has accepted the offer of Charles Rock and Associates, Inc. for purchase of these properties. The purchase, which is expected to close on September 14, 1990, will be financed through an outside source. As of July 31, 1990, the book value of the Knoxville Executive Plaza less depreciation plus the equity interest in the joint venture totaled approximately $833,875 resulting in a potential net gain on the sale of approximately $201,125.



8-20-90 CFr6

WON034 1130 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

2. Lynnhurst Woods Development Lots

The service corporation owns 15 undeveloped lots with a book value of $136,960 at July 31, 1990. The lots are located in the Lynnhurst and Yorkshire subdivision in Peoria, Illinois. Since the previous examination, 20 lots have been sold at an average price of $7,450 a lot. An allowance for losses on lots totaled $92,372 at July 31, 1990.

An offer to purchase 10 of the remaining 15 lots was received on July 26, 1990. This offer is from an investors trust which is independent of the institution and the service corporation. The offer to purchase is for $75,000, and is expected to close in September 1990.

Mr. Kilpatrick stated that the remaining five lots will be difficult to sell due to a less desirable location. He indicated that the valuation allowance should be sufficient to cover the value of these lots.



8-20-90 EP-6

WON034 1131 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990

Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Peoria Savers Development, Inc.

Comparative Statement of Condition

| | Month Ended 07/31/90 | Year Ended 12/31/89 | Year Ended 12/31/88 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash | $1,388,850 | $1,258,566 | $ 816,094 |
| Account Receivable | 9,845 | 28,000 | 27,348 |
| Note Receivables | 0 | 0 | 4,507 |
| Contract for deed | 17,394 | 18,803 | 40,391 |
| Prepaid Expenses | (3,030) | 658 | 1,651 |
| Office building- Knoxville Plaza | 715,775 | 715,775 | 715,775 |
| Furniture and Fixtures | 1,185 | 1,185 | 0 |
| Land- Knoxville Plaza | 152,775 | 152,775 | 152,775 |
| Office building improvements | 237,791 | 237,791 | 236,591 |
| Land- Lynnhurst | 136,960 | 210,660 | 295,960 |
| Spec. Construction | 0 | 0 | 80,469 |
| Building- revaluation | 300,000 | 300,000 | 300,000 |
| Equity in PSD Insurance | 0 | 0 | 237,860 |
| Equity in Knoxville Partners JV. | 12,998 | 16,681 | 220 |
| TOTAL ASSETS | $2,970,543 | $2,940,894 | $2,909,641 |
| **LIABILITIES** | | | |
| Accounts payable | $ 0 | $ 172 | $ 1,285 |
| Mortgage loans payable | 0 | 0 | 70,700 |
| Accrued expenses | 6,704 | 4,458 | 2,883 |
| Accrued Federal/State taxes | 0 | 28,079 | 28,079 |
| Escrow-Lynnhurst lots | 900 | 2,700 | 0 |
| Lots- revaluation Lynnhurst | 92,372 | 91,000 | 91,000 |
| Accrued real estate taxes | 14,750 | 24,881 | 23,255 |
| Allowance for depreciation | 554,168 | 536,989 | 507,165 |
| Allowance- Amortization Bldg. | 31,296 | 15,648 | 0 |
| Reserve for losses on lots | 0 | 9,474 | 26,103 |
| Accrued Space & Usage Fees | 24,500 | 21,000 | 0 |
| Accrued Franchise Tax | 1,030 | 0 | 0 |
| TOTAL LIABILITIES | $ 725,720 | $ 734,401 | $ 750,470 |



8-20-90

EF-6

WON034 1132 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 . CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Peoria Savers Development, Inc.
Comparative Statement of Condition

| | Month Ended 07/31/90 | Year Ended 12-31-89 | 12-31-88 |
|---|---|---|---|
| NET WORTH | | | |
| Common stock | $1,510,000 | $1,510,000 | $1,510,000 |
| Retained earnings | 487,493 | 487,493 | 440,171 |
| Appraised equity capital | 0 | 0 | 0 |
| Purchase accounting equity | 209,000 | 209,000 | 209,000 |
| Undistributed income | 38,330 | | |
| TOTAL NET WORTH | $2,244,823 | $2,206,493 | $2,159,171 |
| TOTAL LIABILITIES AND NET WORTH | $2,970,543 | $2,940,894 | $2,909,641 |

A - 23.5

8-20-90 GF-6

Date: August 20, 1990 Docket No.: 08515

**SERVICE CORPORATIONS**

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

**Peoria Savers Development, Inc.**
**Comparative Statement of Operations**

| | Seven Months Ended 07-31-90 | Year Ended 12-31-89 | Year Ended 12-31-88 |
|---|---|---|---|
| **INCOME** | | | |
| Rental income | $ 73,302 | $ 140,127 | $ 134,285 |
| Interest income-loans | 878 | 2,000 | 8,653 |
| Interest income-investments | 1,544 | 0 | 0 |
| Investment income | 32,520 | 44,917 | 35,098 |
| PSD Insurance income | 0 | 10,364 | 68,858 |
| PSD Mortgage income (loss) | 0 | 0 | (186,967) |
| Income from lot sales | 0 | 17,300 | 27,171 |
| Miscellaneous income | 0 | 132 | 337 |
| Profit from sale- spec. | 0 | 2,468 | 15,689 |
| TOTAL INCOME | $ 108,244 | $ 217,308 | $ 103,124 |
| **EXPENSES** | | | |
| Officer's/Directors fees | $ 2,703 | $ 0 | $ 10,800 |
| Management fees | 24,500 | 42,000 | 42,000 |
| Audit fees | 2,246 | 4,025 | 4,004 |
| State and Fed. inc. tax exp. | (28,079) | 0 | 0 |
| Franchise tax expense | 1,030 | 1,765 | 1,765 |
| Depreciation expense | 17,180 | 29,824 | 29,923 |
| Building expense | 16,639 | 31,556 | 37,735 |
| Real estate taxes | 8,473 | 12,354 | 7,741 |
| Lynnhurst expenses | 0 | 7,612 | 822 |
| Leasing commissions | 0 | 0 | 721 |
| Loss on lots- reserve | 13,150 | 8,395 | 14,395 |
| Loss on loans | (13,150) | 0 | 0 |
| Expenses from lot sales | 6,023 | 13,218 | 20,916 |
| Amortization of Bldg. revaluation | 15,648 | 15,648 | 0 |
| Knoxville Partners JV loss | 3,682 | 1,289 | 17,280 |
| Loss from spec. sale | 0 | 0 | 1,267 |
| Miscellaneous expenses | (131) | 2,300 | 3,774 |
| Dividend expense | 0 | 0 | 31,918 |
| TOTAL EXPENSES | $ 69,914 | $ 169,986 | $ 225,061 |
| NET INCOME (LOSS) | $ 38,330 | $ 47,322 | $ (121,937) |



8-20-90 EP-6

WON034 1134 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Name and Address of Service Corporation:
RIVER VALLEY INSURANCE SERVICES, INC.
7625 North University Avenue
Peoria, Illinois 61614

Location of Offices: Same

Principal Business (Insurance, Construction, Etc.): Insurance

Percent Association Ownership: 50%

Association Investment:

| | Amount | Percent to Total Association Assets |
|---|---|---|
| Stock (at cost) | $1,000 | -% |
| Secured Loans | | |
| Unsecured Loans | | |
| Other | ——— | — |
| TOTAL | $1,000 | -% |

Description of Activities: General insurance sales

Officers, Directors and Major Employees:

| Name | Title | Annual Salary | Relationship With Insured Institution |
|---|---|---|---|
| HOLLAND, Homer J. | D,P | None | D,VCB,CEO |
| ROSS, Howard R. | D | None | CB,D |
| BANGERT, Steven | D,S | None | D,T |
| RICHARDSON,Gary L. | AS | None | SV |

Comments:

This service corporation is a result of the merger of Home Federal. Its only activity is insurance sales. For the seven months ended July 31, 1990, the service corporation had net income of $1.275. For the year ended December 31, 1989, net income totaled $3,269. Assets totaled $15,461.

The other 50% owner is Vic Hefner Insurance Agency which manages the operation of the insurance business.



8-20-90 EF-6

WON034 1135 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

SERVICE CORPORATIONS

Section 563.9-8(B)(10) of the Rules and Regulations for Insurance of Accounts

Name and Address of Service Corporation:
RIVER VALLEY FINANCIAL SERVICES, INC.
200 Southwest Jefferson Street
Peoria, Illinois 61602

Location of Offices: Same

Principal Business (Insurance, Construction, Etc.): Annuity Sales

Percent Association Ownership: 100%

Association Investment:

| | Amount | Percent to Total Association Assets |
|---|---|---|
| Stock (at cost) | $ 1,000 | -% |
| Secured Loans | 5,000 | - |
| Unsecured Loans | | |
| Other | | |
| TOTAL | $ 6,000 | -% |

Description of Activities: Acts as a conduit for annuity sales.

Officers, Directors and Major Employees:

| Name | Title | Annual Salary | Relationship With Insured Institution |
|---|---|---|---|
| HOLLAND, Homer J. | D,P | None | D,VCB,CEO |
| ROSS, Howard R. | D | None | CB,D |
| BANGERT, Steven | D;S | None | D,T |
| RICHARDSON, Gary L. | AS | None | SVP |

Comments:

This service corporation is a result of the merger of Home Federal. For the seven months ended July 31, 1990 and the 12 months ended December 31, 1989, net income was $65,790 and $83,942 respectively. Assets totaled $189,123 on July 31, 1990.



8-20-90 EF-6

Date: August 20, 1990 Docket No.: 08515

OTHER AFFILIATES
Section 2(b) of the Banking Act of 1933 (12 USC 221a(b))

---

Name and Address of Affiliate:
P.S. CAPITAL CORP.
1100 North Market Street
Wilmington, Delaware 19801

Date Last Examined: June 26, 1989

Principal Business (Insurance, Real Estate, Etc.): Finance subsidiary

Other Businesses: None

Officers, Directors and Principals:

| Name<br>Title | Annual Salary | No. of Shares Owned | % of Total Outstanding Shares | Insured Institution |
|---|---|---|---|---|
| KILPATRICK, Roger L.<br>D,P | None | None | None | EVP |
| HOLLAND, Homer J.<br>D | None | None | None | D,VCB,CEO |
| BANGERT, Steven<br>D | None | None | None | D,T |

Comments:

On December 5, 1986, this wholly-owned finance subsidiary of Peoria Savings (insured institution) was formed for the limited purpose of issuing short-term market auction rate non-voting preferred stock ("MAPS"). According to Mr. Kilpatrick, the stock issue was done in order to raise funds at an economical cost because of net operating loss carryforwards of the parent institution. The finance subsidiary was phased out during 1989, and currently has assets consisting only of $10,000 cash. Mr. Kilpatrick said that the dividend cost at periodic auctions increased during 1989 to the extent that the finance subsidiary was no longer an effective means of raising funds. In order to phase out the finance subsidiary, the preferred stock was redeemed at par value, and the collateral (primarily mortgage backed securities) was transferred to the parent institution at book value.

Mr. Kilpatrick stated that additional activity within the finance subsidiary is not projected. He added, however, that minimal amounts of cash will be maintained on the books of the subsidiary, in order to offer management the option of reactivating the subsidiary in the future.



8-20-90 EP-6

WON034 1137 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND GF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

OTHER AFFILIATES

Section 2(b) of the Banking Act of 1933 (12 USC 221a(b))

P.S. Capital Corp.

Comparative Statement of Condition

| | Year Ended 12-31-89 | 12-31-88 | 12-31-87 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash | $ 19,544 | $ 618 | $ 0 |
| Marketable securities | 242,139 | 30,671,981 | 28,267,934 |
| Short-term securities | 0 | 4,178,120 | 5,073,301 |
| Accrued interest receivable | 159,349 | 415,852 | 404,671 |
| Other assets | 0 | 1,864 | 7,706 |
| TOTAL ASSETS | $ 421,032 | $35,268,435 | $33,753,612 |
| **LIABILITIES** | | | |
| Dividends payable | $ 0 | $ 169,531 | $ 86,411 |
| Accounts payable | 13,439 | 542 | 10,050 |
| TOTAL LIABILITIES | $ 13,439 | $ 170,073 | $ 96,461 |
| **NET WORTH** | | | |
| Common stock | $ 10,000 | $ 100 | $ 100 |
| Preferred stock (MAPS) | 0 | 17,194,158 | 17,194,158 |
| Paid in capital | 0 | 14,817,167 | 14,817,167 |
| Retained earnings | 397,593 | 3,086,937 | 1,645,726 |
| TOTAL NET WORTH | $ 407,593 | $35,098,362 | $33,657,151 |
| TOTAL LIABILITIES AND NET WORTH | $ 421,032 | $35,268,435 | $33,753,612 |



8-20-90 EF-6

WON034 1138 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 199[illegible]

Docket No.: 08515

OTHER AFFILIATES

Section 2(b) of the Banking Act of 1933 (12 USC 221a(b))

Reconciliation of Net Worth

| | | | |
|---|---|---|---|
| Beginning balance | $ 35,098,362 | $33,657,151 | $32,063,699 |
| Capitalization | 0 | 0 | 0 |
| Income for period | 1,078,208 | 2,591,681 | 2,518,074 |
| Preferred Stock Redemption | (17,194,158) | 0 | 0 |
| Trsf. of Marketable Sec. | (14,807,267) | 0 | 0 |
| Dividends on Common Stock | (3,767,552) | 0 | 0 |
| Dividends on MAPS | 0 | (1,150,470) | (924,622) |
| Ending net worth | $ 407,593 | $35,098,362 | $33,657,151 |

P.S. Capital Corp.

Comparative Statement of Operations

| | Year Ended 12-31-89 | 12-31-88 | 12-31-87 |
|---|---|---|---|
| INCOME | | | |
| Mortgage backed-securities | $ 2,282,263 | $ 2,433,851 | $ 2,451,269 |
| Investments | 566,773 | 300,808 | 174,237 |
| Amortization of loan premium | 12,110 | (26,772) | 0 |
| TOTAL INCOME | $ 2,861,146 | $ 2,707,887 | $ 2,625,506 |
| EXPENSES | | | |
| Preferred Stock Dividend | $ 1,371,111 | $ 0 | $ 0 |
| Loss-Retir. of Pref. Stk. | 305,842 | 0 | 0 |
| Administrative Expenses | $ 105,985 | $ 116,206 | $ 107,432 |
| TOTAL EXPENSES | $ 1,782,938 | $ 116,206 | $ 107,432 |
| NET INCOME | $ 1,078,208 | $ 2,591,681 | $ 2,518,074 |



8-20-90 EF-6

WON034 1139 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No.: 08515

FINANCIAL REPORTING ERRORS

| Report Date | Line Item | Correct Amount | Reported As |
|---|---|---|---|
| 6-30-90 | SC 210 | 100,448 | 100,427 |
| 6-30-90 | SC 215 | 83,265 | 83,286 |
| 6-30-90 | SC 240 | 1,456 | 1,447 |
| 6-30-90 | SC 272 | 3,348 | 3,357 |
| 6-30-90 | SC 32 | 886 | 3,500 |
| 6-30-90 | SC 300 | 827 | 3,441 |
| 6-30-90 | SC 34 | 9,664 | 7,050 |
| 6-30-90 | SC 323 | 5,879 | 3,265 |
| 6-30-90 | SC 330 | 889 | 886 |
| 6-30-90 | SC348 | 216 | 219 |
| 6-30-90 | SC 780 | 1,990 | 2,019 |
| 6-30-90 | SC 793 | 0 | <29> |



8-20-90

WON034 1140 HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER

Date: August 20, 1990 Docket No: 08515

VIOLATIONS OF LAWS OR REGULATIONS

Instructions: Describe below all violations of laws or regulations discovered during the examination. Note with an asterisk those referred previously and which remain uncorrected.

| Law or Regulation Violated | # of Violations/ Amount of Loss Incurred, If Any | Description of Circumstances Surrounding Violation |
|---|---|---|
| 12 C.F.R. Section | | |
| 567.2 | 3/None | Failed all three capital requirements. |
| 552.6-1(g) | 1/None | Bonuses were approved by those who benefit from them. |
| 563.171 | 1/None | Appraisal policy does not conform. |
| 567.6(a)(1)(iv)(N) | 1/None | Included residuals in 20% risk category instead of 100%. |
| 571.16(d)(2)(i) | 1/None | Securities collateralizing borrowings should be held unencumbered for 35 days in 12 month period. |
| 563.190(a) | 1/None | Surety bond coverage was inadequate. |
| Federal Reserve Act | | |
| Section 22(h)/ 12 U.S.C. Section 375b | 1/None | Loan granted at favorable terms. |
| Section 23B(a)(1)(A) | 1/None | Consulting agreement signed with a related entity without first obtaining competitive bids. |
| Section 23A(c)(1) | 1/None | Unsecured extension to affiliate. |



8-20-90 EF-6

WON034 1141 L HOLLAND 95-524C RIVER VALLEY SB FSB DOCKET # 08515 TRANS 880729 WIN BOX # WC00016963 ACC # 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 OLD BOX # 13 OF 58 C2086 EXAM FILE AND OF FILE; INDEX; AGENDA; REPORTS; CORRESPONDENCE; MEETING MINUTES; EXHIBITS; APPLICATION; FINANCIAL STATEMENTS 900899 - 921299 CONFIDENTIAL MATERIAL - SUBJECT TO PROTECTIVE ORDER