**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 95-524C**
**(Judge George W. Miller)**

---

**HOMER J. HOLLAND, STEVEN BANGERT, Co-Executor of the Estate of HOWARD R. ROSS, and FIRST BANK,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS

---

**MICHAEL HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**JOHN H. ROBERSON**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor, 1100 L Street**
**Washington, D.C. 20530**
**Tele: (202) 353-7972**
**Fax: (202) 514-8640**

**OF COUNSEL:**

**SCOTT D. AUSTIN**
**ELIZABETH A. HOLT**
**WILLIAM G. KANELLIS**
**BRIAN A. MIZOGUCHI**
**AMANDA L. TANTUM**
**JOHN J. TODOR**
**SAMEER P. YERAWADEKAR**
**Trial Attorneys**

**December 17, 2007**

**Attorneys for Defendant**

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES. .......... iv

INTRODUCTION.......... 2

ARGUMENT. .......... 5

I. STANDARD OF REVIEW. .......... 5

II. PLAINTIFFS' SAFSB DAMAGES CLAIMS FAIL AS A MATTER OF FACT AND LAW. .......... 5

A. Plaintiffs Have Not Demonstrated That They Suffered Any Damages Resulting From WCHI's Acquisition Of SAFSB. .......... 6

1. Plaintiffs Have Failed To Show A Close, Direct, And Inevitable Nexus Between The Breach And The Alleged Harm. .......... 6

2. River Valley Mitigated Any Effect Of The Breach With Respect To The SAFSB Opportunity By Facilitating The Acquisition Of SAFSB Through Western Capital Holdings, Inc.. .......... 7

3. The SAFSB Claim Would Result In A Double Recovery. .......... 9

B. Plaintiffs Have Not Shown That The Purported Inability Of River Valley III To Obtain SAFSB Was Caused By The Breach. .......... 11

1. The SAFSB Transaction Was An Independent And Collateral Undertaking. .......... 11

2. River Valley's Inability To Consummate The SAFSB Transaction Was The Result Of Intervening Factors. .......... 12

a. ANB Refused To Lend River Valley More Funds. .......... 12

b. River Valley Did Not Obtain Alternative Financing. .......... 13

c. The SAFSB-Related Damages Were Not Caused By The Breach, But By An Increase In The Market Value Of SAFSB's Assets. .......... 13

C. Any Damages Due To River Valley's Inability To Acquire SAFSB Were Not Foreseeable By The Government. .......... 14

D. Plaintiffs' SAFSB-Related Damage Claims Are Not Reasonably Certain. .......... 16

1. Plaintiffs' New Claim For $45 Million In SAFSB-Related Damages Is Speculative And Unreliable. .......... 16

2. Plaintiffs' New Claim For $35 Million In SAFSB-Related Damages Is Speculative And Unreliable. .......... 17

3. Plaintiffs' New $29.963 Million SAFSB-Related Damage Claim, And Its Prior $28.6 Million Claim Are Speculative And Unreliable. .......... 19

III. PLAINTIFFS HAVE NOT PROVEN THEIR CLAIM FOR DIMINISHED ECONOMIC VALUE. .......... 19

A. Dr. Murphy's Methodology Is Unreliable. .......... 20

1. First Bank's Lost Value Calculation Is Contrary To River Valley's Contemporaneous Direct Valuations. .......... 20

2. Dr. Murphy's Lost Value Model Is Not Based Upon Independent Analysis Or Market-Tested Valuations Of The Preferred Stock. .......... 22

3. Dr. Murphy's Extrapolation To River Valley II Of The Purported Lost Value To River Valley I Is Unreliable. .......... 25

B. Plaintiffs Have Not Shown That The Purported Diminution in Value Was Caused By The Breach. .......... 25

1. Non-Breach Factors Affected The Thrifts But Plaintiffs Failed To Account For Such Factors In Their Diminished Value Claim. .......... 25

2. The Thrifts' High-Risk MBS And Other Mortgage-Related Assets Caused The Regulatory Criticisms Of The Thrift. .......... 27

IV. PLAINTIFFS HAVE NOT PROVEN THEIR RETAINED EARNINGS MITIGATION THEORY. .......... 28

A. Dr. Holland's Retained Earnings Claim. .......... 28

B. Dr. Holland's Retained Earnings Theory Fails As A Matter Of Law. .......... 29

1. The Breach Did Not Cause River Valley To Retain Additional Earnings. .................................................................... 30

2. Dr. Holland Has Not Identified A But-For World. .................................. 31

3. The River Valley Thrifts' Contractual Capital Could Not Have Been Transferred To First Bank, Precluding Retained Earnings Damages After First Bank's Acquisition. ................................ 32

4. First Bank's Retained Earnings Damages Were Not Reasonably Foreseeable At The Time Of Contracting. ........................... 34

C. First Bank's Measure Of Damages For Retained Earnings Is Not Reasonably Certain. .......................................................................... 35

1. River Valley's *Ex Post* Cost Of Capital Should Be Measured By The Actual Dividends Paid. ............................................... 35

2. An Award Based Upon Dr. Holland's Retained Earnings Theory Would Result In A Double Recovery To River Valley's Shareholders. ............................................................... 36

3. Dr. Holland's Retained Earnings Methodology Is Flawed And Unreliable. ........................................................................... 38

a. Dr. Holland's Retained Earnings Theory Is Not Based Upon Actual Dividends Paid Or An Actual Cash Flow. ......................................................................... 38

b. Dr. Holland Effectively Imposes Prejudgment Interest. ............... 39

CONCLUSION. ............................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

Am. Fed. Bank, FSB v. United States,
72 Fed. Cl. 586 (2006), appeal argued, No. 2007-5040 (Fed. Cir. 2007) .................................. 10

Bank of Am., FSB v. Doumani,
495 F.3d 1366 (Fed. Cir. 2007)........................................................................................ *passim*

Bank of Am., FSB v. United States,
67 Fed. Cl. 577 (2005), aff'd sub nom., Bank of Am., FSB v. Doumani,
495 F.3d 1366 (Fed. Cir. 2007)........................................................................................ *passim*

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003)............................................................................................. 10

Bohac v. Dep't. of Agric.,
239 F.3d 1334 (Fed. Cir. 2001)............................................................................................. 14

Cal Fed Bank, FSB v. United States,
395 F.3d 1263 (Fed. Cir. 2005)............................................................................................... 5

Chain Belt Co. v. United States,
115 F. Supp. 701 (1953). ...................................................................................... 5, 15, 30

Cienega Gardens v. United States,
503 F.3d 1266 (Fed. Cir. 2007) ........................................................................................ 2, 29

Citizens Fed. Bank v. United States,
474 F.3d 1314 (Fed. Cir. 2007)............................................................................................... 6

Citizens Fed. Bank v. United States,
66 Fed. Cl. 179 (2005), aff'd, 474 F.3d 1314 (Fed. Cir. 2007). .......................................... 37

Columbia First Bank, FSB v. United States,
60 Fed. Cl. 97 (2004). ............................................................................................................ 5

Cooper v. United States,
37 Fed. Cl. 28 (1996). ............................................................................................................ 5

Daubert v. Merrell Dow Pharm., Inc.,
509 U.S. 579 (1993)............................................................................................................. 25

Estate of Berg v. United States,
687 F.2d 377 (Ct. Cl. 1982). ................................................................................................ 14

Fifth Third Bank of W. Ohio v. United States,
402 F.3d 1221 (Fed. Cir. 2005)...................................................................................... 3, 30, 38

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001).......... 19

Granite Mgmt. Corp. v. United States,
74 Fed. Cl. 155 (2006), appeal argued, No. 2007-5054 (Fed. Cir. 2007).......... 32, 33

Granite Mgmt. Corp. v. United States,
416 F.3d 1373 (Fed. Cir. 2005).......... 30, 38

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004).......... 6, 9

Home Sav. of Am., F.S.B. v. United States,
399 F.3d 1341 (Fed. Cir. 2005).......... 36

Howard Indus. v. United States,
126 Ct. Cl. 283, 115 F. Supp. 481 (1953).......... 5

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed Cir. 2003).......... *passim*

Menne v Celotex Corp.,
861 F.2d 1453 (10th Cir. 1988).......... 6

Myerle v. United States,
33 Ct. Cl. 1 (1897).......... *passim*

N. Helex Co. v. United States,
524 F.2d 707 (Ct. Cl. 1975).......... 14

Ramsey v. United States,
101 F. Supp. 353 (Ct. Cl. 1951).......... 33

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997).......... 32

S. Nat'l Corp. v. United States,
57 Fed. Cl. 294 (2003).......... 6

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996).......... *passim*

**MISCELLANEOUS**

1 Dan B. Dobbs, Law of Remedies § 3.8(2) (2d ed. 1993).......... 14

Restatement (Second) of Contracts (1981) § 351 & cmt. d.......... 15

Restatement (Second) of Contracts (1981) § 351 cmt. e.......... 15, 34

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, co-executor of the<br>ESTATE OF HOWARD R. ROSS, and<br>FIRST BANK, | |
| Plaintiffs, | |
| v. | No. 95-524C |
| | (Judge George W. Miller) |
| THE UNITED STATES, | |
| Defendant. | |

**DEFENDANT'S MOTION FOR JUDGMENT**
**BASED UPON PARTIAL FINDINGS**

Defendant, the United States, respectfully requests the Court to enter judgment pursuant to Rule 52(c) for the Rules of the United States Court of Federal Claims ("RCFC") against plaintiffs, Homer J. Holland, Steven Bangert, co-executor of the estate of Howard R. Ross, and First Bank. Rule 52(c) allows for the entry of judgment as a matter of law after the close of a party's case if the Court finds against that party on the issues it presented. After the close of plaintiffs' case, the facts of record, and applicable precedent, establish that plaintiffs cannot as a matter of law prevail upon any of their claims. Accordingly, we are entitled to judgment in our favor denying plaintiffs' damages claims.

In support of this motion, we rely upon the record established at trial, the parties' joint stipulations of fact ("JSF"), and the following brief.

## INTRODUCTION

Plaintiffs claim: (a) up to $45 million as a result of a purported inability to acquire a Texas thrift, San Antonio Federal Savings Bank ("SAFSB") in 1992, (b) $21 million for a purported diminution-in-value, and (c) $21 million in retained earnings damages. Plaintiffs have therefore asserted that, as a result of FIRREA's phase-out of approximately $20 million in paper regulatory accounting "capital," they are due more than $65 million. Plaintiffs' damage claims are without merit as a matter of both common sense and law. Cf. Cienega Gardens v. United States, 503 F.3d 1266, 1282 n.13 (Fed. Cir. 2007) ("A determination that damages exceed the value of the property should be indicative that the method of computing damages is flawed.").

Even if plaintiffs' inability to acquire SAFSB was injury, a position with which we disagree, plaintiffs successfully mitigated any damage, having secured for themselves SAFSB's profits by using River Valley to help finance and funnel this opportunity to a subsidiary beyond the reach of FIRREA's cross-guarantee provisions. Any repeat recovery of the $45 million claimed actual profits thus would be an impermissible double-recovery windfall. Plaintiffs' alternative claims for SAFSB's hypothetical profits fail the tests of foreseeability, causation and reliability. Moreover, any award for SAFSB damages would result in a double recovery because plaintiffs already received the SAFSB profits.

Plaintiffs' diminution-in-value theory proved to be utterly unreliable. At trial, plaintiffs' expert witness, Dr. Murphy, admitted that: (1) he undertook no independent analysis of the starting point of his valuation, adopting a valuation of $6.5 million that FSLIC itself had characterized as "soft" and assumption dependent; (2) the ending point of his valuation assumed that the difference between the soft FSLIC 1988 valuation and a March 1991 redemption price was due solely to the contractual capital being phased out, ignoring all effects upon value that

would have resulted from River Valley's operations, economic recession and other macroeconomic issues; (3) is counter to River Valley's own valuation, that showed River Valley's value substantially increased between the July 1988 preferred purchase, and its March 1991 redemption; and (4) is based upon an extrapolation from the preferred stock contribution and an assumed complete and unvarying identity between the River Valley I and II thrifts, without any independent analysis that could support such an assumption.

Plaintiffs' cost of retained earnings claim is facially overstated. Specifically, plaintiffs seek $21 million in cash damages (plus SAFSB profits) to replace $20 million of intangible regulatory capital subject to phase-out. Plaintiffs' own witness testified, however, that cash and goodwill are not of equal value. Tr. 500:22-501:17 (Bangert). Dr. Holland also stated that the amount of retained earnings that River Valley had in the actual world would have been in the non-breach world as well, thus showing that the breach did not cause River Valley to retain any additional earnings. Tr. 2444:9-24, 2571:13-23, 2575:3-7, 2593:25-2594:11, 2594:25-2595:17 (Holland). Thus, regardless of the cost of capital of retained earnings, the breach did not cause any damage because River Valley would have retained at least the same level of earnings in the but-for world as the actual world. Finally, plaintiffs' claim is legally unsupportable. As the Federal Circuit instructed in Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1236-37 (Fed. Cir. 2005), purely hypothetical cost of replacement capital models are impermissibly speculative. Plaintiffs' claim for a 20 percent cost of capital for additional capital they did not actually borrow fails this test.

Moreover, even if the Court concludes that River Valley did retain additional earnings due to the breach, the Federal Circuit instructed in Bank of America v. United States that, to the extent that retained earnings could give rise to any costs and damages, such a calculation

appropriately is based upon actual, not hypothetical, dividends paid. As in Bank of America, River Valley was sold to a large, well-capitalized institution, First Bank, providing River Valley shareholders with their "return" upon any additional retained earnings. Tr. 2442:12-25 ("So not only did we require a return of greater than 20 percent, we actually got a return of greater than 20 percent."), 2565:3-2566:15, 2596:4-2597:2 (Holland). Any award for retained earnings would thus grant a double recovery because First Bank already paid River Valley for the value of the retained earnings.

Further, much of plaintiffs' retained earnings calculation puts their loss in a period after First Bank purchased River Valley. Mr. Bangert acknowledged that intangible regulatory capital could not be sold or transferred. Tr. 500:22-501:17 (Bangert). Thus, and consistent with this Court's recent holding in Granite, there is no evidence that plaintiffs' alleged damages accrued after the First Bank acquisition. Plaintiffs' 20 percent retained earnings claim is a hypothetical cost, never paid in the real world, contrary to Federal Circuit precedent, premised upon flawed methodology and assumptions, and lacking causation, foreseeability, and reasonable certainty.

For these and additional reasons set forth below, the Court should grant our motion for judgment upon partial findings.

# ARGUMENT

## I. STANDARD OF REVIEW

Rule 52(c) provides that, during trial, the Court may enter judgment against a party when it determines that an issue must be decided against that party under controlling law. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 101-02 (2004). The applicable standard is not whether the plaintiff has made a prima facie case, as it would be for a directed verdict motion in a jury trial. See Cooper v. United States, 37 Fed. Cl. 28, 35 (1996). Instead, because the Court serves "as both the trier of fact and the trier of law," Rule 52(c) "permits the judge to weigh evidence and does not require that the judge resolve all credibility determinations in favor of the plaintiff." Id. "A plaintiff who has had full opportunity to put on his case and has failed to convince the judge, as trier of facts, of a right to relief, has no legal right . . . to hear the defendant's case." Howard Indus. v. United States, 126 Ct. Cl. 283, 289-90, 115 F. Supp. 481, 484-85 (1953).

## II. PLAINTIFFS' SAFSB DAMAGES CLAIMS FAIL AS A MATTER OF FACT AND LAW

Plaintiffs have failed to make the required showing that their claimed expectancy damages: (1) were the "immediate and proximate result of the breach;" (2) were "within the contemplation of the contracting parties" "because the loss was natural and inevitable upon the breach so that the defaulting party may be presumed from all the circumstances to have foreseen it;" and (3) can be established with "reasonable certainty."[1]

---

[1] Chain Belt Co. v. United States, 115 F. Supp. 701, 714 (1953); Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) (lost profits must flow "inevitably and naturally, not possibly nor even probably" from the breach); accord Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005).

### A. Plaintiffs Have Not Demonstrated That They Suffered Any Damages Resulting From WCHI's Acquisition Of SAFSB

#### 1. Plaintiffs Have Failed To Show A Close, Direct, And Inevitable Nexus Between The Breach And The Alleged Harm

For the plaintiffs to satisfy their burden of proving causation, the alleged damages must flow "inevitably and naturally, not possibly nor event probably" from the breach. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). While we respectfully disagree with the conclusion in Citizens Federal Bank v. United States, 474 F.3d 1314 (Fed. Cir. 2007), that a trial court must decide whether to apply a "substantial factor" test in assessing causation, the "substantial factor" requires the same result as the "but for" test. Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988) (noting that the substantial factor test in tort law has not "replaced the need for each liable defendant to be a but-for and substantial contributor to the indivisible injury").

Furthermore, the plaintiffs "should not be placed in a better position through the award of damages than if there had been no breach[,]" Hansen Bancorp Inc. v. United States, 367 F.3d 1297, 1315 (Fed. Cir. 2004), through an "unfair windfall" created by an award of damages greater than the damages suffered under the breached agreement. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1371 (Fed. Cir. 2003). The Court should reject plaintiffs' lost profits claim because it does not reflect "categories of activities, opportunities, or lines of businesses that the thrift would have undertaken in the but-for world." S. Nat'l Corp. v. United States, 57 Fed. Cl. 294, 306 (2003).

### 2. River Valley Mitigated Any Effect Of The Breach With Respect To The SAFSB Opportunity By Facilitating The Acquisition Of SAFSB Through Western Capital Holdings, Inc.

Even if the breach affected River Valley's capacity to acquire SAFSB in 1992, a premise with which we disagree, River Valley fully mitigated the breach by transferring the SAFSB-related opportunity from River Valley to Western Capital Holdings, Inc. ("WCHI"). All of the benefits of this act of mitigation (i.e., the $45 million in profits actually achieved at SAFSB) must be considered against the costs. Here, the $45 million in benefits of the mitigation enjoyed at an entity (WHCI) created by River Valley's shareholders, fully offset the purported "costs" of the very same $45 million in lost profits. Thus, none of the SAFSB profits were "lost" as a result of the transfer of the opportunity to WCHI.

The testimony of plaintiffs' witnesses demonstrated that the shareholders of River Valley, River Valley Holdings, Inc. ("RVHI"), and WCHI were identical, with the addition of John Rose and Ron Pikus. Mr. Rose brought the SAFSB deal to the attention of Messrs. Holland and Ross; Mr. Pikus was an executive at River Valley. The River Valley team provided a ten percent share in WCHI to Mr. Rose as compensation for the SAFSB opportunity. Tr. 550:21-23 (Bangert). All of the profits allegedly lost as a result of the breach, were obtained by WCHI and its successor.

Furthermore, Mr. Bangert testified that River Valley and SAFSB were unquestionably affiliated. River Valley I, River Valley II, Holland Partners, and SAFSB all shared offices at 200 South Wacker Street in Chicago because they shared the same management team. Tr. 538:9-21 (Bangert). The first employees of SAFSB after its acquisition by WCHI were River Valley Illinois employees and River Valley received no compensation from WCHI for passing on the SAFSB opportunity. Tr. 1436:25-1437:7, 1437:16-22 (Pikus). River Valley characterized its

transactions with SAFSB, which included purchases of loans and loan securitization and servicing, as "affiliated party transactions." DX 1017; Tr. 1389:25-1391:4 (Pikus).

River Valley fully cooperated with, and affirmatively facilitated, River Valley's shareholders' acquisition of SAFSB through WCHI. Specifically, River Valley up-streamed $6 million to RVHI to settle an ANB loan. ANB required this repayment as a condition of lending funds to WCHI for purchasing SAFSB. PX 657 at FHO012 2499-2500; JSF ¶ 350-51. The $6 million dividend was not inconsequential, as it required River Valley to shrink its balance sheet by $110 million. PX 657 at FHO012 2450; Tr. 566:11-24 (Bangert); JSF ¶ 351. By shrinking, River Valley freed up enough borrowing capacity so that it could repay $6 million to ANB (through RVHI), in order to facilitate WCHI's purchase of SAFSB. JSF ¶ 351-52.

Underscoring the elective nature of the structuring of the SAFSB transaction, plaintiffs have conceded that the SAFSB acquisition represented an optimal use of the $6 million, so that, rather than have River Valley retain the funds (and corresponding earnings), Dr. Holland and the other River Valley shareholders simply chose to obtain earnings in SAFSB instead. Tr. 703:13-704:15 (Bangert); Tr. 2699:12-2700:17 (Holland) ("I must have thought I could more than make that up in San Antonio Federal Savings Bank, I think is your question."); DX 644. Mr. Bangert stated that this only occurred because River Valley understood that its shareholders stood to gain the benefit of the SAFSB transaction regardless of whether the transaction occurred directly through River Valley, or through an entity created by its shareholders for the express purpose of realizing the opportunity. Tr. 566:25-567:21 (Bangert).

Finally, even if the Court held that River Valley did not mitigate by transferring the SAFSB-opportunity to WCHI, then in that case it failed to mitigate by not facilitating the transfer of SAFSB back to itself within one or two years of the actual SAFSB transaction, as

River Valley considered doing after the breach. Tr. 2739:22-2740:2 (Holland); JSF ¶ 369; PX 893. Furthermore, OTS terminated the Supervisory Agreement in August 1993. DX 863; Tr. 744:12-23 (Bangert). Even assuming, for the sake of argument, that the higher tangible capital levels in the Supervisory Agreement prevented River Valley from acquiring SAFSB directly, there was no such restriction after this date. Therefore, River Valley's decision not to merge SAFSB into River Valley after August 1993 is a failure to mitigate.

**3. The SAFSB Claim Would Result In A Double Recovery**

Dr. Holland acknowledged that he and Mr. Ross, as the owners of sixty percent of the WCHI stock, received sixty percent of SAFSB's profits during the time that WCHI owned the thrift. Tr. 2704:16-2705:3 (Holland). Should the Court grant damages in the amount of the SAFSB profits to the plaintiffs, plaintiff First Bank will not be the ultimate beneficiary of any award of damages, but is contractually obligated to provide any funds it receives to Dr. Holland and the estate of Mr. Ross. Tr. 2724:12-2725:2, 2727:17-2728:14 (Holland). Thus, any award of damages based upon the profits from SAFSB would bestow an improper windfall of one-hundred percent of SAFSB's profits on Dr. Holland and the estate of Mr. Ross, plaintiffs who have already obtained sixty percent, and who have shown no breach-related reason why they accepted a lower percentage share in SAFSB than they did in River Valley. See Hansen, 367 F.3d at 1315 ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement").

Furthermore, this impermissible double recovery only became possible as a structural matter because, as plaintiffs assert, River Valley cooperated in transferring the SAFSB opportunity to its shareholders (and their self-created entity, WCHI) as a mitigation strategy. As a matter of law, all benefits of mitigation must taken into account as well as costs. The $45

million in profits received by River Valley's shareholders through River Valley's mitigation must be offset against the purported lost profit costs now asserted by River Valley. See Am. Fed. Bank v. United States, 72 Fed. Cl. 586, 610 (2006), appeal argued, No. 2007-5040 (Fed. Cir. 2007) (citing Bluebonnet Sav. Bank, FSB v. United States, 339 F.3d 1341, 1346 (Fed. Cir. 2003)) ("any costs avoided or benefits received as consequence of the breach" must be counted against any costs incurred as a result of the breach).

Plaintiffs' moreover, fail to account for First Bank's purchase of River Valley in 1995. Plaintiffs stipulated prior to trial that River Valley III would have been sold to First Bank on or about January 4, 1995, even without the breach. JSF ¶ 376. Under this scenario, the Court would need to assume, implausibly, that in a nonbreach world, River Valley would have acquired SAFSB, sold it to First Bank in 1995, and yet, once held by First Bank, SAFSB would have been operated in the same fashion, obtaining exactly the same profits, as the actual Texas thrift. Plaintiffs have offered no evidence that First Bank would have wished to acquire SAFSB at the time of the River Valley purchase, nor have they offered any evidence of how First Bank would have operated SAFSB.

In the alternative, if First Bank acquired River Valley but not SAFSB in the but-for world (the same scenario as happened in the real world), then plaintiffs suffered no SAFSB-related damages after First Bank's acquisition of River Valley because they would have owned and operated SAFSB the same way in the but-for world as they did in the actual world. Dr. Holland testified that he assumed that SAFSB would return to its original shareholders in the but-for world. Tr. 2708:11-2709:8 (Holland) (in discussing 2001 expert report, Dr. Holland states that, "The principal difference between the but-for world and the actual world was that the San Antonio [Federal Savings Bank] would be acquired by River Valley from the period August of

'92 through November or December of 1994. And at the end of that period, I assume that San Antonio reverts to being an entity not under River Valley but owned by the shareholders.").

At trial, plaintiffs have improperly attempted to step back from their joint stipulation of fact that River Valley would have been sold to First Bank in the but-for world. JSF ¶ 376; Tr. 482:13-19 (Bangert); Tr. 2380:1-4, 2462:14-23 (Holland). Plaintiffs should not be permitted to escape their joint stipulation merely because they now find it tactically convenient at trial. Nevertheless, if the Court were to assume that River Valley was not sold to First Bank in the but-for world, then plaintiffs' SAFSB claim is wholly speculative because there is no basis in the record for what River Valley's but-for profits, exclusive of SAFSB, would have been from 1995 onward. Dr. Holland testified as to what he believed SAFSB's performance would have been after 1994, but plaintiffs have submitted no evidence as to what River Valley's income, exclusive of SAFSB, would have been. Tr. 2380:13-20, 2386:5-9 (Holland); Tr. 482:3-19 (Bangert). Plaintiffs do not offset the $37 million River Valley purchase price against their damages claims, resulting in a double recovery because they now assume the purchase would not have happened. Moreover, plaintiffs present no evidence that River Valley would have been unable to fund a merger of SAFSB into River Valley at some point after 1994, much as River Valley considered doing earlier in the actual world. JSF ¶ 369; PX 893.

### B. Plaintiffs Have Not Shown That The Purported Inability Of River Valley III To Obtain SAFSB Was Caused By The Breach

#### 1. The SAFSB Transaction Was An Independent And Collateral Undertaking

The SAFSB transaction was an independent business decision not directly related to the 1988 Assistance Agreement contracts, which merely provided that goodwill could be utilized toward regulatory capital computations. The SAFSB claim is, in fact, a classic example of an

improper claim for consequential damage, an "'independent and collateral undertaking'" that is "'too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach.'" Myerle, 33 Ct. Cl. at 26 (citation omitted); Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996). The acquisition of SAFSB in 1992 was remote in terms of time, geography, structure, and regulatory environment from the 1988 Assistance Agreements involving River Valley I and River Valley II.

In 1988, the goals of the River Valley thrifts were focused upon their operations and business opportunities in Illinois. Indeed, the thrifts' stated objectives (for example, before and at about the time of FIRREA's passage) were to become the leading retail banks in the Illinois markets they served. DX 321 at PHO063 0877. In a business plan presented to regulators, River Valley provided no indication that it intended to leverage its regulatory capital in order to pursue thrift acquisitions in other states, especially a state as remote from Illinois as Texas. Tr. 354:20-355:19 (Bangert).

The SAFSB transaction, four years after the River Valley and regulators entered into the purported contracts, resulted from the independent business decisions of the shareholder plaintiffs to pursue an RTC thrift seized in Texas, at a time when River Valley complied fully with FIRREA-mandated capital standards. Thus, the remoteness of First Bank's SAFSB claim from the purported contracts is obvious.

### 2. River Valley's Inability To Consummate The SAFSB Transaction Was The Result Of Intervening Factors

#### a. ANB Refused To Lend River Valley More Funds

River Valley III would not have been able to obtain a loan from its favored lender, ANB, to finance the SAFSB acquisition directly, irrespective of the breach. ANB refused to make such

a loan because of FIRREA's non-breaching cross-guaranty provisions. Those provisions, which held related corporate banking entities mutually liable for capital failures, caused River Valley III's favored lender to decide that it would not lend funds for the SAFSB acquisition directly to the River Valley III, but only to a newly created Texas entity that would not share River Valley's liabilities. Tr. 880:9-11 (Daniels); Tr. 2707:6-2708:2 (Holland) ("But I think that that even didn't work because of this cross-guarantee issue").

**b. <u>River Valley Did Not Obtain Alternative Financing</u>**

Once ANB decided that it would only fund the SAFSB acquisition through an entity newly formed by River Valley's shareholders, River Valley's management took few steps to find another lender. Tr. 466:14-467:15, 469:6-10 (Bangert). Certainly, plaintiffs did not establish that no other loan was available and that they could not have made the acquisition within the River Valley thrifts. Moreover, Messrs. Holland and Ross together had over $50 million in net worth, yet they made no effort to mitigate by lending funds to or infusing funds into River Valley for the purpose of acquiring SAFSB. Tr. 709:20-25 (Bangert) (discussing Mr. Ross's ability to contribute capital). Accordingly, River Valley's failure to obtain another loan cannot be attributed to the breach.

**c. <u>The SAFSB-Related Damages Were Not Caused By The Breach, But By An Increase In The Market Value Of SAFSB's Assets</u>**

Plaintiffs' witnesses testified that plaintiffs' SAFSB-related claims are based upon SAFSB's increased market value after the date of its acquisition. Yet, the increased market value of SAFSB resulted not from the breach but from improved market conditions and lower interest rates after the date of the acquisition by WCHI. Accordingly, the damages based upon the increased value cannot be attributed to the Government.

Indeed, the Federal Circuit's holding in Estate of Berg v. United States, 687 F.2d 377, 379-83 (Ct. Cl. 1982) demonstrates that plaintiffs cannot claim damages due solely to changes in market conditions after the transaction. In that case, the Treasury Department refused to redeem bonds at par value but, instead, redeemed them at fair market value. This was ruled to be a breach of the contract. The bonds later increased in value due to market changes. This Court found that the damages had to be measured as of the time of the breach, and the fact that the market value of the bonds increased after the breach was irrelevant to the determination of damages. Id. at 379-82. Similarly, here plaintiffs have not submitted evidence showing what proportion, if any, of the increase in SAFSB's value was due to market factors, and their claim should thus be rejected.

This basic principle of damage recovery demonstrates the folly of awarding damages based upon unforeseen and unforeseeable increases in the market value of assets. See, e.g., Wells Fargo, 88 F.3d at 1023 (plaintiff cannot recover damages that are not the "'direct and immediate result[]'" of the breach); 1 Dobbs Law of Remedies, § 3.8(2) (2d ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable").

### C. Any Damages Due To River Valley's Inability To Acquire SAFSB Were Not Foreseeable By The Government

Plaintiffs have failed to make the required showing of the foreseeability of its alleged lost profits. This limitation bars recovery where the breaching party cannot reasonably be said to have contemplated the alleged harm at the time of contracting. Bohac v. Dep't. of Agric., 239 F.3d 1334, 1340 (Fed. Cir. 2001); see N. Helex Co. v. United States, 524 F.2d 707, 714-15 (Cl. Ct. 1975); Estate of Berg, 687 F.2d at 383. If several circumstances, including intervening and

superseding causes, give rise to a loss, then all of them must have been foreseeable at the time of contract formation in order for the foreseeability standard to be satisfied. See, e.g., Restatement (Second) of Contracts § 351 & cmt. d; Chain Belt, 115 F. Supp. at 714-15. Plaintiffs' SAFSB claim disregards these precedents and instead it is tantamount to a claim that any potential profitable opportunities that arise after a breach are foreseeable lost profitable opportunities.

Further, it betrays common sense to suggest that, at the time of contracting, regulators could have foreseen that the River Valley thrifts would, roughly four years later, attempt to acquire a thrift located far outside their geographical operations, and soon thereafter be able to sell it for a substantial profit, as First Bank now claims. DX 321 at PHO063 0877 (business plan provided to regulators); Tr. 354:20-355:19 (Bangert). Mr. Bangert testified that even the River Valley shareholders could not have foreseen the SAFSB opportunity in July 1988. Tr. 479:23-25 (Bangert). The fact that River Valley had loans in other states did not permit regulators to foresee all possible acquisitions in other states. Tr. 1335:6-10 (Pikus) (noting the distinction between servicing an out-of-state loan and acquiring an out-of-state branch). Moreover, River Valley's business plans in 1988 and 1989 clearly stated that their intention was to become a leading retail bank in central and northern Illinois. PX 345 at WOL275 0154-0166, 0163; Tr. 2729:14-2731:9 (Holland).

Similarly, in July 1988, regulators could not have foreseen River Valley's purported inability to find a loan to fund the SAFSB transaction. Tr. 710:17-24 (Bangert); JSF ¶ 193. Indeed, the Restatement (Second) of Contracts instructs that, because of the widespread availability of credit, it is unforeseeable as a matter of law that a lender's breach of a contract to provide funds to a borrower would result in a borrower's inability to obtain funds. Restatement (Second) of Contracts § 351 cmt. e.

In short, the remoteness of the 1992 SAFSB transaction from the Illinois acquisitions – in terms of time, geography, structure, and regulatory environment – demonstrates that damages sought by First Bank were undoubtedly unforeseeable, particularly so from the perspective of the Government regulators. Even assuming, for the sake of argument, that plaintiffs were able to acquire SAFSB below its actual value, the Government could not reasonably have foreseen that plaintiffs would be able to stumble upon such an opportunity. Indeed, plaintiffs presented no evidence from the perspective of Government regulators that they could have foreseen the SAFSB losses of which plaintiffs now complain – either in type or magnitude.

### D. Plaintiffs' SAFSB-Related Damage Claims Are Not Reasonably Certain

#### 1. Plaintiffs' New Claim For $45 Million In SAFSB-Related Damages Is Speculative And Unreliable

In its motion for summary judgment, First Bank, by argument of counsel alone, set forth a $45 million claim for SAFSB-related damages, asserting that they can be computed by totaling the pre-tax net income reported on the tax returns of WCHI and Western Capital Holdings Liquidating Trust ("WCHLT") for three different time periods between 1992 and year-end 2004. Pl. Mem. for Summ. J. (Sept. 25, 2007) at 59-60. The majority ($41 million) of these damages occurred between 1995 and 2004, contradicting plaintiffs' pre-trial stipulation that First Bank would have acquired River Valley in 1995. See Pl. Mem. (Sept. 25, 2007) at 38-39; JSF ¶ 376. Even assuming, for the sake of argument, that plaintiffs continued to operate SAFSB as part of River Valley through 2004, plaintiffs' claim still fails to establish damages to a reasonable certainty.

There are several analytical and methodological problems with First Bank's new $45 million damage claim. First, there is no justification for using WCHI and WCHLT's actual

performance through 2004 to measure the value of the SAFSB investment opportunity in 1992. In 1992, River Valley could not have known how WCHI and WCHLT would perform in the future. As noted above, First Bank's post-performance claim amounts to a free option on the underlying investment after the favorable ex post outcome (through 2004) is known.

Other assumptions required by plaintiff's calculation include the assumption that First Bank acquired SAFSB as part of the but-for River Valley III on January 4, 1995, and that First Bank would then have sold SAFSB's assets and liabilities in a transaction identical to the actual WCHI sale to IBC in 1996. Plaintiffs have introduced no testimony that First Bank would have wished to acquire SAFSB in the but-for world. Plaintiffs also have not introduced any testimony as to how First Bank would have managed SAFSB's assets once they acquired them. Plaintiffs' assumptions are thus unsupported.

Furthermore, plaintiffs' new contention that, in a non-breach world, River Valley would not have been sold to First Bank contradicts plaintiffs' assumptions. Tr. 481:16-24 (Bangert); JSF ¶ 376. Moreover, Mr. Bangert testified that he could not say whether River Valley would have operated SAFSB the same way if it were part of River Valley as it was in the actual world. Tr. 482:3-11 (Bangert). In addition, Mr. Bangert testified that if River Valley had acquired SAFSB in 1992, River Valley would have operated it "for a while" or "for a number of more years." Tr. 481:16-24 (Bangert). Plaintiffs do not reconcile this testimony with their previous assumptions.

### 2. Plaintiffs' New Claim For $35 Million In SAFSB-Related Damages Is Speculative And Unreliable

In a second theory of SAFSB-related damages, First Bank argues that River Valley would have acquired SAFSB in a non-breach world, and then would have sold all of its assets at

the end of 1993, realizing a gain of $35 million. This $35 million theory is the result of two fundamental methodological changes from plaintiff's separate $29.9 million claim (discussed below). First, it involves changing the timing of the valuation of WCHI's assets, from August of 1992 to year-end 1993. Second, it shifts the methodology from one based upon the excess of book value over fair value as of the date of the SAFSB acquisition in August 1992, to one based upon the excess of fair value over book value at year-end 1993. This is a completely distinct valuation methodology.

There are, in any event, fundamental problems with the $35 million valuation. First, the $35 million figure is based upon a mark-to-market value of SAFSB's loan portfolio. That value, however, fluctuated wildly, from nearly zero at the time of SAFSB acquisition in August 1992, to $1.75 million in December 1992, to $24.6 million in December 1993, and back down to $13 million in December 1994. See PX 777 at WCH-B76 0114-0157, 0126-0128; PX 1003 at WCH-B75 1603-1628, 1622.

If SAFSB's future performance was unknowable and unforeseen by regulators (or River Valley) at the time of the bank's 1992 acquisition, this is all the more true with respect to the foreseeability of the manner and magnitude of these damages as of July 1988. Furthermore, First Bank has presented no evidence indicating that River Valley would have determined, in a hypothetical world, either that it would sell the SAFSB loans at exactly December 31, 1993, or that there would have been a willing buyer on that date. Indeed, Mr. Rose's testimony that WCHI's "incentive was to try to sell [SAFSB] as quickly as possible, because we had a very large gain upon our purchase, an economic gain" shows that WCHI would have sold SAFSB on any date on which a willing buyer would purchase it. Tr. 961:7-14 (Rose).

### 3. Plaintiffs' New $29.963 Million SAFSB-Related Damage Claim, And Its Prior $28.6 Million Claim Are Speculative And Unreliable

Plaintiffs' $29.963 million SAFSB claim is based upon the excess of the historical book value of the SAFSB assets over their fair value as of August 14, 1992. This figure contradicts Dr. Holland's methodology in his 2005 report because plaintiffs add $1.3 million more in damages by eliminating deductions for alternative minimum taxes and River Valley interest expenses that had been previously recognized by Dr. Holland. Furthermore, both calculations are speculative because they assume that the book value discrepancy translates directly to damages.

Because the claim for $29 million computes damages at the time of the SAFSB acquisition based upon the immediate accounting mark-to-market of SAFSB's assets and liabilities, the claim is foreclosed by the Federal Circuit. In Glendale Fed. Bank v. United States, 239 F.3d 1374, 1382-83 (Fed. Cir. 2001), the Federal Circuit established that the assumption of net liabilities (i.e., a net purchase discount) does not reflect a cost to the acquirer. Plaintiffs now seek to stretch a purchase discount computation to the opposite extreme, arguing that the net purchase discount reflects a windfall – in this case a windfall of which River Valley was purportedly deprived. The law of this circuit does not support such a contention.

## III. PLAINTIFFS HAVE NOT PROVEN THEIR CLAIM FOR DIMINISHED ECONOMIC VALUE

Plaintiffs claim that River Valley suffered a diminution in value of $21 million.[2] This claim is based upon the opinion of plaintiffs' expert witness, Dr. Murphy.

---

[2] We maintain our contention that Dr. Murphy's original exclusion of the $5 million in preferred stock that the Court has held is not contractual capital, should be excluded from this calculation, because there is no breach of contract liability for capital as to which there is no contract. See Def. Cont. of Fact and Law at 108-09.

The starting point of plaintiff's claim is an assumption that River Valley's value can be derived from changes in valuations of its Series A preferred stock. When FSLIC assembled a package of assistance to enable the River Valley transaction, FSLIC was given preferred stock with a par value of $5 million. JSF ¶¶ 80, 102, 103. Dr. Murphy starts his calculation not with the $5 million par value assigned by the parties but rather by noting that a contemporaneous internal FSLIC analysis ascribed a value of $6.5 million to the preferred stock, $3.371 million of which was the anticipated earnings above the 40 basis-point threshold for the supplemental dividend. Tr. 1552:14-22 (Murphy); PX 148 at WOF016 2573, 2577-78; PX 606 at 17 ¶ 39; JSF ¶ 109. On March 28, 1991, the FDIC sold this preferred stock back to River Valley I for $3.675 million. JSF ¶ 278. Dr. Murphy asserts that the difference between these two figures provides a basis for estimating a purported breach-related decline in River Valley I and River Valley II. PX 606 at 17-21. Plaintiffs claim that River Valley suffered a diminution in value of $21.845 million.

The evidence at trial has shown that Dr. Murphy used counter-factual assumptions and contradicted plaintiffs' contemporaneous analyses, which showed a steadily increasing valuation of River Valley before and after FIRREA. Dr. Murphy also conceded methodological defects in his analysis and did not demonstrate a causal link between the posited damage and the breach.

### A. Dr. Murphy's Methodology Is Unreliable

#### 1. First Bank's Lost Value Calculation Is Contrary To River Valley's Contemporaneous Direct Valuations

The Court should reject Dr. Murphy's claim that River Valley declined in value from July 29, 1988 to March 28, 1991 because it is inconsistent with the contemporaneous conclusions of River Valley's management. From 1988 through 1991, the management of River

Valley I and River Valley II marked the institutions' balance sheets to market value in the ordinary course of business. See PX 512 at WON107 1613 ("the bank performs this exercise on a monthly basis and it is carefully monitored by management."); DX 223 at PHO003 0448 (River Valley I Valuation Analysis as of December 31, 1988); DX 457 at PHO003 1514. The deferred compensation agreement for River Valley's executives was measured with respect to River Valley's mark-to-market performance. Tr. 2643:24-2644:11 (Holland). River Valley explained that:

> A third aspect of our management approach is our emphasis on the monthly mark to market. The mark to market is the single most important determinant of the value of River Valley Savings Bank FSB. We therefore rely on it to judge how well the institution and management is performing.

PX 649 at FHO013 1827 (emphasis added); Tr. 623:11-624:8 (Bangert) (mark-to–market is "the best indication of what economic value you're creating").

In February 1991, River Valley represented to the OTS that the combined market value of River Valley I and II's common equity had increased by more than $21.5 million from July 1988 to January 1991. PX 512 at WON107 1613; Tr. 620:2-8 (Bangert). In stark contrast to River Valley's contemporaneous admission of increased value, Dr. Murphy argues that the value of the shareholder plaintiffs' thrifts declined by $21.845 million, $17.5 million of the decline during the July 1988-January 1991 period that River Valley showed a $21.5 million increase. Tr. 1770:14-1772:8 (Murphy).

To support their claim, plaintiffs argue that River Valley's mark-to-market does not attempt to measure the ongoing value of the thrifts as an operating entity rather than a measure of the net liquidation value of all its assets and liabilities. Tr. 571:14-16 (Bergman); Tr. 571:20-

572:14 (Bangert); Tr. 1605:11-1606:25 (Murphy).[3] However, this *post hoc* argument is contradicted by River Valley's pre-lawsuit conduct and statements. In the ordinary course, River Valley calculated its mark to market value, admittedly "the single most important determinant of the value of River Valley Savings Bank, FSB" and further admitted that, "[w]e therefore rely on [River Valley's mark to market value] to judge how well the institution, and management, is performing." PX 649 at FHO013 1827. Elementary economics suggests that a $21.5 million increase in the fair market value of River Valley's assets and liabilities was accompanied by at least a $21.5 million increase in the market value of its operation as a going concern.[4] Mr. Bangert also agreed that the value of the company increased significantly between 1988 and 1992. Tr. 572:23-573:7 (Bangert). Dr. Murphy's analysis simply ignores this increase.

#### 2. Dr. Murphy's Lost Value Model Is Not Based Upon Independent Analysis Or Market-Tested Valuations Of The Preferred Stock

Dr. Murphy's lost value model fails because (1) neither the issuance nor the redemption of the preferred stock were market-valued transactions, and (2) Dr. Murphy performed no independent analysis to determine whether the alleged values were accurate. Tr. 1660:21-1661:4, 1662:5-9 (Murphy) (neither 1988 FSLIC valuation nor 1991 FDIC valuation independently analyzed or verified).

---

[3] Dr. Murphy attempted to diminish River Valley's mark-to-market as not reflecting growth or regulatory risk. Tr. 1605:11-1606:25 (Murphy). But he admitted that he assumes growth is valuable because he assumes earnings are growing, all else held constant. Tr. 1606:18-21 (Murphy). Dr. Murphy also admits that increasing growth with leverage does not guarantee increased earnings (Tr. 1614:13-21), that shrinking thrifts could be more valuable (Tr. 1616:18-1617:7), and that FSLIC bore the ultimate risk if the thrift became insolvent. Tr. 1617:8-14 (Murphy).

[4] Further evidence that River Valley in the ordinary course concluded that its going concern value increased was its decision to pay management bonuses and dividends.

The preferred stock was the subject of only two transactions – issuance and redemption – neither of which involved an arms-length market transaction. The preferred was created as part of a FSLIC aid package to facilitate the consummation of the River Valley I transaction – and a $5 million par value was assigned to the stock. JSF ¶¶ 80, 102, 103. The stock never traded. In March of 1991, it was redeemed, and FDIC effectively increased regulators' contribution to River Valley by taking a $1.325 million discount to the preferred's par value, generating income for River Valley. OTS concurred with this transaction on the condition that River Valley infuse $2 million of capital. Tr. 1656:13-1657:7 (Murphy). The redemption valuation would reflect River Valley's non-payment of dividends. Tr. 1663:4-25, 1660:17-23 (Murphy). In both cases – issuance and redemption -- the counter-party was a regulatory agency contributing assistance and insuring River Valley I's deposits.

The unreliability of an extrapolation of equity value based upon the FSLIC preferred is further underscored by the fact that the preferred was issued with a coupon interest rate of eight percent. At the time, this rate was far below the existing rate for United States Treasuries, yet, obviously, the FSLIC preferred stock was a far riskier investment.[5] The below-market interest rate demonstrates that the preferred's market value was far below $5 million. Thus, the preferred stock was part of a package of non-market priced contributions. At most, an assumption would have to be made that the risk-adjusted value of the contingent share of above-threshold net income would account for the preferred being given a par value of $5 million -

---

[5] The FSLIC preferred stock paid a fixed rate dividend of 8 percent for approximately the first ten years, after which the payments increased gradually to a 12 percent rate. At the time of River Valley I's stock issuance to the FSLIC (i.e., July 1988), the average monthly nominal yield for a ten year constant maturity United States Treasury bond was 9.06 percent. See http://www.federalreserve.gov/releases/h15/data/monthly/H15_TCMNOM_Y10.txt.

when its fixed coupon rate implies a far lower value given the riskiness of a conglomeration of failed thrifts with no prior track record.

Moreover, FSLIC's valuation memo points out why the valuation is likely a non-market number. First, FSLIC explicitly noted that its valuation was based upon financial projections provided by the interested shareholder plaintiffs. JSF ¶ 107. There was no audit of the River Valley thrifts performed by the FSLIC. Second, the FSLIC expressly acknowledged that its valuation of the preferred stock was based upon multiple assumptions and River Valley income projections and was therefore "soft." JSF ¶ 109; Tr. 1663:23-1664:25 (Murphy). Dr. Murphy admitted that River Valley's income projections proved wrong because the thrift failed to generate enough income before FIRREA for any value to be realized upon the income-participation portion of FSLIC's preferred stock. Tr. 1672:14-1673:21, 1680:18-1684:9 (Murphy). Mr. Bangert also testified that River Valley "told [the FSLIC] from the very beginning we really had no intent to ever share any kind of income with them and kind of managed our earnings after the fact to make sure we didn't share and that." Tr. 99:10-100:2 (Bangert).

Dr. Murphy's failure to perform any independent analyses of the assumptions underlying his conclusions is fatal to the reliability of his model. Dr. Murphy simply relied upon FSLIC's and FDIC's valuations, when the FSLIC evaluation, in particular, expressly stated that it was "soft" and relied upon assumptions. Because Dr. Murphy made no attempt to verify or critically consider the FSLIC or FDIC's assumptions that serve as inputs to his model, he simply cannot speak to what the River Valley thrifts were actually worth in 1988 or 1991.

Where, as here, an expert's analysis is undercut by the thrift's own valuations (or valuations commissioned by it), the analysis offers no meaningful guidance to the Court and

should be rejected. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993) ("Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known.").

**3. Dr. Murphy's Extrapolation To River Valley II Of The Purported Lost Value To River Valley I Is Unreliable**

Dr. Murphy failed to perform an independent analysis of the comparability of River Valley I and II. Tr. 1721:4-1729:3 (Murphy). Additional layers of unreliability are interjected by Dr. Murphy's assumptions that: (a) the ongoing value of the entire thrift (River Valley I) can be extrapolated from the value of one piece of its capital structure – the preferred stock; and (b) that this extrapolated value of River Valley I can then serve as the measure of value of a different set of thrifts – River Valley II – that are not identical to River Valley I in either size or in the markets in which they operated. Tr. 1417:9-24 (Pikus). Thus, even if his River Valley I calculations are accurate, Dr. Murphy's calculations for River Valley II are speculative.

**B. Plaintiffs Have Not Shown That The Purported Diminution in Value Was Caused By The Breach**

**1. Non-Breach Factors Affected The Thrifts But Plaintiffs Failed To Account For Such Factors In Their Diminished Value Claim**

Plaintiffs' lost value claim is based upon Dr. Murphy's flawed assumption that all change in the value of River Valley I or River Valley II's equity between 1988 and 1991 was directly and exclusively attributable to the alleged breach. DX 1408 at 237; Tr. 1617:19-22 (Murphy); Pl. Cont. of Law at 57 ¶ 33 ("the breach was the single defining factor causing River Valley's equity value to decline[.]"). At trial, however, the admissions of plaintiffs' expert eviscerated their claim that the breach was the only cause of any possible decline in the thrift's value.

Dr. Murphy did not consider the multitude of non-breach factors that affected the value of River Valley and thus its preferred stock and equity. The value of River Valley I and River Valley II, like most institutions, was affected by numerous factors, such as operations (e.g., thrift management decisions, merger integration, and investment choices); economic factors (e.g., changes in local and national economic conditions, thrift markets, competition, and the public's perception of the safety and soundness of savings and loans), and non-market factors (e.g., changes in laws and regulations) that were unrelated to the alleged breach.[6] Dr. Murphy admitted that such factors could affect the value of the thrift (Tr. 1617:23-1620:18), but that he had conducted no independent analysis of the effect of the economy (Tr. 1620:22-25) or of competition upon the value of River Valley. Tr. 1625:1-10, 1637:1-12 (Murphy).

In fact, the very same RTC memorandum upon which Dr. Murphy relies for his post-breach valuation of River Valley I, Tr. 1566-68, specifically references some of these non-breach factors as causing thrift equity and debt markets to be "severely depressed":

> According to Donaldson, Lufkin and Jenrette Securities Corporation ("DLJ"), an investment banking firm hired to assist the FRF in this transaction, the current market conditions for thrift equity and subordinated debt instruments are severely depressed. This condition is due primarily to a negative perception of the thrift industry as well as the continuing deterioration of the real estate

[6] River Valley suffered substantial runoff in its customer deposits. See PX 455 WON034 1104 (Comparative Statement of Financial Condition showing deposits maintained in River Valley I as of June 30, 1990, of $270.8 million, down from $310 million at year end 1988. River Valley management did not perceive deposit losses at River Valley as having been attributable to FIRREA. Tr. 1341:5-1342:17, 1356:15-22, 1359:24-1360:8, 1377:13-1386:24 (Pikus). River Valley's shrinkage in assets post-FIRREA, while not a subject of plaintiffs' damages claims, was also caused by non-breach factors. To illustrate, in March 1992, River Valley I's management reported that it had "found very few attractive reinvestment opportunities" for $21 million it had obtained from the sale of three CMO issues. River Valley I's management further stated that "[t]his lack of attractive long term investments is partially the cause for the considerable shrinkage that has taken place in the last few months." PX 674 at WON242 0161; Tr. 706:5-707:11 (Bangert).

market with its corresponding negative effect on loan portfolio credit quality.

PX 528 at CHO006 0012-0021, 0017 (emphasis added)[also admitted as DX 524]; Tr. 1566, 1637:18-1638:17 (Murphy).

Dr. Murphy conceded that it was "exactly right" that the market conditions for thrift equity were severely depressed at the date of the FDIC's valuation of the FSLIC preferred stock in 1991. Tr. 1639:12-18 (Murphy). He also conceded that increased market competition, FIRREA's nonbreaching provisions, adverse publicity unrelated to the breach, local market conditions, and general trends in thrift stock prices could affect River Valley's equity. Still, he offered no analysis of those factors. Tr. 1624:19-23, 1628:9-24, 1635:11-17, 1639:19-1641:10, 1643:6-15 (Murphy). Dr. Murphy also did not determine the date of the breach, and conceded that this meant that his diminished value analysis may include factors that preceded FIRREA. Tr. 1651:24-1652:17 (Murphy).

### 2. The Thrifts' High-Risk MBS And Other Mortgage-Related Assets Caused The Regulatory Criticisms Of The Thrift

Further, even assuming, counter-factually, that the thrifts declined in value between 1988 and 1991, the breach did not cause this alleged diminution in value. For all practical purposes, at virtually all times, regulators had not issued any examination reports finding River Valley out of capital compliance because of FIRREA.[7]

[7] OTS's special purpose November 7, 1990 examination commenced Nov. 7, 1990, the day before the Nov 8, 1990 conclusion date of the prior August 22, 1990 exam – the only exam that was ever issued by the OTS with a finding that FIRREA capital requirements had not been met. PX 455; PX 479. OTS issued both the August 22, 1990 and November 7, 1990 examinations to River Valley on the same day, April 2, 1991. DX 537. The FDIC did find higher levels of classified assets resulting from criticisms of River Valley's derivative portfolio. Tr. 404:16-22 (Bangert).

Regulatory criticism of River Valley – and the 1991 Supervisory Agreement entered into with plaintiffs about the time of the proposed merger creating River Valley III – was driven not by FIRREA's capital requirements but rather examiners' discovery of problems associated with River Valley's investment in high-risk mortgage derivatives, including residuals, interest-only, super principal-only, and other such derivatives. PX 455 at WON034 1077-94; PX 479 at FHO012 2762-2769. To the extent regulators restrained the thrifts' investment activities, they did so pursuant to the FDIC's and OTS's obligation to ensure the safety and soundness of the institution. River Valley had no contractual right to avoid this safety and soundness oversight, including a demand for tangible capital well above FIRREA's levels attributable to safety and soundness concerns. Thus, any diminution in value of the thrifts caused by normal regulatory oversight cannot be claimed as breach-related damages.

## IV. PLAINTIFFS HAVE NOT PROVEN THEIR RETAINED EARNINGS MITIGATION THEORY

### A. Dr. Holland's Retained Earnings Claim

Plaintiffs third and final category of damages is premised upon a claim that River Valley hypothetically retained earnings to mitigate the loss of goodwill phased out by FIRREA. Plaintiffs' shareholder and expert, Dr. Holland, argues that the retained earnings had a cost to the thrift that can be calculated based on a hypothetical 20 percent annual expected cost of capital. Dr. Holland then offsets this hypothetical cost with a return based upon a hypothetical investment in riskless 10-year Treasury bonds (yielding 8.8 percent as of mid-1990, reduced to 5.7 percent to account for hypothetical taxes). This analysis results in alleged damages of $21 million for a period running from 1990 to 2013.

## B. Dr. Holland's Retained Earnings Theory Fails As A Matter Of Law

On its face, plaintiffs' claim for $21 million in cash damages to replace $20 million of non-earning amortizing intangible goodwill is overstated. The impermissibly remote and speculative nature of plaintiffs' claims seeking cash awards of amounts multiplying the intangible contractual capital lost, is confirmed by the admission of River Valley's former CEO, Mr. Bangert, that he would rather have cash than intangible regulatory capital "every time" because the intangible capital cannot be invested or sold. Tr. 500:22-501:17, 501:23-502:4 (Bangert).[8] Because plaintiffs claim that the cost of replacing a dollar of intangible contractual capital was more than a dollar of cash, plaintiffs' claim is inconsistent with Federal Circuit precedent. Cf. Cienega Gardens v. United States, 503 F.3d 1266, 1282 n.13 (Fed. Cir. 2007) ("A determination that damages exceed the value of the property should be indicative that the method of computing damages is flawed.").

Indeed, a retained earnings theory calculated in the same way that Dr. Holland calculates damages here has been rejected both by this Court and the Court of Appeals for the Federal Circuit. See Bank of America, FSB v. United States, 67 Fed. Cl. 577 (2005), aff'd sub nom., Bank of America, FSB v. Doumani, 495 F.3d 1366 (Fed. Cir. 2007). Here, as in Bank of America, River Valley's shareholders received their "return" upon earnings retained by the thrift (purportedly due to the breach) in the form of the purchase price River Valley obtained upon its sale to First Bank. See Bank of Am., 495 F.3d at 1373.[9]

---

[8] Moreover, plaintiffs argue that their retained earnings claim is merely a partial mitigation and that, for full recognition of the purported harm from the loss of goodwill, their SAFSB-related damages claim must be added. This results in an implausible $65 million in damages for the loss of the $20 million of regulatory capital. Tr. 2633:10-2634:5 (Holland).

[9] Moreover, given that Dr. Holland's methodology is based upon a hypothetical cost of capital and not actual capital raising costs, his theory also is precluded by precedent from the

For these and additional reasons detailed below, plaintiffs' retained earnings claim should be denied.

### 1. The Breach Did Not Cause River Valley To Retain Additional Earnings

Even assuming (wrongly), for the sake of argument, that retaining earnings are harmful to a thrift, plaintiffs admit that the breach did not cause River Valley to retain additional earnings. Tr. 2444:9-24, 2571:13-23, 2575:3-7, 2593:25-2594:11, 2594:25-2595:17 (Holland); Pl. Cont. at 63 ¶ 55. Indeed, Dr. Holland testified that River Valley "most likely would have retained the earnings that we did retain."[10] Tr. 2593:25-2594:11 (Holland). It follows that the act of mitigation for which plaintiffs claim damages is an act that would have occurred irrespective of the breach, and therefore does not entitle plaintiffs to any damages.

In order for First Bank to satisfy its burden of proof on the cause of the thrifts' shrinkage, it must show that the loss of the contractual regulatory capital directly and inevitably resulted in the retained earnings, to an extent such that a reasonable person would consider the breach – as opposed to all of the other factors (e.g., competition, lack of growth opportunities, etc.) – to be the actual cause of First Bank's claimed harm. Wells Fargo, 88 F.3d at 1023; Chain Belt, 115 F. Supp. at 714; Myerle, 33 Ct. Cl. at 26. Plaintiffs' claim, therefore, depends upon a finding that

---

Federal Circuit instructing that replacement of capital damage claims that are hypothetical and do not reflect the thrift's actual experience are barred. See LaSalle, 317 F.3d at 1375; see also Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1381-82 (Fed. Cir. 2005); Fifth Third, 402 F.3d at 1236-37.

[10] If retained earnings were truly harmful to the River Valley institutions, it would be irrational for these institutions to have retained earnings, and it would be irrational for First Bank to claim that, "but for the breach, River Valley . . . would have had even more retained earnings than it accumulated in the real world . . . ." Pl. Cont. at 63 ¶ 55.

River Valley III's retained earnings post-FIRREA were caused by the breach. Plaintiffs have not shown that the breach caused the retained earnings.[11]

Logically, retained earnings replacement damages cannot be attributed to the breach if there was not an incremental increase of retained earnings over that amount that would have existed absent the breach. That is, if the retained earnings would have existed even absent the breach, then the breach did not result in any incremental retained earnings.

### 2. Dr. Holland Has Not Identified A But-For World

Plaintiffs cannot establish causation because Dr. Holland has not identified a but-for world in his analysis. Tr. 2571:9-12 (Holland) ("In this analysis, I haven't created a but-for world."). Dr. Holland's failure to identify a but-for world leaves no reliable method to determine whether the retained earnings upon which he computes damages would have existed absent the breach. If such retained earnings would have existed even absent the breach, then the breach did not result in any incremental retained earnings, and, thus, no causation of damages.

---

[11] Nor have plaintiffs established that the breach caused River Valley to shrink its asset size, apart from the amount of retained earnings. River Valley I and River Valley II did not shrink immediately following the passage of FIRREA in August 1989 or immediately following the publication of the implementing regulations in November 1989. Indeed, the thrifts continued growing until July 1990, almost a year after the passage of FIRREA. PX 455 at WON034 1104 (showing increase in assets from $380 million as of December 31, 1989 to $416 million as of June 30, 1990). Moreover, as demonstrated above, the thrifts' retained earnings were related to numerous voluntary decisions, regulatory concerns about the composition of the River Valley thrifts' mortgage-related investments, and a lack of investment opportunity. PX 674; Tr. 706:11-707:11 (Bangert) (agreeing with March 1992 statements by Susan Vranes Ells regarding lack of investment opportunity). Although River Valley's asset size is not directly connected with its level of retained earnings, and no lost profits claim is before the Court related to River Valley's asset size, plaintiffs have not shown any decrease in River Valley's asset size due to the breach.

### 3. The River Valley Thrifts' Contractual Capital Could Not Have Been Transferred To First Bank, Precluding Retained Earnings Damages After First Bank's Acquisition

Dr. Holland's retained earnings methodology places most of the damage he computes in the period following First Bank's acquisition in 1995. PX 605 at Exh. N (showing total damages of $7.1 million through September 1994 and $13.8 million after September 1994); Tr. 2562:25-2563:16 (Holland) ("I don't think that it is necessarily relevant that there was an acquisition by First Banks."). Plaintiffs' claim fails because the contract, regulatory policy, and accounting rules would have prevented River Valley's regulatory capital from being sold or transferred to First Bank, irrespective of the breach. Mr. Bangert acknowledged that intangible regulatory capital could not be sold or transferred. Tr. 500:22-501:17, 788:8-9 (Bangert). This Court also recently recognized that goodwill did not affect the sales price of thrifts. See Granite Mgmt. Corp. v. United States, 74 Fed. Cl. 155, 168 (2006), appeal argued, No. 2007-5054 (Fed. Cir. 2007) ("Clearly, the answer to the Federal Circuit's question regarding whether thrifts with goodwill sold for a higher price is 'no.'").

First Bank has put forth no evidence overcoming the prohibition in the Assistance Agreements of transferring the benefits of River Valley III's alleged contract without regulatory approval. See PX 207 at WOF016 1596-97; PX 284 at WOT837 0998-99. Plaintiffs have submitted no evidence regarding whether the regulators would have allowed River Valley to transfer the contractual capital absent the breach. Where damages alleged in the real world are wholly dependent upon a favorable act of agency discretion in the non-breach world, the fact of discretion on the part of the agency breaks any causal chain in the alleged damages. See San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("Too many contingencies – including, most importantly, the discretion of the agency to dispose of

excess water – exist in the causal chain from the government's breach to the asserted lack of water. . . ."). Thus, even if River Valley could have sold or transferred its intangible regulatory capital, the contingency of regulatory discretion precludes plaintiffs from establishing causation after the sale to First Bank.

In any event, however, River Valley's intangible regulatory capital could not be sold, but rather would have disappeared with First Bank's purchase. As Mr. Bangert admitted, "regulatory capital is an intangible, something that we couldn't sell, we couldn't transfer." Tr. 788:8-9 (Bangert). This Court recently examined the transferability issue at length, and reached a conclusion consistent with our contention, and Mr. Bangert's testimony, that intangible regulatory capital could not be sold. See Granite, 74 Fed. Cl. at 159-64 ("[b]ecause defendant presented reliable evidence that supervisory goodwill and the Assistance Agreements were not transferable in this case, we hold that, even absent a breach, plaintiff could not have included supervisory goodwill as an asset in the sale of FNB to First Madison. Hence, no value was lost on the sale and plaintiff suffered no damages.").

Therefore, even assuming that River Valley's damage claims are valid, it nevertheless would have lost the contractual capital in the but-for world when River Valley was sold to First Bank. River Valley could have chosen to avoid the purported damages from the loss of the contractual capital after 1994 in the but-for world by not agreeing to be sold to First Bank in the actual world, but it has conceded that it would have agreed to the sale in the but-for world as well. See JSF ¶ 376; PX 603 at 16 & n. 28; PX 602 at 17. Thus, any damages resulting from this independent business decision cannot be attributed to the Government. Wells Fargo, 88 F.3d at 1021, 1023; Ramsey v. United States, 101 F. Supp. 353, 357-58 (Ct. Cl. 1951); Myerle, 33 Ct. Cl. at 26.

If, in the alternative, the Court accepts plaintiffs' representations at trial that River Valley would not have been sold to First Bank absent the breach, then plaintiffs' claims are speculative because they have offered no evidence of what River Valley's retained earnings or dividends would have been after 1995. Moreover, plaintiffs have not offset the $37 million purchase price, which included compensation for River Valley's retained earnings. For these reasons, First Bank cannot meet its burden to prove causation and foreseeability (much less certainty).

#### 4. First Bank's Retained Earnings Damages Were Not Reasonably Foreseeable At the Time Of Contracting

Plaintiffs' alleged damages were not foreseeable because, even assuming that River Valley had additional profitable opportunities that it was unable to pursue due to a lack of capital, its holding company could have borrowed money and downstreamed it to the thrift for the thrift's investment in those opportunities. As the Restatement of Contracts explains, it is not foreseeable in the usual course of business that the non-breaching party would be unable to find replacement credit. See Restatement (Second) of Contracts (1981) § 351 & cmt. e.

River Valley's holding company, RVHI, borrowed funds in the actual world. It borrowed $7 million from ANB and used the proceeds to repurchase $5 million in preferred stock and $2 million in subordinated debt from ANB. This transaction resulted in no additional funding from ANB but increased River Valley III's tangible capital by $2 million. JSF ¶ 332; PX 727 at H&R-B04 597; PX 643 at H&R-B03 00687; Tr. 2313:17-2314:2 (Holland). Given that River Valley could have, and did, borrow funds through its holding company, any purported harm from the cost of retaining earnings to replace capital was not reasonably foreseeable.

### C. First Bank's Measure Of Damages For Retained Earnings Is Not Reasonably Certain

Even if the Court were to conclude that the breach somehow caused First Bank to retain the earnings for which it now claims damages, First Bank has not established a reasonably certain basis for the cost of those retained earnings.

#### 1. River Valley's *Ex Post* Cost Of Capital Should Be Measured By The Actual Dividends Paid

Assuming that First Bank may recover the cost of retained earnings, this Court and the Federal Circuit rejected a methodology nearly identical to Mr. Holland's in Bank of America. In Bank of America, the thrift affected by the breach claimed damages resulting from the retention of earnings and measured the cost of the retained earnings at 20 percent. Bank of Am., 67 Fed. Cl. at 588. In response to this theory, this Court concluded that the thrift's cost of retained earnings could not be measured by a calculated market cost of stock but, instead, had to be measured by actual dividends paid because those are the only costs that were realized by the thrift. Bank of Am., 67 Fed. Cl. at 588-89. The Court also ruled that the actual dividends paid were the proper cost of retained earnings because the share appreciation was realized upon the thrift's successful sale. Id. at 589, 589 n.28. This Court specifically held that the unrealized share appreciation costs were borne by the outside institution that acquired the thrift and not the thrift itself. Id. at 589. The Federal Circuit affirmed this holding. See Bank of Am., 495 F.3d 1366.

The Federal Circuit held that this Court "did not abuse its discretion in using the dividend rate to determine the cost of retained earnings" due to the realization upon the sale of the thrift:

> The trial court found it unlikely in the rather short period (two-and-a-half years) between the breach of contract and the sale of HonFed to BoA that HonFed incurred costs above those that it

> paid out in dividends. Further, the trial court noted that, in Home Savings, this court affirmed the determination of the costs of retained earnings based on the lowest-cost source of capital from the thrift's earlier capital raisings as a proxy for what the existing shareholders would demand as a return on retained earnings. Home Sav. of Am., F.S.B., v. United States, 399 F.3d 1341, 1353 (Fed. Cir. 2005). The trial court did not abuse its discretion in using the dividend rate to determine the cost of retained earnings.

Bank of America, 495 F.3d at 1373.

Furthermore, in Bank of America, the Federal Circuit specifically considered and rejected the plaintiffs' argument that Home Savings supported the 20 percent rate of return on common stock advanced by the expert in that case. See Bank of Am., 495 F.3d at 1373. This Court also rejected plaintiffs' attempt to recharacterize the Federal Circuit's opinion in Home Savings. See Bank of Am., 67 Fed. Cl. at 589 ("[Home Savings] made no mention of retained earnings, and we are unwilling to infer strong support for a proposition that the court was not asked to address."). Likewise, in LaSalle, the Federal Circuit affirmed this Court's decision not to use the "hurdle rate" used by LaSalle's parent as a rough expected rate of return in its investment in LaSalle as a measure of damages, "for it does not reflect the actual experience that the dividends were paid out of earnings, and that the earnings appear to have exceeded the hurdle rate as well as Talman's projected earnings but for the breach." LaSalle, 317 F.3d at 1375 (citation omitted).

**2. An Award Based Upon Dr. Holland's Retained Earnings Theory Would Result In A Double Recovery To River Valley's Shareholders**

The fact that River Valley's shareholders received the share appreciation of the retained earnings in the form of the purchase price from First Bank means that Dr. Holland's retained earnings theory would result in a double recovery. Dr. Holland's model results in a double recovery from the purchase price paid by First Bank because the alleged 20 percent "cost of equity capital" figure he uses was, in effect, paid by First Bank to River Valley's shareholders.

As this Court held in Bank of America:

> [w]ith the exception, then, of the dividends paid, the retention of earnings cannot be said to harbor a cost borne by [the thrift] since the return ultimately came in the form of share appreciation . . . realized only upon the sale of the thrift to a third party.

Bank of Am., 67 Fed. Cl. at 589.

Here, River Valley's shareholders actually realized this share appreciation when First Bank acquired River Valley. An award of damages based upon the "cost of equity capital" would effectively pay River Valley's shareholders the same return upon the retained earnings for share appreciation twice – once upon the sale to First Bank and again with the damages award.

Furthermore, First Bank argues that the Court should pay this rate of return even after First Bank's acquisition of River Valley, notwithstanding the lack of any evidence that First Bank actually retained any earnings for the purpose of replacing capital lost due to the breach. This result is contrary to this Court's precedent and should be rejected as inconsistent with the economic substance of First Bank's acquisition of River Valley. See, e.g., Bank of Am., 67 Fed. Cl. at 589-90 (damages based upon dividends paid by thrift, no damages after acquisition); Citizens Fed. Bank v. United States, 66 Fed. Cl. 179, 196 (2005), aff'd, 474 F.3d 1314 (Fed. Cir. 2007) (damages based upon tax consequences to thrift, no damages after acquisition).

The facts presented at trial demonstrate that River Valley in fact did receive its return upon the retained earnings in the form of the purchase price received from First Bank. Dr. Holland testified that retained earnings provide a potential return to investors through either dividends or share appreciation. Tr. 2565:3-2566:15 (Holland). Dr. Holland acknowledged that River Valley's shareholders received the share appreciation from First Bank. Tr. 2596:4-2597:2 (Holland). Thus, an award of damages would give the River Valley shareholders the same return

twice. Tr. 2442:12-25 (Holland) ("So not only did we require a return of greater than 20 percent, we actually got a return of greater than 20 percent."); see also Bank of Am., 495 F.3d at 1373 ("BoA admits that the retained earnings resulted in a dollar-for-dollar increase in the sales price of HonFed. The trial court concluded HonFed did not suffer any damages from the forced retained earnings. This court again discerns no error in the trial court's reasoning or clear error in its findings.").

### 3. Dr. Holland's Retained Earnings Methodology Is Flawed And Unreliable

In addition to these conceptual flaws, Dr. Holland's retained earnings methodology also suffers from a number of methodological flaws that render it unreliable. Thus, even if the Court concludes that using the "cost of equity capital" for retained earnings is conceptually sound, Dr. Holland's model suffers from specific flaws that make it an inappropriate basis for measuring damages.

#### a. Dr. Holland's Retained Earnings Theory Is Not Based Upon Actual Dividends Paid Or An Actual Cash Flow

Dr. Holland's estimated 20 percent "cost of equity capital," which he purports to base upon the FSLIC's analysis of the projected dividend rate for River Valley's preferred stock, is flawed. First, using the 20 percent rate fails as a matter of law because it is the result of a purely hypothetical capital replacement. Dr. Holland's 20 percent cost of equity capital is not traceable to any of River Valley's actual cash flows. Tr. 2583:9-16 (Holland). Plaintiffs can offer no evidence that River Valley paid a 20 percent rate for any of its capital. Hypothetical damage awards are barred by binding precedent from the Federal Circuit. See Granite Mgmt. Corp. v. United States, 416 F.3d 1373, 1381-82 (Fed. Cir. 2005); Fifth Third, 402 F.3d at 1236-37.

Indeed, in LaSalle, 317 F.3d at 1375, the Federal Circuit held that a cost of replacement model that did not "reflect the [thrift's] actual experience" was properly rejected by the trial court.

Dr. Holland's cost of equity capital projection is doubly unreliable for First Bank. Dr. Holland testified that he did not known what First Bank's cost of capital was at any point between 1995 and the present time. Tr. 2583:17-19, 2621:13-2622:1 (Holland). Furthermore, as a larger, better-capitalized institution, it is reasonable to conclude that, as part of First Bank, River Valley's cost of equity capital after 1995 would be lower. Plaintiffs also have not submitted evidence to support Dr. Holland's assumption that the offsetting benefit of the retained earnings should be based upon the 1990 intermediate-Treasury rate is also unsupported by River Valley's, and later First Bank's, actual experience.

At trial, plaintiffs have improperly attempted to step back from their joint stipulation of fact that River Valley would have been sold to First Bank in the but-for world. JSF ¶ 376; Tr. 2462:14-23 (Holland). Although there is no basis for plaintiffs to retract their stipulation, even if the Court were to assume that River Valley was not sold to First Bank in the but-for world, then Dr. Holland's retained earnings model is wholly speculative because there is no basis in the record for what River Valley's but-for retained earnings or dividends would have been after 1995.

**b. Dr. Holland Effectively Imposes Prejudgment Interest**

Dr. Holland's model calculates the cost of retained earnings year by year from 1990 to 2013 and applies a discount rate to dates after December 2007 to adjust for the time value of money. Dr. Holland testified that he chose not to discount back to the date of the breach on the advice of counsel. Tr. 2659:5-18 (Holland). However, the choice of date affects the amount of damages. In Dr. Holland's model, the amount of damages increases as the assumed date of

judgment recedes, effectively imposing a prohibited prejudgment interest charge against the Government at the annualized rate of 14.3 percent. For example, even assuming Dr. Holland's basic theory to be correct, if damages were discounted to the date Dr. Holland defines as the date of breach (July 1990), the damages from his model would total $7.76 million rather than $21.92 million.

**CONCLUSION**

For these reasons, we respectfully request that the Court grant our motion for judgment upon partial findings.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

Of Counsel:

SCOTT D. AUSTIN
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
BRIAN A. MIZOGUCHI
AMANDA L. TANTUM
JOHN J. TODOR
SAMEER P. YERAWADEKAR
Trial Attorneys

December 17, 2007

Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson
John H. Roberson