**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, co-executor of the<br>ESTATE OF HOWARD R. ROSS, and<br>FIRST BANK,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 95-524C<br><br>(Judge George W. Miller)<br><br>(Winstar-Related Case) |

**JOINT STIPULATION FOR THE INTRODUCTION OF TRANSCRIPT DESIGNATIONS FROM THE DEPOSITION OF RICHARD J. DALTON**

Defendant, the United States, hereby moves, with the consent and stipulation of plaintiffs, Homer J. Holland, Steven Bangert, co-executor of the Estate of Howard R. Ross, and First Bank, for the admission into evidence at trial of designated passages from the deposition of Richard J. Dalton taken on July 31, 2000. Plaintiffs have set forth counter designated passages of Mr. Dalton's deposition, which we do not oppose, provided that those designations are not construed to be designations made by defendant with respect to the scope of defendant's case in chief.

Defendant's transcript designations are as follows:[1] 4:1-7; 6:23-10:8; 10:11-11:6; 11:22-12:24; 13:10-14:8; 16:12-17:19; 36:9-37:2; 39:2-40:2; 42:10-43:2; 46:17-48:19; 52:9-53:4; 53:12-16; 75:8-76:7; 81:6-16; 101:16-102:21.

[1] Plaintiffs have not set forth any objections (e.g., with respect to the form of the question) with respect to any passage designated by either defendant or plaintiffs.

Plaintiffs' transcript counter-designations are as follows: 12:25-13:9; 14:9-15:5; 30:22-32:16; 71:9-72:23; 84:21-85:10; 102:22-105:1; 110:19-112:2; 112:23-113:16; 115:7-14; 116:16-119:12; 120:10-23; 126:15-128:3.

The combined transcript designations are as follows: 4:1-7; 6:23-10:8; 10:11-11:6; 11:22-15:5; 16:12-17:19; 30:22-32:16; 36:9-37:2; 39:2-40:2; 42:10-43:2; 46:17-48:19; 52:9-53:4; 53:12-16; 71:9-72:23; 75:8-76:7; 81:6-16; 84:21-85:10; 101:16-105:1; 110:19-112:2; 112:23-113:16; 115:7-14; 116:16-119:12; 120:10-23; 126:15-128:3.

Given the foregoing, defendant respectfully moves, with the consent and stipulation of plaintiffs, for the introduction of the combined transcript designations from the deposition of Mr. Dalton set forth above.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

Of Counsel:
SCOTT D. AUSTIN
Senior Trial Counsel
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
BRIAN A. MIZOGUCHI
AMANDA L. TANTUM
JOHN J. TODOR
Trial Attorneys
Department of Justice

January 8, 2008

Attorneys for Defendant

# EXHIBIT A

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - :
HOMER J. HOLLAND and :
HOWARD R. ROSS, :
Plaintiffs, :
v. : NO. 95-524C
THE UNITED STATES OF AMERICA, : Chief Judge Smith
Defendant. :
- - - - - - - - - - - - - - - - :

Denver, Colorado
Monday, July 31st, 2000

Deposition of RICHARD J. DALTON a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by Craig L. Knowles, a Notary Public in and for the State of Colorado, taken at 821 17th Street, 2nd Floor Boardroom, Denver, Colorado, commencing at 9:00 a.m., on Monday the 31st day of July, 2000, and the proceedings being taken down by Stenotype by Craig L. Knowles, and transcribed under his direction.

PROCEEDINGS

Whereupon,

RICHARD J. DALTON

called as a witness by Defendant, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified upon his oath as follows:

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. If you could provide your employment from the time you got your business administration degree up until now. I may break in at points, or I may wait

until you have listed them all and then come back and ask you questions.

A. Fine. 1983 started at Empire Savings and Loan, spent about a year there in the loan servicing area. Left and went to Hawaii for one year. About June or July of '84, to June or July of '87 worked at State Savings and Loan there, basically was liaison between the collections people and attorneys doing work-outs on problem assets.

Came back to Denver about April of '87 to Empire Savings, worked in the finance area, primarily -- started in the loan area, spent only about three months there, and then went to the finance area.

That was sold early '87 and moved to Chicago. That is when I went to work at Holland Partners.

Let's see. '87 to '92 was spent between Chicago and Peoria. Roughly '87, somewhere around January of 1990, I moved down to Peoria for about 18 months.

So until about January of 1990 I spent in Chicago with Holland Partners, and from '90 to about June of '92 I was in Peoria. Left Holland Partners/River Valley, Illinois, to go to McAllen, Texas, and went to work for Western Capital Holdings,

and became, then, president and CEO of River Valley Savings Bank, the Texas organization.

Actually, I was just president initially, and probably a year later was named CEO. Oh. I am sorry.

Q. That's okay.

A. That's the end. Let's see. I have got to '92, June. June of '92, I did that until about June of '96, at which time we did a liability sell there, basically collapsed that charter.

From June of '96 through, I started with where I am -- through December 31st of '96, I kind of worked on winding that organization down and cleaning it up.

January of '97 I started here at Colorado Business Bank Shares. That is where I am today.

Q. Okay. Thank you.

A. Uh-huh.

Q. In terms of your work for Empire between 1985 and 1987 in the finance area, what specifically, what kind of work were you doing?

A. I did basically financial analysis and reporting on the investment portfolio, as well as interest rate risk management modeling. We developed a lot of models to do interest rate risk management and financial analysis.

Q. Were you working with Steve Bangert at that time?
A. Yes, I was. I was working for him.
Q. What was your position at that point?
A. I was an untitled -- I was a financial analyst.
Q. What was Steve Bangert's position at that time?
A. I believe he was a vice president of finance, I think was his title.
Q. And then how did it come about that you would end up going to Holland Partners, Inc.?
A. Steve offered me the position. He was going to work for them. I think he needed an analyst and he encouraged -- at the same time he had left Empire Savings, and he was going to work for them. I was considering a job in Southern California. And he made me an offer -- no, not that I couldn't refuse, but it made good sense.
Q. When you initially started out at Holland Partners, Inc., what type of work were you doing?
A. Basically, financial analysis. At the time we were looking at a lot of failed thrifts. They would hand me a call report, I would plug the call report into a model. It was based very, kind of first-cut

valuation analysis model where, I mean, from a call report you can't get real detailed financial information, so we would just take groups of assets we could identify, spread them to a treasury yield curve, spread them out the treasury yield curve, and try to come up with a starting point of valuation, if, in fact, there were any interest in the institution at all.

REDACTED MATERIAL

Q. Were you doing any work, when you initially started, relating to River Valley Rock Falls?

A. My involvement with River Valley Rock Falls would have been issues related to pricing either deposits or assets, as well as probably doing some interest rate risk modeling, financial statements. And limited as their investment portfolio was, maybe some analysis of whatever securities happened to be in the investment portfolio, or make recommendations for purchases for the investment portfolio. It was a fairly small institution, so there was not a lot of activity at that point in time.

Q. When you took the position with Holland Partners, Inc., what did you understand the position to be in terms of what it was that you would deal with?

A. It really was going to be initially working on financial analysis for acquisitions, basically just running numbers.

If, in fact, when we did acquire institutions, it would be to develop the finance function, much as we had at Empire Savings.

REDACTED MATERIAL

Q. Did you understand when you started working there that you were going to be looking solely at the troubled thrifts? I know you made reference to troubled thrifts. I was wondering if that was all you

were looking at.

A. No. I mean, I think, really, most of my negotiations in terms of my going out there were with Steve, rather than with Ross and Holland. But Ross and Holland, I think their approach was, we will look for opportunities in the banking industry.

I think they felt they had the capital, and I think they felt Mr. Holland had a lot of the management expertise. I think the piece that they were looking for from Bangert, and somewhat to me, but I was more of, you know, his supporter or his analyst, was more the investments on the Asset/Liability side of the equation to, and the valuation piece. I think they felt fairly comfortable that they understood the business.

So I don't know it was necessarily or absolutely had to be troubled. It was just that that is what I seemed to spend a lot of my time looking at. I looked at call reports from a number of institutions.

I mean, I can't tell you. It's in excess of 20 institutions very easily. Some of them Steve would do a preliminary look and might not want to even value it because of -- for whatever reason.

Q. What time period was that that you would have

looked at 20 or so thrifts?

A. I went out there, I think, in April or May of '87, and I think we closed a transaction until mid '88. So over a 12-month period, we probably looked in excess of that.

To be honest, I couldn't tell you how many I looked at. We built the model, you would plug it in and try to come up with just a starting point or, you know, a guess as to what this thing might be valued at.

Q. Were you ever involved in deciding which thrifts to actually take a look at?

A. Nope.

Q. At what point in time did you stop looking at call reports and what-not for thrifts?

A. To be honest with you, I can't -- I know it went well beyond the first or second closing that they did in terms of transactions or acquisitions. But I can't really say. I mean, probably into '89, easily, possibly.

Like I say, in roughly '89, I can't give you an exact, but at that point it was somewhat around FIRREA. My emphasis went more and away from the investments and Asset/Liability management into loan production. We had acquired a group from American National Bank that was doing wholesale lending. So

that was kind of my new assignment, get them up and running, get them functioning. Then take a look at the existing organizations' loan-generating capabilities.

So me personally, sometime mid to late '89 is when I would have walked away from most of that.

Q. That is when you started to do the loan function activities?

A. That's correct.

Q. Subsequent to the Galva/Home/Mutual acquisition which would have been July of '88 --

A. Okay.

Q. -- and Republic acquisition, which also would have been July of '88, did you continue to look at as many call reports for, or troubled thrifts as you had been, or did that slowdown?

A. It may have slowed, but it seemed to me like they were always looking at something. I mean, that was just kind of the nature. It seemed like kind of a, Homer's approach was he would always look for something where he perceived value.

Q. How about subsequent to the Peoria acquisition, which was in December of '88, did it slow down at all after that, or did it continue to be at the same pace?

A. At least my involvement slowed. I know that

they continued to talk and look at other transactions. That is basically, I think I probably got more involved on focusing on what is it that we have here and how do we get it moving, you know.

Q. Okay.

REDACTED MATERIAL

**REDACTED MATERIAL**

Q. How did the transition come about that you ended up going to Peoria and working on the lending function?

First let me ask, were you working on the lending function before you went to Peoria at all?

A. Yes. When I was still in Chicago, we had, that is when we looked to, you know, I would say it's probably, it was probably FIRREA-related in that. The investment activity decreased significantly once FIRREA was passed. The investment portfolios we started, I mean, there were two things that occurred. Going into that, we were bringing in more expertise for analysis of derivatives of the investment portfolio, because it was getting fairly sophisticated. So we were bringing

in people with specialties there.

Secondly, with the advent of FIRREA and capital impact it had, I think the investment portfolio started, well, it was shrunk.

As a result, I was sitting there saying what am I going to do with my life since we have a bunch of specialist-type analysts. I was looking for new, a new opportunity.

They had brought in a gentleman from American National Bank who was doing wholesale lending. I had touched lending earlier in my career, thought it looked kind of interesting. They assigned managing him and his group as my first priority.

But, secondly, taking this network of thrifts that we had acquired and seeing if we could generate some loan volume out of them on a retail basis. We had a wholesale piece going, we had acquired that. Then it was to see if we could get the retail side up and running.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. Do you have an understanding why it was a goal to increase franchise value?

A. Yes. I mean, I think if, and this is where I -- do you want me to talk as at that point in time or

as I perceive it today, I guess? I would like clarification there.
Q. Let's say first at that point in time.
A. Yeah, I mean, at that point in time, I mean, conceptually I can see how that would add value to an association. If, in fact, I ever thought about selling it, or when it became an acquisition target, if, in fact, I could go and show a potential acquirer out of my customer base on the retail side I had generated $25 million in loans last year, or 50, or whatever that number was, that had value. I understood that at that point in time.
Q. Did you understand why there was a focus on the franchise value, or increasing franchise value?
A. I knew Mr. Holland well enough at the time to recognize his -- I mean, he very much is, he is a very sharp businessman, and his intent at all times was to maximize value.
Q. I am still trying to figure out the why. Is there anticipation it was going to be sold at some point?
A. I don't know that was necessarily the driving force. That was never communicated to management that we are trying to clean this thing up and dress it up for eventual sale. In the same sense, I mean, in

America you want to maximize value. If you are in business, at least this is my opinion, you want to maximize value. So that would obviously be the intent.

Q. You don't ever recall having discussions with either Steve Bangert or Homer Holland or Howard Ross on why the emphasis was on increasing franchise value?

A. Well, yes, I guess I could say yes. From the time we started the process, when I went to Chicago, the intent was we have money, we have expertise. If we can bring the capital and the expertise together, if we can buy institutions at the right price and we can take our capital, our expertise, and combine it, we can create value from these entities, whether they be failed, whether they be troubled, or whether they be healthy, yet needing additional management or direction.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. Turning now to the position you took at River Valley Bank Texas. How did that come about?

A. I knew they were looking at a thrift in Texas. That is about all I knew, was that they were looking at one. I think they came to me because I was a known entity. I had shown the ability to manage functions, to take, I think the lending area was an example of that, where I took something that wasn't functioning real well, kind of cleaned it up, made it function, generated some volumes off of it.

But I was a known entity to them. They were acquiring a thrift in Texas where they weren't comfortable with the existing management. They needed someone to go down and manage it, take direction as they saw they would like to develop that asset and be able to execute and implement that plan.

Q. When you say "they," who are you referring

to?

A. That would be Bangert and Holland, primarily.

REDACTED MATERIAL

Q. When you took the position down in Texas, then, initially you were president?

A. Yes.

Q. What were your responsibilities at that point?

A. We went into Texas, you know, my responsibilities were to go down, make initial decisions about the management people that was in place. There was an office in San Antonio which, it was kind of their corporate headquarters. They had all their finance, accounting, loan servicing, investment people up there, as well as all their senior officers. They had a branch down in the Rio Grande Valley about four hours from San Antonio.

I was really given the latitude to see do I want to keep what is in place in San Antonio, or does it need to be centralized? I made that decision. We closed the location in San Antonio and moved those functional areas to the Rio Grande Valley.

That required rebuilding all of those functional areas, you know, finance, audit, compliance, loan servicing. And so that was a fairly large step for that organization.

Big emphasis on troubled assets. We had a

lot of troubled assets in the portfolio. I think our classified assets were 18 to $20 million.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. What is your current involvement with Homer Holland and Howard Ross, if any?

A. I have no involvement with Homer Holland at this time. That would have ended when I left Western Capital, December 31st of '96.

Howard Ross is a shareholder and is on the board of both the bank and the holding company here, and he owns roughly 14 percent of the shares outstanding, I think. That is off the top of my head.

Q. That is the extent of your involvement with Mr. Ross?

A. Yes.

Q. Have there been, over time, any investment opportunities you have pursued with either Homer Holland or Howard Ross?

A. Other than I was given minority interest in

the Texas Bank, that was it. I am a shareholder of
this existing company. That would be with Howard.

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. What is your understanding of the claims alleged in the complaint?

A. From having read it, as well as from knowing what I know, I -- my understanding is that they would contend that there is a contractual obligation. That that was breached.

As a result of that breach, they suffered financial, I don't know if I would say financial loss, but there was opportunity that if they had had the

regulatory capital that they had had at the time of the acquisitions -- I should say preFIRREA, that they could have made a lot more money than they did.

Q. Do you have any view as to the validity of their claims?

A. I mean, in an industry where capital is king, and at times leverage can -- the ability -- I shouldn't say leverage, because that gets misconstrued. But the ability to grow based upon your capital, I can see where you might lose opportunities.

But I think it's real subjective to market conditions, interest rates, your ability to manage and grow an institution.

Q. Did you discuss with Steve Bangert the validity or merits of the claims?

A. Over the last couple years, possibly. Very recently, I would say no. I mean, we have known, yeah, that they were going -- until I was contacted by you -- actually, Howard was the first to tell me I was going to be deposed. But I was aware that they were going to sue.

So had we had conversations? Probably. But specifics, no.

Q. Do you recall generally what Steve Bangert's views were with respect to the validity of the claims?

A. I think Steve and I are probably on the same page in terms of, and I am not a lawyer. You know, Steve's not a lawyer. And was there a breach? I mean, when I read it and when I look at it, I would say yeah. I mean, when we did those transactions, I think people were counting on the capital that we were able to utilize in order to grow the institution. I think that was validated by the sales from the investment portfolio, the shrinking of the balance sheet to fit the capital post FIRREA.

To try to look forward and say was that good or bad is pretty subjective. And it could have been a very good thing. If interest rates had gone the wrong way and the portfolio had not been shrunk, it could have been worse. You know, that is too long ago to sit there and say, if you had a fairly large investment portfolio sitting there funded by repos, or whatever source you were using to fund that, what could the implications have been if interest rate changes.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. You mentioned before, I believe, that leverage can work for or against you. What did you mean by that?

A. Well, I just think -- I mean, and that is probably from business school days, but, you know, they always talked about leverage being a two-edged sword.

As long as you have the expertise and you manage it correctly, I think you can minimize the impact of changes in interest rates in a levered environment. I think people historically got in trouble if they put levered transactions on and kind of fell asleep at the wheel, they weren't monitoring the underlying assets they were funding -- the risk-controlled arbitrages were rather popular. In many years, even in my Empire days.

And that was very much a levered transaction. When people got burned in a levered

transaction, it always seemed to come from them not monitoring and paying attention to what they were doing, rather than some unforeseen interest rate change.

REDACTED MATERIAL

Q. Based on what you were indicating, is it fair to say that you were not involved at all in deciding how the acquisition of San Antonio Federal Savings Bank was structured?

A. That is correct. I had no input.

REDACTED MATERIAL

**REDACTED MATERIAL**

Q. How were they viewed in terms of ability to forecast what would actually occur?

A. I mean, I think they did a pretty good job in terms of the controllables, the non-interest expense, the non-interest income. I think where you probably, and here it's hard to not generalize in the different institutions. But the harder part was always kind of in the, what I would call the uncontrollable, or you know, the wholesale piece of your balance sheet, where interest rates can have more of an impact on earnings than just, non-interest income, non-interest expense, those are pretty straightforward, you can do a pretty good job of budgeting those. It's the growth assumptions, I think, that would probably create variance, or create some of the bigger variances.

But my opinion, at least on the pieces that I saw in the Chicago operation, if, like on the

investment portfolio, if there was an issue, they would hire the expertise or find the expertise to analyze properly. I mean, I know the investment portfolio, the last year I was in Chicago, and I wasn't that involved with it, that they had, was it OTS there? I don't know. It was whoever the thrift regulators were. But they had an investment guy that would spend four months a year in there looking at the investment portfolio. It seemed like he could never come up with any issues that would stop the band.

But they also had about three or four people who were involved in analyzing investments, reporting on them. And so the group tended to address, if they saw an issue or problem, they tended to address it with expertise.

Q. How long a period of time did you think the regulator spent?

A. Oh, I just remember the guy, because he was, Larry Kenney. I think his name was Larry Kenney. There were two guys. But I think the investment specialist, he would come in three or four months to spend time looking at the files of the investments they had.

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. You were referring to STARs before. You mentioned about bank examiner being excited about it. Who were you referring to?

A. I think his name was Larry Kenney. Larry was definitely his name. There was Larry Kenney and Larry someone else. One of them was kind of, if it wasn't the OTS, it was whoever preceded the OTS.

But he was their investment guru. You know, his contention or concern was always if you put derivatives into a portfolio, you have to have the expertise to manage those. I think Steve's comment was, guess what, we have the expertise to manage those, and here is who they are, here is -- really, his approach was more to hiring analysts to track, monitor the position, make sure it was doing exactly what we had anticipated it to do.

Q. Was Larry Kenney, that is the only person you can think of that was really looking at that issue?

A. At that piece, yes. That is the only one I remember. Like I say, I wasn't really that involved in it, other than an interest because of my finance background. But it seemed like he was there an awful lot. I would get in early, and he would be sitting by the door waiting for someone to let him in. So that is how I --

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. Do you have any reason to believe that River Valley did not receive fair market value for the assets that it sold when it was attempting to shrink?

A. Assuming it was done in the capital markets, I mean, I think the markets are fairly efficient. I don't remember -- I mean, if they were selling agency-type paper, Ginnys, Fannie's, Freddie, those type of securities, I think those markets are fairly efficient. So I don't know if they, if there was any damage, it couldn't have been significant, in my opinion.

REDACTED MATERIAL

REDACTED MATERIAL

Q. With what frequency were attractive wholesale spreads available to River Valley?

A. I think in any given time you could go out and find a trade that makes some relatively good sense. Again, that's, in the River Valley days, it

never seemed like we had a huge problem finding decent spreads in the wholesale market. I don't remember a time when there was a loss of transaction. It was more being constrained by whether it was, and I don't know, but it appeared to me it was more constrained by the capital available, rather than the opportunity in the secondary markets.

But that is kind of my perception. If I had to say was there a constraint to that, it was probably capital driven rather than market driven.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. With respect to the concerns expressed by the regulators with respect to the investment portfolio, do you have an understanding as to whether that somehow is related to the alleged breach at issue in this case?

A. If I take the position that the alleged breach created the capital issues, those were separate from the scrutiny on the investment portfolio, at least in my mind. The alleged breach in my mind was capital was taken away, and as a result, there were certain changes that had to be made to the investment portfolio

in terms of shrinking it or shrinking the asset size of the institution.

When I look at the change in the regulatory environment, I separate that from what you would refer to as the alleged breach, in that I think that the amount of scrutiny on the investment portfolio came more from the type of investments that were in that portfolio. That would be the STARs and some of the CMO or residual-type product.

So I don't know that, although they may have occurred simultaneously in time, I don't know that they were concurrent issues.

To me, in my mind, as you defined the breach, that was something that caused shrinkage in the balance sheet. My memory of the regulatory scrutiny of the investment portfolio was not related to capital in some sense or another, although there may have been capital issues there that I wasn't aware of. But it was more in terms of the instruments within that portfolio, how they were being managed, how they were being monitored and why they were there.

Q. What is your basis for that understanding that you have just described?

A. I guess it's just more of an intuitive one, in that I wasn't aware of any capital requirement to

support the investment portfolio, other than just the size of the institution. So regardless of the components of the investment portfolio, that shouldn't -- well, but there are risk-weightings to the capital, so maybe that was part of the issue, too.

See, that's where I wasn't real conversant, because, and this I don't know, but maybe a residual or STAR might require more capital to support it on the balance sheet than would a GinnieMae security.

I know there were risk-weighting issues. As I sit here, I know it's possible the alleged breach could have triggered some of the heightened regulatory concern.

Q. Assuming there were not additional capital requirements for those types of investments.

A. Then I would say they just happened to be concurrent in time.

But you know, as I sit here and talk about it, I know, at least on the balance sheet of this institution, if I have a GinnieMae security versus a home loan, my capital requirements for those two assets are very different.

I don't think it would surprise me if a CMO, especially if it was not a rated or government security, it would require more capital, as I sit here

and think about.

So if they had a STAR or residual or CMO that was just Double A rated, rather than agency guaranteed, it would require more capital. Perhaps the breach created some of those issues. I don't know that for a fact, but, intuitively, it makes sense that that could have been the issue. It wasn't just odd timing, you know.

Q. Is it fair to say that it's possible the regulators would have expressed the concerns that they expressed with respect to the investment portfolio, regardless of the alleged breach?

A. I don't know it's fair to say that. My opinion of the capital markets group that they put together, the regulator said if you are going to do these types of investments, you need to have the expertise. The ownership group said we will go get that expertise, we will put it in place, put the reporting in place.

I think they were fairly fastidious about doing that. If the regulators came in and said you need to do this to address this problem or issue, they would do it.

I think the capital markets group was a fairly sophisticated group and did a pretty good job of

managing that investment portfolio. Personal opinion.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. Turn to the issue of the acquisition of San Antonio Federal Savings Bank.

A. Okay.

Q. Was Western Capital Holding acquisitions of San Antonio accounted for as a purchase?

A. I believe so. I don't know what else it could have been. There was no merger that Western

Capital was the entity created to acquire San Antonio. So I don't know what else it could have been.

Q. What was your understanding regarding any goodwill that was created pursuant to the transaction?

A. I don't know. If there was, I wasn't privy to any understanding related to the goodwill. I mean, I think there was goodwill created in the transaction.

But if there was some type of an understanding in terms of the deal or transaction, I wasn't part of that, or I wasn't aware of it.

Q. Do you have an understanding as to how much was paid for San Antonio?

A. It seems to me like it was around $10 million. I can't tell you for sure. I don't know if that was in the form of a loan that they guaranteed or what.

Q. Do you have an understanding or recall what the mark-to-market value was of San Antonio?

A. No. I mean, in terms of the mark-to-market, no, because I wasn't involved in negotiating it. I was aware of the balance sheet post transaction, but I don't know what it looked like pretransaction. I know there was too much capital in it, because they dividended, like, $15 million back to the government. I remember that was part of the transaction. But that

is all I really -- in terms of seeing a preacquisition balance sheet and a post, I didn't.

REDACTED MATERIAL

Q. Do you have any understanding as to how it may have been that if the mark-to-market value was, assuming 32 million --

A. Yes.

Q. -- and 10 million was paid for it, why the negative goodwill that was created was only 328,000?

A. No. Other than, one of my fond early memories was sitting at a board meeting where a regulator was alluding to the fact that we had, I am not sure of the number, but 20-plus million of classified assets, which was almost twice our capital position. The comment was made, well, that is because it was of the form of accounting, the form of purchase accounting they required, it was pushed down. I am not sure what the differentiation there was.

But, essentially, I don't know if that is why, in fact, you know, out of that 32 million, if that was the difference that resulted in that. I am not sure.

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. Once you were there as president and you were overseeing operations, were there ever issues at that point in time in terms of excess capital?

A. I don't think so. None that I was aware of. I know we were earning a ton of money, but a lot of it was, you know, was accounting, rather than necessarily the institution cranking out a lot of earnings. At least early on.

REDACTED MATERIAL

REDACTED MATERIAL

Q. With respect to the profitability of River Valley Savings Bank Texas, what were the sources of that profitability?

A. I think, I mean, there were different components. Obviously, the operation of the bank more than the savings and loan. There were a number of workout situations from loan portfolios. I mean, we had a lot of classified assets, day one.

As those were resolved and worked out, whether they were paid off, whether they would be -- we

really didn't do a lot, very little, like, renewing a line to someone in order to clean up the asset, per se.

So a lot of the assets that were bought at a discount and a lot of the income that seemed to be generated would come from the troubled asset resolution. But for an institution that size, early on it had some pretty good income being spun off. Those were big chunks of it. Normal operating income from fees and net interest margin were reasonable for an institution like that.

Q. In terms of the purchase accounting income, how significant was that?

A. Probably very. By the third year I think it had, and I don't remember the numbers exactly, but I think early on, as I say, it seems like we had nearly 20 million classified-type assets. Three years later we were down around 2 or 3 million. So that is a pretty significant improvement, and the resolution of a lot of those troubled assets would probably be through, flowing through through the purchase account, I would assume.

Q. What was the general operating strategy of River Valley Savings Bank in Texas?

A. I think it was similar to Illinois in that, I mean, initially it was to stabilize the operation, to

put the checks and balances in place, in terms of from a regulatory perspective, in terms of internal audit and compliance, those types of things, and to focus on the resolution of the troubled assets, the classified assets.

But then longer term would have been to develop the franchise value. That area, NAFTA had just been enacted -- had been, you know, enacted. So there was a lot of growth and a lot of activity. They had a couple of trailers down there, temporary facilities that had, you know, 20 or $30 million worth of deposits in them. We bought two new locations there. That was in Brownsville and one in Harlingen. They were temporary. They were trailer houses that had been parked there for almost ten years and were just starting to collapse on themselves.

So it was to take a look at the market, the nicer area or larger Metropolitan areas there and try to establish reasonable, not reasonable, but nice locations where we could generate deposits in those.

Q. What was the relationship, affiliation of River Valley Savings Bank in Texas with River Valley Peoria?

A. Outside of, and the ownership, some common ownership, common board members, per se, I can't think

of much.

Early on, this was very early on, at acquisition, I think Ron Pikus and a couple of the employees from that bank went to the San Antonio office and announced the acquisition.

I don't know if their capital markets group, I am trying to remember if they had any early involvement. But if they did, it was very minimal.

I mean, I am trying to think if we had any agreements between us in terms of services provided. I can't think of any, any shared services or anything like that.

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. Was there ever discussion of River Valley Texas being merged with River Valley Peoria?

A. If there was, I wasn't a part of it.

Q. So you don't recall ever hearing about that?

A. The name, the similarity of the name came more for, we were working in the Rio Grande Valley with the river -- people said well, we kind of like that name. San Antonio Federal Savings Bank didn't make sense anymore.

So to the best of my knowledge, the name came because people in Texas liked it, so that would probably work.

If there were discussions for a merger, I was not part of those.

REDACTED MATERIAL

**REDACTED MATERIAL**

Q. How did you determine that one way to structure the sale, demise, dissolution of River Valley Texas would be just to sell the deposits and then do something with the remaining assets?

A. I guess it was just kind of looking at it and saying, okay, you know, if you can't sell the whole entity as an ongoing -- not as an ongoing --

I mean, in my mind it was more driven by, as you would go through the mark-to-market on a monthly basis and look at a liquidation analysis, you would focus on the liability side of the balance sheet. It

did have pretty strong core deposits.

So as you marked those, you said, well, if the premium recognizable on the deposits or the liability side is this, and if I have assets that I could fund that sale, because when you move those, you would have to fund those deposits to whoever you sell them to, it was kind of like a backwards look at the mark-to-market. You said well, I'd have 34, $35 million, whatever it is of assets left after the transaction. If I took all my cash that I got from the proceeds of the sale, to fund the deposit sale, I would have "X" million dollars left. Now, that "X" million dollars carried an unique profile, in that it had whole loans, some of which were trouble assets. There was a shopping center down in Port Isabelle.

But some of them were fairly generic. You know, mortgage loans, consumer loans that could relatively easily be serviced. And they could, then, as that income came in the remaining entity, whatever you set up or whatever land, it would have this much to deal with, tax consequences or whatever, they could control that rather than at the transaction, it was at the date of the transaction this is how it happened.

I guess that is the best explanation I can give you as to how we ended -- it was kind of one of

those those things where it was like okay, what are our alternatives. A deposit sale was one of those. And as we started looking down that road --

**REDACTED MATERIAL**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2008, a copy of the foregoing “JOINT STIPULATION FOR THE INTRODUCTION OF TRANSCRIPT DESIGNATIONS FROM THE DEPOSITION OF RICHARD J. DALTON” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson

John H. Roberson