**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| HOMER J. HOLLAND,<br>STEVEN BANGERT, co-executor of the<br>ESTATE OF HOWARD R. ROSS, and<br>FIRST BANK,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 95-524C<br><br>(Judge George W. Miller)<br><br>(Winstar-Related Case) |

**JOINT STIPULATION FOR THE INTRODUCTION OF TRANSCRIPT DESIGNATIONS FROM THE DEPOSITION OF SUSAN VRANES ELLS**

Defendant, the United States, hereby moves, with the consent and stipulation of plaintiffs, Homer J. Holland, Steven Bangert, co-executor of the Estate of Howard R. Ross, and First Bank, for the admission into evidence at trial of designated passages from the deposition of Susan Vranes Ells taken on September 26, 2000. Plaintiffs have set forth counter designated passages of Ms. Ells' deposition, which we do not oppose, provided that those designations are not construed to be designations made by defendant with respect to the scope of defendant's case in chief.

Defendant's transcript designations are as follows:[1] 4:1-5; 6:23-7:19; 7:23-9:4; 9:21-23; 10:10-18; 12:19-13:4; 13:14-17; 14:1-15:9; 15:23-17:24; 21:14-18; 24:21-25:11; 30:20-31:3; 38:6-17; 45:3-7; 48:24-49:13; 49:24-50:10; 51:7-12; 51:21-52:12; 53:2-54:8; 73:23-76:3; 76:16-24; 96:15-97:16.

[1] Plaintiffs have not set forth any objections (e.g., with respect to the form of the question) with respect to any passage designated by either defendant or plaintiffs.

Plaintiffs' transcript counter-designations are as follows: 7:20-22; 9:5-20; 9:24-10:9; 11:1-12:18; 13:18-24; 49:14-23; 51:13-20; 52:13-53:1; 57:10-17; 70:4-24; 76:4-15; 80:7-23; 87:16-88:20; 89:6-90:22.

The combined transcript designations are as follows: 4:1-5; 6:23-10:18; 11:1-13:4; 13:14-24; 14:1-15:9; 15:23-17:24; 21:14-18; 24:21-25:11; 30:20-31:3; 38:6-17; 45:3-7; 48:24-50:10; 51:7-54:8; 57:10-17; 70:4-24; 73:23-76:24; 80:7-23; 87:16-88:20; 89:6-90:22; 96:15-97:16.

Given the foregoing, defendant respectfully moves, with the consent of plaintiffs, for the introduction of the combined transcript designations from the deposition of Ms. Ells set forth above.

Respectfully submitted,

MICHAEL F. HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

/s/ John H. Roberson
JOHN H. ROBERSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street
Washington, D.C. 20530
Tele: (202) 353-7972
Fax: (202) 514-8640

Of Counsel:
SCOTT D. AUSTIN
Senior Trial Counsel
ELIZABETH A. HOLT
WILLIAM G. KANELLIS
BRIAN A. MIZOGUCHI
AMANDA L. TANTUM
JOHN J. TODOR
Trial Attorneys
Department of Justice

January 8, 2008

Attorneys for Defendant

# EXHIBIT A

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HOMER J. HOLLAND AND HOWARD R. ROSS, Plaintiffs, | ) |
| vs. | ) No. 95-524C |
| THE UNITED STATES OF AMERICA, Defendant. | ) |

ORIGINAL

The deposition of SUSAN ELLS, called by the Defendant for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Laura A. Czubak, Certified Shorthand Reporter and Notary Public within and for the County of Cook and State of Illinois, at 205 West Randolph Street, Suite 510, Chicago, Illinois, commencing at 9:00 a.m. on the 26th day of September, A.D., 2000.

(Witness sworn.)

WHEREUPON:

SUSAN ELLS,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. Ms. Ells, if you could start by just providing your educational background from high

school on.

A. Okay. After high school, I graduated from the University of Wisconsin at Madison with a B.B.A. in finance and marketing.

Q. And what year was that?

A. That was in 1997. And I've done --

MR. BERGMAN: You just said "1997," which I don't think is right.

THE WITNESS: 1987.

BY MS. SMITH:

Q. Okay. And then after that?

A. No further formal education.

Q. Okay. Any type of training for work that you've had?

A. I've taken -- I've worked for broker dealers twice in my career, so I've taken the Series 7. I've taken some miscellaneous classes in spreadsheets and databases, but that -- that's the extent of it.

Q. You're not a CPA or --

A. No, I'm not.

Q. -- anything along those lines?

Following your graduation from Wisconsin in 1987, if you could provide your employment up

until the present. And then I may go back and ask some filler-in questions.

A. From graduation to the summer of 1989, I worked for Drexel, Burnham, Lambert in New York City. I then moved to Chicago, and in the fall of 1989 went to work for what was then Holland Partners. I actually worked for Holland Partners and River Valley Savings Bank between 1989 and January of 1995. Actually, I had three employers in that period of time: River Valley Savings Bank, Holland Partners, and another company called Summit Financial Group.

During that time my responsibilities didn't change with the employer, if that makes sense. I went to work for Holland Partners, but worked for River Valley Savings Bank. At one point, they switched us over -- a number of us over to actually working formally for the bank --

Q. Okay.

A. -- River Valley Savings Bank. And then at some point -- and I don't recall the actual point. I could probably give you an approximate time. (Continuing.) -- myself and a number of other employees were switched over to Summit

Financial Group, but the office stayed the same. It was just a matter of if we worked directly for the bank or for another company that had a consulting contract with the bank.

Q. For purposes of the record, and just to be clear I understand, when you refer to "River Valley Savings Bank," you're talking about River Valley in Peoria?

A. Yes.

Q. Okay. Because we may be talking about the River Valley in Rock Falls as well as the River Valley Bank in Texas, so if it makes sense to you, if we refer to those -- or if you're talking about those, if you could then just identify them as River Valley Rock Falls or River Valley Texas; otherwise, I'll assume you're talking about the River Valley of Peoria.

A. Okay. In much -- I'm really, kind of, referring to the group.

Q. Okay.

A. I believe my employer was River Valley Savings Bank Peoria, but I probably don't make that distinction as clearly as you do. I'll try.

Q. Okay. That's all right.

A. I realize there's some overlap between them. But to the extent we're talking, I guess, just about River Valley Rock Falls or just about River Valley Texas, then we can identify those and make the record a little bit cleaner.

Q. Okay. What was the position that you held -- Well, actually before I get there, are you still with Summit Financial Group?

A. No.

Q. Okay. Since January of '95, you've switched over or --

A. Yeah. January '95, I took a little time off. I took about six months off, did a little skiing. And then I went to work for a small broker dealer called Cleary, Gull, Reiland & McDevitt. It's in Milwaukee, Wisconsin. Worked there through August of '96, and then went to work for Homer Holland; the actual company is Holland Partners.

**REDACTED MATERIAL**

Q. What was the position that you held when you were at Drexel, Burnham?

A. I was on a fixed-income research department. I think my title was analyst.

Q. And what type of work did you do?

A. It was mainly mortgage-backed security-type work. We had a software system that was developed within the fixed-income research department; and I focused on training, development, and education around that software system.

Q. So you were training others --

A. Others within the firm. Some of our outside clients had the system.

Q. Okay.

A. And it was a system that analyzed fixed-income bonds, mainly mortgage-backed securities.

Q. How did it come about that you took the position with Holland Partners in the fall of '89?

A. When I left Drexel, I went through the fixed-income research mailing list with a friend of mine who worked in the Chicago office and identified different clients. I wanted to go from what would be considered the buy side, which is

Wall Street, to -- or the sell side, which is considered Wall Street, to the buy side, which is considered portfolio managers, banks, anyone who actually buys securities. And I went through the mailing list and identified "good company to work for, bad company to work for." And Steve Bangert was a customer of Drexel, Burnham, and they were -- he was identified as, you know, a good person, smart, doing interesting things for the banks that he worked for. And so I sent him a letter.

Q. Had you ever met Steve before that?

A. No, I had not.

Q. So it was just recommendations of other people that he was someone good to work with?

A. Exactly. I sent a random letter. He called me randomly. And then we went through the interview process, and I took a job at that point.

Q. When you first started there in the fall of '89, what was the position that you held and the type of work that you were doing?

A. I think my title was assistant portfolio manager. We were not big on titles. I think that was it. But what I did was support Steve in

analyzing the investment portfolio, documenting what we had in the investment portfolio, the trades that we did. It was really support revolving around the investment portfolio.

**REDACTED MATERIAL**

Q. The work that you were doing when you initially started at Holland Partners, was that exclusively for the River Valley entities?

A. Rock Falls and Peoria, correct.

Q. Okay. Because I know at times Holland Partners did some other work, and they may not have been doing it by the time you joined.

But your work was exclusively for the River Valley --

A. Yes.

Q. -- institutions?

Okay. At what point did the work that you were doing change in terms of the responsibilities that you had?

A. I think it evolved over time. You know, I started as a junior portfolio person working for Steve Bangert. And as my depth of knowledge increased, my responsibilities increased; and also as Steve took on more responsibilities, I took on more responsibility from him. I believe it was 1996 where I took over responsibility for the investment portfolio. I still reported to Steve. He was still involved, but -- When did -- Just wait. I've got my dates wrong.

Q. Yeah. I was just going to say -- Maybe if I could help you a little bit. River Valley was sold in '94 to First Banks.

A. Right. Probably about '91 or '92.

MR. BERGMAN: Just for clarity, I think that the sale to First Banks was consummated in '95.

MS. SMITH: Okay.

BY THE WITNESS:

A. But really my job, sort of, evolved over time. I can't really remember how the titles went. But at some point I was made vice president,

probably about that '91/'92 time period.

And then probably, like, a couple years -- maybe '93, I was made senior vice president in charge of the capital markets group. Maybe it was '94, but it really evolved over time.

Q. Was Steve Bangert still at River Valley when you were put in charge of the capital markets group?

A. Yes.

**REDACTED MATERIAL**

Q. Okay. How did your responsibilities evolve over time? Initially, it was support for

Steve, and then what were the additional responsibilities that you added over time?

A. Initially, it was support for Steve in the overall portfolio, and then I probably spent more and more time with the derivatives because we did a lot more documentation. We did a lot more analysis. We bought a software system. We really spent a lot of time modeling them for our own purposes as well as for our board of directors and the regulators. I then spent a lot of time with some of the tax transactions -- the tax residuals that we bought.

Q. The STARS?

A. The STARS.

And so those really became, sort of, my domain.

Then, sort of, as a natural progression, we started doing a lot more modeling of our entire balance sheet, the asset-liability management. And so that -- We bought another component to our software system, Wall Street Analytics, that could do the same type of analysis that we were currently doing on our mortgage-backed securities. We could now do it on our entire balance sheet, and so we

spent more and more time modeling the entire balance sheet. And that's really where I would make the distinction between, sort of, my vice president in charge of investments and senior vice president in charge of capital markets group was really, in my mind; the difference between portfolio management and asset-liability management of the balance sheet.

You know, along with, sort of, that progression and spending time analyzing the balance sheet, I spent more time looking at the loan portfolio, pricing the deposits, analyzing our mortgage servicing portfolio, buying additional servicing portfolios. And this -- You know, what I've described is, sort of, the progression of it timewise; as I, sort of, took on investments, then asset-liability management, and then by virtue of the asset-liability management got involved with the other -- with all aspects of the balance sheet.

Q. So by somewhere in '93, you think when you were made senior VP, you would have already had all of these responsibilities?

A. Yes.

REDACTED MATERIAL

Q. At what point did you start doing work and analysis for River Valley Bank in Texas? Was that from the time that it was acquired by Homer and Howard and others?

A. Yes.

REDACTED MATERIAL

REDACTED MATERIAL

Q. Other than your business relationship with Homer Holland through Holland Partners, do you have other business interest at this point with either Homer Holland or Howard Ross or Steve

Bangert?

A. Yes, with Homer. None with Steve. None with Howard.

Q. And what are those interests that you have with Homer?

A. We can spend as much time or as little time. There's a number of investments that he has made that I've either coinvested with him not personally but in one of the entities that holds his family's money. I've coinvested or we have some relationship -- I guess I've coinvested.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. When you were doing your work for the River Valley entities, did you serve on any committees of them?

A. I was part of the investment committee, but I don't remember if I was actually on the

committee, if we only had board members on the committee and then I just attended the meetings, or if I was actually on the committee.

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. Okay. What involvement did you have with preparing any of the business plans of the River Valley institutions while you were working there?

A. At one point -- And I don't remember what year. It was either in '92 or '93 -- they had all of the group heads prepare a business plan for their group which got rolled into the larger River Valley business plan; and so I wrote the business plan for the capital markets group, which, I believe, went into the full business plan. But that was for River Valley as it stood at that point.

REDACTED MATERIAL

**REDACTED MATERIAL**

Q. From the time that you started your employment with the River Valley entities until the time you left, do you recall generally how the balance sheet changed over time?

A. Yes.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. What contact did you have with any of the

regulators for the River Valley institutions?

A. I had contact with Larry Kenny and his people.

Q. Anyone other than Larry Kenny and his people that you would have had contact with?

A. No.

Q. And what was the involvement that you had with Larry Kenny and his people?

A. Pretty significant as it related to the investment portfolio.

Q. Would that have been from the time you started at River Valley?

A. Probably to some extent.

Q. And what type of dealings did you have with Larry Kenny and his group?

A. They would -- "They" meaning he and his group would have questions about specific securities, specific transactions. I would answer those questions. A lot of times, it was, kind of, education, especially for the junior people. There seemed to be new people every year, and so you would spend a decent amount of time educating them on the types of securities we owned.

Q. Do you recall any of the concerns that

may have been expressed by the regulators with respect to the investments of the River Valley institutions?

A. Well, there were always questions and comments and dialogue back and forth. You know, there were always a lot of questions around the derivatives and how we were using them, how we were analyzing them, you know, how we documented them. You know, just a lot of questions because they were the most unique part of our investment portfolio.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. What concern do you recall them expressing regarding your derivatives?

A. The concern would be in general categories: the amount, the valuation, the analysis, the documentation. And, you know, there were always questions in each of those areas.

Q. Do you recall whether you tended to agree or disagree with any of the concerns being expressed by the OTS regulators?

MR. BERGMAN: I'm not hearing the witness say "concerns." I'm hearing the witness say there were questions. I'm only hearing you characterize it as concern.

BY MS. SMITH:

Q. Well, let me ask if you recall whether there were concerns. I know you said -- You have indicated there were always questions. But I'm asking if there were concerns.

Did it appear to you there were concerns that the OTS regulators had?
A. Sometimes.
Q. Okay. And do you recall generally whether you tended to agree or disagree with any concerns that they may have expressed?
A. That's kind of broad. There were some specific questions and concerns that they had brought up that sometimes I would agree with, and we would make changes. I know that they had a concern on the overall portfolio and the size of it. I disagreed with that.
Q. Okay. Anything that you can specifically recall in terms of concerns that you may have agreed with that they expressed?
A. No.
Q. Did you have any involvement with any of the FDIC regulators?
A. There were from time to time FDIC regulators that would come in with the OTS or in a close time frame. I had much less involvement with them than I did with the OTS. They tended to be much less knowledgeable as a whole. Their questions tended to be much more basic in nature.

They had fewer questions.
Q. Did you ever review the exam reports that were issued by OTS or the FDIC?
A. At least parts of them, yes.
Q. And what was the purpose of your reviewing the portions that you reviewed?
A. Reviewing them was part of my sections that I was involved with -- for knowledge of what was going on and also probably in helping to draft responses.
Q. Do you recall generally any differences with respect to how the OTS and the FDIC regulators viewed the derivatives?
A. The OTS in general was much more reasonable, much more knowledgeable, much more specific in their evaluation. The FDIC was just the opposite.
Q. Do you recall whether you -- Well, let me ask first, do you recall that the FDIC expressed concerns regarding derivatives and other portions of the investment portfolio?
A. Yes.
Q. Do you recall whether you agreed or disagreed with the concerns expressed by the FDIC

regulators?

A. Disagreed.

Q. And do you recall what it is that you disagreed with?

A. Well, they just -- My recollection was they just didn't like derivatives at all. They didn't understand them. They didn't like them. They didn't want to see them on the balance sheet.

**REDACTED MATERIAL**

REDACTED MATERIAL

Q. Did the capital position of the institution at any given point in time affect the management of the asset and liability portfolio?

A. Yes.

Q. Okay. And how would it be impacted?

A. Well, we had capital requirements, so the capital always constrained how large of a balance sheet we could have at any given time.

REDACTED MATERIAL

**REDACTED MATERIAL**

Q. What were -- What was your role with respect to the acquisition of San Antonio by Western Capital Holdings, Inc.?

A. It was analytical. I remember marking their loan portfolio to a market level. I remember looking at their investment portfolio. That's all I remember doing. I might have marked other aspects of the balance sheet to market, you know, as we did with River Valley of Illinois.

Q. Did you have an understanding as to why Homer Holland, Steve, and others were interested in acquiring San Antonio?

A. I believe it was a good deal.

Q. Do you recall what about it made it a good deal?

A. I think that they thought they were going to make money on it. The ultimate goal of making money on it.

Q. Did you have any ownership interest in Western Capital Holdings, Inc.?

A. No.

**REDACTED MATERIAL**

Q. Were you involved at all or do you recall hearing any discussions relating to weaknesses in

the retail banking side of River Valley Peoria or River Valley Rock Falls?

A. I remember discussing retail banking. We went through a number of people who had responsibility for retail banking. It was not one of our strong points. I wouldn't have been that involved with it, but I know that that was not one of our strongest points.

Q. Do you recall why it wasn't one of your strongest points?

A. (No verbal response.)

Q. "Your" being River Valley.

A. Right, because it certainly wasn't mine. You know, I don't know. I mean, if you look at, sort of, the senior people, we -- everybody was, sort of, financial people.

Q. Do you recall why River Valley went through several people to head up their retail banking section?

A. The other people didn't work out, and we were always in search of the person who would really make a difference.

Q. Do you recall whether they ever found the person that would make a difference?

A. I don't think so. We always knew what didn't work.

Q. What's your understanding of the purpose of the mark-to-market analysis that was prepared on a monthly basis?

A. Well, we really thought that that was the most important determinant of how well the bank was doing. Earnings could be manipulated, you know, month to month, year to year. They could go up and down by taking gains or losses. But the mark-to-market really reflect the long-term earning potential of the financial institution. So I know Steve spent a tremendous amount of time really getting the board and Howard and Homer comfortable with the -- as long as there was an increase in the mark-to-market, the short-term measures of financial success were less important than a steady increase in the mark-to-market.

Q. Do you have an opinion as to whether the breach that's been alleged in this case had any impact on the mark-to-market value of River Valley?

A. Well, I'm sure it did to the extent that the breach did not allow the institution to grow

and continue to -- You know, all the growth would have contributed to an increase in the mark-to-market.

Q. Do you have an opinion as to whether, but for the breach alleged by the plaintiffs, growth would have occurred; and, if so, how that growth would have occurred?

A. Well, I'm certain growth would have occurred because if we had the ability to grow, had the capital to grow, we would have utilized it. How that growth would have come, I don't know. The most efficient way we could find to grow, if that was through acquisitions of other institutions or acquisition of specific assets. I think the determination would have been made over time.

Q. Do you know whether the mark-to-market value of River Valley Rock Falls and River Valley of Peoria increased continually from the time you started working at the River Valley entities until the time that you left?

A. Yes. The trend was definitely up. If that was every month -- There were probably small amounts of fluctuation, but the trend was an increase in the mark-to-market value.

**REDACTED MATERIAL**

Q. Do you have an opinion as to the ability of Homer Holland to successfully operate a thrift?

A. Yes. I think he proved that with the institutions that he was involved in, so I think he would be highly successful.

Q. And how about with respect to Howard Ross?

A. He has also been involved with highly successful institutions. He had less day-to-day responsibilities, but he chose people well and chose partners well. So I would consider him very successful also.

Q. And how about Steve Bangert?

A. I think he was highly successful. You know, I worked most closely with him, and he was extremely bright, extremely capable. Probably one of the most talented people I've ever worked with.

REDACTED MATERIAL

Q. Do you have any opinion as to what impact the alleged breach had on the River Valley institutions?

A. It's my belief that the reduction in capital did not allow the institutions to grow as large as they could have if they had had the capital, and thus the earnings of the institutions were impacted negatively.

Q. And I believe you indicated earlier --

please correct me if I'm wrong -- that in terms of how the institution would have grown, you don't have an opinion as to how it would have grown?

A. No. It would have been -- The most profitable and efficient way would be typically how we did things. But I was not involved in the business plan or the -- you know, the exact strategy that would have been deployed at that point.

Q. And do you have an understanding or an opinion as to specifically how earnings were impacted negatively by the alleged breach?

A. Specifically or in general, we had an average of return on assets, you know, of somewhere between a hundred and 200 basis points.

Q. I'm sorry. Say that again.

A. In general, we had a return on assets. And so to the extent that the capital -- the lack of capital didn't allow us to add assets, that would have had an impact on our earnings.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. What's the basis for your understanding that River Valley would have grown but for the alleged breach?

A. Well, I think that the goal was always to use the capital that we had in the most efficient way we could. And so to the extent that we had excess capital available for growth, my basis is more on theory, based on, you know, the decisions that were made that I knew about rather than any specific knowledge of the business plan at that time.

Q. And other than the one time in '92 or '93 where you were involved in drafting a portion of the business plan, you had no role in developing those business plans from the time you started to the time you left?

A. I don't recall the actual business plan. But if you're making the separation between business plan and strategy, I might have updated

that business plan over time. I don't recall.

Q. In terms of strategy, were you involved regarding strategy decisions?

A. No, not directly.

Q. And that was up until the time you left?

A. Correct.

Q. Okay. I guess I'm just trying to still understand the basis for your understanding that it would have grown.

Is it more just from discussions that you had with Steve or --

A. Possibly. But, also, you know, these were astute investors. They don't keep money stuck in a bank account. They look for a high return on their investable capital, you know, if that's personally or within each of their businesses. And, you know, I guess I based my judgment on the individuals who were determining the strategy. And they wouldn't have let capital sit in, you know, any one or combination of their financial institutions without using it to the maximum effectiveness.

**REDACTED MATERIAL**

**REDACTED MATERIAL**

Q. What is your understanding for the reason of the decrease in the size of the derivative portfolio over time?

A. I would guess that there were a number of reasons. I don't remember a specific strategy that said we were going to reduce the portfolio because of, you know, one or two reasons.

Q. Do you recall what any of the reasons were?

A. At one point we started buying servicing

rights which has the same, sort of, hedging impact on the balance sheet as some of the derivatives did. You know, I'm certain the regulators directly or indirectly had some impact on that. I can't recall if it was direct, but it was a pain in the neck from our standpoint. And so that probably had some impact.

Q. When you say "some impact on that," you're talking about the reduction in the size of the derivative portfolio?

A. Exactly.

Q. Okay. Anything else that you can recall?

A. Part of it also was the availability, would be my guess. Wall Street stopped creating those type of assets when the yield curve flattened out.

**REDACTED MATERIAL**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2008, a copy of the foregoing "JOINT STIPULATION FOR THE INTRODUCTION OF TRANSCRIPT DESIGNATIONS FROM THE DEPOSITION OF SUSAN VRANES ELLS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ John H. Roberson

John H. Roberson