# In the United States Court of Federal Claims

No. 95-524 C
Filed August 26, 2008
TO BE PUBLISHED

| | |
|---|---|
| HOMER J. HOLLAND, STEVEN BANGERT, Co-Executor of the Estate of HOWARD R. ROSS, and FIRST BANK, Plaintiffs, v. THE UNITED STATES, Defendant. | *Winstar*-related proceeding, damages for breach of contract, Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), expectation damages, reasonable foreseeability of damages, breach of contract as substantial causal factor in bank's diminution in economic value, reasonable certainty of damages, fair and reasonable approximation of amount of damages, measure of damages for loss of income-producing asset, no damages resulting from hypothetical capital-raising transaction, Gordon growth model. |

David B. Bergman, Michael Johnson, Howard Cayne, and Joshua P. Wilson, Arnold & Porter LLP, Washington, D.C., for plaintiffs.

John H. Roberson, Trial Attorney, Elizabeth A. Holt, Trial Attorney, William G. Kanellis, Trial Attorney, Amanda Tantum, Trial Attorney, John J. Todor, Trial Attorney, Sameer Yerawadekar, Trial Attorney, Brian A. Mizoguchi, Senior Trial Counsel, Scott Austin, Senior Trial Counsel, Kenneth M. Dintzer, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Michael F. Hertz, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

GEORGE W. MILLER, Judge.

This *Winstar*-related proceeding is before the Court for final disposition following a 27-day trial on damages. In earlier proceedings, summary judgment was granted in favor of plaintiffs[1] on the issue of liability. The Court found that certain contracts between the

---

[1] The Court previously held that the diminution in going-concern value of River Valley represents "damages incurred by River Valley, and the claim to recover those damages belongs to

parties—described below—were breached by the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). *Holland v. United States*, 57 Fed. Cl. 540, 565-66 (2003). Between December 3, 2007, and February 5, 2008, the Court held a trial to receive evidence and hear argument regarding the appropriate damages to award for this breach. During the trial, the parties presented 6,321 transcript pages of testimony and argument, and 755 exhibits were admitted into evidence. As discussed below, plaintiffs offer six different damages theories, with amounts ranging from $18,623,000 to $47,335,862. Because some of these theories are additive, plaintiffs assert that their damages amount to $68,252,244 under the most generous combination of theories. By contrast, and as also discussed below, defendant argues that each of plaintiffs' theories fails for one or more of the following reasons: (1) the theory is unduly speculative, (2) the theory is unreliable as a measure of damages, (3) the theory is unsupported by sufficient evidence, and (4) the theory fails as a matter of law. As discussed below, the Court finds that plaintiffs have proven that the value of the River Valley thrifts declined as a result of the Government's breach and that, as a result, plaintiff First Bank is entitled to recover $18,623,000 in damages.

Defendant has also asserted a counterclaim against plaintiffs for breach of what the Court determined to be a covenant not to sue contained in plaintiffs' settlement agreement with the Federal Deposit Insurance Corporation ("FDIC"). *See Holland v. United States*, 75 Fed. Cl. 492, 496-98 (2007) (holding that the accord and satisfaction provision of the settlement agreement constituted a covenant not to sue). On May 15, 2007, pursuant to Rule 42(b) of the Rules of the United States Court of Federal Claims, the Court ordered that defendant's counterclaim be set for a separate trial to be held following the resolution of plaintiffs' breach-of-contract claims against the Government. Order of May 15, 2007 (docket entry 374) at 1. The Court then stayed proceedings on defendant's counterclaims until further notice. *Id.* at 2. The Court now intends to conduct such further proceedings as may be necessary to resolve defendant's counterclaim before directing the entry of a final judgment.

## FACTUAL BACKGROUND

The factual background relevant to this litigation is largely set forth in the Court's earlier decisions, particularly *Holland*, 57 Fed. Cl. 540. The Court will repeat here only those facts that are necessary to a clear understanding of the analysis presented below; these facts were stipulated by the parties or supported by evidence presented at trial, as indicated.

---

River Valley, not [to] Holland and Ross." *Holland v. United States*, 59 Fed. Cl. 735, 741 (2004); *see also* Pls.' Outline of Subjects for Closing Argument (docket entry 472) at 3. Thus, the award of lost-value damages the Court makes here can only be to First Bank, the successor-in-interest to River Valley, and not either to Dr. Holland as a shareholder of River Valley or to Mr. Bangert as the executor of Mr. Ross, who was also a shareholder of River Valley. Although the Court at some points refers to "plaintiffs," the only plaintiff who is entitled to recover the damages awarded in this Opinion is First Bank.

By 1985, plaintiff Homer J. Holland had significant experience as an executive in the banking and thrift business, having held positions ranging from loan officer to president at several financial institutions located in Chicago. DX 1559 at ¶¶ 48-52. Plaintiff Steven Bangert is the executor of the estate of Howard R. Ross, an investor in banking and thrift institutions in Chicago. DX 1559 at ¶ 49. In April 1985, Holland and Ross, along with some other investors, acquired Rock Falls Savings & Loan Association ("Rock Falls"), of Rock Falls, Illinois. DX 1559 at ¶ 53. On December 23, 1986, Holland and Ross purchased their partners' interests in Rock Falls and became the sole shareholders of the institution. DX 1559 at ¶ 55.

By July 1988, many thrift organizations, including Galva Federal Savings and Loan Association of Galva, Illinois ("Galva"), Mutual Savings and Loan Association of Canton, Illinois ("Mutual"), Home Federal Savings and Loan Association of Peoria, Illinois ("Home"), Republic Savings of South Beloit, Illinois ("Republic"), and Peoria Savings and Loan Association of Peoria, Illinois ("Peoria"), had become insolvent as a result of problems affecting the thrift industry in the 1980s. DX 1559 at ¶ 57. The Federal Savings and Loan Insurance Corporation ("FSLIC"), which insured deposits held by thrifts, DX 1559 at ¶ 12, sought to have healthy thrifts acquire Galva, Mutual, Home, Republic, and Peoria. DX 1559 at ¶ 59. Galva, Mutual, and Home were offered for acquisition together as a package. *Id.* Republic and Peoria were offered in two additional transactions, separate from the Galva-Mutual-Home transaction. DX 1559 at ¶ 66, ¶ 67.

Holland and Ross agreed with the Government to acquire Home, Mutual, and Galva, and to merge them into Rock Falls. DX 1559 at ¶ 73. Holland and Ross entered into an assistance agreement with FSLIC to this effect on July 29, 1988. DX 1559 at ¶ 75. Galva, Mutual, and Home were then combined into River Valley Savings Bank, FSB ("River Valley I"[2]), a federal stock savings bank, although they were not immediately merged into Rock Falls. DX 1559 at ¶ 74. As part of the assistance agreement under which Holland and Ross acquired River Valley I, FSLIC agreed to purchase $5,000,000 worth of Class A cumulative preferred stock from River Valley I. DX 1559 at ¶ 80. The terms of this preferred stock required River Valley I to pay FSLIC a fixed divided of eight percent of the purchase price of the stock (for a total of $400,000 per year), along with a profit-sharing payment in the amount of 25 percent of River Valley I's net income in excess of 0.40 percent of the value of its assets. PX 148 at 2573; PX 174 at 2578. The assistance agreement required River Valley I to execute a $4,600,000 subordinated debenture, which was to be included in River Valley I's regulatory capital. DX 1559 at ¶ 81. FSLIC additionally agreed to credit to River Valley I's regulatory capital account a cash contribution of $8,000,000. DX 1559 at ¶ 88. The passage of FIRREA meant that (1) the cash contribution, the subordinated debt, and the cumulative preferred stock could no longer be counted as capital for the purpose of calculating River Valley I's tangible capital, and (2) the cumulative preferred stock and the subordinated debt could no longer be counted as capital for the purpose of calculating River Valley I's core capital. DX 1559 at ¶ 40a. The Court initially held that the

[2] During this litigation, the parties have generally referred to River Valley Savings Bank, FSB, as "River Valley I," and the Court adopts this convention in this Opinion.

elimination by FIRREA of the cash contribution, the cumulative preferred stock, and the subordinated debt as regulatory capital were all breaches of the assistance agreement between the parties. *Holland*, 57 Fed. Cl. at 565. Later, the Court reconsidered its decision with respect to the elimination of the cumulative preferred stock as regulatory capital and held that this provision of FIRREA was not a breach of the assistance agreement. *Holland v. United States*, 74 Fed. Cl. 225, 258-63 (2006).

Rock Falls agreed with the Government to acquire Republic by merging Republic into Rock Falls. DX 1559 at ¶¶ 110-111. Rock Falls entered into an assistance agreement with FSLIC to this effect on July 29, 1988, and a merged institution was created ("River Valley II"[3]). DX 1559 at ¶ 113. The assistance agreement and accompanying FSLIC resolution and forbearance letter permitted River Valley II to include as regulatory capital a $2,000,000 subordinated debenture executed by River Valley II, as well as $5,000,000 of FSLIC's initial cash contribution to River Valley II. DX 1559 at ¶¶ 125, 127. The Court previously held that FIRREA's elimination of these items of regulatory capital constituted a breach by the Government. *Holland*, 57 Fed. Cl. at 566.

By September 1988, Peoria was insolvent, and the Government began marketing it for acquisition by healthy thrifts. DX 1559 at ¶ 142. On December 31, 1988, River Valley I and FSLIC entered into an assistance agreement under which River Valley I would acquire Peoria. DX 1559 at ¶ 145. The resulting institution was still known as River Valley Savings Bank, FSB, or River Valley I. River Valley I and River Valley II merged on March 31, 1991, to form a new institution ("River Valley III"[4]). River Valley III was acquired by First Bank on January 4, 1995.[5] DX 1559 at ¶¶ 374-375. First Bank is thus the successor-in-interest of River Valley I, River Valley II, and River Valley III.

---

[3] During this litigation, the parties have generally referred to the institution that survived the merger of Rock Falls and Republic as "River Valley II." The Court has adopted this convention in this Opinion.

[4] During this litigation, the parties have generally referred to the institution that survived the merger of River Valley I and River Valley II as "River Valley III." As the Court has noted before, this is merely a term of convenience. Because River Valley I acquired River Valley II, rather than the two entities merging to form a completely new thrift organization, the merged entity was technically River Valley I. *Holland v. United States*, 75 Fed. Cl. 483, 488 n.3 (2007). Regardless, the Court has adopted the parties' convention of referring to the post-merger entity as "River Valley III" in this Opinion.

[5] As discussed in a previous order of the Court, the parties initially believed that First Banks, Inc. had acquired River Valley III, but investigation during discovery in this litigation showed that the actual acquiring entity was First Bank, a subsidiary of First Banks, Inc. *Holland v. United States*, No. 95-524, 2005 WL 6115375, at *1 (Fed. Cl. May 12, 2005) (docket entry 263).

The San Antonio Savings Association ("SASA"), a failing thrift located in Texas, was taken over by the Resolution Trust Corporation ("RTC") in 1991. DX 1559 at 2. Separately from the RTC's resolution of SASA, the RTC sought to sell the San Antonio Federal Savings Bank ("SAFSB"), a subsidiary of SASA. *Id.* Initially, Holland and Ross sought to have River Valley III acquire SAFSB. DX 1559 at ¶ 347. River Valley III, however, was unable to get adequate financing to pursue the SAFSB acquisition opportunity. *Id.* On January 31, 1992, Holland and Ross, together with several other investors, including Steven Bangert, John Rose, and Ronald M. Pikus, formed Western Capital Holdings, Inc. ("WCHI") to acquire SAFSB separately. DX 1559 at ¶ 349. On August 14, 1992, with the help of a loan from American National Bank, WCHI acquired SAFSB. DX 1559 at ¶ 351. On August 17, 1992, River Valley III and SAFSB entered into an agreement whereby River Valley III provided accounting, regulatory reporting, portfolio management, troubled asset disposition, capital and tax planning, mortgage loan servicing, and data processing services in exchange for a monthly fee paid by SAFSB. DX 1559 at ¶ 364. SAFSB made several dividend payments to WCHI between 1992 and 1995. DX 1559 at ¶ 366. These dividend payments were used to pay down the loan from American National Bank to WCHI. *Id.* In June 1996, WCHI sold the assets of SAFSB to the International Bank of Commerce, which subsequently liquidated the assets. DX 1559 at ¶ 386.

On August 14, 1991, Holland, Ross, and River Valley III entered into a settlement agreement with FDIC in its capacity as manager of the FSLIC Resolution Fund ("FRF"). *Holland v. United States*, 74 Fed. Cl. 225, 233 (2006). The settlement agreement provided for a payment of $50,000 from River Valley III to FDIC and a payment of $3,276,902.90 from FDIC to River Valley III. *Id.* In addition, the settlement agreement purported to "effect an accord and satisfaction of any and all obligations and liabilities of [the FDIC, Holland, Ross, and River Valley III] under the [a]ssistance [a]greements." *Id.* Thus, after the settlement agreement, plaintiffs no longer could assert a claim against FDIC or the FRF. However, the Court held that the Government's promises in the assistance agreements bound both the Federal Home Loan Bank Board ("FHLBB") and FSLIC. *Id.* at 252. The FDIC did not succeed to the liabilities of the FHLBB; instead, these liabilities were transferred to the Office of Thrift Supervision ("OTS"). *Id.* Accordingly, the Court held that, while the settlement agreement released the FDIC from any liability for breach of the assistance agreements, it did not release all agencies of defendant that might reasonably bear liability for the breach. *Id.* at 253. The Court later resolved the issue whether, pursuant to the law governing the settlement agreement, a release of FDIC from liability also released OTS from any liability for breach of the same contracts; the Court held that no such release was accomplished by the settlement agreement. *Holland*, 75 Fed. Cl. at 498. Instead, the Court found that the settlement agreement should be construed as a covenant by Holland, Ross, and River Valley III not to sue OTS for breach of the assistance agreements. *Id.* Accordingly, defendant filed a counterclaim against plaintiffs for breach of the covenant not to sue. Def.'s Am. Answer to Pls.' Third Am. Compl. (docket entry 375). As noted above, the parties and the Court have not yet taken action to resolve defendant's counterclaim.

## ANALYSIS

To remedy a breach of contract, the Court should award "damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (*citing San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)). Generally, "all losses, however described, are recoverable." *Id.* (*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. c (1981)). Moreover, for plaintiffs to recover damages, they must show that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor [of] the [claimed] damages; and (3) the damages are shown with reasonable certainty." *Id.* (*citing Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)). To "show[] damages with reasonable certainty," *id.*, means to establish the fact of damages with reasonable certainty, "after which the court may 'make a fair and reasonable approximation of the damages,'" the amount of which "may be an estimate, uncertain, or inexact." *Fifth Third Bank v. United States*, 518 F.3d 1368, 1378-79 (Fed. Cir. 2008) (*quoting Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001); ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.8 (6th ed. 2005)).

Plaintiffs offer six theories by which they contend their damages attributable to the Government's breach may be measured and recovered:

1. Plaintiffs contend that, had the breach not occurred, they would have been able to acquire SAFSB within River Valley[6] instead of allowing WCHI to acquire it, and River Valley would have received the profits that SAFSB made in the real world, *i.e.*, $47,335,862.

2. Plaintiffs contend that, had the breach not occurred, they would have been able to acquire SAFSB within River Valley instead of allowing WCHI to acquire it, and River Valley would have received the dividends paid by SAFSB in the real world, *i.e.*, $46,414,530.

3. Plaintiffs contend that, had the breach not occurred, they would have been able to acquire SAFSB within River Valley instead of allowing WCHI to acquire it, and River Valley would have immediately sold the SAFSB assets to recognize its bargain purchase of SAFSB, resulting in gains to River Valley of $38,258,318.

4. Plaintiffs contend that, had the breach not occurred, they would have been able to acquire SAFSB within River Valley instead of allowing WCHI to acquire it, and River Valley would have sold the SAFSB assets on December 31, 1993, to recognize its bargain purchase of SAFSB, resulting in gains to River Valley of $37,405,132.

---

[6] When it is unimportant to differentiate between River Valley I, River Valley II, and River Valley III, the parties have made a practice of referring to those entities collectively as "River Valley." The Court has adopted that practice in this Opinion.

5. Plaintiffs contend that the breach forced them to use retained earnings already on River Valley's books at the time of breach to act as capital to replace the capital lost by the Government's breach; had the breach not occurred, plaintiffs contend these retained earnings could have provided additional capital to support growth in River Valley's balance sheet or could have been paid as dividends to River Valley's stockholders. Plaintiffs contend that their damages for being forced to use these retained earnings as replacement capital should be measured as the price River Valley would have had to pay in order to raise the amount of breached capital on the open market, a sum they compute as $20,916,382.

6. Plaintiffs contend that, at a minimum, they should be awarded damages to compensate for the amount by which the going-concern value of River Valley was diminished as a result of the Government's breach, an amount plaintiffs calculate as $18,623,000.

Plaintiffs contend that, while the theories numbered one through four above are mutually exclusive, any damages awarded under theory number five should be added to the amount awarded under the first four theories. That is, there is no overlap between the cost-of-replacement-capital theory (number five) and any of the various SAFSB damages theories (numbers one through four). The sixth theory, which attempts to measure damages as the diminution in the going-concern value of River Valley, is an alternative to any of the other theories or any combination of the other theories. Each of plaintiffs' six damages theories is discussed separately below.

## I. SAFSB Lost Profits

Under their first damages theory, plaintiffs seek the profits actually earned by SAFSB between 1992 and 2005. Tr. 2368-2401, 6081. This represents the profit that plaintiffs contend would have flowed to River Valley had SAFSB been acquired by River Valley rather than by WCHI. Tr. 6080-81. Specifically, Dr. Holland testified that, had River Valley acquired SAFSB, the profits that would have flowed from SAFSB's operation would have been at least as high as the profits that SAFSB actually made in the real world, having been acquired by WCHI. Tr. 2368-2401. Further, Dr. Holland's testimony that, had River Valley been able to acquire SAFSB, River Valley would not have been sold to First Banks was uncontradicted.[7] Tr. 2380.

---

[7] In their December 31, 2003 Joint Stipulation of Facts, the parties state that "[p]laintiffs contend that it is reasonable to assume that River Valley III would have been sold to First Bank[] on or about January 4, 1995, even without the purported breach by the Government." Jt. Stip. Facts I at ¶ 376. This does not contradict Dr. Holland's testimony that "I don't think we would have sold to First Bank[]" in the absence of the government's breach. Tr. 2380:1-4. Acknowledging that it might be reasonable to assume the sale to First Bank would have taken place (as plaintiffs did here) is not the same as admitting that the sale would in fact have happened. The stipulation permits assumptions of either a sale or no sale to be made, but Dr.

Plaintiffs contend that the profits made by SAFSB over this period amounted to $47,335,862. Tr. 6080. The Court's calculations, based on Dr. Holland's testimony and the documents to which he cites, place this figure somewhat lower, at $44,663,792.[8] Tr. 2368-2401; PX 769; PX 880; PX 1002; PX1008; PX 1067; PX 1086; PX 1088; PX 1094; PX 1137; PX 1140; PX 1144; PX 1148; DX 1361; DX 1362. A precise calculation of damages under the SAFSB lost profits theory is unnecessary, though, because plaintiffs cannot be awarded any damages under this theory.

To the extent that River Valley was harmed by its inability to acquire SAFSB, that harm took the form of a loss of future income from the operation of SAFSB. The lost opportunity to acquire SAFSB was therefore a loss of future-income-generating property. The Court of Appeals for the Federal Circuit has held that a loss of income-generating property is properly compensated only by an award of "the market value of the asset at the time of the breach—not the lost profits that the asset could have produced in the future." *First Federal Lincoln Bank v. United States*, 518 F.3d 1308, 1317 (Fed. Cir. 2008) (*quoting Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000)).

The reason for the distinction between "the market value of the asset at the time of the breach" and "the lost profits that the asset could have produced in the future," *id.*, is that an award of lost actual profits ignores the risk that the profits might not have materialized in the but-for world, a risk encompassed in the market's estimation of the market value of the asset at the time of the breach. Of course, if a stream of future profits of a given size were certain, the market value of an asset that could produce those future profits would be equal to the present value of the stream of future profits to be realized. That is, the type of damages the Federal Circuit has allowed (the market value of the asset) and the type of damages the Federal Circuit has disallowed (the future profits that would have been realized had the asset not been lost through the breach) would be of the same amount, as long as the size of the future profits could be precisely predicted. But such prediction is not always possible. As the Federal Circuit noted in rejecting lost profits in favor of the market value of the lost property as the measure of damages for the loss of income-generating property, "[t]he market value of income-generating property reflects the market's estimate of the present value of the chance to earn future income, discounted by the market's view of the lower future value of the income and the uncertainty of the occurrence and amount of any future [income]." *First Fed. Lincoln*, 518 F.3d at 1317. The market value of income-producing property at the time the property is lost properly reflects the uncertainty that the expected stream of future profits will actually materialize, and that an award

---

Holland's testimony is unequivocal: River Valley would not have been sold to First Bank had River Valley been able to acquire SAFSB.

[8] The discrepancy—$2,672,070—is likely due to plaintiffs' including profits earned through 2005, Tr. 6081:16-22, when the documents presented during Dr. Holland's testimony only cover the years between 1992 and 2004.

of actual lost profits, stemming as it does from a stream of profits that actually did materialize, improperly ignores such uncertainty.

Here, the lost profits that plaintiffs seek under the SAFSB lost-profits theory are profits that were *actually realized* by SAFSB, but the market value of the lost SAFSB acquisition opportunity at the time the opportunity was lost would have been the present value of the cash flows the market *expected* SAFSB to generate for its owners. That is, the market would have estimated the value of the lost SAFSB opportunity by discounting each future year's cash flow by some amount to account for the risk that the cash flow might not occur or might be smaller than anticipated, in addition to discounting for the time value of money. Thus, at least in the present situation, the market value of the lost SAFSB opportunity and the profits that SAFSB actually generated for its owner were not the same, and the Federal Circuit's bar to awarding lost-profits damages without discounting for uncertainty applies. Accordingly, as a matter of law, the Court cannot award plaintiffs damages in the amount of the lost SAFSB profits.

## II. SAFSB Lost Dividends

As an alternative to the SAFSB lost profits theory discussed above, plaintiffs argue that they are entitled to receive the dividends that SAFSB would have paid to River Valley if River Valley had acquired SAFSB as a corporate subsidiary. At trial, John W. Rose, a shareholder of WCHI, testified that WCHI's dividend payments to its shareholders were the same as the dividend payments from SAFSB to WCHI, and he provided testimony regarding the amount of the dividend payments from WCHI to its shareholders between June 1993 and May 2006. Tr. 976-82. Plaintiffs argue that, had River Valley been able to acquire SAFSB, these dividends, which amounted to $46,414,530, would have been paid to River Valley instead.

As with the lost SAFSB profits, the lost SAFSB dividends cannot be awarded as damages for the loss of the SAFSB acquisition opportunity. As plaintiffs acknowledge, the dividends that SAFSB would have paid to River Valley are a measure of "the economic income" that SAFSB would have generated. Tr. 6081-82. But, as discussed above, under the rule articulated in *First Federal Lincoln*, damages in the amount of lost future income are inappropriate to compensate for the loss of income-generating property; the only proper award is one in the amount of the market value of the lost income-generating asset itself. 518 F.3d at 1317. Thus, the Court cannot award plaintiffs damages to replace the dividends that they assert SAFSB would have paid to River Valley in the absence of the Government's breach.

## III. Lost Profits from Bargain Purchase of SAFSB: Immediate Sale of Assets

As an alternative to the profits plaintiffs assert they would have earned by operating SAFSB as part of River Valley, plaintiffs argue they should be awarded the profit they would have realized from selling the assets of SAFSB, which when sold individually would have been worth more than plaintiffs paid for SAFSB. Plaintiffs argue that the sale of assets would have happened at one of two times, either immediately after purchase, or on December 31, 1993.

Although this theory comes closer to appropriately valuing the lost SAFSB opportunity at the market value of the lost asset than do the theories discussed above, this theory still fails because the damages arising from the lost SAFSB acquisition were not reasonably foreseeable to both parties at the time of contracting.

At several times during the trial, the owners and employees of River Valley indicated that the SAFSB opportunity was something more than a garden-variety chance to acquire a subsidiary financial institution. The documentary evidence shows that, for an investment of $10 million, River Valley would have acquired more than $40 million in new capital. DX 628 at WON034 0960. Steve Bangert, an executive of River Valley, testified that the SAFSB acquisition "would have created a tremendous amount of capital for [River Valley]" and that this "would have been a windfall." Tr. 210:7-211:8. Although Mr. Bangert later clarified that his characterization of "a windfall" was meant to apply to the amount of capital that would have flowed into River Valley in the event the acquisition received favorable accounting treatment, Tr. 477:16-478:24, it is clear that acquiring such "a tremendous amount of capital" was not an everyday event at River Valley. Dr. Holland testified that the SAFSB acquisition was "a very good opportunity" and "a particularly good deal," and he stated that he "was surprised . . . that there was that much economic value . . . and that the RTC was willing to sell it at the price they did." Tr. 2828:12-2830:2. John Rose, an investor in WCHI, which ended up acquiring SAFSB when River Valley was unable to do so, testified that, at the time of the acquisition, "it was a once in a lifetime deal," and that, although "[s]ince then, . . . [he had] had better opportunities, . . . it was a very, very good deal." Tr. 992:6-9. It is therefore unsurprising that Mr. Bangert admitted that, in July 1988, when the assistance agreements were entered into, the owners and employees of River Valley "had no way of knowing whether [they] would have found a transaction at that time that was as lucrative as San Antonio Savings." Tr. 480:6-11.

This qualitative difference between the SAFSB opportunity and the typical opportunities available to a thrift to acquire other financial institutions is fatal to plaintiffs' SAFSB damages claims. "Foreseeability requires that *both the type and amount of damages* claimed were, at the time of contract formation, foreseeable consequences 'in the ordinary course of events' of the breach." *Slattery v. United States*, 69 Fed. Cl. 573, 582 (2006) (*quoting* RESTATEMENT (SECOND) OF CONTRACTS § 351 (1982)) (emphasis added); *see also Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001) ("a plaintiff must prove that both the magnitude and type of damages were foreseeable"); RESTATEMENT (SECOND) OF CONTRACTS § 351, cmt. a ("The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable."). Thus, it is not enough for plaintiffs to show that the Government should have expected a breach to result in a loss of capital that would prevent River Valley from pursuing opportunities to acquire other financial institutions and that the Government should have expected that this loss of an opportunity would result in River Valley's loss of profits from a bargain purchase. Instead, to recover under this theory, plaintiffs must additionally demonstrate that the Government should have expected that the lost profits stemming from the loss of such an opportunity would likely be of the magnitude claimed here. As discussed above, the evidence

emphatically does not establish this last point. Instead, the lost SAFSB opportunity was described by multiple witnesses as "a windfall," "a particularly good deal," "a very good opportunity," "a once in a lifetime deal," and "a very, very good deal." Given this testimony, the Court finds that no reasonable person in the Government's shoes at the time of contracting would have foreseen that a breach of the assistance agreements would lead to a loss of capital that would cause River Valley to lose an opportunity to purchase a financial institution for $10 million and then immediately sell its assets for over $40 million. While the parties may have been able to foresee an injury of this type, they could not have foreseen the magnitude of the damages that plaintiffs claim they sustained.

## IV. Lost Profits from Bargain Purchase of SAFSB: Sale of Assets on December 31, 1993

As an alternative to the immediate sale of assets theory discussed above, plaintiffs contend that their damages from losing the opportunity to acquire SAFSB within River Valley and subsequently sell the assets could be measured by assuming that the sale took place on December 31, 1993.[9] This theory suffers from many of the same problems discussed above. In addition, though, this theory fails for the same reason that the lost operational profits theories discussed above fail. That is, under this theory, plaintiffs seek compensation for a lost opportunity that would have produced income for them in the future had they been able to pursue it, and they value that opportunity not by calculating its market value at the time the opportunity was lost, but rather by estimating the income they would have received from a later sale of the assets. To the extent this theory represents an attempt to recover the market value of the lost SAFSB opportunity, that market value is calculated under this theory at December 31, 1993, rather than at the time of the breach or the time of the would-be SAFSB acquisition. But the Federal Circuit has held that "[i]t has been established that the damages for lost income-producing property is properly determined as of the time the property is lost (usually the time of the breach)." *First Federal Lincoln Bank*, 518 F.3d at 1317. Thus, plaintiffs' theory cannot properly be relied upon to award damages.

## V. Rental Cost of Capital Used to Replace Breached Capital

In addition to the damages plaintiffs contend they should be awarded under the SAFSB theories discussed above, plaintiffs also argue that they should receive damages corresponding to the amount they paid to keep retained earnings on the books to take the place of the capital lost to the Government's breach. Specifically, plaintiffs contend that they used retained earnings "to play the role that the regulatory capital that had been eliminated in the breach otherwise would have played." Tr. 2426:12-18. Plaintiffs argue that the breach required them to treat the retained earnings in this way, rather than using retained earnings in some other way. Dr. Holland testified

---

[9] Plaintiffs did not present any explanation at trial of why they chose this date for liquidation of the SAFSB assets under this damages theory. As defendant's witnesses pointed out, though, December 31, 1993, was a particularly favorable date to do so. Tr. 4576:13-25; Tr. 4591:8-12; Tr. 4810:8-11; Tr. 5267:14-5268:17.

that the situation with these retained earnings resembled a hypothetical situation in which the Government "had promised to provide computers [to River Valley] but forced River Valley to use its own computers instead," opining that under these circumstances, "the rental value of the computers would be a reliable measure of the economic harm to River Valley." Tr. 2426:20-24. Similarly, Dr. Holland testified, "[c]apital . . . including retained earnings, has a cost to it; it must be rented from its shareholders." Tr. 2427:4-6. Dr. Holland provided expert testimony showing that River Valley's gross cost of capital was at least 20 percent and that having tangible capital (such as retained earnings) rather than intangible regulatory capital provided a benefit of 5.736 percent after taxes. Tr. 2434-2445. Based on these assumptions, Dr. Holland quantified the net cost to River Valley of being forced to use its retained earnings to do the job of the lost regulatory capital at $20,916,382. Tr. 2457:7-10 (stating damages of "[$]20.916 million" and discussing demonstrative exhibits PX 605 and PX 2002, which both report damages of $20,916,382). Dr. Holland testified that these damages accrued from the time of the breach to trial and beyond, with his analysis terminating in 2013. *E.g.*, Tr. 2449:5-10; Tr. 2450:23-2451:1.

Although plaintiffs were careful not to refer to this model of damages as the result of a hypothetical capital-raising transaction, preferring instead to conceptualize these asserted damages as the reasonable rental value of capital whose use was dictated by the Government's breach, the Court is not persuaded that there is a meaningful difference between these two descriptions of the damages sought by plaintiffs under this theory. In determining River Valley's gross cost of equity capital to be 20 percent, Dr. Holland compared the 20 percent figure to several other ways to measure cost of capital, including the Government's estimated discount rate for River Valley, the rate of return on the FSLIC's River Valley I preferred stock, River Valley's cost of equity capital based on its earnings decline after balance sheet shrinkage or on its cost of subordinated debt, and the rate of return River Valley actually gave its investors, and showing that 20 percent was a lower cost of equity capital than would be arrived at using any of those methods. Tr. 2435:13-2437:7 (showing the FSLIC and RTC discount rate for valuing River Valley was 20.3 percent); Tr. 2437:8-2439:5 (showing the government's return on the River Valley I fixed dividend was either 26.67 percent or 41.39 percent and that the return on the equity dividend would have been higher); Tr. 2439:13-2441:9 (showing River Valley's cost of equity capital based on its cost of subordinated debt was over 22 percent); Tr. 2441:10-2442:11 (showing River Valley's cost of equity capital based on its earnings decline after a balance sheet shrinkage was over 20 percent); Tr. 2442:12-2443:13 (showing that investors in River Valley actually experienced rates of return above 29 percent). From these other measures of cost of capital, it is clear that Dr. Holland's estimated 20 percent cost of capital represents the price River Valley would have paid on the open market to equity investors in order to raise capital sufficient to replace the capital lost due to the Government's breach, a transaction that never actually occurred and is therefore hypothetical.

For instance, one justification Dr. Holland offered for using a 20 percent gross cost of equity capital is that, after having paid a dividend in 1992 that River Valley determined "would reduce its core earnings by . . . $1.2 million per year, because of the shrinkage of the balance sheet," River Valley accepted this shrinkage even though "[h]ad $6 million of capital been

available for 20 percent or less, it would have made sense for River Valley to to acquire that capital, . . . pay less than 20 percent, earn the 20 percent and . . . pocket the difference." Tr. 2441:13-2442:11. Hence, Dr. Holland admitted that attributing to River Valley a 20 percent cost of equity capital is the same as stating that potential investors would have required at least a 20 percent return on their investment in order to be persuaded to invest in River Valley.

More directly, in response to the question "what do you equate the return on your invested funds to," Dr. Holland responded "[i]t's rent" and "[i]t's the cost that we expected when we invested at River Valley." Tr. 2443:1-5. Immediately before being asked this question, Dr. Holland had testified that another justification for a 20 percent cost of equity capital was that, "as a shareholder of River Valley, [Dr. Holland's own] required rate of return . . . exceeded 20 percent." Tr. 2442:12-25. Thus, the evidence supports the conclusion that attributing a 20 percent cost of equity capital to River Valley is equivalent to stating that River Valley would have had to offer equity investors a 20 percent rate of return in order to allow River Valley to raise capital on the open market to replace the breach-eliminated capital.

However, because River Valley is seeking damages equivalent to those that it would have incurred by paying investors a 20 percent return in order to raise sufficient capital to replace that lost because of the Government's breach, it is pursuing damages measured by a hypothetical capital-raising transaction. Both this court and the Federal Circuit have remained skeptical of damages measured by the asserted costs of hypothetical transactions to raise capital. *See, e.g., Fifth Third Bank of Western Ohio v. United States*, 402 F.3d 1221, 1237 (Fed. Cir. 2005) (affirming Court of Federal Claims's rejection of a damages theory that was "based entirely on hypothetical costs that were never actually incurred" and that was thus "highly speculative"); *Citizens Federal Bank v. United States*, 66 Fed. Cl. 179, 193 (2005) (holding that cost-of-replacement-capital damages might be available only where plaintiff "*actually* engaged in transactions to restore its capital positions, and *actually* incurred measurable costs in so doing" (emphasis in original)); *see also Bank of America, FSB v. United States*, 67 Fed. Cl. 577, 587-88 (2005) (rejecting damages theory based on hypothetical costs where actual costs were available to calculate damages). Here, plaintiffs' theory is similarly speculative, and the Court therefore cannot award damages under that theory.

## VI. Diminution in Economic Value of River Valley Due to the Breach

As an alternative to all of the damages theories discussed above, plaintiffs assert a claim for the decline in River Valley's economic value[10] as a result of the breach. This theory was

---

[10] During his testimony, Dr. Murphy, plaintiffs' expert witness, generally used the term "economic value" to describe the measure of River Valley's decline in value due to the Government's breach. Other witnesses sometimes referred to the same concept as "market value" or "going-concern value." To the extent the Court uses these terms in this section of its Opinion, the Court intends to use the terms interchangeably, and intends each of them to refer to the value of River Valley as a whole and as a business that a buyer intended to keep operating. In

supported by the expert testimony of Dr. Neil B. Murphy, who calculated the decline in River Valley's value based on valuations performed by the Government before and after the breach.

**A. The Fact of Damages Due to Diminution in Economic Value**

As an initial matter, the Court finds that there was sufficient evidence to establish with reasonable certainty that the economic value of River Valley as a going concern declined as a result of the breach. To "show[] damages with reasonable certainty," *Indiana Michigan Power Co.*, 422 F.3d at 1373, means to establish the fact of damages with reasonable certainty, "after which the court may 'make a fair and reasonable approximation of the damages,'" proof of whose amount "may be an estimate, uncertain, or inexact." *Fifth Third Bank*, 518 F.3d at 1378-79 (*quoting Bluebonnet Sav. Bank, F.S.B.*, 266 F.3d at 1356-57; ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.8 (6th ed. 2005)).

Plaintiffs' expert witness testimony and other evidence supporting the conclusion that the economic value of River Valley declined as a result of the Government's breach is discussed in detail below. Defendant disputes this conclusion by suggesting that River Valley actually increased in value around the time of the breach, as shown by an increase in River Valley's calculated mark-to-market value[11] during approximately the same time period during which Dr.

---

this sense, economic value or going-concern value is different from liquidation value, which the Court understands as the "value of a business . . . when it is sold in liquidation, as opposed to being sold in the ordinary course of business." BLACK'S LAW DICTIONARY 1587 (8th ed. 2004). The distinction is well-settled. In a typically illuminating comparison, Mr. Justice Jackson said, "A live horse is worth more than a dead one, though the physical object may be the same, and a smooth-going automobile is worth more than an unassembled collection of all its parts. The [assets] used in carrying on a prosperous business are worth more than the same assets in bankruptcy liquidation or on sale by the sheriff." *Railway Express Agency v. Virginia*, 347 U.S. 359, 364 (1954). The Court notes that neither going-concern value nor liquidation value is necessarily synonymous with "fair market value," which is the "price at which [an asset] would change hands between a willing buyer and a willing seller, neither being under a compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (*citing* Treas. Reg. § 20.2031-1(b)). Either going-concern value or liquidation value could represent the fair-market value of an asset, depending on what a willing, reasonable buyer intended to do with the asset (*i.e.*, continue to use it profitably after the acquisition, or liquidate it). The Court uses the terms "going-concern value" and "economic value" to mean fair-market value as a going concern.

[11] The mark-to-market value of an institution is the institution's liquidation value as of a particular date. "[The mark-to-market valuation process] essentially takes the bank through liquidation and sells off all the assets and calculates what the economic gains and losses are in each instrument . . . . What falls out the bottom is what the economic value of the company is if you were to dissolve it on that particular day." Tr. 142:14-19. Although Mr. Bangert used the

Murphy's analysis showed a decline in the economic value of River Valley, *i.e.*, its value as a going concern. Defendant's argument is not without a certain superficial appeal, as plaintiffs provided ample testimony that they considered the mark-to-market value of River Valley an extremely important tool for assessing the thrift's performance. *See, e.g.,* PX 649 at 1827 ("The mark-to-market is the single most important determinant of the value of River Valley Savings Bank FSB. We therefore rely on it to judge how well the institution, and management, is performing."); Tr. 141:17-21 ("Mark-to-market is a better indication of what the long-term viability or the long-term profitability of the company is, where the income statement or the profit-and-loss statement just kind of tells you — it's historical . . . ."). Further, defendant is correct that the evidence establishes that River Valley's mark-to-market value increased by over $20 million between July 1988 and January 1991, a period similar to Dr. Murphy's evaluation period of April 1988 to March 1991. PX 512 at 1613 (showing mark-to-market values of $9,505,000 in July 1988 and $31,025,000 in January 1991). But, as explained above, *see supra* notes 10 and 11, the mark-to-market value of a financial institution and the going-concern value of the same institution are not the same thing.

For example, Dr. Murphy testified about the difference between the mark-to-market value of an entity and the entity's economic value: "if we mark to market the assets, mark to market the liabilities, the difference would be the value. And that doesn't necessarily equal the economic value of the entity." Tr. 1605:13-16. When asked to explain this difference, Dr. Murphy explained that economic valuation requires an "estimate of the cash flows that occur in the future" and that "mark-to-market [analysis] doesn't reflect that." Tr. 1605:22-25. "[T]he mark-to-market balance sheets . . . are snapshots as of a given point in time," so they fail to include the prospect of future growth of the institution. Tr. 1605:18-21. Because the breach reduced River Valley's regulatory capital, "the value of capital compared to liabilities [decreased after the breach]," and this "implies that the risk of seizure increase[d]." Tr. 1606:8-16. "That closeness and increased probability of seizure . . . affects the economic value, no matter what the balance sheet assets and liabilities say," and this "increased risk and diminution in value . . . would not show up in the mark-to-market analyses." Tr. 1606:20-25. Dr. Murphy's explanation of the difference between mark-to-market value and economic value was unchallenged by any other testimony or exhibits received at trial.

Further, a difference between mark-to-market value and economic value is not inconsistent with plaintiffs' testimony that mark-to-market valuation is an important tool for measuring the performance of management. *See, e.g.,* PX 649 at 1827 ("The mark-to-market is the single most important determinant of the value of River Valley Savings Bank FSB. We therefore rely on it to judge how well the institution, and management, is performing."); Tr. 141:17-21 ("Mark-to-market is a better indication of what the long-term viability or the long-term profitability of the company is, where the income statement or the profit-and-loss statement just kind of tells you—it's historical . . . ."). Because the mark-to-market analysis looks at the

---

term "economic value" in this testimony, it is clear from the context that he meant "liquidation value," not economic value in the sense of going-concern value.

current value of the institution's assets and liabilities (which are affected largely by proper management of the institution's portfolio) but does not attempt to value possible future cash flows (which can also be affected by factors out of management's control), Tr. 1605:13-25, intelligent managers might well rely on the mark-to-market analysis to determine whether managers were performing effectively, while still acknowledging that the managers' impact on the institution's economic value was somewhat limited.

Nor is the Court troubled by defendant's argument that "[g]oing concern value should exceed mark-to-market value; when that is not the case, the difference is not great," DX 2500 at 57 (*citing* Tr. 652:5-653:11), an argument that reflects a misunderstanding of the cited testimony by Mr. Bangert. Counsel for defendant asked Mr. Bangert about a single example in which a cash offer by First Bank to purchase River Valley was lower than the most recent mark-to-market valuation of River Valley. Tr. 652:5-16. In response, Mr. Bangert stated that, "[a]t times, market value should exceed mark-to-market [valuation]." Tr. 652:22-23. As the Court sees it, stating that economic value[12] should exceed mark-to-market value "at times" is not at all the same as averring that the economic value should generally exceed the mark-to-market value. Mr. Bangert merely stated that "[o]ver time, I'd say more times than not, the market value is higher than the [mark-to-market] value, over time." Tr. 653:6-7. Moreover, while Mr. Bangert did testify that the cash offer in this one particular case was "real close" to the mark-to-market value, Tr. 653:1-2, he did not at any point in the cited testimony state that, on the occasions when the economic value is less than the mark-to-market value, the difference is never great. The Court interprets Mr. Bangert's testimony to be that, while the economic value of the institution may often exceed the mark-to-market valuation, there is no reliable way to predict which value will be higher under any particular set of presumed circumstances, and there is no limit to how far economic value might depart from mark-to-market valuation when conditions cause economic value to fall below the mark-to-market value.

Thus, the Court remains unpersuaded that an increase in River Valley's mark-to-market value between 1988 and 1991 is evidence that River Valley's economic value must have increased during the same period.[13] Similarly, the asserted increase in River Valley's market

---

[12] The Court concludes from the context of his testimony that Mr. Bangert's reference to "market value" meant economic or going-concern value. In fact, though, it is not clear whether the cash offer in question was to purchase River Valley and continue to operate it (in which case it might arguably reflect economic value), or to purchase River Valley merely in order to liquidate its assets (in which case it would reflect only market liquidation value). If the latter, then Mr. Bangert's testimony has even less relevance to River Valley's economic value than discussed in the text.

[13] Even if River Valley's economic value had increased over that period, it seems likely to the Court that, had the Government not breached its contract with River Valley, the institution's value would have increased even more between 1988 and 1991 than it actually did, although such additional amount does not appear to be quantifiable on this record. However, it would be

value of portfolio equity ("MVPE") between June 1990 and June 1993 does not indicate anything about River Valley's economic value during that time period, because MVPE "is defined as the net present value of assets, liabilities, and off-balance sheet contracts." Tr. 429:8-14. For the same reasons that mark-to-market analysis (which considers only assets and liabilities rather than expected future cash flows) cannot measure the effect on economic value of the Government's breach, MVPE (which also considers assets and liabilities rather than expected future cash flows) cannot measure the effect on economic value of the Government's breach. In any case, the MVPE's increase occurred over the period June 1990 to June 1993, a period distinct from that analyzed by Dr. Murphy, July 1988 to January 1991.

Finally, defendant is incorrect in arguing that "OTS examination results indicate[d that River Valley had] increased [in] value after the passage of FIRREA." DX 2500 at 59. As support for this assertion, defendant points to two pieces of evidence: the increasing mark-to-market values shown in PX 512 (which defendant unhelpfully and confusingly insists on referring to as "market value"), and the results of the October 28, 1991 OTS examination, which showed positive and increasing net income during the period January 1989 through September 1991. The first piece of evidence, the increasing mark-to-market values, is discussed above. The Court will not repeat its analysis here except to note once again that economic value and mark-to-market value are not the same thing. The second prong of defendant's argument, the positive and increasing net income over most of Dr. Murphy's period of analysis, is, unlike defendant's first argument, not based upon a misinterpretation of the evidence, but it is irrelevant to the question whether the Government's breach harmed River Valley. It may be the case that, as Lawrence Kenny testified, the change in an institution's net income over time is relevant to determining its value as a going concern. Tr. 3694:19-22. And the evidence does show, as defendant notes, that River Valley had net income of $1.518 million in 1989, $3.157 million in 1990, and $7.284 million between January 1 and September 30, 1991. PX 625 at 0097. Even if this were sufficient to establish that River Valley's economic value increased between January 1989 and September 1991, a conclusion at odds with the Government's own valuations of River Valley discussed below, the mere fact that River Valley was able to overcome the breach and increase its value would not preclude it from recovering damages, because, absent the breach, its value might have increased even more than it actually did.[14]

---

surprising in the extreme if, as defendant seems to argue, the Government's breach caused River Valley's economic value to do anything other than decrease.

[14] Of course, a lack of evidence showing how much River Valley's economic value would have increased beyond the increase actually observed would make it difficult for River Valley to recover damages under such a theory. But the mere fact that defendant is able to point to some evidence that River Valley's economic value increased in the years immediately following the Government's breach does not mean that plaintiffs have failed to establish the fact of diminution-in-value damages.

Given Dr. Murphy's analysis showing a decline in the economic value of River Valley between 1988 and 1991 (discussed below), and given that none of the evidence offered by defendant rebuts Dr. Murphy's conclusion that River Valley's economic value did decline as a result of the Government's breach, the Court finds that plaintiffs have carried their burden to establish the fact of diminution-in-value damages with reasonable certainty. To recover these damages, plaintiffs must also prove that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; [and] (2) the breach is a substantial causal factor in the damages." *Indiana Michigan Power Co.*, 422 F.3d at 1373 (*citing Energy Capital Corp.*, 302 F.3d at 1320). If these elements are established, plaintiffs must also establish the quantum of damages to which they are entitled, although this may be "'a fair and reasonable approximation of the damages,'" proof of whose amount "may be an estimate, uncertain, or inexact." *Fifth Third Bank*, 518 F.3d at 1378-79 (*quoting Bluebonnet Sav. Bank, F.S.B.*, 266 F.3d at 1356-57; ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.8 (6th ed. 2005)).

**B. Reasonable Foreseeability of Diminution in Value Resulting from Breach**

In its closing argument and accompanying outline and demonstrative exhibit, defendant does not challenge the foreseeability of River Valley's diminution in value as a result of the Government's breach. The Court agrees with defendant's implicit admission that the foreseeability of such damages is self-evident. The breach eliminated a significant amount of regulatory capital from River Valley's books, capital that was vitally important to River Valley's business plans. "[T]he regulatory capital . . . allowed [River Valley] to meet the capital requirements that [it] needed [to meet]. . . . [I]t was real important to [River Valley]. It was part of [River Valley's] strategy to continue to grow the company . . . . And to have access to that capital was going to be an important part of [River Valley's] growth going forward, whether [River Valley] did it through acquisitions or through internal growth." Tr. 100:16-101:9. Given the importance of the regulatory capital in River Valley's plans, the elimination of that capital via the Government's breach could not possibly have any effect other than to reduce the value of River Valley as a going concern.

**C. The Government's Breach as a Substantial Causal Factor in River Valley's Diminution in Value**

As discussed below, Dr. Murphy's estimate of River Valley's lost value was based on two valuations performed by the Government, one performed in June 1988, before the breach, by the Federal Home Loan Bank Board, and the other performed in March 1991, after the breach, by the Resolution Trust Corporation. *See* PX 174, PX 528. Because there is a span of nearly three years between these dates, and because there was therefore time for factors other than the Government's breach to affect River Valley's value, defendant argues that several of these other factors, rather than the breach itself, were responsible for the decline in River Valley's value observed by FSLIC and Dr. Murphy. The Court does not find defendant's arguments in this area persuasive, given that the Government's breach need only be a substantial causal factor of River

Valley's diminution in value; the breach need not be the sole cause of the declining value. *See Indiana Michigan Power Co.*, 422 F.3d at 1373 (*citing Energy Capital Corp.*, 302 F.3d at 1320).

Defendant first suggests that several non-breach factors affecting the thrift industry as a whole might be responsible for River Valley's observed decline in value. Because Dr. Murphy did not consider these factors in his analysis, defendant argues, he must be wrong that the Government's breach was a substantial causal factor in the diminution in value as a going concern of River Valley. These industry-wide factors include a contracting asset base between 1989 and 1996, with industry-wide declines "exceeding 13 percent in each year between 1989 and 1991." DX 2500 at 72 (*citing* DX 1559 at ¶ 47). These declines in asset base were caused by "disintermediation, competition from commercial banks, thrifts converting charters, thrift failures, and finite opportunities for profitable investment, among other factors." DX 1559 at ¶ 47. Consistent with these industry-wide trends, River Valley I's deposits decreased from $310,553,000 to $270,800,000 between December 31, 1988, and June 30, 1990. Tr. 3286:21-3287:2. Even so, defendant's expert, Dr. Andrew Carron, noted only that River Valley's declining value "*might* have [been] affected" by "a general decline in the value of the [thrift] industry or . . . broad market factors." Tr. 4850:25-4851:7 (emphasis added). Dr. Carron did not present any opinion or other testimony regarding the size of the effect these industry-wide factors had on River Valley, and he did not even state that, in his opinion, the decline in deposits actually caused the diminution in value. The diminution in value could of course have more than one cause, but testimony tending to show only that a particular factor (here the declining asset base) *might* have caused the diminution in value is not sufficient to rule out all other factors (such as the Government's breach) as substantial causal factors. Thus, the Court is not persuaded that the mere existence of a decline in deposits in the thrift industry in general or at River Valley specifically proves that the Government's breach had no substantial effect on River Valley's going-concern value.

Next, defendant notes that "[t]he RTC's . . . valuation of the FSLIC preferred [stock] in 1991 was affected by a severely depressed market for thrift equity based in part on a negative perception of the thrift industry." DX 2500 at 73 (*citing* PX 528 at 0017). Again, though, defendant has postulated a factor that may be responsible for some portion of the decline in River Valley's value, without providing evidence of how much of an effect that factor had on the value, and without even providing sufficient evidence to find that such an effect actually (rather than only possibly) occurred. The document defendant cites, a discussion of the value of the RTC's shares of preferred stock in River Valley I, provides three causes for the depressed market in "publicly traded thrift preferred issues." PX 528 at 0018. First, as defendant notes, the document states that the depressed market was caused by "a negative perception of the thrift industry." *Id.* at 0017. But the document also states that the depressed market was caused by "the continuing deterioration in the real estate market" and "more stringent restrictions on the manner in which thrifts do business as mandated by the new capital regulations." *Id.* The document does not provide any relative weighting of these three factors, and so it provides insufficient evidence to support a finding that "the new capital regulations," including the

breaching portions of FIRREA, were not a substantial causal factor of the decline in value of River Valley.

Finally, defendant argues that the post-FIRREA supervisory agreement imposed on River Valley by regulators was imposed because of concern about River Valley's level of "high-risk derivative and residual mortgage-backed securities," rather than because of concern over low capital levels that might be attributable to the Government's breach. DX 2500 at 76. But this is a red herring. While the imposition of the supervisory agreement may have reduced River Valley's value to some degree, the elimination of capital due to the breach caused the value to decline independent of any drop in value attributable to the supervisory agreement. Thus, to the extent that the supervisory agreement sprang from a regulatory concern over low capital levels, the supervisory agreement and the diminution in going-concern value could both be said to be separate and independent effects of the Government's breach, which is something altogether different from saying that the imposition of the supervisory agreement was a necessary logical step on the causal path from the Government's breach to the decline in going-concern value. Therefore, it is irrelevant which concern—low capital levels or high levels of high-risk securities—led to the supervisory agreement being imposed. Further, even if defendant is correct that the supervisory agreement was imposed solely because of high levels of high-risk securities, with no eye to accompanying low capital levels, and even if the supervisory agreement led to some decline in value, this argument fails for the same reason as defendant's other causation arguments. To recover damages for diminution in value, plaintiffs only need to show that the Government's breach was a substantial causal factor in the diminution in value. While defendant points to the supervisory agreement as a possible cause of the decline in going-concern value, defendant fails to establish both (1) that the imposition of the supervisory agreement was an actual (as opposed to merely a possible) cause of that decline in value and (2) the size of the effect this cause had on River Valley's value. Without evidence tending to establish these facts, the Court cannot say that the imposition of the supervisory agreement, even if motivated solely by non-breach factors, was so overwhelming a cause of the claimed diminution in value as to render the Government's breach an insubstantial causal factor.

### D. The Amount of Damages Claimed

As discussed above, plaintiffs have established that River Valley suffered diminution in its going-concern value, that this diminution in value was reasonably foreseeable, and that the Government's breach was a substantial causal factor of the decline in value. To recover these claimed damages, plaintiffs must also establish the quantum of damages to which they are entitled, although this may be "'a fair and reasonable approximation of the damages,'" proof of whose amount "may be an estimate, uncertain, or inexact." *Fifth Third Bank*, 518 F.3d at 1378-79 (*quoting Bluebonnet Sav. Bank, F.S.B.*, 266 F.3d at 1356-57; ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.8 (6th ed. 2005)). Defendant argues that, despite this low hurdle for estimating the amount of damages, plaintiffs failed to offer evidence sufficient to establish that their claimed damages have been fairly and reasonably calculated.

### 1. Dr. Murphy's Use of Valuation Information that Pre-Dates and Post-Dates the Time of Breach

To measure damages due to diminution in going-concern value, plaintiffs rely on Dr. Murphy's calculations, explained through his testimony as an expert witness at trial. As mentioned above, Dr. Murphy's calculation relied on two valuations of the FSLIC's share of the profit-sharing portion of the Class A preferred stock in River Valley that the FSLIC purchased. These valuations were performed by the Government, one in June 1988, before the breach, by the FSLIC, and the other in March 1991, after the breach, by the Resolution Trust Corporation. *See* PX 174; PX 528. Defendant notes that this nearly three-year time span allowed some non-breach factors to affect the value of River Valley and argues that, in addition to the causation issue that this allegedly creates (discussed above in Part VI.C), the possible impact of those non-breach factors during this period makes the amount of damages calculated by Dr. Murphy unreasonably speculative.

The Court disagrees. As discussed above, the only evidence adduced at trial tending to suggest that factors other than the breach were responsible for River Valley's decline in value was the testimony of defendant's expert, Dr. Carron, who noted only that River Valley's value "*might* have [been] affected" by "a general decline in the value of the [thrift] industry or . . . broad market factors." Tr. 4850:25-4851:7 (emphasis added). Dr. Murphy countered that the market factors prevailing between 1988 and 1991 should have caused an increase, rather than a decrease, in River Valley's going-concern value, and that the FSLIC itself observed a decline in value in spite of these factors. Dr. Murphy stated that "during that time, there was a decline in interest rates. . . . [E]verything else held constant, [that] would increase the value of all cash flows and, hence, would increase the value rather than decrease the value of the institution." Tr. 1607:17-21. He also noted that "lower interest rates usually, generally, depending on the exposure of the institution, result in an increase in value of depository financial institution[s]." Tr. 1607-22-25. Dr. Murphy also discussed how the terms of the FSLIC preferred stock should have resulted in an increase in its value (exclusive of any increase in the underlying institution's value) between 1988 and 1991. In particular, the income-sharing portion of the FSLIC preferred stock gave the FSLIC "25 percent of [River Valley's] net income in excess of 40 basis points of the return on assets" for the first ten years that FSLIC held the stock. PX 148 at 2573. After the tenth year, though, FSLIC's share of profits went up, because the 40-basis-point threshold declined by five basis points per year until it reached 15 basis points. *Id.* Dr. Murphy's testimony was that "[e]ach year you get closer to that . . . point, the value [of the FSLIC preferred stock] . . . by present value arithmetic logic would go up." Tr. 1608:6-8. Thus, the Court must weigh Dr. Carron's statement that the economic value of River Valley "might have" declined because of unspecified "broad market factors," Tr. 4850:25-4851:7, against Dr. Murphy's extensive testimony about the FSLIC-observed decline in River Valley's economic value in spite of actual, identified market factors that one would expect to have increased River Valley's value. The weight of the evidence is strongly against finding that the observed decline in River Valley's economic value was due to market factors. The Court finds Dr. Murphy's attribution of the decline in River Valley's economic value to the Government's breach to be well-supported by

the evidence, and the Court also finds that Dr. Murphy's methodology yields an estimate of River Valley's diminution-in-value damages that is not unduly or unreasonably speculative.

### 2. Dr. Murphy's Alleged Lack of Real-World Valuation Experience

Defendant next argues that Dr. Murphy's analysis is flawed because he lacks experience performing valuations of financial institutions and instruments in the real world, rather than as a matter of economic theory. Here, defendant's concern is misplaced. First, Dr. Murphy testified that he did have previous experience "mak[ing] a determination of damages in a litigation context with respect to a financial institution." Tr. 1524:12-1525:1. While defendant ignores this testimony and focuses on Dr. Murphy's testimony that he had never "been retained by a bank or thrift to perform a valuation," Tr. 1522:19-21, it is difficult to imagine any experience more relevant to properly estimating damages in this case than prior employment as an expert witness for the purpose of estimating damages in litigation that, as is true in this case, involves a financial institution. Moreover, whatever Dr. Murphy's lack of real-world valuation experience, he has taught as a professor of finance at Virginia Commonwealth University for 20 years, he has repeatedly taught a course in financial management of financial institutions, including thrifts, and he has published approximately 60 papers in scholarly journals, "almost all of it" relating to depository financial institutions. Tr. 1495:8-1512:12. He holds a Ph.D. in economics and finance, has received several prestigious awards, and has taught at or visited several institutions other than Virginia Commonwealth University, both in this country and abroad. Tr. 1498:6-1516:8. With such a background, the Court finds it impossible to say that Dr. Murphy's expertise is so lacking as to cast doubt on his ability to fairly and reasonably estimate the amount by which River Valley's going-concern value decreased as a result of the Government's breach. Moreover, defendant understandably had no objection at trial to Dr. Murphy's qualification as an expert on "finance and economics of banking institutions, including thrifts." Tr. 1531:5-9. Having failed to object to Dr. Murphy's qualifications at trial, it is disingenuous for defendant now to raise an argument based upon Dr. Murphy's alleged inability to accurately estimate damages. Finally, the Court was favorably impressed by Dr. Murphy's candor and demeanor on the stand, as well as by the objectivity and clarity with which Dr. Murphy explained his methodology, his conclusions, and his responses to defendant's critiques thereof.

### 3. Use of Government Valuations of FSLIC Preferred Stock

Defendant criticizes Dr. Murphy's use of the Government's June 1988 and March 1991 valuations of FSLIC's equity interest in River Valley I. First, defendant argues that the June 1988 valuation is unreliable, because the FSLIC preferred stock was acquired as a form of regulatory assistance rather than as a market investment, and because the FSLIC was not competent to place a value on the stock. Second, defendant argues that the June 1988 and March

1991 valuations are so different in terms of the methodologies used to generate them that they should not be used together to estimate a decline in value.[15]

**a. Use of the June 1988 FSLIC Valuation**

Defendant presents two arguments against using the Government valuations of the FSLIC preferred stock. Both have to do with whether the June 1988 valuation by FSLIC is itself a reliable estimate of the actual value of the FSLIC preferred stock. First, defendant argues that the FSLIC preferred stock was valued by the Government as a form of regulatory assistance rather than as an investment purchased on the open market, making it an inappropriate basis for valuing the institution as a whole. There was certainly ample evidence adduced at trial that showed that the purchase of River Valley preferred stock by FSLIC was intended to be a form of assistance to River Valley. But this is a separate question entirely from whether the FSLIC accurately estimated the stock's value. Dr. Murphy provided sufficient testimony to find that the FSLIC did an adequate job of estimating the preferred stock's value. First, Dr. Murphy noted that the concept of purchasing a stock of this form on the open market is somewhat artificial: "most small- to medium-sized financial institutions, depository institutions, are not publicly traded, so that to look for a market, I think, would be very difficult. Even if they were . . . traded, they wouldn't be traded on a continuous basis the way major, . . . very large corporations would be. So the market is not the place to look." Tr. 1597:25-1598:6. Thus, to the extent defendant's argument is that Dr. Murphy should have simply used the market price of the FSLIC preferred stock instead of the FSLIC's own valuation, defendant's argument is unpersuasive. Further, Dr. Murphy testified that, regardless of whether the FSLIC planned to sell the preferred stock to another buyer in the future or hold onto it to benefit from the resulting cash flows, it "was in their interest" to properly value the stock, and "the fact that it was part of an assisted transaction didn't have any effect on the valuation process." Tr. 1600:24-1601:11. This uncontradicted testimony shows that it is sufficiently likely that the FSLIC properly valued the preferred stock that the Court cannot find the use of the FSLIC valuation to derive the pre-breach value of River Valley to be unduly speculative.[16]

---

[15] Defendant raises no objection to Dr. Murphy's using values of the FSLIC equity interest to determine the overall value of River Valley before and after the breach. Instead, defendant argues that the specific valuations of the FSLIC equity interest that Dr. Murphy used as inputs to this method were flawed for the reasons discussed in the text.

[16] The Court also remains unpersuaded by the evidence of a separate valuation conducted by Lawrence Barr on behalf of River Valley in 1988. DX 514. Nicholas Wilson, a Lawrence Barr employee who prepared the analysis, testified that he believed DX 514, a fax transmitted from Lawrence Barr to River Valley, was "[q]uite close" to a final version, but handwriting on the document demonstrated that it was still a draft version. Tr. 3914:5-3915:3. Because neither party has produced the final version of this analysis, and because the final version could have changed substantially from this draft version, the Court sees no reason to place more weight on DX 514 than on the admittedly final valuation of the FSLIC preferred stock conducted by FSLIC.

Defendant's argument that FSLIC lacked the capacity to determine the value of the preferred stock is similarly unpersuasive. This argument stems from the testimony of J. Richard Earle, the director of mergers and acquisitions at FSLIC in 1988 and 1989. Mr. Earle stated that FSLIC's "valuation of the River Valley I preferred stock . . . inherently could not be accurate." Tr. 3199:22-3200:1. This was because, in his opinion, FSLIC did not perform any due diligence in performing its valuation. Tr. 3199:18-19 ("The valuation placed on the preferred stock . . . didn't involve appraisals or anything."); Tr. 3232:8-11 ("If I were an investment banker, I would not attempt to have valued the River Valley preferred stock without a complete comprehensive audit and appraisal of the properties in question."). The FSLIC valuation itself confirms that the personnel performing the valuation were concerned that it was "'soft' in that the valuation relied upon assumptions concerning the appropriate discount rates and the projected income of the resulting institution." PX 148 at 2573. It may be that the FSLIC valuation was to some degree mathematically inexact; this would not be surprising given the FSLIC's workload during the late 1980s. But, after having testified that he did not believe it was possible for the FSLIC valuation of the preferred stock to be correct, Mr. Earle admitted on cross-examination that he could not specifically "point to any aspect of the [FSLIC valuation process] that [was] deficient or wrong." Tr. 3253:21-25. Given this testimony, the Court cannot place any serious reliance on Mr. Earle's testimony that the valuation process was flawed. Even if there were sufficient evidence to find that the FSLIC process was inexact, the Federal Circuit has made clear that damages for breach of contract do not need to be proven with exacting precision. *Fifth Third Bank*, 518 F.3d at 1378-79 (*quoting Bluebonnet Sav. Bank, F.S.B.*, 266 F.3d at 1356-57; ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.8 (6th ed. 2005)). Given this standard, the Court cannot say that reliance on a Government valuation of preferred stock to be purchased by the Government is so unreliable that it necessarily leads to a damages calculation that is unduly speculative.

**b. Alleged Inconsistency Between the June 1988 FSLIC Valuation and the March 1991 Resolution Trust Corporation Valuation**

Defendant's second set of arguments regarding Dr. Murphy's use of the Government valuations of the FSLIC preferred stock relate to the purported inconsistency in valuation method between the FSLIC valuation in 1988 and the Resolution Trust Corporation valuation in 1991. Here, defendant argues that, because the Government hired an investment banker to conduct independent due diligence when disposing of the preferred stock, the later valuation is so methodologically inconsistent with the earlier valuation as to make any comparison between them meaningless. DX 2500 at 66. But Dr. Murphy testified that "both [valuations] use

---

Even if the Court were to take into account the Lawrence Barr analysis, it is no surprise that River Valley would have valued the preferred stock at an amount less than the Government did. One would naturally expect the seller of an item to place less value on the item than would the buyer; were the situation otherwise, the transaction would not occur. Here, as the seller of the preferred stock, River Valley would of course have been expected to place less value on the stock than did FSLIC, the buyer.

straightforward discounted cash flow procedures, standard approaches," and the Court agrees. Tr. 1603:5-22; PX 528 at 0012 (stating that the 1991 valuation determined the "estimated present value of the future payments from the [p]referred [s]tock"); PX 148 at 2573 (describing the method for valuing the equity sharing portion of the preferred stock as involving discounting expected cash flows). There is therefore no methodological inconsistency whatsoever between the 1988 and 1991 valuations. While the 1991 valuation may have been performed with greater care and with the assistance of personnel more expert in conducting such valuations, it was carried out using the same method as that used in the 1988 valuation. Thus, defendant's argument that the inconsistency between the two valuations was so great as to rule out comparing them is unpersuasive.

### 4. Use of the Gordon Growth Model

Defendant also argues that Dr. Murphy's use of the Gordon growth model to estimate the value of a portion of River Valley I's future earnings was inappropriate. Dr. Murphy testified that the Gordon growth model is an equation "supplied in almost every corporate finance textbook" for determining the value of an endless series of future cash flows. Tr. 1556:4-5. The equation sets the value of the series of cash flows equal to the "initial cash flow" divided by "the difference between the discount rate and the growth rate [of the cash flows]." Tr. 1555:18-20. That is:

$$\text{Value of Series} = \frac{\text{Initial Cash Flow}}{\text{Discount Rate} - \text{Growth Rate}}$$

where "Growth Rate" is the yearly rate of change of the cash flows in the infinite series. Dr. Murphy testified that the Gordon growth model could be used to estimate the value of portion of the FSLIC preferred stock that provided the holder with regular cash flows equal to 0.4% of River Valley I's assets. Tr. 1554:16-25. In his analysis, Dr. Murphy made assumptions regarding the discount rate and growth rate identical to those made by FSLIC in its own documents. Specifically, Dr. Murphy assumed a value of 16% for the discount rate and a value of 7% for the growth rate. Tr. 1562:7-11; Tr. 1563:13-20; PX 148 at 2573; DX 80 at 2563; *see also* PX 2001-A.

Defendant objects to Dr. Murphy's use of the Gordon growth model because River Valley I did not in fact grow at a stable rate. It is true that both Dr. Murphy and Dr. Holland testified that River Valley's growth was "uncertain" and "lumpy," rather than absolutely stable. Tr. 1697:1-18 (Murphy); Tr. 6022:24-6023:4 (Holland). Based on Dr. Murphy's testimony, the Court understands that the Gordon growth model is based on an assumption that the growth of the institution being valued is stable. Tr. 1697:5-6 ("the underlying assumption of the model is that the growth rate is stable"). Thus, the Court understands defendant's hesitancy in accepting the application of this model to an institution like River Valley I, which experienced some degree of fluctuation in earnings. But Dr. Murphy also testified that the Gordon growth model could be used when the growth is "volatile, that is, that [the institution] could be expected to grow at some

percent[age rate], but in any given year, it may be above or below that." Tr. 1697:8-10. In this circumstance, Dr. Murphy stated that the risk of volatility would be accounted for in the discount rate chosen as an input for the Gordon growth model. Tr. 1697:11-12. In the FSLIC valuation analysis that Dr. Murphy relied upon, the Government assumed a discount rate of 16 percent because of "the perceived riskiness of the preferred stock." PX 148 at 2573. This choice of discount rate thus took into account the risks of the preferred stock purchase, including the risk of volatility in the growth rate. Because Dr. Murphy adopted this discount rate in conducting his Gordon growth model analysis, the Court cannot say that Dr. Murphy failed so completely to properly estimate the value of the FSLIC preferred stock as to warrant a holding that his analysis is not a fair and reasonable estimate of the damages of the Government's breach.

### 5. Extrapolation of River Valley I Lost Value to River Valley II

In Dr. Murphy's analysis, he used the Government valuations of River Valley I before and after the breach to estimate the diminution-in-value damages to River Valley I, but because of a lack of similar available data for River Valley II, he extrapolated the River Valley I results to River Valley II. Dr. Murphy did so by determining the amount of lost value at River Valley I attributable to each dollar of capital eliminated by the enactment of FIRREA, then applying that rate to the amount of capital eliminated at River Valley II by FIRREA. PX 2001 at 31-33. Defendant criticizes this approach because, defendant argues, there is no reason to expect the elimination of one dollar of capital at two different financial institutions to have the same effect on both.

The Court understands defendant's argument. If nothing else, as pointed out during Dr. Murphy's cross-examination, the existence of the cross-guarantee provision of FIRREA demonstrates that not all financial institutions under common ownership necessarily always have identical financial performance. Tr. 1725:20-1726:13 ("[T]he cross-guarantee provision of FIRREA required that two thrifts under common ownership, if one of those thrifts became insolvent, the other thrift was required to infuse capital . . . . [T]he fact that one institution is insolvent and the other is not reflects that these institutions are not performing in the same respect."). But this merely illustrates that some jointly-owned financial institutions perform differently from their corporate siblings, without showing that River Valley I and River Valley II in particular should have been expected to operate and perform differently. In this respect, the extrapolation of results from River Valley I to River Valley II represents a simplifying assumption, but the Court does not find that sufficient evidence was adduced at trial to demonstrate that this assumption simplified the analysis so greatly that Dr. Murphy's estimate of diminution-in-value damages can no longer be said to be a fair and reasonable approximation of those damages. While Dr. Murphy could estimate River Valley I's decline in value from the Government's own valuations before and after the breach, no similar valuations were available for River Valley II. Accordingly, some assumption had to be made in order to determine how much River Valley II's value declined. Given that River Valley I and River Valley II operated in similar rural and small-town areas of Illinois, and given that they shared identical management personnel and strategies, the Court finds Dr. Murphy's assumption that the breach would affect

both thrifts identically to be reasonable under the circumstances. Although this simplifying assumption necessarily produces a result that cannot with absolute certainty be said to be exact, such precision is not required. As noted above, the Federal Circuit has held that, to recover damages, it is sufficient for plaintiff to present "'a fair and reasonable approximation of the damages,'" and this approximation "may be an estimate, uncertain, or inexact." *Fifth Third Bank*, 518 F.3d at 1378-79 (*quoting Bluebonnet Sav. Bank, F.S.B.*, 266 F.3d at 1356-57; ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS § 1.8 (6th ed. 2005)). Dr. Murphy's simplifying assumption was reasonable and necessary, and defendant neither proffered a different assumption nor provided evidence of the relative magnitude of any error produced by Dr. Murphy's use of his simplifying assumption. Accordingly, the Court finds that Dr. Murphy's approach meets the standard articulated by the Federal Circuit in *Fifth Third Bank*.

### E. Allocation to Breach-Eliminated Capital

Having found that River Valley's going-concern value declined following the Government's breach, that the breach was a substantial causal factor in the decline in going-concern value, that the decline in going-concern value was a reasonably foreseeable result of the breach, and that Dr. Murphy's method of estimating the amount by which the going-concern value declined was reasonable, it remains for the Court to set an amount of damages based on Dr. Murphy's analysis. During his testimony, Dr. Murphy presented the following amounts as his estimates of the amount of going-concern value that River Valley lost as a result of the elimination of capital that resulted from the enactment of FIRREA:

- River Valley I: $14,794,000
- River Valley II: $7,051,000
- Total: $21,845,000

PX 2001 at 39; Tr. 1592:23-1593:5. Dr. Murphy suggested in his testimony that not all of the capital eliminated from River Valley I by the enactment of FIRREA might be contractual capital. Specifically, Dr. Murphy stated that the FSLIC preferred stock itself, which was treated as regulatory capital before FIRREA but not after FIRREA, might not be considered part of the regulatory capital eliminated by the breach, because it might not be considered to have been contracted for. Tr. 1593:6-1594:2. The Court agrees that this adjustment is necessary. The Court originally held that the treatment of the FSLIC preferred stock as regulatory capital was contractual, and therefore that FIRREA's elimination of the ability to count the FSLIC preferred stock as regulatory capital constituted a breach. *Holland*, 57 Fed. Cl. at 565 ("the court finds that the defendant breached the contractual rights of the plaintiffs . . . [by] prohibit[ing] the plaintiffs from recording FSLIC cash contributions, *preferred stock*, and subordinated debt as assets for regulatory capital purposes, and from amortizing the goodwill" (emphasis added)). But, in 2006, after considering then-recent Federal Circuit decisions, the Court reconsidered the issue and held that the FSLIC preferred stock was not contracted-for regulatory capital and that its elimination as regulatory capital could not therefore be considered a breach. *Holland*, 74 Fed. Cl. at 258-63.

Thus, an allocation of damages to breach-eliminated capital (as opposed to the broader category of FIRREA-eliminated capital, which would include the FSLIC preferred stock) is required.

The Court agrees with Dr. Murphy's method of estimating the effect of this allocation to breach-eliminated regulatory capital. Dr. Murphy notes that the cost to River Valley I of redeeming the FSLIC preferred stock was $3.675 million. Tr. 1593:16-1594:2. Given this, the non-breaching provision of FIRREA that eliminated the FSLIC preferred stock as regulatory capital eliminated $3,675,000 of regulatory capital. Dr. Murphy thus found that only $13,197,000 of the regulatory capital eliminated at River Valley I was contractual; the difference between this value and the total of $16,872,000 of regulatory capital eliminated by FIRREA is the $3,675,000 in FSLIC preferred stock. Tr. 1594:3-14. Next, Dr. Murphy determined what percentage of the total eliminated regulatory capital was represented by the eliminated contractual capital, finding it to be 78.22%. Tr. 1594:15-22. Finally, making the assumption that each dollar of FIRREA-eliminated capital affected River Valley I to the same degree, Dr. Murphy multiplied this percentage by the amount of lost-value damages he had previously determined for River Valley I. Tr. 1594:21-1595:10. This reduces the River Valley I damages from $14,794,000 to $11,572,000. Tr. 1595:12-14. Because no non-contractual regulatory capital was eliminated from River Valley II by FIRREA, no similar analysis for River Valley II is required. Tr. 1595:24-1596:9. The Court finds this adjustment to be warranted and reasonable. Thus, the proper damages figures for River Valley's decline in going-concern value are as follows:

- River Valley I: $11,572,000
- River Valley II: $7,051,000
- Total: $18,623,000

PX 2001 at 38; Tr. 1596:20-25. Accordingly, the Court finds that Dr. Murphy's estimate of $18,623,000 in damages due to River Valley's decline in going-concern value constitutes a fair and reasonable approximation of the damages due to First Bank as successor-in-interest to River Valley by reason of defendant's breach.

## CONCLUSION

For the reasons discussed above, the Court finds that plaintiff First Bank, as successor-in-interest to River Valley, is entitled to recover of and from defendant the sum of $18,623,000 as damages for defendant's breach of contract. As noted earlier, and consistent with the Court's order of May 15, 2007, the Court and the parties have not yet undertaken such further proceedings as may be necessary to resolve defendant's counterclaim. As presently advised, the Court understands that the remaining issues on defendant's counterclaim are (1) whether the covenant not to sue applies to suits against the United States generally or only to suits against the FDIC, the specific entity with which plaintiffs entered into the settlement agreement; (2) whether plaintiffs breached the covenant not to sue by prosecuting the present litigation; and (3) what damages, if any, should be awarded to defendant by reason of plaintiffs' alleged breach of the

covenant. The Court will contact the parties promptly after this Opinion is issued in order to determine what further proceedings are necessary to resolve defendant's counterclaim and to schedule those proceedings. Thereafter, the Court contemplates directing the entry of a final judgment that will take into account both the Court's resolution of defendant's counterclaim and the Court's resolution of plaintiffs' claims as set forth in this Opinion.

**IT IS SO ORDERED.**

s/ George W. Miller
GEORGE W. MILLER
Judge