# In the United States Court of Federal Claims

No. 95-524 C
Filed April 17, 2009
TO BE PUBLISHED

| | |
|---|---|
| HOMER J. HOLLAND, STEVEN BANGERT, Co-Executor of the Estate of HOWARD R. ROSS, and FIRST BANK,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | *Winstar*-related proceeding; Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"); Government's breach of contract; Government's counterclaims; prior settlement agreement between plaintiffs and Federal Deposit Insurance Corporation ("FDIC"); effect of release of only one of two or more joint obligors on a contract; covenant not to sue; claim for setoff of amounts paid by FDIC in prior settlement against damages awarded in this action; burden of proof; Illinois law |

David B. Bergman, Michael Johnson, Howard Cayne, and Joshua P. Wilson, Arnold & Porter LLP, Washington, D.C., for plaintiffs.

John H. Roberson, Trial Attorney, Elizabeth A. Holt, Trial Attorney, William G. Kanellis, Trial Attorney, Amanda Tantum, Trial Attorney, John J. Todor, Trial Attorney, Sameer Yerawadekar, Trial Attorney, Brian A. Mizoguchi, Senior Trial Counsel, Scott Austin, Senior Trial Counsel, Kenneth M. Dintzer, Assistant Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Michael F. Hertz, Deputy Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

After extended proceedings, plaintiffs have prevailed regarding both liability for breach of contract and an award of damages in this *Winstar*-related proceeding. The defendant's counterclaims remain to be resolved. The plaintiffs have now moved to dismiss the counterclaims, which assert that defendant is entitled to damages for plaintiffs' breach of the covenant not to sue or is entitled to a setoff of amounts paid to plaintiffs under a previous settlement agreement between the plaintiffs and the Federal Deposit Insurance Corporation

("FDIC") as Manager of the FSLIC Resolution Fund ("FRF").[1]  For the reasons stated below, the Court grants the plaintiffs' motion to dismiss the counterclaims alleging breach of the covenant not to sue and grants summary judgment in favor of the plaintiffs on defendant's counterclaims asserting entitlement to a setoff.

## I.      Factual Background

This lawsuit has a long and complicated history that it is largely unnecessary to recount here.  *See, e.g.*, *Holland v. United States*, 57 Fed. Cl. 540 (2003).  Only the background information pertinent to the resolution of the pending motion is set forth below.

As part of its efforts to save failing savings and loan associations, in 1988 the Government contracted with plaintiffs Holland and Ross[2] to acquire three thrifts: Galva Federal Savings and Loan Association ("Galva"), Mutual Savings and Loan Association ("Mutual") and Home Federal Savings and Loan Association ("Home").  As part of the transaction, Galva and Mutual merged into Home, and the resulting entity became River Valley Savings Bank, F.S.B. ("River Valley I").  Holland and Ross then acquired River Valley I.  *Holland v. United States*, 74 Fed. Cl. 225, 228 (2006).  Holland and Ross also owned all the stock of an entity named River Valley Savings Bank ("River Valley II").  In a second transaction, River Valley II acquired Republic Savings and Loan Association ("Republic").  *Id.*

In connection with these acquisitions, the Federal Home Loan Bank Board ("FHLBB"), the Federal Savings and Loan Insurance Corporation ("FSLIC"), and the plaintiffs entered into agreements allowing the plaintiffs certain benefits in consideration of their consenting to acquire these troubled financial institutions.  *Holland*, 57 Fed. Cl. at 545-48.  Specifically, the FHLBB promulgated a resolution authorizing each acquisition, and the FHLBB then approved the execution of Assistance Agreements on behalf of the FSLIC.  *Holland*, 74 Fed. Cl. at 230-32.  The Assistance Agreements provided a number of incentives to plaintiffs to undertake the acquisitions.  FSLIC agreed to provide a major infusion of funds to partially cover the existing net worth deficits of the thrifts (*i.e.*, promises of cash assistance by the FSLIC).  The Assistance Agreements also allowed the plaintiffs to leverage their investment of capital in the thrifts by crediting the funds provided by the Government to the entities' regulatory capital accounts, along with crediting "supervisory goodwill" toward their capital reserve requirements as an intangible asset and amortizing that goodwill over 25 years.  *Holland*, 57 Fed. Cl. at 545-48.  Because a thrift had to maintain a certain percentage of regulatory capital relative to its assets to permit federal insurance of its deposits, this agreement allowed the newly acquired thrifts to increase the amount of their insured deposits, hopefully aiding a return to profitability.  Applicable

---

[1]  The Court may occasionally refer simply to the "FDIC."  For the purposes of this opinion, "FDIC" means the FDIC as the Manager of the FRF.

[2]  Mr. Ross is now deceased, and Steven Bangert, the co-executor of his estate, has been substituted as a party.

regulations would have impeded the arrangement, but the Government agreed not to enforce these regulatory requirements. FHLBB sent forbearance letters confirming that it and FSLIC would "waive or forbear from taking action to enforce certain requirements" relating to regulatory capital. *Id.* at 548. The Assistance Agreements and other incorporated documents created a single, unitary contract as to each transaction that included among its multiple provisions these promises of regulatory forbearance (the "River Valley I and II contracts," collectively the "River Valley contracts").

In response to the growing savings and loan crisis, on August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. 101-73, 103 Stat. 183 (codified as amended in scattered sections of 12 U.S.C.). FIRREA abolished the FSLIC, transferred its functions to other Government agencies, and replaced the FHLBB with the Office of Thrift Supervision ("OTS"). *Id.*; *United States v. Winstar Corp.*, 518 U.S. 839, 856 (1996). FIRREA required the OTS to "prescribe and maintain uniformly applicable capital standards for savings associations" and created strict statutory requirements that thrifts "maintain core capital in an amount not less than 3 percent of the savings association's total assets" and forbade "intangible assets" such as "goodwill" from being treated as "core capital." *Id.*

OTS issued regulations implementing FIRREA by requiring a specified minimum amount of regulatory capital, and on January 9, 1990 issued "a bulletin noting that FIRREA 'eliminates [capital and accounting] forbearances previously granted to certain thrifts." *Id.* at 858 (quoting Office of Thrift Supervision, Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments held by a Deposit Insurance Fund, Thrift Bulletin No. 38-2, Jan. 9, 1990).

On August 14, 1991, Holland and Ross, River Valley Savings Bank, F.S.B. ("River Valley III," the surviving entity when River Valley I acquired River Valley II), and the FDIC in its capacity as Manager of the FRF, executed a "Settlement Agreement" which terminated the Assistance Agreements. *Holland*, 74 Fed. Cl. at 233. The specific provisions of the settlement substituted immediate payments for longer term obligations owed by the parties to each other. *Id.* at 237. First, it substituted a single, final, immediate payment by plaintiffs to the FRF for the tax benefit sharing obligations under the Assistance Agreements that plaintiffs owed to FSLIC/FRF. Second, it substituted a single, final immediate payment from the FRF for the cash assistance payment obligations arising under the Assistance Agreements that were owed to plaintiffs. These promises were set forth in Sections 1(a) and 1(b) of the Settlement Agreement. Section 1(a) of the Settlement Agreement read:

> [I]n exchange for the performance by the [FDIC] of its obligations under section 1(b) of this Settlement Agreement, River Valley shall pay to the Manager the sum of [$50,000] in lawful money of the United States of America (hereinafter the "River Valley Federal Cash Payment"). The River Valley Federal Cash Payment shall constitute full satisfaction of River Valley Federal's obligation to share tax

> benefits attributable to the net operating losses under sections 3 and 7 of the
> [agreement] and shall fully discharge River Valley Federal from any obligation or
> liability in connection therewith.

Ex. B to Def.'s Opp. To Pls.' Mot to Dismiss (docket entry 488, Oct. 27, 2008) ("Def.'s Opp.")
at 3.

Section 1(b) stated:

> [I]n exchange for the performance by River Valley Federal of its obligations under
> section 1(a) of this Settlement Agreement, the Manager shall pay to River Valley
> Federal the sum of [$3,276,902.90] . . . (hereinafter the "FRF Cash Payment"). . . .
> The parties hereto agree that the FRF Cash Payment shall constitute full
> satisfaction of any and all remaining payments or contributions due or to become
> due under the Assistance Agreements, and shall fully discharge the Manager and
> the FRF from any obligation or liability in connection therewith, including,
> without limitation, any obligation or liability with respect to (i) payments for
> capital losses, (ii) indemnifications for undisclosed liabilities, unreserved for
> claims, challenges to the transaction, and related claims, and (iii) claims for
> accrued but uncollected interest.

*Id.* at 3-4.

For ease of reference, these specific obligations that were resolved in the Settlement
Agreement will be referred to as the "cash assistance" obligations or promises.  In addition to
resolution of these cash assistance promises, Section 5 of the Settlement Agreement (the "Accord
and Satisfaction clause") further stated:

> Except as otherwise specifically provided herein, performance by each party of its
> respective obligations under this Settlement Agreement shall effect a complete
> accord and satisfaction of any and all obligations and liabilities of such party
> under the Assistance Agreements and, thenceforth, such party shall be fully
> discharged from any obligation or liability of any kind in connection therewith,
> including, without limitation, any and all actions, causes of action, suits, debts,
> sums of money, bonds, covenants, agreements, promises, damages, judgments,
> claims, and demands whatsoever, known or unknown, suspected or unsuspected,
> at law or in equity.

*Id.* at 8-9.

The parties included an integration clause at Section 8(h) of the Settlement Agreement:
"This Settlement Agreement embodies the entire Settlement Agreement among the parties hereto
with respect to the subject matters herein and supersedes all prior agreements and understandings
among the parties, oral or written, concerning such matters."  *Id.* at 18.  Finally, the third-party
beneficiary clause excluded any non-party from the scope of the settlement.  *Id.* at 19 ("Except as

expressly provided in this Settlement Agreement, no provision of this Settlement Agreement is intended to benefit any persons other than the parties hereto.").

In 1995, the plaintiffs (originally Holland and Ross alone) filed their complaint in this action, asserting that the enforcement of regulatory capital requirements by the OTS violated its contractual obligations under the River Valley contracts (docket entry 1, Aug. 8, 1995).  In 1996, the Supreme Court of the United States found that the enactment of FIRREA and its implementing regulations constituted a breach of certain contracts that FHLBB and FSLIC had entered with thrift acquirors regarding forbearances with respect to regulatory capital requirements.  *Winstar*, 518 U.S. at 870 ("When the law as to capital requirements changed . . . the Government . . . became liable for breach. We accept the Federal Circuit's conclusion that the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, . . . the federal regulatory agencies limited the use of supervisory goodwill . . . .").

On July 30, 2003, Judge Horn concluded that the Government had in fact entered into and breached *Winstar*-type contracts with the plaintiffs.  *Holland*, 57 Fed. Cl. at 568.  In 2004, this Court determined that all damages plaintiffs sought to recover belonged to River Valley rather than to Holland and Ross.  *Holland v. United States*, 59 Fed. Cl. 735, 739-41 (2004); *Holland v. United States*, 63 Fed. Cl. 147, 148-50 (2004).  The proper successor in interest to River Valley was ultimately determined to be First Bank, which was then joined to the action and a third amended complaint filed.  *Holland v. United States*, slip. op., No. 95-524C (Fed. Cl. May 12, 2005) (docket entry 263).  Plaintiffs then sought to substitute First Bank as plaintiff, but defendant opposed the motion, asserting that "an accord and satisfaction provision in a 1991 settlement agreement . . . 'acts as complete defense to' First Bank's breach of contract claims." *Holland*, 74 Fed. Cl. at 229.  In other words, the defendant asserted that the Settlement Agreement entered between the FDIC and the plaintiffs in 1991 had resolved the entirety of the the River Valley contracts.

Defendant moved for summary judgment, contending that the Settlement Agreement "mutually released all claims related to the Assistance Agreements."  *Holland*, 74 Fed. Cl. at 237-38.  That is, "in addition to the executory [that is, cash assistance] payment requirements as set forth in Sections 1(a) and 1(b) of the Settlement Agreement, Section 5 further waived any other claims connected with the Assistance Agreements, including claims arising out of the breach of the forbearance promises."  *Id.* at 238.

The Court concluded that the FDIC, acting as Manager of the FRF, executed the Settlement Agreement as FSLIC's successor and in its capacity as an agency of the United States. *Id.* at 238.  The Court further found that "[t]he language of the Accord and Satisfaction clause plainly and unambiguously includes all claims, whether they result from a breach of the executory [cash assistance] promises or a breach of the forbearance promises, so long as those claims are in connection with the Assistance Agreements."  *Id.* at 242; *see also id.* at 246 ("[T]he

5

language of the Accord and Satisfaction clause was sufficiently broad to extend to both the forbearance and the executory promises.").

Because the questions raised by the parties in this motion to dismiss are so closely tied to those previously decided by the Court, it is useful to review those findings in some detail.  In resolving the accord and satisfaction issue, the Court observed that:

> Although defendant is correct that the FDIC, as manager of the FRF, is an agency of the United States and would be a competent party to enter into a settlement agreement on behalf of the Government . . . this fact alone is insufficient for the defendant to prevail on the question whether the Settlement Agreement in fact released all potential claims against the United States.  Defendant must also prove that the FDIC and [First Bank's] predecessors-in-interest intended the Settlement Agreement's terms to apply to the United States (and therefore all of its agencies), and not merely to the FDIC as manager of the FRF.  However, it is clear from the language of the Settlement Agreement that its terms apply only to the FDIC, in its capacity as manager of the FRF, and not to the United States generally. . . . Nowhere in the Settlement Agreement do the parties manifest an intent to make a promise to or receive a promise on behalf of the United States generally or any agency of the United States other than "the Manager." . . . .  Therefore, if any other agency of the Government bore contractual liability for the forbearance promises contained in the River Valley I and II contracts, then the Settlement Agreement would not discharge plaintiff's claims against the United States in this case.

*Id.* at 248.  In a footnote, the Court stated that it "need not decide whether the Government as a whole was an intended third-party beneficiary of a promise . . . to discharge all liabilities of the United States" because the agreement expressly excluded the possibility of any unnamed party being a beneficiary.  *Id.* at 249 n.14.

In arguing the present motion to dismiss defendant's counterclaims, each party relies upon arguments previously raised in the briefing of the accord and satisfaction motion. Plaintiffs, for example, argued in both instances that the FDIC, as manager of the FRF "is not the government party responsible for the regulatory capital promises or their breach."  *Id.* at 248. Plaintiffs assert that the regulatory forbearance promises passed *only* to the OTS under section 401 of FIRREA and therefore any settlement with the FDIC as Manager of the FRF is irrelevant to the present lawsuit.  Plaintiffs' Motion to Dismiss Counterclaims (docket entry 485, Sept. 26, 2008) ("Pls.' Mot.") at 10-12; *Holland*, 74 Fed. Cl. at 250.  Defendant, on the other hand, asserts that either all regulatory forbearance promises passed to the FDIC pursuant to section 215 of FIRREA and therefore the Settlement Agreement constitutes a complete release of the regulatory forbearance promises, or that a release of the FDIC, when acting as an agency of the United States, is a release of all agencies of the United States and the United States itself as principal.  Def.'s Opp. 8-13, 19-33; *Holland*, 74 Fed. Cl. at 249.

The Court previously found that "[w]hile section 215 of FIRREA might be ambiguous as to whether it transferred liability for regulatory forbearance promises of the FSLIC to the FRF, it expressly transfers to the FRF only liabilities of the FSLIC, not liabilities of the FHLBB. Liabilities of the FHLBB, including contractual liabilities for forbearance promises made in FHLBB resolutions and forbearance letters, transferred to the OTS as successor to the FHLBB upon the passage of FIRREA." *Holland*, 74 Fed. Cl. at 252-53. That is, the Court held that OTS was the transferee of at least some of the regulatory forbearance promises, although "[t]he Court need not, and does not, decide the question whether contractual liability for the forbearance promises also transferred to the FRF or transferred solely to OTS upon the enactment of FIRREA." *Id.* at 253. Ultimately, the Court held that the defendant's accord and satisfaction defense failed because the Settlement Agreement only discharged the FDIC as Manager of the FRF and did not release OTS, which inherited at least some of the regulatory forbearance promises. *Id.* at 255 ("Upon enactment of FIRREA, OTS became responsible for the FHLBB's contractual promises. Because the Settlement Agreement did not purport to discharge claims against government agencies other than the FDIC, in its capacity as Manager of the FRF, or against the United States generally, defendant's affirmative defense of accord and satisfaction fails.").

In due course, defendant filed a motion for reconsideration of the Court's accord and satisfaction ruling, maintaining that if the OTS and FDIC/FRF were concurrently liable, given the Settlement Agreement's reliance upon Illinois law in the absence of controlling federal law, a release of one joint obligor was a release of both. *Holland v. United States*, 75 Fed. Cl. 492, 493 (2007). Plaintiffs contended that there was controlling federal law that allowed a party to a contract to release only certain other parties. *Id.* This Court concluded that there was no controlling federal law on point. *Id.* at 495. Under Illinois law, a release of only one of two or more joint obligors creates a covenant not to sue the released obligor. *Id.* at 496. Because the contract clearly evinced an intent to release only the FDIC as Manager of the FRF, the Court held that "under Illinois law, the release would be construed as a covenant not to sue and would have no effect upon plaintiff's claims against defendant for breach of the forbearance promises by OTS." *Id.* at 498.[3]

On May 15, 2007, this Court stayed litigation of defendant's counterclaims. Order (docket entry 374, May 15, 2007). In August 2008, after a lengthy trial, the Court awarded plaintiff First Bank, as successor-in-interest to River Valley, the sum of $18,623,000 as damages for defendant's breach of contract. *Holland v. United States*, 83 Fed. Cl. 507 (2008). At the conclusion of that opinion, the Court noted that the counterclaims remained to be resolved, specifically "(1) whether the covenant not to sue applies to suits against the United States generally or only to suits against the FDIC, the specific entity with which plaintiffs entered into the settlement agreement; (2) whether plaintiffs breached the covenant not to sue by prosecuting

---

[3] The Court left open the question whether the payment from FDIC as Manager of the FRF to plaintiffs under the Settlement Agreement could affect the amount of damages awarded. Order (docket entry 354, Feb. 28, 2007).

the present litigation; and (3) what damages, if any, should be awarded to defendant by reason of plaintiffs' alleged breach of the covenant." *Id.* at 530.

On September 26, 2008, plaintiffs filed a motion to dismiss defendant's counterclaims (docket entry 485) ("Pls.' Mot."), which defendant opposed (docket entry 488, October 27, 2008) ("Def.'s Opp"), and plaintiffs then filed a reply (docket entry 489, Nov. 13, 2008) ("Pls.' Reply").

## II.    Standard of Review

In order to survive a motion to dismiss under Rule 12(b)(6), the court "[does] not requir[e] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007); *see also* Rules of the Court of Federal Claims ("RCFC") 12(b)(6).  When reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, the court "must accept as true all the factual allegations in the complaint, and . . . indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted).

RCFC 12(d) provides that "[i]f, on a motion under RCFC 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56."  In converting a motion to dismiss under RCFC 12(b)(6) to one for summary judgment, the court must afford the "parties . . . a reasonable opportunity to present all the material that is pertinent to the motion." RCFC 12(d).  Here, both parties have submitted and cited to materials outside the pleadings in addressing the plaintiffs' pending motion. Accordingly, the court is entitled to (and does, in part) treat the motion to dismiss as a motion for summary judgment under RCFC 56(c).

Summary judgment is proper when the evidence demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The moving party has the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A "genuine" dispute exists if the issue "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A material fact is one which "might affect the outcome of the suit under the governing law." *Id.* at 248.  Mere denials, conclusory statements, or evidence that is not significantly probative will not suffice to preclude summary judgment. *Id.* at 249-52.  In considering the existence of a genuine issue of material fact, a court must draw all inferences "'in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary judgment may be granted.  *Id.*

III.     **Analysis**

The principal issue raised by the pending motion is whether or not the present lawsuit, filed against the "United States" in accordance with RCFC 10(a), breached the covenant not to sue the FDIC contained in the Settlement Agreement.  The Court determines that it did not. Accordingly, the Court grants plaintiffs' motion to dismiss defendant's counterclaims requesting damages for breach of the covenant not to sue.  The second issue is whether the settlement agreement resolved some portion of the regulatory forbearance promises, and whether the defendant is therefore entitled to a credit of whatever portion of the settlement amount was paid to settle plaintiffs' claim for breach of those promises against the damages awarded in this lawsuit.  The Court determines that such a credit would be appropriate, but that defendant bears the burden of proving the amount of any credit.  Based upon the record as developed by the parties and submitted in support of their filings, the Court treats the motion to dismiss, as it relates to defendant's claimed entitlement to a setoff, as a motion for summary judgment.  *See* RCFC 12(d).  The Court concludes on the undisputed facts that defendant cannot, as a matter of law, meet its burden of proving the amount of any credit and is therefore entitled to no credit. The Court therefore grants summary judgment in favor of the plaintiffs on defendant's counterclaims alleging entitlement to a setoff.

A.     *The Plaintiffs Did Not Breach the Covenant Not to Sue Contained in the Settlement Agreement*

1.     The Regulatory Forbearance Promises Devolved Jointly to Both the FDIC as Manager of the FRF and the OTS

The Court previously found that "OTS is the transferee of at least some of the regulatory forbearance promises" while declining to decide whether contractual liability for the forbearance promises also transferred to the FRF, with the FDIC as its Manager. *Holland*, 74 Fed. Cl. at 253. Each party relies upon the "clear" language of FIRREA as transferring the entirety of the regulatory capital promises to its preferred agency, reiterating the arguments advanced with respect to the accord and satisfaction motion.  *Id.*  But the Court has already observed that the River Valley contracts were "integrated unitary contract[s]." *Id.* at 246.  The mere fact that the cash assistance promises, which were contained in the River Valley contracts, were resolved by the FDIC in the Settlement Agreement indicates agreement that some contractual rights arising out of the unitary River Valley contracts resided in the FDIC.  *See* Def.'s Opp. at 39 ("[P]laintiffs' argument that the regulatory capital provisions of the FSLIC Assistance Agreements transferred to the OTS alone, while the cash assistance promises transferred to the FRF, has no support in FIRREA, and is incorrect as a matter of law."); Pls.' Mot. at 12 (acknowledging that the FRF received the liability of the "cash assistance payments that FSLIC and FHLBB promised Plaintiffs").  FIRREA therefore did not send the entirety of the River Valley contracts either to the OTS or to the FDIC.

9

Courts have determined that the FSLIC followed by FDIC as Manager of the FRF and FHLBB followed by OTS possessed overlapping, concurrent contractual obligations in *Winstar*-type agreements. *See Home Sav. of Am. v. United States*, 399 F.3d 1341, 1357 (Fed. Cir. 2005) (FSLIC and FHLBB supervisory goodwill promises "overlap rather than conflict")*; Resolution Trust Corp. v. FSLIC*, 25 F.3d 1493, 1505 (10th Cir. 1994) ("After Congress enacted FIRREA, contract obligations to New Security resided with OTS as successor to FHLBB and FDIC as successor to FSLIC."); *see also Winstar*, 518 U.S. at 868, 889 (recognizing joint contractual obligations of FHLBB and FSLIC). The Court now concludes that the River Valley I and II contracts constituted joint promises by the FHLBB and the FSLIC as co-obligors, and were held after the enactment of FIRREA by both the OTS and the FDIC as Manager of the FRF.[4] *Holland*, 74 Fed. Cl. at 251-52.

In Illinois, joint promises are generally "taken and held to be joint and several obligations and covenants." *Brokerage Resources, Inc. v. Jordan*, 400 N.E.2d 77, 80 (Ill. App. Ct. 1980). When two defendants jointly promise to perform a single act, any agreement solely between them about who is liable for what does not affect their joint and several liability to the plaintiff. *Pritchett v. Asbestos Claims Mgm't Corp.*, 773 N.E. 2d 1277, 1284 (Ill. App. Ct. 2002); *see also FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000).

Under Illinois law, a joint and several contract "in legal effect, is double, that is, equivalent to independent contracts, founded upon one consideration, for performance severally and also for performance jointly, and distinct remedies upon the same instrument, treating it as a joint contract and as a several contract, may be pursued until satisfaction is fully obtained." *Moore v. Rogers*, 19 Ill. 347 (1857); *see also Illinois v. Harrison*, 82 Ill. 84 (1876) ("Contracts which are joint and several may be regarded as furnishing two distinct remedies: one by a joint action against all the obligors, the other by a several action against each."); 735 Ill. Comp. Stat. 5/2-410 ("All parties to a joint obligation, including a partnership obligation, may be sued jointly, or separate actions may be brought against one or more of them. A judgment against fewer than all the parties to a joint or partnership obligation does not bar an action against those not included in the judgment or not sued. Nothing herein permits more than one satisfaction.").

Each of the obligors "may be liable for the entire damages resulting from the failure to perform." *Brokerage Resources*, 400 N.E.2d at 80. The obligation to pay damages may differ,

---

[4] If the regulatory forbearance promises had passed only to the OTS and not to the FDIC as Manager of the FRF, then the Settlement Agreement would have no effect whatsoever on this lawsuit. If that were the case, the Settlement Agreement, entered into solely by the FDIC as Manager of the FRF, would not have resolved any portion of the regulatory forbearance promises which would, under this theory, reside solely in the OTS. Defendant's counterclaims arguing for damages due to the breach of the covenant not to sue FDIC or setoff of the amounts paid to FDIC under the Settlement Agreement against the damages awarded in this lawsuit would therefore fail to state a claim and would be dismissed.

however, from one obligor to another. *Jones & Brown, Inc. v. W.E. Erickson Constr. Co.*, 391 N.E.2d 1097 (Ill. App. Ct. 1979).

2.    The Accord and Satisfaction Clause of the Settlement Agreement Did Not Resolve OTS's Regulatory Capital Obligations

Under the common law, the discharge of one joint obligor discharged all joint obligors. *Parmelee v. Lawrence*, 44 Ill. 405 (1867). This resulted from the theory that a joint obligation was a single object, and one resolution was all that a plaintiff could obtain. Rest. (2d) Contracts § 292 cmt. a. A settlement by one co-obligor operated to "merge" the promises of all of the co-obligors and extinguish the joint obligation. *Id.* The rule "prevent[ed] multiple recoveries for a single claim." *Cherney v. Soldinger*, 702 N.E.2d 231, 235 (Ill. App. Ct. 1998).

But this rule often produced harsh results and led to the unintended release of joint obligors. Where a contract created a joint and several obligation, extinguishing the joint remedy also eliminated the ability to recover severally. *Benjamin v. McConnell*, 9 Ill. 536 (1847); *see also Cummings v. Illinois*, 50 Ill. 132 (1869) (party suing joint and several obligors must choose to sue all or only one, not an intermediate number). *Cf. McCullough v. Schuberth*, 79 N.E.2d 754, 755 (Ill. App. Ct. 1948) (noting abolition of "sue one or sue all" rule).

This severity was a particular concern for joint tortfeasors. *Cherney*, 702 N.E.2d at 235. Thus, the Illinois legislature eventually adopted the Illinois Joint Tortfeasor Contribution Act, 740 Ill. Comp. Stat. 100/1 *et seq.*, which provided that a covenant not to sue one joint tortfeasor did not release the remaining tortfeasors, but reduced the recovery on any claim against the others to the extent of the consideration for the covenant not to sue. *Cherney*, 702 N.E.2d at 235; *In re Meyer*, Nos. 97-2318, 97-2492, 98-2090, 1998 WL 538160 (7th Cir. Aug. 21, 1998) ("If these earlier recoveries truly compensate the plaintiff for the same injury, they can and will be used to offset the current damages award."). The Joint Tortfeasor Contribution Act, as a statute in derogation of the common law, was strictly construed, and did not extend beyond the tort context. *Cherney*, 702 N.E.2d at 235-36 ("The Act . . . does not direct itself to co-obligors, to persons liable in contract, or to wrongdoers liable on any theory other than tort.").

The merger doctrine was never strictly followed in the contract context, however. *Aiken v. Insull*, 122 F.2d 746, 751 (7th Cir. 1941) ("[T]he harsh rule as to a release of one joint tort-feasor does not prevail in the contract cases. . . . According to the *Parmelee* formula, if there is language in the release of a joint debtor manifesting an intent to preserve the releasor's rights against the other co-obligors, effect is given to this manifestation. Strange though it may seem, the Illinois courts have not seen fit to extend this wholesome and common-sense formula to the tort cases."). Illinois has long held that there is an exception to this general rule of merger and extinguishment of a joint obligation where in the instrument settling the claims of one co-obligor, the plaintiff reserves his rights against the remaining co-obligors. *Parmelee*, 44 Ill. 405. The merger rule was "not designed . . . to prevent a claimant from mutually resolving a claim or dispute with one obligor without the claimant's releasing a different claim against another

11

obligor.  Nor is it the purpose of the doctrine to release a co-obligor when a claim has been only partially settled between the claimant and another obligor if it is the intent of the claimant not to release the other obligor but rather to hold him responsible for the balance of the claim." *Diamond Headache Clinic, Ltd. v. Loeber Motors, Inc.*, 526 N.E.2d 599, 602 (Ill. App. Ct. 1988).

This being so, a settlement with one of two or more joint and several contract obligors does not release the remaining joint promisors where plaintiff's rights have been reserved.  Rest. (2d) Contracts § 294(1)(b).  The settlement is construed as a covenant not to sue the settling co-obligor.  *Parmelee*, 44 Ill. 405; 9 Corbin on Contracts §§ 52.8, 52.9.

Under the applicable law the plaintiffs could not, of course, receive more than one full compensation for their injury, but they could resolve the joint and several liability of the parties to the River Valley contracts in steps, with differing portions of their injury to be compensated at each stage.  *Mitchell v. Weiger*, 371 N.E.2d 888, 891-92 (Ill. App. Ct. 1977).  Though the OTS, the FDIC and the plaintiffs were all bound to a unitary contract, the parties chose to resolve the FDIC's joint and several obligations separately from the joint and several obligations of the OTS.

It therefore does not follow, as defendant contends, that the Court's conclusion that there was a "single unified contract" to which the FSLIC and FHLBB were parties (as predecessors to the FDIC and OTS, respectively) means that the settlement of FDIC's liability extinguished OTS's liability.  Def.'s Opp. at 18-20, 32-33.  In the Settlement Agreement, the FDIC as Manager of the FRF resolved both its liability for the cash assistance payment obligations and any possibility that *the FDIC* would be pursued for breach of the regulatory capital provisions. The Government now claims that its settlement satisfied not only the FDIC's duties, but also the contractual commitments of all of the joint obligors. The Court has rejected that contention and continues to do so.

This Court has already concluded and reaffirms that in their settlement with the FDIC, the plaintiffs effectively reserved their rights to proceed against the OTS as a co-obligor on the River Valley contracts.  While the language of the Settlement Agreement was broad enough to encompass the FDIC's regulatory forbearance promises, the Settlement Agreement did not affect the OTS's obligations arising from its regulatory forbearance promises.  *Holland*, 74 Fed. Cl. at 248-49.

Defendant continues to argue that the Court's prior holding was incorrect, and that the clause of the Settlement Agreement expressly limiting its benefits to the parties to that agreement (that is, FDIC, FRF and the plaintiffs) was insufficient to constitute a reservation of rights. Defendant contends, citing *Pactive Corp. v. Dow Chemical Co.*, 449 F.3d 1227 (Fed. Cir. 2006), that a reservation of rights must be more explicit than limiting the benefits of the agreement to the parties.  *Pactive* involved subsequent litigation between the *same* parties, however, which is a different issue.  The Court agrees that if the Settlement Agreement were to allow the plaintiffs to sue *the FDIC* in the future for breach of the River Valley contracts, in apparent derogation of the

12

release contained in the Settlement Agreement, that the language would have to be explicit. But where the plaintiff reserves rights against a *non-party* to the settlement contract, the language of a general release is overcome by a limitation of the benefits of the agreement.

For example, in *Nickerson v. Suplee*, 174 Ill. App. 136 (1912), the plaintiff obtained a judgment against three defendants, McRoy, Maley and Suplee. Plaintiff subsequently entered a three-paragraph agreement with McRoy and Maley in satisfaction of their obligations under the judgment. The second paragraph of the agreement expressly reserved the plaintiff's right to proceed against Suplee, but the third paragraph could be read as a release of all three of the co-debtors at the expiration of three years from the date of the agreement. The Illinois Supreme Court held that the paragraph of the settlement containing a possible general release did not overcome the specific language limiting the benefits of the settlement to McRoy and Maley; thus Suplee was not released from his debt upon the expiration of three years. Similarly, in *Mitchell v. Weiger,* 371 N.E.2d 888 (Ill. App. Ct. 1977), the plaintiff entered into an agreement broadly releasing one defendant for "all claims and liabilities of every kind and nature which now exist or which may in the future come into existence which arise from or relate to the Agreement." That broad release did not, however, overcome a limitation elsewhere in the agreement reserving the plaintiff's right to sue other potential defendants for the same injury. Nor is it necessary to name the persons against whom rights are reserved. In *Forster v. Sheridan Trust & Savings Bank*, 257 Ill. App. 463 (1930), the release merely promised not to sue one party who might be held jointly liable. The court considered that sufficient to reserve the plaintiff's rights against the co-obligor for the balance of the debt. This Court reaffirms its prior holding that the Settlement Agreement was sufficient to reserve the plaintiffs' right to pursue the OTS as a co-obligor under the River Valley contracts.

The defendant's next line of argument relates to the role of the United States as a principal of both the OTS and the FDIC as its agents. The benefits of the Settlement Agreement were limited to the FDIC, FRF and the plaintiffs. The United States, as discussed below, was only included in the covenant not to sue to the extent of the vicarious liability of the United States for the conduct of FDIC and FRF.

        3.    <u>A Covenant Not to Sue the United States for FDIC's Breach of Contract Rights Does Not Preclude Suing the United States As OTS's Principal for OTS's Breach of Contract Rights</u>

It is manifestly true that agents can bind their principals, and the FSLIC and FHLBB did in fact bind the United States Government to honor the promises made in the River Valley contracts. Both agencies and the United States itself were therefore required to either act in accordance with the contracts or be liable for their breach. It is also true that the Settlement Agreement resolved any liability of the FDIC for breach of the River Valley contracts by the FDIC. It also resolved the liability of the United States *as FDIC's principal* for any breach *by the FDIC*. When an agent enters into a covenant not to sue, that operates as a complete exoneration of the *vicarious liability* of the principal. *Gilbert v. Sycamore Mun. Hosp.*, 622

N.E.2d 788, 797 (Ill. 1993); *Holcomb v. Flavin*, 216 N.E.2d 811, 815 (Ill. 1966); 9 Corbin on Contracts § 52.; Def.'s Opp. at 31 ("[A]ny settlement between the agent and the principal extinguished the principal's *vicarious* liability") (emphasis added); *id.* ("[A] principal is released to the extent of the release given its agent.").

Vicarious liability is "[l]iability that a supervisory party (such as an employer) bears for the actionable conduct of a subordinate or associate (such as an employee) based on the relationship between the two parties." BLACK'S LAW DICTIONARY 934 (2004); *Holcomb*, 216 N.E.2d at 814 ("[T]he master's liability under the doctrine of *respondeat superior* is based not on his own misdeeds but those of his servant, and therefore when the servant is not liable the master for whom he was acting at the time should not be liable."). Thus, when the FDIC obtained a covenant not to sue, its principal, the United States, was also protected from suit for any breach of obligations by the FDIC to the extent of the covenant obtained by the FDIC. It did not, however, resolve the liability of the United States generally or for the obligations of the OTS as a separate and distinct agent of the United States. *Holland*, 74 Fed. Cl. at 248-49 (concluding that Settlement Agreement discharged only the FDIC as Manager of the FRF and not the United States generally or the OTS).

The Court does not dispute that authorized agents of the United States may enter settlement agreements that bind the United States. *Wells v. Nickles*, 104 U.S. 444, 448-49 (1881). The Court does not disagree that the United States was in fact bound by the Settlement Agreement. Def.'s Opp. at 33-34 (arguing that "sole benefit clause" did not exclude the United States as FDIC's principal). But the United States was only bound to the extent of the language in the Settlement Agreement, which benefitted only the FDIC and the FRF. Therefore, the United States was only within the umbrella of the covenant not to sue as FDIC's principal.[5] Def.'s Opp. at 28-32 (an agreement executed for "the benefit of a Government agency cannot be read to exclude the benefit of the release to the United States as the agency's principal"). By reason of the Settlement Agreement, the United States cannot be sued or held liable for the failure of its agent, the FDIC, to honor its obligations under the River Valley contracts. That is all the Settlement Agreement promises.

---

[5] The defendant cites an odd mishmash of cases as standing for the principle that courts "have found that a complete settlement with one agency of the United States bars further claims against the United States for the same transaction." Def.'s Br. at 27-28. First, these cases involve myriad essential factual differences from this case. *Brock & Blevins Co. v. United States*, 170 Cl. Ct. 52, 57-59, 343 F.2d 951, 953-54 (1965); *Kanehl v. United States*, 38 Fed. Cl. 89, 101-03 (1997); *Coleson v. Inspector Gen. of the Dep't of Defense*, 721 F. Supp. 763, 766-68 (E.D. Va. 1989); *Cowhig v. Nat'l Military Establishment*, 109 F. Supp. 519-20 (D.D.C. 1953). Second, the whole point here is that the Settlement Agreement was not in fact "complete," but reserved the plaintiffs' right to proceed against the remaining promisor, which happened to be a separate agency of the United States.

Defendant's argument mangles the law of agency by claiming that a settlement with the FDIC not only released the United States as FDIC's principal, but, contrary to its own earlier position, also released the entire United States Government. April 21, 2006 Oral Arg. Trans. at 17 (docket entry 328, April 24, 2006) (statement by Mr. Whitman for the Government) ("It is certainly not our position . . . that [the Settlement Agreement] discharged every agency of the government from any and all liability, for all of its agencies and constituent branches of Government, such as the Congress and President."); *id*. at 19 ("And the point really is not that the FDIC, as the manager of the FRF, was somehow endowed with the ability to discharge Congress and the President and the OTS and any other agency."). Not only that, the defendant now contends that a settlement with the FDIC has also released *the OTS* because the United States was also its principal. The argument reverse-engineers a limited agreement not to sue one agency of the United States into a blanket agreement not to sue *any* agency of the United States. It is, ultimately, simply a restatement of the defendant's merger argument and is insupportable.

Nor does the fact that *Winstar*-type judgments are paid out of the FRF, which FDIC manages, avail the defendant. Def's Opp. at 18-19 (arguing that the fact that damages were awarded means the FRF is responsible to pay them, which breaches the covenant not to sue); *Holland*, 74 Fed. Cl. at 251 ("The determination of the proper *source of payment* for a judgment in a *Winstar*-related case, however, is neither coextensive with nor dispositive of . . . which agency or agencies were *contractually liable* for the forbearance promises after the enactment of FIRREA."); *see also* April 7 Oral Arg. Trans. at 19 (docket entry 494, April 13, 2009) (describing statutory provision overriding OLC opinion). Whether the FRF is the proper source of funds to pay the judgment for the breaches of these contracts is a matter for the Government to resolve internally. From whence the Government decides to pay the damages does not affect the Court's conclusions regarding the existence of liability and the need for redress.

4.    Plaintiffs Did Not Breach the Covenant Not to Sue By Suing the United States in this Lawsuit

Defendant argues that the plaintiffs must have sued the FDIC in violation of the covenant not to sue because (1) the Court has repeatedly stated that the regulatory forbearance promises belonged to both the FSLIC and the FHLBB, Def.'s Opp. at 5; (2) the plaintiffs named the United States in the caption of their complaint, Def's Opp. at 6; (3) plaintiffs admitted in their complaint that the FDIC succeeded to the FSLIC's responsibilities "for the purposes relevant to this action," Def.'s Opp. at 7; and (4) the regulatory capital promises passed only to the FDIC as Manager of the FRF. Def.'s Opp. at 8-13. Defendant asserts that "the issue in the *Winstar* cases is not which agency or agencies of the United States *breached* the contract; it is which agency or agencies of the United States *made* the regulatory capital promises. . . . Here, the Court found that FSLIC made promises to the plaintiffs connected with the FSLIC Assistance Agreements. The FRF and the FDIC succeeded to those promises." Def.'s Opp. at 13-14.

As noted above, the Court concludes that both the FSLIC and the FHLBB made the regulatory capital promises and both the OTS and the FDIC as Manager of the FRF inherited

15

those promises.  The defendant United States acts through its agencies, but there are two agencies here and though both entered into and were jointly obligated under contracts with plaintiffs, those agencies have since taken different courses of action.   The FDIC possessed obligations with respect to the regulatory capital forbearance promises, and any liability for *FDIC*'s breach of those obligations was resolved in the Settlement Agreement that excluded the OTS from its protection, creating a covenant binding the plaintiffs not to sue the FDIC or the United States to the extent of its vicarious liability for any breach by FDIC of the regulatory forbearance promises.  For all defendant's vehemence regarding a "unitary" contract, the FDIC broke off its own promises for resolution in the Settlement Agreement.  OTS was not covered by the Settlement Agreement but it, as the Court has previously found, failed to honor its contractual obligations to the plaintiffs.

In this lawsuit, the plaintiffs sued the United States (as they were required by statute and court rule to do).[6]  It is impossible to determine from the caption of the case whether the plaintiffs sued alleging breach of contract rights by the FDIC or the OTS.  The first step in examining a breach of contract claim is, of course, to determine whether the United States was a promisor on the contract.  *Laudes Corp. v. United States*, No. 08-121C, 2009 WL 711826 (Fed. Cl. March 16, 2009) (no implied-in-fact contract with United States despite *de facto* control of contract by Government due to lack of privity); *Jennette v. United States*, 77 Fed. Cl. 132 (2007) (no privity of contract with United States).  The complication in this case, of course, is that *both* the FDIC and the OTS were promisors on the River Valley contracts.  But the plaintiffs did not sue because the promises were made; they sued because the promises were breached.  This Court routinely looks to the allegations of the complaint to determine the true object of the suit, most frequently in examining whether a claim is barred by *res judicata* or whether the plaintiff has properly stated a claim against the United States.  *See, e.g., Johnson v. United States*, 82 Fed. Cl. 150 (2008) (United States not named as defendant but alleged wrongs committed by Department of Veterans Affairs, so complaint not dismissed); *May Co., Inc. v. United States*, 38 Fed. Cl. 414 (1997) (United States named as defendant but acts committed by State of Louisiana Department of Transportation, so outside the court's jurisdiction).  Similarly, in this case the Court determines that it is appropriate to look to the plaintiffs' complaint itself to determine whether plaintiffs' suit is directed to a breach of contract rights by the FDIC, the OTS, or both.

From the original complaint filed on August 8, 1995, the plaintiffs have consistently alleged that the OTS breached its contractual obligations to the plaintiffs.  Compl. at ¶ 64 (docket entry 1); *id.* at ¶ 65; *see also* Third Am. Compl. at ¶¶ 65-66 (docket entry 265, May 18, 2005).  The complaint does not contain any assertions that FDIC failed to honor its obligations under the River Valley contracts.  Because plaintiffs do not allege that FDIC breached its obligations under the regulatory capital promises, they have not, in these circumstances, violated any covenant not to sue the FDIC.

---

[6]  28 U.S.C. § 1491(a)(1);  RCFC 4 Rules Committee Note (2002) ("[O]nly the United States is properly the named defendant"); RCFC 10(a) (stating that in a complaint in this court, the United States shall be "designated as the party defendant").

The United States has not lost the benefit of its bargain as embodied in the Settlement Agreement.  The FDIC negotiated and obtained a release of the FDIC's obligations under the River Valley contracts.  Plaintiffs did not sue the Government alleging a breach of the contracts by the FDIC, and no damages have been awarded for any failure to honor the contracts by the FDIC.  Thus, the Government successfully bought its peace in the Settlement Agreement with respect to the FDIC's contractual obligations.  The United States would receive more than it bargained for in a settlement contract that explicitly excluded from its scope any unnamed entity if the effects of the payment under that contract were expanded to include unnamed entities such as the OTS and the United States Government (either on its own behalf or as OTS's principal).  Because only the FDIC was sheltered by the Settlement Agreement, the OTS and the United States Government remained liable for failure to honor their obligations under the River Valley contracts.

> B.  *Because Some Portion of the Settlement Amount Was Paid to Resolve Claims Against the FDIC Based Upon the Regulatory Forbearance Promises, It is Necessary to Determine What Portion of the Settlement Amount, If Any, Should be Credited Against the Damages Awarded to Plaintiffs*

>> 1.  <u>Under Illinois Law, Amounts Paid By One Co-Obligor for A Covenant Not to Sue May be Credited Against, and Thereby Reduce, Any Damages Awarded Against the Second Obligor</u>

Plaintiffs are incorrect when they argue that no setoff is appropriate where a plaintiff settles a contract claim with one joint obligor who pays the settlement amount to plaintiff and, in return, plaintiff executes a covenant not to sue that obligor in the future.  Pls.' Mot. at 8-10 ("[A] 'set-off' against the damages owed by one obligor based on the amount of consideration paid by his co-obligor in connection with a 'covenant not to sue' is a tort concept in Illinois, and is barred in the contractual context.").  In general, "[a]n obligee who receives a payment or a substituted satisfaction, in part or in full, from any of two or more parties who are bound to him for one and the same performance, cannot prevent it from operating as a discharge of the other obligors *in like measure*."  9 Corbin on Contracts § 52.9 (emphasis added); *see also Mitchell*, 371 N.E.2d at 892 (where plaintiff entered covenant not to sue with one co-obligor on contract, he could seek damages against remaining co-obligors "to the extent his claim was not satisfied by the consideration received" in settlement); *Diamond Headache*, 526 N.E.2d at 602 ("Nor is it the purpose of the doctrine to release a co-obligor when a claim has been only partially settled between the claimant and another obligor if it is the intent of the claimant not to release the other obligor, but rather to hold him responsible for the balance of the claim.").   The case upon which plaintiffs rely, *Aldridge v. Morris*, 86 N.E.2d 143 (Ill. App. Ct. 1949), is not to the contrary. *Aldridge* permitted the introduction of the amount paid for a covenant not to sue in a tort action and asserted that it was not "adjusting the burdens of misconduct" but assuring that plaintiffs would obtain only a single recovery, utilizing a rationale that the court stated would not apply to contract.  *Aldridge* has more to do with the confused state of tort law prior to the Illinois Joint

17

Tortfeasor Contribution Act than it does with providing instruction on the proper method of proceeding in a contract action.

Because some part of the regulatory forbearance promises resided with the FDIC and were resolved in the Settlement Agreement, the plaintiffs have received some amount of compensation for the release of whatever part of those contract obligations the FDIC held. *Holland*, 74 Fed. Cl. at 246-47 (finding there was sufficient consideration under the Settlement Agreement to support a resolution of the forbearance promises).

> 2.   Under the Present Circumstances, the Burden to Demonstrate the Amount of Any Credit For Settlement of the Regulatory Forbearance Promises Lies with Defendant

Defendant argues that the entire $3,276,902.90 paid by the FDIC to plaintiffs pursuant to the Settlement Agreement should be set off against the Court's award of damages in this case. Plaintiffs counter that none of it should. The parties disagree on who bears the burden of proving what portion of the $3,276,902.90 was paid in consideration for the covenant not to sue the FDIC regarding the regulatory forbearance promises.

Plaintiffs contend that under *Pasquale v. Speed Products Engineering*, 654 N.E.2d 1365 (Ill. 1995), "the party seeking the setoff bears the burden of proving what portion of a prior settlement was allocated or is attributable to the claim for which he is liable." Pls.' Mot. at 6 (quoting *Pasquale*, 654 N.E.2d at 1382). Because defendant "plainly cannot sustain its burden of demonstrating *exactly what amount* of consideration should be offset against First Bank's damages claim," no set-off is appropriate. Pls.' Mot. at 7-8.

Defendant does not assert that it can prove any allocation of the settlement amount between the forbearance and cash assistance promises. Instead, it argues that pursuant to *Patton v. Carbondale Clinic*, 641 N.E.2d 427 (Ill. 1994), "a defendant is entitled to a set-off of the *entire* amount paid by a settling co-obligor through a covenant not to sue, when the release given by the settling co-obligor covers the same claim being maintained against the non-settling defendant." Def.'s Mot. at 42. That is, defendant maintains that because the plaintiffs failed to allocate the settlement amount in the prior settlement, the defendant is entitled to assume that the entire settlement amount compensated the plaintiffs for the injuries at issue in the present litigation.

The *Patton* rule upon which defendant relies does not apply to co-obligors, but is instead "a narrow ruling" relating to divisible injuries by successive tortfeasors. *Kravcik v. Golub & Co., Inc.*, 676 N.E.2d 668, 675 (Ill. App. Ct. 1996); *Evans v. Tabernacle No. 1 God's Church of Holiness in Christ*, 669 N.E.2d 697, 703 (Ill. App. Ct. 1996). But the defendant asserts that *Patton* requires the plaintiff to prove the amount of the setoff whenever the initial release obtained by the plaintiff was "complete" rather than "partial." April 7 Oral Arg. Trans. at 69-70 ("The rule in Patton is that plaintiffs bear the burden of allocating payments received to various particular damage claims is applicable where there has been an initial complete release of all

18

claims by a plaintiff against a defendant. . . .").  According to defendant, where the initial release was broad and unrestricted (as in this case, the Government asserts), then the plaintiffs bear the burden to show a setoff in any subsequent lawsuit.

Even if the defendant is correct that plaintiffs bear the burden when the first release was unrestricted, defendant here would still bear the burden to prove the amount of any setoff.  There was no broad and unrestricted release of all of the plaintiffs' rights under the River Valley contracts.  *See supra* part I.2.  There was a release of all of the plaintiffs' rights *to performance by the FDIC as Manager of the FRF* under those contracts.  This limitation of the initial settlement, even assuming that the breadth of the initial settlement is the relevant criterion, would, on defendant's reasoning, shift the burden of proof from plaintiffs to defendant to establish the amount of the setoff.

Under Illinois law, the defendant generally bears the burden of proof regarding the amount of a prior settlement to be subtracted from a subsequent judgment against it.  *Pasquale*, 654 N.E.2d at 1382.  *Patton* is a narrow exception to that general rule, and defendant has failed to persuade the Court that it falls into that limited category of defendants who may escape the duty to prove allocation.  Thus, it is defendant's burden to demonstrate the amount paid to plaintiffs under the settlement agreement for the release of the forbearance promises.  If defendant cannot do so, then no setoff is appropriate.  *Thornton v. Garcini*, 382 Ill. App. 3d 813, 821 (2008).

>    3.    Plaintiffs Are Entitled to Summary Judgment That No Setoff is
>           Warranted

To restate, the nonsettling defendant may seek a setoff only where the prior settlement compensates for the same injury with respect to which the nonsettling defendant is found liable.  *Pasquale*, 654 N.E.2d at 1382.  Setoff is inappropriate where the injuries compensated by the settlement are "separate and distinct" from the injury for which the nonsettling defendant is found liable.  *Id.*  The present defendant, OTS, has been found liable for breach of the regulatory forbearance obligations.  It is entitled to a setoff only of that portion of the prior settlement that compensated the plaintiffs for FDIC's breach of the regulatory forbearance obligations.

Plaintiffs characterize the amount "if any" paid to them for the release of the FDIC's regulatory forbearance obligations as "a peppercorn."  April 7 Oral Arg. Trans. at 18 (docket entry 493, April 14, 2009).  If defendant were able to establish the amount of that peppercorn, however, defendant would be entitled to subtract it from the damages awarded in this action.  If,

however, defendant cannot establish that amount, then no setoff is appropriate.[7]  *Dolan v. Gawlicki*, 628 N.E.2d 1188 (Ill. App. Ct. 1994); *Barkei v. Delnor Hospital*, 565 N.E.2d 708 (Ill. App. Ct. 1990).

But defendant contends only that it is entitled to judgment in its favor, even if it possesses the burden of proof, because it should receive a setoff of the *entire* amount paid under the Settlement Agreement against the Court's damages award.  The defendant reads the Illinois cases to say that "where the settling defendant was given a complete release of any and all claims connected with a given tort," then all compensation paid under the settlement is "*for the release*" (regardless of whether the release is for divisible or indivisible injuries for which other successive or concurrent wrongdoers may or may not be liable) and therefore the *entire* amount paid pursuant to the settlement must be subtracted from the damages assessed against *any* other defendant.  Def.'s Response to March 9, 2009 Questions at 36 (docket entry 492, April 3, 2009).  That is, defendant asserts that, regardless of its burden to prove allocation, the whole amount paid "for the release" must be applied to reduce the damages awarded against the non-settling defendant when the settling defendant obtains an unlimited release.

Defendant once again refuses to recognize the limitations in the Settlement Agreement.  Failing to prevail on whether OTS possessed contractual obligations not resolved by the Settlement Agreement, the Government now asserts in the setoff context that if the plaintiffs had wanted to effectively limit the release, they should have said: "in consideration for the $3.2 million we are releasing the government from [cash assistance obligations] only. . . . [W]e reserve our right to bring claims against the government with respect to any and all aspects of the assistance agreement other than the $3.2 million. . . ."  April 7 Oral Arg. Tr. at 63.  Because the plaintiffs failed to do so (although they did limit benefits of the settlement to themselves and the FDIC/FRF, which the defendant contends was ineffective to reserve any rights at all), then the entire $3.2 million was obtained "for the release," and thus should be credited against the Court's damages award, even if defendant bears the burden of proof to show allocation of the settlement amount.  *Id.* at 68.  This argument, while consistent with the Government's position regarding the requirement that a reservation of rights be explicit, the ineffectiveness of limiting the benefits of the Settlement Agreement to the FDIC and plaintiffs, the plaintiffs' inability to assert contract rights against separate agencies of the United States, and the outmoded doctrine of merger, fails for all the same reasons that those arguments have failed.

The Court's prior opinion regarding the existence of consideration for the release of the FDIC's regulatory forbearance obligations observed only that a single payment can be

---

[7]  If one were to hypothesize the allocation of the settlement between the resolution of the cash assistance obligations and release of FDIC's obligations under the regulatory forbearance provisions, the vast bulk of the settlement should be ascribed to the settlement of the cash assistance obligations.  But "[a] court considering a request for setoff will not speculate about such matters" and the Court declines to attempt to specify a number.  *Thornton*, 888 N.E.2d at 1223.

consideration for multiple promises and "two or more promises may be binding even though made for the price of one." *Holland*, 74 Fed. Cl. at 247 (quoting Restatement of Contracts § 80 cmt. a).  It did not support the notion that the entire $3.2 million was a payment for release of the regulatory forbearance promises.

The pertinent facts are undisputed, and the Government's position regarding setoff is untenable as a matter of law.  Because the defendant is unable to meet its burden of proof, the Court grants summary judgment in favor of plaintiffs with respect to defendant's counterclaim seeking a setoff.

## Conclusion

Plaintiffs' motion to dismiss defendant's counterclaims insofar as defendant seeks an award of damages for breach of the covenant not to sue is **GRANTED**.  The Court also **GRANTS** plaintiffs' motion, treated as a motion for summary judgment, with respect to defendant's counterclaims seeking a credit of $3,276,902.90 against the Court's damages award. Having previously held that plaintiff First Bank as successor-in-interest to River Valley is entitled to damages in the amount of $18,623,000, and now having determined that defendant's counterclaim asserting a breach of the covenant not to sue must be dismissed and having concluded that as a matter of law no setoff is warranted, the Court directs the Clerk to enter judgment in favor of plaintiff First Bank in the amount of $18,623,000.

**IT IS SO ORDERED.**

  s/ George W. Miller
GEORGE W. MILLER
Judge

21